UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE:  PETROBRAS SECURITIES LITIGATION | **Case No. 14-cv-9662 (JSR)** |
|  | **<u>DEMAND FOR JURY TRIAL</u>** |

## CONSOLIDATED AMENDED COMPLAINT

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     NATURE OF THE ACTION ................................................................. 6

III.    JURISDICTION AND VENUE ................................................................. 9

IV.     OVERVIEW OF THE EXCHANGE ACT VIOLATIONS ............................................. 10

        A.      The Exchange Act Parties ................................................................. 10

                1.  Lead Plaintiff ................................................................. 10

                2.  The Company................................................................. 10

                3.  The Individual Defendants ................................................................. 11

V.      FACTS RELEVANT TO EXCHANGE ACT CLAIMS ................................................ 15

        A.      The Skewed Bidding Process................................................................. 15

        B.      Bribery Schemes ................................................................. 19

        C.      The Refineries Scams ................................................................. 25

        D.      The Individuals Defendants Were Alerted to the Rampant Fraud at Petrobras.... 32

        E.      The Scheme Rendered the Company's Financial Statements Materially
                False and Misleading ................................................................. 38

        F.      PwC's Purposeful Blind Eye to the Fraud ................................................ 42

VI.     OVERVIEW OF CLAIMS AGAINST THE EXCHANGE ACT DEFENDANTS ........ 53

VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................... 60

        A.      False and Misleading Statements Made in 2010................................................. 60

        B.      False and Misleading Statements Made in 2011................................................. 65

        C.      False and Misleading Statements Made in 2012................................................. 68

        D.      False and Misleading Statements Made in 2013................................................. 73

        E.      False and Misleading Statements Made in 2014................................................. 82

        F.      Reasons Why Statements Made in 2010-2014 Were False and Misleading ........ 90

VIII.   ADDITIONAL ALLEGATIONS RELATED TO THE SCHEME ................................. 93

IX.     RELIANCE: FRAUD ON THE MARKET DOCTRINE ............................................. 114

X.      LOSS CAUSATION................................................................. 116

XI.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ......................................... 116

XII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT............................................ 117

        COUNT I ................................................................. 117

        For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
        Against the Exchange Act Defendants ................................................................. 117

COUNT II ........................................................................................................ 118

For Violations of Section 20(a) of the Exchange Act Against the Individual
Defendants Gabrielli, Foster and Barbassa ...................................................... 118

XIII.   ADDITIONAL CLASS CLAIMS BROUGHT UNDER THE LAW
OF BRAZIL ..................................................................................................... 119

COUNT III ...................................................................................................... 119

By Lead Plaintiff USS For Violations of the Brazilian Corporate Law and CVM
Regulations Against the Individual Defendants ............................................... 119

COUNT IV....................................................................................................... 123

By Lead Plaintiff USS For Violations of the Brazilian Civil Code Against Petrobras .. 123

COUNT V ........................................................................................................ 124

By Lead Plaintiff USS For Violations of the Brazilian Corporate Law,  CVM
Regulations, and the Brazilian Civil Code Against Petrobras ......................... 124

COUNT VI....................................................................................................... 126

By Lead Plaintiff USS For Violations of the Brazilian Securities Law,
CVM Regulations, and the Brazilian Civil Code and the Against PwC......................... 126

XIV.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT .......................................... 127

A.      Introduction........................................................................................ 127

B.      Background ........................................................................................ 129

C.      Relevant Securities Offerings ........................................................... 133

        1.   February 6, 2012 Note Offerings ................................................. 133

        2.   May 15, 2013 Note Offerings ...................................................... 134

        3.   March 11, 2014 Note Offerings ................................................... 135

D.      Securities Act Plaintiffs .................................................................... 136

E.      Securities Act Defendants.................................................................. 137

        1.   Issuer Defendants....................................................................... 137

        2.   Officer Defendants...................................................................... 139

        3.   Director Defendants.................................................................... 139

        4.   Underwriter Defendants............................................................. 141

        5.   Auditor Defendant ...................................................................... 143

        6.   Relevant Non-Defendant Individuals ......................................... 144

F.      Jurisdiction and Venue....................................................................... 145

G.      False and Misleading Statements....................................................... 146

        1.   2010 20-F.................................................................................... 146

2.  11/22/11 6-K ................................................................................. 148

3.  2011 20-F ..................................................................................... 148

4.  8/10/12 6-K ................................................................................... 150

5.  2012 20-F ..................................................................................... 151

6.  4/30/13 6-K ................................................................................... 152

7.  2/26/14 6-K ................................................................................... 153

8.  3/7/14 6-K ..................................................................................... 153

9.  3/11/14 6-K ................................................................................... 154

H.  Petrobras' Financial Statements Failed to Comply With PCAOB Standards
    And SEC Regulations ................................................................... 155

COUNT VII ................................................................................................ 167

For Violations of Section 11 of the Securities Act Against the Securities
Act Defendants ............................................................................................ 167

COUNT VIII .............................................................................................. 170

For Violations Of Section 12(a)(2) of the Securities Act Against Petrobras and PGF... 170

COUNT IX .................................................................................................. 172

For Violations of Section 15 of the Securities Act Against the Officer Defendants ...... 172

XV.   CLASS ALLEGATIONS FOR EXCHANGE ACT COUNTS, SECURITIES ACT
      COUNTS, AND BRAZILIAN LAW COUNTS ............................................ 173

XVI.  PRAYER FOR RELIEF .......................................................................... 175

Lead Plaintiff Universities Superannuation Scheme Limited ("USS" or "Plaintiff"), by and through its undersigned counsel, alleges the following individually and on behalf of a class of all persons and entities similarly situated.  All allegations are made upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's allegations are based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Petroleo Brasileiro S.A. — Petrobras ("Petrobras" or the "Company") and its wholly-owned subsidiaries Petrobras International Finance Company S.A. ("PifCo") and Petrobras Global Finance B.V. ("PGF"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and other publicly available information concerning Petrobras and (as defined herein), the Individual Defendants, the Officer and Director Defendants, the Underwriter Defendants, and Petrobras' outside accountants.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  PRELIMINARY STATEMENT

1.    On March 15, 2015, approximately 1 million Brazilians flooded the streets of cities all over the country, calling for the impeachment of President Dilma Rousseff, who was re-elected by a slim margin for a second term in late October. The trigger for the demonstrations was the  enormous  corruption  scandal  at the government-controlled oil  giant, Petrobras, where Rousseff served as chairwoman from 2003 to 2010.

2.      At its height in 2009, Petrobras was the world's fifth-largest company, with a market capitalization of $310 billion.  Now, amid a rampant money-laundering and kickback scheme, Petrobras is worth just $39 billion.

3.      To date, Company executives have been jailed and powerful politicians across party lines—including the speakers of both Houses of Congress—have been questioned about the money-laundering and bribery scheme at Petrobras.  According to Brazilian prosecutors, construction and engineering firms paid some $800 million to politically-appointed Petrobras executives in exchange for lucrative contracts with the Company, benefiting both the executives and the campaign coffers of the Workers' Party (PT).  The Petrobras executives that received the bribes pocketed vast sums of money.  One manager, Pedro Barusco, has agreed to return nearly $100 million hidden in offshore accounts.  The executives also said they channeled portions of the bribes to the PT party, some of which were used in Rousseff's 2010 campaign.

4.      Tellingly, the Company itself does not deny the widespread bribery and theft of Petrobras' assets.  In a news release to explain why it had delayed its upcoming financial report, Petrobras said it was "undergoing a unique moment in its history, in light of the accusations and investigations of the 'Lava Jato Operation' (Portuguese for 'Operation Car Wash') being conducted by the Brazilian Federal Police, which has led to charges of money laundering and organized crime."

5.      The fraud at the epicenter of this action involves Brazil's biggest graft and money-laundering scandal, in which Petrobras' contractors colluded to inflate bids, with Petrobras executives taking bribes and politicians sharing in the proceeds.  The bribery and money-laundering scheme is estimated by authorities to have diverted *up to or even more than*

*$28 billion from Petrobras' coffers*.[1]  In addition to Petrobras' top executives, the illegal bribery and kickback scheme also involved politicians and a group of at least 16 contractors who formed a cartel that assured that its members would win Petrobras' major contracts.  According to Brazilian prosecutors and the Brazilian Federal Police, Petrobras executives granted contracts to these Brazilian construction companies that systemically inflated their costs by as much as 20%.[2] After winning the contracts, the construction companies kicked back up to 3% of a contract's total value in the form of bribes to Petrobras executives, Brazilian politicians and money launderers."[3]

6.     Among the dozens suspects arrested by the Brazilian Federal Police in connection with the money laundering and bribery scheme at Petrobras is Alberto Youssef ("Youssef'), a black market money launderer.  Youssef led investigators to the Petrobras scheme, according to Brazilian prosecutors and police.  Police discovered the link after they started probing 10 billion reais ($3.8 billion) of suspicious financial transactions involving Youssef that was flagged by Brazil's financial intelligence unit.[4]  Youssef was considered to be the scheme operator and has been promised a reduced sentence by Brazilian prosecutors in exchange for his cooperation. Youssef testified that *the bribery and money-laundering scheme was rampant throughout Petrobras and its subsidiaries, and that each subsidiary's board split the bribery money with politicians.*

7.     Along with former Petrobras officials, several top executives from some of Brazil's largest construction and engineering firms have been jailed and facing corruption

---

[1] Luciana Otoni, *Brazil's Roussef Replacing Petrobras CEO*, February 3, 2015.
[2] Paul Kiernan, *Petrobras Corruption Scandal Draws Attention of U.S. Investigators*, The Wall Street Journal, November 12, 2014.
[3]  *Id.*
[4] The Brazilian federal police and prosecutors are increasingly relying on international cooperation in the investigation.

charges.  As of February 13, 2015, it was revealed that *two thousand employees of Petrobras are now under investigation*, reflecting the rampant widespread nature of the fraud.[5]

8.      Among those Petrobras executives arrested by the Brazilian Federal Police are Paulo Roberto Costa ("Costa") and Renato de Souza Duque ("Duque).  Costa was a member of Petrobras' senior management and the Company's Chief Downstream Officer and Director of Supply from May 14, 2004 through April 2012.  In that position, Costa was the top executive in charge of Petrobras' refining division, and reported directly to the CEO.  Duque was also a member of Petrobras' senior management and was the Company's Chief Services Officer from January 31, 2003 through February 2012.  Duque was in charge of Petrobras' engineering and services division and worked closely with the Company's refining division. *Costa and Duque routinely recommended contracts implicated in the bribery scheme to Petrobras' executive board for approval*.  Costa is cooperating with the Brazilian government's investigation.

9.      Brazilian authorities recently arrested another former Petrobras executive, Nestor Cervero.  Cervero is a former financial director of the Company's fuel distribution subsidiary and also a former director of its international division.  Cervero was forced out of Petrobras in March 2014 amid questions into what prosecutors say was an extraordinarily inflated price paid in 2006 to Belgium's Astra Oil for a refinery in Texas.  A statement from prosecutors said Cervero was arrested because of his "involvement in new illicit facts related to the crimes of corruption and money laundering.

10.      In March of this year, the scandal finally reached a member of Rousseff's inner circle.  The Wall Street Journal reported that on March 16, 2015, the Brazilian federal prosecutors filed charges against the treasurer of the ruling Workers' Party, Joao Vaccari Neto.

---

[5]  The International Business Times, *Petrobras Scandal: Brazil Oil Giant Turns to US SEC for Help on Corruption Costs*, February 13, 2015

4

Prosecutors also brought charges against Renato Duque, Petrobras' former director of services who headed the department responsible for the bulk of Petrobras' investments.  This is Duque's second arrest.[6]  The Workers' Party Treasurer was charged with corruption and money laundering related to allegedly illegal campaign donations that prosecutors say he solicited from Duque.  Duque will face the same charges.  According to federal prosecutor Deltan Dallagnol, "[t]his is a sophisticated and complex money-laundering scheme that was conceived to give the appearance of legality to money with illegal origins . . . These resources weren't illegal just because they were bribe payments but because they were the product and fruit of fraudulent bidding processes and the crime of price-fixing."  Dallagnol said Duque requested "donations" from companies, while Vaccari indicated the bank accounts where they were to be deposited.  Dallagnol said prosecutors have "ample proof" that Vaccari participated in meetings with Mr. Duque and his top manager, Pedro Barusco, to discuss bribes via campaign donations.  Vaccari was "well aware" the donations he was seeking comprised funds stemming from bribes, Dallagnol said, explaining that much of the evidence was obtained from plea bargain deals with executives who were indicted and jailed late last year.  Another former Petrobras executive, Pedro Barusco, told a congressional hearing last week that the Workers' Party had received up to $200 million skimmed from Petrobras contracts.[7]

   11.   Petrobras' Chief Executives covered-up the scheme and, along with Petrobras, continuously deflected and denied wrongdoing, keeping investors in the dark as to the corrupt core of Petrobras' operations.

---

[6]  WSJ, *Brazilian Federal Prosecutors Charge Two in Petrobras Probe*, March 16, 2015.
[7]  Reuters, *Brazil ruling party's treasurer charged in Petrobras scandal*, March 15, 2015.

12.     As of March 16, 2015, the corruption probe at Petrobras has already led to over 40 indictments on racketeering, bribery and money laundering charges.[8]  Prosecutors have asked the Supreme Court to investigate 34 sitting politicians, including the speakers of both houses of Congress, for allegedly receiving bribe money.[9]

13.     The money-laundering and bribery scheme was long-lasting and widespread.  As a result, and as explained in more detail below, Petrobras may be forced to book *a $30 billion asset writedown* in order to reduce the carrying value of some of its assets.  The impairment equals more than half of the Company's market value.

14.     Petrobras is currently the subject of civil and criminal investigations by the U.S. Securities and Exchange Commission ("SEC") and by the U.S. Department of Justice ("DoJ").  The U.S. investigations are said to focus on the bribery scheme and on the quality of Petrobras' bookkeeping and internal controls.  On November 24, 2014, Petrobras announced that it had received a subpoena from the SEC asking for document relating to the investigation.  Reportedly, the SEC also has been receiving information since October 2014 from the task force of Brazilian prosecutors working on the case.[10]

## II.      NATURE OF THE ACTION

15.     This is a federal securities class action brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities who, between January 22, 2010 and March 19, 2015, inclusive (the "Class Period"), purchased or otherwise acquired the securities of Petrobras, including debt securities issued by PifCo and PGF, on the

---

[8]   *Id*.

[9]   *Id*.

[10] The Wall Street Journal, *Petrobras Corruption Scandal Draws Attention of U.S. Investigators*, November 12, 2014.

New York Stock Exchange (the "NYSE") or pursuant to other domestic transactions (the "Class").

16.     This action also is brought pursuant to the Securities Act of 1933 (the "Securities Act") on behalf of all persons or entities who purchased certain debt securities issued by PifCo and/or PGF pursuant and/or traceable to any of three public offerings registered in the United States.  In a debt offering on or about February 6, 2012 (the "2012 Offering"), PifCo sold approximately $7 billion in notes at four sets of interest rate and maturity terms (the "2012 Notes").  Through a second debt offering on or about May 15, 2013 (the "2013 Offering"), PGF sold approximately $11 billion in notes at six sets of interest rate and maturity terms (the "2013 Notes").  PGF sold approximately $8.5 billion in notes (the "2014 Notes" and together with the 2012 Notes and 2013 Notes, the "Notes") at six sets of interest rate and maturity terms in a third debt offering on or about March 11, 2014 (the "2014 Offering" and, together with the 2012 Offering and the 2013 Offering, the "Offerings").

17.     Pursuant to the Securities Act, the Securities Act Defendants are strictly liable for material misstatements in the Offering Documents (as defined herein) issued in connection with the Offerings, and these claims specifically exclude any allegations of knowledge or scienter. The Securities Act claims are based solely on strict liability and negligence, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of Defendants—i.e., the Securities Act claims do not allege, arise from, or sound in, fraud. Plaintiff specifically disclaims any allegation of fraud, scienter, or recklessness in these non-fraud claims.

18.     This action also is brought as a class action for violations of the Brazilian Corporate Law, the Brazilian Civil Code, the Brazilian Securities Law, and the Brazilian Securities Commission ("CVM") Regulations. The claims under Brazilian law are brought on

behalf of class members who purchased or otherwise acquired Petrobras securities on the Brazilian stock exchange during the period between January 22, 2010 and March 19, 2015, and who also purchased or otherwise acquired Petrobras securities traded on the NYSE or pursuant to other domestic transactions during the same period.

19.     The claims asserted herein arise from a series of false statements of material fact and omissions of material adverse information, made by Defendants in the Offering Documents and throughout the Class Period, about the value of Petrobras' assets, the amounts of the Company's periodic expenses and net income, whether the Company suffered from material weaknesses in its disclosure controls and procedures and internal controls over financial reporting, and the Company's repeated reassurances that it operates with the highest level of integrity.  The revelation of the truth about Petrobras through a series of disclosures caused a precipitous decline in the market value of Petrobras, PifCo, and PGF's securities, resulting in billions of dollars in losses and damages to Plaintiff and the Class.

20.     Before and throughout the Class Period, Petrobras pursued plans to expand its production capacity. These plans involved acquiring and contracting for the construction of new facilities and petroleum production assets.  Petrobras' expansion plans required substantial capital investment.  In order to satisfy its capital requirements, the Company undertook a number of securities offerings during the Class Period, selling *more than $98 billion in securities registered on the NYSE* including notes and American depositary shares ("ADSs") representing common and preferred stock.  During the Class Period, *Petrobras' ADRs were one of the most actively traded shares on the New York Stock Exchange*.

**III.      JURISDICTION AND VENUE**

21.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. § 240.10b-5.

22.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Jurisdiction is also conferred by 28 U.S.C. § 1367.

23.      Venue is proper in this District pursuant to Section 22(a) of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Petrobras maintains an office in this District, sponsors ADSs representing the Company's common and preferred equity that are listed on an exchange located in this District, and certain of the acts that constitute the violations of law complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District. Furthermore, of the 36 debt securities currently outstanding issued by PifCo or PGF, 23 are registered with an exchange located in this District, and of the 28 debt securities issued by PifCo or PGF during the Class Period, 19 (including the reopening of two prior issues) are registered with and trade on an exchange located in this District.

24.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.       OVERVIEW OF THE EXCHANGE ACT VIOLATIONS

### A.       The Exchange Act Parties

#### 1.       <u>Lead Plaintiff</u>

25.     Lead Plaintiff Universities Superannuation Scheme Limited ("USS" or "Plaintiff"), acting as sole corporate trustee of Universities Superannuation Scheme, is located at Royal Liver Building, Liverpool, England, L3 1PY.  Established in 1974, USS is a trustee company limited by guarantee, incorporated in England and Wales, and solely set up to administer the scheme provided by Universities, Higher Education and other associated institutions for their employees, and which runs the pensions administration and group functions. USS Investment Management Ltd is a wholly owned subsidiary of USS regulated by the Financial Conduct Authority, which operates the investment arm of the business from its London office.  USS purchased various Petrobras securities as previously set forth in a certification that USS filed in this Action and as set forth on Appendix A, and was damaged thereby.

#### 2.       <u>The Company</u>

26.     Defendant Petrobras is a corporation organized under the laws of Brazil, and maintains its principal executive offices at Avenida Republica do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil. Petrobras also maintains an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022.  The Company's common and preferred shares are listed on the Bovespa, trading under the ticker symbols "PETR3" and "PETR4," respectively. Since 2001, Petrobras has sponsored ADSs representing the Company's common and preferred equity that are listed on the NYSE, trading under the ticker symbols "PBR" and "PBR/A," respectively. These ADSs represent a substantial portion of the average daily trading volume for Petrobras equity, including a significant majority of the volume for the Company's common equity. For example, over the six-month period ending December 22, 2014, the daily average of

NYSE-based trade volume of Petrobras' common stock ADS was 76.9 million shares, or 77.96 percent of all volume for the Company's common equity, compared to a daily average of Bovespa-based trade volume of 21.0 million shares, or 21.27 percent of all volume. The daily average of NYSE-based trade volume of Petrobras' preferred stock ADS over the same period was 30.5 million shares, representing 34.80 percent of all trade volume in the Company's preferred equity.   Additionally, of the 35 debt securities issued by Petrobras and its wholly-owned subsidiaries during the Class Period, 16—including all securities at issue in this action— are registered [and trade] with an exchange located in this District.

27.     Defendant PGF is a wholly-owned finance related subsidiary of Petrobras incorporated in the Netherlands.  PGF maintains its principal executive offices at Weenapoint Toren A, Weena 722, 3014 DA Rotterdam, The Netherlands.  On February 12, 2014, PGF acquired the outstanding shares of PifCo, a wholly-owned subsidiary of Petrobras.  Between the beginning of the Class Period and August 9, 2013, PifCo was organized under the laws of the Cayman Islands with its principal executive offices at 4th Floor, Harbour Place, 103 South Church Street, P.O. Box 1034GT—BWI, George Town, Grand Cayman, Cayman Islands.  On August 9, 2013, PifCo completed a transfer of domicile, registering in Luxembourg with principal executive offices at 40, Avenue Monterey, 2163 Luxembourg.  On December 16, 2013, certain assets and liabilities of PifCo were spun off and subsequently merged into Petrobras.

### 3.     The Individual Defendants

28.     Defendant Maria das Gracas Silva Foster ("Foster") has served as CEO of Petrobras since February 13, 2012. Previously, Foster served as the Company's Director of Gas and Energy. During the Class Period, Foster certified and signed certain of the Company's

periodic financial reports filed with the SEC and communicated with investors, participating in the Company's periodic conference calls.

29.    Defendant José Sergio Gabrielli ("Gabrielli") served as Chief Executive Officer ("CEO") of Petrobras from July 22, 2005 to February 13, 2012.  During the Class Period, Gabrielli certified and signed certain of the Company's periodic financial reports filed with the SEC and communicated with investors, participating in the Company's periodic conference calls.

30.    Defendant Almir Guilherme Barbassa ("Barbassa") served as CFO of Petrobras during the Class Period, certifying and signing the Company's periodic financial reports filed with the SEC and communicating with investors, participating in the Company's periodic conference calls.

31.    Defendant Josue Christiano Gomes da Silva ("Gomes") has served as Director of Petrobras during the Class Period, and signed certain of the Company's reports filed with the SEC.

32.    Defendant Silvio Sinedino Pinheiro ("Pinheiro") has served as Director of Petrobras during the Class Period, and signed the 2012 Registration Statement.

33.    Defendant Daniel Lima de Oliveira served as CEO and Chairman of PifCo from September 1, 2005, and he signed the 2009 Registration Statement and the 2012 Registration Statement.

34.    Defendant José Raimundo Brandão Pereira served as a Director of PifCo from 2003, and he signed the signed the 2009 Registration Statement and the 2012 Registration Statement.

35.     Defendant Sérvio Túlio da Rosa Tinoco served as CFO of PifCo from September 1, 2005, and he signed the signed the 2009 Registration Statement and the 2012 Registration Statement.

36.     Defendant Paulo Jose Alves has served as the Chief Accounting Officer of PifCo since May 2011, and he signed the 2012 Registration Statement.

37.     Defendant Mariângela Monteiro Tizatto served as the Chief Accounting Officer of PifCo from 1998 to May 2011, and she signed the 2009 Registration Statement.

38.     Defendant Gustavo Tardin Barbosa served as CEO and "Managing Director A" of PGF, and he signed the 2012 Registration Statement.

39.     Defendant Alexandre Quintão Fernandes served as CFO and "Managing Director B" of PGF, and he signed the 2012 Registration Statement.

40.     Defendant Marcos Antonio Zacarias served as "Managing Director A" of PGF, and he signed the 2012 Registration Statement.

41.     Defendant Cornelis Franciscus Jozef Looman served as "Managing Director B" of PGF, and he signed the 2012 Registration Statement.

42.     Defendant Theodore Marshall Helms ("Helms") serves as the authorized U.S. Representative for Petrobras and PGF, and served as the authorized U.S. Representative for PifCo.  Helms signed the 2009 and 2012 Registration Statements.

43.     Defendants described in paragraphs 28 -42 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, together with Defendants Petrobras and PGF, are collectively referred to herein as the "Exchange Act Defendants."

### 1.  PricewaterhouseCoopers Auditores Independentes

44.    Defendant PricewaterhouseCoopers Auditores Independentes (PwC) served as Petrobras' independent auditor from January 2012.  On January 16, 2012, Petrobras signed a contract with PricewaterhouseCoopers Auditores Independentes, under which PricewaterhouseCoopers Auditores Independentes was hired to provide specialized technical accounting audit services for the years 2012, 2013 and 2014.

45.    Pricewaterhousecoopers Auditores Independentes is a member firm of PricewaterhouseCoopers International Limited.  Pricewaterhousecoopers Auditores Independentes is based in Sao Paulo, Brazil.

46.    Pricewaterhousecoopers Auditores Independentes, by virtue of their position as independent accountants and auditors of Petrobras, had access to the Company's key personnel, accounting books and records, and transactional documents, at all relevant times.  As a result of their provision of auditing and other services, PwC's personnel were frequently present at Petrobras' offices and had continual access to, and knowledge of, Petrobras' confidential internal corporate, financial and business information, and had the opportunity to observe and review the Company's business and accounting practices, and to test the Company's internal and publicly reported financial statements as well as the Company's internal controls.

47.    PwC examined and opined on the Company's financial statements for the fiscal years 2012 and 2013, and falsely represented that their audits of Petrobras' 2012 and 2013 financial statements had been conducted in accordance with International Financial Reporting Standards ("IFRS"), and wrongfully issued "clean" or unqualified audit reports in which they falsely represented that those financial statements fairly presented the Company's financial condition and results of operations in conformity with IFRS.

48.     PwC profited handsomely for its service.   In connection with Petrobras' work during the fiscal year 2012, PwC pocketed $7.7 million.   PwC pocketed another $8.6 million for work during the fiscal year 2013.

## V.      FACTS RELEVANT TO EXCHANGE ACT CLAIMS

### A.      The Skewed Bidding Process

49.     Petrobras was an active participant in the bidding scheme designed to eliminate any type of competitive bidding process and award contracts to those doling out bribes to Petrobras executives and other officials.   Testimony given by Costa as part of a plea agreement with the Brazilian prosecutors places Petrobras squarely at the center of the bid-rigging scheme. Costa explained that because there were only a handful of companies in Brazil with the technical capability and capacity to complete large scale projects such as those being proposed by the Services and Supply and International Divisions of Petrobras, these companies formed a cartel designed to effectively frustrate and render ineffective the competitive bidding process.   The cartel was in existence at the time the Class Period commenced.

50.     According to Costa's testimony, to ensure that the work always remained with the cartel (and not with foreign companies who may not have been so willing to act illegally and pay kickbacks) and guarantee that the kickbacks always flowed back to the parties, the following system was adopted at Petrobras:

- All of the Divisions or "Directorates" at Petrobras were assigned a sponsor from a patron party (known inside Petrobras as a "Padrinho" or Godfather).

- The Godfather would nominate the Director who was then selected by the Board.

- It was made perfectly clear to each Director that his job security depended on keeping his Godfather (and his party) happy.

- This was accomplished by building a 3% kickback into every major contract.

- This scheme would only work, however, if all of the contractors cooperated.  To gain their cooperation, it was agreed upon that a committee be established among the participating companies that would decide who would win each contract, and that this be rotated equitably between the members.

- The companies agreed that they would coordinate their bids with the respective Director.

51.     The cartel were advised of the estimated cost and then adjusted their bids to conform to the parameters allowing for a 15% to 20% profit plus 3% for the kickback to the political parties and to Petrobras directors.

52.     Costa stated that the cartel members would meet regularly in São Paulo or Rio to decide what contract would go to which company, and what the percentage of overfilling would be in order to cover the bribes and kickbacks that would be required.  Costa represented that *the Directors of Petrobras were aware of the scheme from the beginning and would not question the increased amounts since all of the bids were coordinated in advance*.  If any cartel member failed to include the required 3% that was earmarked for the political parties, money launderers and Petrobras executives, they would be disqualified from future bids by the cartel.

53.     The cartels were advised of the estimated cost and then adjusted their bids to conform to the parameters allowing for a 15% to 20 % profit plus 3% for the kickback to the political parties and to Petrobras directors.

54.     Reportedly, Petrobras participated in the cartel through periodic meetings with the Brazilian Industrial Engineering Association (Abemi) to negotiate texts of calls for tenders and contracts to be signed with the companies.  By adopting this practice, Petrobras acted to standardize procedures for contracts with engineering companies accused in Operation Car Wash, the Brazilian Federal Police investigation into corruption practices involving the oil company.  This reduced competition among companies and increased costs for Petrobras.

55.     Minutes of certain meetings show that Petrobras sent drafts of standard contracts and texts of calls for tenders for Abemi's analysis even before they were launched.   Several Abemi members, such as UTC Engenharia, Toyo Setal, Camargo Corrêa, Odebrecht and Mendes Júnior, are among companies suspected of participating in misappropriation of funds from Petrobras.   In the minutes, Petrobras workers show representatives of the contractors how they should present claims for contract addenda in order to avoid refusal.   The addenda were responsible, for example, for price increases that led the costs of the Abreu e Lima Refinery in Pernambuco to reach $18.5 billion, in comparison with $2.3 billion originally estimated.   The meetings were held at Petrobras' headquarters in Rio de Janeiro, more specifically on the 13th floor of Edifício Edita.

56.     In the minutes of one of the meetings, on February 26, 2007, Petrobras and Abemi representatives addressed the following items: development of contract drafts, liability provisions for a "call for tenders of the gasoline portfolio" at Refinery Presidente Bernardes in Cubatão, São Paulo, definition of tax procedures for the contracts and sales of material and equipment in service contracts.

57.      The call for tenders of the gasoline portfolio was launched to contract the assembly of an industrial unit to produce gasoline at the Cubatão refinery.   In one part of the minutes, it is written that Abemi asked that "the advancements obtained with the negotiated copy in the call for tenders of Refinery Presidente Bernardes, which were due to broad debate in the work group, guide the final text."   That is, the state company discussed before the call for tenders what it wanted to launch precisely with the contractors it would hire for the services. These minutes prove that the texts of the calls for tenders were "negotiated."

58.     In debate about another item at the meeting—"definition of procedures to be adopted because of potential legislation changes"—Petrobras warned the contractors who were members of Abemi about how contract addenda were being done, alleging that "often the claims are not properly justified" and thus rejected.  To avoid new rejections, Petrobras asked Abemi to instruct the engineering companies to change their contracts. "To avoid a prompt rejection of the claims, without prejudice to the need of its adequate preparation and justification, the contract could bring an overall forecast about it," the minute says, referring to claims based on changes in labor, social-security or environmental laws.

59.     Another proof that the cartel united Abemi and Petrobras was a joint statement they signed on May 14, 2009. In it, Petrobras informed the cartel that it would no longer stipulate the deadlines for detailing projects in calls for tenders. This practice was adopted precisely at the time when there was a delay in the detailing of works for Abreu e Lima.  The engineering department was asked about it by the downstream department and answered that it could not demand deadlines for contractors because it had an agreement with Abemi.  The agreement was the statement that exempted contractors from detailing their projects.

60.     There was an additional exemption for contracts addenda, as reflected in the meeting between Abemi and Petrobras on February 26, 2007. That meeting's minutes reflect that, according to Petrobras, "there is no need for altering the current text of the contract to recognize the possibility that contractors make claims for economic-financial adjustments in the contracts."  In practice, that part exempted contractors from the need to change contracts to make the addenda.

61.     The meetings, minutes and joint statements of Petrobras and Abemi paved the way for the increase in spending on contract addenda at Abreu e Lima and at other Petrobras

projects. Although evidence of collusion between Petrobras and the trade group existed since 2007, the active participation of Petrobras in the so-called "cartel of contractors" was only reported this year to members of the Car Wash taskforce. On January 7, Fernando de Castro Sá, a lawyer who worked several years on the legal counsel of the downstream department, testified to the taskforce in Curitiba and revealed that the Petrobras contract minutes, which were prepared by the legal counsel and submitted for approval by department chiefs, started to undergo the mandatory scrutiny of Abemi lawyers. That is, Petrobras' procurement models had to be presented ahead of time to representatives of the companies it would hire. Mr. Castro Sá said the engineering department of Petrobras consulted with its lawyers over the procurement model, citing meetings with Abemi as a parameter.

