UNITED STATES DISTIRCT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                                                )
                                                                )
IN RE PETROBRAS SECURITIES                )        **Civil Action No. 1:14-cv-9662-JSR**
LITIGATION                                                  )
                                                                )        **ECF CASE**
                                                                )
                                                                )
_____)

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO MODIFY THE PSLRA STAY
TO PERMIT LIMITED DOCUMENT DISCOVERY**

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ..................................................................................... 1

II.     FACTUAL BACKGROUND ........................................................................................ 2

III.    SUMMARY OF PARALLEL PROCEEDINGS AND DISCOVERY
        CONDUCTED TO DATE ............................................................................................ 6

IV.     Argument ..................................................................................................................... 7

        A.      The Limited Relief Requested Here Is Consistent With The
                Purposes Of The PSLRA ................................................................................... 8

        B.      Lead Plaintiff's Requested Discovery Is Sufficiently
                Particularized And Places No Added Burden On The
                Producing Parties ........................................................................................... 10

        C.      Lead Plaintiff Will Suffer Undue Prejudice Absent Limited
                Relief ............................................................................................................... 13

V.      Conclusion ................................................................................................................ 15

## <u>TABLE OF AUTHORITIES</u>

Federal Cases

*Gervis v. Berg*,
　No. 00-CV-3362, 2005 WL 3299436 (E D N .Y Nov 29, 2005) ......................................... 12

*In re Bank of Am. Corp. Secs.*,
　No. 9 MDL 2058 (DC), 2009 WL 4796169 (S.D.N.Y. Nov. 16, 2009).............................. 15

*In re Delphi Corp. Sec., Derivative &"Erisa" Litig.*,
　 2007 WL 518626 (E.D. Mich. Feb. 15, 2007)............................................ 9, 10, 13

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
　2002 WL 31845114 (S.D. Tex. 2002) ........................................................... 12, 13

*In re FirstEnergy Corp. Sec. Litig.*,
　229 F.R.D. 541 (N.D. Ohio 2004) .................................................... 9, 10, 12, 13

*In re Grand Casinos, Inc. Sec Litig.*,
　988 F. Supp. 1270 (D. Minn. 1997)............................................................ 11, 12

*In re Labranche Sec. Litig.*,
　333 F. Supp. 2d 178 (S.D.N.Y. 2004) ........................................................ 12, 13

*In re Optionable Inc. Sec. Litig.*,
　2008 WL 4629985 (S.D.N.Y. October 20, 2008)................................................... 9

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
　220 F.R.D. 246 (D. Md. 2004) .............................................................. 7, 10, 12

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
　2003 WL 23830479 (D.N.H. Jan. 29, 2003) ...................................................... 12

*In re WorldCom, Inc. Sec. Litig.*,
　234 F. Supp. 2d 301 (S.D.N.Y. 2002) ....................................................... *passim*

*Seippel v. Sidley, Austin, Brown & Wood LLP*,
　03 Civ. 6942 (SAS), 2005 WL 388561 (S.D.N.Y. Feb. 17, 2005)...................................... 13

*Singer v. Nicor*,
　2003 WL 22013905 (N.D. Ill. Aug. 23, 2003) .................................................... 13

Federal Statutes

15 U.S.C. § 77z-1(b)(1) .......................................................................... 1, 7

15 U.S.C. § 78u-4(b)(3)(B).................................................................... 1, 7, 11

15. U.S.C. § 78u-4(b)(3)(C) ...................................................................... 11

15 U.S.C. § 77k.................................................................................... 3

15 U.S.C. §77(l)(2) ............................................................................... 3

15 U.S.C. § 77o.................................................................................... 3

15 U.S.C. § 78j(b) and 78t(a)...................................................................... 2

15 U.S.C. § 78t(a) ........................................................................................................... 2

28 U.S.C. § 1781 ............................................................................................................. 1

International Treaties

Inter-American Convention on Letters Rogatory,
    14 I.L.M. 339 (1975) (reprinted following 28 U.S.C. § 1781) ("Inter-American Convention")... 1

Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters,
    opened for signature Mar. 18, 1970, 23 U.S.T. 2555 ................................................. 1

## I.   <u>PRELIMINARY STATEMENT</u>

Lead Plaintiff Universities Superannuation Scheme Limited ("Lead Plaintiff"), by and through undersigned counsel, respectfully submits this memorandum of law in support of its motion to partially modify the discovery stay set forth in Section 21(D)(b)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 27(b)(3)(B) of the Securities Act of 1933 (the "Securities Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(3)(B) and 15 U.S.C. § 77z-1(b)(1).

