UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PETROBRAS SECURITIES  LITIGATION

No. 14-cv-9662 (JSR)

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED AMENDED COMPLAINT**

TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS ................................................................... 3

    A.    Petrobras ....................................................................... 3

    B.    The Underwriter Defendants .......................................... 3

    C.    Operation Lava Jato ...................................................... 3

    D.    The Payment Scheme ..................................................... 6

    E.    Petrobras Describes the Impact of the Scheme on Its Financial Statements ........ 7

    F.    This Action ................................................................... 9

ARGUMENT ..................................................................................... 9

    I.    THE EXCHANGE ACT CLAIMS FAIL .......................... 9

        A.    The CAC Fails to Plead Any Materially False or Misleading Statements ........ 9

            1.    Petrobras's Financial Statements Were Not Materially False or Misleading ........ 10

            2.    No Other Statements Were Materially False or Misleading ........ 14

                a.    *Statements of Opinion* ...................................... 14

                b.    *Inactionable Puffery* ......................................... 17

                c.    *Forward-Looking Statements* ............................. 17

                d.    *Other Statements* ............................................. 18

        B.    The CAC Fails to Plead a Strong Inference of Scienter ........ 19

            1.    The Co-Conspirators' Knowledge Cannot Be Attributed to Petrobras ........ 20

            2.    No Actual Knowledge by Any Other Petrobras Party ........ 22

                 a.    *Former CEO Foster* ........................................ 24

                b.    *Former CEO Gabrielli* .................................... 26

             3.    The CAC Fails to Allege Any Motive to Defraud ........ 29

             4.    No Other Circumstantial Evidence Supporting an Inference of Scienter ........ 30

    II.    THE SECURITIES ACT CLAIMS FAIL .......................... 33

        A.    The CAC Pleads No Actionable Misstatements or Omissions ........ 33

            1.    The Heightened Pleading Standard Applies ........ 33

| | 2. | The Alleged Misstatements and Omissions | 34 |
| | | a. | *Financial Statements* | 35 |
| | | b. | *Anti-Corruption Representation* | 37 |
| B. | Plaintiffs Lack Standing to Assert Securities Act Claims | 37 |
| | 1. | The Re-Opened 2012 Note Offerings | 37 |
| | 2. | The Section 12(a)(2) Claims | 39 |
| C. | Plaintiffs' 2012 and 2013 Note Offerings Claims Are Time-Barred | 40 |
| | 1. | The One-Year Discovery Period Ran | 40 |
| | 2. | The 2012 Notes Claims Are Barred by the Statute of Repose | 45 |
| | | a. | *No Tolling* | 47 |
| | | b. | *No Relation Back* | 47 |
| | | c. | *Prior Plaintiff Lacked Standing* | 48 |
| D. | Claims Based Upon Notes Acquired After Earning Statements Covering Twelve Months Subsequent to an Offering Should Be Dismissed | 51 |
| E. | USS and Union's Securities Act Claims Are Barred by the Supreme Court's Decision in *Morrison v. National Australia Bank* and Its Progeny | 53 |
| III. | THE BRAZILIAN LAW CLAIMS SHOULD BE DISMISSED | 55 |
| A. | The Brazilian Law Claims Must Be Arbitrated | 55 |
| | 1. | The Agreement to Arbitrate | 56 |
| | 2. | The Scope of the Arbitration Agreement | 57 |
| B. | Count III Must Be Dismissed as to Mr. Helms | 59 |
| CONCLUSION | 60 |

# Table of Defined Terms

| | |
|---|---|
| 2009 Registration Statement | As defined in ¶ 408 of the CAC |
| 2012 Registration Statement | As defined in ¶ 412 of the CAC |
| 3% Method | As defined on p. 8 of the Memorandum |
| ABEMI | As defined on p. 32 of the Memorandum |
| ADSs | American Depositary Shares |
| Article 58 | Article 58 of the Petrobras Bylaws |
| BCL | The Brazilian Corporate Law |
| BOVESPA | The Brazilian stock exchange |
| CAC | Consolidated Amended Complaint |
| Cartel | As defined on p. 4 of the Memorandum |
| Class Period | As defined in ¶ 15 of the CAC |
| co-conspirators | As defined on p. 4 of the Memorandum |
| Company | Petrobras |
| CVM Regulations | As defined on p. 57 of the Memorandum |
| Exchange Act | Securities Exchange Act of 1934 |
| Exchange Act Defendants | As defined in ¶ 43 of the CAC |
| Fair Value Method | As defined on p. 8 of the Memorandum |
| FLS | Forward-looking statements |
| FSIA | Foreign Sovereign Immunities Act |
| Individual Defendants | As defined in ¶ 43 of the CAC |
| Lava Jato | As defined on p. 3 of the Memorandum |
| Lead Plaintiff | USS |
| NYSE | New York Stock Exchange |

| | |
|---|---|
| Note Offerings | The 2012, 2013 and 2014 note offerings described in CAC ¶¶ 408-19 |
| Officer Defendants | As defined in ¶¶ 427-30 of the CAC |
| Paraná Court | The 13th Criminal District Court of Curitiba, Judicial District of Paraná, Federal Court (Brazil) |
| Payment Scheme | As defined on p. 4 of the Memorandum |
| Petrobras | Petróleo Brasileiro S.A. – Petrobras |
| Petrobras Defendants | Petrobras, PGF, and Theodore M. Helms |
| Petrobras Shareholders | As defined on p. 55 of the Memorandum |
| PGF | Petrobras Global Finance B.V. |
| Plaintiff | USS |
| Plaintiffs | USS, Union, and Employees' Retirement System of the State of Hawaii |
| PP&E | As defined on p. 7 of the Memorandum |
| PSLRA | Private Securities Litigation Reform Act |
| PWC | PricewaterhouseCoopers Auditores Independentes |
| SBM | SBM Offshore |
| SEC | Securities & Exchange Commission |
| Securities Act | Securities Act of 1933 |
| Securities Act Defendants | As defined in ¶ 528 of the CAC |
| SLUSA | Securities Litigation Uniform Standards Act |
| Underwriter Defendants | As defined on p. 1, n. 1 of the Memorandum |
| Union | Union Asset Management Holding AG |
| USS | Universities Superannuation Scheme Limited |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Absolute Activist Value Master Fund Ltd. v. Ficeto,
677 F.3d 60 (2d Cir. 2012)................................................................................ 53-54

Am. Pipe & Constr. Co. v. Utah,
414 U.S. 538 (1974)......................................................................................... 46

Anchutz Corp. v. Merrill Lynch & Co.,
690 F.3d 98 (2d Cir. 2012)............................................................................... 34

Ashcroft v. Iqbal,
556 U.S. 662 (2009)......................................................................................... 45

ATSI Commc'ns Inc. v. Shaar Fund Ltd.,
493 F.3d 87 (2d Cir. 2007)........................................................................19, 20, 30

Bensinger v. Denbury Resources, Inc.,
31 F. Supp. 3d 503 (E.D.N.Y. 2014) ............................................................... 48

Can. Overseas Ores Ltd. v. Compania de Acero del Pacifico, S.A.,
727 F.2d 274 (2d Cir. 1984).............................................................................. 55

Chill v. Gen. Elec. Co.,
101 F.3d 263 (2d Cir. 1996).............................................................................. 25

City of Chi. v. Int'l Coll. of Surgeons,
522 U.S. 156 (1997)......................................................................................... 58, 59

City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,
752 F.3d 173 (2d Cir. 2014).............................................................................. 17

Cohen v. S.A.C. Trading Corp.,
711 F.3d 353 (2d Cir. 2013).............................................................................. 42

Compudyne Corp. v. Shane,
453 F. Supp. 2d 807 (S.D.N.Y. 2006).............................................................. 21

Cortec Indus., Inc. v. Sum Holding L.P.,
949 F.2d 42 (2d Cir. 1991)................................................................................ 5

Cozzarelli v. Inspire Pharm. Inc.,
549 F.3d 618 (4th Cir. 2008) ............................................................................ 34

CTS Corp. v. Waldburger,
134 S. Ct. 2175 (2014) ............................................................. 46

DiFolco v. MSNBC Cable LLC,
622 F.3d 104 (2d Cir. 2011) ........................................................ 5

ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,
553 F.3d 187 (2d Cir. 2009) ......................................... passim

Fieger v. Pitney Bowes Credit Corp.,
251 F.3d 386 (2d Cir. 2001) ........................................................ 56

Footbridge Ltd. Trust v. Countrywide Fin. Corp.,
770 F. Supp. 2d 618 (S.D.N.Y. 2011) ....................................... 46

Freeman Grp. v. Royal Bank of Scot. Grp., PLC,
530 F. App'x 33 (2d Cir. 2013) ................................................. 16

Ganino v. Citizens Utils. Co.,
228 F.3d 154 (2d Cir. 2000) ........................................................ 14

Gavish v. Revlon, Inc.,
No. 00 Civ. 7291, 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ...................................... 27

Glencore Ltd. v. Degussa Engineered Carbons L.P.,
848 F. Supp. 2d 410 (S.D.N.Y. 2012) ....................................... 57

Gustafson v. Alloyd Co.,
513 U.S. 561 (1995) ............................................................ 39, 49

Hutchison v. Deutsche Bank Sec. Inc.,
647 F.3d 479 (2d Cir. 2011) ................................................. 12, 13

IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC,
No. 13-3289, 2015 WL 1653788 (2d Cir. April 15, 2015) ............................. 5, 12

In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,
381 F. Supp. 2d 192 (S.D.N.Y. 2004) ....................................... 49

In re AOL Time Warner, Inc. Sec. Litig.,
503 F. Supp. 2d 666 (S.D.N.Y. 2007) ....................................... 44

In re Axis Capital Holdings Ltd. Sec. Litig.,
456 F. Supp. 2d 576 (S.D.N.Y. 2006) ....................................... 34

In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig.,
No. 09 Civ. 2058, 2011 WL 3211472 (S.D.N.Y. July 29, 2011) ...................................... 5

In re Bernard L. Madoff Inv. Sec. LLC,
721 F.3d 54 (2d Cir. 2013)..................................................................... 22

In re Britannia Bulk Holdings Inc. Sec. Litig.,
665 F. Supp. 2d 404 (S.D.N.Y. 2009)...................................................... 49

In re Century Aluminum Co. Sec. Litig.,
729 F.3d 1104 (9th Cir. 2013) ................................................................ 38

In re ChinaCast Ed. Corp. Sec. Litig.,
CV 12-4621-JFW, 2012 WL 6136746 (C.D. Cal. Dec. 7, 2012) ............ 21

In re Deutsche Telekom AG Sec. Litig.,
No. 00 CIV 9475 (SHS), 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002)........... 40

In re Direxion Shares ETF Trust,
279 F.R.D. 221 (S.D.N.Y. 2012) ............................................................. 48

In re Global Crossing, Ltd. Sec. Litig.,
313 F. Supp. 2d 189 (S.D.N.Y. 2003)...................................................... 38

In re IndyMac Mortg.-Backed Sec. Litig.,
793 F. Supp. 2d 637 (S.D.N.Y. 2011)...................................................... 47

In re Initial Pub. Offerings Sec. Litig.,
471 F.3d 24 (2d Cir. 2006)..................................................................... 37

In re JPMorgan Chase & Co. Sec. Litig.,
MDL No. 1783, 2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) ......................... 20, 21

In re Koreag, Controle et Revision S.A.,
961 F.2d 341 (2d Cir. 1992)................................................................... 56

In re Lehman Bros. Sec. & Erisa Litig.,
799 F. Supp. 2d 258 (S.D.N.Y. 2011)...................................................... 39

In re Longtop Fin. Tech. Ltd. Sec. Litig.,
939 F. Supp. 2d 360 (S.D.N.Y. 2013)...................................................... 47

In re Magnum Hunter Res. Corp. Sec. Litig.,
26 F. Supp. 3d 278 ........................................................................42-43, 48

In re MBIA Inc. Sec. Litig.,
No. 05 Civ. 03514 (LLS), 2007 WL 473708 (S.D.N.Y. Feb. 14, 2007) ............ 44

In re Merrill Lynch & Co., Inc. Sec, Derivative & ERISA Litig.,
No. 07 Civ. 9633 (JSR), 2009 WL 4030869 (S.D.N.Y. March 3, 2009) ............ 33

In re Morgan Stanley Info Fund Sec. Litig.,
592 F.3d 347 (2d Cir. 2010)............................................................... 33, 40

In re Morgan Stanley Mortg. Pass-Through Certificates Litigation,
23 F. Supp. 3d 203 (S.D.N.Y. 2014)................................................... 47, 50

In re MSC Indus. Direct Co. Inc.,
283 F. Supp. 2d 838 (E.D.N.Y. 2003) ................................................. 28

In re Optionable Sec. Litig.,
577 F. Supp. 2d 681 (S.D.N.Y. 2008).................................................. 27-28

In re Refco Sec. Litig.,
779 F. Supp. 2d 372 (S.D.N.Y. 2011)................................................. 22

In re Royal Bank of Scot. Grp. PLC Sec. Litig.,
765 F. Supp. 2d 327 (S.D.N.Y. 2011)................................................. 53

In re Royal Bank of Scot. Grp. PLC Sec. Litig.,
No. 09 Civ. 300 (DAB), 2012 WL 3826261 (S.D.N.Y. Sept. 4, 2012)............. 16

In re Smart Tech., Inc. S'holder Litig.,
295 F.R.D. 50 (S.D.N.Y. 2013) .......................................................... 55

In re Société Générale Sec. Litig.,
No. 08 Civ. 2495 (RMB), 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ........ 17

In re Tremont Sec. Law, State Law and Ins. Litig.,
No. 08 Civ. 11117, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013)................ 25

In re Vivendi S.A. Universal Sec. Litig.,
765 F. Supp. 2d 512 (S.D.N.Y. 2011)................................................. 54

In re Wachovia Equity Sec. Litig.,
753 F. Supp. 2d 326 (S.D.N.Y. 2011)................................................. 31

Janbay v. Can. Solar, Inc.,
No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ........ 16

Janus Capital Grp., Inc. v. First Derivative Traders,
131 S. Ct. 2296 (2011)...................................................................... 31

JSC Surgutneftegaz v. President & Fellows of Harvard Coll.,
No. 04 Civ. 6069 (RCC), 2005 WL 1863676 (S.D.N.Y. Aug. 3, 2005).......... 59

Kalnit v. Eichler,
264 F.3d 131 (2d Cir. 2001)............................................................... 30

Kemp v. Universal Am. Fin. Corp.,
No. 05 Civ. 9883, 2007 WL 86942 (S.D.N.Y. Jan. 10, 2007)............................................ 27

Kirschner v. Grant Thornton LLP,
No. 07 Civ. 11604, 2009 WL 1286326 (S.D.N.Y. Apr. 14, 2009).................................... 20

Kirschner v. KPMG LLP,
15 N.Y.3d 446, 938 N.E.2d 941 (2010)............................................................... 20, 21

Krim v. pcOrder.com, Inc.,
402 F.3d 489 (5th Cir. 2005) ............................................................................ 38

Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,
501 U.S. 350 (1991)......................................................................................... 47

LaSala v. Lloyds TSB Bank, PLC,
514 F. Supp. 2d 447 (S.D.N.Y. 2007)................................................................. 59

Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp. PLC,
902 F. Supp. 2d 329 (S.D.N.Y. 2012).............................................................. 33-34

Matrixx Initiatives, Inc. v. Siracusano,
131 S. Ct. 1309 (2011) .................................................................................... 12

Morrison v. Nat'l Australia Bank Ltd.,
561 U.S. 247 (2010)......................................................................................... 53

Mykytyak-Penning v. Private Eyes Gentlemen's Club,
No. 14 Civ. 5152 (PAC), 2015 WL 1191282 (S.D.N.Y. Mar. 16, 2015) ......................... 56

NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,
693 F.3d 145 (2d Cir. 2012).......................................................................45, 49-51

Novak v. Kasaks,
216 F.3d 300 (2d Cir. 2000) ....................................................................19, 20, 29

Nulife Entm't, Inc. v. Torres,
698 F. Supp. 2d 409 (S.D.N.Y. 2010).................................................................. 56

Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,
135 S. Ct. 1318 (2015)..................................................................................... 14

P. Stolz Family P'ship LP v. Daum,
204 F. Supp. 2d 693 (S.D.N.Y. 2002)............................................................. 45-46

Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE,
763 F.3d 198 (2d Cir. 2014)........................................................................ 53, 54

Penn. Pub. Sch. Emps. Ret. Sys. v. Bank of Am. Corp.,
874 F. Supp. 2d 341 (S.D.N.Y. 2012).................................................................. 26

Pinter v. Dahl,
486 U.S. 622 (1988)........................................................................................ 39, 40

Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.,
721 F.3d 95 (2d Cir. 2013) ...........................................................................46, 47, 50

Police & Fire Ret. Sys. of the City of Detroit v. Goldman Sachs,
No. 10 Civ. 4429, 2014 WL 1257782 (S.D.N.Y. March 27, 2014)................. 47

Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,
991 F.2d 42 (2d Cir. 1993)............................................................................... 57

Pub. Emps.' Ret. Sys. Of Miss. v. Merrill Lynch & Co., Inc.,
714 F. Supp. 2d 475 (S.D.N.Y. 2010) .......................................................... passim

Ret. Bd. of the Policemen's Annuity & Ben. Fund v. Bank of N.Y. Mellon,
775 F.3d 154 (2d Cir. 2014).......................................................................... 50

Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.,
277 F.R.D. 97 (S.D.N.Y. 2011) .................................................................... 51, 52

Rogers v. Petroleo Brasileiro, S.A.,
673 F.3d 131 (2d Cir. 2012)............................................................................. 3

Rombach v. Chang,
355 F.3d 164 (2d Cir. 2004)......................................................................17, 33, 34, 37

Rosenzweig v. Azurix Corp.,
332 F.3d 854 (5th Cir. 2003) ......................................................................... 40

Rothman v. Gregor,
220 F.3d 81 (2d Cir. 2000)............................................................................. 5

S. Cherry St., LLC v. Hennessee Grp. LLC,
573 F.3d 98 (2d Cir. 2009)............................................................................. 22

Santa Fe Indus. Inc. v. Green,
430 U.S. 462 (1977) ....................................................................................... 25

Schnabel v. Trilegiant Corp.,
697 F.3d 110 (2d Cir. 2012)........................................................................... 56

