

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------
In re: PETROBRAS SECURITIES  :  14-cv-9662 (JSR)
LITIGATION  :  MEMORANDUM
 :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

    This litigation arises out of the allegedly massive corruption scandal that has engulfed defendant Petróleo Brasileiro S.A. - Petrobras ("Petrobras"), the Brazilian state-owned oil company. On December 8, 2014, plaintiff in Kaltman v. Petrobras, No. 14-cv-9662 (S.D.N.Y. filed Dec. 8, 2014), filed a putative class action complaint on behalf of Petrobras investors, alleging that the company committed securities fraud in connection with a multi-year, multi-billion dollar money-laundering and bribery scheme. According to the Kaltman complaint, for years Petrobras executives secretly inflated the value of the company's construction contracts and used the proceeds to line their own pockets and to purchase influence over Brazilian politicians. The Kaltman complaint further alleged that none of this was disclosed in the company's public statements or in its filings with the Securities and Exchange Commission, and that, when the truth about these illegal acts finally emerged, the price of Petrobras securities declined precipitously.

    Pursuant to the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3)(A)(i) ("PSLRA"), counsel in the Kaltman case caused a notice to be published in a national newswire advising

1

members of the proposed class of their right to move the Court to serve as lead plaintiff no later than February 6, 2015. Four additional complaints asserting substantially similar claims were subsequently filed, and were designated as related to Kaltman. See Ngo v. Petrobras, No. 14-cv-9760 (S.D.N.Y. filed Dec. 10, 2014); Messing v. Petrobras, No. 14-cv-9847 (S.D.N.Y. filed Dec. 12, 2014); City of Providence v. Petrobras et al., No. 14-cv-10117 (S.D.N.Y. filed Dec. 24, 2014); Kennedy v. Petrobras, No. 15-cv-93 (S.D.N.Y. Jan. 7, 2015). By Order dated February 17, 2015, the Court, on consent, consolidated the five related cases under the above caption. See ECF No. 74.

In advance of the February 6, 2015 deadline, the Court received nine motions for appointment as lead plaintiff. Five of the movants subsequently withdrew their motions, leaving four remaining candidates: (1) the "SKAGEN-Danske" group, comprising three European asset management companies - SKAGEN AS, Danske Invest Management A/S ("Danske Denmark"), and Danske Invest Management Company ("Danske Luxembourg"); (2) the "State Retirement Systems" group, comprising three State pension funds - the Ohio Public Employees Retirement System, the Public Employee Retirement System of Idaho, and the Employees' Retirement System of the State of Hawaii; (3) Universities Superannuation Scheme, Ltd. ("USS"), the sole corporate trustee of a pension fund based in Liverpool, England; and (4)

Daniela Freitas Da Silva, an individual investor.[1] On February 20, 2015, the Court held a hearing at which it received testimony from representatives of the remaining movants and heard argument from their counsel. Following the hearing, the Court gave the movants an opportunity to submit additional briefing. By Order dated March 4, 2015, the Court appointed USS as lead plaintiff and approved its choice of lead counsel, Pomerantz LLP. See ECF No. 99. This Memorandum explains the reasons for those rulings.

The PSLRA directs the Court to appoint as lead plaintiff "the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." Id. § 78u-4(a)(3)(B)(i). The statute creates a rebuttable presumption that said "most adequate plaintiff" is the "person or group of persons" that:

> [1] has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
>
> [2] in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> [3] otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

Id. § 78u-4(a)(3)(B)(iii)(I). Rival candidates for lead plaintiff may rebut this presumption by coming forward with proof that the plaintiff with the largest financial interest "[1] will not fairly

---

[1] Ms. Silva initially filed a joint motion with another individual investor, Antonio Luis Galvao Costa. However, Mr. Costa did not appear at the hearing on appointment of lead plaintiff and Ms. Silva's post-hearing briefing did not refer to him. Accordingly, the Court deems Mr. Costa's motion to have been withdrawn.

and adequately protect the interests of the class; or [2] is subject to unique defenses that render such plaintiff incapable of adequately representing the class." Id. § 78u-4(a)(3)(B)(iii)(II).

In determining each proposed lead plaintiff's financial interest in the litigation, courts consider first and foremost the amount of their respective losses. See Kaplan v. Gelfond, 240 F.R.D. 88, 93 (S.D.N.Y. 2007). Here, SKAGEN-Danske and the State Retirement Systems seek "group" treatment in order to aggregate their members' individual losses for purposes of this determination. In the aggregate, the members of the SKAGEN-Danske group suffered losses on the order of $222 million, calculated on a "last-in-first-out," or "LIFO," basis, giving SKAGEN-Danske the largest financial interest in this case. See Supplemental Declaration of Max W. Berger dated Feb. 13, 2015 ("Berger Supp. Decl."), Ex. A. The State Retirement Systems group suffered approximately $88 million in aggregate LIFO losses, giving it the second largest financial interest. Id.

