UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
                                    :            14-cv-9662 (JSR)
In re: PETROBRAS SECURITIES         :
LITIGATION                          :                    OPINION
                                    :
----------------------------------  :
                                    :
JED S. RAKOFF, U.S.D.J.             :

    Lead Plaintiff Universities Superannuation Scheme Ltd.

("USS") brings this putative class action against the Brazilian

state-owned oil company Petróleo Brasileiro S.A. – Petrobras

("Petrobras" or the "Company"); two of Petrobras' wholly-owned

subsidiaries, Petrobras Global Finance, B.V. ("PGF") and

Petrobras International Finance Company S.A. ("PifCo")[1]; various

former officers and directors of Petrobras and its subsidiaries

(the "Individual Defendants")[2]; Petrobras' independent auditor,

---

[1] Petrobras, PGF, and PifCo are referred to collectively as the "Petrobras Defendants."

[2] Specifically, the Individual Defendants are: Petrobras Chief Executive Officer ("CEO") Maria das Gracas Silva Foster, Petrobras CEO José Sergio Gabrielli, Petrobras Chief Financial Officer ("CFO") Almir Guilherme Barbassa, Petrobras director Josue Christiano Gomes da Silva, Petrobras director Silvio Sinedino Pinheiro, PifCo Chairman and CEO Daniel Lima de Oliveira, PifCo director José Raimundo Brandão Pereira, PifCo CFO Sérvio Túlio da Rosa Tinoco, PifCo Chief Accounting Officer Paulo Jose Alves, PifCo Chief Accounting Officer Mariângela Monteiro Tizatto, PGF CEO and "Managing Director A" Gustavo Tardin Barbosa, PGF CFO and "Managing Director B" Alexandre Quintão Fernandes, PGF "Managing Director A" Marcos Antonio Zacarias, PGF "Managing Director B" Cornelis Franciscus Jozef Looman, and authorized United States Representative Theodore Marshall Helms.

1

PricewaterhouseCoopers Auditores Independentes ("PwC"); and the underwriters of Petrobras's note offerings (the "Underwriter Defendants").[3] Plaintiffs allege that Petrobras was at the center of a multi-year, multi-billion dollar bribery and kickback scheme, in connection with which defendants made false and misleading statements in violation of the Securities Exchange Act of 1934 ("Exchange Act"), the Securities Act of 1933 ("Securities Act"), and Brazilian law.

Between December 8, 2014 and January 7, 2015, five separate class action complaints were filed in this Court asserting substantially similar claims against defendant Petrobras for violation of the federal securities laws. See Kaltman v. Petrobras, No. 14-cv-9662 (S.D.N.Y. filed Dec. 8, 2014), Ngo v. Petrobras, No. 14-cv-9760 (S.D.N.Y. filed Dec. 10, 2014); Messing v. Petrobras, No. 14-cv-9847 (S.D.N.Y. filed Dec. 12, 2014); City of Providence v. Petrobras et al., No. 14-cv-10117 (S.D.N.Y. filed Dec. 24, 2014); Kennedy v. Petrobras, No. 15-cv-93 (S.D.N.Y. filed Jan. 7, 2015). By Order dated February 17,

---

[3] Specifically, the Underwriter Defendants are: BB Securities Ltd., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Itau BBA USA Securities, Inc., Morgan Stanley & Co. LLC, Santander Investment Securities Inc., HSBC Securities (USA) Inc., Banco Votorantim Nassau Branch, Mitsubishi UFJ Securities (USA), Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Standard Chartered Bank, Bank of China (Hong Kong) Limited, Banco Bradesco BBI S.A., Banca IMI S.p.A., and Scotia Capital (USA) Inc.

2015, the Court consolidated the five related cases under the above caption.

In accordance with the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3), the Court received motions by members of the putative class for appointment as lead plaintiff. Following full briefing and oral argument, the Court, by Order dated March 4, 2015, appointed USS as lead plaintiff and approved its choice of lead counsel, the reasons for which it explained by Memorandum dated May 17, 2015. See ECF No. 99; In re Petrobras Secs. Litig., No. 14-cv-9662, 2015 WL 2341359 (S.D.N.Y. May 17, 2015).

On March 27, 2015, USS filed its Consolidated Amended Complaint ("CAC"), which named additional plaintiffs Union Asset Management Holding AG ("Union") and the Employees' Retirement System of the State of Hawaii ("Hawaii ERS") with respect to the claims brought under the Securities Act. ECF No. 109. Plaintiffs then moved to lift the mandatory stay of discovery imposed by the PSLRA with respect to documents that defendants had already produced to regulatory, governmental, or investigative agencies, and requested permission to initiate discovery requests on foreign non-parties pursuant to the Inter-American Convention on Letters Rogatory and the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters. The Court

3

denied plaintiffs' motion by Memorandum Order dated April 13, 2015. ECF No. 137.

The Petrobras Defendants and the Underwriter Defendants then moved to dismiss the CAC pursuant to Rules 8, 9(b), 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure. By "bottom line" Order dated July 9, 2015, the Court granted in part and denied in part defendants' motion. ECF No. 189. This Opinion explains the reasons for these rulings on the motion to dismiss.

The CAC alleges facts relevant to plaintiffs' claims under the Exchange Act and Brazilian law (which are asserted only by USS) separately from those relevant to their claims under the Securities Act (which are asserted by USS, Union, and Hawaii ERS). The Court first summarizes the factual allegations relevant to USS's Exchange Act and Brazilian law claims.[4]

Defendant Petrobras is a corporation organized under the laws of Brazil, whose common and preferred shares are listed on the Brazilian stock exchange ("Bovespa"). CAC ¶ 26. In addition, Petrobras sponsors American Depository Shares ("ADS"), representing its common and preferred equity, that are listed on the New York Stock Exchange ("NYSE"). Id. At its height in 2009,

---

[4] At the time this motion was filed, PwC had not yet been served and it did not join in the instant motion. Accordingly, the Court does not discuss plaintiffs' allegations that are relevant only to PwC.

Petrobras's market capitalization was approximately $310 billion, making it the world's fifth-largest company. Id. ¶ 2. USS alleges that, following the disclosure of rampant fraud and corruption at the Company, which led to the arrest of high-level Petrobras executives and prompted investigations by Brazilian and U.S. authorities, the Company's worth declined to $39 billion. Id. ¶¶ 2-14.

