UNTED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| IN RE PETROBRAS SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) | 14-cv-9662 (JSR)  **FIRST AMENDED COMPLAINT** |

This Document applies to: 15-cv-7568 (JSR)

_____ )

Plaintiffs, WGI Emerging Markets Fund, LLC, Board of Regents of The University of Texas System, Robert K.W.H. Nobriga, Corbett Aaron Kamohaikoikalani Kalama, Micah A. Kane, and Lance Keawe Wilhelm, as Trustees of the Estate of Bernice Pauahi Bishop, acting in their capacity of such trustees, and Bill & Melinda Gates Foundation Trust ("Plaintiffs"),[1] by their undersigned attorneys, as their First Amended Complaint ("Complaint") against Defendants, Petroleo Brasileiro S.A. — Petrobras ("Petrobras" or the "Company") and PricewaterhouseCoopers Auditores Independentes ("PwC") (Petrobras and PwC collectively, "Defendants"), allege as follows:

<u>**Introduction**</u>

1.     This action is to recover damages for losses Plaintiffs suffered as a result of their purchase of American Depository Shares (ADS) issued by Petrobras. As explained in greater detail below, Plaintiffs purchased ADS on the New York Stock Exchange between January 2,

_____

[1] This Complaint is being filed to add claims by two additional plaintiffs that were not joined in the initial complaint, namely Board of Regents of The University of Texas System and the Kamehameha Schools (as defined in paragraph 18 below).

2009 and September 24, 2015, inclusive (the "Relevant Period") in reasonable reliance on materially misleading statements Defendants made about Petrobras and its ADS.

2.      This case arises from a pervasive bribery and money laundering scheme carried out by Petrobras and willfully ignored by PwC.  Senior Petrobras executives have admitted to the conspiracy and described it in detail, Switzerland and Monaco have frozen over $400 million in secret bank accounts held by Petrobras executives and other co-conspirators, and Petrobras and PwC have now ***admitted*** that Petrobras' financial statements overstated the value of Petrobras' assets and profitability by at least ***$17 billion***, a figure which is likely understated and will only continue to grow.

3.      The depth and breadth of the fraud within Petrobras is astounding.  By Petrobras's own admission, the kickback scheme infected over $80 billion of its contracts, representing approximately one-third of its total assets.  Equally breathtaking is that the fraud went on for years under PwC's watch, who repeatedly endorsed the integrity of Petrobras' internal controls and financial reports.  This is not a case of rogue actors.  This is a case of institutional corruption, criminal conspiracy, and a massive fraud on the investing public.

4.      On September 7, 2014, the truth began to come out when it was revealed that Paulo Roberto Costa ("Costa"), Petrobras' former Chief Downstream Officer and a member of the Company's seven-member "Executive Directorate," admitted to conspiring with other Petrobras senior executives, a cartel of Brazilian construction and engineering firms ("Cartel"), and Brazilian politicians, to systematically rig bids and inflate construction and engineering contract prices by up to 20% in exchange for 3% kickbacks to Petrobras executives and their political allies.  As Costa's and others' sworn testimony reveals, this "cartelization" and bribery scheme was "institutionalized" at Petrobras and sanctioned at the highest echelons of Petrobras.

2

5.      Petrobras not only hid the fraud from the investing public, it repeatedly trumpeted the Company's internal controls, financial reporting, and corporate governance in its public statements.   These materially false and misleading statements and omissions allowed the Company to raise a mountain of public equity to fund major capital projects, including a ***$70 billion*** public equity offering in 2010, the largest ever by any company.   Despite investor and analyst complaints and inquiries about the skyrocketing costs of Petrobras's massive capital projects – for example, an $18 billion refinery originally estimated to cost only $4 billion – Petrobras repeatedly but falsely assured the market that its internal controls were rigorous, its bidding was competitive, and that it was simply a victim of unanticipated market, weather, environmental and technical challenges.   Plaintiffs relied on the Company's materially false representations and omissions in deciding to invest in Petrobras securities, and they would not have done so if the Company had disclosed the bid rigging and kickback scheme.

6.      Likewise, PwC's intentional and grossly negligent conduct violated its most basic professional duties as Petrobras's independent auditor.   As both PwC and Petrobras have now admitted, not only was the bid rigging scheme criminal, it caused the Company's financial statements to be materially false and misleading during the Relevant Period, because Petrobras capitalized the bribes and inflated contracts as ***assets***—booked under Property, Plants & Equipment ("PP&E")—a blatant violation of U.S. Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting Standards ("IFRS").

7.      Importantly, PP&E represented up to a staggering <u>70% of the Company's assets</u> during the Relevant Period.   Despite the materiality of PP&E to the Company's financial condition and results, and despite analysts' complaints and other public scrutiny concerning delays and cost overruns with respect to the Company's most significant capital projects, PwC

failed to investigate the Company's inflated contracts with Cartel members.   Instead of performing reasonably competent audits of the Company's key assets, which were subject to a great deal of public scrutiny, PwC assured Plaintiffs and other investors in writing that the value of the Company's PP&E was fairly presented in the Company's financial statements, and that the Company's internal controls and financial reporting practices were strong.   These representations were materially false and misleading.   Plaintiffs relied on these statements in deciding to invest in Petrobras stock, and they would not have done so if PwC's conduct had conformed to its professional obligations and had uncovered fundamentally corrupt bidding practices and artificially inflated contract prices with respect to <u>$80 billion of the Company's contracts,</u> <u>accounting for fully one-third of the Company's assets</u>.

8.      Throughout the Relevant Period, Plaintiffs' portfolio managers studied the company's financials, attended investor days, traveled around the U.S. and to Brazil to speak with Petrobras management, and otherwise followed Petrobras closely.   Their diligence was extensive.   In one-on-one meetings and in other forums, Plaintiffs' portfolio managers personally and repeatedly questioned Petrobras executives on cost overruns and delays associated with the Company's major capital projects, but these executives always had detailed "innocent," and internally coherent, explanations: the local infrastructure was inadequate, the technical and environmental challenges were worse than expected, or project modifications were required. These explanations were consistent with those given by Petrobras in its earnings presentations and in its other communications with Petrobras investors, many of whom shared Plaintiffs' concerns.   They were also consistent with PwC's written assurances that the Company's financial statements fairly presented its financial condition, and that its internal controls were strong.   Indeed, before the fraud came to light, Petrobras executives even stressed to Plaintiffs'

portfolio managers in one-on-one conversations that PwC had rigorously tested the Company's assets for possible impairment and concluded none were warranted.  What these executives knew but failed to disclose in these communications, however, was that the delays and cost overruns in these major capital projects were in fact caused by a multi-billion dollar, long-running bid-rigging and bribery scheme.

9.      Plaintiffs' claims arise from a series of materially false and misleading written and oral statements and/or omissions made by Petrobras and/or PwC to the public at large and specifically to Plaintiffs[2] concerning, among other things, (i) the existence of a kickback and bribery scheme; (ii) Petrobras's conspiring with the Cartel to fix bids on major contracts at inflated values;  (iii) the value of Petrobras's assets, including PP&E, and the value Petrobras's shareholder equity; (iv) Petrobras's profitability and expenses; (v) Petrobras's compliance with GAAP and IFRS; (vi) the integrity and reliability of the Petrobras's internal controls and financial reporting; (vii) the integrity and reliability of PwC's audits of Petrobras, purportedly in accordance with professional and industry standards; and (viii) PwC's false assurances that Petrobras's financial reports accurately represented the Company's financial condition and that its internal controls did not suffer from material weaknesses.

10.      Plaintiffs relied on Defendants' material misstatements and omissions in making their decision to invest in Petrobras's securities over the Relevant Period.  In fact, as all of the Defendants actually knew or were reckless in not knowing, the representations and/or omissions were not true at the time they were made.  Each of the false and misleading statements and omissions set out in detail below were material, and each of them induced Plaintiffs to purchase

---

[2] In this Complaint, where Plaintiffs allege that they have relied on the materials described herein or participated in meetings with Petrobras and others, they have done so through the acts of their investment advisers, including without limitation Westwood Global Investments LLC and certain other managers.

the Company's securities and materially affected the price at which the securities were purchased.  Each of these misstatements and/or omissions was reiterated to Plaintiffs in written and oral presentations and in one-on-one discussions with the Company.  Each of them caused Plaintiffs' losses.

11.     The truth concerning Petrobras' fraudulent scheme, and PwC's willful blindness to it, began to be revealed in part through a series of corrective disclosures beginning on September 7, 2014, when the extensive testimony provided by Costa – nicknamed the "human bomb" in the Brazilian press – became public.  The disclosure of Costa's testimony, along with the ensuing investigations, arrests, guilty pleas, and other fallout, including the $17 billion write-down in April 2015, has caused Petrobras's stock price to fall dramatically.  The scandal escalates by the day – as more guilty pleas, more arrests, and more secret bank accounts are uncovered – but there has yet to be a full accounting of either the magnitude of the scandal or the extent to which it artificially inflated the price of the Petrobras ADS Plaintiffs purchased.

12.     As a result of Defendants' wrongful conduct and material misstatements and omissions, Plaintiffs have lost tens of millions on their Petrobras investments.  Since September 5, 2014, the day before the Costa testimony was revealed, Petrobras' common and preferred American Depository Shares ("ADSs"), in which Plaintiffs invested, have fallen by over 50%.  They have declined even further as additional aspects of the fraud are revealed. Plaintiffs have filed this suit to recover those losses and hold Petrobras and PwC responsible for their misconduct.

## Jurisdiction

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Jurisdiction is also conferred by 28 U.S.C. § 1367.

14.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Petrobras maintains an office in this District, sponsors ADSs representing the Company's common and preferred equity that are listed on an exchange located in this District, and certain of the acts that constitute the violations of law complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District.

15.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## Parties

16.    Plaintiff WGI Emerging Markets Fund, LLC ("WGI"), is an open-ended private investment fund managed and advised by Westwood Global Investments, LLC, a Massachusetts limited liability company. The Fund's overall investment objective is to invest in equity securities of companies operating within developing world markets.  WGI is organized as a Delaware Limited Liability Company, and its principal place of business is located at 99 Summer Street, Suite 1130, Boston, Massachusetts 02110.

17.    Plaintiff Board of Regents of the University of Texas System ("UT Board of Regents") is the governing body of The University of Texas System.  The University of Texas

System is an instrumentality of the State of Texas empowered by the Texas Constitution, with its principal office and place of business in Austin, Texas.  The UT Board of Regents oversees the Permanent University Fund, a public endowment contributing to the support of eligible institutions of The University of Texas System and The Texas A&M University System as provided in Article VII, Section 18 of the Texas Constitution, The University of Texas General Endowment Fund, and its Intermediate Term Fund, among other funds, on whose behalf its managers purchased the Petrobras securities at issue.  These Funds' investments in Petrobras's ADSs at issue in this Complaint are managed by The University of Texas Investment Management Company, Westwood Global Investments, LLC, a Massachusetts limited liability company, and certain other investment managers.

18.     Plaintiffs Robert K.W.H. Nobriga, Corbett Aaron Kamohaikoikalani Kalama, Micah A. Kane, and Lance Keawe Wilhelm, the Trustees of the Estate of Bernice Pauahi Bishop, also known as Kamehameha Schools ("Kamehameha Schools"), a Hawaii charitable educational trust, have their principal place of business in the City and County of Honolulu, State of Hawaii, and file this action in their capacity as such trustees.  Kamehameha Schools operates a private school system in Hawaii serving more than 48,000 learners annually at pre-school and K-12 sites, and additionally operates extensive community outreach programs throughout Hawaii. Kamehameha Schools' investments in Petrobras's ADSs at issue in this Complaint are managed by Westwood Global Investments, LLC, a Massachusetts limited liability company.

19.     Plaintiff Bill & Melinda Gates Foundation Trust (the "Trust") manages assets for the benefit of the Bill & Melinda Gates Foundation.  The Trust is organized as a trust under the laws of the State of Washington, and its principal place of business is located in the State of

Washington.   The Trust's investments in Petrobras's ADSs at issue in this Complaint are managed by Westwood Global Investments, LLC, a Massachusetts limited liability company.

20.     All Plaintiffs purchased Petrobras ADS on the New York Stock Exchange during the Relevant Period.   Each Plaintiff's purchases were made in reasonable reliance on Defendants' false statements about Petrobras and its securities, as described in further detail below.

21.     Defendant Petrobras is a corporation organized under the laws of Brazil, and its principal place of business is located at Avenida Republica do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil.   The Company's common and preferred shares are listed on the Bovespa index in Brazil, trading under the ticker symbols "PETR3" and "PETR4," respectively. Since 2000, Petrobras has also issued ADSs listed on the New York Stock Exchange which represent the Company's common and preferred equity, trading under the ticker symbols "PBR" and "PBR/A," respectively.

22.     Defendant Pricewaterhousecoopers Auditores Independentes (PwC) is a member firm of PricewaterhouseCoopers International Limited. PWC has its principal place of business at Av. Francisco Matarazzo, 1400 - Água Branca, São Paulo - SP, Brazil. PWC served as Petrobras' independent auditor from January 2012.   On January 16, 2012, Petrobras signed a contract with PwC, under which PwC was hired to provide specialized technical accounting audit services for the years 2012, 2013 and 2014.

**Factual Background**

23.     In March 2014, Brazilian police raided Costa's Rio de Janeiro home as part of a bribery and money laundering investigation dubbed "Operation Car Wash," seeking a key to his locked office.  At the same time, a security camera caught his two daughters and sons-in-law in that very locked office stuffing bags with cash and incriminating documents, in a panicked attempt to destroy evidence of the kickback scheme.  Since then, Brazilian police have recovered $500,000 in cash, $28.5 million in Swiss bank accounts, a Land Rover, and other assets from Costa.  When police threatened to prosecute his family, Costa agreed to cooperate with their investigation.  By September 2014, Costa's sworn testimony had implicated dozens more – including Petrobras executives, Cartel members, and high profile Brazilian politicians – who would soon be arrested or plead guilty to participating in the long-running bid rigging and bribery scheme.

24.     Petrobras was incorporated in 1953 as a wholly-owned government enterprise responsible for all oil and gas activities in Brazil.  From that time until 1995, it had a government-granted monopoly for all crude oil and natural gas production and refining activities in Brazil.  As a result of constitutional and statutory reforms from 1995-2002, Petrobras's legal monopoly was dismantled, and the Brazilian government began to deregulate prices.  This deregulation transformed Brazil's oil and gas industry and led to increased participation by international companies in all segments of Petrobras's business.  By law, however, the Brazilian government continues to own a majority of the Company's voting shares, and has the power to appoint a majority of the Company's Board of Directors and its "Executive Directorate," made up of the Company's CEO and six senior executives, who, together with the Board of Directors, are responsible for the Company's day-to-day management.

25.     Petrobras first entered the U.S. public equity markets with a $4 billion offering of ADSs in August 2000, as part of a reduction of the Brazilian government's stake from over 80% to 55% and the continued opening of Petrobras's business to foreign partners, investors, and contractors.   By May 2006, U.S.-listed ADSs accounted for approximately 27% of the Company's common shares and 37% of the Company's preferred shares.  By 2006, the Company was growing steadily, and was producing approximately 2.3 billion barrels of oil per day.

26.     Petrobras's need for capital exploded in 2006 with its discovery of several huge "pre-salt" oil fields off the Brazilian coast, beginning with the October 2006 discovery of the "Lula" field in the Santos basin.  The Lula field was estimated to contain from 5 to 8 billion barrels of oil, but was located in extremely harsh conditions, below 6,600 feet of water and 16,000 feet of salt, sand, and rocks.   Several similar pre-salt fields, with similar technical challenges, were soon discovered nearby.   These discoveries were the most significant oil discoveries in South America in decades, and quickly transformed Brazil into an oil and gas powerhouse with incredible, perhaps unprecedented, growth prospects.

27.     In order for Petrobras to exploit these pre-salt fields, the Company was required to invest billions of dollars in "upstream" exploratory drilling, oil rigs, and infrastructure.  Indeed, it could cost over $100 million to develop a single well, and at least several hundred wells would be required to exploit the pre-salt fields.  At the same time, Petrobras planned to transform its "downstream" operations so that it could refine these huge quantities of oil and gas and reduce Brazil's dependence on imports.   These projects, including major refineries, were likewise incredibly expensive and required huge capital investments in real estate, construction, pipelines, roads and other infrastructure.

28.     On the heels of these major discoveries, on August 14, 2007, Petrobras announced an ambitious strategic plan, calling for $112.4 billion in capital expenditures through 2012 to develop these resources—amounting to a staggering ***$22.5 billion per year***.  This business plan envisioned that Petrobras would nearly ***double*** its daily production of oil and gas from 2.3 billion barrels per day in 2006, to 4.2 billion barrels by 2015.  The plan also envisioned nearly doubling domestic refining capacity from 1.4 billion barrels a day in 2006, to 2.4 billion barrels a day in 2015.

29.     The market rewarded Petrobras for these impressive growth prospects, and the price of its ADSs soared.  By summer 2008, the Company's market capitalization peaked at over ***$250 billion***, making it one of the largest publicly held companies in the world.  Today, following the collapse in the Company's share price as a result of the bribery scandal, its market capitalization has fallen to approximately $60 billion, down over 80% from its 2008 peak.

30.     On June 14, 2012, Petrobras announced an even more aggressive strategic plan which called for the Company to make an additional $236.5 billion in capital expenditures through 2016—or, an even more staggering target of ***$47.3 billion per year***.  The Company also announced its goal to produce 5.7 billion barrels of oil per day by 2020, much higher than its prior target of 4.2 billion barrels by 2015.

31.     Petrobras relied heavily on its access to U.S. securities markets to raise the mountain of capital necessary to achieve its ambitious growth targets.  On September 3, 2010, Petrobras raised over $7 billion through the issuance of common and preferred ADSs on the New York Stock Exchange.  Combined with a concurrent equity offering in Brazil, this September 2010 equity issuance, totaling $70 billion, was the largest in history by any company.  In marketing the offering to investors, Petrobras claimed that it would use the proceeds to make

capital investments pursuant to its strategic business plan, including the funding of a $42 billion payment to the Brazilian government in exchange for the right to develop certain pre-salt fields.

32.     In order to raise this massive amount of capital in the U.S., Petrobras represented to investors and ratings agencies that (i) it met the requirements of the Sarbanes-Oxley Act ("SOX") and was subject to "oversight by the Securities and Exchange Commission in the U.S. ("SEC"), and to all the rules of governance and disclosure of relevant information to the market"; (ii) its financial statements were accurate, and (iii) it would provide accurate financial information and make other disclosures to investors periodically in accordance with U.S. listing guidelines.  These representations were vitally important to U.S. investors who wished to buy a stake in a fast-growing oil and gas company, but needed assurances that Petrobras would be a prudent steward of the huge capital infusion necessary to meet its growth targets.

33.     Additionally, pursuant to Section 404 of SOX, beginning with the Company's Annual Report on Form 20-F for the fiscal year ending December 31, 2006, Petrobras was required to furnish, and did furnish, a report by management on its internal control over financial reporting.  This report contained, among other things, an assessment of the effectiveness of the Company's internal controls over financial reporting, concluding (falsely) that its internal controls over financial reporting were effective.  This assessment was required to include disclosure of any material weakness in internal control over financial reporting identified by management, but the Company disclosed none.  Additionally, pursuant to SOX, the Company's financial reports were required to contain a statement that its outside auditors had issued a certification report on management's assessment of such internal controls – which in every case since PwC signed on in 2012, was included in the Company's annual financial statements without qualification.

34.     The Company conducted extensive outreach to investors in the U.S., including Plaintiffs, through roadshows, investor days, individual meetings, earnings calls, and other communications.  With such huge quantities of cash in its coffers, the Company's representations to Plaintiffs and other investors concerning its internal controls and financial discipline, including its SOX representations, were critical to its access to U.S. capital markets, which in turn was necessary for the success of the Company's announced investment plans and business strategy.

