UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                       )
                                       )    **Case No. 14-cv-9662 (JSR)**
IN RE:  PETROBRAS SECURITIES           )
LITIGATION                             )
                                       )    **<u>DEMAND FOR JURY TRIAL</u>**
                                       )
                                       )
_____)


**CONSOLIDATED FOURTH AMENDED
CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ..................................................................... 1

II.   NATURE OF THE ACTION ......................................................................... 7

III.  JURISDICTION AND VENUE ..................................................................... 9

IV.   OVERVIEW OF THE EXCHANGE ACT VIOLATIONS ........................... 10

    A.    The Exchange Act Parties ................................................................... 10

        1.  Lead Plaintiff .............................................................................. 10

        2.  The Company ............................................................................... 10

        3.  The Individual Defendants .......................................................... 11

        4.  PricewaterhouseCoopers Auditores Independentes...................... 14

V.    FACTS RELEVANT TO EXCHANGE ACT CLAIMS ................................. 15

    A.    The Skewed Bidding Process............................................................... 15

    B.    Bribery Schemes ................................................................................. 24

    C.    The Refineries Scams .......................................................................... 31

    D.    Additional Allegations of Scienter Concerning The Individual Defendants ........ 38

    E.    The Scheme Rendered the Company's Financial Statements Materially False and Misleading................................................................... 54

    F.    The Patently Inadequate Write-Off—From "Operation Car Wash" To Whitewash ................................................................................ 58

    G.    PwC's Purposeful Blind Eye to the Fraud .......................................... 67

VI.   OVERVIEW OF CLAIMS AGAINST THE EXCHANGE ACT DEFENDANTS ........ 78

VII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS .................... 84

    A.    False and Misleading Statements Made in 2010.................................... 84

    B.    False and Misleading Statements Made in 2011.................................... 89

    C.    False and Misleading Statements Made in 2012.................................... 93

    D.    False and Misleading Statements Made in 2013................................... 100

    E.    False and Misleading Statements Made in 2014................................... 109

    F.    False and Misleading Statements Made in 2015................................... 119

    G.    Reasons Why Statements Made in 2010-2015 Were False and Misleading ...... 121

VIII. ADDITIONAL ALLEGATIONS RELATED TO THE SCHEME ................ 125

IX.   RELIANCE: FRAUD ON THE MARKET DOCTRINE .............................. 160

X.    LOSS CAUSATION................................................................................... 162

XI.   INAPPLICABILITY OF STATUTORY SAFE HARBOR .......................... 163

XII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT............................................ 163

COUNT I ................................................................................................................. 163

For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against the
Exchange Act Defendants........................................................................................ 163

COUNT II ................................................................................................................ 164

For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants
................................................................................................................................. 164

XIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ........................................ 165

A.      Introduction.................................................................................................. 165

B.      Background................................................................................................... 167

C.      Relevant Securities Offerings ...................................................................... 171

        1.   May 15, 2013 Note Offerings ................................................................ 171

        2.   March 10, 2014 Note Offerings .............................................................. 172

D.      Securities Act Plaintiffs .............................................................................. 176

E.      Securities Act Defendants ........................................................................... 183

        1.   Issuer Defendants .................................................................................. 183

        2.   Officer Defendants ................................................................................. 185

        3.   Director Defendants ............................................................................... 185

        4.   Underwriter Defendants......................................................................... 186

        5.   Auditor Defendant ................................................................................. 188

        6.   Relevant Non-Defendant Individuals ...................................................... 189

F.      Jurisdiction and Venue................................................................................. 190

G.      False and Misleading Statements.................................................................. 191

        1.   2011 20-F.............................................................................................. 191

        2.   8/10/12 6-K ........................................................................................... 192

        3.   2012 20-F.............................................................................................. 193

        4.   4/30/13 6-K ........................................................................................... 194

        5.   2/26/14 6-K ........................................................................................... 195

        6.   3/7/14 6-K ............................................................................................. 196

        7.   3/11/14 6-K ........................................................................................... 196

H.      Petrobras' Financial Statements Failed to Comply With PCAOB Standards And
        SEC Regulations ......................................................................................... 197

COUNT III................................................................................................................ 209

For Violations of Section 11 of the Securities Act Against the Securities Act Defendants ................................................................................................................................ 209

COUNT IV ........................................................................................................ 212

For Violations Of Section 12(a)(2) of the Securities Act Against Petrobras and PGF ... 212

COUNT V ......................................................................................................... 214

For Violations of Section 15 of the Securities Act Against the Officer Defendants ...... 214

COUNT VI ........................................................................................................ 215

For Violations of Section 15 of the Securities Act Against Petrobras America Inc. ....... 215

XIV.   CLASS ALLEGATIONS FOR EXCHANGE ACT AND SECURITIES ACT COUNTS ................................................................................................................................ 216

XV.   PRAYER FOR RELIEF ............................................................................ 218

XVI.   JURY DEMAND ..................................................................................... 218

Lead Plaintiff Universities Superannuation Scheme Limited ("USS" or "Plaintiff"), by and through its undersigned counsel, alleges the following individually and on behalf of a class of all persons and entities similarly situated.  All allegations are made upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's allegations are based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Petroleo Brasileiro S.A. — Petrobras ("Petrobras" or the "Company") and its wholly-owned subsidiaries Petrobras International Finance Company S.A. ("PifCo") and Petrobras Global Finance B.V. ("PGF"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and other publicly available information concerning Petrobras and (as defined herein), the Individual Defendants, the Officer and Director Defendants, the Underwriter Defendants, and Petrobras' outside accountants.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    PRELIMINARY STATEMENT

1.    On March 15, 2015, approximately 1 million Brazilians flooded the streets of cities all over the country, calling for the impeachment of President Dilma Rousseff, who was re-elected by a slim margin for a second term in late October. The trigger for the demonstrations was the enormous corruption scandal at the government-controlled oil giant, Petrobras, where Rousseff served as chairwoman from 2003 to 2010.

2.    At its height in 2009, Petrobras was the world's fifth-largest company, with a market capitalization of $310 billion.  Now, amid a rampant money-laundering and kickback scheme, Petrobras is worth just $39 billion.

3.     To date, Company executives have been jailed and powerful politicians across party lines—including the speakers of both Houses of Congress—have been questioned about the money-laundering and bribery scheme at Petrobras. According to Brazilian prosecutors, construction and engineering firms paid some $800 million to politically-appointed Petrobras executives in exchange for lucrative contracts with the Company, benefiting both the executives and the campaign coffers of the Workers' Party ("PT"). The Petrobras executives that received the bribes pocketed vast sums of money. One manager, Pedro Barusco, has agreed to return nearly $100 million hidden in offshore accounts. The executives also said they channeled portions of the bribes to the PT party, some of which were used in Rousseff's 2010 campaign.

4.     Tellingly, the Company itself does not deny the widespread bribery and theft of Petrobras' assets. In a news release to explain why it had delayed its upcoming financial report, Petrobras said it was "undergoing a unique moment in its history, in light of the accusations and investigations of 'Operation Lava Jato' (Portuguese for 'Operation Car Wash') being conducted by the Brazilian Federal Police, which has led to charges of money laundering and organized crime."

5.     The fraud at the epicenter of this action involves Brazil's biggest graft and money-laundering scandal, in which Petrobras' contractors colluded to inflate bids, with Petrobras executives taking bribes and politicians sharing in the proceeds. The bribery and money-laundering scheme is estimated by authorities to have diverted *up to or even more than $28 billion from Petrobras' coffers.*[1] In addition to Petrobras' top executives, the illegal bribery and kickback scheme also involved politicians and a group of at least 16 contractors who formed a cartel that assured that its members would win Petrobras' major contracts. According to Brazilian prosecutors

---

[1] Luciana Otoni, *Brazil's Roussef Replacing Petrobras CEO*, February 3, 2015.

and the Brazilian Federal Police, Petrobras executives granted contracts to these Brazilian construction companies that systemically inflated their costs by as much as 20%.[2]  After winning the contracts, the construction companies kicked back up to 3% of a contract's total value in the form of bribes to Petrobras executives, Brazilian politicians and money launderers."[3]

6.      Among the dozens of suspects arrested by the Brazilian Federal Police in connection with the money laundering and bribery scheme at Petrobras is Alberto Youssef ("Youssef"), a black market money launderer.  Youssef led investigators to the Petrobras scheme, according to Brazilian prosecutors and police.  Police discovered the link after they started probing 10 billion Reais ($3.8 billion) of suspicious financial transactions involving Youssef that was flagged by Brazil's financial intelligence unit.[4]  Youssef was considered to be the scheme operator and has been promised a reduced sentence by Brazilian prosecutors in exchange for his cooperation.  Youssef testified that *the bribery and money-laundering scheme was rampant throughout Petrobras and its subsidiaries, and that each subsidiary's board split the bribery money with politicians.*

7.      Along with former Petrobras officials, several top executives from some of Brazil's largest construction and engineering firms have been jailed and facing corruption charges.  As of February 13, 2015, it was revealed that *two thousand employees of Petrobras are now under investigation*, reflecting the rampant widespread nature of the fraud.[5]

---

[2] Paul Kiernan, *Petrobras Corruption Scandal Draws Attention of U.S. Investigators*, The *Wall Street Journal*, November 12, 2014.
[3]  *Id.*
[4] The Brazilian federal police and prosecutors are increasingly relying on international cooperation in the investigation.
[5]  The International Business Times, *Petrobras Scandal: Brazil Oil Giant Turns to US SEC for Help on Corruption Costs*, February 13, 2015.

8.      Among those Petrobras executives arrested by the Brazilian Federal Police are Paulo Roberto Costa ("Costa") and Renato de Souza Duque ("Duque").  Costa was a member of Petrobras' senior management and the Company's Chief Downstream Officer and Director of Supply from May 14, 2004 through April 2012.  In that position, Costa was the top executive in charge of Petrobras' refining division, and reported directly to the CEO.  Duque was also a member of Petrobras' senior management and was the Company's Chief Services Officer from January 31, 2003 through February 2012.  Duque was in charge of Petrobras' engineering and services division and worked closely with the Company's refining division.  *Costa and Duque routinely recommended contracts implicated in the bribery scheme to Petrobras' executive board for approval*.  Costa is cooperating with the Brazilian government's investigation.

9.      Brazilian authorities recently arrested another former Petrobras executive, Nestor Cervero.  Cervero is a former financial director of the Company's fuel distribution subsidiary and also a former director of its international division.  Cervero was forced out of Petrobras in March 2014 amid questions into what prosecutors say was an extraordinarily inflated price paid in 2006 to Belgium's Astra Oil for a refinery in Texas.  A statement from prosecutors said Cervero was arrested because of his "involvement in new illicit facts related to the crimes of corruption and money laundering."

10.     In March of this year, the scandal finally reached a member of Rousseff's inner circle.  The *Wall Street Journal* reported that on March 16, 2015, the Brazilian federal prosecutors filed charges against the treasurer of the ruling Workers' Party, Joao Vaccari Neto.  Prosecutors also brought charges against Renato Duque, Petrobras' former director of services who headed the department responsible for the bulk of Petrobras' investments.  This is Duque's second arrest.[6]

---

[6]  WSJ, *Brazilian Federal Prosecutors Charge Two in Petrobras Probe*, March 16, 2015.

The Workers' Party Treasurer was charged with corruption and money laundering related to allegedly illegal campaign donations that prosecutors say he solicited from Duque.  Duque will face the same charges.  According to federal prosecutor Deltan Dallagnol, "[t]his is a sophisticated and complex money-laundering scheme that was conceived to give the appearance of legality to money with illegal origins . . . These resources weren't illegal just because they were bribe payments but because they were the product and fruit of fraudulent bidding processes and the crime of price-fixing."   Dallagnol said Duque requested "donations" from companies, while Vaccari indicated the bank accounts where they were to be deposited.  Dallagnol said prosecutors have "ample proof" that Vaccari participated in meetings with Mr. Duque and his top manager, Pedro Barusco, to discuss bribes via campaign donations.  Vaccari was "well aware" the donations he was seeking comprised funds stemming from bribes, Dallagnol said, explaining that much of the evidence was obtained from plea bargain deals with executives who were indicted and jailed late last year.  Another former Petrobras executive, Pedro Barusco, told a congressional hearing in March that the Workers' Party had received up to $200 million skimmed from Petrobras contracts.[7]

11.     Petrobras' Chief Executives covered-up the scheme and, along with Petrobras, continuously deflected and denied wrongdoing, keeping investors in the dark as to the corrupt core of Petrobras' operations.  Throughout the Class Period, in response to allegations of contract overpricing and bribes, Petrobras unleashed a forceful campaign designed specifically to deny any allegations of wrongdoing and to assure the market that there was no political or partisan interference in its decisions.  Among other initiatives, Petrobras created an official website linked to its corporate webpage titled "Fados e Datos" ("Facts and Data"), whose stated goal was to achieve maximum possible transparency in the relationship with its stakeholders.  Petrobras

---

[7]  Reuters, *Brazil ruling party's treasurer charged in Petrobras scandal*, March 15, 2015.

characterized this "blog" as a "landmark" in the construction of new bridges of communication with the Company's stakeholders and said it was created to give transparency to the processes of Petrobras and not to undermine the fact finding and journalists' data. With this new tool, Petrobras peppered the market with falsehoods. In a blizzard of statements issued throughout the Class Period, Petrobras *categorically denied any wrongdoing* and *assured investors that it engaged in a competitive, arms-length bidding process.* For example, in a January 28, 2010 post on Facts and Data in response to articles published in several newspapers, including Reuters, Petrobras *"reiterate[d] that there have been no* irregularities *in contracts referring to the works of the Abreu e Lima Refinery [and] in the construction of . . . Comperj."* The next day on Facts and Data, Petrobras stated that it *"reaffirms that there has been no 'overbilling' or 'overpricing' in the Abreu [] refinery."* Similar denials abound. *See infra* at, *e.g.*, ¶¶ 223, 238, 239, 255, 258, 288.

12.     As part of the Lava Jato investigation, Brazilian authorities have discovered that individuals under investigation, including Costa, had destroyed and concealed documents.

13.     Defendants' acts of criminality continue to resurface. On April 30, 2015, the Brazilian press reported that *Petrobras destroyed audio and video recordings obtained during discussions of the Operation Lava Jato investigation and the participation of President Rousseff in the purchase of the Pasadena Refinery.*[8]

14.     As of March 16, 2015, the corruption probe at Petrobras has already led to over 40 indictments on racketeering, bribery and money laundering charges.[9] Prosecutors have asked the Supreme Court to investigate 34 sitting politicians, including the speakers of both houses of Congress, for allegedly receiving bribe money.[10]

---

[8]  *See Estadao, Petrobras Destroys Recordings by the Board of Directors*, April 30, 2015.
[9]  *Id.*
[10]  *Id.*

15.    The money-laundering and bribery scheme was long-lasting and widespread.  As a result, and as explained in more detail below, it was reported in media outlets that Petrobras may be forced to book *a $30 billion asset writedown* in order to reduce the carrying value of some of its assets.  The impairment equals more than half of the Company's market value.

16.    Petrobras is currently the subject of civil and criminal investigations by the U.S. Securities and Exchange Commission ("SEC") and by the U.S. Department of Justice ("DoJ"). The U.S. investigations are said to focus on the bribery scheme and on the quality of Petrobras' bookkeeping and internal controls.   On November 24, 2014, Petrobras announced that it had received a subpoena from the SEC asking for documents relating to the investigation.  Reportedly, the SEC also has been receiving information since October 2014 from the task force of Brazilian prosecutors working on the case.[11]

## II.    NATURE OF THE ACTION

17.    This is a federal securities class action brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities who, between January 22, 2010 and July 28, 2015, inclusive (the "Class Period"), purchased or otherwise acquired the securities of Petrobras, including debt securities issued by PifCo and PGF, on the New York Stock Exchange (the "NYSE") or pursuant to other domestic transactions (the "Class").

18.    This action also is brought pursuant to the Securities Act of 1933 (the "Securities Act") on behalf of all persons or entities who purchased certain debt securities issued by PGF pursuant and/or traceable to either of two public offerings registered in the United States.  In a debt offering on or about May 15, 2013 (the "2013 Offering"), PGF sold approximately $11 billion in notes at six sets of interest rate and maturity terms (the "2013 Notes").  PGF sold approximately

---

[11] The *Wall Street Journal*, *Petrobras Corruption Scandal Draws Attention of U.S. Investigators*, November 12, 2014.

$8.5 billion in notes (the "2014 Notes" and together with the 2013 Notes, the "Notes") at six sets of interest rate and maturity terms in a second debt offering on or about March 11, 2014 (the "2014 Offering" and, together with the 2013 Offering, the "Offerings").

19.     Pursuant to the Securities Act, the Securities Act Defendants are strictly liable for material misstatements in the Offering Documents (as defined herein) issued in connection with the Offerings, and these claims specifically exclude any allegations of knowledge or scienter.

20.     The Securities Act claims are based solely on strict liability and negligence, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of Defendants—i.e., the Securities Act claims do not allege, arise from, or sound in, fraud.  Plaintiff specifically disclaims any allegation of fraud, scienter, or recklessness in these non-fraud claims.

21.     The claims asserted herein arise from a series of false statements of material fact and omissions of material adverse information, made by Defendants in the Offering Documents and throughout the Class Period, about the value of Petrobras' assets, the amounts of the Company's periodic expenses and net income, whether the Company suffered from material weaknesses in its disclosure controls and procedures and internal controls over financial reporting, and the Company's repeated reassurances that it operates with the highest level of integrity.  The revelation of the truth about Petrobras through a series of disclosures caused a precipitous decline in the market value of Petrobras, PifCo, and PGF's securities, resulting in billions of dollars in losses and damages to Plaintiff and the Class.

22.     Before and throughout the Class Period, Petrobras pursued plans to expand its production capacity. These plans involved acquiring and contracting for the construction of new facilities and petroleum production assets.  Petrobras' expansion plans required substantial capital investment.  In order to satisfy its capital requirements, the Company undertook a number of

8

securities offerings during the Class Period, selling *more than $98 billion in securities registered on the NYSE* including notes and American depositary shares ("ADSs") representing common and preferred stock.  During the Class Period, *Petrobras' American Depository Receipts* ("ADRs) *were one of the most actively traded shares on the New York Stock Exchange*.

### III.      JURISDICTION AND VENUE

23.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. § 240.10b-5.

24.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Jurisdiction is also conferred by 28 U.S.C. § 1367.

25.      Venue is proper in this District pursuant to Section 22(a) of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Petrobras maintains an office in this District, sponsors ADSs representing the Company's common and preferred equity that are listed on an exchange located in this District, and certain of the acts that constitute the violations of law complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District. Furthermore, of the 36 debt securities currently outstanding issued by PifCo or PGF, 23 are registered with an exchange located in this District, and of the 28 debt securities issued by PifCo or PGF during the Class Period, 19 (including the reopening of two prior issues) are registered with and trade on an exchange located in this District.

26.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.   OVERVIEW OF THE EXCHANGE ACT VIOLATIONS

### A.   The Exchange Act Parties

#### 1.   <u>Lead Plaintiff</u>

27.    Lead Plaintiff Universities Superannuation Scheme Limited ("USS" or "Plaintiff"), acting as sole corporate trustee of Universities Superannuation Scheme, is located at Royal Liver Building, Liverpool, England, L3 1PY.  Established in 1974, USS is a trustee company limited by guarantee, incorporated in England and Wales, and solely set up to administer the scheme provided by Universities, Higher Education and other associated institutions for their employees, and which runs the pensions administration and group functions.  USS Investment Management Ltd. is a wholly owned subsidiary of USS regulated by the Financial Conduct Authority, which operates the investment arm of the business from its London office.  USS purchased various Petrobras securities as previously set forth in its previously filed Certification, and was damaged thereby.

#### 2.   <u>The Company</u>

28.    Defendant Petrobras is a corporation organized under the laws of Brazil, and maintains its principal executive offices at Avenida Republica do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil. Petrobras also maintains an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022.  The Company's common and preferred shares are listed on the Bovespa, trading under the ticker symbols "PETR3" and "PETR4," respectively. Since 2001, Petrobras has sponsored ADSs representing the Company's common and preferred equity that are listed on the NYSE, trading under the ticker symbols "PBR" and "PBR/A," respectively. These ADSs represent a substantial portion of the average daily trading volume for Petrobras equity, including a significant majority of the volume for the Company's common equity. For example,

10

over the six-month period ending December 22, 2014, the daily average of NYSE-based trade volume of Petrobras' common stock ADS was 76.9 million shares, or 77.96 percent of all volume for the Company's common equity, compared to a daily average of Bovespa-based trade volume of 21.0 million shares, or 21.27 percent of all volume. The daily average of NYSE-based trade volume of Petrobras' preferred stock ADS over the same period was 30.5 million shares, representing 34.80 percent of all trade volume in the Company's preferred equity.  Additionally, of the 35 debt securities issued by Petrobras and its wholly-owned subsidiaries during the Class Period, 16—including all securities at issue in this action—are registered and trade with an exchange located in this District.

29.     Defendant PGF is a wholly-owned finance related subsidiary of Petrobras incorporated in the Netherlands.  PGF maintains its principal executive offices at Weenapoint Toren A, Weena 722, 3014 DA Rotterdam, The Netherlands.  On February 12, 2014, PGF acquired the outstanding shares of PifCo, a wholly-owned subsidiary of Petrobras.  Between the beginning of the Class Period and August 9, 2013, PifCo was organized under the laws of the Cayman Islands with its principal executive offices at 4th Floor, Harbour Place, 103 South Church Street, P.O. Box 1034GT—BWI, George Town, Grand Cayman, Cayman Islands.  On August 9, 2013, PifCo completed a transfer of domicile, registering in Luxembourg with principal executive offices at 40, Avenue Monterey, 2163 Luxembourg.  On December 16, 2013, certain assets and liabilities of PifCo were spun off and subsequently merged into Petrobras.

### 3.      The Individual Defendants

30.     Defendant Maria das Gracas Silva Foster ("Foster") has served as CEO of Petrobras since February 13, 2012. Previously, Foster served as the Company's Director of Gas and Energy. During the Class Period, Foster certified and signed certain of the Company's periodic financial

reports filed with the SEC and communicated with investors, participating in the Company's periodic conference calls.

31.     Defendant José Sergio Gabrielli ("Gabrielli") served as Chief Executive Officer ("CEO") of Petrobras from July 22, 2005 to February 13, 2012.  During the Class Period, Gabrielli certified and signed certain of the Company's periodic financial reports filed with the SEC and communicated with investors, participating in the Company's periodic conference calls.

32.     Defendant Almir Guilherme Barbassa ("Barbassa") served as CFO of Petrobras during the Class Period, certifying and signing the Company's periodic financial reports filed with the SEC and communicating with investors, participating in the Company's periodic conference calls.  Barbassa was a member of the Executive Directorate (Board of Executive Officers).

33.     Defendant Paulo Roberto Costa ("Costa") served as the Director of Supply at Petrobras between May 2004 and April 2012.  Costa was a member of the Executive Directorate (Board of Executive Officers).

34.     Defendant Jose Carlos Cosenza ("Cosenza") served as the Director of Supply at Petrobras from April 2012 to February 2015.  Cosenza was a member of the Executive Directorate (Board of Executive Officers).

35.     Defendant Renato de Souza Duque ("Duque") served as the Director of Services at Petrobras between February 2003 and April 2012.  Duque was a member of the Executive Directorate (Board of Executive Officers).

36.     Defendant Guillherme de Oliveira Estrella ("Estrella") served as the Director of Exploration and Production at Petrobras between January 2003 and February 2012.  Estrella was a member of the Executive Directorate (Board of Executive Officers).

37.     Defendant Jose Miranda Formigli Filho ("Filho") served as the Director of Exploration and Production at Petrobras between February 2012 and February 2015. Formigli was a member of the Executive Directorate (Board of Executive Officers).

38.     Defendant Josue Christiano Gomes da Silva ("Silva") has served as Director of Petrobras during the Class Period, and signed certain of the Company's reports filed with the SEC.

39.     Defendant Silvio Sinedino Pinheiro ("Pinheiro") has served as Director of Petrobras during the Class Period, and signed the 2012 Registration Statement.

40.     Defendant Daniel Lima de Oliveira ("Oliveira") served as CEO and Chairman of PifCo from September 1, 2005, and he signed the 2012 Registration Statement.

41.     Defendant José Raimundo Brandão Pereira ("Pereira") served as a Director of PifCo from 2003, and he signed the signed the 2012 Registration Statement.

42.     Defendant Sérvio Túlio da Rosa Tinoco ("Tinoco") served as CFO of PifCo from September 1, 2005, and he signed the 2012 Registration Statement.

43.     Defendant Paulo Jose Alves ("Alves") has served as the Chief Accounting Officer of PifCo since May 2011, and he signed the 2012 Registration Statement.

44.     Defendant Gustavo Tardin Barbosa ("Barbosa") served as CEO and "Managing Director A" of PGF, and he signed the 2012 Registration Statement.

45.     Defendant Alexandre Quintão Fernandes ("Fernandes") served as CFO and "Managing Director B" of PGF, and he signed the 2012 Registration Statement.

46.     Defendant Marcos Antonio Zacarias ("Zacarias") served as "Managing Director A" of PGF, and he signed the 2012 Registration Statement.

47.     Defendant Cornelis Franciscus Jozef Looman ("Looman") served as "Managing Director B" of PGF, and he signed the 2012 Registration Statement.

13

48.     Defendants described in paragraphs 30-47 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, together with Defendants Petrobras and PGF, are collectively referred to herein as the "Exchange Act Defendants."

### 4.     PricewaterhouseCoopers Auditores Independentes

49.     Defendant PricewaterhouseCoopers Auditores Independentes (PwC) served as Petrobras' independent auditor from January 2012. On January 16, 2012, Petrobras signed a contract with PricewaterhouseCoopers Auditores Independentes, under which PricewaterhouseCoopers Auditores Independentes was hired to provide specialized technical accounting audit services for the years 2012, 2013 and 2014.

50.     PwC is a member firm of PricewaterhouseCoopers International Limited. Pricewaterhousecoopers Auditores Independentes is based in Sao Paulo, Brazil.

51.     PwC, by virtue of its position as independent accountants and auditors of Petrobras, had access to the Company's key personnel, accounting books and records, and transactional documents, at all relevant times.  As a result of their provision of auditing and other services, PwC's personnel were frequently present at Petrobras' offices and had continual access to, and knowledge of, Petrobras' confidential internal corporate, financial and business information, and had the opportunity to observe and review the Company's business and accounting practices, and to test the Company's internal and publicly reported financial statements as well as the Company's internal controls.

52.     PwC examined and opined on the Company's financial statements for the fiscal years 2012 and 2013, and falsely represented that their audits of Petrobras' 2012 and 2013 financial statements had been conducted in accordance with International Financial Reporting Standards ("IFRS"), and wrongfully issued "clean" or unqualified audit reports in which they falsely

represented that those financial statements fairly presented the Company's financial condition and results of operations in conformity with IFRS.  PwC also approved Petrobras' false and misleading write-off of US$ 2,527 million of overpayments on the acquisition of property, plant, and equipment incorrectly capitalized.

53.     PwC profited handsomely for its services.  In connection with Petrobras' work during the fiscal year 2012, PwC pocketed $7.7 million.  PwC pocketed another $8.6 million for work during the fiscal year 2013.  PwC collected another $9.9 million in 2014.

## V.     FACTS RELEVANT TO EXCHANGE ACT CLAIMS

### A.     The Skewed Bidding Process

54.     Petrobras was an active participant in the bidding scheme designed to eliminate any type of competitive bidding process and award contracts to those doling out bribes to Petrobras executives and other officials.  Testimony given by Costa as part of a plea agreement with the Brazilian prosecutors places Petrobras squarely at the center of the bid-rigging scheme.  Costa explained that because there were only a handful of companies in Brazil with the technical capability and capacity to complete large scale projects such as those being proposed by the Services and Supply and International Divisions of Petrobras, these companies formed a cartel designed to effectively frustrate and render ineffective the competitive bidding process.  The cartel was in existence at the time the Class Period commenced.

55.     According to Costa's testimony, to ensure that the work always remained with the cartel (and not with foreign companies who may not have been so willing to act illegally and pay kickbacks) and guarantee that the kickbacks always flowed back to the parties, the following system was adopted at Petrobras:

- All of the Divisions or "Directorates" at Petrobras were assigned a sponsor from a patron party (known inside Petrobras as a "Padrinho" or Godfather).

- The Godfather would nominate the Director who was then selected by the Board.

- It was made perfectly clear to each Director that his job security depended on keeping his Godfather (and his party) happy.

- This was accomplished by building a 3% kickback into every major contract.

- This scheme would only work, however, if all of the contractors cooperated. To gain their cooperation, it was agreed upon that a committee be established among the participating companies that would decide who would win each contract, and that this be rotated equitably between the members.

- The companies agreed that they would coordinate their bids with the respective Director.

56.     The cartel members were advised of the estimated cost and then adjusted their bids to conform to the parameters allowing for a 15% to 20% profit plus 3% for the kickback to the political parties and to Petrobras directors.

57.     Costa stated that the cartel members would meet regularly in São Paulo or Rio to decide what contract would go to which company, and what the percentage of overbilling would be in order to cover the bribes and kickbacks that would be required. Costa represented that *the Directors of Petrobras were aware of the scheme from the beginning and would not question the increased amounts since all of the bids were coordinated in advance*. If any cartel member failed to include the required 3% that was earmarked for the political parties, money launderers and Petrobras executives, they would be disqualified from future bids by the cartel.

58.     The cartels were advised of the estimated cost and then adjusted their bids to conform to the parameters allowing for a 15% to 20 % profit plus 3% for the kickback to the political parties and to Petrobras directors.

59.     The practice, so common and systematic, was described by some of those involved as constituting a "rule of the game." For example, documents submitted by Augusto Mendonca, head of Setal Oil and Gas S/A ("SOG"), a Cartel member, depict meetings held by the Cartel

members before the solicitation process in order to undermine the bid process.  Among these documents, a table depicts the individual preferences of each Cartel member as part of allocating Petrobras' projects.  In the table, there is an annotation, on the left side, of Petrobras projects to be distributed, at the top, the name of the contractors identified by acronyms, and in the following field the preferences of each one (with the numbers 1-3, according to the priority preference).  Also among the documents is one containing the set of rules used by the cartel written jokingly in a manner comparable to those of a "sports tournament."  This process was employed as part of the bid-rigging negotiation.

60.     Similar documents were seized by the Brazilian Federal Police at Engevix Engenharia, another cartel member.  Among them, there is a table depicting each Cartel member's preferences in the allocation of Petrobras projects at Comperj.  The document is titled "List of new business Comperj."   As with the other documents, there are annotations, on the left side, of Petrobras projects in Comperj to be distributed, and at the top, the name of the contractors identified by acronyms, and in the following field the preferences of each one (with the numbers 1-3, according to the priority preference), in anticipation of the negotiations to allocate the projects among the contractors.  This time, jokingly, the preferences of each contractor are called "Rio bingo" and the companies are identified as "players."

61.     Similar tables depicting the cartel members' preferences also exist for Petrobras' projects at the Abreu e Lima refinery ("RNEST").

62.     Further evidence confirming the existence of the cartel consists of admissions provided by top cartel employees.  For example, the president of the construction company Camargo Correa, Dalton dos Santos Avancini, admitted the existence of the cartel.  In testimony, he confirmed his attendance at one of the cartel meetings, in response to a summons addressed to

17

several other cartel members, including Marcio Faria of Odebrecht and Elton Negrao of Andrade Gutierrez.  Dalton Avancini also confirmed that bribes were paid for a contract to level the Abreu e Lima refinery, where the consortium included Odebrecht, Queiroz Galvao and Galvao Engenharia.

63.     Documents seized by the Brazilian Federal Police concerning the solicitation of projects at Abreu e Lima and Comperj show a close match between the results of the auctions and the contractors' preferences depicted in the tables provided by Augusto Mendonca or seized at Engevix.  For example, the solicitation for the installations of UHDTs and UGHs at the Abreu e Lima refinery was won by the consortium RNEST/CONEST, comprised of Odebrecht and OAS, which submitted the lowest bid of R$ 3,260,394,026.95, about 21% higher than Petrobras' estimate (R$ 2,692,667,038.77).  Although about fifteen companies were invited, only three proposals were submitted, all by contractors who were part of the cartel.  After negotiation, the contract was executed for R$ 3,190,646,503.15, just below the maximum value allowed by Petrobras—20% of the estimate.  For both projects, the tables discussed above included the preferences of Odebrecht and OAS.  Similarly, the bidding for the installation of Delayed Coking Unit – UCR at Comperj was won by the consortium TE-AG, comprised of Techint and Andrade Gutierrez, with the lowest bid of R$ 1,938,191,350.00, about 15% higher than the estimate of Petrobras (R$ 1,673,156,044.00).  Only three proposals were submitted, all by contractors who were part of the cartel.  After negotiations, the contract was signed with Petrobras with a 20% over Petrobras' estimate.  For this project, the tables discussed above indicate the preferences for each contractors, Techint and Andrade Gutierrez.

64.     Reportedly, Petrobras participated in the cartel through periodic meetings with the Brazilian Industrial Engineering Association (Abemi) to negotiate texts of calls for tenders and

18

contracts to be signed with the companies.  By adopting this practice, Petrobras acted to standardize procedures for contracts with engineering companies accused in Operation Lava Jato, the Brazilian Federal Police investigation into corruption practices involving the oil company. This reduced competition among companies and increased costs for Petrobras.

65.     Minutes of certain meetings show that Petrobras sent drafts of standard contracts and texts of calls for tenders for ABEMI's analysis even before they were launched.  Several ABEMI members, such as UTC Engenharia, Toyo Setal, Camargo Corrêa, Odebrecht and Mendes Júnior, are among companies suspected of participating in misappropriation of funds from Petrobras.  In the minutes, Petrobras workers show representatives of the contractors how they should present claims for contract addenda in order to avoid refusal.  The addenda were responsible, for example, for price increases that led the costs of the Abreu e Lima Refinery in Pernambuco to reach $18.5 billion, in comparison with $2.3 billion originally estimated.  The meetings were held at Petrobras' headquarters in Rio de Janeiro, more specifically on the 13th floor of Edifício Edita.

66.     In the minutes of one of the meetings, on February 26, 2007, Petrobras and ABEMI representatives addressed the following items: development of contract drafts, liability provisions for a "call for tenders of the gasoline portfolio" at Refinery Presidente Bernardes in Cubatão, São Paulo, definition of tax procedures for the contracts and sales of material and equipment in service contracts.

67.     The call for tenders of the gasoline portfolio was launched to contract the assembly of an industrial unit to produce gasoline at the Cubatão refinery.  In one part of the minutes, it is written that ABEMI asked that "the advancements obtained with the negotiated copy in the call for tenders of Refinery Presidente Bernardes, which were due to broad debate in the work group,

guide the final text." That is, the state company discussed before the call for tenders what it wanted to launch precisely with the contractors it would hire for the services. These minutes prove that the texts of the calls for tenders were "negotiated."

68.     In debate about another item at the meeting—"definition of procedures to be adopted because of potential legislation changes"—Petrobras warned the contractors who were members of ABEMI about how contract addenda were being done, alleging that "often the claims are not properly justified" and thus rejected. To avoid new rejections, Petrobras asked ABEMI to instruct the engineering companies to change their contracts. "To avoid a prompt rejection of the claims, without prejudice to the need of its adequate preparation and justification, the contract could bring an overall forecast about it," the minute says, referring to claims based on changes in labor, social-security or environmental laws.

69.     Another proof that the cartel united ABEMI and Petrobras was a joint statement they signed on May 14, 2009. In it, Petrobras informed the cartel that it would no longer stipulate the deadlines for detailing projects in calls for tenders. This practice was adopted precisely at the time when there was a delay in the detailing of works for Abreu e Lima. The engineering department was asked about it by the downstream department and answered that it could not demand deadlines for contractors because it had an agreement with ABEMI. The agreement was the statement that exempted contractors from detailing their projects.

70.     There was an additional exemption for contracts addenda, as reflected in the meeting between ABEMI and Petrobras on February 26, 2007. Minutes of that meeting reflect that, according to Petrobras, "there is no need for altering the current text of the contract to recognize the possibility that contractors make claims for economic-financial adjustments in the

contracts." In practice, that part exempted contractors from the need to change contracts to make the addenda.

71.     The meetings, minutes and joint statements of Petrobras and ABEMI paved the way for the increase in spending on contract addenda at Abreu e Lima and at other Petrobras projects. Although evidence of collusion between Petrobras and the trade group existed since 2007, the active participation of Petrobras in the so-called "cartel of contractors" was only reported this year to members of the Lava Jato taskforce. On January 7, Fernando de Castro Sá, testified to the taskforce in Curitiba and revealed that the Petrobras contract minutes, which were prepared by the legal counsel and submitted for approval by department chiefs, started to undergo the mandatory scrutiny of ABEMI lawyers. That is, Petrobras' procurement models had to be presented ahead of time to representatives of the companies it would hire. Mr. Castro Sá said the engineering department of Petrobras consulted with its lawyers over the procurement model, citing meetings with ABEMI as a parameter.

72.     Fernando de Castro Sa, a lawyer who worked several years on the legal counsel of the downstream department, testified twice in 2014, both to the Lava Jato investigators in February and before the CPI in April, about his own persecution and subsequent removal from his job after he exposed contractual manipulations by Petrobras and ABEMI that were adopted against the interests of Petrobras. A career employee with Petrobras since 1993, Castro Sá was part of the group of Petrobras lawyers that created the Company's standard norms for contracting (the Manual de Procedimento Contratual – Manual for Contract Procedures or "MPC") in 1999.

73.     Castro Sá testified that the scheme of tampering with the legal opinions concerning contract documents began with the Abreu e Lima Refinery project in 2007. Prior to this time, he (as part of the legal department) would create standard service provision contracts, the drafts of

which would then be approved by the management.   Once the cartel was formed, however, these contracts would also have to pass the inspection of ABEMI, described as the entity that created the cartel.  Castro Sá testified that it got to the point where, for example, "Engineering would tell Supply" they had to approve various addenda, only for those in Legal to see that the addenda had already been signed.  "How are you going to ask for authorization to conclude an addendum that is already signed?" he asked.

74.     Castro Sá also confirmed that another standard procedure was being routinely ignored.  The MPC allowed for the extension of a contract's deadline, but this applied only to contracts already in force.  Duque's Service Board changed and ignored this rule, extending the deadline of contracts that had already expired: "One of the rules of the book is that you can only extend the term of a contract if it is current.  These addenda were signed to extend contract deadlines already dead, which were ended by time," Castro Sá testified.

75.     Castro Sá confirmed that then-Executive Manager of Supply Venina Velosa da Fonseca also objected to the skirting of this rule, refusing to forward such requests.  The response from Supply's Legal Department was that it had "no problem" related to "extension of time limits." While recognizing the "risk of possible non-compliance," Petrobras Legal chose to call this practice merely a "formal and internal error."   After attempting to confront his supervisor in the Legal Department, Nilton Maia, about ABEMI's continuing interference with the model contracts, Maia's assistant told him that "it was absurd for him to (even) mention ABEMI."

76.     According to Castro Sá, in the course of gathering data at the request of his supervisor, he began to understand the "history of ABEMI" and "began to be afraid" as he started "to discover things."  One such thing was the existence of the minutes of a "Working Group" staffed both by ABEMI and by Petrobras Engineering dealing with "legal issues."  Said document

spoke of "joint definitions of contractual liability provisions."  "(Even) more frightening" was finding a document indicating that Petrobras Legal was revising the standard contract which was to be submitted to management but then had to be "forwarded for analysis by ABEMI before the next Working Group meeting."

77.     When Castro Sá saw this, he began to complain at Petrobras. "I was constantly complaining.  One day I wrote openly "Petrobras' lawyers are working for us or for ABEMI?"  "Then I was warned," he recalls.  Castro Sá said that he, along with Fonseca, tried to circumvent the changes in these contracts. But both were called into a meeting by Renato Duque, to "be chewed out."  Paulo Roberto Costa and Pedro Barusco were also present.  "Duque said that our opinions were not taken into consideration and that the addenda would be made based on the decision by Engineering."

78.     Castro Sá testified that an internal Petrobras inquiry was opened against him in 2009.  Aware that this administrative procedure could result in his dismissal, and hearing that both then-president Jose Sergio Gabrielli and Duque wanted his resignation, he sought out then-director of Supply Costa.  According to him, Costa said he had asked to stop the administrative process, and indeed then offered Castro Sá a job in London.  Castro Sá refused due to family issues, but accepted another offer—a transfer to the commercial area of the Company.  Castro Sá recalls: "I was (alone) in a closed room, no cleaning and no computer, without giving me any (work) for six months."  His salary was also cut by more than 50%.  During this period, Castro Sá said he suffered two heart attacks.

79.     Castro Sá testified that meetings were still being held with the legal department of ABEMI to discuss the contracts with the cartel members.  After refusing the direct request of his superiors in the legal department to ratify decisions regarding the "new" contract procedures, in

23

addition to refusing to approve advance payments for services not rendered at the Duque and Caixas refinery in Rio, Castro Sá was informed that he had been removed from his position due to a decision made with the participation of Gabrielli.

80.     Fonseca corroborates Castro Sá's testimony.  For example, Fonseca testified that Castro Sá was complaining at Petrobras about many intrusions from ABEMI in the Petrobras contracts that were not in Petrobras' interests and that those complaints intensified in 2009, just before he was harassed and fired.

81.     In January, 2015, Castro Sá testified to Lava Jato investigators about the involvement of Gabrielli and Duque in blocking Fonseca's dismissal of Geovane de Moraes, Communications Manager and protégé of Gabrielli, found responsible for embezzlement and making non-contract related payments by an internal Petrobras inquiry.

**B.     Bribery Schemes**

Overview of Bribery Schemes

82.     Costa testified that for at least seven years, he and other Petrobras executives accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and "then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves."[12]  Costa revealed that a group of politicians, including members and allies of Rousseff's Workers' Party, had accepted bribes linked to Petrobras contracts. Costa testified that he personally received tens of millions of dollars in bribes and referred to them as a "three percent political adjustment."  Costa named several construction companies that were part of the cartel, including Odebrecht and Camargo Correa S.A.  As part of the criminal case against Costa, prosecutors emphasized that there was "evidence of fraud,

---

[12] Sabrina Valle and Juan Pablo Spinetto, *Petrobras "Human Bomb' Revelations Fixate Brazil as Vote Looms," Bloomberg*, October 24, 2014.

overpricing and kickbacks" in at least seven contracts, including one contract for a 3.4 billion Brazilian Reais coking unit and another contract for a 3.19 billion Brazilian Reais hydro-treater and related units. The contract for the coking unit was cited by prosecutors as evidence of overpricing and over-billing of as much as 446 million Brazilian Reais.

83.     Costa testified that Petrobras was engulfed in a culture of "political patronage," where career advancement did not depend on technical skills and administrative ability, but on political sponsors. Directors were named by the political parties in the ruling coalition. Because the Government of Brazil was Petrobras' majority shareholder, all Board nominations, including that of the President, were made by the political parties as well, with the Workers Party having the majority of the seats. While at Petrobras, Costa recognized that he needed a political "Godfather" in order to be promoted to executive management. Costa testified that he chose to affiliate himself with the Partido Progressista (the Progressive Party) ("PP"), led at the time by José Janene. Costa knew that if he were to be selected as a Director, the PP would demand something in return and that if he did not meet that demand, he would be replaced. Costa stated that this quid pro quo applied to all executive level positions that were part of the patronage system and included diverting funds and resources from works and contracts falling under the control of the official.

84.     Costa explained that once he became Director of Supply at Petrobras with the backing of the PP, he was immediately required to provide the PP and its allied parties, the Partido do Movimento Democratic Brasileiro ("PMDB") and the Partido dos Trabalhadores (the Workers Party, or "PT" ) with funds originating from Petrobras through kickbacks from contractors. According to Costa, the demands for funds came primarily from the PP and PMDB and only occasionally from the PT, who controlled other Directories. Costa recounted that on one occasion, he was approached by a Senator of the PSDB Partido Social Democrat do Brasil ("PSDB"), who

demanded a bribe to block or impede the 2009 Parliamentary Investigative Commission (CPI) into Petrobras being led by his party.

85.     According to Costa, the Directory of Services at Petrobras was responsible for the largest contracts signed by the Company, totaling approximately 90% of applied resources. This Directory was controlled by the PT, who had nominated its Director, Renato Duque and, before him, Pedro Barusco.  Costa explained that seven of the Directories of Petrobras and the Presidency were divided up among the political parties forming the majority coalition as follows, with the directors in parenthesis:

> PT
> Presidency (Sergio Gabrielli)
> Directorate of Services (Pedro Barusco, Renato Duque)
> Directorate of Gas & Energy (Maria das Graças Foster)
> Directorate of Exploration and Production (Guillherme Estrella, José Miranda Formigli Filho)
> Directorate of Finance (Almir Barbassa)
>
> PP and later including PMDB and PT
> Directory of Supply (Paulo Roberto Costa, José Carlos Cosenza)
>
> PMDB
> Directory of International Operations  (Nestor Cerveró)

86.     As explained above, the cartels were advised of the estimated cost and then adjusted their bids to conform to the parameters allowing for a 15% to 20 % profit plus 3% for the kickback to the political parties and directors. On rare occasions with particularly large contracts this kickback amount was reduced to 1.5% or 2%.  According to Costa, in the case of Directories under the PT's control, the funds would be delivered to PT party treasurer Josê Vaccari.  In the case of the other directories, 2% always went to Vaccari for the PT and the remaining 1% was split with 60% going to the party that had nominated the Director.  In Costa's case, the political party was the PP but occasionally Costa would be asked to provide funds to the PMDB.

87.     According to Costa, the 3% kickbacks were to be distributed as follows:

- The entire 3% of Service Directory contracts kickbacks would go to the PT Party minus expenses (which were divided between the Director and the "facilitator")

- 2% of the Directory of Supply contract kickbacks would go to the PT. The remaining 1% was divided among the PP (60%), The Director (20%) and the "facilitator" (20%)

- 2% of all Directory of International Operations contracts kickbacks would go to the PT, while 1% was divided between the PMDb (60%), Director (20%) and the "facilitator" (20%)

88.     The functions of the "facilitator" were as follows: personally collect the kickbacks from the bid winning cartel member; establish a "bank," where all the funds kicked back by the cartel members would be initially kept; launder all funds as required; personally make kickback payments to the designated political party, either in cash or by deposit into a specified bank account; pay the bribe to the Director of the appropriate division; and entertain and process "special" requests made by one of the political parties, cartel members, or directors.

89.     According to Costa, each company had its own mechanism for delivering the payments.  In most cases, the funds went directly from the Company to the Party without the use of intermediaries.  In Costa's Directory, all payments were in cash and sent directly to the PP through an unofficial "bank" maintained by money launderer Alberto Youssef.  Payments made to him were usually in cash (U.S. Dollars), delivered in suitcases to him at his home, office, shopping centers or hotels.   The PT funds were usually delivered personally and in cash (Reais or dollars) to Jose Vaccari, the PT party treasurer.  The PP and PMDB payments were usually in cash in person to one of several party officials or elected officials, but also included deposits to offshore accounts.  Payments to the Directors were a combination of cash in dollars and occasionally in Reais and deposits to offshore accounts.  The facilitator also arranged to smuggle dollars and euros into the country and helped set up offshore accounts.

90.     Reportedly, Petrobras executives also accepted $139 million in bribes from the Dutch firm SBM Offshore ("SBM"), which was bidding to supply oil rigs.  SBM, which relies on Petrobras for almost half of its revenue, opened an investigation in 2012 over improper payments in several countries but, as of March 2014, it had not named the countries or companies involved.  SBM recently confessed to the Netherland's Revenue Service and to the Public Attorney's Office that the company had transferred bribery payments to managers of Petrobras in the amount of over $100 million, all related to offshore rigs and ships.

91.     According to a former executive at SBM, Jonathan Taylor, SBM's main agent through whom bribes were paid in Brazil was Julio Faerman.  Reportedly, Taylor has in his possession several e-mails implicating Petrobras officials, including confidential Petrobras Minutes that refer to a future meeting with Petrobras' engineering chief Jose Antonio de Figueiredo to extend a lease "without going via an open bid."   Petrobras employees "clearly connected to Julio Faerman" include Jose Miranda Formigli Filho (Petrobras' Head of Exploration and Production), Figueiredo (Petrobras' Engineering Director), Renato Duque, Paulo Carneiro, Cleison Pinto, Mauro Mendes, Osmond Coelho, Ricardo Serra, Tuerte Armaral Rolim, Alexandre Valladares Quintino dos Santos, Gilvan D'Amorim, Nilton Oliveira, and Robert Goncalves.  Other documents in Taylor's possession include an Amendment dated February 7, 2007, to an Agreement dated July 2, 1999 with Faercom Energia Ltd. confirms a "commission" of 3% signed by "HT" for SBM Inc.  In an interview dated March 27, 2012, HT confirms that the 3% was split as follows: 1% for Faerman and 2% for Petrobras officials.  Additionally, a "Payments to Agents" Task Force document dated April 17, 2012, prepared by SBM Internal Audit shows *inter alia* payments of $139,216,000.00 to the JF Group of Companies: Faercom, Bienfaire, Oildrive, Jandell, Journey Advisors and Hades Production Inc., including payments made by SBM's Houston office.  The

HT March 27, 2012 interview confirms that these payments (i.e. money allocated for bribes) were paid on to Petrobras officials.

92.    It is reported that Duque and Barusco's relationships (Barusco was Duque's main subordinate in the Engineering and Services Division) with Faerman grew closer starting in 2009, when they reached out to him to help accelerate Petrobras' oil and gas production. [13]   At that time, the government was preparing for the presidential candidacy of Dilma Rousseff, who at the time was the government's Chief of Staff, by capitalizing on Petrobras' growth momentum.  Called into action, Gabrielli, then CEO of Petrobras, drafted a timeline of events for the following year. Gabrielli chose the period between the first and the second round of elections for the "baptism" of the offshore rig P-57.  There was only one issue: agreeing with SBM on the early delivery of the rig.  In October of 2009, as Gabrielli and the PT party were grappling to shut down an investigation by the Congress's Investigation Committee ("CPI"), Duque and Barusco officially presented Faerman with the request. Petrobras wanted P-57 next October, "thus enabling the production start on 2010." SBM would agree, but at additional costs.  Negotiations took place over several months and involved employees Mario Nigri Klein, Ricardo Amador Serro, Antonio Francisco, Fernandes Filho, and Carlos José do Nascimento Travasso.  The negotiations ended in April 2010, six months before the expected delivery date, when officer Duque approved the extraordinarily high costs based on the recommendation of José Antônio Figueiredo and Barusco. These unnecessary costs were incurred solely to benefit the government's political campaign and cost Petrobras millions of dollars.

93.    At the time of this maneuver, Petrobras was under pressure from the Federal Court of Accounts (*Tribunal de Contas da União – TCU*), who was pushing to inspect Petrobras'

---

[13]*O Globo*, *Petrobras Paid SBM an Additional $25 Million for Lula to Launch Offshore Rig*, December 14, 2014.

expenditures related to offshore rigs.  TCU expressed an urgent need to investigate P-57 as Petrobras did not have "even an idea or concept regarding the object (the agreement) or its value." TCU was outraged to find that Petrobras' management purchased the offshore rig for $1.2 billion without at least "a basic project or detailed budget."  For twenty months, federal auditors requested cost appraisals, electronic sheets and calculation charts regarding the costs of offshore rig P-57, by SBM, the Queiroz Galvão pool (consortium), UTC and IESA. Gabrielli consistently stymied and denied such requests on privacy grounds.  One day, Gabrielli sent TCU boxes with printed sheets, but the sheets were useless.  Without the calculation charts, there could be no audit.  Up until 2012 when he left Petrobras, Gabrielli fought and managed to avoid the disclosure associated with the SBM rigs.

94.     Reportedly, the kickbacks relating to P-57 amount to $36.3 million.[14]

95.     In plea agreements and testimony, Petrobras executives admitted the existence of secret bank accounts that were used to receive bribe payments by Petrobras agents from Cartel members, including Odebrecht and Andrade Gutierrez.[15]  For example, Defendants Costa and Barusco admitted the existence of overseas bank accounts and the illicit origin of the funds they held.  Costa testified that almost all the funds deposited in his offshore accounts held in Switzerland originated from Odebrecht.  The bribes were paid by Rogerio Araujo, Director of Odebrecht, and brokered by Bernardo Schiller Freiburghaus, who had a role equivalent to that of Alberto Youssef, the money launderer.  Barusco likewise admitted receiving kickbacks of about $97 million, which were hidden in secret accounts in Switzerland.  The Brazilian Federal Police also discovered secret bank accounts maintained by Defendants Duque and Cervero.  Even before that, evidence of

---

[14]  *Id*.

[15]  Odebrecht and Andrade Gutierrez are the two biggest contractors in Brazil, with gross revenues in 2013 of about ten billion reais and five billion reais, respectively.

millions of dollars in transfers from Cartel members, such as Mendes Junior, Setal, MPE, Engevix, Galvao Engenharia and OAS, to accounts controlled by money launderer Alberto Youssef, were uncovered.

96.     As reported by the press and underscored by the Brazilian prosecutors, there is evidence that the cartel continued to pay kickbacks even after the Lava Jato operation had gained notoriety.

### C.     The Refineries Scams

The Pasadena, Texas Refinery

97.     Reportedly, in 2006, Petrobras drastically overpaid for a refinery in Texas, Pasadena.  Specifically, Petrobras paid $360 million for a 50% stake in the Pasadena refinery.  This amount was stunning, because a Belgian oil company, Astra, had purchased the refinery just a year earlier for $42.5 million.  Interest payments and legal fees brought the price tag for Petrobras' stake in that refinery to $820.5 million.  Eventually, following litigation over Astra's exercise of a put option requiring Petrobras to buy the remaining 50% stake, Petrobras paid a total of $1.18 billion for the Pasadena refinery.  Costa and other Petrobras managers accepted bribes to approve the wildly inflated Houston purchase.[16]

98.     A confidential informant directly witnessed the Pasadena scam.  In January 2002, this informant was sent to the US to be the Gasoline Trading Manager for Petrobras America Inc., in Houston, Texas.  In August 2003, the informant was promoted and assigned to the position of Commercial Manager of Petrobras America Inc, in Houston, Texas.  In 2004, during a lunch with the ex-manager of El Paso Corporation, the informant received information that Crown (the former name of the Pasadena refinery) was being offered on the market.  Subsequently, in 2004, the

---

[16]  *See* globeandmail.com, *Public Focus on Petrobras' Scandals Ignores its Profitability*, May 12, 2014.

informant sent an e-mail offering Crown to Petrobras for a price of approximately $30-40 million. The informant never received a formal response regarding this e-mail.

99.    In 2004, the informant received a phone call from London, Petrobras UK, in which a senior company official told him/her that someone from a business bank was going to call him/her to offer a refinery in the U.S.  The source suspected the refinery was Crown.  A U.S. citizen later called the informant and sent him a written proposal offering the refinery for an amount between $60-80 million.  The informant sent another e-mail to Petrobras Headquarters in Rio, Brazil, and this time a very senior executive answered (by e-mail) stating that "the purchase of this refinery is not part of the company´s strategic planning."

100.    In 2005, Astra purchased Crown utilizing only the profits generated by the refinery (Astra rented and leased Crown for approximately twelve months).   The price paid was approximately $40 million.

101.    Also in 2005, a U.S. executive made a proposal to the informant regarding the acquisition of Crown.  The informant believed this proposal to be a legal, profitable and good deal for Petrobras.  The source passed the proposal to his/her supervisor in Brazil, who in turn passed it on to Nestor Cervero, Director of Petrobras International Operations in Brazil.  The informant was later informed by the executive who made the proposal that someone high up at Petrobras told him/her to forget about any plan or movement involving Crown because the Company's point of view had changed with a focus on the ultimate purchase price of the refinery.  The informant was told by a senior Petrobras Director: "I'm telling you this because I am your friend but I was told by my boss not to discuss this subject with you anymore."  The informant did not alert anyone from Petrobras in Brazil because at that time he/she did not trust anyone there, but the informant alerted his/her supervisor in Houston and the head of the business unit.  The informant recounted

that he/she was outraged and considered the decision to pass on the original offer only to consider a new offer at a much higher price to be illegal. The informant explained that he/she is very familiar with the complexities of the purchase process and is very well informed on all the technical aspects of the refinery operation as well as its financial aspects. The source stated that the Crown refinery was not a modern or particularly productive refinery.

102.    In 2005, while the informant was still in Houston, a man visiting the Petrobras unit, who was the assistant of a politician named "DA" asked the informant: "who is your political godfather?"  The informant responded that he/she was an engineer and a technician, and did not have any political protection. The visitor then told the informant: "that's too bad for you, we are currently in need of your spot here in Pasadena."  According to the informant, Petrobras Brazil sent a Working Group to Houston in hopes of finding any mistakes or problems in the informant's administration of the refinery. The informant understood this maneuver to mean that he/she was viewed as a "problem" and for this reason he/she would be a target. Nothing was found in terms of wrongdoing or mismanagement by the informant. Later, the informant requested the report generated by this purported Working Group but no one found it in the Company files. The informant was very surprised when he/she found out "they" just erased the report. Subsequently, in July 2005, the informant was relieved from his/her position in Texas and sent back to Brazil. He/she remained in limbo for three months, with no assignment at Petrobras' headquarters in Rio.

103.    Upon his/her return to Brazil, in 2005 the informant was introduced through a friend to a top PT politician in Rio. At the politician's office in Rio, the informant explained the details regarding the planned purchase of the Texas refinery and expressed his strong view that the proposed inflated price would be highly damaging to Petrobras. The informant explained that he/she was 100% certain that bribery and corruption schemes related to the purchase of the refinery

were ongoing.   Present at this meeting were the politician, the informant, his/her friend, and a woman who was the politician's administrative assistant.   *The informant's friend later stated that the politician took the Pasadena issue directly to Gabrielli, then Petrobras' President*, and to the Minister of Casa Civil in Brasilia, at that time Dilma Rousseff.   *No action was taken and the deal went forward*.   In 2006, Petrobras bought 50 % of Crown for $340 million.   The true value of the refinery was only about $40 million.

104.   During 2006, the informant met in Rio de Janeiro a former Petrobras high level employee (at this time working as consultant) who told the informant that "the corruption schemes are out of control," using the Brazilian expression "dando bandeira"—meaning they no longer even care about hiding or being low profile when managing the schemes.   That person added that officials at Petrobras hired the same foreign consulting company they hired in the purchase of an Uruguayan refinery that was also a very suspicious and bad deal for Petrobras.   It was clear to the informant that Petrobras hired this advisory firm to facilitate the kickbacks and corruption.

105.   During the years 2010 through 2014, CW1 was assigned to various jobs at Petrobras headquarters and never again promoted.

106.   As described in more detail below, a TCU audit concerning the Pasadena refinery found strong evidence of illegitimate acts conducted by Petrobras.

The Abreu e Lima Refinery

107.   Another example of the bribery and kickback scheme involves the Abreu e Lima refinery in Pernambuco, whose costs skyrocketed from $4 billion to over $18 billion.   Reportedly, much of the cost increase at the refinery was due to add-on-contracts awarded to the cartel companies, which caused an estimated $3.1 billion in padded bids.

34

108.    In May 2009, Brazil's opposition parties, led by the Brazilian Social Democratic Party, collected 32 signatures from senators (five more than necessary) in support of creating a Parliamentary Investigative Committee ("PIC") to investigate cases of corruption involving Petrobras, including overbilling contractors associated with the Abreu e Lima refinery.  Petrobras was determined to prevent the investigation at all costs.  Costa related the details of three meetings he was personally requested to attend, in which Eduardo Da Fonte, a leader of the Partido Progressista (PP) and Senator Sergio Guerra, a leader of the Partido Social Democrata do Brasil (PSDB) were present.  The meetings took place in the Windsor Hotel in Barra de Tijuca, Rio de Janeiro.  During the first meeting, the leaders spoke to Costa about a situation that recently came up regarding Petrobras.   Da Fonte and Guerra told Costa that the Tribunal de Contas da Uniao (TCU) (the National Accounting Court) had recently investigated and audited several Petrobras programs and had discovered serious issues with the site preparation contract related to the Abreu e Lima refinery, which was in the initial phase of construction.

109.    For example, a TCU report prepared in 2008 found overpricing and overbilling for earthwork services provided for the construction of the Abreu e Lima refinery.  The contract, n. 0800.0033808.07.2, was between Petrobras and cartel members including Camargo Correa, Galvao Engeinharia, Queiroz Galvao and Noberto Odebrescht.  The persons responsible for the illicit contract included Jose Sergio Gabrielli, Maria das Gracas Silva Foster, Paulo Roberto Costa, Renato de Souza Duque, Almir Guilherme Barbassa, Jorge Luiz Zelada, and Venina Velosa da Fonseca.  The TCU investigation unearthed evidence of irregularities in the construction of the Abreu e Lima refinery, including:

    a.   No contract registration in SIASG;

    b.   Early investment lasting more than one year but not included on the Multiannual Plan 2003-2007;

    c.   Deficiency in the project;

    d.   **No bid conducted for the project**;

    e.   Bid to furnish an environmental permit not conducted;

    f.   Advance payments;

    g.   Absence of amendment to the contract, despite the occurrence of changes to the originally agreed conditions;

    h.   Incomplete budget;

    i.   **Overpricing of R\$ 81,558,706.86, corresponding to 19% of the contracted price (R\$ 429,207,776.71);** and

    j.   **Overbilling of R\$ 69,597,561.76.**

110.    In light of these concerns raised by the TCU, the opposition block in Congress lobbied for the creation of a CPI to investigate Petrobras.  Da Fonte and Guerra told Costa that such an investigation was not in the interest of either party or the nation.  Costa recounted the content of the meeting to Armando Tripodi, Chief of Staff for Defendant Gabrielli.  Tripodi told Costa that Petrobras could not afford a scandal, particularly in an election year, and agreed that something must be done to stop the CPI.

111.    At the second meeting a short time later, Guerra told Costa that he would help stop the CPI but that the PSDB needed 10 million Reais to do so. Following this meeting, Costa met with Idelfonso Colares Filho, President of Queiroz Galvao Engenheria, a cartel member.  Costa knew that Queiroz Galvao was in a joint venture with another cartel member, IESA at the Abreu e Lima refinery project.  After explaining the concerns of the two politicians and those of Petrobras, Colares agreed that the CPI needed to be stopped and agreed to pay the 10 million Reais.

112.    Costa testified that he set up a third and final meeting with Guerra and Da Fonte and informed them that Queiroz Galvao had agreed to pay the money.  A short time later he spoke

with Colares again and was informed that the 10 million had been paid to Sergio Guerra, but he did not give any details on where, when, how or to whom the cash was delivered.  Costa explained that Youssef was not involved in this transaction and that the funds were later debited from the PP kickback account.

113.    Costa once again went over how the 3% was divided up among the PT, PP and PSDB and how the cash was collected from the cartel members and distributed to the parties, himself, and other Directors at Petrobras.

114.    The CPI was eventually approved and installed in 2010 over the vehement opposition of the majority parties.  Ironically, Senator Sergio Guerra was selected as the President of the CPI and the man responsible for directing the commission's efforts.  The commission found no irregularities and instead accused the TCU's initial audit and investigation of being flawed.

The Comperj Project

115.    The Complexo Petroquimico do Rio de Janeiro ("Comperj") complex is an integrated refining and petrochemical complex that broke ground in 2008, began construction in 2010, and is scheduled to start up on 2015.  According to TCU, Petrobras will spend 60 percent more than originally budgeted at one of its refineries.[17]  A TCU report found that Petrobras will pay $21.6 billion to complete Comperj.  The TCU found "discrepancies between different government agencies, as well as within different Petrobras divisions, over investment needed for Comperj."  The TCU also concluded that Petrobras' management had been "reckless with irregularities in the omission of technical analyses, overpaying for contracts and a lack of effective controls."  One member of the TCU commented that it was "investigating how the structure of Petrobras can undertake such a huge project in such a sloppy way."  The TCU found "irregularities

---

[17]  *Bloomberg*, *Petrobras Accused of Recklessness by Audit Court on Overruns*, October 16, 2014.

in three contracts: two that were overpaid and one that was signed in an 'emergency' time-frame that didn't allow other companies to bid."

116.    The audit found excessive risk-taking and a disregard of standard operating procedures, causing significant effects on the timing and the cost of the project.  Contracts worth $3.1 billion were given without bidding.  The audit warned that the project is threatening Petrobras with heavy losses.  Additionally, the audit found a lack of clarity in disclosing the costs of the project.

### D.    Additional Allegations of Scienter Concerning The Individual Defendants

Gabrielli and Other Petrobras Executives Were Direct Participants in the Fraud

117.    On July 23, 2014, the TCU conducted an audit of the Pasadena refinery and found **serious evidence of illegitimate acts by Defendant Gabrielli** and five other Petrobras executives: Cervero, Duque, Barbassa, Guilherme Estrella and ex director Luis Carlos Moreira da Silva.[18]  The TCU found the elements of conviction to be "**very strong**" and declared that the initial evaluation **"reveal[s] highly reprovable [reprehensible] conducts and significant losses."**  As a result, the TCU concluded that it was necessary **to freeze the personal assets of Gabrielli and to seek a trial**.  *Id*.  The sextet appealed that decision to the Supreme Court of Brazil, which affirmed the lower court's ruling on August 13, 2014.[19]

118.    Key participants in the fraud also implicated Gabrielli.  For example, Youssef testified that Gabrielli was directly involved in the scheme.  Youssef testified that "*the Presidency of the state run company had knowledge of the facts*" and that in one of the illegal acts *Youssef "was given the task of paying these expenses for the participants as a result of a direct order by*

---

[18]  *See* July 23, 2014 TCU Report.
[19]  *See* Precautionary Measure in Writ of Mandamus 33.092 Federal District.

*Sergio Gabrielli, then-president, who had passed on the order from then- Director Paulo Roberto Costa.*"[20]

119.    Gabrielli is implicated in other instances of misconduct.  More recently, on August 14, 2015, *Veja* reported that in early 2007, Petrobras purchased a South Korean drilling ship for $616 million without any bidding process or prior discussion with technicians.  More suspicious was the fact that Petrobras chose an unknown, inexperienced contractor, Schahin, to operate it, paying over $1.6 billion for the service.  In his plea agreement, the money launderer Julio Camargo, who represented Samsung, confessed to having paid $25 million in bribes to directors and other intermediaries, including Nestor Cervero, in connection with a transaction related to the drillship Vitoria 10,000.   The role of Schahin in this drillship transaction was recently revealed by Cervero.  Cervero revealed that the purchase of Vitoria 10,000 was allocated to the Schahin construction company in order to pay off debts of Lula's presidential campaign in 2006.  Cervero said that the PT ended 2006 with a campaign debt of R$60 million to Banco Schahin, belonging to the same group that managed the construction company.  Unable to repay the debt by traditional means, the party used Petrobras' International Division to pay the debt campaign.  Petrobras' CEO at the time, Gabrielli, personally instructed Cervero to handle the matter.

120.    Also recently, *Estadao* reported that federal police forensic experts suggest that Gabrielli breached banking and fiscal secrecy laws, as part of their research into e-mails of Odebrecht's president, Marcelo Odebrecht, arrested June 19, 2015 on suspicion of corruption, money laundering, and criminal organization.  The experts' main targets are commercial proposals "with scaled-up prices related to contracts for rig operating services."

---

[20]  *See* Alberto Youssef Collaboration Term No. 2, dated October 3, 2014, at 2.

121.    Even more recently, on August 26, 2015, *Estadao* reported that a TCU audit blames Gabrielli and other Petrobras executives for over a billion dollar in losses at Presidente Getulio Vargas refinery ("Repar") at Araucaria, Parana, Brazil.  Court auditors detected a loss of R$ 1.27 billion in eight contracts for the modernization of the refinery.  The billion dollar overpricing was calculated from data collected by the court auditors and from information shared in Lava Jato by the Federal Justice in Parana.  The value of the loss could be much greater than previously established because the technical area of the court analyzed R$3.8 billion in expenditures, which corresponded to only a part of the total amount invested (R$ 10.7 billion).  Almost all of the damage to the national treasury is related to three contracts with the so-called "club" of companies investigated in Lava Jato.  In the projects under the responsibility of Camargo Correa and Promon Engineering (CCPR Consortium), the loss was R$ 551 million.  The contract implemented by MPE Montagens with Mendes Junior and SOG Oil and Gas (Interpar Consortium) were inflated by approximately R$ 460 million.  Already, the services under the responsibility of Odebrecht, OAS and UTC (Conpar Consortium) were found to be overpriced by R$ 184 million.  According to the TCU, *the Petrobras Executive Board, presided over by Gabrielli from 2005 to 2012, restricted competition in the biding process as a "corporate strategy," one that favored the companies of the so-called "club."  They were hired at values up to 19% above the initial estimate by the state-owned company.  After that, they received the benefits of contract additions that further increased the amount they were to be paid.*  The auditors found that *"Considering that these procedures greatly facilitated the formation of the cartel of companies revealed through Lava Jato, with grave moral and material consequences to the company (Petrobras), it is deemed appropriate to attribute the blame not only to the president of the company during that era*

*(Gabrielli), but also to the directors, at that time, of Supply, Paulo Roberto Costa, and of Services, Renato Duque, and to the former executive manager, Pedro Barusco."*

<u>The Individual Defendants Had Access to Information Exposing the Rampant Fraud at Petrobras and Approved the Illicit Contracts</u>

122.    According to Petrobras' bylaws, Petrobras is "managed by a Board of Directors with deliberative functions, and a Board of Executive Officers."

123.    Petrobras' bylaws list, among other things, the following responsibilities incumbent upon the Board Directors, "the highest-level guiding and directing body of Petrobras":

- to set the overall direction of the business of the Corporation, defining its mission, its strategic goals and guidelines;

- to approve the strategic plan as well as the pluri-annual and annual programs of expenditures and investments;

- to fiscalize the Officers' management and to establish their assignments, examining at any moment whatsoever the books and documents of the Corporation;

- to evaluate performance results;

- to approve every year the amount above which acts, contracts or operations, although up to the competence of the Board of Executive Officers, particularly those provided for in items III, IV, V, VI and VIII of art. 33 of these Bylaws, must be submitted to the approval of the Board of Directors;

- to set up the overall policies of the Corporation, including those concerning the strategic, commercial, financial, investment, environmental and human resources management;

- to approve the conveyance of the ownership of assets of the Corporation, including concession agreements and authorization regarding oil refining, natural gas processing, transport, import and export of oil, its derivatives and natural gas, with the possibility of limiting the value for performing such acts by the Board of Executive Officers;

- to deliberate about the election and removal of the members of the Board of Executive Officers;

- to deliberate about the setting up of subsidiaries, participations in controlled or affiliated companies, or the termination of such participation, as well as the acquisition of shares or quotas of other companies;

41

- to deliberate about the approval of a Code of Good Practices and of its in-house regulation, which must provide for the designation of the Rapporteur and the organization of Committees of the Board of Directors composed of some of its members with specific assignments regarding the analysis and recommendation in respect of certain matters;

- to deliberate about the approval of the Corporate Governance Guidelines of Petrobras;

- to deliberate about the choice and removal of independent auditors, who will not be allowed to render consultancy services to the Corporation during the effectiveness of the contract;

- to deliberate about the report of the management and the accounts of the Board of Executive Officers;

- to deliberate about the setting up of the Business Committee and approval of the assignments and operational rules of such Committee consistent with the Basic Organizational Plan, and which must be publicized to the market in summary at the time the financial statements of the Corporation are published or when they are altered; and

- to order inspections, audits or rendering of accounts of the Corporation, including the hiring of specialists, experts or external auditors, in order to inform more about the matters submitted to its deliberation. Matters submitted to the appreciation of the Board of Directors must be accompanied by the decision of the Board of Executive Officers, by the statements of the technical area or of the competent Committee, plus a legal opinion whenever necessary for examining the matter.

124.    Petrobras' bylaws list, among other things, the following responsibilities incumbent

upon the Board of Executive Officers:

- to prepare the interim balance-sheet and further financial statements;

- to work out and to submit to the approval of the Board of Directors: a) the bases and guidelines for working out the strategic plan as well as of the annual programs and the pluri-annual plans; b) the strategic plan as well as the respective pluri-annual plans and annual programmes of expenditures and investments of the Corporation with the respective projects; c) the cost and investment budgets of the Corporation; d) the assessment of the result of the performance of the activities of the Company;

- to approve: a) the technical-economic appraisal criteria for investment projects with the respective liability delegation plans for their execution and implementation; b) the criteria for the economic use of producing areas and the minimum coefficient

42

of oil and gas reserves in compliance with the specific legislation; c) the price policy and basic price structures of the products of the Corporation; d) accounting plans, basic criteria for establishing results, the amortization and depreciation of invested capitals and changes in the accounting practices; e) handbooks and rules in respect of accounting, finances, personnel management, the hiring and implementation of works and services, the supply and disposal of materials and equipment in respect of operation and others required to guide the functioning of the Corporation; f) the annual business plans;

- to authorize the acquisition, in accordance with the specific legislation, of real-estate goods, ships and maritime drilling and production units, as well as the encumbrance and the disposal of assets of the Corporation;

- to follow up and control the activities of the subsidiaries and companies in which Petrobras participates, or with which it is associated;

- to deliberate about managerial acts of business of the individual responsibility of each one of the Officers within the contact areas established by the Board of Directors in the Basic Organizational Plan. Furthermore, it is incumbent upon the Officers: (i) to give instructions to the representatives of the Corporation at the General Meeting of its subsidiaries, controlled and affiliated companies in accordance with the guidelines established by the Board of Directors; (ii) to hire and fire employees and to formalize assignments to managerial duties and functions approved by the Board of Executive Officers; (iii) to designate corporate employees for missions abroad; (iv) to sign deeds, contracts and agreements as well as to manage the funds of the Corporation, always jointly with another Officer; and

- The Board of Executive Officers shall forward to the Board of Directors copies of the minutes of its meetings and shall render the information allowing the evaluation of the performance of the activities of the Corporation.

125.    Petrobras' by-laws required its Board of Executive Officers ("shall hold") to "hold a regular meeting once a week with the majority of its membership, among whom the Chief Executive Officer or his deputy, and in a special meeting upon call by the Chief Executive Officer or of two-thirds of the Officers."

126.    Petrobras' Board of Executive Officers met not once, but sometimes twice or more weekly "to focus on the physical and financial monitoring of the principal projects in [Petrobras]' investment plan."

43

127.    During the Class Period, Petrobras' Executive Directorate (the Board of Executive Officers) included Defendants Gabrielli, Foster, Barusco, Duque, Estrella, Formigli, Barbassa, Costa, and Cosenza.

128.    The Individual Defendants that comprised the Board of Directors of Petrobras, PifCo and PGF during the Class Period are listed above under the Individual Defendants Section.

129.    By virtue of their positions requiring them to exercise the above-delineated duties and as further described below in testimony provided by Petrobras employees as part of the Lava Jato investigation, the Individual Defendants had access to and approved the illicit contracts between Petrobras and the cartel members, and were otherwise privy to the illicit acts.

The Executive Directorate, Including Gabrielli and Foster, Had Repeated Notice of the Fraud

130.    In September 2014, Costa testified that he believed Gabrielli knew about the scheme inside Petrobras because Gabrielli was the personal appointee of then-president Luis Inacio Lula da Silva.  *See* Paulo Roberto Costa Collaboration Term No. 14, dated September 1, 2014, at 3; Paulo Roberto Costa Collaboration Term No. 42, dated September 5, 2014, at 4.

131.    Petrobras' former manager of downstream operations, Venina Velosa da Fonseca, testified under police protection that she met with Defendant Foster in 2008 and told her about inflated contracts and payments for services that were not carried out.  Foster led the energy and gas division at that time and reported to then-CEO Jose Sergio Gabrielli.  Fonseca represented that "I met with the CEO personally when she was director of the gas and energy unit.  At that time, we discussed the matter.  I handed over to her the documents about the complaints.  Afterward, she had access to these anomalies at the management meetings."  Fonseca explained that it was not only via email that she warned Defendant Foster of irregularities in Petrobras.  The former manager had a personal meeting with Foster when Foster was director of Gas and Energy at Petrobras.  Fonseca said she handed documents to Foster about the inflated contracts and related

payments.  "Since 2008, I have been reporting these problems to my superiors, culminating now I'm taking all this documentation to the prosecutor," Fonseca said.

132.     The Brazilian newspaper *Valor Economico* similarly reported on Fonseca's nearly five-hours-long testimony to federal prosecutors.[21]  The former manager reported internally for five years several problems in contracts, biddings and practices of Petrobras.  Fonseca ended up being sent to Singapore and, last November 19, was dismissed from her job in that country.

133.     Accompanied by her lawyer Ubiratan Mattos, Fonseca delivered documents and a computer to those in charge of the Lava Jato investigations.  The emails in which Fonseca warns Defendant Foster and José Carlos Cosenza, the officer who heads the internal investigation committee of Petrobras, of wrongdoings are already in the hands of the taskforce, as well as internal Petrobras documents.  Based on this information, Cosenza is also likely to testify.

134.     Reportedly, as part of the investigation, the taskforce received information about three embezzlement schemes.

135.     The first scheme involves misappropriation of funds in the Communications Department of the Supply Division and was discovered by Fonseca in 2008 and 2009.  At the time, Fonseca was a subordinate to then-officer Paulo Roberto Costa and complained to him about a series of contracts in which services were simply not being rendered.  The most significant evidence, however, was of the kickback scheme itself.  Fonseca found a pattern indicating that the contractors were rigging bids and overfilling by up to 20% of estimates.  Costa replied by pointing his finger to the portrait of then-president Luiz Inácio Lula da Silva and asked whether Fonseca "want[ed] to bring down everybody."[22]

---

[21] *Valor Economico, Graca Foster is likely to be called to testify*, April 15, 2014.
[22]   Accused of several irregularities, Costa was arrested and entered into an agreement with the Public Ministry in which it committed to deliver evidence of the crimes in exchange for a sentence reduction.

136.    Reportedly, the scheme in the communication department involved the misuse of funds to the Workers' Party (PT) of Bahia, the political group of then Petrobras CEO José Sérgio Gabrielli.

137.    Fonseca forwarded her complaints to then Petrobras CEO, Jose Sergio Gabrielli. Fonseca testified that Gabrielli created a committee under the chairmanship of Rosemberg Pinto to investigate the case.  Like Gabrielli, Pinto belongs to the same political group of the Workers' Party (PT) of Bahia. The committee's report found out that the company had paid R$58 million in contracts for communication services that were not performed. In addition, the committee identified invoices with the same number for several services, totaling R$44 million.

138.    On April 3 of 2009, at 3:50 a.m., Fonseca sent an e-mail to Defendant Foster seeking her help to complete a report about more than R$58 million embezzled in communication contracts signed by the downstream unit, after an audit she had led.  "I would like to have your opinion on a final text that I need to forward.  Can I leave it for you to read? You know about the matter. Feel free if you feel better not reading it. I await your response to leave or not the material with your secretary."  Foster did not reply.

139.    On the same day, April 3, 2009, Fonseca created a document called "Internal Document of the Petrobras System," called DIP, in which she reached the conclusion that "administrative irregularities" existed in the communications unit of the downstream department.  The subject to which Fonseca referred to was an audit led by her to thwart a scheme that diverted million of Reais from Petrobras.  The scheme benefited Workers' Party (PT) members from Bahia — the same political group of then Petrobras CEO José Sérgio Gabrielli. Fonseca wrote to Defendant Foster in the dawn, just before completing the DIP that called for the resignation of Geovanne de Morais.  She sought Foster's help.

140.    Petrobras said in a note that it fired the employee responsible for the embezzlement, Geovanne de Morais.  However, since he was on medical leave, Petrobras kept him on the job for another four years.  When verifying that Morais had not been fired, Fonseca obtained a legal report ordering the termination of the employee even under medical leave.  Fonseca sent this report to her supervisors, because she thought it was absurd that an employee caught misusing funds would continue on the company's payroll.  But Morais was not dismissed.  It took four more years for him to be fired.

141.    *Valor* also reported that Fonseca sent an email to Defendant Foster on October 7, 2011, citing failures to meet standards and Petrobras' Code of Ethics, as well as problems in contracts and bids, and suggested she could deliver the documents she had to Defendant Foster. "Hi, Graça! I would like to be there, talking to you, looking straight into your eyes, so you feel what I mean, even at the risk of crying before you; it would not be the first time," the geologist wrote. "I will write to you knowing that there is a possibility that you go to Paulo Roberto's office and he then asks me what I was doing in your office," she continues, referring to Mr. Costa, at that time, her immediate boss.   "Today, I can say that I am pretty much alone in the company.  The facts that occurred when I was removed from my post and sent to Singapore led the people closest to me to go away, fearing retaliation." Fonseca referred to her transfer to the Petrobras office in Singapore, a decision reached by Petrobras' Executive Board, where she was sent in February 2010, after making allegations of irregularities in the state-run company.  Arriving in Asia, she was asked not to do any work.  In this email, Fonseca makes comments about the serious problems experienced at Petrobras, revealing that Foster knew about the matter. "Of the five emails I wrote to the director, four were very friendly and, in the last one, I wrote the real reason that kept me from receiving appointments: clash of values," said Fonseca, again referring to Costa. "I wrote to

47

him that I was feeling humiliated, harassed and cornered."  In her email to Foster, Fonseca

continued that "what happened in the ABAST (the downstream department) in the area of

communications and works was absolute nonsense." She questioned disputes between technicians

for new forms of contracting and "bids without apparent efficiency." "Unfortunately, I am not

alone, I cannot venture outside.  If I could, you can be sure it's what I would do. But if I cannot

fight out here, I will go to Brazil to fight for my rights. I did nothing wrong. I will not accept being

penalized for what I didn't do. I will not, in any way, accept it! If I cannot have a dialog within

ABAST, I have no other alternative but to seek other means, but I do not like to do it without

talking to you." Fonseca told Defendant Foster that she was considering what she should do.  She

was explicit in mentioning that part of the documentation that she has about irregularities has

already been brought to Foster's knowledge. "There are alternatives I'm evaluating despite fears

of risking I and my daughters. I would like to introduce you to some of the documentation I have,

I know that some of it you already know," the geologist wrote.  Five months after this email, Foster

became CEO of Petrobras.

142.  As reported by *Valor*, as part of the investigation, the Brazilian taskforce also

received documents regarding the increase in costs at the Abreu e Lima refinery in Pernambuco,

which went from $4 billion to over $18 billion. The information shows that the third phase of

construction was only authorized one month after Fonseca left the Supply department, in October

2009.  Before leaving her post in Costa's department, Fonseca sent notes, emails and documents

warning of the mounting prices at the refinery.  An internal Petrobras document shows that Fonseca

made, at Costa's request, a plan of acceleration of the refinery's works on March 8 of 2007.   At

that time, Fonseca made clear the plan involved a cost increase of $328.7 million in order to make

the refinery start operating before the scheduled date, as requested by Costa.  Fonseca reiterated

that the plan was submitted "to your [Mr. Costa's] consideration" so that, if he were in agreement, it could be submitted to management. ***The plan was submitted to Petrobras' management, which included Foster, and then to the board***, chaired at the time by its Chief of Staff, Ms. Rousseff.[23]

143. Fonseca testified that in the case of Abreu e Lima, "what was abnormal was the price escalation that occurred. It was a project that started in 2005 with $R2.4 billion investment, and I followed this project until 2009. It was already at R$13.5 billion but it closed in 2012 and was already at about R$17 billion. What would happen is that Petrobras utilizes a methodology which we name 'phases' to make the economic evaluation of a project. There are 4 phases: identifying opportunity, conceptual project, basic, and execution. In the first phase, which occurred in September 2005 with an investment of R$2.4 billion, it had a net return of R$210 million. What does that mean? That after the life expectancy of the project ended it would still have a positive return of R$210 million. In December 2006 this project went to phase 2 and had a positive return of R1.7 billion. In November 2009 with an approximate investment of R$13.5 billion the VPL which is the present net value was negative R$1.9 billion and the execution was later approved with an approximate investment of R$17 billion, and a return of negative R$3.1 billion. So what drew attention in this project was the price acceleration."

144. Fonseca testified that "during [her] management, this fact [the price escalation at Abreu & Lima] ***was communicated to director Paulo Roberto Costa during meetings, through documents, through internal documents which we call DIPs, and it was also communicated to the Executive Division where the Directors and the President are.***" Fonseca testified that irregularities showing a VPL negative return of around $3 billion were reported to Petrobras' Executive Board in July 2009. The response was "to continue the project," despite the fact that

---

[23] Fonseca testified that she was responsible for budget control and the economic evaluation of projects, including the Abreu e Lima refinery project.

those price escalations would result in a monumental loss to Petrobras—a return of negative R$3.1 billion.

145.    According to a Petrobras audit as described by Fonseca, much of the cost increase at the Abreu e Lima refinery was due to add-on-contracts awarded to the cartel companies, which caused an estimated $3.1 billion in padded bids.  The audit also blamed Costa for modifying the original plan to add unnecessary features, which were nevertheless approved by the Board of Directors.  The internal audit, which was performed in June of 2012, was presented to the Board, including to Defendant Foster, who despite being informed of the loss, approved the unneeded additions to the project, resulting in further kickbacks to political parties and to Directors.

146.    Fonseca testified that in addition to the irregularities identified at Abreu e Lima, "there were several irregularities occurring in the Supply Division . . . These irregularities were constantly identified and nothing was done by Director Paulo Roberto Costa to resolve them . . . the information regarding the problems was constantly passed to the Executive Board."

147.    Fonseca also testified that as early as 2007, she raised issues to her superiors of improprieties related to a project at Terra Planagem.  According to Fonseca, a report was prepared by the Engineering department, which uncovered services and deadlines that were different from the numbers given by the Supply division, and involved services not rendered.

148.    Fonseca further testified that irregularities not only concerning Abreu e Lima, but also other projects "were constantly identified," that her complaints about the misconduct "intensified" beginning in 2009 and "the ***information regarding the problems was constantly given in writing to the Executive Directors/Board***."   Fonseca testified that at that time*, **the Executive Directors included Costa from Supply, Barbassa from financial, Estrela from AEP, Duque from Services, Foster from the Gas and Energy, and the CEO, Gabrielli**.*  Fonseca

explained that all changes in contracts, including contract additives, were submitted to the Executive Board.

149.    Finally, the federal prosecutors obtained documents about misappropriation of funds by traders of ship fuel in Petrobras units abroad.  More than 1,000 pieces of communication between fuel traders with "strong evidence" of misuse of funds have been received to date by the Public Ministry.

150.    Reportedly, Fonseca last e-mailed Foster on November 17, 2014.  Fonseca wrote that "[s]ince 2008, my life has become a hell, I came across an initial scheme of embezzlement within the Communications of Downstream [unit]. By fighting it, I was threatened and harassed. I even had a gun pointed to my head and received threats against my daughters . . . "I have with me all the documentation of the case, which I never offered to the press out of respect for Petrobras, despite all the journalists' attempts of contacting.  I presented the matter to the company's competent authorities, including the Legal and Audit [departments], which was in vain," she continued.  "Now, in Singapore, I came across other problems, such as cases involving the bunker area and losses, and once again acted in favor of the company, trying to avoid acts against its interests . . . I was not aware of actions taken in the second example cited, implying that there was omission of those who were informed and could act." The geologist ends the message providing her phone number to Ms. Foster.  Two days later, Petrobras' board discharged Fonseca.

151.    An "internal investigation" by Petrobras in 2014, after the Lava Jato Operation was commenced, conducted purportedly to evaluate the contracting procedures adopted in the implementation of the Abreu e Lima refinery found evidence of irregularities, including improper bidding procedures.   This internal investigation placed the blame on the following Petrobras employees: Paulo Roberto Costa; Renato de Souza Duque; Pedro Jose Barusco Jr.; Venina Velosa

de Fonseca; Francisco Pais; Luiz Alberto Gaspar Dominguez; Glauco Colepicolo Legatti; Carlos Alberto Carletto; Omar Antonio Kristocheck Filho; Luis Carlos Queiroz de Oliveira; and Ricardo Luiz Ferreira Pinto Tavora Maia.

Cartel Members Made "Special Gifts" to 100 Top Petrobras Employees, Including Petrobras' Former CEOs and the Members of the Executive Directorate

152.    Documents seized by the Brazilian Federal Police from Odebrecht, the top member of the Cartel, show that Odebrecht doled out "special gifts" in 2010 to one hundred (100) top employees at Petrobras who occupied strategic positions at the Company, including Petrobras' key executives: Petrobras' former CEOs, Defendants Gabrielli and Foster, the President of Petrobras America Inc., and the Presidents and Directors of Petrobras' key refineries, including Abreu e Lima and Comperj.   These gifts include paintings by famous artists such as Oscar Niemeyer, Carybe, Alfredo Volpi and Cicero Dias.   Gabrielli received a painting by Oscar Niemeyer and Foster received a painting by Cicero Dias.   The following divisions at Petrobras received these "special gifts":   the Presidency (including Gabrielli, Gabrielli's Chief of Cabinet, and Gabrielli's assistant);   the Executive Directorate (including Foster, Estrella, Formigli, Barbassa, Costa, Cosenza, Duque, and Cervero); Duque's Assistant; Zelada's assistant; Executive Management for New Business; International Area: Executive Management for Business; Petroquisa; Exploration and Production; Financial Department; Materials Department; Strategy and Business Development; CENPES (a research center for Petrobras); Environment Department; ABAST members of Petrobras; Gas and Energy Department; Petrobras Uruguay; Petrobras Distribuidora S.A.; Engineering Department; Transpetro (largest oil and gas transportation company in Brazil, a fully-owned subsidiary of Petrobras); TBG; the President of Petrobras America Inc. (related to the Pasadena refinery);   the   Energy   Department;   Petrobras   Beijing   Representative   Office;

Petroquimica Suape; Comperj; the Abreu e Lima Refinery; PMCC, Petrobras Bio Combustivel; and TAG.

153.    Documents seized by the Brazilian Federal Police show that Odebrecht made similar "special gifts" in 2009, including to Defendants Gabrielli and Foster.  Gabrielli received a painting by Oscar Niemeyer and Foster received a painting by Alfredo Volpi.  Gifts were doled out to the same Petrobras divisions listed in the paragraph above, including to members of the Executive Directorate.

154.    These illicit gifts were made in furtherance of the fraudulent scheme and directly violated Petrobras' Code of Ethics, Article 12.3, which allowed state employees to accept "only promotional, public, non-exclusive, no commercial value in their relationship with the external public."

155.    Relatedly, on June 19, 2015, the Brazilian Federal Police arrested the CEOs of Odebrecht and Andrade Gutierrez, another top Cartel company.  On that day, the police also detained Marcio Faria and Rogerio Araujo, directors for Odebrecht's construction unit.  Rogerio Araujo was the sender of the "special gifts."  In a search and seizure order released that day, the judge overseeing the case stated that "[t]here is not only oral evidence of rigging of bids among contractors, with the participation of Odebrecht and Andrade Gutierrez, but also documented evidence consistent with it."  In his arrest order, the Judge said that the bribery scheme could not have existed without the knowledge of the CEOs of Odebrecht and Andrade Gutierrez, given that it had gone on for at least a decade and involved hundreds of millions in bribes paid in billions worth of contracts.

Additional Facts Regarding Defendant Foster

156.    Defendant Foster, a Petrobras employee since the 1970s who spent nearly her entire career at Petrobras, moved up the Company's ranks rapidly during Rousseff's 2003-2010 stint as chairwoman of Petrobras' Board.  Throughout the years, Foster and Rousseff have had a very cozy relationship.  Foster is said to be fiercely loyal to Rousseff.  "She is absolutely loyal," said Francois Moreau, an oil industry veteran who for years set at the same negotiating table as Foster. Reportedly, Foster met President Rousseff in the late 1990s when Rousseff was an energy official. Rousseff eventually became energy minister and turned Foster into one of her senior aides.  Two years later, Foster returned to Petrobras.  When Rousseff took office in 2012, she immediately elevated Foster to the top of Petrobras' totem pole.  At the Company's helm, Foster remains Rousseff's trusted lieutenant.  Still, "[y]ou can tell it bothers her—of course it does . . . If she could, she would do the right thing," said Silvio Sinedino, who represents workers on Petrobras' governing council.[24]

157.    At the helm of Petrobras, Defendant Foster remained intricately involved in Petrobras' operations and investments.  In 2012 and 2013, Foster told investors that she "will be closely monitoring the liquidity and leverage limits established by [Petrobras'] Board of Directors, which are essential vectors for insuring the financeability of the PNG."  Executive Board meetings were held twice weekly in order to focus on the physical and financial monitoring of the principal projects in the Company's investment plan.  Foster represented to investors that "I constantly monitor the progress of our investment projects and structuring programs with the Directors, Executive Managers, and all other leaders involved."

**E.**    **The Scheme Rendered the Company's Financial Statements Materially False**

---

[24]    Globe and Mail, *Mending Brazil's Broken Backbone*, May 13, 2014.

**and Misleading**

158.     Petrobras' scheme, whereby it purposefully increased costs on construction projects in order to receive kickbacks and bribe governmental and party officials, caused the Company to materially inflate its reported property, plant and equipment ("PP&E"), necessitating a massive write-down estimated by certain Company officials at $30 billion.   As a result, Petrobras' financial statements, including the carrying value of its property, plant and equipment, reported expenses, and net income, were materially false and misleading at all relevant times.

159.     During the Class Period, Petrobras asserted that it accounted for its acquisitions and the assets from its construction projects in accordance with International Financial Reporting Standards ("IFRS"), claiming its acquired or constructed assets have values equal to the reported costs incurred in their acquisition or construction.

160.     IFRS sets forth the circumstances under which a company may capitalize and depreciate expenditures.  The "assets under construction" class of assets are those assets where the Company has contracted with third parties to build the equipment, facilities or other assets on its behalf.  In accordance with the requirements of IFRS, the costs of construction are accumulated in the "assets under construction" class of PP&E and held in that account until the assets are ready for their intended use.  When ready for their intended use, assets are transferred out of the "assets under construction" account to the land, buildings and improvements account, the equipment and other assets account, or the exploration and development costs account, as appropriate International Accounting Standard ("IAS") 16, *Property, Plant and Equipment*, requires an asset be measured at its cost.[25]  The cost of an item of PP&E includes, among other items, the purchase price and/or any costs "directly attributable to bringing the asset to the location and condition

---

[25] IAS 16, ¶ 15.

necessary for it to be capable of operating in the manner intended by management."[26]   Simply

stated, property, plant and equipment are to include all costs necessary to get the item ready for its

intended use. Once asset costs are transferred out of the "asset under construction account" and

placed into another class of assets within property, plant and equipment, they are reported as being

in service.  That means the assets are depreciated, or allocated to expense on the income statement,

on a systematic basis over their expected useful lives and in accordance with the chosen method.[27]

Over time, the amount of depreciation for each year is accumulated and deducted from the asset

cost on the balance sheet.  Petrobras reports the assets at cost less any accumulated depreciation

and any accumulated impairment losses.[28]  This is referred to as the carrying amount of the PP&E.

161.    Additionally, International Accounting Standard ("IAS") 36, *Impairment of Assets*,

requires a company to evaluate whether the carrying amount of an asset is recoverable.   The

carrying amount is recoverable when (i) the higher of its fair value less costs of disposal or (ii)

value in use is higher than its carrying amount.  The value in use is the discounted present value

of the future cash flows expected from the continued use of the asset.  If the carrying amount is

not recoverable, a loss for the amount of the impairment is included in the operating expenses

section of the income statement, and the carrying amount of the asset on the balance sheet is

reduced to its recoverable amount.

162.    During the Class Period, Petrobras capitalized the bribe repayments (i.e. the inflated

contracts), treating them as costs related to the construction, installation, and completion of oil and

gas infrastructure and recording them as part of the carrying value of the acquired or constructed

assets on the Company's balance sheet. Petrobras then recognized expenses for the depreciation

---

[26] IAS 16, ¶ 16.
[27] IAS 16, ¶ 50.
[28] IAS 16, ¶ 30.

of these assets—including the portion related to bribes—over subsequent periods.  Petrobras further calculated and reported the Company's periodic net income based, in part, on these expense figures.

163.    As explained above, in return for the bribes received, Petrobras inflated the contracts granted to the various cartel members by up to 20%.  Accordingly, the assets on the balance sheet associated with Petrobras' PP&E were massively inflated.  In addition, instead of reporting a corresponding immediate expense for the inflated portion of the contracts in the same period, i.e. in the period the expenses were incurred, Petrobras expensed the bribe repayments (i.e. the overpayment to the contractors) as depreciation over the unit-of-production basis or straight-line method, resulting in materially lower current expenses and materially higher net income in the periods in which the inflated payments were made.

164.    Petrobras' reported asset values were important information for purchasers of the securities of Petrobras, PifCo, and PGF during the Class Period because these measures were understood to offer a fair presentation of the Company's fixed capital and recoverability for creditors.  These reported asset values were used by rating agencies, analysts, and investors to arrive at a number of metrics including the Company's financial leverage (the ratio of net assets to total net debt) and its debt/equity ratio that formed a material basis for the market prices of the securities of Petrobras, PifCo, and PGF.

165.    On January 28, 2015, Defendant Foster acknowledged that "the testimonies examined by Petrobras have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments."

166.     Throughout the Class Period, Petrobras issued public statements, including financial statements that the Company filed with the SEC, which set forth, among other things: (1) the Company's asset carrying values; (2) the Company's periodic expenses and net income; and (3) the assessment that the Company did not suffer from a material weakness in its disclosure controls and procedures or its internal controls over financial reporting.

167.     These statements were false, in that:

(a)     the periodically reported carrying value of the Company's assets was false and misleading because the costs associated with the repayment of bribe-related expenses to contractors had been incorporated into certain asset values at the time of their acquisition or construction and then capitalized as part of those assets' carrying values when recorded on Petrobras' balance sheet, artificially inflating their carrying values;

(b)     had the illegal bribe-related repayments been properly accounted for, the Company would have recognized materially greater expenses and less net income in periods in which the illegal payments were made. Accordingly, during the Class Period, the Company's reported expenses and net income were false and misleading; and

(c)     the Company suffered from material weaknesses in: (1) its disclosure controls and procedures, and (2) its internal controls over financial reporting.  The Company consistently represented that it was acting in conformance with its Code of Ethics (which barred bribery and corruption) as well as an Anti-Corruption Program, which expressly targeted such illegal activities.  Contrary to such representations of compliance, the Company was engaged in a systemic campaign of corruption that reached the highest echelons of the Company and the Brazilian government.

F.     **The Patently Inadequate Write-Off—From "Operation Car Wash" To**

58

**Whitewash**

168.    For years, Petrobras knowingly overpaid the costs on construction projects by up to 20% in exchange for kickbacks and bribes to party officials.  Accordingly, the assets on the balance sheet associated with Petrobras property, plant and equipment ("PP&E") were massively inflated.  Moreover, instead of reporting a corresponding immediate expense for the inflated portion of the contracts in the period the expenses were incurred, Petrobras expensed the bribe repayments (i.e. the overpayment to the contractors) as depreciation over the unit-of-production or straight-line method, resulting in materially lower current expenses and materially higher net income during the periods in which the inflated payments were made.  Ultimately, in light of the arrests and plea bargains of top Petrobras lieutenants, Defendants were forced to admit the falsity of their financial statements.  On January 28, 2015, Defendant Foster acknowledged that "the testimonies examined by Petrobras have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that *the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments.*"

169.    Yet, despite purporting to come clean, on April 22, 2015, Petrobras posted on its website Consolidated financial statements as of December 31, 2014, 2013 and 2012 with report of independent registered public accounting firm, and Fourth Quarter of 2014 Results. These financial statements grossly understated the amount of overpayments incorrectly capitalized. Petrobras reported total overcharges of only $2.5 billion related to the bribery scheme.   Petrobras reached this cherry-picked figure by applying a fixed percentage to the total contract value: the Company estimated the aggregate overpayment by applying a percentage indicated in the

depositions (3%) to the total amounts for identified contracts.[29]  In other words, Petrobras' position is that *the most it overpaid* on the contracts is 3% (the amount of the bribes kicked back to Petrobras executives and their political appointees).  Petrobras claimed that this methodology "produces the best estimate for the aggregate overstatement of its property, plant and equipment resulting from the payment scheme" and "assumes that all contracts with the identified counterparties were affected and that 3% represents the amount by which the Company overpaid on those contracts."

170.    Petrobras' self-serving 3% ceiling is sharply contradicted by the testimony of government cooperators, including Costa, Youssef, and Barusco, who testify that Petrobras routinely paid a 20% premium to the cartel.  Significantly, Costa admitted that the value of Petrobras' construction contracts was overstated by up to 20% as a result of bribes and additional amounts due to the cartel's overpricing of Petrobras' contracts.  Costa testified that "*a cartel was formed there with the object of frustrating the effective competitive bidding process for contracting*" and that "*the bribe comes from a percentage of the enterprise's previously established profit, which, due to the lack of effective competition always stretches to the limit the contracting enterprise allows*."[30]  Youssef similarly testified that the cartel members set the price of their contracts close to the plus 20%: Q: "So, we can conclude that, due to the existence of the cartel, the contracts executed by Petrobras were always executed at the maximum amount possible or close to it?" A: "Or close to it."  A plea agreement executed by Petro Barusco corroborates that Petrobras granted inflated contracts to cartel members for various projects, including those at the Abreu e Lima refinery, and that the cartel demanded contract prices that were "very much above

---

[29]  Petrobras reported that the contracts tainted by the bribery scheme amount to $81.4 billion. *See* Petrobras Consolidated financial statements as of December 31, 2014, 2013 and 2012 with report of independent registered public accounting firm, at 17.

[30]  *See* Paulo Roberto Costa Term of Collaboration No. 01, dated August 29, 2014.

the budget."[31] According to Barusco's plea agreement, Petrobras' contracts with the cartel were always *signed near the maximum amount for the internal budget of Petrobras*. *Id*. at 4-6. Barusco also confirmed that "in the case of [Abreu] there was clear  overbilling." *Id*. at 3.

171.    While discovery will crystalize the precise inflation caused by the cartel and the bribery scheme, Petrobras' own disclosures of billions in impairment charges, which Defendants claim are unrelated to the fraud, provide a glimpse into the real magnitude of the scheme. Petrobras reported a loss of $9.7 billion in 4Q 2012, due mainly to pre-tax *impairment charges of $16.7 billion*—the largest loss ever to be reported by any listed company in Brazil since 1986.[32]  The Company disclosed that its impairment loss was attributable to items such as project planning deficiencies, the use of higher discount rates, delays in future cash inflows and unfavorable business prospects resulting in lower projected growth, and claims that this portion of the write-down was not attributable to the cartel and bribery scheme. *Id*. But in a Form 6-K that Petrobras had filed with the SEC on January 28, 2015, the Company disclosed that the "cartelization of suppliers: corruption and overcharging" was part of the difference when the fair value of an asset was lower than its carrying amount, thereby necessitating a write-down.  Therefore, it is clear that a significant portion of the $16.7 billion that Petrobras classified as mere impairment should have been—but was not—written off as "overpayments incorrectly capitalized."

172.    Moreover, Petrobras disclosed that the $16.7 billion in purported innocuous impairment charges were *"mainly related to" the Abreu e Lima and the Comperj refineries*, two of the refineries marred by corruption, and *amounted to $11.6 billion of the $16.7 billion*. Write-off.[33]  Petrobras wrote down $3.4 billion from Abreu e Lima and $8.22 billion from Comperj.

---

[31] *See* Pedro Barusco Filho Term of Collaboration No. 05, dated November 24, 2014.
[32] *See* Petrobras Fourth Quarter of 2014 Results, at 1.

[33]   *See* Petrobras Fourth Quarter of 2014 Results, at 1.

Petrobras represented that projects at those refineries were postponed for an extended period of time as a result of the Company's measures to preserve cash and of the implications to the Company's suppliers of the Lava Jato investigation.  *Id.*  Yet, Petrobras failed to attribute any of the write-off to the padded contracts that amounted to billions in overpayments.

173.    Petrobras' newly-minted impairment calculation of $16.7 billion stands in sharp contrast to its January calculation, which revealed a potential $30 billion write-down that was tied to the scandal-related losses.  *See infra* at ¶ 446.

174.    Recent events cast additional doubts on Petrobras' quantification of the fraud and support Plaintiffs' allegations that Petrobras' $2.5 billion calculation severely understates the impact of the fraud.  Significantly, on April 29, 2015, the *Wall Street Journal*, citing to the April 22, 2015 minutes of the board of directors released by the Brazilian securities regulator, reported that the only three independent members of Petrobras' board strongly criticized the Company's graft calculations released on April 22 as failing to accurately reflect the massive scope of the fraud.[34]  The independent board members protested that they were given *less than two hours to review 319 pages of documents before voting on the calculation of the impairment charge and asset write-downs*.  Two of the three independent directors voted against the release, while one abstained from the voting process altogether.  Jose Guimaraes Monforte, an independent board member who represents nonvoting shareholders, said that the "*effort . . . fell short of what full due diligence would require on my part, especially given the need for recovering the company's credibility*."  Mr. Guimaraes was the only member who abstained from the vote, citing lack of time.  Mauro Rodrigues da Cunha, who represents minority shareholders, was critical of the time afforded to the board members for the review.  He also *disagreed with the methodology adopted*

---

[34]  *See* WSJ, Three Petrobras Board Members Criticize 2014 Earnings Calculations, April 28, 2015; *See also* Petrobras documents reflecting Board Meeting Minutes of April 22, 2015.

*to calculate the impairment charge, while calling the impairment amount inadequate to account for the fraud-related losses*. Mr. Cunha voted against the release and protested against the Company's decision to withhold documents from the board.  Silvio Sinedino, another independent board member who was elected by company workers, *voted against the release of the earnings as he disagreed with the calculation of asset write-downs*.  Petrobras' Abreu e Lima refinery has been severely overvalued as part of the corruption scheme.  Mr. Sinedino pointed out that *a part of the infamously overvalued refinery was not even included in the impairment charge calculations*.  The three independent directors have since left Petrobras.

175.    Similarly, minority fiscal council members (representing 40% of the oversight body) Reginaldo Ferreira Alexandre and Walter Luis Bernardes Albertoni refused to approve the Company's financial statements as a result of improprieties related to Petrobras' asset impairment test.  Alexandre and Albertoni stated that the *"records proposed for the assets related to the Operation Lava Jao, as a result of the impairment tests, are disconnected from the effective realizable value," in that they "were informed that refinery assets suffering losses are limited to the RNEST (Trem 2) [Abreu] and Comperj projects,"* that *"values recorded now show significant differences when compared to those found by independent evaluators, evidencing the discrepancy between this independent evaluation and the values proposed by the management,"* that *"the evaluation methodology adopted by the Company . . . makes it unfeasible to run a critical analysis of each of the refinery units,"* and that *"different technical discussions held with the management at recent meetings [were] inconclusive." Id.*

176.    At a shareholder meeting held on May 25, 2015, Petrobras sought and obtained shareholder approval of its financial statements and statutory reports for fiscal year ended December 31, 2014.  It was easy to obtain such approval given that Petrobras' majority shareholder

(the federal government) had every incentive to allocate the smallest dollar amount to the graft. Minority shareholders vociferously objected.   For example, Tempo Capital Principal Stock Investment Fund ("Tempo Capital") objected to the write-off calculation, as there was "no clarity on the fraction which relates to undue payments made during the fiscal year of 2014.   The information released does not clarify what were the principles or internal audits used to define the overprice values assigned to the assets, after all it is not only the estimated corruption of R$ 6,194 billion that harmed the Company, but also the great value paid for questionable projects and/or assets and their expected return.   Thus, a shareholder does not have the necessary information to assess whether these write-offs are really adequate or sufficient to adjust the Company's balance sheet.   Furthermore, the Company's bad management has generated losses in the amount of R$ 30,976 billion as a consequence of 'problems in the projects' planning,' among other factors."

177.   Among similar lines, Institutional Shareholder Services, Inc. ("ISS"), the global leader in corporate governance, recommended that shareholders vote ***against*** the approval of Petrobras' financial statements.   According to ISS, a vote against the request was warranted because:

- There [were] significant concerns regarding the accounts presented by the company, and questions were raised regarding the methodology used to calculate the losses due to corruption practices and impairments;

- The 2014 financial statements and statutory reports were approved only by the seven board members appointed by the controlling shareholder, the Brazilian federal government, four of whom [were] being investigated by the Brazilian Securities Regulator (CVM) for potential breach of their fiduciary duties;

- Minority board representatives and the company's employees' board representative either opposed or abstained from approving the financial statements;

- Petrobras' fiscal council minority shareholders' representative also voted against the company's financial statements in light of concerns regarding the methodologies used by the company and the lack of a more conservative approach; and

- The approval of the company's statutory reports could likely discharge directors, some of whom are already under investigation by the country's regulator, from civil liability for decisions made over the relevant fiscal year.

178.    ISS also observed that "contracts signed during [certain] executives' tenures in their respective divisions were not considered in the Company's methodology to estimate corruption losses."  These executives included the former head of the International Division, Nestor Cervero, the former executive of the Company's Services Division, Renato de Souza Duque, and Pedro Jose Barusco Filho, also a former executive of the Services Division, all implicated in the corruption scheme.  Moreover, despite the fact that the most significant changes due to impairment losses were reported for Comperj and Abreu, "the company has not stated that the corruption allegations were part of the reasons for the lower valuation" despite clear evidence of wrongdoing at these refineries.

179.    Additional facts have recently come to light that significantly call into question Petrobras' write-off calculation.

180.    On August 12, 2015, the newspaper Estadao reported that the TCU issued an audit report that found severe irregularities in a construction contract relating to the *Abreu e Lima* refinery.  The audit examined a contract between Petrobras and cartel companies  Camargo Correa and CNEC Engenharia S.A., executed on December 22, 2009, for the initial amount of R$ 3,411,000,000.00.  After sixteen amendments to the original contract, the value of the contract reached  R$ 3,860,489,832.87, despite the fact that construction work and other duties to be performed by CNCC had not been completed.  The TCU concluded that the documents examined strongly indicated overpricing.  After examining a sample of projects amounting to R$ 1.46 billion (out of the total value of the R$ 3.37 billion contract), the TCU concluded that the projects were overpriced by R$ 673 million, or 86%.  The overall amount by which the contract was inflated remains the subject of further investigation.  The TCU was only able to complete its analysis after

it gained access to confidential information belonging to the relevant contractors, including tax invoices, which were made available to the TCU by means of a court order during the investigation of Operation Lava Jato." ***These documents enabled the TCU to conclude that the audited contracts were inflated, and that Petrobras' Board of Directors was responsible***.  In his opinion, Minister Benjamin Zymler pointed out that the percentages by which the contracts were inflated grossly exceed the 3% amount Petrobras used to calculate the write-off.  It is said that **"*the fees accounted for 1%, 2% , 3% of the contracts.  We're talking about 114%.  The numbers are much larger than these absurd numbers that cause us perplexity.*** Most likely, will overcome the dozens millions reais," he said.

181.    Less than one week ago, the Brazilian newspaper Estadao reported that Petrobras' contractors won bids with price proposals 800% higher than Petrobras estimated.  Estadao reported on August 25, 2015 that auditors of BR Distribuidora, a Petrobras subsidiary, have pointed to discrepancy proposals in four bids won by UTC Engenharia ("UTC").  UTC managed to win the bids in BR Distribuidora even with price proposals 795% higher than what was estimated by the subsidiary on some projects.  The audit also showed a "club of bribery" among those contractors invited to bid.  The most glaring overprice was the expansion of the Duque de Caxias Terminal ("Teduc").  UTC's proposal for the project was R$ 895,548.11.  BR Distribuidora estimated this project at R$100 million, a difference of 795.5481%.  In the end, BR Distribuidora agreed to pay the amount charged by the UTC, increasing the total cost of the work by 12.63%.  BR Distribuidora told the auditors that this high price occurred because of the rise in the steel value at the time, in 2010.  During that period, however, the price of steel was down between 5% - 9%.  In another case, BR Distribuidora also agreed to pay 521.61% more than necessary to UTC for four concrete piles to be used in expanding the Caracarais Base, as part of the project Floating Pier in Amazonia.

The UTC was able to win the bid even with prices 14% above BR Distribuidora's estimates.  In another design work, the Floating Pier BEMAR, the audit found an initial estimated price of $31 million, but the amount approved by Petrobras' board was 83%  higher.  In three months, for example, Petrobras increased the price estimates for the hulls of Floating Pier by 117%.  The audit also found a price increase of 62% for construction work at the Base of the Southern Cross Distribution, from R$ 95 million to R$ 154 million, while the capacity of the tanks was reduced by 21%.  The auditors questioned the company's employees about the existence of two spreadsheets containing price estimates that varied widely even though they applied to the same project.  One spreadsheet had price increases of up to 197%.  The auditors were told that no one remembered the spreadsheet with the lower estimates.  Moreover, as discussed above, the Abreu e Lima, Pasadena and Comperj projects were collectively inflated by tens of billions of dollars.  Yet, amazingly, none of this rampant bill padding was included in the Company's write-down.

### G.    PwC's Purposeful Blind Eye to the Fraud

182.    PricewaterhouseCoopers Auditores Independentes ("PwC") reported that it conducted its audits in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB") (United States).[35]  In connection with its audits of Petrobras for the years ended December 31, 2013 and 2012, PwC failed to comply with PCAOB standards and SEC rules governing its conduct.  PwC turned a blind eye to the Individual Defendants' systemic and pervasive scheme of overstating the Company's PP&E as a result of illegal acts committed by the Company and the management defendants.

183.    PwC issued (i) an unqualified audit opinion dated February 25, 2014 on Petrobras' 2013 financial statements, in which is stated that the 2013 financial statements were presented in

---

[35] The PCAOB was established by Congress to oversee the audits of public companies.

conformity with IFRS; and (ii) an unqualified audit opinion dated February 4, 2013 on Petrobras'

2012 financial statements in which it stated that the 2012 financial statements were presented in

conformity with IFRS.   PwC issued these clean opinions despite the fact that PwC knew or

recklessly disregarded the fact that: (1) the Financial Statements had not been prepared in

conformity with IFRS and did not present fairly, in all material respects, the consolidated financial

position of Petrobras at December 31, 2013 and 2012 and the results of its statements of income

and comprehensive income, changes in equity and a cash flows for the years ended December 31,

2013, and 2012; and (2) PwC had not audited Petrobras' financial statements in accordance with

PCAOB standards.   PwC assured investors that as a result of their planning and performance of

the audit, they had obtained reasonable assurance that Petrobras' financial statements were free of

material misstatements.   PwC's assurances were false.

184.     In addition to expressing an opinion on the financial statements, PwC also

expressed an opinion of the Company's internal controls over financial reporting based on its

integrated audits for the years ended December 31, 2012 and 2013.   PwC performed an integrated

audit which included an evaluation of Petrobras' internal controls.   PwC falsely certified that

Petrobras maintained, in all material respects, effective internal control over financial reporting at

December 31, 2013 and 2012.   These assurances were also false.

PwC Ignored Obvious Red Flags Existing Before PwC's Clean Reports

185.     In its audits for the years ended December 31, 2013 and 2012, red flags coming to

the attention to, but ignored by PwC included the following:

- In June of 2012, an internal audit was performed and was presented to the Petrobras Board which revealed that there were highly inflated cost estimates for the Abreu and Lima refinery to be constructed in Pernambuco. The report showed evidence that there were increases in the estimated costs, which skyrocketed from $1.8 billion to $18.8 billion.  Much of the cost increase was due to add-on contracts awarded to the cartel companies, which in turn resulted in an estimated $3.1 billion

loss in padded bids. The report blamed the ex-Director Paulo Roberto Costa for modifying the original plan to add features that were not needed.  Despite being informed of the loss, the Board went ahead and approved further unnecessary additions to the project, resulting in further kickbacks to political parties and Directors.

- The internal audit also uncovered unsubstantiated charges for communications services that were never provided in connection with the Abreu e Lima project. Additional evidence collected by Venina Velosa da Fonseca, who was involved in the Lima e Abreu project, came from the Communications Department of the Supply Division of Petrobras.  Fonseca found millions of dollars for contracts for which no service was provided. The most significant evidence, however, was of the kickback scheme. Velosa stated that she found a pattern indicating the contractors were rigging bids and overfilling by up to 20% of estimates.

- In November 2012, Bloomberg reported that, according to the Brazilian news magazine Veja, the Brazilian federal prosecutor Marinus Marsico was looking into Petrobras' $1.1 billion acquisition of the Pasadena refinery.  It was reported that Delta Airlines purchased a similar refinery for only $150 million.  Petrobras acquired its Pasadena, Texas refinery for over $1 billion in 2006.   Astra had purchased it just a year earlier for only $42.5 million. According to informants, the Pasadena refinery was not modern or a very productive refinery.  It is highly unlikely that the refinery increased in market value by more than 2000% in a mere one year time span.

  On August 11, 2013, the Brazilian weekly newspaper Epoca reported that Petrobras funneled kickbacks to officials from political parties.   The newspaper cited evidence from lobbyist Joao Augusto Rezende, a former head of BR Distribuidora, a Petrobras subsidiary.   Rezende told the press he handled all of Petrobras' foreign contracts and collected a "fee" from the companies involved.  The lobbyist for the Brazilian Democratic Movement Party ("PMDB"), which is part of President Dilma Rousseff's ruling coalition, said between 60% to 70 % of the graft money was passed on to the PMDB.   Epoca also reported that Joao Vaccari Neto, the ruling Workers Party's finance secretary, meanwhile received the equivalent of $8 million in kickbacks from Brazilian construction conglomerate Odebrecht as part of a Petrobras international contract during Rousseff's 2010 presidential campaign.   The newspaper quoted Rezende as saying he and Vaccari arranged for the money to be transferred to the Rousseff campaign.  This information did not materially affect the market for Petrobras bonds, and was not known by the purchasers or holders of Petrobras bonds.

- Petrobras' capital expenditures in 2012 and 2013 were approximately four times greater than Petrobras' net income in those years.

- There were a number of large constructions projects that were severely over budget.

Red Flags Occurring After the Date of PwC's Report

186.    PCAOB Standards require an auditor to consider the effect on its opinion of events occurring after the date of the auditor's report, but before the report is issued.  [AU 530.03-04] The PwC report for the year ended December 31, 2013 was dated February 25, 2014, and was included in the Form 20-F that was filed with the SEC on April 30, 2014.  The events occurring between February 25, 2014 and April 30, 2014 should have provided further evidence to PwC that they should not have issued an unqualified audit opinion.  These events corroborate the information that PwC knew or should have known about illegal activities occurring within Petrobras:

- On March 12, 2014, it was reported that Brazilian lawmakers assembled a committee to investigate kickbacks made to Petrobras by the Dutch firm SBM Offshore, a company that leases floating oil platforms and vessels.

- On March 17, 2014, Petrobras issued a press release announcing that the Company's Board had approved the Company's financial statements for 2013 by a majority vote. The announcement went on to note that:

  > Director Mauro Rodrigues da Cunha *voted against the approval of the Financial Statements* of Petrobras due to: (i) lack of timely dispatch of the financial statements to the Directors to analyze; (ii) disagreement with the hedge accounting policy; and (iii) *lack of information and apparent accounting inadequacy of refinery investments.*

- On or about March 17, 2014, the DPF launched Operation Lava Jato, focused on a scheme run by black-market money dealers who are thought to have illegally transferred and laundered approximately $3.8 billion using, among other things, the purchase and sale of luxury automobiles.

- On or about March 20, 2014, the federal police force of Brazil arrested Paulo Costa, a former senior executive of Petrobras in connection with Operation Lava Jato based on documentation linking Costa to the receipt of a luxury automobile from another individual implicated in the money laundering scheme.

- On April 15, 2014, during the trading session, CEO Foster appeared before the Senate of Brazil to offer testimony relating to the Company's purchase of the Pasadena Refinery and allegations regarding bribery.  As part of her statement,

CEO Foster revealed that Petrobras was conducting a re-evaluation of all contracts that could have been the subject of participation by Costa.

187.    These red flags should have immediately put PwC on notice that there was substantial risk that Petrobras was involved in committing illegal acts and that there was a high likelihood that its financial statements included material misstatements.  Thus, PCAOB Standards required PwC to perform heightened audit procedures, and ultimately retract its audit opinion, which it failed to do.

Violations of PCAOB Reporting Standards, General Standards, and Standards of Field Work

188.    PwC violated PCAOB auditing standards and Section 10A audit requirements of the Exchange Act in the conduct of its audit in the following ways:[36]

(a)    PwC violated PCAOB Standard of Reporting No. 1, which requires the auditor to attest to whether the Financial Statements are presented in accordance with GAAP.[37]  PwC falsely represented that Petrobras' Financial Statements were presented in conformity with IFRS when they were not for the reasons herein alleged, and as evidenced by the pending write-down of up to $30 billion of Petrobras' PP&E;

(b)    PwC violated PCAOB Standard of Reporting No. 4, in that PwC improperly expressed unqualified opinions on Petrobras' financial statements for the years ended December 31, 2013 and 2012 even though its audits were not conducted in accordance with PCAOB standards and the financial statements were not prepared in accordance with IFRS;

1.    PwC failed to consider the effect on its opinion of events occurring after the date of the auditor's report but before the report is issued.  [AU 530.03-04]

---

[36] The foundation of the PCAOB standards rests on ten broad standards which provide a measure of audit quality and objectives to be achieved in an audit.  These audit standards include three general standards about the qualifications of the auditor, the auditor's independence, and the quality of the auditor's work; three standards of field work about how the audit should be conducted; and four reporting standards about the requirements of the auditor's report.  (Auditing Standards ("AU") par. 150.01-.02).  The PCOAB standards that have been adopted by the PCAOB and approved by the SEC are referenced with the symbol ("AS") in the prefix and for standards that have been adopted by the PCAOB as preexisting interim standards are shown with the symbol ("AU") in the prefix.

[37] The first standard of reporting only makes reference to GAAP, but Petrobras issued its financial statements in accordance with IFRS.  The first standard of fieldwork still applies.

(c)     PwC violated PCAOB General Standard No. 3, which requires that due professional care is to be exercised in the performance of the audit and the preparation of the report;

(d)     PwC violated PCAOB Standard of Fieldwork No. 3, which requires sufficient appropriate evidential matter to afford a reasonable basis for: (1) the opinion regarding the financial statements; (2) the opinion regarding internal control over financial reporting; and

(e)     Section 10A (a) (1) of the Exchange Act in that PwC failed to plan and perform audit procedures designed to provide reasonable assurance of detecting illegal acts having direct and material effect on the determination of financial statement amounts.

Due Professional Care and the Exercise of Professional Skepticism

189.    PwC violated AU Section 230—*Due Professional Care in the Performance of Work*.  PwC failed to perform its work with the requisite amount of due care.  "Due professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting." [AU 230 par. .02] Through the exercise of due care, PwC was required to obtain reasonable assurance that the financial statements were free from material misstatement, whether caused by error or fraud. [AU 230.10]  PwC failed to do this.

190.    PwC also failed to exercise the required amount of professional skepticism.  PCAOB standards required PwC to increase its level of professional skepticism once it becomes aware that there could be a misstatement due to fraud.  PwC was required to be continually alert for indications of misstatements of Petrobras' financial statements whether due to error or fraud.  With respect to the risk of fraud, the PCAOB standards require the auditor to approach the audit "with a mindset that recognizes the possibility that a material misstatement due to fraud could be present…" [AU 316.13]  PwC knew or should have known that there was a strong possibility of fraud in connection with Petrobras' financial statements for the 2012 and 2013 years.

191.    AU 316 *Consideration of Fraud in a Financial Statement Audit* states the following regarding exercising professional skepticism:

> Due professional care requires the auditor to exercise professional skepticism. See section 230, *Due Professional Care in the Performance of Work*, paragraphs .07 through .09. Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence….Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest. [AU 316 par.13]

Responses to the Risk of Material Misstatement

192.    PwC violated PCAOB Auditing Standard No. 13 ("AS 13") *The Auditor's Responses to the Risk of Material Misstatement*, which required PwC to respond to the risk of a material misstatement to Petrobras' financial statements once it became aware that there was a heightened fraud risk in connection with bribes, kickbacks and the inflation of construction contracts.  PwC was required to perform increased audit procedures than it otherwise would have performed.  For example, paragraphs 6 and 9 of AS 13 state the following:

> The auditor also should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement. Examples of such pervasive changes include modifying the audit strategy to: (a) increase the substantive testing of the valuation of numerous significant accounts at year end because of significantly deteriorating market conditions, and (b) obtain more persuasive audit evidence from substantive procedures due to the identification of pervasive weaknesses in the company's control environment.  [AS 13 par. 6]

> In designing the audit procedures to be performed, the auditor should: (a) obtain more persuasive audit evidence the higher the auditor's assessment of risk. [AS 13 par. 9a]

193.    Paragraph 14 of AS 13 provides specific examples of how PwC should have modified its audit procedures to address its assessed fraud risks:

The following are examples of ways in which planned audit procedures may be modified to address assessed fraud risks:

    a. Changing the *nature* of audit procedures to obtain evidence that is more reliable or to obtain additional corroborative information;

    b. Changing the *timing* of audit procedures to be closer to the end of the period or to the points during the period in which fraudulent transactions are more likely to occur; and

    c. Changing the *extent* of the procedures applied to obtain more evidence, *e.g.*, by increasing sample sizes or applying computer-assisted audit techniques to all of the items in an account.

<u>PwC's failure to detect Illegal Acts</u>

194.    PwC failed to detect illegal acts engaged in by Petrobras.  The acceptance of bribes and kickbacks combined with the subsequent overpayment to contractors is clearly an illegal act that was also subject to the Foreign Corrupt Practices Act rules and regulations.  Also, bribery by international companies is common when there is close interaction between public and private individuals.  PwC should have recognized the importance of PP&E to the balance sheet and that the most significant cash outflow was capital expenditures.  The capital expenditures in 2012 and 2013 was approximately four times greater than net income.  There were also projects that were severely over budget.  In accordance with AU Section 317 *Illegal Acts by Clients*, PwC was required to perform certain additional procedures when it became aware of information concerning a possible illegal act.  PwC was required to gain an understanding of the nature of the act, the circumstances in which it occurred, and other information to evaluate the effect on the financial statements.  If management failed to provide the information to PwC about the nature of the illegal act, PwC was required to consult with the Petrobras' legal counsel or other specialists.  [AU 317 par.10]  In addition, the standard suggests the following additional audit procedures such as:

    a.  Examining supporting documents

    b.  Confirming significant information concerning the matter

    c.  Determining whether the transaction has been properly authorized

    d.  Considering whether other similar transactions or events have occurred, and apply procedures to identify them.

[AU 317 par .11]

195.    In addition, PwC violated the requirements of Section 10A of the Exchange Act, which requires auditors of public companies to design procedures to provide assurance of detecting illegal acts. PwC failed to perform procedures designed to provide reasonable assurance of detecting illegal acts having a direct material effect on the determination of financial statement amounts. Section 10A of the Exchange Act requires an auditor to notify the SEC if he or she become aware of information indicating that an illegal act has, or may have occurred, if management or the Board of the company fails to take appropriate remedial actions with respect to illegal acts. PwC knew or recklessly ignored that it violated section 10A of the Exchange Act in the performance of its "audits" of Petrobras in 2012 and 2013.

PwC's failure to obtain appropriate evidential matter in its audits of PP&E

196.    PwC failed to obtain sufficient appropriate evidential matter regarding its audits of capital expenditures, construction in progress accounts, and equipment and other assets accounts. An audit is a risk-based process. The amount of capital expenditures made by the Company, including excessive amounts paid to acquire certain refineries, combined with significant budget overruns on large projects, and publications of various press reports asserting the Company's practice of engaging in bribes and kickbacks made this a high risk area for PwC. PP&E was by far the largest asset on Petrobras' balance sheets. At December 31, 2013 and 2012 PP&E represented 70.9% and 62.5% of total assets, respectively. Auditing Standard No. 15, *Audit Evidence*, states that "as the risk increases, the amount of evidence that the auditor should obtain also increases…ordinarily more evidence is needed to respond to significant risks." [AS 15 par. 5]

If PwC had appropriately modified its audit procedures to be responsive to the risk of material misstatement of the Company's financial statements due to misstatements in its PP&E accounts and carried out these procedures with the appropriate degree of professional skepticism, it would have likely discovered that the Company's capital expenditures, PP&E, and Net Income were materially overstated.   The audit procedures that PwC was required to perform included the following:

- Physically inspecting major additions and verifying claims of ownership;

- For constructed property and construction in progress, examining appropriate documentation supporting the amount recorded on the Company's balance sheet, such as review of construction contracts, work orders, job status reports;

- Verifying that all payments for capital expenditures were properly authorized and included appropriate supporting documentation;

- Verifying that change orders went through the proper approval process and that the resulting payments were appropriately authorized;

- Obtaining support for authorization of fixed assets additions by reference to minutes of meetings of the board of directors, capital asset budgets, or other evidence of approval by appropriate personnel;

- In connection with the assets under construction, examining all of the supporting documentation for large expenditures; understanding why certain projects were exceeding their original budgeted amounts and why there were large add-on contracts that increased the original plans.  Key items should have been selected that were large, suspicious, unusual, or risk-prone; [AS 15 par. 25]

- Examining journal entries and other adjustments for evidence of possible material misstatement due to fraud; [AU316 par.58] and

- Inquiring of individuals involved in the financial reporting process about inappropriate or unusual activity relating to the processing of journal entries and other adjustments.

197.    It is clear that PwC violated PCAOB standards by failing to apply some or all of the above procedures.  Had PwC complied with the PCAOB standards, they likely would have found the illegal acts and the material overstatements of PP&E.  In summary, PwC either failed to

properly audit Petrobras' fixed asset additions or having found the illegal overpayments failed to properly report it to the Petrobras' Audit Committee and Board of Directors.

Internal Controls

198.    PwC falsely certified that Petrobras maintained, in all material respects, effective internal control over financial reporting at December 31, 2013 and 2012.  PwC failed to obtain sufficient competent evidential matter to afford a reasonable basis for its opinion regarding internal control over financial reporting.  PwC should have reported material weaknesses in Petrobras' internal controls.  PwC failed to identify a control effective in preventing or detecting a material misstatement caused by the overstatement of PP&E in Petrobras' financial statements at December 31, 2013 and 2012.

199.    Absent the identification and test of an effective control to address the risk of overstatement of PP&E due to the Company paying inflating amounts to acquire or construct infrastructure, PwC should have reported a material weakness in Petrobras' internal controls.

200.    PCAOB Standard No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ("AS 5"), enables auditors to perform an audit of management's assessment of the effectiveness of internal control over financial reporting. [AS 5 par. 1]  The audit of internal control over financial reporting can be integrated with the audit of the financial statements.  [AS 5 par. 6]

201.    AS 5 and paragraph 4 of AU Section 325 *Communications About Control Deficiencies in an Audit of Financial Statements* required PwC to communicate in writing to management and the audit committee all material weaknesses identified during the audit. [AS 5 par. 78]  PwC failed to do this.  PwC was required to disclose to the audit committee that a material weakness had not been disclosed or identified as material weaknesses in management's

assessment, and further required PwC to express an adverse opinion on Petrobras' internal control over financial reporting.  [AS 5 par. 90-91]

## VI.   OVERVIEW OF CLAIMS AGAINST THE EXCHANGE ACT DEFENDANTS

Accounting Improprieties

202.   As explained in more detail above, during the Class Period, the Exchange Act Defendants made materially false and misleading statements by misrepresenting facts and failing to disclose a multi-year, multi-billion dollar money-laundering and bribery scheme.  Specifically, Petrobras' senior executives inflated the value of the Company's construction contracts for the sole purpose of receiving kickbacks from companies that were awarded the contracts illegally.  These illegal acts caused the Company to overstate the PP&E line item on its balance sheet because the overstated amounts paid on inflated third party contracts were carried as assets on Petrobras' balance sheets.

Misleading Statements Regarding Management Integrity and Controls

*Overview*

203.   Throughout the Class Period, Petrobras consistently touted the sufficiency of its internal financial controls and conformance to the standards set forth by the Treadway Commission.[38]  The Company also assured investors that its operations were conducted with full "transparency" and conformance to "best practices."  For example, on May 27, 2010, then-CEO Gabrielli stated that the Company was "[f]ully committed to implementing a fair and transparent

---

[38] "Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control-Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013."

operation, respecting [its] minority shareholders' rights and following the best practices of corporate governance."[39]

204.    In an effort to demonstrate that such assurances were not merely "lip service," Petrobras also adopted a Code of Ethics and Code of Good Practices, as well as established an Ethics Commission whose responsibility was to promote compliance with "ethical principles" and to "develop and strengthen the Petrobras Ethics Management System, which is aimed at assuring the highest ethics standards."[40]   In its 2011 Annual Report filed with the SEC, the Company reiterated that "[w]e guide our business and our relations with third parties by ethical principles…. It is the responsibility of the Ethics Commission to promote compliance with ethical principles and act as a forum for discussion of subjects related to ethics."

205.    The Company also highlighted its "Corruption Prevention Program" manual, which was designed to "reinforc[e] the prevention, detection and correction of acts of fraud and corruption, through integrated management and improvement of actions and controls in our governance structure."  The Manual's adoption was consistent with the Company's acknowledged need to comply with national and international anti-corruption laws, including (i) "Brazilian law 12,846 of August 1, 2013, which governs the administrative and civil liability of legal entities for the practice of acts against the national or foreign public administration;" and (ii) the "United States Foreign Corrupt Practices Act 1977 (FCPA), a federal anti-corruption law to which we are subject since we have American Depositary Receipts (ADRs) traded on the New York Stock Exchange."[41]

---

[39] Similar assurances were made on November 23, 2010, March 15, 2011, May 24, 2011, November 22, 2011, and February 4, 2013.

[40] Petrobras 2009 Annual Report filed on Form 20-F.

[41] *Petrobras Corruption Prevention Program: Manual* (December 2014), *available at* http://www.investidorpetrobras.com.br/en/governance/code-of-ethics/ (last visited January 22,

206.    As recently as February 25, 2014, the Company was still asserting its adherence to anti-corruption practices.  As the CEO stated at the time:

> I would like to notice that in the second half of 2013 we implemented the Corruption Prevention Program, reaffirming the commitment of the Petrobras Executive Board and of its employees with ethics and transparency at our organization. The program complies with both national and international initiatives against fraud and corruption, as well as with the laws of the countries where Petrobras operates, with positive impacts in the relations with all its stakeholders.

*Corruption Prevention*

207.    Petrobras specifically addressed investor concerns about corruption by adopting the Petrobras Corruption Prevention Program ("PCPP") on July 4, 2013.  Defendants asserted that the PCPP was "aimed at reinforcing the prevention, detection and correction of acts of fraud and corruption, through integrated management and improvement of actions and controls in [Petrobras'] governance structure."  Defendants represented that through the implementation of the PCPP, Petrobras was taking "continuous actions to prevent, detect and correct acts of fraud and corruption."  They assured investors that the PCPP was effective as it was subject to a "periodic evaluation in order to verify its effectiveness and compliance with laws."

208.    The Manual for Petrobras' PCPP, posted on the Company's website, represented that:

- "We are committed to rejecting any practices of corruption and bribery, maintaining formal procedures to ensure control and consequences for any violations that occur in our relations with society, government and the state." (Sec. 1.1 at pg. 11)

- "Fraud and Corruption Risk Management: The management of business risks is conducted at a corporate level and deployed at organizational sites… The Internal Audit Area, through the Compliance General Management, is responsible for monitoring compliance risks related to fraud and corruption."

209.    Similar statements appeared in Petrobras' Corruption Prevention Program Manual.

---

2015).

210.     The 2013 20-F represented that the Company had established ad hoc internal commissions "to evaluate our compliance with applicable regulations" and the "scope of each internal commission is established by our management."  Significantly the 2013 20-F represented that on "*March 31, 2014 , our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations*."

*Ethics Program*

211.     The Petrobras Corruption Prevention Program was a focused extension of the Company's Code of Ethics that had been adopted prior to, and existed throughout, the Class Period. The Code of Ethics stated that Petrobras undertook to "conduct its business with transparency and integrity, creating credibility with its shareholders . . . and . . . investors" and to "register its reports and statements in a correct, consistent, accurate and complete way."

212.     Moreover, Defendants undertook to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions" and to "refuse support and contributions to political parties or political campaigns of candidates for elective offices."

213.     The 2009 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the creation of the Petrobras Ethics Commission" "to promote compliance with ethical principles."  Petrobras has been boasting to investors that it acts with "credibility and transparency."   It has claimed that it "adopts the best corporate governance practices and has all the skills to make full use of the most advanced business management tools." The Petrobras Ethics Committee, appointed by the Executive Board, took up its duties in 2008. The committee is directly linked to the CEO and was set up for the purported purpose of handling

81

the question of ethics within the company and serving as a forum for discussion, while enhancing the formal, official nature of Petrobras' Ethics Management System.

214.    Petrobras' directors reviewed and approved the provisions of the Code.

*Internal Controls*

215.    During the Class Period, Petrobras filed reports, forms, and other documents with the SEC that contained false and misleading statements regarding the effectiveness of Petrobras' internal controls and procedures.  Petrobras consistently represented that the "Company identified no change in its internal controls over financial reporting."

216.    Further, during the Class Period, the Company's Chief Executive Officers and Petrobras' Chief Financial Officer, acting on behalf of Petrobras, signed certifications pursuant to the Sarbanes-Oxley Act of 2002.  Those certifications contained representations that Petrobras had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

217.    In making its assessment of internal control over financial reporting, Petrobras used the criteria established by the Committee of Sponsoring Organizations of the Treadway Commission Report, *Internal Control – Integrated Framework* (1992) ("COSO Report").[42]  The COSO Report defines internal control as a process "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations.[43]

---

[42] 2013 Form 20-F page F-3.  The COSO report was originally issued in September 1992 as a four-volume set.  An *Addendum to Reporting to External Parties* was issued in May 1994.  On May 14, 2013, COSO released an updated version of the entire framework.  Unless otherwise noted, all references to the COSO report refer to the 1992 issuance.

[43] COSO Report, Executive Summary.

218.    Here, for example, Chief Executive Officers Maria das Gracas Silva Foster and Jose Sergio Gabrielli, and the Chief Financial Officer, Almir Guilherme Barbassa, failed to comply with SEC regulations and the requirements of COSO.  There were material weaknesses in internal controls whereby Petrobras' internal control system failed to live up to the COSO standards.  There was clear failure to adhere to the culture of integrity and high ethical standards touted by Petrobras.  Corruption, bribery and collusion, were part and parcel of Petrobras' normal operations.  In addition, procurement officers throughout the organization did not conduct themselves in a manner that met high professional standards and integrity.

219.    Petrobras also suffered from material weaknesses in its internal controls over its procurement process.  Procurement is one of the areas within an organization that is most vulnerable to corruption.  Petrobras had a lack of a proactive corruption risk management process in connection with its procurement process.  The company lacked a transparent and accountable procurement system and lacked a review mechanism necessary to ensure that decisions conformed to its procurement regulations.

*Materiality and Misleading Nature of the Foregoing Statements*

220.    Information about management integrity is material to investors. Investors base their investment decisions, at least in part, on factors such as management ethics and accountability.   Both case law and the literature support recognition of investors' presumptive right to rely on the integrity of management in the conduct of corporate affairs.  See, e.g., Donald C. Langevoort, Basic at Twenty: Rethinking Fraud-on-the-Market, 151 Wis. L. Rev. 151 n.140 (2009) ("Presumably, most stock-price declines that follow a surprise revelation of fraud reflect not only the truth with respect to the specific facts misrepresented or omitted but also a

readjustment in expectations regarding other matters on which management was previously thought credible.").

221.    While representing that the Company was making a concerted effort to prevent and root out any corruption, Defendants had been engaged in a corrupt overpayment/kickback scheme prior to, and throughout, the Class Period.  Moreover, Plaintiff and Class Members were entitled to rely upon a presumption of management integrity given, inter alia, the foregoing representations, and which presumption was misplaced given the corruption scheme.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.    False and Misleading Statements Made in 2010

222.    On January 22, 2010, Petrobras issued a press release setting forth certain descriptions of investment agreements entered into by the Company, Odebrecht S.A. ("Odebrecht") and Braskem S.A. ("Braskem"), including, among other things, a partnership agreement relating to their commercial and corporate relationship with COMPERJ. This press release stated in relevant part:

> Petrobras, Odebrecht and Braskem also entered into a partnership agreement ("Partnership Agreement") to regulate their commercial and corporate relationship with [COMPERJ] and with the Suape Petrochemical Complex ("Suape Complex"). Under the Partnership Agreement, Braskem will take on the companies operating COMPERJ's petrochemical first and second generation, as well as, gradually acquire equity interests in companies operating in the Suape Complex, in accordance with the terms and conditions agreed in the Association Agreement.

> The transaction is in line with Petrobras' 2009-2013 Business Plan, which foresees investments in the order of $5.6 billion to the petrochemical segment aiming to operate in the industry in an integrated manner and adding value to the crude oil produced. However, it considers a new model of investments in this segment but in line with the Company's objectives to approve long-term sustainable investments that offer high returns to its shareholders.

223.    In a January 28, 2010 post on Facts and Data, in response to articles published in several newspapers and media outlets, including Reuters, Petrobras *"reiterate[d] that there have*

been no irregularities *in contracts referring to the works of the Abreu e Lima Refinery [and] in the construction of . . . Comperj.*"  The next day on Facts and Data, Petrobras stated that it "*reaffirms that there has been no 'overbilling' or 'overpricing' in the Abreu [] refinery.*"

224.    On March 24, 2010, the Company issued a press release announcing its results of operations for the full year of 2009. The Company reported total assets of $200 billion including net property, plant, and equipment of $136 billion, total costs and expenses of $70 billion including depreciation, depletion, and amortization of $7.1 billion, and net income of $15.5 billion.

225.    That day, Petrobras hosted a conference call for investors and analysts to discuss these results. As part of his prepared remarks, Defendant Gabrielli stated in part:

> Also, we had a very important cost reduction efforts. We operate in several areas. ***We changed our bidding process. We divide the packages and different suppliers in such a way that we could get more competitive bids.*** We standardized more of our purchase.

226.    Later, CEO Gabrielli contributed, in relevant part, to the following exchange:

> **[Analyst]:** [O]n the refining CapEx, ***I'd like to understand why, for instance, the Abreu e Lima refinery is estimated to have a cost that is twice as much the cost of a refinery of similar complexity in the US or Europe.*** I might be missing something, so I just wanted to understand. It may be related to infrastructure or something else. And maybe even the [Modern Young] and Cera refineries seem to be a bit higher in terms of costs versus the international benchmark.
>
> **CEO Gabrielli:** We haven't finished the numbers. If you have the numbers, well, please tell me, because we don't finish it. We don't have them.
>
> **CEO Gabrielli:** Okay, if you have them, that's another thing. But we are finishing the numbers and for sure, that's something that we have to take into consideration, our qualitative base. For example, for example, most of the assessment of the cost of refinance is a kind of plug and play refinery in which you go produce the refinery, and plug to the infrastructure and that's it. It is not our case.

227.   On May 20, 2010, Petrobras and PifCo filed an Annual Report on Form 20-F for 2009 setting forth substantially similar figures as those set forth in the Company's earlier press release.

228.   In addition, the 2009 20-F stated that the "Company's management assessed the effectiveness of [its] internal control over financial reporting as of December 31, 2009" and "has concluded that as of December 31, 2009, [the] Company's internal control over financial reporting is effective."  The Company explained that its "internal control over financial reporting includes those policies and procedures that . . . (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the consolidated financial statements."

229.   The 2009 20-F incorporated the Petrobras Code of Ethics ("Code"), available on the Company's corporate website and stated that the Code "is applicable to all employees, the board of executive officers and the board of directors."  Pursuant to the terms of the Code, Petrobras undertook to "conduct its business with transparency and integrity, creating credibility with its shareholders . . . and . . . investors" and to "register its reports and statements in a correct, consistent, accurate and complete way."  Moreover, Defendants undertook to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions" and to "refuse support and contributions to political parties or political campaigns of candidates for elective offices."  The 2009 20-F represented that in 2008, the Company's executive officers "further developed our ethics management through the creation of the Petrobras Ethics Commission" "to promote compliance with ethical principles."  Petrobras has been boasting to investors that it acts with "credibility and transparency."[44]  It claimed that it "adopts the best

---

[44]   http://www.hotsitespetrobras.com.br/rao2008/i18n/en/relatorio-anual/resultados-e-

corporate governance practices and has all the skills to make full use of the most advanced business management tools."[45]   The Petrobras Ethics Committee, appointed by the Executive Board, began functioning in 2008.  The Company represented that the committee is directly linked to the CEO and was set up for the purpose of handling ethics issues within the Company and serving as a forum for discussion, while enhancing the formal, official nature of Petrobras' Ethics Management System.

230.   On May 27, 2010, Petrobras issued a press release announcing its results of operations for the first quarter of 2010.  The Company reported total assets of $204 billion including net PP&E of $141 billion, total costs and expenses of $21.3 billion including depreciation, depletion, and amortization of $2.0 billion, and net income of $4.3 billion.

231.   In connection with these results, Defendant Gabrielli stated:

> We are going through a period of crucial importance regarding our shareholders. During the next few months we are planning an important capitalization that will prepare Petrobras to go ahead with the investments needed for its integrated growth and the development of new frontiers. ***We are fully committed to implementing a fair and transparent operation, respecting our minority shareholders' rights and following the best practices of corporate governance.***
>
> Our priority is to grow in an integrated manner and with profitability. In order to do so, we rely on a strong business foundation that ensures a substantial cash flow. We also have access to several sources of financings, either through banks or the capital markets, which give us the financial muscle to sustain our expansion and allow us to grow, invest and maintain an appropriate capital structure. ***Our growth is underpinned by the absolute certainty that we have one of the best project portfolios and opportunities in the world, and that we will invest all of our resources with efficiency and discipline, ensuring returns for our shareholders, investors and society as a whole.***

---

gestao/governanca-corporativa.aspx?print=true

[45]   *Id.*

232.    Also on May 27, 2010, Defendant Gabrielli reaffirmed that the Company was "*[f]ully committed to implementing a fair and transparent operation, respecting [its] minority shareholders' rights and following the best practices of corporate governance*."

233.    On June 21, 2010, Petrobras issued a press release announcing that the Company's "Board of Directors approved the 2010-2014 Business Plan on June 18th, with investments totaling $224 billion."  The 2010-2014 Business Plan projected that Petrobras would meet the funding requirements for these investments in part by issuing $96 billion in debt and equity.

234.    On August 24, 2010, Petrobras issued a press release announcing its results of operations for the second quarter of 2010. The Company reported total assets of $211 billion including net PP&E of $147 billion, total costs and expenses of $23.4 billion including depreciation, depletion, and amortization of $2.1 billion, and net income of $4.2 billion.

235.    On August 25, 2010, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ended June 30, 2010 with figures substantially similar to those set forth in the Company's earlier press release.

236.    On September 16, 2010, Petrobras filed Forms F-6 and post-effective amendments thereto registering: (1) 200 million ADSs, each representing two shares of Petrobras common stock; and (2) 500 million ADSs, each representing two shares of Petrobras preferred stock. These registration statements were declared effective on September 17, 2010.

237.    On October 1, 2010, Petrobras issued a press release announcing the closing of the over-allotment of the Company's offering of ADSs representing the Company's common and preferred stock, totaling 65,704,296 preferred shares in the form of ADSs and 75,198,838 common shares in the form of ADSs.

238.    In an October 8, 2010 post on Facts and Data in response to an article reporting that the TCU found overbilling in Petrobras' works in Rio, Petrobras insisted that "there are no irregularities in the contracts of . . . Comperj" and "there is no overbilling" at Comperj, and that it had strictly observe[d] competitive bidding mandates governing the Company's business.

239.    On November 9, 2010, in response to TCU allegations that contracts on the Abreu and Repar refineries were overpriced by billions of dollars, Petrobras posted a statement on Facts and Data, stating that "*Petrobras denies that there have been irregularities in the works of the President Getulio Vargas (Repar) and Abreu e Lima (Rnest) refineries*."

240.    On November 23, 2010, Petrobras issued a press release announcing the Company's results of operations for the third quarter of 2010.  The Company reported total assets of $298 billion including net PP&E of $206 billion, total costs and expenses of $25.1 billion including depreciation, depletion, and amortization of $2.1 billion, and net income of $4.7 billion.

241.    In connection with these results, Defendant Gabrielli stated in part:

> The success of our Global Offering was due to the confidence of our shareholders and investors, the Company's excellent reputation in the capital markets and ***our commitment to transparency*** and investor returns.

242.    On November 24, 2010, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending September 30, 2010 with figures substantially similar to those set forth in the Company's earlier press release.

**B.    False and Misleading Statements Made in 2011**

243.    On January 21, 2011, PifCo filed a prospectus supplement on Form 424B2 for the sale of $6 billion in debt composed of three series of notes: (1) $2.5 billion of notes paying 3.875% due in 2016 at an initial price to the public of 99.663%; (2) $2.5 billion of notes paying 5.375%

due in 2021 at an initial price to the public of 99.801%; and (3) $1 billion of notes paying 6.750% due in 2041 at an initial price to the public of 99.288%.

244.     This Form 424B2 incorporated by reference, among other documents, the 2009 Annual Reports of Petrobras and PifCo, and financial statements and earnings releases for the Company for the period ending September 30, 2010, with figures substantially similar to those set forth in the Company's earlier press release and 2009 Annual Report.

245.     On January 27, 2011, Petrobras issued a press release announcing that the offering of the $6 billion of notes pursuant to the Form 424B2 filed on January 21, 2011 had closed. The release noted that "the transaction was the largest-ever corporate bond offering by a Brazilian company in the international capital markets, and the book was oversubscribed 2.5 times with more than 463 investors from the United States, Europe, Asia and Latin America participating, most of them dedicated to the high grade market.  Petrobras will use the proceeds of this multi-tranche offering to finance Petrobras' planned capital expenditure under its 2010-2014 Business Plan while maintaining an adequate capital structure and staying within Petrobras' targeted financial leverage ratios in accordance with its 2010-2014 Business Plan."

246.     On March 15, 2011, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2010. For 2010, the Company reported total assets of $309 billion including net PP&E of $219 billion, total costs and expenses of $96 billion including depreciation, depletion, and amortization of $8.5 billion, and net income of $19.2 billion.

247.     In connection with these results, Defendant Gabrielli stated in part:

> **Our results** for the fourth quarter and full year of 2010 further underscore our capacity for overcoming challenges, as well as **emphasize the quality of our assets** and investment projects.
>
> **At Petrobras, we are fully aware that our achievements would not have been possible without the adoption of good corporate governance practices**, as well as investments in technology and

workforce training.

248.    On May 24, 2011, Petrobras issued a press release announcing the Company's results of operations for the first quarter of 2011. The Company reported total assets of $331 billion including net PP&E of $230 billion, total costs and expenses of $25.2 billion including depreciation, depletion, and amortization of $2.3 billion, and net income of $6.5 billion.

249.    In connection with these results, Defendant Gabrielli stated in part:

> On the corporate front, we undertook the largest ever international debt issuance by a Brazilian company, placing U.S.$6,000 million in bonds maturing in 5, 10 and 30 years. The proceeds will be used to finance the investments foreseen in our Business Plan, thereby maintaining an appropriate capital structure and financial leverage in line with our objectives.
>
> We achieved the milestones above . . . not only meeting growing demand in these markets, but also ***ensuring that all of the Company's human, financial and operational resources are put to the best possible use.*** We remain confident in our capacity to achieve the goals laid out in our Business Plan, thereby ensuring increasing returns for our shareholders and investors.

250.    On May 26, 2011, Petrobras and PifCo filed an Annual Report on Form 20-F for 2010 setting forth substantially similar figures as those set forth in the Company's earlier press release.

251.    In addition, the 2010 Form 20-F stated that the "Company's management assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2010" and "has concluded that as of December 31, 2010, each Company's internal control over financial reporting is effective."  The Company explained that the "management of [the] Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2010, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

252.     The 2010 20-F incorporated the Code, and made statements substantially similar to those described in ¶ 229 above.

253.     On or about June 6, 2011, Petrobras published its 2010 Sustainability Report on its website.  This document stated that "Petrobras does not make contributions to political parties or political campaigns of candidates to elected positions" and that "this company . . . is not involved in corruption."

254.     On July 22, 2011, Petrobras issued a press release announcing that the Company's "Board of Directors approved today the 2011-2015 Business Plan, involving total investments of US$224.7 billion (R$389 billion)." The 2010-2014 Business Plan set forth the projection that Petrobras would require financing of between $67.0 billion and $91.4 billion.

255.     In an August 15, 2011 post on Facts and Data, Petrobras stated that "*in regard to material 'suspect donations' published in the edition No. 2179 by Istoe, Petrobras vehemently repudiates the insinuation of political favoritism toward the enterprise Jaraque Equipamentos Industriais Ltda. or any other enterprise supplying the Company.*"  Petrobras further stated that it followed strict bidding procedures.

256.     On August 24, 2011, Petrobras issued a press release announcing the Company's results of operations for the second quarter of 2011. The Company reported total assets of $351 billion including net PP&E of $247 billion, total costs and expenses of $31.2 billion including depreciation, depletion, and amortization of $2.5 billion, and net income of $6.6 billion.

257.     On August 25, 2011, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending June 30, 2011 with figures substantially similar to those set forth in the Company's earlier press release.

258.    In a November 8, 2011 post on Facts and Data, Petrobras stated the following: "*Petrobras clarifies that there has not been overbilling, overpricing, or any other irregularity in its works.*"

259.    On November 22, 2011, Petrobras issued a press release announcing the Company's results of operations for the third quarter of 2011. The Company reported total assets of $309 billion including net PP&E of $220 billion, total costs and expenses of $31.5 billion including depreciation, depletion, and amortization of $2.6 billion, and net income of $3.9 billion.

260.    In connection with these results, Defendant Gabrielli stated in part:

> We continue to invest in the expansion of our refineries, strengthening our position as an integrated company.
>
> We improved our performance with respect to economic and social criteria and were **granted the highest score in the Transparency criterion** for the fifth time.
>
> *            *            *
>
> Thanks to product and service quality, **a strong commitment to** sustainable development, state-of-the-art technology and **exemplary management,** Petrobras continues to strengthen its position as a major player in the global oil and gas market and is fully prepared for new conquests.

261.    Also on November 22, 2011, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending November 30, 2011 with figures substantially similar to those set forth in the Company's earlier press release.

## C.    False and Misleading Statements Made in 2012

262.    On January 23, 2012, Petrobras notified the market of possible changes among the Company's executives. On January 24, 2012, the Company issued a press release confirming the upcoming nomination of defendant Foster to replace CEO Gabrielli who was reportedly planning to run for public office.

263.    On February 3, 2012, PifCo filed a prospectus for the offering of various notes (the "2012 Notes"), pursuant to a registration statement (the "2009 Registration Statement") that Petrobras and PifCo filed with the SEC on Form-3ASR on December 11, 2009, for the offer and sale of an indeterminate amount of securities at indeterminate offering prices, including debt securities.  This offering comprised four series of notes: (1) a $2.75 billion re-opening of notes first offered on January 27, 2011 paying 5.375% due in 2021 to be sold at $1041.81 per $1000 par value; (2) a $1.25 billion re-opening of notes first offered on January 27, 2011 paying 6.750% due in 2041 to be sold at $1112.08 per $1000 par value; (3) $1.25 billion of notes paying 2.875% due in 2015 to be sold at $994.99 per $1000 par value; and (4) $1.75 billion of notes paying 3.500% due in 2017 to be sold at $994.19 per $1000 par value.

264.    The 2012 Offering Documents incorporated by reference, among other documents, the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2010, filed with the SEC on May 26, 2011, which included descriptions of Petrobras, its asset values, expenses, net income, and its internal controls, as set forth above.

265.    On February 28, 2012, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2011.  For 2011, the Company reported total assets of $319 billion including net PP&E of $182 billion, depreciation, depletion, and amortization of $10.5 billion, and net income of $20.0 billion.

266.    On February 29, 2012, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for 2011 setting forth figures substantially similar to those set forth in the Company's earlier press release.

267.     On April 2, 2012, Petrobras and PifCo filed an Annual Report on Form 20-F for 2011 setting forth substantially similar figures as those set forth in the Company's earlier press release.

268.     In addition, the 2011 20-F stated that the "Company's management has assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2011" and "has concluded that each Company's internal control over financial reporting was effective as of December 31, 2011." The Company explained that the "management of [the] Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2011, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

269.     The 2011 20-F incorporated the Code and made statements substantially similar to those described in ¶ 229 above.

270.     On April 27, 2012, Petrobras issued a press release announcing that its Board of Directors had, that day, approved the nomination of Jose Carlos Cosenza to replace Paulo Roberto Costa. The press release also announced that Costa would resign from his current position.

271.     On May 15, 2012, Petrobras issued a press release announcing the Company's results of operations for the first quarter of 2012. The Company reported total assets of $338 billion including net PP&E of $194 billion, depreciation, depletion, and amortization of $2.7 billion, and net income of $5.3 billion.

272.     On May 17, 2012, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending March 31, 2012 with figures substantially similar to those set forth in the Company's earlier press release.

273.    In connection with Petrobras' Form 6-K for the period ending March 31, 2012,

PwC issued a Report of Independent Registered Public Accounting Firm, stating the following:

> We have reviewed the accompanying condensed consolidated balance sheet of Petróleo Brasileiro S.A. Petrobras and its subsidiaries as of March 31, 2012, and the related condensed consolidated statements of income, of cash flows, of comprehensive income and of shareholders equity for the three-month period ended March 31, 2012. This interim financial information is the responsibility of the Company s management.

> We conducted our review in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole.  Accordingly, we do not express such an opinion.

> Based on our review, we are not aware of any material modifications that should be made to the accompanying condensed consolidated interim financial information for it to be in conformity International Financial Reporting Standards as issued by the International Accounting Standards Board.

> /s/PricewaterhouseCoopers
> **PricewaterhouseCoopers**
> Auditores Independentes
> Rio de Janeiro, Brazil
> May 15, 2012

274.    On or about June 21, 2012, Petrobras published its 2011 Sustainability Report on

its website.  This document included the following statements about the anti-corruption policies of

the "Petrobras System," i.e., Petrobras and its subsidiaries, affiliates, and associated companies

(among others):

> ***The Petrobras System refuses any practice that involves corruption or bribery***, and uses management instruments such as the Competition Behavior and Good Practice codes, in addition to following the Code of Conduct of the High Federal Administration, the application of which is inspected by the Presidency of the Republic's Ethics Commission.

*      *      *

According to its Code of Ethics' guidelines, the Petrobras System makes no contributions to political parties or to candidates for elective offices. The company's business requires transparency in actions and positions, particularly regarding the information published to society.

*       *       *

To ensure transparency in its relations with the Government, **_Petrobras System's Code of Ethics determines the company will not make contributions to political parties or to campaigns of candidates to elected office. It also emphasizes that it refuses any act of corruption and bribery_** and that it has formal control and consequence procedures in place to handle any breaches occurring within the company.

*       *       *

The company does not use child or slave labor, it is not involved in prostitution or sexual exploitation of children or adolescents, or **_corruption._**

275.    On or about June 25, 2012, Petrobras hosted a presentation and conference call in New York, New York to offer details of the Company's 2012-2016 Business and Management Plan. As part of the presentation, Petrobras described certain initiatives relating to project management, including discussions of capital discipline (described as "ensur[ing] expansion with solid financial indicators") and of the Company's plans to spend more than $141 billion on exploration and production. These capital expenditures were presented based on the explicit assumption of Petrobras maintaining its investment grade rating, including "Leverage lower than 35%." The 2012-2016 Business and Management Plan projected that Petrobras would be required to borrow approximately $80 billion through the debt markets to fund these activities.

276.    On August 3, 2012, Petrobras issued a press release announcing the Company's results of operations for the second quarter of 2012. The Company reported total assets of $311 billion including net PP&E of $185 billion, depreciation, depletion, and amortization of $2.7 billion, and a net loss of $953 million.

277.    In connection with these results, Defendant Foster stated in part:

> **The new [Business and Management] Plan focuses on oil and gas production in Brazil and is underpinned by realism, precise targets and rigorous project management with capital discipline**. Since its publication, we have made advances with several important issues. Recent examples include the signature of contracts for the construction of drilling rigs and pre-salt replicant platform topsides. . . . We will also continue with our efforts to recover the operational efficiency of the Campos Basin and optimize operating costs, two essential vectors for ensuring better results.

278.    On August 10, 2012, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending June 30, 2012 with figures substantially similar to those set forth in the Company's earlier press release.

279.    In connection with Petrobras' Form 6-K for the period ending June 30, 2012, PwC issued a Report of Independent Registered Public Accounting Firm, making statements substantially similar to those described above in connection with previous quarters.

280.    Exhibit 15.1 to Petrobras' Form 6-K for the period ending June 30, 2012 contained the following statements made by PwC:

> We are aware that our report dated August 3, 2012 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the six month period ended June 30, 2012 and included in the Company's quarterly report on Form 6-K for the quarter ended June 30, 2012 is incorporated by reference in its Registration Statement on Form F-3 dated December 12, 2009.

281.    On August 29, 2012, Petrobras, PifCo, and PGF filed the 2012 Registration Statement. The 2012 Registration Statement included a prospectus that incorporated by reference certain documents filed by Petrobras with the SEC, including the Company's Annual Report on Form 20-F for the year ended December 31, 2011, which had been filed with the SEC on March 30, 2012.

282.    Exhibit 15.1 to the 2012 Registration Statement and Prospectus filed on August 29, 2012, contained the following statements made by PwC:

> We are aware that our report dated August 3, 2012 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the six month period ended June 30, 2012 and included in the Company's quarterly report on Form 6-K for the quarter ended June 30, 2012 is incorporated by reference in its Registration Statement on Form F-3 dated August 29, 2012.

283.    The 2012 Registration Statement also incorporated, among other documents, any future filings of Petrobras on Form 20-F made with the SEC after the date of this prospectus and prior to the termination of the offering of the securities offered by this prospectus."

284.    On October 26, 2012, Petrobras issued a press release announcing the Company's results of operations for the third quarter of 2012. The Company reported total assets of $318 billion including net PP&E of $191 billion, depreciation, depletion, and amortization of $2.6 billion, and net income of $2.8 billion.

285.    On October 30, 2012, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the nine-month period ending September 30, 2012, with substantially similar figures as those set forth in the Company's earlier press release.

286.    In connection with Petrobras' Form 6-K for the period ending September 30, 2012, PwC issued a Report of Independent Registered Public Accounting Firm, making statements substantially similar to those described above in connection with previous quarters.

287.    Exhibit 15.1 to Petrobras' Form 6-K for the period ending September 30, 2012 contained the following statements made by PwC:

> We are aware that our report dated October 26, 2012 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the nine month period ended September 30, 2012 and included in the Company's quarterly report on Form 6-K for the quarter ended September 30, 2012 is incorporated by reference in its Registration Statement on Form F-3 dated December 12, 2009.

288.    In a December 29, 2012 post on Facts and Data, Petrobras represented that "all the activities of Petrobras and its employees *are fully oriented by principles of ethics and*

99

*transparency. The Petrobras system denies any practice of corruption and utilizes rigorous*

*management instruments to guarantee the protection of its shareholders' interests.*"

### D.      False and Misleading Statements Made in 2013

289.    On January 7, 2013, in response to questions from *Jornal Nacional* about potential

cost overruns at Comperj, Petrobras stated on Facts and Data: "*Petrobras reiterates that there are*

*no irregularities in the construction of the Abreu e Lima Refinery . . . [and] also reaffirms that*

*there are no irregularities in the Rio de Janeiro Petrochemical Complex works.*"

290.    On February 4, 2013, the Company issued a press release announcing its results of

operations for the fourth quarter and full year of 2012.  For 2012, the Company reported total

assets of $332 billion including net PP&E of $205 billion, depreciation, depletion, and

amortization of $11.1 billion, and net income of $10.9 billion.

291.    In connection with these results, Defendant Foster stated in part:

> Despite the adversities faced by Petrobras in 2012, I would like to
> reiterate my strong belief in the Company's medium and long-term
> prospects. This Administration fully recognizes the difficulties we
> face and is working ceaselessly to overcome them. ***Following an***
> ***extensive and detailed diagnosis of our operating problems,*** we
> defined priorities and implemented short and medium-term
> structuring initiatives to improve our financial and economic
> results.
>
> ***I would like to highlight the Executive Board meetings, which are***
> ***now held twice weekly to focus on the physical and financial***
> ***monitoring of the principal projects in our investment plan.*** We
> have also implemented a number of important structural and
> organizational changes throughout the Company during 2012,
> enhancing efficiency, while at the same time promoting needed
> administrative changes. We are fully aware that only the constant
> pursuit of efficiency will allow us to achieve permanent gains that
> will improve the Company's long term profitability, which is this
> Administration's primary objective.

292.    On February 6, 2013, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for 2012, with figures substantially similar to those set forth in the Company's earlier press release.

293.    In connection with Petrobras' Form 6-K setting forth the Company's financial statements for full year 2012, PwC issued a Report of Independent Registered Public Accounting Firm, which contained the following statements:

> In our opinion, the accompanying consolidated statement of financial position and the related consolidated statements of income, of comprehensive income, of cash flows and of changes in stockholders' equity present fairly, in all material respects, the financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries (the "Company") at December 31, 2012, and the results of their operations and their cash flows for the year ended December 31, 2012 in conformity with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB). Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.
>
> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the

preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The accompanying consolidated balance sheet of Petróleo Brasileiro S.A. — Petrobras as of December 31, 2011 and the related consolidated statements of income, comprehensive income, shareholders' equity and cash flows for each of the years ended December 31, 2011 and 2010, were audited by other auditors whose report thereon dated March 30, 2012, expressed an unqualified opinion on those statements.

Rio de Janeiro, February 4, 2013

PricewaterhouseCoopers
Auditores Independentes
CRC 2SP000160/O-5 "F" RJ

/s/
Marcos Donizete Panassol
Contador CRC 1SP155975/O-8 "S" RJ

294.    Exhibit 23 to Petrobras' Form 6-K setting forth the Company's financial statements

for 2012 contained the following statements:

We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-163665) of Petróleo Brasileiro S.A. - Petrobras, of our report dated February 04, 2013 relating to the financial statements of Petrobras and the effectiveness of internal control over financial reporting, which is included in Petrobras` Form 6-K dated February 05, 2013.

295.    On March 15, 2013, Petrobras issued a press release announcing that the Company's Board had "approved the 2013-2017 Business & Management Plan (2013-17 BP), with investments of US$ 236.7 [billion]." The 2013-2017 Business Plan set forth the projection that Petrobras would meet the funding requirements for these investments in part by issuing $21.4 billion in debt.

296.    On April 26, 2013, Petrobras issued a press release announcing the Company's results of operations for the first quarter of 2013.  The Company reported total assets of $345 billion including net PP&E of $214 billion, depreciation, depletion, and amortization of $3.2 billion, and net income of $3.9 billion.

297.    In connection with these results, Defendant Foster stated in part:

> *We are doing our homework, and results are being delivered as planned. I constantly monitor the progress of our investment projects and structuring programs with the Directors, Executive Managers, and all other leaders involved. I regard the increased integration between the Company's areas and their teams as extremely positive; the proper management of our project portfolio provides us with the confidence that we will be able to achieve the goals of 2013-17 BMP, which will guarantee the returns expected by our shareholders and investors.*

298.    On April 29, 2013, Petrobras filed an Annual Report on Form 20-F setting forth substantially similar figures as those set forth in the Company's earlier press release.

299.    The Annual Report on Form 20-F filed on April 29, 2013, contained PwC's Report of Independent Registered Public Accounting Firm, with statements described in ¶ 293 above.

300.    Exhibit 15.1 to Petrobras' 2012 Form 20-F contained the following statements by PwC:

> We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our report dated February 4, 2013 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Annual Report on Form 20-F.

301.    On April 30, 2013, Petrobras filed a Form 6-K with the SEC setting forth the

Company's financial statements for the period ending March 31, 2013 with figures substantially

similar to those set forth in the Company's earlier press release.

302.    In connection with Petrobras' Form 6-K for the period ending March 31, 2013,

PwC issued a Report of Independent Registered Public Accounting Firm, stating the following:

> We have reviewed the accompanying condensed consolidated statement of financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries as of March 31, 2013, the related condensed consolidated statement of income, of cash flows and of comprehensive income for the three-month periods ended March 31, 2013 and March 31, 2012 and the condensed statement of changes in shareholders' equity for the three-month period ended March 31, 2013. This interim financial information is the responsibility of the Company's management.

> We conducted our review in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

> Based on our review, we are not aware of any material modifications that should be made to the accompanying condensed consolidated interim financial information for it to be in conformity with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB).

> We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet as of December 31, 2012, and the related consolidated statements of income, of comprehensive income, of cash flows (not presented herein) and of shareholders' equity for the year then ended, and in our report dated February 04, 2013, we expressed an unqualified opinion on those consolidated financial statements. In our opinion, the information set forth in the accompanying condensed consolidated balance sheet as of December 31, 2012, is fairly stated in all material respects in relation to the consolidated balance sheet from which it has been derived.

> /s/ PricewaterhouseCoopers
> PricewaterhouseCoopers
> Auditores Independentes
> Rio de Janeiro, Brazil
> April 26, 2013

303.    Exhibit 15.1 to Petrobras' Form 6-K for the period ending March 31, 2013, contained the following statements by PwC:

> We are aware that our report dated April 26, 2013 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the three month periods ended March 31, 2013 and March 31, 2012 and included in the Company's quarterly report on Form 6-K for the quarter ended March 31, 2013 is incorporated by reference in its Registration Statement on Form F-3 dated December 12, 2009.

304.    On May 13, 2013, Petrobras issued a press release announcing the pricing of the 2013 Notes, $11 billion in debt securities to be issued by PGF. On May 15, 2013, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2013 Notes.

305.    The 2013 Offering Documents offered the 2013 Notes, which included six series of notes: (1) $1.25 billion of notes paying 2.00% due in 2016 to be sold at $995.84 per $1000 par value; (2) $2 billion of notes paying 3.00% due in 2019 to be sold at $993.52 per $1000 par value; (3) $3.5 billion of notes paying 4.375% due in 2023 to be sold at $988.28 per $1000 par value; (4) $1.75 billion of notes paying 5.625% due in 2043 to be sold at $980.27 per $1000 par value; (5) $1 billion of floating-rate notes due in 2016 to be sold at par; and (6) $1.5 billion of floating-rate notes due 2019 to be sold at par.

306.    The 2013 Offering Documents incorporated by reference, among other documents, the Company's Annual Report on Form 20-F for the year ended December 31, 2012, filed with the SEC on April 29, 2013, which included descriptions of Petrobras, its asset values, expenses, net income, and its internal controls.  For example, the incorporated Annual Report on Form 20-F stated that Petrobras held assets valued at $332 billion, including property, plant, and equipment valued at $205 billion as of December 31, 2012.

307.    On May 23, 2013, Petrobras issued a press release announcing that the sale of the 2013 Notes had closed on May 20, 2013, noting in part:

The transaction was executed in one day, with a demand of approximately US$ 42 billion as a result of more than 2,000 orders. The average interest rate of the notes was 3.79% with an average life of 10.37 years. This deal sets the following records:

> ➤ Largest Emerging Market USD bond offering ever
> ➤ 5th largest USD bond offering ever
> ➤ 2nd largest USD bond offering this year

The final allocation had the following distribution: United States (73%), Europe (17%) and Asia (7%), mostly dedicated to the high grade market.

The success of the transaction indicates investor confidence in the fundamentals of the Company, its growth strategy and its commitment to maintain investment grade rating, as indicated by debt ratio targets and significant cash flow.

308.    In or around May 2013, Petrobras published its 2012 Sustainability Report on its website.   This document included the following statements regarding the Company's anticorruption policies:

To ensure transparency in our relations with the Government, our Code of Ethics states that *we do not contribute to political parties or political campaigns of candidates to elective office. We emphasize our refusal to countenance corrupt practices or bribery*, and we maintain formal control procedures with consequences in the event of any transgressions in the company.

                    *       *       *

No cases of corruption were detected in 2012.  *We reject all corrupt practices and payment of bribes*, and we use the Competitive Conduct and Good Practice Codes, and follow the Federal Administration Code of Conduct, which has its application overseen by the Public Ethics Commission of the Presidency.

                    *       *       *

The company does not use child or slave labor, nor is it involved in prostitution or sexual exploitation of children or adolescents, *or corruption.*

309.    July 4, 2013, Petrobras announced the adoption of the Petrobras Corruption Prevention Program ("PCPP").  Petrobras stated that the PCPP was "aimed at reinforcing the prevention, detection and correction of acts of fraud and corruption, through integrated management and improvement of actions and controls in [Petrobras'] governance structure."

106

Defendants represented that through the implementation of the PCPP, Petrobras was taking

"continuous actions to prevent, detect and correct acts of fraud and corruption." They assured

investors that the PCPP was effective as it was subject to a "periodic evaluation in order to verify

its effectiveness and compliance with law."

310.    In conjunction with the PCPP, Petrobras posted a Manual on its website, which

made the following statements:

- We are committed to rejecting any practices of corruption and bribery, maintaining formal procedures to ensure control and consequences for any violations that occur in our relations with society, government and the state.

- Fraud and Corruption Risk Management: The management of business risks is conducted at a corporate level and deployed at organizational sites… The Internal Audit Area, through the Compliance General Management, is responsible for monitoring compliance risks related to fraud and corruption.

- The results of integrity due diligence are documented and used by our managers to take decisions about the start of the intended commercial relationships and to define the level of monitoring for potential fraud and corruption risks identified.

- Our contractual instruments for the provision of goods and services, asset acquisitions and divestments, and to form and manage partnerships in the Exploration and Production Area, have clauses related to compliance with anti-corruption legislation.

- We carry out integrity due diligence of our suppliers, joint venture partners and counterparties in acquisitions or divestments at the start of our commercial relationship with them, considering the following factors, among others, the geographical location of the company and where it does business; the company's interaction with public agents; its history and reputation; and the nature of the business.

- Integrity due diligence starts by collecting information related to the trustworthiness at the company and its owners, obtained through declarations from the counterparty and/or other reliable sources, with the possible extension of due diligence procedures in proportion to the risks identified.

311.    In an August 7, 2013 post on Facts and Data, Petrobras quoted statements made by

Gabrielli at a hearing of the Environmental Commission, Consumer Protection and Inspection and

Control, requested by Senator Ivo Cassol, during which Gabrielli vehemently denied any wrongdoing by Petrobras with respect to inflated contracts.  At the time, he insisted that "*the acquisition [of the Pasadena Refinery] was a normal operation, based on market conditions*."

312.    On August 9, 2013, Petrobras issued a press release announcing the Company's results of operations for the second quarter of 2013.  The Company reported total assets of $338 billion including net PP&E of $204 billion, depreciation, depletion, and amortization of $3.4 billion, and net income of $2.7 billion.

313.    On August 13, 2013, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending June 30, 2013 setting forth figures substantially similar to those set forth in the Company's earlier press release.

314.    In connection with Petrobras' Form 6-K for the period ending June 30, 2013, PwC issued a Report of Independent Registered Public Accounting Firm, making statements substantially similar to those described in ¶ 302 above.

315.    Exhibit 15.1 to Petrobras' Form 6-K for the period ending June 30, 2013, contained the following statements by PwC:

> We are aware that our report dated August 9, 2013 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the six month periods ended June 30, 2013 and June 30, 2012 and included in the Company's quarterly report on Form 6-K for the quarter ended June 30, 2013 is incorporated by reference in its Registration Statement on Form F-3 dated December 12, 2009.

316.    On October 25, 2013, Petrobras issued a press release announcing the Company's results of operations for the third quarter of 2013.  The Company reported total assets of $340 billion including net PP&E of $208 billion, depreciation, depletion, and amortization of $3.3 billion, and net income of $1.5 billion.

317.    On October 28, 2013, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending September 30, 2013 with figures substantially similar to those set forth in the Company's earlier press release.

318.    In connection with Petrobras' Form 6-K for the period ending September 30, 2013, PwC issued a Report of Independent Registered Public Accounting Firm, making statements substantially similar to those described in ¶ 302 above.

319.    Exhibit 15.1 to Petrobras' Form 6-K for the period ending September 30, 2013, contained the following statements by PwC:

> We are aware that our report dated October 25, 2013 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the nine month periods ended September 30, 2013 and September 30, 2012 and included in the Company's quarterly report on Form 6-K for the quarter ended September 30, 2013 is incorporated by reference in its Registration Statement on Form F-3 dated December 12, 2009.

320.    On November 13, 2013, Petrobras published a "Clarification" on its Facts and Data website responding to allegations in an *O Estadao de S. Paulo* article regarding the Company's contracts with Odebrecht.  In this post, the Company discussed its bidding process and represented that "*the process of bidding, contracting and executing Petrobras services are constantly being evaluated by its Internal Auditor and its recommendations are diligently analyzed with a view to protecting the Company's interests.*"

**E.    False and Misleading Statements Made in 2014**

321.    On February 25, 2014, Petrobras issued a press release announcing that the Company's Board had "approved the 2030 Strategic Plan (SP 2030) and the 2014 — 2018 Business and Management Plan (BMP 2014-2018)."  The 2013-2017 Business Plan set forth the projection that Petrobras would meet the funding requirements for these investments in part by issuing $5.6 billion in debt.

322.    Also on February 25, 2014, the Company issued a press release announcing its results of operations for the fourth quarter and full year of 2013.  For 2013, the Company reported total assets of $321 billion including net PP&E of $228 billion, depreciation, depletion, and amortization of $13.2 billion, and net income of $10.8 billion.

323.    In connection with these results, Defendant Foster stated in part:

> 2013 stands out for the successful implementation of our Structuring Programs, which by establishing new benchmarks for productivity and management of investment projects, **imposed discipline in the use of the company's financial resources.**
>
> Additionally, I would like to notice that **in the second half of 2013 we implemented the Corruption Prevention Program,** reaffirming the commitment of the Petrobras Executive Board and of its employees with ethics and transparency at our organization. The program complies with both national and international initiatives against fraud and corruption, as well as with the laws of the countries where Petrobras operates, with positive impacts in the relations with all its stakeholders.

324.    On February 26, 2014, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for 2013 with figures substantially similar to those set forth in the Company's earlier press release.

325.    In connection with Petrobras' Form 6-K for the year ending 2013, PwC issued a Report of Independent Registered Public Accounting Firm, which contained the following statements:

> In our opinion, the accompanying consolidated statement of financial position and the related consolidated statements of income and comprehensive income, changes in equity and cash flows present fairly, in all material respects, the financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries (the "Company") at December 31, 2013, and December 31, 2012, and the results of their operations and their cash flows for the years ended December 31, 2013, and December 31, 2012, in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013 based on criteria established in Internal Control - Integrated Framework (1992) issued by the Committee of Sponsoring

Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Rio de Janeiro, February 25, 2013[46]

---

[46] The signature block contains the wrong date.  PwC's Opinion was issued on February 25, 2014.

/s/ PricewaterhouseCoopers
Auditores Independentes
CRC 2SP000160/O-5 "F" RJ
/s/ Marcos Donizete Panassol
Contador CRC 1SP155975

326.    On March 7, 2014, Petrobras issued a press release regarding its management's

report on internal control over financial reporting, stating in relevant part:

> Our management has assessed the effectiveness of our internal
> control over financial reporting as of December 31, 2013, based on
> the criteria established in Internal Control—Integrated Framework
> (1992) issued by the Committee of Sponsoring Organizations of the
> Treadway Commission (COSO). ***Based on such assessment and
> criteria, the Company's management has concluded that
> Company's internal control over financial reporting was effective
> as of December 31, 2013.***

327.    On March 10, 2014, Petrobras filed a Form 6-K/A with the SEC setting forth

substantially the same content as in the March 7, 2014 press release, accompanied by PwC's

Report of Independent Registered Public Accounting Firm, which made statements substantially

similar to those described in ¶ 325 above.

328.    Exhibit A to Petrobras' Form 6-K/A report filed on March 10, 2014, contained the

following statements by PwC:

> We hereby consent to the incorporation by reference in the Registration Statement
> on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our report
> dated February 25, 2014 relating to the financial statements and the effectiveness
> of internal control over financial reporting, which appears in the Petróleo Brasileiro
> S.A. - Petrobras Form 6-K dated February 26, 2014 and the related amendment on
> Form 6-K/A dated March 10, 2014. We also consent to the reference to us as experts
> under the heading "Independent Registered Public Accounting Firm" in such
> Registration Statement. We also consent to the reference to us under the heading
> "Selected Financial Data" in such Registration Statement.

---

The Company and PwC corrected that mistake when Petrobras filed an amended Form 6-K/A with
the SEC on March 10, 2014.

329.    Also on March 10, 2014, Petrobras issued a press release announcing the pricing of the 2014 Notes, $8.5 billion in debt securities to be issued by PGF. On March 11, 2014, PGF filed a prospectus supplement on Form 424B2 for the offer and sale of the 2014 Notes pursuant to the 2012 Registration Statement.

330.    The 2014 Offering Documents offered the 2014 Notes, which included six series of notes: (1) $1.6 billion of notes paying 3.250% due in 2017 to be sold at $999.57 per $1000 par value; (2) $1.5 billion of notes paying 4.875% due in 2020 to be sold at $997.43 per $1000 par value; (3) $2.5 billion of notes paying 6.250% due in 2024 to be sold at $997.72 per $1000 par value; (4) $1 billion of notes paying 7.250% due in 2044 to be sold at $991.66 per $1000 par value; (5) $1 billion of floating-rate notes due in 2017 to be sold at par; and (6) $500 million of floating-rate notes due 2020 to be sold at par.

331.    The 2014 Offering Documents incorporated by reference, among other documents, the Company's report on Form 6-K filed with the SEC on March 7, 2014, containing management's report on internal control over financial reporting described above.

332.    On April 30, 2014, after the market closed, the Company filed an annual report for the year ended December 31, 2013 on Form 20-F with the SEC (the "2013 20-F"), which was signed by Barbassa and Foster, and reiterated the Company's previously announced financial results and financial position. In addition, the 2013 20-F contained signed certifications pursuant to SOX by Barbassa and Foster, stating that the financial information contained in the 2013 20-F was accurate.

333.    The 2013 20-F contained a Report of Independent Registered Public Accounting Firm, issued by PwC, which made statements substantially similar to those described in ¶ 325 above.

334.   Exhibit 15.1 to Petrobras' 2013 20-F contained the following statements by PwC:

We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our report dated February 25, 2014 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Annual Report on Form 20-F.

335.   In addition, the 2013 20-F stated that "Company's "management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013" and "has concluded that Company's internal control over financial reporting was effective as of December 31, 2013."   The Company explained that its "management has not identified any changes in its internal control over financial reporting during the fiscal year ended December 31, 2013, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

336.   The 2013 20-F incorporated the Code, which contained substantially similar language to that described in ¶ 229 above.

337.   The 2013 20-F represented that the Company had established ad hoc internal commissions "to evaluate our compliance with applicable regulations" and the "scope of each internal commission is established by our management."   Significantly the 2013 20-F represented that on "*March 31, 2014, our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations*."

338.   On May 9, 2014, Petrobras issued a press release announcing the Company's results of operations for the first quarter of 2014.   The Company reported total assets of $354 billion including net PP&E of $241 billion, depreciation, depletion, and amortization of $3.0 billion, and net income of $2.4 billion.

339.   In connection with these results, CEO Foster stated in part:

The Company continues to have broad access to the sources of funding necessary for the development of its Business and Management Plan. In the 1Q-2014, we raised US$ 22.8 billion, mainly by issuing bonds in the U.S. and European markets, which allowed us to end the quarter with strong liquidity of US$ 34.7 billion in cash, considering the balance of cash, cash equivalents and government bonds. These resources are sufficient to finance investments in 2014 . . .

*I would like to register, once again, the commitment of Petrobras Executive Board and of its employees with ethics and transparency at our organization, as expressed when we launched in the 2nd half of 2013, the Corruption Prevention Program. All the allegations presented are and will continue to be investigated through the mechanisms created for this specific purpose*.

340.    On May 10, 2014, Petrobras posted an entry on its Facts and Data blog regarding allegations concerning bribes made to Company employees by the Dutch oil rig contractor SBM Offshore.  Petrobras stated that:

Petrobras vehemently denies the story published on Friday[,] May 9, 2014, in the newspaper *O Estado de São Paulo*, reiterating that it became aware of reports of alleged bribes to employees of the company, involving the firm SBM Offshore, on the date the story was published in the newspaper *Valor Econômico* on February 13, 2014.

On that same day, the company established an Internal Verification Committee, which concluded, based on the works performed and within the scope of its regulatory authority, that there were no facts or documents that showed evidence of payment of kickbacks to employees of Petrobras.

341.    On May 12, 2014, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending March 31, 2014 with figures substantially similar to those set forth in the Company's earlier press release.

342.    In connection with Petrobras' Form 6-K for the period ending March 31, 2014, PwC issued a Report of Independent Registered Public Accounting Firm, making statements substantially similar to those described in ¶ 302 above.

343.    Exhibit 15.1 to Petrobras' Form 6-K for the period ending March 31, 2014, contained the following statements by PwC:

We are aware that our report dated May 9, 2014 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the three-month periods ended March 31, 2014 and March 31, 2013 and included in the Company's quarterly report on Form 6-K for the quarter ended March 31, 2014 is incorporated by reference in its Registration Statement on Form F-3 dated August 29, 2012.

344.     In or around May 2014, Petrobras published its 2013 Sustainability Report on its website. This document included the following statements regarding the Company's anticorruption policies:

In the second half of 2013, we introduced our Corruption Prevention Program, which reaffirms Petrobras management and workforce commitment to ethics and transparency in our organization. The program meshes with local and international initiatives to combat fraud and corruption, and the legislation in countries in which we operate, thus favorably impacting relations with all stakeholders.

In July, Petrobras introduced its Corruption Prevention Program in order to prevent, detect and correct fraud and corruption. The program and its implementation are based on three aspects: prevention through education and clear policies on the importance of ethics in all our actions; mechanisms capable of detecting fraud or corruption; and a system of consequences to correct past problems.

The program's benefits include reduced exposure to legal, image and reputational risk, strengthened corporate governance, centralized efforts for the shared aim of combating fraud and corruption, and improved relationships with stakeholders, such as partners and sources of funding.

For our Internal Audit structure, the Executive Board approved a new General Controller Officer to strengthen implementation of control and compliance, including mitigation of fraud and corruption risk, in order to meet legal and regulatory requirements. This decision was ratified by the Board of Directors in November. The responsibilities of this General Office include the Corruption Prevention Program.

All our suppliers and business partners are covered by our guidance on anticorruption policies and procedures through our Code of Ethics stipulated in contractual instruments and posted on our website. ***The Code requires the process of selecting and signing suppliers to be based strictly on legal and technical criteria for quality, cost and punctuality.*** Suppliers must have ethical profiles in terms of their management practices and social and environmental responsibility. They must reject unfair competition practices or others contrary to the code's precepts, including our suppliers' supply chains.

Our standard contracts and services agreements now include an anti-corruption paragraph with procedures to be adopted in cases of illicit actions under Brazilian law, the 1977 Foreign Corrupt Practices Law (USA), or the Bribery Act 2010 (United Kingdom).

*       *       *

***Our Code of Ethics includes a commitment to refuse to support or contribute to political parties or campaigns of candidates running for elected office.***

345.    On May 19, 2014, Petrobras posted an entry on its Facts and Data blog regarding the Abreu e Lima refinery, strongly denying allegations of overbilling and contractual irregularities.  Petrobras stated that:

> Petrobras reiterates that there is no "overbilling of R$69.6 million" in the contract with the Abreu e Lima consortium. Since 2008, the company has been clarifying to the TCU that there are methodological differences for the accounting of items that are specific to the oil industry.  In fact, the Court revised the amounts, after those clarifications were made, to R$19 million.  The company continues in discussions with the TCU to demonstrate that there is no overpricing or overbilling in these projects.

346.    In a May 23, 2014 statement on Facts and Data, the Company represented that *it has strict legal procedures for payments, including for the purchase of Pasadena. . . The payments made for any reason and in any country follow strict and clear procedures and relevant legislation. Additionally, the Company has a structured Internal Audit group, which has unrestricted access to any unit of the Petrobras System to verify the compliance of procedures and transactions made.*

347.    On May 27, 2014, fifteen days before Foster testified on June 11, 2014 before a congressional investigation committee, the Comissao Parlamentar de Inquerito ("CPI"), Petrobras received a letter from SBM warning the Company that Netherland's Public Ministry was inquiring into bribery payments, by SBM to Petrobras' employees.[47]  Notwithstanding that knowledge,

---

[47] *Folha De S.Paulo*, November 20, 2014, *Opposition Party Demands Graca Foster's Immediate Withdrawal From Petrobras' Presidency*,.

Foster falsely represented to the CPI and to the investing public in her testimony on June 11, 2014, that no irregularities were discovered, even though "she knew about several evidences of irregularities"[48] before her testimony on June 11, 2014.

348. In a July 12, 2014 statement on Facts and Data, Petrobras represented that it *has not found any facts or documents evidencing the payment of bribes to employees at Petrobras*. Petrobras also stated that:

> Regarding the purchase of the Pasadena refinery, despite what the story reports, Petrobras did not pay an "in extreme excess." The purchase price was consistent with other refinery purchase/sale transactions in 2006. . . .

> Regarding SBM, Petrobras reiterates, as was already reported to the newspaper, that the Internal Verification Committee established by the company, based on the works performed and within the scope of its regulatory authority, did not find any facts or documents that prove payment of kickbacks to Petrobras employees. It must also be stressed that the investigations conducted by SBM Offshore found no evidence of improper payments.

349. In a July 14, 2014 statement on Facts and Data, Petrobras stated that *there is no indication of irregularities* and *there is no overpricing or overbilling in the project of the Abreu refinery*.

350. On August 8, 2014, Petrobras issued a press release announcing the Company's results of operations for the second quarter of 2014. The Company reported total assets of $363 billion including net PP&E of $254 billion, depreciation, depletion, and amortization of $3.5 billion, and net income of $2.3 billion.

351. On August 11, 2014, Petrobras filed a Form 6-K with the SEC setting forth the Company's financial statements for the period ending June 30, 2014 with figures substantially similar to those set forth in the Company's earlier press release.

---

[48] *Id.*

352.    In connection with Petrobras' Form 6-K for the period ending June 30, 2014, PwC issued a Report of Independent Registered Public Accounting Firm, making statements substantially similar to those described in ¶ 302 above.

353.    Exhibit 15.1 to Petrobras' Form 6-K for the period ending June 30, 2014, contained the following statements by PwC:

> We are aware that our report dated August 8, 2014 on our review of interim financial information of Petróleo Brasileiro S.A. - Petrobras, for the six month periods ended June 30, 2014 and June 30, 2013 and included in the Company's quarterly report on Form 6-K for the quarter ended June 30, 2014 is incorporated by reference in its Registration Statement on Form F-3 dated August 29, 2012.

### F.    False and Misleading Statements Made in 2015

354.    On April 22, 2015, Petrobras published on its website Fourth Quarter of 2014 Results.  Petrobras reported a US$ 7,367 million loss in 2014 resulting from impairment charges in the amount of US$ 16,823 million.  Petrobras reported write-offs of overpayments incorrectly capitalized in the amount of $US 2,527 million related to the payment scheme uncovered by the investigations of the Lava Jato Operation, which losses it stated were recognized in the 3Q-2014.

355.    On April 22, 2015, Petrobras published on its website Consolidated financial statements as of December 31, 2014, 2013 and 2012 with report of independent registered public accounting firm.  Petrobras again reported that in the third quarter of 2014, the Company wrote off US$2,527 million of capitalized costs representing the amounts that Petrobras overpaid for the acquisition of property, plant and equipment in prior years.

356.    The Consolidated financial statements as of December 31, 2014, 2013 and 2012 published by Petrobras on its website on April 22, 2015, contained the following statements by PwC:

> In our opinion, the accompanying consolidated statement of financial position and the related consolidated statements of income, comprehensive income, cash flows and changes in shareholders' equity present fairly, in all material respects, the financial position of

Petróleo Brasileiro S.A. – Petrobras and its subsidiaries (the "Company") at December 31, 2014 and December 31, 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014 in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 3 to the financial statements, the Company wrote off US$ 2,527 million of overpayments on the acquisition of property plant and equipment incorrectly capitalized according to testimony obtained from Brazilian criminal investigations.

/s/ PricewaterhouseCoopers Auditores Independentes
Rio de Janeiro, Brazil
April 22, 2015

357.     On May 15, 2015, the Company filed an annual report for the year ended December 31, 2014 on Form 20-F with the SEC (the "2014 20-F"), which again disclosed the write-off of U.S.$2,527 million of capitalized costs representing the amounts that Petrobras overpaid for the acquisition of property, plant and equipment in prior years.  The Company disclosed that under IAS 16, the amounts it overpaid pursuant to this payment scheme should not have been included in the historical costs of its property, plant and equipment.

358.     With respect to the 2014 20-F, PwC again stated that "[i]n our opinion, the accompanying consolidated statement of financial position and the related consolidated statements of income, comprehensive income, changes in equity and cash flows present fairly, in all material respects, the financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries (the "Company") at December 31, 2014 and 2013, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2014 in conformity with

International Financial Reporting Standards as issued by the International Accounting Standards Board."

### G.    Reasons Why Statements Made in 2010-2015 Were False and Misleading

359.    The statements made in ¶ 222 above that the Comperj project "is in line with Petrobras' 2009-2013 Business Plan which foresees investments in the order of $5.6 billion to the petrochemical segment" and that it is "in line with the Company's objectives to approve long-term sustainable investments that offer high returns to its shareholders" were false and misleading because Petrobras  failed to disclose that contracts worth billions of dollars related to the Comperj project were given without bidding and Petrobras' management had been reckless in the omission of technical analysis, overpaying for contracts and operating without a lack of effective controls.

360.    The Company's reported numbers for total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income numbers were false and misleading because (i) the reported carrying value of the Company's assets was false and misleading as the costs associated with the repayment of bribe-related expenses to contractors had been incorporated into certain assets at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their carrying values; and (ii) had the illegal bribe-related payments been properly accounted for, the Company would have immediately recognized materially greater expenses and less net income.  Moreover, these statements were materially false and misleading because the Company failed to disclose that the carrying value of the Company's PP&E was adversely impacted by illegal activities that inflated the carrying values of numerous construction contracts related to Petrobras' refineries and operations.

361.    Defendant Gabrielli's statements in ¶ 225 above were false and misleading because, rather than permitting a competitive bid process, Petrobras was awarding inflated contracts in

exchange for bribery payments to a selected cartel of companies, thereby foreclosing any type of competitive bids.

362.   Defendant Gabrielli's statements in ¶ 226 above responding to the question why the Abreu e Lima refinery is estimated to cost twice as much as other refineries of similar complexity in US and Europe were false and misleading because Petrobras failed to disclose that most of the increase in the cost of the refinery was due to unnecessary add-on-contracts awarded to the cartel companies and to unnecessary additions to the project, resulting in further kickbacks to political parties and to Petrobras' Directors.

363.   The statements regarding the Company's internal controls were materially false and misleading because Petrobras suffered from material weaknesses in its disclosure controls and procedures, and in its internal controls over financial reporting.  These material weaknesses permitted Defendants to engage in an unprecedented bribery scheme, involving dozens of Petrobras executives and thousands of employees.  Moreover, such weaknesses allowed Petrobras to capitalize the bribe repayments (i.e. the inflated payments under the contract) and treat them as part of those assets' carrying values when recorded on Petrobras' balance sheet, artificially inflating their values, and permitted Defendants to improperly report materially lower expenses and greater net income.  The statements regarding Petrobras' internal controls were materially false and misleading also because Petrobras did not provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the consolidated financial statements.

364.   The statements related to Petrobras' corruption prevention and ethics programs were false and misleading because Petrobras executive were accepting hundreds of millions in bribes from a cartel of builders in return for granting the cartel members inflated contracts paid

with money diverted from Petrobras.  Some of the bribes were in turn funneled into political contributions to prop politicians of Brazil's ruling coalition to which Petrobras executives belonged.  This price-fixing, bribery, and political kickback scheme was hidden from investors. Brazilian authorities allege that during its course, this illegal activity diverted up to $28 billion from Petrobras' coffers.

365.   Defendant Gabrielli's statements in ¶¶ 231 and 260 above were false and misleading because Petrobras did not operate with transparency, did not follow the best practices of corporate governance, and did not invest its resources with efficiency and discipline to ensure returns for its shareholders, investors and society as a whole.  Petrobras was engulfed in a money-laundering and graft scheme, whereby Petrobras executives and other officials accepted bribes from companies to whom Petrobras awarded inflated construction contracts and then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves.  Petrobras continuously tried to cover-up any inquiry into the bribery and corruption, as evidenced by Fonseca's testimony, the squelching of the 2009 inquiry, and the Company's March 2014 statement claiming that Petrobras' "internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations."

366.   Defendant Foster's statements in ¶¶ 277, 291, 297 and 323 above regarding capital discipline and financial monitoring were materially false and misleading because during the Class Period Petrobras' executives were granting contracts to a cartel of construction companies that systemically inflated their costs by as much as 20%.  Defendant Foster's statements in ¶ 339 above regarding Petrobras' transparency and compliance with ethics were false and misleading for the reasons set forth in ¶ 364 above.

367.   PwC's representations made above were false and misleading because (i) the reported carrying value of the Company's assets was materially inflated because costs associated with the repayment of bribe-related expenses to contractors had been incorporated into certain asset carrying values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet; and (ii) had the illegal bribe-related payments been properly accounted for, the Company would have recognized materially greater expenses and less net income.   In addition, PwC intentionally or recklessly ignored material weaknesses regarding Petrobras' internal controls as described herein and had no reasonable basis upon which to issue their statements.

368.   Petrobras' statement made in ¶ 337 above that on "March 31, 2014, our internal commission established to evaluate bribery allegations involving SBM Offshore confirmed that it found no internal evidence to support such allegations" was false and misleading because Defendants were in fact aware that Petrobras executives had accepted $139 millions of dollars in bribes from SBM. As detailed in the Complaint, Defendant Gabrielli also stymied the TCU's investigation into the massive overpayment of the P-57 offshore rig.

369.   The statements made on Facts and Data, above were false and misleading because, as confirmed by a plethora of testimony from whistleblowers, arrests and admissions of guilt detailing the endemic fraud at Petrobras involving, *inter alia*, the Abreu e Lima refinery, Comperj, the Pasadena refinery, and SBM, the Company was systemically paying for inflated contracts in exchange for bribes to Company executives and party officials.

370.   The statements made in ¶¶ 354-358 above regarding the write-off are false and misleading for the reasons stated in ¶¶ 168-181 above.

## VIII.     ADDITIONAL ALLEGATIONS RELATED TO THE SCHEME

371.    On November 9, 2012, *Bloomberg* reported that according to the Brazilian news magazine *Veja*, the Brazilian Federal prosecutor Marinus Marsico has requested information from Petrobras to confirm it spent $1.1 billion to acquire the Pasadena refinery in Texas that it is now looking to sell.[49]  Delta Airlines bought a similar refinery on April 30, 2012, for only $150 million, *Veja* said.  It was reported that the prosecutor's office may open an investigation, depending on Petrobras' reply.    On this news, Petrobras' common ADSs declined 1.97% and Petrobras' preferred ADSs declined 2.03% the next trading day, November 12, and they continued to decline for four more days, as follows: on November 13, Petrobras' common ADSs declined an additional 1.52% and Petrobras' preferred ADSs declined an additional 1.26% on November 14, Petrobras' common ADSs declined an additional 2.59% and Petrobras' preferred ADSs declined an additional 2.76%; on November 15, Petrobras' common ADSs declined an additional 1.38% and Petrobras' preferred ADSs declined an additional 0.79%; on November 16, Petrobras' common ADSs declined an additional 1.5% and Petrobras' preferred ADSs declined an additional 1.54%.  In total, there was a decline of 8.65% for common ADSs and 8.11% for Petrobras' preferred ADSs over the five trading days.

372.    On February 14, 2014, it was reported by *Bloomberg* that Petrobras started an internal investigation related to allegations of bribery payments made by SBM Offshore. Over the next two days that markets were opened for trading, further details about the allegations came to light. On February 18, 2014, *Bloomberg* reported that the Brazilian Comptroller asked Petrobras for information related to the contracts signed with SBM.  *Bloomberg* also reported that on

---

[49]   *Veja* is a Brazilian weekly news magazine published in Sao Paulo and distributed throughout Brazil by media conglomerate Grupo Abril.  It is the leading weekly publication in the country and one of the most influential outlets of the Brazilian press.

February 18, 2014, Foster publicly acknowledged the Company's internal investigation into the SBM bribery allegations. As a result of this news, Petrobras' common ADSs declined for three consecutive trading sessions beginning on February 14, 2014, for a total drop of $0.43 or 3.72%, to close at $11.13 on February 19, 2014. Petrobras' preferred ADSs also declined during these three consecutive trading sessions for a total drop of $0.50 or 4.06%, to close at $11.82 on February 19, 2014.  There was a similar price decline in debt securities.

373.    On March 12, 2014, it was reported that Brazilian lawmakers assembled a committee to investigate kickbacks made to Petrobras by the Dutch firm SBM Offshore, a company that leases floating oil platforms and vessels.  A former SBM employee blew the whistle, alleging that $139 million in bribes were paid to Petrobras officials through intermediaries.[50]   The *quid pro quo* arrangement gave SBM, in turn, preferential treatment for contracts.   "What is happening now with Petrobras, with its shares falling, is the result of misappropriation of public funds," exclaimed opposition Social Democrat lawmaker Vanderlei Macris after the committee's formation was announced.  *Id.*

374.    Over the next five days, covering three trading sessions, a string of news articles was published disclosing new details about the scope and size of the investigation and painting a worsening picture for Petrobras. On March 13, 2014, it was reported in the Brazilian newspaper *O Globo* that members of Brazilian parliament were arguing for expansion of the special commission to investigate bribery allegations, because of fear that some members of the Brazilian government were loyal to Petrobras and its executives.

---

[50] *See* Digital Journal Blog, *Brazil Investigates Alleged Petrobras Graft Case*, March 12, 2014.

375.     Also, on March 13, 2014, *Folha* published an article stating that Brazilian federal police had started a criminal investigation into allegations that Petrobras officials received bribes from SBM.

376.     On March 14, 2014, it was reported by *O Globo* that the TCU, which had previously opened inquiries into Petrobras' dealings with Odebrecht, Abreu e Lima and Comperj refineries, now opened an investigation into the bribery allegations related to SBM.

377.     On March 14, 2014, after the close of trading, *Bloomberg* reported that Opposition lawmaker Antonio Imbassahy proposed a road-map for the congressional commission charged with investigating Petrobras. The road map was presented to leaders of the Brazilian legislature. The following proposals were included in the road map:

- Once the commission is formed to investigate the corruption investigation, it would seek meetings with Petrobras executives.

- Commission would seek assistance from the Prosecutor General's office to obtain access to a separate corruption probe taking place in the Netherlands, in which Petrobras is named.

- Following meetings in Brazil, the commission would travel to the Netherlands to meet and work with Dutch Justice Ministry and other Government agencies investigating SBM Offshore as well as with Dutch Parliament.

- Congress must "supervise" Petrobras.

378.     On March 17, 2014, Petrobras issued a press release announcing that the Company's Board had approved the Company's financial statements for 2013 by a majority vote. The announcement went on to note that:

> Director Mauro Rodrigues da Cunha ***voted against the approval of the Financial Statements*** of Petrobras due to: (i) lack of timely dispatch of the financial statements to the Directors to analyze; (ii) disagreement with the hedge accounting policy; and (iii) ***lack of information and apparent accounting inadequacy of refinery investments.***

379. Also on or about March 17, 2014, the DPF launched operation Car Wash, focused on a scheme run by black-market money dealers who are thought to have illegally transferred and laundered approximately $3.8 billion using, among other things, the purchase and sale of luxury automobiles.

380. On the news that came out between March 13, 2014 and March 17, 2014, Petrobras' common ADSs declined for three consecutive trading sessions, falling $0.15 or 1.40%, $0.17 or 1.61%, and $0.10 or 0.96% respectively, on March 13, 2014, March 14, 2014, and March 17, 2014, for a total three day decline of $0.42 or 3.93%, to close at $10.27 on March 17, 2014.  Petrobras' preferred ADSs also declined for three consecutive trading sessions, falling $0.20 or 1.78%, $0.19 or 1.72%, and $0.18 or 1.66 % respectively, on March 13, 2014, March 14, 2014, and March 17, 2014, for a total three day decline of $0.57 or 5.07% to close at $10.68 on March 17, 2014.  There was a similar price decline in debt securities.

381. On April 8, 2014, *Bloomberg* reported that leaders of the opposition parties filed an injunction with Brazil's Supreme Court to guarantee creation of a parliamentary commission to exclusively investigate Petrobras' purchase of Pasadena.  On the news, Petrobras' common ADSs declined $0.30 or 2.11%, to close at $13.92 and Petrobras' preferred ADSs declined $0.35 or 2.36%, to close at $14.48 on April 8, 2014.

382. On April 9, 2014, the Brazil Senate approved a broader probe involving Petrobras. On this news, Petrobras' common ADSs declined $0.09 or 0.65%, to close at $13.83 and Petrobras' preferred ADSs declined $0.08 or 0.55%, to close at $14.40 on April 9, 2014.  There was a similar price decline in debt securities.

383. The decline in Petrobras securities continued the next trading day as Petrobras' common ADSs declined $0.13 or 0.94%, to close at $13.70 and Petrobras' preferred ADSs

declined $0.19 or 1.32%, to close at $14.21 on April 10, 2014. The total decline over three days was $0.52 or 3.66% for Petrobras' common ADSs and $0.62 or 4.18% for Petrobras' preferred ADSs.

384.    On April 15, 2014, during the trading session, CEO Foster appeared before the Senate of Brazil to offer testimony relating to the Company's purchase of the Pasadena Refinery and allegations regarding bribery.  As part of her statement, CEO Foster revealed that Petrobras was conducting a re-evaluation of all contracts that could have been the subject of participation by Costa.  On this news, Petrobras' common ADSs declined $0.55 or 3.96% to close at $13.33 on April 15, and Petrobras' preferred ADSs declined $0.61 or 4.24% to close at $13.77 on April 15, 2014.

385.    On April 22, 2014, an article was published by *Folha de S.Paulo* that provided details into the purchase of the Pasadena refinery. The article stated that in 2007 the Astra group which originally owned the Pasadena refinery and sold half of it to Petrobras, offered to buy back Petrobras' share in the refinery. Petrobras refused, and in the end, after an extensive legal battle, Petrobras purchased the remaining half still owned by Astra for $885 million bringing the total purchase price for the Pasadena refinery to $1.25 billion.  The refinery was originally purchased by Astra for only $42.5 million in 2005.

386.    On this news, Petrobras' common ADSs declined $0.37 or 2.65%, to close at $13.60 and Petrobras' preferred ADSs declined $0.31 or 2.12%, to close at $14.29 on April 22, 2014.

387.    On April 25, 2014, the Brazilian newspaper *O Estadao de Sao Paulo* reported that an ex-Petrobras official was accused of money laundering.  According to the report, the Federal Court opened a criminal proceeding against the director of the Petrobras supply division.

Specifically, according to the investigation, the embezzlement transactions lasted from 2009 to 2014 and are related to the payment of overpriced contracts to companies who directly or indirectly rendered services to Petrobras, and involved assistance from Costa.  On this news, Petrobras' common ADSs declined $0.23 or 1.68%, to close at $13.50 and Petrobras' preferred ADSs declined $0.21 or 1.45%, to close at $14.27 on April 25, 2014.  There was a similar price decline in debt securities.

388.    On May 8, 2014, *Valor* reported that Petrobras would postpone concluding its internal investigation into the Pasadena refinery purchase for thirty days.  It was expected that the internal investigation, which began on March 24, 2014, would be complete in forty-five days. The findings were to be submitted to the Comptroller, TCU, and other Brazilian regulatory bodies.  On this news, Petrobras' common ADSs declined $0.48 or 3.07%, to close at $15.18 and Petrobras' preferred ADSs declined $0.58 or 3.46%, to close at $16.19 on May 8, 2014.  There was a similar price decline in debt securities.

389.    On May 14, 2014, after the close of trading, the *Wall Street Journal* reported that the Brazil Senate opened the probe into Petrobras' purchase of the Pasadena refinery.  The first action of the Senate panel performing the investigation was to vote on a list of people that would be called before the panel to testify.  The article stated that "Petrobras' current chief executive officer, Maria das Graças Silva Foster, and the CEO before Ms. Foster, José Sergio Gabrielli, are expected to testify next week."

390.    On this news, Petrobras' common ADSs declined $0.32 or 2.05%, to close at $15.27 and Petrobras' preferred ADSs declined $0.24 or 1.45%, to close at $16.27 on May 15, 2014.  There was a similar price decline in debt securities.

391.    On June 17, 2014, *Estadao* reported that another refinery owned by Petrobras has come under investigation by Brazilian authorities. According to the article, the Federal Public Ministry suspects that the Repar refinery in Paraná was subjected to the same scheme that was alleged to have been perpetuated in the Abreu e Lima Refinery, in Pernambuco.  According to the article, the Ministry suspects that contracts were overpriced in the Paraná refining unit and the payments in excess of the true value would later be laundered.  Some of the money may have been transferred to companies that are linked to Costa and Alberto Youssef. Petrobras contracted for the work in Paraná at $ 7.5 billion while a report from the Federal Police, made in April 2014, states that calculations show that the contracts were overpriced by BRL $ 1.4 billion.  On this news, Petrobras' common ADSs declined $0.28 or 1.77%, to close at $15.52 and Petrobras' preferred ADSs declined $0.35 or 2.08%, to close at $16.44 on June 17, 2014.  There was a similar price decline in debt securities.

392.    On July 23, 2014, *Bloomberg* reported that the TCU fined four former top Petrobras officials, including Gabrielli, Costa and Cervero, in a combined amount of $792 million, as a result of improper acts done in connection with the purchase of the Pasadena refinery.  On this news, Petrobras' common ADSs declined $0.47 or 2.67%, to close at $17.15, and Petrobras' preferred ADSs declined $0.76 or 3.99%, to close at $18.28 on July 23, 2014.

393.    On August 12, 2014, after the market closed, *Bloomberg News* reported that a Petrobras-linked money laundering probe had spread to banks. In the article, it stated that prosecutors were investigating whether financial institutions met compliance requirements.  On this news, Petrobras' common ADSs declined $0.72 or 4.45%, to close at $15.46 and Petrobras' preferred ADSs declined $0.84 or 4.88%, to close at $16.37 on August 13, 2014.

394.    On August 22, 2014, *Bloomberg* reported that the Brazilian prosecutors were considering expanding the money-laundering investigation of Petrobras, based on a Brazilian court's consideration to freeze Foster's assets.  On this news, Petrobras' common ADSs declined $0.53 or 2.99%, to close at $17.20, and Petrobras' preferred ADSs declined $0.51 or 2.71%, to close at $18.28 on August 22, 2014.  There was a similar price decline in debt securities.

395.    On September 7, 2014, after the market closed, *Bloomberg News* reported that information was being leaked "to local media from a police investigation into alleged kickbacks involving [Petrobras] in an attempt to alter the results of the October national election."[51]  The article cites a Brazilian magazine, *Veja,* which reported that Costa revealed "a group of politicians, including members and allies of Rousseff's Workers' Party" had accepted bribes linked to Petrobras contracts.  On this news, Petrobras' common ADSs declined $1.03 or 5.31%, to close at $18.35 on September 8, 2014, and Petrobras' preferred ADSs declined $1.03 or 5.08% to close at $19.24 on September 8, 2014.  There was a similar price decline in debt securities.

396.    On September 8, 2014, after the market closed, Petrobras acknowledged the corruption at the Company by issuing a statement concerning Costa's arrest and the federal criminal investigation.  Specifically, a statement issued by Petrobras stated, in part:

> It is in the best interests of the company's management to see the completion of all ongoing investigations. Any irregular acts that may have been committed by a person or group of people, whether or not they are company-employees, do not represent the conduct of the Petrobras institution and its workforce.

397.    On this news, Petrobras' common ADSs declined $0.52 or 2.83%, to close at $17.83 on September 9, 2014, and Petrobras' preferred ADSs declined $0.53 or 2.75%, to close at $18.71 on September 9, 2014.  There was a similar price decline in debt securities.

---

[51]  *Bloomberg*, *Rousseff Ally Says Petrobras Scandal Seeks to Derail Brazil Vote*, September 7, 2014.

398.    On September 12, 2014, the Brazilian newspaper *Folha de S. Paulo* reported that Rousseff stated that she had no affiliations with Costa, who was recently arrested for involvement in Petrobras' corruption scheme.  Dilma stated that she removed Costa from the Company because "*for one, I did not know what he was doing and, secondly, he was not a person I trusted.*"  On this news, Petrobras' common ADSs declined $1.25 or 7.09%, to close at $16.38 and Petrobras' preferred ADSs declined $1.34 or 7.22%, to close at $17.21 on September 12, 2014.  There was a similar price decline in debt securities.

399.    On September 27, 2014, Bloomberg reported that, according to *Veja*, Costa told the Brazilian police that he was approached by members of Dilma Rousseff's 2010 presidential campaign and was asked to donate two million reais. It was further reported by *Valor* that the Government's Ethics Committee said Petrobras failed to provide it with information it requested in August relating to the role of Nestor Cerveró (The Director of Petrobras' International Division) in the Pasadena purchase.  On this news, Petrobras' common ADSs declined $1.76, or 10.69% the next trading day, to close at $14.70 on September 29, 2014, and Petrobras' preferred ADSs declined $1.98 or 11.41%, to close at $15.37 on September 29, 2014.  There was a similar price decline in debt securities.

400.    On September 30, 2014, after the market closed, *Bloomberg News* published an article stating that Duque "stamped and signed at least 6.6 billion Brazilian Reais ($2.7 billion) in contracts for the Abreu e Lima refinery" and recommended to Petrobras' executive board to approve the over-billed contracts in late 2009.[52]  Further, Costa had revealed to prosecutors that "misappropriation of funds also existed in other divisions including the one Duque headed."[53]  On this news, Petrobras' common ADSs declined $0.89 or 6.27%, to close at $13.30 on October 1,

---

[52]   *Bloomberg*, *Probed Petrobras Contracts Reveal Other Signature*, September 30, 2014.
[53]   *Id*.

2014, and Petrobras' preferred ADSs' declined $1.053 or 7.05% to close at $13.84 on October 1, 2014.  There was a similar price decline in debt securities.

401.    On or about October 9, 2014, recordings of testimony by Costa given in Brazilian court were released.  As part of his statement, Costa testified that bribes had been paid in connection with the award of contracts by Transpetro, a segment of Petrobras, implicating Sergio Machado ("Machado"), then the director of Transpetro.  Costa also testified that kickbacks were paid to members of the Workers' Party, the political party of the President of Brazil, Dilma Rousseff.  According to an article by the *Wall Street Journal*, Costa "alleged that a certain percentage of contracts at the refining unit at Petrobras were to go to members of the Workers' Party."[54]  The release of Costa's testimony by the Brazilian federal court, as independently confirmed by *TheStreet.com* caused Petrobras' common ADSs to decline $1.15 or 6.86%, closing at $15.62 on October 10, 2014, and Petrobras' preferred ADSs declined $1.22 or 6.87% to close at $16.55 on October 10, 2014.

402.    On October 15, 2014, the Administrative Council for Economic Defense ("CADE"), an agency of the government of Brazil which was set up to combat corruption, announced that it will formally investigate the existence of a cartel involving enterprises that have contracts with Petrobras.  On this news, Petrobras' common ADSs declined $1.55 or 9.06%, to close at $15.55 and Petrobras' preferred ADSs declined $1.58 or 8.73%, to close at $16.51 on October 15, 2014.

403.    On October 16, 2014, prior to the trading session, news reports circulated of a report issued by the TCU criticizing the management of the construction of the COMPERJ facility, describing the project's management as "reckless" and identifying concerns about inflated

---

[54]  The *Wall Street Journal*, *Ex-Petrobras Executive Says Kickbacks Were Paid to Ruling Party's Officials*, October 9, 2014.

contracts costs.  The TCU report stated that Petrobras will spend 60 percent more than originally budgeted at one of its refineries.[55]  Specifically, the TCU concluded that Petrobras will pay $21.6 billion to complete Comperj.  Comperj is an integrated refining and petrochemical complex that broke ground in 2008, began construction in 2010, and is scheduled to start up on 2015.  The TCU found "discrepancies between different government agencies, as well as within different Petrobras divisions, over investment needed for Comperj."  Moreover, the TCU concluded that Petrobras' management had been "reckless with irregularities in the omission of technical analyses, overpaying for contracts and a lack of effective controls."  One member of the TCU commented that it was "investigating how the structure of Petrobras can undertake such a huge project in such a sloppy way."  The TCU found "irregularities in three contracts: two that were overpaid and one that was signed in an 'emergency' time-frame that didn't allow other companies to bid."  On this news, Petrobras' common ADSs declined $1.05 or 6.75%, to close at $14.50 on October 16, 2014, and Petrobras' preferred ADSs declined $1.30 or 7.87% to close at $15.21 on October 16, 2014. There was a similar price decline in debt securities.

404.    On October 18, 2014, at a news conference during the day, Rousseff admitted that there was embezzlement of public money in Petrobras and that the Brazilian government would seek reimbursement of any money illegally diverted from the Company.  Petrobras' common ADSs declined $0.93 or 6.23%, to close at $14.00 on October 20, 2014, and Petrobras' preferred ADSs declined $1.08 or 6.90% to close at $14.57 on October 20, 2014.  There was a similar price decline in debt securities.

405.    On October 20, 2014, after the market closed, *Bloomberg News* published a detailed article about the money laundering and bribery scheme.  The article noted that Costa had admitted

[55] *Bloomberg*, *Petrobras Accused of Recklessness by Audit Court on Overruns*, October 16, 2014.

to investigators through his testimony on October 8, 2014, that for at least seven years he and other Petrobras officials accepted bribes "from companies to whom Petrobras awarded inflated construction contracts" and "then used the money to bribe politicians through intermediaries to guarantee they would vote in line with the ruling party while enriching themselves."[56]  The article further stated that Costa had admitted that he personally received tens of millions of dollars and called the bribes from the companies a "three percent political adjustment."  Costa named several construction companies that were part of the cartel, including Odebrecht and Camargo Correa S.A.  The article continued that, as part of the criminal case against Costa, prosecutors emphasized that there was "evidence of fraud, overpricing and kickbacks" in at least seven contracts, including one contract for a 3.4 billion Brazilian Reais coking unit and another contract for a 3.19 billion Brazilian Reais hydro-treater and related units.  The contract for the coking unit was cited by prosecutors as evidence of overpricing and over-billing of as much as 446 million Brazilian Reais.  Indeed, according to federal court documents reviewed by *Bloomberg News,* Costa and Duque signed off on the coking unit and hydro-treater contracts and they sent them to Petrobras' executive board, where they were approved. Moreover, in response to Costa implicating Duque in the bribery investigation related to RNEST, Duque responded that the "final decision on all contracts is made collectively by directors and the CEO."  The article also noted that Costa had implicated Youssef for creating fake import Companies to launder the kickbacks.  Consequently, Youssef had revealed to prosecutors and police in his own testimony "how he laundered money overseas from overpriced Petrobras contracts and how he distributed money from construction companies, in cash, to politicians."

---

[56]   *Bloomberg*, *Petrobras 'Human Bomb' Revelations Fixate Brazil as Vote Looms*, October 20, 2014.

406.    Also on October 20, 2014, it was reported that an audit conducted by the TCU related to Comperj found that the project was "riddled with delays, cost overruns and reckless management."[57]

407.    As a result of the revelations that occurred on October 20, 2014, after the close of trading, Petrobras' common ADSs declined $0.80 or 5.71%, to close at $13.20 on October 21, 2014, and Petrobras' preferred ADSs declined $0.98 or 6.73% to close at $13.59 on October 21, 2014.

408.    On October 22, 2014, *Bloomberg* reported that according to an article from *Valor*, the TCU will investigate a payment of $434 million to Bolivia made by Petrobras as a compensation for noble gas components used in a supply agreement of Bolivian gas.  On this news, Petrobras' common ADSs declined $0.37 or 2.80%, to close at $12.83, and Petrobras' preferred ADSs declined $0.35 or 2.58%, to close at $13.24 on October 22, 2014.

409.    On October 22, 2014, after the markets closed, *Bloomberg* reported securities regulators would also begin an inquiry into whether Petrobras violated securities laws.  The article stated, in part:

> The CVM, as the securities agency is known, announced the "administrative procedure" on its website yesterday without providing details. The regulator's press office declined to comment on the case when contacted by telephone. Petrobras declined to comment on the CVM probe in an e-mailed response.

410.    On this news, Petrobras' common ADSs declined $0.72 or 5.61%, to close at $12.11 and Petrobras' preferred ADSs declined $0.88 or 6.65%, to close at $12.36 on October 23, 2014.  There was a similar price decline in debt securities.

---

[57]  ICIS News, *Overruns, recklessness riddle Petrobras Comperj project—audit*, October 20, 2014.

411.   On October 27, 2014, Petrobras issued a press release entitled "Internal steps taken by Petrobras in response to 'Lava Jato Operation.'"   The Company noted that it was taking certain steps in response to the developing investigation, including:

> sign[ing] contracts with two independent investigation companies, a Brazilian and an American, with the aim of examining the nature, extension and impacts of the actions that might have been performed against the Company in the context of what have been said by former Director Paulo Roberto Costa. These companies will also analyze correlated facts and circumstances that might have material impact over the Company's business.

412.   On this news, Petrobras' common ADSs declined $1.77 or 13.69%, to close at $11.16 on October 27, 2014, and Petrobras' preferred ADSs declined $1.97 or 14.64% to close at $11.49 on October 27, 2014.  There was a similar price decline in debt securities.

413.   On October 29, 2014, an article was published by *bidnessetc.com* reporting that Petrobras entered into agreements with private investigators both from Brazil and the U.S. to probe the "extent, nature, and impact of the allegedly illegal act of corruption," which includes the Company's officials and other politicians, including Rousseff.  On this news, Petrobras' common ADSs declined $0.47 or 4.02%, to close at $11.21, and Petrobras' preferred ADSs declined $0.51 or 4.22%, to close at $11.57 on October 29, 2014.   There was a similar price decline in debt securities.

414.   On November 1, 2014, the Brazilian newspaper *O Estado de Sao Paulo* reported that Petrobras' auditor, PwC had declined to sign off on the Company's third quarter financial results in light of the money-laundering and bribery investigations.  Specifically, PwC refused to sign off on the financial results for one of Petrobras' subsidiaries, Transpetro, as they were signed by Machado, the Petrobras executive implicated by Costa.  PwC urged the Company to take action to dismiss Machado.  On November 3, 2014, Machado agreed to take a 31-day unpaid leave of absence.  Also on November 3, 2014, Petrobras issued a press release announcing that Machado

had "presented a letter to the Board of Directors of this subsidiary requesting a non-paid leave for the next 31 days."  On this news, Petrobras' common ADSs declined $0.44 or 3.76% to close at $11.26 on November 3, 2014, and Petrobras' preferred ADSs declined $0.56 or 4.58% to close at $11.67 on November 3, 2014.  There was a similar price decline in debt securities.

415.    On November 9, 2014, the *Financial Times* reported that the DOJ had opened a criminal investigation on whether Petrobras or its employees were paid bribes and that the SEC had opened a civil investigation into the matter.[58]  Specifically, the *Financial Times* reported that the DOJ and the SEC were investigating whether Petrobras or its employees, middlemen or contractors had violated the Foreign Corrupt Practices Act.  On this news, Petrobras' common ADSs declined $0.28 or 2.57%, to close at $10.62 on November 10, 2014, and Petrobras' preferred shares declined $0.23 or 2.04% to close at $11.04 on November 10, 2014.

416.    On November 13, 2014, *Bloomberg* reported that Brazil's federal comptroller general ("CGU") initiated a proceeding against SBM to investigate whether it gained unfair advantages by bribing Petrobras officials.  On this news, Petrobras' common ADSs declined $0.36 or 3.41%, to close at $10.20, and Petrobras' preferred ADSs declined $0.46 or 4.19%, to close at $10.52 on November 13, 2014.  There was a similar price decline in debt securities.

417.    On November 13, 2014, after the market closed, the Company issued a press release acknowledging that if the allegations in Costa's testimony were true, they "could potentially impact the Company s financial statements."  As a result, the Company delayed releasing the financial statements for the third quarter 2014, stating that it would need additional time to:

> (i)    deeply analyze the investigation in course; (ii) adjust the Company based on the allegations of "Operacao Lava Jato;" and (iii) evaluate the need of improving governance control, the Company isn't ready to publish its

---

[58]  *Financial Times*, *US Turns Up Heat With Criminal Investigation Into Petrobras*, November 9, 2014.

balance sheet regarding the third quarter of 2014 on this date.

418.    Then, on November 14, 2014, prior to the trading session, Petrobras revealed that it would "release its third quarter 2014 financial statements, *without a review by its Independent Auditors."*  Petrobras further noted that:

> In light of the ongoing investigations, *it is currently not possible for the Company to determine an estimated date* for the disclosure of its Quarterly Financial Statements (ITR) for the period ended 09.30.2014, together with the review report issued by the Independent Auditors.

419.    That same day, it was reported in various media outlets including *Reuters*, that the Brazilian police issued 27 arrest warrants and, arrested 18 individuals including Duque and Erton Medeiros Fonseca, a director of engineering and infrastructure at Galvao Engenharia S.A.  Also, one of Petrobras' contractors, Odebrecht, confirmed that "its offices in Rio de Janeiro had been searched and documents seized."[59]

420.    On November 14, 2014, Bank of America/Merrill Lynch downgraded Petrobras' stock following revelations of lack of management integrity on the market:  "We are downgrading Petrobras' stock from Buy to Neutral, following postponement of its third quarter earnings release until December 12 due to uncertainty as to financial effects of results of an investigation by the Brazilian Federal Police into charges of money laundering and organized crimes allegedly committed by a former director of the company and other individuals."  On this news, Petrobras' common ADSs declined $0.25 or 2.45%, to close at $9.95 on November 14, 2014, and Petrobras' preferred ADSs declined $0.29 or 2.76% to close at $10.23 on November 14, 2014.  There was a similar price decline in debt securities.

---

[59]   Reuters, *Petrobras Ex-Director Arrested, Shares Sink Amid Graft Scandal*, November 14, 2014.

421.    On November 17, 2014, Petrobras hosted a conference call for analysts and investors to discuss certain aspects of the Company's operations for the third quarter of 2014, provide additional detail regarding the Company's delayed financial statements, and offer commentary on the effects on Petrobras of the unfolding bribery accusations.

422.    In connection with these results, CEO Foster stated in part:

> In light of the accusations and investigations of [O]peration Car Wash . . . Petrobras is unable to publish its third-quarter 2014 financial statements because these accusations, if found to be true, could potentially affect the Company's financial statements.
>
> A determining fact took place on October 8, 2014, when the depositions of former Downstream Executive Director, Mr. Paulo Roberto Costa, and Mr. Alberto Youssef, in a hearing at the 13th Federal Court of Parana, revealed information that may lead to possible adjustments in the financial statements of our Company.
>
> Because of these depositions, therefore, **we need more time to make any possible adjustments to the financial statements.** More time is needed as well to gain greater understanding from the ongoing investigations by the independent law firms; and **we need more time, as it is fundamentally important to improve our internal controls.**

Later, during the question-and-answer portion of the call, CFO Barbassa and CEO Foster engaged in the following exchanges in part:

> [Analyst]: [I]f we suppose . . . BRL5 billion of overprice in the construction of [an asset], how would this be recognized in the balance sheet of the Company? What are the main line items that would be impacted?
>
> **CFO Barbassa:** The adjustment that perhaps could be impacted if the accusations are proven to be true would refer to adjustments at fair price of the PP&E that was acquired. . . . In this case, **this value should be removed from PP&E line item [adjusted] value** and should be taken to the result.
>
> **CEO Foster:** As for the amounts that we would be writing down in terms of our results, our official reference are the depositions made in court. This was what the judges are calling evidence, temporary evidence. So in this case, we have a schedule of activities and we have deadlines to each one of these activities.
>
> For example, there is definition of criteria to measure the effects of losses caused by fraud. In here, **in an objective and material fashion, our reference will be the depositions made so far,** the evidence provided that will be submitted to Petrobras

by the Federal Police. ***We will then use this evidence to have our writedowns, and do the write-downs year after year*** regarding companies A, B, C or D that we might have contracted.

Later in the day, in an article published by *Agencia Brasil,* Foster confirmed that SBM bribed Petrobras employees to win contracts. Foster stated that due to the "overwhelming evidence of noncompliance," SBM "will no longer be eligible to bid for further contracts with Petrobras."[60] Moreover, Foster admitted the following: "We [were] informed in the past that we had identified no irregularities at this matter. After a few weeks or months, I was informed that there were indeed bribes to employees or former employees of Petrobras." Jose Formigli, Petrobras' Head of Exploration and Production, also revealed the following:

> The CEO received a call and a letter where SBM said it had been told of credits to accounts in Switzerland by Public Prosecution in the Netherlands. This overwhelming evidence outright – it's the company's own admission that I was aware of [the bribery].

423.    As a result of the Company's conference call and revelation of SBM bribing Petrobras' employees, Petrobras' common ADSs declined $0.62 or 6.23%, to close at $9.33 on November 17, 2014, and Petrobras' preferred ADSs declined $0.59 or 5.77% to close at $9.64 on November 17, 2014.

424.    On November 20, 2014, it was reported in various media outlets in Brazil that a request was made to the Brazilian Prosecutor's Office in the Federal District and the Public Prosecutor at the Federal Audit Court for the immediate dismissal of Foster as the CEO of Petrobras and to establish a criminal inquiry into the matter.  According to a news article published by *Folha de S. Paulo*, the request argued that Foster did not testify truthfully herself when she testified at a hearing on June 11, 2014 before a congressional investigation committee looking into

---

[60]    Agencia Brasil, *Petrobras CEO Admits SBM Offshore Bribed Officials*, November 18, 2014.

the scandal, the CPI.[61]  Specifically, Foster testified falsely that Petrobras didn't receive any warning from Netherland's authorities concerning bribery payments by SBM to Petrobras' employees.

425.   On November 24, 2014, an article in the Brazilian newspaper *O Globo* reported that at the June 11, 2014 hearing, Foster was asked if Petrobras had identified any evidence of payments amounting to $139 million to Petrobras employees or executives by SBM.  Foster answered that the Company's internal committee "did not identify, within its activities and scope, payments of any benefits to any of our employees."  Next, Foster was asked whether Petrobras already knew about the suspicion of bribery to Petrobras employees since 2012. Foster answered, "I do not confirm this information."  On this news Petrobras' common ADSs declined $0.34 or 3.14%, to close at $10.50 on November 24, 2014, and Petrobras' preferred ADSs declined $0.38 or 3.32% to close at $11.06 on November 24, 2014.

426.   Also on November 24, 2014, after the trading session, Petrobras issued a press release announcing that the Company had received a subpoena from the SEC on November 21, 2014.  The press release revealed that Petrobras was under investigation by the SEC and that the Company would be required to produce certain documents to the agency.  Also on that date, during trading hours, it was reported that a construction company executive under arrest had handed over to police what he said are receipts for bribes paid to Brazilian state oil giant Petrobras.  Defense lawyers for Erton Medeiros Fonseca, head of construction firm Galvao Engineering, presented police with receipts for bribes allegedly paid to a representative of former Petrobras director Renato Duque.  On this news, Petrobras's common ADSs declined $0.11 or 1.05%, to close at

---

[61]   *Folha De S.Paulo*, *Opposition Party Demands Graca Foster's Immediate Withdraw From Petrobras' Presidency*, November 20, 2014.

$10.39, and Petrobras' preferred ADSs further declined $0.04 or 0.36%, to close at $11.02 on November 25, 2014.  There was a similar price decline in debt securities.

427.    On November 28, 2014, *Bloomberg* reported that according to *Valor*, Lava Jato investigators had advanced their findings on the structure used to embezzle Petrobras funds to offshore bank accounts and tax haven territories, including finding that money was diverted to Chinese banks to be redistributed to dozens of secret bank accounts in Europe. The article detailed how several documents obtained from foreign banks were analyzed and stated that Brazilian investigators expected more information to be revealed by Swiss authorities on that date. On this news, Petrobras' common ADSs declined $0.88, or 8.3%, to close at $9.72 on November 28, 2014, and Petrobras' preferred ADSs declined $1.00, or 8.92%, to close at $10.21 on November 28, 2014.

428.    On November 30, 2014, an article published by *Estadao* reported that Machado, would be resigning due to his alleged involvement in the Petrobras corruption scheme. Additionally on November 30, 2014, an article was published by *bidnessetc.com*, reporting that corruption charges were dampening prospects for Petrobras and the Brazilian economy. The article stated, in part:

> As a result of the corruption charges Petrobras has delayed announcing third-quarter earnings for the fiscal year (FY) 2014. Morgan Stanley analyst Bruno Montanarai, indicated that the delay basically because of Petrobras' fear that some of its bond holders could, as a result of the charges, be given the right to demand immediate payments. As a result the company, in a precautionary move has delayed the release of earnings until the full extent of corruption charges is known.
>
> If the company does face this particular situation then it would be forced to issue new shares which could reduce the ownership stake of the government.

429.     On this news, Petrobras' common ADSs declined $0.60 or 6.17%, to close at $9.12 on December 1, 2014, and Petrobras' preferred ADSs declined $0.56, or 5.48%, to close at $9.65 on December 1, 2014.  There was a similar price decline in debt securities.

430.     On December 2, 2014, it was reported that the corruption allegations may affect Petrobras' credit quality to the extent it slows production growth, affects access to debt capital markets, and receives monetary penalties, according to Fitch Ratings.   On this news, Petrobras' common ADSs declined $0.12 or 1.32%, to close at $9.00, and Petrobras' preferred ADSs declined $0.14 or 1.45%, to close at $9.51 on December 2, 2014.  There was a similar price decline in debt securities.

431.     On December 4, 2014, *Bloomberg* reported that Costa testified during a hearing before a congressional committee investigating Petrobras that he "personally" informed Petrobras' Board about the irregularities in 2009 and that he sent an e-mail to the ministry of the presidency when Rousseff headed both entities (the Company's board and the ministry).   On this news, Petrobras' common ADSs declined $0.36 or 3.88%, to close at $8.91, and Petrobras' preferred ADSs declined $0.39 or 3.97%, to close at $9.44 on December 4, 2014.  There was a similar price decline in debt securities.

432.     On December 5, 2014, before the market opened, it was reported that the alleged criminality at Petrobras "came from inside out, *i.e.* from Petrobras' institutional structure itself." On this news, Petrobras' common ADSs declined $0.09 or 1.01%, to close at $8.82, and Petrobras' preferred ADSs declined $0.04 or .42%, to close at $9.40 on December 5, 2014.  There was a similar price decline in debt securities.

433.     On December 5, 2014, after market hours, *Bloomberg* reported that the Brazilian authorities were now investigating foreign companies, including AP Moeller-Maersk A/S

regarding allegations that they bribed Petrobras executives in exchange for contracts, widening the probe from local suppliers to companies working on oil projects throughout the globe.   On this news, Petrobras' common ADSs declined $0.59 or 6.69%, to close at $8.23 the next trading day on December 8, 2014, and Petrobras' preferred ADSs declined $0.65, or 6.91%, to close at $8.75 on December 8, 2014.  There was a similar price decline in debt securities.

434.    On December 10, 2014, several damaging news reports were published regarding the corruption scandal at Petrobras.  According to an article in *Valor*, the illegal kickbacks paid as part of the scheme may have involved at least R$20 billion.  According to an article published in the *Wall Street Journal*, Brazilian police indicted thirteen suspects in the corruption probe. According to an article published by *SeekingAlpha.com*, Petrobras faced limited financing options as the widening corruption probe threatened to temporarily leave it out of capital markets.  On this news, Petrobras' common ADSs declined $0.40 or 4.91%, to close at $7.75 on December 10, 2014, and Petrobras' preferred ADSs declined $0.45, or 5.14%, to close at $8.31 on December 10, 2014. There was a similar price decline in debt securities.

435.    On December 11, 2014, *Bloomberg* reported that Brazilian prosecutors would seek the return of at least R$1 billion as part of their corruption probe involving Petrobras. On this news, Petrobras' common ADSs declined $0.33 or 4.26%, to close at $7.42 on December 11, 2014, and Petrobras' preferred ADSs declined $0.33, or 3.97%, to close at $7.98 on December 11, 2014.

436.    On December 12, 2014, *Valor* reported that internal Company documents showed that Petrobras' Board of Directors, including its chairman, Graca Foster, were informed of the irregularities in the Company long before the revelation of the Lava Jato scandal.  Also on December 12, 2014, *Bloomberg* reported that, according to *Folha*, the Brazilian opposition was demanding Foster's dismissal based on the *Valor* article concerning Fonseca's newest emails to

Foster, and included many declarations of the opposition parties, including one of the PSDB party's representative stating that "the new information is proof that the Petrobras' CEO had knowledge of the illegal activities in the company for years, which is a serious offense and places her [Foster] in a very delicate position."  On this news, Petrobras' common ADSs declined $0.31 or 4.18%, to close at $7.11, and Petrobras' preferred ADSs declined $0.41 or 5.14%, to close at $7.57 that day.  There was a similar price decline in debt securities.

437.    Also on December 12, 2014, after the close of trading, an article was published on *Bloomberg*, reporting that Petrobras would delay announcing its third quarter results for the third time due to disagreements within management as to the size of the write offs related to the corruption probe.  On this news, Petrobras' common ADSs declined $0.85 on the next trading day, or 11.95%, to close at $6.26 on December 15, 2014, and Petrobras' preferred ADSs declined $0.91, or 12.02%, to close at $6.66 on December 15, 2014.  There was a similar price decline in debt securities.

438.    Shares of Petrobras fell as the Company announced, after market hours on December 23, 2014, the formation of a Special Committee for an internal investigation into corruption allegations.  On this news, Petrobras' common ADSs declined $0.11 or 1.43%, to close at $7.60, and Petrobras' preferred ADSs declined $0.04 or 0.50%, to close at $7.95 on December 24, 2014.

439.    On December 29, 2014, *Valor* reported that the leader of the House of Representatives, Eduardo Cunha, indicated that "there [were] people involved from the start" in the bribery scheme, and that Foster was part of the meetings that approved the majority of the illicit investments.  On this news, Petrobras' common ADSs declined $0.12 or 1.62%, to close at

$7.27, and Petrobras' preferred ADSs declined $0.16 or 2.08%, to close at $7.55 on December 29, 2014.

440.    On January 1, 2015, after the close of trading, an article was published on *PetroGlobalNews.com*, reporting that Petrobras was teetering close to technical default as bondholders push for delayed results.  Additionally, on January 2, 2015, an article was published by *bidnessetc.com*, reporting that in addition to the Petrobras investigation being conducted by Brazilian federal police and prosecutors, the Brazilian Market Regulator (CVM) would also begin an investigation into corruption at Petrobras.  On this news, Petrobras' common ADSs declined $0.54, or 7.4%, to close at $6.76 on January 2, 2015, and Petrobras' preferred ADSs declined $0.63, or 8.31%, to close at $6.95 on January 2, 2015.

441.    On January 4, 2015, a Sunday, an article was published on Bloomberg, reporting that Petrobras bondholders were pursuing efforts to force the Company to speed up its assessment of losses related to the corruption scandal, which could cause the Company to be declared technically in default on some of its foreign debt.  On January 5, 2015, it was reported by *Bloomberg* that, according to *Folha*, an internal audit of Petrobras' Comperj Project revealed an R$1 billion loss.  On this news, Petrobras' common ADSs declined $0.69, or 10.21%, to close at $6.07 on January 5, 2015, and Petrobras' preferred ADSs declined $0.69, or 9.93%, to close at $6.26 on January 5, 2015.  There was a similar price decline in debt securities.

442.    On January 12, 2015, *Bloomberg* reported that according to a report issued by a Bank of America analyst, a downgrade of Petrobras bonds to junk status could not be ruled out.  Also, on January 12, 2015, *Bloomberg* reported that Petrobras was delaying projects including a multibillion-dollar refinery after banning builders allegedly involved in the scheme. On this news,

Petrobras' common ADSs declined $0.49, or 6.94%, to close at $6.57 on January 12, 2015, and Petrobras' preferred ADSs declined $0.53, or 7.4%, to close at $6.63 on January 12, 2015.

443.    On January 17, 2015, *O Globo* reported that Cervero blamed Petrobras' Board for errors at the Pasadena refinery.  On January 18, 2015, *Bloomberg* reported that according to *Folha*, Petrobras may lose $3.2 billion related to the Abreu e Lima Refinery. On this news, Petrobras' common ADSs declined $0.25, or 3.54% on the next trading day, to close at $6.81 on January 20, 2015, and Petrobras' preferred ADSs declined $0.08, or 1.11%, to close at $7.11 on January 20, 2015.  There was a similar price decline in debt securities.

444.    On January 23, 2015, *Bloomberg* reported that Brazilian prosecutors were preparing to announce a new round of accusations regarding Lava Jato participants.  Additionally, on the same day, *Bloomberg* reported that Petrobras was still evaluating possible write-down of assets and projects for regulatory filing.

445.    On this news, Petrobras' common ADSs declined $0.40 or 5.23%, to close at $7.25, and Petrobras' preferred ADSs declined $0.36 or 4.52%, to close at $7.61 on January 23, 2015.

446.    On January 27, 2015, the *New York Times* reported that Petrobras decided not to take the corruption-related charge against earnings on its delayed third-quarter results after the Company's Board failed to agree on the extent the graft has inflated the value of its assets.[62] Instead, the Board decided to publish quarterly results without the write-off.  News sources report that Petrobras' Board held a "marathon meeting" on January 27 that lasted about 10 hours, where two of President Rousseff's top appointees, Defendant Foster and Petrobras' current chairman and former finance minister heatedly disagreed about releasing a $30 billion write-down partially tied

---

[62]   The *New York Times*, *Brazil's Petrobras Decides Not to Take Graft Writedown-Paper*, January 27, 2015.

to the scandal-related losses.[63]  Reportedly, the chairman left in the middle of the meeting to call Rousseff, telling his political benefactor that the $30 billion was a bad number conjured up by faulty methodology.  Rousseff agreed.  Later that evening, Defendant Foster had a different message for Rousseff.  In a phone call, Foster expressed the opinion that under Brazilian law the $30 billion figure, whether faulty or not, had to be released because if the board now knew the number, the market had a right to know it as well.  After the dramatic showdown, it was initially concluded that the number would, in fact, be included in a note to Petrobras' overdue third-quarter earnings.

447.   On January 28, 2015, Defendant Foster acknowledged that "the testimonies examined by Petrobras have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments." Nevertheless, Petrobras released its delayed unaudited third-quarter results without the graft write-down, leaving investors in the dark over the financial impact of the multi-billion dollar corruption scandal.  It was reported that after initially concluding to take the write-down, the Board reversed itself under pressure from Chairman and former Finance Minister Guido Mantega, who is close to Brazil's ruling Workers' Party.

448.   After the meeting, Petrobras said in a statement that it *"understands that it will be necessary to make adjustments at the financial statements to correct the [carrying] values of fixed assets that may have been impacted by amounts related to misconducts made by suppliers, politicians, Petrobras employees and other groups in the context of the Lava Jato operation."*

---

[63]   *Bloomberg*, *A $30 Billion Difference of Opinion Let to Petrobras CEO Firing*, March 3, 2015.

(emphasis added).  The revisions were necessary because court documents show "illicit acts, such as suppliers' cartelization and bribes received by former employees," Petrobras said.

449.    Caving to Rousseff, Defendant Foster changed her tune.  Foster said it was "impractical" to quantify the write-down because it was not easy to separate corruption-related charges from those caused by other factors.  Brazilian accounting experts questioned that explanation.  "There is no reason for the company not to have estimated, even in a provisional way, the write-downs related to corruption," said Reginaldo Goncalves, an accounting professor at Faculdade Santa Marcelina, a Sao Paulo university.  "I have the strong impression that this is the government trying to avoid the inevitable."

450.    "Without the write-down, what's the point?" wrote analyst Ricardo Kim of XP Investimentos, a Brazilian brokerage firm.

451.    On this news, Petrobras' common ADSs declined $0.89 or 11.95% to close at $6.56 on January 28, 2015, and Petrobras' preferred shares declined $0.92 or 11.70% to close at $6.94 on January 28, 2015.  There was a similar price decline in debt securities.[64]

452.    On January 30, 2015, *Bloomberg* reported that Moody's downgraded Petrobras rating to "Baa3" as a result of the corruption probe.  The *Wall Street Journal* published an article on the same date, stating that:

> Moody's said it downgraded the company's unsecured debt from Baa2 to Baa3 and lowered Petrobras' baseline credit assessment from ba1 to ba2, based on "concerns about corruption investigations" and "uncertainty about the timely delivery of audited financial statements [that] could lead to significant liquidity pressures." Moody's said the ratings "remain on review for further downgrade."

---

[64]    *See also* The *New York Times*, *Petrobras Shares Sink After Third-Quarter Results Exclude Graft Write-Downs*, January 28, 2015.

On this news, Petrobras' common ADSs declined $0.39 or 6.09%, to close at $6.01, and Petrobras' preferred ADSs declined $0.46 or 6.96%, to close at $6.15 that day.  There was a similar price decline in debt securities.

453.    On February 6, 2015, Petrobras announced that it had appointed a new chief executive, choosing the head of the nation's Banco do Brasil, Aldemir Benedine, to take charge of Petrobras.  Mauro Cunha, who represents minority shareholders on the 10-member board, said he learned about Bendine's appointment from news reports before the Board even had a chance to vote on the appointment:  "We have seen today an episode of disrespect for the board of directors of Petrobras," Cuhna stated.   "Once again the controlling shareholder (the government) has imposed its will over the interests of Petrobras, ignoring the appeals of long-term investors."  Anger at state interference led all three independent Board members to vote against Bendine's appointment.   In a similar vein, Silvio Sinedino, a representative of the Company's unionized employees, said he voted against Bendine and five other senior appointments in protest over the political nature of the appointments and the failure to consult the Board and Company workers.  Sinedino demanded that Petrobras set objective criteria for naming senior executives, and blamed a history of political interference in the selection of top-level Petrobras managers for the corruption scandal that has engulfed the Company.

454.    "Markets wanted a name to bring Petrobras the credibility and the corporate governance lacking today.  Those hopes were ended with Bendine.  It is not a question of whether he is competent or not but rather that he is linked to Dilma," said Marcelo Varejao, an investment analyst with Sao Paulo brokerage Socopa.

455.    On this news, Petrobras' common ADSs declined $0.57 or 8.02% to close at $6.54 on February 6, 2015, and Petrobras' preferred ADSs declined $0.63 or 8.73% to close at $6.59 on February 6, 2015.  There was a similar price decline in debt securities.

456.    On February 10, 2015, *Bloomberg* reported that Petrobras might take a R$10-20 billion write-down.  On this news, Petrobras' common ADSs declined $0.49 or 7.29%, to close at $6.23, and Petrobras' preferred ADSs declined $0.41 or 6.10%, to close at $6.31 on February 10, 2015.  There was a similar price decline in debt securities.

457.    On February 19, 2015, *Bloomberg* reported that the investment fund of George Soros (Soros Fund Management), which manages about $28 billion, sold all its Petrobras shares based on news about Petrobras.  Additionally, *Bloomberg* reported that Judge Moro refused to release four executives (João Ricardo Auler, Dalton dos Santos Avancini and Eduardo Hermelino Leite, of Camargo Corrêa, and Ricardo Ribeiro Pessoa, of UTC) who had been accused of participating in Petrobras' corruption scheme, because their release would pose a  threat to the public order and to the integrity of the judicial system.  On this news, Petrobras' common ADSs declined $0.33 or 4.73%, to close at $6.64, and Petrobras' preferred ADSs declined $0.35 or 4.94%, to close at $6.73 on February 19, 2015.  There was a similar price decline in debt securities.

458.    On February 24, 2015, after the market closed, Moody's Investors Service cut Petrobras' bonds to junk, stripping them of their investment grade rating, as the Company faced a widening corruption probe.  The downgrade "reflects increasing concern about corruption investigations and liquidity pressures," Nymia de Almeida, an analyst at the rating company, said in a statement.  "Petrobras was already living the perfect storm," Adriano Pires, the head of Rio de Janeiro-based energy and infrastructure consulting firm CBIE, said.  "Now it is even worse."

459.    On this news, Petrobras' common ADSs declined $0.37 or 5.39% to close at $6.49 on February 25, 2015, and Petrobras' preferred ADSs declined $0.47 or 6.72% to close at $6.52. There was a similar price decline in debt securities.

460.    On February 28, 2015, the Brazilian newspaper *Folha de Sao Paulo* reported that two executives of the contractor Camargo Correa executed plea agreements with the prosecutors and the federal police (Dalton Avancini and Eduardo Leite, CEO and Vice-President, respectively).  Both were said to be close to Youssef and had been charged with paying R$ 40 million in bribes associated with the Abreu e Lima refinery.  On this news, Petrobras' common ADSs declined $0.26 or 3.92%, to close at $6.37, and Petrobras' preferred ADSs declined $0.21 or 3.13%, to close at $6.50 on the following day, Monday, March 2, 2015.

461.    On March 3, 2015, after the market closed, *Bloomberg* reported that a difference of opinion on a write-down of $30 billion in Petrobras assets led Rousseff to fire Foster earlier that year.  Additionally, on March 4, 2015, the *Financial Times* reported that the Brazilian Attorney General sought the Brazilian Supreme Court's approval to investigate 28 cases involving 54 people, mostly politicians whose names have not yet been disclosed, in connection with the Petrobras corruption.  On this news, Petrobras' common ADSs declined $0.23 or 3.59%, to close at $6.18, and Petrobras' preferred ADSs declined $0.28 or 4.31%, to close at $6.21 on March 4, 2015.  There was a similar price decline in debt securities.

462.    On March 8, 2015, after the market closed, the *Financial Times* reported that documents released by a Brazilian court outlined the alleged use of Swiss bank accounts for the payment of bribes in the Petrobras scandal.  Additionally, on March 9, 2015, the website 247 *Wall St.* revealed further content on the progress of the Lava Jato investigations, reporting a court ruling that 54 Brazilian politicians would indeed be added to the investigation.  On this news, Petrobras'

common ADSs declined $0.37 or 6.21%, to close at $5.59, and Petrobras' preferred ADSs declined $0.35 or 5.80%, to close at $5.68 on March 9, 2015.  There was a similar price decline in debt securities.

463.    On March 10, 2015, the *Wall Street Journal* reported that, while testifying at the CPI, Pedro Barusco said he amassed nearly $100 million in bribes as part of the scheme.  This was the first time Barusco had spoken publicly about the corruption scandal at the state-run company. On this news, Petrobras' common ADSs declined $0.29 or 5.19%, to close at $5.30, and Petrobras' preferred ADSs declined $0.21 or 3.70%, to close at $5.47 on March 10, 2015.  There was a similar price decline in debt securities.

464.    On March 12, 2015, *Bloomberg* and the Brazilian newspaper *Valor Econômico* reported that Gabrielli spoke at a hearing before the CPI and acknowledged that the corruption and the bribes involved "*some people and some suppliers*" and that there was no way to know on a day-to-day basis whether an individual was embezzling money.  On this news, Petrobras' common ADSs declined $0.20 or 3.70%, to close at $5.21, and Petrobras' preferred ADSs declined $0.29 or 5.16%, to close at $5.33 on March 12, 2015.  There was a similar price decline in debt securities.

465.    On March 13, 2015, *Bloomberg* reported that Petrobras would seek to extend the deadline to publish audited results by six months in order to avoid the acceleration of payments on its debt.  On this news, Petrobras' common ADSs declined $0.20 or 3.84%, to close at $5.01, and Petrobras' preferred ADSs declined $0.23 or 4.32%, to close at $5.10 on March 13, 2015.  There was a similar price decline in debt securities.

466.    On March 19, 2015, before the market opened, it was reported that Cristiano Kok, chairman of the contractor Engevix, admitted he paid approximately R$ 10 million in bribes to Alberto Youssef and said he did so in order to win contracts for Petrobras..

155

467.     On this news, Petrobras' common ADSs declined $0.40 or 7.07%, to close at $5.26 and Petrobras' preferred ADSs declined $0.36 or 6.26%, to close at $5.39 on March 19, 2015. There was a similar price decline in debt securities.

468.     On March 26, 2015, both *Bloomberg* and the website *ino*.com reported that Foster testified before the House of Representatives during a parliamentary investigative committee and stated that she and other executives of Petrobras were taken by surprise by the corruption scheme, claiming that she had never before heard of bribes at Petrobras.  Foster also stated that, looking back on the Pasadena refinery purchase, it was not a "good business deal."   On this news, Petrobras' common ADSs declined $0.24 or 3.98%, to close at $5.79, and Petrobras' preferred ADSs declined $0.29 or 4.74%, to close at $5.83 on March 26, 2015.

469.     On April 27, 2015, after Petrobras reported a write-off related to the fraud of over $2 billion, *Barrons.com* reported that Morgan Stanley had changed its Petrobras recommendation from "neutral [hold]" to "sell" based on the company's debt level and the fact that Petrobras' operating cash flow was not enough to support its leverage level.   On this news, Petrobras' common ADSs declined $0.66 or 6.61%, to close at $9.33, and Petrobras' preferred ADSs declined $0.20 or 2.24%, to close at $8.71 on April 27, 2015.   There was a similar price decline in debt securities.

470.     On May 15, 2015, eight minutes before the market closed, it was reported that Petrobras admitted that its internal controls were deficient.   On this news, Petrobras' common ADSs declined $0.44 or 4.34%, to close at $9.69, and Petrobras' preferred ADSs declined $0.24 or 2.56%, to close at $9.14 on the next trading on May 18, 2015.   There was a similar price decline in debt securities.

156

471.    On May 19, 2015, *Folha* reported that eight members of Petrobras' CPI went to London to hear SBM's former employee Johnathan Taylor, who was expected to give details about the relationship between SBM and the money launderer Julio Faerman.  The article details that Faerman's Virgin Islands account received over $31 million in resources of Petrobras.  On this news, Petrobras' common ADSs declined $0.60 or 6.19%, to close at $9.09, and Petrobras' preferred ADSs declined $0.62 or 6.78%, to close at $8.52 on May 19, 2015.

472.    On May 22, 2015, *Folha* reported that documents sent from Monaco's authorities to Lava Jato showed that Petrobras' former officers Duque and Jorge Zelada opened accounts in Monaco, making it clear that both Duque and Zelada had been associated with the transfer of funds from Petrobras to said locations.  On this news, Petrobras' common ADSs declined $0.34 or 3.58%, to close at $9.15, and Petrobras' preferred ADSs declined $0.33 or 3.75%, to close at $8.48 on May 22, 2015.

473.    On May 26, 2015, Bloomberg reported that Petrobras' former Head of International (Nestor Cerveró) was sentenced to five years in prison.  Additionally, on the same day, the Brazilian newspaper *O Estado de São Paulo* reported that Eduardo Leite, a former executive of the cartel contractor Camargo Correa, confirmed the cartel operation at Petrobras during a CPI hearing for the House of Representatives.  On this news, Petrobras' common ADSs declined $0.64 or 6.99%, to close at $8.51, and Petrobras' preferred ADSs declined $0.61 or 7.19%, to close at $7.87 on May 26, 2015.  There was a similar price decline in debt securities.

474.    On June 19, 2015, *Bloomberg* reported that the top executives (including CEOs) of Brazil's biggest contractors—Odebrecht and Andrade Gutierrez—were arrested and that their offices were searched and seized by the Federal Police.  On this news, Petrobras' common ADSs

declined $0.29 or 2.99%, to close at $9.40, and Petrobras' preferred ADSs declined $0.27 or

3.08%, to close at $8.50 on June 19, 2015.

475.    On July 2, 2015, after the close of trading, the *Financial Times* reported that

Petrobras' losses from the corruption scheme could be larger than reported, according to a

statement given by the Brazilian federal prosecutors suggesting that the state-run company could

possibly be forced to adjust its 2014 financial statements.  It was reported that Petrobras' losses

could reach 20% of the value of the contracts.  A delegate from the Federal Police, Igor Romario

de Paulo, one of the Lava Jato coordinators, affirmed that the evidence "could suggest losses to

Petrobras of 15-20% of its contracts."  On this news, Petrobras' common ADSs declined $0.63 or

7.13%, to close at $8.20, and Petrobras' preferred ADSs declined $0.64 or 8.07%, to close at $7.29

on the following trading day, Monday, July 6, 2015.  There was a similar price decline in debt

securities.

476.    On July 8, 2015, *Bloomberg* reported that the President for the Brazilian agency

Control Council for Financial Activities ("COAF"), Antonio G. Rodrigues, said during a hearing

before the CPI that his agency submitted 267 reports to Lava Jato investigators, flagging suspicious

financial transactions in a total of R$ 51.9 billion. On this news, Petrobras' common ADSs

declined $0.25 or 3.02%, to close at $8.04, and Petrobras' preferred ADSs declined $0.24 or

3.24%, to close at $7.17 on July 8, 2015.

477.    On July 17, 2015, *Valor* reported that new allegations given by Julio Camargo

during a testimony before the CPI implicated the President of the House, Eduardo Cunha, in the

scandal.  *Valor* also reported that the Brazilian prosecutors opened a criminal investigation against

the former president Luiz Inacio Lula da Silva regarding his relationship with the cartel contractor

Odebrecht.  On this news, Petrobras' common ADSs declined $0.46 or 5.47%, to close at $7.95,

and Petrobras' preferred ADSs declined $0.38 or 5.03%, to close at $7.18 on July 17, 2015.  There was a similar price decline in debt securities.

478.    On July 20, 2015, Bloomberg reported that Camargo Correa's former executives, Dalton Avancini (former CEO) and Eduardo Leite (former VP), were convicted and would serve over 15 years in prison each for corruption, money laundering and organized crime, all relating to Petrobras' corruption scandal.  On this news, Petrobras' common ADSs declined $0.46 or 5.79%, to close at $7.49, and Petrobras' preferred ADSs declined $0.39 or 5.43%, to close at $6.79 on July 20, 2015.  There was a similar price decline in debt securities.

479.    On July 21, 2015, after the close of trading, *Bloomberg* reported that Braskem (part of Odebrecht's group) was going to revise a contract with Petrobras after the Company confirmed that an internal investigation committee found that some procedures related to the 2009 naphtha supply agreement were not in conformance with the Company's internal guidelines.  On this news, Petrobras' common ADSs declined $0.42 or 5.61%, to close at $7.06, and Petrobras' preferred ADSs declined $0.42 or 6.17%, to close at $6.39 on the following day, July 22, 2015.  There was a similar price decline in debt securities.

480.    On July 24, 2015, the Brazilian newspaper *O Estado de São Paulo* reported that Swiss documents gathered by the Lava Jato investigators and Judge Moro reveal 10 offshore accounts used by Odebrecht to pay bribes, in a sophisticated payment scheme to Petrobras' officers, including Costa, Barusco, Duque, Cerveró and Zelada—a finding that justified the renewal of Marcelo Odebrecht's new prison decree.  Also on that day, *Bloomberg* reported that Brazilian prosecutors were expected to formally charge executives from two of Brazil's top builders with participating in Brazil's biggest corruption scandal in history, chief executive officer of Odebrecht and the president of Andrade Gutierrez.  A judge will decide whether to file charges

against them. On this news, Petrobras' common ADSs declined $0.26 or 3.76%, to close at $6.65, and Petrobras' preferred ADSs declined $0.17 or 2.74%, to close at $6.04 on July 24, 2015. There was a similar price decline in debt securities.

481. On July 27, 2015, the Brazilian newspaper *O Estado de São Paulo* reported that former Petrobras' officers, including Gabrielli and Foster, were given high-value gifts by Odebrecht, including artwork by renowned artists. On this news, Petrobras' common ADSs declined $0.40 or 6.02%, to close at $6.25, and Petrobras' preferred ADSs declined $0.36 or 5.96%, to close at $5.68 on July 27, 2015. There was a similar price decline in debt securities.

482. On July 28, 2015, after the close of trading, *Bloomberg* reported that the Brazilian judge decided to accept the charges against the Odebrecht and Andrade Gutierrez executives. On this news, Petrobras' common ADSs declined $0.22 or 3.11% to close at $6.85, and Petrobras' preferred ADS declined $0.18 or 2.81% to close at $6.22 on July 30. There was a similar price decline in debt securities.

483. The Exchange Act Defendants' false statements and omissions during the Class Period caused the securities issued by Petrobras, PifCo, and PGF to trade at artificially inflated prices during the Class Period. However, as the conditions described above were revealed to the market, the market prices for securities of Petrobras, PifCo, and PGF fell.

## IX.  RELIANCE: FRAUD ON THE MARKET DOCTRINE

484. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

      (a)  the Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

      (b)  the omissions and misrepresentations were material;

      (c)  the securities of Petrobras, PifCo, and PGF traded in an efficient market;

(d)       the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the securities of Petrobras, PifCo, and PGF; and

(e)       Plaintiff and other members of the Class purchased the securities of Petrobras, PifCo, and/or PGF between the time the Exchange Act Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

485.   At all relevant times, the markets for the securities of Petrobras, PifCo, and PGF were efficient for the following reasons, among others:

(a)       as a regulated issuer, Petrobras filed periodic public reports with the SEC on a consolidated basis, including information on behalf of its subsidiaries PifCo and PGF;

(b)       Petrobras regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)       Petrobras was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force(s) and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)       the securities of Petrobras, PifCo, and PGF were actively traded in efficient markets, including the NYSE, where the Company's common and preferred ADSs trade under the ticker symbols "PBR" and "PBR/A," respectively.

486.   As a result of the foregoing, the markets for the securities of Petrobras, PifCo, and PGF promptly digested current information regarding the Company and its subsidiaries from all

publicly available sources and reflected such information in the prices of the securities of Petrobras, PifCo, and PGF. Under these circumstances, all purchasers of the securities of Petrobras, PifCo, and/or PGF during the Class Period suffered similar injury through their purchase of the securities at artificially inflated prices and the presumption of reliance applies.

487.    Further, to the extent that the Exchange Act Defendants concealed or improperly failed to disclose material facts with regard to the Company and its subsidiaries, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153 (1972).

## X.    LOSS CAUSATION

488.    During the Class Period, as detailed herein, the Exchange Act Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the securities issued by Petrobras, PifCo, and PGF, and operated as a fraud or deceit on Class-Period purchasers of such securities by misrepresenting Petrobras' asset values, expenses, net income, and whether the Company suffered from material weaknesses in internal controls.

489.    Later, as the truth relating to Defendants' prior false statements, misrepresentations, and fraudulent conduct were disclosed to the market, the price of the securities of Petrobras, PifCo, and PGF fell as the prior artificial inflation came out of their respective prices. As a result of their purchases of the securities issued by Petrobras, PifCo, and PGF during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities laws.

XI.       **INAPPLICABILITY OF STATUTORY SAFE HARBOR**

490.    The Exchange Act Defendants' verbal "Safe Harbor" warnings accompanying their oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

491.    The Exchange Act Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of the securities of Petrobras, PifCo, and/or PGF who knew that the FLS was false. None of the historic or present tense statements made by the Exchange Act Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Exchange Act Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

XII.      **CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT**

**COUNT I**

**For Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5(b) Against the Exchange Act Defendants**

492.    Plaintiff repeats, incorporates, and realleges paragraphs 1 through 491 by reference. During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew to be false and misleading, or were reckless in their disregard as to the truth of such statements, in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

493.    The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)      employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the securities of Petrobras, PifCo, and/or PGF during the Class Period.

494.     Plaintiff and other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the securities of Petrobras, PifCo, and/or PGF. Plaintiff and other members of the Class would not have purchased such securities at the prices they paid, or at all, if they had been aware that the market prices of such securities had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

495.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the securities of Petrobras, PifCo, and/or PGF during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

496.    Plaintiff repeats, incorporates, and realleges paragraphs 1 through 491 by reference.

497.    Each of the Individual Defendants, by virtue of their control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein,

a control person of Petrobras, PifCo and PGF within the meaning of Section 20(a) of the Exchange Act.

498.     As a result of their control of Petrobras, PifCo and PGF, the Individual Defendants reviewed and approved, or had the opportunity to review and approve, the statements at issue in this litigation and therefore knew or should have known that those statements contained misrepresentations and omissions.  The Individual Defendants could have prevented the issuance of the false and misleading statements and omissions, or caused them to be corrected.  As a result, the Individual Defendants did not act in good faith.

499.     As set forth above, Petrobras, PifCo and PGF each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  By virtue of their positions as control persons, the Individual Defendants are jointly and severally liable pursuant to Section 20(a) of the Exchange Act.

500.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff suffered damages in connection with their purchases of Petrobras' securities.

## XIII.     CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### A.     Introduction

501.     The following allegations are in effect a separate complaint.  For the following claims there is no allegation of fraud, scienter or recklessness.  These claims, brought under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77(l)(2) and 77o, are based solely on claims of strict liability and/or the absence of any affirmative defense based on the reasonableness of the pertinent Defendants' investigation into the true facts.

502.     These Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained in paragraphs 1-363 herein.  These

Securities Act claims are not based on any allegation that any Defendant engaged in fraud or any other deliberate and intentional misconduct, and the Securities Act Plaintiffs (defined below) specifically disclaim any reference to or reliance on fraud allegations.

503.   These Securities Act claims are brought on behalf of persons who purchased or otherwise acquired Petróleo Brasileiro S.A. — Petrobras ("Petrobras" or the "Company") securities issued by Petrobras Global Finance B.V. ("PGF") in or traceable to the Offering Materials issued in connection with the Offerings that are set forth in Appendix A.

504.   Each of the Offerings was conducted pursuant to a Registration Statement and a prospectus supplement issued in connection with that Offering, as identified on Appendix A.  The date of each Offering—and not the prior date of the Registration Statement—was the "effective date" of the Registration Statement for purposes of Section 11 liability pursuant to 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).  According to the Registration Statement, "…for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof."

505.   Further, the Registration Statement provided that: "Each prospectus filed by the registrant pursuant to Rule 424(b)(3) shall be deemed to be part of the registration statement as of the date the filed prospectus was deemed part of and included in the registration statement."  The Registration Statement also provided that: "Each of the undersigned registrants hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of [Petrobras'] annual report pursuant to Section 13(a) or 15(d) of the Exchange Act that is incorporated by reference in the registration statement shall be deemed to be a new registration

statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof."

506.   As to each Offering, certain documents contained untrue statements of material facts and material omissions that were incorporated in the Registration Statement and prospectus supplements, as described in more detail below and identified in Appendix A.

### B.   Background

507.   The Securities Act claims asserted herein arise from a series of materially misleading statements and omissions of material fact about the reported value of Petrobras' assets, periodic expenses, net income, whether Petrobras suffered from material weaknesses in its disclosure controls and procedures and its internal controls over financial reporting, and the Company's repeated assurances that it operates with the highest level of integrity.

508.   According to numerous Petrobras former employees, including Paulo Roberto Costa ("Costa"), a member of Petrobras' senior management and the Company's Chief Downstream Officer from at least May 14, 2004 to April 2012, Petrobras routinely awarded lucrative and inflated contracts to construction and engineering firms in exchange for making hundreds of millions of dollars in improper and undisclosed payments to politically-appointed Petrobras executives, a portion of which found its way to the campaign coffers of Brazil's ruling Workers' Party ("PT"), among others.

509.   In connection with the improper and undisclosed payments to Petrobras executives, government officials and politicians, a group of at least 16 contractors formed a cartel to assure that its membership would win Petrobras' major contracts.   Costa testified that the companies to whom Petrobras sought bids for construction projects would meet regularly in São Paulo or Rio de Janeiro to decide what contract would be awarded to which construction company, and what the percentage of overbilling would be included in the contract in order to cover the improper

payments that would be required.  If any member of the meeting failed to include the required amount earmarked for political parties and Petrobras executives, the member would be disqualified from future bids.

510.     Costa revealed that a group of politicians, including members and allies of President Rousseff's Workers' Party, had accepted improper payments linked to inflated contracts, and Costa named several construction companies that were part of the improper bids and roundtrip payments, including Odebrecht and Camargo Correa S.A.  Costa characterized Petrobras as being engulfed in a culture of "political patronage," where career advancement depended on political sponsors, and that a *quid pro quo* applied to all executive level positions that were part of the patronage system.  Such patronage system included diverting funds and resources to political officials from inflated contracts under the control of the executive.

511.     According to Brazilian prosecutors and Brazil's Federal Police, Petrobras executives awarded contracts to Brazilian construction companies that had systemically inflated their bids by as much as 20%.

512.     Petrobras executives receiving the improper payments have pocketed vast sums of money.  For example, Pedro Barusco ("Barusco"), a former Petrobras service manager, told Brazilian investigators that the PT received as much as $200 million in improper payments during the decade through 2013, and that he personally received nearly $100 million which he deposited in offshore accounts.  According to Costa, payments to him, usually in the form of cash (U.S. Dollars), amounted to tens of millions of dollars and were delivered to him in suitcases to his home, office, shopping centers or hotels.   Costa testified that each company awarded an inflated contract had its own mechanism for delivering the improper payments.

513.     Further, on March 18, 2014, the *Wall Street Journal* reported that Swiss authorities froze hundreds of millions of dollars in assets tied to the improper payments, having unearthed "hundreds of accounts at Switzerland's banks" as part of the alleged wrongdoing.  According to Switzerland's Office of the Attorney General, Switzerland ordered the freezing of roughly $400 million in assets, and ongoing probes have identified more than 300 accounts at more than thirty (30) Swiss banking institutions that officials say were apparently used to process the improper payments now under investigation in Brazil and elsewhere.

514.     On November 13, 2014, after the market closed, the Company issued a press release acknowledging that if the allegations in Costa's testimony were true, they "could potentially impact the Company's financial statements."  As a result, the Company delayed releasing the financial statements for the third quarter 2014, stating that it would need additional time to:

> (i)      deeply analyze the investigation in course; (ii) adjust the Company based on the allegations of [the Brazilian Federal Police]; and (iii) evaluate the need of improving governance control, the Company isn't ready to publish its balance sheet regarding the third quarter of 2014 on this date.

515.     On November 14, 2014, prior to the trading session, Petrobras revealed that it would "release its third quarter 2014 financial statements, without a review by its Independent Auditors."  Petrobras further noted that:

> In light of the ongoing investigations, it is currently not possible for the Company to determine an estimated date for the disclosure of its Quarterly Financial Statements (ITR) for the period ended 09.30.2014, together with the review report issued by the Independent Auditors.

516.     During a November 17, 2014 conference call to discuss the Company's 2013 third quarter results, then-CEO Foster stated:

> In light of the accusations and investigations of [O]peration Car Wash . . . Petrobras is unable to publish its third-quarter 2014 financial statements because these

accusations, if found to be true, could potentially affect the Company's financial statements.

A determining fact took place on October 8, 2014, when the depositions of former Downstream Executive Director, Mr. Paulo Roberto Costa, and Mr. Alberto Youssef, in a hearing at the 13th Federal Court of Parana, revealed information that may lead to possible adjustments in the financial statements of our Company.

Because of these depositions, therefore, we need more time to make any possible adjustments to the financial statements. More time is needed as well to gain greater understanding from the ongoing investigations by the independent law firms; and we need more time, as it is fundamentally important to improve our internal controls.

517.    On January 28, 2015, Defendant Foster acknowledged that the testimony examined by Petrobras indicates "that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments."

518.    At all relevant times, Petrobras asserted that it accounted for its acquisitions and the assets from its construction projects in accordance with International Financial Reporting Standards ("IFRS"), claiming that acquired or constructed assets have values equal to the reported costs incurred in their acquisition or construction.  Increased costs on construction projects in order to receive improper payments, whether to Petrobras executives, governmental, and/or party officials, caused Petrobras to materially inflate its reported property, plant and equipment, necessitating a massive write-down that was reported to reach $30 billion.   As a result, Petrobras' financial statements, including the carrying value of its property, plant and equipment, reported expenses, and net income, were materially false and misleading.

519.    By having inflated the contracts granted to the various construction companies by up to 20%, assets on the balance sheet associated with Petrobras' property, plant, and equipment were massively inflated.  In addition, instead of reporting a corresponding immediate expense for the inflated portion of the contracts in the same period, (*i.e.* in the period the expenses were

170

incurred) Petrobras expensed the repayments (*i.e.* the overpayment to the contractors) as depreciation over the unit-of-production basis or straight-line method, resulting in materially lower current expenses and materially higher net income in the periods in which the inflated payments were made.

520.    Petrobras' reported asset values were important information for purchasers of the Notes because these measures were understood to offer a fair presentation of the Company's fixed capital and recoverability for creditors.  These reported asset values were used by rating agencies, analysts, and investors to arrive at a number of metrics including the Company's financial leverage (the ratio of net assets to total net debt) and its debt/equity ratio that formed a material basis for the market prices of the Notes.

### C.    Relevant Securities Offerings

#### 1.    May 15, 2013 Note Offerings

521.    On August 29, 2012, Petrobras and PGF filed a registration statement with the SEC on Form-3ASR for the offer and sale of an indeterminate amount of securities at indeterminate offering prices, including debt securities (the "Registration Statement" or "2012 Registration Statement").

522.    On May 15, 2013, PGF filed a prospectus supplement on Form 424(b)(2) for the offer and sale of $9.5 billion in notes issued pursuant to the Registration Statement ("2013 Prospectus").  Together, the Registration Statement and 2013 Prospectus are referred to herein as the "2013 Offering Documents".

523.    As set forth on Appendix A, six series of notes were sold pursuant to the 2013 Offering Documents: (1) $1.25 billion of notes paying 2.00% due in 2016 to be sold at $995.84 per $1000 par value; (2) $2 billion of notes paying 3.00% due in 2019 to be sold at $993.52 per $1000 par value;  (3) $3.5 billion of notes paying 4.375% due in 2023 to be sold at $988.28 per

171

$1000 par value; (4) $1.75 billion of notes paying 5.625% due in 2043 to be sold at $980.27 per $1000 par value; (5) $1 billion of floating-rate notes due in 2016 to be sold at par; and (6) $1.5 billion of floating-rate notes due 2019 to be sold at par (collectively, the "2013 Notes Offerings").

524.    As set forth on Appendix A, the following were incorporated by reference into the 2013 Offering Documents: (1) the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2011, filed with the SEC on April 2, 2012, and its amendment on Form 20-F/A, filed with the SEC on July 9, 2012 ("2011 20-F"); (2) Petrobras Form 6-K filed with the SEC on August 10, 2012, containing financial information for the six-month periods ended June 30, 2012 and 2011 ("8/10/12 6-K"); (3) Petrobras' Annual Report on Form 20-F for the year ended December 31, 2012, filed with the SEC on April 29, 2013 ("2012 20-F"); and (4) Petrobras' Form 6-K filed with the SEC on April 30, 2013, containing financial information for the three-month periods ended March 31, 2013 and 2012 ("4/30/13 6-K").

## 2.    March 10, 2014 Note Offerings

525.    On March 10, 2014, PGF filed a prospectus supplement on Form 424(b)(2) for the offer and sale of $8.1 billion in notes issued pursuant to the Registration Statement ("2014 Prospectus").  Together, the Registration Statement and 2014 Prospectus are referred to herein as the "2014 Offering Documents".

526.    As set forth on Appendix A, six series of notes were sold pursuant to the 2014 Offering Documents: (1) $1.6 billion of notes paying 3.250% due in 2017 to be sold at $999.57 per $1000 par value; (2) $1.5 billion of notes paying 4.875% due in 2020 to be sold at $997.43 per $1000 par value; (3) $2.5 billion of notes paying 6.250% due in 2024 to be sold at $997.72 per $1000 par value; (4) $1 billion of notes paying 7.250% due in 2044 to be sold at $991.66 per $1000

par value; (5) $1 billion of floating-rate notes due in 2017 to be sold at par; and (6) $500 million

of floating-rate notes due 2020 to be sold at par (collectively, the "2014 Notes Offerings").

527.    As set forth in Appendix A, the following were incorporated by reference into the

2014 Offering Documents: (1) the 2011 20-F; (2) the 8/10/12 6-K; (3) the 2012 20-F; and (4)

Petrobras' Form 6-K filed with the SEC on February 26, 2014, containing audited consolidated

financial statements as of December 31, 2013 and 2012 and January 1, 2012 and for the years

ended December 31, 2013,  2012 and 2011, and a related amendment on Form 6-K/A, filed with

the SEC on March 10, 2014 ("2/26/14 6-K"); (5) Petrobras' Form 6-K filed with the SEC on March

7, 2014 ("3/3/14 6-K"), identified as "Management's Report on Internal Controls over Financial

Reporting"; and (6) Petrobras' Form 6-K filed with the SEC on March 11, 2014 ("3/11/14 6-K")

attaching the Underwriting Agreement for the 2014 Notes Offerings.

528.    Together, the 2013 Notes Offerings, and 2014 Notes Offerings are at times referred

to herein as the "Notes Offerings."

529.    Both the 2013 and 2014 Prospectus also included the following language:

Except under the limited circumstances described in the accompanying prospectus,
all notes will be book-entry notes.  This means that the actual purchasers of the
notes will not be entitled to have the notes registered in their names and will not be
entitled to receive physical delivery of the notes in definitive (paper) form.  Instead,
upon issuance, all the notes will be represented by one or more fully registered
global notes.

Each global note will be deposited directly with the Depository Trust Company, a
securities depositary, and will be registered in the name of DTC's nominee.

* * *

The registration of the global notes in the name of DTC's nominee will not affect
beneficial ownership and is performed merely to facilitate subsequent transfers.
The book-entry system, which is also the system through which most publicly
traded common stock is held in the United States, is used because it eliminates the
need for physical movement of securities certificates. The laws of some
jurisdictions, however, may require some purchasers to take physical delivery of

their notes in definitive form. These laws may impair the ability of beneficial holders to transfer the notes.

530.    Depository Trust Company ("DTC") is (i) located at 55 Water Street, New York, New York; (ii) a limited purpose trust company organized under the laws of the State of New York; (iii) a member of the Federal Reserve System; (iv) a "clearing corporation" within the meaning of the Uniform Commercial Code; and (v) a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act.

531.    Both the 2013 and 2014 Prospectuses explain:

DTC was created to hold securities for its participants and to facilitate the clearance and settlement of securities transactions between participants through electronic book-entry changes to accounts of its participants. This eliminates the need for physical movement of certificates. Participants in DTC include securities brokers and dealers, banks, trust companies and clearing corporations and may include certain other organizations. DTC is partially owned by some of these participants or their representatives.

532.    Further, the 2013 Prospectus provided:

…. DTC will be the only registered holder of the notes and will be considered the sole representative of the beneficial owners of the notes for purposes of the indenture.

* * *

The underwriters expect to deliver the notes in book-entry form only through the facilities of The Depository Trust Company and its direct and indirect participants, including Clearstream Banking, société anonyme, and Euroclear S.A./N.V., as operator of the Euroclear System, **against payment in New York, New York on or about May 20, 2013.**

* * *

The Bank of New York Mellon, a New York banking corporation, is the trustee under the indenture and has been appointed by PGF as **registrar, paying agent, transfer agent and calculation agent with respect to the notes**. The address of the trustee is 101 Barclay Street, 4E, New York, New York, 10286. PGF will at all times maintain a paying agent in New York City until the notes are paid.

(Emphasis added.)

533.    The 2014 Prospectus included identical language from the preceding paragraph, except that payment would be in New York, New York, on March 17, 2014.

534.    Under subsection titled "Primary Distribution," the 2013 and 2014 Prospectuses set forth the "Payment" and "Clearance and Settlement" procedures for the initial offering and required that "[p]ayment for the notes will be made on a delivery versus payment basis." And, "DTC participants that hold securities through DTC on behalf of investors will follow the settlement practices applicable to United States corporate debt obligations in DTC's Same-Day Funds Settlement System. Notes will be credited the securities custody accounts of these DTC participants against payment in the same-day funds, for payments in U.S. dollars, on the settlement date."

535.    According to the DTC's website, dtcc.com:

The [DTC] benefits begin with the eligibility/underwriting process, which enables the initial distribution of a security offering to be made electronically to financial institutions that are DTC participants and ultimately to investors.  Once a security becomes eligible, DTC, through its nominee Cede & Co., is the registered holder of the securities, routinely processing dividend and interest payments and managing the electronic "book-entry" transfer of interests in securities among participants. These participants are often holding and transferring interests in the securities at the direction of their customers, including ultimate beneficial owners.

536.    Further, The World Bank and International Monetary fund have written a treatise on the functioning of bond markets that discusses settlement through central depositories. The first premise is that, "All transactions in securities involving cash payments should in principal follow DVP (Delivery Versus Payment), implying that delivery of securities must be simultaneous with payment." A core function of the central depository is to match settlement orders one corresponding to the payment of cash and the other to the delivery of securities to complete the settlement process. "Matching validates the authenticity of settlement orders, detects errors, determines the point when settlement orders must become irrevocable, provides trading partners

with additional proof of the contractual agreement they have entered and most importantly is an absolute requirement for controlling implementation of the DVP principal and for keeping track of pending settlement claims."

537.   In addition, DTCC's subsidiary, the National Securities Clearing Corporation ("NSCC"), receives trade details from all major U.S. brokerage firms and clearing companies, performs matching on all key trade elements, and generates trade comparison reports and output files.  The trade comparison reports generated by the NSCC provide details to the broker/dealer for both successful and unsuccessful trade record matches.  Successful matches on a specific trade record result when both the buy side firm and the sell side firm submit matching trade records to NSCC.  The successful match results in a trade comparison or trade contract.  Unsuccessful matching results in either an Uncompared Trade or a Trade Advisory.  Both occur when only one side (buyer or seller) submits its trade record for a particular transaction.

**D.   Securities Act Plaintiffs**

**1.   North Carolina**

538.   Additional plaintiff North Carolina Department of State Treasurer ("North Carolina"), located at 3200 Atlantic Ave, Raleigh, North Carolina, is a State government agency headed by the North Carolina State Treasurer.  Under the State Treasurer's authority, North Carolina operates the State of North Carolina investment programs that purchased various Petrobras securities (*i.e.*, beneficial interests therein) as set forth in their certification previously filed with the Court, including one of the 2013 Notes and one of the 2014 Notes.

539.   Specifically, on the May 13, 2013 offering date and at the $98.828 offering price, North Carolina purchased in Raleigh, North Carolina the 4.375% Note due 2023 (CUSIP 71647NAF6) ("NAF6") directly from Morgan Stanley & Co. LLC ("Morgan Stanley"), a U.S.-based broker-dealer and co-manager and underwriter for the 2013 Notes Offering, and on the

March 10, 2014 offering date and at the $99.772 offering price, North Carolina purchased in Raleigh, North Carolina the 6.250% Note due 2024 (CUSIP 71647NAM1) ("NAM1") directly from Citigroup Global Markets Inc. ("Citigroup"), a U.S.-based broker-dealer and a co-manager and underwriter for the 2014 Notes Offering, and was damaged thereby.  Both purchases settled through the DTC.

540.    More particularly, on May 14, 2013 (at 8:52 am), Mark Luecke of Morgan Stanley sent North Carolina's securities traders Beth Harrison, Jeff Smith and Brett Hall a Bloomberg message confirming North Carolina's purchase of $5,000,000 of the NAF6 note pursuant to the May 13, 2013 offering, indicating a May 13, 2013 "trade date" at the $98.828 offering price, that the seller was "Morgan Stanley & Co. LLC," which has its principal offices in New York, New York.  Mr. Luecke's Bloomberg message indicated a phone number of 212-761-1063, which is a New York City number, and that the trade would settle on May 20, 2013, consistent with the date set forth on the 2013 Prospectus.  *See* Exhibit A attached hereto.

541.    On May 14, 2013, North Carolina received from Morgan Stanley via Bloomberg an "Approved Ticket" indicating that "As of 05/13/13 [at] 08:52:15" North Carolina had purchased $5,000,000 of the NAF6 note at the $98.828 offering price, with a May 20, 2013 settlement date, consistent with the prospectus, and indicating "Settlement Loc DTC," meaning that the trade would settle through DTC.  *See* Exhibit B attached hereto.

542.    On March 10, 2014, Geddes Alexander of Citigroup sent a Bloomberg message to North Carolina confirming North Carolina's purchase of $2,000,000 of the NAM1 note pursuant to the March 10, 2014 initial offering, indicating a March 10, 2014 "trade date" at the $99.772 offering price, that the seller was "Citigroup Global Markets Inc.," which has its principal offices in New York, New York.  The Bloomberg message noted a phone number of 646-554-4019, which

is a New York City number, and that the trade would settle on March 17, 2014, consistent with the date set forth on the 2014 Prospectus.  *See* Exhibit C attached hereto.

543.    On March 11, 2014, North Carolina received via Bloomberg an "Approved Ticket" indicating that "As of 03/10/14 [at] 09:40:55" North Carolina had purchased $2,000,000 of the NAM1 note at the $99.772 offering price, with a March 17, 2014 settlement date, consistent with the prospectus, and indicating "Settlement Loc DTC," meaning that the trade would settle through DTC.  *See* Exhibit D attached hereto.

544.    In connection with North Carolina's purchases of the NAF6 and NAM1 Notes in the 2013 and 2014 Offerings, the orders were placed by North Carolina in Raleigh, North Carolina. The counterparties were underwriters in the respective offerings, located in New York, New York. Payment was made and beneficial ownership in the Notes transferred when the trades were settled by DTC in New York.  Thus, irrevocable liability and transfer of beneficial ownership was incurred in the United States.

### 2.  Hawaii

545.    Additional plaintiff Employees' Retirement System of the State of Hawaii ("Hawaii" or "Hawaii ERS") is a cost-sharing, multiple-employer public employee retirement system established to administer a pension benefits program for all State and county employees, including teachers, police officers, firefighters, correction officers, judges, and elected officials. Hawaii purchased various Petrobras securities (*i.e.*, beneficial interests therein) as previously set forth in a certification Hawaii filed in this Action, including two of the 2013 Notes and one of the 2014 Notes.  Specifically, on the May 13, 2013 offering date and at the $99.352 offering price, PIMCO, a United States based asset manager and one of Hawaii's outside investment managers, purchased from its offices in Newport Beach, California the 3.00% Note due 2019 (CUSIP

71647NAB5) ("NAB5") directly from Citigroup, one of the co-managers and underwriter for the 2013 Notes Offering.  *See* Exhibit E attached hereto.

546.    In connection with that purchase, Hawaii received a SWIFT message from SBOSUS3QPIM (*i.e.,* PIMCO) sent to CNORUS44 (*i.e.,* Northern Trust), Hawaii's custodian bank and DTC participant, providing (i) instructions for the receipt of the $200,000 lot of the NAB5 Notes; and (ii) delivery of the Notes will be via DTC from DEAG(SELL)/DTCYID/00274, *i.e*., Citigroup, which has a unique DTC ID 00274.  *See* Exhibit F attached hereto.   Hawaii also received transaction records from Northern Trust showing that a $200,000 lot of the NAB5 Notes was purchased by PIMCO on behalf of Hawaii on the May 13, 2013 offering date at the $99.352 offering price, directly from Citigroup.  *See* Exhibit G attached hereto.

547.    Further, on the May 13, 2013 offering date, Hawaii's investment manager Bradford & Marzec ("B&M"), located in Los Angeles, California, purchased on behalf of Hawaii $1.319 million of the NAB5 Notes at the $99.352 offering price directly from co-manager and underwriter Citigroup.  *See* Exhibit H attached hereto.  Hawaii received delivery of a confirmation indicating that (i) B&M purchased $1.319 million of the NAB5 Note on the May 13, 2013 offering date at the $99.352 offering price; (ii) that delivery was sent with DTC control No. 392489835; (iii) the settlement location was DTC; and (iv) the "alloc[ating] source," confirms that the Notes were delivered to B&M, located in Los Angeles, CA.  *See* Exhibit I attached hereto.  Hawaii received a trade confirmation from B&M indicating that (i) B&M purchased on Hawaii's behalf $1.319 million the NAB5 Note on the May 13, 2013 offering date at the $99.352 offering price; (ii) the purchase was from Citigroup; (iii) confirmation was sent and received via fax from United States area codes; and (iv) that the settlement (or issue) date was May 20, 2013.  *See* Exhibit J attached hereto.  Hawaii subsequently received a confirmation from Northern Trust in connection with

B&M's purchase of the $1.319 million lot of the NAB5 Notes on behalf of Hawaii, showing that the underwriter was Citigroup, DTC control number 3924, and the security was delivered via DTC from DTC ID-00000274 (Citigroup).  *See* Exhibit K attached hereto.

548.     On May 13, 2013, Hawaii received a trade confirmation from PIMCO showing that (i) on the May 13, 2013 offering date at the $99.584 offering price, PIMCO purchased for Hawaii $4.4 million of the 2.00% Note due 2016 (CUSIP71647NAC3) ("NAC3") denominated in U.S. Dollars; (ii) the underwriter was "JPS – J.P. LLC," *i.e.*, 2013 Notes Offering co-manager and underwriter J.P. Morgan Securities LLC ("J.P. Morgan") located in New York, New York; and (iii) the trade would settle on May 20, 2013.  *See* Exhibit L attached hereto.  On or around May 13, 2013, Hawaii received a SWIFT message from PIMCO that was sent to Northern Trust, providing (i) instructions for the receipt of the $4.4 million lot of the NAC3 Note purchased on behalf of Hawaii; and (ii) that delivery of the Note will be via DTC from DEAG(SELL)/DTCYID/00187, *i.e.* J.P. Morgan, whose unique DTC ID is 00187.  *See* Exhibit M attached hereto.

549.     On March 10, 2014, Hawaii received a trade confirmation from B&M, indicating that (i) B&M purchased for Hawaii on the March 10, 2014 offering date $4.5 million of the 3.250% Note due 2017 (CUSIP 71647NAG4) ("NAG4") at the $99.957 offering price; (ii)  B&M transacted the purchase through Hawaii's current custodian bank and DTC participant, Bank of New York Mellon ("BNYM"); (iii) the Note was purchased from co-manager and underwriter HSBC Securities; and (iv) the trade confirmation was sent and received via fax from United States area codes.  *See* Exhibit N attached hereto.  Hawaii subsequently received a delivery confirmation from BNYM reflecting that (i) Hawaii purchased $4.5 million of the NAG4 Notes on the March 10, 2014 offering date at the $99.957 offering price; (ii) delivery was sent via DTC for Hawaii's

account with Mellon Trust of New England; and (iii) the "alloc[ating] source," HSBC Securities (USA) Inc., "confirms the sale of securities by registration statement/prospectus which would have been delivered …for Rule 172."  *See* Exhibit O attached hereto.  Hawaii also received a trade confirmation demonstrating (i) that B&M (in Los Angeles) purchased on Hawaii's behalf $4.5 million in the NAG4 Notes on the March 10, 2014 offering date at the $99.957 offering price from underwriter HSBC (in New York) for delivery via DTC (in New York); and (ii) the confirmation was sent and received via fax from United States area codes.  *See* Exhibit P attached hereto.

550.    In connection with Hawaii's purchases of the NAB5, NAC3, and NAG4 Notes in the 2013 and 2014 Offerings, the orders were placed by Hawaii's investment managers PIMCO and B&M, located in Newport Beach and Los Angeles, California, respectively.   The counterparties were underwriters in the respective offerings, located in New York, New York.  Payment was made and beneficial ownership in the Notes was transferred when the trades were settled by DTC in New York.  Thus, irrevocable liability and transfer of beneficial ownership was incurred in the United States.

### 3.  Union

551.    Additional plaintiff Union Asset Management Holding AG ("Union") is based in Frankfurt am Main, Germany and is the holding organization of the Union Investment Group with offices in Germany, Switzerland, Luxembourg, Poland, Italy, and Spain.  The Union Investment Group ranks among the leading German fund managers by market share.  Funds affiliated with Union purchased various Petrobras securities as previously set forth in a certification that Union filed in this Action, including one of the 2014 Notes.  Specifically, on the offering date and at the offering price, three funds affiliated with Union (DEVIF-Fonds Nr. 81, UniRenta Corporates, and

UIN Fonds Nr. 618) purchased the 6.250% Petrobras debt security due 2024 (CUSIP 71647NAM1) in the United States, and was damaged thereby.[65]

552.   In particular, on March 12, 2014, Union received from Citigroup, with an address at 390-388 Greenwich Street, New York, New York, confirming that (i) Union fund (UIN Fonds Nr. 618) purchased $100,000 of the NAM1 Note on the March 10, 2014 offering date at the $99.772 offering price; (ii) from underwriter "Citigroup Global Markets Inc."; (iii) that the trade would settle through DTC account 274 ("A/C Citigroup Global Markets Inc."); and (iv) a settlement date of March 17, 2014.  *See* Exhibit Q attached hereto.

553.   On March 13, 2014, Union received from Union Investment Institutional GmbH's depositary bank, WGZ Bank, a confirmation reflecting that (i) on the March 10, 2014 offering date one of Union's funds (DEVIF-Fonds Nr. 81) purchased $300,000 of the NAM1 Note; (ii) in U.S. Dollars; and (iii) that the Note was in "Safekeeping of securities abroad, depository country: U.S.A."  *See* Exhibit R attached hereto.

### 4.  USS

554.   Lead Plaintiff Universities Superannuation Scheme Limited ("USS" or "Plaintiff"), acting as sole corporate trustee of Universities Superannuation Scheme, is located at Royal Liver Building, Liverpool, England, L3 1PY.  Established in 1974, USS is a trustee company limited by guarantee, incorporated in England and Wales, and solely set up to administer the scheme provided by Universities, Higher Education and other associated institutions for their employees, and which runs the pensions administration and group functions.  USS Investment Management Ltd is a wholly owned subsidiary of USS regulated by the Financial Conduct Authority, which operates

---

[65] UniRenta Corporates and UIN Fonds Nr. 618 made minor gains in connection with their purchases on the NAM1 Note.  These two funds' combined gains were significantly less than the loss suffered by DEVIF-Fonds Nr. 81 in connection with its purchase of the NAM1 Note.

the investment arm of the business from its London office.  USS purchased various Petrobras securities as previously set forth in a certification that USS filed in this Action, including one of the 2013 Notes.

555.    Specifically, on or about February 17, 2014, Legal & General Investment Management ("LGIM"), located in the United Kingdom, instructed its U.S. affiliate, Legal & General Investment Management America, Inc. (LGIMA"), located in Chicago, Illinois, to transfer $210,000 of the 4.375% Note maturing May 20, 2023, CUSIP US71647NAF69, at $89.3550, into the account of USS.  LGIMA had been managing in the United States various assets for LGIM, including the NAF69 Note.  On or around February 14, 2014 at 1:06pm, the Note was transferred to USS, with a settlement date indicated as February 19, 2014, and a "Settlement Location: DTC." *See* Exhibit S attached hereto.

556.    USS, Union, Hawaii and North Carolina are collectively hereinafter referred to as "Plaintiffs."

E.    **Securities Act Defendants**

1.    **Issuer Defendants**

557.    Defendant Petrobras is a corporation organized under the laws of Brazil, and maintains its principal executive offices at Avenida Republica do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil.  Petrobras also maintains an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022.  The Company's common and preferred shares are listed on the Bovespa, trading under the ticker symbols "PETR3" and "PETR4," respectively.  Since 2000, Petrobras has sponsored ADSs representing the Company's common and preferred equity that are listed on the NYSE, trading under the ticker symbols "PBR" and "PBR/A," respectively.  Furthermore, of the 35 debt securities currently outstanding issued by PifCo or PGF, 22 are registered with an exchange located in this District and of the 26 debt securities issued by PifCo

or PGF during the Class Period, 16—including all securities at issue in this action—are registered with and trade on an exchange located in this District.

558.   Defendant PGF is a wholly-owned finance-related subsidiary of Petrobras incorporated in the Netherlands.  PGF maintains its principal executive offices at Weenapoint Toren A, Weena 722, 3014 DA Rotterdam, The Netherlands.  On February 12, 2014, PGF acquired the outstanding shares of PifCo, a wholly-owned subsidiary of Petrobras.  Between the beginning of the Class Period and August 9, 2013, PifCo was organized under the laws of the Cayman Islands with its principal executive offices at 4th Floor, Harbour Place, 103 South Church Street, P.O. Box 1034GT — BWI, George Town, Grand Cayman, Cayman Islands.

559.   On August 9, 2013, PifCo completed a transfer of domicile, registering in Luxembourg with principal executive offices at 40, Avenue Monterey, 2163 Luxembourg.  On December 16, 2013, certain assets and liabilities of PifCo were spun off and subsequently merged into Petrobras.  The publicly issued debt of PGF and PifCo is unconditionally guaranteed by Petrobras, and certain issues of this debt are registered with the NYSE.

560.   Defendant Petrobras America Inc. describes itself as a wholly owned subsidiary of Petroleo Brasileiro S.A. and states that "in the US, we have a financial office in New York and a trading and procurement office in Houston, Texas, hiring more than 400 people."  The financial office in New York is located at 570 Lexington Avenue, New York NY 10022.  The trading and procurement office in Texas is located at 10350 Richmond Avenue, Suite 1400, Houston, Texas 77042.  Petrobras America Inc. lists Theodore Helms, Consultant, as the contact person for the New York financial office.  Petrobras America owns Pasadena Refining System Inc., (PRSI), an independent refiner and marketer of petroleum products, including petrochemical feedstock with a related crude oil capacity of just over 100,000 barrels per day.

184

2.      **Officer Defendants**

561.     Defendant Maria das Gracas Silva Foster ("Foster") was the Chief Executive Officer ("CEO") and Director of Petrobras from February 13, 2012 to February 4, 2015. Previously, Foster served as the Company's Director of Gas and Energy, and she signed the Registration Statement.

562.     Defendant Almir Guilherme Barbassa ("Barbassa") served as Chief Financial Officer ("CFO") of Petrobras from July 22, 2005 to February 4, 2015, and he signed the Registration Statement.

563.     Foster and Barbassa are collectively referred to as the "Officer Defendants."

3.      **Director Defendants**

564.     Defendant Josué Christiano Gomes da Silva served as a Director of Petrobras from October 2011 to March 2013, and he signed the Registration Statement.

565.     Defendant Silvio Sinedino Pinheiro ("Pinheiro") served as Director of Petrobras during the Class Period, and he signed the Registration Statement.

566.     Defendant Daniel Lima de Oliveira served as CEO and Chairman of PifCo from September 1, 2005, and he signed the Registration Statement.

567.     Defendant José Raimundo Brandão Pereira served as a Director of PifCo from 2003, and he signed the signed the Registration Statement.

568.     Defendant Sérvio Túlio da Rosa Tinoco served as CFO of PifCo from September 1, 2005, and he signed the Registration Statement.

569.     Defendant Paulo Jose Alves served as the Chief Accounting Officer of PifCo since May 2011, and he signed the Registration Statement.

570.    Defendant Gustavo Tardin Barbosa served as CEO and "Managing Director A" of PGF, and he signed the Registration Statement.

571.    Defendant Alexandre Quintão Fernandes served as CFO and "Managing Director B" of PGF, and he signed the Registration Statement.

572.    Defendant Marcos Antonio Zacarias served as "Managing Director A" of PGF, and he signed the Registration Statement.

573.    Defendant Cornelis Franciscus Jozef Looman served as "Managing Director B" of PGF, and he signed the Registration Statement.

574.    Defendant Theodore Marshall Helms ("Helms") serves as the authorized U.S. Representative for Petrobras and PGF, and served as the authorized U.S. Representative for PifCo. Helms signed the 2012 Registration Statement.  In August 2007, Helms was named the Executive Manager of investor relations for Petrobras.  In 2010, Helms assisted in the planning and execution of Petrobras' $70 billion equity offering.

575.    Defendants identified in paragraphs 541-551 are collectively referred to herein as the "Director Defendants."

### 4.    Underwriter Defendants

576.    Defendant BB Securities Ltd. ("BB Securities") is a subsidiary of Banco do Brasil S.A. incorporated in the United Kingdom with its principal place of business at Pinners Hall, 105-108 Old Broad Street, London, EC2N 1ER, United Kingdom. Banco do Brasil S.A. maintains an office at 535 Madison Avenue, 34th Floor, New York, New York 10022.  BB Securities acted as an underwriter and joint book runner of the 2013 and 2014 Notes Offerings.

186

577.     Defendant Citigroup Global Markets Inc. ("Citigroup") maintains its principal place of business at 388 Greenwich Street, New York, New York 10013.  Citigroup acted as an underwriter and joint book runner of the 2013 and 2014 Notes Offerings.

578.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") maintains its principal place of business at 277 Park Avenue, New York, New York 10172. J.P. Morgan acted as an underwriter and joint book runner of the 2013 and 2014 Notes Offerings.

579.     Defendant Itau BBA USA Securities, Inc. ("Itau") maintains its principal place of business at 767 Fifth Avenue, 50th Floor, New York, New York 10153.  Itau acted as an underwriter and joint book runner of the 2013 Notes Offerings.

580.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") maintains its principal place of business at 1585 Broadway, New York, New York 10036.  Morgan Stanley acted as an underwriter and joint book runner of the 2013 Notes Offerings.

581.     Defendant HSBC Securities (USA) Inc. ("HSBC") maintains its principal place of business at 354 Sixth Avenue, New York, New York 10011.  HSBC acted as an underwriter and joint book runner of the 2013 Notes Offerings and the 2014 Notes Offerings.

582.     Defendant Mitsubishi UFJ Securities (USA), Inc. ("Mitsubishi") maintains an office at 1633 Broadway, 29th floor, New York, New York 10019.  Mitsubishi acted as an underwriter and co-manager of the 2013 Notes Offerings.

583.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") maintains its principal place of business at One Bryant Park, New York, New York 10036.  Merrill Lynch acted as an underwriter and joint book runner of the 2013 Notes Offerings.

584.    Defendant Standard Chartered Bank ("Standard Chartered") maintains its principal place of business at Two Gateway Center 13th Floor, Newark, New Jersey 07102.   Standard Chartered acted as an underwriter and co-manager of the 2013 Notes Offerings.

585.    Defendant Bank of China (Hong Kong) Limited ("Bank of China") maintains its principal place of business at Bank of China Tower, 1 Garden Road, Hong Kong, and has branch offices in New York, including at 410 Madison Avenue, New York, NY 10017.   Bank of China acted as an underwriter and joint book runner of the 2014 Notes Offerings.

586.    Defendant Banco Bradesco BBI S.A. ("Bradesco") has its principal place of business at Avenida Paulista, 1450 8th Floor, Sao Paulo, Brazil, and maintains an office at 450 Park Avenue, New York, New York 10022.   Bradesco acted as an underwriter and joint book runner of the 2014 Notes Offerings.

587.    Defendant Banca IMI S.p.A. ("Banca IMI") has its principal place of business at Largo Mattioli, 3 Milan, MI 20121, Italy, and through its subsidiary Banca IMI Securities Corporation maintains an office at 1 William Street, New York, New York 10004.   Banca IMI acted as an underwriter and co-manager of the 2014 Notes Offerings.

588.    Defendant Scotia Capital (USA) Inc. ("Scotia Capital") maintains its principal place of business at 1 Liberty Plaza, 165 Broadway, 25th Floor, New York, New York 10006. Scotia Capital acted as an underwriter and co-manager of the 2014 Notes Offerings.

589.    Defendants identified in paragraphs 553-565 are collectively referred to herein as the "Underwriter Defendants."

## 5.    Auditor Defendant

590.    PriceWaterhouseCoopers Auditores Independentes ("PwC") maintains an office at Av. José Silva de Azevedo Neto 200, 1st and 2nd Tower Evolution IV, Barra da Tijuca 22775-056

- Rio de Janeiro, and is a network firm of PriceWaterhouseCoopers International Limited and the Brazilian arm of the global PricewaterhouseCoopers organization.

591.    PwC served as Petrobras' independent registered public accounting firm since January 2012, and audited Petrobras' financial statements and its system of internal controls over financial reporting for the years ended December 31, 2012 and 2013, and signed each of the audit opinions included in Petrobras' Form 20-F filings for those years.

### 6.    Relevant Non-Defendant Individuals

592.    Dilma Vana Rousseff ("President Rousseff") currently serves as President of Brazil. President Rousseff served as the Chair of the Board of Directors of Petrobras prior to March 2010.

593.    Guido Mantega currently serves as the Minister of Finance of Brazil and as the Chair of the Board of Directors ("Board").  Mantega signed the Registration Statement.

594.    Marcos Antonio Silva Menezes ("Menezes") served as a member of the Fiscal Council of Fundação Petrobras de Seguridade Social-PETROS, as Chief Accounting Officer for Petrobras, and as a Director of PifCo. Menezes signed the Registration Statement.

595.    Francisco Roberto de Albuquerque serves as a commanding officer in the Army of Brazil and as a Director of Petrobras, and he signed the Registration Statement.

596.    Jorge Gerdau Johannpeter ("Johannpeter") serves as the president of the Chamber of Management Policies, Performance and Competitiveness, an organization linked to the Presidency of Brazil, and as a Director of Petrobras.  Johannpeter signed the Registration Statement.

597.    Luciano Galvão Coutinho ("Coutinho") served Executive Secretary of the Science & Technology Ministry of Brazil, as President of the Brazilian Development Bank, and as a Director of Petrobras. Coutinho signed the Registration Statement.

598.     Sergio Franklin Quintella ("Quintella") served the President of the Federal Tribunal Court and as a Director of Petrobras. Quintella signed the Registration Statement.

599.     Marcio Pereira Zimmermann ("Zimmermann") serves as Deputy Minister of Energy and as a Director of Petrobras. Zimmermann signed the prospectus included in the Registration Statement pursuant to which the Company offered the 2013 Notes and the 2014 Notes.

600.     Miriam Aparecida Belchior ("Belchior") serves as Minister of Planning and as a Director of Petrobras.  Belchior signed the Registration Statement.

### F.     Jurisdiction and Venue

601.     The claims asserted herein arise under Sections 11, 12(a)(2) and 15 (15 U.S.C. §§ 77k, 77l, and 77o) of the Securities Act of 1933 ("Securities Act").

602.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act (15 U.S.C. § 77v).

603.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act (15 U.S.C § 77v) and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District, Petrobras maintains its principal office in New York, New York, and various Petrobras securities trade within this District on the New York Stock Exchange.

604.     In connection with the acts alleged in these Claims for Relief under the Securities Act, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### G.    False and Misleading Statements

#### 1.    <u>2011 20-F</u>

605.    On April 2, 2012, Petrobras and PifCo filed the 2011 20-F, incorporated by reference into the 2013 Offering Documents and 2014 Offering Documents, reporting total assets of $319 billion including net PP&E of $182 billion, depreciation, depletion, and amortization of $10.5 billion, and net income of $20.0 billion, and also incorporated by reference Petrobras' Code of Ethics (the "Code").  Pursuant to the terms of the Code, Petrobras undertook to "conduct its business with transparency and integrity, creating credibility with its shareholders . . . and . . . investors" and to "register its reports and statements in a correct, consistent, accurate and complete way."  Moreover, according to the Code, Petrobras' executives undertook to "refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions" and to "refuse support and contributions to political parties or political campaigns of candidates for elective offices."

606.    Petrobras' 2011 20-F stated that the "Company's management has assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2011" and "has concluded that each Company's internal control over financial reporting was effective as of December 31, 2011."  The Company explained that the "management of [the] Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2011, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

607.    Statements in the 2011 20-F regarding the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income were false and misleading because (i) the reported value of the Company's assets were materially false and misleading as the costs associated with improper

payments made to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values; and (ii) had the improper payments been properly accounted for, the Company would have recognized materially greater expenses and less net income.  Moreover, these statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E was adversely impacted by improper payments that inflated the value of numerous construction contracts related to Petrobras' refineries and operations.

608.    Further, statements in the 2010 20-F regarding compliance with internal control over financial reporting, and statements regarding adherence to the Code, were materially false and misleading and omitted material information by virtue of the improper payments made to contractors and contributions to political parties or political campaigns of candidates for elective offices.

## 2.    8/10/12 6-K

609.    On August 10, 2012, Petrobras filed the 8/10/12 6-K setting forth the Company's financial statements for the period ending June 30, 2012, incorporated by reference into the 2013 Offering Documents and the 2014 Offering Documents, reporting total assets of $311 billion including net property, plant, and equipment of $185 billion, depreciation, depletion, and amortization of $2.7 billion, and a net loss of $953 million.

610.    Statements in the 8/10/12 6-K regarding the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income were false and misleading because (i) the reported value of the Company's assets were materially false and misleading as costs associated with improper

payments made to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values; and (ii) had the improper payments been properly accounted for, the Company would have recognized materially greater expenses and less net income.  Moreover, these statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E was adversely impacted by improper payments that inflated the value of numerous construction contracts related to Petrobras' refineries and operations.

<h3>3.    <u>2012 20-F</u></h3>

611.    On April 29, 2013, Petrobras filed the 2012 20-F, incorporated by reference into the 2013 Offering Documents and 2014 Offering Documents, reporting total assets of $332 billion including net PP&F of $205 billion, depreciation, depletion, and amortization of $11.1 billion, and net income of $10.9 billion.

612.    Petrobras' 2012 20-F stated that the "Company's management has assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2012" and "has concluded that each Company's internal control over financial reporting was effective as of December 31, 2012."  The Company explained that the "management of [the] Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2012, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting."

613.    Statements in the 2012 20-F regarding the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income were false and misleading because (i) the reported value of the

Company's assets were materially false and misleading as the costs associated with improper payments made to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values; and (ii) had the improper payments been properly accounted for, the Company would have recognized materially greater expenses and less net income. Moreover, these statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E was adversely impacted by improper payments that inflated the value of numerous construction contracts related to Petrobras' refineries and operations.

614.    Further, statements in the 2010 20-F regarding compliance with internal control over financial reporting, and statements regarding adherence to the Code, were materially false and misleading and omitted material information by virtue of the improper payments made to contractors and contributions to political parties or political campaigns of candidates for elective offices.

### 4.    4/30/13 6-K

615.    On April 30, 2013, Petrobras filed the 4/30/13 6-K setting forth the Company's financial statements for the period ending March 31, 2013, incorporated by reference into the 2013 Offering Documents and the 2014 Offering Documents, reporting total assets of $345 billion including net PP&E of $214 billion, depreciation, depletion, and amortization of $3.2 billion, and net income of $3.9 billion.

616.    Statements in the 4/30/13 6-K regarding the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income were false and misleading because (i) the reported value of the

Company's assets were materially false and misleading as costs associated with improper payments made to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values; and (ii) had the improper payments been properly accounted for, the Company would have recognized materially greater expenses and less net income.  Moreover, these statements were materially false and misleading because the Company failed to disclose that the value of the Company's PP&E was adversely impacted by improper payments that inflated the value of numerous construction contracts related to Petrobras' refineries and operations.

### 5.      2/26/14 6-K

617.    On February 26, 2014, Petrobras filed the 2/26/14 6-K setting forth the Company's financial statements for 2013 year end, incorporated by reference into the 2014 Offering Documents, reporting total assets of $321 billion including net PP&E of $228 billion, depreciation, depletion, and amortization of $13.2 billion, and net income of $10.8 billion.

618.    Statements in the 2/26/14 6-K regarding the Company's reported total assets, including net PP&E, total costs and expenses, including depreciation, depletion, and amortization, and the reported net income were false and misleading because (i) the reported value of the Company's assets were materially false and misleading as costs associated with improper payments made to contractors had been incorporated into certain asset values at the time of their acquisition and then capitalized as part of those assets' values when recorded on Petrobras' balance sheet, artificially inflating their values; and (ii) had the improper payments been properly accounted for, the Company would have recognized materially greater expenses and less net income.  Moreover, these statements were materially false and misleading because the Company

failed to disclose that the value of the Company's PP&E was adversely impacted by improper payments that inflated the value of numerous construction contracts related to Petrobras' refineries and operations.

### 6.    3/7/14 6-K

619.    On March 11, 2014, Petrobras filed the 3/11/14 6-K, which included the following statement:

> Our management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2013, based on the criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment and criteria, the Company's management has concluded that Company's internal control over financial reporting was effective as of December 31, 2013.

620.    This statement was materially false and misleading and omitted material information by virtue of the improper payments made to contractors and contributions to political parties or political campaigns of candidates for elective offices.

### 7.    3/11/14 6-K

621.    On March 11, 2014, Petrobras filed the 3/11/14 6-K, which attached a copy of the March 2014 Underwriting Agreement between Petrobras, PGF and the Underwriter Defendants who underwrote the 2014 Notes Offerings, stating that neither Petrobras nor any of its officers had engaged in any corruption, including making "any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds" or violating "any provision of the Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 or the Law No. 12,846 of 2013 - *Nova Lei Anticorrupção Brasileira* of 2013 (New Brazilian Anti-Corruption Law)."  The March 2014 Underwriting Agreement further stated that neither Petrobras nor any of its officers had "made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment."

622.     Statements in the 3/11/14 6-K were materially false and misleading because Petrobras and its executives have admitted that they had engaged in a pattern of awarding inflated contracts to foreign and domestic construction and engineering companies, including within these contracts improper influence payments paid to Petrobras executives and Brazilian government officials.

### H.     Petrobras' Financial Statements Failed to Comply With PCAOB Standards And SEC Regulations

623.     PwC audited Petrobras' financial statements and its system of internal controls over financial reporting for the years ended December 31, 2012 and 2013.  PwC also issued and signed audit opinions in which it certified that Petrobras' internal controls were adequate and that the Company's financial statements were free of material misstatements and fairly presented Petrobras' financial position.

624.     PwC subsequently consented to the incorporation by reference of those unqualified audit opinions in the Offering Materials for the Company's 2013 Notes Offerings and 2014 Notes Offerings.

625.     PwC's unqualified opinions on Petrobras' financial statements, incorporated by reference into the 2013 Notes Offerings and 2014 Notes Offerings, were materially false and misleading.  Contrary to their representations, PwC's audits of those financial statements were not conducted in accordance with Generally Accepted Auditing Standards ("GAAS") or Public Company Accounting Oversight Board ("PCAOB") standards, and Petrobras' financial condition and results of operations were not presented in conformity with International Financial Reporting Standards ("IFRS"), as they purported to be.  In issuing unqualified audit opinions and consenting to their incorporation in Petrobras' SEC filings, PwC made false and misleading statements in violation of Section 11 of the Exchange Act.

626.    On February 4, 2013, PwC signed a "Report of Independent Registered Public Accounting Firm" reporting on Petrobras' financial statements and internal controls for the year ended December 31, 2012.  Specifically, PwC reported:

In our opinion, the accompanying consolidated statement of financial position and the related consolidated statements of income, of comprehensive income, of cash flows and of changes in stockholders' equity present fairly, in all material respects, the financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries (the "Company") at December 31, 2012, and the results of their operations and their cash flows for the year ended December 31, 2012 in conformity with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB). Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally

accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Rio de Janeiro, February 4, 2013

PricewaterhouseCoopers
Auditores Independentes
CRC 2SP000160/O-5 "F" RJ

/s/ Marcos Donizete Panassol
Contador CRC 1SP155975/O-8 "S" RJ

627.    On February 6, 2013, Petrobras filed an interim report with the SEC on Form 6-K

in which PwC consented to the incorporation by reference of its report in the Registration

Statement.  Specifically:

We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-163665) of Petróleo Brasileiro S.A. - Petrobras, of our report dated February 04, 2013 relating to the financial statements of Petrobras and the effectiveness of internal control over financial reporting, which is included in Petrobras` Form 6-K dated February 05, 2013.

/s/ PricewaterhouseCoopers

PricewaterhouseCoopers
Auditores Independentes

Rio de Janeiro - Brazil
February 5, 2013

628.    On April 29, 2013, PwC reissued its signed report of February 5, 2013, with

Petrobras' filing of the 2012 20-F with the SEC.  In an exhibit to the 2012 20-F, PwC again

consented to the incorporation by reference of its report in the Registration Statement. Specifically,

> We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our report dated February 4, 2013 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Annual Report on Form 20-F.
>
> /s/ Marcos Donizete Panassol
> Marcos Donizete Panassol
> Engagement Leader
>
> PricewaterhouseCoopers
> Rio de Janeiro - Brazil
> April 26, 2013

629.    On February 25, 2014, PwC signed a "Report of Independent Registered Public Accounting Firm," reporting on Petrobras' financial statements and internal controls for the year ended December 31, 2013.  The report was issued in a Form 6-K filed by Petrobras with the SEC on February 26, 2013.  It reads as follows:

> In our opinion, the accompanying consolidated statement of financial position and the related consolidated statements of income and comprehensive income, changes in equity and cash flows present fairly, in all material respects, the financial position of Petróleo Brasileiro S.A. - Petrobras and its subsidiaries (the "Company") at December 31, 2013, and December 31, 2012, and the results of their operations and their cash flows for the years ended December 31, 2013, and December 31, 2012, in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013 based on criteria established in Internal Control - Integrated Framework  (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for these financial statements, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on these financial statements and on the Company's internal control over financial reporting based on our integrated audits. We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan

and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

We also have audited the adjustments to the 2011 financial statements to retrospectively apply the change in accounting for employee benefit plans for the revisions to IAS 19 Employee Benefits as described in Note 2.3. In our opinion, such adjustments are appropriate and have been properly applied. We were not engaged to audit, review, or apply any procedures to the 2011 consolidated financial statements of the Company other than with respect to the adjustments and, accordingly, we do not express an opinion or any other form of assurance on the 2011 consolidated financial statements taken as a whole.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Rio de Janeiro, February 25, 2013

/s/ PricewaterhouseCoopers
Auditores Independentes
CRC 2SP000160/O-5 "F" RJ

/s/ Marcos Donizete Panassol
Contador CRC 1SP155975

630. On March 10, 2014, PwC reissued its signed report of February 4, 2014, with Petrobras' filing of Form 6-K/A with the SEC. In an exhibit to the Form 6-K/A, PwC again consented to the incorporation by reference of its report in the Registration Statement filed on Form F-3:

> We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our report dated February 25, 2014 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in the Petróleo Brasileiro S.A. - Petrobras Form 6-K dated February 26, 2014 and the related amendment on Form 6-K/A dated March 10, 2014. We also consent to the reference to us as experts under the heading "Independent Registered Public Accounting Firm" in such Registration Statement. We also consent to the reference to us under the heading "Selected Financial Data" in such Registration Statement.
>
> /s/PricewaterhouseCoopers Auditores Independentes
> Rio de Janeiro, Brazil
> March 10, 2014

631. Finally, on April 30, 2014, PwC reissued its signed report of February 25, 2014, with Petrobras' filing of the 2013 20-F with the SEC. In an exhibit to the 2013 20-F, PwC again consented to the incorporation by reference of its report in Petrobras' Registration Statement filed on Form F-3:

> We hereby consent to the incorporation by reference in the Registration Statement on Form F-3 (No. 333-183618) of Petróleo Brasileiro S.A. - Petrobras of our report dated February 25, 2014 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Annual Report on Form 20-F.
>
> /s/ Marcos Donizete Panassol
> Marcos Donizete Panassol
> Engagement Leader

PricewaterhouseCoopers
Rio de Janeiro - Brazil
April 30, 2014

632.    As Petrobras' external auditor, PwC was required to audit the Company's financial statements and the effectiveness of the Company's internal controls over financial reporting in accordance with GAAS, promulgated by the American Institute of Certified Public Accountants ("AICPA"), and the standards of the PCAOB.  The PCAOB, which was established by the Sarbanes-Oxley Act of 2002, adopted GAAS in April 2003.  The standards adopted by PCAOB that also have been approved by the SEC are designated with the prefix "AS."  Preexisting interim standards that have been adopted by the PCAOB are designated by the prefix "AU."

633.    GAAS is comprised of ten standards that fall into three basic categories: General Standards, Fieldwork Standards, and Reporting Standards.  These standards are set forth in AU § 150.01-.02.  Specifically, the General Standards provide guidance to an auditor on the exercise of due professional care in the performance of the audit.  The Standards of Fieldwork provide guidance on audit planning, proper evaluation of internal controls, and the collection of appropriate evidential matter.  Finally, the Standards of Reporting provide guidance to the auditor on the content of an audit report.

634.    An audit is a risk-based process during which the auditor should exercise due care. An auditor should be always aware of the risk of misstatements due to fraud or error, and to the possibility of illegal acts.  As those risks increase or materialize, auditors are obligated by GAAS and PCAOB standards to alter their audit procedures accordingly.  PwC failed to recognize glaring risks and evidence of illegal acts, and consequently, failed to adjust its audit procedures, leading to an unqualified audit report that was materially false and misleading.

635.    For example, PwC failed to exercise sufficient professional care in its audits of Petrobras' financial statements, and thus violated GAAS General Standard No. 3, which requires due professional care to be exercised in the performance of the audit and the preparation of the report, and AU § 230, Due Professional Care in the Performance of Work, which states that "[d]ue professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting."  AU § 230.02.  The duty to exercise due care required PwC to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.  AU § 230.10.  PwC failed to do this.

636.    PwC also failed to exercise sufficient professional skepticism in violation of AU § 316.  Specifically, AU § 316 requires the following:

> Due professional care requires the auditor to exercise professional skepticism. Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the fraud risks.  Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity.  Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest.

AU § 316.13 (internal citations omitted).

637.    AU § 316 therefore required PwC to be continually alert for indications of misstatements of Petrobras' financial statements due to either error or fraud.  The PCAOB standards require the auditor to approach the audit "with a mindset that recognizes the possibility that a material misstatement due to fraud could be present."  AU § 316.13.  As detailed above at

¶¶ 185-187, due to the presence of multiple red flags, PwC knew or should have known that there was a strong possibility of material misstatements in connection with Petrobras' financial statements for the 2012 and 2013 fiscal years.  For example, PwC should have recognized the importance of Property, Plant and Equipment ("PP&E") to the balance sheet and that the most significant cash outflow was capital expenditures.  *Supra* at ¶ 194.  The capital expenditures in 2012 and 2013 were approximately four times greater than net income.  *Supra* at ¶ 185.  There also were projects that were severely over budget.  *Supra* at ¶ 185.

638.    Furthermore, PwC should have been aware that there was a heightened risk in connection with the inflation of construction contracts.  As to that point, it was required to perform increased audit procedures compared to those it otherwise performed.  For example paragraphs 6 and 9 of AS No. 13, The Auditor's Responses to the Risk of Material Misstatements, state the following:

> The auditor also should determine whether it is necessary to make pervasive changes to the nature, timing, or extent of audit procedures to adequately address the assessed risks of material misstatement.  Examples of such pervasive changes include modifying the audit strategy to: (a) increase the substantive testing of the valuation of numerous significant accounts at year end because of significantly deteriorating market conditions, and (b) obtain more persuasive audit evidence from substantive procedures due to the identification of pervasive weaknesses in the company's control environment.

* * *

> In designing the audit procedures to be performed, the auditor should . . . obtain more persuasive audit evidence the higher the auditor's assessment of risk.

639.    AS No. 13.14 provides specific examples of precisely how PwC should have modified its audit procedures to address its assessed risks.  In that regard, PwC should have:

> (a)    Chang[ed] the nature of audit procedures to obtain evidence that is more reliable or to obtain additional corroborative information;

(b)    Chang[ed] the timing of audit procedures to be closer to the end of the period or to the points during the period in which fraudulent transactions are more likely to occur; and

(c)    Chang[ed] the extent of the procedures applied to obtain more evidence, e.g., by increasing sample sizes or applying computer-assisted audit techniques to all of the items in an account.

640.    In failing to modify its audit procedures, PwC failed to comply with AS No. 13. Had PwC appropriately modified its audit procedures to be responsive to the risk of material misstatement of the Company's financial statements due to misstatements in its PP&E accounts and carried out those procedures with the appropriate degree of professional skepticism, it would have discovered that the Company's capital expenditures, PP&E, and net income all were materially overstated.

641.    PwC's failure to obtain sufficient appropriate evidential matter regarding its audits of capital expenditures, construction in progress accounts, and equipment and other assets accounts also did not comply with PCAOB auditing standards.  For example, PwC violated GAAS Standard of Fieldwork No. 3, which requires sufficient appropriate evidential matter to afford a reasonable basis for: (1) the opinion regarding the financial statements and (2) the opinion regarding internal control over financial reporting.  PwC also violated AS No. 15:  Audit Evidence, which states that "as the risk increases, the amount of evidence that the auditor should obtain also increases. . . . [O]rdinarily more evidence is needed to respond to significant risks."  Notwithstanding ample indicators of increased risk of fraud and illegal acts in parts of Petrobras' financial statements, PwC failed to obtain more evidence than it typically would in the absence of increased risk.  For example, the Company made significant capital expenditures, including excessive amounts paid to acquire certain refineries and experiencing significant budget overruns on large projects.  There were also various news articles reporting the Company's practice of engaging in bribes and

kickbacks.  Also, PP&E was by far the largest asset on Petrobras' balance sheets.  At December 31, 2013 and 2012, PP&E represented 70.9% and 62.5% of total assets, respectively.  Furthermore, it is recognized that bribery by international companies is common when there is close interaction between public and private actors.  PwC should have been aware of all of these facts.  And yet, in violation of AS No. 13, AS No. 15 and PCAOB Standard of Fieldwork No. 3, PwC refused to obtain additional evidence or modify its audit procedures.

642.    The audit procedures that PwC was required to perform include the following:

(a)    Physically inspecting major additions and verifying claims of ownership;

(b)    For constructed property and construction in progress, examining appropriate documentation supporting the amount recorded on the Company's balance sheet, such as review of construction contracts, work orders, and job status reports;

(c)    Verifying that all payments for capital expenditures were properly authorized and including appropriate supporting documentation;

(d)    Verifying that change orders went through the proper approval process and that the resulting payments were appropriately authorized;

(e)    Obtaining support for authorization of fixed assets additions by reference to minutes of meetings of the board of directors, capital asset budgets, or other evidence of approval by appropriate personnel;

(f)    In connection with the assets under construction, examining all of the supporting documentation for large expenditures, and understanding why certain projects were exceeding their original budgeted amounts and why there were large add-on contracts that increased the original plans.  Key items should have been selected that were large, suspicious, unusual, or risk-prone (AS No. 15.25);

(g)    Examining journal entries and other adjustments for evidence of possible material misstatement due to fraud (AU § 316.58); and

(h)    Inquiring of individuals involved in the financial reporting process about inappropriate or unusual activity relating to the processing of journal entries and other adjustments.

643.     PwC also failed to detect illegal acts engaged in by Petrobras employees, including the acceptance of bribes and kickbacks and subsequent overpayment to contractors in violation of the Foreign Corrupt Practices Act ("FCPA").  Thus, PwC violated AU § 317, *Illegal Acts by Clients*.  In accordance with AU § 317, PwC was required to perform certain additional procedures when it became aware of information concerning a possible illegal act.  In that regard, PwC was required to gain an understanding of the nature of the act, the circumstances in which it occurred, and other information to evaluate that act's effect on the financial statements.  If management failed to provide necessary information, PwC was required to consult with Petrobras' legal counsel or other specialists.  *See* AU § 317.10.

644.     In addition, AU § 317 suggests the need for following additional audit procedures, all of which PwC failed to conduct:

(a)     Examining supporting documents . . . [;]

(b)     Confirm[ing] significant information concerning the matter . . . [;]

(c)     Determin[ing] whether the transaction has been properly authorized . . . [; and]

(d)     Consider[ing] whether other similar transactions or events have occurred, and apply procedures to identify them.

AU 317.11.

645.     PwC also violated GAAS Standards of Reporting Nos. 1 and 4 by falsely representing that Petrobras' financial statements were presented in conformity with IFRS when they were not—as evidenced by the pending write-down of approximately $30 billion of PP&E— and by improperly providing unqualified opinions on Petrobras' financial statements for the years ended December 31, 2012 and 2013, even though its audits were not conducted in accordance with

PCAOB auditing standards and the financial statements were not prepared in accordance with IFRS.

646.    Under AS No. 5, PwC was required to complete a careful examination regarding Petrobras' effective controls over financial reporting.  PCOAB's rulemaking in connection with AS No. 5 makes clear that PwC could not simply rely on the assessment of internal controls reached and communicated to it by Petrobras management or third parties, but was instead required to conduct its own independent assessment of internal controls before it could issue a "clean" opinion.  According to AS No. 5: "The auditor is required to provide an independent opinion on the effectiveness of the company's internal control over financial reporting. . . .  The auditor cannot obtain sufficient evidence to support an opinion on the effectiveness of internal controls based solely on observation of or interaction with the company's controls.  Rather, the auditor needs to perform procedures such as inquiry, observation, and inspection of documents, or walkthroughs, which consist of a combination of these procedures, in order to fully understand and identify the likely sources of potential misstatements[.]"   After performing an independent analysis, an independent auditor is not permitted to issue a clean opinion if any "material weaknesses" exist.

647.    Because PwC did not identify, let alone independently test the effectiveness of, any internal control that would have prevented the overstatement of PP&E, discussed above, as required by AS No. 5, PwC's unqualified opinions regarding the effectiveness of Petrobras' system of internal controls were materially false and misleading.

## COUNT III

### For Violations of Section 11 of the Securities Act
### Against the Securities Act Defendants

648.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 501-647, as if set forth fully herein and further allege as follows.  This count is based on negligence

and strict liability and dos not sound in fraud.  Any allegation of fraud or fraudulent conduct and/or

motive are expressly excluded from this Count.

649.    This Count is asserted against the Petrobras, PGF, PifCo, the Officer and Director

Defendants, the Underwriter Defendants, and PwC (together, the "Securities Act Defendants") for

violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all

members of the Class who purchased or otherwise acquired the Petrobras securities set forth on

Appendix A pursuant or traceable to the materially false and misleading Registration Statement

and Petrobras SEC filings incorporated therein by reference.

650.    The Registration Statement, including Petrobras' SEC filings incorporated by

reference therein at the time of both offerings, contained untrue statements of material fact and

omitted to state other material facts necessary to make the statements made therein not misleading.

The specific documents containing such untrue statements and omissions that were incorporated

by reference in the Registration Statement with regard to each Offering are identified in Appendix

A.

651.    The Officer Defendants were executive officers and representatives of the

Company responsible for the contents and dissemination of the Registration Statement.  Each of

the Director Defendants was a director of Petrobras at the time the Registration Statement became

effective as to the Notes Offerings.  Each of the Officer Defendants and Director Defendants signed

the Registration Statement or documents incorporated by reference, in their capacities as officers

or directors of Petrobras, and caused and participated in the issuance of the Registration Statement.

By reasons of the conduct alleged herein, each of these Defendants violated Section 11 of the

Securities Act.

652.    PwC was the auditor for Petrobras.  PwC's audit reports, included in Petrobras' 2012 20-F and 2013 20-F incorporated by reference into the 2013 Notes Offerings and 2014 Notes Offerings, falsely certified that Petrobras' financial statements were prepared in accordance with International Financial Reporting Standards and falsely represented that it conducted its audits or reviews in accordance with PCAOB standards.

653.    The Underwriter Defendants were underwriters of certain of the Offerings set forth in Appendix A.  The Underwriter Defendants acted negligently and are liable to members of the Class who purchased or otherwise acquired Petrobras securities sold pursuant or traceable to the Offering Materials for the respective Offerings in which each Underwriter Defendant participated. The Defendants named in this count owed to the purchasers of the securities identified on Appendix A the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, and any incorporated documents, at the time each such Offering became effective to ensure that said statements were true and that there were no omissions of material fact which rendered the statements therein materially untrue or misleading.  The Securities Act Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statement were true, were without omissions of any material facts, and were not misleading.  Accordingly, the Securities Act Defendants acted negligently and are therefore liable to Plaintiffs and members of the Class who purchased or otherwise acquired the securities sold pursuant or traceable to the materially false and misleading Offering Materials set forth in Appendix A.

654.    Plaintiffs and all members of the Class who purchased or otherwise acquired Petrobras securities sold in or traceable to the Notes Offerings did not know of the negligent conduct alleged herein or of the facts concerning the untrue statements of material fact and

omissions alleged herein, and by the reasonable exercise of care could not have reasonably discovered such facts or conduct.

655.    None of the untrue statements or omissions alleged herein was a forward-looking statement but, rather, each concerned existing facts. Moreover, the Defendants named in this Count did not properly identify any of these untrue statements as forward-looking statements and did not disclose information that undermined the validity of those statements.

656.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based from the time that the initial complaint was filed asserting claims arising out of the Registration Statement.  Less than three years elapsed from the time that the securities upon which this Count is brought were offered in good faith to the public to the time that the initial complaint was filed.

657.    Plaintiffs and all members of the Class have sustained damages. The value of the securities sold pursuant or traceable to the Offerings set forth in Appendix A has declined substantially due to the Securities Act Defendants' violations of Section 11 of the Securities Act. By reason of the foregoing, the Securities Act Defendants are liable for violations of Section 11 of the Securities Act to Plaintiffs and all members of the Class.

## COUNT IV

### For Violations Of Section 12(a)(2) of the Securities Act Against Petrobras and PGF

658.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 501-647, as if set forth fully herein and further allege as follows.

659.    This Count is asserted against Petrobras and PGF ("Section 12(a)(2) Defendants") for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2).

660.     Section 12(a)(2) Defendants were sellers, offerors, and/or solicitors of sales of the securities issued in the Notes Offerings pursuant to the Offering Documents, and directly solicited the purchase of securities by Plaintiffs by means of the Offering Documents, motivated at least in part by the desire to serve their own financial interests.

661.     The Offering Documents contained untrue statements of material fact and failed to disclose material facts, as set forth herein.  Union, Hawaii ERS, and North Carolina purchased notes in the Notes Offerings on the offering dates and at the offering prices, pursuant to the materially false and misleading Offering Documents.

662.     Union, Hawaii ERS, and North Carolina did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Offering Documents when they purchased or acquired the Notes.

663.     The value of the Notes issued in connection with the Notes Offerings has declined substantially subsequent to the consummation of the Notes Offerings, and Union, Hawaii ERS, and North Carolina have sustained damages.

664.     Less than one year elapsed between the time Union, Hawaii ERS, and North Carolina discovered or reasonably could have discovered the facts upon which this complaint is based.  Less than three years have elapsed between the time the Notes Offerings were bona fide offered to the public.

665.     By reason of the foregoing, Section 12(a)(2) Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Union, Hawaii ERS, North Carolina, and all members of the Class.

**COUNT V**

**For Violations of Section 15 of the Securities Act**
**Against the Officer Defendants**

666.    Plaintiffs repeat and reallege paragraphs 501-647, as if fully set forth herein. This count is based on negligence and strict liability and does not sound in fraud.  Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

667.    This Count is asserted against the Officer Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired Petrobras securities set forth in Appendix A pursuant or traceable to the Offering Materials and were damaged thereby.

668.    At all relevant times, the Officer Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Each of the Officer Defendants served as an executive officer or director of Petrobras prior to and/or at the time of the Offerings.

669.    The Officer Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Petrobras' business affairs.  As officers and directors of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to Petrobras' financial condition and results of operations.  Because of their positions of control and authority as officers or directors of Petrobras, the Officer Defendants were able to, and did, control the contents of the Offering Materials which contained materially untrue financial information.

670.    By reason of the aforementioned conduct, each of the Officer Defendants is liable under Section 15 of the Securities Act, jointly and severally, to Plaintiffs and the other members

214

of the Class. As a direct and proximate result of the conduct of Petrobras and the Officer Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of the Petrobras securities identified in Appendix A.

671. Less than one year has elapsed between the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was brought. Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## COUNT VI

### For Violations of Section 15 of the Securities Act
### Against Petrobras America Inc.

672. Plaintiffs repeat and reallege paragraphs 501-647, as if fully set forth herein. This count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

673. This Count is asserted against Petrobras America Inc. for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Class who purchased or otherwise acquired Petrobras securities set forth in Appendix A pursuant or traceable to the Offering Materials and were damaged thereby.

674. At the relevant times, Petrobras America Inc. was a controlling person of Defendant Helms within the meaning of Section 15 of the Securities Act. By virtue of its power to control public statements made by Defendant Helms, Petrobras America Inc. had the power and ability to control the actions of Defendant Helms.

675. Less than one year has elapsed between the time Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based and the time this claim was

brought.  Less than three years have elapsed between the time that the securities upon which this Count is brought were bona fide offered to the public and the time this action was commenced.

## XIV.    CLASS ALLEGATIONS FOR EXCHANGE ACT AND SECURITIES ACT COUNTS

676.    Lead Plaintiff, and with respect to the Notes Offerings, all Plaintiffs, bring this action as a class action on behalf of themselves and as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons who and entities who: (i) purchased or otherwise acquired Petrobras securities traded on the NYSE or pursuant to other domestic transactions during the period January 22, 2010 and July 28, 2015, inclusive (the "Class Period"), and were damaged thereby; and/or (ii) purchased or otherwise acquired the 2013 Notes or 2014 Notes pursuant to the Registration Statement before Petrobras made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the Notes Offerings, and were damaged thereby.  Excluded from the Class are Defendants and their families, directors and officers of Petrobras, PifCo, and PGF and their families, and affiliates.

677.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and other members of the Class acquired securities in the offerings pursuant to a registration statement, or purchased or sold Petrobras securities in the market and sustained damages as a result of Defendants' conduct complained of herein.

678.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

679.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the

Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

680.    Common question of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)    whether the Federal securities laws were violated by Defendants' conduct as alleged herein;

(b)    whether the registration statements and prospectuses for the Notes Offerings contained material misstatements or omitted material information;

(c)    whether SEC filings, press releases and other public statements disseminated to the investing public during the Class Period contained material misstatements or omitted material information;

(d)    whether and to what extend Defendant PwC's audits of the Company's financial statements for the years ended 2012 and 2013 failed to be conducted in accordance with the standards of the Public Company Accounting Oversight Board;

(e)    whether and to what extend the market prices of Petrobras' ADSs and other securities were artificially inflated during the Class Period due to the non-disclosure and/or misstatements complained of herein;

(f)    whether, with respect to Plaintiffs' claims under the Securities Act, the Individual Defendants and Underwriter Defendants named in those claims can sustain their burden of establishing an affirmative defense pursuant to the applicable statute;

(g)    whether, with respect to Plaintiffs' claims pursuant to Section 15 of the Securities Act, Defendants named in the claim were controlling persons of Petrobras, and with respect to Lead Plaintiff's Section 20(a) of the Exchange Act, Defendants named in the claim were controlling persons of Petrobras;

(h)    whether, with respect to Lead Plaintiff's claims under the Exchange Act, Defendants named in those claims acted with scienter;

(i)    whether, with respect to Lead Plaintiff's claims under the Exchange Act, reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

(j)  whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

681.  The names and addresses of those persons and entities who purchased or sold Petrobras securities during the Class Period are available from the Company's transfer agent(s) and/or from the Underwriter Defendants.  Notice may be provided to such members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## XV.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## XVI.   JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Lead Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated:  November 30, 2015

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Marc I. Gross
John Kehoe
Emma Gilmore

218

Justin Nematzadeh
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: 212-661-1100
Facsimile:  212-661-8665

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 North LaSalle
Suite 3505
Chicago, IL  60603
Telephone: 312-377-1181
Facsimile:  312-377-1184

**POMERANTZ LLP**
Jennifer Pafiti
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  310-285-5330

*Attorneys for Lead Plaintiff and Named
Plaintiff North Carolina*

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Louis Gottlieb
140 Broadway
New York, NY 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477

*Counsel for Employees' Retirement System
of the State of Hawaii*

**MOTLEY RICE**
William H. Narwold
One Corporate Center
20 Church St. 17th Floor
Hartford, CT 06103
Telephone:  860-882-1676
Facsimile: 860-882-1682

*Counsel for Union Asset Management
Holding AG*

219