USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/21/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
                                        :   14-cv-9662 (JSR)
In re: PETROBRAS SECURITIES             :
LITIGATION                              :   OPINION AND ORDER
                                        :
----------------------------------------x

JED S. RAKOFF, U.S.D.J.

    Lead Plaintiff Universities Superannuation Scheme Ltd. ("USS") brings this putative class action against Brazilian oil company Petróleo Brasileiro S.A. - Petrobras ("Petrobras"); two of Petrobras' wholly-owned subsidiaries, Petrobras Global Finance, B.V. ("PGF")[1] and Petrobras America, Inc. ("PAI"); various former officers and directors of Petrobras and its subsidiaries (the "Individual Defendants")[2]; Petrobras'

---

[1] On February 12, 2014, PGF acquired the outstanding shares of another wholly-owned subsidiary of Petrobras, Petrobras International Finance Company S.A. ("PifCo").

[2] Specifically, the Individual Defendants include Petrobras Chief Executive Officer ("CEO") Maria das Gracas Silva Foster, Petrobras CEO José Sergio Gabrielli, Petrobras Chief Financial Officer ("CFO") Almir Guilherme Barbassa, Petrobras director Paulo Roberto Costa, Petrobras director Jose Carlos Cosenza, Petrobras director Renato de Souza Duque, Petrobras director Guillherme de Oliveira Estrella, Petrobras director Jose Miranda Formigli Filho; Petrobras director Josue Christiano Gomes da Silva, Petrobras director Silvio Sinedino Pinheiro, PifCo Chairman and CEO Daniel Lima de Oliveira, PifCo director José Raimundo Brandão Pereira, PifCo CFO Sérvio Túlio da Rosa Tinoco, PifCo Chief Accounting Officer Paulo Jose Alves, PGF CEO and "Managing Director A" Gustavo Tardin Barbosa, PGF CFO and "Managing Director B" Alexandre Quintão Fernandes, PGF "Managing Director A" Marcos Antonio Zacarias, PGF "Managing Director B" Cornelis Franciscus Jozef Looman, and authorized Petrobras United States Representative Theodore Marshall Helms.

1

independent auditor, PricewaterhouseCoopers Auditores Independentes ("PwC"); and the underwriters of Petrobras's debt offerings (the "Underwriter Defendants").[3] Plaintiffs allege that Petrobras was at the center of a multi-year, multi-billion dollar bribery and kickback scheme, in connection with which defendants made false and misleading statements in violation of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

The details of this case in general are set forth in the Court's Opinion dated July 30, 2015, familiarity with which is here presumed. See Opinion dated July 30, 2015, at 2-14, ECF No. 194. The Court's July 30, 2015, Opinion explained its Order dated July 10, 2015, granting in part and denying in part defendants' motion to dismiss plaintiffs' first Consolidated Amended Complaint (the "CAC"). See Order dated July 10, 2015, ECF No. 189; CAC, ECF No. 110. Since the Court's July 10, 2015 Order, plaintiffs have filed, with leave of Court, three subsequent amended complaints, most recently the Fourth Amended

---

[3] Specifically, the Underwriter Defendants are: BB Securities Ltd., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Itau BBA USA Securities, Inc., Morgan Stanley & Co. LLC, HSBC Securities (USA) Inc., Mitsubishi UFJ Securities (USA), Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Standard Chartered Bank, Bank of China (Hong Kong) Limited, Banco Bradesco BBI S.A., Banca IMI S.p.A., and Scotia Capital (USA) Inc.

Complaint (the "FAC") on November 30, 2015. See FAC, ECF No. 342. Within the confines of the Court's earlier rulings allowing most of the case to proceed, defendants now move to dismiss certain claims, or portions of claims, in the FAC that raise narrower issues than were previously dealt with.[4]

The first and most important of these issues, which was initially raised in defendants' original motion to dismiss and is now ripe for decision, is defendants' argument that plaintiffs' claims based on purchases of Petrobras debt securities (the "Notes") must be dismissed under Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010). Under Morrison, the federal securities laws only reach fraudulent statements made "in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 273 (2010).

