```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    In Re: Petrobras                    14-cv-9662 (JSR)

 4    ------------------------------x

 5                                        New York, N.Y.
                                          February 23, 2018
 6                                        2:10 p.m.

 7
      Before:
 8
                           HON. JED S. RAKOFF
 9
                                          District Judge
10

11                           APPEARANCES
      POMERANTZ LLP
12         Attorneys for Lead Plaintiff USS
           and Plaintiffs North Carolina and the Class
13    BY:  JEREMY A. LIEBERMAN
           MARC I. GROSS
14         EMMA GILMORE
           JOHN A. KEHOE
15
      LABATON SUCHAROW LLP
16         Attorneys for Plaintiff Hawaii
      BY:  LOUIS GOTTLIEB
17
      CLEARY GOTTLIEB STEEN & HAMILTON LLP
18         Attorneys for Petrobas Defendants
      BY:  LEWIS J. LIMAN
19         ROGER COOPER
           RAHUL MUCHHAL
20
      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
21         Attorneys for Underwriter Defendants
      BY:  JAY B. KASNER
22         JEREMY A. BERMAN

23

24

25
```

                              APPEARANCES (Cont'd)

KING & SPALDING
        Attorneys for Defendants PricewaterhouseCoopers
        Auditores Independentes
BY:  MICHAEL R. PAUZE
        KENNETH Y. TURNBULL

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.
        Attorneys for Defendant Jose Sergio Gabrielli
        BY:  EWDARD M. SPIRO

GOODWIN PROCTER, LLP (NYC)
        Attorneys for Consolidated Defendant Maria Das Gracas
Silva Foster
        BY:  RICHARD M. STRASSBERG

 1                (Case called)

 2                THE COURT:  Please be seated.

 3                I think we're now using the same docket number, but

 4      it's In Re: Petrobras Securities Litigation.

 5                Would counsel please identify themselves for the

 6      record.

 7                (Appearances taken)

 8                THE COURT:  So, everyone, good afternoon and welcome.

 9      We're here for a preliminary hearing on the proposed

10      settlement.

11                I do have some questions, but if plaintiffs' counsel,

12      who has made the unopposed motion for preliminary approval

13      wants to say anything first, I'd be happy to hear him.

14                MR. LIEBERMAN:  Your Honor, thank you very much.  Just

15      a few words to try to limit the fanfare with respect to the

16      adequacy of the settlement.  The settlement proposed to the

17      Court and submitted to the Court is comprised of two parts,

18      $2.95 billion paid from Petrobras to defendants and $50,000,000

19      from PwC Brazil.

20                This settlement in the aggregate, $3,000,000,000, is

21      the largest class action settlement in a decade, securities or

22      otherwise.  It is the largest class action involving a foreign

23      issuer.  It's the fifth largest securities class action

24      settlement on record.

25                THE COURT:  Those are very nice things and certainly

1    not irrelevant, but the question, of course -- or one of the

2    questions -- is how much the class is getting in terms of what

3    percentage of what their expected damages would be so that if

4    in fact you had a settlement which was not this, in which was

5    $3,000,000 but the damages that plaintiffs asserted were

6    $300,000,000, that would not be such a great settlement.

7              So the total amount -- this is a big case -- so the

8    figures are big.  I guess one question I have -- this is partly

9    for defense counsel.

10             The question I have for defense counsel is your

11   position throughout has been that the company was a victim, not

12   a wrongdoer.  So why in the world are you paying anything?

13             I'll come back to plaintiffs' counsel in just a

14   minute.

15             MR. LIMAN:  Your Honor knows that the positions of

16   counsel and the parties are not always accepted by the

17   adjudicators.

18             From the clients' perspective, they've thought long

19   and hard about this case.  They've had many meetings of the

20   board and have determined that it is in their best interests to

21   resolve the litigation in the United States; resolve the

22   exposure in the United States, which is large; and to be able

23   to move forward without that hanging over their head.  We

24   believe that there are meritorious defenses, but we also

25   recognize that there are vagaries and risks of litigation, and

```
 1   witnesses can be --

 2           THE COURT:  So you think $3,000,000,000 is a nuisance

 3   value?

 4           MR. LIMAN:  No.  It's a lot of money.  It's a lot of

 5   money, and we think that the plaintiff class has done quite

 6   well in this case.

 7           THE COURT:  So let me ask plaintiffs' counsel who I

 8   rudely interrupted, but it won't be the last time.

 9           So you say in your papers, in answer to the question I

10   just raised, that this represents 22.3 of the likely

11   recoverable damages or 18.6 percent of the likely recoverable

12   damages on a different statistical analysis which compares, you

13   say favorably, to the overall return in many, many class

14   actions looked at collectively.  But this is not like other

15   class actions.  The comparable class actions to this are the

16   few giant class actions.

17           What was the return in those?  Do you know?

18           MR. LIEBERMAN:  Your Honor, I don't have the

19   percentage of recovery.  I don't believe it did get to

20   22 percent.  I'm quite certain that's the case, but I wouldn't

21   want to make a representation without knowing factually.

22           THE COURT:  By the way, what would be the percentage

23   if there were no attorneys' fees?

24           MR. LIEBERMAN:  If there were no attorneys' fees --

25   we'll be requesting --
```

1           THE COURT:  I know you're requesting 9 1/2 percent,

2      which is a modest what?  $285,000,000?

3           MR. LIEBERMAN:  Yes.

4           THE COURT:  But a person's got to live after all.

5           This will not be the case.  Assuming you got zero but

6      just for statistical reasons -- I'll phrase the question

7      differently.

8           What percentage of this 23 or 18 percent is attorneys'

9      fees?

10          MR. LIEBERMAN:  So, your Honor, if you took away from

11     the $3 billion sum, if you assume all, there would probably be

12     around $300 million or $305 million in either attorneys' fees',

13     expenses, or claims administration.  So you'd be left with

14     about $2.7 billion, and comparing that number to the number of

15     $15 billion if you do 95 percent or $17.1 billion if you do the

16     90 percent.  I haven't done that math.  I'm pretty sure it

17     could be done pretty quickly and someone could get that for me.

18          You're taking away about 10 percent or so from the

19     settlements.

