**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PETROBRAS SECURITIES LITIGATION | Case No. 14-cv-09662 (JSR) |
| | ECF CASE |

THIS DOCMENT RELATES TO:

*In Re Petrobras Securities Litigation*, Case No. 14-cv-09662 (JSR)

*The Hartford Mutual Funds, Inc. v. Petroleo Brasileiro S.A. – Petrobras, et al.*, Case No. 15-cv-09182 (JSR)

*Massachusetts Mutual Life Ins. Co. v. Petroleo Brasileiro S.A. – Petrobras, et al.*, Case No. 1:15-cv-09243 (JSR)

*Pacific Funds, et al. v. Petroleo Brasileiro S.A. – Petrobras, et al.*, Case No. 16-cv-02013 (JSR)

*The Prudential Insurance Co.  v. Petroleo Brasileiro S.A. – Petrobras, et al.*, Case No. 16-cv-07192 (JSR)

**DECLARATION OF BENJAMIN GALDSTON IN SUPPORT OF**
**APPLICATION OF BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
**FOR REIMBURSEMENT OF ATTORNEYS' FEES AND LITIGATION EXPENSES**

## <u>TABLE OF CONTENTS</u>

I.   OVERVIEW OF THE PROPOSED SETTLEMENT ...............................................................1

II.  SUMMARY OF PLAINTIFFS' CLAIMS AND THE LITIGATION .....................................2

III. WORK PERFORMED BY COUNSEL FOR THE DIRECT ACTION PLAINTIFFS
     CONFERRED A BENEFIT ON THE CLASS .......................................................................5

IV. THE DIRECT ACTION PLAINTIFFS' COUNSEL REQUEST AN AWARD OF
    REASONABLE ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION
    EXPENSES.........................................................................................................................13

I, BENJAMIN GALDSTON, declare as follows:

1.      I am a partner with the law firm of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), counsel for Plaintiffs in the above captioned actions (the "Direct Actions").  I am familiar with and have personal knowledge of the pleadings and proceedings in this action and the facts set forth in this declaration and, if called upon to do so, could and would testify competently thereto.

2.      This declaration is submitted in support of the Application of Bernstein Litowitz Berger & Grossmann LLP for Reimbursement of Attorneys' Fees and Litigation Expenses.

3.      This declaration does not detail each and every event that has occurred throughout the over three years of this complex coordinated securities litigation involving the Class action, the Direct Actions and numerous other individual actions.  Rather, it provides highlights of the litigation and the benefits conferred upon the Class by the work performed by the Direct Action Plaintiffs' counsel.

I.      **OVERVIEW OF THE PROPOSED SETTLEMENT**

4.      The proposed Class action settlement provides for the resolution of all securities claims against, *inter alia*, Petróleo Brasileiro S.A., Petrobras Global Finance B.V. and Petrobras America Inc. (collectively "Petrobras" or the "Company") in exchange for a cash payment of $3 billion (the "Settlement Amount").

5.      If approved, the Settlement Class will resolve all claims that have been or could have been asserted by Settlement Class Members against any of the Defendants in the Action, including the claims of the Direct Action Plaintiffs and other investors that had previously opted out of the Class Action and were still pursuing their own individual actions.

6.      According to the Class Settlement Notice, Lead Counsel will apply for an award of attorneys' fees not to exceed 9.5% of the Settlement Amount (or $285 million) and reimbursement of litigation expenses in an amount not to exceed $18 million, which will include reimbursement of contributions made by the Direct Action Plaintiffs and other individual plaintiffs to the joint litigation fund, and may also include the reasonable costs and expenses of other counsel such as the Direct Action Plaintiffs' counsel that directly contributed to prosecuting claims in this litigation and conferred a benefit to the Settlement Class.

7.      Counsel for the Direct Action Plaintiffs seek an award of reasonable attorneys' fees to be allocated by Lead Counsel relative to its lodestar of $2,114,085 in connection with the work it performed that benefited the Class (including the Direct Action Plaintiffs as members of the Class), and reimbursement of litigation expenses in the amount of $1,146,873.[1]  This lodestar is less than half of Bernstein Litowitz's total lodestar of $4.4 million in the action which includes substantial time expended in advising other absent Class members.

