**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE PETROBRAS SECURITIES LITIGATION

This Document Applies To:

*In re Petrobras Securities Litigation*, 14-cv-9662 (JSR)

No. 14-cv-9662 (JSR)

---

**CORRECTED DECLARATION OF JEREMY A. LIEBERMAN**
**IN SUPPORT OF (A) CLASS REPRESENTATIVES' MOTION FOR**
**FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN**
**OF ALLOCATION; (B) CLASS COUNSEL'S MOTION FOR AN AWARD OF**
**ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES;**
**AND (C) CLASS REPRESENTATIVES' MOTION FOR REIMBURSEMENT OF COSTS**

# TABLE OF CONTENTS

TABLE OF EXHIBITS ................................................................................................ x

I.    PRELIMINARY STATEMENT ......................................................................... 2

II.   PROSECUTION OF THE ACTION .................................................................. 9

      A.   Commencement of the Action and Appointment of Lead Plaintiff and Class
           Counsel ..................................................................................................... 9

      B.   Class Counsel's Comprehensive Pre-Filing Investigation and Preparation of the
           Consolidated Amended Class Action Complaint ................................... 11

      C.   Plaintiffs' Motion for Partial Modification for the PSLRA's Discovery Stay and
           SEC FOIA Request ................................................................................ 18

      D.   Defendants' Motion to Dismiss the Consolidated Amended Complaint and Lead
           Plaintiff's Responses .............................................................................. 20

           1.   Defendants' Motion to Dismiss the Consolidated Amended Complaint .. 20

           2.   Lead Plaintiff's Opposition to Defendants' Motion to Dismiss .............. 23

           3.   Defendants' Reply and the Parties' Supplemental Filings ...................... 25

           4.   The Court's Ruling on Defendants' Motion to Dismiss the Consolidated
                Amended Complaint ................................................................................. 26

      E.   Class Counsel's Effort on Case Management, Protective and Coordination
           Orders, and Successful Argument for Separate Trials on Individualized Issues
           Unique to the Individual Actions ........................................................... 26

           1.   Case Management Orders ......................................................................... 26

           2.   Protective Orders ..................................................................................... 28

           3.   Coordination Order and Bifurcating Individualized Damages Issues That
                Could Possibly Taint the Class Action .................................................... 29

      F.   Class Counsel's Continuing Investigation and the Preparation of the Second,
           Third and Fourth Amended Consolidated Complaints, and Defendants'
           Responses Thereto ................................................................................. 31

           1.   Second and Third Amended Complaints .................................................. 31

           2.   Defendants' Motion to Dismiss the Third Amended Complaint and
                Plaintiffs' Response ................................................................................ 33

           3.   Oral Argument on Defendants' Motion to Dismiss the Third Amended
                Class Action Complaint ........................................................................... 35

           4.   Fourth Amended Class Action Complaint and Defendants' Motion to
                Dismiss .................................................................................................... 35

           5.   The Court's Ruling on Defendants' Motion to Dismiss the Third and
                Fourth Amended Class Action Complaints .............................................. 36

G.    PwC Brazil's Motion to Dismiss ......................................................... 37

H.    Class Counsel Moved for Alternative Service on the Individual Defendants (other than Helms) and PwC Brazil, While Effectuating International Service Pursuant to Inter-American Convention Requirements ........................ 41

I.    Class Counsel Successfully Opposed DOJ Efforts to Stay Discovery ................ 43

J.    Plaintiffs' Formal Discovery Under the Federal Rules .......................... 44

    1.    Class Counsel Conducted Extensive Document Discovery of Parties and Third Parties ............................................................. 44

        a.    The Parties .................................................................. 45

        b.    Non-Party Discovery ................................................. 50

    2.    Class Counsel's Strategic Use of Interrogatories and Requests to Admit Successfully Strengthened Plaintiffs' Case .......................... 52

        a.    Interrogatories .......................................................... 52

        b.    Requests for Admission ............................................. 53

    3.    Class Counsel's 50 Fact Witness Depositions Strengthened Plaintiffs' Case ...................................................................... 53

    4.    Class Counsel's Use of Focused Motion Practice Strengthened Plaintiffs' Case ...................................................................... 57

        a.    Motion to Compel Cunha's Testimony ...................... 57

        b.    Motion to Compel Fonseca's and Sa's Testimony ...... 59

        c.    Motion to Compel Cintra's Testimony ....................... 60

K.    Class Counsel Propounded Extensive International Requests for Judicial Assistance in the Taking of Evidence Abroad ................................. 61

L.    Formal and Informal Discovery in Brazil Strengthened Plaintiffs' Case ........... 62

    1.    Federal Courts ............................................................... 65

    2.    TCU ............................................................................. 67

    3.    CADE ........................................................................... 68

    4.    CVM ............................................................................. 68

    5.    CPI ............................................................................... 69

    6.    CGU ............................................................................. 70

    7.    Brazilian Local Counsel ................................................. 70

M.    Class Counsel's Extensive Work with Prof. Daniel J. Capra on Key Evidentiary Issues ................................................................... 71

N.    Parties Exchanged 18 Expert Reports in Addition to Two Expert Reports on Market Efficiency Related to Class Certification ........................ 72

1.   Plaintiffs' Four Testifying Experts (in addition to Dr. Feinstein) ........... 72

2.   Defendants' Fourteen Testifying Experts (in addition to Dr. Gompers) .. 77

O.   Parties' Cross Motions for Summary Judgment .................................. 89

P.   Trial Preparation ............................................................................ 97

1.   July and (Preparation for) August Mock Trials ........................................ 97

2.   Class Counsel Worked Extensively with TrialGraphix ........................... 99

3.   Plaintiffs' Strategic Use of Brazilian Testimony/Depositions................. 99

4.   Plaintiffs' Comprehensive Deposition Designations ............................. 101

5.   Plaintiffs' Exhaustive Exhibit List..................................................... 101

a.   Federal Court in Curitiba – State of Paraná and Regional Federal
     Court of the 4th Circuit............................................................. 102

b.   Federal Court and Labor Court in Rio de Janeiro – State of Rio
     de Janeiro .............................................................................. 102

c.   State Prosecutor's Office in São Paulo – State of São Paulo...... 103

d.   Supreme Court and Superior Court of Justice in Brasília –
     Federal District........................................................................ 103

e.   Administrative Council of Economic Defense, Office of the
     Comptroller General and House of Representatives in Brasília –
     Federal District........................................................................ 103

f.   Federal Accounts Court (TCU) in Brasília – Federal District .... 104

6.   Class Counsel's 13 Motions *in Limine* or Daubert Motions.................. 104

7.   Class Counsel's Work with Experts in Anticipation of Trial ................ 105

8.   Class Counsel's Work on a Pretrial Order............................................. 105

III.   Class Certification.................................................................................. 105

A.   Class Counsel Achieves Class Certification .................................... 105

B.   Class Counsel Opposed Defendants' Rule 23(f) Interlocutory Appeal ............. 110

1.   The Petition .......................................................................... 110

2.   Class Counsel Opposed Defendants' Stay Motion ................................ 111

3.   Rule 23(f) Briefing and Oral Argument................................................. 113

C.   Class Counsel Opposed Defendants' Petition for Certiorari to the United States
     Supreme Court ........................................................................ 116

IV.   THE PROPOSED SETTLEMENTS ........................................................ 117

A.   Petrobras Defendants and Underwriter Defendants Settlement........................ 118

1.   Negotiations of the $2.95 billion Settlement .......................................... 118

|  | 2. | Petrobras and Underwriter Stipulation | 119 |
| B. | | PwC Brazil Settlement | 122 |
|  | 1. | Negotiations of the $50 million Settlement | 122 |
|  | 2. | PwC Brazil Stipulation | 122 |
| C. | | Three Institutional Plaintiffs Endorse the Settlements | 123 |
| D. | | Both Settlements Represent an Excellent Result Not Subject to "Pocket Shifting" or "Circularity" Critiques | 124 |
| E. | | Risks of Continued Litigation | 126 |
|  | 1. | Risk Concerning Loss Causation and Damages | 126 |
|  | 2. | Risk Concerning Class Certification | 128 |
|  | 3. | Risk Concerning Scienter | 128 |
|  | 4. | Additional Trial Risk | 130 |
|  | 5. | Risk of Maintaining a Certified Class Through Trial | 131 |
|  | 6. | Risk of Prolonged Appeal | 131 |
|  | 7. | Risk and Burden of Enforcing Judgment in Brazil | 132 |

V. CLASS REPRESENTATIVES' COMPLIANCE WITH THE COURT'S NOTICE ORDER AND CLASS REACTION TO DATE ..... 132

VI. PLAN OF ALLOCATION ..... 136

VII. CLASS COUNSEL'S APPLICATION FOR AWARD OF ATTORNEYS' FEES ..... 138

| A. | | The Requested Fee is Fair and Reasonable | 139 |
|  | 1. | Class Counsel's Significant Time and Labor Devoted to the Action | 141 |
|  | 2. | A Lodestar Cross-Check Confirms the Reasonableness of the Fee Application | 143 |
|  | 3. | The Settlement Amount is Excellent Compared to Typical Recoveries and When Weighed Against the Individual Action Recoveries | 144 |
|  | 4. | Class Counsel Prosecuted the Case in a Uniquely Aggressive Fashion | 147 |
|  | 5. | Class Counsel Faced an Army of Lawyers on the Defense Side | 150 |
| B. | | Class Counsel Sought to Avoid Duplication and Inefficiencies | 152 |
|  | 1. | Class Counsel Utilized a Core Team to Efficiently Prosecute the Case | 152 |
|  | 2. | Class Counsel's Efficient Document Review | 153 |
|  | 3. | Class Counsel Added Attorneys Gradually and When Warranted | 159 |
| C. | | The Risks and Unique Complexities of the Action | 165 |
|  | 1. | Most Securities Class Actions are Dismissed | 165 |
|  | 2. | Securities Class Actions Have Been Lost Even After Successful Trial | 165 |

3.      The Risks of Contingent Fee Litigation and Importance of Ensuring the Availability of Top Quality Counsel in Securities Class Actions........... 167

4.      The Risk Undertaken by Class Counsel in Prosecuting this Action ....... 170

5.      There Was a Significant Risk of Zero Recovery in this Action ............. 172

D.    Class Representatives Endorsement of the Fee Application............................ 174

E.    The Reaction of the Settlement Class to the Fee Application ........................... 176

F.    The Quality of Class Counsel's Representation and Their Standing and Expertise ....................................................................................................... 178

1.      The Excellent Results Obtained from Class Counsel's Efforts ............. 178

2.      The Court's Observations as to the Quality of Class Counsel's Work... 178

3.      Standing and Expertise of Class Counsel ................................. 179

4.      Standing and Caliber of Defense Counsel ............................... 179

VIII.   THE REQUEST FOR REIMBURSEMENT OF CLASS COUNSEL'S REASONABLE LITIGATION COSTS ................................................................ 180

IX.    REIMBURSEMENT OF CLASS REPRESENTATIVES' COSTS ............................ 182

X.    CONCLUSION............................................................................................. 185

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012) ................................................................................................*passim*

*Anixter v. Home-Stake Prod. Co.*,
   77 F.3d 1215 (10th Cir. 1996) ................................................................................................ 180

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ...................................................................................... 124, 126, 129, 130

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
   472 U.S. 299 (1985) .............................................................................................................. 183

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ................................................................................................ 153

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
   954 F. Supp. 2d 276 (S.D.N.Y. 2013) (Rakoff, J.) ............................................................. 159

*City of Providence v. Petróleo Brasileiro et al.*,
   14-cv-10117 (S.D.N.Y.) ......................................................................................................... 22

*Fishoff v. Coty Inc.*,
   No. 09 Civ. 628 (SAS), 2010 WL 305358 (S.D.N.Y. Jan. 25, 2010) *aff'd*, 634 F.3d
   647 (2d Cir. 2011) ................................................................................................................ 142

*Goldberger v. Integrated Resources, Inc.*,
   209 F.3d 43 (2d Cir. 2000) ............................................................................................. 19, 153

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) .......................................................................................... 126, 127, 130

*Hayes v. Wal-Mart Stores, Inc.*,
   725 F.3d 349 (3d Cir. 2013) ................................................................................................ 128

*In re Apollo Grp., Inc. Sec. Litig.*,
   Case No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), rev'd,
   No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) ................................................ 180

*In re Bank of America Corp. Sec., Derivative, and ERISA Litig.*,
   No. 09-MDL-2058 (S.D.N.Y.) ............................................................................................. 179

*In re Bank of America Securities Litigation*,
   09-MDL-2058 (S.D.N.Y) ..................................................................................................... 132

*In re BankAtlantic Bancorp, Inc.*,
   688 F.3d 713 (11th Cir. 2012) ............................................................................................. 180

*In re BankAtlantic Bancorp, Inc.*
    (S.D. Fla. 2010) ............................................................................................................... 179

*In re Celestic Inc. Sec. Litig.*,
    No. 07-cv-0312 ................................................................................................................. 179

*In re Cendant Corp.*,
    264 F. Supp. 2d 201 (3d Cir. 2001) .................................................................................. 141

*In re ChinaCast Educ. Comp. Sec. Litig.*,
    809 F.3d 471 (9th Cir. 2015) ............................................................................................ 143

*In re Citigroup, Inc. Bond Litigation*,
    Master File No. 08-cv-9522 (S.D.N.Y.) ........................................................................... 132

*In re CNOVA NV Sec. Litig.*,
    No. 16-cv-0444 (S.D.N.Y.) ............................................................................................... 178

*In re Crazy Eddie Sec. Litig.*,
    824 F. Supp. 320 (E.D.N.Y. 1993) ................................................................................... 159

*In re Lehman Brothers Equity/Debt Securities Litigation*,
    09-md-2017 (S.D.N.Y.) ............................................................................................. 89, 132

*In re Monster Worldwide, Inc. Sec. Litig.*,
    549 F. Supp. 2d 578 (S.D.N.Y. 2008) .............................................................................. 103

*In re Parmalat Sec. Litig.*,
    No. 04-cv-0030 (S.D.N.Y.) ............................................................................................... 179

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017) ...................................................................................... 15, 128

*In re Petrobras Securities Litigation*,
    No. 14-cv-9662 (JSR) ......................................................................................................... 42

*In re Pfizer Inc. Sec. Litig.*,
    No. 04-cv-9866 (S.D.N.Y.) ............................................................................................... 179

*In re Rite Aid Corp. Sec. Litig.*,
    146 F. Supp. 2d 706 (E.D. Pa. 2001) ................................................................................ 159

*In re Silvercorp Metals, Inc. Sec. Litig.*,
    No. 12-cv-9456 ................................................................................................................. 159

*In re Vivendi Universal, S.A. Sec. Litig.*,
    02-cv-5571 (S.D.N.Y.) .............................................................................................. 178, 180

*In re Vivendi Universal, S.A. Secs Litig.*,
    02-cv-05571 (S.D.N.Y. Jul. 18, 2002) ............................................................................. 145

*In re Worldcom, Inc. Sec. Litig.*,
  No. 02-cv-3288 (DLC) (S.D.N.Y. Aug. 1, 2003) ........................................................ 141

*Jaffe v. Household Intl. Inc.*,
  02-cv-05893 (N.D. Ill. Aug 19, 2002 ........................................................................ 145

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ................................................................................................ 107

*Morrison v. National Australia Bank Ltd.*,
  561 U.S. 247 (2010) ........................................................................................ *passim*

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
  08-cv-8781 (S.D.N.Y.) ............................................................................................ 178

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .................................................................................... 142

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pen. Fund*,
  135 S. Ct. 1318 (2015) .................................................................................... 51, 110

*Robbins v. Koger Props., Inc.*,
  116 F.3d 1441 (11th Cir. 1997) .............................................................................. 180

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................................ 54

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ...................................................................................... 129

*Ward v. Succession of Freeman*,
  854 F.2d 780 (5th Cir. 1998) .................................................................................. 180

**Statutes**

5 U.S.C. § 552(b)(7)(A) ................................................................................................ 32

15 U.S.C. § 77k(c) ...................................................................................................... 109

28 U.S.C. § 1781 .......................................................................................................... 32

28 U.S.C. § 1783 .......................................................................................................... 70

Freedom of Information Act, 5 U.S.C. § 552 ................................................................ 32

Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7246(a) .................................................... 161

**Other Authorities**

17 CFR § 200.80(b)(7)(i) ............................................................................................ 32

Aditya Tejas, *Petrobras Investigation: Brazilian Court Sanctions Probe into Top
 Politicians in Corruption Scandal* ........................................................................... 31

Cornerstone Research, *Securities Class Action Settlements: 2017 Review and Analysis*
 (2017) ....................................................................................................................... 159

John C. Coffee, Jr., *Accountability and Competition in Securities Class Actions: Why
 "Exit" Works Better Than "Voice",* 30 Cardozo L. Rev. 407 (2008).................................. 18

Martha Neil, *Top partner billing rates at BigLaw firms approach $1,500 per hour*, ABA
 Journal (Feb. 8, 2016)............................................................................................. 165

**<u>TABLE OF EXHIBITS</u>**

Exhibit 1        The Top 100 U.S. Settlements of All-Time, ISS Securities Class Action Services (2018).

Exhibit 2        Declaration of Niki L. Mendoza of Garden City Group, LLC Regarding Class Notice and Objections and Exclusion Requests Received to Date, and related Exhibits.

Exhibit 3        Andres Schipani, *Former Petrobras boss found guilty of corruption*, Financial Times, Mar. 7, 2018.

Exhibit 4        Chart prepared by Class Counsel identifying disclosure dates in various Individual Actions.

Exhibit 5        Chart prepared by Class Counsel identifying depositions taken, defended or attended by Class Counsel.

Exhibit 6        Chart prepared by Class Counsel identifying entities and persons to whom Class Counsel served foreign discovery requests.

Exhibit 7        Chart prepared by Class Counsel identifying 701 cooperation statements and testimonies Class Counsel analyzed.

Exhibit 8        Chart prepared by Class Counsel identifying 176 TCU Proceedings Class Counsel analyzed.

Exhibit 9        Chart prepared by Class Counsel identifying 63 Petrobras related CVM proceedings that Class Counsel monitored.

Exhibit 10       Screenshots identifying how Class Counsel accessed unsealed court documents in Brazil.

Exhibit 11       Declaration of Judge Layn R. Phillips (Ret.), dated April 19, 2018.

Exhibit 12       Declaration of Jeremy Hill in Support of (i) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation, (ii) Class Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, and (iii) USS's Request for Reimbursement of Costs, dated April 18, 2018.

Exhibit 13    Declaration of Meryl Murtagh in Support of (i) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation, (ii) Class Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, and (iii) North Carolina Department of State Treasurer's Request for Reimbursement of Costs, dated April 19, 2018.

Exhibit 14    Declaration of Patricia Ohara in Support of (i) Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation, (ii) Class Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, and (iii) Employees' Retirement System of the State of Hawaii's Request for Reimbursement of Costs, dated April 19, 2018.

Exhibit 15    Chart prepared by Class Counsel chart comparing metrics in various mega settlements.

Exhibit 16    Summary table of Class Counsel's lodestar and expenses incurred.

Exhibit 17    Declaration of Thomas A. Dubbs in Support of Class Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses Filed on Behalf of Labaton Sucharow, dated April 19, 2018.

Exhibit 18    Declaration of Gregg S. Levin in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Motley Rice LLC, dated April 19, 2018.

Exhibit 19    Chart combining lodestar for Class Counsel, Labaton and Motley Rice, as well as the sum of each firm's total litigation expenses.

Exhibit 20    Cornerstone Research, Securities Class Action Settlements, 2017 Review and Analysis.

Exhibit 21    Chart identifying "Core Team" lodestar.

Exhibit 22    Chart identifying by month the number of Project Associates employed by Class Counsel who worked on the matter.

Exhibit 23    Chart identifying each attorney, including Staff Attorneys and Project Associates, who worked on the matter for Class Counsel.

Exhibit 24    Recent Trends in Securities Class Action Litigation: 2017 Full-Year in Review (NERA).

Exhibit 25    Pomerantz Firm Resume.

I, JEREMY A. LIEBERMAN, hereby declare as follows:

1.      I am co-managing partner of the law firm Pomerantz LLP ("Pomerantz" or "Class Counsel"). We represent Court-appointed Lead Plaintiff, Universities Superannuation Scheme Ltd. ("USS" or "Lead Plaintiff"), and additional plaintiffs North Carolina Department of State Treasurer ("North Carolina") and Employees' Retirement System of the State of Hawaii ("Hawaii") (together with USS, "Class Representatives") in this consolidated securities class action lawsuit (the "Action").[1]

2.      I respectfully submit this Declaration in support of (a) Class Representatives' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed Settlements and the Plan of Allocation (the "Final Approval Motion"); (b) Class Counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses (the "Fee and Expense Application"); and (c) Class Representatives' Motion for Reimbursement of Costs and Expenses. I have personal knowledge of the matters set forth herein based on my active supervision of and direct participation in all aspects of the institution, prosecution and settlement of the claims asserted on behalf of the Class (defined below) in this Action.

3.      I respectfully believe that the proposed Settlements represent a truly extraordinary and unprecedented result for the Settlement Class and are the product of arduous and protracted litigation spanning over three years. This Action involved the review of more than 25 million pages of documents (most of which were in the original Portuguese), taking 81 depositions, including Defendants' 15 experts, and progressed to within just 48 days from trial when the District Court case was stayed after Defendants pursued interlocutory appeal to the United States Court of

---

[1]      Unless otherwise noted, capitalized terms shall have the same meanings ascribed to them in Stipulation of Settlement and Release dated February 1, 2018 (the "Stipulation"), entered into by and among Class Representatives, the Petrobras Defendants and the Underwriter Defendants.

Appeals for the Second Circuit, and straight through Defendants' petition for a Writ of Certiorari to the Supreme Court of the United States.

4.      This Declaration and attendant memoranda detail the efforts of Class Plaintiffs and Class Counsel to achieve such an outstanding and, by many metrics, a historic result on behalf of the Settlement Class.[2]  For the reasons set forth below and in the accompanying memoranda of law, Plaintiffs and Class Counsel respectfully submit that: (i) the terms of the Settlements are fair, reasonable and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair and reasonable and should be approved by the Court; and (iii) the Fee and Expense Application is supported by the facts and the law and should be granted in all respects.

## I.      PRELIMINARY STATEMENT

5.      This Action has been a high stakes litigation against a multi-billion dollar foreign corporation that is majority-owned by the Government of Brazil and represented by a cadre of exceptionally talented lawyers with an apparently unlimited bench of extraordinary associate

---

[2]      The final approval of the Settlement will resolve all claims in this litigation against all Defendants and the other Defendants' Releasees on behalf of the following Class of persons and entities who:

(a) during the time Period between January 22, 2010 and July 28, 2015, inclusive (the "Class Period"), purchased or otherwise acquired Petrobras Securities, including debt securities issued by PIFCO and/or PGF, on the New York Stock Exchange or pursuant to other Covered Transactions; and/or

(b) purchased or otherwise acquired debt securities issued by Petrobras, PIFCO, and/or PGF, in Covered Transactions, directly in, pursuant and/or traceable to a May 13, 2013 public offering registered in the United States and/or a March 10, 2014 public offering registered in the United States before Petrobras made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the offerings (August 11, 2014 in the case of the May 13, 2013 public offering and May 15, 2015 in the case of the March 10, 2014 public offering).

support, which was further bolstered by their 15 proffered experts, as described below. With other

top-tier law firms representing Underwriter Defendants, PwC Brazil, and separate firms for various

Individual Defendants, Class Counsel was called upon to engage in scores of hard-fought battles

against more than a half dozen top-tier law firms representing 19 corporate and 21 individual

defendants. In so doing, Class Counsel prosecuted the Action through pleadings, discovery, class

certification, expert discovery, opening summary judgment motions and oppositions, up to just

days before trial when the litigation was diverted to the appellate courts, where extensive and

complex issues were successfully briefed and argued before the Second Circuit Court of Appeals

and, eventually, to the Supreme Court of the United States.[3]   As discussed in more detail below,

the rulings from the Second Circuit in *In re Petrobras Sec. Litig.*, 862 F.3d 250 (2d Cir. 2017)

regarding ascertainability and directionality represented groundbreaking precedent for plaintiffs in

---

[3]     Defendants were represented by the law firms of Cleary Gottlieb Steen & Hamilton LLP; Skadden, Arps, Slate, Meagher & Flom LLP; King & Spalding LLP; Morvillo Abramowitz Grand Iason & Anello PC; and Goodwin Procter LLP. Relevant non-parties were represented by other law firms with whom Class Counsel had to interact, including: Goodell, DeVries, Leech & Dann LLP (Crown Central LLP); Moye, O'Brien, Pickert & Dillon LLP (Odebrecht Construction, Inc.); Paul Hastings LLP (SBM Offshore USA, Inc.; Alstom Power, Inc.); Reed Smith LLP (Wells Fargo Bank, N.A.); K&L Gates LLP (Astra Oil Company); Hughes Hubbard & Reed LLP (BNP Paribas North America, Inc.); Covington & Burling LLP (Braskem America, Inc.); Sullivan & Cromwell LLP (Delta National Bank and Trust Company); Miller & Chevalier Chartered (Ensco Offshore Co.); ELP Global (Jaraguá International LLC); Morgan, Lewis & Bockius LLP (Maersk, Inc.); Debevoise & Plimpton LLP (Mitsui & Co. (USA), Inc.; Skanska USA, Inc.); Davis Polk & Wardwell LLP (PricewaterhouseCoopers LLP); Vinson & Elkins LLP (Saipem America, Inc.); Arnold & Porter LLP (Samsung Heavy Industries Co.); Paul Weiss Rifkind, Wharton, & Garrison LLP (Toyo USA, Inc.); K&L Gates LLP (UTC Engineering Services, LLC); and Sutherland Asbill & Brennan LLP (Vantage Drilling Company); and Shutts & Bowen LLP (Julio Lage). Relevant non-parties represented by in-house counsel with whom Class Counsel interacted included: Deloitte Consulting LLP; Ernst & Young LLP; and KPMG LLP. Class Counsel also interacted and coordinated with Kessler Topaz Meltzer & Check LLP who acted as liaison counsel for the Individual Actions and coordinated international requests for judicial assistance with the diplomatic ministries or central authorities of the following countries: United States of America; Brazil; United Kingdom; France; Italy; Monaco; Netherlands; South Korea; and Switzerland.

numerous disciplines of class action litigation, and will form the bedrock of securities class action jurisprudence for decades to come.

6.     Coupled with the enormity of the formal and informal discovery in this litigation—almost all in Portuguese and most not susceptible to predictive coding or other technology assisted eDiscovery tools, as described more fully herein—the economic and reputational risk undertaken by Class Counsel on behalf of Plaintiffs and the Settlement Class were significant and arguably unprecedented in what has been a truly international litigation. It is also important to recognize that facts relevant to the litigation dated back to before 2005, adding substantially to the scope of the investigation and relevant discovery in the Action.

7.     Having overseen this consolidated proceeding, the Court is familiar with the underlying claims and defenses in the Action and the complex factual and legal issues surrounding what amounts to the largest fraud in Brazil's history, as set forth in Plaintiffs' four amended complaints, motion for class certification, and cross-motion for summary judgment. Accordingly, this declaration does not seek to detail each-and-every event that occurred during the litigation. Rather, it provides highlights of the events leading to these historic Settlements and the basis upon which Plaintiffs and Class Counsel recommend their approval.

8.     The proposed settlements now before the Court provide for a global settlement of the Class Action in exchange for a total settlement payment of $3 billion in cash, plus interest thereon, and consist of (a) a $2.95 billion cash settlement from the Petrobras Defendants[4] (the

---

[4]     The Petrobras Defendants include Petróleo Brasileiro S.A. – Petrobras ("Petrobras"), Petrobras Global Finance B.V. ("PGF"), and Petrobras America Inc. ("PAI"). Underwriter Defendants include BB Securities Ltd., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Itaú BBA USA Securities, Inc., Morgan Stanley & Co. LLC, HSBC Securities (USA) Inc., Mitsubishi UFJ Securities (USA), Inc. (n/k/a MUFG Securities Americas Inc.), Merrill Lynch, Pierce, Fenner & Smith Incorporated, Standard Chartered Bank, Bank of China (Hong Kong) Limited, Banco Bradesco BBI S.A., Banca IMI S.p.A. and Scotia Capital (USA) Inc. Individual Defendants include Almir Guilherme Barbassa, Jose Carlos Cosenza, Paulo Roberto Costa, Renato

"Petrobras Settlement"), and (b) a $50 million cash settlement PricewaterhouseCoopers Auditores Independentes ("PwC Brazil"), Petrobras' outside auditor (the "PwC Brazil Settlement").

9.      I respectfully submit that each of the proposed Settlements, for independent reasons detailed herein, represents an outstanding result for the Class. As explained below, the Settlements confer a guaranteed and immediate recovery for the Class while avoiding the substantial risks and expense of continued litigation, including the risk of recovering less than the Settlement Amount, or of no recovery at all after substantial delay.

10.     To put the Settlement Amount into context, if approved it would rank as the fifth largest on record for securities class action lawsuits, the largest securities class action settlement in a decade, the largest payout ever involving a non-U.S. issuer, the largest settlement not involving a restatement of financial results, and the largest settlement ever achieved by a foreign lead plaintiff. *See*, *e.g.*, Exhibit 1 (The Top 100 U.S. Settlements of All-Time, ISS Securities Class Action Services (2018)). Plaintiffs estimate that the Settlements return approximately (i) 22.3% of the likely recoverable damages suffered by the Class, using corrective disclosures accompanied by price declines at a 95% statistical significant level; or (ii) 18.6% of the likely recoverable damages suffered by the Class, using corrective disclosures accompanied by price declines at a 90% statistical significant level —well above the median settlement for securities class actions.

11.     Perhaps more spectacular, Class Plaintiffs estimate that the Settlement Class members will received a 65% premium above and beyond those plaintiffs in the related individual

---

de Souza Duque, Guillherme de Oliveira Estrella, Maria das Graca Silva Foster, Jose Miranda Formigli Filho, José Sergio Gabrielli, Silvio Sinedino Pinheiro, Daniel Lima de Oliveira, José Raimundo Brandão Pereira, Sérvio Túlio da Rosa Tinoco, Paulo Jose Alves, Gustavo Tardin Barbosa, Alexandre Quintão Fernandes, Marcos Antonio Zacarias, Cornelis Franciscus Jozef Looman, and Theodore M. Helms. On March 21, 2016, Class Representatives dismissed without prejudice claims against Daniel Lima de Oliveira, José Raimundo Brandão Pereira, Sérvio Túlio da Rosa Tinoco, Paulo Jose Alves, Gustavo Tardin Barbosa, and Marcos Antonio Zacarias.

actions that have already settled their claims. Such an exceptional achievement is underscored by the fact that sophisticated institutional investors who filed individual actions now seek to rejoin the Class Action in order to participate in the Class Settlement.[5]  It also defies the general consensus amongst legal scholars and practitioners that opting out of a "mega class action" will yield a superior result by many multiples than those who remain in the class. *See* John C. Coffee, Jr., *Accountability and Competition in Securities Class Actions: Why "Exit" Works Better Than "Voice"*, 30 Cardozo L. Rev. 407, (2008), at 440-41. Class Counsel is unaware of any other securities class action where Settlement Class members received a premium over large, sophisticated institutional investors represented by highly competent counsel filing individual actions.

12.    The proposed Settlements are the result of the Class Representatives and Class Counsel's extensive investigation into the claims, the preparation of four detailed complaints, the rounds of dispositive motions, extensive formal and informal discovery, fact and expert depositions, class certification, expert discovery, summary judgment motions, and pretrial preparation for a trial that was just a few weeks from commencing before a Rule 23(f) appeal to the Second Circuit and a petition for certiorari to the United States Supreme Court. As explained below, beginning on December 10, 2015, and continuing throughout, there were protracted settlement negotiations overseen by the Honorable Layn Phillips (Ret.), including six day-long, in-person mediation sessions with multiple rounds of mediation briefs and supporting exhibits.

---

[5]    Class Counsel understands that various institutional plaintiffs who filed individual actions will likely rejoin the Class Action and not exclude themselves by the April 27, 2018 exclusion deadline as set forth in the Notice. Since the exclusion deadline has not yet passed, Class Counsel will further address this issue in reply papers to be filed with the Court on May 25, 2018.

13.     In addition to seeking final approval of the Settlements, Class Representatives seek approval of the proposed Plan of Allocation as fair and reasonable. To prepare the Plan of Allocation, Class Counsel consulted with an expert in the areas of economics and securities litigation damages. Pursuant to the Plan of Allocation, the Settlement Amount, plus interest accrued (after deduction of Court-approved expenses and attorneys' fees), will be distributed on a pro rata basis to members of the Settlement Class who submit Claims Forms that are approved for payment by the Court.

14.     For these extensive efforts, in the face of enormous risks, Class Counsel is applying for award of attorneys' fees and reimbursement of expenses. Specifically, Class Counsel is applying for attorneys' fees of 9.48% of the Settlement Amount, or $284,500,000, and for reimbursement of litigation expenses of $14,515,235.24. The requested fee is well within the range of reasonable fees approved by courts in this district, and around the country, and is amply supported by each of the relevant factors set forth in *Goldberger v. Integrated Res.*, Inc., 209 F.3d 43 (2d Cir. 2000). The reasonableness of the fee request is confirmed with a lodestar cross-check result of a multiplier of only 1.78, which is on the low end of the range of multipliers awarded in other securities class action settlements of similar size.

15.     On March 1, 2018, the Court found that the proposed settlements comply with the requirements of Rule 23(a) and (b) (3) of the Federal Rules of Civil Procedure and are otherwise sufficiently satisfactory as to move forward with the settlement approval process, and the Court also approved the contents of the long-form notice, the publication notice, and the proof of claim form. ECF No. 770. In addition, as of April 13, 2018, pursuant to the same Order, (a) the Garden City Group, Inc. ("GCG"), the Court-approved Claims Administrator in the Action, has mailed an aggregate of 1,053,850 Notice Packets to potential Settlement Class Members and nominees by

first-class mail; (b) the Summary Notice has been widely disseminated through a plethora of domestic and international publications; and (c) copies of the Long-Form Notice (in English, Portuguese, Chinese – Simplified, Dutch, French European, German, Japanese, and Spanish – Universal), Summary Notice (in English, Portuguese, Chinese – Simplified, Dutch, French European, German, Japanese, and twenty-three additional languages) and Claim Form, as well as copies of the Stipulation, Amended Stipulation (with PwC Brazil), and the Preliminary Approval Order were posted on the settlement website: www.petrobrassecuritieslitigation.com. *See* Exhibit 2, at ¶¶ 8-25.

16.     The Notice advised the Settlement Class Members of the definition of the Settlement Class and of the other material terms of the Settlements, and also advised them of their rights to (a) exclude themselves from the Settlement Class; (b) object to any aspect of the Settlements, the Plan of Allocation, or the Fee and Expense Application; and (c) submit a Claim Form in order to be eligible to receive a share of the proceeds of the Settlements. The Notice also informed Settlement Class Members of the procedures to be followed to exercise the foregoing rights.

17.     The Court-ordered deadline for submitting requests for exclusion from the Settlement Class is April 27, 2018, and the deadline to file any objections to the Settlements, Plan of Allocation or the Fee and Expense Application is May 11, 2018. As of April 13, 2018, Class Counsel has received only 280 requests for exclusion, which represent fewer than 47,000 shares of common ADS's purchased during the class period, fewer than 4,800 purchased outside of the class period, and $15,000 USD in Notes. Class Counsel is informed that this is an extremely small fraction of the hundreds of thousands of total estimated Class Members, and of the 1.5 billion plus ADS's traded during the class period. Notably, there were no institutional investors who had

requested exclusion as of April 13, 2018, except for one institutional investor that did not provide the required transactional information. *See* Exhibit 2 (Mendoza Aff.). Class Representatives will address any objections and the requests for exclusion collectively in their supplemental submission to be filed on May 25, 2018, as provided for in the Preliminary Approval Order.

18.     For all the reasons detailed herein, including the outstanding results obtained in the face of significant litigation risks, I respectfully submit that the Settlements are each "fair, reasonable and adequate" in all respects, and the Court should therefore approve them pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. For similar reasons, as well as the reasons set forth in Section VII below, I respectfully submit that Class Counsel's requests for (a) an award of attorneys' fees equal to 9.48% of the Settlement Amount, and (b) the reimbursement of $14,515,235.24 in litigation expenses is also fair and reasonable and should also be approved.

19.     In the sections that follow, this declaration describes: (a) the efforts undertaken by Class Counsel to prosecute the Action (¶¶ 20-293); (b) the Settlements and risks that Class Representatives and Class Counsel considered in determining that the Settlement provides an outstanding recovery for the Settlement Class, (¶¶ 294-331); (c) the Notices to the members of the Settlement Class (¶¶ 332-42); (d) the proposed Plan of Allocation for the Settlement (¶¶ 343-48); and (e) the fee and expense application by Class Counsel (¶¶ 349-450).

## II.     PROSECUTION OF THE ACTION

### A.     Commencement of the Action and Appointment of Lead Plaintiff and Class Counsel

20.     Beginning December 8, 2014, five separate complaints were filed in this Court on behalf of Petrobras investors alleging that the Company violated federal securities laws by

concealing a multi-year, multi-billion dollar bribery and kickback scheme.[6] Pursuant to the Private Securities Litigation Reform Act, 15 U.S. C. § 7 8u-4 (a)(3)(A)(i), a notice was published on a national newswire advising members of the proposed class of their right to move the Court to serve as Lead Plaintiff no later than February 6, 2015.

21.     In evaluating whether to take an active role in the litigation, USS required Pomerantz attorneys to travel to London for an in-person interview, spent many hours analyzing potential claims, and hired another law firm in the United States to perform extensive due diligence on Pomerantz and its fee proposal before retaining the firm. Moreover, prior to agreeing to retain Pomerantz, Jeremy Hill, USS's General Counsel, travelled to Class Counsel's offices in New York to further vet Class Counsel's qualifications, as well as to discuss the Lead Plaintiff and litigation process.  As described in more detail in Section IX below, representatives from USS, including General Counsels Jeremy Hill and Juan Perez Tejedor, spent more than 20 hours reviewing initial complaints and lead plaintiff filings.

22.     In advance of the February 6, 2015 deadline, the Court received nine motions for appointment as lead plaintiff. Five of those movants subsequently withdrew their motions, leaving four remaining movants.[7]

23.     On February 20, 2015, the Court held a hearing at which it received testimony from Mr. Hill, heard arguments from Pomerantz, and testimony from the other proposed representatives

---

[6]     The five actions are *Kaltman v. Petróleo Brasileiro S.A. - Petrobras*, 14-cv-9662; *Ngo v. Petróleo Brasileiro*, 14-cv-9760; *Messing v. Petróleo Brasileiro*, 14-cv-9847; *City of Providence v. Petróleo Brasileiro et al.*, 14-cv-10117; and *Kennedy v. Petróleo Brasileiro*, 15-cv-93. By Order dated February 17, 2015, the Court consolidated the five related cases under the above caption.

[7]     (1) The "SKAGEN-Danske" group, consisting of three European asset management companies - SKAGEN AS, Danske Invest Management A/S, and Danske Invest Management Company; (2) the "State Retirement Systems" group, consisting of three State pension funds - the Ohio Public Employees Retirement System, the Public Employee Retirement System of Idaho, and Hawaii; (3) USS; and (4) Daniela Freitas Da Silva, an individual investor.

and arguments from their counsel. Following the hearing, the Court gave the movants an opportunity to submit additional briefings.

24.     By Order dated March 4, 2015, the Court appointed USS as Lead Plaintiff and approved its choice of Pomerantz as Lead Counsel. Although not having the largest loss of the various movants, the Court noted that USS had "vetted its chosen counsel extensively and negotiated for a more favorable fee agreement", and that the Court "considers that USS is far more likely to deliver the vigorous, investor-driven representation to which the class is entitled than the multi-plaintiff, multi-firm groups that the Court has rejected." *See* ECF No. 166, at 11.

**B.      Class Counsel's Comprehensive Pre-Filing Investigation and Preparation of the Consolidated Amended Class Action Complaint**

25.     On March 6, 2015, the Court held a telephonic conference and ordered Lead Plaintiff to file a consolidated amended complaint no later than March 27, 2015. *See* ECF No. 105. The Court ordered further that Defendants move to dismiss or answer the amended complaint no later than April 17, 2015, Lead Plaintiff file any opposition no later than May 8, 2015, Defendants file any reply no later than May 22, 2015, and scheduled oral argument for May 29, 2015. *Id.*

26.     Even before being appointed as Class Counsel, Pomerantz had developed a comprehensive plan to coordinate an extensive investigation of Lead Plaintiff's claims against Defendants, preserve relevant discovery, and access all relevant information from public and non-public sources. This investigation included, *inter alia*, hiring Richard Ford of Ford International Consulting, an investigator fluent in Portuguese who served 20 years as an agent with the Federal Bureau of Investigation with responsibilities involving Latin American countries, including Brazil, before retiring in 2005. Mr. Ford has since become a permanent resident of Brazil, where he operates a consulting company in São Paulo providing clients with assistance in various FCPA matters. He has extensive experience working with Brazilian police authorities and was well-aware

of the then unfolding Operação Lava Jato ("Lava Jato") investigation, which eventually turned into the largest corruption scandal in Brazil.[8]

27.    Class Counsel's investigator in Brazil began marshalling many critical sources of information, including written cooperation statements provided by Cartel members to authorities in connection with pending criminal actions, and transcripts of testimony taken before Judge Sérgio Fernando Moro, the judge in charge of the prosecution of the Lava Jato investigation. Our investigator also developed leads for potential additional witnesses, including two who, more than a year later, travelled to New York and were deposed in this Action, over Defendants' oppositions to motions to compel, as described more fully below at ¶¶ 132-42.

28.    In addition, Class Counsel's pre-filing investigation included, among other things, a detailed review and analysis of (i) publicly available court filings in Brazil, including, *inter alia*, numerous plea agreements, cooperation statements, videotaped depositions, and criminal complaints; (ii) Congressional testimony in Brazil provided in connection with at least two Congressional investigations into alleged bribery and graft at Petrobras prior to the Class Period; (iii) public filings with the Comissão de Valores Mobiliários ("CVM" or "Securities and Exchange Commission of Brazil"); (iv) public filings with the Securities and Exchange Commission ("SEC"); (v) reports written by Brazil's Tribunal de Contas da União ("TCU") (otherwise known as Brazil's Federal Court of Accounts) and made available to Class Counsel; (vi) documents from Brazil's Administrative Council for Economic Defense ("CADE"); (vii) transcripts of investor conference calls; (viii) posts on Petrobras' company-controlled Fatos e Dados (or "Facts and

---

[8]    Lava Jato is Portuguese for car wash, the name chosen because the money laundering ring used a money transfer service at the Posto da Torre (Tower Gas Station) in Brasília to move illicit payments. *See generally* http://www.pf.gov.br/imprensa/lava-jato (website maintained by the Federal Police of Brazil providing a Lava Jato chronology, news and various statistics, last visited on April 20, 2018).

Data") website; (ix) publicly available presentations by Petrobras and related entities; (x) daily press releases and media reports involving Petrobras;  (xi) daily media coverage in Brazil of the then spiraling Operação Lava Jato investigation; (xii) publicly available information concerning legal actions involving the persons and companies that participated in the bribery and kickback scheme; and (xiii) public material obtained in connection with the continuing investigation by various Brazilian authorities in both civil and criminal actions.

29.    USS is domiciled in the United Kingdom and Class Counsel recognized that Defendants would likely challenge whether its Petrobras bond purchases qualified as domestic transactions within the meaning of *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). As such, USS and Class Counsel strategically sought additional plaintiff coverage for the Section 11 claims under the Securities Act for the bond offerings at issue through three additional plaintiffs, namely, North Carolina, represented by Pomerantz; Hawaii, represented by Labaton Sucharow LLP ("Labaton"); and Union Asset Management Holding AG ("Union"), represented by Motley Rice LLC ("Motley Rice").[9]

30.    By letter to the Court dated March 26, 2015, Lead Plaintiff and Class Counsel requested that Hawaii and Union be added to the Consolidated Amended Complaint to ensure the necessary representation for the bond claims, and the letter attached a Joint Prosecution Agreement with the proposed additional plaintiffs and their respective counsel. *See* ECF No. 112. By Order

---

[9]    North Carolina, represented by Class Counsel, was not added as an additional plaintiff until September 1, 2015, when Plaintiffs filed the Consolidated Third Amended Class Action Complaint. ECF No. 205. Lead Plaintiff's and Class Counsel's request to add additional plaintiffs proved prescient and a significant benefit for the Class, as the Court later found that USS, in connection with its bond purchase, was unable to adequately allege that it suffered the irrevocable liability prong of *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012), and thus unable to allege a domestic transaction.

dated March 30, 2015, the Court approved the addition of Hawaii, Union and their counsel as additional Named Plaintiffs and counsel to the Action. *Id*.

31.     In accordance with the Joint Prosecution Agreement, Lead Plaintiff retained ultimate decision-making authority regarding the prosecution and settlement of the Action, and Class Counsel remained responsible for all communication with defense counsel. *Id*. Thereby, Class Counsel also ensured that there was no duplication of efforts.

32.     As discussed in more detail below, allegations in the Consolidated Amended Complaint (and Third Amended Consolidated Complaint, both filed before Plaintiffs received any responses to formal discovery in this Action) reflected the fruits of Class Counsel's intensive factual investigation, and incorporated numerous factual allegations based from information obtained in Brazil by Class Counsel's investigator, as further detailed in Section II.F below.

33.     This information included allegations that certain individual defendants were alerted to the fraud by former Petrobras manager Venina Velosa da Fonseca ("Fonseca"), who testified before Judge Moro in Brazil. Specifically, that she had met with Defendant Foster, then in charge of the energy and gas division and who reported directly to Defendant Gabrielli, to tell her about inflated contracts and payments for services that had not been performed. Fonseca testified further that after she had reported problems with bidding and contracts to her superiors for five years, she was transferred from Brazil to Singapore and ultimately fired in retaliation. *See* ECF No. 110 at ¶¶ 92-93; *see also* ECF No. 194 at 7-8. As alleged in the Consolidated Amended Complaint, Fonseca testified how defendants Foster, Gabrielli, and the Board of Directors had been alerted to her allegations of fraud. *See generally*, ECF No. 110 at ¶¶ 92-106.

34.     In addition, and as discussed in more detail below, during the investigation that preceded filing the Consolidated Amended Complaint, Class Counsel obtained, through its

investigator in Brazil, copies of written cooperation statements and videotaped testimony of Paulo Roberto Costa ("Costa"), a former member of Petrobras' senior management and Chief Downstream Officer and Director of Supply from May 2004 through April 2012. Costa testified about the existence of the cartel and how it operated to pay kickbacks to the political parties, as alleged in the Consolidated Amended Complaint. *Id*. at 50. He also testified about how the divisions or "directorates" at Petrobras were assigned a sponsor from a patron party (known inside Petrobras as a "padrinho" or "godfather"), who nominated the director of the division who was then selected by the Board, and that each director's job depended on keeping his godfather (and his political party) happy by building a 3% kickback into every major Petrobras contract. *See* ECF No. 110 at ¶¶ 49-52; *see also* ¶¶ 62-69.

35.     During the investigation that preceded filing the Consolidated Amended Complaint, our Brazilian investigator also obtained in Brazil deposition transcripts of Alberto Youssef who testified before Judge Moro that the bribery and money-laundering scheme was rampant throughout Petrobras and its subsidiaries, and that each subsidiary's board split the bribery money with politicians. *Id*. at 6.

36.     In connection with the pre-filing investigation, Class Counsel also analyzed minutes of certain meetings of the Brazilian Association of Industrial Engineering ("ABEMI"), documenting how Petrobras sent drafts of standard contracts and texts of calls for tenders to cartel members even before they were formerly launched. *Id*. at ¶¶ 54-61. ABEMI was allegedly comprised of virtually all the cartel members based in Brazil, including UTC Engenharia, Toyo Setal, Camargo Corrêa, Odebrecht and Mendes, among others, all who have been charged, convicted, or pled guilty to participating in the bid rigging scheme. *Id*. at ¶ 55.

37.     Class Counsel's pre-filing investigation also included obtaining documents from Brazil, The Netherlands, and elsewhere regarding the Dutch firm SBM Offshore. SBM had then

recently confessed to The Netherland's Revenue Service and Public Attorney's Office that the company had paid bribery payments to managers of Petrobras in the amount of over $100 million, related to bid rigging in offshore drilling rigs and ships. *Id*. at ¶ 70.

38.    Class Counsel's SBM investigation zeroed in on the leaked email of SBM former employee Jonathan Taylor, which implicated Petrobras officials and included confidential Petrobras minutes that refer to a future meeting with Petrobras' engineering chief Jose Antonio de Figueiredo to extend a lease "without going via an open bid."   *Id*. at ¶ 71. In connection with leaked SBM documents, Class Counsel also obtained a "Payments to Agents" Task Force document dated April 17, 2012, prepared by SBM Internal Audit which shows, *inter alia*, transfer of $139,216,000 to a group of companies run by an intermediary between SBM and Petrobras who helped facilitate the bribery and kickback scheme.[10] *Id*.

39.    Class Counsel's Brazilian investigator also uncovered a confidential informant who, prior to the Class Period, told a high level Brazilian politician and member of the PT Party that he was 100% certain that a bribery and corruption scheme permeated Petrobras' 2005 purchase of the Pasadena refinery.[11] *Id*. at ¶¶ 76-83. The informant described how his friend later told him that the politician took the Pasadena issue directly to Gabrielli, then Petrobras' President, and to the Minister of Casa Civil in Brazil, who at that time was Dilma Rousseff, who later became President of Brazil before being impeached in 2016. *Id*. at ¶¶ 81-82.

40.    On March 27, 2015, less than one month after being appointed Lead Plaintiff, USS, along with Hawaii and Union, filed the Consolidated Amended Complaint, totaling 177-pages and

---

[10]    On July 16, 2016, more than a year after Plaintiffs filed the Consolidated Amended Complaint, SBM announced that it had agreed to pay Petrobras $342 million in restitution for the bribery scheme through a combination of cash and future discounts.

[11]    PT Party refers to the "Partido dos Trabalhadores" or "Workers' Party," the ruling political party in Brazil throughout the Class Period.

556 paragraphs, which named the Petrobras Defendants, the Underwriter Defendants, Petrobras'

independent auditor PwC Brazil, and various individual defendants.[12]  *See* ECF No. 109.[13]  The

Consolidated Amended Complaint alleged that Petrobras was at the center of a multi-year, multi-

billion dollar bribery and kickback scheme, during which Defendants made false and misleading

statements about Petrobras' financial results and in representations about the state of its business

and management, in violation of the Securities Act (asserted by USS, Hawaii and Union), the

Exchange Act, and Brazilian law (asserted only by USS). Moreover, from the outset of the Class

Period, Class Plaintiffs' strategy was to increase the Class' recovery by seeking to maximize the

alleged recoverable damages. Accordingly, the Consolidated Amended Complaint extended the

end of the Class Period through March 19, 2015, just several days before the complaint was filed.

In an unprecedented turn, through subsequent amendments discussed below, Plaintiffs extended

the Class Period to July 28, 2015 (more than seven (7) months after commencement of the Action),

alleging more than 85 corrective disclosures, further increasing alleged damages and adding to the

number of false statements issued during the Class Period. As a result, the Class Period spanned

---

[12]    Individual defendants named in the Consolidated Amended Complaint include Petrobras'
former CEO Maria das Graças Silva Foster, Petrobras' former CEO Jose Sergio Gabrielli,
Petrobras' former CFO Almir Guilherme Barbassa, Petrobras director Josue Christiano Gomes da
Silva, Petrobras director Silvio Sinedino Pinheiro, PIFCO Chairman and CEO Daniel Lima de
Oliveira, PIFCO director Jose Raimundo Brandao Pereira, PIFCO CFO Servio Tulia da Rosa
Tinoco, PIFCO Chief Accounting Officer Paulo Jose Alves, PIFCO Chief Accounting Officer
Mariangela Monteiro Tizatto, PGF CEO and "Managing Director A" Gustavo Tardin Barbosa,
PGF CFO and "Managing Director B" Alexandre Quintao Fernandes, PGF "Managing Director
A" Marcos Antonio Zacarias, PGF "Managing Director B" Cornelis Franciscus Jozef Looman,
and authorized United States Representative Theodore Marshall Helms.

[13]    On March 31, 2015, Class Counsel refiled the Consolidated Amended Complaint to correct
minor typographical errors. *See* ECF No. 110.

the tenure of three different Petrobras CEOs (Aldemir Bendine ("Bendine") became Petrobras'

CEO in February 2015).[14]

**C.     Plaintiffs' Motion for Partial Modification for the PSLRA's Discovery Stay and SEC FOIA Request**

41.     While Class Counsel was investigating the claims asserted in the Consolidated

Amended Complaint on behalf of the Class, because of the automatic stay of discovery imposed

by the PSLRA, the investigation was without the benefit of formal discovery under the Federal

Rules of Civil Procedure. Meanwhile, Petrobras was producing documents in Brazil in connection

with various criminal and regulatory proceedings brought by Brazilian authorities.

42.     For example, as of March 16, 2015, there had been over forty indictments of

individuals for racketeering, bribery and money laundering, including top executives from the

Cartel companies. *See* ECF No. 110 ¶¶ 7, 12; *see also* ECF No. 134 at 3. Petrobras had also

disclosed that it received a subpoena from the SEC for production of certain documents and had

been cooperating with the SEC to respond.

43.     In addition, on March 6, 2015, in connection with the bribery scheme, the Brazilian

Supreme Court approved an investigation into fifty-four implicated political figures, including

---

[14]     Notably, on March 7, 2018, Bendine was found guilty of corruption charges and Judge Moro sentenced him to 11 years in prison in Brazil. *See* Exhibit 3 annexed hereto (Andres Schipani, *Former Petrobras boss found guilty of corruption*, Financial Times, Mar. 7, 2018). Judge Moro found that Bendine used his position as Petrobras' CEO to take bribes from Cartel member Odebrecht in 2015 and 2016, and wrote: "The condemned took his position as CEO of Petrobras amid a corruption scandal and with the expectation that he would solve problems", adding, "[t]he last behavior one would expect from him would be corruption, once again putting at risk the reputation of the company." *Id.*

twenty-one federal deputies, twelve senators, and the former Brazilian President Fernando Collor de Mello. *See* ECF 133 at Ex. A.[15]

44.     Against this backdrop, on March 31, 2015, following a pre-motion conference with the Court, Lead Plaintiff moved to lift the mandatory discovery stay to (i) obtain copies of documents Petrobras already produced (or would produce) to Brazilian authorities and/or the SEC related to the bribery and kickback scheme; and (ii) to allow Plaintiffs to initiate discovery from foreign non-parties, including Cartel members and overseas banks where former Petrobras employees stashed hundreds of millions of dollars in ill-gotten gains, pursuant to either the Inter-American Convention on Letters Rogatory[16] or Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters.[17]  *See* ECF No. 115.[18]  On April 8, 2015, the Petrobras Defendants, Underwriter Defendants and individual defendant Theodore M. Helms ("Helms") filed a memorandum of law attaching 6 exhibits totaling 28 pages opposing such limited relief from the PSLRA discovery stay. ECF Nos. 133-34.

45.     On April 13, 2015, the Court issued a Memorandum Order that denied Lead Plaintiff's motion. ECF No. 137. Recognizing that international discovery is a cumbersome process that can be an exercise in patience, Class Counsel promptly began working on draft Letters

---

[15]     Aditya Tejas, *Petrobras Investigation: Brazilian Court Sanctions Probe into Top Politicians in Corruption Scandal*, International Business Times (March 7, 2015).

[16]     The Inter-American Convention on Letters Rogatory, 14 I.L.M. 339 (1975) (reprinted following 28 U.S.C. § 1781), and the Additional Protocol with the declarations can be found at 18 I.L.M. 1238 (1979), (reprinted following 28 U.S.C. § 1781) ("Inter-American Convention").

[17]     Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature Mar. 18, 1970, 23 U.S.T. 2555 (reprinted in the notes section following 28 U.S.C. § 1781) ("Hague Convention").

[18]     On April 8, 2015, Lead Plaintiff filed a notice of supplemental authority in further support of Lead Plaintiff's motion to lift the discovery stay. *See* ECF No. 132.

Rogatory in anticipation of overcoming Defendants' forthcoming motions to dismiss and the lifting of the PSLRA stay.

46.     In addition to seeking to lift the discovery stay, on July 20, 2015, pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), Lead Plaintiff served a request upon the SEC (the "FOIA Request") for six narrow categories of documents relating to the Petrobras investigation that the SEC commenced in 2014. On August 17, 2015, the SEC responded to Plaintiffs' FOIA Request, produced no documents, and advised that it was withholding records responsive to the request under 5 U.S.C. § 552(b)(7)(A), 17 CFR § 200.80(b)(7)(i), in order to "protect[] from disclosure records compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement activities."

47.     It is also my understanding that, like here, Petrobras took the position with the SEC that it was not a participant in the illicit bribery and kickback scheme, but rather was the intended victim. To date, the SEC has brought no charges against the Company or its former executives.

**D.     Defendants' Motion to Dismiss the Consolidated Amended Complaint and Lead Plaintiff's Responses**

**1.     Defendants' Motion to Dismiss the Consolidated Amended Complaint**

48.     On April 17, 2015, the Petrobras Defendants, certain Underwriter Defendants and Helms moved to dismiss the Consolidated Amended Complaint. Their motion consisted of a 60-page omnibus brief attaching 42 exhibits and appendices totaling over 358 pages.[19]  *See* ECF Nos. 154-56. Strongly asserting that it was the intended victim of the fraud, not the perpetrator,

---

[19]     Underwriter defendants Banco Votorantim Nassau Branch and Bank of China (Hong Kong) Limited, PwC Brazil and the Individual Defendants (other than Helms) had not yet been served through the requisite international service (then underway), and therefore had not appeared in the Action at that time. Banco Votorantim Nassau Branch was not named in subsequently amended complaints because it did not participate in the 2013 or 2014 Offerings.

Petrobras argued, *inter alia*, that the Consolidated Amended Complaint should be dismissed in whole or in part because:

(a)    Petrobras' financial statements and statements concerning PP&E were not materially misleading because the actual price Petrobras paid Cartel member contracts was in fact the cost of the good or service provided. ECF No. 156 at 10-11.

(b)    Standard procurement practices allowed bids 20% above an internally estimated basic budget to be reasonable. *Id*.

(c)    3% overcharge that Cartel members kicked back to others occurred outside of Petrobras' books and records, and the "unknowing" inclusion of the 3% on Petrobras' balance sheet was not qualitatively material. *Id*. at 12-14.

(d)    Other challenged statements were opinion, puffery, protected forward-looking statements, or not adequately alleged to be misleading. *Id*. at 14-19.

(e)    Knowledge of a few corrupt former employees who departed the Company years earlier is not attributable to Petrobras under the "adverse interest" exception because these former employees acted to defraud Petrobras. *Id*. at 20-22.

(f)    Fonseca knew nothing of the unlawful Cartel scheme and communicated nothing about the scheme to Foster, just generic concerns of "misappropriation of funds," "irregularities" in Petrobras contracts and cost overruns. *Id*. at 24-25.

(g)    Gabrielli was instrumental in creating a committee to investigate the case which uncovered details of the irregularities about which Fonseca complained, and Petrobras fired the employee responsible. *Id*. at 25.

(h)     Cost overruns at the Abreu e Lima refinery were the result of an accelerated timetable and add-on contracts; they showed nothing about Foster of Gabrielli's knowledge of the Cartel; at most they amounted to mismanagement. *Id*. at 25-26.

(i)     Claims by the confidential informant of overcharge in the acquisition of Pasadena failed to plead what Gabrielli was told about the refinery, let alone that he thereby learned of a scheme to defraud. *Id*. at 28.

(j)     SBM allegations at best show knowledge by Duque and Barusco, and reinforce that Petrobras was victimized by contractors, co-conspirators, and politicians who concealed illegal activity from Petrobras. *Id*. at 31.

(k)     The complaint pleads no facts that Petrobras' interactions with ABEMI were in any way illegal or improper, and allegations that ABEMI was involved in the payment scheme amount to nothing more than rank speculation. *Id*. at 32.

(l)     There were no facts showing how legally required and publicly disclosed political ties resulted in any motive for the Company to defraud investors. *Id*. at 30.

(m)     Securities Act claims, "sounded in fraud" and thus were subject to the heightened pleading of Fed. R. Civ. P. 9(b). *Id*. at 34.

(n)     Plaintiffs lacked standing to assert Securities Act claims on the re-opened 2012 Note Offering. *Id*. at 37.

(o)      Plaintiffs' 2012 and 2013 Notes claims were time-barred based on the one-year discovery period. *Id*. at 40-45.

(p)     The 2012 Notes claims were barred by the statute of repose. *Id*. at 45-51.

(q)     Bond purchases occurring after issuance of earnings statements covering twelve months after an offering should be dismissed. *Id*. at 51-52.

(r)      USS and Union's Securities Act claims failed because they did not meet their burden to affirmatively plead that they engaged in a domestic securities transaction pursuant to *Morrison v. National Australia Bank*, 561 U.S. 247 (2010). *Id*. at 53-54.

(s)      Brazilian law claims required dismissal because the Company's bylaws required that they arbitrated in Brazil. *Id*. at 55-59.

## 2.    Lead Plaintiff's Opposition to Defendants' Motion to Dismiss

49.    On May 8, 2015, slightly more than two months after being appointed Class Counsel, and 21 days after being served with Defendants' motion to dismiss, Class Counsel filed a single, comprehensive, 60-page omnibus brief opposing the motion to dismiss, attaching 30 exhibits and appendices totaling 884 pages. *See* ECF Nos. 160-62. Among other things, Plaintiff's opposition brief and supporting material:

(a)      Refuted arguments that Petrobras did not issue materially false or misleading statements by demonstrating how the Company's *Fatos e Dados* website repeatedly denied wrongdoing and falsely assured investors that Petrobras engaged in a competitive, arms-length bidding process. EFC No. 160 at 7-8.

(b)      Described how Petrobras issued its 2014 results on April 22, 2015, after the complaint was filed, and therein grossly understated the Cartel overpayments by limiting them to 3% of the total value of tainted contracts. *Id*. at 9-12.

(c)      Set forth how Petrobras' insufficient $16.7 billion impairment calculation stood in sharp contrast to its January 2015 calculation, which revealed a potential $30 billion write-down tied to scandal-related losses. *Id*. at 12.

(d)      Identified three independent members of Petrobras' board who strongly criticized the $16.7 billion impairment as failing to accurately reflect the massive scope of the

fraud, with two independent directors voting against the release and one abstaining from the voting process altogether.[20]  *Id*. at. 13.

(e)  Argued how Petrobras repeatedly issued false and misleading statements regarding its integrity and transparency that were not statements of opinion, puffery, or forward-looking. *Id*. at 19-22.

(f)  Maintained that scienter can be imputed to Petrobras through the actions of its agents, and that Petrobras' claimed application of the "adverse interest exception" is precluded by the "innocent third-party exception."  *Id*. at 23-29.

(g)  Argued how Fonseca's testimony and contemporaneous documents, among other allegations, sufficiently allege the requisite scienter as to Foster. *Id*. at 29-32.

(h)  Pointed to alleged statements by Costa, Youssef and Foster implicating Gabrielli with having knowledge of the scheme, and attaching TCU finding of "illegitimate acts" of Gabrielli in connection with the Pasadena refinery acquisition, finding it necessary to freeze Gabrielli's personal assets. *Id*. at 32-35.

(i)  Argued how Petrobras was engulfed in a culture of political patronage where advancement depended on political sponsors who routinely demanded kickbacks in return for their support, giving rise to a motive to defraud. *Id*. at 37-38.

(j)  Countered the Defendants' expert, Luiz Leonardo Cantidiano, with the report of Plaintiffs' expert, Professor Érica Gorga, on why Petrobras' arbitration provision in Article 58 of the bylaws fails to comply with the Brazilian Arbitration Act and runs afoul of the Brazilian Federal Constitution. *Id*. at 38-43.

---

[20]  One of the independent board members, Mauro Rodrigues da Cunha, travelled to New York and appeared for a deposition in this Action over Defendants' objection and subsequent to a motion to compel his testimony.

(k)     Argued points and authorities to show that the Securities Act claims do not sound in fraud, and that even if Rule 9(b) applied the complaint satisfied the more rigorous pleading standard. *Id*. at 43-47.

(l)     Refuted arguments that the 2012 and 2013 Note Offerings are untimely due to the August 9, 2013 Época article, because the article is just one individual's unsubstantiated account which Petrobras vehemently denied or refuted with false reassurances regarding the integrity of the procurement process. *Id*. at 49-53.

(m)     Argued that Union and USS have alleged that they purchased Notes on a U.S. exchange or in a domestic transaction as required by *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), as these transactions were cleared through the Depository Trust Corporation ("DTC").

### 3.     Defendants' Reply and the Parties' Supplemental Filings

50.     On May 22, 2015, the Petrobras Defendants, certain Underwriter Defendants and Helms filed their reply papers, which consisted of 26 pages of briefing, attaching 18 exhibits and appendices totaling 295 pages, and a second "Reply Report" of defendants' proffered Brazilian law claims expert Luiz Leonardo Cantidiano ("Cantidiano Reply"). ECF Nos. 169-70.

51.     On June 12, 2015, Plaintiffs filed a supplemental memorandum of law to refute new arguments raised in the reply brief and to address the Cantidiano Reply. ECF Nos. 175-76. Plaintiffs' supplemental filing consisted of two pages of briefing, attaching 29 exhibits and appendices totaling 352 pages. On June 22, 2015, the Petrobras Defendants, certain Underwriter Defendants and Helms field a two-page brief in response to Plaintiffs' supplemental brief, attaching 18 exhibits and appendices totaling 447 pages. ECF. Nos. 177-78.

### 4. The Court's Ruling on Defendants' Motion to Dismiss the Consolidated Amended Complaint

52.     On June 25, 2015, the Court heard argument on Defendants' motion to dismiss the Consolidated Amended Complaint, and after full argument, took the matter under submission.

53.     On July 10, 2015, the Court issued an Order that granted in part, and denied in part, Defendants' motion to dismiss the Consolidated Amended Complaint.[21]   ECF No. 189. Specifically, the Court dismissed the Securities Act claims on the grounds Plaintiffs failed to allege that they purchased the relevant securities in domestic transactions, but granted leave to amend, provided such amended pleading would be filed no later than July 16, 2015. *Id*. at 2.

54.     While granting Defendants' motion with respect to the Brazilian law claims, the Court denied Defendants' motion with respect to the Exchange Act claims, and lifted the PLSRA mandatory discovery stay, thereby clearing the way to commence formal discovery. *Id*. The Court directed the Parties to jointly prepare and submit by July 15, 2015, a proposed Case Management Order pursuant to which the case would be ready for trial by February 1, 2016 (*i.e.*, in less than seven months). *Id*. at 3.

### E. Class Counsel's Effort on Case Management, Protective and Coordination Orders, and Successful Argument for Separate Trials on Individualized Issues Unique to the Individual Actions

#### 1. Case Management Orders

55.     On July 14, 2015, following a series of meet and confers among counsel, the Parties participated in a telephonic call with Chambers regarding a proposed Case Management Order ("CMO") and the Court's February 1, 2016 trial date. On July 17, 2015, Class Counsel filed a joint proposed CMO.

---

[21]     On July 30, 2015, the Court issued a forty-four-page opinion explaining the reasons for the rulings in the July 9, 2015 "bottom line" order. *See* ECF No. 194.

56.     On July 20, 2015, the Court entered the proposed CMO, with slight modification, which, among other things, set forth the following dates (in chronological order):

(a)     First request for production for documents must be served by July 24, 2015.

(b)     Interrogatories must be served by July 31, 2015.

(c)     Initial disclosures must be served by August 14, 2015.

(d)     Initial class certification expert reports must be served by October 15, 2015.

(e)     Motion for class certification shall be filed by October 15, 2015.

(f)     Document production must be substantially complete by January 1, 2016.

(g)     Initial expert disclosures must be made by February 19, 2016.

(h)     Summary judgment motions must be filed no later than March 25, 2016.

(i)     Requests to admit must be served by March 30, 2016.

(j)     All discovery, including depositions, must be completed by April 29, 2016.

(k)     Case must be trial ready on May 1, 2016.

57.     Between July and September 2015, there were seven Individual Actions filed. Given individual issues unique to those actions and additional ongoing discovery in those actions, by Order dated October 31, 2015, the Court indicated it may be necessary to make some modest adjustments to the CMO and directed the Parties to agree on a proposed trial date to commence no earlier than August 8, 2016, and no later than October 17, 2016.

58.     On November 4, 2015, Lead Counsel wrote Chambers to report that counsel for all Parties had met and conferred and agreed upon a trial date of September 26, 2016. On November 5, 2015, to accommodate Lead Counsel's request that trial not be held on seven (7) days in October (as well as certain conflicting obligations of the Court), and to assure that the trial was completed

before the year-end, the Court Ordered that the trial would begin on Monday, September 19, 2016. ECF No. 311.

59.     To accommodate further litigation involving the Individual Actions, particularly as it related to discovery deadlines and a schedule for summary judgment briefing on individualized issues unique to those actions, the Parties negotiated and on November 13, 2015, Lead Counsel submitted to the Court a stipulated and agreed upon revised proposed CMO. On January 6, 2016, after Class Counsel conferred with counsel for all Parties, Class Counsel convened a call with the Court to address the proposed revised CMO.

60.     Upon direction of the Court, on January 8, 2016, following further negotiations among counsel, Class Counsel submitted a proposed amended case management order that maintained an April 29, 2016 discovery cutoff in the Class Action and the September 19, 2016 trial date, but extended dates for discovery unique to the Individual Actions, extended summary judgment briefing deadlines, and included extended summary judgment briefing deadlines on issues limited to those actions.

61.     On January 11, 2016, with slight modification, the Court entered the proposed Amended Civil Case Management Plan. ECF No. 391. Dates in the Amended Civil Case Management Plan remained in effect, and Class Counsel was arduously moving forward to trial, until the district court case was stayed on August 2, 2016. *See* ECF No. 701.

## 2.     Protective Orders

62.     Following negotiations among counsel, on August 27, 2015, Class Counsel convened a conference call including all counsel and the Court regarding a proposed protective order for procedures to be followed which would govern the handling of confidential material. On the same day, Class Counsel submitted a draft proposed order to the Court. On September 1, 2015, following a pre-motion call with Chambers on August 31, 3015, Class Counsel submitted a 6-page

executed jointly proposed protective order. On September 2, 2015, the Court entered the proposed

order. ECF. No. 206.

### 3. Coordination Order and Bifurcating Individualized Damages Issues That Could Possibly Taint the Class Action

63.      By August 2015, at least 10 individual actions had been filed on the heels of the

Class Action. For purposes of efficiency and to preserve judicial resources, Class Counsel

negotiated and agreed upon and jointly proposed an 8-page order coordinating pre-trial matters in

the Class Action and Individual Actions. Class Counsel submitted the proposed order to the Court

on August 3, 2015, as entered by the Court, with slight modification, that same day. ECF No. 195.

64.      Significantly, the Coordination Order placed Class Counsel firmly in the driver's

seat with respect to conduct of the litigation, but with it came a host of responsibilities to prosecute

issues common to both the Class Action and the Individual Actions, such as signing consolidated

filings in which individual plaintiffs joined, conducting all pretrial proceedings on behalf of all

plaintiffs, initiating and conducting fact and expert discovery on behalf of all plaintiffs on common

issues, including taking the lead in all depositions, and briefing all common issues and arguing

them before the Court on behalf of all plaintiffs. *See id*. at 6 (a)-(m). Importantly, the Coordination

Order also appointed Liaison Counsel for the Individual Actions, thereby streamlining

communication channels and allowing Class Counsel to communicate with one counsel

representing the Individual Actions, rather than having to address multiple plaintiffs' counsel.

65.      During a hearing on October 26, 2015, the Court requested letter submissions from

the Parties regarding the structuring and scheduling trial in all the cases comprising *In re Petrobras

Securities Litigation*, No. 14-cv-9662 (JSR). Class Counsel and counsel for the Individual Actions

took conflicting positions. By letter dated October 30, 2015, Matthew Mustokoff, Liaison Counsel

for the Individual Action plaintiffs, wrote to the Court that the Individual Plaintiffs and Defendants

had taken the joint position that "there should be a single trial of all issued in both the class action and all individual action."

66.     Class Counsel recognized and voiced concern internally that most Individual Action plaintiffs had alleged far fewer corrective disclosure dates than Class Plaintiffs, and Class Counsel's more aggressive strategy of alleging corrective drops where others did not could potentially confuse jurors and negatively impact damages in the Class Action. A consolidated trial with different plaintiff experts who conflict with the Class' expert on damages posed an enormous risk and played into Defendants' hands, thus Class Counsel was hardly surprised that Defendants sought just one common trial on all issues.[22] Anticipating this position, on October 30, 2015, Class Counsel responded to the Court's October 26, 2015 directive. Class Counsel argued that issues common to the claims of the Class and the Individual Plaintiffs, such as falsity, materiality, and scienter could be resolved in a single trial, but distinct issues on Individual Plaintiffs' reliance and damages should be resolved in a separate proceeding that followed the common issues trial.

67.     On October 31, 2015, the Court issued an Order directing that a single trial before a single jury be held, combining the Class Action with the Individual Actions. ECF No. 282. The Court held further, however, that the trial would proceed in two phases: in the first the jury would resolve all common issues, and in the second the jury would resolve all individual issues. *Id*. The Court's order was silent regarding whether differing damages theories between the Individual Actions and the Class Actions would be presented at the same or separate trials. The risk of conflicting experts opining regarding widely varying damages scenarios presented a significant risk to Class Plaintiffs in progressing with their case, as set forth in more detail below.

---

[22]     Notably, even the Individual Plaintiffs could not agree upon the same damages expert, and among the various actions identified three different experts holding differing, and at times inconsistent opinions on loss causation and damages.

**F.   Class Counsel's Continuing Investigation and the Preparation of the Second, Third and Fourth Amended Consolidated Complaints, and Defendants' Responses Thereto**

**1.   Second and Third Amended Complaints**

68.   On July 16, 2015, Plaintiffs USS, Union and Hawaii filed the 162-page, 515-paragraph Consolidated Second Amended Class Action Complaint to allege with even more particularity facts concerning purchases of the relevant bond securities by Plaintiffs in domestic transactions for purposes of establishing domesticity for their Note transactions, and directly from the Underwriter Defendants for purposes of Section 12(a)(2) privity. ECF No. 191. On September 1, 2015, following a conference call among counsel and the Court on August 27, 2015, Plaintiffs filed a 213-page, 658-paragraph Third Amended Complaint. ECF No. 205.

69.   First, submitting amended pleadings provided Plaintiffs with the opportunity to add North Carolina as a named plaintiff. Even before the briefing on the April 2015 motions to dismiss, Plaintiffs and Class Counsel determined that there was a meaningful risk that the Securities Act claims asserted in connection with certain Notes had a risk of dismissal as the currently named Plaintiffs may not have been found to have purchased their notes pursuant to or traceable to certain Offerings. Accordingly, the opportunity for North Carolina to join the Action as an additional plaintiff was an opportunity to provide "coverage" for the Note Offerings.

70.   Second, by July 2015, Class Counsel's ongoing factual investigation had identified numerous additional facts that provided still further support for their already well-pled allegations. Among other amendments, the Third Amended Complaint expanded the end of the Class Period from March 19, 2015 to July 28, 2015 (inclusive). *Id.* at ¶ 653. This expansion added 44 additional alleged disclosure dates, including 15 between March 19 and July 28, 2015 (*id.* at ¶¶ 468-82), thereby significantly increasing Class Plaintiffs' alleged class wide damages. In contrast, the last

corrective disclosure date is on or before March 2015 in nearly all the complaints that comprise the Individual Actions.[23]

71.    In addition, the Third Amended Complaint added significantly more detailed factual allegations regarding the fraud that had permeated Petrobras, and this additional detail was alleged before Defendants produced one document in response to the formal discovery that had been served in this Action. Rather, the additional allegations were substantial and the fruit from facts Class Counsel uncovered through the continuing investigation in Brazil.

72.    For example, the Third Amended Complaint included particularized allegations regarding (i) Fernando de Castro Sá ("Sá"), a Petrobras in-house lawyer who testified about contractual manipulations by Petrobras and ABEMI members in connection with construction of the Abreu e Lima refinery (¶¶ 72-81); (ii) millions of dollars hidden in overseas bank accounts (¶¶ 95-96); (iii) TCU reports regarding overpricing and numerous other irregularities in the construction of the Abreu e Lima refinery (¶ 109); and (iv) additional allegations of scienter concerning individual defendants unearthed by Class Counsel in additional TCU reports, testimony in Brazil, cooperation statements by Cartel members, newspaper reports, and other sources. *See generally* ¶¶ 117-30; 143-44; 146-48; 151-55.

73.    Moreover, Class Plaintiffs aggressively expanded the Class Period by an additional four months, to end on July 28, 2015, doubling the alleged disclosure period and additional corrective disclosures, now totaling 85. In contrast, the plaintiffs in the Individual Actions ended their disclosure periods in February or March 2015. Class Counsel is not aware of any other securities class action where an amended complaint has alleged anything approaching 85 corrective disclosures. Similarly striking a different course than the Individual Actions, Class

---

[23]    *See* Exhibit 4 (identifying last disclosure dates in various Individual Actions).

Plaintiffs alleged that the Company's attempts to "come clean" in their 2014 20-F issued on March 22, 2015 with a $2.5 billion fraud related write-down, and a $16.7 billion non-fraud related impairment amounted to nothing more than a "whitewash", as the Company's $2.5 billion write-down was wholly insufficient to account for the significant inflation to PP&E due to fraud, and that the Company purposely hid the true impact of the fraud by taking a concurrent $16.7 billion impairment, instead of properly restating its financials. Plaintiffs alleged that these statements themselves were materially false and misleading. Plaintiffs submit that these allegations, which were ultimately supported by expert testimony, represented a significant pressure point on Defendants, as a finding by the Court or jury that the Company's impairment was insufficient, or that it should have restated its financials, might have forced the Company to actually issue a restatement, triggering a violation of its debt covenants and potentially an acceleration on tens of billions in corporate debt payments. Further, the Third Amended Complaint added additional false statements (¶¶ 238-39; 253, 255, 258, 274, 288-89, 308, 311, 320, 340, 344, 345-46, 348-49; 354-58), and numerous additional disclosures and concomitant stock price drops (¶¶ 392, 394, 398-99, 408, 413, 415-16, 426-45, 452, 456-57, 460-66, 468-82).

74.     In short, by September 1, 2015, Class Counsel's exceptional investigative efforts, combined with their extensive review of publicly available Petrobras-related documents, enabled Plaintiffs to piece together a remarkably coherent picture of the alleged rampant fraud at Petrobras, and its impact on the Company's reported financial results.

### 2.    Defendants' Motion to Dismiss the Third Amended Complaint and Plaintiffs' Response

75.     On October 1, 2015, the Petrobras Defendants and Underwriter Defendants (except Banco Votorantim Nassau Branch and Santander Investments Securities Inc. which were not named as defendants) moved to dismiss the Third Amended Complaint. Their motion consisted of

a 21-page omnibus brief and a declaration attaching seven exhibits. *See* ECF Nos. 224-26. They argued:

          (a)     Class Plaintiffs' Securities Act Claims based on the purchases of Petrobras Notes required dismissal because Plaintiffs failed to properly allege that they were acquired in a domestic transaction. Defendants argued that the allegations regarding where the parties incurred irrevocable liability under *Absolute Activist* were insufficient, and that transfer of beneficial ownership through the Depository Trust Corporation ("DTC") was insufficient to trigger the "transfer of title" prong of *Absolute Activist.*

          (b)     Plaintiffs' extension of the end of the Class Period from March 19 to July 28, 2015 should be rejected because they cannot establish either reliance or loss causation for that additional period.

          (c)     Plaintiffs' control person Count against Petrobras America Inc. ("PAI") warranted dismissal because the Third Amended Complaint did not plead culpable conduct by PAI.

        76.     On October 26, 2015, Plaintiffs filed a 25-page brief in opposition to Defendants' motion to dismiss the Third Amended Complaint, attaching seven exhibits and appendices totaling 69 pages. ECF No. 268-70. In sum, Plaintiffs argued, *inter alia*, that:

          (a)     The lengthening of the Class Period was appropriate because the complaint adequately alleged Plaintiffs' reliance on the false and misleading quantification of the impairment, and the loss causation allegations for that period were sufficient.

          (b)     Plaintiffs' Securities Act Claims satisfied *Morrison*'s domesticity requirement.

          (c)     The complaint properly alleged control person claims against PAI.

77.     On November 11, 2015, the Petrobras Defendants and Underwriter Defendants filed a 10-page reply brief attaching two exhibits and appendices totaling 20 pages.

### 3.     Oral Argument on Defendants' Motion to Dismiss the Third Amended Class Action Complaint

78.     On November 25, 2015 the Court held a hearing on Defendants' motion to dismiss the Third Amended Class Action Complaint. After hearing full argument, the Court granted Plaintiffs permission to file an amended complaint to include additional allegations regarding the domesticity of Class Plaintiffs' Note purchases. The Court further directed the parties to submit further briefing as to whether a trade clearing through the DTC was sufficient to plead a domestic transaction pursuant to *Morrison* and *Absolute Activist*.

### 4.     Fourth Amended Class Action Complaint and Defendants' Motion to Dismiss

79.     On November 30, 2015 Plaintiffs filed the Consolidated Fourth Amended Class Action Complaint alleging additional detail regarding the domesticity of Plaintiffs' bond purchases, such as domestic phone numbers and addresses associated with the transactions, and assorted business records demonstrating that beneficial ownership transferred in the United States. ECF. No. 342. Mindful that the Court was unlikely to grant leave to re-plead standing to bring the bond claims, out of an abundance of caution the Fourth Amended Complaint attached 19 exhibits strongly supporting the domesticity of Plaintiffs' bond purchases in the relevant bond offerings. ECF. No. 342.

80.     On December 7, 2015, the Petrobras Defendants, Underwriter Defendants and Helms filed a 10-page supplemental memorandum of law attaching two exhibits in support of their motion to dismiss the Fourth Amended Complaint (and in further support of their motion to dismiss the Third Amended Complaint). ECF Nos. 349, 351-52. In sum, Defendants essentially argued that transfer of beneficial interest in the US, or the recording of book entries in the US, is not

sufficient to plead a domestic transaction, and that no plaintiff claims to be a DTC participant, and thus any transaction that transferred beneficial interest to them occurred not at DTC but at some other location. On the same day, Plaintiffs simultaneously filed a 10-page supplemental memorandum of law attaching three (3) exhibits, including the Declaration of Susanne Trimbath, MBA, PhD, concerning her knowledge and experience as the Director of Transfer Agent Services at the Depository Trust Company, now a subsidiary of the Depository Trust and Clearing Corporation, and as Operations Analyst at the Pacific Clearing Corporation Vault Manager at the Pacific Securities Depository Trust Company. Dr. Trimbath opined that when securities transactions take place through DTC, the exchange and transfer of ownership of securities occurs through electronic book-entry delivery, and when a broker participant purchases a security under the DTC system for a beneficial owner, the broker participant receives a credit for the purchased security on DTC's records, and therefore any transfer of ownership can only be effected through DTC, regardless of whether it is an IPO or a sale that occurs in the secondary market.

**5.     The Court's Ruling on Defendants' Motion to Dismiss the Third and Fourth Amended Class Action Complaints**

81.     On December 21, 2015, the Court issued a Memorandum Opinion and Order, finding that North Carolina and Hawaii had sufficiently alleged domestic purchases of Petrobras debt securities within the meaning of *Morrison*. ECF No. 374. With respect to USS and Union's Securities Act claims, the Court held that allegations regarding clearance through the DTC were insufficient to plead domesticity under *Morrison* and *Absolute Activist*. This portion of the Court's opinion played a pivotal role in Defendants' ascertainability and predominance challenges to Class Certification, as Defendants would ultimately argue that determinations as to where irrevocable liability was incurred were too difficult and individualized to ascertain in the modern securities markets. Such arguments regarding ascertainability or predominance would not have been possible

had clearance through DTC been found sufficient under the "transfer of title" prong of *Absolute.* The Court also found that while defendants may challenge at a later stage "the novelty" of Plaintiffs' four-month extension of the end of the Class Period from (March 19, 2015 to July 28, 2015), the Fourth Amended Complaint adequately alleged reliance and loss causation for the extended period. *Id*.

82.     On January 18, 2016, the Petrobras Defendants, Underwriter Defendants and Helms answered the Fourth Amended Complaint.[24]  ECF Nos. 398-99. Each denied Plaintiffs' claims in their entirety and asserted numerous affirmative defenses to liability (Petrobras Defendants and Helms asserted 39 affirmative defenses, the Underwriter Defendants asserted 19), including, *inter alia*, that the Petrobras Defendants did not make false statements, any alleged misrepresentations are not material as a matter of law, the FAC failed to plead fraud with the particularity required by Rule 9(b), and that Plaintiffs failed to adequately allege the requisite scienter or loss causation.

#### G.     PwC Brazil's Motion to Dismiss

83.     Class Counsel undertook substantial effort to have PwC Brazil respond to the Consolidated Amended Complaint on the same briefing schedule as the Petrobras and Underwriter Defendants. On April 3, 2015, while seeking to effect service upon PwC Brazil in Brazil pursuant to the Inter-American Convention, Class Counsel also mailed to PwC Brazil in Rio de Janeiro by Federal Express a copy of the Consolidated Amended Complaint, asking that they have their counsel contact Class Counsel as soon as possible.

---

[24]     Individual Defendants began to answer the FAC starting March 4, 2015, as service was made in Brazil pursuant to the Inter-American Convention. *See* ECF Nos. 492, 525-27, 552-57.

84.     On July 15, 2015, Class Counsel again mailed PwC Brazil by FedEx and attached a copy of the Consolidated Amended Complaint translated into Portuguese, along with a copy of the Court's July 10, 2015 Order (also translated into Portuguese), denying, in significant part, the motion to dismiss the Consolidated Amended Complaint. The transmittal letter, also written in Portuguese, notified PwC Brazil that the Court had set a February 1, 2016 trial date, and we encouraged their counsel to contact Class Counsel immediately.[25]

85.     After being served with alternative service (described more fully in Section II.H below), PwC Brazil finally appeared in the Action and moved to dismiss the Fourth Amended Complaint on December 23, 2015. ECF Nos. 377-78. In its 25-page memorandum of law, attaching 19 exhibits totaling 149 pages, PwC Brazil argued that Plaintiffs Section 10(b) claim failed to plead scienter because (i) the scheme occurred almost entirely before PwC Brazil's engagement; (ii) involved employees who had no involvement in Petrobras' financial reporting; (iii) and was concealed through "collusion" between company personnel and third parties, which made payments from accounts outside Petrobras that were not discernable from its accounting records. In other words, Petrobras itself was the victim.

86.     PwC Brazil argued further that Plaintiffs' Section 11 claim failed to plead that PwC Brazil's audit opinions were subjectively false or otherwise amounted to factual misstatements or omissions under the Supreme Court's *Omnicare* decision.

87.     On January 15, 2016, Plaintiffs filed a memorandum of law in opposition to PwC Brazil's motion to dismiss, attaching 8 exhibits totaling 103 pages. ECF Nos. 396-97, 402.

---

[25]     As described in more detail below, on October 29, 2015, following a pre-motion call with the Court, Class Counsel filed an unopposed 14-page brief, attaching four exhibits totaling 35 pages, seeking leave to serve PwC Brazil by alternative means. ECF Nos. 277-79. On  November 2, 2015, the Court granted Plaintiffs' motion. ECF No. 281.

Plaintiffs argued, among other things, that the Fourth Amended Complaint alleged scienter to the extent PwC Brazil knowingly signed-off on the inadequate $2.5 billion impairment, and that PwC Brazil ignored pervasive corruption and that the Fourth Amended Complaint did far more than allege mere boilerplate "red flags." ECF No. 396. In addition, it argued that the Section 11 claim satisfied *Omnicare* with respect to PwC Brazil, insofar as the financial statements themselves are facts not opinions and were themselves embedded within PwC Brazil's audit opinions. PwC Brazil filed its reply brief on January 25, 2016. ECF Nos. 411-12.

88.     On February 19, 2016, after hearing full argument on February 10, 2016, the Court issued a Memorandum Order granting PwC Brazil's motion with respect to Plaintiffs' Section 10(b) claim but denying the motion to dismiss the Section 11 claim. Having PwC Brazil remain a party in the litigation represented a significant victory for Plaintiffs as it exposed PwC Brazil to discovery under the Federal Rules of Civil Procedure.[26]  With the mandatory discovery stay lifted as to PwC Brazil, Class Counsel served a range of formal discovery, including document requests and the depositions of two employees as well as an employee of New York City-based PricewaterhouseCoopers LLP, which resulted in ample admissible evidence that was  used in the summary judgment briefings and designated as trial exhibits supporting Plaintiffs' claims, particularly related to the sufficiency (or insufficiency) of the $2.5 billion impairment Petrobras reported on April 22, 2015.

89.     On March 3, 2016, PwC Brazil answered the Fourth Amended Complaint. ECF No. 491. PwC Brazil denied Plaintiffs' claims in their entirety and asserted twenty-two affirmative

---

[26]     PwC Brazil, located in Brazil, is outside the scope of Fed. R. Civ. P. 45, thus had PwC Brazil been dismissed, Plaintiffs would have been constrained by the Inter-American Convention to pursue discovery from PwC Brazil, thereby facing hopeless scope limitations, procedural obstacles, objections and delays that often accompany discovery sought under international treaty.

defenses to liability, including that (i) PwC Brazil's 2012 and 2013 audit opinions incorporated by reference in the 2013 and 2014 Offering Documents were not false or misleading when made; (ii) the statements challenged by Plaintiffs were matters of opinion that, at the time those statements were made, were genuinely believed by the speaker; (iii) any alleged misrepresentations or omissions were not material; and (iv) Plaintiffs' claims failed because any alleged damages were not proximately caused by any alleged misrepresentations or omissions in Petrobras' 2012 or 2013 audited financial statements or in PwC's Brazil's 2012 or 2013 audit opinions.

90.    Undeterred, and continually seeking to maximize the recovery for the Class, on April 27, 2016, Class Counsel convened a pre-motion call among counsel and the Court seeking leave to amend the Fourth Amended Complaint to reallege Exchange Act claims against PwC Brazil based upon additional evidence uncovered after several months of formal discovery from PwC Brazil and others, including Defendants and third parties. The Court requested short letter briefing regarding the Motion.

91.    On April 27, 2016, Class Counsel submitted to the Court a detailed 5-page redacted and un-redacted letter brief in support of amending the complaint to add Exchange Act claims as to PwC Brazil, attaching 12 exhibits totaling 546 pages, including TCU reports, PwC Brazil audit work papers, and internal Petrobras documents. ECF No. 587. Class Counsel recognized that trying to reassert Exchange Act claims against PwC Brazil was risky, but the alleged inadequate $2.5 billion impairment occurred under PwC Brazil's watch. Moreover, Class Counsel believed that the documentary evidence culled to date had revealed that PWC Brazil was aware of numerous red flags that should have alerted it to the pervasive kickback scheme. On April 29, 2016, PwC Brazil's counsel opposed reinstating the Section 10(b) claims. ECF No. 586.

92.     On May 5, 2016 the Court issued a Memorandum Order denying Plaintiffs' request for leave to amend the Fourth Amended Complaint to reassert Section 10(b) claims against PwC Brazil. ECF No. 585. The Court found that amending the complaint at such a late stage would either unfairly prejudice PwC Brazil or unduly delay the case, and that it was unlikely that Plaintiffs could show that the amendments would not be futile because "it appears that none of the documents offered by plaintiffs meaningfully undercuts an inference that, although PwC might not have been as conscientious as it should have been in monitoring fraud at Petrobras, PwC did take some action once it understood the scale of the alleged fraud."[27] As discussed in more detail below, soon after Plaintiffs and PwC Brazil moved for summary judgment, and shortly thereafter entered they entered a stipulation of settlement, as discussed in Section IV.B.

**H.      Class Counsel Moved for Alternative Service on the Individual Defendants (other than Helms) and PwC Brazil, While Effectuating International Service Pursuant to Inter-American Convention Requirements**

93.     Unlike a typical securities litigation where service is generally without challenge, here the litigation involved 18 Individual Defendants and PwC Brazil which required proper international service to have the defendants appear, and to be able to enforce a judgment from this Court in Brazil. In that regard, Class Counsel undertook extensive effort to effectuate service on defendants extraterritorially, which proved to be expensive, challenging, and a veritable lesson in perseverance.

94.     Class Counsel took all necessary and prudent steps to ensure service was effectuated properly and that any potential U.S. judgment would be recognized under Brazilian Law. On April 6, 2015, Class Counsel filed fourteen requests for issuance of summons as to

---

[27]     The Court observed that "under the PSLRA, the scienter inquiry is inherently comparative, and the court must take into account plausible opposing inferences. Citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (internal quotation marks omitted).

Individual and foreign Defendants located abroad. On April 9, 2015, Class Counsel filed a request for issuance of summons as to foreign Defendant Bank of China (Hong Kong) Limited. Plaintiffs initiated the process of effecting service in accordance with the Inter-American Convention, to which both the U.S. and Brazil are signatories. To facilitate this process, Class Counsel, after considering several service providers, retained and worked with Legal Language Services ("LLS") to provide translation and related services in connection with obtaining Letters Rogatory, and to ensure compliance with the Inter-American Convention's procedural and technical requirements. Class Counsel also utilized its investigator in Brazil to assist with locating the Individual Defendants' addresses. In addition, Class Counsel retained and paid Brasilio Advogados, a law firm in Brazil, to provide guidance on applicable Brazilian law and to monitor the progress of transmission and execution of the Letters Rogatory.

95.     On October 29, 2015, recognizing the delay in serving defendants located abroad pursuant to the Inter-American Convention, and against the backdrop of needing the case to be trial ready by May 1, 2016, Class Counsel filed a 14-page brief in support of a motion for alternative service, supported by four exhibits totaling 34 pages. ECF Nos. 277-79. On November 2, 2015, the Court granted the motion. ECF No. 281. Class Counsel transmitted service by Letters Rogatory via FedEx on November 11, 2015 with receipt on November 13, 2015, and PwC soon after filed its notice of appearance with the Court on December 3, 2015. ECF No. 344. The Brazilian Federal Courts accepted and processed the majority of these requests and began effectuating service on the Individual Defendants located in Brazil January 2016. Thereafter, these Individual Defendants filed notices of appearance with the Court.[28]

---

[28]     Individual Defendants Marcos Antonio Zacarias, Maria das Graças Silva Foster, Paulo Jose Alves, and Jose Sergio Gabrielli appeared on February 1, 2016. ECF Nos. 424-27. Gustavo Tardin Barbosa, Jose Carlos Consenza, Jose Raimundo Branda Pereira, Servio Tulio da Rosa Tinoco, Jose

96.     Class Counsel's extensive efforts eventually succeeded in having PwC Brazil and the Individual Defendants appear and file responsive pleadings in this Action.[29]   Further, by September 12, 2016, Class Counsel's efforts secured proper service pursuant to the Inter-American Convention on sixteen of the eighteen Individual Defendants abroad and then remaining in the litigation at that time.

## I.     Class Counsel Successfully Opposed DOJ Efforts to Stay Discovery

97.     On September 3, 2015, just a few weeks after Plaintiffs served initial document requests, counsel for the U.S. Department of Justice ("DOJ") contacted Class Counsel which the DOJ requesting that Plaintiffs agree to stay discovery in this Action for six months. While Defendants did not object to the notion of a stay, Class Counsel did. On September 14 and 15, 2015, Class Counsel and the DOJ participated in a pre-motion teleconference with the Court concerning a forthcoming application by the DOJ. On September 17, 2015, the Court held a hearing during which it granted the Department of Justice ("DOJ") the right to intervene to make an application to stay discovery in this Action for a period of six months, with leave to file to extend stay at the end of that period. *See* ECF No. 228. During the hearing, Class Counsel made several concessions to avoid the stay of discovery, including agreeing to withdraw a broad request for copies of all documents Petrobras produced to governmental authorities, and by agreeing to

---

Miranda Formigli Filho, Almir Guilherme Barbassa, and Guilherme de Oliveira Estrella appeared on March 7, 2016. ECF Nos. 503-09.

[29]     On December 3, 2015, PricewaterhouseCoopers Auditores Independentes filed its notice of appearance with the Court. ECF No. 344. On February 1, 2016, Marcos Antonio Zacarias, Maria Das Graças Silva Foster, Paulo Jose Alves, and Jose Sergio Gabrielli filed notices of appearance with the Court. ECF Nos. 424-427. On February 4, 2016, Daniel Lima de Oliveira filed his notice of appearance with the Court. ECF No. 446. On March 7, 2016, Gustavo Tardin Barbosa, Jose Carlos Consenza, Jose Raimundo Pereira, Servio Tulio Da Rosa Tinoco, Jose Miranda Formigli Filho, Almir Guilherme Barbassa, and Guillhereme de Oliveira Estrella filed notices of appearances with the Court. ECF Nos. 503-509.

narrow upcoming 30(b)(6) deposition topics on the topic of Petrobras' response to governmental investigations. *Id*.

98.     The Court did, however, grant the DOJ a one-week stay of discovery during which it would meet with Class Counsel to request that discovery be adjusted in ways that the DOJ would deem helpful to their own investigation. After numerous, and at times heated, meet and confers with the DOJ and follow-up correspondence and email, Class Counsel was able to negotiate reasonable and limited discovery request adjustments that alleviated any concern that the civil litigation would impede upon the criminal investigation.

99.     Unfortunately, the DOJ intervention delayed Petrobras' document production by several critically important weeks. Just prior to their intervention, Petrobras' counsel had been prepared to reproduce to Class Counsel documents they had already produced to governmental authorities, as many of Plaintiffs' narrowly tailored requests on other topics were captured within that governmental production. Petrobras' counsel represented to Class Counsel that it would be far easier and more expedient to re-produce the entire governmental production on a hard drive because there was little in that production that was not responsive to other requests that Plaintiffs served. By putting the brakes on the governmental production, Petrobras' counsel had to weed through the production to identify documents responsive to Plaintiffs' other requests. As a result, Petrobras, which had been days away from producing documents when the DOJ intervened in early September 2015, did not begin to meaningfully produce documents until October 1, 2015.

### J.     Plaintiffs' Formal Discovery Under the Federal Rules

#### 1.     Class Counsel Conducted Extensive Document Discovery of Parties and Third Parties

100.    Plaintiffs pursued discovery under the Federal Rules of Civil Procedure from dozens of entities and individuals, both parties and non-parties to the Action. The discovery, as

described in detail below, allowed Plaintiffs and Class Counsel to better prepare their case and thereby provide significant leverage in the settlement negotiations with Defendants.

### a.   The Parties

#### i.   Petrobras

101.   Before the parties exchanged a single document, counsel engaged in weeks of extensive negotiations regarding the scope of discovery, potential sources thereof, and search terms. The discovery plan for production of electronically stored information ("ESI") and other data went through various iterations before an agreement was reached. Because the fraud enveloped overcharges on contracts for various refinery projects, drillship purchases, and other projects, dating back years and involving tens of billions of dollars, negotiations regarding the scope of projects for which Defendants would produce related contracts spanned several weeks and required many telephonic meet-and-confers.

102.   Between July 24, 2015 and March 30, 2016, Lead Plaintiffs served three sets of detailed documents requests (comprising 91 individual requests) covering a wide array of topics pertinent to the claims in the case, including, *inter alia*, the carrying value of Petrobras' reported property, plant and equipment ("PP&E") and cost inputs on several multi-billion dollar refinery projects (particularly RNEST and Comperj), bidding procedures involving hundreds of requests for proposals ("RFPs"), internal communications regarding RFP responses, internal audit reports, and documents related to the company's internal investigation, to name a few. Although Petrobras began producing some responsive material early on, the bulk of the production occurred only after extensive further meet and confers and negotiations regarding the scope of certain requests and the manner of making them available to Lead Counsel.

103.   The bulk of Petrobras' production was loaded onto a computer database, which enabled Lead Counsel to review and analyze documents with maximum efficiency. Among other

document review strategies employed, Class Counsel organized the documents according to custodians and subject-matter and used electronic "search terms" and other techniques to identify specific communications, reports and other materials that were relevant to the claims and defenses in this litigation, all of which allowed Class Counsel to prioritize and focus on particularly relevant Petrobras departments, reports, and personnel. Similarly, search terms and other techniques were used to locate documents relevant to specific cartel projects and the associated bids submitted and whether they followed Petrobras' internal policies and procedures.

104.    In total, Class Counsel reviewed and analyzed a total of over 7 million pages of documents (mostly in Portuguese) that Petrobras produced to Class Counsel responsive to Class Plaintiffs' document requests and that concerned the matters alleged in the Fourth Amended Complaint.

105.    There are several factors that added to the work undertaken and expenses incurred in connection with the Petrobras' document production.

106.    First, a substantial majority of the documents produced was in Portuguese. As detailed below, Class Counsel also obtained tens of thousands of documents through "informal" discovery in Brazil, including criminal plea agreements, cooperation statements, and deposition testimony, also in Portuguese. This required Pomerantz retaining several dozen fulltime Portuguese staff attorneys who were offered full benefits, including, *inter alia*, health insurance, 401(k) participation, disability insurance, and overtime pay, as discussed in more detail below, to review and analyze the growing mountain of evidence that was almost entirely in a foreign language.[30]    Further complicating matters, each time Class Counsel sought to introduce a

---

[30]    Further, some of the staff associates had special knowledge vital to the case, such as experience practicing law in Brazil, a civil law country; familiarity with Brazil's corporate and

Portuguese document at a deposition, or in various motions or responses thereto, including the cross-motion for summary judgment and in our forthcoming oppositions to Defendants' multiple motions (or the many documents on Plaintiffs' fully prepared exhibit list), Class Counsel was required to provide a translation of the document (and in many cases, a costly certified translation). By the time the case had progressed to just 48 days before trial, Class Counsel had obtained certified English translations of more than 750 key documents, with the vast-majority being identified on what was Plaintiffs' forthcoming exhibit list. The total costs in certifying the translation of these documents used at summary judgment or slated to be used at trial was $1,180,654.10.

107.    Second, while Petrobras' counsel dutifully worked to perform the necessary electronic searches and provide responsive documents with the necessary load files and metadata, there were aggravating factors that all counsel, and particularly Class Counsel, had to overcome to make proper use of these documents in a litigation. Despite a heavily negotiated Protective Order in this Action (*see* ECF No. 206), thousands of "hot" documents that Petrobras gathered and produced were imbedded with a watermark across the entirety of each page (at a 45-degree angle) in an extraordinarily large font, which read: "Cleary Gottlieb Steen & Hamilton LLP Copia 01."

108.    Unfortunately, the imbedded watermark eviscerated much of the metadata associated with the underlying document. This caused significant work to isolate tens of thousands of impacted pages, which tended to be more relevant or "hot" material, and then review them individually, line by line, as opposed to through targeted electronic searches. Class Counsel promptly brought the issue to counsel's attention who worked with us in good faith, explaining

---

financial institutions; accounting skills; and an understanding of how Brazilian governmental agencies are connected and function.

that the watermark had been affixed by Petrobras in Brazil and that it would take significant work to recollect and reproduce the documents without the mark. Faced with a tight window, looming fact and expert depositions, and a desire to move discovery forward rather than come to a grinding halt, we isolated the impacted documents and reviewed them individually, one-by-one, without the benefit of predictive coding or optical character recognition ("OCR") search tools. Through this effort, we located documents relevant to the claims in the litigation, and continually moved the case and discovery forward.

109.    Third, many documents highly relevant to the claims in this case were imbedded with a password that prevented Class Counsel from printing the document. We promptly brought this serious technical issue to Petrobras counsel's attention and learned that they were facing a similar problem and that each document had been imbedded with a separate password. It was a complicating factor that Class Counsel worked through with Petrobras' counsel, in good faith on both sides, but it did add additional layers of work—and significant attorney time—to analyze documents Petrobras produced, and use them in physical form as exhibits at depositions or in court filings.[31]

## ii.    Underwriter Defendants

110.    Class Counsel served a set of document requests on all Underwriter Defendants for documents comprising approximately 50 individual requests. Among other topics, Plaintiffs'

---

[31]    These are just a few examples of the many challenges Class Counsel had to overcome with the enormous production, including slanted and cut-off pages, OCR text rendered from documents so poorly that the text, used to locate information and documents in Plaintiffs' ESI database, made that data unsearchable there. Further, there were hundreds of documents with inoperable hyperlinks, which also did not have the linked information connected electronically to the chain in a parent-child relationship, as one would anticipate. These production deficiencies resulted in meet and confers and the exchange of numerous letters regarding the production deficiencies. Lead Counsel demanded that, among other things, Defendants provide access to locked documents and fix the issues with illegibility.

requests focused on the anticipated due diligence defense. In response, the Underwriter Defendants produced more than 2.5 million pages of documents. The kinds of documents produced ranged from emails, board materials, and corporate filings, to internal investigation documents, accounting papers, analyst reports, and reports concerning various governmental investigations.

111.    The bulk of the Underwriter Defendants' production was loaded onto a computer database, which enabled Class Counsel to review and analyze documents with maximum efficiency. Among other document review strategies employed, Class Counsel organized the documents according to custodians and subject-matter, and used electronic "search terms" and other techniques to identify specific communications, reports and other materials that were relevant to the claims and defenses in this litigation, all of which allowed Class Counsel to prioritize and focus on particularly relevant documents related to the Underwriters' due diligence (or lack thereof).

### iii.    PwC Brazil

112.    Class Representatives served on PwC Brazil one set of detailed requests for documents comprising approximately 28 individual requests. PwC Brazil produced approximately 2 million pages of documents in response. The kinds of documents ranged from work papers to emails to investigative reports, and their production was also mostly in Portuguese. Among other document review strategies employed, Class Counsel organized the documents according to custodians and subject-matter, and used electronic "search terms" and other techniques to identify specific communications, reports and other materials that were relevant to the claims and defenses in this litigation, all of which allowed Class Counsel to prioritize and focus on particularly relevant documents related to PwC Brazil's unqualified audit opinion, particularly as it related to reported PP&E and the sufficiency of the $2.5 billion write-down.

113.    Based on Class Counsel's thorough prior investigations and review of all of the discovery produced by Petrobras, the Underwriter Defendants and PwC Brazil, Plaintiffs and Class Counsel concluded that there was significant evidence that would have supported the primary claims asserted in the Fourth Amended Complaint, but that the evidence was often technical and subject to different interpretations, including interpretations that a jury might have found sufficient to support Defendants' positions that there were no material misstatements or omissions, and that no defendant acted with the requisite scienter, or even negligently. As Petrobras emphasized repeatedly, the 3% bribes and kickbacks occurred outside of Petrobras and are not reflected on Petrobras' books and records.

### b.    Non-Party Discovery

114.    Class Counsel also sought relevant discovery from assorted non-parties who were believed to be in possession of documents or who could provide testimony relevant to the claims in the action, including various construction companies, refineries, drillship companies, banking institutions which, according to plea bargain agreements and various complaints, facilitated wire transfers benefiting Petrobras executives, non-defendant accounting firms that audited and analyzed Petrobras financials, and other entities alleged to be implicated in the fraudulent contracts with Petrobras.

115.    Class Counsel was painfully aware that a major obstacle in obtaining relevant discovery from these foreign entities would be navigating the lengthy foreign discovery and service process, which, as discussed below, could take years to complete. To obtain relevant discovery in a timeframe congruent with the lightning pace of discovery in this litigation, Class Counsel researched which of the foreign entities had been implicated in the fraudulent contracts with Petrobras and had U.S. offices, and sought discovery from the U.S. entities.

116.    As a result, Class Counsel propounded discovery requests on more than forty U.S. entities, including: ABN Amro; Alstom Power, Inc.; Astra Oil Co. LLC; Bank of America, NA; Barclays; Bank of New York Mellon; BNP Paribas NA, Inc.; Braskem America, Inc.; Brickell Bank; Camargo Correa USA; Citibank National Association; Crown Central LLC; Deloitte Consulting LLP; Delta National; Deutsche Bank Trust Co. Americas; Ensco Offshore, Inc.; Ernst & Young LLP; Hines Partnership LLP; HSBC USA, Inc.; Jaraguá International LLP; JP Morgan Chase Bank, NA; KPMG LLP; Maersk, Inc; Merrill Lynch Pearce Fenner Smith; Mitsui & Co., Ltd.; Muse & Stancil; Odebrecht Construction, Inc.; Pasadena Refining System, Inc.; PricewaterhouseCoopers LLP; Rolls Royce North America, Inc.; Royal Bank of Scotland; Saipem America, Inc; Samsung Heavy Industries Co.; SBM Offshore USA, Inc.; Sevan Drilling North America; Shearman & Sterling LLP; Skanska USA, Inc.; Standard Chartered Bank; Tecpetrol Corp.; Toyo USA; UBS AG; UBS Americas Inc.; UBS Asset Management (Americas) Inc.; UTC Engineering Services; Vantage Drilling Co.; and Wells Fargo.

117.    Class Counsel engaged in a tremendous amount of work in connection with these subpoenas, including: researching and serving the proper entities; responding to objections to the subpoenas, including opposing motions to quash the subpoenas and filing motions to compel production; engaging in copious meet and confers with counsel for the entities to negotiate the scope of the subpoenas; and researching and negotiating search terms for the production of relevant documents.

118.    Notwithstanding the many objections by these third parties, including that the U.S. entities did not have possession, custody, or control of relevant information, Class Counsel obtained hundreds of thousands of responsive documents because of its persistence and hard-fought efforts. As with other discovery in this litigation, most of the responsive documents Class

Counsel analyzed were in a foreign language (most were produced in Portuguese, and several thousand were produced in Japanese). Many documents produced in non-party discovery, including particularly from PricewaterhouseCoopers LLP ("PwC LLP"), Deloitte Consulting LLP and SBM Offshore USA, were directly relevant to the claims in the Action.

119.    In addition to obtaining relevant documents from U.S. non-parties, Class Counsel deposed certain entities believed to be in possession of relevant evidence, including taking 30(b)(6) depositions of: Deloitte Consulting LLP, BNP Paribas NA, Inc., and Muse, Stancil & Co. regarding their roles in the analysis of the valuation of certain of Petrobras' assets, certain of which culminated in reports that were used by Petrobras to, among other things, calculate the write-down attributed to Lava Jato; PwC LLP regarding its role in the auditing of Petrobras financials; and SBM Offshore USA, Inc. regarding information pertaining to the alleged bribery scheme involving Petrobras and SBM Offshore.

120.    Class Counsel also attended the depositions of USS's and Hawaii's money managers taken by Petrobras throughout the U.S. and England so as to protect the interests of the Class regarding, among other things, Petrobras' relentless attack on market efficiency, truth-on-the-market defenses, and statute of limitations defenses.

> **2.    Class Counsel's Strategic Use of Interrogatories and Requests to Admit Successfully Strengthened Plaintiffs' Case**
>
> **a.    Interrogatories**

121.    Pursuant to the Case Management Plan, on July 31, 2015, Plaintiffs served 49 interrogatories (combined) on the Petrobras Defendants, Underwriter Defendants, and Helms. Plaintiffs' 19 interrogatories served on the Petrobras Defendants strategically targeted identifying documents and procedures related to the procurement/bidding processes, ABEMI meetings, executive meetings, and knowledge of any cartels or illicit bribery payments. Plaintiffs' 17

interrogatories on the Underwriter Defendants focused on identifying persons involved in the underwriting due diligence and the types of information reviewed.

### b.      Requests for Admission

122.    On February 13, 2016, Lead Counsel served the first set of 100 Requests for Admission on Petrobras. On March 30, 2016, Lead Counsel served a second set of 254 requests to Petrobras, along with first sets to PwC Brazil (112 requests) and the Underwriter Defendants (57 requests). The requests effectively narrowed or eliminated various issues that may have helped to streamline the trial, including the admissions of the existence of a cartel that overcharged Petrobras in connection with various refinery projects, that Petrobras had undertaken various investigations at different periods of time, and that the TCU and other enforcement authorities had presented Petrobras with their various findings of various irregularities.

### 3.      Class Counsel's 50 Fact Witness Depositions Strengthened Plaintiffs' Case

123.    Building on the knowledge gleaned through the exhaustive document discovery process, Class Counsel conducted 50 fact-witness depositions between September 28, 2015, and April 29, 2016,[32] including seven of the Individual Defendants; current and former employees of Petrobras; the Underwriter Defendants; PwC Brazil; and non-parties having relevant information.[33] Four of the depositions, of Defendants Foster, Gabrielli, Barbassa, and Mauro Rodrigues da Cunha, a former independent director of Petrobras who represented minority shareholders, and detractor, each took two days to complete.

---

[32]      Twenty-three of these depositions were conducted pursuant to Fed. R. Civ. P. 30(b)(6).

[33]      For the Court's convenience, attached hereto as Exhibit 5 is a chart identifying all the depositions Class Counsel conducted, defended, or attended in this Action, including the names of each witness, for whom each witness testified, date of the deposition, whether it was a 30(b)(6) deposition, and in what language the deponent was examined.

124.    We believe that this universe of witnesses included all the key story-tellers who Class Counsel could have testified at trial, or that Petrobras would likely call as a trial witness, thereby enabling Class Counsel to meaningfully assess the probative value of their expected testimony.

125.    Class Counsel, however, was measured in the approach to the number of depositions sought, progressively requesting additional deponents based on the development of evidence and testimony obtained, rather than proposing an excessive number at the outset. These included 25 depositions of current or former Petrobras employees, including seven individual defendants and six 30(b)(6) witnesses. These depositions included:

1.      Almir Guilherme Barbassa (Defendant)
2.      Daniel Lima De Oliveira (Defendant)
3.      Jose Miranda Formigli Filho (Defendant)
4.      José Sergio Gabrielli de Azevedo (Defendant)
5.      Maria Das Graças Silva Foster (Defendant)
6.      Paulo José Alves (Defendant)
7.      Theodore Marshall Helms (Defendant)
8.      Carlos Alberto Rechelo Neto (30(b)(6))
9.      Vagner Silva dos Santos (30(b)(6))
10.     Carlos Gabriel Lima Macedo (30(b)(6))
11.     Joao Gonçalves Gabriel (30(b)(6))
12.     Marcio Polito Fontes (30(b)(6))
13.     Rodrigo Araujo Alves (30(b)(6))
14.     Mauro Rodrigues da Cunha (Independent Director, Board of Directors)
15.     Ivan de Souza Monteiro (Chief Financial Officer)
16.     Gerson Luiz Gonçalves (Head of Internal Audit since 1993)
17.     Nilton Maia (Head of Legal Department since 2003)
18.     Venina Velosa da Fonseca (whistleblower, former Manager of Supply)
19.     Otavio Lavocat Cintra (whistleblower, former VP Petrobras America)
20.     Amos da Silva Cancio (Accounting Manager)
21.     Antônio Castro (Manager, Business Strategy and Organizational Structure)
22.     Carlos Borromeu de Andrade (Legal, worked on Pasadena acquisition)
23.     Mario Jorge da Silva (Executive Manager of Corporate Performance)
24.     Robson Cecilio da Costa (Internal Audit, Service and Procurement)
25.     Rodrigo Araujo Alves (Accounting Division, Finance Sector)

126.    Class Counsel also conducted depositions of two key PwC Brazil employees involved in the Petrobras audit, Alexandre Figueiredo and Marcos Panassol, the latter of whom testified both individually and as a 30(b)(6) witness on behalf of PwC Brazil.

127.    Further, Class Counsel conducted fifteen depositions of current or former employees of nine of the Underwriter Defendants who were involved in the Offerings and purported due diligence calls. These depositions included:

1.   Pedro Juliano (JPMC)
2.   Leandro de Miranda Araújo (Banco Bradesco)
3.   John Corcoran (Itaú 30(b)(6))
4.   Maria Claudia Guimaraes (BAML)
5.   Alexandre Pereira Rodrigues de Sa Castanheira (Morgan Stanley 30(b)(6))
6.   Maxim Volkov (BAML 30(b)(6))
7.   Felipe Wilberg (Itaú 30(b)(6))
8.   Adrian Guzzoni (CGMI 30(b)(6))
9.   Philip Searson (Bradesco 30(b)(6))
10.  Wang Tong (Bank of China (Hong Kong) 30(b)(6))
11.  Jean Marc Dreyer (CGMI)
12.  Richard Dubbs (Banco do Brasil 30(b)(6))
13.  Rodrigo Choi (JPMC 30(b)(6))
14.  Marianela Espasandinin (JPMC)
15.  Diane Kenna (HSBC 30(b)(6))

128.    These depositions proved to be advantageous as most deponents authored a self-serving declaration in support of the Underwriter Defendant's motion for summary judgment. *See* ECF Nos. 636-37, 640-41, 644-45, 647, 651-53, and 655. In many respects, the depositions yielded such helpful information that the declarations sought to diminish the helpfulness of the deposition testimony, but arguably created inconsistencies with their prior deposition testimony and additional factual and credibility issues for trial.[34]

---

[34]    Class Counsel also conducted eight depositions of non-parties, as described in Section II.J.1.b above.

129.    Over 30 depositions were taken in Portuguese, requiring not only an interpreter, but also a Portuguese-speaking attorney who could (and very often did) object to translations and confer with opposing counsel on what various Portuguese colloquial terms meant. Indeed, it was not uncommon for several lengthy arguments to erupt between the translators designated by each party regarding the meaning of a certain response by the witness during the depositions. These arguments would become a sideshow in and of themselves, ultimately consuming precious time in a deposition limited to seven or eight hours of questioning. Further, the cost of a formal interpreter at each deposition (not including additional costs associated with having a Portuguese speaking attorney who could object to translation accuracy) was between $1,400 and $2,500 depending on the length of the deposition, with some being a bit lower and several being much higher. Moreover, because many of the witnesses were located more than 100 miles from the Court, their depositions were conducted as though they were "trial depositions."   And because of the language and geographic issues involved, all the depositions were videotaped. Ultimately, the cost to Class Counsel of taking and defending depositions, including the expense of transcripts, videography, and attendant interpreters was over $500,000.[35]

130.    Class Counsel believes that the information elicited during these depositions supported the Class claims and was particularly helpful in opposing Defendants' summary judgment motions and preparing for trial. However, we recognize that there was also information that a jury could view as supporting some of Defendants' positions. Nevertheless, these

---

[35]    Class Counsel introduced over 750 exhibits during the fact-witness depositions. Most were in the original Portuguese and, as such, required a translation by either a Portuguese-speaking Project Associate who Class Counsel employed full-time, or costlier certified copies through outside agencies.

depositions, and the exhibits discussed by the witnesses, provided Class Counsel with a solid foundation from which to understand the risks and strengths of the case.

### 4.    Class Counsel's Use of Focused Motion Practice Strengthened Plaintiffs' Case

131.    Counsel for the Parties were able to amicably resolve countless challenging disagreements.  Class Counsel, however, was on several occasions called upon to use limited motion practice to procure the discovery it required to prepare for trial. This motion practice included moving to compel the deposition of three key witnesses, each directly relevant to allegations in the various complaints. Their deposition testimony, taken in this Action, strongly supported Plaintiffs' summary judgment motion and opposition to Defendants' multiple summary judgment motions, as discussed in more detail below, and would likely have been the actual testimony introduced at trial, insofar as each witness was in Brazil, and therefore unlikely to appear in person.

### a.    Motion to Compel Cunha's Testimony

132.    On February 25, 2016, counsel for all Parties participated in a pre-motion call with Chambers in connection with Plaintiffs' application to move to compel the deposition testimony of  Mauro Gentile Rodrigues da Cunha ("Cunha"), to be taken in New York. Cunha had formerly served as an independent member of Petrobras' Board of Directors from 2013 to 2015, and a member of the Audit Committee. Cunha had been publicly critical of the methodology adopted to calculate the $2.5 billion impairment Petrobras recorded in connection with Operation Lava Jato, he refused to sign off on the 2014 Financial Statements, and in a letter to the Board of Directors he wrote that the charge only partially reduced the overvaluation of the refineries. *See* ECF No. 342 at ¶¶ 174, 186, and 378.

133.    On February 29, 2016, Class Counsel filed with the Court a 5-page letter brief with the Court, attaching seven exhibits, requesting that Cunha be compelled to testify in this Action pursuant to Fed. R. Civ. P. 45(b)(3) and 28 U.S.C. § 1783 (the "Walsh Act"), arguing that the importance of his testimony, the Second Circuit's preference for live as opposed to written testimony, and the impending discovery cutoff making Letters Rogatory impractical, militated in favor of allowing Plaintiffs to serve a testimonial subpoena upon Cunha in Brazil. ECF No. 471. Defendants simultaneously filed a 5-page letter brief arguing why Cunha should not be compelled to travel to New York and be deposed in this Action. On March 2, 2016, Class Counsel and Petrobras simultaneously filed 3-page letter briefs responding to the opposing positions taken in the February 29 letter briefs. ECF No. 473.

134.    On March 4, 2016, the Court issued a Memorandum and Order finding that the conditions of the Walsh Act had been satisfied, that Cunha's testimony was necessary in the interest of justice, and there were no practical means of obtaining his testimony other than through the issuance of a subpoena. ECF No. 501. Plaintiffs were also given permission to undertake best efforts to serve Cunha with the subpoena in person by hand. *Id*. On March 10, 2016, Cunha was served by hand in Sao Paulo, Brazil, and proof of service was returned to the Court that day.

135.    On April 18 and 19, 2016, Cunha appeared for a two-day deposition at Pomerantz' New York office. Class Counsel believes the ability to take his deposition represented a significant victory that strongly supported Plaintiffs' case. It provided an opportunity to place before the jury live (albeit by videotape) deposition testimony of a former board and audit committee member who previously refused to sign off on Petrobras' 2014 financial statements with respect to the sufficiency of the impairment and value of the refineries. *See* ECF No. 342 at ¶¶ 174, 186, and 378. His testimony would also help form an evidentiary basis to introduce at trial various key

documents, including letters Cunha authored challenging the adequacy of the impairment. Such testimony and evidence also created factual issues supporting Plaintiffs' forthcoming oppositions to summary judgment.

> **b.     Motion to Compel Fonseca's and Sa's Testimony**

136.     On October 6, 2015, Class Counsel noticed the depositions of Fonseca and Sá. Both were current Petrobras employees who Plaintiffs contended held senior positions that qualified them as "managing agents" within the meaning of Rule 30(b)(1). Both were heavily referenced in the Fourth Amended Complaint. *See*, *e.g.*, ECF No. 342 at ¶¶ 73-77, 80-81, 131-50. By letter dated October 22, 2015, Petrobras objected to making them available. Recognizing that both fell outside the scope of a Rule 45 subpoena, Petrobras suggested that Plaintiffs resort to Letters Rogatory to obtain written testimony, rather than their oral, videotaped deposition testimony under oath in this Action.

137.     On November 6, 2015, following a pre-motion call with Chambers on November 3, 2015, Plaintiffs submitted a 5-page letter brief, attaching six exhibits, arguing that both Fonseca and Sá are managing agents that fall within the meaning of Fed. R. Civ. P. 30(b)(1). On November 11, 2015, Petrobras submitted a 5-page letter brief, also attaching six exhibits, arguing that neither qualified as a managing agent. During a call with counsel and Chambers on November 13, 2015, the Court granted in part, and denied in part, the motion to compel. The Court granted Class Counsel's letter motion to take the videotaped deposition of Fonseca in New York pursuant to Fed. R. Civ. P. 30(b)(1) and denied the motion with respect to Sá.

138.     Class Counsel believes that the ability to take Fonseca's deposition in this Action represented a significant victory. Fonseca, who appeared with separate counsel, was initially deposed by Plaintiffs at Pomerantz's New York office on February 16, 2016. Fonseca returned to Brazil and then, pursuant to an agreement among her counsel and counsel for the Parties,

reappeared at Pomerantz's office on March 9, 2016 to sit for a second day of deposition so Defendants could have time to proffer questions. Providing testimony on key issues over two days, during which she also authenticated and established foundation to introduce numerous documents as evidence at trial, underscores the importance of her deposition in this Action. Fonseca's deposition also provided overwhelming support for Plaintiffs' case at summary judgment and eventually at trial.

### c.      Motion to Compel Cintra's Testimony

139.    In connection with Class Counsel's investigation in Brazil, and prior to filing the Consolidated Amended Complaint, Class Counsel learned that during the Class Period, Otávio Lavocat Cintra ("Cintra") had approached the Brazilian Federal Police's Lava Jato Task Force and expressed his concern with how much Petrobras had paid for the Pasadena refinery. Cintra was interviewed by the police on April 28, 2014 and provided a confidential witness statement.

140.    On March 31, 2016, Brazilian magazine Vejá reported that at the time of the Pasadena acquisition Cintra had complained to the president of Petrobras America about the price Petrobras was paying for the refinery, adding that "it was obvious something was behind it." According to Cintra's 2014 witness statement, and as reported by Vejá, in the second half of 2005, Cintra also met with Representative Jorge Bittar ("Bittar") to express his concern regarding certain "irregularities," and he had reason to believe that Bittar had raised the matter with Gabrielli.

141.    On March 31, 2016, Class Counsel noticed Cintra's deposition. Cintra had formerly been the Downstream Senior Vice President at Petrobras America, Inc., and at the time his deposition was noticed he worked for Petrobras as a lecturer in the "Corporate University." Petrobras subsequently objected to making Cintra available for a deposition in this Action.

142.    On April 7, 2016, the Court held a conference call with counsel regarding Plaintiffs' request to take Cintra's deposition pursuant to Fed. R. Civ. P. 30(b)(1). On April 8, 2016, after

hearing full argument, the Court granted Plaintiffs' application. As described above, on April 29, 2016 (the last day of fact discovery), Cintra was deposed at Cleary Gottlieb's New York office. Class Counsel believes that taking Cintra's testimony in this Action was a significant victory in collecting additional evidence in connection with the summary judgment briefing and preparation for trial.

### K.   Class Counsel Propounded Extensive International Requests for Judicial Assistance in the Taking of Evidence Abroad

143.   The Settlement was reached after Class Counsel engaged in extensive and efficient fact discovery conducted in an extremely compressed schedule, with Defendants only substantially completing document production by January 1, 2016 and April 29, 2016 serving as the fact discovery cutoff. Further, Class Counsel responded to, defended, or participated in fact discovery propounded either by Defendants in the Class Action or by the Individual Plaintiffs in the Individual Actions.

144.   A considerable amount of fact discovery that Plaintiffs (and Defendants) propounded was in the possession of third parties located abroad. Each singular request required drafting, negotiating with Defense Counsel and seeking approval from the Court, and translation. Each request then had to be translated into Portuguese, the accuracy of which resulted in additional negotiations and compromises with Defense Counsel to arrive at agreed upon language. Counsel then had opportunities to lodge objections to the requests, and to serve additional requests. The entire process was resource-consuming, including monitoring and working with Defendants on their requests to many of the same third parties located abroad. Compounding the effort and expense, most responses to the many international requests that Plaintiffs and Defendants propounded, and the concomitant evidence produced, required extensive translation (and in some circumstances, certified translations), review, and analysis.

145.    Plaintiffs served thirteen Requests for Judicial Assistance under The Hague Convention on the Taking of Evidence in Civil or Commercial Matters ("Hague Requests") that were approved by the Court and issued to foreign third parties. Ten requests were for production of documents and three were for live depositions. These requests issued and sought evidence in the United Kingdom, The Netherlands, France, South Korea, Italy, Monaco, and Switzerland, and in five different languages, namely English, Dutch, French, Italian and Korean.[36]

146.    Plaintiffs also served twenty-six Letters Rogatory seeking the production of evidence located abroad, as approved by the Court and issued to foreign third parties. Nine of these requests were for production of documents and seventeen were for written depositions.[37] Additionally, Petrobras Defendants propounded at least eight written depositions through Letters Rogatory.

147.    Each request for evidence abroad transmitted to Brazil required monitoring and coordination by local counsel. These requests took approximately four to ten months to process and receive either a decision of the requested evidence, which is an extremely fast turnaround and is a testament to Class Counsel's thorough and diligent efforts in seeking this international discovery.

**L.    Formal and Informal Discovery in Brazil Strengthened Plaintiffs' Case**

148.    It is my understanding that since Costa's March 2014 arrest (*see* ECF No. 342 at ¶ 186), Brazilian prosecutors have since filed charges against 305 people, mostly politicians and businessmen, and by April 2018, approximately 188 convictions have been secured against 123 people. To date, 395 international cooperation requests to 42 countries have been made, 163

---

[36]    For the Court's convenience, attached hereto as Exhibit 6 is a chart identifying entities and persons to whom Class Counsel served foreign discovery requests.

[37]    *See id.*

individual plea agreements have been signed with Brazilian authorities and 50 investigative operations by federal police have been opened. The scope of the Lava Jato fraud is the largest in Brazilian history, and perhaps among the largest anywhere.

149.    As Petrobras observed in opposing Plaintiffs' motion to lift the PSLRA discovery stay, much of the information related to the indictments, including testimony and plea statements, was becoming publicly available in Brazil. *See* ECF No. 134 at 2. Supported by two local Brazilian law firms, a seasoned investigator and cadre of Brazilian admitted attorneys employed by Class Counsel's offices in New York, Florida, and Chicago, Class Counsel embarked upon an aggressive strategy to obtain and authenticate as much highly incriminating evidence as became available in Brazil, whether through the judicial system or relevant administrative agencies, including the TCU and CVM.

150.    In Brazil, the federal police typically commence an initial investigation by collecting evidence and preparing police reports. Those reports form the basis of the federal prosecutors' complaint against an individual or companies and help define which criminal charges to bring. I understand that due to the scale of Lava Jato, federal prosecutors worked with federal police and in cooperation with several government agencies and entities to gather evidence in the investigation of the corruption scandal. This cooperation between the different government bodies and agencies produced a multitude of documentary evidence, requiring review and translation. As of April 4, 2018, 1,765 proceedings (including, but not limited to search and seizure orders, arrest warrants, cooperation requests, pleas agreements, and criminal complaints) were commenced in the State of Paraná alone.

151.    This expanding mountain of evidence supported Plaintiffs throughout the litigation, including in pleadings, witness depositions, expert discovery, and in Plaintiffs' summary judgment

motion. A significant portion of the evidence Class Counsel gleaned from Brazil formed the core of Plaintiffs' pre-trial exhibit list and oppositions to Defendants' separate motions for summary judgment.

152.    Beginning as early as March 2015, Class Counsel began the arduous and time-consuming process of searching for evidence in Brazil. Attorneys employed by Class Counsel and fluent in Portuguese searched through different agencies' websites and court dockets to download and/or review files or documents relevant to the litigation. Because of these efforts, by mid-July 2015, over 150,000 pages of public documents, from the Lava Jato investigation among other things, (almost all of them in Portuguese) had been gathered, uploaded to the database and were being reviewed by our team of attorneys. This universe greatly expanded in the fall and winter of 2015, as more documents became available on various court or agency websites in Brazil and were subsequently reviewed and analyzed by Class Counsel.[38]

153.    Notably, the vast wealth of "informal discovery" Class Counsel was able to access in Brazil, or through databases we could access from the United States, did not come with load files, metadata, or OCR capabilities (in many instances), and there were no predictive coding tools or other e-Discovery resources that could be deployed to electronically identify relevant material. This informal discovery was "old school," it came in paper format and required a document-by-document review conducted by attorneys fluent in Portuguese, who then translated relevant portions (or in some cases, all) of the documents. Many of these documents were then provided to Class Plaintiffs' experts to assist in drafting relevant expert reports. To the extent we were able to

---

[38]    *See*, *e.g.*, Exhibit 7 (chart prepared by Class Counsel identifying 701 cooperation statements and testimonies Class Counsel reviewed; Exhibit 8 (chart prepared by Class Counsel identifying 176 TCU proceedings Class Counsel analyzed); Exhibit 9 (chart prepared by Class Counsel identifying 63 Petrobras related CVM proceedings that Class Counsel monitored).

deploy translation software, we did so with respect to documents Petrobras produced, with unreliable results. This software did not work sufficiently on the "informal discovery" that we had uploaded to the document management system, primarily because the documents had no underlying metadata, native format, or load files.

154.    Our process to gather and analyze evidence in Brazil is described in detail below.

### 1.    Federal Courts

155.    Several federal courts in Brazil were concurrently overseeing cases from Lava Jato. Those include the Federal Court in Curitiba - State of Paraná, Regional Federal Court of the 4th Circuit (TRF-4), Federal Court in Rio de Janeiro - State of Rio de Janeiro, Regional Federal Court of the 2nd Circuit (TRF2); Superior Court of Justice (STJ) and Supreme Court (STF). All the Lava Jato activity in these courts was monitored daily by specific staff attorneys fluent in Portuguese, who were responsible for extracting relevant information and documents from the courts' dockets, when available.

156.    To obtain relevant documents from the Court's docket, our team had to undergo an onerous process. For example, to retrieve relevant documents from the Federal Court in Curitiba, one had to first search for the official docket number of the criminal case and the corresponding "digital key number" to access it. While most digital keys are publicly available, in the event they were not publicly disclosed by federal prosecutors, Brazilian admitted attorneys from Pomerantz obtained digital key codes specific to Brazilian attorneys and were thereby able to access any unsealed case material. *See* Exhibit 10 (screenshots identifying how Class Counsel accessed unsealed court documents in Brazil).

157.    With the correct docket number in hand and corresponding digital key, our team was able to access the Federal Court's website at https://www.jfpr.jus.br, clicked through sub-headings "E-Proc" (the online docket), "Public Consultation", and finally "Docket Consultation

with a Key" to access each docket. *See id*. After uploading "all phases of the case," our attorneys would have access to all documents uploaded to each docket. Because each docket entry is not easily identifiable with a title that would streamline the process, our team had to open each file, which included transcripts and videos, to review the content for relevance. This process was time-consuming as a single criminal case from Lava Jato contained hundreds of entries, generally multiplied due to the limitations to file size. Therefore, it was common for an initial complaint to contain over 100 attachments, and for a single deposition day to have over 10 videos with multiple witnesses, with each relevant entry reviewed by a member of our team. *See* Exhibit 10. If the documents were relevant, they were downloaded, further reviewed, and translated by our team of attorneys fluent in Portuguese. To the extent the document was used in a Court filing or was anticipated to be used in summary judgment oppositions due just days after the case was stayed, or at trial then just 48 days away, Class Counsel had a certified translation of the document. All of this was part of Class Counsel's extensive investigation that occurred outside the confines of formal discovery under the Federal Rules.

158.    One example of a relevant type of document downloaded through this process is a plea agreement, which had to be approved by the Brazilian Courts. It is my understanding that to date, approximately 163 plea agreements have been signed by individuals as part of the Lava Jato investigations, producing hundreds of separate testimonies, split by topics and conducted by different agencies. Of those agreements, all of which were in Portuguese, hundreds were gathered, reviewed, and translated by our team. By way of example of this undertaking, *see* Exhibit 7 (identifying various plea agreements, testimonies, and other relevant informal discovery), which is just a small subset of the voluminous but highly relevant information Class Counsel accessed and analyzed outside the bounds of formal discovery.

159.    Similar steps were taken by our team to gather and download publicly available documents from different courts and agencies.

## 2.    TCU

160.    The Federal Court of Accounts (TCU) is a Brazilian auxiliary agency responsible for accounting, financial, budget, performance and property oversight of public bodies and entities of the country as for their legality, legitimacy and best value. The TCU evaluates and judges the accounts of administrators responsible for federal public money, assets, and values, as well as of those who have caused loss, misappropriation, or other irregularities resulting in losses to the public treasury. As described above and set forth in the Fourth Amended Complaint and Plaintiffs' cross-motion for summary judgment, TCU reports on the various refineries at issue in the litigation were highly relevant to the underlying claims in the Action and were utilized by Class Plaintiffs in their expert reports, summary judgment briefing, and trial exhibit lists.

161.    With a few exceptions (when cases are sealed), TCU reports are publicly available and can be found on TCU's official website.

162.    Class Counsel assigned three attorneys fluent in Portuguese to monitor a total of 176 TCU cases and review more than 300 reports issued by the TCU. *See* Exhibit 8. Each TCU report is generally voluminous, very technical, and in Portuguese. To review each document, attorneys had to download each relevant document from the TCU, review it to determine whether it related to the claims or defenses in the case, and then upload it to our internal document management system, translate relevant portions into English, and then code the document so it could be retrieved for later use at depositions, summary judgment, or trial.

163.    Class Counsel also filed a request with the TCU to access relevant cases under the Brazilian Statute 12.527/2011, or the Information Access Law. TCU granted Class Counsel access

to unsealed documents from closed cases. Our team of attorneys reviewed this additional production of documents sourced from the TCU.

### 3.    CADE

164.    The Administrative Council for Economic Defense (CADE) is an independent agency of the executive branch of the Brazilian government. Under the authority of the Ministry of Justice, CADE is responsible for investigating cartels and anti-competitive conduct, as well as negotiating and signing leniency and cease and desist agreements with companies and/or individuals implicated in a cartel or antitrust conspiracy. Because of their function, CADE had been investigating construction companies implicated in Lava Jato, and Class Counsel therefore assigned attorneys fluent in Portuguese to closely monitor all CADE proceedings tied to the Lava Jato investigations.

165.    For example, in March 2015, together with Federal Prosecutors, CADE executed a leniency agreement with Brazilian construction company Setal Engenharia e Construções, SOG Óleo e Gás and its employees to investigate the role of the cartel in Petrobras' public bids. Class Counsel closely monitored and reviewed the entire proceeding, including all documents publicly released by CADE until the end of this litigation. Class Counsel engaged in similar review and analyses of other agreements with different Brazilian construction companies, including Camargo Corrêa, Andrade Gutierrez, and UTC Engenharia.

### 4.    CVM

166.    The Comissão de Valores Mobiliários (CVM) is the Securities and Exchange Commission of Brazil and operates as the securities market authority for the country. Linked to the Brazilian Ministry of Finance, this body is responsible for preventing fraud and manipulation, to protect holders of securities and market investors from irregular issuance of securities and/and

or illegal acts of officers and controlling shareholders of publicly-held companies or administrators of securities portfolios.

167.    Class Counsel identified, monitored and closely reviewed available documents of CVM proceedings from 2013 to 2017 linked to Petrobras and its executives. Of those proceedings, at least six were directly related to fraud perpetuated by Petrobras' executives in violation of Brazilian securities law. *See* Exhibit 9.

### 5.    CPI

168.    The Comissão Parlamentar de Inquérito (CPI) or the Parliamentary Inquiry Committee, an investigative committee formed by Brazil's Congress, is responsible for investigating, collecting evidence and taking testimony in connection with complaints raised by Brazilian citizens. Three committees were created to investigate allegations of corruption at Petrobras. The first, the 2009 CPI, was created by Brazil's Senate to investigate irregularities involving Petrobras and ANP, the national agency of petroleum and gas. Then, in connection with the Lava Jato investigations, two committees were created in 2014 and 2015 to investigate the allegations.

169.    Dozens of individuals, including Petrobras employees, money launderers, and executives of construction companies were called to testify before the committees. The testimonies (all in Portuguese), which were recorded and transcribed, were posted online on the committees' website or uploaded on video-sharing websites such as YouTube. Attorneys on the team fluent in Portuguese were assigned to search, download, review and translate these extensive depositions that went to the core issues in the case and were utilized extensively by Class Counsel through the course of the litigation.

### 6.      CGU

170.      The Comptroller General of the Union (CGU), recently re-named the Ministry of Transparency, Inspection and Comptroller General of the Union, is charged with assisting the President of Brazil in fighting corruption through public audits and by implementing procedures to deter fraud.

171.      Generally, the CGU investigates a complaint and, if fraud is found, it begins sanction proceedings against individuals and companies. Generally, these cases are sealed and not publicly available. However, given the importance of such findings, our attorneys fluent in Portuguese closely monitored developments of investigations by reviewing CGU press releases.

172.      A few reports were publicly released by the CGU, including annual audit reports from 2010 to 2015, reports investigating the Pasadena refinery purchase, reports on commissions paid on charter contracts, and a report on Brazilian company Mendes Júnior investigated for its role in the cartel. All these reports had to be reviewed, analyzed, and translated by members of our team of attorneys fluent in Portuguese, and were utilized as evidence by Class Counsel in the expert reports, summary judgment briefings, and trial exhibit lists.

### 7.      Brazilian Local Counsel

173.      Early in the case, Lead Plaintiff, through Class Counsel, hired CTM Advogados Associados based in São Paulo, Brazil to assist in evidence gathering and to provide legal assistance.

174.      Specifically, CTM assisted by gathering sealed documents that were not readily available to the public. Through their efforts, hundreds of pages of documents in Portuguese, including full copies of cases, additional plea agreements, testimonies, videos, hearing certificates and transcripts, reports, and leniency agreements with companies, were gathered for review and translation by our team of attorneys. CTM also took extensive efforts to have documents obtained

in Brazil properly authenticated pursuant to Rule 902 of the Federal Rules of Evidence, as detailed below in ¶ 256-57. Class Counsel incurred $162,880.00 in costs relating to CTM's work.

175.    We believe that the documents obtained resulting from Plaintiffs' "informal discovery" efforts, through judicial or administrative bodies in Brazil supported the Class' claims and a significant number were cited by Class Plaintiffs' experts in summary judgment briefing (initial and opposing briefs) and were listed as trial exhibits. However, we recognized that there were significant evidentiary challenges that we would face to introduce such evidence at trial (or even at summary judgment), and we recognized that there was also information that a jury could view as supportive of Defendants' positions, including that the adverse interest exception applies, or that no due diligence would have uncovered the wrongdoing. Nevertheless, this informal discovery provided Class Counsel with yet another solid foundation from which to understand the risks and strengths of the case.

**M.    Class Counsel's Extensive Work with Prof. Daniel J. Capra on Key Evidentiary Issues**

176.    Class Counsel recognized that there would be a host of challenges in seeking to introduce, at summary judgment and trial, evidence obtained during both formal discovery and our comprehensive investigation in Brazil, particularly third-party cooperation statements, testimony, plea agreements, and evidence presented to Brazilian tribunals, as described above. Such challenge was made evident in Gabrielli's motion for summary judgment which was tantamount to a motion *in limine* to exclude inculpating evidence. ECF Nos. 620, 661, 666, and 669. Among other arguments, Gabrielli strenuously maintained that cooperation statements, testimony and documents uncovered in Brazil were inadmissible on numerous grounds, including hearsay and/or double-hearsay, to name a few. *See* ECF No. 669.

177.     By July 2015, anticipating the many evidentiary challenges and pitfalls that lay
ahead, Class Counsel retained the distinguished Daniel J. Capra, Philip Reed Professor of Law at
Fordham University, who authored, among other works, Principles of Evidence, 7th Edition (West
2015) (with Lilly and Saltzburg); Evidence: The Objection Method, Casebook, 5th edition
(Carolina Academic Press 2016) (with Prater, Saltzburg and Arguello); West's Federal Rules of
Evidence 2011-2016 (Restyled Rules along with Reporter's Notes); and Commentaries on Federal
Rules of Evidence, United States Code Service (Two Volumes) (Lexis, 1999).[39]

178.     Class Counsel provided Prof. Capra copies of many various exemplars of the type
of formal and informal discovery Class Counsel (and our many agents) had obtained through the
course of the litigation. Prof. Capra worked extensively with Class Counsel to formulate strategies
for the admissibility of important evidence, and to ensure that appropriate steps were taken to
create the necessary evidentiary foundations and to have the evidence properly authenticated for
trial, pursuant to the Federal Rules of Evidence. Prof. Capra assisted Class Counsel through
summary judgment, and he was available to Plaintiffs through trial as an expert consultant on
evidentiary issues. In total, Class Counsel paid Prof. Capra $35,500.00 for his services.

## N.     Parties Exchanged 18 Expert Reports in Addition to Two Expert Reports on Market Efficiency Related to Class Certification

### 1.     Plaintiffs' Four Testifying Experts (in addition to Dr. Feinstein)

179.     Throughout the litigation, Class Counsel consulted with numerous experts and
consultants concerning issues such as Brazilian law, language, evidence, trial, appeals, jury

---

[39]     Professor Capra is also a reporter to the Judicial Conference Advisory Committee on the Federal Rules of Evidence, appointed by Chief Justice Rehnquist in October 1996. He drafted texts of amendments and Advisory Committee Notes for new amendments to the Federal Rules of Evidence, effective December 1, 2000, 2002, 2006, 2010, 2011, 2014, and 2017, and was the principal author of Rule 502 and Committee Note, enacted by Congress in September 2008.

selection, accounting, due diligence, loss causation, and damages. These experts' work assisted Class Counsel in supporting class certification, the taking of evidence, analysis of evidence, translations, trial preparation, and the appellate process, among other areas. Pursuant to the Amended Civil Case Management Plan (ECF No. 391), Class Representatives served opening expert reports on May 6, 2016. They proffered the following four experts in support of issues concerning materiality, accounting, damages, and due diligence.

1. Dr. Blaine F. Nye
2. Dr. Steven L. Henning
3. Harris L. Devor
4. James F. Miller[40]

180.    Dr. Nye is a financial economist and the President of Stanford Consulting Group, Inc. ("SCG"), which provides research and consulting services in financial economics and related areas to clients, including government agencies, corporations, and law firms. Dr. Nye has been relied upon as a consultant and expert witness in the areas of market efficiency, materiality, loss causation, and damages in many securities actions, including *WorldCom* and *Enron*. Dr. Nye has a B.A. degree in physics from Stanford University, a M.S. degree in physics from the University of Washington, an M.B.A. degree from Stanford University, and a Ph.D. in finance from Stanford University.

181.    Class Counsel retained Dr. Nye to provide his expert opinion, set forth in his 71-page report, on: (a) materiality; (b) loss causation; and (c) per-security damages for claims on eligible Petrobras securities. Dr. Nye prepared and served a 853-page report, including 2 appendices and 20 exhibits, in which he opined that: (a) the alleged misstatements and omissions in this case were material; (b) these alleged material misrepresentations and omissions caused the

---

[40]    Each of the four experts has previously provided expert testimony in multiple large, high stakes securities class actions.

prices of Petrobras ADSs and Notes to be artificially inflated during the Class Period; (c) sequential revelations about corruption involving Petrobras, and the resulting materialization of risk inherent in perpetrating this massive corruption scheme, caused the prices of Petrobras ADSs and Notes to decline during the Class Period; and (d) Petrobras ADSs and Notes traded in efficient markets during the Class Period. Class Counsel worked extensively with Dr. Nye and his team at SCG. Class Counsel incurred $2,436,928.00 in expenses for Dr. Nye's expert testimony and work related thereto.

182.   Steven L. Henning is a Certified Public Accountant and a partner at Marks Paneth LLP, a public accounting and business consulting firm. Dr. Henning has been relied upon as a consultant and expert witness in the areas of financial reporting, application of the United States' Generally Accepted Accounting Principles ("GAAP") and International Financial Reporting Standards ("IFRS"), and compliance with SEC regulations in a number of securities actions. Dr. Henning has a B.B.A. degree from the University of Wisconsin-Milwaukee, a M.B.A. degree from the University of Miami, and a Ph.D. from the University of Wisconsin-Madison.

183.   Class Counsel retained Dr. Henning to provide his expert opinion on materiality set forth in his 152-page report, including 2 appendices and 20 exhibits, in which he opined that: (a) Petrobras' consolidated financial statements filed with the SEC on Form 20-F for the years ended December 31, 2009 through 2014 were materially misstated as a result of violations of IFRS and SEC regulations; (b) Petrobras' Executive Board and its Board of Directors should have known that the Company's senior management had failed to ensure the effective operation of internal controls over financial reporting. These failures led to material weaknesses in internal controls that resulted in the misapplication of IFRS and the material misstatement of Petrobras' annual financial statements for the years ended December 31, 2009 through 2014; and (c) Petrobras violated the

Foreign Corrupt Practices Act, as well as other laws and regulations. Class Counsel worked extensively with Dr. Henning and his team at Marks Paneth LLP. Class Counsel incurred $1,619,448.75 in expenses for Dr. Henning's expert testimony and work related thereto.

184.    Due to the sheer number of the documents that Dr. Henning and Marks Paneth considered and relied upon were in Portuguese, Class Counsel had stationed several Portuguese attorneys to work daily at Marks Paneth's offices in New York City over the course of several months so that Dr. Henning could be more effective and efficient in the research he performed.

185.    Harris L. Devor is a certified public account and a partner in the accounting firm of Friedman LLP. Mr. Devor has been relied upon as a consultant and expert witness in the areas of accounting and auditing, financial statements, SEC issues, damages, and fraud investigations in many securities actions, including *Household International, Inc.* (02-C5893, N.D. Ill.)  Mr. Devor has a B.B.A. from Temple University.

186.    Class Counsel retained Mr. Devor to provide his expert opinion, set forth in his 213-page report, on the material conformity (or lack thereof) of Petrobras' financial statements with respect to IFRS, and Petrobras' system of internal control over financial reporting for years ended December 31, 2012 and December 31, 2013 and PwC Brazil's audits of such in accordance with standards established and promulgated by the Public Company Accounting Oversight Board ("PCAOB"). Mr. Devor prepared and served a 213-page report, in which he opined that both the material non-conformity of the financial statements of Petrobras with respect to IFRS, and with respect to Petrobras' system of internal control over financial reporting for the years ending December 31, 2012 and December 31, 2013, PwC failed to perform its audits in accordance with standards established and promulgated by the PCAOB. Class Counsel incurred $1,150,352.79 in expenses for Mr. Devor's expert testimony and work related thereto.

187.   James F. Miller is a seasoned Wall Street investment banker with considerable experience in equity offerings. He has worked as a senior equity capital markets investment banker at Merrill Lynch, the head of U.S. Equity Capital Markets at Deutsche Bank Securities, Co-Head of U.S. Equity Capital Markets at Lehman Brothers, and Global Co-Head of Equity Capital Markets at Dresdner Kleinwort Wasserstein. Mr. Miller has a B.A. in economics from Tufts University, *magna cum laude*, and an M.B.A. in finance from the Columbia University Graduate School of Business. Mr. Miller has previously provided expert testimony in the *WorldCom*, *Lehman Securities Litigation*, and *M.F. Global* securities litigation cases.

188.   Class Counsel retained Mr. Miller to provide his expert opinion, set forth in his 63-page report, on the due diligence investigations (or lack thereof) of the Underwriter Defendants in connection with the 2013 and 2014 Notes Offerings. Mr. Miller prepared and served a 69-page Corrected Report on May 19, 2016 that reached the same conclusions as his May 6, 2016 report, in which he opined that the due diligence investigations of both the 2013 and 2014 Notes Offerings were inadequate.[41]   Class Counsel incurred $382,072.52 in expenses for Mr. Miller's expert testimony and work related thereto.

---

[41]      In addition to seconding Portuguese attorneys at Marks Paneth's offices, each of the experts Plaintiffs identified considered and relied upon documents in Portuguese and worked with attorneys fluent in Portuguese to translate relevant material. They also had access to various translation programs that oftentimes were less than reliable when involving technical language.

189.    Notably, Plaintiffs in the Individual Actions identified four separate experts opining on damages: Vinita M. Juneja[42], John D. Finnerty[43], Steven P. Feinstein[44], and Chad Coffman.[45] These reports were monitored and analyzed by Class Counsel for their potential impact on the Class.  Different and lower damages theories put forth in the Individual Actions jeopardized the Class Action, and the conflicting damages numbers were a boon to Defendants' experts, a conflict they noted to argue for the unreliability of the numbers put forth in the Class Action.

### 2.    Defendants' Fourteen Testifying Experts (in addition to Dr. Gompers)

190.    On May 27, 2016, Defendants served the following 14 expert reports:

1. Gary Lawrence
2. Matthew M. Taylor
3. Tsvetan N. Beloreshki
4. Gary B. Goolsby
5. Keith Ugone
6. Philip K. Verleger
7. Michael Ussery
8. Carlos Ari Sundfeld (subsequently replaced by Vera Monteiro)
9. René M. Stulz
10. Cagatay Koç
11. Christopher M. James
12. Sebastian Edwards
13. J. Duross O'Bryan
14. Bernard Black

191.    Gary Lawrence is an adjunct faculty member of the Dedman School of Law at Southern Methodist University, teaching due diligence studies. He is also the founder and executive director of the Center for Advanced Due Diligence Studies, an independent, non-profit

---

[42]    Docket Nos. 15-cv-02214; 15-cv-02165; 15-cv-03860; 15-cv-04043; 15-cv-06643; 15-cv-06661; 15-cv-07605; 15-cv-08995; 15-cv-10159; 15-cv-10158; 15-cv-04951; 15-cv-06618; 15-cv-02192; 15-cv-03733; 15-cv-07615; 15-cv-06243; 15-cv-08192; 15-cv-07568; 15-cv-03887; 15-cv-09182; 15-cv-09243; 15-cv-10111; and 15-cv-10086.

[43]    Docket No. 15-cv-09126.

[44]    Docket Nos. 15-cv-03911; 15-cv-04226; and 15-cv-03923.

[45]    Docket Nos. 15-cv-03733; 15-cv-07615; 15-cv-6618; 15-cv-02192.

academic and research organization dedicated to the study and practice of due diligence and related issues. Lawrence prepared a 93-page report, including 60 pages of exhibits, that sought to contradict the conclusions in the report offered by Class Representatives' expert Miller. Lawrence opined that the Underwriter Defendants and their principal common counsel Shearman & Sterling LLP conducted appropriate due diligence in connection with both the 2013 and 2014 Notes Offerings.

192.    Matthew M. Taylor, an Associate Professor at the School of International Service at American University, and an Adjunct Senior Fellow for Latin America Studies at the Council on Foreign Relations, has a Ph.D. in comparative government from Georgetown University, a master's degree in public policy from Georgetown University, and a bachelor's degree in politics from Princeton University. Taylor prepared a 66-page report, including 12 pages of exhibits. Taylor's opinion: (a) describes the Brazilian political and regulatory environment in which Petrobras and PwC operated at the time; and (b) opined on certain aspects of that environment relevant to the case, particularly that of the TCU. Taylor opined regarding the TCU that: (a) the TCU is not a judicial institution; it is a governmental audit institution; (b) the TCU did not allege that there was corruption or fraud in the contracts for the Petrobras Refineries; (c) indications of potential overpricing identified by the TCU in the Petrobras Refineries are consistent with the short-term inefficiencies associated with the Workers' Party's developmentalist economic policies; and (d) it was reasonable to believe that the TCU's findings of overpricing were not final and determinative, as they were questioned by the three branches of government. Taylor further opined that it was reasonable to believe that the TCU's findings of overpricing were not final and determinative, as they were questioned by the three branches of government.

193.    Tsvetan N. Beloreshki is a Senior Managing Director in the Forensic and Litigation Consulting practice for FTI Consulting, Inc. Beloreshki specializes in securities and financial economics. Over his career, Beloreshki has provided consulting services to individuals, financial institutions, investment managers, corporations, and governments. Beloreshki has a M.B.A. and a B.A. from the University of Chicago. Beloreshki prepared a 54-page report, including 180 pages of exhibits, and performed a negative causation analyses and quantified the amount of damages, if any, sustained by purchasers of the Petrobras Notes resulting from PwC Brazil's alleged violations of Section 11. Beloreshki opined that the negative price movements in the Petrobras Notes did not result from revelation of any materially false or misleading statements or omissions in PwC Brazil's audit opinions or in the Company's audited financial statements included within the Registration Statements, and, therefore, the amount of damages due the Section 11 Class and WSIB is zero.

194.    Gary B. Goolsby is a Certified Public Accountant and a Senior Managing Director in the Forensic and Litigation Consulting Practice of FTI. Goolsby has worked as audit and leadership partner, managing partner, and Chairman of the Global Risk Management Executive Committee for Arthur Andersen. Goolsby has a M.B.A. and B.S. from Louisiana Tech University. Goolsby prepared a 158-page report, including 269 pages of exhibits.

195.    Goolsby's opinion makes an independent evaluation of PwC Brazil's conduct while performing audit procedures for certain areas pursuant to PCAOB Standards when auditing Petrobras' consolidated financial statements and internal control over financial reporting ("ICFR"), as related to Property, Plant, and Equipment for the periods ended December 31, 2012 and 2013. Goolsby opined: (a) PwC Brazil's audit procedures performed during its 2012 and 2013 audits to test Petrobras' ICFR associated with PP&E and related impairment complied with

PCAOB Standards; (b) PwC Brazil's audit procedures performed during its 2012 and 2013 audits to test Petrobras' PP&E balances and related impairment charges complied with PCAOB Standards; (c) the PP&E balances and related impairment charges reported in Petrobras' financial statements for the years ended December 31, 2012 and 2013 complied with IFRS in all material respects as encompassed in PwC Brazil's opinions on these financial statements; (d) the manner in which Petrobras accounted for impairment and the write-off for illicit payments during 2014 was reasonable; (e) the nature of the criminal activity at issue in this case was not capable of being detected using the acceptable audit procedures performed by PwC Brazil pursuant to PCAOB Standards; and (f) the responsibility for filing Petrobras' periodic reports with SEC belonged to company management and PwC Brazil's decision not to issue its review report for the third quarter of 2014 was appropriate.

196.    Keith R. Ugone is a Managing Principal at Analysis Group, Inc., a provider of Economic, financial, and business strategy consulting specializing in the interpretation of economic and financial data and the development of economic and financial models. Dr. Ugone has a B.A. in Economics from the University of Notre Dame, a M.A. in Economics from the University of Southern California, and a Ph.D. in Economics from Arizona State University. Dr. Ugone prepared a 46-page report, including 60 pages of exhibits.

197.    Dr. Ugone's opinion reviewed Dr. Nye's report of May 6, 2016 to evaluate whether Dr. Nye's estimates of inflation per share are reliable and accurate and whether they can be used to calculate reliable and accurate estimates of claimed damages attributable to the individual defendants. Dr. Ugone opined that Dr. Nye's estimates of inflation per share are not reliable and accurate estimates and cannot be used to calculate reliable and accurate estimates of claimed damages attributable to the Individual Defendants.

198.    Philip K. Verleger, Jr. is the President of PKVerleger, LLC, an economic consulting firm focusing primarily on the function and structure of energy and commodity markets. Dr. Verleger has worked as a consultant to the Ford Foundation Energy Policy Project, as a Senior Staff Economist on President Ford's Council of Economic Advisers, and as Director of the Office of Energy Policy at the US Treasury. Dr. Verleger has also been a Senior Research Scholar and Lecturer at Yale University and a Vice President in the Commodities Division at Drexel Burnham Lambert. Dr. Verleger has an A.B. in Economics from Cornell University and a Ph.D. in Economics from MIT. Dr. Verleger prepared an 85-page report, including 13 pages of exhibits.

199.    Dr. Verleger's opinion considered whether the cost increases related to Petrobras' capital improvement projects, specifically the Abreu e Lima refinery (also known as RNEST) and the Petrochemical Complex of Rio de Janeiro ("Comperj"), should have served as "red flags" for Petrobras senior management (including Directors and the Executive Board) that there was fraud in the bidding and construction processes. Dr. Verleger opined that cost increases and delays for the RNEST and Comperj projects would not have been surprising when viewed in the context of: (a) the challenges associated with undertaking grassroots (from the ground up) oil processing and conversion megaprojects; (b) contemporaneous developments in the oil industry and developments in Brazil; and (c) significant changes in scope for these projects over time. Dr. Verleger further opined that the cost increases encountered in these Petrobras projects reasonably could have been seen as a natural result of these factors and therefore would not have been a signal of fraud at Petrobras.

200.    Michael Ussery is a Certified Public Accountant and the Principal and owner of Pt Platinum Consulting, LLC, an accounting advisory and outsourcing services firm serving accounting firms, SEC registrants, and private companies. Ussery has served as an auditor with

Price Waterhouse, the Controller at Triton Energy, the Chief Financial Officer of NetLojix, and the Chief Accounting Officer of another NYSE-listed SEC registrant. Ussery has a BBA in Accounting and Finance, magna cum laude, from Stephen F. Austin State University. Ussery prepared a 115-page report, including 14 pages of exhibits.

201.    Ussery's opinion considered whether: (a) Petrobras performed a reasonable standard of care in planning, staffing, executing and reporting on the effectiveness of its ICFR for each of the years ended December 31, 2010, 2011, 2012, 2013 and 2014; (b) certain issues related to its ICFR raised by Dr. Steven Henning in his report dated May 6, 2016; and (c) alleged "red flags" raised by Mr. Harris Devor in his report dated May 6, 2016 are relevant to the evaluation of the effectiveness of Petrobras' ICFR. Ussery opined: (a) Petrobras' process of planning, staffing, executing and reporting the effectiveness of its ICFR during the Relevant Period was appropriate and provided Petrobras' Executive Board and its Board of Directors a reasonable basis for identifying and assessing any deficiencies in ICFR; (b) Petrobras' response in 2014 to allegations of corruption was reasonable; (c) when Petrobras issued its 2014 20-F, it was not required to reassess the effectiveness of ICFR in prior years because it did not reissue its prior period financial statements; (d) there is no evidence that, at the time Petrobras issued its Form 20-F for each of the years ended December 31, 2010, 2011, 2012 and 2013, Petrobras Leadership knew of material weaknesses in its internal controls that it failed to disclose; (e) Plaintiffs' Experts' analyses and conclusions concerning Petrobras' ICFR are flawed.

202.    Vera Monteiro is a Professor of the São Paulo Law School and of the Brazilian Association of Public Law, an author, a legal advisor on public-private partnerships, and a partner at the law firm Sundfeld Avogados specializing in public law and regulation. Monteiro prepared a 32-page report and served a corrected report on June 26, 2016.

203.    Monteiro's opinion analyzes the technical aspects of the TCU, including its operation, scope and nature of its decisions. Monteiro opined: (a) the TCU is not a judicial body but an independent state institution subject to judicial review; (b) the opinions of the TCU do not have legal effect and are preliminary and nonbinding; (c) as such, declarations of irregularity by the TCU are not final; (d) the specific norms and references the TCU applies to Petrobras contracts are legally questionable; and (e) Brazilian law does not allow these types of TCU declarations to be considered definite conclusions regarding the conduct of the administrators and the company.

204.    René M. Stulz is the Everett D. Reese Chair of Banking and Monetary Economics and the Director of the Dice Center for Research in Financial Economics at The Ohio State University. He has also taught at the Massachusetts Institute of Technology, the University of Chicago, and the University of Rochester. Dr. Stulz has a Ph.D. in Economics from MIT and a license in Economic Sciences from the University of Neuchâtel, Switzerland. Stulz prepared a 54-page report, including 54 pages of exhibits.

205.    Stulz's opinion evaluated: (a) the materiality, and resulting inflation of the price of Petrobras securities, of the statements alleged by Plaintiffs to be false or misleading; (b) certain opinions included in the expert reports submitted by Dr. Blaine Nye, Professor Steven Feinstein, and Individual Action plaintiff damage experts Dr. Vinita Juneja, Dr. John Finnerty, and Mr. Chad Coffman. Stulz opined that: a) given the allegations advanced by the Plaintiffs, the Numeric Disclosures could not have provided investors with value-relevant information that would have changed the price of Petrobras securities, and therefore, any related misstatements or omissions could not have caused inflation; (b) Plaintiffs' damages model with respect to non-numerical disclosures was untenable; (c) factors unrelated to the alleged fraud drove the decline in the price of Petrobras securities; (d) Plaintiffs' experts failed to show how Petrobras' alleged omissions or

misstatements inflated the price of its securities; and (e) alleged misstatements on the facts & data blog did not cause inflation.

206.     Cagatay Koç is a Principal at Cornerstone Research, an economics and finance consulting firm. Dr. Koç has been a Visiting Scholar at the US Federal Trade Commission Bureau of Economics, an Assistant Professor of Economics at the University of Texas at Arlington, and an Adjunct Assistant Professor of Economics at Columbia University. Dr. Koç earned a B.A. in Economics from Bogazici University and a M.S. in Economics and Ph.D. in Economics from the University of Texas at Austin. Dr. Koç prepared a 23-page report, including 5 pages of exhibits.

207.     Dr. Koç's opinion reviewed and assessed the econometric analyses, and the conclusions those analyses generated, contained in the study prepared by the Secretaria de Fiscalização de Infraestrutura de Petroleo, Gas Natural e Mineração (the "Seinfra Study") at the request of Brazil's TCU, which was relied upon by Dr. Henning in his expert report. Dr. Koç opined that: (a) the Seinfra Study's conclusions cannot be independently tested or verified; and (b) the Seinfra Study's econometric analyses and resulting overcharge and damages estimates are unreliable, based on the limited information contained in the Report.

208.     Christopher M. James is the William H. Dial/Sun Bank Eminent Scholar in Finance and Economics and Professor of Finance at the University of Florida and the Pembroke Fellow in International Finance at Cambridge. James also was a professor at the Universities of Oregon and Michigan and held positions at the Federal Reserve Bank of San Francisco, the Federal Deposit Insurance Corporation, and the Treasury Department, as well as serving on the Board of Directors and the Advisory Board to SunTrust Bank of Florida and on the academic board of the Turnaround Management Association, a nonprofit organization devoted to corporate renewal and turnaround management. James prepared a 92-page report, including 236 pages of exhibits.

209.    James's opinion considered whether Plaintiffs' experts have (a) established that the alleged misstatements and omissions in this matter caused the prices of the securities of Petrobras to be inflated; (b) established that the revelation of information about the alleged fraud and bribery at Petrobras or the materialization of allegedly undisclosed risks pertaining thereto caused the prices of the Petrobras Securities to decline and caused losses to investors; and (c) appropriately calculated damages (per-share or aggregate), if any, arising from price declines (if any) on their identified loss causation dates. James's report also calculates Exchange Act damages on a per-share basis and for the individual Plaintiffs.

210.    James opined: (a) the approach contemplated by Dr. Nye incorrectly measured as damages the effects of the underlying conduct, instead of measuring the inflation resulting from a failure to disclose that conduct; (b) Plaintiffs' experts did not establish that the price declines on the alleged loss causation dates they identified were an appropriate measure of inflation. Plaintiffs' experts did not conduct any analysis of the alleged misrepresentation or omission dates or conduct any analysis to establish if and how inflation allegedly entered the prices of the Petrobras Securities; (c) the Individual Plaintiffs' experts vary in the regression models they used in their loss causation event study analyses and were inconsistent with one another; (d) Plaintiffs' experts individually or collectively identified 52 event dates. However, only five of these dates are identified by all four Plaintiffs' experts as being associated with the release of information that is corrective of the alleged misrepresentations and omissions in this case; and (e) Plaintiffs' experts failed to establish that the price declines of the Petrobras Securities on the event dates they analyze were caused by the release of information that is corrective of the alleged misrepresentations or omissions.

211.    Sebastian Edwards is a Professor of Business Economics at the Anderson Graduate School of Management and the Henry Ford II Chair in International Management at the University of California, Los Angeles. Edwards is also a research associate of the National Bureau of Economic Research, a member of the advisory board of Transnational Research Corporation, and co-chairman of the Inter-American Seminar on Economics (IASE). Edwards has also served as the Chief Economist for the Latin America and Caribbean region of the World Bank, as the President of the Latin American and Caribbean Economic Association, and as an associate editor of scholarly journals.

212.    Edwards prepared a 38-page report, including 65 pages of exhibits. Edwards' opinion considered whether: (a) any macroeconomic factors impacted the costs of infrastructure and large investment projects in general, and Petrobras construction projects in particular, during the period from 2006 to 2014, and what drove the construction boom during that period; (b) construction costs rose from 2006-2014; (c) the global commodity boom and the Brazilian government's growth acceleration program had an impact on Brazilian construction and labor costs; (d) the impact on construction costs; (e) the impact of governmental policies on construction costs. Edwards opined: (a) Brazil experienced high growth from 2006-2014, driven by increased consumption, expansion of credit, and a global boom in commodity markets; (b) Brazil had an increase in investment activity during this period, including an increase in construction by both the public and private sectors; (c) tight labor market conditions in Brazil during this period resulted in increases in the cost of labor during the 2006 to 2014 period; (d) commodity markets experienced price increases during the 2006 to 2014 period; and (e) protectionist policies led to increased costs for those who purchase from the protected industry.

213.    J. Duross O'Bryan is a Certified Public Accountant and a partner at Resolution Economics Group, LLC, a finance and economics consulting form. O'Bryan has served as Managing Director at AlixPartners, LLC, a Partner and Partner-in-Charge at PricewaterhouseCoopers LLP. O'Bryan prepared a 162-page report, including 13 pages of exhibits. O'Bryan's report considered: (a) certain accounting methodologies employed or evaluated by Petrobras as a result of the Lava Jato investigation; (b) certain accounting policies related to the Petrobras' fixed assets including property, plant and equipment ("PP&E"), depreciation of PP&E, and impairment of PP&E; and (c) certain opinions included in the expert reports submitted by Dr. Henning and Devor.

214.    O'Bryan opined: (a) Petrobras' decision to expense in the income statement and decrease the carrying amount of PP&E on the balance sheet by approximately $2.5 billion of capitalized costs in the third quarter of 2014 (the "write-off") was reasonable and in accordance with IFRS; (b) this allocation was not material; (c) Petrobras' evaluation and reporting of impairment of its refinery assets under one Cash Generating Unit was reasonable, appropriate, consistent, and in accordance with IFRS; (d) Petrobras' decision to record an impairment charge on the refineries in 2014 was reasonable, appropriate, consistent, and in accordance with IFRS and does not suggest there should have been an earlier impairment or that the write-off should have been greater; and (e) PP&E, as reported on Petrobras' financial statements at historical cost less accumulated depreciation and impairment, is not a measure of the economic value of Petrobras' assets or infrastructure.

215.    Bernard Black is the Nicholas J. Chabraja Professor at Northwestern University, with positions as Professor of Law in the Pritzker School of Law and Professor of Finance in the Kellogg School of Management and a Faculty Associate in Northwestern's Institute for Policy

Research. Black also served as the Hayden W. Head Regents Chair for Faculty Excellence in the School of Law and Professor of Finance in the McCombs School of Business at the University of Texas at Austin, as the George E. Osborne Professor of Law at Stanford Law School, and as a Professor of Law at Columbia Law School. He also served as Counsel at the SEC and as an attorney at Skadden, Arps, Slate Meagher & Flom. Black prepared a 27-page report, including 33 pages of exhibits.

216.    Black's opinion considered: (a) Petrobras' "external" corporate governance practices as they relate to its financial reporting and disclosures; (b) whether Petrobras misrepresented to investors its corporate governance practices or the role of its majority shareholder, the Brazilian government, with respect to those practices; and (c) whether Petrobras and its executives made various false statements with regard to Petrobras' corporate governance practices. Black opined: (a) Petrobras' corporate governance was strong overall; (b) Petrobras fairly represented to investors its corporate governance practices, and the extent to which the Brazilian government's majority ownership of its common shares affected those practices; and (c) the statements cited in the Fourth Amended Complaint are statements of opinion that are consistent with Petrobras' actual practices.

217.    On June 17, 2016, Plaintiffs served three rebuttal expert reports by Nye, Miller and Devor responding to Defendants' experts. The Class Representatives also served the opening expert report of Dr. Nelson Nery Junior on June 17, 2016. Dr. Nery is a Professor of Law at the Pontifical Catholic University of São Paulo and is also an arbitrator in commercial proceedings. Dr. Nery has served as a public defender in São Paulo state and is an academic author. Dr. Nery has a degree in law from the University of Taubaté, and a masters and a doctorate in law from the Pontifical Catholic University of São Paulo. Dr. Nery has a Ph.D. in Civil Procedural Law from

the Friedrich-Alexander University in Erlangen-Nürnberg, Germany. Dr. Nery prepared at 96-page report, including 4 pages of exhibits.

218.    Nery's opinion considered: (a) the legal aspects concerning the functions of the TCU; (b) the binding nature of TCU decisions; and (c) Brazilian legislation applicable to Petrobras. Dr. Nery opined: (a) the TCU is a federal auxiliary agency of the legislative branch of the Brazilian government and is responsible for auditing the management of public resources and assets; (b) all contracts signed by Petrobras are subject to evaluation by the TCU; (c) TCU rulings are final administrative acts and mandatory for their recipients; (d) that TCU rulings are subject to judicial review does not mean they are not final and binding; and (e) Petrobras is subject to the authority of the TCU. The Defendants served rebuttal expert reports by Monteiro and Ugone on June 27, 2016, responding to Dr. Nery's initial report and Plaintiffs' rebuttal reports, respectively.

219.    In the less than three weeks—between May 27, 2016, when Defendants made expert disclosures required by Fed. R. Civ. P. 26(a)(2), and June 15, 2016 when all expert depositions were to be completed—Class Counsel prepared for and deposed each of Defendants' 14 experts (at significant cost) and prepared for and defended the depositions of each of Plaintiffs' four experts. These 18 depositions, and concomitant expert reports, exhibits and related discovery, occurred immediately on the heels of fact discovery and as Class Counsel was preparing to move for summary judgment.

## O.    Parties' Cross Motions for Summary Judgment

220.    On June 20, 2016, Plaintiffs and Defendants moved for summary judgment, as set forth below.[46]

---

[46]    Defendants Costa and Duque did not file summary judgment motions. Both pled guilty in Brazil to crimes arising from the Lava Jato investigation and never entered appearances in the instant Action.

| The Parties' Motions for Summary Judgment | ECF No. |
|---|---|
| Plaintiffs' Motion for Partial Summary Judgment against the Petrobras Defendants | 615 |
| Petrobras Defendants' Motion for Partial Summary Judgment | 616 |
| Motion for Summary Judgment of Defendants Barbassa, Cosenza, Estrella and Formigli | 617 |
| Motion for Summary Judgment of Defendant Foster | 618 |
| Underwriter Defendants' Motion for Summary Judgment | 619 |
| Motion for Summary Judgment of Defendant Gabrielli | 620 |
| Motion for Summary Judgment of PricewaterhouseCoopers Brazil | 621 |

221.    The parties' submissions in support of their summary judgment motions were massive and detailed. They included briefing, statements of undisputed fact pursuant to Local Civil Rule 56.1 and accompanying exhibits. ECF Nos. 628-67, 668-69, 671-75, 678, 682-83, 687-88. Altogether, the parties submitted more than 22,000 pages of materials in connection with their summary judgment motions, including 500 pages of briefing and statements of facts and well over 600 exhibits.

222.    Securities class action plaintiffs rarely move for summary judgment, much less before the end of discovery. Class Counsel is aware of just one example, which was decided by this Court. *In re Monster Worldwide, Inc. Sec. Litig*., 549 F. Supp. 2d 578 (S.D.N.Y. 2008). Here, Plaintiffs decided to move for summary judgment against the Company in advance of merits depositions. The goal was to aggressively focus the case against the Company for trial and to short-circuit some of the Company's core defenses at an early stage. For example, Plaintiffs aimed to attack the Company's claim that it was just an innocent victim of rogue employees by moving for summary judgment against it on the element of scienter, supported by the Company's own admissions and the admissions of its former officers.

223.    Accordingly, in a telephone conference held in early 2016, Plaintiffs asked the Court for leave to move for summary judgment, prior to merits depositions beginning February 2016.  The Court denied Plaintiffs' request.  Still, Plaintiffs submit that this strategy signaled Plaintiffs' confidence in their claims and created leverage over Defendants that contributed to their willingness to settle at the amounts achieved.

224.    Plaintiffs moved for partial summary judgment against the Petrobras Defendants on the issues of falsity, materiality and scienter.  Plaintiffs' motion capped a searching inquiry that began long before the start of formal discovery, as discussed in Sections II.B, II.F and II.L. As more fully described above, Plaintiffs continued to informally investigate Petrobras after filing their amended complaint and throughout the pendency of motions to dismiss, including tracking the criminal proceedings in Brazil against Petrobras' former executives and their co-conspirators in business and government. Class Counsel analyzed plea agreements, criminal complaints, hearing transcripts, sentencing opinions, and years' worth of regulatory reports. Plaintiffs also dispatched a former FBI agent to conduct a "boots-on-the-ground" investigation in Brazil, leading Pomerantz attorneys to travel to Brazil to meet with government authorities and confidential informants.

225.    Through this investigation, and prior to receiving a single document from Defendants, Plaintiffs developed unique evidence supporting their claims against the corporate defendants. Among other things, the investigation led to two whistleblowers, namely Fonseca and Cunha, whom Plaintiffs later deposed in New York, over Defendants' objections.

226.    As set forth in Plaintiffs' summary judgment papers, Fonseca, a former senior executive in Petrobras' Downstream department—one of several business segments involved in the overcharging-and-kickback scheme—testified that from 2008 to 2009 she repeatedly alerted

Defendants Gabrielli, Foster and other top leaders to multi-billion dollar cost overruns in Petrobras' refinery construction projects and suspicious bidding patterns by certain contractors. In retaliation for raising the alarm and then refusing to falsify incriminating financial reports on the refineries, Fonseca testified that she was threatened, demoted, and ultimately transferred to the Company's Singapore office.

227.    Fonseca also testified that Petrobras executives, including the Company's general counsel, punished her colleague Fernando da Castro Sá for raising concerns about Petrobras' subservience toward members of the contracting industry club ABEMI. Sá, a Petrobras attorney who was employed by the Company's Downstream segment, complained that Petrobras was sharing information with ABEMI and tailoring contracts to its members' specifications. Rather than investigate Sá's allegations, Petrobras began to investigate Sá. Management harassed Sá and transferred him to a windowless back office.

228.    Former director Cunha also lent powerful support to Plaintiffs' case. Cunha had joined the Board of Petrobras in 2013 as an independent director representing minority shareholders. Cunha testified that he was removed from the Audit Committee of the Board of Directors when he requested copies of the financials for Petrobras' debt-laden refinery projects. In fiscal 2014, the Company wrote down two of those refineries by over $11 billion.

229.    On the strength of such testimony, coupled with documentary evidence—notably, years of adverse reports and rulings detailing the contentious relationship between the Company and its government regulators at the TCU, Brazil's federal audit court—Plaintiffs moved for summary judgment against the Petrobras Defendants with an eye to pruning away issues not in reasonable dispute and streamlining the case for trial.

230. Defendants also moved for summary judgment on a slew of grounds that required substantial time to factually counter. Aware that responses were due to be filed within a week of the issuance of a mandate in the class certification appeal and to further sharpen the case for trial, Class Counsel continued to work on their responses while the case was stayed.

231. The Petrobras Defendants moved for partial summary judgment as to falsity, materiality and loss causation. Among other things, Petrobras disputed several of the corrective disclosures affirmatively opined on by Dr. Nye. Class Counsel worked intensively with its damages expert to parse through and find further support for drop dates sufficient to preserve them for trial.

232. Additionally, the Company argued that statements made on its corporate blog "Facts and Data" were not actionable because they were made in Portuguese, and hence the information they broadcast was not impounded into the American capital markets.

233. To rebut that argument, Plaintiffs sifted through Defendants' document productions and found evidence that (1) Petrobras had established the blog as a platform to intimidate the media and influence investor perception of adverse news about the Company; (2) Petrobras had invited investors to consult the blog; and (3) English-language newspapers had picked up on Petrobras' misleading version of events and reported it to the market.

234. Individual Defendants Barbassa, Cosenza, Estrella and Formigli also moved for summary judgment (the "Executive Board Defendants"). Barbassa was Petrobras' Class Period CFO, and Cosenza, Estrella and Formigli were former senior officers who had served on the Company's seven-person Executive Board. The Executive Board Defendants joined the Company's arguments, and contended that they lacked both scienter and "ultimate authority" to

make the misstatements supporting Plaintiffs' claims against them, under the Supreme Court's decision in *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011).

235.    Plaintiffs reviewed thousands of documents to counter those arguments. With respect to the Janus point, Plaintiffs found internal policy manuals showing that the Executive Board had final approval authority over SEC-filed financial statements and internal control statements, as well as minutes of Executive Board meetings showing that the Executive Board Defendants had approved Petrobras' financials and its Code of Ethics. Plaintiffs also found emails in which Executive Board Defendants jointly and individually approved alleged misstatements posted to Petrobras' Facts and Data blog.

236.    Regarding scienter, Defendants Barbassa, Estrella, and Formigli argued that they worked in business segments peripheral to the fraud. Cosenza and Formigli argued that they joined the Executive Board in 2012, after the bid-rigging-and-kickback scheme had ended. Plaintiffs developed evidence that, notwithstanding their purported "outsider" status in other business segments, Barbassa, Estrella and Formigli had learned facts showing that Petrobras favored certain counterparties that repeatedly overcharged the Company by massive amounts. Likewise, Plaintiffs adduced a wealth of evidence showing that the fraudulent scheme had persisted until 2015 and had not ended in 2012 as Cosenza and Formigli had claimed.

237.    Petrobras' two former Class Period CEOs, Defendants Gabrielli and Foster, also moved for summary judgment. Gabrielli, who served as CEO from 2005 to 2012, retained criminal counsel who raised a litany of evidentiary objections to some of the most potent evidence against him arising from the Lava Jato investigation and trials in Brazil.

238.    For her part, Foster, who assumed the reins as CEO from Gabrielli in 2012, advanced many of the same arguments as the Executive Board Defendants, including that under

Janus she was not a "statement-maker" as to any misstatement not signed by or expressly ascribed to her. Foster also contended that she could not be held accountable for the investors' losses because Plaintiffs had not tied her statements to any price increase.

239.    In addition to responding to Gabrielli's evidentiary challenges, finding documents showing Foster's authority over unattributed misstatements and refuting her "price maintenance" argument, Plaintiffs focused their responses on establishing Gabrielli's and Foster's knowledge of the fraudulent scheme, as illustrated in the below examples.

- Plaintiffs discovered that Gabrielli had played a key role in pushing through Petrobras' purchase of "Pasadena," a rusted Texas refinery that Petrobras bought for multiples over what the seller had paid for it a year earlier. Internal emails showed that shortly before the purchase, Gabrielli had relaxed the Company's "hurdle rate" for foreign investments, substantially boosting the claimed value of the refinery. Gabrielli also failed to provide Petrobras' Board with a due diligence report that assigned a value to the refinery that was far lower than Petrobras paid. When, in 2012, the TCU froze the assets of Gabrielli and other Petrobras executives for their roles in the irregularities connected to the purchase, Company documents showed that Foster managed the Company's campaign of denials to the market.

- Gabrielli and Foster each knew that the Brazilian contractor Odebrecht had repeatedly defrauded Petrobras. For example, Plaintiffs uncovered evidence of Gabrielli's complicity in awarding an $800 million contract to Odebrecht. The evidence showed that the contract, which contained nearly $400 million of charges for fictitious and duplicative services, was awarded as part of a political quid pro quo. Company documents further showed that Foster learned that the contract had been inflated by a factor of two but did not investigate the reasons until her hand was forced by a media exposé. In 2017, by monitoring the Lava Jato trials in Brazil, Class Counsel secured further evidence of Foster's knowledge when Odebrecht's leaders testified that Foster knew that the contract involved kickbacks to politicians.

- Gabrielli knew for years about Petrobras' connection to Mensalão, a massive fraud revealed in 2005 that involved key players in the fraud in this Action. As with the scheme in this Action, Mensalão implicated Petrobras executives in rigging bids on behalf of Brazilian contractors in order to funnel Company money to political benefactors. Plaintiffs discovered that Petrobras had drawn scrutiny from Brazilian authorities relating to Mensalão just as Gabrielli was named President of Petrobras. Further, internal documents and emails showed that Gabrielli knew but ignored that

> Mensalão implicated Defendants Costa and Duque, who were convicted a decade later for their roles as ringleaders of the scheme in this Action.

240.    The Underwriter Defendants sought summary judgment as to Plaintiffs' claims against them under the Securities Act of 1933. Asserting affirmative defenses of reliance and due diligence, Defendants sought to evade liability for underwriting Petrobras' issuance of $19.5 billion in debt securities in 2013 and 2014. In support of their motion, the Underwriter Defendants filed a 5,500-page submission, consisting of 120 pages of briefing and fact statements, twenty-four declarations and over 200 exhibits.

241.    Plaintiffs prepared a thorough response. In 300 pages of briefing and fact statements, accompanied by over 230 exhibits, Plaintiffs showed that the underwriters had been aware of but failed to investigate numerous red flags pointing to Petrobras' financial fraud-countering their claim to have diligenced the offerings with the reasonableness "required of a prudent man in the management of his own property," 15 U.S.C. § 77k(c). Among other things, deposition testimony and documents showed that the Underwriter Defendants (1) agreed to underwrite offerings on three days' notice by the Company; (2) could not point to any evidence that they had asked Petrobras' management to explain known allegations of fraud against the Company; and (3) relegated due diligence duties for multi-billion dollar capital raises to a first-year associate.

242.    PricewaterhouseCoopers Brazil moved for summary judgment as to Plaintiffs' Securities Act claims against it, asserting a negative causation defense, attacking four of Plaintiffs' corrective disclosures, and claiming that their clean audit reports were defensible statements of opinions under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pen. Fund*, 135 S. Ct. 1318 (2015). Plaintiffs prepared a fulsome response supported by expert evidence, deposition testimony, and documents countering these arguments. In addition to defending PwC Brazil's loss

causation and damages arguments, Plaintiffs adduced evidence that PwC Brazil had ample reason to disbelieve its audit reports. For example, the evidence showed that PwC Brazil learned of numerous adverse reports by the TCU and Brazilian regulators regarding Petrobras' refinery projects; moreover, PwC Brazil knew of but ignored Director Cunha's protests that Petrobras was accounting for its refineries as a single cash-generating unit, which obscured billions of dollars in overcharges by the cartel.

243.    All told, Class Counsel readied responses to Defendants' summary judgment motions that totaled over 40,000 pages, including over 1,000 pages of briefing and nearly 800 exhibits, many of them certified translations of documents produced in Portuguese.

**P.    Trial Preparation**

244.    As the Court is surely aware, this Action had progressed to just 48-days before trial when stayed by the Second Circuit on August 2, 2016, over Plaintiffs objection. And by that time, Plaintiffs were well on the way to being prepared for trial.

**1.    July and (Preparation for) August Mock Trials**

245.    In May 2016, during summary judgment briefing and Defendants' Rule 23(f) petition, Plaintiffs began to prepare for a two-day mock trial held in New York City on July 21-22. In preparation, Class Counsel retained (and paid) Edge Litigation Consulting LLC and their jury consultant, Dr. Dan Jacks, PhD ("Dr. Jacks") who has consulted on jury research and jury selection in many high-profile cases, including prior securities litigation trials in the Southern District of New York. Class Counsel also retained (and paid) Dominic J. Gianna ("Gianna") and Lisa A. Marcy ("Marcy"), two prominent faculty members with the National Institute of Trial Advocacy faculty who assisted Class Counsel in administering the July 2016 mock trial and preparing for the second mock trial in August 2016.

246.    To have an unbiased pool of jurors, a panel of 30 surrogate jurors was recruited from the Southern District of New York area to participate in the 2-day jury research exercise. Jurors listened to three argumentative presentations (Plaintiffs, Petrobras, and PwC Brazil), viewed deposition testimony played during the mock trial, and heard live direct examination, cross-examination, and redirect examination of Plaintiffs' damage expert, Dr. Nye. Jurors' private reactions to the presentations were measured using electronic response devices and moment-to-moment response technology. After presentations, jurors answered additional questions designed to measure their verdict orientation, strength of commitment, and reactions to key case issues. Jurors were then divided into three deliberation groups and asked to deliberate to a verdict. Quantitative and qualitative results from the research were analyzed, summarized, and ultimately helped to guide Class Counsel in preparing for trial. Class Counsel incurred $151,987.55 in expenses related to administering the July 2016 mock trial and in preparation for the second mock trial scheduled for August 2016.

247.    In addition, Class Counsel also retained and began working with David Mann ("Mann") in May 2016, who through his work with Loyola School of Law and the National Institute for Trial Advocacy consults with trial attorneys in formulating impactful opening and closing arguments. Mr. Mann worked directly with Class Counsel to help formulate for the jurors the most direct, persuasive story in Plaintiffs' opening and closing statements, helping to translate into plain language the complex legal issues and jargon involved in this Action.[47]  Class Counsel incurred $30,303.00 in expenses related to working with Mr. Mann.

---

[47]     Notably, Class Counsel paid the full cost of Dr. Jacks, Gianna, Marcy and Mann and the comprehensive mock trial involving 30 paid mock jurors, trial graphics, numerous videotaped testimony, jury instructions, verdict forms, and a mock court room with various breakout rooms, each with video recording, and Class Counsel bore the full economic risk of the exercise in the event the Action was dismissed or there was an unfavorable judgment.

248.    When the Second Circuit stayed the Action on August 2, 2016, Class Counsel, with the assistance of Dr. Jacks, Gianna, Marcy and Mann, had been preparing for a second and more in-depth mock trial to occur in New York City in August 2016.

### 2.    Class Counsel Worked Extensively with TrialGraphix

249.    In preparation for the two mock trials, and for the actual September trial, Class Counsel also retained RLM | TrialGraphix ("RLM") in May 2016. TrialGraphix (which RLM acquired in 2014) is a trial graphics industry pioneer in making powerful graphic presentations to be delivered in court. Class Counsel worked directly with RLM in creating colorful courtroom demonstratives that summarized the large volume of criminal activity in Brazil, tying that activity to Petrobras former employees and Petrobras' various refinery projects. Class Counsel also worked in-hand with RLM to blow-up documentary evidence and extract and highlight admissible text. As with virtually every aspect of this case, the amount of work involved was compounded because almost all the written evidence was in Portuguese, requiring certified translations and text boxes (pull outs from documentary evidence) showing both Portuguese and English, thereby necessitating several Portuguese speaking attorneys to interact directly with RLM on this project. Class Counsel incurred $95,157.63 in expenses related to work performed by RLM.

### 3.    Plaintiffs' Strategic Use of Brazilian Testimony/Depositions

250.    As described above in Section II.L, and further set for on Exhibit 7, videotaped depositions taken in Brazil of confessed money-launderer Youssef, former Petrobras employees Costa, Cerveró, Pedro José Barusco Filho, cartel members Milton, Salim, and Fernando Schahin, and whistleblower Fernando de Castro Sá (along with too many cartel members, politicians, and intermediaries to list here), formed an important source of evidence that Plaintiffs intended to introduce at trial.

251.    There were few persons involved in the scheme within the reach of this Court who could be compelled to sit for a deposition in this Action or to testify at trial. Class Counsel therefore believed that videotaped confessions taken in Brazil, along with associated plea agreements and written cooperation statements, presented powerful evidence to be introduced to a fact finder, and Class Counsel had been working with Prof. Capra to address anticipated objections from Defendants related to the admissibility of this evidence.

252.    Unfortunately, unlike videotaped depositions taken in this Action, where the written transcript is synchronized to the video for the purpose of selecting deposition testimony to play in court, there was no such synchronization in the Brazilian testimony and corresponding transcripts and videotape. They did not link. Compounding the work, both the video of the testifying witness and associated transcripts were in Portuguese. Therefore, extensive work had to be done by Class Counsel on the front-end to synchronize the original sources and then to extract, transcribe, and translate the testimony and link it to the video to be played at trial. After selecting the relevant testimony excerpts and having them linked the videotape to the transcript—that itself had be translated into English and certified as such. Class Counsel then worked on the back-end of this project with RLM to select testimony taken in Brazil to be introduced to the jury in this Action. This included taking the selected testimony and then inserting English subtitles (linked to the audio) to play before the jury in a coherent visual and audio form that would overcome Defendants' many anticipated objections.

253.    Preparing to introduce the Brazilian testimony at trial—and in summary judgment oppositions—was no small feat. Class Counsel is respectfully unfamiliar with any litigation of this magnitude where so many depositions were taken in another country, in a foreign language, and that required the work to identify, translate, synchronize, and prepare to be introduced before a

jury. It was a costly and time-consuming endeavor but necessary and essential work on behalf of the Class.

### 4.    Plaintiffs' Comprehensive Deposition Designations

254.    In addition to the expansive breadth of the Brazilian depositions that Class Counsel continued to monitor as they accumulated through the Settlement Date, Class Counsel had also designated specific testimony from 20 depositions of fact witnesses taken in this Action to be utilized at trial. This work was fully performed by August 2016 in anticipation of exchanging deposition designations with Defendants, while Plaintiffs then sought to negotiate aggressive dates with Defendants to accomplish various pretrial milestones before the anticipated September trial.

### 5.    Plaintiffs' Exhaustive Exhibit List

255.    With trial looming just weeks away, Class Counsel had also prepared an exhaustive exhibit list amounting to over 1500 exhibits comprised of electronic evidence (video and audio recordings), Brazilian evidence in a variety of forms, documents Petrobras issued publicly and other documents it produced confidentially to Class Counsel, Underwriter documents relating to their due diligence defense, dozens of reports by various governmental agencies in Brazil and elsewhere (including the United States, The Netherlands, Switzerland, the United Kingdom, and Korea), such as reports authored by the TCU, CVM, SEC, DOJ, and Cade, among others. Because much of the evidence on the exhibit list was produced in Portuguese, Class Counsel also attached costly and time consuming certified English translations of more than 700 proposed exhibits.

256.    Given the importance of the Brazilian Evidence at trial, Class Counsel worked through an extraordinarily bureaucratic process in Brazil to have as much of the Brazilian Evidence authenticated as possible, pursuant to the dictates of Fed. R. Evid. 902. Such extraordinary effort, done with the assistance of CTM, foreign officials in Brazil, attorneys working at Class Counsel's offices in New York, Florida and Chicago, and with the input of Prof. Capra, included:

a.   **Federal Court in Curitiba – State of Paraná and Regional Federal Court of the 4th Circuit**

- 10 requests to the Federal Court in Curitiba and Regional Federal Court of the 4th Circuit to authenticate case documents through the Notary Office.

- 10 requests for certifications of copies through the Ministry of Foreign Affairs.

- 10 requests for certifications of copies through the U.S. Consulate in Brazil.

- 4 motions presented against the Federal Prosecutors Office to obtain certified copies of key documentary evidence in Case Nos. 5029398-45.2016.4.04.7000 and 5029739-71.2016.4.04.7000.

- 2 motions for clarification filed before 13th Federal Court in Rio de Janeiro in Case Nos. 5029398-45.2016.4.04.7000 and 502973971.2016.4.04.7000.

- 2 requests of access to sealed cases in Federal Court in Curitiba in Case Nos. 5047635-64.2015.4.04.7000 and 5049557-14.2013.4.04.7000 (to obtain Police Report Nos. 2786/2014, 1342/2015, 1476/2015 and 2400/2015).

- 1 request for information filed before Lava-Jato task force at Federal Police Headquarters in Curitiba.

- 109 requests of copies of cases filed both to the Federal Court in Curitiba and to the Notary Office.

- 75 copies apostilled through the Notary Office.

b.   **Federal Court and Labor Court in Rio de Janeiro – State of Rio de Janeiro**

- 2 requests of copies filed to Federal Court in Rio de Janeiro.

- 1 request of access to a sealed case in Federal Court in Rio de Janeiro, followed by a personal hearing with the judge responsible (Case No. 0022781-56.2014.4.02.5101).

- 1 request of copy filed to Labor Court in Rio de Janeiro.

- 2 requests for certifications of copies through Ministry of Foreign Affairs.

- 2 requests for certifications of copies through the U.S. Consulate in Brazil.

- 1 request of certified document to the Board of Trade of the State of Rio de Janeiro.

- 1 request to access sealed investigation (Crim. Inv. No. 1.30.001.000.837/2014-69 before Federal Prosecutor's Office in Rio de Janeiro, followed by personal hearing with the prosecutor responsible for the investigation).

      **c.**      **State Prosecutor's Office in São Paulo – State of São Paulo**

- Request for a full copy of Civil Investigation No. 66.0695.0001211/2014-9 / 54.0261.004960/15.

- Request to access sealed information in Civ. Inv. No. 66.0695.0001211/2014-9 / 54.0261.004960/15, followed by a personal hearing with the prosecutor responsible for the investigation).

      **d.**      **Supreme Court and Superior Court of Justice in Brasília – Federal District**

- 31 requests of copies filed with the Court.

- 7 certifications of copies obtained through the Ministry of Foreign Affairs.

- 21 copies apostilled through the Notary Office.

      **e.**      **Administrative Council of Economic Defense, Office of the Comptroller General and House of Representatives in Brasília – Federal District**

- 26 requests of copies filed, 3 of them to access sealed documents.

- 22 apostilled through the Notary Office.

- 1 certification through Ministry of Foreign Affairs.

- 1 certification of copy through the U.S. Consulate in Brazil.

- 2 appeals presented before the House of Representatives in order to obtain access to sealed documents related to Jonathan Taylor's deposition to CPI Petrobras in 2015.

- 3 appeals presented before the Office of the Comptroller General (CGU) to obtain access to the sealed CGU Report on the Pasadena refinery, Administrative No. 201407539.

- 1 appeal presented before Administrative Council of Economic Defense (CADE) regarding Administrative No. 08700.000.338/201732.

      **f.**      **Federal Accounts Court (TCU) in Brasília – Federal District**

- 38 requests for documents filed.

- 9 requests to access sealed cases and documents.

- 24 certifications through the Ministry of Foreign Affairs.

- 24 certifications through the U.S. Consulate in Brazil.

- 14 copies apostilled through Notary Office.

- Draft and file of a motion for clarification before the TCU in Case No. 015.402/2016-9 and one motion before TCU in Case No. 015.404/2016-1.

257.    In sum, more than 130 cases were researched on the ground in Brazil. In total, there were 205 requests for documents or to access cases. To properly authenticate the documents for admissibility at trial, 45 documents were certified though Ministry of Foreign Affairs and U.S. Consulate in Brazil, and 171 documents were apostilled through Notary Office. I believe each was included on Plaintiffs' exhaustive exhibit list. To be used at trial, each of these documents required costly certified translations.

      **6.**      **Class Counsel's 13 Motions *in Limine* or Daubert Motions**

258.    Being just 48 days from trial, Class Counsel had been working diligently on motions in limine and Daubert motions when the case was stayed by the Second Circuit over Plaintiffs' opposition. This included, *inter alia*, motions to exclude: (i) argument that Petrobras was a victim; (ii) evidence concerning certain information related to Class Representatives; (iii) introduction of class-wide aggregate damages (as opposed to per share inflation); (iv) any reference to Plaintiffs' damage expert's prior career as a professional football player (Dr. Nye played nine years as right guard with the Dallas Cowboys); (v) any reference to Fonseca's Brazilian labor litigation against Petrobras; and (vi) all or portions of the purported expert testimony of Cagatay Koç, Christopher James and Rene Stulz. Further, we researched and prepared

a comprehensive memorandum of law asking the Court to bifurcate the damages portion of the trial so damages experts for the Individual Actions would not heard during any portion of the Class Action trial. Bifurcating damages was particularly important to Class Counsel given the prospect of a fact finder being presented with no less than four competing damages analyses on the Plaintiff side alone.

**7.      Class Counsel's Work with Experts in Anticipation of Trial**

259.      As the trial date approached, Class Counsel continued to work with experts on issues regarding loss causation, materiality, and accounting, and had designated on the exhibit list which documents were relevant to their anticipated trial testimony. And with the importance of damages and the many challenging issues proving 85 disclosures, Class Counsel had been working extensively with Dr. Nye and his team throughout the mock trial in anticipation of his being a key trial expert.

**8.      Class Counsel's Work on a Pretrial Order**

260.      With only a month and a half to trial, in addition to (i) the comprehensive deposition designations (with marked-up copies of the portions of transcripts of depositions intended to be read into evidence), and (ii) the exhaustive exhibit list, Class Counsel had also worked on drafting a pre-trial consent order and trial pending exchanges, including a witness list, proposed jury charge, proposed verdict form, and proposed voir dire requests. Class Counsel had proposed dates to Defendants and began negotiating those dates and pre-trial exchanges when the District Court case was stayed.

**III.    Class Certification**

**A.      Class Counsel Achieves Class Certification**

261.      On July 20, 2015, the Court issued an order setting the schedule for class certification discovery and class certification briefing, among other things. ECF No. 192.  The

motion for class certification was vigorously contested and entailed extensive discovery, much of which occurred before the filing of the motion. Class Counsel's experience and expertise enabled it to complete what turned out to be an enormous undertaking in less than three months in accordance with the Court's July 20, 2015 Order. *Id*. Thus, for example, while Defendants' various motions to dismiss were pending, Class Counsel streamlined discovery by exchanging and responding to discovery requests (which included requests that pertained to class certification) and met and conferred with Defendants regarding any objections to discovery. This greatly assisted Class Representatives in meeting the Court's class certification schedule.

262.    With the assistance of Class Counsel, the proposed Class Representatives, including Lead Plaintiff, collected, reviewed, and produced hundreds of thousands of pages of documents in response to thirty-five requests contained in Defendants' First Request for Documents, which included, among other things, Plaintiffs' trading histories in Petrobras securities and the securities of other government owed entities, documents in their possession concerning Petrobras, and all documents relating to or concerning Fonseca, Sá, or CWI referenced in the Consolidated Second Amended Complaint. Defendants also served subpoenas on outside investment managers for the Class Representatives, and Class Counsel coordinated and conferred with each of these outside managers regarding the permissible scope of discovery.

263.    In addition to document discovery, Defendants deposed five persons from proposed Class Representatives pursuant to Rule 30(b)(6) deposition notices, including: Chris Shale (USS, October 20, 2015), Jeremy Hill (USS, October 21, 2015), and Jeff Smith (North Carolina, October 28, 2015). Defendants also deposed three of the proposed Class Representatives' investment managers: Gregory Haendel (outside manager for Hawaii, February 5, 2016); Daniel Summerfield (USS, March 1, 2016); and Alice Elizabeth Harrison (North Carolina, March 23, 2016).

264.    There was also considerable expert discovery taken in connection with the motion for class certification. Plaintiffs submitted opening (89-pages) and rebuttal (167-pages) expert reports of Dr. Steven P. Feinstein (on October 15 and November 23, 2015, respectively) in support of class certification. Both reports attached numerous exhibits that included over 1400 analyst reports, hundreds of the Company's public filings, numerous Company press releases and internal reports, along with articles and other materials totaling tens of thousands of pages. Defendants deposed Dr. Feinstein on two separate occasions (once on October 26 and again on December 4, 2015). Class Counsel defended both depositions, working closely with Prof. Feinstein in preparing for them.

265.    Conversely, on November 6, 2015, Defendants submitted the 72-page expert report of Dr. Paul A. Gompers, relying on thousands of pages of analyst and press reports, public filings and academic literature, which challenged Dr. Feinstein's opinions and claimed, *inter alia*, that his analysis was inadequate to establish market efficiency throughout the proposed Class Period, that his approach to test the fifth *Cammer* factor was flawed and that his use of Z-tests was not appropriate. On November 11, 2015, after extensive analysis and preparation, Class Counsel took Dr. Gompers' deposition in this Action. On December 8, 2015, Defendants served Dr. Gompers' 37-page reply report.

266.    On October 15, 2015, the proposed Class Representatives filed their motion for Class Certification and appointment of Class Representatives and Class Counsel (the "Class Certification Motion"). ECF Nos. 255-57, 264.

267.    On November 6, 2015, the Petrobras Defendants, Underwriter Defendants, and Helms jointly filed a 30-page memorandum, attaching 27 supporting exhibits totaling over 650 pages, in opposition to the Class Certification Motion. ECF Nos. 294-95. They argued, *inter alia*,

that Class Representatives do not establish numerosity and superiority, were not appropriate class representatives, could not establish superiority, and that individualized issues concerning the location of each class member's transactions defeat predominance for Petrobras notes. With respect to numerosity and superiority, Defendants pointed to the more than 500 plaintiffs that had filed Individual Actions, contending that the class action devise was neither necessary nor advisable in this case. They also challenged Dr. Feinstein's market efficiency model, arguing that it did not test whether the stock price reactions tested reacted in a directionally appropriate manner. Moreover, Defendants argued any class period must end well before July 28, 2015. *See generally*, ECF No. 295.

268.    On November 23, 2015, while engaged in extensive fact discovery and Defendants' then pending motion to dismiss the Third Amended Complaint, Class Representatives filed a 15-page reply brief attaching eight exhibits totaling more than 900 pages in further support of the Class Certification Motion.

269.    On December 21, 2015, the Court held a hearing on the Class Certification motion and heard full argument from counsel and received testimony from both Dr. Feinstein and Dr. Gompers and took the matter under submission. The Court permitted the parties to submit supplemental briefing on or before January 6, 2016, to address the testimony provided at the December 21 hearing, and to respond to other matters applicable to the Class Certification Motion.

270.    On January 5, 2016, the Petrobras Defendants and Helms filed a declaration in further opposition to class certification, attaching the December 21 hearing transcript, and Defendants' eight-part "Binder" referenced at the hearing. The next day, Defendants filed a supplemental memorandum of law in opposition to class certification. Class Counsel

simultaneously filed a supplemental memorandum of law in further support of the Class Certification motion.

271.   On February 2, 2016, the Court issued an Opinion and Order granting the Class Certification Motion, and appointing North Carolina and Hawaii as class representatives for the Securities Act Class and USS as class representative for the Exchange Act Class, and appointing Pomerantz as Class Counsel for both Classes (the "Class Certification Order"). ECF No. 428.[48] The Class Certification Order limited the classes based on the Second Circuit's objective criteria of purchasers in domestic transactions and found that the determination of class membership was administratively feasible and manageable because it was "susceptible to the bureaucratic process" of examining objective documentation typically provided by financial institutions. Indeed, the Court had employed this mechanism and readily determined, based on purchase orders and other objective criteria, that North Carolina and Hawaii met the "domestic transaction" standard, while two others did not. The Court also found both direct and indirect evidence that Petrobras' securities traded in an efficient market.

272.   Immediately after the Class Certification Order, and a pre-motion call with the Court, Defendants sought permission to serve ten interrogatories directed to *all* absent Class Members and submitted a 7-page single spaced letter brief in support thereof on February 8, 2016. Defendants claimed that discovery from each class member was necessary to determine whether purchases of debt securities were domestic transactions within the meaning of *Morrison*, and to

---

[48]   On May 9, 2016, in connection with the Court's certification of the Class, the Court approved the Class Notice prepared by Class Counsel. ECF No. 589; *see also* Exhibit 2. The Class Notice, issued shortly thereafter, notified potential Class Members of, among other things: (i) the Action pending against Defendants; (ii) the Court's certification of the Action to proceed as a class action on behalf of the Court-certified Class; and (iii) their right to be excluded from the Class, the effect of remaining in the Class or requesting exclusion, and the requirements for requesting exclusion.

determine possible defenses based on a given class member's knowledge of, and reliance on, the false statements issued.

273.    Strongly opposing this application, Class Counsel argued, *inter alia*, that their request was untimely and improper, not directly relevant to common questions, and necessary at trial for issues common to the certified class. Class Counsel filed a 10-page, single spaced letter brief opposing Defendants' novel request on February 15, 2016. ECF No. 453. On February 18, 2016, Defendants filed a 3-page single spaced reply letter brief in further support of their request for an order permitting interrogatories directed to Class members. ECF No. 460.

274.    Finding that none of the relevant considerations weighed in favor of granting Defendants' request to serve 10 interrogatories on absent class members, the Court issued a Memorandum Order denying Defendants' request on February 21, 2016. ECF No. 462.

### B.    Class Counsel Opposed Defendants' Rule 23(f) Interlocutory Appeal

#### 1.    The Petition

275.    On February 16, 2016, while in the middle of fact witness depositions (most deposed in Portuguese) and just weeks after the "substantial completion date" of document discovery, Defendants filed a petition with the Second Circuit Court of Appeals seeking leave under Fed. R. Civ. P. 23(f) for an interlocutory appeal of the Class Certification Order. They presented two questions: "Whether this Court should review the district court's certification of a multi-year investor class seeking billions of dollars in damages in connection with purchases of a foreign issuer's non-exchange traded globally offered notes where the location of each purchase raises individualized issues that defeat ascertainability, predominance, and superiority", and "Whether this Court should review the district court's erroneous determination that Plaintiffs satisfied their evidentiary burden to invoke the *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)

presumption of reliance." The petition was supported by a 20-page brief that attached eight exhibits totaling 300 pages.

276.    Just ten days later, on February 26, 2016, Plaintiffs responded to Defendants' Rule 23(f) petition arguing, *inter alia*, that: (i) the Class Certification Order raises no novel issues about the proper identification of Class Members; and (ii) the finding that Petrobras' securities traded in an efficient market did not require review. Plaintiffs' filing was supported by a 20-page brief attaching two volumes of exhibits totaling over 400 pages.

277.    On March 7, 2016, pursuant to Fed. R. App. P. 27, Defendants requested leave to file a reply brief in support of their petition. Neither the Federal Rules of Appellate Procedure nor Second Circuit rules explicitly address the filing of a reply in support of a Rule 23(f) petition. Just one week later, on March 14, 2016, Plaintiffs opposed Defendants' motion for leave to file a reply. On March 18, 2106, Defendants filed a reply brief in further support of their motion for leave to file a reply brief in support of their Rule 23(f) petition. Throughout this process, the Parties submitted initial and responsive letters before the Clerk of Court for the Second Circuit pursuant to Fed. R. App. P. 28(j) to apprise the Court of pertinent authority with respect to the Rule 23(f) petition.

278.    On June 15, 2016, the Second Circuit granted the petition for leave to appeal the Class Certification Order pursuant to Fed. R. Civ. P. 23(f), ordered that the appeal be expedited, and set the following schedule: (i) Defendant's (appellant) brief must be filed on or before July 21, 2016; (ii) Plaintiffs (appellees) brief must be filed on or before August 25, 2016, and (iii) any reply papers must be filed on or before September 8, 2016.

### 2.    Class Counsel Opposed Defendants' Stay Motion

279.    On June 22, 2016, just two days after summary judgment motions were filed and following a pre-motion call with the Court, Defendants submitted a two-page, single-spaced letter

requesting an order staying the trial and pre-trial proceedings in the Action pending the Second Circuit's decision on Defendants' interlocutory appeal of the Class Certification Order. ECF No. 625. On the same day, Class Counsel submitted a two-page, single-spaced letter opposing Defendants' requested stay order. ECF No. 626. In a 9-page Memorandum Order issued June 24, 2016, the Court found that certain factors weighed against granting a stay, concluding that the balance of hardships did not tip in favor of Defendants. ECF No. 623.

280.    On June 28, 2016, one day after exchanging briefs and thousands of pages of supporting material in connection with summary judgment motions, the Defendants filed an emergency motion with the Second Circuit to stay the proceedings pending consideration of their appeal of the Class Certification Order, filing a 19-page brief attaching ten exhibits totaling 80 pages. Plaintiffs opposed imposition of an emergency stay on July 8, 2016, filing a 28-page brief supported by nine exhibits totaling 300 pages. On July 15, 2016, Defendants filed an 11-page reply brief in further support of their motion to stay the district court proceeding, attaching 70 exhibits.

281.    On July 12, 2016, just six days before Plaintiffs were to oppose Defendants' six motions for summary judgment, Circuit Judge Peter W. Hall referred Defendants' motion for a stay to the three-judge panel sitting on July 26, 2016, but granted a temporary stay pending determination of the stay motion by the panel.

282.    On August 2, 2016, Circuit Judges José A. Cabranes, Susan L. Carney, and Christopher F. Droney granted Defendants' motion for a stay pending an expedited interlocutory appeal under Fed. R. Civ. P. 23(f). While the case remained stayed at the District Court, Plaintiffs and Class Counsel continued to zealously represent the Class before the Second Circuit and the Supreme Court of the United States.

### 3.      Rule 23(f) Briefing and Oral Argument

283.    On July 21, 2016 (the first day of Plaintiffs' mock trial), the Petrobras Defendants filed a 57-page opening appellate brief with the Second Circuit that presented the following two issues:

(a)      Whether the District Court erred in holding that Plaintiffs satisfied their evidentiary burden to invoke the presumption of reliance under *Basic*, 485 U.S. 224, in the absence of empirical evidence showing a cause and effect relationship between news and directionally appropriate stock price movement on particular days, and in the face of evidence that Petrobras Securities did not trade in efficient markets. *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2408 (2014) ("*Halliburton II*").

(b)      Whether the District Court erred in certifying investor classes seeking billions of dollars in damages in connection with purchases of a foreign issuer's non-exchange-traded globally offered notes, where the required existence of domestic transactions raises numerous individual issues of fact that defeat ascertainability, predominance, superiority, and due process. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012).

284.    On the same day, the Underwriter Defendants filed a 39-page brief that presented the following issues:

(a)      If the extraterritorial reach of such a class is limited only by the phrase "in domestic transactions," is the class ascertainable;

(b)      Do questions of law or fact common to Class Members predominate over questions concerning the "domestic" nature of transactions, which must be resolved on an individual basis; and

(c)      Is a class action in this circumstance superior to other available methods for fairly and efficiently adjudicating the controversy.

285.   Defendants also filed a 7,446-page, 32-volume Joint Appendix that Class Counsel helped compile in early July in anticipation of opposing Defendants' Rule 23(f) interlocutory appeal.

286.   On August 25, 2016, Plaintiffs filed a 59-page brief arguing that the District Court correctly certified an ascertainable class that was administratively feasible and had dutifully followed *Halliburton II* when finding market efficiency. Plaintiffs also filed a 7-volume Supplemental Appendix totaling over 1,250 pages in support of Plaintiffs' opposition to the Rule 23(f) appeal. On September 8, 2016, the Petrobras Defendants filed, under seal, a 29-page brief, and the Underwriter Defendants filed a 29-page brief responding to Plaintiffs' opposition.[49]

287.   On November 2, 2016, Circuit Judges Peter W. Hall and Deborah Ann Livingston, and Judge Nicholas G. Garaufis (of the United States District Court for the Eastern District of New York, sitting by designation) heard approximately 50 minutes of oral argument.[50]

288.   On July 7, 2017, the Second Circuit vacated parts of the Class Certification Order. *In re Petrobras Sec. Litig.,* 862 F.3d 250, 257 (2d Cir. 2017). Notably, however, the Second Circuit found the classes here were ascertainable and squarely rejected Defendants' invitation to adopt the heightened ascertainability requirement promulgated by the United States Court of Appeals for the Third Circuit in *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349 (3d Cir. 2013), which would have required Plaintiffs to demonstrate at the class certification stage that determining membership in a

---

[49]   The importance of the Class Certification Order and issues on appeal is underscored by the many *amicus curiae* briefs filed in the Circuit, including by the National Conference on Public Employee Retirement Systems, State Board of Administration of Florida, U.S. Chamber of Commerce, Securities Industry and Financial Markets Association, Depository Trust Company, Associacao Brasileira de Bancos Internacionais, and many prominent law professors.

[50]   After the oral argument and before the Court's Opinion on July 7, 2017, the parties sent several letters to the Court pursuant to Fed. R. App. P. 28(j) to provide supplemental authority relevant to the issues presented for consideration by the Court. *See* App. Dkt. Nos. 312, 314, 316, 319-20.

class is "administratively feasible." *In re Petrobras*, 862 F.3d at 265. Nevertheless, it vacated the Class Certification Order because the District Court had not evaluated the effect of the *Morrison* inquiry on Rule 23(b)(3)'s predominance requirement and observed that "the investigation of domesticity" required when deciding whether a purchase of Petrobras securities was domestic might "be an 'individual question.'"  *Id*. at 272. The Court expressly took no position "as to whether, on remand, the District Court might properly certify one or more classes that capture some or all of the securities holders who fall within the Classes as currently defined." *Id*. at 274.

289.    On the issue of market efficiency, the Second Circuit also refused to adopt a requirement, urged by Defendants, that all securities class action plaintiffs seeking class certification prove through direct evidence (*i.e*., via an event study) that the prices of the relevant securities moved in a particular direction in response to new information. *Id.* at 277. The Second Circuit rejected the notion that complicated event studies be submitted by plaintiffs at the class certification stage, agreeing with Plaintiffs that "event studies offer the seductive promise of hard numbers and dispassionate truth, but methodological constraints limit their utility in the context of single-firm analyses."[51]  *Id.* at 278. The Second Circuit left open the question as to whether market efficiency could be satisfied in the absence of any event study.

290.    The impact of the precedent set by Petrobras was demonstrated when the Second Circuit handed another significant win to plaintiffs in *Waggoner v. Barclays PLC* (also argued by Class Plaintiffs) where, building on its decision in Petrobras, it held that "direct evidence of price impact . . . is not always necessary to establish market efficiency and invoke the Basic presumption" of reliance. *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017). Importantly, the Second Circuit also held that defendants seeking to rebut the presumption of reliance must do

---

[51]     On August 24, 2017, the Second Circuit denied Defendants' petition for rehearing en banc.

so by a preponderance of the evidence rather than merely meeting a burden of production. *Id.* at 101. The Second Circuit's decisions in Petrobras, following by Barclays, are seminal decisions which will form a critical part of class action jurisprudence for decades to come.

### C.     Class Counsel Opposed Defendants' Petition for Certiorari to the United States Supreme Court

291.    On November 1, 2017, Defendants filed a 41-page petition for a writ of certiorari with the Supreme Court of the United States. According to the petition, the Second Circuit decision raised two recurring issues of importance under the federal securities laws and the law governing class actions, on which Defendants asserted the lower courts are deeply divided: (1) the proof required to establish a presumption of reliance in securities fraud cases under *Basic*, 485 U.S. 224 and *Halliburton II*, 134 S. Ct. 2398; and (2) the requirement that class membership be ascertainable through administratively feasible means under Rule 23 of the Federal Rules of Civil Procedure. Defendants asserted the rulings would have a significant impact on the global financial markets, the ability of issuers to utilize those markets, and the due process rights of both plaintiffs and defendants in federal class actions.

292.    On November 14, 2017, Plaintiffs filed a 35-page brief in opposition to Defendants petition, arguing that neither of the two questions presented warranted review. Specifically, Defendants did not identify a circuit conflict on the narrow question they presented about the presumption of reliance under *Basic*, 485 U.S. 224, and that no Court of Appeals has adopted "directionality" as a prerequisite to showing market efficiency. Plaintiffs likewise argued that there is no split among the Circuits regarding the degree of ascertainability required under Rule 23, and as the Second Circuit explained, there is "growing consensus" on "ascertainability" and its role

under Rule 23. On November 27, 2017, Defendants filed a 14-page reply brief in further support of their petition for a writ of certiorari.[52]

293.    On November 29, 2017, Defendants' petition for a writ of certiorari was scheduled to be distributed for conference on January 5, 2018. Two days before, on January 3, 2018, after more than three-years of hard fought litigation, and having finally reached settlement terms as memorialized in the MOU executed December 31, 2017, the Parties filed a joint motion to defer consideration of the petition.

## IV.    THE PROPOSED SETTLEMENTS

294.    The combined recovery from the proposed settlements is $3 billion. As set forth more fully below, the Petrobras and Underwriter Defendants Settlement ($2.95 billion to be paid by Petrobras) and the PwC Brazil Settlement ($50 million) achieved in this case (together, the "Settlements") were the result of arms-length negotiations, by fully informed Plaintiffs and Class Counsel, overseen by Judge Phillips.

295.    The Settlement provides members of the Class with an immediate cash benefit and eliminates the significant risk of taking this Action to trial. For the reasons set forth herein and in the memorandum in support of the final Approval Motion, Class Counsel respectfully believes that the proposed Settlements are fair, reasonable, and excellent results for members of the Settlement Classes considering the risk of recovering nothing or less than the Settlement Amounts after substantial delay.

---

[52]    Further underscoring the importance of the Class Certification Order and issues on appeal, *amicus curiae* briefs were filed by the Securities Industry and Financial Markets Association, Associacao Brasileira de Bancos Internacionais, various "Financial Economists and Legal Scholars" and two law professors.

A.      **Petrobras Defendants and Underwriter Defendants Settlement**

1.      **Negotiations of the $2.95 billion Settlement**

296.    The process of achieving the $2.95 billion settlement was long and arduous.
Beginning on December 10, 2015, and continuing through the Settlement Date, Class Counsel and
counsel for the Petrobras Defendants participated in five face-to-face mediation sessions in New
York City (punctuated throughout by countless conferences by telephone) before Judge Phillips.
These sessions at times included presentations by counsel and consulting experts, and were all
attended by Jeremy Hill (and often Juan Perez Tejedor) from USS, as well as executives from
Petrobras.

297.    Judge Phillips is a former Assistant United States Attorney in the Central District
of California, who then served as United States Attorney in the Northern District of Oklahoma. He
was subsequently appointed and served as a United States District Judge for the Western District
of Oklahoma for four years. In 1991, he resigned from the federal bench and joined Irell & Manella
LLP. The majority of Judge Phillips' professional time at Irell & Manella was devoted to serving
as a mediator and arbitrator in connection with large, complex cases like this one. In 2014, Judge
Phillips opened his own mediation firm, Phillips ADR Enterprises. He has been nationally
recognized as a mediator by the Center for Public Resources Institute for Dispute Resolution
("CPR"), serving on CPR's National Panel of Distinguished Neutrals. By way of example, Judge
Phillips served as mediator for *In re Bank of America Securities Litigation*, 09-MDL-2058
(S.D.N.Y) ($2.425 billion cash settlement); *Household International, Inc.*, 02-C-5893 (N.D. Ill.)
($1.575 billion cash settlement); *In re Citigroup, Inc. Bond Litigation*, Master File No. 08-cv-9522
(S.D.N.Y.) ($730 million in cash settlement); *In re Lehman Brothers Equity/Debt Securities
Litigation*, 09-md-2017 (S.D.N.Y.) ($516,218,000 combined cash settlement), among other high

profile securities class actions. A detailed account of the mediation and settlement process is set forth in the accompanying Declaration of Layn R. Phillips, annexed hereto as Exhibit 11.

298.    For more than two years, the parties remained far apart in their respective positions, with a number of mediation sessions being aborted well before 5:00 p.m. on any given day, including the last mediation session held on August 1, 2017 (a day before the discovery stay) due to the wide chasm between the respective parties' positions. After the Second Circuit stayed the Action, meaningful settlement negotiations then stalled during the Rule 23(f) appeal. Not until late September 2017, after the Second Circuit issued the Opinion on the Class Certification Order and with the prospect of a potential trial date soon, did negotiations begin again in earnest.

299.    After heated negotiations on New Year's Eve (which occurred on a Sunday), Plaintiffs and the Petrobras Defendants finally reached an agreement in principle at 8:40 p.m. (eastern) to settle for $2.95 billion in cash, culminating in an executed MOU on December 31, 2017. Following execution of the MOU, Class Counsel and the Petrobras Defendants negotiated the specific terms of the $2.95 billion Settlement, as set forth in the Stipulation and related exhibits.

## 2.    Petrobras and Underwriter Stipulation

300.    Pursuant to the Stipulation dated February 1, 2018, in full and complete settlement of the Settled Claims (as that term is defined in ¶ 1.zz of the Stipulation), the Petrobras Defendants paid into the Escrow Account nine hundred eighty three million dollars ($983,000,000.00), and shall pay nine hundred eighty three million dollars ($983,000,000.00) within ten (10) days of entry of the final approval by the Court of the Settlement; and nine hundred eighty four million dollars ($984,000,000.00) within six (6) months of final approval by the Court of the Settlement or by January 15, 2019, whichever is later, subject to the terms and conditions of the Stipulation.

301.    The "Exchange Act Class" is defined as all Persons who between January 22, 2010 and July 28, 2015 (inclusive), purchased or otherwise acquired Petrobras Securities, including debt

securities issued by PIFCO and/or PGF, on the New York Stock Exchange or pursuant to other Covered Transactions.[53]

302.    The "Securities Act Class" is defined as all Persons who purchased or otherwise acquired debt securities issued by Petrobras, PIFCO, and/or PGF, in Covered Transactions, directly in, pursuant to, and/or traceable to, a May 13, 2013 public offering and/or a March 10, 2014 public offering registered in the United States.  Such purchases must have been made before Petrobras generally made available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the offerings (August 11, 2014 in the case of the May 13, 2013 public offering and May 15, 2015 in the case of the March 10, 2014 public offering).

303.    Both the Exchange Act and Securities Act Classes exclude Defendants, current or former officers and directors of Petrobras, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which Defendants have or had a controlling interest, and any Persons who have been or subsequently are the subject of a final judgment convicting them of a criminal or civil offense related to corruption under the laws of Brazil, or under the United States Code, arising out of or relating to conduct related to the allegations asserted in the Action.

304.    The Petrobras Settlement will release the "Settled Claims," as defined in ¶ 1.zz of the Stipulation, against the "Released Parties."  The Released Parties, as defined in ¶ 1.vv of the

---

[53]    "Covered Transaction" means any transaction that satisfies any of the following criteria: (i) any transaction in a Petrobras Security listed for trading on the New York Stock Exchange ("NYSE"); (ii) any transaction in a Petrobras Security that cleared or settled through the Depository Trust Company's book-entry system; or (iii) any transaction in a Petrobras Security to which the United States securities laws apply, including as applicable pursuant to the Supreme Court's decision in *Morrison*. Excluded from the definition of Covered Transaction are purchases of any Petrobras Security on the BOVESPA. *See* Stipulation at ¶ 1.j.

Stipulation, include Petróleo Brasileiro S.A.– Petrobras, Petrobras Global Finance B.V., Petrobras America Inc., Petrobras International Finance Company, BB Securities Ltd., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Itaú BBA USA Securities, Inc., Morgan Stanley & Co. LLC, HSBC Securities (USA) Inc., Mitsubishi UFJ Securities (USA), Inc. (n/k/a MUFG Securities Americas Inc.), Merrill Lynch, Pierce, Fenner & Smith Incorporated, Standard Chartered Bank, Bank of China (Hong Kong) Limited, Banco Bradesco BBI S.A., Banca IMI S.p.A. Scotia Capital (USA) Inc., Banco Votorantim Nassau Branch, Santander Investment Securities Inc., Almir Guilherme Barbassa, Jose Carlos Cosenza, Paulo Roberto Costa, Renato de Souza Duque, Guilherme de Oliveira Estrella, Maria das Graças Silva Foster, Jose Miranda Formigli Filho, José Sergio Gabrielli, Silvio Sinedino Pinheiro, Daniel Lima de Oliveira, José Raimundo Brandão Pereira, Sérvio Túlio da Rosa Tinoco, Paulo Jose Alves, Gustavo Tardin Barbosa, Alexandre Quintão Fernandes, Marcos Antonio Zacarias, Cornelis Franciscus Jozef Looman, Theodore M. Helms, Josue Christiano Gomes da Silva, Mariângela Monteiro Tizatto, PwC Brazil, and any other Person that is or has been at any time a defendant in this Action.[54]

305.   The Stipulation provides that the Petrobras Defendants shall have, in their sole and absolute discretion, the option to terminate the Stipulation if members of the Settlement Class that, in the aggregate, have transactions resulting in Recoverable Losses (as defined in the Plan of Allocation) equal to or greater than 5% of the class damages estimated by Dr. Blaine Nye (or $831,740,713), validly request exclusion from the Settlement Class. The filed Individual Actions

---

[54]   "Non-Released Individual Defendants", as defined in ¶ 1.cc of the Stipulation, includes Paulo Roberto Costa, Renato de Souza Duque, and any other individual who has been or subsequently is the subject of a final judgment convicting them of a criminal or civil offense related to corruption under the laws of Brazil, or under the United States Code, arising out of or relating to conduct concerning the allegations asserted in the Action.

are not included in this calculation. Based on the exclusions received to date, it appears that the Recoverable Losses for those requesting exclusion are well below $1 million.

### B.    PwC Brazil Settlement

#### 1.    Negotiations of the $50 million Settlement

306.    On the heels of the Court's May 5, 2016 Memorandum Order denying Plaintiffs' request to amend the Fourth Amended Complaint to reassert Exchange Act claims against PwC Brazil, counsel for Plaintiffs and PwC Brazil began settlement discussions. The Parties' respective positions were further influenced by the arguments set forth in their respective cross-motions for summary judgment filed June 27, 2016. On July 8, 2016, Class Counsel for Plaintiffs and PwC Brazil participated in a day-long mediation session with Judge Phillips, exchanging in advance detailed mediation statements setting forth their respective positions.

307.    On August 2, 2016, the same day that the Second Circuit stayed this Action, the parties executed an MOU settling the claims against PWC Brazil. The parties executed a Stipulation of Settlement dated November 30, 2017. To conform to the terms set forth in the February 1, 2018 Settlement Stipulation with the other defendants, Plaintiffs and PwC Brazil, through their respective counsel, entered into an Amended Stipulation and Agreement of Settlement (the "PwC Brazil Stipulation").

#### 2.    PwC Brazil Stipulation

308.    Pursuant to terms of the PwC Brazil Stipulation, and in full and complete settlement of the Released Claims (as defined below) which were or could have been asserted in this Action against PwC Brazil, PwC Brazil has paid $50 million cash into escrow on behalf of Plaintiffs and the Settlement Class.

309.    The PwC Brazil Settlement will release the "Settled Claims" (as defined in ¶ 1.tt of the    PwC    Brazil    Stipulation),    including    Unknown    Claims    (as    defined    in

¶ 1.lll), (a) alleged or which could have been alleged by Class Representatives or Settlement Class Members in the Action, or (b) that have been, could have been, or in the future can or might be asserted in any federal, state or foreign court, tribunal, forum or proceeding against PwC Brazil or against any other of the PwC Released Parties, arising out of or relating in any manner to the Action or the allegations, claims, defenses, and counterclaims asserted in the Action, including Claims relating to any audits or reviews of any of the financial statements of Petrobras and Claims relating to the Petrobras securities described herein, except for claims to enforce the Settlement, whether arising under state, federal, or common law.

310.   "PwC Released Parties" means each of the following: (a) PwC Brazil and all past and present partners and employees; (b) PricewaterhouseCoopers LLP, and all past and present partners and employees; and (c) any entity or partnership (whether or not incorporated) which carries on business under a name which includes all or part of the PricewaterhouseCoopers name or is otherwise (directly or indirectly) within the worldwide network of PricewaterhouseCoopers firms, including PricewaterhouseCoopers International Limited and any member firm, network firm, specified subsidiary or connected firm of PricewaterhouseCoopers International Limited, and the respective past and present partners and employees of all of the foregoing.[55]

### C.   Three Institutional Plaintiffs Endorse the Settlements

311.   The three institutional Plaintiffs (USS, North Carolina and Hawaii) fully endorse and support the Settlement. *See* declarations submitted on their behalf attached hereto as Exhibits 12 through 14. Based on their collective experience in the prosecution of complex securities

---

[55]      Also included are the present and former family, heirs, principals, owners, trustees, trusts, executors, administrators, predecessors, successors, assigns, members, agents, subsidiaries, employees, associates, officers, managers, directors, general partners, limited partners, bankers, attorneys, accountants, auditors, representatives, estates, divisions, advisors, estate managers, indemnifiers, insurers, and reinsurers of each of the PwC Released Persons.

litigation and close knowledge of the facts and applicable law, as well as their understanding of the risks involved in taking an action such as this Action to trial and overcoming the various defenses Defendants would likely assert which, if accepted by a jury, would substantially reduce or eliminate altogether the amount of damages for which Plaintiffs allege Defendants are liable (*see* Sections IV.E below), Class Counsel recommended and the Plaintiffs determined that the settlement was in the best interest of the Class.

### D. Both Settlements Represent an Excellent Result Not Subject to "Pocket Shifting" or "Circularity" Critiques

312. The settlements are also fair because there is minimal or no issue of "circularity" or "pocket shifting" that some commentators have criticized with respect to certain securities class action settlements–*i.e.* that some securities class actions added little economic value to class members because investors benefiting from a recovery are the same owners of the company merely paying themselves, with attorney fees and costs essentially serving as a tax on investors.[56]  First, such criticisms are largely philosophical in nature. The law universally recognizes that the shareholder and corporation are distinct legal entities, with different rights and duties, and there is simply no change in that relationship when it comes to shareholder litigation. As such, there should be no challenge to a shareholder trying to maximize his or her recovery in a securities class action. Second, there is no academic or statistical evidence demonstrating that an outstanding recovery on behalf of a Class (as was accomplished here) is harmful to share price. In most cases, when a class action settlement is achieved, the stock of a company either increases, because the elimination of

---

[56]      *See*, *e.g.*, John C. Coffee, Jr., *Symposium: Litigation Reform Since the PSLRA: A Ten-Year Retrospective: Panel One: Private Securities Litigation Reform Act: Reforming the Securities Class Action: An Essay on Deterrence and its Implementation*, 106 Colum. L. Rev. 1534, 1556-59 (2006) (explaining the distinctions between different types of wealth transfers between shareholders in securities class actions).

risk to the Company, or is not impacted. That is precisely what occurred here. On January 3, 2018, the first day of trading after the precedent setting $2.95 billion settlement with Petrobras was achieved, Petrobras' share price increased by 2.5%, hardly harming current shareholders of the Company. Even more significant, the speculative concerns raised by academics with respect to "circularity" are simply not the concern of a securities class action litigant or its counsel. Rule 23 and the PSLRA vest a Lead Plaintiff and Class Counsel with one mandate in a securities class action: to maximize recovery for investors. They simply have no duty, and likely no right, to weigh any other consideration with respect to the impact of their lawsuit on Defendants.

313.    With that said, such "circularity" concerns are simply not present here. First, according to publicly available data, of all the institutional investors (which consist of a significant majority of Petrobras ADR holders) that held Petrobras ADRs as of 9/30/14, the quarter just before the first corrective disclosure identified by Plaintiffs' damages expert, only 58% also held shares as of December 31, 2017. Thus, approximately 42% of all Class Period institutional investors cannot even be arguable harmed by the Petrobras Settlement. Moreover, with respect to the ADRs held by institutional investors as of December 31, 2017, 89% were purchased after September 30, 2014, *i.e.*, after the share prices became depressed from the revelation of the fraud, with the share price reflecting the risk of this lawsuit on Petrobras. As such, virtually every current Petrobras ADR holder cannot credibly complain that it has been harmed by the Settlements of this Class Action.

314.    Moreover, even assuming every Class Member currently retained its Petrobras ADRs and Notes (which they clearly did not), the composition of Petrobras securities holders would negate any "circularity" concern. According to publicly available data, during the Class Period, common and preferred ADRs represented only 19% of the total common and preferred

stock outstanding at Petrobras. Sixty-four percent are owned by either the Brazilian government or government related entities, with the remaining securities held by purchasers on the BOVESPA. Thus, with respect to ADR holders, it is 81% of the shareholders (most of which is the Brazilian government, whose leaders played a significant role in the fraud) paying a much smaller percentage (19%) of ADR holders.

315.   Moreover, the pocket-shifting critique is wholly inapplicable to Petrobras Noteholders, representing approximately 20-25% of total damages according to Plaintiffs' damages experts, insofar as they are creditors and not owners of Petrobras. Concerns of pocket-shifting or circularity simply do not apply to creditors who purchased debt instruments. And lastly, the $50 million settlement achieved with PWC Brazil is a clear added value benefit to Class Members.

### E.    Risks of Continued Litigation

316.   At the time the Settlements were reached, Plaintiffs and Class Counsel had a thorough understanding of the strengths and weaknesses of the Action. While Plaintiffs and Class Counsel believe that the claims asserted against the Defendants have merit, they also recognize that there were considerable risks involved in pursuing the Action against the Defendants through trial and beyond. Even though Plaintiffs had prevailed at the motion to dismiss stage on certain of their fraud claims under Section 10(b) of the Exchange Act and negligence claims under Section 11 of the Securities Act, Plaintiffs faced a substantial risk that a Court or jury would rule against Class Plaintiffs on key elements of their claims, as set forth below.

### 1.    Risk Concerning Loss Causation and Damages

317.   As referenced above, Plaintiffs took a peculiarly aggressive stance towards establishing damages in this case. First, they alleged a disclosure period spanning from October 16, 2014 through July 28, 2015. This was more than double the disclosure period alleged in the

Individual Actions, which ended their disclosure periods in February and March 2015. Moreover, Class Plaintiffs alleged an unprecedented 85 corrective disclosures in the Third Consolidated Amended Complaint, compared to the disclosures alleged in most the Individual Actions (*see* Exhibit 4), with Class Plaintiffs' expert affirmatively opining on 21 of these disclosures as corrective. Class Counsel is unaware of any securities class action since the passage of the PSLRA where a plaintiff has alleged anything approximating 85 corrective disclosures, and Class Plaintiffs' damages expert is not aware of any case where an expert has affirmatively opined on 21 corrective disclosure dates. *Compare In re Cendant Corp.*, 264 F. Supp. 2d 201, 221-22 (3d Cir. 2001) (3 corrective disclosures); *Tyco*, 535 F. Supp. 2d at 260 (8 corrective disclosures); *Enron*, 529 F. Supp. 2d 644, 713, 743, 755 (S.D. Tex. 2006) (4 corrective disclosures); *In re Worldcom, Inc. Sec. Litig.*, No. 02-cv-3288 (DLC) (S.D.N.Y. Aug. 1, 2003) (First Amended Class Action Complaint at ¶¶ 3, 6, 105, ECF No. 343 (1 corrective disclosure)).

318.    As such, Plaintiffs' expert and the three damages experts designated by the Individual Actions disagreed with each other markedly regarding the inflation in Petrobras ADRs and Notes during the Class Period. While Class Counsel believes that Plaintiffs' damages allegations were eminently reasonable given the unique facts of this case, there is a significant risk that a factfinder would have ultimately agreed with both the Individual Action plaintiffs and Defendants that damages beyond March 2015 were not recoverable, as the market was already aware of the alleged fraud. Moreover, the specter of five competing damages experts opining at trial regarding the proper inflation per share during the Class Period raised a significant risk of hopelessly confusing a factfinder regarding the actual damages suffered by investors and leading the finder of fact to agree with Defendants that there were no recoverable damages in this case.

## 2.    Risk Concerning Class Certification

319.    Plaintiffs' damages expert attributed approximately 25% of the total damages to the Petrobras Notes purchased during the Class Period. Pleading *Morrison's* domestic transaction requirement proved daunting, and while Class Counsel strongly believes that determining whether a member of the Class purchased the relevant notes in a domestic transaction is administratively feasible, and does not raise any predominance concerns, we recognized that there was significant risk that the Supreme Court would grant certiorari and address the issue in a manner that would make it impossible to certify a class including Note purchasers. Moreover, even if the Supreme Court denied Defendants' certiorari petition, this Court may have stricken a significant portion of the Noteholders from the Class definition upon performing the predominance review mandated by the Second Circuit with respect to the *Morrison* issues implicated by the Noteholder transactions.

320.    In addition to the Class Certification risks with respect to the Note purchaser claims, had the Supreme Court granted Defendants certiorari petition, Class Plaintiffs risked the reversal of the Second Circuit's favorable decision regarding whether directionality need be proven in order to establish market efficiency, jeopardizing Class Certification with respect to the ADRs as well.

## 3.    Risk Concerning Scienter

321.    A plaintiff's burden in proving scienter under Section 10(b) of the Exchange Act is a heavy one. "The element of scienter is often the most difficult and controversial aspect of a securities fraud claim." *Fishoff v. Coty Inc.*, No. 09 Civ. 628 (SAS), 2010 WL 305358, at *2 (S.D.N.Y. Jan. 25, 2010) *aff'd*, 634 F.3d 647 (2d Cir. 2011). By preponderance of the evidence, Plaintiffs would have to prove that Defendants knew or were reckless in not knowing that Petrobras' financial statements and statements about internal controls and transparency were false when issued. *See Novak v. Kasaks*, 216 F.3d 300, 311-12 (2d Cir. 2000).

322.    Throughout the course of the litigation, Petrobras has argued strenuously that it is the "victim" of the bribery and kickback scheme perpetrated by outside cartel members and a few rogue executives at Petrobras. While this argument failed at the motion to dismiss stage, it was thereafter wildly successful in Brazil with both regulators and Courts agreeing that Petrobras was indeed a "victim" of the cartel scheme.[57] Defendants were thus armed with a potential "adverse interest" exception to Section 10(b) liability, which holds that the scienter of executives who act adversely to the corporation cannot be imputed to that corporation. Class Plaintiffs believed that there was a very credible argument such an exception did not apply to claims by open market shareholders pursuant to *In re ChinaCast Educ. Comp. Sec. Litig.*, 809 F.3d 471, 477 (9th Cir. 2015), and that the evidence would demonstrate that cooperation with government politicians in executing the bribery scheme was actually advancing the corporate interests of Petrobras at the time.  Still, there is no guarantee that this Court would have adopted the Ninth Circuit's *ChinaCast* decision or that a factfinder would agree that participation in the bribery scheme was not averse to Petrobras' corporate interests.

323.    Indeed, during Plaintiffs' July 21-22, 2016 mock trial, several jurors struggled with finding that Petrobras should be held liable for the misconduct of several employees who, from the jurors' perspective, were stealing from Petrobras. Thus, Class Plaintiffs faced a potentially steep hurdle with respect to scienter.

---

[57]    For example, the CPI's final report concluded that Petrobras was a victim; Judge Moro in several opinions referred to Petrobras as a victim, and Petrobras' website states the following: "The public authorities in charge of the Lava Jato investigation and the Brazilian Supreme Court have acknowledged that Petrobras is a victim of the facts reveled by this investigation.  As a result, the Company has already received approximately R\$ 660 million recovered by the Brazilian authorities from the companies and individuals involved in the illegal acts that harmed Petrobras." *See*, *e.g.*, www.investidorpetrobras.com.br/en/press-releases/clarification-news-1

####     4.     Additional Trial Risk

324.     At the time the agreement-in-principle to settle the action was reached, the Parties had already exchanged-motions for summary judgment, and at one point the case had been just 48 days from trial. While Plaintiffs and Class Counsel believe that the claims asserted against Defendants were strong, we also recognize that there were considerable risks in trying the case.

325.     For example, given the complex nature of the claims, Class Counsel intended to rely heavily on expert opinion concerning materiality, compliance with IFRS, damages and loss causation. To counter this expert testimony, Defendants designated a stunning array of 14 experts that submitted reports to counter Class Plaintiffs' claims. Accordingly, Plaintiffs bore the risk that: (i) the experts could be subject to successful *Daubert* motions prior to trial, permitting little or no expert testimony on these key issues; or (ii) if allowed to testify, a jury would be confused by wading through the twenty-three contradictory expert opinions collectively submitted by Class Plaintiffs, the Individual Plaintiffs, and Defendants.

326.     Plaintiffs also faced risks because of the extraterritorial nature of the Action.  In particular, most of the evidence was located in Brazil, and Petrobras had greater access and ability to influence court proceedings by having itself designated as an "assistant prosecutor" in several of the criminal and regulatory proceedings, providing it with both greater access to documents than Class Plaintiffs, as well as the ability to influence the conduct of proceedings to give them a tactical advantage in the U.S. Courts. Further, most witnesses were located abroad and therefore outside the reach of the Federal Rules of Civil Procedure, like Sá, among others, and thus Petrobras' access to witnesses and potential trial witnesses was extremely asymmetrical compared to Plaintiffs. Because trial requires witnesses, Plaintiffs were disadvantaged because they were forced to present the case mainly through deposition testimony, experts or adverse witnesses. There was no certainty that key witnesses, like Fonseca or Cunha, would have appeared at trial to give live testimony.

327.     Further, in addition to being adversaries, none of the Individual Defendants that Plaintiffs could call at trial had been criminally charged for having participated in the scheme, and to the extent cartel members had provided testimony in Brazil, Defendants were sure to challenge the admissibility of that testimony, particularly on hearsay grounds. While Plaintiffs were prepared to argue that the testimony fell within various hearsay exceptions, including prior testimony because Petrobras had become an "assistant prosecutor" in Brazil to assist in prosecuting cartel members, it is not clear that the testimony taken in Brazil from a non-party would have been deemed admissible. Further, Petrobras had certainly helped to prosecute cartel members in Brazil, and had recovered substantial sums along the way, and such involvement, if presented to the jury, would have played directly into Petrobras' victim defense.

### 5.      Risk of Maintaining a Certified Class Through Trial

328.     Assuming the Supreme Court would not grant certiorari and the case was transferred back to this Court, even if Plaintiffs were successful in yet again obtaining Class Certification from this Court, Defendants would almost certainly again seek a Rule 23(f) interlocutory appeal from decision, injecting further uncertainty, risk, and delay.

### 6.      Risk of Prolonged Appeal

329.     Even if Plaintiffs were successful in obtaining a jury verdict on all or part of their claims, it was a foregone conclusion that a jury verdict would have been just the beginning of a long appellate process. Given the scope of the litigation and many novel issues concerning materiality, damages, and the duties attendant under Sections 10(b) and 11, an arduous appellate process, likely proceeding to the highest review with the possibility of reversal, presented extreme risk to the Class of actual recovery. *Jaffe v. Household Intl. Inc.*, 02-cv-05893 (N.D. Ill. Aug 19, 2002) (commenced in 2002, final judgment entered on October 17, 2013, ECF No. 1898); *In re*

*Vivendi Universal, S.A. Secs Litig.*, 02-cv-05571 (S.D.N.Y. Jul. 18, 2002) (commenced in 2002, final judgment entered December 22, 2014, ECF No. 1231).

### 7.   Risk and Burden of Enforcing Judgment in Brazil

330.   Even if Plaintiffs were successful in obtaining a jury verdict on all or part of their claims, and the verdict survived the inevitable appeals, enforcing the judgment in Brazil would represent yet another obstacle. Based upon legal advice provided by Brazilian counsel, Class Counsel understands that to be enforced in Brazil, a foreign judgment must first be granted recognition by the Superior Court of Justice. *See* Article 963 Brazilian, Code of Civil Procedure and Articles 216-A to 216-N, Rules of Procedure of the Superior Court of Justice.

331.   We further understand that to be enforced, the foreign judgment must comply with the requirements of Article 963 of the Code of Civil Procedure and Articles 216-D and 216-F of the Rules of Procedure of the Superior Court of Justice. Notably, the judgment cannot offend Brazilian res judicata, and that commercial matters decided on foreign judgments that offend Brazilian public policy or national sovereignty are not enforceable in Brazil. That Petrobras is majority-owned by the Brazilian government and that its claims of victimhood appear to have great resonance in Brazil created some concern that enforcing a judgment in Brazil would not be a foregone conclusion, but instead may have been met with many challenges.

## V.   CLASS REPRESENTATIVES' COMPLIANCE WITH THE COURT'S NOTICE ORDER AND CLASS REACTION TO DATE

332.   The Preliminary Approval Order directed that the Notice of (I) Proposed Settlement and Plan of Allocation; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Settlement Notice") be disseminated to the Class, set the deadline for Class Members to submit objections to the

Settlement, the Plan of Allocation and/or the Fee and Expense Application as May 11, 2018, and set a final approval hearing date of June 4, 2018. ECF Nos. 770, 772.

333.    The Preliminary Approval Order authorized Class Counsel to retain GCG as the Claims Administrator in the Action and ordered the mailing of the Court-approved Settlement Notice and Proof of Claim Form (together, the "Notice Packet") to potential Class Members no later than March 14, 2018, and to publish the summary notice by no later than March 10, 2018.

334.    A description of the terms of the Settlements and the proposed Plan of Allocation are set forth in the Settlement Notice, which also provides potential Class Members with, among other things, a description of their right to object to any aspect of the Settlement, the Plan of Allocation, and/or Class Counsel's request for an award of attorneys' fees and reimbursement of Litigation Expenses and the manner for submitting a Proof of Claim Form in order to be eligible to receive a payment from the Settlement. The Settlement Notice informs Class Members of Class Counsel's intention to apply for an award of attorneys' fees in an amount not to exceed $285,000,000 and for reimbursement of no more than $18,000,000 for litigation expenses paid or incurred in connection with the prosecution and resolution of the Action, as well as Plaintiffs' application for a compensatory award not to exceed $400,000.

335.    Further, as set forth in the Affidavit of Niki L. Mendoza (attached as Exhibit 2 hereto), pursuant to this Court's May 9, 2016 Memo Endorsement on Notice of Pendency of Class Action (ECF No. 589), GCG was retained by Class Counsel to mail the Notice of Pendency of Class Action (the "Notice of Pendency") to potential class members. GCG commenced the mailing of the Notice of Pendency on May 18, 2016, and, as of March 13, 2018 (the day prior to the Mailing Date of the settlement Notice), GCG had mailed a total of 684,448 Notices of Pendency to potential class members and nominees by first-class mail (the "Pendency Mailing").

336.    Pursuant to the Preliminary Approval Order, beginning on March 14, 2018, GCG mailed the long-form Notice (the "Notice" or "Long-Form Notice"), Request for Exclusion Form (the "Exclusion Form"), and Proof of Claim and Release (the "Claim Form" and, collectively with the Notice and Exclusion Form, the "Notice Packet") to potential class members.

337.    As detailed below, contact information for potential class members was obtained from numerous sources, including: (a) contact information obtained in connection with the dissemination of the Notice of Pendency that was sent during the Pendency Mailing; (b) contact information provided by Petrobras' counsel; and (c) contact information provided by brokers, nominees, and others who received the Notice pursuant to GCG's outreach to those listed on GCG's proprietary list of the largest and most common U.S. and international brokers and nominees. Specifically, in connection with the Pendency Mailing, GCG received names and mailing addresses for 645,693 potential class members which were loaded into the database established for this action.

338.    On March 1, 2018, Petrobras' counsel circulated lists containing 2,401 additional unique names and addresses. On March 14, 2018, Notice Packets were disseminated by first-class mail to each of the 2,401 potential class members. On March 5, 2018, Petrobras' counsel circulated a list of 64 additional investors which did not contain address information. GCG researched these entities against its Settlement Database and determined that 36 of them were already included in GCG's Settlement Database, and therefore were already scheduled to and did get sent the Notice Packet on March 14, 2018, as noted above. For the 28 newly identified investors that were not already in GCG's Settlement Database, GCG performed independent research to obtain mailing addresses. GCG subsequently disseminated Notice Packets by first-class mail to each of the 28 newly identified investors, to a total of 36 potential addresses, for which addresses could

reasonably be located. On March 14, 2018, GCG disseminated a total of 686,203 Notice Packets by first-class mail.

339.     As of April 13, 2018, pursuant to the same Order, (a) GCG has mailed an aggregate of 1,053,850 Notice Packets to potential Settlement Class Members and nominees by first-class mail; (b) the Summary Notice has been widely disseminated through a plethora of domestic and international publications; and (c) copies of the Long-Form Notice (in English, Portuguese, Chinese – Simplified, Dutch, French European, German, Japanese, and Spanish – Universal), Summary Notice (in English, Portuguese, Chinese – Simplified, Dutch, French European, German, Japanese, and twenty-three additional languages) and Claim Form, as well as copies of the Stipulation, Amended Stipulation (with PwC Brazil), and the Preliminary Approval Order were posted on the settlement website: www.petrobrassecuritieslitigation.com. *See* Affidavit of Niki L. Mendoza (of Garden City Group, LLC ("GCG")) Regarding Class Notice and Objections and Exclusion Requests Received to Date ("Mendoza Aff.") attached hereto as Exhibit 2, at ¶¶ 8-25.

340.     GCG has also caused the publication of the Summary Notice in all of the publications spanning several dozens of countries as required by paragraph 21 and Exhibit B-3 to the Petrobras Stipulation, with the handful of limited exceptions as explained in the Mendoza Affidavit. *See id*. In total, GCG has caused 139 publications of the Summary Notice in a total of 99 different publications, in 33 countries/regions, and in 31 languages. The details of the publication dates, number of insertions, and publication frequency for the relevant publications are set forth on the table at Exhibit 3 attached to the Mendoza Affidavit.

341.     As of April 13, 2018, Class Counsel has received only 280 requests for exclusion, which represent fewer than 47,000 shares of common ADSs purchased during the class period, fewer than 4,800 purchased outside of the class period, and $15,000 USD Notes. Class Counsel is

informed that this is an extremely small fraction of the hundreds of thousands of total estimated Class Members, and of the 1.5 billion plus ADS's traded during the class period. Notably, there were no institutional investors who have requested exclusion as of April 13, 2018, other than one institutional investor that did not provide the required transactional information. *See* Exhibit 2 (Mendoza Aff.).[58]

342.    The Court-ordered deadline for Class Members to file objections to the Settlements, the Plan of Allocation and/or the Fee and Expense Application or to request to opt back into the Class is May 11, 2018. To date, GCG has received no objections to the Settlement or Fee and Expense Application from Class Members.[59]

## VI.    PLAN OF ALLOCATION

343.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who wish to participate in the distribution of the Settlement Fund must submit a valid Claim Form and all required information that is postmarked no later than June 9, 2018. As set forth in the Notice, after deducting all appropriate taxes, notice, and administrative costs, and Court-approved attorneys' fees and litigation expenses, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to a plan of allocation approved by the Court.

344.    If approved by the Court, the proposed Plan of Allocation set forth in the Notice will govern how the Net Settlement Fund will be distributed among the Settlement Class Members who submit timely and valid Claim Forms (the "Authorized Claimants"). Class Counsel developed

---

[58]    As the deadline for submitting objections has not passed, Class Counsel will address all objections in reply papers to be filed with the Court on May 25, 2018.

[59]    GCG received from Class Counsel a copy of a letter dated January 8, 2018, that was received by the Court from an individual who disagrees with the large amount of the settlement. There is no indication that the individual is a class member.

the Plan of Allocation in consultation with Plaintiffs' damages expert based upon the contents of

his expert loss causation and damages report submitted on May 6, 2016 and believes that the Plan

provides a fair and reasonable method to equitably allocate the Net Settlement Fund among the

Authorized Claimants.

345.    The Plan of Allocation, which is set forth at pages 12-18 of the Notice, was

designed as a method for allocating the Net Settlement Fund among the Authorized Claimants

based on the losses they suffered from the wrongdoing alleged in the Action. As described in the

Notice, the computations under the Plan of Allocation are not intended be estimates of, nor

indicative of, the amounts that Settlement Class Members might have been able to recover at trial.

Instead, the calculations under the plan are merely a method to weigh the claims of Settlement

Class Members against one another for the purposes of making pro rata allocations of the Net

Settlement Fund.

346.    Under the Plan of Allocation, a "Recognized Loss Amount" or "Recognized Gain

Amount" will be calculated for each purchase/acquisition of the relevant securities during the Class

Period that is listed in the Claim Form and for which adequate documentation is provided. The

calculation of Recognized Loss or Gain Amounts will depend upon which securities were

purchased/acquired, when they were purchased/acquired, and in what amounts, and whether the

securities were sold, and if so, when they were sold, and in what amounts. The Plan of Allocation

is structured so that the Net Settlement Fund will be distributed on a pro rata basis to all eligible

Authorized Claimants based on their Class Period purchases/acquisitions of any of the relevant

securities.

347.    Additionally, in the interests of fairness, the Plan of Allocation provides that

Settlement Class Members are eligible to share in the Settlement Fund only to the extent that they

suffered an overall net recognized loss on their purchases/acquisitions of the relevant securities during the Settlement Class Period.

348.     In sum, the Plan of Allocation, which was developed in consultation with Plaintiffs' damages expert, was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the strength of their claims and whether they suffered losses on their transactions in the relevant securities attributable to the alleged wrongdoing. Accordingly, Class Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

## VII.   CLASS COUNSEL'S APPLICATION FOR AWARD OF ATTORNEYS' FEES

349.     In addition to seeking final approval of the Settlement and Plan of Allocation, Class Counsel is making an application to the Court for a collective award of in attorneys' fees in the amount of $284,500,000, reimbursement of $14,515,235.24 in litigation expenses incurred during the Action, and PSLRA awards for the Plaintiffs for the costs they incurred in connection with their representation of the Class in the Action. As discussed below, Class Counsel is applying for a fee amounting to slightly less than 9.5% of the Settlement Amount. It is also submitting the fee application with the prior approval of the Class Representatives. *See* Exhibits 12-14 attached hereto.

350.     The fee application is, in all respects, in accordance with the retainer agreement entered into by Lead Plaintiff and Class Counsel at the outset of the Action. Under the retainer agreement, Class Counsel agreed to undertake the litigation on an entirely contingent basis, meaning that Class Counsel would not be compensated at all, or reimbursed for any litigation expenses incurred on behalf of the Class, unless Class Counsel obtained a recovery for the Class. Significantly, the percentage award agreed upon between Class Counsel and USS was an arms-length negotiation, with USS retaining Keith Johnson, Esq., of Reinhart Boerner Van Dueren, the

former Chief Legal Counsel at the State of Wisconsin Investment Board, who has decades of experience overseeing securities class action litigation. Based upon the advice received by Mr. Johnson, USS rejected Pomerantz's initial fee proposal and instead agreed to the retainer agreement previously submitted to the Court. The retainer agreement provided for a fee percentage that was staggered based upon the recovery achieved. It was also less than half of the fees agreed to by another competing lead plaintiff movant in this Action, and was amongst the lowest fee agreements among all other lead plaintiff movants.

351.    In determining whether a requested award of attorneys' fee is fair and reasonable, district courts are guided by the factors first articulated by the Second Circuit in *City of Detroit v. Grinnell Corp*., 495 F.2d 448 (2d Cir. 1974). As summarized more in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), these factors include:

> (1) The time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50. Based on consideration of each of the foregoing factors as further discussed below, and on the additional legal authorities set forth in the accompanying Fee Memorandum being filed contemporaneously herewith, we respectfully submit that Class Counsel's requested fee should be granted.

### A.    The Requested Fee is Fair and Reasonable

352.    Based on the extensive efforts expended on behalf of the Class, the extraordinary result achieved, the risks of the litigation and the contingent nature of the representation, Class Counsel submits that the request for an award of attorneys' fees in the amount of less than 9.5% of the Settlement Fund (net of Class Counsel's expenses) is justified and should be approved.

353.    As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in

being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances. The percentage method is also supported by public policy, has been recognized as appropriate by the United States Supreme Court for cases of this nature, is the authorized method under the PSLRA and represents the overwhelmingly current trend in the Second Circuit and most other Circuits.

354.    Moreover, as discussed in the accompanying Fee Memorandum, and as set forth in the chart below, Class Counsel's request for a fee award of 9.48% of the Settlement Fund net of Class Counsel's expenses is on the lower end of fee percentages customarily sought and awarded in federal securities law class actions, and falls squarely within the middle of the range (*i.e.*, 14 out of 29) of fees awarded in similar settlements in other "mega class action" settlements. *See also* Exhibit 15 attached hereto (chart comparing metrics in various mega settlement).[60]

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

---

[60]    Class Counsel has removed from its lodestar calculation any time incurred since the execution of the Settlement papers that was exclusively time devoted to the Fee Application.

| | Ranked By Attorney Fees as % of Settlement | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| # | Case | Type | Court | Year | Amt (b) | Atty Fees (m) | Atty Fees % | Approx. Hours | Lodestar (m) | Multipli |
| 1 | Allapattah | Contract | SD Fla | 2006 | $1.1 | $337 | 31.33% | 140,179 | $43 | 7.90 |
| 2 | TFT-LCD | AT | ND Ca | 2013 | $1.1 | $308 | 28.50% | n/a | $117 | 2.60 |
| 3 | Household | Sec | ND Ill | 2013 | $1.6 | $389 | 24.68% | 119,501 | $55 | 7.00 |
| 4 | Merck Sec Der | Sec | DNJ | 2016 | $1.1 | $212 | 20.00% | 448,502 | $206 | 1.00 |
| 5 | Foreign Exchange | AT | SDNY | May-18 | $2.3 | $381 | 16.51% | 330,600 | $174 | 2.20 |
| 6 | Peru Copper - | Der | Del | 2012 | $2.0 | $305 | 15.00% | 8,597 | $3.5 | 88.00 |
| 7 | Tyco | Sec | DNH | 2007 | $3.2 | $460 | 14.50% | 488,468 | $172 | 2.70 |
| 8 | Nasdaq | AT | SDNY | 1998 | $1.0 | $144 | 14.00% | 129,628 | $36 | 3.90 |
| 9 | Credit Default Swaps | Sec | SDNY | 2016 | $1.9 | $254 | 13.61% | 93,000 | $41 | 6.20 |
| 10 | Toyota Accel | Cons | CD Ca | 2013 | $1.6 | $200 | 12.30% | 165,930 | $70 | 2.90 |
| 11 | Royal Ahold | Sec | DMD | 2006 | $1.1 | $131 | 12.00% | 147,896 | $51 | 2.60 |
| 12 | Payment Interchange | AT | EDNY | 2014 | $5.7 | $545 | 9.60% | 500,000 | $160 | 3.40 |
| 13 | Enron | Sec | SD TX | 2008 | $7.2 | $688 | 9.52% | 289,593 | $132 | 5.20 |
| 14 | Petrobras | Sec | SDNY | Jun-18 | $3.0 | $285 | 9.50% | 322,757 | $160 | 1.78 |
| 15 | Nortel II | Sec | SDNY | 2006 | $1.3 | $106 | 8.00% | 58,700 | $17 | 6.00 |
| 16 | Black Farmers | Disc | DDC | 2013 | $1.2 | $91 | 7.40% | 240,000 | $50 | 2.00 |
| 17 | Toshiba Diskette | Cons | ED Tx | 2000 | $2.1 | $147 | 7.10% | n/a | $150 | 0.98 |
| 18 | Diet Drugs | PL | ED Pa | 2008 | $6.4 | $434 | 6.75% | 553,020 | $167 | 2.60 |
| 19 | Vioxx | PL | ED La | 2010 | $4.8 | $315 | 6.50% | 562,943 | $250 | 1.30 |
| 20 | Visa Mastercard | AT | EDNY | 2003 | $3.4 | $220 | 6.50% | n/a | $63 | 3.50 |
| 21 | BOA / Merrill | Sec | SDNY | 2013 | $2.4 | $152 | 6.28% | 193,547 | $88 | 1.73 |
| 22 | AOL Time Warner | Sec | SDNY | 2006 | $2.6 | $147 | 5.90% | 135,181 | $47 | 3.60 |
| 23 | WorldCom | Sec | SDNY | 2005 | $6.1 | $336 | 5.50% | 472,862 | $83 | 4.00 |
| 24 | Prudential | Sales | DNJ | 2000 | $1.8 | $90 | 5.00% | n/a | $40 | 2.10 |
| 25 | BP Gulf Oil Spill | Env'tl | ED La | 2016 | $13.0 | $555 | 4.30% | 527,000 | $237 | 2.34 |
| 26 | Nortel I | Sec | SDNY | 2006 | $1.1 | $34 | 3.00% | 47,800 | $17 | 2.00 |
| 27 | Sulzer Hip | PL | ND OH | 2003 | $1.0 | $30 | 2.90% | 50,508 | $18 | 1.70 |
| 28 | Cendant | Sec | DNJ | 2003 | $3.2 | $55 | 1.73% | 35,000 | $8 | 6.90 |
| 29 | VW Diesel | Cons | ND Cal | 2017 | $10.0 | $167 | 1.70% | 120,111 | $63 | 2.60 |

Note: The Foreign Exchange settlement is before the court but has not yet been approved.

### 1.    Class Counsel's Significant Time and Labor Devoted to the Action

355.    The work undertaken by Class Counsel in investigating and prosecuting this case and arriving at the present Settlements in the face of substantial risks has been time consuming and challenging. As more fully set forth above, the Action settled only after Class Counsel

overcame multiple legal and factual challenges, the Parties had litigated the case close to the eve of trial, and then successfully to the Second Circuit and eventually the Supreme Court. Among other efforts, Class Counsel conducted an extensive investigation into the Class's claims; researched and prepared four detailed amended complaints; successfully opposed Defendants' multiple motions to dismiss; won several highly contested motions to compel; moved for partial summary judgment and were fully prepared to oppose Defendants' multiple motions for summary judgment; successfully moved for Class certification and created ground-breaking precedent opposing Defendants' interlocutory appeal of the Class Certification Order; consulted extensively with experts and consultants; obtained, organized and reviewed more than 25 million pages of documents obtained from Defendants and non-parties (most in Portuguese); took or defended 81 expert, fact witness or 30(b)(6) depositions (most fact and 30(b)(6) witnesses in Portuguese); prepared for a trial scheduled to commence just 48 days from when the case was stayed; and engaged in hard-fought and protracted settlement negotiations with highly experienced defense counsel representing multiple defendants.

356.    At all times throughout the pendency of the Action, Class Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the Class, whether through settlement or trial. The substantial time and expense incurred by Class Counsel has achieved precisely such an outcome, and accordingly, this factor weighs strongly in favor of Class Counsel's Fee Application.

357.    It is also notable that Class Counsel took lead on virtually all aspects of the case that overlapped with the Individual Actions. For example, Class Counsel (i) took each of the fact witnesses depositions identified in ¶¶ 123-30 above; (ii) developed and hosted the large document repository database that Individual Action plaintiffs subsequently joined; (iii) drafted the summary

judgment       motion       that       Individual       Action       plaintiffs       adopted; (iv) identified, retained and worked with materiality, accounting and other experts that Individual Action plaintiffs joined; (v) coordinated all certified translations; and (vi) conducted the July 2016 two-day mock trial that Individual Action plaintiffs observed and received the benefit therefrom. Class Counsel also took lead on all common issue arguments before the Court.

358.    Although counsel for the Individual Action plaintiffs provided valuable input and editorial assistance on certain common discovery requests, and took lead on one summary judgment opposition brief, and while we appreciate the high quality of their work product and extent to which it may have benefited all harmed investors, I respectfully submit that Individual Action plaintiffs and their counsel benefited far more from the work Class Counsel performed.

### 2.    A Lodestar Cross-Check Confirms the Reasonableness of the Fee Application

359.    As described in the accompanying Fee Memorandum, the requested fee percentage is not only fair and reasonable under the percentage method, but a lodestar cross-check confirms the reasonableness of the fee.

360.    Attached hereto as Exhibit 16 is a schedule that summarizes Class Counsel's lodestar and expenses incurred by category (the "Fee and Expense Schedules"). Also attached hereto as Exhibits 17 and 18 are declarations from counsel with Labaton and Motley Rice in support of the request for an award of attorneys' fees and reimbursement of litigation expenses, along with the Fee and Expense Schedules contained within, each indicating the amount of time spent on this case by each attorney and professional support staff they employed, and the lodestar

calculations based on their current billing rates.[61]  As set forth in each declaration, the declarations were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms, which were previously provided to Petrobras' counsel for their review, whose comments thereto will be submitted to the Court on May 7, 2018. The hourly rates for attorneys and professional support staff included in these schedules are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation. For attorneys or professional support staff no longer employed by Class Counsel, the lodestar calculations are based upon the billing rates for each such person in his or her final year of employment.

361.   As summarized in Exhibits 16-18 attached hereto, Class Counsel (along with Labaton and Motley Rice) have expended 324,307.7 hours in the investigation, prosecution and resolution of the Action against Defendants, for a collective lodestar value of $159,496,169.50 through today. Under the lodestar approach, the requested fee yields a multiplier of 1.78 on the lodestar. This multiplier is at the lower range (*i.e.*, 24 of 29) of multipliers awarded in mega class action settlements. *See* Exhibit 15.

### 3.     The Settlement Amount is Excellent Compared to Typical Recoveries and When Weighed Against the Individual Action Recoveries

362.   Class Counsel respectfully submits that the results obtained in these settlements are simply extraordinary by any measure. This factor, without more, weighs strongly in favor of finding that the quality of Class Counsel's representation was literally at the top of the scale. The Settlements presently pending before the Court represent the fifth largest securities class action

---

[61]   Attached as Exhibit 19 is a summary chart of the hours expended and lodestar amounts for Class Counsel, Labaton and Motley Rice, as well as a summary of each firm's total litigation expenses.

recovery in history, based on published information. *See* Exhibit 1 attached hereto. It also represents the largest securities class action settlement in a decade, the largest payout ever involving a non-U.S. issuer, the largest settlement not involving a restatement of financial results, and the largest settlement ever achieved by a foreign lead plaintiff.

363.    The Settlement is an excellent result for the Settlement Class. Plaintiffs estimate that the Settlement returns approximately (i) 22.3% of the likely recoverable damages suffered by the Class, using corrective disclosures accompanied by price declines at a 95% statistical significant level; or (ii) 18.6% percent of the likely recoverable damages suffered by the Class, using corrective disclosures accompanied by price declines at a 90% statistical significant level. This is well above the median settlement for securities class actions. *See* Exhibit 20 attached hereto (Cornerstone Research, *Securities Class Action Settlements: 2017 Review and Analysis*, at 6-10 (2017) (noting that in 2017, securities settlements overall returned a median of 5.2% of damages, with 3.5% where damages are greater than $150 million)); *see also Order,  In re Silvercorp Metals, Inc. Sec. Litig*., No. 12-cv-9456 (S.D.N.Y. Nov. 12, 2014), ECF Nos. 60, 63 (Rakoff, J.) (granting preliminary approval of settlement that was just over 10% of the likely recoverable damages); *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp*., 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013) (Rakoff, J.) (granting final approval of a settlement that was "10% of the plaintiff's best-case damages model"); *In re Rite Aid Corp. Sec. Litig*., 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (citing studies indicating that the average securities fraud class action settlement since 1995 has resulted in a recovery of 5.5% – 6.2% of estimated losses); *In re Crazy Eddie Sec. Litig*., 824 F. Supp. 320 (E.D.N.Y. 1993) (approving settlement that was 10% of estimated maximum recovery).

364.    Perhaps most extraordinary, the settlements achieved by Class Counsel represents a staggering 65% premium over the settlements achieved by the Individual Plaintiffs, consisting

of some of the largest institutional investors in the world represented by equally sophisticated counsel. The basis for Class Plaintiffs' assertion is as follows: Petrobras has recorded charges of $448 million with respect to its settlement with the Individual Actions to date. Class Plaintiffs estimate that these institutions represent 20% of the outstanding ADRS and Notes relevant to the Class Action. By extrapolation, applying this $448 million in settlements to the remaining 80% of ADRS and relevant Note purchasers, the Class Settlement should have yielded a settlement of $1.792 billion. Therefore, the $3 billion settlement achieved represents more than a 65% premium to the Individual Action settlements. Indeed, during the February 23, 2018 preliminary settlement hearing, Petrobras' counsel confirmed that the settlements represent a premium to those achieved by the Individual Actions, acknowledging, "[I agree with] the bottom line proposition that in gross, the plaintiff class here did better than the individuals [sic] plaintiffs." *See* Feb. 23, 2015 transcript at 10. Such a result is simply unprecedented, bucking the "common knowledge" of legal scholars, commentators and practitioners that opt outs always achieve a better result than Class Members. *See* John C. Coffee, Jr., *Accountability and Competition in Securities Class Actions: Why "Exit" Works Better Than "Voice"*, 30 Cardozo L. Rev. 407, 440-41 (2008).

365.    Further acknowledging the superior result achieved by Class Plaintiffs, most of the Plaintiffs in the Individual Actions—represented by stellar securities class action firms—still pending have indicated to Class Counsel that they intend to participate in the Class Settlements and ultimately dismiss their individual cases. This rather unprecedented turn of events is a ringing endorsement of the excellent results Class Counsel has achieved. Moreover, it enhances public policy and judicial economy, as shareholder class action litigation, as a whole, is better served if there are not hundreds of opt outs splintering into disparate cases, distracting from the efficient prosecution of the Action, and diluting the potency of the class action device. As detailed further

below, while Class Counsel and counsel for the Individual Actions did work amicably together, with the Individual Action Plaintiffs' counsel working with the highest degree of professionalism, the existence of multiple counsel for the Individual Plaintiffs whose cases needed to be coordinated with Class Plaintiffs, as well as the multiple conflicting damages experts, hindered the prosecution of the Class Action. This observation is in no way meant to be a poor reflection on the excellent attorneys representing the Individual Actions but is rather a natural consequence of "too many cooks spoiling the pot" in modern shareholder litigation. And while Liaison Counsel worked hard to corral the Individual Plaintiffs, there were still many instances of having to inform, update and otherwise interact with multiple plaintiff firms representing various interests, and with different damages experts.

366.    Further, demonstrating the benefit of the Settlement to the Class, while Petrobras has announced that the SEC commenced an investigation into Petrobras and the Individual Defendants, the SEC has not brought a formal action against Petrobras nor has it recovered any monies pursuant to the Fair Fund and Disgorgement Plans, established by the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7246(a).

### 4.    Class Counsel Prosecuted the Case in a Uniquely Aggressive Fashion

367.    The superior result achieved in these Settlements is not the result of mere happenstance. Rather, it is the product of very aggressive (and risky) positions that Class Counsel consistently took in pleading and prosecuting the Action.

368.    For example, the Fourth Amended Complaint alleged an unprecedented 85 disclosure dates that increased damages, compared to far fewer disclosures alleged in some Individual Actions. *See* Exhibit 4 attached hereto. Further, the Fourth Amended Complaint extended the Class Period to July 28, 2015, alleging that the $2.5 billion impairment taken by the Company was insufficient. No other Individual Plaintiff extended their relevant periods to that

date, nor alleged that the Company's impairment itself was a false and misleading statement. Similarly, Class Plaintiffs' damages expert opined on an unprecedented 21 disclosure dates negatively impacting Petrobras securities. Neither Class Counsel nor its damages expert is aware of another case where an expert has affirmatively opined on such a large number of corrective disclosure dates. This was intentional. Given the ample public record regarding the underlying facts of this case, Class Counsel immediately grasped that the "rubber would hit the road" regarding achieving a significant recovery by making every effort to maximize potential damages. The undersigned personally spent well above 400 hours in consultation with various damages experts to craft the most expansive credible damages theory. Moreover, Class Plaintiffs retained at least three damages experts (at great cost) to determine if their theory of damages would match Class Plaintiffs' expansive view of recoverable damages, finally settling upon Dr. Nye's analysis as the most appropriate for the Class. Class Counsel largely credits this singular focus on recoverable damages as the key difference between the recovery achieved by the Class as compared to the Individual Actions.

369.    In addition, Class Counsel named PwC Brazil as a defendant in both Exchange Act and Securities Act claims, whereas only five of over 30 Individual Actions asserted any claims against PwC Brazil. Naming PwC Brazil and having it remain in the case after the Court partially denied its motion to dismiss (see ECF No. 461) proved to be an extremely valuable litigation strategy. It meant that Class Counsel was able to obtain discovery from PwC Brazil rather than through the time-consuming and limited Letters Rogatory process that Class Counsel had also initiated but that proved to be fruitless. Discovery from PwC Brazil resulted in the production of approximately 2 million pages of documents that Class Counsel otherwise would not have obtained. In addition, Class Counsel was able to depose two of PwC Brazil employees in April

2016, who travelled to New York for their depositions. Documents and testimony obtained from PwC Brazil strongly contributed to Class Plaintiffs' bargaining power with PwC Brazil at mediation and ultimately contributed to the excellent result achieved for the Settlement Class. Indeed, Class Counsel's aggressive approach resulted in an additional and meaningful $50 million settlement with PwC Brazil that is itself remarkable and one of the largest settlements from a foreign auditor ever achieved in a securities class action.

370.     Even more, the Fourth Amended Complaint named 21 individual defendants whom Class Representatives alleged issued false statements, and several, like Costa and Duque, who were unquestionably behind the scheme, and others, such as Gabrielli and Barbassa, who had their personal assets frozen by the TCU. By contrast, many Individual Actions did not assert claims against an individual defendant. Class Counsel's aggressive approach in naming individual wrongdoers was more than mere window-dressing. Had Class Counsel not named Gabrielli, Barbassa and Foster, among others, it is unlikely these defendants—who were central to the litigation—would have been deposed in the Action or appeared for trial. All were former employees when deposed, and thus far outside the jurisdictional reach of Rule 45. The only means of obtaining their testimony would have been through Letters Rogatory.

371.     Testimony from their depositions provided strong support for Plaintiffs' cross-motion for summary judgment and in opposition to Defendants' multiple summary judgment motions, and the breadth of the pretrial designations from their depositions is a testament to the value of their testimony heading into trial. It also helped Class Representatives and Class Counsel further weigh the strengths and weaknesses of the respective positions.

372.     Further, and as described above in Section II.O, early on (in February 2016) Class Counsel unsuccessfully sought leave to move for summary judgment, and Plaintiffs eventually

moved for summary judgment in June 2016 on issues of falsity, materiality and corporate scienter. It is very uncommon for plaintiffs in securities class actions to move for summary judgment, and we submit that Class Plaintiffs' summary judgment motion put considerable pressure on Defendants. If summary judgment had been granted on these issues, it would have been a serious blow to Defendants, potentially eviscerating the victimhood defense.

373.    Because of Class Counsel's particularly aggressive litigation approach, an article appearing in *Corporate Counsel* magazine on January 8, 2018, cautioned, "If any general counsel out there are still letting their companies sleepwalk through compliance programs, Wednesday's $2.95 billion class action settlement with the Brazilian oil company Petrobras should smack them wide awake."

374.    *The Wall Street Journal* quoted Sean Griffith, an expert in corporate and securities law at Fordham University School of Law, who commented on the spectacular result achieved here, stating: "The plaintiffs must have been able to prove their damages case pretty convincingly in order to move the defendants to the negotiating table and to get them to settle around such a large number."[62]

### 5.    Class Counsel Faced an Army of Lawyers on the Defense Side

375.    Throughout the litigation, Class Counsel was vastly outnumbered by six of the highest caliber New York law firms and their leading trial lawyers. Staffing on the Plaintiff side paled in comparison with their army of lawyers, consultants and experts representing Defendants and third parties. *See* note 3 *supra*.

---

[62]    Paul Kiernan, *Petrobras to Pay $2.95 Billion to Settle U.S. Suit Over Corruption*, Wall St. J. (Jan. 3, 2018).

376.     Indeed, during depositions, Class Counsel typically assigned either two associates or one partner and one associate who were vastly outnumbered by Defendants. By way of example, in the deposition of José Sergio Gabrielli de Azevedo, former CEO of Petrobras, taken on April 20, 2016, Defendants had over twice the number of Class Counsel in the room. In attendance for Class Counsel were John Kehoe, who took the deposition, Marc Gross, Emma Gilmore, and me.[63] Hui Chang, now an associate of the firm, who is fluent in Portuguese, was second seat. Ms. Chang handled the exhibits that were in the original Portuguese along with the English translations and she assisted by improving on the interpretation when needed.

377.     Opposing counsel had 10 attorneys present. Roger Cooper, Brent Tunis, Eduardo Santiago, and Franklin Davi Moura attended for Cleary Gottlieb; David Carney attended for Skadden; Israel Dahan attended for King & Spalding; and Edward Spiro, Elkan Abramowitz, Jasmine Juteau, and Howard Locker attended for Morvillo Abramowitz.

378.     This has been Class Counsel's experience throughout this litigation, and is equally applicable to other aspects of the litigation, including motions to dismiss, throughout all facets of offensive and defensive fact discovery upon many separate Defendants, expert discovery (Defendants proffered 15 experts, including their market efficiency expert; Class Representatives proffered just five), summary judgment (Defendants filed six separate motions that Class Representatives had to oppose), and during the various appellate stages of the litigation.

379.     Class Counsel has no visibility into the time allocated by opposing defense counsel and third-party counsel, and while we suspect that the combined lodestar of these firms is likely

---

[63]     Marc Gross and Emma Gilmore each attended for less than one hour in order to evaluate Gabrielli's demeanor and credibility for trial.  Marcela Levi, fluent on Portuguese, was in the office but attended by phone for 3.5 hours in order to download from the Relativity database documents germane to Gabrielli's testimony.

higher than Class Counsel's, publicly available information reveals that their billing rates were certainly higher. For example, according to the ABA Journal, top partner billing rates at "BigLaw" firms have approached $1,500 per hour.[64] As discussed below, Class Counsel's average billing rate for partners assigned to the matter, including two Co-Managing Partners at Pomerantz, is $875. The highest billing rate is $1,000 for a partner who has been with Pomerantz for over four decades and served as managing partner from 2009 to 2016. As such, at all stages of the litigation, Class Counsel was outmanned and outgunned by highly sophisticated and compensated counsel, with no limit to Defendants' resources in sight.

**B.      Class Counsel Sought to Avoid Duplication and Inefficiencies**

**1.      Class Counsel Utilized a Core Team to Efficiently Prosecute the Case**

380.      A significant amount of the legal work on this case was performed by a core team of 25 attorneys who undertook a wide range of tasks in the prosecution of the Action, as recounted in detail below.[65]   This core team, which constituted approximately $49.42 million or approximately 31% of Class Counsel's total attorney lodestar, conducted the initial investigation, helped draft the various amended complaints filed in the summer and fall of 2015, worked on opposing Defendants' multiple motions to dismiss during the same period, assisted in facets of discovery, including taking, defending and preparing for depositions, worked on class certification and summary judgment briefing and opposing Defendants' six motions for summary judgment, and worked extensively on the mock trial and preparing this Action for trial, including work on the exhibit list, deposition designations, and various pretrial materials.

---

[64]      Martha Neil, *Top partner billing rates at BigLaw firms approach $1,500 per hour*, ABA Journal (Feb. 8, 2016).

[65]      *See* Exhibit 21 attached hereto identifying Core Team lodestar.

381.     Through this core team, Class Counsel was able to centralize the repository of knowledge among a small group of lawyers, including eight fluent in Portuguese. Members of the core team further focused their attention on discrete areas to eliminate duplication of effort that could have arisen from multiple attorneys having to relearn and digest the same information as the litigation moved forward to trial. Areas ranged from internal control deficiencies, damages, scienter, overcharges at individual refineries and drill ships, sufficiency of the $2.5 billion write off, claims against PwC, Underwriters' due diligence defense, and drafting motions in limine, to name a few. The core team met regularly to discuss key documents and deposition testimony, and to exchange ideas and theories of the case. [66]

382.     In accordance with this concentrated and efficient staffing, twelve attorneys from the core team, each assisted by an attorney fluent in Portuguese, conducted, defended or attended all 50 fact depositions and each of the 18 expert depositions. Class Counsel was thus able to maximize the repository of knowledge among a small group of lawyers, thereby eliminating duplication of effort that could have arisen from multiple individuals having to relearn and digest the same information for subsequent depositions. This effort reflects Class Counsel's desire to maintain an efficient balance of work-flow within the core litigation team.

### 2.     Class Counsel's Efficient Document Review

383.     As a threshold matter, the document review included analyzing approximately one million pages of documents that Class Counsel collected informally from various sources in Brazil,

---

[66]      Class Counsel maintained daily control and monitoring of the work provided by all the lawyers on this case. While I personally devoted substantial time to this case, other experienced attorneys at my firm (and at Motley Rice and Labaton) undertook tasks appropriate to their levels of expertise, skill and experience, and more junior attorneys and paralegals worked on matters appropriate to their experience levels. Throughout the Action, and as directed by the Court, Class Counsel allocated work assignments among the attorneys at Pomerantz, and among Motley Rice and Labaton, to avoid unnecessary duplication of effort.

including from the Federal Courts, TCU, CVM, CADE, CPI and others. In addition, Class Counsel received and analyzed approximately 22 million pages of documents from Defendants and non-parties. Unlike virtually all other securities class actions, the overwhelming number of documents produced here were in a foreign language, namely Portuguese, rendering the document review particularly cumbersome.

384.    Class Counsel's ability to conduct an extremely efficient document review began at the outset by interviewing and receiving competitive bids from three separate external technology and litigation support vendors specializing in eDiscovery and document hosting. Class Counsel's selection process included several rounds of competitive bids to reduce overall costs and that eventually allowed Class Counsel to "go with the lowest bid" while garnering the highest level of sophisticated intelligence capabilities to assure the most efficient document review under the circumstances.

385.    For efficiency and to reduce cost, time, and effort, the documents were placed in an electronic database that was created by and maintained by vDiscovery, a Manhattan-based provider that has for over 40 years provided proprietary and best-in-breed solutions for document review and electronic discovery. Class Counsel also relied upon "BatchGuru," an acclaimed software set developed by vDiscovery to extend Relativity's functionality and normalize the multi-source data received. vDiscovery, through detailed consult with our review team, also customized the Relativity workspace specifically for the Action to create a seamless process for identification and review of the Portuguese language documents hosted in the Relativity environment.

386.    The review platform Class Counsel selected, called Relativity, allowed Class Counsel to materially reduce the number of documents that needed to be reviewed by using Boolean-type searches, as well as by multiple categories, such as by author and/or recipients, type

of document (*e.g.*, emails, memoranda, SEC filings), date, Bates number, etc. More importantly, however, Relativity, with vDiscovery's "Veca Integration," offered sophisticated tools and various artificial intelligence capabilities, including the following:

Beg-End to List:  This tool converted BegDoc and EndDoc fields to a sequential list of Bates numbers and wrote it to a new field that lists every page of the document, which facilitated easy tagging and searching.

Clustering:  This tool grouped documents together thematically, putting documents about the same topic together. Clustering prioritized documents for review and deprioritized less relevant document groups.

Conceptually Similar Document Detection: This tool finds documents about the same topic that may not be Textual Near Duplicates. Conceptual similarity looks at the concepts in documents that arise from the language, rather than the language itself. As a result, document reviewers were able to search for documents about relevant issues without the limitation of key word searching or text-based comparisons.

Email Header Parser: This tool extracted various metadata that typical processing software does not extract, including email collected data that stores folders/labels in email headers.

Email Threading: This tool allowed teams to review fewer documents by grouping email threads together and allowing review teams to focus on only the most "inclusive" emails. An email is inclusive if (i) it is the latest email in time that would generally contain all of the previous emails in a given thread, or (ii) it is a lesser included thread, but it has an attachment, or (iii) it is the latest email in time of a conversation that branched off from the original email thread.

Tag as Document or Attachment:  This tool allowed for the generation of new hash values based on fields Class Counsel selected, facilitating customized deduplication.

Native File Exporter:  This tool allowed document reviewers to quickly export sets of native files as a ZIP container without using Relativity's desktop client and allowing for PC and Mac compatibility.

Parent ID & Attach IDs:  This tool enabled document reviewers to create Summation-compatible DAT files that could be exported directly from the Relativity interface.

Production Exporter: This tool allows exports to run distributed on multiple servers, eliminating the need to remote into a station to start the process. This saved a significant amount of time given the very large productions.

Production Helper:  This tool allowed reviewers to update fields in 1 click with the use of saved presets, eliminating the requirement of multiple tools.

Remove Email Address:  This tool removed email addresses from the sender and recipient fields, leaving only names, making exported reports (and privilege logs) easier to read.

Sort Date:  This tool took the date of a parent email and applied it to all its attachments, so families of documents could be sorted chronologically.

Tag as Document or Attachment: This tool identifies which record is a parent and which is a child based on a group identifier so that the filter option in a view can be used to display specific documents.

Textual Near-Duplicate Detection: Using the produced text of the documents, the Textual Near-Duplicate tool identified documents with very similar text creating the following efficiencies and advantages:

>        (i)        Searches were expanded to include Textual Near Duplicates, finding previous versions of documents and documents that may have incorporated other documents;

      (ii)     Production prioritization found truly new documents by identifying documents in each production that did not have Textual Near Duplicates; and

      (iii)    Productions could be compared across producing parties to further reduce the amount of document review necessary.

387.    Relativity, supported by vDiscovery, allowed for a technically sophisticated and highly organized document repository that provided extremely powerful tools that Class Counsel repeatedly deployed to exhaustively search voluminous productions from 15 defendants on an extremely efficient and expedited basis. As a replacement for simply reviewing each document one-by-one in Bates numbered order in which they were produced, Class Counsel maximized Relativity's technology—supported by vDiscovery—by searching the documents for information concerning key witnesses, refinery projects, and other case-related concepts. Class Counsel deployed a forensic approach in nature that heavily relied on the document "metadata" (the embedded bibliographic information in the documents) to identify the key witnesses, document custodians, and highly relevant documents in short order.[67]

388.    Efficiencies of Class Counsel's document review procedures were particularly necessary here, enabling witness depositions to commence on February 16, 2016, slightly more than one month after Defendants' document productions were substantially completed on January 1, 2016, in accordance with the Civil Case Management Plan.[68]  In the slightly more than two

---

[67]    Class Counsel also sought to deploy these same tools for the approximately 150,000 pages of informal document production Class Counsel obtained in Brazil and that was outside of Petrobras' custody or control and therefore not subject to formal discovery. These highly relevant documents helped strengthen the pleadings and were integral in summary judgment, as discussed above in Section II.L, but they did not come with load files, metadata, or in native file format, thereby making the review of those documents much more cumbersome and time-consuming, insofar as the technological tools had limited value.

[68]    As discussed above, Class Counsel took Petrobras' deposition pursuant to Rule 30(b)(6) on September 25, 2015. Among the various deposition topics noticed was Petrobras' policies and procedures concerning its collection and preservation of documents, including the likely locations

months that followed (*i.e.*, between February 16 and the April 29, 2016 discovery cutoff date), Class Counsel took 44 depositions. Defendants continued to produce new documents after January 1, 2016, while depositions were ongoing, including approximately 730,000 pages from Petrobras. Many of these documents pertained to critical witnesses whose depositions were already calendared and scheduled to proceed shortly thereafter.

389.     Technological tools that Class Counsel brought to bear allowed us to quickly assemble witness specific exhibits for each deposition, and then to have those exhibits translated to English (most were in Portuguese), in the most efficient manner possible. For instance, if a document pertained to one witness, the document database linked it to exhibits being identified for other related depositions. By implementing and utilizing these technological tools, Class Counsel was able to effectively prepare for and take or defend a total of 81 witness or 30(b)(6) depositions in a matter of a few months, with many depositions being double-tracked or triple tracked on the same day. *See* Exhibit 5 attached hereto.

390.     Relativity, supported by vDiscovery, provided a forensic value that was central to Class Counsel's ability to timely identify key emails, charts, reports and other documents each containing evidence strongly supporting the Class Representatives' claims, with which Class Counsel were able to confront the witnesses produced for deposition. Because of this technology, the depositions were far more productive than they would otherwise have been and strongly contributed to the Class Representatives' bargaining position during mediation, and ultimately the excellent Settlements obtained. Indeed, Class Counsel's extensive document review made it

---

of records relevant to the subject matter of the action. By staging this deposition early, Class Counsel was better prepared to understand the process and thoroughness by which Petrobras collected documents, and to tailor additional document requests based on knowledge acquired during the deposition.

extremely well prepared for depositions, summary judgment and trial, making Defendants aware that Class Counsel had identified key evidence, within a mountain of documents, including those obtained through informal discovery in Brazil, that was potentially troublesome for Defendants at trial.[69]

### 3.    Class Counsel Added Attorneys Gradually and When Warranted

391.    By July 2015, as Class Counsel began to collect what amounted to over 150,000 pages of highly relevant material through informal discovery efforts in Brazil, Netherlands, Switzerland, United States and elsewhere, we began to add to the team of Project Associates fluent in Portuguese to identify, analyze and, when appropriate, informally translate key documents. These additional attorneys were brought aboard as the case progressed and Class Counsel obtained key information sources that were the bases to plead certain allegations in the amended complaints, enter as exhibits during depositions, help form the bases for expert opinions, to support Class Representatives' summary judgment arguments, and which were eventually added to the Class Representatives' list of exhibits to be introduced at trial.

392.    Notably, and as described above in Section II.L above, the voluminous informal document discovery that Class Counsel obtained directly from Brazilian enforcement agencies, including the Federal Courts, did not come in native format with embedded ESI, such as load files and related metadata fields, or other formats that are present and the subject of significant negotiation when parties produce documents in response to formal discovery requests under the Federal Rules. Rather, the informal discovery (*i.e.*, indictments, criminal pleas, TCU reports, CVM

---

[69]    As a testament to the efficiency of Class Counsel's document hosting platform and the usefulness of various analytical tools available, counsel for Individual Actions requested and were provided access to the underlying documents and analytical tools, devoid of Class Counsel's underlying document coding and work product.

reports, transcripts, etc.) was comprised of hard copy paper and dozens of videotaped depositions taken in Brazil and made publicly available on court websites described above in Section II.L, or as posted on social websites, such as YouTube.[70]  Most of these documents were not susceptible to typical eDiscovery technology—they were paper documents (or deposition videotapes) with no load files or metadata. This evidence, central to the case, such as incriminating testimony, required a line-by-line analysis, which took substantial work by the Project Associates.

393.    With this collection of growing evidence, Class Counsel began to add to the team of Project Associates fluent in Portuguese during the summer and fall of 2015. Additional Project Associates were hired to work directly with the four trial experts that Class Counsel had retained and who required attorneys fluent in Portuguese to cull through the growing informal and formal discovery at the expert's direction. Indeed, because of the overwhelming presence of key documents in Portuguese, at times up to four Project Associates were stationed at the offices of our materiality expert (Dr. Henning) who assisted in identifying and analyzing key documents in Portuguese relevant to Dr. Henning's work.

394.    In addition to the plethora of informal discovery providing powerful evidence that Class Counsel relied upon for the pleadings and initial summary judgment motions, and was prepared to unleash in opposing summary judgment and at trial, the Project Associates were indispensable in identifying, analyzing, coding, and informally translating, when necessary, the more than four million pages of documents Defendants produced in the fall and winter of 2015-16.

---

[70]     *See*, *e.g.*, https://www.youtube.com/watch?v=jzQQMPcOjPM (examination of Defendant Paulo Roberta Costa, in Portuguese) (last visited April 20, 2018).

395.    Attached as Exhibit 22 is a chart that identifies, by month, the number of Project Associates employed by Class Counsel who worked on the matter. As reflected, the team began to increase in July 2015 when Class Counsel amassed a mountain of informal discovery (described herein) and through the remainder of 2015 as Defendants produced what amounted to over three million pages of documents by January 1, 2016 (the "substantial completion" date). Their number peaked in February 2016 as fact depositions began in earnest, which were heavily based on the extraordinary work that the Project Associates performed in reviewing and analyzing Defendants' document production. Their number steadily declined (before the imposition of the stay) as we completed expert discovery and summary judgment opening briefs.

396.    Class Counsel recognizes that 149 Project Associates (at the peak in December 2015) is a large number compared to an average securities case.[71]  This case, however, was not average. Most documents were in Portuguese, increasing the workload exponentially. Potentially key documents had to be reviewed by a Project Associate fluent in Portuguese. Relevant portions were then summarized in English when computer-assisted translation tools did not provide accurate translations, as was frequently the case given the poor image quality and the highly technical nature of the documents. Further, in keeping with the Civil Case Management Plan, the time frame was extraordinarily condensed with fact discovery concluding on April 29, 2016. While in most cases it may be possible to review millions of pages of formal and informal discovery (and work with experts, prepare for depositions and work on summary judgment related projects) with half or even a third of the document review Associates, Staff Attorneys and Project Associates, here the discovery period (running from mid-July 2015 through April 29, 2016) was likely a third

---

[71]    Notably, the 149 is tempered by the fact that 16 of the project associates each billed less than 400 hours to the matter.

or less than that of a similarly complex mega class action. As such, while the amount of staff and project associates is admittedly high, the total lodestar incurred is within the range of other mega class action settlements, notwithstanding the fact that the Project Associates and Staff Attorneys here were more expensive to employ in those case. *See* Exhibit 15 (chart showing lodestar in cases such as *Tyco* and *Merck* where lodestar was above $140 million).

397.    Class Counsel then served additional discovery requests and third-party subpoenas in early 2016 and received more documents from Defendants and third parties, and Project Associates were essential in analyzing this information as it related to the claims and defenses in the Action. Further, because most of the key documents were in Portuguese, project associates were instrumental in assisting in the preparation of witness kits for the many fact depositions. Rather than have certified translation prepared for each of the more than 350 exhibits introduced at depositions taken in Portuguese, which would have been highly uneconomical, Class Counsel frequently relied on Project Associates to prepare partial or full uncertified translations, saving the certified translations for only the key exhibits. These versions were provided to defense counsel who routinely objected to showing a witness an original document in Portuguese without providing counsel an English translation.

398.    As attorneys were added to the matter, they were assigned to teams that focused on discrete aspects of the litigation so there could be an efficient division of labor and concentration of knowledge in specific areas to avoid unnecessary duplication of effort. For example, at the peak, a team of approximately 148 attorneys fluent in Portuguese were assigned to review Petrobras' seven million-page production and then analyze, code, and where necessary translate documents relevant to the litigation. Another team of approximately 25 attorneys were assigned to the Underwriter Defendants' production of approximately 2.5 million pages of documents. At various

time approximately 128 attorneys fluent in Portuguese worked on translations, and up to ten attorneys were assigned to review the third-party productions of approximately 400,000 pages that Class Counsel obtained in the litigation. Class Counsel also assigned up to six attorneys fluent in Portuguese to work directly with the Class's experts, particularly Dr. Henning. Project associates worked hand in hand with the core team of attorneys that were tasked with these specific aspects of the litigation, and who reported the results of their review to Partners on the case, including how the results were being used to assist in both fact and expert discovery and what further work was required. In addition, Class Counsel dispersed the document review among locations in New York, Chicago and Florida, where Class Counsel has offices, and assigned Partners alongside Associates in each office to supervise the team of reviewers to ensure high quality and non-duplicative work.

399.   Notably, Project Associates who worked on the matter were full-time employees given commensurate benefits, including health insurance (or a cash payment if they declined the insurance), disability insurance, and an opportunity to participate in the Firm's 401(k) program, with the Firm paying required payroll taxes. Further, the Project Associates' lodestar is not a reflection of atypical billing rates, but rather the numbers of hours and significant work they performed, under the direct supervision of Class Counsel, weeding through the enormous and challenging informal and formal discovery obtained by Class Counsel.

400.   A chart identifying each attorney, including Staff Attorneys and Project Associates, who worked on the matter for Class Counsel, their credentials, experience and billings rates, is attached hereto as Exhibit 23.[72]

401.   Based on a review of fee applications in many cases since 2010 (focusing on cases that were larger, involved foreign parties, or were more recent), hourly rates for similar types of

---

[72]      Similar information for Labaton and Motley Rice is attached as Exhibits 17 and 18.

attorneys commonly fall between the low-$300 and low-$400 range, with the higher end regularly above this range, up to $650 per hour. These attorneys are variously called staff attorneys, contract attorneys, project attorneys, contractors, or similar titles. These rates generally do not contemplate any premium for attorneys fluent in a foreign language, having other significant experience, or hired on a full-time basis with full benefits, as was the case here. Where such special circumstances exist, higher rates are applied. The average billing rate for Project Associates here was $457.80.

402.    Fee applications have routinely applied rates above $400 per hour based on a document review attorney's level and quality of experience. For example, on June 22, 2015, in *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 08-cv-8781 (S.D.N.Y.) (a case brought by MBS investors), rates ranged from $240 to $650 for "Discovery Counsel." The firm explained that it hired these attorneys "[t]o review the more than four million pages of documents that were produced.... Each discovery counsel retained was an experienced attorney with, on average, 11.5 years as a barred attorney and each of them possessing extensive complex securities litigation experience." Attorneys with more years of experience generally billed at higher rates. But length of experience was not the only relevant factor because in some instances attorneys with fewer years of experience billed at higher rates.

403.    In *In re CNOVA NV Sec. Litig.*, No. 16-cv-0444 (S.D.N.Y.), rates included $600 to $625 for "Brazilian Of Counsel" and $500 for non-attorney "Brazilian Investigator[s]/Reviewer[s]." Lead counsel explained that it hired three Brazilian attorneys and two Brazilians with substantial investigatory experience "to assist with the review and organization of Defendants' documents and to assist with the completion of discovery" (including interviewing witnesses). Bios for these individuals were included with the firm resume.

404.     Unlike *Residential Capital, LLC* and *CNOVA*, firms in most cases typically provide scant information supporting rates applied to staff/contract/project attorneys, but rates for these attorneys have been billed as high as $605 (*In re Vivendi Universal, S.A. Sec. Litig.*, No. 02-cv-5571 (S.D.N.Y.) (ECF No. 1286-12, Ex. A)); $500 (*In re Bank of America Corp. Sec., Derivative, and ERISA Litig.*, No. 09-MDL-2058 (S.D.N.Y.) (ECF No. 829-11)); $480 (*Household Int'l, Inc.* No. 02-C5893 (N.D. Ill.) (ECF No. 2225-2)); $450 (*In re Parmalat Sec. Litig.*, No. 04-cv-0030 (S.D.N.Y.) (ECF No. 1105-8)) and $400 to $420 (several cases).[73]   The same types of factors (length and quality of experience, or special skills such as foreign language work) should support rates at the higher end in these cases as well.

## C.     The Risks and Unique Complexities of the Action

### 1.     Most Securities Class Actions are Dismissed

405.     Prosecuting securities class actions on a contingent basis, as opposed to being paid a guaranteed billable hour, is, by definition, risky business. The PSLRA substantially heightened the risk by staying discovery pending the motion to dismiss and raising the pleading standard to require a strong inference of scienter, and statistics bear that out, showing that most securities class actions are dismissed. Specifically, 45% of cases filed between January 2000 and December 2017 were dismissed in full. *See* Exhibit 24 (*Recent Trends in Securities Class Action Litigation: 2017 Full-Year in Review*, Fig. 14 at 19).

### 2.     Securities Class Actions Have Been Lost Even After Successful Trial

406.     Assuming Plaintiffs would have prevailed at summary judgment, the risk of a complete loss at trial or on appeal is very real in securities class actions. For example, in *In re*

---

[73]     *See*, *e.g*, *In re Pfizer Inc. Sec. Litig.*, No. 04-cv-9866 (S.D.N.Y.) (up to $420) (ECF No. 713-9); *In re Celestic Inc. Sec. Litig.*, No. 07-cv-0312 (S.DN.Y.) (up to $410) (ECF No. 262-1). Fee applications in these cases were approved.

*BankAtlantic Bancorp, Inc.*, (S.D. Fla. 2010), the jury rendered a verdict in plaintiffs' favor on liability. The District Court, however, granted defendants' motion for judgment as a matter of law, nullifying the jury verdict, and entered judgment on all claims for defendants. The Eleventh Circuit affirmed the District Court's ruling on the basis that plaintiffs had not presented sufficient evidence on loss causation. *In re BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012). There is simply no guarantee that Class Plaintiffs would not have suffered a similar fate with respect to their loss causation allegations.

407.    *In re Vivendi, S.A. Securities Litigation* (S.D.N.Y. 2010) is another example. There, again, plaintiffs won at trial with the jury finding Vivendi liable.[74]  Within months of the jury verdict the Supreme Court ruled in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), holding that the Exchange Act does not apply extraterritorially. Because Vivendi securities had been largely traded abroad and not in the United States, this destroyed the vast majority of plaintiffs' damages claims. *See also Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice in securities action); *In re Apollo Grp., Inc. Sec. Litig.*, No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court overturned unanimous verdict for plaintiffs, verdict later reinstated by the Ninth Circuit Court of Appeals, and judgment finally re-entered after denial of certiorari by the United States Supreme Court).

---

[74]     It is worth noting that it took over 10 years from the time *Vivendi* was initially filed until the judgment was finally entered.

408.     Respectfully, we submit that the critical question when evaluating a fee application is whether the amount requested is reasonably warranted by the quality of the representation and the result obtained, in light of both the risk of no fee if the case is not settled, as well as diminished recoveries for the Class if counsel took the easier route by accepting a subpar settlement without significant expenditure of time or talent. This inquiry is highly contextual. But in making this evaluation here, this case provides a unique opportunity to do so given the existing litigation risks and presence of the Individual Actions, providing one of the rare instances when the Court has a direct "comp" with which to compare other counsel's work dealing with similar factual and legal issues, and the recoveries they obtained.

### 3.     The Risks of Contingent Fee Litigation and Importance of Ensuring the Availability of Top Quality Counsel in Securities Class Actions

409.     As a general matter, it should also be observed that there are numerous cases where plaintiffs' counsel in contingent-fee cases such as this have expended thousands of hours and millions of dollars only to receive no compensation whatsoever. Class Counsel knows from personal experience that despite the most vigorous and competent of efforts, a law firm's success in contingent litigation, such as this, is never assured – and that many able plaintiffs' law firms have suffered major defeats after years of litigation, after expending tens of millions of dollars of time and expenses, without receiving any compensation at all for their efforts.

410.     Large-scale securities class action lawsuits where billions of dollars in alleged damages are at stake are exceedingly expensive to litigate successfully. Outsiders often focus on the gross fees awarded but ignore the fact that those fees are used to fund enormous overhead expenses incurred during many years of litigation, are taxed by federal, state, and local authorities, and when reduced to a bottom line, are far less substantial to each individual firm involved than the gross fee awarded appears.

411.    In understanding the general risks of contingent litigation, it is also necessary to understand the economics of running a law office. It is generally accepted that a law office's overhead is well more than 50% of its gross billing fees. This amount is necessary to cover expenses such as associate, clerical and staff salaries, office rent, insurance, and office computer information and data management systems (among other things), which expenses must be paid regardless of whether counsel are ultimately awarded fees for work on their cases which result in a meaningful recovery. Moreover, even though a major fee may be anticipated within a certain time, the actual payment of the award may be delayed due to, *e.g*., objections and appeals, which can occasionally result in considerable hardships.

412.    Another factor is the contingency fee firm's loss of the use of fees earned, but unpaid, during the litigation. Law firms representing paying clients receive their fees regularly and immediately. Those fees are then available to them for investment (such as the hiring of additional experienced attorneys and more junior associates and the leasing of additional office space), which in turn has the prospect of generating additional revenues over time. A contingent fee law firm typically sacrifices this "time value" of money, whereas large defense firms (who seem to be constantly and continuously expanding) are able to immediately reinvest the value of attorneys' fees, for the simple reason that they are able to actually collect the value of their time soon after it is incurred, typically through monthly (or at least quarterly) billing. Nor do the laws of market economics exempt top-tier plaintiffs' counsel from having to compete with the best defense firms to hire either quality young associates, or more experienced counsel with significant private or public sector experience dealing with securities law enforcement issues – or from frequently having to advance (and thereafter carry) the costs of retaining the same kinds of high-priced expert talent that defense firms can immediately pass on to their clients for payment (while plaintiffs'

counsel also bear the risk of having to "eat" these and all other litigation costs if the case is unsuccessful). In addition to these costs, the sheer cost of hiring experienced experts able to opine on the various elements of Class Plaintiffs' claims, and to rebut Defendants' more than 14 affirmative and rebuttal experts is significant. Here, Class Counsel expended $5,588,802.00 on accounting, materiality, damages and Brazilian regulatory issues alone. While very costly, Class Counsel was far more efficient than Defendants in their utilization of experts, employing only four compared to Defendants' 14 designated experts.

413.   Moreover, for decades the United States Supreme Court (and countless lower courts) have repeatedly and consistently recognized that the public has a strong interest in having experienced and able counsel enforce the federal securities laws and related regulations designed to protect investors from the pernicious effects of false and misleading statements that are made in connection with the issuance or subsequent purchase or sale of publicly-traded securities. *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'"). Indeed, as Congress recognized in passing the Private Securities Litigation Reform Act of 1995 ("PSLRA"),

> Private securities litigation is an indispensable tool with which defrauded investors can recover their losses without having to rely on government action. Such private lawsuits promote public and global confidence in our capital markets and help to deter wrongdoing and to guarantee that corporate officers, auditors, directors, lawyers and others properly perform their jobs. This legislation seeks to return the securities litigation system to that high standard.

H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 31, at 31 (1995). Simply stated, the SEC, a vital but seriously understaffed agency whose inadequate funding has been the subject of numerous news stories and other accounts in recent years, does not have anywhere near the budget or

personnel to ensure enforcement of the securities laws, and if anything, its problems have grown only more severe in recent years.[75]  If the critically important public policy of supplementing SEC enforcement through effective private litigation is to be carried out, the courts should award fees that appropriately reward the best plaintiffs' counsel for obtaining outstanding results in the face of the many risks that they assume in prosecuting securities class actions.

414.    The importance of this public policy is particularly evident in this case. Here the SEC was apparently either unwilling or unable to even file a complaint against Petrobras or PwC Brazil—yet Class Counsel has recovered $3 billion on behalf of investors. Such recoveries are only possible where plaintiffs' counsel receive rewards commensurate with the magnitude of their successes because assuredly there will be significant losses in other similarly risky cases brought against similarly powerful financial institutions who, after all, can afford to retain the very best lawyers in the world to defend them.

**4.    The Risk Undertaken by Class Counsel in Prosecuting this Action**

415.    Because the prosecution was undertaken by Class Counsel on an entirely contingent-fee basis and involved a mountain of evidence and highly complex factual issues, Class

---

[75]    For commentary on how the SEC's inadequate staffing and budget problems go back for at least the last 20 years, according to SEC chairmen appointed by both Republican and Democratic residents, *see*, *e.g.*, Statement of SEC chairman Arthur Levitt, Hearings on S. 1260 before the Subcommittee on Securities of the Senate Comm. on Banking, Housing, and Urban Affairs, 105th Cong. (Oct. 29, 1997) ("Private actions are an especially important supplement to the [SEC's] enforcement program today because of the phenomenal growth of the securities industry during a time when the Commission's staff and budget levels have remained relatively constant"); and Testimony of SEC chairman Richard C. Breeden, Hearings on the Securities Investor Protection Act of 1991 before the Subcommittee on Securities of the Senate Comm. on Banking, Housing and Urban Affairs, 102d Cong. 15-16 (Oct. 2, 1991) ("Private actions under [the securities laws] have long been recognized as a 'necessary supplement' to actions brought by the Commission and as an 'essential tool' in the enforcement of the federal securities laws. Because the Commission does not have adequate resources to detect and prosecute all violations of the federal securities laws, private actions perform a critical role in preserving the integrity of our securities markets.").

Counsel understood that it was embarking on an expensive and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require. Nevertheless, to avoid losing any control over the litigation, Class Counsel did not resort to litigation funders, who had indicated that any funding would come with strings attached as to how the case would be litigated. Rather, Class Counsel took lines of credit three times more than the amount it ever had available prior to taking the case, and the top tier of financing necessitated Pomerantz's three main principals to pledge their liquid assets. As a result, Class Counsel's debt levels ballooned to more than 12 times the highest levels of the firm's debt in prior years. As such, this case was not just "bet the Company" litigation for Petrobras, it was "bet the firm" litigation for Pomerantz, with very little margin for error.

416.     As demonstrated here, with an average lag time of several years for cases of this type and magnitude to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid a guaranteed amount on an ongoing basis. Indeed, Class Counsel, Labaton and Motley Rice have received no compensation whatsoever during the more than three years since first beginning the investigation into the claims asserted in this matter, and has also incurred over $14.5 million in direct expenses, let alone the many millions more in overhead and fixed labor costs.

417.     In sum, the risks of litigation in this case were anything but purely theoretical. To the contrary, the risks were so concrete that many sophisticated institutional investors represented by competent plaintiff counsel chose to settle their parallel actions earlier and at a discount to what Class Counsel has achieved here on behalf of the Settlement Class.[76]

---

[76]     Further, and as detailed throughout herein, Class Counsel took additional risk in extending the Class Period over five years, greatly increased the work load placed upon Class Counsel to plead and prove false statements made in dozens of periodic, quarterly and annual reports that Petrobras filed with the SEC and the CVM throughout this expansive period, and during more than

### 5.    There Was a Significant Risk of Zero Recovery in this Action

418.    The risks assumed by Class Counsel in bringing these claims have been detailed in

Section IV.E above, and those risks are equally relevant to an award of attorneys' fees, including,

*inter alia*, risks concerning loss causation and damages, class certification, scienter, maintaining a

certified class through trial, additional trial risk, risk of prolonged appeals, and the risk of enforcing

a judgment in Brazil.

419.    Further, that Petrobras is majority-owned by the government of Brazil not only

injected risks in enforcing a judgment in Brazil, as detailed above in Section IV.E.7, there was

significant political upheaval going on in Brazil throughout the pendency of the Action that

injected risks. For example, President Dilma Rousseff of the PT was impeached in 2016, and the

highly popular former President Luiz Inacio Lula da Silva was convicted and sentenced to 12 years

in prison for his role in Lava Jato. Such political instability is underscored by Lula recently

announcing that, despite his conviction, he would be a candidate of the PT at the upcoming

presidential elections in October 2018.[77]  Against this changing and at times volatile political

landscape, there was considerable risk that Lula or others could take political or legislative action

to limit Petrobras' exposure to the Class Action, or to make it difficult or impossible for Plaintiffs

to enforce a judgment in Brazilian courts.[78]

---

twenty investor conference calls in which Petrobras executives participated. Class Counsel also
named PwC Brazil, Underwriter Defendants and various Individual Defendants which greatly
enhanced the settlement pressure exerted on Petrobras, but thereby increased the work load and
concomitant financial risk placed upon Class Counsel

[77]    *See* Kiernan, P. and Trevisani, P., *Brazil's 'Lula' to Run for President Despite Losing
Corruption Appeal*, Wall St. J. (Jan. 18, 2018), available at: https://www.wsj.com/articles/lula-to-
run-for-brazil-presidency-despite-losing-corruption-appeal-1516919526.

[78]    *See More than a million Brazilians protest against 'horror' government*, The Guardian
(March 13, 2016), available at: https://www.theguardian.com/world/2016/mar/13/brazil-anti-
government-protests-dilma-rousseff-rio-de-janeiro.

420.    Class Counsel also faced additional risk based on changing landscapes in the United States. For example, on July 17, 2017, Michael Piwowar, a Republican member of the SEC, voiced support for possibly allowing companies to change bylaws that would force shareholders to resolve claims through arbitration rather than in court. Specifically, Piwowar observed, "For shareholder lawsuits, companies can come to us to ask for relief to put in mandatory arbitration into their charters. . . I would encourage companies to come and talk to us about that."[79]  Piwowar was hardly a lone voice in the woods. His view has been echoed by many conservative think tanks and the U.S. Chamber of Commerce, and there has been a more recent report that the SEC is "laying the groundwork" for allowing public companies to include forced arbitrations in their corporate governance documents.[80]  As Bloomberg reported, "as President Donald Trump's pro-business agenda sweeps through Washington, the SEC is laying the groundwork for a possible policy shift, said three people familiar with the matter. The agency, according to two of the people, has privately signaled that it's open to at least considering whether companies should be able to force investors to settle disputes through arbitration."

421.    With 83% of its shares traded on the BOVESPA and already subject to a mandatory arbitration provision in Brazil, Petrobras was uniquely positioned to seek to inject an arbitration provision in its bylaws as to the ADRs, and then have it apply retroactive to scuttle this litigation.

---

[79]    Lynch, S., *U.S. SEC's Piwowar urges companies to pursue mandatory arbitration clauses*, Reuters (July 17, 2017), available at: https://www.reuters.com/article/us-usa-sec-arbitration/u-s-secs-piwowar-urges-companies-to-pursue-mandatory-arbitration-clauses-idUSKBN1A221Y.

[80]    Bain, B., *SEC Weighs a Big Gift to Companies: Blocking Investor Lawsuits*, Bloomberg (Jan. 26, 2018), available at https://www.bloomberg.com/news/articles/2018-01-26/trump-s-sec-mulls-big-gift-to-companies-blocking-investor-suits.

While it is difficult to predict the likelihood that this ploy would succeed, it potentially exposed Class Counsel to additional risk of the enforceability of such a mandatory arbitration clause.

422. Class Counsel also faced the risk of a bill titled the "Fairness in Class Action Litigation Act of 2017" (H.R. 985) becoming law. The bill would prohibit a federal court from certifying any proposed class seeking monetary relief for personal injury or economic loss unless the party seeking the class action shows that each proposed class member suffered the same type and scope of injury as the named class representative or representatives. If enacted in its current form, H.R. 985 would require a court, in issuing a class certification order for any class subject to the bill's requirements, to also certify that those requirements have been met based on a rigorous analysis of the evidence presented, and would require that class action lawyers should only get paid after the victims get paid and would order any third-party funding agreement to be disclosed to the district court.

### D. Class Representatives Endorsement of the Fee Application

423. Each of the three Class Representatives—sophisticated institutional investors of the type favored by Congress when passing the PSLRA—fully supports Class Counsel's Fee Application.

424. Universities Superannuation Scheme Limited ("USS") is the largest public pension fund in the U.K., organized for the benefit of current and retired academic and academic-related employees in U.K universities. With investment assets in excess of £60 billion (including short-term investments) on behalf of 390,000 members and over 350 employer institutions as of March 31, 2017, USS is an active, engaged steward of assets that works with investee companies and asset fund managers and policy makers to encourage responsible behavior. USS is an international leader among institutional investors in direct engagement regarding corporate governance, shareholder rights, and climate change.

425.    North Carolina Department of State Treasurer ("North Carolina") administers the public employee retirement systems for more than 900,000 North Carolinian teachers, judges, legislators, firefighters, rescue squad workers, National Guard members, and other state and government employees, as well as the 401(k) and 457 plans for public employees. With investments totaling $104.77 billion at the end of the fiscal year ending June 30, 2016, North Carolina actively promotes sound public finance and fiscal policy, financial education, sustainability in government, financial and debt management policies, and corporate governance and accountability.

426.    Employees' Retirement System of the State of Hawaii ("Hawaii") provides retirement, disability, survivor, and other benefits to more than 135,000 members of retirees, beneficiaries, and public employees, including teachers, professors, police officers, firefighters, correction officers, judges, and elected officials, working for the State & Counties of Hawaii. With investments totaling $14.1 billion (including short-term investments) as of June 30, 2016, Hawaii was ranked as one of the 250 largest institutional investors globally.

427.    Class Representatives have evaluated Class Counsel's Fee Application, as well as the Expense Application discussed in Section VIII below, and believe it to be fair and reasonable and warranting consideration and approval by the Court. As a result, Class Representatives collectively endorse Class Counsel's application for an award of attorneys' fees constituting slightly less than 9.5% of the Settlement Fund, net of Class Counsel's expenses, an amount consistent with the amount set forth in each of Lead Plaintiff's retainer agreement with Class Counsel. Moreover, throughout the course of the litigation, Lead Plaintiff has demanded monthly billing and expense reports from Class Counsel, followed by many follow up phone calls to discuss the necessity of these expenditures.

428.    In addition to their responsibilities as the Court-appointed Lead Plaintiff (in the case of USS) and Class representatives, as public pension funds, each of the Class Representatives has independent duties and obligations to their respective constituents to ensure that they are acting in their best interests and that they are appropriately reviewing Class Counsel's Fee and Expense Application. Accordingly, their endorsement of Class Counsel's Fee and Expense Application is significant.

### E.    The Reaction of the Settlement Class to the Fee Application

429.    As noted above, as of April 13, 2018, GCG had mailed an aggregate of 1,053,850 Notice Packets to potential Settlement Class Members and nominees by first-class mail; (b) the Summary Notice has been widely disseminated through a plethora of domestic and international publications; and (c) copies of the Long-Form Notice (in English, Portuguese, Chinese – Simplified, Dutch, French European, German, Japanese, and Spanish – Universal), Summary Notice (in English, Portuguese, Chinese – Simplified, Dutch, French European, German, Japanese, and twenty-three additional languages) and Claim Form, as well as copies of the Stipulation, Amended Stipulation (with PwC Brazil), and the Preliminary Approval Order were posted on the settlement website: www.petrobrassecuritieslitigation.com. *See* Exhibit 2, at ¶¶ 8-25.

430.    The Notice advised the Settlement Class Members of the definition of the Settlement Class and of the other material terms of the Settlements, and also advised them of their rights to (a) exclude themselves from the Settlement Class; (b) object to any aspect of the Settlements, the Plan of Allocation, or the Fee and Expense Application; and (c) submit a Claim Form in order to be eligible to receive a share of the proceeds of the Settlements. The Notice also informed Settlement Class Members of the procedures to be followed to exercise the foregoing rights.

431.     The Court-ordered deadline for submitting requests for exclusion from the Settlement Class is April 27, 2018, and the deadline to file any objections to the Settlements, Plan of Allocation or the Fee and Expense Application is May 11, 2018. As of April 13, 2018, Class Counsel has received only 280 requests for exclusion, which represent fewer than 47,000 shares of common ADS's purchased during the class period, fewer than 4,800 purchased outside of the class period, and $15,000 USD in Notes. Class Counsel is informed that this is an extremely small fraction of the hundreds of thousands of total estimated Class Members, and of the 1.5 billion plus ADS's traded during the class period. Notably, there were no institutional investors who had requested exclusion as of April 13, 2018, except for one institutional investor that did not provide the required transactional information. *See* Exhibit 2 (Mendoza Aff.). Class Representatives will address any objections and the requests for exclusion collectively in their supplemental submission to be filed on May 25, 2018, as provided for in the Preliminary Approval Order.  In total, GCG has caused 139 publications of the Summary Notice in a total of 99 different publications, in 33 countries/regions, and in 31 languages. The details of the publication dates, number of insertions, and publication frequency for the relevant publication are set forth in the table at Exhibit 3 attached to the Mendoza Affidavit.

432.     To date, no objections to the attorneys' fees set forth in the Notice Packet or Summary Notice have been received.  Should any objections to the attorneys' fees be received, they will be addressed in Class Counsel's reply papers.[81]

---

[81]     As noted above, GCG received from Class Counsel a copy of a letter dated January 8, 2018, that was received by the Court from an individual who disagrees with the large amount of the settlement. There is no indication that the individual is a class member.

**F.     The Quality of Class Counsel's Representation and Their Standing and Expertise**

433.    Many considerations may be relevant to assessing the quality of Class Counsel's representation, including the Court's own observations, Class Counsel's experience and standing at the bar, and the quality of opposing counsel. Ultimately, however, the acid test for evaluating "quality of the representation" is the quality of the results achieved for the Class members whom Class Counsel was appointed to represent.

**1.     The Excellent Results Obtained from Class Counsel's Efforts**

434.    Here, for the reasons previously detailed above, Class Counsel respectfully submits that the Settlement, consisting of $3 billion in cash—including the second largest securities class action settlement ever paid by a single corporate defendant—is an extraordinary result for the Class. Indeed, the result achieved for the Class reflects the superior quality of Class Counsel's representation, hard work, persistence, and skill in a case that presented significant litigation risks. If approved, the Settlement would represent the fifth largest settlement in securities class action history.

**2.     The Court's Observations as to the Quality of Class Counsel's Work**

435.    The Court may, of course, also consider its own observations of the quality of Class Counsel's representation throughout this litigation. Since the inception of the Action in December 2014, Class Counsel has appeared on multiple occasions before the Court, and the Court has reviewed myriad motions and briefing submitted by Class Counsel, including, *inter alia*, four detailed amended complaints, briefing in opposition to Defendants' multiple motions to dismiss, a motion and briefing in support of class certification, a motion for partial summary judgment, and the numerous papers in connection with both preliminary and final approval of the Settlement. Although this work represents only a fraction of the total work performed by Class Counsel

throughout the pendency of the Action, I respectfully submit that the quality of that work is reflective of the quality, thoroughness, and professionalism of the effort that Class Counsel have devoted to all aspects of this Action on behalf of the Class.

### 3.    Standing and Expertise of Class Counsel

436.    Class Counsel, Labaton, and Motley Rice are highly experienced in prosecuting complex litigation, particularly securities class actions, and worked diligently and efficiently in prosecuting this Action. As demonstrated by Pomerantz's firm resumes attached hereto as shown in Exhibit 25 and the respective declarations of Thomas A. Dubbs and Gregg S. Levin (*see* Exhibits 17-18), the law firms of Pomerantz, Labaton, and Motley Rice are among the most experienced and skilled firms in the securities litigation field, and each firm has a long and successful track record in securities cases throughout the country.

### 4.    Standing and Caliber of Defense Counsel

437.    The quality of the work performed by Class Counsel in attaining the Settlement should also be evaluated against the quality of the opposition. Here, Defendants were represented by no fewer than 6 law firms, which included many of the nation's most elite firms. Defense counsel included Cleary Gottlieb Steen & Hamilton LLP; Skadden, Arps, Slate, Meagher & Flom LLP; King & Spalding LLP; Morvillo Abramowitz Grand Iason & Anello PC; and Goodwin Procter LLP. These firms vigorously represented the interests of their respective clients. In the face of this experienced, formidable, and well-financed opposition who aggressively litigated the Action on behalf of their clients to essentially the "eve" of trial, and then successfully in the appellate courts, Class Counsel was nonetheless able to persuade Defendants to settle the case on terms highly favorable to the Class—a fact which makes Class Counsel's success here all the more impressive.

## VIII.  THE REQUEST FOR REIMBURSEMENT OF CLASS COUNSEL'S REASONABLE LITIGATION COSTS

438.    Class Counsel seek payment from the Settlement Fund of $14,515,235.24 in litigation expenses reasonably and necessarily incurred by Class Counsel, Labaton, and Motley Rice in connection with prosecuting the claims against Defendants. *See* Exhibits 16-18. The Settlement Notice advised potential Class Members that Class Counsel would seek payment of expenses not to exceed $18 million. *See* Exhibit 2 at Exhibits 1 and 2 attached thereto. Class Counsel's request is below this "cap."

439.    From the beginning of the case, Class Counsel was aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved. Thus, Class Counsel was motivated to take steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case. Class Counsel maintained strict control over the litigation expenses.

440.    Class Counsel, Labaton and Motley Rice have incurred a total of $14,515,235.24 in litigation expenses in connection with the prosecution of the Action as set forth on Exhibits 16-18. As attested to, these expenses are reflected on the books and records maintained by each firm. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. Expenses are set forth in detail in each firm's declaration, which identifies the specific category of expense—*e.g.*, online/computer research, experts' fees, travel costs, duplicating, telephone, fax and postage expenses, and other costs incurred for which counsel seek payment. These expense items are billed separately by each firm and such charges are not duplicated in the respective firms' billing rates.

441.    Of the total amount of expenses, $8,673,554.42, or approximately 59.8%, was expended on experts and consultants.  As set forth in Section II.N above, these professionals were

utilized and essential to prepare the various complaints, obtain class certification, move for summary judgment, oppose Defendants' summary judgment briefs, assist in mediation briefs, and to prepare the case for trial. Their involvement helped to refute Defendants' principal attacks on loss causation, scienter and damages, and to address the impact of many enforcement activities ongoing in Brazil, particularly with respect to the TCU, and the many highly complex accounting standards and internal control deficiencies that were at the heart of the alleged fraud. Class Counsel believes that the quality of the experts had a significant impact throughout the mediation and substantially increased the value of the Settlements. Moreover, Class Counsel's expenditures on expert were dwarfed by those of Defendants: Class Plaintiffs designated 4 experts to testify at trial, compared to Defendants' 14 experts.

442.    Another significant component of expenses, $1,478,115.11 or 10.2% of the total expenses, relates to the electronic document hosting and searching database. As set forth in Section VII.B.2 above, to effectively and efficiently review and analyze the documents, such document management system was necessary in order to conduct intelligent searches, using de-duping algorithms, clustering (artificial intelligent technology that groups documents by related concepts), as well as other enhancements that substantially reduced the amount of attorney time needed to review documents.

443.    Additionally, Class Counsel incurred $1,180,654.10 in expenses, representing 8.1% of total expenses, for certified translations of relevant evidence that was in Portuguese. As referenced here throughout, the overwhelming majority of documents Petrobras produced were documents in Portuguese. Beyond the additional associated cost of reviewing these documents to identify responsive material, Class Counsel was also put to task to have certified translations prepared for documents anticipated to be used in summary judgment briefings and at trial.

444.    Another significant expense, totaling $379,045.78 and amounting to 2.6% of the total costs, was incurred in connection with court reporting services, including translators (more than 35 depositions were taken in Portuguese) and videographers, and for transcript fees. Such costs were necessarily incurred in furthering the litigation.

445.    Further, Class Counsel has incurred a cost of $434,503.68 related to travel, business transportation, and meals. In connection with the truly international nature of this litigation (Class Counsel travelled to Brazil and travelled to London several times, as well as having paid for Lead Plaintiff's travel expenses to the U.S.), and in connection with the extensive discovery taken and defended by Class Counsel in the Action, among other tasks, Class Counsel was required to engage in extensive travel throughout the country and abroad and seeks payment for the costs of this travel.

446.    Class Counsel also seeks reimbursement for $263,887.27 in mediation fees expended on behalf of the Class. This amount does not include amounts that Petrobras paid the mediator.

447.    The other expenses for which plaintiffs' counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include court fees, online legal and factual research, transcription costs, costs related to the document productions, copying costs, long distance telephone and facsimile charges, and postage and delivery expenses.

448.    All the litigation expenses incurred were necessary to the successful prosecution and resolution of the claims against Defendants.

## IX.    REIMBURSEMENT OF CLASS REPRESENTATIVES' COSTS

449.    Additionally, Class Representatives USS, North Carolina, and Hawaii seek reimbursement of their reasonable lost wages, pursuant to the PSLRA, 15 U.S.C. §78u-4(a)(4), incurred in connection with their representation of the Class in the total amount of $400,000.00.

The amount of time and effort devoted to this Action by the representatives of USS, North Carolina, and Hawaii, who were deposed and produced documents, attended mediation sessions, and participated in ongoing settlement discussions, is detailed in the accompanying USS, North Carolina, and Hawaii Declarations. *See* Exhibits 12-14 attached hereto. Only reimbursement for time devoted to certain extensive work, largely out of the office, is being sought.

450.    Class Counsel respectfully submits that this award, which would be paid directly to Class Representatives, is fully consistent with Congress's intent, as expressed in the PSLRA, of encouraging institutional and other highly experienced plaintiffs to take an active role in bringing and supervising actions of this type. As set forth in the Fee Memorandum and in the supporting declarations submitted on behalf of Class Representatives, these fiduciaries have been fully committed to pursuing the Class's claims against the Defendants. USS, North Carolina, and Hawaii have actively and effectively fulfilled their obligations as representatives of the Class, complying with the many demands placed upon them during the litigation and settlement of this Action, and providing valuable assistance to Class Counsel. The efforts expended by Mr. Hill, Mr. Tejedor, and Mr. Summerfield for USS, Mr. Smith, Ms. Harrison, and Ms. Murtagh for North Carolina, and Ms. Ohara for Hawaii during this Action are precisely the types of activities courts have found to support reimbursement to class representatives, and fully support Class Representatives' request for reimbursement.

451.    Notably, the independence and involvement of USS were driving factors leading to this Court's appointment of Lead Plaintiff. This Action was not prosecuted by "wholly artificial groupings" of institutional investors with "hands-off attitude[s]." *See* ECF No. 166. Indeed, this Court expressed its concerns in this regard in appointing the USS as sole Lead Plaintiff over other sophisticated individual investors who in the Court's view had "little inclination to take a firm

hand in their dealings with counsel." *Id.* This firm hand was evidenced by USS's competitive retainer agreement, which provided for one of the lowest fee percentages of the competing Lead Plaintiff movants. USS was not only extremely selective in its choice of lead counsel and their arrangement with Pomerantz, but also of the type of cases in which it would seek the responsibility of Lead Plaintiff and Class Representative. Here, due to the nature of the conduct complained of in this Action, USS was driven by its own policies and its fiduciary obligations to seek appointment. USS's tenacity and engagement with every aspect of this litigation was unwavering. USS reviewed and provided comments on every substantive pleading and brief, including the relevant Settlement documentation, attended nearly every significant hearing and each of the six mediation sessions. Moreover, USS participated in many in\-person meetings with Pomerantz throughout the course of the litigation, both at Pomerantz's and USS's offices. While at Pomerantz's offices, Jeremy Hill met collectively and individually with a significant number of team members to discuss the various aspects of the litigation. Moreover, throughout the course of the litigation, USS required Pomerantz to submit a detailed lodestar and expense report for its review monthly. Moreover, USS made extensive efforts to coordinate the oversight of this litigation with Hawaii and North Carolina, travelling to North Carolina on multiple occasions, and conducting monthly conference calls with Class Plaintiffs without the Class Counsel being present.

452.    USS, North Carolina and Hawaii were served detailed document requests (USS with two) comprising 35 individual requests covering a broad set of topics, from the Class Representatives' communications and trading activities to the investment publications and resources they had access to. USS alone produced approximately 300,000 pages of documents responsive to Defendants' requests, with North Carolina producing approximately 448,000 pages and Hawaii producing approximately 330,000 pages. USS representatives sat for four depositions,

including of their external money manager, General Investment Management America; North Carolina sat for two; and Hawaii sat for one. The Petrobras Defendants propounded 462 individual requests for admission on USS, and 460 individual requests on both Hawaii and North Carolina, as well as 12 individual interrogatories on each of the Class Representatives.

453.    The Settlement Notice apprised the Class that Class Counsel may seek reimbursement of the costs and expenses of Class Representatives in a total amount not to exceed four hundred thousand dollars ($400,000.00). *See* Exhibit 2. The total amount requested herein by Class Representatives USS ($300,000.00), North Carolina ($50,000.00), and Hawaii ($50,000.00) equals this cap.

## X.    CONCLUSION

454.    In view of the significant recovery to the Class and the substantial challenges presented by the claims and facts in this case, as described above and in the accompany memorandum of law, Class Representatives and Class Counsel respectfully submit that the Settlements should be approved as fair, reasonable and adequate and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate. In view of the significant recovery achieved and the quality of work performed, among other things, as described above and in the accompanying memoranda of law, Class Counsel also respectfully submits that a fee in the amount of $284,500,000.00 (plus interest) be awarded; that Plaintiffs' Counsel's expenses in the amount of $14,515,235.24 be reimbursed in full; and the Class Representatives' costs in the amount of $400,000.00 be reimbursed in full as PSLRA awards.

455.    I declare, under penalty of perjury, that the foregoing facts are true and correct to the best of my knowledge.

Executed on April 23, 2018                              _____
New York, New York                                              Jeremy A. Lieberman