**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| IN RE PETROBRAS SECURITIES LITIGATION | : : : : : : : : : : : : : | Case No. 14-cv-9662 (JSR)  **CLASS ACTION** |

**MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS' MOTION**
**FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION**

**POMERANTZ LLP**
Jeremy A. Lieberman
Marc I. Gross
Emma Gilmore
John A. Kehoe
Brenda Szydlo
600 Third Avenue
New York, NY 10016
Tel: (212) 661-1100
Fax: (212) 661-8665

*Counsel for Class Representatives and the*
*Settlement Class*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

I.   PRELIMINARY STATEMENT ............................................................................... 1

THE SETTLEMENT WARRANTS FINAL APPROVAL .......................................... 6

II.  The Standard for Court Approval of a Class Action Settlement .......................... 6

III. As the Product of Arm's-Length Negotiations By Informed and Knowledgeable
     Counsel, the Settlement Is Presumptively Fair ..................................................... 7

IV.  A Review of the *Grinnell* Factors Confirms That the Settlement Is Fair, Adequate, and
     Reasonable ............................................................................................................. 8

     A.   Continued Litigation Would Be Long, Complex, and Expensive .......................... 8

     B.   The Advanced Stage of the Proceedings Supports Approval of the Settlement ..... 9

     C.   The Risks of Establishing Liability and Damages Support Approval of the
          Settlement ....................................................................................................... 10

     D.   The Risks of Maintaining the Class Action Through Trial Support Approval of
          the Settlement.................................................................................................. 12

     E.   The Ability of Defendants to Withstand a Greater Judgment.............................. 15

     F.   The Range of Reasonableness of the Settlement Amount Supports the
          Settlement ....................................................................................................... 15

     G.   Additional Benefits of the Settlement............................................................... 17

     H.   The Reaction of the Class to the Settlement ..................................................... 18

THE PLAN OF ALLOCATION IS FAIR, ADEQUATE AND REASONABLE, AND
SHOULD BE APPROVED ............................................................................................ 18

THE REQUIREMENTS FOR CLASS CERTIFICATION HAVE BEEN MET AND THE
SETTLEMENT CLASS SHOULD BE CERTIFIED.................................................... 19

NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE
PROCESS ....................................................................................................................... 24

CONCLUSION............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc.* v. *Windsor*,
521 U.S. 591 (1997)......................................................................................................19, 20

*Choi v. Tower Research Capital LLC*,
No. 17-cv-648 (2d Cir. Mar. 29, 2018)...........................................................................23, 24

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)........................................................................................6, 7, 8, 10

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
954 F. Supp. 2d 276 (S.D.N.Y. 2013)..............................................................................2

*City of Providence v. Aeropostale*,
No. 11 Civ. 7132, 2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd sub nom.*
*Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015)..........................................................6, 7

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001)..............................................................................................7

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)........................................................................................................19

*George v. China Auto. Sys., Inc.*,
No. 11-cv-7533, 2013 WL 3357170 (S.D.N.Y. July 3, 2013)..................................................12

*Green v. Wolf Corp.*,
406 F.2d 291 (2d Cir. 1968)..........................................................................................21, 22

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
No. 11-cv-4209, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013)................................................12

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001).............................................................................11

*In re Am. Int'l Grp. Sec. Litig.*,
689 F.3d 229 (2d Cir. 2012)............................................................................................22

*In re AOL Time Warner, Inc. Sec. Litig.*,
Nos. MDL 1500, 02-cv-5575, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006).......................15, 18

*In re Bear Stearns Cos. Sec., Derivative & ERISA Litig.*,
999 F. Supp. 2d 259 (S.D.N.Y. 2012)...............................................................................7

*In re Blech Sec. Litig.*,
     No. 94 Civ. 7696, 2002 WL 31720381 (S.D.N.Y. Dec. 4, 2002)............................................9

*In re CitiGroup, Inc. Bond Litig.*,
     296 F.R.D. 147 (S.D.N.Y. 2013) ........................................................................................6, 25

*In re Crazy Eddie Sec. Litig.*,
     824 F. Supp. 320 (E.D.N.Y. 1993) ...........................................................................................2

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
     No. 98-cv-4318, 2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 19, 2000) ..........................22

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
     No. 05 Civ. 10240, 2007 WL 2230177 (S.D.N.Y. July 27, 2007) .........................................18

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
     312 F.R.D. 332 (S.D.N.Y. 2015) ............................................................................................22

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
     No. 02-CV-3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)....................................8, 9, 18

*In re Giant Interactive Grp., Inc.*,
     279 F.R.D. 151 (S.D.N.Y. 2011) .......................................................................................8, 18

*In re Gilat Satellite Networks, Ltd.*,
     No. 02-cv-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007).................................................8

*In re Global Crossing Sec. & ERISA Litig.*,
     225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................................9, 10, 25

*In re IMAX Sec. Litig.*,
     283 F.R.D. 178 (S.D.N.Y. 2012) ............................................................................................18

*In re Initial Pub. Offering Sec. Litig.*,
     671 F. Supp. 2d 467 (S.D.N.Y. 2009).....................................................................................16

*In re Interpublic Sec. Litig.*,
     No. 02-cv- 6527, 2003 U.S. Dist. LEXIS 19784 (S.D.N.Y. Nov. 6, 2003).............................22

*In re Lloyd's Am. Tr. Fund Litig.*,
     No. 96 Civ. 1262, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002), *aff'd sub*
     *nom. Adams v. Rose*, No. 03-7011, 2003 WL 21982207 (2d Cir. Aug. 20,
     2003) .........................................................................................................................................9

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
     233 F.R.D. 306 (E.D.N.Y. 2006) ..............................................................................................8

*In re Marsh & McLennan Cos. Sec. Litig.*,
    No. 04 Civ. 8144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)......................................19, 25

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    246 F.R.D. 156 (S.D.N.Y. 2007) .............................................................................................24

*In re MetLife Demutualization Litig.*,
    229 F.R.D. 369 (E.D.N.Y. 2005) .............................................................................................22

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd,* 117 F.3d 721 (2d Cir. 1997)...............................7, 18

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017).............................................................................................3, 4, 21

*In re Platinum & Palladium Commodities Litig.*,
    No. 10-cv-3617, 2014 WL 3500655 (S.D.N.Y. July 15, 2014)..................................................7

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) .............................................................................................19

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    164 F.R.D. 362 (S.D.N.Y. 1996) .............................................................................................24

*In re Reliance Sec. Litig.*,
    MDL No. 1304, 2002 U.S. Dist. LEXIS 29422 (D. Del. Feb. 8, 2002) ...................................23

*In re Rite Aid Corp. Sec. Litig.*,
    146 F. Supp. 2d 706 (E.D. Pa. 2001) ...................................................................................2, 16

*In re Salomon Analyst Metromedia Litig.*,
    544 F.3d 474 (2d Cir. 2008)...............................................................................................20, 21

*In re Silvercorp Metals, Inc. Sec. Litig.*,
    No. 12-cv-9456 (S.D.N.Y. Nov. 12, 2014)...............................................................................1

*In re Smart Techs., Inc. S'holder Litig.*,
    295 F.R.D. 50 (S.D.N.Y. 2013) ...............................................................................................22

