**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE PETROBRAS SECURITIES
LITIGATION

:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 14-cv-9662 (JSR)

**CLASS ACTION**

**MEMORANDUM OF LAW IN SUPPORT OF CLASS COUNSEL'S MOTION FOR AN
AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION
EXPENSES**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................... 1

ARGUMENT ............................................................................................. 2

I. CLASS COUNSEL IS ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE $3 BILLION COMMON FUND ............................... 2

II. THE APPLICABLE STANDARD ......................................................... 3

III. THE REQUESTED FEE AWARD IS REASONABLE UNDER EITHER THE PERCENTAGE OR THE LODESTAR METHODS .................................... 4

    A. The Requested Fee Is a Reasonable and Fair Percentage of the Recovery .............................................................................. 4

    B. The Requested Fee Is Reasonable Under the Lodestar Method ................. 9

IV. THE OTHER *GOLDBERGER* FACTORS CONFIRM THE FAIRNESS AND REASONABLENESS OF THE REQUESTED FEE ................................... 11

    1. The Time and Labor Expended by Counsel ................................. 12

    2. The Magnitude, Complexity, and Risks of Litigation Support the Requested Fee ........................................................................ 13

    3. Class Counsel's Skill and Work Product Have Been Exemplary .................................................................................. 15

    4. The Requested Fee in Relation to the Settlement ......................... 16

    5. Public Policy Considerations Support the Requested Fee ........... 16

V. THE FEE HAS BEEN NEGOTIATED AT ARM'S LENGTH AND APPROVED BY LEAD PLAINTIFF, WARRANTING A PRESUMPTION OF REASONABLENESS OR, AT A MINIMUM, SERIOUS CONSIDERATION ............................................................ 17

VI. THE CLASS' REACTION TO THE FEE REQUEST SUPPORTS THE REQUESTED FEE ............................................................................. 22

VII. CLASS COUNSEL'S EXPENSES WERE REASONABLY AND NECESSARILY INCURRED IN THE PROSECUTION OF THIS ACTION ........................................................................................... 22

VIII. TIMING OF PAYMENT ..................................................................... 23

IX.    LEAD AND NAMED PLAINTIFFS SHOULD BE AWARDED THEIR
REASONABLE COSTS AND EXPENSES UNDER 15 U.S.C. §78u-
4(a)(4) ................................................................................................................ 24

CONCLUSION ........................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)..................................................................................................16

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
   472 U.S. 299 (1985)....................................................................................................3

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980)....................................................................................................2

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)......................................................................................10

*Fogarazzo v. Lehman Bros., Inc.*, No. 03-cv-5194,
   2011 WL 671745 (S.D.N.Y. Feb. 23, 2011)..............................................................15

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000)............................................................................. *passim*

*Hicks v. Morgan Stanley & Co.*, No. 01-cv-10071,
   2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005)............................................................24

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 LMM,
   2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006),
   *aff'd*, 272 F. App'x 9 (2d Cir. 2008).........................................................................16

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, No. 09 MDL 2058, 2013
   WL 12091355 (S.D.N.Y. Apr. 8, 2013),
   *aff'd*, 772 F.3d 125 (2d Cir. 2014)............................................................................24

*In re Bisys Sec. Litig.*, No. 04-cv-3840,
   2007 U.S. Dist. LEXIS 51087 (S.D.N.Y. July 16, 2007).........................................11

*In re Cardinal Health Inc. Sec. Litig.*,
   528 F. Supp. 2d 752 (S.D. Ohio 2007)......................................................................18

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001)................................................................................17, 18

*In re Colgate-Palmolive Co. ERISA Litig.*,
   36 F. Supp. 3d 344 (S.D.N.Y. 2014)............................................................................5

*In re Comverse Tech., Inc. Sec. Litig.*, No. 06-cv-1825,
   2010 WL 2653354 (E.D.N.Y. June 24, 2010) ......................................................17

*In re Deutsche Telekom AG Sec. Litig.*, No. 00-cv-9475,
   2005 U.S. Dist. LEXIS 45798 (S.D.N.Y. June 9, 2005)...........................................10

*In re Enron Corp. Sec.*,
   586 F. Supp. 2d 732 (S.D. Tex. 2008) .............................................................8, 18

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400,
   2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)................................................3, 15, 24

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ....................................................................18

*In re Interpublic Sec. Litig.*, No. 02-cv-6527 (DLC),
   2004 U.S. Dist. LEXIS 21429 (S.D.N.Y. Oct. 26, 2004) ......................................10

*In re Marsh & McLennan Cos. Sec. Litig.*, No. 04-cv-8144,
   (S.D.N.Y. Dec. 23, 2009)..............................................................................24

*In re Metlife Demutualization Litig.*,
   689 F. Supp. 2d 297 (E.D.N.Y. 2010) ...................................................... *passim*

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ..................................................................4, 10

*In re Nortel Networks Corp. Sec. Litig.*,
   539 F.3d 129 (2d Cir. 2008)............................................................................17

*In re Sumitomo Copper Litig.*,
   189 F.R.D. 274 (S.D.N.Y. 1999) ......................................................................15

*In re Synthroid Mktg. Litig.*,
   264 F.3d 712 (7th Cir. 2001) ......................................................................18, 21

*In re Tronox, Inc. Sec. Litig.*, No. 09-cv-6220,
   (S.D.N.Y. Nov. 26, 2012) ..............................................................................24

*In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249
   (D.N.H. 2007) ................................................................................................8

*In re Union Carbide Corp. Consumer Products. Business Sec. Litig.*,
   724 F. Supp. 160 (S.D.N.Y. 1989) ..................................................................17

*In re Veeco Instruments Sec. Litig.*, No. 05 MDL 01695,
   2007 U.S. Dist LEXIS 85554 (S.D.N.Y. Nov. 7, 2007)........................................22

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005)........................................................................6, 8, 10, 17

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002)......................................................................................10, 16

*Mo. v. Jenkins*,
   491 U.S. 274 (1989).........................................................................................................................9

*N.Y. State Ass'n for Retarded Children, Inc. v. Carey*,
   711 F.2d 1136 (2d Cir. 1983)..........................................................................................................9

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
   318 F.R.D. 19 (S.D.N.Y. 2016) .....................................................................................................24

*Police & Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009)...........................................................................................14

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, No. 08-cv-10841-JSR-JLC,
   2012 U.S. Dist. LEXIS 191996 (S.D.N.Y. May 8, 2012).............................................................11

*Reichman v. Bonsignore, Brignati & Mazzotta P.C.*,
   818 F.2d 278 (2d Cir. 1987)...........................................................................................................22

*Savoie v. Merchants Bank*,
   166 F.3d 456 (2d Cir. 1999).......................................................................................................4, 9

