Anna St. John
COMPETITIVE ENTERPRISE INSTITUTE
  CENTER FOR CLASS ACTION FAIRNESS
1310 L Street NW, 7th Floor
Washington, DC 20005
Phone: (917) 327-2392
Email:  anna.stjohn@cei.org

*Attorney for Objector William Thomas Haynes,*
*as trustee for the benefit of W Thomas and Katherine Haynes*
*Irrevocable Trust for the benefit of Sara L. Haynes*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN   RE   PETROBRAS   SECURITIES LITIGATION** | Case No. 14-CV-9662 (JSR)<br><br>**CLASS ACTION** |

**OBJECTION OF WILLIAM THOMAS HAYNES, AS TRUSTEE FOR THE BENEFIT OF W THOMAS AND KATHERINE HAYNES IRREVOCABLE TRUST FOR THE BENEFIT OF SARA L. HAYNES, TO THE PROPOSED CLASS ACTION SETTLEMENT AND ATTORNEYS' FEE REQUEST**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 1

I.    Objector is a member of the Settlement Class. ................................................ 1

II.   A court owes a fiduciary duty to unnamed class members. ............................. 2

III.  The Settlement Class cannot be certified due to intraclass conflicts between class members who purchased Petrobras Securities in domestic transactions as defined by *Morrison* and those who purchased the securities by foreign transaction. ........................ 3

    A.    Class members were not adequately represented where the same counsel represented those who purchased Petrobras Securities in domestic and foreign transactions. ................................................................................. 5

    B.    The Settlement Class cannot satisfy (b)(3)'s predominance requirement. ............. 9

IV.   Class counsel's excessive fee request should be decreased to $90.3 million to ensure that class counsel does not receive a windfall based on their overstated lodestar. .................. 12

    A.    Class counsel's unsupported lodestar is overstated by at least $96 million because it seeks legal fees for foreign attorneys and exorbitant rates for contract attorneys. ................................................................................. 12

    B.    A multiplier of 1.78 stands at the outer limit of what the Court should allow. .... 19

    C.    A fee award of $90.3 million amounts to a reasonable 3.0% of the $3 billion megafund and would return $194.6 million windfall to the class. ....................... 23

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

<u>Cases</u>

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)..................................................................................4, 5, 6, 10

*In re Agent Orange Prods. Liab. Litig.,*
    818 F.2d 216 (2d Cir. 1987).......................................................................................3, 23

*Alexander v. FedEx Ground Package System*,
    2016 WL 3351017 (N.D. Cal. 2016) ...............................................................................12

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 (1997).............................................................3, 5, 6, 7, 8, 11, 12, 21

*In re Am. Int'l Group, Inc. Sec. Litig.*
    689 F.3d 229 (2d Cir. 2012)...........................................................................................7

*Banas v. Volcano Corp.*,
    47 F. Supp. 3d 957 (N.D. Cal. 2014) .............................................................................14

*In re BankAmerica Corp. Sec. Litig.*,
    775 F.3d 1060 (8th Cir. 2015) .........................................................................................9

*In re Beacon Assocs. Litig.*,
    2013 WL 2450960 (S.D.N.Y. May 9, 2013) ..................................................................16

*In re Bristol-Myers Squibb Secs. Litig.*,
    361 F. Supp. 2d 229 (S.D.N.Y. 2005)...........................................................................24

*Brown v. Stackler*,
    612 F.2d 1057 (7th Cir. 1980) .......................................................................................18

*Carrera v. Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013)...........................................................................................21

*In re Cendant Corp. PRIDES Litig.*,
    243 F.3d 722 (3d Cir. 2001)...........................................................................................22

*In re Citigroup Inc. Bond Litig.*,
    988 F. Supp. 2d 371 (S.D.N.Y. 2013)................................................................12, 23, 24

*In re Citigroup Inc., Secs. Litig*,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013)....................................................................12, 18, 20

*City of Pontiac Gen. Empls. v. Lockheed Martin*,
    954 F. Supp. 2d 276 (S.D.N.Y. 2013)...............................................................................16

*City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)..........................................................................................4, 5

*In re CNOVA NV Sec. Litig.*,
    No. 16-cv-0444 (S.D.N.Y.).......................................................................................13, 14

*Cobell v. Salazar*,
    679 F.3d 909 (D.C. Cir. 2012) ...................................................................................24, 25

*Commonwealth Electric Co. v. Woods Hole*,
    754 F.2d 46 (1st Cir. 1985)...............................................................................................18

*In re CRM Holdings*,
    2016 WL 4990290 (S.D.N.Y. Sept. 6, 2016)....................................................................21

*Detroit v. Grinnell Corp.*,
    560 F.2d 1093 (2d Cir. 1977)...........................................................................................20

*Dial Corp. v. News Corp.*,
    317 F.R.D. 426 (S.D.N.Y. 2016) .................................................................14, 20, 23, 25

*In re Dry Max Pampers*,
    724 F.3d 713 (6th Cir. 2013) .............................................................................................3

*Felix v. Northstar Location Servs.*,
    290 F.R.D. 397 (W.D.N.Y. 2013)......................................................................................18

*Florin v. Nationsbank, N.A.*,
    34 F.3d 560 (7th Cir. 1994) ..............................................................................................22

*In re Global Crossing Secs. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) .......................................................................................3

*Goldberger v. Integrated Res.*,
    209 F.3d 43 (2d Cir. 2000).........................................2, 3, 12, 17, 19, 20, 21, 22, 23, 24, 25

*In re Grand Theft Auto Video Game Consumer Litig.*,
    251 F.R.D. 139 (S.D.N.Y. 2008) .....................................................................11

*Grant v. Bethlehem Steel Corp.*,
    823 F.2d 20 (2d Cir. 1987)................................................................................2

*In re Indymac Mortgage-Backed Secs. Litig.*,
    94 F. Supp. 3d 517 (S.D.N.Y. 2015)...............................................14, 20, 24, 25

*In re KeySpan Corp. Sec. Litig.*,
    2005 WL 3093399 (E.D.N.Y. Aug. 25, 2005)..................................................19

*Kruman v. Christie's Int'l PLC*,
    2004 WL 2914955 (S.D.N.Y. Dec. 16, 2004) .................................................13

*Lacovara v. Hard Rock Cafe Int'l (USA), Inc.*,
    2012 WL 603996 (S.D.N.Y. Feb. 24, 2012)....................................................18

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011)....................................................................5, 6, 7, 8

*Lola v. Skadden, Arps, Slate, Meagher & Flom*,
    620 Fed. Appx. 37 (2d Cir. 2015) ...................................................................15

*Masters v. Wilhelmina Model Agency*,
    473 F.3d 423 (2d Cir. 2007)..............................................................................9

*In re Mercury Interactive Secs. Litig.*,
    618 F.3d 988 (9th Cir. 2010) ...........................................................................17

*In re Merrill Lynch Tyco Research Secs. Litig.*,
    249 F.R.D. 124 (S.D.N.Y. 2008) ................................................................20, 21

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010)................................................................3, 4, 5, 6, 8, 10, 11

*Nachshin v. AOL, LLC*,
    663 F.3d 1034 (9th Cir. 2011) ..........................................................................9

*In re Nortel Networks Corp. Secs. Litig.*,
    539 F.3d 129 (2d Cir. 2008)............................................................................24

*N.Y. State Ass'n for Retarded Children, Inc. v. Carey,*
    711 F.2d 1136 (2d Cir. 1983) ............................................................................17

*In re One Infant Child,*
    No. 12 CIV. 7797 PKC, 2014 WL 704037 (S.D.N.Y. Feb. 20, 2014) ...........13

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999) .............................................................................3, 5, 6, 8

*Pa. Pub. Sch. Employees Ret. Sys. v. Bank of Am. Corp.,*
    318 F.R.D. 19 (S.D.N.Y. 2016) ......................................................................16

*PaineWebber Ltd. P'ships Litig.*
    999 F. Supp. 719 (S.D.N.Y. 1998) .................................................................20

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.,*
    827 F.3d 223 (2d Cir. 2016).........................................................................8, 21

*In re Petrobras Sec. Litig.,*
    150 F. Supp. 3d 337 (S.D.N.Y. Dec. 20, 2015) ...................................4, 5, 6, 10

