USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PETROBRAS SEC. LITIG.          )          14-cv-9662 (JSR)
                                     )
_____     )

## SHAREHOLDER OBJECTIONS TO PROPOSED SETTLEMENT, PLAN OF ALLOCATION, PROOF OF CLAIM, CLASS NOTICE AND REQUEST FOR ATTORNEYS' FEES

**Table of Contents**

ARGUMENT...................................................................................................1

I.   An *Amchem* Structural Conflict Precludes Approval of the Proposed Settlement
     Because Non-Domestic DTC-Settled Debt Claims are Adverse to ADS Claims...........1

II.  The Class Notice Fails to Disclose Materially Relevant Information.........................9

III. The Request for Attorneys' Fees is Clearly Excessive and Unreasonable.................10

     A.   No Lodestar Multiplier is Warranted for Piggybacking on the Prosecutors in a
          Case Where the Risk of Non-Recovery Was Practically Nonexistent.............11

     B.   A Fee Award of 2% ($60 million) is Amply Supported by Precedent.............13

     C.   The Unexceptional Quality of Representation Does Not Merit a Multiplier.......14

     D.   Public Policy Disfavors a $284,500,000 Attorneys' Fee............................17

     E.   Class Counsel's Lodestar is Vastly Inflated...........................................18

CONCLUSION...............................................................................................20

## Table of Authorities

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)............................................*passim*

*In re American International Group Securities Litigation*, 689 F.3d 229 (2d Cir. 2012).........7,8

*In re AT&T Corp.*, 455 F.3d 160 (3d Cir. 2006).........................................................14

*In re Beacon Assocs. Litig.*, No. 09 Civ. 777, 2013 WL 2450960 (S.D.N.Y. May 9, 2013).......18

*In re Bristol-Myers Squibb Securities Litigation*, 361 F. Supp. 2d 229 (S.D.N.Y. 2005)..........13

*In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003).......................................14

*Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013).........................................................4

*Choi v. Tower Research Capital LLC*, No. 17-cv-648 (2d Cir. Mar. 29, 2018).......................7

*In re Citigroup Inc. Securities Litigation*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013)...................18

*City of Pontiac Gen. Empls. Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276 (S.D.N.Y. 2013)...........................................................................................................18

*In re Enron Corp.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008)...............................................15

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000)...........................11,12

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992)............12

*In re IndyMac Mortgage Backed Sec. Litig.*, 94 F. Supp. 3d 517 (S.D.N.Y. 2015)..........11,12,19

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011)........2,3,4

*McDaniel v. County of Schenectady*, 595 F.3d 411 (2d Cir. 2010)....................................14

*Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010)................................*passim*

*In re Nortel Networks Corp. Securities Litigation*, No. 01-cv-1855 (S.D.N.Y. Jan. 29, 2007) *aff'd* 539 F.3d 129 (2d Cir. 2008)...........................................................................13,14

*In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016)..........................................................................................................3

*In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337 (S.D.N.Y. 2015)....................................4,5

*In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017)..................................................3,5,6,7

*In re Satyam Computer Servs. Ltd. Secs. Litig.*, 915 F. Supp. 2d 450 (S.D.N.Y. 2013).............5

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011)........................................8

*In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003)...12,17

*Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96 (2d Cir. 2005)................................17

*In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005)............................15

Richard and Emelina Gielata (the "Shareholders") purchased 500 American depositary shares ("ADS") of Petrobras (common) in 2011 for $18,382 and sold them in 2016 for $5,000, losing $13,382. Trade confirmations are attached. Their estimated recovery under the proposed settlement will be in the vicinity of $600 (*see* Class Notice at 8 indicating an estimated average distribution per share of $1.20 per ADS). The Shareholders object to the proposed settlement, the plan of allocation, class notice and the requests for attorneys' fees for the following reasons.

## ARGUMENT

## I. An *Amchem* Structural Conflict Precludes Approval of the Proposed Settlement Because Non-Domestic DTC-Settled Debt Claims are Adverse to ADS Claims.

The proposed settlement cannot be approved as currently structured due to a glaring conflict of interest that threatens to reduce the Shareholders' share of the settlement fund. The Shareholders and other investors purchased ADS listed on a U.S. exchange, entitling them to relief under U.S. securities laws. *See Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). For debtholders, only those who prove that they purchased securities within the U.S. have viable claims under *Morrison*. Indeed, at class certification, this Court culled two of the four proposed debtholder representatives in view of *Morrison*, specifically holding that DTC settlement alone does not establish a domestic transaction—a holding expressly endorsed by the Second Circuit. Yet the proposed settlement inexplicably covers any DTC-settled transaction regardless of location. Despite the *Morrison* questions looming over this litigation, the proposed settlement and proof of claim form say nothing about the location of a debtholder claimant's transactions. Due to this inexcusable error by class counsel, debtholders with no viable claim due to *Morrison* are nonetheless invited to take settlement funds away from class members holding valid claims. Unless the proposed settlement is restructured to fix this flaw, it would fall afoul of *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) and its Second Circuit progeny.

To rectify the structural conflict, the Court should appoint an independent counsel to weed out debtholder claims based on non-U.S. transactions. So long as debtholder claims are zealously scrutinized to evaluate domesticity under *Morrison*, there is no *Amchem* problem. After all, those without viable claims are not part of the class. But the settlement as currently proposed lacks the "structural assurance of fair and adequate representation for the diverse groups and individuals affected" and thus must be rejected. *Amchem*, 521 U.S. at 627.

The diagram below illustrates the structural conflict in the proposed settlement:



If DTC-settled debt purchases regardless of location are covered by the settlement, then a portion of the settlement will go to non-class members. The adversity of interest is clear: class members (ADS purchasers and debtholders who purchased securities within the U.S.) will receive more money for every debtholder claim rejected on *Morrison* grounds.[1] *See In re*

---

[1] The Class Notice estimates that the Shareholders will recover approximately $1.20 per share from the settlement fund (Class Notice at 8) but their calculated loss from purchase price inflation is over $9 per share (Class Notice, Table 2). Reducing the number of debtholder claimants would increase the pro rata share of ADS claimants. *See* Proof of Claim at 13 ("An Authorized Claimant's pro rata share of the Net Settlement Fund will be the amount of the Net

*Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 252 (2d Cir. 2011) (vacating approval of settlement due to structural conflict: "Any improvement in the compensation of, for example, Category C claims would result in a commensurate decrease in the recovery available for Category A and B claims."); *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 236 (2d Cir. 2016) (reversing approval of settlements because "[s]tructural defects in this class action created a fundamental conflict between the (b)(3) and (b)(2) classes and sapped class counsel of the incentive to zealously represent the latter.").

