

**Jeremy A. Lieberman**
Managing Partner

May 18, 2018

**VIA ECF & HAND DELIVERY**

Hon. Jed S. Rakoff, U.S.D.J.
United States District Court
 for the Southern District of New York
500 Pearl Street, Courtroom 14B
New York, New York 10007

Re:   *In re Petrobras Sec. Litig.*, No. **14-cv-9662 (JSR)**

Dear Judge Rakoff:

This letter, on behalf of Class Representatives in the above-captioned action, responds to Cleary Gottlieb Steen & Hamilton LLP's May 7, 2018 letter (the "Letter") regarding Class Counsel's lodestar and issues they believe the Court may wish to inquire further upon.[1]  Class Counsel appreciates the thorough work Cleary Gottlieb performed to review time sheets dating back to March 2015 documenting the time that was necessary to achieve the historic $3 billion settlement.

Broadly speaking, Cleary Gottlieb's issues concerning Class Counsel's work are limited to three areas, namely: (1) use of staff attorneys and project associates and reasonableness of their billing rates; (2) use of staff attorneys and project associates to translate key documents in a timely and cost-efficient manner, rather than relying upon outside vendors; and (3) instances where Cleary Gottlieb questions the amount of time expended or time sheet detail provided.

What follows are Class Counsel's responses.  For clarity and efficiency, the responses appear in the order in which Cleary Gottlieb's questions are raised.

**A. Pomerantz Time Sheets**

    **1. Total Staff Attorney and Project Associate Time**
        **a. Lodestar Prior to September 30, 2015**

---

[1]  *See* ECF No. 793.  Unless otherwise noted, capitalized terms have the same meanings assigned to them in the Stipulation of Settlement and Release.  ECF No. 767-1.  "Class Counsel" refers to Pomerantz LLP, Labaton Sucharow LLP and Motley Rice LLC, the three law firms requesting attorneys' fees pursuant to the motion originally filed on April 20, 2018.  ECF Nos. 789-91.

jalieberman@pomlaw.com

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 2

*"... Pomerantz's lodestar figure [] includes approximately 32,305 hours ($15,257,314) billed by staff and project attorneys before September 30, 2015, prior to significant document production in this case. Although we understand that some of this pre-production time pertains to reviewing documents for production pursuant to the Petrobras Defendants' requests for production, fact investigation, and/or briefing the Petrobras Defendants' motion to dismiss, we observed several entries in which staff and project attorneys charged for general tasks during this time period such as reading news articles and summarizing and translating publicly available information."* Letter at 5.

### (i) Litigation Context

Petrobras has strongly and consistently asserted that it was a victim of the fraud, not the perpetrator.[2]  According to Petrobras, bad acts of a few corrupt former employees who left years earlier could not be attributed to Petrobras under the adverse interest doctrine, and those who issued allegedly false statements had no knowledge of the fraud.[3]  Petrobras even became an assistant prosecutor in actions against corrupt cartel companies, recovering hundreds of millions of dollars, an achievement Petrobras would likely try to place before a jury.  PwC Brazil jumped on the bandwagon and argued that the scheme involved few former employees who had no financial reporting responsibilities and who concealed the scheme from those who did.  *Id.* ¶ 85.

While Petrobras' adverse interest argument failed at the motion to dismiss, it has become wildly successful in Brazil, with both regulators and a federal judge agreeing that Petrobras was a victim of the cartel.  By way of example, a congressional inquiry in Brazil concluded that Petrobras was a victim, Judge Sérgio Fernando Moro, overseeing the Lava Jato prosecutions, referred to Petrobras as a victim in several opinions, and Petrobras has trumpeted these findings in public statements.  Specifically:

> It is important to highlight that the public authorities in charge of the "Lava Jato" investigation and the Brazilian Supreme Court have acknowledged that Petrobras is a victim of the facts reveled by this investigation.  As a result, the Company has

---

[2] *See, e.g.*, ECF No. 789, Declaration of Jeremey A. Lieberman in Support of (A) Class Representatives' Motion for Final Approval of Class Action Settlement and Plan of Allocation; (B) Class Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses; and (C) Class Representatives' Motion for Reimbursement of Costs ("Lieberman Decl.") ¶ 48.

[3] *See* ECF No. 156 at n.13 ("There are no facts alleged showing that Foster knew at the time of any evidence of irregularities..."); p.24 ("None of those statements show that Foster knew anything about the Payment Scheme, or the basis of the CAC's claims."); n.22 ("If anything, other allegations in the CAC actually support the opposite inference regarding Gabrielli's scienter ... Gabrielli was instrumental in acting on Fonseca's complaints of misappropriation of funds in the Communications Department of the Supply Division in 2008-2009 []; it was Gabrielli who launched a formal inquiry, and he spearheaded the effort to dismiss the employee responsible.").  *See also* ECF Nos. 618 and 620 (Foster and Gabrielli summary judgment motions strongly asserting the absence of facts supporting scienter).

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 3

already received, to date, R$ 716 million recovered by the Brazilian authorities from the companies and individuals involved in the illegal acts that harmed Petrobras.[4]

Unlike other mega securities class actions that followed criminal convictions of the CEOs and CFOs, such as WorldCom, Enron, and Tyco, here CEO Maria das Graca Silva Foster ("Foster"), former CEO José Sergio Gabrielli ("Gabrielli"), and former CFO Almir Barbassa ("Barbassa") (*i.e.*, those who issued the allegedly false statements), have not been charged with any crime despite the comprehensive and sweeping investigation. Indeed, the Individual Defendants' summary judgment motions emphasize the strength of their scienter arguments. *See* ECF Nos. 617-18, 619. Instead of following a trail blazed by enforcement authorities as those from afar may suppose, Class Counsel sought to stitch together a mosaic of evidence to demonstrate that senior executives who issued the false statements did so deliberately or, at a minimum, with reckless disregard for the truth.

In addition to opposing scienter at every turn, Petrobras fervently argued that overcharges by the cartel companies had at best an immaterial impact on its balance sheet. Strongly supporting this argument, Petrobras reported in a March 22, 2015, filing with the U.S. Securities and Exchange Commission that the actual overcharge was just 3% of a contract's value. It then attributed just $2.5 billion, or a very small fraction of the $218.7 billion reported property, plant & equipment ("PP&E") as of December 31, 2014, to an asset write-down resulting from the cartel. Lieberman Decl. ¶ 73. In other words, the PP&E inflation was barely more than 1% and therefore was immaterial.

This materiality argument was more than window dressing. Petrobras determined that only 52 individual assets, representing just 32% of its total PP&E as of December 31, 2014, included amounts paid to contractors implicated by Lava Jato.[5] Although Petrobras admits that the overpayments were incurred for contracts entered between 2004 and April 2012, it concluded that it was impracticable to identify exact amounts and time periods in which the overpayments were capitalized thereby enabling it to avoid a critical restatement. Specifically:

> Since the company cannot identify the amount of overpayments for specific contractual payments or in specific accounting periods, it cannot determine the periods in which to adjust property, plant and equipment.[6]

---

[4] *See* www.investidorpetrobras.com.br/en/press-releases/clarification-news-1

[5] Petrobras and its consultants evaluated 52 assets valued at R$188.4 billion as of September 30, 2014. Applying an exchange rate of 2.65 as of December 31, 2014, these assets would have been valued at approximately $70.9 billion in Petrobras' 2014 Form 20-F, amounting to 32% of the total $218.73 billion reported PP&E as of December 31, 2014.

[6] *See* 2014 Form 20-F at F-14.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 4

Assigning fractions of the $2.5 billion write-down to specific periods proved a difficult and time-consuming exercise that Class Counsel had to undertake to demonstrate that earlier statements concerning PP&E were materially misleading. Like scienter, Petrobras' materiality argument could have torpedoed the litigation at the motion to dismiss, in summary judgement, or at trial. Indeed, whether the fraud had a material impact on Petrobras' balance sheet was a hotly contested issue and presented a real risk that Class Counsel faced throughout the pleadings, motions to dismiss, summary judgment, and anticipated facing at trial. To rebut this argument, Class Counsel needed to "recreate" the cost attributable to several multibillion dollar refinery construction projects and then demonstrate through TCU or other analyses the amount of inflation of PP&E for each project. This was a daunting and extensive task involving scores of documents in Portuguese. Ultimately, using an army of Portuguese speaking reviewers, Class Counsel was able to "crack the code" with respect to these projects, culminating in Dr. Henning's expert report regarding materiality.

### (ii) Initial Staffing

In this context, Pomerantz began assigning staff attorneys and project associates to the matter in June 2015. Initially, Pomerantz hired four staff attorneys.[7] Two had extensive experience practicing law in Brazil, were admitted in both Brazil and New York, and one previously managed a law practice in Brazil after clerking for the Court of Justice in São Paulo. Another is a highly skilled attorney with supervisory experience who is admitted to practice in New York and Massachusetts and who graduated from Harvard Law School in 1990. All four are fluent in Portuguese.

All the staff attorneys and project associates not previously with the Firm and working on other matters were interviewed by Pomerantz associates, counsel, or partners with the Firm and tested on their Portuguese language skills, particularly with respect to analyzing legal documents.[8] In addition to background screening, language skills testing, and education and applicable bar admission verification, candidates also completed a document review skills screening and were subjected to conflicts checks. Reflecting the demanding hiring process, significantly more applicants were not offered employment for any number of reasons than those hired as fulltime Pomerantz employees.

---

[7] One of those staff attorneys has since become a Pomerantz associate, another left the Firm just months ago for a job with a Wall Street bank.

[8] The language test was administered by ALTA Language Services and is designed to verify whether a candidate can read and comprehend legal documentation written in Portuguese at a pre-determined level of skill based on ALTA's protocol. Each test consisted of a variety of sample documentation written in Portuguese, with each passage being followed by a series of multiple-choice questions about the information contained within. Scoring is done on a percentage basis, making it easy to determine which candidate was able to read and comprehend legal documentation in Portuguese.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 5

Project associates were closely monitored and supervised throughout their involvement in the litigation.[9]  Working in Pomerantz offices in New York, Chicago and Florida, project associates were supervised by Pomerantz partners, counsel, and senior associates who delegated responsibilities to ensure non-duplication of effort and that work performed added value to the pleadings, during depositions and at summary judgment, and ultimately at trial.  As the Lieberman Declaration describes generally, and as further detailed below, project associates were central to the prosecution of the case that provided the Settlement Class with much more value than hourly contract attorneys who typically perform more document coding or "first-level" document review, as described in the various cases referenced by Cleary Gottlieb.[10]

Indeed, in recognition of the elevated job responsibilities demanded here, and the value of their Portuguese fluency, project associates were hired as full-time employees and provided with commensurate firm benefits, including health insurance (or a cash payment if they declined the insurance), disability insurance, and an opportunity to participate in the Firm's 401(k) program, with the Firm paying required payroll taxes.[11]  *See* Lieberman Decl. ¶ 399.

Project associates who previously practiced in Brazil were uniquely positioned to assist Class Counsel through a Portuguese thicket of informal discovery.  They added critical knowledge and experience with Brazil's Federal Court system, governmental agencies, and laws and procedures governing access to this informal discovery.  Because of the unique international aspect of the litigation, with most of the evidence located in Brazil, Project associates admitted in Brazil added as much, and at times more, value than attorneys admitted in the U.S. who also happened to be fluent in Portuguese.  To access documents on the Federal Court website, one needed to be an admitted attorney in Brazil and have been issued what is, in effect, a password or electronic key.  *Id.* ¶ 156.

While there is generally no shortage of "contract attorneys" available to staff a document review, there was a significant difference here.  Project associates fluent in Portuguese, particularly those with prior legal experience in Brazil, were in very short supply, and we understood that there was also significant demand for their services by other law firms, including those involved in this litigation.  As a result, to attract the proper skill set, compensation paid to the project associates was comparable to the compensation package offered to all Pomerantz associates.  Indeed, more experienced project associates received compensation in a range comparable to Pomerantz' more senior associates.

