# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE PETROBRAS SECURITIES LITIGATION | Case No. 14-cv-9662 (JSR) **CLASS ACTION** |

## REDACTED REPLY MEMORANDUM OF LAW IN SUPPORT OF (1) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (2) CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

I.  TWO OF THE OBJECTORS LACK STANDING TO OPPOSE THE SETTLEMENT .. 3

    A.  Renewable Carbon Corp. Has No Standing to Object ............................................ 4

    B.  The Bishops Have No Standing To Object ............................................................ 4

II.  A NUMBER OF OBJECTORS HAVE IMPROPER MOTIVES .................................... 4

    A.  CCAF Is A Serial Objector With An Anti-Class Action Agenda .......................... 5

    B.  Joseph Gielata Has A Colorful Past And Has Opposed Other Mega-Settlements To Extract Payments ............................................................................................. 10

    C.  Joshua Furman Is A Serial Objector ................................................................... 12

III.  The Objections Are Meritless ...................................................................................... 14

    A.  The *Morrison* Objection Should Be Rejected ..................................................... 14

    B.  Haynes's Objection That The Settlement Class Cannot Satisfy Rule 23(b)(3)'s Predominance Requirement Is Meritless .............................................................. 23

IV.  The Objectors' Remaining Arguments Are Meritless ................................................... 24

    1.  The Fee Request ................................................................................................ 24

    2.  *Cy Pres* .............................................................................................................. 25

    3.  Breakdown of Lodestar ...................................................................................... 25

V.  Additional Responses Concerning Fees ........................................................................ 25

    1.  Wolf Popper & Almeida's Motion ..................................................................... 26

    2.  KSF's Motion .................................................................................................... 27

    3.  BLBG's Motion ................................................................................................. 28

CONCLUSION ............................................................................................................... 30

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)....................................................................16, 18, 20, 24

*All Indirect Purchaser Actions v. Infineon Techs. AG* (*In re Dynamic Random
  Access Memory Antitrust Litig.*),
  No. M-02-1486-PJH, 2013 U.S. Dist. LEXIS 188116 (N.D. Cal. Jan. 7, 2013) ....................19

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)...................................................................................17, 22

*Barnes v. FleetBoston Fin. Corp.*,
  No. 01-cv-10395, 2006 WL 6916834 (D. Mass. Aug. 22, 2006) .............................................5

*Blessing v. Sirius XM Radio Inc.*,
  507 F. App'x 1 (2d Cir. 2012) .............................................................................8

*Choi v. Tower Research Capital LLC*,
  No. 17-cv-648 (2d Cir. Mar. 29, 2018)...........................................................15, 17

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)..................................................................................1, 2

*City of Livonia Emps.' Ret. Sys. v. Wyeth*,
  No. 07-cv-10329, 2013 WL 4399015 (S.D.N.Y. Aug. 7, 2013).............................................7

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)....................................................................................18

*Cobell v. Salazar*,
  679 F.3d 909 (D.C. Cir. 2012) .................................................................................17

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)......................................................................................2

*Dennis v. Kellogg Co.*,
  No. 09-cv-1786-IEG (WMC), 2013 U.S. Dist. LEXIS 129205 (S.D. Cal. Sept.
  10, 2013) ..................................................................................................7

*Dennis v. Kellogg Co.*,
  No. 09-cv-1786-L, 2013 WL 6055326 (S.D. Cal. Nov. 14, 2013).......................................4, 7

*Dewey v. Volkswagen of Am.*,
  728 F. Supp. 2d 546 (D.N.J. 2010) .............................................................................8

*Dewey v. Volkswagen of Am.*,
   909 F. Supp. 2d 373 (D.N.J. 2012), *aff'd, Dewey v. Volkswagen
   Aktiengesellschaft,* 558 F. App'x 91 (3d Cir. 2014) ................................................5

*Feder v. Elec. Data Sys. Corp.*,
   248 F. App'x 579 (5th Cir. 2007) .........................................................................3

*Garber v. Office of Comm'r of Baseball*,
   No. 12-cv-03704 (VEC), 2017 WL 752183 (S.D.N.Y. Feb 27, 2017)....................5

*Gielata v. Eisenhofer*,
   No. 10-cv-00648-GMS (D. Del. Aug. 3, 2010) ...................................................11

*Gielata v. Eisenhofer*,
   No. 11-cv-442-PB (D.N.H. Nov. 30, 2012)..........................................................11

*Goldberger v. Integrated Resources, Inc.*,
   209 F.3d 43 (2d Cir. 2000)...................................................................................25

*Grant v. Bethlehem Steel Corp.*,
   823 F.2d 20 (2d Cir. 1987).....................................................................................3

*Green v. Wolf Corp.*,
   406 F.2d 291 (2d Cir. 1968).................................................................................23

*In re Aetna UCR Litig.*,
   No. 07-cv-3541, 2013 WL 4697994 (D.N.J. Aug. 30, 2013) ...............................21

*In re Am. Int'l Grp. Sec. Litig.*,
   689 F.3d 229 (2d Cir. 2012).................................................................................15

*In re Animation Workers Antitrust Litig.*,
   No. 14-cv-04062 (N.D. Cal.) ...............................................................................13

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   Nos. MDL 1500, 02-cv-5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6,
   2006) ......................................................................................................................3

*In re APA Assessment Fee Litig.*,
   311 F.R.D. 8 (D.D.C. 2015)..................................................................................19

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001)............................................................................3, 19

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
   No. 05-cv-10240, 2007 WL 2230177 (S.D.N.Y. July 27, 2007)...........................21

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
    No. 02-cv-3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010).............................................21

*In re Gielata*,
    933 A.2d 1249 (Del. 2007) ...........................................................................................11

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ....................................................................................2

*In re Google Buzz Privacy Litig.*,
    No. 11-16642 (9th Cir. July 7, 2011)......................................................................12, 13

*In re Initial Pub. Offering Sec. Litig.*,
    721 F. Supp. 2d 210 (S.D.N.Y. 2010)....................................................................4, 13

*In re Initial Public Offering Sec. Litig.*,
    No. 21 MC 92 (SAS), 2011 WL 3792825 (S.D.N.Y. Aug. 25, 2011).......................................3

*In re Ins. Brokerage Antitrust Litig.*,
    579 F.3d 241 (3d Cir. 2009)........................................................................................25

*In re Law Office of Jonathan E. Fortman, LLC*,
    No. 13-mc-00042 AGF, 2013 WL 414476 (E.D. Mo. Feb. 1, 2013) ...................................5

*In re Online DVD Rental Antitrust Litig.*,
    No. 09-md-2029 (N.D. Cal.) .........................................................................................12

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) .......................................................................................8

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
    No. 05-md-1720 (E.D.N.Y Oct. 20, 2005) .........................................................12, 22

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*,
    827 F.3d 223 (2d Cir. 2016).........................................................................................22

*In re Petrobras Securities Litigation*,
    862 F.3d 250 (2d Cir. 2017)..............................................................................15, 23, 24

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
    461 F. Supp. 2d 383 (D. Md. 2006) ...........................................................................13

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
    No. 07-cv-05634-CRB (N.D. Cal. July 13, 2015) ......................................................10

*In re Tyco, Int'l, Ltd. Multidistrict Litigation*
    (D.N.H. Aug. 23, 2002) .............................................................................................11

*In re UnitedHealth Grp. Inc. PSLRA Litig.*,
   643 F. Supp. 2d 1107 (D. Minn. 2009) ...............................................................12

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   No. C-07-6140 EMC, 2014 U.S. Dist. LEXIS 20044 (N.D. Cal. Feb. 18, 2014) ...................19

*Lonardo v. Travelers Indem. Co.*,
   706 F. Supp. 2d 766 (N.D. Ohio 2010) .................................................................7

*Maley v. Del Glob. Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ..................................................................21

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010) ............................................................................ *passim*

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ..............................................................................22, 23

*Pappas v. Naked Juice Co. of Glendora*,
   No. 14-55023 (9th Cir. Jan. 7, 2014) .............................................................12, 13

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
   No. 08-cv-42, 2013 WL 4525323 (E.D.N.Y. Aug. 27, 2013) ..............................................2

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) .....................................................................19, 25

*Rodriguez v. W. Publ'g Corp.*,
   No. 05-cv-3222 (C.D. Cal. Apr. 29, 2005) ..............................................................12

*Schlesinger v. Ticketmaster*,
   No. BC304565 (L.A. Super. Ct.) .......................................................................12

*SEC v. Ahmed*,
   No. 15-cv-675, 2018 WL 1585691 (D. Conn. Mar. 29, 2018) ..............................................18

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011) ............................................................15, 19, 20, 23

*TBK Partners, Ltd. v. W. Union Corp.*,
   675 F.2d 456 (2d Cir. 1982) ..........................................................................15

*Trombley v. Nat'l City Bank*,
   826 F. Supp. 2d 179 (D.D.C. 2011) .....................................................................8

