USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
                                     :
                                     :        14-cv-9662
In re: PETROBRAS SECURITIES          :
LITIGATION                           :        OPINION AND ORDER
                                     :
-------------------------------------x

JED S. RAKOFF, U.S.D.J.

The $3 billion settlement of this somewhat large securities class action is before the Court for final approval. The Settlement Agreement[1] comports with all legal requirements, and the objections to the settlement are without merit. But the nearly $300 million in attorneys' fees requested by plaintiffs' counsel needs to be reduced by roughly one-third.

Named plaintiffs Universities Superannuation Scheme Limited acting as sole corporate trustee for Universities Superannuation Scheme ("USS"), North Carolina Department of State Treasurer ("North Carolina"), and Employees' Retirement System of the State of Hawaii ("Hawaii") (collectively, "Class Representatives" or "Class Plaintiffs"), seek final approval of a proposed settlement agreement with defendants Petróleo Brasileiro S.A. ("Petrobras"), Petrobras Global Finance B.V., Petrobras America Inc. (collectively, the "Petrobras Defendants"), BB Securities Ltd., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Itaú

---

[1] Except where otherwise noted, all capitalized terms in this Opinion and Order have the same meanings as those assigned to them in the Stipulation of Settlement and Release. See Dkt. 767-1.

1

BBA USA Securities, Inc., Morgan Stanley & Co. LLC, HSBC Securities (USA) Inc., Mitsubishi UFJ Securities (USA), Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Standard Chartered Bank, Bank of China (Hong Kong) Limited, Banco Bradesco BBI S.A., Banca IMI S.p.A., Scotia Capital (USA) Inc. (collectively, the "Underwriter Defendants"), Almir Guilherme Barbassa, Jose Carlos Cosenza, Paulo Roberto Costa, Renato de Souza Duque, Guillherme de Oliveira Estrella, Maria das Graca Silva Foster, Jose Miranda Formigli Filho, José Sergio Gabrielli, Silvio Sinedino Pinheiro, Daniel Lima de Oliveira, José Raimundo Brandão Pereira, Sérvio Túlio da Rosa Tinoco, Paulo Jose Alves, Gustavo Tardin Barbosa, Alexandre Quintão Fernandes, Marcos Antonio Zacarias, Cornelis Franciscus Jozef Looman, Theodore M. Helms (collectively, the "Individual Defendants"), Banco Votorantim Nassau Branch, Santander Investment Securities Inc., Petrobras International Finance Company, and PricewaterhouseCoopers Auditores Independentes ("PwC Brazil").[2] See Memorandum of Law in Support of Class Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation ("Pl. Mem."), Dkt. 776. Contingent on approval of the settlement, counsel for Class Representatives, namely, Pomerantz LLP ("Pomerantz"), Labaton Sucharow LLP ("Labaton"), and Motley Rice LLC ("Motley

---

[2] Pursuant to the Stipulation of Settlement and Release, Dkt. 767-1, however, Paulo Roberto Costa and Renato de Souza Duque are not Released Parties, id. at 22.

2

Rice")[3] (collectively, "Class Counsel"), move for fees and costs, see Dkt. 791, as do four other law firms, namely, Wolf Popper LLP ("Wolf Popper"), Almeida Advogados ("Almeida"), Kahn, Swick & Foti, LLC ("KSF"), and Bernstein Litowitz Berger & Grossmann LLP ("BLBG"), who are counsel for plaintiffs in related individual actions, see Dkts. 777, 781, 784.

Six members of the class filed timely objections to either the settlement, the motion for fees and expenses, or both: William Thomas Haynes, as trustee for the W Thomas Haynes and Katherine Haynes Irrevocable Trust for the benefit of Sara L. Haynes ("Haynes"), see Objection of William Thomas Haynes ("Haynes Obj."), Dkt. 797; Spencer R. Bueno, see Objections of Spencer R. Bueno to Class Action Settlement ("Bueno Obj."), Dkt. 803; Julio A. Martinez and Sandra V. Bennun Serrano ("Martinez"), see Objection to Approval of Class Action ("Martinez Obj."), Dkt. 806; Mathis and Catherine Bishop ("Bishop"), see Objection to Proposed Settlement and Fee Application ("Bishop Obj."), Dkt. 811; Giulio Formenti on behalf of Renewable Carbon Corporation ("Formenti"), see Objection to the Petrobras Securities Litigation Case ("Formenti Obj."), Dkt. 812; and Richard and Emelina Gielata ("Gielata"), see Shareholder Objections to Proposed Settlement,

---

[3] Motley Rice is counsel for Union Asset Management Holding AG.

Plan of Allocation, Proof of Claim, Class Notice and Request for Attorneys' Fees ("Gielata Obj."), Dkt. 813.[4]

Class Plaintiffs, responding to the objections, argue that they are without merit. See Reply Memorandum of Law in Support of (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) Class Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Pl. Reply"), Dkt. 824.[5] Defendants concur as regards the Settlement Agreement, see Petrobras Defendants' and Underwriter Defendants' Reply in Support of Class Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation ("Def. Reply"), Dkt. 825; PricewaterhouseCoopers Auditores Independentes' Reply in Support of Class Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, Dkt. 828, and

---

[4] The Court is also in receipt of a letter from MaryAnne Lassegard who objects to the notice and settlement amount. See Letter dated June 5, 2018, Dkt. 832. This objection is untimely and Ms. Lassegard has not demonstrated standing to object. Id. Ms. Lassegard's objection is also without merit as Ms. Lassegard is incorrect that smaller shareholders will be disadvantaged by this Settlement compared with larger shareholders.

[5] Class Plaintiffs have also accused certain objectors of having improper motives including, in the case of Bueno and Gielata, allegedly seeking to extort personal payments through the device of frivolous appeals. See Pl. Reply at 4-14. As Class Plaintiffs do not currently seek any specific relief at the district court level, and the allegations of extortion, if true, will only become evident on appeal, the Court sees no need to reach these issues at this time.

take no position on the Plan of Allocation or Class Counsel's motion for fees and costs, see id.[6]

By way of brief background, on February 1, 2018, Class Plaintiffs moved, unopposed, for preliminary approval of a settlement agreement, see Dkt. 765, pursuant to the terms of which, the Petrobras Defendants would pay $2.95 billion and PwC Brazil would pay $50 million to the class in exchange for releases from all claims. See Stipulation of Settlement and Release, Dkt. 767-1; Amended Stipulation and Agreement of Settlement, Dkt. 767-10. On February 23, the Court held a preliminary approval hearing. See Transcript, Dkt. 773. On February 28, the Court granted Class Plaintiffs' motion for preliminary approval. See Order at 2, Dkt. 770. Thereafter, more than one million copies of the Class Notice were mailed to potential class members and a summary notice was published in major news publications worldwide. See Pl. Reply at 1.

