I649petc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE: PETROBRAS,

4
                                        14 CV 9662 (JSR)
5

6   ------------------------------x
                                        New York, N.Y.
7                                       June 4, 2018
                                        2:09 p.m.
8
    Before:
9
                        HON. JED S. RAKOFF
10
                                              District Judge
11
                            APPEARANCES
12
    POMERANTZ
13          Attorneys for Class Plaintiffs
    BY:  JEREMY LIEBERMAN
14       MARC I. GROSS
         BRENDA SZYDLO
15       EMMA GILMORE
         JENNIFER PAFITI
16       JOHN A. KEHOE

17  USS INVESTMENT MANAGEMENT LIMITED
    BY:  JEREMY HILL
18  Group General Counsel

19  LABATON SUCHAROW
         Attorneys for Plaintiff Hawaii
20  BY:  THOMAS A. DUBBS
         LOUIS GOTTLIEB
21
    STATE OF NORTH CAROLINA
22  DEPARTMENT OF STATE TREASURER
    BY:  MERYL MURTAGH
23  Corporate Governance Attorney

24

25

I649petc

APPEARANCES CONTINUED

CLEARY GOTTLIEB STEEN & HAMILTON
        Attorneys for Defendant Petrobras
BY:   ROGER A. COOPER
        LEWIS J. LINMAN

SKADDEN, ARPS, SLATE, MEAGHER & FLOM
        Attorneys for Underwriters
BY:   JAY B. KASNER
        SCOTT D. MUSOFF

KING & SPALDING
        Attorneys for Defendant PricewaterhouseCoopers Brazil
BY:   MICHAEL R. PAUZÉ
        JAMES J. CAPRA, JR.

I649petc

1              (Case called)

2              MR. LIEBERMAN:  Good afternoon, your Honor.

3              Jeremy Lieberman from Pomerantz for class plaintiffs.

4      With me is Jeffrey Hill from USS.

5              THE COURT:  Good afternoon.

6              MR. DUBBS:  Good afternoon, your Honor.  Thomas Dubbs

7      for Hawaii.

8              MS. GILMORE:  Good afternoon.  Emma Gilmore from

9      Pomerantz.

10             MS. MURTAGH:  Meryl Murtagh with the North Carolina

11     State Treasurer for the plaintiffs.

12             MS. SZYDLO:  Brenda Szydlo, Pomerantz, plaintiffs.

13             MR. GROSS:  Marc Gross, Pomerantz, for the lead

14     plaintiffs.

15             MR. COOPER:  Good afternoon, your Honor.

16             Roger Cooper from Cleary Gottlieb on behalf of

17     Petrobras defendants.

18             MR. LINMAN:  Good afternoon.  Lewis Linman from Cleary

19     Gottlieb on behalf of Petrobras defendants.

20             MR. KASNER:  Good afternoon, your Honor.  Jay Kasner

21     from Skadden Arps on behalf of the underwriters.

22             And before my colleague introduces himself, which I

23     would dare not do, we have a number of summer students that are

24     spending the summer with us that are in the courtroom as well.

25             THE COURT:  Wait a minute.  You have let summer

I649petc

students leave your premises?

     MR. KASNER:  Your Honor, I took your cue, having

brought your class down to the last hearing.

     THE COURT:  Fair enough.

     MR. MUSOFF:  Good afternoon, your Honor.

     Scott Musoff from Skadden Arps for the underwriter

defendants.

     MR. PAUZÉ:  Good afternoon, your Honor.

     Michael Pauzé and Jim Capra from King & Spalding on

behalf of PricewaterhouseCoopers Brazil.

     THE COURT:  Who, in addition to counsel for the

parties, is there anyone here for any of the objectors?

     MS. ST. JOHN:  Good afternoon, your Honor.

     Anne St. John with the Competitive Enterprise

Institute on behalf of objector William Thomas Haynes as

Trustee of the W. Thomas and Katherine Haynes irrevocable trust

for the been of Sara Haynes.

     THE COURT:  Good to have you here.  Anyone else?

     MR. MARTINEZ:  Jul Martinez.

     I'm one of the objectors, me and my wife, Sandra

Bennun.

     THE COURT:  Anyone else?  From the objectors?

     All right.  So I should mention I have a jury that is

deliberating as we speak.  So if they have notes at any time

we'll have to interrupt and you'll have to clear the counsel

I649petc

1    table for those occasions.  But at least for now they're quiet.

2            So I have a number of questions and then we'll hear

3    from anyone who wants to be heard independent of my questions.

4            Of the objections that were raised, I thought the one

5    that at least gave me some pause was that even though the class

6    that I had certified for trial purposes did not include what

7    I'll call nondomestic parties or nondomestic claimants.  The

8    settlement did include those.  Many of them may have been, in

9    fact, domestic, but these were shareholders whose transactions

10   were settled by Depository Trust Company and the question then

11   becomes whether they should have been separately represented in

12   the settlement discussions.

13           So the first thing I need to know from plaintiffs'

14   counsel, because I didn't go back and check, are all the

15   individual plaintiffs, what I'm calling domestic in the sense

16   that they were covered by the original class certification

17   ordered by the Court.

18           MR. LIEBERMAN:  Your Honor, good afternoon.  Thank

19   you.  The class plaintiffs Hawaii, North Carolina, their

20   purchases are all domestic and were all deemed to be domestic.

21   USS did have bond transactions that were dismissed by -- with

22   respect to your Court's decision.

23           THE COURT:  Did it have others that were not?

24           MR. LIEBERMAN:  Well, sure.

25           THE COURT:  So, in terms of the settlement they could

I649petc

1     wear both hats, assuming that was permissible?

2               MR. LIEBERMAN:  Absolutely.

3               And I would raise the issue is -- those who have been

4     dismissed, if they should be represented separately that

5     raises -- they were treated -- those who were dismissed were

6     treated equally as those who were not dismissed.  So it's a

7     fair deal for those foreign purchasers.  The question is:  Is

8     it a fair deal for those who purchased in the United States?

9               THE COURT:  That's the objection.  The objection came

10    from a domestic purchaser.

11              MR. LIEBERMAN:  Yes.

12              THE COURT:  Making the claim that it's possible that

13    if they had been separately represented, the representatives of

14    the domestic purchasers would have demanded more and would have

15    demanded -- and would have argued that the nondomestic

16    purchasers weren't entitled to anything or to very little since

17    their claims have been dismissed.

18              So, I can understand from the defense standpoint why

19    they would be delighted to have a global settlement.  But the

20    question is whether the return for the domestic purchasers was

21    diminished by the fact that the settlement also includes

22    nondomestic purchasers.

23              MR. LIEBERMAN:  Your Honor, there is no evidence that

24    there was any material effect.  What we've submitted to the

25    Court is of the noteholders from what we see, about 70 percent

I649petc

1    were those located in the United States.  If you take those

2    70 percent, using statistical analyses, you would have about

3    91 percent of the noteholders would be those that qualify as --

4    in the domestic transaction, either you're purchasing from or

5    you are a domestic transaction.

6             So 91 percent of the noteholders, comparing that to

7    the overall class, you're talking about, that's about two

8    percent then of the entire class as a whole.

9             So then there is a possibility that two percent is

10   getting a better deal than they should.  That's what the

11   argument would be.

12            They certainly have to get something.  Because they

13   didn't have dismissed claims.  It was subject to appeal.  We

14   think it was a credible appeal to that and potentially credible

15   motion for reconsideration.

16            But what we analyze is based on that two percent did

17   it make sense -- that forces us then, if we're going to start

18   to change the plan of allocation, we have to then plunge into

19   the merits of every single one of those note transactions and

20   determine whether or not they've met the domesticity test.

21            Your Honor, as defendants made a very good show of

22   this through the year-and-a-half appeal that we were wrong,

23   that could be a complicated question, and that raises

24   complicated questions.  The question would be:  Where did you

25   make your transaction?  Where were you located?

I649petc

1          THE COURT:  What you are saying, if I understand it,

2    is that the kind of analysis that you did was from the

3    standpoint of that it was still in the, to the benefit of the

4    domestic purchasers to enter into this deal notwithstanding

5    that included this two percent.

6          MR. LIEBERMAN:  That's correct, your Honor.

7          THE COURT:  Because both logistically and in other

8    ways it would have been prohibitive to proceed otherwise; and

9    that if you excluded them altogether, you ran the risk of not

10   getting a settlement.  But I'm a little unsure about whether

11   I'm right about the latter part of that.

12         MR. LIEBERMAN:  It's not just a matter of getting the

13   settlement.  It's about how complicated would the claims

14   administration process be.

15         THE COURT:  I understand that point.

16         My point is:  Did you propose to defense counsel:

17   Well, we'll just settle for the -- everyone but that two

18   percent?

19         MR. LIEBERMAN:  Your Honor, that was not a -- that was

20   not part of the negotiation.  It was agreed upon that this was

21   an appropriate way to proceed.  We felt it was appropriate --

22   we were representing those claimants throughout the case.  And

23   they did have a right to appeal.  So the question is then:

24   Will you have to cordon off a class, those whose claims would

25   have been dismissed and would not have met the Morrison

I649petc

1    standard under irrevocable liability but may under this DTC

2    test meet it, and that's really the question that's before the

3    Court.

4            They did have a claim.  Those claims did warrant them

5    compensation.  And so then the question is:  Was it appropriate

6    to make the plan of allocation uniform as to those claimants

7    and was it appropriate for us to represent those shareholders?

