RECEIVED
SDNY DOCKET UNIT
2018 AUG 27  PM 3: 52

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

IN RE PETROBRAS SEC. LITIG.  )  14-cv-9662 (JSR)
             )
_____ )

**RICHARD, EMELINA AND JOSEPH GIELATA'S
MEMORANDUM OF LAW IN OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR SANCTIONS
AND MOTION FOR AN APPEAL BOND
AND COUNTER-REQUEST FOR SANCTIONS
AGAINST JEREMY LIEBERMAN AND POMERANTZ LLP**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8-27-18

## Table of Contents

SUMMARY OF ARGUMENT................................................................1

BACKGROUND...........................................................................2

ARGUMENT...............................................................................4

I.    The Gielatas Are Beneficial Objectors With a Legitimate Appeal.............................4

II.   There is No Reason to Impose a Rule 7 Bond for Taxable Costs on Appeal................11

III.  The Rule 11 Motion Is Untimely...............................................................16

IV.  The Gielatas' Contentions Were Well-Founded and Non-Frivolous........................18

V.   Joseph Gielata Represented Only Himself, And Not His Parents,
But In Any Event New York Permits Retired Lawyers to Practice Law.....................20

VI.  Jeremy Lieberman and Pomerantz Should Be Sanctioned....................................22

CONCLUSION............................................................................25

**Table of Authorities**

**Cases**

Abdelhamid v. Altria Group, Inc., 515 F. Supp. 2d 384 (S.D.N.Y. 2007)............................19

Adsani v. Miller, 139 F.3d 67 (2d Cir. 1998)............................14

Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997)............................*passim*

AmeriFirst Bank v. Bomar, 757 F. Supp. 1365 (S.D. Fla. 1991)............................1

Ario v. Underwriting Members of Syndicate 53 at Lloyds, 618 F.3d 277 (3d Cir. 2010).........23

Bell Atlantic Corp. v. Bolger, 2 F.3d 1304 (3d Cir. 1993)............................4

Blessing v. Sirius XM Radio Inc., No. 09-cv-10035 (HB), 2011 WL 5873383 (S.D.N.Y. Nov. 22, 2011)............................13

Bluebird Partners, L.P. v. First Fidelity Bank, N.A., 94 N.Y.2d 726, 709 N.Y.S.2d 865, 731 N.E.2d 581 (2000)............................20

Castro v. Mitchell, 727 F. Supp. 2d 302 (S.D.N.Y. 2010)............................16

Central States Southeast v. Merck-Medco, 504 F.3d 229 (2d Cir. 2007)............................5

Denney v. Deutsche Bank AG, 443 F.3d 253 (2d Cir. 2006)............................13

Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170 (3d Cir. 2012)............................13

Draper and Kramer, Inc. v. Baskin-Robbins, Inc., 690 F. Supp. 728 (N.D. Ill. 1988)............................22

Farey-Jones v. Buckingham, 132 F. Supp. 2d 92 (E.D.N.Y. 2001)............................1

Garbowski v. Tokai Pharma., Inc., No. 16-cv-11963, 2018 WL 1370522 (D. Mass. Mar. 16, 2018)............................24

Goldberger v. Integrated Resources, Inc., 209 F.3d 43 (2d Cir. 2000)............................12

Hansberry v. Lee, 311 U.S. 32 (1940)............................25

In re AOL Time Warner, Inc., Sec. & ERISA Litig., No. 02 Civ. 5575, 2007 WL 2741033 (S.D.N.Y. Sept. 20, 2007)............................13

In re Asbestos Litigation, 134 F.3d 668 (5th Cir. 1998)............................9

In re Community Bank of N. Va., 622 F.3d 275 (3d Cir. 2010)............................13

In re General Elec. Co. Sec. Litig., 998 F. Supp. 2d 145 (S.D.N.Y. 2014)............................16

In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Litig., 55 F.3d 768 (3d Cir. 1995).13

In re Initial Public Offering Sec. Litig., 728 F. Supp. 2d 289 (S.D.N.Y. 2010)............................14,15

In re Libor-Based Fin. Instruments Antitrust Litig., No. 11-cv-2613, slip op. (Ex. N) (S.D.N.Y. Feb. 28, 2018)............................24

In re Literary Works in Elec. Databases Copyright Litig., 654 F.3d 242 (2d Cir. 2011)......*passim*

In re Nortel Networks Corp. Securities Litigation, 539 F.3d 129 (2d Cir. 2008)..................12

In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig., 827 F.3d 223 (2d Cir. 2016)...........................................................................................................7,8

In re Pennie & Edmonds LLP, 323 F.3d 86 (2d Cir. 2003)...............................................16,17

In re Petrobras Sec. Litig., 150 F. Supp. 3d 337 (S.D.N.Y. 2015)........................................9

In re Petrobras Sec. Litig., 152 F. Supp. 3d 186 (S.D.N.Y. 2016)........................................9

In re Petrobras Sec., 862 F.3d 250 (2d Cir. 2017)..............................................................5

In re Prudential Ins. Co. Am. Sales Practice Litig., 278 F.3d 175 (3d Cir. 2002)..................20

In re Target Corp. Customer Data Sec. Breach Litig., 847 F.3d 608 (8th Cir. 2017)..............15

In re Visa Check/MasterMoney Antitrust Litig., No. 96 Civ. 5283, 2004 U.S. Dist. LEXIS 8729 (E.D.N.Y. Apr. 27, 2004).................................................................................................4

Internationale Kapitalanlagegesellschaft mbH v. Petróleo Brasileiro S.A., No. 15-cv-6618 (JSR), 2016 U.S. Dist. LEXIS 46570 (S.D.N.Y. Mar. 25, 2016)...............................................9

Juris v. Inamed Corp., 685 F.3d 1294 (11th Cir. 2012)......................................................5

Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 785-86 (7th Cir. 2004)................................13

Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010)...............................*passim*

O'Brien v. Alexander, 101 F.3d 1479 (2d Cir. 1996).......................................................19

Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999)..............................................................9

Patelco Credit Union v. Sahni, 262 F.3d 897 (9th Cir. 2001)...........................................22

Peer v. Lewis, 606 F.3d 1306 (11th Cir. 2010)................................................................17

Rand v. Anaconda-Ericsson, Inc., 623 F. Supp. 176 (E.D.N.Y. 1985)................................23

Reynolds v. Beneficial Nat. Bank, 288 F.3d 277 (7th Cir. 2002)........................................4

Ridder v. City of Springfield, 109 F.3d 288 (6th Cir. 1997)...............................................17

Rodick v. City of Schenectady, 1 F.3d 1341 (2d Cir. 1993)..............................................19

Roth v. Green, 466 F.3d 1179 (10th Cir. 2006)...............................................................17

Safe-Strap Co., Inc. v. Koala Corp., 270 F. Supp. 2d 407 (S.D.N.Y. 2003)........................22

Sassower v. Field, 973 F.2d 75, 80 (2d Cir. 1992)..........................................................20

Shaw v. Toshiba Am. Info. Sys., Inc., 91 F. Supp. 2d 942 (E.D. Tex. 2000)........................5

Simon DeBartolo Group v. Richard E. Jacobs Group, 186 F.3d 157 (2d Cir. 1999)..............18

Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269 (2008)......................................1

Stephenson v. Dow Chemical Co., 273 F.3d 249 (2d Cir. 2001).......................................5

Storey v. Cello Holdings, LLC, 347 F.3d 370 (2d Cir. 2003)........................................18

Sullivan v. DB Investments, Inc., 667 F.3d 273 (3d Cir. 2011)....................................13

Taniguchi v. Kan Pacific Saipan, Ltd., 566 U.S. 560 (2012)......................................14

Vaughn v. American Honda Motor Co., Inc., 507 F.3d 295 (5th Cir. 2007).........................13

Wal-Mart Stores, Inc. v. Visa USA, Inc., 396 F.3d 96 (2d Cir. 2005)............................12

White v. Auerbach, 500 F.2d 822 (2d Cir. 1974).................................................4

Wolfert ex rel. Wolfert v. Transamerica Home First, Inc., 439 F.3d 165 (2d Cir. 2006)...........7

## Statutes and Rules

28 U.S.C. § 1927............................................................................20,22

Fed. R. App. P. 7..........................................................................11,14

Fed. R. App. P. 8.............................................................................14

Fed. R. App. P. 38............................................................................15

Fed. R. App. P. 39............................................................................12

2d Cir. LR 30.1...............................................................................14

2d Cir. LR 31.1...............................................................................14

2d Cir. LR 39.1...............................................................................14

Fed. R. Civ. P. 11........................................................................*passim*

## Other Authorities

2 James Wm. Moore et al., Moore's Federal Practice § 11.22[1][c] (3d ed. 2014)................17

5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1337.2 (3d ed. 2004)..........................................................................................17

Assoc. of the Bar of the City of New York Comm. on Prof. Ethics, Formal Opinion 2005-06: Retired attorneys' use of professional letterhead and special disclosure obligations to clients and prospective clients (June 2005)....................................................................21

John C. Coffee, Jr., Conflicts, Consent, and Allocation after Amchem Products-- Or, Why Attorneys Still Need Consent to Give Away their Clients' Money, 84 Va. L. Rev. 1541 (1998)...6

Eric Alan Isaacson, A Real-World Perspective on Withdrawal of Objections to Class-Action Settlements and Attorneys' Fee Awards: Reflections on the Proposed Revisions to Federal Rule of Civil Procedure 23(e)(5), 10 Elon Law Review 35 (2018)....................................10,11

Marie Leary, The Comparative Study Of The Taxation Of Costs In The Federal Circuit Courts Of Appeals Under Rule 39 Of The Federal Rules Of Appellate Procedure (Federal Judicial Center, Apr. 2011)...............................................................................14

## Glossary of Defined Terms

**Amchem**: Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997)

**Morrison**: Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010)

**Literary Works**: In re Literary Works in Elec. Databases Copyright Litig., 654 F.3d 242 (2d Cir. 2011)

**Payment Cards**: In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig., 827 F.3d 223 (2d Cir. 2016)

**ADS**:  American Depositary Shares of Petrobras

**Obj.**:  The objections to the settlement filed by Richard and Emelina Gielata, Dkt. 813

**Op.**: This Court's opinion approving the settlement and awarding attorneys' fees, Dkt. 834

**Tr.**: The transcript of the June 4, 2018 hearing on the settlement.

**Decl. ¶_**:  The declaration of Joseph Gielata, filed herewith

**Ex. _**: Exhibit attached to the declaration of Joseph Gielata

Richard, Emelina and Joseph Gielata[1] (together, the "Gielatas") respectfully submit this brief in opposition to class plaintiffs' Rule 11 motion and appeal bond motion.

## SUMMARY OF ARGUMENT

The Gielatas are beneficial objectors whose participation bolsters the integrity of this class action's resolution, and their participation in appellate review should be welcomed rather than punished.  As explained below, they have committed to seeking this Court's approval if they withdraw their appeal for any reason, thus removing any question as to their motives.

Class counsel's "total war" strategy to crush dissent should be rejected.  There is no reason to impose a cost bond because: (1) this Court's fee decision (which the Gielatas will defend on appeal) will almost certainly be affirmed, in which case each side should bear its own costs; (2) taxable costs on appeal are unlikely to exceed a few hundred dollars; and (3) the Gielatas have provided additional security to ensure payment of taxable costs on appeal, practically eliminating any risk of nonpayment.

The Rule 11 motion should be summarily denied as untimely because it was served nearly a month after the Court had already ruled on the Gielatas' objections, which were based on extensive research and serious reasoning.  The baseless and scattershot request for sanctions is nothing more than an ill-considered tactical gambit to thwart appellate review.  The malicious lies in Mr. Lieberman's filings cross the line from forceful advocacy to misconduct and should not be tolerated by this Court.  Mr. Lieberman's repeated falsehoods warrant censure for conduct unbecoming a member of the bar and a monetary sanction to be paid into the settlement fund.

---

[1] Joseph Gielata has standing by assignment.  See In re Petrobras Sec. Litig., 152 F. Supp. 3d 186, 191 (S.D.N.Y. 2016) (upholding facial validity of assignment) (citing Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 271 (2008)).  See also Farey-Jones v. Buckingham, 132 F. Supp. 2d 92, 100 (E.D.N.Y. 2001) ("[T]he parties to the instant action have not provided the Court with a single case in which a federal court has held that the express assignment of a 10(b) claim is invalid.  Nor has this Court found such a case.");  AmeriFirst Bank v. Bomar, 757 F. Supp. 1365, 1371 (S.D. Fla. 1991) (upholding partial assignment of Rule 10b-5 rights).

1

## BACKGROUND

The resolution of this class action has been marred by class counsel's strategic decision to steamroll all opposition with a smear campaign of rabid personal attacks and heavy-handed abuse of process. Richard and Emelina Gielata are retirees (a steelworker and schoolteacher, respectively) who lost over $10,000 on their investment in Petrobras American Depositary Shares ("ADS"), for them a substantial loss, of which the settlement will provide an estimated recovery of around $600. See Obj. at 1. Prior to this case, the Gielatas had never objected to any class action settlement. See Decl. ¶2. In May 2018, Richard and Emelina submitted objections composed by their son Joseph, a retired lawyer. See Dkt. 813. They objected to the adequacy of representation of ADS class members, the class notice and the fee request.

In retaliation against absent class members who objected to the proposed settlement, Mr. Lieberman dispatched process servers across the country to knock on doors and deliver deposition subpoenas to Richard and Emelina Gielata, to Joseph Gielata, and to other objectors and their counsel. See Ex. A. Abusing the authority entrusted to attorneys by federal courts, the subpoenas (signed by Mr. Lieberman) ordered Richard and Emelina Gielata to document their annual income over a ten-year period, see id. at Request for Production No. 16(ii), to provide other documents of no relevance to the litigation, and to appear for video-recorded depositions.

Mr. Lieberman's blitzkrieg of bullying hit a speedbump when this Court quashed the subpoenas, with narrow exceptions. See Dkt. 818. As a recipient of one of the subpoenas, Joseph Gielata represented himself on teleconferences with chambers, consistently making clear that he did not represent his parents. See Decl. ¶5. The Gielatas dutifully complied with the Court's narrow discovery order. Ignoring the Court's discovery ruling, Mr. Lieberman once again pushed for a deposition of Richard Gielata, which the Court denied summarily.

At the June 4 settlement hearing, Mr. Lieberman made an incredible claim found nowhere in the briefs: "We have two percent potentially of the class, we don't know, potentially two percent of the class not getting any reduction," referring to non-ADS class members whose claims would not be reduced despite lacking domesticity.  Tr. at 10.  The claims deadline had yet to pass, and the claims administrator is not evaluating claims for domesticity, so evidently Mr. Lieberman concocted this number to mislead the Court.  The self-serving 2% guess clashes with publicly available evidence indicating a far higher percentage (see Part I), perhaps an order of magnitude higher.  When Joseph Gielata asked Mr. Lieberman to provide a factual basis for the 2% claim, the request was met with telling silence.  Decl. ¶5.  The ferocity of Mr. Lieberman's personal attacks on Joseph Gielata are undoubtedly driven by Mr. Lieberman's panic over being caught deceiving a federal judge yet again (for the third time this year, see Part VI).

Citing Mr. Lieberman's fabricated statistic, the Court approved the settlement and generously awarded nearly $200 million in attorneys' fees.  Op. at 18 n.11, 41.  Consistent with this Court's widespread reputation for thoughtful analysis and even-handedness, the written opinion incisively cut through the thicket of contentions and provided clear reasons for its conclusions.  The Court ignored class counsel's tawdry and irrelevant smears against objectors, noting that "allegations of extortion, if true, will only become evident on appeal[.]"  Id. at 4 n.5.

The Court added its own Solomonic enhancement of the settlement by granting half the attorneys' fees upfront and the remainder upon full distribution of the settlement fund, an optimal structure that should be standard practice in all class actions.  Id. at 37-38.

As the intersection of Amchem and Morrison is an issue of first impression, the Gielatas filed a notice of appeal in order to seek appellate review of the issue of adequate representation of the ADS subclass.  Pomerantz LLP filed a notice of appeal of the fee award.

3

# ARGUMENT

## I.     The Gielatas Are Beneficial Objectors With a Legitimate Appeal

The Gielatas are beneficial objectors who submitted a thoughtful critique of the settlement to provide the Court with an adversarial presentation, the very basis of our judicial system so often lacking in the context of class action settlement approval.  See In re Visa Check/MasterMoney Antitrust Litig., No. 96 Civ. 5283, 2004 U.S. Dist. LEXIS 8729, at *5 (E.D.N.Y. Apr. 27, 2004) ("[T]he objectors' contribution was to make the proceedings more adversarial."); Reynolds v. Beneficial Nat. Bank, 288 F.3d 277, 288 (7th Cir. 2002) (Posner, J.) ("It is desirable to have as broad a range of participants in the fairness hearing as possible because of the risk of collusion over attorneys' fees and the terms of settlement generally."); Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1310 (3d Cir. 1993) ("In assessing settlements of representative actions, judges no longer have the full benefit of the adversarial process. … [O]bjectors play an important role by giving courts access to information on the settlement's merits."); White v. Auerbach, 500 F.2d 822, 828 (2d Cir. 1974) ("objectors have a valuable and important role to perform in preventing collusive or otherwise unfavorable settlements").

The Gielatas are absolutely not "serial objectors" seeking a payoff to drop a frivolous appeal, and class counsel's tiresome *ad hominems* are squarely foreclosed by this firm commitment: **The Gielatas will not dismiss their appeal without first seeking the approval of this Court.**  The Court has retained jurisdiction to oversee the settlement, and the Gielatas' unambiguous commitment should remove any doubt about their motives.  The Gielatas have no interest in delaying distribution of the settlement.

The Gielatas' appeal concerns the vital issue of adequate representation that the Supreme Court and Second Circuit have repeatedly deemed critical to satisfy due process as to absent

class members.  The ultimate objective is to achieve a higher recovery for the subclass of ADS

class members.  Literary Works provides a practical blueprint, as there the successful objector

was appointed to represent the inadequately represented subclass, and a revised settlement

satisfying Amchem was negotiated on remand.[2]  Per the Second Circuit's suggestion, a

"representative sample" of the Notes claims overseen by independent representatives and

counsel would yield an evidence-based and adversarially-negotiated reallocation between the

ADS and non-ADS subclasses.[3]  In re Petrobras Sec., 862 F.3d 250, 274 n.27 (2d Cir. 2017).

    A preview of the merits of the appeal will confirm that the Gielatas' appeal concerns a

fairly debatable and legitimate issue.  Professor Coffee points out that "[t]he problem of conflicts

may well be worse at the allocation stage than at the earlier settlement negotiation stage because

---

[2] The district court awarded $600,000 in fees to the objector in Literary Works.  See Ex. D.  The class plaintiffs question the Gielatas' economic motive on appeal (Dkt. 860 at 3), but it is no secret that objectors whose efforts confer a substantial benefit may request an award of expenses and fees for experts or attorneys.  See, e.g., Shaw v. Toshiba Am. Info. Sys., Inc., 91 F. Supp. 2d 942, 974 (E.D. Tex. 2000) (awarding $6 million in fees to "Beneficial Objectors").

[3] The settlement agreement specifically contemplates the possibility of resubmitting an amended settlement, referring to the "refusal to approve this Stipulation in any material respect without leave to amend and resubmit" and "declining to enter the Judgment in any material respect without leave to amend and resubmit".  (Stipulation of Settlement and Release ¶ 57 (emphasis added).)  Cf. Central States Southeast v. Merck-Medco, 504 F.3d 229, 248 (2d Cir. 2007) ("We note that the new subclass…will be better able to assert any challenge to the discount with the benefit of independent counsel.  Since the Self-Funded Plans do not challenge on appeal, as they did in the District Court, the reasonableness of the size of the settlement fund, there is no need to renegotiate that aspect of the Settlement Agreement; the new subclass will be free on remand to negotiate only for a reallocation of the settlement proceeds, with any agreed change subject to the reasoned approval of the District Court.") (emphasis added).  Ultimately, the defendants would benefit from separate representation of subclasses because a release is more likely to be upheld against an absent class member if the settlement includes structural assurances of adequate representation.  See, e.g., Stephenson v. Dow Chemical Co., 273 F.3d 249, 261 (2d Cir. 2001) ("[W]e hold that the prior Agent Orange settlement does not preclude these plaintiffs from asserting their claims alleging injury due to Agent Orange exposure.  Because these plaintiffs were inadequately represented in the prior litigation, based on the Supreme Court's teaching in Amchem and Ortiz, they were not proper parties to the litigation."), aff'd in part by an equally divided court and vacated in part, 539 U.S. 111 (2003).  See also Juris v. Inamed Corp., 685 F.3d 1294, 1324 (11th Cir. 2012) (upholding preclusion of claim due to settlement over Amchem objection where separate representation obviated any Amchem problem).

plaintiffs' attorneys have little economic incentive to make a 'fair' allocation, whereas they generally have a strong economic incentive to maximize the size of the settlement fund." John C. Coffee, Jr., Conflicts, <u>Consent, and Allocation after Amchem Products-- Or, Why Attorneys Still Need Consent to Give Away their Clients' Money</u>, 84 Va. L. Rev. 1541, 1542 (1998).

In this case, the class definition in the complaint was limited to domestic transactions (including all ADS trades on the NYSE) in order to satisfy <u>Morrison</u>. Dkt. 342 ¶ 676.  There was no intraclass conflict.  Later, during settlement negotiations, the parties agreed upon a broader class definition (at whose insistence, it is unclear), one that included non-domestic transactions.  As this Court put it: "What this boils down to as a practical matter is that certain claimants who would have been unable to join the litigation classes previously certified by the Court because of extraterritorial impediments are now included in the settlement class so that the defendants can buy 'global peace.'" Op. at 11.  With that expanded class, an intraclass conflict arose and the ADS subclass was no longer adequately represented.  The ADS subclass suffers from no <u>Morrison</u> problem whatsover, yet there was no representative or counsel advocating exclusively for the ADS subclass.  By contrast, the non-ADS subclass had a <u>Morrison</u> issue, as trading in Notes included a complicated mix of non-domestic and domestic transactions.  The settlement failed to discount the claims of the non-ADS subclass at all (to the contrary, a 25% premium allocated to Section 11 claims was <u>not</u> available to the ADS subclass).

This Court observed that "all plaintiffs have been placed on an equal footing" (Op. at 17), but that is precisely why independent representation is necessary: <u>the ADS subclass should not be placed on an equal footing with the non-ADS subclass.</u>  In <u>Literary Works</u>, the Second Circuit noted why this is impermissible: "Indeed, had the Settlement failed to account for this weakness, the 'very decision to treat [claims] all the same [would] itself [have been] an allocation decision'

unfair to the interests of those" in the subclass.  654 F.3d at 253 (citing <u>Ortiz</u>, 527 U.S. at 857).

<u>See also</u> <u>Payment Cards</u>, 827 F.3d at 232 ("A second **fatal deficiency** in the <u>Ortiz</u> settlement was

that all present claimants were treated equally, **notwithstanding that some had claims that**

**were more valuable.**") (emphasis added).

This Court reasoned that the Hawaii and North Carolina plaintiffs, while representing the

entire class, provided adequate representation because they had exclusively domestic claims.

Op. at 19.  But they did not have exclusively ADS claims (as the Gielatas do).  <u>See</u> <u>Literary</u>

<u>Works</u>, 654 F.3d at 251 ("Owning Category C claims in addition to other claims does not make

named plaintiffs adequate representatives for those who hold only Category C claims.").  The

Second Circuit explained the need for subclass representation:

> **Even if some named plaintiffs have only Category C claims, that is not**
> **enough** to protect the Category C-only plaintiffs, because each named plaintiff
> represented the entire class. <u>See</u> <u>Amchem</u>, 521 U.S. at 627, 117 S. Ct. 2231.
> Without subclasses, named plaintiffs with only Category C claims were obligated
> to advance the collective interests of the class, rather than those of the subset of
> class members whose claims mirrored their own. **Only the creation of**
> **subclasses, and the advocacy of an attorney representing each subclass**, can
> ensure that the interests of that particular subgroup are in fact adequately
> represented. …
>      It is for this reason that the participation of impartial mediators and
> institutional plaintiffs does not compensate for the absence of independent
> representation.  Although the mediators safeguarded the negotiation process, and
> the institutional plaintiffs watched out for the interests of the class as a whole,
> **no one advanced the strongest arguments in favor of Category C's recovery.**

<u>Id.</u> at 252-53 (emphasis added).  <u>See also</u> <u>Wolfert ex rel. Wolfert v. Transamerica Home First,</u>

<u>Inc.</u>, 439 F.3d 165, 173 n.10 (2d Cir. 2006) ("[T]he existence of antagonistic groups within the

class is not remedied by naming as a representative a member of one of those antagonistic

groups.").

In this case no one exclusively and adequately represented the ADS subclass.  There was

no class representative with only ADS claims, nor was an attorney arguing for the ADS subclass.

Confirming that the ADS subclass was not adequately represented, it emerged at the fairness hearing that Hawaii and North Carolina were deeply interested in maximizing the Section 11 premium, which is <u>adverse</u> to the ADS subclass:

> [Mr. Lieberman:] And it is important to note that both North Carolina and Hawaii were very active with respect to the Section 11 claims as to whether or not there should be a premium and what level of premium they were. Ultimately we came to an agreement. But they had pushed back. They demanded a certain premium. And the premium we proposed was insufficient. And we ultimately came to a premium that was sufficient. [Tr. at 12:1-7] …
> [Mr. Dubbs, on behalf of Hawaii:] [W]e rejected USS's proposal with respect to how much the Section 11 claimants were going to get and vigorously argued for and eventually obtained a substantial premium for that. [Tr. at 18:15-17] [Ex. B]

The clear holding of <u>Literary Works</u> is that a settlement cannot survive <u>Amchem</u> scrutiny if adverse subgroups are not separately represented, regardless of overlapping interests, and the Second Circuit removed any lingering doubt in <u>Payment Cards</u>: "Since some named representatives held claims across all three categories, the class did not encompass mutually exclusive groups as in <u>Amchem</u>; still, each impermissibly 'served generally as representative for the whole, not for a separate constituency.'" 827 F.3d at 233 (citations omitted). Here, although Hawaii and North Carolina had domestic claims only (both ADS and Notes), their mix of holdings led them to favor the non-ADS subclass at the expense of the ADS subclass.

There remains the "estimate" by class counsel that only 2% of the class consisted of claims that, but for the broadened settlement class definition, would have been barred by <u>Morrison</u>. <u>First</u>, the 2% figure is nothing but a self-serving fabrication invented by conflicted counsel without adversarial testing, precisely the type of unreliable and inadequate advocacy that <u>Amchem</u> and <u>Literary Works</u> aimed to prevent. Separate counsel for subclasses would have pressed the strongest arguments for the ADS and non-ADS subclasses and such a fair process

8

would have produced a legitimate result.  By contrast, class counsel minimized the issue with an untested and spurious estimate conjured even before the claims deadline had passed.

Second, the Morrison rulings in this case all strongly indicate a far higher percentage of non-domestic debt purchases: in 5 of 11 of the individual actions, non-ADS trades were dismissed on Morrison grounds in In re Petrobras Securities Litigation, 152 F. Supp. 3d 186, 192 (S.D.N.Y. 2016); in more granular detail, 30% of the non-ADS trades (by dollar volume) were dismissed on Morrison grounds in Internationale Kapitalanlagegesellschaft mbH v. Petróleo Brasileiro S.A., No. 15-cv-6618 (JSR) (Dkt. 60), 2016 U.S. Dist. LEXIS 46570 (S.D.N.Y. Mar. 25, 2016) (Decl. ¶9); and 2 of 4 class representatives were unable to satisfy Morrison with their non-ADS trades.  See In re Petrobras Sec. Litig., 150 F. Supp. 3d 337, 340-45 (S.D.N.Y. 2015).

Third, the claims data is not accessible to the objectors (who were denied discovery), precluding a calculation of the actual percentage.  But the claims data is not relevant to the legal analysis.  See Literary Works, 654 F.3d at 254 n.7 ("Even if we were to consider [the actual claims data], we would find it immaterial because it was not available at the time of negotiation, which is the relevant time frame when determining whether the actions of the parties indicate a conflict of interests.").  Absent the claims data, an objective a priori guess is that $500 million of the settlement will go to non-domestic claims under probability analysis.  See Decl. ¶10.

Fourth, even taking the 2% statistic as true, it represents $60 million, which is more than triple the entire settlement in Literary Works.  The notion that an intraclass conflict can be ignored if it constitutes only 2% of the class is unsupported by precedent.  The following excerpt comes from the dissenting opinion in In re Asbestos Litigation, 134 F.3d 668 (5th Cir. 1998), which was vindicated when the Supreme Court vacated the settlement in Ortiz: "A corollary of rule 23(a)(4)'s mandate of unconflicted representation as a 'structural assurance' is that any real

9

conflict, even if minor when compared to interests held in common, will render the representation inadequate. Thus, Amchem did not weigh the myriad common interests within that class against the conflicts, in order to decide whether the conflicts were *'de minimis'* or were somehow overcome by the commonalities." Id. at 677.

As shown above, the Gielatas have a nonfrivolous issue to argue on appeal. The decision to appeal was not made lightly, given class counsel's scorched-earth campaign to crush dissent by any means. Class counsel is itself appealing the Court's gigantic fee award while furiously denouncing the objector appeals. Before the Second Circuit, the Gielatas will defend this Court's fee decision as impeccably-reasoned and well within the capacious discretion on fee awards articulated by the Second Circuit. Thus, the Gielatas will be defending the interests of the entire class against class counsel's insatiable pursuit of an even higher fee.

A recent law review article by a class action practitioner illuminates the plight of beneficial objectors. See Eric Alan Isaacson, A Real-World Perspective on Withdrawal of Objections to Class-Action Settlements and Attorneys' Fee Awards: Reflections on the Proposed Revisions to Federal Rule of Civil Procedure 23(e)(5), 10 Elon Law Review 35 (2018) (attached as Ex. E). Mr. Isaacson, an experienced appellate litigator, presents this critical insight: "In my twenty-six years of practice in the plaintiffs' class-action bar, not a single case came to my attention wherein class counsel paid objectors to withdraw frivolous objections or appeals. When class counsel pay objectors to drop an appeal it is not because they believe the appeal is frivolous, but because class counsel fear that the objection and appeal may, in fact, have substantial merit." Id. at 36-37.

Thus, the true culprit behind the payment of objectors to abandon appeals may be class counsel, not the other way around: "Though the plaintiffs' class-action bar may rant about

'extortion' by 'professional objectors,' the truth is that class counsel can and do buy off objectors when the objector's counsel would much rather press objections for the benefit of the class." Id. at 62.  "Far too often, objections are withdrawn not because objectors believe they lack merit, but on account of bullying and harassment by unscrupulous class counsel." Id. at 66.  Indeed, when Mr. Isaacson himself objected to a class action settlement, he was promptly served with a deposition subpoena and a cost bond motion, leading him to lament: "Class counsel far too often put more effort into harassing objectors, and into seeking exorbitant bonds as a condition for appeal, than they do into actually litigating claims on behalf of the class." Id. at 53.

Amendments to Rule 23 are due to take effect on December 1, 2018.  The amended Rule 23(e)(5) will require the district court's approval of any "payment or other consideration" to an objector in connection with dismissing or abandoning an appeal of the settlement.  Id. at 63 n.112.  The Gielatas have committed to seeking this Court's approval if they withdraw their appeal for any reason, going beyond the requirements of the future Rule 23, thus ensuring transparency and eliminating any possibility of a quiet payoff to withdraw their appeal.  This commitment addresses and resolves the core argument in both of class plaintiffs' motions.

In sum, the Gielatas are beneficial objectors seeking appellate review of a legitimate issue.  Given the Gielatas' demonstrated commitment to protect the integrity of the process, it would be detrimental to impede their participation in the resolution of this case.

## II.   There is No Reason to Impose a Rule 7 Bond for Taxable Costs on Appeal

Federal Rule of Appellate Procedure 7 provides in pertinent part: "In a civil case, the district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal." Fed. R. App. P. 7 (emphasis added).

In most cases, the primary element covered by the term "costs on appeal" is the expense, under Rule 39(c), of copying the appellate briefs and appendix, as is reflected in the Second Circuit "Bill of Costs" form.  <u>See</u> Ex. F.  As set forth below, the requested bond for administrative expenses and interest on the class fund goes against precedents in this district, and is obviously brought for the improper purpose of blocking the Gielatas' appeal.

Pomerantz has appealed this Court's $186 million fee award (plus interest), which will almost certainly be affirmed in light of Second Circuit precedents on class action fee awards. <u>See, e.g.</u>, <u>Goldberger v. Integrated Resources, Inc.</u>, 209 F.3d 43, 53 (2d Cir. 2000) ("[T]his Court has never found that a district court abused its discretion by awarding in a common fund case a fee that counsel assailed as too stingy."); <u>In re Nortel Networks Corp. Sec. Litig.</u>, 539 F.3d 129, 134 (2d Cir. 2008) (observing that class counsel "points to no case where we have held that a district court abused its discretion in awarding a fee that is too low."); <u>Wal-Mart Stores, Inc. v. Visa USA, Inc.</u>, 396 F.3d 96, 124 (2d Cir. 2005) ("[W]e cannot say that the district court abused its discretion merely because it chose not to heed the terms of an agreement purportedly reached between lead plaintiffs and their counsel when settlement payments to approximately five million absent class members are at stake.").

As the Gielatas will be defending this Court's fee decision on the consolidated appeal, they expect to be the prevailing party as to affirmance of the fee award, in which case no costs on appeal would be taxed against them.  Thus, even if the Gielatas lose their appeal, the most likely outcome is that each side would bear its own costs.  Historically, the <u>Amchem</u>-<u>Literary Works</u> issue is one where the Supreme Court and Second Circuit (and other circuits) have vacated settlements on multiple occasions, so the merits of the appeals weigh against imposition of a

Rule 7 cost bond.[4]  Moreover, "imposing too great a burden on an objector's right to appeal may discourage meritorious appeals or tend to insulate a district court's judgment in approving a class settlement from appellate review." Vaughn v. American Honda Motor Co., Inc., 507 F.3d 295, 300 (5th Cir. 2007) (reducing Rule 7 bond from $150,000 to $1,000).

Beyond the merits of the respective appeals, the Gielatas have dutifully complied with this Court's discovery rulings and have not engaged in any vexatious conduct suggesting a risk of nonpayment.  Absent evidence of bad faith, district courts have been disinclined to order Rule 7 cost bonds against objectors who seek an appeal of settlement approval. See, e.g., Blessing v. Sirius XM Radio Inc., No. 09-cv-10035 (HB), 2011 WL 5873383, slip op. at 5 (S.D.N.Y. Nov. 22, 2011) (Ex. G) (rejecting an appeal bond where "[a]lthough it is unlikely that the Objectors will succeed in their appeal, Plaintiffs have failed to demonstrate either that there is a significant risk of nonpayment or that the Objectors have engaged in bad faith or vexatious conduct.").

In an oft-cited decision examining this issue, where it appeared that the objector was not even a class member, but was pursuing a dubious appeal for an improper purpose (seeking recovery for unrelated claims), the court nevertheless denied a requested cost bond of $983,625, instead ordering a cost bond of only $800. See In re AOL Time Warner, Inc., Sec. & ERISA Litig., No. 02 Civ. 5575, 2007 WL 2741033, at *5, *17 (S.D.N.Y. Sept. 20, 2007).  And where objectors blatantly flouted court orders and were unquestionably found to be serial objectors, a

---

[4] Class action settlements are notoriously vulnerable to reversal on appeal due to intraclass conflicts.  Settlements were rejected in Amchem and Ortiz.  More recently the Second Circuit vacated class action settlements in Literary Works, Payment Cards and Merck-Medco.  See also Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170 (3d Cir. 2012) (reversing approval of class action settlement due to Amchem conflict); In re Community Bank of N. Va., 622 F.3d 275 (3d Cir. 2010) (same); Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 785-86 (7th Cir. 2004) (reversing approval of class action settlement based on inter alia intra-class conflict and lack of separate representation for subclass); In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Litig., 55 F.3d 768 (3d Cir. 1995) (reversing approval of class action settlement based on intra-class conflict).  But see Denney v. Deutsche Bank AG, 443 F.3d 253 (2d Cir. 2006) (rejecting Amchem objection); Sullivan v. DB Investments, Inc., 667 F.3d 273 (3d Cir. 2011) (same).

