## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PETROBRAS SECURITIES LITIGATION | Case No. 14-cv-9662 (JSR) <br><br> **CLASS ACTION** |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR RENEWED MOTION FOR SANCTIONS AGAINST THE GIELATA OBJECTORS AND TO INCREASE APPEAL BOND

**TABLE OF CONTENTS**

**Page(s)**

I.      INTRODUCTION ............................................................................................... 1

II.     JOSEPH GIELATA IS A PROVEN EXTORTIONIST WITH A CRIMINAL
        RECORD ......................................................................................................... 6

III.    JOSEPH GIELATA CONTINUES TO ENGAGE IN THE UNAUTHORIZED
        PRACTICE OF LAW DESPITE THIS COURT'S ADMONISHMENT ......................... 9

IV.     THE GIELATAS SHOULD BE SANCTIONED FOR THEIR NEW GIMMICKS ....... 12

V.      THE COURT SHOULD INCREASE THE APPEAL BOND ........................................ 23

VI.     CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Askins v. Doe No. 1*,
727 F.3d 248 (2d Cir. 2013)........................................................................15

*Bletas v. Deluca*,
No. 11-cv-5422, 2013 U.S. App. LEXIS 25925 (2d Cir. June 18, 2013)................12

*Caisse Nationale de Credit Agricole-CNCA v. Valcorp, Inc.*,
28 F.3d 259 (2d Cir. 1994).........................................................................13

*Carr v. Tillery*,
591 F.3d 909 (7th Cir. 2010) ......................................................................12

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990).................................................................................2

*Enmon v. Prospect Capital Corp.*,
675 F.3d 138 (2d Cir. 2012)........................................................................22

*Garber v. Office of Comm'r of Baseball*,
No. 12-cv-03704, 2017 WL 752183 (S.D.N.Y. Feb. 27, 2017) ............................13

*Gurary v. Winehouse*,
235 F.3d 792 (2d Cir. 2000)........................................................................23

*Hansberry v. Lee*,
311 U.S. 32 (1940)..................................................................................20

*Hoxworth v. Blinder, Robinson & Co.*,
980 F.2d 912 (3d Cir. 1992)........................................................................19

*In re 60 E. 80th St. Equities, Inc.*,
218 F.3d 109 (2d Cir. 2000)....................................................................13, 22

*In re Bagdade*,
334 F.3d 568 (7th Cir. 2003) ......................................................................12

*In re Broadcom Corp. Sec. Litig.*,
No. 01-cv-275, 2005 U.S. Dist. LEXIS 45656 (C.D. Cal. Dec. 5, 2005)..............22, 25

*In re Credit Default Swaps Antitrust Litig.*,
No. 13-md-2476, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016)...........................25

*In re Gielata*,
   933 A.2d 1249, 2007 Del. LEXIS 376 (Del. Aug. 28, 2007) ...........................................6, 7, 8

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006).................................................................................................19

*In re Ivan F. Boesky Sec.*,
   948 F.2d 1358 (2d Cir. 1991).............................................................................................23

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011)..........................................................................................15, 21

*In re Marcone*,
   395 F. App'x 807 (3d Cir. 2010) .......................................................................................12

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   187 F.R.D. 124 (S.D.N.Y. 1999) .......................................................................................23

*In re Petrobras Sec. Litig.*,
   317 F. Supp. 3d 858 (S.D.N.Y. 2018).....................................................................2, 3, 14, 21

*In re Petrobras Sec. Litig.*,
   No. 14-cv-9662, 2018 U.S. Dist. LEXIS 161898 (S.D.N.Y. Sept. 19, 2018) ................ *passim*

*In re Polyurethane Foam Antitrust Litig.*,
   No. 17-3361, 2017 U.S. App. LEXIS 25352 (6th Cir. Dec. 14, 2017)...................................22

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   278 F.3d 175 (3d Cir. 2002)..............................................................................................22

*In re Wal-Mart Wage & Hour Emp't Practices Litig.*,
   No. 06-00225, 2010 WL 786513 (D. Nev. Mar. 8, 2010) .....................................................25

*Johnpoll v. Thornburgh*,
   898 F.2d 849 (2d Cir. 1990)..............................................................................................19

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010)..............................................................................................19

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985)........................................................................................................20

*Richards v. Jefferson Cty., Ala.*,
   517 U.S. 793 (1996)........................................................................................................20

*Roadway Express, Inc. v. Piper*,
   447 U.S. 752 (1980)........................................................................................................13

*United States v. Blodgett*,
   709 F.2d 608 (9th Cir. 1983) ..........................................................................13

*United States v. Braunig*,
   553 F.2d 777 (2d Cir. 1977)............................................................................15

*United States v. Cruz-Flores*,
   56 F.3d 461 (2d Cir. 1995)..............................................................................20

*United States v. Johnson*,
   327 F.3d 554 (7th Cir. 2003) ..........................................................................12

*United States v. Scali*,
   No. 16-cr-466, 2018 WL 461441 (S.D.N.Y. Jan. 18, 2018)............................10

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)...........................................................................5, 14

**Statutes**

28 U.S.C. §1927.....................................................................................12, 13, 22

N.Y. Jud. Law §478...........................................................................................10

N.Y. Jud. Law §485-a........................................................................................10

N.Y. Jud. Law §486...........................................................................................10

**Rules**

ABA Model Rules of Professional Conduct........................................................11

ABA Rules of Practice 5.5...................................................................................9

Delaware Lawyers' Rules of Professional Conduct: Rule 8.4(b)-(d). ...............8

F.R.A.P. 42(b)....................................................................................................22

Fed. R. Civ. P. 7................................................................................................25

Fed. R. Civ. P. 11.........................................................................2, 12, 13, 23

Fed. R. Civ. P. 23.............................................................................14, 19, 20

New York Rule 5.5.........................................................................................9, 11

## I.      INTRODUCTION

With the Claims Administrator now ready to commence a partial distribution of the Net Settlement Fund, the only impediment to Class members' enjoying the fruits of the historic Settlement achieved in this Action is a spurious appeal advanced by a professional objector that admitted to engaging in criminal conduct and has faced severe disciplinary action.  It is readily apparent that Joseph Gielata and his parents Richard and Emelina Gielata ("Gielatas") are straining to find any viable theory for their appeal, in an attempt to score another $2 million bounty like the one they unscrupulously obtained in the *Tyco* case.  Plaintiffs respectfully request that the Court assist in putting an end to this transparent stick-up by imposing sanctions on the Gielatas and/or increasing the appeal bond previously ordered by the Court.   The Claims Administrator is now ready to distribute 35% of the Settlement, or nearly $1 billion, to aggrieved Class members.  Previously, the Court stopped short of sanctioning the Gielatas despite finding their arguments to be entirely meritless and pursued in bad faith, but reserved the right to revisit the issue once Gielatas' conduct "materially prejudice[s]" the Class.  Now that Class members are unquestionably materially prejudiced in their ability to collect significant damages, disciplining the Gielatas will show that courts will not sit idly by and permit professional objectors to abuse the legal process.

