UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PETROBRAS SECURITIES LITIGATION

This Document Applies To:

*In re Petrobras Securities Litigation*, 14-cv-9662 (JSR)

No. 14-cv-9662 (JSR)

# MEMORANDUM OF LAW
## IN SUPPORT OF JOSE SERGIO GABRIELLI DE AZEVEDO'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

MORVILLO ABRAMOWITZ GRAND IASON &
ANELLO P.C.
565 Fifth Avenue
New York, New York  10017
(212) 856-9600 (phone)
(212) 856-9494 (fax)

*Attorneys for Defendant Jose Sergio Gabrielli de Azevedo*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................ii

I.    PRELIMINARY STATEMENT .................................................................................1

II.   STATEMENT OF FACTS .........................................................................................2

III.  ARGUMENT ............................................................................................................4

    A. Hearsay Statements Purporting to Implicate Dr. Gabrielli Cannot
       Defeat Summary Judgment ...................................................................................5

       1.  The Brazil Statements Cannot Be Considered on Summary Judgment ..........6

       2.  The Brazil Statements Are Not Admissible Under Any Hearsay
          Exception for Prior Statements of Unavailable Witnesses...........................10

       3.  The Purported Evidence Relating to Dr. Gabrielli Is Inadmissible
          Hearsay Within Hearsay.................................................................................14

    B.  The Remaining Evidence Is Legally Insufficient................................................16

       1.  It is Undisputed that Dr. Gabrielli Had No Knowledge of the
          Cartel and Bribery Scheme............................................................................17

       2.  Unrelated Incidents of Suspected Wrongdoing Were Addressed
          Appropriately..................................................................................................18

       3.  The TCU Audit Reports are "Red Herrings" Not "Red Flags".....................21

    C.  Plaintiffs Cannot Demonstrate That Dr. Gabrielli Made Certain
       Alleged Misstatements or That Others Are Actionable ........................................24

CONCLUSION...................................................................................................................25

APPENDIX A – Inadmissible Hearsay Statements............................................................A-1

APPENDIX B – Allegedly False and Misleading Statements That Are Not
Actionable Against Dr. Gabrielli ......................................................................................B-1

i

# TABLE OF AUTHORITIES

## Cases

Advani Enter., Inc. v. Underwriters at Lloyds, No. 95-CIV-4864, 2000 WL
      1568255, at *3 (S.D.N.Y. Oct. 19, 2000) ............................................................6

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ........................................16

Annunziata v. City of New York, No. 06 CIV. 7637, 2008 WL 2229903, at *9
      (S.D.N.Y. May 28, 2008)..................................................................................12

Antonucci v. Morgan Stanley Dean Witter & Co., No. 02-CIV-5246, 2005
      WL 627556, at *4 (S.D.N.Y. Jan. 11, 2005), adopted by 2005 WL
      5300159 (S.D.N.Y. May 23, 2005)..................................................................11

Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir.1994) ....................................4

Badalamenti v. United States, 201 F.3d 430 (2d Cir. 1999)........................................13

Bortell v. Eli Lilly & Co., 406 F. Supp. 2d 1, 8-9 (D.D.C. 2005) .................................10

Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 90 (2d Cir. 2002) ...................16

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986) ............................................3, 4

Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n,
      768 F.3d 183, 192 (2d Cir. 2014).......................................................................4

Chamberlin v. Principi, No. 02 CIV. 8357, 2005 WL 1963942, at *10
      (S.D.N.Y. Aug. 16, 2005) ................................................................................10

CL-Alexanders Laing & Cruickshank v. Goldfeld, 739 F. Supp. 158, 161
      (S.D.N.Y. 1990) ..........................................................................................3, 16

Deutsche Asset Mgmt., Inc. v. Callaghan, No. 01-CIV-4426, 2004 WL 758303,
      at *14, 14 n.11 (S.D.N.Y. Apr. 7, 2004).........................................................14

Estate of Ungar v. Palestinian Auth., 451 F. Supp. 2d 607, 612 (S.D.N.Y. 2006)........................6

French Am. Banking Corp. v. Flota Mercante Grancolombiana, S.A.,
      693 F. Supp. 1421, 1426 (S.D.N.Y. 1987).......................................................14

Jack v. Trans World Airlines, Inc., 854 F. Supp. 654, 659 (N.D. Cal. 1994)............................7, 8

Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) ....................................................4

In re Pinnacle Airlines Corp., 483 B.R. 381, 403 (Bankr. S.D.N.Y. 2012) .....................................7

In re Symbol Tech. Class Action Litig, 950 F. Supp. 1237, 1242 (E.D.N.Y. 1997) .......................4

Instinet Inc. v. Ariel (UK) Ltd., No. 08-CIV-7141, 2012 WL 4195391,
    at *6 (S.D.N.Y. Sept. 20, 2012) .........................................................................................5, 8

Lamberti v. United States, 22 F. Supp. 2d 60, 71 n.52 (S.D.N.Y. 1998) ......................................13

Magrino v. New York City Off-Track Betting Corp., No. 91 CIV. 5626,
    1994 WL 4446, at *2 (S.D.N.Y. Jan. 3, 1994) .....................................................................7

Manessis v. New York City Dep't of Transp., No. 02-CIV-359, 2003 WL 289969,
    at *14 (S.D.N.Y. Feb. 10, 2003) aff'd sub nom. Manessis v. Chasin, 86 F.
    App'x 464 (2d Cir. 2004) .....................................................................................................15

Matter of Sterling Nav. Co., 444 F. Supp. 1043, 1046 (S.D.N.Y. 1977) .......................................11

Pettus v. City of New York, No. 10-CV-1442, 2011 WL 4458901, at
    *6 (E.D.N.Y. Aug. 23, 2011), adopted by 2011 WL 4440209
    (E.D.N.Y. Sept. 23, 2011) ....................................................................................................14

Realuyo v. Diaz, No. 98-CV-7684, 2006 WL 695683, at *5
    (S.D.N.Y. Mar. 17, 2006) .....................................................................................................14

Ricciuti v. New York City Transit Auth., No. 90-CIV-2823, 1998 WL 171469,
    at *4 (S.D.N.Y. Apr. 14, 1998) .............................................................................................11

Robbins v. Moore Med. Corp., 894 F. Supp. 661, 667 (S.D.N.Y. 1995) ......................................16

Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001) ..........................................................8, 9, 10

Sawant v. Ramsey, No. 07-CV-980, 2012 WL 1605450,
    at *3 (D. Conn. May 8, 2012) ...............................................................................................11

Scott v. Harris, 550 U.S. 372, 380 (2007) ....................................................................................19

S.E.C. v. Espuelas, 699 F. Supp. 2d 655, 662-663 (S.D.N.Y. 2010) ...........................................24

Shamrock Power Sales, LLC v. Scherer, No. 12-CV-8959, 2015 WL 5730339,
    at *18 (S.D.N.Y. Sept. 30, 2015) ...........................................................................................8

Sterling Fifth Associates v. Carpentile Corp., No. 03 CIV 6569 (HB),
    2003 WL 22227960, at *5 (S.D.N.Y. Sept. 26, 2003) ..........................................................7

Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998)................................................24

United States v. Jackson, 335 F.3d 170, 179 (2d Cir. 2003) ........................................................12

United States v. North, 713 F. Supp. 1450, 1451 (D.D.C. 1989)
      aff'd, 910 F.2d 843 (D.C. Cir. 1990) ...............................................................................11

United States v. Pollaro, 733 F. Supp. 2d 364, 370 (E.D.N.Y. 2010) ............................................7

United States v. Tropeano, 252 F.3d 653, 658 (2d Cir. 2001)......................................................13

## Statutes

28 U.S.C. § 1746...........................................................................................................................7

## Rules

Fed. R. Civ. P. 28(b)(1)................................................................................................................6

Fed. R. Civ. P. 56(a) ....................................................................................................................4

Fed. R. Civ. P. 56(c)(1)................................................................................................................6

Fed. R. Civ. P. 56(c)(2)............................................................................................................5, 8

Fed. R. Civ. P. 56(e) ..................................................................................................................16

Fed. R. Evid. 105 ........................................................................................................................16

Fed. R. Evid. 801(c).....................................................................................................................8

Fed. R. Evid. 804(b)...............................................................................................................10, 12

Fed. R. Evid. 804(b)(1)...............................................................................................................10

Fed. R. Evid. 804(b)(3)...........................................................................................................10, 12

Defendant Jose Sergio Gabrielli de Azevedo ("Dr. Gabrielli") respectfully submits this memorandum of law in support of his motion, pursuant to Fed. R. Civ. P. 56, for summary judgment dismissing all claims against him in the Fourth Amended Complaint ("Complaint") (Dkt. 342).[1]

## I.  PRELIMINARY STATEMENT

Dr. Gabrielli was the CEO of Petróleo Brasileiro S.A. ("Petrobras" or the "Company") from July 2005 to February 2012.  What the world *now* knows is that during at least part of that period there were corrupt Petrobras employees who were part of a well-concealed scheme to award construction project bids to an organized cartel of companies in exchange for bribes and kickbacks paid to employees and to political operatives.  Dr. Gabrielli played no role in that corrupt scheme.  After months of discovery, millions of pages of produced documents and email, and the depositions of dozens of witnesses, Plaintiffs have failed to identify any admissible evidence supporting their claim that Dr. Gabrielli should be held liable as a result of these events.

This is not a typical motion for summary judgment.  The Plaintiffs' strategy and the constraints of the ongoing Brazilian judicial process present unique and significant evidentiary complications for the upcoming trial.  Since liberal civil discovery and record evidence *in this action* failed to yield the result they desired, Plaintiffs sought "evidence" elsewhere—from the *Lava Jato* investigation in Brazil and related press.  Plaintiffs apparently believe that there are ten people who can offer at least some relevant information concerning Dr. Gabrielli.  However, *eight* were never deposed in this action; we know that *one* is incarcerated in Brazil, *three* are

---

[1] Dr. Gabrielli respectfully joins and incorporates by reference, to the extent applicable, the memoranda and evidence supporting the motions for summary judgment of the Petrobras Defendants ("Petrobras Motion"), defendant Maria das Graças Foster ("Foster Motion") and individual defendants, Almir Guilherme Barbassa, Jose Carlos Cosenza, Guilherme de Oliveira Estrella and Jose Miranda Formigli Filho ("Individual Defendants Motion").

under house arrest and *two* are in the midst of negotiating guilty pleas with the Brazilian authorities; *one* appears to be of interest to Plaintiffs solely because of an interview he gave to a Brazilian weekly magazine. Their statements are replete with multiple hearsay, the very grist of the rumor-mill. However, to survive summary judgment at this late stage Plaintiffs must come forward with more than innuendo and second-hand speculation spread through a scandal-ready Brazilian media.

