UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PETROBRAS SECURITIES LITIGATION

This Document Applies To:

*In re Petrobras Securities Litigation*, 14-cv-9662 (JSR)

No. 14-cv-9662 (JSR)

**LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED IN SUPPORT OF JOSE SERGIO GABRIELLI DE AZEVEDO'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56(c), Local Civil Rule 56.1 and Section C of the Amended Civil Case Management Plan entered on January 11, 2016 (Dkt. 391), Defendant Jose Sergio Gabrielli de Azevedo ("Dr. Gabrielli") respectfully submits this statement of material facts as to which there is no genuine issue to be tried.

**Dr. Gabrielli's Background and Employment at Petrobras**

1.      In 1972, Dr. Gabrielli earned a bachelor's degree in economics from the Federal University of Bahia in Bahia, Brazil.  Gabrielli Decl. ¶ 1; Ex. 2, Gabrielli Tr. at 11:7-10.[1]

2.      In 1975, Dr. Gabrielli earned a master's degree in economics from Boston University.  Gabrielli Decl. ¶ 1; Ex. 2, Gabrielli Tr. at 11:10-11, 13:6-7.

3.      In 1988, Dr. Gabrielli earned a Ph.D. in economics from Boston University.  His doctoral thesis was entitled "Multi-Sectoral Model to Analyze Investment of State-Owned Companies in Brazil from 1975-1979."  Gabrielli Decl. ¶ 1; Ex. 2, Gabrielli Tr. at 12:5-12.

4.      From 2000 to 2001, Dr. Gabrielli was a research fellow at the London School of Economics.  Gabrielli Decl. ¶ 1; Ex. 2, Gabrielli Tr. at 11:12-14, 12:21-23.

---

[1] Citations to "Ex." refer to the exhibits to the Declaration of Jasmine Juteau in Support of Dr. Gabrielli's Motion for Summary Judgment.

5.      Before 2003, Dr. Gabrielli's employment history included working for the government of Bahia and serving as an economics professor, Dean of Research and Graduate Studies, Dean of the School of Economics, and head of investments at the Federal University of Bahia.  Gabrielli Decl. ¶ 2.

6.      Dr. Gabrielli served as Chief Financial Officer and Investor Relations ("CFO") of Petróleo Brasileiro S.A. ("Petrobras" or the "Company")[2] from February 1, 2003 to July 21, 2005.  Id. ¶ 3.

7.      Dr. Gabrielli served as Chief Executive Officer ("CEO") of Petrobras from July 21, 2005 to February 13, 2012.  Id. ¶ 4.

8.      Dr. Gabrielli served on Petrobras's Board of Directors from July 21, 2005 to February 13, 2012.  Id. ¶ 5.

9.      Dr. Gabrielli served on Petrobras's Board of Executive Officers ("Executive Board") from February 1, 2003 to February 13, 2012.  Id. ¶ 6.

10.     During Dr. Gabrielli's employment at Petrobras, the membership of the Executive Board consisted of the CEO and six directors elected by the Board of Directors.  Id. ¶ 8.

11.     When Dr. Gabrielli was CEO, the members of the Executive Board were:

- Dr. Gabrielli
- Almir Guilherme Barbassa, CFO and Director of the Financial Area
- Maria das Graças Silva Foster, Director of the Gas & Power Area
- Paulo Roberto Costa ("Costa"), Director of the Supply Area
- Guilherme de Oliveira Estrella, Director of the Exploration & Production Business Area
- Nestor Cerveró followed by Jorge Zelada, Director of the International Area
- Renato de Souza Duque, Director of the Services Area

---

[2] Further background on Petrobras can be found in paragraphs 1 through 5 of Petrobras's Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried ("Petrobras's 56.1 Statement"), which is incorporated herein by reference.

Id. ¶ 9.

12.     As of February 13, 2012, Dr. Gabrielli no longer served as Petrobras's CEO or on its Executive Board or Board of Directors.  Id. ¶ 10.

**The Brazil Statements and Declarants Relevant to This Motion**

13.     As a result of the ongoing criminal investigation in Brazil called *Lava Jato*, since early 2014 there have been dozens of Brazilian citizens who have given written statements or in-person testimony to various Brazilian governmental agents and bodies concerning their involvement with Petrobras.[3]  Dotti Decl. ¶¶ 5.

Police Statements

14.     Statements to the federal police are unsworn, written statements that are signed by the declarant but are not made under penalty of perjury ("Police Statements").  Id. ¶ 16.

15.     On December 9, 2015, Dr. Gabrielli provided a Police Statement to representatives of the Brazilian Federal Police.  Gabrielli Decl. ¶ 31.

16.     Other than his own December 9, 2015 Police Statement, neither Dr. Gabrielli nor an attorney representing Dr. Gabrielli has been present for any Police Statements.  Id. ¶ 32.

Cooperation Statements

17.     Numerous Brazilian citizens have entered into cooperation and plea agreements with Brazilian federal prosecutors in the *Lava Jato* criminal investigation.  Dotti Decl. ¶ 17.

18.     Pursuant to a cooperation agreement, a person cooperating ("cooperator") is required to provide one or more statements to Brazilian federal prosecutors.  Id. ¶ 18.

---

[3] Further background on the events underlying the *Lava Jato* investigation can be found in the "Payment Scheme" section of Petrobras's 56.1 Statement, which is incorporated herein by reference.

19.    These are written statements made pursuant to the cooperator's agreement to plead guilty to criminal offenses, stating in writing that the cooperator affirms his or her legal commitment to tell the truth, and signed by the cooperator ("Cooperation Statements").  Id. ¶ 19.

20.    When Cooperation Statements are given to Brazilian federal prosecutors, only government officials, the cooperator, and his or her attorney are present.  Id. ¶ 20.

21.    Cooperation Statements expressly reference Brazilian Law No. 12.850/2013, a law enacted in 2013 that defines "criminal organization," provides regulations for criminal investigations, means of evidence collection, related criminal offenses and criminal procedures. Id. ¶ 21.

22.    Law No. 12.850/2013 includes, among other provisions, Article 4 addressing "Plea Agreements."  Article 4 states, in relevant part, that upon the request of the parties, the sentencing court may impose a reduced imprisonment sentence, reducing the sentence by up to two-thirds (2/3) of the total, or substitute another restriction of rights for imprisonment (such as house arrest), for the accused who has collaborated effectively and voluntarily with the investigation and the criminal proceedings.  Id. ¶ 22.

