# EXHIBIT 16

GAB 19

FEDERAL PUBLIC PROSECUTION
PARANÁ PROSECUTOR'S OFFICE
"OPERATION LAVA JATO" TASK FORCE


DECLARATION NO. 1
made by
AGOSTHILDE MÔNACO DE CARVALHO

This declaration was made on November 11, 2015 at the MPF's headquarters in Curitiba/PR.

[Boilerplate language]

THAT from February 2003 to February 2008, he served as Assistant Director for the International Division;

THAT the position of Assistant Director is one of trust because each Director may appoint up to three assistants;

THAT the Director of the International Division during the entire period was Mr. NESTOR CUÑAT CERVERÓ;

THAT in late 2004, Director NESTOR ordered him to identify oil refineries being sold in the United States of America for PETROBRAS to purchase;

THAT during that time, it was part of PETROBRAS's strategic plan to export the company's excess oil production;

THAT the interest in purchasing a refinery that could refine marlin oil stemmed from the fact that the oil produced in the Campos Basin (Marlin field), was trading at a discount of up to 20% less than the price per light barrel due to the fact that it was a heavy oil that technically could not be refined at scale given that it was not economically viable to do so in any of our refineries at that time;

THAT during a routine trip to PAI-PETROBRAS AMERICA INC., the declarant became aware that a trading company (ASTRA OIL) had acquired a refinery in the city of Pasadena, Texas and that a former PETROBRAS employee, Mr. ALBERTO FAILHABER, was the Vice President of trading operations for that Company for Latin America;

THAT the declarant asked Engineer CARLOS ROBERTO BARBOSA, a PETROBRAS employee transferred to PAI, to help him establish contact with Mr. ALBLERTO FAILHABER because CARLOS ROBERTO BARBOSA and ALBERTO AILHABER had worked together at PETROBRAS and maintained a friendship;

THAT the declarant did not know ALBERTO FAILHABER before they were introduced by CARLOS ROBERTO BARBOSA;

THAT ROBERTO CARLOS BARBOSA was a personal friend of ALBERTO FAILHABER;

THAT in January 2015, using a phone belonging to PETROBRAS, the declarant contacted Mr. ALBERTO FAILHABER ( tel. 714.959.6569 ) , Vice President of Latin American Trading for ASTRA OIL, based in Huntington Beach, California, and was made aware that the company had just acquired the PASADENA refinery and would be interested in negotiating up to 100% of it;

THAT during this exchange, Mr. ALBERTO FAILHABER was asked about the condition of the refinery, and he said that it needed to "get a makeover" to be in compliance with PETROBRAS' quality standards because it had been purchased "on the cheap" given that its former owner (CROWN) experienced financial problems and hardly invested in preventive maintenance, the facilities were worn out and poorly maintained, there were operational safety issues, the employees were unmotivated, and mainly, there were no funds to purchase oil, its operational raw material;



THAT he communicated this information to Director NESTOR who smiled and said: "We can also buy this refinery on the cheap since being that Astra is a trading company, it has no technical or capital structure to make an adequate investment. Moreover, if we come to an agreement with ASTRA, a Revamp of the refinery could please the President of PETROBRAS, because I know he has some political commitments to honor, and therefore PASADENA could kill two birds with one stone: refine the marlin oil in the United States and enable President GABRIELLI to honor his political commitments";

THAT the declarant then suggested that Mr. ALBERTO FAILHABER request a meeting with the Director of the International Division with the purpose of offering him the sale of the refinery;

THAT the correspondence requesting the meeting was received in February 2005;

THAT when Nestor Cerveró received the letter, he asked the declarant to host Mr. ALBERTO FAILHABER at PETROBRAS to confirm the contents of the proposal;

THAT once the declarant confirmed the contents of the proposal, a meeting between NESTOR CERVERÓ and ALBERTO FAILHABER was scheduled at PETROBRAS, approximately in late February or early March, and the declarant was not present at that meeting;

THAT NESTOR CERVERÓ told the declarant that during the meeting, ALBERTO FAILHABER had confirmed his proposal to sell the Refinery and had informed him of the appalling state in which the refinery was in;

THAT, immediately, the declarant was asked to organize a committee to visit the Pasadena Refinery and carry out an evaluation;

THAT during that visit that took place between March 29–31, 2005, he was able to confirm that the refinery was in an appalling state compared to Brazilian refineries and that it would take many renovations for the Refinery to be in good condition;

THAT all the members of the committee agreed that the Refinery was not in good condition;

THAT the physical location of the Refinery was praised but not its operating conditions;

THAT upon returning to Brazil, he transmitted this information to Director NESTOR who answered: "Do not interfere Monaco, this is a matter for the Presidency";

THAT this information scared the declarant because the International Division was new;

THAT from then on, the Pasadena refinery was nicknamed "redhead" because of the numerous equipment and structures that were rusted;

THAT the refinery only operated with light oil and was performing poorly, with production equivalent to 80% of its maximum output capacity;

THAT the Pasadena refinery required renovations and expansions (REVAMP) in order to refine oil from the marlin field and that this fact was known to all;

THAT after the first due diligence was carried out from May 23 to June 17, 2005, PETROBRAS confirmed its interest in purchasing 50% of the Pasadena refinery as long as there was a REVAMP that would allow it to operate with 70% of marlin oil;

THAT according to the information provided by NESTOR CERVERO, this deal would meet the interests of GABRIELLI to carry out the REVAM P and the interests of the international division to acquire the Refinery;

THAT knowing the financial situation of the ASTRA Group and to not scare Astra out of the deal, the working group of the International Division, led by MOREIRA was directed by President Gabrielli to not to mention to ASTRA the interest in modifying the quantity from 100,000 to 200,000 barrels/day;

THAT this happened because the purchase agreement had to mention ASTRA's obligation to participate financially in the REVAMP;

THAT "behind the scenes," PETROBRAS was carrying out a study for the REVAMP using the 200,000 barrel/day figure;

THAT everyone at PETROBRAS knew that ASTRA did not have the necessary means to participate financially in a REVAMP of 200,000 barrels/day and that it was not economically viable for PETROBRAS for the REVAMP to take place, only to have the refinery operate with 70,000 barrels/day of heavy oil (marlin field) and 30,000 barrels/day of light oil;

THAT ASTRA only became aware of these studies for the REVAMP of 200,000 barrels/day on 9/19/2006 when President GABRIELLI announced the change to 200,000 barrels during an interview with the press;

THAT the declarant knew through Director NESTOR, that before the signing of the purchase contract for the PASADENA refinery, President GABRIELLI had already chosen the Construction company NORBERTO ODEBRECHT to perform the REVAMP for 200,000 barrels/day:

THAT Director NESTOR, in a rant, told the Declarant that president GABRIELLI was very interested in resolving the issue and giving the REVAMP project to ODEBRECHT;

THAT on this same day, Director Nestor showed him the email, dated May 25, 2006, which was sent to him by RENATO DUQUE where a representative from NORBERTO ODEBRECHT reported the invitation to other companies to bid to split up the REVAMP project for the PASADENA refinery;

THAT the other construction companies called to the bidding round were ANDRADE GUTIERREZ, CAMARGO CORREA, QUEIROZ GALVÃO and ULTRATEC;

THAT he knew that the REVAMP was the reason for the fight between PETROBRAS and ASTRA;

# EXHIBIT 17



Now witness will be sworn in.

**MR. FERNANDO DE CASTRO SÁ**—I swear under oath that I will answer truthfully everything that is asked of me.

**THE CHAIRMAN** (Deputy Antonio Imbassahy)—Ladies and gentleman, I ask that you please abide by the Internal Rules of Procedure of this House.

Up to 20 minutes will be granted to those invited to speak, which may be extended at the discretion of the Committee—art. 256, § 2— with no interruptions allowed. Deputies wishing to ask questions must sign up beforehand with the Secretary.

I give the floor for up to 20 minutes to the witness Dr. Fernando de Castro Sá.

**MR. FERNANDO DE CASTRO SÁ**—Good afternoon everyone. I hope to be able to contribute here in some fashion. I was initially called to testify by the Federal Attorney General's Office. I gave a lengthy statement in Curitiba to the Federal Attorney General's Office. Subsequently, I was summoned to help in the independent investigation that PETROBRAS is conducting with the offices of Gibson & Dunn and Trench, Rossi and Watanabe. I also prepared a lengthy presentation about the subject, and I am at your disposal. I joined PETROBRAS by way of a civil servant exam in 1993. I was hired on December 6, 1993. I began working at PETROBRAS on December 13, 1993. In November of 1995 I became the head of the Contract Writing and Review Section. At the time PETROBRAS had a legal department. It was called Legal Services—SEJUR. It was divided according to subject areas, and there was a division called the Contract Division. The Contract Division had three sections. One section was the Contract Writing and Review Section, which was made up of attorneys. Our role was to review and support the bidding process and all PETROBRAS contracts that did not have to do with employment or financial matters. The other section in this division was called the Technical and Inspection Section. It was made up of engineers who would analyze all of the claims filed by contractors, because the claims were analyzed by the legal department with the idea that it was an independent entity because it did not do the actual contracting. And there was another section, which was the Registry Section. All service providers for Petrobras were registered, and this registry was done in the Legal Department, due to its being an independent department. In 2000, a restructuring was implemented at PETROBRAS. The legal service began being called Legal, and it was divided according to business areas. At the time I was invited to organize and to be Legal

13



I find this very interesting. If you could answer that question, specifically about the content of those opinions, this would be important for the Committee. What were the subjects they dealt with?

**DEPUTY ALTINEU CÔRTES**—I think I am going to ask another three questions to give the others an opportunity, since we will have other testimonies. Is it true that you prepared a dossier containing the irregularities found at PETROBRAS?

**MR. FERNANDO DE CASTRO SÁ**—Well, what happened was that, as I explained, I did the last one in 2009… the middle of 2009, I complained formally, via email, about the issue of those procedures that were being adopted, in response to ABEMI requests regarding contractual guidance. Then the executive manager of Legal ordered that I prove this. I began doing a survey. And when I began to do this survey I began finding these minutes, these opinions and I became very concerned. And I sent an email, posing certain questions to the coordinator of the contracts section, the attorney there who took care of that section. She responded that she did not know how to answer these questions. Then the executive manager put out a communiqué saying that he was not expecting questions on my part. He was awaiting a written and signed dossier. I then went back to the then legal manager from the administrative department and I said to him that…

**DEPUTY ALTINEU CÔRTES**—Who was that at the time?

**MR. FERNANDO DE CASTRO SÁ**—For the administrative department at that time, it was Eduardo Jorge Albuquerque. I told him that I was concerned with preparing a dossier of this size. And then it was confirmed that it should be prepared. And I prepared this dossier, at the order of the executive manager of Legal. He established a deadline when it should be delivered by, which was the 7th or 8th of July, and when I arrived he stated that I was relieved from my position and that he did not want receive it. I told him that he would have to receive it, that it was there, it was all there, what was there. He told me that I should not approach any of the Directors, because he had already agreed with Chairman Gabrielli, Director Duque, and Director Paulo that I would be transferred to the international section, to international Legal, as a regular attorney.

# SEPARATOR SHEET



**DEPUTY DELEGADO WALDIR—**But did only you see that irregularity? Were there not other competent attorneys? Could no one file a complaint with the Attorney General, the Federal Police? Did everyone seeing that irregular situation keep quiet, Sir?

**MR. FERNANDO DE CASTRO SÁ—**Perhaps I was more out in front because of the placement of projects in the procurement department. Perhaps I was closer. I believe that this was the reason. As for RNEST—let me explain— there, previously, when CEO Reichstul arrived at PETROBRAS, he put a new face on the business areas at PETROBRAS. So, what did he do? Formerly, the engineering department dealt with project budgets. And then, when that change in vision for the business areas came, budget was transferred to the business areas. But there are a placement made...assets were handled by engineering. In other words, it was more or less as follows: you want to build your house, you have the money, you have the land, but necessarily the one who is going to build your house is that stonemason. What's the big problem that you have here? It is that you do not have control over what the stonemason is spending. In reality, the stonemason is building, he is spending, and he is giving you the bill. And you can only monitor and oversee to see whether or not this fits into the budget. So, that was the big problem that you had. But this is a characterization that was produced by the situation that the business department owned the budget for that asset that one day would come to it, and all of the assets were placed in another department, which did contracting, expenditures, supervision, the whole process. So that was the situation. I do not know why those people might have wanted me to resign. Perhaps, as Director Duque put it, I was inflexible. Perhaps, I don't know! There is an interesting fact. On the date of meeting of the Internal Committee created by PETROBRAS to review the issue of Abreu e Lima, one of the people, one of the members who was there, who was a member of audit, he stood up and made a comment, and that was when perhaps I agreed. He said the following to me: *"When you leave the legal department, people will see that the thing gets worse."* Perhaps I was actually in some way being very inflexible and in that way hindering, I don't know.

**DEPUTY DELEGADO WALDIR—**Did you hear that Dr. Sergio Gabrielli was interested in your resigning?



**MR. FERNANDO DE CASTRO SÁ**—That was said by an assistant in the office when there was that complaint.

**CHAIRMAN** (Deputy Antonio Imbassahy)—O.K.

**MR. FERNANDO DE CASTRO SÁ**—As I stated previously. What happened at the meeting with Director Duque? When the Refinery Acceleration Plan was created, that study was performed that I cited earlier, reviewing what the points of impact were so that you could successfully make that project go forward. And this was accepted, it was submitted to the Executive Directorate and subsequently to the Board of Administration. The Board of Administration decided that a detailed plan was to be drawn up within 45 days. That was actually done, it was submitted to the Executive Directorate and it was submitted to the Board of Administration. So what was the institutional orientation? Having what people call a project contract, Engineering, Procurement and Construction—EPC, under the international model, as had been proposed in that matter. When we began to have discussions with engineering, there was a big conflict, and hence the positions of procurement and engineering were not resolved, and that meeting took place. It was a meeting to which Director Duque invited me, Barusco, and Venina, and there was one other person at the meeting. And, at that meeting, Director Duque said that we were creating problems, that it was no use trying to contract in a way that contractors did not contract, because they know, and engineering knew how they did things, and that it would not be that way. And then the meeting ended, he said that it was going to be the way that engineering wanted, and subsequently he sent an email that was copied to Barusco. That email was to Director Paulo. Director Paulo forwarded the email, which said that it would be done the way that engineering wanted, and that any possible suggestions from Procurement would be incorporated, as appropriate, and contracting was to begin immediately subject to a final decision by the Executive Directorate.

**CHAIRMAN** (Deputy Antonio Imbassahy)—Very well.

**DEPUTY DELEGADO WALDIR**—The last question.

**CHAIRMAN** (Deputy Antonio Imbassahy)—Your Excellency, you have already gone over your time, Deputy Delgado Waldir, you already asked all possible questions.

**DEPUTY DELEGADO WALDIR**—No, I asked a question, I just want a response.

# EXHIBIT 18



**globo.com**   **g1**   **ge**   **gshow**   **famosos**   **videos**

Sign up for season

Time Ideas Life Columns Channels

Search

[ Submit ]

## TIME

# The complaints of the PMDB operator Petrobras

João Augusto Henriques lobbyist denounces collection of bribes to close contracts and says that money went to deputies - and even the presidential campaign

**DIEGO ESCOSTEGUY WITH FLÁVIA TAVARES, MARCELO ROCHA, MURILO RAMOS AND LEANDRO LOYOLA**
08/09/2013 - 21h51 - 16h38 Updated 08/12/2013



world is like. . And that's anywhere "Then he says:" If I do business in another board, there was no fee (commission) to the party. And I spoke to them: here I have nothing. " João Augusto seemed genuinely hurt by the partners in the PMDB. "Once you know the background, does not sleep more tranquil. You think it's easy deny calling you? 'The campaign's there ...' I deny cursing Zelada because there was money "At the same time, he seemed to feel guilty for not meet the high expectations of Members". The guys welcomed me so well ... You feel like you have to help the group".

And who coordinated the "group" after the death of Fernando Diniz? "An hour was the (deputy) Mauro Lopes, another was the (deputy) João Magalhães." (Mauro Lopes claims to know João Augusto for over 20 years and says he suggested his name to occupy the International Board of Directors of Petrobras to the then leader of . PMDB bench Minas Gerais, Fernando Diniz and denies having been benefited with cash transfers) "I do not know how was the division:. to whom they gave, they were given right ... just sent." John Augustus down to the details of transactions: " usually (MPs) gave me (the account abroad) and I sent via money changer. "He says he always received complaints. "It was a lot of people (to receive). A $ 5 million operation looks good but (...) ten, 12 people. In the end, (the deputies) found one m ... "



## A CPI FOR HERE, A CONTRACT FOR THERE

After a two-hour revelations, João Augusto seems ready to tell his greatest achievement, according to other PMDB lobbyists: the contract of nearly $ 1 billion between Petrobras' International Area and Odebrecht construction company, closed on the eve of the second round of the 2010 election under the agreement, Odebrecht take care Petrobras environmental safety in ten countries.



– And Odebrecht?

– Odebrecht? I rode all.

