# EXHIBIT 29

 GROUP II – CLASS V – Plenary Session
TC 008.472/2008-3
Nature: Audit Investigation Report (Fiscobras 2008)
Entity: Petróleo Brasileiro S.A. – PETROBRAS
Interested Party: National Congress
Attorneys in the files: Nilton Antonio de Almeida Maia, OAB/RJ 67,460; Nelson Sá Gomes Ramalho, OAB/RJ 37,506; Alexandre Lorga Villar, OAB/RJ 139,078; Alexandre Rosa Botelho, OAB/SP 206,529; Aline Dias de Souza Mendes, OAB/RJ 141,708; Amilton Rodrigues Junior, OAB/MG 101,743; Ana Paula Mioni Acuy, OAB/RJ 107,126; Ana Silvia Lima Azevedo, OAB/MG 77,432; André Luis Fares Frances, OAB/RJ 66,211; Andrea Damiani Maia, OAB/RJ 113,985; Breno Gonçalves Arman, OAB/RJ 127,317; Carolina Bastos Lima, OAB/RJ 135,073; Claudia Padilha de Araujo Gomes, OAB/RJ 119,361; Cristiane Carvalho Monte Lage, OAB/RJ 94,802; Daniela Couto da Silva; OAB/RJ 115,470; Danieli Ribeiro Silva, OAB/RJ 127,133; Danielle Gama Bessa, OAB/RJ 115,408; Diogo Jorge Favacho dos Santos, OAB/RJ 114,256; Eduardo Valiante de Rezende, OAB/RJ 114,485; Elisaura Fernandes da Silva, OAB/RJ 138,329; Fábio Ribeiro Soares da Silva, OAB/RJ 131,412; Fernando de Sousa, OAB/RJ 35,895; Gustavo Dimitri de Souza Gonçalves, OAB/MG 80,338; Gustavo Henrique da Silva Marques, OAB/RJ 122,044; Gustavo Ribeiro Ferreira, OAB/RJ 104,339; Heloisa de Paula Batista Zorattini, OAB/RJ 149,195; Henrique da Silva Louro, OAB/RJ 114,792; Juliana de Hollanda Lima Quintela, OAB/RJ 131,414; Karina Drumond Martins, OAB/MG 98,568; Liana Ferreira Rocha Costa, OAB/RJ 112,943; Luciana de Lourdes e Castro, OAB/MG 85,422; Luis Carlos Nogueira Alves, OAB/RJ 121,230; Marcela Conrado de Farias Ribeiro, OAB/RJ 138,779; Márcio Polito Fontes, OAB/MG 79,903; Marcos de Oliveira Araújo, OAB/RJ 49,940; Monique Sá Freire Chagas, OAB/RJ 148,037; Nayra Rosa Marques, OAB/MG 103,884; Pedro Bastos de Souza, OAB/RJ 135,165; Raphaela Cristina de Magalhães Nascimento, OAB/RJ 129,398; Ricardo José da Rocha Silva, OAB/RJ 134,996; Tude José Cavalcante Brum de Oliveira, OAB/RJ 119,500; Vitor Thomé El Hader, OAB/RJ 103,466; Candido Ferreira da Cunha Lobo, OAB/RJ 49,659; Alexandre Yukito More, OAB/DF 22,742; Andréia Bambini, OAB/DF 18,331; Antônio Carlos Motta Lins, OAB/RJ 55,070; Ellen Cristiane Jorge, OAB/DF 19,821; Igor Vasconcelos Saldanha, OAB/DF 20,191; Joeny Gomide Santos, OAB/DF 15,085; Juliana Carneiro Martins de Menezes, OAB/DF 21,567; Lenoir de Souza Ramos, OAB/DF 3,492; Lívia Maria Morais Vasconcelos Saldanha, OAB/DF 21,035; Rafael de Matos Gomes da Silva, OAB/DF 21,567; Sílvia Alegretti, OAB/DF 19,920; Tales David Macedo, OAB/DF 20,227; Nelson Barreto Gomyde, OAB/SP 147,136; André de Almeida Barreto Tostes, OAB/DF 20,596;

 Bruno Henrique de Oliveira Ferreira, OAB/DF 15,345; Alexandre Aroeira Salles, OAB/DF 28,108; Nayron Sousa Russo, OAB/MG 106,011; Patrícia Guercio Teixeira, OAB/MG 90,459.

**Summary:** AUDIT INVESTIGATION. FISCOBRAS/2008. CONSTRUCTION WORK AT REFINARIA ABREU E LIMA, IN RECIFE-PE. PT 25.753.0288.1P650026 IN LOA 2008. SIGNS OF SERIOUS IRREGULARITIES. OVERPRICE AND OVERVALUATION. ADOPTION OF PREVENTIVE MEASURE AFTER PRIOR HEARING. WITHHOLDING PAYMENTS. POSSIBILITY TO CONTINUE THE WORK. HEARING. DETERMINATION. NOTIFICATION TO MIXED COMMISSION.

**REPORT**

This is the audit investigation report these files related to an audit investigation report for the audit carried out by Secob at the construction works of Refinaria Abreu e Lima, in Recife – PE, also known as Refinaria do Nordeste, with funds provided for under the terms in the 2008 Budget Law in the amount of R$ 389,775,448.00 under PT No. 25.753.0288.1P650026 and provided for in PPA 2008-2011, in the total amount of R$ 10,140,000,000.00.

2. At the time of the audit investigation, the technical entity identified twelve signs of irregularities with the following content, in short:

1) lack of registration of the contract with SIASG;
2) beginning of investment with term over one year with no inclusion into the Multi-Annual Plan 2003-2007;
3) deficiency in the basic project;
4) contract without bidding process for the basic project;
5) work contracted with bidding process without environmental license;
6) lack of unit and global price acceptability criteria in the invitation to bid;
8) advanced payments;
9) lack of amendment due to changes in the initially agreed upon conditions;
10) incomplete budget, without the composition of unit prices for each expected service;
11) overprice of R$ 81,558,706.86, corresponding to 19% of contracted prices (R$ 429,207,776.71);
12) overprice by the Measurement Bulletin 38 (period March to April 2008), R$ 71,969,885.59.

3. Considering above-mentioned irregularities, the irregularities applicable to the contract refer to the document executed by and between PETROBRAS and Consórcio Camargo Corrêa, Galvão Engenharia, Queiroz Galvão e Norberto Odebrecht, under No. 0800.0033808.07.2, which object is *"the execution of project design and earthwork services and supplemental services for drainage, street layout, and paving, to prepare the area destined for the construction and assembly of Refinaria do Nordeste."* The value in the contract, at initial prices, is R$ 429,207,776.71, base-date June 22, 2007.

4. In view of audit findings informed in this report on pages 519-624, the audit team prepared proposals to provide to the entity and to the Ministry of Planning,

 Budget and Management, to hear several managers of the state company and the adoption of preventive measure that determines to PETROBRÁS to:

*'A) proceed with full withholding, in future invoices under contract No. 0800.0033808.07.2, of the value of R$ 71,969,885.59, relative to values paid in excess under contract No. 0800.0033808.07.2, regarding payments under Measurement Bulletin 1 to Measurement Bulletin 38 by Petrobras, notifying this TCU about measures adopted. [FINDINGS 3.11 AND 3.12];*

*B) starting with Measurement Bulletin 38, not make payments for services under contract No. 0800.0033808.07.2 with unit prices higher than the ones listed in Exhibit I in this report, notifying this TCU about measures adopted. [FINDINGS 3.11 AND 3.12].'*

5. Considering the expressive amount of the possible value to be withheld, as well as the complex nature of the matter under discussion, I deemed to be recommendable to, prior to deciding about the adoption or not of the urgent measure, hear PETROBRAS and the consortium, under the terms in Article 276, § 2, in the Internal Rule.

6. Upon arranging the hearings and the filing of the comments of the parties to the files, Secob included its analysis on pages 923-961, which excerpts are embedded into this report, when needed to better understand this matter:

***"1. History***

*2. ...*

*3. ...*

*4. ...*

*5. ...*

*6. ...*

***2. Signs of overprice and overvaluation in the earthwork contract***

*7. Below, there is a brief description of the irregularities related to overprice and overvaluation, followed by comments presented by the state company and the consortium of construction companies.*

***2.1 Description of irregularities***

***2.1.1 Overprice** (item 3.11 in the report, pages 587-603 volume 2)*

*8. Overprice of R$ 81,558,706.86 was found in contract No. 0800.0033808.07.2 (total value of R$ 429,207,776.71), which object if the 'the execution of project design and earthwork services and supplemental services for drainage, street layout, and paving at Refinaria do Nordeste. The overprice in the contract was result of:*

*(i) BDI rate used in the contract equal to 35.37% over direct cost (declared by the audit team), when the rate deemed to be acceptable by the audit team was 27.48%, in analysis based in Decision 325-2007-TCU-PL;*

*(ii) direct cost of several services in the contract above reference market values, in analysis based on Sicro2 and Sinapi;*

*(iii) price of materials according to the contracted proposal higher than reference market values and/or effectively paid values;*

*(iv) hour and monthly cost of professionals according to the contracted proposal higher than reference market values and/or effectively paid values; and*

*(v) equipment cost according to contractor's estimate higher than reference market values.*

*9. The overprice identified in the report considered only the analysis referring to service prices (items 'i' and 'ii'). That is, using a BDI rate that is appropriate to the work (estimated at 27.48%) and direct cost of services based on market reference (Sicro2), we found market prices for the services, multiplied by the quantity contracted and*

*compared with contractual values. The table related to overprice is found on page 595 (volume 2).*

***2.1.2 Overvaluation*** *(item 3.12 in the report, pages 603-608 in volume 2)*

*10. Considering the total quantity executed in each item from Measurement Bulletin 01 (related to the period between 8/9/2007 and 9/25/2007) to Measurement Bulletin 38 (related to the period between 3/26/2008 and 4/25/2008) an overvaluation value of R$ 71,969,885.59 was calculated, and the total value paid by BM 38 was R$ 208,210,973.80. The table related to overvaluation is found in page 605 (volume 2).*

*11. It is important to note the analysis ran by the audit that ended up showing the existence of 'creative accounting' in the contract.*

*12. As seen in the report, two other irregularities of the work referred to defective basic project (pages 533-552 in volume 2) and the lack of acceptability criteria for maximum prices (unit and global) (pages 561-566 in volume 2).*

*13. Criteria used to classify the basic project as deficient include changes in the quantity of services 3.2, 4.15, and 5.1, that resulted in significant difference between values paid to the construction consortium, as seen in the table below (taken from the report, page 548 in volume 2), that considered quantities executed by Measurement Bulletin BM-38/April-2008.*

***Table 1** – Quantity differences*

| Item | Short Description | Estimate (R$ ) | Realized (R$ ) | Realized (%) | Balance (R$ ) |
|---|---|---|---|---|---|
| 3.2 | *ECT with DMT up to 4,500 m* | 18,792,510.00 | 6,338,320.96 | 33.80 | 12,414,669.04 |
| 4.15 | *Fiber-chemical drainage* | 1,435,200.00 | 8,283,385.16 | **577.16** | -6,848,185.16 |
| 5.1 | *Sand drainage* | 4,765,770.00 | 52,910,364.40 | **1,110.22** | -48,144,594.40 |

*14. Regarding services 4.15 and 5.1 the team said that (page 544 in volume 2):*

*'Only quantities executed for these two items, exceeding the contractual estimate, sum 12.8% of* ***addition to the contractual value (approximately R$ 55 million more) to date****, causing economic-financial unbalance in the contract, considering measured quantities. Note that the contract follows the execution model based on unit prices.' [Emphasis added].*

*15. Regarding the lack of criteria for price acceptability, several services were contracted with prices higher than market prices, resulting in a risk of creative accounting and global overprice of the contract.*

*16. Lastly, related to the overprice, the report indicated that (page 604 in volume 2):*

*'The total value paid by BM 38 (3/26/2008 – 4/25/2008) is known to be R$ 208,210,973.80.* ***If the contract execution ended with this BM, the least advantageous proposal for the management would have been the one arising out of the contract of this consortium, because all other proposals had lower values.*** *Therefore, creative accounting is used in the contract, in the sense that more expensive services are executed in the beginning of the contract, and the cheapest are left to the end of the contract.' [Emphasis added].*

***2.2 Hearing involved companies***

*17. The analysis of the hearings was structured in order that arguments by Petrobras and the consortium related to the same theme were grouped and each group was analyzed.*

*18. In general, arguments related to the inapplicability of the reference BDI and reference cost sources adopted and the reverse periculum in mora. The comments by Petrobras, in its entirety, are available on pages 670-694 (in volume 2) and by the consortium on pages 697-918 (in volume 3).*

*19. The following topics present a summary of the comments by Petrobras and the construction consortium, with joint analysis of arguments.*

 

***2.2.1 The inapplicability of the reference BDI***

***a) Arguments by Petrobras***

*20. The state company argues that the criteria adopted in the inspection report (market price based on an acceptable BDI of 27.84% and direct costs found based on Sicro2) are wrong and contrary to the case law by this Court. This statement by Petrobras is based on the 'non-obligation to apply the standard BDI and 'non-use of the Sicro2 table.'*

*21. The company claims that the overprice and overvaluation found in the audit report are based on acceptability by Petrobras of the contracted proposal with BDI higher than the value admitted as acceptable by Decision 325/2007-PL. The company argues that the imposition of a standard BDI as intended by the audit team is not supported by the legal system, and not even by the case law of the TCU.*

*22. The company mentions the conducting vote in Decision 325/2007-PL saying that the study was carried out with works on transmission lines and that the establishment of acceptability criteria is an attribution of the contractor and influenced by the project of each work. Additionally, the comment alerts that the formula to establish the BDI is surrounded by controversies in the doctrine and depends on different variations.*

*23. Petrobras also argues that (page 674 in volume 2):*

*'In this scenario, the adoption of a rigid, absolute, and uniform mean is a disfiguration of the BDI price composition process in real economy.*

*This Court of Accounts has recognized in different precedents that it is not possible to establish a standard BDI to be sued as proposal acceptability criterion. This is the conducting vote by Reporting Judge Marcos Bemquerer Costa in TC No. 006.754/2007-4 listed in Decision No. 2,469/2007:*

*'... I note that the TCU is not responsible for setting fixed percentages for each item comprising the BDI rate, ignoring the specificities of the management structure of each company contracting with Public Administration. The role of the Court of Accounts is to prevent that abusive or unjustified high values are paid and this is why it is important to find reference values, although due to the logistics of the companies, there will naturally be fluctuation of values in the estimate of indirect expenses and the profit margin to be found.'*

*24. Along the same line, the state company incudes excerpts of the Decisions Nos. 424/2008-PL and 2,382/2007-PL which deal with the need to comply with the characteristics of each contract work in the composition of the contractual BDI and the inappropriateness of reference values established in Decision 325/2007-PL to the construction works of the office building of the Labor Prosecution Office.*

*25. Lastly, the conclusion is that the BDI composition in the concrete case did not present excesses and that the 6.90% of profit used by the audit cannot be applied in an abstract way to every and any cost (the winning bidder's was 10%). Otherwise, this would represent an offense against the principle of free initiative provided for in the Federal Constitution.*

*26. The company also comments about the percentage adopted by the Central Administration (where, TCU analysis – 4.07% and winning proposal– 9.00%) (page 677 in volume 2):*

*'Regarding the Central Administration item. Especially because it is based on the wrong premise of adapting parameters from the Decision 325/2007 Plenary Session, the audit team adopted the mean percentage of 4.07%. As seen, as the use of the BDI from Decision 325/2007-PL prepared for transmission lines contracts is unfeasible for this contract, the application of this percentage is absurd for the central administration item.*

*Additionally, it would be absurd to believe that the company would interfere in the organization of private companies with which it intended to enter into contracts, imposing central administration costs. The management structure of each company, in the exercise of free will, shall organize its own central administration as intended. Obviously a better managed company, with less costs for central administration, will be able to, many times, presented a global price that is reduced compared to a company with an organization that is not effective or streamlined. But these distortions will influence prices presented in the bidding process, which will affect the final result.'*

***b) Arguments by the construction consortium***

*27. Initially, the bidder argues that a significant portion of overprice, approximately, R$ 34 million, is due to the proposed reduction in BDI.*

*28. The consortium notes that there is no rule determining what should and should not be included in the BDI, which is directly related to the contractual spreadsheet, even mentioning part of the 'Dnit Road Costs Manual.' Therefore, application of a generic BDI rate does not reflect the specificities of the contract work, or the company.*

*29. The consortium understands that this is the understanding of the TCU, citing excerpts of votes in Decisions Nos. 1,595/2006-PL, 1,017/2001-PL, which present comments in the sense that different works may have different BDI rates. Additionally, notes that the BDI discussed in Decision No. 325/2007-PL was used for transmission lines works.*

*30. The consortium notes that the Court, by means of Decisions 424/2008-PL and 1,551/2008-PL, recognized as legitimate the BDI rates that are different from the ones in Decision 325/2007-PL, and in the second decision, the rate taken as legitimate was equal to 40%.*

*31. The Consórcio Refinaria Abreu e Lima notes that reduction of the BDI rate is possible solely when there is unquestionable evidence of inadequacy, which is not the case in this case.*

*32. The* ***contractual BDI at 33.95%*** *(rate presented by the consortium) cannot be reduced without considering at least the specificities of the contract work. To evidence the 33.95% rate, construction companies send attached the detailed calculation (pages 889-900 in volume 3). Values used to evidence this rate are summarized in the table below:*

**Table 2** – *Statements of BDI and direct costs, including local administration (hearing the Consortium)*

| Description | Value | BDI | CD | Local Adm. |
|---|---|---|---|---|
| **Refinaria Abreu e Lima** | **421,953,776.73** | **106,946,850.33** | **222,512,403.07** | **92,494,523.33** |
| Civil works | 417,747,961.57 | 105,684,730.90 | 221,395,298.59 | 90,667,932.08 |
| Project | 4,205,815.16 | 1,262,119.43 | 1,117,104.48 | 1,826,591.25 |

CD: direct production cost

*33. Despite understanding the evidence of inapplicability of average percentage established in Decision 325/2007-PL, the consortium presents an analysis of each item in the contractual BDI:*

*34. (i) Profit: is related to the commercial and strategic structure of the company, but the audit team adopted an average percentage which is 6.90%. The percentage adopted by the audit is net and the contractual percentage of gross (10%). Considering the costs with the payment of taxes (IRPJ and CSLL) in the Secob percentage, the value reaches a percentage of 10.45%, which is higher than the contractual percentage.*

*35. Additionally, although TCU has removed these taxes from the BDI, this does not mean that these costs should not be considered by the companies in their proposals, according to the conducting vote in Decision 1,591/2008-PL. The consortium concludes noting that there was no legal prediction for the TCU, or any other entity, to determine or limit the profit percentage intended by the bidders, citing an excerpt from the report used as basis for Decision 325/2007-PL. The consortium provides several references with profit rate between 5-15%, noting that it looks for its legitimate economic interests, recognized including in the vote of the Decision 155/2006-PL.*

*36. (ii) Risks, guarantees, and insurances: the Consortium presented 1.50% referring to the contingency portion and 0.67% for insurances, in a total of 2.17%, thus, being compatible with the ones by the audit team.*

*37. (iii) Financial expenses: 0.50% portion compatible with the one by the audit team.*

*38. (iv) Taxes: all taxes will be paid according to legislation.*

*39. (v) Central administration: the consortium starts the argument noting that several factors may influence this item and present an excerpt from an opinion prepared by the National Association of Companies of Road Works that concludes that rates may vary between 9.5 and 19%. The consortium also presents an excerpt of the vote by the Reporting Judge in the Decision 2,641/2007-PL:*

