# EXHIBIT 30
# Part 2 of 2

Because of this, it is necessary to create a differential in order to attract the workforce to the region of the construction works. Petrobras emphasizes that this attractiveness has the function   of stimulating the flow of workers to settle in a different area than the one they normally reside in. (Main Volume – pages 208/215)

**3.1.9 - Corrective measures:**

Repricing of analyzed contracts (UDA, UCR, UHDT/UGH and Pipelines), with the minimum reduction in the amount of overpricing calculated for each contract, as presented in Table 3.1.1, meeting the provisions of the LDO [Law of Budgetary Guidelines] and the normal market values.

**3.1.10 Final conclusion of team:**

The analysis of the contracted prices, performed by the auditing team, for the contracts UDA, UHDT/UGH, UCR and Pipelines, pointing out an overpricing of R$ 1,324,116,792.62, was based on analysis of the Petrobras' cost estimates, once it own cost estimates are the references parameters of Petrobras for the acceptability of the winning proposals of the bids.

This being so, the team has performed an analysis in a representative sample for each contract, having as the main adopted criteria: (i) the suitability of the variation range for the acceptability of proposals (level FEL-3 adopted by Petrobras between -15 to + 20%); (ii) the analysis of the  input prices adopted in the cost estimates, involving direct labor, indirect labor, equipment costs, costs of construction inputs, transportation and food supply costs for personnel, and site implementation costs; (iii) BDI differential for the supply of materials and equipment.

It should be clarified that Petrobras, in its preliminary statement, questioned only the suitability of the variation range for acceptability of proposals and the analysis of the salaries of direct labor, especially as to the percentage of attractiveness. Thus, Petrobras did not manifest itself about the analysis of the prices of inputs adopted in the Petrobras' cost estimates, neither about the BDI differential for materials and equipment adopted by the auditing team.

It is observed that Petrobras did not add new elements to the report which are able to rebut, modify or justify the pointed out overpricing, whose analysis will be displayed in detail below.

Analysis of the statement about the variability rage of Petrobras

Initially, we must clarify that this auditing team, when analyzing the prices of the audited contracts, did not make changes in the methodology used by Petrobras for the receiving and acceptability of the price proposals of bidders, but merely adapted the range of variability of the acceptability of the proposals of bidders. That is, for the tagged goods and materials with certain quantities, any needed change in amounts will be settled through a contractual addendum term, as provided in Appendix XXII of the referenced contracts.

For tagged goods, the team considers them to be fixed goods, defined in project, specified and with ascertained amounts; necessary for the industrial processes of the refinery. Therefore, only the values of these goods (with certain quantities) were considered as market benchmarks, not being accepted variability range for the proposals. For all other services (including labor, consumable goods, equipment and others) linked to the tagged goods, and that have been predicted in Petrobras' cost estimates, have been maintained with the admission of the variability range, proposed in level FEL-3 of Petrobras.

Ii is important to report that for all inputs used, it is necessary to research market prices, as defined in Article 109 of the LDO/2009. Thus, the values of the inputs reported by Petrobras should be considered as a maximum parameter for acceptability of prices (for these inputs). Therefore, stating the values of inputs as being from the market (LDO/2009)  and maintaining the certain quantities (in case of any change, a contractual addendum will be formalized), there is no reason to accept variation, for increase, in the proposals of the bidders, taking the risk of accepting values with overpricing.

15

Confidential                                                                                          PBRCG_00711662

The same rationale is extended to the materials with certain quantities defined in Appendix XXII of the referred contracts (UDA, UHDT/UGH, UCR and Pipelines). Thus, only the amounts (quantities x Unit Prices) were considered invariable, since there is the explicit prediction that if there is a change in these quantities, such amounts should be timely reviewed by means of a contractual addendum (Appendix XXII of referred contracts). Thus, for the other services linked to these materials with certain quantities, such as, labor, consumable goods, equipment and others, the variability for proposals acceptability was kept.

This analysis, carried out by the auditing team, whatever is the withdrawal of the variability range of tagged goods and materials with certain quantities, only with respect to their values inputs, marks the principle of economy, in which admission of percentage additions in market values for inputs (tagged goods and materials with certain quantities) contradicts the provisions of the LDO/2009, particularly in Article 109 of the referred federal law.

As observed, Petrobras mentions in its preliminary statement that "the very methodology states that it is a guideline and not a closed pattern or an absolute parameter for procurement".

Thus, being that the methodology adopted by Petrobras (extracted from practices recommended by an international institution the -- AACE [Association for the Advancement of Cost Engineering International]) was as a guideline, not a closed standard, Petrobras itself should adapt this methodology to meet the principle of economizing; adopting a different treatment for tagged goods and certain quantities in relation to other services and items composing the cost estimates.

The company's claim that "abruptly dividing the cost estimates would be dividing Petrobras' cost estimate in a number of minutely low estimates, which, in turn, should have a specific variability range that would consider its own risks, and not the variables involving the estimate," is also not well-grounded. To confirm this, see Table 3.1.1 which brings the percentage relevance of items in question (tagged goods and certain quantities) and the results that this division brings in terms of economic viability.

Concerning these two items, Petrobras also concludes that "the predetermined quantity of some materials or the prior specification of certain equipment has two main purposes, which do not intervene in each other, neither are they related to the variability range. They are the following: i) ensure the quality of services performed or of the equipment that should be used, preventing them from being replaced within the own logic of the contract EPC (procurement that encompasses service and executive project - similar to turn key); ii) avoid a pass-through of contingencies [Extra amount on cost estimates, that cover errors and omissions of planning and estimation] in prices offered by bidders, stimulating the competitiveness within the bid based on real suppositions".

Thus, if the intention of Petrobras, by adopting this methodology, was to ensure the guarantee of quality and prevent the replacement of this equipment, there is no need to talk about uncertainties regarding those goods and materials. Concerning the contingencies, that natural competition in bidding contributes to the indication of the fairest value to be set by contingencies. Thus, when Petrobras takes on the risk of the business, adopting the variability range, it is removing one of the competitive stages of the bidders, whatever the risk may be.

Analysis of the preliminary statement about the percentage of attractiveness for direct labor

Regarding the figures of the salaries adopted in the Petrobras' cost estimates for direct labor (contracts UDA, UHDT/UGH, UCR and Pipelines), it is observed that the adoption of the figures of the Collective Labor Agreement (ACT) must be understood to be the maximum parameter used in Petrobras' estimates. The position of SECOB also remains unchanged, also because no study was presented (in terms of LDO section 3, Article 112) which could justify the appropriateness of the application of attractiveness.

16

Confidential                                      PBRCG_00711663

TC 009.830/2010-3

Therefore, there should not be added a percentage of attractiveness, especially with respect to the Petrobras' cost estimates, to the amounts of the salaries of the direct labor, which insults the defined federal law.

In its preliminary statement, Petrobras mentions that the implementation area of the construction works of Abreu and Lima Refinery is unable to meet the demand for a specialized workforce, it being necessary to raise the salaries to be offered, especially in order to attract workers from other states, keeping in mind the incurred costs on workers, such as change of address, renting and others.

Even if Petrobras would show (which it actually did not) the increase of local demand, implying a possible need to "import" a workforce from other states, such an "assumption" should not be included in the cost estimates because, for, bearing in mind the natural competition of the bidding process, companies would be making the necessary allocation of salaries to meet the needs and demands, which could also result in values lower than the ones estimated by Petrobras itself.

Another important point observed in the audit is the geographic region where the implementation works of the refinery are located. Thus, being an industrial area in expansion, the occurrence of higher salaries than in other Brazilian regions (condition reflected in collective labor agreements), besides the availability of skilled labor, can be observed. Thus, the migration process of workers from regions with a greater rate of unemployment and lower salaries, to regions with more job opportunities and higher salaries, occurs in a natural way, without the need for an additional salary advantage.

Therefore, the insertion of an additional rate of attractiveness for direct labor into the Petrobras' cost estimates is not allowed, increasing the established values of cost estimation, as well as the constants of Collective Labor Agreement, and consequently, besides the constants of the Sinapi, insulting the provisions of Article 109 of Law 11.1768/2008 (LDO 2009).

In face of this, the pointed out irregularity remains, which is the overpricing of R$ 1,324,116,792.62 in the four analyzed contracts (UCR: R$ 522,638,923.70; UDA: R$ 133,082,906.66; UHDT: 351,443,396.64 and Pipelines: 316,951,565.62).

