**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PETROBRAS SECURITIES LITIGATION | No. 14-cv-9662 (JSR)<br><br>**CLASS ACTION** |

**DECLARATION OF THE CLAIMS ADMINISTRATOR IN SUPPORT OF**
**CLASS REPRESENTATIVES' MOTION FOR APPROVAL OF DISTRIBUTION PLAN**

I, Stephanie Amin-Giwner, declare as follows:

1.      I am a Manager of Client Services for Epiq Class Action & Claims Solutions, Inc. ("Epiq").[1]  The following statements are based on personal knowledge and information provided to me by other Epiq employees, and if called on to do so, I could and would testify competently thereto.

2.      As Claims Administrator, GCG (now operating as Epiq, and will be referred to as Epiq hereinafter) has, among other things:  (i) mailed the notice of pendency of the class action (the "Class Cert Notice"); (ii) mailed the notice of settlements (the "Settlement Notice"); (iii) published the Summary Notice; (iv) provided, upon request, additional copies of the Notice Packet to brokers and nominees; (v) created and continues to maintain a settlement website and telephone helpline for Claimant inquiries; (vi) received and reported on requests for exclusion; (vii) participated in three telephone conferences with the Court and testified at the final Settlement

---

[1] Garden City Group, LLC ("GCG"), the court-appointed Claims Administrator in this action, was acquired by Epiq on June 15, 2018 and is now continuing operations as part of Epiq.

Hearing; (viii) provided various declarations at the request of Class Counsel; and (ix) received and processed Proofs of Claim.[2]  *See* ECF Nos. 789-2, 827-7.

3.      On July 2, 2018, the Court entered the Judgment (ECF No. 838), granting final approval to the settlements reached in the Action (the "Settlements").  Pursuant to the Settlements, we understand that a total of $2.016 billion was paid into escrow for the benefit of the Settlement Class in 2018, with the remaining $984 million paid on January 15, 2019.

4.      Pursuant to this Court's Order dated July 12, 2019 (ECF No. 942), Epiq has processed all Proofs of Claim received through January 31, 2019, in accordance with the terms of the Settlements and the Court-approved Plan of Allocation set forth in the Notice, and hereby submits its administrative determinations accepting and rejecting the Claims in preparation for a distribution of the Net Settlement Fund to Authorized Claimants.

## DISSEMINATION OF THE NOTICE PACKET

### Notice Packet Mailing

5.      As more fully described in prior Declarations (ECF Nos. 789-2 and 827-7), through May 21, 2018, Epiq had mailed a total of 1,193,667 Notice Packets to potential Settlement Class Members and nominees.  Since that date, Epiq has mailed 3,032 additional Notice packets.  In total, Epiq has mailed 1,196,699 Notice Packets to potential Settlement Class Members or their nominees.

### Settlement Website and Telephone Helpline

6.      Epiq    established    and    continues    to    maintain    a    website (www.petrobrassecuritieslitigation.com) and a telephone helpline ((855) 907-3218) dedicated to

---

[2] All terms with initial capitalization not otherwise defined herein shall have the meanings ascribed to them in the Stipulations.

the Settlements to assist potential Settlement Class Members.  The settlement website and telephone helpline enable Settlement Class Members to access important documents relevant to the Settlements, file claims on-line,[3] and obtain information about the Settlements, including the exclusion, objection, and Claim filing deadline.  In connection with establishing and maintaining the settlement website and telephone helpline, Epiq, among other things, formulated a system to ensure that proper responses were provided to all telephone and electronic inquiries.  That work included working with Class Counsel to develop and modify, as needed, an Interactive Voice Response system, or "IVR"; training telephone agents to respond to inquiries specific to the Settlements by developing a series of common questions and the answers thereto, known as Frequently Asked Questions, or "FAQs"; loading key documents onto the settlement website; and programming the website to permit the viewing and downloading of documents and the filing of Claims.

**Publication of Summary Notice**

7.     Epiq caused the Summary Notice to be published in 99 international, national, and regional media in 31 languages and in 33 countries/regions as proposed by Petrobras, as described in paragraphs 7 and 17 through 25 of the Claims Administrator's Declaration filed April 23, 2018 (ECF No. 789-2).  Among other things, the Summary Notice advised potential Settlement Class Members of how they could obtain Notice Packets and the deadline for the submission of Claims.

## PROCEDURES FOLLOWED IN PROCESSING PROOFS OF CLAIM

8.     As set forth in the Notice, each Settlement Class Member who wished to be potentially eligible to receive a distribution from the Net Settlement Funds was required to

---

[3] On July 27, 2018, after the claim filing deadline had passed, as instructed by Class Counsel, Epiq disabled the online claim filing portal.

complete and submit to Epiq a properly executed Proof of Claim postmarked no later than June 9, 2018, together with adequate supporting documentation for the transactions and holdings reported therein.  Through January 31, 2019, Epiq has received 264,587 Proofs of Claim.

9.     Epiq created a database dedicated to the Settlements (the "Settlement Database") by customizing its proprietary database management software to accommodate the specifics of these Settlements, which included developing various computer programs and screens for entry of Settlement Class Members' identifying and transactional information and developing a proprietary "calculation module" that would calculate Recognized Claims pursuant to the Court-approved Plan of Allocation set forth in the Notice.  In addition, Epiq trained its staff in the specifics of the Settlements so that Proofs of Claim are properly processed and formulated a system so that telephone inquiries are properly handled.