B.    Bribery Schemes

Overview of Bribery Schemes

62.    Costa testified that for at least seven years, he and other Petrobras executives accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and "then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves."[11] Costa revealed that a group of politicians, including members and allies of Rousseff's Workers' Party, had accepted bribes linked to Petrobras contracts. Costa testified that he personally received tens of millions of dollars in bribes and referred to them as a "three percent political adjustment." Costa named several construction companies that were part of the cartel, including Odebrecht and Camargo Correa S.A. As part of the criminal case against Costa, prosecutors emphasized that there was "evidence of fraud, overpricing and kickbacks" in at least seven contracts, including one contract

---

[11] Sabrina Valle and Juan Pablo Spinetto, *Petrobras "Human Bomb' Revelations Fixate Brazil as Vote Looms*, Bloomberg, October 24, 2014.

for a 3.4 billion Brazilian reais coking unit and another contract for a 3.19 billion Brazilian reais hydro-treater and related units.  The contract for the coking unit was cited by prosecutors as evidence of overpricing and over-billing of as much as 446 million Brazilian reais.

63.     Costa testified that Petrobras was engulfed in a culture of "political patronage," where career advancement did not depend on technical skills and administrative ability, but on political sponsors.  Directors were named by the political parties in the ruling coalition.  Because the Government of Brazil was Petrobras' majority shareholder, all Board nominations, including that of the President, were made by the political parties as well, with the Workers Party having the majority of the seats.  While at Petrobras, Costa recognized that he needed a political "Godfather" in order to be promoted to executive management.  Costa testified that he chose to affiliate himself with the Partido Progressista (the Progressive Party) ("PP"), led at the time by José Janene.  Costa knew that if he were to be selected as a Director, the PP would demand something in return and that if he did not meet that demand, he would be replaced.  Costa stated that this quid pro quo applied to all executive level positions that were part of the patronage system and included diverting funds and resources from works and contracts falling under the control of the official.

64.     Costa explained that once he became Director of Supply at Petrobras with the backing of the PP, he was immediately required to provide the PP and its allied parties, the Partido do Movimento Democratic Brasileiro ("PMDB") and the Partido dos Trabalhadores (the Workers Party, or "PT" ) with funds originating from Petrobras through kickbacks from contractors.  According to Costa, the demands for funds came primarily from the PP and PMDB and only occasionally from the PT, who controlled other Directories.  Costa recounted that on one occasion, he was approached by a Senator of the PSDB Partido Social Democratic do Brasil

("PSDB"), who demanded a bribe to block or impede the 2009 Parliamentary Investigative Commission (CPI) into Petrobras being led by his party.

65.     According to Costa, the Directory of Services at Petrobras was responsible for the largest contracts signed by the Company, totaling approximately 90% of applied resources. This Directory was controlled by the PT, who had nominated its Director, Renato Duque and, before him, Pedro Barusco.  Costa explained that seven of the Directories of Petrobras and the Presidency were divided up among the political parties forming the majority coalition as follows, with the directors in parenthesis:

PT
Presidency (Sergio Gabrielli)
Directorate of Services (Pedro Barusco, Renato Duque)
Directorate of Gas & Energy (Maria das Graças Foster)
Directorate of Exploration and Production (Guillherme Estrella, José Miranda Formigli Filho)
Directorate of Finance (Almir Barbassa)

PP and later including PMDB and PT
Directory of Supply (Paulo Roberto Costa, José Carlos Cosenza)

PMDB
Directory of International Operations  (Nestor Cerveró)

66.     As explained above, the cartels were advised of the estimated cost and then adjusted their bids to conform to the parameters allowing for a 15% to 20 % profit plus 3% for the kickback to the political parties and directors. On rare occasions with particularly large contracts this kickback amount was reduced to 1.5% or 2%.  According to Costa, in the case of Directories under the PT's control, the funds would be delivered to PT party treasurer Josê Vaccari.  In the case of the other directories, 2% always went to Vaccari for the PT and the remaining 1% was split with 60% going to the party that had nominated the Director.  In Costa's

case, the political party was the PP but occasionally Costa would be asked to provide funds to the PMDB.

67.     According to Costa, the 3% kickbacks were to be distributed as follows:

- The entire 3% of Service Directory contracts kickbacks would go to the PT Party minus expenses (which were divided between the Director and the "facilitator")

- 2% of the Directory of Supply contract kickbacks would go to the PT. The remaining 1% was divided among the PP (60%), The Director (20%) and the "facilitator" (20%)

- 2% of all Directory of International Operations contracts kickbacks would go to the PT, while 1% was divided between the PMDb (60%), Director (20%) and the "facilitator" (20%)

68.     The functions of the "facilitator" were as follows: personally collect the kickbacks from the bid winning carte member; establish a "bank," where all the funds kicked back by the cartel members would be initially kept; launder all funds as required; personally make kickback payments to the designated political party, either in cash or by deposit into a specified bank account; pay the bribe to the Director of the appropriate division; and entertain and process "special" requests made by one of the political parties, cartel members, or directors.

69.     According to Costa, each company had its own mechanism for delivering the payments.  In most cases, the funds went directly from the Company to the Party without the use of intermediaries.  In Costa's Directory, all payments were in cash and sent directly to the PP through an unofficial "bank" maintained by money launderer Alberto Youssef.  Payments made to him were usually in cash (U.S. Dollars), delivered in suitcases to him at his home, office, shopping centers or hotels.   The PT funds were usually delivered personally and in cash (reais or dollars) to Jose Vaccari, the PT party treasurer.  The PP and PMDB payments were usually in cash in person to one of several party officials or elected officials, but also included deposits to offshore accounts.  Payments to the Directors were a combination of cash in dollars and

occasionally in reais and deposits to offshore accounts.  The facilitator also arranged to smuggle dollars and euros into the country and helped set up offshore accounts.

70.     Reportedly, Petrobras executives also accepted $139 million in bribes from the Dutch firm SBM Offshore ("SBM"), which was bidding to supply oil rigs.  SBM, which relies on Petrobras for almost half of its revenue, opened an investigation in 2012 over improper payments in several countries but, as of March 2014, it had not named the countries or companies involved.  SBM recently confessed to the Netherland's Revenue Service and to the Public Attorney's Office that the company had transferred bribery payments to managers of Petrobras in the amount of over $100 million, all related to offshore rigs and ships.

71.     According to a former executive at SBM, Jonathan Taylor, SBM's main agent through whom bribes were paid in Brazil was Julio Faerman.  Reportedly, Taylor has in his possession several e-mails implicating Petrobras officials, including confidential Petrobras Minutes that refer to a future meeting with Petrobras' engineering chief Jose Antonio de Figueiredo to extend a lease "without going via an open bid."  Petrobras employees "clearly connected to Julio Faerman" include Jose Miranda Formigli Filho (Petrobras' Head of Exploration and Production), Figueiredo (Petrobras' Engineering Director), Renato Duque, Paulo Carneiro, Cleison Pinto, Mauro Mendes, Osmond Coelho, Ricardo Serra, Tuerte Armaral Rolim, Alexandre Valladares Quintino dos Santos, Gilvan D'Amorim, Nilton Oliveira, and Robert Goncalves.  Other documents in Taylor's possession include an Amendment dated February 7, 2007, to an Agreement dated July 2, 1999 with Faercom Energia Ltd. confirms a "commission" of 3% signed by "HT" for SBM Inc.  In an interview dated March 27, 2012, HT confirms that the 3% was split as follows: 1% for Faerman and 2% for Petrobras officials.  Additionally, a "Payments to Agents" Task Force document dated April 17, 2012, prepared by SBM Internal

Audit shows *inter alia* payments of $139,216,000.00 to the JF Group of Companies: Faercom, Bienfaire, Oildrive, Jandell, Journey Advisors and Hades Production Inc., including payments made by SBM's Houston office.   The HT March 27, 2012 interview confirms that these payments (i.e. money allocated for bribes) were paid on to Petrobras officials.

72.     It is reported that Duque and Barusco's relationships (Barusco was Duque's main subordinate in the Engineering and Services Division) with Faerman grew closer starting in 2009, when they reached out to him to help accelerate Petrobras' oil and gas production. [12]   At that time, the government was preparing for the presidential candidacy of Dilma Rousseff, who at the time was the government's Chief of Staff, by capitalizing on Petrobras' growth momentum.  Called into action, Gabrielli, then CEO of Petrobras, drafted a timeline of events for the following year.   Gabrielli chose the period between the first and the second round of elections for the "baptism" of the offshore rig P-57.  There was only one issue: agreeing with SBM on the early delivery of the rig.  In October of 2009, as Gabrielli and the PT party were grappling to shut down an investigation by the Congress's Investigation Committee ("CPI"), Duque and Barusco officially presented Faerman with the request. Petrobras wanted P-57 next October, "thus enabling the production start on 2010." SBM would agree, but at additional costs. Negotiations took place over several months and involved employees Mario Nigri Klein, Ricardo Amador Serro, Antonio Francisco, Fernandes Filho, and Carlos José do Nascimento Travasso. The negotiations ended in April 2010, six months before the expected delivery date, when officer Duque approved the extraordinarily high costs based on the recommendation of José Antônio Figueiredo and Barusco. These unnecessary costs were incurred solely to benefit the government's political campaign and cost Petrobras millions of dollars.

---

[12] Globo, *Petrobras Paid SBM an Additional $25 Million for Lula to Launch Offshore Rig*, December 14, 2014.

73.     At the time of this maneuver, Petrobras was under pressure from the Federal Court of Accounts (*Tribunal de Contas da União – TCU*), who was pushing to inspect Petrobras' expenditures related to offshore rigs.  TCU expressed an urgent need to investigate P-57 as Petrobras did not have "even an idea or concept regarding the object (the agreement) or its value."  TCU was outraged to find that Petrobras' management purchased the offshore rig for $1.2 billion without at least "a basic project or detailed budget."  For twenty months, federal auditors requested cost appraisals, electronic sheets and calculation charts regarding the costs of offshore rig P-57, by SBM, the Queiroz Galvão pool (consortium), UTC and IESA. Gabrielli consistently stymied and denied such requests on privacy grounds.  One day, Gabrielli sent TCU boxes with printed sheets, but the sheets were useless.  Without the calculation charts, there could be no audit.  Up until 2012 when he left Petrobras, Gabrielli fought and managed to avoid the disclosure associated with the SBM rigs.

74.     Reportedly, the kickbacks relating to P-57 amount to $36.3 million.[13]

**C.      The Refineries Scams**

The Pasadena, Texas Refinery

75.     Reportedly, in 2006, Petrobras drastically overpaid for a refinery in Texas, Pasadena.  Specifically, Petrobras paid $360 million for a 50% stake in the Pasadena refinery. This amount was stunning, because a Belgian oil company, Astra, had purchased the refinery just a year earlier for $42.5 million.  Interest payments and legal fees brought the price tag for Petrobras' stake in that refinery to $820.5 million.  Eventually, following litigation over Astra's exercise of a put option requiring Petrobras to buy the remaining 50% stake, Petrobras paid a

---

[13] Globo, *Petrobras Paid SBM an Additional $25 Million for Lula to Launch Offshore Rig*, December 14, 2014.

total of $1.18 billion for the Pasadena refinery.  Costa and other Petrobras managers accepted bribes to approve the wildly inflated Houston purchase.[14]

76.     A confidential informant directly witnessed the Pasadena scam.  In January 2002, this informant was sent to the US to be the Gasoline Trading Manager for Petrobras America Inc., in Houston, Texas.  In August 2003, the informant was promoted and assigned to the position of Commercial Manager of Petrobras America Inc, in Houston, Texas.  In 2004, during a lunch with the ex-manager of El Paso Corporation, the informant received information that Crown (the former name of the Pasadena refinery) was being offered on the market. Subsequently, in 2004, the informant sent an e-mail offering Crown to Petrobras for a price of approximately $30-40 million.  The informant never received a formal response regarding this e-mail.

77.     In 2004, the informant received a phone call from London, Petrobras UK, in which a senior company official told him/her that someone from a business bank was going to call him/her to offer a refinery in the U.S.  The source suspected the refinery was Crown.  A U.S. citizen later called the informant and sent him a written proposal offering the refinery for an amount between $60-80 million.  The informant sent another e-mail to Petrobras Headquarters in Rio, Brazil, and this time a very senior executive answered (by e-mail) stating that "the purchase of this refinery is not part of the company´s strategic planning."

78.     In 2005, Astra purchased Crown utilizing only the profits generated by the refinery (Astra rented and leased Crown for approximately twelve months).  The price paid was approximately $40 million.

---

[14] *See* globeandmail.com, *Public Focus on Petrobras' Scandals Ignores its Profitability*, May 12, 2014.

79.     Also in 2005, a U.S. executive made a proposal to the informant regarding the acquisition of Crown.  The informant believed this proposal to be a legal, profitable and good deal for Petrobras.  The source passed the proposal to his/her supervisor in Brazil, who in turn passed it on to Nestor Cervero, Director of Petrobras International Operations in Brazil.  The informant was later informed by the executive who made the proposal that someone high up at Petrobras told him/her to forget about any plan or movement involving Crown because the Company's point of view had changed with a focus on the ultimate purchase price of the refinery.  The informant was told by a senior Petrobras Director: "I'm telling you this because I am your friend but I was told by my boss not to discuss this subject with you anymore."  The informant did not alert anyone from Petrobras in Brazil because at that time he/she did not trust anyone there, but the informant alerted his/her supervisor in Houston and the head of the business unit.  The informant recounted that he/she was outraged and considered the decision to pass on the original offer only to consider a new offer at a much higher price to be illegal.  The informant explained that he/she is very familiar with the complexities of the purchase process and is very well informed on all the technical aspects of the refinery operation as well as its financial aspects.  The source stated that the Crown refinery was not a modern or particularly productive refinery.

80.     In 2005, while the informant was still in Houston, a man visiting the Petrobras unit, who was the assistant of a politician named "DA" asked the informant: "who is your political godfather?"  The informant responded that he/she was an engineer and a technician, and did not have any political protection.  The visitor then told the informant: "that's too bad for you, we are currently in need of your spot here in Pasadena."  According to the informant, Petrobras Brazil sent a Working Group to Houston in hopes of finding any mistakes or problems in the

informant's administration of the refinery.  The informant understood this maneuver to mean that he/she was viewed as a "problem" and for this reason he/she would be a target.  Nothing was found in terms of wrongdoing or mismanagement by the informant.  Later, the informant requested the report generated by this purported Working Group but no one found it in the Company files.  The informant was very surprised when he/she found out "they" just erased the report.  Subsequently, in July 2005, the informant was relieved from his/her position in Texas and sent back to Brazil.  He/she remained in limbo for three months, with no assignment at Petrobras' headquarters in Rio.

81.     Upon his return to Brazil, in 2005 the informant was introduced through a friend to a top PT politician in Rio.  At the politician's office in Rio, the informant explained the details regarding the planned purchase of the Texas refinery and expressed his strong view that the proposed inflated price would be highly damaging to Petrobras.  The informant explained that he/she was 100% certain that bribery and corruption schemes related to the purchase of the refinery were ongoing.  Present at this meeting were the politician, the informant, his/her friend, and a lady who was the politician's administrative assistant.  *The informant's friend later told him/her that the politician took the Pasadena issue directly to Gabrielli, then Petrobras' President*, and to the Minister of Casa Civil in Brasilia, at that time Dilma Rousseff.  *No action was taken and the deal went forward.*  In 2006, Petrobras bought 50 % of Crown for $340 million.  The true value of the refinery was only about $40 million.

82.     During 2006, the informant met in Rio de Janeiro a former Petrobras high level employee (at this time working as consultant) who told the informant that "the corruption schemes are out of control," using the Brazilian expression "dando bandeira"—meaning they no longer even care about hiding or being low profile when managing the schemes.  That person

added that officials at Petrobras hired the same foreign consulting company they hired in the purchase of an Uruguayan refinery that was also a very suspicious and bad deal for Petrobras. It was clear to the informant that Petrobras hired this advisory firm to facilitate the kickbacks and corruption.

83.     During the years 2010 through 2014, CW1 was assigned to various jobs at Petrobras headquarters and never again promoted.

<u>The Abreu & Lima Refinery</u>

84.     Another example of the bribery and kickback scheme involves the Abreu & Lima refinery in Pernambuco, whose costs skyrocketed from $4 billion to over $18 billion. Reportedly, much of the cost increase at the refinery was due to add-on-contracts awarded to the cartel companies, which caused an estimated $3.1 billion in padded bids.

85.     In May 2009, Brazil's opposition parties, led by the Brazilian Social Democratic Party, collected 32 signatures from senators (five more than necessary) in support of creating a Parliamentary Investigative Committee ("PIC") to investigate cases of corruption involving Petrobras, including overbilling contractors associated with the Abreu & Lima refinery. Petrobras was determined to prevent the investigation at all costs. Costa related the details of three meetings he was personally requested to attend, in which Eduardo Da Fonte, a leader of the Partido Progressista (PP) and Senator Sergio Guerra, a leader of the Partido Social Democrata do Brasil (PSDB) were present. The meetings took place in the Windsor Hotel in Barra de Tijuca, Rio de Janeiro. During the first meeting, the leaders spoke to Costa about a situation that recently came up regarding Petrobras. Da Fonte and Guerra told Costa that the Tribunal de Contas da Uniao (TCU) (the National Accounting Court) had recently investigated and audited several Petrobras programs and had discovered serious issues with the site preparation contract

29

related to the Abreu e Lima refinery, which was in the initial phase of construction.  In light of these concerns raised by the TCU, the opposition block in Congress lobbied for the creation of a CPI to investigate Petrobras.  Da Fonte and Guerra told Costa that such an investigation was not in the interest of either party or the nation.  Costa recounted the content of the meeting to Armando Tripodi, Chief of Staff for Defendant Gabrielli.  Tripodi told Costa that Petrobras could not afford a scandal, particularly in an election year. and agreed that something must be done to stop the CPI.

86.     At the second meeting a short time later, Guerra told Costa that he would help stop the CPI but that the PSDB needed 10 million Reais to do so. Following this meeting, Costa met with Idelfonso Colares Filho, President of Queiroz Galvao Engenheria, a cartel member. Costa knew that Queiroz Galvao was in a joint venture with another cartel member, IESA at the Abreu e Lima refinery project.  After explaining the concerns of the two politicians and those of Petrobras, Colares agreed that the CPI needed to be stopped and agreed to pay the 10 million Reais.

87.     Costa testified that he set up a third and final meeting with Guerra and Da Fonte and informed them that Queiroz Galvao had agreed to pay the money.  A short time later he spoke with Colares again and was informed that the 10 million had been paid to Sergio Guerra, but he did not give any details on where, when, how or to whom the cash was delivered.  Costa explained that Youssef was not involved in this transaction and that the funds were later debited from the PP kickback account.

88.     Costa once again went over how the 3% was divided up among the PT, PP and PSDB and how the cash was collected from the cartel members and distributed to the parties, himself, and other Directors at Petrobras.

89.     The CPI was eventually approved and installed in 2010 over the vehement opposition of the majority parties.   Ironically, Senator Sergio Guerra was selected as the President of the CPI and the man responsible for directing the commission's efforts.   The commission found no irregularities and instead accused the TCU's initial audit and investigation of being flawed.

The Comperj Project

90.     The Complexo Petroquimico do Rio de Janeiro ("Comperj") complex is an integrated refining and petrochemical complex that broke ground in 2008, began construction in 2010, and is scheduled to start up on 2015.   According to TCU, Petrobras will spend 60 percent more than originally budgeted at one of its refineries.[15]   A TCU report found that Petrobras will pay $21.6 billion to complete Comperj.   The TCU found "discrepancies between different government agencies, as well as within different Petrobras divisions, over investment needed for Comperj."   The TCU also concluded that Petrobras' management had been "reckless with irregularities in the omission of technical analyses, overpaying for contracts and a lack of effective controls."   One member of the TCU commented that it was "investigating how the structure of Petrobras can undertake such a huge project in such a sloppy way."   The TCU found "irregularities in three contracts: two that were overpaid and one that was signed in an 'emergency' time-frame that didn't allow other companies to bid."

91.     The audit found excessive risk-taking and a disregard of standard operating procedures, causing significant effects on the timing and the cost of the project.   Contracts worth $3.1 billion were given without bidding.   The audit warned that the project is threatening

---

[15]   Bloomberg, *Petrobras Accused of Recklessness by Audit Court on Overruns*, October 16, 2014.

Petrobras with heavy losses.  Additionally, the audit found a lack of clarity in disclosing the costs of the project.

### D.  The Individuals Defendants Were Alerted to the Rampant Fraud at Petrobras

Defendants Foster, Gabrielli, and the Board of Directors

92.     Petrobras' former manager of downstream operations, Venina Velosa da Fonseca, testified under police protection that she met with Defendant Foster in 2008 and told her about inflated contracts and payments for services that were not carried out.  Foster led the energy and gas division at that time and reported to then-CEO Jose Sergio Gabrielli.   Fonseca represented that "I met with the CEO personally when she was director of the gas and energy unit.  At that time, we discussed the matter.  I handed over to her the documents about the complaints.  Afterward, she had access to these anomalies at the management meetings."  Fonseca explained that it was not only via email that she warned Defendant Foster of irregularities in Petrobras.  The former manager had a personal meeting with Foster when Foster was director of Gas and Energy at Petrobras.  Fonseca said she handed documents to Foster about the inflated contracts and related payments.   "Since 2008, I have been reporting these problems to my superiors, culminating now I'm taking all this documentation to the prosecutor," Fonseca said.

93.     The Brazilian newspaper Valor Economico similarly reported on Fonseca's nearly five-hours-long testimony to federal prosecutors.[16]  The former manager reported internally for five years several problems in contracts, biddings and practices of Petrobras.  Fonseca ended up being sent to Singapore and, last November 19, was dismissed from her job in that country.

94.     Accompanied by her lawyer Ubiratan Mattos, Fonseca delivered documents and a computer to those in charge of the Car Wash investigations.  The emails in which Fonseca warns

---

[16] Valor Economico, *Graca Foster is likely to be called to testify*, April 15, 2014.

Defendant Foster and José Carlos Cosenza, the officer who heads the internal investigation committee of Petrobras, of wrongdoings are already in the hands of the taskforce, as well as internal Petrobras documents.  Based on this information, Cosenza is also likely to be testify.

95.     Reportedly, as part of the investigation, the taskforce received information about three embezzlement schemes.

96.     The first scheme involves misappropriation of funds in the Communications Department of the Supply Division and was discovered by Fonseca in 2008 and 2009.  At the time, Fonseca was a subordinate to then-officer Paulo Roberto Costa and complained to him about a series of contracts in which services were simply not being rendered.   The most significant evidence, however, was of the kickback scheme itself.  Fonseca found a pattern indicating that the contractors were rigging bids and overfilling by up to 20% of estimates. Costa replied by pointing his finger to the portrait of then-president Luiz Inácio Lula da Silva and asked whether Fonseca "want[ed] to bring down everybody."[17]

97.     Reportedly, the scheme in the communication department involved the misuse of funds to the Workers' Party (PT) of Bahia, the political group of then Petrobras CEO José Sérgio Gabrielli.

98.     Fonseca forwarded her complaints to then Petrobras CEO, Jose Sergio Gabrielli. Fonseca testified that Gabrielli created a committee under the chairmanship of Rosemberg Pinto to investigate the case.  Like Gabrielli, Pinto belongs to the same political group of the Workers' Party (PT) of Bahia. The committee's report found out that the company had paid R$58 million in contracts for communication services that were not performed. In addition, the committee identified invoices with the same number for several services, totaling R$44 million.

---

[17]    Accused of several irregularities, Costa was arrested and made a plea bargain with the Public Ministry in which it committed to deliver evidences of the crimes in exchange for a sentence reduction.

99.     On April 3 of 2009, at 3:50 a.m., Fonseca sent an e-mail to Defendant Foster seeking her help to complete a report about more than R$58 million embezzled in communication contracts signed by the downstream unit, after an audit she had led.  "I would like to have your opinion on a final text that I need to forward.  Can I leave it for you to read?  You know about the matter. Feel free if you feel better not reading it. I await your response to leave or not the material with your secretary."  Foster did not reply.

100.    On the same April 3, 2009, Fonseca created a document called "Internal Document of the Petrobras System," called DIP, in which she reached the conclusion that "administrative irregularities" existed in the communications unit of the downstream department.  The subject to which Fonseca referred to was an audit led by her to thwart a scheme that diverted million of reais from Petrobras.  The scheme benefited Workers' Party (PT) members from Bahia — the same political group of then Petrobras CEO José Sérgio Gabrielli.  Fonseca wrote to Defendant Foster in the dawn, just before completing the DIP that called for the resignation of Geovanne de Morais.  She sought Foster's help.

101.    Petrobras said in a note that it fired the employee responsible for the embezzlement, Geovanne de Morais.  However, since he was on medical leave, Petrobras kept him on the job for another four years.  When verifying that Morais had not been fired, Fonseca obtained a legal report ordering the termination of the employee even under medical leave.  Fonseca sent this report to her supervisors, because she thought it was absurd that an employee caught misusing funds would continue on the company's payroll.  But Morais was not dismissed.  It took four more years for him to be fired.

102.    Valor also reported that Fonseca sent an email to Defendant Foster on October 7, 2011, citing failures to meet standards and Petrobras' Code of Ethics, as well as problems in

contracts and bids, and suggested she could deliver the documents she had to Defendant Foster. "Hi, Graça! I would like to be there, talking to you, looking straight into your eyes, so you feel what I mean, even at the risk of crying before you; it would not be the first time," the geologist wrote. "I will write to you knowing that there is a possibility that you go to Paulo Roberto's office and he then asks me what I was doing in your office," she continues, referring to Mr. Costa, at that time, her immediate boss.  "Today, I can say that I am pretty much alone in the company.  The facts that occurred when I was removed from my post and sent to Singapore led the people closest to me to go away, fearing retaliation." Fonseca referred to her transfer to the Petrobras office in Singapore, where she was sent in February 2010, after making allegations of irregularities in the state-run company.  Arriving in Asia, she was asked not do any work.  In this email, Fonseca makes comments about the serious problems experienced at Petrobras, revealing that Foster knew about the matter. "Of the five emails I wrote to the director, four were very friendly and, in the last one, I wrote the real reason that kept me from receiving appointments: clash of values," said Fonseca, again referring to Costa. "I wrote to him that I was feeling humiliated, harassed and cornered."   In her email to Foster, Fonseca continued that "what happened in the ABAST (the downstream department) in the area of communications and works was absolute nonsense." She questioned disputes between technicians for new forms of contracting and "bids without apparent efficiency." "Unfortunately, I am not alone, I cannot venture outside.  If I could, you can be sure it's what I would do. But if I cannot fight out here, I will go to Brazil to fight for my rights. I did nothing wrong. I will not accept being penalized for what I didn't do. I will not, in any way, accept it! If I cannot have a dialog within ABAST, I have no other alternative but to seek other means, but I do not like to do it without talking to you." Fonseca told Defendant Foster that she was considering what she should do.  She was explicit in

mentioning that part of the documentation that she has about irregularities has already been brought to Foster's knowledge. "There are alternatives I'm evaluating despite fears of risking I and my daughters. I would like to introduce you to some of the documentation I have, I know that some of it you already know," the geologist wrote.  Five months after this email, Foster became CEO of Petrobras.

103.   As reported by Valor, as part of the investigation, the Brazilian taskforce also received documents regarding the increase in costs at the Abreu e Lima refinery in Pernambuco, which went from $4 billion to over $18 billion. The information shows that the third phase of construction was only authorized one month after Fonseca left the Supply department, in October 2009.  Before leaving her post in Costa's department, Fonseca sent notes, emails and documents warning of the mounting prices at the refinery.  An internal Petrobras document shows that Fonseca made, at Costa's request, a plan of acceleration of the refinery's works on March 8 of 2007.   At that time, Fonseca made clear the plan involved a cost increase of $328.7 million in order to make the refinery start operating before the scheduled date, as requested by Costa. Fonseca reiterated that the plan was submitted "to your [Mr. Costa's] consideration" so that, if he were in agreement, it could be submitted to management.  The plan was submitted to Petrobras' management, which included Foster, and then to the board, chaired at the time by its Chief of Staff, Ms. Rousseff.

104.   According to a Petrobras audit as described by Fonseca, much of the cost increase at the Abreu e Liman refinery was due to add-on-contracts awarded to the cartel companies, which caused an estimated $3.1 billion in padded bids.   The audit also blamed Costa for modifying the original plan to add unnecessary features, which were nevertheless approved by the Board of Directors.  The internal audit, which was performed in June of 2012, was presented

to the Board, including to Defendant Foster, who despite being informed of the loss, approved the unneeded additions to the project, resulting in further kickbacks to political parties and to Directors.

105.     Finally, the federal prosecutors obtained documents about misappropriation of funds by traders of ship fuel in Petrobras units abroad.   More than 1,000 pieces of communication between fuel traders with "strong evidence" of misuse of funds have been received to date by the Public Ministry.

106.     Reportedly, Fonseca last e-mailed Foster on November 17, 2014.  Fonseca wrote that "[s]ince 2008, my life has become a hell, I came across an initial scheme of embezzlement within the Communications of Downstream [unit]. By fighting it, I was threatened and harassed. I even had a gun pointed to my head and received threats against my daughters . . . "I have with me all the documentation of the case, which I never offered to the press out of respect for Petrobras, despite all the journalists' attempts of contacting.  I presented the matter to the company's competent authorities, including the Legal and Audit [departments], which was in vain," she continued.  "Now, in Singapore, I came across other problems, such as cases involving the bunker area and losses, and once again acted in favor of the company, trying to avoid acts against its interests . . . I was not aware of actions taken in the second example cited, implying that there was omission of those who were informed and could act." The geologist ends the message providing her phone number to Ms. Foster.   Two days later, Petrobras' board discharged Fonseca.

Additional Facts Regarding Defendant Foster

107.     Defendant Foster, a Petrobras employee since the 1970s who spent nearly her entire career at Petrobras, moved up the Company's ranks rapidly during Rousseff's 2003-2010

stint as chairwoman of Petrobras' Board.   Throughout the years, Foster and Rousseff have had a very cozy relationship.  Foster is said to be fiercely loyal to Rousseff.  "She is absolutely loyal," said Francois Moreau, an oil industry veteran who for years set at the same negotiating table as Foster.  Reportedly, Foster met President Rousseff in the late 1990s when Rousseff was an energy official.  Rousseff eventually became energy minister and turned Foster into one of her senior aides.  Two years later, Foster returned to Petrobras.  When Rousseff took office in 2012, she immediately elevated Foster to the top of Petrobras' totem pole.  At the Company's help, Foster remains Rousseff's trusted lieutenant.  Still, "[y]ou can tell it bothers her—of course it does . . . If she could, she would do the right thing," said Silvio Sinedino, who represents workers on Petrobras' governing council.[18]

108.   At the helm of Petrobras, Defendant Foster remained intricately involved in Petrobras' operations and investments.  In 2013 and 2013, Foster told investors that she "will be closely monitoring the liquidity and leverage limits established by [Petrobras'] Board of Directors, which are essential vectors for insuring the financeability of the PNG."  Executive Board meetings were held twice weekly in order to focus on the physical and financial monitoring of the principal projects in the Company's investment plan.  Foster represented to investors that "I constantly monitor the progress of our investment projects and structuring programs with the Directors, Executive Managers, and all other leaders involved."

### E.   The Scheme Rendered the Company's Financial Statements Materially False and Misleading

109.    Petrobras' scheme, whereby it purposefully increased costs on construction projects in order to receive kickbacks and bribe governmental and party officials, caused the Company to materially inflate its reported property, plant and equipment ("PP&E"),

---

[18]   Globe and Mail, *Mending Brazil's Broken Backbone*, May 13, 2014.

necessitating a massive write-down estimated by certain Company officials at $30 billion.   As a result, Petrobras' financial statements, including the carrying value of its property, plant and equipment, reported expenses, and net income, were materially false and misleading at all relevant times.

110.    During the Class Period, Petrobras asserted that it accounted for its acquisitions and the assets from its construction projects in accordance with International Financial Reporting Standards ("IFRS"), claiming its acquired or constructed assets have values equal to the reported costs incurred in their acquisition or construction.