Lead Plaintiff seeks only the following limited relief from the discovery stay:

(1) Permission to obtain documents that Petróleo Brasileiro S.A. – Petrobras and its wholly-owned subsidiary Petrobras Global Finance B.V. ("PGF") (together, "Petrobras"), and the Underwriter Defendants[1] (together with Petrobras, the "Defendants") have already produced, or will soon produce, to regulatory, governmental or investigative agencies in connection with the wrongdoing that is the subject of Lead Plaintiff's Amended Complaint for Violations of the Securities Laws ("Complaint")[2]; and

(2) Permission to ***initiate*** the process to obtain discovery from foreign non-parties pursuant to either the Inter-American Convention on Letters Rogatory[3] or Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters,[4] as applicable based on the location of the foreign non-parties.

---

[1] Underwriter Defendants include: BB Securities Ltd., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Itau BBA USA Securities, Inc., Morgan Stanley & Co. LLC, Santander Investment Securities Inc., HSBC Securities (USA) Inc., Banco Votorantim Nassau Branch, Mitsubishi UFJ Securities (USA), Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Standard Chartered Bank, Bank of China (Hong Kong) Limited, Banco Bradesco BBI S.A., Banca IMI S.p.A., and Scotia Capital (USA) Inc.

[2] *See* Docket No. 110.

[3] The Inter-American Convention on Letters Rogatory, 14 I.L.M. 339 (1975) (reprinted following 28 U.S.C. § 1781), and the Additional Protocol to the Additional Protocol with the declarations can be found at 18 I.L.M. 1238 (1979), (reprinted following 28 U.S.C. § 1781) ("Inter-American Convention").

[4] Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature Mar. 18, 1970, 23 U.S.T. 2555, reprinted in the notes section following 28 U.S.C. § 1781 ("Hague Convention").

This modification is necessary to mitigate the potentially irreversible prejudice the Class has already suffered, and is likely to suffer in the future, as Lead Plaintiff falls further behind other interested parties who are utilizing their access to millions of pages of highly relevant documents to pursue their own agendas concerning the stunning bribery scheme that pervaded Petrobras.   While governmental authorities, including the Department of Justice ("DOJ"), Securities and Exchange Commission ("SEC"), Brazilian prosecutors, and the Brazilian Federal Police ("BFP") have access to this evidence, the PSLRA stay currently precludes Lead Plaintiff from obtaining any of the same materials.  Thus, Lead Plaintiff is at an increasing informational disadvantage in relation to other interested parties.

The PSLRA provides that a court may grant this limited relief under the circumstances here, and providing Lead Plaintiff with copies of materials collected and produced to other interested parties would not frustrate the purposes underlying the PSLRA.  Rather, Lead Plaintiff merely seeks to ensure that it—and the prospective class it seeks to represent—is on equal footing with other litigants in related proceedings.  Further, Lead Plaintiff seeks to initiate the time-consuming process of serving document requests upon foreign non-parties pursuant to international treaties to avoid subsequent discovery delay and potential loss of relevant evidence.

## II.  FACTUAL BACKGROUND

Lead Plaintiff asserts claims pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), in connection with Petrobras' common and preferred American Depository Shares that traded at artificially inflated values on the New York Stock Exchange ("NYSE") throughout the Class Period.  ¶¶ 358-363.[5]  Lead Plaintiff, and additional plaintiffs Union Asset Management Holding AG and Employees' Retirement System

---

[5] ¶__ is reference to paragraphs in the Complaint.

of the State of Hawaii, assert additional claims arising under Sections 11, 12(a)(2) and 15 the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77(l)(2) and 77o, from Petrobras' issuance of sixteen (16) debt offerings for collective proceeds of approximately $26.5 billion, pursuant to documents ("Offering Material") that contained materially untrue statements and omitted material facts regarding, *inter alia*, Petrobras' asset values, expenses, net income, disclosure procedures, and internal controls over financial reporting.  ¶¶ 527-544.