Shain v. Duff & Phelps Credit Rating Co.,
915 F. Supp. 575 (S.D.N.Y. 1996) ............................................................... 40

Shaw v. Digital Equip. Corp.,
82 F.3d 1194 (1st Cir. 1996) ........................................................................... 40

Slayton v. Am. Express Co.,
604 F.3d 758 (2d Cir. 2010) ........................................................................... 18

Stream SICAV v. Wang,
989 F. Supp. 2d 264 (S.D.N.Y. 2013) ............................................................ 21

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,
531 F.3d 190 (2d Cir. 2008) ............................................................... 19-20, 22

Tellabs Inc. v. Makor Issues & Rights, Ltd.,
551 U.S. 308 (2007) ........................................................................................ 19

Williams v. Parkell Prods.,
91 F. App'x 707 (2d Cir. 2003) ...................................................................... 56

Yung v. Lee,
432 F.3d 142 (2d Cir. 2005) ...................................................................... 39, 49

Zucco Partners, LLC v. Digimarc Corp.,
445 F. Supp. 2d 1201 (D. Or. 2006) ............................................................... 28

## Rules and Statutes

15 U.S.C. § 77k(e) (1998) .......................................................................... 48-49

15 U.S.C. § 77m (1998) ............................................................... 38, 40-41, 45

15 U.S.C. § 77z-2(i)(1)(B) (2010) ................................................................. 15

15 U.S.C. § 78u-4(b) (2010) ............................................................................ 9

15 U.S.C. § 78u-4(b)(1) (2010) ........................................................................ 9

15 U.S.C. § 78u-4(b)(2) (2010) ...................................................................... 19

15 U.S.C. § 78u-4(b)(3) (2010) ........................................................................ 9

15 U.S.C. §§ 78u-5(i)(1)(B)-(C) (1995) ........................................................ 17

15 U.S.C. § 78u-5(c)(1)(A) (1995) ................................................................ 17

15 U.S.C. § 78u-5(c)(1)(B) (1995) ................................................................. 17

28 U.S.C. § 1603(b) (2005) ............................................................................. 3

17 C.F.R. § 210.4-01(a) (2011)........................................................... 53

17 C.F.R. § 230.158(a) (2008) ........................................................... 52, 53

The Petrobras Defendants and the Underwriter Defendants[1] respectfully submit this memorandum of law in support of their motion to dismiss the CAC under Rules 8, 9(b), 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The CAC is premised on the recent findings of a Brazilian investigation into what the CAC calls "Brazil's biggest graft and money-laundering scandal."  CAC ¶ 5.  Nearly all of the CAC's core factual allegations thus come directly from testimony released by Brazilian federal prosecutors, news articles purporting to summarize it, or Petrobras's own public disclosures about the scandal and its consequences.  Relying on this record, however, the CAC directs its criticisms at all the wrong parties.  As Brazilian prosecutors have described, and as the allegations in the CAC themselves confirm, Petrobras itself was the victim in this scandal, carried out by a criminal cartel of Brazil's largest construction and engineering companies, which engaged in the "theft of Petrobras'[s] assets," id. ¶ 4, to make unlawful bribery payments.  The real wrongdoers here are the members of that cartel, who designed and for years carried out the scheme, rogue politicians and other elected officials who accepted improper payments, and four former Petrobras employees (out of 80,000) identified by the CAC who were co-conspirators in that scheme.  None of them, however, is named as a defendant here.

Assuming for purposes of this motion only that the allegations in the CAC have any basis in fact, they reveal a scheme whereby a discrete group of corrupt individuals and companies

---

[1]    The Underwriter Defendants are those identified in the Underwriters Defendants' Rule 7.1 Statement (filed as ECF 26 on the docket for related action City of Providence v. Petróleo Brasileiro S.A.- Petrobras et al., 14-cv-10117 (JSR) (2014) ("City of Providence")), and have been named in this action solely based upon their having allegedly served as underwriters for one or more of the Note Offerings.  Banco Votorantim Nassau Branch and Bank of China (Hong Kong) Limited have neither been served in this action nor appeared.

       In addition, the CAC names over a dozen individual defendants, only one of whom has been served, and PWC, which has also not been served.

conspired to overcharge Petrobras and divert those funds as bribes. The CAC's attempts to manufacture claims based on that scheme, however, are directly contradicted by the very sources that are integral to the CAC and upon which it relies, including the principal basis for the CAC's allegations: testimony from former Petrobras employee Paulo Roberto Costa given as part of a plea agreement with the Brazilian prosecutors. In the end, the patchwork of selective quotations, hyperbole and bald accusations – with countless side detours through completely irrelevant matters – does not even add up to a coherent theory, much less one that states a claim for violations of the law by any defendant.

This memorandum is organized as follows: Part I addresses Count I, which alleges violations of Section 10(b) of the Exchange Act by the Exchange Act Defendants, and Count II, which alleges violations of Section 20(a) of the Exchange Act by certain Individual Defendants. Part II addresses Counts VII (Section 11), VIII (Section 12(a)(2)) and IX (Section 15), which allege violations of the Securities Act based on the three Note Offerings. The Section 11 claim (Count VII) is brought against the Securities Act Defendants and is the only claim brought against the Underwriter Defendants. The Section 12(a)(2) claim (Count VIII) is brought against Petrobras and PGF, and the Section 15 claim (Count IX) is brought against the Officer Defendants. Part III addresses purported violations of Brazilian law by Petrobras and the Individual Defendants (Counts III-V).

For the reasons set forth below, each count of the CAC should be dismissed with prejudice.

## STATEMENT OF FACTS

### A.     Petrobras

Petrobras is one of the largest energy companies in the world.  It has over 80,000 employees and is majority owned by Brazil.[2]  Ex. 1 at 17, 108.[3]  Its operations are centered in Brazil.  Its common and preferred shares are listed and traded on the Brazilian stock exchange, the BOVESPA, and it has ADSs listed on the NYSE.  Id. at 113.

### B.     The Underwriter Defendants

The Underwriter Defendants have been named in this action solely on Plaintiffs' Section 11 claim (Count VII), based upon their having allegedly served as underwriters for one or more of the Note Offerings, as detailed in Appendix A attached hereto.[4]  As detailed in Appendix A, not all Underwriter Defendants participated in all of the Note Offerings.  The Underwriter Defendants are not otherwise alleged to have participated in any of the other conduct that the CAC alleges to have taken place.

### C.     Operation Lava Jato

In 2009, Brazilian federal prosecutors launched an investigation named Operation Lava Jato ("Lava Jato") aimed at criminal organizations in Brazil engaged in money laundering.  CAC ¶ 4.  The initial focus of the investigation was on criminal organizations' use of gas stations and car washes to launder money.  Id. ¶ 291.  In 2014, part of the investigation shifted to focus on irregularities involving certain Brazilian contractors and suppliers to Petrobras, including some of Brazil's largest construction and engineering firms.  This investigation uncovered an unlawful

---

[2]     Petrobras's majority ownership by the Federal Republic of Brazil makes it an "agency or instrumentality" of Brazil and thus a "foreign state" within the meaning of the FSIA.  28 U.S.C. § 1603(b) (2005); see Rogers v. Petroleo Brasileiro, S.A., 673 F.3d 131, 135 (2d Cir. 2012).

[3]     All cited exhibits are attached to the April 17, 2015 Declaration of Roger A. Cooper.

[4]     Appendix A sets forth details of the Note Offerings, including which defendants were involved with which Note Offering(s) and which Plaintiffs purchased each Note.

cartel formed by companies that had contracted with Petrobras on certain large-scale projects (the "Cartel"), id. ¶ 5, which had been operating in secret for nearly a decade. Id. ¶ 62. The Cartel ran a widespread bribery scheme, through which Cartel members engaged in the "theft of Petrobras' assets," id. ¶ 4, by imposing an approximately 3% hidden overcharge on Petrobras contracts. Id. ¶ 51. The Cartel companies then used the overcharged amounts to make payments to Brazilian political parties, public officials, money launderers and four corrupt, now-former, Petrobras employees (the "Payment Scheme"). Id. ¶¶ 5, 315.

The CAC identifies the four former Petrobras employees alleged to have been involved in the Payment Scheme. See id. ¶¶ 3, 8, 9. They are Paulo Roberto Costa (former Chief Downstream Officer and Director of Supply from May 14, 2004 through April 2012, id. ¶ 8) and Pedro Barusco (former manager of the Engineering Services area until July 2011, id. ¶ 399), who have both entered pleas and are cooperating with prosecutors, id. ¶¶ 3, 8, 399, and Renato de Souza Duque (former Chief Services Officer from January 31, 2003 through February 2012, id. ¶ 8) and Nestor Cervero (former director of the International Division until March 2014, id. ¶ 9), who have been arrested, id. ¶¶ 9, 10 (together, the "co-conspirators").

The Brazilian investigation into the Cartel has been directed not at Petrobras, but at Cartel member companies, Brazilian political parties, public officials, money launderers and the co-conspirators. There have been over 40 indictments for conspiracy, bribery and money laundering, including of top executives employed by Cartel member companies. Id. ¶¶ 7, 12. Prosecutors have asked the Brazilian Supreme Court to investigate 34 sitting politicians for receiving bribes, have filed charges against one party official, id. ¶¶ 10, 12, and have filed administrative misconduct complaints against five Cartel members based on the Payment Scheme. Ex. 2.

Costa has provided testimony as part of the Brazilian investigation, which has been made public, and the CAC relies heavily upon it. CAC ¶¶ 49-51, 53, 62-67, 69, 85-88, 310, 395-97, 399. The CAC also relies on the publicly available testimony of others, including Alberto Youssef, id. ¶ 6, who was not a Petrobras employee and who allegedly facilitated payments from the Cartel to Costa and certain public officials, id. ¶¶ 69, 315. As the Second Circuit just emphasized, when a pleading relies on testimony that is public, and the content of that testimony "is not subject to reasonable dispute" – as here – on a Rule 12(b)(6) motion the Court may consider that testimony "in determining the merits and context of the allegations of the [pleading] that are based on them." IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC, No. 13-3289, 2015 WL 1653788, at *4 (2d Cir. April 15, 2015).[5]

Consistent with the allegations well-pleaded in the CAC, the Brazilian investigation has demonstrated that Petrobras was a victim of this Cartel activity. Brazilian prosecutors have publicly stated their conclusion that Petrobras was a victim, Ex. 3, and Judge Moro of the Paraná Court, who is presiding over the public proceedings in Brazil, has also recognized that Petrobras was "the victim of unlawful acts." Ex. 4. Petrobras itself never paid any bribes to anyone. CAC

---

[5] The Court may also consider all other documents that are integral to the CAC, including exhibits and documents incorporated by reference, legally required public disclosure documents filed with the SEC, documents possessed by or known to the plaintiffs and upon which they relied in bringing suit, and matters subject to judicial notice. See DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2011); Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991).

Particularly since Ashcroft v. Iqbal, 556 U.S. 662 (2009), when pleadings are based on or reference source documents, those documents must be reviewed in their entirety and in their context on a motion to dismiss. Where a plaintiff relies on excerpts of testimony provided in other proceedings, a court may refer to the entire transcript of the testimony for context. See In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig., No. 09 Civ. 2058 (PKC), 2011 WL 3211472, at *8 n.9 (S.D.N.Y. July 29, 2011) (considering deposition transcript excerpts provided by defendants on a motion to dismiss).

¶¶ 51, 53.  As Costa testified, the payments "went directly from, shall we say, the [Cartel] companies through persons, to the officials.  No, there was nothing, nothing went through Petrobras." Ex. 5 at 8:14-15.  Rather, all payments were made by Cartel members or their agents with the overpayments they secretly obtained.  CAC ¶¶ 5, 62, 395.  The Payment Scheme existed to benefit Cartel members, "the campaign coffers of " political parties, id. ¶ 3, and the co-conspirators who participated in the Payment scheme "for the sole purpose of receiving kickbacks from companies that were awarded the contracts illegally," id. ¶ 139 (emphasis added).

**D.    The Payment Scheme**

During the relevant time period, there were only a handful of companies capable of completing the large-scale and sophisticated projects that Petrobras sought to develop.  CAC ¶ 49.  Those companies formed the Cartel that, unbeknownst to anyone at Petrobras – except for the four co-conspirators – subverted Petrobras's competitive bidding process in order to extract overpayments from the Company to fund the Payment Scheme.  Id. ¶ 49.  The Petrobras Engineering Services Division, which was headed by Duque, initiated the bidding process for a contract by soliciting bids from qualified companies, which usually consisted of companies within the Cartel.  Ex. 5 at 4:21-29.  The Cartel determined in advance which companies would be invited to bid and which company should win that bid and at what price.  CAC ¶¶ 50, 52.  The invited companies then submitted bids to Petrobras, and the Company compared them to a "basic budget" representing Petrobras's internal estimate of the cost to complete the contract.  Ex. 5 at 4:31-32.  Petrobras considered reasonable any contract bid within a range of 15% below that basic budget and up to 20% above it.  Id. at 4:32-35.  If all bids were above the 20% threshold, Petrobras negotiated for a bid price within its reasonable range, and if that failed, it canceled the bidding and initiated a new bidding process for the contract altogether.  Id. at 4:36-44, 13:40-45.

Petrobras strictly followed this practice, and nothing in its internal budgeting process was manipulated.  Id. at 13:3-10.  The Cartel was therefore limited in what price it could propose to Petrobras to win a bid, since Petrobras rejected as unreasonable any bid greater than 20% above the basic budget.  Id. at 4:40-45.  But, unbeknownst to Petrobras, the rigged winning bids the Cartel members submitted included 3% overcharges, which the winning contractor then used to make payments to political parties, public officials, money launderers and one or more of the four co-conspirators.  CAC ¶¶ 5, 50, 51.  Significantly, Costa testified that, because of the sheer size of the projects and the volume of supplies required, it would have been nearly impossible to detect an overcharge within the bids, Ex. 6 at 3, and he doubted that even an internal audit would have identified this.  Id. at 4.

### E.    Petrobras Describes the Impact of the Scheme on Its Financial Statements

Costa was arrested on or about March 20, 2014 and later charged with money laundering and corruption.  On October 8, 2014, Costa and Youssef testified in the Paraná Court, describing the Payment Scheme, and the next day the Paraná Court released the transcript of that testimony. CAC ¶ 310.  On November 13, 2014, Petrobras issued a press release that it was "undergoing a unique moment in its history, in light of the accusations and investigations of the 'Lava Jato Operation'" and that if statements made by Costa proved to be true, it "could potentially affect the company's financial statements."  Ex. 7; see also CAC ¶¶ 325, 403.  The Company then postponed the release of its third quarter 2014 financial results to determine whether to adjust its financial statements based on information related to Lava Jato.

On January 27, 2015, Petrobras released its unaudited financials for the third quarter 2014, but stated that the financial statements contained "errors in the carrying amount of certain property, plant and equipment [("PP&E")], which could not be corrected by the Company as of the date of issue of these financial statements."  Ex. 8 at 8.  The errors, it explained, were due to

certain contractors and suppliers "us[ing] funds from their contracts with Petrobras to make improper payments to political parties, Petrobras personnel and other persons." Id. at 9; see CAC ¶¶ 338-39. Petrobras had included in its historical cost for PP&E the full amounts paid under the affected Cartel contracts, but it should not have capitalized any overpayment that Cartel members used to make improper payments. Petrobras explained, however, that it was unable at that time to correct any errors because the improper "payments were made by external suppliers and cannot be traced back to the company's accounting records," Ex. 9 at 2, and it had not yet determined a reasonable way of quantifying the error.

Petrobras described two methodologies it had considered using to quantify the error: (1) subtracting 3% from all contracts entered into from January 2004 to April 2012 between Petrobras and Cartel members (the "3% Method"); and (2) hiring independent appraisers to estimate the fair value of assets that were the subject of contracts between Petrobras and the Cartel members (the "Fair Value Method"). Ex. 8 at 12-14. Based on the information available at the time, Petrobras rejected both methodologies. There was not "at [that] moment, sufficient detail regarding the specific payments to support recording an entry in the Company's books and records" pursuant to the 3% Method. Id. at 13. Had it used this method at that time, however, the resulting PP&E write-down would have been approximately US$ 1.298 billion (R$ 4.06 billion). Id. The Company rejected the "Fair Value Method" as being inadequate because it largely captured amounts unrelated to the Payment Scheme and also did not conform to applicable accounting standards. Ex. 9 at 2; Ex. 8 at 13-14. Indeed, under this method, the Company explained that the fair value of certain assets were below book value by R$ 88.6 billion (about US$ 30 billion), but the fair value of other assets exceeded book value by R$ 27.2 billion (about US$ 9 billion). Ex. 8 at 14. For multiple reasons explained by the Company –

including, powerfully, that under it certain assets actually exceeded book value by R$ 27.2 billion – the Fair Value Method could not be used to measure the impact of a scheme that was premised on overcharges to Petrobras. Thus, Petrobras explained that "the evaluation of assets at fair value does not serve to provide an estimate [for the Payment Scheme]" on the Company's financial statements. Ex. 8 at 14. The CAC disregards Petrobras's conclusion that the Fair Value Method did not appropriately measure the Payment Scheme, ignores the R$ 27.2 billion in undervalued assets produced by that method, and simply pretends that a US$ 30 billion reduction in PP&E appropriately reflects the effect of the Payment Scheme.

## F.     This Action

On December 8, 2014, a putative class action complaint was filed alleging that Petrobras made materially misleading statements regarding the value of its PP&E, its internal controls and compliance with its Code of Ethics. Four other similar actions were later filed, and then consolidated. Lead Plaintiff filed the CAC on March 27, 2015.