Although the PSLRA expressly permits the Court to appoint a "group of persons" to serve as lead plaintiff, many courts, including this one, are skeptical of such arrangements when they are the product of an artificial grouping designed merely to qualify as lead plaintiff under the PSLRA.[2] Congress's express purpose in

---

[2] See, e.g., In re LightInTheBox Holding Co., Ltd. Sec. Litig., No. 13-cv-6016, 2013 WL 6145114, at *2 (S.D.N.Y. Nov. 21, 2013) reconsideration denied, 2014 WL 129043 (S.D.N.Y. Jan. 14, 2014); Varghese v. China Shenghuo Pharm. Holdings, Inc., 589 F. Supp. 2d 388, 392 (S.D.N.Y. 2008); In re Tarragon Corp. Sec. Litig., No. 07-cv-7972, 2007 WL 4302732, at *1 (S.D.N.Y. Dec. 6, 2007); In re Doral

4

mandating that the lead plaintiff (if otherwise qualified) be appointed on the basis of financial interest was to "transfer primary control of private securities litigation from lawyers to investors." S. REP. 104-98, at 6 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 685; see also H.R. CONF. REP. 104-369, at 32 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 731 (stating that the PSLRA "protects investors who join class actions against lawyer-driven lawsuits by giving control of the litigation to lead plaintiffs with substantial holdings of the securities of the issuer"). Allowing unrelated plaintiffs to band together in order to manufacture a larger financial interest does just the opposite. It ensures that the lawyers, who are invariably the matchmakers behind such marriages of convenience, are the true drivers of the litigation. Moreover, it creates problems of coordination, risks duplication of effort, and reduces the incentive of any individual group member to carry out its lead plaintiff duties to the fullest extent.

Accordingly, courts regularly require proposed lead plaintiff "groups" to demonstrate their ability to function as a cohesive and independent unit to protect the interests of the class. Relevant considerations include whether the group's members have a pre-

---

Fin. Corp. Sec. Litig., 414 F. Supp. 2d 398, 401-02 (S.D.N.Y. 2006); In re Pfizer Inc. Sec. Litig., 233 F.R.D. 334, 337 (S.D.N.Y. 2005); In re Veeco Instruments, Inc. Sec. Litig., 233 F.R.D. 330, 334 (S.D.N.Y. 2005); In re Razorfish, Inc. Sec. Litig., 143 F. Supp. 2d 304, 308 (S.D.N.Y. 2001); In re Donnkenny Inc. Sec. Litig., 171 F.R.D. 156, 157-58 (S.D.N.Y. 1997).

existing relationship, whether they have cooperated effectively thus far, and whether they have a coherent plan for dividing responsibilities, resolving conflicts, and managing the litigation. See Varghese, 589 F. Supp. 2d at 392. A plaintiff group will generally be rejected if the court determines that it is "simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as 'lead plaintiff.'" In re Razorfish, 143 F. Supp. 2d at 308.

Here, both SKAGEN-Danske and the State Retirement Systems are wholly artificial groupings. The members of the SKAGEN-Danske group hail from three different countries: SKAGEN AS is based in Norway and the Danske entities are based in Denmark and Luxembourg, respectively. These three companies, in turn, manage nineteen distinct member funds that invested, independently, in Petrobras securities. Although the two Danske entities are affiliates, they have no prior relationship with SKAGEN AS whatsoever. In fact, the only common thread between the three companies is their longtime connection to a law firm, Kessler Topaz Meltzer & Check LLP, which admittedly served as the catalyst for the group's formation. See Transcript dated Feb. 20, 2015 ("Tr.") at 7:13-21, 8:1-3, 10:8-15.

Reflective, perhaps, of this lawyer-driven artificial grouping, it quickly became apparent at the hearing on appointment of lead plaintiff that the members of the SKAGEN-Danske group had little inclination to take a firm hand in their dealings with counsel. The representative of Danske Denmark, for example, testified that his

company had not considered any other law firm to represent it in this case and had simply accepted Kessler Topaz's proposed retainer agreement and fee arrangement without negotiation. See Tr. 54:18-22, 55:15-17. The consequences of this hands-off attitude were evident. SKAGEN-Danske's retainer agreement, which the Court reviewed in camera, permitted its counsel to seek fees approximately double those permitted by the other lead plaintiff candidates in their respective retainer agreements. See Tr. 60:10-13. Nor could SKAGEN-Danske adequately explain why it was applying in its motion to be represented in this case not only by the Kessler Topaz firm but also by a second law firm, Bernstein, Litowitz, Berger & Grossmann, LLP, which did not have a previous attorney-client relationship with any of the members of the SKAGEN-Danske group, but did have an established relationship with Kessler Topaz. See Tr. 8:6-9; Mem. in Supp. of SKAGEN-Danske Group's Motion for Appointment as Lead Plaintiff dated Feb. 6, 2015, at 15.