The alleged corruption scheme was as follows. Before and during the period from January 22, 2010 through March 19, 2015 (the "Class Period"), Petrobras, particularly its Services and Supply and International Divisions, pursued plans to expand its petroleum production capacity, which involved acquiring and contracting for the construction of new facilities and petroleum production assets. Id. ¶ 20. However, there were only a limited number of companies in Brazil with the technical capability to complete such large-scale projects. Id. ¶ 49. Those companies formed a cartel for the purpose of circumventing Petrobras' competitive bidding process. Id. They did this with the help of certain corrupt Petrobras officials, in particular, former Chief Downstream Officer and Director of Supply Paulo Roberto Costa, former Chief Services Officer Renato de Souza Duque, former Director of the International Division Nestor Cervero, and former executive in the Engineering and Services Division Pedro

Barusco (collectively, the "Corrupt Executives"). Id. ¶¶ 8-10, 50.

According to the CAC, the Corrupt Executives would apprise the cartel members of the estimated cost that Petrobras assigned to a project. Id. 66. The cartel members would then agree amongst themselves which company would win the contract and adjust their bids to conform to Petrobras' parameter allowing for a 15-20% profit above that figure. Id. ¶¶ 50-51. On top of that profit, they would build into the winning bid a "three percent political adjustment," which would be used to pay kickbacks to the Corrupt Executives and their political patrons, known as "Padrinhos," or Godfathers, within the Brazilian political parties. Id. ¶¶ 50-51, 62.

Under Petrobras' system of political patronage, each of the company's seven divisions, known as Directorates, was allocated to one of the political parties forming the majority coalition: the Partido Progressista ("PP"), the Partido do Movimento Democratic Brasileiro ("PMDB"), and the Partido dos Trabalhadores ("PT"). Id. ¶ 65. Because the Brazilian government was Petrobras' majority shareholder, the political parties had the power to appoint the directors of the divisions under their control, as well as to nominate all members of Petrobras' Board of Directors, including its President. Id. ¶ 63. In return for the parties' sponsorship of their careers, individual executives

were expected to provide kickbacks to the parties by diverting
Company funds from works and contracts under their control. Id.

The CAC alleges that the corruption scheme resulted in
Petrobras drastically overpaying for several refineries that it
acquired or built during this time period. For example, in 2006,
Petrobras acquired a refinery in Pasadena, Texas for a total of
$1.18 billion, including interest and legal fees, when a Belgian
oil company had purchased the same refinery just a year earlier
for only $42.5 million. Id. ¶ 75. Petrobras officials allegedly
approved the inflated purchase price after accepting bribes. Id.
The cost of another refinery, the Abreu e Lima refinery in
Pernambuco, Brazil, allegedly increased from $4 billion to over
$18 billion largely because of padded contracts awarded to
cartel companies. Id. ¶ 84. Similarly, Petrobras will be obliged
to spend sixty percent more than it originally budgeted at one
of the refineries comprising the Complexo Petroquimico do Rio de
Janeiro ("Comperj Project"). Id. ¶ 90. An audit of the Comperj
Project found irregularities in several contracts and a lack of
effective controls. Id.

The CAC further alleges that the Individual Defendants were
alerted to the fraud at the Company. For example, a former
Petrobras manager, Venina Velosa da Fonseca, testified that she
met with Defendant Foster, who was then in charge of the energy
and gas division and reported to then-CEO Gabrielli, to tell her

7

about inflated contracts and payments for services that had not been carried out. Id. ¶ 92. Fonseca claimed that she had repeatedly reported problems with bidding and contracts to her superiors for five years, and was transferred to Singapore and ultimately fired in retaliation. Id. ¶ 93. She allegedly forwarded her complaints to CEO Gabrielli. Id. ¶ 98. He created a committee to investigate, which found that the Company had paid R$ 58 million for communication services that were not performed. Id. However, the employee responsible for the embezzlement was kept on Petrobras' payroll for several years thereafter. Id. ¶ 101. Similarly, a confidential informant reported that, in 2005, a PT politician in Rio took his concerns about bribery and corruption related to the Pasadena refinery purchase directly to Gabrielli, who was then Petrobras' President. Id. ¶ 81.

The corruption scheme was eventually uncovered as part of an extensive money-laundering investigation by the Brazilian Federal Police known as Operation "Lava Jato," meaning "car wash." Id. ¶ 4. As the details of the scheme slowly emerged, the price of Petrobras' securities suffered decline after decline. Id. ¶¶ 283-48. Over the course of the Class Period, the price of Petrobras' common ADS fell by 80.92% and the price of its preferred ADS fell by 78.01%. Id. at 349.

8

USS alleges that defendants made two categories of false and misleading statements. First, it alleges that the corruption scheme rendered the Company's financial statements materially false and misleading. Id. ¶ 109. Specifically, it alleges that Petrobras, in accordance with International Financial Reporting Standards, accounted for costs related to the construction, installation, and completion of oil and gas infrastructure as part of the carrying value of its property, plant and equipment ("PP&E") on the Company's balance sheets. Id. ¶¶ 110-13. Because the amounts that Petrobras paid for its construction contracts were inflated by the bribe payments and overcharges from the cartel, however, the reported value of its PP&E was correspondingly inflated. Id. ¶¶ 114, 139. USS alleges that on January 28, 2015, Petrobras issued a statement acknowledging that it will be necessary to make adjustments to its financial statements to correct the carrying values of its fixed assets. Id. ¶ 339.

Second, the CAC alleges that Petrobras made false and misleading statements regarding the integrity of its management and the effectiveness of its financial controls. Id. ¶ 140. For example, the Company allegedly made statements to reassure investors that its operations were conducted with full transparency and in compliance with applicable laws and regulations, and also touted its Code of Ethics and corruption

prevention program. Id. ¶¶ 140-50. Furthermore, Petrobras repeatedly represented that it maintained effective internal controls and procedures, when in fact those controls and procedures suffered from material weaknesses. Id. ¶ 152-56.

On the basis of the above allegations, USS asserts two causes of action on behalf of all persons and entities who purchased or otherwise acquired Petrobras securities on the NYSE or pursuant to other domestic transactions during the Class Period: violation of Section 10(b) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5(b) promulgated thereunder against Petrobras, PGF, and the Individual Defendants (Count I); and violation of Section 20(a) of the Exchange Act against defendants Gabrielli, Foster, and Barbassa (Count II).