35.     At the same time, the billions in cash raised from U.S. public equity markets also presented enormous opportunities for graft, dishonesty, and fraud.  Despite Petrobras's promises to investors that it would prudently invest and safeguard their cash it raised in the American securities markets, the temptation to defraud investors proved too strong.   Instead of safeguarding and prudently investing this capital, Petrobras orchestrated and participated in a criminal conspiracy with its political allies and the Cartel to fix the prices of major contracts at highly inflated values—up to 20% higher than warranted—in exchange for the personal enrichment of Petrobras executives and favored politicians and political parties.   PwC was willfully blind to the scheme, and pocketed $7.7 million for its 2012 work, and $8.6 million for its 2013 work on audits and financial reports that concealed, rather than revealed, the fraud and its magnitude.

### Petrobras Has *Admitted* the Fraudulent Scheme and Taken a $17 Billion Writedown

36.     Petrobras (and PwC) have now ***admitted*** to the basic structure of this long running kickback and bid-rigging scheme.   On April 22, 2015, after a several-month delay, and as evidence of the scheme mounted and began to paint a picture of a multi-billion dollar fraud, Petrobras released its Third Quarter 2014 financial statements. These statements included a ***$17***

***billion writedown*** to correct Petrobras's prior false and misleading financial statements.  In this

April 22, 2015 earning announcement, Petrobras described the basic structure of its fraudulent

scheme as follows:

> According to the information available to the Company described above, under the payment scheme, **a large number of contractors and suppliers colluded with the former Petrobras personnel to overcharge Petrobras under construction contracts** and contracts to provide Petrobras with goods and services, and **used the overpayments to make improper payments to political parties, elected officials or public officials, individual contractor personnel, or the former Petrobras personnel.**
>
> **[…]**
>
> **In addition to the payment scheme, the investigations identified several other specific instances in which Petrobras was overcharged in connection with the acquisition of [PP&E].**  The amount that Petrobras was overcharged was used to make unrelated payments to Petrobras personnel.
>
> **[…]**
>
> **These records reflect the terms of the contract entered into by the Company, which entailed payments that were inflated because of the conspiracy among the cartel members and the former Petrobras personnel to overcharge Petrobras**.

37.     The conduct described by Petrobras itself is obviously criminal in nature.  By

Petrobras's own admission, Petrobras executives "colluded" with a "large number of

contractors" to "overcharge Petrobras under construction contracts" and "used the overpayments

to make improper payments to political parties, elected officials or public officials, individual

contractor personnel, or the former Petrobras personnel."  As this stunning admission shows,

Petrobras has now acknowledged essential elements of its fraud: the awarding of inflated

contracts to the Cartel, as well as the kickbacks to Petrobras executives and their political allies.

38.     Setting aside the criminal nature of the scheme, Petrobras (and PwC) have also

admitted that their failure to disclose the bribes and properly account for them as expenses, rather

than assets, rendered Petrobras's financial statements materially false and misleading throughout the Relevant Period.  Both GAAP (which governed the Company's financial statements prior to January 1, 2011) and IFRS (which governed the Company's financial statements after January 1, 2011) prohibited Petrobras's capitalization of bribes and inflated costs as "assets" or "property plant and equipment" entries in the Company's financial statements.

39.     IFRS's International Accounting Standard ("IAS") 16 states that "[a]n item of [Property Plant & Equipment or "PPE"] that qualifies for recognition as an asset shall be measured at its cost," where "cost" is defined as "the amount of cash or cash equivalents paid or the fair value of the other consideration given to acquire an asset at the time of its acquisition or construction."  Similarly, under GAAP, Accounting Standards Codification ("ASC") 360, companies may record the "historical cost" of PP&E, which includes only "the costs necessarily incurred to bring it to the condition and location necessary for its intended use."

40.     Petrobras and PwC have now admitted that the bribes received by Petrobras executives and their political allies, as well as the fraudulent overpricing of contracts awarded to the Cartel, were not "costs" of the assets under IFRS's IAS 16 because they were not "given to acquire an asset at the time of its acquisition or construction."  Likewise, Petrobras and PwC have admitted that these amounts were not "necessarily incurred to bring [the asset] to the condition and location necessary for its intended use" under GAAP's ASC 360.  Thus, instead of treating the bribes and inflated contracts as assets and capitalizing them under PP&E, it should have accounted for them as *expenses*.  By failing to do so, and by capitalizing the costs of kickbacks, Petrobras materially overstated the value of its assets, profitability, and shareholder equity throughout the Relevant Period.

41.     Petrobras and PwC have now formally admitted that this error rendered the Company's financial statements false and misleading when they were issued. Petrobras has now recorded a $2.5 billion write-down to re-characterize the 3% kickbacks as expenses, and not assets booked under PP&E.   The Company and PwC described the rationale for the recharacterization as follows:

> As previously mentioned, **Petrobras believes that under IAS 16, the amounts it overpaid pursuant to the payment scheme should not have been included in the historical cost of the [PP&E]**. Therefore, under Brazilian tax legislation, **this write-off is considered a loss resulting from unlawful activity** and subject to the evolution of the investigations in order to establish the actual extent of the losses before they can be deducted from an income tax perspective.
>
> […]
>
> The Company included in its historical cost for property, plant and equipment all of the amounts paid under the affected contracts.  **However, the Company believes that the amount of its contract payments representing overpayments to contractors and suppliers pursuant to the payment scheme should not have been capitalized as property, plant and equipment**.
>
> […]
>
> Based on the available information described above, **the Company concluded that the portion of the costs incurred to build its [PP&E] that resulted from contractors and suppliers in the cartel overcharging the Company to make improper payments should not have been capitalized**.

42.     This conclusion was consistent with management's prior statement to investors in a November 17, 2014 conference call, after announcing it would delay its Third Quarter 2014 financial statements as a result of the bribery scandal.  Specifically, the Company's former Chief Financial Officer, Almir Guilherme Barbassa ("Barbassa"), stated to investors on that call that "a fixed asset, PP&E … should not include values which are not a fair value for that good or service" and that "the way we see this now, **we would deduct from [PP&E] any amount that could be linked to bribery of any sort, any excessive price that would have been charged**,

17

which would be the case for adjustments resulting from the facts, as we know from today, from this date."

43. The Company's former CEO Maria das Graças Silva Foster ("Foster") echoed CFO Barbassa's statement in the November 17, 2014 conference call, noting that the Company has an "obligation to write off from the asset a cost related to corruption for the asset can give us the best return possible.  But still, **if there is a cost related to corruption in the value of that asset, even if the asset can pay off that cost, you have an obligation to write off that cost, you have to discount that cost. Okay**?"

44. Additionally, in a conference call with investors on January 29, 2015, CEO Foster explained that "[w]e need to rectify the error" of "values improperly recognized in the company's PP&E due to corruption.  As I said the depositions of Mr. Paulo Roberto Costa, Mr. Julio Camargo, Augusto Mendoca, and Youssef to which Petrobras had access has borrowed evidence.  I mentioned a list of suppliers and contractors, 23 companies in total involved in the alleged misconduct.  And depositions state that the improper payments averaged 3% of the total price of the contracts involved."

45. Reflecting both the indisputable evidence and institutionalization of the scheme, the Company's methodology to estimate the value of the unlawful kickbacks was simply to identify and calculate 3% of *every single contract* entered into between Petrobras and the Cartel members between 2004 and April 2012.  In other words, Petrobras has admitted that the bribes were so pervasive that they likely infected *each and every* contract entered into with a member of the Cartel from 2004 to April 2012.  The Company explained its methodology as follows:

> **The estimate assumes that all contracts with the identified counterparties were affected and that 3% represents the amount by which the Company overpaid on those contracts.  Both assumptions are supported by the testimony**, even though some testimony indicated lower percentages with respect

to certain contracts, a shorter period (2006 to 2011), or fewer contractors involved.

[…]

**[T]he information available to the Company is, in general, consistent in terms of the individuals and companies involved in the payment scheme, the period during which the payment scheme was in effect, and the percentage of overcharging applied over the total contract values under affected contracts** and used to fund the improper payments made by contractors and suppliers.

46.     As these statements show, Petrobras has been forced to admit that the testimony of Petrobras executives and others was "consistent in terms of the individuals and companies involved" as well as in terms of "the period during which the payment scheme was in effect, and the percentage of overcharging applied over the total contract values under affected contracts." In other words, Petrobras and PwC were convinced by the evidence – principally the testimony of Costa, Carmago, Mendoca, and Youssef, each of whom is discussed below in more detail – that *every single one of the Company's contracts with the Cartel* was likely infected by a 3% kickback.   Using this methodology, the Company and PwC estimated that $2.5 billion in "improper payments" were made to Petrobras executives, political officials, and contractors over that eight-year period.[3]

47.     Petrobras also prepared a summary table identifying the total value of its contracts with the Cartel from 2004 to April 2012 in each of its business segments, and quantifying the amount of write-offs by business segments:

---

[3] As is explained in greater detail below, this write-down—based as it was on a uniform *assumption* of a 3% inflation and kickback amount—likely understates the magnitude of the fraud (and the artificial inflation of Petrobras's assets) by additional billions of dollars.

| "Write-off – overpayments incorrectly capitalized" | E&P | RTM | GAS & POWER | DISTRIB. | INTER. | CORP. | TOTAL |
|---|---|---|---|---|---|---|---|
| Payment scheme: | | | | | | | |
| Total contract amounts [*] | 25,573 | 45,233 | 8,663 | 309 | 307 | 1,355 | 81,440 |
| Estimated aggregate overpayments (3%) | 767 | 1,358 | 260 | 9 | 9 | 41 | 2,444 |
| Unrelated payments (outside the cartel) | 57 | – | 4 | – | – | – | 61 |
| | 824 | 1,358 | 264 | 9 | 9 | 41 | 2,505 |
| Reversal of depreciation of the affected assets | (35) | (81) | (21) | – | – | (4) | (141) |
| Impact on property, plant and equipment | 789 | 1,277 | 243 | 9 | 9 | 37 | 2,364 |
| Write-down of tax credits related to affected assets [**] | 15 | 121 | 23 | – | – | 4 | 163 |
| Write-off – overpayments incorrectly capitalized | 804 | 1,398 | 266 | 9 | 9 | 41 | 2,527 |

[*] Of this amount, US$ 17,999 represents amounts scheduled to be paid after September 30, 2014.
[**] Write-down of tax credits that will not be applicable in the future.

48.     On April 22, 2015, in addition to the $2.5 billion writedown which corrected for the improperly accounted for 3% kickbacks, the Company also took a $14.7 billion impairment charge attributable to, among other things, ":(i) project planning deficiencies; (ii) the use of a higher discount rate, reflecting a specific risk premium for the postponed projects; (iii) a delay in expected future cash inflows resulting from postponing the project; and (iv) the Company's business context of lower projected economic growth."

49.     The largest impairments were taken on two major Brazilian refineries central to the bid rigging and kickback scheme: the Comperj refinery ($8.2 billion impairment charge) and the second refinery unit at Abreu in Northeast Brazil ($3.4 billion impairment charge), both of which are described in detail below.  Thus, the $14.7 billion impairment charge was largely attributable to the bribery scandal, as the scandal, and the facts underlying it, directly caused "project planning deficiencies," the "delay in expected future cash inflows" and the increased "risk premium" for the projects.

**Petrobras Financials Are Overstated by Billions More**

50.     Petrobras and PwC have also admitted that "the amount of [the Company's] contract payments representing overpayments to contractors and suppliers pursuant to the payment scheme should not have been capitalized as [PP&E]" and will likely require Petrobras and PwC to grapple with the evidence that up to *20%* of its contract values represented

"overpayments … pursuant to the payment scheme." Thus, although Petrobras has taken a $2.5 billion write-down to reflect a uniform assumption that kickbacks amounted to 3% of the contract price, it has yet to account for the excessive costs of the overpayments that resulted from the scheme. Thus, though the "3% write-down" has impaired its contracts with the Cartel by approximately $14.7 billion, Petrobras will likely be forced to take additional charges to reflect the fact that its contracts with the Cartel were not merely inflated by 3% (the value of the kickback), but instead were inflated by up to 20% as a result of the kickback and bid-rigging scheme. Based on the admissions of Petrobras and PWC, these "overpayments" were additional misstatements of Petrobras's assets and Property Plant & Equipment. Petrobras has tacitly acknowledged another write-down and restatement could be required; as it stated in its delayed quarterly financial reports, "**Petrobras believes that under IAS 16, the amounts it overpaid pursuant to the payment scheme should not have been included in the historical cost of the [PP&E]**." Thus, the Company will likely be forced to take further write-downs representing up to an additional 17% by which its contracts were overpriced as a result of the illegal bid rigging and kickback scheme.

51.     Petrobras's admission in this regard is required by both GAAP and IFRS, which prohibit the booking of inflated contract prices as assets where the inflation is attributable to illegal conduct such as a bid-rigging scheme. Specifically, under GAAP ASC 360, a company may record the "historical cost" of PP&E as an asset, defined as the "cost[] necessarily incurred to bring [the asset] to the condition and location necessary for its intended use." It is plainly unnecessary to inflate contract prices by 20% to facilitate a bid rigging and kickback scheme, so any portion of the contract prices above the 3% kickback associated with bid rigging, is not properly booked as an asset under PP&E. Likewise, the Company itself explained that

"Petrobras believes that under IAS 16, the amounts it <u>overpaid</u> pursuant to the payment scheme should not have been included in the historical cost of 'PP&E.'"

52.     Furthermore, Petrobras itself relied on the testimony of key participants in the bid rigging and bribery scheme in deciding to take a writedown for the estimated value of 3% the kickbacks.  Petrobras and PwC cannot credibly take the position that this testimony is reliable to the extent it revealed 3% kickbacks to Petrobras executives, politicians, and political parties, yet unreliable to the extent it revealed a criminal conspiracy to fix contract prices by up to <u>20% more</u> than warranted.  The Company's and PwC's apparent decision to ignore the price inflation attributable to fraud – above and beyond the 3% kickbacks – cannot be squared with its previous admissions concerning the reliability of the public testimony and the impropriety of counting <u>any</u> <u>fraudulent overpayments</u> as assets under PP&E.

53.     Indeed, in connection with the Company's long-delayed release of its financial results in April 2015, certain members of Petrobras's Board of Directors objected to the Company's failure to further write down the value of PP&E connected to major refinery assets because of these concerns.

54.     For example, Board member Mauro Rodrigues Da Cuhna voted not to approve the Company's financial statements for year-end 2014 in part because he concluded that the Company had not written down the value of the Comperj and Abreu assets sufficiently. Specifically, Mr. Cuhna's written explanation for his vote stated as follows:

> Last year, I commented for "apparent inappropriateness of the booking of investment in refineries." I reiterate my vote this year.
>
> The facts appearing in 2014 and 2015 corroborated that the financial statements of 2013 presented inappropriate values in fixed assets. Additional to accusations in Operation [Car Wash], and <u>the excessive discrepancies between costs of the</u> <u>[Abreu] and Comperj project and international metrics</u>, we obtained further evidence of the problem based on the independent evaluation contracted by the

Executive Directors to analyze assets impacted by corruption accusations. The divergence between fair value and book value – although useless for immediate book recording under the terms in CPC 01 – made clear that there was something wrong with parameters used by the Company to make the impairment tests to date.

We see this moment the presentation of a recording of a difference that in my opinion is not related with the dimension of the asset overvaluation.

Specifically, we have been informed that the refinery assets suffering losses are limited to [Abreu] - Trem 2 and Comperj projects - essentially due to the recent decision by the department of postponing those investments. In other words, the loss was basically due to this decision, and not (apparently) due to the overvaluation of the assets, existing since 2013. Values are not related therefore with those found by independent evaluators …

I cannot agree with this approach.

As example, based on the numbers showed by the administration of Refinaria Abreu e Lima, our books present the amazing figure of 27X EBITD. The proposed impairment would cause this indicator to be 22X – much higher than any acceptable parameter. The same should be true to Comperj, and even for other refineries, that received significant investments in recent years (including installation of HDT units).

55.    Mr. Cuhna's concern was that there was something fundamentally flawed in the Company's (and PwC's) impairment testing with respect to the Abreu and Comperj refineries. Even after the $17 billion writedown, Mr. Cuhna notes that the valuation of those refineries on the Company's books (22 times EBITD) is still "much higher than any acceptable parameter." Mr. Cuhna's critique further pointed out the "excessive discrepancies between costs of the [Abreu] and Comperj project and international metrics."  Contrary to the Company's prior false representations, this "excessive discrepancy" was not due to market and technical challenges, but instead was due to a massive bid rigging and kickback scheme.  The $17 billion earnings charge, however, does not fully grapple with that excessive discrepancy, which is directly attributable to the fraudulent conspiracy.

56.     Indeed, Board Members Reginaldo Ferreira Alexandre and Walter Luis Bernardes Albertoni agreed with Mr. Cuhna's critique, and explained that they objected to the Company's 2014 financial statements in part because "[t]he volume of the difference between fair value and book value [with respect to Abreu and Comperj] made it clear that <u>there was something very wrong with the parameters that have been used by the Company to perform asset impairment tests</u>."

57.     Likewise, Board member Silvio Sinedino objected to the Company's $17 billion writedown as inadequate.  Mr. Sinedino noted that in its initial attempt to calculate the write-off, following PwC's recommendation, "the Company contracted two external consulting firms that, independently, evaluated the write off at [an] incredible [$30 billion], <u>an amount that even surprised PwC, thus causing the need to use a different calculation method</u>.  Then the decision was made to write off a percentage for corruption in projected identified as corrupted, using the concept of UGC (Cash Generating Unit) … I agree with the use of UGC, but <u>I cannot agree that units in operation as the first part of Abreu do not have individual cost write off when it is known that by the average maximum international cost they should have a cost of US$35 thousand/capacity of refined barrel, and at Abreu we have US$81 thousand/capacity of refined barrel.</u>"

58.     In other words, Mr. Sinedino, like several other directors, believed that the Company's $17 billion writedown failed to adequately write down the value of the Abreu and Comperj refineries.  Like Mr. Cuhna, in light of the corruption scandal, Mr. Sinedino was concerned about the discrepancy between the cost of the Abreu refinery and the cost of similar international projects.  As we now know, yet the Company and PwC have failed to fully grapple

with, this discrepancy was caused by the bid rigging and kickback scheme, and not market and technical challenges as the Company had previously and falsely represented.

59.     Therefore, in all likelihood, Petrobras's PP&E is still overvalued and the Company may be forced to take additional write-downs, perhaps up to ***$14 billion***—representing up to the additional 17% cost inflation multiplied by the $81.4 billion in total contracts awarded to the Cartel as revealed in the Company's summary table replicated at Paragraph 47 above.

### The Kickback Scheme

60.     Taken together, the publicly released witness testimony, the arrests, and the frozen assets give rise to a strong inference not just of a fraudulent scheme to inflate the value of Petrobras assets and its ADS, but that this scheme was implemented through intentional misstatements and wrongdoing that was intended to and did mislead investors, including Plaintiffs. Petrobras and PwC were forced to admit that the scheme likely infected ***each and every one*** of the Company's contracts with the Cartel from 2004 through April 2012.  The scheme involved Petrobras executives conspiring with members of the Cartel to rig bids on major contracts, so that the contracts would be awarded to pre-selected members of the cartel, who each were given their "turn" to win these rigged contracts, often inflated by up to 20%.  In exchange for awarding these rich, inflated contracts to Cartel members, senior Petrobras executives would typically receive 3% of the value of the contracts as a cash bribe to be split among various co-conspirators, including politicians and money launderers. This Section describes the kickback and bid-rigging scheme in more detail.