With respect to the first Morrison prong -- the purchase or sale of a security listed on an American stock exchange -- the parties agree that, although the Notes were listed or intended

---

[4] The motion was originally directed at plaintiffs' Third Amended Complaint, but following oral argument the Court allowed plaintiffs to file the FAC, following which it received further briefing on the motion to dismiss. See Fed. R. Civ. P. 15(a)(2) ("[A] court should freely give leave [to amend].") Nevertheless, barring unusual circumstances, no further amendments will be permitted.

3

to be listed on the New York Stock Exchange (the "NYSE"), they did not trade there. See Defendants' Reply Memorandum of Law in Further Support of their Motion to Dismiss the Third Consolidated Amended Complaint ("Def. Reply") at 2, ECF No. 299; Class Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Third Consolidated Amended Complaint ("P. Opp.") at 19, ECF No. 268. Notwithstanding Morrison's references to "listing," the Second Circuit has held that mere listing, without trading, is insufficient to satisfy Morrison's first prong. See City of Pontiac Policemen's and Firemen's Retirement System v. UBS AG, 752 F.3d 173, 179-81 (2d Cir. 2014). This is because the rationale of Morrison clearly focuses on the location of actual transactions, "with the domestic listing acting as a proxy for a domestic transaction." Id. at 180.

Plaintiffs argue, however, that although "the Notes do not trade on a national exchange per se," they trade on what plaintiffs call "the bond market" in New York. P. Opp. at 19. But that market, as plaintiffs concede, is an "over-the-counter" market, and over-the-counter transactions are, by definition, those that do not occur on an exchange. See BLACK'S LAW DICTIONARY 1279 (10th ed. 2014) (defining "over-the-counter" as "[n]ot listed or traded on an organized securities exchange"). Accordingly, plaintiffs' allegations do not satisfy Morrison's first prong.

Of course, over-the-counter purchases or sales made in the U.S. might seemingly satisfy Morrison's second prong: "the purchase or sale of any [non-listed] security in the United States." Morrison, 561 U.S. at 273. But, again, the Second Circuit has construed the Morrison test narrowly, in line with its underlying rationale. Specifically, the Second Circuit has held that the second prong of Morrison is satisfied only "when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States." Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 69 (2d Cir. 2012). Moreover, conclusory assertions that irrevocable liability has been incurred or that title has passed are insufficient. The parties must allege more specific facts, "including, but not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." Id. at 70.

With respect to irrevocable liability, two of the named plaintiffs, North Carolina Department of State Treasurer ("North Carolina") and Employees' Retirement System of Hawaii ("Hawaii"), have adequately pleaded domestic incurrence of such liability. Specifically, ¶¶ 539-43 of the FAC describe how North Carolina's traders in Raleigh, North Carolina purchased Notes on May 13, 2013, and March 10, 2014, from underwriters in New York,

New York,[5] and ¶¶ 545-50 of the FAC describe how Hawaii's investment managers in Newport Beach, California and Los Angeles, California purchased Notes on Hawaii's behalf from New York-based underwriters on May 13, 2013, and March 10, 2014.[6]

Plaintiffs do not, however, adequately allege that the two other named plaintiffs, Union Asset Management Holding AG ("Union") and USS, satisfy the irrevocable liability prong of Absolute Activist. With respect to Union, the FAC alleges that "three funds affiliated with Union . . . purchased [a Petrobras Note] in the United States." FAC ¶ 551. However, "the mere assertion that transactions 'took place in the United States' is insufficient to adequately plead the existence of domestic transactions." Absolute Activist, 677 F.3d at 70.

The FAC does plead more specific allegations with respect to two of the funds affiliated with Union. First, the FAC alleges that UIN Fonds Nr. 618 purchased Petrobras Notes from Citigroup Global Markets, Inc., an underwriter located at 390-388 Greenwich St, New York, New York. FAC ¶ 552. The Court, however, need not reach the question of whether this allegation

---

[5] With respect to North Carolina, the FAC includes the kinds of facts required by Absolute Activist, including New York area code phone numbers on the confirmations sent by representatives of the underwriters. FAC ¶¶ 540, 542.

[6] The FAC also includes facts, such as the area codes from which purchase confirmations were sent, to indicate that Hawaii's transactions occurred in the United States. FAC ¶ 549.