20          THE COURT:  I see your colleague just handed you maybe

21     his computation.  I didn't realize he had that many toes and

22     fingers.

23          Anyway, what --

24          MR. LIEBERMAN:  It's around 20 percent, your Honor, if

25     you're going at a 22 percent recovery.  I think though what's

1    very important to understand is the damages figure that we've

2    submitted to the Court as a benchmark because it was quite

3    unique, I must say, your Honor.

4             I think we're very fortunate in this case in that we

5    do have an objective comparative metric to compare this

6    settlement to other similar cases.  Namely, the damages model

7    that we have submitted as part of our expert report was

8    peculiarly aggressive, your Honor.

9             We think it was an accurate number.  It was a number

10   that really contemplated 21 alleged corrective disclosures.  If

11   you look at other mega settlements, nothing compares to the 21,

12   your Honor.  There are no large class actions, *Enron*, *WorldCom*,

13   etc., that alleged such a large amount of disclosures.

14            That was a very aggressive model that was used, we

15   think appropriately so, but it was extraordinary, your Honor.

16   If you look at actually the opt-out cases, we estimate about

17   20 percent of the class had opted out.

18            If you would apply, based on their alleged corrective

19   disclosures to the remainder of the class, damages would be

20   about $5 billion or $5.5 billion.  So now you're comparing

21   $2.7 billion left after the fees and expenses to that $5.5

22   billion and we're still over 50 percent, your Honor.  That is

23   actually objectively a fantastic result.

24            THE COURT:  So you want to argue that there was

25   something to the defense position here.  So we might think

1    about their corrective analysis and compare the return to what,

2    even though if the litigation had gone forward, you would take

3    the position that their corrective analysis was wrong.

4              MR. LIEBERMAN:  Your Honor, the position we're taking

5    is that ours is the correct analysis, but I think it has to be

6    understood in the context of the alleged damages how unique the

7    claim of damages that we were proposing to the Court.

8              It was unique.  We do think it was accurate.  We do

9    think it was sustainable in a court, but we have 20 odd

10   complainants of very sophisticated attorneys representing very

11   sophisticated pension funds.

12             And if you were to take those damages, they would be

13   about $5.5 billion.  So these are not defense numbers.  These

14   are plaintiffs' numbers, and there we're exceeding 50 percent.

15   So I think that then, your Honor, that is a proper context for

16   the numbers.

17             I'm not proposing that that's the appropriate number.

18   There's a reason why we proposed the number that we did, but

19   it's a very important context.  I can tell you that I

20   personally spent about 400 or 450 hours with our damages expert

21   working on it figuring out the best way that we could present

22   damages in a way that was appropriately aggressive, your Honor.

23             THE COURT:  So you raised a minute ago -- you raised

24   more expressly in your papers -- that this is also a good

25   settlement in comparison with the settlements that have already

1    been entered into with the opt-out or tag-along institutions.

2         What was their settlement?

3         MR. LIEBERMAN:  Your Honor, I don't have their

4    settlement papers.  Those are confidential.  All we have is a

5    reasonable inference that the charges that were taken along

6    with those settlements are $448 million, and that represents

7    about 20 percent of the outstanding securities in this case,

8    possibly a little more.

9         So, if you take that $448 million, multiply it by

10   about 20 percent the class opted out, we've got 80 percent

11   remaining -- I hope I have enough fingers to do this math --

12   but if you multiply that number by 4 using to see what the

13   class should have gotten, using that number, we'd be at about

14   $1.7 million or $1.8 million.

15        So this number here is $3 billion, taking in

16   attorney's fees, etc.  They also charged attorneys' fees.  So,

17   taking this number, we've got $1.3 billion dollars or

18   $1.2 billion in excess of that.  That's more than 60 percent,

19   your Honor.

20        If you want to talk about history, that's actually

21   history, your Honor.  The perceived wisdom is that opt-outs

22   always do better.  You've got large institutions --

23        THE COURT:  So let me ask defense counsel.  First of

24   all, without commenting on any individual under the settlement,

25   do you agree with the analysis made by plaintiffs' counsel?

 1          MR. LIMAN:  I'm not sure I agree with every number,

 2   but I agree with the bottom line proposition that in gross, the

 3   plaintiff class here did better than the individuals

 4   plaintiffs.

 5          THE COURT:  Are there any remaining opt-outs?

 6          MR. LIMAN:  There are, your Honor.

 7          THE COURT:  Who are they?

 8          MR. LIMAN:  There are 13 different opt-outs.  They are

 9   all members of the settlement class here, and our hope is that

10   they will decide to participate.

11          THE COURT:  Are they all institutions as opposed to

12   individuals?

13          MR. LIMAN:  Yes, they are.  They are.

14          THE COURT:  What percentage of the total number of

15   shares did they hold collectively?

16          MR. LIEBERMAN:  Your Honor, our understanding -- and

17   Mr. Solano can correct me if I'm wrong -- is that the remaining

18   opt-outs are a small, a very small slither of the outstanding

19   shares, but the majority, the bulk of the opt-outs had already

20   settled.

21          MR. LIMAN:  I concur.  We don't know in part because

22   we don't know in the individual cases how many shares are at

23   issue in each of those cases.  That hasn't been shared with us.

24          THE COURT:  I'm surprised you don't know this because

25   I thought the whole point of that side agreement, one of the

two side agreements that have now been disclosed, was that if

more than 5 percent disapproved the settlement, opted out or

whatever, that the settlement was dead.

MR. LIMAN:  It excludes the opt-out cases.

THE COURT:  I see.  Let's talk about legal fees.

First of all, if a notice goes out, my normal practice -- and I

see no reason to change this -- is to notify each and every

member of the class in dollar terms, as well as percentage

terms, what the legal fees that are being sought are because I

think that's clearly a material factor for anyone who wants to

know whether they should join in this settlement or object to

it or opt-out.  So we'll get to notice later.  While it's on my

mind, I wanted to mention that.

I looked at the legal fees on a percentage basis of

the settlement in a few major cases that I had some familiarity

with such as the WorldCom case, such as the Bank of America

case, and one or two other cases.  And they were mostly in the

4 to 5 percent range.