## II.      SUMMARY OF PLAINTIFFS' CLAIMS AND THE LITIGATION

8.      All plaintiffs generally alleged that, Petrobras, Petrobras International Finance Company, and Petrobras Global Finance B.V. ("Defendants"), violated the federal securities laws by making material, public misrepresentations and omissions concerning Petrobras's financial statements, business, operational and compliance policies, and participating in a bribery and corruption scheme.

9.      As alleged in the Complaints, Petrobras was a state-run semi-public energy and oil production company headquartered in Rio de Janeiro, Brazil, whose American Depositary

---

[1]  In accordance with the Court's instructions at the February 23, 2018 preliminary settlement approval hearing, counsel for the Direct Action Plaintiffs met and conferred with and provided detailed time records to both Petrobras's counsel and Class Counsel.

Receipts ("ADR") traded on the New York Stock Exchange ("NYSE").  At the beginning of the Relevant Period, Petrobras was the largest corporation in Brazil (and in the Southern Hemisphere) by market capitalization, and one of the largest integrated oil and gas conglomerates in the world.

10.     Plaintiffs alleged that throughout the Relevant Period, Petrobras and its senior officers, including former Chief Executive Officer ("CEO") Maria das Graças Silva Foster ("Foster"), insisted that Petrobras was a global leader in corporate governance and transparency. However, in truth, for more than ten years, Petrobras officials conspired with a cartel of Company contractors to overcharge Petrobras on construction and service contracts.  Billions of dollars in kickbacks and bribes were funneled back to Petrobras executives and distributed to Brazil's ruling political parties.   The bid-rigging, graft and money-laundering scheme is estimated by authorities to have diverted up to or more than $28 billion from the Company's coffers.  Rather than accounting for these bribes and overstated costs as expenses in its financial statements, which would have decreased the Company's reported assets and net income, Petrobras fraudulently capitalized the bribes as assets to mask the kickback scheme, in violation of both U.S. Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting Standards ("IFRS").  As the truth was disclosed to the market, the price of Petrobras's publicly traded securities plummeted.  At its height in 2009, Petrobras was the world's fifth largest company, with a market capitalization of $310 billion.  By the time complaints were filed in this litigation, Petrobras was worth just $39 billion.

11.     The Direct Actions were commenced on November 20, 2015, November 23, 2015, March 17, 2016, and September 14, 2016 by filing complaints in this District.

12.     On March 24, 2015, this Court ordered that any "Individual Action that may be filed is consolidated with this Consolidated Securities Litigation for pre-trial [and trial] purposes[.]" ECF No. 105 at 2.  A second consolidation order was issued on August 3, 2015, applying the March 24, 2015 Order to any subsequently filed individual action.  ECF No. 195. That order also directed that evidence developed in the Class Action was admissible in the direct actions, and vice-versa.  *Id*. at 7.

13.     On July 20, 2015, the Court set a pre-trial schedule, directing that document productions be substantially completed by January 1, 2016, and that all discovery, including witness depositions, be complete by April 29, 2016.  ECF No. 192.  The schedule also required motions for summary judgment to be fully briefed by April 22, 2016, and provided a trial ready date of May 1, 2016.  Hence, the Class Action and nearly all of the individual actions were consolidated and proceeded in tandem under a single, highly organized structure.

14.     Despite filing their individual complaints on November 20, 2015 and November 23, 2015, Direct Action Plaintiffs – specifically, in *The Hartford* and *MassMutual* actions – were required to adhere to the coordinated schedule.  On January 11, 2016, the Court issued an Amended Civil Case Management Plan, directing plaintiffs in the individual actions to substantially complete their production of documents by January 31, 2016.  ECF No. 391. During a February 16, 2016 telephonic conference with the Court, *The Hartford* and *MassMutual* plaintiffs' request for an extension to complete their document production was largely denied, with the Court granting only a limited 14-day extension.

15.     Under this compressed schedule, the Class Action and nearly all of the individual actions proceeded on the same track, with plaintiffs working to conduct discovery, bring pertinent motions, and move the case toward trial.  Lead Plaintiff and the individual action

plaintiffs coordinated efforts and divided certain tasks, under the auspices of a Court-appointed Plaintiffs' Steering Committee.  ECF No. 195.