*In re Sony SXRD Rear Projection Television Class Action Litig.*,
    No 06 Civ. 5173, 2008 U.S. Dist. LEXIS 36093 (S.D.N.Y. May 1, 2008).............................15

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) ...............................................................................................8

*In re Telik Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)......................................................................................18

*Katz v. Image Innovations Holdings, Inc.*,
　　No. 06-cv-3707, 2010 U.S. Dist. LEXIS 73929 (S.D.N.Y. July 21, 2010) ............................22

*Maley v. Del Global Techs. Corp.*,
　　186 F. Supp. 2d 358 (S.D.N.Y. 2002) .................................................................................8, 11

*McBean v. City of New York*,
　　233 F.R.D. 377 (S.D.N.Y. 2006) ...............................................................................................15

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
　　No. 10-cv-00302, 2013 U.S. Dist. LEXIS 179190 (C.D. Cal. Dec. 5, 2013) .........................23

*Morrison v. National Australia Bank*,
　　561 U.S. 247 (2010) ............................................................................................................ *passim*

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
　　135 S. Ct. 1318 (2015) ...............................................................................................................11

*Parker v. Time Warner Entm't Co.*,
　　631 F. Supp. 2d 242 (E.D.N.Y. 2009), *aff'd sub nom. Lobur v. Parker*, 378 F.
　　App'x 63 (2d Cir. 2010) ...................................................................................................9, 10, 15

*Police & Fire Ret. Sys. of the City of Detroit v. Safenet, Inc.*,
　　645 F. Supp. 2d 210 (S.D.N.Y. 2009) .......................................................................................11

*Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
　　277 F.R.D. 97 (S.D.N.Y. 2011) ...........................................................................................21, 22

*Shapiro v. JPMorgan Chase & Co.*,
　　No. 11 Civ. 7961, 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ...............................................7

*Silberblatt* v. *Morgan Stanley*,
　　524 F. Supp. 2d 425 (S.D.N.Y. 2007) .......................................................................................18

*State St. Cayman Tr. Co. v. Petróleo Brasileiro S.A. – Petrobras*,
　　No. 15-cv-10158 (S.D.N.Y. 2015) .............................................................................................16

*Sullivan v. DB Invs., Inc.*,
　　667 F.3d 273 (3d Cir. 2011) .......................................................................................................23

*Waggoner v. Barclays PLC*,
　　875 F.3d 79 (2d Cir. 2017) ...........................................................................................................4

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
　　396 F.3d 96 (2d Cir. 2005) ......................................................................................................6, 24

*Wash. State Inv. Bd. v. Petróleo Brasileiro S.A. – Petrobras*,
　　No. 15-cv-3923 (S.D.N.Y. 2015) ...............................................................................................16

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982)..................................................................................19

*Weseley v. Spear, Leeds & Kellogg*,
   711 F. Supp. 713 (E.D.N.Y. 1989) ......................................................................8

**Statutes**

Exchange Act ...................................................................................................................20

PSLRA .............................................................................................................................2

Securities Act ..................................................................................................................20

**Rules**

Fed. R. Civ. P. 23 ..................................................................................... *passim*

**Other Authorities**

B. Morris and Stuart Z. Goldstein, *Guide to Clearance and Settlement, An
   Introduction to DTCC* ........................................................................................23

Cornerstone Research, *Securities Class Action Settlements: 2013 Review and
   Analysis* (2014) ...................................................................................................1

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure,  Lead Plaintiff Universities Superannuation Scheme Ltd., acting as sole corporate trustee of Universities Superannuation Scheme ("USS"), and named plaintiffs North Carolina Department of State Treasurer ("North Carolina") and the Employees' Retirement System of the State of Hawaii ("Hawaii") (collectively, "Class Representatives," "Class Plaintiffs," or "Plaintiffs"), individually and on behalf of each Settlement Class Member, respectfully submit this memorandum in support of Plaintiffs' motion for final approval of the proposed Settlement of this securities class action (the "Action"), and of the Plan of Allocation.[1]

## I.   PRELIMINARY STATEMENT

Plaintiffs are pleased to present to the Court the largest securities class action settlement in a decade, for an amount of $3 billion (the "Settlement"), $2.95 billion to be paid by the Petrobras Defendants and $50 million to be paid by defendant PricewaterhouseCoopers Auditores Independentes ("PwC Brazil").  The Settlement is an excellent result for the Settlement Class. Plaintiffs estimate that the Settlement returns approximately (i) 22.3% of the likely recoverable damages suffered by the Class, using corrective disclosures accompanied by price declines at a 95% statistical significant level; or (ii) 18.6% of the likely recoverable damages suffered by the Class, using corrective disclosures accompanied by price declines at a 90% statistical significant level—well above the median settlement for securities class actions.  *See* Cornerstone Research, *Securities Class Action Settlements: 2013 Review and Analysis*, at 8-9 (2014) ("Cornerstone") (noting that in 2013, securities settlements overall returned a median of 2.1% of damages, with 4.3% where damages are between $50-124 million); *see also* Order, *In re Silvercorp Metals, Inc. Sec. Litig.*, No. 12-cv-9456 (JSR) (S.D.N.Y. Nov. 12, 2014), ECF No. 63 (Rakoff, J.) (granting

---

[1]  Unless otherwise defined herein, all capitalized terms used herein have the meanings set forth and defined in the Petrobras Stipulation (ECF No. 767-1).

preliminary approval of settlement that was just over 10% of the likely recoverable damages); *see also* Memorandum of Law in Support of Preliminary Approval of settlement (Oct. 23, 2014), ECF No. 60; *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013) (Rakoff, J.) (granting final approval of settlement that was "10% of the plaintiff's best-case damages model"); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (citing studies indicating that the average securities fraud class action settlement since 1995 has resulted in a recovery of 5.5% – 6.2% of estimated losses); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 323-24 (E.D.N.Y. 1993) (approving settlement that was 10% of estimated maximum recovery).

Significantly, the Settlement represents the largest single payout by a foreign issuer in a securities class action in history, as well as the largest securities class action settlement involving a foreign Lead Plaintiff.  It is also the largest securities class action settlement not involving a restatement of financials.  Even more impressive, based upon the charges recognized to date by the Petrobras Defendants with respect to the settlements of the Individual Actions, the Class's recovery in this Action represents a 65% premium over those recoveries—an unprecedented result. Further breaking the mold, after reviewing the excellent results obtained by the Settlement, most of the remaining plaintiffs in the Individual Actions—sophisticated institutional investors represented by excellent counsel—have indicated their intention to remain Settlement Class Members and forego their individual claims.  *See* Declaration of Jeremy A. Lieberman ("Lieberman Decl.) ¶ 364.[2]  Class Counsel is unaware of any securities class action since the passage of the PSLRA where a class recovery was greater than that of individual actions,

---

[2] The Declaration of Jeremy A. Lieberman is being submitted in Support of (A) Class Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (B) Class Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses.

compelling the remaining individual plaintiffs to abandon their cases.  Thus, by any metric, the recovery achieved by Plaintiffs is an excellent result.

The Settlement has been praised by commentators.  An article appearing in the *Corporate Counsel* magazine on January 8, 2018, cautioned that "if any general counsel out there are still letting their companies sleepwalk through compliance programs, Wednesday's $2.95 billion class action settlement with the Brazilian oil company Petrobras should smack them wide awake." Lieberman Decl. ¶ 373.  And the *Wall Street Journal* quoted Sean Griffith, an expert in corporate and securities law at Fordham University School of Law, who commented on the spectacular result achieved here, stating that "[t]he plaintiffs must have been able to prove their damages case pretty convincingly in order to move the defendants to the negotiating table and to get them to settle around such a large number."  *Id*. ¶ 374.