*State St. Cayman Tr. Co. v. Petróleo Brasileiro S.A. – Petrobras*, No. 15-cv-10158
   (S.D.N.Y. Dec. 30, 2015)................................................................................................................8

*Teachers' Ret. Sys. of La.*, No. 01-cv-11814,
   2004 WL 1087261 (S.D.N.Y. May 14, 2004) ...............................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..........................................................................................................................3

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005).........................................................................................3, 4, 10, 17

*Wash. State Inv. Bd. v. Petróleo Brasileiro S.A. – Petrobras*, No. 15-cv-3923
   (S.D.N.Y. Jan. 29, 2016)..................................................................................................................8

## **Statutes**

15 U.S.C. §78u-4(a)(4) ....................................................................................................................24

Private Securities Litigation Reform Act of 1995 ................................................................. *passim*

## **Rules**

Fed. R. Civ. P. 23(h) .................................................................................................................1

Court-appointed Class Counsel, having achieved a $3 billion Settlement in cash for the benefit of the Class in this action, respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 23(h), for an award of attorneys' fees in the amount of $284.5 million, representing slightly less than 9.5% of the Settlement Amount, plus interest on such amount at the same rate as earned by the Settlement Fund.[1] Class Counsel also seek reimbursement of $14,515,235.24 in litigation expenses that were reasonably and necessarily incurred by Class Counsel in prosecuting and resolving the Action, as well as awards pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs and expenses incurred by Class Plaintiffs directly related to their representation of the Class in the total amount of $400,000.

## PRELIMINARY STATEMENT

Class Counsel's fee request is eminently fair and reasonable. Class Counsel has obtained a significant recovery for the Class. If approved, the $3 billion Settlement will represent the largest single payout by a foreign issuer in a securities class action in history, as well as the largest securities class action settlement involving a foreign Lead Plaintiff. Even more impressive, based upon the charges recognized to date by the Petrobras Defendants with respect to the settlements of the Individual Actions, the Class's recovery in this Action represents a *sixty five percent (65%) premium* over those recoveries. Further evidence of the spectacular result achieved for the Class

---

[1] Lead Plaintiff Universities Superannuation Scheme Ltd. ("USS") and Named Plaintiffs North Carolina Department of State Treasurer ("North Carolina") and the Employees' Retirement System of the State of Hawaii ("Hawaii") (collectively, "Class Representatives," Class Plaintiffs," or "Plaintiffs") are simultaneously submitting herewith the Declaration of Jeremy A. Lieberman ("Lieberman Decl."), the Declaration of Jeremy Hill ("Hill Decl."), the Declaration of Meryl Murtagh ("Murtagh Decl."), and the Declaration of Elmira K.L. Tsang ("Tsang Decl.") in Support of (A) Class Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and (B) Class Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses. Unless otherwise noted, all capitalized terms used herein have the meanings set forth and defined in the Petrobras Stipulation. (ECF No. 767-1).

is that most of the remaining plaintiffs in the Individual Actions, including Hartford Mutual Funds, Inc., Massachusetts Mutual Life Insurance Co., Pacific Funds and Aura Capital Ltd., have all opted to join the remarkable recovery achieved for the Class rather than hazard their own chances at getting a better recovery. Both the premium over the settled Individual Actions and the "opt-in" by these large institutional investors who have yet to settle are unprecedented occurrences in modern U.S. class action history and speak volumes to the tenacity and skill with which this case was prosecuted.

The fee percentage requested here of slightly less than 9.5% of the $3 billion recovery ($284.5 million) is well within the percentage of fees awarded in mega class action settlements exceeding $1 billion, falling roughly in the middle of those recoveries. Significantly, the requested fee reflects a multiplier of 1.78, which is one of the lowest multipliers awarded in the mega class action settlements. The requested fee comports with the dictates of the retainer agreement struck between Lead Plaintiff USS and Pomerantz following robust arms-length negotiations, where USS was independently advised by Keith Johnson, Esq. of Reinhart Boerner Van Dueren LLP, an attorney with decades of experience overseeing securities class actions in the United States, including while serving as the Chief Legal Counsel of the State of Wisconsin Investment Board, and was commended by the Court at the outset of the litigation. Given these circumstances, the requested fee is eminently fair and reasonable.

## ARGUMENT

## I.     CLASS COUNSEL IS ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE $3 BILLION COMMON FUND

It is well settled that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "The rationale for the doctrine is

an equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).

Fee awards "serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and therefore "to discourage future misconduct of a similar nature." *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 (CM) (PED), 2010 WL 4537550, at *23 (S.D.N.Y. Nov. 8, 2010). In addition, the Supreme Court has emphasized that private securities actions are "an essential supplement to criminal prosecutions and civil enforcement actions" brought by the SEC. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *accord Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'") (citation omitted).

## II.   THE APPLICABLE STANDARD

The Second Circuit approves of two ways to determine a reasonable and fair attorney's fee in common fund cases:  the "percentage-of-recovery" and the "lodestar/multiplier" methods. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121-22 (2d Cir. 2005) (stating that the percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation," and noting that the "trend in this Circuit is toward the percentage method."); *see also Goldberger*, 209 F.3d at 48-50. A court has discretion to choose whichever method is most appropriate, depending on the circumstances of a particular case. *Wal-Mart*, 396 F.3d at 121. Regardless of the method used, several factors identified in *Goldberger*, discussed below, ultimately determine the reasonableness of a fee award. Under the lodestar approach, a court first determines the lodestar—that is, the number of hours spent on the case multiplied by appropriate hourly rates—and then, if warranted, upwardly adjusts

3

that number (awards a multiplier) to account for several factors, including the risks assumed by the lawyers and the extent of their success. *See Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999).

### III.   THE REQUESTED FEE AWARD IS REASONABLE UNDER EITHER THE PERCENTAGE OR THE LODESTAR METHODS

#### A.   The Requested Fee Is a Reasonable and Fair Percentage of the Recovery

Class Counsel's fee request, which represents slightly less than 9.5% of the Settlement Class' recovery, is well within the range of fee awards in other securities fraud and antitrust class actions. In securities class actions, attorneys' fees awarded routinely range from 20% to 33% of the settlement fund and commonly represent multipliers of 3 to 4.5 of counsel's lodestar. *See* 4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 14:6 (4th ed. 2012) ("In the normal range of common fund recoveries in securities and antitrust suits, common fee awards fall in the 20 to 33 per cent range"); *Visa*, 396 F.3d at 123 ("multipliers of between 3 and 4.5 have become common") (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998)).