*In re Petrobras Sec.,*
    862 F.3d 250 (2d Cir. 2017).......................................................4, 5, 6, 9, 10

*Perdue v. Kenny A,*
    559 U.S. 542 (2010)...............................................................................21, 22

*Redman v. Radioshack Corp.,*
    768 F.3d 622 (7th Cir. 2014) ..........................................................................17

*Sakiko Fujiwara v. Sushi Yasuda Ltd.,*
    58 F. Supp. 3d 424 (S.D.N.Y. 2014).........................................................16, 22

*Schoolcraft v. City of New York,*
    2016 WL 4626568, (S.D.N.Y. Sept. 1, 2016) ................................................18

*Scott v. City of New York,*
    626 F.3d 130 (2d Cir. 2010)............................................................................17

*Simmons v. N.Y.C. Transit Auth.,*
    575 F.3d 170 (2d Cir. 2009)............................................................................15

*In re Smart Techs., Inc. S'holder Litig.*,
    295 F.R.D. 50 (S.D.N.Y. 2013) ......................................................................11

*Sobel v. Hertz*,
    2011 WL 2559565 (D. Nev. Jun. 27, 2011)...................................................22

*Souratgar v. Lee Jen Fair*,
    818 F.3d 72 (2d Cir. 2016)...........................................................................13

*Spanos v. Skouras*,
    364 F.2d 161 (2d Cir. 1966)........................................................................13

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)...........................................................16

*In re Tremont Secs. Litig.*,
    699 Fed. Appx. 8 (2d Cir. 2017)...................................................................20

*Tyson Foods v. Bouaphakeo*,
    136 S. Ct. 1036 (2016)..................................................................................9

*United States v. Williams*,
    475 U.S. F.3d 468 (2d Cir. 2007) ..................................................................7

*United States ex rel. Palmer v. C&D Techs., Inc.*,
    2017 WL 1477123 (E.D. Pa. Apr. 25, 2017) ................................................16

*Wal-Mart Stores v. Visa USA*,
    396 F.3d 96 (2d Cir. 2005).............................................................................23

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994) ............................................................12, 22, 25

<u>Rules and Statutes</u>

42 U.S.C. § 1988...........................................................................................22

Fed. R. Civ. P. 23 .................................................................................3, 7, 11

Fed. R. Civ. P. 23(a) ........................................................................................

Fed. R. Civ. P. 23(a)(4) ....................................................................................................1, 5, 8

Fed. R. Civ. P. 23(b)(3) ..................................................................................................9, 10, 11

Fed. R. Civ. P. 23(e) ...........................................................................................................2, 11

Fed. R. Civ. P. 23(h) ...................................................................................................17, 22, 25

S.D.N.Y. Local Rule 1.3(c) ....................................................................................................13

Other Authorities

ABA Standing Committee on Ethics,
    ABA Formal Opinion 08-451 ...........................................................................................14

Brickman, Lester,
    LAWYER BARONS (2011) ....................................................................................................15

Eisenberg, Theodore & Miller, Geoffrey P.
    *Attorney Fees and Expenses in Class Action Settlements: 1993–2008,*
    7 J. EMPIRICAL L. STUD. 248, 263 (2010) ........................................................................23

Estes, Andrea
    *Critics hit law firms' bills after class-action lawsuits,*
    BOSTON GLOBE (Dec. 17, 2017) ..........................................................................................2

Fitzpatrick, Brian T.,
    *The End of Objector Blackmail?,*
    62 VAND. L. REV. 1623 (2009) ............................................................................................2

REUTERS,
    *Brazil's Petrobras says received U.S. SEC Subpoena for Documents*
    (Nov. 24, 2014) .................................................................................................................21

## INTRODUCTION

Plaintiffs ask for a *quarter-billion* dollar payday despite failing to adequately represent putative class members and seeking to circumvent the law of the case by settling valid claims arising from domestic purchases on equal footing with meritless foreign purchases. The domestic shareholders are harmed once by having their recovery diluted by such claims, with no separate representative negotiating on their behalf, and again to the extent they continue to hold their shares by the overbroad settlement payment and improper use of *cy pres* for any remainder. The proposed settlement fails Rule 23(a)(4) and (b)(3). Independently, the gobsmacking fee request—which serves to dilute class recovery further—is based on the brazen overbilling of contract attorneys to the tune of nearly $100 million and is not justified in this case, where the large recovery is attributable primarily to the size of the class, the scope of the misconduct, and prior criminal enforcement actions by U.S. and Brazilian officials. If the Court certifies the class and approves the settlement, a more appropriate fee is $90.3 million, a reasonable 3.0% of the megafund and equal to the requested 1.78 multiplier once the lodestar is properly stripped of the most egregious excesses and reduced further to incentivize against such abusive practices.

## ARGUMENT

### I.      Objector is a member of the Settlement Class.

Objector William Thomas Haynes purchased 55 shares of Petrobras Common ADS ("PBR") at $45.56 per share on March 4, 2010, as trustee for the benefit of W Thomas and Katherine Haynes Irrevocable Trust for the benefit of Sara L. Haynes (the "Trust") and continues to hold these shares. Decl. of William Thomas Haynes ("Haynes Decl.") ¶4 & Ex. 1. Neither individually nor in his capacity as trustee of the Trust is Haynes a defendant or current or former officer or director of Petrobras, nor is a member of his immediate family or legal representative, heir, successor or assign. Neither individually nor in his capacity as trustee of the Trust has he been convicted of any criminal or civil offense related to corruption under the laws of Brazil or

under the U.S. Code arising out of or related to conduct related to the allegations asserted in this action. *Id.* ¶5. Haynes therefore is a member of the Exchange Act Class within the Settlement Class with standing to object to the settlement. Fed. R. Civ. P. 23(e)(5). Haynes's address is 540 Slane Trace, Roswell, GA 30076. His telephone number is (678) 221-1051. Haynes Decl. ¶2.

The Competitive Enterprise Institute's Center for Class Action Fairness ("CCAF"), through attorney Anna St. John, represents Haynes *pro bono*. St. John gives notice of her intent to appear at the fairness hearing, where she wishes to discuss matters raised in this Objection. CCAF represents class members *pro bono* in class actions where class counsel employs unfair class action procedures to benefit themselves at the expense of the class. Since it was founded in 2009, CCAF has "recouped more than $100 million for class members" by driving the settling parties to reach an improved bargain or by reducing outsized fee awards. Andrea Estes, *Critics hit law firms' bills after class-action lawsuits*, BOSTON GLOBE (Dec. 17, 2017). CCAF's track record—and preemptive response to the most common false *ad hominem* attacks made against it by attorneys defending unfair settlements and fee requests—can be found in the Declaration of Theodore H. Frank. To avoid doubts about his motives, Haynes is willing to stipulate to an injunction prohibiting him from accepting compensation in exchange for the settlement of this objection. *See* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (suggesting inalienability of objections as solution to objector blackmail). Haynes brings this objection through CCAF in good faith to protect the interests of the class. Haynes Decl. ¶ 10. He adopts any arguments filed or submitted to the Court regarding the settlement and fee request that are not inconsistent with this objection.

## II.    A court owes a fiduciary duty to unnamed class members.

A "district court ha[s] a fiduciary responsibility to the silent class members," *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir. 1987), and must act "with a jealous regard" for the rights and interests of such absent class members, *Goldberger v. Integrated Res.*, 209 F.3d 43, 53 (2d Cir. 2000). The fiduciary role is necessary "because inherent in any class action is the

potential for conflicting interests among the class representatives, class counsel, and absent class members." *In re Global Crossing Secs. & ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004) (internal quotation omitted). While class counsel and the defendant have an incentive to bargain over the size of the settlement, similar incentives do not govern their critical decisions about how to divvy it up—including allocation to counsel's own fees. *In re Dry Max Pampers*, 724 F.3d 713, 718 (6th Cir. 2013). "The concern is not necessarily in isolating instances of major abuse, but rather is for those situations, short of actual abuse, in which the client's interests are somewhat encroached upon by the attorney's interests." *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 224 (2d Cir. 1987) (internal quotation omitted). Motivated by fear of "routine windfalls where the recovered fund runs into the multi-millions" and noting that some courts had "apparently eased into a practice of systematically awarding fees in the 25% range, regardless of type of case, benefits to the class, numbers of hours billed, size of fund, size of plaintiff class, or any other relevant factor," this Circuit emphasizes the importance of exacting scrutiny into the individual facts of each case. *Goldberger*, 209 F.3d at 51, 52 (internal quotations omitted). A court's "overarching concern [is] for moderation." *Id.* at 53

## III.     The Settlement Class cannot be certified due to intraclass conflicts between class members who purchased Petrobras Securities in domestic transactions as defined by *Morrison* and those who purchased the securities by foreign transaction.