Without an independent advocate, there is no one policing the allocation to maximize recovery for the Shareholders and other valid claimants. Distracted by the prospect of a Powerball-sized fee, class counsel abandoned its duty and failed to identify and rectify this structural conflict. Indeed, class counsel created the conflict by inviting claims for any debtholder purchase settled through the DTC even after this Court and the Second Circuit both explicitly rejected DTC settlement as sufficient to satisfy *Morrison*. *See In re Petrobras Sec.*, 862 F.3d 250, 272 n.24 (2d Cir. 2017) ("As did the district court, we reject Plaintiff's argument that a securities transaction is 'domestic' under *Morrison* and *Absolute Activist* if it settles through the DTC."); *contra* Class Notice at 3 (including all transactions that "cleared or settled through the Depository Trust Company's book-entry system").

Both this Court and the Second Circuit devoted extensive analysis to the *Morrison* issue, yet class counsel chose to ignore its restrictive impact in the proposed settlement, to the detriment of ADS purchasers and other class members. This failure by class counsel produced a settlement that cannot survive judicial scrutiny. *See Payment Card*, 827 F.3d at 235-36 ("As in *Amchem*, *Ortiz*, and *Literary Works*, settlements that are approved simultaneously with class

Settlement Fund, multiplied by the ratio of the amount of the Authorized Claimant's Recognized Claim to the amount of aggregate Recognized Claims of all Authorized Claimants.").

3

certification are especially vulnerable to conflicts of interest because the imperatives of the settlement process, which come to bear on the defendants, the class counsel, and even the mediators and the court itself, can influence the definition of the classes and the allocation of relief. For this reason, we scrutinize such settlements more closely.").[2] To be precise, the problem here is not the "classic" *Amchem* conflict necessitating subclasses. Rather, the structural conflict here is between settlement claimants: class member claimants versus claimants that cannot be part of the class because their claims are barred by *Morrison*.

Class counsel naturally sought to maximize the size of the class in order to maximize the recovery, but at the current juncture, class members are interested in winnowing out non-U.S. debt purchases from the claims. Class counsel created the structural conflict by including any DTC-settled debt purchase and thus cannot be relied upon to represent adequately the interests of class members in rectifying the problem of invalid debtholder claims.[3] Therefore, the Court should appoint an independent counsel to assist the claims administrator in weeding out invalid claims. *See Literary Works*, 654 F.3d at 253 ("[H]ow can the value of any subgroup of claims be properly assessed without independent counsel pressing its most compelling case?").

The proposed proof of claim confirms that class counsel has ignored the conflict of interest. Part V of the proof of claim concerns transactions in Petrobras notes. The location of the transaction is not requested. There is no space for information that would permit anyone to

---

[2] Because the Second Circuit vacated class certification to permit this Court to reconsider predominance, the proposed settlement here is subject to the "heightened attention" given in *Literary Works* and *Payment Card*, unlike a settlement entered into after class certification. *See Charron v. Wiener*, 731 F.3d 241, 250 (2d Cir. 2013). *See also Amchem*, 521 U.S. at 620.

[3] This Court found that the lead plaintiff USS's purchases of notes did not satisfy *Morrison*. *See Petrobras*, 150 F. Supp. 3d at 341. This may explain class counsel's poor decision to include DTC-settled transactions in the plan of allocation. Or perhaps the defendants insisted on that provision to fend off lawsuits outside this country. In any event, class counsel cannot adequately represent class members in weeding out non-domestic transactions because class counsel's own client USS has an interest in including transactions that do not satisfy *Morrison*.

4

evaluate whether the debtholder claim satisfies *Morrison*. "[A] plaintiff may demonstrate the domesticity of a particular transaction by producing evidence 'including, but not limited to, facts concerning the formation of the contracts, the placement or purchase orders, the passing of title, or the exchange of money.'" *Petrobras*, 862 F.3d at 272 (quoting *Absolute Activist*, 677 F.3d at 70). Yet the proof of claim does not request such information even though it is critical. *See id.* at 271 ("[A] putative class member only has a viable cause of action if the specific Petrobras Securities sued upon were purchased in a qualifying 'domestic transaction.'").

The claims administrator cannot be expected to engage in legal advocacy to ensure that debtholder claims are thoroughly scrutinized for *Morrison* domesticity. An independent counsel could work with the claims administrator to analyze and resolve problematic debtholder claims. The burden is on the claimant to provide records showing that its purchases took place in the U.S. *Ibid. See also In re Satyam Computer Servs. Ltd. Secs. Litig.*, 915 F. Supp. 2d 450, 457 (S.D.N.Y. 2013) ("[T]he plaintiff...bears the burden of alleging adequately that each type of transaction occurred in the United States.") (citing *S.E.C. v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 159 (S.D.N.Y. 2011)). For U.S.-based claimants who purchased Petrobras debt securities using a U.S.-based broker, there should be little difficulty establishing purchases within the U.S. The Court's various *Morrison* rulings in this litigation offer considerable guidance for an independent counsel sifting through problematic debtholder claims. However, class counsel and the claims administrator may not simply ignore *Morrison* and include all debt purchases regardless of their location. *See In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 340 (S.D.N.Y. 2015) ("[T]he Second Circuit has construed the *Morrison* test narrowly, in line with its underlying rationale."). To do so would unjustly transfer settlement funds away from class members with viable claims to debtholders with no viable claim.

5

Without citing *Amchem*, the Second Circuit nonetheless recognized the lurking intraclass tension due to *Morrison* and suggested one possibility: "the district court might certify a subclass — or a separate class — of Petrobras ADS holders who purchased their securities on the NYSE, or of Petrobras Noteholders who acquired their Notes directly through one of the initial Offerings." *Petrobras*, 862 F.3d at 274 n.26. The Second Circuit also "emphasize[d] that district courts are authorized to implement management strategies tailored to the particularities of each case." *Id.* at 274. In this case, an independent counsel is the optimal solution because the interests of those with valid claims (as part of the class) are fully aligned against the interests of those with invalid non-U.S. claims (who cannot be part of the class).

The independent counsel's compensation should be tied to the value of claims culled on *Morrison* grounds. This would provide "structural assurance" that the members of the class are adequately represented, which the class counsel failed to do by including DTC-settled debt purchases as covered transactions in the settlement, plan of allocation and proof of claim.

Class counsel contends that DTC settlement is irrelevant in the settlement context. (*See* Mem. of Law in Supp. of Class Pls.' Mot. for Final Approval of Settlement and Plan of Allocation ("Class Mem.") at 23-24.) The authorities they cite do not support this contention. First, class counsel fails to mention that the Second Circuit itself specifically affirmed this Court's holding that DTC settlement cannot satisfy *Morrison*. *See Petrobras*, 862 F.3d at 272 n.24 ("As did the district court, we reject Plaintiff's argument that a securities transaction is 'domestic' under *Morrison* and *Absolute Activist* if it settles through the DTC."). The Second Circuit took pains to apply *Morrison* in the predominance analysis, yet class counsel now seeks to ignore its clear instruction as to debtholder claims: "The predominance analysis must account for such individual questions, particularly when they go to the viability of each class member's

6

claims." *Id.* at 274 (emphasis added). The Second Circuit would disapprove of class counsel's attempt to sidestep "the robust predominance inquiry that Rule 23 demands." *Id.* at 274-75. Ignoring the problem doesn't make it go away. Appointing an independent counsel would address the *Morrison* problem and provide the structural assurance that *Amchem* demands.