---

[9] Because Pomerantz had just four staff associates assigned to the matter, for brevity, reference to the term "project associate" hereafter includes project associates and staff attorneys.  With respect to this Action, both positions performed nearly identical functions.  Any difference in title reflects that staff attorneys also worked on other firm matters and could be promoted to associate.

[10] *See, e.g., Pa. Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 318 F.R.D. 19, 26 (S.D.N.Y. 2016) or *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 377 (S.D.N.Y. 2013).

[11] Notably, during the pendency of the Action, several project associates became staff attorneys and remain employed with Pomerantz; several staff attorneys became associates and remain employed with Pomerantz; and two associates were elevated to partner, positions they continue to hold today.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 6

### (iii)   Work Projects Performed Prior to September 30, 2015

Based on having practiced law in Brazil and their familiarity with the Brazilian Federal Court system and government agencies, project associates quickly observed that there was a treasure trove of publicly available evidence relevant to core issues in the case, particularly scienter and materiality.  For example, a project associate hired in July 2015 helped steer Class Counsel to a mountain of indictments, plea agreements, cooperation statements, videotaped testimony, and other information directly relevant to the claims and defenses here, particularly with respect to pleading and proving scienter.[12]  *See, e.g.*, Lieberman Decl. ¶¶ 148-72, Exhibits 7-10.

Cleary Gottlieb raises no issues concerning the importance of the staggering "informal discovery" that project associates identified and accessed from Brazil while seated at their desks in Pomerantz's offices.  Using websites maintained by Brazil's Federal Courts, Tribunal de Contas da União ("TCU"), Comissão de Valores Mobiliários ("CVM"), and Administrative Council for Economic Defense ("CADE"), among others, project associates identified a significant amount of evidence that was used at depositions, pleadings, summary judgment, and were ultimately included on Class Representatives' proposed trial exhibit list.[13]  *Id.* ¶¶ 155-75.

Each project associate fluent in Portuguese mined the informal discovery databases, at one time or another, analyzed the information and, when necessary because of high relevancy or pressing time requirement, partially or fully translates or summarized "hot" documents into English.  This work added enormous value at pleadings,[14] depositions, and in opposing summary judgment.[15]  Class Counsel respectfully believes that it would have been highly irresponsible to ignore relevant and "hot" documents and testimony available in Brazil that directly supported the amended complaints, summary judgment, and trial strategy.  All of it was in Portuguese, and the volume was enormous.

To help the Court more fully assess the work performed by Class Counsel, Exhibit 7 to the Lieberman Declaration is a chart identifying 701 declarations, cooperation statements and other witness testimony that became available in Brazil in almost real time and that dozens of project associates helped review.  *Id.* Ex. 7.  Accessing this highly relevant information, however, was no small feat.  Witnesses or defendants (in Brazil) were interviewed multiple times by police, prosecutors, and eventually Judge Moro.  As Exhibit 7 shows, Alberto Youssef, the notorious money launderer, provided at least 102 testimonies or written statements to authorities.

---

[12] This project associate, with a billing rate of $550.00, was formerly a senior associate with a prominent São Paulo law firm who continues to be employed by Pomerantz (currently as a staff attorney working on other matters) while simultaneously pursuing an LLM from NYU School of Law.

[13] *See* Section II.L of Lieberman Decl. and Exhibits 7-10 appended thereto, providing a more fulsome description of the "informal discovery" referenced herein.

[14] Some of the material directly buttressed allegations in the Third Amended Complaint.  *Id.* ¶¶ 71-72.

[15] *See, e.g., id.* ¶¶ 224-25, 229, 235-36 (identifying the fruits of these efforts).

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 7

Roberto Costa, a Defendant in this Action, did so 117 times. As the case in Brazil proceeded, stories of those targeted in Lava Jato changed over time.

Respectfully, Brazil's Federal Court records system (equivalent to PACER) is somewhat arcane and is challenging to navigate, even for the well-experienced. Exemplifying the maze that project associates had to traverse is Exhibit 10 to the Lieberman Declaration, a compilation of documents showing what project associates had to do to access the relevant material, a process more fully described within the Lieberman Declaration. *See* ¶¶ 155-59. Exhibit 7 to the Lieberman Declaration is a subset of the vast information available to project associates prior to September 30, 2015, and Exhibit 10 shows the strained process by which project associates were able to obtain information from the Federal Court that is set forth on Exhibit 7.

Project associates also pointed to Brazil's TCU, CVM, and CADE as having relevant sources of information. They observed that those governmental entities had been investigating Petrobras for years, particularly the TCU, and upon closer scrutiny by project associates, we learned that the TCU had identified many "irregularities" in contracts and bidding processes and "overcharges" in contracts far exceeding the 3% write-down that Petrobras had recorded.

Set forth in Exhibit 8 to the Lieberman Declaration is a compilation of 176 TCU proceedings relevant to materiality (*i.e.*, overcharges) and information received by Petrobras' senior-most officers—including Gabrielli, Barbassa and Foster—of irregularities in bidding processes and inexplicable overcharges on individual refinery projects. Nearly all these TCU investigations predate September 30, 2015, and almost all were publicly available.[16] *See also* Lieberman Decl. ¶¶ 160-63. Project associates played a central role in identifying, analyzing, and summarizing these documents in English or, where appropriate, translating the document or relevant portions thereof. Ultimately, these 176 reports needed to be compiled on a project-by-project basis and weaved into one expert report whereby Class Counsel could tally the estimated inflation of PP&E on an annualized basis, as was ultimately opined upon by Dr. Henning.

Likewise, set forth on Exhibit 9 are 63 separate CVM proceedings that, to varying degrees, were either directly relevant to the claims and defenses in this action or could have led to the discovery of admissible evidence. Project associates pointed to these investigations as another source of important information to be analyzed and they led the review. *Id.* ¶¶ 166-67.

There were also significant investigations that had occurred or were then ongoing by CADE and by the Comissão Parlamentar de Inquérito ("CPI" or congressional parliamentary investigation). Project associates who previously practiced in Brazil told Class Counsel that these investigations would likely yield relevant information and should be analyzed. Indeed, the final report of the CPI, amounting to thousands of pages, contained highly useful information.

---

[16] Where not available from the TCU website, Class Counsel retained a Brazilian law firm that it paid hourly (and has not included their lodestar in the Fee Motion, but rather as an expense). This local firm acted as "boots on the ground" and obtained and authenticated additional documents not readily available through governmental websites. *Id.* ¶ 173-75.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 8

*Id.* ¶¶ 164-65, 168-69.  Project associates identified, analyzed, and when appropriate summarized or translated into English the CADE and CPI documents.[17]

Complicating matters, all this "informal discovery" was in Portuguese and none of it came with load files, metadata, or in native format susceptible to intelligent ESI tools.  Rather, it was obtained in paper format, extracted from websites and videotape testimonies and downloaded from Federal Courts' website without time-corresponding transcripts.  With Petrobras strongly asserting the absence of scienter or materiality, among other defenses, project associates rolled up their sleeves and got to work in the Summer of 2015 to review, assimilate and where necessary translate relevant documents.

And once again, because the documents and statements that comprise the informal discovery were in Portuguese, the role of competent project associates fluent in Portuguese cannot be overstated.  Respectfully, Class Counsel is unaware of any other litigation involving millions of pages of relevant documents and hundreds of videotaped depositions and other cooperating statements, available in a foreign language through a patchwork of websites, requiring intensive analysis to place the evidence into proper context.

Informal discovery came in the form of, *inter alia*, plea agreements, videotaped testimony, written cooperation statements, criminal complaints, hearing transcripts, sentencing opinions, and years' worth of regulatory reports.  *Id.* ¶¶ 148-72.   Although much of the review occurred on computer screens which makes it difficult to determine the total number of pages reviewed, approximately 5 million pages of informal discovery was uploaded to the database as being relevant, and most of the material was accessed and analyzed by project associates prior to September 30, 2015.

During this pre-September 30 period, project associates also analyzed Defendants' document requests to determine which documents were responsive, resulting in the production of over a million pages to Defendants.  This included production of over 300,000 pages by USS, 448,000 pages by North Carolina, and 330,000 pages by Hawaii.  Indeed, 18 project associates were assigned to the team to review documents collected from the Class Representatives, who then made decisions regarding which documents were responsive and which were privileged.[18]

---

[17]  In July 2015, recognizing that Class Counsel was sitting atop a treasure trove of key evidence that project associates identified and collected, including plea agreements, criminal complaints, hearing transcripts, sentencing opinions, cooperating statements, testimony, and years' worth of regulatory reports that would likely be subject to admissibility and authenticity challenges, Class Counsel retained Daniel J. Capra, Philip Reed Professor of Law at Fordham University, to help address those issues.  *See* Lieberman Decl. ¶¶ 176-78.

[18]  This project was overseen by a project associate already employed at Pomerantz, working on other matters, and who remains employed by Pomerantz after being promoted to staff attorney.  His standard billing rate is $550.00, a reflection of being admitted to practice in New York for 13 years following graduation from Boston University School of Law with a Masters in Banking and Financial Law (LL.M.). He also attended certificate programs at Oxford University and Harvard University.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 9

Cleary Gottlieb also raises no question concerning the substantial involvement of project associates in drafting written discovery that Class Counsel served on Defendants prior to September 30, 2015, including helping to define ESI search terms—almost all of Petrobras' document production was in Portuguese. Further, project associates worked diligently drafting third party discovery under Fed. R. Civ. P. 45 of the Federal Rules, which was served soon after the discovery stay was lifted. *Id.* ¶¶ 114-20. At least three project associates regularly worked on the third-party discovery, and up to ten were at times involved in analyzing documents that third parties produced, particularly documents produced by PricewaterhouseCoopers LLP, Deloitte & Touche LLP, and KPMG US LLP.

As the mountain of informal discovery expanded, and in anticipation of the additional millions of pages of documents that Defendants indicated were forthcoming, Class Counsel increased the number of project associates to 85 by August and 102 by September 2015. As the Lieberman Declaration acknowledges, 102 project associates right before formal document production, growing ultimately to 149 just before the January 1, 2016 substantial completion date, is an extraordinary number. ¶ 396. However, the circumstances here were extraordinary. By September 2015, Class Counsel anticipated receiving at least 10-15 million pages of documents (mostly in Portuguese) from Defendants and third parties.

In order to meet this Court's inviolable April 29, 2016 fact discovery cut off, more than 22 million documents that were eventually produced, most before January 1, 2016, needed to be reviewed, analyzed and where appropriate, translated within a 3 to 4-month window in order to render them useful for the 50 fact witness depositions that began February, 2016. As such, while in a slower-paced litigation of this scope, 60-80 project attorneys would have been sufficient to analyze more than 22 million documents in a 15 to 18-month window provided for voluminous document discovery, this was not a typical trial schedule, with Class Representatives having less than one third of that time to accomplish this monumental task. Given the volume of documents compared to the razor thin discovery window, the amount of project associates retained was essential. [19]

Such numbers are not unprecedented. Indeed, in *Tyco*, a case litigated in English, class counsel had 165 staff or "contract attorneys" working on the matter.[20] Using a smaller cadre of project associates here to review and assimilate nearly 22 million pages of formal and informal discovery in a very short discovery window provided was simply impracticable and would have left Class Representatives less prepared for depositions, summary judgment briefing, and

---

[19] By Order entered July 20, 2015, the Court required that the case be ready for trial less than ten months later, on May 1, 2016 (ECF No. 192), a deadline to which Class Counsel dutifully sought to adhere despite the enormity of informal and formal discovery, almost all in Portuguese, that followed.