*U.S. v. Georgiou*,
   777 F.3d 125 (3d Cir. 2015) ..........................................................................18

*U.S. v. Vilar*,
    729 F.3d 62 (2d Cir. 2013)..................................................................................18

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005)...............................................................................2, 15

*Woburn Ret. Sys. v. Salix Pharm., Ltd.*,
    No. 14-cv-8925 (KMW), 2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017)................................3

*Young v. Conway*,
    715 F.3d 79 (2d Cir. 2013)..................................................................................20

*Zhang v. E\*Trade Fin. Corp.*,
    No. B221098 (Cal. Ct. App. 2d Dec. 21, 2009)..................................................12

**Statutes**

15 U.S.C. §78c(a)(38) ..........................................................................................18

PSLRA ..................................................................................................................26

**Rules**

D.C. Rules of Prof. Resp., Rule 1.2(a) ................................................................10

Delaware Lawyers' Rules of Professional Conduct: Rule 8.4....................................11

Fed. R. Civ. P. 11 ............................................................................................5, 10, 14

Fed. R. Civ. P. 23 ........................................................................................ *passim*

N.Y. Rules of Prof. Conduct, Rule 1.2(a) .........................................................10

**Other Authorities**

Alan Stuart and J. Keith Ord, *Probability and Statistical Inference*, *Kendall's
    Advanced Theory of Statistics* 288-90......................................................................17

B. Morris and Stuart Z. Goldstein, *Guide to Clearance and Settlement, An
    Introduction to DTCC* ........................................................................................16

*Black's Law Dictionary* (10th ed. 2014)..............................................................9

CEI Board of Directors, W. Thomas Haynes (Chairman), *available at*
    https://cei.org/cei-board-directors ......................................................................6

*Class Action Avenger Discusses Coupon Crusades*, Legal Pad, Sept. 23, 2009,
    *available at* http://legalpad.typepad.com/my_weblog/2009/09/class-action-
    avenger-discusses-coupon-crusades.html ...........................................................6

Competitive Enterprise Institute, Conservative Transparency database, *available at* http://conservativetransparency.org/recipient/competitive-enterprise-institute/..............................................................................................................7

*The Deal Breakers: A look at professional class action objectors in MD*, The Daily Record, May 23, 2010.........................................................................6

Eilperin Juliet, "Anatomy of a Washington dinner: Who funds the Competitive Enterprise Institute?", The Washington Post (June 20, 2013)....................................7

*Guide to Clearance & Settlement, an Introduction to DTCC, supra* n.8......................................18

John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 398 (2000) ..........................22

Joseph M. McLaughlin, *McLaughlin on Class Actions: Law and Practice* 141 § 6:28 (5th ed. 2009)......................................................................................16

Karen Lee Torre, *Challenging Cy Pres Scams*, Conn. L. Tribune, Nov. 22, 2010 ........................6

New York County (N.Y.) Ethics Op. 699 (1994).......................................................10

4 *Newberg on Class Actions* § 11:55 (4th ed. 2002)....................................................3

Theodore Frank, *Enron: Extortion, Interrupted*, N.Y. Sun, Jan. 23, 2008.....................................6

Court-appointed Class Counsel, having achieved a $3 billion Settlement in cash for the benefit of the Class in this action, respectfully submit this reply memorandum of law in further support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and Class Counsel's Motion for an Award of Attorneys' Fees and Expenses and Reimbursement of Litigation Expenses.[1]

## PRELIMINARY STATEMENT

In their opening papers, Class Representatives demonstrated that the factors set forth by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), together with other pertinent considerations, weighed heavily in favor of approving the Settlement. Now, the Class's overwhelmingly positive reaction to the Settlement demonstrates that the Settlement is fair and reasonable and should be approved. As discussed in the Lieberman Declaration, as of April 13, 2018, more than 1,053,850 copies of the Notice were mailed to potential Class Members, and a Summary Notice was published in major publications spanning several dozens of countries. (ECF. No. 789 ¶¶ 333, 340). The Notice advised class members that Class Counsel would seek a fee in an amount not to exceed $285 million and for reimbursement of expenses of no more than $18 million and contained the plan of allocation. *Id.* ¶ 334.[2] And although Petrobras' securities at issue were held by literally thousands of institutions during the Class Period, *no institutional investor has objected* to the Settlement. In fact, the Class Representatives, as institutional investors, strongly support the Settlement. Moreover, after reviewing the excellent results obtained by the Settlement, all but one of the remaining institutional plaintiffs in the Individual Actions—sophisticated institutional investors represented by sophisticated counsel—have

---

[1] A Proposed Order Awarding Attorneys' Fees and Expenses to Class Representatives is attached hereto as Exhibit 1.

[2] The requested fee of $284.5 million has been reduced to $284.4 million pursuant to a call with the Court on April 30, 2018.

indicated their intention to remain Settlement Class Members and forego their individual claims. *See* ECF. No. 789 ¶ 11 n.5.  One brave institution, Washington State Investment Board, represented by Robbins Geller Rudman and Dowd LLP ("RGRD"), has decided to continue its action, despite the fact that the other four opt-outs represented by RGRD have now opted to remain in the Settlement Class.

Significantly, there have been only six objections—including two professional objectors and another who has been found to have been engaged in "conduct that is prejudicial to the administration of justice" and who "committed a criminal act that reflects adversely on his honesty and trustworthiness"— to the Settlement and 490 timely requests for exclusion.[3]  This result is a testament to the extraordinary achievement here.  "[T]he favorable reaction of the overwhelming majority of class members to the Settlement is perhaps the most significant factor in [the] Grinnell inquiry."  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 119 (2d Cir. 2005).  Where, as here, only a tiny proportion of the class has objected or sought to exclude themselves from the Class, the most important *Grinnell* factor is satisfied.  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) ("The District Court properly concluded that this small number of objections [18 objections to settlement with 27,883 class notices sent] weighted in favor of the settlement."); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 457, 458 (S.D.N.Y. 2004) (six objections out of a class of approximately one million was "vanishingly small" and "constitutes a ringing endorsement of the settlement by class members"); *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-cv-42, 2013 WL 4525323, at *7 (E.D.N.Y.

---

[3] On May 9, 2018, two days before the deadline to object, John Jacob Pentz, a Massachusetts attorney purporting to represent a Class member named Anne Cochran, applied to the Court for admission *pro hac vice*.  (ECF. No. 794).  The Court granted Pentz's application (ECF. No. 802), but Pentz and/or Cochran have not filed any other documents, nor have they given notice that they object to the Settlement.

Aug. 27, 2013) (approving settlement where 183 members out of "hundreds of thousands" opted out, and two objected).   Particularly where, as here, sophisticated institutions constitute a significant portion of the class, the absence of any institutional objections further demonstrates the adequacy of the Settlement.   *See, e.g., In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, Nos. MDL 1500, 02-cv-5575 (SWK), 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006); *Woburn Ret. Sys. v. Salix Pharm., Ltd.*, No. 14-cv-8925 (KMW), 2017 WL 3579892, at *2-3 (S.D.N.Y. Aug. 18, 2017).   In cases such as this, involving a large class and an extensive notice campaign, it is extremely unusual to receive such a limited number of objections.   To the contrary, a certain number of objections are to be expected.   *See, e.g., Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir. 1987) (affirming settlement approval despite opposition by 36% of the class, as "[w]e perceive no reason why a settlement cannot be considered fair despite opposition from . . . significantly less than half of the class; *In re AOL Time Warner*, 2006 WL 903236, at *10 (approving settlement with 10,082 opt-outs from a putative class of 4.7 million).[4]

As explained below, the few objections are meritless and should be rejected.

## I.      TWO OF THE OBJECTORS LACK STANDING TO OPPOSE THE SETTLEMENT

"[A]s a general rule, only class members have standing to object to a proposed settlement." *See* 4 *Newberg on Class Actions* § 11:55 (4th ed. 2002); *see also Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579, 581 (5th Cir. 2007) (an objector who "produced no evidence substantiating his membership in the class" had no standing to object); *In re Initial Public Offering Sec. Litig.*, No. 21 MC 92 (SAS), 2011 WL 3792825, at *1 (S.D.N.Y. Aug. 25, 2011) ("to be a class member Hayes must… [have been] damaged thereby.")

---

[4] *See also In re Cendant Corp. Litig.*, 264 F.3d 201, 234 (3d Cir. 2001) (receipt of only four objections by class members "cut strongly in favor of the Settlement, as the number of objectors was quite small in light of the number of notices sent and claims filed.").