On April 20, Class Plaintiffs moved for final approval of the proposed Settlement and Plan of Allocation and certification of the Settlement Class. See Dkt. 776. No institutional investor

---

[6] At the request of the Court, the Petrobras Defendants submitted a letter identifying time entries in Class Counsel's fee request warranting the Court's attention. See Letter from the Petrobras Defendants dated May 7, 2018 ("Def. Ltr.") at 2, Dkt. 793. Also at the Court's request, Class Counsel submitted a reply. See Letter on Behalf of Class Representatives dated May 18, 2018 ("Pl. Ltr."), Dkt. 814.

objected to the Settlement Agreement, Plan of Allocation, or proposed fee award and all but one of the institutional plaintiffs who had previously filed separate lawsuits but had not yet settled with defendants indicated their intention to remain members of the class and forego their individual claims. See Pl. Reply at 1-2.[7] On June 4, 2018, the Court held a settlement hearing at which objectors Haynes and Martinez appeared. See Transcript dated June 4, 2018 ("Tr."). After careful consideration of all the voluminous written filings and oral argument in this case, the Court hereby grants Class Plaintiffs' motion for final approval, finding that the Settlement Agreement and Plan of Allocation are fair, reasonable, adequate, and comport with all requirements of law. The Court also grants in full the motions of Wolf Popper, Almeida, and KSF for fees and costs, but only grants in part the motions of Class Counsel and BLBG for the same.

## I.   The Stipulation of Settlement and Plan of Allocation

---

[7] More than a dozen institutional investors filed separate, so-called "tag-along" actions based on the same basic allegations as the class complaint. Several have previously settled, and, with one exception, the remainder have decided to forgo their separate actions and, instead, receive their pro rata distributions as members of the class. The only separate institutional investor that has not so far indicated that it will, in effect, opt in to the settlement is Washington State Investment Board ("WSIB"). Counsel for that party and counsel for defendants should jointly call chambers by no later than July 2, 2018 to schedule the prompt trial of that remaining case.

6

This case grows out of a massive fraud, but whether defendants were responsible for the fraud or were themselves victims of the fraud was one of several hotly-contested issues that made the outcome of this case uncertain. The proposed settlement followed more than three years of litigation including, among other things, non-frivolous (though mostly unsuccessful) motions by defendants to dismiss plaintiffs' claims, defeat class certification, and obtain summary judgment in their favor, as well as extensive fact and expert discovery (including 68 depositions and review of more than 25 million pages of documents), preparations for trial, a substantial Second Circuit appeal, and a fully briefed petition for certiorari. See Pl. Mem. at 5-6. Familiarity with all these prior matters is here assumed.

The Settlement Amount equals approximately 22.3% of the likely recoverable damages suffered by the class (as estimated by Class Plaintiffs). See id. at 1. It represents, moreover, a 65% premium over the recoveries enjoyed by various individual plaintiffs (sophisticated institutional investors represented by experienced counsel) who have previously reached settlements with the Petrobras Defendants. Id. at 2. Furthermore, as mentioned, all but one of the remaining institutional plaintiffs have indicated their intention to remain class members and forgo their individual claims. See Pl. Reply at 1-2.

7

Under Federal Rule of Civil Procedure 23(e), the Court must approve a class action settlement before it can take effect. "A court may approve a class action settlement if it is fair, adequate, and reasonable, and not a product of collusion." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005) (internal quotations omitted). In making its determination, the Court can take into account, inter alia, (1) the complexity, expense, and duration of the litigation; (2) the class's reaction to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the defendants' ability to withstand a greater judgment; and (8) the range of reasonableness of the settlement fund in light of best possible recovery and all attendant litigation risks. See City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974). Furthermore if, as here, the "settlement class" is different from the litigation class or classes previously certified, the Court must now certify the settlement class, although certain Rule 23 considerations are not applicable in this context. See, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997) ("a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial").

8

Since, in preliminarily approving the proposed settlement, the Court tentatively concluded that all the forgoing standards for approval had been met, it makes sense to re-visit these preliminary conclusions chiefly in terms of the objections that have now been raised. Objectors here principally challenge (1) certification, (2) the sufficiency of the class notice, (3) the proposed cy pres recipient, and (4) the settlement amount. The Court reviews each of these objections in turn. (Several objectors also take issue with the fee award requested by Class Counsel; the Court addresses these latter objections in Part II, infra.)

## A. Certification

Objectors argue that the proposed settlement class is overbroad, and that, accordingly, it fails to satisfy the requirements of Rule 23 that (1) the diverse groups and individuals within the class be adequately represented by the named plaintiffs, see Haynes Obj. at 3-8; Gielata Obj. at 1-8; Bueno Obj. at 6-9, and that (2) common issues of law and fact predominate over those issues subject only to individualized proof, see Haynes Obj. at 9-12.

### (1) Adequate Representation

The proposed settlement agreement defines the Settlement Class as all persons who purchased Petrobras Securities in a transaction "that satisfies any of the following criteria: (i) any transaction in a Petrobras Security listed for trading on the New

9

York Stock Exchange ("NYSE"); (ii) any transaction in a Petrobras Security that cleared or settled through the Depository Trust Company's book-entry system; or (iii) any transaction in a Petrobras Security to which the United States securities laws apply, including as applicable pursuant to the Supreme Court's decision in Morrison v. National Australia Bank, 561 U.S. 247 (2010)." Stipulation of Settlement and Release ¶ 1(j), Dkt. 767-1. Haynes, Gielata, and Bueno purport to identify an intraclass conflict in this case between those persons whose purchases of Petrobras Securities are connected to the U.S. solely by virtue of the fact that their transactions were cleared or settled through the Depository Trust Company ("DTC") in New York (the "DTC claimants") and those persons whose purchases of Petrobras Securities are otherwise domestic under the operative case law (the "domestic claimants"), for example because their purchases took place on U.S. exchanges. According to Gielata, the DTC claimants are not properly part of the class at all and should be filtered out by a special master. See Gielata Obj. at 4 ("the problem here is not the 'classic' Amchem conflict necessitating subclasses. Rather, the structural conflict here is [] class member claimants versus claimants that cannot be part of the class because their claims are barred by Morrison"). According to Haynes, while the DTC claimants may properly be part of the class, the domestic claimants are entitled to separate representation given the

relative strength of their claims. See Haynes Obj. at 6. Haynes proposes that the Court certify two or three subclasses for purposes of negotiating a new settlement (or continuing the litigation). Id. at 8. Bueno similarly suggests that the Court appoint subclass representatives. See Bueno Obj. at 9.