8    We think the answer is absolutely yes in both instances.

9            THE COURT:  So, the Second Circuit has a case that I

10   think might be of relevance, In Re:  Literary Works, 654 F.3d

11   242, a 2011 Second Circuit decision, that the objectors

12   actually didn't refer to but you referred to it obliquely and

13   said you with distinguish it but I don't think I remember you

14   actually doing that.

15           So why doesn't In Re:  Literary Works apply?

16           MR. LIEBERMAN:  Your Honor, In Re:  Literary Works the

17   situation is vastly different.  There, there were three

18   categories of claimants and settlements:  Those who timely

19   filed their work with the copyright office, those who had done

20   so not timely, and those who had not filed their work with the

21   copyright office.  So those are the three claimants.  And all

22   of them got a separate distribution.  And the issue was on

23   category C.  There was a category C reduction.  Category C in

24   that case accounted for 99 percent of the claimants in that

25   action.  And, yet, they were getting the largest reduction.

I649petc

1    And even worse, not only did they get the largest reduction

2    because, well, they hadn't filed their copyright yet so,

3    therefore, their claim was less viable; but if the claims in

4    that case had reached a certain level, they would be even

5    further diluted; potentially they would get nothing.  And so

6    you had that scenario.  99 percent of the class was in this

7    category C.  They were clearly getting a reduction.  And not

8    only that, the plan of allocation would have given them even a

9    further reduction.

10          That's much different than what we have.  We have two

11   percent potentially of the class, we don't know, potentially

12   two percent of the class not getting any reduction and the

13   question then is -- there is no question of fairness to those

14   who have been dismissed.  The question is:  Is it fair to it's

15   rest of the class?

16          THE COURT:  No.  That's the objection that's being

17   raised.

18          MR. LIEBERMAN:  We determined, after talking to the

19   claims administrator, that automatically if we would limit the

20   class to those who met this Court's irrevocable -- would meet

21   this Court's irrevocable liability test under Absolute Activist

22   that would necessarily be a very costly and time-intensive

23   exercise.  The claims distribution process could be upheld for

24   months.  Because there could be litigation on that very point.

25   Do all these factors meet Absolute Activist test?  I hate to --

I649petc

```
1    I know this Court is well aware.  Absolute Activist can be
2    applied in many different ways, and there is no clarity as to
3    how it's applied.  Whether or not if you -- if your broker
4    dealer, if he makes a transaction, is that sufficient?  Is it
5    sufficient if you make your transaction outside of the United
6    States?  Is it sufficient if you purchase your shares through
7    bank accounts in the United States?
8              THE COURT:  So the -- forgive me for interrupting you
9    but I just want to make sure I understand a point you alluded
10   to a few minutes ago.
11             Your client, your individual client, USS, has both
12   claimants or its shares fit into both categories, both the
13   domestic and what we're calling the nondomestic categories,
14   yes?
15             MR. LIEBERMAN:  That's correct, your Honor.
16             THE COURT:  The other individual plaintiffs are only
17   domestic.
18             MR. LIEBERMAN:  That's my understanding, your Honor,
19   yes.
20             THE COURT:  So if there were anything to this
21   objection, they presumably would have objected to the
22   settlement that you were prepared to sign onto because they
23   only represented purely domestic people and they did not
24   object, correct?
25             MR. LIEBERMAN:  That is correct, your Honor.
```

I649petc

1              And it is important to note that both North Carolina

2    and Hawaii were very active with respect to the Section 11

3    claims as to whether or not there should be a premium and what

4    level of premium they were.  Ultimately we came to an

5    agreement.  But they had pushed back.  They demanded a certain

6    premium.  And the premium we proposed was insufficient.  And we

7    ultimately came to a premium that was sufficient.

8              If they felt that they were being unfairly diluted,

9    they would have come and they would have complained.  We had

10   all felt that this was really a practical matter as to whether

11   or not we're going to hold up the settlement and potentially

12   have the claims administration subject to countless appeals

13   because Absolute Activist is no way clear as to its

14   application, and whether or not that was better for the class,

15   who had no questions to domesticity, or do we make a more

16   smooth and efficient process whereby all claims could go

17   quickly and smoothly with an easy test to pass here.

18             THE COURT:  All right.  Let me hear from anyone on the

19   defense side who wants to be heard on this.

20             MR. COOPER:  Your Honor, Roger Cooper again on behalf

21   of Petrobras.

22             I just wanted to add.  You're right, your Honor,

23   defendants were looking for global peace.  And had we not been

24   able to achieve a settlement of global peace, the settlement

25   amount would have been substantially less.  And had we not had

I649petc

1    a clear understanding who was going to be within the class, we

2    would have had the problems that Mr. Lieberman described, not

3    really knowing what kind of peace we were getting, because we

4    wouldn't know whose claims were getting a settlement and who

5    wouldn't for the reasons that Mr. Lieberman described.

6            THE COURT:  Of the two objectors who are here, the

7    only one of those two who raised this objection was the Haynes

8    objection.  So if counsel wants to be heard on this, I'll hear

9    her.

10           MS. ST. JOHN:  Thank you, your Honor.

11           A couple points.  First, the fact that 70 percent of

12   the class was US-based institutional investors doesn't tell us

13   anything about the number of domestic transactions.  Under

14   Absolute Activist the residency or location of an investor is

15   not a relevant factor to determining where irrevocable

16   liability occurred.  So I think we're getting ahead of

17   ourselves to say that only two percent of the transactions that

18   were included within the class were foreign.  I think the

19   evidence is that it may have been much higher than that.  We

20   had half of the named plaintiffs' claims based on those

21   transactions dismissed.  That alone tells us the percentage is

22   likely higher.  Even if you are looking at only two percent,

23   two percent of a settlement this size is still significant.

24   That's $60 million, up to $60 million at issue.  If you're

25   looking at 30 percent, 9 percent, 2 percent, that's a lot.  The

I649petc

1      70 percent figure only relates to a single quarter in 2014.

2      There are over 20 other quarters in this class period for which

3      we don't have information.  So it's a very narrow and

4      self-interested figure that's being put before the Court as far

5      as that goes.

6           Second, there's still needs to be separate counsel

7      representing the groups with different interests.  Yes, there

8      may have been a class representative who only had domestic

9      transactions at issue in the case.  But under Literary Works

10     it's the representation of unconflicted counsel that is also

11     necessary.

12          Administrative feasibility is not a good reason.

13          THE COURT:  Wait a minute.  I don't quite understand.

14     Your clients fit in the domestic category.

15          MS. ST. JOHN:  Yes, your Honor.

16          THE COURT:  So they have no reason to complain about

17     the other category being represented or unrepresented,

18     whatever.  So, in your category, namely the category -- among

19     the individual plaintiffs there were two individual plaintiffs

20     represented by separate counsel who only represented the same

21     category as your clients.  There was a third that represented

22     both.  So why is that -- what is the basis on which you have a

23     basis to complain?

24          MS. ST. JOHN:  My understanding is that class counsel

25     who negotiated the settlement was still representing both

I649petc

domestic purchasers and foreign purchasers.  There was not

separate counsel dedicated to advocating the interests

exclusively of domestic purchasers and separate counsel

exclusively representing the interests of foreign purchasers.

And what we ended up with shows that lack of aligned interests.

We have a settlement where foreign purchasers are recovering at

the same amount as domestic purchasers despite having no claim

in this case.  Under Literary Works that's the reading.  Even

though the allocational amounts under the settlement were

divided up purportedly by the strength of the claims, the

Second Circuit still held that there needed to be separate

counsel and separate representatives.

THE COURT:  That case, the facts were much more

extreme than anything here.

I'm having a little problem understanding.  Here, we

have counsel that, yes, they are co-class counsel, but two of

them represent exclusively people -- representatives of their

individual clients, as to whom they also have a fiduciary

duty -- exclusive domestic shareholders who, if there was

anything of what you're raising, would presumably be screaming

bloody murder.

Moreover, while the 90 percent estimate may or may not

be totally accurate, it was to avoid the very complicated fact

finding that would have to be done after the claims have been

submitted that would have been itself a very large expense that

I649petc

counsel said:  Well, our sense of it is, it's about 90 percent,

leaving only 2 percent.  And rather than go through that huge

expense, we think it's in the interests of the domestic

category in order to get the global peace that defense counsel

quite reasonably are demanding to make this cut that we have

done of treating everyone alike.

Why aren't those -- I don't understand how that rises,

in that context, to the kind of conflict that was presented or

anything like the kind of conflict that was presented in the

Literary Works case.

MS. ST. JOHN:  Taking the latter scenario first, the

administrative feasibility, that may have been the conclusion

reached had there been separate counsel representing these two

different subgroups.  Maybe they would have reached that

conclusion.  We don't know because there wasn't an arm's length

negotiation with respect to the different interests of the

defendants, the domestic purchasers, and the foreign purchasers

to try to work out what does a fair settlement look like.  And,

instead, we had counsel who was conflicted because they wanted

global peace as well.  They wanted to end a litigation.  There

wasn't anyone specifically devoted to the domestic transaction

class members to make sure that they got their fair share from

the settlement.