$25,000 cost bond was ordered. See In re Initial Public Offering Sec. Litig., 728 F. Supp. 2d 289, 294-95 (S.D.N.Y. 2010). But the facts in IPO do not remotely resemble the facts here: the Gielatas are not serial objectors (indeed, this is their first objection and first appeal), they have followed this Court's discovery orders and the issue on appeal is legitimate and deserving of appellate review. Furthermore, Joseph Gielata has provided additional security by personally guaranteeing to pay any taxed costs on appeal and stipulating to the jurisdiction of this Court in connection with acting as a surety, facilitating the collection of any taxed costs. See Dkt. 849; FRAP 7 & 8(b). Rule 7 bonds are for appellants who represent a "payment risk" —for example, in Adsani v. Miller, 139 F.3d 67, 75 (2d Cir. 1998), the appellant had no assets in this country and had already failed to pay a supersedeas bond. No such risk exists here.

Even assuming that Pomerantz wins its appeal and the Gielatas do not, the taxed costs are likely to be a few hundred dollars primarily for photocopying briefs. Cf. Taniguchi v. Kan Pacific Saipan, Ltd., 566 U.S. 560, 573 (2012) ("Taxable costs are limited to relatively minor, incidental expenses... [They are] limited by statute and are modest in scope"). According to the Federal Judicial Center, the total median average cost award was well under $2,000 across all circuits.[5] Because the Second Circuit restricts copies and the maximum cost per page below other circuits, the likely cost award would be even lower. See 2d Cir. LR 31.1 (6 copies of briefs); 2d Cir. LR 30.1 (3 copies of appendix); 2d Cir. LR 39.1(b) (20 cents per page maximum). While class plaintiffs hint that they will intentionally bloat the appendix to inflate costs (Dkt. 860 at 19 n.15), doing so would be sanctionable. See 2d Cir. LR 30.1(f) (providing for "sanctions against an attorney who unreasonably and vexatiously increases litigation costs by including unnecessary material in the appendix").

---

[5] See Marie Leary, The Comparative Study Of The Taxation Of Costs In The Federal Circuit Courts Of Appeals Under Rule 39 Of The Federal Rules Of Appellate Procedure 3–4 (Federal Judicial Center, Apr. 2011), avail. at http://www.uscourts.gov/sites/default/files/frap39rep.pdf

Lastly, there is no dispute that the Gielatas have the financial ability to pay normal costs on appeal (probably less than $2,000), making a cost bond unnecessary. But hardly anyone would be capable of paying the unprecedented and absurdly high sum exceeding $3 million that the class plaintiffs have concocted. Either way, this factor weighs against a Rule 7 cost bond.

Class plaintiffs' arguments for including other costs border on frivolous. "[N]either delay costs nor attorneys' fees are appropriate" for a Rule 7 bond in a securities class action. IPO, 728 F. Supp. 2d at 296. See also In re Target Corp. Customer Data Sec. Breach Litig., 847 F.3d 608, 615 (8th Cir. 2017) (refusing to include delay-based administrative costs in Rule 7 cost bond). The Court of Appeals decides whether an appeal is frivolous and may award costs, see FRAP 38, so this is not to be included in a Rule 7 cost bond. See IPO, 728 F. Supp. 2d at 297.

Interest is accruing on the settlement fund during the pendency of the appeals (the Court may take judicial notice of rising interest rates), so there is no reason to force the Gielatas to pay interest that is already accruing. The Pomerantz appeal and the claims administrator's processing of claims are delaying distribution of the settlement fund regardless of the Gielata appeal. Notably, the claims administrator did not estimate how long it would take to process all the claims in the absence of the appeals, but in other large settlements the processing of claims has taken more than a year.[6] Also, the compensation of the claims administrator is capped in this case and it is not argued that the costs of administration would be below the cap but for Gielatas' appeal. Such costs are not appropriately included in taxable costs on appeal, as courts in this district have repeatedly held. Accordingly, taxable costs are not likely to exceed several hundred dollars and the requested cost bond exceeding $3 million is ludicrous.

---

[6] In the WorldCom case, the time period between final approval and the 75% initial distribution was 15 months. (Ex. H) In the Tyco case, the time period between final approval and the 90% initial distribution was 14 months. (Ex. I) In order to expedite distribution of the settlement in this case pending appeals, Joseph Gielata has proposed an initial distribution of 2/3 of the settlement fund, subject to agreement by the parties and Court approval. See Decl. ¶17.

The decision relied upon heavily by class plaintiffs notes that "a district court must not create an impermissible barrier to appeal." In re General Elec. Co. Sec. Litig., 998 F. Supp. 2d 145, 151 (S.D.N.Y. 2014). The serial objector in GE sent a letter with generic and conclusory objections, held a miniscule fraction of a single share, and had a lengthy history of threadbare objections and frivolous appeals. Id. at 155-56. The Gielatas held 500 shares and lost a substantial sum (for them), they submitted a well-researched brief, and they have never submitted an objection previously nor delayed a settlement with an appeal. GE is inapposite.

In sum, there is almost no chance that Pomerantz's appeal of the fee award will prevail, and thus it is very likely that there will be no taxation of costs against the Gielatas. Any taxable costs would be minimal and the Gielatas have provided security to ensure any such payment. Accordingly, there is no reason for a bond to ensure repayment of any costs on appeal.

## III.   The Rule 11 Motion Is Untimely

Rule 11 "does not contemplate the filing of a motion when there is no pleading or other paper before the Court that violates Rule 11(b)." Castro v. Mitchell, 727 F. Supp. 2d 302, 308 (S.D.N.Y. 2010). Courts routinely dismiss Rule 11 motions that are filed "after a point in the litigation when the lawyer sought to be sanctioned lacked an opportunity to correct or withdraw the challenged submission." In re Pennie & Edmonds LLP, 323 F.3d 86, 89 (2d Cir. 2003). "A party cannot bypass the safe-harbor requirement by submitting the motion at a point in the litigation in which it is no longer possible for the offending party to correct or retract the allegedly sanctionable statement." Castro, 727 F. Supp. 2d at 309 (citation omitted).

The text of the Rule does not explicitly state when a Rule 11 motion should be brought, but the drafters advise that it should be brought early: "Ordinarily the motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as

untimely.  In other circumstances, it should not be served until the other party has had a

reasonable opportunity for discovery. Given the 'safe harbor' provisions ... a party cannot delay

serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending

contention)."  Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendments).

 A leading federal practice treatise explains the rationale for this rule: "[S]ervice of a

sanctions motion after the district court has dismissed the claim or entered judgment prevents

giving effect to the safe harbor provision or the policies and procedural protections it provides,

and it will be rejected." 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and

Procedure § 1337.2, at 727 (3d ed. 2004); see also 2 James Wm. Moore et al., Moore's Federal

Practice § 11.22[1][c] (3d ed. 2014) ("if the court disposes of the offending contention within the

21-day safe-harbor period after service, it becomes impossible under the provision of Rule

11(c)(2) to file the motion or otherwise present it to the court.").

 While the Second Circuit addressed this issue in Pennie & Edmonds, the Sixth Circuit

analyzed the issue at greater length in Ridder v. City of Springfield, 109 F.3d 288, 296-97 (6th

Cir. 1997) ("the 'safe harbor' provision cannot have any effect if the court has already rendered

its judgment in the case; it is too late for the offending party to withdraw the challenged claim.").

See also Peer v. Lewis, 606 F.3d 1306, 1313 (11th Cir. 2010) ("Lewis' motion for Rule 11

sanctions was thus untimely because the district court had already rejected the offensive pleading

at the time Lewis moved for sanctions."); Roth v. Green, 466 F.3d 1179, 1193 (10th Cir. 2006)

(citing decisions from multiple circuits holding that a Rule 11 motion is untimely if filed after

judgment or dismissal).

 In this case, the Rule 11 motion is plainly untimely.  The Gielatas submitted their

objections in the beginning of May, and the Court ruled on the objections and the settlement at

the end of June.  Class counsel waited until the middle of July to serve its Rule 11 motion, long

after the objections had been submitted and well after the Court had already ruled on the

objections.  Accordingly, the Rule 11 motion should be dismissed as untimely.

## IV.   The Gielatas' Contentions Were Well-Founded and Non-Frivolous

Each of the contentions advanced in the Gielatas' submission to the Court was based on

careful inquiry and serious reasoning.  The brief was painstakingly tailored to the unique

attributes of this case and obviously reflects a thorough review of the relevant opinions in the

litigation and the settlement documents.  The contentions cite applicable Supreme Court and

Second Circuit decisions and other relevant authorities in support of the objections.  See Simon

DeBartolo Group v. Richard E. Jacobs Group, 186 F.3d 157, 166 (2d Cir. 1999) ("the extent to

which a litigant has researched the issues...should certainly be taken into account" when deciding

whether sanctions are appropriate).  It is abundantly evident that the Gielatas heeded Rule 11's

duty of pre-filing inquiry and well-founded argumentation.

Specifically, the Amchem-Literary Works argument was "warranted by existing law or

by a nonfrivolous argument for the extension, modification, or reversal of existing law or the

establishment of new law." Fed. R. Civ. P. 11(b)(2).  Although the Court determined that

independent representation for subclasses was not necessary (Op. at 20), it discussed two

relevant Second Circuit cases (cited by the Gielatas) in which settlement approvals were reversed

due largely to inadequate representation of subclasses.  The Second Circuit and the Supreme

Court have found the issue of adequate representation significant enough to reverse large class

action settlements on multiple occasions, and thus it cannot be said that the Gielatas' Amchem-

Literary Works argument was frivolous in violation of Rule 11.  See Storey v. Cello Holdings,

LLC, 347 F.3d 370, 391 (2d Cir. 2003) (vacating Rule 11 sanctions where, "[a]lthough all of

Cello's arguments may not ultimately have prevailed, none are patently contrary to existing law...nor are they so lacking in merit as to amount to a frivolous argument for the extension of existing law.").

The Gielatas' precisely-targeted class notice objections were all well-founded.  As a preliminary matter, the class plaintiffs did not address this issue in their settlement briefs, so they cannot claim to have spent attorney hours on these issues.  (The defendants addressed the three class notice objections (Dkt. 825 at 8-9) but they have not moved for Rule 11 sanctions.)

The first class notice objection pointed out a particular paragraph in the settlement agreement indicating that the parties knew, but failed to disclose, the percentage of the settlement allocated to ADS class members, which is relevant to the Amchem-Literary Works contention. The second objection likewise tied into the Amchem-Literary Works issue by pointing out that, unlike the ADS subclass, some of the Notes subclass members were favorably treated even though the underwriter defendants made no contribution to the settlement.  Although the Court overruled these two objections, the contentions were based on a careful reading of the lengthy settlement agreement, the complicated class notice and the proof of claim.  See O'Brien v. Alexander, 101 F.3d 1479, 1489 (2d Cir. 1996) ("sanctions may not be imposed unless a particular allegation is utterly lacking in support."); Abdelhamid v. Altria Group, Inc., 515 F. Supp. 2d 384, 392 (S.D.N.Y. 2007) ("'When divining the point at which an argument turns from merely losing to losing *and* sanctionable' courts must 'resolve all doubts in favor of the signer of the pleading.'") (quoting Rodick v. City of Schenectady, 1 F.3d 1341, 1350 (2d Cir. 1993)).

The third class notice objection was effectively meritorious.  The Gielatas suggested competitive bidding if the claims administrator anticipated compensation exceeding 1% of the settlement.  Regarding this issue, the claims administrator "disclosed at the hearing (at the

Court's direction) that it will in no event be paid 1% or more of the settlement fund and that its

compensation is capped at $19 million." Op. at 23. Thus, the legitimate concern articulated by

the Gielatas was properly brought to the Court's attention and efficiently resolved. Far from a

Rule 11 violation, the Gielatas' beneficial objection led to a valuable disclosure on the record

and exemplifies how beneficial objectors can assist judges reviewing class action settlements.

On the issue of the fee award, the Court devoted considerable time reviewing all the

parties' submissions, including the objections. Id. at 32. The Court "agree[d] with objectors that

a reduction is appropriate to account for the considerable time spent by [contract] attorneys on

low level document review." Id. at 33. While disagreeing with certain objections, the Court

concluded: "A more appropriate reduction is the one suggested by Gielata of 20%." Id. at 34.

As the Gielatas' fee arguments prevailed at least in part, they should be deemed nonfrivolous.

Moreover, the Gielatas' objections to the fee award were based on Second Circuit decisions and

other relevant authorities. Accordingly, the Gielatas' contentions amply satisfied Rule 11.[7]

## V.    Joseph Gielata Represented Only Himself, And Not His Parents, But In Any Event New York Permits Retired Lawyers to Practice Law

Joseph Gielata scrupulously followed ethics opinions in disclosing his role in composing

his parents' objections, stating clearly: "Disclosure: This brief was prepared by the

---

[7] Other arguments by class plaintiffs merit little response. Section 1927 does not apply to Richard Gielata because he is not a lawyer. Sassower v. Field, 973 F.2d 75, 80 (2d Cir. 1992). The cases cited in support of such sanctions involve objectors who clogged the docket with multiple baseless motions and egregious misconduct, see, e.g., In re Prudential Insurance Company America Sales Practice Litigation, 278 F.3d 175, 189-90 (3d Cir. 2002) (objector was "bombard[ing] the Court with paper"; "his transgressions evidence a pattern of obfuscation and mean spiritedness"; "His behavior since his arrival on the scene in this litigation has been deplorable."), whereas here the Gielatas submitted only their objections and one motion, for leave to file a concise sur-reply responding to newly-raised arguments by the defendants (to which the defendants consented), citing Supreme Court and Second Circuit decisions for the Court's benefit, not unlike an amici curiae brief, and quite the opposite of sanctionable conduct. Lastly, the assignment to Joseph Gielata is nonchampertous because he has not filed any lawsuit and thus is not "bringing an action." See Bluebird Partners, L.P. v. First Fidelity Bank, N.A., 94 N.Y.2d 726, 736, 709 N.Y.S.2d 865, 871, 731 N.E.2d 581 (2000).

Shareholders' son, Joseph Gielata, a retired lawyer." Obj. at 20.  At no time did Joseph Gielata hide his role, nor did he claim to represent his parents at any point, nor did he appear in Court representing his parents.  In teleconferences with chambers, and in one letter to the Court, Joseph Gielata represented himself because class counsel had served him with a subpoena and sought discovery from him.  A retired lawyer representing himself to fight against a bad-faith subpoena is not unauthorized practice of law.  The accusations are meritless and purely tactical.

In any event, in New York a retired attorney may continue to perform legal services without compensation.  See Assoc. of the Bar of the City of New York Comm. on Prof. Ethics, Formal Opinion 2005-06: Retired attorneys' use of professional letterhead and special disclosure obligations to clients and prospective clients (June 2005).[8]  (Joseph Gielata lives in California, and his parents live in Pennsylvania, so there is also a non-obvious choice-of-law question.)

As a policy matter, this Court recently expressed concern over the high cost of legal services and the lack of legal representation for individual litigants, noting that the legal "profession is a cartel, keeping others out through the prohibition of the unauthorized practice of law."[9]  As Judge Posner points out: "The need of pro se litigants for legal assistance is obvious. Few people can afford to pay an attorney for the years that a lawsuit often takes to get resolved. Also, the U.S. legal system is so complicated and confusing that no layperson can successfully get through its maze unaided by expert legal assistance."[10]  Given these compelling policy concerns, it is difficult to see how a retired lawyer aiding his parents in submitting an objection

---

[8] Available at https://www.nycbar.org/member-and-career-services/committees/reports-listing/reports/detail/formal-opinion-2005-06-retired-attorneys-use-of-professional-letterhead-and-special-disclosure-obligations-to-clients-and-prospective-clients
[9] Kramer, Bennette D., Judge Rakoff Receives Learned Hand Medal at Law Day Dinner, 25 Federal Bar Council Quarterly 12, 13 (Mar./Apr./May 2018), available at https://www.federalbarcouncil.org/FBC/Publications/Quarterly/Federal_Bar_Council_Quarterly_Mar.Apr.May_2018.aspx
[10] The Renamed "Posner Center of Justice for Pro Se's" is Open for Business (Apr. 15, 2018), available at http://www.justice-for-pro-ses.org/

to a class settlement could be considered a crime—it is too thin a reed on which to base a felony accusation. If anything, our legal system needs more retired lawyers assisting pro se litigants.

## VI.    Jeremy Lieberman and Pomerantz Should Be Sanctioned

Class counsel deployed the Rule 11 motion to threaten the objectors unless they "waive[d] any right to file an appeal", which is an improper purpose. See Ex. K & Dkt. 858-1 at 2. The Rule 11 motion is frivolous, untimely and littered with false statements reeking of bad faith. Thus, the Rule 11 motion itself violates Rule 11. Class counsel has unjustifiably multiplied these proceedings, violating 28 U.S.C. § 1927 and needlessly burdening the Court.

"Rule 11 is not a toy. A lawyer who transgresses the rule abuses the special role our legal system has entrusted to him." Safe-Strap Co., Inc. v. Koala Corp., 270 F. Supp. 2d 407, 421 (S.D.N.Y. 2003) (quoting Draper and Kramer, Inc. v. Baskin-Robbins, Inc., 690 F. Supp. 728, 732 (N.D. Ill. 1988)). "[T]he filing of a motion for sanctions is itself subject to the requirements of [Rule 11] and can lead to sanctions." Ibid (quoting Fed. R. Civ. P. 11 advisory committee's note). "A party defending a Rule 11 motion need not comply with the separate document and safe harbor provision when counter-requesting sanctions." Ibid (quoting Patelco Credit Union v. Sahni, 262 F.3d 897, 913 (9th Cir. 2001)).

The Rule 11 motion is untimely and should be denied on that basis alone. Furthermore, in light of the motion's misrepresentations, untimeliness and improper purpose, its denial should be compounded by sanctions against Jeremy Lieberman and Pomerantz LLP. Mr. Lieberman has used both the threat and the filing of the motion, not as a means to filter a frivolous claim but as a bullying tactic to intimidate the Gielatas into not filing an appeal. According to the Advisory Committee Notes, an improper purpose would include any effort "to intimidate an adversary into withdrawing contentions that are fairly debatable." Rule 11 imposes a duty on the

22

party seeking sanctions to be circumspect in pursuing such a drastic remedy and to not use the device for an improper purpose lest it discourage expansion of the law through creative legal theories. See Ario v. Underwriting Members of Syndicate 53 at Lloyds, 618 F.3d 277, 297 (3d Cir. 2010) (Rule 11 "should not be applied to adventuresome, though responsible, lawyering which advocates creative legal theories.") (citations omitted).

In this case, Mr. Lieberman has been viciously attacking the Gielatas, abusing his subpoena power and cowardly hiding behind the privilege in judicial proceedings to file libelous personal attacks. Mr. Lieberman has baselessly accused the Gielatas of extortion and of being serial objectors (even though this is their first objection). Perhaps the most blatant and malicious falsehood by Mr. Lieberman is calling Joseph Gielata a "felon" in the cost bond brief. See Dkt. 860 at 1, 2, 7. Mr. Lieberman has crossed the line from advocacy to sanctionable misconduct.

Mudslinging, name calling and false *ad hominem* arguments should have no place in a federal courtroom. "Such a tactic insults the intelligence of the Court because it suggests that irrelevant and prejudicial matters may influence the Court's decisionmaking." Rand v. Anaconda-Ericsson, Inc., 623 F. Supp. 176, 190 (E.D.N.Y. 1985). Mr. Lieberman chose to engage in a smear campaign against the Gielatas because his motions rest on flimsy legal arguments. In violation of Rule 11, the motions (signed by Mr. Lieberman) are littered with blatant and inexcusable misrepresentations, among them:

**Lieberman Lie #1**: Calling Joseph Gielata a felon. See Dkt. 860 at 1. In fact, Joseph Gielata has never been convicted of any crime in his entire life. See Decl. ¶18. This is gratuitously malicious name-calling and demonstrates bad faith. There is no excuse for calling someone a felon who has never been convicted of any crime. This would be libel outside of a legal filing.

**Lieberman Lie #2:**  Falsely asserting that Joseph Gielata was "sanctioned as a felon by the Delaware State Bar." Dkt. 860 at 2. Once again, this is completely untrue. Over a decade ago, the Delaware Supreme Court publicly reprimanded Joseph Gielata over what the lower court likened to "a sophomore prank," but the underlying charges were entirely dismissed. <u>See</u> Ex. L.

**Lieberman Lie #3:**  Calling the Gielatas "professional objectors" and "serial objectors" even though the Gielatas have never before objected to a class action settlement. <u>See</u> Dkt. 860 at 1-3.

**Lieberman Lie #4:**  Claiming that the Gielatas refused an expedited briefing schedule on appeal. <u>See</u> Dkt. 860 at 1. In reality, Joseph Gielata proposed an expedited briefing schedule, which Pomerantz initially accepted, but then rejected in favor of clogging the docket with the frivolous Rule 11 and cost bond motions. <u>See</u> Decl. ¶20.

Mr. Lieberman's penchant for mendacity is perhaps fueled by hubris after winning a $186 million fee (which he decries as too low and an abuse of discretion). But Mr. Lieberman has engaged in deceitful conduct in other courts as well. This year alone, two federal judges have caught Mr. Lieberman red-handed in frauds on the Court. <u>See</u> <u>Garbowski v. Tokai Pharma., Inc.</u>, No. 16-cv-11963, 2018 WL 1370522, at *8 n.5, *11 n.7 (D. Mass. Mar. 16, 2018) (ousting Pomerantz as lead counsel, finding that Mr. Lieberman filed an inaccurate declaration and also "filed the documents in a manner that misrepresented the contents of the Certification"); <u>In re Libor-Based Fin. Instruments Antitrust Litig.</u>, No. 11-cv-2613, slip op. at 262-69 (Ex. N) (S.D.N.Y. Feb. 28, 2018) (finding an "appearance of impropriety" where Mr. Lieberman hid from the Court a kickback deal to split 15% of Pomerantz's fees with the son of the lead plaintiff's CEO). In light of this documented pattern of deception, it is little wonder that Mr. Lieberman fabricated a statistic at the fairness hearing in order to mislead the Court into

approving the settlement.  Mr. Lieberman's unchecked proclivity to deceive the judicial system will only worsen unless a judge imposes sanctions to remind him of his duty of candor.

This Court possesses the wisdom and experience to craft a suitable sanction.  As the Gielatas are currently unrepresented, they have not incurred attorneys' fees.  Alternative sanctions include (1) censure for conduct unbecoming a member of the bar, (2) a monetary sanction paid into the settlement fund or to the Court, or (3) amending the judgment to deny interest on the attorneys' fee award (in which case the interest would instead go to the settlement class).  Finally, if the Court deems the motions unworthy of judicial consideration due to Mr. Lieberman's inappropriate conduct, an efficient and effective response would be simply to deny the motions summarily.  It is highly unlikely that Pomerantz would include the denial of these frivolous motions to its long-shot appeal of the fee award.

## CONCLUSION

Class actions would be much simpler if absent class members would just keep quiet.  But honoring due process and adequate representation for absent class members is not optional, a principle emphasized in Hansberry v. Lee, 311 U.S. 32 (1940), clarified in Amchem and Ortiz, and enforced strictly in Literary Works and Payment Cards.

For all the reasons above, the Rule 11 motion and the cost bond motion should be denied, and Mr. Lieberman and Pomerantz should be sanctioned for violating Rule 11.

August 22, 2018                    Respectfully submitted,


Joseph N. Gielata
7811 Eads Avenue #207
La Jolla, CA 92037
(302) 507-4400
gielata@gmail.com          *(Additional signatures on next page)*

25

**Certificate of Service**

Pursuant to SDNY ECF Rules 3.2, 9.2 and 17.1, and Standing Order M10-468, I certify that I have mailed the foregoing Memorandum of Law and also the accompanying Declaration via Federal Express to the SDNY Pro Se Intake Unit to be scanned and docketed through the Court's ECF system, which will effectuate service of this Memorandum of Law and Declaration upon all attorneys who are electronically registered in this matter.  I am mailing courtesy copies of the foregoing to chambers and to Brenda Szydlo of Pomerantz LLP.

Dated:  August 23, 2018           By: _____

                                  Joseph Gielata

August **22**, 2018

As to Parts I & II only:

*Emelina Gielata*

Emelina Gielata
100 Westbury Drive
Coraopolis, PA 15108

As to Parts I, II, III & IV only:

*Richard R. Gielata*

Richard Gielata
100 Westbury Drive
Coraopolis, PA 15108

## DECLARATION

I, Joseph N. Gielata, pursuant to 28 U.S.C § 1746, declare as follows:

1. This declaration is based upon my personal knowledge.

2. My parents Richard and Emelina are retired. My father was previously a blast furnace foreman at Shenango, Inc. My mother was previously a Spanish teacher at South Fayette High School. My parents reside in Pennsylvania and I reside in California. Neither I nor my parents have filed any objections to a class action settlement other than in the Petrobras case. Neither I nor my parents have filed a notice of appeal other than in the Petrobras case.

3. Attached as Exhibit A are true and correct copies of three subpoenas from Jeremy Lieberman directed to Joseph Gielata, Emelina Gielata and Richard Gielata.

4. I am a retired lawyer and I voluntarily deactivated my Delaware law license in 2016 after moving to California. I do not represent my parents in the Petrobras case, and at no time did I claim to represent my parents. I fully disclosed my role in preparing my parents' objections to the settlement after researching a variety of ethics opinions. I have not received any compensation in connection with this matter. I have not been to New York since 2012.

5. I did not anticipate any further involvement in the Petrobras case after my parents filed and served their objections. However, after being served with a subpoena in this case, I represented myself on teleconferences with chambers to argue against the relevance of the subpoena requests to me, regarding the resolution of an unrelated matter in which I served as counsel. I complied with the Court's discovery rulings.

6. Attached as Exhibit B are true and correct copies of excerpts from the transcript of the June 4, 2018 settlement fairness hearing in the Petrobras case.

7. On July 31, 2018, in reply to an email from Jeremy Lieberman, I inquired of him: "Something in the Rule 11 motion caught my attention (and, frankly, contributed to the decision to seek an appeal): your estimate at the settlement hearing that only 2% of the class consists of non-domestic claims. Given that the claims deadline had not yet passed when this critical representation was made, what is your basis for this puzzling figure? Everything indicates a substantially higher percentage, perhaps 20% or more." Attached as Exhibit C is a true and correct copy of the email exchange.

8. Attached as Exhibit D is a true and correct copy of the "C Counsel" fee order, dated June 10, 2014, in In re Literary Works in Elec. Databases Copyright Litig..

9. I reviewed the opinion and four appendices in Internationale Kapitalanlagegesellschaft mbH v. Petróleo Brasileiro S.A., No. 15-cv-6618 (JSR) (Dkt. 60), 2016 U.S. Dist. LEXIS 46570 (S.D.N.Y. Mar. 25, 2016). (The opinion is Dkt. 539 in the consolidated class action docket.) I totaled the dollar volume of the transactions in the four appendices: Appendix I total: $300,617,000. Appendix II total: $40,905,000. Appendix III total: $55,627,000. Appendix IV total: $28,445,000. The transactions in Appendices II-IV were dismissed on Morrison grounds. The transactions in Appendix I were not dismissed. Rounding the Appendix I total to $300 million, and the totals of Appendices II-IV to $125 million, the percentage of transactions by dollar volume dismissed on Morrison grounds is 29.4%. However, on closer review of Appendix I, it appears that several sequentially identical entries were duplicates. Removing the duplicates, the Appendix I total is

$281,674,000.  Rounding the adjusted Appendix I total to $282 million, and the totals of Appendices II-IV to $125 million, the percentage of transactions by dollar volume dismissed on <u>Morrison</u> grounds is 30.7%.

10. During my undergraduate studies at the University of Pittsburgh, I studied Bayes' theorem in connection with classes taught by Professor Adolf Grünbaum and Professor Nicholas Rescher, both in the Philosophy of Science department.  Based on my understanding of Bayes' theorem, an uninformative prior probability assumption can be created to reflect a balance among outcomes when no information is available. Here, the percentage split between the ADS subclass and the non-ADS subclass has not been disclosed.  Accordingly, a balanced assumption is that half of the settlement fund will go to the ADS subclass and half to the non-ADS subclass.  As to the percentage of the non-ADS subclass that would not satisfy <u>Morrison</u>, we have some information from the Court's <u>Morrison</u> rulings.  Based on the 30% non-<u>Morrison</u> percentage in <u>Internationale Kapitalanlagegesellschaft</u> (detailed above) and the two other rulings indicating that approximately half of the plaintiffs could not satisfy <u>Morrison</u> as to non-ADS transactions, a conservative assumption is that one-third of the non-ADS transactions do not satisfy <u>Morrison</u>.  Accordingly, an objective *a priori* estimate is that $500 million of the settlement (one-third of half of $3 billion) will go to non-domestic claims.  The actual figure may be significantly higher if, for instance, fewer ADS claims are received due to the complicated claims form and the relative lack of sophistication of retail investors holding ADS claims versus institutional investors who likely comprise much of the non-ADS subclass.

11. Attached as Exhibit E is a true and correct copy of <u>A Real-World Perspective on</u>
<u>Withdrawal of Objections to Class-Action Settlements and Attorneys' Fee Awards:</u>
<u>Reflections on the Proposed Revisions to Federal Rule of Civil Procedure 23(e)(5),</u>
10 Elon Law Review 35 (2018), by Eric Alan Isaacson.

12. Attached as Exhibit F is a true and correct copy of the Second Circuit Bill of Costs
form, available at
http://www.ca2.uscourts.gov/clerk/case_filing/forms/pdf/Verified%20Itemized%20Bi
ll%20of%20Costs.pdf

13. Attached as Exhibit G are true and correct copies of the slip opinion in <u>Blessing v.</u>
<u>Sirius XM Radio Inc.,</u> No. 09-cv-10035 (HB), 2011 WL 5873383, slip op. (S.D.N.Y.
Nov. 22, 2011) and <u>In re Air Cargo Shipping Services Antitrust Litig.,</u> 06-MD-1775
(JG)(VVP) Mem. and Order (E.D.N.Y. Mar. 22, 2010), which is cited in the <u>Blessing</u>
opinion.

14. Attached as Exhibit H is a true and correct copy of the "Key Developments" timeline
for the WorldCom securities class action settlement (available at
http://www.worldcomlitigation.com/html/kd.html ) (viewed 8/21/18).

15. The date of the initial distribution order in the Tyco securities class action,
distributing 90% of the settlement fund, is February 3, 2009.  The date of the final
distribution order in the Tyco securities class action, distributing the remainder of the
settlement fund, is July 22, 2010.  Attached as Exhibit I are true and correct copies of
both orders.  The lawsuit to which the class plaintiffs refer (Dkt. 860 at 4,6; Dkt. 863
at 3) was commenced on August 3, 2010, <u>after</u> the distributions.  The lawsuit did not
delay the distribution of the Tyco class action settlement fund.

16. In an email exchange with Pomerantz lawyers, I stated: "Here is another option to accelerate the distribution of the settlement: in many of the largest settlements there are two distributions, usually a large one and then a smaller one after resolution of disputed claims, etc. Even if the appellate court reverses on the Amchem issue, or on the attorneys' fees issue, I believe it would still be feasible to distribute, say, 2/3 of the settlement initially. Please let me know your thoughts on this idea. We could enter into an appropriate stipulation to facilitate such a process." Attached as Exhibit J is a true and correct copy of the August 6, 2018 email exchange.

17. Attached as Exhibit K is a true and correct copy of the July 17, 2018 Rule 11 letter from Jeremy Lieberman to Joseph and Richard Gielata.

18. I have not been convicted of any crime in my life. The criminal charges to which Mr. Lieberman refers in his brief were dismissed with prejudice.

19. Attached as Exhibit L is a true and correct copy of an excerpt from the transcript of a January 6, 2006 teleconference before the Honorable T. Henley Graves in Delaware.

20. Attached as Exhibit M is a true and correct copy of the complete August 10, 2018 email exchange in which I emailed Brenda Szydlo of Pomerantz to propose an expedited briefing schedule with briefing to be concluded in November.

21. Attached as Exhibit N is a true and correct copy of the cited excerpt from In re Libor-Based Fin. Instruments Antitrust Litig., No. 11-cv-2613, Dkt. 715 at 262-69 (Ex. (S.D.N.Y. Feb. 28, 2018).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of August, 2018.

Joseph N. Gielata

# Exhibit A

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Southern District of New York

| | |
|---|---|
| In re: Petrobras Securities Litigation | ) |
| _Plaintiff_ | ) |
| v. | )    Civil Action No.   14-CV-9662 (JSR) |
| | ) |
| | ) |
| _Defendant_ | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:       Joseph N. Gielata, 7811 Eads Avenue Unit 207, La Jolla, CA 92037

_(Name of person to whom this subpoena is directed)_

☑ _Testimony:_ **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Hilton Garden Inn & Homewood Suites, 2137 Pacific Highway, San Diego, CA 92101 | Date and Time: <br> 05/17/2018 9:30 am |
|---|---|

The deposition will be recorded by this method:   Transcription and Video Tape.

☑ _Production:_ You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Attachment A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 5/11/2018

| _CLERK OF COURT_ | OR | |
|---|---|---|
| _____ | | _____ |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_    Class Reps.
Universities Superannuation Scheme Limited, et al.       , who issues or requests this subpoena, are:

Jeremy A. Lieberman, POMERANTZ LLP, 600 Third Avenue, Floor 20, New York, NY 10016, Phone: 212-661-1100, Email: jalieberman@pomlaw.com

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 14-CV-9662 (JSR)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____                          _____
                                                           *Server's signature*

                                               _____
                                                           *Printed name and title*

                                               _____
                                                           *Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
　(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
　(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
　　(i) is a party or a party's officer; or
　　(ii) is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
　(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
　(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
　(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
　(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
　　(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
　　(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**

　(A) When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

　　(i) fails to allow a reasonable time to comply;
　　(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
　　(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
　　(iv) subjects a person to undue burden.
　(B) When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

　　(i) disclosing a trade secret or other confidential research, development, or commercial information; or
　　(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
　(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
　　(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
　　(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
　(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
　(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
　(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
　(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
　(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
　　(i) expressly make the claim; and
　　(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
　(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A**

**DEFINITIONS**

1.     "You" and "your" refer to the above-named deposition witness.

2.     "Document" has the meaning set forth in Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 34(a) and specifically embraces the original, an identical copy if the original is not available, non-identical copies (whether different from the original because of notes made thereon or otherwise), electronically stored information, and photographs.  Documents shall further include all drafts of documents defined above.

3.     "Communication" shall mean any transmission or exchange of information between two or more persons; orally or in writing, and includes, without limitation, any conversation or discussion whether face-to-face or by means of telephone, facsimile, email or other digital form of communication, or other media, and the circumstances by which you came into possession of the document evidencing the communication.

4.     "And" and "or" are to be considered both conjunctively and disjunctively.  The singular form of a noun or pronoun includes the plural form and vice versa.  The word "all" also includes "each" and vice versa.  "Any" is understood to include and encompass "all."

5.     "Relating to" and "in relation to" shall mean, in whole or in part, discussing, describing, pertaining to, deriving from, arising from, resulting from, referencing or alluding to, reflecting, containing, analyzing, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, or concerning.