At the Final Approval Hearing held on June 4, 2018 (which the Gielatas did not bother to attend), this Court underscored that, in the context of big settlements like the one here, there are "so-called professional objectors, . . . people who are seeking to extort monies on their own private behalf, not because they expect that their objections will receive any weight at the district court level ***but because they can delay the entire process, can delay the doing of justice, can delay the payment to victims*** of monies that in some cases they sorely need and that, in any event, they're entitled to for months or even years on end."  June 4, 2018 Hr'g Tr. at 55:23-56:6,

Dkt. No. 843.  Accordingly, the Court expressly retained jurisdiction, "even after entry of final

judgment," over the objectors after a final ruling on the fairness and adequacy of the Settlement:

> *I have expressly retained jurisdiction in this case over the objectors even after I*
> *issue my final rulings on the matters before me today* if I am convinced that
> some discovery is needed because of extortionate motivations on the part of any
> of those objectors.

*Id*. at 56:7-11 (emphasis added); Dkt. No. 896 at 5-6 ("[O]bjectors were reminded that by filing

their objections to the class settlement, they and their counsel were subject to the continuing

jurisdiction of the Court and that, if appropriate, the Court would retain jurisdiction to inquire

into their compliance with Rule 11 and analogous provisions of federal law").  That sentiment

was echoed in the Court's Opinion approving the Settlement.  *See* Dkt. No. 834 at 4 n.5.[1]

In a 42-page decision issued on June 22, 2018, this Court approved the Settlement and

Plan of Allocation, and certified the Settlement Class after an exhaustive review of both the

settlement process and the substantive terms: "After careful consideration of all the voluminous

written filings and oral argument in this case, the Court hereby grants Class Plaintiffs' motion for

final approval, finding that the Settlement Agreement and Plan of Allocation are fair, reasonable,

adequate, and comport with all requirements of law."  *In re Petrobras Sec. Litig.*, 317 F. Supp.

3d 858, 864 (S.D.N.Y. 2018).  Significantly, as the Court noted, "[n]o institutional investor

objected to the Settlement Agreement [and] Plan of Allocation . . . and all but one of the

institutional plaintiffs who had previously filed separate lawsuits but had not yet settled with

defendants indicated their intention to remain members of the class and forego their individual

claims."  *Id*.  The Court thoroughly considered and rejected the objections filed by Richard and

---

[1] "[T]he imposition of a Rule 11 sanction is not a judgment on the merits of an action."  *Cooter
& Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990).  "Rather, it requires the determination of a
collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction
would be appropriate.  Such a determination may be made after the principal suit has been
terminated." *Id*.

Emelina Gielata (which were drafted by their son Joseph Gielata) as meritless.  *Id.* at 865-77.
The Gielatas "purport[ed] to identify an intraclass conflict in this case between those persons
whose purchases of Petrobras securities are connected to the U.S. *solely* by virtue of the fact that
their transactions were cleared or settled through the Depository Trust Company ("DTC") in
New York (the "DTC Claimants") and those persons whose purchases of Petrobras Securities are
otherwise domestic under the operative case law . . . , for example because their purchases took
place on U.S. exchanges." *Id.* at 866 (emphasis in original).

More specifically, the Gielatas stressed that the DTC Claimants are not part of the Class
and should be excluded entirely from any distributions of the settlement fund.  *Id.*  Referencing
controlling authority, this Court properly rejected the Gielatas' meritless challenge.  It explained
that "[w]hat [their argument] boils down to as a practical matter is that certain claimants who
would have been unable to join the litigation classes previously certified by the Court because of
extraterritorial impediments are now included in the settlement class so that the defendants can
buy 'global peace.'"  *Id.*  But, as the Court reasoned, "[i]n the Second Circuit, plaintiffs are
entitled to settle even entirely non-meritorious claims." *Id.* (citing *In re Am. Int'l Grp., Inc. Sec.
Litig. ("AIG")*, 689 F.3d 229, 243 (2d Cir. 2012)).  The Court further observed that "defendants
waived any domesticity challenge for settlement purposes" and that "both the DTC claimants
and domestic claimants in this case suffered the same injury and are receiving the same relief."
*Id.* at 868-69.

On August 10, 2018, Plaintiffs moved for sanctions and for an appeal bond against
objectors Joshua Furman ("Furman") and Richard Gielata and his de facto counsel, his son
Joseph Gielata.  The Court ordered Furman's client to post an appeal bond of $5,000 and the
Gielatas to post a bond of $50,000, and sanctioned Furman in the amount of $10,000 for his

frivolous objections and bad faith conduct.  While it stopped short of sanctioning the Gielatas, the Court was "deeply troubled" by their conduct, finding that their arguments were "relatively lacking in merit and unsupported by case law," and that the Gielatas exhibited "some bad faith conduct," with "some of the Gielatas' behavior in this case and other cases cast[ing] more doubt on their bona fides."  *In re Petrobras Sec. Litig.,* No. 14-cv-9662, 2018 U.S. Dist. LEXIS 161898, at *19, 36, 38, 45 (S.D.N.Y. Sept. 19, 2018).

Joseph Gielata ("Gielata"), pulling the strings on behalf of his parents who suffered $660 in recoverable damages, continues to thumb his nose at the Court's concern with the prompt administration of justice.  But for his bogus appeal, driven by the singular aim of lining his *own* pockets, tens of thousands of Class claimants would be receiving long-overdue monetary relief. In the appeal brief he recently filed on November 8, 2018, he abandoned the basis for his underlying objection to the Settlement, instead advancing arguments that ***he explicitly disclaimed in this Court***, and which this Court explicitly rejected.  No other Class member saw fit to disturb the hard-fought compromise by forcing the nonsensical "solution" that this lone objector seeks to impose on the entire Class.

In the appeal brief, Gielata jettisoned the specious objection he asserted on behalf of his parents in this Court: that purportedly meritless claims cannot be settled ("That holding is not challenged on this appeal").  *See* Exhibit A to the Declaration of Jeremy A. Lieberman ("Lieberman Decl.") (Opening Brief or "OB") at 57.  What makes the Gielatas' conduct even more egregious is that in this Court, they ***expressly disavowed*** the specious argument that is now the crux of their appeal.  In essence, the Gielatas now argue for the first time on appeal that a "structural conflict" exists between the purchasers of ADRs and the Notes that can only be solved by creating subclasses.  In the District Court, the Gielatas argued the exact opposite: "To

4

be precise, the problem here is not the 'classic' *Amchem* conflict necessitating subclasses." Dkt. No. 813 at 4. "The law in th[e] [Second] Circuit is clear that where [the Gielata objectors] ha[ve] shifted [their] position on appeal and advance[] arguments available but not pressed below, . . . waiver will bar raising the issue on appeal." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 124 n.29 (2d Cir. 2005). Moreover, in the objections they made in this Court, the Gielatas never referenced the newly-minted conflict they make on appeal, *i.e.*, that a conflict exists between ADR purchasers and ***all*** Noteholders, irrespective of whether those Noteholders can demonstrate a domestic transaction, necessitating that all Noteholders' claims be discounted in the Plan of Allocation. Gielatas' new argument is unsupported by the evidence and the record. There is no "fundamental conflict" necessitating subclasses of ADR and Notes purchasers. Only an infinitesimal fraction of foreign transactions in Notes exists, and the plan of allocation the Gielatas propose for the first time on appeal is unworkable and inequitable.