Whether such statements are admissible in a Brazilian proceeding, or could on some basis be admissible here against others, they cannot be admitted against Dr. Gabrielli. Plaintiffs do not come close to satisfying their evidentiary burden for claims against him. Summary judgment is an opportunity for the Court to dismiss claims that are demonstrably lacking in evidentiary support, and thereby to streamline the trial with a sharp focus on potential liability supported by actual, admissible evidence for the jury's consideration. Now that discovery has closed resulting in virtually no evidence that is or ever will be admissible with respect to Dr. Gabrielli, no reasonable jury could find him liable for violations of Sections 10(b), 20(a) and Rule 10b-5—the only claims against him—and a dismissal removing Dr. Gabrielli from this case is warranted.

## II.  STATEMENT OF FACTS

The Complaint purports to tie Dr. Gabrielli to several events that Plaintiffs allege demonstrate his involvement in, or at least reckless disregard concerning, the cartel and bribery scheme at the heart of the Plaintiffs' case. The problem for Plaintiffs—and one reason that the Court should grant our motion for summary judgment—is that they do not have even a single piece of admissible evidence with respect to many of these alleged events. The only support for the following allegations are hearsay statements that are not admissible, now or at trial.

- Allegation that concerns about bribery in connection with the Pasadena refinery were raised by an unnamed "confidential informant" in late 2005 and conveyed to Dr. Gabrielli through a "top PT politician." Ex. 1 ¶ 103; App'x A.9.[2]

- Allegation that the 2006 acquisition and revamp of the Pasadena refinery would be politically beneficial to Dr. Gabrielli and that he had pre-determined that a company called Odebrecht would be selected for the revamp project. App'x A.1; Juteau Decl. ¶ 7(a).

- Allegation that in mid-2009 Dr. Gabrielli sought the transfer or termination of a lawyer in the Petrobras legal department who raised questions about the construction contracting process at Petrobras and purported undue influence of the Brazilian Industrial Engineering Association ("ABEMI"). Ex. 1 ¶¶ 64-79; App'x A.2.

- Allegation, from an August 2013 magazine article, that in 2009 a Brazilian Senator had an agreement with Dr. Gabrielli to facilitate Petrobras' approval of a large environmental mitigation contract for Odebrecht and in exchange the Senator's political party would close a Congressional inquiry into Petrobras activities. App'x A.3; Juteau Decl. ¶ 7(c).

- Allegation that in late 2006 Dr. Gabrielli asked Nestor Cerveró, the former Petrobras Director of the International Division, to steer the operating contract for a drillship to a company called Schahin in exchange for the forgiveness of a PT campaign debt held by the Schahin Bank. Ex. 1 ¶ 119; App'x A.4.

- Generic statements that Dr. Gabrielli "knew" or "had knowledge" about the scheme at Petrobras. Ex. 1 ¶¶ 118, 130; App'x A.7, 8.[3]

These allegations are wholly unsupported by admissible evidence and should be disregarded entirely in the Court's summary judgment determination. Indeed, "[o]ne of the purposes of summary judgment is 'to isolate and dispose of factually insupportable claims.'" CL-Alexanders Laing & Cruickshank v. Goldfeld, 739 F. Supp. 158, 161 (S.D.N.Y. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986)). The remaining allegations

---

[2] Citations to "Ex." refer to the exhibits to the Declaration of Jasmine Juteau in Support of Jose Sergio Gabrielli de Azevedo's Motion for Summary Judgment, submitted herewith.

[3] There is no evidentiary support whatsoever—hearsay or otherwise—for two additional allegations raised in the Complaint: the allegation of a news article reporting that "federal police forensic experts suggest that Gabrielli breached banking and fiscal secrecy laws, as part of their research into e-mails of Odebrecht's president," Ex. 1 ¶ 120; and the allegation that in 2009 the delivery of an offshore drilling rig, the P-57, was accelerated by Dr. Gabrielli at additional costs to Petrobras in order to benefit the presidential campaign of Dilma Rousseff, id. ¶ 92.

against Dr. Gabrielli, resting on a thin reed of potentially admissible evidence, are legally insufficient and will not satisfy the Plaintiffs' burden to present a "genuine" issue of material fact to be tried.

## III. ARGUMENT

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex, 477 U.S. at 322. "There is no genuine dispute when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n, 768 F.3d 183, 192 (2d Cir. 2014) (internal quotation omitted). "[T]o defeat summary judgment, 'a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful.'" Id. at 197 n.10 (quoting Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005)). The non-movant "must point to specific, admissible evidence that, if believed, would cause a jury to find in their favor." In re Symbol Tech. Class Action Litig., 950 F. Supp. 1237, 1242 (E.D.N.Y. 1997) (citing Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir.1994)).

Plaintiffs cannot meet this standard. The evidence for the majority of the Plaintiffs' allegations against Dr. Gabrielli is inadmissible hearsay that should not be considered on summary judgment or at trial. Moreover, the remaining facts fail to create a "genuine" disputed issue of material fact as to Dr. Gabrielli's liability for Sections 10(b), 20(a) and Rule 10b-5 violations. Lastly, Plaintiffs concede that Dr. Gabrielli did not make a number of the alleged misstatements, and cannot show that he made others or that others are even actionable. For all of these reasons, summary judgment on behalf of Dr. Gabrielli is warranted on all counts.

4

### A.  Hearsay Statements Purporting to Implicate Dr. Gabrielli Cannot Defeat Summary Judgment

The majority of the Plaintiffs' allegations against Dr. Gabrielli were derived from written statements and testimony offered by Brazilian citizens to Brazilian authorities under a variety of conditions ("Brazil Statements").  There are four categories of Brazil Statements that Plaintiffs have raised during discovery:

1) *Transcripts of testimony* before the Brazilian criminal courts prosecuting offenses uncovered by the *Lava Jato* investigation.  ¶¶ 13, 66.[4]  The testimony is under oath and under penalty of perjury; the transcripts are not signed by the witness.  Id.

2) *Transcripts of statements to CPIs.*  These are transcripts of statements made before a *Comissão Parlamentar de Inquérito* ("CPI"), a parliamentary inquiry commission convened by the National Congress of Brazil.  ¶¶ 81, 83.  The statements are made under oath and the transcripts are not signed by the witness.  ¶¶ 84-85.

3) *Cooperation Statements.*  These are unsworn, written statements made pursuant to the declarant's agreement to plead guilty to criminal offenses, stating in writing that the declarant affirms his or her legal commitment to tell the truth and signed by the declarant.  ¶¶ 18-19.

4) *Police Statements.*  These are unsworn, written statements made to the federal police that are signed by the declarant but are not made under penalty of perjury.  ¶ 14.

Plaintiffs did not depose most of the declarants relevant to their claims against Dr. Gabrielli and those individuals will not testify at trial.  "In deciding a motion for summary judgment, the Court may consider only evidence that can be 'presented in a form that would be admissible in evidence.'"  Instinet Inc. v. Ariel (UK) Ltd., No. 08-CIV-7141, 2012 WL 4195391, at *6 (S.D.N.Y. Sept. 20, 2012) (quoting Fed. R. Civ. P. 56(c)(2)).[5]  First, the Brazil Statements are not cognizable on summary judgment and, even if they were, the declarants will not testify at

---

[4] Citations to "¶" refer to the Local Rule 56.1 Statement of Material Facts submitted herewith in support of Dr. Gabrielli's motion for summary judgment.

[5] We contest the truth and admissibility of these statements and, as such, do not include them in the Local Rule 56.1 Statement of Facts.  Instead, for the Court's convenience, we have listed the inadmissible hearsay statements at issue in Appendix A.

trial.  Second, the statements do not qualify for any applicable hearsay exception.  Third, even if the declarants were to testify, the relevant statements purportedly concerning Dr. Gabrielli merely repeat the hearsay statements of other individuals, constituting double (and sometimes triple) hearsay.  Because Plaintiffs cannot meet their evidentiary burden, Dr. Gabrielli is entitled to summary judgment.

### 1.  The Brazil Statements Cannot Be Considered on Summary Judgment

The Federal Rules require a party opposing summary judgment to support the existence of a disputed material fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  None of the Brazil Statements qualify as appropriate Rule 56(c) submissions, such as depositions, affidavits or declarations.  For example, the Brazil Statements are not properly considered "depositions."  Rule 28 states that a deposition may be taken in a foreign country "under an applicable treaty or convention; under a letter of request . . . ; *on notice*, before a person authorized to administer oaths . . . ; or before a person *commissioned by the court* to administer any necessary oath and take testimony."  Fed. R. Civ. P. 28(b)(1) (emphasis added). Rule 28 sets the "standards for the *sufficiency* of depositions taken outside the reach of the federal courts."  Estate of Ungar v. Palestinian Auth., 451 F. Supp. 2d 607, 612 (S.D.N.Y. 2006). The Brazil Statements, the result of criminal investigations, prosecutions and congressional inquiries in Brazil, do not meet any of these standards.  Failure to comply with Rule 28(b) renders foreign testimony "procedurally defective."  Advani Enter., Inc. v. Underwriters at Lloyds, No. 95-CIV-4864, 2000 WL 1568255, at *3 (S.D.N.Y. Oct. 19, 2000).

Nor do the written Brazil Statements, i.e., the Cooperation Agreements and Police Statements, qualify as written affidavits or declarations.[6]  Neither are affidavits because they are not "properly sworn before a person authorized to administer oaths in the venue shown on the affidavit."  See Magrino v. New York City Off-Track Betting Corp., No. 91-CIV 5626, 1994 WL 4446, at *2 (S.D.N.Y. Jan. 3, 1994); see also ¶¶ 14, 30, 36, 44, 52, 61.  They do not meet even the minimum requirements of a declaration because statements at issue do not satisfy the statutory requirements for recognizing unsworn declarations signed outside of the United States, as provided in 28 U.S.C. § 1746(1).  In particular, a declaration "executed without the United States" must state in substance:  "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on (date).  (Signature)."  Id.