23.    The court may grant judicial forgiveness as specified in Article 4 as long as the cooperator's information produces one or more of the following results:

      a.    the identification of the other co-authors or the other participants in the criminal organization or their criminal offenses;

      b.    the revelation of the hierarchical structure and the distribution of tasks within the criminal organization;

      c.    the prevention of criminal offenses stemming from the criminal organization's activities;

d.      the complete or the partial recovery of the product or the profit stemming

from the criminal organization's activities;

e.      the location of the victim, if there is one, with his/her physical integrity

preserved.

Id. ¶ 23.

24.      Article 4, Paragraph 7 of Law No. 12.850/2013 states, in relevant part, that Cooperation Statements shall be sent to the court for its review and approval and that the court may require the cooperator to appear before it to confirm the contents of the Cooperation Statements.  Id. ¶ 24.

25.      Article 4, Paragraph 8 of Law No. 12.850/2013 states that the court may refuse to approve the cooperation and plea agreement if the legal requirements are not met.  Id. ¶ 25.

26.      Article 4, Paragraph 14 of Law No. 12.850/2013 states that the cooperator waives his or her right to remain silent and is advised that he or she "shall be held liable for the legal commitment of telling the truth," a provision that is specifically cited in Cooperation Statements. Id. ¶ 26.

27.      Dr. Gabrielli has not entered into a cooperation and plea agreement or made a Cooperation Statement.  Gabrielli Decl. ¶ 33.

28.      Neither Dr. Gabrielli nor an attorney representing him has been present for anyone offering a Cooperation Statement.  Id. ¶ 34.

**Agosthilde Mônaco de Carvalho**

29.      On November 11, 2015, Agosthilde Mônaco de Carvalho ("Mônaco") provided a Cooperation Statement to the Brazilian Federal Public Prosecutor's Office of Paraná.  Juteau Decl. ¶ 7(a).

30.     Mônaco's November 11, 2015 Cooperation Statement was not sworn.  Id.

31.     Mônaco's November 11, 2015 Cooperation Statement does not state, in substance, "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."  Id.

32.     Neither Dr. Gabrielli nor an attorney representing Dr. Gabrielli was present for Mônaco's November 11, 2015 Cooperation Statement.  Gabrielli Decl. ¶ 34.

33.     Mônaco has entered into an agreement to plead guilty with the Office of the Chief Public Federal Prosecutor, and the guilty plea has been formally accepted by the relevant tribunal.  Dotti Decl. ¶ 12.

34.     Subjects of the *Lava Jato* investigation generally have not been permitted to travel outside of Brazil after they agreed to plead guilty to criminal offenses.  Id. ¶ 13.

### Fernando Antonio Falcão Soares

35.     On September 9, 2015, Fernando Antonio Falcão Soares ("Soares") provided a Cooperation Statement to the Brazilian Federal Public Prosecutor's Office.  Juteau Decl. ¶ 7(e).

36.     Soares's September 9, 2015 Cooperation Statement was not sworn.  Id.

37.     Soares's September 9, 2015 Cooperation Statement does not state, in substance, "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."  Id.

38.     Neither Dr. Gabrielli nor an attorney representing Dr. Gabrielli was present for Soares's September 9, 2015 Cooperation Statement.  Gabrielli Decl. ¶ 34.

39.     Soares has pleaded guilty to criminal offenses. His plea was accepted by the 13° Federal Brazilian Court of Justice in Curitiba, Paraná, Brazil ("Brazilian Court").  Dotti Decl. ¶ 8.

40.     Soares is subject to house arrest until November 17, 2016 and house arrest in semi-open conditions until November 17, 2017.  Id. ¶ 8(b).

41.     As a condition of house arrest, Soares is not permitted to travel outside of Brazil until his term of house arrest has concluded.  Id.

42.     Soares is a defendant in two other pending criminal cases in which he is charged with committing various criminal offenses.  Id.

### Eduardo Costa Vaz Musa

43.     On December 9, 2015 Eduardo Costa Vaz Musa ("Musa") provided a Cooperation Statement to the Brazilian Federal Public Prosecutor's Office.  Juteau Decl. ¶ 7(f).

44.     Musa's December 9, 2015 Cooperation Statement was not sworn.  Id.

45.     Musa's December 9, 2015 Cooperation Statement does not state, in substance, "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."  Id.

46.     Neither Dr. Gabrielli nor an attorney representing Dr. Gabrielli was present for Musa's December 9, 2015 Cooperation Statement.  Gabrielli Decl. ¶ 34.

47.     Musa has pleaded guilty to criminal offenses.  His plea was accepted by the Brazilian Court.  Dotti Decl. ¶ 11.

48.     He is not incarcerated but he is still subject to certain court-imposed restrictions for two years.  Id.

49.     One of those conditions is that he must notify and justify to the Brazilian Court any travel outside of Brazil, which the Brazilian Court must approve.  Id.

50.     Musa is a defendant in two other pending criminal cases in which he is charged with committing various criminal offenses.  Id.

**Alberto Youssef**

51.     On October 3, 2014, Alberto Youssef ("Youssef") provided a Cooperation Statement to the Brazilian Federal Public Prosecutor's Office.  Juteau Decl. ¶ 7(g).

52.     Youssef's October 3, 2014 Cooperation Statement was not sworn.  Id.

53.     Youssef's October 3, 2014 Cooperation Statement does not state, in substance, "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."  Id.

54.     Neither Dr. Gabrielli nor an attorney representing Dr. Gabrielli was present for Youssef's October 3, 2014 Cooperation Statement.  Gabrielli Decl. ¶ 34.

55.     Youssef has pleaded guilty to criminal offenses.  His plea was accepted by the Brazilian Court.  He was sentenced to a term of imprisonment, which he is currently serving until March 17, 2017.  He will be subject to court-imposed restrictions upon release.  Dotti Decl. ¶ 7.

56.     Youssef cannot travel outside of Brazil during his incarceration.  Id.

57.     Youssef is also a defendant in eleven other pending criminal cases in which he is charged with committing various criminal offenses.  Id.