João Augusto says, at the Petrobras CPI peak in the Senate, in the second half of 2009, the rapporteur of the committee, Senator Romero Juca, the PMDB, who was also leader of the government, summoned him to a meeting in Brasilia. He said he had an agreement with the president of Petrobras, Gabrielli: the PMDB help bury the CPI, which was already warm, and in return, Gabrielli would not create difficulties for the approval by the executive board of Petrobras, the "project" Odebrecht . "Send John present," said Gabrielli to Juca, according to the account of John Augustus. Soon after, in December



2009, Juca submitted its final report which exempted Petrobras irregularities. The CPI dying as planned. (Juca denies having named John Augustus to Brasilia to discuss the contract between Petrobras and Odebrecht. "There was no kind of conversation with Gabrielli on any contract in exchange for CPI. Also because I was leader of the government, I was treating seriously. ")

To make the contract, João Augusto says he made "a working group, technical, seriously." "We worked one year on it. Petrobras needed to consolidate these same environmental operations out there. The company did not know the size of the liability, who took care of what. It was necessary to centralize, "says João Augusto. Why not make a bid? "Odebrecht had to win. He came to my mind. The size of it. By default, "he says. Petrobras formally invited other contractors. All declined. He gave Odebrecht. Heard about the case, Odebrecht denies having been engaged by João Augusto Henriques. And he said in a statement: "The claim that Odebrecht paid the equivalent of US $ 8 million for the 2010 campaign of President Dilma Rousseff, through the Secretary of Finance of PT, John Vaccari, is unfounded. Odebrecht make their donations in a Republican vision and for democracy and economic and social development of the country, strictly within the limits and conditions imposed by the electoral law. "

The moment Gabrielli should fulfill its part of the agreement with Juca, the PMDB was betrayed, says João Augusto. "When she (Odebrecht) won, Gabrielli did everything to oust the board. The CPI, of course, had passed. I wanted to f ... business. The contract entered on the agenda of the board, but they  wrapped. "With his political experience, João Augusto know what to do. Account that talked first with its partners in Odebrecht. Then sought Vaccari also considered PT man in Petrobras. "I told him, Odebrecht will help you in the campaign. Go on and hit with them, "says João Augusto. What is the value agreed? "They gave more or less the equivalent of US $ 8 million for Vaccari" he says.

Difficulties in management continued for a few more weeks. On October 26, 2010, five days of the runoff between Rousseff and José Serra, of the PSDB, Petrobras' board approved the contract. "Everyone received. The party, I and the people who help. Who helps, win, "says João Augusto. Who received? He does not answer. "Insiders (Petrobras) I paid." The PMDB received? "They were $ 10 million or $ 11 million. Do not move with money from others. Odebrecht has hers channels with the parties, "he says. And how was the payment? "Part

# EXHIBIT 19

GAB 10

**Cervero's Deposition**

**Part 1**

**Judge Sergio Moro:** Let's start. So in this criminal action 506157851, deposition of Mr. Nestor Cuñat Cerveró. Mr. Cervero you were accused of a crime in this process by the Federal Prosecutor's Office. In this situation, under normal conditions, you would have the right to remain silent. You would not need to answer any questions, but it is known that you made a collaboration agreement with the Office of the Chief Public Federal Prosecutor, through this agreement you have promised to tell only the truth before the Court and to collaborate. Is that right, Mr. Nestor?

**Cevero:** Yes

**Judge Sergio Moro:** Do you intend to keep this agreement?

**Cervero:** Yes, I intend.

**Judge Sergio Moro:** So, Mr. Cervero as a consequence of this agreement. I'll warn you that you have not the right to be silent and if you do not tell the truth during your testimony, you will criminally respond for that. Also, Mr. Cervero, I want to make clear that what interests to the Court is only the truth of the facts. It's not for you to suppress anything or for you to exaggerate any affirmation. Is that right?

**Cervero:** Right

**Judge Sergio Moro:** Mr. Cervero some initial questions. Were you Director of Petrobras' International Division?

**Cervero:** Yes: From January 31, 2003 to March 3, 2008.

**Judge Sergio Moro:** This case, this accusation, specifically concerns to an operation contract of the drillship Vitoria 10000 that would have been assigned by Petrobras to Schahin Group. The questions I 'm going to ask you are related solely to this case. Eventually, something else more at the end, but the focus is in this specific case. Right?

**Cervero:** Yes.

**Judge Sergio Moro:** I know that eventually your collaboration can transcend these cases, but what matters to the process is only this. Right?

**Cervero:** Yes

**Judge Sergio Moro:** Can you describe to me when you had contact with this specific case or with this question of assigning this drillship to Schahin. Can you describe to me how these facts were?

**Cervero:** Right. If I talk too much, please interrupt me because this is linked to the whole process of all drillships, Petrobras 10000 and Vitoria 10000.

**Judge Sergio Moro:** All right.

1

**Cervero:** We already have analyzed, we already talked on occasions about the Petrobras 10000 and Vitoria 10000. In continuation to the agreement we made about Petrobras 10000, which was the first drillship that we decided to charter with Samsung, in partnership with Mitsui. Samsung offered these lots, this opportunity of a second drillship, identical to Petrobras 10000 that even would be called Petrobras Two, 10000, and within our strategic planning and our course of business, developed and presented to the Board of Directors, and all that we had the need to expand the number of such type of vessels, mainly because of our goals, our blocks that we had acquired in Africa and in the Gulf of Mexico were located in tracks. It was the trend of the world at that time, to look for waters increasingly deeper, to search for oil production. So we have agreed on, we agreed on the basics and I will allow myself to quote from my collaboration agreement: in the first drillship,  Petrobras 10000, there was a bribe arrangement with Samsung of $15 million and in the second drillship, Samsung increased this bribe to $20 million. Bribe that was not paid. Eventually, many difficulties occurred and finally only after several years, Fernando Soares managed, through and with the support of Deputy Eduardo Cunha, to  receive part of the bribe of this second drillship, but they are related. However, in the case of the second drillship, Vitoria 10,000, Schahin became interested.

**Judge Sergio Moro:** Right.

**Cervero:**  A Schahin, I had already talked to my development manager

**Judge Sergio Moro:** Who would be the manager?

**Cervero:** I had a new business development manager. I had four managers. And one of them dealt with new business, including this issue of .... Although it was not a new business, it was more to support the new business, it was subordinate to him. Then, the manager of new business was Luiz Carlos Moreira and the subordinate manager to Luiz Carlos Moreira, who was an expert on the subject of ships, who I even had an opportunity to hear his plea agreement, was Eduardo Musa, who was the general manager subordinated  to Moreira. They brought to me, so there was a first contact, a first meeting with people from Schahin, through Mr. Sandro Tordin who was then the president of the bank. A new meeting was scheduled to discuss a form of association analogous to the one we had done with Mitsui. That is, this association would be an association with headquarters outside the country to buy the drillship from Samsung and charter to Petrobras, which had already been done.

**Judge Sergio Moro:** But were you at this meeting?

**Cervero:** Not in that first contact, but a second meeting was scheduled which I attended ... a meeting already more formal, already to commit, to set the commitment and to confirm the interests. Mr.  Milton Schahin and Mr. Salim Schahin participated in this meeting, together with Moreira  and I, where the initial grounds were agreed to or where the initial foundation of what would this society be was agreed to.

**Judge Sergio Moro:** Was somebody else in this second meeting?

**Cervero:** I think Sandro Tordin was present, but I 'm not sure .

**Judge Sergio Moro:** approximately, when was this meeting?

**Cervero:** That was 2006, end of 2006. Dates and many issues.

**Judge Sergio Moro:** Perfect

**Cervero:** In this meeting, then, Schahin was already the operator of drillships here in the Campos Basin. It was the only Brazilian company that had some tradition in this matter of operation and they expressed, but there was not any kind of commitment, there was not any link in relation to operation of the drillship. Well, coincidentally with that period, I remember now, it was after the election because it was after November 2006. I had been pressured by the Minister Silas Rondeau, who was from the PMDB, one of the PMDB leaders and who was demanding my help ... better say, he was asking me to help settle a campaign debt that the PMDB had acquired around 10 million to 15 million. Then, this was before this opportunity of the drillship, but it was more or less coincidently that time. I went to talk with President Gabrielli, president of Petrobras at that time, I said "Gabrielli I have been pressured by Silas, he is bugging me, because the person is persistent, right? And I do not how to do it, the election fundraising period has passed." Gabrielli turned to me and said the following: "I will make you a proposal." This was a conversation at Gabrielli's office.

**Judge Sergio Moro:** So, just you and him or somebody else?

**Cervero:** Only him and me. This type of matter ...

**Judge Sergio Moro:** Yes

**Cervero:** "Let me solve Silas' problem and you solve PT' problem." Then, I was like, but the PT's. "And I will determine that you will solve the PT's problem because PT has a campaign debt of R$ 50 million, precisely, or not precisely, then, the question of Schahin emerged, with the Schahin bank that needed to be resolved. Then, he decided. He was the president and I was the director, he said: "let me solve the easiest part and you solve the most difficult part." Given this coincidence and knowing the interest of Schahin that had already been expressed, such interest that they wanted to expand, increase activity as a drillship operator. Not only be the partners of the enterprise. I called Mr. Fernando Schahin, who was a director, who was the son of one Schahin. At that time he was a very young man, 27 or 28 years old. That was at the end of 2006, I called him for a private meeting, in my room, in my office. And I told him: "look, an opportunity appeared, you guys had mentioned that interest." but he said: " but it is already solved." He was quiet arrogant at the time, perhaps because of his age. So I told him that "this is not solved, you came here today only because of this. I called you today to see if we can solve that."

**Judge Sergio Moro:** but what did he mean with this assertion that this was already resolved?

**Cervero:** Under that circumstances, in his understanding, because we had already created an entity to be the owner of the drillship it would be a consequence, it would be natural for them that they would be [the operator]. Because different from Mitsui and Petrobras, Mitsui is not the drillship operator. So we chose one of the best, if not the best operation company, there are only two or three, Transocean and Pride, which are the best in the international market. And our intention in this second drillship was to repeat the invitation to Transocean and Pride, which are the two best operators. Not exactly the best, but the ones that have more international experience. And our activity would be, we would work outside of the country. It has different conditions and all that. Good. Then he said "it is already settled with the agreement." So I said, "No, nothing is settled. You have an interest, we can reach an agreement with the crucial condition that you guys ... there is a debt of Bank Schahin, or better to say, there is a PT's debt with Schahin Bank and for we deal with that issue and you guys become operators or we have a way to hire them as operators, although you have experience in Campos Basin, but frankly, our preference would be not for you guys, although qualification." Then, he said: " I had misunderstood."
I said no " It is easy to understand: There is a pending issue of R$ 50 million resulting from the campaign in which you guys have to settle this pendency and after that, then, we can address the question of hiring Schahin as operator of the second drillship. And I said it has to be fast, you guys have to make a quick decision. Because we have already entered into a commitment with Samsung, we had already advanced

with the lots, with the booking commitment of lots with Samsung and we have already make progress because this is an integrated process. That is, along with the construction of a drillship, the team that will operate, this applies to Petrobras 10000 and this applies to many types of equipment. The group that will operate, either a ship or industrial equipment, we delegate. Petrobras had and has this tradition of appointing a group to monitor the construction and even training, some needed a special training, the Transocean had this to get to know the equipment in details. So we have to solve this soon, so I need an answer from you in the shortest possible time, in a matter of days. Then, I talked with Gabrielli, I said; "Gabrielli, I spoke with Schahin people and they will give me an answer. He though the idea was good. And quickly, 2 or 3 days, I do not remember exactly, but that time was very short. Gabrielli call me directly. The directorate had a direct phone line without going through the Secretary.

**Judge Sergio Moro:** I understand.

**Cervero:** Gabrielli, he called me, the phone rang, he said without saying anything,  he said: "Nestor, the pendency that you told me was resolved. You  can "stir the boat" (you had the Green light)

**Judge Sergio Moro:** When was this?

**Cervero:** That was at the end of 2006. I do not know if it was at the beginning of 2007. But between December 2006 and January 2007. Stir the boat meant that "You can hire Schahin because they already discharged or agreed to discharge the debt. Then, I called Moreira who was my executive manager of development and Musa and I said, "look: the operator of the second drillship will be Schahin and then we will prepare the documentation and initial agreements. Then, it has a sequence of Memorandum of Understanding because that we will formally present to the board. This was already agreed with Gabrielli, the President, and now and we need to continue with the subsequent phases. I have not yet got the 2007, but there was a serious of obstacles, but already related to the financial department, i.e., our finance department unlike Mitsui, which is a world power, which has no problem of credit restriction. The Schahin economically ... our financial department established a series of obstacles, doubts about the ability to actually perform, not as an operator. Although,  I saw a recently report, which was prepared now, that I'm talking about 2006, eight years ago, at that time Schahin had, I educated myself about that at that time, Schahin had a reasonable performance of  good quality, here, in the Campos Basin, in waters of up to 1500 or 1600 meters deep which established it experience.
Because in reality we hire a drill whip, both the  Petrobras 10000 as well as the Vitoria 10000 and like the others we hired these that can operate up to 3000 meters deep, but it does not mean that they will only operate at 2000 and 3000 meters deep. It can operate, it is adapted, and it is built to operate without anchoring.

**Judge Sergio Moro:** Perfect.

**Cervero:**  A characteristic of deepness when anchoring does not exist.

**Judge Sergio Moro:** What I understand. From what you told me. If it were to consider only the technical aspect, the preference would be for those two foreign companies, Transocean and Pride.

**Cervero:** Yes. Because as I told you. This was a new activity at that time. And in the world there were few. Because the world has moved to deeper waters in the decade of 2000. 1999 and 2000. Brazil is a pioneer in this deep-water question. There were too few available drillships. For this reason, our need and our planning to acquire four drillships in a short period of time. Acquiring  meaning to charter four drillships. This was the case of pre-salt, in which making an analogy considered to hire up to 26 drillships. Because the few drillships in the market were already chartered by Exxon or BP.

4

**Judge Sergio Moro:** but returning Mr. Cervero, you had this first meeting with Mr. Milton and Mr. Salim. Is that?

**Cervero:** yes.

**Judge Sergio Moro:** After, did you have this meeting with Mr. Fernando Schahin?

**Cervero:** This meeting was only with Fernando and I.

**Judge Sergio Moro:** Right. After you had this contact with Mr. Gabrielli. In this first meeting that you had with Mr. Gabrielli. Did he mention Schahin? This debt of the Worker's Party?

**Cervero:** No. He mentioned. The conversation was as I have reported to you, which also is included in my collaboration agreement, which is on these terms: I was the one who brought to him a problem, a different problem…

**Judge Sergio Moro:** Yes, but when he said to you take care of that other…

**Cervero:** He as president used the power of president and ordered me that I would be in charge of resolving the debt of PT.

**Judge Sergio Moro:** But did he mention the debt of PT with Schahin?

**Cervero:** Yes, debt of PT with Schahin, but not what I did …. That was one thing I had to solve.

**Judge Sergio Moro:** But he did not mentioned the drillship?

**Cervero:** No. The drillship was a decision I made given the knowledge I had that they were interested in this operation.

**Judge Sergio Moro:** but then you said in that communication you reported your option.

**Cervero:** No, I reported before the call. After talking with Fernando Schahin. I said to Gabrielli: "Gabrielli, I presented the situation and gave them a couple of days to respond to me, and they're going to get in touch." Then, he, Gabrielli, took the initiative to call me directly to say: look, that one problem, he did not mention, especially because it was a telephone conversation, "that problem is solved you can stir the boat "

**Judge Sergio Moro:** And you mentioned that you had these difficulties with the financial part of the business. Was there a new meeting that you had with the staff of Schahin on this subject?

**Cervero:** None. After that I had no more contact with Schahin. I delegated that because the agreement had already been done, so a part of negotiating the agreements and all that was in charge of my managers.

**Judge Sergio Moro:** And you did not have any more contact with this business until you left in 2008?

**Cervero:** Contact, but not directly with the new people, contacts, and I do not remember. Maybe there was a contact, a conversation something to clarify some questions. Because the issue was no longer a concern of the international area. The concern of the international area was to have an available drillship to work in three years. And the question of financial structuring, though it was an international financial structuring, it was in the scope of the financial department. Of course, this was discussed within the

# EXHIBIT 20

*OAB 9*

[LOGO HERE]
**FEDERAL PROSECUTOR'S OFFICE**
**PROSECUTOR GENERAL**

---

**DECLARATION NO. 04**
**FERNANDO ANTONIO FALCAO SOARES**

On the ninth day of the month of September 2015, at the Superintendence of the Federal Police in Curitiba, in the presence of Federal Prosecutors Rodrigo Telles de Souza and Andrey Borges de Mendonça and the Public Prosecuting Attorney of MPDFT Sergio Bruno Cabral Fernandes, Working Group members instituted by the Attorney General through Ordinance No. PGR/MPU no. 3 of 01/19/2015, as well as the Federal Police Chiefs Ricardo Hiroshi Ishida and Joselio Azevedo de Sousa, and Federal Police Officer Luiz Carlos Milhomem, the deposition of **FERNANDO ANTONIO FALCAO SOARES** was held, complying with all confidentiality provisions and prescriptions (statute of limitations) of Law 12.850/2013. Also present were counsel Sérgio Guimarães Riera (OAB/RJ no. 93068) and Isabella Correa de Lucena (OAB/RJ no. 189661). **FERNANDO ANTONIO FALCAO SOARES**, CPF [REDACTED], who declared: THAT he waives, in the presence of his counsel, his right to remain silent, reaffirming his legal commitment to tell the truth pursuant to § 14 of art. 4 of Law No. 12.850/2013; THAT the declarer and his counsel expressly permit and acknowledge the audiovisual recording of this act of collaboration via digital media (HD Samsung 1Tera, Serial Number E2FWJJHFA06272), as well as its written record (two signed, paper copies of the declaration), pursuant to §13 of art. 4 of Law No. 12.850/2013, and said documents will, at the end of the proceeding, be properly maintained by the representatives of Federal Prosecutor's Office who are now present and who will be responsible for the custody, safekeeping, and preservation of the confidentiality of the information, and which will be subsequently submitted to the Federal Supreme Court. When asked about the facts discussed in Annex 3 (Acquisition and Operation of the Drilling Platform for Deep Waters Vitoria 10,000 Agreement), specifically in relation to the operation of said drilling rig by the Schahin Group, he affirmed the following: THAT in relation to the subject matter, at the end of 2006, and not recalling the exact month