*'Additionally, as well presented by Judge Marcos Bemquerer in Decision 2,641/2007 – Plenary Session, 'that the TCU is not responsible for setting fixed percentages for each item comprising the BDI rate, ignoring the specificities of the management structure of each company contracting with Public Administration. The role of the Court of Accounts is to prevent that abusive or unjustified high values are paid and this is why it is important to find reference values, although due to the logistics of the companies,*



*there will naturally be fluctuation of values in the estimate of indirect expenses and the profit margin to be found.'*

*40. (vi) Local administration: the consortium starts by presenting the concept of this item according to the Dnit Costs Manual that, according to this reference, the percentage of 2.5% should be adopted when costs involved are not detailed. Noting that in this case, costs are detailed in the DFP at: (i) local indirect labor; (ii) personnel food; (iii) expense with safety, environment, and health; (iv) personnel transportation; (v) facilities; and (vi) general expenses.*

*41. The consortium notes that the portions applicable to PPE, transportation, food, should not be part of the BDI, and should be accounted separately, or in the unit cost of services, according to Decision 325/2007-PL, as well as the Dnit Manual.*

*42. The consortium understands that the 2.5% adopted by Secob for local administration does not reflect the structure needed to execute the contract work. The consortium says that 2.5% over contract direct costs (R$ 312,063,230.67) result in approximately R$ 7.8 million, where only the food portion, which is one of the items for local administration, represents R$ 12,166,200.00. Another example noted by the consortium that would prove the insufficiency of the value for local administration found based on Sicro refers to Petrobras requirements, as one of the guidelines for health, related to the acquisition of health and dental care for direct and indirect labor, resulting in R$ 5,803,728.00, value that by itself corresponds to almost the entire value proposed by Secob for local administration.*

*c) Secob Analysis*

*43. The Road Costs Manual (Dnit 2003) indicates the need to consider additional costs for labor, aside from social fees, including, for instance the 1.12% over labor costs for PPEs, 4.79% for personnel transportation, 9.6% for food and 5% for manual tools.*

*44. Although the manual says that considering these costs only the last one (manual tools) is considered in the analytical composition (only when needed), this is not what we found. That is, the manual is outdated. This can be easily proved by comparing the compositions of Sicro in the state of Pernambuco. Note that by January 2007 'Adc.M.O. – Tools' was 0% or 5%, on the other hand, starting in March 2007 the percentage varied between 15.51% and 20.51%, which represents the sum of the above-mentioned additional labor costs (1.12% + 4.79% + 9.6% + 5%), and the 15.51% is used for services where there is no need to include the 5% related to the tools additional.*

*45. Note that* ***in the composition of unit cost used as reference by the audit team, expenses with transportation, food, and PPE were considered, although they were classified as 'Adc.M.O. – Tools'*** *(a. 15.51% or 20.5% depending on the service, as seen on pages 53-70 in Exhibit 10).*

*46. Therefore, while comprising the reference price for this work, not only costs with labor food was considered, but also costs with PPE, personnel transportation and manual tools. Note also that the values adopted a margin in favor of responsible parties, considering that the percentages 15.51% or 20.51% incurred over the cost of labor* ***including*** *social fees, and not prior to the incurrence of the latter[1]. Considering that the audit team analysis contemplated social fees equal to 151% (for those paid by the hour), the conclusion may be that the evaluation used in the audit report, conservatively, used percentage rates to estimate costs with labor add-ons higher than the double of those indicated by the Dnit costs system.*

*47. On the other hand, there are two aspects related to the BDI that need to*

---

[1] There is Decision indicating that the Sicro 2 percentages related to these costs should be applied over the labor cost, without social fees, as seen in the excerpt of Decision 1,592/2006 – Plenary Session, transcribed below:

*9.2.6. 'apply, in the composition of unit costs for services, percentages related to expenses with tools, transportation, food and Personal Protection Equipment – PPE that incur over the labor, without calculating social fees;'*

 *be further discussed: (i) the BDI rate in the contract was not 35.37% as seen in the audit report; and (ii) some specificities in this case are not included in the reference BDI.*

*48. The audit team calculated the contract BDI applying a formula different from the one effectively used in the contract, which resulted in a different rate. Although this fact does not affect results found in the report directly, it is important to correct that. Upon using the formula that is really used in the Price Formation Statement – DFP[2] (page 918 in volume 3) the percentage found is 33.87%[3]. The following notes are important: (i) the civil construction DFP was considered (since the project represents only 1% of the contractual value); and (ii) 4.50% for ISS, according to report by the bidding commission (page 468, Volume 2, Exhibit 2), and not 3.00%.*

*49. Therefore,* ***the BDI used in the contract, should be considered as 33.87%.***

*50. Additionally, note that the process includes 3 DFPs prepared by the consortium with different values, one with the initial proposals in the total value (project and civil construction) of R$ 433,543,208.80 (pages 402-418 in volume 2 in exhibit 2 and 902-918 in volume 3 in the principal, which was provided by the consortium at the hearing), a second one of R$ 421,953,776.72 (pages 461-477 in volume 2 in exhibit 2) and a third one of R$ 436,294,223.43 (pages 485-500 in volume 2 in exhibit 2).*

*51. We were not able to find in the process the DFP that resulted in the contractual value of R$ 429,207,776.71 (page 749 in volume 3). On the other hand, the Meeting Minutes AR-EAB-RNEST-029 (page 528 in volume 2 in exhibit 2) that the consortium should make adjustment in order that the final value of the proposal was comprised by DFP Project – R$ 4,205,815.16, DFP Civil Construction – R$ 417,747,961.56 and Additional Services – R$ 7,254,000.00. Summing these values, you find the contracted value.*

*52. Regarding the rate informed by the consortium de 33.95%, it should be noted that not all values of the contract were considered, because the analysis by the consortium presents the total value of R$ 421,953,776.72, lower than the contract value. Note that the consortium did not consider values related to item 9 in the unit price spreadsheet – 'Additional Services' (R$ 7,254,000.00).*

*53. Something that calls the attention in 'Table 2 – Statements of BDI and direct costs, including local administration (hearing the Consortium)', provided by the construction companies, is the excessive contribution of local administration and BDI in the formation of the total price of the contract. To reach the contract value using direct costs, it has to be multiplied by 1.9.*

*54. Note that the values provided by the consortium in said table are different from the ones in the DFP forwarded attached to the comments. Totals presented for civil work and project are the same in the DFP on pages 461-477 in volume 2, exhibit 2.*

*55. Upon clarifying this item, we now discuss specificities of this work that were not considered in the reference BDI.*

*56. Petrobras makes requirements that were not considered in the audit report, as the ones related to health and dental care for all the employees and dependents. Costs arising out of this requirements, according to the DFP provided by the consortium, are around R$ 5.8 million, representing 1.8% on direct cost. Therefore, it is appropriate to alter the percentage of the reference BDI related to Local Administration, to be 4.30% complementing also expenses with health (2.5% by Sicro, adopted by the audit team added with 1.8% referring to costs with health care).*

*57. Note that the unit price spreadsheet of the contract does not include a specific item for administration of the work, reason why the audit team chose to include percentage related to local administration in the composition of reference BDI, procedure maintained in this analysis.*

*58. Considering the new percentage adopted by local administration – 4.30% and adopted by the central administration– 4.07% note that there are 8.37% for reference BDI related to administration expenses. This percentage is little below 9% as informed by the consortium, as central administration in BDI composition.*

*59. The percentage rage for profit is not abusive, compared to the market. For instance, the range in the Decision 325/2007-PL, namely from 3.83 to 9.96%. Therefore, exceptionally, we adopt*

---

[2] BDI = {[(1 + Ac + Conting + Insurance) x (1 + Profit)]/(1 – Funding Costs – ISS – COFINS – PIS)} – 1

[3] BDI = {[(1 + 9% + 1.5% + 0.67%) x (1 + 10%)]/(1 – 0.50% – 4.50% – 3.00% – 0.65%)} – 1

*in the formation of the reference BDI the percentage of 10.00% adopted in the contract relative to gross profit.*

*60. Other items comprising the contracted BDI are within acceptable limits and shall be maintained.*

*61. Considering the arguments at the hearing and the analysis, we note that the reference BDI rate should be higher than the one adopted by the team. Find below new values for the reference BDI, comparing those to the percentages adopted by the consortium and in the audit report.*

*Table 3 – New BDI composition*

| Item | BDI | | |
|---|---|---|---|
| | Consortium | TCU | |
| | | Audit Report | New Composition |
| Contingencies | 1.50% | 1.50% | 1.50% |
| Financial expenses | 0.50% | 0.60% | 0.50% |
| Central administration | 9.00% | 4.07% | 4.07% |
| Local administration | - | 2.50% | 4.30% |
| Profit | 10.00% | 6.90% | 10.00% |
| ISS | 4.50% | 4.50% | 4.50% |
| COFINS | 3.00% | 3.00% | 3.00% |
| PIS | 0.65% | 0.65% | 0.65% |
| **BDI** | **33.87%** | **27.48%** | **33.26%** |

*Note: the formula adopted by the consortium presents slight divergence compared to the one in Decision 325/2007-PL*

*62. Considering the closeness of values between the new rate and the rate calculated by the consortium, the subjective character in the estimate of the reference BDI and in order to dismiss the discussion regarding the BDI percentage, we choose, in favor of responsible parties, to adopt as reference the rate adopted in the earthwork contract.*

*63. **Therefore, the reference BDI rate is now 33.87%**. The new tables relative to overprice and overvaluation are included in topic 3 hereunder – 'New estimate of overprice and overvaluation in the earthwork contract,' with changes arising out of the analysis of the hearing of the companies.*

***2.2.2 Inapplicability of Sicro2***

***a) Arguments by Petrobras***

*64. Regarding the inapplicability of Sicro2, although recognizing the importance of the cost reference system, the state company understands that this system is directly related to road works, and not to every work. Petrobras argues that the system manual advises to consider the specificities of the work, as location, natural, social, and logistic conditions.*

*65. Petrobras adds that Secob, in an operational audit report (TC 002.489/2002-4) 'concluded that there is not much statistic attention to the treatment of information collected by Dnit to create Sicro2'.*

*66. The company notes that there are specificities in land works in the oil industry that indicate the inapplicability of Sicro2, especially in works of Petrobras, which are carried out under very strict and specific conditions, for instance the requirement of labor qualification with quality, safety, environment, and health. On page 679 (volume 2), the company adds that:*

*'In fact, Sicro2 is totally unable to reflect works with technical requirements and standards that are completely different. The estimate cost of Sicro2 for earthwork to deploy a minor road is far from being comparable to the costs of an earthwork the size of the work carried out to deploy Refinaria Abreu e Lima. This would be the same as comparing two absolutely different objects. Carrying out this comparison will cause conflicts that will obviously lead to an improper imposition of overprice by the company.'*

 *67. Petrobras says that there are specificities in the earthwork for the Refinery that determine the inapplicability of Sicro2, additional to the volume of services of earth movement that may reach expressive 23 million cubic meters. The company continues saying that there was a detailed histogram study of the labor, equipment, logistics, and others, considering the need of hour/day shift from Monday to Saturday, a short term for performance, the need of a large equipment station and the national market warm-up, as well as other factors.*

*68. Other points raised that would make comparison with the Dnit cost system unviable are: the need of 20 million liters of for 600 equipment, representing 30 thousand liters of fuel, a day; need of a workshop station for the maintenance of equipment; requirement of health care plan for all employees and dependents, certified PPE, requirements of specific training, strict SMS requirements by PETROBRAS; need to have access roads and night lighting; execution and maintenance of provisional drainage network in area of approximately 518 hectares, with no additional costs to the company; installation of a worksite of approximately 5,000 m2, as well as electric network with approximately 3 km, cafeteria, leisure area, dressing room and respective sewage and water facilities; impacts relative to rains, constant and predictable in the area in the period between April and August, reason why the contracted company had to maintain approximately 1,000 direct and indirect employees and 350 equipment during the rainy season, with no additional costs to the contractor.*

*69. Thus (page 681 in volume 2):*

*'It is expected that this court reflects and evaluates some basic criteria determined in Decisions, regarding the indiscriminate applicability in any kind of work, using as reference Sinapi and Sicro2 Tables, without recognizing the specificities of different works in Commercial and Residential Buildings and Road works, to apply such tables.'*

*70. Regarding the list of services indicated as having overprice, the company says that Sicro2 would not reflect the reality of this work, because of:*

- *Landfill compaction services: Secob used the unit price of R$ 2.71/m³ in the table Sicro2, thus, disregarded the variations arising out of type of material, considering the price of landfill compaction of regular soils at 100% regular Proctor equal to the compaction of an area with soft soil and in contention dikes. Additionally, there was no consideration to the fact that Petrobras requires compaction at 100% regular Proctor, and not 95% which is accepted by Dnit, which leads to more hours of equipment use and consequently more costs;*
- *BSTC Casting (5.5) and BSTC Opening (5.6): no consideration to the fact that the services correspond to more than mere execution of the BTSC casting and opening, including mandatory services to excavate a ditch, landfill compaction, removal of waste material and/or importing material.*

*71. The state company claims the existence of technical inconsistencies in the report, considering (page 683 in volume 2):*

*'The price comparison chart 'ABC Curve – Contract' presented by the final report, is comprised by 41 items, out of which, 27 items adopted a reducing factor of 6.18% over the consortium price and the other 14 items adopted the unit price of Sicro2, without the appropriate considerations mentioned above.*

*First, it should be considered that the adoption of a reducing factor of 6.18% by the audit team was not accompanied by the appropriate technical justification.*

*If the spreadsheet prepared by the audit team of Secob was presented during the bidding process, it would be disqualified for non-compliance with percentage limitations presented in the invitation to bid, established to avoid creative accounting practices (for instance, prevent that the mobilization value was over 5% of the total estimate value in the spreadsheet, thus avoiding that the contracted company could obtain capital and have financial gains at the beginning of the work). ...'*

***b) Arguments by the construction consortium***

*72. The consortium argues that Sicro is unable to detect local and construction specificities, especially because this is a reference for road works, advising that the Dnit and technical literature recommend adapting compositions in order to allow*

*an effective and realistic cost estimate. The consortium also mentions Decisions 1,414/2003-PL and 255/2004-Second Chamber, that indicate the importance of considering the specificities of each work.*

*73. The consortium understands that there are requirements for the earthwork of the Refinery that are stricter than the ones applicable to road works, presenting a list of documents and technical rules that must be complied with. The consortium also notes the strict quality control aspects, as well as the industrial safety, hygiene and occupational medicine obligations required under the terms in the contract.*

*74. After reporting contract requirements, the consortium concludes that the differences compared to a road work are clear, influencing the service execution. For illustration purposes, the consortium of construction companies presents a table comparing parameters required by Petrobras with those required by Dnit (page 706 in volume 3), below:*

***Table 4** – Criteria to establish the service unit price (hearing the Consortium)*

| **Criteria** | **Parameters** | |
|---|---|---|
| | **Petrobras** | **Dnit** |
| | | |
| ***ITEM 4.06 – LANDFILL COMPACTING WITH 100% PN*** | | |
| | | |
| *Thickness of landfill layers* | *Thickness of landfill layers is 0.20 m measured prior to compaction, as described below:* | *Thickness of landfill layers is 0.30 m measured after compaction, as described below:* |
| | *Contract, Exhibit I, item 5.5.11* | *Technical Specification DNER-ES-282/97, Item 5.3.4* |
| *Preparation of compaction tests* | *Testes every 500 m³ of compacted soil* | *Performance of tests every 1,000 m³ of compacted soil* |
| | *Contract, Exhibit I, item 5.5.12 b* | *Technical specification DNER-ES-282/97, Item 7.1 a), b), c) and d)* |
| *Effects of the loss of term and productivity as consequence of rains* | *Contract, Item 4.34 Admits dilation of terms due to rains, but does not mention costs of effects of unproductivity due to rain.* | *Aspects related to rains are not considered in the composition of unit prices of SICRO. The guideline in the Road Costs Manual is 'to be considered at each budget'* |
| | *Rule N-0862. Item 4.1 – All services must be executed according to project documents, considering also the following factors: a) nature and formation of soil, b) rain regime, c) volume to be moved, d) distance of transportation.* | *Road Costs Manual Introduction to Vol. 4 Volume 1 and 2.1.2 Rains General Criteria Adopted to form Unit Prices in Earthwork and Paving* |
| *Service pathways, dust removal* | *'The Contracted Company must throw water on service pathway.* | *DNIT has special specification for pathways and considers excavation, primary coating, and drainage of service pathways as measurement object. Maintenance must be considered within constructor costs.* |
| | *Contract, Exhibit I, item 5.5.10* | *Service specification DNER-ES 279/97, items 8.2 and 8.3.* |

| | | |
|---|---|---|
| *Social Fees* | *Effective in the Earthwork contract for Refinaria Abreu e Lima 151%. Percentage higher than the one adopted by DNIT because of:* | *Social Fees DNIT around 126.30%* |
| | *Number of hours worked per day, approximately 30% higher than the quantity adopted by the DNIT Road Cost Manual to form percentages relative to items of Social Fees in Group B.* | |
| | *Average period of employees at the Earthwork 'site of the Refinery, lower than adopted by DNIT while calculating the fine for termination of employment work without just cause and indemnified prior notice. Work with great staff turnover in short period.* | |
| | *Nightshift considered in the formation of percentages of fees for the Earthwork Contract for the Refinery for Group B and not considered by DNIT in the formation of social fees. Work with very intense schedule compared to traditional road works.* | |
| | *Differences above affect the increase in item 'recurrence rates' Group D, increasing the difference between adopted percentages.* | |
| | *Spreadsheet showing Social Fees presented in the bidding process. Attached.* | *Road Costs Manual Introduction to Vol. 1, Item 4.1.2. Attached.* |
| *Medical and dental care plan extensive to dependents* | *Full cost of private health and dental care to all employees and dependents.* | *No terms and not required.* |
| | *Directions in SMS Contract, Item 13.24.2* | |
| *Excavation and compaction volumes provided in the current plan to be resumed after the winter, works of Refinery and BR-101 Batch 7.* | *Refinaria Abreu e Lima* | *Road BR-101* |
| | *To meet the challenging schedule, personnel and equipment must remain mobilized during the winter, at Constructor's costs.* | *Increased terms in the physical schedule allow the construction company to demobilize teams and equipment during the winter.* |
| | *September 1,960,005 m³* | *September 75,000 m³* |
| | *October 1,962,673 m³* | *October 180,000 m³* |
| | *November 1,974,055 m³* | *November 223,000 m³* |

 | | | |
|---|---|---|
| | *December 1,979,278 m³* | *December 262,000 m³* |
| | *January 2,030,452 m³* | *January 265,000 m³* |
| | | |
| ***ITEM 5.1 – SAND DRAIN*** | | |
| | | |
| *To form Unit Price for services to be executed in Sand Drain in the Earthwork Contract of the Refinery the following criteria were adopted, that are not included in the cost formation reference of SICRO for sand drain services in road works, or that are part of the composition of specific or supplemental unit prices.* | *- Sand loaded in the mine, including execution and maintenance of service pathway.* | |
| | *- Transportation of 70% of the sand volume between the mine area and the area of drains, as well as transportation of 20% of the sand volume for provisional storage areas, with average distance of 7.50 km.* | |
| | *- In the price formation, adoption that 30% of the sand volume for drains were transported from the mine to storage areas and later, after another loading and unloading, carried again for more 200 m between the storage areas and drain performance areas.* | |
| | *- Release, spreading and spreading sand for drains in areas with low resistance soils with influence on the water table or area with water from estuaries.* | |
| | *- Provision and execution of crushed stone drain involved with geotextile blanket, including excavation of ditches inside the sand drain, and filling ditches to recompose the sand drain.* | |
| | *- Prevision of deployment of the water table lowering system in areas with soft soil, after execution of the sand drain and crushed stone drain, allowing accommodation during the period of construction, with the following characteristics* | |
| | *1 Construction of pumping wells with concrete tubes, seated on the crushed stone drain and height corresponding to the thickness of the landfill in areas with soft soil.* | |
| | *2 Provision and installation of the set of hydraulic pumps in concrete tube wells, to control the water table during elevation of clay in soft soil areas.* | |
| | *3 Provision and installation of the power system to feed pumps comprised by cables, Circuit Switch, Control Board, and supports to distribute interconnection wires between generators in the pumping well.* | |
| | *4 Provision and installation of the hydraulic system with PVC PBA Pipes, interconnecting the pumping well and flowing the water upstream in soft soil areas.* | |
| | *5 Provision of power through generating groups with the appropriate voltage to feed the pumps during operation of the lowering and control of the water table (period of construction in clay) in soft soil areas.* | |
| | *6 Team for operation, maintenance, handling changes in the positions of lines in hydraulic pipes, and power feeding lines between generators and pumps, construction of concrete tube wells. Teams comprised by Service Operators, Electricians, Workers, Plumbers, Carpenters, and Helpers, as well as the use of munck truck, maintained 24 hours a day, during the construction in soft soil areas.* | |