The adopted methodology considered inadequate the variation of up to 20% for tagged goods and materials with certain quantities (as provided in Appendix XXII of the analyzed contracts), applying this variation to the rest of the services, due to the uncertainties of the Basic Project used in the bid (level FEL-3). In case the variations would not be respected for these services, the contracted values would be R$ 2,669,848,785.06 above the market benchmarks.

### 3.1.11 – Responsible parties:

**Name**: Sérgio dos Santos Arantes - **TIN**: 335.417.367-04 - **Position**: Engineering Manager of

SL-ECP (from 05/05/2009 to 05/07/2010)

**Conduct**: Approve the Cost Estimates (EC) of the units UDA, UHDT, UCR and Pipelines, overestimated, resulting in the overpricing of R$ 1,324,116,792.62 (14%) for the four above audited contracts with values above the reference and without justification.

**Causation**: The preparation of Cost Estimates of units UDA, UHDT, UCR and Pipelines with values higher than the market benchmarks gave rise to the contracting of companies/consortia with overpricing, due to the fact Petrobras' cost estimate is itself the parameter of acceptability of prices proposed during bid.

**Culpability**: The responsible should have assessed the appropriateness of the Petrobras' cost estimates, in a manner that respects the criteria of the Law of Budgetary Guidelines and the case law of the TCU, especially as concerns the input pricing, and the applicability of the variation range defined in the FEL-3.

17

Confidential                                                                          PBRCG_00711664

[Logo] FEDERAL COURT OF AUDITORS                                        TC 009.830/2010-3

In light of the foregoing, it can be concluded that the conduct of the person responsible is culpable, that is, reprehensible, for which reason he should be heard in court hearing in order to evaluate whether he deserves to be punished with the application of a fine.

**Name:** Ivo Tasso Bahia Baer - **TIN:** 413.054.427-68 - **Position:** Implementation Manager of

Pipelines enterprise (from 07/22/2008 to 05/07/2010)

**Name:** Marcos José Pessoa de Resende - **TIN:** 128.157.134-20 - **Position:** Implementation Manager of UHDT/UGH enterprise (from 07/21/2008 to 05/07/2010)

**Name:** Flavio Fernando Casa Nova da Motta - **TIN:** 377.258.404-78 - **Position:** Implementation Manager of UDA and UCR enterprises (from 03/19/2009 to 05/07/2010)

**Conduct:** Approve the reports of the Bidding Committee, and consequently, the winning proposals containing prices of inputs higher than those established in Article 109 of Law 11,768/2008 (LDO 2009), as well as signing the contracts with the winning companies of the bidding procedures, which gave rise to the possible overpricing of R$ 1,324,116,792.62 (14%), being distributed as follows: R$ 133,082,906.66 in UDA, R$ 522,638,923.70 in UCR, R$ 316,951,565.62 in contract of Pipelines, and R$ 351,443,396.04 in contract of UHDT.

**Causation:** The approval of these reports the Bidding Committee, without the proper analysis of input prices in compliance with the provisions of Article 109 of LDO 2009 (analysis of input prices according to the market), leading to the procurement of companies/consortia with overpricing.

**Culpability:** The responsible should have assessed the adequacy of the Petrobras' cost estimates, in a manner that respects the criteria of the Law of Budgetary Guidelines and case law of TCU [Federal Court of Auditors].

In light of the foregoing, it can be concluded that the conduct of the person responsible is culpable, that is, reprehensible, for which reason he should be heard in court hearing in order to evaluate whether he deserves to be punished with the application of a fine.

**Name:** Luis Carlos Queiroz de Oliveira - **TIN:** 080.526.797-29 - **Position:** Coordinator of Bidding Committee of UHDT/UGH enterprise (from 03/31/2009 to 05/07/2010)

**Name:** Omar Antônio Kristoschek Filho - **TIN:** 900.295.340-20 - **Position:** Coordinator of Bidding Committee of UDA and UCR enterprises (from 03/19/2009 to 05/07/2010)

**Name:** Ricardo Luiz Ferreira Pinto Tavora Maia - **TIN:** 746.600.047-91 - **Position:** Coordinator of Bidding Committee of Pipelines enterprise (from 07/22/2008 to 05/07/2010)

**Conduct:** Prepare the reports of the Bidding Committee, in which they accepted the winning proposals containing input prices higher than those established in the Article109 of Law 11,768/2008 (LDO 2009) [Law of Budgetary Guidelines 2009], and which gave rise to the possible overpricing of R$ 1,324,116,792.62 (14%), being distributed as follows: R$ 133,082,906.66 in the UDA, R$ 522,638,923.70 in UCR, R$ 316,951,565.62 in contract of Pipelines and R$ 351,443,396.04 in contract of UHDT.

**Causation:** The preparation of the aforementioned Bidding Committee Reports, without the proper analysis of input prices in compliance with the provisions of Article 109 of LDO 2009 (analysis of input prices according to the market), leading to the contracting of companies/consortia with overpricing.

**Culpability:** The responsible party should have assessed the adequacy of the Petrobras' cost estimates, in a manner that respects the criteria of the Law of Budgetary Guidelines and case law of TCU [Federal Court of Auditors].

It is reasonable to state that it was not possible for the responsible party to be conscious of the illegality of the practiced act, having in mind that the Bidding Committee only verifies if the price of the best proposal is within the allowed margin (-15% to + 20% applied on the Estimate of Petrobras).

18

[Logo] FEDERAL COURT OF AUDITORS                                          TC 009.830/2010-3

However, the conduct of the responsible person is culpable, that is, reprehensible, for which reason he should be heard in court hearing in order to evaluate whether he deserves to be punished with the application of a fine.

**3.2 – Deficient study of technical, economic and financial feasibility.**

**3.2.1 – Typifying the findings:**

Classification - other irregularities

**3.2.2 - Situation encountered:**

It has been found that the documentation delivered by Petrobras cannot be considered a Study of Technical Economic and Environmental Feasibility [EVTE-A].

The EVTE-A can be defined as a set of studies, developed prior to the beginning of the basic project, for the assessment of the social and economic benefits arising from investments in the implementation of an enterprise, comparing alternative solution projects, with the identification of the resulting environmental, social and economic impacts.

The internal document of Petrobras, entitled PG-12-SL/ECP-00l - Cost Estimate of Investments, in its item 6.14, defines the EVTE-A as follows:

"Document prepared in the pre-investment phase to be submitted to Senior Management of the Company, aiming to demonstrate the technical, economic and environmental feasibility of a certain investment, based on the necessity identified by the organizational units of the Company.".

Expanding the concept of Feasibility Studies, it is defined that, according to the Federal Department of Transport Infrastructure – DNIT, the EVTE-A is a set of assessments able to ascertain whether the estimated benefits surpass the costs with the projects and execution of planned works, computing the values during the period from the beginning of the investment stage to the end of the considered useful life. Based on the cash flow, feasibility indicators are calculated, such as: Internal Rate of Return (IRR), Net Present Value (NPV) relation between Cost and Benefit (C/B). In addition, analysis of sensitivity is also presented, in which various scenarios are worked out through the surcharge of the estimated costs, simultaneously with the mitigation of the expected benefits. The EVTE-A identifies the most feasible technical, environmental and economic alternative, in a justifiable manner.

The Manual of Presentation of Feasibility Studies of Large-Scale Projects, a document approved by the Commission for Monitoring and Assessment (CMA) of the Multi-Year Plan 2008-2011, through the Resolution CMA/MP no.5, of September 17, 2009, sets out the items required in the feasibility studies, which are: (a) Executive Summary; (b) Registered Data; (c) Fundamental Analysis; (d) Technical Aspects; (e) Financial Analysis; (f) Environmental Analysis; (G) Socioeconomic Analysis and (h) Management Analysis.

When asked to submit the Feasibility Studies of the Abreu and Lima Enterprise, Petrobras, in response to Requisition Letter No. 01-271/2010 of 04/20/2010, presented a document entitled "CALCULATION CHART SUPPLY/PROGRAM OF INVESTMENT/RNEST INFORMATION ABOUT ABREU AND LIMA REFINERY," consisting of eight pages, including the cover page, as the EVTE-A of the refinery.

The auditing team, understanding that it was not the document forwarded as the EVTE-A, requested, via e-mail (attached to the proceeding), confirmation of this matter and, if necessary, complementation of documentation, aimed to meet the terms requested in item 1.1 of the requisition letter No. 01-271/2010.

In response to the questions raised in the email, Petrobras sent, as complementation of the previous document, a new document entitled "Premises and Results of Economic and Financial Analysis of the Abreu e Lima Refinery (RNEST)".