10.     Settlement Class Members seeking to share in the Net Settlements Funds were directed in the Notice to submit their Proofs of Claim to a Post Office box address specifically designated for the Settlements.  Epiq sorted incoming mail into Proofs of Claim and administrative mail such as requests for Proof of Claim forms, notifications of change of address, and questions regarding the administrative process or status of the administration.  Notice Packets that were returned by the Post Office as undeliverable were reviewed for updated addresses and, where available, new addresses were entered into the database and new Notice Packets were mailed to the updated addresses.  Administrative mail was reviewed and, where necessary, appropriate responses were provided to the senders.

**Processing Paper Proofs of Claim**

11.     Of the 264,587 Proofs of Claim received through January 31, 2019, 48,909 were paper Claims.  Once received, paper Proofs of Claim were opened and prepared for scanning.  This

process included unfolding documents, removing staples, copying non-conforming sized documents, sorting documents, and, where Claimant identification information was not provided on the Proof of Claim, copying and attaching the envelope with the return address to the file.  This manual task of preparing the paper Proofs of Claim is very laborious and time-intensive.  Once prepared, paper Proofs of Claim were scanned into the Settlement Database together with all submitted documentation.  Subsequently, each Proof of Claim was assigned a unique Proof of Claim number if it did not already have a pre-assigned number.  Once scanned, the information from each Proof of Claim, including the name, address, and last four digits of the taxpayer identification number or social security number of the Claimant, and the Claimant's purchase/acquisition transactions, sale transactions, and holdings listed on the Proof of Claim, was entered into the Settlement Database.

12.     Next, the information provided by each Claimant in support of his, her, or its Proof of Claim was reviewed to, among other things, determine whether the Claimant had eligible purchases of any Petrobras Securities as set forth in the Notice; confirm that the prices set forth in the Proofs of Claim were within the range of known trading prices for the day of the transaction; determine if the security was sold; and track transfers between Claims and accounts.

13.     In order to process the transactions detailed in the Proofs of Claim, Epiq utilized dozens of internal Proof of Claim messages to identify and classify Proofs of Claim and any deficiency or ineligibility conditions that existed within those Proofs of Claim.  The appropriate messages were assigned to the Proofs of Claim as they were processed.  For example, where a Proof of Claim was submitted by a Claimant who did not have *any* eligible purchases or acquisitions of Petrobras Securities, that Proof of Claim received a Proof of Claim-level message that denoted ineligibility.  Similar Proof of Claim-level ineligible messages were used to denote

other ineligible conditions, such as duplicate Proofs of Claim.  These messages indicated to Epiq that the Claimant is not eligible to receive any payment from the Net Settlement Funds with respect to that Claim unless the deficiency is cured.

14.     Because a Proof of Claim may be deficient only in part, but otherwise acceptable, Epiq also utilized messages that are only applied to specific transactions within a Proof of Claim. For example, if a Claimant submitted a Proof of Claim with supporting documentation for all but one purchase transaction, that one transaction received a transaction-level message.  That message indicated that the one transaction was deficient, but that the Claim was otherwise eligible for payment if other transactions in the Proof of Claim calculated to a Recognized Claim according to the Court-approved Plan of Allocation.  Thus, even if the transaction-level deficiency was never cured, the Claim would still be paid in part.

15.     Epiq also received 4,396 Claims that were submitted online through the Settlement website ("Web Claims").  The processing of the Web Claims is substantially similar to the processing of the paper Claims.

**Processing Electronically Filed Proofs of Claim**

16.     Of the 264,587 Proofs of Claim received through January 31, 2019, 211,282 were filed electronically ("Electronic Claims").  Electronic Claims are typically submitted by institutional investors who may have hundreds or thousands of potentially eligible transactions. Rather than provide reams of paper requiring data entry, the institutional investors filing Electronic Claims either mail a computer disc or email a file to Epiq so that Epiq may electronically upload all transactions to the Settlement Database.

17.     Epiq maintains an electric filing operations team (the "Electronic Filing Team") to coordinate and supervise the receipt and handling of all Electronic Claims.  In this case, the

Electronic Filing Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with Epiq's required format, and to identify any potential data issues or inconsistencies within the file.  If any issues or inconsistencies were noted, Epiq promptly notified the sender.  If the electronic file was deemed to be in an acceptable format, it was then forwarded to Epiq programming staff with detailed loading instructions including the number of Claims and transaction totals that the institution provided when it sent the electronic file.

18.     Once the electronic file was loaded, Epiq personnel reviewed the electronic file to confirm that the number of Claims and transactions matched the information provided by the filer. The Electronic Filing Team then sent an email notification to the filer that included a spreadsheet with the Claim numbers and respective beneficial owner and address information for each Claim. In this email, the filer was also notified of any discrepancies in the data.

19.     Once all counts were confirmed, the Electronic Claims were coded just like manually processed Proofs of Claim with messages to identify and classify Electronic Claims and any deficiency or ineligibility conditions that existed within them.  These messages are generally the same as those applied to manually filed Proofs of Claim; however, the process in applying messages differs from the process used for paper Proofs of Claim.  Rather than manually applying messages, the Electronic Filing Team performed programmatic reviews on Electronic Claims to identify deficient and ineligible conditions (such as, but not limited to, ineligible security, price per share validation, out of balance conditions, and transactions outside the Class Period).  The appropriate messages were then assigned programmatically once the output of the reviews was thoroughly analyzed and confirmed as accurate.