111.    IFRS sets forth the circumstances under which a company may capitalize and depreciate expenditures.  The "assets under construction" class of assets are those assets where the Company has contracted with third parties to build the equipment, facilities or other assets on its behalf.   In accordance with the requirements of IFRS, the costs of construction are accumulated in the "assets under construction" class of PP&E and held in that account until the assets are ready for their intended use.  When ready for their intended use, assets are transferred out of the "assets under construction" account to the land, buildings and improvements account, the equipment and other assets account, or the exploration and development costs account, as appropriate International Accounting Standard ("IAS") 16, *Property, Plant and Equipment*, requires an asset be measured at its cost.[19]  The cost of an item of PP&E includes, among other items, the purchase price and/or any costs "directly attributable to bringing the asset to the location and condition necessary for it to be capable of operating in the manner intended by management."[20]  Simply stated, property, plant and equipment are to include all costs necessary to get the item ready for its intended use. Once asset costs are transferred out of the "asset under

---

[19] IAS 16, ¶ 15.
[20] IAS 16, ¶ 16.

construction account" and placed into another class of assets within property, plant and equipment, they are reported as being in service. That means the assets are depreciated, or allocated to expense on the income statement, on a systematic basis over their expected useful lives and in accordance with the chosen method.[21] Over time, the amount of depreciation for each year is accumulated and deducted from the asset cost on the balance sheet. Petrobras reports the assets at cost less any accumulated depreciation and any accumulated impairment losses.[22] This is referred to as the carrying amount of the PP&E.

112. Additionally, International Accounting Standard ("IAS") 36, *Impairment of Assets*, requires a company to evaluate whether the carrying amount of an asset is recoverable. The carrying amount is recoverable when (i) the higher of its fair value less costs of disposal or (ii) value in use is higher than its carrying amount. The value in use is the discounted present value of the future cash flows expected from the continued use of the asset. If the carrying amount is not recoverable, a loss for the amount of the impairment is included in the operating expenses section of the income statement, and the carrying amount of the asset on the balance sheet is reduced to its recoverable amount.

113. During the Class Period, Petrobras capitalized the bribe repayments (i.e. the inflated contracts), treating them as costs related to the construction, installation, and completion of oil and gas infrastructure and recording them as part of the carrying value of the acquired or constructed assets on the Company's balance sheet. Petrobras then recognized expenses for the depreciation of these assets—including the portion related to bribes—over subsequent periods. Petrobras further calculated and reported the Company's periodic net income based, in part, on these expense figures.

---

[21] IAS 16, ¶ 50.
[22] IAS 16, ¶ 30.

114.    As explained above, in return for the bribes received, Petrobras inflated the contracts granted to the various cartel members by up to 20%.  Accordingly, the assets on the balance sheet associated with Petrobras' PP&E were massively inflated.  In addition, instead of reporting a corresponding immediate expense for the inflated portion of the contracts in the same period, i.e. in the period the expenses were incurred, Petrobras expensed the bribe repayments (i.e. the overpayment to the contractors) as depreciation over the unit-of-production basis or straight-line method, resulting in materially lower current expenses and materially higher net income in the periods in which the inflated payments were made.

115.    Petrobras' reported asset values were important information for purchasers of the securities of Petrobras, PifCo, and PGF during the Class Period because these measures were understood to offer a fair presentation of the Company's fixed capital and recoverability for creditors.  These reported asset values were used by rating agencies, analysts, and investors to arrive at a number of metrics including the Company's financial leverage (the ratio of net assets to total net debt) and its debt/equity ratio that formed a material basis for the market prices of the securities of Petrobras, PifCo, and PGF.

116.    On January 28, 2015, Defendant Foster acknowledged that "the testimonies examined by Petrobras have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments."

117.    Throughout the Class Period, Petrobras issued public statements, including financial statements that the Company filed with the SEC, which set forth, among other things: (1) the Company's asset carrying values; (2) the Company's periodic expenses and net income;

and (3) the assessment that the Company did not suffer from a material weakness in its disclosure controls and procedures or its internal controls over financial reporting.

118.    These statements were false, in that:

(a)    the periodically reported carrying value of the Company's assets was false and misleading because the costs associated with the repayment of bribe-related expenses to contractors had been incorporated into certain asset values at the time of their acquisition or construction and then capitalized as part of those assets' carrying values when recorded on Petrobras' balance sheet, artificially inflating their carrying values;

(b)    had the illegal bribe-related repayments been properly accounted for, the Company would have recognized materially greater expenses and less net income in periods in which the illegal payments were made. Accordingly, during the Class Period, the Company's reported expenses and net income were false and misleading; and

(c)    the Company suffered from material weaknesses in: (1) its disclosure controls and procedures, and (2) its internal controls over financial reporting. The Company consistently represented that it was acting in conformance with its Code of Ethics (which barred bribery and corruption) as well as an Anti-Corruption Program," which expressly targeted such illegal activities. Contrary to such representations of compliance, the Company was engaged in a systemic campaign of corruption that reached the highest echelons of the Company and the Brazilian government.

**F.    PwC's Purposeful Blind Eye to the Fraud**

119.    PricewaterhouseCoopers Auditores Independentes ("PwC") reported that it conducted its audits in accordance with the standards of the Public Company Accounting

Oversight Board ("PCAOB") (United States).[23]  In connection with its audits of Petrobras for the years ended December 31, 2013 and 2012, PwC failed to comply with PCAOB standards and SEC rules governing its conduct.  PwC turned a blind eye to the Individual defendant's systemic and pervasive scheme of overstating the Company's PP&E as a result of illegal acts committed by the Company and the management defendants.

120.    PwC issued (i) an unqualified audit opinion dated February 25, 2014 on Petrobras' 2013 financial statements, in which is stated that the 2013 financial statements were presented in conformity with IFRS; and (ii) unqualified audit opinion dated February 4, 2013 on Petrobras' 2012 financial statements in which it stated that the 2012 financial statements were presented in conformity with IFRS.  PwC issued these clean opinions despite the fact that PwC knew or recklessly disregarded that fact that: (1) the Financial Statements had not been prepared in conformity with IFRS and did not present fairly, in all material respects, the consolidated financial position of Petrobras at December 31, 2013 and 2012 and the results of its statements of income and comprehensive income, changes in equity and a cash flows for the years ended December 31, 2013, and 2012; and (2) PwC had not audited Petrobras' financial statements in accordance with PCAOB standards.  PwC assured investors that as a result of their planning and performance of the audit, they had obtained reasonable assurance that Petrobras' financial statements were free of material misstatements.  PwC's assurances were false.

121.    In addition to expressing an opinion on the financial statements, PwC also expressed an opinion of the Company's internal controls over financial reporting based on its integrated audits for the years ended December 31, 2012 and 2013.  PwC performed an integrated audit which included an evaluation of Petrobras' internal controls.  PwC falsely

---

[23] The PCAOB was established by Congress to oversee the audits of public companies.

certified that Petrobras maintained, in all material respects, effective internal control over financial reporting at December 31, 2013 and 2012. These assurances were also false.

<u>PwC Ignored Obvious Red Flags Existing Before PwC's Clean Reports</u>

122.    In its audits for the years ended December 31, 2013 and 2012, red flags coming to the attention to, but ignored by PwC included the following:

- In June of 2012, an internal audit was performed and was presented to the Petrobras Board which revealed that there were highly inflated cost estimates for the Abreu and Lima refinery to be constructed in Pernambuco. The report showed evidence that there were increases in the estimated costs, which skyrocketed from $1.8 billion to $18.8 billion. Much of the cost increase was due to add-on contracts awarded to the cartel companies, which in turn resulted in an estimated $3.1 billion loss in padded bids. The report blamed the ex-Director Paulo Roberto Costa for modifying the original plan to add features that were not needed. Despite being informed of the loss, the Board went ahead and approved further unnecessary additions to the project, resulting in further kickbacks to political parties and Directors.

- The internal audit also uncovered unsubstantiated charges for communications services that were never provided in connection with the Abreu e Lima project. Additional evidence collected by Venina Velosa da Fonseca, who was involved in the Lima e Abreu project, came from the Communications Department of the Supply Division of Petrobras.  Fonseca found millions of dollars for contracts for which no service was provided. The most significant evidence, however, was of the kickback scheme. Velosa stated that she found a pattern indicating the contractors were rigging bids and overfilling by up to 20% of estimates.

- In November 2012, Bloomberg reported that, according to the Brazilian news magazine Veja, the Brazilian federal prosecutor Marinus Marsico was looking into Petrobras' $1.1 billion acquisition of the Pasadena refinery.  It was reported that Delta Airlines purchased a similar refinery for only $150 million. Petrobras acquired its Pasadena, Texas refinery for over $1 billion in 2006.   Astra had purchased it just a year earlier for only $42.5 million. According to informants, the Pasadena refinery was not modern or a very productive refinery.  It is highly unlikely that the refinery increased in market value by more than 2000% in a mere one year time span.

    On August 11, 2013, the Brazilian weekly newspaper Epoca reported that Petrobras funneled kickbacks to officials from political parties.  The newspaper cited evidence from lobbyist Joao Augusto Rezende, a former head of BR Distribuidora, a Petrobras subsidiary.  Rezende told the press he handled all of Petrobras' foreign contracts and collected a "fee" from the companies

involved.  The lobbyist for the Brazilian Democratic Movement Party ("PMDB"), which is part of President Dilma Rousseff's ruling coalition, said between 60% to 70 % of the graft money was passed on to the PMDB.   Epoca also reported that Joao Vaccari Neto, the ruling Workers Party's finance secretary, meanwhile received the equivalent of $8 million in kickbacks from Brazilian construction conglomerate Odebrecht as part of a Petrobras international contract during Rousseff's 2010 presidential campaign.   The newspaper quoted Rezende as saying he and Vaccari arranged for the money to be transferred to the Rousseff campaign.  This information did not materially affect the market for Petrobras bonds, and was not known by the purchasers or holders of Petrobras bonds.

- Petrobras' capital expenditures in 2012 and 2013 were approximately four times greater than Petrobras' net income in those years.

- There were a number of large constructions projects that were severely over budget.

Red Flags Occurring After the Date of PwC's Report

123.    PCAOB Standards require an auditor to consider the effect on its opinion of events occurring after the date of the auditor's report, but before the report is issued.  [AU 530.03-04]  The PwC report for the year ended December 31, 2013 was dated February 25, 2014, and was included in the Form 20-F that was filed with the SEC on April 30, 2014.  The events occurring between February 25, 2014 and April 30, 2014 should have provided further evidence to PwC that they should not have issued an unqualified audit opinion.  These events corroborate the information that PwC knew or should have known about illegal activities occurring within Petrobras:

- On March 12, 2014, it was reported that Brazilian lawmakers assembled a committee to investigate kickbacks made to Petrobras by the Dutch firm SBM Offshore, a company that leases floating oil platforms and vessels.

- On March 17, 2014, Petrobras issued a press release announcing that the Company's Board had approved the Company's financial statements for 2013 by a majority vote. The announcement went on to note that:

> Director Mauro Rodrigues da Cunha **voted against the approval of the Financial Statements** of Petrobras due to:
> (i) lack of timely dispatch of the financial statements to the

> Directors to analyze; (ii) disagreement with the hedge accounting policy; and (iii) ***lack of information and apparent accounting inadequacy of refinery investments.***

- On or about March 17, 2014, the DPF launched operation Car Wash, focused on a scheme run by black-market money dealers who are thought to have illegally transferred and laundered approximately $3.8 billion using, among other things, the purchase and sale of luxury automobiles.

- On or about March 20, 2014, the federal police force of Brazil arrested Paulo Costa, a former senior executive of Petrobras in connection with Operation Car Wash based on documentation linking Costa to the receipt of a luxury automobile from another individual implicated in the money laundering scheme.

- On April 15, 2014, during the trading session, CEO Foster appeared before the Senate of Brazil to offer testimony relating to the Company's purchase of the Pasadena Refinery and allegations regarding bribery.  As part of her statement, CEO Foster revealed that Petrobras was conducting a re-evaluation of all contracts that could have been the subject of participation by Costa.

124.    These red flags should have immediately put PwC on notice that there was substantial risk that Petrobras was involved in committing illegal acts and that there was a high likelihood that its financial statements included material misstatements.   Thus, PCAOB Standards required PwC to perform heightened audit procedures, and ultimately retract its audit opinion, which it failed to do.

Violations of PCAOB Reporting Standards, General Standards, and Standards of Field Work

125.    PwC violated PCAOB auditing standards and Section 10A audit requirements of the Exchange Act in the conduct of its audit in the following ways:[24]

---

[24] The foundation of the PCAOB standards rests on ten broad standards which provide a measure of audit quality and objectives to be achieved in an audit.  These audit standards include three general standards about the qualifications of the auditor, the auditor's independence, and the quality of the auditor's work; three standards of field work about how the audit should be conducted; and four reporting standards about the requirements of the auditor's report.  (Auditing Standards ("AU") par. 150.01-.02).  The PCOAB standards that have been adopted by the PCAOB and approved by the SEC are referenced with the symbol ("AS") in the prefix and for standards that have been adopted by the PCAOB as preexisting interim standards are shown with the symbol ("AU") in the prefix.

(a)     PwC violated PCAOB Standard of Reporting No. 1, which requires the auditor to attest to whether the Financial Statements are presented in accordance with GAAP.[25]   PwC falsely represented that Petrobras' Financial Statements were presented in conformity with IFRS when they were not for the reasons herein alleged, and as evidenced by the pending write-down of up to $30 billion of Petrobras' PP&E;

(b)     PwC violated PCAOB Standard of Reporting No. 4, in that PwC improperly expressed unqualified opinions on Petrobras' financial statements for the years ended December 31, 2013 and 2012 even though its audits were not conducted in accordance with PCAOB standards and the financial statements were not prepared in accordance with IFRS;

1.   PwC failed to consider the effect on its opinion of events occurring after the date of the auditor's report but before the report is issued.  [AU 530.03-04]

(c)     PwC violated PCAOB General Standard No. 3, which requires that due professional care is to be exercised in the performance of the audit and the preparation of the report;

(d)     PwC violated PCAOB Standard of Fieldwork No. 3, which requires that sufficient appropriate evidential matter to afford a reasonable basis for: (1) the opinion regarding the financial statements; (2) the opinion regarding internal control over financial reporting; and

(e)     Section 10A (a) (1) of the Exchange Act in that PwC failed to plan and perform audit procedures designed to provide reasonable assurance of detecting illegal acts having direct and material effect on the determination of financial statement amounts.

Due Professional Care and the Exercise of Professional Skepticism

126.   PwC violated AU Section 230—*Due Professional Care in the Performance of Work*.  PwC failed to perform its work with the requisite amount of due care.  "Due professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting."  [AU 230 par. .02] Through the exercise of due care, PwC was required to obtain reasonable assurance that the financial

_____

[25] The first standard of reporting only makes reference to GAAP, but Petrobras issued its financial statements in accordance with IFRS.  The first standard of fieldwork still applies.

statements were free from material misstatement, whether caused by error or fraud. [AU 230.10] PwC failed to do this.

127.    PwC also failed to exercise the required amount of professional skepticism. PCAOB standards required PwC to increase its level of professional skepticism once it because aware that there could be a misstatement due to fraud.  PwC was required to be continually alert for indications of misstatements of Petrobras' financial statements whether due to error or fraud. With respect to the risk of fraud, the PCAOB standards require the auditor to approach the audit "with a mindset that recognizes the possibility that a material misstatement due to fraud could be present…" [AU 316.13]  PwC knew or should have known that there was a strong possibility of fraud in connection with Petrobras' financial statements for the 2012 and 2013 years.

128.    AU 316 *Consideration of Fraud in a Financial Statement Audit* states the following regarding exercising professional skepticism:

> Due professional care requires the auditor to exercise professional skepticism. See section 230, *Due Professional Care in the Performance of Work*, paragraphs .07 through .09. Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence….Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest. [AU 316 par.13]

Responses to the Risk of Material Misstatement

129.    PwC violated PCAOB Auditing Standard No. 13 ("AS 13") *The Auditor's Responses to the Risk of Material Misstatement*, which required PwC to respond to the risk of a material misstatement to Petrobras' financial statements once it became aware that there was a heightened fraud risk in connection with bribes, kickbacks and the inflation of construction

contracts.  PwC was required to perform increased audit procedures than it otherwise would have performed.  For example, paragraphs 6 and 9 of AS 13 state the following:

> The auditor also should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement. Examples of such pervasive changes include modifying the audit strategy to: (a) increase the substantive testing of the valuation of numerous significant accounts at year end because of significantly deteriorating market conditions, and (b) obtain more persuasive audit evidence from substantive procedures due to the identification of pervasive weaknesses in the company's control environment.  [AS 13 par. 6]

> In designing the audit procedures to be performed, the auditor should: (a) obtain more persuasive audit evidence the higher the auditor's assessment of risk. [AS 13 par. 9a]

130.    Paragraph 14 of AS 13 provides specific examples of how PwC should have modified its audit procedures to address its assessed fraud risks:

> The following are examples of ways in which planned audit procedures may be modified to address assessed fraud risks:

> a.   Changing the *nature* of audit procedures to obtain evidence that is more reliable or to obtain additional corroborative information;

> b.   Changing the *timing* of audit procedures to be closer to the end of the period or to the points during the period in which fraudulent transactions are more likely to occur; and

> c.   Changing the *extent* of the procedures applied to obtain more evidence, *e.g.*, by increasing sample sizes or applying computer-assisted audit techniques to all of the items in an account.

PwC's failure to detect Illegal Acts

131.    PwC failed to detect illegal acts engaged in by Petrobras.  The acceptance of bribes and kickbacks combined with the subsequent overpayment to contractors is clearly an illegal act that was also subject to the Foreign Corrupt Practices Act rules and regulations.  Also, bribery by international companies is common when there is close interaction between public and private individuals.  PwC should have recognized the importance of PP&E to the balance sheet and that the most significant cash outflow was capital expenditures.  The capital

expenditures in 2012 and 2013 was approximately four times greater than net income.  There were also projects that were severely over budget.  In accordance with AU Section 317 *Illegal Acts by Clients*, PwC was required to perform certain additional procedures when it became aware of information concerning a possible illegal act.  PwC was required to gain an understanding of the nature of the act, the circumstances in which it occurred, and other information to evaluate the effect on the financial statements.  If management failed to provide the information to PwC about the nature of the illegal act, PwC was required to consult with the Petrobras' legal counsel or other specialists.  [AU 317 par.10]  In addition, the standard suggests the following additional audit procedures such as:

     a.  Examining supporting documents

     b.  Confirming significant information concerning the matter

     c.  Determining whether the transaction has been properly authorized

     d.  Considering whether other similar transactions or events have occurred, and apply procedures to identify them.

[AU 317 par .11]

132.    In addition, PwC violated the requirements of Section 10A of the Exchange Act, which requires auditors of public companies to design procedures to provide assurance of detecting illegal acts.  PwC failed to perform procedures designed to provide reasonable assurance of detecting illegal acts having a direct material effect on the determination of financial statement amounts.  Section 10A of the Exchange Act requires an auditor to notify the SEC if he or she become aware of information indicating that an illegal act has, or may have occurred, if management or the Board of the company fails to take appropriate remedial actions with respect to illegal acts.  PwC knew or recklessly ignored that it violated section 10A of the Exchange Act in the performance of its "audits" of Petrobras in 2012 and 2013.

PwC's failure to obtain appropriate evidential matter in its audits of PP&E

133.    PwC failed to obtain sufficient appropriate evidential matter regarding its audits of capital expenditures, construction in progress accounts, and equipment and other assets accounts.  An audit is a risk-based process.  The amount of capital expenditures made by the Company, including excessive amounts paid to acquire certain refineries, combined with significant budget overruns on large projects, and publications of various press reports asserting the Company's practice of engaging in bribes and kickbacks made this a high risk area for PwC. PP&E was by far the largest asset on Petrobras' balance sheets.  At December 31, 2013 and 2012 PP&E represented 70.9% and 62.5% of total assets, respectively.  Auditing Standard No. 15, *Audit Evidence*, states that "as the risk increases, the amount of evidence that the auditor should obtain also increases…ordinarily more evidence is needed to respond to significant risks." [AS 15 par. 5]  If PwC had appropriately modified its audit procedures to be responsive to the risk of material misstatement of the Company's financial statements due to misstatements in its PP&E accounts and carried out these procedures with the appropriate degree of professional skepticism, it would have likely discovered that the Company's capital expenditures, PP&E, and Net Income were materially overstated.  The audit procedures that PwC was required to perform included the following:

- Physically inspecting major additions and verifying claims of ownership;

- For constructed property and construction in progress, examining appropriate documentation supporting the amount recorded on the Company's balance sheet, such as review of construction contracts, work orders, job status reports;

- Verifying that all payments for capital expenditures were properly authorized and included appropriate supporting documentation;

- Verifying that change orders went through the proper approval process and that the resulting payments were appropriately authorized;

- Obtaining support for authorization of fixed assets additions by reference to minutes of meetings of the board of directors, capital asset budgets, or other evidence of approval by appropriate personnel;

- In connection with the assets under construction, examining all of the supporting documentation for large expenditures; understanding why certain projects were exceeding their original budgeted amounts and why there were large add-on contracts that increased the original plans.  Key items should have been selected that were large, suspicious, unusual, or risk-prone; [AS 15 par. 25]

- Examining journal entries and other adjustments for evidence of possible material misstatement due to fraud; [AU316 par.58] and

- Inquiring of individuals involved in the financial reporting process about inappropriate or unusual activity relating to the processing of journal entries and other adjustments.

134.    It is clear that PwC violated PCAOB standards by failing to apply some or all of the above procedures.  Had PwC complied with the PCAOB standards, they likely would have found the illegal acts and the material overstatements of PP&E.  In summary, PwC either failed to properly audit Petrobras' fixed asset additions or having found the illegal overpayments failed to properly report it to the Petrobras' Audit Committee and Board of Directors.

Internal Controls

135.    PwC falsely certified that Petrobras maintained, in all material respects, effective internal control over financial reporting at December 31, 2013 and 2012.  PwC failed to obtain sufficient competent evidential matter to afford a reasonable basis for its opinion regarding internal control over financial reporting.  PwC should have reported material weaknesses in Petrobras' internal controls.  PwC failed to identify a control effective in preventing or detecting a material misstatement caused by the overstatement of PP&E in Petrobras' financial statements at December 31, 2013 and 2012.

136.    Absent the identification and test of an effective control to address the risk of overstatement of PP&E due to the Company paying inflating amounts to acquire or construct infrastructure, PwC should have reported a material weakness in Petrobras' internal controls.

137.    PCAOB Standard No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ("AS 5"), enables auditors to perform an audit of management's assessment of the effectiveness of internal control over financial reporting.  [AS 5 par. 1]  The audit of internal control over financial reporting can be integrated with the audit of the financial statements.  [AS 5 par. 6]

138.    AS 5 and paragraph 4 of AU Section 325 *Communications About Control Deficiencies in an Audit of Financial Statements* required PwC to communicate in writing to management and the audit committee all material weaknesses identified during the audit. [AS 5 par. 78]   PwC failed to do this.  PwC was required to disclose to the audit committee that a material weakness had not been disclosed or identified as material weaknesses in management's assessment, and further required PwC to express an adverse opinion on Petrobras' internal control over financial reporting.  [AS 5 par. 90-91]

## VI.    OVERVIEW OF CLAIMS AGAINST THE EXCHANGE ACT DEFENDANTS

Accounting Improprieties

139.    As explained in more detail above, during the Class Period, the Exchange Act Defendants made materially false and misleading statements by misrepresenting facts and failing to disclose a multi-year, multi-billion dollar money-laundering and bribery scheme.  Specifically, Petrobras' senior executives inflated the value of the Company's construction contracts for the sole purpose of receiving kickbacks from companies that were awarded the contracts illegally. These illegal acts caused the Company to overstate the PP&E line item on its balance sheet

because the overstated amounts paid on inflated third party contracts were carried as assets on Petrobras' balance sheets.

Misleading Statements Regarding Management Integrity and Controls

*Overview*

140.    Throughout the Class Period, Petrobras consistently touted the sufficiency of its internal financial controls and conformance to the standards set forth by the Treadway Commission.[26]  The Company also assured investors that its operations were conducted with full "transparency" and conformance to "best practices."  For example, on May 27, 2010, then CEO Jose Sergio Gabrielli de Azevedo ("Gabrielli") stated that the Company was "[f]ully committed to implementing a fair and transparent operation, respecting [its] minority shareholders' rights and following the best practices of corporate governance."[27]

141.    In an effort to demonstrate that such assurances were not merely "lip service," Petrobras also adopted a Code of Ethics and Code of Good Practices, as well as established an Ethics Commission whose responsibility was to promote compliance with "ethical principles" and to "develop and strengthen the Petrobras Ethics Management System, which is aimed at assuring the highest ethics standards."[28]  In its 2011 Annual Report filed with the SEC, the Company reiterated that "[w]e guide our business and our relations with third parties by ethical

---

[26] "Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control-Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013."

[27] Similar assurances were made on November 23, 2010, March 15, 2011, May 24, 2011, November 22, 2011, and February 4, 2013.

[28] Petrobras 2009 Annual Report filed on Form 20-F.

principles…. It is the responsibility of the Ethics Commission to promote compliance with ethical principles and act as a forum for discussion of subjects related to ethics."

142.   The Company also highlighted its "Corruption Prevention Program" manual, which was designed to "reinforc[e] the prevention, detection and correction of acts of fraud and corruption, through integrated management and improvement of actions and controls in our governance structure."   The Manual's adoption was consistent with the Company's acknowledged need to comply with national and international anti-corruption laws, including (i) "Brazilian law 12,846 of August 1, 2013, which governs the administrative and civil liability of legal entities for the practice of acts against the national or foreign public administration;" and (ii) the "United States Foreign Corrupt Practices Act 1977 (FCPA), a federal anti-corruption law to which we are subject since we have American Depositary Receipts (ADRs) traded on the New York Stock Exchange."[29]

143.   As recently as February 25, 2014, the Company was still asserting its adherence to anti-corruption practices.  As CEO Gabrielli stated at the time:

> I would like to notice that in the second half of 2013 we implemented the Corruption Prevention Program, reaffirming the commitment of the Petrobras Executive Board and of its employees with ethics and transparency at our organization. The program complies with both national and international initiatives against fraud and corruption, as well as with the laws of the countries where Petrobras operates, with positive impacts in the relations with all its stakeholders.
>
> *Corruption Prevention*

144.   Petrobras specifically addressed investor concerns about corruption by adopting the Petrobras Corruption Prevention Program ("PCPP") on July 4, 2013.  Defendants asserted that the PCPP was "aimed at reinforcing the prevention, detection and correction of acts of fraud

---

[29] *Petrobras Corruption Prevention Program: Manual* (December 2014), *available at* http://www.investidorpetrobras.com.br/en/governance/code-of-ethics/ (last visited January 22, 2015).

and corruption, through integrated management and improvement of actions and controls in [Petrobras'] governance structure."  Defendants represented that through the implementation of the PCPP, Petrobras was taking "continuous actions to prevent, detect and correct acts of fraud and corruption."  They assured investors that the PCPP was effective as it was subject to a "periodic evaluation in order to verify its effectiveness and compliance with laws."

145.  The Manual for Petrobras' PCPP, posted on the Company's website, represented that:

- "We are committed to rejecting any practices of corruption and bribery, maintaining formal procedures to ensure control and consequences for any violations that occur in our relations with society, government and the state." (Sec. 1.1 at pg 11)

- "Fraud and Corruption Risk Management: The management of business risks is conducted at a corporate level and deployed at organizational sites… The Internal Audit Area, through the Compliance General Management, is responsible for monitoring compliance risks related to fraud and corruption."

146.  Similar statements appeared in Petrobras Corruption Prevention Program Manual.

147.  The 2013 20-F represented that the Company had established ad hoc internal commissions "to evaluate our compliance with applicable regulations" and the "scope of each internal commission is established by our management."   Significantly the 2013 20-F represented that on "*March 31, 2014 , our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations*."

*Ethics Program*

148.  The Petrobras Corruption Prevention Program was a focused extension of the Company's Code of Ethics that had been adopted prior to, and existed throughout, the Class Period. The Code of Ethics stated that Petrobras undertook to "conduct its business with

transparency and integrity, creating credibility with its shareholders . . . and . . . investors" and to "register its reports and statements in a correct, consistent, accurate and complete way."

149.    Moreover, Defendants undertook to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions" and to "refuse support and contributions to political parties or political campaigns of candidates for elective offices."

150.    The 2009 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the creation of the Petrobras Ethics Commission" "to promote compliance with ethical principles."   Petrobras has been boasting to investors that it acts with "credibility and transparency."   It has claimed that it "adopts the best corporate governance practices and has all the skills to make full use of the most advanced business management tools."   The Petrobras Ethics Committee, appointed by the Executive Board, took up its duties in 2008.  The committee is directly linked to the CEO and was set up for the purported purpose of handling the question of ethics within the company and serving as a forum for discussion, while enhancing the formal, official nature of Petrobras' Ethics Management System.

151.    Petrobras' directors reviewed and approved the provisions of the Code.

*Internal Controls*

152.    During the Class Period, Petrobras filed reports, forms, and other documents with the SEC that contained false and misleading statements regarding the effectiveness of Petrobras' internal controls and procedures.   Petrobras consistently represented that the "Company identified no change in its internal controls over financial reporting."

57

153.    Further, during the Class Period, the Company's Chief Executive Officers, Jose Sergio Gabrielli de Azevedo ("Azevedo") and Maria das Gracas Silva Foster ("Foster"), and its Chief Financial Officer, acting on behalf of Petrobras, signed certifications pursuant to the Sarbanes-Oxley Act of 2002.  Those certifications contained representations that Petrobras had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

154.    In making its assessment of internal control over financial reporting, Petrobras used the criteria established by the Committee of Sponsoring Organizations of the Treadway Commission Report, *Internal Control – Integrated Framework* (1992) ("COSO Report").[30]  The COSO Report defines internal control as a process "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations.[31]

155.    Here, Chief Executive Officers Maria das Gracas Silva Foster and Jose Sergio Gabrielli, and the Chief Financial Officer, Almir Guilherme Barbassa, failed to comply with SEC regulations and the requirements of COSO.  There were material weaknesses in internal controls whereby Petrobras' internal control system failed to live up to the COSO standards.  There was clear failure to adhere to the culture of integrity and high ethical standards touted by Petrobras. Corruption, bribery and collusion, were part and parcel of Petrobras' normal operations.  In

---

[30] 2013 Form 20-F page.F-3.  The COSO report was originally issued in September 1992 as a four-volume set.  An *Addendum to Reporting to External Parties* was issued in May 1994.  On May 14, 2013, COSO released an updated version of the entire framework.  Unless otherwise noted, all references to the COSO report refer to the 1992 issuance.

[31] COSO Report, Executive Summary.

addition, procurement officers throughout the organization did not conduct themselves in a manner that met high professional standards and integrity.

156.    Petrobras also suffered from material weaknesses in its internal controls over its procurement process.  Procurement is one of the areas within an organization that is most vulnerable to corruption.  Petrobras had a lack of a proactive corruption risk management process in connection with its procurement process.  The company lacked a transparent and accountable procurement system and lacked a review mechanism necessary to ensure that decisions conformed to its procurement regulations.

*Materiality and Misleading Nature of the Foregoing Statements*

157.    Information about management integrity is material to investors. Investors base their investment decisions, at least in part, on factors such as management ethics and accountability.   Both case law and the literature support recognition of investors' presumptive right to rely on the integrity of management in the conduct of corporate affairs.  See, e.g., Donald C. Langevoort, Basic at Twenty: Rethinking Fraud-on-the-Market, 151 Wis. L. Rev.151 n.140 (2009) ("Presumably, most stock-price declines that follow a surprise revelation of fraud reflect not only the truth with respect to the specific facts misrepresented or omitted but also a readjustment in expectations regarding other matters on which management was previously thought credible.").

158.    While representing that the Company was making a concerted effort to prevent and root out any corruption, Defendants had been engaged in a corrupt overpayment/kickback scheme prior to, and throughout, the Class Period.  Moreover, Plaintiffs and Class Members were entitled to rely upon a presumption of management integrity given, inter alia, the foregoing representations, and which presumption was misplaced given the Corruption Scheme.

## VII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.   False and Misleading Statements Made in 2010

159.   On January 22, 2010, Petrobras issued a press release setting forth certain descriptions of investment agreements entered into by the Company, Odebrecht S.A. ("Odebrecht") and Braskem S.A. ("Braskem"), including, among other things, a partnership agreement relating to their commercial and corporate relationship with COMPERJ. This press release stated in relevant part:

> Petrobras, Odebrecht and Braskem also entered into a partnership agreement ("Partnership Agreement") to regulate their commercial and corporate relationship with [COMPERJ] and with the Suape Petrochemical Complex ("Suape Complex"). Under the Partnership Agreement, Braskem will take on the companies operating COMPERJ's petrochemical first and second generation, as well as, gradually acquire equity interests in companies operating in the Suape Complex, in accordance with the terms and conditions agreed in the Association Agreement.
>
> The transaction is in line with Petrobras' 2009-2013 Business Plan, which foresees investments in the order of $5.6 billion to the petrochemical segment aiming to operate in the industry in an integrated manner and adding value to the crude oil produced. However, it considers a new model of investments in this segment but in line with the Company's objectives to approve long-term sustainable investments that offer high returns to its shareholders.