Prior to and throughout the Class Period, Petrobras facilitated a scheme in which various contractors paid multi-million dollar bribes to high-level Petrobras executives, governmental officials, political organizations, and others in exchange for Petrobras' lucrative oil and gas construction contracts.  ¶¶ 62-74, 394-407.   In return, Petrobras' executives compensated the contractors for the illegal bribes by paying inflated amounts under the contracts.  *Id*.  Petrobras then improperly capitalized the bribery payments, treating them as costs related to the construction, installation, and completion of oil and gas infrastructure, recording the payments as part of the value of the acquired assets on the Company's balance sheet.  ¶¶ 113-114, 405-406. After capitalizing the expenses, Petrobras depreciated the value of these assets—including the portion related to illegal bribes—over subsequent periods.  ¶¶ 114, 406.   Petrobras further calculated and reported the Company's periodic net income based, in part, on these inflated expense figures.  *Id*.

On or about March 20, 2014, the BFP arrested Paulo Roberto Costa ("Costa"), a former Petrobras refining chief, accusing him of colluding with a well-known Latin American money launderer to hide or distribute kickbacks as part of the plan to inflate Petrobras' construction contracts.  ¶ 123.  Some of the money launderers ran an operation out of a gas-station chain, giving the investigation its code name: "Operation Car Wash."  ¶¶ 4, 123, 291.   Among the

dozens of suspects arrested by the Brazilian Federal Police in connection with the money laundering and bribery scheme is Alberto Youssef ("Youssef"), a black market money launderer who led investigators to the Petrobras scheme, according to Brazilian prosecutors and police.  ¶ 6.  Youssef testified that the bribery scheme was rampant throughout Petrobras.  *Id.*

Costa's testimony, as part of a plea agreement with Brazilian prosecutors, places Petrobras squarely at the center of the bid-rigging scheme, and reveals that Petrobras had long been compromised—for at least seven years—while Costa and other high-level Petrobras executives siphoned hundreds of millions in kickbacks from companies to whom Petrobras awarded inflated construction contracts.  ¶¶ 49-53, 62-69, 396-397.  Costa testified that the payments financed campaigns and bribed politicians through intermediaries to guarantee they would vote in line with the ruling Workers' Party.  ¶¶ 50-53, 62, 64, 66-70, 396-397.  In addition, Pedro Barusco ("Barusco"), a former Petrobras service manager, told Brazilian investigators that the Workers' Party received as much as $200 million in improper payments, and that he received nearly $100 million, which he deposited in offshore accounts.

On January 14, 2015, Brazilian authorities arrested Nestor Cervero, a former financial director of Petrobras' fuel distribution subsidiary and former director of its international division. Petrobras terminated Cervero in March 2014 amid questions into what prosecutors subsequently characterized as a hugely inflated price paid in 2006 to Belgium's Astra Oil for a refinery in Texas.  ¶ 9.  According to Brazilian prosecutors, Cervero was arrested because of his "involvement in new illicit facts related to the crimes of corruption and money laundering [at Petrobras]."  *Id.*  On March 16, 2015, *The Wall Street Journal* reported that Brazilian federal prosecutors charged the treasurer of the ruling Workers' Party, Joao Vaccari Neto, with corruption and money laundering related to allegedly illegal campaign donations that prosecutors

4

say he solicited from Renato de Souza Duque ("Duque"), a member of Petrobras' senior management and Chief Services Officer from January 31, 2003 through February 2012. ¶ 10.