<div align="center">ARGUMENT</div>

## I.     <u>THE EXCHANGE ACT CLAIMS FAIL</u>

### A.     The CAC Fails to Plead Any Materially False or Misleading Statements

Section 10(b) claims, like Count I, are subject both to Rule 9(b)'s particularity standard as well as the heightened pleading requirements of the PSLRA. <u>See</u> 15 U.S.C. § 78u-4(b) (2010). Accordingly, to state a Section 10(b) claim, the CAC must, among other things, "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is

misleading." Id. § 78u-4(b)(1). "The court shall . . . dismiss the complaint" if these pleading requirements "are not met." Id. § 78u-4(b)(3).[6]

        1.       Petrobras's Financial Statements Were Not Materially
                    False or Misleading

The CAC's core allegation is that "Petrobras executives granted contracts to [certain] Brazilian construction companies that systemically inflated their costs by as much as 20%," and that "[a]fter winning the contracts, the construction companies kicked back up to 3% of a contract's total value in the form of bribes to Petrobras executives, Brazilian politicians and money launderers." CAC ¶ 5. Because these contracts were inflated "by up to 20%," the CAC contends, "the assets on the balance sheet associated with Petrobras' PP&E were massively inflated," id. ¶ 114, and "Petrobras may be forced to book a $30 billion asset write-down in order to reduce the carrying value of some of its assets," id. ¶ 13.[7]

This theory of liability, however, is belied by the very sources on which the CAC relies and fails to state a claim as a matter of law. First, the CAC's allegations are all drawn from the Brazilian investigatory record, and there is nothing in it that supports the CAC's invention that Cartel contracts were "inflated" by "up to 20%." Id. ¶ 114. That 20% was merely the upper limit of a range that Petrobras had determined was reasonable to pay for a contract. The Company's standard practice for procurement expressly allowed it to accept bids up to this level. And the Company considered any bid that came within that range (between 15% below and 20% above an internally estimated basic budget) to be reasonable. See supra p. 6. Moreover, that

---

[6]       The Section 20(a) claim asserted in Count II is derivative of the Section 10(b) claim, CAC ¶¶ 362-63, and has only been asserted against three individual defendants, none of whom has been served.

[7]       The CAC also challenges the accuracy of the Company's "periodic expenses and net income," CAC ¶¶ 19, 118, but for the same reason Petrobras's PP&E values are not actionable, the reported expense and net income values are not actionable, and the CAC pleads no further facts showing otherwise.

record demonstrates that Petrobras itself neither inflated contracts nor paid bribes; rather, the Cartel companies unlawfully manipulated the bidding process and extracted overcharges hidden from Petrobras, equal to 3% of the contract amount, which Cartel members thereafter used to make illegal payments. See supra p. 7. As noted, Brazilian prosecutors and the Paraná Court overseeing the investigation have therefore concluded that Petrobras was the victim of the Payment Scheme. See supra p. 5.

Second, even if the Cartel was able to use its position to enter into contracts with Petrobras at the high end of its pricing range, the CAC still fails to plead how such manipulation improperly inflated Petrobras's PP&E, the metric the CAC contends was falsely reported. At best, the CAC conclusorily alleges that (1) because contracts were inflated by up to 20%, then (2) "the assets on the balance sheet associated with Petrobras' PP&E were massively inflated," and therefore (3) Petrobras should have "report[ed] a corresponding immediate expense for the inflated portion of the contracts in the same period." CAC ¶ 114. This is ipse dixit, not the required particularized facts. The CAC offers nothing to explain why the asserted cascading consequences are plausible, much less correct. Under the applicable accounting standards, the actual price Petrobras agreed to pay the for Cartel member contracts was in fact the cost of the good or service provided, see International Accounting Standard 16 (2012) (defining "cost" as "all costs necessary to bring the asset to working condition for its intended use"), and there is no allegation that Petrobras's recording of the asset at cost was in any way inaccurate.

Indeed, the Company itself informed investors on January 27, 2015 of a need to write down PP&E only with respect to any bribery payments that were made, describing "errors in the carrying amount of certain property, plant and equipment," Ex. 8 at 8, stemming from the fact that certain of its contractors and suppliers "used funds from their contracts with Petrobras to

make improper payments to political parties, Petrobras personnel and other persons." Id. at 9. The CAC itself separately alleges that the carrying value of Petrobras's assets was false and misleading only because of "the costs associated with the repayment of bribe-related expenses to contractors." See CAC ¶¶ 118, 274. Nowhere in the CAC is there any suggestion that bribe-related payments were as much as 20% of a contract, or any particularized allegation of any bribe-related payment exceeding 3% of a contract. See, e.g., id. ¶ 5 (alleging that construction companies "inflated their costs by as much as 20%"); id. ¶ 50 (alleging that "a 3% kickback [was built] into every major contract").

Third, the CAC's separate allegations regarding the Cartel's additional 3% overcharge of Petrobras, with which Cartel members made unlawful payments, including to the Petrobras co-conspirators, id. ¶¶ 51, 53, 113, also fails to state a claim, because Plaintiff has not alleged with particularity that this overcharge resulted in any misstatement that was material.

To plead materiality, the CAC must plausibly allege that there "is a substantial likelihood that the disclosure of the omitted fact [or correction of the false statement] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1318 (2011) (internal quotation marks omitted). The Second Circuit has made clear that the materiality of numerical misstatements, as are challenged here, should be assessed in light of "quantitative" factors and that a five percent numeric threshold is a "good starting place" for doing so. See Royal Bank of Scot. Grp., PLC, 2015 WL 1653788, at *4; ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 204 (2d Cir. 2009).[8] The CAC makes no effort to

---

[8] Further, where, as here, an alleged misstatement does not affect "a particular product or product line, or division or segment of a company's business, [that] has independent significance

adequately plead how 3% overpayments (that still fell within a range of reasonableness) on some contracts materially misstated the Company's PP&E.

Through distortion, the CAC asserts that the aggregate of the 3% overcharges amounted to US$ 30 billion. CAC ¶¶ 13, 109, 337-38. That number is explicitly drawn from Petrobras's January 27, 2015 release, in which it sets forth why that estimate is <u>not</u> correct. The CAC simply ignores the "not." Petrobras explained there that it had not yet been able to calculate the amount of the overcharges it unknowingly paid, set forth two possible methods for doing so, and discussed why the one that produced a US$ 30 billion estimate "was <u>not</u> an adequate proxy for the unlawful values paid, as this adjustment would also include amounts originated from different situations, which are impossible to be individually quantified." Ex. 9 at 2 (emphasis added).[9]

Beyond this distortion, there is nothing in the CAC even attempting to quantify the impact of the 3% bribe payments on Petrobras's PP&E, much less purporting to show its materiality to any other metric on Petrobras's reported balance sheet. With total PP&E assets valued at nearly US$ 191 billion (R$ 597.4 billion), and total assets valued at over US$ 263 billion (R$ 825 billion), Ex. 8 at 3, Petrobras's January 27, 2015 release explained that, based upon what it then knew, Costa's 3% figure for the Payment Scheme would have resulted in an estimated error in the PP&E of about US$ 1.298 billion (R$ 4.06 billion), or less than <u>.7%</u> of

for investors," its numeric size is considered in the context of the company as a whole. <u>Hutchison v. Deutsche Bank Secs. Inc.</u>, 647 F.3d 479, 488 (2d Cir. 2011).

[9]     The Company explained that those unrelated amounts reflecting different situations included "changes in the economic and financial variables (exchange rate, discount rate, risk metrics and cost of capital); changes in the estimates of prices and margins of the input; changes in the projections of prices, margins and demand for products sold; changes in equipment and input prices, wages and other correlated costs; as well as project planning deficiencies (engineering and supply)." Ex. 9 at 2. It also pointed out – which the CAC ignores – that this fair valuation method showed certain assets <u>exceeded</u> their book values by R$ 27.2 billion, which highlights the impact of these other factors.

PP&E and less than .5% of total assets. Those numbers "do[] not suggest materiality." ECA, 553 F.3d at 204 (concluding this with respect to an accounting classification that affected less than one-third of a percent of total assets); see also Hutchison, 647 F.3d at 481-82, 488-89 (impairment of loans with carrying value of $50 million in context of a loan portfolio of over $1 billion is immaterial).

The CAC also does not allege that the unknowing inclusion of the 3% overcharge on the Company's balance sheet was qualitatively material. Nor could it. By reason of the overpayments, Petrobras paid more for contracts than it should have, making it appear financially weaker – not stronger. Had it not been victimized by the Cartel (and its disloyal employees), Petrobras would have acquired those assets more cheaply, leaving it with additional resources (the overcharged amounts) and the same assets (at lower cost) producing the same revenues. In context, as a result of the Cartel's Payment Scheme, Petrobras's assets appeared more expensive and less productive than they would have had it not been victimized. In other words, any PP&E and asset overstatements resulting from the Payment Scheme made Petrobras look worse to investors, not better and was therefore qualitatively immaterial. See Royal Bank of Scot. Grp., PLC, 2015 WL 1653788, at *5 (to be qualitatively material, disclosure must mask issuer's misconduct or negative results); Ganino v. Citizens Utils. Co., 228 F.3d 154, 166 (2d Cir. 2000) (accounting misstatement was material in part because it concealed negative financial performance).

### 2. No Other Statements Were Materially False or Misleading

The remainder of the challenged statements are expressions of opinion, not adequately alleged to be misleading, inactionable puffery or protected forward-looking statements.

a. *Statements of Opinion*. To plead the falsity of a statement of opinion or belief, a pleading must allege not only that the statement turned out to be objectively false but also set

-14-

forth particularized facts showing that the opinion was not honestly held at the time it was made. Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1327 (2015). Further, an honestly held statement of opinion is not misleading unless facts related to how the speaker formed the opinion are different from what would reasonably be assumed and that difference was not disclosed. Id. at 1328-29. Here, the CAC fails to satisfy these requirements for each of the numerous statements of opinion and belief that it challenges.

The challenged opinions concern management's beliefs about Petrobras's financial performance and the effectiveness of its internal controls. By way of example, the CAC asserts as fraudulent the 2010 statement that the Comperj project is "in line" with the Company's "2009-2013 Business Plan" to invest approximately $5.6 billion in a particular energy segment. CAC ¶ 159. That is an obvious opinion regarding the Company's investment plans, but the CAC makes no effort to explain how or why that project was not "in line" with those plans. It only complains that there was no disclosure of the Cartel's Payment Scheme. Id. ¶ 273. No explanation is offered as to how that scheme somehow made the Comperj project not "in line" with the Petrobras's segment investment plans, much less that Petrobras was not in fact of that opinion when the statements were made.[10] See 15 U.S.C. § 77z-2(i)(1)(B) (2010) (PSLRA safe harbor protects statements reflecting "objectives of management for future operations").

---

[10] Another example is the CAC's assertion that Petrobras's statement in its 2013 Form 20-F that "its internal commission to evaluate bribery allegations involving [Dutch firm] SBM [Offshore] confirmed that it found no internal evidence to support such allegations," CAC ¶ 262, was misleading because "Defendants were in fact aware that Petrobras executives had accepted $139 millions of dollars in bribes from SBM," id. ¶ 282. That allegation fails to plead both objective falsity and that the investigation's "confirmation" was not truly believed. Indeed, the conclusory statement about Petrobras's awareness of bribes is not supported by any facts whatsoever (apart from the knowledge of the co-conspirators, which cannot be imputed to the company, see infra Point I.B.1); the only allegation in this regard is that on May 27, 2014, almost a month after the Form 20-F was filed on April 30, 2014, SBM sent Petrobras a letter telling it of an inquiry by Dutch authorities into bribery payments; not only is the letter dated well after the

Statements that Petrobras "concluded" that its internal controls were effective are similarly inactionable opinions. CAC ¶¶ 152, 153, 164, 184, 198, 251, 256, 260, 478, 485, 491, 498; see Freeman Grp. v. Royal Bank of Scot. Grp., PLC, 530 F. App'x 33, 37 (2d Cir. 2013) (characterization of risk management policies as "effective" is a statement of opinion). The CAC pleads no support for the assertion that the Company's statements regarding its internal controls were false when made. While the CAC challenges statements that Petrobras "assessed the effectiveness" of its controls and "concluded" that each was "effective," CAC ¶ 478, it pleads no facts showing that the controls were not in fact assessed, or that the Company did not reach that conclusion. In re Royal Bank of Scot. Grp. PLC Sec. Litig., No. 09 Civ. 300 (DAB), 2012 WL 3826261, at *8 (S.D.N.Y. Sept. 4, 2012) (dismissing claims challenging adequacy of internal controls lacking "contemporaneous support to show that the [procedures] were not followed"), aff'd sub nom. Freeman Grp. v. Royal Bank of Scot. Grp. PLC, 540 F. App'x 33 (2d Cir. 2013).[11] The CAC similarly alleges only conclusory assertions that these opinions that the controls were effective were not honestly held at the time they were given, see, e.g., CAC ¶ 375,

---

filing of the Form 20-F, but there is no allegation that it stated that any misconduct had actually occurred. CAC ¶ 268.

[11]     See also Janbay v. Can. Solar, Inc., No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012) ("Plaintiffs have failed to allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why.").

Furthermore, Petrobras also cautioned investors that "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements on a timely basis," and that internal "controls may become inadequate, or that the degree of compliance with the policies or procedures may deteriorate." See Ex. 10 at 158; Ex. 11 at 177; Ex. 12 at 173; Ex. 13 at 151; Ex. 1 at 156.

The Company similarly cautioned investors as to its disclosure controls and procedures: "There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Accordingly, even effective disclosure controls and procedures can only provide reasonable assurance of achieving their control objectives." See Ex. 10 at 158; Ex. 11 at 177; Ex. 12 at 172; Ex. 13 at 151; Ex. 1 at 155.

and does not allege any undisclosed facts related to the formation of the opinions, that would render the opinions misleading.

b. *Inactionable Puffery*. "It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery.'" <u>City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG</u>, 752 F.3d 173, 183 (2d Cir. 2014). So is optimism about future earnings or results, <u>see, e.g.</u>, <u>Rombach v. Chang</u>, 355 F.3d 164, 173-74 (2d Cir. 2004), and statements promoting the "discipline" and "efficacy" of risk management systems, <u>see, e.g.</u>, <u>ECA</u>, 553 F.3d at 205-06 ("discipline"); <u>In re Société Générale Sec. Litig.</u>, No. 08 Civ. 2495 (RMB), 2010 WL 3910286, at *3, *8 (S.D.N.Y. Sept. 29, 2010) ("efficacy").

Here, many of the challenged statements are plainly puffery, and are therefore immaterial as a matter of law. Those statements consist of:

- Statements touting Petrobras's ethical behavior, including in its Code of Ethics, CAC ¶¶ 141, 150, 165, 167, 185, 199, 261, 264, 479, 484, expressed generally in terms of "adopt[ing]…good corporate governance practices," or "following the best practices," and conducting business with "transparency" and "integrity," <u>id.</u> ¶¶ 165, 167, 174, 180, 264; <u>see</u> <u>City of Pontiac</u>, 753 F.3d at 173.

- Statements concerning the "effectiveness" of internal controls and promoting the quality and efficiency of Petrobras's management, CAC ¶¶ 140, 152, 164, 184, 198, 251, 256, 260, 478, 485, 491, 498; <u>see</u> <u>In re Société Générale</u>, 2010 WL 3910286 at *8 (labeling claims of "highly sophisticated" risk management as puffery).

- General assertions that Petrobras is "invest[ing] with efficiency and discipline," imposing "discipline" on financial resources, "doing [its] homework," "constantly monitor[ing] the progress of [its] . . . projects," "ensuring that all . . . resources are put to the best possible use," employing "rigorous project management," has "a strong commitment to . . . exemplary management," and a "commitment to . . . respecting our minority shareholders rights," CAC ¶¶ 167, 182, 190, 206, 218, 224, 248.

These challenged statements of corporate optimism cannot sustain a securities fraud claim. <u>See</u> <u>City of Pontiac</u>, 753 F.3d at 173; <u>Rombach</u>, 355 F.3d at 173-74; <u>ECA</u>, 553 F.3d at 205-06.

c. *Forward-Looking Statements*. Under the PSLRA, "forward looking statements" are entitled to a safe harbor if accompanied by "meaningful cautionary statements," 15 U.S.C.

§ 78u-5(c)(1)(A) (1995), or if the plaintiff does not properly allege that the speaker had "actual knowledge" that the statement was false or misleading, id. § 78u-5(c)(1)(B). Such statements are broadly defined to include "a statement of the plans and objectives of management for future operations" and "a statement of future economic performance." See id. §§ 78u-5(i)(1)(B)-(C). Here, the CAC challenges several forward-looking statements, including that Petrobras had confidence it "[would] be able to achieve the goals of the 2013-2017 [Business Management Plan]," CAC ¶ 224, or that it would "continue with [its] efforts to recover the operational efficiency of the Campos Basin and optimize operating costs, two essential vectors for ensuring better results, id. ¶ 206. The closest that the CAC comes to pleading that these forward-looking statements were disbelieved is the utterly conclusory allegation that "at the time each FLS was made, the speaker knew the FLS was false or misleading." CAC ¶ 357. This bald assertion is inadequate as a matter of law. See Slayton v. Am. Express Co., 604 F.3d 758, 773 (2d Cir. 2010).

d.     *Other Statements*.  The CAC also fails to adequately plead that certain other alleged misstatements were false or misleading at all. It alleges that statements in and regarding Petrobras's Corruption Prevention Program Manual were revealed to be false as a result of the Payment Scheme. CAC ¶¶ 143-49, 235, 236, 245, 248. But it fails to plead how the statements in that manual – discussing the creation and purposes of the program, the means through which it was implemented, and its benefits – were actually false or misleading. Further, the CAC does not and cannot allege that Petrobras ever represented that the program had uncovered or would uncover any and all instances of corruption.[12] Finally, the CAC fails to offer a theory – even a

---

[12]     The CAC similarly fails to explain what is false about Foster's statement that there had been an "extensive and detailed diagnosis of [Petrobras's] operating problems" and there were "twice weekly" Executive Board meetings "to focus on the physical and financial monitoring of

conclusory one – explaining how challenged statements about Petrobras's business plans, personnel decisions, and capital raising were false or misleading.  See CAC ¶¶ 165, 168, 178, 186, 204, 222, 234, 246.[13]

### B. The CAC Fails to Plead a Strong Inference of Scienter

The CAC also fails to plead scienter.  Both Rule 9(b) and the PSLRA require a plaintiff to allege with particularity facts showing a strong inference of scienter – intent to "deceive, manipulate, or defraud."  ECA, 553 F.3d at 198 (internal quotation marks omitted).[14]  It is not enough to show that a reasonable factfinder could infer scienter from the CAC's allegations, Tellabs, 551 U.S. at 314.  Rather, an inference of scienter is sufficient only where "'a reasonable person . . . deem[s] [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  ATSI Commc'ns Inc. v. Shaar Fund Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (quoting Tellabs, 551 U.S. at 323).  "When the defendant is a corporate entity . . . the

principal projects."  CAC ¶ 218.  The assertion that these statements are somehow misleading because of the Payment Scheme is unsupported by any facts.