Similarly, as to the State Retirement Systems, there is no obvious affinity between the states of Ohio, Idaho, and Hawaii, and no prior relationship among their state retirement funds beyond common membership in certain professional organizations. See Declaration of Frederic S. Fox dated Feb. 6, 2015, Ex. D ¶ 10. Indeed, the representative of the Ohio pension system testified, candidly, that Ohio sought to join with other state pension systems in order to increase its financial interest and therefore its chances of being appointed lead plaintiff. See Tr. 66:2-17. And

7

although the State Retirement Systems exercised more initiative than did the SKAGEN-Danske group members with respect to selecting and supervising their counsel, see Tr. 68:25-69-4, 73:9-74:6, 76:17-77:13, the Court was concerned at their apparent lack of advance planning regarding how the litigation would be managed among the three plaintiffs and two law firms. The three states had, for example, no agreement in place regarding the resolution of disputes amongst themselves, see Tr. 68:2-24, the division of authority and responsibility between the two law firms, see Tr. 74:7-18, or the resolution of discrepancies in their three separate retainer agreements, see Tr. 71:1-12, 77:17-79:23. Thus, not only was the State Retirement Systems group clearly assembled for the sole purpose of participating in this litigation, but also it failed to show that it would act with the cohesion necessary to prosecute the case effectively.

In addition to the concerns described above, SKAGEN-Danske is subject to various unique defenses regarding its trading patterns and public statements. For example, SKAGEN AS's only transactions in common American Depository Shares ("ADSs") were a relatively small number of shares purchased by three of its member funds on October 2, 2014, after the first partial disclosures of the alleged fraud, all of which were promptly sold, at a profit, on October 17, 2014. See Declaration of Max W. Berger dated Feb. 6, 2015, Ex. A. Similarly, all of Danske Denmark's retained shares of common ADS were purchased on November 14, 2014, after partial disclosures were

made and just two weeks before the end of the class period. Id. These transactions raise serious questions regarding SKAGEN-Danske's reliance on the alleged misrepresentations and omissions. See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 179 (2d Cir. 1990) (affirming denial of class certification where named plaintiff continued to purchase securities despite being on notice of alleged fraud); George v. China Auto. Sys., Inc., No. 11-cv-7533, 2013 WL 3357170, at *6-*7 (S.D.N.Y. July 3, 2013) (denying class certification where named plaintiffs were in-and-out traders and continued to purchase securities after the fraud was revealed).

Another SKAGEN AS member fund, SKAGEN Kon-Tiki, is similarly vulnerable to attack. SKAGEN Kon-Tiki sold its holdings in Petrobras in March 2013, explaining that "Petrobras … continued to disappoint operationally, on top of alarming cost increases and big investments which are now stretching their balance sheet." Supplemental Declaration of Frederic S. Fox dated Feb. 13, 2015, Ex. G. It then made a significant investment in Petrobras securities in January 2015, after the alleged fraud had been fully revealed, stating publicly that its decision to purchase was based on "significant production upside, which is not reflected in the current depressed valuation" and commenting that "[p]roduct pricing is protected for now and current valuation corresponds to depressed 2003 levels, when oil price was about half today's level." Id. Ex. H. Such statements would provide fodder for defendants to argue that SKAGEN AS relied

9

on its own valuation of Petrobras securities, and not on their market price. See Rocco v. Nam Tai Electronics, Inc., 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (denying class certification where lead plaintiff's "post-class purchases indicate, if anything, that he was relying not on the market, but on his own assessment of the value of the stock").[3]

Accordingly, the Court finds that neither the SKAGEN-Danske group nor the State Retirement Systems group is suitable to be appointed as lead plaintiff.[4]

The remaining institutional candidate is USS, which suffered approximately $84 million in LIFO losses. See Berger Supp. Decl., Ex. A. Unlike the two movants discussed above, USS is a single entity represented by a single law firm. Indeed, USS declined to join a plaintiff group because it wished to retain its independence.

---

[3] USS further argues that the great majority of SKAGEN-Danske's losses are in preferred ADSs, which have priority over common ADSs in the event of bankruptcy and liquidation. Thus, the interests of common and preferred ADS holders - and therefore between SKAGEN-Danske and the rest of the class - may diverge at some future juncture. See In re Fannie Mae Matters, No. 08-cv-7831, Transcript dated Feb. 13, 2009, at 8:5-9 ("I do not think it's possible for a lead plaintiff that has primarily suffered losses on preferred stock to fairly represent the interest of common shareholders…"). Although no bankruptcy is imminent, and therefore this potential conflict is not dispositive, the Court finds that this issue further calls into question SKAGEN-Danske's adequacy.