USS further asserts four causes of action under Brazilian law on behalf of all persons or entities who, in addition to purchasing Petrobras securities on the NYSE or pursuant to domestic transactions, also purchased or otherwise acquired Petrobras securities on the Bovespa during the Class Period: violation of the Brazilian Corporate Law and the regulations of the Brazilian Securities and Exchange Commission ("Comissão de Valores Mobiliários" or "CVM") against the Individual Defendants (Count III); violation of the Brazilian Civil Code against Petrobras (Count IV); violation of the Brazilian Corporate Law,

CVM Regulations, and Brazilian Civil Code against Petrobras (Count V); and violation of the Brazilian Securities Law, CVM Regulations, and the Brazilian Civil Code against PwC (Count VI).

Turning to the Securities Act Claims, plaintiffs USS, Union, and Hawaii ERS assert that their allegations under the Securities Act are "in effect a separate complaint," and state that they "do not incorporate any of the allegations" pled in relation to the Exchange Act and Brazilian law claims. Id. ¶ 388. With respect to these claims, they disclaim "any allegations of fraud or scienter" or "any other deliberate and intentional misconduct." Id. ¶ 389.

Nonetheless, the factual allegations regarding the corruption scheme and its effect on Petrobras' balance sheet are substantially similar to the facts that USS alleges with respect to the Exchange Act and Brazilian law claims. Plaintiffs allege that, for years, Petrobras routinely awarded inflated contracts to a cartel of construction and engineering firms in exchange for those firms making hundreds of millions of dollars in improper and undisclosed payments to corrupt Petrobras executives and Brazilian political parties. Id. ¶¶ 395-96. This, plaintiff alleges, occurred as a result of Petrobras' culture of political patronage, whereby Company executives were promoted on

the basis of political sponsors who, in exchange, demanded contributions to their campaign funds. Id. ¶ 397.

The contracts were allegedly inflated by "as much as 20%," with the result that the reported carrying value of Petrobras' PP&E, expenses, and net income were materially false and misleading. Id. ¶ 405. Plaintiffs further allege that defendant Foster has acknowledged that the bribe payments were improperly recognized as part of the cost of the Company's fixed assets and will require adjustment. Id. ¶ 404. The Company, plaintiffs allege, is facing an asset write-down that "may reach $30 billion." Id. ¶ 405. In addition, the fact that Petrobras did not report the overpayments as immediate expenses resulted in its expenses appearing lower and its net income higher during the periods in which the inflated payments were made. Id. ¶ 406.

The allegedly false and misleading statements that form the basis for plaintiffs' Securities Act Claims were made in offering documents for several Notes Offerings between 2012 and 2014. Specifically, the Petrobras Defendants offered notes pursuant to prospectus supplements with the SEC on February 3, 2012 (the "2012 Notes Offerings"), on May 15, 2013 (the "2013 Notes Offerings), and on March 11, 2014 (the "2014 Notes Offerings"). Id. ¶¶ 408-18. The registration statements and prospectus supplements that Petrobras filed with the SEC in connection with these Notes Offerings (collectively, the

12

"Offering Documents") incorporated by reference other documents such as Annual Reports on Form 20-F and reports on Form 6-K that the Petrobras Defendants filed with the SEC during the relevant periods. Id. ¶¶ 411, 415, 418.

Plaintiffs allege that the documents incorporated by reference into the Offering Documents contained numerous false and misleading statements. Specifically, those documents contained representations regarding Petrobras' total assets, including net PP&E, its total costs and expenses, including depreciation, depletion, and amortization, and its net income. Id. ¶¶ 477, 482, 484, 488, 490, 494, 496. Plaintiffs allege that such statements were materially false and misleading because Petrobras included the cost of improper payments in the value of its assets, as described above.

The Offering Documents further incorporated representations, for example, that the Company's internal control over financial reporting was effective and also incorporated by reference Petrobras' Code of Ethics, pursuant to which it undertook to "conduct its business with transparency and integrity," to "register its reports and statements in a correct, consistent, accurate and complete way," and to "refuse any corrupt and bribery practices" and "refuse support and contributions to political parties." Id. ¶¶ 478-79, 485, 491, 498. Finally, on March 11, 2014, Petrobras filed a form 6-K,

13

which incorporated a statement that neither Petrobras nor any of its officers had engaged in corruption, made any bribe or unlawful payment, or violated any provision of certain U.S., U.K., and Brazilian anti-corruption laws. Id. ¶ 500. These statements, plaintiffs allege, were materially false and misleading because Petrobras had, in fact, engaged in rampant corrupt activities and utterly lacked effective controls.

On the basis of these allegations, plaintiffs assert three Securities Act causes of action: violation of Section 11 of the Securities Act against the Petrobras Defendants, the Individual Defendants, the Underwriter Defendants, and PwC (Count VII); violation of Section 12(a)(2) of the Securities Act against defendants Petrobras and PGF (Count VIII); and violation of Section 15 of the Securities Act against defendants Foster, Gabrielli, and Barbassa (Count IX).

Exchange Act Claims. Defendants moved to dismiss the Exchange Act Claims for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 9(b), 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "In considering a motion to dismiss … the court is to accept as true all facts alleged in the complaint" and

14

must "draw all reasonable inferences in favor of the plaintiff."
Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d
Cir. 2007). However, mere conclusory statements and "formulaic
recitation[s] of the elements of a cause of action" will not
suffice. Twombly, 550 U.S. at 555.

Furthermore, Section 10(b) claims are subject to the
heightened pleading standards of Rule 9(b) and the PSLRA.
Accordingly, to state a claim for violation of Section 10(b), a
plaintiff must "state with particularity the circumstances
constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Second
Circuit has interpreted Rule 9(b) to require that a complaint:
"(1) specify the statements that the plaintiff contends were
fraudulent, (2) identify the speaker, (3) state where and when
the statements were made, and (4) explain why the statements
were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir.
2004) (citation and internal quotation marks omitted). In
addition, under the PSLRA, the plaintiff must "specify each
statement alleged to have been misleading [and] the reason or
reasons why the statement is misleading." 15 U.S.C. § 78u-
4(b)(1).

Section 10(b) of the Exchange Act makes it unlawful to "use
or employ, in connection with the purchase or sale of any
security … any manipulative or deceptive device or contrivance
in contravention of such rules and regulations as the Commission

may proscribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5, which implements the statute, prohibits "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). In order to establish a claim under these provisions, a plaintiff bears the burden to prove that "(1) the defendant made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 389 (2d Cir. 2015).