61.     Before proceeding, listed below are several key individuals, including senior Petrobras executives, Cartel executives, money launderers, and others, who have submitted sworn testimony or are otherwise key figures in the scheme:

- **Roberto Costa** ("Costa"),  Petrobras' former Chief Downstream Officer and a member of the Company's seven-member "Executive Directorate" whose March 2014 arrest and August 2014 sworn testimony set off a wave of further investigations, arrests, and plea agreements;

- **Pedro José Barusco Filho** ("Barusco"), a former executive in the Company's Services business segment, who, like Costa, has entered into a plea agreement and provided extensive testimony about the bribery scheme, and who has agreed to return approximately $97 million to the Company -- representing bribes and capital gains on funds held in secret foreign bank accounts;

- **Alberto Youssef** ("Youssef"), a so-called "black-market central banker" and confessed money launderer who smuggled cash for Brazil's corrupt, rich and powerful and facilitated the bid rigging and kickback scheme, and who is cooperating with authorities;

- **Renato de Souza Duque** ("Duque"), the Company's former Chief Services Officer, who has been arrested twice, the second time after attempting to transfer 20 million euros from Swiss bank accounts to Monaco accounts, and who remains in custody in Brazil;

- **Joao Vaccari Neto** ("Neto"), the Treasurer of the Worker's Party (PT), who was charged with corruption and money laundering related to illegal campaign donations he solicited from Duque;

- **Julio Camargo** ("Camargo"), an executive at Toyo Setal Empreendimentos Ltda. ("Toyo"), a member of the Cartel, who is cooperating with authorities and has detailed tens of millions of bribes paid to Barusco and Duque through intermediaries;

- **Augusto Mendonca** ("Mendoca"), also an executive at Toyo who is cooperating with authorities and has described the cartel and the payment of briberies to Petrobras executives through intermediaries like Youssef;

- **Nestor Cerveró** ("Cerveró"), the Company's former Chief International Officer, who was charged by Brazilian federal prosecutors in December 2014 in connection with $53 million in briberies; and

- **Jorge Zelada** ("Zelada"), a former member of Petrobras's Board of Directors, who is under investigation and whose $10.6 million bank account was frozen by Monaco.

62.    According to media reports and the public testimony of several former Petrobras executives, the scheme began with the organization of major Brazilian engineering and

construction firms – the Cartel – to bid on Petrobras's most significant capital projects.  The Cartel then colluded with Petrobras to ensure that contracts would be set at fixed prices, inflated by up to 20%, to a revolving member of the Cartel.  The Cartel even kept meticulous records and spreadsheets detailing the participants, the contracts at issue, and the amounts and recipients of the bribes to ensure the scheme ran smoothly.

63.     The bid rigging scheme worked as follows according to Costa and others, whose testimony Petrobras cited in deciding to take the $2.5 billion write-down.  The "cartelization" process began when Petrobras embarked on the large projects, such as highly complex oil platforms and refineries in remote areas, necessary to build the upstream and downstream capacity required in order to exploit and process the huge quantities of oil and gas in its pre-salt fields.  Costa explained that the Cartel included each of the major Brazilian construction and engineering companies who had the ability to engineer and construct these projects.  Thus, the formation of the Cartel, which included each of the key players in the Brazilian construction and engineering sector, meant that these companies could effectively dictate the bidding process and ultimately the price received by Petrobras.

64.     Mechanically, Costa testified that Petrobras would calculate the actual cost of performing the contract—that is, the cost of capital and labor and any other incidentals associated with the contract.  Importantly, the Company was typically prohibited from accepting bids at prices higher than 20% over this internal calculation.  The Company would then select the contractors to bid on the projects and would secretly communicate that threshold to the Cartel. The Cartel members would then place their bids significantly higher, indeed as high as possible, in the first round of bidding.  With respect to the Abreu contracts, for example, Barusco testified

that the initial bids were "stratospherically above" those in the Petrobras budget, sometimes almost <u>double</u> Petrobras's budget.

65.     Barusco explained that the next step was that the Company would typically reject all of those bids, which were "obviously excessive," and that a "re-bid" would then occur. At this step, Petrobras employees would "show representatives of the [Cartel members] how they should present claims for contract addenda in order to avoid refusal" by the Company.  For the re-bid, a pre-selected winning bid would come in *just under* the 20% threshold, with the pre-selected losing bids coming in just above that threshold.  Barusco confirmed that "what [the Cartel] would do among themselves was <u>define among themselves who would win a certain bid competition</u>; Basically, with respect to the cartel, the intervention was along the lines of having <u>management selection in favor of specific enterprises</u> …"  In this way, the winning and losing bids were chosen in advance.  Youseff also testified that the companies themselves decided the winners beforehand in this bidding process.

66.     Without competitive bidding, the resulting contract prices were much higher than they would have been in a competitive bidding system.  Costa himself explained that "the bribe comes from a percentage of the enterprise's previously established profit, which due to the lack of effective competition always stretches to the limit" and that the "cartelization obviously results in a price hike" to Petrobras.  Barusco explained that Petrobras would enter into inflated contracts with Cartel members and that the Cartel colluded with Petrobras to impose contract prices that were "way above budget."  According to Barusco, Petrobras's contracts with Cartel members were always "signed near the maximum amount for the internal budget of Petrobras." Youseff also testified that the contracts were always executed at the maximum amount possible or close to it.

67.    As Petrobras's April 22, 2015 earnings release shows, a 3% kickback, or "political adjustment" as they came to be known internally, was built into this price inflation of typically up to 20%.  The bidding process was designed to give the *appearance* that the actual cost of performing the work was significantly higher than it really was, in order to drive up the contract price to the maximum possible value, while at the same time creating the false impression that the winning bid was the true price leader in an open, competitive bidding system.

68.    Barusco maintained a spreadsheet that detailed the payment of bribes in connection with some of Petrobras's key projects.  The co-conspirators would allocate kickbacks of specific percentages among Petrobras executives and their political allies.  According to Costa, in connection with Cartel contracts, 2% of the kickback was typically allocated to Petrobras executives.  Of the remaining 1%, "60% went to the [Political Party], 20% was for expenses ... and the remaining 20% was allocated 70% to me and 30% either to [Brazilian politicians or money launderers.]"

69.    Because the contracts at issue were huge, the kickbacks were also enormous.  As Barusco testified at a March 2015 Brazilian congressional hearing, Brazil's Worker's Party (PT) received up to ***$200 million*** in kickbacks through this scheme.  Costa would receive his bribes "in cash, normally at [his] home or in a shopping mall, or at the office, after [he] opened [his] own consulting firm."

70.    According to Costa, the Cartel was able to operate in secret for so long because of the tremendous power that Brazilian politicians and political parties had over the fate of Petrobras's executives and contractors.  As Costa explained, there was "never, never" an instance where a Cartel member refused to pay the illegal bribes because: "[if the Cartel member] did not contribute to a certain political party at that time, this would be reflected in other works at the

government level, and the political parties would not look kindly to this .... If you create a problem on one side, it can create a problem on the other. So in my time there, I do not remember any company that failed to pay. <u>There was, there were some delays, by cartel companies, but they never failed to pay</u>."  Corroborating Costa's testimony, Mendoca, one of the Cartel executives cooperating with authorities, explained that members of the Cartel knew that the payment of bribes to Petrobras senior executives was the only way to secure lucrative construction and engineering contracts. Medoca testified specifically that "as for the payment for the payment of commissions to Petrobras' directors, maybe <u>that didn't even merit a discussion, because everyone was aware that it would be very much mandatory</u>."

71.    Costa's and others' testimony also revealed the close relationship between Brazilian political parties and Petrobras's seven Executive Directors and their respective business segments.  Because, as noted above, Brazil is a majority owner of Petrobras and controls a majority of the board seats, it is able to appoint the Company's powerful seven-member Executive Directorate.  According to the testimony of Costa and others, in exchange for these political appointments to the vaunted Executive Directorate and subsequent political protection, Petrobras's executives and outside contractors were obligated to funnel some of the kickbacks to the Executive Director's political allies, including parties and elected officials.

72.    Costa testified extensively about the alignment between certain business segments within Petrobras and certain political parties because "the departments of Petrobras, and the chairmanship of Petrobras were always by way of political appointments.  I have always given the example here … of how generals never reach the rank of general without being appointed." Costa himself was appointed by the Progressive Party (PP) to take charge of the Downstream Division, and his future depended on maintaining a strong relationship with the PP.  In contrast,

the exploration, gas and energy, and services departments were more aligned with the Workers Party (PT).

73.    In the case of Duque, for example, who headed the Services division and has been arrested and charged twice, prosecutors allege that he conspired with Neto, the former Worker's Party (PT) Treasurer, to provide the PT with illegal campaign donations in exchange for political protection.  As the Brazilian prosecutor said in connection with the arrests of Duque and Neto in March 2015, "[t]hese [improper campaign donations] weren't illegal just because they were bribe payments but because they were the product and fruit of fraudulent bidding processes and the crime of price-fixing."

74.    This scheme was pervasive and not one involving isolated or rogue actors.  Many of the Company's most senior executives either benefited personally from the kickback scheme, or were at the very least aware of it and recklessly failed to stop or disclose it to investors. Youssef testified that the "Directors of the services, international and supply areas <u>knew for sure</u> <u>[about] the cartelization process</u>" and that "the President of Petrobras <u>probably knew</u>."   Costa testified that the Company's Board of Directors approved <u>all contracts</u> with respect to the Abreu refinery.

75.    Not only were senior officials involved – more junior employees were necessarily involved as well.  Costa explained that for each major contract, a bidding coordinator, together with a committee consisting of two or three members, would manage the bidding process with outside contractors.  As Petrobras's $17 billion writedown indicates, contracts worth over $80 billion (representing approximately one-third of the Company's assets) were implicated in this fraudulent scheme, and each of those contracts necessarily went through this competitive bidding committee system, which necessarily involved many individual employees to carry out the

logistics of large scale bids involving dozens of the largest construction and engineering companies in Brazil.

76.     In fact, Barusco admitted that a new project relating to the Downstream Division would be tendered practically every month, and that each such project would be used to funnel bribes to Petrobras executives, yet another indicator of the massive scope of the fraud and its pervasive impact on the Company's financial results.  One Company official currently in custody testified that he personally received bribes in connection with 90 Petrobras contracts between 2003 and 2013.  Given the "committee" structure of the bidding system, and the dollar value and number of contracts and bids at issue, the fraud could not have occurred without the knowledge and/or participation of, at the very least, dozens of individuals within the Company, who participated in, were aware of, and benefitted from the bid rigging and kickbacks.

77.     As the public testimony shows, the kickback and bid rigging scheme was endemic and "institutionalized."  In order to further illustrate the mechanics of the scheme, the following section describes several key projects – the Abreu refinery, the Comperj refinery, and a contract with SBM Offshore – which account for a great deal of the $17 billion writedown to correct the Company's materially false and misleading financial statements.

**The Abreu Refinery**

78.     In 2005, Petrobras approved plans to build the Abreu e Lima ("Abreu") refinery in Northeast Brazil, one of Brazil's first new oil refinery projects in over 20 years.  Abreu was expected to be able to process 200,000 barrels of oil a day into various refined products, principally diesel fuel, the most consumed fuel in Brazil.  Start-up of operations was forecast for the second half of 2010, reaching full capacity in 2011, and Abreu was expected to require an

investment of approximately $4 billion.  Costa, as Director of Petrobras's Downstream Division, was responsible for negotiating contracts for the engineering and construction of Abreu.

79.     It soon became clear that the refinery would not be completed on time or on budget.  In August 2009, for example the Brazilian publication *Estado* reported that the Brazilian federal court overseeing government spending – the Brazilian Federal Accounting Court or "TCU" – sent a report to a Brazilian Senate committee identifying overpayments of over $65 million on construction projects for the Abreu refinery.  Shortly thereafter, the Senate committee announced that it would seek a formal explanation for the surging costs.  By 2009, the cost estimate for Abreu had skyrocketed to $12 billion, up from the initial $4 billion estimate.

80.     Petrobras aggressively countered public scrutiny concerning cost overruns and delays with respect to Abreu.  For example, to counter negative press reports about Abreu, Petrobras stated in a January 28, 2010 post on a company-sponsored website called "Facts and Data": "Petrobras reiterates that there are no irregularities in contracts for the construction of the [Abreu] Refinery."  The very next day, Petrobras stated on the same blog that the Company "reaffirms that there was no 'overbilling' or 'overpricing' in the construction works of the Abreu [] refinery."

81.     Petrobras's representations reassured analysts and investors over the growing costs of the Abreu refinery.  For example, following a meeting with Costa and the Company's CFO Barbassa on November 19, 2010, Morgan Stanley analysts "walked out of the presentation ... convinced that the concerns surrounding the construction of the refineries are overstated" and explained that Costa "made a thorough presentation touching on every single controversy raised by the market over the past 18 months and justifying every decision made by the company based on economics," including those related to Abreu.

82.     As the costs of Abreu continued to increase, so did press and analyst questions. On August 5, 2012, in response to an article issued by the Brazilian publication *Valor* reporting that TCU had again identified irregularities with respect to Abreu contracts, Petrobras stated that it "does not recognize any of the signs of irregularities identified by the Court (TCU) … These so-called irregularities found by the Court (TCU) are based in methodological differences between the Court and Petrobras regarding the analysis of the costs of the works."  The Company went on to state that "[t]here wasn't overestimation of the costs by Petrobras" and that "its estimates are developed by observation of the prices on the market."  Likewise, on January 7, 2013, in response to questions posed by the *Jornal Nacional*, a Brazilian television news program, Petrobras again claimed that there were "no irregularities in the construction of the Abreu[] Refinery."

83.     Contrary to Petrobras's claims at the time, Petrobras has now admitted there were systematic irregularities with respect to the Abreu refinery that caused the cost of the project to skyrocket, from its initial budget of $4 billion, to over $18 billion through just November 2014.

84.     Costa and others have testified extensively about the systematic overbilling and bribery with respect to these Abreu contracts.  For example, Costa testified as follows in his plea agreement:

> [T]he deponent [Costa] clarifies that … upon being provided with the table of all the [Abreu] agreements in a total of approximately $R 18,738,591,265.74, with 23 companies or consortiums, the deponent clarified that considering these companies, payments of undue advantages were made by ENGEVIX, ALLUSA, TECHINT, TOME, CONEST CONSORTIUM, CNCC, QUEIROZ GALVAO, IESA, AND GALVAO ENGENHARIA; that some of these companies paid undue advantages although they were not part of the cartel, especially ALLUSA and TOME, that are smaller companies…

85.     In his plea agreement, Barusco admitted that "in the case of [Abreu], there was a clear overbilling."  Indeed, Barusco testified that the overbilling was "most obvious in [Abreu.]"

34

With respect to Abreu, Barusco testified that in addition to pre-selecting winners, the Cartel "wanted to impose prices 'very much above the budget' of Petrobras, not only in [the first bid but also] in the rebid." He further explained that there was "'organized pressure' to close the contract values at prices at the very top limit of the Petrobras budget."

86.     Specifically, Barusco testified that Rogerio Araujo, the Director of Odebrecht, a leading Cartel member, "presented a list written by hand in ink containing the names of the enterprises that should be invited to bid for the two large packages of [Abreu] works" and that Rogerio "said at that time that the list of companies that were going to participate had already been decided, with [Costa]." Although Barusco testified that he tore up and destroyed the hand-written list, he verified that the companies invited to bid for those Abreu projects were those mentioned in the hand-written list provided by Rogerio.

87.     Barusco further testified that he would "leak" Petrobras's internal lists of contractors selected to bid for major contracts – compiled in the Petrobras System Internal Document (DIP) – which the Cartel would use to organize their bid packets and to "divide the lots" of the contracts. With respect to the Abreu, Barusco testified that in order to avoid detection, instead of reproducing the DIP file directly, he would write the list out in Microsoft Word or by hand, and would deliver the list to the Cartel at meetings outside the Company, including at happy hours and lunches.

88.     Youssef corroborated the testimony of Barusco and Costa with respect to Abreu bid rigging and kickbacks. He testified that with respect to several multi-billion Abreu contracts, "[t]here was the payment of 3% of the total amount of the contract as a bribe," and Youssef also identified the same Cartel members as Costa had identified as paying improper benefits with

respect to Abreu contracts: ENGEVIX, ALLUSA, TECHINT, TOME, CONEST CONSORTIUM, CNCC, QUEIROZ GALVAO, IESA, AND GALVAO ENGENHARIA.

89.     As described above, the Cartel would typically submit their first bids far above Petrobras's internal budget, and that a re-bid would then occur.  Barusco testified that this basic scheme was carried out with respect to major Abreu contracts as well.  For example, with respect to a "Coking" project, Petrobras had an internal budget of approximately R$ 3.4 billion (~US$ 1 billion), but the two Cartel members who ultimately secured the contract bid almost R$ 6 billion (~US$ 2 billion), almost double Petrobras' internal budget.

90.     Barusco further testified that he and Duque, who remains in custody today, received bribes up to $50 million in connection with 90 Petrobras contracts between 2003 and 2013, including contracts for Abreu.  According to Barusco, Duque required Barusco to deliver approximately $21,500 in cash to his home every two weeks.  Bloomberg has also reported that Duque stamped, signed and referred to the Petrobras board of directors at least $2.67 billion in contracts for Abreu.

91.     Barusco has provided detailed information to the Brazilian Federal Police concerning specific projects performed in connection with the Abreu refinery totaling over $7 billion, which were used to divert bribes to Petrobras executives and public officials.  These contracts included, for example:

- a nearly $635 million contract for the construction of a powerhouse, compressed air unit, input substation, and related structures (the "CAFOR da Abreu e Lima" project) awarded to Cartel member Alusa;

- a nearly $2 billion contract for the UHDT hydrotreatment unit project awarded to Odebrecht and OAS; and

- an approximately $2 billion contract for a Delayed Coking Unit awarded to Camargo and CENC.

92.     Abreu finally began operations in November 2014, approximately four years behind schedule, at a cost-to-date of $18.6 billion, over $14 billion more than its original budget, making it one of the most expensive refineries ever built, and far more expensive than comparable refineries constructed around the world.

93.     Based on the testimony described above, on April 22, 2015, Petrobras took a $3.4 billion impairment charge for the Abreu refinery, and recorded hundreds of millions of charges – the exact amount is unclear, but possibly exceeding $500 million (3% * $18.6 billion) – reflecting 3% kickbacks to Petrobras executives and their political allies in connection with Abreu contracts awarded to the Cartel.

## The Comperj Refinery

94.     A second major refinery implicated in the bribery scandal is the Petrochemical Complex of Rio de Janeiro ("Comperj"), which, like Abreu, was intended to reduce the Company's reliance on imports and build the capacity to refine the massive quantities of oil and gas contained in the pre-salt fields.  The project dated back to 2004, when it was forecast to be operational by 2011 and to cost approximately $6.1 billion.  It was expected to have capacity of 150,000 barrels per day.  By 2006, however, the costs had jumped to $8.4 billion, and the start-up date was pushed to 2012.

95.     Like Abreu, as the costs of the project jumped and the completion date was delayed, both investors and Brazilian politicians asked the Company what the cause of the cost overruns and delays was.  For example, in October 2010, TCU raised a number of questions with respect to Comperj contracts, and pointed to a $31 million contract for a water treatment unit that was being constructed in Rio de Janeiro by the same contractor for one-third of that amount.

96.     Once again, Petrobras denied any "irregularities."  In an October 8, 2010 "Facts and Data" post, Petrobras claimed that there was "no overpricing" at Comperj, and that the Company had "strictly observe[d]" competitive bidding mandates governing the Company's business.

97.     However, like Abreu, Comperj's costs continued to skyrocket.  Another TCU report, released in November 2014, indicated that as of that date the cost for Comperj stood at $21.6 billion, even though the project is still incomplete.  The TCU also found "discrepancies between different government agencies, as well as within different Petrobras divisions, over investment needed for Comperj" and concluded that Petrobras' management had been "***reckless with irregularities in the omission of technical analyses, overpaying for contracts and a lack of effective controls***."

98.     The TCU has also found that ***$3.1 billion*** in Comperj contracts were awarded without bidding.  One member of the TCU commented that it was "investigating how the structure of Petrobras can undertake such a huge project in such a sloppy way."  The TCU found "irregularities in three contracts: two that were overpaid and one that was signed in an 'emergency' time-frame that didn't allow other companies to bid."

99.     Barusco confirmed that the same "tactics" used by Petrobras and the Cartel to bid up prices and pay bribes for Abreu were used at the Comperj refinery as well. In his plea bargain, Barusco identified numerous instances of Comperj projects that were subject to bid-rigging and bribery, and testified that the same Cartel members were invited to bid for the major Comperj contracts as those invited to bid for the major Abreu contracts, and that they used the "same tactics" with respect to Comperj.