6

satisfies Absolute Activist, because, as the FAC itself states, UIN Fonds Nr. 618 made minor gains in connection with this purchase. FAC ¶ 551 n.65. Union and UIN Fonds Nr. 618 are distinct entities, and Union can base its claim on UIN Fonds Nr. 618's purchase only because UIN Fonds Nr. 618 assigned its claim to Union. See Declaration of Rebecca M. Katz in Support of Motion of the Institutional Investors Group for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Counsel, Ex. E at 6, ECF No. 19. However, because UIN Fonds Nr. 618 made gains in connection with the only Notes it purchased that the FAC sufficiently alleges were purchased in the United States, it has no claim to assign. Losses are an essential element of any federal securities claim. See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342 (2005).

The FAC also alleges that another fund affiliated with Union, DEVIF-Fonds Nr. 81, purchased Notes on the March 10, 2014 offering date in U.S. dollars and that the Notes were held in "[s]afekeeping of securities abroad, depository country: U.S.A." FAC ¶ 553. But the FAC does not allege that this DEVIF-Fonds Nr. 81 purchase occurred in the United States. Indeed, the FAC's language suggests that the purchase occurred outside the United States because it refers to the United States as "abroad." Id. Accordingly, plaintiffs have failed to allege that Union or its

7

counterparties incurred irrevocable liability in the United States.

With respect to the final named plaintiff, USS, the FAC alleges that Legal & General Investment Management ("LGIM"), located in the United Kingdom, instructed its U.S. affiliate, located in Chicago, Illinois, to transfer Petrobras Notes to USS, located in the United Kingdom. FAC ¶ 555. These allegations fail to include the specific facts related to a domestic purchase required by Absolute Activist. Indeed, a "transfer," rather than a purchase, is all that is alleged. Moreover, the allegations suggest that irrevocable liability was incurred in the United Kingdom, where USS and LGIM are both located, rather than the United States. Accordingly, the FAC fails to adequately allege that USS satisfied the irrevocable liability prong of Absolute Activist.

Plaintiffs argue that Union and USS nonetheless satisfy Absolute Activist's alternative requirement that transfer of title occurred in the United States. But plaintiffs do not claim that legal title in the Petrobras Notes was transferred in the United States. Class Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint on Morrison Grounds at 8, ECF No. 350. Instead, they allege that beneficial ownership was transferred in the United States because their Notes purchases settled through the Depository

8

Trust Company (the "DTC") in New York, New York, and that this is the functional equivalent of transfer of title.

The Notes Prospectuses explain that the "DTC was created to hold securities for its participants and to facilitate the clearance and settlement of securities transactions between participants through electronic book-entry changes to accounts of its participants." FAC ¶ 531. The DTC, or its nominee Cede & Co., holds legal title to the vast volume of securities, and Cede & Co.'s name is listed as the registered owner of these securities. Nevertheless, to reflect that investors, such as the plaintiffs here, are usually the beneficial owners of such securities, an investor's brokerage firm name is also listed in DTC's ownership records, and an investor's name, in turn, is listed on the brokerage's own records as the ultimate beneficial owner. In these circumstances, plaintiffs contend that when DTC adjusts its books to settle an investor's trade, it is the functional equivalent of transfer of title.

Plaintiffs are correct that global financial markets could not properly function without the DTC or similar depository institutions and that the chain reaction of adjustments to book entries set off by a securities transaction is necessary to complete a purchase. However, the operations of the DTC are insufficient to satisfy Absolute Activist, even assuming that DTC's bookkeeping affects a change in beneficial ownership in

9

New York. Quite apart from Absolute Activist's clear language requiring a transfer of [legal] title, Absolute Activist, 677 F.3d at 68, the Second Circuit has elsewhere indicated that domestic "actions needed to carry out . . . transactions, and not the transactions themselves[,]" are insufficient to satisfy Morrison. Loginovskaya v. Batratchenko, 764 F.3d 266, 275 (2d Cir. 2014). The mechanics of DTC settlement are actions needed to carry out transactions, but they involve neither the substantive indicia of a contractual commitment necessary to satisfy Absolute Activist's first prong nor the formal weight of a transfer of title necessary for its second.