So why in the world, in a giant case like this, should

I consider a 9 1/2 percent legal fee?

MR. LIEBERMAN:  Your Honor, I think there is more --

there are a lot of mega settlements where -- *Enron* I believe

was more than a 10 percent legal fee.  In the *Tyco* case, it was

well above 10 percent.  So I think we're happy to make that

presentation, but we would suggest that the less than 9 1/2

1    percent that we'll be proposing as a fee -- it will be about

2    9.4 percent --

3              THE COURT:  I would certainly welcome any submission

4    that you want to give me on mega cases, for lack of a better

5    term.

6              What was your Lodestar?

7              MR. LIEBERMAN:  The Lodestar, your Honor, was about

8    $160 million.

9              THE COURT:  $160 million.  How did you spend $160

10   million in hourly rates?

11             MR. LIEBERMAN:  Your Honor, not happily I can say,

12   your Honor.  This was a case -- and I think if we compare it to

13   other mega settlements, we had gotten a lot closer to trial

14   than those cases.  We were six weeks away from trial.

15             THE COURT:  I cannot help but mention that the big

16   issue in this case is whether Petrobras is a perpetrator or a

17   victim, and the result of this settlement, which may be a

18   wonderful settlement -- and I may approve it -- is that no one

19   ever will know the answer to that.

20             Go ahead.

21             MR. LIEBERMAN:  Fair enough, your Honor.  I don't

22   think that's the only issue in the case.

23             THE COURT:  No.  It's not the only issue.

24             MR. LIEBERMAN:  Damages would be a key issue.

25             THE COURT:  I am sure that as in every settlement

1    conference I've ever held, you will tell me how good the

2    arguments from the other side were, and he will tell me how

3    terrifying the plaintiffs' arguments were, and you both hope I

4    don't remember your earlier papers when you each said that each

5    side's arguments and the other side's arguments were terrible.

6    Go ahead.

7            MR. LIEBERMAN:  Your Honor, we would have hoped to

8    have lived to see the day when we got to trial, your Honor.

9    This case has been stayed for 18 months which has been very

10   taxing with respect to the case.

11           THE COURT:  You know whose fault that is, and it's not

12   the district court.

13           MR. LIEBERMAN:  That's correct, your Honor.  Certainly

14   not.  The rocket docket was run, and the fact that we're here

15   at settlement after such a delay I thinks does speak to the

16   Court's speed as an adjudicator.

17           Nevertheless, your Honor, we potentially were looking

18   at a Supreme Court appeal.  We don't know as to how that appeal

19   would have succeeded, particularly with the bonds.  The bonds

20   here represent about 25 percent of the class.

21           I, quite frankly, don't know how your Honor would have

22   ruled with respect to class certification for the bonds, given

23   the Second Circuit's guidance.  A lot of times we think we know

24   how this Court is going to rule, and we're taught otherwise.

25           So, if we lost that 25 percent on the bonds, we're

1  looking at a much lower number.  So the risk there was quite

2  large, both from the bonds we'd say and from the damages.

3         THE COURT:  You're saying you had no ascertainability

4  as to how this Court would rule?

5         MR. LIEBERMAN:  No, your Honor.  We didn't.  We only

6  had hopes, high hopes, your Honor.

7         THE COURT:  Go ahead.

8         MR. LIEBERMAN:  So I think in that context, we were

9  looking at really putting together a trial, summary judgment on

10 issues.  Do we think the Court would have ultimately ruled on

11 the victimhood, that that would have been an adequate defense

12 to shield Petrobras from liability?  Likely no, your Honor.

13        THE COURT:  So let's go back.  Let's assume your

14 Lodestar was fine.  Give me that figure again.

15        MR. LIEBERMAN:  About $160 million.

16        THE COURT:  So why shouldn't I give you $160 million?

17        MR. LIEBERMAN:  Because of the significant risk that's

18 been taken in this case, the significant result that's been

19 made in this case.  We have a result here that's over 50

20 percent better than attorneys who may have charged even more on

21 their fees than we're seeking today.  It actually might be a

22 discount for the class.

23        I think very importantly, your Honor, is we have a

24 sophisticated institutional investor that negotiated this fee

25 with counsel, not only on his own, hired outside counsel to

1    look at the fee request at the outset of litigation, and

2    actually they had negotiated us down significantly from where

3    our initial proposal was.

4           With their outside counsel, they came to this number.

5    It's an aggregate.  It's actually a staggered fee, but in the

6    aggregate it turns to about a little less than 9.5 percent.

7           I think it's very important.  If the Court had seen

8    those numbers when it was presented, of course the Court

9    wouldn't commit to granting those numbers.  We understand that.

10          But I can say, running a case that has the cost of

11   this case, your Honor can question whether or not we needed to

12   have a Lodestar of $160 million.  I can tell you, given the

13   multipliers that justify the fee, we didn't need to.

14          As far as if we're just trying to look good for a fee,

15   the work needed to be done.  We had 20 million documents to

16   review.  We had 65 depositions that were taken.  There was

17   significant economic expense by the firm.

18          We can say the partners personally took a tremendous

19   liability in order to finance this case, never invited a funder

20   in because we were worried that we would lose control of the

21   case.

22          So three years of litigation, negotiating the case,

23   back and forth, mediation, and economics do obviously impact

24   case management.  If we're always thinking the entire three

25   years 9.5 percent is the fee and then we learn, well,

 1    Judge Rakoff didn't think so.  It's actually half of that,

 2    your Honor, that could be a staggering result not just in this

 3    case but in cases going forward.  Certainly there's no

 4    visibility at the outset of the case what the fee would be.

 5    Respectfully, your Honor --

 6         THE COURT:  It would mean that people, if I follow

 7    your point, it would mean that class actions of this size would

 8    only be brought when plaintiffs' counsel were really, really

 9    sure they had a winning case.

10         What would be so wrong with that?

11         MR. LIEBERMAN:  Your Honor, we think it's not only

12    really, really sure cases that should be brought.  It's cases

13    that should be credible that should be brought.  That's a

14    standard lower.