## III.    WORK PERFORMED BY COUNSEL FOR THE <u>DIRECT ACTION PLAINTIFFS CONFERRED A BENEFIT ON THE CLASS</u>

16.    As detailed below, the Direct Action Plaintiffs performed a host of tasks that conferred a substantial benefit to the Class.  These tasks included, *inter alia*, researching and drafting detailed pleadings; participating in written discovery, deposition discovery, and expert discovery; assisting with the coordinated summary judgment briefing on common issues; participating in an all-hands trial preparation meeting at Class Counsel's New York office; performing additional pre-trial work; and contributing to a litigation fund that the Class used to fund certain common expenses.

17.    The Direct Action Plaintiffs received discovery requests that were substantively identical to the requests served in the Class Action.  These requests focused on common issues such as materiality, reliance, investment strategies, transactional records, and other documents concerning price movement, loss causation, and the physical location of the investment transactions.  Defendants also served similar discovery requests on third party investment advisors (including investment advisors to named plaintiffs in the Class Action), which included several of the Direct Action Plaintiffs' own investment advisors.  *See*, *e.g.*, Exs. 1-4.

18.    Only days after *The Hartford* and *MassMutual* complaints were filed, Defendants served broad requests for the production of documents on the Direct Action Plaintiffs.  In responding to the requests, Bernstein Litowitz worked with its clients' internal IT personnel and two leading e-discovery vendors, Epiq and DTI, to identify relevant custodians and other locations where relevant documents and information might be found, search for and collect documents, apply appropriate search terms, establish a review protocol, screen for potentially

privileged information, and cull relevant, responsive, non-privileged documents for production. To facilitate this work, ESI litigation databases were established and hosted by Epiq and DTI in connection with the collection, processing and review of millions of pages of documents.

19.     As part of the document collection process, the Direct Action Plaintiffs participated in nearly a dozen meet and confers with Defendants.  These conferences covered, among other things, the proper scope of the requests, search terms, date restrictions, document custodians, and privilege issues.

20.     Combined, *The Hartford* and *MassMutual* plaintiffs produced more than 2.3 million pages of documents, including documents collected from: (i) shared drives; (ii) hard drives; (iii) hardcopy storage; (iv) relevant databases; and (v) more than 23 custodians.

21.     In addition to responding to document requests and making voluminous productions, the Direct Action Plaintiffs complied with other discovery obligations.  They served their Initial Disclosures on January 7, 2016, and responded to two sets of interrogatories and 80 requests for admission.  *See* Exs. 5-10.

22.     The Direct Action Plaintiffs also responded to third-party discovery in connection with the stayed *Prudential* Direct Action.  Two Prudential subsidiaries, PGIM, Inc. ("PGIM") and Jennison Associates LLC ("Jennison"), served as outside investment managers to a number of other individual plaintiffs during the relevant period.   Accordingly, Defendants issued document and deposition subpoenas to PGIM and Jennison, pertinent excerpts of which are attached as Exs. 11-12.  After numerous meet and confer calls and emails with Defendants regarding scope, search terms, and custodians, Bernstein Litowitz worked with PGIM and Jennison employees to identify the relevant custodial files, shared drives, and other locations where relevant documents were likely to be found.  Once responsive documents had been

identified and collected, Bernstein Litowitz retained DTI to host, process, and produce the documents.  In total, PGIM produced more than 283,000 pages of documents and Jennison produced more than 131,000 pages.

23.      In addition to the written and document discovery discussed above, between May 17, 2016 and June 22, 2016, the Defendants took eight depositions in connection with the Direct Actions, including two depositions in the *MassMutual* action, and two depositions in *The Hartford* action.  Defendants also deposed two third-party witnesses from PGIM and Jennison (who, as noted, served as outside investment managers to a number of the individual plaintiffs, and in-house investment managers to a number of plaintiffs in the *Prudential* action).  Pertinent excerpts of the deposition subpoenas are attached as Exs. 13-20.