While securing an extraordinary result for the Settlement Class, Plaintiffs also secured important precedent favorable to class members in securities and other class action disciplines.  In an issue of first impression, the Second Circuit squarely rejected Defendants' invitation to adopt the heightened ascertainability requirement promulgated by the U.S. Court of Appeals for the Third Circuit, which would have required Plaintiffs to demonstrate that determining membership in a class is "administratively feasible."  *In re Petrobras Sec. Litig.*, 862 F.3d 250, 267-69 (2d Cir. 2017).  The Second Circuit also refused to adopt a requirement, urged by Defendants, that all securities class action plaintiffs seeking class certification prove through direct evidence (*i.e.*, via an event study) that the prices of the relevant securities moved in a directionally appropriate manner in response to new information.  *Id*. at 276-79.  The Second Circuit rejected the notion that such event studies were required to  be submitted by Plaintiffs at the class certification stage, agreeing with Plaintiffs that "[e]vent studies offer the seductive promise of hard numbers and

dispassionate truth, but methodological constraints limit their utility in the context of single-firm analyses." *Id*. at 278.  Building on its decision in *Petrobra*s, in *Waggoner* v. *Barclays PLC*, another case where Pomerantz serves as sole lead counsel, the Second Circuit held that it might be possible to certify a class without *any* event study, concluding that "direct evidence of price impact [*i.e.*, an event study] . . . is not always necessary to establish market efficiency and invoke the *Basic* presumption" of reliance.  *Waggoner v. Barclays PLC*, 875 F.3d 79, 96-97 (2d Cir. 2017).  Importantly, the Second Circuit also held in *Waggoner* that defendants seeking to rebut the presumption of reliance must do so by a preponderance of the evidence rather than merely meeting a burden of production.  *Id*. at 101.  These favorable rulings by the Second Circuit will form the bedrock of class action jurisprudence for decades to come.

Counsel for Plaintiffs and the Petrobras Defendants engaged in extensive efforts and negotiations to resolve the Action since early December 2015.  Among other things, Plaintiffs and the Petrobras Defendants prepared and exchanged extensive mediation statements outlining their settlement positions and engaged in five in-person mediation sessions before a respected and experienced mediator, former U.S. District Judge Layn R. Phillips.  Counsel for Plaintiffs and Defendant PwC Brazil also held a mediation session in July 2016 before Judge Phillips.  In addition to these in-person mediation sessions, the participants in the mediation expressed their positions in dozens of hours of telephonic follow-ups.  An agreement with Defendant PwC Brazil was reached on August 2, 2016.  After many attempts to settle, Plaintiffs also reached an agreement in principle with the Petrobras Defendants, which was formalized on December 31, 2017.

The Settlement resolves the claims of persons who purchased Petrobras securities (American Depository Receipts and Notes) involving "Covered Transaction[s]," as defined in the Stipulation and Agreement of Settlement ("Stipulation").  (ECF No. 767-1 at 17-18.).  Pursuant to

the terms of the Stipulation, "'Covered Transaction' means any transaction that satisfies any of the following criteria: (i) any transaction in a Petrobras Security listed for trading on the New York Stock Exchange ("NYSE"); (ii) any transaction in a Petrobras Security that cleared or settled through the Depository Trust Company's book-entry system; or (iii) any transaction in a Petrobras Security to which the United States securities laws apply, including as applicable pursuant to the Supreme Court's decision in *Morrison v. National Australia Bank*, 561 U.S. 247 (2010)." *Id.* "Excluded from the definition of Covered Transaction are purchases of any Petrobras Security on the BOVESPA." *Id.*

Before the settlements were reached, Class Counsel engaged in over three years of vigorous litigation, which included (i) conducting an extensive investigation into the Class's claims; (ii) drafting four detailed amended complaints based on an extensive pre-filing investigation that included hiring an investigator fluent in Portuguese who served 20 years as an agent with the Federal Bureau of Investigation, with responsibilities involving Brazil; meeting with members of the Brazilian Federal Police and the Brazilian press; obtaining written cooperation statements provided by Cartel members to Brazilian authorities in connection with criminal actions or investigations; securing videotaped depositions and criminal complaints filed in Brazil; locating congressional testimony in Brazil; obtaining public filings with the "CVM" (the equivalent of the SEC of Brazil), securing reports issued by the Brazilian Federal Court of Accounts and documents from Brazil's Administrative Council for Economic Defense; (iii) successfully opposing Defendants' multiple efforts to dismiss Plaintiffs' claims; (iv) successfully opposing Defendants' efforts to defeat Class Certification in the District Court and securing a favorable decision by the Second Circuit; (v) engaging in extensive class, fact and expert discovery, including participating in 68 depositions and reviewing more than 25 million pages of documents; (vi) preparing

oppositions to Defendants' motions for summary judgment; (vii) preparing Class Plaintiffs' own motion for partial summary judgment; (viii) consulting extensively with experts and consultants in the areas of materiality, accounting, economics and securities litigation damages, and Brazilian law; (ix) opposing Defendants' petition for a writ of certiorari to the Supreme Court; and (x) preparing for trial, including drafting Daubert motions, motions in limine, jury verdict forms, jury instructions, voir dire and draft pre-trial orders, and an exhaustive exhibit list amounting to over 1,500 exhibits.

## THE SETTLEMENT WARRANTS FINAL APPROVAL

## II.     The Standard for Court Approval of a Class Action Settlement

"A court may approve a class action settlement if it is fair, adequate, and reasonable, and not a product of collusion." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (citation and quotations omitted).  In making this determination, courts apply the *Grinnell* factors: (1) the litigation's complexity, expense and likely duration; (2) class reaction to the settlement; (3) stage of the proceedings and amount of discovery completed; (4) risks of establishing liability; (5) risks of establishing damages; (6) risks of maintaining the class action through trial; (7) defendants' ability to withstand a greater judgment; and (8) range of reasonableness of the settlement fund in light of best possible recovery and all attendant litigation risks. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).

"[N]ot every factor must weigh in favor of the settlement, but rather the court should consider the totality of these factors in light of the particular circumstances," *City of Providence v. Aeropostale*, No. 11 Civ. 7132 (CM) (GWG), 2014 WL 1883494, at *4 (S.D.N.Y. May 9, 2014), (citation and quotations omitted), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015), "stop[ping] short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Grinnell*, 495 F.2d at 462; *In re CitiGroup, Inc. Bond Litig.*, 296

F.R.D. 147, 155 (S.D.N.Y. 2013).  A court's function in reviewing a settlement is not to rewrite the settlement agreement reached by the parties or to try the case by resolving issues intentionally left unresolved. *See, e.g., Shapiro v. JPMorgan Chase & Co.*, No. 11 Civ. 7961 (CM), 2014 WL 1224666, at *10 (S.D.N.Y. Mar. 24, 2014).

The Settlement is a great result, is presumptively fair, and satisfies the *Grinnell* factors.