In the twenty-nine cases involving recoveries of $1 billion and over, fee awards have been granted in the range of 1.7% to 31.3% of the recovery, with multipliers ranging from 0.98 to 88.0, as reflected in the Lieberman Decl. ¶ 354 and Ex. 15.  Here, the fee percentage is well within the range of fee percentages awarded in class actions where the recovery exceeds $1 billion.  The fee request of slightly less than 9.5% falls roughly in the middle of those recoveries and, assuming the fee request in the *Foreign Exchange* Action (*see id.*, entry 5) is granted, it would represent the fourteenth largest percentage award out of twenty-nine $1-billion-plus recoveries.  *Id.*

The reasonableness of the fee request is also confirmed by academic and expert studies serving as an "unbiased and useful reference for comparing fee cases of similar magnitude." *In re*

*Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 349 (S.D.N.Y. 2014) (citing Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248 (2010) (Table 7) (analyzing all reported class action settlements between 1993 and 2008 and finding a mean of 12% and a median of 10.2% for cases in their top decile (>175.5 million)); *see also* Theodore Eisenberg, Geoffrey Miller, & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 947, 950-52 (2017) (analyzing all reported class action settlements between 2009 and 2013, inclusive, and concluding that the mean fee percentage awarded in class actions across the country was 27% and the median fee percentage was 29%; for the 74 securities settlements nationwide, the mean fee was 23% and the median fee was 25%); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 839 (2010) (examining every class action settlement approved by a federal court over 2006-2007 and concluding that the mean percentage-method fee award for the 9 settlements above $1 billion was 13.7% and the median was 9.5%); Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27, 51 (2004) (concluding that the average percentage award in published securities decisions was 24.1% between 1993 and 2002 but recognizing that the average percentage award in cases covered by the publication *Class Action Reports*, from 1993 through 2002, was 30%); John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 390 (2000) (class counsel "receive a median contingent fee that is typically between 27% and 30% of the class's recovery, plus their expenses . . . ").[2]

---

[2] Earlier studies of fee awards in settled securities fraud cases further support the fee requested here. *See* Todd S. Foster, Denise M. Martin, Vinita M. Juneja and Frederick C. Dunbar, *Trends in*

The singular result achieved in this Action warrants an even higher award than what Class Counsel requests. The Class recovery achieved here is unprecedented in the annals of securities class action litigation. Significantly, many institutional investors opted out of the Class in order to pursue their own litigation, expecting to achieve a higher recovery than the Class. Common wisdom in securities class action litigation dictates that, when large institutional investors opt out of a class and pursue their own litigation represented by sophisticated counsel, they obtain a significant premium to the Class's recovery. One of the reasons provided for this "rule of thumb" is that the large institutional plaintiff is not saddled with the difficulties of having a class certified or with the unique issues that may arise to certain portions of the class whose claims might be weaker. *See*, *e.g.*, Neal R. Troum, *The Securities Class Action Opt-Out Plaintiff: By The Numbers*, Metro. Corporate Counsel, Nov. 2012 (observing that five of the pension funds who opted out of the *WorldCom* securities litigation received "three times more than they would have recovered if they had joined the class"; opt-outs in the *AOL Time Warner* class action fared much better than the class, with the State of Arkansas recovering "50 times more than what [it] would have received if [it] had remained in the class," CalPERS recovering "approximately 17 times what [it] would have recovered if [it] stayed in the class," University of California obtaining "16 to 24 times" what it would have enjoyed in the class, and five Ohio state pension funds receiving $135 million more than they would have recovered if they remained in the class; opt-outs in the *Qwest* securities fraud litigation included the state of Arkansas' pension funds, which recovered 45 times what they would have received in the class; the Teachers Retirement System of Texas, who claimed a 40 times

---

*Securities Litigation and the Impact of PSLRA* (Figure 12) (NERA June 1999); Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* (Table 12b) (NERA 1996).

recovery over the class; and CalSTRS, who claimed a recovery of 30 times over the class; opt-out recoveries in the *Tyco* securities litigation, where several New Jersey pension funds recovered 80% of their losses, in contrast with a 3% recovery by the class); *see similarly* John C. Coffee, Jr., *Entrepreneurial Litigation: Its Rise, Fall, and Future* 83 (2015) ("… opt-outs seem to settle their cases on markedly superior terms to the class—and by a dramatic margin."); Joshua H. Vinik, Andrei Rado and John R.S. McFarlane, *Why institutional investors are opting out of class-action litigation*, Pension & Investments (July 25, 2011) ("Legal scholar John Coffee estimated investors who have brought opt-out actions recovered on average 20% to 40% of their actual losses, while class members only received on average 2% to 3%. Thus, much larger recoveries are possible outside of class litigation for institutions").[3]

The Settlement is a stunning departure from that seemingly immutable rule. Based upon Petrobras' public disclosures regarding the impairments it has taken to settle the Individual Actions, the Settlement represents *a 65% premium* compared to the settlements achieved by the institutional investors who opted out of the class. *See* Lieberman Decl. ¶ 364. The fact that the Class settled at a significant premium was confirmed by counsel for Petrobras at the February 23, 2018 Hearing. *Id.* Indeed, reflecting the stellar result achieved for the Class, most of the remaining Individual Actions pursued by institutional investors have opted to remain in the Class and participate in the recovery obtained by Class Plaintiffs, thereby conceding that they did not believe that they could achieve a better result on their own, despite being represented by some of the best law firms in the country. *Id.* ¶ 11. The recovery is all the more astounding where, as here, the Securities and Exchange Commission and the Department of Justice have not been able to secure

---

[3] *See* http://www.pionline.com/article/20110725/PRINT/307259985/why-institutional-investors-are-opting-out-of-class-action-litigation.

any recovery for investors.

Class Plaintiffs' aggressive damages model was a key component in securing the Settlement. The model alleged no less than 85 corrective disclosures, with their damages expert opining that at least 21 of those disclosures were statistically significant at the 95% Confidence Interval level. Class Plaintiffs' consultation with their expert indicated that maximum Class-wide damages based on this aggressive model were likely (i) USD$13.43 billion, using corrective disclosures accompanied by price declines at a 95% statistical significance level, or (ii) USD$16.116 billion, using corrective disclosures accompanied by price declines at a 90% statistical significance level. *See* Lieberman Decl. ¶ 363. By comparison, when price inflation is estimated using the allegations of the individual plaintiffs (which asserted less than 12 corrective disclosures)[4], the aggregate damages for the ADSs and Notes are estimated to be approximately $5.68 billion for the remaining Class members (*i.e.*, for those who have not opted out of the Class). This implies that the settlement of $3 billion represents a recovery of 52% for the remaining Class. The use of such an aggressive damages model alleging 21 corrective disclosures is unprecedented in securities class actions. *Compare In re Cendant Corp.*, 264 F. Supp. 3d 201, 221-22 (3d Cir. 2001) (3 corrective disclosures); *In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249, 260 (D.N.H. 2007) (8 corrective disclosures); *Enron*, 529 F. Supp. 2d 644, 713, 743, 755 (S.D. Tex. 2006) (4 corrective disclosures); *In re Worldcom, Inc. Sec. Litig.,* No. 02-cv-3288 (DLC) (S.D.N.Y. Aug. 1, 2003), First Amended Class Action Complaint at ¶¶ 3, 6, 105, ECF No. 343 (1 corrective disclosure).