When "[c]onfronted with a request for settlement-only class certification, the court must look to the factors designed to protect absentees." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Rule 23(a) and (b) "focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives," a "dominant concern [that] persists when settlement, rather than trial, is proposed." *Id.* at 621. Judicial supervision requires the court to weigh the value of differently-situated class members' claims against one another to determine whether there exist irreconcilable intraclass conflicts that demand separate representation ((a)(4)) or whether the common questions predominate ((b)(3)). "[I]ntraclass equity" is a "requirement." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 863 (1999).

Here, the Court already has examined a critical issue that precludes a finding of adequate representation and predominance in the proposed class. Under *Morrison v. National Australia Bank Ltd.*, the federal securities laws only reach fraudulent statements made in connection with a purchase or sale of a security traded on a U.S. stock exchange or "the purchase or sale of any other security *in the United States*." 561 U.S. 247, 273 (2010) (emphasis added); *City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 179-81 (2d Cir. 2014); *In re Petrobras Sec.* ("*Petrobras Appeal*"), 862 F.3d 250, 271 (2d Cir. 2017) (class member "only has a viable cause of action if the specific Petrobras Securities sued upon were purchased in a qualifying 'domestic transaction'"). The purchase of a security not traded on a domestic exchange is "domestic if irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012).

Based on this precedent, the Court held that a purchase of Petrobras Notes is not domestic—and thus not subject to U.S. securities law—simply because it was settled through the Depository Trust Company ("DTC") or the Notes were listed on the NYSE. *In re Petrobras Sec. Litig.* ("*Petrobras I*"), 150 F. Supp. 3d 337, 342-43 (S.D.N.Y. Dec. 20, 2015). The Court dismissed the claims of two named plaintiffs who purchased Notes *listed* but not *traded* on the NYSE. Plaintiffs alleged ownership was transferred in the U.S. because their Notes purchases settled through the DTC in New York, and this is the "functional equivalent of transfer of title." *Id.* at 341. The Court rejected this argument, holding that "the operations of the DTC are insufficient to satisfy *Absolute Activist*," as the mechanics "involve neither the substantive indicia of a contractual commitment … nor the formal weight of a transfer of title." *Id.* at 342. The Second Circuit affirmed this conclusion. *Petrobras Appeal*, 862 F.3d at 272 n.24.

Despite this history, the parties nevertheless persist in including foreign Note purchasers in the Settlement Class. The definition of "Covered Transaction" includes purchases of a Petrobras Security, including certain Petrobras Notes, that "cleared or settled through the [DTC's] book-entry system." Settlement ¶1(i), (q); Notice at 3. Additional foreign transactions

are included to the extent Securities were merely "listed for trading" rather than actually traded on the NYSE. The class definition includes no further requirement of a domestic transfer of title that would subject a purchase to U.S. securities laws under *Morrison*, *UBS* and *Absolute Activist*.

Including foreign purchases in the class raises two problems for certification: First, a single set of counsel and representatives cannot adequately represent the interests of foreign and domestic purchasers under Rule 23(a)(4); more recovery of the fund by one group necessary means a reduction in recovery by the other. *In re Literary Works in Elec. Databases Copyright Litig.,* 654 F.3d 242 (2d Cir. 2011). Second, the question of whether one's purchase of Notes was foreign or domestic cannot be answered through common evidence; instead, each inquiry will focus on individualized locational evidence. *Petrobras Appeal*, 862 F.3d at 262; *Petrobras I*, 150 F. Supp. 3d at 340. The Settlement Class fails Rule 23(a)(4) and (b)(3) and cannot be certified.

## A.   Class members were not adequately represented where the same counsel represented those who purchased Petrobras Securities in domestic and foreign transactions.

Adequacy of representation, a prerequisite to class certification, Fed. R. Civ. P. 23(a)(4), requires "structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem*, 521 U.S. at 627. Each such group must have "separate representation to eliminate conflicting interests of counsel." *Ortiz*, 527 U.S. at 856."Only the creation of subclasses, and the advocacy of an attorney representing each subclass, can ensure that the interests of that particular subgroup are in fact adequately represented." *Literary Works,* 654 F.3d at 252. Thus, "[a]dequacy is twofold: the proposed class representative [and counsel] must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Id.* at 249 (internal quotation omitted).

Here, the Settlement Class—and both the Exchange Act Class and Securities Act Class[1]—kludges together two subgroups with qualitatively different claims: (i) those who

---

[1] As trustee to the Trust, Haynes is a member of the Exchange Act Class, within the overarching Settlement Class. Both the Exchange Act and Securities Act Classes suffer from the same (a)(4) and (b)(3) defects, and do not appear to have had separate representation themselves.

purchased Petrobras Securities through a domestic transaction (and have stronger claims), and those who purchased Petrobras Securities through a foreign transaction (and have no claim, as evidenced by the Court's earlier dismissal of such claims). *See Amchem*, 521 U.S. at 619-20. Because the two groups are competing for the same settlement funds, it creates an untenable intraclass conflict of interest to merge them into the same class with the same representation. *See, e.g.*, *Ortiz*, 527 U.S. at 857; *Literary Works*, 654 F.3d at 251-52; *see also Petrobras Appeal*, 862 F.3d at 271 (domesticity of transaction is a material issue).

Plaintiffs acknowledge that foreign transactions that "ultimately may have been dismissed by the Court" are "encompassed in the definition of Covered Transactions." Dkt. 776 at 23. Purchases of Petrobras Notes frequently clear or settle through the DTC's book-entry system. *Petrobras I*, 150 F. Supp. 3d at 342. All such transactions are included under subpart (ii) of "Covered Transactions" regardless of whether a particular transaction was domestic. Many of these transactions will be excluded from the reach of the Securities Act and Exchange Act—and therefore should be dismissed—because "they involve neither the substantive indicia of a contractual commitment necessary to satisfy *Absolute Activist*'s first prong nor the formal weight of a transfer of title necessary for its second." *Id.* at 340. Additionally, Petrobras Notes "were listed or intended to be listed on the [NYSE, but] they did not trade there." *Id.* at 339. As such, foreign transactions are also included in the Settlement Class to the extent that subpart (i) of "Covered Transactions" includes Notes that were listed but not actually traded on the NYSE. *Id.* at 340. Class members who purchased stock actually traded on the NYSE such as Haynes do not face the devastating hurdle to their claims that foreign purchasers face.

Plaintiffs' defense of the inclusion of meritless claims in the Settlement Class flounders. It centers in part on a "respectful[] disagree[ment]" with the Second Circuit's holding that every DTC transaction is not a domestic transaction under *Morrison*. Dkt. 776 at 23. That ruling is the

---

While the Court could address these problems in each class separately using the same analysis, for ease of reference, Haynes addresses the problem at the level of the overarching Settlement Class.

law of the case and cannot be challenged now. *See United States v. Williams*, 475 U.S. F.3d 468, 475 (2d Cir. 2007). Their defense also centers on a handful of out-of-circuit cases that are of marginal relevance or, in some cases, undermine their argument. While opining in *In re Am. Int'l Group, Inc. Sec. Litig.* that settlement class certification might be warranted if trial management concerns are the only obstacle, the court made clear that other Rule 23(a) and (b) criteria still apply in the settlement context: "if there appear to be conflicts within the class, with some members who could satisfy the presumption and others who cannot, a district court may need to address the applicability of the [fraud-on-the-market] presumption in order to make findings with respect to adequacy of representation or predominance, or to evaluate whether subclasses are necessary." 689 F.3d 229, 243 (2d Cir. 2012) (cited at Dkt. 776 at 23).