Second, class counsel's reliance on *Choi v. Tower Research Capital LLC*, No. 17-cv-648 (2d Cir. Mar. 29, 2018) is bizarre: "Class Plaintiffs believe that *Choi* would have served as a basis for this Court to reconsider its ruling regarding DTC transactions." (Class Mem. at 24.) But the *Choi* opinion does not mention DTC at all. *Choi* merely addresses the plausibility of domesticity allegations on a motion to dismiss. *See* slip op. at 17 ("Plaintiffs' allegations make it plausible that the parties incurred irrevocable liability for their KRX night market trades on CME Globex in Illinois, which is all that is required at this stage of the litigation.").

Third, *In re American International Group Securities Litigation*, 689 F.3d 229 (2d Cir. 2012) is inapposite. There the Second Circuit vacated a class certification ruling and held that a settlement class ordinarily need not demonstrate that the fraud-on-the-market presumption applies to its claims in order to satisfy the predominance requirement. Class counsel cites the following dicta from the opinion: "Defendants in class action suits are entitled to settle claims pending against them on a class-wide basis even if a court believes that those claims may be meritless, provided that the class is properly certified under Rules 23(a) and (b) and the settlement is fair under Rule 23(e)." *Id.* at 243-44. Under *Amchem*, a class cannot be properly certified under Rule 23(a) if there exists a structural conflict because Rule 23(a)(4)'s requirement of adequate representation is not satisfied. *See* 521 U.S. at 627 ("The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation

7

for the diverse groups and individuals affected.").  Indeed, *American International Group* reaffirms the importance of uncovering structural conflicts:

> On remand, the district court should pay particular attention to *Amchem*'s guidance that in the settlement context Rule 23's requirements "designed to protect absentees by blocking unwarranted or <u>overbroad class definitions ... demand undiluted, even heightened, attention</u>." 521 U.S. at 620. ... Because the Gen Re class has not previously been certified, the district court has not yet had the opportunity to hear from <u>potential objectors, who might be able to raise these or other concerns as appropriate</u>. *See* Fed.R.Civ.P. 23(c)(2)(B) & (e)(5) (requiring that members of a Rule 23(b)(3) class receive notice upon the class's certification and permitting any class member to object to a proposed class settlement); *see also In re Literary Works*, 654 F.3d at 249-50 (analyzing objectors' arguments that a settlement violated Rule 23(a)(4)'s adequacy of representation requirement because of conflicts of interests between those class members with lucrative claims and those with lower-value claims).

689 F.3d at 243 (emphasis added).

<u>Fourth</u>, class counsel's reliance on the Third Circuit opinion *Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) is unavailing. *Sullivan* is an outlier decision that conflicts with *Amchem*. The forceful dissent makes clear why *Sullivan* was wrongly decided:

> The problem is that some class members who deserve nothing are included in the settlement and hence are diluting the recovery of those who are entitled to make claims. That harm is real, and the cause of it, the overbreadth of the class, is akin to the problem in *Amchem*.

667 F.3d at 363 n.22 (Jordan, J., joined by Smith, J., dissenting).

In sum, the proposed settlement cannot be approved under *Amchem* and *Morrison*. The following modifications would rectify the settlement's structural conflict:

1) The Court should appoint an independent counsel (or special master) to assist the claims administrator in culling debtholder claims based on non-U.S. purchases.

2) Compensation of the independent counsel should be tied to weeding out non-U.S. purchases from debtholder claims, and fees for the independent counsel should be paid out of any fees awarded to class counsel (who created the problem, after all).

3) Debtholder claimants should be advised that any purchase made outside of the U.S. does not qualify for recovery from the settlement fund; and they should be required to provide sufficient documentation to establish the location of their purchase(s).

4) The Court should strike part (ii) from the definition of Covered Transactions in the proof of claim. (*See* Proof of Claim at 3 ("'Covered Transaction' means…(ii) any transaction in a Petrobras Security that cleared or settled through the Depository Trust Company's book-entry system")

For the reasons above, the Court should reject the impermissible settlement structure that counsel created and appoint an independent advocate to weed out *Morrison*-barred claims.

## II.    The Class Notice Fails to Disclose Materially Relevant Information.

First, the class notice fails to disclose what percentage of the settlement fund is apportioned to the ADS versus the various debt securities. A simple pie chart would have sufficed. Without this information, it is impossible to assess whether the settlement is lopsidedly allocated to debtholders (including those with no domestic transactions) at the expense of ADS purchasers. The settlement agreement indicates that this materially relevant information is available, and it should be disclosed. *See* Stipulation of Settlement and Release at 11 ¶ CC ("Petrobras, as the issuer of the American Depositary Receipts ('ADRs'), will pay that portion of the Settlement Amount that is based on the alleged damages caused to purchasers of ADRs as a result of the conduct alleged in the Action, and PGF, as the issuer of the debt securities alleged in the Action will pay that portion of the Settlement Amount that is based on alleged damages caused to purchasers of the debt securities as a result of the conduct alleged in the Action.").

Second, there is no explanation of why a release is given to the underwriter defendants without any contribution. The Section 11 claims against the underwriters are brought only on

9

behalf of debtholders and they are given preferential treatment in the plan of allocation.[4]
Assuming *arguendo* that Section 11 claims are more easily proved at trial than Section 10(b)
claims, why did class counsel grant a release to the underwriter defendants without any
contribution? The debtholders' share of the settlement fund comes at the expense of the ADS
purchasers (*see* Part I *supra* regarding the *Amchem* conflict) and therefore an explanation for
granting a release to the underwriters without any consideration should be disclosed.

Third, the notice fails to disclose how much the claims administrator will be paid. The
Shareholders respectfully suggest that class counsel should have sought competitive bids if the
cost of administration is anticipated to exceed 1% of the settlement fund.

Accordingly, the Court should order supplemental notice posted on the website for this
litigation: http://www.petrobrassecuritieslitigation.com/ (to save on postage).

## III.   The Request for Attorneys' Fees is Clearly Excessive and Unreasonable.

Class counsel seeks a Powerball-sized $285 million in attorneys' fees, **more than a**
**quarter billion dollars**, even though Brazilian prosecutors and police did all the heavy lifting,
exposing the crimes and securing guilty pleas and disgorgement from corporate executives.
Insofar as class counsel touts its achievement, the Court should keep in mind the true heroes who
uncovered the Petrobras skulduggery and prosecuted high-level corporate executives:

> The case exploded onto the national scene under the direction of nine little-known
> prosecutors who are taking on some of the most powerful forces in the country.
> Many studied abroad, and they are using strategies relatively novel in Brazil, such
> as the plea bargain. Local media call them the Nine Horsemen of the Apocalypse.
> ...