[20] *See* Joint Decl. of Richard S. Schiffrin, Jay W. Eisenhoffer, and Sanford P. Dumain, *In re Tyco International Ltd. Secs. Litig.*, No. 1:02-md-01335 (D.N.H. Aug. 23, 2002), ECF No. 1146, Ex. 24, Ex. A. (Schiffrin Affidavit) (64 contract attorneys for Schiffrin Barroway Topaz & Kessler); Ex. 30, Ex. A. (Eisenhoffer Affidavit) (44 staff attorneys for Grant & Eisenhoffer); Ex. 31, Ex. A. (Dumain Affidavit) (57 contract attorneys for Milberg Weiss).

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 10

ultimately trial. Likewise, there were 161 associates and contract attorneys working on the Countrywide securities litigation, a case involving discovery in English, not Portuguese.[21]

In sum, Class Counsel could not sit idle between March and September 2015 while awaiting an onslaught of documents from Petrobras and the Underwriters. Rather, while negotiating the scope of discovery from Defendants, Class Counsel focused on the critical informal discovery. *See id.* ¶¶ 148-75. Such information strongly supported the prosecution of the case, and project associates added great value in the identification and analysis of this very helpful material. Accordingly, Class Counsel stands by its $15,257,314 in lodestar for this period.

### (iv) Work Project Associates Performed Between October 1, 2015 and July 31, 2016

Despite questioning the need for the number of project associates who worked on the matter prior to September 30, 2015, Cleary Gottlieb does not suggest that 149 project associates and 4 staff attorneys was an excessive number between October 1, 2015 and August 3, 2016, before the District Court case was stayed. Their suggestion, however, that project associates comprised "just over 80% of the total lodestar amount requested" fails to fully appreciate their roles in this unique international matter.

Throwing all team members in a category of "project associates" without accounting for the significance of the work they performed fails to provide an accurate portrayal. Here, a significant amount of work was performed by a "core team" of 32 attorneys who helped draft the various amended complaints filed in the Summer and Fall of 2015, worked on opposing Defendants' multiple motions to dismiss during the same period, assisted in facets of discovery, including taking depositions, attended weekly "all hands" meetings, worked on class certification and summary judgment briefing and opposing Defendants' six motions for summary judgment, and worked extensively on the mock trial and preparing this Action for trial, including work on the exhibit list, deposition designations, and various pretrial materials.

This core team constituted approximately $49.42 million of lodestar, or approximately 31% of Class Counsel's total attorney lodestar, and was comprised of six project associates, eight partners, two of counsel, ten associates, and six staff attorneys.[22] *See* Lieberman Decl. Ex. 21. After subtracting from the lodestar $13,174,549 that Cleary Gottlieb has attributed to translations (to be addressed below), the core team constitutes 33.78% of the adjusted total lodestar.

---

[21] See Decl. of Joel H. Bernstein, at 23, para. 59, *In re Countrywide Fin. Corp. Secs. Litig.*, No. 2:07-cv-05295-MRP-MAN (C.D. Cal. Aug. 14, 2007), ECF No. 985 ("[l]ead Counsel hired a team of 119 short-term attorneys ("STAs"), all admitted to practice in New York, to review and analyze the documents under the supervision of Labaton Sucharow partners and associates").

[22] This includes members of the core team from Labaton and Motley Rice.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 11

In addition to analyzing the millions of pages of Portuguese documents, project associates assisted in preparation for the 81 depositions, including those of 15 experts that Petrobras designated. For example, approximately 69 project associates helped to prepare deposition kits and others "second seated" nearly all depositions to assist with exhibits, mostly in Portuguese, that were accompanied by an English certified or "courtesy" translation distributed to the many counsel in attendance.[23] One project associate with extensive litigation experience, and who remains employed with Pomerantz on other matters, took the lead examination in three fact witness depositions. *See* Pomerantz Time Sheet, rows 3302-04; 3323-28; 3341-47.

Other project associates fluent in Portuguese served another important role during the 30 depositions taken in Portuguese. They were uniquely able to object to the interpreter's translations. The importance of this work is supported by Cleary Gottlieb having Portuguese-speaking attorneys serve an identical role at the same depositions.

Class Counsel also unleashed very aggressive litigation strategies that Cleary Gottlieb does not question, such as naming Foster, Gabrielli, and Barbassa as defendants, thereby opening the door to taking their testimony in the United States. Approximately seven project associates assisted in preparing for these highly important depositions. Class Counsel also brought claims against PricewaterhouseCoopers Auditores Independentes ("PwC Brazil"), garnering important discovery against Petrobras, along with a $50 million settlement, and the 8 Project associates working on the PwC Brazil team helped bring about this tremendous result.

Project associates also took a leading role in working on "buckets" that involved analysis of key issues in the case and the identification of supporting materials. Several project associates drafted bucket memos and made formal presentations and during team meetings. Bucket topics included highlighting key Brazilian testimony (both favorable and adverse), plea agreements, criminal complaints, hearing transcripts, sentencing opinions, and years' worth of regulatory reports. Other topics included overcharges on specific refineries, analyzing statements and testimony of whistleblowers Venina Velosa da Fonseca (*see* Lieberman Decl. ¶¶ 33, 136-38) and Otávio Lavocat Cintra (*id.* ¶¶ 139-42). Still other project associates took ownership over bucket memos that summarized TCU, CGU, CPI and CADE findings, and another led a bucket team focused on Federal Court material, namely cooperation statements, indictments and criminal pleas. This work was overseen by core team members who ensured that the work product was shared with relevant experts and included in deposition kits, and ultimately the proposed trial exhibit list. In total, 73 project associates participated in the "bucket" projects that were critical to organizing and framing the litigation.

As project associates were added to the matter, they were also assigned to teams that focused on discrete aspects of the litigation so that there could be an efficient division of labor

---

[23] Notably, defense counsel objected at an early deposition to a Portuguese document being introduced if it was not accompanied by corresponding English translation. Because translation services charge a steep premium for rushed jobs that can still take up to a week to turnaround, most of the 750 deposition exhibits in Portuguese had to be translated "on the fly" and in-house by project associates.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 12

and concentration of knowledge in specific areas to avoid unnecessary duplication of effort. For example, a team of at least 25 attorneys were assigned to review the Underwriter Defendants' production of approximately 2.5 million pages of documents. Because the case was essentially litigated in Portuguese on a compressed time schedule, at various times approximately 128 attorneys fluent in Portuguese performed some degree of document summaries or translation into English. Moreover, three project associates formed a core third-party team who, working with other project associates, were assigned to review third-party productions of approximately 400,000 pages that Class Counsel obtained in the litigation.

Class Counsel also assigned seven project associates to work alongside Dr. Steven L. Henning, Class Representatives' materiality expert. The documents Dr. Henning relied upon for his expert opinion, such as TCU reports and Petrobras' books and records, were almost exclusively in Portuguese. For efficiency and to further his analysis, Dr. Henning requested that a number of these project associates work directly out of his New York office. Likewise, four project associates fluent in Portuguese worked with Dr. Blaine F. Nye, the damages expert, three project associates worked alongside Harris L. Devor, the accounting expert, and five project associates were assigned to work with James F. Miller, Class Representatives' due diligence expert. None of these experts spoke Portuguese and each of them requested the project associate assistance.

Cleary Gottlieb surely appreciates the enormous work performed between October 1, 2015 and August 3, 2016, such as obtaining class certification, unparalleled fact discovery in a foreign language, extensive expert discovery given Defendants' designated 14 experts, moving for partial summary judgment and opposing Defendants' six motions for summary judgment while defending against Defendants' Rule 23(f) appeal. During this same period, Class Counsel held a comprehensive mock trial, prepared for another, all while working on pre-trial submissions for a case that had advanced to 48 days from trial prior to the stay.[24] Project associates helped with each facet and the value they added cannot be overstated.

### b. Lodestar from August 3, 2016 to July 7, 2017.

*"The lodestar figure also includes approximately 17,661 hours ($10,040,522) billed by all Pomerantz professionals (including partners, counsel, associates, staff attorneys, project attorneys, and other legal professionals) for the one-year period from August 3, 2016, the day after the Second Circuit issued a stay pending appeal, to July 7, 2017, when the Second Circuit issued its decision on class certification. While some portion of this amount would represent reasonable work performed in connection with the Second Circuit appeal and preparing for return of the case to the District Court, the Court may wish to inquire regarding the nature of that work and whether the amount of work performed during these periods was appropriate."*
Letter at 5 (footnote omitted).

---

[24] *See generally* Lieberman Decl. Section II.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 13

As Cleary Gottlieb recognizes in their letter (at p.8), during this nearly year-long period, a handful of partners and associates who could have devoted time to other Firm matters instead worked hundreds of hours in connection with the Second Circuit appeal. Indeed, the undersigned billed over 200 hours, or $186,850, preparing for the oral argument. In total, Class Counsel expended over 1,500 hours of partner, of counsel, and associate time, or roughly $1.1 million in lodestar, defending against the Second Circuit appeal.

We respectfully believe this was time very well-spent. Petrobras filed a 57-page opening brief and the Underwriter Defendants filed a 39-page opening brief with the Second Circuit. They jointly filed a 7,446-page, 32-volume Joint Appendix. Class Representatives in turn filed a 59-page brief and a 7-volume Supplemental Appendix totaling over 1,250 pages, in support of Plaintiffs' opposition to the appeal.[25] The work, which sophisticated institutional investor Class Representatives have not questioned, was plainly necessary to defend against an appeal that could have substantially narrowed or dispensed with the case.[26] Any suggestion that class counsel in some way overprepared for oral argument involving such a dense record with hundreds of pages of briefing, hundreds of case citations, and over 10,000 pages of a joint appendix, is a suggestion that would not serve the Class well. Less preparation would have been a disservice to the Settlement Class.

Moreover, the issues on appeal relating to ascertainability and predominance were critical not just to this case, but to securities and other class actions nationwide. The results obtained from this preparation were nothing sort of phenomenal: the Second Circuit has squarely rejected the heightened ascertainability requirement advocated by Defendants and adopted by the Third Circuit; and ruled that directionality need not be proved with respect to establishing the fraud on the market theory, paving the way for the Second Circuit's critical ruling in *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017), that an event study is not necessarily required to establish market efficiency. Simply put, the $1.1 million billed in litigating Defendants' appeal was time very well spent. Of course, an objective measure of the appropriateness of this time spent would be to compare the time spent by both Cleary Gottlieb and Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps") with respect to the appellate proceedings if they would be inclined to share their time entries.

Cleary Gottlieb also recognizes in its letter that Class Counsel took advantage of the Second Circuit stay to better prepare the case for a trial. Such preparation to benefit the

---

[25] After the November 2, 2016, oral argument and before the Court's Opinion on July 7, 2017, the parties sent several letters to the Court pursuant to Fed. R. App. P. 28(j) to provide supplemental authority relevant to the issues presented for consideration by the Court. *See* App. Dkt. Nos. 312, 314, 316, 319-20.

[26] The importance of the appeal is underscored by the many *amicus curiae* briefs filed in the Circuit, including by the National Conference on Public Employee Retirement Systems, State Board of Administration of Florida, U.S. Chamber of Commerce, Securities Industry and Financial Markets Association, Depository Trust Company, Associacao Brasileira de Bancos Internacionais, and many prominent law professors.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 14

Settlement Class was plainly necessary. As noted, one counsel who could have devoted her time to other Firm matters, instead worked up to 329 hours on motions *in limine*, including, *inter alia*, motions to exclude: (i) the argument that Petrobras was a victim; (ii) evidence concerning certain information related to Class Representatives; (iii) introduction of class-wide aggregate damages (as opposed to per share inflation); (iv) any reference to Plaintiffs' damage expert's prior career as a professional football player (Dr. Nye played nine years as right guard with the Dallas Cowboys); (v) any reference to Fonseca's Brazilian labor litigation against Petrobras; and (vi) all or portions of the purported expert testimony of Cagatay Koç, Christopher James and Rene Stulz.