### A.     Renewable Carbon Corp. Has No Standing to Object

The trading records produced by Renewable Carbon Corp. make clear that this objector lacks standing to challenge the Settlement.   Renewable Carbon represents and provides corresponding documentary evidence that it "acquired shares of Petroleo Brasiliero Petrobras SA ADR (PBR) on 02/02/2010, 17,500 ADS at $41.9545; on 3/29/2010, 9,600 ADS at $43.8597 and on 02/01/2013, 63,100 ADS at $18.6159.  Adding up to total of 90,200.00 shares. *All shares were sold on 7/31/2013 . . . .*" (emphasis added) (ECF. No. 812, including transaction records reflecting the sale of all PBR ADRs on 7/31/2013).  The first corrective disclosures occurred on October 16, 2014, so Renewable Carbon Corp's damages are zero.

### B.     The Bishops Have No Standing To Object

The Bishops, who purport to have purchased 445 Petrobras ADSs, failed to present any documentary evidence such as bank records of their transactions in Petrobras securities.  Exhibit A to the Bishops' objection is a claim form filled out by the Bishops themselves without any appropriate corresponding brokerage or similar reliable records (ECF. No. 811).   Such an incomplete submission is insufficient to demonstrate standing and would be rejected by the Claims Administrator.

## II.     A NUMBER OF OBJECTORS HAVE IMPROPER MOTIVES

In analyzing the merits of the arguments raised by the Objectors, this Court should consider their ideological and monetary motivations. *See In re Initial Pub. Offering Sec. Litig.*, 721 F. Supp. 2d 210, 215 (S.D.N.Y. 2010) ("I concur with the numerous courts that have recognized that professional objectors undermine the administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients."); *Dennis v. Kellogg Co.*, No. 09-cv-1786-L (WMc), 2013 WL 6055326, at *4 n.2 (S.D. Cal. Nov. 14, 2013) ("[W]hen assessing the merits of an objection to a class action settlement, courts consider the

background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first.") (quoting *In re Law Office of Jonathan E. Fortman, LLC*, No. 13-mc-00042 AGF, 2013 WL 414476, at *5 (E.D. Mo. Feb. 1, 2013)); *Dewey v. Volkswagen of Am.*, 909 F. Supp. 2d 373, 396 n.24 (D.N.J. 2012) ("[C]ertain objectors are represented by attorneys who are in the profession of objecting to class action settlements, whether motivated by views of the law, ideology, or otherwise."), *aff'd, Dewey v. Volkswagen Aktiengesellschaft,* 558 F. App'x 91 (3d Cir. 2014); *see similarly Barnes v. FleetBoston Fin. Corp.*, No. 01-cv-10395, 2006 WL 6916834, at *1 (D. Mass. Aug. 22, 2006).  Indeed, the objectors' bad motives are grounds for the imposition of sanctions under Fed. R. Civ. P.  11, which the Court may impose *sua sponte*.  Rule 11 mandates that any paper presented to the Court not be made "for any improper purpose," such as "to extract fees from class counsel in exchange for the withdrawal of a meritless objection to the proposed class settlement."  *Garber v. Office of Comm'r of Baseball*, No. 12-cv-03704 (VEC), 2017 WL 752183, at *4 (S.D.N.Y. Feb 27, 2017).  Filing an objection to advance anti-class action agenda is similarly an "improper purpose," as it has nothing to do with the best interests of class members, or the objectors' financial interest in a settlement.

A.      **CCAF Is A Serial Objector With An Anti-Class Action Agenda**

CCAF professes pure motives in bringing its objections to protect the class, but in reality it is nothing but a wolf in sheep's clothing, advancing the corporate interests of its donors at the expense of Class members.  CCAF's sole purpose is to object to class action settlements.  *See* https://cei.org/issues/class-action-fairness.  Here, its Objection is submitted on behalf of Thomas Haynes and is accompanied by the Declaration of Theodore H. Frank.  Haynes serves as the Chairman of CEI's board and is a member of CCAF's litigation advisory committee.  Haynes served as the CEO of the Coca-Cola Bottlers' Association, Inc., where he built a $100 million health-care benefits business.  *See* CEI Board of Directors, W. Thomas Haynes (Chairman),

*available at* https://cei.org/cei-board-directors. As a wealthy former corporate executive, the fact that Haynes is seeking to scuttle a historic $3 billion settlement for shareholders when the Trust held a meager 55 shares, ***suffering recognizable losses of $66.00***, speaks volumes about his motivation. Anna St. John, Haynes's attorney, works for CCAF and has on numerous occasions either represented objectors who were employees of CCAF or served herself as an objector. *See* St. John Decl. ¶ 4 (ECF. No. 800) and Frank Decl. ¶ 11 (ECF No. 799).

Frank founded CCAF.[5] He has described his outlet as a "guerilla operation" dedicated to challenging class actions. Kate Moser, *Class Action Avenger Discusses Coupon Crusades*, Legal Pad, Sept. 23, 2009, *available at* http://legalpad.typepad.com/my_weblog/2009/09/class-action-avenger-discusses-coupon-crusades.html. He has described plaintiffs' class action attorneys as "parasites," who have formed an "unholy" alliance with "collaborationist" judges. *See* Brendan Kearney, *The Deal Breakers: A look at professional class action objectors in MD*, The Daily Record, May 23, 2010; Karen Lee Torre, *Challenging Cy Pres Scams*, Conn. L. Tribune, Nov. 22, 2010 ("CCAF is a non-profit, public interest law firm dedicated to bringing to light and challenging in court the misdoings of an unholy trinity—the class action bar, special interest groups, and collaborationist jurists"). He has admitted that his objections are laser-focused on making class action litigation financially unattractive for attorneys to pursue: "the problem of destructive securities litigation will only be solved when Congress takes contingent-fee trial lawyers and their perverse incentives out of the equation." Theodore Frank, *Enron: Extortion, Interrupted*, N.Y. Sun, Jan. 23, 2008. In his Twitter account, Frank bemoans this Court's approval of class action notice plans generally: "I can guarantee that J. Rakoff has discretionarily approved numerous class

---

[5] In 2015, CCAF merged into the Competitive Enterprise Institute ("CEI") and became a division within their law and litigation unit. (Frank Decl. at 4, ECF No. 799).

action notice plans with similar waivers and worse notice." Ted Frank (@tedfrank), Twitter (March 6, 2018, <u>4:22 PM</u>).

Advancing this ideological agenda has not been without its rewards for CCAF. The organization functions through the receipt of millions of dollars in contributions used to advance its ultra-conservative, corporate-friendly, anti-class action litigation agenda. Past contributors include the Koch family foundations, Exxon-Mobil Corporation, Marathon Petroleum, *The American Conservative*, Monsanto, Google, Facebook, Pepsico, MasterCard, and the American Bankers Association.[6] These entities do not represent the interests of the Class. Rather, as courts have recognized, the goal of CCAF is to eliminate class action litigation. *See, e.g., City of Livonia Emps.' Ret. Sys. v. Wyeth*, No. 07-cv-10329, 2013 WL 4399015, at \*5 (S.D.N.Y. Aug. 7, 2013) ("Petri's objection on this count does not seem grounded in the facts of this case, but in her and her attorney's [Ted Frank] objection to class actions generally."); *Dennis v. Kellogg Co.*, No. 09-cv-1786-IEG (WMC), 2013 U.S. Dist. LEXIS 129205, at \*\*11, 13 n.2, 3 (S.D. Cal. Sept. 10, 2013) ("the Court notes that present objectors' counsel, Darrell Palmer and Theodore Frank of the Center for Class Action Fairness, have both been widely and repeatedly criticized as serial, professional, or otherwise vexatious objectors," observing that Frank "works for and represents an ostensibly 'activist' organization"), *opinion replaced by Dennis v. Kellogg* Co., 2013 U.S. Dist. LEXIS 163118, at \*1 (S.D. Cal. Nov. 14, 2013) (same in all substantive respects except strikes language critical of Frank, *supra,* after granting Joint Motion to Strike, which Frank stipulated to not appeal); *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 785 (N.D. Ohio 2010) (criticizing CEI's

---

[6] Eilperin Juliet, "Anatomy of a Washington dinner: Who funds the Competitive Enterprise Institute?", The Washington Post (June 20, 2013); *see also* Competitive Enterprise Institute, Conservative Transparency database, *available at* http://conservativetransparency.org/recipient/competitive-enterprise-institute/ (collecting IRS Form 990 donor data).

objections as "long on ideology and short on law," and noting that CCAF was objecting despite admitting that "this Settlement could be approved under current Sixth Circuit law."); *Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 575 (D.N.J. 2010) (describing Frank as a "professional objector" of which "federal courts are increasingly weary").[7]