What this boils down to as a practical matter is that certain claimants who would have been unable to join the litigation classes previously certified by the Court because of extraterritorial impediments are now included in the settlement class so that the defendants can buy "global peace." In the Second Circuit, plaintiffs are entitled to settle even entirely non-meritorious claims. See In re Am. Int'l Grp., Inc. Sec. Litig., ("AIG"), 689 F.3d 229, 243 (2d Cir. 2012) ("defendants in class action suits are entitled to settle claims pending against them on a class-wide basis even if a court believes that those claims may be meritless"). While "no class may be certified that contains members lacking Article III standing," class members who have suffered injuries-in-fact, as all putative members here have, can settle their claims "irrespective of whether their injuries are sufficient to sustain any cause of action." Denney v. Deutsche Bank AG, 443 F.3d 253, 264-5 (2d Cir. 2006).

Domesticity - although not a matter of Article III standing, see Morrison v. Nat'l Australia Bank, 561 U.S. 247, 254 (2010) ("to ask what conduct § 10(b) reaches is to ask what conduct §

11

10(b) prohibits, which is a merits question") - is an element of plaintiffs' securities fraud claims. If contested by defendants, domesticity must be proven by plaintiffs as part of their case-in-chief. But defendants here have waived any domesticity requirement for the purposes of settlement. See Def. Reply at 3. Accordingly, even though the Court previously found that the DTC claimants could not establish domesticity as a matter of law (but not because they lacked Article III standing), Gielata is wrong that the DTC claimants cannot be part of the settlement class (assuming that the other requirements of Rule 23 are met). See AIG, 689 F.3d at 237-44 (certifying a settlement class even though some or all of the class members could not satisfy the reliance element of their securities fraud claims); Sullivan v. DB Invs., Inc., 667 F.3d 273 (3d Cir. 2011) (certifying a settlement class even though some members of the class lacked statutory standing).

Another objector, Haynes, concedes this much. But, Haynes argues, while the "release of claims arising from foreign transactions might command some settlement value," the "proper valuation" of such "foreign" claims must be "tested through arms-length negotiation by separate representatives." Haynes Obj. at 7. Since Class Counsel were "obligated to advance the collective interests of the class," Haynes reasons, they were unable to represent the distinct interests of the subclasses. Id. (quotations omitted). As a result, Haynes concludes, Class Counsel

12

agreed to a proposed settlement agreement that unfairly diluted the recovery of domestic-purchasing class members (like Haynes).

Federal Rule of Civil Procedure 23(a)(4) requires that the representatives in a class action "fairly and adequately protect the interests of the class." The Rule, among other things, "serves to uncover conflicts of interest between named parties and the class they seek to represent." Amchem, 521 U.S. at 625. Representation is "adequate" where the class representatives have (1) an interest in vigorously pursuing the claims of the class and (2) no interests antagonistic to the interests of the other class members. In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig. ("Payment Card"), 827 F.3d 223, 231 (2d Cir. 2016), cert. denied sub nom. Photos Etc. Corp. v. Home Depot U.S.A., Inc., 137 S. Ct. 1374 (2017).

In the event a court identifies a "fundamental" conflict that goes "to the very heart of the litigation," Charron v. Wiener, 731 F.3d 241, 250 (2d Cir. 2013) (quotations omitted), the conflict must be addressed with a "structural assurance of fair and adequate representation for the diverse groups and individuals" among the class, Amchem, 521 U.S. at 627. "One common structural protection is division of the class into 'homogenous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel.'" Payment Card, 827 F.3d at 231 (quoting Ortiz v. Fibreboard Corp., 527 U.S. 815, 856 (1999)). Where a court

13

certifies a class at the same time as it approves a settlement, these requirements - "designed to protect absentees by blocking unwarranted or overbroad class definitions" - "demand undiluted, even heightened, attention." Amchem, 521 U.S. at 620.

Two Second Circuit cases bear on the question of whether there is a fundamental conflict here between the DTC claimants and the domestic claimants such that a failure to divide the settlement class into subclasses makes it impossible for the Court to determine whether the interests of all class members were fairly and adequately represented. The first is In re Literary Works in Electronic Database Copyright Litigation ("Literary Works"), 654 F.3d 242 (2d Cir. 2011), a copyright dispute. In that case the proposed settlement agreement divided the class into three categories: "Category A" covered works that had been registered with the Copyright Office in time to be eligible for statutory damages and attorneys' fees under the Copyright Act; "Category B" covered works that had been registered with the Copyright Office but not in time to be eligible for statutory damages; and "Category C" covered all other works, none of which could be litigated for damages purposes until they were registered with the Copyright Office. Id. at 246. Category A and B claims were substantially stronger than Category C claims, but Category C claims comprised more than 99% of all claims held by the putative class. Id.

14

The proposed plan of allocation in Literary Works employed a damages formula that disadvantaged Category C claims in a variety of ways. Among other things, the formula paid each Category A or B claim substantially more than each Category C claim. Id. The settlement also capped defendants' total liability at $18 million and, if the total amount of all claims plus costs and fees exceeded $18 million, then the payout to Category C claims would be reduced pro rata until the total amount of all claims plus costs and fees reached $18 million. Id. Only if, after reducing Category C claims to zero, the payout due to Category A and B claims exceeded the available funds would a reduction be applied to the Category A and B claims. Id.

In these circumstances, the Second Circuit found that class members' "interests diverge[d] as to the distribution of" the recovery because "each category of claim is of different strength and therefore commands a different settlement value." Id. at 254. Although all parties in Literary Works agreed that Category C claims were the weakest, the court saw "no basis for assessing whether the discount applied to Category C's recovery appropriately reflect[ed] that weakness." Id. at 253. Nor could such a basis be established, the court concluded, "in the absence of independent representation." Id. After all, the named plaintiffs — who held combinations of claims — had "no incentive to maximize the recovery for Category-C only plaintiffs, whose

15

claims were lowest in settlement value but eclipsed all others in quantity." Id. at 254.

In the second relevant case, Payment Card, the settlement agreement split plaintiffs into two classes: a Rule 23(b)(3) class covering merchants who accepted Visa or MasterCard between 2004 and 2012 (the "(b)(3) class") and a Rule 23(b)(2) class covering merchants who accepted Visa or MasterCard from 2012 onwards (the "(b)(2) class"). See 827 F.3d at 229. The proposed plan of allocation awarded the (b)(3) class up to $7.25 billion in monetary relief and the (b)(2) class injunctive relief in the form of changes to various network rules. Id. While members of the (b)(3) class could opt out, members of the (b)(2) class could not. Id. Nonetheless, the same counsel represented both classes. Id. at 234. In these circumstances, the Second Circuit found that representation was inadequate because the (b)(3) class "would want to maximize the cash compensation for past harm" and the (b)(2) class "would want to maximize restraints on network rules to prevent harm in the future." Id. at 233. "Unitary representation of separate classes that claim distinct, competing, and conflicting relief create unacceptable incentives for counsel to trade benefits to one class for benefits to the other in order somehow to reach a settlement." Id. at 234.