THE COURT:  What was the total loss that your client

suffered?

I649petc

1          MS. ST. JOHN:  For the particular account that he

2    submitted the objection for, the total amount that he recovers

3    I believe is about $66.  The total loss is far more than that.

4    There was additional money he could have recovered had the

5    settlement been larger.

6          THE COURT:  I'm just talking -- I'm talking in total

7    monetary terms what was it, number one, that your client, the

8    actual shareholders, not the entity that is also involved in

9    your representation, but the actual shareholders.  How much

10   money did they lose?  How much money are they recovering under

11   this settlement?  And how much more money do you have any basis

12   for saying they would have been able to recover on any scenario

13   if there had been the separate representation?

14         MS. ST. JOHN:  I'm sorry, your Honor, I don't have

15   information about his other accounts so I can't make a

16   representation about the total loss.  He had about 55 shares at

17   issue.  And the trust that's objecting today, the total

18   recovery is about $66.  I don't have additional information.

19   I'm sorry.

20         THE COURT:  $66 total?

21         MS. ST. JOHN:  Yes, your Honor.

22         THE COURT:  So let's assume -- all right.  So there is

23   an aspect of this that is de minimis in terms of your

24   particular client.

25         MS. ST. JOHN:  Perhaps.  But in a $3 billion

I649petc

1    settlement it's not de minimis for domestic purchasers.

2            THE COURT:  Well I understand that but I think it's

3    not irrelevant given that very, very few objections -- there

4    were a grand total, of all of six objections filed, two of whom

5    are represented here today.  I've considered, of course, all

6    six.

7            OK.  Anything any counsel wanted to say in response to

8    the arguments just raised by objector's counsel.

9            MR. DUBBS:  Thomas Dubbs for Hawaii, your Honor.  Just

10   so the record is clear, Hawaii supports the settlement for all

11   the reasons that were stated.  Hawaii's transactions are all,

12   quote unquote, domestic as per the Court's prior order.  And

13   the fact that Hawaii was not, to borrow a phrase from a

14   Washington lawyer, "a potted plant," is evidenced by the fact

15   that we rejected USS's proposal with respect to how much the

16   Section 11 claimants were going to get and vigorously argued

17   for and eventually obtained a substantial premium for that.  So

18   that, we would submit, shows that certainly Hawaii, as well as

19   North Carolina, reviewed this situation and are satisfied with

20   the result.  Thank you.

21           THE COURT:  All right.  Anything else?

22           MR. LIEBERMAN:  Your Honor, just on that point, very

23   briefly, is that if we would accept Ms. St. John's analysis to

24   how this should proceed, we are -- we would potentially have

25   dozens of questions on each claim as to whether or not they met

I649petc

the domesticity test and ultimately appeals on those issues

because whether or not you -- one of the six issues that were

raised by Absolute Activist is enough, there is simply no

unanimity amongst the courts on that point.  So we could have

people saying well you're hurting the shareholders because you

said that binding the United States is enough; we say it's not

enough.  You say broke dealers are enough; we say it's not

enough.  You're diluting the people who didn't purchase through

a broker dealer, who purchased while in the United States, and

this could be an endless litigation for years to come, your

Honor.

        THE COURT:  OK.  Let's move on.

        One of the objectors -- not one who is represented

here but one who submitted written objections argues that class

counsel should disclose how much is going to be paid, worst

case, to the claims administrator, acknowledging that that

can't be determined in absolute terms right now but a cap can

be determined and objects if that payout exceeds one percent of

the settlement fund or $30 million.

        Now, my recollection -- but this may have not -- this

may have been in a telephone conversation with counsel on some

of the logistical issues rather than something on the record,

but my recollection is the claims administrator's estimate was

about 18 million or well below the 30 million.

        Is there anyone here from the claims administration?

I649petc

```
 1              Why don't you come forward.
 2              MS. BENNUN:  Your Honor, with respect to the
 3    previous --
 4              THE COURT:  I'm sorry?
 5              MS. BENNUN:  With respect to the --
 6              THE COURT:  I can't hear you.
 7              MS. BENNUN:  Your Honor, with respect to the previous
 8    objection, I would like to make comment.  Although we are
 9    objectors representing ourselves.  My name is --
10              THE COURT:  No, no, no.  This was not an objection you
11    had raised.
12              MS. BENNUN:  Right.  I know.
13              THE COURT:  Then I'm not going to hear it now.
14              I will hear, any objection that you raised in writing,
15    I'm delighted to hear now orally.
16              MS. BENNUN:  I see.  I thought that -- in my objection
17    I wrote a reservation of right to --
18              THE COURT:  I always am amused when people reserve
19    their rights.
20              MS. BENNUN:  I didn't know.
21              THE COURT:  You know what, I'll tell you what.  Where
22    are you from?
23              MS. BENNUN:  I'm from -- I live in New York, but I'm
24    originally from Argentina.
25              THE COURT:  Are you a lawyer?
```

I649petc

1              MS. BENNUN:  No.  I'm not a lawyer.

2              THE COURT:  So --

3              THE WITNESS:  I'm representing myself.

4              THE COURT:  If you're not a lawyer, I'm going to give

5     you a little slack.  So, go ahead.  What is it you wanted to

6     say?

7              MS. BENNUN:  My name is Sandra Bennun.

8              I want to make a comment on that objection because I'm

9     a New York resident.  I have been here 20 years.  Me and my

10    husband we bought many stocks for our retirement as well as for

11    our investment with our savings and it's more like 50 percent

12    of our savings and our retirement that we invest in Petrobras

13    and we have those frozen for already five years and they're

14    still frozen and we couldn't even pay out a downpayment of a

15    house because we lost.  When we wrote those objections, I got

16    the letters very clear stating that this is for only ADR --

17    it's both in the United States.  But since I hear the objection

18    from the other person, I thought that -- I also bought

19    investments in Argentina for my dad and for myself.  And it's a

20    lot of money that we invest and we also are in the same

21    situation.  So I kind of got confused when you were talking

22    about domestic and not domestic, probably doesn't -- is not

23    like related, but I would compare about that because I never

24    make any claims because I thought that as a foreign we don't

25    have any rights and we just don't have -- there was nothing.

I649petc

1    So the only thing I object and it was for this that we both

2    here in the United States.

3             THE COURT:  Thank you for bringing that to my

4    attention.

5             MS. BENNUN:  OK.  Thanks.

6             THE COURT:  Now let's go back to the claims

7    administrator.

8             MS. MENDOZA:  Good afternoon, your Honor.

9             Niki Mendoza and Ed Barrero.

10            THE COURT:  So, worst case, how much do you think the

11   expenses of the claims administrator would be?

12            MS. MENDOZA:  Your Honor, in this administration we

13   have an agreement that has a cap at different levels, depending

14   on volumes of notices and claims.  And right now we're at the

15   cap level that's 14 million for fees and expenses.  There's

16   another level above that which would be 19 million.

17            THE COURT:  OK.  So no way can it be anything like 30

18   million?

19            MS. MENDOZA:  Correct.

20            THE COURT:  OK.  Very good.  That's what I wanted to

21   make sure.

22            There were a number of objections related to the

23   so-called cy pres recipient.  I'm unclear why any money should

24   go to any cy pres recipient.  There's money leftover.  I'm not

25   sure why there should be money leftover.  But if there is money

I649petc

1   leftover, why shouldn't it go back to the company?

2            MR. LIEBERMAN:  Your Honor, there will always be a

3   small amount of money that is left that is uneconomical to

4   distribute.  The company typically -- in typical agreements, we

5   don't want to have the company continue to have an interest in

6   the administration.  Actually, they disavowed the interest in

7   the administration of the claim.  And we don't want them to be

8   involved in that as well.

9            THE COURT:  OK.  That's the usual way it comes up.  I

10  have had cases like that.  But I don't understand if there's a

11  little money leftover why shouldn't it go back to the company?

12           MR. LIEBERMAN:  Because, your Honor, I think it will

13  invite Petrobras into our claims administration process and

14  potentially arguing with us as to what is administratively

15  feasible to distribute or not.  At a certain point we make the

16  determination --

17           THE COURT:  I think the determination has to be,

18  forgive me, not made by them, and not made by you, but by the

19  Court.

20           MR. LIEBERMAN:  We would make the determination and

21  present it to the Court.

22           THE COURT:  So it's a little more work for me, doesn't

23  change my hourly rate.

24           MR. LIEBERMAN:  Your Honor, I'm not sure that the

25  Petrobras should be rewarded with respect to any monies backing

24

I649petc

1     this action.

2              THE COURT:  No, no, no.  The question is this.

3     There's going to be -- and I think you're right.  There

4     typically is, in these end kind of things, a small amount,

5     usually it's quite small, but a small amount of money leftover,

6     and leftover because it would be administratively more

7     expensive to distribute it further than to just treat it as a

8     lump sum and to give it to someone.  So you have the so-called

9     cy pres doctrine which in the bad old days not that long ago

10    some judges gave to their alma maters and things like that.

11             So the Second Circuit then says it should, if you're

12    going to have it, it should go to some entity that will fulfill

13    what the general purposes of the litigation from the

14    plaintiffs' point of view was.  So, like if it was a consumer

15    class action you might give it to Consumers Union or something

16    like that.