6.     "Represent" and "representation" shall mean the provision of legal advice or counsel, appearance in a legal matter, or the preparation of legal instruments, including with

respect to the preparation of any objection, documents, legal pleadings, arguments, settlements, or settlement negotiations.

7.      "Objection" shall mean any legal filings or pleadings opposing a proposed or existing class action settlement or an award of attorneys' fees and expenses in a class action case.

8.      "Person" shall mean any natural person, firm, association, organization, partnership, corporation, joint venture, trust, or public entity.

9.      "Petrobras Litigation" shall mean *In re Petrobras Securities Litigation*, Case No. 14-cv-9662 (JSR), pending in the United States District Court for the Southern District of New York and any appeal taken therefrom.

## INSTRUCTIONS

1.      The documents to be produced pursuant to these requests specifically embrace, in addition to documents within your possession, custody or control, documents within the possession, custody or control of your agents or representatives, including your attorneys.

2.      Unless otherwise specified, the relevant time period for these requests is from January 22, 2010 to the present.

3.      In accordance with Fed. R. Civ. P. 26(b)(5), if any document responsive to these requests is withheld based up a claim of privilege or trial preparation material, state separately for each such document, in addition to any other information requested: (a) the nature of the privilege claimed; (b) its date; (c) its author; (d) its addressees, if any; (e) the title or position of its author, as well as the author's addressees; (f) the type of document (e.g., letter, memorandum, electronic mail, report, recording disc, etc.); (g) its title and general subject matter (without revealing the information as to which the privilege is claimed); and (h) with sufficient

particularity to permit the court to make a full determination as to whether the claim of privilege is valid, and the factual basis on which you claim such privilege.

## REQUESTS FOR PRODUCTION

1.      All documents relating to any complaints, legal actions, investigations, regulatory proceedings, alleged attorney ethics violations or other types of proceedings commenced against you relating to alleged false statements or fraudulent conduct by you in court filings or otherwise in connection with a lawsuit.

2.      All documents relating to any communication with any person (including but not limited to Richard Gielata and/or Emelina Gielata) regarding the Objection filed by Richard Gielata and Emelina Gielata in the Petrobras Litigation.

3.      All documents relating to agreements between you and any other person (including but not limited to Richard Gielata and/or Emelina Gielata or any other attorney) in relation to the Petrobras Litigation, including, but not limited to, any retainer agreements and related documents.

4.      All documents relating to your representation of, or assistance to, Richard Gielata and/or Emelina Gielata in relation to the Petrobras Litigation.

5.      All documents relating to any Objection or subsequent appeal filed in the last ten years by you, by any attorney acting on your behalf, or by any attorney who is or has been involved or associated with you.

6.      All documents relating to any settlement made in relation to any Objection or subsequent appeal filed in the last ten years by you, by any attorney acting on your behalf, or by any attorney who is or has been involved or associated with you.

7.      All documents relating to the amount of any monetary compensation received by you, by any attorney acting on your behalf, or any attorney who is or has been involved or associated with you, for making, refraining from making, or withdrawing, an Objection or subsequent appeal within the last ten years.

8.      All documents relating to your efforts to obtain payment in connection with making, refraining from making, or withdrawing, an Objection or subsequent appeal within the last ten years.

9.      All documents relating to changes made to any settlements as a result of any Objection or subsequent appeal made within the last ten years by you, by any attorney acting on your behalf, or by any attorney who is or has been involved or associated with you.

10.    Documents sufficient to identify the amount of time you spend each year working on Objections or subsequent appeals.

11.    All court orders that have criticized or overruled your client's Objections or Objections that you have worked on.

AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

| | | |
|---|---|---|
| In re: Petrobras Securities Litigation | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   14-CV-9662 (JSR) |
| | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Emelina Gielata, 100 Westbury Drive, Coraopolis, PA 15108, Phone:
302-507-4400, Email: gielata@gmail.com
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Pittsburgh Reporting Service, 428 Forbes Ave., Suite 1900, Pittsburgh, P.A. 15219 | Date and Time:<br>05/17/2018 9:30 am |
|---|---|

The deposition will be recorded by this method:   Transcription and Video Tape.

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Attachment A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| *CLERK OF COURT* | | |
|---|---|---|
| | | OR |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Class Reps.,
Universities Superannuation Scheme Limited, et al. _____ , who issues or requests this subpoena, are:

Jeremy A. Lieberman, POMERANTZ LLP, 600 Third Avenue, Floor 20, New York, NY 10016, Phone: 212-661-1100, Email: jalieberman@pomlaw.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   14-CV-9662 (JSR)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____  on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00        .

I declare under penalty of perjury that this information is true.

Date: _____                     _____
                                                          *Server's signature*

                                                          _____
                                                          *Printed name and title*

                                                          _____
                                                          *Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A**

**DEFINITIONS**

1.      "You" and "your" refer to the above-named deposition witness.

2.      "Document" has the meaning set forth in Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 34(a) and specifically embraces the original, an identical copy if the original is not available, non-identical copies (whether different from the original because of notes made thereon or otherwise), electronically stored information, and photographs.  Documents shall further include all drafts of documents defined above.

3.      "Communication" shall mean any transmission or exchange of information between two or more persons; orally or in writing, and includes, without limitation, any conversation or discussion whether face-to-face or by means of telephone, facsimile, email or other digital form of communication, or other media, and the circumstances by which you came into possession of the document evidencing the communication.

4.      "And" and "or" are to be considered both conjunctively and disjunctively.  The singular form of a noun or pronoun includes the plural form and vice versa.  The word "all" also includes "each" and vice versa.  "Any" is understood to include and encompass "all."

5.      "Relating to" and "in relation to" shall mean, in whole or in part, discussing, describing, pertaining to, deriving from, arising from, resulting from, referencing or alluding to, reflecting, containing, analyzing, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, or concerning.

6.      "Represent" and "Representation" shall mean the provision of legal advice or counsel, appearance in a legal matter, or the preparation of legal instruments, including with

respect to the preparation of any objection, documents, legal pleadings, arguments, settlements, or settlement negotiations.

7.     "Objection" shall mean any legal filings or pleadings opposing a proposed or existing class action settlement or an award of attorneys' fees and costs in a class action case.

8.     "Person" shall mean any natural person, firm, association, organization, partnership, corporation, joint venture, trust, or public entity.

9.     "Petrobras Litigation" shall mean *In re Petrobras Securities Litigation*, Case No. 14-cv-9662 (JSR), pending in the United States District Court for the Southern District of New York and any appeal taken therefrom.

10.    "Defendants" shall mean the Petrobras Defendants, the Underwriter Defendants, the Individual Defendants, Josue Christiano Gomes da Silva, Mariângela Monteiro Tizatto, Banco Votorantim Nassau Branch, Santander Investment Securities Inc., Petrobras International Finance Company, PwC Brazil, and any other Person that is or has been at any time a defendant in the Petrobras Litigation.

11.    "Petrobras" shall mean Petróleo Brasileiro S.A.– Petrobras.

12.    "Petrobras Defendants" shall mean Petrobras, Petrobras Global Finance B.V., and Petrobras America Inc.

13.    "Underwriter Defendants" shall mean BB Securities Ltd., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Itau BBA USA Securities, Inc., Morgan Stanley & Co. LLC, HSBC Securities (USA) Inc., Mitsubishi UFJ Securities (USA), Inc. (n/k/a MUFG Securities Americas Inc.), Merrill Lynch, Pierce, Fenner & Smith Incorporated, Standard Chartered Bank, Bank of China (Hong Kong) Limited, Banco Bradesco BBI S.A., Banca IMI S.p.A. and Scotia Capital (USA) Inc.

2

14.     "PwC Brazil" shall mean PricewaterhouseCoopers Auditores Independentes.

15.     "Settlement Class" shall mean: (i) the Exchange Act Class; and (ii) the Securities Act Class as defined herein.

16.     "Exchange Act Class" shall mean all Persons who, during the Class Period, purchased or otherwise acquired Petrobras Securities, including debt securities issued by PifCo and/or PGF, on the New York Stock Exchange or pursuant to other Covered Transactions, excluding Defendants, current or former officers and directors of Petrobras, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which Defendants have or had a controlling interest, and any Persons who have been or subsequently are the subject of a final judgment of conviction convicting them of a criminal or civil offense related to corruption under the laws of Brazil, or under the United States Code, arising out of or relating to conduct related to the allegations asserted in the Petrobras Litigation. For avoidance of doubt, the foregoing exclusion shall not cover "Investment Vehicles," which for these purposes shall mean any investment company, pooled investment fund or separately managed account (including, but not limited to, mutual fund families, exchange-traded funds, fund of funds, private equity funds, real estate funds, hedge funds, and employee benefit plans) in which any Underwriter Defendant or any of its affiliates has or may have a direct or indirect interest or as to which any Underwriter Defendant or any of its affiliates may act as an investment advisor, general partner, managing member or in other similar capacity.

17.     "Securities Act Class" shall mean all Persons who purchased or otherwise acquired debt securities issued by Petrobras, PifCo, and/or PGF, in Covered Transactions, directly in, pursuant to and/or traceable to a May 13, 2013 public offering registered in the United States and/or a March 10, 2014 public offering registered in the United States before

3

Petrobras made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the offerings (August 11, 2014 in the case of the May 13, 2013 public offering and May 15, 2015 in the case of the March 10, 2014 public offering), excluding Defendants, current or former officers and directors of Petrobras, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which Defendants have or had a controlling interest, and any Persons who have been or subsequently are the subject of a final judgment of conviction convicting them of a criminal or civil offense related to corruption under the laws of Brazil, or under the United States Code, arising out of or relating to conduct related to the allegations asserted in the Action. The foregoing exclusion shall not cover "Investment Vehicles," which for these purposes shall mean any investment company, pooled investment fund or separately managed account (including, but not limited to, mutual fund families, exchange-traded funds, fund of funds, private equity funds, real estate funds, hedge funds, and employee benefit plans) in which any Underwriter Defendant or any of its affiliates has or may have a direct or indirect interest or as to which any Underwriter Defendant or any of its affiliates may act as an investment advisor, general partner, managing member or in other similar capacity.

18.    "Class Period" shall mean the time period between January 22, 2010 and July 28, 2015, inclusive.

19.    "Petrobras Securities" shall mean the securities of Petrobras, including debt securities issued by PifCo and/or PGF, purchased or otherwise acquired during the Class Period on the New York Stock Exchange or pursuant to other Covered Transactions and debt securities issued by Petrobras, PifCo, and/or PGF that were purchased or otherwise acquired during the Class Period in Covered Transactions, directly in, pursuant to and/or traceable to a May 13, 2013

4

public offering registered in the United States and/or a March 10, 2014 public offering registered in the United States before Petrobras made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the offerings.

20.    "PifCo" shall mean Petrobras International Finance Company S.A.

21.    "PGF" shall mean Petrobras Global Finance B.V.

22.    "Covered Transaction" shall mean any transaction that satisfies any of the following criteria: (i) any transaction in a Petrobras Security listed for trading on the New York Stock Exchange ("NYSE"); (ii) any transaction in a Petrobras Security that cleared or settled through the Depository Trust Company's book-entry system; or (iii) any transaction in a Petrobras Security to which the United States securities laws apply, including as applicable pursuant to the Supreme Court's decision in *Morrison v. National Australia Bank*, 561 U.S. 247 (2010). Excluded from the definition of Covered Transaction are purchases of any Petrobras Security on the BOVESPA. The Petrobras Securities that satisfy the criteria were set forth in the notice mailed to Settlement Class members.

## INSTRUCTIONS

1.    The documents to be produced pursuant to these requests specifically embrace, in addition to documents within your possession, custody or control, documents within the possession, custody or control of your agents or representatives, including your attorneys.

2.    Unless otherwise specified, the relevant time period for these requests is from January 22, 2010 to the present.

3.    In accordance with Fed. R. Civ. P. 26(b)(5), if any document responsive to these requests is withheld based up a claim of privilege or trial preparation material, state separately

for each such document, in addition to any other information requested: (a) the nature of the privilege claimed; (b) its date; (c) its author; (d) its addressees, if any; (e) the title or position of its author, as well as the author's addressees; (f) the type of document (e.g., letter, memorandum, electronic mail, report, recording disc, etc.); (g) its title and general subject matter (without revealing the information as to which the privilege is claimed); and (h) with sufficient particularity to permit the court to make a full determination as to whether the claim of privilege is valid, and the factual basis on which you claim such privilege.

## REQUESTS FOR PRODUCTION

1.      All documents supporting your Objection filed in the Petrobras Litigation, including those supporting your assertion that you are a member of the Settlement Class.

2.      Documents sufficient to identify all of your transactions in the Petrobras Securities.

3.      Documents sufficient to identify all brokerages or financial institutions through which you transacted in Petrobras Securities.

4.      For each brokerage or financial institution responsive to Request No. 3 herein, documents from that brokerage or financial institution that are sufficient to confirm all of your transactions in Petrobras Securities conducted through that brokerage or financial institution.

5.      All documents relating to your decision to invest in Petrobras Securities during the Class Period.

6.      All documents relating to any communication with any person (including but not limited to Joseph Gielata or any attorney) relating to the Petrobras Litigation.

7.    All documents relating to agreements between you and any other person (including but not limited to Joseph Gielata or any attorney) in relation to the Petrobras Litigation, including, but not limited to, any retainer agreements and related documents.

8.    All documents relating to the representation of you by any person in relation to the Petrobras Litigation.

9.    All documents relating to any Objection or subsequent appeal filed in the last ten years by you, by any person acting on your behalf, or by any attorney who is or has been involved or associated with the representation of you in the Petrobras Litigation.

10.    All documents relating to any settlement made in relation to any Objection or subsequent appeal filed in the last ten years by you, by any person acting on your behalf, or by any attorney who is or has been involved or associated with the representation of you in the Petrobras Litigation.

11.    All documents relating to the amount of any monetary compensation received by you for making, refraining from making or withdrawing an Objection or subsequent appeal within the last ten years.

12.    All documents relating to your efforts to obtain payment in connection with making, refraining from making, or withdrawing an Objection or subsequent appeal within the last ten years.

13.    All documents relating to changes made to any settlements as a result of any Objection or subsequent appeal by you within the last ten years

14.    All documents that show how you came to learn of the settlement in the Petrobras Litigation.

15.     With respect to any attorney who is, or has been, involved or associated with the representation of you in the Petrobras Litigation, all documents that show a relationship between you and such attorney prior to December 31, 2017.

16.     Documents sufficient to identify the amount of your income arising from (i) Objections or subsequent appeals filed in the last ten years, and (ii) all other sources.

17.     Documents sufficient to identify the amount of time you spend each year working on Objections or subsequent appeals.

18.     All documents relating to any complaints, legal actions, investigations, regulatory proceedings, or other types of proceedings commenced against you relating to alleged false statements or fraudulent conduct by you in court filings or otherwise in connection with a lawsuit.

AO 88A  (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

| | |
|---|---|
| In re: Petrobras Securities Litigation | ) |
| _Plaintiff_ | ) |
| v. | ) |
| | ) |
| | ) |
| _Defendant_ | ) |

Civil Action No.    14-CV-9662 (JSR)

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:    Richard Gielata, 100 Westbury Drive, Coraopolis, PA 15108, Phone:
302-507-4400, Email: gielata@gmail.com
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Pittsburgh Reporting Service, 428 Forbes Ave., Suite 1900, Pittsburgh, P.A. 15219 | Date and Time:<br>05/17/2018 9:30 am |
|---|---|

The deposition will be recorded by this method:    Transcription and Video Tape.

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: See Attachment A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| _CLERK OF COURT_ | OR | |
|---|---|---|
| _____ | | _____ |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Class Reps.,
Universities Superannuation Scheme Limited, et al. _____ , who issues or requests this subpoena, are:
Jeremy A. Lieberman, POMERANTZ LLP, 600 Third Avenue, Floor 20, New York, NY 10016, Phone: 212-661-1100,
Email: jalieberman@pomlaw.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  14-CV-9662 (JSR)

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____                    _____

                                                                        *Server's signature*

                                                            _____

                                                                        *Printed name and title*

                                                            _____

                                                                        *Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A) Appearance Not Required.** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B) Objections.** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  **(A) When Required.** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B) When Permitted.** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C) Specifying Conditions as an Alternative.** In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A) Documents.** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B) Form for Producing Electronically Stored Information Not Specified.** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C) Electronically Stored Information Produced in Only One Form.** The person responding need not produce the same electronically stored information in more than one form.
  **(D) Inaccessible Electronically Stored Information.** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A) Information Withheld.** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B) Information Produced.** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A**

**DEFINITIONS**

1.      "You" and "your" refer to the above-named deposition witness.

2.      "Document" has the meaning set forth in Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 34(a) and specifically embraces the original, an identical copy if the original is not available, non-identical copies (whether different from the original because of notes made thereon or otherwise), electronically stored information, and photographs.  Documents shall further include all drafts of documents defined above.

3.      "Communication" shall mean any transmission or exchange of information between two or more persons; orally or in writing, and includes, without limitation, any conversation or discussion whether face-to-face or by means of telephone, facsimile, email or other digital form of communication, or other media, and the circumstances by which you came into possession of the document evidencing the communication.

4.      "And" and "or" are to be considered both conjunctively and disjunctively.  The singular form of a noun or pronoun includes the plural form and vice versa.  The word "all" also includes "each" and vice versa.  "Any" is understood to include and encompass "all."

5.      "Relating to" and "in relation to" shall mean, in whole or in part, discussing, describing, pertaining to, deriving from, arising from, resulting from, referencing or alluding to, reflecting, containing, analyzing, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, or concerning.

6.      "Represent" and "Representation" shall mean the provision of legal advice or counsel, appearance in a legal matter, or the preparation of legal instruments, including with

1

respect to the preparation of any objection, documents, legal pleadings, arguments, settlements, or settlement negotiations.

7.    "Objection" shall mean any legal filings or pleadings opposing a proposed or existing class action settlement or an award of attorneys' fees and costs in a class action case.

8.    "Person" shall mean any natural person, firm, association, organization, partnership, corporation, joint venture, trust, or public entity.

9.    "Petrobras Litigation" shall mean *In re Petrobras Securities Litigation*, Case No. 14-cv-9662 (JSR), pending in the United States District Court for the Southern District of New York and any appeal taken therefrom.

10.   "Defendants" shall mean the Petrobras Defendants, the Underwriter Defendants, the Individual Defendants, Josue Christiano Gomes da Silva, Mariângela Monteiro Tizatto, Banco Votorantim Nassau Branch, Santander Investment Securities Inc., Petrobras International Finance Company, PwC Brazil, and any other Person that is or has been at any time a defendant in the Petrobras Litigation.

11.   "Petrobras" shall mean Petróleo Brasileiro S.A.– Petrobras.

12.   "Petrobras Defendants" shall mean Petrobras, Petrobras Global Finance B.V., and Petrobras America Inc.

13.   "Underwriter Defendants" shall mean BB Securities Ltd., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Itau BBA USA Securities, Inc., Morgan Stanley & Co. LLC, HSBC Securities (USA) Inc., Mitsubishi UFJ Securities (USA), Inc. (n/k/a MUFG Securities Americas Inc.), Merrill Lynch, Pierce, Fenner & Smith Incorporated, Standard Chartered Bank, Bank of China (Hong Kong) Limited, Banco Bradesco BBI S.A., Banca IMI S.p.A. and Scotia Capital (USA) Inc.

14.     "PwC Brazil" shall mean PricewaterhouseCoopers Auditores Independentes.

15.     "Settlement Class" shall mean: (i) the Exchange Act Class; and (ii) the Securities Act Class as defined herein.

16.     "Exchange Act Class" shall mean all Persons who, during the Class Period, purchased or otherwise acquired Petrobras Securities, including debt securities issued by PifCo and/or PGF, on the New York Stock Exchange or pursuant to other Covered Transactions, excluding Defendants, current or former officers and directors of Petrobras, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which Defendants have or had a controlling interest, and any Persons who have been or subsequently are the subject of a final judgment of conviction convicting them of a criminal or civil offense related to corruption under the laws of Brazil, or under the United States Code, arising out of or relating to conduct related to the allegations asserted in the Petrobras Litigation. For avoidance of doubt, the foregoing exclusion shall not cover "Investment Vehicles," which for these purposes shall mean any investment company, pooled investment fund or separately managed account (including, but not limited to, mutual fund families, exchange-traded funds, fund of funds, private equity funds, real estate funds, hedge funds, and employee benefit plans) in which any Underwriter Defendant or any of its affiliates has or may have a direct or indirect interest or as to which any Underwriter Defendant or any of its affiliates may act as an investment advisor, general partner, managing member or in other similar capacity.

17.     "Securities Act Class" shall mean all Persons who purchased or otherwise acquired debt securities issued by Petrobras, PifCo, and/or PGF, in Covered Transactions, directly in, pursuant to and/or traceable to a May 13, 2013 public offering registered in the United States and/or a March 10, 2014 public offering registered in the United States before

3

Petrobras made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the offerings (August 11, 2014 in the case of the May 13, 2013 public offering and May 15, 2015 in the case of the March 10, 2014 public offering), excluding Defendants, current or former officers and directors of Petrobras, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which Defendants have or had a controlling interest, and any Persons who have been or subsequently are the subject of a final judgment of conviction convicting them of a criminal or civil offense related to corruption under the laws of Brazil, or under the United States Code, arising out of or relating to conduct related to the allegations asserted in the Action. The foregoing exclusion shall not cover "Investment Vehicles," which for these purposes shall mean any investment company, pooled investment fund or separately managed account (including, but not limited to, mutual fund families, exchange-traded funds, fund of funds, private equity funds, real estate funds, hedge funds, and employee benefit plans) in which any Underwriter Defendant or any of its affiliates has or may have a direct or indirect interest or as to which any Underwriter Defendant or any of its affiliates may act as an investment advisor, general partner, managing member or in other similar capacity.

18.   "Class Period" shall mean the time period between January 22, 2010 and July 28, 2015, inclusive.

19.   "Petrobras Securities" shall mean the securities of Petrobras, including debt securities issued by PifCo and/or PGF, purchased or otherwise acquired during the Class Period on the New York Stock Exchange or pursuant to other Covered Transactions and debt securities issued by Petrobras, PifCo, and/or PGF that were purchased or otherwise acquired during the Class Period in Covered Transactions, directly in, pursuant to and/or traceable to a May 13, 2013

4

public offering registered in the United States and/or a March 10, 2014 public offering registered in the United States before Petrobras made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the offerings.

20.    "PifCo" shall mean Petrobras International Finance Company S.A.

21.    "PGF" shall mean Petrobras Global Finance B.V.

22.    "Covered Transaction" shall mean any transaction that satisfies any of the following criteria: (i) any transaction in a Petrobras Security listed for trading on the New York Stock Exchange ("NYSE"); (ii) any transaction in a Petrobras Security that cleared or settled through the Depository Trust Company's book-entry system; or (iii) any transaction in a Petrobras Security to which the United States securities laws apply, including as applicable pursuant to the Supreme Court's decision in *Morrison v. National Australia Bank*, 561 U.S. 247 (2010). Excluded from the definition of Covered Transaction are purchases of any Petrobras Security on the BOVESPA. The Petrobras Securities that satisfy the criteria were set forth in the notice mailed to Settlement Class members.

## INSTRUCTIONS

1.    The documents to be produced pursuant to these requests specifically embrace, in addition to documents within your possession, custody or control, documents within the possession, custody or control of your agents or representatives, including your attorneys.

2.    Unless otherwise specified, the relevant time period for these requests is from January 22, 2010 to the present.

3.    In accordance with Fed. R. Civ. P. 26(b)(5), if any document responsive to these requests is withheld based up a claim of privilege or trial preparation material, state separately

for each such document, in addition to any other information requested: (a) the nature of the privilege claimed; (b) its date; (c) its author; (d) its addressees, if any; (e) the title or position of its author, as well as the author's addressees; (f) the type of document (e.g., letter, memorandum, electronic mail, report, recording disc, etc.); (g) its title and general subject matter (without revealing the information as to which the privilege is claimed); and (h) with sufficient particularity to permit the court to make a full determination as to whether the claim of privilege is valid, and the factual basis on which you claim such privilege.

## REQUESTS FOR PRODUCTION

1.      All documents supporting your Objection filed in the Petrobras Litigation, including those supporting your assertion that you are a member of the Settlement Class.

2.      Documents sufficient to identify all of your transactions in the Petrobras Securities.

3.      Documents sufficient to identify all brokerages or financial institutions through which you transacted in Petrobras Securities.

4.      For each brokerage or financial institution responsive to Request No. 3 herein, documents from that brokerage or financial institution that are sufficient to confirm all of your transactions in Petrobras Securities conducted through that brokerage or financial institution.

5.      All documents relating to your decision to invest in Petrobras Securities during the Class Period.

6.      All documents relating to any communication with any person (including but not limited to Joseph Gielata or any attorney) relating to the Petrobras Litigation.

7.      All documents relating to agreements between you and any other person (including but not limited to Joseph Gielata or any attorney) in relation to the Petrobras Litigation, including, but not limited to, any retainer agreements and related documents.

8.      All documents relating to the representation of you by any person in relation to the Petrobras Litigation.

9.      All documents relating to any Objection or subsequent appeal filed in the last ten years by you, by any person acting on your behalf, or by any attorney who is or has been involved or associated with the representation of you in the Petrobras Litigation.

10.      All documents relating to any settlement made in relation to any Objection or subsequent appeal filed in the last ten years by you, by any person acting on your behalf, or by any attorney who is or has been involved or associated with the representation of you in the Petrobras Litigation.

11.      All documents relating to the amount of any monetary compensation received by you for making, refraining from making or withdrawing an Objection or subsequent appeal within the last ten years.

12.      All documents relating to your efforts to obtain payment in connection with making, refraining from making, or withdrawing an Objection or subsequent appeal within the last ten years.

13.      All documents relating to changes made to any settlements as a result of any Objection or subsequent appeal by you within the last ten years

14.      All documents that show how you came to learn of the settlement in the Petrobras Litigation.

15.     With respect to any attorney who is, or has been, involved or associated with the representation of you in the Petrobras Litigation, all documents that show a relationship between you and such attorney prior to December 31, 2017.

16.     Documents sufficient to identify the amount of your income arising from (i) Objections or subsequent appeals filed in the last ten years, and (ii) all other sources.

17.     Documents sufficient to identify the amount of time you spend each year working on Objections or subsequent appeals.

18.     All documents relating to any complaints, legal actions, investigations, regulatory proceedings, or other types of proceedings commenced against you relating to alleged false statements or fraudulent conduct by you in court filings or otherwise in connection with a lawsuit.

# Exhibit B

I649petc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE: PETROBRAS,

4
                                    14 CV 9662 (JSR)
5

6   ------------------------------x
                                    New York, N.Y.
7                                   June 4, 2018
                                    2:09 p.m.
8
    Before:
9
                        HON. JED S. RAKOFF
10
                                         District Judge
11
                            APPEARANCES
12
    POMERANTZ
13          Attorneys for Class Plaintiffs
    BY:  JEREMY LIEBERMAN
14          MARC I. GROSS
            BRENDA SZYDLO
15          EMMA GILMORE
            JENNIFER PAFITI
16          JOHN A. KEHOE

17  USS INVESTMENT MANAGEMENT LIMITED
    BY:  JEREMY HILL
18  Group General Counsel

19  LABATON SUCHAROW
            Attorneys for Plaintiff Hawaii
20  BY:  THOMAS A. DUBBS
            LOUIS GOTTLIEB
21
    STATE OF NORTH CAROLINA
22  DEPARTMENT OF STATE TREASURER
    BY:  MERYL MURTAGH
23  Corporate Governance Attorney

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

I649petc

1   And even worse, not only did they get the largest reduction

2   because, well, they hadn't filed their copyright yet so,

3   therefore, their claim was less viable; but if the claims in

4   that case had reached a certain level, they would be even

5   further diluted; potentially they would get nothing.  And so

6   you had that scenario.  99 percent of the class was in this

7   category C.  They were clearly getting a reduction.  And not

8   only that, the plan of allocation would have given them even a

9   further reduction.

10          That's much different than what we have.  We have two

11  percent potentially of the class, we don't know, potentially

12  two percent of the class not getting any reduction and the

13  question then is -- there is no question of fairness to those

14  who have been dismissed.  The question is:  Is it fair to it's

15  rest of the class?

16          THE COURT:  No.  That's the objection that's being

17  raised.

18          MR. LIEBERMAN:  We determined, after talking to the

19  claims administrator, that automatically if we would limit the

20  class to those who met this Court's irrevocable -- would meet

21  this Court's irrevocable liability test under Absolute Activist

22  that would necessarily be a very costly and time-intensive

23  exercise.  The claims distribution process could be upheld for

24  months.  Because there could be litigation on that very point.

25  Do all these factors meet Absolute Activist test?  I hate to --

I649petc

1          And it is important to note that both North Carolina

2    and Hawaii were very active with respect to the Section 11

3    claims as to whether or not there should be a premium and what

4    level of premium they were.  Ultimately we came to an

5    agreement.  But they had pushed back.  They demanded a certain

6    premium.  And the premium we proposed was insufficient.  And we

7    ultimately came to a premium that was sufficient.

8          If they felt that they were being unfairly diluted,

9    they would have come and they would have complained.  We had

10   all felt that this was really a practical matter as to whether

11   or not we're going to hold up the settlement and potentially

12   have the claims administration subject to countless appeals

13   because Absolute Activist is no way clear as to its

14   application, and whether or not that was better for the class,

15   who had no questions to domesticity, or do we make a more

16   smooth and efficient process whereby all claims could go

17   quickly and smoothly with an easy test to pass here.

18         THE COURT:  All right.  Let me hear from anyone on the

19   defense side who wants to be heard on this.

20         MR. COOPER:  Your Honor, Roger Cooper again on behalf

21   of Petrobras.

22         I just wanted to add.  You're right, your Honor,

23   defendants were looking for global peace.  And had we not been

24   able to achieve a settlement of global peace, the settlement

25   amount would have been substantially less.  And had we not had

I649petc

1   settlement it's not de minimis for domestic purchasers.

2          THE COURT:  Well I understand that but I think it's

3   not irrelevant given that very, very few objections -- there

4   were a grand total, of all of six objections filed, two of whom

5   are represented here today.  I've considered, of course, all

6   six.

7          OK.  Anything any counsel wanted to say in response to

8   the arguments just raised by objector's counsel.

9          MR. DUBBS:  Thomas Dubbs for Hawaii, your Honor.  Just

10  so the record is clear, Hawaii supports the settlement for all

11  the reasons that were stated.  Hawaii's transactions are all,

12  quote unquote, domestic as per the Court's prior order.  And

13  the fact that Hawaii was not, to borrow a phrase from a

14  Washington lawyer, "a potted plant," is evidenced by the fact

15  that we rejected USS's proposal with respect to how much the

16  Section 11 claimants were going to get and vigorously argued

17  for and eventually obtained a substantial premium for that.  So

18  that, we would submit, shows that certainly Hawaii, as well as

19  North Carolina, reviewed this situation and are satisfied with

20  the result.  Thank you.

21         THE COURT:  All right.  Anything else?

22         MR. LIEBERMAN:  Your Honor, just on that point, very

23  briefly, is that if we would accept Ms. St. John's analysis to

24  how this should proceed, we are -- we would potentially have

25  dozens of questions on each claim as to whether or not they met

# Exhibit C

 Gmail

**J GIELATA <gielata@gmail.com>**

## Petrobras/Call with Chambers
6 messages

**Jeremy Lieberman** <jalieberman@pomlaw.com>      Tue, Jul 31, 2018 at 11:33 AM
To: "jrf@furmanlawyers.com" <jrf@furmanlawyers.com>, Joseph Gielata <gielata@gmail.com>
Cc: Brenda Szydlo <bszydlo@pomlaw.com>, Emma Gilmore <egilmore@pomlaw.com>

Counsel:

Please advise regarding your availability for a call with Chambers today before 6:00 p.m. to discuss the briefing schedule for Class Plaintiffs' Motion for Sanctions and Motion to Require Appellate bond against Appellants.  If you are not available today, please advise regarding your availability for a call from noon to 1:00 p.m. tomorrow.

We have already agreed to a briefing schedule of 8/10, 8/24 and 8/30 with Appellant Bishop.  Please advise if you agree to the same schedule.

Moreover, the Bishops have agreed to an expedited briefing schedule at the Second Circuit Court of Appeals following the schedule set forth in Rule 31.2(b)(3) of the Local Rules of the Second Circuit Court of Appeals.

Please advise if you will abide by the same schedule.

Jeremy


Jeremy A. Lieberman

## POMERANTZLLP

600 Third Avenue, 20th Floor

New York, NY 10016

Phone: 212-661-1100, ext. 243

Direct Dial: 646-581-9971

Fax: 646-607-2426

www.pomlaw.com

jalieberman@pomlaw.com


This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any

attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 661-1100 and permanently delete all copies of the email and any attachments.

---

**Joseph Gielata** <gielata@gmail.com>                              Tue, Jul 31, 2018 at 2:02 PM
To: Jeremy Lieberman <jalieberman@pomlaw.com>
Cc: "jrf@furmanlawyers.com" <jrf@furmanlawyers.com>, Brenda Szydlo <bszydlo@pomlaw.com>, Emma Gilmore <egilmore@pomlaw.com>

Jeremy:

I am hiking in the Alps with intermittent internet access, returning to California late Friday. I can be available for a call anytime after my return.

The proposed briefing schedule is acceptable on the motions. However, the Rule 11 motion, if filed, would be sanctionably frivolous because, among other reasons, it was not served back in May before the judge ruled on the settlement and the objections. See Rule 11 advisory notes ("a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention)"). Rule 11 "does not contemplate the filing of a motion when there is no pleading or other paper before the Court that violates Rule 11(b)." Castro v. Mitchell, 727 F. Supp. 2d 302, 308 (S.D.N.Y. 2010). Courts routinely dismiss Rule 11 motions that are filed "after a point in the litigation when the lawyer sought to be sanctioned lacked an opportunity to correct or withdraw the challenged submission." In re Pennie & Edmonds LLP, 323 F.3d 86, 89 (2d Cir. 2003); see also Homkow v. Musika Records, Inc., No. 04 Civ. 3587, 2009 WL 721732, at *20 (S.D.N.Y. Mar. 18, 2009) ("A party cannot bypass the safe-harbor requirement by submitting the motion at a point in the litigation in which it is no longer possible for the offending party to correct or retract the allegedly sanctionable statement."). Furthermore, the Rule 11 motion contains a number of demonstrable misrepresentations. Filing an error-filled and prima facie defective Rule 11 motion is likely to backfire.

As to the appellate cost bond, I have personally guaranteed any costs on appeal, and accordingly there is no legitimate basis for such a bond.

Something in the Rule 11 motion caught my attention (and, frankly, contributed to the decision to seek an appeal): your estimate at the settlement hearing that only 2% of the class consists of non-domestic claims. Given that the claims deadline had not yet passed when this critical representation was made, what is your basis for this puzzling figure? Everything indicates a substantially higher percentage, perhaps 20% or more.

In sum, I am unavailable for a call with the Court until after Friday, but the proposed briefing schedule is acceptable if you decide to file the motion(s).

-Joe

[Quoted text hidden]

---

**Jeremy Lieberman** <jalieberman@pomlaw.com>                        Tue, Jul 31, 2018 at 2:14 PM
To: Joseph Gielata <gielata@gmail.com>, "jrf@furmanlawyers.com" <jrf@furmanlawyers.com>
Cc: Brenda Szydlo <bszydlo@pomlaw.com>, Emma Gilmore <egilmore@pomlaw.com>

Joseph—

Please advise as to whether you agree to file your appellate brief pursuant to the expedited briefing schedule set forth in Rule 31.2(b)(3) of the Local Rules of the Second Circuit Court of Appeals. Mr. and Mrs. Bishop have agreed to this schedule. We will communicate your position regarding scheduling to the Court.