While on appeal the Gielatas purport to seek the creation of subclasses, at bottom the only ultimate change that would be created would be to the Plan of Allocation. OB at 55. Significantly, according to the express terms of the Settlement, the Court can approve the Settlement without approving the Plan of Allocation. Dkt. No. 767-1 at 41 ¶23. The Gielatas specifically acknowledge that the Plan of Allocation is ***not*** a material term of the Settlement: "any change, modification, or alteration to the Plan of Allocation by the District Court or by any appellate court shall not be grounds for termination of the Settlement." OB at 55. Consistent with the limited relief sought by the Gielatas on appeal, Plaintiffs proposed to the Gielatas two options permitting them the right to propose changes to the Plan of Allocation in the District Court, while not contesting the certification of the Settlement Class, which is a material term of the Settlement. The distinction is significant: if Gielatas' appeal is limited to the Plan of

Allocation, the Settlement becomes final, allowing for at least a partial distribution to the Class. If it is not so limited, the distribution process is delayed for months, if not years. The Gielatas refused this proposal, insisting that the Class must be decertified so that Joseph Gielata can extract significant fees for the spurious "benefit" he claims to convey to the ADR shareholders at the expense of all Noteholders (the majority of which have domestic claims). The Court has the power and the tools necessary to protect the Class from Gielatas' abuse.

## II.     JOSEPH GIELATA IS A PROVEN EXTORTIONIST WITH A CRIMINAL RECORD

In 2005, Joseph Gielata was arrested on multiple counts of theft, including felony theft, and conspiracy in the second degree, a felony. *See* Amended Complaint ¶114, *Gielata v. Rocanelli*, No. 05-cv-00567-GMS (D. Del. Jan. 30, 2006), ECF No. 25 ("Rocanelli Complaint"); *In re Gielata*, 933 A.2d 1249, 2007 Del. LEXIS 376 (Del. Aug. 28, 2007). The charges arose from his using sham transactions attempting to benefit illegally from PayPal's Money-Back Guarantees. More specifically, in 2004 Joseph Gielata schemed with a friend to sell paintings to each other, make claims against PayPal, a company in the business of accepting payments for transactions, and then pursue a bogus legal action against PayPal to recover not only under the company's Money Back Guarantee, but treble damages and attorneys' fees as well. *In re Gielata*, 2007 Del. LEXIS 376, at *4-6. Gielata voluntarily dismissed his PayPal lawsuit on June 16, 2004, with the intention of re-filing a class action purportedly on behalf of all persons who purchased Money Back Guarantee option put contracts. Rocanelli Complaint ¶58. Through this maneuver, Gielata sought to extract significant attorneys' fees for his frivolous complaint.

Meanwhile, Gielata also schemed to obstruct an unrelated class action settlement that was reached with PayPal in July 2004. Gielata acknowledged that he "was preparing to campaign against [the] class action settlement" and "began to draft a solicitation intended to recruit

objectors to the proposed settlement."  Rocanelli Complaint ¶¶6, 62.

On July 25, 2005, the Delaware Department of Justice indicted Gielata on felony charges of theft and conspiracy to commit theft.  *Id*. ¶93.  In retaliation, on January 30, 2006, Gielata sued the Chief Counsel and the Office of Disciplinary Counsel for the Supreme Court of Delaware, and the State of Delaware (the "Delaware State Defendants"), alleging civil rights violations, malicious prosecution, intentional infliction of emotional distress, violation of his First Amendment right to object to a class action settlement involving PayPal, and tortious interference with Gielata's ability to prosecute class action and derivative actions, seeking declaratory and injunctive relief, as well as compensatory and punitive damages.  Rocanelli Complaint ¶¶105-84.

Gielata's biggest gripe was that the Delaware State Defendants were getting in the way of his chosen tradecraft: acting as a professional objector.  According to Gielata, they violated his First Amendment rights to "draft a solicitation intended to recruit objectors to [a] proposed" nationwide class action settlement involving PayPal (*id.* ¶62), and the Chief Counsel "intimidated [Gielata] into silence on a matter of public concern, namely, the fairness, adequacy and reasonableness of the nationwide class action settlement proposed by PayPal in 2004."  *Id*. ¶107.  He also sought damages for malicious prosecution on the basis that he "has lost prospective economic rights, including substantial claims to [attorneys'] fees in connection with pending suits he was or is prosecuting, such as the MBNA [class action] Litigation and the JPM [derivative] Litigation."  *Id*. ¶158.

On May 9, 2006, Joseph Gielata pled guilty to misdemeanor theft on PayPal in exchange for dismissal of some charges.  *In re Gielata*, 2007 Del. LEXIS 376, at *5.  The plea "was a probation before judgment plea and pursuant to 4218 of the criminal code, the respondent

admitted that he was guilty of theft . . . ." *Id.* at *5-6.   Delaware's Board of Professional Responsibility subsequently charged that Joseph Gielata had "committed a criminal act that reflects adversely on his honesty and trustworthiness"; "engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation"; and "engaged in conduct that is prejudicial to the administration of justice," thereby violating Delaware Lawyers' Rules of Professional Conduct: Rule 8.4(b)-(d).   *Id.* at *2-3.   For his criminal misconduct, Gielata was publicly reprimanded by the Supreme Court of Delaware. *Id.* at *10.

Advancing bogus arguments they explicitly eschewed in this Court, Gielatas' chicanery continues unabated despite this Court's warnings.   The Gielatas are not good faith objectors seeking to advance the interests of the Class.   Instead, they are forestalling tens of thousands of injured investors from obtaining long-overdue monetary redress so that they can extract an undeserved bounty.   The Gielatas have extorted other class counsel in similar mega-settlements, with no desire to benefit the class.   On August 3, 2010, Joseph Gielata, on behalf of his father, Richard Gielata, filed a federal class action for breach of fiduciary duty, breach of contract, as well as other claims against Grant & Eisenhofer P.A. ("G&E"), a securities litigation firm where Joseph Gielata had been employed as an attorney.   The claims arose from the attorneys' fees awarded by the court to G&E in *In re Tyco Int'l, Ltd. Multidistrict Litigation*, No. 02-md-01335 (D.N.H. Aug. 23, 2002), in which the firm secured a class action settlement for $3.2 billion in 2007.   *See* Complaint for Damages ¶¶5, 6, *Gielata v. Eisenhofer*, No. 10-cv-00648-GMS (D. Del. Aug. 3, 2010), ECF No. 1.   The case was transferred to the District of New Hampshire, and on November 30, 2012, Richard Gielata filed a notice of voluntary dismissal with prejudice. *Gielata v. Eisenhofer*, No. 11-cv-442-PB (D.N.H. Nov. 30, 2012), ECF No. 92.   Richard Gielata received an ***outlandish payday of $2 million*** (which he tried to conceal in this action) to settle

the matter and withdraw his suit.  The class got nothing from the shakedown lawsuit.