The Police Statements and the Cooperation Statements fail to comply with Section 1746 because they do not contain this language or any approximation of it.  ¶¶ 31, 37, 45, 53, 62; Sterling Fifth Associates v. Carpentile Corp., No. 03-CIV-6569, 2003 WL 22227960, at *5 (S.D.N.Y. Sept. 26, 2003) (rejecting an unsworn declaration executed outside the United States, made "pursuant to 28 U.S.C. § 1746 and under penalty of perjury," because it failed to state that "its contents are true and correct" and did not "indicate that the statement is made under penalty of perjury *under the laws of the United States of America*.") (emphasis in original); Jack v. Trans World Airlines, Inc., 854 F. Supp. 654, 659 (N.D. Cal. 1994) (striking twenty-four foreign

---

[6] Transcripts of oral testimony are not affidavits or declarations.  See United States v. Pollaro, 733 F. Supp. 2d 364, 370 (E.D.N.Y. 2010) (separately considering both the declarants' "written affidavit and oral testimony"); In re Pinnacle Airlines Corp., 483 B.R. 381, 403 (Bankr. S.D.N.Y. 2012) (distinguishing between witnesses' "written declarations" and later "oral direct testimony in Court").

declarations though made "under penalty of perjury").[7]  Statements that do not satisfy the

Section 1746 requirements cannot be used to oppose summary judgment.  Shamrock Power

Sales, LLC v. Scherer, No. 12-CV-8959, 2015 WL 5730339, at *18 (S.D.N.Y. Sept. 30, 2015)

(striking declarations as insufficient under Section 1746 and granting summary judgment).

      Even if the Brazil Statements could be treated as or converted to cognizable Rule 56(c)

submissions for summary judgment, a "party may object that the material cited . . . cannot be

presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2); Santos v.

Murdock, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary judgment

must be admissible themselves or must contain evidence that will be presented in an admissible

form at trial.").  The Brazil Statements themselves are hearsay, out-of-court statements that

Plaintiffs seek to use "to prove the truth of the matter asserted" with respect to Dr. Gabrielli.

Fed. R. Evid. 801(c).[8]  Furthermore, because there is no possibility that the declarants will appear

at trial to testify, the Brazil Statements will not ultimately be reduced to admissible testimony

and must be disregarded on summary judgment.[9]

      Multiple allegations involving Dr. Gabrielli are based entirely on the Brazil Statements of

individuals who have never been deposed in this case, including Nestor Cerveró ("Cerveró"),

---

[7] As explained in Jack, "[t]he purpose of requiring a person outside the United States to execute the document under penalty of perjury under the laws of the United States is to impress upon him the seriousness of the obligation to tell the truth and the possibility of prosecution for perjury if he fails to tell the truth."  Id. at 659 n.3.

[8] News articles cited by Plaintiffs are also inadmissible hearsay (containing further hearsay statements of those interviewed).  See, e.g., App'x A.3 (alleged statements made by João Augusto Rezende Henriques reported in a weekly magazine).  Plaintiffs may not rely on evidence like this to create "a genuine dispute as to an issue of material fact."  Instinet Inc., 2012 WL 4195391, at *6 (finding articles cited in opposition were inadmissible hearsay and granting motion for summary judgment).

[9] ¶¶ 33-34, 40-42, 47-50, 55-57, 64-65, 77-80 (addressing the legal status of and travel restrictions on declarants).

Agosthilde Mônaco de Carvalho ("Mônaco"), Fernando de Castro Sá ("Castro Sá"), Fernando

Antonio Falcão Soares ("Soares"), Eduardo Vaz Costa Musa ("Musa"), Paulo Roberto Costa

("Costa") and Alberto Youssef ("Youssef").  App'x A.1-2, 4-8.  More importantly, Plaintiffs

cannot make a credible showing that any of these individuals will testify at trial.

- Cerveró and Soares pleaded guilty to criminal offenses and were sentenced to house arrest until December 23 and November 17, 2017, respectively.  They will not be permitted to travel outside of Brazil until these terms have expired.  ¶¶ 39-42, 77-80.

- Youssef has pleaded guilty to criminal offenses and is currently serving a term of imprisonment until March 17, 2017.  Youssef cannot travel outside of Brazil during his incarceration.  ¶¶ 55-57.

- Costa pleaded guilty to criminal offenses and was sentenced to house arrest through October 1, 2016, at which time he will be subject to unknown conditions to be established by the court.  ¶¶ 64-65.

- Musa and Mônaco have both pleaded guilty but have not been sentenced.  However, in general, those who have pleaded guilty in the *Lava Jato* criminal cases have not been permitted to travel outside of Brazil.  ¶¶ 33-34, 47-50.

Castro Sá, by contrast, has not been prosecuted or pleaded guilty.  ¶ 95.  However he, like all the

declarants listed above, is a foreign citizen residing in Brazil and outside the reach of any

subpoena.[10]  The hearsay Brazil Statements made by these declarants cannot be considered on

summary judgment.  Santos, 243 F.3d at 684 (holding that a "showing that the affiant is prepared

to testify in a manner consistent with an affidavit is required to oppose summary judgment").  In

Santos, on *de novo* review the Second Circuit refused to consider an affidavit proffered by the

plaintiff in opposition to defendants' motion for summary judgment because it "would be

inadmissible at trial for substantive purposes and [the plaintiff] did not show that the witness

would testify in support of [his] case at trial."  Id. at 682.

---

[10] Even if he were to appear at trial, Castro Sá has no admissible testimony to offer with respect to Dr. Gabrielli.  See discussion infra Part III.A.3.

Plaintiffs cannot merely rest on the Brazil Statements (even if they were proper summary judgment evidence) without demonstrating the witnesses' "availability to testify and undergo cross-examination either at trial or in a pre-trial deposition." Bortell v. Eli Lilly & Co., 406 F. Supp. 2d 1, 8-9 (D.D.C. 2005). Absent such a demonstration "the Court cannot credit the affidavits as anything more than hearsay." Id. at 9 (granting summary judgment and disregarding affidavits of unavailable affiants). Plaintiffs "must present some indication that [the declarant] is prepared to testify at trial." Chamberlin v. Principi, No. 02-CIV-8357, 2005 WL 1963942, at *10 (S.D.N.Y. Aug. 16, 2005) (holding that an affidavit could not be considered and granting summary judgment). Plaintiffs cannot do so and cannot defeat summary judgment with "speculative" assertions that the declarants "might testify" consistent with their prior statements in wholly independent Brazilian proceedings. Santos, 243 F.3d at 683.

### 2. The Brazil Statements Are Not Admissible Under Any Hearsay Exception for Prior Statements of Unavailable Witnesses

Under certain limited circumstances prior statements of witnesses may be admissible even when "the declarant is unavailable." Fed. R. Evid. 804(b). The only two Rule 804 hearsay exceptions that could possibly apply to the Brazil Statements are the 804(b)(1) exception for "former testimony," and the 804(b)(3) exception for a "statement against interest." Id. The Brazil Statements pertaining to Dr. Gabrielli do not satisfy either of these exceptions.

Rule 804(b)(1) creates an exception for "former testimony" when the testimony was "given as a witness at a trial, hearing, or lawful deposition," and is "offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Id. Only two forms of the Brazil Statements—testimony before the CPI and testimony in the Brazilian federal courts—arguably

qualify as testimony "at a trial, hearing, or lawful deposition."[11]   Nonetheless, this exception

does not apply here because neither Dr. Gabrielli, nor his predecessor in interest, had "an

opportunity and similar motive" to cross-examine any declarant during these proceedings.  It is

undisputed that Dr. Gabrielli was not present at any CPI hearing (other than when he addressed

the commission), did not attend any testimony to the federal courts other than his own and was

not a party to any *Lava Jato*-related criminal cases.  ¶¶ 69-71, 73, 91-92.  Antonucci v. Morgan

Stanley Dean Witter & Co., No. 02-CIV-5246, 2005 WL 627556, at *4 (S.D.N.Y. Jan. 11, 2005)

("[I]f the opportunity to cross-examine is lacking, the prior testimony must be excluded.")

(internal quotation omitted), adopted by 2005 WL 5300159 (S.D.N.Y. May 23, 2005); Sawant v.

Ramsey, No. 07-CV-980, 2012 WL 1605450, at *3 (D. Conn. May 8, 2012) (Rule 804(b)(1)

exception not satisfied, and prior testimony excluded, absent showing that defendants "were

present and had an opportunity to challenge the testimony").

CPI hearings are congressional proceedings that do not permit any questioning by

interested parties.  ¶¶ 81, 86-87.  The only questions are those posed by the members of the

commission, members of Brazil's National Congress.  ¶¶ 83, 87.  See Matter of Sterling Nav.

Co., 444 F. Supp. 1043, 1046 (S.D.N.Y. 1977) (excluding testimony from "hearings [that] are

non-adversary fact-finding proceedings" and "cannot be said to give rise to the type of

adversarial cross-examination contemplated by Rule 804(b)"); Ricciuti v. New York City Transit

Auth., No. 90-CIV-2823, 1998 WL 171469, at *4 (S.D.N.Y. Apr. 14, 1998) (same).  The

defendants in the criminal proceedings were permitted to cross-examine witnesses, however, the

former testimony exception requires a "similar motive" to develop testimony.  ¶ 67.  While Dr.

---

[11] But see United States v. North, 713 F. Supp. 1450, 1451 (D.D.C. 1989) (noting "there are no cases under the Rule directly dealing with whether testimony given in a Congressional hearing" constitutes Rule 804(b)(1) former testimony and finding statement to congressional hearing did not meet requirements of the Rule), aff'd, 910 F.2d 843 (D.C. Cir. 1990).

Gabrielli's alleged conduct may be "critical to [the] cause of action" against him in this case, "the same fact[s] [were] only peripherally related" at best to federal criminal prosecutions of others in Brazil. Annunziata v. City of New York, No. 06 CIV. 7637, 2008 WL 2229903, at *9 (S.D.N.Y. May 28, 2008) (internal quotation omitted). The defendants in Brazil shared no similar motive with Dr. Gabrielli to cross-examine witnesses regarding their statements about him.