58.     Dr. Gabrielli never met Youssef.  Ex. 2, Gabrielli Tr. at 218:25-219:3.

**Paulo Roberto Costa**

59.     Costa was arrested in connection with the *Lava Jato* investigation in March 2014.  Id. at 18:2-10.

60.     On September 1, 2014, September 3, 2014, September 5, 2014, and September 8, 2014, Costa provided Cooperation Statements to the Brazilian Federal Public Prosecutor's Office.  Juteau Decl. ¶ 7(h)-(k).

61.    Costa's September 1, 2014, September 3, 2014, September 5, 2014, and September 8, 2014 Cooperation Statements were not sworn.  Id.

62.    Costa's September 1, 2014, September 3, 2014, September 5, 2014, and September 8, 2014 Cooperation Statements do not state, in substance, "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."  Id.

63.    Neither Dr. Gabrielli nor an attorney representing Dr. Gabrielli was present for Costa's September 1, 2014, September 3, 2014, September 5, 2014, and September 8, 2014 Cooperation Statements.  Gabrielli Decl. ¶ 34.

64.    Costa has pleaded guilty to criminal offenses.  His plea was accepted by the Brazilian Court.  He was sentenced to a term of house arrest, which he is currently serving until October 1, 2016.  He will be subject to court-imposed restrictions upon release to be established by the Brazilian Court.  Dotti Decl. ¶ 10.

65.    Costa is not currently authorized to travel outside of Brazil.  Id.

Testimony Before Brazilian Courts

66.    The statements made by witnesses testifying before the Brazilian courts are made under oath and under penalty of perjury; the testimony transcripts are not signed by the witness. Id. ¶ 27.

67.    The court is permitted to question the witness.  In addition, criminal defendants who are being prosecuted are present and their attorneys are permitted to question the witness. Id. ¶¶ 28-29.

68.    When the witness is a cooperator subject to a cooperation agreement, the cooperator's testimony is offered in accordance with Law No. 12.850/2013.  Id. ¶ 30.

69.     Dr. Gabrielli testified before Judge Sergio Moro ("Judge Moro"), a federal judge in Curitiba, Brazil who oversees the *Lava Jato* investigation, on the following dates:  September 15, 2014 in Criminal Action No. 5026212-82.2014.404.7000; October 1, 2015 in Criminal Action No. 503652823.2015.404.7000; March 26, 2015 in Criminal Action No. 508383859.2014.404.7000; June 17, 2015 in Criminal Action No. 5012331-04.2015.404.7000; and March 14, 2016 in Criminal Action No. 506157851.2015.404.7000.  Gabrielli Decl. ¶ 35.

70.     On the above-referenced dates, Dr. Gabrielli testified as a witness to the criminal prosecutions of other individuals and not as a cooperator or defendant.  Id. ¶ 36.

71.     Neither Dr. Gabrielli nor an attorney representing Dr. Gabrielli has appeared at any federal court hearing when another witness or cooperator offered testimony in the *Lava Jato* criminal proceedings.  Id. ¶ 37.

72.     Dr. Gabrielli has not been charged with a crime in Brazil (or anywhere else), except he was convicted in 1973 during the military dictatorship in Brazil for political activities against the military government.  Id. ¶ 38.

73.     Dr. Gabrielli has not been admitted as a party to any pending criminal matter before the Brazilian federal courts relating to *Lava Jato*.  Id. ¶ 39.

**Nestor Cerveró**

74.     On April 18, 2016, Nestor Cerveró ("Cerveró") testified before Judge Moro in connection with the *Lava Jato* investigation.  Juteau Decl. ¶ 7(d).

75.     Cerveró's testimony on April 18, 2016, confirmed written statements he had made previously pursuant to his cooperation and plea agreement.  Dotti Decl. ¶¶ 24(a).

76.     Neither Dr. Gabrielli nor an attorney representing Dr. Gabrielli was present for Cerveró's April 18, 2016 testimony or any statement made by Cerveró to the Brazilian federal prosecutors.  Gabrielli Decl. ¶ 37.

77.     Cerveró has pleaded guilty to criminal offenses, which the Brazilian Court has accepted.  Dotti Decl. ¶ 8.

78.     Cerveró is currently subject to house arrest until December 23, 2017.  Id. ¶ 8(a).

79.     As a condition of house arrest, Cerveró is not permitted to travel outside of Brazil until his term of arrest has concluded.  Id.

80.     Cerveró is a defendant in two other pending criminal cases in which he is charged with committing various criminal offenses.  Id.

CPI and CPMI Statements

81.     A *Comissão Parlamentar de Inquérito* ("CPI") is a parliamentary inquiry commission convened by one chamber of the National Congress of Brazil.  Id. ¶ 31.

82.     A *Comissão Parlamentar Mista de Inquérito* ("CPMI") is a parliamentary inquiry commission convened by both chambers of the National Congress of Brazil.  Id. ¶ 32.

83.     The members of a CPI or CPMI are members of Brazil's parliament.  Id. ¶ 33.

84.     Testimony before the CPI or CPMI is given under oath.  Id.

85.     Testimony before the CPI or CPMI is transcribed, but the transcriptions are not reviewed or signed by the witnesses who have given testimony.  Id. ¶ 35.

86.     A CPI or CPMI is convened as a fact-finding tool concerning a particular topic or area of inquiry.  It is not an adversarial proceeding.  Id. ¶ 36.

87.     The only persons permitted to ask questions of a witness testifying before the CPI or CPMI are the members of the commission.  Id. ¶ 37.

88.     There was a CPI convened in 2009 ("2009 CPI") to inquire into Petrobras's construction of the RNEST refinery.  Id. ¶ 38.

89.     There was a CPMI convened in 2014 ("2014 CPI") to inquire into the conduct of Petrobras and its employees in connection with refinery projects and the *Lava Jato* investigation. Id. ¶ 39.

90.     There was a CPI convened in 2015 ("2015 CPI") to inquire into the conduct of Petrobras and its employees in connection with the *Lava Jato* investigation.  Id. ¶ 40.

91.     Dr. Gabrielli testified before a CPI or CPMI on the following dates:  November 10, 2009 before the CPI established by Request No. 569 in 2009; May 20, 2014 before the CPMI established by Request No. 302 in 2014; June 25, 2014 before the CPMI established by Request No. 2 in 2014; and March 12, 2015 before the CPI established by Request No. 74 in 2015. Gabrielli Decl. ¶ 28.