[Various Initials]

the deponent had a conversation with JOSÉ CARLOS BUMLAI, in which he came to talk to the deponent; THAT he was introduced to BUMLAI by a friend, WILSON QUINTELA, as they worked together in CONSTRAN; THAT he believes to have been introduced to him in 2006; THAT BUMLAI was a partner or an executive of CONSTRAN and QUINTELA was OLACIR DE MORAIS' partner who owned CONSTRAN; THAT BUMLAI wanted to see if the deponent could help him with a pending issue that existed between him and the SCHAHIN group; THAT when asked what was the said pending issue about, according to BUMLAI, it was to obtain a contract for the construction and the leasing of one or two drilling rigs in favor of SCHAHIN together with the Exploration and Production Division of PETROBRAS; THAT BUMLAI, approximately two years ago, sought to make such project viable, but to no avail; THAT the deponent even questioned why BUMLAI did not address the issue directly with the then Director of the Exploration and production division, GUILHERME ESTRELA, appointed by the WORKERS' PARTY, at which time BUMLAI told him that ESTRELA was difficult to deal with and he had no access to him; THAT BUMLAI even told him that JOSÉ GABRIELLI, who was already president of PETROBRAS and was dealing directly with ESTRELLA, was not able to obtain satisfactory results in relation to this subject matter; THAT when questioned about the relationship between BUMLAI and SCHAHIN, responded that he asked BUMLAI about what would be his interest and gain with this; THAT BUMLAI explained that this pending issue was due to a loan that THE WORKERS' PARTY obtained from the SCHAHIN BANK and that BUMLAI was listed as guarantor of this loan; THAT then BUMLAI wanted the help of the deponent in obtaining these contracts with PETROBRAS for the SCHAHIN group; THAT, in other words, the contract with PETROBRAS would be a way to repay the loan made with the SCHAHIN BANK; THAT the loan with the SCHAHIN BANK would not be paid by THE WORKERS' PARTY and the way of compensating [the bank] would be by the SCHAHIN Group obtaining the drilling rig contracts with PETROBRAS' Exploration and Production Division; THAT this negotiation between the Exploration and Production Division and the SCHAHIN Group had been ongoing for two years, or roughly since 2004, without a resolution; THAT when the deponent was questioned as to the reason why

[Various Initials]

THE WORKERS' PARTY obtained a loan with the SCHAHIN BANK, the deponent heard from the very BUMLAI that said loan was made to pay off debts incurred by the Party during the presidential campaign of 2002; THAT when questioned what was the amount of the loan between THE WORKERS' PARTY and SCHAHIN, he affirms that BUMLAI said that in 2006, the amount was approximately between forty to fifty million reais; THAT BUMLAI would say that it was THE WORKERS' PARTY's loan, but he did not know if the Party was formally named as the borrower; THAT subsequently he heard from other people that this money was obtained to pay a blackmail that President Lula was suffering; THAT, however, the deponent discovered this only through third parties, which he could not name; THAT when questioned who would said people be, he believes that it was a technician at PETROBRAS or someone that he and BUMLAI knew in common who said this, but he really does not remember; THAT he also heard about this blackmail story in the media afterwards; THAT he later even questioned BUMLAI about the blackmail story, when the testimony of MARCOS VALÉRIO emerged, at which time BUMLAI denied this story and said that it was rumor; THAT when questioned why would BUMLAI have been the guarantor of the loan to THE WORKERS' PARTY, the deponent replied that BUMLAI had a very strong friendship with former President Lula; THAT the deponent during this time did not really have a friendship with BUMLAI, a friendship that only became stronger after said facts, but he heard from third parties that BUMLAI and LULA were very close; THAT he even witnessed BUMLAI accepting and making telephone calls for then President LULA and there was a great level of intimacy in the discussions; THAT BUMLAI contacted the deponent and asked for help exactly during the same period of time in which he was negotiating the acquisition of the Second drilling ship built by SAMSUNG (VITORIA 10.000); THAT the deponent told BUMLAI that he could not help him with the Board of Exploration and Production as he did not have any relationship with any employee within the division; THAT, however, he commented with BUMLAI that there existed this ongoing negotiation at the International Division, and that PETROBRAS did not even have a chosen partner for this project, as PETROBRAS

[Various Initials]

no longer wanted MITSUI as a partner; THAT he told BUMLAI that the deponent would need to speak to NESTOR CERVERO and with LUIS CARLOS MOREIRA to verify whether there would be a possibility to bring SCHAHIN in as a partner in the VITORIA 10.000 project; THAT, then, still in 2006, the deponent talked to NESTOR CERVERO and with LUIS MOREIRA at PETROBRAS regarding this issue, during which time the deponent exposed the situation in clear terms, exactly how it had been reported to him by BUMLAI, as well as having clarified who he was; THAT, he even mentioned the closeness of BUMLAI with then President LULA and even with DELCIDIO DO AMARAL himself; THAT BUMLAI was close to DELCIDIO because BUMLAI is one of the biggest farmers and businessmen of Mato Grosso do Sul; THAT BUMLAI met DELCIDIO when he left PETROBRAS and became the Secretary of State of the Government of ZECA with PT in Mato Grosso do Sul; THAT NESTOR CERVERO said that there were no problems as long as SCHAHIN's economic, financial, and technical capacity could be proven; THAT CERVERO also asked MOREIRA to evaluate SCHAHIN's capacity; THAT as soon as this evaluation was made, a meeting would be scheduled with the people from SCHAHIN to discuss said possibility; THAT the deponent followed up with BUMLAI and asked that he begin to discuss with the people from SCHAHIN; THAT it was arranged with BUMLAI that as soon as there was an "in agreement" from NESTOR CERVERO, a meeting would be scheduled with the SCHAHIN group; THAT, there even was a meeting between BUMLAI, CERVERO and the deponent at PETROBRAS to discuss this subject matter and at which time, the deponent introduced BUMLAI to CERVERO so that they got to know each other and so that CERVERO would hear from the BUMLAI himself what the deponent had told him; THAT a few days thereafter NESTOR CERVERO gave the OK so that the meeting would be scheduled, this really occurred; THAT during this first meeting, the two brothers, MILTON and SALIM SCHAHIN, besides another person, which he does not remember if it was SANDRO TARDIM, who was the president of the SCHAHIN BANK at the time, or if it was FERNANDO SCHAHIN, the son of one of the two brothers; THAT this meeting was held in 2006; THAT during this meeting they discussed how to reconcile PETROBRAS' interests and that of SCHAHIN's; THAT in the first instance, PETROBRAS demonstrated a certain reluctance in naming SCHAHIN as a partner because of the size of

[Various Initials]

the project; THAT SCHAHIN was negotiating in the division of Exploration and Production drilling rigs for shallow waters, in an amount between US$ 100 to 150 million dollars, while the drilling rig VITORIA 10.000 was a highly technologically sophisticated piece of equipment for deep waters and of considerable value, approximately US$ 600 million dollars; THAT PETROBRAS' reluctance was related to SCHAHIN's financial capacity in entering into the project as a partner, which said reluctance was minimized by SCHAHIN's representatives because they would say that they had the capacity to provide the guarantees; THAT at this time NESTOR CERVERO authorized the discussions between the technicians of the two companies with a goal to make the venture viable; THAT soon thereafter a series of technical negotiations were held; THAT in this interim, because PETROBRAS had already anticipatorily paid the slot for SAMSUNG, it was necessary to have the contract with the shipyard approved, which is why in March of 2007, the contract between PETROBRAS and SAMSUNG was approved, but without naming any partner and who would be the operator of the drillship; THAT after the approval of this contract, the negotiations with SCHAHIN advanced, but without being able to bring SCHAHIN as a partner of the project because it was not able to prove its financial capacity in being able to provide the necessary guarantees associated with the project; THAT precisely because of this, PETROBRAS ended up being the only partner of the drillship VITORIA 10.000; THAT, however, SCHAHIN was retained to be VITORIA 10.000's operator; THAT, however, this approval of SCHAHIN being named as the operator also involved a series of obstacles because the issue was taken three times to the Execute Board for evaluation and it was only during the third time that it was approved; THAT the issue was taken three times in an interim of a maximum of six months; THAT the person that always took the proposal to the Executive Board was EDUARDO MUSA; THAT with every subject matter a technician of the division was chosen to present the issue to the Executive Board and in this case, the chosen technician was MUSA; THAT during the first two times, the Executive Board did not approve it; taking it off the agenda and requesting technical supplementary explanations; THAT in light of the difficulties that they encountered to put SCHAHIN in the project, the deponent always suggested to BLUMAI that maybe they needed his political support and that this be discussed with GABRIELLI, so that he could discuss the issue with the other directors; THAT during the first two times, the deponent did not demand to know who would be BUMLAI's representatives;

[Various Initials]

THAT during the third time, however, the deponent pressured BLUMAI to trigger the actions of his contacts, especially GABRIELLI and President LULA; THAT BUMLAI responded that the deponent could remain calm as he was going to trigger the actions of GABRIELLI and the "Beard", which was how BUMLAI referred to President LULA; THAT BUMLAI told the deponent that as soon as he contacted his contacts, he would let him know so that the issue could be put back on the agenda; THAT BUMLAI subsequently notified the deponent that everything was okay and that the issue could be taken to the Executive Board because it would be approved; THAT BUMLAI did not mention names, but affirmed that he had discussed with the "individuals"; THAT during this discussion, unlike the previous one, BUMLAI did not mention who were the said individuals; THAT, then, the deponent notified MUSA; THAT MUSA then took the issue to the Executive Board where the SCHAHIN group was really approved as the operator of the drillship VITORIA 10.000; THAT, subsequently, in the Federal Police's prison, RENATO DUQUE commented with the deponent that BUMLAI met with him to ask for SCHAHIN's approval regarding this subject matter; THAT, as far as he knows, generally, there would not be the need to obtain the approval of a drillship operator by the Executive Board; THAT in this case, however, there was, as he found out, a clause which would give SCHAHIN the option to buy the equipment at the end of the contractual term, which was ten or fifteen years, it was a type of *leasing*; THAT he believes that one of the difficulties in obtaining the approval by the Executive Board was precisely this possibility that SCHAHIN would acquire the drillship at the end; THAT such clause, as he believes, was not a standard clause and believes that it was the solution found to compensate for the fact that SCHAHIN was not chosen to be PETROBRAS' partner in connection with the drillship; THAT, as with SCHAHIN's approval as the operator of the drillship, it was the very deponent that notified BLUMAI; THAT in this business deal involving SCHAHIN, there was no direct solicitation of commission by the deponent made to SCHAHIN because on one side, the deponent and the PETROBRAS' employees were already receiving a commission from SAMSUNG and, on the other side, the business deal benefitted THE WORKERS' PARTY, which is whey neither the deponent nor PETROBRAS' employees felt comfortable asking for the commission; THAT the deponent also did not feel comfortable requesting the commission from the SCHAHIN Group because its hiring was already a compensation for the loan made by THE WORKERS' PARTY; THAT, furthermore

[Various Initials]

# EXHIBIT 21



GAB 8

**FEDERAL PUBLIC PROSECUTOR OFFICE**
**OFFICE OF THE FEDERAL PROSECUTOR FOR PARANÁ**
**TASK-FORCE**

**TERM OF DEPOSITION.**

On the ninth day of December of 2015, in the headquarters of the Federal Police in Curitiba, present the Regional Federal Prosecutor JANUÁRIO PALUDO and the Federal Prosecutor DIOGO CASTOR DE MATTOS, appeared EDUARDO COSTA VAZ MUSA, RG 6107069/SSP/SP, who serves in the role of collaborator, duly accompanied by his lawyer, Doctor AUGUSTO FIGUEIREDO BASTO, OAB/PR 16950/PR. To the questions, he responded that he was General Manager of the international Area of PETROBRAS during the period of July of 2006 to July of 2009. That NESTOR CERVERÓ was the Director of the International Area until the beginning of 2008. Later on JORGE ZELADA took over as Director. That NESTOR CERVERÓ participated from the start of the operation for the prior contracting of SCHAHIN both as operator of the VITÓRIA 10000 as well as the charterer of that same drill-ship, having participated in the prior meetings that would define that model of contracting of SCHAHIN in compensation for a solution to the "PT's loan" together with the Banco SCHAHIN. That he recalls that at that time, in discussions with the colleagues of the international area, with MOREIRA and CESAR TAVARES, as it seems to him, the same attempt had been done together with the Directorate of Production and Exploration of Director GUILHERME ESTRELA in order for that Directorate to be contracted to SCHAHIN. By what he heard, the request to the E&P had come from the president SÉRGIO GABRIELLI and had not been attended to by GUILHERME ESTRELA. That NESTOR CERVERÓ had said to GABRIELLI: "leave with me I will solve it", passing on then to coordinate the operation. Therefore, considering that on 12/13/2006, the SANSUNG, by means of a letter offered the SLOT for the construction of a second ship, that was called PETROBRAS II – 1000, and which would be called VITÓRIA 10000, was started the operation for the contracting of that ship by the international area for the SCHAHIN to participate in the operation of the ship, having NESTOR delivered to LUIS CARLOS MOREIRA the referenced letter to provide follow up. Based on the study regarding the PETROBRAS 10000, the deponent and LUIS CARLOS MOREIRA sent a proposal to NESTOR CERVERÓ, having forwarded for this a draft of a letter of intention for the Executive Board's approval. On 01/18/2007, a proposal of the International Directorate was approved to sign a LOI (letter of intention) with the SANSUNG and to pay a reservation rate of US$ 10 million; On 01/26/2007, a LOI was signed with the SANSUNG and provided payment of US$ 10 million, in other words, in a little more than one month after the proposal's receipt. That this type of expedited procedure was not common, and it takes close to 06 months according to the deponent's understanding. Such rapidity was due to the fact that there was a prior arrangement for that contracting. On 03/08/2007, the Executive Board approved the DINTER (International Directorate) proposition of signing an MOU (memorandum of understanding) with the SCHAHIN in order for it to be the operator of the *DRILL SHIPP* [sic], with a participation of between 20% and 30% by the SPE (corporation for a specific purpose which would be the ship's owner) and also approved the signing of the contract with the SANSUNG. According to his recollection, the area of the Financial Directorate of PETROBRAS had done a study of SCHAHIN'S economic situation, in which he



**FEDERAL PUBLIC PROSECUTOR OFFICE**
**OFFICE OF THE FEDERAL PROSECUTOR FOR PARANÁ**
**TASK-FORCE**

recalls, favorably, that it made the participation of SCHAHIN in the SPE possible.  That he does not recall who developed the study and how this was forwarded to the deponent, but he would confirm; That the Memorandum of understanding was signed on March 9 of 2007, that the prior period of 90 days for the creation of the SPE, ended up being extended 02 more times.  That the period was extended twice because it was difficult to negotiate with SCHAHIN with regard to the contract periods, basically due to commercial conditions.  That there was fear on the part of SCHAHIN of not being able to maintain compliance with the contract, especially if the costs would increase a lot.  That from this negotiation participated the declarant, MARIO OLIVEIRA (DINTER), the MONICA (legal manager), someone from the finance and taxation areas, and for SCHAHIN, sometimes FERNANDO SCHAHIN, JOÃO MEIRA (Finance Director or Finance Manager), RODRIGUES LOPES (Manager of Operations) and a Manager of SCHAHIN named EÔNIO, and that sometimes an external Lawyer.  That those external meetings were commercial technical matters where clauses of the DSC were discussed and that would make a Head of Agreement; That on 12/6/2006 the Executive Board finally approves the signing of the Head of Agreement, that defined the guidelines and values in order for Schahin to operate the ship, already with a 20 year provision.  In the meantime, in January of 2008,   NESTOR  CERVERÓ left the International Directorate, having JORGE ZELADA assumed the position.  That he already met JORGE ZELADA during the time in which he worked in the PETORBRAS Engineering division.  That JORGE ZELADA took over the Directorate sustaining the same speed as his predecessor with regard to the contracting of SCHAHIN for the Vitoria 10000, such that on 04/02/2008, a short time after having assumed thus, he submitted a request to the Executive Board, for the extension of the period of validity of the HoA, in order to give more time for the negotiation, which was approved. On July 12, 2008, once the contractual negotiations were concluded, it was submitted for the approval of the Executive Board, all of the contracts negotiated with SCHAHIN. In that opportunity, the Executive Board did not approve the proposition and maintains the matter on the agenda, because the Finance Director ALMIR BARBASSA asked for additional explanations regarding the financial studies and the rights of SCHAHIM, compared with those of the PETROBRAS 1000.  That the area of the deponent is which does the studies.  That he recalls, on the 12 or 13 of July, an invitation was issued for an internal meeting in order to set a strategy to presentation again the project to the Executive Board, meeting which occurred on 07/14/2008.  He does not recall what was the change in the strategy, but probably with some change in the form of the presentation to the Executive Board, without changing the content.  On 07/31/2008, there was a new presentation to the prior DIP, with some modifications, which were also not approved, which he recalls as Director BARBASSA was in disagreement.   That this matter again was maintained on the agenda before that request for explanations by Director BARBASSA, the deponent's impression is that ALMIR BARBASSA was not complacent with the business with SCHAHIN since he felt there was something mistaken; That on 07/28/2008 the Executive Manager for new business in the international area ABI RAMIA convened a prior meeting to prepare the meeting with the Executive Board, without, however, having changed the content. On 07/31/2008 the Executive Board, again did not approve the matter, maintaining it on the agenda, also by



**FEDERAL PUBLIC PROSECUTOR OFFICE**
**OFFICE OF THE FEDERAL PROSECUTOR FOR PARANÁ**
**TASK-FORCE**

questioning of Financial Director Almir Barbassa. That in the sequence, the Director Jorge Zelada suggested the modification of the presentation that should be re-submitted to the Executive Director, proposing the preparation of a presentation with a comparative chart of the operation contracts between TRANSOCEAN/PETROBRAS 1000 and the SCHAHIN/VITORIA 10.000. That the deponent forwarded that new presentation to JORGE ZELADA's assistant called SOCRATES with this new presentation in which the comparisons are done between the operation contracts of TRANSOCEAN/PETROBRAS 1000. That all of that comparison had been requested by the Director ALMIR BARBASSA. On the day 08/07/2008, for the third time, was done the new presentation to the Executive Directors with the presentation of the comparative chart between the contracts TRANSOCEAN and SCHAHIN. On that occasion, the proposal was not approved again in light of the opposition by the Director ALMIR BARBASSA. That on the day 08/12/2008 the deponent sent an email to the Executive Manager ABI RAMIA informing that the Executive Directors once again had not approved the hiring of SCHAHIN and that the greatest resistance to this came from the Financial Director BARBASSA thus thinking that the continuity of the relationship with SCHAHIN would be in jeopardy. You have to remember that at that time PETROBRAS was led by JORGE ZELADA and that this ex-director suggested that "in order to bring SCHAHIN back to the table and since the Financial Director was implicated", it was for the deponent to make contact with FERNANDO SCHAHIN in order to set up a meeting for the 1st of September of 2008. That effectively on the day 08/26/2008 SCHAHIN, through the Office of FERNANDO SCHAHIN requested the meeting with the director JORGE ZELADA, which took place on 09/01/2008; That on the same day 09/01/2008, after an intense email exchange that included comments between Legal, Executive Manager ABI RAMIA, the Director JORGE ZELADA and other assistants, it was submitted a letter to SCHAHIN( FERNANDO SCHAHIN), with the retroactive date of 08/19/2008, which originally would have been signed by the Director JORGE ZELADA, but it was signed instead by the Executive manager ABI RAMIA, informing that the Executive Directorship had not approved the matter and therefore the HoA remained without validity and requested SCHAHIN'S initiative to re-initiate the negotiations. That on 09/02/2008 SCHAHIN sent a letter in reply agreeing to re-start the negotiations. The witness does not remember with certainty but believes that the letter sent with retroactive date to SCHAHIN was a combined strategy with FERNANDO SCHAHIN so that the re-starting of the negotiations would have happened already in the meeting which occurred on 09/01/2008. From Sept 1st to 09/24/2008, there were intensive meetings involving Legal, Taxes, and Finances and SCHAHIN, restructuring the model of the deal now with the introduction of MITSUBISHI as a partner of SPC with 50% participation. That since SCHAHIN did not have financial capacity to assume the enterprise and already had a partner in the SPE quota, MITSUBISHI ended up assuming the entire quota from SCHAHIN, in order to overcome the aforementioned obstacle by the Financial Directors. On 09/24/2008, it was scheduled the new presentation to the Executive Directors in the meeting of 09/25/2008, showing the new structured deal with the Mitsubishi being the partner, which ended up being approved with the recommendation that it be returned to the Executive Directors Committee for the approval of the final contracting documents.