 ***c) Secob Analysis***

*75. Initially, we note that the Refinery contract where the overprice/overvaluation was identified is essentially an earthwork contract, and there should be no argument that the references used were applied to items that are so specific to refineries that the reference sources cannot be used, provided that these are adapted if needed, and the audit team prepared adaptations in the Sicro compositions aiming to contemplate the work specificities.*

*76. Therefore, there are no grounds when the state company claims that using Sicro as reference for this work 'would be the same as comparing two absolutely different objects.' Such statement is even contrary to the contract executed between the interested parties, which includes many references to the specifications of Dnit or Dner (pages 769 and 770 in volume 3).*

*77. Note that the arguments provided by Petrobras about references adopted in the composition of direct costs were, in most part, analyzed when the responsible parties commented regarding the preliminary audit report, as seen in the excerpt transcribed below (pages 601 and 602 in volume 2):*

*'... object of the work is basically earthwork services, and the price reference used is from SICRO 2, in TCU is defined that price system SICRO 2 is the price reference to be used by public entities in case of road and earthwork works, as seen in Decisions 1,050/2003-TCU-Plenary Session, 267/2003-TCU-Plenary Session, 40/2003-TCU-Plenary Session and 1,379/2004-TCU-Plenary Session and Decision 417/2002-TCU-Plenary Session.*

*...*

*At this point, it is important to indicate a contradiction in the comment by Petrobras when, initially, the company defends that the DNIT prices reference are not applicable to this work. But afterwards, when the state company condemns application of the SINAPI price reference, it claims it adopts DNIT, EMOP, PINI and FGV references, and the first two references (DNIT and EMOP) include information about heavy civil construction works, addressed to large works, that are similar to the works in the oil industry and the contract work in question. As these DNIT references are nothing but the SICRO 2 price reference, the comment seems to claim that SICRO AND EMOP ARE APPLICABLE TO WORKS IN THE OIL INDUSTRY AND THE CONTRACT WORK IN QUESTION.*

*Regarding the 'inapplicability to use the SINAPI price reference,' the argument that this price reference is to be used only in building civil construction works is not accepted, after all. Within the scope of contract No. 0800.0033808.07.2, item 2.1 – 'Installation of the worksite, mobilization of personnel, tools, utilities, material, equipment and deployment of team and Control and Planning Systems, Quality System, SMS, and Asset Safety,' refers specifically to the construction of the worksite, a building civil construction work. Add to that the fact that the material, for instance the '18 annealed wire' will have the same price if used in this work or if used in a building construction work. Likewise, the labor, for instance: 'topography assistant' and 'topographer', both positions will have the same hourly fee if the measurement is done in this work or in a building construction work.*

*Thus, arguments presented by the manager, in its preliminary comments, cannot be accepted.'*

*78. Regarding statistic failures in Sicro2, these are not sufficient, in any event, to disqualify its use as cost reference. The TCU case law is clear about the use of this cost system as reference.*

*79. Even being a contract work that involve large volumes of earth movement, which implies additional difficulties, this argument is not sufficient to disqualify the use of Sicro2 as reference. There are road works that involve earthwork volumes in similar numbers, and even higher than the Refinery.*

*80. Additional costs arising out of the different working hours were considered by the audit, as the percentage of social fees adopted in the composition of the reference were 151%, the same adopted by the construction consortium. There is no justification to claims against the social fees rate adopted in the report. Although Sicro considers 126% as the percentage of social fees, indeed, considering the specificities of the earthwork at Refinaria Abreu e Lima, the team considered a social fee rate of 151% for man/hour and 85% for man/month, therefore, the same as those presented by the consortium. Thus, there are no grounds to make the Dnit cost system unfeasible*

*to be used as reference for this work.*

*81. The national market warm-up, that would cause price increase, cannot disqualify the cost system adopted as reference because Sicro is based on local and timely searches, that is, considers the prices at the intended location and time.*

*82. Regarding facilities needed to support the work, as power network, workshop for equipment and storage of the required fuel volume, note that the unit price spreadsheet provides for the installation of worksite and equipment mobilization, with a price estimate of over R$ 21 million (2.1 – Installation of the worksite, mobilization of personnel, tools, utilities, material, equipment and deployment of team and Control and Planning Systems, Quality System, SMS, and Asset Safety). Additionally, note item 5.3.1 in the Service Description Memory (Exhibit I to the contract), transcribed below (pages 774 and 775 in volume 3):*

*'5.3.1 The SUPPLIER shall be responsible for deployment of the worksite, including the provision of provisional installations to PETROBRAS, including:*

*...*

*g) Workshop;*

*h) Medical Office;*

*i) Telephone, power, hydraulic, and sanitary facilities in the worksite and service locations (daytime and nighttime);*

*j) Provision of drinking and raw water;*

*...*

*l) Provision of power;*

*...*

*p) Washing, maintenance, and storage areas for machinery and equipment;*

*...'*

*83. Arguments presented at the hearing are not sufficient to modify the understanding by this technical entity regarding the applicability of Sicro. Additionally,* ***Petrobras and the consortium did not provide the composition of unit costs for services****. Both parties seem to be reluctant to provide this information, as noted timely by the audit team (pages 580 and 581 in volume 2):*

***'There is no composition of unit price for none of the services in the contract No.*** *0800.0033808.07.2 (SAP 4600242271), which object is 'project design and execution of earthwork and supplemental drainage, street layout, and paving services at Refinaria do Nordeste.' The only document provided is the Price Formation Statement (DFP), which would be the total value of equipment, labor, and material in the contract as a whole, for Petrobras Estimate and the proposal by the contracted consortium.*

***Petrobras, even upon request, did not provide the unit price composition for each service*** *in the 'Petrobras Estimate Budget – Earthwork RENEST' and the budget proposed by the that was the winning bidder, as seen in communication 14-83/2008 in the notes by the Audit Team:*

*...*

*Note that the lack of the unit price composition for each service in the Petrobras Estimate Budget caused the lack of the unit price spreadsheet and consequently the lack of unit price acceptability criteria, as indicated in the finding named 'Inadequacy or non-existence of unit and global price acceptability criteria.' The lack of unit price acceptability criteria was one of the causes of overprice in different contracted services, as seen in the finding 'overprice.' [Emphasis added].*

*84. At the time, the team indicated the vast case law by this Court in the sense that Petrobras has an obligation to prepare analytical compositions (pages 581-583 in volume 2):*

*'Note that this issue has been discussed in the vote of Decision 549/2006-TCU-Plenary Session:*

*'... the requirement of detailed price estimate with the composition of unit costs, set forth in Article 7, § 2, item II, in Law No. 8,666/93, is not prejudicial to the performance of Petrobras in a competitive environment, because the detailed budget analysis is recommended in any private work, and much more reasonable in case of mixer-economy company, where*

 *public interest is unquestionable. ...*

*Even if the bidding regulation entitles Petrobras to negotiate with the winning bidder or successively, with other bidders, better contract conditions, the prior establishment of these negotiation parameters are not bureaucratic obstacles.*

*The lack of pre-defined criteria to select the most advantageous proposal violates basic principles of impersonality, isonomy, and objective judgment, set forth under the terms in Article 37, caput and item XXI, in CF/88, Article 3 in Law No. 8,666/93, and item 1.2 in Decree No. 2,745/98, and may also establish improper guidelines in the bidding processes.'*

*Decision No. 549/2006-TCU-Plenary Session (DOU 12/09/2005) set forth:*

*' ...*

*9.3. Order PETRÓLEO BRASILEIRO S.A., to:*

*9.3.1. present the Price Formation Statement (DFP) of all services provided for in the budget, with analytical composition of unit costs, detailing input (components) that comprise them, indicating for each input, the unit, the productivity coefficient, the consumption and unit cost, as well as the analytical composition in percentages and values of items comprising the Bonus and Indirect Expenses (BDI) of bidding processes Nos. 114.8.019.04-4, 114.8.007.03-5, 117.8.071.03-8, 117.8.015.03-6, 118.8.101.03-4, 118.8.070.03-9, 000.5.084.04-8, 117.8.020.03-8, 117.8.027.03-7, 114.8.008.03.8, and 117.8.082.03.6; (See Decision 549/2006-TCU-Plenary Session – Minutes 15. Reexamination request not granted.)'*

*While Decision 45/2006-TCU-Plenary Session (DOU 2/1/2006) sets forth:*

*'The Judges of the Federal Court of Accounts, meeting at Plenary Session, in view of reasons mentioned above by the Reporting Judge, AGREE:*

*...*

*9.2. order Petrobras to, while carrying out bidding processes for works and services, comply with the terms in Article 7 §2, item II and §4 in the same article in Law No. 8,666/93';*

*Note Decision 2,354/2006-TCU-Plenary Session (DOU 12/13/2006)*

*'...*

*9.1.2. according to the terms in Article 7, § 2, item II, and § 4, in Law No. 8,666/93, to improve the budget methodology used to calculate the estimate budget, especially in bidding processes for construction and assembly services for gas pipes, with attention to the distribution of direct and indirect costs in the Unit Cost Spreadsheets PPU, in order to indicate the costs of services to be executed, with quantifiable units using the basic project, without using the unit 'allowance – vb', unless under exceptional circumstances, which must be duly justified in the respective process;*

*...*

*9.1.5. considering the principle of objective judgment, under the terms in Article 3 in Law No. 8,666/93, to develop and make available in invitations to bid, models/standards for bidding companies to demonstrate their unit cost composition for items in the Unit Price Spreadsheets – PPU, for direct as well as for indirect costs, requiring that bidders duly fill in those spreadsheets;'*

*Also indicate Decision 2,385/2006-TCU-Plenary Session (DOU 12/13/2006)*

*'...*

*9.2. order Petrobras to:*

*9.2.1. only adopt bidding processes for engineering works and services when there is a detailed budget in spreadsheets that express the composition of unit costs, under the terms in Article 7, § 2, item II, /in Law No. 8,666/1993, avoiding what happened in this case, which budgets related to EPCI of PRA-1 did not meet these legal terms;'*

*85. Instead of just seeing failures in Sicro, to attempt to justify contracted prices, the responsible parties should present their own analytical compositions of unit costs.*

*86. Note the difficulty to evaluate services due to the low level of details in the description of services, exhibit I to the contract (774-785 in volume 3). This technical analysis of service costs considered only: Description Memory (774-785 in volume 3), Appropriateness of the Earthwork Project (pages 794-837, volume 4, exhibit 2) and Study on Landfills on Soft Soil for Refinaria Nordeste (pages 981-1009, volume 4, exhibit 2).*

*87. Regarding technical differences between services contracted by Dnit and by Petrobras,*

*again, the analysis is prejudiced by the lack of analytical compositions and limitations described in the previous paragraph. Yet, ungrounded arguments are clear as follows:*

*i) Although most cases of landfills in road works adopt as criterion the compaction at 95% regular Proctor Normal, Sicro provides for services that require compaction at 100% Proctor, and this is the model adopted by the audit team while composing the reference for the landfills of Refinaria Abreu e Lima (2 S 01 511 00 – Compaction of landfills at 100% regular Proctor, as seen on page 58 in exhibit 10). That is, the argument raised by the parties is ungrounded, in the sense of disqualifying the use of Sicro2 as reference for this service.*

*ii) On the other hand, we deem the argument by the party is relevant while considering lower productivity by the equipment in the case of compaction for contention dikes. Therefore, the cost reference was changed for this specific service (attached, page 967 in volume 4).*

*iii) In the case of arguments relative to BSTC, data in the files did not allow altering the understanding of the technical team. The state company provides documents attached to evidence the statements made along the comment, but fails to present details about what is part of the services '5.5 – BSTC Casting' and '5.6 – BSTC Opening'. The description memory of services (Exhibit I of the contract, pages 768-786 in volume 3) does not include conclusive mentions about it. On the other hand, the contract unit price spreadsheet (pages 787-790 in volume 3) in item '5 – Drainage execution' induces that excavation and backfilling services are paid separately, because there are specific items for them in the spreadsheet (5.10 – Excavation and 5.11 – Backfill).*

*88. Arguments related to lower productivity due to rain events should not be accepted, because no data was presented demonstrating the occurrence of exceptional rain in the region. Therefore, the position is maintained that the Dnit cost system provides some room for possible losses of productivity due to ordinary rain (for instance: Decisions 580/2002 – Second Chamber, 1,199/2004 – PL and 2,061/2006 – PL).*

*89. As reported while describing the irregularities, the procedure adopted in the overprice estimate was based on the comparison between contracted unit price and the market estimate price for the services (considering the BDI reference and the composition of direct costs for services based on Sicro2 or Sinapi).*

*90. Petrobras claims that 27 of the 41 services in the unit price spreadsheet adopted a reducing factor of 6.18% over the consortium price, with no technical justification.*

*91. The 6.18% figure arose out of the contractual BDI reduction made by the audit team. Considering that this analysis adopted the same BDI percentage as the contract, this reduction will be eliminated from new overprice/overvaluation estimate spreadsheets.*

*92. The following paragraphs present the analysis of specific arguments presented by the consortium of Refinaria Abreu e Lima related to the Landfill Compaction at 100% regular Proctor and Sand Drainage.*

*93. First, we note again that the analysis was prejudiced by the lack of analytical composition of the service cost by the parties.*

*94. Regarding Landfill Compaction, despite the relevance of the argument relative to differences between the thickness of landfill layers required in the Dnit reference and the Refinery work, this fact does not alter the reference composition cost, because while preparing the productivity of earthwork teams, Sicro has considered a landfill layer of 20 cm. That is, even if in the Dnit specification the 20 cm layer is required only in the last landfill layer, the analytical composition of costs considered the 20 cm thickness, the same one adopted in the earthwork of the Refinery. See the following image, taken from the Sicro2 Manual:*

**Figure 1** – Composition of compaction costs for landfills at 100% regular Proctor



| CODE [illegible] | | SERVICE: Compaction of landfills at 100% regular PROCTOR | | | | | | UNIT m3 |
|---|---|---|---|---|---|---|---|---|
| | INTERVENING VARIABLES | Unit | EQUIPMENT | | | | | |
| | | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | |
| a | SPREADING | | | | | | | |
| b | CAPACITY | 1 | | | | | 10,000 | |
| c | CONSUMPTION (QUANTITY) | l/m3 | | | | | 53 | |
| d | DISTANCE | m | 150 | 150 | 150 | | 5,000 | |
| e | SPACING | | | | | | | |
| f | THICKNESS | m | 0.20 | 0.20 | 0.20 | | | |
| g | [ILLEGIBLE] | | | | | | | |
| h | CONVERSION FACTOR | | | | | | | |
| i | EFFICIENCY FACTOR | | 0.83 | 0.83 | 0.83 | | 0.83 | |
| j | OPERATION WIDTH | m | 2.13 | 3.55 | | | | |
| l | OVERPOSITION WIDTH | m | 0.20 | 0.20 | | | | |
| m | USEFUL WIDTH | m | 1.93 | 3.35 | 2.45 | | | |
| n | NUMBER OF STEPS | | 6 | 6 | 6 | | | |
| o | DEPTH | | | | | | | |
| p | FIXED TIME (LOAD, UNLOAD, AND MANEUVER) | min | | | | | 40 | |
| q | JOURNEY TIME (ONE-WAY) | min | | | | | 10 | |
| r | RETURN TIME | min | | | | | 10 | |
| s | TOTAL CYCLE TIME | min | | | | | 60 | |
| t | AVERAGE SPEED (ONE-WAY) | m/min | 70 | 100 | 80 | | 505000 | |
| u | RETURN SPEED | m/min | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| NOTES SERVICE SPEC. DNER ES-282 | FORMULAS | | | | |
|---|---|---|---|---|---|
| | | | | | |
| HOUR PRODUCTION | 168 | 556 | 325 | 315 | 157 |
| NUMBER OF UNITS | 1 | 1 | 1 | 1 | 2 |
| OPERATION USE | 1.00 | 0.30 | 0.52 | 0.54 | 0.54 |
| UNPRODUCTIVE USE | 0.00 | 0.70 | 0.48 | 0.48 | 0.48 |
| TEAM PRODUCTION | 168 | 168 | 168 | 168 | 168 |
| MT/DNIT – National Department of Transportation Infrastructure Road Cost System – SICROS | | PRODUCTION OF MECHANIC TEAMS | | | |

*95. Regarding the compacted soil tests, we note that the tests mentioned by the party (item 7.1 in DNER-ES-282/97) are related to compacting tests carried out with the non-worked sample, that is, prior to material compaction. In this case, Petrobras' requirements for the Refinery are similar to Dnit's, performance of compaction tests every 1,000 m³ of material for the landfill body (according to line 'a', item 5.5.12 in the Description Memory, page 780 in volume 3). Additionally, these costs have been accounted for in the local administration of the work, contemplated in the reference BDI.*

*96. Regarding the need of water in the service pathways and the health care plans, these items are contemplated in the BDI, which, conservatively, considered the same percentage applied in the contract.*

*97. The composition used as reference for the Sand Drainage has considered the loading and transportation of sand. Additionally, the maintenance of service pathways is included in the work administration, and should not be accounted again.*

*98. On the other hand, we note that adjustments are needed in the reference composition for the Sand Drainage service, to better suit the work service, namely: alter the reference composition in sand extraction and add costs with material spreading. Thus, the unit costs for this service is R$ 23.55/m³ instead of R$ 19.28/m³ (see new composition attached, pages 968-970 in volume 4). Considering the reference BDI of 33.87%, the reference unit price of this item is R$ 31.53/m³.*

*99. There is great discrepancy between the unit price of these services set forth by the consortium and the proposal of other bidders. While the consortium set forth this service at R$ 176.51/m³, the average of other proposals was R$ 60.92/m³, with prices varying from R$ 20.98/m³ to R$ 104.24/m³ (pages*

 *372-395, volume 2, exhibit 2). Probably, the difference between the unit prices of the other bidders and the TCU is due to the use of cost relative to the input 'sand,' because the reference price of the TCU does not include the cost of this input because the sand is made available free of charge to the companies, as reported by the audit team (page 591 in volume 2):*