Therefore, the documents presented by Petrobras, in response to the questions of item 1.1 of the requisition letter No. 01-271/2010 are: (i) CALCULATION CHART SUPPLY/PROGRAM OF INVESTMENT/RNEST INFORMATION ABOUT

To verify the signatures, access www.tcu.gov.br/autenticidade, inserting the code 45484078.

Confidential                                                      PBRCG_00711666

TC 009.830/2010-3

ABREU AND LIMA REFINERY and (ii) Premises and Results of Economic and Financial Analysis of the Abreu and Lima Refinery (RNE), which will be analyzed below.

In the analysis of the first document sent (CALCULATION CHART SUPPLY/PROGRAM OF INVESTMENT/RNEST INFORMATION ABOUT ABREU AND LIMA REFINERY), it was preliminarily found that this document appeared as a brief description of the project, covering only EVTE-A information, but not the actual studies.

In the executive summary, which would have as one of its purposes the description of the physical goals to be achieved by the work or service, the limitation in succinctly stating the very broad goals is observed. In the description of the project, in the submitted documentation, the Scope Statement is cited; MD-5290.00-2000-911-PBL-001 Rev. A, validated on September 9, 2009, a date subsequent to the beginning of the project. Therefore, it is not part of the Feasibility Study, which is prepared in the pre-investment stage, and only in this way it would be capable to define the previous decisions of the management.

The fundamental analysis of the project is incomplete, for it does not explain in detail the cause or condition that motivates the existence of the project, neither does it meet the recommendation of being accompanied by maps of the socioeconomic infrastructure of the project's area of influence.

Regarding the technical aspects, the document displays little information, such as the estimated refining capacity of barrels of oil per day, in addition to stating the units involved in the production chain and their capabilities. Nevertheless, no evaluated technical alternative for the implementation of the project was found, neither the technical description of the project and estimated useful life of the enterprise. No mention is made of the financial execution schedule, for example.

The items of financial, socioeconomic, managerial and environmental analyses are not included in the submitted document, despite being essential for a feasibility study. In short, the submitted document represents only a summary of some information, and not a suitable Feasibility Study (EVTE-A).

Going on to the analysis of the second document sent, entitled "Premises and Results of Economic and Financial Analysis of the Abreu and Lima Refinery (RNEST)," this was found to be a document consisting of six pages; cover page included.

After reading and analyzing this document, it is observed that these premises, according to the document, had as a starting point the "race 21.739 - Base March/2009," a date subsequent to the due previous study of feasibility, since the enterprise had already begun as of this date.

In the remainder of this document, it went on to discuss the expected data and results of the already defined enterprise (Rnest). Also in this part, no detailed study is present; but only summaries of the data.

In light of this, it is concluded that none of the two submitted documents, separately or taken together, cover what is defined as an EVTE-A. At this point, it is recorded that one of stages of EVTE-A, the EIA/RIMA [Study and Report of Environmental Impact], a document of several hundred pages, was submitted by Petrobras, in response to another item (1.6) of the Requisition Letter No. 01- 271/2010.

The case law of this Court seeks the collectability of technical and economic feasibility studies for engineering works, as is stated in Judgments 2674/2009; 2510/2009; 2425/2009 and 1837/2009, all of the plenary of this Court.

Furthermore, the beginning of implementation of large-scale projects without preliminary technical, economic and environmental feasibility studies, with all the elements necessary for its proper characterization, may represent reckless management of public funds, as provisioned in Law 11.653/2008, in Article 10, §4, reproduced below:

"§4. Additional criteria and requirements shall be adopted for the implementation, internal and external monitoring and control, including the prior assessment of technical and

20

Confidential

PBRCG_00711667

TC 009.830/2010-3

socioeconomic feasibility, always when the total estimated cost of the large-scale project is equaled or superior to:

I - one hundred million reais; when financed with funds from the budget of investment of state-owned companies, under the responsibility of public companies or their subsidiaries; or

II - fifty million reais, when financed with funds from the tax budget and social security or with the budget resources from state-owned companies that do not fit into the provisions of the previous item."

Therefore, because there is a great gap between what is recommended to be covered in a Study of Technical, Economic and Environmental Feasibility and the documents submitted by Petrobras, the irregularity (pending information) pointed out above is confirmed. An appropriate solution is to assign a deadline for the delivery of the complete EVTE-A, accompanied by all the studies and calculation memories that substantiate it, warning that non-compliance can result in a fine and even IG-P, as established in Article 42, Section 2 of Law 8443/1992 and Article 94, Section1 of Law 12.017/2009.

### 3.2.3 – Items in which the findings were encountered:

**(OI) - Contract 0800.0053457.09.2,** February 02/05/2010, Delayed Coking Units (U-21 and U-22) its substations and Control Centers, its Regenerative Caustic Treatment Sections (U-26 and U-27), including materials supply, partial supply of equipment, construction, electromechanical assembly, preservation, conditioning, testing, pre-operation, start-up assistance for the operations, technical assistance and training in Abreu and Lima Northeast Refinery- RNEST.

**Classification changed from IG-C to OI.**

The use of a deficient Technical, Economic and Environmental Feasibility Study can generate an erroneous decision in regard to the definition of the enterprise. In this, there is the possibility of causing losses to the public treasury, in the case of an inadequate choice of the alternative project or of the economic unviability (financial return) of the enterprise. However, it is understood that until the present time, Petrobras did not provide any document that can be entitled as an EVTE-A. Thus, it is appropriate to classify this finding, up to this point, as OI (Other Irregularities), not being fitting to propose a hearing (accountability) as long as the team does not have the exact requested documentation.?

Additionally, the existence of the EIA/RIMA is also observed, completing the environmental part of the EVTE-A, as well as the presentation of the premises and results, required in an EVTEA.

**(OI) - Contract 0800.0053456.09-2,** 01/28/2010, Services and supplies necessary for the implementation of Atmospheric Distillation Units - UDA (U-II and U-12), of Refinaria Abreu e Lima S.A.. – RNEST, comprising the service of construction, electromechanical installments, material supply, partial supply of equipment, preservation, conditioning, testing, pre-operation, start-up, technical assistance for the operation, technical assistance and training in Refinaria Abreu and Lima S.A. - RNEST, Consortium Rnest-Conest (Integrated by the companies Odebrecht and Oas.

**Classification changed from IG-C to OI**

The use of a deficient Technical, Economic and Environmental Feasibility Study can generate an erroneous decision in regard to the definition of the enterprise. In this, there is the possibility of causing losses to the public treasury, in the case of an inadequate choice of the alternative project or of the economic unviability (financial return) of the enterprise. However, it is understood that until the present time, Petrobras did not provide any document that can be entitled as an EVTE-A. Thus, it is appropriate to classify this finding, up to this point, as OI (Other Irregularities), not being fitting to propose a hearing (accountability) as long as the team does not have the exact requested documentation.

Additionally, the existence of the EIA/RIMA is also observed, completing the environmental part of the EVTE-A, as well as the presentation of the premises and the supposed results in an EVTEA.

21

Confidential

**(OI) - Contract 0800.0055148.09-2**, 02/09/2010, Diesel Hydro-treatment Unit (U-31 and U-32), Naphtha Hydro-treatment (U-33 and U-34) and Hydrogen Generation UGH (U- 35 and U-36), including material supply, partial supply of equipment, construction, electromechanical assembly, preservation, conditioning, testing, pre-operation, start-up, assistance for the operation, technical assistance and training in Refinaria Abreu and Lima S.A. – RNEST.

**Classification changed from IG-C to OI.**

The use of a deficient Technical, Economic and Environmental Feasibility Study can generate an erroneous decision in regard to the definition of the enterprise. With this, there is the possibility of causing losses to the public treasury, in the case of an inadequate choice of the alternative project or of the economic unviability (financial return) of the enterprise. However, it is understood that until the present time, Petrobras did not provide any document that can be entitled as an EVTE-A. Thus, it is appropriate to classify this finding, up to this point, as OI (Other Irregularities), not being fitting to propose a hearing (accountability) as long as the team does not have the exact requested documentation.?

Additionally, the existence of the EIA/RIMA is also observed, completing the environmental part of the EVTE-A, as well as the presentation of the premises and results, required in an EVTEA.

**(OI) - Contract 0800.0057000.10-2**, 04/16/2010, Services and supplies required for the implementation of the interconnection pipelines of RNEST comprising the services of analysis of the consistency of the basic project, breakdown project, supply of materials, partial supply of equipment, construction, electromechanical assembly, preservation, pump house, conditioning, testing, pre-operation, startup, assistance for the operation, technical assistance and training in Refinaria Abreu and Lima S.A – RNEST.