20.     The review process also included flagging any Electronic Claims that were not accompanied by the following:  (i) a signed Proof of Claim form, which serves as a "Master Proof

of Claim Form" for all accounts referenced on the electronic file submitted; (ii) an electronic filing summary sheet; (iii) supporting documentation, such as a signed or notarized letter on company letterhead attesting to the truth and accuracy of the data on the electronic file, trade confirmations, and/or brokerage account statements; (iv) a notarized affidavit, corporate resolution or corporate by-laws verifying that the individual who executed the Proof of Claim and submitted the electronic file is an authorized signatory of his or her company with the authority to file such information; and (v) documentation to demonstrate the authority to file on behalf of the Claimant. This portion of the review process was also reviewed by other Epiq personnel overseeing quality assurance, who worked in conjunction with the Electronic Filing Team to contact the institutional filers whose electronic files were missing information. This process ensures that only fully completed Proofs of Claim, submitted by a properly authorized representative of the Claimants, are considered potentially eligible for payment from the Net Settlement Funds.

21.     In addition, Epiq performed various additional internal reviews of Electronic Claims. Specifically, Epiq reached out to a number of electronic filers who, in lieu of providing specific trade confirmations, provided another form of supporting documentation, and requested that various sample transactions selected by Epiq be documented by providing confirmation slips or other transaction-specific supporting documentation. This random sampling helps to ensure that electronic data supplied by Claimants did not contain inaccurate information. Epiq performed this final check on a variety of electronic files randomly selected, as well as on the electronic files with the largest valued Claims.

**Excluded Persons and Entities**

22.     Epiq also reviewed all Proofs of Claim to ensure that they were not submitted by, or on behalf of, persons or entities excluded from the Settlement Class by definition to the extent

8

that the identities of such persons or entities were known to Epiq through the list of Defendants and other excluded persons and entities set forth in the Stipulations and the Notice and through the Claimants' certifications on the Proofs of Claim.  Epiq also reviewed all Proofs of Claim against the list of persons and entities who were excluded from the Settlement Class pursuant to requests for exclusion, as set forth on Exhibit 1 attached to the Court's Judgment entered July 2, 2018 (ECF No. 838).[4]

**Additional Complexities Encountered In Claims Processing**

23.     Whether measured by settlement value, the number of notices mailed, the summary notice publication campaign, or Claims received, this is one of the largest securities class action settlement administrations in history.  Accordingly, in addition to the complexities which are noted herein that were encountered because of the nature of the claims asserted and the issues in the Action, any one-off issue in a typical administration was magnified by the sheer volume of Claims and transactions that were processed in this administration.  Examples of complexities faced in this administration include:

**Eligible Securities**

24.     The eligible securities in this Settlement include Petrobras American Depository Common Shares (ADSs), Preferred ADS and numerous Notes.  Accordingly, the sheer number and differing types of securities significantly increased the complexity of this administration in a variety of ways.  The number of securities caused a more time consuming claims process to ensure that the proper security was identified based on the supporting documentation.  Many times, claimants were uncertain and listed their purchases on multiple transactions pages of the Claim

---

[4] One individual, Asim Altamimi, withdrew his exclusion request, and the Court accepted the withdrawal.  ECF Nos. 897, 900.  He was, therefore, removed from the exclusion list.

Form.  Supporting documentation was carefully scrutinized to ensure the proper security was accurately captured in the Settlement Database.

**Plan of Allocation**

25.     The Court-approved Plan of Allocation in this matter was more complex than many securities administrations, for several reasons.  As mentioned above, because of the number of securities, the Plan of Allocation included distinct loss calculations for common ADS, preferred ADS and certain Notes.  Moreover, since some of the Notes were subject to both Section 11 and 10(b), the Plan of Allocation required the calculation of these transactions under both Section 11 and 10(b) in order to determine the greater of the Recognized Loss amount.  In addition, the calculation under the Plan of Allocation entailed a market loss calculation and a cap based on that calculation in addition to the distinct Recognized Loss calculations.  This multi-faceted plan involving the interplay of the various calculations necessitated additional development, testing and auditing throughout the administration in order to ensure the correct calculation of Recognized Losses.

**Other Complexities**

26.     Another complexity faced is that 253,801 Proofs of Claim, or approximately 95.9% of the Proofs of Claim received through January 31, 2019, were partially or wholly ineligible for one or more reasons, and, therefore, were subject to the additional processing, correspondence, and telephonic communications described in the section below entitled "The Deficiency Process."

27.     During the processing of Proofs of Claim, Epiq encountered "non-conforming" Proofs of Claim, which, in general, require significantly more work than standard Proofs of Claim because of the information contained in or missing from the Proof of Claim, or because of the manner in which the Proof of Claim was completed.  Non-conforming Claims include, among

other conditions, missing pages, no name or address, Proofs of Claim that are blank but submitted with documentation for Epiq to complete, and Proofs of Claim that are so materially deficient as to make what is being claimed unrecognizable. Again, because of the sheer number of Claims received, a significant amount of time and resources were required to review these "non-conforming" Proofs of Claim.

### THE DEFICIENCY PROCESS

28.     As noted above, many of the Proofs of Claim submitted were incomplete, not signed, not properly documented, or were otherwise deficient.  Much of Epiq's efforts in handling an administration involve Claimant communications so that all Claimants have sufficient opportunity to cure any deficiencies in their Proofs of Claim.  The "Deficiency Process," which involved letters and emails to Claimants, and inbound and outbound calls to Claimants, was intended to assist Claimants in properly completing their otherwise deficient submissions so that they would be eligible to participate in the Settlement.  The process also was designed to advise Claimants of their right to request this Court's review of their Proofs of Claim if they disputed Epiq's final determination.  As a result of this process, a significant number of Claimants, excluding those who submitted Proofs of Claim with incurable deficiencies (*e.g.,* Claims that lack any eligible purchases or acquisitions or Claims that have no Recognized Claim under the Plan of Allocation), are now recommended as eligible for participation in the Settlement.