160.   On March 24, 2010, the Company issued a press release announcing its results of operations for the full year of 2009. The Company reported total assets of $200 billion including net property, plant, and equipment of $136 billion, total costs and expenses of $70 billion including depreciation, depletion, and amortization of $7.1 billion, and net income of $15.5 billion.

161.   That day, Petrobras hosted a conference call for investors and analysts to discuss these results. As part of his prepared remarks, Defendant Gabrielli stated in part:

> Also, we had a very important cost reduction efforts. We operate in several areas. ***We changed our bidding process. We divide the packages***

*and different suppliers in such a way that we could get more competitive bids.* We standardized more of our purchase.

162. Later, CEO Gabrielli contributed, in relevant part, to the following exchange:

> **[Analyst]:** [O]n the refining CapEx, *I'd like to understand why, for instance, the Abreu e Lima refinery is estimated to have a cost that is twice as much the cost of a refinery of similar complexity in the US or Europe.* I might be missing something, so I just wanted to understand. It may be related to infrastructure or something else. And maybe even the [Modern Young] and Cera refineries seem to be a bit higher in terms of costs versus the international benchmark.
>
> **CEO Gabrielli:** We haven't finished the numbers. If you have the numbers, well, please tell me, because we don't finish it. We don't have them.
>
> **[Analyst]:** We got the numbers from [one of local Pested] and from (inaudible) reports from the PCU indicator.
>
> **CEO Gabrielli:** Okay, if you have them, that's another thing. But we are finishing the numbers and for sure, that's something that we have to take into consideration, our qualitative base. For example, for example, most of the assessment of the cost of refinance is a kind of plug and play refinery in which you go produce the refinery, and plug to the infrastructure and that's it. It is not our case.

163. On May 20, 2010, Petrobras and PifCo filed an Annual Report on Form 20-F for 2009 setting forth substantially similar figures as those set forth in the Company's earlier press release.

164. In addition, the 2009 20-F stated that the "Company's management assessed the effectiveness of [its] internal control over financial reporting as of December 31, 2009" and "has concluded that as of December 31, 2009, [the] Company's internal control over financial reporting is effective." The Company explained that its "internal control over financial reporting includes those policies and procedures that . . . (iii) provide reasonable assurance regarding

prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the consolidated financial statements."

165.    The 2009 20-F incorporated the Petrobras Code of Ethics ("Code"), available on the Company's corporate website and stated that the Code "is applicable to all employees, the board of executive officers and the board of directors."   Pursuant to the terms of the Code, Petrobras undertook to "conduct its business with transparency and integrity, creating credibility with its shareholders . . . and . . . investors" and to "register its reports and statements in a correct, consistent, accurate and complete way."   Moreover, Defendants undertook to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions" and to "refuse support and contributions to political parties or political campaigns of candidates for elective offices."   The 2009 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the creation of the Petrobras Ethics Commission" "to promote compliance with ethical principles."   Petrobras has been boasting to investors that it acts with "credibility and transparency."[32]   It claimed that it "adopts the best corporate governance practices and has all the skills to make full use of the most advanced business management tools."[33]   The Petrobras Ethics Committee, appointed by the Executive Board, began functioning in 2008.   The Company represented that the committee is directly linked to the CEO and was set up for the purpose of handling ethics issues within the Company and serving as a forum for discussion, while enhancing the formal, official nature of Petrobras' Ethics Management System.

---

[32]   http://www.hotsitespetrobras.com.br/rao2008/i18n/en/relatorio-anual/resultados-e-gestao/governanca-corporativa.aspx?print=true

[33]   *Id.*

166.    On May 27, 2010, Petrobras issued a press release announcing its results of operations for the first quarter of 2010.  The Company reported total assets of $204 billion including net PP&E of $141 billion, total costs and expenses of $21.3 billion including depreciation, depletion, and amortization of $2.0 billion, and net income of $4.3 billion.

167.    In connection with these results, Defendant Gabrielli stated:

> We are going through a period of crucial importance regarding our shareholders. During the next few months we are planning an important capitalization that will prepare Petrobras to go ahead with the investments needed for its integrated growth and the development of new frontiers. ***We are fully committed to implementing a fair and transparent operation, respecting our minority shareholders' rights and following the best practices of corporate governance.***
>
> Our priority is to grow in an integrated manner and with profitability. In order to do so, we rely on a strong business foundation that ensures a substantial cash flow. We also have access to several sources of financings, either through banks or the capital markets, which give us the financial muscle to sustain our expansion and allow us to grow, invest and maintain an appropriate capital structure. ***Our growth is underpinned by the absolute certainty that we have one of the best project portfolios and opportunities in the world, and that we will invest all of our resources with efficiency and discipline, ensuring returns for our shareholders, investors and society as a whole.***

168.    On June 21, 2010, Petrobras issued a press release announcing that the Company's "Board of Directors approved the 2010-2014 Business Plan on June 18th, with investments totaling $224 billion."  The 2010-2014 Business Plan projected that Petrobras would meet the funding requirements for these investments in part by issuing $96 billion in debt and equity.

169.    On August 24, 2010, Petrobras issued a press release announcing its results of operations for the second quarter of 2010. The Company reported total assets of $211 billion

including net PP&E of $147 billion, total costs and expenses of $23.4 billion including depreciation, depletion, and amortization of $2.1 billion, and net income of $4.2 billion.

170.   On August 25, 2010, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ended June 30, 2010 with figures substantially similar to those set forth in the Company's earlier press release.

171.   On September 16, 2010, Petrobras filed Forms F-6 and post-effective amendments thereto registering: (1) 200 million ADSs, each representing two shares of Petrobras common stock; and (2) 500 million ADSs, each representing two shares of Petrobras preferred stock. These registration statements were declared effective on September 17, 2010.

172.   On October 1, 2010, Petrobras issued a press release announcing the closing of the over-allotment of the Company's offering of ADSs representing the Company's common and preferred stock, totaling 65,704,296 preferred shares in the form of ADSs and 75,198,838 common shares in the form of ADSs.

173.   On November 23, 2010, Petrobras issued a press release announcing the Company's results of operations for the third quarter of 2010.  The Company reported total assets of $298 billion including net PP&E of $206 billion, total costs and expenses of $25.1 billion including depreciation, depletion, and amortization of $2.1 billion, and net income of $4.7 billion.

174.   In connection with these results, Defendant Gabrielli stated in part:

> The success of our Global Offering was due to the confidence of our shareholders and investors, the Company's excellent reputation in the capital markets and ***our commitment to transparency*** and investor returns.

175.    On November 24, 2010, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending September 30, 2010 with figures substantially similar to those set forth in the Company's earlier press release.

**B.      False and Misleading Statements Made in 2011**

176.    On January 21, 2011, PifCo filed a prospectus supplement on Form 424B2 for the sale of $6 billion in debt composed of three series of notes: (1) $2.5 billion of notes paying 3.875% due in 2016 at an initial price to the public of 99.663%; (2) $2.5 billion of notes paying 5.375% due in 2021 at an initial price to the public of 99.801%; and (3) $1 billion of notes paying 6.750% due in 2041 at an initial price to the public of 99.288%.

177.    This Form 424B2 incorporated by reference, among other documents, the 2009 Annual Reports of Petrobras and PifCo, and financial statements and earnings releases for the Company for the period ending September 30, 2010, with figures substantially similar to those set forth in the Company's earlier press release and 2009 Annual Report.

178.    On January 27, 2011, Petrobras issued a press release announcing that the offering of the $6 billion of notes pursuant to the Form 424B2 filed on January 21, 2011 had closed. The release noted that "the transaction was the largest-ever corporate bond offering by a Brazilian company in the international capital markets, and the book was oversubscribed 2.5 times with more than 463 investors from the United States, Europe, Asia and Latin America participating, most of them dedicated to the high grade market.  Petrobras will use the proceeds of this multi-tranche offering to finance Petrobras' planned capital expenditure under its 2010-2014 Business Plan while maintaining an adequate capital structure and staying within Petrobras' targeted financial leverage ratios in accordance with its 2010-2014 Business Plan."

179.    On March 15, 2011, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2010. For 2010, the Company reported total

assets of $309 billion including net PP&E of $219 billion, total costs and expenses of $96 billion including depreciation, depletion, and amortization of $8.5 billion, and net income of $19.2 billion.

180.   In connection with these results, Defendant Gabrielli stated in part:

> ***Our results*** for the fourth quarter and full year of 2010 further underscore our capacity for overcoming challenges, as well as ***emphasize the quality of our assets*** and investment projects.
>
> ***At Petrobras, we are fully aware that our achievements would not have been possible without the adoption of good corporate governance practices***, as well as investments in technology and workforce training.

181.   On May 24, 2011, Petrobras issued a press release announcing the Company's results of operations for the first quarter of 2011. The Company reported total assets of $331 billion including net PP&E of $230 billion, total costs and expenses of $25.2 billion including depreciation, depletion, and amortization of $2.3 billion, and net income of $6.5 billion.

182.   In connection with these results, Defendant Gabrielli stated in part:

> On the corporate front, we undertook the largest ever international debt issuance by a Brazilian company, placing U.S.$6,000 million in bonds maturing in 5, 10 and 30 years. The proceeds will be used to finance the investments foreseen in our Business Plan, thereby maintaining an appropriate capital structure and financial leverage in line with our objectives.
>
> We achieved the milestones above . . . not only meeting growing demand in these markets, but also ***ensuring that all of the Company's human, financial and operational resources are put to the best possible use.*** We remain confident in our capacity to achieve the goals laid out in our Business Plan, thereby ensuring increasing returns for our shareholders and investors.

183.   On May 26, 2011, Petrobras and PifCo filed an Annual Report on Form 20-F for 2010 setting forth substantially similar figures as those set forth in the Company's earlier press release.

184.    In addition, the 2010 Form 20-F stated that the "Company's management assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2010" and "has concluded that as of December 31, 2010, each Company's internal control over financial reporting is effective."    The Company explained that the "management of [the] Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2010, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

185.    The 2010 20-F incorporated the Code, and made statements substantially similar to those described in ¶ 165 above.

186.    On July 22, 2011, Petrobras issued a press release announcing that the Company's "Board of Directors approved today the 2011-2015 Business Plan, involving total investments of US$224.7 billion (R$389 billion)." The 2010-2014 Business Plan set forth the projection that Petrobras would require financing of between $67.0 billion and $91.4 billion.

187.    On August 24, 2011, Petrobras issued a press release announcing the Company's results of operations for the second quarter of 2011. The Company reported total assets of $351 billion including net PP&E of $247 billion, total costs and expenses of $31.2 billion including depreciation, depletion, and amortization of $2.5 billion, and net income of $6.6 billion.

188.    On August 25, 2011, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending June 30, 2011 with figures substantially similar to those set forth in the Company's earlier press release.

189.    On November 22, 2011, Petrobras issued a press release announcing the Company's results of operations for the third quarter of 2011. The Company reported total assets of $309 billion including net PP&E of $220 billion, total costs and expenses of $31.5 billion

including depreciation, depletion, and amortization of $2.6 billion, and net income of $3.9 billion.

190.    In connection with these results, Defendant Gabrielli stated in part:

We continue to invest in the expansion of our refineries, strengthening our position as an integrated company.

We improved our performance with respect to economic and social criteria and were **granted the highest score in the Transparency criterion** for the fifth time.

*       *       *

Thanks to product and service quality, **a strong commitment to** sustainable development, state-of-the-art technology and **exemplary management,** Petrobras continues to strengthen its position as a major player in the global oil and gas market and is fully prepared for new conquests.

191.    Also on November 22, 2011, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending November 30, 2011 with figures substantially similar to those set forth in the Company's earlier press release.

C.    **False and Misleading Statements Made in 2012**

192.    On January 23, 2012, Petrobras notified the market of possible changes among the Company's executives. On January 24, 2012, the Company issued a press release confirming the upcoming nomination of defendant Foster to replace CEO Gabrielli who was reportedly planning to run for public office.

193.    On February 3, 2012, PifCo filed the 2012 Prospectus for the offering of the 2012 Notes. This offering comprised four series of notes: (1) a $2.75 billion re-opening of notes first offered on January 27, 2011 paying 5.375% due in 2021 to be sold at $1041.81 per $1000 par value; (2) a $1.25 billion re-opening of notes first offered on January 27, 2011 paying 6.750% due in 2041 to be sold at $1112.08 per $1000 par value; (3) $1.25 billion of notes paying 2.875%

due in 2015 to be sold at $994.99 per $1000 par value; and (4) $1.75 billion of notes paying 3.500% due in 2017 to be sold at $994.19 per $1000 par value.

194.    The 2012 Offering Documents incorporated by reference, among other documents, the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2010, filed with the SEC on May 26, 2011, which included descriptions of Petrobras, its asset values, expenses, net income, and its internal controls, as set forth above.

195.    On February 28, 2012, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2011.  For 2011, the Company reported total assets of $319 billion including net PP&E of $182 billion, depreciation, depletion, and amortization of $10.5 billion, and net income of $20.0 billion.

196.    On February 29, 2012, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for 2011 setting forth figures substantially similar to those set forth in the Company's earlier press release.

197.    On April 2, 2012, Petrobras and PifCo filed an Annual Report on Form 20-F for 2011 setting forth substantially similar figures as those set forth in the Company's earlier press release.

198.    In addition, the 2011 20-F stated that the "Company's management has assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2011" and "has concluded that each Company's internal control over financial reporting was effective as of December 31, 2011."  The Company explained that the "management of [the] Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2011, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

199.    The 2011 20-F incorporated the Code and made statements substantially similar to those described in ¶ 165 above.

200.    On April 27, 2012, Petrobras issued a press release announcing that its Board of Directors had, that day, approved the nomination of Jose Carlos Cosenza to replace Paulo Roberto Costa. The press release also announced that Costa would resign from his current position.

201.    On May 15, 2012, Petrobras issued a press release announcing the Company's results of operations for the first quarter of 2012. The Company reported total assets of $338 billion including net PP&E of $194 billion, depreciation, depletion, and amortization of $2.7 billion, and net income of $5.3 billion.

202.    On May 17, 2012, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending March 31, 2012 with figures substantially similar to those set forth in the Company's earlier press release.

203.    In connection with Petrobras' Form 6-K for the period ending March 31, 2012, PwC issued a Report of Independent Registered Public Accounting Firm, stating the following:

> We have reviewed the accompanying condensed consolidated balance sheet of Petróleo Brasileiro S.A. Petrobras and its subsidiaries as of March 31, 2012, and the related condensed consolidated statements of income, of cash flows, of comprehensive income and of shareholders equity for the three-month period ended March 31, 2012. This interim financial information is the responsibility of the Company s management.
>
> We conducted our review in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole.  Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the accompanying condensed consolidated interim financial information for it to be in conformity International Financial Reporting Standards as issued by the International Accounting Standards Board.

/s/PricewaterhouseCoopers
**PricewaterhouseCoopers**
Auditores Independentes
Rio de Janeiro, Brazil
May 15, 2012

204.    On or about June 25, 2012, Petrobras hosted a presentation and conference call in New York, New York to offer details of the Company's 2012-2016 Business and Management Plan. As part of the presentation, Petrobras described certain initiatives relating to project management, including discussions of capital discipline (described as "ensur[ing] expansion with solid financial indicators") and of the Company's plans to spend more than $141 billion on exploration and production. These capital expenditures were presented based on the explicit assumption of Petrobras maintaining its investment grade rating, including "Leverage lower than 35%." The 2012-2016 Business and Management Plan projected that Petrobras would be required to borrow approximately $80 billion through the debt markets to fund these activities.

205.    On August 3, 2012, Petrobras issued a press release announcing the Company's results of operations for the second quarter of 2012. The Company reported total assets of $311 billion including net PP&E of $185 billion, depreciation, depletion, and amortization of $2.7 billion, and a net loss of $953 million.

206.    In connection with these results, Defendant Foster stated in part:

> **The new [Business and Management] Plan focuses on oil and gas production in Brazil and is underpinned by realism, precise targets and rigorous project management with capital discipline**. Since its publication, we have made advances with several important issues. Recent examples include the signature of contracts for the construction of drilling rigs and pre-salt replicant platform topsides. . . . We will also continue with our efforts to

recover the operational efficiency of the Campos Basin and optimize operating costs, two essential vectors for ensuring better results.

207.    On August 10, 2012, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending June 30, 2012 with figures substantially similar to those set forth in the Company's earlier press release.

208.    In connection with Petrobras' Form 6-K for the period ending June 30, 2012, PwC issued a Report of Independent Registered Public Accounting Firm, making statements substantially similar to those described above in connection with previous quarters.

209.    Exhibit 15.1 to Petrobras' Form 6-K for the period ending June 30, 2012 contained the following statements made by PwC:

> We are aware that our report dated August 3, 2012 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the six month period ended June 30, 2012 and included in the Company's quarterly report on Form 6-K for the quarter ended June 30, 2012 is incorporated by reference in its Registration Statement on Form F-3 dated December 12, 2009.

210.    On August 29, 2012, Petrobras, PifCo, and PGF filed the 2012 Registration Statement.  The 2012 Registration Statement included a prospectus that incorporated by reference certain documents filed by Petrobras with the SEC, including the Company's Annual Report on Form 20-F for the year ended December 31, 2011, which had been filed with the SEC on March 30, 2012.

211.    Exhibit 15.1 to the 2012 Registration Statement and Prospectus filed on August 29, 2012, contained the following statements made by PwC:

> We are aware that our report dated August 3, 2012 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the six month period ended June 30, 2012 and included in the Company's quarterly report on Form 6-K for the quarter ended June 30, 2012 is incorporated by reference in its Registration Statement on Form F-3 dated August 29, 2012.

212.    The 2012 Registration Statement also incorporated, among other documents, any future filings of Petrobras on Form 20-F made with the SEC after the date of this prospectus and prior to the termination of the offering of the securities offered by this prospectus."

213.    On October 26, 2012, Petrobras issued a press release announcing the Company's results of operations for the third quarter of 2012. The Company reported total assets of $318 billion including net PP&E of $191 billion, depreciation, depletion, and amortization of $2.6 billion, and net income of $2.8 billion.

214.    On October 30, 2012, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the nine-month period ending September 30, 2012, with substantially similar figures as those set forth in the Company's earlier press release.

215.    In connection with Petrobras' Form 6-K for the period ending September 30, 2012, PwC issued a Report of Independent Registered Public Accounting Firm, making statements substantially similar to those described above in connection with previous quarters.

216.    Exhibit 15.1 to Petrobras' Form 6-K for the period ending September 30, 2012 contained the following statements made by PwC:

> We are aware that our report dated October 26, 2012 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the nine month period ended September 30, 2012 and included in the Company's quarterly report on Form 6-K for the quarter ended September 30, 2012 is incorporated by reference in its Registration Statement on Form F-3 dated December 12, 2009.

### D.    False and Misleading Statements Made in 2013

217.    On February 4, 2013, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2012.  For 2012, the Company reported total assets of $332 billion including net PP&E of $205 billion, depreciation, depletion, and amortization of $11.1 billion, and net income of $10.9 billion.

218.    In connection with these results, Defendant Foster stated in part:

Despite the adversities faced by Petrobras in 2012, I would like to reiterate my strong belief in the Company's medium and long-term prospects. This Administration fully recognizes the difficulties we face and is working ceaselessly to overcome them. ***Following an extensive and detailed diagnosis of our operating problems,*** we defined priorities and implemented short and medium-term structuring initiatives to improve our financial and economic results.

***I would like to highlight the Executive Board meetings, which are now held twice weekly to focus on the physical and financial monitoring of the principal projects in our investment plan.*** We have also implemented a number of important structural and organizational changes throughout the Company during 2012, enhancing efficiency, while at the same time promoting needed administrative changes. We are fully aware that only the constant pursuit of efficiency will allow us to achieve permanent gains that will improve the Company's long term profitability, which is this Administration's primary objective.

219.    On February 6, 2013, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for 2012, with figures substantially similar to those set forth in the Company's earlier press release.

220.    In connection with Petrobras' Form 6-K setting forth the Company's financial statements for full year 2012, PwC issued a Report of Independent Registered Public Accounting Firm, which contained the following statements:

In our opinion, the accompanying consolidated statement of financial position and the related consolidated statements of income, of comprehensive income, of cash flows and of changes in stockholders' equity present fairly, in all material respects, the financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries (the "Company") at December 31, 2012, and the results of their operations and their cash flows for the year ended December 31, 2012 in conformity with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB). Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the

accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The accompanying consolidated balance sheet of Petróleo Brasileiro S.A. — Petrobras as of December 31, 2011 and the related consolidated statements of income, comprehensive income, shareholders' equity and cash flows for each of the years ended December 31, 2011 and 2010, were audited by other auditors whose report thereon dated March 30, 2012, expressed an unqualified opinion on those statements.

Rio de Janeiro, February 4, 2013

PricewaterhouseCoopers
Auditores Independentes
CRC 2SP000160/O-5 "F" RJ

/s/
Marcos Donizete Panassol
Contador CRC 1SP155975/O-8 "S" RJ

221.    Exhibit 23 to Petrobras' Form 6-K setting forth the Company's financial statements for 2012 contained the following statements:

> We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-163665) of Petróleo Brasileiro S.A. - Petrobras, of our report dated February 04, 2013 relating to the financial statements of Petrobras and the effectiveness of internal control over financial reporting, which is included in Petrobras` Form 6-K dated February 05, 2013.

222.    On March 15, 2013, Petrobras issued a press release announcing that the Company's Board had "approved the 2013-2017 Business & Management Plan (2013-17 BP), with investments of US$ 236.7 [billion]." The 2013-2017 Business Plan set forth the projection that Petrobras would meet the funding requirements for these investments in part by issuing $21.4 billion in debt.

223.    On April 26, 2013, Petrobras issued a press release announcing the Company's results of operations for the first quarter of 2013.  The Company reported total assets of $345 billion including net PP&E of $214 billion, depreciation, depletion, and amortization of $3.2 billion, and net income of $3.9 billion.

224.    In connection with these results, Defendant Foster stated in part:

> *We are doing our homework, and results are being delivered as planned. I constantly monitor the progress of our investment projects and structuring programs with the Directors, Executive Managers, and all other leaders involved. I regard the increased integration between the Company's areas and their teams as extremely positive; the proper management of our project portfolio provides us with the confidence that we will be able to*

76

> *achieve the goals of 2013-17 BMP, which will guarantee the*
> *returns expected by our shareholders and investors*.

225.   On April 29, 2013, Petrobras filed an Annual Report on Form 20-F setting forth

substantially similar figures as those set forth in the Company's earlier press release.

226.   The Annual Report on Form 20-F filed on April 29, 2013, contained PwC's

Report of Independent Registered Public Accounting Firm, with statements described in ¶ 220

above.

227.   Exhibit 15.1 to Petrobras' 2012 Form 20-F contained the following statements by

PwC:

> We hereby consent to the incorporation by reference in the Registration Statement
> on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our
> report dated February 4, 2013 relating to the financial statements and the
> effectiveness of internal control over financial reporting, which appears in this
> Annual Report on Form 20-F.

228.   On April 30, 2013, Petrobras filed a Form 6-K with the SEC setting forth the

Company's financial statements for the period ending March 31, 2013 with figures substantially

similar to those set forth in the Company's earlier press release.

229.   In connection with Petrobras' Form 6-K for the period ending March 31, 2013,

PwC issued a Report of Independent Registered Public Accounting Firm, stating the following:

> We have reviewed the accompanying condensed consolidated statement of
> financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries as of
> March 31, 2013, the related condensed consolidated statement of income, of cash
> flows and of comprehensive income for the three-month periods ended March 31,
> 2013 and March 31, 2012 and the condensed statement of changes in
> shareholders' equity for the three-month period ended March 31, 2013. This
> interim financial information is the responsibility of the Company's management.
>
> We conducted our review in accordance with the standards of the Public
> Company Accounting Oversight Board (United States). A review of interim
> financial information consists principally of applying analytical procedures and
> making inquiries of persons responsible for financial and accounting matters. It is
> substantially less in scope than an audit conducted in accordance with the
> standards of the Public Company Accounting Oversight Board (United States),

the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our review, we are not aware of any material modifications that should be made to the accompanying condensed consolidated interim financial information for it to be in conformity with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB).

We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet as of December 31, 2012, and the related consolidated statements of income, of comprehensive income, of cash flows (not presented herein) and of shareholders' equity for the year then ended, and in our report dated February 04, 2013, we expressed an unqualified opinion on those consolidated financial statements. In our opinion, the information set forth in the accompanying condensed consolidated balance sheet as of December 31, 2012, is fairly stated in all material respects in relation to the consolidated balance sheet from which it has been derived.

/s/ PricewaterhouseCoopers
PricewaterhouseCoopers
Auditores Independentes
Rio de Janeiro, Brazil
April 26, 2013

230.    Exhibit 15.1 to Petrobras' Form 6-K for the period ending March 31, 2013, contained the following statements by PwC:

We are aware that our report dated April 26, 2013 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the three month periods ended March 31, 2013 and March 31, 2012 and included in the Company's quarterly report on Form 6-K for the quarter ended March 31, 2013 is incorporated by reference in its Registration Statement on Form F-3 dated December 12, 2009.

231.    On May 13, 2013, Petrobras issued a press release announcing the pricing of the 2013 Notes, $11 billion in debt securities to be issued by PGF. On May 15, 2013, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2013 Notes.

232.    The 2013 Offering Documents offered the 2013 Notes, which included six series of notes: (1) $1.25 billion of notes paying 2.00% due in 2016 to be sold at $995.84 per $1000 par value; (2) $2 billion of notes paying 3.00% due in 2019 to be sold at $993.52 per $1000 par

value;  (3) $3.5 billion of notes paying 4.375% due in 2023 to be sold at $988.28 per $1000 par

value; (4) $1.75 billion of notes paying 5.625% due in 2043 to be sold at $980.27 per $1000 par

value; (5) $1 billion of floating-rate notes due in 2016 to be sold at par; and (6) $1.5 billion of

floating-rate notes due 2019 to be sold at par.

233.    The 2013 Offering Documents incorporated by reference, among other

documents, the Company's Annual Report on Form 20-F for the year ended December 31, 2012,

filed with the SEC on April 29, 2013, which included descriptions of Petrobras, its asset values,

expenses, net income, and its internal controls.  For example, the incorporated Annual Report on

Form 20-F stated that Petrobras held assets valued at $332 billion, including property, plant, and

equipment valued at $205 billion as of December 31, 2012.

234.    On May 23, 2013, Petrobras issued a press release announcing that the sale of the

2013 Notes had closed on May 20, 2013, noting in part:

> The transaction was executed in one day, with a demand of approximately US$ 42
> billion as a result of more than 2,000 orders. The average interest rate of the notes
> was 3.79% with an average life of 10.37 years. This deal sets the following
> records:
>
> > ➢ Largest Emerging Market USD bond offering ever
> > ➢ 5th largest USD bond offering ever
> > ➢ 2nd largest USD bond offering this year
>
> The final allocation had the following distribution: United States (73%), Europe
> (17%) and Asia (7%), mostly dedicated to the high grade market.
>
>
> The success of the transaction indicates investor confidence in the fundamentals
> of the Company, its growth strategy and its commitment to maintain investment
> grade rating, as indicated by debt ratio targets and significant cash flow.

235.    On July 4, 2013, Petrobras announced the adoption of the Petrobras Corruption

Prevention Program ("PCPP").  Petrobras stated that the PCPP was "aimed at reinforcing the

prevention, detection and correction of acts of fraud and corruption, through integrated

management and improvement of actions and controls in [Petrobras'] governance structure." Defendants represented that through the implementation of the PCPP, Petrobras was taking "continuous actions to prevent, detect and correct acts of fraud and corruption." They assured investors that the PCPP was effective as it was subject to a "periodic evaluation in order to verify its effectiveness and compliance with law."

236. In conjunction with the PCPP, Petrobras posted a Manual on its website, which made the following statements:

- We are committed to rejecting any practices of corruption and bribery, maintaining formal procedures to ensure control and consequences for any violations that occur in our relations with society, government and the state.

- Fraud and Corruption Risk Management: The management of business risks is conducted at a corporate level and deployed at organizational sites… The Internal Audit Area, through the Compliance General Management, is responsible for monitoring compliance risks related to fraud and corruption.

- The results of integrity due diligence are documented and used by our managers to take decisions about the start of the intended commercial relationships and to define the level of monitoring for potential fraud and corruption risks identified.

- Our contractual instruments for the provision of goods and services, asset acquisitions and divestments, and to form and manage partnerships in the Exploration and Production Area, have clauses related to compliance with anti-corruption legislation.

- We carry out integrity due diligence of our suppliers, joint venture partners And counterparties in acquisitions or divestments at the start of our commercial relationship with them, considering the following factors, among others, the geographical location of the company and where it does business; the company's interaction with public agents; its history and reputation; and the nature of the business.

- Integrity due diligence starts by collecting information related to the trustworthiness at the company and its owners, obtained through declarations from the counterparty and/or other reliable sources, with the possible extension of due diligence procedures in proportion to the risks identified.

237.    On August 9, 2013, Petrobras issued a press release announcing the Company's results of operations for the second quarter of 2013.  The Company reported total assets of $338 billion including net PP&E of $204 billion, depreciation, depletion, and amortization of $3.4 billion, and net income of $2.7 billion.

238.    On August 13, 2013, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending June 30, 2013 setting forth figures substantially similar to those set forth in the Company's earlier press release.

239.    In connection with Petrobras' Form 6-K for the period ending June 30, 2013, PwC issued a Report of Independent Registered Public Accounting Firm, making statements substantially similar to those described in ¶ 229 above.

240.    Exhibit 15.1 to Petrobras' Form 6-K for the period ending June 30, 2013, contained the following statements by PwC:

> We are aware that our report dated August 9, 2013 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the six month periods ended June 30, 2013 and June 30, 2012 and included in the Company's quarterly report on Form 6-K for the quarter ended June 30, 2013 is incorporated by reference in its Registration Statement on Form F-3 dated December 12, 2009.

241.    On October 25, 2013, Petrobras issued a press release announcing the Company's results of operations for the third quarter of 2013.  The Company reported total assets of $340 billion including net PP&E of $208 billion, depreciation, depletion, and amortization of $3.3 billion, and net income of $1.5 billion.

242.    On October 28, 2013, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending September 30, 2013 with figures substantially similar to those set forth in the Company's earlier press release.

243.     In connection with Petrobras' Form 6-K for the period ending September 30, 2013, PwC issued a Report of Independent Registered Public Accounting Firm, making statements substantially similar to those described in ¶ 229 above.

244.     Exhibit 15.1 to Petrobras' Form 6-K for the period ending September 30, 2013, contained the following statements by PwC:

> We are aware that our report dated October 25, 2013 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the nine month periods ended September 30, 2013 and September 30, 2012 and included in the Company's quarterly report on Form 6-K for the quarter ended September 30, 2013 is incorporated by reference in its Registration Statement on Form F-3 dated December 12, 2009.

245.     In 2013, the Company also issued a Sustainability Report, where Petrobras again discussed the adoption of its Corruption and Prevention Program "in order to prevent, detect and correct fraud and corruption.  The program and its implementation are based on three aspects: prevention through education and clear policies on the importance of ethics in all our actions; mechanisms capable of detecting fraud or corruption; and a system of consequences to correct past problems . . .   The program's benefits include reduced exposure to legal, image and reputational risk, strengthened corporate governance, centralized efforts for the shared aim of combating fraud and corruption, and improved relationships with stakeholders, such as partners and sources of funding."

### E.     False and Misleading Statements Made in 2014

246.     On February 25, 2014, Petrobras issued a press release announcing that the Company's Board had "approved the 2030 Strategic Plan (SP 2030) and the 2014 — 2018 Business and Management Plan (BMP 2014-2018)."  The 2013-2017 Business Plan set forth the projection that Petrobras would meet the funding requirements for these investments in part by issuing $5.6 billion in debt.

247.     Also on February 25, 2014, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2013.   For 2013, the Company reported total assets of $321 billion including net PP&E of $228 billion, depreciation, depletion, and amortization of $13.2 billion, and net income of $10.8 billion.