According to Brazilian prosecutors, Petrobras granted contracts to construction companies that systemically inflated the construction contracts by as much as 20%. ¶¶ 51, 96, 114, 122, 398, 406. Upon being awarded the inflated contracts, the construction companies then kicked back up to 3% of a contract's total value in the form of bribes to Costa, Barusco, other Petrobras executives, and Brazilian politicians and money launderers. ¶¶ 5, 50-53, 66-67, 88, 397. Costa explained that politicians, including members and allies of President Dilma Vana Rousseff's Workers' Party, accepted bribes linked to Petrobras contracts, which Costa referred to as a "three percent political adjustment." ¶ 62.

Costa named several construction companies involved in the bribery cartel, including Odebrecht and Camargo Correa S.A. ¶¶ 62, 315, 397. These companies are now under investigation and Brazilian prosecutors have publicly stated that there is "evidence of fraud, overpricing and kickbacks." ¶ 62, 315. On November 14, 2014, Odebrecht confirmed that "its offices in Rio de Janeiro had been searched and documents seized." ¶ 327. Similarly, Petrobras executives accepted $139 million in bribes from the Dutch firm SBM Offshore ("SBM"), which was bidding to supply oil rigs. ¶ 70. SBM recently confessed to the Netherland's Revenue Service and to the Public Attorney's Office that the company had transferred over $100 million in bribery payments to managers of Petrobras, related to offshore rigs and ships. *Id.*

Petrobras also participated in the cartel through periodic meetings with the Brazilian Industrial Engineering Association ("Abemi"). ¶ 54. Minutes of certain Abemi meetings reveal that Petrobras sent drafts of standard contracts and texts of calls for tenders for Abemi's analysis even before they were launched, and several Abemi members, such as UTC Engenharia, Toyo

Setal, Camargo Corrêa, Odebrecht and Mendes Júnior, are among the companies suspected of participating in misappropriation of funds from Petrobras. ¶ 55.  In the Abemi minutes, Petrobras workers show representatives of the contractors how they should present claims for contract addenda in order to avoid refusal.  *Id.*

As of March 16, 2015, the corruption probe at Petrobras has already led to over forty (40) indictments on racketeering, bribery and money laundering charges.  Prosecutors have asked Brazil's Supreme Court to investigate thirty-four (34) sitting politicians, including the speakers of both houses of Congress, for allegedly receiving bribe money.   According to federal prosecutor Deltan Dallagnol, "[t]his is a sophisticated and complex money-laundering scheme that was conceived to give the appearance of legality to money with illegal origins . . . These resources weren't illegal just because they were bribe payments but because they were the product and fruit of fraudulent bidding processes and the crime of price-fixing."  ¶ 10.

III.   **SUMMARY OF PARALLEL PROCEEDINGS
       <u>AND DISCOVERY CONDUCTED TO DATE</u>**

In the wake of the bribery scandal and serious questions regarding the true value of Petrobras' assets, reported financial results, and the content of its public disclosures, the DOJ, SEC, Brazilian prosecutors, Brazil's National Congress, and Switzerland's Office of the Attorney General have launched investigations into wrongdoing at Petrobras, and criminal probes continue in different courts in Brazil.  ¶¶ 6, 9-10, 12, 14, 49-52, 268, 289, 333, 335, 400.

In response to these investigations, and as set forth throughout the Complaint, Petrobras and/or its current and former employees have been producing documents, appearing before the Brazilian National Congress, and attending depositions before Brazilian prosecutors.  Further, the SEC served a subpoena on Petrobras on November 21, 2014.  ¶ 335.  Additionally, *The Wall Street Journal* reported that Switzerland's Office of the Attorney General recently unearthed

"hundreds of accounts at Switzerland's banks used to funnel bribes as part of the alleged wrongdoing at Brazil's state oil company."   ¶ 400.   Switzerland's Attorney General froze roughly $400 million in assets related to the scandal, and ongoing probes have identified more than 300 accounts at more than thirty (30) Swiss "banking institutions" that the officials say were apparently used to funnel Petrobras bribery payments now under investigation in Brazil and elsewhere.  *Id.*

## IV.   <u>ARGUMENT</u>

Under the PSLRA, discovery is generally stayed "during the pendency of any motion to dismiss."  15 U.S.C. §§ 77z-1(b)(1) and 78u-4(b)(3)(B).  As courts have explained, "Congress enacted the discovery stay in order to minimize the incentives for plaintiffs to file frivolous securities class actions in the hope either that corporate defendants will settle those actions rather than bear the high cost of discovery, or that the plaintiff will find during discovery some sustainable claim not alleged in the complaint."  *In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 305 (S.D.N.Y. 2002) (internal citations omitted).