[13]      Another such example is the allegation that "Foster falsely represented [to Congress] . . . that no irregularities were discovered [by the internal commission that evaluated bribery allegations involving SBM], even though 'she knew about several evidences of irregularities' before her testimony."  CAC ¶ 268.  There are no facts alleged showing that Foster knew at the time of any evidence of irregularities or that the statement, which merely repeats what the Company previously disclosed in its Form 20-F about the internal commission, see id. ¶ 262, was misleading.  As discussed above, supra note 10, the allegations regarding a letter received 15 days before the testimony from SBM warning of an inquiry by Dutch authorities into bribery payments, id. ¶ 268, fail because the CAC does not allege the SBM letter conveyed any evidence of bribery – only an inquiry.  The CAC also relies on a news article as the source for the allegation of Foster's alleged knowledge, CAC n.35, but the snippet the CAC quotes is actually reporting a quote from "Opposition lawmaker" Antonio Imbassahy, see CAC ¶ 289, stating only his opinion about Foster's knowledge, and even then with respect to the Pasadena refinery, and not SBM at all.  Ex. 14.

[14]      See also 15 U.S.C. § 78u-4(b)(2); Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007) ("Congress require[s] plaintiffs to plead with particularity facts that give rise to a 'strong' – i.e., a powerful or cogent – inference."); Novak v. Kasaks, 216 F.3d 300, 309-10 (2d Cir. 2000) (PSLRA "effectively adopts the Second Circuit's pleading standard for scienter wholesale").

pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." <u>Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.</u>, 531 F.3d 190, 195 (2d Cir. 2008).

Absent particularized allegations of a specific intent to defraud by an individual whose scienter can be imputed to the Company, as is the case here, the CAC can only satisfy the "strong inference" standard by alleging compelling facts either "(1) showing that the defendants had both motive and opportunity to commit the fraud, or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." <u>ATSI</u>, 493 F.3d at 99. The CAC does not satisfy either of these requirements. <u>See</u> <u>Novak</u>, 216 F.3d at 309-10.

        1.    <u>The Co-Conspirators' Knowledge Cannot Be Attributed to Petrobras</u>

The CAC attempts to impute the scienter of co-conspirators Costa, Duque, Barusco and Cervero to Petrobras itself. Well-established principles of agency law applicable in the securities context compel the opposite conclusion. While there is a common law presumption that the knowledge of an agent acting within the scope of his authority is imputed to his principal, the "adverse interest" exception holds that "where an officer acts entirely in his own interests and adversely to the interests of the corporation, that misconduct cannot be imputed to the corporation." <u>Kirschner v. Grant Thornton LLP</u>, No. 07 Civ. 11604 (GEL), 2009 WL 1286326, at *5 (S.D.N.Y. Apr. 14, 2009), <u>aff'd</u>, <u>Kirschner v. KPMG LLP</u>, 626 F.3d 673, 675 (2d Cir. 2010). Thus, the critical question is "whether an executive's fraud operates to benefit the company or whether fraud is committed against the company." <u>In re JPMorgan Chase & Co. Sec. Litig.</u>, MDL No. 1783, 2007 WL 4531794, at *9 (N.D. Ill. Dec. 18, 2007) (citation and quotation marks omitted).[15]

---

[15]    The exception typically applies in "those cases – outright theft or looting or embezzlement – where the insider's misconduct benefits only himself or a third party; <u>i.e.</u>, where

The adverse interest exception plainly applies here. The CAC does not even attempt to plead that the Cartel Payment Scheme provided any benefit to Petrobras – and, indeed, the CAC's allegations show that it did not. The CAC's fraud theory of liability is based on the alleged criminal conduct of the four former employee co-conspirators, Costa, Duque, Barusco and Cervero, the gravamen of which is they defrauded Petrobras: they were engaged in "theft of Petrobras' assets," CAC ¶ 4; the "fraud at the epicenter of this action . . . diverted [cash] *from Petrobras' coffers*," id. ¶ 5 (emphasis in original); and the Payment Scheme benefitted "executives and the campaign coffers" of political parties, id. ¶ 3. The CAC further alleges that these "Petrobras[ ] senior executives inflated the value of the Company's construction contracts for the sole purpose of receiving kickbacks from companies that were awarded the contracts illegally," id. ¶ 139 (emphasis added); see also id. ¶ 67 (describing that the distribution of the 3% kickbacks went solely into individuals' pockets and political party coffers); id. ¶ 100 (the "scheme benefited [political party] members"). And Costa testified that he received tens of

_____

the fraud is committed *against* a corporation rather than on its behalf." Kirschner v. KPMG LLP, 15 N.Y.3d 446, 466, 938 N.E.2d 941, 952 (2010) ("Kirschner II"). The rationale is that the "presumption that an agent will communicate all material information to the principal operates except in the narrow circumstance where the corporation is actually the victim of a scheme undertaken by the agent to benefit himself or a third party personally, which is therefore entirely opposed (i.e., 'adverse') to the corporation's own interests." Id. at 467.

Numerous courts within this District and others have applied the adverse interest doctrine at the motion to dismiss stage to securities fraud claims requiring corporate scienter as an element. See, e.g., Stream SICAV v. Wang, 989 F. Supp. 2d 264, 277 (S.D.N.Y. 2013) (denying motion to dismiss Section 10(b) claim based on adverse interest exception where executive's conduct allegedly benefited corporation); Compudyne Corp. v. Shane, 453 F. Supp. 2d 807, 824 n.5 (S.D.N.Y. 2006) (same); In re ChinaCast Ed. Corp. Sec. Litig., CV 12-4621-JFW, 2012 WL 6136746, at *9 (C.D. Cal. Dec. 7, 2012) (dismissing Section 10(b) claim against corporation because CEO's scienter could not be imputed to corporation where CEO engaged in illegal activities against company's interests); In re JPMorgan, 2007 WL 4531794, at *9 (dismissing Section 10(b) claim against corporation because scienter of executive could not be imputed to corporation where allegations suggested executive enriched himself at expense of corporate entity).

millions of dollars from amounts Petrobras overpaid the Cartel, calling it a "'three percent political adjustment.'" Id. ¶ 62.

The impact the "theft of Petrobras'[s] assets," id. ¶ 4, had on Petrobras's financial statements, which are alleged to be false as a result of the Cartel's scheme, was to the detriment – not the benefit – of the Company. Without the Payment Scheme, Petrobras would have acquired the same assets for as much as 3% less, with that 3% amount then available to the Company for other purposes. Further, if Petrobras had not been victimized by the Payment Scheme, its assets would have appeared to be more efficient and productive, as they would have generated the same amount of actual and expected cash flows, but would have cost the Company less to acquire. There is no conceivable benefit to Petrobras flowing from the Payment Scheme, and the CAC alleges none. Not surprisingly, the CAC fails to plead any facts supporting the conclusion that Petrobras could somehow simultaneously be an "active participant" in the Cartel's bid-rigging scheme, id. ¶ 49, but also its victim, see id. ¶¶ 4, 62, 67. The CAC's theory is thus a prototypical case for an application of the adverse interest exception.[16]

### 2.   No Actual Knowledge by Any Other Petrobras Party

A complaint may also satisfy Section 10(b)'s "required strong inference" of scienter by "sufficiently alleg[ing] that the defendants . . . knew facts or had access to information suggesting that their public statements were not accurate." Dynex, 531 F.3d at 194. To do so, it must plead with particularity that defendants actually were aware of such facts. S. Cherry St.,

---

[16]    See, e.g., In re Bernard L. Madoff Inv. Sec. LLC, 721 F.3d 54, 64 (2d Cir. 2013) (exception appropriate "for cases of 'outright theft or looting or embezzlement . . . where the fraud is committed against a corporation rather than on its behalf'" (citation omitted) (emphasis in original)); In re Refco Sec. Litig., 779 F. Supp. 2d 372, 376 (S.D.N.Y. 2011) (Rakoff, J.) ("'theft or looting or embezzlement' . . . is the classic example of the adverse interest exception" (quoting Kirschner II, 15 N.Y.3d at 466)).

LLC v. Hennessee Grp. LLC, 573 F.3d 98, 114 (2d Cir. 2009). Allegations that defendants merely "'would' have learned" something are insufficient. Id.

The CAC's conclusory characterizations of testimony given to Brazilian prosecutors do not satisfy Dynex. The CAC summarily asserts that Costa testified that "the Directors of Petrobras were aware of the scheme from the beginning and would not question the increased amounts since all of the bids were coordinated in advance," CAC ¶ 52, and that Youssef testified that "the bribery and money-laundering scheme was rampant throughout Petrobras and its subsidiaries," id. ¶ 6. But the actual testimony of Costa – explicitly relied on by the CAC – does not support this. Ex. 15 at 4. In fact, Costa emphasized that, because of the sheer size of the projects and the volume of supplies required, it would have been nearly impossible to detect a surcharge for bribes within the bids, Ex. 6 at 3, and confirmed that "he never talked about this subject directly to [the Petrobras CEOs during Costa's tenure: José Eduardo Dutra, Gabrielli or Foster]" and so could not speak to their knowledge. Ex. 15 at 4-5. The same is true for Youssef, who was never a Petrobras employee and testified that his involvement in the Payment Scheme was limited to Petrobras's Downstream division, in which Costa worked, and that he had no knowledge of operations in any other part of Petrobras. Ex. 5 at 52:9-18. Even when pressed to speculate, Youssef named only the former heads of the International and Services divisions as possibly involved – the divisions formerly headed by Duque and Cervero. Id. at 27-28.[17]

---

[17] Buried near the end of the Exchange Act section, the CAC alleges that Costa testified that "bribes had been paid in connection with the award of contracts by Transpetro," a subsidiary of Petrobras, "implicating Sergio Machado," allegedly the director of Transpetro. CAC ¶ 310. This comes nowhere close to showing that Machado knew of the Cartel, received any bribes, or had knowledge that any others did. Nor are there any factual details offered – such as the amount of any bribes paid in connection with Transpetro contracts, to whom, or when – or (even in a conclusory way) the quantitative materiality of any such payments. In any event, even disregarding the fundamental inadequacy of this single-sentence allegation, were Machado a

Nor do the CAC's conclusory allegations that former CEOs Gabrielli and Foster and the Board of Directors were "alerted to the rampant fraud," CAC ¶¶ 91- 92, and that the "Chief Executives covered-up the scheme," satisfy the standard, id. ¶ 11. The CAC attempts to support those assertions with purported factual allegations, but as set forth below, all are simply irrelevant and completely disconnected from the Cartel Payment Scheme at the CAC's core, and thus do not support its conclusory claims.

a. *Former CEO Foster*. The CAC attempts to show that Foster had knowledge of the Cartel's bribery scheme by alleging that a former Petrobras manager of downstream operations, Venina Velosa da Fonseca, informed Foster of "inflated contracts and payments for services that were not carried out." Id. ¶ 92. But the CAC pleads nothing showing that Fonseca herself knew anything about the Cartel's unlawful Payment Scheme or the involvement of the four co-conspirators, let alone that she communicated anything about the scheme to Foster.[18] See id. ¶¶ 92-106. Rather, the CAC merely alleges that Fonseca raised with Foster concerns about generic "misappropriation of funds," id. ¶ 105, "irregularities" in Petrobras contracts, id. ¶ 100, cost overruns, id. ¶ 104, and complaints about contracts in which services were not rendered, id. ¶ 92. None of those statements show that Foster knew anything about the Payment Scheme, or the basis of the CAC's claims.

First, Fonseca's focus was the "misappropriation of funds" relating to contracts dating from 2008 and 2009 in the Communications Department of the Supply Division. Id. ¶ 96. This Communications Department is nowhere described in the CAC as having anything to do with the

_____

recipient of any such bribes, his knowledge, if pleaded, would also be subject to the adverse interest exception. See supra Part I.B.1.

[18] The CAC's allegation that Fonseca identified evidence of a kickback scheme and "found a pattern indicating that the contractors were rigging bids and overfilling by up to 20% of estimates," CAC ¶ 96, is made up out of whole cloth and appears nowhere in the article on which the allegation explicitly relies. See Ex. 16.

Payment Scheme. Indeed, the description of the supposed "misappropriation" details just "R$58 million [approx. US$ 18.8 million] in contracts for communication services that were not performed." Id. ¶ 98. There is not even a suggestion that this allegation – which, even if true, would at most amount to mismanagement, not securities fraud, Santa Fe Indus. Inc. v. Green, 430 U.S. 462, 477, 480 (1977) – relates to the "bribery and money-laundering scheme" that constitutes the Payment Scheme. CAC ¶ 5. Further, the amount alleged at issue (just under US$ 19 million) comes nowhere close to the amounts the CAC contends were at issue in the Payment Scheme, let alone could they be considered remotely material to Petrobras's multi-billion dollar balance sheet. Finally, even if Fonseca's complaints did constitute "red flags" related to bribery at Petrobras – which they do not – the CAC itself alleges that executives to whom Fonseca allegedly reported these "irregularities" in the Communications Department did follow up on them: the CAC alleges that Gabrielli in fact "created a committee . . . to investigate the case," which uncovered details of the irregularities about which Fonseca complained, and Petrobras fired the employee responsible. Id. ¶¶ 98-101. The CAC's own allegations of this course of conduct thus defeat any inference of knowledge or recklessness.[19]

Second, the CAC alleges that Petrobras's investigation into irregularities following Fonseca's contentions also uncovered cost overruns at the Abreu e Lima refinery, id. ¶ 103, and asserts in a conclusory way that the irregularities in the project "result[ed] in further kickbacks to political parties and to Directors," id. ¶ 104. The allegations that an internal audit was performed in June 2012 and discovered that increased costs were the result of an accelerated timetable, add-

_____

[19] See Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (allegations must show that defendant "egregious[ly] refus[ed] to see the obvious, or to investigate the doubtful"); In re Tremont Sec. Law, State Law & Ins. Litig., No. 08 Civ. 11117, 2013 WL 5179064, at *6 (S.D.N.Y. Sept. 16, 2013) (finding no recklessness where defendant did investigate the red flags alleged).

on contracts, and supposedly unnecessary features, id. ¶¶ 103-04, however, do not show that

Foster (or anyone else) thereby learned of the Cartel or the Payment Scheme.[20]  At most, those

allegations may show mismanagement, but not knowledge of fraud.[21]

b.      *Former CEO Gabrielli*.  The CAC's attempts to plead knowledge by former CEO

Gabrielli also fail.[22]  First, with respect to the Abreu e Lima refinery, the only allegation relating

to Gabrielli is that his chief of staff purportedly said to Costa, in connection with a potential

Brazilian parliamentary investigation into increased costs at the refinery, that "Petrobras could

not afford a scandal, particularly in an election year."  Id. ¶ 85.  The CAC does not allege that

this generic statement – which is not attributed to Gabrielli himself and where there is no

allegation he even knew of it – relates to the Cartel Payment Scheme or was a suggestion that

anyone should act improperly.  Even if the Abreu e Lima refinery turned out to be an expensive

project or was subject to cost overruns, CAC ¶ 84, that does not show bribery or corruption, let

---

[20]      The CAC also alleges that Fonseca sent an email to Foster about "failures to meet standards and Petrobras's Code of Ethics," CAC ¶ 102, but there is no context provided for what she supposedly said, much less that it related to the Cartel Payment Scheme.

[21]      As part of its allegations about Fonseca, the CAC also alleges that federal prosecutors have obtained documents about misappropriation of funds by traders of ship fuel in Petrobras units abroad, CAC ¶ 105, but it makes no link between this allegation and the Cartel Payment Scheme, much less one to any knowledge Foster had of the Payment Scheme.  Similarly, the CAC's allegation that Foster had ties to Brazilian President Dilma Rousseff does not support scienter, as it provides no explanation of the relevance of this fact or any link to the alleged misstatements.  Finally, that Foster was "intricately involved in Petrobras's operation and investments" does not show scienter or suggest recklessness; it shows that she was doing her job: she was the CEO.  Penn. Pub. Sch. Emps. Ret. Sys. v. Bank of Am. Corp., 874 F. Supp. 2d 341, 360 (S.D.N.Y. 2012) (finding that an executive "had ultimate decisionmaking authority . . . does not suggest that [the executive] was aware of" supposedly misleading statements).

[22]      If anything, other allegations in the CAC actually support the opposite inference regarding Gabrielli's scienter.  As discussed above, the CAC also alleges that Gabrielli was instrumental in acting on Fonseca's complaints of misappropriation of funds in the Communications Department of the Supply Division in 2008-2009, see supra p. 25; it was Gabrielli who launched a formal inquiry, and he spearheaded the effort to dismiss the employee responsible.

alone that Gabrielli knew about it. The only other facts alleged regarding the Abreu e Lima refinery are that Costa arranged for bribes to be made to stop the congressional inquiry. See id. ¶¶ 86-87. Critically, neither Costa's testimony nor the CAC provides any facts linking Gabrielli to any such bribery, or any knowledge of it.

Second, the CAC's allegations about the Pasadena refinery also fail. The CAC refers to statements of an anonymous informant to allege generally that the purchase of the Pasadena refinery – years before the start of the putative class period – involved bribery. See id. ¶¶ 75-82. These statements are vague and conclusory, and are mostly the informant's opinion, not his observed facts; thus, they do nothing to support the CAC's claims. Kemp v. Universal Am. Fin. Corp., No. 05 Civ. 9883 (JFK), 2007 WL 86942, at *12-13 (S.D.N.Y. Jan. 10, 2007) (rejecting as "not actionable" the "mere opinions of confidential witnesses").[23] Further, the informant's purported statements make no connection between the refinery and the Payment Scheme, or show that any alleged bribes relating to the Pasadena refinery contributed to any alleged misstatements. Critically, the Pasadena refinery did not involve a construction or supply contract with any Cartel company; rather, the CAC alleges merely that "Petrobras drastically overpaid for a refinery in Texas, Pasadena . . . [from a] Belgian oil company, Astra." CAC ¶ 75.[24]

---

[23]     See also Gavish v. Revlon, Inc., No. 00 Civ. 7291 (SHS), 2004 WL 2210269, at *14 (S.D.N.Y. Sept. 30, 2004) (attributing to a confidential witness an "otherwise totally unparticularized allegation does not transform it into an allegation that meets the particularity requirements of the PSLRA").