[4] SKAGEN AS has the largest individual financial interest in the litigation, with approximately $157 million in LIFO losses, but it at no time sought to serve as individual lead plaintiff. See Berger Supp. Decl. Ex. A. Moreover, even if it had so moved, the Court would have rejected the application because the Court finds that it is subject to unique defenses for the reasons described above.

10

See Tr. 36:7-14. In addition, USS vetted its chosen counsel extensively and negotiated for a more favorable fee agreement. See Tr. 35:19-26:4, 36:25-37:4. The Court considers that USS is far more likely to deliver the vigorous, investor-driven representation to which the class is entitled than the multi-plaintiff, multi-firm groups that the Court has rejected.

As to the requirements of Rule 23, the Court finds that USS has carried its burden to "make a preliminary showing that it satisfies the typicality and adequacy requirements." In re eSpeed, Inc. Sec. Litig., 232 F.R.D. 95, 102 (S.D.N.Y. 2005) (internal quotation marks and citation omitted). Like the other members of the class, USS seeks recovery for losses incurred as a result of defendants' alleged misrepresentations and omissions with respect to the bribery and kickback scheme, whose revelation resulted in declines in the price of Petrobras securities. Thus, its claims "'arise[] from the same course of events'" and it makes "'similar legal arguments to prove the defendant[s'] liability' as the other putative class members," which is all that is required to demonstrate typicality at this stage. In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig., 258 F.R.D. 260, 269 (S.D.N.Y. 2009) (citation omitted). As to adequacy, the USS's massive losses insure that it has "'a sufficient interest in the outcome to ensure vigorous advocacy' on behalf of the class." Marsch v. Feng, 2013 WL 3204193, at *2 (S.D.N.Y. June 13, 2013) (citation omitted). Moreover, its chosen counsel, Pomerantz LLP, possess sufficient experience and expertise to represent the class,

11

and there is no apparent conflict between USS's interests and those of the rest of the class.

Finally, none of the competing movants has come forward with "proof" that USS will not fairly and adequately protect the interests of the class, or that it is subject to any unique defense. The only objection to USS's adequacy and typicality that has been raised is that it enjoyed a net gain on its investments in Petrobras debt securities, and therefore lacks standing and/or incentive to pursue those claims. However, USS did in fact suffer losses on two of the three Petrobras note issues that it purchased during the class period. See Further Submission of USS dated Feb. 27, 2015, at 1. Moreover, the Second Circuit has explained that "it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim," and that the PSLRA "does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class." Hevesi v. Citigroup, Inc., 366 F.3d 70, 82-83 (2d Cir. 2004).

The remaining candidate, Ms. Silva, recognizes that, with approximately $252,000 in LIFO losses, see Berger Supp. Decl. Ex. A, her financial interest in this case cannot rival that of the institutional investors, but nonetheless seeks to be appointed as co-lead plaintiff in order to represent the interests of individual investors. However, Ms. Silva does not specify any particular interests that are not adequately represented by USS as an institutional investor, nor any reason why USS's considerable

12

incentives to maximize recovery to the class would not accrue to the benefit of individual investors on the same terms as institutional investors. Furthermore, Ms. Silva's appointment would risk creating the very problems of duplication and coordination that the Court seeks to avoid by designating a single lead plaintiff and lead counsel. Finally, the Court is cognizant of the PSLRA's "statutory preference for institutional lead plaintiffs." In re KIT Digital, Inc. Sec. Litig., 293 F.R.D. 441, 446 (S.D.N.Y. 2013). Accordingly, the Court finds that appointing Ms. Silva as co-lead plaintiff is, at best, unnecessary.

Finally, the PSLRA provides that the most adequate plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). This provision "evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention." Varghese, 589 F. Supp. 2d at 398 (citation omitted). In this case, USS has selected Pomerantz, LLP as its counsel and has submitted a declaration detailing Pomerantz's extensive experience with complex class action litigations such as this one. See Declaration of Jeremy A. Lieberman dated Feb. 6, 2015, Ex. D. The Court is familiar with the Pomerantz firm from previous matters, see, e.g., Marsch, 2013 WL 3204193, at *3, and finds that it is well qualified to serve as lead counsel.

For the foregoing reasons, the Court appointed USS as lead plaintiff and approved its choice of Pomerantz LLP as lead counsel.

13

SO ORDERED.

Dated:  New York, NY
        May 17, 2015

_____
JED S. RAKOFF, U.S.D.J.

14