     With respect to the first element of an Exchange Act claim, defendants argue that the CAC fails to plead any material misrepresentation or omission. "A statement or omission is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.'" Id. (quoting ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009)). Materiality is "a mixed question of law and fact and is rarely a basis for dismissal on the pleadings." City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012). A complaint may be dismissed for

16

failure to plead materiality only if "the misstatements are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" Id.

As discussed above, Petrobras' allegedly false and misleading statements fall into two categories: its financial statements and its representations about the state of its business and management. Plaintiffs allege that Petrobras' financial statements misrepresented the value of the Company's PP&E, expenses, and net income because the Company improperly capitalized costs associated with payments to cartel members, to the Corrupt Executives, and to political parties. Plaintiffs allege that the Company's contracts with cartel companies were inflated by as much as twenty percent, with the result that Petrobras may be forced to book a $30 billion asset write-down. CAC ¶¶ 5, 13.

Defendants argue that the public documents on which the CAC expressly relies — most importantly, the testimony of Paulo Roberto Costa, one of the Corrupt Executives who is now cooperating with the investigation — do not support plaintiffs' allegations. Where a complaint cites reports and testimony whose "contents as public documents are not subject to reasonable dispute," the Court may "consider them in determining the merits and context of the allegations of the [complaint] that are based

17

on them." IBEW Local, 783 F.3d at 390. In this case, defendants correctly point out that Costa's testimony was not that the cartel contracts were inflated by twenty percent, but rather that, pursuant to its procurement guidelines, Petrobras would consider bids up to twenty percent over its internal budget estimate. See Declaration of Roger A. Cooper dated April 17, 2015 ("Cooper Decl.") Ex. 5, at 4. Costa further testified that the bribe payments added only three percent to the contract price. Id. Thus, to the extent that plaintiffs characterize Costa's testimony as stating that the contracts were systematically inflated by up to 20%, defendants are correct that the testimony itself belies that characterization.

However, it does not follow that Petrobras paid only three percent more on the cartel contracts than it would have under an honest bidding system. If the cartel companies were paying three percent in bribes and kickbacks, it is reasonable to infer that the corruption scheme allowed them to inflate the contract prices by considerably more than three percent. Otherwise, the bribery scheme would not be worth their while. This conclusion is supported by Costa's statements, for example, that the amounts paid for the works were "much higher than the real values" and that, by virtue of the bribery scheme, the cartel companies were able to "stretch[]" their profits "to the limit the contracting enterprise allows." Declaration of Emma Gilmore

18

dated May 8, 2015 ("Gilmore Decl.") Ex. 17, at 290-91. Thus, a fair reading of Costa's testimony permits the inference that the contracts were inflated by much more than three percent.

Defendants argue that the three percent bribe payment built into the cartel contracts did not materially affect the accuracy of Petrobras' financial statements. According to the SEC's Staff Accounting Bulletin ("SAB") No. 99, which the Second Circuit has deemed to be persuasive authority, the court should consider both quantitative and qualitative factors in assessing a statement's materiality. ECA, Local 134, 553 F.3d at 198-99 (citing SAB No. 99, 1999 WL 1123073). SAB No. 99 establishes a "rule of thumb" that changes of less than five percent to financial statements are presumptively immaterial. City of Pontiac, 875 F. Supp. 2d at 368. However, SAB No. 99 recognizes that a misstatement can be material even if does not cross the five percent threshold and sets out relevant qualitative factors such as "(1) concealment of an unlawful transaction, (2) significance of the misstatement in relation to the company's operations, and (3) management's expectation that the misstatement will result in a significant market reaction." ECA, Local 134, 553 F.3d at 198.

In this case, plaintiffs' allegation that Petrobras overstated the value of its assets by as much as $30 billion relies on a statement that the Company made in January 2015. See

Cooper Decl. Ex. 8. However, as defendants point out, the statement on which plaintiffs rely does not, in fact, establish that Petrobras' assets were overvalued by $30 billion. Instead, the Company acknowledged that costs relating to improper payments should not have been capitalized and that an asset write-down may be necessary to correct this error. Id. at 11-12. The statement discusses two methods for calculating the asset write-down that the Company considered but ultimately decided not to adopt. Id. at 11-12.

The first of those methods was to measure the difference between the fair value and the carrying amount of Petrobras' assets. Id. at 13. This method found that fifty-two of Petrobras' assets had a fair value below their carrying amount, for a total discrepancy of R$ 88.6 billion, or almost US $30 billion. Id. at 14. This, presumably, is the source of plaintiffs' allegation. However, the January 2015 statement explains that Petrobras decided not to adopt this method because it was not capable of distinguishing discrepancies in valuation of assets related to improper payments from those caused by, for example, changed economic conditions. Id. at 13-14.

The second method that the January 2015 statement discusses is to calculate the amount of bribes paid to the cartel based on documents and testimony that have emerged in the course of the investigation, including Costa's testimony that the bribe

20

payments accounted for about three percent of the value of the Company's contracts with the cartel companies. Id. at 12-13. This approach would lead to an asset write-down of R$ 4.06 billion, or approximately US $1.3 billion. Id. at 13. Defendants contend that $1.3 billion amounts to less than 0.7 percent of Petrobras' total PP&E assets. However, the Company also rejected this method because the investigation has not revealed sufficient detail regarding the improper payments to support recording an entry in its books and records. Id. at 13.

Based on the above, it appears that plaintiffs' contention that Petrobras faces an asset write-down of US $30 billion is not supported by the document on which it relies. Nonetheless, that document does not clearly establish, as defendants contend, that the write-down will be lmited to US $1.3 billion. Thus, in terms of the quantitative factors, it is not clear whether Petrobras' alleged misstatement reaches the five percent "rule of thumb," though there is a plausible possibility that it might.

In any event, however, the quantitative analysis is not dispositive of materiality. Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 714 (2d Cir. 2011). Here, the qualitative factors strongly favor a finding of materiality. The errors in Petrobras' financial statements were directly related to its concealment of the unlawful bribery scheme, revelation of which

21

would "call into question the integrity of the company as a whole." Strougo v. Barclays PLC, No. 14-CV-5797 SAS, 2015 WL 1883201, at *10 (S.D.N.Y. Apr. 24, 2015). Moreover, the misstatements related to the value of Petrobras' oil-producing infrastructure, which is the core of its business. Finally, plaintiffs allege that Petrobras' share price dropped dramatically when news of the corruption scheme emerged, indicating that investors did, in fact, consider that information to be material. Accordingly, the Court cannot conclude that the alleged misrepresentations in Petrobras' financial statements were immaterial as a matter of law.