100.    Barusco specifically identified three Comperj projects valued at over $2.4 billion implicated in the bid rigging and kickback scheme, including:

- An $838 million project awarded to Alusa to build a Catalytic Hydrocracking Unit (RCC);

- a $1.15 billion project awarded to Andrade Gutierrez Techint to build a Coking Unit; and

- a $484 million "earthworks" project.

101.    On April 22, 2015, Petrobras took an $8.2 billion impairment charge for Comperj, and recorded hundreds of millions of charges – the exact amount is unclear but possibly exceeding $640 million (3% * $21.6 billion) – reflecting 3% kickbacks to Petrobras executives and their political allies in connection with Comperj contracts awarded to the Cartel. These actions confirm that Petrobras's financial statements, and its statements about the construction contracts and costs for Comperj, were materially false and misleading at the time they were made.

**SBM Offshore Project**

102.    In February 2014, reports surfaced indicating that one of its most significant contractors in Petrobras's upstream division, SBM Offshore N.V. ("SBM"), a Dutch engineering company, was suspected of paying bribes to Petrobras executives.   In light of those reports, Petrobras announced that it had conducted an internal investigation into the allegations and "concluded that, based on work performed and limited to its regulatory scope, no facts or documents were found that prove the payment of bribes to employees of Petrobras."  As late as June 11, 2014, former CEO Foster testified that "no irregularities were discovered" between SBM and Petrobras.

103.     Contrary to Petrobras's claims, however, the evidence is clear that SBM paid over $100 million in bribes to Petrobras.  SBM has even *confessed* to the Netherland's authorities that the company had transferred over $100 million in bribery payments to Petrobras executives in exchange for awarding key contracts.   Indeed, Barusco alone has said he would return $22 million which came from SBM Offshore.  On November 17, 2014, Petrobras's CEO Foster was forced to admit that SBM had indeed paid bribes to Petrobras, and that SBM would be banned from bidding on any Petrobras contracts in the future.

### Red Flags

104.     As the testimony of Costa and Barusco and others shows, members of Petrobras's Executive Directorate were involved in and aware of the bribery scheme, and took steps to cover it up.

105.     Indeed, when two separate whistleblowers brought the scheme to the executives' attention, the executives not only ignored the red flags, but fought back and silenced the whistleblowers.

### Venina Velosa da Fonseca

106.     The first whistleblower was Venina Velosa da Fonseca ("Velosa"), a Petrobras executive from 1990 to 2014.  In 2008 and 2009, Velosa was an executive manager under Costa in the Downstream division, where she was responsible for helping to budget for and evaluate the economic viability of downstream projects.   Velosa also interacted regularly with former CEO Foster.  Specifically, Velosa stated to the Brazilian publication *Fantastico*, "we always had a lot of access. I knew [Foster] when she was manager of technology, in the gas sector; I was manager of the contract management sector. We were close."

107.    Velosa has stated that she informed both former CEO Gabrielli and former CEO Foster about problems with bidding relating to the construction of the Abreu refinery, including payments for services that were never rendered.  Velosa testified to the Brazilian Federal Police that her team performed a comparative study examining the cost increases at Abreu to similar projects around the world, which revealed "prices for equipment that were four times higher than for the same equipment abroad."   Similarly, Velosa's team discovered that work on an earthmoving contract that was supposedly complete had not in fact been done.  As Velosa explained, "there were always gaping holes."

108.    Velosa testified that she reported these and other problems to Duque and Costa (including via emails), but no actions were ever taken.  Velosa also testified that she personally met with former CEO Foster to discuss these issues and other identified irregularities: "[I]n 2008, as an executive manager, I informed ... the director at the time, Paulo Roberto Costa. I informed other directors, like [former CEO] Foster. And, at a different time, as a general manager, I informed my executive managers, Jose Raimundo Brandao Pereira and Abilio, who was my executive manager at the time. I informed director Cosenza, in his position as director, since he was my peer, and as executive manager. I informed [former CEO] Gabrielli."

109.    In April 2009, Velosa prepared a memorandum outlining the details of the misappropriation of funds that her team had uncovered in its audit of various projects, which she intended to circulate to senior management.  On April 3, 2009, Velosa asked former CEO Foster to review the memorandum. At the time, Foster was Petrobras's Director of Gas and Energy. Velosa's email asked: "I would like to have your opinion on a final text that I need to forward. Can I leave it for you to read? You know about the matter. Feel free if you feel better not reading it. I await your response to leave or not the material with your secretary."  Foster did not reply.

110.    Hearing nothing from Foster, Velosa circulated her memorandum to the Board of Directors.  Still, she heard nothing.  In October 2009, Velosa was transferred to Petrobras's Singapore office, without explanation.  She testified that when she arrived in Singapore, she was asked not to work and advised to take a training course.  Finally, as *Valor* described, on November 19, 2014, "after making hundreds of warnings and recommendations on money misappropriations in the company, [Velosa] was ousted by the current management without being informed the reason, along with several employees suspected of being involved in Operation Car Wash."

### **Fernando de Castro Sa**

111.    Velosa was not the only Petrobras employee who objected to the Company's improper practices and was dismissed or demoted for her efforts.  On January 7, 2015, Brazilian Federal Prosecutors deposed Fernando de Castro Sa ("Fernando"), a lawyer who worked in Petrobras's downstream division and regularly interacted with Duque and former CEO Gabrielli during the Relevant Period. In the interview, Fernando, who holds a master's degree from the University of California in international trade law, described in detail his discovery of significant "irregularities" at Petrobras and how he reported them to Gabrielli, Costa, Duque and others in 2008 and 2009 before being silenced.

112.    Fernando drafted a legal opinion in early April 2009 concluding that Geovane de Morais should be terminated following Velosa's internal inquiry, which determined that Morais was responsible for improper payments in the downstream division.  Later that month, Fernando's superior informed Fernando that he had received a call at home from Duque and Gabrielli regarding Fernando's recommendation to dismiss Morais.  Nilton stated that Gabrielli was very angry about Foster's recommendation.  According to Fernando's testimony, Petrobras's

senior management determined that "the legal department [would] give an opinion revising the previous opinions" concerning the findings of improper payments.

113.    Like Velosa, after speaking out, Fernando was transferred to a small, isolated office, with no computer and without any work to do, his salary was decreased, and his former colleagues were instructed not to speak with him.  Importantly, Fernando's new role did not involve any interaction with outside contractors.

**PwC's Role**

114.    PwC's failure to detect this pervasive and institutionalized scheme was a clear violation of its most basic professional duties as the Company's independent auditor beginning in January 2012.

115.    PwC knew that its name, and the imprimatur of the involvement of a worldwide accounting firm, were used by Petrobras to market its ADSs to investors in the United States, including Plaintiffs.  PWC knew that Plaintiffs would rely upon its involvement and audit practices, including its assessment of the Company's internal controls and compliance with Sarbanes-Oxley, in deciding to purchase the Company's ADSs.  Plaintiffs relied (and were both entitled and intended by PwC to rely) on PwC's known role and responsibilities, on its reports, and upon the absence of any disclosure by PwC of an ongoing bid rigging and kickback scheme infecting over one-third of the Company's assets, which were already subject to public scrutiny because of cost overruns and delays.  Plaintiffs' reliance was actual, justified and was the proximate cause of Plaintiffs' losses.  Had PwC made the required disclosures, undertaken reasonably competent audits and reviews of Petrobras's financial statements in accordance with industry standards, and made truthful representations instead of false ones, Plaintiffs' losses would have been avoided.

116.    PwC issued opinions for years 2012 and 2013 that Petrobras's financial statements complied with the International Financial Reporting Standards ("IFRS"), and represented that those results fairly and accurately presented the Company's financial condition and results of operations in conformity with IFRS.  PwC also claimed that it conducted its audits in compliance with the standards of the Public Company Accounting Oversight Board ("PCAOB").    Additionally, PwC certified that Petrobras's internal controls over financial reporting were effective in all materials respects.  PwC's assurances in this regard were set out in its audit opinions dated February 25, 2014 (for fiscal year 2013), and February 4, 2013 (for fiscal year 2012).

117.    PwC's failure to uncover the fraud was not limited to its regular audits of the Company's financial statements.  Instead, in late 2013, PwC was asked to appraise the "net book equity value" of the Abreu refinery as of March 31, 2013 in connection with the merger of Refinaria Abreu E Lima S.A. – a wholly owned subsidiary of the Company whose sole asset was the Abreu refinery – with and into the Company.  This corporate consolidation would "allow greater flexibility for new investments and greater efficiency in the execution of [the Company's] strategic decisions."  PwC issued an appraisal which valued Abreu's PP&E at $R 22 billion, and its net book equity value to be $R 10.7 billion.

118.    In PwC's engagement letter with respect to this appraisal of Abreu, it noted that it would "report in writing any significant deficiencies in internal control considered relevant to the balance sheet [of Abreu] that we may identify during the audit."  In the actual appraisal report, PwC further noted that "[w]e believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our conclusion [concerning the net book equity value of Abreu.]"

119.    As the Company and PwC have now admitted, however, Petrobras's internal controls were materially inadequate, it failed to comply with IFRS, and its financial reports were false and materially misleading because, among other reasons, Petrobras falsely reported the 3% kickbacks as *assets,* booked under PP&E.  PwC falsely assured investors that for 2012 and 2013, PwC had conducted its audits in compliance with PCAOB standards, Petrobras's financial statements conformed with IFRS and fairly and accurately presented the Company's financial condition, and the Company's internal controls were effective.  Likewise, PwC had made the same promises in connection with its appraisal of the book value of Abreu as of March 31, 2013, in which PwC failed to obtain appropriate audit evidence, and failed to identify massive holes in the Company's internal controls with respect to Abreu.

120.    As a result of PwC's audit and other services, PwC was frequently present at Petrobras's offices, and had access to the Company's confidential books and records.  As the Company's outside auditor, PwC had a professional duty to evaluate the company's internal controls, financial and accounting systems, and financial reports.  Given that its PP&E represented up to *70%* of the Company's assets, PwC's job included looking critically at that PP&E, which was already subject to public scrutiny because of the cost overruns and delays at the Abreu and Comperj refineries.  Either PwC did so and was aware of the fraud, or it did not and was reckless and grossly negligent in not doing so.

121.    PwC's assurance to investors were made despite the existence of red flags concerning internal controls and financial reporting with respect to several of the major capital projects implicated in the scandal, including the Abreu and Comperj refineries.  PwC either knew or was reckless and grossly negligent in not knowing that these massive cost overruns and delays were the result of a kickback and bid rigging scheme.  PwC failed to investigate, for example,

why the Abreu refinery was completed over four years behind schedule, at a cost of $18.6 billion, over $14 billion more than the original estimate.

122.    Likewise, PwC failed to act on the clear red flags identified by whistleblowers Velosa and Fernando, including Velosa's report identifying irregularities in the Abreu refinery, and Fernando's legal memorandum that concluded that Morais, a Petrobras executive in the downstream division, was responsible for improper payments and should be terminated.  At the very least, if PwC had conducted a minimally probing audit of the Abreu and Comperj refineries – as Velosa conducted herself – it would have discovered the bid rigging and kickback scheme.

123.    Had PWC diligently investigated these red flags and audited the Company's financial statements in conformity with prudent auditing practice and generally accepted auditing standards, the pervasive fraud and malfeasance would have been revealed and losses to the Plaintiffs would have been avoided.  PWC's audits of the Company's financial statements were not conducted in accordance with generally accepted auditing standards.  PWC failed to plan and perform its audits in a manner that would detect even gross and material misstatements and deficiencies in the Company's financial statements.

124.    Specifically, by ignoring these many red flags and failing to discover the fraud, PwC violated a number of professional standards set out by the PCAOB.  The following are some of PWC's intentional, reckless and/or negligent failures to properly adhere to generally accepted accounting standards for its 2012 and 2013 examinations and reviews.

125.    PwC violated PCAOB AU No. 230, which requires that due professional care is to be exercised in the performance of the audit and the preparation of the report.  This standard required PwC to obtain reasonable assurance that Petrobras's financial statements were free from material misstatement.  PwC violated this standard by failing to identify the massive, admitted

46

kickback scheme, which infected over $80 billion of the Company's contracts, amounting to approximately one-third of the Company's assets.

126.    In light of the red flags described above, and the significance of PP&E to Petrobras's balance sheet, PwC violated PCAOB Accounting Standard No. 13, which states that "[t]he auditor also should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement," and Accounting Standard No. 15, which states that "as the risk increases, the amount of evidence that the auditor should obtain also increases. …" These accounting standards required PwC to increase substantive testing of the PP&E line item, and to otherwise obtain more persuasive audit evidence with respect to PP&E, because of the higher level of risk associated with PP&E as a result of the cost overruns, delays, public scrutiny, and importance to the Company's financial statements.

127.    PwC also violated PCAOB AU 316 ("Consideration of Fraud in a Financial Statement Audit"), which states that "the auditor's exercise of professional skepticism is important when considering the fraud risks.  Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence … [T]he auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest." *Id.* Despite the massive cost overruns and delays, and red flags identified above, PwC did not exercise the requisite professional skepticism with respect to the Company's stated values for PP&E.

128.    PwC violated PCAOB AU 317 ("Illegal Acts by Clients"), which states that "[t]he auditor should make inquiries of management and the audit committee concerning the client's compliance with laws and regulations and knowledge of violations or possible violations of laws

47

or regulations. Where applicable, the auditor should also inquire of management concerning—The client's policies relative to the prevention of illegal acts [and] [t]he use of directives issued by the client and periodic representations obtained by the client from management at appropriate levels of authority concerning compliance with laws and regulations."  PwC failed to test the Company's representations and detect an "institutionalized" and "endemic" bribery scheme affecting one-third of the Company's assets, and therefore violated AU 317.

129.    PwC violated PCAOB 326 ("Evidential Matter"), which states that "[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  PwC failed to obtain sufficient evidence of the Company's internal controls and financial results to have a reasonable basis to form an opinion regarding the Company's financial statements or internal controls.

130.    PwC violated PCAOB 330 ("The Confirmation Process") by failing to obtain and evaluate communications from third parties who were in a position to identify the bid rigging and kickback scheme.  For example, PwC should have sought confirmations from third parties of Petrobras's explanations for the cost overruns and delays with respect to the Abreu and Comperj refineries.

131.    PwC violated AU 410 ("Adherence to Generally Accepted Accounting Principles") by falsely certifying that the Company's financial statements for 2012 and 2013 were presented in accordance with generally accepted accounting principles when, in truth, they grossly misrepresented the company's financial results.

132.    In a final example of PwC's failures, PwC's certification that Petrobras's internal controls were effective during years 2012 and 2013 violated a number of its professional

obligations, including PCAOB Standard No. 5, which required PwC to test the effectiveness of Petrobras's internal controls through a "mix of inquiry of appropriate personnel, observation of the company's operations, inspection of relevant documentation, and re-performance of the control."   In truth, the Company's internal controls suffered from systemic and material weaknesses, causing the Company's financial statements to be grossly misleading.

133.    Despite PwC's failures to meet its most basic duties as Petrobras's independent auditor, PwC was paid handsomely for its services: $7.7 million for its 2012 work, and $8.6 million for its 2013 work.

**The Truth Begins to Come Out**

134.    On Sunday, September 7, 2014, *Veja*, a Brazilian magazine, reported that a group of politicians were allegedly receiving kickbacks linked to inflated Petrobras contracts. According to *Veja*, Costa had testified to police investigators as part of a confidential plea deal that he was involved in a vast kickback scheme involving bribes paid to Petrobras officials and their political allies.   *Veja* further explained that Costa had been arrested in March 2014 in connection with a money laundering probe dubbed "Operation Car Wash," or "Lava Lato." Although Operation Car Wash initially had nothing to do with Petrobras, Costa's connection to Youssef, the money launderer at the center of the investigation, dragged him and Petrobras into the investigation.

135.    The *Veja* report said the names listed by Costa included, among others, 25 lower house representatives, two former governors, and Brazil's energy Minister Edison Labao.  These allegations were featured on the front page of Brazilian newspapers, and Brazilian media quickly dubbed Costa a "ticking time bomb" because he had threatened to name high-profile politicians benefiting from illegal funds.

136.    In response to the revelation of Costa's testimony and the Company's response, Petrobras's common ADSs fell approximately 5.3%, from $19.38 on September 5, 2014, to $18.35 on Monday, September 8, 2014.  Likewise, the preferred ADSs fell approximately 5.1%, from $20.27 to $19.24.

137.    On September 8, 2014, after markets closed, Petrobras issued a statement indicating that it had requested full access to the Costa testimony, and that it was in the best interest of the company to see the completion of all ongoing investigations.  Likewise, Brazilian president Dilma Rousseff, who was chairman of Petrobras during part of the timeframe in which the kickback scheme was alleged to have occurred,  told reporters that Energy Minister Labao, who had been named by Costa, had denied the report, and that she was unaware of any criminal activity in Petrobras.

138.    In response to Petrobras's statement, Petrobras' common ADSs fell approximately 3%, from $18.35 on Monday, September 8, 2014 to $1 7.83 on September 9, 2014, and Petrobras' preferred ADSs declined approximately 2.75%, from $19.24 to $18.71 on September 9, 2014.

139.    On September 12, 2014, it was reported that Brazilian construction companies cited in the money-laundering probe were listed among the main contributors to President Rousseff's re-election campaign.  The three companies, OAS SA, Andrade Gutierrez SA, and UTC Engenharia SA, had donated a combined $15.7 million to the campaign, according to those reports.

140.    In response to the implication of Petrobras's major contractors in the bribery scheme, Petrobras's common ADSs fell approximately 7.1%, from $16.63 on September 11,

2014, to $16.38 on Friday, September 12, 2014.   Likewise, the preferred ADSs fell approximately 7.2%, from $18.55 to $17.21.

141.   After the markets closed on September 30, 2014, Bloomberg issued an article reporting that the scope of the bribery scheme may have been broader than Costa's downstream division.   Specifically, Bloomberg reported that "misappropriation of funds also existed in other divisions including the one Duque headed [i.e. services]."   The article also noted that Duque had approved approximately $2.7 billion in contracts for the Abreu refinery.   On October 1, 2014, before the market closed, it was reported that Brazilian police were probing links between Youssef and Petrobras.

142.   In response to reports of the widening scope of the bribery scandal, Petrobras' common ADSs fell approximately 6%, from $14.19 on September 30, 2014, to $13.30 on October 1, 2014, and Petrobras' preferred ADSs' declined approximately 7%, from $14.89 to $13.84 on October 1, 2014.

143.   On October 9, 2014, after the market closed, the Wall Street Journal reported that the Brazilian court had released the audio tapes of Costa's sworn testimony.   In the recordings, which were released online, Costa alleged that kickbacks to members of Ms. Rousseff's Workers' Party, or PT, were commonplace in his and other divisions of Petrobras.   In response, the Company issued a statement indicating that it was cooperating with investigators.

144.   In response to the full release of Costa's testimony and the Company's statement that it was cooperating with the investigation, Petrobras's common ADSs fell approximately 6.9%, from $16.77 on October 9, 2014, to $15.62 on October 10, 2014.   Likewise, the preferred ADSs fell approximately 6.9%, from $17.77 to $16.55.

145.    On October 15, 2014, various news articles confirmed that the Administrative Council for Economic Defense ("CADE"), a Brazilian federal anti-corruption agency, had opened a probe into the bribery scandal.

146.    In response to the news of the CADE anti-corruption probe into Petrobras, Petrobras' common ADSs fell approximately 9%, from $17.10 on October 14, 2014 to $15.55 on October 15, 2015.  The preferred ADS fell approximately 8.7%, from $18.09 to $16.51.

147.    On October 16, 2014, various news articles reported that TCU, the Brazilian audit court, criticized the construction of the Comperj refinery, and identified inflated contracts and other wasteful spending.  In particular, it was reported that TCU found that Petrobras had been "reckless," that there were irregularities, a lack of effective controls, and inflated contracts.  At least three contracts were identified in particular: two that were overpaid and one that was signed in an "emergency" time-frame that didn't allow other companies to bid. The TCU report was widely covered in the press.

148.    In response to the TCU audit report, Petrobras' common ADSs fell approximately 6.8%, from $15.55 on October 15, 2015, to $14.50 on October 16, 2015.  The preferred ADS fell approximately 7.9%, from $16.51 to $15.21.