Moreover, assuming the parties are correct that most securities transactions settle through the DTC or similar depository institutions, the entire thrust of Morrison and its progeny would be rendered nugatory if all DTC-settled transactions necessarily fell under the reach of the federal securities laws. The laws would reach most transactions, not because they occurred on a domestic exchange but because they settled through the DTC. This result cannot be squared with the plain language and careful reasoning of Morrison and Absolute Activist.

Plaintiffs raise one final argument that they satisfy Absolute Activist. They argue that allegations that a plaintiff purchased Notes "on the offering date and at the offering price"

are sufficient to demonstrate irrevocable liability because all the underwriters who sold in the initial offerings only did so in the United States. FAC ¶ 551. However, although plaintiffs cite provisions in the Supplemental Prospectuses that indicate that some Notes were initially offered in the United States, the actual Supplemental Prospectuses referenced in the FAC do not state that the Notes were exclusively initially offered in the United States. See P. Opp. at 16-17; Declaration of Emma Gilmore in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Third Consolidated Amended Complaint Ex. 5, Ex. 6, ECF No. 269. Indeed, the Supplemental Prospectuses imply that some underwriters did initially offer the Notes outside the United States. See, e.g., id. Ex. 5 at S-48, Ex. 6 at S-72 ("Standard Chartered Bank will not effect any offers or sales of any notes in the United States unless it is through one or more U.S. registered broker-dealer . . . .") ("BB Securities Ltd. is not a broker-dealer registered with the SEC and therefore may not make sales of any notes in the United States or to U.S. persons except in compliance with applicable U.S laws and regulations."). Accordingly, even if plaintiffs had adequately alleged that they purchased the Notes only in initial offerings, this alone would not be sufficient to satisfy Absolute Activist.

For the foregoing reasons, the claims of Union and USS based on Notes purchases must be dismissed under Morrison. The Notes claims of North Carolina and Hawaii remain, as do the non-Notes claims of Union and USS.

The second of the issues raised in defendants' instant motion to dismiss is defendants' objection to the FAC's four-month extension of the Class Period of plaintiffs' Exchange Act claims, such that the Class Period now begins on January 22, 2010 and ends on July 28, 2015. FAC ¶ 17. This extension is based on allegedly misleading financial statements Petrobras released on April 22, 2015 and May 15, 2015. FAC ¶¶ 354-57. Specifically, Petrobras reported total overcharges of around $2.5 billion related to the scandal. FAC ¶ 169. Plaintiffs claim this figure and the accompany statements were a "whitewash," FAC ¶ 167-68, and that the true figure, of which the Petrobras Board was aware, was closer to $30 billion, FAC ¶ 446. Plaintiffs allege that, after this whitewash, corrective disclosures were made to the market through July 28, 2015, and the prices of Petrobras securities declined. FAC ¶¶ 469-82.

Defendants first object to the extension of the Class Period on reliance grounds. The FAC invokes the fraud-on-the-market doctrine to plead reliance. FAC ¶¶ 484-87. See Basic, Inc. v. Levinson, 485 U.S. 224, 246-47 (1988). Defendants argue that plaintiffs' fraud-on-the-market theory cannot extend past

12

March 27, 2015, when plaintiffs filed the Consolidated Amended Complaint, alleging that the fraud had diverted "up to or even more than $28 billion from Petrobras's coffers." CAC ¶ 5 (emphasis omitted). Defendants argue that the Consolidated Amended Complaint's allegations were based on publicly available information, so it would be unreasonable for plaintiffs or the market to thereafter rely on the earlier fraudulent statements or the alleged whitewash.

In effect, Petrobras is arguing (rather remarkably) that its own estimate of $2.5 billion in losses was so outlandishly incorrect that the market and investors in its securities should have known better than to rely on it. But this argument is fact-based and not cognizable on a motion to dismiss. See DeMarco v. Lehman Bros., Inc., 309 F. Supp. 2d 631, 636 (S.D.N.Y. 2004). Accordingly, plaintiffs have adequately pleaded reliance for the Class Period.