15         Even more importantly, it's no secret to anybody that

16    economic decisions are made at the outset of a case as to the

17    value of the case and ultimately the fees --

18         THE COURT:  How can it be right that the Court should

19    determine legal fees in any material way based on calculations

20    that you privately made at the outset of the case?  That sounds

21    to me like the tail wagging the dog.

22         MR. LIEBERMAN:  It wasn't private, your Honor.  It was

23    actually before the Court.  The Court was well aware --

24         THE COURT:  I don't recall expressing any view of

25    that.

1          MR. LIEBERMAN:  That's correct.  There was obviously

2     no commitment.  That wasn't the case.  We can just say the

3     Court will grant or deny, however it wishes, this fee.  We

4     always understood that.

5          We can say, as a matter of practice, if you're going

6     in with a large institutional investor negotiating not just

7     with that institutional investor but with its outside counsel

8     and ultimately you're presenting those fees and you're deemed

9     at that stage to at least be competitive, and then people do

10    decide what investment should you make in the case, what

11    investment would be worthwhile.  And to learn thereafter that,

12    okay.  Your fee is actually half of what you thought.  Your

13    investment decisions were completely foolhardy, will we

14    survive.  Of course we'll survive.  I don't think anyone will

15    cry.

16          THE COURT:  On that theory, if you had said, gee, we

17    shouldn't really take on this case unless we get 50 percent of

18    the return, so then you had in my hypothetical applied now for

19    50 percent and I had said something judicious like you must be

20    nuts, and you would say, oh, but Judge, this was the

21    calculation we made at the time we entered into this case.  So

22    it will send the wrong message if you don't abide by our

23    calculations, I don't understand that argument.

24          MR. LIEBERMAN:  Your Honor, you're right.  What

25    your Honor just stated would not be an appropriate thought

1    process.  An appropriate thought process would be that if under

2    the case law and under jurisprudence and under the agreement

3    with a sophisticated institutional investor, as the PSLRA had

4    intended, there is an understanding as to what an appropriate

5    fee is.

6          And based upon that very learned decision, which is

7    all based on prior jurisprudence and based on the prior

8    protocol that we've discussed, and then to learn that you

9    completely wildly miscalculated what your return on investment

10   here, your Honor, it would ultimately wreak havoc on

11   decision-making with respect to these cases, we respectfully

12   submit.

13         With that being said, your Honor, we are happy to

14   present -- it's not about what Pomerantz expected to make here,

15   your Honor.  That's certainly not the question.  The question

16   is what is an appropriate fee.

17         One of the key issues in what an appropriate fee is

18   what was negotiated with the client.  There was a marketplace

19   here, your Honor.  There was a marketplace with a very

20   sophisticated institutional investor who was actually guided by

21   outside counsel who is an expert in U.S. securities class

22   actions.

23         So that goes to the appropriateness of the fee.  But

24   what would also go to the appropriateness of the fee is the

25   prior jurisprudence which we'll be happy to present, either at

1   this stage or at the final approval hearing, which is when, we

2   would submit, it's most appropriate, and get the work done.

3          THE COURT:  I don't think it's going to be decided

4   until the final hearing in terms of any ultimate decision, both

5   by definition but because I'll need to hear from any objectors

6   who wish to be heard.

7          Speaking of your client, you're asking for a $400,000

8   incentive fee.  I don't know why it's called an incentive fee.

9          MR. LIEBERMAN:  I think it was called a compensatory

10  award.  If we said incentive, we misspoke.

11         THE COURT:  In any event, I've had cases where it's

12  been $5,000, $10,000.

13         In what case has it been anything like $400,000?

14         MR. LIEBERMAN:  Your Honor, it's $400,000 for all

15  three plaintiffs combined.  We will present to your Honor the

16  work that was done by Mr. Hill who I think you've seen at every

17  single hearing in this litigation, the tremendous document

18  production that was done as a part of this case.

19         THE COURT:  Let's talk about document production.

20         Now, what role did your client or the three clients,

21  whatever, play in document production?

22         MR. LIEBERMAN:  Your Honor, going through USS' files

23  to get the very, we felt burdensome at the time, perhaps

24  appropriate, document request that defendants had propounded

25  and to do it in a way where we wouldn't have --

```
1              THE COURT:  You of course didn't answer any documents.

2         Go ahead.

3              MR. LIEBERMAN:  Yes.  Going through that process.  USS

4    going through that process and North Carolina and Hawaii was --

5    sitting for three depositions with respect to USS, Hawaii sat

6    for two.  North Carolina sat --

7              THE COURT:  I understand sitting for depositions.  You

8    were referring to the document production.

9              MR. LIEBERMAN:  Right.  Your Honor, we can provide a

10   factual record, again, at the appropriate time.  What we'll

11   submit is we will make the relationship between the fees

12   requested and the ultimate time that's been taken out of

13   Mr. Hill's time, his colleagues' time, and the deputy --

14             THE COURT:  For you, I will obviously want for the

15   lawyers time sheets.

16        Do you have the equivalent for the clients' work?

17             MR. LIEBERMAN:  He says that could be produced,

18   your Honor.

19             THE COURT:  What about the other clients?

20             MR. LIEBERMAN:  He says yes, your Honor.

21             THE COURT:  That would be very helpful.

22             MR. LIEBERMAN:  We would submit, your Honor, with

23   respect to that request, it should be tethered to the time

24   spent, and there should be a relationship between the time

25   spent and the fee requested.
```

1        We completely agree with this.  What we would say is

2   that the efforts and time spent by USS and North Carolina being

3   a steward for this, we believe, excellent result has been

4   significant, substantial, and we think it should be --

5        THE COURT:  I have no difficulty.  I appointed counsel

6   in part based on the notion that the clients that I had -- the

7   representatives, the class representatives that the Court had

8   chosen, were going to be very hands on.  So, if they had failed

9   in that duty, which they clearly did not, I would have been

10  very disappointed.

11       But I'm unclear how, for example, they would play any

12  material role in document production for example.

13       MR. LIEBERMAN:  Your Honor, we'll document the

14  substantial efforts there were in producing the documents

15  relevant to the depositions and the discovery propounded by the

16  defendants.

17       THE COURT:  So we should put some timeframe on that.

18  After I issue my order, assuming that I preliminarily approve

19  this settlement, I'll want the Lodestar and the similar

20  documents relating to the fee for the plaintiffs, what?  Two

21  weeks?