24.      Bernstein Litowitz prepared all eight witnesses in advance of their depositions, and represented them during the examination.  These depositions occurred in three different cities – Boston, New York, and Newark – and required extensive preparation and travel. Significantly, these depositions counted against Defendants' deposition limit imposed by the Court in its February 13, 2016 Order, and reduced the number of depositions Defendants could seek from the Class.  ECF No. 454.

25.      During these depositions, Defendants examined the witnesses on a host of common issues relevant to Class certification, including reliance on public information and private investment models when transacting in Petrobras securities, and knowledge of public information about the risks of investments in Brazilian companies generally and Petrobras specifically.    Defendants also elicited testimony on *Morrison*-related issues, exploring transaction level details such as the geographic locations of the subject investment teams, trading desks, executing and clearing brokers, and counterparties.  These witnesses were also questioned

about their trading mechanisms and platforms, and the myriad types of evidence generated by the transactions at issue, such as trade tickets, trade confirms, account statements, custodial reports, and other trade documentation for both fixed income and equity investments.

26.     The Direct Action Plaintiffs provided favorable testimony on these issues.  For example, Nikola Ivanov, a Principal in Credit Research at PGIM, testified that it was PGIM's belief that the risk of corruption at Petrobras was lower than the risk of corruption in Brazil generally, including because Petrobras's financial statements were audited.  *See* Ex. 21 (Ivanov Transcript)

27.     On *Morrison*-related issues, The Hartford's Sector Head of Emerging Markets, Christopher Cooper, gave favorable testimony concerning the domesticity of the transactions at issue.  *See* Ex. 22 (Cooper Transcript) (Q: "Are all of the people that you work with at HIMCO's broker dealers people who are based within the United States?"  A: "Yes.").

28.     On materiality, when asked if cash flows are a key consideration in deciding in which companies to invest, Mr. Cooper testified that cash flows are "the most important or one of the most important things."  *Id.*

29.     Regarding reliance on Petrobras's statements, Jennison's Corporate Bond Portfolio Manager, Eric Staudt, testified that Jennison's investment team "me[]t with company management[,] review[ed] financial statements[, and] look[ed] at third-party research."  *See* Ex. 24 (Staudt Transcript).  MassMutual's Co-Head of Investment-Grade Credit, Charles Sanford, similarly testified that MassMutual's investment team reviewed "all the publicly available sources of information.  And . . . look[ed] at [Petrobras's] earnings reports, you know, earnings, annuals all the regular filings. [And went] to industry conferences."  *See* Ex. 23 (Sanford Transcript).

30.     Defendants generally did not differentiate among the Class and Direct Action or other individual plaintiffs in discovery or motion practice, and sought extensive discovery from plaintiffs in both the Class Action and individual actions on a host of common issues.  Here, the discovery obtained from the Direct Action Plaintiffs allowed Petrobras to test and develop factual and legal theories relevant to its class certification and merits challenges.  Ultimately, the discovery proved largely beneficial to the Class, and was cited by the Lead Plaintiff, among other evidence, in support of its class certification briefing to the Second Circuit and Supreme Court.

31.     The testimony provided by the Direct Action Plaintiffs' investment advisors was also beneficial to the Class in defeating Defendants' *Morrison*-related arguments on appeal.  In support of Lead Plaintiff's ascertainability argument, Lead Plaintiff noted that "the feasibility of establishing domesticity is also demonstrated by the related individual actions" where Defendants "did not even challenge on *Morrison* grounds" the individual actions' secondary market transactions.  *Petrobras* Appeal, ECF No. 189 at 19-20.  Lead Plaintiff emphasized that "deposition testimony from individual plaintiffs with some of the largest losses further demonstrates that their secondary market transactions were domestic."  *Id*. at 36-37.  Lead Plaintiff cited (*id*. at 37) deposition testimony from two of the Direct Action Plaintiffs' outside investment managers: (1) Steven Saruwatari of Western Asset Management Company ("WAMCO"); and (2) Kofi Bentsi of Pacific Investment Management Company.

32.     In its briefing to the Second Circuit, Lead Plaintiff also highlighted that many of the individual plaintiffs, like the Direct Action Plaintiffs, filed amended complaints that utilized "objective factors" of domesticity set forth in *Absolute Activist*, such as "the name and location of plaintiffs' investment managers, the counterparty, and the settlement location."  *Id*. at 20.