### III.   As the Product of Arm's-Length Negotiations by Informed and Knowledgeable Counsel, the Settlement Is Presumptively Fair

To determine fairness, a court should consider the "negotiating process leading up to the settlement, i.e., procedural fairness, as well as the settlement's substantive terms, i.e., substantive fairness." *In re Platinum & Palladium Commodities Litig.*, No. 10-cv-3617, 2014 WL 3500655, at *11 (S.D.N.Y. July 15, 2014) (quoting *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)).  "A strong initial presumption of fairness attaches to a proposed settlement if it is reached by experienced counsel after arm's-length negotiations." *Aeropostale*, 2014 WL 1883494, at *10. The Settlement was reached after extended arm's-length negotiations by Lead Counsel and defense counsel, premier securities litigation firms who believe it to be fair, reasonable, and adequate. *See id.* at *4, *9; *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997), *aff'd,* 117 F.3d 721 (2d Cir. 1997). There were no fewer than six mediation sessions regarding the Settlement, five of them between Class Plaintiffs and Petrobras, and nearly all of them contentious. Lieberman Decl. ¶¶ 296-98.  The Hon. Layn Phillips presided over the sessions.  All of the sessions occurred before the August 2, 2016, stay of proceedings ordered by the Second Circuit.  The Settlement is thus presumptively fair. *See In re Bear Stearns Cos. Sec., Derivative & ERISA Litig.*, 999 F. Supp. 2d 259, 265 (S.D.N.Y. 2012) (approving settlement where parties "engaged in extensive arm's length negotiations, which included multiple sessions mediated by retired federal judge Layn R. Phillips, an experienced and well-regarded mediator of complex securities cases");

*In re Giant Interactive Grp., Inc.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011) (approving settlement and finding it was entitled to a presumption of fairness where the "settlement was the product of prolonged, arms-length negotiation" facilitated by Judge Phillips, "a respected mediator").

## IV.   A Review of the *Grinnell* Factors Confirms That the Settlement Is Fair, Adequate, and Reasonable

### A.   Continued Litigation Would Be Long, Complex, and Expensive

"[I]n evaluating the settlement of a securities class action, federal courts … 'have long recognized that such litigation is notably difficult and notoriously uncertain.'" *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM) (PED), 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010) (citations omitted).  Indeed, courts recognize that "[s]ecurities class actions are generally complex and expensive to prosecute," *In re Gilat Satellite Networks, Ltd.*, No. 02-cv-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007).[3]  Accordingly, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).  Here, the action had been stayed for nearly a year and a half with potentially no end in sight.  Defendants recently filed a writ of certiorari seeking Supreme Court review of the Second Circuit's decision, resulting in more delay and risks.

The parties also would have faced further litigation—particularly a trial—that would have been expensive and risky.  Among other things, the jury would have had to determine whether Petrobras was a victim or the perpetrator of the fraud, and whether the culpable individual defendants acted adversely to Petrobras or at least partially in pursuit of Petrobras interests.  The

---

[3] *See similarly Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999); *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989).

jury would have had to decide a battle of the experts, determining whether Petrobras' securities traded on an efficient market, entitling Plaintiffs to a presumption of reliance, but permitting Defendants' now-inevitable rebuttal evidence on price impact under *Halliburton*. Moreover, Defendants had designated 14 experts to opine at trial regarding a host of issues, including materiality, scienter, damages, and the Brazilian regulatory framework, in comparison to just 4 experts designated by Class Plaintiffs. Accordingly, there was a risk that a jury might be swayed by the sheer number of experts hired by Defendants. Even more concerning, the Individual Action Plaintiffs had retained ***three*** different damages experts, each of them premised on complaints alleging a significantly lower damages-per-share than that opined by Class Plaintiffs' experts. Thus, there was a significant risk that the factfinder would be hopelessly confused by four contradictory damages opinions, finding none of them to be credible.[4] The Settlement provides an outstanding and certain recovery, without the further expense, delay, and risk of a smaller recovery or potentially no recovery for the Class presented by continued litigation.

### B.   The Advanced Stage of the Proceedings Supports Approval of the Settlement

"This factor relates to whether the plaintiffs had sufficient information on the merits of the case to enter into a settlement." *Parker v. Time Warner Entm't Co.*, 631 F. Supp. 2d 242, 259 (E.D.N.Y. 2009), *aff'd sub nom. Lobur v. Parker*, 378 F. App'x 63 (2d Cir. 2010). Extensive discovery ensures

---

[4] *See*, *e.g.*, *FLAG Telecom*, 2010 WL 4537550, at *18 ("Undoubtedly, in this action, establishing the amount of damages at trial would have resulted in a 'battle of experts.' The jury's verdict with respect to damages would thus depend on its reaction to the complex testimony of experts, a reaction that is inherently uncertain and unpredictable."); *In re Lloyd's Am. Tr. Fund Litig.*, No. 96 Civ. 1262 RWS, 2002 WL 31663577, at *21 (S.D.N.Y. Nov. 26, 2002) ("The reaction of a jury to such complex expert testimony is highly unpredictable."), *aff'd sub nom. Adams v. Rose*, No. 03-7011, 2003 WL 21982207 (2d Cir. Aug. 20, 2003); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004); *In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2002 WL 31720381, at *1 (S.D.N.Y. Dec. 4, 2002) ("[e]stablishing damages from the drop in the relevant stock price, would, Plaintiffs claim, have degenerated into a 'battle of the experts' and thus posed a risk to Plaintiffs").

the parties had access to sufficient material to evaluate their cases and to assess the settlement given strengths and weaknesses. *Id.* Here, the proceedings were sufficiently advanced to provide Plaintiffs with a thorough understanding of the strengths and weaknesses of the Class's claims. Fact and expert discovery were completed by the time the parties agreed to settle. The parties were a mere 48 days from trial when the Second Circuit stayed the proceedings. Discovery has been particularly robust. For example, the Petrobras Defendants produced over 7 million pages of documents; the Underwriter Defendants produced over 2.5 million pages of documents; PwC Brazil produced approximately 2 million pages of documents; in response to subpoenas issued by Plaintiffs, relevant third parties produced approximately 400,000 pages of documents; and in response to subpoenas issued by Defendants, relevant third parties produced over 9.4 million pages of documents. Lieberman Decl. ¶ 383. The Parties also obtained testimony from witnesses through more than 65 depositions of Plaintiffs, Defendants, third parties, and experts. *Id*. ¶¶ 123, 219. Accordingly, the state of the proceedings and discovery completed weigh strongly in favor of approving the Settlement.

### C.   The Risks of Establishing Liability and Damages Support Approval of the Settlement

The Court must also balance the risks of establishing liability and damages against the benefits afforded to the Class, and the immediacy and certainty of a substantial recovery against the risks of continuing litigation. *Grinnell*, 495 F.2d at 463. Courts approve settlements where, as here, "plaintiffs would have faced significant legal and factual obstacles to proving their case." *Global Crossing* , 225 F.R.D. at 459. Here, liability and damages have been hotly contested. Throughout this hard-fought litigation, Defendants have consistently denied any wrongdoing. For example, Petrobras claimed it was the victim of the fraudulent scheme rather than the perpetrator. Lieberman Decl. ¶¶ 47-8, 85, 322. Following the dismissal of the Section 10(b) securities fraud claim against it, PwC Brazil

was prepared to defend the remaining Section 11 claim on the grounds that no PwC Brazil personnel were alleged to have been involved in any corruption and that its audits complied with the professional standards.  *Id*. at ¶ 85.  PwC Brazil also maintained that its properly-performed audits could not have identified overcharges or improper payments that were not reflected in company records.  *Id*. at ¶ 85.  PwC Brazil argued that Plaintiffs failed to plead that PwC Brazil's opinions were false statements under Section 11 and the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015).  *Id*. at ¶ 86.  Among other attacks, Defendants also challenged falsity and materiality, maintaining that the money diverted for unlawful payments included only the bribes themselves, but not the billions of dollars in overpriced contracts awarded to cartel members and other corrupt contractors.  *Id*. at ¶ 89.