Notably, in an unprecedented turn, Class Counsel also extended the Class Period by an additional four months through July 28, 2015, nearly doubling the corrective disclosure period

---

[4] *See*, *e.g.*, *State St. Cayman Tr. Co. v. Petróleo Brasileiro S.A. – Petrobras*, No. 15-cv-10158 (JSR), Compl. (S.D.N.Y. Dec. 30, 2015), Dkt. 1; *Wash. State Inv. Bd. v. Petróleo Brasileiro S.A. – Petrobras*, No. 15-cv-3923 (JSR), Third Am. Compl. (S.D.N.Y. Jan. 29, 2016), Dkt. 74.

alleged in the Individual Actions, thereby increasing total damages on behalf of the Class. Lieberman Decl. ¶ 368 And, unlike many of the Individual Actions, Class Counsel also asserted claims against the underwriters and Petrobras's outside auditor, PwC Brazil. As a result of Class Plaintiffs' aggressiveness, PwC Brazil paid $50 million to resolve the claims asserted against them. *Id*. ¶ 369. These aggressively successful steps underscore the uniqueness of Class Counsel's litigation strategy, which contributed to the significant premium extracted over the Individual Actions, and fully support the requested fee.

### B.    The Requested Fee Is Reasonable Under the Lodestar Method

The fee request is also supported by the lodestar/multiplier analysis. The Second Circuit allows courts to utilize a lodestar cross-check to ensure the reasonableness of a fee awarded under the percentage-of-the-fund method. *See Goldberger*, 209 F.3d at 50. To arrive at the lodestar, the hours expended are multiplied by each attorney's respective hourly rate, as long as the rate is reasonable, as here. *See Savoie*, 166 F.3d at 460; *see also* Lieberman Decl. ¶ 359. It is well-settled that the use of an attorney's *current* rate is proper since such rate compensates for inflation and the loss of funds' use. *See Mo. v. Jenkins*, 491 U.S. 274, 283-84 (1989); *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1153 (2d Cir. 1983).

Class Counsel devoted 324,307.70 hours of attorney and other professional support time to prosecuting this action. *See* Lieberman Decl. ¶ 361. The total lodestar for Class Counsel is $159,496,169.50.  *See id*.[5]  The requested fee of $284,500,000.00 represents a multiplier of 1.78. Class Counsel respectfully requests a 1.78 upward adjustment of its lodestar.

---

[5] The lodestar for Pomerantz LLP, Class Counsel and counsel for USS and North Carolina, is $146,909,825. The lodestars for Labaton Sucharow LLP, counsel for Employees' Retirement System of the State of Hawaii and Motley Rice, counsel for Union Asset Management Holding AG are, respectively, $10,681,114.50 and $1,905,230.00.

Class Counsel worked on a wholly contingent-fee basis and has not received any compensation or reimbursements since this case began over three years ago. As the Second Circuit has recognized, the risk of no compensation to lawyers who work under a contingency fee arrangement is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974) (citation omitted); *see also In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297, 361 (E.D.N.Y. 2010).

Indeed, in complex class actions with significant contingency risks, lodestar multipliers between 3 and 4.5 are commonly awarded. *See Visa*, 396 F.3d at 123 (upholding multiplier of 3.5 as reasonable on appeal and quoting the district court's statement that "multipliers of between 3 and 4.5 have become common"); *In re Deutsche Telekom AG Sec. Litig.*, No. 00-cv-9475 (NRB), 2005 U.S. Dist. LEXIS 45798, at *13-14 (S.D.N.Y. June 9, 2005) (awarding fee representing a 3.96 multiplier); *WorldCom,* 388 F. Supp. 2d at 354  (awarding fee representing a 4.0 multiplier); *In re Interpublic Sec. Litig.*, No. 02-cv-6527 (DLC), 2004 U.S. Dist. LEXIS 21429, at *36-37 (S.D.N.Y. Oct. 26, 2004) (awarding multiplier of 3.96 and noting that in recent years, multipliers of between 3 and 4.5 have been common in securities class actions); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 369, 371 (S.D.N.Y. 2002) (awarding fee representing a 4.65 multiplier, which was "well within the range awarded by courts in this Circuit and courts throughout the country"); *NASDAQ Market-Makers*, 187 F.R.D. at 487-89 (awarding fee representing a 3.97 multiplier). This court has awarded higher multipliers than the one Class Counsel requests here. *See In re Bisys Sec. Litig.*, No. 04-cv-3840 (JSR), 2007 U.S. Dist. LEXIS 51087 (S.D.N.Y. July

16, 2007) (awarding a 2.9 multiplier in connection with a $66 million settlement); *Pub. Emps.'
Ret. Sys. of Miss. v. Merrill Lynch & Co.*, No. 08-cv-10841-JSR-JLC, 2012 U.S. Dist. LEXIS
191996, ¶ 4, 6(g), (S.D.N.Y. May 8, 2012) (awarding a 2.3 multiplier in connection with a $315
million settlement).

The 1.78 multiplier requested here is well below the average multiplier in settlements
exceeding $1 billion, ranking 24 out of the 29 class action mega-settlements, and is the third lowest
multiplier of the 13 securities class action mega-settlements. *See* Lieberman Decl. Ex. 15.  It is
also a fraction of the 88.0 multiplier awarded by Chancellor Leo E. Strine Jr. in the Southern Peru
Copper Company derivative litigation and sustained by the Delaware Supreme Court.  And it is
less than the median multiplier, either in securities fraud cases specifically or in all mega-
settlements generally. *See id*. Empirical evidence also demonstrates the reasonableness of the 1.78
multiplier here. *See* Eisenberg, *supra*, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L.
Rev. at 965 (Table 12) (finding a strong correlation between class recovery and lodestar
multipliers, with lodestar multipliers increasing as recovery grows, and noting that for 35 cases
with recoveries in excess of $67.5 million, the average multiplier was 2.72); Eisenberg, *supra,*
*Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud.
at 272 (Table 14) (finding that for cases with class recoveries of more than $175.5 million, the
mean multiplier was 3.18).  Here, the multiplier is well below what would be expected in a case
of similar size, cementing the reasonableness of Class Counsel's fee request.