The release of claims arising from foreign transactions might command some settlement value; however, the proper valuation should have been tested through arms-length negotiation by separate representatives. Each subgroup required counsel whose sole duty was to represent and advocate on its behalf. Instead, class counsel was "obligated to advance the collective interests of the class, rather than those of a subset of class members"; entirely absent was "the advocacy of an attorney representing each subclass" or subgroup as required by Rule 23 to "ensure the interests of that particular subgroup are in fact adequately represented." *Literary Works*, 654 F.3d at 252. The recovery of domestic purchasing class members such as Haynes is unfairly diluted by the inclusion of foreign purchasers, while the parties benefit by achieving a holistic settlement and release of claims without sharing the fees with counsel for a separate subclass.

*Amchem* required subclassing where the conflict was even less stark. There, the proposed class encompassed members who had already manifested asbestos-related injuries, *i.e.*, those with present claims, and those with who had been exposed to asbestos but did not show signs of injury, *i.e.*, those with only potential future claims. The "two subgroups … had competing interests in the distribution of a settlement whose terms reflected 'essential allocation decisions designed to confine compensation and to limit defendants' liability.'" *Literary Works*, 654 F.2d

at 250 (quoting *Amchem*, 521 U.S. at 627). *See also Ortiz*, 527 U.S. at 857 (groups holding claims of significantly different value had conflicting interests that should have been addressed with "reclassification with separate counsel").

The Second Circuit has applied *Amchem* and *Ortiz* to vacate class certification in similar circumstances. In *Literary Works*, the court struck down a settlement on Rule 23(a)(4) grounds where class counsel attempted to negotiate compensation for three separate "categories" of copyright-holding class members in a single settlement, where each class representative "served generally as a representative for the whole, not for a separate constituency." 654 F.3d at 246, 251. Class representatives "cannot have had an interest in maximizing compensation for *every* category" where each category had qualitatively different claims. *Id.* at 252 (emphasis in original). The Second Circuit again rejected the adequacy of unitary representatives who "were in the position to trade diminution [of one subgroup's] relief for increase of [another's] relief" in *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 827 F.3d 223, 234 (2d Cir. 2016). *Payment Card* recognized the incentives that generally undergird this problem: "(i) the interest of class counsel in fees, and (ii) the interest of defendants in a bundled group of all possible claimants who can be precluded by a single payment." *Id.* at 236.

Subclassing is required, with "separate representation to eliminate conflicting interests of counsel." *Ortiz*, 527 U.S. at 856. It may be necessary to create three subclasses: (1) purchasers of Petrobras Securities traded on a domestic exchange, (2) purchasers of Petrobras Securities through domestic transactions that require evidence beyond the bright-line domestic exchange prong of *Morrison*, and (3) purchasers through foreign transactions.

Class counsel's inadequate representation is further evidenced by the *cy pres* settlement term. The Settlement Agreement provides, as suggested by Petrobras, that any remainder from the settlement fund will be donated to "a program in Brazil devoted to fighting corruption and improving corporate governance, which will be selected by Petrobras and approved by Class Counsel." Settlement, Dkt. 767-1 ¶ HH. This provision runs afoul of the limitations on the use of

*cy pres*. "The purpose of Cy Pres distribution is to put the unclaimed fund to its *next best* compensation use, e.g., for the aggregate, indirect, prospective benefit of the class." *Masters v. Wilhelmina Model Agency*, 473 F.3d 423, 436 (2d Cir. 2007) (internal quotation omitted). A program devoted to fighting corruption in Brazil has an inappropriately narrow geographic scope where there has been no demonstration that all or even most of the class is Brazilian or owns securities in other Brazilian entities. Moreover, there is an inappropriately weak connection to the issue of securities fraud. *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1040 (9th Cir. 2011) (rejecting *cy pres* distribution with narrow geographic focus and no relation to the objectives of the underlying law); *In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060 (8th Cir. 2015) (similar). A recipient with a much closer nexus to a class seeking damages for alleged shareholder fraud is the SEC Fair Funds for Investors, which benefits shareholders injured by securities fraud. By acceding to Petrobras's suggestion of a *cy pres* recipient that fails to benefit the class, class counsel again showed themselves to be inadequate representatives.

## B.    The Settlement Class cannot satisfy (b)(3)'s predominance requirement.

The conflict between domestic and foreign purchases also undermines the cohesiveness necessary for Rule 23(b)(3) predominance. The Second Circuit addressed the predominance requirement at length in Petrobras's appeal of this Court's certification decision. *Petrobras Appeal*, 862 F.3d 250. The predominance requirement "is satisfied if: (1) resolution of any material legal or factual questions … can be achieved through generalized proof, and (2) these [common] issues are more substantial than the issues subject only to individualized proof." *Id.* at 270 (internal quotation omitted). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized class-wide proof." *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (alteration and quotations omitted).

Here, the Settlement Class is not sufficiently cohesive: class members who purchased a

Petrobras Security in a domestic transaction have viable monetary claims, while those who purchased a Petrobras Security in a foreign transaction have no viable monetary claim. The Second Circuit recognized that "[o]n the available record, the investigation of domesticity appears to be an 'individual question requiring putative class members to present evidence that varies from member to member." *Petrobras Appeal*, 862 F.3d at 272 (internal quotations omitted). That is because a plaintiff may prove domesticity with evidence "'including, but not limited to, facts concerning the formation of contracts, the placement or purchase orders, the passing of title, or the exchange of money.'" *Id.* (quoting *Absolute Activist*, 677 F.3d at 70).

This Court's analysis of the putative named plaintiffs' evidence offered as proof of the domestic nature of their purchases shows how these transaction-specific facts are not susceptible to class-wide proof. *See id.*; *Petrobras I*, 150 F. Supp. 3d at 340-41. Rather, an individualized locational inquiry is essential to determining which transactions are domestic versus foreign under *Morrison* because Petrobras Securities were purchased in myriad ways. *Id.* at 273. "[T]he potential for variation across putative class members—who sold them the relevant securities, how those transactions were effectuated, and what forms of documentation might be offered in support of domesticity—appears to generate a set of individualized inquiries" for purposes of Rule 23(b)(3)'s predominance requirement. *Id.*

On remand, plaintiffs have not put forth "class-wide evidence" of domesticity that would prevent the fact-finder from "hav[ing] to look at every class member's transaction documents to determine who did and who did not have a valid claim." *Petrobras Appeal*, 862 F.3d. at 274 (internal quotation omitted). Instead, in their motion for final approval, they acknowledge the risk that they could not meet predominance absent settlement, and base their defense on cherry picked snippets from the Second Circuit ruling and inapplicable cases. *See* Dkt. 776 at 14, 21.

Plaintiffs zero in on a single sentence in a footnote where the Second Circuit comments that after carefully weighing "the relationship between common and individual questions," this Court could "determine that any variation across plaintiffs is, on balance, insufficient to defeat

predominance." Dkt. 776 at 21. With this slender reed, plaintiffs seek to undermine *Amchem*'s direction that "the predominance inquiry—as distinguished from the trial-manageability inquiry—should not be watered down merely because the parties have entered a proposed settlement." *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 159 (S.D.N.Y. 2008). *Amchem* is clear: The "safeguards" of Rule 23(a) and (b) "are not impractical impediments—checks shorn of utility—in the settlement class context." 521 U.S. at 621.[2] Rule 23(e) "was designed to function as an additional requirement, not a superseding direction." *Id.*

They also divert attention from the actual individualized question of transaction locality that undermines predominance to the more generalized issues of *defendants' conduct*. Even if other cases have held that common issues predominate with respect to the falsity and materiality of statements, plaintiffs offer no authority holding that individual issues do not predominate with respect to transaction locality in securities suits where a defendant has globally traded securities. *Cf.* Dkt. 766 at 21-22 (citing cases). In fact, in their only case to address *Morrison* directly, the Court certified a class only after it excluded any putative class members who "purchased, incurred 'irrevocable liability,' or obtained 'title' to securities … outside the United States [because] they do not have a viable cause of action under the Securities Act, and may not be included in the class certified here," and it further related to the specific issue of "traceability" of the securities at issue. *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 57 (S.D.N.Y. 2013). Transaction locality is not a "various secondary issue" but rather at the heart of whether a putative class member has a damages claim such that certification of her claims is permissible.

Under the holdings of *Amchem* and the Second Circuit in this case, the Settlement Class cannot be certified due to lack of predominance.