---

[4] *See* Class Notice at 15 ("In the view of Class Representatives and Class Counsel, liability under
Section 11 would have been more easily proved at trial than liability under Section 10(b).
Therefore, the Recognized Loss on a USD Note purchased/acquired in the Class Period, having
Claims under both Section 11 and Section 10(b), will be the maximum of either the loss on
transactions in this USD Note under Section 11 or the loss on transactions in this USD Note
under Section 10(b), plus an increment of 25% of that maximum amount (i.e., the Recognized
Loss will be that maximum amount multiplied by 1.25).") (emphasis added).

10

"Fear of the law was something that did not exist in Brazil for white-collar criminals and politicians," said Paulo Roberto Galvão de Carvalho, one of the nine prosecutors. "This needs to change, and is changing."

...

"They're trying to bring some stuff from the U.S. legal system into the Brazilian legal system," said Jose Vicente Mendonça, a state attorney in Rio de Janeiro and former Harvard classmate of [lead prosecutor] Mr. Dallagnol. "It's part of a general changing of the mind-set in Brazil. This is a turning point in the Brazilian legal system."

Will Connors and Luciana Magalhaes, *How Brazil's 'Nine Horsemen' Cracked a Bribery Scandal*, Wall St. J. (April 6, 2015).

## A. No Lodestar Multiplier is Warranted for Piggybacking on the Prosecutors in a Case Where the Risk of Non-Recovery Was Practically Nonexistent.

Riding the coattails of the "Nine Horsemen of the Apocalypse," class counsel was able to leverage the guilty pleas and the stock collapse into a settlement fund in this country. That service merits a fee without a risk multiplier. In *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 54, 56 (2d Cir. 2000), the Second Circuit upheld a lodestar fee with no multiplier where the attorneys had been "helped enormously" by the "spadework" performed by prosecutors in actions against the same defendants and because the legal issues presented were not novel.

*Goldberger* was a securities case in which class counsel sought an award amounting to 25% of a $54 million settlement. The District Court, however, awarded class counsel only its lodestar of $2.1 million, with no multiplier. The Second Circuit upheld that decision. Although class counsel argued for a multiplier, assertedly on the basis of the risk it undertook in bringing the case, the Second Circuit believed that the case never had any real risk of not settling, and thus "fell in the low range of the risk continuum." *Id.* at 54. The Court also expressed its "nagging suspicion that attorneys in these cases are routinely overcompensated for such things as contingency risk," and expressed a "preference for moderation" in awarding fees. *Id.* at 57. *See also In re IndyMac Mortgage Backed Sec. Litig.*, 94 F. Supp. 3d 517, 525-26 (S.D.N.Y. 2015)

11

("First, securities cases like this practically always settle, meaning that the risk of total non-recovery was almost nonexistent. Second, plaintiffs in this case had the benefit of pre-existing investigations by government authorities, a fact that rendered the case less risky than it otherwise might have been.") (citations omitted).

The legal issues in this litigation are not groundbreaking. As in any securities case, defendants here have a variety of defenses—scienter, damages, loss causation, statutes of limitation and repose, etc. However, that alone does not justify a risk multiplier. Counsel cannot simply "point to . . . general hurdles – such as the defenses available to defendants –" and "argue that because their fee was entirely contingent on their ability to overcome such hurdles, they *must*, as a matter of law, be compensated by a fee enhancement." *Goldberger*, 209 F.3d at 54.

The fee award in *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) is also instructive. Unlike class counsel in this case, "Lead Counsel did not benefit from any previous or simultaneous government litigation, *see, e.g., In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992) ('[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill. They did all the work on their own.')." *Id.* at 523-24. *See also id.* at 524 n.31 ("Indeed, the government piggybacked on Class Counsel's efforts."). If class counsel had ferreted out the Petrobras kickbacks before the Brazilian prosecutors, a 9.5% fee would indeed have been deserved. But here the class counsel merely administrated the usual follow-on civil case in the wake of the investigations and prosecutions by Brazilian prosecutors and police.[5] Like the sweepers who follow an elephant in a parade, the work done by class counsel was necessary but hardly beyond the call of duty.

---

[5] Paragraphs 151-52 of the Lieberman Declaration reveal that the key evidence-gathering effort by class counsel was little more than downloading publicly-available transcripts and documents

12

The Brazilian prosecutors and police who exposed the Petrobras scandal and prosecuted the culpable executives should be saluted. Class counsel piggybacked afterward but risked little. Accordingly, no risk multiplier should be granted above class counsel's lodestar.

## B.   A Fee Award of 2% ($60 million) is Amply Supported by Precedent.

For its work, class counsel should receive 2% of the fund, amounting to $60 million, an enormous and generous fee by any measure. This is consistent with the 3% fee award in *In re Nortel Networks Corp. Securities Litigation*, No. 01-cv-1855 (S.D.N.Y. Jan. 29, 2007) (attached as Exhibit A), *aff'd* 539 F.3d 129 (2d Cir. 2008) (upholding fee award over objections by class counsel). The Second Circuit confirmed the district court's discretion to award a non-exorbitant 3% fee even though the lead counsel sought 8.5% based on a negotiated fee with the lead plaintiff:

> [W]e have found nothing indicating a congressional intent for courts to consider the fees agreed upon by PSLRA lead plaintiffs as presumptively reasonable. Indeed, the only PSLRA provision related to attorneys' fees places an obligation on district courts to ensure independently that fees are reasonable: "Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 78u-4(a)(6).

539 F.3d at 133.

Also supporting a non-exorbitant fee award is the 4% fee award granted in connection with the $300 million securities class action settlement in *In re Bristol-Myers Squibb Securities Litigation*, 361 F. Supp. 2d 229 (S.D.N.Y. 2005). There, "Lead Counsel merely drafted complaints setting out roughly chronologically the material in the public record and alleging

---

from the Brazilian investigation: "A significant portion of the evidence Class Counsel gleaned from Brazil formed the core of Plaintiffs' pre-trial exhibit list and oppositions to Defendants' separate motions for summary judgment. ... Attorneys employed by Class Counsel and fluent in Portuguese searched through different agencies' websites and court dockets to download and/or review files or documents relevant to the litigation."

Defendants' knowledge and scienter." *Id.* at 234. The 4% fee award in *Bristol-Myers* amounted to nearly $12 million. Here a 2% award would yield five times that, or $60 million.[6]

In all the cases cited above (*Goldberger*, *Nortel*, *Bristol-Meyers*, *Visa Check* and *IndyMac*), the courts rejected the requested fee as excessive. The Second Circuit will not disturb a finding that no risk multiplier is warranted, so this Court's discretion is secure. *See McDaniel v. County of Schenectady*, 595 F.3d 411, 425 (2d Cir. 2010) ("Our case law makes clear…that an award of no lodestar multiplier at all is within the district court's discretion."). *See also Goldberger*, 209 F.3d at 53 ("[T]his Court has never found that a district court abused its discretion by awarding in a common fund case a fee that counsel assailed as too stingy."); *Nortel*, 539 F.3d at 134 (observing that class counsel "points to no case where we have held that a district court abused its discretion in awarding a fee that is too low.").