This same counsel also researched and prepared a comprehensive memorandum of law asking the Court to bifurcate the damages portion of the trial so damages experts for the Individual Actions would not be heard during any portion of the Class Action trial. Bifurcating damages was particularly important to Class Counsel given the prospect of a fact finder being presented with no less than four competing damages analyses on the Plaintiff side alone, with each of the Individual Action Plaintiffs' experts opining on a significantly lower damages per share than Class Representatives. Lieberman Decl. ¶¶ 317-18. In the relative calm before the storm, Class Counsel also further developed and improved upon work on a pre-trial consent order and trial-pending exchanges, including work on a witness list, proposed jury charge, proposed verdict form, and proposed *voir dire* requests that began before the case was stayed. *Id.* ¶ 260.

Any suggestion that motions *in limine*, *Daubert* motions and substantial pretrial work should have been held in abeyance until a frenetic rush to trial is not a suggestion that serves the Class.[27] Class Counsel could not embrace such a wait-and-see approach. Instead, Class Counsel continued to aggressively prepare the case for trial during the stay, posturing the case to be even more trial-ready once the stay was lifted. This activity allowed Class Representatives to negotiate a $3 billion settlement from a position of strength, knowing full well that their case would be trial-ready should negotiations falter.

Likewise, Class Counsel continued to perfect the summary judgment oppositions while the District Court case was stayed. Specifically, on June 27, 2016, just slightly more than one month before the Second Circuit imposed the stay, Defendants filed six summary judgment briefs on a swath of separate issues, supported by hundreds of pages of briefing and hundreds of exhibits totaling thousands of pages, further supported by several dozen dense declarations. *See, e.g.*, Lieberman Dec. ¶¶ 220-43. Cleary Gottlieb suggests that because Class Counsel had a few weeks to prepare oppositions prior to the Second Circuit stay, it should have been "pencils down" on August 3, 2016. That would have been malpractice.

---

[27] By having continued to develop the case for trial during the Second Circuit stay, Class Counsel was prepared so that a trial could be held at the Court's earliest possible convenience once the stay was lifted, and the case was even more trial-ready on July 7, 2017, than it had been on August 3, 2016.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 15

Cleary Gottlieb's suggestion ignores that Defendants served 14 expert reports on May 27, 2016. Between then and June 15, 2016, Class Counsel was tasked with understanding the disclosures and taking their experts' depositions—it would have been irresponsible to face experts for the first time at trial—while preparing to defend against Defendants' depositions of Plaintiffs' four experts. In short, the May and June 2016 time-period (which fell immediately on the heels of fact discovery) can be aptly described as a marathon performed at a sprinter's pace. Further, Class Counsel dutifully drafted oppositions to Defendants' multiple summary judgment motions in the few weeks before the stay was imposed, but undoubtedly there was more work that could have been done to improve the briefing, but we were operating under the gun.

Recognizing the import and significant risks posed by Defendants' six summary judgment motions, Class Counsel spent more than 2500 hours, or roughly $1.6 million in lodestar, during the stay perfecting the opposition briefs, supported by counterstatements of material facts that totaled over 1,000 additional pages, along with nearly 800 exhibits that amounted to over 40,000 pages, with many exhibits being accompanied by certified English translations.[28] *See* ECF Nos. 615-21. Again, a comparison between the total time spent by Class Counsel and ***all*** Defendants' counsel on summary judgment briefing might be an appropriate objective comparison.

Moreover, during the period of the stay, Class Counsel prepared appropriate exhibit lists and deposition designations, as well as trial graphics, to allow the case to immediately proceed to trial upon the lifting of the stay. Additionally, further targeted document review during this period was needed to make sure that critical evidence was not overlooked during the severely compressed discovery schedule. Nevertheless, despite some targeted document review, after the stay was imposed, the number of project associates working on the matter declined to three, and for most months to just one. *See id.* Ex. 22.

In short had the stay not been imposed, Class Representatives would have been able to put together a bare bones trial coming right off the lightening pace of fact and expert discovery. The stay, however, afforded Class Counsel time to draft motions *in limine*, perfect summary judgment briefs and prepare for trial in a more measured fashion, ensuring that no stone was left unturned in prosecuting the Class' claims. As such, Class Counsel maintains that the $10,040,522 billed during the post-stay period was eminently reasonable.

---

[28] As Cleary Gottlieb surely knows, material facts changed while the case was stayed with additional pleas agreements and cooperation statements. For example, on December 14, 2016, Marcelo Odebrecht, the former CEO of Odebrecht and apparent ringleader of the cartel, provided a cooperation statement that implicated Foster as having knowledge of the scheme. Further, on or about July 27, 2017, Brazilian federal police arrested the former CEO Aldemir Bendine, who on March 7, 2018, was found guilty of corruption charges and sentenced to 11 years in prison in Brazil. *See* Lieberman Decl. n.14, Exhibit 3. Class Counsel continually remained abreast of the evolving developments in Brazil during the stay, weaving those facts into the summary judgment oppositions.

### c. Staff Attorney and Project Associate Billing Rates

"... *Pomerantz charged the Settlement Class billing rates ranging from $325 per hour to $635 per hour. In some cases, attorneys billing as high as $625 per hour were used for first-level document review (the lowest level of review). The Court may wish to inquire into these rates.*" Letter at 5-6.

Cleary Gottlieb calculated the median billing rate for these attorneys to be $450 and the weighted average billing rate to be approximately $466. *See* Cleary Gottlieb Letter at 10. The rates that Class Counsel applied to each of these staff attorneys and project associates correspond to their level of experience and credentials. *See* Lieberman Decl. ¶¶ 399-401 and Ex. 23.

These rates are consistent with rates that firms typically apply in securities litigation, accounting for the special qualifications and enhanced role of the staff attorneys and project associates in this case. *See* Lieberman Decl. ¶¶ 401-04. Moreover, these rates are consistent with rates that Clearly Gottlieb itself charges for its less-senior attorneys and non-attorney staff. For example, in the *In re Modular Space Holdings, Inc.* bankruptcy proceedings, Cleary Gottlieb stated in December 2016 that its "hourly rates for New York office timekeepers," which were "subject to periodic adjustments to reflect economic and other conditions," included $490 per hour for "International Lawyers", $450 for Law Clerks, $445 for Summer Associates, and $305 to $410 for Paralegals (with Associate rates ranging from $555 to $935 and more senior attorneys billing at even higher rates). *In re Modular Space Holdings, Inc.*, No. 16-12825 (Bankr. D. Del. Dec. 29, 2016), Dkt. No. 106 ¶ 26.

Cleary Gottlieb has also explained that the rates it applied in a recent bankruptcy proceeding "are subject to the same client-driven market forces and scrutiny as its other professionals in any of their engagements." *In re Alpha Natural Resources, Inc.*, No. 15-33896, (Bankr. E.D. Va. Sept. 22, 2015), Dkt. No. 507 ¶ 10 (listing hourly rates of $410 per hour for International Lawyers, $375 for Law Clerks, $255 to $345 for Paralegals, and $465 to $785 for Associates). Class Counsel also observes that New York associates who performed due diligence on the Note Offerings undertook some of the very same work tasked to project associates here, namely reviewing board minutes, internal audit reports, compliance documents, analyzing news related to Petrobras, and internal control procedures, all requiring a similar analysis.

Some have argued that one cannot properly compare the billing rates charged by a top-flight law firm such as Cleary Gottlieb to those of plaintiffs' firms such as Class Counsel. This proposition makes little sense. Class Counsel was expected to go head to head with Cleary, Skadden Arps, King & Spalding, and a host of other well-respected white-collar firms representing the Individual Defendants in this sprawling litigation and was clearly outmanned at every stage. Notwithstanding, Class Counsel procured historic results for the Class. Applying lower billing rates for the work performed by Class Counsel compared to defense firms would only further tilt the balance of shareholder and class action litigation on the side of the defendants. Indeed, it would lead to substandard representation and mediocre recoveries. While

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 17

this is the precise intent of corporate aligned interest such as the objectors represented by the Competitive Enterprise Institute, it undercuts the public policy of robust private enforcement of the federal securities laws.

Indeed, for decades the United States Supreme Court (and countless lower courts) have repeatedly and consistently recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.[29]  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

Moreover, although Cleary Gottlieb notes that "[i]n some cases, attorneys billing as high as $625 per hour were used for first-level document review," the project associates, particularly those who previously practiced in Brazil, did important work that was the equivalent of work done by members of the defense team that billed at far higher rates.  For example, an associate from Cleary Gottlieb fluent in Portuguese regularly attended depositions to ensure the accuracy of translated testimony and exhibits.   Project associates working on behalf of the class performed that very same task.  Furthermore, as discussed above, project associates with experience and professional qualifications from Brazil provided Class Counsel with specialized insight into hard-to-find materials related to the Petrobras scandal that were available only in Brazil (and in Portuguese).

The fees in a case that Cleary Gottlieb cites, *Bank of America Corp.*, 318 F.R.D. 19, are consistent with the fees requested here.  In that case, there was no evidence that the "temporary associates" did anything more than "first-cut document review."  *Id.* at 26.  Here, in contrast, project associates performed crucial work that enabled Class Counsel to investigate and understand the voluminous—and largely foreign—materials related to this case.  Moreover, even after accounting for this issue, the court in *Bank of America Corp.* awarded attorneys' fees of 12% of the settlement fund (or approximately $41 million).[30]  *Id.* at 27.

---

[29] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 28, 313 (2007); *Herman & McLean v. Huddleston*, 459 U.S. 375, 380 (1983); *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964) (private rights of action under the securities laws are a "necessary supplement to Commission action.").

[30]  The court explained that "[t]his percentage and multiplier is within the range of fees awarded in similar cases in this Circuit."  *Id.*  Class Counsel here seek fees that amount to an even lower portion of the Settlement Amount (9.48%) and a multiplier of 1.78.  These figures are well within the range of fee awards in other securities fraud and antitrust class actions and are consistent with the retainer agreement Class Counsel has with the Court-appointed Lead Plaintiff, with the 1.78 multiplier falling well below the average in class action settlements of similar size.  *See* Memo of Law in Support of Class Counsel's Motion for an Award of Attorneys' Fees at 4-11; Lieberman Decl. ¶¶ 14, 354, 361 and Ex. 15.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 18

## 2. Reliance on Project Associates to Translate Certain Documents

*"The Court might wish to inquire about the decision to charge the Settlement Class for the use of attorneys to provide [translation] services as opposed to lower-cost alternatives."* Letter p.6.

Cleary Gottlieb's concern regarding translation costs is overstated. Project associates did not simply translate documents; they also completed review and analysis of those very documents for relevancy, often tasked to translate "just the relevant portions," a judgment only they could make given the documents were, by definition, in Portuguese. Indeed, it is not clear what process Cleary Gottlieb would have in mind to perform the task. Should the entirety of the 7.5 million pages Petrobras produced have gone out to translation at $66 per page (a rate Class Counsel finds to be wishful thinking when dealing with highly technical documents on larger A4 paper with rushed turnaround times) and then reviewed by English speaking attorneys for content? That process would have resulted in well over $100 million in translation expenses. It was far more efficient to have a Portuguese speaking attorney first review relevant documents for content and then translate the document, or a limited subset thereof, that would to be used by Class Representative's experts and team leaders, in pleadings, during depositions, or in summary judgment briefing.

Further, in our experience, Cleary Gottlieb's suggested $52.50 to $66 per page translation cost is aspirational, at best. By way of example, despite negotiating competitive deals from the three vendors that provided certified translations, one provided a quote of $188.34 per page, or $0.33 per word, for a rush certified translation of excerpts of a key report, a far cry from Cleary Gottlieb's proposed "standard cost." Likewise, other vendors proposed charging at least twice and sometimes three times Cleary's proposed cost, depending on the requested turnaround time.