In furtherance of the goal of stifling class action litigation, CCAF (or CEI) has filed objections in over 85 class action settlements over the past nine years. In a phone call with the Court on May 15, 2018, Ms. St. John proudly proclaimed that CCAF would file even more objections to class action settlements but for a dearth of resources. In an ironic twist, CCAF's crusade against class action litigation is largely fueled by its own employees regularly "pitching in" and serving as objectors, with Ms. St. John and Mr. Frank repeatedly acting as objectors. *See* St. John Decl. ¶4 (Dkt. No. 800) and Frank Decl. ¶11 (Dkt. No. 799) (showing that St. John objected or represented objectors to 9 settlements, and Frank objected or represented objectors to 90 settlements). The Frank Decl. reveals that CCAF has represented their own employees—or relatives—on *at least 44 separate occasions*. This includes objections from CCAF attorneys Ted Frank (23 objections), Anna St. John (4 objections), Melissa Holyoak (4 objections), Adam Schulman (3 objections), Daniel Greenberg (3 objections), and Frank Bednarz (2 objections), as well as CEI employees Sam Kazman (3 objections), John Berlau (1 objection), Ryan Radia (1 objection), Fred Smith (1 objection), and Frances Smith (1 objection). *Id.* It also includes relatives, such as Joshua Holyoak (an apparent relative of Melissa Holyoak, who objected twice) and Merideth Halsey (the wife of CCAF employee Frank Bednarz, who objected once). Apparently,

---

[7] *See also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 n.5 (9th Cir. 2015) ("we reject [CCAF's] arguments that the attorneys' fees in this case are unreasonable or over-inflated"). *See similarly Blessing v. Sirius XM Radio Inc.*, 507 F. App'x 1, 5 (2d Cir. 2012); *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 205 (D.D.C. 2011).

attorney-driven litigation is acceptable to CCAF as long as it is used to deprive class members of their rightful recovery.

Further testing the bounds of irony, CCAF has been less than candid regarding its receipt of attorneys' fees relating to its serial objections. Ms. St. John sanctimoniously professes that CCAF is representing Haynes on a *pro bono* basis in this action. (ECF. No. 797 at 2). Yet, paragraph 3 of CCAF's retainer agreement with Haynes specifically allows CCAF to seek attorneys' fees with respect to its representation. Similarly, in at least twelve other federal cases CCAF purported to be working on a *pro bono* basis, but actually sought and received attorneys' fees in those cases.[8] The term "*pro bono*" is not subject to ambiguity: it means "without compensation."[9]

The suspect nature of CCAF's modus operandi is highlighted by the language of the retainer agreement with Mr. Haynes ("Retainer Agreement"), which appears to be a form letter that CCAF commonly uses. *See Gilmore Decl. Ex. B* (footer stating "Revised 7/8/2015" in Haynes' retainer letter executed May 10, 2018). As explained in Plaintiffs' letter to the Court dated May 24, 2018, the Retainer Agreement subordinates the objectors' own interests to those of CCAF (as mentioned above, sometimes CCAF uses its own lawyers to serve as objectors) and violates basic standards of professional responsibility. Among other things, its provisions clearly conflict with the "client's" absolute right to make decisions whether to settle and appeal the matter; moreover, the "client" is forced to acknowledge that by filing the objection (and possibly appeal), he/she might be acting adverse to its interests as a class member by delaying the settlement. *See*

---

[8] *See* Declaration of Emma Gilmore in support hereof ("Gilmore Decl.") Exh. A.

[9] *Black's Law Dictionary* (10th ed. 2014) (defining "pro bono" as "Uncompensated, esp. regarding free legal services performed for the indigent or for a public cause").

9

D.C. Rules of Prof. Resp., Rule 1.2(a); N.Y. Rules of Prof. Conduct, Rule 1.2(a); New York County (N.Y.) Ethics Op. 699 (1994).

In his Supplemental Declaration (Dkt. No. 819), Haynes admits that his companies are long-standing donors to CEI and that he has earned substantial consulting fees from the organization.  Haynes claims that the catalyst for his objection is the "keen[] interest in the financial affairs of [his] children's trusts and in assuring that any losses those trusts may have suffered . . . is [sic] fully redressed," but those ***losses only amount to $66 in damages***—a pittance that pales in comparison to what Haynes has made in consulting fees from CEI.  Haynes obviously has a significant motive in objecting to this settlement to assist in his "fundraising" efforts for CEI, and potentially receive additional lucrative consulting fees.

Moreover, CCAF's attack on class counsel's fees is not made in good faith.  CCAF has in the past sought outrageous hourly rates of $2,865 and a 5.97 multiplier of its lodestar in attorneys' fees.  Plaintiffs' Opposition to Objector Amy Yang's Motion for Attorneys' Fees at 2, *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. 07-cv-05634-CRB (N.D. Cal. July 13, 2015), ECF No. 1033.  These bloated requests pale in comparison to the highest hourly rate of $1,000 (ECF No. 789-23) and the mere 1.78 multiplier requested here by Class Counsel.  The scores of objections made by CCAF to class action settlements on behalf of its ready stable of paid employees, masquerading under the bait of *pro bono* representation that is promptly switched to requests for attorneys' fees at inflated billing rates and even more inflated multipliers, smacks of an unprecedented abuse of the judicial process and violates Rule 11.

### B.   Joseph Gielata Has A Colorful Past And Has Opposed Other Mega-Settlements To Extract Payments

Joseph Gielata is the son of Objectors Richard and Emelina Gielata, who purchased 500 shares during the Class Period and have losses of approximately $660.  Joseph Gielata, a "retired"

attorney, disclosed that he is the drafter of his parents' objection. Joseph Gielata has a colorful past which includes an arrest in Delaware and charges on July 25, 2005, for multiple counts of theft, including felony theft, and conspiracy in the second degree, a felony; a guilty plea on May 9, 2006, to misdemeanor theft in exchange for dismissal of the remaining charges; and a public reprimand by the Supreme Court of Delaware in 2007. *In re Gielata*, 933 A.2d 1249 (Del. 2007) (reprimanding Gielata for his role in a scheme in which he tried to take advantage of PayPal's money-back guarantee by using sham transactions). In connection with the public reprimand, the Panel of the Board on Professional Responsibility found that Joseph Gielata violated the following Delaware Lawyers' Rules of Professional Conduct: Rule 8.4(b) – Gielata "committed a criminal act that reflects adversely on his honesty and trustworthiness"; Rule 8.4(c) – Gielata "engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation"; and Rule 8.4(d) – Gielata "engaged in conduct that is prejudicial to the administration of justice." *Id.*

On August 3, 2010, Joseph Gielata, on behalf of his father, Richard Gielata, filed a federal class action for breach of fiduciary duty, breach of contract, as well as other claims against Grant & Eisenhofer P.A. ("G&E"), a securities litigation firm, and Jay Eisenhofer, G&E's Managing Director. The claims arose from the attorneys' fees awarded by the court to G&E in *In re Tyco, Int'l, Ltd. Multidistrict Litigation* (D.N.H. Aug. 23, 2002), in which G&E represented two public pension funds as co-lead plaintiffs in a securities class action that settled for $3.2 billion in 2007. *See Gielata v. Eisenhofer*, No. 10-cv-00648-GMS (D. Del. Aug. 3, 2010). The case was eventually transferred to the District of New Hampshire, and on November 30, 2012, Richard Gielata filed a notice of voluntary dismissal with prejudice. *Gielata v. Eisenhofer*, No. 11-cv-442-PB (D.N.H. Nov. 30, 2012), ECF No. 92. ████████████████████████████████████████

11

████████████████████████. *See* Gilmore Decl. Ex. C. Apparently, ████████████

████████████████████████ than to commit petty theft against Paypal.

## C.    Joshua Furman Is A Serial Objector

Mr. Furman appears to be a part of a "cabal" of objector attorneys who represent each other as objectors in class action settlements in order to earn fees for one another.    In one case, Mr. Furman represented Mr. Jon Zimmerman, another attorney who represents objectors, in connection with his objection and appeal in the *Google Buzz Privacy Litigation*.  *See In re Google Buzz Privacy Litig.*, No. 11-16642 (9th Cir. July 7, 2011).  Mr. Furman and Mr. Zimmerman also worked together as counsel for an objector in *Pappas v. Naked Juice Co. of Glendora*, No. 14-55023 (9th Cir. Jan. 7, 2014).   Appeals in these actions were voluntarily dismissed with no benefit to Class members.  Mr. Furman also represented another objector, Barbara Cochran, a relative of another well-known attorney for objectors, Mr. Edward F. Cochran, in *TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827, 2013 U.S. Dist. LEXIS 9904, at *36 (N.D. Cal. Jan. 23, 2013).   Edward Cochran has been described by courts as a "remora[]' who "contributed nothing" of value with his "laughable" objections and whose only "goal was, and is, to hijack as many dollars for [himself] as [h]e can wrest from a negotiated settlement." *In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1107, 1108-09 (D. Minn. 2009) (Edward Cochran represented the objector as co-counsel with John Pentz, described below).  Furman has appeared for objectors in other cases that failed to yield a successful result for class members. *See, e.g.*, *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, No. 05-md-1720 (E.D.N.Y Oct. 20, 2005) (attorneys' fees denied); *Rodriguez v. W. Publ'g Corp.*, No. 05-cv-3222 (C.D. Cal. Apr. 29, 2005) (objections overrruled, and subsequent motion for attorneys' fees denied by district court); *Zhang v. E*Trade Fin. Corp.*, No. B221098 (Cal. Ct. App. 2d Dec. 21, 2009) (appeal apparently abandoned); *Schlesinger v. Ticketmaster*, No. BC304565 (L.A. Super. Ct.) (objectors' fees denied); *In re Online*

*DVD Rental Antitrust Litig.*, No. 09-md-2029 (N.D. Cal.) (appeal denied); *In re Animation Workers Antitrust Litig.*, No. 14-cv-04062 (N.D. Cal.) (objections voluntarily dismissed).