The facts in the instant situation are dramatically different from the facts in Literary Works and Payment Card. To begin with,

16

here, unlike in Literary Works, all plaintiffs have been placed on an equal footing because defendants waived any domesticity challenge for settlement purposes.[8] And here, unlike in Payment Card,[9] where the same lawyers sought to represent two settlement classes with starkly distinct interests, both the DTC claimants and domestic claimants in this case suffered the same injury and are receiving the same relief. Moreover, there are no claimants here who have not yet been injured, i.e. there is a closed universe of potential claimants.

Additionally, here, unlike in Literary Works,[10] the parties provide an explanation for why the weaker claims are being treated

_____

[8] In Literary Works, the proposed plan of allocation divided plaintiffs' claims into three sub-groups, with those eligible for statutory damages receiving greater relief than those not eligible for statutory damages. 654 F. 3d at 246.

[9] In Payment Card, the Second Circuit examined the settlement's substance for evidence of prejudice and found that "the bargain that was struck between relief and release on behalf of absent class members [was] so unreasonable that it evidences inadequate representation." 827 F.3d at 236. The problem was that merchants in the (b)(2) class that accept American Express or operate in states that prohibit surcharging would gain "no appreciable benefit from the settlement" and merchants that began business after July 20, 2021 would gain "no benefit at all." Id. at 238. Thus, in exchange for nothing, "class counsel forced these merchants to release virtually any claims they would ever have against the defendants." Id. No such problem exists here, where, at worst, recoveries of the domestic claimants are very slightly diluted because the Plan of Allocation does not include a process for differentiating between their claims and the claims of weaker claimants (and awarding the latter a lesser amount).

[10] In Literary Works, the Second Circuit said it could "discern no reason, and authors and publishers offer none" for why the Category

17

equally to the stronger ones: the substantial administrative costs

of differentiating between the comparatively small number of DTC

claimants and the overwhelming majority of domestic claimants.[11]

See Supplemental Declaration of Niki L. Mendoza Regarding Class

Notice, Exclusion Requests, Objections, and Claims Received to

Date ("Mendoza Decl.") ¶¶ 17-19, Exhibit G, Declaration of Emma

Gilmore in Support of Class Plaintiffs' Reply Memorandum of Law,

Dkt. 827 (affirming that "it would be costly to require

transaction-by-transaction determinations of whether" DTC claims

otherwise complied with Morrison and that such analysis would be

"time-consuming" and potentially "delay the administration of

---

C claimants should bear all the losses if the amount of total
claims exceeded the settlement cap. 654 F.3d at 254. "That only
one category of claim was targeted for this penalty without
credible justification," the court reasoned, "strongly suggests a
lack of adequate representation for those class members who hold
only claims in this category." Id.

[11] Class Plaintiffs estimate that DTC claimants make up about 2%
of the class as defined in the stipulation. See Tr. at 7. This is,
they argue, because most of the noteholders whose purchases cleared
through DTC in New York were domestic within the meaning of
Morrison for other reasons having to do with, for example, the
location of the buyers or sellers or the location of the brokers.
See Pl. Reply at 17. Although Class Plaintiffs' evidence on this
point is not conclusive, objectors provide no alternative
calculations supporting their contention that the percentage is
higher than 2%. Additionally, were the Court to adopt objectors'
proposal, no one contests that the claims administrator would have
to undertake an analysis of each transaction and that such a
process would be both timely and costly, detracting from the
recovery of the Settlement Class and delaying distribution. Id. at
20.

claims and distribution of funds"). Lending credence to Class Plaintiffs' explanation is the fact that not one institutional investor has joined Haynes in his objection and Haynes himself has at most a couple hundred dollars at stake. See Tr. at 17:3 (St. John) (estimating Haynes' expected recovery at $66).[12]

Further still, each of the three named plaintiffs in this case are represented by separate counsel, and two of those three named plaintiffs, Hawaii and North Carolina, have exclusively domestic claims, while USS has both domestic and non-domestic claims. In other words, Hawaii and North Carolina are the sort of domestic-only class representatives that Haynes and Bueno ask the Court to appoint. Both were involved in the settlement negotiations and neither objected to the equal treatment of the DTC claimants, even though these institutional investors have orders-of-magnitude more money on the line than Bueno or Haynes and have no plausible reason to agree to disadvantageous settlement terms. See Tr. at 18:12-20 (Dubbs) (explaining that all of Hawaii's transactions were "domestic" per the Court's prior order, that Hawaii was actively engaged in the settlement negotiations, and that Hawaii is "satisfied with the result"). Objectors, for their part, provide no explanation as to why Hawaii or North Carolina would agree to

---

[12] Moreover, the Court notes that defendants "would not have agreed to the Settlement Amount without the inclusion of all the Settlement Class Members as defined." Def. Reply at 7.

19

a settlement that unfairly diluted their expected recovery. Indeed, counsel for these Representatives, while also representing the class as a whole, have a fiduciary duty to their individual clients to ensure that the Agreement and Plan advance their clients' interests. Accordingly, the Court finds that there is insufficient evidence of prejudice here to warrant the appointment of subclass representatives. See Literary Works at 252 (in evaluating the adequacy of representation a Court may "examine a settlement's substance for evidence of prejudice to the interests of a subset of plaintiffs").

### (2) Predominance

Haynes also argues that the presence of the DTC claimants in the class definition means that the proposed class fails to meet the predominance requirement of Rule 23(b)(3). See Haynes Obj. at 9. The problem, according to Haynes, is that domesticity is an individual question requiring class members to present evidence that varies from member to member (including, e.g., facts concerning the formation of contracts, placement of purchase orders, and exchange of money). Id. Haynes faults plaintiffs for failing to put forth "class-wide evidence" of domesticity, which, Haynes argues, is needed to "prevent the fact-finder from 'having to look at every class member's transaction documents to determine who did and who did not have a valid claim.'" Haynes Obj. at 10 (quoting In re Petrobras Sec., 862 F.3d 250, 274 (2d Cir. 2017)).

20

But the predominance requirement differs between trial and settlement. See AIG, 689 F.3d at 241. That, as noted above, is because "with a settlement class, the manageability concerns posed by numerous individual questions [] disappear." Id. After all, the proposal is "that there be no trial." Amchem, 521 U.S. at 620. Although a Court must still consider whether the class is "cohesive," all plaintiffs here claim injury by reason of the same conduct, defendants' purported misrepresentations and omissions are common to all, plaintiffs' proof of intent would not differ between class members, and all class members have suffered an identical kind of injury. See Green v. Wolf Corp., 406 F.2d 291, 299-301 (2d Cir. 1968).[13] Accordingly, while a class including DTC claimants and domestic claimants might have created manageability problems or other challenges at trial, here, in the settlement context, such concerns are irrelevant. As domesticity is the only issue objectors contend poses a problem in this regard, the Court finds that common issues predominate and that Rule 23(b)(3) is satisfied for purposes of settlement.[14]

---

[13] Moreover, the Second Circuit has previously held in this very case that, even in the trial context, after weighing the relationship between common and individual questions, the district court might yet "determine that any variation across plaintiffs" when it comes to domesticity on balance were "insufficient to defeat predominance." In re Petrobras Sec., 862 F.3d at 274 n.27.