17             Here, you have a whole little provision to give it to

18    a Brazilian good government entity that you would choose and

19    then -- or they would choose and you would approve afterwards

20    and then I suppose I'd have to, presumably, would have to get

21    into it, and that's going to be really hard trying to figure

22    out the bona fides of some foreign entity.  But since we're

23    talking about such a small amount, I don't see why it shouldn't

24    just go back to the company.

25             MR. LIEBERMAN:  From our perspective, from class

I649petc

plaintiffs' perspective, having -- it is unwise to have

Petrobras involved.  It would invite them into the claims

administration process.  They become vested --

THE COURT:  I'm not inviting them into the claims

administration process, although I'm not sure they are

precluded from that in any event.  They're a party to this

lawsuit.

But what we're talking about is to whom -- let's

assume everything goes the way you anticipate it goes, none of

the evil counsel for the defendants involved in mucking up the

claims administration process, and then we wind up with, I'll

hypothesize, $3 million left.  Why shouldn't that go back to

the company?

At that point, by your own analysis, it's not worth

while to distribute that further.  And I suspect it may be a

lot less than $3 million, but whatever it is.  It can't go to

you, and it can't go to the Court, and it can't go to my own

preferred charity, the New York Yankees, and so why shouldn't

it just go back to the company?

MR. LIEBERMAN:  Your Honor, worst things could happen

than money going back to the company.  We would still suggest

that the better view is that Petrobras, and the better view in

all these cases, defendant cuts the check that is administrated

to the best of everyone's ability.  Usually it's a very small

amount, $30,000 or so, some tiny amount.  And the better view

I649petc

is, the more enlightened view, we think, is Petrobras should

have no interest in that administration.  They disavowed that

in the stipulation.  They disavowed taking a position on the

administration plan of allocation, and they should really have,

in a sense, kissed that money good-bye.  And we think that is a

better way.

          THE COURT:  Let me hear if anyone else wants to be

heard on this issue.

          MS. ST. JOHN:  Thank you, your Honor.

          From our perspective this is money that belongs to the

class.  It's damages for their --

          THE COURT:  The hypothesis -- this only arises when

you get down -- 30,000 is much closer to the reality than 3

million -- you get down to an amount that literally, just

ascertaining how to send -- or even sometimes the postage costs

of sending it to thousands of shareholders exceeds the amount

that's left.  So if you had $30,000 leftover that it would cost

$40,000 to mail out checks for, doesn't make any sense.  So

that's where you get the cy pres.

          MS. ST. JOHN:  I understand, your Honor.  And we

suggest sending it to SEC Fair Funds for Investors.  It's a

fund that helps shareholders, helps prevent shareholder fraud

type actions, and we believe that's a better recipient of class

members' damages money than the party that harmed them and

caused this lawsuit to begin with.

I649petc

1          THE COURT:  So well, of course, it's always the SEC --

2     as near as I can tell, this is an arm of the SEC you're

3     recommending?

4          MS. ST. JOHN:  I believe it's run by them, yes, your

5     Honor.

6          THE COURT:  It's their fair funds kind of thing.  We

7     don't want to deprive them of what they tell Congress every

8     year which is that they're seriously underfunded.

9          But, more seriously, the Second Circuit says, as I

10    indicated previously, that it should go to an organization that

11    fairly represents what the lawsuit was about from the

12    plaintiffs' point of view.  And the SEC Fair Funds sounds like

13    a much more general kind of thing than the Second Circuit might

14    have in mind.

15         Have you looked at the Second Circuit precedent?

16         MS. ST. JOHN:  Yes, your Honor.  The next best

17    standard.  And I still submit that the SEC Fair Funds is a

18    closer fit to helping prevent shareholder fraud than giving it

19    back to the party that committed shareholder fraud to begin

20    with.

21         THE COURT:  OK.  Let me find out actually what about

22    that?  Any objections to that from the plaintiff's counsel?

23         MR. LIEBERMAN:  Your Honor, on behalf of class

24    plaintiffs, the recipient in our view is immaterial, and it

25    should not be Petrobras.  We do agree with that.  And so

I649petc

1    ultimately if the Court says it should be Fair Funds, we're

2    fine with that.  It should go to a good cause.

3            THE COURT:  I take it, my question is:  Do you have

4    any objection if the Court were to send it to the SEC Fair

5    Funds?

6            MR. LIEBERMAN:  No, as long as they use it well, your

7    Honor.

8            THE COURT:  How about defense counsel?

9            MR. LINMAN:  Your Honor, it's not been briefed and,

10   therefore, I'm not sure it's actually administratively

11   feasible.  What I understand the Fair Funds procedures, that

12   they are set up on a case-specific basis and I believe -- but

13   I'm not sure of this, if the Court is thinking about this, I

14   think it might need briefing.  I think that the SEC will not

15   take essentially general contributions.

16           THE COURT:  So that's -- let me go back -- because

17   usually the way the Fair Funds works is in a situation where

18   the SEC itself obtains money as part of an SEC settlement and

19   then, thanks to changes in the law that occurred some years

20   ago, they are now able to send it off, that money, rather than

21   keeping it in the SEC's coffers, send it off to the victims of

22   whatever particular fraud was involved; whereas, yours sounds

23   like more for administrative expenses or something like that.

24   I'm not quite sure whether the SEC can accept what you're

25   recommending.

I649petc

1          MS. ST. JOHN:  That's something we'd be happy to look

2     into further and participate in briefing on, your Honor, or

3     find a separate organization that, likewise, addresses

4     shareholder fraughted rather than --

5          THE COURT:  I'll tell you what.  At this point we

6     don't know what's going to be left, it would not make sense, I

7     don't think, to have briefing.  Let's say there's $2,000 left.

8     It would not -- from no one's standpoint except lawyers would

9     it be useful to have briefing at that point.  So let's see

10    what's left and I'll keep in your mind your request and hear it

11    again at that point.

12         MS. ST. JOHN:  Thank you, your Honor.

13         THE COURT:  All right.

14         Now, there was a question again raised by the Haynes

15    objectors that under relevant precedent the attorneys' fees of

16    attorneys who are not licensed to practice law in the United

17    States should be treated as an expense rather than as part of

18    the attorneys' fees.  I'm not sure it means that much in the

19    end but let me see whether plaintiffs' counsel wants to say

20    anything about that.

21         MR. LIEBERMAN:  Sure, your Honor.  I think, again, I

22    think the view is, Judge Easterbrook's view is the best one, is

23    that we should go in the private marketplace.  And when Cleary

24    Gottlieb or Skadden or others hire attorneys who may not be --

25    may be licensed in different countries to assist on a relevant

I649petc

1      case, how do they bill out those attorneys?  I'm quite sure

2      that they don't bill them out -- they don't expense then.  I'm

3      quite sure that they actually bill their time.

4            In the ModSpace bankruptcy proceeding, which we have

5      on the record, as well as the Alpha National Resources case,

6      there are entries by Cleary Gottlieb for international lawyers.

7      We would understand that to be lawyers who are not admitted in

8      the United States but yet are admitted in another country and

9      their work is relevant to the work and subject matter at hand.

10     So we're quite sure that if you go into the private marketplace

11     and then see how the great firms, Skadden and Cleary and

12     others, do assess the time that it is actually billed and it's

13     not expensed.

14            Very significantly here, your Honor, the Petrobras

15     admitted attorneys, whether or not they were admitted in

16     Portuguese, the -- the work that they had done was significant

17     to the work we were doing to understanding what was going on in

18     Brazil vis-a-vis the proceedings there, vis-a-vis how to get

19     documents from there, vis-a-vis helping us to authenticate

20     documents.  So we didn't need them to help us for work in the

21     United States.  We actually needed them for their help in

22     Brazil.  So I don't see what the value was of U.S. admission in

23     the United States.  Their value was in Brazil.  That's why we

24     needed them.  And, once again, that's how everyone bills.  It's

25     not just everyone does it.  That's the private marketplace.

31

I649petc

There's good reason for it.  We took on their liability.  We took on their health insurance.  We took on their benefits.  And for us to just expense those would seem to be not really appropriate in this instance.

THE COURT:  Does counsel for the objectors want to say anything on that?

MS. ST. JOHN:  Yes, your Honor.

Under the case law an attorney must at least be eligible for U.S. admission before attorneys' fees can be recovered.  Here, it's no different than hiring a consultant to help in highly complex litigation.  These attorneys -- it doesn't convert the work to legal work.  They were doing investigative type work, translation work.  That should have been billed as a cost just like the other local Brazilian attorney and translation cost that class counsel did bill as a cost.  I don't see where in the record they're getting information about what Cleary Gottlieb did in some other case where we don't know whether those attorneys were eligible for U.S. admission.  Regardless of the value added by these attorneys and their experience, they still needed to be admitted to the U.S. before they could be eligible for fees.  This is a litigation of U.S. claims in U.S. court and the class should not be billed up to 20 times the cost plus a 1.78 multiplier on top of that.

THE COURT:  All right.  I will think about all of

I649petc

1    that.