Mr. Furman, Judge Rakoff's Individual Practices mandate that you make yourself available for a teleconference with the Court within 24 hours of a request to convene a call. Please advise of your availability to join a call with Chambers prior to 2:30 p.m. tomorrow.

Best Regards,


Jeremy


Jeremy A. Lieberman

**POMERANTZ**LLP

600 Third Avenue, 20th Floor

New York, NY 10016

Phone: 212-661-1100, ext. 243

Direct Dial: 646-581-9971

Fax: 646-607-2426

www.pomlaw.com

jalieberman@pomlaw.com


**From:** Joseph Gielata <gielata@gmail.com>
**Sent:** Tuesday, July 31, 2018 5:03 PM
**To:** Jeremy Lieberman <jalieberman@pomlaw.com>
**Cc:** jrf@furmanlawyers.com; Brenda Szydlo <bszydlo@pomlaw.com>; Emma Gilmore <egilmore@pomlaw.com>
**Subject:** Re: Petrobras/Call with Chambers

[Quoted text hidden]
[Quoted text hidden]

---

**Joshua R. Furman** <jrf@furmanlawyers.com>                 Tue, Jul 31, 2018 at 3:30 PM
To: Jeremy Lieberman <jalieberman@pomlaw.com>, Joseph Gielata <gielata@gmail.com>
Cc: Brenda Szydlo <bszydlo@pomlaw.com>, Emma Gilmore <egilmore@pomlaw.com>


Jeremy,


Judge Rakoff's individual practice rules concerning 24-hour availability for phone calls pertains to motions and applications. What is the nature of the motion or application you intend to bring? The briefing schedule for your proposed Rule 11 Motion does not require court approval, we should follow the rules. If you want to set a different briefing schedule, please explain the good cause you intend to show for a different briefing schedule during the call.


The 2d Circuit's expedited calendar rules do not apply to the appeal we filed. We do not agree to expedited briefing. In any case, the rule does not provide for a stipulation to the XAC.


Joshua R. Furman
JOSHUA R. FURMAN LAW
14724 Ventura Boulevard, Suite 509 ♦ Sherman Oaks, California 91403
t (818) 646-4300     f (818) 646-4301     e jrf@furmanlawyers.com

The information contained in this email is confidential and intended to be sent only to the stated recipient of the transmission. If you are not the intended recipient, reading it may be prohibited by law. If you have received this email in error, please contact us immediately and destroy any copies of this email.

IRS Circular 230 Notification: Any tax advice herein is not intended for the purpose of avoiding any penalty under the Internal Revenue Code or promotion or marketing of any applicable matter.

**From:** Jeremy Lieberman <jalieberman@pomlaw.com>
**Date:** Tuesday, July 31, 2018 at 2:14 PM
**To:** Joseph Gielata <gielata@gmail.com>, "Joshua R. Furman" <jrf@furmanlawyers.com>
**Cc:** Brenda Szydlo <bszydlo@pomlaw.com>, Emma Gilmore <egilmore@pomlaw.com>
**Subject:** RE: Petrobras/Call with Chambers

[Quoted text hidden]

**Jeremy Lieberman** <jalieberman@pomlaw.com>                          Tue, Jul 31, 2018 at 3:43 PM
To: "Joshua R. Furman" <jrf@furmanlawyers.com>, Joseph Gielata <gielata@gmail.com>
Cc: Brenda Szydlo <bszydlo@pomlaw.com>, Emma Gilmore <egilmore@pomlaw.com>

Joshua—

We are filing a Motion for Sanctions and Motion to Require an Appellate Bond. Judge Rakoff's rules require a call prior to making said Motions. Moreover, Judge Rakoff agreed to the deadline set forth below with respect to the Bishop appeal. Are you refusing to get on a call with Chambers within the requisite 24 hours?

Please advise ASAP as we will notify the Court in writing of your refusal to join a call, as well as your refusal to agree to the briefing schedule and an expedited briefing schedule at the Second Circuit.

Joseph—please advise ASAP as to whether you will agree to an expedited briefing schedule with the Second Circuit, as the Bishops have.

Thank you.

Jeremy

Jeremy A. Lieberman

**POMERANTZ**LLP

600 Third Avenue, 20th Floor

New York, NY 10016

Phone: 212-661-1100, ext. 243

Direct Dial: 646-581-9971

Fax: 646-607-2426

www.pomlaw.com

jalieberman@pomlaw.com

**From:** Joshua R. Furman <jrf@furmanlawyers.com>
**Sent:** Tuesday, July 31, 2018 6:31 PM
**To:** Jeremy Lieberman <jalieberman@pomlaw.com>; Joseph Gielata <gielata@gmail.com>
**Cc:** Brenda Szydlo <bszydlo@pomlaw.com>; Emma Gilmore <egilmore@pomlaw.com>

[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]

---

**Joshua R. Furman** <jrf@furmanlawyers.com>                                Tue, Jul 31, 2018 at 5:12 PM
To: Jeremy Lieberman <jalieberman@pomlaw.com>, Joseph Gielata <gielata@gmail.com>
Cc: Brenda Szydlo <bszydlo@pomlaw.com>, Emma Gilmore <egilmore@pomlaw.com>

Jeremy,

I am not refusing to do anything.

We cannot have a phone call on your sanctions motion because the safe harbor period has not expired.

We cannot have a phone call on the appellate briefing schedule because Judge Rakoff has no power to make such orders.  Please provide authority if you disagree.

I am available for a phone call on your motion for a cost bond on appeal at 10:00 a.m. Los Angeles time tomorrow.  You have provided no grounds for a briefing schedule other than by rule, so I have nothing to respond to at this point.

-Josh

---

**From:** Jeremy Lieberman <jalieberman@pomlaw.com>
**Date:** Tuesday, July 31, 2018 at 3:43 PM
**To:** "Joshua R. Furman" <jrf@furmanlawyers.com>, Joseph Gielata <gielata@gmail.com>

[Quoted text hidden]

[Quoted text hidden]

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

)
IN RE LITERARY WORKS IN ELECTRONIC     )     MDL No. 1379
DATABASES COPYRIGHT LITIGATION         )
)

**ORDER GRANTING MOTION OF CATEGORY C CLAIMS COUNSEL
FOR AWARD OF ATTORNEYS' FEES, COSTS AND INCENTIVE AWARDS**

This matter is before the Court pursuant to the Motion of Category C Claims Counsel for
Award of Attorneys' Fees, Costs and Incentive Awards. Having read and considered Category C
Claims Counsel's fee application and supporting papers, and having held a hearing on Category
C Claims Counsel's fee application, it is hereby

ORDERED as follows:

1.     The sum of $600,000 is hereby approved and awarded to C Counsel, to be applied
to (i) his attorneys' fees and reasonable costs; and (ii) special awards to the two C Plaintiffs and
eight Former Objectors.

2.     Category C Claims Counsel shall be paid on the date and in the manner set forth
in the Revised Settlement Agreement.

DATED this _____ day of _____, 2014.

JUN 10 2014

George B. Daniels
The Honorable George B. Daniels
United States District Judge

# Exhibit E

A REAL-WORLD PERSPECTIVE ON WITHDRAWAL OF OBJECTIONS TO CLASS-ACTION SETTLEMENTS AND ATTORNEYS' FEE AWARDS: REFLECTIONS ON THE PROPOSED REVISIONS TO FEDERAL RULE OF CIVIL PROCEDURE 23(e)(5)

BY ERIC ALAN ISAACSON*

I.   INTRODUCTION ........................................................................ 36
II.  MY PROFESSIONAL BACKGROUND AND EXPERIENCE
     WITH CLASS-ACTION LITIGATION ........................................... 38
     A.  My Experience as a Member of the Plaintiffs'
         Class-Action Bar ............................................................. 38
     B.  My Recent Experience on the Objectors' Side of the
         Table ................................................................................ 48
III. THE PROBLEM POSED BY "PROFESSIONAL OBJECTORS" AND
     BY OFFERS TO PAY OBJECTORS TO DROP OBJECTIONS OR TO
     FOREGO APPEALS .................................................................. 53
IV.  DEALING WITH CLASS COUNSEL'S PAYMENTS TO
     OBJECTORS–THE CURRENT FRAMEWORK AND PROPOSED
     REVISIONS TO RULE 23(e)(5) .................................................. 62
     A.  Dispensing With Court Approval When No
         Consideration Is Paid for an Objection's Withdrawal
         May Encourage Harassment of Objectors by
         Class Counsel ................................................................. 65
     B.  Requiring District-Court Approval for Payments While
         Providing No Standards for Approval, and Without

\* Member of the California bar; J.D., 1985, Duke University School of Law.  This article is based on the author's testimony concerning proposed revisions to Federal Rule of Civil Procedure 23(e)(5), given before the Judicial Conference of the United States Advisory Committee on Civil Rules in its February 16, 2017, Public Hearing on Proposed Amendments to the Federal Rules of Civil Procedure.  Isaacson's written testimony is available at https://www.regulations.gov/document?D=USC-RULES-CV-2016-0004-0076; his oral testimony is available at http://www.uscourts.gov/sites/default/files/transcript_of_2-16-17_hearing_0.pdf.

35

    *Permitting Reconsideration of a Settlement Previously*
       *Approved, Likely Will Not Do Much Good*..........................67
  V.   RECOMMENDATIONS .................................................................69
  VI.  CONCLUSION..............................................................................71

## I.   INTRODUCTION

The Judicial Conference of the United States Advisory Committee on Civil Rules is proposing certain amendments to Rule 23(e)(5). These proposed amendments are meant to address problems believed to surround objections to proposed class-action settlements, and their withdrawal by objectors in exchange for payments from class counsel.[1] This article seeks to address the proposed amendments in light of my practical knowledge from decades of legal practice as a member of the plaintiffs' class-action bar.[2]

It appears to me that the Advisory Committee may be operating under the impression that patently meritless objections to proposed class-action settlements often are filed solely for the purpose of noticing frivolous appeals from orders overruling those objections, and with the intention of "extorting" payments from plaintiffs' class-action counsel in return for voluntarily dismissing the appeals.[3] I do not believe that this is a serious real-world problem. In my twenty-six years of practice in the plaintiffs' class-action bar, not a single case came to my attention wherein class counsel paid objectors to withdraw frivolous objections or appeals. When class counsel pay objectors to drop an appeal it is not because they believe the

---

[1] *See* Memorandum from the Hon. John D. Bates, Chair of the Advisory Comm. on Civ. Rules, to the Hon. Jeffrey S. Sutton, Chair of the Comm. on Rules of Prac. & Proc., on Report of the Advisory Comm. on Civil Rules 193–232 (May 12, 2016, rev. July 1, 2016); JUDICIAL CONF. COMM. ON RULES OF PRACTICE & PROCEDURE, *Proposed Amendments to the Federal Rules of Civil Procedure*, *in* COMMITTEE ON RULES OF PRACTICE AND PROCEDURE OF THE JUDICIAL CONFERENCE OF THE UNITED STATES, PRELIMINARY DRAFT OF PROPOSED AMENDMENTS TO THE FEDERAL RULES OF APPELLATE, BANKRUPTCY, CIVIL AND CRIMINAL PROCEDURE 215–17, 228–31 (2016) [hereinafter PRELIMINARY DRAFT].

[2] *See infra* Section II.A (describing my background in the plaintiffs' class-action bar).

[3] *See* PRELIMINARY DRAFT, *supra* note 1, at 194 ("the amendments respond to widespread concern about the behavior of some objectors or objector counsel"); *see also infra* pp. 54–55 (discussing plaintiffs' offers to induce the withdrawal of objections).

appeal is frivolous, but because class counsel fear that the objection and appeal may, in fact, have substantial merit.[4]

The current requirement that district courts approve the withdrawal of an objection to a proposed settlement is extraordinarily ineffective, primarily because it does not provide a standard for district courts to apply.[5] But neither do the proposed amendments currently under consideration.[6] And they may, in certain respects, make things even worse.

I fear that the proposed revision eliminating judicial review under Rule 23(e)(5), when objections are withdrawn without the payment of any consideration, for example, will be an invitation to harassment of objectors by class counsel–who even now employ deposition subpoenas to harass and bully absent class members into withdrawing good-faith objections.[7]

Moreover, though the proposed revisions to Rule 23(e)(5) would require district-court approval whenever payments are made in exchange for the withdrawal of an objection or the voluntary dismissal of an objector's appeal, the proposed rule neither provides, nor references, any standards to guide the district court.[8] One judge may readily conclude that it is wrong to reward objectors who withdraw ostensibly meritless appeals in exchange for payments, and therefore withhold approval.[9] Another judge might, on identical facts, conclude that it is best to approve the compensated withdrawal in order to obviate whatever delays and costs extended appellate proceedings might entail.[10]

Even more problematic–what standards should govern an objector's dismissal, for payment, of appeals that may have merit? It might make sense for a district judge asked to approve the dismissal of an objector's appeal being abandoned in return for a large payment to stop and reconsider the original settlement approval in light of the proposed transaction. But the proposed revisions do not permit this.[11]

---

[4] *See infra* pp. 57–62.

[5] *See infra* pp. 57–62.

[6] *See infra* pp. 67–69.

[7] *See infra* pp. 52-53, 63-67; *see also infra* note 126.

[8] *See infra* pp. 67–68.

[9] *See infra* pp. 62–63, 67–68.

[10] *See id.*

[11] *See infra* pp. 68–69.

*Elon Law Review*                         [VOL. 10

I close with several recommendations.  I believe that review of objections withdrawn without the payment of consideration should be strengthened, not abandoned, and that class counsel who bully and harass absent class members should be checked.  Clear standards should be articulated to govern the withdrawal or dismissal of objections and appeals in return for consideration – recognizing that frivolous objections and appeals are not the real problem.  The real problem is that class counsel pay objectors to drop objections and appeals that may have real merit and could benefit the class.  Currently, court-appointed class representatives and class counsel have a duty to act as fiduciaries for the class, but objectors and their counsel do not.[12]  If the Advisory Committee intends to change the rules to require that objectors and their counsel act for the benefit of the class, it should say so clearly.  Moreover, the Advisory Committee should close the loophole that currently exists for objections to attorneys' fee awards under Rule 23(h)(2), withdrawals of which are not subject to any requirement of judicial review or approval.[13]

## II.  MY PROFESSIONAL BACKGROUND AND EXPERIENCE WITH CLASS-ACTION LITIGATION

### A.  My Experience as a Member of the Plaintiffs' Class-Action Bar

---

[12] *See* Shane Grp., Inc. v. Blue Cross Blue Shield of Mich., 825 F.3d 299, 309 (6th Cir. 2016) (when evaluating a class-action settlement, "the district court 'must carefully scrutinize' whether the named plaintiffs and [class] counsel have met their fiduciary obligations to the class"); Eubank v. Pella Corp., 753 F.3d 718, 719 (7th Cir. 2014) ("named plaintiffs are the representatives of the class—fiduciaries of its members"); *In re* Dry Max Pampers Litig., 724 F.3d 713, 718 (6th Cir. 2013) ("[I]n class-action settlements the district court cannot rely on the adversarial process to protect the interests of the persons most affected by the litigation—namely, the class. Instead, the law relies upon the 'fiduciary obligation[s]' of the class representatives and, especially, class counsel, to protect those interests. . . . [C]lass counsel are no more entitled to disregard their 'fiduciary responsibilities' than class representatives are.") (citations omitted); Radcliffe v. Experian Info. Sols., Inc., 715 F.3d 1157, 1167 (9th Cir. 2013) ("class counsel has a fiduciary duty to the class as a whole"); Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 968 (9th Cir. 2009) ("class counsel's fiduciary duty is to the class as a whole"); Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 785 (7th Cir. 2004) ("district judges presiding over [class] actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole"); *In re* Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Litig., 55 F.3d 768, 801 (3d Cir. 1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed.").

[13] *See* FED. R. CIV. P. 23(h)(2).

I speak from my experience of twenty-six years as a member of the plaintiffs' class action bar, first as an attorney with Milberg Weiss Bershad Hynes & Lerach LLP, from 1989 to 2004, and then as a founding partner of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, known since 2010 as Robbins Geller Rudman & Dowd LLP.

Those two firms, though at times subjects of considerable controversy, rank among the major players in the securities class-action plaintiffs' bar. Before its West Coast partners departed in 2004 to form the firm now known as Robbins Geller, the Milberg Weiss firm was generally recognized as the "largest plaintiffs' firm specializing in the complex field of securities and derivative litigation," being dubbed by *Fortune Magazine* as the "king of the class action domain."[14]  Robbins Geller subsequently took Milberg Weiss's place as the leading plaintiffs' securities class-action firm.[15]

I began working as an associate at Milberg Weiss in 1989, and I became a partner in 1994.  In 2004, in the midst of a federal criminal investigation concerning the firm's under-the-table incentive payments to named plaintiffs, most of Milberg Weiss's West Coast partners left to form Lerach Coughlin Stoia Geller Rudman & Robbins LLP, of which I was a founding partner.[16]  The new firm's name changed to Coughlin Stoia

---

[14] John C. Coffee, Jr., *The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation*, 48 L. & CONTEMP. PROBS. 5, 20 n.49 (1985); *see also* James P. McDonald, *Milberg's Monopoly: Restoring Honesty and Competition to the Plaintiffs' Bar*, 58 DUKE L.J. 507, 508 (2008); Lonny Hoffman & Alan F. Steinberg, *The Ongoing Milberg Weiss Controversy*, 30 REV. LITIG. 183, 184 (2011) ("Milberg was . . . the top securities class action firm in the country (so far ahead of its competitors that for many years there was not a close second to speak of).").

[15] *See* Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements 2011 Review and Analysis*, CORNERSTONE RES. 17 (2012), https://www.cornerstone.com/Publications/Reports/Securities-Settlements-2011-Review-and-Analysis.pdf (noting that in the field of securities class actions, Robbins Geller "was the most active firm for the period from 2010 to 2011, involved in 35 percent of settled cases" and "is likely to continue to maintain the largest market share for settlements in future years").  Professor Coffee summarizes: "A 2011 Cornerstone Research study found that three plaintiff's law firms accounted for 58 percent of the securities class action settlements in that year . . . .  The three firms were Robbins Geller Rudman & Dowd (which handled 35 percent of the settlements in that year), Labaton Sucharow (which handled 13 percent), and Bernstein Litowitz Berger & Grossman (which handled 10 percent)."  JOHN C. COFFEE, JR., ENTREPRENEURIAL LITIGATION: ITS RISE, FALL, AND FUTURE 81 n.54 (2015).

[16] *See* COFFEE, *supra* note 15, at 76 (noting that "in 2003-2004, a longstanding federal criminal investigation of Milberg, Weiss and its partners intensified"); Troy Wolverton, *Securities Lawyer Lerach Departs Firm*, MERCURY NEWS (June 1, 2007, 1:25 AM), http://www.mercurynews.com/2007/06/01/securities-lawyer-lerach-departs-firm/.

*Elon Law Review*

Geller Rudman & Robbins LLP in 2007, when our leading partner, William S. Lerach, left the practice of law to deal with criminal charges related to the Milberg Weiss scheme of concealed payments to named plaintiffs.[17] Lerach, after pleading guilty to a federal felony charge, was barred from practicing law.[18] In addition to a two-year prison sentence, he agreed to pay a $250,000 fine and a $7.5 million forfeiture, which barely put a dent in his personal net worth. At that time, his net worth was estimated at "upward of $700 million," which was, of course, derived principally from court-approved class-action attorneys' fee awards.[19] In all, four former Milberg Weiss partners served time in prison and were disbarred for their part in their secret scheme.[20]

In 2008 Lerach's firm, whose name had changed to Coughlin Stoia upon his departure, nonetheless collected a $688 million attorneys' fee award from settlements in the *Enron* securities litigation—a substantial portion of which the firm's Executive Committee passed on to Mr. Lerach, despite his felony conviction and disbarment.[21] The firm's name thereafter

---

[17] *See* Jenny Anderson, *Lawyer Quits Firm to Focus on Inquiry*, N.Y. TIMES (Aug. 29, 2007), http://www.nytimes.com/2007/08/29/business/29legal.html?mcubz=0; Molly Selvin, *Lawyer under Cloud to Retire: William Lerach Says He's Stepping Down to Focus on the Fraud Case that Implicates Him*, L.A. TIMES (Aug. 29, 2007), http://articles.latimes.com/2007/aug/29/business/fi-lerach29.

[18] *See* PATRICK DILLON & CARL M. CANNON, CIRCLE OF GREED: THE SPECTACULAR RISE AND FALL OF THE LAWYER WHO BROUGHT CORPORATE AMERICA TO ITS KNEES 164–65, 307, 393–94, 451 (2010).

[19] *See id.* at 3, 451; *see also* COFFEE, *supra* note 15, at 71 (noting that by 2007, when Lerach pleaded guilty to felony obstruction of justice and was disbarred, he had "by some estimates . . . amassed a personal fortune of over $700 million"); Ann Woolner, *Convicted King of Class Actions Builds Aviary, Regrets Nothing*, BLOOMBERG BUS. (Oct. 11, 2011), https://article.wn.com/view/2011/10/12/Convicted_King_of_Class_Actions_Bill_Lerach_Builds_Aviary_Re/ ("The San Diego Business Journal estimated in 2007 that he was worth $900 million.").

[20] *See* COFFEE, *supra* note 15, at 76 (noting that four "partners of Milberg, Weiss – [Melvyn I.] Weiss, [William S.] Lerach, [David] Bershad, and [Steven] Schulman – went to prison"). The judge who sentenced Lerach found it "painfully evident that the paid plaintiffs were motivated to abandon their fiduciary duties to the absent class members and take actions or make decisions in [their class-action] cases in order to maximize the award of attorneys' fees, all at the expense of the absent class." DILLON & CANNON, *supra* note 18, at 450 (quoting Judge John F. Walter's remarks at Lerach's sentencing hearing). I should note that I was entirely ignorant of the scheme, which the firm's Executive Committee concealed from the firm's other partners. *See id.* at 164–65, 212–13, 307 (noting that knowledge of the scheme was confined to "a handful of the firm's senior partners").

[21] *See infra* pp. 45–46 and notes 46–47 (discussing *Enron* fee award).

changed again, to Robbins Geller Rudman & Dowd LLP in early 2010, following Patrick J. Coughlin's departure from active management.[22] It remains, I think, America's largest securities-fraud class-action law firm.[23]

Although I worked on some state-court proceedings,[24] my decades of practice with these firms focused primarily on federal civil appeals in securities and other class actions. In the course of 26 years I personally briefed and argued appeals before the First,[25] Second,[26] Third,[27] Fifth,[28]

---

[22] *See* Zach Lowe, *Coughlin Stoia Changes Name as Coughlin Steps Down*, THE AMLAW DAILY (Feb. 24, 2010, 5:53 PM), http://amlawdaily.typepad.com/amlawdaily/2010/02/cough-linstoia.html; Petra Pasternak, *Firm Name Changing at Coughlin Stoia*, THE RECORDER (Feb. 25, 2010), http://www.therecorder.com/id=1202444506978/Firm-Name-Changing-at-Cough-lin-Stoia.

[23] *See* Ryan & Simmons, *supra* note 15, at 17.

[24] *See, e.g.*, Mangini v. R.J. Reynolds Tobacco Co., 7 Cal. 4th 1057, 875 P.2d 73 (Cal. 1994); Mirkin v. Wasserman, 5 Cal. 4th 1082, 858 P.2d 568 (Cal. 1993); Kuykendall v. State Bd. of Equalization, 22 Cal. App. 4th 1194, 27 Cal. Rptr. 2d 783 (Cal. Ct. App. 1994).

[25] *See* Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762 (1st Cir. 2011).

[26] *See, e.g.*, Fait v. Regions Fin. Corp., 655 F.3d 105 (2d Cir. 2011), *overruled by* Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318 (2015); Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406 (2d Cir. 2008); Cal. Pub. Emps.' Ret. Sys. (CalPERS) v. N.Y. Stock Exch., Inc. (*In re* NYSE Specialists Sec. Litig.), 503 F.3d 89 (2d Cir. 2007); *In re* Elevator Antitrust Litig., 502 F.3d 47 (2d Cir. 2007); *In re* WorldCom Sec. Litig., 496 F.3d 245 (2d Cir. 2007).

[27] *See In re* Constar Int'l Inc. Sec. Litig., 585 F.3d 774 (3d Cir. 2009); Alaska Elec. Pension Fund v. Pharmacia Corp., 554 F.3d 342 (3d Cir. 2009); Cal. Pub. Emps.' Ret. Sys. (CalPERS) v. Chubb Corp., 394 F.3d 126 (3d Cir. 2004).

[28] *See* Owens v. Jastrow, 789 F.3d 529 (5th Cir. 2015); Fener v. Operating Eng'r Constr. Indus. & Miscellaneous Pension Fund, 579 F.3d 401 (5th Cir. 2009).

*Elon Law Review* [VOL. 10

Sixth,[29] Seventh,[30] Eighth,[31] Ninth,[32] Eleventh,[33] and District of Columbia Circuits.[34]  I took part in the merits briefing of several cases before the United States Supreme Court.[35]  I wrote and filed numerous amicus curiae briefs on behalf of institutional investors, academics, and others, addressing critical issues in class-action litigation.[36]  I was also responsible for

---

[29] *See* Ind. State Dist. Council of Laborers v. Omnicare, Inc., 719 F.3d 498 (6th Cir. 2013), *vacated sub nom.* Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318 (2015); *In re* Vertrue Inc. Mktg. & Sales Prac. Litig., 719 F.3d 474 (6th Cir. 2013); Ind. State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc., 583 F.3d 935 (6th Cir. 2009); Fidel v. Farley, 392 F.3d 220 (6th Cir. 2004), *overruled in part* Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007); New England Health Care Emps. Pension Fund v. Ernst & Young, LLP, 336 F.3d 495 (6th Cir. 2003).

[30] *See* City of Livonia Emp. Ret. Sys. v. Boeing Co., 711 F.3d 754 (7th Cir. 2013); Beck v. Dobrowksi, 559 F.3d 680 (7th Cir. 2009); Ill. Mun. Ret. Fund v. CitiGroup, Inc., 391 F.3d 844 (7th Cir. 2004); Albert v. Trans Union Corp., 346 F.3d 734 (7th Cir. 2003).

[31] *See* Romine v. Acxiom Corp., 296 F.3d 701 (8th Cir. 2002).

[32] *See* Makaeff v. Trump Univ., LLC, 715 F.3d 254 (9th Cir. 2013), *en banc rehearing denied*, 736 F.3d 1180 (9th Cir. 2013); Sanford v. MemberWorks, Inc., 625 F.3d 550 (9th Cir. 2010); Hatfield v. Halifax PLC, 564 F.3d 1177 (9th Cir. 2009); Sanford v. MemberWorks, Inc., 483 F.3d 956 (9th Cir. 2007); Sanchez v. Cty. of San Diego, 464 F.3d 916 (9th Cir. 2006), *en banc rehearing denied*, 483 F.3d 965 (9th Cir. 2007) (with eight judges dissenting); Sparling v. Daou (*In re* Daou Sys., Inc. Sec. Litig.), 411 F.3d 1006 (9th Cir. 2005); Deutsch v. Turner Corp., 324 F.3d 692 (9th Cir. 2003); Chaset v. Fleer/Skybox Int'l, 300 F.3d 1083 (9th Cir. 2002); DSAM Glob. Value Fund v. Altris Software, Inc., 288 F.3d 385 (9th Cir. 2002); Ronconi v. Larkin, 253 F.3d 423 (9th Cir. 2001); Hertzberg v. Dignity Partners, Inc., 191 F.3d 1076 (9th Cir. 1999); Yourish v. Cal. Amplifier, Inc., 191 F.3d 983 (9th Cir. 1999); Chappell v. Robbins, 73 F.3d 918 (9th Cir. 1995).

[33] *See* Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp., 762 F.3d 1248 (11th Cir. 2014).

[34] *See* City of Harper Woods Emps.' Ret. Sys. v. Olver, 589 F.3d 1292 (D.C. Cir. 2009).

[35] *See* Brief for the Respondents, Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318 (2015) (No. 13-435), 2014 WL 4253028; Brief for Respondents, Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27 (2011) (No. 09-1156), 2010 WL 4477792; Brief for Respondents, Dura Pharm., Inc., v. Broudo, 544 U.S. 336 (005) (No. 03-932), 2004 WL 2671450.

[36] *See* Brief for NECA-IBEW Welfare Tr. Fund as Amicus Curiae Supporting Respondent, Campbell-Ewald Corp. v. Gomez, 136 S. Ct. 663 (2016) (No. 14-857), 2015 WL 5169105; Brief for Civil Procedure and Securities Law Professors as Amici Curiae Supporting Respondent, Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455 (2013) (No. 11-1085), 2012 WL 4503267; Brief for Employees' Retirement Sys. of the Gov't of the Virgin Islands as Amicus Curiae Supporting Respondent, Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135 (2011) (No. 09-525), 2010 WL 4380232; Brief for MN Services Vermogensbeheer, B.V. et al. as Amici Curiae Supporting Petitioners, Morrison v. Nat'l Austl. Bank, Ltd., 561 U.S. 247 (2010) (No. 08-1191), 2010 WL 342029; Brief for Change to Win and the Change to Win Inv. Group as Amici Curiae Supporting Respondents, Merck & Co. v. Reynolds, 559 U.S. 633 (2010)

several pro bono amicus curiae briefs filed on behalf of religious organizations supporting equal rights for LGBT people and religious liberty for all.[37] In my spare time, I also authored and coauthored articles relating to

(No. 08-905), 2009 WL 3477290; Brief for Legal Scholars, et al. as Amici Curiae Supporting Respondent, Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) (law professors' brief) (No. 05-1126), 2006 WL 2966600; Brief for Nat'l Ass'n of Sec. & Commercial Law Attorneys ("NASCAT") as Amicus Curiae Supporting Respondent, Cent. Bank v. First Interstate Bank, 511 U.S. 164 (1994) (No. 92-854), 1993 WL 13006273; Brief for National Association of Securities and Commercial Law Attorneys ("NASCAT") as Amicus Curiae Supporting Petitioners, Musick, Peeler & Garrett v. Employers Ins. of Wausau, 508 U.S. 286 (1993), 1992 U.S. Supreme Court Briefs LEXIS 739; Brief for Amalgamated Bank, as Trustee for the Longview Funds as Amicus Curiae Supporting Plaintiff-Appellee, Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190 (2d Cir. 2008) (No. 06-2902-cv), 2007 WL 5753317; Brief for The Regents of the Univ. of Cal. as Amicus Curiae Supporting Plaintiffs-Appellants, Simpson v. AOL Time Warner, Inc., 452 F.3d 1040 (9th Cir. 2006) (No. 04-55665), 2004 WL 2085335, *vacated and remanded, sub nom.* Avis Budget Grp., Inc. v. Cal. State Teachers' Ret. Sys., 552 U.S. 1162 (2008), *on remand sub nom.* Simpson v. Homestore.com, Inc., 519 F.3d 1041 (9th Cir. 2008).

[37] *See* Brief for California Council of Churches et al. as Amici Curiae Supporting Petitioners, Obergefell v. Hodges, 135 S. Ct. 2584 (2015) (California religious organizations' brief supporting marriage equality) (Nos. 14-556, 14-562, 14-571, 14-574), 2015 WL 1021453; Brief for California Council of Churches et al. as Amici Curiae Supporting Respondents, Hollingsworth v. Perry, 133 S. Ct. 2652 (2013) (No. 12-144), 2013 WL 795543; Brief for California Faith for Equality et al. as Amici Curiae Supporting Plaintiffs-Appellees, Pickup v. Brown, 740 F.3d 1204 (9th Cir. 2014) (religious organizations' brief supporting constitutionality of California statute barring healthcare professionals from subjecting minors to "Sexual Orientation Change Efforts") (Nos. 12-17681, 13-15023), 2013 WL 526228; Brief of California Faith for Equality et. al. as Amici Curiae Supporting Respondents, Perry v. Brown, 671 F.3d 1052 (9th Cir. 2012) (No. 12-144), 2010 WL 4622578; Brief for Forum on the Military Chaplaincy et al. as Amici Curiae Supporting Plaintiff-Appellee, Log Cabin Republicans v. United States, 658 F.3d 1162 (9th Cir. 2011) (opposing "Don't Ask Don't Tell") (Nos. 10-56634, 10-56813), 2011 WL 2443730; Brief for Unitarian Universalist Association of Congregations et al. as Amici Curiae Supporting Plaintiffs-Appellees, Winkler v. Gates, 481 F.3d 977 (7th Cir. 2007) (opposing government support for the Boy Scouts of America's discriminatory program) (No. 05-3451), 2006 WL 498552; Brief for California Faith for Equality et al. as Amicus Curiae Supporting Respondents, Perry v. Brown, 265 P.3d 1002 (Cal. 2011) (California religious organizations' brief on question of standing certified by the Ninth Circuit) (No. 12-144), 2011 WL 2140962; Brief for California Council of Churches, et al. as Amici Curiae Supporting Petitioners, Strauss v. Horton, 207 P.3d 48 (Cal. 2009) (California religious organizations' brief opposing Proposition 8) (Nos. S168047, S168066, S168078); Brief for Unitarian Universalist Association of Congregations et al. as Amici Curiae Supporting Parties Arguing in Favor of Marriage Equality, *In re* Marriage Cases, 183 P.3d 384 (Cal. 2008) (interfaith brief supporting marriage equality); Brief of Unitarian Universalist Legislative Ministry California et al. as Amici Curiae Supporting Plaintiffs, Perry v. Schwarzenegger, 704 F. Supp. 2d 921 (N.D. Cal. 2010) (California religious organizations' brief supporting marriage equality) (No. 12-144), 2013 WL 795543.

*Elon Law Review* [VOL. 10

issues in securities class actions,[38] and even a few concerning civil rights and religious liberty.[39]

In my twenty-six years as a member of the plaintiffs' class-action bar, I frequently consulted on proceedings involving class counsel's attorneys' fee applications.[40] I also frequently consulted with my colleagues concerning formal objections filed against our firms' class-action settlements and attorneys' fee applications.[41] I personally defended appeals that were filed by objectors to class-action settlements or that otherwise involved class-action attorneys' fee awards.[42] I also represented institutional

---

[38] *See, e.g.,* Eric Alan Isaacson, *The Roberts Court and Securities Class Actions: Reaffirming Basic Principles,* 48 AKRON L. REV. 923 (2015); Patrick J. Coughlin, Eric Alan Isaacson & Joseph D. Daley, *What's Brewing in Dura v. Broudo? The Plaintiffs' Attorneys Review the Supreme Court's Opinion and its Import for Securities-Fraud Litigation,* 37 LOY. U. CHIC. L.J. 1 (2005); William S. Lerach & Eric Alan Isaacson, *Pleading Scienter Under Section 21D(b)(2) of the Securities Exchange Act of 1934: Motive, Opportunity, Recklessness and the Private Securities Litigation Reform Act of 1995,* 33 SAN DIEGO L. REV. 893 (1996); Patrick J. Coughlin & Eric Alan Isaacson, *Securities Class Actions in the United States, in* LITIGATION ISSUES IN THE DISTRIBUTION OF SECURITIES: AN INTERNATIONAL PERSPECTIVE 399–423 (William G. Horton & Gerhard Wegen, eds.; London, Kluwer International/International Bar Ass'n, 1997); Patrick J. Coughlin & Eric Alan Isaacson, *Commencing Litigation Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), in* SECURITIES LITIGATION 9 (Jay B. Kasner & Bruce G. Vanyo eds. Practicing Law Institute, 1996).