This Court recognized that the Gielatas' conduct in *Tyco* "*was the substantive equivalent of an extortionate objection, using a class action as a vehicle to realize large personal profits without benefitting the class*."  *In re Petrobras*, 2018 U.S. Dist. LEXIS 161898, at *39 (emphasis added).  In requiring the Gielatas to post a $50,000 bond in connection with their unmeritorious appeal, this Court found that the Gielatas' offer of personal guarantee that they would pay the costs associated with an unsuccessful appeal "are undercut by . . . Joseph Gielata's history of fraud."  *Id*. at *44-45.  The Court also found that the Gielatas "*have exhibited some bad faith conduct*," *id*. at *45*, and that "some of the *Gielatas' behavior in this case and other cases casts more doubt on their bona fides*."  *Id*. at *38.

## III.   JOSEPH GIELATA CONTINUES TO ENGAGE IN THE UNAUTHORIZED PRACTICE OF LAW DESPITE THIS COURT'S ADMONISHMENT

Plaintiffs have already exposed Gielata for his unauthorized practice of law before this Court, reflecting multiple legal violations.  *See* Dkt. No. 863.  For example, Plaintiffs showed that despite actively engaging in this proceeding, including preparing and filing papers with the Court, conferring with Lead Counsel on his parents' behalf, participating in a number of conference calls with the Court, and corresponding with the Court on his parents' behalf, Gielata's attorney status remained "inactive" throughout.  *Id*. at 8.  He never sought admission *pro hac vice*, nor did he seek to affiliate with New York local counsel, as required by the ABA Rules of Practice 5.5 and New York Rule 5.5.  *Id*.  The failure to seek such *pro hac* admission was undoubtedly due to the fact that no such admission would have been granted.  *Id*.  Though reprimanded by the Delaware Court for his criminal misconduct, Gielata was still technically "admitted," but his status was "inactive."  *Id*.  Any *pro hac vice* admission effort not only would likely have been denied, but also would have triggered formal suspension by Delaware for

unauthorized practice of the law.  *Id.* at 8-9.  Gielata's de facto practice of law before this Court was also a violation of N.Y. Jud. Law §478, which forbids "Practicing or appearing as attorney-at-law without being admitted and registered."  *Id.* at 9.  Moreover, under N.Y. Jud. Law §486, it is a misdemeanor to practice law when one "has been suspended from practice and has not been duly and regularly reinstated."  *See United States v. Scali*, No. 16-cr-466 (NSR), 2018 WL 461441, at *10 (S.D.N.Y. Jan. 18, 2018) (Roman, J.).  Additionally, under §485-a of the same code, it is a class E felony if a person violates §486 and both "(1) falsely holds himself or herself out as a person licensed to practice law in this state, a person otherwise permitted to practice law in this state, or a person who can provide services that only attorneys are authorized to provide; and (2) causes another person to suffer monetary loss or damages exceeding one thousand dollars or other material damage resulting from impairment of a legal right to which he or she is entitled."  N.Y. Jud. Law §485-a.

Undeterred from lining his pockets at the expense of the Class, Gielata drafted the appeal brief on behalf of his parents and ultimately seeks to extract sizeable fees for obtaining a bogus "benefit" for the Class.  To that end, Joseph Gielata executed a sham "assignment" purporting to confer on him standing "to prosecute any objection or appeal." Dkt. No. 849 at 4.  Specifically, the assignment purports to assign "all associated rights . . . as to ONE (1) SHARE in the Class Action settlement," from Joseph Gielata's parents to himself for the explicit purpose to "confer Article III standing on Joseph Gielata to prosecute any objection or appeal in the Class Action." *Id*.  The assignment was also crafted to permit Joseph Gielata to "reassign the assigned claim . . . at any time." *Id*.  Gielata's gimmick was not lost on this experienced Court: "***it would seem that the assignment was executed for the explicit purpose of circumventing* pro hac vice *admission requirements*.*"  In re Petrobras*, 2018 U.S. Dist. LEXIS 161898, at *41 (emphasis added).

Because the assignment was executed in connection with the appeal, however, the Court considered it appropriate for the Second Circuit to address this narrow issue.  Disturbed by Gielata's conduct, however, this Court explicitly declared that "***to the extent such 'gamesmanship' impacts any further proceedings in this Court, the Court will continue to monitor the situation***." *Id.* (emphasis added).

But old habits die hard.  In his latest maneuver, Gielata is not appearing as a lawyer at all, but he and his parents are each appearing *pro se*, through a single brief that he wrote for all of them.  This transparent strategy does not disturb the fact that Gielata is exercising legal judgment and acumen—"practicing law"—not just for himself, but for his parents.  For starters, he drafted the single appellate brief filed collectively on behalf of all three litigants (acknowledging that "[t]his document was drafted in whole, or substantial part, by an attorney," Joseph Gielata, "Member of the Delaware bar (inactive))."  OB at 1.  Indeed, all three purported "*pro se*" objectors are riding on the coattails of Joseph Gielata's legal judgment and work.  Although what constitutes "practice of law" is context-specific, Gielata's conduct before the Second Circuit clearly fits within its ambit.  *See* Rule 5.5 of the ABA Model Rules of Professional Conduct, Comment 2 ("[T]he practice of law relates to the rendition of services for others that call for the professional judgment of a lawyer. The essence of the professional judgment of a lawyer is the educated ability to relate the general body and philosophy of law to a specific legal problem of a client . . . [.]").  Gielata is still acting as an attorney in pursuit of a fee, advocating that "counsel" creating a benefit for the ADR purchasers (which he claims to be advancing) be entitled to a percentage of the recovery.  OB at 60-62. Quite simply, Gielata continues to engage in the unauthorized practice of law, regardless of whether he has standing to appear *pro se* on his own behalf.

"[C]onsidering the serious threat that the unauthorized practice of law poses both to the integrity of the legal profession and to the effective administration of justice, resort to the inherent powers [of the court] . . . is an appropriate remedial measure."  *United States v. Johnson,* 327 F.3d 554, 560 (7th Cir. 2003).  *See also Bletas v. Deluca*, No. 11-cv-5422, 2013 U.S. App. LEXIS 25925, at *2 (2d Cir. June 18, 2013) ("Because we have determined that Appellant . . . has engaged in the unauthorized practice of law by acting on behalf of the other, purportedly *pro se* Appellants and exerted significant . . . control over the Appellants' filings in this appeal, the January 17, 2013 order granting sanctions remains effective . . . ."); *In re Bagdade*, 334 F.3d 568, 571-72 (7th Cir. 2003) (holding litigant in civil contempt of court for engaging in the unauthorized practice of law and imposing sanctions, including fines and reimbursement for costs and reasonable attorneys' fees); *In re Marcone*, 395 F. App'x 807, 809 (3d Cir. 2010) (affirming district court order imposing sanctions for unauthorized practice of law).  This Court can and should sanction Gielata for unabashedly engaging in the unauthorized practice of law.  At a minimum, this Court should hold Gielata in contempt for continuing to engage in the unauthorized practice of law with impunity, and impose appropriate monetary sanctions.  The time has now come for Gielata's conduct to be referred to the Delaware Bar Association for further investigation and appropriate disciplinary proceedings.  Fed. R. Civ. P. 11(c)(4), for example, expressly authorizes "nonmonetary" sanctions "to deter repetition of the conduct or comparable conduct by others similarly situated."