In addition to the former testimony exception, Rule 804(b) also permits the introduction of a prior "statement against interest" that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . [had] a tendency to . . . expose the declarant to civil or criminal liability." Fed. R. Evid. 804(b)(3). However, none of the particular Brazil Statements specifically identified in Appendix A are admissible under this exception. Castro Sá—who was merely a witness in the Brazil proceedings and was not criminally prosecuted—testified that he heard from others that Dr. Gabrielli approved of his demotion or transfer. ¶¶ 93, 95; App'x A.2. Nothing about these statements exposed Castro Sá to criminal or civil liability. Mônaco made statements regarding information he allegedly heard about Dr. Gabrielli and the Pasadena refinery. Id. A.1. These statements are not evidence of Mônaco's wrongdoing. Similarly, Soares' and Musa's statements of what they allegedly heard others say about Dr. Gabrielli and Schahin do not implicate them. Id. A.5-6. Finally, generic allegations that others "knew" of unspecified conduct, such as those made by Costa and Youssef, do not incriminate the declarant. Id. A.7-8. Statements that are not self-inculpatory to the declarant are not admissible under the Rule 804(b)(3) exception. United States v. Jackson, 335 F.3d 170, 179 (2d Cir. 2003) (after particularized review, holding statements inadmissible that "were not themselves self-inculpatory" as to the declarant).

Moreover, Costa, Cerveró, Mônaco, Musa, Soares and Youssef were each being criminally prosecuted when they made their statements about Dr. Gabrielli.  ¶¶ 17-19, 29, 35, 43, 51, 60, 74-75.  Their statements were made in furtherance of their guilty pleas and agreements to cooperate.  Id.  The Cooperation Statements refer explicitly to the declarant's status as "collaborators" and obligations under Law No. 12.850/2013.  ¶¶ 19, 21.  See, e.g., Exs. 20, 23-26.  Under this law, the court "may grant judicial forgiveness" including a two-thirds reduction in a prison sentence for an accused who has offered effective and voluntary cooperation.  ¶¶ 22-23.  Such relief is contingent upon achieving one or more enumerated results, including the "identification of . . . other participants in the criminal organization" and revealing "the hierarchical structure and distribution of tasks" in the organization.  ¶ 23.

Thus, even if the declarants' statements expose them to criminal liability, "given the circumstances surrounding them," namely a strong incentive to name and blame Dr. Gabrielli in particular, the "statement[s] [are] not sufficiently self-inculpatory to be admissible under Rule 804(b)(3)."  United States v. Tropeano, 252 F.3d 653, 658 (2d Cir. 2001).  The declarants, "who had not yet been sentenced, had every incentive . . . to provide the government with the information it wanted," as an express condition for favorable sentencing treatment under Law No. 12.850/2013, and their statements therefore "lacked the necessary guarantees of trustworthiness" to satisfy the hearsay exception.  Id. at 659.[12]

---

[12] Cerveró's testimony before the Brazilian court about his alleged meeting with Dr. Gabrielli concerning Schahin also reiterated statements from his earlier Cooperation Statement agreement.  ¶ 75; App'x A.4.  Repeating potentially self-inculpatory information that has previously been provided to the authorities negates its "tend[ency] to subject the declarant to . . . criminal liability," as required by Rule 804(b)(3).  Lamberti v. United States, 22 F. Supp. 2d 60, 71 n.52 (S.D.N.Y. 1998), aff'd sub nom., Badalamenti v. United States, 201 F.3d 430 (2d Cir. 1999) (holding the same inculpatory testimony during a second trial did not qualify as a statement against interest).

The Brazil Statements do not satisfy the requirements of Rule 804(b)(1) or (3), or any other applicable hearsay exception, and constitute "inadmissible hearsay that cannot defeat a motion for summary judgment." Deutsche Asset Mgmt., Inc. v. Callaghan, No. 01-CIV-4426, 2004 WL 758303, at *14, 14 n.11 (S.D.N.Y. Apr. 7, 2004) (not admissible under Rule 804(b)(3)); Pettus v. City of New York, No. 10-CV-1442, 2011 WL 4458901, at *6 (E.D.N.Y. Aug. 23, 2011) (not admissible under Rule 804(b)(1)), adopted by 2011 WL 4440209 (E.D.N.Y. Sept. 23, 2011).

### 3. The Purported Evidence Relating to Dr. Gabrielli Is Inadmissible Hearsay Within Hearsay

Lastly, much of the alleged evidence with respect to Dr. Gabrielli would be inadmissible against him regardless of the declarant's appearance at trial for the additional reason that the purported statements merely recount what *another person* purportedly said to him. Realuyo v. Diaz, No. 98-CV-7684, 2006 WL 695683, at *5 (S.D.N.Y. Mar. 17, 2006) (declarants' statements "recounting what they were allegedly told by" another person was inadmissible "hearsay within hearsay"). Even if Plaintiffs were able to present certain witnesses at trial, those witnesses could not testify as to statements made by others under these facts.[13]

Unable to overcome this hurdle, Plaintiffs do not have any evidence at all on most of their allegations with respect to Dr. Gabrielli. For example, Plaintiffs have no evidence that Dr.

---

[13] The Complaint also cites inadmissible Cooperation Statements made by Costa that he "believed Gabrielli knew about the scheme inside Petrobras" (Ex. 1 ¶ 130), and a Cooperation Statement by Alberto Youssef that "the Presidency . . . had knowledge of the facts" (Ex. 1 ¶ 118). The statements are purely speculative, lack any foundation in personal knowledge, and therefore are inadmissible. App'x A.7-8. French Am. Banking Corp. v. Flota Mercante Grancolombiana, S.A., 693 F. Supp. 1421, 1426 (S.D.N.Y. 1987) (hearsay statements inadmissible where declarant "had no personal knowledge of [the subject's] alleged participation"). Indeed, Costa's statements undermine any foundation for his "belief"—he stated on numerous occasions that he never discussed the cartel and bribery scheme with Dr. Gabrielli. App'x A.8.

Gabrielli ever desired Castro Sá's demotion or transfer.  That allegation is entirely based on Castro Sá's retelling of alleged comments made to him by others and there is no other evidence suggesting Dr. Gabrielli had any role in the change in Castro Sá's position.[14]  App'x A.2. Similarly, Plaintiffs have no admissible evidence—only second-hand rumors—of Dr. Gabrielli's alleged political motives for the Pasadena refinery acquisition, his purported desire to steer the Pasadena revamp contract to Odebrecht, or his alleged agreement to grant the SMS Contract to Odebrecht in exchange for the closing of the 2009 CPI inquiry.  Id. A.1, 3.  The same is true of Plaintiffs' claims that a "top PT politician" met with Dr. Gabrielli regarding alleged improprieties in connection with the Pasadena refinery acquisition.  Ex. 1 ¶ 103.  During his deposition, the witness, Octavio Lavocat Cintra, explained that a friend *had told him* that the politician met with Dr. Gabrielli; Cintra has no first-hand knowledge of this alleged meeting or if it ever took place.  App'x A.9.

Plaintiffs' allegation that Youssef received directions for marketing services payments directly from Gabrielli is similarly misleading.  Ex. 1 ¶ 118.  Youssef stated that the alleged "order" from Gabrielli was "passed on" to Costa, and then from Costa to Youssef.  App'x A.7. There is no evidence that Gabrielli ever interacted with Youssef; Dr. Gabrielli testified he never met him.  ¶ 58.[15]  Collectively, these statements are impermissible multiple hearsay and are insufficient to defeat summary judgment.  Manessis v. New York City Dep't of Transp., No. 02-

---

[14] In contrast, Castro Sá's former supervisor, Nilton Antoniode Almeida Maia ("Maia"), stated during his deposition—testimony that *is admissible* on summary judgment—that "[t]he removal of Fernando Sá's managerial responsibilities had nothing to do with Abemi.  It had to do with . . . behavior issues on his part."  Ex. 9, Maia Tr. at 198:12-18.

[15] Musa's and Soares' statements of what they allegedly learned from Cerveró and others about Dr. Gabrielli's involvement in the Schahin drillship contract are similarly inadmissible multiple hearsay.  App'x A.5-6.  The only other evidence on this issue is Cerveró's testimony to a Brazilian federal court.  Id. A.4.  Because that statement is not cognizable 56(c) evidence *and* Cerveró will not be permitted to travel to the United States to testify, this allegation is also entirely unsupported and insufficient to create a genuine dispute of fact.  ¶¶ 77-80.

CIV-359, 2003 WL 289969, at *14 (S.D.N.Y. Feb. 10, 2003) (finding "double hearsay" inadmissible and holding that "it cannot create a material issue of fact to defeat summary judgment"), aff'd sub nom, Manessis v. Chasin, 86 F. App'x 464 (2d Cir. 2004).[16]

### B.  The Remaining Evidence Is Legally Insufficient

Summary judgment in favor of Dr. Gabrielli is appropriate because the record taken as a whole lacks sufficient evidence to find him liable for violations of Sections 10(b), 20(a) and Rule 10b-5.  "To defeat a motion for summary judgment, the adverse party . . . must set forth specific facts showing that there is a genuine issue for trial."  CL-Alexanders, 739 F. Supp. at 162 (citing Fed. R. Civ. P. 56(e)).  "The mere existence of some alleged factual dispute" is not enough.  Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 90 (2d Cir. 2002) (internal quotation omitted).  "In demonstrating that the issue in dispute is 'genuine,' the non-moving party must offer *evidence sufficient to allow a reasonable jury to return a verdict in its favor*."  Robbins v. Moore Med. Corp., 894 F. Supp. 661, 667 (S.D.N.Y. 1995) (emphasis added) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  After stripping away the innuendo and baseless rumors against Dr. Gabrielli upon which the Plaintiffs' case is founded, no reasonable jury could find him liable on the remaining evidence.

---

[16] This case will involve complex evidentiary questions as to when certain pieces of evidence are admissible against some parties and not others, further compounded by the fact that only portions of this case will be tried to a jury.  The Court's task—to restrict appropriately the scope of evidence presented at various stages—will be made simpler by streamlining the case at summary judgment.  See Fed. R. Evid. 105 ("If the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly.").