92.     Other than the instances identified in paragraph 91 of Dr. Gabrielli's 56.1 Statement, neither Dr. Gabrielli nor an attorney representing Dr. Gabrielli has appeared before a CPI or CPMI.  Id. ¶ 29.

**Fernando de Castro Sá**

93.     On April 28, 2015, Fernando de Castro Sá testified before the 2015 CPI.  Juteau Decl. ¶ 7(b).

94.     Neither Dr. Gabrielli nor an attorney representing Dr. Gabrielli was present for Castro Sá's April 28, 2015 testimony.  Gabrielli Decl. ¶ 29.

95.     Castro Sá has not been charged with any criminal offense in connection with *Lava Jato* and has served as a witness on behalf of the prosecution in the related criminal cases.  Dotti Decl. ¶ 14.

**Dr. Gabrielli's Compensation and Purchases of Petrobras Shares**

96.    Dr. Gabrielli's gross compensation for the years during which he served as CEO

was as follows:

| Year | Salary (USD) |
|------|-------------|
| 2005 | $246,760.24 |
| 2006 | $337,013.39 |
| 2007 | $593,256.77 |
| 2008 | $522,389.01 |
| 2009 | $447,497.87 |
| 2010 | $635,349.43 |
| 2011 | $1,050,756.19 |
| 2012 | $192,471.26 |

Juteau Decl. ¶ 4; Gabrielli Decl. ¶ 11.

97.    Dr. Gabrielli did not receive shares or any option to purchase shares of Petrobras

as part of his compensation from Petrobras.  Gabrielli Decl. ¶ 12.

98.    While employed at Petrobras, Dr. Gabrielli did not make any purchases of or own

Petrobras shares.  After he left Petrobras, Dr. Gabrielli made the following purchases of

Petrobras shares, which he still owns:

|     | Date | Number of Shares | Price per Share (BRL) | Value (BRL) | Value (USD) |
|-----|------|-----------------|----------------------|-------------|-------------|
| 1.  | 3/30/12 | 10,900 | R$23.28 | R$253,752.00 | $139,197.38 |
| 2.  | 8/31/12 | 2,000 | R$18.68 | R$37,360.00 | $18,395.23 |
| 3.  | 12/28/12 | 1,000 | R$19.50 | R$19,500.00 | $9,533.17 |
| 4.  | 2/6/13 | 2,850 | R$17.57 | R$50,074.50 | $25,193.89 |
| 5.  | 7/25/13 | 2,000 | R$15.95 | R$31,900.00 | $14,149.53 |
| 6.  | 8/20/13 | 1,000 | R$17.71 | R$17,710.00 | $7,398.07 |
| 7.  | 8/30/13 | 1,000 | R$17.70 | R$17,700.00 | $7,438.69 |
| 8.  | 2/10/14 | 6,000 | R$13.80 | R$82,800.00 | $34,579.12 |
| 9.  | 9/29/14 | 2,000 | R$18.90 | R$37,800.00 | $15,450.27 |
| 10. | 10/27/14 | 5,000 | R$14.20 | R$71,000.00 | $27,973.26 |
|     |  | 33,750 |  | R$619,596.50 | $299,308.63 |

Juteau Decl. ¶ 5; Gabrielli Decl. ¶ 13.

99.     From 2005 to the present, Dr. Gabrielli has not had any financial interest in any business entity, not including stocks or bonds.  Ex. 2, Gabrielli Tr. at 65:15-24.

100.     Dr. Gabrielli has only one bank account outside of Brazil—in Portugal—into which he receives compensation for serving on the board of directors of Galp Energia, SGPS, S.A. ("Galp"), a publicly-traded Portuguese company.  Id. at 65:25-66:18; Juteau Decl. ¶ 6.

101.     Dr. Gabrielli pays income taxes on the compensation he receives from Galp and also includes that compensation in his Brazilian income tax return.  Ex. 2, Gabrielli Tr. at 66:9-12.

102.     Dr. Gabrielli's wife does not have a financial interest in any bank account outside of Brazil aside from Dr. Gabrielli's account in Portugal.  Id. at 67:20-23.

**Dr. Gabrielli Was Unaware of the Cartel and Bribery Scheme**

103.     During his tenure as CEO of Petrobras, Dr. Gabrielli had no knowledge or awareness that contractors of Petrobras had allegedly formed a cartel in order to fix the bidding processes used to award contracts with Petrobras.  Gabrielli Decl. ¶ 14.

104.     During his tenure as CEO of Petrobras, Dr. Gabrielli had no knowledge or awareness of any bid-rigging involving Petrobras's contracts.  Id. ¶ 15.

105.     During his tenure as CEO of Petrobras, Dr. Gabrielli had no knowledge or awareness that employees of Petrobras aided members of the alleged cartel to fix the bidding process.  Id. ¶ 16.

106.     During his tenure as CEO of Petrobras, Dr. Gabrielli had no knowledge or awareness of bribes allegedly paid to Brazilian government officials by the alleged cartel of contractors in connection with Petrobras contracts.  Id. ¶ 17.

107.    During his tenure as CEO of Petrobras, Dr. Gabrielli had no knowledge or awareness that alleged cartel members, Petrobras employees, and others used various means, including Swiss bank accounts, to conceal the receipts of the alleged scheme.  Id. ¶ 18.

108.    Stephen L. Henning, Ph.D., CPA, an expert retained by the Plaintiffs, admitted during his deposition that he "[does not] have any knowledge that" Dr. Gabrielli, among others, "knew or should have known of the cartel scheme," nor was he expressing an opinion that Dr. Gabrielli, among others, "knew or should have known of the cartel scheme."  Ex. 31, Henning Tr. at 82:5-14.

### Dr. Gabrielli Reasonably Believed that Petrobras Internal Controls Were Sound

109.    During his tenure as CEO of Petrobras, Dr. Gabrielli worked to ensure that Petrobras had adequate internal controls.  Gabrielli Decl. ¶ 19.

110.    During his tenure as CEO of Petrobras, Dr. Gabrielli was not aware of any unaddressed weaknesses in Petrobras's internal controls.  Id. ¶ 20.