**FEDERAL PUBLIC PROSECUTOR OFFICE**
**OFFICE OF THE FEDERAL PROSECUTOR FOR PARANÁ**
**TASK-FORCE**

On 09/27/2008 the director JORGE ZELADA submitted an e-mail to the President JOSE GABRIELLI, with a copy for the deponent, informing that the Executive Directors approve, in the meeting of 09/25/2008, the proposed deal's structure, which caught de deponent's attention, since the President of PETROBRAS should be present, except in cases of trips in which case his substitute should be present in the Executive Directors' meeting and would keep him (GABRIELLI) informed.  That on the day 12/19/2008 the Executive Directors, as shown in the Minutes DE 4737, approved the proposition of the DIP DINTER 461 on 12/12/2008 and authorized the signing of the approved contracts with SCHAHIN and Mitsubishi, which was done on 01/29/2009. In this session, the declarant submitted a hard drive with the documentation referred to here. Nothing else to declare, I, Diogo Castor, have read and signed.

Diogo Castor de Mattos,

Januário Paludo

Eduardo Vaz Musa

Antonio Augusto Figueiredo Basto

# EXHIBIT 22



CONFIDENTIAL
FEDERAL POLICE
REGIONAL SUPERINTENDENT OFFICE IN THE STATE OF PARANA
DRCOR – Regional Organized Crime Police Unit
**DELEFIN – Unit for Suppression of Crimes against the Financial System and Misappropriation of Public Funds**

## COOPERATION AGREEMENT No. 02

SUMMARY OF STATEMENTS
made by **ALBERTO YOUSSEF**

On October 3, 2014, at the Regional Superintendent Office of the Federal Police Department in Curitiba, PR, before MARCIO ADRIANO ANSELMO, Federal Police Inspector, 1st Class, registration no. 9837, in compliance with the request of the Federal Attorney included in Official Letter no. 1152/Gab to take the deposition of ALBERTO YOUSSEF, a married Brazilian, RG 3506470-2/PR, CPF 532.050.659-72, son of Kalim Youssef and Antonieta Youssef, who signed a cooperation agreement which will be submitted to the Chief Federal Prosecuting Attorney for ratification, and in the presence of Federal Prosecutor ROBERSON HENRIQUE POZZOBON, with delegation of the former to act in the case, and the attorney of the declarant, TRACY JOSEPH REINALDET DOS SANTOS, OAB/PR 56300, under all the secrecy cautions determined, in service to the provisions of Law 12,850/2013, particularly with regards articles 4 to 7, when inquired, ALBERTO YOUSSEF **RESPONDED**: THAT the declarant states that attorney TRACY JOSEPH REINALDET DOS SANTOS, OAB/PR 56300, now present, is his defense counsel legally appointed to assist him in the present act, as determined in article 4, § 15, of Law 12,850/2013; THAT the declarant states that he intends to cooperate effectively and voluntarily with the police investigations and criminal prosecutions, according to the documents signed with the Federal Prosecution Service; THAT the declarant waives, in the presence of his defense counsel, the right to silence, signing the legal commitment to tell the truth, pursuant to the terms of article 4, § 14, of Law 12,850/2013; THAT the declarant and his defense counsel expressly authorize and are aware of the audiovisual recording of the present deposition on a digital medium (**HD Samsung 1Tera, Serial Number E2FWJJHD2223B7**), additional to the written record (two printed copies of the signed agreement), pursuant to the terms of article 4, § 13, of Law 12,850/2013, which at the end of the act will be duly sealed and delivered to the representative of the Federal Prosecution Service, now present, who will be responsible for the custody and preservation of the secrecy of the information; THAT the declarant states that he is aware that the present act of cooperation will depend on judicial ratification based on verification of its regularity, legality and free will. The judge may deny ratification if the legal requirements are not met or adapt it to the case. He also acknowledged awareness that the effects of the state's evidence cooperation depend on one or more of the following results, among others, pursuant to article 4 of Law 12,850/2013: I – identification of the other coauthors and participants in the criminal organization and the criminal offense committed by them; II – information about the hierarchical structure and task-sharing in the criminal organization; III – prevention of criminal offenses resulting from activities of the criminal organization; IV – total or partial recovery of the proceeds or income resulting from the criminal offenses committed by the criminal organization; also, the concession of the benefit will take into consideration the personality of the declarant, the nature, circumstances, seriousness and the social repercussion of the criminal act and the effectiveness of the cooperation; THAT the declarant also declares that the is aware of the cooperation rights provided in article 5 of

1

*302* [initials]



CONFIDENTIAL
FEDERAL POLICE
REGIONAL SUPERINTENDENT OFFICE IN THE STATE OF PARANA
DRCOR – Regional Organized Crime Police Unit
**DELEFIN – Unit for Suppression of Crimes against the Financial System and Misappropriation of Public Funds**

Law 12,850/2013: I – will enjoy the protection measures provided in specific legislation; II – will have his name, personal details, image and other information preserved; III – will be examined in court separately from the other coauthors and participants; IV – will participate in the hearings without visual contact with the other accused parties; V – will not have his identity revealed by the communication media or be photographed or filmed without his previous written authorization; VI – will serve prison time in a different facility than the other coauthors or persons convicted; THAT, as a complement to the statements made yesterday, the declarant would like to point out that both Petrobras' management and the "Palácio do Planalto" [office of the President of the Republic, akin to "the White House"] were aware of the structure that involved the distribution and transfer of the commissions at the level of the state-controlled company; THAT when inquired about who he was talking about when he mentioned the term "Palácio do Planalto" he clarifies that both the President of the Republic, Presidential Chief of Staff, Minister of Mines and Energy, namely LUIS INACIO LULA DA SILVA, GILBERTO CARVALHO, ILDELI SALVATTI, GLEISE HOFFMAN, DILMA ROUSSEFF, ANTONIO PALOCCI, JOSÉ DIRCEU and EDSON LOBÃO, among others listed; THAT he also clarifies that power struggles were common among political parties, related to the distribution of jobs within Petrobras, and that these disputes went up to the Palácio do Planalto for resolution; THAT he reaffirms that the high-level officials of the government were aware of the situation; THAT when asked about the officers of Petrobras, he clarifies that the Presidency of the company was aware of the facts; THAT he recalls a situation in which there was a specific situation in which a specific process related to the contracting of marketing services for Petrobras that was interrupted due to irregularities; THAT in one of those "parallel minutes" the declarant was charged with paying these expenses of the participants as a result of the direct order of SERGIO GABRIELI, then president, who would have passed on the order to then Director PAULO ROBERTO COSTA; THAT because the contract was interrupted, the declarant paid the rest of the amounts owed, remembering that the payments were made by means of a TED [electronic bank transfer of immediately available funds] from the account of the company MO CONSULTORIA E LAUDOS ESTATÍSTICOS; THAT the declarant then received the amounts payable to the service providers and transferred the amounts to these communication companies; THAT he does not remember the names of the companies, only that one of them was based in São Paulo and another in Rio de Janeiro; THAT as regards the process that resulted in the dismissal of PAULO ROBERTO COSTA from PETROBRAS Procurement Department, the declarant believes that it happened due to power struggles within the Progressive Party (Partido Progressista—PP), as well as political disputes with other parties; THAT after PAULO ROBERTO COSTA left the company, the declarant states that some payments continued related to "obligations" assumed at that time; THAT several payments continued to be made after PAULO ROBERTO COSTA left; THAT the subsequent payments were divided in the proportion of 70% to PAULO ROBERTO COSTA, 15% to the declarant and 15% to JOÃO CLÁUDIO GENU; THAT after PAULO ROBERTO left, they reached an "agreement" about the pending expenses related to contracts of the time when the same was the supply director; THAT payments were usually made by means of TED and the declarant transferred the amounts by means of physical delivery of cash to PAULO ROBERTO COSTA and JOÃO CLAUDIO GENU; THAT the payments were usually based on services that were not rendered or due to fraud in measurement of services rendered; THAT he clarifies that some

2

Case 1:14-cv-09662-JSR Document 96-4 Filed 08/12/19 Page 37 of 85
Case 1:14-cv-09662-JSR Document 160-2 Filed 08/22/15 Page 37 of 85



CONFIDENTIAL
FEDERAL POLICE
REGIONAL SUPERINTENDENT OFFICE IN THE STATE OF PARANA
DRCOR – Regional Organized Crime Police Unit
**DELEFIN – Unit for Suppression of Crimes against the Financial System and Misappropriation of Public Funds**

payments made to PAULO ROBERTO COSTA were formalized as consulting contracts signed directly with same; THAT the payments by means of consulting directly to PAULO ROBERTO COSTA, intermediated by the declarant, were formalized with the contractors CAMARGO CORREIA and ENGEVIX; THAT the other contractors transferred the amounts to the declarant, who was responsible for the distribution of the amounts; THAT the contract with ENGEVIX and COSTA GLOBAL was dealt with directly with GERSON ALMADA; THAT the consulting contracts with CAMARGO CORREIRA [sic] were intermediated by EDUARDO LEITE, commercial vice-president of the company; THAT the contracts were formalized, duly supported by the issuance of invoices and their corresponding payments; THAT he believes that CAMARGO CORREIA and ENGEVIX still have payments to receive; THAT inquired about the amounts of the consulting contracts intermediated with CAMARGO CORREIA and ENGEVIX, he knows that the contract with CAMARGO CORREIA was in the amount of three million paid in monthly installments of one hundred thousand reais; THAT the contract with ENGEVIX was in the amount of approximately R$ 730,000.00, paid in monthly installments of R$ 30,000.00; THAT all involved parties (the declarant, PAULO ROBERTO, JOÃO CLÁUDIO GENU, Progressive Party, maintained "control" of the amounts paid); THAT JOÃO CLAUDIO GENU, even after PAULO ROBERTO COSTA left, continued receiving the amounts, which were distributed by the declarant by means of physical deliveries in BRASÍLIA/DF; THAT the payments were made by means of TED to individuals or legal entities using the operator CARLOS HABIB CHATER or by means of physical deliveries which were transported to BRASÍLIA/DF; THAT the physical transportation was usually carried out by the declarant, by RAFAEL ÂNGULO LOPEZ or ÁDARICO MONTENEGRO; THAT inquired about the participation of GRAÇA FOSTER, the declarant clarifies that he believes that she was aware of the transfers made by the construction companies to the political parties, but he cannot confirm it; THAT, however, the practice of appointment to political jobs in exchange for payments is routine and occurs in all cases; THAT the declarant also clarifies that after PAULO ROBERTO COSTA left there was a meeting with him, the declarant and JOÃO CLÁUDIO GENU for "settling of accounts" of the amounts still pending to be paid to PAULO ROBERTO and the others involved; THAT when inquired about the continuity of the scheme of distribution of amounts after PAULO ROBERTO COSTA left, the declarant clarifies that such "scheme" has not stopped; THAT he states that the Progressive Party does not have any influence in the present procurement department. With nothing further to be recorded, it was determined that the present agreement be prepared, and after being read and found in conformity, it was signed by all and sealed in envelopes with seal numbers 10597 and 10598, Federal Police standard.

POLICE AUTHORITY: _____[signature]_____
Márcio Adriano Anselmo



*304* [initials]

CONFIDENTIAL
FEDERAL POLICE
REGIONAL SUPERINTENDENT OFFICE IN THE STATE OF PARANA
DRCOR – Regional Organized Crime Police Unit
**DELEFIN – Unit for Suppression of Crimes against the Financial System and Misappropriation of Public Funds**

DECLARANT: _____ [signature]_____
Alberto Youssef

FEDERAL PROSECUTOR: _____ [signature]_____
Roberson Henrique Pozzobon

ATTORNEY: _____ [signature]_____
Tracy Joseph Reinaldet dos Santos

WITNESS: _____ [signature]_____
Federal Police Clerk João Paulo de Alcantara

<table>
<tr><td>The unauthorized dissemination of this information is a violation of the functional secrecy defined in art. 325 of the Brazilian Penal Code. Punishment: two (2) to six (6) years confinement and fine.</td><td>It is a crime to intercept telephone, computer or telematic communications or to breach investigative secrecy without a court order or with purposes not authorized by law, pursuant to the terms of article 10 of Law 9,296/96. Punishment: two (2) to four (4) years confinement and fine.</td></tr>
</table>

1640227884-5245



translations@geotext.com
www.geotext.com

STATE OF NEW YORK      )
                         )    ss
                         )
COUNTY OF NEW YORK   )

## **CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Portuguese into English of the attached summary of statements made by Alberto Youssef.

Rachele Rossanese, Project Manager
Geotext Translations, Inc.

Sworn to and subscribed before me
this _18_ day of _May_ , 20_15_.

LYNDA GREEN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01GR6205401
Qualified in New York County
My Commission Expires May 11, 2017

New York
t: +1.212.631.7432

London
t: +44.20.7553.4100

Washington, D.C.
t: +1.202.828.1267

Paris
t: +33.1.42.68.51.47

Chicago
t: +1.312.242.3756

Stockholm
t: +46.8.463.11.87

Houston
t: +1.713.353.3909

Frankfurt
t: +49.69.7593.8434

San Francisco
t: +1.415.576.9500

Hong Kong
t: +852.2159.9143

# EXHIBIT 23



BRAZILIAN FEDERAL POLICE
REGIONAL SUPERINTENDENCE IN THE STATE OF PARANÁ
DRCOR - Regional Police Department for Fighting Organized Crime
**DELEFIN - Police Department for Fighting Crimes Against the Financial System and Embezzlement by Government Official**

## COOPERATION AGREEMENT 14

DECLARATION AGREEMENT
made by **PAULO ROBERTO COSTA**

On September 1st, 2014, in this Regional Superintendence of the Federal Police Department, in Curitiba/PR, before EDUARDO MAUAT DA SILVA, Chief of Brazilian Federal Police, Special Class, registered with no.8190 in compliance with the request by the Federal Attorney General contained in the Official Letter no. 1152/Gab to provide the testimony by PAULO ROBERTO COSTA, Brazilian, married, son of Paulo Bachmann Costa and Evolina Pereira da Silva Costas, born on 01/01/1954 in Monte Alegre/PA, an Engineer, bearer of Identify Card no. 1708889876 - CREA [Regional Council of Engineering, Architecture and Agronomy]/RJ, who made the cooperation agreement which shall be taken for the Federal Attorney General to ratify it and in the presence of the Federal Prosecutor ROBERSON HENRIQUE POZZOBON, with the delegation of the latter to work in the case, and of declarant' attorneys-in-fact, BEATRIZ CATTA PRETA, registered with OAB/SP (Brazilian Bar Association) under no. 153879 (absent herein), and LUIZ HENRIQUE VIEIRA, registered with OAB/SAP under no. 320868, under all safeguards of confidentiality, comply with the provisions of Law no. 12850/2013, namely, regarding the provisions of Articles 4 and 7, he was examined, PAULO ROBERTO COSTA ANSWERED:THAT the declarant states that the attorney-in-fact BEATRIZ CATTA PRETA, registered with OAB/SP herein is his legally appointed defense council to assist him herein, as required by §15 of article 4 of Law no. 12850/2013;THAT the declarant states that he intends to collaborate effectively and voluntarily with police investigations and criminal proceedings under the agreement made with the Federal Public Prosecutor's Office; THAT the declarant resigns, in the presence of his defense council, the right to remain in silence, and he makes a legal commitment to tell the truth under §14 of article 4 of Law No. 12850/2013;THAT the declarant and his defense counsel expressly authorize and are aware of the audiovisual record of this collaborative act in digital media (HD SAMSUNG 1Tera, serial number E2E2JJHD123134), as well as the written record (in two counterparts from the agreement signed in paper) pursuant to §13 of article4 of Law No. 12850/2013, which shall be at the end thereof, duly sealed and delivered to the representative of the Federal Public Prosecutor's Office present herein, which shall be in charge of the keeping, custody and preservation of confidentiality of information; THAT the declarant states he is aware that this collaboration act shall depend on the approval of the Judiciary, which shall check the regularity, legality and willingness, and the judge may refuse to approve it in the event it does not meet the legal requirements or adapt it to the specific case, and he is aware that the effects of state's evidence collaboration also depend on one or more of the following results, among others, according to the article 4 of Law No. 12850/2013;I - Identifying other principals and accessories of the criminal organization and criminal offenses committed by them;II - Disclosing the hierarchical structure and the division of labor of the criminal organization; III -

score="4"