*'Note that the extracted sand used in service 5.1 – 'sand drains' has no cost for the consortium. SUAPE is increasing the depth of the port by means of drainage and the sand resulting from this drainage operation is made available free of charge to construction companies working at SUAPE.'*

*100. No sufficient elements were provided to evidence that the 'Sand Drain' service for the Refinery requires crushed stone drainage and prediction to lower the water table in the sand drain. Note also that: the service description memory does not mention these items, or the measurement criterion of the Sand Drain (page 769 in volume 3)[4], for services of this kind, the use of crushed stone drain and lowering of the water table are not always required; during the inspection by the audit team, these services were not being carried out; and the analytical composition of unit costs was not provided.*

***2.2.3 Regular bidding process and best price established in the bidding process***

***a) Arguments by Petrobras***

*101. The state company presents a brief report of facts, noting that the invitation to bid was issued for 10 companies, and that they received proposals from 5 companies and 1 consortium, and the consortium was classified as winner, for presenting the 'best price' compared to other items, being 5.32% below the company estimate. Yet, the Bidding Commission, under the terms in item 6.23 in Decree No. 2,745/1998, was able to get a discount to the proposal, resulting in the final value of R$ 429,207,776.72.*

***b) Arguments by the construction consortium***

*102. The consortium presents a brief report on the facts and the importance of this contract work. The consortium says that Petrobras invited 10 well-known companies to participate in the bidding process, and the proposal submitted by the consortium had the lowest price. Although this was the most advantageous proposal, the state company was able to negotiate a reduction in the contractual price, from R$ 433,543,208.80 (5.32% less than the Petrobras estimate, which was known by the consortium by means of the Secob report) to R$ 429,207,776.71.*

*103. Therefore (page 700 in volume 3):*

*'Considering the best price criterion established in the bidding process, the commission considered that the Consortium proposal presented the best price conditions and met the interests of Petrobras.'*

*104. Note that notwithstanding the regular bidding process, while competitiveness was guaranteed, as well as the choice of the most advantageous proposal, the audit team identified overprice due to the BDI rate and the direct cost of several services in the contract.*

*105. First, the party notes that the initial proposal was reduced in over R$ 4 million, certain that contractual terms would be maintained. Upon presenting a comparison table with values proposed by the bidders, the party advises that (page 701 in volume 3):*

*'Note that the difference between the Consortium proposal and the average of all proposals is approximately 37 (thirty-seven) million reais. And the difference between the Consortium and the second lowest proposal is 25 million reais, summing over 69 million when compared to the value proposed by Construbase.*

*Additional to the regular and competitive bidding process, another relevant fact that confirms the adequacy of the global price proposed by the Consortium is the Petrobras budget, which was prepared considering the complex nature and specificities of the contract work under analysis. It is important to note that Petrobras does not disclose the work budget.'*

*106. The party claims that it would not be fair to indicate overprice in a work with competitive bidding process, and notes that the TCU has understood that if the global price is*

[4] The prediction to perform drainage and crushed stone services and the water table lowering services in the 'Sand Drain' were not located in the reference documents or in the technical rules applicable to the Service Description Memorial (pages 769 and 770 in volume 3).



*adherent, unit prices could not cause prejudices to the treasury, according to the excerpt transcribed below (pages 707 and 708 in volume 3):*

*'30. With all due respect, it is not fair to indicate overprice in a work that was subject to competitive bidding process and prices over 25 million reais lower than the second lowest proposal, approximately 38 million reais lower than the average of other proposals, and almost 29 million lower than the cost estimate prepared by Petrobras.*

*31. In this context, it is important to explain that this Court of Accounts has understood that if the global price is according to the bidding process budget, unit prices for services cannot cause prejudice to the treasury, because the bidding processes are adjudicated according to the lowest global price.*

*32. In this sense, it is worth noting recent decisions by the Plenary Session of this Court of Accounts that corroborate the above-mentioned:*

*'DECISION No. 798/2008 – TCU – PLENARY SESSION*

*51. However, I do not accompany the proposal that determines the refund of payments in excess. This is because the Court has understood that the methodology to check possible overprice in administrative contracts must be grounded on changes that cause unbalance to the original economic-financial balance. This conclusion implies that the comparison of reference unit prices (market) with those in the contract must occur when quantity additions and reductions are identified, as well as inclusions and exclusions of items, due to illegitimate changes resulting from the lack of plan and compromising public disbursements, which most of the times are characterized by insufficiency of the original project, as seen in the introduction of this Vote.*

*DECISION No. 2,046/2008 – TCU – PLENARY SESSION*

*19. Regarding the occurrence of the event described in line 'b' in paragraph 13 (sign of overprice in proposals for Batches 2, 3, 4, 7, and 8), I understand differently from the technical entity. In this case, I follow the case law issued by this Court in Decisions 583/2003; 1,414/2003; 388/2004, and 2,137/2005, 1,767/2008, all in Plenary Session.*

*20. In these cases, the decision was that there is no overprice in specific services included in the unit price spreadsheets in the bidders' proposal as if global prices are within acceptable limits determined by the budget of bidding processes.'*

***c) Secob Analysis***

*107. The Court has presented the understanding that if the global price is fair, unit prices would not cause losses to the treasury. In this case, due to unit prices with overprice, the audit team identified global overprice in the contract. That is, the parties' claim is meaningless, because unit overprice was identified as well as the overprice over the global value of the contract. Additionally, creative accounting was also identified in the contract.*

*108. When the argument is that the consortium was contracted by means of a competitive bidding process, that resulted in 'best price,' for the contractor, it is essential to highlight two things:*

*i) the procedure that executed a contract for R$ 430 million was based on invitation, noting even more the need for Petrobras to meet a series of orders by this Court to comply with legal obligations, searching for better prices and the guarantee of greater transparency, as reported in this analysis ('present the Price Formation Statement (DFP) for all services provided for in the budget, with the analytical composition of unit costs'; 'while carrying out bidding processes for works and services, comply with the terms in Article 7 §2, item II and §4 in the same article in Law No. 8,666/93;' 'demonstrate their unit cost composition for items in the Unit Price Spreadsheets – PPU, for direct as well as for indirect costs;' 'only adopt bidding processes for engineering works and services when there is a detailed budget in spreadsheets that express the composition of unit costs, under the terms in Article 7, § 2, item II, in Law No. 8,666/1993');*

*ii) even within the universe of competition, a question is raised if there is real 'best price' for the contractor because due to, without limitation, lack of unit price acceptability criteria and deficiency of the basic project, there was contract of a unit price spreadsheet above market reference. Consequently, and considering the expressive changes to the quantities in the basic project, the audit team*

 *concluded that (page 604 in volume 2):*

*iii) The total value paid by BM 38 (3/26/2008 – 4/25/2008) is known to be R$ 208,210,973.80.* ***If the contract execution ended with this BM, <u>the least advantageous proposal</u> for the management would have been the one arising out of the contract of this consortium, because all other proposals had lower values.*** *Therefore, creative accounting is used in the contract, in the sense that more expensive services are executed in the beginning of the contract, and the cheapest are left to the end of the contract. [Emphasis added]*

*109. Other arguments contrary to the understanding of the parties are related to the use of invitation to a work as big as the earthwork of a refinery and the non-disclosure of the work base budget, which certainly prejudice the great competition in the bidding process. Note some portions of Law No. 8,666/93:*

*'Article 23. The bidding process models referred to in items I to III in the previous article will be determined according to the following limitations, considering the estimate contract value:*

***I – for engineering works and services:***

***a) competitive bidding – up to R$ 150,000.00 (one hundred and fifty thousand reais);***

*b) request for quotation – up to R$ 1,500,000.00 (one million and five hundred thousand reais);*

*c) invitation to bid – above R$ 1,500,000.00 (one million and five hundred thousand reias [sic]);*

*...*

*Article 40. The invitation to bid will contain in the preamble the order number in the annual series, the name of the interested entity and the sector, the model, the regime and type of bidding process, the mention that the process is to be governed by this Law, the location, date and time to submit the documents and the proposal, as well as to start opening the envelopes, and must indicate the following:*

*...*

*§ 2* ***The following are attached*** *and part of the invitation to bid:*

*...*

***II – estimate budget in spreadsheets with unit prices and quantities;***

*...'. [Emphasis added].*

*110. Note that none of the requirements above were complied with by the state company in the contracting of the consortium: the invitation to bid model to select the best proposal, and there was no estimate budget for the work with unit prices and quantities attached to the invitation.*

***<u>2.2.4 Transparency the Petrobras methodology</u>***

***<u>a) Arguments by the construction consortium</u>***

*111. The party notes that the methodology to present price spreadsheets required by Petrobras (DFP) provides transparency and makes inspection easier, as it allows individual viewing of all input and costs involved, being an effective instrument to evaluate the cost of the contract work.*

*112. After illustrating the use of the DFP, the construction consortium concludes that the budget criteria are according to the criteria set forth by the TCU and the Dnit.*

*113. Later, the consortium presents three tables (pages 711 and 713 in volume 3) comparing the unit costs of some input (equipment and material), comparing values in the contracted DFP with the values in Sicro2:*

***Table 5*** *– Comparison of material unit prices (hearing of the Consortium)*

| Code | Equipment | Operat | Unprod | Labor | Total | QTY DFP | PRICE DFP | PRICE SICRO | TOTAL DFP | TOTAL SICRO |
|---|---|---|---|---|---|---|---|---|---|---|
| Dfp | Hydraulic Excavator CAT 320 | 176.04 | | 6.60 | 182.64 | 990 | 32,875.20 | | 32,546,448 | |
| E063 Sicro2 | Hydraulic Excavator CAT 320 CL – with belt | 150.44 | 14.46 | | 164.90 | 990 | | 29,682.65 | | 29,385,822 |
| Dfp | Motor grader 135H | 162.49 | | 7.20 | 169.69 | 990 | 30,544.20 | | 30,238,758 | |
| E015 Sicro2 | Motor grader CAT 140H | 158.29 | 13.68 | | 171.97 | 990 | | 30,953.93 | | 30,644,395 |
| Dfp | Wheel loader | 159.49 | | 6.00 | 165.49 | 56 | 29,788.20 | | 1,668,139 | |
| E010 Sicro2 | Tire loader CAT 950H 3.3 m3 | 163.88 | 13.68 | | 177.56 | 56 | | 31,961.68 | | 1,789,854 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *Dfp* | *Backhoe* | | | | | *56* | | | | |
| *E011 Sicro2* | *Tire backhoe MF-86HF* | *64.46* | *13.68* | | *78.14* | *56* | | *14,065.34* | | *787,659* |
| *Dfp* | *Bulldozer D6M* | *159.32* | | *6.00* | *165.32* | *154* | *29,757.60* | | *4,582,670* | |
| *E002 Sicro2* | *Bulldozer CAT D6M – with blade* | *182.52* | *13.68* | | *196.20* | *154* | | *35,315.30* | | *5,438,556* |
| *Dfp* | *Compacter Hyster* | *177.41* | | *4.44* | *181.85* | *302.4* | *32,733.00* | | *9,898,459* | |
| *E056 Sicro2* | *Compacter Dynapac CT-262 – sheep foot* | *223.39* | *10.55* | | *233.94* | *302.4* | | *42,109.31* | | *12,733,855* |
| *Dfp* | *Tire tractor* | *61.03* | | *4.44* | *65.47* | *734.4* | *11,784.60* | | *8,654,610* | |
| *E007 Sicro2* | *Tractor MF 292/4* | *59.08* | *10.55* | | *69.63* | *734.4* | | *12,534.21* | | *9,205,124* |
| *Dfp* | *Disk grid* | *8.82* | | | | | | | | |
| *Sicro2* | | | | | | | | | | |
| *Dfp* | *Bucket truck 12m3* | *65.24* | | *4.44* | *69.68* | *4517.63* | *12,542.40* | | *56,661,92* | |
| *E404 Sicro2* | *Dumper MB 2423 K 10 m3* | *98.03* | *12.51* | | *110.50* | *4517.63* | | *19,900.40* | | *89,902,66* |
| *Dfp* | *Water truck 20,0000 L* | *76.67* | | *4.44* | *81.11* | *972* | *14,599.80* | | *14,191,00* | |
| *E421 Sicro2* | *Tank truck MB 2423 K 13,000 l* | *97.11* | *12.51* | | *109.62* | *972* | | *19,731.63* | | *19,179,16* |
| *Dfp* | *Supply truck* | *33.18* | | *4.44* | *37.62* | *181.44* | | | | |
| *Sicro2* | | | | | | *181.44* | | | | |
| *Dfp* | *Motoscraper* | *251.88* | | *7.20* | *259.08* | | *46,634.40* | | *46,634* | |
| *E005 Sicro2* | *Motoscraper CAT 621G* | *328.18* | *13.68* | | *341.86* | | | *61,534.12* | | *61,534* |
| *Dfp* | *Bulldozer D8* | *278.24* | | *6.00* | *284.24* | | *51,163.20* | | *51,163* | |
| *E014 Sicro2* | *Bulldozer D8R/RB w/ scarifier* | *325.60* | *13.68* | | *339.28* | | | *61,069.84* | | *61,070* |
| | | | | | | | | | *158,539,81* | *199,189,69* |

***Table 6** – Comparison of material unit prices (Consortium x SICRO) (hearing of the Consortium)*

| ***Material*** | ***Unit price DFP (final)*** | ***Unit price SICRO (material)*** | ***Unit price SICRO (transportation)*** | ***Unit price SICRO (final)*** |
|---|---|---|---|---|
| *Coarse sand* | *28.00* | *18.00* | *18.00* | *36.00* |
| *Board 1' x 12'* | *4.70* | *4.60* | *-* | *4.60* |
| *Concrete tube PAI D=0.8 m (CA1)* | *120.00* | *206.16* | *-* | *206.16* |
| *Porous concrete tube diameter 0.20 m* | *16.00* | *13.15* | *–* | |
| *Drilling bit set S12* | *1,718.91* | *1,640.10* | *-* | *1,640.10* |
| *Board 1' x 6'* | *2.35* | *3.26* | *-* | *3.26* |
| *Stem* | *386.10* | *762.97* | *-* | *762.97* |
| *Handle T45* | *565.07* | *491.40* | *-* | *491.40* |
| *Annealed wire* | *4.60* | *4.44* | *-* | *4.44* |

***Table 7** – Spreadsheet with quantities and differences of unit prices compared to SICRO prices hearing of the Consortium)*

| *Material* | *DFP Quantity* | *Difference unit price* | *Total difference* |
|---|---|---|---|
| *Board 1' x 12'* | *15,290.93* | *0.10* | *1,529.09* |
| *Porous concrete tube diameter 0.20 m* | *3,150.00* | *2.85* | *8,977.50* |
| *Drilling bits set S12* | *21.20* | *78.81* | *1,670.77* |
| *Handle T45* | *21.20* | *73.67* | *1,561.80* |
| *Annealed wire* | *30.00* | *0.16* | *4.80* |
| *Total* | | | *13,743.96* |

***b) Secob Analysis***

*114. Without discussing the importance of the Price Formation Statement (DFP) tool within Petrobras' contracts, based on the series of decisions and arguments presented, it is clear that the company lacks a budget methodology, especially in the sense of offering greater transparency to the price formation procedure.*

*115. It is important to highlight the difference of values found in documents attached by the consortium – contract (R$ 429,207,776.71, clause 5.1, page 749 in volume 3), Unit Price Spreadsheet (R$ 429,207,776.71, page 790 in volume 3), DFP (R$ 433,543,208.80, considering design and civil construction, pages 906 and 918 in volume 3) and table on page 890 in volume 3 (R$ 421,953,776.72).*

*116. There is unjustified resistance by the parties to present the analytical compositions of unit costs of the services. Based on information made available, it is not possible to determine the quantities in the DFP, an issue that could be minimized with the presentation of the compositions. There is even a proposal to submit the audit report instructing the consortium to present the analytical compositions (page 621 in volume 2):*

*'Hearing of Responsible Party: Consórcio Refinaria Abreu e Lima: 1) to comment, if intended, about the existence of overprice of, at least, R$ 71,969,885.59 by execution of contract No. 0800.0033808.07.2, referring to Measurement Bulletins 1 (related to the period 8/9/2007 to 9/25/2007) to 38 (related to the period 3/26/2008 to 4/25/2008), advising that the rate could result in refund of amounts paid in excess, due to:*

*...*

*2) if commenting, **the consortium must present the compositions of unit costs of all services** in contract No. 0800.0033808.07.2 (including amendments, if any), and must certify:*

*A) that compositions have appropriate and sufficient detailing for the analysis, indicating in detail the equipment, material, and labor used for each service;*

*B) the hourly fee for equipment and labor, as well as the input prices, documents that evidence compatibility with the market price;*

*C) that the use of coefficient, production factors different from the ones used in cost reference systems, for instance SINAPI, SICRO, and TCPO must also be object of justifications, as well as the use of materials, labor and equipment that are not included in these systems.*

*TERM FOR COMPLIANCE: 15 DAYS.' [Emphasis added].*

*117. In this sense, tables presented with unit costs for equipment and materials (Tables 5 to 7) budget by the consortium and the values presented by Sicro are less important, because there is no demonstration of how quantities in the DFP were found.*

*118. Additionally, the tables are prejudiced because of incoherencies among data, including:*

*i) in order to estimate the equipment values, using hourly fees in Sicro (Table 5), the party adopted a methodology that lacks technical grounds (page 711 in volume 3) 'The methodology used to form prices for Equipment was to consider for the Dnit*



*equipment values the sum of Operative and Unproductive values in the Sicro table ....' This method has no technical grounds, both values should not be summed, there is clear incoherence. The total hourly fee cost of an equipment is the sum of two figures. The first one is the operational hour cost multiplied by the operation use coefficient. The other is the unproductive cost multiplied by the unproductive use coefficient. The total hour cost of an equipment will never be represented by the mere sum of the operational and the unproductive hour value, according to the methodology adopted by the party. The conclusion is that, by acting this way, the defense did not calculate the equipment hour cost, but the cost of the equipment for two hours of operation, one in full production operation and the other unproductive. Therefore, there was increase to the reference prices presented by the company;*

*ii) the audit team analytical composition that includes the 'sand' input (page 68 in exhibit 10) costs with transportation were included, contrary to what the party claims. On the other hand, it is not correct to include the cost of commercial sand into the input, considered that the input is obtained at a mine close to the site, with no additional costs, as seen in the audit report (page 591 in volume 2).*

***2.2.5. The heavy fines imposed in the contract***

*a) Arguments by the construction consortium*

*119. The party notes that the heavy fines imposed by Petrobras in case of delays in the work influenced the formulation of the proposal, mentioning clause nine in the contract that establishes a 0.2% fine over the contract value, per delay day.*

*b) Secob Analysis*

*120. This argument per se should not be accepted. This is a sanction provided for in the law of bidding process and contracts and the percentage adopted by Petrobras is coherent with the practice adopted by other public administration entities.*

***2.2.6 Reverse periculum in mora and adoption of less expensive preventive measure***

*a) Arguments by Petrobras*

*121. The state company argues that eventual withholding of values will cause the work to stop, causing incalculable losses to Petrobras. As basis for such statement, the company presents a letter sent by the construction company consortium informing that eventual adoption of preventive measure would prevent continuing with the services.*

*122. Additionally, the party notes the importance of the work for Petrobras and for the region. Possible delay in the work would cause losses of US$ 16,000.00-18,000.00 per day.*