**Classification changed from IG-C to OI.**

The use of a deficient Technical, Economic and Environmental Feasibility Study can generate an erroneous decision in regard to the definition of the enterprise. In this, there is the possibility of causing losses to the public treasury, in the case of an inadequate choice of the alternative project or of the economic unviability (financial return) of the enterprise. However, it is understood that until the present time, Petrobras did not provide any document that can be entitled as an EVTE-A. Thus, it is appropriate to classify this finding, up to this point, as OI (Other Irregularities), not being fitting to propose a hearing (accountability) as long as the team does not have the exact requested documentation.?

Additionally, the existence of the EIA/RIMA is also observed, completing the environmental part of the EVTE-A, as well as the presentation of the premises and results, required in an EVTEA.

**(OI) – Contract 0800.0049716.09-2**, 03/31/2009, Services required for the implementation of Storage tanks - Lot I -

**Classification changed from IG-C to OI.**

The use of a deficient Technical, Economic and Environmental Feasibility Study can generate an erroneous decision in regard to the definition of the enterprise. In this, there is the possibility of causing losses to the public treasury, in the case of an inadequate choice of the alternative project or of the economic unviability (financial return) of the enterprise. However, it is understood that until the present time, Petrobras did not provide any document that can be entitled as an EVTE-A. Thus, it is appropriate to classify this finding, up to this point, as OI (Other Irregularities), not being fitting to propose a hearing (accountability) as long as the team does not have the exact requested documentation.?

Additionally, the existence of the EIA/RIMA, is also observed, completing the environmental part of the EVTE-A, as well as the presentation of the premises and results, required in an EVTEA.?

**(OI) – Contract 08000045921082**, 12/02/2008, Services related to the executive project, supply, construction and installation, testing, pre-operation and assistance to the operation, for the

22

Confidential                                                          PBRCG_00711669

TC 009.830/2010-3

implementation of the Power House – CAFOR, for Abreu and Lima Northeast Refinery– RNEST, in Ipojuca-PE, for the following Processing Units and Complementary Systems.

Power house - CAFOR U-50 (including SE-5000 and SE-5010)

SE-5000 (4TURBOGENERATORS OF 62.5 MVA in 3.8 KV)

SE-5010 (69 KV-2XI00 MVA)

Compressed Air Unit U-57

Substation External Input U-5500 (230/69 KV-2XI00MVA)

Substations Isle:


SE-5020 (69/13.8 KV-45/60 MVA)

SE-5030 (69/13.8 KV-45/60 MVA)

SE-5040 (69/13.8 KV-45/60 MVA)

SE-5050 (69/13.8 KV-45/60 MVA)

Electric interconnection of SE-5500 with CAFOR., Alusa Engenharia Ltda.

**Classification changed from IG-C to OI.**

The use of a deficient Technical, Economic and Environmental Feasibility Study can generate an erroneous decision in regard to the definition of the enterprise. In this, there is the possibility of causing losses to the public treasury, in the case of an inadequate choice of the alternative project or of the economic unviability (financial return) of the enterprise. However, it is understood that until the present time, Petrobras did not provide any document that can be entitled as an EVTE-A. Thus, it is appropriate to classify this finding, up to this point, as OI (Other Irregularities), not being fitting to propose a hearing (accountability) as long as the team does not have the exact requested documentation.?

Additionally, the existence of the EIA/RIMA is also observed, completing the environmental part of the EVTE-A, as well as the presentation of the premises and results, required in an EVTEA.

**(OI) – Contract 0800.0033808.07.2**, 08/09/2007, Project and execution of Earthmovings and complementary drainage services, arrangements of roads and paving, Consortium Abreu and Lima (Norberto Odebretch/Galvão/ Camargo Correia/Queiroz Galvão).

**Classification changed from IG-C to OI.**

The use of a deficient Technical, Economic and Environmental Feasibility Study can generate an erroneous decision in regard to the definition of the enterprise. In this, there is the possibility of causing losses to the public treasury, in the case of an inadequate choice of the alternative project or of the economic unviability (financial return) of the enterprise. However, it is understood that until the present time, Petrobras did not provide any document that can be entitled as an EVTE-A. Thus, it is appropriate to classify this finding, up to this point, as OI (Other Irregularities), not being fitting to propose a hearing (accountability) as long as the team does not have the exact requested documentation.?

Additionally, the existence of the EIA/RIMA is also observed, completing the environmental part of the EVTE-A, as well as the presentation of the premises and results, required in an EVTEA.?

**(OI) – Contract 0800.0049738.09-2,** 04/30 2009, Services required for the implementation of Storage Tanks - Lot II -

**Classification changed from IG-C to OI.**

The use of a deficient Technical, Economic and Environmental Feasibility Study can generate an erroneous decision in regard to the definition of the enterprise. In this, there is the possibility of causing losses to the public treasury, in the case of an inadequate choice of the alternative project or of the economic unviability (financial return) of the enterprise. Still,

23

Confidential                                                                                 PBRCG_00711670

TC 009.830/2010-3

it is understood that until the present time, Petrobras did not provide any document that can be entitled as an EVTE-A. Thus, it is appropriate to classify this finding, up to this point, as OI (Other Irregularities), not being fitting to propose a hearing (accountability) as long as the team does not have the exact requested documentation.?

Additionally, the existence of the EIA/RIMA is also observed, completing the environmental part of the EVTE-A, as well as the presentation of the premises and results, required in an EVTEA...?

**(OI) – Contract 0800.0049742.09-2,** 05/04/2009, Services and supplies required for the preparation of the executive and Civil Construction with supply of materials and equipment of Buildings, including urbanization, of the Administrative Area of Refinaria Abreu and Lima S.A. - RNEST in Ipojuca/PE Consortium Rnest O. C. Buildings (Engevix/Eit).

**Classification changed from IG-C to OI.**

The use of a deficient Technical, Economic and Environmental Feasibility Study can generate an erroneous decision in regard to the definition of the enterprise. In this, there is the possibility of causing losses to the public treasury, in the case of an inadequate choice of the alternative project or of the economic unviability (financial return) of the enterprise. However, it is understood that until the present time, Petrobras did not provide any document that can be entitled as an EVTE-A. Thus, it is appropriate to classify this finding, up to this point, as OI (Other Irregularities), not being fitting to propose a hearing (accountability) as long as the team does not have the exact requested documentation.?

Additionally, the existence of the EIA/RIMA is also observed, completing the environmental part of the EVTE-A, as well as the presentation of the premises and results, required in an EVTEA.

**(OI) – Contract 08000049741092,** 03/30/2009, Materials and equipment supply and implementation, under the lump sum price system, by the CONTRACTED, of the services of basic project development, project breakdown, construction, electromechanical assembly , preservation, conditioning, testing, pre-operation, start-up, assisted operation, technical assistance and training for the implementation of Water Treatment Plant ETA (U-51) for Abreu and Lima Northeast Refinery RNEST. (Contract period 819 days).

THE CONTRACT WAS ENTERED INTO WITH THE CONSORTIUM ENFIL/VEOLIA - 'RNEST'. COMPRISED OF THE COMPANIES:

ENFIL S.A CONTROLE AMBIENTAL [ENFIL S.A ENVIRONMENTAL CONTROL] (CNPJ 00.286.550/0001-19

VEOLIA WATER SYSTEMS BRAZIL LTA (CNPJ 96.591.128/0001-46.

**Classification changed from IG-C to OI.**

The use of a deficient Technical, Economic and Environmental Feasibility Study can generate an erroneous decision in regard to the definition of the enterprise. In this, there is the possibility of causing losses to the public treasury, in the case of an inadequate choice of the alternative project or of the economic unviability (financial return) of the enterprise. However, it is understood that until the present time, Petrobras did not provide any document that can be entitled as an EVTE-A. Thus, it is appropriate to classify this finding, up to this point, as OI (Other Irregularities), not being fitting to propose a hearing (accountability) as long as the team does not have the exact requested documentation.?

Additionally, the existence of the EIA/RIMA is also observed, completing the environmental part of the EVTE-A, as well as the presentation of the premises and results, required in an EVTEA.

**(OI) - Contract RPQS-4501495403,** Basic Project Development of Earthmoving and Drainage - Northeast Refinery in SUAPE, Pernambuco, Prodec Consultoria para Decisão S/C Ltda.