### The "Notice of Rejection of Your Entire Claim"

29.     As described above, Epiq utilized internal Proof of Claim messages to identify and classify Proofs of Claim and conditions that existed within them.  These Proof of Claim conditions included, among other things, notations about which Proofs of Claim were partially deficient and which were wholly deficient.  If a Proof of Claim was determined to be wholly deficient (for

example, if the Proof of Claim was missing documentation for the entire Proof of Claim, if the Claimant did not sign the Proof of Claim or did not provide enough information to calculate the Claim, or if the Proof of Claim was determined to have no Recognized Claim when calculated under the Court-approved Plan of Allocation), Epiq mailed a letter entitled "Notice of Rejection of Your Entire Claim."  This letter described to the Claimant the defect(s) with his, her, or its Proof of Claim and what, if anything, was necessary to cure the Claim.  The letter advised the Claimant that submission of the appropriate information and/or documentary evidence to complete the Proof of Claim was required within 20 days from the date of the letter, or the Claim would be recommended for rejection in its entirety.  As of September 11, 2019, Epiq mailed (or e-mailed in the case of Electronic Claims) a "Notice of Rejection of Your Entire Claim" in connection with approximately 246,000 Proofs of Claim.

**The "Notice of Rejection of Part of Your Claim"**

30.     If a Proof of Claim was determined to be partially deficient (for example, if the Claimant was missing documentation for some transactions, or did not supply some transactional information), Epiq mailed a letter entitled "Notice of Rejection of Part of Your Claim."  This letter described to the Claimant the defect(s) in his, her, or its Proof of Claim and what was necessary to cure the defect(s) in the Claim.  This letter also provided a 20-day period to cure the Claim.  As of September 11, 2019, Epiq mailed (or e-mailed in the case of Electronic Claims) a "Notice of Rejection of Part of Your Claim" in connection with approximately 7,400 Proofs of Claim.[5]

---

[5] The total number of rejection and deficiency letters sent exceeds the total number of deficient Claims because, in certain cases, the document sent in response to a Notice of Rejection of Part of Your Claim caused the Claim to become totally ineligible, thus requiring a Notice of Rejection of Your Entire Claim to be sent.

31.     Attached hereto as Exhibit A are examples of the types of letters sent to notify Claimants of the deficiencies in, or the ineligibility of, their Proofs of Claim.  Both letters advised Claimants that, if they disagreed with Epiq's administrative determinations, they had the right to request the Court's review of their Proofs of Claim.  Each such letter also explained that this deficiency process was the Claimant's opportunity to cure the deficiencies in the Claim (to the extent that the deficiencies could be cured), and that a Claimant desiring to contest the administrative determination was required to submit a written statement to the claims administrator requesting review of his, her, or its Proof of Claim and setting forth the basis for the request within 20 days of the date of the letter.

32.     Claimants' responses to these complete or partial rejection letters were scanned into the Settlement Database and associated with the related Proofs of Claim.  Those responses were then carefully reviewed and evaluated by Epiq's team of processors.  If a Claimant's response corrected the defect(s), Epiq updated the Settlement Database manually to reflect the change in status of the Claim.

**Calling Campaign to Claimants Who Did Not Cure Deficiencies**

33.     After responses to the "deficiency" letters were received and evaluated, and the Proofs of Claim updated, Epiq called Claimants with still-deficient Proofs of Claim to provide them with an opportunity to cure the deficiencies in their Claims.

34.     During this calling campaign, when an Epiq agent spoke with a Claimant, he or she explained that the Proof of Claim was still deficient and advised the Claimant of the steps required to cure the deficiency.  Epiq provided assistance to Claimants where possible, depending on the nature of the deficiency.  For example, if a Claimant needed additional documentation, Epiq

explained the types of documentation that would render the Claim eligible and how the Claimant could obtain the necessary documentation. Epiq also provided Claimants with direct phone numbers and fax numbers so that Claimants could receive continued personalized attention and assistance.

35.     If Epiq could not reach a Claimant to speak one-on-one, Epiq left a voice message, if possible, requesting a return call. Epiq explained in that voice message that it was calling to assist the Claimant in remedying the outstanding deficiencies in his, her, or its Claim.

36.     Further, Epiq coordinated an automated calling campaign to certain Claimants with still-deficient Proofs of Claim. The automated message informed Claimants that their Claim was still deficient, and that they should call the toll-free telephone helpline for further information as to how to complete their Claim(s).

37.     If a Claimant cured the deficiency by providing the appropriate information and/or supporting documentation, Epiq updated the Settlement Database to reflect the change in the status of the Claim.

## CLAIMANTS SEEKING JUDICIAL REVIEW OF THEIR PROOFS OF CLAIM

38.     As set forth above, both the Notice of Rejection of Your Entire Claim and the Notice of Rejection of Part of Your Claim advised Claimants that, if they did not agree with the administrative determinations, they had the right to request judicial review of their Proofs of Claim. As of September 11, 2019, Epiq has received letters from 605 Claimants contesting the administrative rejection of their Claims in whole or in part. A significant number of those Claimants simultaneously provided Epiq with documentation and/or information that was sufficient to cure the deficiencies in their Proofs of Claim. As a result, the letters requesting further

review submitted by those Claimants are now moot and their Claims are being recommended for payment.  Indeed, one of the main purposes of providing Claimants with the opportunity to challenge the administrative determination to reject their Claim is to provide those Claimants with another opportunity to provide the information and/or material needed to complete their Proofs of Claim.