248.     In connection with these results, Defendant Foster stated in part:

> 2013 stands out for the successful implementation of our Structuring Programs, which by establishing new benchmarks for productivity and management of investment projects, ***imposed discipline in the use of the company's financial resources.***
>
> Additionally, I would like to notice that ***in the second half of 2013 we implemented the Corruption Prevention Program,*** reaffirming the commitment of the Petrobras Executive Board and of its employees with ethics and transparency at our organization. The program complies with both national and international initiatives against fraud and corruption, as well as with the laws of the countries where Petrobras operates, with positive impacts in the relations with all its stakeholders.

249.     On February 26, 2014, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for 2013 with figures substantially similar to those set forth in the Company's earlier press release.

250.     In connection with Petrobras' Form 6-K for the year ending 2013, PwC issued a Report of Independent Registered Public Accounting Firm, which contained the following statements:

> In our opinion, the accompanying consolidated statement of financial position and the related consolidated statements of income and comprehensive income, changes in equity and cash flows present fairly, in all material respects, the financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries (the "Company") at December 31, 2013, and December 31, 2012, and the results of their operations and their cash flows for the years ended December 31, 2013, and December 31, 2012, in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013 based on criteria established in Internal Control - Integrated Framework  (1992) issued by the

Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Rio de Janeiro, February 25, 2013[34]
/s/ PricewaterhouseCoopers
Auditores Independentes
CRC 2SP000160/O-5 "F" RJ
/s/ Marcos Donizete Panassol
Contador CRC 1SP155975

251.    On March 7, 2014, Petrobras issued a press release regarding its management's

report on internal control over financial reporting, stating in relevant part:

> Our management has assessed the effectiveness of our internal
> control over financial reporting as of December 31, 2013, based on
> the criteria established in Internal Control—Integrated Framework
> (1992) issued by the Committee of Sponsoring Organizations of
> the Treadway Commission (COSO). **Based on such assessment
> and criteria, the Company's management has concluded that
> Company's internal control over financial reporting was effective
> as of December 31, 2013.**

252.    On March 10, 2014, Petrobras filed a Form 6-K/A with the SEC setting forth

substantially the same content as in the March 7, 2014 press release, accompanied by PwC's

Report of Independent Registered Public Accounting Firm, which made statements substantially

similar to those described in ¶ 250 above.

253.    Exhibit A to Petrobras' Form 6-K/A report filed on March 10, 2014, contained the

following statements by PwC:

> We hereby consent to the incorporation by reference in the Registration Statement
> on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our
> report dated February 25, 2014 relating to the financial statements and the
> effectiveness of internal control over financial reporting, which appears in the
> Petróleo Brasileiro S.A. - Petrobras Form 6-K dated February 26, 2014 and the
> related amendment on Form 6-K/A dated March 10, 2014. We also consent to the
> reference to us as experts under the heading "Independent Registered Public
> Accounting Firm" in such Registration Statement. We also consent to the
> reference to us under the heading "Selected Financial Data" in such Registration
> Statement.

---

[34] The signature block contains the wrong date.  PwC's Opinion was issued on February 25,
2014.  The Company and PwC corrected that mistake when Petrobras filed an amended Form 6-
K/A with the SEC on March 10, 2014.

254.     Also on March 10, 2014, Petrobras issued a press release announcing the pricing of the 2014 Notes, $8.5 billion in debt securities to be issued by PGF. On March 11, 2014, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2014 Notes pursuant to the 2012 Registration Statement.

255.     The 2014 Offering Documents offered the 2014 Notes, which included six series of notes: (1) $1.6 billion of notes paying 3.250% due in 2017 to be sold at $999.57 per $1000 par value; (2) $1.5 billion of notes paying 4.875% due in 2020 to be sold at $997.43 per $1000 par value; (3) $2.5 billion of notes paying 6.250% due in 2024 to be sold at $997.72 per $1000 par value; (4) $1 billion of notes paying 7.250% due in 2044 to be sold at $991.66 per $1000 par value; (5) $1 billion of floating-rate notes due in 2017 to be sold at par; and (6) $500 million of floating-rate notes due 2020 to be sold at par.

256.     The 2014 Offering Documents incorporated by reference, among other documents, the Company's report on Form 6-K filed with the SEC on March 7, 2014, containing management's report on internal control over financial reporting described above.

257.     On April 30, 2014, after the market closed, the Company filed an annual report for the year ended December 31, 2013 on Form 20-F with the SEC (the "2013 20-F"), which was signed by Barbassa and Foster, and reiterated the Company's previously announced financial results and financial position. In addition, the 2013 20-F contained signed certifications pursuant to SOX by Barbassa and Foster, stating that the financial information contained in the 2013 20-F was accurate.

258.     The 2013 20-F contained a Report of Independent Registered Public Accounting Firm, issued by PwC, which made statements substantially similar to those described in ¶ 250 above.

259.    Exhibit 15.1 to Petrobras' 2013 20-F contained the following statements by PwC:

We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our report dated February 25, 2014 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Annual Report on Form 20-F.

260.    In addition, the 2013 20-F stated that "Company's "management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013" and "has concluded that Company's internal control over financial reporting was effective as of December 31, 2013."  The Company explained that its "management has not identified any changes in its internal control over financial reporting during the fiscal year ended December 31, 2013, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

261.    The 2013 20-F incorporated the Code, which contained substantially similar language to that described in ¶ 165 above.

262.    The 2013 20-F represented that the Company had established ad hoc internal commissions "to evaluate our compliance with applicable regulations" and the "scope of each internal commission is established by our management."  Significantly the 2013 20-F represented that on "*March 31, 2014, our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations*."

263.    On May 9, 2014, Petrobras issued a press release announcing the Company's results of operations for the first quarter of 2014.  The Company reported total assets of $354 billion including net PP&E of $241 billion, depreciation, depletion, and amortization of $3.0 billion, and net income of $2.4 billion.

264.    In connection with these results, CEO Foster stated in part:

The Company continues to have broad access to the sources of funding necessary for the development of its Business and Management Plan. In the 1Q-2014, we raised US$ 22.8 billion, mainly by issuing bonds in the U.S. and European markets, which allowed us to end the quarter with strong liquidity of US$ 34.7 billion in cash, considering the balance of cash, cash equivalents and government bonds. These resources are sufficient to finance investments in 2014 . . .

*I would like to register, once again, the commitment of Petrobras Executive Board and of its employees with ethics and transparency at our organization, as expressed when we launched in the 2nd half of 2013, the Corruption Prevention Program. All the allegations presented are and will continue to be investigated through the mechanisms created for this specific purpose*.

265.    On May 12, 2014, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending March 31, 2014 with figures substantially similar to those set forth in the Company's earlier press release.

266.    In connection with Petrobras' Form 6-K for the period ending March 31, 2014, PwC issued a Report of Independent Registered Public Accounting Firm, making statements substantially similar to those described in ¶ 229 above.

267.    Exhibit 15.1 to Petrobras' Form 6-K for the period ending March 31, 2014, contained the following statements by PwC:

We are aware that our report dated May 9, 2014 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the three-month periods ended March 31, 2014 and March 31, 2013 and included in the Company's quarterly report on Form 6-K for the quarter ended March 31, 2014 is incorporated by reference in its Registration Statement on Form F-3 dated August 29, 2012.

268.    On May 27, 2014, fifteen days before Foster testified on June 11, 2014 before a congressional investigation committee, the Comissao Parlamentar de Inquerito ("CPI"), Petrobras received a letter from SBM warning the Company that Netherland's Public Ministry

was inquiring into bribery payments, by SBM to Petrobras' employees.[35]  Notwithstanding that knowledge, Foster falsely represented to the CPI and to the investing public in her testimony on June 11, 2014, that no irregularities were discovered, even though "she knew about several evidences of irregularities"[36] before her testimony on June 11, 2014.

269.    On August 8, 2014, Petrobras issued a press release announcing the Company's results of operations for the second quarter of 2014. The Company reported total assets of $363 billion including net PP&E of $254 billion, depreciation, depletion, and amortization of $3.5 billion, and net income of $2.3 billion.

270.    On August 11, 2014, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending June 30, 2014 with figures substantially similar to those set forth in the Company's earlier press release.

271.    In connection with Petrobras' Form 6-K for the period ending June 30, 2014, PwC issued a Report of Independent Registered Public Accounting Firm, making statements substantially similar to those described in ¶ 229 above.

272.    Exhibit 15.1 to Petrobras' Form 6-K for the period ending June 30, 2014, contained the following statements by PwC:

> We are aware that our report dated August 8, 2014 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the six month periods ended June 30, 2014 and June 30, 2013 and included in the Company's quarterly report on Form 6-K for the quarter ended June 30, 2014 is incorporated by reference in its Registration Statement on Form F-3 dated August 29, 2012.

---

[35] *Opposition Party Demands Graca Foster's Immediate Withdrawal From Petrobras' Presidency*, FOLHA DE S.PAULO, November 20, 2014.

[36] *Id.*

**F.      Reasons Why Statements Made in 2010-2014 Were False and Misleading**

273.     The statements made in ¶ 159 above that the Comperj project "is in line with Petrobras' 2009-2013 Business Plan which foresees investments in the order of $5.6 billion to the petrochemical segment" and that it is "in line with the Company's objectives to approve long-term sustainable investments that offer high returns to its shareholders" were false and misleading because Petrobras  failed to disclose that contracts worth billions of dollars related to the Comperj project were given without bidding and Petrobras' management had been reckless in the omission of technical analysis, overpaying for contracts and operating without a lack of effective controls.

274.     The Company's reported numbers for total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income numbers were false and misleading because (i) the reported carrying value of the Company's assets was false and misleading as the costs associated with the repayment of bribe-related expenses to contractors had been incorporated into certain assets at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their carrying values; and (ii) had the illegal bribe-related payments been properly accounted for, the Company would have immediately recognized materially greater expenses and less net income.  Moreover, these statements were materially false and misleading because the Company failed to disclose that the carrying value of the Company's PP&E was adversely impacted by illegal activities that inflated the carrying values of numerous construction contracts related to Petrobras' refineries and operations.

275.     Defendant Gabrielli's statements in ¶ 161 above were false and misleading because,  rather than permitting a competitive bid process, Petrobras was awarding inflated

contracts in exchange for bribery payments to a selected cartel of companies, thereby foreclosing any type of competitive bids.

276.    Defendant Gabrielli's statements in ¶162 above responding to the question why the Abreu e Lima refinery is estimated to cost twice as much as other refineries of similar complexity in US and Europe were false and misleading because Petrobras failed to disclose that most of the increase in the cost of the refinery was due to unnecessary add-on-contracts awarded to the cartel companies and to unnecessary additional to the project, resulting in further kickbacks to political parties and to Petrobras' Directors.

277.    The statements regarding the Company's internal controls were materially false and misleading because Petrobras suffered from material weaknesses in its disclosure controls and procedures, and in its internal controls over financial reporting.  These material weaknesses permitted Defendants to engage in an unprecedented bribery scheme, involving dozens of Petrobras executives and thousands of employees.  Moreover, such weaknesses allowed Petrobras to capitalize the bribe repayments (i.e. the inflated payments under the contract) and treat them as part of those assets' carrying values when recorded on Petrobras' balance sheet, artificially inflating their values, and permitted Defendants to improperly report materially lower expenses and greater net income.  The statements regarding Petrobras' internal controls were materially false and misleading also because Petrobras did not provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

278.    The statements related to Petrobras' corruption prevention and ethics programs were false and misleading because Petrobras executive were accepting hundreds of millions in bribes from a cartel of builders in return for granting the cartel members inflated contracts paid

with money diverted from Petrobras. Some of the bribes were in turn funneled into political contributions to prop politicians of Brazil's ruling coalition to which Petrobras executives belonged. This price-fixing, bribery, and political kickback scheme was hidden from investors. Brazilian authorities allege that during its course, this illegal activity diverted up to $28 billion from Petrobras' coffers.

279. Defendant Gabrielli's statements in ¶¶ 167 and 190 above were false and misleading because Petrobras did not operate with transparency, did not follow the best practices of corporate governance, and did not invest its resources with efficiency and discipline to ensure returns for its shareholders, investors and society as a whole. Petrobras was engulfed in a money-laundering and graft scheme, whereby Petrobras executives and other officials accepted bribes from companies to whom Petrobras awarded inflated construction contracts and then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves. Petrobras continuously tried to cover-up any inquiry into the bribery and corruption, as evidenced by Fonseca's testimony, the squelching of the 2009 inquiry, and the Company's March 2014 statement claiming that Petrobras' "internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations."

280. Defendant Foster's statements in ¶¶ 206, 218, 224 and 248 above regarding capital discipline and financial monitoring were materially false and misleading because during the Class Period Petrobras' executives were granting contracts to a cartel of construction companies that systemically inflated their costs by as much as 20%. Defendant Foster's statements in ¶ 264 above regarding Petrobras' transparency and compliance with ethics were false and misleading for the reasons set forth in ¶ 278 above.

281.    PwC's representations made above were false and misleading because (i) the reported carrying value of the Company's assets was materially inflated because costs associated with the repayment of bribe-related expenses to contractors had been incorporated into certain asset carrying values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet; and (ii) had the illegal bribe-related payments been properly accounted for, the Company would have recognized materially greater expenses and less net income.  In addition, PwC intentionally or recklessly ignored material weaknesses regarding Petrobras' internal controls as described herein and had no reasonable basis upon which to issue their statements.

282.    Petrobras' statement made in ¶ 262 above that on "March 31, 2014, our internal commission established to evaluate bribery allegations involving SBM Offshsore confirmed that it found no internal evidence to support such allegations" was false and misleading because Defendants were in fact aware that Petrobras executives had accepted $139 millions of dollars in bribes from SBM.  As detailed in the Complaint, Defendant Gabrielli also stymied the TCU's investigation into the massive overpayment of the P-57 offshore rig.

## VIII.    ADDITIONAL ALLEGATIONS RELATED TO THE SCHEME

283.    On November 9, 2012, Bloomberg reported that according to the Brazilian news magazine Veja, the Brazilian Federal prosecutor Marinus Marsico has requested information from Petrobras to confirm it spent $1.1 billion to acquire the Pasadena refinery in Texas that it is now looking to sell.[37]  Delta Airlines bought a similar refinery on April 30, 2012, for only $150 million, Veja said.  It was reported that the prosecutor's office may open an investigation,

---

[37]    Vega is a Brazilian weekly news magazine published in Sao Paulo and distributed throughout Brazil by media conglomerate Grupo Abril.  It is the leading weekly publication in the country and one of the most influential outlets of the Brazilian press.

depending on Petrobras' reply.  On this news, Petrobras' shares declined 1.96% the next trading day on November 12, declined an additional 1.49% on November 13, declined an additional 2.61% on November 14, declined an additional 1.39% on November 15, and declined an additional 1.47% on November 16, a total decline of 8.92% over the five trading days.

284.   On February 14, 2014, it was reported by *Bloomberg* that Petrobras started in internal investigation related to allegations of bribery payments made by SBM Offshore. Over the next two days that markets were opened for trading, further details about the allegations came to light. On February 18, 2014, *Bloomberg* reported that the Brazilian Comptroller asked Petrobras for information related to the contracts signed with SBM.  *Bloomberg* also reported that on February 18, 2014, Foster publicly acknowledged the Company's internal investigation into the SBM bribery allegations. As a result of this news, Petrobras' common ADSs declined for three consecutive trading sessions beginning on February 14, 2014, for a total drop of $0.42 or 3.75%, to close at $10.77 on February 19, 2014. Petrobras' preferred ADSs also declined during these three consecutive trading sessions for a total drop of $0.47 or 4.04%, to close at $11.15 on February 19, 2014.  There was a similar decline in debt securities.

285.   On March 12, 2014, it was reported that Brazilian lawmakers assembled a committee to investigate kickbacks made to Petrobras by the Dutch firm SBM Offshore, a company that leases floating oil platforms and vessels.  A former SBM employee blew the whistle, alleging that $139 million in bribes were paid to Petrobras officials through intermediaries.[38]   The quid pro quo arrangement gave SBM, in turn, preferential treatment for contracts.   "What is happening now with Petrobras, with its shares falling, is the result of misappropriation of public funds . . . .," exclaimed opposition Social Democrat lawmaker Vanderlei Macris after the committee's formation was announced.  *Id.*

---

[38] *See* Digital Journal Blog, *Brazil Investigates Alleged Petrobras Graft Case*, March 12, 2014.

286. Over the next five days, covering three trading sessions, a string of news articles was published disclosing new details about the scope and size of the investigation and painting a worsening picture for Petrobras. On March 13, 2014, it was reported in the Brazilian newspaper *O Globo* that members of Brazilian parliament were arguing for expansion of the special commission to investigate bribery allegations, because of fear that some members of the Brazilian government were loyal to Petrobras and its executives.

287. Also, on March 13, 2014, *Folha* published an article stating that Brazilian federal police had started a criminal investigation into allegations that Petrobras officials received bribes from SBM.

288. On March 14, 2014, it was repoted by *O Globo* that the TCU, which had previously opened inquiries into Petrobras' dealings with Odebrecht, Abreu e Lima and Comperj refineries, now opened an investigation into the bribery allegations related to SBM.

289. On March 14, 2014, after the close of trading, *Bloomberg* reported that Opposition lawmaker Antonio Imbassahy proposed a road-map for the congressional commission charged with investigating Petrobras. The road map was presented to leaders of the Brazilian legislature. The following proposals were included in the road map:

- Once the commission is formed to investigate the corruption investigation, it would seek meetings with Petrobras executives.

- Commission would seek assistance from the Prosecutor General's office to obtain access to a separate corruption probe taking place in the Netherlands, in which Petrobras is named.

- Following meetings in Brazil, the commission would travel to the Netherlands to meet and work with Dutch Justice Ministry and other Government agencies investigating SBM Offshore as well as with Dutch Parliament.

  - Congress must "supervise" Petrobras

290. On March 17, 2014, Petrobras issued a press release announcing that the Company's Board had approved the Company's financial statements for 2013 by a majority vote. The announcement went on to note that:

> Director Mauro Rodrigues da Cunha *voted against the approval of the Financial Statements* of Petrobras due to: (i) lack of timely dispatch of the financial statements to the Directors to analyze; (ii) disagreement with the hedge accounting policy; and (iii) *lack of information and apparent accounting inadequacy of refinery investments.*

291. Also on or about March 17, 2014, the DPF launched operation Car Wash, focused on a scheme run by black-market money dealers who are thought to have illegally transferred and laundered approximately $3.8 billion using, among other things, the purchase and sale of luxury automobiles.

292. On the news that came out between March 13, 2014 and March 17, 2014, Petrobras' common ADSs declined for three consecutive trading sessions, falling $0.14 or 1.35%, $0.17 or 1.67%, and $0.09 or 0.90 % respectively, on March 13, 2014, March 14, 2014, and March 17, 2014, for a total three day decline of $0.40 or 3.87%, to close at $9.94 on March 17, 2014. Petrobras' preferred ADSs also declined for three consecutive trading sessions, falling $0.19 or 1.79%, $0.17 or 1.63%, and $0.17 or 1.66 % respectively, on March 13, 2014, March 14, 2014, and March 17, 2014, for a total three day decline of $0.53 or 5% to close at $10.08 on March 17, 2014.

293. On April 8, 2014, *Bloomberg* reported that leaders of the opposition parties filed an injunction with Brazil's Supreme Court to guarantee creation of a parliamentary commission to investigate exclusively, Petrobras' purchase of Pasadena. On the news, Petrobras' common ADSs declined $0.30 or 2.11%, to close at $13.92 and Petrobras' preferred ADSs declined $0.35 or 2.36%, to close at $14.48 on April 8, 2014. On April 9, 2014, the Brazil Senate approved a broader probe involving Petrobras. On this news, Petrobras' common ADSs declined $0.09 or

0.65%, to close at $13.83 and Petrobras' preferred ADSs declined $0.08 or 0.55%, to close at $14.40 on April 9, 2014. The decline in Petrobras securities continued the next trading day as Petrobras' common ADSs declined $0.13 or 0.94%, to close at $13.70 and Petrobras' preferred ADSs declined $0.19 or 1.32%, to close at $14.21 on April 10, 2014. The total decline over three days was $0.52 or 3.66% for Petrobras' common ADSs and $0.62 or 4.18% for Petrobras' preferred ADSs.

294.    On April 15, 2014, during the trading session, CEO Foster appeared before the Senate of Brazil to offer testimony relating to the Company's purchase of the Pasadena Refinery and allegations regarding bribery.  As part of her statement, CEO Foster revealed that Petrobras was conducting a re-evaluation of all contracts that could have been the subject of participation by Costa.  On this news, Petrobras' common ADSs declined ($0.55) or 3.96% to close at $13.33 on April 15, and Petrobras' preferred ADSs declined ($0.61) or 4.24% to close at $13.77 on April 15, 2014.

295.    On April 22, 2014, an article was published by *Folhade S.Paulo* that provided details into the purchase of the Pasedena refinery. The article stated that that in 2007 the Astra group which originally owned the Pasedena refinery and sold half of it to Petrobras, offered to buy back Petrobras' share in the refinery. Petrobras refused, and in the end, after an extensive legal battle, Petrobras purchased the remaining half still owned by Asra for $885 million bringing to total purchase price for the Pasedena refinery to $1.25 billion. The refinery was originally purchased by Astra for only $42.5 million in 2005.

296.    On this news, Petrobras' common ADSs declined $0.37 or 2.65%, to close at $13.60 and Petrobras' preferred ADSs declined $0.31 or 2.12%, to close at $14.29 on April 22, 2014.

297.    On April 25, 2014, the Brazilian newspaper *O Estado de Sao Paulo* reported that an ex-Petrobras official was accused of money laundering. According to the report, the Federal Court opened a criminal proceedings against the director of the Petrobras supply division. Specifically, According to the investigation, the embezzlement transactions lasted from 2009 to 2014 and are related to the payment of overpriced contracts to companies who directly or indirectly rendered services to Petrobras, and involved assistance from Costa.

298.    On this news, Petrobras' common ADSs declined $0.23 or 1.68%, to close at $13.50 and Petrobras' preferred ADSs declined $0.21 or 1.45%, to close at $14.27 on April 22, 2014.  There was a similar decline in debt securities.

299.    On May 8, 2014, *Valor* reported that Petrobras would postpone concluding it internal investigation into the Pasedena refinery purchase for thirty days. It was expected that the internal investigation, which began on March 24, 2014, would be complete in forty-five days. The findings were to be submitted to the Comptroller, TCU, and other Brazilian regulatory bodies. On this news, Petrobras' common ADSs declined $0.48 or 3.07%, to close at $15.18 and Petrobras' preferred ADSs declined $0.58 or 3.46%, to close at $16.19 on May 8, 2014.  There was a similar decline in debt securities.

300.    On May 14, 2014, after the close of trading, the Wall Street Journal reported that the Brazil Senate opened the probe into Petrobras' purchase of the Pasedena refinery. The first action of the Senate panel performing the investigation, was to vote on a list of people that would be called before the panel to testify. The article stated that "Petrobras' current chief executive officer, Maria das Graças Silva Foster, and the CEO before Ms. Foster, José Sergio Gabrielli, are expected to testify next week."

301.    On this news, Petrobras' common ADSs declined $0.32 or 2.05%, to close at $15.18 and Petrobras' preferred ADSs declined $0.24 or 1.45%, to close at $16.27 on May 15, 2014.

302.    On June 17, 2014, *Estado* reported that another refinery owned by Petrobras has come under investigation by Brazilian authorities. According to the article, the Federal Public Ministry suspects that the Repar refinery in Paraná was subjected to the same scheme that was alleged to have been perpetuated in the Abreu e Lima Refinery, in Pernambuco. According to the article, the Ministry suspects that contracts were overpriced in the Paraná refining unit and the payments in excess of the true value would later be laundered. Some of the money may have been transferred to companies that are linked to Costa and Alberto Youssef. Petrobras contracted for the work in Paraná at $ 7.5 billion while a report from the Federal Police, made in April, states that calculations show that the contracts were overpriced by of BRL $ 1.4 billion.

303.    On this news, Petrobras' common ADSs declined $0.28 or 1.77%, to close at $15.52 and Petrobras' preferred ADSs declined $0.35 or 2.08%, to close at $16.44 on June 17, 2014.  There was a similar decline in debt securities.

304.    On August 12, 2014, after the market closed, *Bloomberg News* reported that a Petrobras-linked money laundering probe had spread to banks. In the article, it stated that prosecutors were investigating whether financial institutions met compliance requirements.

305.    On this news, Petrobras' common ADSs declined $0.72 or 4.45%, to close at $15.46 and Petrobras' preferred ADSs declined $0.84 or 4.88%, to close at $16.37 on August 13, 2014.

306.    On September 7, 2014, after the market closed, *Bloomberg News* reported that information was being leaked "to local media from a police investigation into alleged kickbacks

involving [Petrobras] in an attempt to alter the results of the October national election."[39]   The article cites a Brazilian, magazine, *Veja*, which reported that Costa revealed "a group of politicians, including members and allies of Rousseff's Workers' Party" had accepted bribes linked to Petrobras contracts.  On this news, Petrobras' common ADSs declined $1.03 per ADS or more than 5%, to close at $18.35 on September 8, 2014, and Petrobras' preferred ADSs declined ($1.03) or 5.08% to close at $19.24 on September 8, 2014.  There was a similar decline in debt securities.

307.    On September 8, 2014, after the market closed, Petrobras acknowledged the corruption at the Company by issuing a statement concerning Costa's arrest and the federal criminal investigation.  Specifically, a statement issued by Petrobras stated, in part:

> It is in the best interests of the company's management to see the completion of all ongoing investigations. Any irregular acts that may have been committed by a person or group of people, whether or not they are company-employees, do not represent the conduct of the Petrobras institution and its workforce.

308.    On this news, Petrobras' common ADSs declined $0.52 per ADS or nearly 3%, to close at $1 7.83 per ADS on September 9, 2014, and Petrobras' preferred ADSs declined ($0.53) or 2.75%, to close at $18.71 on September 9, 2014.   There was a similar decline in debt securities.

309.    On September 30, 2014, after the market closed, *Bloomberg News* published an article stating that Duque "stamped and signed at least 6.6 billion Brazilian reais ($2.7 billion) in contracts for the Abreu e Lima refinery" and recommended to Petrobras' executive board to approve the over-billed contracts in late 2009.[40]  Further, Costa had revealed to prosecutors that

---

[39]  Bloomberg, *Rousseff Ally Says Petrobras Scandal Seeks to Derail Brazil Vote*, September 7, 2014.

[40]  Bloomberg, *Probed Petrobras Contracts Reveal Other Signature*, September 30, 2014.

"misappropriation of funds also existed in other divisions including the one Duque headed."[41] On this news, Petrobras' common ADSs declined $0.89 per ADS or more than 6%, to close at $13.30 per ADS on October 1, 2014, and Petrobras' preferred ADSs' declined ($0.53) or 2.75% to close at $18.71 on October 1, 2014.

310.    On or about October 9, 2014, recordings of testimony by Costa given in Brazilian court were released.  As part of his statement, Costa testified that bribes had been paid in connection with the award of contracts by Transpetro, a segment of Petrobras, implicating Sergio Machado ("Machado"), then the director of Transpetro.  Costa also testified that kickbacks were paid to members of the Workers' Party, the political party of the President of Brazil, Dilma Rousseff ("Rousseff").  According to an article by *The Wall Street Journal*, Costa "alleged that a certain percentage of contracts at the refining unit at Petrobras were to go to members of the Workers' Party."[42]   The release of Costa's testimony by the Brazilian federal court, as independently confirmed by *TheStreet.com* caused Petrobras' common ADSs to decline $1.15 per ADS or nearly 7%, closing at $15.62 per ADS on October 10, 2014, and Petrobras' preferred ADSs declined ($1.22) or 6.87% to close at $16.55 on October 10, 2014.

311.    On October 15, 2014, the Administrative Council for Economic Defense ("CADE") an agency of the government of Brazil which was set up to combat corruption, announced that it will formally investigate the existence of a cartel involving enterprises that have contracts with Petrobras.

312.    On this news, Petrobras' common ADSs declined $1.55 or 9.06%, to close at $15.55 and Petrobras' preferred ADSs declined $1.58 or 8.73%, to close at $16.51 on October 15, 2014.

---

[41]   *Id.*
[42]   The Wall Street Journal, *Ex-Petrobras Executive Says Kickbacks Were Paid to Ruling Party's Officials*, October 9, 2014.

313.     On October 16, 2014, prior to the trading session, news reports circulated of a report issued by the TCU criticizing the management of the construction of the COMPERJ facility, describing the project's management as "reckless" and identifying concerns about inflated contracts costs.  The TCU report stated that Petrobras will spend 60 percent more than originally budgeted at one of its refineries.[43]  Specifically, the TCU concluded that Petrobras will pay $21.6 billion to complete the Complexo Petroquimico do Rio de Janeiro ("Comperj") complex.  Comperj is an integrated refining and petrochemical complex that broke ground in 2008, began construction in 2010 and is scheduled to start up on 2015.  The TCU found "discrepancies between different government agencies, as well as within different Petrobras divisions, over investment needed for Ccimperj."  Moreover, the TCU concluded that Petrobras' management had been "reckless with irregularities in the omission of technical analyses, overpaying for contracts and a lack of effective controls."  One member of the TCU commented that it was "investigating how the structure of Petrobras can undertake such a huge project in such a sloppy way."  The TCU found "irregularities in three contracts: two that were overpaid and one that was signed in an 'emergency' time-frame that didn't allow other companies to bid."  On this news, Petrobras' common ADSs declined $1.05 per ADS or nearly 7%, to close at $14.50 per ADS on October 16, 2014, and Petrobras' preferred ADSs declined ($1.30) or 7.87% to close at $15.21 on October 16, 2014.  There was a similar decline in debt securities.

314.     On October 18, 2014, during a news conference during the day, Rousseff admitted that there was embezzlement of public money in Petrobras and that the Brazilian government would seek reimbursement of any money illegally diverted from the Company. Petrobras' common ADSs declined $0.93 per ADS or more than 6%, to close at $14.00 per ADS

---

[43]   Bloomberg, *Petrobras Accused of Recklessness by Audit Court on Overruns*, October 16, 2014.

on October 20, 2014, and Petrobras' preferred ADSs declined ($1.08) or 6.90% to close at $14.57 on October 20, 2014.

315.   On October 20, 2014, after the market closed, *Bloomberg News* published a detailed article about the money laundering and bribery scheme.  The article noted that Costa had admitted to investigators through his testimony on October 8; 2014, that for at least, seven years, he and other Petrobras officials accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and "then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves."[44]  The article further stated that Costa had admitted that he personally received tens of millions of dollars and called the bribes from the companies a "three percent political adjustment."  Costa named several construction companies that were part of the cartel including Odebrecht and Camargo Correa S.A.  The article continued that, as part of the criminal case against Costa, prosecutors emphasized that there was "evidence of fraud, overpricing and kickbacks" in at least seven contracs, including one contract for a 3.4 billion Brazilian reais coking unit and another contract for a 3.19 billion Brazilian reais hydro-treater and related units. The contract for the coking unit was cited by prosecutors as evidence of overpricing and over-billing of as much as 446 million Brazilian reais.  Indeed, according to federal court documents reviewed by *Bloomberg News,* Costa and Duque signed off on the coking unit and hydro-treater contracts and they sent them to Petrobras' executive board, where they were approved. Moreover, in response to Costa implicating Duque in the bribery investigation related to RNEST, Duque responded that the "final decision on all contracts is made collectively by directors and the CEO."  The article also noted that Costa had implicated Youssef for creating fake import

---

[44]   Bloomberg, *Petrobras 'Human Bomb' Revelations Fixate Brazil as Vote Looms*, October 20, 2014.

Companies to launder the kickbacks.  Consequently, Youssef had revealed to prosecutors and police in his own testimony "how he laundered money overseas from overpriced Petrobras contracts and how he distributed money from construction companies, in cash, to politicians."

316.  Also on October 20, 2014, it was reported that an audit conducted by the TCU related to Comperj found that the project was "riddled with delays, cost overruns and reckless management."[45]

317.  As a result of the revelations that occurred on October 20, 2014, Petrobras' common ADSs declined $0.80 per ADS or nearly 6%, to close at $13.20 per ADS on October 21, 2014, and Petrobras' preferred ADSs declined ($0.98) or 6.73% to close at $13.59 on October 21, 2014.  There was a similar decline in debt securities.

318.  On October 22, 2014, after the markets closed, *Bloomberg* reported securities regulators would also begin an inquiry into whether Petrobras violated securities laws.  The article stated, in part:

> The CVM, as the securities agency is known, announced the "administrative procedure" on its website yesterday without providing details. The regulator's press office declined to comment on the case when contacted by telephone. Petrobras declined to comment on the CVM probe in an e-mailed response.