The PSLRA's discovery stay is not absolute.  Rather, upon the motion of a party, a court may lift the stay where it concludes "that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party."  15 U.S.C. §§ 77z-1(b)(1) and 78u-4(b)(3)(B).  In conducting this inquiry, courts typically examine: (1) whether the relief is consistent with the purposes of the PSLRA; (2) whether the request is sufficiently particularized (and, relatedly, the extent of any burden on the producing parties); and (3) whether the relief will prevent undue prejudice or preserve evidence.  *See*, *e.g.*, *WorldCom*, 234 F. Supp. 2d at 305-06; *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 220 F.R.D. 246, 249-52 (D. Md. 2004).  Lead Plaintiff's suit is particularly meritorious, and all of the relevant factors weigh in favor of granting Lead Plaintiff's limited request for relief.

**A.    The Limited Relief Requested Here Is Consistent With The Purposes Of The PSLRA**

The PSLRA discovery stay seeks to prevent the filing of frivolous strike suits filed in the hope that the high cost of discovery will coerce otherwise innocent defendants to settle.  *See*, *e.g.*, H.R. Conf. Rep. No. 104-369, at 37 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 736; *WorldCom*, 234 F. Supp. 2d at 305.  Further, the stay seeks to prevent "fishing expeditions," where a plaintiff files a frivolous suit and seeks to use discovery to search for a viable claim not alleged in the complaint.  *See, e.g.*, S. Rep. No. 104-98, reprinted in 1995 U.S.C.C.A.N. 679, 693; *WorldCom*, 234 F. Supp. 2d at 305.  Neither concern is present here.

First, a cursory examination of the Complaints' detailed allegations reveals that the suit is meritorious.  As summarized above, the Complaint contains detailed allegations describing how Petrobras insiders knowingly or recklessly made materially false and misleading statements and omitted crucial information regarding, *inter alia*, Petrobras' assets, expenses, net income, disclosure controls, and internal controls over financial reporting, and how Petrobras issued approximately $26.5 billion of debt pursuant to materially untrue registration statements.[6]

Second, granting Lead Plaintiff's request will place, at most, a minimal burden on the producing parties.  Lead Plaintiff seeks materials already produced, or soon to be produced, to various government investigators.  Producing parties have already searched and collected the materials and could, for example, simply provide copies of the materials to Lead Plaintiff.

_____

[6] Lead Plaintiff's allegations are supported by, among other things, testimony and internal documents disclosed during hearings before the Brazilian National Congress, as described by Brazilian federal prosecutors, and recently revealed through accounts of former employees with first-hand knowledge of the fraudulent activity.  Moreover, reinforcing the strength of Lead Plaintiff's claims, numerous governmental agencies have initiated investigations and parallel proceedings related to the misconduct alleged in the Complaint.

Absent any meaningful burden, permitting Lead Plaintiff to have access to materials already available, or soon to be available, to government agencies would certainly not involve any coercion, and there is no concern that innocent parties would be forced to settle simply because of the high cost of discovery.  As such, courts recognize that "maintaining the discovery stay as to materials already provided to government entities does not further the policies behind the PSLRA."  *In re FirstEnergy Corp. Sec. Litig.*, 229 F.R.D. 541, 545 (N.D. Ohio 2004); *see also In re Delphi Corp. Sec., Derivative & "Erisa" Litig.*, 2007 WL 518626, at *8 (E.D. Mich. Feb. 15, 2007) ("[M]aintaining the discovery stay as to materials already provided to the federal authorities and to the Unsecured Creditors Committee does not further the policies behind the PLSRA.").