[24]     The CAC also asserts that "Costa and other Petrobras managers accepted bribes to approve the wildly inflated Houston purchase," CAC ¶ 75, but the only support for this statement is a Globe and Mail article from May 12, 2014 – parts of which the CAC merely copies – that reports that Costa "is in jail pending a federal investigation into money-laundering, including the allegation that he and other managers accepted bribes to approve the wildly inflated Houston purchase." See Ex. 17 at 1. Thus, in contrast to the CAC, the article itself describes this as merely an "allegation" which is not supported by any well-pleaded particularized facts. See In re Optionable Sec. Litig., 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) ("[N]ewspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently

But even if a connection between the Pasadena refinery purchase in 2006 and the Cartel Payment Scheme were alleged, which it is not, the CAC still fails to plead Gabrielli's knowledge. At best, the CAC alleges that (i) the purported informant told a politician in 2005 that the price of the Pasadena refinery was too high and that he was "certain" the deal involved bribery and that (ii) the informant's friend later told the informant "that the politician took the Pasadena issue directly to Gabrielli" and "no action was taken and the deal went forward." CAC ¶ 81. But that combination of hearsay and vague locution ("took the issue to Gabrielli") does not plead particularized facts to show what, if anything, Gabrielli was actually told about the Pasadena refinery, let alone that he thereby learned of the Payment Scheme.[25] Other allegations that in 2006 the informant heard from an unnamed former "high level" Petrobras employee that corruption was "out of control," CAC ¶ 82, and believed a consulting company was hired to facilitate bribery – evidently in connection with some other unrelated Uruguayan refinery that was "also very suspicious," see id. – are simply irrelevant, as there is no link between these allegations and the Payment Scheme itself or Gabrielli's knowledge.

Finally, allegations about SBM and Gabrielli's purported involvement in the early delivery by SBM of the P-57 offshore rig, id. ¶¶ 72-73, do not show Gabrielli's knowledge of any improper payments or resulting misleading statements. Even if true that, in connection with the P-57 rig, "unnecessary costs were incurred solely to benefit the government's political campaign and cost Petrobras millions of dollars," id. ¶ 72, that is mere mismanagement, and

---

particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel . . . ." (citation and internal quotation marks omitted)).

[25] See In re MSC Indus. Direct Co. Inc., 283 F. Supp. 2d 838 (E.D.N.Y. 2003); Zucco Partners, LLC v. Digimarc Corp., 445 F. Supp. 2d 1201, 1205-06 (D. Or. 2006) (explaining that confidential witness's "hearsay rather than personal knowledge [has no weight since it is] not probative" and confidential witness's "opinions as to why [defendants] took certain actions during the class period . . . are speculative" and should be rejected).

there is no allegation that Gabrielli's alleged role gave him knowledge of any bribery, let alone the Cartel Payment Scheme.

### 3.     The CAC Fails to Allege Any Motive to Defraud

A complaint can also plead a strong inference of scienter through motive and opportunity to defraud, but to do so, must allege that defendants "benefitted in some <u>concrete and personal</u> way from the purported fraud." <u>Novak</u>, 216 F.3d at 311 (emphasis added). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable . . . , do not constitute 'motive' for purposes of this inquiry. Rather, the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." <u>ECA</u>, 553 F.3d at 198.

The CAC does almost nothing to attempt to satisfy this standard. It has not alleged that any defendant (or anyone else whose scienter can be attributed to the Company) had <u>any</u> motive to permit "bribery and theft of Petrobras's assets," CAC ¶ 4, or to conceal that misconduct from shareholders. Rather, the only reasonable inference is that, apart from the four co-conspirators, no one at Petrobras knew of the Payment Scheme, and any errors in the Company's financial disclosures were purely an unknown consequence of the four co-conspirators' concealment of the scheme from Petrobras management.

As a result, the CAC attempts to invent a motive to defraud by suggesting that Petrobras had a culture of political patronage and a quid-pro-quo arrangement with political sponsors. <u>See id.</u> ¶¶ 63, 65. But Petrobras openly disclosed its political connections to the Brazilian federal government in its publicly filed Form 20-Fs. Not only did it make known that the Brazilian government owns a controlling stake in the Company, and is required by Brazilian law to do so, but also that the "Brazilian federal government will have the power to elect a majority of the members of [Petrobras's] board of directors and, through them, a majority of the executive

officers who are responsible for [Petrobras's] day-to-day management." Ex. 1 at 17.[26]  There are

no facts alleged showing how these legally required and publicly disclosed political ties resulted

in any motive for the Company to commit fraud.

4.    No Other Circumstantial Evidence Supporting an Inference of Scienter

In the absence of "motive and opportunity," a securities plaintiff must plead scienter

through particularized facts showing "strong circumstantial evidence of conscious misbehavior

or recklessness." ATSI, 493 F.3d at 99.  Recklessness is conduct that is "highly unreasonable

and which represents an extreme departure from the standards of ordinary care to the extent that

the danger was either known to the defendant or so obvious that the defendant must have been

aware of it." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted).  Where, as

here, a plaintiff does not allege a motive, "the strength of the circumstantial allegations

[demonstrating recklessness] must be correspondingly greater." Id. (internal quotation marks

omitted).

First, the CAC's scattershot attempt to extend knowledge to countless anonymous

individuals at Petrobras is wholly conclusory.  It states summarily that the bribery at Petrobras

was "widespread," CAC ¶ 4, and that the "scheme was rampant throughout Petrobras and its

subsidiaries," id. ¶ 6, "involving dozens of Petrobras executives and thousands of employees," id.

¶ 277.  There are no particularized facts pleaded to support these conclusory assertions.[27]  At best,

the CAC alleges a "rogue fiefdom" within Petrobras, not (as is required) that "reports . . .

---

[26]    Petrobras also disclosed that as a result of its political connections, "[Petrobras] may
engage in activities that give preference to the objectives of the Brazilian federal government
rather than to [Petrobras's] own economic and business objectives." Ex. 1 at 17.

[27]    The CAC alleges that 2,000 Petrobras employees are "under investigation." See CAC ¶ 7.
But the document on which it relies makes clear that this "investigation" consisted of simply the
seizure of computers and phones of employees potentially "with access to information relating to
the federal police's 'Lava Jato Operation'"; there is no suggestion that any of these employees
had any knowledge of or involvement in the Payment Scheme. See Ex. 18 at 2.

circulated to senior . . . management" alerting them to the falsity of their statements. In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 358 (S.D.N.Y. 2011).[28]

Second, the CAC's allegations regarding SBM fare no better. CAC ¶ 70. They assert that SBM paid bribes to Petrobras managers in connection with offshore rigs and ships, id., but do not allege that anyone other than co-conspirators Duque and Barusco participated in or were aware of this alleged scheme.[29] Id. ¶ 72. Accordingly, even if the SBM scheme did play out exactly as alleged, those allegations do not show knowledge by anyone else at Petrobras, and in fact reinforce that it was victimized by contractors, the co-conspirators, and politicians who concealed illegal activity from everyone else.

Third, the CAC's thin (or non-existent) allegations relating to each of the individual defendants do not show any intent to defraud, let alone a mental state that can be imputed to Petrobras. Specifically, the CAC does not even plead that Theodore M. Helms, the only individual defendant to be served, made any allegedly actionable misstatement, see Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2301-02 (2011), let alone that he acted

---

[28] The CAC also baldly alleges that "Costa represented that the Directors of Petrobras were aware of the scheme from the beginning and would not question the increased amounts since all of the bids were coordinated in advance." CAC ¶ 52. As the CAC acknowledges, see, e.g., id. ¶¶ 8, 9, 10, when Costa used the term "director" here, he was speaking of the directors of the three divisions implicated in the Payment Scheme: Costa, Duque and Cervero were, respectively, the "Director" of the supply or downstream, engineering services, and international departments. See Ex. 5 at 2:1 (referring to himself as the Supply Department Director). Costa was not speaking of the members of the Company's Board of Directors. Moreover, the CAC does not allege anywhere that Petrobras's Board of Directors had any awareness of the Payment Scheme allegedly taking place within the three Divisions the co-conspirators led. Id. at 6:5-16 (when asked whether the "directors of Petrobras" received portions of kickbacks, Costa immediately refers to directors of the Service Department and the heads of other departments).

[29] Plaintiff makes a single threadbare allegation that multiple unnamed employees at Petrobras were "clearly connected to Julio Faerman," a businessman who allegedly acted as an intermediary between SBM and Petrobras in connection with the alleged bribery scheme. CAC ¶ 71. This allegation, without more, does not support any particularized allegation that anyone else at Petrobras was aware of illicit payments to Barusco and Duque.

with the requisite state of mind. Indeed, Mr. Helms's name appears in the CAC in two instances, both of which do no more than describe his title and his status as signatory of the 2009 and 2012 Registration Statements. See CAC ¶¶ 42, 442. Indeed, the CAC does not even allege that Mr. Helms served in a sufficiently senior position for his mental state to be attributed to Petrobras; he is neither a director, nor an officer. CAC ¶¶ 42, 442.[30] Furthermore, the CAC pleads no facts to suggest that any of PGF's directors or executive officers, and by extension PGF, had any knowledge of the Payment Scheme or otherwise acted with scienter.

Finally, the CAC also attempts to allege that "Petrobras [itself] participated in the cartel," id. ¶ 54, and that somehow there was "collusion between Petrobras and [a] trade group," some of whose members were part of the Cartel, id. ¶ 61, whereby Petrobras conspired in the "bribery and theft of [its own] assets," id. ¶ 4. This incoherent theory defies both logic and reason. The only attempt to support it is the allegation that Petrobras and the Brazilian Industrial Engineering Association ("ABEMI"), a trade association, colluded to perpetrate the alleged bribery scheme. Id. ¶¶ 54-61. But the CAC pleads no facts that Petrobras's interactions with ABEMI were in any way illegal or improper, or even that ABEMI was involved in the improper Payment Scheme. Instead, Plaintiff invents a theory that because some ABEMI members were allegedly involved in the Cartel, id. ¶ 55, the whole of ABEMI must be involved, and ABEMI and Petrobras must therefore have been "united" in some corrupt purpose, id. ¶ 59. This rank speculation, resting

---

[30]     The CAC likewise fails to raise a strong inference of scienter for the other individual defendants not already mentioned: Almir Guilherme Barbassa, Josué Christiano Gomes da Silva, José Raimundo Brandão Pereira, Sérvio Túlio da Rosa Tinoco, Mariângela Monteiro Tizatto, Gustavo Tardin Barbosa, Marcos Antonio Zacarias, Daniel Lima de Oliveira, Paulo José Alves and Alexandre Quintão Fernandes, Comelis Franciscus and Jozef Looman. None have yet been served, and therefore they have not appeared in the action. But, the CAC does not provide any particularized facts suggesting that any knew of the Payment Scheme, or that any of them "made" any untrue statement, much less with scienter.

solely on illogical steps in the syllogism the CAC constructs, does not qualify as the strong

inference of scienter necessary under the PSLRA.

## II.    THE SECURITIES ACT CLAIMS FAIL

Counts VII (Section 11) and VIII (Section 12(a)(2)) allege violations of the Securities

Act based on the Note Offerings as detailed in Appendix A attached hereto.[31]  The Section 11

claim (Count VII) is brought against all defendants and is the only claim brought against the

Underwriter Defendants.  The Section 12(a)(2) claim (Count VIII) is brought against Petrobras

and PGF.[32]  Each Securities Act claim fails to state a claim as a matter of law.

### A.    The CAC Pleads No Actionable Misstatements or Omissions

#### 1.    The Heightened Pleading Standard Applies

Securities Act claims that sound in fraud are subject to Rule 9(b)'s heightened pleading

standard.  Rombach v. Chang, 355 F.3d 164, 172-173 (2d Cir. 2004); In re Merrill Lynch & Co.,

Sec, Derivative & ERISA Litig., No. 07 Civ. 9633 (JSR), 2009 WL 4030869, at *1 (S.D.N.Y.

Mar. 3, 2009) (Rakoff, J.).  The CAC attempts to sidestep that requirement by disavowing any

"allegation of fraud, scienter or recklessness" in the Securities Act claim allegations.  CAC ¶

388.  That is ineffective as a matter of law, particularly when (as here) the underlying theory of

falsity for the Securities Act and the Exchange Act claims are the same.  Lighthouse Fin. Grp. v.

Royal Bank of Scot. Grp. PLC, 902 F. Supp. 2d 329, 339 (S.D.N.Y. 2012) (applying Rule 9(b)

where "the false and misleading statements and omissions alleged for both sets of claims pertain

---

[31]      Appendix A sets forth details of the Note Offerings including which defendants were
involved with which Note Offerings.

[32]      The Section 15 claim asserted in Count IX is derivative of the Sections 11 and 12(a)(2)
claims asserted in Counts VII and VIII, In re Morgan Stanley Info Fund Sec. Litig., 592 F.3d 347,
358 (2d Cir. 2010), and has only been asserted against three individual defendants, none of
whom has been served.

to the exact same underlying events"), aff'd sub nom. Royal Bank of Scot. Grp., PLC, 2015 WL 1653788, at *4.[33]

For each set of claims, the CAC alleges that asset values (PP&E) were "inflated," CAC ¶ 480, and that disclosures made about, among other things, the Company's internal controls and its "level of integrity," id. ¶ 394, were misleading because "Petrobras executives awarded contracts to Brazilian construction companies that had systemically inflated their bids by as much as 20%" and "the accounting treatment of these improper payments" requires Petrobras to take "an asset write-down," id. ¶ 398. Indeed, virtually every "false and misleading statement" included in the Securities Act claims is also included in the Exchange Act claims.[34] And, the theory underlying the Securities Act claims is also premised on the same testimony from co-conspirator Costa, id. ¶ 395, and the same alleged underlying Cartel conduct, which the CAC asserts elsewhere involved "rampant fraud," id. ¶¶ 91-92, and "widespread bribery and theft of Petrobras' assets," id. ¶ 4. This plainly sounds in fraud. Rombach, 355 F.3d at 172-73. Thus, the Securities Act claims must do more than just identify purportedly false statements; the CAC must explain why they were false.[35]

### 2. The Alleged Misstatements and Omissions

The CAC fails to plead adequately why any of the statements forming the basis of a Securities Act claim, see CAC ¶¶ 394-407, are false. As noted, the statements alleged to be

---

[33]    See also In re Axis Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 598 (S.D.N.Y. 2006) ("Courts have repeatedly noted that the insertion of a simple disclaimer of fraud is insufficient"); Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 629 (4th Cir. 2008).

[34]    E.g., compare CAC ¶¶ 477-81 with id. ¶¶ 163-65; id. ¶¶ 482-83 with id. ¶¶ 189-91; id. ¶¶ 484-87 with id. ¶¶ 197-99.

[35]    Anchutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 108 (2d Cir. 2012); see also Rombach, 355 F.3d at 172 (2d Cir. 2004) (holding that Section 11 and 12 claims subject to Rule 9(b) pleading requirements must "explain why the statements were fraudulent").

"false and misleading" for Securities Act purposes are also alleged to be "false and misleading" for Exchange Act purposes.  See supra note 34.  The principal difference between the two sets of "false statement" allegations is that those in the Securities Act section soft peddle the payment of bribes by Cartel members when discussing the balance sheet implications of the CAC's contentions, focusing instead on the contracts with Cartel members being "inflated" by 20%.  Because of this substantial overlap, the claims based on materially false allegations in the Securities Act claims fail for the same reasons as those in the Exchange Act claims.  See supra Part I.A.  The few differences, discussed below, also fail.

       a.     *Financial Statements.*  The CAC alleges that the reported value of Petrobras's assets (specifically, in PP&E) was "inflated . . . by up to 20%."  CAC ¶ 406.  For Securities Act purposes, the CAC alleges that PP&E valuations were false only because contracts were awarded to Cartel members "that had systemically [sic] inflated their bids by as much as 20%," and that, as a result, "Petrobras is currently facing an asset write-down of approximately $30 billion . . . to reduce the carrying value of some of its assets."  Id. ¶ 398.  Not only are these allegations not pleaded with sufficient particularity, but the CAC's underlying theory is belied by the very documents and other sources of information on which it relies.

      First, there are no facts pleaded to show that contracts were inflated by 20%.  The only such allegation in the Securities Act section is pure ipse dixit.  Id. ¶ 406.  While the CAC alleges vaguely that Costa testified that "Petrobras routinely awarded lucrative and inflated contracts to construction and engineering firms," CAC ¶ 395, not only did he not testify that Petrobras contracts with Cartel members were inflated by "up to 20%," CAC ¶ 114, he specifically testified that the 20% figure was not an "inflated" amount but, rather, within the range Petrobras

considered reasonable and acceptable <u>ab initio</u>, as a result of its standard budgeting practice.  Ex. 5 at 4:32-35.

Second, even if the CAC adequately pleaded that the Cartel's manipulation caused Petrobras to overpay for certain contracts by 20%, it still fails to plead how that manipulation inflated Petrobras's PP&E.  The CAC attempts to rely on a January 27, 2015 statement by former Petrobras CEO Foster that "the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustment."  CAC ¶ 404.  But that statement concerned the need to write-down PP&E with respect to any overpayment used for <u>bribes</u> made by Cartel members with the overpayments, <u>not</u> for purportedly unrelated additional "inflation" in contracts.[36]  The Company thus described correcting "errors in the carrying amount of certain property, plant and equipment" because certain of its contractors and suppliers "used funds from their contracts with Petrobras to make improper payments to political parties, Petrobras personnel and other persons."  Ex. 8 at 9.  And, the CAC excluded the 3% bribery allegations made elsewhere from this portion of the Securities Act claims.

Finally, the US\$ 30 billion figure claimed to be the amount of the Company's likely write-down for "inflated contracts," CAC ¶¶ 397-98, 405, is also flatly contradicted by documents on which the CAC relies, <u>see</u> <u>id.</u> ¶ 404.  Petrobras's January 27, 2015 release described two methodologies it considered at that time to evaluate the effect of the <u>bribery</u> scheme on the value of its PP&E.  Under one method, certain assets were overvalued (against book value) by approximately US\$ 30 billion.  But the very disclosure from which the CAC draws this number made clear that this calculation reflected adjustments for completely unrelated issues – and, indeed, would result in certain other assets <u>exceeding</u> book value by R\$ 27.2 billion.

---

[36]     Ex. 9 at 2 ("former employees taking bribes" is what required the adjustment).