With respect to Petrobras' general statements about its business, defendants argue that these statements are not actionable because they are either statements of opinion, mere puffery, or forward-looking statements subject to the PSLRA's "safe harbor" provision, 15 U.S.C. § 78u-5(c).

A statement of opinion is not materially false just because it is incorrect unless it is not "honestly held" or omits facts about the speaker's basis for holding that view, and those facts conflict with what a reasonable investor would understand from the statement itself. See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318, 1327 (2015). Defendants argue that many of their allegedly false and misleading statements were statements of opinion, and that

22

plaintiffs have not plausibly alleged that those opinions were not honestly held.

For example, they contend that Petrobras' alleged statements regarding the effectiveness of its internal controls are not actionable for this reason. See, e.g., CAC ¶¶ 164, 184, 198, 251, 260. However, plaintiffs allege that at the time the Company's management was professing its opinion that the company's internal controls were effective, that same management was well aware of the extensive corruption in the Company's procurement activities. See, e.g. id. ¶ 158. These allegations are sufficient to infer that the Company disbelieved the alleged statements at the time they were made. See Varghese v. China Shenghuo Pharm. Holdings, Inc., 672 F. Supp. 2d 596, 607 (S.D.N.Y. 2009) (holding that plaintiffs plausibly alleged that defendant's "internal control problems were much more serious than the picture conveyed by its filings and press releases"); In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007) (holding that "plaintiffs' factual allegations, accepted as true, suggest that the Company recklessly or intentionally misled investors as to the state of its internal controls").

With respect to puffery, "[s]tatements of general corporate optimism … do not give rise to securities violations." IBEW Local, 783 F.3d at 392; City of Pontiac Policemen's & Firemen's

Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014) ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'"). Defendants argue that many of Petrobras' alleged statements are mere puffery. These include statements that Petrobras established a commission "aimed at assuring the highest ethical standards," CAC ¶ 141; that it "adopts the best corporate governance practices," CAC ¶ 150; that it undertook to "conduct its business with transparency and integrity" and to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions," CAC ¶ 165; that it was "fully committed to implementing a fair and transparent operation" and "will invest all of our resources with efficiency and discipline," CAC ¶ 167; and that its Business and Management Plan "is underpinned by realism, precise targets and rigorous project management with capital discipline," CAC ¶ 206.

Whether a representation is "mere puffery" depends, in part, on the context in which it is made. See Arkansas Teacher Ret. Sys. v. Bankrate, Inc., 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014); U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co., No. 12-cv-6811, 2013 WL 791462, at *7 (S.D.N.Y. Mar. 5, 2013). While some of the alleged statements, viewed in isolation, may be mere

puffery, nonetheless, when (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company. Accordingly, the Court cannot find that all of Petrobras' alleged statements regarding its general integrity and ethical soundness were immaterial as a matter of law. See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976) (noting that the issue of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact").

Finally, the PSLRA provides for a safe harbor for "forward looking statements" if accompanied by "meaningful cautionary statements," 15 U.S.C. § 78u-5(c)(1)(A), or if the plaintiff does not properly allege that the speaker had "actual knowledge" that the statement was false or misleading, id. § 78u-5(c)(1)(B). Such statements are defined to include "a statement of the plans and objectives of management for future operations" and "a statement of future economic performance." Id. § 78u-5(i)(1)(B)-(C).

Defendants argue that some of the alleged material misstatements are subject to the safe harbor provision. For

example, they highlight the allegations that Petrobras stated that "the proper management of our project portfolio provides us with the confidence that we will be able to achieve the goals of 2013-17 BMP, which will guarantee the returns expected by our shareholders," CAC ¶ 224, and that the Company would "continue with [its] efforts to recover the operational efficiency of the Campos Basin and optimize operating costs," CAC ¶ 206. The Court agrees with defendants that these two statements are protected by the PSLRA's safe harbor for forward-looking statements because there is no allegation that the speaker had actual knowledge that they were false or misleading. This conclusion, however, does not undercut the Court's broader conclusion that plaintiffs have adequately pled material misstatements such that their Exchange Act claims survive defendants' motion to dismiss.

With respect to the second element of an Exchange Act claim, defendants argue that the CAC fails to plead scienter. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007). "When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008). The PSLRA provides that the

complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In making this determination, a court considers whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 323. When so considered, the inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

Defendants rely on the so-called "adverse interest" exception to the general rule that a corporate executive's scienter is attributable to the corporation. This exception applies where "an officer acts entirely in his own interests and adversely to the interests of the corporation." Kirschner v. Grant Thornton LLP, No. 07-cv-11604, 2009 WL 1286326, at *5 (S.D.N.Y. Apr. 14, 2009) aff'd sub nom. Kirschner v. KPMG LLP, 626 F.3d 673 (2d Cir. 2010). Although defendants do not dispute that the CAC adequately pleads scienter with respect to the four Corrupt Executives who carried out the bribery scheme, they argue that the adverse interest exception applies to the Petrobras entities because the Corrupt Executives acted entirely to benefit themselves and their political patrons, at the Company's expense.

However, "where a corporation benefits to any extent from the fraudulent acts of its agents, the agents cannot be said to have 'totally abandoned' the interests of the corporation." Id. at *6. In this case, the CAC plausibly alleges that, as a result of the bribery scheme, the value of Petrobras' PP&E appeared to be higher than it actually was, which in turn inflated the value of Petrobras' securities. Thus, the inflation of the Company's PP&E operated as a fraud on the investing public, not on Petrobras itself. Moreover, the Corrupt Executives' failure to correct Petrobras' various statements about its integrity, its compliance with applicable laws and regulation, and the effectiveness of its internal controls clearly benefitted the Company, which was able to continue to attract investment and to complete its large-scale expansion plans. See Stream SICAV v. Wang, 989 F. Supp. 2d 264, 277 (S.D.N.Y. 2013).

Finally, the CAC alleges that Petrobras operated on a system of political patronage. CAC ¶ 63. Each division of the Company was aligned with one of the political parties forming Brazil's government, which was also the Company's majority shareholder. Id. ¶ 65. Accordingly, it is reasonable to infer that the Company benefited from remaining in favor with its political patrons. See Kirschner v. KPMG LLP, 15 N.Y.3d 446, 468 (Ct. App. 2010) ("So long as the corporate wrongdoer's fraudulent conduct enables the business to survive — to attract

investors and customers and raise funds for corporate purposes —
— this test is not met."). Therefore, the allegations of the CAC
do not conclusively establish that the Company received no
benefit from the Corrupt Executives' actions, as required to
render the adverse interest exception applicable.