149.    On Saturday, October 18, 2014, President Rouseff admitted for the first time during a news conference that evidence existed that money was illegally diverted from Petrobras, and that the Company would seek reimbursement of any money illegally diverted.   This statement was widely covered over the weekend in the press.

150.    In response to President Rouseff's interview, Petrobras' common ADSs fell approximately 6.2%, from $14.93 on October 17, 2014, to $14.00 on Monday, October 20, 2014. The preferred ADS fell approximately 6.9%, from $15.65 to $14.57.

151.    After the market closed on October 20, 2014, Bloomberg published a detailed article entitled "Petrobras 'Human Bomb' Revelations Fixate Brazil as Vote Looms," which explored how Costa—the "human bomb—and others had siphoned kickbacks from companies to whom Petrobras awarded inflated contracts, and that Costa himself had admitted to receiving tens of millions in bribes.  Among other things, the article noted that court documents released by a judge presiding over the case in Brazil's Parana state assert that on the day federal cops went to roust Costa from his Rio home, seeking a key to his locked office, a security camera caught his two daughters and their husbands in that very office stuffing suitcases and bags with cash, incriminating documents and a laptop, all of which they hoped to hide from the police.

152.    The article also reported that federal cops raiding Costa'a Rio de Janeiro house had found about $500,000 in cash, a mix of dollars, Euros and Brazilian reals, and that Swiss court documents indicated that $28.5 million had been stashed in secret Swiss bank accounts, including $5 million in accounts for Costa's relatives.  The article also noted that under Costa's deal with prosecutors, as revealed by Brazilian federal court documents, Costa had agreed to turn over to the government all the Swiss cash and surrender other assets including a $440,000 yacht, $1.3 million worth of land, and a Land Rover.

153.    The article went on to describe how the audio tapes from Costa's interview indicated that members of the ruling-party coalition had introduced Costa to Youssef, the admitted money launderer whom authorities accused of setting up fake import companies to launder the kickbacks.  The article also described how a police investigation into Yousseff, who had served time in a Brazilian prison for his role in a major money-laundering operation in Latin America, led to the discovery of Costa's involvement. Authorities were looking into suspicions that Youssef had returned to his old occupation, only to stumble upon the fact that Costa was one

of his major clients, the article explained.  When Youssef was arrested for money laundering on March 17, he had seven mobile phones in his possession, and police found 27 others at his office -- one for each of his clients -- Bloomberg reported.

154.    In response to this article, Petrobras' common ADSs fell approximately 5.7%, from $14.00 on Monday, October 20, 2014, to $13.20 on October 21, 2014.  The preferred ADSs fell approximately 6.7%, from $14.57 to $13.59.

155.    After the market closed on October 22, 2014, it was announced that the Brazilian Securities and Exchange Commission (CVM) had opened an investigation into the kickback scheme.  The CVM announced the "administrative procedure" on its website without providing details.  The CVM was looking into corruption allegations at Petrobras related to the money-laundering case known as Car Wash, *Epoca* Magazine had earlier reported on its website on October 21.  The CVM announcement was widely covered in the press.

156.    On October 27, 2014, Petrobras acknowledged for the first time, in a form 6-K, that it had hired two "independent specialized investigation companies," later revealed to be two law firms--Brazilian firm Trench, Rossi e Watanabe Advogados and U.S. firm Gibson, Dunn & Crutcher LLP--to "examin[e] the nature, exten[t] and impacts of the actions that might have been performed" at the Company and to "analyze correlated facts and circumstances that might have [a] material impact over the Company's business."  The Company also announced, for the first time, that these investigations "will also analyze correlated facts and circumstances *that might have material impact over the Company's business*."  In other words, for the first time, Petrobras appeared to be admitting that the allegations of a kickback scheme were legitimate and could have a significant financial impact on the Company.

157.    In response, Petrobras' common ADSs plunged 13.7%, from $12.93 on October 24, 2014, to $11.16 on October 17, 2014, and Petrobras preferred ADSs fell 14.6%, from $13.46 to $11.49.

158.    On November 1, 2014, Brazilian articles reported that PwC had refused to sign off on Petrobras' third-quarter 2014 financial statements.  In particular, it was reported that PwC had refused to sign off on the financial results for Petrobras's transport subsidiary known as Transperto, which were signed by Sergio Machado.  Costa had said in videotaped testimony that he had received 500,000 reais ($202,000) from Machado.  On November 3, 2014, Petrobras announced that Machado had announced he would take a one-month, unpaid leave.

159.    On this news, Petrobras' common ADSs fell approximately 3.8%, from $11.70 on October 31, 2014, to $11.26 on November 3, 2014.  Likewise, the preferred ADSs fell approximately 4.6%, from $12.23 on October 31, 2014, to $11.67 on November 3, 2014.

160.    On November 9, 2014, the Financial Times published a detailed article entitled, "US Turns Up Heat With Criminal Investigation Into Petrobras," which reported that the U.S. Department of Justice and Securities and Exchange Commission had opened criminal and civil investigations into Petrobras.

161.    In response, Petrobras' common ADSs fell approximately 2.6%, from $10.90 on November 7, 2014, to $10.62 on November 10, 2014.  The preferred ADSs also fell approximately 2%, from $11.27 on November 7, 2014, to $11.04 on November 10, 2014.

162.    On November 13, 2014, after the market closed, Petrobras issued a press release, which it filed with the SEC on Form 6-K.  The Company stated that it would be unable to publish its third-quarter 2014 financial statements by the SEC's deadline of November 14, because it required additional time to quantify the impact of the corruption allegations on its

financial condition. The Company further revealed that the alleged kickback scheme could impact the Company's financial statements.  The Company announced that it expected to release financial results for the third quarter by December 12, 2014.

163.    On the same day, Bloomberg reported that the Company was exploring potential accounting adjustments.  Bloomberg also reported that PwC had refused to sign off on Petrobras's results and would alert U.S. authorities if appropriate action wasn't taken to probe the allegations.  According to Bloomberg, following PwC's decision, Machado had announced that he would take an unpaid, one month leave of absence.

164.    In response, Petrobras's common ADSs fell 3.4% on November 13, 2014, from $10.56 on November 12, 2014, to $10.20 on November 13, 2014.  The preferred ADSs fell 4.2%, from $10.98 to $10.52.

165.    On November 14, 2014, more bad news came to light.  The Brazilian Federal Police arrested Duque, the former senior Petrobras executive who headed the engineering and services business and who was a member of the company's Executive Directorate.  The Police also arrested 27 senior executives at Cartel members, whose contracts with Petrobras were worth approximately $59 billion.  It was also reported that the Federal police served dozens of search warrants and raided the offices of 11 companies, including Petrobras, that were suspected of involvement in the bribery scheme.

166.    The same day, Petrobras announced that, once again, it would fail to meet the deadline to file its third-quarter financials.  Specifically, the Company stated: "[A]s a result of the time needed to (i) gain greater understanding from the ongoing investigations by the independent law firms (ii) make any adjustments to the financial statements based on the accusations and investigations related to [Operation Car Wash] and (iii) evaluate the need for

internal controls improvements, Petrobras is unable to release its third quarter 2014 financial statements at this time."

167.    In response, Petrobras's common ADSs continued their plunge, falling 2.5%, from $10.20 on November 13, 2014, to $9.95 on November 14, 2014.  Likewise, the preferred ADSs fell 2.8%, from $10.52 on November 13, 2014, to $10.23 on November 14, 2014.

168.    On Monday, November 17, 2014, before the market opened, the Company held its previously-scheduled earnings conference call with investors.  Former CEO Foster stated that "the accusations and investigations of the [O]peration Car Wash ... if found to be true, could potentially affect the Company's financial statements."  Although the Company refused to quantify the potential financial impact, CFO Barbassa explained that "if the accusations are proven to be true ... payment above what would be a fair value for a good [or] service ... should be removed from the PP&E line item ... and should be taken to the result."  Barbassa also stated that the line item for PP&E "should not include values which are not a fair value for that good or service" and that the Company "would deduct from it any amount that could be linked to bribery of any sort; any excessive price that would have been charged."  Former CEO Foster explained that the Company would have "an obligation to write off from the asset a cost related to corruption . . . if there is a cost relating to corruption in the value off [a] net asset, even if the asset can pay off that cost, you have an obligation to write off that cost.  You have to discount that cost"  Foster further explained that "we need more time, as it is fundamentally important to improve our internal controls."

169.    The same day, Foster confirmed to *Agencia Brasil*, that there was "overwhelming evidence of noncompliance" with respect to SBM, an offshore contractor, and that SBM "will no longer be eligible to bid for further contracts with [the Company.]"

170.    In response to the admission from Foster and Barbassa that major write-downs could be coming, that the Company's internal controls needed improvement, and that the evidence that SBM had paid bribes was "overwhelming," Petrobras's common ADSs fell over 6%, from $9.95 on November 14, 2014 to $9.33 per share on November 17, 2014.  The preferred ADSs fell approximately 6%, from $10.23 on November 14, 2014, to $9.64 on November 17, 2014.

171.    On November 24, 2014, before the market opened, Petrobras announced that it had received an SEC subpoena in connection with the SEC's investigation into the Company, and that the Company would be required to produce certain documents in connection with that investigation.

172.    In response, Petrobras's common ADSs fell 3%, from $10.84 on November 21, 2014, to $10.50 on November 24, 2014.  Likewise, the preferred ADSs fell 3%, from $11.44 to $11.06.

173.    On November 27, 2014, Bloomberg published an article entitled "Petrobras Internal Texas Refinery Probe Recommends Penalties."  The article reported that the Company's internal investigation into its Pasadena, Texas refinery recommended penalties for a group of employees.  Reports on the Abreu and Comperj refineries, where costs exceeded the state-run oil producer's original estimates, would be presented at a Dec. 12 board meeting, Bloomberg also reported.

174.    In response, Petrobras's common ADSs fell 8%, from $10.60 on November 26, 2014, to $9.72 on November 28, 2014.  Likewise, Petrobras's preferred ADSs fell 8.9%, from $11.21 on November 26, 2014, to $10.21 on November 28, 2014.

175.    On December 11, 2014, charges were filed in Brazil against 35 people involved in the kickback scheme, including 22 executives of Cartel members.

176.    On December 12, 2014, the Company announced that it would delay, yet again, its third-quarter 2014 financials.  Among other factors, the Company cited new developments in the widening corruption probe, including the December 11 indictments of executives at the country's largest engineering firms.  However, Bloomberg reported that the real reason for delay was "disagreement" among Petrobras's Board members, who "differ[ed] on the size of write downs stemming from graft-related costs."

177.    On December 15, 2014, Brazilian criminal authorities announced Cervero's formal indictment for acts of corruption and money laundering.

178.    As a result of the series of bad news revealed on December 11 through 15th, Petrobras's stock fell significantly.  The common ADSs fell approximately 19%, from $7.75 on December 10, 2014, to $6.26 on December 15, 2014.  Likewise, the preferred ADSs fell approximately 20%, from $8.31 on December 10, 2014, to $6.66 on December 15, 2014.

179.    On January 2, 2015, Brazil's securities regulator announced that it had opened an investigation into the Company.  Bloomberg reported that Petrobras "declined as officials opened an inquiry into management at the oil producer, which is at the center of the biggest corruption investigation in the country's history."  The article also noted that Petrobras said that it was banning 23 contractors, including Brazil's top builders, from taking part in bidding.

180.    On this news, the common ADSs fell 7.4%, from $7.30 on December 31, 2014, to $6.76 on January 2, 2015.  The preferred ADSs fell 8%, from $7.58 on December 31, 2014, to $6.95 on January 2, 2015.

181.    On Sunday, January 4, 2015, several news sources disclosed significant new information concerning the scope of the fraud and its impact on the Company's financial results. First, Brazilian publication *Globo* revealed that a previously confidential TCU audit had uncovered overpricing in contracts for a pipeline exceeding 1800%, prompting calls for further investigations.

182.    On January 5, 2015, news reports surfaced that an internal Petrobras audit had uncovered a major loss on the Comperj refinery.   Specifically, reports indicated that an internal committee created in April 2014 to evaluate projects related to the Comperj refinery concluded its work in November 2014, and sent a report to federal police and the CVM, among other public agencies.

183.    In response, common ADSs fell approximately 10%, from $6.76 on January 2, 2015, to $6.07 on January 5, 2015.  Likewise, the preferred ADSs fell approximately 19%, from $6.95 to $6.26.

184.    After the markets closed on January 27, 2015, Petrobras released incomplete third-quarter 2014 results. These results did not quantify the specific writedown attributable to the bribery scheme, but disclosed that at least "***1/3 of the company's total fixed assets***" reflected "contracts signed between Petrobras and the [Cartel] companies ... from 2004 to April 2012." Additionally, the Company provided a range of potential write-downs on these assets from ***$1.5 billion to $34 billion***.

185.    Petrobras further admitted that by booking the bribes as "assets" under PP&E, it had improperly accounted for the bribes, leading to "errors" in its financial statements. In a letter to shareholders accompanying Petrobras's financial results, CEO Foster admitted that former Petrobras employees had committed "unlawful acts" and that "payments to ... suppliers were

improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments." Additionally, in her letter to shareholders, Foster stated that the Company was working with PwC to adjust its financial statements and to "enhance [its] internal controls."

186. In Note 3 to the Form 6-K accompanying the earnings release, in a heading titled "Reasons to correct the carrying amount of specified [PP&E]," the Company admitted that "[t]he information currently available to the Company indicates that contracts entered into between January 1, 2004 and April 30, 2012 ... with suppliers and contractors named in the depositions may have included amounts related to the misconduct by suppliers and contractors, political agents, Petrobras personnel and other people."

187. The Company also elaborated on the improper treatment of the bribes as PP&E: "The payments related to the misconduct previously mentioned were recognized as part of the cost of certain [PP&E] and, as of September 30, 2014, most of those assets were under construction or were recently completed, and therefore, had little accumulated depreciation … under the circumstances described above, the Company believes that amounts related to the misconduct by third parties were capitalized as part of the historical cost of its property, plant and equipment and are still part of their carrying amount. However, those costs should not have been capitalized."

188. The Company also admitted in Note 2 that the improper booking of bribes as PP&E was a material failure that did not comply with IFRS: "These consolidated interim financial statements and notes to the financial statements have not been reviewed by independent auditors and reflect management's best judgment in fairly presenting the Company's financial position in light of facts known to management and based on documentation available as of the current date, except for errors in the carrying amount of certain [PP&E], which could not be

corrected by the Company as of the date of issue of these financial statements, as set out in note 3."

189.    On January 28, 2015, before the markets closed, Bloomberg reported that in a 10-hour meeting, Company directors could not reach a consensus on the write-down.  Bloomberg also noted that a more than two month delay in quarterly results was shutting it out of debt markets at a time of six-year-low oil prices.

190.    In response to the disclosures reflecting the pervasiveness of the bribery scheme and the massive potential writedown – possibly exceeding $30 billion – and the lack of clarity concerning the timing and amount of the writedown, the Company's common ADSs plunged 12% on January 28, 2015, from $7.45 on January 27, 2015 to $6.56 on January 28, 2015.  The preferred ADSs likewise fell approximately 12%, from $7.86 on January 27, 2015, to January 28, 2015.

191.    On January 29, 2015 Moody's downgraded Petrobras to the lowest level of investment grade, citing as a main reason for the downgrade the risk resulting from the Company's inability to quantify the costs of the corruption scandal.  Also following the release of the Company's third-quarter earnings, both Moody's (on January 29) and Fitch (on February 3) downgraded the Company to the lowest level of investment grade. Both credit rating agencies cited as a main reason the risk resulting from the Company's inability to quantify the costs of the corruption scandal, and the liquidity pressures that follow as investors are left in the dark.

192.    The media also explained the market's disappointment at the Company's failure to quantify the scandal and take a writedown, with the Wall Street Journal commenting that, "'[w]hen it didn't [announce a writedown], the credibility went down the drain and nothing else matters. We need to see, as investors, a credible statement with the numbers."  On January 30,

2015, Reuters noted that the Company's decision not to provide a "monetary estimate for how much the company's assets were overvalued as a result of the corruption scheme" was "a surprise decision."

193.    On January 30, 2015, Bloomberg also published an article entitled, "Prosecutors prepare Cartel Charges Against Brazilian Builders."  The article noted that "[s]ome of Brazil's biggest contractors, which are also being investigated for bribery and money laundering, will face charges of forming a cartel to manipulate bidding for Petrobras work, Carlos Lima, a prosecutor in the case, said."  The prosecutor commented to Bloomberg in an interview that "[w]e are sure that there was a cartel."

194.    In response to the Moody's downgrade on January 29, 2015 and to further disclosures concerning the scope of the bribery scheme, Petrobras' common ADSs fell approximately 6.1%, from $6.40 on January 29, 2015, to $6.01 on January 30, 2015.

195.    On February 6, 2015, Petrobras announced the appointment of a new CEO, Aldemir Bendine.  It was reported that the independent directors of Petrobras learned of the appointment from news reports prior to the board vote, and all three independent directors voted against the appointment.

196.    In response, Petrobras's common ADS fell approximately 8%, from $7.11 on February 5, 2015, to $6.54 on February 6, 2015.   Likewise, the preferred ADSs fell approximately 6%, from $6.72 to $6.31.

197.    On February 24, 2015, Brazil's Attorney General filed criminal charges against Cervero, accusing him of money laundering and criminal conspiracy.  The same day, Moody's cut Petrobras's debt rating to junk status, and indicated more downgrades may follow. According to Moody's, the downgrade was due to increasing concerns about the investigations

on the huge corruption scheme which involved several high level executives and major construction companies in Brazil. The Wall Street Journal reported that the size and timing of the downgrade "surprised" analysts and "sent the country's leaders into a defensive crouch." Bloomberg reported that "Petrobras stocks plummet after Moody's downgrade."

198.    On the news of the Cervero charges and the Moody's downgrade, Petrobras common ADSs fell approximately 5.4%, from $6.86 on February 24, 2015, to $6.49 on February 25, 2015. The preferred ADSs also fell, by approximately 6.7%, from $6.99 on February 24, 2015, to $6.52 on February 25, 2015.

199.    On Friday, March 6, 2015, Brazil's Supreme Court released a list of 49 politicians whom the Prosecutor recommended for investigation for crimes connected with a massive kickback scheme centered on the country's state-owned oil company Petrobras. On Monday, March 9, 2015, it was reported that the Supreme Court authorized the investigation of charges involving those 49 political leaders. Included in the list were the presidents of both houses of Congress, seven former cabinet ministers, one ex-president of Brazil plus other congressional leaders.

200.    On this news, on March 9, 2015, Petrobras's common ADSs fell approximately 6.2%, from $5.96 on March 6, 2015, to $5.59 on March 9, 2015. The preferred ADSs fell by approximately 6%, from $6.03 on March 6, 2015, to $5.68 on March 9, 2015.

201.    On March 18, 2015, it was reported that Switzerland had frozen $400 million in assets linked to the Petrobras scandal, over $120 million of which was repatriated to Brazil. Bloomberg reported that more than 300 Swiss bank accounts at over 30 banking institutions were used to process bribery payments, and that the beneficial owners of the accounts were senior Petrobras executives, suppliers, financial intermediaries, and companies that had paid the bribes.

The Swiss Attorney General announced that Switzerland was cooperating with Brazil in its investigation.

202.    In response to this startling revelation – of both the number of accounts and the sums of money involved – Petrobras's common ADSs fell approximately 7%, from $5.66 on March 18, 2015, to $5.26 on March 19, 2015.  The preferred ADSs fell approximately 6%, from $5.75 on March 18, 2015, to $5.39 on March 19, 2015.

203.    On April 23, 2015, Petrobras finally issued its third quarter 2014 financial statements, in which the Company recorded total write-downs of approximately $17 billion, as described above, and admitted to the basic structure of the bid rigging and kickback scheme.

204.    As additional disclosures have mounted over the course of 2015, the price of Petrobras ADS has continued to decline, reflecting both the ongoing disclosures of the scope of the fraud and the fact Petrobras has yet to make a full and complete corrective disclosure to account for it.