Defendants also object to the extension of the Class Period on loss causation grounds. They claim that plaintiffs have failed to allege that any new corrective disclosures were made during the extended Class Period. They argue that the post-April 2015 disclosures are speculative or merely "negative characterization[s] of already-public information." In re Omnicom, Inc. Securities Litigation, 597 F.3d 501, 512 (2d Cir. 2010). In re Omnicom, however, concerned a motion for summary

judgment. On a motion to dismiss, all that is required is "some indication of the loss and the causal connection that the plaintiff has in mind." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005).

The FAC alleges fourteen different disclosures between April 22, 2015, and July 28, 2015. FAC ¶¶ 469-82. Each of these disclosures are described as "news," see id.; some involve details and developments, such as criminal convictions, that could not have been known before they occurred, see FAC ¶ 478; and at least one pertains directly to whether Petrobras's loss estimates were too low, see FAC ¶ 475. Moreover, the FAC alleges that the price of Petrobras securities declined in response to each disclosure. FAC ¶¶ 469-82. At a later stage, defendants may challenge the novelty and accuracy of plaintiffs' alleged news and its impact on the market, but plaintiffs have adequately alleged loss causation.

As the third issue raised in their instant motion to dismiss, defendants correctly note that plaintiffs cannot assert claims under § 11 of the Securities Act based on purchases after May 15, 2015 of the Notes initially offered on March 10, 2014 (the "2014 Notes"). Petrobras filed Forms 20-F and 6-K on May 15, 2015, covering the twelve-month period following the effective date of the 2014 Notes' offering. See Declaration of Jared Gerber in Support of Defendants' Motion to Dismiss the

14

Third Consolidated Amended Complaint Ex. 6, Ex. 7, ECF No. 225. A plaintiff bringing a § 11 claim must prove reliance on a misrepresentation in a registration statement if the plaintiff "acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a). Plaintiffs do not plead that they relied on the original registration statements for purchases made after the issuance of the earnings statements, nor do they respond to defendants' argument in their briefing. Accordingly, plaintiffs' § 11 claims based on purchases of the 2014 Notes made after May 15, 2015 must be dismissed.

Next, defendants argue that plaintiffs' § 15 control person claims against PAI must be dismissed because they fail to plead that PAI engaged in "meaningful culpable conduct." Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc., 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010). The FAC alleges that "[b]y virtue of its power to control public statements by Defendant Helms, [PAI] had the power and ability to control the actions of Defendant Helms." FAC ¶ 674. The FAC also alleges that PAI lists Helms as a Consultant and as the contact person for its New York financial office. FAC ¶ 560. Helms allegedly signed Petrobras's 2012 Registration Statement. FAC ¶ 574. These allegations

15

satisfy Fed. R. Civ. P. 8's standard of notice pleading because they provide defendants with "with fair notice of [plaintiffs'] theory of control" and allege that a person controlled by PAI signed a Registration Statement containing material misrepresentations. In re WorldCom, Inc. Sec. Litig., 2004 WL 1097786 at *3 (S.D.N.Y. May 18, 2004). Although defendants also challenge the details and extent of PAI's alleged control over Helms, these are not a proper subject of a motion to dismiss.

Finally, defendants argue that Union's claims must be dismissed because Union lacks standing. Plaintiffs respond that Union has properly demonstrated its standing through filing assignments. See Declaration of Rebecca M. Katz in Support of Motion of the Institutional Investors Group for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Counsel, Ex. E, ECF No. 19. Defendants do not respond to this point in their reply papers and wisely so: "an assignment of claims . . . fulfills the constitutional requirement of an 'injury-in-fact.'" W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 108 (2d Cir. 2008).

In sum, the Court, for the foregoing reasons, dismisses with prejudice the claims of plaintiffs Union and USS based on purchases of Notes and dismisses with prejudice the claims of all plaintiffs under § 11 of the Securities Act to the extent they are based on purchases of the 2014 Notes made after May 15,

2015. In all other respects, defendants' instant motion to dismiss is denied.

The Clerk of Court is hereby directed to close documents numbered 224 and 349 on the docket of this case.

SO ORDERED.

Dated: New York, NY
December 20, 2015

JED S. RAKOFF, U.S.D.J.