22       MR. LIEBERMAN:  Your Honor, I think our side to

23  organize that -- what we proposed in the schedule was 42 days

24  before the final hearing.  If your Honor wants it earlier than

25  that, we certainly can do so.  If you can give us five weeks to

1    put everything together.

2            THE COURT:  I forgot what you had proposed in the

3    schedule.  Presumably you already have your hourly notations.

4    Yes?

5            MR. LIEBERMAN:  Your Honor, we do.  We would lake

6    to --

7            THE COURT:  So you could in theory produce them

8    tomorrow?

9            MR. LIEBERMAN:  We could produce them in an hour, but

10   in a way that your Honor can digest.

11           THE COURT:  What takes five weeks?

12           MR. LIEBERMAN:  As long as your Honor would give us.

13           THE COURT:  We'll look at that in a minute.

14           While we're on the subject of legal fees, what's this

15   side agreement all about?

16           MR. LIEBERMAN:  The attorneys' fees letter?

17           THE COURT:  Yes.

18           MR. LIEBERMAN:  With respect to the attorneys' fees

19   letter, it was not something that was anything that counsel

20   wanted or was interested in signing.  Defendants -- we

21   understand the Court may have its own restrictions as to the

22   timing of the fees.  We certainly understand that and

23   anticipated something like that, but defendants wanted certain

24   restrictions put on the ability to take fees prior to the

25   judgment being final.

1          So that was something they had negotiated.  So,

2     therefore, that was -- we simply had to abide by their demands

3     in order to get this done.  So we structured the letter

4     independently that USS had said, if you're already doing this,

5     I want to put in a certain safeguard right away to make sure

6     that claims administration is done rapidly, and they put in

7     their own requirements of that only 10 percent -- there would

8     be a 10 percent remainder of fees held back until 75 percent of

9     the distributions were made.

10          Your Honor, we've had discussions with USS.  We may

11    make an even more stringent proposal to the Court.  We know the

12    Court has certainly opined on this.

13          THE COURT:  My practice in the past is that this

14    doesn't go to the side matter distribution, and every case is

15    different.  I don't think I've ever approved more than a

16    50 percent of attorneys' fees distribution at the time of the

17    approval of the settlement, and then I've always had the other

18    50 percent only after everything else was distributed, the

19    point being that it incentivizes everyone to push to get the

20    rest of the money distributed and also because there is a

21    certain, I think, equity in attorneys not being fully paid

22    until their clients are paid, in this case, the broader

23    clients, the members of the class.

24          Would you have any problems with that?

25          MR. LIEBERMAN:  Your Honor, if I can just suggest a

1   slight alteration of that.  The concern is that given this is

2   the largest class action settlement in a decade, there will be

3   a lot of people coming out of the woodwork trying to halt the

4   distribution in order to halt the distribution of a large

5   amount of fees to exercise leverage.

6          So what we would suggest, your Honor, if possible, if

7   we were to do 50 percent and 50 percent but until the claims

8   administrator certificates that it's ready to distribute in

9   case there are any appeals and people just holding this up just

10  to hold it up.

11         THE COURT:  I'm willing to think about that.

12         MR. LIEBERMAN:  We appreciate it, your Honor.

13         THE COURT:  Now, how much is the distribution agent?

14  You're recommending Garden City Group if I recall.

15         MR. LIEBERMAN:  That's correct, your Honor.

16         THE COURT:  And I've had them in other cases.  They do

17  a good job, but they're expensive.

18         How much are they going to charge here?

19         MR. LIEBERMAN:  Your Honor, we've negotiated a cap

20  with them based upon the amount of claims that come in.  The

21  cap that we've negotiated is assuming -- which is their

22  estimate, is that there will be one million notices sent out,

23  and there will be a quarter of a million claims that do come

24  in.

25         If that's the case, their fee would be capped at $6

1    million, but there's a key caveat in that a part of the

2    paperwork that had been presented to the Court was defendants'

3    insistence on what we believe to be an extraordinarily robust

4    notice program which we have close to 100 newspapers where

5    there will be advertisements made.  That was not at

6    lead counsel's request.  That was at defendants' insistence.

7                 THE COURT:  I think that makes perfect sense because

8    most newspapers are in dire economic straits.  They need all

9    the help they can get.

10               MR. LIEBERMAN:  I think this will help the worldwide

11   newspaper business, your Honor.

12               It will increase that cap by I think about $2 million

13   or $3 million because that was something that came in at the

14   end of the negotiation process.

15               THE COURT:  I don't recall.  Was the agreement with

16   Garden City one of the documents you submitted?

17               MR. LIEBERMAN:  No, your Honor.

18               THE COURT:  I will want to see that.

19               MR. LIEBERMAN:  Absolutely.

20               THE COURT:  Now, before selecting Garden City Group,

21   did you shop this around?  Did you get any other bids?

22               MR. LIEBERMAN:  We put it out for bid with three other

23   we thought appropriate claims administrators.  Garden City did

24   not initially come with the lowest bid, but we made sure that

25   they matched ultimately the lowest bid.  We felt that not only

1   were they best suited for this but they should come at the best

2   price.

3        THE COURT:  Now, I'm a little unclear of who, given

4   the various opt-outs, some of which have been settled with and

5   some of which have not, who the now class consists of.

6        Do you have any idea?  Are these still mostly

7   institutions?  Are they mostly individuals?  Do you have any

8   feel for that?

9        MR. LIEBERMAN:  We do believe it's mostly

10  institutional investors.  That's our understanding.  I'd like

11  to -- I'd say overwhelmingly it is institutional investors.

12  Whether or not it's 90 percent or 75 percent, I don't know.

13        THE COURT:  And I raise that in part because I think,

14  to the extent there are any meaningful number of individual

15  investors, and there may not be -- the class notice is

16  something that, from a lawyer's standpoint, it's actually a

17  relatively simple document, simple in the sense of the

18  languages for a lawyer, fairly straightforward.

19        For someone who is not a lawyer, I think some of the

20  language is obscure.  And I think we need to work on that a

21  little bit if there are non-institutional investors, even if

22  there are only 10 percent and certainly if there are

23  25 percent.  I'll come back to that in a minute to give you an

24  example, but I think that's of some concern to me.