Lead Plaintiff noted that "Defendants effectively dropped their attacks" on *Morrison* as a result of work done in the individual actions, and "conced[ed] that the trading records of the [individual plaintiffs] sufficiently demonstrated domestic transactions." *Id*.  In support of this argument, Lead Plaintiff cited individual complaints involving the Direct Action Plaintiffs and/or their shared investment managers, including Prudential, WAMCO, and Wellington Management Company. *Id*.

33.    Lead Plaintiff's opposition to Defendants *certiorari* petition also cited the individual actions.  In arguing that the *Morrison* standard could easily be met, Lead Plaintiff highlighted the fact that "[w]hen [the individual] plaintiffs amended their complaints to include details of the transactions, defendants dropped their *Morrison* defense in the vast majority of cases, declining to challenge over 1500 transactions." *Petroleo Brasileiro S.A. – Petrobras, et al. v. Universities Superannuation Scheme Ltd, et al.* Case No. 17-664 (Sup. Ct.) at 6, n.1.  Here, *The Hartford* plaintiffs and *MassMutual* plaintiffs had amended their complaints to add numerous facts showing that their transactions were domestic, including that: (1) these Direct Action Plaintiffs are U.S. entities; (2) their trades were placed by their U.S. managers/advisers/sub-advisers; (3) their trades were executed by U.S. brokers; (4) their trades were executed through U.S. markets or in IPOs conducted by U.S. underwriters; (5) their trades were settled and paid in U.S. dollars; and (6) the counterparties were U.S. underwriters or otherwise often based in the U.S.  Lead Plaintiff also cited the individual actions in arguing that "the district court had first-hand experience with the administrative feasibility of making the *Morrison* determination." *Id*. at 30 ("The district court had similar experience in myriad opt-out cases."). Ex. 25.

34.     Finally, Defendants filed six motions for partial summary judgment (ECF Nos. 616-21), arguing, among other things, that the market did not rely on certain allegedly false statements and that plaintiffs had failed to establish loss causation.  Plaintiffs' joint opposition brief would have been due filed two days after the stay was lifted.  Defendants would have been forced to confront favorable testimony from the individual actions, including testimony provided by the Direct Action Plaintiffs and their relevant investment personnel.  For example, in addition to the Direct Action Plaintiff testimony discussed above, Prudential's Corporate Bond Portfolio Manager Eric Staudt provided favorable testimony concerning Jennison's reliance on Petrobras's public statements.  Mr. Staudt testified that when it was disclosed that Petrobras's financials were misstated, "We sold.  If you cannot rely on them, it doesn't matter [what was misstated]." Ex. 29 (Staudt Transcript) at 148: 13-16.

35.     At the time of Defendants' appeal, the Class Action and the individual actions were only two months away from trial.  The Lead Plaintiff and the individual action plaintiffs had recently prepared plaintiffs' joint motion for partial summary judgment on the issues of materiality, falsity, and scienter.   In addition, the individual plaintiffs were preparing their own motions for partial summary judgment, including on issues relating to loss causation and damages.  Moreover, the individual plaintiffs had been tasked by Lead Plaintiff with preparing the opposition to Defendants' motion for summary judgment on the issues of reliance and loss causation, as well as a variety of pre-trial motions, including motions *in limine* and motions to strike.

36.     Counsel for plaintiffs in more than 20 individual actions had also met with Class Counsel in Manhattan for an "all hands" trial preparation conference on July 12, 2016.  Counsel for the Direct Action Plaintiffs traveled from San Diego to attend the meeting.  Counsel for other

individual action plaintiffs also travelled from around the country to attend.  The purpose of the meeting was to: (1) assign work necessary to complete the Joint Pre-trial Order, including preparation of deposition designations, jury instructions/verdict form, etc.; (2) assign responsibility to draft various motions *in limine*; (3) discuss the evidence to be introduced and live witness list for examination at trial; and (4) allocate responsibility among plaintiffs' counsel to examine those witnesses and undertake other roles at trial.