Defendants also assailed Plaintiffs' expert's damages analysis and launched various loss causation attacks.  *Id*. at ¶¶ 82, 209-210, 317-318.  Accordingly, Plaintiffs would have encountered potentially fatal loss causation defenses at the summary judgment phase, as well as at trial.  For example, this Court might have found that Plaintiffs' expert failed to properly disaggregate the portion of the alleged price declines that arose from the disclosures that corrected the fraud alleged by Plaintiffs from those that pertained to other issues not directly relevant to the Action.  *See, e.g.*, *Police & Fire Ret. Sys. of the City of Detroit v. Safenet, Inc.*, 645 F. Supp. 2d 210, 228-29 (S.D.N.Y. 2009) (dismissing claims based on stock drop following press release because the complaint failed to "explain why the disclosure on page eight—as opposed to all the other information in the extended 12-page press release—caused the price decline").  Moreover, a jury could have been swayed by experts for Defendants (and the Individual Plaintiffs) that the amount of recoverable damages was significantly less than what Class Plaintiffs alleged.  *See Maley*, 186

F. Supp. 2d at 365 (citing *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 427 (S.D.N.Y. 2001)).   Indeed, as set forth in more detail in the Lieberman Declaration, Class Plaintiffs' damages allegations were particularly aggressive, alleging a disclosure period more than double that alleged by the Individual Plaintiffs, containing 85 corrective disclosures.   Class Plaintiffs' expert report was similarly aggressive, alleging an unprecedented 21 corrective disclosures, the largest amount of alleged corrective disclosures that both Class Plaintiffs and their well-regarded expert (Dr. Blaine Nye) have ever encountered.   While Class Plaintiffs believe that their damages allegations were properly tethered to the unique facts of the case, there was a risk that the Court or the factfinder would have struck or rejected them in whole or in part.

### D.   The Risks of Maintaining the Class Action Through Trial Support Approval of the Settlement

While certification of securities class action remains the norm, it is by no means automatic. *See, e.g.*, *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11-cv-4209 (KBF), 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) (denying motion for certification of class of U.S. purchasers of large foreign bank's Global Registered Shares); *George v. China Auto. Sys., Inc.*, No. 11-cv-7533 (KBF), 2013 WL 3357170 (S.D.N.Y. July 3, 2013) (denying motion for certification of class of purchasers of stock of China-based U.S.-listed company).   To be entitled to class certification, Plaintiffs must show that common issues predominate over individual ones.   Plaintiffs can meet their burden by showing that Petrobras' securities traded on an efficient market, entitling purchasers to the presumption of reliance on Defendants' materially false statements.   Under *Halliburton II*, Defendants are permitted to rebut the presumption of reliance by proving the absence of price impact from the alleged misstatements, thereby defeating class certification.   In their petition for writ of certiorari, the Petrobras Defendants argued that the Second Circuit committed a "fundamental error" by "excus[ing] plaintiffs from offering any empirical proof of

even indirect price impact." Pet. at 15.  The Petrobras Defendants maintained that to invoke the presumption of reliance, Plaintiffs needed to demonstrate that Petrobras's securities reacted in a directionally predictable manner to new, material information. *Id.* at 16.  The Petrobras Defendants also argued that the Second Circuit "not only eliminated the 'essential precondition' [of empirical proof] to the presumption of reliance in the first place, [but] it also deprived defendants of the ability to introduce empirical evidence to rebut the presumption of reliance."  *Id.* at 15-16. Moreover, at the Supreme Court level, Defendants also challenged the Second Circuit's refusal to adopt a heightened ascertainability standard.  If the Supreme Court agreed with Defendants, potentially all or a significant portion of the Petrobras Notes would be thrown out, and the court's class certification decision with respect to the ADSs would be overturned, reducing the amount of recoverable damages significantly.

There was also a risk that, on remand, this Court would have found that predominance was not met for transactions that did not trade on a U.S. exchange.  For example, on July 7, 2017, the Second Circuit affirmed in part and vacated in part the District Court's decision certifying the classes and remanded the case to the District Court.  (ECF No. 754).  With respect to ascertainability, the Second Circuit held that "a freestanding administrative feasibility requirement is neither compelled by precedent nor consistent with Rule 23."  *Id.* at 28.  The court explained that "[t]he ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries."  *Id.*  Applying this doctrine, the court held that "ascertainability is not an impediment to certification of the Classes as currently defined."  *Id.*  Regarding predominance, however, the Second Circuit observed that the District Court failed to undertake an analysis on *Morrison*'s impact on this requirement and, for this reason, it vacated the certification of the Classes insofar as they include all otherwise

13

eligible class members who acquired their Securities in domestic transactions.  *Id*. at 53-54.  The Second Circuit explained that, while "[t]he need for *Morrison* inquiries nominally presents a common question because the need to show a 'domestic transaction' applies equally to each putative class member," "Plaintiffs bear the burden of showing that, more often than not, they can provide common *answers*."  *Id*. at 50 (emphasis in original).  The Court observed that "[i]n this case, the potential for variation across putative class members—who sold them the relevant securities, how those transactions were effectuated, and what forms of documentation might be offered in support of domesticity—appears to generate a set of individualized inquiries that must be considered within the framework of Rule 23(b)(3)'s predominance requirement."  *Id*. at 50-51.  In this Action, the Court noted, "it cannot be said that the class members' *Morrison* inquiries will prevail or fail in unison . . . The district court has already adjudicated several individualized *Morrison* inquiries, preserving some plaintiffs' claims and dismissing others . . . [W]ithout class-wide evidence of domesticity, the fact-finder would have to look at every class member's [transaction] documents to determine who did and who did not have a valid claim . . . The predominance analysis must account for such individual questions, particularly when they go to the viability of each class member's claims."  *Id*. at 52 (citations and quotations omitted).[5]

Thus, without a settlement, the risk remained of maintaining the Class Action through trial.

---

[5] The Second Circuit took "no position as to whether, on remand, the district court might properly certify one or more classes that capture some or all of the Securities holders who fall within the Classes as currently defined. Our purpose is merely to outline the contours of the robust predominance inquiry that Rule 23 demands."  *Id*.  at 53-54.  The Second Circuit "le[ft] the adjudication thereof to the district court in the first instance." *Id*. The Second Circuit acknowledged that there was a "wide range of conceivable circumstances in which plaintiffs may assert class claims in connection with foreign-issued securities that do not trade on a domestic exchange." *Id*.