## IV.    THE OTHER *GOLDBERGER* FACTORS CONFIRM THE FAIRNESS AND REASONABLENESS OF THE REQUESTED FEE

In *Goldberger*, the Second Circuit identified factors for courts to consider in evaluating fee
requests, including: the time and labor expended by counsel (*i.e.*, the lodestar); the magnitude,
complexity and risks of the litigation; the quality of representation; the requested fee in relation to

11

the settlement; and public policy considerations. 209 F.3d at 50. An analysis of these factors, together with the considerations above, demonstrate that the fee requested here is both reasonable and fair.

### 1.    The Time and Labor Expended by Counsel

As summarized below and fully detailed in the Lieberman Decl., Class Counsel undertook a herculean task in prosecuting this case to a successful resolution for the Class. Class Counsel's efforts included, among other things, the following:

- identifying potential claims available to purchasers of Petrobras' securities, including common stock, preferred stock, and notes (Lieberman Decl. ¶¶ 20-21);

- conducting an extensive pre-filing investigation and drafting four detailed amended complaints of over one hundred seventy pages each, including retaining investigators, both in Brazil and in the United States, experts in Brazilian law and Portuguese-fluent attorneys to assist in discovery practice, accounting and damages experts and consultants, traveling to Brazil, meeting with Brazilian reporters and the Brazilian Police, securing critical witness interviews and testimonies, technical reports from the Brazilian Federal Court of Accounts, police reports, and other documents prepared by the Administrative Council for Economic Defense, an agency of the government of Brazil established in order to combat corruption (*id*. ¶¶ 25-39);

- researching and preparing comprehensive briefs and successfully opposing in large part Defendants' motions to dismiss in three separate rounds of briefing concerning the Petrobras defendants; one round of briefing concerning Petrobras' outside accountants, PwC Brazil, and three rounds of briefing concerning the 13 Underwriters (*id*. ¶¶ 68-92);

- successfully moving for class certification, which included substantial class certification discovery over a condensed amount of time (including nine depositions that Class Counsel either defended, participated in, or conducted) (*id*. ¶¶ 261-74);

- opposing Defendants' petition for interlocutory appellate review and obtaining a precedent-setting decision by the Second Circuit, which rejected the heightened ascertainability requirement for obtaining class certification that had been imposed by other circuits and rejected Defendants' insistence on an event study that demonstrated "directionaly" appropriate stock price reactions (*id*. ¶¶ 275-90);

- engaging in massive discovery, which included taking and defending 81 class, fact and expert merits depositions and reviewing and analyzing more than 25 million pages of documents, mostly in Portuguese, as well as other foreign languages (*id*. ¶¶ 100-42);

- conducting foreign discovery, including requests for documents and/or testimony from entities and/or individuals in Brazil, the Netherlands, Monaco, the United Kingdom,

Switzerland, France, and Italy (*id.* ¶¶ 143-75);

- preparing opposition submissions in response to Defendants' motions for summary judgment (*id.* ¶¶ 220-43);

- preparing Class Plaintiffs' own motion for partial summary judgment concerning the alleged materiality and falsity of Defendants' statements, as well as corporate scienter against Petrobras (*id.*);

- preparing for trial, including designating deposition testimony, obtaining certified translations of more than 750 documents, creating an exhibit list of over 1,500 exhibits, preparing motions in limine and Daubert motions, preparing jury instructions, jury verdict forms, voir dire and draft pre-trial orders (*id.* ¶¶ 254-60);

- conducting two moot court sessions to prepare for trial (*id.* ¶¶ 245-53);

- opposing Defendants' petition for a writ of certiorari related to the Second Circuit's decision (*id.* ¶¶ 291-3); and

- successfully negotiating a $3 billion settlement (*id.* ¶¶ 294-310).

Indeed, the foreign aspect of this litigation made discovery particularly onerous. Class Counsel expended more than $1 million dollars on procuring certified translations of documents to be used as exhibits at trial and retained over 125 Portuguese-speaking project associates on a full-time basis with full benefits to assist with the review of Portuguese language documents, motion and pleading preparation, and depositions. *Id.* ¶¶ 392-9. Accordingly, and as fully detailed in the Lieberman Decl., Class Counsel expended substantial efforts in prosecuting this case, confirming that the fee request here is reasonable.

### 2. The Magnitude, Complexity, and Risks of Litigation Support the Requested Fee

The Second Circuit has acknowledged that the "risk of success" prong is "perhaps the foremost factor to be considered in determining whether to award an enhancement." *Goldberger*, 209 F.3d at 54. "Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *In re Metlife*, 689 F. Supp. 2d at 361 (citation omitted). In particular, "securities actions have become more difficult from a plaintiff's perspective in the wake of the [PLSRA]." *Id.*

13

While Class Representatives and Class Counsel believe that the claims against Defendants were highly meritorious, they also recognize that they faced considerable risks in prosecuting the Action. In the event the Supreme Court were to agree with Defendants on the merits regarding class certification, all or a significant portion of the Petrobras Notes would have been excluded from the Class, reducing potential damages by nearly 25%. Moreover, had the Court's class certification decision with respect to the ADSs been overturned, any potential recovery would have been significantly reduced. The parties also would have faced further litigation—particularly a trial—that would have been expensive and risky. Among other things, the jury would have had to determine whether Petrobras was a victim or the perpetrator of the fraud, and whether the culpable individual defendants acted adversely to Petrobras or at least partially in pursuit of Petrobras' interests. The jury would have had to decide a battle of the experts, determining whether Petrobras' securities traded on an efficient market, entitling Plaintiffs to a presumption of reliance, but permitting Defendants' now-inevitable rebuttal evidence on price impact under *Halliburton*. The jury would then have had to decide other expert-dependent issues—what was the artificial inflation of Petrobras' securities and how much of the price declines were attributable to what Plaintiffs alleged were the disclosures of information correcting Defendants' false statements. *See*, *e.g.*, *Police & Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 228-29 (S.D.N.Y. 2009) (dismissing claims based on stock drop following press release because the complaint failed to "explain why the disclosure on page eight—as opposed to all the other information in the extended 12-page press release—caused the price decline"). Here, the battle of damages experts would have been particularly confusing for a jury, because Class Plaintiff's expert not only would be contesting Defendants' expert, but also the three experts for the various individual plaintiffs that alleged a significantly lower inflation per share than Class Plaintiffs.

Thus, the case was highly complex, the demands of the case were high, and the Settlement was far from a foregone conclusion. Class Counsel carried a considerable financial burden and risk in prosecuting the action. Courts have long recognized that securities class action litigation is "notably difficult and notoriously uncertain." *FLAG Telecom*, 2010 WL 4537550, at *27 (quoting *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)); *see also Fogarazzo v. Lehman Bros., Inc.*, No. 03-cv-5194 (SAS), 2011 WL 671745, at *3 (S.D.N.Y. Feb. 23, 2011) ("securities actions are highly complex"); *FLAG Telecom*, 2010 WL 4537550, at *27 (same).