---

2 Plaintiffs misleadingly omit language clarifying that only the "likely difficulties in managing a class action" of 23(b)(3)(D) are not an issue for settlement-only certification. Dkt. 776 at 20. That is just one of "[t]he matters pertinent to" predominance under Rule 23(b)(3).

**IV.    Class counsel's excessive fee request should be decreased to $90.3 million to ensure that class counsel does not receive a windfall based on their overstated lodestar.**

**A.      Class counsel's unsupported lodestar is overstated by at least $96 million because it seeks legal fees for foreign attorneys and exorbitant rates for contract attorneys.**

When class counsel request a fee award based on the percentage of recovery, courts use a lodestar cross-check to test the "reasonableness of the requested percentage." *Goldberger*, 209 F.3d at 52. "[I]n megafund cases, the lodestar cross-check assumes particular importance." *Alexander v. FedEx Ground Package System*, 2016 WL 3351017, at *2 (N.D. Cal. 2016). That is because percentage-based awards become especially arbitrary in this context where, as here, the difference of a few percentage points translates to over a hundred million dollars for the class. *See In re Wash. Pub. Power Supply Sys. Sec. Litig.* ("*WPPSS*"), 19 F.3d 1291, 1298 (9th Cir. 1994). The crosscheck helps "avoid awarding plaintiffs' counsel a windfall at the expense of the class—a special concern where the recovered fund runs into the multi-millions." *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 374 (S.D.N.Y. 2013) (internal quotation omitted).

"[T]he lodestar serves little purpose as a cross-check if it is accepted at face value." *In re Citigroup Inc., Secs. Litig*, 965 F. Supp. 2d 369, 376 (S.D.N.Y. 2013). Class counsel's acknowledgment here that the lodestar is "admittedly high" is an understatement. *See* Lieberman Decl., Dkt. 789 ¶ 396. Attempting to capture the windfall for themselves, class counsel overstated their actual lodestar by an outrageous 250% (actual lodestar of approximately $63.4 million v. overstated lodestar of $159.5 million), by padding their time with (1) $27.9 million of time for 27 foreign "Project Associates" that should have been included as an expense rather than attorneys' fees; (2) $82.2 million of time for 145 contract attorneys that charged exorbitant billing rates ($325-$635 per hour). Indeed, the overstatement is likely much greater but cannot be determined because class counsel has failed to include any billing summaries.

**1.      Class counsel's lodestar improperly includes $27.9 million for Brazilian "associates" which should instead be treated as an expense.**

Class counsel improperly seeks $49.8 million in attorneys' fees ($27.9 million lodestar

times 1.78 multiplier) for Brazilian "Project Associates." *See* St. John Decl. ¶ 5. Federal courts have rejected recovery of fees for foreign attorneys that are unable to be admitted to the court. In *In re One Infant Child*, the court rejected a request for $51,629 in attorneys' fees for a Singaporean lawyer with 26 years experience. 2014 WL 704037, at *5 (S.D.N.Y. Feb. 20, 2014), *rev'd sub nom. on other grounds*, *Souratgar v. Lee Jen Fair*, 818 F.3d 72 (2d Cir. 2016). The court held that the foreign attorney was not entitled to compensation because "[t]here is no showing that [the foreign attorney] is admitted to practice in [this state] or before this Court." *Id.* (internal quotation omitted); *see also Kruman v. Christie's Int'l PLC,* 2004 WL 2914955, at *1 (S.D.N.Y. Dec. 16, 2004) (noting that foreign attorneys are not subject to same ethical rules and courts are not familiar with foreign legal markets to analyze fee applications).

The Second Circuit requires that the attorney must at least be *capable* of being admitted *pro hac vice* in order to recover fees for legal services. *Spanos v. Skouras*, 364 F.2d 161, 168 (2d Cir. 1966) (en banc). In *Spanos*, the court permitted an out-of-state attorney to receive fees for work related to a case in federal court when it was certain he *would have* been admitted *pro hac vice* because he was well trained and a member in good standing of the California Bar. *Id.* at 168-69. To be admitted *pro hac vice* in this Court, an attorney must be a "member in good standing of the bar of any state or of any United States District Court."  S.D.N.Y. Local Rule 1.3(c). In this case, the "Project Associates" that are admitted only in Brazil would be incapable of being admitted *pro hac vice* and thus plaintiffs cannot recover attorneys' fees for their time.

Class counsel relies on *In re CNOVA NV Sec. Litig.* in support of their request for fees for the Brazilian attorneys. *See* Lieberman Decl. ¶ 403. But in *CNOVA*, the court never considered that the attorneys were Brazilian. No. 16-cv-0444 (S.D.N.Y.), Dkt. 148. In fact, the plaintiffs' motion for attorneys' fees in *CNOVA* did not even mention that any of the attorneys were foreign, Dkt. 139, but only described the attorneys as Brazilian in a supporting declaration, Dkt. 137 ¶¶ 84, 230. *CNOVA* provides no support for class counsel's lodestar here. *See In re Indymac Mortgage-Backed Secs. Litig.*, 94 F. Supp. 3d 517, 522-23 (S.D.N.Y. 2015) (refusing to put stock

in "lawyer-authored boilerplate").

While class counsel has provided no summaries of what work the project associates performed, class counsel described that they were assigned to "analyze, code, and where necessary translate documents" and "worked on translations." Lieberman Decl., Dkt. 789 ¶ 398. The reasonableness of this work is questionable, *see* Petrobas Letter, Dkt. 793 at 6-9, but even if reasonable, these services should be charged to the class as an expense similar to the translation and Brazilian legal expert expenses for which class counsel is seeking reimbursement. *See* Dkt. 789-16 at 8 ($1.2 million for translation, $316,872 Brazilian law expert, $119,612 Brazilian investigators). But class counsel should ***not*** be permitted to treat such expenses as fees, upcharge them to the class at likely 20 times their cost, and then receive a multiplier of 1.78 on top of that.

Class counsel's stated lodestar of $159.5 million should be decreased by $27.9 million to exclude the Brazilian attorneys.

2.    **The lodestar is overstated by over $68.2 million because the contract attorneys' rates are exorbitant.**

In addition to the Brazilian attorneys, the lodestar includes $82.2 million of time for 145 contract attorneys or "Project Associates" that charged exorbitant billing rates ($325-$635 per hour). *See* St. John Decl. ¶ 6. Like the Brazilian attorneys, the best practice is to bill the contract attorneys at cost. In *Dial Corp. v. News Corp.*, the district court commended class counsel for treating contract attorney work as an expense, charging the 25,000 hours at $39/hour with no mark-up applied. 317 F.R.D. 426, 430 n.2 & 438 (S.D.N.Y. 2016); *see also Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 980 (N.D. Cal. 2014) (awarding contract attorney time as "costs" at billing rate of $47 to $59 per hour). Indeed, it is likely unethical to charge more than cost. The ABA Standing Committee on Ethics ruled that "In the absence of an agreement with the client authorizing a greater charge, the lawyer may bill the client only its actual cost plus a reasonable allocation of associated overhead, such as the amount the lawyer spent on any office space, support staff, equipment, and supplies for the individuals under contract." ABA Formal Opinion

08-451. Indeed, "overhead costs associated with the provision of such services may be minimal or nonexistent if and to the extent that the outsourced work is performed off-site without the need for infrastructural support." *Id.* Much of the multimillion document review here was likely conducted offsite, and under the supervision performed by attorneys who are already being billed separately. *See also generally, e.g.*, Lester Brickman, LAWYER BARONS 378-87, 501-06 (2011). That the project associates were paid benefits or temporarily became "employees," *see* Lieberman Decl., Dkt. 789 ¶ 399, may have slightly increased that expense but does not transform that contract work into legal services deserving of $325 to $635 per hour.