## C. The Unexceptional Quality of Representation Does Not Merit a Multiplier.

What distinguishes an extraordinary settlement is (1) securing personal contributions from individual defendants and (2) recovering from alternative deep pockets (usually Wall Street) when the corporate defendant declares bankruptcy. After any gigantic corporate scandal, numerous lawyers swarm and there are several firms that have obtained a billion-dollar recovery so long as the corporation is not bankrupt. Here, the end result of class counsel's representation

---

[6] In the *Cendant* fee saga, the district court ultimately awarded 1.7% of the $3.2 billion settlement fund on remand. *See In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166, 172 (D.N.J. 2003). The *Cendant* precedent, while correctly reflecting a reasonable low-single-digit percentage in a mega-fund settlement, is inapposite because there the lead plaintiff litigated tenaciously against the lead counsel for a lower fee after the district court awarded a much higher fee. The Second Circuit has declined to adopt the Third Circuit's *ratio decidendi* in the *Cendant* decision. *See Nortel*, 539 F.3d at 133. Indeed, the Third Circuit has since attenuated its own *Cendant* holding. *See In re AT&T Corp.*, 455 F.3d 160, 168-69 (3d Cir. 2006) ("We now emphasize that the presumption of reasonableness set forth in *Cendant* does not diminish a court's responsibility to closely scrutinize all fee arrangements to ensure fees do not exceed a reasonable amount. We caution against affording the presumption too much weight at the expense of the court's duty to act as 'a fiduciary guarding the rights of absent class members.'") (citation omitted).

14

is not a game-changer like the settlements in Enron and WorldCom, where individual defendants personally contributed millions of dollars and the corporate defendants were bankrupt. *See In re Enron Corp.*, 586 F. Supp. 2d 732, 740 n.2 & 789 (S.D. Tex. 2008) (noting bankruptcy hurdle and settlements with directors); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 339 (S.D.N.Y. 2005) ("[T]he Director Defendants…have collectively given up twenty percent of certain personal assets and…[o]f the Officer Defendants, Ebbers and Sullivan have contributed substantially all of their personal assets to this and other settlements[.]").

In the Petrobras case, the settlement is not extraordinary because class counsel obtained zero personal liability and the corporation is not bankrupt. Class counsel did not track down hidden Swiss bank accounts or hold any individuals accountable. They did not go beyond what the Brazilian prosecutors and police investigated and prosecuted. Like an accountant diligently preparing a tax return, class counsel prepared and filed the proper paperwork to connect the guilty pleas and corporate admissions to liability under U.S. securities laws. As any competent lawyer preparing for trial must do, they propounded discovery and hired experts. At the end of the day, class counsel failed to extract anything from the underwriter defendants, nor from any Petrobras executive. The case against Petrobras itself was a layup after so many guilty pleas.

The $3 billion recovery is meager when seen against Petrobras investor losses exceeding $100 billion.[7] Morgan Stanley expected a $10 billion recovery, which would have justified a Powerball fee.[8] "JPMorgan…had expected a settlement of over US$5 billion[…]. The market had anticipated a settlement of between US$5 billion and US$10 billion, according to analysts at

---

[7] *See* Consolidated Fourth Amended Complaint, D.I. 342 ¶ 2 ("At its height in 2009, Petrobras was the world's fifth-largest company, with a market capitalization of $310 billion. Now, amid a rampant money-laundering and kickback scheme, Petrobras is worth just $39 billion.").

[8] *See* https://www.bloomberg.com/news/articles/2018-01-03/petrobras-to-pay-3-billion-to-end-u-s-class-action-over-graft (visited May 1, 2018).

15

Brazilian bank BTG Pactual."[9] While admittedly speculative, it is certainly plausible that a more tenacious law firm could have secured a higher recovery closer to market expectations.

The *Amchem* structural conflict created by class counsel also militates against a Powerball-sized fee. Class counsel fumbled the football just before entering the end zone and failed the class by attempting to include DTC-settled transactions in the plan of allocation. While class counsel deserves a reasonable fee, their performance at the finish line was imperfect, and their fee ought to reflect that blemish.

Any plaintiff's firm will tout its achievements as historic and extraordinary, but ultimately the Court undertakes much of the critical work in terms of mapping out the boundaries in complex litigation. As this Court has expressed, the efforts of the lawyers only go so far because the facts and the law largely determine the outcome in a given case:

> **Jed Rakoff:** In a close case, the skill of the lawyer can make the difference, but most cases are not that close. [...] As far as the court is concerned, most cases chiefly involve motion practice, where the judge will be doing his own legal research and analysis that may go well beyond what the lawyers present and will, in any case, not be much affected by who is the better lawyer. [...]
>
> **Rakoff:** I know it is very hard for such a talented (and high-priced) lawyer...to contemplate that the facts and the law might carry the day regardless of the lawyering, but that has been my experience, and I find it reassuring. It evidences that, in most cases, we are a country governed not by lawyers but by laws.[10]

Here, the primary determinant driving the settlement size was the massive market capitalization erased by the Petrobras scandal, but class counsel had nothing to do with that. Accordingly, the unexceptional quality of the representation weighs against a multiplier.

---

[9] *See* https://oilprice.com/Latest-Energy-News/World-News/US-Court-Gives-Preliminary-Nod-To-3B-Petrobras-Class-Action-Settlement.html (visited May 1, 2018).

[10] Joel Cohen, Richard A. Posner, and Jed S. Rakoff, *Do Courtroom Lawyers Make a Difference?*, SLATE (July 31, 2017), http://www.slate.com/articles/news_and_politics/jurisprudence/ 2017/07/posner_and_rakoff_debate_whether_courtroom_lawyers_ever_make_a_difference.html (last visited May 1, 2018).

16

## D. Public Policy Disfavors a $284,500,000 Attorneys' Fee.

This Court should refuse to rubber stamp a quarter-billion dollar fee because public policy disfavors overcompensation of class action attorneys. When attorneys ask for the moon, the Court should bring them back to earth. Judge Gleeson offered this retort while slashing a fee request by two-thirds: "Only in comparison to the amount sought can it be considered anything but generous. If it amounts to punishment, I am confident there will be many attempts to self-inflict similar punishment in future cases." *Visa Check*, 297 F. Supp. 2d at 525.

Awarding a $60 million fee would deliver $225 million more of the settlement fund to the class, including elderly retirees like the Shareholders, who lost more than $10,000 on their Petrobras investment. *See Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 123 (2d Cir. 2005) ("[T]he district court's decision in favor of protecting the instant class from an excessive fee award militates against awarding attorneys' fees based purely on economic incentives.").