There were other material drawbacks to relying on outside vendors for translation services. An enormous number of documents needed to be translated on-the-go for the benefit of attorneys working on the case who were not fluent in Portuguese. In many instances, crucial documents were translated and immediately imparted to the core team, providing invaluable information for the prosecution of this case. As part of their analysis of Petrobras-produced documents, our team of project associates also drafted short summaries for the documents reviewed, which necessarily required translation. None of this could have been accomplished through outside vendors.

This same urgency for expedited translations was also apparent when Class Counsel took depositions in this case. The majority of the 750 exhibits introduced at depositions required corresponding English translations, as was insisted upon by defense counsel. Due to a tight court schedule, with many depositions double-tracked or scheduled only a few days apart, Class Counsel could not wait weeks for translations from vendors. It would also have posed an administrative nightmare to outsource thousands of documents for translation services in a short period of time, and then track the progress and attach the translations to the original Portuguese documents within the document database.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 19

As discussed in Lieberman Decl. ¶ 153, working with our vendor who maintained the Relativity database, we sought to deploy different forms of translation software, but the results were unreliable. It was apparent that the software was unable to process the context in which Portuguese was being used, or the highly technical nature of the documents made it such that the software-translated work did not accurately reflect the meaning of the text.

When computer-assisted translation tools did not provide fully accurate translations but generated rough translations, project associates would work with the rough translations and, in effect, clean them up. Indeed, Cleary Gottlieb's attention to the costs for project associate translations highlights the efficient nature of Class Counsel's employment of project associates. The cost of $13.7 million in time translating documents at $66 per page, a figure substantially lower than what Class Counsel experienced on average, reflects the amount it would cost to translate approximately 207,000 pages. This is less than 2 percent of the 12 million pages of Portuguese language documents produced by Petrobras and through informal discovery. As such, the use of project associates to translate a fraction of the Portuguese documents was a necessary and reasonable expenditure of time.

### 3. Whether Attorney Time Was Excessive or There is Sufficient Detail in the Time Records

*"In addition to making these overall observations concerning the amount of time billed by staff and project attorneys, and in particular their use to perform significant translation work, we also identified various specific timesheet entries where the Court may wish to inquire as to whether the Settlement Class was properly billed for the attorney time."* Letter at 7.

- *We identified instances in the time sheets where staff attorneys and project attorneys, in between translation and document review assignments, billed full days to activities such as reading Petrobras-related news and the plaintiffs' own pleadings, as well as other tasks that may warrant further inquiry. For example:*

  - *One project attorney spent approximately 23 consecutive billable days reading news articles on Petrobras, on most days purportedly for exactly 8.0 hours or 9.0 hours, totaling approximately 185 hours, see Pomerantz Time Sheets rows 13320–42. See also id. rows 12816–17, 12823, 12825 (35 hours reading updated case news from local and international newspapers); id. rows 16631–61, 16663–67 (over 294 hours spent updating "cast of characters"). Id.*

Class Counsel believes the time entries accurately reflect the actual work performed to review news on the rapidly developing facts in Brazil relevant to the case, and with respect to work done at the request of Class Representatives' damages expert who specifically requested that project associates scour news surrounding disclosure dates and stock price drops. There were hundreds of news articles in Portuguese coming to press each day regarding Lava Jato, and

Plaintiffs' damages experts needed reliable translations of relevant documents in order to assess what information was material, when was it first released to the market, and whether the timing of the release correlated to a decline in the price of Petrobras securities.

Operation Lava Jato was headline news, particularly in Brazil, where such news was being reported daily as hundreds of politicians and dozens of cartel executives were implicated and being arrested. Some were cooperating with prosecutors to varying degrees. Highly relevant breaking news was a daily occurrence, and it was often the case that Brazilian newspapers included links to documents or testimony. Moreover, virtually all the news was in Portuguese. From time-to-time, project associates knowledgeable in the case were tasked with scouring news for relevant information. In so doing, they circulated highly detailed, written news compilations so that non-Portuguese speaking attorneys could stay abreast of Lava Jato related events in Brazil. To ignore the news would have been a disservice to the Class.

Class Counsel also believes time spent building upon a "Cast of Characters" (rows 16631–61, 16663–67) was also appropriate time that benefited the Settlement Class. Such work resulted in a detailed excel file with separate spreadsheets identifying relevant persons, separated into relevant categories (*i.e.*, "Auditors"; "Cartel Members"; "Intermediaries"; "Operators and Money Launderers"; "Petrobras Employees"; "Plea Agreements"; Projects and Refineries" and "Underwriters"). There were hundreds of key names and entities to track, for any number of litigation purposes, including for experts, Class Representatives' attorneys, and for running names through the massive document repository to identify potentially key documents bearing their names.

> o *One project attorney spent seven consecutive days reviewing the Consolidated Third Amended Class Action Complaint for at least 48 hours of time (after it had been filed), see id. rows 10655–61; see also Pomerantz Time Sheets rows 25414–18 (five days spending 50 hours reading Third Amended Complaint); id. rows 12411–13 (four days spending approximately 31 hours reviewing case updates and reading Fourth Amended Complaint). Letter at 7.*

Reviewing the Third Amended Complaint, the Fourth Amended Complaint, and case updates, were necessary and appropriate uses of time for all project associates, including after the complaints were filed. These assignments included binders of material beyond the description contained in the time entries, including the major motions and decisions in the litigation, the cast of characters, motions to dismiss, oppositions thereto, related Orders, highly relevant documents, and important testimonies.

> o *One project attorney spent approximately six straight weeks (approximately 264 hours) working on a spreadsheet apparently cataloguing decisions from the TCU, see id. rows 18960–92. Id.*

The time spent collecting, analyzing and cataloging decisions of the TCU pertaining to Petrobras was critical to litigating this Action. The material was voluminous, highly relevant to

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 21

the central issues in the case, and admissible evidence. Petrobras' contracts are subject to evaluation by the TCU, and the TCU's proceedings became a massive source of auditing and technical analysis of the hundreds of Petrobras contracts implicated in the Lava Jato investigation. Dr. Henning made ample use of translated versions of these TCU materials when preparing his expert report.[31]

> o *On November 26 and 27, 2015 (Thanksgiving and the following day), a project attorney billed eight hours each day at $450 per hour, but listed only "[o]ffice closed" as the work description, see id. rows 21317–18.* Letter at 7.

These entries are plainly the result of an errant clerical error where the two entries should have been recorded as holidays (compensation included paid holidays) but were inadvertently recorded as billable time. They amount to a de minimis $7,200 and have been removed from the lodestar.

> o *On June 28, 2016, a project attorney billed 10 hours attending an International Corporate Governance Network event, see id. row 23902. Id.*

Time spent participating for the conference was necessary and appropriate. Throughout the litigation, Pomerantz engaged in an outreach campaign to convince institutional investors to remain in the Class and thereby maintain the cohesion of this litigation. This advice was clearly beneficial to these Class members in light of the significant premium earned by Class members compared to those Individual Action members who settled their claims. Lieberman Decl. ¶ 364.

> o *One project attorney spent approximately 52 hours "renaming" documents on Relativity, see id. rows 18929–33, 18936–37. Letter at 7.*

The time spent by project associates cataloging and organizing documents produced by Petrobras where there was nonexistent or minimal metadata was a necessary and appropriate use of time. The searching and coding functionality of the document review platform was significantly impeded by numerous production sets lacking proper metadata. *Id.* n.31. As the vast majority of these documents were in Portuguese, it was also necessary for project associates to tackle this meticulous task.

> • *In certain instances, time sheets revealed occasions when individual attorneys appeared to spend a large number of hours translating a single document or small portion of a document. For example:*
>
> > o *The time sheets reflect that it took one project attorney 50 hours to translate a single article on Operation Lava Jato. See, e.g., Pomerantz Time Sheets rows 10400–06. Letter at 8.*

---

[31] The spreadsheet referenced here is attached as Exhibit 8 to the Lieberman Declaration.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 22

Class Counsel believes these time entries do not accurately reflect the actual work that was performed. However, because we are unable to identify the specific article translated or the related English translation (from among hundreds of news article translated from Portuguese to English), such entries have been removed from the lodestar total.

> o *Another project attorney spent 65 hours (or six and a half hours per page) to translate 10 pages. See id. rows 25442–48. Id.*

Class Counsel believes these time entries accurately reflect the actual work performed, some pages were extremely dense. Nevertheless, Class Counsel has removed these time entries from the total lodestar.

> • *We also noted several instances of Pomerantz attorney time (i.e., that of partners, counsel, and associates) of which the Court might wish to inquire:*

> o *A partner billed 23 consecutive billable days and over 200 hours (or $186,850) preparing for and handling the Second Circuit oral argument on November 2, 2016. See Pomerantz Time Sheets rows 383–405. Id.*

The time referenced was not billed in 23 consecutive days, but rather was billed between September 14 and November 2, 2016. Such preparation involved analyzing and understanding hundreds of pages of briefing that cited to hundreds of authorities, all supported by over 10,000 pages of a Joint Appendix, as well as conducting a significant amount of legal research. The oral argument at issue was one of the most significant cases relating class action litigation in the past several years. As the Second Circuit decision reflects, the preparation proved to be extraordinarily valuable and was time very well spent on behalf of the Settlement Class.

Cleary Gottlieb must understand that time had to be spent preparing for oral argument. Given the large record, complex issues, and critical bearing on the case, Class Counsel does not believe the time was excessive by any measure.

> o *Over a period of time from August 6, 2015, to October 1, 2015, a partner regularly billed time organizing, preparing for, and conducting potential client outreach ahead of a Council of Institutional Investors conference at which Pomerantz apparently discussed this litigation, see id. rows 1410– 11, 1417–18, 1420–27,1433, 1437–42, 1444. Id.*

The referenced time entries are "block" entries with significantly more tasks performed than "outreach ahead of a Council of Institutional Investors" ("CII") conference that Cleary Gottlieb identified. For example:

- "interview with Chris Shale," a USS employee (row 1410);
- "email from Cleary Gottlieb re: responses to 30b6 notice" (row 1417);
- "dates received from USS re: dates to avoid for deposition" (row 1420);

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 23

- "Read defendant Theo Marshall Helms' response to LP request for production of documents; read underwriters' first set of requests for production of documents; Petrobras' responses to LP first request for production of documents" (row 1422);
- "email exchange with USS re: clarification of issues arising from TAC, namely, how TAC relates to SAC, differences in author notes, final proofread" (row 1423);
- "Review redline draft of amended complaint filed; review mediation email from JL to team re: Petrobras approach to mediation and two potential mediators, review combined summary of ADR and bond damages, email Daniel Summerfield re: corporate governance reforms; email exchange with USS re: organize call to discuss mediation approach by Petrobras . . . read email from JL and multi exchanges re: corporate governance reform; email exchange with USS re: discussion of mediation suggested by defendants and need to discuss date for mediation." (row 1426).

Further, many block entries reflect de minimis time: (*see, e.g.*, 0.75 hours - row 1411; 2.75 hours - rows 1417-18; 1.0 hour - row 1420; 1.25 hours - row 1421; 2.0 hours row 1425).

As described above, the purpose of preparing for and attending CII was to meet with and present to potential opt out plaintiffs on the many reasons to remain in the Class Action as opposed to filing a separate individual action. Class Counsel prepared a detailed memo provided to potential opt outs, and such persuasion was ultimately helpful reduce the number of institutional investors who opted out of the Class Action.