Mr. Furman also works with another well-known serial objector attorney, Mr. John Pentz, who filed a *pro hac vice* motion in this case on behalf of Anne Cochran (wife of Edward Cochran), but ultimately opted not to file an objection on her behalf upon advance receipt of subpoenas from class counsel. Pentz also represented Barbara Cochran along with Furman in the *TFT-LCD* case discussed above. Judge Scheindlin found that Mr. Pentz, a "serial objector," engaged in "bad faith and vexatious conduct" and granted plaintiffs' motion to require him to post an appeal bond in *In re Initial Public Offering Sec. Litig.*, 721 F. Supp. 2d 210, 212, 215 (S.D.N.Y. 2010). Pentz is recognized outside this District as a "professional and generally unsuccessful objector." *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383, 386 (D. Md. 2006).

Pursuant to a Court order, Furman . *See* Gilmore Decl. Exhs. D, E.

Moreover, Furman's arguments are largely incomprehensible and/or baseless. For example, he contends that the plan of allocation was not provided on the settlement notice website, but this is simply not true. The plan of allocation is part of the Notice of Settlement, which has been and continues to be available at http://www.petrobrassecuritieslitigation.com/docs/LFN.pdf, starting with page 11 and includes multiple exhibits and tables, spanning over 15 pages. Furman also improperly accuses Class Plaintiffs of trying to mislead the Court and investors by supposedly

concealing the blow provision because it would have showed lower damages. Not true. The $830 million represents 5% of $16 billion, which is the damages estimate provided by Dr. Nye and is set forth in Class Counsel's Motion for an Award of Attorneys' Fee and Reimbursement of Litigation Expenses, Dkt. No. 792 at 15. Furman also incomprehensibly argues that a "fund-sharing scheme" is illegal, but there is nothing illegal about creating a settlement fund for distribution. Rule 11 requires that all papers submitted to the Court be made "after an inquiry reasonable under the circumstances" and not be made "for any improper purpose." Furman's papers were either indiscriminately cut and pasted or were drafted without an iota of thought. Either scenario would violate Rule 11.

## III.    The Objections Are Meritless

Haynes argues that the Class cannot be certified because (1) there exists an "intraclass conflict" between purchasers of Petrobras securities in domestic transactions and those who purchased Petrobras securities in foreign transactions; and (2) determining whether a transaction is domestic involves "individualized locational evidence" failing to satisfy Rule 23(b)(3)'s predominance requirement. The Gielatas contend that the Settlement should not have included any dismissed claims. (Dkt. No. 813 at 1-9). These arguments should be rejected.

### A.    The *Morrison* Objection Should Be Rejected

Haynes and the Gielatas take issue with the "inclusion of meritless claims" in the Settlement, *i.e.*, of transactions that settled or cleared at DTC. (ECF No. 797 at 6; ECF No. 813 at 1-4, 7). This Court dismissed claims on *Morrison* grounds based on the allegation that the purchase or sale was cleared through the DTC, so it is possible that certain transactions encompassed in the definition of the released claims include claims that may not have satisfied *Morrison*. But as explained in Plaintiffs' opening brief for Final Approval of Settlement, the merits of the claims involving DTC transactions are irrelevant for settlement purposes, and courts regularly approve

14

settlements that allocate funds to claims that were dismissed from the action. *See* Opening Br. at 23-24, citing, *inter alia*, *In re Am. Int'l Grp. Sec. Litig.*, 689 F.3d 229, 242-44 (2d Cir. 2012) (holding that a settlement may include claims "even if a court believes that those claims may be meritless, provided that the class is properly certified under Rules 23(a) and (b) and the settlement is fair under Rule 23(e)"); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 310-11 (3d Cir. 2011) (holding that assessing the merits of settled claims "would effectively rule out the ability of a defendant to achieve 'global peace' by obtaining releases from all those who might wish to assert claims, meritorious or not"). Indeed, claims can be released by class settlements if they "share the same integral facts" or "a realistic identity of issues," even if those claims were not and "could not have been" pleaded in the settled class action. *See Wal-Mart Stores, Inc.*, 896 F.3d at 106-07 (quoting *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 461 (2d Cir. 1982), in which federal court approved settlement releasing previously-dismissed state court claims arising from same facts). What matters is the nature and extent of the factual overlap. Here, the Settlement releases claims arising from the "identical factual predicate" of the Action. At a minimum, that factual predicate includes Defendants' rampant money-laundering and kickback scheme and centers upon the dizzying number of false and misleading statements made by Defendants during the Class Period, as well as the purchase of securities pursuant to Covered Transactions during the Class Period.

Plaintiffs also explained that the recent Second Circuit decision in *Choi v. Tower Research Capital LLC*, No. 17-cv-648 (2d Cir. Mar. 29, 2018), appears inconsistent with the Second Circuit's *Morrison* application in *In re Petrobras Securities Litigation*, 862 F.3d 250 (2d Cir. 2017), raising the specter of a meritorious motion for reconsideration or appeal. (ECF. No. 790 at 23-24). *Choi* held that the fact that transactions placed on a Korean exchange were afterwards electronically matched with counterparties on a platform in the United States was sufficient to

trigger domesticity under *Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60 (2d Cir. 2012). A similar matching process occurs in every DTC transaction in New York[10] but this Court held that such "mechanics" are "actions needed to carry out transactions involv[ing] neither the substantive indicia of a contractual commitment necessary to satisfy *Absolute Activist*'s first prong nor the formal weight of a transfer of title necessary for its second." (ECF. No. 374 at 10).

Defendants in class action litigation invariably seek a global release that eliminates their risk of future exposure under all potential claims arising from a common nucleus of operative facts and transactions. *See* Joseph M. McLaughlin, *McLaughlin on Class Actions: Law and Practice* 141 § 6:28 (5th ed. 2009) (observing that "a settlement is ordinarily impractical unless it covers all claims, actual and potential, state and federal, arising out of the transaction [] at issue."). Here, Class Counsel negotiated the largest securities class action settlement in a decade and the fifth-largest class action settlement ever achieved in the United States. It is unlikely that such a blockbuster settlement would have been reached if the DTC-settled claims were not released. Indeed, a settlement might not have been reached at all.

While the law is clear that the Settlement can release dismissed claims, the crux of Haynes's argument is that the plan of allocation is improper. But the Court can approve the Settlement without approving the plan of allocation. (ECF No. 767-1, ¶23). In any event, there simply is no good reason to reject the plan of allocation. Haynes acknowledges that "[t]he release of claims arising from foreign transactions might command some settlement value," but contends that these claims should be assigned less value than the claims based on domestic transactions. (ECF 797 at 7-8). Haynes asserts that "the proper valuation" of the foreign transactions claims

---

[10] *See* B. Morris and Stuart Z. Goldstein, *Guide to Clearance and Settlement, An Introduction to DTCC*, at 2 ("DTCC uses a sophisticated infrastructure of physical equipment, software programs, and risk management systems to deliver essential services, including trade matching…").

"should have been tested through arms-length negotiation by separate representatives." *Id.* at 7. But Lead Plaintiff USS, who purchased Petrobras ADSs, had its claims based on Note purchases that settled at DTC dismissed (ECF No. 374 at 9-12), so Class Counsel had every incentive to maximize the value of the Settlement. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between *named parties* and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (emphasis added) (assessing conflict based on divergence of interests of "the named plaintiffs" from class members with different claims).

Additionally, while this Court held that clearance or settlement at DTC is insufficient on its own to satisfy *Morrison*'s domestic transaction prong, it is highly likely that most of the transactions in the Notes were domestic. Objectors Haynes and the Gielatas never even attempt to quantify the purported dilution to their recovery. *See Cobell v. Salazar*, 679 F.3d 909, 437-38 (D.C. Cir. 2012) (rejecting similar arguments made by attorney Frank, who represents objector Haynes here, that an intra-class conflict exists and that the Settlement allocates more to dismissed claims). In fact, a sampling of the Notes reveals that approximately 70% of the top Petrobras bondholders during Q4 2014 are U.S.-based institutional investors. *See* Gilmore Decl. Ex. F.[11] According to the classical axioms of probability formulated by A. N. Kolmogorov, as well as Bayes' Theorem (*see* 1 Alan Stuart and J. Keith Ord, *Probability and Statistical Inference*, *Kendall's Advanced Theory of Statistics* 288-90, (6th ed.1994), if U.S. investors held 70% of the Petrobras bonds during the Class Period, the conditional probability of any given trade involving a U.S. investor (on at least one side of the trade) increases to approximately 91%.[12]

---

[11] Chart showing range of quarterly holdings of Petrobras bonds with CUSIP numbers 71645WAN, 71647NAM, and 71645WAP (source: Bloomberg Terminal).