[14] The Court approves the Plan of Allocation for the same reasons set forth above, finding that it is fair, reasonable, and adequate.

## B. Class Notice

Gielata argues that the Class Notice is deficient because it fails to disclose three categories of materially relevant information: (1) the percentage of the Settlement Fund apportioned to American Depository Shares ("ADS"); (2) an explanation of why a release is given to the underwriter defendants despite their failure to contribute to the Settlement Amount; and (3) the compensation due to the claims administrator. See Gielata Obj. at 9-10. Gielata seeks supplemental notice and objects to the compensation of the claims administrator to the extent that it exceeds 1% of the Settlement Fund ($30 million). Id.

As regards the percentage of the Settlement Fund apportioned to ADS, the Plan of Allocation discloses how that percentage will be calculated and Gielata cites no case law for the proposition that such notice is deficient where it does not include break-downs of expected payouts.

As regards the Underwriter Defendants' contribution (or lack thereof) to the Settlement Fund, there is no requirement that the Notice disclose the rationale behind the release. See O'Brien v. Nat'l Prop. Analysts Partners, 739 F. Supp. 896, 902 (S.D.N.Y. 1990). Moreover, it is permissible for an issuer to provide to the underwriters that it indemnifies a release in a settlement without requiring a contribution from those underwriters. And, as the Court knows from its familiarity with the underlying case, the

22

plaintiffs' case against the underwriters was materially weaker than its case against the Petrobras Defendants and PwC Brazil.

As regards the claims administrator, that administrator, the Garden City Group, disclosed at the hearing (at the Court's direction) that it will in no event be paid 1% or more of the settlement fund and that its compensation is capped at $19 million. See Tr. at 22. Accordingly, the Court finds that the disclosure in this case was sufficient (and that the compensation of the claims administrator is reasonable).[15]

## C. Cy Pres Award

Haynes and Bueno object to the cy pres recipient designated in the proposed settlement agreement. See Haynes Obj. at 8-9; Bueno Obj. at 4. As mentioned at the hearing, see Tr., the Court will permit further briefing on this issue, as appropriate, if and when the question becomes ripe for consideration, and the Court retains jurisdiction for that purpose.

## D. Settlement Amount

Giulio Pieter Formenti, on behalf of Renewable Carbon Corp. ("RCC"), objects to the size of the settlement, arguing that a "fair" settlement for investors would be "the full value of the loss realized," or $12.40 per share. See Formenti Obj. at 2. RCC,

---

[15] Bueno also argues that the Notice was deficient because, inter alia, the Plan of Allocation was not provided on the notice website and Class Plaintiffs have concealed the damages estimate provided by their expert. These arguments are without factual basis.

however, lacks standing to make this objection. RCC sold all of its Petrobras Securities on July 31, 2013, more than a year before the first alleged corrective disclosure in this case on October 16, 2014. See id. at 8 (showing that RCC sold its 90,200 shares of Petrobras on July 31, 2013). Moreover, as previously noted, any recovery in this case was far from a certainty, given the substantial defenses that were raised.

Bueno also objects to the settlement amount as part of a "kitchen-sink" brief that purports to identify inequities relating to at least a dozen aspects of the proposed settlement. See Bueno Obj. at 2-12. But as regards the settlement amount, Bueno argues only that Class Plaintiffs overstate the risks of proceeding to trial, see id. at 6, and that certain market analysts had expected settlement figures of between $5 billion and $10 billion, see id. at 2 n.1. Bueno does not weigh the other Grinnell factors, or consider the fact that the settlement amount represents a 65% premium over the settlements reached by institutional plaintiffs in the previously-settled individual actions. Indeed, the small number of objectors, their minor stakes in the settlement, and the size of the premium strongly suggest that the settlement amount is fair, adequate, and reasonable.

## E. Other Objections

Bueno also objects to the Plan of Allocation as an "improper claimant fund-sharing scheme," id. at 9-11, that is "inappropriate

24

to the extent that silent class members receive nothing and class members who submit claims do not receive anything approaching their actual damages," id. at 10. But the only relevant authority cited by Bueno for this proposition is entirely inapposite. See Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1018 (2d Cir. 1973), vacated, 417 U.S. 156 (1974) (finding "fluid recovery" an "illegal" solution to manageability problems).[16] Among other things, the proposed settlement here requires proof of claim and the Plan of Allocation sets forth estimated distributions per share and per note before fees and expenses.

Martinez objects to the settlement's release of unknown claims, its failure to take into account "damages due to emotional stress," its failure to stipulate or disclose the "value" of the net settlement fund, and the payment of Class Counsel prior to the Court's determining what amount "was actually paid in cash to the class." See Martinez Obj. at 1-3.

Martinez cites no authority for his arguments. Indeed, the Court is of the view that the notice was sufficient and the Settlement is highly beneficial to Martinez. If Martinez remains a member of the class, Martinez will enjoy a recovery 65% larger per share than that enjoyed by numerous institutional plaintiffs

---

[16] In Eisen, "the cost of obtaining proofs of claim by individual members of the class and processing such claims was such as to make it clear that the amounts payable to individual claimants would be so low as to be negligible." 479 F.2d at 1017.

25

who spent large sums of money affirmatively litigating their same claims against defendants. Moreover, it is worth noting that, even taking the allegations in plaintiffs' complaints as fact, only a portion of the losses suffered by Petrobras shareholders in recent years are attributable to defendants' fraud. Losses incurred due to economic and political factors cannot be recovered through class action litigation. Finally, Martinez's objection to the timing of payment of counsel is discussed below.

## II.  Plaintiffs' Motions for Attorneys' Fees and Costs

Bueno objects to the compensatory award requested by the Class Representatives, and Bueno, the Bishops, Martinez, Gielata, and Haynes object to the fee award requested by Class Counsel. Wolf Popper, Almeida, KSF, and BLBG also move, without opposition or objection, for their fees and costs. The Court considers each request in turn.

### A. Class Representatives

Class Representatives seek, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), an award of $400,000 for expenses incurred directly relating to their representation of the class. See Memorandum of Law in Support of Class Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Fee Mem.") at 1, Dkt. 787.