2           Now, a different objector raised the argument that the

3    class representatives are not entitled to have their expenses

4    reimbursed if they did not provide a breakdown.  Now, in fact,

5    each of the representatives did make submissions in that

6    regard, some quite detailed, although I don't know that they

7    provided quite the kind of breakdown that I have for the

8    attorneys' fees.

9           For example, USS, which seeks reimbursement in the

10   amount of $300,000, say that they devoted actually much more

11   than that, an estimated $703,590.51 in time spent.  But it

12   wasn't clear to me where that figure was coming from.  We did

13   have the general counsel saying that he personally worked at

14   least 248 hours on the action and I was delighted to see that

15   because it was very important to me that USS be hands-on as

16   they had been.  But I wondered whether -- how did you come up

17   with that estimate?

18           MR. HILL:  Yes.  So, your Honor, we did a fair amount

19   of work back in London.  There were four employees who account

20   for most of the time at USS:  Myself; my legal colleague, Jaime

21   Perez, who is here today; Chris Shale, who is the lead

22   portfolio manager in Petrobras; and Dr. Diamond Summerfield who

23   works in our public affairs and governance department.  In

24   addition, a number of our operational staff spent hours

25   collecting documentation, checking out trading records and so

I649petc

1    on.  That's how we related the number of hours.  It was a

2    fairly conservative number.  We only went with the number of

3    hours we could justify by looking back at calendar records and

4    so on.  We don't keep detailed time records.

5              THE COURT:  So it's my -- I mean that's really the

6    heart of it.  Unlike lawyers you don't record daily billable

7    hours in the way that a lawyer does, true?

8              MR. HILL:  True.

9              THE COURT:  Well lucky you.

10             MR. HILL:  But we were very cognizant of that, your

11   Honor.  Therefore, the numbers we present to the Court are

12   conservative.  We're confident of that.

13             THE COURT:  The next thing I wanted to raise concerns

14   Bernstein Litowitz's claim for fees.  Is anyone here from

15   Bernstein?

16             MR. DUBBS:  Excuse me, your Honor.  Thomas Dubbs from

17   Hawaii.  May I be heard on that last point just for the record?

18             THE COURT:  Sure.

19             MR. DUBBS:  The Hawaii's claim for out-of-pocket fees

20   and expenses is detailed in some regard in Exhibit 14 to

21   Mr. Lieberman affidavit and it includes person by person time,

22   and the Hawaii in-house people do keep time like private

23   practice attorneys do, and they have specific fees.  And I

24   think it's outlined in sufficient detail.

25             THE COURT:  I did notice that but thank you very much

I649petc

1        for noting that on the record.

2                Is someone here from Bernstein Litowitz?

3                MR. GALDSTON:  Yes, your Honor.

4                THE COURT:  Do you want to come up to the microphone,

5        please.  And identify yourself for the record.

6                MR. GALDSTON:  Good afternoon.  Benjamin Galdston of

7        Bernstein Litowitz and I'm joined by my colleague, my partner,

8        Salvatore Graziano.

9                THE COURT:  Now maybe there's something else, and

10       there's so much volume of paper here maybe I missed it, but I

11       think all I got from you with regard to your expenses was an

12       overall summary which was Exhibit 28 to one of the submissions.

13       And it shows very large numbers for what was not lead counsel:

14       External ESI vendors, 616,000 plus; loss causation damages

15       expert, 256,000 plus; financial consultant, $192,000 plus; and

16       then various other categories, all coming up to a total of

17       $1,146,873.73.

18               Even plaintiffs' lead counsel thinks that you

19       shouldn't get the damages expert payment but I'm wondering --

20       did I miss?  Did you give us a breakdown of specifics for each

21       of those categories?

22               MR. GALDSTON:  Your Honor, the exhibit that we

23       submitted is the breakdown of our expenses.  We did not provide

24       additional detail on those expenses.  We did, however --

25               THE COURT:  I don't see in the world why I should give

I649petc

1   you a penny of it.

2            MR. GALDSTON:  Let me explain --

3            THE COURT:  You must know from the thousands of cases

4   where you have been lead counsel that a court doesn't do its

5   job unless it scrutinizes these expenses in detail which your

6   categories give me no opportunity to do.

7            MR. GALDSTON:  Well, your Honor, I'm happy to address

8   the expenses in detail presently, today, and I'm happy to

9   submit additional detail if your Honor would like.

10           We did provide counsel for Petrobras, as well as

11  counsel for the lead plaintiffs, our detailed expense --

12           THE COURT:  My recollection is while they've agreed to

13  pay whatever I approve out of their total attorney fee

14  allocation, they, if I recall correctly, left it to me to

15  determine how much the total is going to be.  In fact, my

16  recollection is that's what the law provides.  And my

17  recollection is that you must know that law well.  So I am,

18  frankly, dismayed that all I got from you directly or

19  indirectly was these very large, unspecified categories.

20           MR. GALDSTON:  Your Honor, it's addressed in detail in

21  our papers.  Let me go through them if I may.

22           On the ESI vendors we have incurred expenses in the

23  amount as detailed in our appendix there of $616,745.70.  That

24  relates to two ESI vendors that were necessarily retained for

25  our clients.

I649petc

1              THE COURT:  To do what?

2              MR. GALDSTON:  To comply with your Honor's schedule.

3              THE COURT:  Don't tell to comply.  Tell me what they

4       did.

5              MR. GALDSTON:  So these are vendors who collected

6       enormous quantities of electronically-stored information from

7       our clients.  As you know, we represent large institutional

8       investors with billions of dollars in assets under management.

9       They have complicated organizations, with diverse locations.

10      We had some 53 separate plaintiff entities.  The requests that

11      were served upon us were the same or substantially identical

12      requests that were served on the class plaintiffs.  And in

13      order to collect responsive documents and process those

14      documents to determine which documents were relevant and

15      responsive and should be produced, we had to necessarily incur

16      these expenses for these two vendors, which I might add, and

17      this is again detailed in our application, were the vendors

18      that were required by our clients.  Our clients used these

19      vendors because they have satisfied certain security criteria

20      and are the vendors that are authorized to go into their files

21      and to collect data and information.

22             THE COURT:  That last point seems to me to be

23      problematic.  Let's say in a hypothetical you had a choice of

24      two vendors, one of whom charged $5 an hour and one who charged

25      $50 an hour, and the client said:  Oh, we're not going to let

I649petc

1    anyone in but the $50 an hour, then the proper thing would have

2    been to come to the Court and the Court might have told your

3    clients they don't have a choice unless they want to eat the

4    $45 an hour difference for their own privacy purposes.  So I

5    don't see how they -- their dictation to you of who to use

6    should be of any weight to me at all.

7              MR. GALDSTON:  Well, your Honor, I think the salient

8    question here is what were we doing at the time that we were

9    collecting these documents.  At that time we represented our

10   clients as individual litigants who were prosecuting their own

11   claims and doing everything that they could in order to comply

12   with the discovery deadlines.

13             THE COURT:  And, of course, if they were prosecuting

14   their own claims they were free to continue to opt out and

15   pursue their own claims at their own expense.  But now they're

16   asking to have their fees paid.

17             MR. GALDSTON:  That's correct, your Honor, because now

18   they are effectively part of the class.  They are the class.

19   They are, by definition of the settlement class, they are

20   included.  Their damages have been included in the recovery and

21   it's part of the amount that is predicated upon counsel's

22   request for a fee.  So it would not be equitable for our

23   clients to now be forced to bear those expenses or for

24   Bernstein Litowitz to be forced to bear those expenses when

25   that work had a benefit for the class and advanced the

I649petc

1    settlement.

2             THE COURT:  What about your expert who they claim --

3    plaintiffs' lead counsel says was detrimental to the class.

4             MR. GALDSTON:  Your Honor, I respectfully disagree.  I

5    think our expert, Dr. Juneja, is a well known economist who has

6    been before this and many other courts.  You're familiar with

7    NERA.  We retained NERA.  And we retain our expert not based on

8    some outcome-directed approach but because they will apply an

9    independent analysis of the case as it pertains to our clients'

10   investments.  And the opinion that was rendered by Dr. Juneja

11   was not adverse or hostile to the opinion of --

12            THE COURT:  If the case had gone to trial with you as

13   having opted out, would you have called him?

14            MR. GALDSTON:  If the case had gone to trial and we

15   had opted out --

16            THE COURT:  If you were the plaintiff, in other words,

17   would you have called him?

18            MR. GALDSTON:  Correct.  As an individual litigant,

19   that would have been our expert at trial for our clients -- to

20   prove our clients' damages.

21            May I just -- your Honor, may I point out that the

22   misstatements and the corrective curative disclosures that

23   Dr. Juneja identified, these are consistent with and, in fact,

24   supportive of those that were identified by the class expert

25   Blaine Nye.  The fact that they're not the same and don't

I649petc

1    encompass all of those same disclosures does not make Dr. -- or

2    does not render Dr. Juneja's opinion hostile or adverse to the

3    class experts; in fact, it's supportive.

4            THE COURT:  Let me interrupt for a moment and ask

5    plaintiffs' counsel.  So you say this should not be paid

6    because it was not helpful to the class or words to that

7    effect.

8            They went out to a well respected organization.  They

9    hired an independent expert.  And they got an independent

10   opinion.  What's wrong with that?