[39] *See, e.g.,* Eric Alan Isaacson, *Free Exercise for Whom? – Could the Religious-Liberty Principle that Catholics Established in* Perez v. Sharp *also Protect Same-Sex Couples' Right to Marry?,* 92 U. DET. MERCY L. REV. 29 (2015); Eric Alan Isaacson, *Goodridge Lights A Nation's Way to Civic Equality,* 57 BOSTON B.J. 1 (2013); Eric Alan Isaacson, *Are Same-Sex Marriages Really a Threat to Religious Liberty?,* 8 STAN. J.C.R. & C.L. 123 (2012); Eric Alan Isaacson, *Assaulting America's Mainstream Values: Hans Zeiger's Get Off My Honor: The Assault on the Boy Scouts of America,* 5 PIERCE L. REV. 433 (2007) (review essay); Eric Alan Isaacson, *Traditional Values, or a New Tradition of Prejudice? The Boy Scouts of America vs. the Unitarian Universalist Association of Congregations,* 17 GEO. MASON U. C.R.L.J. 1 (2006); Eric Alan Isaacson, *The Flag Burning Issue: A Legal Analysis and Comment,* 23 LOY. L.A. L. REV. 535 (1990).

[40] *See In re* Wash. Pub. Power Supply Sys. Litig., 19 F.3d 1291 (9th Cir. 1994) (attorneys' fee appeal).

[41] Powers v. Eichen, 229 F. 3d 1249 (9th Cir. 2000).

[42] *See, e.g.,* Fidel v. Farley, 534 F.3d 508 (6th Cir. 2008) (objector's appeal concerning class notice and attorneys' fees); Morris v. Lifescan, Inc., 54 F. App'x 663, 664 (9th Cir. 2003) (objector's appeal concerning attorneys' fees); *see also In re* Trans Union Corp. Privacy Litig., 664 F.3d 1081 (7th Cir. 2011) (fee dispute); *In re* Trans Union Corp. Privacy Litig., 629 F.3d 2011 (7th Cir. 2011) (earlier fee dispute).

investors who opted out of a federal securities class action with the belief that individual litigation would better serve their interests.[43]

Some of the matters involving objections to settlements and attorneys' fee awards on which I worked, or with which I was otherwise familiar, were resolved on undisclosed terms with appeals voluntarily dismissed by the objectors.[44] The *Enron* securities-fraud class action was one such matter.[45]

In 2008, my firm, by then known as Coughlin Stoia Geller Rudman & Robbins LLP, due to William S. Lerach's departure,[46] collected a $688 million attorneys' fee award from class-action settlements in *Enron*–a substantial portion of which the firm's Executive Committee passed on to Mr.

---

[43] *See In re* WorldCom Sec. Litig. (Cal. Pub. Emps.' Ret. Sys. (CalPERS) v. Caboto-Gruppo Intesa, BCI), 496 F.3d 245 (2d Cir. 2007) (briefed and argued for pension funds that opted out of WorldCom class action to file individual suits; successful appeal from ruling that the pension funds' individual actions were untimely filed), *rev'g In re* WorldCom Inc. Sec. Litig. (State of Alaska Dept. of Revenue v. Ebbers), 294 F. Supp. 2d 431 (S.D.N.Y. 2003), *and In re* WorldCom Inc. Sec. Litig. (Cal. Pub. Emps.' Ret. Sys. (CalPERS) v. Ebbers), 308 F. Supp. 2d 214 (S.D.N.Y. 2004); Ill. Mun. Ret. Fund v. CitiGroup, Inc., 391 F.3d 844 (7th Cir. 2004) (briefed and argued for pension fund preferring to opt out of the *WorldCom* class action).

[44] *See, e.g.*, Stipulated Dismissal of Appeal Pursuant to Federal Rule of Civil Procedure 42(b), Newby v. Enron Corp., No. 08-20648 (5th Cir. Sept. 16, 2009) [hereinafter Dismissal Order] (stipulated dismissal of objectors' appeal from $688 million attorneys' fee award representing a multiplier of 5.2 times the lawyers' claimed reasonable hourly rates: "Pursuant to the joint stipulation of the parties this appeal is dismissed this 16th day, September, 2009, *see* FED. R. APP. P. 42(b)."); Rule 42(b) Mandate, N.Y. State Teachers' Ret. Sys. v. Alaska Elec. Pension Fund, No. 07-1197 (4th Cir. Feb. 22, 2008) (stipulated dismissal of objector's appeal from $17,625,000 attorneys' fee award representing a multiplier of six times the lawyers' claimed reasonable hourly rates); Order of Dismissal, Schwartz v. TXU Corp., Nos. 06-10040, 06-10041, 01-10042 (5th Cir. June 11, 2007) (stipulated dismissal of objectors' appeals from settlement approval and $33,244,500 attorneys' fee award: "Pursuant to the joint motion of the parties this appeal is dismissed this 11th day of June, 2007, *see* FED. R. APP. P. 42(b).").

[45] *See* Dismissal Order, *supra* note 44.

[46] *See* Jacqueline Bell, *Enron Plaintiffs Want Lerach Off the Docket*, LAW360 (Oct. 2, 2007), https://www.law360.com/texas/articles/36432/enron-plaintiffs-want-lerach-off-the-docket ("Plaintiffs in the multidistrict securities litigation over the implosion of Enron Corp. have asked a federal judge to withdraw former powerhouse plaintiff's lawyer William Lerach as attorney of record after he left his firm and pleaded guilty to conspiring to obstruct justice . . . . In pleading guilty, Lerach, a former name partner at Milberg Weiss, admitted that he and other partners at the firm secretly paid individuals to serve as lead plaintiffs in class action suits. Lerach also admitted that the plaintiffs who received the payments lied under oath about the existence of the kickback arrangement.").

*Elon Law Review*                        [VOL. 10

Lerach despite his felony conviction and disbarment.[47]  I cannot say how
much of the award was given to him, as the firm's partnership agreement
prohibited ordinary equity partners such as myself from reviewing the
firm's financial records, or from learning how its revenues and profits are
distributed.[48]

    Some *Enron* class members thought that the $688 million attorneys'
fee award, which represented more than five times the attorneys' claimed
reasonable hourly rates, was just a bit too much, so they filed objections–
which the district court ultimately rejected.[49]  Eleven objectors then no-
ticed an appeal that was resolved in September 2009 with a "Stipulated
Dismissal of Appeal Pursuant to Federal Rule of Appellate Procedure
42(b)."[50]  The "Stipulated Dismissal" recited that the objectors' appeal was
being dismissed by agreement among the parties, "with an agreed upon
amount in fees and costs to be paid to [the Objector-] Appellants as pro-
vided in a letter agreement separately entered into" on behalf of the Lead
Plaintiff and Objector-Appellants,[51] but that was not attached to the "Sti-
pulated Dismissal" or otherwise included in the public record.[52]

---

    [47] *In re* Enron Corp. Sec. Litig., 586 F. Supp. 2d 732, 814 n.94, 828 (S.D. Tex. 2008) (reject-
ing objection to "awarding fees to convicted criminal William Lerach" on the basis of "more
than adequate briefing demonstrating the propriety of any fee sharing with Mr. Lerach before
and after he left the firm and after his indictment, guilty plea, and sentencing," and then awarding
attorneys' fees of "approximately $688 million, plus interest accrued").

    [48] *See* P'ship Agreement of Lerach Coughlin Stoia & Robbins LLP 6 (May 1, 2004) ("[N]one
of the books or records of the Partnership shall at any time be available for inspection by any
Partner (other than members of the Executive Committee when serving as such).") (on file with
author).  A similar provision in the Milberg Weiss partnership agreement is, I believe, what
enabled that firm's Executive Committee members to pay themselves secret bonuses and make
under-the-table payments to class representatives, without disclosing the scheme to the rest of
the firm's partners. *See* DILLON & CANNON, *supra* note 18, at 164–65 ("[David] Bershad and
[Melvyn I.] Weiss devised the scheme.  Those who were part of it, the inner circle of very senior
partners (and Lerach was one of them), would award themselves annual bonuses.  The bonuses
would more or less match the amount the firm spent on referrals and indirectly reward the serial
plaintiffs in their stable . . . .  [I]t meant that in order to pay for plaintiffs, all the attorneys at
Milberg Weiss would contribute, directly or indirectly, whether they knew it or not."); *see also
id.* at 307 (noting that because of a federal criminal investigation, "a painstakingly meticulous
federal prosecutor would soon know more about Milberg Weiss's complicated and long-stand-
ing system of kickbacks to named plaintiffs than all but a handful of the firm's senior partners.").

    [49] *See Enron*, 856 F. Supp. 2d at 803–28.

    [50] *See* Dismissal Order, *supra* note 44.

    [51] *Id.* at 1.

    [52] *See generally id.* (failing to attach letter that provided the agreed-upon amount fees and
costs).

We can only guess what its terms might have been.   I had worked on some other aspects of the case.[53]  But I was not privy to the terms of that letter agreement.   And given the confidentiality that currently surrounds mediated settlements of federal appeals, I could not in any event say whether, or how much, the objectors might have been paid to drop their appeal from the $688 million fee award.[54]

I do, however, think I have a good idea of how and why such agreements most often are entered by class counsel in order to secure the dismissal of objectors' appeals.   And it most certainly is not because class counsel believe the objections are frivolous, as some judges and commentators seem to assume.[55]

---

[53] *See, e.g.,* Regents of the Univ. of Cal. v. Credit Suisse First Boston, 482 F.3d 372, 376 (5th Cir. 2007) (class-certification appeal), *cert. denied sub nom.*  Regents of the Univ. of Cal. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 552 U.S. 1170 (2008) (petition for a *writ of certiorari*); Opposition to Petitions for Writs of Mandamus, *In re* Barclays PLC, Nos. 03-20178, 03-20185, 03-20187, 2003 WL 22020185 (5th Cir. Mar. 6, 2003) (consolidated opposition to defendants' three mandamus petitions); *see also* DILLON & CANNON, *supra* note 18, at 411 (regarding a motion to recuse a Fifth Circuit judge in the class-certification appeal: "Speed was essential, and Isaacson finished in two days.").

[54] *See* ROBERT J. NIEMIC, MEDIATION & CONFERENCE PROGRAMS IN THE FEDERAL COURTS OF APPEALS: A SOURCEBOOK FOR JUDGES AND LAWYERS 12 (2d ed. 2006) ("All of the [federal appellate mediation] program offices operate with confidentiality . . . .  Local rules usually prohibit mediators, the parties, and the parties' attorneys from disclosing the substance of a conference to any judge or non-party.  Generally not considered confidential, however, are the fact that the mediation took place and the bare results of the mediation (for example, settled, not settled, or continued)."); *see also, e.g.,* 1ST CIR. R. 33.0(c); 2ND CIR. R. 33.1(e); 3RD CIR. R. 33.5(c); 4TH CIR. R. 33; General Order Governing the Appellate Conference Program (5th Cir. 2000); 6TH CIR. R. 33(b)(4)(D); 8TH CIR. R. 33A(c); 9TH CIR. R. 33-1(c); 10TH CIR. R. 33.1(d); 11TH CIR. R. 33-1(c)(3).

[55] *See, e.g.,* John E. Lopatka & D. Brooks Smith, *Class Action Professional Objectors: What To Do About Them?*, 39 FLA. ST. U. L. REV. 865, 866 (2012) ("Professional objectors are attorneys who, on behalf of non-named class members, file specious objections to class action settlements and threaten to file frivolous appeals of district court approvals merely to extract a payoff.").  Objections to the $688 million *percent-of-fund* attorneys' fee award in *Enron*, for example, were by no means frivolous.  The Fifth Circuit's leading opinion on common-fund fee awards was Longden v. Sunderman, 979 F.2d 1095 (5th Cir. 1992), which in a footnote acknowledged that "the prevailing trend in other circuits and district courts has been towards awarding fees and expenses in common fund cases based on percentage amounts," but stated that "the Fifth Circuit has yet to adopt this method." *Id.* at 1099 n.9.  Under the heading "Lodestar or Percentage of Recovery" *Longden* held: "This circuit utilizes the 'lodestar method' to calculate attorneys' fees." *Id.* at 1099.  The Tenth Circuit thus cited *Longden* as showing that "one circuit has explicitly adhered to the lodestar method, acknowledging that 'the prevailing trend in other circuits' was to use the percentage method.'"  Gottlieb v. Barry, 43 F.3d 474, 483 (10th Cir.

## B.   My Recent Experience on the Objectors' Side of the Table

I also have some experience on the class-action objectors' side of the table.

After more than two decades in the plaintiffs' class-action bar, in March of 2016 I struck out on my own to establish an independent class-action and appellate practice.   Since then I have represented objectors in several matters.[56]   I also have personally appeared as an objector in one proceeding, where I challenged a proposed class-action settlement and fee award in a case alleging that Godiva Chocolatier violated the Fair and Accurate Credit Transaction Act ("FACTA") and placed its customers at risk of identity theft by printing too many digits of the customers' credit-card numbers on their receipts.[57]

Although the statutory violations were undisputed in that case, and although Godiva's potential exposure to statutory damages exceeded $300

---

1994).  Citing the rule in several "other circuits . . . that district courts enjoy the discretion to use either the lodestar of the percentage method," the Second Circuit flagged *Longden* as a "*but see*" citation because the Fifth Circuit had apparently rejected percent-of-fund fee awards.  Goldberger v. Integrated Res., Inc., 209 F.3d 43, 49 (2d Cir. 2000); *see also In re* Copley Pharmaceuticals, Inc., 1 F. Supp. 2d 1407, 1410–11 (D. Wyo. 1998) (citing *Longden*: "The Fifth Circuit alone appears to require the continued use of the lodestar method.").  Subsequent Fifth Circuit precedents appeared to follow *Longden* in mandating lodestar fee awards to the exclusion of percentage fee awards.  *See, e.g., In re* High Sulfur Content Gasoline Prod. Liab. Litig., 517 F.3d 220, 228 (5th Cir. 2008) ("This circuit requires district courts to use the 'lodestar method' to 'assess attorneys' fees in class action suits.") (quoting Strong v. BellSouth Telecomm., Inc., 137 F.3d 844, 850 (5th Cir. 1998)).  Several years after the *Enron* appeal was resolved by a voluntary dismissal and on undisclosed terms–protecting class counsel's enormous $688 million fee award from meaningful appellate review–the Fifth Circuit ruled that percent-of-fund fee awards are permissible, provided they are subject to a lodestar cross check applying factors that "may be more searching than the 'lodestar cross-check' commonly referenced in other courts."  Union Asset Mgmt. Holding A.G. v. Dell, Inc., 669 F.3d 632, 664 & n.42 (5th Cir. 2012).  Whether the *Enron* percent-of-fund award would have survived appellate review under this standard is open to considerable doubt.

[56] *See, e.g.*, Chieftain Royalty v. Enervest, 861 F.3d 1182 (10th Cir. 2017) (appeal successfully challenging class counsel's $17.3 million attorneys' fee award); Objection of Class Member Isaacson/Weaver Family Trust to Proposed Attorneys' Fee Award, *In re* BioScrip, Inc. Sec. Litig., No. 13-cv-6922 (AJN), 2017 U.S. Dist. LEXIS 118881 (S.D.N.Y. July 26, 2017) (objection to class counsel's attorneys' fee award).

[57] *See, e.g.*, Muransky v. Godiva Chocolatier, Inc., No. 0:15-cv-60716-WPD, 2016 U.S. Dist. LEXIS 133695 (S.D. Fla. Sept. 28, 2016), *appeal docketed*, Muransky v. Godiva Chocolatier, Inc., No. 16-16486 (11th Cir. Feb. 22, 2017).

million even excluding potential actual damages, a named plaintiff with a criminal record for fraud who alleged no concrete injury to himself entered a class-action settlement purporting to release other class members' claims for both statutory and actual damages–in return for a class-action recovery of just $6.3 million.  His lawyers, who had conducted no formal discovery and who refused to say how much time they had devoted to the case, let alone what their hourly rates might be, requested a third of that sum as common-fund attorneys' fees.  They asked the district court to award their class-representative client, who had himself suffered no real injury, and who had declined to sit for a deposition, an incentive award of $10,000 as compensation for his personal services in securing a class-action settle-ment barring other class members' ability even to seek relief for any actual damages.[58]

My objection in the *Godiva* case focused first on the failure to com-ply with the rule of *Mercury Interactive Corp. Securities Litigation*[59] and *Redman v. RadioShack Corp.*[60]  Those decisions hold that Rule 23(h) re-quires class members' deadline for filing objections to attorneys' fee ap-plications to be placed *after* rather than *before* the date when class counsel will file the fee motion that the objections challenge.[61]  It seems pretty obvious:  class members and their lawyers should be able to see class coun-sel's fee application before being required to frame whatever objections to it they might have.  I further objected that the proposed $2.1 million attor-neys' fee award to class counsel, who apparently had devoted little time to the case and who refused to provide any information concerning their hours or billing rates, was inadequately supported and excessive.  Eleventh Circuit precedents governing common-fund fee awards mandate that even in setting a percent-of-fund attorneys' fee award, the district court shall

---

[58] *See* Motion for Final Approval of Class Action Settlement, *Muransky v. Godiva Chocolat-ier, Inc.*, No. 0:15-cv-60716WPD, DE No. 74, at 19 (S.D. Fla. Aug. 21, 2016); Plaintiff's Motion for Award of Attorneys' Fees and Expenses, *Muransky*, DE No. 76, at 1.

[59] *In re* Mercury Interactive Corp. Sec. Litig., 618 F.3d 988, 993 (9th Cir. 2010).

[60] Redman v. RadioShack Corp., 768 F.3d 622, 637 (7th Cir. 2014).

[61] Objection to Proposed Settlement and Notice of Intent to Appear, *Muransky*, No. 0:15-cv-60716WPD, DE No. 59 at 3–4; *see Redman*, 768 F.3d at 638–39 ("There was no excuse for permitting so irregular, indeed unlawful, a procedure."); *Mercury Interactive*, 618 F.3d at 994–95 ("[A] schedule that requires objections to be filed before the fee motion itself is filed denies the class the full and fair opportunity to examine and oppose the motion that Rule 23(h) contem-plates."); *accord In re* NFL Players Concussion Injury Litig., 821 F.3d 410, 446 (3d Cir. 2016) (asserting in dictum that "[w]e have little trouble agreeing that Rule 23(h) is violated in those circumstances").

*Elon Law Review*                    [VOL. 10

first consider "the time and labor required," starting with the "hours claimed or spent on a case" which "are a necessary ingredient to be considered" in any award of common-fund attorneys' fees.[62]   As for the $10,000 incentive bonus to a class representative with a criminal record who had suffered no injury and who refused to be deposed in the case, I observed that the Supreme Court's seminal common-fund precedents appear to flatly proscribe such payments to class representatives for personal services that they rendered in securing a common fund.[63]

---

[62] Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 717 (5th Cir. 1974); *see* Camden I Condo. Ass'n v. Dunkle, 946 F.2d 768, 772 & n.3, 775 (11th Cir. 1991) (noting that application of the Johnson factors starts with an evaluation of "the time and labor required," and then holding that "the Johnson factors continue to be appropriately used in evaluating, setting, and reviewing percentage fee awards in common fund cases").

[63] The seminal common-fund decisions, allowing for payment of attorneys' fees from recoveries benefitting a class, are two late nineteenth-century class actions prosecuted for the benefit of bondholders: *Trustees v. Greenough*, 105 U.S. 527 (1882), and *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885). The common-fund doctrine established by these decisions permits an award of attorneys' fees to a representative plaintiff whose efforts created a common fund benefitting a larger class, but they hold that an award for the class representative's personal services was wholly unwarranted and "illegally made," as the Court explained in *Greenough*:

> But there is one class of allowances made by the court which we consider decidedly objectionable.  We refer to those made for the personal services and private expenses of the complainant . . . .  The reasons which apply to his expenditures incurred in carrying on the suit, and reclaiming the property subject to the trust, do not apply to his personal services and private expenses.  We can find no authority whatever for any such charge by a person in his situation . . . .  It would present too great a temptation to parties to intermeddle in the management of valuable property or funds in which they have only the interest of creditors, and that perhaps only to a small amount, if they could calculate upon the allowance of a salary for their time and of having all their private expenses paid.  Such an allowance has neither reason nor authority for its support.  We are of opinion, therefore, that the allowance for these purposes was illegally made, and that to this extent the orders should be reversed.  We refer to the allowance in the last order, of $15,003.35 for private expenses, and of $34,625 for personal services.

*Greenough*, 105 U.S. at 537–38.  The Court reiterated the point in *Pettus*, when Justice Harlan wrote for the Court:

> In *Trustees v. Greenough*, 105 U.S. 527, we had occasion to consider the general question as to what costs, expenses and allowances could be properly charged upon a trust fund brought under the control of court by suits instituted by one or more persons suing in behalf of themselves and of all others having a like interest touching the subject-matter of the litigation.  That suit was instituted by the holder of the bonds of a railroad company, on behalf of himself and other bondholders, to save

The last time I checked, the Supreme Court's decisions on a point of law are binding on lower courts until revisited and overruled by the Supreme Court itself.[64]   I was also under the impression that class counsel have a duty to call such authority to the district court's attention.[65]   Moreover, I was troubled by the notion that a class representative who suffered no injury should be able to evade the burden of demonstrating his own Article III standing under *Spokeo Inc. v. Robins*,[66] when entering a class-action settlement that purports to release other class members' claims for actual damages.   It seems to me that a litigant who invokes federal jurisdiction to settle and bar other people's claims should have to satisfy the standing requirements of Article III subject-matter jurisdiction.   Such were my contentions as an objector in *Godiva*.[67]

---

from waste and spoliation certain property in which he and they had a common interest.   It resulted in bringing into court or under its control a large amount of money and property for the benefit of all entitled to come in and take the benefit of the final decree.   His claim to be compensated, out of the fund or property recovered, for his personal services and private expenses was rejected as unsupported by reason or authority.   "It would present," said Mr. Justice Bradley, speaking for the court, "too great a temptation to parties to intermeddle in the management of valuable property or funds in which they have only the interests of creditors, and that, perhaps, only to a small amount, if they could calculate upon the allowance of a salary for their time and having all their private expenses paid."

*Pettus*, 113 U.S. at 122 (quoting *Greenough*, 505 U.S. at 538).

[64] *See, e.g.*, Bosse v. Oklahoma, 137 S. Ct. 1, 2 (2016) (reiterating the rule that it is the Supreme Court's "prerogative alone to overrule one of its precedents") (quoting United States v. Hatter, 532 U.S. 557, 567 (2001) (quoting State Oil Co. v. Khan, 522 U.S. 3, 20 (1997))); Hohn v. United States, 524 U.S. 236, 252–53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989) (even if a Supreme Court precedent "appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions"). *See generally* BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 28–33 (2016) (examining the process of binding lower courts by the decisions of higher courts in their jurisdiction).

[65] *See* MODEL RULES OF PROF'L CONDUCT r. 3.3(a)(2) (AM. BAR ASS'N 2014) ("A lawyer shall not knowingly: . . . (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel").   *See generally* Elaine Bucklo, *The Temptation Not to Disclose Adverse Authority*, 40 LITIG. 26 (2014) (examining the duty to disclose under Rule 3.3(a)(2)).

[66] Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1553 (2016).

[67] *See* Objection to Proposed Settlement and Notice of Intent to Appear, *Muransky*, No. 0:15-cv-60716WPD , DE No. 59; Class Member Eric Alan Isaacson's Supplemental Brief, *Muransky*, No. 0:15-cv-60716WPD, DE No. 88; Objection to Magistrate's Report and Recommendation

*Elon Law Review* [VOL. 10

To my surprise class counsel, who had obtained no merits discovery in the case, responded to my objection with a deposition subpoena, making me the first and only person deposed in the litigation. Although my membership in the class was not contested, and although my objections related to questions of law and the existing record in the case, class counsel insisted that, because I was an absent class member who had filed an objection, I was obligated to produce documents from other cases and to sit for a deposition. Mind you, my personal stake in the *Godiva* class action was rather small—I had as yet suffered no actual damages (beyond the annoyance associated with cancellation and replacement of a credit card), the statutory damages sought came to at most $1,000 per class member, and although the class notice falsely informed class members that we could expect to receive $235 apiece from the proposed settlement, class counsel's subsequent filings admitted that the real recovery per class member would be far less—maybe forty dollars, if I was lucky.[68]   Though it was a waste of everyone's time, I in fact sat for the first and only deposition that class counsel bothered to take in the case.

When I later filed a notice of appeal from the district court's order rejecting my objections and granting settlement approval and attorneys' fees, class counsel naturally filed a motion asking the court to require the posting of "an appeal bond totaling $115,934.00" should I desire the Eleventh Circuit to consider my objections.[69]   The district court thought that was excessive. But even though an appellee's taxable costs seldom exceed a few hundred dollars,[70] the district court ultimately required a $2,500

---

on Attorneys' Fees, *Muransky*, No. 0:15-cv-60716WPD, DE No. 92, at 22; Transcript of Fairness Hearing, *Muransky*, No. 0:15-cv-60716WPD, DE No. 115, at 30–56.

[68] *Compare* Postcard Notice of Class Action Lawsuit and Proposed Settlement, *Muransky*, No. 0:15-cv-60716WPD, DE No. 59-1 ("Class Counsel estimate that a Settlement Class Member who submits a valid claim form . . . may receive a payment of around $235 subject to pro rata distribution."), *with* Motion for Final Approval of Class Action Settlement, *Muransky*, No. 0:15-cv-60716WPD, DE No. 74, at 7 (stating that class members "will receive approximately $60," before deducting a third for attorneys' fees).

[69] Amended Motion to Require Posting of Appeal Bond and Inc. Memorandum of Law, *Muransky*, No. 0:15-cv-60716WPD, DE No. 107, at 2.

[70] *See* MARIE LEARY, THE COMPARATIVE STUDY OF THE TAXATION OF COSTS IN THE FEDERAL CIRCUIT COURTS OF APPEALS UNDER RULE 39 OF THE FEDERAL RULES OF APPELLATE PROCEDURE 3–4 (Federal Judicial Center, Apr. 2011) ("Leaving out the larger awards that were identified as outliers in several circuits, the data show that across all circuits average costs awarded to appellees under subsection 39(a)(1) ranged from $84.15 to $198.08 ($153.68 median average award); under subsection 39(a)(2) average costs awarded to appellees ranged from $18.20 to $345.04 ($219.06 median average costs) . . . ."); *see also In re* MagSafe

bond to appeal–which was itself far more than my personal stake in the case as an absent class member.[71]

This, I have learned, is how things are done in many consumer class actions. Class counsel far too often put more effort into harassing objectors, and into seeking exorbitant bonds as a condition for appeal, than they do into actually litigating claims on behalf of the class.

## III. The Problem Posed by "Professional Objectors" and by Offers to Pay Objectors to Drop Objections or to Forego Appeals

Based on my experience as a longtime plaintiffs' class-action lawyer, I wish first to address concerns that "professional objectors" present a serious problem by filing frivolous objections and appeals, and then "extorting" money from class counsel in return for withdrawing the objections and dismissing the appeals. In my twenty-six years in the plaintiffs' class-action bar, I never saw that happen. Not once did I witness payments made in return for the withdrawal of a frivolous objection or appeal. My own experience as a member of the plaintiffs' class-action bar strongly corroborates the Public Citizen Litigation Group's similar conclusion: "Our experience leads us to believe that objectively frivolous objections are not a serious problem."[72]

Thus, to the extent that proposed revisions of Rule 23 are designed to deal with the problem of "professional objectors" who file frivolous objections in order extort money from class counsel,[73] they are apt to be seriously misdirected.

The view seems, however, to be fairly widespread that frivolous objections and appeals currently present a serious challenge to efficient class-

---

Apple Power Adapter Litig., 571 F. App'x 560, 563 (9th Cir. 2014) (unpublished) (in appeal of class-action settlement, vacating bond of $15,000 because appeal costs "rarely exceed more than a few hundred dollars when taxed against an appellant").

[71] See Order Adopting Report of Magistrate Judge; Overruling Objections; Requiring Posting of Appeal Bond, *Muransky*, No. 0:15-cv-60716WPD, DE No. 121, at 4.

[72] Scott L. Nelson & Allison M. Zieve, *Comment to the Rule 23 Subcommittee of the Civil Rules Advisory Committee on Behalf of Public Citizen Litigation Group*, at 3 (Apr. 9, 2015).

[73] See generally *id.* at 4 (discussing that objections are subject to court approval under the current language of Rule 23 and its proposed changes).

action litigation.[74]  Professor Brian T. Fitzpatrick paints the picture of law-yers working as "professional objectors," who induce "class members to file wholly frivolous objections and appeals for no other reason than to induce . . . payments from class counsel . . . ."[75]  He writes that "[c]ourts and commentators believe that [such] objector blackmail is a serious prob-lem."[76]  As Professor John E. Lopatka and Chief Judge D. Brooks Smith of the United States Court of Appeals for the Third Circuit describe the problem: "Professional objectors are attorneys who, on behalf of nonnamed class members, file specious objections to class action settle-ments and threaten to file frivolous appeals of district court approvals merely to extract a payoff.  Their behavior amounts to a kind of lawful extortion."[77]

Professor William Rubenstein suggests that this view of "professio-nal objectors" was behind the 2003 addition to Rule 23 of subdivision (e)(4)(A)'s current mandate that "an objection may be withdrawn only with the court's approval."[78]  It appears to be motivating the currently pro-posed further revisions, requiring court approval for whenever payments are made for an objector either to withdraw an objection or to voluntarily dismiss or otherwise forego an appeal.[79]

Strange as it may seem, however, in my twenty-six years of practice in the plaintiffs' class-action bar, no instance ever came to my attention of a payment made in return for the withdrawal of a clearly meritless objec-tion, or the voluntary dismissal of a frivolous appeal.  I have to agree with the conclusion of the Public Citizen Litigation Group: "Truly frivolous objections are unlikely to impede settlement approval or to be appealed."[80]

---

[74] *See* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1624, 1624 (2009) (discussing frivolous objections and appeals being used to generate fees and are creating a problem in class-action litigation).

[75] *Id.* at 1624–25.

[76] *Id.*

[77] Lopatka & Smith, *supra* note 55, at 865.

[78] 4 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS 415 (5th ed. 2014).

[79] *See Report of the Advisory Committee on Civil Rules, supra* note 1, at 228; *see also* PRELIMINARY DRAFT *supra* note 1, at 194 ("[the] [a]mendments to Rule 23(e)(2) seek to focus the court and the parties on the core considerations that should inform the court's review of a proposed settlement").

[80] Nelson & Zieve, *supra* note 72, at 3.

Frivolous objections, by definition, have little prospect of success, whether before the district court or before the court of appeals.[81] After a genuinely frivolous objection is rejected by a district court, a resulting appeal can typically be resolved without expenditure of much time or effort. "This is so because appellate courts may on motion dismiss frivolous claims at the outset (that is, before substantial fees are incurred)."[82] Indeed, "[t]he traditional countermeasure for an appeal thought to be frivolous is a motion in the appellate court to dismiss, which is available at the outset of the appeal and before expenses thereon begin to mount."[83] "Moreover, upon sustaining such a challenge, an award of fees and double costs would be warranted,"[84] since Federal Rule of Appellate Procedure 28 provides: "If a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee."[85]

---

[81] *Id.*; *see* Neitzke v. Williams, 490 U.S. 319, 325 (1989) ("[A]n appeal on a matter of law is frivolous where '[none] of the legal points [are] arguable on their merits.'") (quoting Anders v. California, 386 U.S. 738, 744 (1967)); Chevron U.S.A. Inc. v. M&M Petrol. Servs., 658 F.3d 948, 952 (9th Cir. 2011) ("A frivolous case is one that is groundless . . . with little prospect of success . . . .") (quoting Rodriguez v. United States, 542 F.3d 704, 709 (9th Cir. 2008)); Orr v. Bank of Am., 285 F.3d 764, 784 n.34 (9th Cir. 2002) ("An appeal is frivolous 'if the result is obvious or the appellant's arguments are wholly without merit.'") (citation omitted); Cash v. United States, 261 F.2d 731, 735 (D.C. Cir. 1958) ("'Frivolous' has a colloquial meaning of trifling or silly. It also has an established meaning in law, when applied to appeals, of 'manifestly insufficient or futile,' 'without merit and futile.'") (citation omitted); Robert G. Bone, *Modeling Frivolous Suits*, 145 U. PA. L. REV. 519, 533 (1997) ("A suit is frivolous (1) when a plaintiff files knowing facts that establish complete (or virtually complete) absence of merit as an objective matter on the legal theories alleged, or (2) when a plaintiff files without conducting a reasonable investigation which, if conducted, would place the suit in prong (1).").

[82] Pedraza v. United Guar. Corp., 313 F.3d 1323, 1333 n.14 (11th Cir. 2002); *see also* United States v. Mason, 343 F. 3d 893, 894 (7th Cir. 2003) ("appellees are urged to move to dismiss frivolous appeals before briefing in order to save the parties' money and the court's time").

[83] *In re* Am. President Lines, Inc., 779 F.2d 714, 717 (D.C. Cir. 1985).

[84] *Pedraza*, 313 F.3d at 1333 n.14 (citing Geaneas v. Willets, 911 F.2d 579, 582 (11th Cir. 1990)).

[85] FED. R. APP. P. 38. *See, e.g.*, Wachovia Sec., LLC v. Loop Corp., 726 F.3d 899, 910 (7th Cir. 2013) (stating that the court will determine the appropriate amount of fees once the appellees submit their costs associated with the appeal and allow the appellant to have a reasonable time to respond); Gallop v. Cheney, 642 F.3d 364, 370 (2d Cir. 2011) (ordering Gallop to show cause in writing as to why she and her counsel should not have to pay double the costs and damages); Horoshko v. Citibank, N.A., 373 F.3d 248, 250 n.1 (2d Cir. 2004) (awarding the appellees reasonable attorneys' fees and instructing the court clerk to assess double the costs against the Horoshkos, because they did not respond after being notified during oral arguments of the

In the Ninth Circuit frivolous appeals from orders approving settlements may also be dealt with by means of motions for summary affirmance, which are regularly granted when objectors' appeals fail to present genuinely substantial issues.[86]  Although orders dismissing such appeals are typically unpublished, their existence is well publicized and widely known to members of the plaintiffs' class-action bar.[87]  *The National Law Review,* for example, reports that class counsel employing motions for summary affirmance have been "able to effectively dispose of" appeals asserting insubstantial objections "without expending significant resources or incurring substantial delay."[88]

In truth, however, relatively few objections are genuinely frivolous. Class members' objections typically raise legitimate concerns—even if the abuse-of-discretion standard of review means that orders approving settlements or attorneys' fee awards will more often be affirmed than reversed. Class counsel have little to gain by paying objectors off to drop really weak appeals, and are quite willing to defend them through oral argument and

---

possibility of sanctions); Grove Fresh Distrib., Inc. v. John Labatt, Ltd., 299 F.3d 635, 642 (7th Cir. 2002) (requiring the appellant to pay costs, plus damages, for abusing the litigation process and the frivolous nature of the claim).

[86] *See, e.g.,* Order from Ninth Circuit Court of Appeals, Klee v. Nissan N. Am., No. 2:12-cv-08238-AWT-PJW (9th Cir. Dec. 9, 2015), DE No. 176 (order for summary affirmance in objectors' appeal in the Nissan Leaf class-action litigation: "A review of the record and the opposition to the motion for summary affirmance indicates that the questions raised in this appeal are so insubstantial as not to require further argument."); Dennings v. Clearwire Corp., No. 2:10-cv-01859-JLR, 2013 WL 12233931 (9th Cir. Apr. 22, 2013) (summary affirmance in objector's appeal from settlement approval in Clearwire Internet-service class action); *In re* Wal-Mart Wage & Hour Emp't Practices Litig., No. 2:06-cv-0225-PMP-PAL, 2010 WL 11545542 (9th Cir. Aug. 25, 2010) (summary affirmance in three consolidated objectors' appeals from settlement of employment-practices class action).