## IV.       THE GIELATAS SHOULD BE SANCTIONED FOR THEIR NEW GIMMICKS

Gielatas' new gimmicks call for the imposition of sanctions, which this Court may issue under either Rule 11, 28 U.S.C. §1927, and/or its inherent power.  A court may impose sanctions *sua sponte.*  *Carr v. Tillery*, 591 F.3d 909, 919-20 (7th Cir. 2010).  Rule 11 is aimed at "deter[ing] baseless filings and the curbing of abuses."  *Caisse Nationale de Credit Agricole-*

*CNCA v. Valcorp, Inc.*, 28 F.3d 259, 266 (2d Cir. 1994).  As observed in *Garber v. Office of Comm'r of Baseball*, No. 12-cv-03704 (VEC), 2017 WL 752183, at *4 (S.D.N.Y. Feb. 27, 2017), Rule 11 mandates that any paper presented to the Court not be made "for an improper purpose," such as "to extract fees from class counsel in exchange for the withdrawal of a meritless objection to the proposed class settlement."  The imposition of sanctions under § 1927 requires a finding that counsel acted in bad faith, *In re 60 E. 80th St. Equities*, *Inc.,* 218 F.3d 109, 115 (2d Cir. 2000), while those imposed under a court's inherent power require a finding that counsel's conduct "constituted or was tantamount to bad faith," *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980).  "[B]ad faith may be inferred where the action is completely without merit."  *60 E. 80th St. Equities*, 218 F.3d at 116.  The Second Circuit held that "an award under §1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Id*. at 115 (citation omitted); *accord*, *United States v. Blodgett*, 709 F.2d 608, 610 (9th Cir. 1983) (a "district court ha[s] the power to sanction counsel for filing a frivolous appeal in bad faith, and that filing solely for purposes of delay constitutes bad faith.").

In the District Court, the Gielatas' problem with the Settlement was that it improperly released non-meritorious claims: "*Yet the proposed settlement inexplicably covers any DTC-settled transaction regardless of location*. . . . Due to this inexcusable error by class counsel, debtholders with *no viable claim* due to *Morrison* are nonetheless invited to take settlement funds away from class members holding valid claims."  Dkt. No. 813 at 1 (emphases in original). This Court carefully considered the Gielatas' argument and found it utterly meritless under Second Circuit precedent, which permits Defendants to buy "global peace" by settling even entirely non-meritorious claims.  *In re Petrobras*, 317 F. Supp. 3d at 866.

In their appeal brief, the *Gielatas abandoned their spurious objection* that DTC claimants cannot be part of the settlement Class: "That holding is not challenged on this appeal. If defendants elect to pay claimants for non-domestic claims in exchange for a broader release, that is their prerogative." OB at 56-57. Instead, *they concocted a new argument*: "However, *Rule 23's adequacy requirement compels subclassing* if a broadened settlement class creates a structural conflict . . . The issue on appeal is how to ensure adequate representation of the Shares subgroup in dividing the settlement fund with the Notes subgroup. . . . [T]he structural protection of two subclasses would solve the structural conflict . . . ." *Id.* at 57 (emphasis added). But this new argument was *explicitly disavowed* by the Gielatas in this Court. In this Court, they unequivocally contended that the Settlement did not pose a "structural conflict" in the real *Amchem* sense, but instead argued that the Settlement was structurally deficient because it settled invalid claims: "*To be precise, the problem here is <u>not the 'classic' Amchem conflict necessitating subclasses</u>.* Rather, the structural conflict here is between settlement claimants: class member claimants versus *claimants that cannot be part of the class because their claims are barred by Morrison*." Dkt. No. 813 at 4 (emphases added).

On appeal, the Gielatas are "shifting [their] position," arguing that the *Amchem* "conflict" *<u>can only be cured through the creation of subclasses</u>*: "As a matter of law, only the creation of subclasses, and the advocacy of an attorney representing each subclass, can ensure that the interests of adverse subgroups are in fact adequately represented"; "In this case the structural protection of two subclasses would solve the structural conflict between the Shares subgroup and the Notes subgroup." OB at 27, 57. The law does not permit this blatant gamesmanship. *Wal-Mart Stores,* 396 F.3d at 124 n.29 ("The law in th[e] [Second] Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below, . . .

waiver will bar raising the issue on appeal."); *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir. 1977) ("[W]here a party has shifted his position on appeal and advances arguments available but not pressed below, . . . and where that party has had ample opportunity to make the point in the trial court in a timely manner, . . . waiver will bar raising the issue on appeal."); *see similarly Askins v. Doe No. 1*, 727 F.3d 248, 252 (2d Cir. 2013); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 255 n.8 (2d Cir. 2011).

The Gielatas' stunning reversal does not stop here.  The ***nature*** of the subclasses they propose on appeal contradicts the process they urged in this Court.  Here, they requested the appointment of an independent counsel to weed out Note purchasers that could establish domesticity only through DTC clearance or settlement.  All remaining Class members, including Note purchasers that can show domesticity through means other than DTC clearance, would then participate in the proceeds of the Settlement equally.  Dkt. No. 813 at 4-6, 9.  Shifting course, the Gielatas now ask that ***all*** Note purchasers, including those that ***can*** prove a domestic transaction, be represented by separate counsel and have their claims discounted in the Plan of Allocation.  This is the first time the Gielatas ever advocated creating Noteholder and ADR subclasses, and the first time they demand penalizing all Noteholders' claims, even though the overwhelming majority of that subclass can fully demonstrate a domestic transaction.  No Class member ever urged such a nonsensical apportionment.  As even the Gielatas concede, most Note purchasers satisfy *Morrison*, so this newfangled argument is groundless.