### 1.  It is Undisputed that Dr. Gabrielli Had No Knowledge of the Cartel and Bribery Scheme

The record is devoid of evidence that Dr. Gabrielli exhibited any corrupt conduct—much less that he had actual knowledge of the bribery scheme conducted by certain corrupt executives at Petrobras.  ¶¶ 103-07.  Plaintiffs' own expert, Dr. Steven L. Henning, explicitly distinguishes between the individuals who "had intimate, first-hand knowledge of the supplier cartel, including both the bribery schemes and the overpayments made by Petrobras," and Dr. Gabrielli, whom he contends—by contrast—failed to maintain adequate controls.  Ex. 31 at 1-7.  In his deposition, Henning admitted that he does not "have any knowledge" of whether Dr. Gabrielli, among others, "knew or should have known of the cartel scheme."  ¶ 108.  Unlike the corrupt executives charged in the *Lava Jato* case, there is no allegation, much less evidence, that Dr. Gabrielli funded a Swiss Bank account with ill-gotten gains.  ¶ 100.  As the CEO of a state-owned entity, Dr. Gabrielli's compensation was modest by comparison to the standards typical for corporate executives, particular given that he was running a company that Plaintiffs contend "was the world's fifth largest company, with a market capitalization of $310 billion" in 2009.  Ex. 1 ¶ 2. Between 2005 and 2011 his annual compensation ranged from the equivalent of approximately $250,000 to $1 million.  ¶ 96.[17]

---

[17] Plaintiffs have also alleged that Dr. Gabrielli was rewarded for his participation in the alleged scheme with gifts of valuable artwork from alleged cartel participant Odebrecht, based on a document Brazilian authorities seized from Odebrecht.  Ex. 1 ¶¶ 152-53.  Dr. Gabrielli's uncontroverted testimony is that he did not receive any such gifts.  ¶¶ 182-83.  A Petrobras employee, Carlos Alberto Rechelo Neto, was deposed concerning the Company's investigation of these allegations.  He testified that the document from Odebrecht is merely "a list of individuals with the title 'Special Trinket List,'" and that the Company found that some employees never received the trinkets and others who did receive something said "there was not commercial value to them whatsoever and that [they were a print] in many of the cases" which were kept in closets at the Petrobras offices.  ¶¶ 185-86.

The evidence dispels any suggestion that Dr. Gabrielli was motivated by a desire to fraudulently bolster Petrobras' stock price. Dr. Gabrielli's compensation did not include any stock of Petrobras. ¶ 97. All of the purchases of Petrobras stock that he made were *after* he had left his position at Petrobras and during the alleged class period, making him similarly situated to many of the investors who brought this case. ¶ 98. Specifically, on ten occasions during the class period, Dr. Gabrielli purchased a total of 33,750 Petrobras shares for approximately $300,000, which he continues to hold today. Id. Indeed, his final two purchases, which took place in September and October 2014, occurred after Costa was initially arrested in March 2014. ¶¶ 59, 98. These circumstances negate any suggestion that Dr. Gabrielli was involved in or aware of the cartel and bribery scheme.

### 2. Unrelated Incidents of Suspected Wrongdoing Were Addressed Appropriately

Plaintiffs are unable to prove that Dr. Gabrielli was aware of or benefited from the cartel and bribery scheme, and their scattershot claims that Dr. Gabrielli was aware of other, wholly unrelated instances in which employees engaged (or may have engaged) in improper activities are legally insufficient to defeat summary judgment. Plaintiffs have raised two instances in which Dr. Gabrielli learned of potential misconduct by Petrobras employees the first involved allegations of excessive payments issued by a manager in the communications department. The undisputed evidence shows that the matter concerned a single employee named Geovane de Morais who made unapproved disbursements for Petrobras-sponsored promotional events above permissible spending limits. ¶¶ 126-151. That matter had nothing to do with the cartel and bribery scheme that Plaintiffs contend harmed them. Far from evidence of a Section 10(b) violation, Dr. Gabrielli's actions in response to the Morais issue were exemplary.

Dr. Gabrielli's uncontroverted testimony is that upon being notified of the issue, he immediately formed a committee to conduct an internal investigation.  ¶¶ 126-29.  When that brief preliminary analysis was complete, the Company decided to conduct a closer analysis of the specific payments at issue.  ¶ 144.  While the matter was under investigation, Morais was removed from his position and ultimately he was dismissed.  ¶ 146.  The report produced by this investigation includes the following undisputed details:  the investigation was conducted by a five-person commission including an auditor and a member of the legal department.  ¶ 130.  Documents were collected and reviewed and four employees were interviewed by the Commission, including Morais.  ¶¶ 131-32.  The investigation confirmed that from 2006 to 2008 Morais had issued payments over his permissible individual payment limit of R$32,000, had put through many more payments than permitted, had structured payments to evade controls and had exceeded the department's budget.  ¶¶ 133-37.  The report recommended evaluating appropriate disciplinary sanctions for Morais, improved controls at various levels and departments and a thorough "examination of the documentation related to [these payments] that, due to the lack of time, were not analyzed."  ¶¶ 141-43.  Dr. Gabrielli also testified that he was informed by the legal department that this report was forwarded to the public prosecutors and other authorities. ¶¶ 147-48.

Plaintiffs rely on the testimony of Venina Velosa da Fonseca ("Velosa"), Morais's supervisor, to suggest that this matter somehow supports their claims.  But Velosa's testimony is inconsistent with indisputable facts regarding the investigation and cannot give rise to a genuine issue of fact for trial.  Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Velosa testified that the investigation was "superficial" in her view because of "the report's quality and . . . the group of witnesses who testified."  Ex. 28, Velosa Tr. at 30:12-16. She asserted that the committee heard only two individuals and that she believed that Morais was not among them.  Id. at 30:17-22.  These statements are contradicted by the report itself:  four individuals including Morais were interviewed.  ¶ 131.  Velosa further testified that the investigation was insufficient because it did not review "different payments made without any products linked to them" and because "they did not investigate the facts."  Id. at 31:12-21.  But the report recommended that the Company "[d]eepen the examination of the documentation" attached to the report that had not been analyzed in light of insufficient time.  ¶ 143.[18]  Velosa also conceded that she was asked to conduct the secondary investigation.  Ex. 28, Velosa Tr. at 28:3-19.  So the Company not only recommended a follow-up review, but tasked her with carrying it out.[19]  Despite Velosa's attempt to characterize the investigation as "superficial," the uncontroverted evidence shows it was anything but, and certainly did not appear so to Dr. Gabrielli.

Indeed, the evidence demonstrates that Dr. Gabrielli's knowledge of these events served to underscore his belief that the Company's internal controls—including an efficient process to address the Morais issue—were proper and effective.  ¶¶ 109-10, 112-13.  No evidence indicates that a closer investigation of these events, even if warranted, would have given Dr. Gabrielli any

---

[18] See ¶ 145 (testimony of Maia, head of the Petrobras legal department, stating that there were two investigations "[b]ecause the documents that were supposed to be analyzed were many . . . a volume . . . and they had to have a second commission.").

[19] Moreover, Velosa testified that she believed the results of the second investigation, including the recommendation to dismiss Morais, were provided to the Board of Directors, which included Dr. Gabrielli.  Ex. 28, Velosa Tr. at 88:4-13, 89:3-8; ¶ 8.  Dr. Gabrielli testified that he was advised of the conclusions of the second investigation and that he agreed with Morais' dismissal.  ¶¶ 149-51.

insight into the wholly unrelated cartel and bribery scheme taking place in connection with Petrobras construction projects.

The second incident of alleged wrongdoing about which Dr. Gabrielli was made aware is no more helpful to Plaintiffs. This claim is supported by a lone January 2009 email attaching articles in the *Los Angeles Times* and *San Diego Union-Tribune*, reporting that a former executive of a U.S. company pleaded guilty to paying approximately $1 million in bribes over a four-year period from 2003 to 2007 to unidentified employees at government-owned energy companies, including Petrobras, in at least six countries. ¶¶ 153-56. The articles were forwarded to Dr. Gabrielli and the Executive Board, with the recommendation to engage U.S. counsel to learn which Petrobras employees were involved "so that we take appropriate measures." ¶ 153.

Dr. Gabrielli testified that he did not recall this subject, but assumes it was forwarded to the legal department. ¶ 157. Similarly, the Petrobras CFO, Almir Guilherme Barbassa, also received the email and testified that he did not recall it but understood that it would have been handled by the appropriate personnel at Petrobras. ¶158. There is no evidence contradicting their belief that the matter was appropriately handled by the Company. And again there is no evidence indicating that exploration of this matter would have given Petrobras any information whatsoever regarding the bribery scheme involving a cartel of Brazilian construction companies.

### 3. The TCU Audit Reports are "Red Herrings" Not "Red Flags"

The remainder of Plaintiffs' case against Dr. Gabrielli turns on allegations that he ignored "red flags" of fraud, specifically cost overruns and alleged pricing and bidding irregularities at the Abreu e Lima refinery project ("RNEST"), as identified in two audit reports, issued two years apart, to Petrobras by Brazil's Federal Court of Accounts (the "TCU"). See Juteau Decl. ¶ 7(n), (o). But there is no evidence that these or any other TCU audit report issued during Dr.

Gabrielli's tenure identified pricing or bidding irregularities ascribed to bribery, cartel practices or any form of fraud.  The TCU audits addressed entirely different issues.

The undisputed evidence shows that while he was CEO, Dr. Gabrielli understood that prices paid by Petrobras in connection with refinery projects were inconsistent with the TCU's pricing methodology and therefore were "overpriced" only by comparison to the particular price standards it used.  ¶ 162.

- As Dr. Gabrielli testified during his deposition:  "[O]verprice in the concept of TCU is a [freight] rate above what TCU considers to be right  . . . [according to] internal tables used by TCU."  ¶ 161.  "[T]he price of material, [costs of professionals and cost of equipment] were above reference value[s] that TCU uses as a reference."  Id.  Moreover, "TCU's market prices are strongly based  . . .  on the construction of roads and not necessarily a refinery[, which] is highly complex, high pressure equipment, emission of [residuals] of high vibration and high temperature.  Therefore . . . engineering costs are not the same to those of a road."  Id.