111.    Barbassa, the former CFO of Petrobras, testified: "I believe that the control system, that the control system in operation was sound enough to exclude any weaknesses."  Ex. 8, Barbassa Tr. at 68:14-16.

112.    During his tenure as CEO of Petrobras, in connection with the filing of its annual financial statements, Petrobras repeatedly received clean audit opinions from reputable accountants at Ernst & Young Auditores Independentes S/S (fiscal year 2005) and KPMG Auditores Independentes (fiscal years 2006 through 2011), whose function included testing Petrobras's internal controls systems.  Gabrielli Decl. ¶ 21.

113.    Further information on Petrobras's internal controls can be found in the "Internal Auditing Controls at Petrobras" and "Internal Financial Controls at Petrobras" sections of the

Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried filed by

Defendants Almir Guilherme Barbassa, Jose Carlos Cosenza, Guilherme de Oliveira Estrella and

Jose Miranda Formigli Filho in support of their Motion for Summary Judgment, which is

incorporated herein by reference.

> 2009 KMPG Audit

114.    At year-end 2009 KPMG "audited the Company's internal control over financial

reporting as of December 31, 2009, based on criteria established in Internal Control – Integrated

Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission

('COSO')" and "conducted [its] audits in accordance with the standards of the Public Company

Accounting Oversight Board (United States)."  Ex. 3, Petrobras 2009 Form 20-F, p. F-3, KPMG

Report.

115.    KPMG reported the steps it took as part of its audit work:

> Those standards require that we plan and perform the audits to
> obtain reasonable assurance about whether the consolidated
> financial statements are free of material misstatement and whether
> effective internal control over financial reporting was maintained in
> all material respects. Our audits of the consolidated financial
> statements included examining, on a test basis, evidence supporting
> the amounts and disclosures in the consolidated financial
> statements, assessing the accounting principles used and significant
> estimates made by management, and evaluating the overall
> consolidated financial statements presentation.  Our audit of internal
> control over financial reporting included obtaining an understanding
> of internal control over financial reporting, assessing the risk that a
> material weakness exists and testing and evaluating the design and
> operating effectiveness of internal control based on the assessed
> risk. Our audits also included performing such other procedures as
> we considered necessary in the circumstances. We believe that our
> audits provide a reasonable basis for our opinions.

Id.

116.     KPMG noted that even rigorous internal controls will not detect every instance of fraud, stating "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements." Id. at F-4.

117.     KPMG concluded:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Petróleo Brasileiro S.A. – Petrobras and subsidiaries as of December 31, 2009 and 2008, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2009, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, Petróleo Brasileiro S.A. - Petrobras and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in COSO.

Id.

### 2010 KMPG Audit

118.     At year-end 2010 KPMG again "audited the Company's internal control over financial reporting as of December 31, 2010, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ('COSO')" and "conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)." Ex. 4, Petrobras 2010 Form 20-F, p. F-3, KPMG Report.

119.     KPMG similarly reported the steps it took as part of its audit work:

> Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the consolidated financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall consolidated financial statements presentation. Our audit of internal

> control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances.  We believe that our audits provide a reasonable basis for our opinions.

Id.

120.     KPMG noted that even rigorous internal controls will not detect every instance of fraud, stating "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements."  Id. at F-4.

121.     KPMG again concluded as follows:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Petróleo Brasileiro S.A. – Petrobras and subsidiaries as of December 31, 2010 and 2009, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2010, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, Petróleo Brasileiro S.A. – Petrobras and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in COSO.

Id.

2011 KPMG Audit

122.     At year-end 2011 KPMG "audited the Company's internal control over financial reporting as of December 31, 2011, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ('COSO')" and "conducted [its] audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)."  Ex. 5, Petrobras 2011 Form 20-F, p. F-4, KPMG Report.

123.     KPMG reported the same steps it took as part of its audit work:

> Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the consolidated financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall consolidated financial statements presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances.  We believe that our audits provide a reasonable basis for our opinions.

Id.

124.    KPMG again noted that even rigorous internal controls will not detect every instance of fraud, stating "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements."  Id. at F-5.

125.    KPMG once again concluded:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Petróleo Brasileiro S.A. – Petrobras and subsidiaries as of December 31, 2011 and 2010, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2011, in conformity with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB).  Also, in our opinion, Petróleo Brasileiro S.A. - Petrobras and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2011, based on criteria established in COSO.

Id.

**Events Related to Geovane de Morais**

126.    Paulo Roberto Costa informed Dr. Gabrielli that an issue with Geovane de Morais ("Morais"), a Petrobras employee, arose where "there were indications of nonconformity related

to payments of small amounts and an investigation would be required."  Ex. 2, Gabrielli Tr. at 80:4-14.

127.    Dr. Gabrielli "immediately formed an investigation committee" and "allowed them ten days for a preliminary investigation."  Id. at 80:15-20.

128.    Dr. Gabrielli was motivated to form the investigation commission because the allegations against Morais "referred to activities that went beyond downstream and involving several sectors" including "institutional relation[s]" and "exploration and production."  Id. at 80:21-81:6.

129.    The CEO's office oversees "institutional relations" which refers to the "relations of the company with different government levels and with different society representatives."  Id. at 81:7-81:17.

130.    An internal investigation commission was established on December 8, 2008, and consisted of Rosemberg Evangelista Pinto, GAPRE Coordinator; Paulo Cesar dos Santos, Auditor; Erasmo Granado Ferreira, Institutional Corporate Communication; Fransisco Pais, Supply; and Carlos da Silva Fontes Filho, Legal.  Ex. 6, Report of the Commission of Internal Investigation, dated December 19, 2008 ("Investigation Report"), at 3.

131.    The investigation commission spoke with Morais, Jose Roberto Kaschel Vieira, General Manager of the Supply Area, Jose Augusto Nunes, Junior, and Carlos Manuel Melo Goncalves, Assistant of the Executive Manager of Institutional Communication.  Id. at 3-4.

132.    In addition, the investigation commission requested and reviewed documents, including documents from Morais and Vieira.  Id.

133.    The investigation commission found several instances of violations of Petrobras's policies, including an excessive number of payments to the same entities, payments greater than

the internal limit of R$32,000, and payments exceeding the amount budgeted for department activities in 2006, 2007 and 2008.  Id. at 4-6.