REGIONAL SUPERINTENDENCE IN THE STATE OF PARANÁ

DRCOR - Regional Police Department for Fighting Organized Crime

**DELEFIN - Police Department for Fighting Crimes Against the Financial System and Embezzlement by Government Official**

Preventing criminal offenses arising from the activities of the criminal organization; IV - In whole or partially recovering the product or benefit of criminal offenses committed by the criminal organization; as well as granting the benefit shall take into account the collaborator's personality, nature, circumstances, severity and the social impact of the criminal act and the effectiveness of collaboration; THAT the declarant further states he is aware as collaborator under article 5 of Law No. 12850/2013 he is entitled to: I - Make use of the protective measures as provided for in specific legislation; II - Have his name, identification, images and other information preserved under confidentiality; III - Be directed in court separately from other co-prepatrators and accessories; IV - Take part in hearings without visual contact with the other defendants; V - Not have either his identity disclosed by the media, or be photographed or filmed without his prior written consent; VI - Serve sentence in a prison different from the other co-defendants or convicts; THAT he is being warned that he should avoid any kind of communication with other suspects as a way to agree versions, agreement or any form to make his statements, both directly and indirectly (through attorneys, family members or otherwise), which may result in the damage to his agreement; THAT regarding the subject involving a Parliamentary Committee of Investigation [CPI] to investigate Petrobras in 2010, he said that this was an election year, and EDUARDO DA FONTE from PP got in touch with him, he met him at Windsor Hotel in Rio de Janeiro; THAT this meeting was also attended by the Senator SERGIO GUERRA, president of PSDB, which was surprising to the declarant, since opposition and situation were interested in that meeting; THAT they said that Federal Accounting Court [TCU] would have investigated some irregularities related to overpricing at Abreu e Lima Refinery (RNEST), but that would not be of interest nor the opposition, nor the situation of that CPI; THAT the declarant reported this situation to ARMANDO TRIPODI, chief of office of SÉRGIO GABRIELI, which agreed that the CPI should be barred given the potential losses, especially in an election year; THAT another meeting was scheduled, also attended by EDUARDO DA FONTE and Senator SERGIO GUERRA, and PSDB allegedly wanted a compensation in the amount of ten million Brazilian Real in order to bar the CPI; THAT after that meeting the declarant got in touch with ILDEFONSO COLARES FILHO, president of QUEIROZ GALVÃO, consortium company with IESA one of the works of Abreu e Lima and after explaining the situation he agreed that CPI would be a bad deal and agreed to pay the amount requested by SERGIO GUERRA; THAT there was a third meeting with Sergio GUERRA and EDUARDO DE FONTE where he informed them that the subject would be solved and that the company Queiroz Galvão would release the postulated action; THAT later he spoke to IDELFONSO COLARES and he even said to have made the transfer in the amount of ten million Brazilian Real in favor of SERGIO GUERRA without denial as it was done and who would have received the amounts; THAT this money was not mediated by ALBERTO YOUSSEF; THAT he believes that all meetings were held in apartments in the Windsor Hotel of Barra da Tijuca, one of them may have been held at Sheraton Hotel, which is close to Windsor Hotel; THA they do not know who booked the rooms, and upon arriving at the site the congress people were already waiting for him; THAT he does not know explain why EDUARDO DA FONTE and SÉRGIO the GUERRA got in touch with him together; THAT



BRAZILIAN FEDERAL POLICE
REGIONAL SUPERINTENDENCE IN THE STATE OF PARANÁ
DRCOR - Regional Police Department for Fighting Organized Crime
**DELEFIN - Police Department for Fighting Crimes Against the Financial System and Embezzlement by Government Official**

the amounts of ten million was charged to the funds to be received by PP in the amount of one percent (1%) managed by the declarant; THAT he explains, as stated above, about the systematic transfer of bribes at PETROBRAS for politicians, the declarant states that all major contracts of this state-owned company had the participation of companies (contractors) cartelized; THAT such companies set on their bids a margin of overpricing of about 3% in order to reach fund in excess to be transferred to politicians, and from this percentage the declarant had to manage amounts within the amount of one percent (1%), while the Chief Supply Officer directed the funds mostly to PP; THAT in relation to the other two percent (2%) of contracts and intended for political purposes, RENATO DE SOUZA DUQUE, chief services officer was in charge of the control, the bidding and execution of all contracts of large company investments (more than twenty million Brazilian Real); THAT he further clarifies that for the Exploration and Production (larger budget of PETROBRAS) and Gas and Energy Managements were run persons appointed by PT, and all the amount by way of overpricing was for PT, and RENATO DUQUE, Chief Service Officer was in charge of allocation of that amount in accordance with the guidelines and requests received from such party; THAT, for the International Management, the appointment was made by PMDB, the declarant does not know how the apportionment of three percent (3%) for the overpricing of contracts was done; THAT within the percentage of three percent (3%) of political use for PETROBRAS contracts, one percent (1%) for the declarant's autonomy were transferred directly by the contractors to ALBERTO YOUSSEF and later to HENRY HOYER which controlled the "fund" and the destination according to the demands that were submitted and authorized by the declarant; THAT he was asked why he would have a certain autonomy in the management of funds to benefit politicians (one percent) while other managements did not have it, he states this occurred in view of his appointment and tenure in office is related to PT, PP and PMDB; THAT he adds that possibly the International Management, held by NESTOR CERVERO (appointed by DELCÍDIO AMARAL) and later by JORGE ZELADA (appointed by the federal deputies from Minas Gerais, PMDB) should also have some autonomy related to the allocation of funds to politicians given the connection to more than one party. THAT he was asked whether JOSÉ SÉRGIO GABRIELLI was aware of this scheme within PETROBRAS mounted to favor some political parties, he says he was unaware of it believing so in view it was a personal political appointment of then President Luiz Inácio Lula da Silva; THAT he says he has never commented directly on such subjects with SÉRGIO GABRIELLI. As they were no further issues to addressed, it was determined that this agreement was closed, once it was read and found to be in order shall be signed by all and sealed in envelopes with seals number 10461 and 10462 Federal Police Standard.

POLICE AUTHORITY: _____  *[It bears the signature]*
Eduardo Mauat da Silva



### BRAZILIAN FEDERAL POLICE
REGIONAL SUPERINTENDENCE IN THE STATE OF PARANÁ
DRCOR - Regional Police Department for Fighting Organized Crime
**DELEFIN - Police Department for Fighting Crimes Against the Financial System and Embezzlement by Government Official**

POLICE AUTHORITY:    _____*[It bears the signature]*_____
                                                        Felipe Eduardo Hideo Hayashi

DECLARANT:              _____*[It bears the signature]*_____
                                                        Paulo Roberto Costa

ATTORNEY:             _____ *[It bears the signature]*
                                                        Luiz Henrique Vieira

FEDERAL
ATTORNEY                                                *[It bears the signature]*
GENERAL:              _____
                                              Roberto Henrique Pozzobon

WITNESS:              _____ *[It bears the signature]*
                                                        Rodrigo Prado Pereira

**The unauthorized dissemination of this information characterizes violation of functional secrecy provided for in Article 325 of the Brazilian Criminal Code. Penalty: Imprisonment from six (2) to six (6) years, and a fine.**

**It is a crime to make the interception of telephone communications, information technology or telematics, or violation of legal confidentiality without judicial authorization or with unauthorized purposes in law under article 10 of Law 9296/96. Penalty: Imprisonment from two to four years, and a fine.**

# EXHIBIT 24

CONFIDENTIAL



FEDERAL POLICE
PARANÁ STATE REGIONAL SUPERINTENDENCY
DRCOR - Regional Organized Crime Control Bureau
**DELEFIN - Control Bureau for Crime against the Financial System and Misappropriation of Public Funds**

### COLLABORATION AGREEMENT No .35

RECORD OF DEPOSITION

provided by **PAULO ROBERTO COSTA**

On the 3rd day of September 2014, at this Regional Superintendency of the Federal Police Department, in Curitiba/PR, before FELIPE EDUARDO HIDEO HAYASHI, Chief of the Federal Police, First Class, registration No. 16027, meeting the Federal Attorney General's request included in Notice No. 1152/Gab to proceed with the hearing of PAULO ROBERTO COSTA, Brazilian, married, son of Paul and Bachmann Costa and Evolina Pereira da Silva Costa, born on 01/01/1954 in Monte Alegre/ PR, Engineer, identity card No. 1708889876 - CREA/RJ, entered into a collaboration agreement that shall be subject to the ratification of the Federal Attorney General, and in the presence of Federal Prosecutors ANDREY BORGES DE MENDONÇA, with delegation of the former to act in the case, and of the informant's attorney, BEATRIZ CATTA PRETA, enrolled with the OAB/SP under No. 153 879 (absent herein), and LUIZ HENRIQUE VIEIRA, enrolled with the OAB/SP under No. 320868, under all confidentiality orders, in compliance with the provisions of Law 12.850/2013, especially regarding provisions of Articles 4 to 7, respondent, PAULO ROBERTO COSTA STATED: THAT the informant states that attorney LUIZ HENRIQUE VIEIRA, OABSP 320868, present herein, is his defense attorney legally appointed to assist him in this act, as required by §15 of art. 4 of Law No. 12.850/2013; THAT the informant states that he undertakes to collaborate effective and voluntarily with police investigations and criminal proceedings under the agreement entered into with the Federal Prosecution Office; THAT, the informant waives, in the presence of his defense attorney, the right to silence, executing legal undertakings to tell the truth, pursuant to §14 of art. 4 of Law 12.850/2013; THAT, the informant and his defense attorney expressly authorize and are aware of the audiovisual record of this collaborative act in digital media (HD Samsung 1Tera, Serial Number E2FWJJHD2223B7), in addition to the written record (two counterparts of the agreement in paper), pursuant to § 13 Art. 4 of Law No.12.850/2013, which shall be, at the end of the act, duly sealed and delivered to the representative of the Federal Prosecution Office herein present, which shall be responsible for the custody and preservation of confidentiality of the information; THAT the informant states to be aware that this collaboration act shall depend on the approval of the Judiciary Brach, which shall verify the regularity, legality and willingness, and the judge may refuse the approval in the event it does not meet the legal requirements or adapt it to the specific case, being aware, yet, that the effects of the plea agreement depend on one or more of the following results, among others, according to art. 4 of Law No. 12.850/2013: I - the identification of the other co-authors and participants of the criminal organization and criminal

CONFIDENTIAL



FEDERAL POLICE
PARANÁ STATE REGIONAL SUPERINTENDENCY
DRCOR - Regional Organized Crime Control Bureau
**DELEFIN - Control Bureau for Crime against the Financial System and Misappropriation of Public Funds**

offenses committed by them; II - the disclosure of the hierarchical structure and the segregation of duties of the criminal organization; III - the prevention of criminal offenses arising from the activities of the criminal organization; IV - the total or partial recovery of the product or benefit of criminal offenses committed by the criminal organization; as well as the grant of benefit shall take into account the collaborator's personality, the nature, circumstances, severity and the social impact of the criminal act and the effectiveness of collaboration; THAT, the informant is also aware that the collaborator's rights under art. 5 of Law No. 12.850/2013: I - make use of the protective measures provided for in specific legislation; II - have the name, identification, images and other information preserved; III - be conducted in court, separately from other co-authors and participants; IV - participate in hearings without visual contact with the other defendants; V - not having their identity disclosed by the media, nor being photographed or filmed without their prior written permission; VI - serving sentences in correctional facilities other than that of other codefendants or convicted; THAT he is being advised that he should avoid any kind of communication with the other investigated persons in order to arrange versions, adjustment, or how to conduct their statements, both directly and indirectly (through attorneys, family members or otherwise), which could result in the damage to their agreement; THAT he is being advised that he should avoid any kind of communication with the other investigated persons in order to arrange versions, adjustment, or how to conduct their statements, both directly and indirectly (through attorneys, family members or otherwise), which could result in the damage to their agreement; THAT, the contractors that participated in the cartel system involving PETROBRAS agreements had an overpricing margin of 3% (three percent) for political use; That this overpricing margin was included in the price sheet or the BDI; THAT, he explains that as transfers of agreements in progress were made, i.e., as invoices were paid, the contractors undertook to disburse funds; THAT, he details that in the Directorate of Supply, 2% of the amounts for political use were transferred to JOAO VACARI NETO, PT treasurer, when they were intended for the Workers' Party; THAT, in the case of amounts due to the Progressive Party, the amounts were received and controlled by JOSE JANENE until 2008, and when he became ill, ALBERTO YOUSSEF assumed such position; THAT, when asked about the PETROBRAS agreements where there was payment of kickbacks, the informant states that there was payment of kickbacks by all companies participating in the cartel process, which occurred both in the department of the informant and in other departments of PETROBRAS; That, he can confirm that large companies participating in the cartel process were used for misappropriation of public funds in the engineering, gas and energy, supply and international departments; That in his yellow cover (Mitsui & Co) 2012 appointment book, regarding team RJRJ 79, item 11, seized at the residence of the informant, there are several payments made to politicians of amounts from the contracting companies of PETROBRAS; These notes mention the many Congressmen and Senators who received

CONFIDENTIAL



FEDERAL POLICE
PARANÁ STATE REGIONAL SUPERINTENDENCY
DRCOR - Regional Organized Crime Control Bureau
**DELEFIN - Control Bureau for Crime against the Financial System and Misappropriation of Public Funds**

amounts from these agreements with PETROBRAS, as already clarified in detail in other instruments; That, he confirms that companies that were part of cartelization process were CAMARGO CORRÊA, O AS, UTC, ODEBRECHT, QUEIROZ GALVÃO, TOYO SETAL, TECHINT, GALVÃO ENGENHARIA, ANDRADE GUTIERREZ, I ESA, ENGEVIX, among others that he does not remember at the moment; That, ALBERTO YOUSSEF contacted all these companies, since he was responsible for raising, as from 2008, illicit amounts with the companies; That, when asked who were the informant's contact people for each company, he reported that in general he had contacted the CEO or the Directors of companies, and did not contact people of lower positions; That his contact people in CAMARGO CORRÊA were EDUARDO LEITE AND DALTON; THAT, he is aware that ALBERTO YOUSSEF had a very close relationship with EDUARDO LEITE; That, his contact people in OAS were LEO PINHEIRO and AGENOR FRANKLIN MAGALHÃES MEDEIROS; That his contact person at UTC was RICARDO PESSOA, only; THAT, he is aware that ALBERTO YOUSSEF had a very close relationship with RICARDO PESSOA, in fact they were partners in some enterprises; That, his contact people in ODEBRECHT were MÁRCIO FARIA and ROGÉRIO ARAÚJO; That his contact person in QUEIROZ GALVÃO was IDELFONSO COLARES; That his contact person in TOYO SETAL was JÚLIO CAMARGO; THAT the informant is aware that JÚLIO CAMARGO was also owner of company TREVISO; THAT, he is aware ALBERTO YOUSSEF had a very close relationship with JÚLIO CAMARGO; THAT his contact person in TECHINT was RICARDO OURIQUE; THAT his contact person in GALVÃO ENGENHARIA was ERTON FONSECA, CEO of Industrial Engineering; THAT, his contact person in ANDRADE GUTIERREZ was PAULO DALMAZO; THAT his contact person in IESA was WALDIR LIMA CARREIRO; THAT his contact person in ENGEVIX was GERSON ALMADA; That all works that these companies participated in before PETROBRAS went through cartelization; That, for instance, RNEST, REPAR, pipeline, shipbuilding, rig construction, onshore natural gas station agreements, i.e.,, all agreements of various PETROBRAS fields already mentioned were part of cartelization and also the payment of kickbacks; Other government agencies were also involved, as already explained above, such as ELETROBRÁS, Hydroelectric Power Plant Construction, ports, airports, etc.; That as to the payment of kickbacks, the informant never received money directly from the companies mentioned; That the amounts were always transferred to JOSÉ JANENE and, after 2008, to ALBERTO YOUSSEF; That JANENE or YOUSSEF then made the distribution of amounts in the percentage already informed by the informant, which is, 60% for politicians, 20% for other costs and 20% were divided between the informant and JOSÉ JANENE or ALBERTO YOUSSEF in the proportion of 70 % for the informant and 30% for JOSÉ JANENE or ALBERTO YOUSSEF; The informant believes the amount due to the informant was transferred about 10 days after payment was made to JANENE or YOUSSEF by contractors; That, the informant states that contractors are paid within 30 days after PETROBRAS carrying out the measurement of service for the previous