*123. Petrobras understands that the proposal of preventive measure should not be accepted, due to the lack of presumptions of fumus boni [sic] and periculum in mora, which was intended to be proven in the comment. The party also says that the reverse peculium in mora is characterized.*

*b) Arguments by the construction consortium*

*124. The party presents an excerpt of the vote contained in Decision 1,115/2007-PL advising that upon adoption of preventive measure there should be as little burden as possible to the contracted entities and advises that it has informed the contractor that it could only be linked to the contractual provision when strictly compliant with the conditions in the proposal and the current contract.*

***c) Secob Analysis***

*125. The relevance of the maintenance of the proposal of the preventive measure will be analyzed after a new estimate of overprice/overvaluation, considering analysis of the hearings, which is the next item in this opinion.*

***3. New estimate of overprice and overvaluation and evaluation of relevance of adopting preventive measure***

*126. The analysis of the hearing of the parties resulted in changes that need to be considered in the estimate of work market values, and consequently in a new estimate of overprice/overvaluation in the earthwork contract.*

*127. According to the methodology of price formation in the market for purposes of comparing contracted values, that is, preparation of cost analytical compositions and use of the reference BDI, deemed to be necessary to comprise the costs of other services that had not been evaluated in the audit report, in order to increase the sample.*

***3.1 Composition of unit costs for services that were not evaluated in the report***

*128. For purposes of increasing the sample of services analyzed, other four services were evaluated (compositions attached). These four services and the items evaluated before represent 82% of the contract (74% before). New services evaluated and their respective reference costs are listed in the table below.*

***Table 8** – New services evaluated*

| ***Item*** | ***Service Description*** | ***Unit*** | ***Minimum reference cost (R$)*** |
|---|---|---|---|
| *3.2* | *Excavation, loading, transportation, and spreading low resistance soil in disposal area, with DMT up to 5,000 m* | *m³* | *27.,70* |
| *4.5* | *Excavation, loading, transportation, spreading and compacting soil with 3rd class material in disposal area, with DMT up to 5,200 m* | *m³* | *38.90* |
| *6.2* | *Sub-base of graduate crushed stone, including maintenance of this layer until conclusion of services* | *m³* | *86.59* |
| *9.1* | *Additional demolition, geotechnical investigation, earthwork, drainage, paving, contention, concrete structures and foundation services not provided for in items 1 to 8 in this spreadsheet* | *allowance* | |

*129. For service '9.1 – Additional demolition, geotechnical investigation, earthwork, drainage, paving, contention, concrete structures and foundation services not provided for in items 1 to 8 in this spreadsheet' its inclusion in the unit price spreadsheet was deemed to be fully inappropriate. This service is a composition of several other costs included ion the unit price spreadsheet. It does not make sense to charge for them again. Additionally, there is no mention to 'Service Measurement Criteria' (Exhibit III in contract, pages 791-802 in volume 3).*

*130. This topic was subject to several comments by the audit team questioning the regular nature (see pages 540, 541, 550, 583, and 587 in volume 2), including:*

*'Regarding item 9 – 'Additional Service', sub-item 9.1 – 'Additional demolition, geotechnical investigation, earthwork, drainage, paving, contention, concrete structures and foundation services not provided for in items 1 to 8 in this spreadsheet', Petrobras claims that such contingency allowance is needed due to 'the magnitude and complex nature of the area to be worked,' to 'execute urgent services, avoiding the stoppage of the contract work.'*

*All services in sub-item 9.1 are included in the unit price spreadsheet – PPU. As the execution regime is based on unit price, there is no plausible justification to have a specific item for such purpose, with the unit 'allowance', and with no measurement criterion (Measurement Criteria: Exhibit III to contract 0800.033808.07.2). Services that exceed quantities in truly non-significant numbers could be executed, measured, and paid according to the items in the spreadsheet, with no possibility of compromising the execution of the contract work. Services with great scope should be object of contractual amendments.*

*In its clarification, Petrobras considers 'minimum' the 1.7% in item 9.1 regarding the contractual value. Note that this should be 2.1% considering only service items provided for in the PPU. The figure the manager names "minimum" corresponds to R$ 7,254,000.00 (seven million, two hundred and fifty-four thousand reais), which is not a "minimum" value. The manager is not entitled to this definition, because no public money is spendable, and should be taken care of, respecting rules and principles relative to Public Administration.'*

*131. Article 6, item VIII, line 'b', in Law 8,666/1993 sets forth that the work contracted for unit price is characterized by contracts based on 'fixed price of specific units.' The irregularity in item 9.1 – Additional services is evident.*

*132. Due to their nature, possible occurrences that may or may not occur in a work depend solely on the type of contract under which the work is executed. In a work based on global price, risks of unpredicted facts, with impacts on work cost, that must be borne by the constructor, are more relevant. Other contract models minimize these risks, especially when the consequent cost variation may be compensated otherwise.*

*133. In a contract work based on unit prices, variations upward or downward in the quantity of services are solved by measurement, that determine the effective quantities worked. Changes in input prices are compensated by the adjustment rate of invoices and, finally, new services that are not predicted initially in the invitations to bid, as the ones arising out of project changes, are subject to amendments with the inclusion of new prices in the contract.*

*134. In the case under analysis, the BDI established by the consortium, as well as the reference BDI, provides a 1.5% for contingencies. It is important to also note that the items comprising this service are included in the unit price spreadsheet and are subject to separate measurement.*

*135. As example of the TCU case law, we include below two excerpts of decisions issued by this Court on this matter:*

*'9.1.6.12. promote change to measurement units in different items that appear in the budget as allowance, considering that in several cases the measurement definition is perfectly viable, for instance items... (Decision 1,387/2006-PL).*

*12. Regarding the establishment of a provisional allowance in several contract works (sub-items 9.3 and 9.5), I confirm the Secex/BA proposal, considering that the matter is solved in TCU case law, including determinations addressed to CBTU (Decisions Nos. 930/2001, 1,302/2002, and 1,303/2002 and Decision No. 1,391/2004, all by this Plenary Session). (Conducting vote in Decision No. 2,065/2006-PL)*

*9.1. order the Local Government of Salvador to deploy, if it didn't, within thirty (30) days, from the date when the notification is received, under the terms in Article 71, item IX, in the Federal Constitution and 45 in Law No. 8,443/1992, the necessary measures in the sense of excluding or reallocating the provisional allowance in the service spreadsheets de related to Contracts No. SA-01, SA-03, and SA-04, due to lack of legal grounds for such prediction. (Decision 2,065/2006-PL)'*

***3.2 New estimate of overprice and overvaluation***

*136. The analysis of the hearing results in new estimate of overprice and overvaluation, due to changes to some premises adopted in the audit report. In short, changes made were:*

*i) new reference BDI, from 27.48% used by the audit team to 33.87%, the same percentage adopted by the consortium in the contract, adopted conservatively in the analysis;*

*ii) change to reference unit cost of two services (4.8 – Landfill compaction of contention dikes at 100% regular Proctor and 5.1 – Sand drains); and*

*iii) analysis of unit cost for four services that had not been evaluated, in order to increase the analyzed sample.*

*137. In the following pages, there are tables with the new estimates of overprice and overvaluation (up to Measurement Bulletin 38 – 4/25/2008).*

*138. Considering data in the table, we note that the* ***new estimate of overprice in the contract is approximately R$ 54 million****, where 18% related to evaluated items (that correspond to 82% of the contract) and 13% regarding the total value of the contract.*

*139. Note that the estimate total overprice was reduced (from R$ 81,558,706.86 para R$ 53,834,329.15), especially due to: (i) new reference BDI (increased in favor of the responsible parties); (ii) change to reference unit costs in two services (increased); and (iii) inclusion of four new services (that resulted in a decrease in overprice).*

*140.* ***The new estimate of overprice in the contract is approximately R$ 59 million*** *(considering up to Measurement Bulletin 38), where 50% regarding items evaluated (that correspond to 85% of the invoiced value by BM 38) and 28% regarding the total value of invoicing by BM 38.*

*141. With a behavior similar to overprice, the new estimate of overvaluation was decreased from R$ 71,969,885.59 to R$ 58,527,813.73.*

 *142. The value of the sign of overprice calculated by BM 38 is higher than the total estimated overprice, this is due to considerable differences between quantities provided in the unit price spreadsheet and what is executed. The position issued by the audit team regarding the concern relative to the possibility of intense variation in the quantity of some services, especially service 5.1 – Sand Drains, which quantity increased by 1,110%, where the estimate of overprice is 460% and the unit price set forth by the consortium is much higher to the other proposals.*

*143. After the new estimate of market values of the contract, and consequently overprice and overvaluation, we now evaluate the relevance of maintaining the proposed preventive measure.*

***3.3 Adoption of preventive measure***

*144. Initially, we note the materiality of contracted values, as well as of the signs of estimate overprice and overvaluation, the importance of the contract work for all the involved and the society as a whole and the possible risk of a stoppage at the Refinery works.*

*145. After these preliminary comments, we now analyze the relevance of adopting the preventive order object of the hearing of Petrobras and Consórcio Refinaria Abreu e Lima, according to the Order by the Reporting Judge, namely:*

*'10.1.1. order Petrobras to fully withhold in the future invoices of contract No. 0800.0033808.07.2, the amount of R$ 71,969,885.59, relative to amounts paid in excess under this contract, relative to the payment of Measurement Bulletin 01 to Measurement Bulletin 38 of Petrobras, informing the TCU about measures adopted [according to the signs of overprice in the audit findings 3.11 and 3.12, pages 587-608]; and*

*10.1.2. that starting with Measurement Bulletin 38, not make payments for services in contract No. 0800.0033808.07.02 with unit prices higher than the ones in exhibit I to the inspection report, informing the TCU about measures adopted [according to the signs of overprice in the audit findings 3.11 and 3.12, pages 587-608].'*

*146. Considering that in the audit as well as in this analysis the signs of overprice and overvaluation are proved, we now have one of the prerequisites to adopt the preventive order, 'fumus boni iuris'.*

*147. Now we evaluate the other requisite, 'periculum in mora'.*

*148. Regarding the proposal to withhold R$ 71,969,885.59 in future invoices, we note that after analyzing the hearing, the estimate overprice value for the period between BM 01 and BM 38 (8/9/2007 – 4/25/2008) was reduced to R$ 58,527,813.73, equivalent to 28% of the value invoiced by the analyzed BM (R$ 208 million, 49% of the estimate total for the contract).*

*149. Although the estimate value of overvaluation is reduced, there is still a significant amount of funds..*

*150. On the other hand, the current situation of the contract is no longer the same when the proposal of the preventive measure was made, considering that six (5) months have passed after Measurement Bulletin 38 (3/26/2008 – 4/25/2008).*

*151. According to Petrobras information, the estimate date to conclude the work is 5/31/2009 (considering the extension due to rain, see letter GAPRE-529/08, dated 11/10/08, pages 975-976 in volume 4), and there is a balance to be invoiced of R$ 145,469,116.96.*

*152. Note the closeness of the date expected for conclusion of the work and the great significance of the value of overvaluation estimated by BM 38 (R$ 59 million) relative to the balance to be invoiced (R$ 145 million). Therefore, there is a substantially increased risk that the construction consortium would stop the work.*

*153. Also note the comparison between the value to be withhold in this specific earthwork contract (R$ 59 million) and the total estimate investment of the refinery (around R$ 10 billion). The full withholding of the estimate overvaluation may compromise the schedule of the refinery as a whole.*

*154. In view of the above, the adoption of the preventive order is no longer deemed to be relevant as it requires withholding in future invoices of the amount paid in excess by Petrobras (item 10.1.1 in the Order), due to the existence of 'reverse periculum in mora.'*

*155. Considering that, until this analysis, the existence of overvaluation by BM 38 is evident, this process must be converted into a Special Account*

*Investigation – TCE. Therefore, after the broad defense and adversary system of responsible parties, should the irregularity still be evident, there will be possibility to have overvalued funds refunded, noting that no other possibility to recover the funds at the current phase of the contract work.*

*156. Regarding the proposal of preventive measure to determine that Petrobras should, hereinafter, not make payments of services with unit prices higher than estimated by Secob, the previously issued understanding by the technical entity is maintained, because there are no sufficient justifications to alter the audit understanding. Due to results found in this analysis, some changes to service reference prices were made, therefore, the upper limit of unit prices are the values in the overprice table in this document, and no longer the exhibit I to the inspection report.*

*157. In this case, as detailed by the audit team, payments that have not been made yet, there is 'periculum in mora,' because the delayed action by the Court may cause damages to the treasury.*

*158. Additional to converting the process into TCE, Secob determinations must be monitored in any preventive measure is adopted, and there should be new inspection in the refinery works for purposes of updating the estimate overprice amount, based on the latest measurement, to check the existence of contractual amendments and identify other parties responsible for the irregularities found in the contract, which are fundamental to file the TCE.*

***4 Conclusion***

*159. The conclusion is that the global value of the sign of overprice in the contract was reduced compared to what was calculated by the audit team. The new estimate of overprice corresponds to R$ 53,834,329.15, which is equivalent to 18% higher than the reference of the market of evaluated services (corresponding to 82% of the contract) and 13% of the overprice de compared to the total value of the contract.*

*160. The value of the estimate overvaluation by Measurement Bulletin 38 (4/25/08) was also reduced. The new estimate of overvaluation is R$ 58,527,813.73, equal to 50% relative to evaluated items (that correspond to 85% of the invoiced value by BM 38) and 28% compared to the total value of invoicing by BM 38.*

*161. Regarding the proposal of preventive measure object of the hearing of the companies, the same should be altered:*

*i) the proposal to withhold values paid in excess in future invoices is no longer appropriate due to the current estimate phase of the works.*

*ii) the proposal to determine Petrobras should, not make payments of services with unit prices higher than estimated by Secob is still appropriate. In face of results found with the analysis of the hearing, there were some changes to service reference prices were made, therefore, the upper limit of unit prices are the values in the overprice table in this document, and no longer the exhibit I to the inspection report.*

*162. Additionally: (i) there must be monitoring on the orders given by Secob if any preventive measure is adopted; (ii) this process should be converted into a TCE; and (iii) there should be new inspection in the works of the refinery for purposes of updating the estimate overvaluation, checking the existence of contractual amendments and identifying other parties responsible for the irregularities found in the contract.*

*163. In view of the proposal to convert this process into a TCE and the new inspection to update the estimate overvaluation value, at this stage of the process there is no need to have a hearing regarding irregularities 3.11 – Overprice and 3.12 – Overvaluation.*

**164. *The proposals of forwarding contained in the Audit Report that did not include the object of the hearing of the companies were not evaluated under this document, therefore, they should be maintained, proceeding only with minor changes in form and qualification of infringed legal rules.***

***5 Proposal of forwarding***

*165. In view of the above, we submit the files to be appreciated suggesting the forwarding, replacing the text on pages 609-624 in volume 2:*

*i) under the terms in Article 45 in Law No. 8,443/1992 and Article No. 276 in the Internal Rule of the TCU,*

*to **preventively** determine to Petrobras to abstain from making payments for remaining services under contract No. 0800.0033808.07.2 with unit prices higher than those indicated in the following table, until the Court finally deliberates on this matter:*

| Item | Service Description | Unit. | Unit Price |
|---|---|---|---|
| 4.2 | Landfill compaction in soft soil areas at 100% regular Proctor | $m^3$ | 2.85 |
| 4.6 | Landfill compaction at 100% regular Proctor | $m^3$ | 2.85 |
| 4.8 | Landfill compaction of contention dikes at 100% regular Proctor | $m^3$ | 3.19 |
| 4.9 | Compacting disposal material (clay and silty soils) | $m^3$ | 1.88 |
| 4.10 | Vegetable coverage slopes and edges, with Capim Sândalo grass | $m^2$ | 5.85 |
| 5.1 | Sand drainage | $m^3$ | 31.53 |
| 5.5 | BSTC body, 0.80 m diameter, including crib | m | 492.25 |
| 5.6 | BSTC mouth Ø 0.80 m | unit | 1,050.20 |
| 6.2 | Sub-base of graduate crushed stone, including maintenance of this layer until conclusion of services | $m^3$ | 115.92 |
| 6.3 | Gutter | m | 49.44 |
| 9.1 | Additional demolition, geotechnical investigation, earthwork, drainage, paving, contention, concrete structures and foundation services not provided for in items 1 to 8 in this spreadsheet | allowance | 0.00 |

*ii) Under the terms in Articles 12, II, and 47 in Law No. 8,443/92 and Article 252 in RI/TCU, convert the files into a Special Accounts Investigation, hereby authorizing Secob to adopt the inspection and/or diligences required to calculate the updated debt and identify the responsible parties.*

*iii) Determine to Secob to:*

*1) adopt monitoring of compliance with the preventive measure;*

*2) proceed to issue the summons of the following parties responsible for the overvaluation, without prejudice to other parties that may be identified after the inspection/diligence authorized above:*

*a) MARCO TULIO VIEIRA CARNEIRO (CPF: 375.043.127-20; Petrobras), TAIS MARIA DA FONSECA DINIZ (CPF: 013.434.366-21; Petrobras), and OTTO ROCHA SILVA (CPF: 625.709.277-91; Petrobras), for having prepared the 'Petrobras Estimate Budget – Earthwork RENEST';*

*b) LUIZ GERSZT (CPF: 231.097.007-78; Petrobras), for having checked the budget, and SERGIO DOS SANTOS ARANTES (CPF: 335.417.367-04; Manager of Cost and Term Estimates – SL/ECP – Petrobras/Engineering), for having approved the budget;*

*c) JORGE FERNANDES DE ABREU (president of the bidding commission No. 0322573.07-8, CPF: 548.951.467-15); ROGERIO HUNGERBUHLER LOPES (CPF: 335.230.457-20), SALOMAO DOUMIT BOUHAYA (CPF: 352.428.687-91), DEWTON SILVA CARVALHO (CPF: 580.942.106-72); PAULO CÉZAR FARAH MUNIZ (CPF: 528.388.467-87); and LUIS ALBERTO SPAGNOLO JUNIOR (CPF: 027.830.956-96), all members of the bidding commission No. 0322573.07-8;*

*d) CONSORCIO REFINARIA ABREU E LIMA (CNJP No. 08.966.717/001-02), represented by the leading company Construtora Norberto Odebrecht S.A. (CNPJ No. 15.102.288/0001-82), for having benefitted with improper profit.*

*iv) Determine the hearing, under the terms in Article 43, II, in Law No. 8,443/92, of Mr. JORGE FERNANDES DE ABREU (manager of contract RPQS-4501495403/SAP-R3 and president of the bidding commission No. 0322573.07-8, CPF: 548.951.467-15) to present justification reasons on the following items:*

*1) for having approved and deemed as sufficient the Basic Project prepared by PRODEC and having it forwarded to prepare Invitation to Bid No 3225733.07-8, when such project did not cover all the technical solutions for the work as accurately as needed, in non-compliance with Law No. 8,666/1993, Article 6, item IX*

*and Decree 2,745/1998, item 1.3;*

*2) for direct contract of the company PRODEC Consultoria para Decisão S/C Ltda., with no characterization of presumptions in Articles 24 and 25 in Law No. 8,666/1993 /and items 2.1, 2.2, and 2.3 in Decree No. 2,745/1998 and without exposure of reasons by the competent authority for Dismissal or Non-Enforceability of Bidding Process, under the terms in items 2.2 and 2.5 in the same Decree mentioned above, also infringing the terms in Article 37, XXI, in the Federal Constitution;*