**Classification changed from IG-C to OI.**

The use of a deficient Technical, Economic and Environmental Feasibility Study can generate an erroneous decision in regard to the definition of the enterprise. In this, there is the possibility of causing losses to the public treasury, in the case of an inadequate choice of the alternative

24

Confidential                                                                              PBRCG_00711671

TC 009.830/2010-3

project or of the economic unviability (financial return) of the enterprise. However, it is understood that until the present time, Petrobras did not provide any document that can be entitled as an EVTE-A. Thus, it is appropriate to classify this finding, up to this point, as OI (Other Irregularities), not being fitting to propose a hearing (accountability) as long as the team does not have the exact requested documentation.

Additionally, the existence of the EIA/RIMA is also observed, completing the environmental part of the EVTE-A, as well as the presentation of the premises and results, in a supposed EVTEA.

### 3.2.4 - Causes of the finding having occurred:

Negligence - Omission of Petrobras by not submitting, upon request, documentation that may be characterized as an EVTE-A (Study of Technical, Economic and Environmental Feasibility)

### 3.2.5 - Effects/Consequences of the findings:

Risk of the occurrence of acquisitions or procurements that do not meet the need of the organ (potential effect) - The use of a deficient Study of technical, economic and environmental feasibility can lead to an erroneous decision in regard to the definition of the enterprise, which generates a capability of causing losses to the public treasury, also because it is not allowed to invest in large-scale projects without the prior approval of an EVTE-A.

### 3.2.6 - Criteria:

Judgment 1837/2009, the Federal Court of Auditors, Plenary

Judgment 2425/2009, the Federal Court of Auditors, Plenary

Judgment 2510/2009, the Federal Court of Auditors, Plenary

Judgment 2674/2009, the Federal Court of Auditors, Plenary

Internal document, PG-12-SL/ECP-001 - Cost Estimate of Investments - Petrobras

MANUAL OF INVESTMENTS, Manual of Business Analysis of Investment Projects- 2006 – PETROBRAS

Resolution 5/2009, Commission for Monitoring and Assessment of the Multi-Year Plan, Art. 1; Art. 2

### 3.2.7 - Evidence:

Document: "CALCULATION CHART SUPPLY/PROGRAM OF INVESTMENT/RNEST INFORMATION ABOUT ABREU AND LIMA REFINERY"; (Annex 6 – Main body – pages 1/200)

Document of Petrobras: Premises and Results of Economic and Financial Analysis of the Abreu and Lima Refinery (RNEST); (Annex 6 – Main body – pages 1/200)

Letter No. 01-271/2010-TCU/SECOB-3, of 04/20/2010; (Main Volume - pages 6/27)

email sent by the auditing team to Petrobras on May 19, 2010. (Main Volume - page 145)

### 3.2.8 – Final conclusions of the Team:

Given the foregoing, it can be concluded that none of the two submitted documents, separately or together, meet what is defined as an EVTE-A

In their analysis, the team adopted as reference not only the orientations contained in the Presentation Manual of Feasibility Studies of Large-Scale Projects, of mandatory observance by Petrobras, pursuant to Article 1. of Resolution CMA/MP No. 5, of September 17, 2009, but also the very internal document of Petrobras, entitled - Cost Estimate of Investments.

In its item 6.14, the aforementioned document Petrobras DIP [Internal Document of the Petrobras System] No. PG-12-SL/ECP-001, which was cited in the report of the team, defines the EVTE-A as the following:

25

Confidential                                                          PBRCG_00711672

[Logo] FEDERAL COURT OF AUDITORS                                   TC 009.830/2010-3

"Document prepared in the pre-investment phase, to be submitted to the Senior Management of the Company, aiming to demonstrate the technical, economic and environmental feasibility of a certain investment, based on the needs identified by the organizational units of the Company."

Given the above, it is proposed to sign a deadline for Petrobras to present the documents relevant to the Feasibility Study, as prescribed in the manual cited above, as well as the entire decision support package at all levels (FEL-I, FEL-2 and FEL-3), adopted by Petrobras, and which substantiated the choice of the implementation of the project.

(...)

## 6 – CONCLUSION

The following findings have been identified in this work:

Question 9 Overprice due to excessive prices if compared to market. (Item 3.1)

Moreover, the following finding has been obtained with no link to auditing matters:

Deficient study of technical, economic and financial feasibility. (Item 3.2)

Among the benefits estimated in this inspection, a potential savings of R$ 1,324,116,792.62 can be highlighted, due to possible reduction in the amount of 4 contracts (UDA, UCR, UHDT/UGH and Pipelines), which is equivalent to an overpricing of 14%.

It is essential to emphasize that the 14% of overpricing detected in the 4 contracts aforementioned originates from the amounts that surpass the "CEILING" of price acceptability of Petrobras, which, for the present case, would be 20% above the Estimate developed by the Company and adjusted by the Technical Unit. If this percentage of +20% is disregarded (prevailing only the adjustments of the Technical Unit), this benefit could reach R$ 2,669,848,785.06 (32.91% that would be renegotiated for the same contracts).

Also considered as a potential benefit is the non-payment of the expected amounts of extra funds due to suspension caused by rain, concerning the signed contracts, which, in the patterns in which they are currently found, could result in loss for the public treasury and Petrobras (positive economic impact).

Added to the benefits is the supply of subsidies for the performance of the National Congress.

It should be reported that evidence of irregularity of overpricing for the contracts inspected by Fiscobras 2009 [Report of Public Works Inspection], (Cafor, Tanks I and II and Buildings) were pointed out. However, when employing the same methodology of 2010 (which was impossible for the auditing team of Fiscobras of 2009, due to non-delivery of Estimates) for the other contracts (audited in the scope of Fiscobras 2009), a significant increase is noted of the sample subject to analysis. Assessing the suitability of the prices for this new sample, it was noted that the overpricing initially pointed out (derived from DFP) would remain, well characterized, only if the margin of + 20% would be excluded for items that are not tagged goods or certain quantities. This fact led the team to conclude as being absent the requisites essential to match into the framework of Article 94, Section 1, item IV of Law 12.017/2009 (LDO 2010) , what also removed the need to maintain the IG-P.

## 7 – REFERRAL

### Proposal of the team

In face of the aforementioned, the referral of the report for higher consideration is proposed, with the following proposals:

1. Hearing of the responsible parties:

1.1 Hold a hearing, pursuant to Art. 43, II of Law No. 8.443/92, of Mr. Flávio Fernando Casa Nova da Motta (TIN: 377.258.404-78), Implementation Manager of the UDA and UCR enterprises, in order to present the reasons that justify the following: (a) approve, as a member of the bidding committee (Invitations 0629131098- UCR and 0634314098-UDA), the winning bid containing input prices superior to those established in Art. 109 of Law 11.768/2008 (LDO 2009); (b) sign the aforementioned contracts, which resulted in

26

Confidential                                                                 PBRCG_00711673

possible overpricing of R$ 133,082,906.66 (one hundred and thirty-three million, eighty-two thousand, nine hundred and six reais and sixty-six cents) in contract No. 0800.0053456.09-2 (UDA), and R$ 522,638,923,70 (five hundred twenty-two million, six hundred and thirty-eight thousand, nine hundred and twenty-three reais and seventy cents) in the contract No. 0800.0053457.09.2 (UCR). (Overpricing resulting from excessive prices if compared to market, in contract 0800.0053456.09-2 and 0800.0053457.09.2);

1.2. Hold a hearing, pursuant to Art. 43, II, of Law No. 8.443/92, of Mr. Ivo Tasso Bahia Baer (TIN: 413.054.427-68), Implementation Manager of Pipelines enterprise, in order to present the reasons that justify the following: (a) approve, as a member of the bidding committee (Invitation 0629064.09-8), winning bid with input prices higher than established in Art. 109 of Law 11.768/2008 (LDO 2009) [Law of Budgetary Guidelines/2009], (b) sign the aforementioned contract, resulting in a possible overpricing of R$ 316.951.565.62 (three hundred and sixteen million, nine hundred and fifty-one thousand, five hundred and sixty-five reais and sixty-two cents) in the contract No. 0800.0057000.1 0-2 (Pipelines). (Overpricing as a result of excessive prices if compared to market, contract No. 0800.0057000.10-2);