39.     In addition, subsequent to receipt of all of the requests for judicial review, Epiq attempted by telephone and/or letter to contact each contesting Claimant whose Claim still had uncured deficiencies or was otherwise ineligible, to advise him, her, or it of the status of his, her, or its Claim, and to explain the basis of the administrative determination to reject the Claim.  Epiq also attempted by telephone and/or letter to contact each contesting Claimant who cured his, her, or its deficient Claim in connection with the subjection of the request for Court review to explain that the Claim was now complete and would be recommended for payment.  As a result of these efforts, 391 requests for Court review have either been cured or the request for Court review has been retracted.

40.     There are 10 Claims where the Claim is now in good standing, however, the request for Court review has not been withdrawn:

a. **Claim 1636988:**  The Claimant received a notice of rejection for missing supporting documentation for certain transactions and transfers in.  The documentation submitted by the Claimant with the request for Court review did reflect or support eligible transactions beyond those contained in the original submission and the Claim is now in good standing and recommended herein for acceptance.  Epiq attempted to contact the Claimant to explain that the claim is in good standing, however, the Claimant did not affirmatively withdraw the request for Court review.

b. **Claim 2162905:**  The Claimant received a notice of rejection for missing supporting documentation for certain transactions.  The documentation submitted by the Claimant with the request for Court review did reflect or support eligible transactions beyond those contained in the original submission and the Claim is now in good standing and recommended herein for acceptance.  Epiq contacted the Claimant to explain that the claim is in good standing, however, the Claimant wishes to maintain the request for Court review.

c. **Claim 1603845:**  The Claimant received a notice of rejection for missing supporting documentation for transfers in.  The documentation submitted by the Claimant with the request for Court review did reflect or support eligible transactions beyond those contained in the original submission and the Claim is now in good standing and recommended herein for acceptance.  Epiq contacted the Claimant to explain that the claim is in good standing, however, the Claimant wishes to maintain the request for Court review.

d. **Claim 2176312:**  The Claimant received a notice of rejection that claim does not balance.  The documentation submitted by the Claimant with the request for Court review did reflect or support eligible transactions beyond those contained in the original submission and the Claim is now in good standing and recommended herein for acceptance.  Epiq attempted to contact the Claimant to explain that the claim is in good standing, however, the Claimant did not affirmatively withdraw the request for Court review.

e. **Claim 2176310:**  The Claimant received a notice of rejection that claim does not balance.  The documentation submitted by the Claimant with the request for Court review did

reflect or support eligible transactions beyond those contained in the original submission and the Claim is now in good standing and recommended herein for acceptance. Epiq attempted to contact the Claimant to explain that the claim is in good standing, however, the Claimant did not affirmatively withdraw the request for Court review.

f. **Claim 2123355:** The Claimant received a notice of rejection for missing and inadequate documentation.  The documentation submitted by the Claimant with the request for Court review did reflect or support eligible transactions beyond those contained in the original submission and the Claim is now in good standing and recommended herein for acceptance.  Epiq attempted to contact the Claimant to explain that the claim is in good standing, however, the Claimant did not affirmatively withdraw the request for Court review.

g. **Claim 1324666:**  The Claimant received a notice of rejection for gift or transfer in.  The documentation submitted by the Claimant with the request for Court review did reflect or support eligible transactions beyond those contained in the original submission and the Claim is now in good standing and recommended herein for acceptance.  Epiq attempted to contact the Claimant to explain that the claim is in good standing, however, the Claimant did not affirmatively withdraw the request for Court review.

h. **Claim 1233372:** The Claimant received a notice of rejection for transfer out.  The documentation submitted by the Claimant with the request for Court review did reflect or support eligible transactions beyond those contained in the original submission and the Claim is now in good standing and recommended herein for acceptance.  Epiq

attempted to contact the Claimant to explain that the claim is in good standing, however, the Claimant did not affirmatively withdraw the request for Court review.

i. **Claim 1374109:** The Claimant received a notice of rejection for claim out of balance. The documentation submitted by the Claimant with the request for Court review did reflect or support eligible transactions beyond those contained in the original submission and the Claim is now in good standing and recommended herein for acceptance. Epiq contacted the Claimant to explain that the claim is in good standing, however, the Claimant wishes to maintain the request for Court review.

j. **Claim 2176272**: The Claimant received a notice of rejection that purchases of 4.875% Global Notes due 2018 purchased on June 10 2014 and July 24, 2014 were non-domestic ad ineligible. The documentation submitted by the Claimant with the request for Court review did not provide any further documentation regarding these Notes. However, the remaining transactions in the Claim are in good standing and are recommended herein for acceptance. Epiq contacted the Claimant to further explain the status of the Claim, but the Claimant did not respond.

41.     Of the 605 Claimants that had contested Epiq's determination to reject their Claims, 204 Claimants (each a "Disputing Claimant") have outstanding requests for Court review (each a "Disputed Claim"). Exhibit B attached hereto (the "Disputed Claims Chart") contains copies of Claims and supporting documentation submitted by the 204 Disputing Claimants, and other documents related to each Disputed Claim.[6]  The Disputed Claims are labeled Disputed Claims 1-204 and are categorized as follows:

---

[6] For privacy reasons, the documents included in Exhibit B have been redacted to remove all personal information such as street addresses, email addresses, telephone numbers, account numbers, Taxpayer ID, Social Security Numbers, and all financial and transaction information not

| Disputed Claims Category | Number of Claims |
|---|---|
| Claims determined not to have a Recognized Claim | 175 |
| Deficient Claims Not Cured | 16 |
| Claims with no eligible Class Period purchases of eligible Petrobras securities | 13 |

42.   Epiq recommends the rejection of Disputed Claims 1-175 for the following reasons:

(a) Category 1:   Claims determined not to calculate to a Recognized Claim under the Plan of Allocation.   As set forth in the Disputed Claims Chart, Epiq recommends Disputed Claims 1-175 for rejection because these Claims do not calculate to a Recognized Claim under the Court-approved Plan of Allocation.