319.  On this news, Petrobras' common ADSs declined $0.72 or 5.61%, to close at $12.11 and Petrobras' preferred ADSs declined $0.88 or 6.65%, to close at $12.36 on October 23, 2014.  There was a similar decline in debt securities.

320.  On October 27, 2014, Petrobras issued a press release entitled "Internal steps taken by Petrobras in response to 'Lava Jato Operation.'"  The Company noted that it was taking certain steps in response to the developing investigation, including:

---

[45]  ICIS News, *Overruns, recklessness riddle Petrobras Comperj project—audit*, October 20, 2014.

sign[ing] contracts with two independent investigation companies, a Brazilian and an American, with the aim of examining the nature, extension and impacts of the actions that might have been performed against the Company in the context of what have been said by former Director Paulo Roberto Costa. These companies will also analyze correlated facts and circumstances that might have material impact over the Company's business.

321.    On this news, Petrobras' common ADSs declined $1.77 per ADS or nearly 14%, to close at $11.16 per ADS on October 27, 2014, and Petrobras' preferred ADSs declined ($1.97) -14.64% to close at $11.49 on October 27, 2014.

322.    On November 1, 2014, the Brazilian newspaper *O Estado de Sao Paulo* reported that Petrobras' auditor, PricewaterhouseCoopers ("PwC") had declined to sign off on the Company's third quarter financial results in light of the money-laundering and bribery investigations.  Specifically, PwC refused to sign off on the financial results for one of Petrobras' subsidiaries, Transpetro, as they were signed by Sergio Machado ("Machado"), the Petrobras executive implicated by Costa.  PwC urged the Company to take action to dismiss Machado.  On November 3, 2014, Machado agreed to take a 31-day unpaid leave of absence.   Also on November 3, 2014, Petrobras issued a press release announcing that Machado had "presented a letter to the Board of Directors of this subsidiary requesting a non-paid leave for the next 31 days."  On this news, Petrobras' common ADSs declined ($0.44) or 3.76% to close at $11.26 on November 3, 2014, and Petrobras' preferred ADSs declined ($0.56) or 4.58% to close at $11.67 on November 3, 2014.  There was a similar decline in debt securities.

323.    On November 9, 2014, The Financial Times reported that the U.S. Department of Justice ("DOJ") had opened a criminal investigation on whether Petrobras or its employees were paid bribes and that the SEC had opened a civil investigation into the matter.[46] Specifically, *The*

---

[46]  Financial Times, *US Turns Up Heat With Criminal Investigation Into Petrobras*, November 9, 2014.

*Financial Times* reported that the DOJ and the SEC were investigating whether Petrobras or its employees, middlemen or contractors had violated the Foreign Corrupt Practices Act.

324. On this news, Petrobras' common ADSs declined $0.28 per ADS or 2.5%, to close at $10.62 on November 10, 2014, and Petrobras' preferred shares declined ($0.23) or 2.04% to close at $11.04 on November 10, 2014. There was a similar decline in debt securities.

325. On November 13, 2014, after the market closed, the Company issued a press release acknowledging that if the allegations in Costa's testimony were true, they "could potentially impact the Company s financial statements." As a result, the Company delayed releasing the financial statements for the third quarter 2014, stating that since it would need additional time to:

> (i) deeply analyze the investigation in course; (ii) adjust the Company based on the allegations of "Operacao Lava Jato;" and. (iii) evaluate the need of improving governance control, the Company isn't ready to publish its balance sheet regarding the third quarter of 2014 on this date.

326. Then, on November 14, 2014, prior to the trading session, Petrobras revealed that it would "release its third quarter 2014 financial statements, ***without a review by its Independent Auditors.***" Petrobras further noted that:

> In light of the ongoing investigations, ***it is currently not possible for the Company to determine an estimated date*** for the disclosure of its Quarterly Financial Statements (ITR) for the period ended 09.30.2014, together with the review report issued by the Independent Auditors.

327. That same day, it was reported in various media outlets including *Reuters*, that the Brazilian police issued 27 arrest warrants and, arrested 18 individuals including Duque and Erton Medeiros Fonseca, a director of engineering and infrastructure at Galvao Engenharia S.A. Also,

one of Petrobras' contractors, Odebrecht, confirmed that "its offices in Rio de Janeiro had been searched and documents seized."[47]

328.   On November 14, 2014, Bank of America/Merrill Lynch downgraded Petrobras' stock following revelations of lack of management integrity on the market:   "We are downgrading Petrobras' stock from Buy to Neutral, following postponement of its third quarter earnings release until December 12 due to uncertainty as to financial effects of results of an investigation by the Brazilian Federal Police into charges of money laundering and organized crimes allegedly committed by a former director of the company and other individuals."

329.   On this news, Petrobras' common ADSs declined $0.25 per ADS or nearly 2.5%, to close at $9.95 on November 14, 2014, and Petrobras' preferred ADSs declined ($0.29) or 2.76% to close at $10.23 on November 14, 2014.  There was a similar decline in debt securities.

330.   On November 17, 2014, Petrobras hosted a conference call for analysts and investors to discuss certain aspects of the Company's operations for the third quarter of 2014, provide additional detail regarding the Company's delayed financial statements, and offer commentary on the effects on Petrobras of the unfolding bribery accusations.

331.   In connection with these results, CEO Foster stated in part:

In light of the accusations and investigations of [O]peration Car Wash . . . Petrobras is unable to publish its third-quarter 2014 financial statements because these accusations, if found to be true, could potentially affect the Company's financial statements.

A determining fact took place on October 8, 2014, when the depositions of former Downstream Executive Director, Mr. Paulo Roberto Costa, and Mr. Alberto Youssef, in a hearing at the 13th Federal Court of Parana, revealed information that may lead to possible adjustments in the financial statements of our Company.

Because of these depositions, therefore, ***we need more time to make any possible adjustments to the financial statements.*** More time is needed as well to gain

---

[47]   Reuters, *Petrobras Ex-Director Arrested, Shares Sink Amid Graft Scandal*, November 14, 2014.

greater understanding from the ongoing investigations by the independent law firms; and *we need more time, as it is fundamentally important to improve our internal controls.*

Later, during the question-and-answer portion of the call, CFO Barbassa and CEO Foster engaged in the following exchanges in part:

> [Analyst]: [I]f we suppose . . . BRL5 billion of overprice in the construction of [an asset], how would this be recognized in the balance sheet of the Company? What are the main line items that would be impacted?

> **CFO Barbassa:** The adjustment that perhaps could be impacted if the accusations are proven to be true would refer to adjustments at fair price of the PP&E that was acquired. . . . In this case, *this value should be removed from PP&E line item [adjusted] value* and should be taken to the result.

> **CEO Foster:** As for the amounts that we would be writing down in terms of our results, our official reference are the depositions made in court. This was what the judges are calling evidence, temporary evidence. So in this case, we have a schedule of activities and we have deadlines to each one of these activities.

> For example, there is definition of criteria to measure the effects of losses caused by fraud. In here, *in an objective and material fashion, our reference will be the depositions made so far,* the evidence provided that will be submitted to Petrobras by the Federal Police. *We will then use this evidence to have our writedowns, and do the write-downs year after year* regarding companies A, B, C or D that we might have contracted.

Later in the day, in an article published by *Agencia Brasil,* Foster confirmed that SBM bribed Petrobras employees to win contracts. Foster stated that due to the "overwhelming evidence of noncompliance," SBM "will no longer be eligible to bid for further contracts with Petrobras."[48]  Moreover, Foster admitted the following: "We [were] informed in the past that we had identified no irregularities at this matter. After a few weeks or months, I was informed that there were indeed bribes to employees or former employees of Petrobras." Jose Formigli, Petrobras' Head of Exploration and Production, also revealed the following:

The CEO received a call and a letter where SBM said it had been told of credits to

---

[48]   Agencia Brasil, *Petrobras CEO Admits SBM Offshore Bribed Officials*, November 18, 2014.

accounts in Switzerland by Public Prosecution in the Netherlands. This overwhelming evidence outright – it's the company's own admission that I was aware of [the bribery].

332.    As a result of the Company's conference call and revelation of SBM bribing Petrobras' employees, Petrobras' common ADSs declined $0.62 per ADS or 6%, to close at $9.33 per ADS on November 17, 2014, and Petrobras' preferred ADSs declined ($0.59) or 5.77% to close at $9.64 on November 17, 2014.

333.    On November 20, 2014, it was reported in various media outlets in Brazil that a request was made to the Brazilian Prosecutor's Office in the Federal District and the Public Prosecutor at the Federal Audit Court for the immediate dismissal of Foster as the CEO of Petrobras and to establish a criminal inquiry into the matter.  According to a news article published by *Folhade S.Paulo*, the request argued that Foster did not testify truthfully herself when she testified at a hearing on June 11, 2014 before a congressional investigation committee looking into the scandal, the Comissao Parlamentar de Inquerito.[49]  Specifically, Foster testified falsely that Petrobras didn't receive any warning from Netherland's authorities concerning bribery payments by SBM to Petrobras' employees.

334.    On November 24, 2014, a similar article in Brazilian newspaper *Globo*, reported that at the June 11, 2014 hearing Foster was asked if Petrobras had identified any evidence of payments amounting to $139 million to Petrobras employees or executives by SBM. Forster answered that the Company's internal committee "did not identify, within its activities and scope, payments of any benefits to any of our employees." Next, Foster was asked whether Petrobras already knew about the suspicion of bribery to Petrobras employees since 2012. Foster answered, "I do not confirm this information."

---

[49]  Folha De S.Paulo, *Opposition Party Demands Graca Foster's Immediate Withdraw From Petrobras' Presidency*, November 20, 2014.

335.   Also on November 24, 2014, prior to the trading session, Petrobras issued a press release announcing that the Company had received a subpoena from the SEC on November 21, 2014.  The press release revealed that Petrobras was under investigation by the SEC and that the Company would be required to produce certain documents to the agency.

336.   On this news Petrobras' common ADSs declined $0.34 per ADS or 3%, to close at$10.50 per ADS on November 24, 2014, and Petrobras' preferred ADSs declined ($0.38) or 3.32% to close at $11.06 on November 24, 2014.  There was a similar decline in debt securities.

337.   The next day, on January 27, 2015, the New York Times reported that Petrobras decided not to take the corruption-related charge against earnings on its delayed third-quarter results after the Company's Board failed to agree on the extent the graft has inflated the value of its assets.[50]  Instead, the Board decided to publish quarterly results without the write-off.  News sources report that Petrobras' Board held a "marathon meeting" on January 27 that lasted about 10 hours, where two of President Rousseff's top appointees, Defendant Foster and Petrobras' current chairman and former finance minister heatedly disagreed about releasing a $30 billion write-down partially tied to the scandal-related losses.[51]  Reportedly, the chairman left in the middle of the meeting to call Rousseff, telling his political benefactor that the $30 billion was a bad number conjured up by faulty methodology.  Rousseff agreed.  Later that evening, Defendant Foster had a different message for Rousseff.  In a phone call, Foster expressed the opinion that under Brazilian law the $30 billion figure, whether faulty or not, had to be released because if the board now knew the number, the market had a right to know it as well.  After the

---

[50]   The New York Times, *Brazil's Petrobras Decides Not to Take Graft Writedown-Paper*, January 27, 2015.
[51]   Bloomberg, *A $30 Billion Difference of Opinion Let to Petrobras CEO Firing,*, March 3, 2015.

dramatic showdown, it was initially concluded that the number would in fact be included in a note to Petrobras' overdue third-quarter earnings.

338. On January 28, 2015, Defendant Foster acknowledged that "the testimonies examined by Petrobras have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments." Nevertheless, Petrobras released its delayed unaudited third-quarter results without the graft write-down, leaving investors in the dark over the financial impact of the multi-billion dollar corruption scandal. It was reported that after initially concluding to take the writedown, the Board reversed itself under pressure from Chairman and former Finance Minister Guido Mantega, who is close to Brazil's ruling Workers' Party.

339. After the meeting, Petrobras said in a statement that it "understands that it will be necessary to make adjustments at the financial statements to correct the [carrying] values of fixed assets that may have been impacted by amounts related to misconducts made by suppliers, politicians, Petrobras employees and other groups in the context of the Lava Jato operation." (emphasis added). The revisions were necessary because court documents show "illicit acts, such as suppliers' cartelization and bribes received by former employees," Petrobras said.

340. Caving to Rousseff, Defendant Foster changed her tune. Foster said it was "impractical" to quantify the write-down because it was not easy to separate corruption-related charges from those caused by other factors. Brazilian accounting experts questioned that explanation. "There is no reason for the company not to have estimated, even in a provisional way, the writedowns related to corruption," said Reginaldo Goncalves, an accounting professor

at Faculdade Santa Marcelina, a Sao Paulo university.  "I have the strong impression that this is the government trying to avoid the inevitable."

341.    "Without the write-down, what's the point?" wrote analyst Ricardo Kim of XP Investimentos, a Brazilian brokerage firm.

342.    On this news, Petrobras' common ADSs declined ($0.89) or 11.95% to close at $6.56 on January 28, 2015, and Petrobras' preferred shares declined ($0.92) or 11.70% to close at $6.94 on January 28, 2015.[52]

343.    On February 6, 2015, Petrobras announced that it has appointed a new chief executive, choosing the head of the nation's Banco do Brasil to take charge of Petrobras.  Mauro Cunha, who represents minority shareholders on the 10-member board, said he learned about Bendine's appointment from news reports before the Board even had a chance to vote on the appointment:  "We have seen today an episode of disrespect for the board of directors of Petrobras," Cuhna stated.  "Once again the controlling shareholder (the government) has imposed its will over the interests of Petrobras, ignoring the appeals of long-term investors." Anger at state interference led all three independent Board members to vote against Bendine's appointment.  In similar vein, Silvio Sinedino, a representative of the Company's unionized employees, said he voted against Bendine and five other senior appointments in protest over the political nature of the appointments and the failure to consult the Board and Company workers. Sinedino is demanding that Petrobras set objective criteria for naming senior executives, and blamed a history of political interference in the selection of top-level Petrobras managers for the corruption scandal that has engulfed the Company.

---

[52]    *See also* The New York Times, *Petrobras Shares Sink After Third-Quarter Results Exclude Graft Write-Downs*, January 28, 2015.

344.    "Markets wanted a name to bring Petrobras the credibility and the corporate governance lacking today.  Those hopes were ended with Bendine.  It is not a question of whether he is competent or not but rather that he is linked to Dilma," said Marcelo Varejao, an investment analyst with Sao Paulo brokerage Socopa.

345.    On this news, Petrobras' common ADSs declined ($0.57) or 8.02% to   close   at $6.54 on February 6, 2015, and Petrobras' preferred ADSs declined ($0.63) or 8.73% to close at $6.59 on February 6, 2015.  There was a similar decline in debt securities.

346.    On February 25, 2015, Moody's Investors Service cut Petrobras' bonds to junk, stripping them of their investment grade rating, as the Company faced a widening corruption probe.  The downgrade "reflects increasing concern about corruption investigations and liquidity pressures," Nymia de Almeida, an analyst at the rating company, said in a statement.  "Petrobras was already living the perfect storm," Adriano Pires, the head of Rio de Janeiro-based energy and infrastructure consulting firm CBIE, said.  "Now it is even worse."  On this news, Petrobras' common ADSs declined ($0.37) or 5.39% to close at $6.49 on February 25, 2015, and Petrobras' preferred ADSs declined ($0.47) or 6.72% to close at $6.52.  There was a similar decline in debt securities.

347.    On March 19, 2015, it was reported by a number of news sources that Swiss regulators seized $400 million of bank assets as part of the probe into Petrobras. In addition *Thestreet.com* reported a number of problems tied to the Brazilian state-owned energy company's ongoing corruption scandal. First, the TCU announced that it had chosen to investigate whether Petrobras board members mismanaged the company. Also Brazil's Comptroller-General Office added six more construction and engineering firms to its investigation into contractors that allegedly participated in corrupt dealings at the energy company. According to the article, this

brings the total number of firms under investigation to twenty four. The claims allege that the firms overpriced their contracts in a multibillion-dollar scheme that pushed bribes to Petrobras executives and Brazilian politicians.

348.    On this news, Petrobras' common ADSs declined $0.40 or 7.07%, to close at $5.26 and Petrobras' preferred ADSs declined $0.36 or 6.26%, to close at $5.39 March 19, 2015. There was a similar decline in debt securities.

349.    The Exchange Act Defendants' false statements and omissions during the Class Period caused the securities issued by Petrobras, PifCo, and PGF to trade at artificially inflated prices during the Class Period. However, as the conditions described above were revealed to the market, the market prices for securities of Petrobras, PifCo, and PGF fell.  For example, the price of the Company's common ADSs fell by $39.58 per share—or 80.92%—from its Class Period-high closing price of $48.91 per ADS on January 6, 2010. Similarly, the price of the Company's preferred ADSs fell by $34.19 per share—or 78.01%—from its Class Period-high closing price of $43.83 per ADS on January 4, 2010.

## IX.    RELIANCE: FRAUD ON THE MARKET DOCTRINE

350.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    the Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the securities of Petrobras, PifCo, and PGF traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the securities of Petrobras, PifCo, and PGF; and

(e)     Plaintiff and other members of the Class purchased the securities of Petrobras, PifCo, and/or PGF between the time the Exchange Act Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

351.    At all relevant times, the markets for the securities of Petrobras, PifCo, and PGF were efficient for the following reasons, among others:

(a)     as a regulated issuer, Petrobras filed periodic public reports with the SEC on a consolidated basis, including information on behalf of its subsidiaries PifCo and PGF;

(b)     Petrobras regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Petrobras was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force(s) and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     the securities of Petrobras, PifCo, and PGF were actively traded in efficient markets, including the NYSE, where the Company's common and preferred ADSs trade under the ticker symbols "PBR" and "PBR/A," respectively.

352.    As a result of the foregoing, the markets for the securities of Petrobras, PifCo, and PGF promptly digested current information regarding the Company and its subsidiaries from all publicly available sources and reflected such information in the prices of the securities of Petrobras, PifCo, and PGF. Under these circumstances, all purchasers of the securities of

Petrobras, PifCo, and/or PGF during the Class Period suffered similar injury through their purchase of the securities at artificially inflated prices and the presumption of reliance applies.

353. Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company and its subsidiaries, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153 (1972).

## X. LOSS CAUSATION

354. During the Class Period, as detailed herein, the Exchange Act Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the securities issued by Petrobras, PifCo, and PGF, and operated as a fraud or deceit on Class-Period purchasers of such securities by misrepresenting Petrobras' asset values, expenses, net income, and whether the Company suffered from material weaknesses in internal controls.

355. Later, as the truth relating to Defendants' prior false statements, misrepresentations, and fraudulent conduct were disclosed to the market, the price of the securities of Petrobras, PifCo, and PGF fell as the prior artificial inflation came out of their respective prices. As a result of their purchases of the securities issued by Petrobras, PifCo, and PGF during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

## XI. INAPPLICABILITY OF STATUTORY SAFE HARBOR

356. The Exchange Act Defendants' verbal "Safe Harbor" warnings accompanying their oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

357. The Exchange Act Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of the securities of Petrobras, PifCo, and/or PGF who knew that the FLS was false. None of the historic or present tense statements made by the Exchange Act Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Exchange Act Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act
and Rule 10b-5(b) Against the Exchange Act Defendants**

358. Plaintiff repeats, incorporates, and realleges paragraphs 1 through 357. During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew to be false and misleading, or were reckless in their disregard as to the truth of such statements, in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

359. The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

      (a)      employed devices, schemes, and artifices to defraud;

      (b)      made untrue statements of material facts or omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the securities of Petrobras, PifCo, and/or PGF during the Class Period.

360. Plaintiff and other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the securities of Petrobras, PifCo, and/or PGF. Plaintiff and other members of the Class would not have purchased such securities at the prices they paid, or at all, if they had been aware that the market prices of such securities had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

361. 258. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the securities of Petrobras, PifCo, and/or PGF during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants Gabrielli, Foster and Barbassa

362. Plaintiff repeats, incorporates, and realleges paragraphs 1 through 357 by reference.

363. The Individual Defendants acted as controlling persons of Petrobras, PifCo, and/or PGF within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about the Company, the Individual Defendants had the power and ability to control the actions of Petrobras, PifCo, and/or PGF and

the employees thereof. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**XIII.     ADDITIONAL CLASS CLAIMS BROUGHT UNDER THE LAW OF BRAZIL**

**COUNT III**

**By Lead Plaintiff USS For Violations of the Brazilian Corporate Law and CVM Regulations Against the Individual Defendants**

364.    Plaintiff repeats, incorporates, and realleges paragraphs 1 through 357 by reference.

365.    Lead Plaintiff USS assert civil liability claims against the Individual Defendants based on article 158, subheadings I and II, of the Brazilian "Corporate Law" (Law 6.404/76).

366.    Article 158 provides that officers and board members are civilly liable by damages caused when (I) they act within the scope of their authority, with negligence or scienter or (II) when they violate the law or the corporate bylaws.  The same article also establishes that officers and board members are liable for unlawful acts when acting in connivance with them, when neglecting to investigate such acts or when, despite knowledge of them, they fail to take action to prevent such acts (paragraph 1°).  The law provides that officers and board members shall be jointly and severally liable for the losses caused by failure to comply with the duties imposed by law to ensure the normal operation of the corporation, even when in accordance with the bylaws such duties do not devolve upon all them (paragraph 2°).  Furthermore, under Article 158 Paragraph 5° anyone who concurs in the performance of any act contrary to the law or bylaws with the intention of obtaining advantages for himself or for a third party shall be jointly and severally liable with the officer.

367.    Brazilian Corporate law article 159 paragraph 7 provides shareholders directly harmed by acts of officers and board members with the right of legal action against them.

368.    The Individual Defendants breached fiduciary duties and obligations required by the Brazilian Corporate Law.  In its article 145, the law establishes that rules regarding duties and responsibilities apply to both officers and board members.  The law requires that officers and board members shall employ the care and diligence that an industrious and honest man customarily employs in the administration of his own affairs (article 153). The Brazilian corporate law also determines that board members elected by a group or class of shareholders shall have the same duties toward the corporation as the other officers and shall not fail to fulfill such duties, even at the expense of the interests of those who elected him (article 154 paragraph 1º).  Article 154 paragraph 2º provides that officers and board members are prohibited from (a) performing any act of liberality to the detriment of the corporation; (b) taking advantage of its standing for his own benefit or for the benefit of a corporation in which he has an interest or of a third party, without the prior approval of a general meeting or the administrative council; (c) by virtue of his position, receiving any type of direct, or indirect, personal advantage from third parties, without authorization in the bylaws or from a general meeting.

369.    The Individual Defendants also breached their duty of loyalty established by article 155. Article 155 prohibits officers and board members from I - using any commercial opportunity which may come to their knowledge, by virtue of their position, for their own benefit or that of a third party, whether or not harmful to the corporation; II - failing to exercise or protect corporation rights or, in seeking to obtain advantages for themselves or for a third party, failing to make use of a commercial opportunity which they know to be of interest to the Corporation.

370.    Article 156 paragraph 1° sets forth the duty to not participate in corporate transactions in which an officer or board member has an interest which conflicts with an interest

of the corporation and to contract with the corporation under fair and reasonable conditions identical to prevailing market conditions or under which the corporation would contract with third parties.

371. By omitting to disclose the illegal bribery and kickback scheme, the Individual Defendants also breached their legal duty to inform the market (article 157), therefore engaging in securities fraud. The Brazilian Corporate law requires that officers of a publicly held corporation shall immediately inform the stock exchange and publish in the press any relevant fact which occurs in its business affairs, which may substantially influence the decision of market investors to sell or buy securities issued by the Corporation (article 157 paragraph 4º).

372. In the same vein, the Individual Defendants further violated rules of the Brazilian Securities and Exchange Commission ("Comissão de Valores Mobiliárior or "CVM"). Instruction No. 358/02, which regulates the duties to report material acts and facts, Article 3 determines the duty of the Officer for Relations with Investors to report to CVM any material act or fact. Paragraph 1 provides the same duty for officers, board members and members of the fiscal council or other committees with technical function, who shall report information of material acts or facts to the Officer for Relations with Investors.[53] Therefore officers, board members, members of the fiscal council and the issuer itself violated duties to disclose information according to Brazilian securities law.

373. The Individual Defendants likewise breached their duty to publish accurate financial statements, which shall clearly indicate its assets and liabilities as well as the changes

---

[53] Instruction 480/09 makes it clear that the duty to disclose information is not exclusive of the Officer for Relation of Investors. "Article 46 - The responsibility attributed to the officer of investor relations does not remove the responsibilities of the issuer, controller, and other administrators of the issuer for the violation of legal and regulatory rules that govern the securities market."

that occurred during the fiscal year (article 176, subheadings and paragraphs). Article 177 paragraph 4 requires that such financial statements shall be signed by the officers of the corporation and by legally qualified accountants. The Individual Defendants further violated rules from Instructions No. 400/03 and 480/09, which determine duties to report such periodical financial information in connection with the register of a publicly-held corporation and the public issuance of securities.[54]

374. By failing to disclose accurate information (item 3 above) and to deliver accurate financial statement (item 4 above), the Individual Defendants, moreover, violated legal rules of Instruction No. 8/79 of the Brazilian Securities Commission ("CVM") as they have created artificial conditions for offering and trading of Petrobras securities, price manipulation, engaging in fraud and adopting non-equitable practices. The failure to disclose relevant facts and true and accurate financial statements has resulted in financial damages to USS and similarly situated plaintiffs.

375. The Individual Defendants were required to observe and comply with the duties established by Brazilian Corporate Law, as clearly provided by article 239 that sets forth that officers and board members of corporations shall have the same duties and responsibilities as the officers and board members of publicly held corporations. Furthermore, according to the Brazilian corporate law, article 142, subheading III, V and VI, board members are responsible, among others, for supervising the performance of officers, soliciting information of contracts, and opining about managerial reports, accounts of the officers, acts and contracts. Board members of Petrobras have been negligent in the exercise of their authority. By failing to

---

[54] Article 56-B from Instruction 400/2003 provides that the offeror administrators within its legal and statutory powers, are responsible for fulfilling the obligations imposed on the offeror by this Instruction. Article 56-C from Instruction 400/2003 provides that the issuer administrators within its legal and statutory powers, are responsible for fulfilling the obligations imposed on the issuer by this Instruction.

oversee corporate affairs, monitor contracts and supervise officers, the board members did not accomplish the responsibilities determined by the law.

376.    Plaintiffs suffered damages from actions and omissions of the Individual Defendants, as alleged above and therefore seek indemnification for all the losses suffered. Plaintiffs assert tort and civil liability claims against the Individual Defendants by damages unduly inflicted to investors.  By failing to disclose the kickback scheme, and how it would impact Petrobras' financial condition, the Individual Defendants engaged in securities fraud, causing severe financial damages to investors.  Article 186 of the Brazilian Civil Code provides that anyone, by action or voluntary omission, negligence or imprudence, violates rights and causes damages to others, even though exclusively moral, commits an illicit act.  Under article 927, anyone who causes damages to others by committing illicit acts, is liable for damages. Such liability shall be according to the damages suffered (article 944).  Therefore, Lead Plaintiff seeks compensation for the losses caused by the illicit acts, omission, negligence and imprudent actions perpetrated by the Individual Defendants.

## COUNT IV

**By Lead Plaintiff USS For Violations of the Brazilian Civil Code Against Petrobras**

377.    Plaintiff repeats, incorporates, and realleges paragraphs 1 through 357 by reference.

378.    Lead Plaintiff asserts as a class claim that Petrobras is liable by actions taken by its officers and board members.  Article 138 paragraph 1º provides that officers represent the corporation. Article 144 provides that each officer shall represent the corporation and take such actions as are necessary for its normal operation. By representing the corporation in its corporate affairs, officers assume obligations and liabilities on behalf of the Corporation towards its shareholders and investors.  Petrobras therefore is liable by the actions undertaken by its officers,

and by the lack of disclosure of material facts contained in its and financial statements and press releases. The failure to provide accurate financial statements has deprived USS and similarly situated investors of the inherent right to supervise the management of the corporate business (article 109, subheading III).

379.    Petrobras is also liable as employer and/or principal of all the Individual Defendants for financial damages caused to USS and the class in the exercise of the Individual Defendants' fiduciary duties or by reason thereof (Brazil Civil Code Article 932 subheading III).

<u>**COUNT V**</u>

**By Lead Plaintiff USS For Violations of the Brazilian Corporate Law,
CVM Regulations, and the Brazilian Civil Code Against Petrobras**

380.    Plaintiff repeats, incorporates, and realleges paragraphs 1 through 357 by reference.

381.    Article 235 paragraph 1 of Law 6.404/76 makes it clear that corporations such as Petrobras shall be subject to Brazilian corporate law and to the regulations issued by CVM.

382.    Instruction CVM No. 457/2007 provides that publicly-held corporations shall present financial statements according to international accounting standards. Instruction CVM No. 400/2003 article 38 requires that the prospectus prepared by the issuer contains complete, accurate, true, current, clear, objective and necessary, in accessible language, so that investors can judiciously form their investment decision. Article 39 sets forth that the prospectus shall not omit material facts, nor contain information that may mislead investors, containing information about the issuer and its financial, economic and patrimonial situation (subheading IV). Article 56 establishes that the issuer is responsible for the accuracy, consistency, quality and sufficiency of the information provided at registration and supplied to the market during distribution. The issuer and the leading underwriter, furthermore shall declare that the Prospectus contains the relevant

information to identify the offer by investors, the securities offered, the issuer, its activities, economic and financial situation, the risks inherent to its activity and any other relevant information and that the Prospectus has been prepared in accordance with the relevant rules. With this declaration the issuer assumes – together with the underwriter – the liability for the information provided to investors.  Furthermore, Petrobras has violated all provisions of CVM Instruction 480/09, Chapter III (Obligations of the Issuer), Subsection I (Content and Form of the Information). For instance, article 13 requires that the issuer must send to CVM periodical and occasional information, which are accurate, complete, consistent and which do not induce investors in error. Article 16 requires that the issuer shall disclose information comprehensively, fairly and simultaneously for the entire market. Article 17 requires that the information provided by the issuer should be useful to assess the securities issued by it. Petrobras has failed to provide periodical information to investors, violating article 21 of Instruction 480/09. Petrobras has not updated information in its reference form ("Formulário Cadastral") in a timely manner, in violation of article 23, which provides that the issuer has up to 7 (seven) days to update its form counted from the fact that gave rise to a change.  By failing to disclose information that would impact its securities Price, Petrobras has violated disclosure rules established by CVM rules and is liable by those violations as a publicly held corporation, according to article 46, which expressly provides that "[t]he responsibility attributed to the officer of investor relations does not remove the responsibilities of the issuer, controller, and other administrators of the issuer for the violation of legal and regulatory rules that govern the securities market."

383.    Plaintiffs assert tort and civil liability claims against the Petrobras by damages unduly inflicted to investors. By failing to disclose the kickback scheme, and how it would fact its financial situation, Petrobras has engaged in securities fraud, causing severe financial

damages to investors. Article 186 of the Brazilian Civil Code provides that anyone, by action or voluntary omission, negligence or imprudence, violates rights and causes damages to others, even though exclusively moral, commits an illicit act. Under article 927, anyone who causes damages to others by committing illicit acts, is obliged to indemnify the damage. Such indemnification shall be given by the extent of the damage (article 944). Therefore plaintiffs seek compensation for the losses caused by the illicit acts, omission, negligence and imprudent actions perpetrated by Petrobras.

<u>**COUNT VI**</u>

**By Lead Plaintiff USS For Violations of the Brazilian Securities Law,
CVM Regulations, and the Brazilian Civil Code and the Against PwC**

384.    Plaintiff repeats, incorporates, and realleges paragraphs 1 through 357 by reference.

385.    Brazilian Securities Law (Law 6.385/76), article 26 provides that only audit firms or independent auditors which are registered with the Securities Commission of Brazil ("CVM") may audit, the financial statements of publicly held corporations and institutions, companies or corporations which compose the securities distribution and intermediation system. Article 26 Paragraph 2 provides that independent auditors or auditing firms shall be subject to civil liability for any losses caused to third parties as a result of negligence or fault (scienter) in the exercise of the functions provided for in this article. Brazilian Corporate Law (Law 6.404/76) article 177 paragraph 4º, moreover, requires that legally qualified accountants shall sign the corporation's financial statements along with the officers.

386.    By failing to account for the illegal bribery and kickback scheme, the auditors also violated legal rules of CVM Instruction No. 8/79 as they created artificial conditions for

demand and trading of Petrobras securities, price manipulation, engaging in fraud and adopting non-equitable practices.