Third, there is no coercion imposed on Defendants or any other party by modifying the discovery stay to initiate the administrative process of serving subpoenas on foreign non-parties pursuant to the Inter-American Convention or Hague Convention.  As discussed in more detail below, Lead Plaintiff will not seek to obtain production from foreign non-parties until *after* the PSLRA stay is lifted.

Fourth, Lead Plaintiff is not on a "fishing expedition" to locate a claim not alleged in the Complaint.  Lead Plaintiff has already conducted an extensive investigation and filed a pleading setting forth claims in detail.  *Cf. In re Optionable Inc. Sec. Litig.*, 2008 WL 4629985, *1 (S.D.N.Y. October 20, 2008) (denying motion to lift PSLRA stay because plaintiffs had failed to seek leave to amend in the allotted time and because plaintiffs sought to lift the stay merely to uncover facts sufficient to state a claim).

In sum, under the circumstances here, granting Lead Plaintiff's motion would not contravene the coercion or fishing expedition rationale underlying the PSLRA's discovery stay.

**B.**     **Lead Plaintiff's Requested Discovery Is Sufficiently Particularized**
**And Places No Added Burden On The Producing Parties**

To satisfy the PSLRA's particularity requirement, "the party seeking discovery under the exception must adequately specify the target of the requested discovery and the types of information needed. *In re Lernout & Hauspie Sec. Litig*., 214 F. Supp. 2d 100, 108 (D. Mass. 2002) (citing *Mishkin v. Ageloff*, 220 B.R. 784, 792-95 (S.D.N.Y. 1998)).  As here, courts routinely hold that a request to lift the stay is sufficiently particularized where it is limited to a closed universe of materials that either has been produced, or will be produced, to government investigators in related cases.  *See*, *e.g.*, *WorldCom*, 234 F. Supp. 2d at 306 (lifting stay as to materials produced to public agencies in related proceedings); *FirstEnergy*, 229 F.R.D. 541 (N.D. Ohio 2004) (lifting stay as to documents produced to governmental entities).  Here, Lead Plaintiff only seeks access to a specific and circumscribed universe—namely, materials that have been or will soon be produced in parallel governmental proceedings.  As explained in *WorldCom*, *FirstEnergy*, *Delphi*, and other cases, Lead Plaintiff's request for access to these limited materials is sufficiently particularized.

In addition, the volume of material encompassed in the request does not determine whether a request is particularized.  For example, in *Royal Ahold*, even though the plaintiffs sought access to an estimated one million pages, the court rejected the defendants' argument that the plaintiffs' request was not particularized, explaining that particularized did not "necessarily mean 'small.'"  220 F.R.D. at 250.

Further, recognizing that international discovery from non-parties may take six months, if not longer, Lead Plaintiff seeks only to *initiate* the process by delivering the discovery requests to the proper foreign governmental authorities, and ultimately to the third parties, which is a sufficiently particularized request.  Lead Plaintiff would instruct any such foreign non-party to

merely preserve relevant documents and not begin the process of production until *after* the PSLRA discovery stay is lifted.   In that regard, the PSLRA provides that, despite the presumptive stay of discovery, "particularized discovery [may be had where] necessary to preserve evidence." 15 U.S.C. § 78u-4(b)(3)(B).  Indeed, recognizing that "the imposition of a stay of discovery may increase the likelihood that relevant evidence may be lost," Congress enacted Section 78u-4(b)(3)(C) of the PSLRA.  S. Rep. No. 104-98, 104th Congress, *reprinted in* 1995 U.S.C.C.A.N. 679, 693 (1995).  Section 78u-4(b)(3)(C) provides:

> During the pendency of any stay of discovery pursuant to [the PSLRA], unless otherwise ordered by the court, any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(b)(3)(C).