Accordingly, the US$ 30 billion number "was not an adequate proxy for the unlawful values paid," Ex. 9 at 1 (emphasis added), and was therefore rejected. There is thus no factual basis whatsoever for the CAC's prediction about the size of any asset write-down for "inflated contracts."

b. *Anti-Corruption Representation.* Finally, the CAC alleges that the representations regarding compliance with anti-corruption laws included in the March 2014 Underwriting Agreement among Petrobras, PGF and the relevant Underwriter Defendants was misleading by stating that neither Petrobras nor its officers made "any direct or indirect unlawful payment[s] to any foreign or domestic government official." CAC ¶ 500. But as the CAC explicitly pleads, neither Petrobras nor its officers made unlawful payments to public officials and others; any such payments were made by Cartel members and those working in concert with them. CAC ¶ 395; see Ex. 5 at 8:14-15; 9:28-31; 10:21-26. Rombach, 355 F.3d at 172 (allegation fails because plaintiffs fail to "explain why the statements were fraudulent").

## B. Plaintiffs Lack Standing To Assert Securities Act Claims

### 1. The Re-Opened 2012 Note Offering.

"To prevail on a Section 11 claim for a misleading registration statement, a plaintiff must be able to 'trace' his or her shares to the defective registration statement." In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 31 n.1 (2d Cir. 2006). Each of two series of notes in the 2012 Notes Offering re-opened an issuance first offered in January 2011, CAC ¶¶ 193, 410,[37] which is "fully fungible with" the original notes. Ex. 19 at 1. To proceed on the "re-opened" Notes, therefore, Plaintiffs must adequately plead that any such Notes were purchased by putative class members pursuant to the 2012 Notes Offering. They have not, and cannot do so.

---

[37] 5.375% Global Notes due 2021 bearing CUSIP 71645WAR2 and 6.750% Global Notes due 2041 bearing CUSIP 71645WAS0. Ex. 19.

The CAC alleges that putative class members "purchased or otherwise acquired the Petrobras securities set forth on Appendix A pursuant or traceable to the materially false and misleading 2009 Registration Statement and 2012 Registration Statement." CAC ¶ 528. But the CAC does nothing to differentiate the Notes sold in or traceable to the 2012 Note Offering from those in the original issuance, which were also sold pursuant to the 2009 Registration Statement, and which are indistinguishable from those issued in 2011; indeed, they share all of the same features, including the same CUSIP. The CAC fails to plead any basis upon which one could be differentiated from another, and makes no effort even to explain how that could be done.

Accordingly, Plaintiffs cannot meet their burden of showing that any Notes in the re-opened series purchased by putative class members in fact trace to those re-opened offerings, as opposed to the original, time-barred,[38] 2011 Note Offerings. "When a company has issued shares in multiple offerings under more than one registration statement . . . a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering." In re Century Aluminum Co. Sec. Litig., 729 F.3d 1104, 1107 (9th Cir. 2013). "Aftermarket purchasers usually will not be able to trace their shares back to a particular offering. Thus, in this case, plaintiffs had to allege facts from which we can reasonably infer that their situation is different." Id. at 1107-08. No such facts were alleged here.[39]

---

[38] See 15 U.S.C. § 77m (three year statute of repose).

[39] See also Krim v. pcOrder.com, Inc., 402 F.3d 489, 492, 500 (5th Cir. 2005) ("Congress conferred standing on those who *actually* purchased the tainted stock, not on the whole class of those who *possibly* purchased tainted shares."); In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003) (Lynch, J.) ("Only those who purchase securities that are subject to allegedly false registration statement, and not those who buy identical stocks already being traded, can sue under section 11.").

2.      The Section 12(a)(2) Claims

In Count VIII, USS asserts Section 12(a)(2) claims solely against Petrobras and PGF, based upon the Notes.  But neither USS nor any putative class members have standing to bring them, for two reasons:  (1) there is no adequate allegation that any such Notes were purchased "in" the initial offering and (2) neither Petrobras nor PGF are alleged to be "statutory sellers," a necessary predicate to asserting such claims against them.  Since Count VIII is only asserted against Petrobras and PGF, it should be dismissed.

First, it is well-established that only purchasers in a public offering of securities, rather than purchasers in the secondary market, have standing to bring Section 12(a)(2) claims. Gustafson v. Alloyd Co., 513 U.S. 561, 570, 577 (1995); Pinter v. Dahl, 486 U.S. 622, 644 n.21 (1988); Yung v. Lee, 432 F.3d 142, 148 (2d Cir. 2005).  Therefore, Plaintiffs' allegation that putative class members "purchased the Notes Offerings in or traceable pursuant to the materially false and misleading Offering Documents," CAC ¶ 540, does not state a 12(a)(2) claim because notes "traceable to" an offering may include aftermarket purchases.  Pub. Emps.' Ret. Sys. Of Miss. v. Merrill Lynch & Co., Inc., 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (Rakoff, J.) ("Merrill Lynch II") (rejecting plaintiffs' "coy[ ]" allegation premising standing on the assertion that putative class members purchased securities "pursuant and/or traceable to" the prospectus); In re Lehman Bros. Sec. & ERISA Litig., 799 F. Supp. 2d 258, 310-11 (S.D.N.Y. 2011) ("A complaint that alleges that the plaintiff purchased its securities 'pursuant and/or traceable to' the Offering Documents is not sufficient.").

Second, the CAC fails to allege that Petrobras or PGF was a "statutory seller," which requires one to have (1) actually passed title to the securities to plaintiffs, or (2) actively solicited plaintiffs' purchase of the securities motivated at least in part by a desire to serve the defendant's

own financial interests.  <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d 347, 359 (2d Cir. 2010) (citing <u>Pinter</u>, 486 U.S. at 642, 647)).  Here, all of the Notes were sold in firm commitment underwritings:  PGF sold the Notes to underwriters, not to the public.[40]  Therefore, neither Petrobras nor PGF directly passed title to Plaintiffs.

Third, the CAC fails to plead, as required, that Petrobras or PGF actively solicited purchases by putative class members.  <u>Pinter</u>, 486 U.S. at 647; <u>Shain v. Duff & Phelps Credit Rating Co.</u>, 915 F. Supp. 575, 581 (S.D.N.Y. 1996) (holding that "persons are not liable under § 12 for solicitation unless they directly or personally solicit the buyer").[41]  The CAC alleges only in conclusory fashion that "Defendants were sellers, offerors, and/or solicitors" and "directly solicited the purchase of securities by Plaintiffs . . . motivated at least in part by the desire to serve their own financial interests."  CAC ¶ 539.  There are no specific allegations to support the claim that Petrobras or PGF directly solicited any putative class members to purchase the Notes.

### C.  Plaintiffs' 2012 and 2013 Note Offerings Claims Are Time-Barred

#### 1.  The One-Year Discovery Period Ran

Section 11 and 12(a)(2) claims must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the

---

[40]  <u>See</u> Ex. 19 at S-45; Ex. 20 at S-48; Ex. 21 at S-72.  Petrobras, as guarantor, did not issue any Notes.  Ex. 19 at S-10; Ex. 20 at S-10; Ex. 21 at S-13.

[41]  <u>See also</u> <u>Rosenzweig v. Azurix Corp.</u>, 332 F.3d 854, 871 (5th Cir. 2003) ("[T]he seller must, at a minimum, directly communicate with the buyer."); <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d 1194, 1216 (1st Cir. 1996) ("[N]either involvement in preparation of a registration statement or prospectus nor participation in 'activities' relating to the sale of securities, standing alone, demonstrates the kind of relationship between defendant and plaintiff that could establish statutory seller status."); <u>In re Deutsche Telekom AG Sec. Litig.</u>, No. 00 CIV 9475 (SHS), 2002 WL 244597, at *5 (S.D.N.Y. Feb. 20, 2002) ("Plaintiffs' bald allegations of solicitation are insufficient to sustain [defendant's] section 12(a)(2) liability as a 'seller' pursuant to the second <u>Pinter</u> test.").

exercise of reasonable diligence." 15 U.S.C. § 77m.  The first complaint was filed on December

8, 2014.  ECF 1.[42]  If misstatements or omissions alleged in the CAC were, or should have been,

discovered on or before December 7, 2013, the Securities Act claims based upon the 2012 and

2013 Notes are time-barred.  As discussed above, the misconduct that the CAC asserts should

have been disclosed was the product of a concealed fraud committed against Petrobras and was

not known (or knowable) to senior management or the Underwriter Defendants.  However, if

USS's own allegations are accepted as true for purpose of this motion only, then based on USS's

own representations to the Court – representations central to its "loss" claim in its successful lead

plaintiff application – the Securities Act claims are time barred as these same conclusory

allegations of corruption and bribery could have been made well more than one year before this

litigation began.

     USS contended in its lead plaintiff appointment motion papers that it had suffered

millions of dollars in losses from trading preferred ADSs during the Class Period.  ECF 69 at 2.

Its trading records show that it closed out its position in these securities in October 2013.  ECF

40-3 at 3.  To claim relevant losses in these securities, USS asserted that in August 2013 there

was a "corrective disclosure," after which it sold (on October 3-4, 2013) "more than 2.5 million

preferred ADSs," ECF 69 at 21.  This was well before any allegedly corrective disclosure

identified in any prior class pleading filed in this case.  These sales constitute the lion's share of

USS's claimed losses in these securities; indeed, all other sales by USS of these securities took

place even earlier.

     Accordingly, in order to show that those October 2013 sales caused its loss relevant to the

lead plaintiff contest, USS repeatedly argued that a "corrective disclosure" occurred "on August

---

[42]     Unless stated otherwise, references to ECF are to entries on the docket for case 14-cv-9662-JSR.

9, 2013, when Época magazine published a report on [the] illegal use [by] Petrobras to transfer

funds to members of [a] Brazilian [political] party." ECF 69 at 21 n.7; see also ECF 87 at 4 n.4.

USS made the point even more strongly in a later submission: "[it] held more than 2.5 million

preferred shares at the time that corrective information relating to Petrobras's fraud initially

reached the market in [August] 2013." ECF 87 at 4 (citing the Época article). And, in their

initial memorandum seeking to lift the PSLRA automatic discovery stay (which violated the

Court's page length limit and accordingly was replaced with a shorter version), USS flatly stated

that "[t]he first allegation of Petrobras' corruption began to partially surface in 2013, with

newspapers publishing articles alleging a bribery scheme at the Company." ECF 113 at 4.

USS also represented to the Court in its lead plaintiff submissions that this Época report

about "fraud" and "corruption" at Petrobras involving payments to politicians, Ex. 22, had

market-wide effects. USS noted that Bloomberg, Ex. 23, drew attention to the Época disclosure,

and further represented that the information it revealed was promptly impounded into the

market's assessment of Petrobras's value. In specific, USS asserted that "the price of the

preferred ADS shares fell $0.79, or over 5%," on the release of that news. ECF 69 at 21 n.7; see

ECF 87 at 4 n.4 (same).

Under Section 13, the one year discovery limitations period commences once a

misstatement or omission is either discovered (actual notice) or should have been discovered

(inquiry notice). Merrill Lynch II, 714 F. Supp. 2d at 479. Moreover, the limitations clock

begins to run once plaintiff is on notice of misstatements or omissions; it is not necessary for the

full details of the claim to be revealed.[43] Here, as discussed above, the Securities Act allegations

---

[43]     See, e.g., Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 361 (2d Cir. 2013) ("The
triggering information [to start the limitations period] 'need not detail every aspect of the
subsequently alleged fraudulent scheme.'" (internal quotation marks omitted)); In re Magnum

are insufficient to state a claim.  However, if these allegations are deemed sufficient, then the same allegations could have been made – if USS's representations are accepted as true – based on the Época disclosures and its Bloomberg coverage which, according to USS, not only revealed what USS contends was a fraudulent scheme at Petrobras involving illegal payments to politicians, but themselves moved the market.  Contrast Merrill Lynch II, 714 F. Supp. 2d at 479-80 (finding no limitations effect where articles neither referred to the defendant nor affected the ratings of the securities it issued).  Indeed, the ten-page Época article reported on what USS describes as a general scheme to make payments to politicians out of proceeds from Petrobras contracts, including with a specifically identified counterparty, Odebrecht, that the CAC asserts was a member of the Cartel that victimized Petrobras. Ex. 22; CAC ¶¶ 395-98.  As the CAC (¶ 122) asserts:

> Epoca reported that Petrobras funneled kickbacks to officials from political parties [, citing] evidence from [a] lobbyist [, who] told the press he handled all of Petrobras' foreign contacts and collected a 'fee' from the companies involved.  The lobbyist [for a political party] said between 60% to 70% of the graft money was passed on to [that party].  Epoca also reported that Joao Vaccari Neto, the ruling Worker's Party finance secretary, meanwhile received the equivalent of $8 million in kickbacks from Brazilian construction conglomerate Odebrecht as part of a Petrobras international contract.

Having been alerted to the "corrective disclosure" that USS contends the Época article and Bloomberg report constituted, putative class members – which invested in a Brazilian company majority-owned by Brazil and whose operations were largely centered in Brazil – would have found many more articles published in the Brazilian press between August and November 2013 discussing the subject of the Época disclosure, including reports of overcharging

---

Hunter Res. Corp. Sec. Litig., 26 F. Supp. 3d 278, 302 (S.D.N.Y. 2014) ("[T]he statute of limitations for Securities Act claims is not somehow tolled until the appearance of disclosures that perfectly match the allegations that a plaintiff chooses to include in its complaint.").

in connection with the Odebrecht contract cited in the Época article and news that prosecutors had opened a criminal investigation into the allegations.[44]  Even one article can be enough to trigger the running of the Section 13 limitations period, see In re MBIA Inc. Sec. Litig., No. 05 Civ. 03514 (LLS), 2007 WL 473708, at *6 (S.D.N.Y. Feb. 14, 2007) (citing to other cases in which one article was sufficient), but here there were many more.

Moreover, a plaintiff may not have it both ways:  either a disclosure is sufficiently impactful that it affects the market and constitutes a corrective disclosure – and triggers a limitations clock – or it is not a corrective disclosure.  In re AOL Time Warner, Inc. Sec. Litig., 503 F. Supp. 2d 666, 679 (S.D.N.Y. 2007) (plaintiffs may not argue that they lacked knowledge of a fraud in order to "withstand the statute of limitations" yet argue that the fraud was disclosed for purposes of loss causation prior to the date they allege they were put on notice (interpreting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 (2d Cir. 2005))).  Here, not only has USS repeatedly (and successfully) maintained that the Época report was a corrective disclosure, but that it was – alone – so significant as to constitute a "red flag" that should have come to the attention of Petrobras's auditors.  CAC ¶ 122.  Accepting for purposes of the motion the CAC's assertion that the Época newspaper report constituted a "red flag," it triggered the one-year discovery period.

USS's sole effort at avoiding the limitations period consequences of its allegations and representations is assertions that the Época article "did not materially affect the market for

---

[44]    There were many reports between August 9, 2013 and November 10, 2013, including in such prominent publications as O Globo, Folha de Sao Paulo and Valor.  For example, articles in November, in particular, focused on the Brazilian authorities' interest in investigating alleged overcharging related to the Odebrecht contract.  See Ex. 24 (stating that federal prosecutors were looking into overcharging and embezzlement relating to Petrobras's contract abroad); Ex. 25 (stating that documents collected from sources provide indications that the bidding was set up and there was overbilling).

Petrobras bonds," and that the article "was not known by the purchasers or holders of Petrobras Bonds." Id. ¶ 122. The latter is a remarkable assertion that could be responsibly made only if USS actually spoke to every such purchaser and holder, and there is no suggestion that it did. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth"). Moreover, as each Plaintiff in this case demonstrates, purchasers of Notes also purchased ADSs during the Class Period. At minimum, if USS's allegation that the Época report constituted a "red flag" for the auditors is accepted as true solely for purposes of this motion, then it should trigger notice for all securities holders including Noteholders. As to the former assertion, even if the Época report did not move the debt market (as USS asserts), that is not necessary to trigger the running of the one-year limitations period: Section 13 does not require a price decline to start the limitations clock; it only requires discovery of "the untrue statement or the omission." 15 U.S.C. § 77m; see also NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 154 n.7 (2d Cir. 2012) (The statute establishes "a one-year statute of limitations for §§ 11 and 12(a)(2) claims which begins to run upon 'the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence.'").

Accordingly, the Securities Act claims based upon the 2012 and 2013 Notes Offerings are time-barred under the applicable one-year statute of limitations and should be dismissed.

2.    The 2012 Notes Claims Are Barred by the Statute of Repose

Section 13 contains a statute of repose providing that "[i]n no event" shall any action under Section 11 be brought "more than three years after the security was bona fide offered to the public." 15 U.S.C. § 77m (emphasis added); see also P. Stolz Family P'ship LP v. Daum,

204 F. Supp. 2d 693, 694 (S.D.N.Y. 2002) (Rakoff, J.), aff'd, 355 F.3d 92 (2d Cir. 2004). "[A]

statute of repose is a judgment that defendants should 'be free from liability after the

legislatively determined period of time, beyond which the liability will no longer exist and will

not be tolled for any reason.'" CTS Corp. v. Waldburger, 134 S. Ct. 2175, 2183 (2014) (citation

omitted).

Here, the date of bona fide offering is the date of the relevant prospectus supplement, see

Footbridge Ltd. Trust v. Countrywide Fin. Corp., 770 F. Supp. 2d 618, 623 (S.D.N.Y. 2011)

(Castel, J.) (citing 17 C.F.R. § 230.430B(f)(2), (4) (2011)), which for the 2012 Note Offering is

February 1, 2012. See Ex. 19.[45] Yet, the CAC was filed on March 27, 2015, more than three

years later. Thus, any Securities Act claims in the CAC relating to purchases in or traceable to

the 2012 Note Offering are time-barred. Plaintiffs cannot rely upon the filing of the complaint

on December 24, 2014 by a different plaintiff, the City of Providence (the only original plaintiff

to have brought Securities Act claims),[46] to save its untimely claims because (i) there can be no

American Pipe[47] tolling of a statute of repose; (ii) "relation back" under Federal Rule of Civil

Procedure 15(c) is unavailable to extend a statute of repose; and (iii) even if relation back were

permitted to extend the statute of repose, there can be no relation back here where City of

Providence lacked standing to bring claims on the 2012 Note Offering.

---

[45]    Plaintiffs' allegation that the 2012 Bonds are dated February 6, 2012, CAC ¶ 113, must
be an error as it is belied by the face of the February 1, 2012 Prospectus Supplement, Ex. 19,
publicly available data and Union's own trading. See, e.g., ECF 19-1.