Accordingly, the Court denied defendants' motion to dismiss
the Exchange Act claims for failure to plead materiality and
scienter.

Securities Act Claims. Defendants moved to dismiss the
Securities Act claims on a variety of grounds.

First, they moved to dismiss all of the Securities Act
claims in their entirety for failure to plead any materially
false or misleading statement. As defendants recognize, however,
the Securities Act claims rest on many of the same allegedly
false statements in Petrobras' financial statements as the
Exchange Act claims. Thus, plaintiffs' allegation that Petrobras
entered inflated contracts which, in turn, caused it to inflate
the reported value of its PP&E survives defendants' motion for
the same reasons as discussed above. Even though the contracts
may not have been inflated by the full twenty percent alleged by
plaintiffs, the CAC plausibly alleges that they were materially
inflated, and that such inflation was reflected in the Company's
financial statements. Similarly, the CAC plausibly alleges that
Petrobras' statements regarding its transparency and ethical

controls are sufficient for the same reasons discussed above. See supra. That is all that is required at this stage.[5]

Second, defendants moved to dismiss certain of plaintiffs' Securities Act claims on the ground that plaintiffs lack standing to bring such claims. As to the Section 11 claims (Count VII), defendants moved to dismiss plaintiffs' claims regarding the 2012 Notes Offering on the ground that plaintiffs lack standing to assert them. Section 11 provides that a purchaser of a security may sue if the registration statement "contained an untrue statement of a material fact." 15 U.S.C. § 77k(a). Section 11 creates strict liability for any defendant who (1) signed the statement at issue; (2) was a director, person performing similar functions, or partner in the issuer at the time the statement was issued; (3) was named in the statement, with that party's consent, as being or about to become a director, person performing similar functions, or partner; (4) was an expert whose involvement was, with that

---

[5] Defendants also argue that Petrobras' statement in the March 2014 Underwriting Agreement that neither Petrobras nor its officers made "any direct or indirect unlawful payment to any foreign or domestic government or official," CAC ¶ 500, was not false because the cartel members, and not Petrobras or its officers, made the unlawful payments. However, the CAC alleges that the cartel companies made those payments pursuant to an understanding with the Corrupt Executives, squarely qualifying them as "indirect" unlawful payments by Petrobras officers.

party's consent, listed in the statement; or (5) was a statutory underwriter of the security. Id. § 77k(a)(1)-(5).

In order to have standing to sue under Section 11, aftermarket purchasers must be able to "trace their shares to an allegedly misleading registration statement." Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 407 (S.D.N.Y. 2007). Defendants argue that plaintiffs cannot trace their shares to the 2012 Notes Offering. The 2012 Notes Offering, they argue, was a "re-opening" of a previous notes offering. Because the 2012 Notes are indistinguishable from the earlier-offered notes, the plaintiffs, according to defendants, will not be able to trace their shares to the 2012 Notes Offering.

However, the "pleading requirement for Section 11 standing is satisfied by 'general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement.'" Caiafa, 525 F. Supp. 2d at 407 (internal citation and quotation marks omitted). At this stage, plaintiffs are not "required to explain how their shares can be traced." In re Authentidate Holding Corp., No. 05-cv-5323, 2006 WL 2034644, at *7 (S.D.N.Y. July 14, 2006) (citation and internal quotation marks omitted) (emphasis added). Accordingly, plaintiffs' allegation that they purchased the notes "pursuant to or traceable to the materially false and misleading" registration statements suffices, at this stage, to establish their standing under Section 11. CAC ¶ 528.

31

Defendants also argue that plaintiffs lack standing with respect to the Section 12(a)(2) claims (Count VIII). Section 12(a)(2) imposes liability on anyone who "offers or sells a security … by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact." 15 U.S.C. § 77l. Standing to assert a Section 12(a)(2) claim is limited to persons who directly purchase securities from the defendant in a public offering, rather than on the secondary market. Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 578 (1995). Here, plaintiffs fail to allege that they purchased their shares in the public offering, and therefore lack standing. See Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co. Inc., 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (finding allegation that plaintiffs purchased securities "pursuant and/or traceable to" the defective offering documents insufficient). However, the Court, in its Order of July 9, 2015 granted plaintiffs leave to amend to correct this defect if they can.[6]

Third, defendants moved to dismiss plaintiffs' Securities Act claims arising from the 2012 and 2013 Notes Offerings as

---

[6] The Court considered defendants' other arguments regarding plaintiffs' standing to bring Section 12(a)(2) claims and found them to be without merit.

32

barred by the statute of limitations and/or the statute of repose. As to the statute of limitations, Section 11 and 12(a)(2) claims must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of due diligence." 15 U.S.C. § 77m. "The one-year limitations period applicable to discovery of the violation begins to run after the plaintiff 'obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.'" LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 154 (2d Cir. 2003) (emphasis omitted). Thus, as the first complaint in this consolidated action was filed on December 8, 2014, the claims are time barred if plaintiff had actual or constructive notice of them on or before December 7, 2013.

Defendants argue that representations that USS made in support of its lead plaintiff application establish that it should have discovered its claims before that date. Specifically, USS sold all its preferred ADSs in October 2013. In order to claim a loss in that class of securities, USS asserted that there was a corrective disclosure in August 2013, namely, a report in Epoca magazine on illegal transfers by Petrobras to members of a Brazilian political party. USS asserted that the Epoca report caused the price of preferred

ADSs to drop by over 5%, and that additional reports were published from August through November 2013 containing similar disclosures. Thus, defendants argue, USS's claims based on the 2012 and 2013 Notes Offerings are time-barred.

However, determining "whether a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).'" LC Capital Partners, 318 F.3d at 156. Here, determining whether the Epoca report contained sufficient information about the fraud to put plaintiffs on constructive notice would require the Court to resolve complex disputes of fact. Moreover, "[t]here are occasions when, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management." Id. at 155. Thus, additional factual disputes exist as to whether a reasonable investor would have relied on the Company's statements regarding its transparency and integrity such that they were not placed on inquiry notice. Accordingly, the Court cannot determine, as a matter of law, that plaintiffs were on inquiry notice of their claims before December 7, 2013.