### Materially False and Misleading Statements and Omissions

205.    Throughout the Relevant Period, Defendants made many materially false and misleading statements and omissions to the public at large and specifically to Plaintiffs through oral and written communications. These included in-person meetings and telephone conversations in which Defendants were untruthful about or failed to discuss, among other things, (i) the existence of a kickback and bribery scheme; (ii) the Company's conspiring with the Cartel to fix bids on multi-billion contracts at inflated values;  (iii) the value of Petrobras's assets, including PP&E, and shareholder equity; (iv) Petrobras's profitability and expenses; (v) Petrobras's compliance with GAAP and IFRS; (vi) the integrity and reliability of the Company's internal controls and financial reporting; and (vii) the integrity and reliability of PwC's audits of

Petrobras and its false assurances that Petrobras's internal controls did not suffer from material weaknesses.

## Specific Representations to Plaintiffs

206.    Throughout the Relevant Period, Plaintiffs conducted extensive diligence in connection with their investments in Petrobras's ADSs.  Plaintiffs' portfolio managers studied the company's financials, attended investor days, traveled around the U.S. and to Brazil to speak with Petrobras management, and otherwise followed the Company closely.   This diligence included at least *seven trips* to Brazil to speak with management about the Company's business strategy, operations, and financial results.  Additionally, Plaintiffs participated in quarterly and annual earnings calls with management, and met personally with management in Massachusetts and in California.   Through these trips and meetings, Plaintiffs had numerous one-on-one conversations with the Company's senior most management, including its CFO Barbassa and CEO Gabrielli.

207.    Plaintiffs also frequently spoke to individuals in Petrobras's investor relations department as questions arose concerning the Company's business operations and financial results.   Plaintiffs also read and analyzed the company's quarterly and annual earnings statements, which were publicly filed with the Securities and Exchange Commission.  Finally, Plaintiffs reviewed and considered analyst reports published by securities analysts firms who also covered the Company, assessed its business operations and financial results – relying for their information on misrepresentations and omissions by the Company.

208.    Specifically, Plaintiffs made the following trips to meet with Petrobras management in connection with their research and analysis into the Company's business operations and financial results:

| Date | Location |
|---|---|
| September 2008 | Brazil |
| October 2010 | Brazil |
| March 2011 | Brazil |
| June 2011 | California |
| January 2012 | Brazil |
| June 2012 | California |
| May 2013 | Brazil |
| January 2014 | Brazil |
| March 2014 | Brazil |

209.    In addition, Petrobras's management traveled to Boston, Massachusetts on the following occasions, trumpeting the Company's prospects to Plaintiffs:

| Date | Petrobras Attendees Included |
|---|---|
| September 2012 | CEO Gabrielli |
| April  2012 | Paula Costa, Lincoln Guardado |
| April 2012 | Representatives of Queiroz Galvao |
| August 2012 | Theodore M. Helms (investor relations) |
| March 2013 | Pedro Mederios, Juan Tavarez |
| May 2014 | Theodore M. Helms (investor relations) and Luis Xavier |
| December 2014 | Leandro da Rocha Santos |
| January 2015 | Leandro da Rocha Santos |
| January 2015 | Theodore M. Helms (investor relations) |

210.    Like many investors, Plaintiffs had been attracted to the Company by its impressive upstream and downstream growth prospects, including its huge pre-salt discoveries in 2006 and the announced construction of the Abreu and Comperj refineries.  Plaintiffs were also attracted to the Company by its listing on the New York Stock Exchange, which Petrobras touted as evidence of its strong financial reporting and internal controls.

211.    As Plaintiffs and other investors understood, Petrobras's ambitious growth targets would require major capital investments.  Soon after these projects got underway, however, Plaintiffs noticed, like other investors, that they were more costly than the Company had expected, and, importantly, were turning out to be significantly more expensive than similar projects around the globe.  That is to say, compared with "benchmarks," the cost and timelines associated with Petrobras's major projects were significantly worse than similar projects throughout the world.  Of course, these cost overruns and delays, especially with respect to the Comperj and Abreu refineries, which were so important to building the Company's downstream capacity, would significantly reduce the profitability of the Company's capital projects.

212.    Plaintiffs, like many other investors, asked management about the reasons for these cost overruns and delays.  Plaintiffs had numerous conversations with Petrobras management in the U.S. and Brazil about these concerns, but management always had detailed plausible explanations: the local infrastructure was inadequate, the technical challenges were worse than expected, or project modifications were required.  Likewise, Petrobras's management, including its CEO Foster and CFO Barbassa, assured Plaintiffs in face-to-face conversations that there were no irregularities, that these cost overruns and delays were one-time "hiccups," and that the Company's future refinery projects would be completed much more quickly and less expensively.

213.    Looking face-to-face with management, Plaintiffs relied on the truth of these explanations.  Without the benefit of access to the Company's books and records, to which only the Company and its auditor PwC were privy, these explanations, while disappointing, were at least internally consistent and certainly plausible.  As it turns out, however, these explanations were false when made and could not have been further from the truth.  Petrobras's management

68

either knew that these explanations were false, or they were reckless in not knowing that they were false.

214.    Although Plaintiffs had many direct conversations with management in this regard, several specific discussions are worth describing here.  In each of these conversations, Petrobras management not only failed to disclose what they knew to Plaintiffs about the existence of the bid rigging and kickback scheme, they also provided Plaintiffs with false explanations for the cost overruns at the Company's key downstream capital projects, including Abreu and Comperj.  These discussions, among others, are described below.

215.    On August 26, 2009, Petrobras issued a note to investors, from the Company's Investor Relations department, addressing the delays and cost overruns that with respect to Abreu.  The Company first noted that when announced in 2006, the initial target was for Abreu to be fully operational by 2011, at a capacity of 200,000 barrels of oil per day, and at a cost of $4.056 billion.  Then, the Company explained that from 2007 to 2009, the "degree of definition of the technical and planning requirements for the project was advanced," and the operations were expected to "go on stream in 2011," at a slightly increased capacity of 230,000 barrels per day, but a massively higher cost -- $12.00 billion, or about three times higher than originally expected.  The note to investors provided a very specific explanation for the cost increase:

> [T]he increase in the planned investments [from $4 billion to $12 billion] can be explained based on the following factors: (a) an increase in the project's scope intended to increase refining capacity and include new systems to improve product quality, (b) a significant surge in equipment and service prices compared to the original estimates on account of a cost inflation in the oil industry as a result of the spike in international oil prices in the past few years and, (c) a less expensive Dollar compared to the Real, which increases the costs incurred in Reais, in which most of the cost is denominated ...

216.    Shortly after receiving this note from Petrobras, one of Plaintiffs' portfolio managers called Petrobras's investor relations department to go over the reasons for the jump in costs on Abreu to $12 billion from $4 billion, which caused the cost per billion barrels of processing capacity to rise from about $20,000 to over $52,000.  Echoing the Company's prior note to all investors, but adding additional detail, Petrobras's investor relations employee explained to Plaintiffs that higher costs were due to installation of the "delayed coking" process, hydro treatment, hydrogen generation, and chemical waste treatment.

217.    The company's explanations for the cost overruns provided in this August 26, 2009 note to investors, as well as the more detailed explanation provided by investor relations to Plaintiffs over the phone, were completely false.  The overruns were not attributable to exchange rates, or a "surge" in equipment and services prices because of rising oil prices:  The truth was that the cost overruns were driven by massively inflated contracts with the Cartel for these services.

218.    Indeed, Barusco's testimony revealed that two of the biggest Abreu contracts with the Cartel were the nearly $2 billion contract for the hydro treatment unit awarded to Odebrecht and OAS, and the approximately $2 billion contract for the delayed coking unit awarded to Camargo and CENC.  The investor relations department had correctly identified the contracts responsible for the cost overruns, but had failed to disclose that the true reasons for those high costs. Petrobras, which knew or was reckless in not knowing the true reasons for the overruns, was equally intentional or reckless in permitting its investor relations personnel to mislead Plaintiffs when they asked specific questions that, if answered truthfully, would have revealed the fraud and kickbacks at Abreu.

219.    In October 2010, Plaintiffs traveled to Brazil and met with, among others, CFO Barbassa.  Plaintiffs once again raised the issue of cost overruns in the refinery projects.  CFO Barbassa said that the expenditures were "necessary" because the Company was not making money on diesel imports (Abreu would specialize in diesel), and because new "environmental issues" posed technical challenges.  In total, Barbassa represented that the Company would ultimately spend about $30,000 per barrel of refining capacity, and that capital expenditure on refining capacity would come down once the new refining projects and upgrades were complete "in 2014."  As the Company has now admitted, these expenditures were not "necessary" nor were they caused by environmental factors or other technical challenges – there were caused by fraud.

220.    By summer 2012, however, the Company had yet again increased the cost estimate for the Abreu refinery, this time to $17.1 billion.  In June 2012, Plaintiffs specifically discussed the reasons for that cost increase with Petrobras's CEO Gabrielli.  Additionally, Plaintiffs asked why the Company would proceed with the project at such a high cost, while delaying another refinery, which presented more favorable returns and met gasoline demand and/or diesel demand.  Again, the Company did not reveal the true reason for proceeding with Abreu: it was an absolute cash cow for Petrobras management and their political allies.  In fact, the higher the costs, the more bribes they were paid.

221.    In May 2013, Plaintiffs traveled to Brazil to meet with management to discuss the Company's business operations and financial results.  In this trip, the topic of the Abreu refinery once again came up.  Management assured Plaintiffs that in the future, refineries would not cost so much.  Once again, management emphasized the technical and logistical challenges and pointed to the increased capacity from 200,000 barrels per day as originally envisioned, to

230,000 barrels per day as modified.   Remarkably, management even commented that CEO Foster had visited the refinery a week before and that it looked "beautiful" and was nearing completion. These statements were knowingly false when made and were intended to deceive Plaintiffs about the true facts regarding Abreu and the soundness of their investment in Petrobras ADS.

222.   A month later, in June 2013, Plaintiffs spoke with the Company and inquired about the cost overruns and delays on the Comperj refinery, as Plaintiffs had concluded that the Comperj facility was likely to cost <u>twice</u> as much as global benchmarks.   The Company explained that part of the delays and higher expenses were due to add-ons of a pipeline and Petrochem facility.   Of course, Petrobras again failed to disclose the existence of a long-running bribery and kickback scheme, a failure that again misled Plaintiffs about the safety and soundness of their investment in Petrobras ADS.

223.   Yet another such conversation occurred in March 2014.   By that time, the total costs of Abreu had risen to over $20 billion.   After it was disclosed that one of the Company's directors, Mauro Cunha, had cast a dissenting vote against 2013 Petrobras's financial statements, Plaintiffs called Petrobras's investor relations department to gather more information about the reason for the dissent, as it had been reported that Cunha felt the board was not given adequate time and sought more information concerning the possible need to impair certain of the Company's capital projects which had experienced significant cost overruns and delays.   The investor relations department explained that Cunha had the right intentions, but was not a "specialist in corporate finance."   Furthermore, they explained that although the Abreu refinery had experienced cost overruns, PwC had conducted "thorough" impairment tests and that such outside accounting tests, together with technical tests, showed there was no need to impair the

value at which the Company had booked the Abreu refinery.  In seeking to downplay Cunha's dissent and assure Plaintiffs that they could rely on PwC's audits, the Company had, yet again, misled Plaintiffs about Abreu and intentionally failed to disclose the existence of the massive bid rigging and kickback scheme and sought to artificially inflate the prices of its ADSs.

## Conference Calls with Investors

224.    In its conference call with investors concerning its 2009 full-year results, Petrobras provided materially false and misleading explanations of the cost overruns with respect to its key refinery projects.  UBS analyst Lilyanna Yang asked why Abreu was expected to cost more than twice as much as refineries of similar complexity in the U.S. or Europe, and former CEO Gabrielli provided the completely false explanation that local infrastructure and environmental reasons were to blame for the overruns, when in reality they were caused by the bid rigging and kickback scheme:

> **<Q - Lilyanna Yang, UBS**>: … And secondly, and more on the refining CAPEX, I would like to understand why for instance the Abreu and Lima refinery is estimated to have a cost that is twice as much the cost of a refinery of similar complexity in the United States or Europe? I might be missing something so I just wanted to understand if maybe it is related to infrastructure or something else, and maybe even the Maranhão and Ceará refineries seem to be a bit higher in terms of cost versus the international benchmark. So these are my two questions. Thank you.

> **<A - José Sergio Gabrielli de Azevedo>:** … The second thing is on the refinery costs, we are finishing the numbers. If you have the numbers, please tell me because we have not finished it, we do not have them.

> **<Q - Lilyanna Yang, UBS>:** We got the numbers from what the global press said and from what local reports from what the TCU indicates.

> **<A - José Sergio Gabrielli de Azevedo>:** OK, if you have them, which is another thing. But we are finishing the numbers and for sure that is something that we have to take into consideration on a qualitative basis. For example, most of the assessment of the cost of refineries is a kind of plug-and-play refinery in which you go, produce the refinery and plug to the infrastructure and this is it.

**This is not our case. We have to develop part of the infrastructure within the project of the refinery. Power generation, power distribution, the utilization of residuals, transportation, some things that are necessary to build, the offsite of our refineries are bigger than the offsite of those international traditional companies.**

**These are important things to consider because the choice of a new refinery outside of the infrastructure existing today has several important reasons. One is the environmental reason.** The other is the marketing type of decision, because our refineries that have been planned to be built are in the Northeastern of Brazil, North of Brazil, they have a market that we do not have enough capacity today for refining in those markets, and also they have a competitive advantage to be near, closer to the United States, the Central America and the European markets. And this means that we have to pay to consider this difference.

But, I am talking about the qualitative type of numbers, **I do not have the quantitative right now to give you, because we are finishing our process.** And all people that are around me here, they have told me that they have not finished the numbers. If you have them, I would like to know them.

225.   In its conference call with investors concerning its second quarter 2009 results, investors again asked about the high refinery costs, and management once again explained that despite technical challenges, the investments were very important.  Costa himself responded to investor questions about Comperj. Given his involvement in the scheme, there is no doubt that his statements—made on behalf of Petrobras in an investor call—were materially false and misleading. They were intended to and did deceive investors about the candor and completeness of Petrobras's disclosures regarding its construction contracts and their costs. Plaintiffs relied, however, on the perceived candor of these statements in continuing to purchase and hold Petrobras ADS.

226.   Specifically, Costa—on behalf of Petrobras—stated in this investor call that Comperj was the Company's "**most important expenditure**."

**<Q - Arjun Murti>**: Thanks, Ted. Just a follow-up question on the refining spending. I think you mentioned you had started spending on the Abreu e Lima refinery. What is the timing of developing a cost estimate and starting spending

on – I think you call it Premium I and Premium II – the additional 900,000 barrels a day of refining capacity you'd mentioned in your business plan? Thank you.

<A - Paulo Roberto Costa>: Yes. **We are spending a little bit high with that money in Abreu e Lima refinery. That's because we are on the construction phase. We are in this at the beginning. And this is the main reason why we spend more money this year in comparison with the last year**.

…

<Q - Arjun Murti>: I mean I guess, you have a five-year plan, which includes the building of Premium I and Premium II, and **so I was wondering the cost estimates for the Abreu e Lima refinery are quite high, presumably the natural refinery in part benefit from that infrastructure, so really just curious when the timeframe would be when you can give a cost estimate for the next round of refining spending, and when you plan on actually starting with that construction**?

<A - Theodore M. Helms, Investor Relations Executive Manager>: Really, the Premium I or II are really happening, especially Premium I, really, Premium II is not really within the next five years. And so what you'd say is that Premium I spending really only happens in starts beginning, assuming the project is approved in 2013, '014 and I think we're still, correct me if I'm wrong, Roberto, at a stage where saying, any – it's still in very development phase and saying anything about cost and prices would just be a pure guess. We're just not even – haven't even – we're not
close to being there yet. Is that correct, Roberto?

<A - Paulo Roberto Costa>: Yes, that's right.

…

<Q - Paul Cheng>: Hey, guys. Ted, the two refineries that are currently under construction, can you tell us again what is the cost estimate, and which one in the startup time, and see if there is any changes from previously what you disclosed?

<A - Theodore M. Helms, Investor Relations Executive Manager>: Yes. Roberto, so cost estimate, I think we have in the past put out a number is that correct – publicly I think?

<Q - Paul Cheng>: Yes, one, I think they was talking about 12 billion, one is 9 billion. I just wanted to see if that had been changed?

<A - Theodore M. Helms, Investor Relations Executive Manager>: To the best of my recollection, and I might have read in the press – I don't know if we ever had

an official number, but anyway, but I don't think we have any – we haven't made ourselves any disclosure or certainly any change or – to the start up. Do we have the dates, Roberto, these dates on startups of either Comperj or refineries in the Northeast?

<A - Paulo Roberto Costa>: **We're expanding our investments. We're expand our investment money mainly in conversion units inside of the existing refineries and quality, to improve the color quality, 83 millimeters, and to expand our capacity. Also, we have Northeast refinery. We have a Comperj also. And this is – we can say that this is our most important expenditure.**

227.     In its conference call with investors concerning the Company's first quarter 2012 results, the Company once again failed to disclose the existence of the bribery scheme when asked about the costs of the projects, and even evaded answering simple questions concerning the total cost and ultimate timeline for the projects:

**<Q - Paul Cheng>:** How about that the two already under construction, the Northeast refinery the 230,000 barrel per day and also that Comperj that 165,000 barrel per day. I think that previously you gave a budget of $13 billion for the Northeast refinery and $9 billion for the second one, and supposed to come on stream in 2013 in both, I just want to see if there is any update on those?

**<A - Almir Guilherme Barbassa>**: Paul, just a moment please.

**<A - José Carlos Cosenza>:** **Well, for Northeast refinery and Comperj refinery, we do not – well, the numbers are above that, but we do not disclose those figures for each specific project.**

**<Q - Paul Cheng>:** Can you tell us that whether the number is higher or much higher now or that it's still roughly about the same? And whether that is still going to be on stream into 2013 or it is being delayed?

**<A - José Carlos Cosenza>**: They will be running on 2013 and 2014 and beyond that.

**<Q - Paul Cheng>: Because you did gave a budget on both previously.** So, I just want to see if that budget now is going to be much higher or is still roughly about the same?

**<A - José Carlos Cosenza>:** Around the same that were announced, the public numbers that you already have.

228.    Each of these statements concerning the reasons for the cost overruns at the Company's Abreu and Comperj refineries was materially false and misleading, because these statements failed to disclose that the true reason for the problems was a long-running bid rigging and kickback scheme.   These material misstatements were intended to induce investors, including Plaintiffs, to purchase the Company's ADSs.   Plaintiffs relied on these misrepresentations, and would not have purchased the Company's ADSs if the Company had disclosed the true reason for these cost overruns and delays, or if it had, they would have paid significantly less for them.

229.    The Company made other misrepresentations to investors, including Plaintiffs, in separate conference calls with investors.  During the Company's August 6, 2012 conference call to discuss the Company's second quarter 2012 financial results, Foster stated to analysts: "We have qualified people. We know how to work. We know how to operate. We have invested along our history billions dollars in our development and we know what we are doing. **Our results are absolutely true and legitimate**."   On May 9, 2014, in response to an interview question asking CEO Foster to identify "the most important aspects of the company's governance," Foster stated that Petrobras "compl[ies] with the rules of the Securities and Exchange Commission (SEC) and the NYSE in the United States, the Latibex and Bolsa y Mercado Espafioles, Spain and the National Securities Commission (CNV) and the Buenos Aires Stock Exchange, Argentina."

230.    Foster's statements that the Company's results were "absolutely true and legitimate" and her statements attesting to Petrobras's compliance with the SEC's and NYSE's rules, including the SEC's requirement that all financial statements be accurately reported, were false and misleading when made for the reasons set forth above.  These material misstatements were intended to induce and did induce investors, including Plaintiffs, to purchase the

Company's ADSs.  Plaintiffs relied on these misrepresentations, and would not have purchased the Company's ADSs if the Company had disclosed the true reason for these cost overruns and delays, or if they had, they would have paid significantly less for them.