25        To what extent are the members of the class current

1    shareholders as opposed to past shareholders?

2            MR. LIEBERMAN:  Your Honor, given that they're large

3    institutional investors, we would assume that a significant

4    portion -- the way the investments have worked with respect to

5    Petrobras, why people invested with Petrobras is because they

6    needed to have coverage both in Latin America and in the oil

7    sector.

8            So, if you're dealing like an entity like USS, they

9    have a mandate to beat a certain index.  In order to beat that

10   index, they have to actually have a certain weighting within

11   that index.

12           So we would presume, to the extent they're

13   institutional investors, which we understand that is the

14   overwhelming majority of the current class, that they are

15   current shareholders as well.

16           THE COURT:  I wonder if that detracts a little bit

17   from your notion that this is such a wonderful settlement if

18   it's really, in effect, current shareholders paying themselves.

19           MR. LIEBERMAN:  Your Honor, I think you can look at it

20   in two ways.  One is the PwC portion --

21           THE COURT:  That's a very small portion.

22           MR. LIEBERMAN:  That is the tail wagging the dog,

23   your Honor.  With respect to the other portion of the

24   settlement, it's the company paying.  The company consists of

25   minority and majority shareholders.  So basically every 50

 1    cents that are being paid, a dollar is going to the minority

 2    shareholders.  They're actually benefiting more because the

 3    government --

 4          THE COURT:  Right.  But my point is this:  Let's

 5    assume, which I'm sure is not the case but may be close, that

 6    the members of the class are all current shareholders.  Then,

 7    in effect, this is not a $3 billion or $2.95 billion

 8    settlement.  It's half of that.  Right?

 9          MR. LIEBERMAN:  Your Honor, what was clear from the

10    trading data is that there was a tremendous selloff in the wake

11    of Lavo Jato by these institutional investors getting out of

12    the stock or significantly selling their positions because of

13    what they'd learn to be the tremendous liability that they

14    incurred, both criminally and civilly.  And thereafter, they do

15    make further investments --

16          THE COURT:  Are you saying that the extent of their

17    investment may be very substantially lower?  So the 2-to-1

18    would not be a fair way to look at it under those

19    circumstances.

20          MR. LIEBERMAN:  Lower, and when they purchased again,

21    which is one of the current shareholders after their selloff --

22          THE COURT:  They purchased at a lower number.

23          MR. LIEBERMAN:  Yes, your Honor.

24          THE COURT:  All right.  This may be too arduous, but

25    it would be useful -- and maybe the defense counsel is in the

1    position to give me that information more easily than

2    plaintiffs' counsel, what the members of class -- what they

3    held at the time of the underlying events versus what they hold

4    now and whether what they hold now was largely purchased at a

5    lower price.

6            In other words, the very things we're just discussing,

7    the data that backs that up.

8            Is that something you can supply us with?

9            MR. LIMAN:  Your Honor, I don't think so.  I don't

10   think Petrobras has records that are put together in that way.

11   We've tried for other purposes to do that kind of analysis,

12   similar types of analyses, and Petrobras just doesn't have

13   those records on an investor by investor basis.

14           THE COURT:  We could make it a condition of qualifying

15   as a class member, but I think that would be unfair and much

16   too arduous.  So we'll just let that one go.

17           But it still is I think somewhat relevant in assessing

18   how much -- to the extent this settlement is the right hand

19   paying the left hand, it's a lesser settlement than a $3

20   billion settlement.  The question is we don't know how many

21   that is.

22           MR. LIEBERMAN:  Your Honor, we don't know how much

23   that is.  For the reasons we had said, we think there is an

24   overwhelming portion, more than 50 percent, that is being paid

25   is actually going to the right hand.  The right hand is getting

 1   more than is being given out by the left hand.

 2          THE COURT:  Did I understand that you're proposing,

 3   for settlement purposes, a single class as opposed to multiple

 4   classes?

 5          MR. LIEBERMAN:  Your Honor, as I understand, it's one

 6   settlement class that encompasses both classes.

 7          THE COURT:  Yes.  That's what I meant.

 8          MR. LIEBERMAN:  Yes.  Ultimately it's all defined the

 9   same way, which makes sense, your Honor, given the settlement

10   context.

11          THE COURT:  I'm not quarreling with that.  I just want

12   to make sure because I have to make findings for quasi

13   certification purposes.  So, in that sense, both classes still

14   exist, even though they're now combined into a single class for

15   settlement purposes.

16          MR. LIEBERMAN:  That's correct, your Honor.  The class

17   members were always the same.

18          THE COURT:  Yes.  That's right.

19          Now let's look for a minute at the notice.  Let's

20   assume you're a -- this is the summary notice, which is Exhibit

21   B2 to your motion.

22          So here I am, Mr. John Jones.  I'm rich enough to

23   invest in Petrobras, but I'm not an institution.  I don't have

24   some in-house lawyer who can read this stuff for me.  So I get

25   this notice, and first I see in the first sentence about 300

1    words or so -- this is Faulknerian.

2         It's to "All persons or entities who:  A, during the

3    time period between January 22, 2010, and July 28, 2015,

4    inclusive (the class period) purchased or otherwise acquired

5    Petrobras securities, including debt securities issued by PifCo

6    and/or PGF, on the New York Stock Exchange or pursuant to other

7    covered transactions," whatever that may be, "And/or:  B,

8    purchased or otherwise acquired debt securities issued by

9    Petrobras, PifCo, and/or PGF and covered transactions directly

10   in, pursuant and/or traceable to, a May 13, 2013, public

11   offering registered in the United States or a March 10, 2014,

12   public offering registered in the United States before

13   Petrobras made generally available to its securities holders an

14   earning statement covering a period of at least 12 months

15   beginning after the effective date of the offerings (August 11,

16   2014, in the case of the May 13, 2013, public offering and

17   May 15, 2015, in the case of the March 10, 2014, public

18   offering)."

19        Although actually, there shouldn't be a period there

20   because it's just the subject of the sentence.  Who knows what

21   you might have accomplished if you had added a verb and a few

22   other clauses.