37.      During the July 2016 strategy summit, the Steering Committee noted that the number one priority was streamlining the trial exhibit list, which Class Counsel confirmed included 1,500 documents, including numerous Portuguese-language documents that had not been translated.  It was further agreed that the individual plaintiffs would review two tiers of testimony, and prepare related witness memos, concerning: (i) testimony in English (*e.g.*, deposition transcripts and exhibits); and (ii) testimony in Portuguese (*e.g.*, about 200 official transcripts) that had been translated.  Time permitting, the Class and/or the individual plaintiffs would review a third tier of testimony: (iii) rough translations (non-certified) of Brazilian testimony.  This assigned work was in addition to the individual plaintiffs' then-pending review of all fact witness depositions and preparation of all deposition designations – all within a two-week timeframe.  Other coordinated work covered at the meeting included the joint overview of the case and descriptions of each parties' claims, the particularized contentions and proposed findings of fact and conclusions of law, motions *in limine*, and jury instructions.  Additionally, a mock trial was scheduled to rehearse and refine plaintiffs' arguments and presentation of the evidence, including the direct- and cross-examination of experts.

38.      Class Counsel also asked counsel for the Direct Action Plaintiffs and other individual plaintiffs' counsel to help finance the litigation.  With trial approaching and expenses

growing, Class Counsel called upon counsel to the individual plaintiffs to contribute to a common litigation fund. The fund was to be used by the Class to pay for necessary and mutually beneficial litigation expenses, including the significant costs of various court reporting services, certified translations, and hosting massive databases of ESI produced by Defendants. The individual action plaintiffs agreed to Class Counsel's request. The Direct Action Plaintiffs' counsel contributed $30,000.

## IV.    THE DIRECT ACTION PLAINTIFFS' COUNSEL REQUEST AN AWARD OF REASONABLE ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

39.    Bernstein Litowitz is applying for an award of reasonable attorneys' fees to be allocated by Lead Counsel relative to its lodestar of $2,114,085 and reimbursement of litigation expenses in the amount of $1,146,873 in connection with the work it performed that benefited the Class (including the Direct Action Plaintiffs as members of the Class).[2] This lodestar is less than half of Bernstein Litowitz's total lodestar of $4.4 million in the action, which includes substantial time expended in advising other absent Class members. Importantly, counsel for the Direct Action Plaintiffs is not seeking a separate fee award payable from the common fund that would impact the net Class recovery. Instead, the fees would be paid by Class Counsel from its own fee award.

40.    The legal authorities supporting the requested fees and expenses are discussed in the accompanying Memorandum. The primary factual bases for the requested fees and expenses are summarized below.

---

[2]   In accordance with the Court's instructions at the February 23, 2018 preliminary settlement approval hearing, counsel for the Direct Action Plaintiffs has provided detailed time records to both Petrobras's counsel and Class Counsel.

41.     The schedule attached hereto as Exhibit 26 is a summary of time spent by attorneys and professional support staff employees of my firm who, with one exception, billed ten or more hours to the Direct Actions from inception of the engagements through March 2018, and the lodestar calculation for those individuals based on my firm's current billing rates.  For personnel who are no longer employed by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by my firm.  The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm.  Time expended on the application for fees and reimbursement of expenses has not been included.

42.     The hourly rates for the attorneys and professional support staff in my firm included in Exhibit 26 are the same as the regular rates charged for their services, which have been accepted in other securities or shareholder litigation.

43.     The total number of hours reflected in Exhibit 26 from the inception of the respective engagements through and including April 3, 2018, is 4,057.50.  The total lodestar reflected in Exhibit 26 for that period is $2,144,085 consisting of $1,752,451.25 for attorneys' time and $361,633.75 for professional support staff time.

44.     My firm's lodestar figures are based upon the firm's billing rates, which rates do not include charges for expense items.  Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

45.     Throughout the litigation, Bernstein Litowitz maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

46.     As described above in greater detail, the work that Bernstein Litowitz performed that benefited the class included: (i) conducting an extensive investigation into the alleged fraud including a review of SEC filings, analyst reports, conference call transcripts, press releases, company presentations, media reports and other public information; (ii) engaging in substantial fact discovery, which included responding to Defendants' extensive discovery requests, reviewing thousands of pages of documents produced by Defendants and third parties, and preparing for and defending six depositions in three different cities; (iii) consulting extensively with experts concerning loss causation and damages; and (iv) engaging in vigorous arm's-length settlement negotiations to help achieve the Settlement.