###### E.      The Ability of Defendants to Withstand a Greater Judgment

Class Plaintiffs obtained an outstanding recovery for the Class.  The recovery achieved here has been described by many commentators as "huge," "stunning," a "blockbuster payday," and the "fifth largest on record for securities class-action suits."  *See* ECF No. 766 at 17-18.  The mere fact that a defendant "is able to pay more than it offers in settlement does not, standing alone, indicate the settlement is unreasonable or inadequate."[6]  *See Parker*, 631 F. Supp. 2d at 261 (citation omitted); *In re AOL Time Warner, Inc. Sec. Litig.*, Nos. MDL 1500, 02-cv-5575 (SWK), 2006 WL 903236, at *12 (S.D.N.Y. Apr. 6, 2006) ("the mere ability to withstand a greater judgment does not suggest that the Settlement is unfair"); *see similarly In re Sony SXRD Rear Projection Television Class Action Litig.*, No 06 Civ. 5173 (RPP), 2008 U.S. Dist. LEXIS 36093, at *23 (S.D.N.Y. May 1, 2008) ("A defendant is not required to 'empty its coffers' before a settlement can be found adequate." (*quoting McBean v. City of New York*, 233 F.R.D. 377, 388 (S.D.N.Y. 2006)).   Moreover, while Petrobras' ability to withstand a judgment is one consideration, the ability of Class Plaintiffs to enforce a judgment was particularly uncertain given that Petrobras is a foreign entity, and the enforceability of a class action judgment in Brazil has not been tested.

###### F.      The Range of Reasonableness of the Settlement Amount Supports the Settlement

The $3 billion Settlement is historic.  It represents the largest securities class action settlement in a decade.  It is also the largest settlement ever in a class action involving a foreign issuer and it is the fifth-largest securities class action settlement ever achieved in the United States.  The Settlement is the largest class action settlement involving no restatement.  It is also the biggest settlement achieved

---

[6] It is far from certain that Petrobras would have been able to pay significantly more to settle the Action.

by a foreign lead plaintiff.  Plaintiffs' consultation with their expert indicated that maximum Class-wide damages were likely (i) USD$13.43 billion, using corrective disclosures accompanied by price declines at a 95% statistical significance level, or (ii) USD$16.116 billion, using corrective disclosures accompanied by price declines at a 90% statistical significance level.  Accordingly, the Settlement returns (i) approximately 22.3 percent (22.3%) of the likely recoverable damages suffered by the Class, using corrective disclosures followed by price declines at a 95% statistical significant level; or (ii) 18.6% of the likely recoverable damages suffered by the Class, using corrective disclosures followed by price declines at a 90% statistical significant level—well above the median settlement for securities class actions.  Plaintiffs' damages model, however, was particularly aggressive, alleging no less than 85 corrective disclosures, with their damages expert opining that at least 21 of those disclosures were statistically significant at the 95% Confidence Interval level.  By comparison, when price inflation is estimated using the allegations of the Individual Plaintiffs[7], the aggregate damages for the ADSs and Notes are estimated to be approximately $5.68 billion for the remaining Class members (*i.e.*, for those who have not opted out of the Class).  This implies that the settlement of $3 billion represents a recovery of 52% for the remaining Class.

Under any of these ranges, the recovery achieved on behalf of the Class is remarkable.  *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 483 n.130 (S.D.N.Y. 2009) (citing a law review article finding that "the ratio of securities class action settlements to investors' economic losses has ranged over recent years between two and three percent"); *In re Rite Aid*, 146 F. Supp. 2d at 715 (noting a study showing that settlements since 1995 have recovered between 5.5% and 6.2% of estimated losses).

---

[7] *See, e.g., State St. Cayman Tr. Co. v. Petróleo Brasileiro S.A. – Petrobras*, No. 15-cv-10158 (JSR) (ECF No. 1); *Wash. State Inv. Bd. v. Petróleo Brasileiro S.A. – Petrobras*, No. 15-cv-3923 (JSR) (ECF No. 74).

### G.    Additional Benefits of the Settlement

The Settlement represents a pure benefit to Settlement Class Members, with none of the "circularity" or "pocket shifting" concerns raised by legal scholars.  First, the overwhelming majority of Settlement Class members do not continue to hold the same Petrobras securities that they held at the beginning of the Class Period, with 42% of Class Period institutional investors abandoning investments in the Company altogether.  Lieberman Decl. ¶ 313.  As for the remaining 58% that did continue investing in Petrobras, virtually all of them had sold their Class Period holdings in the wake of the Lava Jato scandal, and subsequently reinvested at lower prices that incorporated the risk of this Action in their share price.  *Id*.  Additionally, even assuming that most Class Period investments were held to today (they were not), common and preferred ADRs represent only 19% of the total Petrobras common and preferred stock outstanding, with 64% of the securities being held by the Brazilian government and related entities.  *Id*. ¶ 314.  Thus, even if all Class Members were to have retained their investments, they are not paying themselves; instead, 81% of the Company's shareholders (the majority of which were held by the Brazilian government) are paying a minority 19% their settlement monies.  More significantly, on the day that the Settlement was announced, Petrobras share price increased by 2.5%.  *Id*. ¶ 312. Accordingly, there is simply no evidence that the Settlement is harmful at all to current Petrobras shareholders.  Notably, unlike many other mega class action settlements, the $3 billion recovery is the only compensation available to Petrobras investors that had neither the resources nor inclination to file their own individual action.   The SEC has not even filed a complaint against Defendants, and there is no recovery from any regulatory agency or body in sight, let alone a substantial recovery, leaving the Settlement as the sole mechanism by which defrauded investors can receive any compensation.

### H.    The Reaction of the Class to the Settlement

Pursuant to the terms of the Preliminary Approval Order, and as set forth in the Settlement Notice, the deadline for Class Members to submit objections to the Settlement, the Plan of Allocation and/or Class Counsel's request for an award of attorneys' fees and reimbursement of litigation expenses is May 11, 2018.  As of April 13, 2018, The Claims Administrator, Garden City Group ("GCG"), disseminated more than one million copies of the Notice Packet to potential Class Members and nominees.  *See* Exhibit 2 to the Affidavit of Niki Mendoza of GCG ("Mendoza Aff.", submitted herewith), ¶ 16.  The Notice Packets contain the Plan of Allocation and advise Settlement Class Members of their right to object to the proposed Plan of Allocation.  *Id.* ¶ 6.  To date, no valid objections to the Settlement have been received.  *Id.*  ¶ 32.  While there have been 280 exclusions to date, all have been submitted by individuals, except for a single institution that is not a Settlement Class Member.  *Id.* ¶ 32.  Class Plaintiffs will address all objections in their reply papers, which are due to be filed with the Court on May 25, 2018.

### THE PLAN OF ALLOCATION IS FAIR, ADEQUATE AND REASONABLE, AND SHOULD BE APPROVED

A plan for allocating settlement proceeds, like the Settlement itself, should be approved if it is fair, reasonable and adequate.  *See, e.g., In re IMAX Sec. Litig.,* 283 F.R.D. 178, 192 (S.D.N.Y. 2012); *Giant Interactive,* 279 F.R.D. at 163*; AOL Time Warner,* 2006 WL 903236, at *17. Generally, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable.  *See In re Telik Inc. Sec. Litig.,* 576 F. Supp. 2d 570, 580 (S.D.N.Y. 2008) ("A reasonable plan may consider the relative strengths and values of different categories of claims.").  Plans of allocation, however, need not be tailored to fit each and every class member with "mathematical precision."  *In re Paine Webber,* 171 F.R.D. at 133; *see also Silberblatt* v. *Morgan Stanley,* 524 F. Supp. 2d 425, 430 (S.D.N.Y. 2007) (same). Moreover, in assessing a

proposed plan of allocation, courts give great weight to the opinion of informed counsel. *See, e.g.,* *FLAG Telecom,* 2010 WL 4537550, at *21 (the conclusion of "experienced and competent counsel . . . that the Plan of Allocation is fair and reasonable is . . . entitled to great weight"); *In re EVCI Career Colls. Holding Corp. Sec. Litig.,* No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007) ("In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel.").