The risks taken by Class Counsel were even more acute given the challenging legislative environment during the Class Period, characterized by repeated efforts to curb class actions, amid an increasingly unsympathetic political atmosphere. For example, a bill passed by the House of Representatives on March 9, 2017 (H.R. 985), seeks to restrict class actions by preventing federal courts from certifying any "personal injury or economic loss" class action unless the lead plaintiff can show that each and every class member has "suffered the same type and scope of injury" as the named plaintiff. Under this proposed bill, a case cannot proceed as a class without satisfying the restrictive definition of a "same injury" class. This proposed legislation potentially would have restricted or otherwise eviscerated securities class action litigation, leaving Settlement Class members without any remedy.

### 3.    Class Counsel's Skill and Work Product Have Been Exemplary

Pomerantz is the oldest and one of the best regarded securities class action firms in the country.  Moreover, the skill, diligence, and outstanding Settlement achieved by Class Counsel in this litigation support their requested fee. The quality of the opposition faced by Plaintiffs' counsel should also be considered when assessing the quality of counsel's performance. *See, e.g., In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 LMM, 2006 WL 3378705,

at *3 (S.D.N.Y. Nov. 16, 2006) ("The fact that the settlements were obtained from defendants represented by 'formidable opposing counsel from some of the best defense firms in the country' also evidences the high quality of lead counsels' work") (citation omitted), *aff'd,* 272 F. App'x 9 (2d Cir. 2008); *Teachers' Ret. Sys. of La.*, No. 01-cv-11814 (MP), 2004 WL 1087261, at *7 (S.D.N.Y. May 14, 2004) ("The quality of opposing counsel is also relevant in evaluating the quality of services rendered by Plaintiffs' Counsel."). Here, Defendants were represented by many of the nation's most elite defense firms, with seemingly unlimited resources to prosecute this Action. *See* Lieberman Decl. ¶ 437. Notwithstanding this formidable opposition, Class Counsel's decades of experience in litigating securities fraud class actions and their aggressive litigation strategy led to the outstanding Settlement achieved for the benefit of the Class.

### 4. The Requested Fee in Relation to the Settlement

This factor strongly counsels for granting the fees requested for the reasons already discussed.

### 5. Public Policy Considerations Support the Requested Fee

This nation has a public policy of encouraging skilled attorneys to bring meritorious cases under the federal securities laws. *See Metlife*, 689 F. Supp. 2d at 363 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 230-31 (1988)); *Maley*, 186 F. Supp. 2d at 373 ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered."). The typical class representative is unlikely to be able to pursue long and protracted litigation at his or her own expense, particularly with the knowledge that others similarly situated will be able to "free ride" on these efforts at no cost or risk to themselves.[6]  Furthermore, the

---

[6] *See also In re Union Carbide Corp. Consumer Products. Business Sec. Litig.*, 724 F. Supp. 160, 169 (S.D.N.Y. 1989) ("A large segment of the public might be denied a remedy for violations of

significant expense combined with the high degree of uncertainty of ultimate success means that contingent fees are virtually always recovered for such cases. Lawyers that pursue private suits such as this on behalf of investors augment the overburdened SEC by "acting as 'private attorneys general.'" *Metlife,* 689 F. Supp 2d at 363 (citation omitted). Thus, public policy considerations "favor[] the granting of [attorneys'] fees sufficient to reward counsel for bringing these actions and to encourage them to bring additional such actions." *Id.*

## V.    THE FEE HAS BEEN NEGOTIATED AT ARM'S LENGTH AND APPROVED BY LEAD PLAINTIFF, WARRANTING A PRESUMPTION OF REASONABLENESS OR, AT A MINIMUM, SERIOUS CONSIDERATION

While this Court is not required to adhere to a retainer agreement, *see Visa*, 396 F.3d at 123-24, courts give such agreements a presumption of reasonableness or, at a minimum, considerable weight. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133-34 (2d Cir. 2008) (district courts are "expect[ed] to give serious consideration to negotiated fees [between lead plaintiffs and their counsel]"); *WorldCom*, 388 F. Supp. 2d at 356 ("when class counsel in a securities lawsuit have negotiated an arm's-length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close supervision of the litigation, the court should give the terms of that agreement great weight"); *In re Converse Tech., Inc. Sec. Litig.*, No. 06-cv-1825 (NGG) (RER), 2010 WL 2653354, at *4 (E.D.N.Y. June 24, 2010) ("The fact that this fee request is the product of arm's-length negotiation between Lead Counsel and the lead plaintiff is significant"); *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001) ("under the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that

---

the securities laws if contingent fees awarded by the courts did not fairly compensate counsel for the serviced services provided and the risks undertaken.").

was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel");

*In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004) ("in class action

cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement

negotiated at arm's length between lead plaintiff and lead counsel are reasonable").

A presumption of reasonableness is even stronger where the fee was negotiated *ex ante*. As

Judge Frank Easterbrook observed, "[t]he best time to determine [a contingent fee lawyer's] rate

is the beginning of the case, not the end . . . This is what happens in actual markets." *In re Synthroid*

*Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001); *accord*, *In re Cardinal Health Inc. Sec. Litig.*, 528

F. Supp. 2d 752, 758-59 (S.D. Ohio 2007) (applying presumption of reasonableness to *ex-ante* fee

agreements); *Enron,* 586 F. Supp. 2d at 766 (finding that the *ex ante* fee agreement "weighs heavily

in support of awarding Lead Counsel 9.52% of the net settlement fund.")[7]

---

[7] The history of the PSLRA's provision for selection of lead plaintiff is supportive of this presumption for *ex ante* fee agreements. The provision was based on a law review article by Professors Weiss and Beckerman, wherein they argued that courts "might well feel confident in assuming that a fee arrangement an institutional investor had negotiated with its lawyers *before* initiating a class action maximized those lawyers' incentives to represent diligently the class'[s] interests, reflected the deal a fully informed client would negotiate, and thus was presumptively reasonable."  (emphasis supplied). Elliot J. Weiss and John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J. 2053, 2105 (1995). The Manual for Complex Litigation (Third) likewise recommends that judges establish at the outset of the case ground rules for fee awards, including the "range of likely percentages." §24.21. These recommendations are similar to those of the Third Circuit Task Force, which recommended overriding the presumption only when the agreed compensation is "clearly excessive," "has been rendered unfair by unforeseen developments," or "was not reached by arm's-length negotiation between the lead plaintiff and counsel." 208 F.R.D. at 425-26, following *In re Cendant*, 264 F 3d. 201. Recent scholarly research bolsters the case for a presumption of reasonableness for *ex ante* agreements. Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions*, 115 Colum. L. Rev. 1371, 1393-94, 1432 (2015) (proposing "best practices," *i.e.*, that the lead plaintiff should negotiate a fee when retaining counsel to handle the case, which the district court should review before appointing class counsel, and recommending that "[w]hen reviewing class counsel's request for a fee award at the end of litigation, the district court should apply the agreed terms unless unforeseen developments have rendered those terms clearly excessive or unfair").