Further, the services by the "Project Associates" should be billed at cost because the work performed was not legal work. Project associates were assigned to "analyze, code, and where necessary translate documents" and "worked on translations." Lieberman Decl., Dkt. 789 ¶ 398. Coding and translating documents is devoid of legal judgment and cannot justify $325 to $625 hourly legal rates. *See Lola v. Skadden, Arps, Slate, Meagher & Flom*, 620 Fed. Appx. 37, 40 (2d Cir. 2015) (holding that such $25/hour work was so devoid of legal judgment it may not constitute the practice of law). If the 186,814 hours were billed at cost, e.g., a generous rate of $35/hour, the contract attorney lodestar would drop from $82.2 million to $6.5 million. The cost is likely much lower because current employment advertisements for Portuguese-speaking document review attorneys show compensation between $15 to $33 per hour (and require U.S. bar membership). *See* St. John Decl. Ex. 1-3.

But even if the "Project Associates" time is treated as legal fees, the $325 to $625 hourly rates are exorbitant. The reasonable fee is an estimation of what a reasonable cost-conscious client would pay. *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009). Contract attorneys are hired to do relatively unskilled document review work that discerning paying clients refuse to pay a premium for. Indeed, across the country, paying clients refuse to pay even as much as $150/hour for document review (even if law-firm attorneys conduct it)—and then only if the temporary attorneys are not billed directly to the client as a direct cost. "[T]here is

absolutely no excuse for paying these temporary, low-overhead employees $40 or $50 an hour and then marking up their pay ten times for billing purposes." *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *18 (S.D.N.Y. May 9, 2013); *Pa. Pub. Sch. Employees Ret. Sys. v. Bank of Am. Corp.*, 318 F.R.D. 19, 26 (S.D.N.Y. 2016) (holding that charging the class $362/hr for temporary attorney work "is unreasonable and warrants a reduction in the attorneys' fees").

Even if there is discretion to charge a markup, class counsel provides no evidence of the market rate for contract attorneys. Instead, class counsel points to other cases where marked up hourly rates were included in fee applications, *see* Lieberman Decl. ¶ 404 (citing cases), but none of those cases involved the substantive review of hourly rates. The manufactured hourly rates do not reflect market rates: "By submitting proposed orders masquerading as judicial opinions, and then citing to them in fee applications, the class action bar is in fact creating its own caselaw on the fees it is entitled to. . . . No wonder that 'caselaw' is so generous to plaintiffs' attorneys." *Sakiko Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp. 3d 424, 436 (S.D.N.Y. 2014).

Instead, the best measure of the market rate is to review what paying clients are willing to pay. *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y. 2008) (recommending looking at defense rates to determine plaintiff-side rates). "[A] sophisticated client, knowing these contract attorneys cost plaintiff's counsel considerably less than what the firm's associate attorneys cost (in terms of both salaries and benefits) would have negotiated a substantial discount in the hourly rates charged the client for these services." *City of Pontiac Gen. Empls. v. Lockheed Martin*, 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013) (Rakoff, J.). In today's legal market, clients refuse to tolerate law firms treating gigantic document review projects as a profit center, or in other words "a trough where herds of lawyers try to muscle their way to the front to quench their thirst without explanation and with no appreciation of moderation." *United States ex rel. Palmer v. C&D Techs., Inc.*, 2017 WL 1477123, at *6 (E.D. Pa. Apr. 25, 2017). Petrobas should disclose what it paid for document review to illuminate the market rates: it is likely closer to $35/hour than $75/hour, but nowhere near $325 to $625 per hour. If the court applies $75 per

hour, the $82.2 million contract attorney lodestar drops to $14 million.

In sum, while the Project Associates time should be billed at cost, if the time is included in the lodestar, the lodestar should be decreased by another $68.2 million (difference between $82.2 million in fee application and $14 million if contract attorneys are charged at $75/hour).

### 3. The lodestar is likely overstated even more than estimated because class counsel has failed to provide objectors with sufficient billing summaries.

While Haynes estimates the lodestar inflation based on the unreasonable billing rates and the excessive number of firms involved, the actual extent of the overstatement cannot be calculated because plaintiffs' attorneys have failed to provide sufficient detail in their billing summaries. Class counsel's exhibits accompanying the fee application provide no specific breakdown at all; they merely list the hourly fees of each biller and total hours expended without even a general description of tasks. Although class counsel have apparently provided their time record to Defendant (*see* Dkt. 793), that is insufficient to satisfy Rule 23(h), which entitles class members to a full and fair opportunity to object to counsel's fee requests. *See, e.g., In re Mercury Interactive Secs. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010); *Redman v. Radioshack Corp.*, 768 F.3d 622, 637-38 (7th Cir. 2014). Class review is even more important in the common fund context where the "adversary system is typically diluted—indeed suspended." *Goldberger*, 209 F.3d at 52.

"[C]ontemporaneous time records are a prerequisite for attorney's fees in this Circuit." *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147 (2d Cir. 1983); *Scott v. City of New York*, 626 F.3d 130, 133 (2d Cir. 2010) ("[W]e are adamant that, after *Carey*, applications for attorney's fees allowed by federal law 'must' be accompanied by contemporaneous time records."). Although a cross-check does not require the bean-counting that the base lodestar method entails, it would "serve[] little purpose as a crosscheck if it is accepted at face value." *Citigroup Secs.*, 965 F. Supp. 2d at 389. Additional detail is necessary because a "summary spreadsheet reciting attorney names, hourly rates, and total hours spent"

provides an "inadequate basis for the Court to place great weight on the lodestar as a valid cross-check." *Lacovara v. Hard Rock Cafe Int'l (USA), Inc.*, 2012 WL 603996, at *3 (S.D.N.Y. Feb. 24, 2012). "Class counsel cannot present effectively unreviewable hours in the name of convenience." *Citigroup Secs.*, 965 F. Supp. 2d. at 393. "If plaintiffs and their attorneys are acting like they have something to hide from the absent class members, perhaps it's because they do." *Felix v. Northstar Location Servs.*, 290 F.R.D. 397, 408 (W.D.N.Y. 2013). And based on the examples cited by Defendant, *see* Dkt. 793, class counsel may have a lot to hide.

### 4.   The lodestar should be reduced for lack of billing judgment.

Finally, an appropriate sanction for overinflating lodestar is to reduce the lodestar. If the only consequence from trying to claim more than what class counsel is entitled to is that class counsel will get what they would have been entitled to if they had filed a fair petition in the first place, there is no incentive to be forthright with a court in the original request. *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980). On the rare occasions they get caught, they are no worse off; if no objector investigates, they receive a windfall. An "outside-chance opportunity for a megabucks prize must cost to play." *Commonwealth Electric Co. v. Woods Hole*, 754 F.2d 46, 49 (1st Cir. 1985). Public policy and the law demand that there be material consequences for the assertion that lodestar is over $159 million when it is inflated by at least $96 million. In the face of excessive and misleading submissions, the Court has discretion to reduce hours across the board. *Schoolcraft v. City of New York*, 2016 WL 4626568, at *10 (S.D.N.Y. Sept. 1, 2016) (reducing by 35% to account for the "excess and waste" that "was not adequately trimmed" by counsel). Class counsel will argue "But everyone does it," and that shows deterrence is necessary because it's so infrequently caught. Class counsel's actual lodestar should be further reduced by 20%—otherwise, if class counsel is caught only half the time, they would come out ahead.

&#42;&#42;&#42;                                    &#42;&#42;&#42;                                    &#42;&#42;&#42;

In sum, based on Haynes's estimates, the $159.5 million stated lodestar is inflated by at least $96 million: $27.9 million for foreign attorneys and $68.2 million for overpriced contract

attorneys. The corrected lodestar of $63.4 million should be reduced 20% for lack of billing judgment for a total lodestar of $50.7 million.

**B.     A multiplier of 1.78 stands at the outer limit of what the Court should allow.**

Class counsel request a multiplier enhancement of 1.78. Fee Mem. (Dkt. 787) at 9. After the lodestar exaggeration is excised, the *de facto* multiplier requested is 5.61. Given the realities of securities litigation and the context of this particular case, no more than the requested 1.78 multiplier is warranted. As plaintiffs observe, the Second Circuit considers risk of success to be "perhaps the foremost factor to be considered in determining whether to award an enhancement." Fee Mem. 13 (quoting *Goldberger*, 209 F.3d at 54). While relying heavily on *Goldberger*, they neglect to quote the following passage of direct relevance to their request for an enhancement:

> But the principal analytical flaw in counsel's argument lies in their assumption that there is a substantial contingency risk in every common fund case. We harbor some doubt that this assumption is justified in cases such as this. At least one empirical study has concluded that "there appears to be no appreciable risk of non-recovery" in securities class actions, because "virtually all cases are settled." Anecdotal evidence tends to confirm this conclusion.... Of course, we are not suggesting that compensation for risk is never permitted, merely that it is not—under either the percentage or lodestar methods—an appropriate starting assumption.