A Powerball-sized fee sends a powerful signal to the rest of society as to the type of endeavor that our justice system rewards. Granting the fee and expense request for roughly $300,000,000 would overcompensate class counsel and encourage even more securities litigation, drawing talent and resources away from endeavors benefitting society like the Innocence Project, scientific discovery or medical research. As the late Justice Scalia lamented:

> I mean lawyers, after all, don't produce anything. They enable other people to produce and to go on with their lives efficiently and in an atmosphere of freedom. That's important, but it doesn't put food on the table and there have to be other people who are doing that. And I worry that we are devoting too many of our very best minds to this enterprise.

Ashby Jones, *Scalia: 'We Are Devoting Too Many of Our Best Minds to Lawyering'*, Wall St. J. L. Blog (Oct. 1, 2009), https://blogs.wsj.com/law/2009/10/01/scalia-we-are-devoting-too-many-of-our-best-minds-to-lawyering/ (last visited May 1, 2018).

*   *   *

Considering the interests of absent class members, the unexceptional quality of representation, the absence of groundbreaking issues, public policy and the exorbitance of the fee request, $60 million is reasonable and more than fair to compensate class counsel for its work.

**E.     Class Counsel's Lodestar is Vastly Inflated.**

For purposes of the lodestar cross-check, class counsel claims a lodestar of nearly $160 million. However, the partners, of counsel and associates of the triumvirate of law firms represent only 17% of this lodestar, or $27.5 million. (Ex. 21 to Lieberman Decl.) The remainder of the claimed lodestar is attributable to contract attorneys primarily engaged in the drudgery of reviewing millions of mostly irrelevant documents (obviously, the most highly relevant evidence consists of the transcripts and plea agreements from the Brazilian prosecutors). After making appropriate adjustments described below, the normalized lodestar for this case is $60 million, which is consistent with a 2% fee award.

First, a "sophisticated client could have negotiated a total of, say, half...or less" of contract attorney billing rates, "knowing these contract attorneys cost plaintiff's counsel considerably less than what the firm's associate attorneys cost[.]" *City of Pontiac Gen. Empls. Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013) (Rakoff, J.). *See also In re Beacon Assocs. Litig.*, No. 09 Civ. 777(CM), 2013 WL 2450960, at *18 (S.D.N.Y. May 9, 2013) ("[T]here is absolutely no excuse for paying those temporary, low-overhead employees $40 or $50 an hour and then marking up their pay ten times for billing purposes.").

In *In re Citigroup Inc. Securities Litigation*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013), the district court thoroughly examined the issue of billing contract attorneys at inflated rates for lodestar calculation in a class action. There, the Court concluded that $200 was the appropriate blended rate for contract attorneys. *Id.* at 398-99 ("The Court finds that the hypothetical paying

18

client here is one with significant negotiating leverage, as evidenced by the hard-fought battle for appointment."). This Court should follow that precedent, which would result in an adjusted lodestar of slightly less than $75 million.[11]

Second, the number of hours is unreasonable. Class counsel failed to indicate the percentage of hours devoted to document review versus substantive litigation (pleadings, court appearances, depositions, etc.). Given that 83% of the total lodestar is attributable to contract attorneys, it is fair to estimate that perhaps 90% of the lodestar is attributable to discovery. In *IndyMac*, the court found that the lodestar was excessive where nearly 60% of all hours spent on the case were attributable to discovery. *See* 94 F. Supp. 3d at 527. The court "exercise[d] its discretion to cut 'surplusage' on a percentage basis by reducing the portion of each firm's lodestar attributable to discovery by 25 percent." *Ibid.* Here, class counsel failed to show how much of the lodestar is attributable to discovery, but it appears that the vast majority of the lodestar, perhaps 90%, is attributable to discovery. The Shareholders respectfully suggest that the adjusted lodestar of $75 million be reduced by 20%, yielding a lodestar of **$60 million**.[12]

Third, the billing rates for class counsel are ludicrously high and fail to reflect the discounts that sophisticated clients normally insist upon. Nominal billing rates are not the same as collected bills. While a preeminent litigator (say, David Boies) can legitimately bill $1,000+ per hour, it is doubtful that a litigator with apparently zero trial experience, who graduated from law school in 2002, could actually command $925 per hour from a paying client. (*See* Ex. 23, listing $925 hourly rate for Jeremy Lieberman.) As noted above, the billing rates for the contract attorneys are excessive. Even the $305 rate for paralegals (Ex. 16 at 6) is more than double the

---

[11] $200 multiplied by 236,547.63 "project attorney" hours (Lieberman Decl. Ex. 22) equals $47,309,526. Adding this to the $27,545,586.35 lodestar from partners, of counsel and associates (*see id.* Ex. 21) yields a total lodestar of $74,855,112.35.

[12] A 20% across-the-board reduction is mathematically equivalent to the 25% reduction in *IndyMac* with the cautious assumption that 80% of the lodestar here is attributable to discovery.

19

average billing rate for paralegals by any measure (region, firm size, or years of experience).[13] It is clear that the billing rates claimed by class counsel are inflated across the board.

Moreover, insofar as class counsel relies upon rates by other law firms, the Court should compare class counsel's requested compensation against the $1.66 million average profits-per-partner for the Am Law 100.[14] By contrast, the requested fee here amounts to more than $35 million for each of the eight partners listed on the core team. (Ex. 21 to Lieberman Decl.) Even generously assuming out-of-pocket expenses of $50 million (for associate salaries, contract attorney payments and other costs), the fee per partner would be nearly $30 million, approximately 18 times the average profits-per-partner at Am Law 100 firms. The billing rates for class counsel are unreasonably high, and the implied profits-per-partner are wildly out of sync with the average profits-per-partner for large law firms. These considerations should further inform and justify downward adjustments to the total lodestar.

For the reasons above, the Court should adjust the total claimed lodestar to $60 million.

## CONCLUSION

For the foregoing reasons, the Court should appoint an independent counsel for the class and order supplemental notice to the class. If the settlement is approved, the Shareholders respectfully suggest an award of attorneys' fees of 2% of the settlement fund.

May 9, 2018                         Respectfully submitted,

Richard Gielata                      Emelina Gielata
100 Westbury Drive, Coraopolis, PA 15108, (302) 507-4400, gielata@gmail.com

Disclosure: This brief was prepared by the Shareholders' son, Joseph Gielata, a retired lawyer.