> o *An associate billed up to approximately 528 hours on an opposition to Individual Defendant José Sergio Gabrielli's 30-page summary judgment motion, most of which were billed after the case was stayed, see id. rows 4389–4401, 4403, 4405–45. Another associate billed up to 570 hours in connection with motions for summary judgment by Gabrielli and by other Individual Defendants, all of which was entirely incurred after the case was stayed, see id. rows 5145–5228.*

Cleary Gottlieb's observations do not fully capture the gargantuan task that Class Counsel faced. Gabrielli's motion was much more than just a 30-page summary judgment motion. Rather, it was accompanied by two appendices setting forth various statements arguably implicating Gabrielli, three supporting declarations, a 32-page statement of material facts pursuant to Local Civil Rule 56.1, and 30 exhibits. In effect, Gabrielli had converted summary judgment into a motion *in limine* to try and prevent inculpating statements from being introduced against him at trial. *See* ECF Nos. 620, 661, 666-67, 669, 671.

In response, Class Counsel prepared a 25-page brief in opposition to Gabrielli's motion for summary judgment, with two appendices, supported by a 188-page counterstatement of material facts pursuant to Local Civil Rule 56.1, attaching 205 exhibits. Defeating Gabrielli's motion for summary judgment was not only imperative, Class Counsel viewed it as a bell weather to what evidence the Court would likely admit at trial.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 24

*As part of our markup, we also sampled approximately 21,000 rows to determine whether there was sufficient information for us to provide an observation to the Court and in some instances found that there was not. For example:*

- *One project attorney billed approximately 584 hours as largely "Review Documents and News updates," without any further elaboration, see id. rows 17510–29, 17531–54, 17557–70.*

The time spent by project associates searching for new information generated by the Lava Jato investigation and relevant to this litigation was a necessary and appropriate use of time. Class Counsel obtained relevant information, admissible evidence, and witness leads through the extensive and organized process. This process often involved cross-checking the Relativity database for evidence of reported information or versions of the same public documents that were produced in this litigation.

- *A counsel billed up to 329 hours over the course of approximately two months working on motions in limine (while the case was stayed), without clearly indicating the number of such motions, see id. rows 2093–2115, 2123–2139, 2165–66.*

As described above, motions *in limine* referenced here include, *inter alia*, motions to exclude: (i) the argument that Petrobras was a victim; (ii) evidence concerning certain information related to Class Representatives; (iii) introduction of class-wide aggregate damages (as opposed to per share inflation); (iv) any reference to Plaintiffs' damage expert's prior career as a professional football player (Dr. Nye played nine years as right guard with the Dallas Cowboys); (v) any reference to Fonseca's Brazilian labor litigation against Petrobras; and (vi) all or portions of the purported expert testimony of Cagatay Koç, Christopher James and Rene Stulz.

- *Similarly, a project attorney billed 40 hours to "Edit Assignment #1," see id. Rows 18612–15.*

The time spent by project associates on the initial set of assignments was necessary and appropriate. Large sets of documents obtained by investigators in Brazil and downloaded by project associates in New York needed to be organized, analyzed, translated, and summarized at the outset of the review process and before Defendants' produced any documents. Assignment No. 1 was a subset of various assignments provided to project associates in August 2015, and it involved a compilation of informal discovery material that needed to be analyzed and, in some cases, relevant portions were summarized into English for non-Portuguese speaking attorneys, including partners, of counsel, and associates working on the case.

- *A project attorney billed at least 41 hours to "Read Assignment," see id. rows 20718–22.*

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 25

Class Counsel believes these time entries do not accurately reflect the actual work performed but they have been removed from the lodestar total.

- *A project attorney billed 184 hours to "Relativity Document Review," without providing batch numbers or volume of documents reviewed, see id., rows 24521–24540.*

These time entries are block billed and the work performed was a necessary and appropriate use of time. The document review process successfully analyzed millions of pages of documents on an extremely compressed timeframe. Most of the time entries questioned were in February 2016, as Class Counsel was preparing for the wave of 46 fact depositions that Class Counsel took or defended during the 12 weeks that followed.

### B. Labaton

The issues raised by Cleary Gottlieb regarding certain time entries of Labaton Sucharow ("Labaton") staff attorneys are also without basis.[32] Cleary Gottlieb notes that Labaton staff attorneys billed approximately 728 hours ($416,765) prior to September 30, 2015, when Defendants began their production in response to Plaintiffs' first request for production of documents.

As detailed in their time entries, the staff attorneys' work during this time period primarily relates to (i) learning the legal and factual issues of the case by reviewing, *inter alia,* the Second and Third Consolidated Amended Complaints and the briefing on Defendants' Motion to Dismiss (218 hours); (ii) review and redaction of documents produced by the Hawaii Employees Retirement System and four of its investment managers (219 hours); and translation, summary and analysis of highly relevant Portuguese documents that were publicly available (290 hours), including:

As detailed in their time entries, this work primarily relates to (i) learning the legal and factual issues by reviewing, *inter alia,* the Second and Third Consolidated Amended Complaints and the briefing on Defendants' Motion to Dismiss (218 hours); (ii) review and redaction of documents produced by the Hawaii Employees Retirement System and four of its investment managers (219 hours); and translation, summary and analysis of highly relevant Portuguese documents that were publicly available (290 hours), including:

- reports issued in connection with Brazilian state and federal investigation commissions;
- Brazilian criminal and civil court transcripts;
- Brazilian federal tax investigation reports;

---

[32] Other than with respect to work done during the stay, Cleary Gottlieb does not raise any questions regarding the time billed by Labaton partners, of counsel, associates and paralegals.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 26

- publicly available deposition transcripts of key figures involved in the Lava Jato scandal;
- charging documents issued by the Brazilian federal prosecutor's office;
- internal Petrobras documents made public by the Brazilian federal prosecutor's office;
- Brazilian federal police reports; and
- investigative articles and news reports.[33]

As such, all the time Labaton billed prior to September 30, 2015, was both necessary and appropriate.

Cleary Gottlieb also notes that Labaton professionals billed a total of 528.3 hours ($296,203) from August 3, 2016 to July 7, 2017, when the litigation was stayed. First, none of these hours was billed by a staff attorney. Moreover, a review of Labaton time records for that period shows:

(i) three Labaton partners billed a total of 127.2 hours working on Plaintiffs' response to Defendants' appeal of the Court's class certification ruling (95.0 hours), evaluating opt out settlements and the draft PwC settlement and analyzing Class damages for Section 11 claims (16.1 hours), analyzing the law related to a parallel Brazilian arbitration (13.1 hours), and meeting with a potential whistleblower (3.0 hours);

(ii) three Labaton associates billed at total of 176.5 hours working on Plaintiffs' response to Defendants' appeal of the Court's class certification ruling (95.9 hours), evaluating opt out settlements and the draft PwC settlement and analyzing Class damages for Section 11 claims (6.6 hours), analyzing the law related to a parallel Brazilian arbitration procedure (45.8 hours), and finalizing Plaintiffs' opposition to the Underwriter Defendants' summary judgment motion (28.2 hours);

(iii) six Labaton paralegals billed a total of 213 hours assisting in responding to Defendants' appeal of the Court's class certification ruling (141.3 hours), finalizing Plaintiffs' opposition to the Underwriter Defendants' summary judgment motion (48.4 hours), and researching opt outs and organizing the case files (23.3 hours); and

(iv) a Labaton of counsel and two analysts billed a total of 11.6 hours on various tasks in support of the work described above.

As such, all the time Labaton billed during the stay was both necessary and appropriate.

---

[33] Other than specific projects related to preparing for depositions taken by Labaton attorneys, all document review and translation work by Labaton staff attorneys were directly assigned by Lead Counsel.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 27

In addition, Cleary Gottlieb stated that the time spent on certain translating work done by four Labaton staff attorneys "raised further questions." The time at issue amounts to 376 hours, or 1.9% of the 19,700 hours billed by Labaton professionals.

As an initial point, we emphasize that all Labaton staff attorneys were directly supervised by Labaton associates or partners to ensure that the staff attorneys' assignments were completed both efficiently and with high quality work product. Upon examination of Labaton's time records, we believe that all the questioned entries were fully appropriate.[34]

### 1.  Labaton Time Sheets.xlsx row 2263

Staff Attorney Barry Kaplan billed 10 hours with the narrative "Translated Brazilian economic reporter's article on Petrobras's offshore drilling project." The article in question, "O papel da Petrobras no governo Lula" by Graziella Valenti, was published in *Valor Econômico*, on October 28, 2015. The article was approximately 3,500 words in length — 14 pages in the translation. Moreover, the work product for the 10 hours also included a summary of factual and legal points drafted for use in depositions.

### 2.  Labaton Time Sheets.xlsx row 3358

Staff Attorney Nitoya Munson billed 9 hours with the narrative "Translated a news article about Petrobras' selling off its gas pipeline assets (potentially) to Canadians and the perceived ramifications of doing so." The article is "Petrobras pode obter até US$ 6 bi com venda de dutos de gás da TAG" by Cláudia Schüffner and Camila Maia, *Valor Econômico*, dated December 2, 2016. Ms. Munson's work product exceeded 2,800 words and included both a summary of legal points relevant for use in depositions and details from translations of related *Valor Economico* articles from February 22, 2016, March 4, 2016, May 23, 2016, and September 22, 2016.

### 3.  Labaton Time Sheets.xlsx rows 2199–2201, 2205–2211

Staff Attorney Barry Kaplan billed 90.7 hours over the course of 10 days for reviewing and translating the testimony of whistleblower Alberto Youssef in Brazilian federal court. The testimony in question comprised over 230 pages.

### 4.  Labaton Time Sheets.xlsx rows 3119–3124, 3129–3132

Staff Attorney Vasili Hernandez billed 86 hours over the course of 10 days reviewing and translating a "Brazilian statute regulating the bidding and contracting process for the execution of public projects by private companies and/or companies of mixed capital." The statute is approximately 18,000 words, and the final work product was 51 pages. In addition to the translation, Mr. Hernandez's drafted a summary of the regulatory framework applicable for

---

[34] As background, all translation work done by Labaton staff attorneys was assigned by Lead Counsel and directly supervised by a Labaton attorney who was born in Brazil and fluent in Portuguese.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 28

questioning in depositions and also included references to relevant documents that he had previously reviewed.

### 5.  Labaton Time Sheets.xlsx rows 1992–98, 2002–09, 2014–17

Staff Attorney Maritza Bolano billed 180.3 hours over the course of 19 days for "translating the testimony of 'several informants.'"  The testimony at issue was more than 32,000 words, and the final work product was over 75 pages.  Moreover, all the entries indicate that Ms. Bolano not only translated the testimony but analyzed it as well. And three of the entries include descriptions of document review work in addition to the translating work at issue.  *See* Labaton Time Sheet Entry lines 2014, 2016 and 2017.

As such, all the time billed for translating work by Labaton staff attorneys was both necessary and appropriate.

### C.  Motley Rice

With respect to Cleary Gottlieb's suggestion that an excessive amount of time was devoted to document review or translation, we respectfully disagree.  This document-intensive case was especially demanding because many documents were produced in Portuguese, thereby requiring time-consuming translation and specialized reviewers.  Accordingly, Class Counsel believes the time entries were overwhelmingly reasonable and made with sufficient particularity. That said, Motley Rice reviewed the "small handful of instances" that Cleary Gottlieb identified, specifically the approximately 48 hours a project attorney spent translating a newspaper article. *Id.* at 11 (citing Motley Rice Petrobras Time Sheets.xlsx rows 245-57).  While Motley Rice believes the work was performed that generated a corresponding benefit for the Settlement Class, Motley Rice will omit those "approximately 48 hours" from the fee request.

Finally, Defendants observe that "Motley Rice staff and project attorneys billed approximately 167 hours ($66,690) before September 30, 2015, when the Petrobras Defendants sent their first response to the Plaintiffs' first request for production."  *Id.* at 10.  This is both unsurprising and entirely proper.  Motley Rice's role in the case was not limited to tasks pertaining to the Petrobras Defendants' document requests to its client (Union Asset Management Holding AG ("Union")), but rather included work on the amended complaint (ECF No. 109) and motion to dismiss briefing at the direction of Lead Counsel.