[12] The Second Circuit defines irrevocable liability in the alternative, meaning a plaintiff may "allege facts leading to the plausible inference that . . . ***the purchaser incurred irrevocable liability***

Moreover where, as here, U.S. brokers facilitated the transactions in the Notes, either on behalf of the seller or the purchaser, *Morrison* is satisfied. *See U.S. v. Georgiou*, 777 F.3d 125, 135 (3d Cir. 2015) ("some of the relevant transactions required the involvement of a purchaser **or** seller working with a [U.S.] market maker," satisfying *Morrison*) (emphasis added).[13]   DTC, through its affiliate, the National Securities Clearing Corporation, is the "leading provider of U.S. clearance, netting, risk management and settlement for *virtually all U.S. broker-to-broker trades involving* equities, *corporate*, and municipal *debts*[.]" *See* Consolidated Annual Financial Statements for 2013 and 2014 of DTCC, at 38.   The DTC is credited with attracting the flow of investment capital to the U.S., indicating that most DTC-related trading activity actually occurs in the U.S. *See Guide to Clearance & Settlement, an Introduction to DTCC*, *supra* n.8, ECF. No. 353-2, at 1, 18.   As DTC itself recognizes, institutions deposit securities at DTC in New York. ECF. No. 293-02, at 9-10.   Thus, by using DTC, the brokers involved in the Notes transactions had an account set up at DTC, where money changed hands.   Courts have held that the exchange of money in the U.S. supports domesticity. *See, e.g., Absolute Activist,* 677 F.3d at 70 (facts concerning the "exchange of money" relevant to domesticity); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 n.33 (2d Cir. 2014) (same); *U.S. v. Vilar*, 729 F.3d 62, 78 (2d Cir. 2013) ("[F]acts concerning the formation of the contracts and the exchange of money . . . are precisely the sort that we indicated may suffice to prove that irrevocable liability was incurred in the United States."); *see similarly Georgiou*, 777 F.3d at 136; *SEC v.*

---

*within the United States* to take and pay for a security, *or that the seller incurred irrevocable liability within the United States* to deliver a security." *Absolute Activist,* 677 F.3d at 68 (emphasis added).

[13] In the context of over-the-counter transactions, a market maker, which "facilitates trading in a stock," is the equivalent of a broker-dealer. *Id.* at 131 n.7 (citing 15 U.S.C. §78c(a)(38)); 78c(a)(4), (5)).

*Ahmed*, No. 15-cv-675, 2018 WL 1585691, at \*22 (D. Conn. Mar. 29, 2018).

These and other realities demonstrate that the plan of allocation is fair and reasonable. *See*,

*e.g.*, *Sullivan*, 667 F.3d at 236-27 (rejecting objectors' arguments that differences in state laws

(some of which may have precluded recovery) mandated a differential allocation in the percentage

of recovery of class members, and noting with approval the District Court's reasoning that "there

were no intra-class conflicts since all putative members experienced injury caused by [defendant],

all sought recovery for overpayment caused by allegedly anticompetitive behavior, and all shared

common interests in establishing damages . . . "); *In re Cendant*, 264 F.3d at 250 ("we are chary

of holding that the respective legal strengths of the § 10(b) and § 11 claims involved here should

have been factored into the fairness of the settlement determination. This would be a speculative

enterprise at best, and the differences in strength of these claims" do not warrant a differential plan

of allocation);  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 961 n.6 (9th Cir. 2009) (rejecting

objectors' argument that "an intra-class conflict exist[ed] based on  speculation that the statute of

limitations and tolling principles would allow only a subclass to pursue the section 7 [of the

Clayton Act] claim.").[14]    Here, weighing distribution for the relevant Petrobras Notes would have

---

[14] See similarly *In re VeriFone Holdings, Inc. Sec. Litig.*, No. C-07-6140 EMC, 2014 U.S. Dist. LEXIS 20044, at \*13-15 (N.D. Cal. Feb. 18, 2014) (granting final approval of the settlement agreement, "which contains a release of claims of all investors, foreign or domestic, irrespective of whether *Morrison* applies," where plan of allocation did not treat domestic and foreign purchases differently); *In re APA Assessment Fee Litig.*, 311 F.R.D. 8, 20-21 (D.D.C. 2015) (reasoning that Rule 23 requires a settlement to be "fair, reasonable, and adequate—not ideal," and concluding that, while "there will also be some dilution with respect to the stronger claims and over-recovery on the weaker ones . . . the Court does not think any dilution here is great enough to impugn the overall fairness of the settlement."); *All Indirect Purchaser Actions v. Infineon Techs. AG* (*In re Dynamic Random Access Memory Antitrust Litig.*), No. M-02-1486-PJH, 2013 U.S. Dist. LEXIS 188116, at \*320-23 (N.D. Cal. Jan. 7, 2013) (observing that "not every difference in position between settlement class members requires the creation of a formal subclass," and holding that "any weighted distribution plan would unduly complicate and prolong the settlement approval process and invite appeals in this litigation [and] … may ultimately turn on subjective

been entirely subjective, unreliable, and imprecise at best.  It would also have had the effect of unnecessarily complicating the claims process to a high degree, requiring the claims administrator to undertake a painstaking analysis of each Note transaction to weigh whether or not said transaction meets the criteria set forth in *Absolute Activist*.   The Court-appointed Claims Administrator, the Garden City Group, has confirmed that such a process, while feasible, would be both timely and costly, detracting from the recovery to Settlement Class Members and delaying the distribution of the Settlement.[15]

Additionally, Defendants here waived any *Morrison* challenge for settlement purposes, placing domestic and foreign purchasers on equal footing.  "It is well-settled that non-jurisdictional arguments and defenses may be waived."  *Young v. Conway*, 715 F.3d 79, 85 (2d Cir. 2013).  The U.S. Supreme Court specifically addressed whether a potential extraterritorial application of Section 10(b) creates a jurisdictional problem and held that it does not.  *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010).  Here, the settlement agreement defined the settlement class to include people who purchased bonds listed on the NYSE or settled on DTC.  By signing it, Defendants waived any *Morrison* defense for settlement purposes.  In fact, they acted affirmatively to include those investors in the Class.  Once Defendants waived their *Morrison* argument for settlement purposes, it was appropriate to treat all investors the same.  *See Sullivan*, 667 F.3d at 302-03, 307 (rejecting intra-class conflict of interest objections as "beside the point," because even though they raised questions about some class members' standing to recover at all, the issue "is

_____

views as to the relative merits … of the totality of a class member's released claims, and spawn an ancillary round of litigation among class member objectors about who should get how much and on what basis.").
[15] *See* Supplemental Declaration of Niki L. Mendoza Regarding Class Notice, Exclusion Requests, Objections, and Claims Received to Date ("Mendoza Decl.") ¶¶17-20, Gilmore Decl. Ex. G.

*not jurisdictional*" and "is simply another element of proof for an antitrust claim, rather than a predicate for asserting a claim in the first place," and observing that the fact that defendant agreed to settle those state law claims "*marginalizes the objectors' concern* that state law variations undermine a finding of predominance.") (emphasis added); *In re Aetna UCR Litig.*, No. 07-cv-3541, 2013 WL 4697994, at \*8 (D.N.J. Aug. 30, 2013) (rejecting argument that the proposed class representative was inadequate because "he did not exhaust his administrative remedies" as "*of no moment here*, where a majority of the absent class members have likely not sought the appropriate administrative remedies *and because Aetna has waived certain defenses, including exhaustion*, in the spirit of settlement." (emphasis added).

The plan of allocation was prepared by Class Counsel with input from Class Representatives' damages expert, an economist who specializes in plans of distribution in class settlements. In assessing a proposed plan of allocation, courts give great weight to the opinion of informed counsel. *See, e.g.*, *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-cv-3400, 2010 WL 4537550, at \*21 (S.D.N.Y. Nov. 8, 2010) (the conclusion of "experienced and competent counsel . . . that the Plan of Allocation is fair and reasonable is . . . entitled to great weight"); *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05-cv-10240, 2007 WL 2230177, at \*11 (S.D.N.Y. July 27, 2007) ("In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel.") Courts also consider the Class's reaction to a proposed plan of allocation. Here, the fact that the *only two* objections to the plan of allocation were made by objectors whose motives are to advance their own interests rather than to protect the hundreds of thousands of Petrobras shareholders, demonstrates the Settlement Class's overwhelming approval of the plan. *See, e.g.*, *In re EVCI*, 2007 WL 2230177, at \*11 (courts should "consider the reaction of a class to a plan of allocation"); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 367

(S.D.N.Y. 2002) ("the favorable reaction of the Class supports approval of the proposed Plan of Allocation"). In grating preliminary approval, the Court approved the plan of allocation set forth in the Notice. (ECF No. 770). There is no reason to do a one-eighty.