Bueno argues that there is no way for the Court to calculate the reasonableness of the amount as plaintiffs have not provided

a break-down. See Bueno Obj. at 12. But each Representative has provided sworn statements detailing the work performed, the people who performed it, and the time expended. See Dkts. 789-12-14. The Representatives also calculated estimated hourly rates. Id. The work performed by named plaintiffs was beneficial to the class and included reviewing drafts of the complaints, responding to defendants' interrogatories and document requests, producing responsive documents, providing oversight of the mediation and settlement process, authorizing the settlements, and reviewing drafts of the settlements before they were filed with the Court. See Corrected Decl. of Jeremy A. Lieberman ¶¶ 449-53, Dkt. 789. Lead plaintiff USS's representatives, for example, attended every substantive hearing and mediation session, and reviewed the vast majority of significant filings. See Fee Mem. at 25. USS also conducted at least 70 telephonic and in-person meetings with Class Counsel. Id.

When selecting the Class Representatives, the Court explicitly sought out representatives prepared to be highly engaged in the litigation. From its own review, the Court is more than satisfied that this expectation has been fully met. Accordingly, the Court finds that the requested awards are fair and reasonable.

**B. Class Counsel**

27

Class Counsel seeks a fee award of \$284.4 million and reimbursement of \$14,515,235.24 in litigation expenses.

Haynes, Gielata, Bueno, the Bishops, and Martinez object. Haynes argues (1) that Class Counsel's lodestar is substantially overstated, (2) that a multiplier of 1.78 stands at the outer limit of what the Court should allow, and that, accordingly, (3) class counsel's fee request should be reduced to \$90.3 million or 3% of the \$3 billion fund. See Haynes Obj. at 12-25. Gielata argues that (1) no lodestar multiplier is warranted in this case, (2) Class Counsel's lodestar is vastly inflated, (3) public policy disfavors a \$285 million fee award, and (4) a fee award of 2% or \$60 million would be appropriate. See Gielata Obj. at 10-20. Bueno argues that Class Counsel's fee request is excessive. See Bueno Obj. at 13. The Bishops argue that Class Counsel's fee award should be cut in half. See Bishop Obj. at 1. And Martinez argues that the Court should not award attorney's fees as a percentage of the Settlement Amount. See Martinez Obj. at 2.[17]

Under controlling law, "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his

---

[17] As noted, defendants, at the Court's request, submitted a letter on May 7, 2018 assessing the reasonableness of Class Counsel's fee application, and flagging for the Court's consideration, inter alia, the rates charged by more than 100 staff attorneys and project attorneys, the rates charged for translation work, and specific instances where counsel's time sheets do not support the amount of time billed. See Def. Ltr. at 2-3.

client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). "The rationale for the doctrine is an equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost." Goldberger v. Integrated Res., Inc., 209 F.3d 43, 47 (2d Cir. 2000). Fee awards also "serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons," and therefore "to discourage future misconduct of a similar nature." In re FLAG Telecom Holdings, Ltd. Sec. Litig., No. 02 Civ. 3400, 2010 WL 4537550, at *23 (S.D.N.Y. Nov. 8, 2010).

At the same time, counsel are not entitled to reap a windfall. See Goldberger, 209 F.3d at 49; Grinnell, 495 F.2d at 469. To that end, the Court must consider the reasonableness of the fee award in light of (1) the time and labor expended; (2) the magnitude and complexities of the litigation; (3) the risks of the litigation; (4) the quality of counsel's representation; (5) the requested fee in relation to the settlement; and (6) public policy. Id. at 50 (citing Union Carbide, 724 F. Supp. at 163). In considering these factors, Class Counsel's "lodestar" - i.e., what its work would have cost if billed at ordinary hourly rates - "remains useful as a baseline." Id.

**(1) The Lodestar**

29

Class Counsel states a lodestar of $158,923,426.50. This amount comprises over $110 million "billed" by Pomerantz contract and staff attorneys and over $27 million "billed" by Pomerantz partners and associates.[18] It also includes over $10 million "billed" by Labaton lawyers and $1.8 million "billed" by Motley Rice lawyers.

Rather than go to the added, considerable expense of appointing a Special Master, the Court asked the Petrobras Defendants to review the time sheets of Class Counsel and to identify issues meriting the Court's close attention. See Transcript dated February 23, 2018 at 34-35, Dkt. 773. Although somewhat unusual, the Court took this step because of defendants' intimate knowledge of various aspects of the case, and the Court's confidence was rewarded by the highly professional way in which defendants' counsel undertook their Court-directed task.

Among other things, defendants identified a series of specific instances where counsel's time sheets did not support the amount of time billed. For example, defendants' highlighted entries for one project attorney who billed 23 consecutive billable

---

[18] Nonetheless, it is well to keep in mind that cases like this one are always handled on a contingent fee basis, so that plaintiffs' counsel never do, in fact, bill the class on an hourly basis. Plaintiffs' counsel's real profit is the difference between what they pay their attorneys and staff on a salaried basis and what they receive in their fee award, and to this extent the "lodestar" is a somewhat artificial measure, though still useful as a check.

days for reading news articles on Petrobras - on most days for exactly 8.0 or 9.0 hours per day - totaling approximately 185 hours. Id. at 7. In another instance, a project attorney spent seven consecutive days reviewing the Consolidated Third Amended Class Action Complaint for at least 48 hours of total time after the Complaint had been filed. Id. Yet another project attorney billed eight hours per day at $450 per hour listing only "office closed" as the work description. Id.

While Class Plaintiffs did not necessarily concede the dubiousness of these and other charges questioned by defendants, they did voluntarily remove a number of them (such as the project attorney time billed while the office was "closed"), reducing their total lodestar from $159,496,169.50 to the above-mentioned $158,923,426.50. See Pl. Ltr. at 29. At the same time, Class Plaintiffs strenuously defended as justified and appropriate certain other charges identified by defendants. See id. In the end the Court, having undertaken its own personal review of the time sheets, concludes that the more global reductions described below, together with the aforementioned reductions agreed to by plaintiffs' counsel, sufficiently account for any sporadic and idiosyncratic overcharging that may have occurred.

Gielata argues that Pomerantz's billing rates for staff and contract attorneys are excessive and that such rates should be capped at a maximum of $200 per hour. See Gielata Obj. at 18-20.

Gielata further argues that the Court should reduce the number of reimbursable hours billed by these attorneys by 20% because their work focused on document review. Id. at 19.

Haynes argues that the $27,857,241.50 charged by 27 foreign project associates should be billed at-cost as an expense, see Decl. of Anna St. John ¶ 5, Dkt. 800 (listing the contract attorneys admitted only in Brazil and their amounts billed). According to Haynes, an attorney must be at least capable of being admitted pro hac vice in this Court in order to recover fees for legal services. See Haynes Obj. at 13-14 (citing Spanos v. Skouras, 364 F.2d 161, 168 (2d Cir. 1966) (en banc) and In re One Infant Child, No. 12 Civ. 7797, 2014 WL 704037, at *5 (S.D.N.Y. Feb. 20, 2014), rev'd sub nom. Souratgar v. Lee Jen Fair, 818 F.3d 72 (2d Cir. 2016) (denying reimbursement for legal services by a foreign attorney not admitted to practice in the United States)). Haynes further argues that the rates for contract attorneys should be reduced to $75 per hour and that the Court should sanction Class Counsel for overinflating their lodestar by applying a further 20% reduction. Id. at 18.