11           MR. LIEBERMAN:  Your Honor, as we stated in our

12   papers, we think -- and respect Dr. Juneja and we respect NERA.

13   There is no doubt that the four competing damages analyses --

14   three by the individual plaintiffs, one by defendants -- was a

15   constant thorn in our side throughout the litigation and

16   throughout the mediation process.  Simply, it's unique to the

17   whole case here that individual plaintiffs would not use our

18   damages analyst.  Once that break occurred, that hurt, quite

19   frankly, the negotiation positions and it would have

20   potentially added to a motion to exclude.  This Court may have

21   said:  Well, Dr. Nye is obviously out of his mind; he's

22   alleging threes times the amount that these well experienced

23   plaintiffs are.  So we make very clear we don't think that's a

24   benefit to the class.

25           THE COURT:  So your point, if I understand, is not

I649petc

that you challenge his expertise per se.  You say it shouldn't
be coming out of the class funds because it didn't advance the
class position, it just advanced their own clients' position at
best.

        MR. LIEBERMAN:  Well I think, more to the point, it
hurt the class throughout the negotiations.  There is no doubt
about it, your Honor.  That's our strong belief.  It was a
major issue.

        THE COURT:  But I'm just not sure I totally follow.

        So, supposing in their legal fees they spent, my
hypothetical, a hundred hours arguing to you that their client
should get more than the rest of the class -- this probably
didn't happen, I'm just doing it as a hypothetical -- you would
say then that they're not entitled to have those legal fees
paid out of the total legal fees?

        MR. LIEBERMAN:  Your Honor, that would probably be our
position.  We took the position we took with respect to legal
fees was:  Listen, we see this lodestar of $2 million.  We
don't want to get into an audit situation here with Bernstein
Litowitz.  We would have questions.  They wanted the lodestar
to be acknowledged.  And we said:  Listen, it could be
acknowledged.  At the end of the day -- there is benefit, there
is benefit to -- they did do some work at the direction of
class counsel.  We didn't want to get into the weeds as to what
was at our direction, what was not.

I649petc

1          THE COURT:  Why should I be paying -- or, in effect,

2    you be paying but I it will be from a total amount that I will

3    set -- for stuff that wasn't done at your direction?

4          MR. LIEBERMAN:  As we said in our papers, we would

5    apply a significant discount to that $2 million because it was

6    not at our direction.  We're not going to be paying, your

7    Honor, $2 million.  It's pretty clear.

8          THE COURT:  Let me go back to counsel for Bernstein

9    Litowitz.

10         So they say they're not challenging that you had a

11   nice independent expert.  They said it wasn't of any benefit to

12   the class.  And this is class money that's now being, in

13   effect, taken from a class and given to the lawyers.  What

14   about that?

15         MR. GALDSTON:  Your Honor, I disagree.  Our clients

16   are now the class.  The scenario that I think was --

17         THE COURT:  You mean they are members of the class.

18         MR. GALDSTON:  They are members of the class.  And the

19   class was defined --

20         THE COURT:  My recollection is there are some other

21   members.

22         MR. GALDSTON:  Correct.

23         But Mr. Lieberman posed a hypothetical.  We're not in

24   that hypothetical.  We're now in the very unusual circumstance

25   where the settlement class has been defined to include my

I649petc

1    clients.  This was a material term to the settlement.

2    Petrobras defendants have made that clear.  The amount of the

3    settlement and the release that is given would not have been

4    provided had the settlement class not been defined to include

5    my clients as well as any other individual litigant.  So we are

6    effectively now members of the class.

7            What might have happened had the cases gone to trial

8    is not relevant now at this point.  We are here regarding the

9    settlement that has been reached and the expenses that my

10   clients incurred in prosecuting their claims, in presenting

11   their liability case, in refuting the various defenses that the

12   defendants raised, in providing supportive testimony and

13   evidence that went to class certification, all of that is

14   compensable because it contributed to the class overall

15   recovery, to my clients' recovery.

16           And I want to provide your Honor with one other point

17   just for context.  As you know, the lead plaintiff

18   Universities -- USS is seeking reimbursement of $300,000 on its

19   own behalf for expenses.  I represent four plaintiffs here,

20   four clients.  At that rate at $300,000 you have one hundred --

21   $1.2 million in expenses.  So it's certainly on par, if not

22   consistent, with the application that's been made of the

23   representative class -- the class representative.

24           THE COURT:  Perhaps there's a difference between when

25   we were selecting lead counsel and there were many candidates,

43

I649petc

1    including your firm, and one of the reasons I selected the lead

2    plaintiff I did, the primary lead plaintiff, was because I was

3    impressed with the ability and commitment of USS to be a very

4    hands-on lead plaintiff as the PSLRA contemplates.  I made no

5    determination about your clients' or whether they were entitled

6    to one penny or anything else.  They come in here after the

7    fact, having cut a deal, and say:  Well, we contributed too.

8    That may well be, but it wasn't because this Court made any

9    determination about the ability of your clients to do anything.

10   So I'm not sure it's the same situation.

11           Let me ask you one last question, though.  What's this

12   financial consultant $192,000?

13           MR. GRAZIANO:  May, I just address -- I'm sorry for

14   double teaming the Court on this presentation, but I need to

15   correct something you said.

16           THE COURT:  I'm used to it.  I have three daughters.

17           MR. GRAZIANO:  We have not cut any deal here, your

18   Honor.  What happened was, to our surprise, our clients' claims

19   were settled as now part of the class, and because there is no

20   deal we're in this very unfair position where our clients'

21   actual out-of-pocket expenses potentially may go unreimbursed.

22   We have the underlying bills.  We can submit them to the Court.

23   We don't normally do that even in our class settlements.

24           THE COURT:  You don't?  I'm amazed.  I'm shocked.

25           MR. GRAZIANO:  Well we don't, your Honor.

I649petc

1          THE COURT:  Well then you better do it.  I will give

2     you 48 hours to do it.

3          MR. GRAZIANO:  We can do it in 24 hours, your Honor.

4          THE COURT:  I'll take you up on that offer.

5          MR. GRAZIANO:  I don't want there to be any

6     misimpression that we had a deal with class counsel.  We don't.

7     We are outsiders who are now dragged in and part of this class.

8     And the choice was to opt out, even though the class settlement

9     is higher because of our four very large clients being in the

10    class.  And that would have been unfair as well.

11         So what we did was we stayed in the class, and we

12    sought half of our time in this case, on behalf of our four

13    clients, our actual out-of-pocket expenses that were paid, and

14    we have bills for that we can share with the Court within 24

15    hours.  And the point here is, just to eliminate any notion

16    that there's somehow some improper dealing going on where we

17    were denied lead counsel and then made a deal after the fact.

18    We were happy to prosecute our own cases and we were doing that

19    until one day we woke up and realized our cases were settled.

20    This is a very unusual situation, your Honor and that is what

21    led to this application.

22         THE COURT:  All right.  That's a fair point.  Let me

23    ask what is the story on the financial consultant?

24         MR. GALDSTON:  Your Honor, the financial consultant is

25    an expert, if you will, but who bills at a much cheaper rate,

I649petc

1    that assisted us in the drafting of the complaint, evaluating

2    the clients' financial interests, and their transactions, their

3    trading, also assisted us in evaluating the proposed

4    settlement, and making a determination whether to remain in the

5    class.

6              THE COURT:  So why is that an expense that's a benefit

7    to the class?

8              MR. GALDSTON:  For all of the reasons that are set

9    forth in our application, because this is an individual who

10   contributed to the litigation strategy, to the filing of the

11   individual actions, and to the determination to remain in the

12   class.

13             THE COURT:  OK.  Thank you very much.

14             MR. GRAZIANO:  Thank you, your Honor.

15             MR. GALDSTON:  Thank you, your Honor.

16             THE COURT:  Now, the last thing I had and then I'll

17   open the table for anything that anyone else, including the

18   objectors, want to raise; is the broad issue I've spent a lot

19   of time on, whether class counsel's lodestar is reasonable,

20   whether it should be subject to the multiplier proposed by

21   class counsel, whether the Court should be bound in any way by

22   the fee agreement negotiated between class counsel and their

23   client, etc.

24             I've had extensive submissions on this so I don't know

25   that I have anything that I need to ask about.  And I'm

I649petc

grateful also to defense counsel for their submission in this

regard which I know is in some ways an awkward request but one

that I think they perform with great diligence.  But I did,

since that is the big, big issue before me, in terms of money,

whether the plaintiffs' counsel or anyone else wanted to say

anything further on that issue.

          MR. LIEBERMAN:  Your Honor, thank you.

          The few requests -- I think delving into the arguments

and delving into whether or not any lodestar incurred is too

much, too little, etc., we think -- respectfully, we think it's

a fool's errand.  If there would be -- to be an objective

measure of our fee requests or the lodestar, the most

subjective would be to look at all defendants, look at the time

they incurred and if our time that we incurred was

significantly higher, then I think there would be a fair

argument that we spent too much.  There's always going to be a

question:  Are you charging?  Are your rates too high?  Have

you spent too much time?  And all those questions that come up

in every litigation.