[87] *See, e.g.,* Anna C. Haac, *Ninth Circuit Grants Summary Affirmance In Objectors' Appeal from Class Action Settlement: A Case Study in Dealing with Serial Objectors,* NAT'L L. REV. (Dec. 12, 2013), https://www.natlawreview.com/article/ninth-circuit-grants-summary-affir-mance-objectors-appeal-class-action-settlement-cas ("One tool that can be used against such serial objectors on appeal is the motion for summary affirmance, which asks the appellate court to affirm the final approval of the settlement quickly, without the delay that normally accompanies full appellate briefing and argument. Proceedings following a recent settlement of three class actions against Clearwire, which was approved by the United States District Court for the Western District of Washington, demonstrate the effectiveness of the summary affirmance procedure.").

[88] *Id.*

judgment–as I indeed have.[89]  The prospect of defending such appeals is a cost of doing business, and of honoring due process that allows class members to present objections to judgments that will bind them.

Any notion that weak appeals somehow engender systematic "extortion" by objectors and their counsel of payments from class counsel is simply contrary to my experience.  Class counsel have little incentive to pay for the voluntary withdrawal of objections, or the dismissal of objectors' appeals, that they believe are obviously meritless.  Well-capitalized class counsel–that is to say, any counsel who are equipped to adequately represent a class–generally will have the financial wherewithal to negotiate "so-called 'quick-pay' provisions in their settlement agreements so that counsel receive their fees at final judgment, not after all appeals, taking the sting out of counsel's having to defend objector appeals."[90]  "With the consent of the defendants, class counsel insert provisions into class action settlements that permit counsel to receive whatever fees district courts award them as soon as those courts approve the settlements, regardless of whether the settlements are appealed," with class counsel to refund the fees if the settlement or fee award is reversed on appeal.[91]  Thus, as Professor Brian T. Fitzpatrick explains, "objectors who bring meritless appeals can no longer delay the point at which class counsel receive their fees" and "class counsel have little incentive to pay objectors a premium to avoid this delay."[92]  "Quick-pay provisions are not only already in use," Professor Fitzpatrick adds, "they are already in wide use."[93]

For class counsel who choose to pay nuisance value to obtain the dismissal of weak appeals, moreover, the payments are just that–a mere nuisance, rather than a serious problem requiring much attention.  Focusing on such payments misses the greater problem: class counsel who pay objectors to drop meritorious objections and to abandon appeals having a strong chance of success.  In my twenty-six years in the plaintiffs' class-action bar, I never became aware of a case in which class counsel paid

---

[89] *See* Fidel v. Farley, 534 F.3d 508, 510 (6th Cir. 2008) (objector's appeal concerning class notice and attorneys' fees); Morris v. Lifescan, Inc., 54 F. App'x 663, 664 (9th Cir. 2003) (objector's appeal concerning attorneys' fees).

[90] RUBENSTEIN, *supra* note 78 § 13:34; *see* Fitzpatrick, *supra* note 74, at 1623 (discussing quick-pay provisions); *see also* RUBENSTEIN, *supra* note 78 § 13:8 (discussing "terms of art" in class action settlement agreements).

[91] Fitzpatrick, *supra* note 74, at 1625.

[92] *Id.*

[93] *Id.* at 1626.

objectors to dismiss appeals that they believed to be frivolous or of insubstantial merit. The payments I knew of all were made to induce objectors to abandon appeals that class counsel feared the objectors were apt to win.

When class counsel make substantial payments to induce objectors to withdraw appeals they do so, in truth, not because the objections were frivolous, but because class counsel fear that the objections have genuine merit and may well be sustained on appeal. In so doing, class counsel place their own interests over those of the class whose interests they supposedly represent, paying objectors to drop appeals that threaten to benefit the class but that could thereby reduce class counsel's fee awards, or even eliminate them altogether–as in cases where class counsel labors under an irresolvable conflict of interest, or has obtained class certification in violation of fundamental principles of due process, or in violation of Article III standing requirements. The fault when such payments are made lies not with objectors who owe no duty to the class, or with objectors' counsel whose ethical obligations run to their own clients (the objectors), but with class counsel who do in fact have fiduciary duties running to the class whose interests they are supposed to advance.[94]

Class counsel place the objectors' lawyers in a box by offering payments far beyond the value of the objecting class members' individual claims. When a class member whose individual claim in a class action might be worth a few dollars is offered thousands, or tens of thousands, or even hundreds of thousands of dollars to drop her objection, she may well be tempted to do so. Her counsel can advise against it, and urge her to pursue her objection through appeal in order to benefit the class–but the decision whether to press the objection or withdraw it is the client's, not the lawyer's. Rules of professional conduct command: "A lawyer shall abide by a client's decision whether to settle a matter."[95] And the objector, in all likelihood, has bills to pay. She may have a mortgage or educational debt; her parents may have medical bills; she may hope to finance her own children's college education so that they may avoid the specter of crushing educational debt. Such considerations are apt to weigh heavily when an objecting class member is told that class counsel has offered to pay her a

---

[94] *See generally* Katherine Ikeda, *Silencing the Objectors*, 15 GEO. J. LEGAL ETHICS 177, 196–200 (2001) (arguing that class counsel who pay objectors to drop substantial objections or appeals thereby breach their fiduciary duties to the class they were appointed to represent).

[95] MODEL RULES OF PROF'L CONDUCT r. 1.2(a) (AM. BAR ASS'N 2014); *accord, e.g.*, Attorney Grievance Comm'n v. Thaxton, 415 Md. 341, 343, 353, 358–59, 1 A.3d 470, 471 n.1, 477, 480–81 n.12 (2010); Rizzo v. Haines, 520 Pa. 484, 500–02, 555 A.2d 58, 66–67 n.9 (1989).

large sum to abandon her objection in a case where her personal stake, as a member of the class, is by comparison quite modest.[96] And there is little that the objector's lawyer can do to stop her.

If class counsel offers cash in return for withdrawing an objection or dismissing an appeal, the objector's counsel must of course communicate class counsel's offer to his or her client, the objector.[97] If the client decides to accept the payment, then class counsel who made it can be expected to revile the objector's counsel—who perhaps advised his client against accepting the payment—for filing the objection in order to "extort" the payment. This has given objectors' counsel a very bad name in some circles.[98] But any fault lies, in truth, with class counsel who offer objectors large sums to drop objections and appeals that could benefit the class at the expense of maximizing class counsel's fees.

As things currently stand, such payments are for the most part invisible and undocumented—most often made under the auspices of appellate-court mediation programs whose rules typically prohibit public disclosures concerning the substance of any communications or agreements entered in the course of mediation.[99] This gives class counsel the opportunity to offer, and objectors the opportunity to accept, substantial payments without

---

[96] *See generally* Robert B. Gerard & Scott A. Johnson, *The Role of the Objector in Class Action Settlements: A Case Study of the General Motors Truck "Side Saddle" Fuel Tank Litigation*, 31 LOY. L.A. L. REV. 409 (1998) (discussing the objector's temptation to settle).

[97] *See* MODEL RULES OF PROF'L CONDUCT r. 1.4 cmt. 2 (AM. BAR ASS'N 2014) ("[A] lawyer who receives from opposing counsel an offer of settlement in a civil controversy . . . must promptly inform the client of its substance . . . ."); *accord, e.g.*, Attorney Grievance Comm'n, 415 Md. at 341, 343, 354–55, 358, 1 A.3d at 470, 471 n.4, 478, 481 n.14 (2010); Rizzo v. Haines, 520 Pa. 484, 500–01, 555 A.2d 58, 66 (1989).

[98] Professor Edward Brunet notes that some in the plaintiffs' bar revile objectors and their counsel as "warts on the class action process" and "bottom feeders." Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 411.

[99] *See, e.g.*, 1ST CIR. R. 33.0(c); 2ND CIR. R. 33.1(e); 3RD CIR. R. 33.5(c); 4th Cir. R. 33; General Order Governing the Appellate Conference Program (5th Cir. 2000); 6TH CIR. R. 33(b)(4)(D); 8TH CIR. R. 33A(c) (repealed 2016); 9TH CIR. R. 33-1(c); 10TH CIR. R. 33.1(D); 11TH CIR. R. 33-1(c)(3). *See also* ROBERT J. NIEMIC, MEDIATION & CONFERENCE PROGRAMS IN THE FEDERAL COURTS OF APPEALS: A SOURCEBOOK FOR JUDGES AND LAWYERS 12 (2d ed. 2006) ("All of the [mediation] program offices operate with confidentiality . . . . Local rules usually prohibit mediators, the parties, and the parties' attorneys from disclosing the substance of a conference to any judge or non-party.  Generally not considered confidential, however, are the fact that the mediation took place and the bare results of the mediation (for example, settled, not settled, or continued).").

*Elon Law Review* [VOL. 10

fear of public disclosure. But a declaration that Theodore ("Ted") Frank and his nonprofit Center for Class Action Fairness filed in the Seventh Circuit *Capital One* appeal provides a glimpse of how class counsel too often operate.[100] Even Frank and the Center have had to abandon objectors' appeals that they earnestly desired to press, but that their clients directed them to drop when class counsel offered large sums of money.[101]

Frank's *Capital One* declaration explains that the Center is a nonprofit public-interest group organized to provide legal representation for objectors, so that it "cannot and does not settle its objections for *quid pro quo* cash payment to withdraw."[102] That is a fine aspiration. But the rules of professional ethics say that it is up to the client, not the attorney, to decide whether to accept a settlement offer.[103] The result is that class counsel, who wish to dispose of a strong appeal based on a meritorious objection, often can induce the objecting class member to abandon the appeal against his or her lawyer's wishes. Frank's declaration in *Capital One* explains:

> In a 2010 case, I represented a client with a meritorious Ninth Circuit appeal of approval of a settlement where the attorneys received $4 million and the class received zero. The appeals court ordered mediation, though I indicated to the mediator that my clients did not want to settle. After we filed our opening brief, class counsel offered an extraordinary sum to my clients to dismiss their appeals. (Unfortunately, the offer was confidential, and I cannot disclose it absent a court order.) One of my clients, an attorney friend, apologetically indicated that the offer was too good to refuse. I withdrew as attorney for the

---

[100] *See* Declaration of Theodore H. Frank in Support of Motion to Intervene, *In re* Capital One Tel. Consumer Prot. Act Litig., Appeal of: Jeffrey Collins et al., No. 15-1400, 2015 WL 2156680 (7th Cir. May 5, 2015) (No. 15-1400), DE No. 60-2, ¶¶ 17–18, 80–81 [hereinafter Frank].

[101] *See id.*

[102] *Id.* ¶ 15. The Seventh Circuit describes Frank as a "professional objector to hollow class-action settlements." *In re* Subway Footlong Sandwich Mktg. & Sales Practices Litig., 869 F.3d 551, 552 (7th Cir. 2017). He has secured the reversal of numerous class-action settlements and attorneys' fee awards. *See, e.g., id.; In re* Walgreen Co. Stockholder Litig., 832 F.3d 718, 721, 726–27 (7th Cir. 2016); *In re* BankAmerica Corp. Sec. Litig., 775 F.3d 1060, 1062–63 (8th Cir. 2014); Pearson v. NBTY, Inc., 772 F.3d 778, 787 (7th Cir. 2014); Redman v. RadioShack Corp., 768 F.3d 622, 626 (7th Cir. 2014); Eubank v. Pella Corp., 753 F.3d 718, 719 (7th Cir. 2014); *In re* Dry Max Pampers Litig., 724 F.3d 713, 715–16 (6th Cir. 2013); *In re* HP Inkjet Printer Litig., 716 F.3d 1173, 1175–76 (9th Cir. 2013); *In re* Baby Prods. Antitrust Litig., 708 F.3d 163, 168–70 (3d Cir. 2013); Robert F. Booth Trust v. Crowley, 687 F.3d 314, 318–20 (7th Cir. 2012); Dewey v. Volkswagen Aktiengesellschaft, 681 F. 3d 170, 173 (3d Cir. 2012); *In re* Bluetooth Headset Prods Liab. Litig., 654 F.3d 935, 938, 941–50 (9th Cir. 2011).

[103] MODEL RULES OF PROF'L CONDUCT r. 1.2(a) (AM. BAR ASS'N 2014).

two appellants, and they settled and dismissed the appeal. Neither the Center nor I received any compensation as part of that settlement.[104]

As a consequence of that experience, Frank's declaration recounts, the Center now insists on retainer agreements in which objecting class members pledge not to take payments in return for abandoning objections.[105] Even with these provisions in its retainer agreements, however, the Center cannot control clients who decide to accept payments from class counsel–as demonstrated by what happened in *Capital One* itself, where an objector who retained the Center to represent him and who agreed *not* to abandon his objections in return for an individual payment, nonetheless ultimately accepted a class counsel's offer of $25,000 to dismiss his appeal.[106]

---

[104] Frank, *supra* note 100, ¶ 17.

[105] *See id.* ¶ 18. Frank's *Capital One* declaration explains:

> Since that time, the Center's retainer agreements contain multiple clauses relating to the motivations of the Center's clients and the possibility of settling objections for money. Among other provisions, the Center discloses that retaining the Center might deprive clients of the most financially advantageous outcome; clients promise that they are not seeking to settle their objections for money; and clients authorize the Center to move for an injunction prohibiting them from doing so. The Center also very carefully screens its clients to ensure their good faith in objecting and, when possible, uses Center attorneys or board members who are class members to object. We do not represent clients who do not agree to these terms.

*Id.*

[106] *See* Frank, *supra* note 100, ¶¶ 34–82. Frank's declaration explains that in *Capital One* a class member and objector (Jeffrey Collins) who had initially appeared pro se retained the Center to represent him in objection to class counsel's attorneys' fee application. "The objection was partially successful, and the district court reduced the $22.6 million attorney-fee request of class counsel by about $7 million." *Id.* ¶ 43; *see also In re* Capital One Tel. Consumer Prot. Act Litig., 80 F. Supp. 3d 781, 794–809 (N.D. Ill. 2015). Believing the attorneys' fee award should be further reduced, the Center filed a notice of appeal on behalf of Mr. Collins. With the matter on appeal, class counsel communicated an offer: "Mr. Collins must dismiss his appeal by close of business June 8, 2015, with $25,000 payable to Mr. Collins upon the appeal's dismissal." Frank, *supra* note 100, ¶ 74. Under the settlement offer from Lieff Cabraser Partner Jonathan D. Selbin, class counsel would pay Collins $25,000 in return for dismissing his appeal and withdrawing his pending fee petition in the district court. *Id.* ¶ 80. Frank was in a pickle, for when the offer was communicated to his client, an objector who had agreed not to accept such payments in return for withdrawing his objection:

> Mr. Collins indicated to me that he now wished to accept the offer notwithstanding his earlier agreement and statements. Research indicated that legal ethics rules required me to accept an unethical settlement offer, notwithstanding the retainer

*Elon Law Review* [VOL. 10

When class counsel offer a substantial sum to an objecting class member whose individual claim is worth only a few dollars, or even several hundred dollars, the objector's lawyer is at his or her client's mercy. Though the plaintiffs' class-action bar may rant about "extortion" by "professional objectors,"[107] the truth is that class counsel can and do buy off objectors when the objector's counsel would much rather press objections for the benefit of the class.

The lawyers whose objector clients accept such payments, though denigrated as so-called "professional objectors" and "extortionists," are not at fault in these transactions. Their duty runs to their client, not to the class, however much they may wish to press an objection for the benefit of the class.[108] It is court-appointed class counsel who have a fiduciary duty to the class–a duty they breach by making self-interested payments in order to do away with objections and appeals that, if successful, stand to benefit the class.[109]

## IV. DEALING WITH CLASS COUNSEL'S PAYMENTS TO OBJECTORS–THE CURRENT FRAMEWORK AND PROPOSED REVISIONS TO RULE 23(E)(5)

As currently framed Rule 23 is, without doubt, extremely ineffective in dealing with payments to objectors in exchange for their withdrawal of objections. Rule 23(e)(5) currently states that when a class-action settlement is proposed "[a]ny class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval."[110] Yet no standard is stated in

---

agreement and my reliance upon it . . . and I wrote Mr. Selbin to indicate that Mr. Collins accepted the offer.
*Id.* ¶ 81.

[107] *See* Brunet, *supra* note 98, at 409 (noting that some in the plaintiffs' class-action bar revile objectors and their counsel as "warts on the class action process" and "bottom feeders"); Bruce D. Greenberg, *Keeping the Flies Out of the Ointment: Restricting Objectors to Class Action Settlements*, 84 ST. JOHN'S L. REV. 949, 986 n.150, 994 (2010) (complaining of "groundless objections" and objectors' "motives of extortion," and denouncing "the scourge of extortionate and dilatory objections").

[108] *See* MODEL RULES OF PROF'L CONDUCT r. 1.2 (AM. BAR ASS'N 2014) ("A lawyer shall abide by a client's decision whether to settle a matter."); *see supra* note 95.

[109] *See generally* Katherine Iketa, *Silencing the Objectors*, 15 GEO. J. LEGAL ETHICS 177, 196–200 (2001) (arguing that class counsel who do this breach fiduciary duties to the class that they were appointed to represent).

[110] FED. R. CIV. P. 23(e).

the rule, or anywhere else for that matter, to guide the district court's determination. And, as things currently stand, "[o]nce an objector appeals, control of the proceeding lies in the court of appeals," placing it beyond the district court's power to monitor.[111]

The current rule's greatest shortcoming is that it establishes no standard at all for approving the withdrawal of an objection–a shortcoming that the revision currently under consideration does nothing to correct.[112]

Should a district judge approve the withdrawal, in return for payment, of an objection that he or she believes is meritless in order to avoid the delay that the objection's full prosecution might otherwise cause? Or should the court refuse to approve withdrawal of an apparently meritless objection in return for a payment from class counsel–thereby inducing the objector to file and prosecute a presumptively meritless appeal? It is easy to imagine different judges reaching different conclusions on identical facts. What is the standard for withdrawal of an objection that the district court is inclined to reject, but that an appellate court may find has substantial merit? Should withdrawal of such an objection ever be approved? Under what circumstances?

---

[111] FED. R. CIV. P. 23(e) (discussing the details regarding the advisory committee's note to 2003 amendment). The Advisory Committee Note adds: "[t]he court of appeals may undertake review and approval of a settlement with the objector, perhaps as part of appeal settlement procedures, or may remand to the district court to take advantage of the district court's familiarity with the action and settlement." *Id.* In practice, however, the appellate courts have not done this.

[112] The proposed amendment now under consideration would strike Rule 23(e)(5)'s current requirement that an objection to settlement approval "may be withdrawn only with the court's approval," to instead provide, with respect to objections to settlement approval:

> (A) In General. Any class member may object to the proposal if it requires court approval under this subdivision (e).
> (B) Court Approval Required For Payment to an Objector or Objector's Counsel. Unless approved by the court after a hearing, no payment or other consideration may be provided to an objector or objector's counsel in connection with:
>> (i) forgoing or withdrawing an objection, or
>> (ii) forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal.
> (C) Procedure for Approval After an Appeal. If approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending.

See PRELIMINARY DRAFT, *supra* note 1, at 215–17.

Rule 23(e)(5) currently provides no answers to any of these questions.[113]  Neither do the Advisory Committee Notes to the 2003 Amendments that created it.  The leading treatise on class actions advises: "'The Rule itself does not set forth the circumstances under which such approval may be given, nor is there any controlling authority on the issue.'"[114]  Perhaps that is why, in practice, the requirement of court approval for withdrawal of objections to settlements generally is ignored–although many objections are withdrawn, one seldom sees district courts actually passing on the propriety of the withdrawals.  The paucity of meaningful precedent, given the significant number of objections that are withdrawn, is truly remarkable.

Rule 23's loophole for objections to attorneys' fees is even more remarkable.  Rule 23(h) authorizes class members to object to an attorneys' fee application, just as Rule 23(e)(5) authorizes objections to settlement approval.[115]  But where Rule 23(e)(5) requires court approval for withdrawal of an objection to a settlement, Rule 23(h) contains no parallel requirement of court approval for withdrawal of an objection to class counsel's attorneys' fee application.[116]  Thus, it appears that class counsel may freely pay objectors to drop objections to attorneys' fee awards without disclosure to, let alone approval from, the district court.

The proposed amendment to Rule 23(e)(5) does little, if anything, to help.  Rule 23(e)(5)'s current requirement that an objection to approval of a settlement "may be withdrawn only with the court's approval," would be stricken and replaced with a new requirement of approval only when an objector or objector's counsel receives payment in return for the withdrawal of an objection to approval of a settlement.[117]  It would further provide that if such an objection is withdrawn after an objector's appeal has

---

[113] *See* FED. R. CIV. P. 23(e)(5).

[114] RUBENSTEIN, *supra* note 78, § 13:34, at 417 (quoting Glass v. UBS Fin. Servs. Inc., No. C-06-4068 MMC, 2007 WL 160948, at *2 (N.D. Cal. Jan. 17, 2007) (allowing objector to withdraw when other objectors were pressing the same points anyway)).

[115] FED. R. CIV. P. 23.

[116] Rule 23(e)(5) currently provides: "[a]ny class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval." FED. R. CIV. P. 23(e)(5).  In contrast, Rule 23(h)(2) currently authorizes objections to attorneys' fee awards without requiring court approval for withdrawal of such objections.  It simply states: "[a] class member, or a party from whom payment is sought, may object to the motion." FED. R. CIV. P. 23(h)(2).

[117] *See supra* note 112; PRELIMINARY DRAFT, *supra* note 1, at 215–17, 228–29.

been docketed, the required approval can be sought pursuant to the provisions of Rule 62.1, allowing for limited remands for district courts to entertain a motion over which a pending appeal would otherwise deprive it of jurisdiction.[118]  Applying only to Rule 23(e) objections to settlement approval,  the amendments still would not require court approval for the withdrawal of Rule 23(h)(2) objections to attorneys' fees.

I see at least two fundamental problems with this proposal. First, by striking the requirement that district courts approve all withdrawals of objections, it invites class counsel's harassment of objectors.[119] Second, it provides no guidance at all as to what standards a district court should apply in determining whether or not to approve the withdrawal of an objection or appeal in return for a payment.[120]

### A.    Dispensing With Court Approval When No Consideration Is Paid for an Objection's Withdrawal May Encourage Harassment of Objectors by Class Counsel

The proposed amendment under consideration would strike Rule 23(e)(5)'s current requirement that "the objection may be withdrawn only with the court's approval," while adding new text requiring judicial approval only if payment or consideration is provided to the objector or its counsel.[121] The Committee Note explains that with respect to objections to settlement approval:

---

[118] FED. R. CIV. P. 62.1 provides:

> (a) Relief Pending Appeal. If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may:
>> (1) defer considering the motion;
>> (2) deny the motion; or
>> (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.
> (b) Notice to the Court of Appeals. The movant must promptly notify the circuit clerk under Federal Rule of Appellate Procedure 12.1 if the district court states that it would grant the motion or that the motion raises a substantial issue.
> (c) Remand. The district court may decide the motion if the court of appeals remands for that purpose.

[119] *See infra* p. 65–67.

[120] *See infra* pp. 67–69.

[121] *See supra* note 112; PRELIMINARY DRAFT, *supra* note 1, at 215–17, 228–29.

*Elon Law Review* [VOL. 10

> The rule is amended to remove the requirement of court approval for every withdrawal of an objection. An objector should be free to withdraw on concluding that an objection is not justified. But Rule 23(e)(5)(B)(i) requires court approval of any payment or other consideration in connection with withdrawing the objection.[122]

Striking the general requirement of judicial approval for the withdrawal of any objection to the approval of a settlement is apt to encourage abuse. While it is true that an objector should be free to withdraw on concluding an objection is in fact not justified, a district court still should inquire to ensure that this really is the reason the objector seeks to withdraw the objection.[123]

Far too often, objections are withdrawn not because objectors believe they lack merit, but on account of bullying and harassment by unscrupulous class counsel.[124] In most class-action cases the great majority of class members have rather small stakes. Yet objectors with small claims who take the trouble to inform the court of concerns about a proposed settlement or fee award may find themselves swiftly subpoenaed to produce documents and be deposed–as I was when I had the audacity to object to the proposed settlement and attorneys' fee award in the *Godiva* FACTA litigation.[125] The costs of complying with such subpoenas are apt in many instances to greatly exceed objectors' stake in a class action, inducing them to drop even sincere and likely meritorious objections.

The practice of bullying objectors with subpoenas and discovery has become widespread in consumer class-action litigation.[126] As things

---

[122] PRELIMINARY DRAFT, *supra* note 1, at 228.

[123] Lopatka & Smith, *supra* note 55, at 889–90.

[124] *See infra* note 125.

[125] *See supra* p. 53 (As noted above, my deposition as an objector turned out to be the *only* deposition that was taken in the case.).

[126] Consider, for example, the withdrawal of an objection to the proposed settlement and attorneys' fee award in *Home Depot Breach Litigation*, in which the *pro se* objector informed Judge Thomas Thrash:

> I withdraw my objection to the proposed settlement of Case No. 14-md-02583-TWT (The Home Depot, Inc. Customer Security Breach Litigation). I still believe that my objection has merit, but wish to avoid the cost and inconvenience of a deposition (including travel and missing work). As discussed with Mr. Theodore Maya of Ahdoot & Wolfson, PC, (1) I am notifying him by e-mail and the court by U.S. mail, (2) he will withdraw the subpoena that was delivered to me, and (3) he will cancel the deposition that had been scheduled for August 5, 2016. I am receiving no money or other consideration for withdrawing my objection.

currently stand, district courts are asking *too few* questions, rather than too many, about objections withdrawn without the payment of any consideration. They should be required to review *every* withdrawal of an objection–though under the current rule, they seldom really do so; very likely because no standards currently exist to guide their review.

### B.  *Requiring District-Court Approval for Payments While Providing No Standards for Approval, and Without Permitting Reconsideration of a Settlement Previously Approved, Likely Will Not Do Much Good*

The proposed revision to Rule 23(e)(5) would require district-court approval not only when payments are made in return for the withdrawal of an objection to a settlement, but also when payments are made for the withdrawal of any appeal from the denial of such an objection.[127] But, much like the current Rule 23(e)(5), the proposed revision provides no guidance at all concerning what the appropriate standard for approval might be.

Should the court approve the withdrawal of a relatively weak appeal in return for a modest payment? Should it approve withdrawal of the weak appeal in return for a large payment? Or should it withhold approval, and insist that the objector proceed with what the court believes is weak

---

Letter from Stephen Weinstein re: Withdrawal of Objection, *In re* Home Depot, Inc. Customer Data Sec. Breach Litig., No. 1:14-md-02583-TWT, 2016 WL 6902351, at *4, DE No. 255 (N.D. Ga. Aug. 2, 2016); *see also* Declaration of John R. Bevis in Support of Final Approval, Home Depot, Inc. Customer Data Sec. Breach Litig., 2016 WL 6902351, DE No. 254-3, ¶ 4 ("On July 28, 2016, Mr. Weinstein represented to Consumer Counsel that he is withdrawing his objection and is sending a copy of his withdrawal to the Court.").

Mr. Weinstein probably was not the only objector harassed by class counsel into withdrawing his objection. The case drew multiple objections from class members who complained that notice was inadequate, because they received it only after the time for filing objections had run – but who then withdrew their objections without explanation:

> At the final approval hearing, the parties informed the Court that the following untimely objectors wished to withdraw their objections and opt-out of the Settlement; and pursuant to the parties' stipulation they will be included in the opt-out list and not bound by the terms of the Settlement: Michael Dwyer, Timothy Haley, and Peter Scoolidge.

Order Granting Final Approval of Class Action Settlement and Final Judgment, *In re* Home Depot, Inc., Customer Data Sec. Breach Litig., 2016 WL 6902351, at *5, DE No. 260, at 12.

[127] PRELIMINARY DRAFT, *supra* note 1, at 228–29.

appeal?  The Advisory Committee Note provides mixed messages on what a court should do.

On the one hand, the Advisory Committee Note to the proposed revision of Rule 23(e)(5) seems to suggest that district courts should approve payments made for the dismissal of weak appeals simply in order to avoid the delay that appellate proceedings may cause: "Because an appeal by a class-action objector may produce much longer delay than an objection before the district court, it is important to extend the court approval requirement to apply in the appellate context."[128]  On the other hand, the Advisory Committee Note also appears to say that the amendments are motivated by the view that such payments should be condemned: "At least in some instances, it seems that objectors–or their counsel–have sought to extract tribute to withdraw their objections or dismiss appeals from judgments approving class settlements."[129]  So what is a district judge to do?  Approve a payment for dismissal of a really weak appeal in order to avoid the delay occasioned by full appellate proceedings?  Or deny approval because the payment is some taboo "tribute"?  Neither the proposed revisions nor their Advisory Committee Notes provide clear guidance.  And different judges might reach very different conclusions on fundamentally similar facts.

What if class counsel has offered an objector a *very large* payment in return for abandoning a supposedly "meritless" appeal?  Should the district court perhaps reconsider whether the objection has merit, so that it should be sustained rather than withdrawn?  That might make sense, if the interest of the class were what mattered–but the proposed amendments do not appear to permit such reconsideration.

With the proposed revisions, a new Rule 23(e)(5)(C) would require judicial approval of payments made to induce the dismissal of a pending appeal by providing: "If approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending."[130]  But Rule 62.1 provides that "[i]f a timely motion is made for relief that the [district] court lacks authority to grant because of an appeal that has been docketed and is

---

[128] PRELIMINARY DRAFT, *supra* note 1, at 230.

[129] *Id.* at 229.

[130] *Id.* at 216–17.  The Advisory Committee Note to this revision adds: "Because the court of appeals has jurisdiction over an objector's appeal from the time that it is docketed in the court of appeals, the procedure of Rule 62.1 applies." *Id.* at 231.

pending, the [district] court may:  (1) defer considering the motion, (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."  And then:  "The district court may decide the motion if the court of appeals remands for that purpose."[131]

Thus, it appears that the district court receives jurisdiction to decide only "the motion" in question–concerning whether to approve voluntary dismissal of an objector's appeal in return for payment.  The proposed revision does not authorize the district court to consider anything more than this.[132]  While a large payment might signal that the appeal has merit, and that the district court should perhaps reconsider the objection to settlement approval itself, the court would lack authority to do so.

Of course, the district court that originally rejected an objection probably is not the best judge of whether an appeal from its own order has merit.  Responsibility for approving such transactions would be better vested in the appellate court or another district judge, who can evaluate the matter more objectively, than remanded to the judge who personally rejected the objection in the first instance.

## V.   RECOMMENDATIONS

I think it makes sense to require searching judicial inquiry and approval before any class members' objection is withdrawn or compromised.  Thus, the current requirement of judicial approval for any withdrawal of an objection should be retained and strengthened, rather than abandoned whenever no consideration is paid.

District courts should be wary when good-faith objections are withdrawn without the payment of consideration, and they should be swift to punish class counsel who serve subpoenas on objectors for purposes of harassment and intimidation.[133]  Class counsel who engage in such programs of harassment clearly do not have the class's best interests at heart.

---

[131] FED. R. CIV. P. 62.1(c).

[132] See generally PRELIMINARY DRAFT, supra note 1, at 211–18 (discussing the proposed revision to FED. R. CIV. P. 23).

[133] See, e.g., In re Classmates.com Consol. Litig., No. C09-45RAJ, 2012 WL 3854501, at *9–11 (W.D. Wash. June 15, 2012) (reducing class counsel's attorneys' fee award by $100,000 on account of aggressive behavior towards an objector and his counsel, which included serving

Unfortunately, district courts cannot be expected to engage in productive inquiries concerning withdrawals of objections when there are no clear standards to be applied.[134]  Currently there are none.[135]  Top priority should be given to study of how the system currently works, in order to frame standards that will operate to benefit class members by facilitating potentially meritorious objections and appeals while barring class counsel from paying objectors to terminate them.  The real problem is not that objectors secure payments from class counsel in order to abandon frivolous objections and appeals.  It is that class counsel pay objectors to drop objections and appeals that have merit and could benefit the class.

Expanding the requirement of district-court approval to encompass voluntary dismissal of appeals without first providing clear standards is not likely to help much.  Disclosure and transparency are surely are to be desired, and class counsel who seek to pay objectors to withdraw appeals should not be able to hide behind letter agreements and appellate-mediation confidentiality rules.  But clear standards should be developed before the requirement of judicial approval is expanded.[136]

Rhetoric condemning objectors, and their counsel, for pursuing their own interests rather than those of the class, raises serious questions about whether objectors and their lawyers have duties running to the class.  The Advisory Committee Note to the proposed revisions to Rule 23(e)(5)(B) say that "[g]ood-faith objections can assist the court in evaluating a proposal under Rule 23(e)(2) . . . .  But some objectors may be seeking only personal gain, and using objections to obtain benefits for themselves rather than assisting in the settlement-review process."[137]

As things currently stand class representatives, and their lawyers, are supposed to act as fiduciaries to the class they represent.[138]  An objector, as an absent class member, currently owes no such duty.  And an objector's

---

subpoenas on the objector's counsel, and was "conduct that was plainly not in the interests of the class").

[134] *See supra* Part IV.

[135] *Id.*

[136] *See generally id.* (discussing the lack of standards currently available).

[137] PRELIMINARY DRAFT, *supra* note 1, at 229.

[138] *See supra* note 12; *see also* Howard M. Downs, *Federal Class Actions: Diminished Protection for the Class and the Case for Reform*, 73 NEB. L. REV. 646, 652 (1994) ("[t]he named representatives functions as a fiduciary to the class with a duty to protect the absent class members in key decisions throughout the course of the lawsuit.").

counsel is obligated to represent its objector client's interests rather than those of the class.[139]  If the Advisory Committee wishes to change the rules, and to impose fiduciary duties running to the class on objectors' and their counsel, it should say so clearly.

Once clear standards have been promulgated, transparency and full disclosure of class counsel's payments to secure the withdrawal of objections should be expanded to encompass objections to attorneys' fees authorized by Rule 23(h)(2), as well as objections to settlement approval authorized by Rule 23(e)(5).  The existing loophole for objections to attorneys' fee awards should be closed.

Finally, recognizing that objectors' counsel may be influenced by financial self-interest, it would be helpful to promulgate rules under which objectors' counsel can expect to be paid at least as much for successfully prosecuting an objection benefitting the class as they can expect when an objection is instead abandoned or an appeal dismissed.  Financial incentives should be structured to encourage assertion of objections for the benefit of the class, rather than their abandonment in return for a payment by class counsel that benefits only the individual objectors and their counsel.

## VI. CONCLUSION

The proposed amendments to Rule 23(e)(5) fail to take account of the practical realities of class-action practice.  In my twenty-six years in the plaintiffs' class-action bar, I have never seen class counsel make a payment in return for the withdrawal of a frivolous objection.  But class counsel will pay large sums to induce objectors to drop potentially meritorious objections that could well benefit the class.  Any fault in such transactions rests with class counsel, who owe a fiduciary duty to the class as such, rather than to the objector's counsel who owes no such duty but is, to the contrary, obligated to represent the objector's interest as an individual should he or she decide to accept a settlement offer.

Judicial review of the withdrawal or compromise of an objection should be strengthened, whether or not consideration is paid to the objector.  But most of all, clear standards are needed to guide district courts' review when consideration is offered.  The currently proposed amendments provide none.

---

[139] *See supra* Part III; Frank, *supra* note 100.

# Exhibit F

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## VERIFIED ITEMIZED BILL OF COSTS

| THIS SECTION MUST BE COMPLETED BY COUNSEL | | |
|---|---|---|
| CASE TITLE: | USCA DOCKET NUMBER: | COUNSEL'S NAME: |
| | DISTRICT/AGENCY: | COUNSEL'S ADDRESS: |
| | DISTRICT/AGENCY NUMBER: | DATE: |

Counsel for

_____

respectfully submits, pursuant to FRAP 39 (c) the within bill of costs and requests the Clerk to prepare an itemized statement of costs taxed against the

_____

and in favor of

_____

for insertion in the mandate.