Indeed, Plaintiffs informed the District Court that the majority of the Notes transactions were domestic, estimating that roughly 2% of the Class' damages pertained to non-domestic transactions in the Notes.  Dkt. No. 843 at 6-7; Dkt. No. 789 at 128; Dkt. No. 824 at 17.[2]  Neither

---

[2] Plaintiffs showed that a sampling of the Notes revealed that approximately 70% of the top

the Gielatas nor any other objector provided any calculation supporting any different percentage. On appeal, the Gielatas argue misleadingly that "the district court's *Morrison* rulings in this litigation uniformly suggest a higher percentage in reality, probably closer to 20% than to 2%." OB at 50.  To support this invention, the Gielatas self-servingly pluck one individual opt-out action brought by a foreign plaintiff (INKA[3]) and argue that in that action, 30% of the Notes were dismissed on *Morrison* grounds.  *Id*. at 50-51.  But when the focus is properly shifted from just one foreign individual action, the transactions in the Notes are overwhelmingly domestic. Of all the Individual Actions where pleadings were adjudicated, consisting of more than $12 billion in Note transactions, just 1% of the Note transactions ($125 million in transactions alleged by INKA or approximately 30% of INKA's Notes transactions) were dismissed on *Morrison* grounds, demonstrating that Plaintiffs' 2% estimate is highly conservative.[4]  And, as the Gielatas concede, 70% percent of the transactions of even foreign plaintiffs like INKA were domestic.  In light of the fact that only 25% of the Settlement Class were Note purchasers, the rest being ADR purchasers whose domesticity cannot be questioned, even the Gielatas' ill-

---

Petrobras bondholders during Q4 2014 are U.S.-based institutional investors. Dkt. No. 824 at 17. Based on principles of probability and statistical inference, if U.S. investors held 70% of the Petrobras bonds during the Class Period, the conditional probability of any given trade involving a U.S. investor (on at least one side of the trade) increased to approximately 91%.  *Id*.  Using these figures and the fact that Plaintiffs' damages expert estimated that 25% of the total damages pertained to all transactions in the Notes (domestic or otherwise) (Dkt. No. 789 ¶319), Plaintiffs estimated that roughly 2% of the damages pertained to non-domestic transactions in the Notes.

[3] *Inka Internationale Kapitalanlagegesellschaft mbH v. Petroleo Brasileiro S.A. – Petrobras*, No. 15-cv-06575-JSR (S.D.N.Y. Aug. 19, 2015).

[4] No. 15-cv-02192-JSR (ECF No. 59-1) ($140,500,618); No. 15-cv-03733-JSR (ECF Nos. 56-1, 56-2) ($396,320,369); No. 15-cv-03887-JSR (ECF No. 52-1) ($64,728,514); No. 15-cv-03923-JSR (ECF No. 74) ($96,534,870); No. 15-cv-09182- JSR (ECF No. 18) ($8,664,457); No. 15-cv-09243-JSR (ECF No. 18) ($19,683,025); No. 15-cv-10111-JSR (ECF No. 57) ($591,431,886); No. 15-cv-08192-JSR (ECF No. 65-1) ($10,420,672,386); No. 15-cv-07615-JSR (ECF No. 93-1) ($172,566,612); No. 15-cv-6618-JSR (ECF No. 51-1) ($299,377,000); No. 15-cv-6618-JSR (ECF No. 51-21) ($125,727,000).  Out of $12,336,206,737 worth of bond purchases, 98.98% of transactions, or $12,210,479,737, were not dismissed, and only 1.02% of total transactions, or $125,727,000, were dismissed.

conceived estimate demonstrates that the overwhelming majority of the Class easily satisfies *Morrison*.  The Gielatas concede that their brand-new proposal harms Notes purchasers with domestic claims:

> ***The Notes subgroup contains domestic claims and non-domestic claims***. Some individual Notes subgroup members may themselves have a combination of domestic and non-domestic trades. This raises the question of whether the Notes subgroup should be further subdivided into subclasses of domestic claims and non-domestic claims. The problem is that there is no obvious dividing line within the Notes subgroup. ***The essential defect impairing the Notes subgroup . . . is that it is not easy to figure out whether a particular Notes claim is domestic or not***. This suggests that the Notes subgroup should be a single subclass.

OB at 57-58.  Indeed, the Gielatas recognize that if their proposed subclasses were adopted, objectors would "emerge[] from the Notes subgroup" to attack the Gielatas' Plan of Allocation, with no end in sight.  *Id*. at 59.

The Gielatas' concession that "it is not easy to figure out" whether a particular Note transaction is domestic—while acknowledging that most transactions in the Notes meet domesticity—demonstrates the wisdom of Plaintiffs' Plan of Allocation.  Rather than engaging in a fact-intensive and contentious process to determine which transactions meet the Court's *Morrison* requirements, Plaintiffs simply proposed treating all purchasers of Notes that cleared through DTC equally, allowing for an efficient and streamlined process for administering the Settlement Fund.  The Gielatas' incessant flip-flopping in identifying a problem with the Settlement and Plan of Allocation or a sensible solution to that problem demonstrates the frivolity of their arguments.  Settlement Class members should not have to wait months if not years while a professional objector with a criminal record tries to "figure out" the basis for his appeal and the relief he is requesting.

The Gielatas likely do not want to distinguish between domestic and non-domestic Notes purchasers because such a conflict would have been addressed sufficiently by counsel for Lead

Plaintiff USS (with foreign Notes purchases) and Plaintiff Hawaii (with domestic Notes purchases). Ironically, the Gielatas now seeks the appointment of the Labaton law firm to represent the subclass for the Notes subgroup (OB at 62), but Labaton would not qualify under the Gielatas' logic because their client, Hawaii, holds both Notes *and* ADRs. Hardly a master of subtlety, Joseph Gielata advocates to line his *own* pockets by extracting attorneys' fees under the guise of a "benefit" he is conferring on the ADR claimants, advocating for a percentage of the money he seeks to shift around to the detriment of *Morrison*-compliant Noteholders. In doing so, he states that "counsel" for the ADRs subclass should receive this windfall (which he apparently claims will be in the millions)—leaving it clear to the naked eye that Gielata is still flouting local rules and ethical requirements by acting as an attorney in this matter. OB at 60-62 (arguing that "structural protections should include a suitable incentive for subclass counsel . . . through a fee based on a percentage of any additional recovery provided to the Shares subgroup by the reallocation. The percentage should be . . . sufficient to motivate subclass counsel to maximize the interests of the Shares subgroup.")

The Gielatas advance other frivolous arguments. Their argument that Lead Plaintiff USS suffered from a conflict of interest because it was incentivized to increase recovery for its DTC claims at the expense of the ADR class is belied by the record. The overwhelming majority of USS's $87.6 million damages is based on its ADR purchases. *See* Lieberman Decl., Ex. B. Just an infinitesimal portion of USS's damages, approximately $7,821.00 or 0.008% of its total damages, pertained to DTC claims based on Note purchases that had been dismissed for failure to satisfy *Morrison*, and even those losses pertained only to one particular note. *Id*. In reality, USS is akin to an ADR-only purchaser, and had every financial incentive to maximize the recovery for all ADR purchasers. The Gielatas cannot point to any reason why Hawaii was

unable to represent purely domestic Noteholders if the subclasses were divided between domestic Note purchasers and non-domestic purchasers, or why USS would not be an appropriate Class Representative if the subclasses were divided between ADRs purchasers and Note purchasers, as they now belatedly advocate. Under either scenario, the Gielatas are simply unable to articulate a coherent deficiency in the adequacy of representation in this Action.