- Dr. Gabrielli's understanding of this issue is confirmed in the Report of Dr. Carlos Ari Sundfeld, who noted with respect to the "existence or non-existence of overpricing . . . TCU has adopted norms and references that are specific to the common public administration, to which PETROBRAS does not belong.  The applicability of these norms and references to the company is legally questionable."  ¶ 164.

- Petrobras, though its legal department, consistently contested the applicability of the pricing methodology adopted by the TCU.  As Maia, the head of the Petrobras legal department, testified:  "[T]he company has a point of view which is in disagreement totally with the position of TCU in connection with the overpricing mentioned."  ¶ 163.

There is no allegation or evidence that the Petrobras position on this issue was anything other than a good faith dispute about the applicable pricing standards.  ¶ 177.

Dr. Gabrielli also understood that a second source of the TCU's criticisms, regarding the Company's bidding procedures, stemmed from a longstanding disagreement over the applicable legal requirements for bidding, one that began as early as 1998 and is an unsettled legal question still on appeal to the Brazilian courts.  ¶ 165.

- As Dr. Gabrielli testified, this was "another long controversy between Petrobras and TCU," concerning the application of a 1993 law which "regulates the purchases made by

federal organs in Brazil," and the impact of a 1998 presidential decree "saying that Petrobras should follow a specific regulation when doing its purchases," and permitting Petrobras to enter contracts with a "global price" rather than the 1993 law which required unit pricing.  Id.

- Again, Dr. Sundfeld's report confirms Dr. Gabrielli's understanding, stating that the TCU's reliance on Law 8666 of 1993 for the "legal foundation" of its claims about the Petrobras bidding procedures "is incorrect."  He states that the intervening 1998 presidential decree which Petrobras applies "has been in force since then" and "is not as regulatory and demanding as Law 8666." ¶ 166-67.

- Dr. Sundfeld further confirmed that the TCU and Petrobras have been in a long-running and unresolved conflict over the applicable legal regime before the Federal Supreme Court ("STF"), during which "individual decisions by the judges who comprise [the STF] (justices) regularly suspend enforcement of TCU decisions when challenged."  ¶ 168.

These uncontroverted facts demonstrate that the TCU audits comprise nothing more than unresolved technical and legal differences about Petrobras contracting procedures.

Moreover, TCU audits are iterative processes.  ¶ 170.  As explained by Marcos Panassol, PricewaterhouseCoopers audit partner for Petrobras, TCU audit reports are issued in stages, subject to responses by the company and further review by the agency.  ¶ 171.  "[N]ot all communications [from the TCU] are allegations."  Id.  It is a "forth and back [sic] process.  That is not in itself ended until there is a final ruling by TCU."  Id.  Dr. Sundfeld similarly opined that "no statement of irregularity contained in a judgment issued in the preliminary phases is binding and final for the TCU itself . . . until the issuance of the judgment containing the decisions of the ministers in the last of the appeals that may be brought."  ¶ 172.  For instance, the two TCU audit reports identified by Plaintiffs that occurred while Dr. Gabrielli was CEO were an initial report on the RNEST refinery and a follow-up report on the same refinery *two years later*.  Juteau Decl. ¶ 7(n), (o); Exs. 29-30.

In addition, as explained by numerous witnesses, TCU audit reports were addressed through the Company's internal procedures, by both the internal audit department and the legal

department.  ¶¶ 174-176.  Gerson Luis Goncalves, former Petrobras Executive Manager for Internal Audit, testified that "[t]he president's cabinet submits the reports to the internal auditing division" and "[w]ithin internal audit, there is a management in charge of following up the responses of the company to the TCU."  ¶ 175.  Maia, head of the legal department, also testified that "[a]ll those points were being analyzed and discussed in a specific area in the legal department that deals with TCU matters."  ¶ 176.  In hindsight, the TCU audit reports' references to "overpricing" and bidding "irregularities" may have the outward appearance of pointing to fraud in the refinery construction contracts.  But in fact the evidence shows that the TCU's observations had no correlation with the cartel and bribery scheme and were not "red flags" warranting special attention.  In general, Dr. Gabrielli had no reason to believe that Petrobras' internal procedures regime was deficient.  During his tenure as CEO, Petrobras was audited by KPMG which repeatedly validated Petrobras's internal controls.  ¶¶ 114-15, 117-19, 121-23, 125.[20]

### C.  Plaintiffs Cannot Demonstrate That Dr. Gabrielli Made Certain Alleged Misstatements or That Others Are Actionable

To hold Dr. Gabrielli liable, Plaintiffs must also prove that he made a false or misleading statement.  See Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998).  Dr. Gabrielli left Petrobras on February 13, 2012, ¶ 7, and Plaintiffs concede he is not liable for statements made after that date.[21]  ¶ 184; S.E.C. v. Espuelas, 699 F. Supp. 2d 655, 662-663 (S.D.N.Y. 2010)

---

[20] The Petrobras 20-Fs for 2009 through 2011 included KPMG's unqualified audit opinion that Petrobras "maintained, in all material respects, effective internal control over financial reporting."  ¶¶ 117, 121, 125.  Petrobras former CFO, Barbassa also testified:  "I believe that the control system . . . in operation was sound enough to exclude any weakness."  ¶ 111.

[21] There is one exception:  Plaintiffs assert that Dr. Gabrielli is liable for an alleged misstatement after he left Petrobras—an August 12, 2013 *Fatos e Dados* blog post referencing comments Dr. Gabrielli made at a Brazilian government hearing.  Ex. 1 ¶ 311.  It is undisputed that Dr. Gabrielli was retired from Petrobras when that statement was made and there is no

(granting summary judgment where the SEC conceded that the defendant "did not make any of the misstatements").[22]

## IV. CONCLUSION

For all of the foregoing reasons, Dr. Gabrielli respectfully requests that the Court grant his motion for summary judgment and dismiss the case against him in its entirety.

Dated: New York, New York
       June 27, 2016

                                        Respectfully submitted,

                                        MORVILLO ABRAMOWITZ GRAND IASON &
                                        ANELLO P.C.

                                        By:   /s/ Elkan Abramowitz
                                              Elkan Abramowitz
                                              Edward M. Spiro
                                              Jasmine Juteau
                                              Howard A. Locker
                                        565 Fifth Avenue
                                        New York, New York  10017
                                        (212) 856-9600 (phone)
                                        (212) 856-9494 (fax)

                                        *Attorneys for Defendant Jose Sergio Gabrielli de Azevedo*

---

evidence that as a former employee he had any role in deciding to post that statement on the Company's blog.  In addition, the alleged misstatements from January 23 and 24, 2012 are not actionable.  Id. ¶ 262.  These are truthful statements by Petrobras publishing possible changes among the Company's executives and stating that Dr. Gabrielli was going to be replaced as CEO by Ms. Foster.  On February 13, 2012, shortly after those announcements, Ms. Foster did, in fact, replace Dr. Gabrielli.  Id. ¶ 30.  Tellingly, Plaintiffs do not identify what is false or misleading about those statements.

[22] We also join in the Petrobras, Foster and Individual Defendants Motions demonstrating that Plaintiffs cannot survive summary judgment based on inactionable opinion or forward-looking statements.  See App'x B (listing statements not actionable as to Mr. Gabrielli for these reasons).  We further join the Petrobras and Foster Motions demonstrating that Plaintiffs cannot establish loss causation or reliance and their Sections 10(b), 20(a) and Rule 10b-5 claims additionally fail for those reasons.

**Appendix A – Inadmissible Hearsay Statements**

| No. | Declarant | Document | Summary of Statement | Hearsay Analysis |
|---|---|---|---|---|
| 1 | **Agosthilde Mônaco de Carvalho**, Assistant Director for the Petrobras International Division from February 2003 to February 2008 | **Brazil - Cooperation Statement** (Nov. 11, 2015), Ex. 16 (emphasis added) | In or about January 2005, Mônaco had a conversation with Cerveró regarding the potential acquisition of the Pasadena refinery, during which "[*Cerveró*] . . . *smiled and said*: . . . "if we come to an agreement with Astra, a revamp of the refinery could please the President of Petrobras, because I know he has some political commitments to honor, and therefore Pasadena could kill two birds with one stone:  refine the marlin oil in the United States and enable President Gabrielli to honor his political commitments."[1]<br><br>Mônaco further said: "That *according to the information provided by Nestor Cerveró*, this deal would meet the interests of Gabrielli to carry out the revamp."<br><br>Mônaco further said that he "*knew through* [*Cerveró*], that before the signing of the purchase contract for the Pasadena refinery, President Gabrielli had already chosen the Construction company Norberto Odebrecht to perform the revamp for 200,000 barrels/day," and that "[*Cerveró*], *in a rant, told* [*Mônaco*] that president Gabrielli was very interested in resolving the issue and giving the revamp project to Odebrecht." | 1.  Mônaco will not be available to testify at trial.<br><br>2.  Not former testimony, Fed. R. Evid. 804(b)(1).<br><br>3.  Not statement against interest, Fed. R. Evid. 804(b)(3).<br><br>4.  Inadmissible hearsay within hearsay. |

---

[1] The original statements quoted throughout this Appendix in some instances capitalize proper names and certain other words in their entirety.  For readability purposes, only the first letter of each proper noun is capitalized in this Appendix.

| No. | Declarant | Document | Summary of Statement | Hearsay Analysis |
|---|---|---|---|---|
| 2 | **Fernando de Castro Sá,** employee in the Petrobras Legal Department in 2009 | **Brazil – CPI 2015 Statement** (Apr. 28, 2015), Ex. 17 (emphasis added) | Castro Sá testified that in "the middle of 2009," he was asked by the Executive Manager of Legal, Nilton Maia, and the Legal Manager for the Administrative Department, Eduardo Jorge Albuquerque, to prepare a "dossier" regarding Castro Sá's concerns about Petrobras's contracting procedures and involvement of Brazilian Industrial Engineering Association, "ABEMI."<br><br>Castro Sá further testified that Alburquerque "established a deadline when it should be delivered by, which was the 7th or 8th of July, and when I arrived he stated that I was relieved from my position."<br><br>Castro Sá further testified, regarding Alburquerque: "*He told me that I should not approach any of the Directors, because he had already agreed with Chairman Gabrielli*, Director Duque, and Director Paulo that I would be transferred to the international section, to international Legal, as a regular attorney."<br><br>Later in the CPI, Castro Sá was asked by a commission member: "Did you hear that Dr. Sergio Gabrielli was interested in your resigning?" Castro Sá answered: "*That was said by an assistant in the office* when there was that complaint." | 1. Not former testimony, Fed. R. Evid. 804(b)(1).<br><br>2. Not statement against interest, Fed. R. Evid. 804(b)(3).<br><br>3. Inadmissible hearsay within hearsay. |