134.    In particular, the investigation commission found "evidence of fractioning of performed services contrary to the principles of the [Company's policies]."  Id. at 6.

135.    The investigation commission also found evidence that Morais issued contracts, known as ZPQS, with "values above his competency limit" contrary to Petrobras's policy.  Id.

136.    The investigation commission concluded that certain controls regarding budgeting and contracting were not followed or were insufficient.  Id.

137.    The investigation commission found that "elaboration and monitoring of [the department's] budget were not conducted in accordance with the best practices of management."  Id.

138.    The investigation commission also found that "there [were] no issuance control for ZPQS" in the department.  Id.

139.    It found Petrobras's account software "allow[ed] the issuance of ZPQS in the value assigned . . . independent to the competency limit of the manager that is issuing."  Id.

140.    It further found that the Finance Department did "not have mechanisms to detect the issuance of several ZPQS for the same company which may indicate the existence of fractioning services."  Id.

141.    The investigation commission recommended "[e]valuat[ing] the possibility of disciplinary sanctions" for the employee (Morais) involved.  Id.

142.    It further recommended specific reforms to internal controls that would address the problem, including:

   f.  "mechanisms to elaborate and control for the tracking of budget

achievements";

   g.  "reduce the issuance of ZPQS, prioritizing the formalizing of contracts";

   h.  making "a plan for periodic evaluations of the activities" of the

department;

   i.  creating "mechanisms . . . to observe [policy limits for ZPQS] in a range

of areas in the company"; and

   j.  "[s]tudy the possibility of FINANCE implementing mechanisms that

detect and alert the Units to the occurrence of simultaneous [contract] payments

for the same service provider in short space of time."  <u>Id.</u> at 6-7.

  143.  It also recommended that the Company "[d]eepen the examination of the

documentation related to the procurement procedures carried out by [Morais's department] since

they were listed on various documents and that due to the lack of time, were not analyzed."  <u>Id.</u>

at 6.

  144.  Dr. Gabrielli testified that a second internal commission was recommended

because there were "hundreds of documents to be analyzed," which "would be impossible to

analyze … in a short period of time."  Ex. 2, Gabrielli Tr. at 90:15-91:23.

  145.  Similarly, Nilton Antonio de Almeida Maia ("Maia"), the head of the Petrobras

legal department, testified there were two investigations "[b]ecause the documents that were

supposed to be analyzed were many of them, a volume of them, and they had to have a second

commission."  Ex. 9, Maia Tr. at 182:9-13.

  146.  Dr. Gabrielli testified that "we determined to have a close analysis of the problem

by the downstream area, which was done and eventually [Morais] was fired.  During that period

he was taken away from his functions and it was determined that inappropriate behavior on his part stopped." Ex. 2, Gabrielli Tr. at 82:12-25.

147.    Dr. Gabrielli also testified that he was informed by the legal department that the Investigation Report was "forwarded to the public prosecutors and the CGU." Id. at 88:6-89:4.

148.    The CGU is the *Controladoria-Geral da União*, or the Comptroller General of Brazil, a federal agency responsible for the oversight of public property and entities, including Petrobras, through the promotion of management transparency, internal controls and public audits. Dotti Decl. ¶ 41.

149.    Dr. Gabrielli agreed with the decision by Morais's indirect superior, Venina Velosa de Fonseca ("Velosa"), to terminate Morais. Ex. 2, Gabrielli Tr. at 82:13-24.

150.    Dr. Gabrielli understood that the second internal commission had been created based on the recommendation for further review contained in the Investigation Report. Id. at 92:18-92:24.

151.    Dr. Gabrielli testified he had not seen the second internal commission report but had been informed of its conclusions. Id. at 91:24-92:13.

152.    Dr. Gabrielli considers Velosa's transfer to Singapore to have been beneficial to her and testified that "being the head of Singapore's office, it is a very favorable condition for an employee, not a negative condition. Your salary goes up, your family conditions improve." Id. at 95:17-24.

### *Los Angeles Times* and *San Diego Union-Tribune* Articles

153.    On January 9, 2009, Guilherme de Oliveira Estrella sent *Los Angeles Times* and *San Diego Union-Tribune* articles to Dr. Gabrielli with the message:

President

A grave issue, involving the name of the company in corruption with developments that can be very negative when we go abroad in search of financing.  It is the period of our management.  I think we should engage attorneys in the U.S. to compel this Covino to state the names so that we take appropriate measures.

Estrella.

Ex 7, January 9, 2009, Email from Guilherme de Oliveira Estrella to Jose Sergio Gabrielli.

154.     The articles state that Mario Covino, an executive of an American valve company, pleaded guilty in a U.S. federal court to paying bribes to government-owned energy companies in at least six countries:  China, India, Brazil, South Korea, Malaysia and the United Arab Emirates, one of which was Petrobras.  Id.

155.     The articles further report that U.S. Department of Justice prosecutors said that Covino acknowledged directing valve company employees and agents to pay about $1 million in total to employees of government-owned energy companies from March 2003 through August 2007.  Id.

156.     The articles do not identify the Petrobras employee or employees involved and provide no details on the payments related to Petrobras.  Id.

157.     Dr. Gabrielli testified that he did not recall this subject, but "believe[s] that [it] must have been forwarded to the legal department."  Ex. 2, Gabrielli Tr. at 192:20-193:6.

158.     Petrobras's CFO at the time, Barbassa, who also received the email, testified that he did not recall the email but that he understood that "it would have been dealt [with] by the appropriate structure in the company."  Ex. 8, Barbassa Tr. at 196:11-15.

**Reports of Brazil's Federal Court of Accounts**

159.     Brazil's *Tribunal de Contas a União* ("TCU"), or Federal Court of Accounts, is an independent government agency responsible for conducting external audits of contracts

24

entered by public entities, including the contracts of state-owned enterprises such as Petrobras.
Ex. 14, Expert Report of Carlos Ari Sundfeld ("Dr. Sundfeld") (May 27, 2016) ("Sundfeld
Report") ¶ 13.

160.   While Dr. Gabrielli served as CEO of Petrobras, he was aware of "a large and
long controversy between Petrobras and the TCU about how to evaluate the costs of special
Petrobras work."  Ex. 2, Gabrielli Tr. at 173:9-24.