CONFIDENTIAL



FEDERAL POLICE
PARANÁ STATE REGIONAL SUPERINTENDENCY
DRCOR - Regional Organized Crime Control Bureau
**DELEFIN - Control Bureau for Crime against the Financial System and Misappropriation of Public Funds**

month; That, then JANENE or YOUSSEF contacted the contractors to collect payment and the informant does not know how long it took; That, sometimes it was necessary to issue invoices, which could change the payment term; That, the amounts transferred by YOUSSEF or JANENE to the informant did not occur with the same frequency; That, sometimes the amounts were received by the informant in order to cover payments of more than one contractor or more than one agreement; That the greatest proof of payment of kickbacks that the informant has is the table included on his appointment book, already mentioned, which starts with "2010 (pp. 28.5)"; That, this table prepared on his appointment book was handwritten from a table he obtained in ALBERTO YOUSSEF's office; That this table relates to 2010 and the amounts were significant, because it was an election year, and some people received more than 5 million; That all of such matter has been detailed in other records of deposition; That, when asked if there are other proof of payment of kickbacks, the informant said; "If I received, then others also received"; That, he received undue amounts from 2005 to April 2012; That, when asked about the larger agreements, he clarifies the following; That, as to joint venture IPOJUCA INTERLIGAÇÕES, of RNEST, the agreement was 2.7 billion reais; That, as to CNCC, the agreement was 3.3 billion reais; That, the CONEST joint venture agreement was 3.1 billion reais; That, these RNEST agreements, as well as all other agreements entered into by the above companies, there was payment of 3% of the total amount of the agreement as a kickback, which would be split as already informed, i.e., 2% for PT and 1% for the Progressive Party; That, the informant states that the Abreu e Lima Refinery has two production trains, the first of which only comes into operation in November this year (2014) and the other in April of next year; That, he states that because the mentioned agreements are of three or four years for implementation and that when he left the company in April 2012, these agreements were still in early implementation, on average around 25% to 30% of physical implementation; That, when the table with all agreements of RNEST, totaling approximately BRL 18,738,591,265.75, with 23 companies or joint ventures were shown to the informant, the latter stated that from these companies, there was payment of undue advantages by ENGEVIX, ALLUSA, TECHINT, TOME, CONSÓRCIO CONEST, CNCC, QUEIROZ GALVÃO, I ESA and GALVÃO ENGENHARIA; That some of these companies have made payments of undue advantages, though they did not participate in the cartel, especially ALLUSA and TOME, which are smaller companies; That the informant states that these agreements cover only the Directorate of Supply, but this pattern repeats in other agreements and particularly in the area of exploration and production, which holds 60 to 70% of the PETROBRAS investment budget; That, it should be demanded of PETROBRAS a list of all the agreements that the companies participating in the cartel held with PETROBRAS, from 2003 to September 2014, in the fields of supply, exploration and production, gas and energy and international ; That, with this information it would be possible to have a general and complete overview of the cartel and the payment of kickbacks; That, all investment

CONFIDENTIAL



FEDERAL POLICE
PARANÁ STATE REGIONAL SUPERINTENDENCY
DRCOR - Regional Organized Crime Control Bureau
**DELEFIN - Control Bureau for Crime against the Financial System and Misappropriation of Public Funds**

agreements of these fields are made and controlled by the services department, from beginning to end, i.e. from the bid until the completion of the work; That the international department is important because some of the cartel companies provided services abroad, such as TOYO; That with such, it would be possible to have a full and joint overview of the amounts that were diverted by way of undue advantage; That the informant knows that in his department 3% of the amount of the agreement was paid as kickback, divided between PT and PP, as already explained; That, although he never talked to another director of PETROBRAS on the amount of their departments, he believes the percentage was the same; That, however, there was a difference, because in the services, exploration and production and gas and energy departments, since the Directors were appointed by PT, the full amount of such 3% was allocated to such party; That, in the international department, the appointment was from DELCIDIO DO AMARAL, from PT, but he also paid accounts for PMDB, as has already been described; That, PETROBRAS made several drilling rigs and vessels (FPSO) in Singapore, South Korea and China and all it was managed by the services department and there was probably payment of benefits; That, these agreements had enormous amounts; That the services department managed these agreements abroad; That, at the time in which the informant was Director, the Director of Services was RENATO DUQUE, appointed with JOSE DIRCEU; That, RENATO DUQUE or his wife were relatives of JOSÉ DIRCEU; That, RENATO DUQUE left PETROBRAS in 2012, along with the informant, in April; That RENATO DUQUE was replaced by RICHARD OLM on April 27, 2012; That the latter, due to health problems, was replaced in May 2012 by JOSÉ ANTÔNIO DE FIGUEIREDO, who currently holds the same position; That, the large agreements of all mentioned departments of PETROBRAS were entered into by the same large companies, since no other companies were able to perform agreements in the country; That from the departments of PETROBRAS, he states that the Directors of the services, international and supply departments were absolutely aware of the cartelization process; That, the Directors of these departments were aware and participated in the process, benefiting from the undue advantage; That the CEO of PETROBRAS probably knew, but the informant cannot say if they knew of the undue receipt of amounts; There being no further business, this instrument is concluded, read and approved and is hereby signed by all and sealed in envelopes with seals number 10503 and 10504 as standard of the Federal Police.

POLICE AUTHORITY _____ *[signature]* _____
Felipe Eduardo Hideo Hayashi

INFORMANT: _____ *[signature]* _____

CONFIDENTIAL



FEDERAL POLICE
PARANÁ STATE REGIONAL SUPERINTENDENCY
DRCOR - Regional Organized Crime Control Bureau
**DELEFIN - Control Bureau for Crime against the Financial System and Misappropriation of Public Funds**

---

ATTORNEY:          Paulo Roberto Costa *[signature]*
                              Luiz Henrique Vieira

FEDERAL PROSECUTOR:          *[signature]*
                              Andrey Borges de Mendonça

WITNESS:               *[signature]*
                            APF Rodrigo Prado Pereira

**The unauthorized disclosure of this document is a breach of the confidentiality agreement provided for in art. 325 of the Brazilian Penal Code: 2 (two) to 6 (six) year-detention and fine.**

**Telephone, computer or telematics tapping, or breaching secrecy of legal proceedings, without legal consent or with objectives not authorized by law, as provided for in art. 10 of Law 9.296/96.**
**Penalty: Two to four year detention and fine.**

# EXHIBIT 25

CONFIDENTIAL



FEDERAL POLICE
PARANÁ STATE REGIONAL SUPERINTENDENCY
DRCOR - Regional Organized Crime Control Bureau
**DELEFIN - Control Bureau for Crime against the Financial System and Misappropriation of Public Funds**

### COLLABORATION AGREEMENT No .41

RECORD OF DEPOSITION

provided by **PAULO ROBERTO COSTA**

On the 05th day of September 2014, at this Regional Superintendency of the Federal Police Department, in Curitiba/PR, before EDUARDO MAUAT DA SILVA, Chief of the Federal Police, Special Class, registration No. 8190, meeting the Federal Attorney General's request included in Notice No. 1152/Gab to proceed with the hearing of PAULO ROBERTO COSTA, Brazilian, married, son of Paul and Bachmann Costa and Evolina Pereira da Silva Costa, born on 01/01/1954 in Monte Alegre/ PR, Engineer, identity card No. 1708889876 - CREA/RJ, entered into a collaboration agreement that shall be subject to the ratification of the Federal Attorney General, and in the presence of Federal Prosecutors DIOGO CASTOR DE MATTOS, with delegation of the former to act in the case, and of the informant's attorney, BEATRIZ CATTA PRETA, enrolled with the OAB/SP under No. 153 879 (absent herein), and LUIZ HENRIQUE VIEIRA, enrolled with the OAB/SP under No. 320868, under all confidentiality orders, in compliance with the provisions of Law 12.850/2013, especially regarding provisions of Articles 4 to 7, respondent, PAULO ROBERTO COSTA STATED: THAT the informant states that attorney LUIZ HENRIQUE VIEIRA, OABSP 320868, present herein, is his defense attorney legally appointed to assist him in this act, as required by §15 of art. 4 of Law No. 12.850/2013; THAT the informant states that he undertakes to collaborate effective and voluntarily with police investigations and criminal proceedings under the agreement entered into with the Federal Prosecution Office; THAT, the informant waives, in the presence of his defense attorney, the right to silence, executing legal undertakings to tell the truth, pursuant to §14 of art. 4 of Law No. 12.850/2013; THAT, the informant and his defense attorney expressly authorize and are aware of the audiovisual record of this collaborative act in digital media (HD Samsung 1Tera, Serial Number E2FWJJHD2223B7), in addition to the written record (two counterparts of the agreement in paper), pursuant to § 13 Art. 4 of Law No.12.850/2013, which shall be, at the end of the act, duly sealed and delivered to the representative of the Federal Prosecution Office herein present, which shall be responsible for the custody and preservation of confidentiality of the information; THAT the informant states to be aware that this collaboration act shall depend on the approval of the Judiciary Brach, which shall verify the regularity, legality and willingness, and the judge may refuse the approval in the event it does not meet the legal requirements or adapt it to the specific case, being aware, yet, that the effects of the plea agreement depend on one or more of the following results, among others, according to art. 4 of Law No. 12.850/2013: I - the identification of the other co-authors and participants of the criminal organization and criminal offenses committed by them; II - the disclosure of the hierarchical structure and the

1

CONFIDENTIAL



FEDERAL POLICE
PARANÁ STATE REGIONAL SUPERINTENDENCY
DRCOR - Regional Organized Crime Control Bureau
**DELEFIN - Control Bureau for Crime against the Financial System and Misappropriation of Public Funds**

segregation of duties of the criminal organization; III - the prevention of criminal offenses arising from the activities of the criminal organization; IV - the total or partial recovery of the product or benefit of criminal offenses committed by the criminal organization; as well as the grant of benefit shall take into account the collaborator's personality, the nature, circumstances, severity and the social impact of the criminal act and the effectiveness of collaboration; THAT, the informant is also aware that the collaborator's rights under art. 5 of Law No. 12.850/2013: I - make use of the protective measures provided for in specific legislation; II - have the name, identification, images and other information preserved; III - be conducted in court, separately from other co-authors and participants; IV - participate in hearings without visual contact with the other defendants; V - not having their identity disclosed by the media, nor being photographed or filmed without their prior written permission; VI - serving sentences in correctional facilities other than that of other codefendants or convicted; THAT he is being advised that he should avoid any kind of communication with the other investigated persons in order to arrange versions, adjustment, or how to conduct their statements, both directly and indirectly (through attorneys, family members or otherwise), which could result in the damage to their agreement; THAT, in respect of the cartel system involving PETROBRAS and other government-controlled companies, he states that there are few large engineering companies in Brazil in return to the demand for large works, and such fact promoted the emergence of a collusion between such companies in order to define who would win each bid; THAT, the companies that were part of cartelization process were CAMARGO CORRÊA, O AS, UTC, ODEBRECHT, QUEIROZ GALVÃO, TOYO SETAL, TECHINT, GALVÃO ENGENHARIA, ANDRADE GUTIERREZ, IESA, ENGEVIX, among others that he does not remember at the moment; That, ALBERTO YOUSSEF contacted all these companies, since he was responsible for raising, as from 2008, illicit amounts with the companies; That, when asked who were the informant's contact people for each company, he reported that in general he had contacted the CEO or the Directors of companies, and did not contact people of lower positions; That his contact people in CAMARGO CORRÊA were EDUARDO LEITE AND DALTON; THAT, he is aware that ALBERTO YOUSSEF had a very close relationship with EDUARDO LEITE; That, his contact people in OAS were LEO PINHEIRO and AGENOR FRANKLIN MAGALHÃES MEDEIROS; That his contact person at UTC was RICARDO PESSOA, only; THAT, he is aware that ALBERTO YOUSSEF had a very close relationship with RICARDO PESSOA, in fact they were partners in some enterprises; That, his contact people in ODEBRECHT were MÁRCIO FARIA and ROGÉRIO ARAÚJO; That his contact person in QUEIROZ GALVÃO was IDELFONSO COLARES; That his contact person in TOYO SETAL was JÚLIO CAMARGO; THAT the informant is aware that JÚLIO CAMARGO was also owner of company TREVISO; THAT, he is aware ALBERTO YOUSSEF had a very close relationship with JÚLIO CAMARGO; THAT his contact person in TECHINT was RICARDO OURIQUE; THAT his contact person in GALVÃO ENGENHARIA was ERTON FONSECA, CEO of Industrial

CONFIDENTIAL



FEDERAL POLICE
PARANÁ STATE REGIONAL SUPERINTENDENCY
DRCOR - Regional Organized Crime Control Bureau
**DELEFIN - Control Bureau for Crime against the Financial System and Misappropriation of Public Funds**

Engineering; THAT, his contact person in ANDRADE GUTIERREZ was PAULO DALMAZO; THAT his contact person in IESA was WALDIR LIMA CARREIRO; THAT his contact person in ENGEVIX was GERSON ALMADA; That all works that these companies participated in before PETROBRAS went through cartelization; That, for instance, RNEST, REPAR, pipeline, shipbuilding, rig construction, onshore natural gas station agreements, i.e.,, all agreements of various PETROBRAS fields already mentioned were part of cartelization and also the payment of kickbacks; Other government agencies were also involved, as already explained above, such as ELETROBRÁS, Hydroelectric Power Plant Construction, ports, airports, etc.; That as to the payment of kickbacks, the informant never received money directly from the companies mentioned; That the amounts were always transferred to JOSÉ JANENE and, after 2008, to ALBERTO YOUSSEF; That JANENE or YOUSSEF then made the distribution of amounts in the percentage already informed by the informant, which is, 60% for politicians, 20% for other costs and 20% were divided between the informant and JOSÉ JANENE or ALBERTO YOUSSEF in the proportion of 70 % for the informant and 30% for JOSÉ JANENE or ALBERTO YOUSSEF; The informant believes the amount due to the informant was transferred about 10 days after payment was made to JANENE or YOUSSEF by contractors; That, the informant states that contractors are paid within 30 days after PETROBRAS carrying out the measurement of service for the previous month; That, then JANENE or YOUSSEF contacted the contractors to collect payment and the informant does not know how long it took; That, sometimes it was necessary to issue invoices, which could change the payment term; That, the amounts transferred by YOUSSEF or JANENE to the informant did not occur with the same frequency; That, sometimes the amounts were received by the informant in order to cover payments of more than one contractor or more than one agreement; That the greatest proof of payment of kickbacks that the informant has is the table included on his appointment book, already mentioned, which starts with "2010 (pp. 28.5)"; That, this table prepared on his appointment book was handwritten from a table he obtained in ALBERTO YOUSSEF's office; That this table relates to 2010 and the amounts were significant, because it was an election year, and some people received more than 5 million; That all of such matter has been detailed in other records of deposition; That, when asked if there are other proof of payment of kickbacks, the informant said; "If I received, then others also received"; That, he received undue amounts from 2005 to April 2012; That, when asked about the larger agreements, he clarifies the following; That, as to joint venture IPOJUCA INTERLIGAÇÕES, of RNEST, the agreement was 2.7 billion reais; That, as to CNCC, the agreement was 3.3 billion reais; That, the CONEST joint venture agreement was 3.1 billion reais; That, these RNEST agreements, as well as all other agreements entered into by the above companies, there was payment of 3% of the total amount of the agreement as a kickback, which would be split as already informed, i.e., 2% for PT and 1% for the Progressive Party; That, the informant states that the Abreu e Lima Refinery has two production trains, the first of which only comes into operation in November this year (2014) and the other in April of next year; That, he states

CONFIDENTIAL



FEDERAL POLICE
PARANÁ STATE REGIONAL SUPERINTENDENCY
DRCOR - Regional Organized Crime Control Bureau
**DELEFIN - Control Bureau for Crime against the Financial System and Misappropriation of Public Funds**

that because the mentioned agreements are of three or four years for implementation and that when he left the company in April 2012, these agreements were still in early implementation, on average around 25% to 30% of physical implementation; That, when the table with all agreements of RNEST, totaling approximately BRL 18,738,591,265.75, with 23 companies or joint ventures were shown to the informant, the latter stated that from these companies, there was payment of undue advantages by ENGEVIX, ALLUSA, TECHINT, TOME, CONSÓRCIO CONEST, CNCC, QUEIROZ GALVÃO, I ESA and GALVÃO ENGENHARIA; That some of these companies have made payments of undue advantages, though they did not participate in the cartel, especially ALLUSA and TOME, which are smaller companies; That the informant states that these agreements cover only the Directorate of Supply, but this pattern repeats in other agreements and particularly in the area of exploration and production, which holds 60 to 70% of the PETROBRAS investment budget; That, it should be demanded of PETROBRAS a list of all the agreements that the companies participating in the cartel held with PETROBRAS, from 2003 to September 2014, in the fields of supply, exploration and production, gas and energy and international ; That, with this information it would be possible to have a general and complete overview of the cartel and the payment of kickbacks; That, all investment agreements of these fields are made and controlled by the services department, from beginning to end, i.e. from the bid until the completion of the work; That the international department is important because some of the cartel companies provided services abroad, such as TOYO; That with such, it would be possible to have a full and joint overview of the amounts that were diverted by way of undue advantage; That the informant knows that in his department 3% of the amount of the agreement was paid as kickback, divided between PT and PP, as already explained; That, although he never talked to another director of PETROBRAS on the amount of their departments, he believes the percentage was the same; That, however, there was a difference, because in the services, exploration and production and gas and energy departments, since the Directors were appointed by PT, the full amount of such 3% was allocated to such party; That, in the international department, the appointment was from DELCIDIO DO AMARAL, from PT, but he also paid accounts for PMDB, as has already been described; That, PETROBRAS made several drilling rigs and vessels (FPSO) in Singapore, South Korea and China and all it was managed by the services department and there was probably payment of benefits; That, these agreements had enormous amounts; That the services department managed these agreements abroad; That, at the time in which the informant was Director, the Director of Services was RENATO DUQUE, appointed with JOSE DIRCEU; That, RENATO DUQUE or his wife were relatives of JOSÉ DIRCEU; That, RENATO DUQUE left PETROBRAS in 2012, along with the informant, in April; That RENATO DUQUE was replaced by RICHARD OLM on April 27, 2012; That the latter, due to health problems, was replaced in May 2012 by JOSÉ ANTÔNIO DE FIGUEIREDO, who currently holds the same position; That, the large agreements of all mentioned departments of PETROBRAS were entered into by the same large companies, since no other companies

CONFIDENTIAL



FEDERAL POLICE
PARANÁ STATE REGIONAL SUPERINTENDENCY
DRCOR - Regional Organized Crime Control Bureau
**DELEFIN - Control Bureau for Crime against the Financial System and Misappropriation of Public Funds**

were able to perform agreements in the country; That from the departments of PETROBRAS, he states that the Directors of the services, international and supply departments were absolutely aware of the cartelization process; That, the Directors of these departments were aware and participated in the process, benefiting from the undue advantage; That the CEO of PETROBRAS probably knew, but the informant cannot assert that it was a reality, since he never directly addressed this subject with JOSE EDUARDO DUTRA, SÉRGIO GABRIELLI and GRACA FOSTER, CEO of the government-controlled company, when he held a position in it; THAT, he states that the fact that he appointed smaller companies to participate in bids, among them SANTA BARBARA, MULTITEC, FIDENS, TENASSE, ALUSÁ, EIT, JARÁGUA, occurred in order to break up this monopoly, and he added that the participation of each one occurred in segments in which they actually had the capacity to operate; THAT, this initiative in disregard to the rules of the cartel led to a reaction of the big contractors, having been approached by some directors and agents who told him that the informant would "fall flat on his face", and in some cases that actually occurred, because these smaller companies did not manage to execute the agreements and ended up going bankrupt; THAT, that occurred around 2008/2009; THAT, when asked if this initiative would aim to increase his commissions, he says no, that he was actually a bit tired of this scheme and the only way to stop it would be weakening the cartel or leaving the directorate; THAT, nevertheless, he ended up receiving spontaneous commissions by ALUSA (two million) and FIDENS (200 thousand reais); THAT, in fact, he knew he should "help" PP as from its appointment to the Directorate of Supply, as told by JANENE JOSE, but only later, around 2005, he became aware of the cartel scheme and transfers to political parties; THAT, he can say that all bids in which the big contractors participated had the incidence of cartelization and manipulation of the outcome of the bidding; THAT, when questioned how the cartelized companies were aware that the bid, even with the average overpricing of 3%, would be within a competitive range, he states some reference sources of costs of PETROBRAS and of the companies were the same; being that this would lead to an estimate as to the base budget of each construction work; THAT, he wishes to add that he has no information about information leakage as to the base estimates of the company's bids; THAT, regarding the existence of a fraud system to the bid, as occurred in PETROBRAS with regard to works managed by other government-controlled companies, he states he cannot make say, but he only assumes that the scheme was within this small group of companies in all bids in which they participate; THAT, when asked how the link between the contractors and PETROBRAS was operated, he states, as explained in detail in previous instruments, the people involved in this activity were: JOAO VACCARI NETO and RENATO DUQUE (PT), JOSE JANENE, ALBERTO YOUSSEF and HENRI HOYER (PP), FERNANDO SOARES (FERNANDO BAIANO), JORGE ZELLADA and NESTOR CERVERO (PMDB). There being no further business, this instrument is concluded, read and approved and is hereby signed by all and sealed in envelopes with seals number 10515 and 10516 as standard of the Federal Police.