*3) for the lack of determination of the acceptability criteria global maximum and minimum prices in the invitation to bid and the respective bidding process, in non-compliance with the terms in Article 40, item X, in Law No. 8,666/1993 and determinations by the TCU – Decisions 1,324/2005-TCU-Plenary Session, item 9.3.2 (DOU 9/12/2005), 2,354/2006-TCU-Plenary Session, item 9.1.6 (DOU 12/13/2006) and 87/2008-TCU-Plenary Session, item 9.5.2 (DOU 2/1/2008).*

*v) Determine the hearing, under the terms in Article 43, II, in Law No. 8,443/92, of ROGERIO HUNGERBUHLER LOPES (CPF: 335.230.457-20), SALOMAO DOUMIT BOUHAYA (CPF: 352.428.687-91), DEWTON SILVA CARVALHO (CPF: 580.942.106-72), and PAULO CÉZAR FARAH MUNIZ (CPF: 528.388.467-87), all members of the bidding commission No. 0322573.07-8, to present justification reasons on the following items:*

*1) for the lack of determination of the acceptability criteria global maximum and minimum prices in the invitation to bid and the respective bidding process, in non-compliance with the terms in Article 40, item X, in Law No. 8,666/1993 and determinations by the TCU – Decisions 1,324/2005-TCU-Plenary Session, item 9.3.2 (DOU 9/12/2005), 2,354/2006-TCU-Plenary Session, item 9.1.6 (DOU 12/13/2006) and 87/2008-TCU-Plenary Session, item 9.5.2 (DOU 2/1/2008).*

*vi) Determine the hearing, under the terms in Article. 43, II, in Law No. 8,443/92, of LUIS ALBERTO SPAGNOLO JUNIOR (inspector of contract RPQS-4501495403/SAP-R3 and member of the bidding commission No. 0322573.07-8, CPF: 027.830.956-96) to present justification reasons on the following items:*

*1) for having approved and deemed as sufficient the Basic Project prepared by PRODEC and having it forwarded to prepare Invitation to Bid No 3225733.07-8, when such project did not cover all the technical solutions for the work as accurately as needed, in non-compliance with Law No. 8,666/1993, Article 6, item IX and Decree 2,745/1998, item 1.3;*

*2) for the lack of determination of the acceptability criteria global maximum and minimum prices in the invitation to bid and the respective bidding process, in non-compliance with the terms in Article 40, item X, in Law No. 8,666/1993 and determinations by the TCU – Decisions 1,324/2005-TCU-Plenary Session, item 9.3.2 (DOU 9/12/2005), 2,354/2006-TCU-Plenary Session, item 9.1.6 (DOU 12/13/2006) and 87/2008-TCU-Plenary Session, item 9.5.2 (DOU 2/1/2008)*

*vii) Determine the hearing, under the terms in Article. 43, II, in Law No. 8,443/92, of SANDRO DERENZI BELODI (who signs as civil field inspector of contract No. 0800.0033808.07.2, CPF: 071.888.678-01) to present justification reasons on the following items:*

*1) for having approved the quantity of services that were not effectively and completely carried out in the collection month related to contracted company RM: 02/2007 – Oct/2007 – service 3.1, 03/2007 – Nov/2007- services 3.1, 3.2, 4.3, and 5.1, 04/2007 – Dec/2007- Services 3.2, 4.3, and 4.6, 05/2007 – Jan/2008 – services 3.1 and 3.2, 06/2007 – Feb/2008 – service 4.3 and 07/2007 – Mar/2008 – Service 4.3, infringing item 5.1.2 in the contract, Article 37, item XXI, in CF/88, Article 62 and Article 63, §2, III in Law No. 4,320/64;*

*2) for failing to inform the need to execute an amendment that updated the quantity of services needed to conclude the earthwork at Refinaria do Nordeste, infringing item 7.2.b in Decree No. 2,745/1998, items 5.4.3 and 5.4.4 in Petrobras Contractual Procedures Manual and item 9.1 in Decision 837/2004-TCU-Plenary Session (DOU 7/8/04) and item 9.3.3 in Decision 1,014/2007-TCU-Plenary Session (DOU 6/5/2007).*

*viii) Determine the hearing, under the terms in Article. 43, II, in Law No. 8,443/92, of HELENO LIRA (who signed as manager of contract No. 0800.0033808.07.2, CPF: 151.074.184-49) to present justification reasons on the following items:*

*1) for having approved the quantity of services that were not effectively and completely carried out in the collection month related to contracted company RM: 02/2007 – Oct/2007 – service 3.1, 03/2007 – Nov/2007- services 3.1, 3.2, 4.3, and 5.1, 04/2007 – Dec/2007- Services 3.2, 4.3, and 4.6, 05/2007 – Jan/2008 – services 3.1 and 3.2, 06/2007 – Feb/2008 – service 4.3 and 07/2007 – Mar/2008 – Service 4.3, infringing item 5.1.2 in the contract, Article 37, item XXI, in CF/88, Article 62 and Article 63, §2, III in Law No. 4,320/64;*

*2) for failing to execute an amendment that updated the quantity of services needed to conclude the earthwork at Refinaria do Nordeste, infringing item 7.2.b in Decree No.*

 *2,745/1998, items 5.4.3 and 5.4.4 in Petrobras Contractual Procedures Manual and item 9.1 in Decision 837/2004-TCU-Plenary Session (DOU 7/8/04) and item 9.3.3 in Decision 1,014/2007-TCU-Plenary Session (DOU 6/5/2007).*

*ix) Determine the hearing, under the terms in Article. 43, II, in Law No. 8,443/92, of MARCO TULIO VIEIRA CARNEIRO (CPF: 375.043.127-20), TAIS MARIA DA FONSECA (CPF: 013.434.366-21) and OTTO ROCHA SILVA (CPF: 625.709.277-91) to present justification reasons on the following items:*

*1) for preparing the 'Petrobras Estimate Budget– Earthwork RENEST' for invitation to bid No. 0322573.07-8:*

*a) without composition of unit prices for services in non-compliance with Article 37, caput and item XXI, in CF/88, and Article 7, §2, item II, in Law No. 8,666/1993, item 1.2 in Decree No. 2,745/98, item 9.3.1 in Decision 549/2006-TCU-Plenary Session (DOU 9/12/2005), item 9.1.2 in Decision 2,354/2006-TCU-Plenary Session (DOU 12/13/2006) and item 9.2.1 in Decision 2,385/2006-TCU-Plenary Session (DOU 12/13/2006);*

*b) which invitation to bid and executed contract No. 0800.0033808.07.2 presented in the unit price spreadsheet and its measurement criteria, services 1.1, 1.3, 2.1, 4.16, 7.1, 8.1, and 9.1, which measurement unit is allowance, in non-compliance with an order by the Federal Court of Accounts, under the terms in item 9.1.2. in Decision 2,354/2006-TCU-Plenary Session (DOU 12/13/2006).*

*x) Determine the hearing, under the terms in Article. 43, II, in Law No. 8,443/92, of LUIZ GERSZT (CPF: 231.097.007-78) to present justification reasons on the following items:*

*1) for checking the 'Petrobras Estimate Budget– Earthwork RENEST' for invitation to bid No. 0322573.07-8:*

*a) without composition of unit prices for services in non-compliance with Article 37, caput and item XXI, in CF/88, and Article 7, §2, item II, in Law No. 8,666/1993, item 1.2 in Decree No. 2,745/98, item 9.3.1 in Decision 549/2006-TCU-Plenary Session (DOU 9/12/2005), item 9.1.2 in Decision 2,354/2006-TCU-Plenary Session (DOU 12/13/2006) and item 9.2.1 in Decision 2,385/2006-TCU-Plenary Session (DOU 12/13/2006);*

*b) which invitation to bid and executed contract No. 0800.0033808.07.2 presented in the unit price spreadsheet and its measurement criteria, services 1.1, 1.3, 2.1, 4.16, 7.1, 8.1, and 9.1, which measurement unit is allowance, in non-compliance with an order by the Federal Court of Accounts, under the terms in item 9.1.2. in Decision 2,354/2006-TCU-Plenary Session (DOU 12/13/2006).*

*xi) Determine the hearing, under the terms in Article. 43, II, in Law No. 8,443/92, of SÉRGIO DOS SANTOS ARANTES (CPF: 335.417.367-04) to present justification reasons on the following items:*

*1) for approving the 'Petrobras Estimate Budget– Earthwork RENEST' for invitation to bid No. 0322573.07-8:*

*a) without composition of unit prices for services in non-compliance with Article 37, caput and item XXI, in CF/88, and Article 7, §2, item II, in Law No. 8,666/1993, item 1.2 in Decree No. 2,745/98, item 9.3.1 in Decision 549/2006-TCU-Plenary Session (DOU 9/12/2005), item 9.1.2 in Decision 2,354/2006-TCU-Plenary Session (DOU 12/13/2006) and item 9.2.1 in Decision 2,385/2006-TCU-Plenary Session (DOU 12/13/2006);*

*b) which invitation to bid and executed contract No. 0800.0033808.07.2 presented in the unit price spreadsheet and its measurement criteria, services 1.1, 1.3, 2.1, 4.16, 7.1, 8.1, and 9.1, which measurement unit is allowance, in non-compliance with an order by the Federal Court of Accounts, under the terms in item 9.1.2. in Decision 2,354/2006-TCU-Plenary Session (DOU 12/13/2006).*

*xii) Determine the hearing, under the terms in Article. 43, II, in Law No. 8,443/92, of JOSÉ SÉRGIO GABRIELLI DE AZEVEDO (member of the Executive Board of Petrobras at the time of approval of investments for the Refinery and president of Petrobras since 8/1/2005 to date, CPF: 042.750.395-72) to present justification reasons on the following items:*

*1) for approving investments for Refinaria do Nordeste (earthwork and supplemental services), to be performed in 2007 without compliance with the terms in Article 167, §1 and item I, in the Federal Constitution, also contrary to the terms in Article 6, § 1 in Law No. 10,933/2004;*

*2) for non-compliance with the Decision 1,322/2005-Plenary Session, item 9.3.2 (DOU 9.12.2005);*

*3) for the lack of registration with SIASG of contracts Nos. 0800.0033808.07-2, 6000.0033727.07-2, and 6000.0035355.07-3 executed by Petrobras, in non-compliance with the terms in §1 in Article 21 in Law No. 11,514/2007 and disregarding the order in Decision 1,329/2003-TCU-Plenary Session, item 9.1.6 (DOU 9/18/2003), as the situation is repeated with no expected definition, which is inferred by several Decisions as 1,579/2006-TCU-Plenary Session, item 9.5 (DOU 9/1/2006), and 87/2008-TCU-Plenary Session, item 9.4 (DOU 2/1/2008);*

 *4) for reiterated non-compliance with the orders by the Federal Court of Accounts in the sense of establishing maximum, global, and unit prices for bidders' proposals, according to the terms in Decisions 1,324/2005-TCU-Plenary Session, item 9.3.2 (DOU /9/12/2005), 2,354/2006-TCU-Plenary Session, item 9.1.6 (DOU 12/13/2006) and 87/2008-TCU-Plenary Session, item 9.5.2 (DOU 2/1/2008);*

*5) for non-compliance with the order by the Federal Court of Accounts in the sense of avoiding the practice of performing services with no contractual coverage, under the terms in item 9.3.3 in Decision 837/2004-TCU-Plenary Session (DOU 7/8/04) and item 9.3.3 in Decision 1,014/2007-TCU-Plenary Session (DOU 6/5/2007);*

*6) for reiterated non-compliance with the orders by the Federal Court of Accounts in the sense:*

*a) only establish bidding process for engineering works and services when there is detailed budget with spreadsheets that indicate the composition of all unit costs, under the terms in Article 7, § 2, item II, in Law No. 8,666/1993, according to the terms in item 9.3.1 in Decision 549/2006-TCU-Plenary Session (DOU 9/12/2005), items 9.1.2 and 9.1.5 in Decision 2354/2006-TCU-Plenary Session (DOU 12/13/2006) and item 9.2.1 in Decision 2,385/2006-TCU-Plenary Session (DOU 12/13/2006);*

*b) abstain from using the unit allowance under the terms in item 9.1.2. in Decision 2,354/2006-TCU-Plenary Session (DOU 12/13/2006).*

*xiii) Determine the hearing, under the terms in Article. 43, II, in Law No. 8,443/92, of GUILHERME DE OLIVEIRA ESTRELLA (CPF: 012.771.627-00), PAULO ROBERTO COSTA (CPF: 302.612.879-15), ILDO LUIS SAUER (CPF: 265.024.960-91), ALMIR GUILHERME BARBASSA (CPF: 01211358615) and RENATO DE SOUZA DUQUE (CPF: 510.515.167-49), all members of the Executive Board of Petrobras at the time, to present justification reasons on the following items:*

*1) for approving investments for Refinaria do Nordeste (earthwork and supplemental services), to be performed in 2007 without compliance with the terms in Article 167, §1 and item I, in the Federal Constitution, also contrary to the terms in Article 6, § 1 in Law No. 10.933/2004;*

*xiv) Determine to Petrobras to, within fifteen (15) days:*

*1) include, in every contract and bidding process related to the Construction of Refinaria Abreu e Lima, upon approval of the law of the Municipality of Ipojuca-PE, to exempt or reduce the ISS rates, the reduction of values contracted or to be contracted by reduction of the ISS in the BDI calculation;*

*2) ensure that in every contract and bidding process related to the Construction of Refinaria Abreu e Lima, the reduction of values contracted or to be contracted by reduction of the ICMS, according to fiscal benefits set forth by Law No. 13,072 dated July 19, 2006, from the State of Pernambuco, that grants deferred ICMS on the acquisition of goods for fixed assets and the acquisition of input, oil and other raw material.*

*3) inform the schedule of joint actions with the Ministry of Planning, Budget, and Management that allow effective compliance with the terms in §1 in Article 21 in Law No. 11,514/2007;*

*4) only adopt procedures to contract services and works that require environmental licensing with basic project prepared after the issuance of the prior licensing, in order to consider requirements, limitations and conditions of the environmental rules as indicated in the license;*

*5) regarding all drafts and contracts in foreign language executed in Brazil for compliance and execution within national territory, arrange the translation or full copy attached, with the same content, signed by the same parties and witnesses, translated into Portuguese, as condition to be legally valid before Brazilian laws, under the terms in Articles 224 and 435 in Law No. 10,406/2002 (Brazilian Civil Code), combined with Article 9 in Decree-Law 4,657/1942 (Law of Introduction of Civil Code) and Article 148 in Law No. 6,015/73 (Law of Public Registration).*

*xv) Determine to the Ministry of Planning, Budget, and Management to, within 15 days, inform the schedule of joint actions with Petróleo Brasileiro S.A. that allow effective compliance with the terms in §1 in Article 21 in Law No. 11,514/2007.*

*xvi) Notify the Mixed Commission of Plans, Public Budgets, and Inspection of the National Congress that, regarding the signs of irregularities found in contract No. 0800.0033808.07.2; relative to the deployment of Refinaria Abreu e Lima, the partial withholding of payments determined hereunder*

 *by the Court, safeguard the treasury against possible damages, with no recommendation of the suspension of physical, budget, and financial execution."*

7. Proposals to forwarding were corroborated by the technical entity, according to orders on pages 961 and 977.

8. As this process was under discussion, I received at my office a brief by PETROBRAS that I attached to pages 978-979 requesting the opening of a new fifteen (15) day term for defense regarding the reasons that justify the preventive measure suggested by SECOB. This request, according to the company, was motivated by the inclusion, after the hearing, of four new services previously not questioned by the Technical Entity, with impact on the overprice estimate and increasing the scope of the possible preventive measure.

This is the report.

 VOTE

The analysis is for the audit investigation report for the audit carried out by Secob at the construction works of Refinaria Abreu e Lima, in Recife – PE, also known as Refinaria do Nordeste, with funds provided for under the terms in the 2008 Budget Law in the amount of R$ 389,775,448.00 under PT No. 25.753.0288.1P650026 and provided for in PPA 2008-2011, in the total amount of R$ 10,140,000,000.00.

2. When the audit team concluded its technical report, twelve signs of irregularities were identified, related to the bidding process phase, the contract of basic project and events related to the contract executed between PETROBRAS and Consórcio Camargo Corrêa, Galvão Engenharia, Queiroz Galvão and Norberto Odebrecht, under No. 0800.0033808.07.2, which object was 'the execution of project design and earthwork services and supplemental services for drainage, street layout, and paving, to prepare the area destined for the construction and assembly of Refinaria do Nordeste', in the value, at initial prices, of R$ 429,207,776.71, base-date June 22, 2007.

3. Irregularities initially identified by the inspection team, the occurrence of overprice in the budget and in the contract, for R$ 81,558,706.86 and, consequently, the execution of services, until Measurement Bulletin 38 (phase of the work at the time of the audit) R$ 71,969,885.59, as estimated by Secob analysts.

4. Due to alleged irregularities, proposals of forwarding contemplate the hearing of responsible parties, the issuance of orders and adoption of the preventive measure aiming the withholding of values to be paid by the construction consortium, added with the value deemed as overpriced.

5. Upon seeing the files, I issued the order (pages 650-651) where I decided about the request to remove the files from the facilities of the Court and, under the terms in Article 276, § 2, in the Internal Rule, I determined the hearing of the interested parties prior to deliberating about the preventive order, which is issued under the following terms:

> *"The files discuss the investigation in the audit carried out at Petróleo Brasileiro S.A., under Fiscobras 2008, which object is the construction works of Refinaria Abreu e Lima, in Recife-PE.*
>
> *2. Upon examining a request presented by the attorney of PETROBRAS to take the files out of the facilities of the Court (page 644).*
>
> *3. The process was sent to Secob, for preliminary examination regarding compliance with requirements set forth under the terms in Resolution No. 163, in 2003, despite defining that this request complies with requirements set forth in this Resolution, the technical entity suggests alternatively and for reasons properly defined, the granting of the files to be viewed and copied.*
>
> *4. Notwithstanding the comments by Secob, I understand that upon compliance with regulatory requirements, the party is entitled to retrieve the files, and Secob should adopt safeguarding measures deemed to be appropriate under applicable rules, namely regarding documents which restoration is deemed to be difficult.*
>
> *5. However, the alternative solution suggested by Secob may be notified to the attorney of PETROBRAS, and the chosen option should be at his sole discretion: either retrieval of files or seeing and copying the files.*
>
> *6. Upon analysis of the files, I find a question in the files that, due to procedural economy, may be appreciated hereby in preliminary terms.*



*7. I refer to the proposal of the inspection team related to the determination to PETROBRAS to:*

*'A) proceed with full withholding, in future invoices under contract No. 0800.0033808.07.2, of the value of R$ 71,969,885.59, relative to values paid in excess under contract No. 0800.0033808.07.2, regarding payments under Measurement Bulletin 1 to Measurement Bulletin 38 by Petrobras, notifying this TCU about measures adopted. [FINDINGS 3.11 AND 3.12];*

*B) starting with Measurement Bulletin 38, not make payments for services under contract No. 0800.0033808.07.2 with unit prices higher than the ones listed in Exhibit I in this report, notifying this TCU about measures adopted. [FINDINGS 3.11 AND 3.12].'*

*8. I believe the expressive amount of the possible value to be withhold, as well as the complex nature of the matter, recommend that prior to deciding upon the adoption or not of the urgent measure, the state company and the contracted company should be heard, under the terms in Article 276, § 2, in the Internal Rule.*

*9. Also considering the magnitude of the physical volume of the files (647 pages and 67 volumes of exhibits), the strategic relevance of this work, the materiality of values questioned by the audit team, as well as the technical nature the audit findings that support the preventive measure to withhold values, I hereby determine a fifteen (15) day term for PETROBRAS and the contracted consortium to present elements deemed to be necessary to clarify the matter.*

*10. Thus I decide:*

*10.1. based on the terms in Article 276, § 2, in the Internal Rule, determine the hearing of PETROBRAS and Consórcio Refinaria Abreu e Lima (Norberto Odebretch [sic]/Galvão/Camargo Correia/Queiroz Galvão) to, in the exceptional fifteen (15) day term, to present elements deemed to be necessary regarding the proposal of adoption of preventive measure related to:*

*'10.1.1. order Petrobras to fully withhold in the future invoices of contract No .0800.0033808.07.2, the amount of R$ 71,969,885.59, relative to amounts paid in excess under this contract, relative to the payment of Measurement Bulletin 01 to Measurement Bulletin 38 of Petrobras, informing the TCU about measures adopted [according to the signs of overprice in the audit findings 3.11 and 3.12, pages 587-608]; and*

*10.1.2. that starting with Measurement Bulletin 38, not make payments for services in contract No. 0800.0033808.07.02 with unit prices higher than the ones in exhibit I to the inspection report, informing the TCU about measures adopted [according to the signs of overprice in the audit findings 3.11 and 3.12, pages 587-608].'*

*10.2. grant the request to take the files presented by PETROBRAS on page 644, without prejudice of notifying the alternative possibility of seeing and copying the files, suggested by Secob on pages 648-649;*

*10.3. determine to Secob to:*

*10.3.1. adopt safeguarding measures deemed to be appropriate under Resolution No. 163, 2003, namely regarding documents which restoration is deemed to be difficult to restore, should PETROBRAS decide upon retrieving the files;*

*10.3.2. in the notice notifying the attorney of the above-mentioned entity, clarify the alternative possibility of seeing and copying the files as suggested on pages 648-649;*

*10.3.3. prior to formalizing the notification mentioned in the above item, certify the arrangement for the hearings provided for in item 10.1 hereunder;*

*10.4. upon arranging the hearings, examine the elements that PETROBRAS and the construction consortium may present regarding the preventive measure and submit the files to the reporting judge, with suggestions deemed to be appropriate;*

*10.5. authorize Secob, if requested, to extend for the same period the term defined in item 10.1.*

*The files should be returned to Secob, for measures required for compliance with this order."*

6. Upon arranging the hearing and analyzing the comments by PETROBRAS and Consórcio Refinaria Abreu e Lima, Secob issued the instruction I transcribed almost entirely in the report precedent to this vote.