1.3 Hold a hearing, pursuant to Art. 43, II, of Law No. 8.443/92, of Mr. Marcos José Pessoa Resende (TIN: 128.157.134-20), Implementation Manager of UHDT/UGH enterprise, in order to present the reasons that justify the following: (a) approve, as a member of the bidding committee (Invitation 0634316.09-8), a winning bid containing prices of inputs higher than those established in the Art. 109 of Law 11.768/2008 (LDO 2009), (b) sign the contract, resulting in a possible overpricing of R$ 351,443,396.04 (three hundred and fifty-one million, four hundred forty-three thousand, three hundred ninety-six reais and four cents) in the contract No. 0800.0055148.09-2 (UHDT/UGH). (Overpricing due to excessive prices if compared to market, contract No. 0800.0055148.09-2);

1.4 Hold a hearing, pursuant to Art.43, II, of Law 8.443/92, of Mr. Luis Carlos Queiroz de Oliveira (TIN: 080.526.797-29), Coordinator of the Bidding Committee of the UHDT/UGH enterprise (Invitation 0634316.09-8), in order to present the reasons that justify the acceptance of a winning proposal containing input prices higher than those established in Art. 109 of Law 11.768/2008 (LDO 2009), resulting in a possible overpricing of R$ 351,443,396.04 (Three hundred fifty-one million, four hundred forty-three thousand, three hundred and ninety-six reais and four cents) in the contract No. 0800.0055148.09-2 (UHDT/UGH). (Overpricing due to excessive prices if compared to market, contract No. 0800.0055148.09-2);

1.5 Hold a hearing, pursuant to Art. 43, II, of Law No. 8.443/92, of Mr. Omar Antonio Kristoschek Filho (TIN: 900.295.340-20), Coordinator of the Bidding Committee of UDA and UCR enterprises (Invitations 0629131098- UCR and 0634314098-UDA) and Manager of Contract of the UCR enterprise (Contract No. 0800.0053457.09.2), in order to present the reasons that justify the acceptance of winning bids containing input prices superior to those established in Art. 109 of Law 11.768/2008 (LDO 2009), resulting in the possible overpricing of R$ 133,082,906.66 (one hundred thirty-three million, eighty-two thousand, nine hundred and six reais and sixty six cents) in contract No.0800.0053456.09.2 (UDA) and R$ 522,638,923.70 (five hundred twenty-two million, six hundred thirty-eight thousand, nine hundred and twenty-three reais and seventy cents) in contract No. 0800.0053457.09.2 (UCR); (Overpricing due to excessive prices if compared to market, contracts No. 0800.0053456.09-2 and 0800.0053457.09.2);

1.6 Holding a hearing, pursuant to Art. 43, II, of Law No. 8.443/92, of Mr. Ricardo Luiz Ferreira Pinto Távora Maia (TIN: 746.600.047-91), Coordinator of the Bidding Committee of the enterprise in contract No. 0800.0057000.10-2, in order to present the reasons that justify the acceptance of winning bids containing input prices superior to those established in Art. 109 of Law 11.768/2008 (LDO 2009 ), resulting in a possible overpricing of R$ 316,951,565.62 (three hundred and sixteen million, nine hundred fifty-one thousand, five hundred and sixty-five reais and sixty-two cents) in contract No. 0800.0057000.10-2 (Pipelines). (Overpricing due to excessive prices if compared to market, contract No. 0800.0057000.10-2);

27

Confidential

TC 009.830/2010-3

1.7 Hold a hearing, pursuant to Art. 43, II, of Law No. 8.443/92, of Mr. Sérgio dos Santos Arantes (TIN: 335.417.367-04), Engineering Manager of SL-ECP, to present reasons that justify the approving of cost estimates of the processes that resulted in procurements with indication of overpricing of R$ 1,324,116,792.62 (one billion, three hundred twenty-four million, one hundred and sixteen thousand, seven hundred and ninety-two reais and sixty-two cents - 14%) for the audited contracts No. 0800.0053456.09-2 (UDA), No. 0800.0053457.09.2 (UCR), contract No. 0800.0057000.10-2 (Pipelines), contract No. 0800.0055 148.09-2 (UHDT/UGH), thus disregarding Art. 109 of Law 11.768/2008 (LDO 2009), as well as the case law of TCU [Federal Court of Auditors] (Judgments 325/2007, 1599/2008 and 1607/2008, Federal Court of Auditors, Plenary); (Overpricing due to excessive prices if compared to market).

2. Ordinance of Internal Provisions to TCU [Federal Court of Auditors of Brazil]:

2.1. Reveal the results of this report to Petrobras and the companies and consortiums contracted, informing them that, in case they see fit, it is optional for them to intervene in the records to present the elements necessary for the protection of their interests, within 15 days, concerning the indication of irregularities pointed out in this report, which could determine the need for Petrobras to renegotiate the aforementioned contracts. (Overpricing due to excessive prices if compared to market): (i) ODEBRECHT PLANTAS INDUSTRIAIS E PARTICIPAÇÕES S/A [ODEBRECHT INDUSTRIAL PLANTS AND PARTICIPATIONS S/A] - CNPJ No. 09334075/0001-83 (contract No. 0800.0053456.09.2 - UDA and 0800.0055 148.09.2 - UHDT); (ii) CONSTRUTORA OAS LTDA [CONTRACTOR OAS LTDA] - CNPJ No. 14.310.577/0001-04 (contracts No. 0800.0053456.09.2 - UDA and 0800.0055148.09.2 - UHDT); (iii) CONSORTIUM RNEST - CONEST - CNPJ No. 11.045.775/0001-08 (contract No. 0800.0053456.09.2 - UDA and 0800.0055148.09.2 - UHDT); (iv) CONSTRUÇÕES E COMÉRCIO CAMARGO CORREA S/A [CONSTRUCTION AND COMMERCE CAMARGO CORREA S/A] - CNPJ No. 61.522.512/0001-02 (contract No. 0800.0053457.09.2 - UCR); (v) CNEC - ENGENHARIA S.A [CNEC - ENGINEERING S.A] - CNPJ No. 61.564.639/0001-94 (contract No. 0800.0053457.09.2 - UCR) (vi) CONSORTIUM CNCC - CAMARGO CORREA - CNEC - CNPJ No. 10.517.133/0001-93 (contract No. 0800.0053457.09.2 - UCR); (vii) CONSTRUTORA QUEIROZ GALVÃO S/A [CONSTRUCTION COMPANY QUEIROZ GALVÃO S/A] - CNPJ No. 33.412.792/0001-60 (contract No. 0800.0057000.10-2 - Pipelines); (viii) IESA ÓLEO & GAS S/A [IESA OIL & GAS] - CNPJ No. 07.248.576/0001-11 (contract No. 0800.0057000.10-2 - Pipelines) and (ix) CONSORTIUM CII - CONSORTIUM IPOJUCA INTERCONNECTIONS - CNPJ No. 11.387.267/0001 -08 (contract No. 0800.0057000 Pipelines).

2.2. Order to body or entity:

5.2.1 On the basis of Article 42, Section 1 of Law No. 8.443/92, combined with Article 245, item II, of the Internal Regulations, assign a deadline of 15 days for Petrobras to submit copies, in digital format, of the complete set of Studies of Technical, Economic and Environmental Feasibility, concerning the Abreu and Lima Refinery enterprise (PE), as required in the Manual of Business Analysis of Investment Projects (2006), Presentation Manual of Feasibility Studies of the Large-Scale Projects, document approved by the Commission of Monitoring and Assessment of the Multi-year Plan 2008-2010 (CMA), as well as the internal policy of Petrobras - PG-12-SL/ECP-001, with the approval of competent authorities or responsible parties, accompanied by:

a) a decision support package in all levels (FEL-1, FEL-2 and FEL-3), adopted by Petrobras, or economic and financial Evaluation Reports, and furthermore, documents containing information about the EVTE;

c) electronic spreadsheets developed for economic and financial evaluation of the project, in digital form, with detailed formulas, without requiring access passwords or any other obstruction to the access of calculations and, when needed, description of the interrelationship of the submitted spreadsheets, in accordance with the Discounted Cash Flow (FCD);

d) study of demand or volume of sales developed based on the characteristics of the enterprise, including all operational revenues or other that make up the total of revenues, and furthermore, specifying the area of influence of the project;

e) estimated costs and expenses for the provision of services or for production;

28

Confidential                                                                 PBRCG_00711675

TC 009.830/2010-3

f) projection of the revenues, the costs and the operational expenses duly founded on economic and financial premises;

g) economic and financial premises (ex; price of the product or input, exchange rate, inflation rate, rate of GDP growth, etc.) used for the projection of the components of cash flow based on official sources or, in case non-official sources are adopted, present reasons for this measure;

h) investments that are to be made, with reference date and detailed with quantitative data and prices used in the budgeting;

i) parameters that are to be used for the definition of the discount rate or the minimum rate of attractiveness, accompanied by the corresponding calculations, definition criteria and justification, consistent with the methodology of WACC [Weighted average cost of capital];

j) database and of projection horizon, according to stabilization of cash flow;

k) calculation and value of perpetuity, if applicable;

l) analysis of the sensitivity of the main premises that influence the cash flow;

m) technical operational parameters that aim to optimize production capacity and idleness, for internal and external market, in a way that makes it possible to verify the investment alternatives, proving them from an economic and financial point of view.