(1)   Disputed Claims 1-145-: These Disputed Claims are recommended for rejection because all shares of Petrobras ADS were purchased during the Class Period and were sold prior to October 16, 2014.   The applicable calculation provision of the Plan of Allocation provides that, for Petrobras ADS purchased or acquired in the Class Period and sold before October 16, 2014, the Recognized Loss is zero. *See* Notice pp. 14-15, #1.   As all Petrobras ADS purchased during the Class Period were sold prior to October 16, 2014, each of these Disputing Claimants' Recognized Loss on the transactions is zero and, as they had no other transactions in eligible Petrobras securities, the Recognized Claims are, in turn, also zero.

(2)   Disputed Claims 146-162: These Disputed Claims are recommended for rejection because the transaction in these Claims results in a Net Market Gain.   The applicable calculation provision of the Plan of Allocation provides that, if the Authorized Claimant has a Net Market Gain, his/her/their

---

related to the Claimants' transactions in Petrobras securities, unless that information serves as a basis of the dispute or the Claims' rejection.

Recognized Claim will be US$0.00.  As each of these Disputing Claimants' Claim calculated to a Net Market Gain, the Recognized Claim is zero.

(3)  <u>Disputed Claims 163-166</u>:  These Disputed Claims are recommended for rejection because all eligible Notes purchased during the Class Period were sold prior to the initial date of reduction in alleged price inflation in that Note.  The applicable calculation provision of the Plan of Allocation provides that, a USD Note purchased/acquired in the Class Period must have been held through at least one date of allegedly fraud-related price decline and resulting reduction in price inflation for that USD Note, to be eligible to recovery under the Section 10(b) calculation of Recognized Loss in this Plan..  *See* Notice p. 16, #1. As all eligible Notes purchased during the Class Period were sold prior to the initial date of reduction in alleged price inflation in that Note, each of these Disputing Claimants' Recognized Loss on the transactions is zero and, as they had no other transactions in eligible Petrobras securities, the Recognized Claims are, in turn, also zero.

(4)  <u>Disputed Claims 167-175</u>:  These Disputed Claims are recommended for rejection because when calculated pursuant to the Plan of Allocation, as set forth in more detail in the Disputed Claims Chart, the Claim results in a Recognized Claim of zero.

(b)  **Category 2**: Claims found to be deficient with no adequate response to the notice of rejection.  As set forth in greater detail in the Disputed Claims Chart, Epiq recommends Disputed Claims 176-191 for rejection because none of these Disputing

Claimants adequately responded to the notice of rejection, and thus the deficiency in the Claim was never remedied.

(c)     **Category 3**: Claims found to have no Class Period purchases of eligible Petrobras securities.  As set forth in more detail in the Disputed Claims Chart, Epiq recommends Disputed Claims 192-204 for rejection because none of these Disputing Claimants have documented Class Period purchases of eligible Petrobras securities.

## QUALITY ASSURANCE, FRAUD PREVENTION, AND REGULATORY COMPLIANCE

43.     An integral part of Epiq's settlement administration in this case is its Quality Assurance review.   Epiq's Quality Assurance personnel worked throughout the entire administration process to ensure that Proofs of Claim were processed properly; that deficiency and ineligibility message codes were properly applied to Proofs of Claim; that deficiency letters were mailed to the appropriate Claimants; and that Epiq's computer programs were operating properly.

44.     In support of the claims processing work described above, Epiq's computer staff designed and implemented and the Quality Assurance team tested the following programs for this administration:   (i) data entry screens that store Proof of Claim information (including all transactional data included on each Proof of Claim) and attach message codes and, where necessary, text to denote conditions existing within the Proof of Claim; (ii) programs to load and analyze transactional data submitted electronically for all Electronic Claims (the load program converts the data submitted into the format required by the calculation program, and the analysis program determines if the data is consistent and complete and triggers a response to the electronic filer where appropriate); (iii) a program to compare the claimed transaction prices against the reported market prices to confirm that the claimed transactions were within an acceptance range of the reported market prices; (iv) a calculation program to analyze the transactional data for all

Proofs of Claim, and calculate each Recognized Claim based on the Plan of Allocation; (v) programs to generate various reports throughout and at the conclusion of the administration, including lists of all eligible and ineligible Proofs of Claim; and (vi) programs that calculate each Authorized Claimant's Distribution Amount by determining the proration factor for the Settlement, and applying it to the Recognized Claim as calculated above.

45.     Epiq's Quality Assurance team performed a final project wrap-up on all of the Claims that are included in this motion to determine whether deficiency letters were mailed and deficiency responses were reviewed and processed and to ensure the correctness and completeness of all of the Proofs of Claim before Epiq prepared its final reports to Class Counsel.  Here, in connection with this Quality Assurance wrap-up, Epiq (i) confirmed that valid Proofs of Claim have no messages denoting ineligibility; (ii) confirmed that Proofs of Claim that are ineligible have messages denoting ineligibility; (iii) confirmed that Proofs of Claim that contained purchases that occurred before or after the Class Period contain appropriate ineligibility messages; (iv) confirmed that Proof of Claim detail (transaction) messages appear only on Proof of Claim detail records; (v) confirmed that all Proofs of Claim requiring "deficiency" letters were sent such letters; (vi) performed a sample review of deficient Proofs of Claim; (vii) reviewed Proofs of Claim with large dollar losses; (viii) sampled Proofs of Claim that had been determined to be ineligible, including those with no calculated Recognized Claim under the Plan of Allocation, in order to verify that all transactions had been captured correctly; and (ix) retested the accuracy of the calculation program.