387. Plaintiffs assert tort and civil liability claims against the auditors by damages unduly inflicted to investors. By failing to provide their "gatekeeper" duties and turning a blind eye, and covering up Petrobras securities fraud, auditors caused financial damages to investors. Article 186 of the Brazilian Civil Code provides that anyone, by action or voluntary omission, negligence or imprudence, violates rights and causes damages to others, even though exclusively moral, commits an illicit act. Under article 927, anyone who causes damages to others by committing illicit acts, is liable for damages to the damaged party. Such liability shall limited to the extent of the damages suffered (article 944). Therefore plaintiffs seek compensation for the losses caused by the illicit acts, omission, negligence and imprudent actions perpetrated by the auditors.

## XIV.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### A.    Introduction

388. The following allegations are in effect a separate complaint. For the following claims there is no allegation of fraud, scienter or recklessness. These claims, brought under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77(l)(2) and 77o, are based solely on claims of strict liability and/or the absence of any affirmative defense based on the reasonableness of the pertinent Defendants' investigation into the true facts.

389. These Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained in paragraphs 1-118 herein. These Securities Act claims are not based on any allegation that any Defendant engaged in fraud

or any other deliberate and intentional misconduct, and the Securities Act Plaintiffs (defined below) specifically disclaim any reference to or reliance on fraud allegations.

390. These Securities Act claims are brought on behalf of persons who purchased or otherwise acquired Petróleo Brasileiro S.A. — Petrobras ("Petrobras" or the "Company") securities issued by Petrobras International Finance Company S.A. ("PifCo") and Petrobras Global Finance B.V. ("PGF") in or traceable to the Offering Materials issued in connection with the Offerings that are set forth in Appendix A.

391. Each of the Offerings was conducted pursuant to a Registration Statement and a prospectus supplement issued in connection with that Offering, as identified on Appendix A. The date of each Offering—and not the prior date of the Registration Statement—was the "effective date" of the Registration Statement for purposes of Section 11 liability pursuant to 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2). According to each Registration Statement, "…for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof."

392. Further, each Registration Statement provided that: "Each prospectus filed by the registrant pursuant to Rule 424(b)(3) shall be deemed to be part of the registration statement as of the date the filed prospectus was deemed part of and included in the registration statement." Both shelf Registration Statements also provided that: "Each of the undersigned registrants hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of [Petrobras'] annual report pursuant to Section 13(a) or 15(d) of the Exchange Act that is incorporated by reference in the registration statement shall be deemed to be a new

registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof."

393.    As to each Offering, certain documents contained untrue statements of material facts and material omissions that were incorporated in the Registration Statements and prospectus supplements, as described in more detail below and identified in Appendix A.

**B.    Background**

394.    The Securities Act claims asserted herein arise from a series of materially misleading statements and omissions of material fact about the reported value of Petrobras' assets, periodic expenses, net income, whether Petrobras suffered from material weaknesses in its disclosure controls and procedures and its internal controls over financial reporting, and the Company's repeated assurances that it operates with the highest level of integrity.

395.    According to numerous Petrobras former employees, including Paulo Roberto Costa ("Costa"), a member of Petrobras' senior management and the Company's Chief Downstream Officer from at least May 14, 2004 to April 2012, Petrobras routinely awarded lucrative and inflated contracts to construction and engineering firms in exchange for making hundreds of millions of dollars in improper and undisclosed payments to politically-appointed Petrobras executives, a portion of which found its way to the campaign coffers of Brazil's ruling Workers' Party ("PT"), among others.

396.    In connection with the improper and undisclosed payments to Petrobras executives, government officials and politicians, a group of at least 16 contractors formed a cartel to assure that its membership would win Petrobras' major contracts.   Costa testified that the companies to whom Petrobras sought bids for construction projects would meet regularly in São Paulo or Rio de Janeiro to decide what contract would be awarded to which construction company, and what the percentage of overbilling would be included in the contract in order to

cover the improper payments that would be required.  If any member of the meeting failed to include the required amount earmarked for political parties and Petrobras executives, the member would be disqualified from future bids.

397.    Costa revealed that a group of politicians, including members and allies of President Rousseff's Workers' Party, had accepted improper payments linked to inflated contracts, and Costa named several construction companies that were part of the improper bids and roundtrip payments, including Odebrecht and Camargo Correa S.A.  Costa characterized Petrobras as being engulfed in a culture of "political patronage," where career advancement depended on political sponsors, and that a *quid pro quo* applied to all executive level positions that were part of the patronage system.  Such patronage system included diverting funds and resources to political officials from inflated contracts under the control of the executive.

398.    According to Brazilian prosecutors and Brazil's Federal Police, Petrobras executives awarded contracts to Brazilian construction companies that had systemically inflated their bids by as much as 20%.   As explained in more detail below, as a result of the accounting treatment of these improper payments, Petrobras is currently facing an asset write-down of approximately $30 billion—amounting to approximately 60% of the Company's market value—to reduce the carrying value of some of its assets.

399.    Petrobras executives receiving the improper payments have pocketed vast sums of money.  For example, Pedro Barusco ("Barusco"), a former Petrobras service manager, told Brazilian investigators that the PT received as much as $200 million in improper payments during the decade through 2013, and that he personally received nearly $100 million which he deposited in offshore accounts.  According to Costa, payments to him, usually in the form of cash (U.S. Dollars), amounted to tens of millions of dollars and were delivered to him in

suitcases to his home, office, shopping centers or hotels.   Costa testified that each company awarded an inflated contract had its own mechanism for delivering the improper payments.

400.   Further, on March 18, 2014, *The Wall Street Journal* reported that Swiss authorities froze hundreds of millions of dollars in assets tied to the improper payments, having unearthed "hundreds of accounts at Switzerland's banks" as part of the alleged wrongdoing. According to Switzerland's Office of the Attorney General, Switzerland ordered the freezing of roughly $400 million in assets, and ongoing probes have identified more than 300 accounts at more than thirty (30) Swiss banking institutions that officials say were apparently used to process the improper payments now under investigation in Brazil and elsewhere.

401.   On November 13, 2014, after the market closed, the Company issued a press release acknowledging that if the allegations in Costa's testimony were true, they "could potentially impact the Company's financial statements."   As a result, the Company delayed releasing the financial statements for the third quarter 2014, stating that it would need additional time to:

> deeply analyze the investigation in course; (ii) adjust the Company based on the allegations of [the Brazilian Federal Police]; and (iii) evaluate the need of improving governance control, the Company isn't ready to publish its balance sheet regarding the third quarter of 2014 on this date.

402.   On November 14, 2014, prior to the trading session, Petrobras revealed that it would "release its third quarter 2014 financial statements, without a review by its Independent Auditors."  Petrobras further noted that:

> In light of the ongoing investigations, it is currently not possible for the Company to determine an estimated date for the disclosure of its Quarterly Financial Statements (ITR) for the period ended 09.30.2014, together with the review report issued by the Independent Auditors.

403.    During a November 17, 2014 conference call to discuss the Company's 2013 third quarter results, then-CEO Foster stated:

> In light of the accusations and investigations of [O]peration Car Wash . . . Petrobras is unable to publish its third-quarter 2014 financial statements because these accusations, if found to be true, could potentially affect the Company's financial statements.
>
> A determining fact took place on October 8, 2014, when the depositions of former Downstream Executive Director, Mr. Paulo Roberto Costa, and Mr. Alberto Youssef, in a hearing at the 13th Federal Court of Parana, revealed information that may lead to possible adjustments in the financial statements of our Company.
>
> Because of these depositions, therefore, we need more time to make any possible adjustments to the financial statements. More time is needed as well to gain greater understanding from the ongoing investigations by the independent law firms; and we need more time, as it is fundamentally important to improve our internal controls.

404.    On January 28, 2015, Defendant Foster acknowledged that the testimony examined by Petrobras indicates "that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments."

405.    At all relevant times, Petrobras asserted that it accounted for its acquisitions and the assets from its construction projects in accordance with International Financial Reporting Standards ("IFRS"), claiming that acquired or constructed assets have values equal to the reported costs incurred in their acquisition or construction.  Increased costs on construction projects in order to receive improper payments, whether to Petrobras executives, governmental, and/or party officials, caused Petrobras to materially inflate its reported property, plant and equipment, necessitating a massive write-down that may reach $30 billion.   As a result, Petrobras' financial statements, including the carrying value of its property, plant and equipment, reported expenses, and net income, were materially false and misleading.

406.     By having inflated the contracts granted to the various construction companies by up to 20%, assets on the balance sheet associated with Petrobras' property, plant, and equipment were massively inflated.  In addition, instead of reporting a corresponding immediate expense for the inflated portion of the contracts in the same period, (*i.e.* in the period the expenses were incurred) Petrobras expensed the repayments (*i.e.* the overpayment to the contractors) as depreciation over the unit-of-production basis or straight-line method, resulting in materially lower current expenses and materially higher net income in the periods in which the inflated payments were made.

407.     Petrobras' reported asset values were important information for purchasers of the Notes because these measures were understood to offer a fair presentation of the Company's fixed capital and recoverability for creditors.  These reported asset values were used by rating agencies, analysts, and investors to arrive at a number of metrics including the Company's financial leverage (the ratio of net assets to total net debt) and its debt/equity ratio that formed a material basis for the market prices of the Notes.

### C.     Relevant Securities Offerings

### 1.     February 6, 2012 Note Offerings

408.     On December 11, 2009, Petrobras and PifCo filed a registration statement with the U.S. Securities and Exchange Commission ("SEC") on Form-3ASR for the offer and sale of an indeterminate amount of securities at indeterminate offering prices, including debt securities ("2009 Registration Statement").

409.     On February 3, 2012, PifCo filed a prospectus supplement with the SEC on Form 424(b)(2) for the offer and sale of $7 billion in notes issued pursuant to the 2009 Registration Statement ("2012 Prospectus").  Together, the 2009 Registration Statement and 2012 Prospectus are hereinafter referred to as the "2012 Offering Documents."

410.    As set forth on Appendix A, four series of notes were sold pursuant to the 2012 Offering Documents: (1) $2.75 billion re-opening of notes first offered on January 27, 2011 paying 5.375% due in 2021 to be sold at $1041.81 per $1000 par value; (2) $1.25 billion re-opening of notes first offered on January 27, 2011 paying 6.750% due in 2041 to be sold at $1112.08 per $1000 par value; (3) $1.25 billion of notes paying 2.875% due in 2015 to be sold at $994.99 per $1000 par value; and (4) $1.75 billion of notes paying 3.500% due in 2017 to be sold at $994.19 per $1000 par value (collectively, the "2012 Notes Offerings").

411.    As set forth on Appendix A, the following were incorporated by reference into the 2012 Offering Documents: (1) the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2010, filed with the SEC on May 26, 2011 ("2010 20-F"); and (2) reports on Form 6-K Petrobras filed with the SEC on November 22, 2011 concerning the financial condition and results of operations of Petrobras for the nine-month period ended September 30, 2011, and Petrobras' financial statements as of September 30, 2011 and for the nine-month periods ended September 30, 2011 and 2010 ("11/22/11 6-K").

## 2.    **May 15, 2013 Note Offerings**

412.    On August 29, 2012, Petrobras and PGF filed with a registration statement with the SEC on Form-3ASR for the offer and sale of an indeterminate amount of securities at indeterminate offering prices, including debt securities ("2012 Registration Statement").

413.    On May 15, 2013, PGF filed a prospectus supplement on Form 424(b)(2) for the offer and sale of $9.5 billion in notes issued pursuant to the 2012 Registration Statement ("2013 Prospectus").  Together, the 2012 Registration Statement and 2013 Prospectus are referred to herein as the "2013 Offering Documents".

414.    As set forth on Appendix A, six series of notes were sold pursuant to the 2013 Offering Documents: (1) $1.25 billion of notes paying 2.00% due in 2016 to be sold at $995.84 per $1000 par value; (2) $2 billion of notes paying 3.00% due in 2019 to be sold at $993.52 per $1000 par value;  (3) $3.5 billion of notes paying 4.375% due in 2023 to be sold at $988.28 per $1000 par value; (4) $1.75 billion of notes paying 5.625% due in 2043 to be sold at $980.27 per $1000 par value; (5) $1 billion of floating-rate notes due in 2016 to be sold at par; and (6) $1.5 billion of floating-rate notes due 2019 to be sold at par (collectively, the "2013 Notes Offerings").

415.    As set forth on Appendix A, the following were incorporated by reference into the 2013 Offering Documents: (1) the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2011, filed with the SEC on April 2, 2012, and its amendment on Form 20-F/A, filed with the SEC on July 9, 2012 ("2011 20-F"); (2) Petrobras Form 6-K filed with the SEC on August 10, 2012, containing financial information for the six-month periods ended June 30, 2012 and 2011 ("8/10/12 6-K"); (3) Petrobras' Annual Report on Form 20-F for the year ended December 31, 2012, filed with the SEC on April 29, 2013 ("2012 20-F"); and (4) Petrobras' Form 6-K filed with the SEC on April 30, 2013, containing financial information for the three-month periods ended March 31, 2013 and 2012 ("4/30/13 6-K").

### 3.      March 11, 2014 Note Offerings

416.    On March 11, 2014, PGF filed a prospectus supplement on Form 424(b)(2) for the offer and sale of $8.1 billion in notes issued pursuant to the 2012 Registration Statement ("2013 Prospectus").  Together, the 2012 Registration Statement and 2013 Prospectus are referred to herein as the "2013 Offering Documents".

417.     As set forth on Appendix A, six series of notes were sold pursuant to the 2014 Offering Documents: (1) $1.6 billion of notes paying 3.250% due in 2017 to be sold at $999.57 per $1000 par value; (2) $1.5 billion of notes paying 4.875% due in 2020 to be sold at $997.43 per $1000 par value; (3) $2.5 billion of notes paying 6.250% due in 2024 to be sold at $997.72 per $1000 par value; (4) $1 billion of notes paying 7.250% due in 2044 to be sold at $991.66 per $1000 par value; (5) $1 billion of floating-rate notes due in 2017 to be sold at par; and (6) $500 million of floating-rate notes due 2020 to be sold at par (collectively, the "2014 Notes Offerings").

418.     As set forth in Appendix A, the following were incorporated by reference into the 2014 Offering Documents: (1) the 2011 20-F; (2) the 8/10/12 6-K; (3) the 2012 20-F; and (4) Petrobras' Form 6-K filed with the SEC on February 26, 2014, containing audited consolidated financial statements as of December 31, 2013 and 2012 and January 1, 2012 and for the years ended December 31, 2013,  2012 and 2011, and a related amendment on Form 6-K/A, filed with the SEC on March 10, 2014 ("2/26/14 6-K"); (5) Petrobras' Form 6-K filed with the SEC on March 7, 2014 ("3/3/14 6-K"), identified as "Management's Report on Internal Controls over Financial Reporting"; and (6) Petrobras' Form 6-K filed with the SEC on March 11, 2014 (3/11/14 6-K") attaching the Underwriting Agreement for the 2014 Notes Offerings.

419.     Collectively, the 2012 Notes Offerings, 2013 Notes Offerings, and 2014 Notes Offering are at times referred to herein as the "Notes Offerings."

### D.     Securities Act Plaintiffs

420.     Lead Plaintiff Universities Superannuation Scheme Limited ("USS" or "Plaintiff"), acting as sole corporate trustee of Universities Superannuation Scheme, is located at Royal Liver Building, Liverpool, England, L3 1PY.  Established in 1974, USS is a trustee company limited by guarantee, incorporated in England and Wales, and solely set up to

administer the scheme provided by Universities, Higher Education and other associated institutions for their employees, and which runs the pensions administration and group functions. USS Investment Management Ltd is a wholly owned subsidiary of USS regulated by the Financial Conduct Authority, which operates the investment arm of the business from its London office. USS purchased various Petrobras securities as previously set forth in a certification that USS filed in this Action and was damaged thereby.

421.   Additional plaintiff Union Asset Management Holding AG ("Union") is based in Frankfurt am Main, Germany and is the holding organization of the Union Investment Group with offices in Germany, Switzerland, Luxembourg, Poland, Italy, and Spain. The Union Investment Group ranks among the leading German fund managers by market share. Union purchased various Petrobras securities as previously set forth in a certification that Union filed in this Action and was damaged thereby.

422.   Additional plaintiff Employees' Retirement System of the State of Hawaii ("Hawaii ERS") Hawaii ERS is a cost-sharing, multiple-employer public employee retirement system established to administer a pension benefits program for all State and county employees, including teachers, police officers, firefighters, correction officers, judges, and elected officials. Hawaii ERS purchased various Petrobras securities as previously set forth in a certification Hawaii ERS filed in this Action and was damaged thereby.

423.   USS, Union, and Hawaii ERS are collectively hereinafter referred to as "Plaintiffs."

E.   **Securities Act Defendants**

1.   **Issuer Defendants**

424.   Defendant Petrobras is a corporation organized under the laws of Brazil, and maintains its principal executive offices at Avenida Republica do Chile, No. 65, 23rd Floor,

20031-912, Rio de Janeiro, Brazil. Petrobras also maintains an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022. The Company's common and preferred shares are listed on the Bovespa, trading under the ticker symbols "PETR3" and "PETR4," respectively. Since 2000, Petrobras has sponsored ADSs representing the Company's common and preferred equity that are listed on the NYSE, trading under the ticker symbols "PBR" and "PBR/A," respectively. Furthermore, of the 35 debt securities currently outstanding issued by PifCo or PGF, 22 are registered with an exchange located in this District and of the 26 debt securities issued by PifCo or PGF during the Class Period, 16—including all securities at issue in this action—are registered with and trade on an exchange located in this District.

425. Defendant PGF is a wholly-owned finance-related subsidiary of Petrobras incorporated in the Netherlands. PGF maintains its principal executive offices at Weenapoint Toren A, Weena 722, 3014 DA Rotterdam, The Netherlands. On February 12, 2014, PGF acquired the outstanding shares of PifCo, a wholly-owned subsidiary of Petrobras. Between the beginning of the Class Period and August 9, 2013, PifCo was organized under the laws of the Cayman Islands with its principal executive offices at 4th Floor, Harbour Place, 103 South Church Street, P.O. Box 1034GT — BWI, George Town, Grand Cayman, Cayman Islands.

426. On August 9, 2013, PifCo completed a transfer of domicile, registering in Luxembourg with principal executive offices at 40, Avenue Monterey, 2163 Luxembourg. On December 16, 2013, certain assets and liabilities of PifCo were spun off and subsequently merged into Petrobras. The publicly issued debt of PGF and PifCo is unconditionally guaranteed by Petrobras, and certain issues of this debt are registered with the NYSE.

## 2. **Officer Defendants**

427.    Defendant Maria das Gracas Silva Foster ("Foster") has served as Chief Executive Officer ("CEO") and Director of Petrobras since February 13, 2012.  Previously, Foster served as the Company's Director of Gas and Energy, and she signed the 2012 Registration Statement.

428.    Defendant José Sergio Gabrielli ("Gabrielli") served as Chief Executive Officer ("CEO") of Petrobras from July 22, 2005 to February 13, 2012, and he signed the 2009 Registration Statement.

429.    Defendant Almir Guilherme Barbassa ("Barbassa") has served as Chief Financial Officer ("CFO") of Petrobras since July 22, 2005, and he signed the 2009 Registration Statement and the 2012 Registration Statement.

430.    Foster, Gabrielli, and Barbassa are collectively referred to as the "Officer Defendants."

## 3. **Director Defendants**

431.    Defendant Josué Christiano Gomes da Silva served as a Director of Petrobras from October 2011 to March 2013, and he signed the 2012 Registration Statement.

432.    Defendant Silvio Sinedino Pinheiro ("Pinheiro") has served as Director of Petrobras during the Class Period, and signed the 2012 Registration Statement.

433.    Defendant Daniel Lima de Oliveira served as CEO and Chairman of PifCo from September 1, 2005, and he signed the 2009 Registration Statement and the 2012 Registration Statement.

434.     Defendant José Raimundo Brandão Pereira served as a Director of PifCo from 2003, and he signed the signed the 2009 Registration Statement and the 2012 Registration Statement.

435.     Defendant Sérvio Túlio da Rosa Tinoco served as CFO of PifCo from September 1, 2005, and he signed the signed the 2009 Registration Statement and the 2012 Registration Statement.

436.     Defendant Paulo Jose Alves has served as the Chief Accounting Officer of PifCo since May 2011, and he signed the 2012 Registration Statement.

437.     Defendant Mariângela Monteiro Tizatto served as the Chief Accounting Officer of PifCo from 1998 to May 2011, and she signed the 2009 Registration Statement.

438.     Defendant Gustavo Tardin Barbosa served as CEO and "Managing Director A" of PGF, and he signed the 2012 Registration Statement.

439.     Defendant Alexandre Quintão Fernandes served as CFO and "Managing Director B" of PGF, and he signed the 2012 Registration Statement.

440.     Defendant Marcos Antonio Zacarias served as "Managing Director A" of PGF, and he signed the 2012 Registration Statement.

441.     Defendant Cornelis Franciscus Jozef Looman served as "Managing Director B" of PGF, and he signed the 2012 Registration Statement.

442.     Defendant Theodore Marshall Helms ("Helms") serves as the authorized U.S. Representative for Petrobras and PGF, and served as the authorized U.S. Representative for PifCo.  Helms signed the 2009 and 2012 Registration Statements.

443.     Defendants identified in paragraphs 432 - 442 are collectively referred to herein as the "Director Defendants."

4.      **Underwriter Defendants**

444.    Defendant BB Securities Ltd. ("BB Securities") is a subsidiary of Banco do Brasil S.A. incorporated in the United Kingdom with its principal place of business at Pinners Hall, 105-108 Old Broad Street, London, EC2N 1ER, United Kingdom. Banco do Brasil S.A. maintains an office at 535 Madison Avenue, 34th Floor, New York, New York 10022.  BB Securities acted as an underwriter and joint book runner of the 2012 Notes Offerings and the 2013 Notes Offerings.

445.    Defendant Citigroup Global Markets Inc. ("Citigroup") maintains its principal place of business at 388 Greenwich Street, New York, New York 10013.  Citigroup acted as an underwriter and joint book runner of the Notes Offerings.

446.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") maintains its principal place of business at 277 Park Avenue, New York, New York 10172. J.P. Morgan acted as an underwriter and joint book runner of the Notes Offerings.

447.    Defendant Itau BBA USA Securities, Inc. ("Itau") maintains its principal place of business at 767 Fifth Avenue, 50th Floor, New York, New York 10153.  Itau acted as an underwriter and joint book runner of the 2012 Notes Offerings and the 2013 Notes Offerings.

448.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") maintains its principal place of business at 1585 Broadway, New York, New York 10036.  Morgan Stanley acted as an underwriter and joint book runner of the 2012 Notes Offerings and the 2013 Notes Offerings.

449.    Defendant Santander Investment Securities Inc. ("Santander") is a subsidiary of Santander S.A., which has its principal place of business at Santander Group City, Av. de Cantabria s/n, 28660 Bobadilla del Monte, Madrid, Spain, and maintains an office at 45 East

53rd Street, New York, New York 10022. Santander acted as an underwriter and joint book runner of the 2012 Notes Offerings.

450. Defendant HSBC Securities (USA) Inc. ("HSBC") maintains its principal place of business at 354 Sixth Avenue, New York, New York 10011. HSBC acted as an underwriter and joint book runner of the 2013 Notes Offerings and the 2014 Notes Offerings.

451. Defendant Banco Votorantim Nassau Branch ("Banco Votorantim") maintains an office at Saffrey Square Building, Suite 204 Bay Street Bank Lane, Nassau, Bahamas. Banco Votorantim is a subsidiary of Banco Votorantim S.A., which has its principal place of business at Av. das Nacoes Unidas 14171, Torre a, 18° andar, Vila Gertrudes, SA'o Paulo, Brazil, and maintains an office at 126 East 56th Street, New York, New York 10022. Banco Votorantim acted as an underwriter and co-manager of the 2012 Notes Offerings.

452. Defendant Mitsubishi UFJ Securities (USA), Inc. ("Mitsubishi") maintains an office at 1633 Broadway, 29th floor, New York, New York 10019. Mitsubishi acted as an underwriter and co-manager of the 2012 Notes Offerings and the 2013 Notes Offerings.

453. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") maintains its principal place of business at One Bryant Park, New York, New York 10036. Merrill Lynch acted as an underwriter and joint book runner of the 2013 Notes Offerings.

454. Defendant Standard Chartered Bank ("Standard Chartered") maintains its principal place of business at Two Gateway Center 13th Floor, Newark, New Jersey 07102. Standard Chartered acted as an underwriter and co-manager of the 2013 Notes Offerings.

455. Defendant Bank of China (Hong Kong) Limited ("Bank of China") maintains its principal place of business at Bank of China Tower, 1 Garden Road, Hong Kong, and has branch

offices in New York, including at 410 Madison Avenue, New York, NY 10017.  Bank of China acted as an underwriter and joint book runner of the 2014 Notes Offerings.

456.    Defendant Banco Bradesco BBI S.A. ("Bradesco") has its principal place of business at Avenida Paulista, 1450 8th Floor, Sao Paulo, Brazil, and maintains an office at 450 Park Avenue, New York, New York 10022.  Bradesco acted as an underwriter and joint book runner of the 2014 Notes Offerings.

457.    Defendant Banca IMI S.p.A. ("Banca IMI") has its principal place of business at Largo Mattioli, 3 Milan, MI 20121, Italy, and through its subsidiary Banca IMI Securities Corporation maintains an office at 1 William Street, New York, New York 10004.  Banca IMI acted as an underwriter and co-manager of the 2014 Notes Offerings.

458.    Defendant Scotia Capital (USA) Inc. ("Scotia Capital") maintains its principal place of business at 1 Liberty Plaza, 165 Broadway, 25th Floor, New York, New York 10006.  Scotia Capital acted as an underwriter and co-manager of the 2014 Notes Offerings.

459.    Defendants identified in paragraphs 444 - 458 are collectively referred to herein as the "Underwriter Defendants."

### 5.    **Auditor Defendant**

460.    PriceWaterhouseCoopers Auditores Independentes ("PwC") maintains an office at Av. José Silva de Azevedo Neto 200, 1st and 2nd Tower Evolution IV, Barra da Tijuca 22775-056 - Rio de Janeiro, and is a network firm of PriceWaterhouseCoopers International Limited and the Brazilian arm of the global PricewaterhouseCoopers organization.

461.    PwC served as Petrobras' independent registered public accounting firm since January 2012, and audited Petrobras' financial statements and its system of internal controls over

financial reporting for the years ended December 31, 2012 and 2013, and signed each of the audit opinions included in Petrobras' Form 20-F filings for those years.

### 6.   Relevant Non-Defendant Individuals

462.    Dilma Vana Rousseff ("President Rousseff") currently serves as President of Brazil. President Rousseff served as the Chair of the Board of Directors of Petrobras prior to March 2010, and signed the 2009 Registration Statement.

463.    Guido Mantega currently serves as the Minister of Finance of Brazil and as the Chair of the Board of Directors ("Board").  Mantega signed the 2009 Registration Statement and 2012 Registration Statement.

464.    Silas Rondeau Cavalcante Silva served as Brazil's Minister of Mines and Energy between 2005 and 2007, and as a Director of Petrobras, and he signed the 2009 Registration Statement.

465.    Fabio Colletti Barbosa ("Barbosa") served as a member of the President of Brazil's National Council for Economic and Social Development, and as a Director of Petrobras, and he signed the 2009 Registration Statement.

466.    Marcos Antonio Silva Menezes ("Menezes") served as a member of the Fiscal Council of Fundação Petrobras de Seguridade Social-PETROS, as Chief Accounting Officer for Petrobras, and as a Director of PifCo. Menezes signed the 2009 Registration Statement and the 2012 Registration Statement.

467.    Francisco Roberto de Albuquerque serves as a commanding officer in the Army of Brazil and as a Director of Petrobras, and he signed the 2009 Registration Statement and the 2012 Registration Statement.

468.    Jorge Gerdau Johannpeter ("Johannpeter") serves as the president of the Chamber of Management Policies, Performance and Competitiveness, an organization linked to the Presidency of Brazil, and as a Director of Petrobras.  Johannpeter signed the 2009 Registration Statement and the 2012 Registration Statement.

469.    Luciano Galvão Coutinho ("Coutinho ") served Executive Secretary of the Science & Technology Ministry of Brazil, as President of the Brazilian Development Bank, and as a Director of Petrobras. Coutinho signed the 2009 Registration Statement and the 2012 Registration Statement.

470.    Sergio Franklin Quintella ("Quintella") served the President of the Federal Tribunal Court and as a Director of Petrobras. Quintella signed the 2009 Registration Statement and the 2012 Registration Statement.

471.    Marcio Pereira Zimmermann ("Zimmermann") serves as Deputy Minister of Energy and as a Director of Petrobras. Zimmermann signed the prospectus included in the 2012 Registration Statement pursuant to which the Company offered the 2013 Notes and the 2014 Notes.

472.    Miriam Aparecida Belchior ("Belchior") serves as Minister of Planning and as a Director of Petrobras. Belchior signed the 2012 Registration Statement.

**F.    Jurisdiction and Venue**

473.    The claims asserted herein arise under Sections 11, 12(a)(2) and 15 (15 U.S.C. §§ 77k, 77l, and 77o) of the Securities Act of 1933 ("Securities Act").

474.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act (15 U.S.C. § 77v).

475.    Venue is proper in this District pursuant to Section 22(a) of the Securities Act (15 U.S.C § 77v) and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the wrongs alleged

145

and/or their effects have occurred within this District, Petrobras maintains its principal office in New York, New York, and various Petrobras securities trade within this District on the New York Stock Exchange.

476.    In connection with the acts alleged in these Claims for Relief under the Securities Act, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### G.    False and Misleading Statements

#### 1.    <u>2010 20-F</u>

477.    On May 26, 2011, Petrobras and PifCo filed the 2010 20-F, incorporated by reference into the 2012 Offering Documents, reporting total assets of $331 billion including net property, plant, and equipment ("PP&E") of $230 billion, total costs and expenses of $25.2 billion including depreciation, depletion, and amortization of $2.3 billion, and net income of $6.5 billion.

478.    Petrobras' 2010 20-F stated that the "Company's management assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2010" and "has concluded that as of December 31, 2010, each Company's internal control over financial reporting is effective."   The Company explained that the "management of [the] Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2010, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

479.    Petrobras' Code of Ethics (the "Code") was incorporated by reference into the 2010 20-F.  Pursuant to terms of the Code, Petrobras undertook to "conduct its business with transparency and integrity, creating credibility with its shareholders . . . and . . . investors" and to

"register its reports and statements in a correct, consistent, accurate and complete way." Moreover, according to the Code, Petrobras' executives undertook to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions" and to "refuse support and contributions to political parties or political campaigns of candidates for elective offices."

480.    Statements in the 2010 20-F regarding the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income were false and misleading because (i) the reported value of the Company's assets were materially false and misleading as the costs associated with improper payments made to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values; and (ii) had the improper payments been properly accounted for, the Company would have recognized materially greater expenses and less net income.  Moreover, these statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E was adversely impacted by improper payments that inflated the value of numerous construction contracts related to Petrobras' refineries and operations.

481.    Further, statements in the 2010 20-F regarding compliance with internal control over financial reporting, and statements regarding adherence to the Code, were materially false and misleading and omitted material information by virtue of the improper payments made to contractors and contributions to political parties or political campaigns of candidates for elective offices.

### 2.    11/22/11 6-K

482.    On November 22, 2011, Petrobras filed the 11/22/11 6-K with the SEC setting forth the Company's financial statements for the period ending November 30, 2011, incorporated by reference into the 2012 Offering Documents, reporting total assets of $309 billion, including net PP&E of $220 billion, total costs and expenses of $31.5 billion including depreciation, depletion, and amortization of $2.6 billion, and net income of $3.9 billion.

483.    Statements in the 11/22/11 6-K regarding the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income were false and misleading because (i) the reported value of the Company's assets were materially false and misleading as costs associated with improper payments made to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values; and (ii) had the improper payments been properly accounted for, the Company would have recognized materially greater expenses and less net income.  Moreover, these statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E was adversely impacted by improper payments that inflated the value of numerous construction contracts related to Petrobras' refineries and operations.

### 3.    2011 20-F

484.    On April 2, 2012, Petrobras and PifCo filed the 2011 20-F, incorporated by reference into the 2013 Offering Documents and 2014 Offering Documents, reporting total assets of $319 billion including net PP&E of $182 billion, depreciation, depletion, and amortization of

$10.5 billion, and net income of $20.0 billion, and also incorporated the Code and made statements substantially similar to those described in ¶ 479 above.