Permitting Lead Plaintiffs to serve subpoena *duces tecum* and direct third parties to preserve relevant evidence "further[s] Congress' intent by subjecting relevant evidence to a 'stay put' directive whether in the hands of the parties, or in those of third parties…."  *In re Grand Casinos, Inc. Sec Litig*., 988 F. Supp. 1270, 1272 (D. Minn. 1997).  As here, plaintiffs in *Grand Casinos* expressly represented that they would not seek to enforce the subpoenas but, rather, desired to "place the third-persons on notice that [their] action exist[ed], and to impose an affirmative duty on those persons to preserve the sought-after evidence until after a ruling on Defendants' Motion to Dismiss."  *Id*.  Finding that the issuance of such subpoenas would further Congress' interest in ensuring the preservation of all relevant documents, the court granted

plaintiffs leave to serve subpoenas on third-parties.[7]  *See also Gervis v. Berg*, No. 00-CV-3362, 2005 WL 3299436, at *3 (E D N .Y Nov 29, 2005) (lifting PSLRA stay to permit plaintiffs to serve subpoena on third party directing it to preserve documents).

Finally, in "deciding whether or not to lift the PSLRA's discovery stay, 'it is customary to consider whether a production places an undue burden on the party from which it is requested.'"  *In re Labranche Sec. Litig.*, 333 F. Supp. 2d 178, 183 (S.D.N.Y. 2004) (quoting *WorldCom*, 234 F. Supp. 2d at 306).  As various courts have explained, granting access to materials already produced to other parties imposes virtually no additional burden on any producing parties.  *See, e.g., id.* (lifting stay as to documents produced in investigations by SEC and NYSE); *Royal Ahold*, 220 F.R.D. at 249 (lifting stay as to documents produced in internal and external investigations of foreign defendant); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, MDL No. 02-1335-B, 2003 WL 23830479, at *4 (D.N.H. Jan 29, 2003) (lifting stay as to documents produced in related actions not subject to PSLRA stay). As the *Enron* court summarized:  "In a sense, this discovery has already been made, and it is merely a question of keeping it from a party because of the strictures of a statute designed to prevent discovery abuse."  2002 WL 31845114, at *3; *see also FirstEnergy*, 229 F.R.D. at 545; *WorldCom*, 234 F. Supp. 2d at 306.

Likewise, permitting Lead Plaintiff to initiate the process of serving discovery on foreign non-parties pursuant to applicable international treaties places no burden on Defendants, other parties, or non-parties.  It would, however, serve to avoid needless delay when the case moves into discovery, and would also help to preserve critical evidence.

---

[7] The court in *Grand Casinos* noted that it "need not reach a decision on whether Plaintiffs should be allowed to enforce the Subpoenas, during the course of the stay, as that issue [was] not before [it] in view of the Plaintiffs' express representation that such an enforcement would not be effected."  *Id*. at 1273 n.1.

C.      **Lead Plaintiff Will Suffer Undue Prejudice Absent Limited Relief**

Undue prejudice in the context of the PSLRA stay means "improper or unfair detriment that need not reach the level of irreparable harm." *Lernout*, 214 F. Supp. 2d at 107. Courts, including several within this district, have repeatedly found that securities plaintiffs would suffer undue prejudice if they were denied access to materials provided to government investigators and other litigants, as the lack of access would prejudice their ability to make informed strategy decisions in a rapidly shifting landscape. *See, e.g.*, *LaBranche*, 333 F. Supp. 2d at 182; *WorldCom*, 234 F. Supp. 2d at 305; *FirstEnergy*, 229 F.R.D. at 545; *Delphi*, 2007 WL 518626, at *6-*8; *Seippel v. Sidley, Austin, Brown & Wood LLP*, 03 Civ. 6942 (SAS), 2005 WL 388561, at *1 (S.D.N.Y. Feb. 17, 2005); *Singer v. Nicor*, 2003 WL 22013905, at *2 (N.D. Ill. Aug. 23, 2003); *Enron*, 2002 WL 31845114, at *1. As in *WorldCom* and the other cases cited above, numerous governmental authorities have access to, or will soon have access to, materials produced by Petrobras, other defendants, and third parties. Lead Plaintiff, however, is currently precluded by the PSLRA's discovery stay from accessing the same materials. Undoubtedly, some of the other interested parties have already engaged in settlement discussions with Brazilian prosecutors. In Switzerland, hundreds of illicit accounts holding hundreds of millions of dollars directly related to the Petrobras bribery scandal have been unearthed and are now subject to governmental proceedings.