[46]    City of Providence, ECF 1.

[47]    In American Pipe & Constr. Co. v. Utah, 414 U.S. 538 (1974), the Supreme Court held
that "the commencement of a class action suspends the applicable statute of limitations as to all
asserted members of the class who would have been parties had the suit been permitted to
continue as a class action." Police & Fire Ret. Sys. v. IndyMac MBS, Inc., 721 F.3d 95, 100 (2d
Cir. 2013) (quoting American Pipe, 414 U.S. at 554).

a.     *No Tolling.*  Tolling is not available for statutes of repose.  See <u>Lampf, Pleva,</u>

<u>Lipkind, Prupis & Petigrow v. Gilbertson</u>, 501 U.S. 350, 363 (1991) (then-applicable three-year

statute of repose for Section 10(b) establishes an outer limit that is "inconsistent with tolling . . .

[b]ecause the purpose of the 3-year limitation is clearly to serve as a cutoff"); <u>IndyMac</u>, 721 F.3d

at 107-10 (Securities Act statute of repose not subject to tolling under <u>American Pipe</u>).

b.     *No Relation Back.*  Federal Rule of Civil Procedure 15(c), which allows amended

pleadings to "relate back" to original pleadings in certain circumstances, cannot be used to

circumvent the statute of repose.  See <u>In re Longtop Fin. Tech. Ltd. Sec. Litig.</u>, 939 F. Supp. 2d

360, 380 (S.D.N.Y. 2013) (Rules Enabling Act barred use of Fed. R. Civ. P. 15(c) to overcome

statute of repose); <u>In re IndyMac Mortg.-Backed Sec. Litig.</u>, 793 F. Supp. 2d 637, 643 (S.D.N.Y.

2011) (Kaplan, J.) (quoting 28 U.S.C. § 2072(b)), <u>aff'd</u>, 721 F.3d 95.  The Second Circuit's

<u>IndyMac</u> decision has, as numerous courts have recognized, foreclosed the use of the relation-

back doctrine to add new claims or new parties after the statute of repose has expired.[48]

The original complaint in this case asserting violations of the Securities Act based on the

2012 Note Offering was filed by City of Providence on December 24, 2014.  City of Providence

Complaint, <u>City of Providence</u>, ECF <u>1</u>.  But now, City of Providence is no longer separately

pursuing its claims.[49]  Instead, at the eleventh hour before filing the CAC, Lead Plaintiff sent a

letter to the Court, nearly three weeks after the Court requested it, believing "that it would be

---

[48]     <u>See</u> <u>Police & Fire Ret. Sys. of the City of Detroit v. Goldman Sachs</u>, No. 10 Civ. 4429,
2014 WL 1257782 at *9 (S.D.N.Y. March 27, 2014) (Cedarbaum, J.) (relying on <u>IndyMac</u> and
the Rules Enabling Act to hold that a plaintiff cannot use relation-back to add new claims that
would otherwise be barred by the statute of repose); <u>In re Morgan Stanley Mortg. Pass-Through
Certificates Litig.</u>, 23 F. Supp. 3d 203, 208 (S.D.N.Y. 2014) (Swain, J.) (new plaintiffs could not
relate back to an original complaint under Federal Rule of Civil Procedure 15(c) because a
statute of repose is a substantive right, and cannot be abridged by a Federal Rule, as this would
violate the Rules Enabling Act).

[49]     As discussed below, City of Providence lacks standing in any event to pursue claims
based on the 2012 Note Offering.  <u>See</u> Point II.C.2.c.

advisable to include additional plaintiffs in the [CAC]." Ex. 26. As Lead Plaintiff's counsel acknowledged, adding new plaintiffs, including Union, was necessary "in order to ensure that the necessary standing is satisfied for all the relevant claims Lead Plaintiff anticipates asserting therein." Id. This Court permitted USS to add these additional plaintiffs "in order to ensure that the plaintiffs have standing to assert all relevant claims." ECF 112 at 1. Because the CAC was filed on March 27, 2015 (ECF 109), however, after the expiration of the Securities Act's statute of repose for the 2012 Note Offering, the addition of this new plaintiff's 2012 Note Offering claims under Sections 11 is barred by the three year statute of repose, and under IndyMac relation back cannot be used to overcome that bar.

      c.    *Prior Plaintiff Lacked Standing.* Even if relation back were otherwise available, the untimely 2012 Notes claims cannot relate back to the claims purportedly brought by a plaintiff who lacked standing.[50] City of Providence lacked standing to pursue claims on the 2012 Note Offering.

      City of Providence provided a certification attached to its complaint indicating it bought two tranches of the 2012 Note Offering. See City of Providence Complaint at 73-75, City of Providence, ECF 1. As to the first tranche, City of Providence certified that it purchased the notes in the offering on February 1, 2012. But it sold those notes one week after the offering for a profit. Id. City of Providence therefore did not have standing to pursue Securities Act claims based on this tranche as it suffered no monetary loss. See 15 U.S.C. § 77k(e) (damages "shall

---

[50]    See In re Magnum Hunter, 26 F. Supp. 3d at 303 (where original plaintiff did not allege purchases traceable to offering, new plaintiffs' claims could not relate back and were untimely); see also IndyMac, 721 F.3d at 110-11 (new plaintiffs' claims were outside of the statute of repose and could not relate back to timely claim of original plaintiff that lacked standing); Bensinger v. Denbury Res., Inc., 31 F. Supp. 3d 503, 509-11 (E.D.N.Y. 2014) (Gleeson, J.) (same); In re Direxion Shares ETF Trust, 279 F.R.D. 221, 237 (S.D.N.Y. 2012) (Forrest, J.) (where original plaintiff lacked standing on certain securities, new plaintiffs' claims on those securities could not relate back and were untimely).

-48-

represent the difference between the amount paid for the security . . . and . . . the price at which such security shall have been disposed of in the market before suit"); <u>In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.</u>, 381 F. Supp. 2d 192, 245-46 (S.D.N.Y. 2004) (Kram, J.) (plaintiff who did not suffer monetary loss on note purchases had not suffered injury in fact and did not have Article III or statutory standing).

As to the second tranche, purchased on September 18, 2014, City of Providence cannot trace its purchase of the Notes to the 2012 Note Offering. This second tranche of notes was first offered to the public in January 2011 and then reopened in 2012, with both offerings made pursuant to the same 2009 shelf registration statement. <u>See</u> <u>supra</u> Part II.B.1. As a result, like the plaintiff in <u>Magnum Hunter</u>, City of Providence lacked standing under the Securities Act to pursue claims on that tranche of the 2012 Notes, because it did not, and cannot, plead that the Notes it purchased in 2014 were, or could be, traceable to the 2012 Note Offering.[51]

Any attempt now for Plaintiffs to rely on <u>NECA</u> to assert that City of Providence had standing should be rejected because (i) so-called "class standing" is not sufficient to satisfy the statute of repose and, even if it was, (ii) <u>NECA</u> cannot be read so broadly to give City of Providence such class standing for the 2012 Note Offering. After the Second Circuit's decision in <u>IndyMac</u>, <u>NECA</u> cannot be read to revive claims that were brought after the statute of repose expired based on the pendency of a putative class action brought by someone who did not

---

[51]     Union's Section 12(a)(2) claims – brought only against Petrobras and PGF and not the Underwriter Defendants – based on the 2012 Notes must be dismissed for the same reason. First, claims under Sections 11 and 12(a)(2) have similar pleading requirements. <u>See</u> <u>In re Britannia Bulk Holdings Inc. Sec. Litig.</u>, 665 F. Supp. 2d 404, 412 (S.D.N.Y. 2009). Second, Section 12(a)(2) does not apply to aftermarket purchases, <u>see generally</u> <u>Gustafson v. Alloyd Co.</u>, 513 U.S. 561, 571-72 (1995), <u>Yung v. Lee</u>, 432 F.3d 142, 149 (2d Cir. 2005), and thus whether a purchase after an offering can be traced to that offering is irrelevant. <u>See</u> <u>Merrill Lynch II</u>, 714 F. Supp. 2d at 483. City of Providence therefore lacks standing on this tranche under Section 12(a)(2) as well.

actually have statutory standing.  See In re Morgan Stanley, 23 F. Supp. 3d at 208 ("The Second

Circuit's holding in IndyMac that a plaintiff whose claim is untimely under a statute of repose

cannot look to the pendency of a putative class action to revive its direct claim against the

defendant forecloses [plaintiffs'] invocation of [NECA] to validate their direct claims.").  As

explained by the Second Circuit, the Rules Enabling Act prohibits procedural rules such as

Federal Rule of Civil Procedure 23 – the basis for the finding of "class standing" in NECA –

from "abridg[ing], enlarg[ing] or modify[ing] any substantive right."  IndyMac, 721 F.3d at 109

(quoting 28 U.S.C. § 2072(b)); see Merrill Lynch II, 714 F. Supp. 2d at 480 ("[I]t is black letter

law that a rule of procedure [Rule 23] cannot create standing." (citing 28 U.S.C. § 2072(b))).[52]

Additionally, even if class standing were sufficient to satisfy the statute of repose – and it

is not – NECA cannot be read so broadly as to give City of Providence class standing on the

2012 Note Offering based on its purchase in other Note Offerings where, among other things,

there were different registration statements, different defendants and different alleged

wrongdoing in each of the Note Offerings at issue.  See Ret. Bd. of the Policemen's Annuity &

Ben. Fund v. Bank of N.Y. Mellon, 775 F.3d 154, 159-63 (2d Cir. 2014) ("class standing" does

not exist where a lead plaintiff sought to represent investors in trusts backed by loans from

different originators than those purchased by absent class members).

Lead Plaintiff itself recognizes the narrow scope of NECA: as it explained to the Court, it

was compelled to add plaintiffs that purchased in all of the offerings at issue "in order to ensure

_____

[52]     As this Court explained pre-NECA, "[t]hat a suit may be a class action . . . adds nothing
to the question of standing, for even named plaintiffs who represent a class 'must allege and
show that they personally have been injured, not that injury has been suffered by other,
unidentified members of the class to which they belong and which they purport to represent."
Merrill Lynch II, 714 F. Supp. 2d at 480 (quoting Lewis v. Casey, 518 U.S. 343 (1996)).  Even if
now under NECA class standing may be sufficient to state a claim, it is not sufficient to satisfy
the statute of repose under IndyMac.

that the necessary standing is satisfied for all the relevant claims." See Ex. 26. The Court

granted this request to add plaintiffs "in order to ensure that the necessary standing is satisfied

for all the relevant claims." ECF 112 at 1. The addition of two new named plaintiffs would not

have been necessary if NECA allowed USS to have class standing across all three Note

Offerings. Here, City of Providence, just like USS, does not have class standing to pursue claims

based on the 2012 Note Offering because – unlike in NECA – the 2012 Note Offering was (i)

issued pursuant to a different shelf registration statement than the 2013 and 2014 Note Offerings,

compare CAC ¶ 408 with CAC ¶ 412, (ii) underwritten by a different underwriting syndicate, see

App. A,[53] and (iii) issued by Petrobras subsidiaries that are not alleged to have common

ownership or control with the Underwriter Defendants.

### D.  Claims Based Upon Notes Acquired After Earning Statements Covering Twelve Months Subsequent to an Offering Should Be Dismissed

A Section 11 claimant must show reliance "if the plaintiff 'acquired the security after the

issuer has made generally available to its security holders an earning statement covering a period

of at least 12 months beginning after the effective date of the registration statement.'" Pub.

Emps.' Ret. Sys. v. Merrill Lynch & Co., 277 F.R.D. 97, 112 (S.D.N.Y. 2011) (Rakoff, J.)

("Merrill Lynch III") (quoting 15 U.S.C. § 77k(a) (1998)).[54] Petrobras issued earning statements

that covered twelve-month periods after the effective dates of each of the 2012 and 2013 Notes

Offerings. In specific, Petrobras issued earning statements in April 2013 (on Forms 20-F and 6-

---

[53]     As set forth in the Appendix A, for example, Underwriter Defendants HSBC, Merrill Lynch, Standard Chartered, Bradesco, Banca IMI and Scotia participated in the 2013 and/or 2014 Note Offerings but did not participate in the 2012 Note Offering.

[54]     In Merrill Lynch III, this Court held that certain distribution reports issued on Form 10-D did not qualify as an earning statement under Section 11 because these distribution reports did not contain information statutorily required of an earning statement. 277 F.R.D. at 114. This is not at issue here because Form 20-F and Form 6-K filings are expressly included in what constitutes an earning statement under 17 C.F.R. § 230.158 (2008). Id.

K) covering the twelve month period following the February 1, 2012 effective date of the 2012

Note Offering, CAC ¶¶ 490, 494, and in April and August 2014 (again on those Forms) covering

the twelve month period following the May 13, 2013 effective date of the 2013 Note Offering.[55]

Nevertheless, no required reliance is pleaded in the CAC for any purchase made after the

issuance of the earning statements – April 30, 2013 for the 2012 Notes, and August 11, 2014 for

the 2013 Notes. Indeed, no such reliance is even pleaded by Union, whose filings in this case

show that it purchased Notes in each series after those dates.[56] All such claims by Union, and

---

[55] An "earning statement" need not be a single document. Any "combination of reports" covering a twelve-month period, which can include Form 20-F and Form 6-K, may be considered an "earning statement." See 17 C.F.R. § 230.158(a)(2)(ii) (2008) (an "earning statement" for purposes of Section 11(a) shall be sufficient if the information is contained in any combination of reports in, among others, Forms 20-F and 6-K); see also Merrill Lynch III, 277 F.R.D. at 114 ("An 'earning statement' must consist of one, or any combination, of the following corporate reports: Forms . . . 20–F . . . [or] 6–K"). Also, "[a] subsidiary issuing debt securities guaranteed by its parent" meets the requirements for an earning statement under Section 11(a) "if the parent's income statements satisfy the criteria of [17 C.F.R. § 230.158(a)] and information respecting the subsidiary is included to the same extent as was presented in the registration statement." 17 C.F.R. § 230.158. The 2012 Note Offering was issued by PifCo and the 2013 Note Offering was issued by PGF, both of which were subsidiaries of Petrobras at the time of the offerings and the filing of the subsequent financial statements for the relevant period of time at issue. Thus, it is the Petrobras filings that constitute an "earning statement" for purposes of Section 11(a). Id.

[56] The following are the purchases of 2012 Notes by Union after the issuance of an earning statement covering 12 months since the 2012 Note Offering: (i) the May 2, 2013 purchase of PETBRA 6.75%, CUSIP 71645WAS0; (ii) the July 15, 2013 purchase of PETBRA 2.875%, CUSIP 71645WAV3; (iii) the July 16, 2013 purchase of PETBRA 2.875%, CUSIP 71645WAV3; (iv) the October 21, 2013 purchase of PETBRA 2.875%, CUSIP 71645WAV3; (v) the February 28, 2014 purchase of PETBRA 2.875%, CUSIP 71645WAV3; (vi) the November 25, 2014 purchase of PETBRA 2.875%, CUSIP 71645WAV3; (vii) the July 8, 2014 purchase of PETBRA 5.375%, CUSIP 71645WAR2; and (viii) the November 20, 2014 purchase of PETBRA 3.5%, CUSIP 71645WAU5. See ECF 19-1.

The following are the purchases of 2013 Notes by Union after the issuance of an earning statement covering 12 months since the 2013 Note Offering: (i) the November 17, 2014 purchase of PETBRA 5.625%, CUSIP 71647NAA7; (ii) the November 14, 2014 purchase of PETBRA 4.375%, CUSIP 71647NAF6; and (iii) the November 25, 2014 purchase of PETBRA 4.375%, CUSIP 71647NAF6. See ECF 19-1.

any other putative class member, should therefore be dismissed.[57]

### E. USS and Union's Securities Act Claims Are Barred by the Supreme Court's Decision in <u>Morrison v. National Australia Bank</u> and Its Progeny

The U.S. securities laws reach only securities traded on U.S. stock exchanges, or certain other domestic transactions, and do not apply to transactions that occurred outside of the United States.  <u>See Morrison v. Nat'l Austral. Bank Ltd.</u>, 561 U.S. 247, 273 (2010) (U.S. securities laws reach "the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States").[58]  <u>Morrison</u>'s two prongs are the minimum requirement for the securities laws to apply.  <u>See Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE</u>, 763 F.3d 198, 216 (2d Cir. 2014) (although some plaintiffs purported to enter into equity-based swap agreements in the U.S., these transactions relating to securities of a foreign issuer were "predominantly foreign").

It is Plaintiffs' burden to affirmatively plead, with well-pleaded allegations, that they engaged in a domestic securities transaction.  <u>See Absolute Activist Value Master Fund Ltd. v.</u>

---

[57]     To the extent the Court's citation in <u>Merrill Lynch III</u> to <u>In re WorldCom, Inc. Sec. Litig.</u>, 219 F.R.D. 267, 293-4 (S.D.N.Y. Oct. 24, 2003) could be read more broadly to hold that financial statements that are alleged to be false and misleading should not be considered an "earning statement" for purposes of Section 11(a)'s actual reliance requirement, Defendants respectfully submit that this holding in <u>WorldCom</u> is simply wrong.  There is nothing the plain text of Section 11, its legislative history or the SEC regulations to suggest such a result or that would characterize a false and misleading filing as a nullity.  <u>See, e.g.</u>, 17 C.F.R. § 210.4-01(a) (2011) and 17 C.F.R. § 230.158(a) (2008).  And this novel and extra-textual interpretation of Section 11(a) would lead to the absurd result that any filing that is deemed to be false or misleading (even if not intentionally) would be considered a nullity.

[58]     In <u>Morrison</u>, the Supreme Court recognized that "[t]he same focus on domestic transactions is evident in the Securities Act of 1933 . . . and forming part of the same comprehensive regulation of securities trading." 561 U.S. at 262.  Thus, <u>Morrison</u>'s limitations are equally applicable to Securities Act claims as to Exchange Act claims.  <u>See In re Royal Bank of Scot. Grp. PLC Sec. Litig.</u>, 765 F. Supp. 2d 327, 338 (S.D.N.Y. 2011) (Batts, J.) ("[U]nder Morrison, the Securities Act, like the Exchange Act, does not have extraterritorial reach.").