Section 11 claims are also subject to a statute of repose, which provides that "[i]n no event" shall an action be brought "more than three years after the security was bona fide offered

34

to the public." 15 U.S.C. § 77m. In this case, the 2012 Notes
Offering was made on February 1, 2012, but plaintiffs did not
file the CAC until March 27, 2015, over three years later. The
so-called "American Pipe" doctrine, which provides that the
filing of a class action complaint tolls the statute of
limitations with respect to members of the putative class, does
not apply to statutes of repose. See In re IndyMac Mortgage-
Backed Sec. Litig., 793 F. Supp. 2d 637, 642 (S.D.N.Y. 2011)
aff'd in part sub nom. Police & Fire Ret. Sys. of City of
Detroit v. IndyMac MBS, Inc., 721 F.3d 95 (2d Cir. 2013);
American Pipe and Construction Co. v. Utah, 414 U.S. 538 (1974).
Nor does the "relation back" doctrine apply, so plaintiffs may
not rely on the complaint filed by a different plaintiff, the
City of Providence, in one of the related cases. Id. Therefore,
the statute of repose bars plaintiffs' Section 11 claims based
on the 2012 Notes Offering.

Accordingly, in the Order of July 9, 2015, the Court denied
defendants' motion to dismiss plaintiffs' claims based on the
2012 and 2013 Notes Offerings as barred by the one-year statute
of limitations, but granted defendants' motion to dismiss
plaintiffs' claims based on the 2012 Notes Offering as barred by
the three-year statute of repose.

Fourth, defendants moved to dismiss certain Section 11
claims because plaintiff failed to plead reliance on the

35

Offering Documents. A Section 11 plaintiff must prove reliance on the misrepresentation in the registration statement "if the plaintiff 'acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least 12 months beginning after the effective date of the registration statement." Pub. Emps.' Ret. Sys. v. Merrill Lynch & Co., 277 F.R.D. 97, 112 (S.D.N.Y. 2011) (quoting 15 U.S.C. § 77k(a)).

Defendants contend that Petrobras issued earning statements that covered twelve-month periods after the effective dates of each of the 2012 and 2013 Notes Offerings, specifically: (1) earning statements issued on Forms 20-F and 6-K in April 2013, covering the twelve-month period following the February 1, 2012 effective date of the 2012 Notes Offering, and (2) earning statements issued on Forms 20-F and 6-K in April and August 2014 covering the twelve-month period following the May 13, 2013 effective date of the 2013 Notes Offering. Defendants further contend, and plaintiffs do not dispute, that Union purchased Notes after the relevant earning statements were issued.[7] Plaintiffs nonetheless fail to plead that they relied on the

---

[7] The specific Notes that defendants contend were purchased after the relevant earning statements were issued are listed on page 52, footnote 56 of Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Complaint dated April 17, 2015, ECF No. 156.

original registration statements. Accordingly, the Court granted defendants' motion to dismiss plaintiffs' Section 11 claims based on Notes purchased after Petrobras issued the relevant earning statements.

Fifth, defendants moved to dismiss plaintiffs' Securities Act claims on the ground that plaintiffs failed to allege that they purchased the relevant securities in domestic transactions. The Securities Act applies only to securities listed on a domestic stock exchange or purchased or sold in the United States. See Morrison V. National Australia Bank, 561 U.S. 247, 273 (2010). The CAC fails to plead that plaintiffs purchased the relevant securities in such domestic transactions. However, based on plaintiffs' representations in their briefs and at oral argument that they did, in fact, purchase the securities in domestic transactions, the Court granted them leave to amend.

Brazilian Law Claims. Counts III through V allege violations of Brazilian law on behalf of class members who, in addition to purchasing Petrobras securities in the United States, also purchased Petrobras common or preferred shares on the Brazilian stock exchange, known as the Bovespa. Defendants moved to dismiss these Brazilian law claims on the ground that they are subject to mandatory arbitration pursuant to the Company's bylaws.

37

Article 58 of Petrobras' bylaws provides that "disputes …
involving the Corporation, its shareholders, managers and
members of the Audit Board" regarding "the rules issued … by the
Brazilian Securities and Exchange Commission (Comissão de
Valores Mobiliários – CVM) as well as in all further rules
applicable to the operation of the capital market in general,"
"shall be resolved according to the rules of the Market
Arbitration Chamber." Expert Report of Luiz Cantidiano dated
April 17, 2015, Cooper Decl. Ex. 27 ("Cantidiano Rep.") ¶ 10.
The Market Arbitration Chamber was created by the Bovespa to
serve as a specialized forum for resolution of disputes related
to corporate and securities laws. Id. ¶ 47.

Both parties agree that whether purchasers of Petrobras
securities on the Bovespa agreed to the mandatory arbitration
clause is a question of Brazilian law. See Schnabel v.
Trilegiant Corp., 697 F.3d 110, 119 (2d Cir. 2012). The Court is
persuaded that, under Brazilian law, Petrobras' arbitration
clause is valid and enforceable against purchasers of Petrobras
securities on the Bovespa. According to defendants' expert, in
2001 Brazil amended Article 109 of the Brazilian Corporate Law
("BCL") to expressly authorize companies to include mandatory
arbitration clauses in their bylaws: "The corporation's bylaws
may establish that any disputes between the shareholders and the
corporation, or between the majority shareholders and the

minority shareholders may be resolved by arbitration under the terms specified by it." Cantidiano Rep. ¶ 20.

Around the same time, the Bovespa created the so-called "Novo Mercado," a special listing segment that required companies to adopted increased corporate governance standards as a prerequisite to eligibility, one of which was adoption of an arbitration provision in their bylaws. Id. ¶ 25. Leading Brazilian scholars have opined that shareholders manifest their consent to such arbitration clauses by purchasing shares of the company after the arbitration bylaw is enacted, and are therefore bound thereby. Id. ¶¶ 28-29; Reply Report of Luiz Cantidiano dated May 22, 2015 ("Cantidiano Reply Rep."), Reply Declaration of Roger A. Cooper dated May 22, 2015 ("Cooper Reply Decl.") Ex. 5, ¶¶ 9-13.