231.    On May 12, 2014, following reports that SBM had bribed Petrobras executives to secure a contract, CEO Foster stated that the Company had "conducted investigations" and "there are no facts or a document that would document the payment of bribery to any employees of Petrobras.  The final report … was offered to the national authorities as not only executive and legislative, but also judicial authorities."  This representation was false when made because there was "overwhelming evidence" that SBM has paid bribes to Petrobras, as the Company would later be forced to admit to the investing public.

## Financial Statements

232.    Petrobras reported materially false and misleading financial results at the end of each quarter and fiscal year throughout the Relevant Period.  In particular, the PP&E, total assets, expenses and net income figures that Petrobras reported during the Relevant Period, which are set forth in detail below, were materially false and misleading when made.  Petrobras has now admitted that these bribes were improperly capitalized under both IFRS and GAAP, and that PP&E was overstated by approximately $2.5 billion.

233.    By wrongfully recognizing the cash paid out in bribes as assets instead of expenses, Petrobras materially overstated the value of its PP&E, its total assets, and its shareholder equity in each of its quarterly and annual financial statements during the Relevant Period. In addition, Petrobras's net income and profitability was artificially inflated during the Relevant Period because the Company failed to record an impairment charge – which would track through the Company's income statement – to correct for the improperly overstated PP&E

values.   Petrobras also reported falsely understated expenses during the Relevant Period, because, as the Company has admitted, the improper kickback payments should have been classified as expenses, rather than assets booked under PP&E.

234.   Petrobras's May 28, 2010 Form 6-K represented that Petrobras's financial statements "have been prepared in accordance with U.S. generally accepted accounting principles (U.S. GAAP) and the rules and regulations of the Securities and Exchange Commission (SEC) for interim financial statements."  Petrobras made the same representations in each quarterly and annual statement it filed the March 26, 2010 Form 6-K; August 25, 2010 Form 6-K; November 24, 2010 Form 6-K; March 17,2011 Form 6-K; May 26, 2011 Form 6-K; August 25, 2011 Form 6-K; and November 22, 2011 Form 6-K.  Likewise, Petrobras represented in the 2009 Form 20-F and 2010 Form 20-F that the Company's "audited consolidated financial statements ... and the accompanying notes, contained in this report have been presented in U.S. dollars and prepared in accordance with U.S. generally accepted accounting principles, or U.S. GAAP."

235.   Each of these representations was false and misleading when made, because the Company's financial statements were not prepared in accordance with U.S. GAAP, as Petrobras has admitted.   These material misstatements were intended to induce investors, including Plaintiffs, to purchase the Company's ADSs.  Plaintiffs relied on these misrepresentations, and would not have purchased the Company's ADSs if the Company had disclosed the true reason for these cost overruns and delays.

236.   Following Petrobras's transition to IFRS reporting, the Company represented that Petrobras's financial statements were "presented" and/or "prepared" "in accordance with IAS 34 Interim Financial Reporting issued by the International Accounting Standards Board (IASB)" in

its May 17, 2012 Form 6-K, August 10, 2012; October 30, 2012 Form 6-K; April 30, 2013 Form 6-K; August 13, 2013 Form 6-K; October 28, 2013 Form 6-K; May 12,2014 Fonn 6-K; and August 11, 2014 Form 6-K. Similarly, the Company's 2011 Form 20-F; 2012 Form 20-F; 2013 Form 20-F; February 29, 2012 Form 6-K; February 6, 2013 Form 6-K; and February 26, 2014 Form 6-K.

237.    Each of these representations was false and misleading when made, because the Company's financial statements were not prepared in accordance with IFRS, as Petrobras has admitted.  These material misstatements were intended to induce investors, including Plaintiffs, to purchase the Company's ADSs.  Plaintiffs relied on these misrepresentations, and would not have purchased the Company's ADSs if the Company had disclosed the true reason for these cost overruns and delays.

238.    The 2009 Form 20-F and 2010 Form 20-F contained certifications executed by CEO Gabrielli and CFO Barbassa which represented that the annual report "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and "fairly presents, in all material respects, the financial condition and results of operations of the Company."  The 2011 Form 20-F, 2012 Form 20-F and 2013 Form 20-F contained the same certifications executed by Foster and Barbassa. The 2012 Form 20-F and 2013 Form 20-F also contained the following representation regarding the Company's accounting policy for valuing PP&E: "[PP&E] are measured at the cost to acquire or construct, including all costs necessary to bring the asset to working condition for its intended use, adjusted during hyperinflationary periods, as well as by the present value of the estimated cost of dismantling and removing the asset and restoring the site and reduced by accumulated depreciation and impairment losses."

239.    Each of these representations was false and misleading when made, because the Company's financial statements did not fairly present the Company's financial condition, because the carrying value of PP&E on the Company's balance sheet was massively inflated during the Relevant Period, and because the cost overruns in the Company's major contracts were caused by bribery and a bid rigging scheme and were therefore not "necessary to bring the asset to working condition."  These material misstatements were intended to induce investors, including Plaintiffs, to purchase the Company's ADSs.  Plaintiffs relied on these misrepresentations, and would not have purchased the Company's ADSs if the Company had disclosed the true reason for these cost overruns and delays.

**Facts and Data Website**

240.    The Company's "Facts and Data" blog was another source of many materially false and misleading statements and/or omissions.

241.    On January 28, 2010, in response to newspaper articles reporting that TCU had identified possible irregularities with respect to several of its capital projects, Petrobras posted that "there have been no irregularities" in its contracts and that "[t]here are differences in the parameters utilized by TCU and Petrobras, which results in different values in some of these works contracts."  Petrobras further stated that "[t]he Company cooperates systematically with the control organs and, when there are differences, it attempts to clarify them – which is what is being done in the case of these four works."  The very next day, on January 29, 2010, Petrobras further stated on Facts and Data that it "reaffirms that there has been no 'overbilling' or 'overpricing' in the [Abreu] works.  The TCU uses National Department of Transportation Infrastructure (DNIT) criteria for road construction as a reference for contract analysis. Petrobras has already clarified innumerable times that those criteria do not apply to the ground

leveling operations of a petroleum refinery, a much more complex work with specific conditions quite different from the characteristics of a highway.  One of the great challenges for the construction of the [Abreu] refinery, in the ground leveling phase, was the type of soil of the region.  Part of it is expansive, that is, with a great variation of volume and mobility.  In addition to that the rainy season brought additional difficulties to the work."

242.    On October 8, 2010, in response to TCU allegations, Petrobras posted that it "reiterates that there are technical divergences between the methodologies adopted by the company and by TCU.  The criteria utilized by the Court are insufficient and do not apply to works such as Comperj, much more complex with its own specificities.  Petrobras collaborated with TCU in all its requests and there was no obstruction at any time."

243.    On November 9, 2010, in response to TCU allegations that the Abreu refinery contracts were overpriced, Petrobras posted a statement on its Facts and Data website stating: "Petrobras denies that there were irregularities in the construction works of the Presidente Getulio Vargas (Repar) and Abreu e Lima (Rnest) refineries. … The criteria utilized by the TCU are not applicable to works such as a petroleum refinery, more complex and with their own specificities. … In the preparation of its call to bids, Petrobras rigorously observes the terms of Decree No. 2,745/98, which deals with Simplified Bidding Procedure and which endows the Company with agility to develop its projects with efficiency, economy, and profitability. Petrobras reiterates that the criteria of acceptability of prices questioned by the Court are aligned with national and international technical standards in regard to the subject.  In addition, in the formation of prices, the Company also considers aspects related to safety items, the environment, health, and social responsibility.  These requirements produce important results, such as a low on-the-job accident index."

244.   On November 8, 2011, Petrobras posted on Facts and Data the following: "Petrobras clarifies that there has not been an overbilling, overpricing, or any other irregularity in its works. … A refinery is an enterprise of great complexity and with its own specificities. Such works present a series of different practices, such as logistics, the qualification of labor, geographic localization, contract guarantees, among other things."

245.   On August 5, 2012, in response to an article issued by the Brazilian publication *Valor* reporting that TCU had identified irregularities with respect to approximately $500 million in contracts related to Abreu, Petrobras stated on Facts and Data that it "does not recognize any of the signs of irregularities identified by the Court (TCU) . …. These so-called irregularities found by the Court (TCU) are based in methodological differences between the Court and Petrobras regarding the analysis of the costs of the works." The Company went on to state that "[t]here wasn't overestimation of the costs by Petrobras" and that "its estimates are developed by observation of the prices on the market."

246.   On December 29, 2012, Petrobras posted to Facts and Data that it "denies any practice of corruption and utilizes rigorous management instruments to guarantee the protection of its shareholders' interests. … Petrobras has its accounts analyzed in a permanent and continuous manner by internal and external auditors under the auspices of the Comptroller General of the Union (CGU) and the Court of Accounts of the Union (TCU). The Company complies with the requirements of such agencies as the Securities Values Commission (CVM), the United States Securities and Exchange Commission (SEC) and the Sarbanes-Oxley Law, having had all its balances audited and approved in all instances. In 2012, for the 12th consecutive year, Petrobras was honored with the Transparency Trophy awarded by [Brazilian finance and accounting associations]."

247.     On January 7, 2013, in response to questions concerning potential overpricing, Petrobras stated on Facts and Data: "Petrobras reaffirms that there are no irregularities in the construction of the Abreu e Lima Refinery in Pernambuco. The reporting in *Fantastico* improperly compares the values of the basic refinery project, prepared seven years ago, with what is being constructed. The initial project underwent various modifications in function of changes in the scenario. The Company also reaffirms that there are no irregularities in the Rio de Janeiro Petrochemical Complex works. Petrobras has clarified all questions put forth by the [TCU] and reaffirms that as of this point in time no definitive judgment has noted any irregularity whatsoever."

248.     On May 19, 2014, Petrobras made the following statement on its Facts and Data website concerning the Abreu refinery: "Petrobras restates that there is no "overcharging of R$69.9 million" in the contract with the consortium Abreu e Lima. Since 2008, the company has been telling the TCU that there are methodological divergences in accounting for items that are specific to the oil industry. The court itself has revised the values, after the clarification, for R$19 million. The company is still communicating with the TCD to demonstrate that there is no overpricing or overbilling in the works." The Company issued virtually identical statements on Facts and Data again on May 20, 2014, June 17, 2014, June 21, 2014, June 22, 2014, June 23, 2014, and July 14, 2014.

249.     On July 23, 2014, Petrobras stated: "Regarding the matter 'TCU points to irregularities,' Petrobras reaffirms that there is no overbilling in its works." It went on to state: "Regarding the work at Abreu e Lima refinery, Petrobras reaffirms that there is no overbilling or overpricing."

250.   Each of the statements made on the Facts and Data blog listed above were materially false and misleading when made because, in fact, a significant number of the contracts Petrobras entered into in connection with Abreu, Comperj, and other projects were tainted by "irregularities" as a result of the "cartelization" of Petrobras, which inflated many of the Abreu contracts by up to 20%, and the "mandatory" kickbacks to Company executives and their political sponsors.   Furthermore, the cost overruns and delays associated with Abreu and Comperj were not caused by project complexities, technical challenges, environmental issues, soil problems, logistical challenges, project modifications, labor issues, or any other non-fraud explanation identified in the blog posts.   Furthermore, the Company's bidding practices plainly did not comply with the Simplified Bidding Procedure Regulations or the Company's internal procurement standards.   Instead, they were caused by a long-running and systematic bid rigging and kickback scheme.   The material misstatements and/or omissions in the Facts and Data blog were intended to induce investors, including Plaintiffs, to purchase the Company's ADSs. Plaintiffs relied on these misrepresentations, and would not have purchased the Company's ADSs if the Company had disclosed the true reason for these cost overruns and delays.

## Company Website

251.   On its website, the Company claimed during the Relevant Period that "[t]o reduce our exposure to fraud and corruption risks, we established segregation of functions among employees who demand goods or services, those who conduct the procurement process, and those who are responsible for approving it. We also established limits of authority, updated and approved periodically by the Executive Board, for the signing of contracts."

252.   This statement was materially false and misleading when made because, in fact, its procurement processes were rigged and tainted by fraud and corruption.   Similarly, employee

functions were not segregated.  This material misrepresentation was intended to induce investors, including Plaintiffs, to purchase the Company's ADSs.  Plaintiffs relied on these misrepresentations, and would not have purchased the Company's ADSs if the Company had disclosed that the Company's procurement processes were rigged, and resulted in massively inflated contracts awarded to a pre-selected member of an organized Cartel of engineering and construction firms.

253.    The Company also claimed on its website during the Relevant Period that, with respect to third party suppliers, it "[carried] out integrity due diligence of our suppliers, joint venture partners and counterparties in acquisitions or divestments at the start of our commercial relationship with them, considering the following factors, among others: the geographical location of the company and where it does business; the company's interaction with public agents; its history and reputation; and the nature of the business."

254.    This statement was materially false and misleading when made because, in fact, the Company's selection of contractors was rigged and tainted by fraud and corruption, and lacked "integrity" and "due diligence."  This material misrepresentation was intended to induce investors, including Plaintiffs, to purchase the Company's ADSs.  Plaintiffs relied on these misrepresentations, and would not have purchased the Company's ADSs if the Company had disclosed that the Company's procurement processes were rigged, and resulted in massively inflated contracts awarded to a pre-selected member of an organized Cartel of engineering and construction firms.

### Internal Controls

255.    Throughout the Relevant Period, former CEOs Foster and Gabrielli and CFO Barbassa certified the effectiveness of the Company's internal controls and procedures.

Specifically, each of the Company's Forms 20-F included a certification signed by Barbassa, as well as Gabrielli (for the 2009 Form 20-F and the 2010 Form 20-F) and Foster (for the 2011 Form 20-F, the 2012 Form 20-F, and the 2013 Form 20-F), stating that: "The Company's other certifying officer and I ... have: (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; … The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions): (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting."

256.    Additionally, the February 29, 2012 Form 6-K, the 2010 Form 20-F and the 2011 Form 20-F contained the following statement: "[M]anagement assessed the effectiveness of [the] Company's internal control over financial reporting as of December 31 [of the reporting year], based on the criteria established in Internal Control Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that assessment, management has concluded that as of December 31 [of the reporting year,] [the] Company's internal control over financial reporting is effective."

257.     The 2012 Form 20-F, the 2013 Form 20-F and the March 7, 2014 Form 6-K filed with the SEC contained the following representation: "Our management has assessed the effectiveness of our internal control over financial reporting as of December 31 [of the reporting year], based on the criteria established in Internal Control-Integrated Framework [(1992)] issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31 [of the reporting year]."

258.     Each of the statements set forth above was materially false and misleading when made for the following reasons: As described in detail herein, Petrobras's internal controls were grossly ineffective and were routinely overridden during the Relevant Period. Specifically, numerous high-level Petrobras executives engaged in a decade-long scheme involving bid-rigging on construction contracts and the overpayment of costs in connection with these contracts in exchange for substantial kickbacks to Petrobras executives.

259.     Foster has now admitted that the Company "need[ed] to enhance [its] internal controls," and Petrobras further stated that it would "evaluate the need for improvements in its internal controls."

260.     The statements regarding the adequacy and effectiveness of the Company's internal controls during the Relevant Period were also materially false and misleading when made because Velosa informed Gabrielli and Foster as early as 2008 of the "[i]rregularities," including "contracts that ... were overbilled," yet no action was taken by the Company to discontinue the fraudulent scheme or disclose the weakness in its internal controls.

261.     Between March and August 2014, as Operation Car Wash began to unfold, Petrobras, Foster and Costa vehemently denied any participation in or knowledge of the bribery

scheme, affirming repeatedly that there were "no facts or documents that evidence the payment of bribes to Petrobras employees," that Costa's "involvement in money laundering and remittance abroad is zero," that "you will not find anything illegal at Petrobras, because there is nothing illegal about Petrobras," that "there is no indication of irregularities" at Abreu and "there is no overpricing or overbilling in the project of the Abreu e Lima refinery." These Petrobras statements, like the others above, were knowingly false when made and were intended to and did deceive investors, including Plaintiffs.

<u>**Scienter**</u>

262.    Petrobras knowingly and/or recklessly made the materially false and misleading statements and omissions of material fact alleged herein. Throughout the Relevant Period, Petrobras's former executives, including former CEOs Foster and Gabrielli, former CFO Barbassa, and former Executive Directorate members Costa, Duque and Cervera were active, culpable, and primary participants in the fraudulent scheme. These executives were also responsible for issuing the materially false and misleading statements and omissions of material fact alleged herein based upon: (i) their actual issuance of and/or control over Petrobras's materially false and misleading statements, and (ii) their knowledge or reckless disregard of the fraudulent and criminal conduct described herein. These senior executives made or had control over the statements alleged herein and knew or recklessly disregarded that each of these statements was materially false and misleading and/or omitted material facts at the time it was made.

263.    Costa and Barusco, senior members of Petrobras's management who have testified that the scheme was endemic and institutionalized at the Company, have pled guilty to bribery and money laundering charges. Costa, with full knowledge and active participation in the

scheme, was authorized by Petrobras to speak directly to its investors, including Plaintiffs. On behalf of Petrobras, Costa knowingly provided investors, including Plaintiffs, with willfully false explanations for cost overruns on Petrobras's construction projects. As discussed above, scores of senior executives at Petrobras have also resigned or been terminated—including the entire Executive Directorate—as a result of their participation in the fraud alleged herein.

264.   Similarly, on the very same day in April 2012, both Costa and Duque, now identified as two central executives involved in the fraudulent scheme, were replaced as the Directors of Supply and Services, respectively. The suspicious timing and nature of these departures strengthens the overall inference of Petrobras's scienter.

265.   All of the Petrobras senior executives who participated in the kickback scheme had actual or apparent authority to act on behalf of Petrobras in undertaking and operating the scheme. Petrobras itself benefitted from the scheme: the political payments made pursuant to the scheme enabled Petrobras to curry favor with the Brazilian politicians who controlled Brazil's equity stake in Petrobras. The wrongful actions of these senior Petrobras executives, including: a) their implementation of a scheme to generate funds not just for themselves, but for kickbacks to politicians on behalf of Petrobras, b) the misleading statements these and other executives made to investors, and c) the misstatements that infected Petrobras's public financial statements as a result of their wrongful actions, are all wrongful acts and misstatements of Petrobras itself.

## THE FRAUD-ON-THE-MARKET DOCTRINE APPLIES

266.   At all relevant times, the markets for Petrobras's common and preferred ADSs were efficient for the following reasons, among others:

a) Petrobras's ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient electronic stock market;

b) As a registered and regulated issuer of securities, Petrobras filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

c) Petrobras regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Company's websites, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d) Petrobras was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

e) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Petrobras's ADS securities; and

f) Without knowledge of the misrepresented or omitted facts, Plaintiffs purchased or otherwise acquired Petrobras ADS securities between the time that Petrobras made the material misrepresentations and omissions and the time that the truth was revealed, during which time the prices of Petrobras's securities were artificially inflated by Petrobras's misrepresentations and omissions.

267.    As a result of the foregoing, the market for Petrobras ADSs promptly digested current information regarding Petrobras from all publicly available sources, and the prices of Petrobras securities reflected such information. Based upon the materially false and misleading statements and omissions of material fact alleged herein, Petrobras's ADSs traded at artificially inflated prices during the Relevant Period.  Plaintiffs purchased Petrobras ADSs relying upon the

integrity of the market price of those securities and other market information relating to Petrobras, and were damaged thereby. Plaintiffs continue to sustain damage as further disclosures are made about the scope and extent of the fraud because, as set forth above, Petrobras has not yet made—and the market has not yet digested—a full and complete corrective disclosure about the scope, costs, and consequences of the fraud for Petrobras and its ADS securities.

## THE STATUTORY SAFE HARBOR IS INAPPLICABLE

268.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any such forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those set forth in the purportedly forward-looking statement.

269.    Alternatively, to the extent the statutory safe harbor does apply to any forward-looking statements pleaded herein, Petrobras is liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Petrobras who knew that those statements were false when made.

## CLAIMS FOR RELIEF

### Count I
*Common Law Fraud*
*Asserted Against Petrobras and PwC*

270.    Plaintiffs incorporate paragraphs 1-263 by reference as if fully set forth herein.

271.     As described herein, Defendants are liable to Plaintiffs for damages because they committed common law fraud by intentionally supplying materially false information to Plaintiffs, concealing material facts they had a duty to disclose, and intending that Plaintiffs would rely on such false information and purchase the Company's ADSs.