23        Now, every institutional investor, even a small one,

24   would be more than capable of handling that, but I don't know

25   what an individual is going to say, huh?  What the heck does

1    this mean?  I just wonder if there isn't an easier way to

2    express that maybe by breaking it down or something.

3           I got a notice the other day, because I own a 2004

4    Honda CRV and it's on 180,000 miles -- so this is a free ad for

5    Hondas.  It had a Takata airbag.

6           So first I got the notice saying, you may be part of a

7    class for that settlement.  You might take a look at it because

8    I thought it was a model of clarity.  It was simple English.

9    It's a simpler case I understand.

10          I then got the notice a couple days ago saying that if

11   you haven't put in any paperwork showing that you were actually

12   injured by an exploding airbag, you're out of the case.  The

13   Lord giveth, and the Lord taketh away.

14          Then we have here two footnotes just on the first

15   sentence that I just read.  The first footnote is something

16   about:  "All capitalized terms shall have the same meanings in

17   the stipulation of settlement," which of course you have to go

18   to your website to see, but that's okay.

19          And the second one is:  "The settlement class excludes

20   defendants, current or former officers or directors of

21   Petrobras, members of their immediate family and legal

22   representatives," blah, blah, blah.  It goes on at great

23   length.

24          I'm not saying you don't have to have that, but I do

25   wonder whether there is an easier way, a more simple way, to

1  express all that.  So take a look at that.  Without multiplying

2  examples, I think as you go through this, you'll see similar

3  problems, not substantive problems really, just expression.

4         I do think the one substantive point, which I've

5  already made, is that in addition, as you do, to saying you

6  want 9.5 percent of the settlement for fees, you need to

7  express how much money that is because that, at least, is

8  something I think that any class member would want to see.

9         MR. LIEBERMAN:  Will do, your Honor.  Just to make

10 sure that we don't hold up the granting of the order, when

11 should we get it in?  Leaving us enough time to get this done.

12        THE COURT:  I would like to issue the order on the

13 hearing we're having today no later than the end of February.

14 So, if you can get it in before then, that would be great.

15        MR. LIEBERMAN:  Your Honor, we'll get it in by

16 Wednesday next week.

17        THE COURT:  Terrific.

18        Your schedule generally -- I want to go take a look at

19 the schedule for what happens after I give the approval, if I

20 give the approval.  It looked generally fine.  I'll take a

21 tighter look at that before I issue my order.

22        Now let me ask defense counsel.  I've sometimes seen

23 in agreements between parties where there have been oral

24 understandings, which I've never understood, that the defendant

25 remain silent as to the request for attorneys' fees made by the

 1   plaintiff.

 2           Is there any such agreement here?

 3           MR. LIMAN:  There is no such agreement.

 4           THE COURT:  Did you think that all those 65

 5   depositions, for example, were needed?

 6           MR. LIMAN:  I'm recycling in my head what the 65

 7   depositions were.  No.  I don't think all of the depositions

 8   were needed.

 9           THE COURT:  The trouble is -- I don't criticize

10   plaintiff in this respect -- the adversary system really breaks

11   down in these kind of hearings.  I think it would be very

12   useful to the Court for you to receive a copy of the time

13   sheets of the plaintiff that constitute their Lodestar

14   calculation and give me your views as someone who obviously

15   lived through the case, as to whether any of those seem to you

16   to have been excessive.

17           Now, I know that's an awkward position to put you in,

18   but I think it is consistent with the obligation that we all

19   have to the class as a whole.  I can't assess that.  I can

20   look, and I can see 65 depositions, but I don't know how many

21   of those could have been dispensed with, should have been

22   dispensed with.

23           I can look at hourly rates for a paralegal and 14

24   hours for reviewing X document, but I don't know whether X

25   document was 500 pages or two pages.  So I think it would be

 1    very useful to have your analysis of that.

 2            MR. LIMAN:  I'll be happy to provide it.  Your Honor,

 3    it's unclear to me what form and shape that takes.

 4            THE COURT:  I think you can take just their hourly --

 5    what they provide to the Court in terms of the time sheets,

 6    which I assume will be detailed, and then just mark it up in

 7    the margins.

 8            It may be questions whether this is justified or

 9    something like that.  And then I can, if necessary, contact or

10    hold a telephone conference with you and plaintiffs' counsel

11    and have them explain any given entry.

12            They'll see your comments before we would have any

13    such hearing.  So they could respond to it.  The Lodestar is

14    not, of course, binding on me.  It's just one of the ways to

15    look at the entire request, but I think it's an important one.

16            MR. LIMAN:  Happy to do it, your Honor.

17            MR. LIEBERMAN:  Your Honor, it might be instructive --

18    we can probably even look at the public record -- as to how

19    much Petrobras spent in investigating the claims on their own

20    and defending the lawsuit.  I'm quite sure that they have

21    exceeded the $160 million.

22            THE COURT:  That's a different story.  They're not

23    asking for their attorneys' fees, and the federal government

24    couldn't afford their attorneys' fees.  So that's a different

25    question.

1        The point is part of the justification for your 9 1/2

2   percent is that it's a reasonable multiple of Lodestar given

3   the risk factors involved.  So calculating what the Lodestar

4   really is, which may be exactly what you just said -- but it

5   may be less.  If it was significantly less, that would be a

6   factor for the Court to consider.

7        MR. LIEBERMAN:  Sure, your Honor.  We would also say

8   that the adversarial system remains.  We do have quite an

9   adversary here.  We have the class plaintiff who wants to get

10  every dollar possible out of this litigation.  It's a

11  formidable adversary.

12       THE COURT:  I don't see any adversary.  I see two

13  parties that want to get a settlement done and a Court that

14  just likes to ask hard questions.

15       Let me see if I had any other questions.  I think

16  those are the questions I had.

17       I do have one last thing to raise with you in a

18  minute.

19       Is there anything else either counsel or any counsel

20  wish to say?  We haven't really talked much about the PW

21  portion of the settlement.  The fact that it's a much smaller

22  portion makes it easier to deal it, but I'm still going to look

23  at it with the same scrutiny as I do everything else.

24       So, if there is anything else that counsel wants to

25  say on the PW side, I'll be happy to hear you.