47.     As demonstrated by the firm resume included as Exhibit 27 hereto, which provides a brief biography of my firm and attorneys in my firm who were involved in this Action, Bernstein Litowitz is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases. Bernstein Litowitz is consistently ranked among the top plaintiffs' firms in the country.  Further, Bernstein Litowitz has taken complex cases such as this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities actions.  I believe this experience and ability conferred a substantial benefit on the Settlement Class.

48.     Bernstein Litowitz also seeks reimbursement of $1,146,873 in litigation expenses that were reasonably incurred in connection with the prosecution of the Direct Actions.

49.     As detailed in Exhibit 28, my firm is seeking reimbursement for a total of $1,146,873 in expenses incurred in connection with the prosecution of the Direct Actions from the inception of the engagements through and including April 15, 2018.

50.     The expenses reflected in Exhibit 26 are the expenses actually incurred by my firm or reflect "caps" based on the application of the following criteria:

   a.   Out-of-town travel - airfare is at coach rates, hotel charges per night are capped at $350 for large cities and $250 for small cities (the relevant cities and how they are categorized are reflected on Exhibit 2); meals are capped at $20 per person for breakfast, $25 per person for lunch, and $50 per person for dinner.

   b.   Internal Copying - Charged at $0.10 per page.

   c.   On-Line Research - Charges reflected are for out-of-pocket payments to the vendors for research done in connection with this litigation.  On-line research is billed to each case based on actual time usage at a set charge by the vendor. There are no administrative charges included in these figures.

51.     The expenses incurred in the Direct Actions are reflected on the books and records of my firm.  These books and records are prepared from expense vouchers, check records and other source materials and are an accurate record of the expenses incurred.

52.     The expenses for which reimbursement are sought are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses principally include external e-discovery service providers, expert and consultant fees, on-line factual and legal research, court reporting and transcripts, photocopying, travel costs, and postage expenses.

53.     The largest expense is the cost for external electronic discovery vendors in collecting, processing, and hosting the substantial database of ESI collected, and providing

sophisticated e-discovery forensics, which came to $616,745.70, or 53.7% of the total litigation expenses.

54.     The amount of these ESI-related charges is attributable to a number of factors, described briefly as follows.  Plaintiffs in the above-referenced actions are institutional investors with large and complex organizations.   In many cases, the impacted funds and accounts were managed by divergent business units located across the organization, including mutual funds, insurance companies, institutional money managers, general accounts, retirement accounts, and trusts.   These plaintiffs have sophisticated data systems, employ thousands of people, and maintain offices in various geographic locations.  Additionally, many of the plaintiffs were active traders with public reporting obligations.  As a result, the plaintiffs generate enormous quantities of ESI daily.  Specifically, the Direct Action Plaintiffs together collected millions of pages of documents, which were processed, reviewed and analyzed on ESI databases with the support of ESI vendors.

55.     Furthermore, the scope of Defendants' discovery requests and search terms necessitated the collection of vast quantities of data that were hosted by the vendors, processed, searched, made available for attorney review, screened for privileged documents, culled for relevance and responsiveness, and ultimately produced in discovery.  As a result, *The Hartford* and *MassMutual* plaintiffs collectively produced more than 2.3 million pages of documents.

56.     Another significant expense was the retention of the Direct Action Plaintiffs' loss causation/damages expert, which totaled $256,867.35 or 22.3% of the total expenses, and the retention of their expert financial consultant, which totaled $192,400 or 16.7% of the total expenses.

57.     The combined costs for on-line legal and factual research, in the amount of $18,810.09, represented 1.6% of the total amount of expenses.

58.     These expense items are billed separately and such charges are not duplicated in the firm's hourly billing rates.


I declare under penalty of perjury under the laws of the United States that the foregoing facts are true and correct.  Executed on this 20th day of April 2018, at San Diego, California.

_____

BENJAMIN GALDSTON