The proposed Plan of Allocation was prepared with the assistance of Class Plaintiffs' damages expert (who crafted the Plan based upon the corrective disclosures identified in his report, Lieberman Decl. ¶ 343) and was described in the Notice at 12-18.  It provides *pro rata* payments to Class Members based on when, if ever, they sold their Petrobras Securities.  It is designed to ensure that those Class Members who purchased Petrobras Securities at artificially inflated prices, and then sold or held stock after a corrective disclosure occurred (*i.e.*, those who could show loss causation) are the sole beneficiaries of the Settlement.  By the same token, it provides that any Class Member who purchased Securities that were sold before any corrective disclosure will receive nothing, since they would have been unable to establish loss causation.  *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336 (2005).  The Plan of Allocation thus has a rational basis and should be approved.

## THE REQUIREMENTS FOR CLASS CERTIFICATION HAVE BEEN MET AND THE SETTLEMENT CLASS SHOULD BE CERTIFIED

The Second Circuit has long acknowledged the propriety of certifying a class solely for purposes of a class action settlement.  *See Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir. 1982); *In re Marsh & McLennan Cos. Sec. Litig.,* No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *8 (S.D.N.Y. Dec. 23, 2009); *see also In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200, 205 (S.D.N.Y. 1995) (certification of a settlement class "has been recognized throughout the

country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants").  While a settlement class, like other certified classes, must satisfy the requirements of Rules 23(a) and (b), the manageability concerns of Rule 23(b) are not at issue when certifying a settlement class.  *See Amchem Prods., Inc.* v. *Windsor,* 521 U.S. 591, 593 (1997) ("Whether trial would present intractable management problems . . . is not a consideration when settlement-only certification is requested . . . .").

Here, the parties stipulated to certification of the Class for settlement purposes as follows:

(i) all purchasers who, during the period January 22, 2010 through and including July 28, 2015 (the "Class Period"), purchased or otherwise acquired the securities of Petrobras, including debt securities by PifCo and/or PGF on the New York Stock Exchange (the "NYSE") or pursuant to other Domestic Transactions (the "Exchange Act Securities"), excluding Defendants, current or former officers and directors of Petrobras, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest (the "Exchange Act Class"); and (ii) all purchasers who purchased or otherwise acquired debt securities issued by Petrobras, PifCo, and/or PGF, in Domestic Transactions, directly in, pursuant and/or traceable to a May 13, 2013 public offering registered in the United States and/or a March 10, 2014 public offering registered in the United States before Petrobras made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the offerings (the "Securities Act Securities") (together with the Exchange Act Securities, the "Petrobras Securities"), excluding Defendants, current or former officers and directors of Petrobras, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest (the "Securities Act Class") (together with the Exchange Act Class, the "Settlement Class Members").

In its Order preliminarily approving the Settlement, the Court conditionally certified the Class for purposes of settlement.  Because all requirements for class certification are met, *see* Fed. R. Civ. P. 23(a), (b)(3), and in light of the substantial benefits the Settlement confers, Plaintiffs respectfully request that the Court now grant final class certification for purpose of the Settlement. *See Amchem*, 521 U.S. 591 (settlement classes permissible).   As explained in Plaintiffs' Memorandum of Law in Support of Preliminary Approval of Settlement (ECF No. 766 at 19-24), the proposed Settlement Class warrants certification for settlement purposes.  Plaintiffs have

demonstrated why the predominance prong is satisfied.  *Id.*  To satisfy predominance, "a plaintiff must show that those issues in the proposed action that are subject to generalized proof outweigh those issues that are subject to individualized proof."  *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 480 (2d Cir. 2008) (citation omitted).  This inquiry "tests whether a proposed class is sufficiently cohesive to warrant adjudication by representation."  *Id.* (citation and quotations omitted).  There are questions of law and fact common to the Class that predominate over any individual questions, specifically whether Defendants' alleged actions, which were centralized and uniform, violated federal securities laws and whether those violations were knowing or reckless.  These common issues predominate over any individual issues.  *See Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 111 (S.D.N.Y. 2011) (Rakoff, J.) ("'individual issues will likely arise in this case as in all class action cases,' and to allow 'various secondary issues of plaintiffs' claim[s] to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws.'") (citation omitted) (alteration in original).

Here, as noted above, in reviewing this Court's decision certifying the class for non-settlement purposes, the Second Circuit acknowledged that even if the *Morrison* determination would involve individualized issues, common issues can *still* predominate, warranting class certification.  *In re Petrobras*, 862 F.3d at 274 n.27.  The Second Circuit explained that the "district court could . . . carefully weigh the relationship between common and individual questions in the case and determine that any variation across plaintiffs is, on balance, insufficient to defeat predominance."  *Id.*  That is precisely the case here, where liability turns primarily on whether Defendants made misstatements and omissions, an issue subject to generalized proof.  Indeed, the Second Circuit long ago held that in class actions claiming violations of the U.S. federal securities laws, as here, where certain misrepresentations and omissions "are common to all . . .

prospectuses," where the fraudulent background is common to all those who might have been injured, and where proof of intent by a defendant to manipulate is an element of the claim, necessarily presenting a common question, predominance is easily met. *Green v. Wolf Corp.*, 406 F.2d 291, 299-301 (2d Cir. 1968). In *Green*, the Second Circuit found that common questions predominated despite potential individual issues of reliance. *Id.* And courts in this Circuit routinely find that common issues such as the falsity and materiality of statements in offering materials or other publications overwhelmingly predominate over individual questions. *See Merrill Lynch & Co.*, 277 F.R.D. at 101, 116-18 (predominance met where "[t]he instant action depends, more than anything else, on establishing that certain statements and omissions common to all the offerings were material misrepresentations," despite individual issues of knowledge); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 346-52 (S.D.N.Y. 2015) (predominance met despite individualized inquiries of knowledge and despite issues of traceability to domestic transactions).[8] Particularly where, as here, the case "is of a staggering size, involving a very great number of potential claimants," "[t]he presence of common questions and answers is therefore an extremely heavy counterweight to any individualized questions." *Id.* at 346. Accordingly, despite potential individualized issues related to making a *Morrison* evaluation for Petrobras Note purchasers, such issues are overwhelmingly overshadowed by the common questions of law and fact that predominate for each Settlement Class Member.