Here, the fee request is the result of *ex ante* arm's-length negotiations between Lead Plaintiff and Class Counsel. At the outset of the action, Lead Plaintiff, a sophisticated institutional investor, consulted with outside independent counsel with significant securities class action experience regarding the appropriate fees awarded in large securities class action settlements. Lieberman Decl. ¶ 250. Lead Plaintiff, fully informed about the risks of the case and the range of awards and fees in other large cases, rejected Class Counsel's proposed fee award and negotiated a significantly reduced fee. *Id.* The retainer agreement allowed a "fee grid" whereby the attorney fees would be adjusted based upon the amount recovered and the stage of the proceedings, with the fee percentage decreasing with the size of the settlement, resulting in the $284,500,000 fee sought here. A presumption of reasonableness or, at a minimum, considerable weight should be given to the *ex ante* fee agreement. Indeed, the competitive fee agreement negotiated by Lead Plaintiff was specifically cited by this Court as one of the key reasons for appointing USS as Lead Plaintiff. *Id.* ¶ 24 (ECF No. 166 at 11) ("In addition, USS vetted its chosen counsel extensively and negotiated for a more favorable fee agreement."). Moreover, Class Counsel understands that, of all the competing lead plaintiff movants, the fee agreement negotiated between Class Counsel and USS was amongst the lowest.

The negotiated fee mechanism offers attorneys a necessary degree of predictability in pursuing otherwise high stakes and high-risk litigation. Indeed, this case was not only "bet the Company" for Petrobras, but "bet the firm" for Pomerantz. Refusing to invite a litigation funder

---

There are other compelling reasons to presume the reasonableness of *ex ante* agreements. Behavioral economists have shown that judges are just as susceptible as others to render decisions with "hindsight" bias, *i.e.*, knowing the outcome of an event effects its perceived *ex ante* "risk" (or lack thereof). *See* Chris Guthrie, Jeffrey J. Rachlinski, and Magistrate Judge Andrew J. Wistrich, *Inside the Judicial Mind*, 86 Cornell L. Rev.777, 803 (2001).

that might wish to impose its own case management views on Class Counsel, the principal partners of the firm at one point were forced to pledge their own personal liquid assets in order to finance this litigation, taking on a debt load more than 10 times they had taken in previous years. In extending themselves, the equity partners made risk/benefit calculations, in large part informed by the *ex ante* fee agreement that was previously reviewed (and commended) by the District Court. There would be little value to institutions spending significant resources in negotiating and vetting attorneys' fees (here, with the assistance of outside counsel) if they could be simply upended by the subjective *post hoc* determinations of a district court. Such an approach would eschew predictability and rationality in fee determinations, inviting in their place caprice and whim. Risk and reward assessments are part and parcel of every decision-making process for a class action litigant, as well as the law firm litigating the case on a contingency fee basis. The prospect that an *ex ante* negotiated fee agreement could be discarded by a *post hoc* determination of a court will add another major risk to complex contingency fee litigation: not only will class action practitioners risk the prospect of failing to recover on their claim, they will also risk that a court might unilaterally reduce the negotiated fee agreement with its sophisticated client by an uncertain sum. The outcome of this significant risk will be lower investments in large, complex claims, and as a result, reduced recoveries.

Moreover, to the extent that this Court determines that the fee agreement with Lead Plaintiff should not be given deference, logic would dictate that both a higher and a lower fee award should be considered. *See*, *e.g.*, Coffee, John. C. Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 697 (1986) ("[T]he most logical answer to this problem of premature settlement would be to base fees on a graduated, increasing percentage of the

recovery formula—one that operates, much like the Internal Revenue Code, to award the plaintiff's attorney a marginally greater percentage of each defined increment of the recovery"); Schwartz, David L., *The Rise of Contingent Fee Representation in Patent Litigation*, 64 Ala. L. Rev. 335, 360 (2012) (finding that "[t]here are two main ways of setting the fees for the contingent fee lawyer [in corporate patent infringement litigation]: a[n increasing] graduated rate and a flat rate"; "The graduated rates typically . . . tied rates to recovery dates. As the case continued, the lawyer's percentage increased."); *In re Synthroid*, 264 F.3d at 721 ("[D]eclining marginal percentages . . . create declining marginal returns to legal work . . . This feature exacerbates the agency costs inherent in any percentage-of-recovery system . . ."). Here, the *ex ante* agreement provided for a downward adjustment of fee percentages as the recovery increases. It could have been the other way. Class Counsel respectfully submit that a fee higher than $284.5 million would be warranted. Class Counsel estimate that pro-rata, the Settlement exceeds the recovery for the Individual Action settlements by more than $1.2 billion. Lieberman Decl. ¶ 364. If the Court were to award Class Counsel 30% of that amount, or $360 million, the Class would have still benefited compared to those settlements by $840 million, still a 50% premium—an excellent result by any standard. This fee award would not include the time and effort expended by Class Counsel in litigating the Action, which helped to set the baseline for the amount settled by the Individual Actions. To be clear, Class Counsel is not seriously requesting that this Court award a fee higher than the amount negotiated with Lead Plaintiff, but is rather positing that the fee award process should not be viewed as a "race to the bottom," where a court can choose either the negotiated retainer rate with a sophisticated lead plaintiff, or some lower undetermined amount.

## VI.   THE CLASS' REACTION TO THE FEE REQUEST SUPPORTS THE REQUESTED FEE

The reaction of the Class to date also supports the requested fee. As of April 13, 2018, the Claims Administrator has disseminated the Settlement Notice to more than one million potential Class Members and nominees informing them of, *inter alia*, Class Counsel's intention to apply to the Court for an award of attorneys' fees of up to 9.5% of the Settlement Fund and reimbursement of up to $18 million in expenses and $400,000 total in PSLRA awards. Lieberman Decl. ¶¶ 334, 349, 429. While the time to object to the fee and expense application does not expire until May 11, 2018, to date, no valid objections to the amounts of attorneys' fees and expenses provided in the Settlement Notice have been received.  *Id.* ¶ 342 n. 60. Class Counsel will address all objections received in their reply papers to be filed with the Court on May 25, 2018.