*Id.* (internal citation omitted)*; accord In re KeySpan Corp. Sec. Litig.*, 2005 WL 3093399, at *6 (E.D.N.Y. Aug. 25, 2005) (even after PSLRA, "the settlement rate of cases between 1998 and 2001 ranged between 73.6% to 78.6% and less than 1% of cases were tried"). Owing to its suspicion that "attorneys in [securities] cases are routinely overcompensated for such things as contingency risk," *Goldberger* shifts the baseline presumption against applying a risk multiplier in securities actions. 209 F.3d at 54-57. As a rule, post-*Goldberger* courts no longer commonly countenance multipliers in the 3-4.5 range. *E.g., IndyMac*, 94 F. Supp. 3d at 528 (rejecting 1.83 multiplier; applying 1.33); *Dial*, 317 F.R.D. at 437 (rejecting 2.01 multiplier; applying 1.75); St. John. Decl. ¶7 (compiling cases). "[C]ounsel's fee request must be reduced in order to provide a fair and reasonable fee that translates to a multiplier that is not markedly greater than twice

counsels' lodestar and an aggregate hourly wage that is less than $1,000." *In re Merrill Lynch Tyco Research Secs. Litig.*, 249 F.R.D. 124 (S.D.N.Y. 2008) (rejecting 2.33 multiplier; applying 2.09). Even "[a] lodestar multiplier of 2.5 would be considered high for a standard common fund case in this Circuit." *In re Tremont Secs. Litig.*, 699 Fed. Appx. 8, 18 (2d Cir. 2017).

Lead counsel's empirical evidence supports capping the multiplier at 2. Mr. Lieberman observes that 45% of securities cases filed January 2000 and December 2017 were dismissed in full. Lieberman Decl. ¶ 405. That number is an overstatement as only 38% of cases were dismissed with prejudice. Ex. 24 to Lieberman Decl. at 19. But even if the ultimate number of dismissals were 45%, and if attorney time were evenly concentrated before and after the motion to dismiss, a multiplier of 1.81 would fully compensate contingency risk. For, "[v]irtually all securities actions that survive motions to dismiss the pleadings ultimate settle prior to trial." *Citigroup Secs.*, 965 F. Supp. 2d at 399.

So the question becomes, in the context of this case, what were the odds of surviving a motion to dismiss? The odds of survival were high because "prior government investigations" "traditionally render securities cases most likely to survive a motion to dismiss." *Id.* "[W]here claims were precipitated by public events, the risk undertaken by class counsel is especially slight." *Merrill Lynch Tyco*, 249 F.R.D. at 139 (internal quotation omitted); *accord Indymac*, 94 F. Supp. 3d at 525-26; *PaineWebber Ltd. P'ships Litig.* 999 F. Supp. 719, 724-25 (S.D.N.Y. 1998). The Second Circuit itself has long recognized that riding the coattails of government investigations and prosecutions eliminates substantial risk. *Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1102 (2d Cir. 1977); *Goldberger*, 209 F.3d at 54.

Here, by lead counsel's own account, as of last month, Brazilian authorities had filed charges against 305 individuals and secured convictions against 188 individuals involved in the Lava Jato kickback schemes; federal police had opened 50 investigations; and Brazilian authorities had entered into 163 plea agreements. Lieberman Decl. ¶ 148. Counsel details the immense scope of these efforts and their extensive use of evidence generated in such

proceedings. *Id.* ¶¶ 27-28, 33-34, 42-43, 72, 148-175, 224-225, 250-253, 256-257. "This expanding mountain of evidence supported Plaintiffs throughout the litigation, including in pleadings." *Id.* ¶ 151. Plaintiffs reviewed more than 700 testimonies originating in Brazilian proceedings, analyzed 176 TCU proceedings, monitored 63 CVM proceedings. *See* Lieberman Decl. Exs. 7, 8, and 9 (Dkts. 789-7, 789-8, 789-9); *compare Merrill Lynch Tyco*, 249 F.R.D. at 139 (that counsel reviewed "NYAG's voluminous documentation" and "transcripts of the criminal trials" demonstrated the minimal risk).

In addition to Brazilian proceedings, the filing of this case was preceded by public SEC and DOJ investigations against Petrobras. *See* REUTERS, *Brazil's Petrobras says received U.S. SEC Subpoena for Documents* (Nov. 24, 2014). In combination with the Lava Jato scandal itself, the unyielding enforcement proceedings here and abroad created hydraulic pressure on Petrobras to settle the claims in this action and simultaneously made this case less risky to plaintiffs.[3] That this case followed from myriad Brazilian proceedings and multiple U.S. enforcement investigations should weigh heavily on this Court's analysis of the *Goldberger* enhancement factors. *See In re CRM Holdings*, 2016 WL 4990290, at *3 (S.D.N.Y. Sept. 6, 2016).

*Goldberger*'s general presumption against substantial multipliers is buttressed by the Supreme Court's holding that "there is a strong presumption that the lodestar is sufficient" without an enhancement multiplier. *Perdue v. Kenny A*, 559 U.S. 542, 546 (2010). *Kenny A.* allocates "the burden of proving that an enhancement is necessary [to] the fee applicant." *Id.* at 553. A lodestar enhancement is only justified in "rare and exceptional" circumstances where

---

[3] To be sure, there was risk that the class would not be certified (Fee Mem. 14), but this is not the type of pro-class risk counsel must be incentivized to overcome. The ascertainability and predominance requirements protect absent class members from overbroad class definitions and dilution of their legitimate claims. *E.g., Amchem*, 521 U.S. at 620; *Carrera v. Bayer Corp.*, 727 F.3d 300, 310 (3d Cir. 2013). Although the largest possible class may serve class counsel's interest, that path does serve the class's interest. *Payment Card*, 827 F.3d at 234-36; *see also* Section III. Class counsel ought not be rewarded for overcoming "risk" designed to benefit class members.

"specific evidence" demonstrates that an unenhanced "lodestar fee would not have been adequate to attract competent counsel." *Id*. at 554. Here, there was no trouble attracting counsel as there were nine applications for lead plaintiff involving more firms than that vying for control. Dkt. 166 at 2. A multiplier of 5.61 is outside the permissible range of outcomes. *Kenny A*'s limitation on enhancements was made in the context of interpreting 42 U.S.C. § 1988's language of "reasonable" fee awards, but there's little justification for claiming that "reasonable" in § 1988 means something different than "reasonable" in class action fee awards made under Fed. R. Civ. P. 23(h). *See* St. John Decl. ¶8 (citing cases applying *Kenny A* to Rule 23(h) awards). Every case cited by plaintiffs (Fee Mem. 10) that awarded a multiplier above 3 predates *Kenny A.*

Sister circuits' decisions parallel the *Goldberger* presumption. *E.g. In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir. 2001) ("strongly suggest[ed]" a multiplier of 3 is an "appropriate ceiling for a fee award"; vacating award amounting to multiplier of 7 or 10); *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 565 (7th Cir. 1994) (multiplier of 2 might be a "sensible ceiling" to avoid windfalls). Certainly there are exceptions to the general rule that courts in this Circuit no longer award multipliers above 3. Indeed, language supporting excessive multipliers has "made its way into many court 'decisions' in this Circuit via proposed orders drafted by plaintiffs' attorneys." *Fujiwara*, 58 F. Supp. 3d at 437. But in reality, "the cases cited … in support of this proposition provide weak support for such lofty multipliers." *Id.* at 438.

Beyond risk, class counsel also tout the outstanding result of this settlement. Fee Mem. 15-16. But a multiplier "may not be awarded based on a factor that is subsumed in the lodestar calculation"—either in the number of hours or hourly rate. *Kenny A*., 559 U.S. at 553. Thus, a multiplier based on outstanding results requires "exceptional success" beyond the "expectancy of excellent or extraordinary results" already baked into high hourly rates. *WPPSS*, 19 F.3d at 1304; *see "Agent Orange,"* 818 F.2d at 234 (Supreme Court "severely restricted" quality multipliers).