---

[13] *See* National Association of Legal Assistants 2016 National Utilization & Compensation Survey Report, at 21-22, available at https://www.nala.org/sites/default/files/files/banner/2016%20NALA%20Utilization%20Compensation%20Survey%20Report.pdf

[14] *See* https://abovethelaw.com/2017/04/the-2017-am-law-100-a-turning-point-for-biglaw/

20

# E*TRADE FINANCIAL*

Trading • Investing • Banking

**Account Number:**
**Account Type:**

E*TRADE Securities LLC
PO Box 484
Jersey City, NJ 07303-0484
1-800-ETRADE-1 (1 800-387-2331)
www.etrade.com

**Account Name:**
RICHARD P GIELATA &
EMELINA C AGUAYO JTWROS

**Customer Update**
NEED HELP? Visit our Online Service Center. The fastest way to get the answers you need.
Go to etrade.com/servicecenter

| TRADE DATE | SETL DATE | MKT CPT | SYMBOL/ CUSIP | BUY/ SELL | QUANTITY | PRICE | ACCT TYPE | | |
|---|---|---|---|---|---|---|---|---|---|
| 01/07/11 | 01/12/11 | 0 1 | PBR | BUY | 300 | $36.76 | Margin | PRINCIPAL | $11,028.00 |
| | | | | | | | | COMMISSION | $9.99 |
| | | | | | | | | NET AMOUNT | $11,037.99 |

***PETROLEO BRASILEIRO SA PETROBRAS
SPONSORED ADR

| TRADE DATE | SETL DATE | MKT CPT | SYMBOL/ CUSIP | BUY/ SELL | QUANTITY | PRICE | ACCT TYPE | | |
|---|---|---|---|---|---|---|---|---|---|
| 01/07/11 | 01/12/11 | 0 1 | PBR | BUY | 200 | $36.77 | Margin | PRINCIPAL | $7,354.00 |
| | | | | | | | | NET AMOUNT | $7,354.00 |

***PETROLEO BRASILEIRO SA PETROBRAS
SPONSORED ADR

DETACH HERE

RICHARD P GIELATA &
EMELINA C AGUAYO JTWROS
100 WESTBURY DRIVE
CORAOPOLIS PA 15108-1025

DETACH HERE

**Use This Deposit Slip**    **Acct:**

**Please do not send cash**

| Dollars | Cents |
|---|---|
| | |
| | |
| | |
| | |

**TOTAL DEPOSIT**

Make checks payable to E*TRADE Clearing LLC.
Mail deposits to:

E*TRADE CLEARING LLC
PO Box 484
Jersey City, NJ 07303-0484

0107201100001 900663691047

# E*TRADE FINANCIAL

Trading · Investing · Banking

**E*TRADE Securities**
Investment Account

## TRADE CONFIRMATION

**Account Number:**

E*TRADE Securities LLC
PO Box 484
Jersey City, NJ 07303-0484
1-800-ETRADE-1 (1-800-387-2331)
etrade.com

**Account Name:**
RICHARD P GIELATA &
EMELINA A GIELATA JTWROS

**Customer Update**
Go Paperless with Electronic Delivery! It is a convenient, secure way to receive your
E*TRADE statements and tax documents. Learn more at etrade.com/paperless.

| TRADE DATE | SETL DATE | MKT/CPT | SYMBOL/CUSIP | BUY/SELL | QUANTITY | PRICE | ACCT TYPE | | |
|---|---|---|---|---|---|---|---|---|---|
| 10/05/16 | 10/11/16 | 6 1 | PBR | SELL | 500 | $10.00 | Margin | PRINCIPAL | $5,000.00 |
| | | | | | | | | COMMISSION | $9.99 |
| ***PETROLEO BRASILEIRO SA PETROBRAS | | | | | | | | FEE | $0.11 |
| SPONSORED ADR | | | | | | | | NET AMOUNT | $4,989.90 |

---

▲ DETACH HERE

RICHARD P GIELATA &
EMELINA A GIELATA JTWROS
100 WESTBURY DRIVE
CORAOPOLIS PA 15108-1025

**Use This Deposit Slip**     Acct:

Please do not send cash

| | Dollars | Cents |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Make checks payable to E*TRADE Securities LLC.
Mail deposits to:

**TOTAL DEPOSIT**

E*TRADE Securities LLC
PO Box 484
Jersey City, NJ 07303-0484

100520160001 900663691047

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------X
```
In re NORTEL NETWORKS CORP. SECURITIES          :
LITIGATION                                       :        **EXHIBIT A**
                                                 :        **ATTORNEYS' FEES**
                                                 :
```
------------------------------------------------------------------X
```

## I.    Introduction

Lead Plaintiff's Counsel seeks attorneys' fees in the amount of 8.5% of the $438,667,428 Gross

Cash Settlement Fund, 8.5% of the 314,333,875 Gross Settlement Shares, plus $3,750,041.27 in

expenses, which would total approximately $101 million in fees and expenses and which is proposed

to be shared among nine law firms ("Fee Application").[1] (See Memorandum of Law in Support of

Plaintiffs' Counsel's Application For an Award of Attorneys' Fees and Reimbursement of Expenses

("Pl. Mem."), dated September 5, 2006, at 1-2.) Lead Plaintiff's Counsel also claims a lodestar of

$16,655,970.60 based upon 47,846.07 hours worked (including lawyers and paralegals) (see

Compendium of Affidavits, dated September 5, 2006); and seeks a lodestar "multiplier" of 5.8 (Pl.

Mem. at 15) which is to say fees totaling 5.8 times the number of hours actually worked. Lead

Plaintiff argues that the Fee Application should be granted because, among other reasons: (1) the "fee

requested in this case, 8.5% of the proposed Settlement, is at the lower end of, or below, the range of

fees awarded by courts under the percentage method in cases involving very large recoveries" (Pl.

Mem. at 3); (2) "[s]ignificantly higher percentage fees have been awarded in numerous cases that were

far less risky, were not as intensely litigated and did not get past the class certification stage" (Pl.

Mem. at 3); and (3) "OPTrust ... the fiduciary representative of the Nortel I Class, has stated its belief

that such fee is fair and reasonable to the Nortel I Class and Plaintiff Counsel and should be approved

by the Court." (Pl. Mem. at 4.)

Ten objections were filed in opposition to Lead Plaintiff's Counsel's Fee Application, one of

---

[1]    See Order Approving Lead Counsel, dated February 4, 2002, at 1 ("[T]he Court hereby ...
affirms its choice of (lead) counsel, Milberg Weiss, as sole lead Plaintiff's counsel....").

which, Rinis Travel Service, offers detailed and substantive grounds for its opposition. Rinis argues that "[t]he overall size of the fee is grossly excessive ... and ... is much more than should be justified in this settlement." (See Objections and Notice of Intent to Appear at the Fairness Hearing, dated September 19, 2006, at 2.) **The Court, for the reasons set forth below, finds that an award of $101 million in legal fees and expenses is excessive.**

## II.    Legal Standard

A party seeking attorneys' fees bears the "burden of 'establishing entitlement to an award . . . .'" Savoie v. Merchants Bank, 166 F.3d 456, 463 (2d Cir. 1999) (citation omitted).

Attorneys who create a "common fund" are entitled to "a reasonable fee--set by the court--to be taken from the fund." Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2d Cir. 2000). Under the lodestar method, "the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate." Id. The lodestar may be increased "by applying a multiplier based on 'other less objective factors,' such as the risk of the litigation and the performance of the attorneys." Id. (citations omitted). Under the percentage method of awarding legal fees, the "court sets some percentage of the recovery as a fee," but "look[s] to the same 'less objective' factors that are used to determine the multiplier for the lodestar." Id.; Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 123 (2d Cir. 2005).

"[N]o matter which method is chosen, district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: '(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.'" Goldberger, 209 F.3d at 50 (citation omitted).

## III.    Analysis

Employing the percentage method of fixing Plaintiff's attorney compensation (while relying

-2-

upon the lodestar method as a "cross-check"), the Court finds, for the reasons that follow, that 3% of the Gross Cash Settlement Fund and 3% of the Gross Settlement Shares is fair and reasonable fee under Goldberger and related cases. This would result in legal fees of approximately $34 million (using a 2.05 multiplier of the lodestar). This result serves the dual purposes of encouraging counsel to bring appropriate cases and not granting fee awards that are excessive. See Goldberger, 209 F.3d at 53.

The first Goldberger factor relates to "the time and labor expended by counsel." Because the Court is awarding fees on a percentage basis, the Court need not "exhaustively scrutinize" counsel's hourly submissions. Goldberger, 209 F.3d at 49-50. But, in fact, the Court has reviewed counsel's hourly submissions and concluded that they appear accurate.

As to the second and third Goldberger factors -- i.e., "the magnitude and complexities of the litigation" and the risk of pursuing the case on a contingency basis -- the Court finds that the complexity and risks faced by Plaintiffs in this case are not significantly different or greater than those faced by plaintiffs in other large securities litigations and are certainly fairly compensated at 2.04 times the hours actually expended. See, e.g., In re Bristol-Myers Squibb Secs. Litig., 361 F.Supp.2d 229, 234 (S.D.N.Y. 2005). Plaintiffs identified the following (not altogether atypical) complexities, among others: (i) Plaintiffs would have to prove that Nortel's forward guidance and accounting were materially false and misleading; (ii) "the difficulties and complexities of issues relating to proof of loss causation and damages were very real"; and (iii) Nortel might not be able financially to survive two liability and damage judgments resulting from Nortel I and Nortel II. (See Plaintiff's Memorandum of Law In Support of Final Approval, dated September 5, 2006, at 9, 15.)

As to the fourth Goldberger factor – i.e. "quality of the representation" – the Court notes that Plaintiff's counsel Milberg, Weiss, Bershad, & Schulman ("Milberg Weiss") is qualified and

-3-

experienced in these matters.[2] Counsel's primary work in this matter, apart from discovery, was

successfully defending against a defense motion to dismiss, filed in or about April 2002, (see Decision

and Order, dated January 6, 2003), and obtaining class certification in September 2003. (See Decision

and Order, dated September 8, 2003.)

With respect to the fifth Goldberger factor - i.e., "the requested fee in relation to the settlement"

- the Court finds that a 3% fee is reasonable under the circumstances of this case and is consistent with

fees granted in other securities cases. See, e.g., In re Bristol-Myers Squibb Securities Litigation, 361

F.Supp.2d 229, 237 (S.D.N.Y. 2005) (approving a lodestar multiplier of 2.29); In re WorldCom, Inc.

Securities Litigation, No. 02 Civ. 3288, 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004) (approving

lodestar multiplier of 2.46); Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 123 (2d Cir. 2005)

(approving lodestar multiplier of 3.5)

As to the sixth Goldberger factor - "public policy considerations" – a fee award of 3% or two

times the value of hours actually worked (by nine law firms) both encourages lead plaintiff's counsel

to pursue securities litigations and helps ensure against the specter of excessive fees of individual firms

or multiple firms in the aggregate. See Klein v. Salvi, 02 Civ.1862, 2004 WL 596109, at *10-11

(S.D.N.Y. March 30, 2004); see also In re Dreyfus Aggressive Growth Mut. Fund Litigation, 98 CV

4318, 2001 WL 709262, at *7 (S.D.N.Y. June 22, 2001). This result balances the "overarching

concern for moderation" (with respect to attorneys' fees) with the public policy encouraging the

enforcement of the securities laws. See Goldberger, 209 F.3d at 53.

The reasonableness of the award proposed by the Court is confirmed by a lodestar analysis

"cross-check." Goldberger, 209 F.3d at 50. Based upon a lodestar of $16,655,970.60, a 3% fee award

---

[2]    It should also be noted that on or about May 18, 2006, an Indictment was filed in the United
States District Court for the Central District of California against Milberg Weiss and two of its
partners, David Bershad and Steven Schulman. Following a hearing held by this Court on June 15,
2006, Milberg Weiss (voluntarily) substituted Sanford P. Dumain, a partner in the firm, for Mr.
Bershad, who had been principal counsel in this action. (See Transcript, dated June 15, 2006, at 21.)

reflects a multiplier of approximately 2.05. See, e.g., In re Bristol-Myers Squibb Securities Litigation, 361 F.Supp.2d 229, 230, 237 (S.D.N.Y. 2005) (approving a lodestar multiplier of 2.29, resulting in an award of 4% of a $300 million settlement fund); In re WorldCom, Inc. Securities Litigation, No. 02 Civ. 3288, 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004) (approving lodestar multiplier of 2.46, resulting in a 5.5% award of a $2.6 billion settlement fund); Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 106, 123 (2d Cir. 2005) (approving lodestar multiplier of 3.5, resulting in an award of 6.5% of $3 billion settlement fund).

The Court also finds that Lead Plaintiff's Counsel's request for the reimbursement of expenses in the amount of $3,750,041.27 is reasonable. See In re Ashanti Goldfields, No. 00 Civ. 717, 2005 WL 3050284, at *5 (E.D.N.Y. Nov. 15, 2005) ("Counsel is entitled to reimbursement from the common fund for reasonable litigation expenses."). The requested fees consist of, among other things, payment of experts and consultants ($2,616,636.61), photocopying and reproduction ($537,961.01), legal research ($49,810.10), and transportation and lodging ($311,476.43). (See Compendium of Affidavits, dated September 5, 2006, at Ex. A.)

\*    \*    \*

## Certificate of Service

I, Richard Gielata, certify that I sent copies of the foregoing document to the following by first class mail:

*Richard P. Gielata 5/9/18*

Clerk's Office
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

Pomerantz LLP
Jeremy A. Lieberman, Esq.
600 Third Ave., 20th Floor
New York, NY 10016

Cleary Gottlieb Steen & Hamilton
LLP
Lewis J. Liman, Esq.
One Liberty Plaza
New York, NY 10006

King & Spalding LLP
Michael R. Pauzé, Esq.
1700 Pennsylvania Ave. NW
Washington, DC 20006

Skadden, Arps, Slate,
Meagher & Flom LLP
Jay B. Kasner, Esq.
Four Times Square
New York, NY 10036

The Honorable Jed S. Rakoff
500 Pearl Street Room 1340
New York, NY 10007-1312