Motley Rice attorneys and staff also spent time analyzing Union's funds' trading data and corresponding with Union's representatives about the case.  The fact that "Motley Rice did not submit time entries after February 2016 and therefore billed no time to the Settlement Class during the year or so in which the litigation was stayed" reflects that Motley Rice's involvement ended after Union was dismissed from the action and further demonstrates that Motley Rice did not engage in unnecessary or duplicative efforts. *Id.* 10-11.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 29

### D. Conclusion

Cleary Gottlieb has raised questions regarding the lodestar of Class Counsel, the overwhelming majority of which we believe has been adequately addressed herein.[35] Moreover, to address rare instances where Class Counsel was unable to justify certain time entries, Class Counsel agrees to strike them. Attached hereto is an amended lodestar report, reducing Class Counsel's lodestar from $159,496,169.50 to $158,923,426.50. *See* Exhibit A attached hereto. The revised lodestar would yield a 1.79 multiplier if Class Counsel's fee award is granted.

Indeed, even if Cleary Gottlieb had identified a significant amount of overbilling by Class Counsel (they did not), the 9.48% fee request is nevertheless eminently reasonable. For example, as detailed above, $49.2 million of the lodestar incurred was by a core group of 32 attorneys who played a substantial role in leading the prosecuting this action. It is difficult to credibly maintain that their work was not for the prosecution of this Action. As to the remaining $110 million in lodestar, it is reasonable for the "less core" lodestar to be at or around double of the "core lodestar" given the nearly 22 million pages of publicly available and produced documents, mostly in Portuguese, that were reviewed in this matter.

Indeed, as set forth in the Lieberman Declaration, the lodestar incurred in this Action falls well within the range of lodestars in other mega class actions.[36] While one could quibble with the number of reviewers utilized and the robustness of the time entries, the question remains: Why should this class have had less resources committed to this Action than *Tyco* or *Countrywide*? Enforcing such a result would discourage the full-throated, no holds barred and no resource spared litigation posture that led to the historic recovery achieved by Class Counsel.

Nevertheless, if one were to assume that as much as *half* of the "non-core" project associate time was overbilled, a strained assumption, Class Counsel's lodestar would be $104,461,062, and its requested multiplier would be 2.7, well within the range of acceptable multipliers in this Circuit, and within the range of multipliers awarded by this Court.[37] Similarly, assuming the Court applies a lower billable rate of $275 or even as low as $225 per project attorney, the requested fee would yield multipliers of 2.45 and 2.73 respectively, well within the range of awards in this Circuit, and in other mega class actions.

Indeed, the heightened subjectivity of finding the "true lodestar" in class actions militates strongly in favor of applying a percentage of recovery. Here, application of a percentage of recovery would be even more appropriate in light of the fee agreement negotiated between Lead Plaintiff and Class Counsel. Courts throughout the country, as well as legal scholars have

---

[35] Enclosed herein is a CD containing a markup of the Pomerantz, Labaton and Motley Rice time sheets Cleary Gottlieb previously reviewed. Class Counsel has added a new column indicating time that would be removed from the total lodestar, and another column responding to issues Cleary Gottlieb flagged.

[36] Lieberman Decl. Ex. 15.

[37] *See* Memorandum of Law in Support of Class Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses ("Fee Brief"), ECF No. 792 at 10-11.

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 30

advocated strongly for creating a presumption that an *ex ante* agreement between an institutional investor and class counsel constitutes an appropriate fee.[38]

This presumption should be given more weight when the Court has been provided with a copy of the agreement at the outset of a litigation. *See* Fee Brief at 18, n.7. Such deference to an *ex ante* fee agreement is particularly appropriate in this case where USS actively negotiated the fees with Class Counsel, employing outside independent counsel to advise regarding an appropriate fee amount. Lieberman Dec. ¶ 21. These efforts bore significant fruit, resulting in a retainer agreement that provided for one of the lowest fees of competing Lead Plaintiff movants. *Id.* ¶ 24. Oversight of counsel's attorney fees is one of the key functions of a Lead Plaintiff. There would be little purpose for USS to have retained outside counsel to advise it on negotiating a competitive rate with Class Counsel if that rate can be so easily upended *post hoc* by a court.

Moreover, deference to an *ex-ante* agreement would provide counsel with an important degree of certainty when litigating a high-risk, bet the company/firm litigation. To have class counsel expend overwhelming resources in litigating an extremely complex case against the best lawyers in the country, only to advise it at the end of the case that the underlying cost/benefit assumptions were completely off base due to unknown *post hoc* determinations, would have the unintended consequence of chilling significant investment in large complex actions.

Even worse, counsel would have no objective confirmation that its efforts at maximizing the recovery for the class yielded it a higher fee, throwing into disarray the alignment of interests between class members and their counsel, which a contingency fee is meant to encourage. Indeed, it is difficult to find any industry whereby compensation is determined after the goods are delivered or services performed. Rational financial and risk assessment would be impossible. It would be akin to an insurance regulator setting premium rates three and a half years after the insurance policies were issued. Class action litigation, with the enormous risk and expenditures involved, should be no exception.

---

[38] *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133-34 (2d Cir. 2008) (district courts are "expect[ed] to give serious consideration to negotiated fees [between lead plaintiffs and their counsel]"); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 356 (S.D.N.Y. 2005) ("when class counsel in a securities lawsuit have negotiated an arm's-length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close supervision of the litigation, the court should give the terms of that agreement great weight"); *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-cv-1825 (NGG) (RER), 2010 WL 2653354, at *4 (E.D.N.Y. June 24, 2010) ("The fact that this fee request is the product of arm's-length negotiation between Lead Counsel and the lead plaintiff is significant"); *In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001) ("under the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel"); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004) ("in class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable").

Hon. Jed S. Rakoff, U.S.D.J.
May 18, 2018
Page 31

In light of the foregoing, Class Counsel submits that the lodestar is proper and that its requested fee is an appropriate award for its efforts in achieving a historic settlement.

Respectfully submitted,

Jeremy A. Lieberman

Cc:    Defense Counsel

Enclosure (by hand):

DVD containing marked up copies of time sheets of Pomerantz LLP, Labaton Sucharow LLP, and Motley Rice LLC.

# Exhibit A

**EXHIBIT 1**

*In re Petrobras Securities Litigation*
**14-CV-9662 (JSR)**

**POMERANTZ LLP**

**TIME REPORT**

**From inception through April 17, 2018**

| NAME | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|
| **Partners** | | | |
| Lieberman, J. | 3,050.45 | $925.00 | $2,821,666.25 |
| Gross, M. | 878.50 | $1,000.00 | $878,500.00 |
| Dahlstrom, P. | 139.80 | $995.00 | $139,101.00 |
| Bruckner, G. | 0.60 | $835.00 | $501.00 |
| Silverman, J. | 43.70 | $820.00 | $35,834.00 |
| Goldstein, J. | 125.80 | $820.00 | $103,156.00 |
| Smollar, L. | 8.25 | $820.00 | $6,765.00 |
| Tuccillo, M. | 33.40 | $775.00 | $25,885.00 |
| Gilmore, E. | 3,554.60 | $725.00 | $2,577,085.00 |
| Wernke, M. | 11.30 | $725.00 | $8,192.50 |
| Pafiti, J. | 1,171.03 | $700.00 | $819,721.00 |
| | | | |
| **Of Counsel** | | | |
| Szydlo, B. | 2,377.40 | $765.00 | $1,818,711.00 |
| Kehoe, J. | 3,735.50 | $750.00 | $2,801,625.00 |
| Weinrib, T. | 10.50 | $725.00 | $7,612.50 |
| Carino, M. | 100.10 | $685.00 | $68,568.50 |
| Grunfeld, M. | 187.60 | $675.00 | $126,630.00 |
| | | | |
| **Associates** | | | |
| Kurtz, A. | 3,527.52 | $705.00 | $2,486,901.60 |
| Tyner, S. | 29.30 | $645.00 | $18,898.50 |
| Weiswasser, S. | 3,791.80 | $625.00 | $2,369,875.00 |
| Moehlman, M. | 4,946.25 | $625.00 | $3,091,406.25 |
| Ludwig, L. | 1.60 | $625.00 | $1,000.00 |
| Dell, J. | 108.50 | $575.00 | $62,387.50 |
| Gorrie, M. | 5,178.30 | $575.00 | $2,977,522.00 |
| Adams, S. | 3.50 | $565.00 | $1,977.50 |
| Nematzadeh, J. | 2,520.75 | $565.00 | $1,424,223.75 |

| NAME | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|
| Sobers, J. | 3,171.95 | $510.00 | $1,617,694.50 |
| McConville, F. | 93.00 | $465.00 | $43,245.00 |
| Goldstein, M. | 218.90 | $360.00 | $78,804.00 |
| Chang, H. | 3,316.20 | $350.00 | $1,160,670.00 |
| Berger, D. | 409.00 | $300.00 | $122,700.00 |
| | | | |
| **Staff Attorneys** | | | |
| Perrone, L. | 478.00 | $625.00 | $298,750.00 |
| Souza, A. | 3,792.55 | $625.00 | $2,370,343.75 |
| Salley, R. | 2,732.80 | $625.00 | $1,708,000.00 |
| Fernandes Levi, M. | 5,111.90 | $550.00 | $2,811,545.00 |
| Schiffer, F. | 2,628.00 | $550.00 | $1,445,400.00 |
| | | | |
| **Project Attorneys** | | | |
| Dean, J. | 2,167.75 | $635.00 | $1,376,521.25 |
| Meskelis, W. | 2,507.50 | $625.00 | $1,567,187.50 |
| Sherman, H. | 781.50 | $625.00 | $488,437.50 |
| Guglielmelli, J. | 608.00 | $625.00 | $380,000.00 |
| Azevedo. C. | 1,734.00 | $625.00 | $1,084,187.50 |
| Crain, C. | 1,799.50 | $625.00 | $1,124,687.50 |
| Sosa Marquez, M. | 1,915.80 | $550.00 | $1,053,690.00 |
| Ocasio, M. | 760.00 | $550.00 | $418,000.00 |
| Graham, M. | 2,191.05 | $550.00 | $1,205,077.50 |
| Barcarcel, S. | 268.50 | $550.00 | $147,675.00 |
| Ocriciano, A. | 2,474.60 | $550.00 | $1,361,030.00 |
| Lattea, F. | 1,778.77 | $550.00 | $978,323.50 |
| Lucente, J. | 1,629.60 | $550.00 | $896,280.00 |
| Memnon, C. | 696.00 | $550.00 | $382,800.00 |
| Aquino, A. | 1,160.75 | $550.00 | $638,412.50 |
| Penson, L. | 1,842.50 | $550.00 | $1,013,375.00 |
| Rickman, J. | 2,362.75 | $550.00 | $1,299,512.50 |
| Dos Santos, T. | 2,357.15 | $550.00 | $1,296,432.50 |
| Condini, A. | 3,815.58 | $550.00 | $2,098,569.00 |
| DePhillips, S. | 631.40 | $550.00 | $347,270.00 |
| Wood, S. | 2,223.00 | $550.00 | $1,222,650.00 |
| Gallego, E. | 1,765.50 | $550.00 | $971,025.00 |
| Sherman, L. | 1,657.25 | $550.00 | $911,487.50 |
| Iguina, C. | 2,117.25 | $550.00 | $1,164,487.50 |
| Borges, D. | 2,280.90 | $550.00 | $1,254,495.00 |
| Jose, M. | 906.45 | $550.00 | $498,547.50 |
| Menezes, J. | 1,858.00 | $550.00 | $1,021,900.00 |
| Mackey, M. | 1,966.20 | $550.00 | $1,081,410.00 |
| Martins, D. | 906.85 | $550.00 | $498,767.50 |