The cases on which Haynes relies for the proposition that subclasses with different representation were required for those who purchased Notes in domestic versus foreign transactions (ECF. No. 797 at 7-8) are easily distinguishable. In *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, 827 F.3d 223, 233-34 (2d Cir. 2016), the same class counsel sought to represent two settlement classes with starkly distinct interests: one class sought *damages* under Fed. R. Civ. P. 23(b)(3) for past harm, while the other sought *injunctive relief* under Rule 23(b)(2) for future harm ("[t]he former would want to maximize cash compensation for past harm, and the latter would want to maximize restraints on network rules to prevent harm in the future"); *see also id.* at 232 ("'[I]t is obvious after *Amchem* that a class divided between holders of present and future claims . . . requires division into homogen[e]ous subclasses . . . with separate representation.'") (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999)). In stark contrast, the Settlement Class here seeks damages for past harms, and there is no need whatsoever to separate the Class. *See* John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 398 (2000) ("If subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened. Such a fragmented class might be unmanageable, certainly would reduce the economic incentives for legal entrepreneurs to act as private attorneys general, and could be extremely difficult to settle if each subclass (and its attorney) had an incentive to hold out for more."). Moreover, in *Interchange* and *Ortiz*, class members had no ability to opt out. *See Interchange*, 827 F.3d at 234 ("The trouble with unitary

representation here is exacerbated because the members of the worse-off [Rule] (b)(2) class could not opt out."); *Ortiz*, 527 U.S. at 846-47 (members of Rule 23(b)(1) class have no opportunity to opt out). This factor creates no impediment here, where class members are free to (and have) opted out, and all Settlement Class Members have purchased and sold the same set of securities during the Class Period.

### B.     Haynes's Objection That The Settlement Class Cannot Satisfy Rule 23(b)(3)'s Predominance Requirement Is Meritless

Haynes argues that determining domesticity involves individual questions, hence a Settlement Class is impossible to certify for lack of predominance. (ECF No. 797 at 9-11). But in fact, the inclusion of transactions that settled or cleared at DTC eviscerates any obstacles to predominance as well as any individualized issues with respect to those Notes. Moreover, as explained in Plaintiffs' briefs supporting preliminary and final approval of the Settlement (ECF No. 766 at 19-24; ECF No. 790 at 13-14), Plaintiffs have demonstrated that the issues subject to generalized proof (*i.e.*, where liability turns primarily on whether Defendants made false and misleading statements and omissions) outweigh those issues that are subject to individualized proof. *See In re Petrobras*, 862 F.3d at 274 n.27 (recognizing that even if the *Morrison* determination may involve individualized issues, common issues can *still* predominate); *Green v. Wolf Corp.*, 406 F.2d 291, 299-301 (2d Cir. 1968) (individual issues predominate where certain misrepresentations and omissions "are common to all . . . prospectuses," the fraudulent background is common to all those who might have been injured, and proof of intent by a defendant to manipulate is an element of the claim); *see also* ECF No. 790 at 22 n.8) (collecting cases); *see similarly Sullivan*, 667 F.3d at 299-302 (predominance met due to the extent of common questions: "the answers to questions about De Beers's alleged misconduct and the harm it caused would be common as to all of the class members, and would thus inform the resolution of the litigation if it

23

were not being settled"; variations in state law did not defeat predominance because they "likely fall into a handful of clearly discernible statutory schemes," still allowing the class action to proceed efficiently under a variety of precedents).  Critically, the Second Circuit recognized that Plaintiffs "may assert class claims in connection with foreign-issued securities that do not trade on a domestic exchange" under a "wide range of conceivable circumstances." *Petrobras*, 862 F.3d at 275 n.27.  For example, "Class plaintiffs may propose a mechanism for assembling a representative sample of the manner in which a given security will trade, with an emphasis on the domesticity factors highlighted in *Absolute Activist*."  *Id.*  Accordingly, it was possible—but unnecessary—for the Plaintiffs to propose, and for the Court to certify, subclasses.[16]

## IV.    The Objectors' Remaining Arguments Are Meritless

### 1.    The Fee Request

Haynes, the Gielatas, and Bueno claim that the fee requested by Class Counsel is excessive. Some or all of them complain that Class Counsel's lodestar is overstated because it improperly includes Brazilian attorneys and that the contract attorney rates are "exorbitant."  (Dkt. No. 797 at 18; Dkt. No. 813 at 17-18).  As Class Counsel explained in detail in their letter to the Court on May 18, 2018, and in the Lieberman Decl. Dkt. No. 789 ¶361, the lodestar is reasonable and justified.  *See* ECF. No. 814, incorporated herein by reference.  Haynes and the Gielatas also attack the 1.78 multiplier and argue that the percentage of the recovery should be much less than the 9.5% of the settlement fund negotiated by Lead Plaintiff before the litigation began.  (Dkt. No. 797 at

---

[16] Such subclasses could have included, for example, the following permutations based on common indicia of domesticity: (i) transactions where a purchaser/its agent/investment manager/anyone else acting on its behalf contracted in the U.S. to purchase the Notes; (ii) transactions where a seller/its agent/investment manager/anyone else acting on its behalf contracted in the U.S. to sell the Notes; (iii) purchases in the IPO from U.S. underwriters; (iv) transactions where the counterparty or its representative was located in the U.S. when it agreed to sell the class member (or its broker or intermediary) the security, and the transaction was made in U.S. dollars; and (v) transactions that cleared or settled at DTC.

19-23; Dkt. No. 813 at 8).  But, as demonstrated at length in Class Counsel's opening papers, the fee percentage falls roughly in the middle of the range of percentages awarded in class actions where recovery exceeds $1 billion (with fee awards in the range of 1.7% to 31.3%) and, assuming the fee request in the *Foreign Exchange* Action is granted, it would represent the fourteenth largest percentage award out of twenty-nine $1-billion-plus recoveries.  Dkt. No. 792 at 4.

### 2.    *Cy Pres*

Haynes attacks Plaintiffs' *cy pres* selection, but the "trigger point" for considering *cy pres* has not been reached.  *See Rodriguez,* 563 F.3d at 966 (stating that *cy pres* "becomes ripe only if the entire settlement fund is not distributed to class members.").  At this stage of the settlement, disbursement from the settlement fund is not imminent and the amount potentially remaining in the settlement fund is unknown.  Moreover, any *cy pres* award recipients are subject to court approval.  Dkt. 767-10 ¶34.

### 3.    **Breakdown of Lodestar**

Haynes demands that Class Counsel submit a breakdown of the lodestar (ECF No. 797 at 17-18), despite the fact that such a breakdown is not required by *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 48-50 (2d Cir. 2000), which states that where, as here, the lodestar is "used as a mere cross-check" to a percentage calculation, "the hours documented by counsel need not be exhaustively scrutinized by the district court."  *See also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 281 (3d Cir. 2009).  Here, Class Counsel did provide the Court with each time entry and a 38-page rebuttal letter to the issues raised by Defense Counsel, as well as a line-by-line rebuttal to over 17,000 entries questioned by Defense Counsel.  (ECF. No. 814).

## V.    **Additional Responses Concerning Fees**

Class Plaintiffs respectfully submit this response to the Motions of Wolf Popper LLP ("Wolf Popper") and their Brazilian Counsel, Almeida Advogados ("Almeida"), Kahn Swick &

Foti LLC ("KSF") and Bernstein Litowitz Berger & Grossman LLP ("BLBG's") for an award of attorneys' fees and reimbursement of expenses.

### 1.   Wolf Popper & Almeida's Motion

Wolf Popper & Almeida collectively request $307,629 in attorneys' fees and reimbursement of $1,219.66 in expenses.  Mem. in Supp. of Mot. for an Award of Attorneys' Fees & Reimbursement of Expenses to Counsel Filing the Initial Kaltman Action, at 1 (Apr. 20, 2018), ECF No. 778.  With respect to attorneys' fees Wolf Popper submits a lodestar of $107,629 primarily, for its work in filing the first filed complaint in this Action, *Kaltman v. Petroleo Brasileiro S.A. – Petrobras, et. al.,* and its filing of the first publication notice pursuant to § 21D(a)(3)(A)(i) of the PSLRA ("PSLRA Notice"), which triggered the deadline for putative class members to file motions for appointment as lead plaintiff.  Decl. of Chet B. Waldman, at ¶¶3-6, 11 (Apr. 20, 2018), ECF No. 779.  Almeida submits a lodestar of $220,199.98 in support of its Motion, which it states reflects the firm's assistance in working with Wolf Popper to draft the *Kaltman* complaint, including investigating the news reports and publicly available information regarding the Lavo Jato investigation.  Decl. of Andre de Almeida Rodrigues, at ¶¶2-4 (Apr. 20, 2018), ECF No. 780.