In evaluating these and other objections, the Court has spent a considerable amount of time personally reviewing the billing documentation submitted by plaintiffs' counsel, as well as the objections and responses pertaining thereto. The various reductions made below reflect not only that review, but also the

Court's familiarity from various other cases with appropriate billing rates and time allocations.

As regards the time billed by 27 foreign attorneys, Class Counsel do not address the case law cited by Haynes or identify cases supporting their position. Moreover, it would be improper to charge the class U.S.-attorney rates for this work. Accordingly, the full amount billed by these individuals must be deducted from Class Counsel's lodestar (approximately $27,569,829).[19] However, Class Counsel may add to their reimbursement request the actual costs they incurred compensating these attorneys.

As regards the amounts billed by staff and contract attorneys in this action (approximately $89,410,520.50 at Pomerantz, $6,375,370 at Labaton, and $1,180,333 at Motley Rice), see Def. Ltr. at 10,[20] the Court agrees with objectors that a reduction is appropriate to account for the considerable time spent by these attorneys on low level document review. However, given the legal

---

[19] This figure takes into account the fact that Pomerantz, in adjusting its original lodestar, already subtracted around $287,412.50 from the time billed by these attorneys. See Decl. of Anna St. John ¶ 5, Dkt. 800.

[20] Whereas the Petrobras Defendants calculated a staff and project attorney lodestar for Motley Rice of $1,201,798, see Dkt. 793 at 10, the lower figure cited above takes into account the fact that Motley Rice withdrew certain time entries, reducing this amount by at least $21,465. Similarly, the figure for Pomerantz represents the firm's revised lodestar, $116,980,349.50, see Pl. Ltr. at Ex. A, less the amount billed by individuals not admitted to practice law in the United States, $27,569,829.

experience, language skills, and status of these attorneys,[21] the Court disagrees with Gielata and Haynes that their rates should be capped at or below $200. A more appropriate reduction is the one suggested by Gielata of 20%.

As regards the amounts billed by these attorneys for translating documents, however, a further reduction is required. While Class Counsel appropriately used attorneys to perform certain translation work in this case, such work is not appropriately billed at rates of between $325 and $625 per hour. Accordingly, these amounts (approximately $10 million at Pomerantz, $4,162,555 at Labaton, $752,783 at Motley Rice)[22] must be reduced by a further 50%.

Applying all the foregoing adjustments, and "rounding up" the figures in counsel's favor, the Court calculates an adjusted

---

[21] For example, some of these attorneys received health insurance and an opportunity to participate in the firm's 401(k) program.

[22] $13,174,549 of Pomerantz's original lodestar is attributable solely to translation work performed by staff and project attorneys. See Def. Ltr. at 6. This figure, however, is both over- and under-inclusive. It is over-inclusive because it counts the time "billed" by non-U.S. attorneys, which the Court determined should be subtracted in its entirety. It is under-inclusive because it does not count the substantial amount of time "block billed" by Pomerantz lawyers for multiple tasks, including translation work. Indeed, the total time attributable in whole or in part to translation is more than $35 million and, subtracting non-U.S. attorney time, around $25 million. Nonetheless, this figure is still considerably over-inclusive. Accordingly, the Court adopts $10 million as a reasonable estimate of the amount of time Pomerantz billed (in its remaining lodestar) for translation work.

34

lodestar of $104.8 million, consisting of $96.0 million at Pomerantz, $7.5 million at Labaton, and $1.3 million at Motley Rice.

**(2)  The Multiplier**

"[T]here is a strong presumption that the lodestar is sufficient," Perdue v. Kenny A., 559 U.S. 542, 546 (2010), without an enhancement multiplier. The fee applicant bears "the burden of proving that an enhancement is necessary." Id. at 553.

Gielata contends that no multiplier is warranted in this case because the risk of non-recovery was practically nonexistent, and Class Counsel's representation was unexceptional. See Gielata Obj. 11-16. Haynes concedes that a multiplier is warranted but argues that no more than the requested 1.78 multiplier is appropriate. See Haynes Obj. at 19-23. Anticipating a possible lodestar reduction, Class Counsel argues that even at "$104,461,062 [the] requested multiplier would be 2.7, well within the range of acceptable multipliers in this Circuit." Pl. Ltr. at 29. Accordingly, Class counsel contend, the Court should honor the ex ante fee agreement executed by Class Counsel with USS and award $284.5 million. See Fee Mem. at 17-21.

As an initial matter, the Court finds that there was, as previously mentioned, sufficient risk at both the motion to dismiss phase and the motion for summary judgment phase to warrant a multiplier. Additionally, the Court finds that Class Counsel's

35

performance was in many respects exceptional, with the result that, as noted, the class is poised to enjoy a substantially larger per share recovery than the recovery enjoyed by numerous large and sophisticated plaintiffs who separately settled their claims. It also bears mentioning, however, that this case involved fraud allegations that were previously widely reported and heavily investigated by the authorities in Brazil, so that much of the work that might otherwise have been required of plaintiffs' counsel had already been done, and done in a way that enhanced plaintiffs' bargaining position. As for the fact that plaintiffs negotiated, at the outset of the case, a particular fee arrangement with a particular client, this is at best just one factor to be weighed in assessing, after settlement has been reached, the full set of intervening events that have occurred and that provide a much better indication of what was the value of the attorneys' work to the class as a whole than any before-the-fact private agreement reached with an individual plaintiff.

Indeed, one purpose of the lodestar check is to ensure that even an arms-length fee agreement reached between class counsel and class representatives does not result in a harvest of fees at the expense of the class. As Class Counsel's adjusted lodestar is $104.8 million (and Class Counsel likely spent far, far less than this compensating its attorneys), the Court believes that the original 1.78 multiplier requested by Class Counsel is sufficient

to adequately account for the risks undertaken and the results achieved. Additional compensation above this amount would represent a windfall to Class Counsel, who were highly incentivized to heavily litigate this huge case regardless of the expected fee award.

It is important to also remember that we are dealing here, not just with percentages, billable rates, and multipliers, but with very large amounts of money in absolute terms that plaintiffs' counsel will be receiving under any analysis. Accordingly, the Court grants Class Counsel's motion in part and awards fees in the amount of $186.5 million - consisting of $170,880,000 to Pomerantz, $13,350,000 to Labaton, and $2,314,000 to Motley Rice - or roughly two-thirds of what was sought. The Court also awards costs in the amount of $14,515,235.24, plus whatever amount Class Counsel paid to employ the 27 foreign contract attorneys mentioned above.