          THE COURT:  Well I mean I'm not unsympathetic to the

argument in the abstract that the -- using the lodestar is a

sort of check on the overall request may not be the most

promising way to proceed because if you really look at it in

economic terms any contingent fee lawyer, whether it be in a

huge case like this or just in a simple everyday personal

47

I649petc

           1    injury case, is looking at two things:  His or her costs, not

           2    the lodestar, not what the billable rates are, but what he or

           3    she actually has to pay to his or her associates or paralegals

           4    or whatever versus the risk involved which is usually viewed in

           5    a percentage way.  So you figure out, well, on any given case,

           6    let's say a personal injury situation, on any given case I'm

           7    going to have to expend at least a hundred thousand dollars.

           8    My chances of winning more than a hundred thousand dollars is

           9    going to happen in one out of three cases and so -- you would

          10    work out a formula in effect based on the risk and reward, none

          11    of which would have to do with lodestar.  So the lodestar is

          12    somewhat artificial.  Nevertheless, I'm a simple district court

          13    and the Second Circuit has repeatedly told me I've got to look

          14    at it as a check.  It's not the defining, ultimate

          15    determination but it's an important check on the reasonableness

          16    or unreasonableness of counsel's fee.  So I have to look at it.

          17            MR. LIEBERMAN:  Fair enough, your Honor.  We think

          18    that the broad check is, is the amount of work done in the

          19    case; what was the type of work necessary to accomplish these

          20    fees and accomplish the fantastic result we have in this case.

          21    So the work done here was we went six weeks before trial.  We

          22    took 81 depositions.  There were 14 experts we needed to report

          23    to.  And we did all this in an extraordinarily condensed

          24    schedule.  And so that's really --

          25            THE COURT:  But then you deprive me of all the fun of

I649petc

1      having a trial so what good is that?

2                MR. LIEBERMAN:  Fair enough.

3                THE COURT:  Anyway, I understand your point.  Anything

4      else that you wanted to add?

5                MR. LIEBERMAN:  On this issue I would raise two

6      points.  I think we have to look at -- I think the general duty

7      of the Court is:  Is this a fair deal to the class?  Is the

8      class somehow getting bilked by their lawyers, or are they

9      getting outsized award that somehow it's unfair to them and

10     they're getting hurt?  And we think there is no way that

11     argument can be made in this case.

12               THE COURT:  I didn't address that here today and I

13     will, of course, address it in my written opinion which will --

14     because I'm making no determinations today, I'll have a written

15     opinion to follow.  But I was quite satisfied at the time of

16     the preliminary hearing and still am that this was quite a good

17     settlement from the plaintiffs' standpoint.  Nothing can take

18     away from that.

19               MR. LIEBERMAN:  So, your Honor, I would just like to

20     show some figures to the Court.  It's, as we state, and nobody

21     has objected to, there's a $1.2 billion benefit to the class by

22     having -- really, by having Pomerantz serve as lead counsel.

23     Had this been settled at the settlement level of the opt-outs

24     this would have been about a $1.78 billion settlement.  So we

25     have sophisticated counsel, some of the best in the world, who

I649petc

looked at this case, proceeded with their litigation and had we

applied the amount that they received, it would have been

$1.78 billion.  We created a benefit for 1.2 billion.

So the question is:  Is the $285 million that we're

asking for, is that unfair with that $1.2 billion premium?  And

there is no way that that could be argued, your Honor.  If we

can make a deal with any -- again, we welcome to court to go

into the private marketplace.  If I would go to any

sophisticated institutional investor MDL with hundreds of

plaintiffs and I would go to a sophisticated institutional

investor and say to them:  I'm going to make you $1.2 billion,

more than anybody else who is a litigant in this case.  What do

you have to pay me? $285 million.  There would be a line from

Pearl Street to this courtroom to sign up for that deal.  That

is the private marketplace working.  That is the benefit we

incurred.  And that doesn't reflect the fact that to get the

$1.78 billion threshold our firm was the one who did all the

work in order to get that benefit for all the individual

actions.  We were the ones that headed the case.

We would say, your Honor, look at the 1.78 billion

achieved as pro bono work.  We do that pro bono.  And we'll

take the $1.2 billion and say that's complete, verifiable

objective benefit where Pomerantz did something where nobody

else could have done it.  And that's a fact.  And of that

benefit, you clearly have a $900 million remainder to the

I649petc

1    class.  That's a 52 percent premium to the individual actions.

2    That's simply, your Honor, says --

3            THE COURT:  I like your thought.  I think maybe we

4    should recognize the important pro bono in this case, and I

5    think you should not charge any fees but we should have a

6    plaque.

7            Thank you very much.

8            Anyone else want to be heard on this issue and is

9    there anything else, more generally, from the objectors that

10   they want to raise?

11           MR. LIEBERMAN:  Your Honor, Mr. Hill did have some

12   words he's prepared.

13           THE COURT:  Yes.  We'll hear from him first and we'll

14   hold the objector for a minute.

15           MR. HILL:  Thank you, your Honor.

16           First your Honor on behalf of USS could I express our

17   appreciation to the Court for the care and diligence in

18   adjudicating this action and the particular brisk pace which

19   this case has progressed, despite the 16-month stay, and the

20   significant recovery we've achieved, from our standpoint in the

21   U.K. at least, speaks very well of the U.S. judicial system and

22   provides great confidence in the U.S. securities markets.  So,

23   your Honor, thank you very much for your help on that.

24           As you'll recall, your Honor, USS --

25           THE COURT:  Well, I must say I appreciate that.  And I

I649petc

1   wish the U.K. the very best in their adventure away from the --

2           MR. HILL:  Thank you.  We will need it.  Thank you

3   very much.

4           As you recall, your Honor, USS is very selective when

5   it comes to engaging in securities litigation, whether in the

6   U.K. or anywhere else.  And prior to this case USS had not

7   acted as lead plaintiff in any U.S. securities class action.

8   We chose to become involved in this one due to the scale of the

9   unique character of some of the allegations and the scope of

10  fraud which had affected Petrobras, as well as the significant

11  losses which had affected USS, and we did believe that we could

12  play an important role in achieving a significant recovery for

13  investors in what appeared to be a case with some significant

14  public interest.  And I must say, again, we are grateful for

15  the trust and responsibility that you placed in us to pursue

16  those objectives for the class and also our own members, of

17  course, back in the U.K.

18          Your Honor we, respectfully, would submit that the

19  results achieved, with Pomerantz's guidance, of course, in the

20  settlement brought out the objective.  Obviously, the scale of

21  the settlement itself is being well recorded in the papers.

22  The premium, which Mr. Lieberman just spoke to so eloquently,

23  the 65 percent premium to the opt-out achievement I think is a

24  notable thing as well.  And, above all, I think that the

25  adequacy and extraordinary nature of the result we've achieved

I649petc

1    is evidenced by a number of very sophisticated institutional

2    investors who had opted out of the action now opting back in.

3    It's our understanding that both the premium achieved as well

4    as the discontinuance of those individual actions is

5    unprecedented.

6              Your Honor, I've already spoken a little bit about the

7    time and resource that USS has committed over the last three

8    years in making our contribution to this action.  So, again, in

9    summary, USS personnel have spent at least 850 hours in

10   overseeing or participating in this litigation.  And, again,

11   the particular activities which form part of that are well

12   recorded in the papers.  But they do include either myself or

13   Mr. Perez attending all significant hearings, all mediation

14   sessions.  We have reviewed every significant pleading and the

15   settlement papers.  And we've also reviewed class counsel

16   lodestar and expense reports and have responded to defendants'

17   interrogatories and document requests, and have produced

18   hundreds of pages of documents in response to those things.

19   That, based on the conservative estimate as we discussed, leads

20   us to ask the Court for an award of compensatory award of

21   $300,000 which would represent a significant discount to the

22   several hundred thousand dollars as a conservative estimate

23   that we estimate we've spent on litigation.

24             We'd also take this opportunity of endorsing North

25   Carolina and Hawaii's requests for their respective

I649petc

compensatory awards of $50,000 reach as being fair and

reasonable.

        In closing, your Honor, just a few quick words from me

on class counsel's fee request of 9.48 percent of the

settlement fund.  We do believe that Pomerantz has led this

claim skillfully and diligently.  We do believe that they've

added significant value for the class as demonstrated, in

particular, about a 65 percent premium to the opt-out

settlements.  As your Honor knows well, that 9.4 -- 9.4

representative fee does reflect the ex-ante retainer agreement

which was entered into between USS and Pomerantz.  And, again,

as you recall, your Honor, USS did at its own expense take the

advice from Keith Johnson at Reinhart in respect of that,

Mr. Johnson having much experience of overseeing U.S.

securities class actions.  Working with Mr. Johnson at the

time, we did reject Pomerantz's initial fee proposal and agreed

to a lower rate as ultimately agreed upon with class counsel.

And I think throughout the course of the litigation both

Pomerantz and USS believe that the applicable attorneys' fees

in this case would be the amount reflected in that retainer

agreement.

        We are aware, of course, that a very small number,

six, class members have objected to the settlement.  Of these

objectors, we note that not one is an institutional investor

with a significant stake in the litigation.  As already noted,

I649petc

institutional investors with individual claims are opting back
into the settlement.  And we believe that most significant
stakeholders in this action agree this is an excellent result
and would wish distribution thereof to proceed as quickly as
possible.