Docketing Fee                                                                          _____

Costs of printing appendix (necessary copies _____ )          _____

Costs of printing brief (necessary copies _____ ___ )          _____

Costs of printing reply brief (necessary copies _____ )          _____


**(VERIFICATION HERE)**

                                                                          _____

                                                                          Signature


Rev. April, 2011

# Exhibit G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CARL BLESSING ET AL.,                          :
                                               :
         Plaintiffs,                           :
                                               :       09 CV 10035 (HB)
              - against -                       :
                                               :       OPINION &
SIRIUS XM RADIO INC.,                          :       ORDER
                                               :
         Defendant.                            :
------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge:**

 Before the Court is Plaintiffs-Appellees' ("Plaintiffs") motion pursuant to Rule 7 of the
Federal Rules of Appellate Procedure for an order requiring Appellants-Objectors ("Objectors") to
post a Bond in the amount of $200,000 or such other amount as the Court deems appropriate to cover
the Plaintiffs' potential costs and attorneys' fees that could result from Objectors' appeal from this
Court's Final Judgment and Order and Order Awarding Attorneys' Fees and Expenses, both entered
on August 25, 2011. The August 25, 2011 Orders concluded a class action against Sirius XM.
Objectors are Class Members who objected to approval of the Settlement Agreement and the award
of attorneys' fees and expenses to Class Counsel, and have appealed to the Second Circuit. For the
reasons set forth below, the Motion is DENIED.

### I. Costs Included in an Appeal Bond

 Under Rule 7 of the Federal Rules of Appellate Procedure, a district court "may require an
appellant to file a bond or provide other security in any form and amount necessary to ensure
payment of costs on appeal." Fed. R. App. Proc. 7. "The power to impose an appeal bond under Rule
7 has been specifically given to the discretion of the district court." *Adsani v. Miller*, 139 F.3d 67, 79
(2d Cir. 1998).

 The parties disagree about whether attorneys' fees may be included in the costs of an appeal
bond in this case. There are two potential bases for including attorneys' fees in an appeal bond: (1)
the substantive statute under which the appeal is sought provides for attorneys' fees "as part of the
costs" awarded to the prevailing party, *id.* at 75, or (2) the district court determines that the court of
appeals might award fees under Fed. R. App. P. 38 because the appeal is frivolous, regardless of
whether the underlying statute permits an attorneys' fee award. *In re Currency Conversion Fee
Antitrust Litig.*, 01 MDL No. 1409, 2010 U.S. Dist. LEXIS 27605, at *7 (S.D.N.Y. Mar. 5, 2010); *In*

1

*re AOL Time Warner, Inc., Sec. & "ERISA" Litig.*, 02 Cv. 5575, 2007 WL 2741033, at *4-5 (S.D.N.Y. Sept. 20, 2007).

Plaintiffs concede that the substantive statute under which the appeal is sought in this case, Section 4 of the Clayton Act, only provides a basis for requiring antitrust defendants to pay the attorneys' fees of successful antitrust plaintiffs and that attorneys' fees are not appropriately included in the Bond on this basis. Pls.' Reply 4; *In re Currency Conversion*, 2010 U.S. Dist. LEXIS 27605, at *7 (rejecting award of attorneys' fees on the basis of Section 4 of the Clayton Act because the Clayton Act provides for fees only to successful plaintiffs). However, Plaintiffs argue that attorneys' fees are appropriate under Fed. R. App. P. 38, because the appeal in this case is frivolous.

Appellate Rule 38 states that, "[i]f a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion on notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee." Fed. R. App. Proc. 38. Although some courts in other circuits have awarded fees under Rule 38 where they found that the court of appeals might make a determination that the appeal was frivolous, courts in the Second Circuit have found that "the imposition of sanctions is a question for the Court of Appeals to determine." *In re Currency Conversion*, 2010 U.S. Dist. LEXIS 27605, at *8-9 (finding that Rule 38 was not a basis for including attorneys' fees in the bond); *In re Initial Public Offering Sec. Litig.*, 728 F. Supp. 2d 289, 297 (S.D.N.Y. 2010) (same); *In re AOL Time Warner*, 2007 WL 2741033, at *4-5 (same). Because an award of attorneys' fees under Rule 38 would impermissibly infringe on the authority given to the Second Circuit under Rule 38, I would not include attorneys' fees in any possible bond award.[1]

## II. Appropriateness of a Bond

In deciding whether to grant a motion for an appeal bond, courts consider several nonexhaustive factors including, "(1) the appellant's financial ability to post a bond, (2) the risk that the appellant would not pay appellee's costs if the appellant loses, (3) the merits of the appeal, and

---

[1] Plaintiffs' argument that *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 124 (S.D.N.Y. 1999) is "[o]n all fours with the instant case" is unpersuasive. *NASDAQ* was an antitrust case in which the district court included attorneys' fees in a Rule 7 bond. *Id.* at 128. However, that case—incorrectly in my view—included attorneys' fees in the bond on the basis of the underlying statute, the Clayton Act, not under Rule 38. *Id.* As Plaintiffs concede, and as numerous other courts in this Circuit have concluded, the inclusion of attorneys' fees in a bond on the basis of a statute that is not a fee-shifting statute, such as the Clayton Act, is not proper. *See, e.g., In re Currency Conversion*, 2010 U.S. Dist. LEXIS 27605, at *7 (rejecting award of attorneys' fees on the basis of Section 4 of the Clayton Act because the Clayton Act provides for fees only to successful plaintiffs); *In re Initial Public Offering Sec. Litig.*, 728 F. Supp. 2d at 297 (rejecting award of attorneys' fees on the basis of Section 11(e) of the 1933 Securities Act because "section 11(e) is not a fee-shifting statute"). Moreover, in the only section where *NASDAQ* refers to Rule 38, it does so in a manner that undercuts, rather than supports, Plaintiffs' argument. 187 F.R.D. at 128 n.4 (rejecting plaintiffs argument that the bond should secure double costs on appeal pursuant to Rule 38 because "it is for the court of appeals and not the district court to decide whether Rule 38 costs and damages should be allowed in any given case") (internal quotation marks and citation omitted).

(4) whether the appellant has shown any bad faith or vexatious conduct." *Baker v. Urban Outfitters Wholesale, Inc.*, 01cv5440, 2006 U.S. Dist. LEXIS 90120, at *1 (S.D.N.Y. Dec. 12, 2006).

## A. Financial Ability to Post a Bond

A finding that an appellant is financially unable to post a bond might weigh against the imposition of an appeal bond in a specific case. *Adsani*, 139 F.3d at 77, 79 (noting that "Government's power to 'close its courts' by imposing fees upon appeal . . . is not unlimited" but finding that the appellant had not made a showing of "financial hardship"); *In re Initial Public Offering*, 728 F. Supp. at 293 (finding appellant was not arguing that it lacked the financial ability to post a bond where no financial information was submitted ); *In re AOL Time Warner*, 2007 WL 2741033, at *2 (same).

None of the Objectors provide specific financial information detailing their inability to post a bond, and in fact, just one of the Objectors states that joint and several liability for a $200,000 bond would make pursuing this appeal nearly impossible for him. *See* Ireland Opp. Memo 6 ("This Appellant can pay a small cost bond . . . [h]owever, in his wildest dreams, Appellant does not have the means to post a cost bond for $200,000."). Because none of the other Objectors state that they would be unable to pay a $200,000 bond, I find, as have other courts to examine the issue, that the other Objectors are not opposing the bond on this basis. *See In re Initial Public Offering*, 728 F. Supp. 2d at 293; *In re AOL Time Warner*, 2007 WL 2741033, at *2. Further, although Ireland specifically states that he could not afford a $200,000 bond, he could pay a "small cost bond." Ireland Opp. Memo 6. Plaintiffs have not taken the trouble to separate out the portion of the bond attributable to potential attorneys' fees from the portion attributable to potential costs. However, a bond including only a provision for costs would likely be substantially smaller than $200,000,[2] and alleviate any risk of chilling the Objectors' right to appeal. *Adsani*, 139 F.3d at 79. In short, the Objectors would have the financial ability to post a substantially smaller bond limited to Plaintiffs' potential costs; however, for the reasons below, I find such a bond unnecessary.

## B. Risk of Objectors' Nonpayment

Plaintiffs have failed to demonstrate that there is a substantial risk of nonpayment of appeal costs by the Objectors, merely noting that appellants are scattered around the country. Pls.' Reply 2. Furthermore, Plaintiffs appear far more concerned with ensuring that they have "a bond to secure any award of attorneys' fees," which as noted above is not permissible in this case, than they are with securing any potential award for costs. Although some courts have found a significant risk of

---

[2] Although in reply, Plaintiffs argue that the bond would be "substantial" even if it were limited to costs, they again fail to provide any estimate of the separate amount attributable to fees versus costs.

3

nonpayment merely because the appellants were "dispersed around the country," *see In re Currency Conversion*, 2010 U.S. Dist. LEXIS 27605, at *5; *In re Initial Public Offering*, 728 F. Supp. 2d at 293, other courts have found a legitimate risk of nonpayment, and consequently imposed a bond, where specific facts established a substantial likelihood of nonpayment. *Adsani*, 139 F.3d at 70 (finding risk of nonpayment when appellant had no assets in the United States); *Tri-Star Pictures, Inc. v. Unger*, 32 F. Supp. 2d 144, 147 (S.D.N.Y. 1999) (same); *Baker v. Urban Outfitters Wholesale, Inc.*, 2006 U.S. Dist. LEXIS 90120, at *3 (finding risk of nonpayment established where appellant had failed to comply with previous court order to pay costs). Plaintiffs have not shown a significant risk of nonpayment, especially in light of the fact that any bond in this case would not include attorneys' fees and so would be substantially smaller than the $200,000 Plaintiffs request. *In re Air Cargo Shipping Services Antitrust Litig.*, 06-MD-1775, 2010 WL 1049269, at *2 (E.D.N.Y. Mar. 22, 2010) (finding the small amount of the possible bond, which would not include requested attorneys' fees, "considerably reduces any financial risk").

## C. The Merits of the Appeal

Naturally, this appeal in my view lacks merit, a factor weighing in favor of requiring a bond. *Baker v. Urban Outfitters Wholesale, Inc.*, 2006 U.S. Dist. LEXIS 90120, at *3. The settlement resulted from extensive negotiations and followed a fairness hearing at which objectors were heard; I find it unlikely that the Objectors will succeed.

## D. Bad Faith or Vexatious Conduct

Although the Plaintiffs characterize several of the attorneys involved in this appeal as "professional objectors," I do not find that they have exhibited any bad faith or vexatious conduct in filing this appeal or in the litigation in general. *Id.* Merely characterizing some of the attorneys as "professional objectors" without specifying what, exactly, they have done that is either in bad faith or vexatious, is not enough. *Compare In re Air Cargo Shipping Services Antitrust Litig.*, 2010 WL 1049269, at *3 (finding that although plaintiffs characterized one attorney as a professional objector and noted vexatious conduct he had engaged in during earlier litigation, "in my judgment, that is insufficient to support a finding in this case") *with In re Initial Public Offering*, 728 F. Supp. 2d at 294-95 (finding vexatious conduct where, in addition to the fact that attorneys were professional objectors, one attorney had sought an exorbitant fee from Class Counsel in exchange for withdrawing their appeal and several others had refused to comply with the court's orders); *In re AOL Time Warner*, 2007 WL 2741033, at *3 (finding some evidence of bad faith or vexatious conduct where non-class member tried to "extract a settlement from the Plaintiff, but it failed to provide the information necessary to complete the extraction").

### E. A Bond is Inappropriate

Although it is unlikely that the Objectors will succeed in their appeal, Plaintiffs have failed to demonstrate either that there is a significant risk of nonpayment or that the Objectors have engaged in bad faith or vexatious conduct. *In re Air Cargo Shipping Services Antitrust Litig.*, 2010 WL 1049269, at *3 (rejecting an appeal bond where the objectors were "unlikely to prevail on appeal" but "I find that the low risk of nonpayment and the lack of bad faith by the appellants obviate the need for an appeal bond in this case").

### Conclusion

For the reasons stated above, the Plaintiffs-Appellees' motion to require Objectors-Appellants to Post an Appeal Bond is DENIED. The clerk of the Court is instructed to close the motion and remove it from my docket.

**SO ORDERED**

November 2∤, 2011
New York, New York

Hon. Harold Baer, Jr.
U.S.D.J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK                    FOR ELECTRONIC PUBLICATION
                                                ONLY

-----------------------------------------------------------x

IN RE AIR CARGO SHIPPING SERVICES               MEMORANDUM AND
ANTITRUST LITIGATION                            ORDER
                                                06-MD-1775 (JG)(VVP)

-----------------------------------------------------------x

A P P E A R A N C E S:

        LABATON SUCHAROW LLP
        140 Broadway
        New York, New York 10005
        By:     Jay L. Himes
        *Attorneys for Plaintiffs-Movants*

        CLASS ACTION FAIRNESS GROUP
        2 Clock Tower Place, Suite 440
        Maynard, Massachusetts 01754
        By:     John J. Pentz
        *Attorneys for Brickman Concerts, Inc. and I.O.D. Group LLC*

JOHN GLEESON, United States District Judge:

        This multi-district antitrust litigation stems from an investigation by governmental

authorities of worldwide price-fixing activity in the air cargo industry.  On September 11, 2006,

Deutsche Lufthansa AG, Lufthansa Cargo AG, and Swiss International Air Lines Ltd.

(collectively, "Lufthansa") and the plaintiffs executed a settlement agreement in which Lufthansa

agreed to pay class members $85 million and provide cooperation in exchange for a release of all

claims related to the alleged price-fixing conspiracy.  On September 25, 2009, I filed a

memorandum and order approving the settlement agreement and allocation plan.  Final judgment

was entered on October 6, 2009.  On November 2, 2009, two class members, Brickman

Concerts, Inc. ("Brickman") and I.O.D. Group LLC ("I.O.D.") appealed my order approving the

settlement agreement and allocation plan.  On December 23, 2009, the plaintiffs filed a motion

for an order directing Brickman and I.O.D. to post an appeal bond to cover the plaintiffs' costs on appeal. Lufthansa joined the plaintiffs in this motion. On January 8, 2010, Brickman and I.O.D. filed their opposition to the plaintiffs' request. I heard oral argument on January 15, 2010. For the reasons stated below, the plaintiffs' and Lufthansa's motion for an appeal bond is denied.

BACKGROUND

The facts of this multi-district litigation have been set forth more fully in several prior opinions of the Court, familiarity with which is assumed.

On July 13, 2007, the proposed settlement agreement between Lufthansa and the plaintiffs ("Lufthansa settlement agreement") was submitted for preliminary approval. On March 14, 2008, Judge Viktor Pohorelsky entered a Report and Recommendation recommending preliminary approval. On April 4, 2008, I entered an order preliminarily approving the settlement, certifying the class, appointing settlement class counsel and directing settlement class counsel to issue notice of the proposed Lufthansa settlement to potential class members.

Only a handful of class members objected to the settlement, including Brickman and I.O.D., who objected to the allocation of the settlement plan funds. They argued that a portion of the settlement funds was improperly allocated to foreign purchasers, whose claims, according to the objectors, were barred by the Foreign Trade Antitrust Improvements Act ("FTAIA") of 1982, 15 U.S.C. §6a (2000). In an order dated August 21, 2009, I addressed this issue and held that the foreign-purchaser claims are not barred by the FTAIA. I also noted in my order approving the Lufthansa settlement that it was not necessary to determine which party would have prevailed on the underlying foreign purchaser claims because the critical question was whether the settlement reflected a reasonable compromise. After holding a fairness hearing on December 12, 2008, and after directing and considering supplemental submissions by the

2

parties, I found that the settlement reflected a reasonable compromise, and I approved it in an

order dated September 25, 2009.

## DISCUSSION

A.    *Costs Included in an Appeal Bond*

Rule 7 of the Federal Rules of Appellate Procedure provides that "[i]n a civil

case, the district court may require an appellant to file a bond or provide other security in any

form and amount necessary to ensure payment of costs on appeal." Fed. R. App. P. 7. "The

power to impose an appeal bond under Rule 7 has been specifically given to the discretion of the

district court." *Adsani v. Miller*, 139 F.3d 67, 79 (2d Cir. 1998).

The parties disagree about the meaning of "costs on appeal" in this case. The

plaintiffs seek an appeal bond in the amount of $216,160, which includes attorneys' fees, delay

damages, and taxable costs. Brickman and I.O.D. argue that attorneys' fees and delay damages

cannot be included in an appeal bond in this case. I agree.

The Second Circuit has held that "costs on appeal' may include the definition of

'costs' contained in the relevant substantive statute under which appeal is sought and are not

limited by the enumeration of some 'costs' found in Rule 39." *Adsani*, 139 F.3d at 75 n. 9.

Thus, the Court held that attorney's fees could be included in the appeal bond where the relevant

statute provides for the award of such fees to the "prevailing party." *Id.* at 71 (citing 17 U.S.C. §

505). Here, however, the statute at issue -- § 4 of the Clayton Act -- does not allow for

attorney's fees and costs to the "prevailing party," but rather to "any person who [is] injured in

his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15.

Pursuant to the statute, therefore, the plaintiffs and Lufthansa could not recover attorney's fees or

costs from Brickman and I.O.D., or other members of the plaintiff class. *See Azizian v.*

*Federated Dep't Stores, Inc.,* 499 F.3d 950, 959 (9th Circ. 2007); *see also In re AOL Time Warner, Inc.,* 02-CV-5575, 2007 WL 2741033, at *4 (S.D.N.Y. Sept. 20, 2007)(holding delay damages cannot be included in appeal bond because underlying statute does not provide for the inclusion of such costs). Accordingly, the appeal bond may not include attorney's fees or delay damages. The remaining costs at issue are the taxable costs of the appeal, for which the plaintiffs request $785.88.

B.      *The Plaintiffs' Motion for an Appeal Bond*

Courts consider several factors when determining whether to order an appellant to post an appeal bond: (1) the financial ability of the appellants to post the bond; (2) the risk of the appellants' nonpayment if the appeal is unsuccessful; (3) the merits of the appeal; and (4) whether the appellants' have shown "bad faith or vexatious conduct." *Baker v. Urban Outfitters, Inc.,* 01-CV-5440, 2006 WL 3635392, at *1 (S.D.N.Y. Dec. 12, 2006).

In this case, Brickman and I.O.D. have not submitted any financial information and, thus, I conclude that the appellants have the financial ability to post the requested bond. Second, the plaintiffs have not shown that there is any risk of nonpayment of the appeal's costs by Brickman and I.O.D.   In a footnote in their submission, the plaintiffs argue that Brickman and I.O.D. are unlikely to pay costs awarded against them on appeal, because they do not have any financial interest at stake in the litigation. I find this argument insufficient to establish a real risk of nonpayment. *See Baker,* 2006 WL 3635392, at *1 (risk of nonpayment found when appellant had failed to comply with previous court order to pay costs); *Adsani,* 139 F.3d at 70 (risk of nonpayment found when appellant had no assets in the United States). Furthermore, the small amount of the possible bond, $785.88, considerably reduces any financial risk to the plaintiffs and Lufthansa.

As to the merits of the appeal, I will surprise no one by saying that, in my view, it lacks merit and that the plaintiffs and Lufthansa will prevail.[1] The settlement and allocation plan were the result of extensive negotiations on the part of the parties and a fairness hearing in which the objections of Brickman and I.O.D. were considered.

Lastly, though as the plaintiffs characterize John Pentz as a professional objector, I do not find that he or the parties he represents have engaged in "bad faith or vexatious conduct" in this litigation. The plaintiffs point to such conduct in other similar litigations, but in my judgment, that is insufficient to support a finding in this case. *See In re NASDAQ Market-Maketers,* 94-CV-3996, 1999 U.S. Dist. LEXIS 7740, at *8 (S.D.N.Y. May 24, 1999)(finding bad faith and vexatious conduct where appellant filed repeated motions in class action for "his own unrelated purposes"); *In re AOL Time Warner,* 2007 WL 2741033, at *3 (finding some evidence of bad faith and vexatious conduct where non-class member "attempt[ed] to extract a settlement from the [p]laintiff, but it failed to provide the information necessary to complete the extraction").

CONCLUSION

Although I find that Brickman and I.O.D. are unlikely to prevail on appeal, I find that the low risk of nonpayment and the lack of bad faith by the appellants obviate the need for an appeal bond in this case. Accordingly, the plaintiffs' and Lufthansa's motion is denied.

So Ordered.
John Gleeson, U.S.D.J.

Date:   March 22, 2010
        Brooklyn, New York

---

[1] The plaintiffs argue that the appeal is frivolous. The Second Circuit may, pursuant to Rule 38 of the Federal Rules of Appellate Procedure, determine that the appeal is frivolous and award "damages and single or double costs" to the plaintiffs and Lufthansa. Fed. R. App. P. 38. However, "it is for the court of appeals and not the district court to decide whether Rule 38 costs and damages should be allowed in any given case." *In re American President Lines, Inc.,* 779 F.2d 714, 717 (D.C. Cir. 1985).

# Exhibit H

# KEY DEVELOPMENTS

- **December 20, 2013:** Fourth Distribution of Settlement Fund (including proceeds of supplemental settlement with Arthur Andersen) made in accordance with Court's Prior Orders.

- **December 14, 2012:** Judge Cote Grants Final Approval to Settlement of Contingent Payment Claim with Arthur Andersen LLP. Click here to view the Court's Judgment approving the Settlement. Click here to view the Court's Judgment approving the Settlement.

- **October 2, 2012:** Judge Cote Preliminarily Approves Proposed Settlement of Contingent Payment Claim with Arthur Andersen LLP and Schedules Settlement Hearing for December 14, 2012. Click here to view the Court's order.

- **March 26, 2010:** Third Distribution of Settlement Fund Made in Accordance with Court Order of September 18, 2009.

- **September 18, 2009:** Judge Cote Grants Approval of the Final Distribution Plan. Click here to view the Court's order.

- **February 15, 2008:** Second Distribution of Settlement Fund Made in Accordance with Court Order of January 23, 2008.

- **January 23, 2008:** Judge Cote Grants Approval of Second Distribution of Net Settlement Fund. Click here to view the Court's order.

- **December 15, 2006:** Initial Distribution of 75% of Settlement Fund Made in Accordance with Court Order of November 29, 2006. Click here to view the Notice of Initial Distribution of Net Settlement Fund.

- **November 29, 2006:** Judge Cote Grants Approval of Initial Distribution of 75% of Settlement Fund. Click here to view the Court's order.

- **November 21, 2006:** Lead Plaintiff Files Motion to Allow an Initial Distribution of the Settlement Fund for Authorized Claimants who Filed Their Claim Forms by the June 15, 2006 Deadline, Seeking to Distribute 75% of the Settlement Fund.

- **June 20, 2006:** Judge Cote Orders an Extension of the Deadline for Submitting Proof of Claim Forms until June 15, 2006. Click here to view the Court's order.

- **September 21, 2005:** Judge Cote Grants Final Approval of All of Settlements Reached in the WorldCom Securities Litigation. Click on the links below to view:
  > 09/21/05 - Judgment Approving the Underwriter Settlements and Dismissing the Action Against the Settling Underwriter Defendants
  > 09/21/05 - Judgment Approving Settlement and Dismissing Action Against Arthur Andersen LLP
  > 09/21/05 - Judgment Approving Settlement and Dismissing Action Against the Director Defendants
  > 09/21/05 - Order Approving Settlement and Dismissing Action Against Bernard Ebbers
  > 09/21/05 - Order Approving Settlement and Dismissing Action Against Scott D. Sullivan
  > 09/21/05 - Judgment Approving Settlement and Dismissing Action Against Buford Yates and David Myers
  > 09/21/05 - Order Approving Lead Plaintiff's Plans of Allocation with Respect to Settlements with the Underwriter Defendants
  > 09/21/05 - Order Approving Lead Plaintiff's Plans of Allocation with Respect to Settlements with the Director Defendants, Arthur Andersen LLP, Bernard Ebbers and Scott Sullivan
  The total recovery for the Class stands at $6.13 billion, plus interest.

- **June 14, 2005:** Judge Cote Issues Hearing Order Providing Requirements for Mailing and Publication of Settlement Documents; Setting Deadlines for Filing of Briefs, Affidavits and Objections Relating to Settlements; Extending Deadline for Claim Form Submittal to August 26, 2005; and Scheduling Final Settlement Hearing for September 9, 2005. Click here to view the Court's order.

- **January 18, 2005:** Judge Cote Denies Partial Motion for Summary Judgment of Arthur Andersen, Requiring Andersen to Stand Trial. Click here to view the Court's order.

- **December 15, 2004:** Judge Cote Issues Summary Judgment Decision Clearing Way for February 2005 Trial Against the Underwriter Defendants; Also Grants Partial Summary Judgment to Lead Plaintiff, Finding 2001 Registration Statement Materially False and Misleading. Click here to view the Court's order.

- October 25, 2004: Judge Cote Sets New Trial Date - to Begin February 28, 2005. Click here to view the Court's order.

- July 8, 2004: Second Circuit Court of Appeals Denies Defendant's Petition for a Writ of Mandamus; Trial Date Remains Scheduled for January 10, 2005. Click here to view the Court's order.

- May 10, 2004: **Citigroup Defendants Agree to Pay $2.65 Billion to Settle All Claims Against Them in WorldCom Securities Litigation.** Click here for details on the Citigroup settlement and click here to see the answers to frequently asked questions regarding the Citigroup settlement. Click here to view the press release of Lead Plaintiff the New York State Common Retirement Fund.

- April 16, 2004: Securities and Exchange Commission files Amicus Curiae ("Friend of the Court") Brief Regarding the Proper Interpretation of the Fraud-on-the-Market Presumption Under Section 10(b) of the Securities Exchange Act of 1934 Supporting the Plaintiff and Opposing Salomon Smith Barney in the Second Circuit Court of Appeals. To view the SEC's Amicus Curiae Brief, click here.

- December 11, 2003: Judge Cote Issues Notice of Class Action and Notice to All Investors Who Have Filed Individual WorldCom Actions. See Class Notices page.

- November 21, 2003: Judge Cote Issues Opinion and Order Granting in Part and Denying in Part the Underwriter Defendants' Motions to Dismiss Claims Filed in State of Alaska Dep't of Revenue, and Granting Director Defendants' and Ebbers' Motions to Dismiss With Prejudice. See Opinion & Order.

- November 17, 2003: Judge Cote Issues Order Responding to Lead Plaintiff's October 29, 2003 Letter Regarding Milberg Weiss' Solicitations of Class Members, and Allows Lead Plaintiff to Circulate a Curative Notice Which Will Be Mailed to Each Plaintiff Who Has Filed an Individual Action. To view the order, click here.

- October 24, 2003: Judge Cote Issues Opinion and Order Granting Lead Plaintiff's Motion for Class Certification. To view the opinion, click here.

- August 1, 2003: Lead Plaintiff, on behalf of the Class, files the First Amended Class Action Complaint in the WorldCom Securities Litigation. To view the complaint, click here.

- June 24, 2003: Judge Cote rules that Arthur Andersen LLP will remain a defendant in the WorldCom Securities Litigation and dismisses the claims against Arthur Andersen (United Kingdom), Andersen Worldwide Societe Cooperative, Melvin Dick and Mark Schoppet. See Opinion & Order.

- May 28, 2003: Judge Cote issues a memorandum opinion and consolidation order finalizing the consolidation of the class actions and the individual actions for pre-trial purposes. See Memorandum Opinion & Consolidation Order.

- May 22, 2003: Judge Cote issues an opinion explaining how the class actions and individual actions will be consolidated for pre-trial purposes. See Opinion.

- May 20, 2003: Judge Cote denies third application of certain individual plaintiffs to remand their cases to state court. See Opinion.

- May 19, 2003: Judge Cote denies, in major part, the motions to dismiss the Complaint filed by the Salomon Defendants, the Director Defendants, the Underwriter Defendants and Bernard J. Ebbers. See Opinion.

- May 13, 2003: Lead Plaintiff files its opposition to WorldCom's disclosure statement in United States Bankruptcy Court. See Opposition.

- May 5, 2003: Judge Cote denies motions by plaintiffs in certain individual actions to remand their cases to state court, citing her Opinion dated March 3, 2003. See Opinion.

- April 17, 2003: The United States Attorney's Office files additional criminal charges against Scott Sullivan, adding two new counts of bank fraud and two counts of making false statements in connection with loan and credit applications to the existing indictment.

- March 28, 2003: Judge Lynch appoints Barrack, Rodos & Bacine and Bernstein Litowitz Berger & Grossmann LLP to serve as Co-Lead Counsel in the Salomon Analyst WorldCom Litigation. See Order. For more information about the Salomon Analyst Litigation, click here.

- March 24, 2003: Judge Cote denies the motion of defendants Salomon Smith Barney, Inc., Citigroup, Inc. and Jack Grubman to transfer certain of Lead Plaintiff's claims against them to the Salomon Analyst WorldCom Litigation. See Order.

- March 20, 2003: Judge Gerard Lynch appoints the New York State Common Retirement Fund to serve as Lead Plaintiff in the Salomon Analyst WorldCom Litigation. See Order. For more information about the Salomon Analyst Litigation, click here.

- March 3, 2003: Judge Cote denies the motion of the New York City Employees' Retirement System to remand its individual action to state court, holding that "judicial economy and efficiency are best served by exercising the jurisdiction that so clearly exists." See Opinion.

- January 24, 2003: Lead Plaintiff files its consolidated opposition to the five motions to dismiss in the WorldCom Securities Litigation. See Opposition.

- January 24, 2003: Judge Barbara Jones issues an order in the Salomon Analyst Litigation separating the cases by securities issuer. The order creates nine separate actions, including one called the Salomon Analyst WorldCom Litigation. See Order. For more information about the Salomon Analyst Litigation, click here.

- December 13, 2002: Five groups of defendants -- Bernard Ebbers, the Director Defendants, Arthur Andersen LLP and Melvin Dick, the Salomon Defendants, and the Underwriter Defendants -- file motions to dismiss certain of the claims against them in the WorldCom Securities Litigation.

- December 10, 2002: Lead Plaintiff files its opposition to the Salomon Defendants' motion to sever claims relating to Jack Grubman. See Opposition brief.

- December 5, 2002: Judge Cote grants the motions of defendants Scott Sullivan and David Myers to stay their involvement in the WorldCom Securities Litigation while they participate in related criminal proceedings in the Southern District of New York. See Order.

- November 21, 2002: Judge Cote grants Lead Plaintiff's motion and issues a landmark ruling that partially lifts the stay on discovery imposed by the Private Securities Litigation Reform Act of 1995, allowing Lead Plaintiff to obtain from WorldCom important documents that the Company had produced previously to Congress, the Securities & Exchange Commission, and the United States Attorney's Office. The order also paves the way for Lead Plaintiff to obtain additional documents from the law firm retained by WorldCom's Audit Committee to investigate the massive fraud at WorldCom, once the Audit Committee issues its report. See Order. Lead Plaintiff issues subpoena to WorldCom that same day. See Subpoena.

- November 21, 2002: Salomon Defendants move to sever claims relating to Jack Grubman from the WorldCom Securities Litigation and transfer them to the Salomon Analyst Litigation.

- November 8, 2002: The Bankruptcy Court grants Lead Plaintiff's motion for limited modification of the automatic stay, allowing Lead Plaintiff to obtain documents from WorldCom subject to the approval of the District Court. See Order.

- November 7, 2002: Judge Cote orders the parties in the WorldCom Securities Litigation to participate in settlement negotiations under the supervision of Magistrate Judge Michael H. Dolinger. See Order.

- November 5, 2002: WorldCom announces that the total amount of its misstated earnings may exceed $9 billion. To read more about the WorldCom fraud, click here.

- October 11, 2002: Lead Plaintiff, on behalf of the Class, files the Class Action Complaint in the WorldCom Securities Litigation. To view the complaint, click here. For a summary of the case, click here. For a list of the defendants in this case, click here.

- October 10, 2002: Betty Vinson and Troy Normand plead guilty to securities fraud and conspiracy to commit securities fraud. Vinson reveals in her plea allocution that the fraud was committed on the orders of WorldCom's senior management.

- October 8, 2002: The Judicial Panel on Multidistrict Litigation orders that 42 cases "arising out of alleged misrepresentations or omissions concerning WorldCom's financial condition and accounting practices" will be centralized in the Southern District of New York with the WorldCom Securities Litigation and WorldCom ERISA Litigation already pending before Judge Cote. See Order. For more information about the proceedings before the Panel and the WorldCom ERISA Litigation, click here.

- October 7, 2002: Buford Yates, Jr. pleads guilty to securities fraud and other felonies.

- October 2, 2002: Lead Plaintiff files a motion in United States Bankruptcy Court seeking permission to obtain important documents from WorldCom, which, because it filed for bankruptcy, is under the protection of the automatic stay. See Motion.

- September 26, 2002: David Myers, WorldCom's former Controller, pleads guilty to securities fraud and other felonies.

- August 15, 2002: Judge Denise Cote consolidates nineteen separate securities class actions, creating the WorldCom Securities Litigation, and appoints the New York State Common Retirement Fund to serve as Lead Plaintiff. Judge Cote also approves Lead Plaintiff's selection of Bernstein Litowitz Berger & Grossmann LLP and Barrack Rodos & Bacine as Co-Lead Counsel for the Class. See Order.

- August 8, 2002: Scott Sullivan, and Buford Yates, Jr. are indicted for securities fraud and other felonies in the Southern District of New York.

- August 8, 2002: WorldCom announces that it has discovered an additional $3.3 billion in misreported financial results, bringing the total amount of the admitted fraud to nearly $7.2 billion. To read more about the WorldCom fraud, click here.

- August 1, 2002: Scott Sullivan, and David Myers, WorldCom's former Controller, are arrested and charged with seven felonies, including securities fraud, conspiracy to commit securities fraud, and filing false statements with the Securities & Exchange Commission.

- July 21, 2002: WorldCom files the largest bankruptcy proceeding in United States history. For more information about WorldCom's bankruptcy proceeding, click here.

- June 25, 2002: WorldCom stuns the investing public by announcing that it would restate its earnings for 2001 and the first quarter of 2002 by $3.8 billion. To read more about the WorldCom fraud, click here.