The Gielatas also blatantly misstated the standard of review on appeal, claiming without valid legal support that the applicable standard is *de novo*. It is black letter law that the Second Circuit will only disturb a district court's ruling on class certification, including its determination that individual Rule 23 requirements were met, if there has been an *abuse of discretion*. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 31-32 (2d Cir. 2006); *see similarly Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). As the Second Circuit recognizes, "the abuse-of-discretion standard has regularly been applied in reviewing a district judge's conclusions with respect to individual requirements of Rule 23 both by this Court, *see, e.g., . . . Johnpoll v. Thornburgh*, 898 F.2d 849, 852 (2d Cir. 1990) (adequacy of class definition and ***adequacy of representation***) . . . and by other Circuits, *see, e.g., . . . Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 924, 925 (3d Cir. 1992) (***adequacy of representation***, predominance, and duration of class period). We will apply the abuse-of-discretion standard both to Judge Scheindlin's ultimate decision on class certification as well as her rulings as to Rule 23 requirements." *In re IPO,* 471 F.3d at 32 (emphases added). The cases on which the Gielatas rely have nothing whatsoever to do with the standard of review for Rule 23's adequacy of representation prong.[5] It

---

[5] *See Hansberry v. Lee*, 311 U.S. 32, 37 (1940) (suit to enjoin the breach of a restricted covenant agreement); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (in class action seeking interest on overdue royalty payments, discussing whether Kansas opt-out procedure satisfies due process); *Richards v. Jefferson Cty., Ala.,* 517 U.S. 793, 794, 801-02 (1996) (suit involving a challenge to a county's occupation tax on federal constitutional grounds); *United*

is utterly frivolous for the Gielatas to present them as authority.

Another recent evidence of the Gielatas' bad faith conduct is their refusal to execute a proposed stipulation consistent with the limited relief they seek on appeal: allocating a larger portion of recovery to the ADR purchasers.  The stipulation would have permitted tens of thousands of aggrieved Petrobras investors to collect close to a billion dollars in recovery from the Settlement fund.  At bottom, if the Gielatas were granted the full relief they now request, the only change would be to the Plan of Allocation.  OB 55-56.  By demanding that the Settlement Class be decertified in order to achieve this relief, however, the Gielatas appeal the finality of the Settlement, thereby precluding a distribution of the Net Settlement Fund.

Consistent with the relief sought in the Gielatas' appeal, and in an effort to commence distribution to the tens of thousands of Petrobras Class members who will be prejudiced by the undue delay caused by his appeal, counsel for Plaintiffs presented Joseph Gielata with two proposed stipulations aimed to redress the harm.  *See* Lieberman Decl. Ex. C.  Each stipulation would have permitted the Gielatas to seek the true relief they now demand with respect to their appeal, yet left the certification of the Settlement Class unchallenged in order to allow for a distribution to aggrieved Class members.

Sensing that any chance of leveraging his appeal to extort fees would dissipate upon an agreement that would leave the Settlement intact, Joseph Gielata refused Plaintiffs' proposal.  While conceding that the "remedy sought in Gielata's appeal relates to the allocation of the Net Settlement Fund" (*see* Ex. C), Gielata refused to allow a prompt distribution to Class members,

---

*States v. Cruz-Flores*, 56 F.3d 461, 463 (2d Cir. 1995) (criminal action, where a deportee was misinformed of the prison sentence length he faced if caught returning).

insisting that Class certification must be vacated in order to accomplish his change.  *Id.*[6]  There is no legal basis for the Gielatas to seek vacatur of the Class certification order when the only remedy they seeks relates to the Plan of Allocation.  The cases on which the Gielatas rely to support their new argument on appeal have been thoroughly analyzed and distinguished by this Court as "dramatically different."  (*In re Petrobras*, 317 F. Supp. 3d at 867-70) (discussing argument made by *another* objector who did not file a notice of appeal).  Moreover, the settlement agreements in *Literary Works*, *Payment Card*, and *Ortiz*[7] are inapposite—none contain the provision specifically bargained for by the parties here, *i.e.*, that the Plan of Allocation is **not** a material term of the Settlement.  *See* Lieberman Decl. Ex. D (*Literary Works* settlement agreement); Ex. E (*Payment Card* settlement agreement); and Ex. F (*Ortiz* settlement agreement).[8]  There is no legal nor factual justification to vacate the Settlement in order to alter the Plan of Allocation.

In yet another episode of bad faith, Joseph Gielata was the only obstructionist refusing to stipulate to the voluntary dismissal of an appeal filed by Pomerantz concerning the fees awarded to the firm by this Court in connection with the Settlement.  Lead Counsel filed the notice of appeal as a result of objectors' (including Gielata) attacking the attorneys' fees granted by this Court to Lead Counsel, and moved to dismiss the appeal as soon as it became clear that no objectors were pursuing such an appeal.  Gielata opposed the voluntary dismissal for invalid reasons and in an effort to inject improperly irrelevant issues before the Court of Appeals.[9]

---

[6] The terms of the Settlement Agreement preclude any distribution until the Settlement is final. (Dkt. No. 767-1 ¶ 19).

[7] *In re Payment Card*, 827 F.3d 223 (2d Cir. 2016); *Ortiz v. Fireboard*, 527 U.S. 815 (1999). Plaintiffs have been unable to locate the *Amchem* settlement agreement.

[8] Plaintiffs have been unable to locate the *Amchem* settlement agreement.

[9] Appellant Pomerantz's Response to Appellee Joseph Gielata's Opposition to Motion to Voluntarily Dismiss Appeal Pursuant to F.R.A.P. 42(b), *In re Petrobras Sec. Litig.*, No. 18-2324-CV (2d Cir. Nov. 28, 2018), ECF No. 72.

In sum, the Gielatas advance with impunity frivolous arguments made entirely in bad faith.  They are the quintessential example of obstructionists who are "seeking to extort monies on [their] own private behalf" at the expense of the Class.  Their waste of judicial resources and abuse of the legal process are "delay[ing] the payment to victims of monies that in some cases they sorely need."  The Gielatas' conduct deserves significant sanctions.  At a minimum, the Court should assess damages, including all reasonable costs and attorneys' fees incurred by Lead Counsel in responding to the appeal, against the Gielatas.  Plaintiffs spent roughly 490.25 hours and $298,034.00 opposing Gielatas' appeal.  Lieberman Decl. Ex. G.  *See, e.g.*, *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 147 (2d Cir. 2012) (explaining the "salutary effect overall" of a district court's ability to impose sanctions and affirming the district court's imposition of sanctions under its inherent powers and §1927 for a voluntary withdrawal of a frivolous appeal filed in bad faith with dilatory motive); *In re 60 E. 80th St. Equities,* 218 F.3d at 116 ("an award under §1927 is proper when the attorneys' actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay"); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 193 (3d Cir. 2002) (affirming §1927 sanctions imposed on professional objectors); *In re Broadcom Corp. Sec. Litig.*, No. 01-cv-275 DT (MLGx), 2005 U.S. Dist. LEXIS 45656, at *16 (C.D. Cal. Dec. 5, 2005) (imposing §1927 sanctions on professional objector who interposed objections for the purpose of delaying the administration of the settlement); *In re Polyurethane Foam Antitrust Litig.*, No. 17-3361, 2017 U.S. App. LEXIS 25352, at *3 (6th Cir. Dec. 14, 2017) (awarding sanctions under §1927, equal to the interest that had been lost to the class, for preventing the disbursement of settlement monies through repetitive, frivolous challenges to appeal bond); *In re Ivan F. Boesky Sec.*, 948 F.2d 1358, 1368 & n.2 (2d Cir. 1991) ("The result

has been that Objectors, constituting about two percent of their own class and an infinitesimal fraction of the classes as a whole, and pursuing weak claims, have injured all classes by this appeal. Counsel contemplating similar actions in the future should be aware of Rule 11"); *Gurary v. Winehouse*, 235 F.3d 792, 800 (2d Cir. 2000) (reversing district court's refusal to impose sanctions for a frivolous filing); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 124, 127-31 (S.D.N.Y. 1999) ("[W]here, as here, an objector to a class action settlement pursues an unmeritorious appeal in order to pursue a strategy of tactical disruption and delay, he should be aware of Rule 11. In the present action, [the objector] has abused the litigation process by pursuing his personal agenda even though his claims have no chance of success . . . For the reasons set forth, [the objector] has violated Rule 11.").