A-2

| No. | Declarant | Document | Summary of Statement | Hearsay Analysis |
|---|---|---|---|---|
| 3 | **João Augusto Rezende Henriques**, a Brazilian lobbyist | **News Article** (Aug. 9, 2013, *Época* Magazine), Ex. 18 (emphasis added) | According to the article, Augusto said that "in the second half of 2009, the rapporteur of the [CPI], Senator Romero Juca, the PMDB [party member] who was also leader of the government, summoned him to a meeting in Brasilia. [*Juca*] *said he had an agreement with the president of Petrobras, Gabrielli*: the PMDB help bury the CPI. . . and in return, Gabrielli would not create difficulties for the approval by the executive board of Petrobras [for] the 'project' Odebrecht."<br><br>The article further states: "'Send John present,' *said Gabrielli to Juca, according to the account of John* [*Augusto*]."<br><br>The article further states "Juca denies having [summoned Augusto] to Brasilia to discuss the contract between Petrobras and Odebrecht. 'There was no kind of conversation with Gabrielli on any contract in exchange for CPI.'" | 1. Not former testimony, Fed. R. Evid. 804(b)(1).<br><br>2. Not statement against interest, Fed. R. Evid. 804(b)(3).<br><br>3. Inadmissible hearsay within hearsay. |

| No. | Declarant | Document | Summary of Statement | Hearsay Analysis |
|---|---|---|---|---|
| 4 | **Nestor Cerveró,** former Director of the Petrobras International Division | **Brazil – Federal Court Testimony** (Apr. 18, 2016), Ex. 19 (unofficial transcription) | Cerveró described a one-on-one meeting that allegedly took place between him and Dr. Gabrielli in late 2006. <br><br> Cerveró testified that he said in the meeting:  "Gabrielli I have been pressured by Silas,[2] he is bugging me because the person is persistent, right?  And I do not [know] how to do it, the election fundraising period has passed." <br><br> According to the testimony, in response Gabrielli said:  "I will make you [a] proposal. . . .  Let me solve Silas' problem and you solve PT['s] problem. . . .  And I will determine that you will solve the PT's problem because PT has campaign debt of R$50 million." <br><br> Cerveró testified that "[t]hen the question of Schahin emerged, with the Schahin bank that needed to be resolved," and Gabrielli said:  "[L]et me solve the easiest part and you solve the most difficult part." <br><br> • Judge Moro asked Cerveró, regarding this discussion, "But [Gabrielli] did not mention the drillship?" to which Cerveró responded:  "No.  The drillship was a decision I made . . . ." <br><br> • Cerveró also testified:  "The conversation was as I have reported to you, which also is included in my collaboration agreement." <br><br> Cerveró testified that he spoke with Dr. Gabrielli a second time and said to him:  "Gabrielli, I presented the situation [to Schahin] and gave them a couple of days to respond to me, and they're going to get in touch." <br><br> Cerveró further testified that two or three days after the second conversation, Dr. Gabrielli called him on the telephone and said to Cerveró:  "[T]hat problem is solved, you can stir the boat."  That was the entire conversation.  According to Cerveró, the "problem, he did not mention." | 1. Cerveró will not be available to testify at trial. <br><br> 2. Not former testimony, Fed. R. Evid. 804(b)(1). <br><br> 3. Not statement against interest, Fed. R. Evid. 804(b)(3). |

---

[2] Referring to Minister Silas Rondeau from the Brazilian Democratic Movement Party ("PMDB").

A-4

| No. | Declarant | Document | Summary of Statement | Hearsay Analysis |
|---|---|---|---|---|
| 5 | **Fernando Antonio Falcão Soares**, an intermediary for companies that did business with Petrobras | **Brazil – Cooperation Statement** (Sept. 9, 2015), Ex. 20 (emphasis added) | Soares stated that in 2006 he had a conversation with José Carlos Bumlai, who was not a Petrobras employee.  Bumlai indicated that he been attempting unsuccessfully since 2004 to obtain a contract with Petrobras for Schahin.<br><br>Soares's statement says:  "*Bumlai even told him* that José Gabrielli, who was already president of Petrobras and was dealing directly with Estrella,[3] was not able to obtain satisfactory results in relation to this subject matter."<br><br>The statement further indicates that he had another discussion with Bumlai in which "*Bumlai responded* that [Soares] could remain calm as he was going to trigger the actions of Gabrielli."<br><br>Soares's statement also says:  "*Bumlai subsequently notified* [Soares] that everything was okay and that the issue could be taken to the Executive Board because it would be approved . . . *Bumlai did not mention names, but affirmed that he had discussed [it] with the 'individuals'* . . . ." | 1.   Soares will not be available to testify at trial.<br><br>2.   Not former testimony, Fed. R. Evid. 804(b)(1).<br><br>3.   Not statement against interest, Fed. R. Evid. 804(b)(3).<br><br>4.   Inadmissible hearsay within hearsay. |

[3] Referring to Guilherme de Oliveira Estrella, Petrobras Director of the Exploration & Production Business Area.

| No. | Declarant | Document | Summary of Statement | Hearsay Analysis |
|---|---|---|---|---|
| 6 | **Eduardo Vaz da Costa Musa**, General Manager of the Petrobras International Division from July 2006 to July 2009 | **Brazil - Cooperation Statement** (Dec. 9, 2015), Ex. 21 (emphasis added) | Musa stated, in reference to contracting with Schahin for the Vitoria 10,000 drillship "in compensation for a solution to the 'PT's loan'" that "he recalls that at that time, *in discussions with* . . . *Moreira and Cesar Tavares*, . . . the same attempt had been done . . . with the Directorate of Production and Exploration of Director Guilherme Estrela [sic] in order for that Directorate to be contracted to Schahin. *By what he heard* the request to the E&P had come from the president Sergio Gabrielli and had not been attended to by Guilherme Estrela [sic]. That Nestor Cerveró had said to Gabrielli 'leave with me I will solve it. . . . .'" | 1. Musa will not be available to testify at trial.<br><br>2. Not former testimony, Fed. R. Evid. 804(b)(1).<br><br>3. Not statement against interest, Fed. R. Evid. 804(b)(3).<br><br>4. Inadmissible hearsay within hearsay. |

| No. | Declarant | Document | Summary of Statement | Hearsay Analysis |
|---|---|---|---|---|
| 7 | **Alberto Youssef**, money launderer on behalf of cartel companies | **Brazil – Cooperation Statement** (Oct. 3, 2014), Ex. 22 (emphasis added) | Youssef's cooperation statement says:  "[W]hen asked about the officers of Petrobras, he clarifies that the Presidency of the company was aware of the facts."<br><br>Youssef also stated "he recalls a situation  . . . in which a specific process related to the contracting of marketing services for Petrobras that was interrupted due to irregularities; [and Youssef] was charged with paying these expenses of the participants as a result of the direct order of Sergio Gabrielli, then president, *who would have passed on the order to then Director Paulo Roberto Costa*." | 1.  Youssef will not be available to testify at trial.<br><br>2.  Lacks foundation/ no personal knowledge.<br><br>3.  Not former testimony, Fed. R. Evid. 804(b)(1).<br><br>4.  Not statement against interest, Fed. R. Evid. 804(b)(3).<br><br>5.  Inadmissible hearsay within hearsay. |

A-7

| No. | Declarant | Document | Summary of Statement | Hearsay Analysis |
|---|---|---|---|---|
| 8 | **Paulo Roberto Costa**, Director of Supply | **Brazil – Cooperation Statement** (Sept. 1, Sept. 3, Sept. 5, Sept. 8, 2014), Exs. 23-26 | Costa stated on multiple occasions that the CEO of Petrobras "probably knew" [about the "cartelization process"], "but . . . cannot assert that it was a reality, since he never directly addressed this subject with . . . Sergio Gabrielli." | 1. Costa will not be available to testify at trial.<br><br>2. Lacks foundation/ no personal knowledge.<br><br>3. Not former testimony, Fed. R. Evid. 804(b)(1).<br><br>4. Not statement against interest, Fed. R. Evid. 804(b)(3). |

| No. | Declarant | Document | Summary of Statement | Hearsay Analysis |
|---|---|---|---|---|
| 9 | **Octavio Lavocat Cintra**, Commercial Manager at Petrobras America from 2003 through July 2005 | Deposition Testimony (Apr. 29, 2016). Ex. 27 at 118:18-119:8; 120:9-18; 121:17-124:11; 125:23-126:20 (emphasis added); 129:17-23. | Cintra testified during his deposition:  In the second half of 2005, Cintra attended a meeting with a Brazilian politician named Jorge Bittar that was arranged by Cintra's acquaintance Paulo Cesar Araujo.  Specifically, Cintra told Bittar that he "strongly disagree[d] . . . with the price" of the Pasadena refinery though Cintra was not part of the "confidential" negotiations between Petrobras and Astra but overheard price figures that were leaked by the participants in the negotiations.<br><br>Bittar "asked [Cintra] if [he] wanted to talk to Mr. Gabrielli."  Cintra said "no."  Cintra did not ask Bittar to contact Mr. Gabrielli about these issues and did not know whether Bittar would do so.<br><br>In 2014, "just days after Mr. Paulo Roberto [Costa] was arrested," Cintra met Cesar Araujo "by chance" in the lobby of a building while waiting for the elevator, and *Cesare Araujo told Cintra "that Bittar had told him that [Cintra's] concerns, messages, whatever, were passed at that time to Mr. Gabrielli."* | 1.  Inadmissible hearsay within hearsay. |