161.   Dr. Gabrielli understood that this controversy stemmed from the fact that
Petrobras and the TCU used different benchmarks to evaluate the cost of a project:  "Petrobras
tries to analyze the technical specifications of each work and compare it with market prices, and
TCU in general compares the prices paid by Petrobras with a table that they consider . . . to be
valid prices."  Id. at 173:9-24.  As he further explained:

> [O]verprice in the concept of TCU is a BDI rate above what TCU
> considers to be right and the right cost above what table SICRO 2
> and SINAPI, which are . . . internal tables used by TCU, the price of
> material which were above reference value that TCU uses as a
> reference, costs of professionals above the reference values and cost
> of equipment above the reference value. . . . TCU's market prices
> are strongly based . . . on the construction of roads and not
> necessarily a refinery.  And a refinery does not necessarily have the
> same cost as building a road.   A refinery is highly complex, high
> pressure equipment, emission of atmospheric residuals, liquid
> residuals of high vibration and high temperature. Therefore . . .
> engineering costs are not the same to those of a road.

Id. at 177:18-25, 178:16-24.

162.   Dr. Gabrielli understood that when the TCU uses the terms "overpricing" and
"overvaluation," the terms "refer to comparisons of evaluations of prices paid against prices [the
TCU] believe[s] are correct, and they don't necessarily have to be market prices."  Id. at 174:18-
175:13.

163.     For example, with respect to the TCU audit of the earthworks contract at the RNEST refinery, Petrobras disputed the TCU's findings regarding the contract pricing.  Maia, the head of the legal department at Petrobras, testified that "the legal department is analyzing and conducting the company's defense because the company has a point of view which is in disagreement totally with the position of TCU in connection with the overpricing mentioned." Ex 9, Maia Tr. at 158:20-159:3.

164.     This was also the expert opinion offered by Dr. Sundfeld—Head Professor of the São Paolo Law School, who prepared an expert report analyzing the "technical aspects of the [TCU], its operations, scope and nature of its decisions"—which stated:  "[R]egarding . . . the contracted price (i.e. existence or non-existence of overpricing), TCU has adopted norms and references that are specific to the common public administration, to which PETROBRAS does not belong.  The applicability of these norms and references to the company is legally questionable."  Ex. 14, Sundfeld Report ¶¶ 1-9, 16.

165.     In addition, Dr. Gabrielli understood that Petrobras and the TCU differed on the law applicable to its bidding procedures.  As he testified:

> That is another long controversy between Petrobras and TCU.  The application of Law 8666.  That law of 1993 regulates the purchases made by federal organs in Brazil. In 1998 the state monopoly, oil monopoly, finished, and, as a result of that "l[aw]," in 1998 President Fernando Henrique Cardoso signed a decree saying that Petrobras should follow a specific regulation when doing its purchases, and that regulation has some differences if compared to 8666, and one of those differences is the obligation to reveal the unit price.  Petrobras could make a contract with the global price, and this is another general discussion between Petrobras and TCU that, if I'm not mistaken, reflects here as well.

Ex. 2, Gabrielli Tr. at 180:17-181:10.

166.     Dr. Sundfeld also explained the legal dispute over the contracting and bidding procedures, stating that one basis for the TCU's view that Petrobras was subject to "common

bidding and contract laws" was "Law 8666, of 1993 . . . [which] expressly states that 'the provisions of this law' are also applicable to joint stock companies."  Ex. 14, Sundfeld Report ¶ 76.

167.    As Dr. Sundfeld further states:

> PETROBRAS, however, reasonably believes that, at least in this particular case, this legal foundation is incorrect.  Law 9478, of 1998 (Petroleum Law, published after Law 8666, of 1993, and already effective in the current wording of Art. 173, § 1 of the Constitution), excluded subjection of PETROBRAS to common laws, upon providing for the following, in its Art. 67:  "The contracts signed by PETROBRAS for the acquisition of goods and services, will be preceded by a simplified bidding procedure, to be defined by decree of the President of Brazil."  PETROBRAS's regulation itself was actually enacted by Decree No. 2.745, of 1998 and has been in force since then, and it is not as regulatory and demanding as Law 8666, of 1993 (the regulation is less detailed and less bureaucratic than the law).

Id. ¶ 77.

168.    Professor Sundfeld further concludes, consistent with Dr. Gabrielli's understanding during his tenure as CEO, that the TCU and Petrobras have been in a long-running and unresolved conflict over the applicable legal regime before the Federal Supreme Court ("STF"), during which "individual decisions by the judges who comprise [the STF] (justices) regularly suspend enforcement of TCU decisions when challenged."  Id. ¶¶ 67-82.

169.    Dr. Gabrielli also understood that, to the extent the TCU identified contract "irregularities," these irregularities were not indicative of fraud but a deviation from a technical requirement, testifying:

> Irregularities are all types of nonconformities with legal requirements that they believe are relevant. Legal requirements. Irregularities are deviations regarding legal procedures that they believe are relevant. Maybe the signature is lacking on a page. It lacks the date. It could be more relevant things. Thus, it is a concept of comparison with legal requirements.

Ex. 2, Gabrielli Tr. at 174:18-175:13.

170.    With respect to the procedural aspects of the TCU's review, Dr. Gabrielli understood that the issuance of a TCU audit report was merely the beginning of a process that often resulted in modified conclusions.  He testified that "[t]he issuance of TCU's preliminary reports leaves room for Petrobras to discuss the technical characteristics of TCU's conclusions, and in the majority of the cases at the end of the process at TCU, initial estimates are deeply modified."  Id. at 173:9-24.

171.    Marcos Panassol, PricewaterhouseCoopers audit partner for Petrobras, confirmed Dr. Gabrielli's understanding of the preliminary nature of the TCU audit reports, testifying that:

> The company receives the communications, and not all communications are allegations. There is a customary process between TCU and the company, in any state company in which TCU would review, ask question, send requests and whenever they identify the need to clarification, they would send those documents, the request to the company. So that's a forth and back process. That is not in itself ended until there is a final ruling by TCU that there was any noncompliance proceeded by the company.

Ex. 10, Panassol Tr. at 79:8-80:17.