CONFIDENTIAL



FEDERAL POLICE
PARANÁ STATE REGIONAL SUPERINTENDENCY
DRCOR - Regional Organized Crime Control Bureau
**DELEFIN - Control Bureau for Crime against the Financial System and Misappropriation of Public Funds**

POLICE AUTHORITY          *[signature]*
_____
                          Eduardo Mauat da Silva

INFORMANT:                *[signature]*
_____
                          Paulo Roberto Costa

ATTORNEY:                 *[signature]*
_____
                          Luiz Henrique Vieira

FEDERAL PROSECUTOR:       *[signature]*
_____
                          Diogo Castor de Mattos

WITNESS:                  *[signature]*
_____
                          APF Wiligton Gabriel Pereira

**The unauthorized disclosure of this document is a breach of the confidentiality agreement provided for in art. 325 of the Brazilian Penal Code: 2 (two) to 6 (six) year-detention and fine.**

**Telephone, computer or telematics tapping, or breaching secrecy of legal proceedings, without legal consent or with objectives not authorized by law, as provided for in art. 10 of Law 9.296/96. Penalty: Two to four year detention and fine.**

# EXHIBIT 26



# FEDERAL POLICE

## REGIONAL SUPERINTENDENCY OF THE STATE OF PARANÁ

**DRCOR - Delegacia Regional de Combate ao Crime Organizado (Regional Police Department for Fighting Organized Crime)**

DELEFIN - Delegacia de Repressão a Crimes Financeiros e Desvios de
Recursos Públicos (Police Department for Repression of Financial Crimes and Misappropriation of Public Funds)

### COOPERATION INSTRUMENT No. 61

DEPOSITION INSTRUMENT
by **PAULO ROBERTO COSTA**

On September 8, 2014, at the Regional Superintendency of the Federal Police Department in Curitiba/PR, in the presence of EDUARDO MAUAT DA SILVA, Special Class Federal Police Chief, registration No. 8190, in compliance with the General Federal Attorney's request contained in the Official Letter No. 1152/Gab to proceed with the testimony of PAULO ROBERTO COSTA, Brazilian, married, son of Paulo Bachmann Costa and Evolina Pereira da Silva Costa, born in 1/1/1954 in Monte Alegre/PR, Engineer, holder of identity card No. 1708889876 - CREA/RJ, who has signed a cooperation agreement which will be submitted to the General Federal Attorney for ratification, and in the presence of the Federal Prosecutor DIOGO CASTOR DE MATTOS, authorized by the latter to act in the case, and the declarant's lawyers, BEATRIZ CATTA PRETA, OAB/SP 153879 (absent in this act), and LUIZ HENRIQUE VIEIRA, OABSP 320868, under all the set out secrecy precautions, in accordance with the dictates of Law 12,850/2013, especially regarding the provisions of Articles 4 to 7, PAULO ROBERTO COSTA **ANSWERED:** THAT the declarant affirms that the lawyer LUIZ HENRIQUE VIEIRA, OABSP 320868 is his defense counsel legally appointed to assist him in this act, as per §15 of art. 4 of Law no. 12850/2013; THAT the declarant affirms that he intends to effectively and voluntarily cooperate with police investigations and criminal procedures, under the instruments signed with the Federal Prosecutors Office; THAT the declarant waives, in the presence of his defense counsel, the right to silence, making a legal commitment to say the truth, under the provisions of §14 of art. 4 of Law no. 12850/2013; THAT the declarant and his defense counsel expressly authorize and are aware of the audiovisual recording of this cooperation act in digital media **(HD SAMSUNG 1 Terabyte, Serial Number E2FWJJHD2223B7)**, in addition to the written record (two copies of the instrument signed on paper), under the provisions of §13 of art. 4 of Law no.12850/2013, which will, by the end of the act, be duly sealed and delivered to the Federal Prosecutors Office's representative present, who will be responsible for the safeguard, custody and preservation of the secrecy of the information; THAT the declarant affirms he is aware that this cooperation act will depend on the approval of the Judiciary, which will verify its correctness, legality and voluntariness, and that it is subject to refusal by the judge if it does not meet the legal requirements or to adjustment to the concrete case, and he is also aware that the effects of the plea agreement depend on one or more of the results below, among others, in accordance with art. 4 of Law no. 12850/2013: I - the identification of the other co-authors and participants in the Criminal organization and criminal offenses committed by them; II - the disclosure of the hierarchical structure and the division of tasks of the Criminal organization; III - the prevention of criminal offenses arising from the activities of the criminal organization; IV - the total or partial recovery of the product or benefit of criminal offenses committed by the criminal organization; besides, the granting of the benefit will take into account the collaborator's personality, the nature, circumstances, seriousness and the social impact of the criminal act and the effectiveness of the cooperation; THAT the declarant also acknowledges the collaborator's rights under art. 5 of Law no. 12850/2013: I - to usufruct protective measures provided for in specific legislation; II - to have the name, identification, image and other information preserved; III - to be conducted in court, separately from other co-authors and participants; IV - to participate in hearings without visual contact with the other defendants; V - to not have his identity disclosed by the media, nor be photographed or filmed without his prior written consent; VI - to serve his sentences in different penal establishment of other co-defendants or convicted; THAT, he is being warned that he shall avoid any kind of communication with others subject to



# FEDERAL POLICE
## REGIONAL SUPERINTENDENCY OF THE STATE OF PARANÁ
### DRCOR - Delegacia Regional de Combate ao Crime Organizado (Regional Police Department for Fighting Organized Crime)
DELEFIN - Delegacia de Repressão a Crimes Financeiros e Desvios de
Recursos Públicos (Police Department for Repression of Financial Crimes and Misappropriation of Public Funds)

investigation as a way to agree on or adjust versions or any way of conducting their statements, both directly and indirectly (through lawyers, family or otherwise), which may result in the damage to their agreement; THAT, concerning the company TOYO SETAL, he affirms that it was part of the cartel system linked to the PETROBRAS's works and possibly to other state-owned companies; THAT, the companies that were part of the cartelization process were CAMARGO CORRÊA, OAS, UTC, ODEBRECHT, QUEIROZ GALVÃO, TOYO SETAL, TECHINT, GALVÃO ENGENHARIA, ANDRADE GUTIERREZ, IESA, ENGEVIX, among others he does not remember; That ALBERTO YOUSSEFF had contact with all these companies, as he was responsible for collecting, from 2008, the illegal values from the companies for PP; THAT, from TOYO SETAL, he had contact with JULIO CAMARGO; THAT the declarant knows that JULIO CAMARGO was also the owner of the company TREVISO; THAT he knows that ALBERTO YOUSSEFF had a quite strong relationship with JULIO CAMARGO; THAT there was cartelization in all the works in which these companies participated together with Petrobras; THAT, specifically concerning TOYO SETAL, he remembers that it participated in the work related to RNEST and COMPERJ; THAT, regarding the payment of bribes, the declarant has never received money directly from the mentioned companies; THAT, the amounts were always passed to JOSÉ JANENE and, from 2008 on, to ALBERTO YOUSSEFF; THAT, JANENE or YUSSEF then distributed the amounts in the percentage already informed by the declarant, that is, 60% for politicians, 20% for expenses and the remaining 20% were split between the declarant and JOSÉ JANENE or ALBERTO YOUSSEFF in the proportion of 70% for the declarant and 30% for JOSÉ JANENE or ALBERTO YOUSSEFF; THAT, the declarant guesses that the amount due to the declarant was transferred around 10 days after the payment for JANENE or YUSSEFF by the contractors; THAT the declarant clarifies that the contractors are paid 30 days after Petrobras have measured the service provided in the previous month. THAT, then JANENE or YOUSSEFF got in touch with the contractors to collect the payment and the declarant does not know how long it took; THAT, sometimes it was necessary to issue an invoice, what could change the deadline for payment; THAT the amounts transferred by YOUSSEFF or JANENE to the declarant did not have the same frequency or periodicity; That sometimes the amounts were received by the declarant in order to embody payments of more than one contractor or more than one contract; That the best proof of payment of bribes that the declarant has is the table contained in his appointment book, already mentioned, which starts with "2010 (pp 28,5)"; That such table made in his appointment book was copied by hand from a table he obtained in ALBERTO YOUSSEFF's office; That this table refers to the year 2010 and the amounts were expressive, as it was an election year, and that there were some people who received more than 5 million; THAT, all this information has already been detailed in other deposition instruments; That, when asked if there is other proof of the payment of bribes, the declarant stated: "if I received it means others also did"; That he received undue amounts from 2005 to April 2012; That, asked about the higher volume contracts, he clarifies; That regarding the consortium IPOJUCA INTERLIGAÇÕES, of RNEST, the contract was worth 2.7 billion reais; That concerning CNCC, the contract was worth 3.3 billion reais; That the contract of the CONEST Consortium was worth 3.1 billion reais; That in these RNEST's contracts, as well as in all other contracts signed by the aforementioned companies, the payment of 3% on the total amount of the contract was made as bribery, which would be split in the way already mentioned, that is, 2% for PT and 1% for Partido Progressista. That the declarant clarifies that the Abreu e Lima Refinery has two production trains, whereas the first only starts operating this November (2014) and the other one in April next year; That he states this because these mentioned contracts provide for three or four years of implementation and that when he left the company, in April 2012, these contracts were still in the beginning of its implementation phase, around in average 25% to 30% of physical implementation. That when the table with all the contracts of RNEST, totaling roughly R$ 18,738,591,265.75, with 23 companies or



# FEDERAL POLICE

### REGIONAL SUPERINTENDENCY OF THE STATE OF PARANÁ

**DRCOR - Delegacia Regional de Combate ao Crime Organizado (Regional Police Department for Fighting Organized Crime)**

DELEFIN - Delegacia de Repressão a Crimes Financeiros e Desvios de
Recursos Públicos (Police Department for Repression of Financial Crimes and Misappropriation of Public Funds)

consortia was shown to the declarant, he clarified that, these companies, ENGEVIX, ALLUSA, TECHINT, TOME, CONSÓRCIO CONEST, CNCC, QUEIROZ GALVÃO, IESA and GALVÃO ENGENHARIA paid bribes; That some of these companies paid bribes, although they did not participate in cartels, especially ALLUSA and TOME, which are smaller companies; THAT he clarifies that TOME has never paid directly, but as a member of other consortia composed by companies member of the cartel; That the declarant explains that these contracts only relates to the Supply Department, but this pattern happens in other contracts, specially in the exploration and production area, which holds 60 to 70% of the Petrobras's budget for investments; That it would be convenient to ask Petrobras a list with all the contracts that the companies that participated in the cartel signed with Petrobras in the period of 2003 to September 2014, in the supply, exploration and production, gas and energy and international areas. That with this information it would be possible to have a complete overview of the cartel and of the payment of bribes; That all investment contracts of these areas are made and controlled by the services department, from the beginning to end, that is, from the bidding process to the completion of the construction work. That the international department is important because some of the companies of the cartel provided services abroad, such as TOYO; That, with this information it would be possible to have a joint overview of the amounts that were embezzled for the payment of bribes; That the declarant is able to state that in his area 3% of the contract value was paid as bribes, split between PT and PP, as already explained; That, although he had never talked to other directors of Petrobras about the value of their areas, he believes that the percentage was the same; That, however, there was a difference, because in the services, exploration and production and gas and energy departments, as the Directors were appointed by PT, all the amount of 3% remained with the latter party; That in the international department, the nomination was made by DELCÍDIO DO AMARAL, that belonged to PT, but who also reported to PMDB, as already explained; That Petrobras built several FPSOs and drilling rigs in Singapore, South Korea and China and these were managed by the services department, and, probably, bribes were paid; That these contracts provided for huge amounts; That the services department managed these contracts abroad; That when the declarant was a Director, the Services Director was RENATO DUQUE, appointed with JOSÉ DIRCEU; That RENATO DUQUE or his wife was JOSÉ DIRCEU's relative; That RENATO DUQUE left Petrobras in 2012, together with the declarant, in April; That RICHARD OLM replaced RENATO DUQUE in April 27, 2012; That OLM, due to health issues, was replaced by JOSÉ ANTÔNIO DE FIGUEIREDO in May, 2012, who holds the position to date; That the most important contracts of all Petrobras's departments mentioned were performed by the same big companies, as there were no other companies that were able to perform the contract inside the national territory. That from Petrobras's departments, he can affirm, the Directors of the services, international and supply departments surely knew about the cartelization process; That the these Directors knew and participated in the process, and received bribes; THAT, the President of Petrobras probably knew about it, but the declarant cannot assure that it was a reality as he had never discussed such issue with JOSE EDUARDO DUTRA, SÉRGIO GABRIELLI and GRAÇA FOSTER, presidents of the state-owned company while working there; THAT, in fact he knew he should "help" PP since he was appointed to the Supply Department, as stated by JOSE JANENE but, only later, around 2005, he learned about the cartelization system and transfers to political parties; THAT he can affirm that in all bidding processes in which the big contractors participated there was cartelization and manipulation of the result of the bidding processes; THAT, asked about how the companies that formed the cartel knew that the bid, even overpriced by 3%, would be within a competitive margin, he affirmed that some costs reference sources from PETROBRAS and from the companies were the same; So it would lead to an estimation for the base budget of each work; THAT, he wishes to add that he has no information on the leakage of information concerning the base budgets of bidding processes of the



# FEDERAL POLICE
## REGIONAL SUPERINTENDENCY OF THE STATE OF PARANÁ
### DRCOR - Delegacia Regional de Combate ao Crime Organizado (Regional Police Department for Fighting Organized Crime)
DELEFIN - Delegacia de Repressão a Crimes Financeiros e Desvios de
Recursos Públicos (Police Department for Repression of Financial Crimes and Misappropriation of Public Funds)

company; THAT, regarding the existence of a system of frauds in bidding processes such as the one that existed in PETROBRAS in works managed by other state-owned companies, he says he cannot affirm anything, he only assumes that the system was applied to all the bidding processes in which this small group of companies participated; THAT, asked about how the link between contractors and PETROBRAS took place, he says that, as explained in details in previous instruments, the people involved in this activity were: JOAO VACCARI NETO and RENATO DUQUE (PT), JOSE JANENE, ALBERTO YOUSSEFF and HENRI HOYER (PP), FERNANDO SOARES (FERNANDO BAIANO), JORGE ZELLADA and NESTOR CERVERO (PMDB). There being nothing else to be recorded, this instrument is considered closed, and after read and agreed, it will be signed by all involved and sealed in envelopes with Federal Police standard seals number 10555 and 10556.

POLICE AUTHORITY:

**Eduardo Mauat da Silva**

DECLARANT:

**Paulo Roberto Costa**

LAWYER:

**Luiz Henrique Vieira**

FEDERAL PROSECUTOR:

**Diogo Castor de Mattos**

WITNESS:

**APF Rodrigo Prado Pereira**

**The unauthorized dissemination of the information contained herein characterizes breach of confidentiality defined in article 325 of the Brazilian Penal Code.**
**Penalty: imprisonment for 2 (two) to six (6) years and a fine.**

**Making the interception of telephone, information technology or telematic communications, or violating the secrecy of legal proceedings, without judicial authorization or with objectives unauthorized by law is considered a crime, pursuant to art. 10 of Law 9296/96. Penalty: Imprisonment for two to four years and a fine.**

# EXHIBIT 27

1

CONFIDENTIAL - OCTAVIO LAVOCAT CINTRA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In Re: | : | |
| | : | CASE NO. |
| PETROBRAS SECURITIES LITIGATION | : | 14-CV-9662 |
| | : | |
| This Document Applies to:  All | : | |
| Cases | : | |

Transcript of the videotaped deposition of

OCTAVIO LAVOCAT CINTRA, called for Oral

Examination in the above-captioned matter, said

deposition taken by and before SILVIA P. WAGE, a

Certified Shorthand Reporter, Certified Realtime

Reporter, Registered Professional Reporter, and

Notary Public for the State of New Jersey, New

York, Pennsylvania and Delaware, at the offices

of CLEARY GOTTLIEB STEEN & HAMILTON LLP, One

Liberty Plaza, 31st Floor, New York, New York, on

Friday, April 29, 2016, commencing at 10:14 a.m.