7. Therefore, in this procedural phase, upon appreciating the new proposal of preventive measure issued by the specialized entity, the suggestions in the hearing of different managers of the state company, the issuance of orders and the conversion of the files in special account investigations, to ask for possible damage arising out of the prices paid in excess by PETROBRAS in earthworks contracted with said consortium.

8. First, I choose to narrate points of forwarding where I disagree with the technical entity.

9. First, I understand that the process is not yet, at the time, sufficiently mature to be converted into special account investigation for purposes of asking for values where the alleged overprice has been paid.

10. I believe the best recommendation at the time would be the hearing of responsible parties to present justification reasons about the event of overprice in the budget and in the contract and overvaluation of services measured and paid by PETROBRAS to the construction consortium, while, prior to conclude for the eventual summoning of the responsible parties, establishing opportunity to present justifications for the great price difference identified by the technical entity. Thus, I deem to be appropriate that, at the current phase of the investigation of this irregularity, there is promotion of hearing of the managers of the public entity and the consortium companies, to allow upon appreciation of the justification reasons to the Court, the determination, with greater accuracy, of the real amount of damage possibly incurred by PETROBRAS.

11. Additionally, the elements in the files regarding possible debit due to overprice refer only to the period until Measurement Bulletin 38, calculated in the period between March and April this year, and for collection of elements needed to convert the files into special account investigation, there should be investigation regarding services provided for in other measurements to date and the dates of payment of the measurements, as well as the due causal relationship between the responsible parties to be notified and the debit , as recognized by the analyst who included this instruction in the files:

> *"Under the terms in Articles 12, II, and 47 in Law No. 8,443/92 and Article 252 in RI/TCU, convert the files into Special Account Investigation,* ***hereby authorizing Secob to adopt inspection and/or diligences necessary to calculate the updated debit and identify the responsible parties.****"* (Emphasis added).

12. I also consider that the decision upon the conversion of files into special account investigation should be made upon thorough analysis of the matter, ensuring the presence of elements arising out of detailed analysis of the facts, as well as the presence of all presumptions to file a process of this type. At the current time, this is a mere verisimilitude analysis and preliminary cognition to decide upon the preventive withholding of values, as suggested by Secob, because the facts that support the conclusion for the filing of special account investigation is the same that determines adoption of the urgent measure, that is, the allegation of prices above market price for several services that are executed under the terms in Contract No. 0800.0033808.07.2.

13. That is, if the Plenary Session decides upon the adoption of the preventive measure which I tend to accompany, according to the Secob proposal, the decision will be based on signs that are sufficient to this measure, in view of certification of presence of presumptions of fumus boni juris and periculum in mora, while, to propose the conversion of the process into specialized account investigation and the summon of responsible parties to return the values, this is a deliberation that requires more exhaustive appreciation and a higher level of cognition.

14. For these reasons, I disagree with the Secob proposal of filing hereby the special account investigation, and I would rather hear the responsible parties, in order to make broad adversary system viable as well as the collection of other elements to safely support this decision.

15. Regarding the proposal to have a hearing due to the lack of inclusion of the contract work in the Multi-Annual plan for 2003-2007, I understand this is a failure that could be deemed to be mitigated, considering that PETROBRAS arranged to include the contract work in the Multi-Annual plan for 2008-2011, as seen in the audit investigation report (page 528) and physical execution of the main contract of the work started only in October 2007 (see information in the table on page 627), that is, by the end of the period covered by the 2003-2007 PPA. Thus, I deem as excessive strictness to call company managers to clarify the non-inclusion of the contract work in the PPA which is terminated.

16. Regarding the suggested hearing of the President of PETROBRAS, I also deem it to be unnecessary. This is because the first imputation applicable to the highest position of the state company would be the point discussed above, that is, the lack of inclusion of the work in the 2003-2007 PPA. Additionally, other possible irregularities attributed to that manager refer to the presumed non-compliance with orders by the Court. However, upon checking such orders, I note that the orders were addressed abstractly to the company, and not specifically its President (Decisions Nos. 1,329/2003, 837/2004, 1,324/2005, 549/2006, 2,354/2006, 2,385/2006, 87/2008, 1,014/2007, all in Plenary Session), and the obligation for compliance applies to the specific hierarchic managers in the company. Due to irregularities under investigation in these files, arising out of infringement of the above-mentioned orders, the hearing has been arranged for other responsible parties who, due to the nature of their conduct and the functions they work on, are really the people who should respond for the imputations.

17. Lastly, the last point which I disagree with the technical entity refers to the time of issuance of the suggested orders. I understand that these orders should be adopted upon exercising the adversary system and evaluation of the defenses filed in the files, and should be materialized, if the case may be, at a later time, that is, while judging the process.

18. I now discuss what I deem as the center of the material question to be appreciated in this procedural phase.

19. I refer to the proposal of adoption of preventive measure, under the terms determined by Secob, as presented in the report preceding this vote.

20. I hereby agree with the conservative proposal by Secob to determine to PETROBRAS to abstain from making payments for remaining services in Contract No. 0800.0033808.07.2 for items indicated in the table on page 955 with unit prices higher than those in the table, which are reference market prices usually adopted by the Court to investigate overprice and overvaluation in this type of work.

21. However, I exclude form said table the items "Sub-base of graduate crushed stone, including maintenance of this layer until conclusion of services" and "Additional demolition, geotechnical investigation, earthwork, drainage, paving, contention, concrete structures and foundation services not provided for in items 1 to 8 in this spreadsheet". I exclude these items from the scope of the preventive measure because they were not initially questioned by the inspection team and, therefore, PETROBRAS and the consortium did not have the opportunity to comment preliminarily about these issues. Including them now, although possible as inaudita altera pars, would mean to suppress a step of the adversary system, because, due to the reasons exposed in the order transcribed in the report preceding this vote, I would rather arrange the prior hearing of the parties, prior to deciding about the preventive procedure. However, these items should be part of the object of

the hearings I submit below to consideration by the Plenary Session, under the terms in the draft of the decision filed below.

22. As summary cognition, under the analysis performed by Secob after examining the prior comments by the parties (PETROBRAS and Consórcio Refinaria Abreu de Lima), summoned to comment on the possible adoption of preventive measure, I understand that the requisites for periculum in mora and fumus boni juris are present regarding the withholdings defended as preventive measure, in order to prevent continuity of possible losses to the state company treasury, due to the payment of services with prices allegedly higher than market prices.

23. It is important to note that this overprice is due, essentially, to the practice of prices much higher than SICRO references, for items related basically to the earthwork.

24. Arguments presented by the state company and the consortium consist in attempt to disqualify the validity of the SICRO references for this work. However, in its analysis, Secob was able to show that the specificities of the contract work were considered to make required adaptations, in order to allow comparing contractual prices with market prices, considering the real conditions under which the contract work is developed. I copy from the report the following excerpts where we see that there were adaptations in price composition, as claimed by PETROBRAS and the Consortium in their comments regarding possible adoption of preventive measure:

> *77. Note that the arguments provided by Petrobras about references adopted in the composition of direct costs were, in most part, analyzed when the responsible parties commented regarding the preliminary audit report, as seen in the excerpt transcribed below (pages 601 and 602 in volume 2):*
>
> *'... object of the work is basically earthwork services, and the price reference used is from SICRO 2, in TCU is defined that price system SICRO 2 is the price reference to be used by public entities in case of road and earthwork works, as seen in Decisions 1,050/2003-TCU-Plenary Session, 267/2003-TCU-Plenary Session, 40/2003-TCU-Plenary Session and 1,379/2004-TCU-Plenary Session and Decision 417/2002-TCU-Plenary Session.*
>
> ...
>
> *At this point, it is important to indicate a contradiction in the comment by Petrobras when, initially, the company defends that the DNIT prices reference are not applicable to this work. But afterwards, when the state company condemns application of the SINAPI price reference, it claims it adopts DNIT, EMOP, PINI and FGV references, and the first two references (DNIT and EMOP) include information about heavy civil construction works, addressed to large works, that are similar to the works in the oil industry and the contract work in question. As these DNIT references are nothing but the SICRO 2 price reference, the comment seems to claim that SICRO AND EMOP ARE APPLICABLE TO WORKS IN THE OIL INDUSTRY AND THE CONTRACT WORK IN QUESTION.*
>
> *Regarding the 'inapplicability to use the SINAPI price reference,' the argument that this price reference is to be used only in building civil construction works is not accepted, after all. Within the scope of contract No. 0800.0033808.07.2, item 2.1 – 'Installation of the worksite, mobilization of personnel, tools, utilities, material, equipment and deployment of team and Control and Planning Systems, Quality System, SMS, and Asset Safety,' refers specifically to the construction of the worksite, a building civil construction work. Add to that the fact that the material, for instance the '18 annealed wire' will have the same price if used in this work or if used in a building construction work. Likewise, the labor, for instance: 'topography assistant' and 'topographer', both positions will have the same hourly fee if the measurement is done in this work or in a building construction work.*
>
> *Thus, arguments presented by the manager, in its preliminary comments, cannot be accepted.'*



*79. Even being a contract work that involve large volumes of earth movement, which implies additional difficulties, this argument is not sufficient to disqualify the use of Sicro2 as reference. There are road works that involve earthwork volumes in similar numbers, and even higher than the Refinery.*

*80. Additional costs arising out of the different working hours were considered by the audit, as the percentage of social fees adopted in the composition of the reference were 151%, the same adopted by the construction consortium. There is no justification to claims against the social fees rate adopted in the report. Although Sicro considers 126% as the percentage of social fees, indeed, considering the specificities of the earthwork at Refinaria Abreu e Lima, the team considered a social fee rate of 151% for man/hour and 85% for man/month, therefore, the same as those presented by the consortium. Thus, there are no grounds to make the Dnit cost system unfeasible to be used as reference for this work."*

25. Thus, we see that the arguments presented in response to the hearing are not able to dismiss the fumus boni juris characterized by the huge difference of contractual prices in view of SICRO reference prices, as seen in the table below, which I extract from the spreadsheet on page 951:

| Item | Service Description | Unit. | Contractual Price | TCU Analysis | Diff. % |
|---|---|---|---|---|---|
| 4.2 | Landfill compaction in soft soil areas at 100% regular Proctor | $m^3$ | 6.80 | 2.85 | 138.89% |
| 4.6 | Landfill compaction at 100% regular Proctor | $m^3$ | 6.37 | 2.85 | 123.78% |
| 4.8 | Landfill compaction of contention dikes at 100% regular Proctor | $m^3$ | 36.50 | 3.19 | 1,045.89% |
| 4.9 | Compacting disposal material (clay and silty soils) | $m^3$ | 3.56 | 1.88 | 89.29% |
| 4.10 | Vegetable coverage slopes and edges, with Capim Sândalo grass | $m^2$ | 8.00 | 5.85 | 36.77% |
| 5.1 | Sand drainage | $m^3$ | 176.51 | 31.53 | 459.86% |
| 5.5 | BSTC body, 0.80 m diameter, including crib | m | 652.46 | 492.25 | 32.55% |
| 5.6 | BSTC mouth Ø 0.80 m | unit | 1,888.73 | 1,050.20 | 79.85% |
| 6.3 | Gutter | m | 69.86 | 49.44 | 41.30% |

26. Also note that there are strong signs of "creative accounting" in the contract, considering that one of the items with the highest percentage variation between contractual price and Secob analysis (sand drain), with upward difference of 459.86%, presented hugely increased quantities, compared to what was executed and provided for in the budget. Initially, the estimate was 27,000 m3, but by BM 38 there were 299,758 m3 of this service.

27. The argument presented by the parties, attempting to disqualify the use of SICRO, is also prejudiced by PETROBRAS reluctance to present the analytical composition of unit cost for services, in order to justify the coherence of contractual prices with plausible data, and not only the theoretical argument with no grounds on real costs that support the claim that the specificities of the earthwork of the land where the refinery will be constructed cause the construction company to incur in higher costs. On this issue, I understand that it is important to repeat the analysis by the Secob team:

*"83. Arguments presented at the hearing are not sufficient to modify the understanding by this technical entity regarding the applicability of Sicro. Additionally,* ***Petrobras and the consortium did not provide the composition of unit costs for services****. Both parties seem to be reluctant*

 *to provide this information, as noted timely by the audit team (pages 580 and 581 in volume 2):*

***'There is no composition of unit price for none of the services in the contract No.*** *0800.0033808.07.2 (SAP 4600242271), which object is 'project design and execution of earthwork and supplemental drainage, street layout, and paving services at Refinaria do Nordeste.' The only document provided is the Price Formation Statement (DFP), which would be the total value of equipment, labor, and material in the contract as a whole, for Petrobras Estimate and the proposal by the contracted consortium.*

***Petrobras, even upon request, did not provide the unit price composition for each service*** *in the 'Petrobras Estimate Budget – Earthwork RENEST' and the budget proposed by the that was the winning bidder, as seen in communication 14-83/2008 in the notes by the Audit Team:*

...

*Note that the lack of the unit price composition for each service in the Petrobras Estimate Budget caused the lack of the unit price spreadsheet and consequently the lack of unit price acceptability criteria, as indicated in the finding named 'Inadequacy or nonexistence of unit and global price acceptability criteria.' The lack of unit price acceptability criteria was one of the causes of overprice in different contracted services, as seen in the finding 'overprice.' [Emphasis added].*

28. Regarding the requisite that refers to the danger of delay, I also deem this is present. After thorough analysis of the defense to be presented by the parties, if the imputation of overprice and overvaluation is confirmed, the probable loss to PETROBRAS treasury, estimated by Secob by BM 38 in R$ 58,527,813.73, may increase a lot until the end of the work.

29. Regarding the risk of reverse damage, according to the new proposal of preventive measure suggested by the technical entity upon analysis of comments presented by the state company and the construction consortium, I consider that it is minimized compared to the first proposal presented by the inspection team.

30. First, I note the acceptance of the arguments related to the BDI to be considered, and the reporting analyst, upon authorization by Secob directors, evaluated as acceptable the claims in the sense that the 33.87% rate is coherent with limits admitted by the case law of this Court. This new perspective has implied reduction in the overvaluation initially identified by the inspection team from R$ 71,969,885.00 to R$ 58,572,813.00. Consequently, prices presumably above market prices are reduced, which causes the preventive withholding to be lower than initially proposed.

31. Additionally, there is no proposal for full withholding of the values paid as overprice, considering that the contractual balance of approximately R$ 145 million (see information on pages 975-976, provided by PETROBRAS) would not support this scope of the initial preventive measure, under risk of compromising the financial capacity of the consortium companies and thus cause interruption of the works, which was expressly mentioned by the consortium, in a letter addressed to the contractor (pages 690-694).

32. The withholding considered at the time consists in prevent the payment in excess for main services with signs of overprice.

33. While the initially proposed withholding, prior to the hearing of the parties, represented 19% of the contracted value, the suggestion I present hereby to be appreciated by the Plenary Session will represent an amount close to 4% of the total contracted value. This is because the signs of prices higher than market prices represent approximately 20% of the value to be paid for items described in the table above in this vote, and there should be discount of values of items suggested by Secob but that were not subject to prior hearing, as I mentioned in item 21 in this vote, reason why

 the scope of the preventive measure to be adopted is reduced, should this be the understanding of Plenary Session. That is, the contractual balance of approximately 145 million is financially able to support the withholding, until the Court examines exhaustively the signs of irregularities that recommend adoption of the urgent measure. Additionally, a memorial presented by the consortium that I filed on 984/1004, corroborates the percentage estimate of preventive withholding regarding the entire contract. In this memorial, based on data in Secob proposal, the withholding refers to R$ 23 million over the remaining balance, which represents a little over 5% over the contract value. Under the point of view of public interest, the intention with this measure is to prevent effective future overvaluation, which would create a situation much harder to be reverted, with the expensive process of special account investigation. Unfortunately, if, by the end of the process, the signs of irregularities investigated hereunder are confirmed, upon confirmation of the debt in measurements paid, the unquestionable solution is the collection of the loss supported by PETROBRAS by means of a TCE against the consortium and the responsible state company agents.

34. It is important to also note that, according to document provided by PETROBRAS to this Court (pages 975-976), the contract shall be in effect by the end of May 2009, therefore, with sufficient time for the responsible parties to present justification reasons and the consortium to comment, additional to those included in the files according to the memorial (pages 984-1004), and the arguments of defense will be examined, in order to allow the Court to comment on the merit, when, upon full cognition, it shall finally deliberate in the sense of confirming or rejecting the signs of overprice and overvaluation analyzed hereunder in preliminary terms.

35. Regarding the other proposals to hearings presented by Secob, related to several irregularities identified by the inspection team, except for considerations made in the beginning of the vote, I agree upon them, reason why I understand they are appropriate, under the terms defined in the draft of decision I submit to my peers this time.

36. Regarding the brief by PETROBRAS requesting the opening of a new fifteen (15) day term for defense regarding the reasons that justify the preventive measure suggested by SECOB, I understand this should be rejected, considering the scope of the preventive measure subject to analysis by the Plenary Session does not incorporate the increase determined by the technical entity upon examination by the inspection team, as I mentioned in item 21 in this vote.