3. Study provided to the Body/Entity:

3.1 NATIONAL CONGRESS

To communicate to the Mixed Committee on Planning, Public Budgets and Supervision of the National Congress that:

3.1.1 Under the present supervision, evidence of irregularities was detected, which are set forth in Subsection IV of §1, Article 94 of Law no. 12.017/2009 (LDO/2010), for the contracts described below, related to the work on the Construction of the Abreu e Lima Refinery in Recife, in the State of Pernambuco, the potential losses to the public treasury having been estimated at R$ 1,324,116,792.62 (one billion, three hundred twenty-four million, one hundred sixteen thousand, seven hundred ninety-two reais and sixty-two cents), and that its correction depends on the renegotiation of the respective contracts, as described below:

- UDA, 0800.0053456.09.2: R$ 133,082,906.66 (one hundred thirty-three million, eighty-two thousand, nine hundred six reais and sixty-six cents);

- UDHT, 0800.0055148.09.2: R$ 351,443,396.04 (three hundred fifty-one million, four hundred forty-three thousand, three hundred ninety-six reais and four cents);

- UCR, 0800.0053457.09.2: R$ 522,638,923.70 (five hundred twenty-two million, six hundred thirty-eight thousand, nine hundred twenty-three reais and seventy cents);

- Pipelines, 0800.0057000.10-2: R$ 316,951,565.62 (three hundred sixteen million, nine hundred fifty-one thousand, five hundred sixty-five reais and sixty-two cents);

3.1.2 In relation to the findings on overpricing arising from excessive prices in light of the market, noted in Fiscobras 2009, linked to the contracts described below, even though it may not be considered corrected (it was altered for IG-C), it is no longer framed in the provision of Subsection IV, §1, Article 94 of Law no. 12.017/2009 (LDO/2010):

- BUILDINGS – Contract 0800.0049742.09-2;

- CAFOR – Contract 0800004592108-2;

- TANK LOTS I – Contract 0800.0049716.09-2;

- TANK LOTS II – Contract 0800.0049738.09-2

3.1.3 In relation to the inadequate and anti-economic criteria found, noted in Fiscobras 2009, linked to the contracts described below, even though it may not be

29

Confidential

PBRCG_00711676

considered corrected, its classification was altered for IG-C, as it no longer fit Subsection IV, §1, Article 94 of Law no. 12.017/2009 (LDO/2010), once there was mischaracterization of the potential risk to the public treasury, embodied non-effectiveness of any payment referring to rainy day funds.

- BUILDINGS – Contract 0800.0049742.09-2;

- CAFOR – Contract 0800004592108-2;

- TANK LOTS I – Contract 0800.0049716.09-2;

- TANK LOTS II – Contract 0800.0049738.09-2

- ETA – Contract 08000049741092;

- PIPELINES – Notice 0629064.09-8

- UCR – Notice 0629131.09-8;

- UDA – Notice 0634314.09-8;

- UHDT/UGH – Notice 0634316.09-8;

3.1.4 In relation to the findings on overpricing and overbilling arising from excessive prices in light of the market, noted in Fiscobras 2009, in reference to contract 0800.0033808.07.2 (Mining), it was found that up until the time of the inspection, there were certain withholdings effectuated in a total of R$ 16,007,261.07 (Dec/08 to Apr/09), so that Petrobras comes to satisfy the determinations set forth in the 2010 Annual Budgeting Law (IGR).

3.2 To provide a study of the Agreement that may come to be proffered, as well as the Report and the Vote that provide the basis for it, to the Mine and Energy Commission of the Chamber of Deputies, to the Federal Police Department, to the Federal Public Prosecutor's Office and to the Ministry of Mines and Energy, which portfolio is linked to Petrobras. (Overpricing arising from Excessive Prices in light of the market).

4. Constitution of Separate Proceedings

4.1 Form separate proceedings based on copy of the present report and on the judgment or order that will be issued, as well as by the extraction of the present reports of the documents referring to each one of the contracts listed below, for examination of the hearings here proposed, as well as the carrying out of further procedural measures according to need.

- 0800.0053456.09-2, 01/28/2010, Services and supplies required for the implementation of Atmospheric Distillation Units - UDA (U-II and U-12), of Abreu and Lima Refinery S.A. - RNEST;

- 0800.0053457.09.2, 02/05/2010, Delayed Coking Units (U-21 and U-22), its substations and control houses, its Regenerative Caustic Treatment Sections (U-26 and U-27);

- 0800.0057000.10-2, 04/16/2010, Services and supplies required for the implementation of interconnection pipelines of RNEST;

- 0800.0055148.09-2, 0/09/2010, Units of Diesel Hydro-treatment (U-31 and U-32), of Naphtha Hydro-treatment (U-33 and U-34), and of Hydrogen Generation UGH (U-35 and U-36).

2.          When the records were forwarded to this Office with proposal of merit, all volumes and annexes were sealed in an envelope marked as confidential. Noting that the affixing of the seal of confidentiality to all volumes, including the one with the instructions of the technical unit, would hamper the exercise of full defense of the responsible parties and the companies contracted by the entity, the reports should be returned to the technical unit in order to detail the documents of the reports which should be marked as confidential, giving them proper treatment by means of the formation of specific volumes.

3.          After accurate analysis, the technical unit returned the reports to this Office, proposing that the seal of confidentiality should be kept for the documents that make up Annexes II, III, IV, V, VI

Confidential

[Logo] FEDERAL COURT OF AUDITORS                                               TC 009.830/2010-3

and VIII, created for the purpose of keeping in this category the documents classified as confidential. It was further reported that, pursuant to the provisions of Section 1 of Art. 8 of Resolution No. 229/2009 – TCU [Federal Court of Auditors], combined with Art. 3 of Art. 2 of the Administrative rule 124/2010 – TCU, all the elements classified as confidential in this procedure were thus kept with restrictions of access by Petrobras.

4               This is the report.

31

Confidential                                                                    PBRCG_00711678

[Logo] FEDERAL COURT OF AUDITORS                                                    TC 009.830/2010-3

VOTE

        This is an audit performed at the construction works of Abreu and Lima Refinery in Recife/PE (Fiscobras 2010), more specifically in the following units: Delayed Coking Units (UCR), Atmospheric Distillation Units (UDA), Units of Diesel Hydro-treatment, of Naphtha Hydro-treatment and of Hydrogen Generation (UHDT/UGH) and Interconnections (Pipelines).

2.        In this inspection, the auditing team found that none of the two documents presented by Petrobras as a Study of Technical-economic and Environmental Feasibility (EVTE-A) contain the information that must necessarily be included in this study, In sight of this, the technical unit proposes to sign a deadline for the delivery of the complete EVTE-A, accompanied by all the studies and calculation memories that substantiate it. I demonstrate my agreement with this proposal in advance.

3.        The auditing team also detected indication of irregularity that fits in the framework of the provisions of item IV of Section 1 of Art. 94 of Law No. 12.017/2009 (LDO/2010) in the contracts for the implementation of the aforementioned units - Contracts No. 0800.0053456.09-2 (UDA), No. 0800.0053457.09-2 (UCR), No. 0800.0055148.09-2 (UHDT) and 0800.0057000.10-2 (Interconnections - Pipelines) – substantiated in the overpricing of R$ 1,324,116,792.62, which corresponds to 14% of total contracted value.

4.        In view of the indication of overpricing, the instructional unit proposes hearings of the managers responsible for the signing of the aforementioned contracts and of the responsible parties for the corresponding bidding procedures.

5.        The assessment of overpricing involved the analysis of the applicability of the acceptability range of the price proposals (-15% to + 20%) adopted by Petrobras, and of the prices of inputs contained in the cost estimates, pursuant with Art. 109 of Law No. 11768/2008 (LDO/2009) [Law of Budgetary Guidelines/2009]. I proceed to the analysis of these items.