46.     Epiq also used a variety of fraud protection controls throughout the administration process to identify potentially fraudulent Proofs of Claim.  Duplicate Claim searches (by beneficial owner, last four digits of the tax identification number, and Recognized Claim amounts), duplicate transaction searches (which compared duplicate transactions within the same Proof of Claim and

other Proofs of Claim), high value reviews, spot reviews, and other standard reviews that examined the information in a variety of ways, were used during the Proof of Claim review.  Epiq reviewed and compared the entire database for the Settlements against the "watch list" of known potential fraudulent filers that Epiq has developed.

47.     In accordance with the regulations and guidelines of the U.S. Treasury Department, Office of Foreign Assets Control ("OFAC"), Epiq will perform searches on payments to payees whose names may appear on the federal government's restricted persons list or who reside in countries to which payments are prohibited.

**<u>Independent Third-Party Review of Claims Processing</u>**

48.     In consultation with Epiq, Class Counsel engaged EisnerAmper LLP ("Eisner") to perform an independent review of certain processed claims using procedures agreed upon by Class Counsel.  The review commenced on or about November 1, 2018.  In its Report on Applying Agreed-Upon Procedures (Exhibit C attached hereto), Eisner reported to Class Counsel and Epiq that it had performed an independent calculation of the Recognized Claim amounts for 200 Claims with the largest Recognized Claims  and agreed with those amounts.

49.     For each Claim that it reviewed, Eisner verified the following details of each individual transaction in the Claim during the Class Period: (a) identity and eligibility of the Petrobras security, (b) number of Petrobras securities traded; (c) transaction date; (d) transaction price; and (e) total transaction amount and calculated the Recognized Claim amounts pursuant to the Plan of Allocation and agreed the Recognized Claim amounts as determined by Epiq.  In addition, Eisner determined whether the documentation supported the transactions listed on the Claim and that those transactions "balance."  Eisner also examined Claims determined by Epiq to be deficient, and confirmed those determinations.

## DISPOSITION OF PROOFS OF CLAIM

50.     As of September 11, 2019, Epiq has completed the processing of 264,587 Proofs of Claim that were received in connection with the Settlements through January 31, 2019, and has determined that 62,182 are acceptable in whole or in part, and 202,405 should be wholly rejected because they are ineligible for payment from the Net Settlement Funds.[7]   The 202,405 wholly rejected Proofs of Claim are ineligible for the following reasons:

### Summary of Rejected Proofs of Claim

| Reason for Ineligibility | Number of Proofs of Claim |
|---|---|
| Claim Did Not Fit the Class Definition[8] | 61,390 |
| Deficient Claim Never Cured | 29,839 |
| Duplicate Claim[9] | 1,259 |
| Claim Did Not Result in a Recognized Claim[10] | 109,917 |
| **TOTAL** | **202,405** |

51.     A list of the Claims received and their ultimate disposition is contained in the Administrator's Report (the "Report") submitted herewith as Exhibit D.  Exhibit D-1, entitled "Timely Eligible Claims," lists all timely-filed provisionally accepted Claims and states their

---

[7] Pursuant to this Court's July 12, 2019 Order, all claims received after January 31, 2019 shall be null and void.

[8] Examples of these types of claims are claims that do not include any Class Period purchases, claims that do not include any purchases of eligible securities, claims that were withdrawn and claims that have been replaced with a consolidated claim by the beneficial owner.

[9] Epiq has confirmed that each of these duplicate claims is an exact match to a Claim that is included in the list of Authorized Claims or Rejected Claims.

[10] This includes Claim No. 1649103 that pursuant to the Court's September 12, 2019 Order (ECF No. 955), has been rejected.

Recognized Claim.  Exhibit D-2, entitled "Ineligible Claims," lists all wholly rejected Claims and states the reason for their ineligibility.  For privacy reasons, Exhibit D provides only the Claimant's Claim number, and Recognized Claim or Reason for Ineligibility (no names, addresses, or social security or other taxpayer identification numbers are disclosed).

52.     The provisionally accepted Claims represent a total of $8,635,548,734.71 in Recognized Claims calculated in accordance with the Court-approved Plan of Allocation. According to the Plan of Allocation, each Authorized Claimant with a Recognized Claim shall receive a *pro rata* share of the Net Settlement Fund, which shall be the Authorized Claimant's Recognized Claim divided by the sum total of the Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Funds.  However, as set forth in the Court-approved Plan of Allocation, if an Authorized Claimant's Distribution Amount calculates to less than $10.00, it will not be included in the calculation and the Claimant will not receive any distribution.

## CLAIMS ADMINISTRATION FEES AND EXPENSES

53.     Epiq agreed to be the Claims Administrator in exchange for payment of its fees and expenses.  Class Counsel was billed on a regular basis and received regular reports of work Epiq performed with respect to the administration of the Settlements, and authorized the claims administration work performed herein.   Through August 31, 2019, Epiq has incurred $8,097,884.71 in fees and $4,348,869.67 in expenses in connection with the class certification phase and the settlement phase, for a total of $12,446,754.38.[11]   To date, Epiq has received

---

[11] This is within the $19 million fee cap previously approved as reasonable by the Court, ECF No. 834, p. 23, and includes a reduction pursuant to a call with the Court on April 30, 2018.

payment of its fees and expenses for a total of $4,579,643.57.[12]   Accordingly, there is an outstanding balance of $7,867,110.81 in fees and expenses payable to Epiq.  In addition, Eisner incurred fees and expenses of $200,00 in connection with its work on this matter.