485.    Petrobras' 2011 20-F stated that the "Company's management has assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2011" and "has concluded that each Company's internal control over financial reporting was effective as of December 31, 2011."  The Company explained that the "management of [the] Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2011, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

486.    Statements in the 2011 20-F regarding the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income were false and misleading because (i) the reported value of the Company's assets were materially false and misleading as the costs associated with improper payments made to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values; and (ii) had the improper payments been properly accounted for, the Company would have recognized materially greater expenses and less net income.  Moreover, these statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E was adversely impacted by improper payments that inflated the value of numerous construction contracts related to Petrobras' refineries and operations.

487.    Further, statements in the 2010 20-F regarding compliance with internal control over financial reporting, and statements regarding adherence to the Code, were materially false

and misleading and omitted material information by virtue of the improper payments made to contractors and contributions to political parties or political campaigns of candidates for elective offices.

### 4. 8/10/12 6-K

488.    On August 10, 2012, Petrobras filed the 8/10/12 6-K setting forth the Company's financial statements for the period ending June 30, 2012, incorporated by reference into the 2013 Offering Documents and the 2014 Offering Documents, reporting total assets of $311 billion including net property, plant, and equipment of $185 billion, depreciation, depletion, and amortization of $2.7 billion, and a net loss of $953 million.

489.    Statements in the 8/10/12 6-K regarding the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income were false and misleading because (i) the reported value of the Company's assets were materially false and misleading as costs associated with improper payments made to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values; and (ii) had the improper payments been properly accounted for, the Company would have recognized materially greater expenses and less net income.  Moreover, these statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E was adversely impacted by improper payments that inflated the value of numerous construction contracts related to Petrobras' refineries and operations.

5.    **2012 20-F**

490.    On April 29, 2013, Petrobras filed the 2012 20-F, incorporated by reference into the 2013 Offering Documents and 2014 Offering Documents, reporting total assets of $332 billion including net PP&F of $205 billion, depreciation, depletion, and amortization of $11.1 billion, and net income of $10.9 billion.

491.    Petrobras' 2012 20-F stated that the "Company's management has assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2012" and "has concluded that each Company's internal control over financial reporting was effective as of December 31, 2012." The Company explained that the "management of [the] Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2012, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

492.    Statements in the 2012 20-F regarding the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income were false and misleading because (i) the reported value of the Company's assets were materially false and misleading as the costs associated with improper payments made to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values; and (ii) had the improper payments been properly accounted for, the Company would have recognized materially greater expenses and less net income. Moreover, these statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E was adversely impacted

by improper payments that inflated the value of numerous construction contracts related to Petrobras' refineries and operations.

493.    Further, statements in the 2010 20-F regarding compliance with internal control over financial reporting, and statements regarding adherence to the Code, were materially false and misleading and omitted material information by virtue of the improper payments made to contractors and contributions to political parties or political campaigns of candidates for elective offices.

### 6.    4/30/13 6-K

494.    On April 30, 2013, Petrobras filed the 4/30/13 6-K setting forth the Company's financial statements for the period ending March 31, 2013, incorporated by reference into the 2013 Offering Documents and the 2014 Offering Documents, reporting total assets of $345 billion including net PP&E of $214 billion, depreciation, depletion, and amortization of $3.2 billion, and net income of $3.9 billion.

495.    Statements in the 4/30/13 6-K regarding the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income were false and misleading because (i) the reported value of the Company's assets were materially false and misleading as costs associated with improper payments made to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values; and (ii) had the improper payments been properly accounted for, the Company would have recognized materially greater expenses and less net income.  Moreover, these statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E was adversely impacted

by improper payments that inflated the value of numerous construction contracts related to Petrobras' refineries and operations.

### 7.    2/26/14 6-K

496.    On February 26, 2014, Petrobras filed the 2/26/14 6-K setting forth the Company's financial statements for 2013 year end, incorporated by reference into the 2014 Offering Documents, reporting total assets of $321 billion including net PP&E of $228 billion, depreciation, depletion, and amortization of $13.2 billion, and net income of $10.8 billion.

497.    Statements in the 2/26/14 6-K regarding the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income were false and misleading because (i) the reported value of the Company's assets were materially false and misleading as costs associated with improper payments made to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values; and (ii) had the improper payments been properly accounted for, the Company would have recognized materially greater expenses and less net income.  Moreover, these statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E was adversely impacted by improper payments that inflated the value of numerous construction contracts related to Petrobras' refineries and operations.

### 8.    3/7/14 6-K

498.    On March 11, 2014, Petrobras filed the 3/11/14 6-K, which included the following statement:

> Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in

Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013.

499.    This statement was materially false and misleading and omitted material information by virtue of the improper payments made to contractors and contributions to political parties or political campaigns of candidates for elective offices.

**9.    3/11/14 6-K**

500.    On March 11, 2014, Petrobras filed the 3/11/14 6-K, which attached a copy of the March 2014 Underwriting Agreement between Petrobras, PGF and the Underwriter Defendants who underwrote the 2014 Notes Offerings, stating that neither Petrobras nor any of its officers had engaged in any corruption, including making "any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds" or violating "any provision of the Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 or the Law No. 12,846 of 2013 - *Nova Lei Anticorrupção Brasileira* of 2013 (New Brazilian Anti-Corruption Law)."  The March 2014 Underwriting Agreement further stated that neither Petrobras nor any of its officers had "made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment."

501.    Statements in the 3/11/14 6-K were materially false and misleading because Petrobras and its executives have admitted that they had engaged in a pattern of awarding inflated contracts to foreign and domestic construction and engineering companies, including within these contracts improper influence payments paid to Petrobras executives and Brazilian government officials.

### H.   Petrobras' Financial Statements Failed to Comply With PCAOB Standards And SEC Regulations

502.   PwC audited Petrobras' financial statements and its system of internal controls over financial reporting for the years ended December 31, 2012 and 2013.  PwC also issued and signed audit opinions in which it certified that Petrobras' internal controls were adequate and that the Company's financial statements were free of material misstatements and fairly presented Petrobras' financial position.

503.   PwC subsequently consented to the incorporation by reference of those unqualified audit opinions in the Offering Materials for the Company's 2013 Notes Offerings and 2014 Notes Offerings.

504.   PwC's unqualified opinions on Petrobras' financial statements, incorporated by reference into the 2013 Notes Offerings and 2014 Notes Offerings, were materially false and misleading.  Contrary to their representations, PwC's audits of those financial statements were not conducted in accordance with Generally Accepted Auditing Standards ("GAAS") or Public Company Accounting Oversight Board ("PCAOB") standards, and Petrobras' financial condition and results of operations were not presented in conformity with International Financial Reporting Standards ("IFRS"), as they purported to be.   In issuing unqualified audit opinions and consenting to their incorporation in Petrobras' SEC filings, PwC made false and misleading statements in violation of Section 11 of the Exchange Act.

505.   On February 4, 2013, PwC signed a "Report of Independent Registered Public Accounting Firm" reporting on Petrobras' financial statements and internal controls for the year ended December 31, 2012.  Specifically, PwC reported:

In our opinion, the accompanying consolidated statement of financial position and the related consolidated statements of income, of comprehensive income, of cash flows and of changes in stockholders' equity present fairly, in all material respects, the financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries (the

"Company") at December 31, 2012, and the results of their operations and their cash flows for the year ended December 31, 2012 in conformity with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB). Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness

to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Rio de Janeiro, February 4, 2013

PricewaterhouseCoopers
Auditores Independentes
CRC 2SP000160/O-5 "F" RJ

/s/ Marcos Donizete Panassol
Contador CRC 1SP155975/O-8 "S" RJ

506.   On February 6, 2013, Petrobras filed an interim report with the SEC on Form 6-K

in which PwC consented to the incorporation by reference of its report in Petrobras' 2012

Registration Statement.  Specifically:

> We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-163665) of Petróleo Brasileiro S.A. - Petrobras, of our report dated February 04, 2013 relating to the financial statements of Petrobras and the effectiveness of internal control over financial reporting, which is included in Petrobras` Form 6-K dated February 05, 2013.

> /s/ PricewaterhouseCoopers

> PricewaterhouseCoopers
> Auditores Independentes

> Rio de Janeiro - Brazil
> February 5, 2013

507.   On April 29, 2013, PwC reissued its signed report of February 5, 2013, with

Petrobras' filing of the 2012 20-F with the SEC.  In an exhibit to the 2012 20-F, PwC again

consented to the incorporation by reference of its report in Petrobras' 2012 Registration

Statement.  Specifically,

> We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our report dated February 4, 2013 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Annual Report on Form 20-F.

/s/ Marcos Donizete Panassol
Marcos Donizete Panassol
Engagement Leader

PricewaterhouseCoopers
Rio de Janeiro - Brazil
April 26, 2013

508.    On February 25, 2014, PwC signed a "Report of Independent Registered Public

Accounting Firm," reporting on Petrobras' financial statements and internal controls for the year

ended December 31, 2013.  The report was issued in a Form 6-K filed by Petrobras with the SEC

on February 26, 2013.  It reads as follows:

> In our opinion, the accompanying consolidated statement of financial position and
> the related consolidated statements of income and comprehensive income,
> changes in equity and cash flows present fairly, in all material respects, the
> financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries (the
> "Company") at December 31, 2013, and December 31, 2012, and the results of
> their operations and their cash flows for the years ended December 31, 2013, and
> December 31, 2012, in conformity with International Financial Reporting
> Standards as issued by the International Accounting Standards Board. Also in our
> opinion, the Company maintained, in all material respects, effective internal
> control over financial reporting as of December 31, 2013 based on criteria
> established in Internal Control - Integrated Framework  (1992) issued by the
> Committee of Sponsoring Organizations of the Treadway Commission (COSO).
> The Company's management is responsible for these financial statements, for
> maintaining effective internal control over financial reporting and for its
> assessment of the effectiveness of internal control over financial reporting,
> included in the accompanying Management's Report on Internal Control over
> Financial Reporting. Our responsibility is to express opinions on these financial
> statements and on the Company's internal control over financial reporting based
> on our integrated audits. We conducted our audits in accordance with the
> standards of the Public Company Accounting Oversight Board (United States).
> Those standards require that we plan and perform the audits to obtain reasonable
> assurance about whether the financial statements are free of material misstatement
> and whether effective internal control over financial reporting was maintained in
> all material respects. Our audits of the financial statements included examining,
> on a test basis, evidence supporting the amounts and disclosures in the financial
> statements, assessing the accounting principles used and significant estimates
> made by management, and evaluating the overall financial statement presentation.
> Our audit of internal control over financial reporting included obtaining an
> understanding of internal control over financial reporting, assessing the risk that a

material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

We also have audited the adjustments to the 2011 financial statements to retrospectively apply the change in accounting for employee benefit plans for the revisions to IAS 19 Employee Benefits as described in Note 2.3. In our opinion, such adjustments are appropriate and have been properly applied. We were not engaged to audit, review, or apply any procedures to the 2011 consolidated financial statements of the Company other than with respect to the adjustments and, accordingly, we do not express an opinion or any other form of assurance on the 2011 consolidated financial statements taken as a whole.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Rio de Janeiro, February 25, 2013

/s/ PricewaterhouseCoopers
Auditores Independentes
CRC 2SP000160/O-5 "F" RJ

/s/ Marcos Donizete Panassol
Contador CRC 1SP155975

509.    On March 10, 2014, PwC reissued its signed report of February 4, 2014, with Petrobras' filing of Form 6-K/A with the SEC.  In an exhibit to the Form 6-K/A, PwC again consented to the incorporation by reference of its report in Petrobras' Registration Statement filed on Form F-3:

> We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our report dated February 25, 2014 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in the Petróleo Brasileiro S.A. - Petrobras Form 6-K dated February 26, 2014 and the related amendment on Form 6-K/A dated March 10, 2014. We also consent to the reference to us as experts under the heading "Independent Registered Public Accounting Firm" in such Registration Statement. We also consent to the reference to us under the heading "Selected Financial Data" in such Registration Statement.
>
> /s/PricewaterhouseCoopers Auditores Independentes
> Rio de Janeiro, Brazil
> March 10, 2014

510.    Finally, on April 30, 2014, PwC reissued its signed report of February 25, 2014, with Petrobras' filing of the 2013 20-F with the SEC.  In an exhibit to the 2013 20-F, PwC again consented to the incorporation by reference of its report in Petrobras' Registration Statement filed on Form F-3:

> We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our report dated February 25, 2014 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Annual Report on Form 20-F.
>
> /s/ Marcos Donizete Panassol
> Marcos Donizete Panassol
> Engagement Leader
>
> PricewaterhouseCoopers
> Rio de Janeiro - Brazil
> April 30, 2014

511. As Petrobras' external auditor, PwC was required to audit the Company's financial statements and the effectiveness of the Company's internal controls over financial reporting in accordance with GAAS, promulgated by the American Institute of Certified Public Accountants ("AICPA"), and the standards of the PCAOB. The PCAOB, which was established by the Sarbanes-Oxley Act of 2002, adopted GAAS in April 2003. The standards adopted by PCAOB that also have been approved by the SEC are designated with the prefix "AS." Preexisting interim standards that have been adopted by the PCAOB are designated by the prefix "AU."

512. GAAS is comprised of ten standards that fall into three basic categories: General Standards, Fieldwork Standards, and Reporting Standards. These standards are set forth in AU § 150.01-.02. Specifically, the General Standards provide guidance to an auditor on the exercise of due professional care in the performance of the audit. The Standards of Fieldwork provide guidance on audit planning, proper evaluation of internal controls, and the collection of appropriate evidential matter. Finally, the Standards of Reporting provide guidance to the auditor on the content of an audit report.

513. An audit is a risk-based process during which the auditor should exercise due care. An auditor should be always aware of the risk of misstatements due to fraud or error, and to the possibility of illegal acts. As those risks increase or materialize, auditors are obligated by GAAS and PCAOB standards to alter their audit procedures accordingly. PwC failed to recognize glaring risks and evidence of illegal acts, and consequently, failed to adjust its audit procedures, leading to an unqualified audit report that was materially false and misleading.

514. For example, PwC failed to exercise sufficient professional care in its audits of Petrobras' financial statements, and thus violated GAAS General Standard No. 3, which requires

due professional care to be exercised in the performance of the audit and the preparation of the report, and AU § 230, Due Professional Care in the Performance of Work, which states that "[d]ue professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting." AU § 230.02. The duty to exercise due care required PwC to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud. AU § 230.10. PwC failed to do this.

515. PwC also failed to exercise sufficient professional skepticism in violation of AU § 316. Specifically, AU § 316 requires the following:

> Due professional care requires the auditor to exercise professional skepticism. Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

AU § 316.13 (internal citations omitted).

516. AU § 316 therefore required PwC to be continually alert for indications of misstatements of Petrobras' financial statements due to either error or fraud. The PCAOB standards require the auditor to approach the audit "with a mindset that recognizes the possibility that a material misstatement due to fraud could be present." AU § 316.13. As detailed above at ¶¶ 122-124, due to the presence of multiple red flags, PwC knew or should have known that there was a strong possibility of material misstatements in connection with Petrobras' financial

statements for the 2012 and 2013 fiscal years.  For example, PwC should have recognized the importance of Property, Plant and Equipment ("PP&E") to the balance sheet and that the most significant cash outflow was capital expenditures.  *Supra* at ¶ 131.  The capital expenditures in 2012 and 2013 were approximately four times greater than net income.  *Supra* at ¶ 122.  There also were projects that were severely over budget.  *Supra* at ¶ 122.

517.    Furthermore, PwC should have been aware that there was a heightened risk in connection with the inflation of construction contracts.  As to that point, it was required to perform increased audit procedures compared to those it otherwise performed.  For example paragraphs 6 and 9 of AS No. 13, The Auditor's Responses to the Risk of Material Misstatement, state the following:

> The auditor also should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement.  Examples of such pervasive changes include modifying the audit strategy to: (a) increase the substantive testing of the valuation of numerous significant accounts at year end because of significantly deteriorating market conditions, and (b) obtain more persuasive audit evidence from substantive procedures due to the identification of pervasive weaknesses in the company's control environment.

> * * *

> In designing the audit procedures to be performed, the auditor should . . . obtain more persuasive audit evidence the higher the auditor's assessment of risk.

518.    AS No. 13.14 provides specific examples of precisely how PwC should have modified its audit procedures to address its assessed risks.  In that regard, PwC should have:

> (a)    Chang[ed] the nature of audit procedures to obtain evidence that is more reliable or to obtain additional corroborative information;

> (b)    Chang[ed] the timing of audit procedures to be closer to the end of the period or to the points during the period in which fraudulent transactions are more likely to occur; and

(c)     Chang[ed] the extent of the procedures applied to obtain more evidence, e.g., by increasing sample sizes or applying computer-assisted audit techniques to all of the items in an account.

519.    In failing to modify its audit procedures, PwC failed to comply with AS No. 13. Had PwC appropriately modified its audit procedures to be responsive to the risk of material misstatement of the Company's financial statements due to misstatements in its PP&E accounts and carried out those procedures with the appropriate degree of professional skepticism, it would have discovered that the Company's capital expenditures, PP&E, and net income all were materially overstated.

520.    PwC's failure to obtain sufficient appropriate evidential matter regarding its audits of capital expenditures, construction in progress accounts, and equipment and other assets accounts also did not comply with PCAOB auditing standards.  For example, PwC violated GAAS Standard of Fieldwork No. 3, which requires sufficient appropriate evidential matter to afford a reasonable basis for: (1) the opinion regarding the financial statements and (2) the opinion regarding internal control over financial reporting.  PwC also violated AS No. 15:  Audit Evidence, which states that "as the risk increases, the amount of evidence that the auditor should obtain also increases. . . . [O]rdinarily more evidence is needed to respond to significant risks."  Notwithstanding ample indicators of increased risk of fraud and illegal acts in parts of Petrobras' financial statements, PwC failed to obtain more evidence than it typically would in the absence of increased risk.  For example, the Company made significant capital expenditures, including excessive amounts paid to acquire certain refineries and experiencing significant budget overruns on large projects.  There were also various news articles reporting the Company's practice of engaging in bribes and kickbacks.  Also, PP&E was by far the largest asset on Petrobras' balance sheets.  At December 31, 2013 and 2012, PP&E represented 70.9% and 62.5% of total assets,

164

respectively.  Furthermore, it is recognized that bribery by international companies is common when there is close interaction between public and private actors.  PwC should have been aware of all of these facts.  And yet, in violation of AS No. 13, AS No. 15 and PCAOB Standard of Fieldwork No. 3, PwC refused to obtain additional evidence or modify its audit procedures.

521.    The audit procedures that PwC was required to perform include the following:

(a)    Physically inspecting major additions and verifying claims of ownership;

(b)    For constructed property and construction in progress, examining appropriate documentation supporting the amount recorded on the Company's balance sheet, such as review of construction contracts, work orders, and job status reports;

(c)    Verifying that all payments for capital expenditures were properly authorized and including appropriate supporting documentation;

(d)    Verifying that change orders went through the proper approval process and that the resulting payments were appropriately authorized;

(e)    Obtaining support for authorization of fixed assets additions by reference to minutes of meetings of the board of directors, capital asset budgets, or other evidence of approval by appropriate personnel;

(f)    In connection with the assets under construction, examining all of the supporting documentation for large expenditures, and understanding why certain projects were exceeding their original budgeted amounts and why there were large add-on contracts that increased the original plans.  Key items should have been selected that were large, suspicious, unusual, or risk-prone (AS No. 15.25);

(g)    Examining journal entries and other adjustments for evidence of possible material misstatement due to fraud (AU § 316.58); and

(h)    Inquiring of individuals involved in the financial reporting process about inappropriate or unusual activity relating to the processing of journal entries and other adjustments.

522.    PwC also failed to detect illegal acts engaged in by Petrobras employees, including the acceptance of bribes and kickbacks and subsequent overpayment to contractors in violation of the Foreign Corrupt Practices Act ("FCPA").  Thus, PwC violated AU § 317, *Illegal*

*Acts by Clients*.  In accordance with AU § 317, PwC was required to perform certain additional procedures when it became aware of information concerning a possible illegal act.  In that regard, PwC was required to gain an understanding of the nature of the act, the circumstances in which it occurred, and other information to evaluate that act's effect on the financial statements. If management failed to provide necessary information, PwC was required to consult with Petrobras' legal counsel or other specialists.  *See* AU § 317.10.

523.  In addition, AU § 317 suggests the need for following additional audit procedures, all of which PwC failed to conduct:

(a)  Examining supporting documents . . . [;]

(b)  Confirm[ing] significant information concerning the matter . . . [;]

(c)  Determin[ing] whether the transaction has been properly authorized . . . [; and]

(d)  Consider[ing] whether other similar transactions or events have occurred, and apply procedures to identify them.

AU 317.11.

524.  PwC also violated GAAS Standards of Reporting Nos. 1 and 4 by falsely representing that Petrobras' financial statements were presented in conformity with IFRS when they were not—as evidenced by the pending write-down of approximately $30 billion of PP&E—and by improperly providing unqualified opinions on Petrobras' financial statements for the years ended December 31, 2012 and 2013, even though its audits were not conducted in accordance with PCAOB auditing standards and the financial statements were not prepared in accordance with IFRS.

525.   Under AS No. 5, PwC was required to complete a careful examination regarding Petrobras' effective controls over financial reporting.  PCOAB's rulemaking in connection with AS No. 5 makes clear that PwC could not simply rely on the assessment of internal controls reached and communicated to it by Petrobras management or third parties, but was instead required to conduct its own independent assessment of internal controls before it could issue a "clean" opinion.  According to AS No. 5: "The auditor is required to provide an independent opinion on the effectiveness of the company's internal control over financial reporting. . . .  The auditor cannot obtain sufficient evidence to support an opinion on the effectiveness of internal controls based solely on observation of or interaction with the company's controls.  Rather, the auditor needs to perform procedures such as inquiry, observation, and inspection of documents, or walkthroughs, which consist of a combination of these procedures, in order to fully understand and identify the likely sources of potential misstatements[.]"  After performing an independent analysis, an independent auditor is not permitted to issue a clean opinion if any "material weaknesses" exist.

526.   Because PwC did not identify, let alone independently test the effectiveness of, any internal control that would have prevented the overstatement of PP&E, discussed above, as required by AS No. 5, PwC's unqualified opinions regarding the effectiveness of Petrobras' system of internal controls were materially false and misleading.

## COUNT VII

### For Violations of Section 11 of the Securities Act
Against the Securities Act Defendants

527.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 388-526, as if set forth fully herein and further allege as follows.  This count is based on

negligence and strict liability and dos not sound in fraud.  Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

528.    This Count is asserted against the Petrobras, PGF, PifCo, the Officer and Director Defendants, the Underwriter Defendants, and PwC (together, the "Securities Act Defendants") for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all members of the Class who purchased or otherwise acquired the Petrobras securities set forth on Appendix A pursuant or traceable to the materially false and misleading 2009 Registration Statement and 2012 Registration Statement (together, the "Registration Statements") and Petrobras SEC filings incorporated by reference.

529.    The Registration Statements, including Petrobras' SEC filings incorporated by reference therein at the time of each offering, contained untrue statements of material fact and omitted to state other material facts necessary to make the statements made therein not misleading.  The specific documents containing such untrue statements and omissions that were incorporated by reference in the Registration Statements with regard to each Offering are identified in Appendix A.

530.    The Officer Defendants were executive officers and representatives of the Company responsible for the contents and dissemination of the Registration Statements.  Each of the Director Defendants was a director of Petrobras at the time the Registration Statement became effective as to each Note Offering.  Each of the Officer Defendants and Director Defendants signed the 2009 Registration Statement and/or the 2012 Registration Statement, or documents incorporated by reference, in their capacities as officers or directors of Petrobras, and caused and participated in the issuance of the 2009 Registration Statement and/or the 2012

Registration Statement.  By reasons of the conduct alleged herein, each of these Defendants violated Section 11 of the Securities Act.

531.    PwC was the auditor for Petrobras.  PwC's audit reports, included in Petrobras' 2012 20-F and 2013 20-F, and incorporated by reference into the 2013 Note Offerings and/or 2014 Note Offerings, falsely certified that Petrobras' financial statements were prepared in accordance with International Financial Reporting Standards and falsely represented that it conducted its audits or reviews in accordance with PCAOB standards.

532.    The Underwriter Defendants were underwriters of certain of the Offerings set forth in Appendices A.  The Underwriter Defendants acted negligently and are liable to members of the Class who purchased or otherwise acquired Petrobras securities sold pursuant or traceable to the Offering Materials for the respective Offerings in which each Underwriter Defendant participated.  The Defendants named in this count owed to the purchasers of the securities identified on Appendix A the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements, and any incorporated documents, at the time each such Offering became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue or misleading.  The Securities Act Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statements were true, were without omissions of any material facts, and were not misleading.  Accordingly, the Securities Act Defendants acted negligently and are therefore liable to Plaintiffs and members of the Class who purchased or otherwise acquired the securities sold pursuant or traceable to the materially false and misleading Offering Materials set forth in Appendix A.

533.     Plaintiffs and all members of the Class who purchased or otherwise acquired Petrobras securities sold in or traceable to these Offerings did not know of the negligent conduct alleged herein or of the facts concerning the untrue statements of material fact and omissions alleged herein, and by the reasonable exercise of care could not have reasonably discovered such facts or conduct.

534.     None of the untrue statements or omissions alleged herein was a forward-looking statement but, rather, each concerned existing facts. Moreover, the Defendants named in this Count did not properly identify any of these untrue statements as forward-looking statements and did not disclose information that undermined the validity of those statements.

535.     Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based from the time that the initial complaint was filed asserting claims arising out of the Registration Statements.  Less than three years elapsed from the time that the securities upon which this Count is brought were offered in good faith to the public to the time that the initial complaint was filed.

536.     Plaintiffs and all members of the Class have sustained damages. The value of the securities sold pursuant or traceable to the Offerings set forth in Appendix A has declined substantially due to the Securities Act Defendants' violations of Section 11 of the Securities Act. By reason of the foregoing, the Securities Act Defendants are liable for violations of Section 11 of the Securities Act to Plaintiffs and all members of the Class.

## COUNT VIII

### For Violations Of Section 12(a)(2) of the Securities
### Act Against Petrobras and PGF

537.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 388-526, as if set forth fully herein and further allege as follows.

170

538.    This Count is asserted against Petrobras and PGF ("Section 12(a)(2) Defendants") for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2).

539.    Section 12(a)(2) Defendants were sellers, offerors, and/or solicitors of sales of the securities issued in the Notes Offerings pursuant to the Offering Documents, and directly solicited the purchase of securities by Plaintiffs by means of the Offering Documents, motivated at least in part by the desire to serve their own financial interests.

540.    The Offering Documents contained untrue statements of material fact and failed to disclose material facts, as set forth herein.  Plaintiffs purchased the Notes Offerings in or traceable pursuant to the materially false and misleading Offering Documents.

541.    Plaintiffs did not know, nor in the exercise of reasonable diligence could it have known, of the untrue statements of material fact or omissions of material facts in the Offering Documents when they purchased or acquired the Notes.

542.    The value of the Notes issued in connection with the Notes Offerings has declined substantially subsequent to the consummation of the Notes Offerings, and Plaintiffs have sustained damages.

543.    Less than one year elapsed between the time Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based. Less than three years have elapsed between the time the Notes Offerings were bona fide offered to the public.

544.    By reason of the foregoing, Section 12(a)(2) Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiffs and all members of the Class.

**COUNT IX**

**For Violations of Section 15 of the Securities Act**
**Against the Officer Defendants**

545.     Plaintiffs repeat and realleges paragraphs 388-526, as if fully set forth herein. This count is based on negligence and strict liability and dos not sound in fraud.  Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

546.     This Count is asserted against the Officer Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired Petrobras securities set forth in Appendix A pursuant or traceable to the Offering Materials and were damaged thereby.

547.     At all relevant times, the Officer Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Each of the Officer Defendants served as an executive officer or director of Petrobras prior to and/or at the time of the Offerings.

548.     The Officer Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Petrobras' business affairs.  As officers and directors of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to Petrobras' financial condition and results of operations.  Because of their positions of control and authority as officers or directors of Petrobras, the Officer Defendants were able to, and did, control the contents of the Offering Materials which contained materially untrue financial information.

549.     By reason of the aforementioned conduct, each of the Officer Defendants is liable under Section 15 of the Securities Act, jointly and severally, to Plaintiffs and the other members

172

of the Class. As a direct and proximate result of the conduct of Petrobras and the Officer Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of the Petrobras securities identified in Appendix A.

550. Less than one year has elapsed between the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## XV.  CLASS ALLEGATIONS FOR EXCHANGE ACT COUNTS, SECURITIES ACT COUNTS, AND BRAZILIAN LAW COUNTS

551. Lead Plaintiff, and with respect to the Note Offerings, all Plaintiffs, bring this action as a class action on behalf of themselves and as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons who and entities who: (i) purchased or otherwise acquired Petrobras securities traded on the NYSE or pursuant to other domestic transactions during the period January 22, 2010 and March 16, 2015, inclusive (the "Class Period"), and were damaged thereby; (ii) purchased or otherwise acquired the 2012 Notes pursuant to the 2009 Registration Statement, or the 2013 Notes or 2014 Notes pursuant to the 2012 Registration Statement and were damaged thereby; (iii) purchased or otherwise acquired Petrobras securities on the Brazilian stock exchange during the period January 22, 2010 and  March 19, 2015, who also purchased or otherwise acquired Petrobras securities traded on the NYSE or pursuant to other domestic transactions during the same period.  Excluded from the Class are Defendants and their families, directors and officers of Petrobras, PifCo, and PGF and their families, and affiliates.

552.    Plaintiffs' claims are typical of the claims if the members of the Class.  Plaintiffs and other members of the Class acquired securities in the offerings pursuant to a registration statement, or purchased or sold Petrobras securities in the market and sustained damages as a result of Defendants' conduct complained of herein.

553.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs has no interests that are adverse or antagonistic to the Class.

554.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, he expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

555.    Common question of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.   Among the questions of law and fact common to the Class are:

      (a)    whether the Federal securities laws were violated by Defendants' conduct as alleged herein;

      (b)    whether the registration statements and prospectuses for the Notes Offerings contained material misstatements or omitted material information;

      (c)    whether SEC filings, press releases and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted material information;

      (d)    whether and to what extend Defendant PwC's audits of the Company's financial statements for the years ended 2012 and 2013 failed to be conducted in accordance with the standards of the Public Company Accounting Oversight Board;

(e)     whether and to what extend the market prices of Petrobras' ADSs and other securities were artificially inflated during the Class Period due to the non-disclosure and/or misstatements complained of herein;

(f)     whether, with respect to Plaintiffs' claims under the Securities Act, the Individual Defendants and Underwriter Defendants named in those claims can sustain their burden of establishing an affirmative defense pursuant to the applicable statute;

(g)     whether, with respect to Plaintiffs' claims pursuant to Section 15 of the Securities Act, Defendants named in the claim were controlling persons of Petrobras, and with respect to Lead Plaintiff's Section 20(a) of the Exchange Act, Defendants named in the claim were controlling persons of Petrobras;

(h)     whether, with respect to Lead Plaintiff's claims under the Exchange Act, Defendants named in those claims acted with scienter;

(i)     whether, with respect to Lead Plaintiff's claims under the Exchange Act, reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

(j)     whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

556.    The names and addresses of those persons and entities who purchased or sold Petrobras securities during the Class Period are available from the Company's transfer agent(s) and/or from the Underwriter Defendants.  Notice may be provided to such members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## XVI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## IV.    JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Lead Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated:  March 27, 2015

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Marc I. Gross
John Kehoe
Emma Gilmore
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile:  212-661-8665

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 North LaSalle
Suite 3505
Chicago, IL  60603
Tel:  312-377-1181

**POMERANTZ LLP**
Jennifer Pafiti
468 North Camden Drive
Beverly Hills, CA 90210
Tel:  310-285-5330

*Attorneys for Lead Plaintiff*

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Christopher J. Keller
Eric J. Belfi
Michael W. Stocker
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
tdubbs@labaton.com
ckeller@labaton.com
ebelfi@labaton.com
mstocker@labaton.com

*Counsel for Employees' Retirement System
of the State of Hawaii*

**MOTLEY RICE**
Rebecca M. Katz
600 Third Avenue, 21st Floor
New York, NY 10016
Telephone:  212-577-0040
Fax: (212) 577-0054
Email: rkatz@motleyrice.com

*Counsel for Union Asset Management
Holding AG*

177