Without access to these materials, Lead Plaintiff will be at an unfair disadvantage in relation to other interested parties when forming litigation and settlement strategies. The court in *LaBranche* explained the prejudice facing securities plaintiffs under these circumstances:

> Lead Plaintiffs must now determine their litigation strategy, principally whether or not to seek an early settlement to benefit the class without further expense. The requested discovery is essential to determine that strategy and to assist in formulating an appropriate settlement demand. The Lead Plaintiffs will suffer undue prejudice in having to defer such decisions.

13

333 F. Supp. 2d at 184.

This threatened prejudice is even greater here, where the Petrobras scandal involves authorities in several countries and may be complicated by disputes among numerous interested parties regarding the true owner of various assets, including funds paid improperly to certain contractors, alongside kickback payments to current or former Petrobras executives, and to political parties and governmental officials.  Certain individuals connected to the bribery scheme have already forfeited over $100 million to the Brazilian government, and hundreds of millions of dollars have been hidden in Switzerland banks.  As such, Lead Plaintiff and the prospective class are at a pronounced disadvantage in relation to other parties with regard to its litigation strategy and settlement discussions.

Finally, Brazil is a signatory to the Inter-American Convention.  Non-party contractors and engineering companies located in Brazil with information relevant to Lead Plaintiff's claims—particularly those engaged in fraudulent payments to Petrobras executives, governmental officials and others—will likely assert that compulsion of evidence must be taken before a Brazilian court pursuant to letters rogatory that first must be sent to Brazil's Ministry of Justice.  Unfortunately, the Inter-American Convention provides no time limit for the Ministry of Justice to effect service, and given Brazil's arduous legal and procedural requirements, service upon parties and non-parties may be a lesson in perseverance.  According to the U.S. Department of State, service in Brazil may take from six months to a year.[8]   Indeed, as this Court generally imposes strict discovery deadlines upon parties in securities class actions, there exists a strong

---

[8] *See*, *e.g.*,  http://travel.state.gov/content/travel/english/legal-considerations/judicial/service-of-process/iasc-and-additional-protocol.html ("As a general rule it may take from 6 months to a year for a request to be executed.")

possibility that Plaintiffs will be unable to serve and receive documents from foreign non-parties in time for the fact discovery cut-off, severely prejudicing Lead Plaintiff and the Class.  Indeed, "District courts have construed undue prejudice to mean improper or unfair treatment amounting to something less than irreparable harm." *In re Bank of Am. Corp. Secs.*, No. 9 MDL 2058 (DC), 2009 WL 4796169, at *2 (S.D.N.Y. Nov. 16, 2009).  Courts also "may consider other factors, such as the defendants' financial state, settlement negotiations, case management, and the ***effect of delay in determining whether to lift the discovery stay***." *In re Bank of Am.*, 2009 WL 4796169 at *2. (emphasis added).  Accordingly, given the complexities of the Action and numerous non-parties with relevant evidence, Lead Plaintiff respectfully submits that the discovery stay should be modified to permit Lead Plaintiff to *initiate* the process of requesting discovery from foreign non-parties pursuant to applicable international treaties.

## V.    CONCLUSION

For the reasons stated above, partial lifting of the PSLRA's discovery stay would prevent undue prejudice to Lead Plaintiff and the prospective class.  Given that Lead Plaintiff only seeks documents gathered and produced in other proceedings, and to initiate the process of serving subpoenas *duces tecum* on foreign non-parties pursuant to applicable international treaty, the requested relief would impose minimal burden on the producing parties.

Dated: March 31, 2015                              *s/s Jeremy A. Lieberman*

**POMERANTZ LLP**
Marc I. Gross
Jeremy A. Lieberman
John Kehoe
Emma Gilmore
600 Third Avenue, 20th Floor
New York, New York 10016
Tel: 212-661-1100
Fax: 212-661-8665

*Counsel for Lead Plaintiff*