Ficeto, 677 F.3d 60, 70 (2d Cir. 2012). For transactions not on a U.S. exchange, to plead a domestic transaction a plaintiff must affirmatively allege that (1) it incurred irrevocable liability in the U.S., or (2) title was transferred in the U.S. See Parkcentral, 763 F.3d at 210-12 (citing Absolute Activist, 677 F.3d at 69). Irrevocable liability is where the purchaser takes and pays for the security or where the seller delivers the security. Absolute Activist, 677 F.3d at 69.

Neither Union nor USS alleges, as they must, that either purchased Notes on a U.S. exchange or otherwise engaged in a domestic transaction for Notes.[59] Neither Plaintiff alleges that it incurred irrevocable liability in the U.S. or that title to the Notes transferred in the U.S. Rather, Union is a German asset manager, CAC ¶ 421, and USS is a British pension administrator operating "the investment arm of the business from [the] London office." Id. ¶ 25. Neither Plaintiff alleges it has any U.S. operations. The offerings at issue were each made on a global basis, including to investors in Europe. See, e.g., Ex. 19 at S-47. In the absence of well-pleaded allegations to the contrary, it is entirely more plausible that these transactions occurred in Europe. Thus, Union and USS's purchases are not adequately pleaded as domestic transactions and any claims premised on their purchase must be dismissed.[60]

---

[59]    While the Court need not reach the issue, the reason Plaintiffs cannot allege they acquired the Notes on a U.S. Exchange is because the Notes are not traded on an exchange. Listing on an exchange does not mean they are traded, and listing alone does not satisfy Morrison. See In re Vivendi S.A. Universal Sec. Litig., 765 F. Supp. 2d 512 (S.D.N.Y. 2011) (Holwell, J.). Plaintiffs provide no facts to support their allegation that Petrobras's debt securities "are registered and trade" on the NYSE. CAC ¶ 26 (emphasis added).

[60]    Note purchases are not domestic transactions simply because the offering documents were filed with the SEC. CAC ¶¶ 408, 409, 412, 413, 416; see Absolute Activist, 677 F.3d at 70 (holding that "while the complaint alleges that the U.S. Penny Stocks were . . . registered with the SEC, th[is] fact[] do[es] not demonstrate that the purchases and sales were 'made in the United States'" (quoting Morrison, 561 U.S. at 270)); In re Smart Tech., Inc. S'holder Litig., 295 F.R.D. 50, 56-57 (S.D.N.Y. 2013) (Forrest, J.).

## III. THE BRAZILIAN LAW CLAIMS SHOULD BE DISMISSED

### A. The Brazilian Law Claims Must Be Arbitrated[61]

Counts III-V are brought against Petrobras or the Individual Defendants under Brazilian law on behalf of those putative class members who, in addition to having "purchased or otherwise acquired the securities of Petrobras . . . on the [NYSE] or pursuant to other domestic transactions," also "purchased or otherwise acquired Petrobras securities on the Brazilian stock exchange during the period between January 22, 2010 and March 19, 2015." CAC ¶¶ 15, 18 (emphasis added). The only Petrobras securities listed on the Brazilian stock exchange, BOVESPA, are shares of Petrobras common and preferred stock.[62] Thus, by Plaintiffs' definition, the only putative class members on whose behalf Counts III-V are asserted are "shareholders" of Petrobras ("Petrobras Shareholders") who also acquired Petrobras ADSs or Notes during the Class Period.[63]

Article 58 of Petrobras's bylaws requires Petrobras Shareholders to arbitrate against Petrobras and its directors and officers all disputes that relate to the "rules applicable to the operation of the capital markets." See Ex. 27 (Report of Luiz Cantidiano) ¶¶ 10-12. Because any putative class member asserting a Brazilian law claim is, by definition, a Petrobras

---

[61] Inasmuch as the CAC fails to plead any basis for jurisdiction over Petrobras with respect to the Brazilian law claims consistent with the FSIA, Petrobras is not waiving, and is expressly reserving, the defense of sovereign immunity to the extent those claims are not dismissed as subject to arbitration and are sought to be pursued in this forum. See Can. Overseas Ores Ltd. v. Compania de Acero del Pacifico, S.A., 727 F.2d 274, 277 (2d Cir. 1984) (motion to dismiss based on forum non conveniens that does not raise immunity defense does not constitute a waiver of immunity).

[62] See Ex. 1 at 113; Ex. 27 ¶ 9.

[63] Notably, none of the named Plaintiffs falls within this subclass on whose behalf they are prosecuting Counts III-V as they have pleaded those counts. According to their filed certifications, none of them claims to have acquired common or preferred Petrobras shares traded on BOVESPA during the Class Period.

Shareholder, the claims asserted in Counts III-V arising out of its acquisition of BOVESPA shares are "subject to arbitration" and therefore must be dismissed.[64]

### 1. The Agreement to Arbitrate

Whether Petrobras Shareholders "have agreed to arbitrate [their disputes against Petrobras and its directors and officers] is a question of state," rather than federal, law. Schnabel v. Trilegiant Corp., 697 F.3d 110, 119 (2d Cir. 2012). Brazilian law, as the law of the jurisdiction with "the most significant relationship to the transaction and the parties,"[65] determines whether a shareholder in a Brazilian corporation who acquired her shares on the Brazilian stock exchange is bound by the mandatory arbitration clause in the bylaws of a Brazilian corporation.

Article 58 of Petrobras's bylaws provides that "disputes . . . involving the Corporation, its shareholders, managers and members of the Audit Board" regarding "the rules issued . . . by the Brazilian Securities and Exchange Commission (Comissão de Valores Mobiliários - CVM) as well as in all further rules applicable to the operation of the capital market in general" "*shall* be resolved according to the rules of the Market Arbitration Chamber." See Ex. 27 ¶ 10 (emphasis added).[66] Petrobras's shareholders approved Article 58 in 2002, id. ¶ 31, which was proposed under the specific authority of the Brazilian Corporate Law ("BCL") that encouraged public

---

[64]    Nulife Entm't, Inc. v. Torres, 698 F. Supp. 2d 409, 414 (S.D.N.Y. 2010) (dismissing action "[b]ecause all of the disputes raised in the plaintiff's complaint in this case are subject to arbitration and no purpose will be served by a stay"); see also Williams v. Parkell Prods., 91 F. App'x 707, 709 (2d Cir. 2003) (affirming Rule 12(b)(6) dismissal where arbitration agreement required plaintiff to arbitrate his claims); Mykytyak-Penning v. Private Eyes Gentlemen's Club, No. 14 Civ. 5152 (PAC), 2015 WL 1191282, at *3 (S.D.N.Y. Mar. 16, 2015) (dismissing action under 9 U.S.C. § 3 where "all the issues to be decided must [b]e arbitrated").

[65]    Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 394 (2d Cir. 2001) (internal quotation marks omitted). New York and federal choice of law rules result in the application of Brazilian law. See In re Koreag, Controle et Revision S.A., 961 F.2d 341, 350 (2d Cir. 1992).

[66]    The language of Article 58 appears, in its entirety, in paragraph 11 of Ex. 27.

companies to adopt bylaws providing for arbitration as the dispute resolution mechanism for shareholder disputes.  Id. ¶¶ 20-21 (citing BCL Art. 109 ¶ 3).  Such bylaw provisions are valid, binding, and enforceable under Brazilian law as to all persons who acquire shares after the enactment of the bylaw.  Id. ¶¶ 22, 30.  By acquiring Petrobras shares long after the adoption of Article 58, Petrobras Shareholders manifested their assent to be bound by its mandatory arbitration provision.  See id. ¶¶ 22, 33.  Petrobras Shareholders are thus required to resolve by arbitration all disputes that fall within the scope of Article 58 – disputes involving Petrobras and its "managers" (i.e., officers and directors)[67] relating to "the rules issued . . . by the [CVM]" (the "CVM Regulations"), "as well as in all further rules applicable to the operation of the capital market in general."  Id. ¶¶ 10, 38.

### 2. The Scope of the Arbitration Agreement

There being a valid agreement to arbitrate under Brazilian law, the Court next determines "whether the scope of that agreement encompasses [the claims] asserted."  Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 45 (2d Cir. 1993) (citation omitted) (internal quotation marks omitted).  In determining "whether an agreement applies to the dispute at hand," the "presumption of arbitrability under the [FAA, which] supplies a background principle of interpretation," "serves as a thumb on the scale favoring arbitral coverage."  Glencore Ltd. v. Degussa Engineered Carbons L.P., 848 F. Supp. 2d 410, 421 (S.D.N.Y. 2012).

Article 58 broadly provides for arbitration of the disputes of Petrobras Shareholders involving Petrobras and its directors and officers regarding the CVM Regulations, as well as all "rules applicable to the operation of the capital market in general."  See Ex. 27 ¶¶ 33-40.  Counts

---

[67]    See Ex. 27 at ¶ 39.

III-V squarely fall within the scope of the arbitration clause of Article 58, as those Counts purport to assert claims on behalf of Petrobras Shareholders in connection with their acquisition of BOVESPA-traded Petrobras shares against Petrobras and certain of its directors and officers for violations of the CVM Regulations, the BCL, and the Brazilian Civil Code. CAC ¶¶ 364-83. All of the Brazilian law claims arise out of the same alleged materially false and misleading statements and omissions in Petrobras's press releases and year-end filings with the SEC that are claimed to violate the "the rules issued . . . by the [CVM]," or in the context of the claims asserted, "rules applicable to the operation of the capital market." See Ex. 27 ¶¶ 40. Accordingly, the claims asserted on behalf of Petrobras Shareholders against Petrobras in Counts IV and V, and against directors and officers of Petrobras in Count III, are within the scope of the mandatory arbitration provision of Article 58. See id. ¶¶ 40-42.

The CAC presumes that Petrobras Shareholders are, in addition to asserting claims under Brazilian law, also asserting Exchange Act claims based upon such putative class members' trading in ADSs. Such Exchange Act claims similarly involve "rules applicable to the operation of the capital market," see id. ¶ 44, and "derive from a common nucleus of operative fact"[68] with the Brazilian law claims, as evidenced by the CAC's reliance upon supplemental jurisdiction under 28 U.S.C. § 1367 as the sole basis to bring the Brazilian law claims. CAC ¶ 22. An owner of ADSs indirectly holds common or preferred Petrobras shares, and the rights of that ADS holder are derivative of the rights of holders of Petrobras common or preferred shares. See Ex. 27 ¶ 43. As "shareholders," both directly through BOVESPA-traded shares and indirectly through ADSs, Petrobras Shareholders are bound by Article 58 to arbitrate their disputes

---

[68] City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 165 (1997) (supplemental jurisdiction under 28 U.S.C. § 1367 exists over state law claims that "derive from a common nucleus of operative fact" as federal question claims asserted (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966))).

regarding these security purchases that "derive from a common nucleus of operative fact"[69] alleging violations of "rules applicable to the operation of the capital market." See id. ¶ 44. Petrobras Shareholders who are also ADS holders must arbitrate all of their claims against Petrobras and its directors and officers based on their direct and indirect ownership of equity in Petrobras, including the Exchange Act claims based on ADSs asserted on their behalf in Count I,[70] and their claims under Brazilian law based on BOVESPA-traded shares in Counts III - V. See id. ¶¶ 44-45.

Accordingly, the Court should dismiss Counts III - V as asserted against Petrobras and its officers and directors, and Count I to the extent it purports to be asserted on behalf of Petrobras Shareholders who are bringing Exchange Act claims based upon ADS trading.

**B.     Count III Must Be Dismissed as to Mr. Helms**

The claims alleged under Brazilian law in Count III may only be asserted against directors and officers of a Brazilian company. See Ex. 27 ¶ 35. Mr. Helms is not, and is not alleged to be, a director or an officer of Petrobras. See CAC ¶ 42 (Helms is the company's U.S. representative). Thus, Count III must be dismissed as against him for that reason. Also, SLUSA, 15 U.S.C. § 78bb(f) (2010), would appear to preempt claims brought under Brazilian law as a class action with respect to a "covered security." See LaSala v. Lloyds TSB Bank, PLC, 514 F. Supp. 2d 447, 471-72 (S.D.N.Y. 2007) (Haight, J.) (SLUSA precluded claims brought under Swiss law).

---

[69]     City of Chi., 522 U.S. at 165.

[70]     See JSC Surgutneftegaz v. President & Fellows of Harvard Coll., No. 04 Civ. 6069 (RCC), 2005 WL 1863676 (S.D.N.Y. Aug. 3, 2005) (enforcing arbitration provision in deposit agreement governing ADS of Russian corporation).

## CONCLUSION

For the foregoing reasons, the counts asserted against the undersigned defendants in the

CAC should be dismissed with prejudice.

Dated: New York, New York
April 17, 2015

Respectfully submitted,

CLEARY GOTTLIEB STEEN &
  HAMILTON LLP

SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM LLP

By:____/s/ Mitchell A. Lowenthal_____
        Mitchell A. Lowenthal
        Roger A. Cooper

By:____/s/ Jay B. Kasner_____
        Jay B. Kasner
        Scott D. Musoff

One Liberty Plaza
New York, New York  10006
(212) 225-2000

4 Times Square
New York, New York  10036
(212) 735-3000

*Attorneys for the Petrobras Defendants*
(as defined herein)

*Attorneys for the Underwriter Defendants*
(as defined herein)

*In re Petrobras Securities Litigation*, 14 Civ. 9662 (JSR)

<u>APPENDIX A</u>

# PETROBRAS NOTE OFFERINGS WITH ALLEGEDLY <u>FALSE OR MISLEADING OFFERING DOCUMENTS</u>

| FEBRUARY 1, 2012 NOTE OFFERING | | | | | | |
|---|---|---|---|---|---|---|
| Bona Fide Offering Date | Issuer | Coupon | Maturity | Cusip | Plaintiff Purchaser(s)[71] | Underwriting Syndicate and Allocation[72] |
| 02/01/2012[73] | PifCo | 2.875 | 02/06/2015 | 71645WAV3 | Union | • BB Securities Ltd. (16%) • Citigroup Global Markets Inc. (16%) • Itau BBA USA Securities Inc. (16%) • J.P. Morgan Securities LLC (16%) • Morgan Stanley & Co. LLC (16%) • Santander Investment Securities Inc. (16%) • Banco Votorantim Nassau Branch[74] (2%) • Mitsubishi UFJ Securities (USA), Inc. (2%) |
| | | 3.500 | 02/06/2017 | 71645WAU5 | Union | |
| | | 5.375[75] | 02/06/2021 | 71645WAR2 | Union | |
| | | 6.750[5] | 02/06/2041 | 71645WAS0 | Union | |

---

[71] Based on Lead Plaintiff Certifications, ECF 19-1 (Union Certification), ECF 30-2 (Hawaii Certification), ECF 40-2 (USS Certification)

[72] Based on Prospectus Supplement dated as of the bona fide offering date.

[73] Form 424B2 Prospectus Supplement (Feb. 1, 2012), issued pursuant to Form F-3 Registration Statement (Dec. 11, 2009).

[74] Not served with Complaint.

[75] Reopened notes first issued on January 27, 2011.

*In re Petrobras Securities Litigation*, 14 Civ. 9662 (JSR)

<u>APPENDIX A</u>

| <div align="center">**May 13, 2013 NOTE OFFERING**</div> | | | | | | |
|---|---|---|---|---|---|---|
| **Bona Fide Offering Date** | **Issuer** | **Coupon** | **Maturity** | **Cusip** | **Plaintiff Purchaser(s)[76]** | **Underwriting Syndicate and Allocation[77]** |
| 05/13/2013[78] | PGF | 2.000 | 05/20/2016 | 71647NAC3 | Union Hawaii | • BB Securities Ltd. (13.7%) |
| | | Float | 01/15/2019 | 71647NAE9 | Union Hawaii | • Citigroup Global Markets Inc. (13.7%)<br>• HSBC Securities (USA) Inc. (13.7%)<br>• Itau BBA USA Securities, Inc. (13.7%) |
| | | Float | 05/20/2016 | 71647NAD1 | Union | • J.P. Morgan Securities LLC (13.7%) |
| | | 5.625 | 05/20/2043 | 71647NAA7 | Union Hawaii | • Merrill Lynch, Pierce, Fenner & Smith Incorporated (13.7%) |
| | | 3.000 | 01/15/2019 | 71647NAB5 | Union Hawaii | • Morgan Stanley & Co. LLC (13.7%)<br>• Mitsubishi UFJ Securities (USA), Inc. (2%) |
| | | 4.375 | 05/20/2023 | 71647NAF6 | Union USS | • Standard Chartered Bank (2%) |

---

[76] Based on Lead Plaintiff Certifications.

[77] Based on Prospectus Supplement dated as of the bona fide offering date.

[78] Form 424B2 Prospectus Supplement (May 13, 2013), issued pursuant to Form F-3 Registration Statement (Aug. 29, 2012).

*In re Petrobras Securities Litigation*, 14 Civ. 9662 (JSR)

<u>APPENDIX A</u>

| MARCH 10, 2014 NOTE OFFERING | | | | | | |
|---|---|---|---|---|---|---|
| **Bona Fide Offering Date** | **Issuer** | **Coupon** | **Maturity** | **Cusip** | **Plaintiff Purchaser(s)[79]** | **Underwriting Syndicate and Allocation[80]** |
| 03/10/2014[81] | PGF | Float | 03/17/2020 | 71647NAL3 | Union | • Bank of China (Hong Kong) Limited[82] (16%) <br> • BB Securities Ltd. (16%) <br> • Banco Bradesco BBI S.A. (16%) <br> • Citigroup Global Markets Inc. (16%) <br> • HSBC Securities (USA) Inc. (16%) <br> • J.P. Morgan Securities LLC (16%) <br> • Banca IMI S.p.A. (2%) <br> • Scotia Capital (USA) Inc. (2%) |
| | | Float | 03/17/2017 | 71647NAJ8 | Union | |
| | | 3.250 | 03/17/2017 | 71647NAG4 | Union <br> Hawaii | |
| | | 4.875 | 03/17/2020 | 71647NAH2 | Union | |
| | | 7.250 | 03/17/2044 | 71647NAK5 | USS <br> Union | |
| | | 6.250 | 03/17/2024 | 71647NAM1 | Union | |

[79] Based on Lead Plaintiff Certifications.

[80] Based on Prospectus Supplement dated as of the bona fide offering date.

[81] Form 424B2 Prospectus Supplement (March 10, 2014), issued pursuant to Form F-3 Registration Statement (Aug. 29, 2012).

[82] Not served with Complaint.