In the wake of these changes, over 160 Brazilian companies have adopted bylaws mandating arbitration of shareholder disputes. Id. ¶ 24. One such company was Petrobras, which adopted the arbitration provision in Article 58 of its bylaws in 2002 by Board resolution and shareholder vote. Cantidiano Rep. ¶ 31. Petrobras disclosed the existence of this provision to current and prospective shareholders via its annual filings with the SEC. Id. ¶ 32. Because the members of the putative class by definition purchased their shares in or after 2010, they are bound by Article 58.

Moreover, Article 58, by its plain terms, encompasses the Brazilian law claims asserted in Counts III through V of the CAC, which allege violations of the CVM Regulations and other Brazilian laws applicable to securities transactions. These claims are "disputes … involving the Corporation, its shareholders, [and] managers" arising from "the rules issued … by the Brazilian Securities and Exchange Commission (Comissão de Valores Mobiliários – CVM) as well as in all further rules applicable to the operation of the capital market in general." Id. ¶ 10. Accordingly, plaintiffs are bound to arbitrate these claims.

Plaintiffs' arguments to the contrary are not persuasive.[8] First, plaintiffs' expert argues that the Brazilian Arbitration Act provides that a party is bound by an arbitration clause contained in a contract of adhesion only if that party either initiates the arbitration or expressly agrees in writing to be bound. See Expert Report of Erica Gorga ("Gorga Rep."), Gilmore Decl. Ex. 29, at 5. However, defendants' expert persuasively

---

[8] On June 10, 2015, in a conference call with the Court, plaintiffs' lead counsel requested permission to file a surreply expert report to address specific issues that they claimed were raised for the first time in defendants' reply report. The Court granted that request based on their representation that the proposed surreply report would be limited to the narrow issues specified by lead counsel. The report that lead counsel filed went far beyond those issues. See ECF No. 175-1. As a result, plaintiffs' lead counsel burdened both the Court and defense counsel with duplicative and unauthorized argument.

demonstrates that the weight of authority holds that the
provisions of the BAA regarding adhesion contracts apply to
contracts of unequal bargaining power, such as consumer
contracts, and not to arbitration provisions contained in
corporate bylaws. See Cantidiano Reply Rep., ¶¶ 8-14. Moreover,
plaintiffs' expert's opinion would render unenforceable the
bylaws of over 160 Brazilian companies that provide for
mandatory arbitration, including all of those listed on the Novo
Mercado. Id. ¶ 15.

Second, plaintiffs' expert opines that an arbitration
clause must be approved unanimously at the shareholder meeting
at which it is adopted in order to bind all shareholders. Gorga
Rep. at 8. However, Article 136 the BCL provides a general rule
that "resolutions of a general meeting shall be passed by a
simple majority of votes." Cantidiano Reply Rep. ¶ 18 & n.30.
Articles 221 and 294 of the BCL specify certain corporate
changes that require unanimous agreement of the shareholders, of
which adoption of an arbitration clause is not one. Id. ¶ 17. In
addition, defendant's expert cites articles discussing whether
an arbitration clause is binding on a shareholder who voted
against it or abstained from voting, implying that an
arbitration clause adopted by non-unanimous vote is not per se
void. Id. ¶ 19 & n.32.

41

Earlier this year, the Brazilian National Congress approved legislation, which was drafted by a commission of judges, arbitration experts, and government officials, providing that "[a]pproval of the addition of an arbitration agreement in the bylaws, with due regard for the quorum set out in art. 136 [of the BCL], binds all shareholders." See Cantidiano Reply Rep. ¶ 22 & App'x J. This provision is consistent with the prevailing view among Brazilian legal scholars, as described by defendants' expert, that arbitration bylaws are valid if approved by a simple majority, are not considered contracts of adhesion, and are binding on all shareholders. Thus, the adoption of this provision provides further support for the Court's conclusion that Article 58 is valid and binding under Brazilian law.

Third, plaintiffs' expert argues that Article 58 was not validly adopted because the meeting agenda published in advance of the shareholders' meeting did not provide adequate notice of the proposed amendment. Gorga Rep. at 16-17. Article 124 of the BCL provides that the notice of the shareholder meeting "shall contain the agenda, and, in the case of an amendment to the bylaws, an indication of the subject-matter." Id. However, the agenda for the March 22, 2002 shareholders' meeting, at which Article 58 was approved, notified shareholders that a vote would be held on the reform of the Company's bylaws to promote "changes to enhance corporative governance practices and to move

toward fulfillment of requirements for listing in Level 2 of the
Sao Paulo Stock Exchange - BOVESPA." Cantidiano Reply Rep. ¶ 30
& App'x K. The requirements for such listing, in turn, included
adoption of an arbitration bylaw. Thus, this notice was
sufficient under Brazilian law. See id. ¶ 32 (quoting CVM
Opinion that notice is valid so long as subject matter of the
decided issue "is virtually or implicitly contained in" the
agenda).

Finally, defendants argue that plaintiffs who purchased
Petrobras securities both pursuant to U.S. transactions and on
the Bovespa must also arbitrate their Exchange Act claims. By
purchasing Petrobras shares on the Bovespa, they argue, this
subset of the class agreed to the arbitration provision of the
Company's bylaws. That provision encompasses all claims arising
from "rules applicable to the operation of the capital market in
general," which, defendants argue, includes the U.S. federal
securities laws.

However, it is a bedrock principle that "a party cannot be
required to submit to arbitration any dispute which he has not
agreed so to submit." AT&T Technologies, Inc. v. Communications
Workers of America, 475 U.S. 643, 648 (1986). "[A]s with any
other contract, the parties' intentions control." Cohen v. UBS
Fin. Servs., Inc., No. 14-781-CV, 2015 WL 3953348, at *2 (2d
Cir. June 30, 2015). As discussed above, as a matter of

Brazilian law, purchasing Petrobras shares on the Bovespa indicates the purchaser's consent to be bound by the arbitration clause in the company's bylaws. But nothing about such share purchases indicates that the purchaser consents to arbitrate different claims relating to different securities purchased in different transactions in another country (the United States). Accordingly, the Court finds that there is no valid arbitration agreement with respect to the Exchange Act claims.

Accordingly, in its Order of July 9, 2015, the Court granted defendants' motion to dismiss Counts III through V on the basis of the mandatory arbitration provision of the Company's bylaws, but denied defendants' motion to dismiss the Exchange Act Claims pursuant to that provision.

For the foregoing reasons, the Court, by Order dated July 9, 2015, granted in part and denied in part defendants' motion to dismiss.

Dated:    New York, NY
          July 30, 2015

                                        JED S. RAKOFF, U.S.D.J.

44