272.     The untrue statements and omissions detailed in the Company's financial statements, Facts and Data website, and in other written and oral presentations, including one-on-one meetings between Plaintiffs and the Company, were material in that they related to matters that would have been of importance or significance in Plaintiffs' decision whether to purchase the ADSs.   Furthermore, Plaintiffs would have viewed the disclosure of the true facts as significantly altering the total mix of information available.

273.     At the time they acquired the ADSs, Plaintiffs were not aware of the above-detailed untruths or omissions.

274.     Defendants made the above-detailed statements and omissions with knowledge of their falsity at the time they were made, or at least with gross recklessness, and with the intent that Plaintiffs rely on the representations.

275.     Plaintiffs actually, reasonably and justifiably relied to their detriment on the material misrepresentations and omissions of the Defendants in purchasing the ADSs, and that reliance caused the harm Plaintiffs seek to redress in this lawsuit.   Had Plaintiffs known the truth, they would not have purchased the ADSs.

276.     Plaintiffs have been severely damaged as a direct and proximate result of Defendants' fraud.   Plaintiffs are therefore entitled to recover from the Defendants all of the damages Plaintiffs sustained as a result of Defendants' fraud.   In addition, due to the nature of Defendants' conduct, Plaintiffs are entitled to recover exemplary damages from all Defendants.

## Count II

*Negligent Misrepresentation*
*Asserted Against Petrobras and PwC*

277.   Plaintiffs incorporate paragraphs 1-270 by reference as if fully set forth herein.

278.   As described herein, each of the Defendants is also liable to Plaintiffs in damages for committing negligent misrepresentations by supplying materially false information to Plaintiffs, concealing material facts they had a duty to disclose, and intending that Plaintiffs would rely on such false information and purchase the Company's ADSs.

279.   The Defendants issued and approved the Company's materially misleading and false financial statements and made other written and oral communications to Plaintiffs. Defendants prepared these documents and made these representations for the express purpose, and on the express understanding, that they would be distributed to a known, limited class of potential investors, including Plaintiffs, in order to induce them to buy the Company's ADSs. Plaintiffs are therefore reasonably foreseeable recipients of the Company's and other representations and part of the known and identifiable class whom Defendants knew or had reason to know were likely to rely on the Defendants' misrepresentations.

280.   The Defendants each had a duty to provide Plaintiffs with materially accurate information, and each had a duty not to misrepresent the Company's financial results, its bidding practices, or the integrity of its internal controls.  However, each Defendant failed to exercise reasonable care in making these oral and written representations to Plaintiffs.

281.   Defendants acted at least negligently by making the various untrue statements of material facts and omitting to state in full detail the facts necessary in order to make the statements they made, as described above, not misleading.

282.     The untrue statements and omissions detailed above and the other written and oral presentations were material in that they related to matters that would have been of importance or significance in Plaintiffs' decision whether to purchase the ADSs.  Furthermore, Plaintiffs would have viewed the disclosure of the true facts as significantly altering the total mix of information available.

283.     The Defendants also acted with gross negligence when they made the misrepresentations, and omitted to state in full detail the material facts set out above.

284.     At the time of such misrepresentations and omissions of material facts, Plaintiffs were ignorant of their falsity and believed them to be true.  Plaintiffs foreseeably relied upon the superior knowledge and expertise of Defendants, and justifiably relied, to their detriment, on the misrepresentations and omissions made by the Defendants.  Had Plaintiffs been aware of the truth, they would not have purchased the ADSs.

285.     Plaintiffs are therefore entitled to recover from the Defendants all of the damages for the losses Plaintiffs sustained as a result of their reliance on the Defendants' negligent misrepresentations and omissions of the facts pertinent to the Notes.

<u>**Count III**</u>
*Common Law Unjust Enrichment*
*Asserted Against Petrobras and PwC*

286.     Plaintiffs incorporate as if fully set forth here the facts and allegations contained in this Complaint.  Plaintiffs bring this cause of action against all Defendants.

287.     Each Defendant wrongfully benefited from and was enriched by its role in the bid-rigging and kickback scheme by receiving some type of compensation, payment or fee for its services, and Defendants appreciated or had knowledge of such benefit.

288.    The wrongful benefit and enrichment of each Defendant was at the expense of the Plaintiffs.

289.    Because the retention by the Defendants of these benefits and enrichment would be unjust, Plaintiffs are entitled to collect from each Defendant the benefits and enrichment each received in connection with their services.

## Count IV
*Common Law Aiding and Abetting*
*Asserted Against Petrobras and PwC*

290.    Plaintiffs incorporate as if fully set forth here the facts and allegations contained in this Complaint.  Plaintiffs bring this cause of action against all Defendants.

291.    The fraudulent bid rigging and kickback scheme at the Company, outlined above in detail, produced substantial injury to the Plaintiffs.

292.    Each Defendant knowingly and substantially assisted the other Defendants in perpetrating this fraudulent scheme, and each Defendant was aware of its role in the overall tortious activity.

293.    As such, each Defendant is jointly and severally liable to Plaintiffs for the damage caused to Plaintiffs.

## Count V
*Negligence and Gross Negligence*
*Asserted Against Petrobras and PwC*

294.    Plaintiffs incorporate as if fully set forth here the facts and allegations contained in this Complaint.  Plaintiffs bring this cause of action against all Defendants.

295.    As described herein, each Defendant is also liable to Plaintiffs in damages for its negligent and grossly negligent behavior.

296.    Defendants owed a duty to Plaintiffs to use ordinary and reasonable care in carrying out their obligations.  Defendants breached this duty through the conduct described above.

297.    Plaintiffs were directly and foreseeably injured as a result of Defendants' negligence and gross negligence. As a direct and proximate result of this breach of ordinary or reasonable care, Plaintiffs were damaged.

298.    By reason of the foregoing, Plaintiffs are therefore entitled to recover all of the damages Plaintiffs sustained as a result of Defendants' negligence and gross negligence.

### Count VI
*Professional Negligence*
*Asserted Against PwC*

299.    Plaintiffs incorporate as if fully set forth here the facts and allegations contained in this Complaint.

300.    PwC owed Petrobras and its investors a duty to perform its audits and professional services in accordance with professional standards.  PwC breached its duty in the following ways, among others:

a)  Failing to verify the integrity and competitiveness of the bidding process for Petrobras's most significant capital projects;

b)  Failing to detect the 20% price inflation in over 1/3 of Petrobras's contracts, totaling over $80 billion, falsely booked as "assets" under PP&E;

c)  Repeatedly certifying that Petrobras's internal controls did not suffer from material weaknesses;

d)  Failing to investigate red flags in connection with Abreu and Comperj, including massive cost overruns and delays, reports by Brazil's TCU identifying irregularities in the refinery projects, and reports from whistleblowers including Fonseca and Velaso;

e)  Failing to consider the significant increase in fraud risks relating to Abreu and Comperj in light of such red flags and the significance of those projects to the

Company's PP&E, which accounted for up to 70% of the Company's total assets during the Relevant Period;

f) Failing to employ appropriate audit procedures for the Petrobras account;

g) Failing to require sufficiently persuasive evidence to support its conclusions and Petrobras's material accounting and financial estimates and representations;

h) Failing to corroborate management's explanations and representations concerning the reasons for the cost overruns and delays in the Company's major capital investments.

301. Each of these failures violated one or more of the following applicable professional standards:

- AU 230 – Due Professional Care in the Performance of Work

- AU 312 – Audit Risk and Materiality in Conducting an Audit

- AU 316 – Consideration of Fraud in a Financial Statement Audit

- AU 317 – Illegal Acts by Clients

- AU 326 – Evidential Matter

- AU 330 – The Confirmation Process

- AU 410 – Adherence to Generally Accepted Accounting Principles

- AS No. 5 – An Audit of Internal Control Over Financial Reporting That is Integrated with an Audit of Financial Statements

## Count VII
### *For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Asserted Against Petrobras and PwC*

302. Plaintiffs incorporate as if fully set forth here the facts and allegations contained in this Complaint.

303. During the Relevant Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mail system, and U.S. securities exchanges, including the New

York Stock Exchange, to make materially false and misleading statements and omissions of material fact to deceive the public, including Plaintiffs, to artificially inflate the price of Petrobras's common and preferred ADSs, and to induce the public, including Plaintiffs, to purchase common and preferred ADSs at such inflated prices.

304.     While in possession of material, non-public information, Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mail system, and U.S. securities exchanges, including the New York Stock Exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common and preferred ADSs in an effort to maintain artificially high prices for Petrobras's common and preferred ADSs in violation of Section 10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

305.     As a result of their executive positions, including membership in Petrobras's Executive Directorate and on its Board of Directors, the Petrobras officers and directors described above were aware of and participated in the fraudulent bid rigging and kickback scheme, and were authorized to make public representations on Petrobras's behalf to the public, including Plaintiffs.  These executives and directors acted with knowledge or a reckless disregard for the truth when they make the misrepresentations and omissions alleged herein.  Petrobras's material misrepresentations and omissions were made knowingly and/or recklessly, and had the effect of concealing the truth with respect to Petrobras's operations, business, performance and prospects from the investing public and supporting the artificially inflated price of its common and preferred ADSs.

306.    As described in greater detail above, in its capacity as Petrobras's accounting firm, PWC willfully or with severe recklessness ignored the pervasive bribery and money laundering scheme carried out by Petrobras. PWC repeatedly endorsed the integrity of Petrobras' internal controls, only to admit later that the financial statements PWC audited overstated Petrobras' value, assets, and profitability by $17 billion. The size of the Petrobras fraud is staggering, pervasive, and of long-standing, including such red flags as Petrobras's repeated *capitalization* of bribes, kickbacks, and artificially inflated contracts as Property, Plants & Equipment costs. Only a grossly negligent audit, or one conducted with willful blindness and conscious indifference for PWC's professional standards and obligations to investors, could have failed to uncover and disclose these and the other fraudulent and wrongful practices described above to investors. Despite its obligations to speak truthfully, completely, and carefully to investors, and despite its awareness of numerous red flags and badges of fraud in Petrobras's financial records, PWC repeatedly made materially false and misleading statements to the investing public regarding Petrobras, including:   a) its statements in 2012 and 2013 that Petrobras's annual audited financial statements presented its financial condition fairly and accurately in accordance with IFRS standards, and b) its statements that Petrobras's internal controls for 2012 and 2013 were effective in all respects and did not suffer from material weaknesses. When it made these statements, PWC knew and intended that investors would rely on them in investing in Petrobras securities. PWC also permitted Petrobras to make public statements assuring investors that its assets values were accurate, based on false claims that PWC had conducted thorough impairment tests on them. If conducted properly and with integrity, PWC's impairment tests on Petrobras's assets should have revealed and required disclosure of the massive fraud and kickback scheme; instead, PWC's purported "impairment" test was

conducted improperly, was based on inadequate evidence, and so resulted in "valuations" that served to conceal Petrobras's fraud and permitted Petrobras to its assets by more than $10 billion.

307.   As a result of its position as Petrobras's auditor, the tasks it performed for Petrobras, and the evidence it gathered in order to permit it to do so, PWC was well aware of, or with severe recklessness disregarded, numerous red flags regarding Petrobras's material misrepresentations and omissions regarding its assets, financial condition, and internal controls. PWC was also well aware of its own misrepresentations regarding the accuracy of Petrobras's annual financial statements and the adequacy and strength of Petrobras's internal controls. PWC also made its own statements knowingly and/or recklessly, and its statements had the effect of concealing the truth with respect to Petrobras's operations, business, performance and prospects from the investing public and supporting the artificially inflated price of its common and preferred ADSs.

308.   Plaintiffs purchased Petrobras's common and preferred ADSs during the Relevant Period without knowing that the price of those securities was inflated as a direct result of Defendants' material misrepresentations and omissions concerning the bid-rigging and kickback scheme, as well as the accuracy and fair presentation of Petrobras's annual financial statements and the strength of its internal controls.  Plaintiffs relied on those material misrepresentations and omissions when they purchased the Company's common and preferred ADSs.

309.   As a direct and proximate result of the wrongful conduct by Petrobras and PWC described above, Plaintiffs suffered damages in connection with their transactions in the Company's common and preferred ADSs during the Relevant Period.

310.    As the truth of the fraudulent scheme began to be revealed, the prices of the Company's common and preferred ADSs fell dramatically, and the artificial inflation in the securities' prices began to dissipate.  The massive decline in the securities' prices has caused Plaintiffs tens of millions of dollars in losses.  Plaintiffs continue to suffer losses as additional disclosures about the fraud come to light.  Had Plaintiffs known the truth about Petrobras's bid rigging and kickback scheme, Plaintiffs would not have purchased Petrobras's ADS securities.

311.    By virtue of the foregoing, Petrobras and PWC violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### Count VIII
*For Violations of Massachusetts General Law Section 110A*
*Asserted Against Petrobras*

312.    Plaintiffs incorporate as if fully set forth here the facts and allegations contained in this Complaint.

313.    Plaintiffs conducted much of their investment activities, including their assessment of the Company's business operations and financial prospects, in Massachusetts, where WGI maintains its headquarters and where its investment personnel are based.  Plaintiffs purchased Petrobras's common and preferred ADSs in Massachusetts.

314.    Petrobras management, including CFO Barbassa, traveled to Massachusetts in order to solicit investors in the Company's publicly traded securities, including the common and preferred ADSs.  Petrobras management, including CFO Barbassa, met with Plaintiffs in their offices in Massachusetts to discuss the Company's business operations and financial prospects.  Additionally, Plaintiffs attended other presentations hosted by Petrobras in Massachusetts.  Petrobras also marketed its securities to public investors in Massachusetts, including Plaintiffs, through investor presentations, conference calls, and securities disclosures, including the Form

20F, 6-K, and the disclosures described above.  Petrobras intended to solicit Massachusetts investors in its ADSs through these communications and disclosures.

315.    Petrobras made untrue statements of material fact and omitted to state material facts to Plaintiffs in Massachusetts concerning the existence of the kickback and bid-rigging scheme through these disclosures.  Plaintiffs purchased Petrobras's common and preferred ADSs during the Relevant Period without knowing of these untruths or omissions, and Petrobras knew, or in the exercise of reasonable care would have known, of the untruths and omissions.

316.    As a direct and proximate result of Petrobras's wrongful conduct, Plaintiffs suffered damages in connection with their transactions in the Company's common and preferred ADSs during the Relevant Period.

317.    As the truth of the fraudulent scheme began to be revealed, the prices of the Company's common and preferred ADSs fell dramatically, and the artificial inflation in the securities' prices began to dissipate.  The massive decline in the securities' prices has caused Plaintiffs tens of millions of dollars in losses.  Plaintiffs continue to suffer losses as additional disclosures about the fraud come to light.  Had Plaintiffs known the truth about Petrobras's bid rigging and kickback scheme, Plaintiffs would not have purchased Petrobras's securities.

318.    By virtue of the foregoing, Petrobras has violated Massachusetts General Law Section 110A.

### Count IX
*For Violations of California Corporations Code Sections 25400 and 25500*
*Asserted Against Petrobras*

319.    Plaintiffs incorporate as if fully set forth here the facts and allegations contained in this Complaint.

320.     Plaintiffs attended investment conferences in California in which Petrobras executives solicited investors in the Company's publicly traded securities, including the common and preferred ADSs.  Petrobras management, including CFO Barbassa, met with Plaintiffs in California to discuss the Company's business operations and financial prospects.  Petrobras also marketed its securities to public investors in California, including Plaintiffs, through investor presentations, conference calls, and securities disclosures including the Form 20F, 6-K, and the disclosures described above.  Petrobras intended to solicit California investors in its ADSs through these communications and disclosures.

321.     Petrobras made materially false or misleading statements concerning the existence of the kickback and bid-rigging scheme which it knew or had reasonable ground to believe was false or misleading.  Plaintiffs purchased Petrobras's common and preferred ADSs during the Relevant Period without knowing the falsity of these materially false or misleading statements.

322.     As a direct and proximate result of Petrobras's wrongful conduct, Plaintiffs suffered damages in connection with their transactions in the Company's common and preferred ADSs during the Relevant Period.

323.     As the truth of the fraudulent scheme was revealed, the prices of the Company's common and preferred ADSs fell dramatically, and the artificial inflation in the securities' prices began to dissipate.  The massive decline in the securities' prices has caused Plaintiffs tens of millions of dollars in losses.  Plaintiffs continue to suffer losses as additional disclosures about the fraud come to light.   Had Plaintiffs known the truth about Petrobras's bid rigging and kickback scheme, Plaintiffs would not have purchased Petrobras's securities, or if they had purchased such securities.

324.   By virtue of the foregoing, Petrobras has violated California Corporations Code § 25400.

325.   Under Section 25500, Defendants are therefore liable to Plaintiffs for damages measured by the difference between the price at which Plaintiffs purchased the ADSs and market value that the ADSs would have had at the time of the purchase in the absence of the misconduct.

**Count X**

*For Violations of California Corporations Code Sections 25401 and 25501*
*Asserted Against Petrobras*

326.   Plaintiffs incorporate as if fully set forth here the facts and allegations contained in this Complaint.

327.   Plaintiffs attended investment conferences in California in which Petrobras executives solicited investors in the Company's publicly traded securities, including the common and preferred ADSs.  Petrobras management, including CFO Barbassa, met with Plaintiffs in California to discuss the Company's business operations and financial prospects.   Petrobras also marketed its securities to public investors in California, including Plaintiffs, through investor presentations, conference calls, and securities disclosures including the Form 20F, 6-K, and the disclosures described above.  Petrobras intended to solicit California investors in its ADSs through these communications and disclosures.

328.   Petrobras directly and indirectly employed devices, schemes, and artifices to defraud investors, including Plaintiffs, in California, and made untrue statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not misleading.  Petrobras also engaged in acts, practices, and a course of business that operated as a

fraud and deceit upon the purchasers of the Company's common and preferred ADSs in California.

329.    Plaintiffs purchased Petrobras's common and preferred ADSs during the Relevant Period without knowing of these untrue statements of material fact and/or material omissions, and Petrobras knew, or in the exercise of reasonable care would have known, of the untrue statements of material fact and/or material omissions.

330.    As a direct and proximate result of Petrobras's wrongful conduct, Plaintiffs suffered damages in connection with their transactions in the Company's common and preferred ADSs during the Relevant Period.

331.    As the truth of the fraudulent scheme was revealed, the prices of the Company's common and preferred ADSs fell dramatically, and the artificial inflation in the securities' prices began to dissipate.  The massive decline in the securities' prices has caused Plaintiffs tens of millions in losses. Plaintiffs continue to suffer losses as additional disclosures about the fraud come to light.   Had Plaintiffs known the truth about Petrobras's bid rigging and kickback scheme, Plaintiffs would not have purchased Petrobras's securities.

332.    By virtue of the foregoing, Petrobras has violated California Corporations Code § 25401 and 25501.

### Count XI
*Exemplary Damages*
*Asserted Against Petrobras and PwC*

333.    Plaintiffs incorporate as if fully set forth here the facts and allegations contained in this Complaint.  Plaintiffs bring this cause of action against all Defendants.

334.    Defendants' actions as described in detail above were done with malice aforethought and in conscious disregard of the substantial risk of tremendous harm to Plaintiffs.

335.    Due to the fraudulent and/or grossly negligent nature of their acts, Defendants are liable to Plaintiffs for exemplary and punitive damages.

## JURY DEMAND

336.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, including:

a)  Awarding compensatory damages in favor of Plaintiffs against Petrobras and PwC for all damages sustained as a result of Petrobras's and PwC's wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

b)  Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

c)  Plaintiffs their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

d)  Awarding such other and further relief as may be just and proper.

Dated: October 23, 2015

WARNER PARTNERS, P.C.


By:  _/s/ Kenneth E. Warner_____
        Kenneth E. Warner (KW-5524)

950 Third Avenue, 32nd Floor
New York, New York 10022
(212) 593-8000

Kathy D. Patrick (subj. to *pro hac vice* admission)
Scott A. Humphries (subj. to *pro hac vice* admission)
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, Texas 77002
(713) 650-8805

*Attorneys for Plaintiffs*