1          MR. LIEBERMAN:  Your Honor, with respect to

2     plaintiffs, there were a significant amount of individual

3     actions that were filed by sophisticated counsel, by

4     sophisticated investors.

5          Most of them did not even try to get any monies out of

6     PwC.  We think not only our prosecution of PwC needed a

7     monetary award, it was also important for accountability in a

8     case like this to do so.

9          THE COURT:  Mr. Liman.

10         MR. LIMAN:  Your Honor, with respect to the date of

11    the final here, my colleague reminds me that under CAFA there's

12    a requirement that there be a 90-day period from the date the

13    notice is sent out.

14         THE COURT:  I thought that was the worst provision in

15    CAFA.

16         MR. LIMAN:  There may be other ones that aren't great.

17         We also would request -- and I'm somewhat hesitant to

18    do there because I know that your Honor likes to move the

19    docket along -- that there be a period of something like 80 to

20    90 days set for an opt-out period.

21         We realize that that's somewhat unusual, that it be

22    that long.  But given the fact that there are investors

23    worldwide in this case, we think that that would be

24    appropriate.  That would set the date some point shortly after

25    July 4.

1     THE COURT:  I will certainly consider that and thank

2   you for raising it.  Although, if they are mostly, if not

3   entirely, institutions, albeit maybe small institutions, they

4   must be used to communicating in a very rapid way.  So, even if

5   they live in Azerbaijan, they're on the web all the time.

6   Right?

7     MR. LIMAN:  I would assume that's the case for the

8   institutions.  I just don't know how many individuals there

9   are.

10     THE COURT:  I'll think about that anyway.

11     MR. LIEBERMAN:  Your Honor, that's generally fine with

12   us.  We'd say the first available date, July 2 and thereafter,

13   we'd like to have a final hearing.

14     THE COURT:  I was thinking we should have a hearing on

15   July 4 because I now realize from what plaintiffs' counsel has

16   told me that the national interest has never been so fully

17   carried out.

18     Do counsel for PW want to say anything?

19     MR. PAUZE:  Thank you, your Honor.  Michael Pauze from

20   King & Spalding.

21     Judge, of course, PricewaterhouseCoopers Brazil is not

22   Petrobras.  As the Court knows, as the external auditor in this

23   case, we're in a very unusual circumstance.  It's not unusual

24   for the external auditor to settle for a number that is much

25   smaller.

1          I think in this case, I think there are a number of

2     factors, your Honor, that make our situation unique here.  Of

3     course, the judge dismissed the Section 10(b) claim against PwC

4     Brazil which leaves a Section 11 claim which of course is not

5     insubstantial but I think is much, much smaller than the

6     universe that we had with Section 10(b).

7          I also think, Judge, we had some very good defenses

8     here.  I think the settlement number takes into account,

9     for example, PwC Brazil, of course, wasn't involved in any of

10    the underlying alleged scheme that was alleged in the

11    complaint, that's a focus of the complaint.

12         In fact, your Honor, PwC Brazil didn't even sort of

13    come on the scene here with respect to Petrobras until after

14    the alleged scheme was over, which I think ended allegedly no

15    later than April of 2012, and our first audit opinion didn't

16    come out until February of 2013.

17         You know, also, your Honor, as the external auditors,

18    I think we had a very good defense.  We did what an audit firm

19    ought to do under these circumstances.  Our lead engagement

20    partner was deposed.  We think he was a very formidable

21    witness.  We think he came across as a straightforward, very

22    engaged, knowledgeable straight shooter.

23         We had our expert deposed, almost 30 years of

24    experience in auditing.  We think he persuasively made the case

25    that the method by which the cartel here concealed the

1    underlying fraud made it such that even a good audit couldn't

2    uncover it.  So we think we had some good defenses here, Judge.

3    We also had I think a very strong negative causation defense.

4         THE COURT:  So you've convinced me.  I approve your

5    part of the settlement because there's no doubt that it's

6    unfair to you and we should proceed to trial where your chances

7    of winning, as I understand it, are 99.9 percent.

8         MR. PAUZE:  If that were the case, Judge, we wouldn't

9    be standing here.  We certainly recognize the substantial cost

10   of a trial, and we certainly recognize the risk.  We think,

11   under those circumstances, it's more than fair.

12        THE COURT:  Did any of the individual plaintiffs

13   themselves, the class representatives, want to say anything?

14   You don't have to, but you're welcome to if you wish to.

15        Okay.  The last question I have was this -- we'll

16   clear the courtroom, and then you can tell me whether you want

17   to do this or not.  With the consent of all counsel, I had

18   invited down my class on class actions from Columbia Law

19   School.  That's that incredibly good-looking group that you see

20   here in the jury box.

21        I told them in advance, in a moment of weakness, that

22   the lawyers in this case were some of the best lawyers in the

23   United States, if not in the world.  So now they want to hear

24   from you.

25        So what I thought -- feel free to say no -- is we

```
 1    could clear the courtroom and then, on a strictly informal

 2    basis, obviously no record -- not discussing this case at

 3    all -- I won't permit anyone to discuss this case, but I think

 4    members of my class would be very interested to hear what it's

 5    like to be a plaintiffs' securities lawyer, what it's like to

 6    be a defense lawyer.  I think it would be a real educational

 7    value for them.

 8              So I was hoping you guys could agree.  I didn't mean

 9    to spring it on you at the last minute, but if you would be

10    agreeable to that, I would be most grateful, and they would be

11    most grateful indeed because they would learn a lot.

12              MR. LIEBERMAN:  It's certainly agreeable with

13    plaintiff.

14              MR. LIMAN:  It's certainly agreeable with defendants.

15    If I may ask Mr. Lieberman one question.

16              (Counsel conferred)

17              MR. LIMAN:  I've got a couple family members here.  If

18    they could be permitted to stay.

19              THE COURT:  Of course.  I don't hold to the rumor that

20    I've heard that this is the only time they've ever seen you.

21              Thank you all very much.  Everyone else should leave,

22    but the lawyers remain.  None of this will be about the case.

23    It will be other things.  Thanks again.  For everyone else's

24    purpose, the court is adjourned, and you can leave.

25              (Adjourned)
```