This Court dismissed claims on *Morrison* grounds based on the allegation that the purchase

---

[8] *See also In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 61 (S.D.N.Y. 2013); *Katz v. Image Innovations Holdings, Inc.*, No. 06-cv-3707 (JGK), 2010 U.S. Dist. LEXIS 73929, at *16-17 (S.D.N.Y. July 21, 2010); *In re MetLife Demutualization Litig.*, 229 F.R.D. 369, 380 (E.D.N.Y. 2005); *In re Interpublic Sec. Litig.*, No. 02-cv- 6527 (DLC), 2003 U.S. Dist. LEXIS 19784, at *13 (S.D.N.Y. Nov. 6, 2003); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98-cv-4318 (HB), 2000 U.S. Dist. LEXIS 13469, at *31 (S.D.N.Y. Sept. 19, 2000).

or sale was cleared through the DTC.  Thus, it is possible that there are certain transactions encompassed in the definition of Covered Transactions that ultimately may have been dismissed by the Court.  The merits of the claims involving DTC transactions, however, are irrelevant for settlement purposes.  *See In re Am. Int'l Grp. Sec. Litig.*, 689 F.3d 229, 242-44 (2d Cir. 2012) (holding that a settlement may include claims "even if a court believes that those claims may be meritless, provided that the class is properly certified under Rules 23(a) and (b) and the settlement is fair under Rule 23(e)"); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 310-11 (3d Cir. 2011) (holding that assessing the merits of settled claims "would effectively rule out the ability of a defendant to achieve 'global peace' by obtaining releases from all those who might wish to assert claims, meritorious or not").  Indeed, courts regularly approve settlements that allocate funds to claims that were dismissed from the action.  *See Me. State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10-cv-00302 MRP (MANx), 2013 U.S. Dist. LEXIS 179190, at *33-35, *67-68 (C.D. Cal. Dec. 5, 2013) (approving plan of allocation apportioning 35% of settlement proceeds to two categories of dismissed claims and rejecting objection that "each category should be designated as a subclass with its own appointed subclass counsel"); *In re Reliance Sec. Litig.*, MDL No. 1304, 2002 U.S. Dist. LEXIS 29422, at *45-47 (D. Del. Feb. 8, 2002) (approving plan of allocation that awarded settlement proceeds to Section 14(a) claim that was dismissed on summary judgment as to certain defendants).  Class Plaintiffs respectfully disagree with the Court on whether clearance through DTC is sufficient to trigger a domestic transaction under *Morrison* and would have pursued appeals on that ruling at the appropriate time.  Indeed, a recent Second Circuit decision, *Choi v. Tower Research Capital LLC*, No. 17-cv-648 (2d Cir. Mar. 29, 2018) held that the fact that transactions placed on a Korean exchange were electronically matched with counterparties on a platform in the United States was sufficient to trigger domesticity under *Absolute Activist*.  A

23

similar matching process occurs in every DTC transaction in New York.  *See* B. Morris and Stuart Z. Goldstein, *Guide to Clearance and Settlement, An Introduction to DTCC*, at 2 ("DTCC uses a sophisticated infrastructure of physical equipment, software programs, and risk management systems to deliver essential services, including trade matching, clearing, netting, and settling securities transactions.").  Accordingly, Class Plaintiffs believe that *Choi* would have served as a basis for this Court to reconsider its ruling regarding DTC transactions.  In any event, to resolve any risk regarding the appealability of these claims, it was necessary for Defendants to include such transactions in the Settlement Class and the Court may and should approve the settlement of such claims.

## NOTICE TO THE CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

Notice to class members of a settlement satisfies Rule 23(e) and due process where, as here, it fairly apprises "members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."  *Visa*, 396 F.3d at 114; *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 164 F.R.D. 362, 368 (S.D.N.Y. 1996).  Notice need not be perfect or received by every class member, but instead be reasonable under the circumstances.  *See* Fed. R. Civ. P 23(e)(1) ("The court must direct notice in a reasonable manner to all class members who would be bound by the [settlement] proposal."); *Visa*, 396 F.3d at 114.  Notice is adequate if the average class member understands the terms of the proposed settlement and the options he, she or it has.  *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 246 F.R.D. 156, 166 (S.D.N.Y. 2007).

Pursuant to the Preliminary Approval Order, as of April 13, 2018, GCG disseminated more than one million copies of the Notice Packet to potential Class Members and nominees.  Mendoza Aff. ¶ 16.  To disseminate the Notice Packet, GCG mailed the notice to all the names and addresses

24

to which it disseminated the notice of class certification having obtained the names and addresses of potential Class Members from listings provided by Petrobras and its transfer agent and from banks, brokers and other nominees. *Id*. ¶¶ 8-16. Between March 7 and March 26, 2018, GCG caused the publication of the Summary Notice in various publications spanning over 33 countries throughout the globe. *Id*. ¶¶ 17-25. The sheer amount of publications where the Summary Notice was published is unprecedented. GCG also established a toll-free informational telephone line and caused information regarding the Settlement to be posted on the website specifically established for the Action, www.petrobrassecuritieslitigation.com, which provides access to, among other documents, downloadable copies of the Settlement Notice and Proof of Claim Form. *Id*. ¶¶ 27-30.

The Settlement Notice summarizes in plain language the terms of the Settlement and Class Members' rights in connection with the Settlement. Among other information, the Settlement Notice contains a thorough description of the Settlement, the Plan of Allocation and Class Members' rights to: (i) participate in the Settlement and (ii) object to the Settlement, Plan of Allocation or request for attorneys' fees and reimbursement of expenses. The combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented by publication notice in several widely-circulated newspapers and sources in circulation in 33 foreign countries, in their respective language, easily qualifies as best notice practicable under the circumstances. *See, e.g.*, *In re Citigroup*, 296 F.R.D. at 154; *In re Marsh & McLennan*, 2009 WL 5178546, at *12-13; *Global Crossing*, 225 F.R.D. at 448-49. Accordingly, the notice program here was reasonable.

## CONCLUSION

In light of the foregoing, Plaintiffs respectfully request that the Court approve the proposed Settlement as fair, reasonable and adequate; approve the Plan of Allocation as fair and reasonable; and certify the Settlement Class for purposes of effectuating the Settlement.

Dated:  April 20, 2018                   Respectfully submitted,

                                         **POMERANTZ LLP**

                                         */s/ Jeremy A. Lieberman*
                                         Jeremy A. Lieberman
                                         Marc I. Gross
                                         Emma Gilmore
                                         John A. Kehoe
                                         Brenda Szydlo
                                         600 Third Avenue, 20th Floor
                                         New York, NY 10016
                                         Telephone: 212-6612-1100
                                         Facsimile: 917-463-1044

                                         **POMERANTZ LLP**
                                         Patrick V. Dahlstrom
                                         10 North LaSalle
                                         Suite 3505
                                         Chicago, IL 60603
                                         Telephone: 312-377-1181
                                         Facsimile: 312-229-8811

                                         **POMERANTZ LLP**
                                         Jennifer Pafiti
                                         468 North Camden Drive
                                         Beverly Hills, CA 90210
                                         Telephone: 310-285-5330

                                         *Counsel for Class Representatives*
                                         *Universities Superannuation Scheme Limited,*
                                         *North Carolina Department of State*
                                         *Treasurer, and the Settlement Class*

                                         **LABATON SUCHAROW**
                                         Thomas A. Dubbs
                                         Louis Gottlieb
                                         John Esmay
                                         140 Broadway
                                         New York, NY 10005
                                         Telephone: 212-907-0700
                                         Facsimile: 212-818-0477

                                         *Counsel for Employees' Retirement System of*
                                         *the State of Hawaii*