## VII.   CLASS COUNSEL'S EXPENSES WERE REASONABLY AND NECESSARILY INCURRED IN THE PROSECUTION OF THIS ACTION

Class Counsel also requests the reimbursement of $14,515,235.24 in expenses reasonably and necessarily incurred while prosecuting this action. *See In re Veeco Instruments Sec. Litig*., No. 05 MDL 01695 (CM), 2007 U.S. Dist LEXIS 85554, at *32 (S.D.N.Y. Nov. 7, 2007) ("It is well established that counsel who create a common fund are entitled to the reimbursements of expenses that they advance to a class."); *see also Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir. 1987).  Class Counsel has submitted a declaration attesting to the accuracy of its expenses. Here, the litigation expenses incurred in the prosecution of this action totaled $14,515,235.24. *See* Lieberman Decl. ¶ 349. These expenses include the costs of experts and consultants, online legal and factual research, costs associated with the electronic discovery platform that counsel used to search, review, and analyze documents produced during the course of this action, court fees, translation fees, travel expenses, copying costs, court reporting services,

postage and delivery expenses, and Judge Phillips' mediation fees. These charges are not duplicated in the law firms' billing rates. The Settlement Notice informed potential Class Members that Class Counsel would apply for reimbursement of no more than $18 million in litigation expenses and $400,000 total in PSLRA awards.  To date, no valid objection has been received regarding the maximum figure provided in the Notice. These expenses are reasonable, and reimbursement should be approved.

## VIII.   TIMING OF PAYMENT

Class Counsel respectfully request that 100% of the expenses and 50% of the attorneys' fees be payable from the Gross Settlement Fund immediately after the date the Court grants final approval of the Settlement, with 40% of attorney fees to be paid upon an executed declaration by the Claims Administrator attesting that it is prepared to make a settlement distribution, and the remaining 10% of the attorney fees to be paid at the time 75% of the litigation fund is distributed. While this proposal deviates slightly from this Court's usual practice of postponing 50% of fees until distribution, Class Counsel respectfully submit that this adjustment is necessary here because there are likely to be multiple objectors that will appeal the Settlement and fee award in order to hinder the distribution of the settlement funds, in the hopes of exercising leverage on Class Counsel.  *See, e.g.,* John E. Lopatka and D. Brooks Smith, *Class Action Professional Objectors: What To Do About Them?*, 39 Fla. St. U. L. Rev. 865-66 (2012) ("prospect of financial loss caused by delay in implementation of a class settlement has given rise to a cottage industry of so-called professional objectors: attorneys who oppose settlements on behalf of non-named class members and threaten to file meritless appeals of the final judgment merely to extract a payoff"). Nevertheless, as demanded by Lead Plaintiff, receipt of the remaining 10% of the attorneys' fees will await actual distribution to properly incentivize Class Counsel to ensure that said distribution

occurs as expeditiously as possible.

## IX.   LEAD AND NAMED PLAINTIFFS SHOULD BE AWARDED THEIR REASONABLE COSTS AND EXPENSES UNDER 15 U.S.C. §78u-4(a)(4)

In connection with their request for reimbursement of litigation expenses, Class Counsel also seek $300,000.00 in PSLRA awards for Lead Plaintiff USS and $50,000.00 each for Class Representatives North Carolina and Hawaii, representing the costs incurred by them directly relating to their representation of the Class. The PSLRA provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4). "Courts in [the Second] Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the actions and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *Hicks v. Morgan Stanley & Co.*, No. 01-cv-10071 (RJH), 2005 WL 2757792, at *10 (S.D.N.Y. Oct. 24, 2005).

Courts have approved large awards to lead plaintiffs. *See Allapattah*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006, Apr. 16, 2007) (granting $1.7 million each to nine class representatives, for a total of $15.4 million); *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, No. 09 MDL 2058 (PKC), 2013 WL 12091355 (S.D.N.Y. Apr. 8, 2013) (awarding $259,610 to one plaintiff and $125,688 to a second plaintiff), *aff'd*, 772 F.3d 125 (2d Cir. 2014); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 318 F.R.D. 19, 27 (S.D.N.Y. 2016) (awarding $130,323 to sole lead plaintiff); *In re Tronox, Inc. Sec. Litig.*, No. 09-cv-6220 (SAS), Final Judgment Approving Class Action Settlement (S.D.N.Y. Nov. 26, 2012), Dkt. 202 (awarding $194,460, including $129,804 to two related lead plaintiffs); *FLAG Telecom*, 2010 WL 4537550, at *31 (awarding a lead plaintiff $100,000); *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04-cv- 8144 (CM), Decision and Order

24

Approving Settlement (S.D.N.Y. Dec. 23, 2009), Dkt. 333 (awarding $214,657, including $144,657 to related New Jersey pension funds).

Here, the efforts and contributions by Lead and Named Plaintiffs were substantial. These institutions actively participated in the prosecution of the Action, devoting valuable time and assistance through, *inter alia*, reviewing drafts of each of the complaints before filing; responding to Defendants' interrogatories and document requests; producing responsive documents; providing oversight regarding the mediation and settlement process; authorizing entry into the Settlements, and reviewing drafts of the Settlement papers before they were filed with the Court. *See* Lieberman Decl. ¶¶ 449-53. With respect to USS, its legal personnel attended every substantive hearing, all six mediation sessions, as well as reviewed the vast majority of significant filings, including the Settlement papers. *Id*. Moreover, USS conducted at least 70 telephonic and in-person meetings with Class Counsel, as well as with the other Class Representatives, to provide significant oversight over the progress of the Action. Based on their extensive involvement in the Action, the awards sought by Lead and Named Plaintiffs are reasonable and fully justified under the PSLRA.

## CONCLUSION

For all the foregoing reasons and those set forth in the accompanying declarations, Class Counsel respectfully request that the Court grant their application for an award of attorneys' fees, reimbursement of litigation expenses, and PSLRA awards to Lead and Named Plaintiffs.

Dated:  April 20, 2018                     Respectfully submitted,

                                           **POMERANTZ LLP**

                                           */s/ Jeremy A. Lieberman*
                                           Jeremy A. Lieberman
                                           Marc I. Gross
                                           Emma Gilmore
                                           John A. Kehoe
                                           Brenda Szydlo
                                           600 Third Avenue, 20th Floor

25

New York, NY 10016
Telephone: 212-6612-1100
Facsimile: 917-463-1044

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 North LaSalle
Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile: 312-229-8811

**POMERANTZ LLP**
Jennifer Pafiti
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: 310-285-5330

Counsel for Class Representatives
Universities Superannuation Scheme Limited,
North Carolina Department of State
Treasurer, and the Settlement Class

**LABATON SUCHAROW**
Thomas A. Dubbs
Louis Gottlieb
John Esmay
140 Broadway
New York, NY 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477

Counsel for Employees' Retirement System
of the State of Hawaii