As in *Goldberger*, the magnitude of the recovery is attributable mostly to the size of the class, the scope of the misconduct, and prior criminal enforcement actions relating to the subject

matter of the case. 209 F.3d at 56. There the settlement recovered at least 60% of the market losses (and by the plaintiffs' count 90% of class damages). *Id.* Nevertheless, the Second Circuit held a quality multiplier was not required. *Id.* By contrast, this settlement provides the class with less than 20% of its claimed damages. While that may be a good result, it still means "the class is being asked to 'settle,' yet Class Counsel has applied for fees as if it had won the case outright." *Sobel v. Hertz*, 2011 WL 2559565, at *14 (D. Nev. Jun. 27, 2011). Meanwhile, class counsel effectively seek a multiplier of 5.61, equating to fees of more than $5,000/hour.[4] Instead, the court should apply the requested 1.78 multiplier (to the excised lodestar of $50.7 million) for a total fee award of $90.3 million.

### C.  A fee award of $90.3 million amounts to a reasonable 3.0% of the $3 billion megafund and would return $194.6 million windfall to the class.

"In cases with exceptionally large common funds, courts often 'account for these economies of scale by awarding fees in the lower range." *Citigroup Bond*, 988 F. Supp. 2d at 374 (quoting *Goldberger*, 209 F.3d at 52). "The existence of a scaling effect—the fee percent decreases as class recovery increases—is central to justifying aggregate litigation such as class actions [and] a hallmark of a well-functioning class action system." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL L. STUD. 248, 263 (2010). Failing to apply a sliding scale results in overcompensating law firms "who obtain huge settlements. Whether by happenstance or skill, … to the detriment of the class members they represent." *Wal-Mart Stores v. Visa USA*, 396 F.3d 96, 122 (2d Cir. 2005). Thus, in *Wal-Mart*, the Second Circuit affirmed an award of 6.5% of a $3.4 billion fund, nearly a 2/3 reduction from the 18% requested by counsel. *Id.* at 123. It found paramount the "public policy concerns" of "protecting the instant class" from diminished recovery; if a 6.5% fee award of a multi-billion settlement "amounts to punishment" one can be sure "there will be

---

[4] Moreover, the inscrutable bloated timekeeping described in Section IV.A and IV.B, *supra* weigh against awarding a quality of representation multiplier. *Dial*, 317 F.R.D. at 437.

many attempts to self-inflict similar punishment in future cases." *Id*. Fee percentages should be set with a recognition that "every dollar that goes to the lawyers is a dollar less that goes to the class members." *Citigroup Bond*, 988 F. Supp. 2d at 380; *see In re Nortel Networks Corp. Secs. Litig.*, 539 F.3d 129 (2d Cir. 2008) (affirming 3% common fund fee of a $1.1 billion settlement).

As class counsel acknowledges (Fee Mem. 17), the Court is not bound by the retainer agreement with lead plaintiff. *See In re Bristol-Myers Squibb Secs. Litig.*, 361 F. Supp. 2d 229, 236 n.8 (S.D.N.Y. 2005). This makes sense, because while the lead plaintiff possesses a greater stake than a typical class member, a lower fee still "would result in only a miniscule pro rata gain" for the lead plaintiff. *Goldberger*, 209 F.3d at 53 (internal quotation omitted). "[A]n agreement between plaintiffs and their lawyers is no substitute for an adversary testing of counsel's assertions." *IndyMac*, 94 F. Supp. 3d at 526. The class has not been apprised of the terms of the specific retainer here, but if it fails to preclude a windfall hourly rate, then it does not satisfactorily protect the class's interests. Class counsel fear that there is no value to *ex ante* vetting if courts can "simply upend[] [agreements] by the subjective post hoc determinations" Fee Mem. 20. Not so; a negotiated fee can reasonably serve as a ceiling even if it is inappropriate to employ it as a floor. With the overarching object of "prevent[ing] unwarranted windfalls" and demonstrating a "jealous regard" for the interests of the class, *Goldberger*, 209 F.3d at 49, 53, then this is a race to the top, not a "race to the bottom." (Fee Mem. 20).

Class counsel proposes to measure the reasonableness of their 9.48% request by comparing it to the rough median fee award in what they purport to be a catalog of all settlements over $1 billion regardless of court or subject matter. *See* Lieberman Decl. Ex. 15. But their catalog is incomplete, at the very least it is missing *Cobell v. Salazar*, 679 F.3d 909 (D.C. Cir. 2012), where the attorneys won $1.512 billion of direct pecuniary relief for the class. *Id.* at 914-15. The attorneys were awarded $99 million in fees (6.5%). *Id.* at 916 n. 5. *Cobell* not only involved 24 opinions and multiple appeals to the D.C. Circuit on unprecedented issues of Indian

law and sovereign immunity; the case lasted from 1996 to 2012, over four times as long as this case. It is unclear whether *Cobell* is the only omission from their compendium.

More importantly, class counsel offer no reason to look at the entire universe of billion-dollar cases regardless of location and subject matter. It seems more appropriate to winnow the universe to billion-dollar securities settlements in the Second Circuit, a set of seven cases. *See* St. John Decl. ¶ 9. Of this set, the median fee award is 6.09%, significantly below the request here and surely a result of the rigorous scrutiny required by *Goldberger*. *Id.* When dealing with megafunds, making the decision to award 9.5% or 6% or 3% in a vacuum "would be like picking a number out of hat." *WPPSS*, 19 F.3d at 1297. Surveying other cases essentially amounts to "looking out over a crowd and picking out one's friends." *IndyMac*, 94 F. Supp. 3d at 523. Simply put, "[t]here is no one-size-fits-all 'benchmark' in determining the appropriate fee—in fact, courts should avoid that practice because it could easily lead to routine windfalls where the recovered fund runs into the multi-millions." *Dial*, 317 F.R.D. at 433 (internal quotations omitted). When the circumstances of this case are considered, an award of 3.0% is reasonable.

## CONCLUSION

For the foregoing reasons, the Court should decertify the Settlement Class. If the Court were to approve the settlement, it should reduce the Rule 23(h) award.

Dated: May 10, 2018

/s/ *Anna St. John*
Anna St. John
COMPETITIVE ENTERPRISE INSTITUTE
  CENTER FOR CLASS ACTION FAIRNESS
1310 L Street NW, 7th Floor
Washington, DC 20005
Phone: (917) 327-2392
Email: anna.stjohn@cei.org

*Attorney for Objector William Thomas Haynes,*
*as trustee for the benefit of W Thomas and Katherine*
*Haynes Irrevocable Trust for the benefit of Sara L. Haynes*

I, William Thomas Haynes, as trustee for the benefit of W Thomas and Katherine Haynes Irrevocable Trust for the benefit of Sara L. Haynes, am the objector. I sign this written objection drafted by my attorneys as required by the Class Notice § 16.

William Thomas Haynes, as trustee for the benefit of
W Thomas and Katherine Haynes Irrevocable Trust for the
benefit of Sara L. Haynes

**Certificate of Service**

The undersigned certifies she electronically filed the foregoing Objection and associated declarations and exhibits via the CM/ECF system for the Southern District of New York, thus sending the Objection and declarations and exhibits to the Clerk of the Court and also effecting service on all attorneys registered for electronic filing.

Additionally, she caused to be served via overnight delivery a copy of this Objection and associated documents upon the following:

| | |
|---|---|
| United States District Court for the Southern District of New York 500 Pearl Street New York, NY 10007 | Pomerantz LLP Jeremy A. Lieberman, Esq. 600 Third Ave., 20th Floor New York, NY 10016 |
| Cleary Gottlieb Steen & Hamilton LLP Lewis J. Liman, Esq. Roger A. Cooper, Esq. One Liberty Plaza New York, NY 10006 | Skadden, Arps, Slate, Meagher & Flom LLP Jay B. Kasner, Esq. Four Times Square New York, NY 10036 |
| King & Spalding LLP Michael R. Pauzé, Esq. 1700 Pennsylvania Ave. NW Washington, DC 20006 | King & Spalding LLP James J. Capra, Jr., Esq. 1185 Avenue of the Americas New York, NY 10036 |

Dated: May 10, 2018

/s/ *Anna St. John*
Anna St. John