| NAME | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|
| Naranjo, L. | 1,147.00 | $550.00 | $630,850.00 |
| Nebot Alonso, A. | 1,170.00 | $550.00 | $643,500.00 |
| Newman, Norvella | 667.06 | $550.00 | $366,883.00 |
| Campos-Rocha, N. | 1,985.50 | $550.00 | $1,092,025.00 |
| Parente, M. | 2,328.36 | $550.00 | $1,280,598.00 |
| Pollard, C. | 1,854.00 | $550.00 | $1,019,700.00 |
| Rodriguez, J. | 293.50 | $550.00 | $161,425.00 |
| Santos-Tricoche, R. | 934.00 | $550.00 | $513,700.00 |
| Wasung, P. | 1,191.50 | $550.00 | $655,325.00 |
| Espindola, M. | 2,693.25 | $550.00 | $1,481,287.50 |
| Lanza, D. | 2,748.00 | $550.00 | $1,511,400.00 |
| Duverger, F. | 1,485.00 | $550.00 | $816,750.00 |
| Friend, M. | 758.00 | $550.00 | $416,900.00 |
| De la Cruz, J. | 2,376.30 | $550.00 | $1,306,965.00 |
| Freund, A. | 2,331.30 | $550.00 | $1,282,215.00 |
| Chaves, M. | 741.00 | $550.00 | $407,550.00 |
| Trieff, D. | 1,537.50 | $550.00 | $845,625.00 |
| Rudman, A. | 453.20 | $550.00 | $249,260.00 |
| Braswell, M. | 2,002.45 | $550.00 | $1,101,347.50 |
| Sidi, S. | 1,249.25 | $550.00 | $687,087.50 |
| Paternoster, M. | 638.00 | $550.00 | $350,900.00 |
| Valenti, R. | 1,604.50 | $550.00 | $882,475.00 |
| Barros, A. | 2,133.65 | $550.00 | $1,173,507.50 |
| Neu-Stoppelman, M. | 1,249.00 | $525.00 | $655,725.00 |
| Barros, I. | 1,105.10 | $450.00 | $497,295.00 |
| Guadalupe Baerga, A. | 612.50 | $450.00 | $275,625.00 |
| Oliveira, C. | 2,135.00 | $450.00 | $960,750.00 |
| Herrera, J. | 2,097.00 | $450.00 | $943,650.00 |
| King, S. | 367.90 | $450.00 | $165,555.00 |
| Klein, A. | 2,443.60 | $450.00 | $1,099,620.00 |
| Nascimento, J. | 1,109.00 | $450.00 | $499,050.00 |
| Nemecek, M. | 2,065.00 | $450.00 | $929,250.00 |
| Jaffe, A. | 190.00 | $450.00 | $85,500.00 |
| Conrad, S. | 1,075.00 | $450.00 | $483,750.00 |
| Rodriguez, H. | 1,036.00 | $450.00 | $466,200.00 |
| Schiappa, M. | 1,871.10 | $450.00 | $841,995.00 |
| Villagra, H. | 437.50 | $450.00 | $196,875.00 |
| Vivo, K. | 389.75 | $450.00 | $175,387.50 |
| DuBois, D. | 2,124.05 | $450.00 | $955,822.50 |
| Elayan-Martinez, A. | 1,829.10 | $450.00 | $823,095.00 |
| Froes-Howard, R. | 1,501.00 | $450.00 | $675,450.00 |
| Davila, G. | 228.00 | $450.00 | $102,600.00 |
| De Jesus, L. | 1,672.00 | $450.00 | $752,400.00 |

| NAME | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|
| Sriken, L. | 2,994.50 | $450.00 | $1,347,525.00 |
| Favila, M. | 190.00 | $450.00 | $85,500.00 |
| Bastos, C. | 1,749.50 | $450.00 | $787,275.00 |
| Chaves, A. | 939.92 | $450.00 | $422,964.00 |
| De Jesus, F. | 2,597.32 | $450.00 | $1,168,794.00 |
| Vazquez Cognet, J. | 1,846.00 | $450.00 | $830,925.00 |
| Ferreiro, M. | 1,034.15 | $450.00 | $465,367.50 |
| Villacreces, F. | 2,090.50 | $450.00 | $940,725.00 |
| Gallagher, S. | 1,952.50 | $450.00 | $878,625.00 |
| Gomez, L. | 1,920.00 | $450.00 | $864,000.00 |
| Steiner, A. | 292.50 | $450.00 | $131,625.00 |
| Small, H. | 1,042.50 | $450.00 | $469,125.00 |
| Solot, L. | 2,087.50 | $450.00 | $939,375.00 |
| Prado, J. | 2,278.25 | $450.00 | $1,025,212.50 |
| Bates, A. | 270.30 | $450.00 | $121,635.00 |
| Ampudia, R. | 1,725.25 | $450.00 | $776,362.50 |
| Hosen, M. | 2,384.50 | $450.00 | $1,073,025.00 |
| Ortiz, R. | 239.50 | $450.00 | $107,775.00 |
| Neto, O. | 2,554.50 | $450.00 | $1,149,525.00 |
| Rivera, S. | 309.25 | $450.00 | $139,162.50 |
| Leal, B. | 129.25 | $450.00 | $58,162.50 |
| Lee, E. | 1,665.20 | $450.00 | $749,340.00 |
| Licandro, I. | 394.00 | $450.00 | $177,300.00 |
| Luce, P. | 388.25 | $450.00 | $174,712.50 |
| Malphurs, J. | 1,702.00 | $450.00 | $765,900.00 |
| Molina, F. | 2,286.00 | $450.00 | $1,028,700.00 |
| Hansen, P. | 722.00 | $450.00 | $324,900.00 |
| Jones, S. | 1,626.50 | $450.00 | $731.925.00 |
| Oliveira-Gonzalez, A. | 1,529.50 | $450.00 | $688,275.00 |
| Moraes, V. | 1,208.50 | $450.00 | $543,825.00 |
| Uwisavye, N. | 287.35 | $450.00 | $129,307.50 |
| Orozco, L. | 2,331.25 | $450.00 | $1,049,062.50 |
| Verdun, A. | 807.00 | $450.00 | $363,150.00 |
| Geller, A. | 1,538.25 | $450.00 | $692,212.50 |
| Oliveira, F. | 2,045.00 | $450.00 | $920,250.00 |
| Lang, N. | 966.60 | $450.00 | $434,970.00 |
| Mayer, M. | 1,987.50 | $450.00 | $894,375.00 |
| Mitchell, J. | 1,848.50 | $450.00 | $831,825.00 |
| Kennedy, S. | 491.00 | $450.00 | $220,950.00 |
| Kim, H. | 286.00 | $450.00 | $128,700.00 |
| Guerra Perez, C. | 1,767.75 | $450.00 | $795,487.50 |
| De Martin, C. | 401.70 | $450.00 | $180,765.00 |
| Ruiz, D. | 1,278.20 | $450.00 | $575,190.00 |

| NAME | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|
| Doyle, D. | 1,964.50 | $450.00 | $884,025.00 |
| Galbes, F. | 2,559.05 | $450.00 | $1,151,572.50 |
| Fuardo, C. | 2,024.25 | $450.00 | $910,912.50 |
| Varajoa, N. | 661.00 | $350.00 | $231,350.00 |
| Fortunato, M. | 866.25 | $350.00 | $303,187.50 |
| Devereaux, J. | 2,030.50 | $350.00 | $710,675.00 |
| Geller, N. | 1,305.00 | $350.00 | $456,750.00 |
| Robinson, D. | 121.00 | $350.00 | $42,350.00 |
| Rodrigues, L. | 2,256.00 | $350.00 | $789,600.00 |
| Rodriguez, G. | 2,209.00 | $350.00 | $773,150.00 |
| Pitarch, R. | 1,745.00 | $350.00 | $610,750.00 |
| Montanez, M. | 750.50 | $350.00 | $262,675.00 |
| Montoya, C. | 2,141.50 | $350.00 | $749,525.00 |
| Lee, I. | 302.74 | $350.00 | $105,959.00 |
| Lopez, D. | 1,938.10 | $350.00 | $678,335.00 |
| Jones, T. | 403.60 | $350.00 | $141,260.00 |
| Bensimon, A. | 835.00 | $350.00 | $292,250.00 |
| Britto, G. | 704.00 | $350.00 | $246,400.00 |
| Alfonso, M. | 2,457.50 | $350.00 | $860,125.00 |
| Barone, S. | 520.44 | $350.00 | $182,154.00 |
| Knighten, C. | 1,913.50 | $350.00 | $669,725.00 |
| Gonzalez, J. | 2,298.25 | $350.00 | $804,387.50 |
| Serrano Mercado, A. | 851.50 | $350.00 | $298,025.00 |
| Clemente, R. | 1,233.00 | $350.00 | $431,550.00 |
| Marin, D. | 502.00 | $350.00 | $175,700.00 |
| McLaughlin, T. | 510.00 | $350.00 | $178,500.00 |
| Johnson, K. | 812.25 | $350.00 | $284,287.50 |
| Condarco, C. | 776.00 | $350.00 | $271,600.00 |
| Aduayi, N. | 1,124.25 | $350.00 | $393,487.50 |
| Guzman, J. | 2,187.50 | $350.00 | $765,625.00 |
| Gastmann, N. | 1,667.00 | $350.00 | $583,450.00 |
| Costa, D. | 2,135.50 | $350.00 | $747,425.00 |
| Lima, J. | 2,204.00 | $325.00 | $716,300.00 |
| Merlini, P. | 1,873.50 | $325.00 | $608,887.50 |
| Meza, E. | 32.00 | $325.00 | $10,400.00 |
| Norris, A. | 752.00 | $325.00 | $244,400.00 |
| Johnson, G. | 901.25 | $325.00 | $292,906.25 |
| Klopman, A. | 1,051.50 | $325.00 | $341,737.50 |
| Israel, R. | 1,238.00 | $325.00 | $402,350.00 |
| Adam, V. | 1,854.50 | $325.00 | $602,712.50 |
| Cassamassina, D. | 2,065.50 | $325.00 | $671,287.50 |
| Holland, M. | 2,142.25 | $325.00 | $696,231.25 |
| Heicklen, A. | 879.50 | $325.00 | $285,837.50 |

5

| NAME | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|
| Risenmay, R. | 1,847.25 | $325.00 | $600,356.25 |
| Saint Vitus, T. | 1,644.00 | $325.00 | $534,300.00 |
| Sena, J. | 1,697.75 | $325.00 | $551,768.75 |
| Urena, Y. | 864.00 | $325.00 | $280,800.00 |
| Fernandes, M. | 1,101.00 | $325.00 | $357,825.00 |
| De Jesus, E. | 624.25 | $325.00 | $202,881.25 |
| Vaklinov, E. | 815.50 | $325.00 | $265,037.50 |
| Lorenzo, J. | 3,066.25 | $325.00 | $996,531.25 |
| | | | |
| **Paralegals** | | | |
| Lo, J. | 439.50 | $305.00 | $134,047.50 |
| Jarmon, R. | 2,018.40 | $305.00 | $615,612.00 |
| Leifer, D. | 9.60 | $305.00 | $2,928.00 |
| Cavener, A. | 650.10 | $275.00 | $178,777.50 |
| | | | |
| **Legal Assistants** | | | |
| Barbosa, A. | 8.60 | $150.00 | $1,290.00 |
| Goodman, E. | 3.25 | $150.00 | $487.50 |
| | | | |
| **Other Timekeepers** | | | |
| R. Reddock | 41.00 | $305.00 | $12,505.00 |
| Lee, K. | 14.00 | $205.00 | $2,870.00 |
| Szydlo, J. | 4.00 | $175.00 | $700.00 |
| | | | |
| **TOTALS** | **298,347** | | **$146,358,547** |