With respect to their request for reimbursement of expenses, Wolf Popper and Almeida seek reimbursement of $1219.66 in costs for their filing fee, press release the PSLRA Notice and online research.  Class Plaintiffs believe that this Motion is reasonable, and that the requested fees and expenses are an appropriately modest amount for the obvious benefit to the Class of commencing the first action and publishing the PSLRA notice.  Moreover, movants note that "prior to, and at the time of the filing of the *Kaltman* Complaint, no law firm had issued a press release announcing an investigation into the Company" and that the potential action "had managed to slip past other law firms."  ECF No. 778, at 3.  Class Plaintiffs observe that there is some truth

to this assertion, in light of the foreign nexus of the allegations in this Action. As such, Class Plaintiffs recommend that the Wolf Popper & Almeida application be granted in its entirety. With respect to the attorneys' fees portion of this Motion, Class Counsel agrees to pay the requested amount out of its attorney fee award.

### 2.  KSF's Motion

KSF requests $589,915.50 in attorneys' fees and reimbursement of $2,650 in expenses. Mem. in Supp. of Kahn Swick & Foti, LLC's App. for Award of Attorneys' Fees and Expenses, at 1 (Apr. 20, 2018), ECF No. 782. KSF's request is based on the lodestar it incurred in this case from March 1, 2015 through the present. Significantly, KSF seeks to recover its lodestar only for work performed at the direction of Class Counsel, pursuant to its participation on the Plaintiffs' Steering Committee for the Individual Actions, which coordinated certain discovery and work which was common to both the Individual Actions and the Class Actions pursuant to this Court's Case Management Order. Decl. of Kim E. Miller, at 1 (Apr. 20, 2018), ECF No. 783. KSF is not seeking attorneys' fees for work which was done solely on behalf of its client, Aura Capital, Ltd. ("Aura Capital"), which has opted to abandon its Individual Action and participate in the Settlement. *Id.* at 2. With respect to its request for reimbursement of expenses, KSF's $2,650.50 request consists primarily of court reporter/transcript costs, photocopies, and legal research.

Class Counsel acknowledges that KSF performed the work for which it seeks compensation at Class Counsel's request. Class Counsel further believes that these assignments were performed with proper diligence and care. Significantly, Class Plaintiffs believe that there is an additional value to having a sophisticated institutional investor such as Aura Capital confirm the excellent result achieved by the Settlement by opting to discontinue its Individual Action, for which it has committed significant time and resources in litigating and remain in the Settlement Class. In light of the work performed and benefit for the Class described above, Class Plaintiffs

recommend that KSF's Motion be granted in its entirety.  With respect to KSF's attorneys' fees, Class Counsel agrees to pay the requested amount from its fee award.

### 3.   BLBG's Motion

BLBG seeks payment of attorneys' fees based upon a lodestar of $2,114,085, to be allocated at Lead Counsel's discretion, and reimbursement expenses of $1,146,873, for work performed and expenses incurred directly in relation to the prosecution of its claims on behalf of Individual Action Plaintiffs in the *Prudential Ins.*, *Hartford Mutual, MassMutual* and *Pacific Funds* Actions ("BLBG Individual Action Plaintiffs").  Application of Bernstein Litowitz Berger & Grossmann LLP for Reimbursement of Attorneys' Fees and Litigation Expenses, at 1 (Apr. 20, 2018), ECF No. 785.  Similar to KSF's application, Class Plaintiffs recognize that there is a benefit to the Class by having sophisticated institutional investors such as the BLBG Individual Action Plaintiffs, which likely assumed that they would extract a premium compared to the Settlement Class, provide independent confirmation of the excellent result achieved by Class Plaintiffs by opting to discontinue their action and participate in the Settlement.

Significantly, unlike KSF's fee application, BLBG's application includes time spent directly prosecuting the claims on behalf of the BLBG Individual Action Plaintiffs and is not limited to work performed at the direction of Class Counsel.  As such, further scrutiny of its application is appropriate.  Indeed, as set forth in the Lieberman Declaration, the existence of over 500 individual plaintiffs was hardly a benefit to the Class Action.  First, coordination of the prosecution with the Individual Action Plaintiffs, represented by multiple counsel with varying opinions on how to litigate the common claims, was a cumbersome and distracting task.  Lieberman Decl., at 146 ¶ 365 (Apr. 23, 2018), ECF No. 789.  Moreover, the existence of more than 500 opt-out plaintiffs diluted the potency of this Class Action and was referenced by Defendants as a reason to deny Class Plaintiffs' Motion for Class Certification.  *See* Dkt. No. 295

at 2-4, 11.   Perhaps most significantly, the various Individual Plaintiffs (including those represented by BLBG) retained no less than three damages experts, each of whom alleged a significantly lower inflation per share than did Class Plaintiffs' expert.  The specter of four experts (including Defendants') each testifying at trial that damages were significantly lower than those alleged by Class Plaintiffs' expert was a serious threat to Class Plaintiffs' damages expert's opinion, potentially resulting in a successful motion *in limine* by Defendants, and at the very least hopelessly confusing a jury about an already arcane subject.

As such, while BLBG's work done at the direction of Class Counsel should certainly be compensable, Class Plaintiffs question whether hours billed towards representing Individual Action plaintiffs for the ostensible purpose of securing a larger recovery than Settlement Class members is truly beneficial to the Class.   Nevertheless, to BLBG's credit, it does not seek compensation of the entirety of its $2,114,085 lodestar, but rather wishes that lodestar to be recognized by the Court and allocated at Class Counsel's discretion.  ECF No. 785 at 19.  With that caveat, Class Plaintiffs endorse BLBG's application with respect to attorneys' fees, with the understanding that Class Counsel will apply a significant discount to the lodestar in light of the mixed benefit to the Class resulting from the Individual Actions.   As the Settlement Fund, rather than Class Counsel, will be paying for reimbursement of expenses, BLBG's Motion for reimbursement of $1,146,873 in expenses warrants additional scrutiny.   Class Plaintiffs observe that $256,867.35 of the requested expenses is attributable to the retention of the Direct Action Plaintiffs' loss causation/damages expert.  Class Plaintiffs assume that this expert is Dr. Vinita Juneja, who submitted an expert report on behalf of several Individual Action Plaintiffs.  Liberman Decl., ECF No. 789, at 77 ¶ 189.  While Dr. Juneja is known to be a well-qualified damages expert, Class Plaintiffs do not believe that her report was beneficial to the Settlement Class.  Specifically,

Dr. Juneja opined on a significantly lower damages per share estimate than Class Plaintiffs, a fact that was not lost upon Defendants throughout the course of the litigation as well as mediation discussions.   As such, Class Plaintiffs believe that her report in this case was detrimental to Class members, and reimbursement of expenses towards her report should be denied.

The remaining items for which BLBG seeks reimbursement do not appear to be for expenses that were facially adverse to the Settlement Class' interests.   As such, Class Plaintiffs suggest that the Court consider the following factors in weighing BLBG's expense reimbursement request: 1) the benefit of the Settlement Class to having sophisticated institutional investors represented by well qualified counsel independently verify the merits of the Settlement, ultimately concluding that they were unlikely to achieve a better recovery on their own; 2) BLBG did perform certain litigation tasks at the direction of Class Counsel; 3) Class Plaintiffs' observation that while there was some benefit to BLBG defending the depositions and participating in discovery of investment managers employed by their clients, said depositions were unlikely to have been noticed had these Individual Plaintiffs not filed their own lawsuits; 4) BLBG's clients were litigating this case not for the purposes of improving the Class's recovery, but rather their own, potentially at the cost of the Class; and 5) while BLBG's Individual Action Plaintiffs' recoverable damages accounted for less than .002% of those of the Settlement Class, it is requesting reimbursement of nearly 7% of the total expenses requested by Class Counsel.

## CONCLUSION

For the foregoing reasons, Class Counsel respectfully request that the Court grant final approval of the Settlement and award the requested attorneys' fees and expenses, and grant the requested awards to Lead and Named Plaintiffs.

Dated:  May 25, 2018

Respectfully submitted,

**POMERANTZ LLP**

Jeremy A. Lieberman
Marc I. Gross
Emma Gilmore
John A. Kehoe
Brenda Szydlo
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: 212-6612-1100
Facsimile: 917-463-1044

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 North LaSalle
Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile: 312-229-8811

**POMERANTZ LLP**
Jennifer Pafiti
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: 310-285-5330

Counsel for Class Representatives
Universities Superannuation Scheme Limited,
North Carolina Department of State
Treasurer, and the Settlement Class

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Louis Gottlieb
140 Broadway
New York, NY 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477

Counsel for Employees' Retirement System
of the State of Hawaii

32