As regards the fee award, fifty percent is payable to counsel immediately upon entry of final judgment. The other fifty percent shall be paid only after the distribution is completed. This schedule, which the Court has routinely employed in other cases, reflects that, on the one hand, counsel have spent a great deal of time and money to litigate this case and should not have to continue to shoulder the costs of funding this litigation any longer than necessary, but that, on the other hand, counsel should not be paid in full before their clients have received any of their

37

recovery, nor would it be helpful to eliminate an incentive for counsel to monitor the distribution agent and ensure that the settlement funds are distributed expeditiously. Dispensing half of counsel's fee award now and half later achieves both these purposes.[23]

## C. Wolf Popper and Almeida

Wolf Popper and Almeida, counsel for the plaintiffs in Kaltman v. Petroleo Brasileiro S.A., No. 14 Civ. 9662 (S.D.N.Y.), seek an award of $307,629 in attorneys' fees and reimbursement of $1,219.66 in expenses. See Pl. Reply at 26-27. Class Counsel agrees to pay these fees out of its fee award. Id. As regards Wolf Popper's reimbursement request (which includes costs for filing fees, publishing the PSLRA notice, and online research) Class Counsel states that it is reasonable and the Petrobras Defendants state that counsel made a substantial contribution to the settlement outcome for the Settlement Class. Accordingly, the Court grants Wolf Popper's and Almeida's motions in full.

## D. KSF

KSF seeks $589,915.50 in attorneys' fees and reimbursement of $2,650 in expenses. Id. at 27. Class Counsel agrees to pay the requested fees from its fee award. As regards KSF's expense request

---

[23] As noted earlier, Martinez objects to the immediate payment of counsel's legal fees. While it is not clear what timing objector has in mind or exactly what his rationales are, this resolution more than addresses any legitimate concerns he might have.

38

(which includes primarily transcript and court reporter costs), Class Counsel represents that KSF's work was performed with proper diligence and the Petrobras Defendants state that KSF made a substantial contribution to the class. Accordingly, the Court grants KSF's motion in full.

## E. BLBG

BLBG seeks $2,114,085 in attorneys' fees and reimbursement of expenses in the amount of $1,146,873 for work performed and expenses incurred in relation to the prosecution of its claims on behalf of plaintiffs in four related cases: Hartford Mutual Funds, Inc. v. Petroleo Brasileiro S.A., No. 15 Civ. 9182 (S.D.N.Y.); Massachusetts Mutual Life Insurance Co. v. Petroleo Brasileiro S.A., No. 15 Civ. 9243 (S.D.N.Y.); Pacific Funds, et. al v. Petroleo Brasileiro S.A., No. 16 Civ. 2013 (S.D.N.Y.); and The Prudential Insurance Co. v. Petroleo Brasileiro S.A., No. 16 Civ. 7192 (S.D.N.Y.). See Application of Bernstein Litowitz Berger & Grossmann LLP for Reimbursement of Attorneys' Fee and Litigation Expenses ("BLBG Mem."), Dkt. 785.

BLBG does not seek an award equal to its lodestar but rather wishes that its adjusted lodestar be recognized by the Court and allocated at Class Counsel's discretion. See BLBG Mem. at 5. Class Counsel offers, with this caveat, to pay BLBG's fees out of its own fee award. See Pl. Reply at 29.

39

As regards BLBG's reimbursement request, Class Counsel "observe[s] that $256,867.35 of the requested expenses [are] attributable to the retention of the Direct Action Plaintiffs' loss causation/damages expert," who submitted a report that, Class Counsel asserts, was not beneficial to the Settlement Class. See id. Indeed, Class Counsel argues that the report was, in fact, detrimental to the Class and that reimbursement of this expense should be denied. See id. at 30.

The balance of BLBG's expense request consists of $616,745.70 for external ESI vendors, $192,400 for a financial consultant, $21,371.91 for travel, working meals, and transportation, $18,810.09 for legal research services, $17,842.96 for court reporting, transcripts, court fees, and service of process, $17,333.34 for mediation fees, and $5,502.38 for telephone costs, postage, and delivery costs. See Dkt. 786-28.

While BLBG persuasively argues that many of its efforts substantially aided the class and that the inclusion of the four above-mentioned plaintiffs in the settlement was a material term to the Settlement Agreement, a contention that neither defendants nor objectors dispute, see BLBG Mem. at 18, BLBG fails to show that its disbursements for mediation costs and expert costs advanced the interests of the class.[24] When these plaintiffs

---

[24] BLBG does not even seek to explain why or how the mediation benefited the class. See BLBG Mem. at 20.

decided to pursue individual actions rather than join the class, they accepted the risk that expense incurred by their counsel for efforts that did not redound to the benefit of the class (for whatever reason) would not be reimbursed by the class in the event that they later chose to opt-in to a class-wide settlement. Accordingly, the Court awards fees to BLBG in an amount to be determined by Class Counsel to be paid out of Class Counsel's fee award, but costs to BLBG in the amount of only $872,673.04 to be paid out of the Settlement Fund.

## III. Conclusion

For the reasons stated above, and in the Court's preliminary approval of the settlement, the Court finds that the Settlement Agreement and Plan of Allocation are fair, reasonable, adequate, and otherwise in compliance with all applicable legal standards. Accordingly, the Court grants the motion of Class Plaintiffs for certification of the Settlement Class and for final approval of the Settlement Agreement and Plan of Allocation.

The Court also grants in part Class Counsel's motion for fees and costs, awarding in fees $300,000 to USS, $50,000 to North Carolina, $50,000 to Hawaii, $170,880,000 to Pomerantz, $13,350,000 to Labaton, and $2,314,000 to Motley Rice, and $14,515,235.24 plus the costs expended by Pomerantz on 27 foreign contract attorneys to Class Counsel in costs.

41

The Court also grants in part the motion of BLBG, awarding BLBG fees in an amount to be determined by Class Counsel to be paid from Class Counsel's fee award and $872,673.04 in costs to be paid from the Settlement Fund; grants in full Wolf Popper's motion, awarding Wolf Popper $107,629 in fees to be paid from Class Counsel's fee award and $1,219.66 in costs to be paid from the Settlement Fund; grants in full Almeida's motion, awarding Almeida $200,000 in fees to be paid from Class Counsel's fee award; and grants in full KSF's motion, awarding KSF $589,915.50 in fees to be paid from Class Counsel's fee award and $2,650.59 in costs to be paid from the Settlement Fund. As regards the fee awards, as noted above, counsel are to be paid 50% of the amounts due upon entry of final judgment and the remaining amounts after the settlement funds have been fully distributed to the class.

The Clerk is instructed to enter Final Judgment in accordance with the preceding paragraph, to close docket entry numbers 777, 781, 784, and 791, and to close the case. The Court will, however, retain jurisdiction over any further disputes arising in connection with the implementation of the Settlement or the payment of fees and costs.

SO ORDERED.

Dated:   New York, NY
         June 22, 2018                    _____
                                          JED S. RAKOFF, U.S.D.J.

42