          While not being particularly familiar with the U.S.
judicial system, we do find it somewhat troubling that a $3
billion settlement could be delayed by up to two years or more,
potentially, by individuals and their attorneys who appear to
have a negligible stake in the outcome of their appeals.  So,
your Honor, we'd respectfully ask the Court to take whatever
legal remedies are available to it in order to protect class
members from any vexatious and dilatory practices and allow the
benefit to this good recovery to reach aggrieved shareholders
as soon as practical.

          So, your Honor, with renewed thanks to the Court for
its care and diligence in adjudicating this action, that
concludes my few remarks.

          THE COURT:  Thank you very much.

          Just with reference to the last point you raised.  So,
there are at least three different kinds of objectors that
arise in these situations.  One are people, members of the
class, who believe that for one reason or another the
settlement is wrong or this provision or that provision is
wrong or the attorneys' fees is wrong or whatever, and the very

I649petc

1    nature of class actions is such that they must be given every

2    opportunity to be heard because they are otherwise the silent

3    members of the class.  And that's why the law provides for both

4    written and oral objections as we have had in this case.

5         So I think it's an -- and I'm sure you aren't

6    suggesting this, but it's not fair to label all objectors as

7    having bad motives.  I think there are numerous cases where

8    settlements have been perfected and made better because of the

9    points raised by legitimate objectors.

10        There are also, and we have one example in this case,

11   people who are objecting for ideological reasons or

12   socioeconomic reasons and the Haynes objectors fit that

13   situation.  They have an arrangement where they are supported

14   by an organization that basically thinks class actions are a

15   big mistake and that they can achieve at least some modest

16   modicum of reform by suggesting at least some shortcomings of

17   class actions in instances where they have standing to do so.

18   And I don't regard that as improper.  It's relevant to know

19   where they're coming from.  But if the objections have

20   independent weight and force, the fact that they were raised

21   for, if you will, ideological reasons is I think neither here

22   nor there.

23        The third group of objectors, the ones to whom you

24   were really referring to, the so-called professional objectors,

25   are people who are seeking to extort monies on their own

I649petc

private behalf, not because they expect that their objections

will receive any weight at the district court level but because

they can delay the entire process, can delay the doing of

justice, can delay the payment to victims of monies that in

some cases they sorely need and that, in any event, they're

entitled to for months or even years on end.

            I have expressly retained jurisdiction in this case

over the objectors even after I issue my final rulings on the

matters before me today if I am convinced that some discovery

is needed because of extortionate motivations on the part of

any of those objectors.  But I want to be clear that I don't

start with that presumption.  There are many perfectly

straightforward, well intentioned objectors.  There are many

objectors who, even if their motives are ideological, they're

not improper, they're not extortionate.  They are trying to

bring to the Court's attention real issues.  So we'll see how

that all sorts out with reference to the six objectors here.

But thank you for your comments.

            MR. HILL:  Thank you, your Honor.

            THE COURT:  That door that just opened is to the

federal jail and I will not make any presumptions about whether

any of the objectors deserve to go through that door.

            All right.  Let me hear from objectors' counsel.

            MS. ST. JOHN:  With that prefatory comment, I just

have a few points to address issues that class counsel raised

I649petc

in our reply.  You have our brief.  I won't repeat our points now.

First, it's not a coincidence -- I don't think it's a coincidence that our corrected lodestar is 50.7 million and class counsel's lodestar from what they call a core team is 49 million.  So I think that there's some overlap here in terms of what we're saying and what's borne out by the records.

I also want to point out that in a settlement of this size the percentage itself can be a bit arbitrary.  There is, as Goldberger emphasizes, there can be a big difference between five and six percent.  Here we're talking millions of dollars for the class.  And so that's why the lodestar becomes an important crosscheck.  And in order to be a crosscheck, it needs to be accurate.  It might not be the same line-by-line analysis that you would undertake when it's used as a base method but it still needs to be accurate in order to ensure that the percentage selected is appropriate.

Here, class counsel doesn't dispute that much of the work done by US project attorneys was, in fact, document reviews, translation, even file management and organization.  They didn't respond to our case law showing that these -- this type of work should be billed to the class as a cost, not as fees.  If they were paying additional benefits to the attorneys, maybe you increase the rate above the $15 per hour that you often see in the market, but you don't get into the

I649petc

 1    multi-hundred dollar rates that they're seeking here.

 2              Class counsel says they should be able to bill the

 3    same hourly rate as the defendants.  We don't necessarily

 4    disagree, but there's nothing in the record showing that any of

 5    the defense firms here billed first level document review any

 6    kind of coding or translation at the excessive rates that class

 7    counsel is charging the class.

 8              Once the overall lodestar is reduced, then the fee

 9    should be reduced as well.  It doesn't make sense to say well

10    we'll just increase the multiplier once the lodestar is

11    decreased.  In that situation there is no incentive for class

12    counsel not to include excessive billings or other abusive

13    practices if, either way, they end up with the same fee award.

14              For all the reasons in our brief we're asking for a

15    hundred million dollar -- 190 million fee reduction and for

16    that amount to be returned to the class.

17              THE COURT:  Thank you very much.  And I don't want

18    anyone to assume that I have either approved or disapproved any

19    of the competing lodestar calculations that have been presented

20    to me.  There are a lot of I think significant questions that

21    were raised about the work in this case, whether -- and what

22    would be an appropriate charge, and I will address all of that

23    in my written opinion, but I want to be clear I'm not making

24    any kind of rulings today in that regard.

25              So thank you very much.  And let me hear from the

I649petc

1   other objector.

2           MR. MARTINEZ:  Let me address a few points.

3   Especially I want to tap into what the counsel said about the

4   one billion and you know three hundred million dollars.  You

5   know that is share property that come from people and I think

6   is quite different to all the plaintiffs for the class action.

7   So I don't think that should be considered at all, your Honor.

8           Regarding the nine point some number percent, 287

9   million.  You know, how many people is going to get that?  Two

10  hundred?  You know, the plaintiffs how many are in the class,

11  thousand?  Let me give you some numbers.  We, domestic, we

12  lost, with my wife, $47,000.  Probably we get ten thousand

13  dollars the way it is now presented.  You know we are going to

14  be saying, OK.  Regarding the nondomestic, which my wife has a

15  similar amount of money.  You know, that is not even spoken in

16  this court today, which, you know, that is problematic to us,

17  to all the class members.  I can give you another example, you

18  know, because we are talking about numbers, so let me give you

19  numbers.  Your Honor, BP, British Petroleum, the big oil spill

20  a couple years ago.  That was another multibillion dollar

21  class.  And you know the total attorney fees, you know,

22  expenses and so forth, it was a 4.2 percent.  Now we're talking

23  twice as much.  Now we have pretty much this handful of money,

24  so let's get it to us per se.  That is what is happened today.

25  You know we are, honestly, very unhappy about that.  Let me

60

I649petc

1    give you another example.  You know, they've been talking about

2    risk and so on and so forth.  You know I'm a volunteer

3    firefighter.  I've been in millions and millions of costs,

4    thousands of costs, sorry.  I charge still two or three.  I'm a

5    document chemical engineer.  I have my own money.  So if they

6    don't know how to balance their risk, probably they should

7    reconsider what they're doing.

8         Another problem I want to bring about these persons

9    that the shares are brought out, that they are done in the U.S.

10   I got my Ph.D. here in the U.S.  If I go to my home country in

11   Argentina, I use the same degree, they will tell me:  Sorry,

12   you have to take all the requirements or evaluations to charge

13   us a penny.  So I don't think those costs or expenses are valid

14   at all, your Honor.  So you know I think the lodestar formula

15   that the problems -- it should be pretty much not valid.  Thank

16   you for your time.

17        THE COURT:  Thank you very much.

18        All right.  Is there anyone else who wants to be

19   heard?

20        OK.  I will take this matter sub judice.

21        MR. LIEBERMAN:  Your Honor, just to sum it all up in

22   closing, very briefly.  First, the issue on the objectors does

23   weigh heavily with respect to our minds and class plaintiffs as

24   to the potential that we do have a scenario where either $66 or

25   a $500 loss could hold up this distribution by potentially two

I649petc

1    years.  So we just want to raise that.  We will take whatever

2    measures we think we can to make sure that does not occur but

3    we think it is -- it does provide a certain inequity that would

4    need to be addressed.  That's one point.

5             The other point is just to, we'd like to take this

6    opportunity to thank the Court for its time, effort, and

7    diligence on this case.  And, really, to thank the entire team

8    here.  It was not only one person litigating this case.  There

9    were a core team of attorneys here who are sitting here in this

10   courtroom who really did a fantastic job in working on this

11   case and making the excellent result that occurred.

12            We do want to think also defense counsel both Cleary,

13   Skadden, King & Spalding, and others.  We think this was

14   really -- ultimately turned out to be an excellent result for

15   everybody.  And so really it's been a privilege of a lifetime

16   to serve as lead counsel in this Court.  And it's been an honor

17   and, most of all, it's been fun.  So we really appreciate the

18   Court's time.

19            THE COURT:  It's still more fun to go to a Yankees

20   game.

21            OK.  Much appreciated.  This matter is adjourned.

22   Thanks very much.

23            (Adjourned)

24

25