# Exhibit I

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| IN RE TYCO INTERNATIONAL, LTD., SECURITIES LITIGATION | ) MDL Docket No. 02-1335-PB ) ) This document relates to: ) Securities Action ) Civil Action No. 02-266-PB |

### ORDER AUTHORIZING INITIAL DISTRIBUTION OF THE NET SETTLEMENT FUND

WHEREAS, by its Final Order Approving Settlement, Plan of Allocation and Attorneys' Fees and Expense Reimbursement Request dated December 19, 2007, this Court approved the terms of the Stipulation of Settlement With Tyco International, Ltd., Michael A. Ashcroft, Mark A. Belnick and PricewaterhouseCoopers LLP dated as of July 6, 2007 (the "Settlement Agreement") and the Plan of Allocation for distributing the settlement proceeds to Class Members; and

WHEREAS, this Court had directed the parties to consummate the terms of the Stipulation and Plan of Allocation; and

WHEREAS, the $3.2 billion cash settlement proceeds ($2.975 billion in cash on behalf of Tyco International, Ltd. ("Tyco"), Michael A. Ashcroft and Mark A. Belnick, and $225 million on behalf of PricewaterhouseCoopers LLP ("PwC")) have been deposited by the Defendants into segregated interest-bearing escrow accounts established by Co-Lead Counsel, on behalf of the Class (collectively, the "Settlement Fund"); and

WHEREAS, as set forth in the Notice of Proposed Settlement, Motion for Attorneys' Fees and Fairness Hearing (the "Notice"), the deadline for Class Members to submit Proof of

Claim and Release forms ("Proofs of Claim") in order to participate in the distribution of the Settlement Fund was December 28, 2007; and

WHEREAS, pursuant to Co-Lead Counsel's instruction, The Garden City Group, Inc. ("GCG"), the claims administrator for the Settlement, has continued to process Proofs of Claim received through August 31, 2008; and

WHEREAS, in satisfaction of due process requirements, all Class Members who filed claims that were in any way ineligible or deficient were: (1) informed that their claims were ineligible or deficient; and (2) given opportunities to correct any deficiency prior to their claims being finally rejected, or to contest the determination as to the deficiency, by requesting a hearing before the Court; and

WHEREAS, the process of reviewing all Proofs of Claim received through August 31, 2008 has been completed; and

WHEREAS, Co-Lead Counsel now seek authorization to make an initial distribution of the Net Settlement Fund to Authorized Claimants, after deduction of the fees and expenses previously approved by the Court, less any taxes due on the income earned on the fund and less the Reserve Fund (as defined below); and

WHEREAS, this Court has retained jurisdiction of this Action for the purpose of considering any further application or matter which may arise in connection with the administration and execution of the Settlement and the processing of Proofs of Claim and the distribution of the Net Settlement Fund to the Authorized Claimants;

NOW, THEREFORE, upon reading and filing: (i) the Affidavit of Stephen J. Cirami in Support of Lead Plaintiffs' Motion for Initial Distribution of the Net Settlement Fund (the "Cirami Affidavit") of GCG; (ii) the Joint Declaration of David Kessler of Barroway Topaz

Kessler Meltzer & Check, LLP, Jay W. Eisenhofer of Grant & Eisenhoffer P.A. and Sanford P. Dumain of Milberg LLP, Co-Lead Counsel for Lead Plaintiffs and the Class; and upon all prior proceedings heretofore had herein, and after due deliberation, it is hereby

ORDERED, that the administrative determinations of GCG accepting the claims as indicated on the computer printout of accepted claims submitted and described in the Cirami Affidavit, calculated under the Court-approved Plan of Allocation, including claims submitted after the original December 28, 2007 submission deadline through August 31, 2008, be and the same hereby are approved, and said claims are hereby accepted; and it is further

ORDERED, that the administrative determinations of GCG rejecting the claims as indicated on the computer printout of rejected claims submitted with and described in the Cirami Affidavit under the Court-approved Plan of Allocation be and the same hereby are approved, and said claims are hereby rejected; and it is further

ORDERED, that GCG continue to work with the 35 Disputed Rejected Claims which have outstanding requests for further review of their claims in an attempt to resolve these disputes, and continue to process Proofs of Claim received through February 20, 2009; and it is further

ORDERED, that in view of the additional time required to resolve the Disputed Rejected Claims, and so as not to delay payment to the large number of Class Members whose Proofs of Claim have already been found to be acceptable, a reserve fund, consisting of approximately ten percent (10%) of the amount otherwise payable to all Authorized Claimants whose *pro rata* payment, if 100% of the Net Settlement Fund was distributed, would have been more than $100.00 (the "Reserve Fund"),[1] shall be set aside for payment of, among other things: (i) any

---

[1] Authorized Claimants whose entire award would have been $100.00 or less will receive 100% of their payment at the time of the initial distribution, rather than 90%.

Disputed Rejected Claims that are ultimately accepted by the Court; (ii) any claims that, after the initial distribution, are found to have been underpaid or incorrectly calculated; (iii) any claims received by GCG after August 31, 2008 and on or before February 20, 2009, to the extent these claims may be approved by GCG and allowed by the Court; and (iv) the additional administrative fees and expenses relating to the final administration and distribution of the balance of the Settlement Fund; and it is further

ORDERED, that the balance of the Settlement Fund less the Reserve Fund and after deducting the payments previously allowed and set forth herein (the "Net Settlement Fund") shall be distributed to the Authorized Claimants listed on the computer printout submitted with the Cirami Affidavit under the Court-approved Plan of Allocation in proportion to each Authorized Claimant's Recognized Claim as compared to the total Recognized Claim of all accepted claimants as shown on such printout; and it is further

ORDERED, that the distributions to the Authorized Claimants shall bear the notation "CASH PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION 180 DAYS AFTER DISTRIBUTION DATE." Co-Lead Counsel and GCG are authorized to take appropriate action to locate and/or contact any Authorized Claimant who has not cashed his, her or its distribution within said time; and it is further

ORDERED, that following GCG's efforts to resolve the 35 Disputed Rejected Claims and the processing of any additional Proofs of Claims received through February 20, 2009, Co-Lead Counsel shall present to the Court for review GCG's administrative determinations regarding the Disputed Rejected Claims, the claims received through February 20, 2009 and any other claim revisions; and it is further

4

ORDERED, that this Court retain jurisdiction over any further application or matter
which may arise in connection with this Action.

Dated: 2-3-09

PAUL J. BARBADORO
UNITED STATES DISTRICT JUDGE

5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**In Re Tyco International, Ltd.**
**Securities Litigation**

MDL Docket No. 02-1335-PB
This document relates to:
Securities Action
Civil Action No. 02-266-PB

**ORDER RE: FINAL CLASS DISTRIBUTION OF**
**THE SETTLEMENT FUNDS**

WHEREAS, by its Final Order Approving Settlement, Plan of Allocation and Attorneys' Fees and Expense Reimbursement Request dated December 19, 2007, this Court approved the terms of the Stipulation of Settlement With Tyco International, Ltd., Michael A. Ashcroft, Mark A. Belnick and PricewaterhouseCoopers LLP dated as of July 6, 2007 and the Plan of Allocation for distributing the settlement proceeds to Class Members; and

WHEREAS, by Order Authorizing Initial Distribution of the Net Settlement Fund dated February 3, 2009 (the "Initial Distribution Order"), this Court approved the administrative determinations of the Claims Administrator, The Garden City Group, Inc. ("GCG") accepting and rejecting most of the Proofs of Claim submitted herein, including claims submitted after the initial deadline of December 28, 2007 through August 31, 2008, except for 35 Disputed Rejected Claims which were to be further developed, and authorized GCG to continue to process any

additional claims submitted after August 31, 2008 through February 20, 2009, and

WHEREAS, the Initial Distribution Order directed a distribution to the then accepted claimants, but withheld a reserve fund of ten percent (10%) of the amount otherwise payable to all Authorized Claimants whose *pro rata* payment, if 100% of the Net Settlement Fund was distributed, would have been more than $100.00 (the "Reserve Fund")[1]; and

WHEREAS, the process of reviewing the 35 Disputed Rejected Claims has been completed as described in the Affidavit of George A. Bauer III Reporting on Disputed Rejected Claims and in Support of Lead Plaintiffs' Motion for an Order Authorizing Distribution of the Reserve and Residual Settlement Funds (the "Bauer Affidavit"); and

WHEREAS, as described in the Affidavit of Stephen J. Cirami in Support of Lead Plaintiffs' Motion for Orders: Approving Resolution of Disputed Rejected Claims; Approving Additional Payments on Adjusted Claims; Authorizing Acceptance of All Claims Initially Submitted Through June 30, 2010; Approving Payment of Remaining Claims Administration Expenses; and Directing

---

[1] Aughotized Claimants whose entire award was $100.00 or less received 100% of their payment at the time of the initial distribution, rather than 90%.

Distribution of the Reserve and Residual Settlement Funds (the "Cirami Affidavit"), GCG has completed the processing of the claims initially submitted after August 31, 2008 through February 20, 2009, and has also processed additional claims through June 30, 2010; and

WHEREAS, as also described in the Cirami Affidavit, after the initial distribution a number of claims were found to have been underpaid or incorrectly calculated, and are entitled to additional amounts; and

WHEREAS, Plaintiffs' Co-Lead Counsel now seek authorization to: (I) make an initial distribution from the Reserve Fund to the claimants that have been accepted from: the 35 Disputed Rejected Claims, the Proofs of Claim received from August 31, 2008 through February 20, 2009, and the Proofs of Claim received from February 21, 2009 through June 30, 2010; (ii) to pay the Claims Administrator the remaining fees and expenses it has incurred and will incur to make the distributions requested herein; and (iii) make a supplemental distribution as provided in the Plan of Allocation previously approved by the Court, of all funds remaining in the Net Settlement Fund after the foregoing payments to the claimants who were previously (or are now being) paid based upon 90% of their estimated entitlements; and

WHEREAS, this Court has retained jurisdiction of this Action

-3-

for the purpose of considering any further application or matter which may arise in connection with the administration and execution of the Settlement and the processing of Proofs of Claim and the distribution of the Net Settlement Fund to the Authorized Claimants;

NOW, THEREFORE, upon reading and filing: (I) the Cirami Affidavit; (ii) the Bauer Affidavit; and upon all prior proceedings heretofore had herein, and after due deliberation, it is hereby

ORDERED, that the determinations of Plaintiffs' Co-Lead Counsel and GCG accepting and rejecting the 35 Disputed Rejected Claims, as described in the Bauer Affidavit, and accepting and rejecting the Proofs of Claim received from August 31, 2008 through February 20, 2009, and accepting and rejecting the Proofs of Claim received from February 21, 2009 through June 30, 2010, as indicated on the computer printouts of accepted and rejected claims submitted and described in the Cirami Affidavit, be and the same hereby are approved, and said claims are hereby accepted or rejected as indicated in the printout; and it is further

ORDERED, that the claimants accepted pursuant to the foregoing Order shall be paid from the Settlement Fund amounts equivalent to the amounts paid to accepted claimants in the initial distribution, based upon their Recognized Claims; and it

-4-

is further

ORDERED, that a supplemental distribution be made to the claimants that were found to have been underpaid; which distributions shall be made in amounts to bring them up to the equivalent to the amounts paid to accepted claimants in the initial distribution; and it is further

ORDERED, that GCG be paid the sum of $815,232.64 from the Settlement Fund for its fees and expenses incurred and to be incurred in connection with the services performed and to be performed from February 1, 2009 through June 30, 2010, and its fees and expenses expected to be incurred in connection with the forthcoming distribution, as described in the accompanying Cirami Affidavit; and it is further

ORDERED, that any funds remaining in the Net Settlement Fund by reason of returned or unpaid distributions or otherwise, including the remaining portion of the Reserve Fund not used to pay claimants accepted by the foregoing paragraphs, and administration fees and expenses, is to be proportionately re-distributed to eligible claimants who have cashed their initial distributions (or are now receiving their initial distributions) and who were (or are now being) paid 90% of their estimated entitlements; and it is further

-5-

ORDERED, that, as provided in the Plan of Allocation previously approved by the Court, if six months after such re-distribution, sufficient funds remain in the Cash Settlement Accounts, to economically make a further re-distribution, then such funds shall be further re-distributed to Authorized Claimants who have cashed their most recent re-distribution and who would receive at least $10.00 from such further re-distribution, after payment of any unpaid costs or fees incurred in administering the Cash Settlement Accounts for such re-distribution. The redistributions shall continue until the residue is less than $500,000 or it becomes economically unfeasible to continue re-distributions based upon the costs associated with such re-distributions, after which such balance shall be contributed to non-sectarian, not-for-profit 501(c)(3) organization(s) to be designated by Plaintiffs' Co-Lead Counsel with the consent of Tyco and PwC, such consent not to be unreasonably withheld; and it is further

ORDERED, that the distributions to all the Authorized Claimants shall bear the notation "CASH PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION 180 DAYS AFTER DISTRIBUTION DATE." Plaintiffs' Co-Lead Counsel and GCG are authorized to take appropriate action to locate and/or contact any Authorized Claimant who has not cashed his, her or its distribution within

-6-

said time; and it is further

ORDERED, that no claim submitted, and no deficient claim corrected, after June 30, 2010 may be accepted for any reason whatsoever, except to the extent that the claimant has sought an adjustment of its claim and, after the date that this order issues, the claimant has (1) received a notice from the Claims Administrator stating that its request for adjustment has been denied, and (2) filed a timely objection with the court; and it is further

ORDERED, that this Court retain jurisdiction over any further application or matter which may arise in connection with this Action.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

July 22, 2010

cc:  Counsel of Record

-7-

# Exhibit J

 Gmail

**J GIELATA <gielata@gmail.com>**

---

## Petrobras - Draft Stipulation

3 messages

---

**Brenda Szydlo <bszydlo@pomlaw.com>**                    Thu, Aug 2, 2018 at 1:32 PM
To: Joseph Gielata <gielata@gmail.com>

Joseph:

Judge Rakoff has encouraged Objectors/Appellants to seek an expedited appeal.  While you were away on vacation, this was the subject of our call with Judge Rakoff on Wednesday, August 1.  As such, attached is a draft stipulation for your review.  Please let me know no later than Monday, August 6 at 5:00 pm (EST) whether you and your parents are willing to sign it.  If you have any proposed edits (other than with respect to timing), please let me know.

Regards,

Brenda

Brenda Szydlo

**POMERANTZLLP**

600 Third Avenue, 20th Floor

New York, NY 10016

Tel: 646-581-9996

bszydlo@pomlaw.com

Legal Assistant: Ariana Barbosa

abarbosa@pomlaw.com

This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified any dissemination, distribution or copying of this email, and any attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify me at (212) 661-1100 and permanently delete all copies of the email and any attachments.

📄 **Draft Gielata Stipulation - Expedited Appeal (00289020-2xC40C2).docx**
24K

---

**Joseph Gielata <gielata@gmail.com>**                    Mon, Aug 6, 2018 at 8:10 AM
To: Brenda Szydlo <bszydlo@pomlaw.com>

Brenda,

I am willing to agree to an expedited briefing schedule for the appeals, but Rule 31.2(b) is obviously inapplicable.  It is also unnecessary, as the parties are expected to propose deadlines for briefs, and we don't require a district court order

to agree upon an appellate court briefing schedule.

The various anticipated Rule 11 and cost bond motions are an impediment to an expedited schedule as they will consume considerable time and attention in the coming weeks. All that motion practice is slowing things down substantially since I cannot fully concentrate on the appeal brief until those issues are briefed and decided, and the rulings on those motions may themselves necessitate further appeals. If class counsel decides against filing those motions (and the Rule 11 motions are certainly untimely as they should have been served and filed back in May, if at all), then let's discuss an expedited briefing schedule.

Here is another option to accelerate the distribution of the settlement: in many of the largest settlements there are two distributions, usually a large one and then a smaller one after resolution of disputed claims, etc. Even if the appellate court reverses on the Amchem issue, or on the attorneys' fees issue, I believe it would still be feasible to distribute, say, 2/3 of the settlement initially. Please let me know your thoughts on this idea. We could enter into an appropriate stipulation to facilitate such a process.

-Joe
[Quoted text hidden]

---

**Jeremy Lieberman** <jalieberman@pomlaw.com>                    Mon, Aug 6, 2018 at 10:46 AM
To: Brenda Szydlo <bszydlo@pomlaw.com>, Emma Gilmore <egilmore@pomlaw.com>, John Kehoe <jkehoe@pomlaw.com>
Cc: Joseph Gielata <gielata@gmail.com>

Joseph—


Please advise if you will agree to the briefing schedule set forth in our stipulation. While we appreciate your offer to "allow" a distribution of 2/3 of the Settlement Funds, the terms of the Stipulation preclude said distribution until the Settlement is Final, irrespective of your permission.


In any event, discussion regarding distribution of Settlement funds is premature. For now, please advise by 5:00 p.m. today if you will agree to the schedule set forth in the draft Stipulation we have provided.


Thank you.


Jeremy


**From:** Brenda Szydlo
**Sent:** Monday, August 6, 2018 11:13 AM
**To:** Jeremy Lieberman <jalieberman@pomlaw.com>; Emma Gilmore <egilmore@pomlaw.com>; John Kehoe <jkehoe@pomlaw.com>
**Subject:** FW: Petrobras - Draft Stipulation


FYI


**From:** Joseph Gielata <gielata@gmail.com>
**Sent:** Monday, August 06, 2018 11:11 AM
**To:** Brenda Szydlo <bszydlo@pomlaw.com>
**Subject:** Re: Petrobras - Draft Stipulation

[Quoted text hidden]
[Quoted text hidden]

# Exhibit K



**Jeremy A. Lieberman**
Managing Partner

July 17, 2018

<u>**Via Email and Overnight Courier**</u>

Joseph Gielata
7811 Eads Ave. No 207
La Jolla, CA.  92037

Richard Gielata
100 Westbury Drive
Coraopolis, PA 15108

        Re:    *In re Petrobras Securities Litigation*
               No. 14-cv-9662 (JSR)

Gentlemen:

    You are hereby notified pursuant to the safe harbor provision of Rule 11, Fed. R. Civ. P., that Lead Plaintiff intends to seek sanctions against both of you based on the Objections to the Settlement and Fee Request previously filed in this action. The grounds for such sanctions are detailed in the annexed Motion and Memorandum of Law, accompanied by the Declaration of Marc I. Gross.

    Lead Plaintiff will file these papers in twenty-one (21) days unless you withdraw the Objections and/or waive any right to file an appeal of the Court's Order and Final Judgement.  The highlighted portions of the enclosed papers and exhibits will be redacted from the public filing. If any other portions should be redacted, please advise.

                              Respectfully,

                              Jeremy A. Lieberman

jalieberman@pomlaw.com
600 Third Avenue, New York, New York 10016   tel: 212.661.1100   www.pomerantzlaw.com
NEW YORK       CHICAGO       LOS ANGELES       PARIS

# Exhibit L

# COPY

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

```
----------------------------X
STATE OF DELAWARE              :   ID No. 0506021946
                                   ID No. 0507018523
          v.                   :

JOSEPH N. GIELATA,             :   Criminal Action Nos.
          Defendant                IN05-07-1615 and 1616
       and                     :
WAYNE CHEN,                        Criminal Action Nos.
          Co-Defendant.        :   IN05-07-1617 and 1618
----------------------------X
```

T R A N S C R I P T
O F
P R O C E E D I N G S

Sussex County Courthouse
Georgetown, Delaware
Friday, January 6, 2006

The above-entitled matter was scheduled for a teleconference in Judge's Chambers at 9:00 o'clock a.m.

BEFORE:
THE HONORABLE T. HENLEY GRAVES, Judge.

APPEARANCES:  (Via telephone)

SEAN LUGG, Deputy Attorney General,
appearing on behalf of the State of
Delaware.

EUGENE J. MAURER, JR., Esquire, appearing
on behalf of Defendant Gielata.

JOSEPH N. GIELATA, Esquire, Defendant,
appearing Pro Se.

JOSEPH HURLEY, Esquire, appearing on
behalf of Co-Defendant Chen.

KATHY S. PURNELL

1    Prothonotary's office.

2          MR. LUGG:  Sean Lugg from the State.

3          MR. GIELATA:  Joseph Gielata on his own

4    behalf.

5          MR. HURLEY:  Joe Hurley.

6          THE COURT:  If anybody speaks, I think I

7    can probably tell your voice, but the court

8    reporter that's here may not be able to.  So if you

9    could just announce who you are when you are

10    speaking.

11          Let me ask you all this.  I understand the

12    State's allegations, and I understand what is going

13    on in this case.  I think this:  I think that if

14    the State's allegations are correct, that this may

15    have been, it seems to me, like a sophomore prank

16    more than the enrichment aspect of it.  I would

17    think that with that, that you all ought to be able

18    to sit down, Mr. Hurley, defense, and Mr. Gielata,

19    and the prosecutor, and explore ways of resolving

20    this, that is not going to be career busters for

21    both of the defendants, but which would satisfy the

22    State and the victim, if there is a victim, the

23    complaining witnesses.  You have all kinds of ways

# Exhibit M

 Gmail                                        **J GIELATA <gielata@gmail.com>**

---

## Expedited briefing schedule

4 messages

---

**Joseph Gielata** <gielata@gmail.com>                    Fri, Aug 10, 2018 at 9:09 AM
To: Brenda Szydlo <bszydlo@pomlaw.com>

> Brenda,
> Here is my proposal for an expedited briefing schedule on the appeals:
> October 22- opening briefs
> November 12- answering briefs
> November 26- reply briefs
>
> This proposal assumes no further motion practice, which slows everything down.
>
> Also, attached is a screen capture reflecting the annual dues I've paid in Delaware over the last several years.  The Rule
> 11 motion asserts that I haven't paid dues, which is clearly false.  The motion also asserts that I "failed to keep current" on
> CLE requirements-- also a false assertion.  The Rule 11 motion contains other falsehoods.  Therefore, the untimely and
> meritless Rule 11 motion would itself violate Rule 11 if signed and filed.  Your firm is on notice.
>
> -Joe

 **Screenshot 2018-08-07 at 7.12.49 AM.png**
147K

---

**Brenda Szydlo** <bszydlo@pomlaw.com>                    Fri, Aug 10, 2018 at 9:22 AM
To: Joseph Gielata <gielata@gmail.com>
Cc: Jeremy Lieberman <jalieberman@pomlaw.com>

> Thx, Joe.  Those dates work for us.  We will send you a proposed stipulation to sign.
>
>
> **From:** Joseph Gielata <gielata@gmail.com>
> **Sent:** Friday, August 10, 2018 12:10 PM
> **To:** Brenda Szydlo <bszydlo@pomlaw.com>
> **Subject:** Expedited briefing schedule
>
> [Quoted text hidden]
>
> This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may
> contain legally privileged and/or confidential information. If you are not the intended recipient of this
> email, you are hereby notified any dissemination, distribution or copying of this email, and any
> attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify
> me at (212) 661-1100 and permanently delete all copies of the email and any attachments.

---

**Brenda Szydlo** <bszydlo@pomlaw.com>                    Fri, Aug 10, 2018 at 10:38 AM
To: Joseph Gielata <gielata@gmail.com>
Cc: Jeremy Lieberman <jalieberman@pomlaw.com>

Joe:

We have proposed these dates to defendants and are waiting to hear back from them.  In the interim, attached is a draft stipulation for your review.  Please note that I will be out of the office all of next week.  As such, please include Jeremy on your emails.

Thanks,

Brenda

**From:** Joseph Gielata <gielata@gmail.com>
**Sent:** Friday, August 10, 2018 12:10 PM
**To:** Brenda Szydlo <bszydlo@pomlaw.com>
**Subject:** Expedited briefing schedule

Brenda,

[Quoted text hidden]

```
This email and any attachments thereto, is intended only for use by the addressee(s) named herein and may
contain legally privileged and/or confidential information. If you are not the intended recipient of this
email, you are hereby notified any dissemination, distribution or copying of this email, and any
attachments thereto, is strictly prohibited. If you receive this email in error please immediately notify
me at (212) 661-1100 and permanently delete all copies of the email and any attachments.
```

 **Gielata Stipulation Re Briefing Schedule (00289020-2xC40C2).docx**
23K

**Joseph Gielata** <gielata@gmail.com>                                      Fri, Aug 10, 2018 at 10:46 AM
To: Brenda Szydlo <bszydlo@pomlaw.com>

OK, I'll cc Jeremy on any emails next week.

The stip needs to indicate that we're not filing motions (the Rule 11 motion, the cost bond motion, etc.).  That permits everyone sufficient time to prepare their appeal briefs.  If you're still going to file those motions, these dates don't work.
[Quoted text hidden]

# Exhibit N

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
In re:

LIBOR-Based Financial Instruments
Antitrust Litigation.

This Document Applies to:

Exchange-Based Plaintiff Action

OTC Plaintiff Action

Lender Plaintiff Action

------------------------------------X

**MEMORANDUM AND ORDER**

11 MD 2262 (NRB)

11 Civ. 2613 (NRB)

11 Civ. 5450 (NRB)

12 Civ. 5723 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

# LIBOR VII

## Table of Contents

I.    Introduction............................................... 3
II.   General Legal Standards.................................... 4
   1. Class Certification .................................... 4
      1.1. Standing........................................... 5
      1.2. Rule 23(a)......................................... 8
      1.3. Rule 23(b)(3)..................................... 12
      1.4. Ascertainability................................. 17
      1.5. Modifications to the Class Definition............. 18
   2. Expert Opinion ........................................ 23
      2.1. The Daubert Standard.............................. 23
      2.2. Application at Class Certification................ 33
III.  Exchange-Based Action.................................... 37
   1. Rabobank's Daubert Motions ............................ 41
      1.1. Dr. Seyhun....................................... 41
      1.2. Dr. Netz......................................... 78
      1.3. Mr. Beevers...................................... 95

PNC Bank, N.A., No. 06-1075, 2007 WL 2343800, at *5 (W.D. Pa. Aug. 15, 2007)); see also Gross, 2017 WL 3668844, at *1; Gordon, 92 F. Supp. 3d at 200; and (4) the extent of the related attorney's involvement in the litigation, see Gross, 2017 WL 3668844, at *1; Gordon, 92 F. Supp. 3d at 199. A "potential conflict of interest" is sufficient to render a named plaintiff an inadequate class representative, Hale v. Citibank, N.A., 198 F.R.D. 606, 607 (S.D.N.Y. 2001); see also Gordon, 92 F. Supp. 3d at 199 (referring to "the appearance of impropriety"); In re IMAX, 272 F.R.D. at 157 (same); cf. Malchman, 761 F.2d at 900 n.2 (observing, in the adequacy of representation context, that "the notion that the appearance of conduct is as important as the conduct itself is a predicate for the Code of Professional Responsibility" (quoting Susman, 561 F.2d at 93)), and a conflict need not violate state law or professional responsibility rules in order to render a named plaintiff inadequate, see Hale, 198 F.R.D. at 607 ("Whether these problematic arrangements violate New York State law or ethics is not before this Court.").

Defendants' class certification papers revealed for the first time that Mordchai Krausz, whom interim class counsel Pomerantz LLP has agreed to pay "15% of the net fees that [Pomerantz] receives for [his] participating in the work and responsibility in connection with [this] litigation," is the son of Berkshire's CEO Moses Krausz (Mishkin Decl. ex. 16), and Mordchai Krausz's

extensive history with Berkshire is a newer revelation still (Hr'g Tr. 29:13-14). Applying the factors outlined above, we conclude that Mordchai Krausz's 15% interest in attorneys' fees earned by class counsel is sufficient to create the "appearance of impropriety" and renders Berkshire an inadequate class representative.

First, the relationship between Berkshire, with Moses Krausz as Berkshire's CEO, and Mordchai Krausz is sufficiently close to raise at least some appearance of impropriety. Berkshire correctly identifies that this case is unique in that the named plaintiff is a corporate entity with a board of directors rather than an individual plaintiff, but a close relationship need not be familial in order to raise adequacy issues: "a close familial or business relationship or friendship with class counsel" is enough to do so. 1 William B. Rubenstein, Newberg on Class Actions § 3:70 (5th ed.) (Westlaw 2017) (emphasis added); see also, e.g., Susman, 561 F.2d at 90 ("[C]ourts . . . have refused to permit class attorneys, their relatives, or business associates from acting as the class representative." (emphasis added)). Berkshire's acknowledgement of an extensive business relationship with Mordchai Krausz beyond the context of this litigation (Hr'g Tr. 30:5-9) does not lessen this concern.

This concern is confirmed by the remaining factors that are frequently analyzed in assessing whether a close personal or

business relationship precludes a finding of adequacy of representation. Mordchai Krausz's role in this case -- let alone his entitlement to fees -- was not disclosed until recently, and then only by Lender defendants. Further, Mordchai Krausz has not entered a notice of appearance nor has he signed any of the pleadings. See In re IMAX, 272 F.R.D. at 156 ("Even to this day, [the related attorney] has not filed a notice of appearance.").

Further, the amount of attorneys' fees to Pomerantz -- and Mordchai Krausz's 15% share thereof -- is likely to greatly exceed any recovery by Berkshire. Berkshire's complaint alleges a total of $45,861 in damages under its "but-for LIBOR" theory of damages. (SAC ¶ 20.) Mordchai Krausz would stand to receive more than this amount if Pomerantz's fee award were to exceed $305,740; given that this action has been extensively litigated for more than five years and that Berkshire has settled with Citi and HSBC for a combined $27 million, any fee award to Pomerantz is likely to greatly exceed this amount.[142]

And finally, we find that the record suggests that Mordchai Krausz's role in the litigation has been limited such that a 15% cut of Pomerantz's fees -- potentially 4.5% of the total recovery -- would be disproportionate. Berkshire contends that Mordchai

---

[142] If Pomerantz were to seek attorneys' fees equal to 30% of the recovery produced by these settlements (the maximum it may seek), its fee award would be $8.1 million and Mordchai Krausz's share would be $1.22 million. We, of course, reserve judgment on the propriety of these settlements and any attendant application for attorneys' fees that might be made.

Krausz is experienced and "has assisted substantially in the prosecution of this claim including the review of filings and providing comments to Pomerantz." (Berkshire Class Reply 29.) Even assuming Mordchai Krausz's experience and qualifications, Berkshire's description of his role in this litigation -- having reviewed the pleadings and provided comments to class counsel -- nonetheless suggests a limited role, not an extensive one.

Resisting this conclusion, Berkshire suggests that our power to review proposed settlements for fairness is sufficient to protect the class despite any potential impropriety. (Berkshire Class Reply 30.) Berkshire also identifies four cases in which a class representative was found to provide adequate representation despite a close personal relationship with class counsel: Judge Pauley's recent decision in Gross, 2017 WL 3668844, as well as Elias v. Ungar's Food Prods., Inc., 252 F.R.D. 233 (D.N.J. 2007); In re Cardizem CD Antitrust Litig., 200 F.R.D. 326 (E.D. Mich. 2001); and Zakaria v. Gerber Prods. Co., No. LA CV15-00200 JAK, 2016 WL 6662723 (C.D. Cal. Mar. 23, 2016).

Berkshire's first argument cannot be reconciled with Rule 23 or Supreme Court and Second Circuit precedent.  Rule 23(a)(4) requires us to ask whether "the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), not whether we believe the interests of absent class members are being fairly treated, cf. Fed. R. Civ. P. 23(e)(2)

("[T]he court may approve [a settlement] only after a hearing and on finding that it is fair, reasonable, and adequate."). Consistent with this distinction set forth in the structure of Rule 23, the Supreme Court and Second Circuit have made clear that the adequacy of a named plaintiff's representation and the fairness of a subsequent settlement are wholly distinct inquiries. See Amchem, 521 U.S. at 622 ("Federal courts, in any case, lack authority to substitute for Rule 23's certification criteria a standard never adopted -- that if a settlement is 'fair,' then certification is proper."); Denney, 443 F.3d at 268 ("Adequacy must be determined independently of the general fairness review of the settlement."). Indeed, as courts have recognized, "[t]he adequacy of the proposed class representative is widely considered the most important of the Rule 23(a) factors because it directly implicates the due process rights of absent class members who will be bound by the judgment." Gordon, 92 F. Supp. 3d at 198; see also Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562 (2d Cir. 1968) (concluding, following the 1966 enactment of Rule 23 and its allowance of class actions with preclusive effect, that "a court must now carefully scrutinize the adequacy of representation in all class actions").[143]

---

[143] At oral argument, counsel for Berkshire suggested that we have jurisdiction to preclude Mordchai Krausz from receiving any attorneys' fees that are ultimately awarded to Pomerantz. (Hr'g Tr. 29:7-10.) We are skeptical that our jurisdiction extends to what is ultimately a private contractual agreement between class counsel and an attorney who still has not entered a

Berkshire's reliance on Gross fares no better.  Contrary to Berkshire's characterization (Letter from Jeremy Lieberman to the Court, Aug. 25, 2017, ECF No. 2240), the related lawyer's role in Gross had been disclosed: the related lawyer had been named as class counsel, Gross, 2017 WL 3668844, at *1, and a review of the docket shows that not only had the related lawyer entered a notice of appearance well before class certification, but the related lawyer had also been actively involved in litigating the case.  He signed a number of the pleadings and motions papers filed by the plaintiff and made a number of court appearances on the putative class's behalf -- including presenting oral argument in opposition to defendants' motion to dismiss.  (Gross, No. 14 Civ. 9438, ECF Nos. 1, 37, 44.)  Accordingly, Gross's facts are simply not comparable to the facts here. Rather, under the factors identified in Gross which we analyze above, Mordchai Krausz's relationship with Berkshire and his father the CEO -- and his previously undisclosed 15% interest in any attorneys' fees awarded to Pomerantz -- suggests that Berkshire is not an adequate representative.  The existence of a "large pool of disinterested investors who could serve as class representatives," In re IMAX, 272 F.R.D. at 157, which we presume to exist based on Berkshire's contention that there are "thousands of financial institutions"

---

notice of appearance in this case. But even if our jurisdiction does so extend, such a post hoc remedy would be no more effective than post-settlement fairness review in curing a first-order adequacy problem.

meeting the class definition (Berkshire Class Mem. 7), weighs further in favor of such a finding.

We are no more persuaded by Berkshire's additional authorities. In *Elias* and *In re Cardizem*, a named plaintiff had a parent-child relationship with a lawyer employed by one of the firms representing the putative class. *Elias*, 252 F.R.D. at 244; *In re Cardizem*, 200 F.R.D. at 337. Unlike those courts, our concern is not that "named plaintiffs would receive a benefit not available to other class members," *Elias*, 252 F.R.D. at 244, but rather that the class representative "might sacrifice the interests of the class for the benefit of class counsel." 5 *Moore's Federal Practice* § 23.25[2][b][vi] (3d ed. 2017); *see also In re IMAX*, 272 F.R.D. at 155-56. Further, there was no indication in those cases that the related lawyers were actively involved in litigating the case in which their relative was serving as named plaintiff, unlike Mordchai Krausz. *See Elias*, 252 F.R.D. at 244-45; *In re Cardizem*, 200 F.R.D. at 338. The firms in those cases also had a defined role, whereas Mordchai Krausz's role here remains unclear and limited at best. Additionally, the presence of multiple class representatives in those cases reduces the likelihood that a single named plaintiff -- like Berkshire here -- may conduct the litigation in an individually beneficial but

class-detrimental way.[144]   Finally, the court in Zakaria explicitly acknowledged that "a relationship between the named plaintiff and class counsel can defeat adequacy of representation," but reasoned that "in general, more than such a relationship must be shown." 2016 WL 6662723, at *6.   Here, Mordchai Krausz's 15% interest in class counsel's attorneys' fees provides that additional factor.

In sum, we conclude that Berkshire is not an adequate representative given the previously undisclosed relationship between Moses Krausz and Berkshire on the one hand and Mordchai Krausz on the other.   "We do not suggest that [Berkshire's] representation would in fact be inadequate -- but the possibility of inadequacy and the appearance of impropriety are sufficient for us to deny certification of a class with [Berkshire] as [the only] representative."   In re IMAX, 272 F.R.D. at 157.

## 2.2. Ascertainability

Lender defendants offer no challenge to the proposed class's ascertainability.   Berkshire makes no reference to the implied requirement of ascertainability in its papers, but we nonetheless conclude that the proposed class is ascertainable.   The proposed class definition's reference to certain transactions into which a putative class member must have entered serves as the "objective criteria that establish a membership with definite boundaries."

---

[144] Additionally, to the extent Berkshire relies on In re Cardizem to suggest that review of settlements for fairness under Rule 23(e)(2) may stand in for adequacy of representation under Rule 23(a)(4), we have rejected that contention.



**Express**

Extremely Urgent

For FedEx Express® Shipments Only

ᴧƆ꓄Ԁ **XA**

10007
NY-US   EWR

TRK# ☐0201 **7824 4902 9607**

FRI – 24 AUG 3:00P
STANDARD OVERNIGHT



REF:
REF:
(212) 806-0228
INV:
P01:

NEW YORK NY 10007
500 PEARL ST ROOM 200
DANIEL PATRICK MOYNIHAN
PRO SE INTAKE UNIT
UNITED STATES COURTHOUSE

TO

ORIGIN ID:SANA   (302) 507-4400
JOSEPH GIELATA
7811 EADS AVE UNIT 207
LA JOLLA, CA 92037
UNITED STATES US



BILL CREDIT CARD

SHIP DATE: 23AUG18
ACTWGT: 1.90 LB
CAD: 6992379/SSF01904

Joe Gielata
7811 Eads Ave #207
La Jolla, California 92037

United States District Court
of the Southern District of New York
**Pro Se Intake Unit**
Daniel Patrick Moynihan
United States Courthouse
**500 Pearl Street, Room 200**
New York, New York 10007