## V.      THE COURT SHOULD INCREASE THE APPEAL BOND

This Court previously adjudged the strength of the Gielatas' objections to the Settlement and found them to be meritless, not to mention advanced in bad faith. *In re Petrobras,* 2018 U.S. Dist. LEXIS 161898, at *36-45. "Deeply troubled by some of Gielatas' conduct," the Court required them to post a $50,000 bond for the taxable costs of the appeal. *Id*. at *36, 45. ("Finally, and most critically, as discussed in detail above, while the Gielatas' appeal is slightly more colorable than Bueno's frivolous appeal, both appeals lack merit and both appellants have exhibited some bad faith conduct . . . Based on its assessment of the relevant factors, the Court thus finds that an appeal bond is warranted as to both Bueno and the Gielatas.)"  Given the Gielatas' $2 million windfall in the *Tyco* Settlement, however, such an appeal bond is hardly a deterrent to a veteran extortionist like Joseph Gielata.

Since then, the Gielatas have pursued other tricks to extort a payment.  For example, as explained above, the Gielatas abandoned the meritless objection made in this Court and on appeal advance new arguments they explicitly eschewed in this Court; the Gielatas make

23

arguments directly contradicted by the record and the evidence, *i.e.*, that 30% of the Class members are not *Morrison*-compliant; and the Gielatas seek the limited relief of amending the Plan of Allocation yet refuse to execute a stipulation consistent with that relief that allows distribution to the tens of thousands of aggrieved Class members awaiting payment.  Simply put, the Gielatas are making a mockery of the administration of justice.  The Claims Administrator represents that it now stands ready to distribute promptly 35% of the Settlement Fund, or nearly $1 billion.  *See* Lieberman Decl. Ex. H ¶8.  The significant administrative costs associated with the Gielatas' delay in the distribution of the Settlement fund *are now accruing and Gielatas' bad-faith conduct is now "materially prejudic[ing] [the] Class."  Cf.  In re Petrobras,* 2018 U.S. Dist. LEXIS 161898, at *40-41 (stopping short of sanctioning the Gielatas at the time because their actions had "not materially prejudiced" the Class, but "retaining the right to revisit" sanctions against the Gielatas in the future).  According to the Claims Administrator, it is incurring needless administrative costs averaging approximately $155,000 per month. Ex. H ¶13. While Plaintiffs have requested that the appeal be resolved with a non-precedential order, without oral argument and as expeditiously as possible to minimize the harm to the Settlement Class (Opp. Br. at 3), Lead Counsel's recent experience is that it can take up to one and a half years for a decision to be issued in the Second Circuit.  *See Strougo et al. v. Barclays PLC et al.*, No. 16-1912 (2d Cir. June 15, 2016).  Therefore, Plaintiffs request that the Gielatas be sanctioned and/or required to pay a bond equaling $155,000 for every month that distribution of the Settlement Fund is delayed by the appeal.  This is the amount that the Claims Administrator estimates at minimum would be the additional cost per month.

This Court has the power to impose a sizeable bond commensurate with the harm caused by the Gielatas.  *See* Dkt. No. 860   at 19-25 citing, *inter alia*, *In re Credit Default Swaps*

*Antitrust Litig.*, No. 13-md-2476, 2016 WL 2731524, at *19 (S.D.N.Y. Apr. 26, 2016) (administrative expenses can "be included in a Rule 7 bond . . . The damages that an appellee class incurs when confronted with a frivolous appeal from a judgment entered pursuant to a class action settlement include those additional administrative costs that are associated with the delay in distribution of a settlement fund); *In re Wal-Mart Wage & Hour Emp't Practices Litig.*, No. 06-00225, 2010 WL 786513, at *2 (D. Nev. Mar. 8, 2010) (requiring a $500,000 appeal bond); *In re Broadcom,* 2005 U.S. Dist. LEXIS 45656, at *9 (including costs of delay and disruption of settlement administration in appeal bond – estimated at $517,700 – resulting from, *inter alia*, "costs of updating addresses and other information needed to remain in contact with Class members, locating lost Class members . . . paying monthly fees for maintaining the website created to inform Class members, and providing phone support to answer inquiries from the Class members").

## VI.       CONCLUSION

It is simply absurd that an individual who has: 1)  engaged in past criminal conduct; 2) extorted Class counsel in another matter for $2 million while providing no benefit  to the Class; 3)  been found by this Court to have illegally acted as an attorney in this matter and continues to do so; 4) completely shifted his bases for objecting to the Settlement; and 5) asserts standing on the basis of a sham assignment, should have the ability to delay the distribution of this objectively excellent Settlement.  He does so at little financial risk, while the Settlement Class suffers immensely.  Plaintiffs respectfully request that the Court protect the Class from this obvious abuse of process and sanction the Gielatas accordingly, and also refer Joseph Gielata's misconduct to the Delaware Bar Association.

Dated:  December 20, 2018                          **POMERANTZ LLP**

                                                   */s/ Jeremy A. Lieberman*

Jeremy A. Lieberman
Emma Gilmore
Brenda Szydlo
Austin P. Van
Jennifer B. Sobers
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: 212-661-1100
Facsimile: 212-661-8665

*Attorneys for Lead Plaintiff Universities*
*Superannuation Scheme Limited and Named*
*Plaintiff North Carolina Department of State*
*Treasurer*

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Louis Gottlieb
140 Broadway
New York, NY 10005
Telephone: 212-907-0700
Facsimile: 212-818-0477

*Attorneys for Employees' Retirement*
*System of the State of Hawaii*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 20, 2018, I caused a true and correct copy of the foregoing to be served on counsel of record by electronically filing it with the Clerk of the Court using the ECF system, which will send notification of such filing to the registered participants; and I caused a true and correct copy of the foregoing to be served upon the following objectors by first class mail and e-mail:

Richard Gielata and
Emelina Gielata
100 Westbury Drive
Coraopolis, PA 15108
emgielata@gmail.com

Joseph Gielata
7811 Eads Avenue #207
La Jolla, CA 92037
gielata@gmail.com


<u>/s/ Jeremy A. Lieberman</u>
Jeremy A. Lieberman