**Appendix B – Allegedly False and Misleading Statements That Are Not Actionable Against Dr. Gabrielli[1]**

| Complaint Reference | Disclosure Date | Alleged Misrepresentation | Reason(s) Why Alleged Misrepresentation Is Not Actionable As To Dr. Gabrielli |
|---|---|---|---|
| FAC ¶ 222 | 1/22/2010 | "Petrobras issued a press release setting forth certain descriptions of investment agreements entered into by the Company, Odebrecht S.A. ("Odebrecht") and Braskem S.A. ("Braskem"), including, among other things, a partnership agreement relating to their commercial and corporate relationship with COMPERJ. This press release stated in relevant part:<br><br>'Petrobras, Odebrecht and Braskem also entered into a partnership agreement ("Partnership Agreement") to regulate their commercial and corporate relationship with [COMPERJ] and with the Suape Petrochemical Complex ("Suape Complex").  Under the Partnership Agreement, Braskem will take on the companies operating COMPERJ's petrochemical first and second generation, as well as, gradually acquire equity interests in companies operating in the Suape Complex, in accordance with the terms and conditions agreed in the Association Agreement.<br><br>'The transaction is in line with Petrobras' 2009-2013 Business Plan, which foresees investments in the order of \$5.6 billion to the petrochemical segment aiming to operate in the industry in an integrated manner and adding value to the crude oil produced.  However, it considers a new model of investments in this segment but in line with the Company's objectives to approve long-term sustainable investments that offer high returns to its shareholders.'" | 1.  Forward-looking statements. |
| FAC ¶ 228 | 5/20/2010 | "In addition, the 2009 20-F stated that the 'Company's management assessed the effectiveness of [its] internal control over financial reporting as of December 31, 2009' and 'has concluded that as of December 31, 2009, [the] Company's internal control over financial reporting is effective.'  The Company explained that its 'internal control over financial reporting includes those policies and procedures that . . . (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the consolidated financial statements.'" | 1.  Forward-looking statements. |

---

[1] Plaintiffs have conceded that the allegedly false and misleading statements in paragraphs 265 to 310 and 312 to 357 of the Complaint are not attributable to Dr. Gabrielli.  See 56.1 Statement ¶ 184.

| Complaint Reference | Disclosure Date | Alleged Misrepresentation | Reason(s) Why Alleged Misrepresentation Is Not Actionable As To Dr. Gabrielli |
|---|---|---|---|
| FAC ¶ 229 | 5/20/2010 | "The 2009 20-F incorporated the Petrobras Code of Ethics ('Code'), available on the Company's corporate website and stated that the Code 'is applicable to all employees, the board of executive officers and the board of directors.' Pursuant to the terms of the Code, Petrobras undertook to 'conduct its business with transparency and integrity, creating credibility with its shareholders . . . and . . . investors' and to 'register its reports and statements in a correct, consistent, accurate and complete way.' Moreover, Defendants undertook to 'refuse any corrupt and bribery practices, keeping formal procedures for control and consequences of any transgressions' and to 'refuse support and contributions to political parties or political campaigns of candidates for elective offices.' The 2009 20-F represented that in 2008, the Company's executive officers 'further developed our ethics management through the creation of the Petrobras Ethics Commission' 'to promote compliance with ethical principles.' Petrobras has been boasting to investors that it acts with 'credibility and transparency.' It claimed that it 'adopts the best corporate governance practices and has all the skills to make full use of the most advanced business management tools.' The Petrobras Ethics Committee, appointed by the Executive Board, began functioning in 2008. The Company represented that the committee is directly linked to the CEO and was set up for the purpose of handling ethics issues within the Company and serving as a forum for discussion, while enhancing the formal, official nature of Petrobras' Ethics Management System." | 1.  Statements of opinion. |
| FAC ¶ 231 | 5/27/2010 | "In connection with [the first quarter of 2010] results, Defendant Gabrielli stated:<br><br>'We are going through a period of crucial importance regarding our shareholders. During the next few months we are planning an important capitalization that will prepare Petrobras to go ahead with the investments needed for its integrated growth and the development of new frontiers. *We are fully committed to implementing a fair and transparent operation, respecting our minority shareholders' rights and following the best practices of corporate governance.*<br><br>'Our priority is to grow in an integrated manner and with profitability. In order to do so, we rely on a strong business foundation that ensures a substantial cash flow. We also have access to several sources of financings, either through banks or the capital markets, which give us the financial muscle to sustain our expansion and allow us to grow, invest and maintain an appropriate capital structure. *Our growth is underpinned by the absolute certainty that we have one of the best project portfolios and opportunities in the world, and that we will invest all of our resources with efficiency and discipline, ensuring returns for our shareholders, investors and society as a whole.*'"<br><br>(Emphasis in FAC.) | 1.  Statements of opinion.<br><br>2.  Forward-looking statements. |

| Complaint Reference | Disclosure Date | Alleged Misrepresentation | Reason(s) Why Alleged Misrepresentation Is Not Actionable As To Dr. Gabrielli |
|---|---|---|---|
| FAC ¶ 232 | 5/27/2010 | "Defendant Gabrielli reaffirmed that the Company was '*[f]ully committed to implementing a fair and transparent operation, respecting [its] minority shareholders' rights and following the best practices of corporate governance*.'"<br><br>(Emphasis in FAC.) | 1. Statements of opinion.<br><br>2. Forward-looking statements. |
| FAC ¶ 233 | 6/21/2010 | "Petrobras issued a press release announcing that the Company's 'Board of Directors approved the 2010-2014 Business Plan on June 18th, with investments totaling $224 billion.' The 2010-2014 Business Plan projected that Petrobras would meet the funding requirements for these investments in part by issuing $96 billion in debt and equity." | 1. Forward-looking statements. |
| FAC ¶ 241 | 11/23/2010 | "In connection with [the third quarter of 2010] results, Defendant Gabrielli stated in part: 'The success of our Global Offering was due to the confidence of our shareholders and investors, the Company's excellent reputation in the capital markets and ***our commitment to transparency*** and investor returns.'"<br><br>(Emphasis in FAC.) | 1. Statements of opinion. |
| FAC ¶ 245 | 1/27/2011 | "Petrobras issued a press release announcing that the offering of the $6 billion of notes pursuant to the Form 424B2 filed on January 21, 2011 had closed. The release noted that 'the transaction was the largest-ever corporate bond offering by a Brazilian company in the international capital markets, and the book was oversubscribed 2.5 times with more than 463 investors from the United States, Europe, Asia and Latin America participating, most of them dedicated to the high grade market. Petrobras will use the proceeds of this multitranche offering to finance Petrobras' planned capital expenditure under its 2010-2014 Business Plan while maintaining an adequate capital structure and staying within Petrobras' targeted financial leverage ratios in accordance with its 2010-2014 Business Plan.'" | 1. Forward-looking statements. |

| Complaint Reference | Disclosure Date | Alleged Misrepresentation | Reason(s) Why Alleged Misrepresentation Is Not Actionable As To Dr. Gabrielli |
|---|---|---|---|
| FAC ¶ 247 | 3/15/2011 | "In connection with these results, Defendant Gabrielli stated in part:<br><br>'*Our results* for the fourth quarter and full year of 2010 further underscore our capacity for overcoming challenges, as well as *emphasize the quality of our assets* and investment projects.<br><br>'*At Petrobras, we are fully aware that our achievements would not have been possible without the adoption of good corporate governance practices*, as well as investments in technology and workforce training.'"<br><br>(Emphasis in FAC.) | 1. Statements of opinion. |
| FAC ¶ 249 | 5/24/2011 | "In connection with [the first quarter of 2011] results, Defendant Gabrielli stated in part:<br><br>'On the corporate front, we undertook the largest ever international debt issuance by a Brazilian company, placing U.S. $6,000 million in bonds maturing in 5, 10 and 30 years.  The proceeds will be used to finance the investments foreseen in our Business Plan, thereby maintaining an appropriate capital structure and financial leverage in line with our objectives.<br><br>'We achieved the milestones above . . . not only meeting growing demand in these markets, but also *ensuring that all of the Company's human, financial and operational resources are put to the best possible use*. We remain confident in our capacity to achieve the goals laid out in our Business Plan, thereby ensuring increasing returns for our shareholders and investors.'"<br><br>(Emphasis in FAC.) | 1. Statements of opinion.<br><br>2. Forward-looking statements. |
| FAC ¶ 251 | 5/26/2011 | "The 2010 Form 20-F stated that the 'Company's management assessed the effectiveness of each Company's internal control over financial reporting as of December 31, 2010' and 'has concluded that as of December 31, 2010, each Company's internal control over financial reporting is effective.' The Company explained that the 'management of [the] Company identified no change in its internal control over financial reporting during the fiscal year ended December 31, 2010, that has materially affected or is reasonably likely to materially affect its internal control over financial reporting.'" | 1. Statements of opinion. |
| FAC ¶ 252 | 5/26/2011 | "The 2010 20-F incorporated the Code, and made statements substantially similar to those described in ¶ 229 above." | 1. Statements of opinion. |

| Complaint Reference | Disclosure Date | Alleged Misrepresentation | Reason(s) Why Alleged Misrepresentation Is Not Actionable As To Dr. Gabrielli |
|---|---|---|---|
| FAC ¶ 254 | 7/22/2011 | "Petrobras issued a press release announcing that the Company's 'Board of Directors approved today the 2011-2015 Business Plan, involving total investments of US$224.7 billion (R$389 billion).' The 2010-2014 Business Plan set forth the projection that Petrobras would require financing of between $67.0 billion and $91.4 billion." | 1.  Forward-looking statements. |
| FAC ¶ 260 | 11/22/2011 | "In connection with these results, Defendant Gabrielli stated in part:<br><br>'We continue to invest in the expansion of our refineries, strengthening our position as an integrated company.<br><br>'We improved our performance with respect to economic and social criteria and were **granted the highest score in the Transparency criterion** for the fifth time.<br>* * *<br>'Thanks to product and service quality, **a strong commitment to** sustainable development, state-of-the-art technology and **exemplary management,** Petrobras continues to strengthen its position as a major player in the global oil and gas market and is fully prepared for new conquests.'"<br><br>(Emphasis in FAC.) | 1.  Statements of opinion.<br><br>2.  Forward-looking statements. |
| FAC ¶ 262 | 1/23/2012 | "On January 23, 2012, Petrobras notified the market of possible changes among the Company's executives. On January 24, 2012, the Company issued a press release confirming the upcoming nomination of defendant Foster to replace CEO Gabrielli who was reportedly planning to run for public office." | 1.  Not false or misleading. |