172.    Professor Sundfeld also concludes that "no statement of irregularity contained in a judgment issued in the preliminary phases is binding and final for the TCU itself . . . until the issuance of the judgment containing the decisions of the ministers in the last of the appeals that may be brought."  Ex. 14, Sundfeld Report ¶ 55.

173.    Dr. Gabrielli knew that Petrobras was subject to regular oversight and auditing by the TCU and that the Company received numerous reports from the TCU addressing many aspects of the Company's operations and expenditures, not limited to refinery construction. Gabrielli Decl. ¶ 22.

174.     Dr. Gabrielli believed that the TCU audit reports were properly evaluated and that any issues raised in the reports were at all times appropriately addressed by the relevant personnel within Petrobras, particularly employees specializing in TCU reviews within the internal audit and legal departments.  Id. ¶ 23.

175.     Gerson Luis Goncalves, the former Petrobras Executive Manager for Internal Audit, confirms Dr. Gabrielli's understanding.  He testified that "[t]he president's cabinet submits the reports to the internal auditing division" and "[w]ithin internal audit, there is a management in charge of following up the responses of the company to the TCU."  Ex. 11, Goncalves Tr. at 130:4-11.

176.     Maia also confirmed that understanding, testifying that "[a]ll those points were being analyzed and discussed in a specific area in the legal department that deals with TCU matters."  Ex 9, Maia Tr. at 158:20-159:3.

177.     During his tenure as CEO of Petrobras, Dr. Gabrielli believed that the TCU's reports, to the extent that they identified issues with Petrobras contracts for services such as "overpricing" and "irregularities," were the result of good-faith disagreements between Petrobras and the TCU about the proper cost benchmarks and applicable law regarding Petrobras's contracts.  Gabrielli Decl. ¶ 24.

178.     Dr. Gabrielli understood that the legal dispute between Petrobras and the TCU about the applicable contracting price benchmarks and bidding procedures had been ongoing for several years preceding his time at Petrobras, dating back at least to 1998 when the President of Brazil issued a decree specific to Petrobras exempting the Company from certain bidding procedure requirements, effectively giving Petrobras greater flexibility in and discretion over contracting for services than is generally permitted for other state-owned entities.  Dr. Gabrielli

understood that the TCU did not recognize this presidential decree, that the TCU believed that

Petrobras was subject to the general law for bidding procedures applicable to state-owned

entities, and that this issue was contested before the Brazilian courts (and continues to be

contested even today).  Id. ¶ 25.

179.    Dr. Gabrielli is not aware of any TCU audit report issued to Petrobras during his

tenure as CEO that stated or found that the "overpricing" and "irregularities" identified were

caused by or had any connection to fraudulent activities.  Id. ¶ 26.

180.    During his tenure as CEO, Dr. Gabrielli had no reason to believe that any costs in

connection with the refinery projects underway were inflated due to the cartel and bribery

scheme that came to light years after his departure.  Id. ¶ 27.

181.    Professor Sundfeld notes that due to the legal disputes between the TCU and

Petrobras:

> [A]lthough the TCU might express concerns about the company's
> managers' decisions on accepting specific price proposals, these
> concerns are not necessarily based on proofs or signs of fraud.
> These concerns can be based on the questionable assumption that
> PETROBRAS should adopt methodology similar to that commonly
> used for analysis of common public administration contracts, and on
> the basis of the common public bidding laws (and interpretations
> and guidelines that the TCU issued based on them).

Ex. 14, Sundfeld Report ¶¶ 83-102.  This is the same legal issue being litigated between

Petrobras and the TCU.  Id.

**Alleged Gifts from Odebrecht**

182.    During his tenure as CEO of Petrobras, Dr. Gabrielli never received any gifts of

material value from Odebrecht.  Ex. 2, Gabrielli Tr. at 169:17-172:3.

183.    With regard to whether he received an Oscar Niemeyer painting from anyone in or around 2009 or 2010, Dr. Gabrielli testified that he "didn't get one, much less two."  Id. at 171:11-14.

184.    During his tenure as CEO of Petrobras, Dr. Gabrielli did not know of any employee receiving a gift of value from anyone at Odebrecht.  Id. at 171:21-172:3.

185.    A Petrobras employee, Carlos Alberto Rechelo Neto, was deposed concerning the Company's investigation of the list of alleged Odebrecht gifts.  Regarding the list he testified:  "I wouldn't be able to tell if they are trinkets, if they are gifts or if they are anything at all . . . .  All I have here in my hands is a list of individuals with the title "Special Trinket List."  Ex. 12, Neto Tr. at 32:4-10.

186.    According to Neto, through the Company's investigation "it was found out in fact that some [Petrobras employees] did not receive the trinkets listed" and others said they had received a gift but "there was not commercial value to them whatsoever and that [they were a print] in many of the cases . . . .  And they continued to be kept on offices, many times inside closets."  Id. at 33:13-34:14.

## Alleged Misstatements and Omissions Relating to Dr. Gabrielli

187.    The Plaintiffs have admitted that Dr. Gabrielli did not make the allegedly false and misleading statements in the following paragraphs of the Consolidated Fourth Amended Class Action Complaint (Dkt. 342):  Ex. 1 ¶¶ 265-310, 312-357; Ex. 15 (Pls.' Resps. and Objs. to Petrobras Defs.' Corr. First Set of Reqs. for Admis., Resp. Nos. 157, 161, 165, 169, 173, 177, 181, 185, 190, 195, 199, 203, 207, 211, 215, 219, 224, 229, 233, 237, 241, 245, 249, 253, 257, 261, 266, 271, 281, 285, 289, 293, 297, 302, 307, 311, 315, 319, 323, 327, 331, 335, 339, 343, 347, 352, 356, 361, 366, 371, 376, 381, 386, 390, 394, 398, 402).

Dated: New York, New York
      June 27, 2016

                  Respectfully submitted,

                  MORVILLO ABRAMOWITZ GRAND IASON &
                  ANELLO P.C.

                  By:  /s/ Elkan Abramowitz
                        Elkan Abramowitz
                        Edward M. Spiro
                        Jasmine Juteau
                        Howard A. Locker
                  565 Fifth Avenue
                  New York, New York  10017
                  (212) 856-9600 (phone)
                  (212) 856-9494 (fax)

                  *Attorneys for Defendant Jose Sergio Gabrielli de Azevedo*