JOB NO. 12437

HUDSON REPORTING & VIDEO                 1-800-310-1769

```
 1            CONFIDENTIAL - OCTAVIO LAVOCAT CINTRA
 2    project as well.
 3            Q.  And so how long did you meet with
 4    Mr. Bittar?
 5            A.  I don't know, maybe an hour.  It
 6    wasn't long.
 7            Q.  And tell me everything you recall as
 8    to what was discussed during that meeting.
 9            A.  I was in an office with walls in, you
10    know, in wood.  We sat in the small table.  It
11    wasn't a large table.  The door were open.  I
12    could see his assistant.  It's -- is that what
13    you want, right?
14            Q.  Uh-huh.  So what did you and
15    Mr. Bittar talk about?
16            A.  About my concerns about possible
17    wrongdoings going on in this acquisition.
18            Q.  And can you be more specific about
19    what you mean by the "wrongdoings going on in
20    this acquisition" that you spoke about with
21    Mr. Bittar?
22            A.  Okay, alright.  I strongly disagree,
23    right, with the price were talked, right.  I
24    haven't seen any offer, any paper.  But, you
25    know, it is confidential, all those negotiations
```

1           CONFIDENTIAL - OCTAVIO LAVOCAT CINTRA

2     are confidential, but, you know, people would

3     start talking, you know, by, you know, hazard,

4     you know, they leak by, you know, by chance.

5           And I got aware that the figures were

6     around, right.  I cannot tell you that I heard at

7     that time it was 306 million, but it was roughly

8     numbers around the 350 to 400.

9           Q.  And why did you go have a meeting

10    with Mr. Bittar?

11          MS. VICENS:  Objection, asked and

12    answered.

13          A.  Because Mr. Araujo had, you know,

14    asked me to go to tell him what I've told him.

15          Q.  But you, ultimately, went to that

16    meeting and told him what you told him.

17          And I'm trying to understand --

18          A.  Just the facts.

19          Q.  -- is the reason because Mr. Araujo

20    asked you to go to that meeting or is there some

21    other reason in addition to that?

22          MS. VICENS:  Objection, asked and

23    answered.

24          A.  Everything I was doing and everything

25    I've done I thought was on a way to preserve

```
 1          CONFIDENTIAL - OCTAVIO LAVOCAT CINTRA

 2     Petrobras, the company, prevent Petrobras from

 3     doing anything, you know, bad to the company.

 4     And I thought that was my opinion was bad and,

 5     you know, something was wrong going on and, you

 6     know, I wanted -- you know, if you have

 7     suspicion, right, I think, you have the

 8     obligation to do that, right.

 9          Q.  I couldn't agree more.

10          But my question for you is, why

11     Mr. Bittar, did you expect Mr. Bittar to do

12     something?

13          MS. VICENS:  Objection, form.

14          A.  Okay.  Mr. Bittar asked me if I

15     wanted to talk to Mr. Gabrielli.

16          You want to talk Mr. Gabrielli what you

17     just told me?

18          I said, no.

19          Q.  I'm sorry.  Specifically, what did

20     Mr. Bittar and you talk about with respect to

21     Mr. Gabrielli?

22          A.  Well, I had suspicions there was, you

23     know, something wrong with acquisition.  As I

24     explained, I strongly disagreed with the figures.

25     I -- I -- what do you say?  I disagreed with the
```

```
 1            CONFIDENTIAL - OCTAVIO LAVOCAT CINTRA
 2     figures.  I thought it wouldn't -- it would not
 3     fit our strategy plan, so things that I've
 4     explained to Mr. Bertani, right.  And I thought,
 5     you know, because -- why talking to someone from
 6     Labor Party?  Because I thought they were, you
 7     know, good guys, right.  And then maybe there's
 8     something wrong they should know because the
 9     managers were appointed by them, right, the top
10     manager like board, executive board, and I think
11     they should be aware, you know because --
12            Q.  Go ahead.
13            A.  Yeah, because, you know, they
14     probably something was wrong and they were not
15     aware and they should be aware.  And I think was
16     my obligation to bring to the knowledge, right.
17            Q.  Mr. Cintra, in that case, why didn't
18     you contact Mr. Gabrielli directly?
19            MR. BAILEY:  Objection.
20            MS. VICENS:  Objection, form.
21            A.  First, I was, let's say, lower
22     management.  I was a former lower manager, right,
23     very far from Mr. Gabrielli, right, in the
24     hierarchy of the company.  And I think, you know,
25     I didn't want to get so much involved, right.  I
```

122

1          CONFIDENTIAL - OCTAVIO LAVOCAT CINTRA

2     just wanted to help.

3          Q.  When you met with Mr. Bittar, did you

4     ask Mr. Bittar to contact Mr. Gabrielli?

5          A.  No.

6          Q.  Did Mr. Bittar offer to contact

7     Mr. Gabrielli?

8          A.  Offered to led me -- to lead me --

9     bring me to Gabrielli, yes.

10          Q.  To arrange a meeting --

11          A.  Yes.

12          Q.  -- between you and Mr. Gabrielli?

13          A.  Yeah, yeah.

14          Q.  And what was your response?

15          A.  No.  I feel comfortable.  I think

16     I've done my, you know, my part.  It's up to you

17     now and go ahead and do the diligence that you

18     think should be done.  You --

19          MS. VICENS:  Sorry, sorry.

20     I think he said, I don't feel comfortable.

21          MR. KEHOE:  That's what he said.

22     We're on the same page.

23          Q.  Did you have an understanding as you

24     left that meeting -- strike that.  Let me ask a

25     different question.

1           CONFIDENTIAL - OCTAVIO LAVOCAT CINTRA

2               Did you anticipate when you left that

3      meeting that Mr. Bittar would follow up with

4      Mr. Gabrielli?

5           A.  I don't know.  I did not have idea --

6               MS. VICENS:  Objection, calls for

7      speculation.

8           A.  I did not have idea that who would be

9      talking to, you know.  Because he asked me the

10     question, if I knew Mr. Gabrielli, for instance.

11     Do you know Mr. Gabrielli?

12          I've seen him maybe twice, once, twice.

13          What's your opinion about him, he asked

14     me.

15          I have -- at that time, you know, I cannot

16     make, you know, assessment of Mr. Gabrielli from

17     one meeting or two meetings.  What I can tell you

18     that, you know, he understood very -- from my

19     point of view -- well how the, you know, the

20     company worked because Mr. Gabrielli came from

21     academy.

22          (There is a discussion in Portuguese off the

23     record.)

24          A.  Scholar, he was a scholar.

25               THE INTERPRETER:  Yeah, he has

124

1          CONFIDENTIAL - OCTAVIO LAVOCAT CINTRA

2     academic background.

3          A.  Yeah, he has, you know, Ph.D. here in

4     the United States, right, in economics, but he

5     never worked for a corporation, right.

6          And I said, you know, he was smart enough

7     to understand, I think, or be well supported or

8     get, you know, enough assistance.  It was running

9     well, I mean, in financing aspects, right.  He

10    just had turned president I don't know exactly

11    when, but he was not for long time, right.

12         Q.  Yes, sir.  You knew he was a member

13    of the PT?

14         A.  Member of PT?  Yes, I think -- I

15    think -- well, how would I say?  Affiliated PT,

16    you know, I mean -- how can I...

17         I presumed he was, right.  I presumed he

18    was.

19         Q.  And Mr. Bittar was a member of the

20    PT?

21         A.  Yeah, of course.  He was a

22    congressman for PT.

23         Q.  For PT.  And I think we've

24    established this.

25         President Dilma was a member of PT?

125

1        CONFIDENTIAL - OCTAVIO LAVOCAT CINTRA

2             A.   Dilma at the time was Casa Sea/view

3        (phonetic), right.  Casa Sea/view (phonetic), is

4        it Chief of Staff?

5             THE INTERPRETER:  Chief of Staff.

6             Q.   For President Lulu?

7             A.   President Lulu, right.

8             Q.   Who was with the PT?

9             A.   Yeah, right.

10            Q.   This article goes on Page three of 5,

11       the second bold line, and there's a paragraph

12       there.  The English version, it begins, "How do

13       you know that the then Minister Dilma was

14       alerted?"  And there's a response to that.

15            It goes on to indicate that Mr. Araujo

16       said to you attributing having brought the matter

17       to the attention of Gabrielli.

18            Do you see where I'm referring to, sir?

19            A.   Uh-huh, uh-huh.

20            Q.   Did Mr. Araujo tell you that?

21            MS. VICENS:  Objection, vague as to

22       time.

23            Q.   Did Mr. Araujo ever tell you that,

24       which is in this paragraph here?

25            A.   Well, I went back to Brazil in 2013

126

         CONFIDENTIAL - OCTAVIO LAVOCAT CINTRA

1    and I got divorced in 2013 and I had no, you

2    know, more opportunity to meet Mr. Araujo again.

3    And just by chance, I met him at the lobby of a

4    building like this one in Rio de Janeiro, which

5    has a lot of law firms, and was the same building

6    that Mr. Bittar had his representative office in

7    Rio where I had -- was the meeting -- the 2005

8    meeting was held, right.

9         Q.  Yes.

10        A.  And, just by chance, we met in the

11   lobby.  I was waiting in the elevator, he was

12   getting down, buh, buh, buh.  This was just days

13   after Mr. Paulo Roberto was arrested.  And we

14   chat.

15        At this moment, he comment that Bittar had

16   told him that my, let's say, concerns, messages,

17   whatever, were passed at that time to

18   Mr. Gabrielli and to the Chief of Staff.  He did

19   not mention Dilma.

20        Q.  By name?

21        A.  Right.

22        Q.  Well, did you assume when he --

23            MS. VICENS:  Objection, form.

24        Q.  Did you assume when he said the Chief

# SEPARATOR SHEET

129

```
 1          CONFIDENTIAL - OCTAVIO LAVOCAT CINTRA

 2          Q.  I'm sorry?

 3          A.  It says here, right, in the report,

 4    the journalist has written, half a dozen suspects

 5    are involved in this negotiation.  It was not the

 6    right term.

 7          Q.  Okay.

 8          A.  When we say half dozen, we are

 9    talking about -- in Portuguese, it's very common

10    to say, well, I thought it might be limit to half

11    a dozen people.  I wasn't pointing.  I have

12    suspicion that, you know, if anything -- you

13    know, I have suspicion some wrongdoing was going

14    on.  But, in my perception, my opinion was

15    limited to the people were in this project,

16    right.

17          Q.  Okay.  Other than that, what else in

18    these two --

19          A.  Ah, okay.  Well, I didn't say that

20    Bittar brought the subject to Chief of Staff and

21    President Gabrielli because I did not know at the

22    time.  I just learned by chance, as I explained

23    before, in 2014, much later on.

24          Q.  So later on you learned that, yes?

25          A.  Later on I've learned that it was
```

# EXHIBIT 28

Page 1

1

2              C O N F I D E N T I A L

3   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

4   ---------------------------------------

5   In Re PETROBRAS SECURITIES LITIGATION      Case No.

                                               14-cv-9662

6   This Document Applies to: All Cases

7   ---------------------------------------

8

                         February 16, 2016

9                        9:23 a.m.

10

11       Videotaped deposition of VENINA VELOSA

12   DA FONSECA, taken by Plaintiffs, pursuant to Notice,

13   held at the offices of Pomerantz LLP, 600 Third

14   Avenue, New York, New York, before Joseph R. Danyo,

15   a Shorthand Reporter and Notary Public within and

16   for the State of New York.

17

18

19

20

21

22

23

24

25

Page 28

                    da Fonseca - Confidential
1
2         A.    Yes.   CEO.
3         Q.    What did you do in connection with
4    preparing this document that you were asked to do?
5         A.    I prepared it and I submitted it.
6         Q.    Did you conduct an investigation in
7    connection with the preparation of the report?
8              MR. COOPER:  Objection to form.
9         A.    They conducted a superficial
10   investigation and within the investigation group
11   there were individuals from the auditing division,
12   from the legal department, from the supply
13   division.  I think that is it.  Actually there must
14   be more, but I don't remember.  So as a result of
15   the final report, they requested an investigation,
16   actually not an investigation, but research into
17   the hiring or contracting procedures of small
18   services that fell into my division which restricts
19   a bit the scope.  I created the committee.
20              So I created this committee which
21   conducted investigations and heard witnesses
22   including Geovane, and at the end they issued a
23   report, and after receiving the report I dismissed
24   Geovane and I sent the report to the divisions in
25   charge of continuing the investigation of the

Page 29

1                    da Fonseca - Confidential
2    companies.  The dismissal was based on two legal
3    opinions which said that even being off due to
4    health reasons you could be dismissed, but this
5    dismissal was not conducted.
6         Q.    Okay.  Let's go back first to the first
7    investigation.  You referred to that investigation
8    as a superficial one.  Two questions first.  Who is
9    they who conducted the superficial investigation?
10                MR. COOPER:  Objection to form.
11        A.    It was conducted by one of Gabrielli's
12   assistants.  He was the committee's coordinator.
13        Q.    Do you recall his or her name?
14        A.    No.
15        Q.    Would you be able to look during the
16   break to see if you can remember the name?
17        A.    Sure.
18        Q.    Anybody else other than this Gabrielli
19   assistant involved in the first superficial
20   investigation?
21                MR. COOPER:  Objection to form.
22        A.    No.  The person involved in the
23   investigation was Gabrielli's assistant.  Francisco
24   Pais from the supply division, he was the
25   officer -- supply division officer assistant.

Page 30

                    da Fonseca - Confidential

1

2          Q.    By that, do you mean Roberto Costa's

3    assistant?

4          A.    Correct.   There was a representative of

5    the legal department whose name I don't remember,

6    and also a representative of the auditing division

7    department.

8          Q.    Do you recall the representative from

9    the audit department's name?

10         A.    I already said that I did not.   No, I

11   did not.

12         Q.    Why do you refer to this investigation

13   as a superficial investigation?

14         A.    Due to the report's quality and by the

15   group of witnesses who testified, the testimony

16   provided was not in accordance with the report.

17         Q.    Can you explain that for me?

18         A.    During that committee two individuals

19   were heard.   One was the general manager, Jose

20   Roberto, and the other one was Augusto Nunez,

21   contracting manager.   I don't remember exactly if

22   Geovane was heard or not, but I believe he was not.

23         Q.    Why did you think hearing these two

24   witnesses was superficial?

25         A.    I think it is better that you ask again

Page 31

```
 1                 da Fonseca - Confidential
 2    because that question didn't make any sense to me.
 3         Q.    Okay.  I will try.  You said that this
 4    investigation that was called for by Gabrielli was
 5    superficial and you said that the report quality
 6    and the group of witnesses was superficial.  Why?
 7              MR. COOPER:  Objection to form.
 8         A.    Because it did not reflect exactly the
 9    evidence that we had in our hands, so they were not
10    appropriately investigated by or during this
11    committee.
12         Q.    What was the evidence you had in your
13    hands that was not reflected in this investigation
14    conducted by Gabrielli?
15              MR. COOPER:  Objection to form.
16         A.    Various different payments made without
17    any products linked to them.
18         Q.    Anything else?
19         A.    Basically everything that occurred, they
20    basically stayed with that case, but they did not
21    investigate the facts.
22         Q.    You said subsequent to the superficial
23    investigation, you conducted your own
24    investigation.  Correct?
25              MR. COOPER:  Objection to form.
```

# SEPARATOR SHEET

Page 88

1                    da Fonseca - Confidential

2          Q.    Did those executives include Gabrielli?

3          A.    No.

4          Q.    Do you know if Gabrielli received a copy

5     of the internal investigation reports prepared by

6     the investigation committee that you had put

7     together?

8          A.    I sent the report to the auditing

9     division.  There is a regulation that says that

10    they have to present the contents of the reports to

11    their superiors, and that case would be the board

12    of directors.  I'm not sure if they did that or

13    not.

14         Q.    Is the regulation that you just talked

15    about something Petrobras has in writing?

16               MR. COOPER:  Objection to form.

17         A.    I wouldn't know.

18         Q.    Is it just common practice that the

19    audit department would send the information they

20    have to the board of directors?

21               MR. COOPER:  Objection to form.

22         A.    No, because the auditing division is

23    connected to the board.  It is not connected to the

24    CEO of Petrobras.  This reality was in those days.

25    Now there is a lot of restructuring going on, so I

```
1                    da Fonseca - Confidential
2      don't know what they did with it.
3            Q.    Just so I understand your testimony, at
4      that time the audit committee was supposed to send
5      information to the board of directors or the board
6      of executive officers or both?
7                    MR. COOPER:  Objection to form.
8            A.    Board of directors.
9            Q.    Do you recall at the time who was on the
10     board of directors of Petrobras?
11           A.    I know that Dilma was.  The CEO
12     Gabrielli, ABR's president, who was Mr. Lima, and I
13     don't remember, there was one from the Brazilian
14     central bank, but I don't remember.
15           Q.    Let's now turn to the Abreu and Lima
16     refinery.  Can you describe for me the
17     irregularities you encountered when you were
18     employed at Petrobras in connection with the Abreu
19     de Lima refinery, and if you can, can you walk us
20     from the beginning so it is easy to understand what
21     happened?
22                    MR. COOPER:  Objection to form.
23           A.    Petrobras had signed an agreement with
24     Venezuela, and in those days Venezuela was
25     represented by Pedavesa.  This agreement had been
```