37. Lastly, it is important to inform the Mixed Commission of Plans, Public Budgets, and Incorporation of the National Congress that, regarding the signs of irregularity found in Contract No. 0800.0033808.07.2 related to the deployment of Refinaria Abreu e Lima, partial withholding of payments determined by the Court, should this be the understanding of this Plenary Session, prevents the occurrence of possible future losses, with no objections to continue with the physical, budget, and financial performance of the contract work.

In view of the above, I VOTE for adoption of the decision I now submit for appreciation by this Plenary Session.

TCU, Session Room Judge Luciano Brandão Alves de Souza, on December 10, 2008.

VALMIR CAMPELO
Reporting Judge

 DECISION No. 3,044/2008 – TCU – Plenary Session

1. Process No. TC 008.472/2008-3
2. Group II – Class: V – Subject: Audit Investigation Report (Fiscobras 2008)
3. Interested Party: National Congress.
4. Entity: Petróleo Brasileiro S.A. – PETROBRAS
5. Reporting Judge: Judge Valmir Campelo
6. Representative of the Federal Executive Office: no one.
7. Technical Entity: Secretariat of Inspection of Works and Assets of the Federal Government (SECOB))
8. Attorneys in the files: no one

9. Decision:

READ, reported and discussed about these files related to an audit investigation report for the audit carried out by Secob at the construction works of Refinaria Abreu e Lima, in Recife – PE, also known as *Refinaria do* Nordeste, with funds provided for under the terms in the 2008 Budget Law in the amount of R$ 389,775,448.00 under PT No. 25.753.0288.1P650026 and provided for in PPA 2008-2011, in the total amount of R$ 10,140,000,000.00.

The Judges of the Federal Court of Accounts, meeting at Plenary Session, in view of reasons mentioned above by the Reporting Judge, AGREE

9.1. determine, preventively, to Petróleo Brasileiro S.A. – PETROBRAS, under the terms in Article 45 in Law No. 8,443/92 and Article 276 in the Internal Rule, until the Court finally decides about the matter, to:

9.1.1. abstain from making payments for remaining services in Contract No. 0800.0033808.07.2 for items indicated below in the table (included in exhibit II in the Unit Price Spreadsheet in the contract) with unit prices higher than those in the table below, withholding payments to be made to the construction consortium, the difference between prices indicated below and contracted prices:

| Item | Service Description | Unit. | Unit Price |
|---|---|---|---|
| 4.2 | Landfill compaction in soft soil areas at 100% regular Proctor | $m^3$ | 2.85 |
| 4.6 | Landfill compaction at 100% regular Proctor | $m^3$ | 2.85 |
| 4.8 | Landfill compaction of contention dikes at 100% regular Proctor | $m^3$ | 3.19 |
| 4.9 | Compacting disposal material (clay and silty soils) | $m^3$ | 1.88 |
| 4.10 | Vegetable coverage slopes and edges, with Capim Sândalo grass | $m^2$ | 5.85 |
| 5.1 | Sand drainage | $m^3$ | 31.53 |
| 5.5 | BSTC body, 0.80 m diameter, including crib | m | 492.25 |
| 5.6 | BSTC mouth Ø 0.80 m | unit | 1,050.20 |
| 6.3 | Gutter | m | 49.44 |

9.1.2. Alternatively, inform PETROBRAS that, should the contracted company be interested, that the preventive withholding of values to be calculated as overprice may be replaced by guarantees provided for in Article 56, § 1 in Law No. 8,666/1993, in the amount of R$ 59,000,000.00 with sufficient scope to ensure the result of the investigation in the

Federal Court of Accounts about the possible damage to Treasury, arising out of Contract 0800.0033808.07.2, especially containing clauses that set forth:

9.1.2.1. term linked to the final decision by the TCU which is not subject to appeal with suspending effects;

9.1.2.2. monthly adjustment; and

9.1.2.3. in the case of bank collateral, obligation by a Guarantor Bank to deposit the guarantee with the Federal treasury, in up to 30 days after a Decision by this Court condemning the company to refund values becomes res judicata;

9.2. promote, under the terms in Article 43, II, in Law No. 8,443/92 and Article 250, IV, in the Internal Rule, hearing of Marco Túlio Vieira Carneiro (CPF 375.043.127-20), Tais Maria da Fonseca Diniz (CPF 013.434.366-21), and Otto Rocha Silva (CPF 625.709.277-91), as parties responsible for preparing the "Petrobras Estimate Budget – Earthwork RENEST"; Luiz Gerszt (CPF 231.097.007-78) and Sérgio dos Santos Arantes (CPF 335.417.367-04), as parties responsible for checking and approving, respectively, said budget; Jorge Fernandes de Abreu (CPF 548.951.467-15), Rogério Hungerbuhler Lopes (CPF 335.230.457-20, Salomão Doumit Bouhaya (CPF 352.428.687-91), Dewton Silva Carvalho (CPF 580.942.106-72); Paulo Cezar Farah Muniz (CPF 528.388.467-87), and Luis Alberto Spagnolo Junior (CPF 027.830.956-96), respectively as president and members of the Bidding Commission No. 0322573.07-8; to, within fifteen (15) days, present justification reasons regarding the following points:

9.2.1. signs of overprice in the value of R$ 53,834,329.15 (fifty three million eight hundred thirty four thousand three hundred twenty nine reais and fifteen cents) in Contract No. 0800.0033808.07.2, arising out of service prices included in the budget and the bidding process above market reference prices, causing possible overvaluation, by Measurement Bulletin 38, equal to R$ 58,527,813.73 (fifty eight million five hundred twenty seven thousand eight hundred thirteen reais and seventy three cents) in earthwork and supplemental services for drainage, street layout, and paving, to prepare the area destined for the construction and assembly of Refinaria do Nordeste (the overprice is higher than the initial overprice of the contract considering considerable differences between estimate quantities and executed quantities), according to tables on pages 951 and 952 in the files;

9.2.2. improper inclusion of item 9.1 in exhibit II of the Unit Price Spreadsheet of Contract No. 0800.0033808.07.2 ("Additional demolition, geotechnical investigation, earthwork, drainage, paving, contention, concrete structures and foundation services not provided for in items 1 to 8 in this spreadsheet"), because such item is a composition of other items that are included in this spreadsheet, with no justification to pay for them twice;

9.3. open fifteen (15) days term for the contracted consortium (Norberto Odebretch/Galvão/Camargo Correia/Queiroz Galvão), if so intended, to present elements deemed to be appropriate in its defense, considering the signs of having had improper advantage by Measurement Bulletin No. 38, in the amount of R$ 58,527,813.73 (fifty eight million five hundred twenty seven thousand eight hundred thirteen reais and seventy three cents) in earthwork and supplemental services for drainage, street layout, and paving, to prepare the area destined for the construction and assembly of Refinaria do Nordeste, due to practice of overprice, according to the table on page 954 in the files;

9.4. promote, under the terms in Article 43, II, in Law No. 8,443/92 and Article 250, IV, in the Internal Rule, hearing of Jorge Fernandes de Abreu (CPF 548.951.467-15), as manager of contract RPQS-4501495403/SAP-R3 and president of the Bidding Commission No. 0322573.07-8, to, within fifteen (15) days, present justification reasons regarding the following items:

9.4.1. for having approved and deemed as sufficient the Basic Project prepared by PRODEC and having it forwarded to prepare Invitation to Bid No. 3225733.07-8, when such project did not cover all

 the technical solutions for the work as accurately as needed, in non-compliance with Law No. 8,666/1993, Article 6, item IX and Decree 2,745/1998, item 1.3;

9.4.2. for direct contract of the company PRODEC Consultoria para Decisão S/C Ltda., with no characterization of presumptions in Articles 24 and 25 in Law No. 8,666/1993 /and items 2.1, 2.2, and 2.3 in Decree No. 2,745/1998 and without exposure of reasons by the competent authority for Dismissal or Non-Enforceability of Bidding Process, under the terms in items 2.2 and 2.5 in the same Decree mentioned above, also infringing the terms in Article 37, XXI, in the Federal Constitution;

9.4.3. for the lack of determination of the acceptability criteria global maximum and minimum prices in the invitation to bid and the respective bidding process, in non-compliance with the terms in Article 40, item X, in Law No. 8,666/1993 and determinations by the TCU – Decisions 1,324/2005-TCU-Plenary Session, item 9.3.2 (DOU 9/12/2005), 2,354/2006-TCU-Plenary Session, item 9.1.6 (DOU 12/13/2006) and 87/2008-TCU-Plenary Session, item 9.5.2 (DOU 2/1/2008);

9.5. promote, under the terms in Article 43, II, in Law No. 8,443/92 and Article 250, IV, in the Internal Rule, hearing of Rogério Hungerbuhler Lopes (CPF 335.230.457-20), Salomão Doumit Bouhaya (CPF 352.428.687-91), Dewton Silva Carvalho (CPF 580.942.106-72) and Paulo Cézar Farah Muniz (CPF 528.388.467-87), all members of the bidding commission No. 0322573.07-8, to, within fifteen (15) days, present justification reasons for the lack of determination of the acceptability criteria global maximum and minimum prices in the invitation to bid and the respective bidding process, in non-compliance with the terms in Article 40, item X, in Law No. 8,666/1993 and determinations by the TCU – Decisions 1,324/2005-TCU-Plenary Session, item 9.3.2 (DOU 9/12/2005), 2,354/2006-TCU-Plenary Session, item 9.1.6 (DOU 12/13/2006) and 87/2008-TCU-Plenary Session, item 9.5.2 (DOU 2/1/2008);

9.6. promote, under the terms in Article 43, II, in Law No. 8,443/92 and Article 250, IV, in the Internal Rule, hearing of Luis Alberto Spagnolo Junior (CPF 027.830.956-96), as inspector of Contract RPQS-4501495403/SAP-R3 and member of the Bidding Commission No. 0322573.07-8, to, within fifteen (15) days, present justification reasons regarding the following items:

9.6.1. for having approved and deemed as sufficient the Basic Project prepared by PRODEC and having it forwarded to prepare Invitation to Bid No 3225733.07-8, when such project did not cover all the technical solutions for the work as accurately as needed, in non-compliance with Law No. 8,666/1993, Article 6, item IX and Decree 2,745/1998, item 1.3;

9.6.2 for the lack of determination of the acceptability criteria global maximum and minimum prices in the invitation to bid and the respective bidding process, in non-compliance with the terms in Article 40, item X, in Law No. 8,666/1993 and determinations by the TCU – Decisions 1,324/2005-TCU-Plenary Session, item 9.3.2 (DOU 9/12/2005), 2,354/2006-TCU-Plenary Session, item 9.1.6 (DOU 12/13/2006) and 87/2008-TCU-Plenary Session, item 9.5.2 (DOU 2/1/2008);

9.7. promote, under the terms in Article 43, II, in Law No. 8,443/92 and Article 250, IV, in the Internal Rule, hearing of Sandro Derenzi Belodi (CPF: 071.888.678-01), as civil field inspector of Contract No. 0800.0033808.07.2, to, within fifteen (15) days, present justification reasons regarding the following items:

9.7.1 for having approved the quantity of services that were not effectively and completely carried out in the collection month related to contracted company RM: 02/2007 – Oct/2007 – service 3.1, 03/2007 – Nov/2007- services 3.1, 3.2, 4.3, and 5.1, 04/2007 – Dec/2007- Services 3.2, 4.3, and 4.6, 05/2007 – Jan/2008 – services 3.1 and 3.2, 06/2007 – Feb/2008 – service 4.3 and 07/2007 – Mar/2008 – Service 4.3, infringing item 5.1.2 in the contract, Article 37, item XXI, in CF/88;

9.7.2. for failing to inform the need to execute an amendment that updated the quantity of services needed to conclude the earthwork at Refinaria do Nordeste, infringing item 7.2.b in Decree No. 2,745/1998, items 5.4.3 and 5.4.4 in Petrobras Contractual Procedures Manual and item 9.3.3 in Decision 1,014/2007-TCU-Plenary Session (DOU 6/5/2007).;

9.8. promote, under the terms in Article 43, II, in Law No. 8,443/92 and Article 250, IV, in the Internal Rule, hearing of Heleno Lira (CPF 151.074.184-49), as manager of Contract No. 0800.0033808.07.2, to, within fifteen (15) days, present justification reasons regarding the following items:

9.8.1 for having approved the quantity of services that were not effectively and completely carried out in the collection month related to contracted company RM: 02/2007 – Oct/2007 – service 3.1, 03/2007 – Nov/2007- services 3.1, 3.2, 4.3, and 5.1, 04/2007 – Dec/2007- Services 3.2, 4.3, and 4.6, 05/2007 – Jan/2008 – services 3.1 and 3.2, 06/2007 – Feb/2008 – service 4.3 and 07/2007 – Mar/2008 – Service 4.3, infringing item 5.1.2 in the contract, Article 37, item XXI, in CF/88, Article 62 and Article 63, §2, III in Law No. 4,320/64;

9.8.2) for failing to execute an amendment that updated the quantity of services needed to conclude the earthwork at Refinaria do Nordeste, infringing item 7.2.b in Decree No. 2,745/1998, items 5.4.3 and 5.4.4 in Petrobras Contractual Procedures Manual and item 9.1 in Decision 837/2004-TCU-Plenary Session (DOU 7/8/04) and item 9.3.3 in Decision 1,014/2007-TCU-Plenary Session (DOU 6/5/2007).;

9.9. promote, under the terms in Article 43, II, in Law No. 8,443/92 and Article 250, IV, in the Internal Rule, hearing of Marco Tulio Vieira Carneiro (CPF 375.043.127-20), Tais Maria da Fonseca (CPF 013.434.366-21) and Otto Rocha Silva (CPF 625.709.277-91) to, within fifteen (15) days, present justification reasons for preparing the "Petrobras Estimate Budget – Earthwork RENEST" for Invitation to Bid No. 0322573.07-8:

9.9.1 without composition of unit prices for services in non-compliance with Article 37, caput and item XXI, in CF/88, and Article 7, §2, item II, in Law No. 8,666/1993, item 1.2 in Decree No. 2,745/98, item 9.3.1 in Decision 549/2006-TCU-Plenary Session (DOU 9/12/2005), item 9.1.2 in Decision 2,354/2006-TCU-Plenary Session (DOU 12/13/2006) and item 9.2.1 in Decision 2,385/2006-TCU-Plenary Session (DOU 12/13/2006);

9.9.2. including in the unit price spreadsheet and measurement criteria services 1.1, 1.3, 2.1, 4.16, 7.1, 8.1, and 9.1, which measurement unit is allowance, in non-compliance with an order by the Federal Court of Accounts, under the terms in item 9.1.2. in Decision 2,354/2006-TCU-Plenary Session (DOU 12/13/2006), causing them to be provided for in the invitation to bid and, consequently, integrating these items in the resulting Contract No. 0800.0033808.07.2;

9.10. promote, under the terms in Article 43, II, in Law No. 8,443/92 and Article 250, IV, in the Internal Rule, hearing of Luiz Gerszt (CPF 231.097.007-78) to, within fifteen (15) days, present justification reasons for checking the "Petrobras Estimate Budget – Earthwork RENEST" for Invitation to Bid No. 0322573.07-8 and having allowed its approval:

9.10.1. without composition of unit prices for services in non-compliance with Article 37, caput and item XXI, in CF/88, and Article 7, §2, item II, in Law No. 8,666/1993, item 1.2 in Decree No. 2,745/98, item 9.3.1 in Decision 549/2006-TCU-Plenary Session (DOU 9/12/2005), item 9.1.2 in Decision 2,354/2006-TCU-Plenary Session (DOU 12/13/2006) and item 9.2.1 in Decision 2,385/2006-TCU-Plenary Session (DOU 12/13/2006);

9.10.2. including in the unit price spreadsheet and measurement criteria services 1.1, 1.3, 2.1, 4.16, 7.1, 8.1, and 9.1, which measurement unit is allowance, in non-compliance with an order by the Federal Court of Accounts, under the terms in item 9.1.2. in Decision 2,354/2006-TCU-Plenary Session (DOU 12/13/2006), causing them to be provided for in the invitation to bid and, consequently, integrating these items in the resulting Contract No. 0800.0033808.07.2;

9.11. promote, under the terms in Article 43, II, in Law No. 8,443/92 and Article 250, IV, in the Internal Rule, hearing of Sérgio Dos Santos Arantes (CPF 335.417.367-04) to, within fifteen (15) days, present justification reasons for approving the "Petrobras Estimate Budget – Earthwork RENEST" for Invitation to Bid No. 0322573.07-8:

9.11.1 without composition of unit prices for services in non-compliance with Article 37, caput and item XXI, in CF/88, and Article 7, §2, item II, in Law No. 8,666/1993, item 1.2 in Decree No. 2,745/98, item 9.3.1 in Decision 549/2006-TCU-Plenary Session (DOU 9/12/2005), item 9.1.2 in Decision

 2,354/2006-TCU-Plenary Session (DOU 12/13/2006) and item 9.2.1 in Decision 2,385/2006-TCU-Plenary Session (DOU 12/13/2006);

9.11.2. including in the unit price spreadsheet and measurement criteria services 1.1, 1.3, 2.1, 4.16, 7.1, 8.1, and 9.1, which measurement unit is allowance, in non-compliance with an order by the Federal Court of Accounts, under the terms in item 9.1.2. in Decision 2,354/2006-TCU-Plenary Session (DOU 12/13/2006), causing them to be provided for in the invitation to bid and, consequently, integrating these items in the resulting Contract No. 0800.0033808.07.2;

9.12. reject the request to reopen the term presented by PETROBRAS on pages 978-979;

9.13. notify the Mixed Commission of Plans, Public Budgets, and Inspection of the National Congress that, regarding the signs of irregularities found in Contract No. 0800.0033808.07.2; relative to the deployment of Refinaria Abreu e Lima, the partial withholding of payments determined by the Court in sub-items 9.1 or the provision of guarantees provided for in Article 56, §1 in Law No. 8.666/1993, prevents the incurrence of possible losses, with no objections to continue with the physical, budget, and financial performance of the contract work;

9.14. notify this decision to:

9.14.1. the Mixed Commission of Plans, Public Budgets, and Inspection of the National Congress;

9.14.2. PETROBRAS;

9.14.3. the House of Staff of the Presidency of the Republic;

9.14.4. the Ministry of Mines and Energy, to which PETROBRAS is related;

9.14.5. the Federal Controller;

9.14.6. the Consórcio Refinaria Abreu e Lima, comprised by the companies Odebrecht/Queiroz Galvão/ Camargo Corrêa/ Galvão Engenharia;

9.15. return the files to Secob to proceed with the instruction and appreciation of new elements of defense filed on pages 984-1004 with responses coming from the hearings.

10. Minutes No. 53/2008 – Plenary Session.
11. Session Date: 12/10/2008 – Ordinary.
12. Electronic code to locate at the TCU website on the internet: AC-3044-53/08-P.
13. Quorum specification:
13.1. Attending Judges: Ubiratan Aguiar (President), Marcos Vinicios Vilaça, Valmir Campelo (Reporting Judge), Walton Alencar Rodrigues, Benjamin Zymler, Augusto Nardes, Aroldo Cedraz (Reviewer), and Raimundo Carreiro
13.2. Invited deputy judge: Augusto Sherman Cavalcanti
13.3. Attending deputy judges: Marcos Bemquerer and André Luís de Carvalho.

UBIRATAN AGUIAR
President

VALMIR CAMPELO
Reporting Judge

In my presence:

PAULO SOARES BUGARIN
General Prosecutor, in office

 TC 008.472/2008-3

[BLANK PAGE]

47