        I - Acceptability Range of Price Proposals (-15% + 20%)

6.        In the bidding procedures of the contracts here analyzed, Petrobras adopted basic projects of the level FEL-3, which is the nomenclature regarding the level of detail of these projects.

7.        According to internal regulations of Petrobras PG-12-SL/ECP-001 - Cost Estimates of Investments, the entity accepts bids with prices ranging from -15% to + 20% in the values of cost estimates of the biddings in which the basic project, in form and level of detail FEL-3, presents uncertainties that may negatively influence the estimated quantitative data of services and its values, resulting in variability of the estimated overall values.

8.        In view of the inaccuracy of the basic projects, the technical unit has also adopted in his calculations the percentage of a variability of + 20% on the adjusted estimates of costs.

9.        However, in relation to the "tagged" goods and the certain quantities, the instructional unit believes that the variability percentage of + 20% should not be applied to the corresponding adjusted values, since the project already specifies the quantities provided in the conceptual project and in the process design and that contractual forecast already exists regarding these items for the renegotiation of the parties, in case the executed quantitative data surpass the values originally estimated.

10.        With regard to the adherence of this procedure to the current legislation, it was determined by this Plenary session, by means of Judgment No. 3069/2010-P, which assessed the TC 029.545/2009-1, regarding the audit of the aforementioned works carried out by Fiscobras 2009 [Report of Public Works Inspection], the constitution of a separate proceeding with the purpose of dealing specifically with the matter.

                                                                                                                    1

Confidential                                                                              PBRCG_00711679

11.        In the cases of the contracts here analyzed, given that Petrobras itself admits the inaccuracy of the basic projects related to the corresponding bidding procedures, an inaccuracy which may quantitatively and qualitatively influence the estimated services, I consider correct the position of Secob-3 [Secretariat of Construction Works and Assets Inspection] to include in its calculations the price variability range adopted by the entity, with the exception of the "tagged" goods and items with certain quantities.

II - Prices of Inputs Adopted in the Cost Estimates

12.        The auditing team analyzed the cost estimates taking as analysis premise the match of input prices with market benchmarks, researched especially in the National Research System of Construction Costs and Indices (Sinapi). The reference prices of the market adopted by the technical unit may be found on the spreadsheets, pages 1217/1280 (Annex 6, volume 5).

13.        In addition, when not available in Sinapi the input contained in the cost estimates of Petrobras, the inspection team used other market benchmarks such as Sicro2 [Reference System of Road Costs], Datafolha, Table ABEMI - Brazilian Association of Industrial Engineering - (for large-scale equipment such as cranes) and Cadterc - Registry of Service Provision of the São Paulo State Government.

14.         In cases where the inputs required specifications that were not contained in the references used, the prices of these items were not analyzed. Thus, the instructional unit stresses that only the prices of inputs whose characteristics were similar to those contained in the reference were analyzed.

15.        The sample analyzed for the four contracts covered approximately 70% of total cost estimates and included the analysis of the following items: direct labor, indirect labor, equipment, building construction (inputs), food supply, transportation and BDI on supply of goods.

16.        With regard to item "direct labor" (share of employees with remuneration linked to working hours), Petrobras considered as a salary parameter the values provided in the Collective Agreement of Labor (ACT) of the region, increased by an extra rate of attractiveness of 30% for possible labor coming from others States of the Federation, other than Pernambuco.

17.        The technical unit, however, understanding that the salaries established in the ACT [Collective Agreement of Labor] already constitute reasonable values to be adopted as a maximum reference of the salaries of direct labor involved in the works of the audited units of the Abreu and Lima Refinery, did not consider in its calculations the aforementioned extra rate of attractiveness.

18.        Another point highlighted by the inspection team regarding this issue is the geographic region in which the implementation works of the plant are located. Due to the fact of being an industrial area in expansion, it was noticed, besides the availability of skilled labor, the occurrence of even higher salaries than in other regions (condition reflected in the collective labor agreements). Thus, the team concludes that *"the migration process of workers from regions with a greater rate of unemployment and lower salaries, to regions with more jobs opportunities and higher salaries, occurs in a natural way, without the need for additional remuneration advantage."*

19.        I consider the opinion of Secob-3 acceptable, even because in the cost estimates no justification is found or any study that substantiates the reasonableness of the use of the additional rate of attractiveness of 30%.

20.        With regard to item "construction – inputs" of the cost estimate referring to the Pipelines contract, it was found that the entity adopted as price reference for the inputs the values contained in Sinapi for the city of Natal (RN), even though the works in question are located near Recife/PE.

2

Confidential

TC 009.830/2010-3

21.          Considering the lack of justification for the adoption of this premise, the inspection team used as reference the prices of inputs contained in Sinapi for the city of Recife/PE.

22.          The technical unit also verified that Petrobras added to some estimated values of the inputs of the construction, a percentage by way of BDI [Indirect Costs and Benefits] of subcontractors. This BDI was not considered in the reference prices used by the inspection team, since such references, taken from the average values of Sinapi constitute the maximum prices to be adopted, as provided in LDO/2009 [Law of Budgetary Guidelines/2009].

23.          With regard to the "BDI for the supply of goods," it was found that Petrobras established the following percentages in the contracts in question: (i) BDI supply for UCR, UDA and UHDT = 27.5%; (ii) BDI of equipment and materials by resale of the Pipelines contract = 18.91%; and (iii) BDI of equipment for cession of rights and obligations of the Pipelines contract = 16.38%.

24.          As highlighted by the instructional unit, the values assigned to the aforementioned BDI are much higher than the levels normally accepted by TCU [Federal Court of Auditors]. According to various judgments cited in the previous report, this Court adopts a percentage of BDI of around 10% for supply of materials, with exceptional cases of 13%.

25.          Thus, the auditing team, adopting conservative criteria, used the percentage of 13% by way of BDI for simple supply of goods and equipment for the four analyzed contracts.

26.          Considering that there is no justification found in the estimated budget for the adoption of percentages so much superior to the ones aforementioned as suitable by the case law of this Court, I agree with the percentage used by the instructional unit.

27.          The technical unit, after carrying out the aforementioned adjustments in the cost estimates of Petrobras and considering the increase of 20% in the adjusted prices of all items, except the "tagged" goods and those with certain quantities, reached the overpricing of R$ 1,324,116,792.62.

28.          Given this indication of overpricing, I agree with the proposal of the technical unit as to the calling for hearings of the responsible parties for this occurrence, in the scope of the contracts analyzed here.

29.          Finally, it is appropriate to make some considerations about the indication of overpricing found in the audited contracts by Fiscobras 2009 - Power House (Cafor) Tanks I and II, Buildings, corresponding to TC 029.544/2009-4, TC 029.546/2009-9, TC 029.548/2009-3 and TC 029.545/2009-1, respectively.

30.          After employing the same methodology used in this process, the technical unit noted that the overpricing found in each one of the aforementioned contracts was within the acceptability range of + 20%. Given the inaccuracy of the basic projects regarding the bidding procedures of these contracts, the inspection team considered acceptable the use of the margin of acceptability adopted by Petrobras, concluding that the requirements necessary to fit into the provisions of Art. 94, Section 1, Item IV, of Law No. 12.017/2009 (LDO 2010) were no longer present, which removed the need for the maintenance of the IG-P [Grave Irregularities with Suspension Recommendation].

31.          The Court, through Judgments No. 3069/2010, 3070/2010, 3071/2010 and 3072/2010, all of the Plenary, agreed with the position of Secob-3 [Secretariat of Construction Works and Assets Inspection].

32.          This was different with the other contracts here analyzed, since the related overpricing is above the margin of acceptability of + 20% adopted by Petrobras, reason for which the IG-P was maintained in these agreements.

33.          As appropriate, I will monitor the other proposals of the technical unit concerning the formation of separate proceedings and the performance of the proceedings and necessary communications, with exception of

3

Confidential                                                                          PBRCG_00711681

[Logo] FEDERAL COURT OF AUDITORS                                          TC 009.830/2010-3

the communications to the National Congress regarding the contracts inspected by Fiscobras 2009, since such measures have already been adopted by the judgments mentioned in item 31 above.

Based on the foregoing, I vote for the Court to adopt the Judgment that I now submit to this Board for consideration.

TCU [Federal Court of Auditors], Sessions Chambers of Justice Luciano Brandão Alves de Souza, on December 8, 2010.


BENJAMIN ZYMLER

Rapporteur


4

Confidential                                                        PBRCG_00711682

[Logo] FEDERAL COURT OF AUDITORS                                      TC 009.830/2010-3

Confidential                                                          PBRCG_00711682