## PROPOSED DISTRIBUTION

54.    Should the Court concur with Epiq's determinations concerning the provisionally accepted and rejected Claims, Epiq recommends the following process of making distributions of the Net Settlement Funds:

(a) Epiq will conduct an initial distribution (the "Initial Distribution") of the Net Settlement Funds, after deducting all payments approved by the Court, and after payment of any estimated taxes, the cost of preparing appropriate tax returns, and any escrow fees, while maintaining a 15% reserve to address any contingencies that may arise, including if the Court disagrees with Epiq's determination regarding any of the Disputed Claims, as follows:

(1) Epiq will calculate award amounts for all Authorized Claimants as if the entire Net Settlement Funds were to be distributed now.  Pursuant to the Court-approved Plan of Allocation, Epiq will calculate each Authorized Claimant's *pro rata* share of the Net Settlement Funds based on the amount of the Authorized Claimant's Recognized Claim in comparison to the total Recognized Claims of all Authorized Claimants.

(2)  Epiq will, pursuant to the terms of the Court-approved Plan of Allocation, eliminate from the Initial Distribution any Authorized Claimant whose *pro*

---

[12] This amount paid to Epiq consists of $779,643.57 for fees and expenses associated with the Notice of Pendency phase and $3,800,000 in fees and expenses pursuant to the Stipulation with the Petrobras Defendants.

*rata* share calculates to less than $10.00.  These Claimants will not receive any payment from the Net Settlement Funds.

(3) After eliminating Authorized Claimants who would have received less than $10.00, Epiq will recalculate the *pro rata* share of the Net Settlement Funds for Authorized Claimants who would have received $10.00 or more pursuant to the calculations described in sub paragraph (a)(1) above.  This *pro rata* share is the Authorized Claimant's "Distribution Amount."

(4) Authorized Claimants whose Distribution Amount calculates to less than $500.00 pursuant to subparagraph (a)(3) above will be paid their full distribution Amount in the Initial Distribution ("Claims Paid in Full").  These Authorized Claimants will get no additional funds in subsequent distributions.

(5) After deducting the payment to the Claims Paid in Full, 85% of the remaining balance of the Net Settlement Fund will be distributed to Authorized Claimants whose Distribution Amount calculates to $500.00 or more pursuant to subparagraph (a)(3) above, on a *pro rata* basis based on their Distribution Amounts.  The remaining 15% of the Net Settlement Funds will be held in reserve (the "Reserve") to address any contingencies that may arise.  To the extent the Reserve is not depleted, the remainder will be fully distributed in the "Final Distribution" described in subparagraph (c) below.

(b) In order to encourage Authorized Claimants to promptly deposit their payments, all Initial Distribution checks (and any other checks distributed to Authorized Claimants in this Action, unless otherwise stated herein or otherwise ordered) will bear the

notation: "CASH PROMPTLY.  VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT CASHED BY 90 DAYS AFTER ISSUE DATE."[13]

(c)   Consistent with the Court-approved Plan of Allocation, 120 days after the Initial Distribution, Epiq will conduct the distribution of the reserve ("Final Distribution") to those Authorized Claimants whose Distribution Amounts calculates to $500.00 or more as described in subparagraph (a)(5) above.  As noted above, Final Distribution checks will bear the notation: "CASH PROMPTLY.  VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT CASHED BY 90 DAYS AFTER ISSUE DATE."

(d)   Consistent with the Court-approved Plan of Allocation, Authorized Claimants who do not cash their Initial Distribution and/or Final Distribution checks within the time allotted will irrevocably forfeit all recovery from the Settlements.  To the extent such funds exist, these funds from stale-dated checks will be available to be redistributed to other Authorized Claimants who cashed their Initial and/or Final Distribution checks.

(e)   As set forth in (d) above, after Epiq has made reasonable diligent efforts to have Authorized Claimants cash their Initial Distribution and Final Distribution checks, Epiq will conduct a supplemental distribution of the Net Settlement Funds.  Any amounts remaining in the Net Settlement Funds after the Final Distribution, after deducting Epiq's fees and expenses incurred in connection with administering the Settlements for

---

[13] For Authorized Claimants whose checks are returned as undeliverable, Epiq will endeavor to locate new addresses by running the undeliverable addresses through the USPS National Change of Address database.  Where a new address is located, Epiq will update the database accordingly and re-issue a distribution check to the Authorized Claimant at the new address. In the event an Authorized Claimant loses or damages his, her, or its check, or otherwise requires a new check, Epiq will issue replacements.  Distribution re-issues will be undertaken only upon written instructions from the Authorized Claimant, and provided that the Authorized Claimant returns the first check where appropriate.  If a check is deemed lost, Epiq will void the initial payment check prior to re-issuing a payment.

which it has not yet been paid (including Epiq's estimated costs for the Final and any supplemental distributions), and after deducting the payment of any estimated taxes, the cost of preparing appropriate tax returns, and any escrow fees, will be distributed to all Authorized Claimants who cashed their initial and final distribution checks and who would receive at least $10.00 from such distribution based on their *pro rata* share of the remaining funds. Additional distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur thereafter until no funds remain in the Net Settlement Funds.

## **CONCLUSION**

Epiq respectfully requests that the Court enter an Order approving Epiq's administrative determinations accepting and rejecting the Proofs of Claim addressed herein, and approving the distributions as proposed by Class Counsel. Epiq also respectfully requests approval for payment of its remaining fees and expenses.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 20th day of September, 2019, in Lake Success, New York.

Stephanie Amin-Giwner