# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: PETROBRAS SECURITIES LITIGATION

This Document Applies To:

ALL CASES

14-cv-9662 (JSR)

**PETROBRAS DEFENDANTS' MEMORANDUM OF LAW
<u>IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 1

      A.    Petrobras ............................................................................ 1

      B.    The Payment Scheme................................................................ 2

ARGUMENT ........................................................................................................ 3

    I.     MANY OF THE ALLEGED MISSTATEMENTS ARE
           INACTIONABLE PUFFERY OR FORWARD-LOOKING
           STATEMENTS................................................................................ 4

      A.    Inactionable puffery ........................................................... 4

      B.    Forward-looking statements.................................................. 9

    II.    STATEMENTS MADE ON PETROBRAS'S *FATOS E DADOS* BLOG
           ARE NOT ACTIONABLE BECAUSE THERE IS NO EVIDENCE THE
           MARKET RELIED ON THEM ....................................................... 12

    III.   MANY OF PLAINTIFFS' ALLEGED CORRECTIVE DISCLOSURES
           ARE NOT COMPENSABLE AS A MATTER OF LAW ................................. 15

      A.    Plaintiffs have provided no evidence that any decline in the price
           of Petrobras securities was linked to an alleged corrective
           disclosure on certain dates ...................................................... 16

      B.    Disclosures on certain dates are not corrective as a matter of law .......... 17

      C.    Plaintiffs have failed to disaggregate the impact of clear,
           significant confounding news from the impact of alleged corrective
           disclosures on certain dates...................................................... 19

    IV.   THE PETROBRAS DEFENDANTS JOIN ARGUMENTS IN FAVOR
           OF SUMMARY JUDGMENT MADE BY OTHER DEFENDANTS, TO
           THE EXTENT APPLICABLE .......................................................... 22

CONCLUSION....................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

Fed. R. Civ. P. 56(a) ................................................................................................3, 6

**Cases**

Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,
750 F.3d 227 (2d Cir. 2014)....................................................................................15

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)..................................................................................................3

City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,
752 F.3d 173 (2d Cir. 2014).......................................................................................8

CL-Alexanders Laing & Cruikshank v. Goldfeld,
739 F. Supp. 158 (S.D.N.Y. 1990) ...........................................................................3

Dartell v. Tibet Pharms., Inc.,
No. 14-3620, 2016 WL 718150 (D.N.J. Feb. 22, 2016) ..............................................14

Dura Pharms., Inc. v. Broudo,
544 U.S. 336 (2005)...........................................................................................14, 16

ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
553 F.3d 187 (2d Cir. 2009).....................................................................................7, 8

Fujitsu Ltd. v. Fed. Express Corp.,
247 F.3d 423 (2d Cir. 2001).......................................................................................4

Glidepath Holding B.V. v. Spherion Corp.,
No. 04 Civ. 9758, 2010 WL 1372553 (S.D.N.Y. Mar. 26, 2010) ................................10

Halliburton Co. v. Erica P. John Fund, Inc.,
134 S. Ct. 2398 (2014)........................................................................................ 13-14

In re Aegon N.V. Sec. Litig.,
No. 03 Civ. 603, 2004 WL 1415973 (S.D.N.Y. June 23, 2004)...................................10

In re BP p.l.c. Sec. Litig.,
No. 10-md-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ...................................14

In re Flag Telecom Holdings, Ltd. Sec. Litig.,
574 F.3d 29 (2d Cir. 2009).........................................................................................19, 22

In re Focus Media Holding Ltd. Litig.,
701 F. Supp. 2d 534 (S.D.N.Y. 2010).............................................................................10

In re Fuwei Films Sec. Litig.,
634 F. Supp. 2d 419 (S.D.N.Y. 2009).............................................................................14

In re Int'l Bus. Machines Corp. Sec. Litig.,
163 F.3d 102 (2d Cir. 1998)..............................................................................................9

In re Merck & Co., Inc. Sec. Litig.,
432 F.3d 261 (3d Cir. 2005)............................................................................................18

In re Nokia Oyj (Nokia Corp.) Sec. Litig.,
423 F. Supp. 2d 364 (S.D.N.Y. 2006).............................................................................11

In re Omnicom Grp., Inc. Sec. Litig.,
597 F.3d 501 (2d Cir. 2010).............................................................................17, 19, 20

In re Williams Sec. Litig.-WCG Subclass,
558 F.3d 1130 (10th Cir. 2009) ......................................................................................17

Ind. Pub. Ret. Sys. v. SAIC, Inc.,
818 F.3d 86, 97 (2d Cir. 2016) ..................................................................................5, 7, 8

Jeffreys v. City of New York,
426 F.3d 549 (2d Cir. 2005)..............................................................................................3

Lentell v. Merrill Lynch & Co.,
396 F.3d 161 (2d Cir. 2005)............................................................... 15-16, 17, 18

Leykin v. AT & T Corp.,
423 F.Supp.2d 229 (S.D.N.Y. 2006)................................................................................18

Matrixx Initiatives, Inc. v. Siracusano,
563 U.S. 27 (2011).......................................................................................................5-6

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986)..........................................................................................................3

Meyer v. Greene,
710 F.3d 1189 (11th Cir. 2013) ................................................................ 17-18

Phillips v. Scientific-Atlanta, Inc.,
489 F. App'x 339 (11th Cir. 2012) ................................................................17

Scott v. Gen. Motors Co.,
605 F. App'x 52 (2d Cir. 2015) ......................................................................9

Shenk v. Karmazin,
868 F. Supp. 2d 299 (S.D.N.Y. 2012) ............................................................3

Slayton v. Am. Exp. Co.,
604 F.3d 758 (2d Cir. 2010) .........................................................................12

Smith v. Menifee,
No. 00 Civ. 2521, 2002 WL 461514 (S.D.N.Y. Mar. 26, 2002) .....................3

## TABLE OF DEFINED TERMS

| Term | Definition |
|------|------------|
| FAC | Consolidated Fourth Amended Class Action Complaint |
| CAC | Consolidated Amended Complaint |
| Cartel | As defined on p. 2, <u>infra</u> |
| Class Period | As defined in ¶ 17 of the FAC |
| Exchange Act | Securities Exchange Act of 1934 |
| Lava Jato | As defined on p. 2, <u>infra</u> |
| Payment Scheme | As defined on p. 2, <u>infra</u> |
| Petrobras | Petróleo Brasileiro S.A. – Petrobras |
| Petrobras Defendants | Petrobras and PGF |
| PGF | Petrobras Global Finance B.V. |
| Plaintiffs | Plaintiffs in the above-captioned actions |
| PSLRA | Private Securities Litigation Reform Act |
| 56.1 | Petrobras Defendants' Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried |
| SEC | Securities & Exchange Commission |

The Petrobras Defendants respectfully submit this memorandum of law in support of their motion for partial summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Now that discovery is complete, it is clear that the Petrobras Defendants are entitled to summary judgment with respect to numerous alleged misstatements that are simply not actionable under the federal securities laws.  These include general statements about Petrobras's ethics and compliance programs, and forward-looking statements concerning the Company's future plans.  Plaintiffs have also attempted to base their claims in part on statements made in Petrobras's *Fatos e Dados* blog, but the evidence developed through discovery uniformly reflects that the market did not rely on those statements.  Finally, Plaintiffs' claims must fail to the extent they are based on faulty expert analysis concerning the alleged corrective disclosures.

For the reasons set forth below, the Petrobras Defendants are entitled to partial summary judgment on certain claims asserted against them.

## STATEMENT OF FACTS

### A.  Petrobras

Petrobras is one of the largest energy companies in the world.  56.1 ¶ 1.  Its operations are centered in Brazil, where it is the dominant participant in the oil and gas sector.  Id. ¶ 2.  During the period 2010 to 2015, it operated in as many as 24 countries worldwide, through five different business segments.  Id. ¶¶ 3-4.  It has nearly 80,000 employees and is majority owned by the Brazilian federal government.  Id. ¶¶ 5-6.  Its common and preferred shares are listed on the Brazilian stock exchange, the BOVESPA, and it has ADSs listed on the NYSE.  Id. ¶ 8.

B.       **The Payment Scheme**

At the heart of this case are the operations of an illegal cartel of 27 Brazilian contractors and suppliers (the "Cartel"), including some of Brazil's largest construction and engineering firms, that engaged in an intricate and well-concealed scheme (the "Payment Scheme") between 2004 and 2012 to rig bids and overcharge Petrobras on certain refinery construction projects in Brazil (primarily in the "Downstream" or "Supply" segment).  The Cartel used the proceeds of this scheme to bribe Brazilian political parties, elected officials or other public officials, individual contractor personnel and certain former Petrobras executives who were involved in the scheme.  56.1 ¶¶ 11-16.  The Payment Scheme has been under investigation in Brazil since 2014 as part of Operation Lava Jato ("Lava Jato"), id. ¶¶ 9-16, which has resulted in 105 convictions, including numerous employees of Cartel companies who have admitted to using bribe payments to benefit their own companies and the few former Petrobras executives who exploited Petrobras to benefit themselves.  Neither Petrobras nor any of its current employees have been charged in connection with the Payment Scheme.  Indeed, Petrobras – which was deceived by the Payment Scheme – has been found to be a victim of the scheme by the court of first instance in Brazil, the Brazilian Supreme Court and Brazilian prosecutors, is cooperating in the investigations of the wrongdoers, and is participating as an assistant to the Brazilian prosecutors in proceedings seeking to recover damages from Cartel members.  Id. ¶¶ 17-19.

Based on these facts, Plaintiffs allege that Petrobras made a variety of misstatements.  Most are related to Petrobras's financial statements from 2009 forward, but Plaintiffs also allege misstatements in press releases, oral comments, and blog postings.  See, e.g., FAC ¶¶ 359-70.

**ARGUMENT**

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Shenk v. Karmazin, 868 F. Supp. 2d 299, 305 (S.D.N.Y. 2012) (Rakoff, J.). "One of the purposes of summary judgment is 'to isolate and dispose of factually insupportable claims.'" CL-Alexanders Laing & Cruickshank v. Goldfeld, 739 F. Supp. 158, 161 (S.D.N.Y. 1990) (quoting Celotex, 477 U.S. at 323–24). Accordingly, where, as here, there are no genuine issues as to material fact as to certain claims or a "part" of a claim and where summary judgment can help to narrow the issues for trial, Courts have not hesitated to grant summary judgment. Fed. Civ. P. 56(a); Smith v. Menifee, No. 00 Civ.2521 (DC), 2002 WL 461514, at *3 (S.D.N.Y. Mar. 26, 2002) ("Summary judgment is used appropriately 'to streamline the process for terminating frivolous claims and to concentrate [the court's] resources on meritorious litigation.'") (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir.1986)).

A party may not oppose summary judgment by ipse dixit. Thus, to defeat summary judgment, the nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (quoting D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir.1998)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). Thus, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986),

and "may not rely on conclusory allegations or unsubstantiated speculation." Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

# I.   MANY OF THE ALLEGED MISSTATEMENTS ARE INACTIONABLE PUFFERY OR FORWARD-LOOKING STATEMENTS

Many of the alleged misstatements are inactionable as either puffery or forward-looking statements subject to the PSLRA's "safe harbor."  There are no factual disputes with respect to these statements, and the Petrobras Defendants are now entitled to summary judgment on them.

## A.   Inactionable puffery

As this Court recognized at the motion-to-dismiss stage, "[i]t is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery.'"  Op. at 24, No. 14-9662 (JSR) (S.D.N.Y. July 30, 2015) (ECF No. 194) (quoting City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014)).  In denying Defendants' motion to dismiss the CAC, however, the Court accepted Plaintiffs' allegations that certain of Defendants' "statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, [so] a reasonable investor could rely on them." Op. at 25.  In so ruling, the Court recognized that "some of the alleged statements, viewed in isolation, may be mere puffery," but held that it could not conclude that "all of Petrobras' alleged statements regarding its general integrity and ethical soundness were immaterial as a matter of law." Op. at 24-25.

Two things have changed since the motion-to-dismiss ruling.  First, the Second Circuit has squarely rejected the argument – virtually identical to Plaintiffs' argument here – that a general statement that a company has a "culture of high ethical standards, integrity, operational excellence, and customer satisfaction" and a "reputation for upholding the highest standards of

personal integrity and business conduct" that otherwise would be inactionable can be made

actionable based on facts showing that the statements were false and the company had the

opposite of a commitment to ethics and integrity.  Ind. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 86,

97 (2d Cir. 2016) ("SAIC"). In SAIC, the company defendant falsely touted its culture of ethics

and integrity when, all the while, it was knowingly engaged in a fraudulent scheme to overcharge

New York City on a significant governmental contract.  818 F.3d at 89-90, 97-98.  The Court

rejected Plaintiffs' argument and affirmed the dismissal of claims based on such statements,

ruling that the materiality of a misstatement does not turn upon its truth or falsity or upon the

motive or intent with which it is made but on whether a reasonable investor would have deemed

the statement important in an investment decision.  It held that "Plaintiffs' claim that these

statements were knowingly and verifiably false when made does not cure their generality, which

is what prevents them from rising to the level of materiality required to form the basis for

assessing a potential investment." Id. at 97-98 (quoting City of Pontiac, 752 F.3d at 183).  The

Court recognized two limited exceptions to that rule, both based on the content of the company's

statements and not on the motive the company had in making them: where "a company's specific

statements . . . emphasize its reputation for integrity or ethical conduct as central to its financial

condition or . . . are clearly designed to distinguish the company from other specified companies

in the same industry."  Id. at 98.

    Second, Plaintiffs have now had the opportunity to take discovery.  Accordingly,

the question is no longer whether Plaintiffs' "allegations suffice to 'raise a reasonable

expectation that discovery will reveal evidence' satisfying the materiality requirement." Matrixx

Initiatives, Inc. v. Siracusano, 563 U.S. 27, 46 (2011) (quoting Bell Atl. Corp. v. Twombly, 550

U.S. 544, 556 (2007)).  Trial is approaching.  Thus, the question is whether based on that

discovery there remains a genuine dispute of material fact as to a claim or "part" of a claim.  Fed R. Civ. P. 56(a); see also Matrixx, 563 U.S. at 50 (noting that whether a party has "adequately pleaded" an element of its claims "is an altogether different question" from "[w]hether [it] can ultimately prove [its] allegations").

Both of these changes now support granting summary judgment.

Here, Plaintiffs have alleged misstatements concerning Petrobras's Code of Ethics and Corruption Prevention Program,[1] as well as its commitment to transparency or internal monitoring,[2] that are simply "too general to cause a reasonable investor to rely upon them."[3] SAIC, 818 F.3d at 98.  First, there are a handful of statements from 2010 mentioning Petrobras's "transparent operation" and its "commitment to transparency."[4]  Second, there are statements drawn from Petrobras's Code of Ethics on the basis that the company included a link to the Code in its Form 20-F filings, as required by the SEC.[5]  56.1 ¶ 22 (Item 16B of Form 20-F requires each filer to "[d]isclose whether [it] has adopted a code of ethics," "[p]ost the text of such code of ethics on its Internet website and disclose, in its annual report, its Internet address").  Third, there are brief descriptions of the Code of Ethics in Petrobras's annual sustainability reports.[6] Fourth, there are two alleged misstatements related to Petrobras's announcement in July 2013 of

---

[1]     FAC ¶¶ 229, 252, 269, 274, 308-10, 336, 344, 605.

[2]     Id. ¶¶ 231-32, 241, 323, 339

[3]     The Petrobras Defendants have submitted herewith a table identifying the misstatements alleged by Plaintiffs in the individual actions that, for the same reasons discussed in this section, constitute inactionable puffery.  See Ex. 7B.

[4]     FAC ¶¶ 231-32, 241.

[5]     Id. ¶¶ 229, 252, 269, 336, 605.

[6]     FAC ¶¶ 274, 308, 344.

the Corruption Prevention Program and the publishing of the associated manual, and two more statements in 2014 referring back to the launch of the program.[7]

These statements do not fit into either of the limited exceptions articulated in SAIC: they neither "emphasize [Petrobras's] reputation for integrity or ethical conduct as central to its financial condition" nor "are clearly designed to distinguish the company from other specified companies in the same industry." SAIC, 818 F.3d at 98. At most, these statements indicated to investors that Petrobras had a Code of Ethics and a Corruption Prevention Program. There is no evidence that statements about standard compliance measures such as these were "clearly designed to distinguish the company from other specified companies in the same industry." Id. To the contrary, they are the sort of statements that "[n]o investor would take . . . seriously in assessing a potential investment, for the simple fact that almost every [company] makes these statements." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 205-206 (2d Cir. 2009). In addition, there is nothing about these statements, spread sparsely over a five-year period, to suggest that they were part of some improper "effort to reassure the investing public," as Plaintiffs alleged at the pleading stage. Op. at 25 (ECF No. 194).

Moreover, discovery has confirmed that ECA's holding applies squarely to these statements. The very investors whose purchases of Petrobras securities are at issue in this action, including Plaintiffs and their outside investment managers, in large part did not review, or could not recall reviewing, Petrobras's Code of Ethics, Conduct Guide or Corruption Prevention Program Manual. 56.1 ¶ 23. And there is no evidence that either Plaintiffs or their outside

---

[7]     Id. ¶¶ 309-10, 323, 339.

investment managers relied on statements in Petrobras's securities filings describing these documents.

Thus, when these statements are viewed in their proper context and with the benefit of discovery, it is apparent that they are indistinguishable from the types of statements that courts have repeatedly held are too general to be actionable.  See, e.g., SAIC, 818 F.3d at 97-98 (statements regarding defendant's "culture of high ethical standards, integrity, operational excellence, and customer satisfaction" and its "reputation for upholding the highest standards of personal integrity and business conduct" are too general to be actionable); City of Pontiac, 752 F.3d at 183 ("general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery'"); ECA, 553 F.3d at 205-206 (holding that statements touting "highly disciplined" risk management and "standard-setting reputation for integrity" are "too general to cause a reasonable investor to rely upon them").

For the same reasons, the Petrobras Defendants are also entitled to summary judgment on general statements regarding Petrobras's future plans and aspirations,[8] which were not addressed in the Court's opinion on Defendants' motion to dismiss.  These include, for example, statements that Petrobras "remain[ed] confident in [its] capacity to achieve the goals laid out in [its] Business Plan" (FAC ¶ 249) and that "Petrobras continues to strengthen its position as a major player in the global oil and gas market and is fully prepared for new conquests" (id. ¶ 260).  Again, these general expressions of optimism are the same sort of statements that any company in Petrobras's position could be expected to make and, accordingly, they are not actionable.  ECA, 553 F.3d at 206 ("No investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every [company]

---

[8]      FAC ¶¶ 232, 249, 260.

makes these statements."); see also Scott v. Gen. Motors Co., 605 F. App'x 52, 54 (2d Cir. 2015)

(statements about strengthening brand reputation, improving profitability and transaction prices

are "expression[s] of mere 'corporate optimism' that [are] too general to cause a reasonable

investor to rely"); In re Int'l Bus. Machs. Corp. Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998) (a

"highly qualified expression of corporate optimism is not sufficiently material, as a matter of

law, to support a claim for securities fraud").

### B.    Forward-looking statements

On Defendants' motion to dismiss the CAC, the Court previously dismissed two

alleged misstatements on the grounds that they were "protected by the PSLRA's safe harbor for

forward-looking statements" and "there [was] no allegation that the speaker had actual

knowledge that they were false or misleading." Op. at 26 (ECF No. 194). The Court should do

the same for several other challenged statements that are no different from those already

dismissed.

As the Court previously explained, under the PSLRA, "forward looking

statements" are entitled to safe harbor if accompanied by "meaningful cautionary statements," or

if the plaintiff fails to prove that the speaker had "actual knowledge" that the statement was false

or misleading. Op. at 25 (ECF No. 194) (quoting 15 U.S.C. §§ 78u-5(c)(1)(A) and (c)(1)(B)).

Forward looking statements are broadly defined to include "a statement of the plans and

objectives of management for future operations" and "a statement of future economic

performance." Op. at 25 (ECF No. 194) (quoting 15 U.S.C. §§ 78u-5(i)(1)(B)-(C)).

In ruling on Defendants' motion to dismiss the CAC, the Court concluded that the

following two statements are forward-looking and protected by the PSLRA safe harbor "because

there is no allegation that the speaker had actual knowledge that they were false or misleading":

(i) Petrobras's statement that "the proper management of our project portfolio provides us with

the confidence that we will be able to achieve the goals of 2013-17 BMP [Business &

Management Plan], which will guarantee the returns expected by our shareholders" (CAC

¶ 224); and (ii) the statement that Petrobras would "continue with [its] efforts to recover the

operational efficiency of the Campos Basin and optimize operating costs" (id. ¶ 206).  Op. at 26

(ECF No. 194).  Despite the Court's ruling, these two statements remain unchanged in the FAC

(¶¶ 277, 297), as do a number of similar statements that qualify for protection under the

PSLRA.[9]

     First, there are statements that, like paragraph 224 of the CAC, discuss

Petrobras's Business Plans for future years.[10]  These are plainly forward-looking.  See In re

Aegon N.V. Sec. Litig., No. 03 Civ. 0603 (RWS), 2004 WL 1415973, at *12 (S.D.N.Y. June 23,

2004) ("Forward-looking statements also include management's plans and objectives for future

operations, statements of future economic performance and assumptions underlying either."); see

also Glidepath Holding B.V. v. Spherion Corp., No. 04 Civ. 9758 (RJS), 2010 WL 1372553, at

*11 (S.D.N.Y. Mar. 26, 2010), aff'd, 425 F. App'x 76 (2d Cir. 2011) (statements in defendant's

business plan and its sales projections were "forward-looking statements of opinion that could

not reasonably have been relied on"); In re Focus Media Holding Ltd. Litig., 701 F. Supp. 2d

534, 541 (S.D.N.Y. 2010) ("No reasonable investor could have construed . . . statements about

anticipated gradual improvements over time as anything but optimistic projections related to a

time horizon well beyond the quarter in progress.").  These include statements about the Board

of Directors approving specific Business Plans and indicating the overall level of funding (FAC

¶¶ 233, 295) and statements touting Petrobras's "confiden[ce] in [its] capacity to achieve the

---

[9]     The Petrobras Defendants have submitted herewith a table identifying the misstatements alleged by Plaintiffs in the individual actions that, for the same reasons discussed in this section, qualify for protection under the PSLRA safe harbor.  See Ex. 7B.

[10]     FAC ¶¶ 233, 245, 249, 254, 275, 277, 295, 297, 321.

goals laid out in [its] Business Plan" (FAC ¶ 249).  Also entitled to protection are various

projections and assumptions included in Petrobras's Business Plans, such as the statement in the

2013-2017 Business Plan that "Petrobras [will] meet the funding requirements for [investments

of $236.7 billion] in part by issuing $21.4 billion in debt" (id. ¶ 295), and the assumption that

Petrobras would "maintain[] its investment grade rating" (id. ¶ 275).

       Second, there are general statements concerning Petrobras's future plans and

aspirations, which are similar to paragraph 206 of the CAC, such as the declaration that"[d]uring

the next few months we are planning an important capitalization that will prepare Petrobras to go

ahead with the investments needed for its integrated growth and the development of new

frontiers" (id. ¶ 231), and the statement that Petrobras is "[f]ully committed to implementing a

fair and transparent operation" (id. ¶ 232).  These fall squarely within the PSLRA's definition of

forward-looking statements.  See In re Nokia Oyj (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364,

398 (S.D.N.Y. 2006) (concluding that a "general statement of optimism that is not alleged to be

without a basis in fact" was an inactionable forward-looking statement).

       Like the statements on which the Court has already ruled, these forward-looking

statements are entitled to protection under the PSLRA's safe harbor provision because they were

(1) accompanied by cautionary statements and (2) there is no evidence that the speaker acted

with "actual knowledge" that the statement was false or misleading.

       First, to the extent the allegedly misleading forward-looking statements were

contained in press releases (FAC ¶¶ 233, 245, 254, 295, 321), they were accompanied by

cautionary statements warning investors that the statements were forward looking in nature and

based on management's current views and estimates of future economic circumstances, industry

conditions, company performance and financial results.  56.1 ¶ 20.  The cautionary statements

also made clear that there was no guarantee that the expected events, trends or results on which management's views and estimates were based would actually materialize.  Id.  The statements attributed to former Petrobras CEOs José Sergio Gabrielli and Maria das Graças Silva Foster in certain of the press releases (FAC ¶¶ 249, 272, 297) were accompanied by similar cautionary statements, as was the one statement made during a conference call (id. ¶ 275).  56.1 ¶ 21.

Second, despite Plaintiffs' conclusory allegation that "at the time each [forward-looking statement] was made, the speaker knew the [forward-looking statement] was false or misleading" (FAC ¶ 491), Plaintiffs have failed to develop any evidence that Petrobras or the individual speaker acted with "actual knowledge" that any of the forward-looking statements were false or misleading.  Thus, the statements are protected by the safe harbor for this reason as well.  See Slayton v. Am. Exp. Co., 604 F.3d 758, 773 (2d Cir. 2010) ("The safe harbor provision also requires dismissal if the plaintiffs do not prove that the forward-looking statement was made or approved by an executive officer with actual knowledge by that officer that the statement was false or misleading.") (internal citations omitted).

## II.    STATEMENTS MADE ON PETROBRAS'S *FATOS E DADOS* BLOG ARE NOT ACTIONABLE BECAUSE THERE IS NO EVIDENCE THE MARKET RELIED ON THEM

Summary judgment should also be granted on Plaintiffs' claims regarding Petrobras' *Fatos e Dados* blog[11] because there is no evidence that any of those Portuguese-language statements were ever seen by analysts or investors in this case or known to the relevant market.  On the contrary, a review of analyst reports, public press and Plaintiffs' own deposition testimony confirms that the *Fatos e Dados* blog posts never made it to the market and thus did

---

[11]    FAC ¶¶ 223, 238, 239, 255, 258, 288-89, 311, 320, 340, 345-46, 348-49.  The Petrobras Defendants have submitted herewith a table identifying the misstatements in the *Fatos e Dados* blog alleged by Plaintiffs in the individual actions.  See Ex. 7B.

not impact the price of Petrobras securities.  Id. ¶¶ 24-28.  The analyst reports published around the dates of the *Fatos e Dados* blog posts make no mention of them.  Id. ¶ 24.  Bloomberg News articles published on the relevant days also make no mention of the *Fatos e Dados* blog posts, and the commercial press database Factiva contains not a single English-language article referencing the *Fatos e Dados* blog posts at issue in this case.[12]  Id. ¶¶ 25, 27.  Most significantly, not one of the Plaintiffs or investment advisors deposed in this case, who together represent a significant cross-section of sophisticated investors in Petrobras securities, has testified that they read the *Fatos e Dados* blog posts, much less relied on the information posted. Rather, deponent after deponent affirmatively testified either that they did not read, did not know whether others had read or had not even heard of the blog.  Id. ¶ 28.

       "Investors can recover damages in a private securities fraud action only if they prove that they relied on the defendant's misrepresentation in deciding to buy or sell a company's stock."  Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2405 (2014). Although investors "c[an] satisfy this reliance requirement by invoking a presumption that the price of stock traded in an efficient market reflects all public, material information," id., "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance," id. at 2408 (emphasis added).  The first requirement for Plaintiffs to invoke the presumption is that "the alleged misrepresentations were publicly known," which "follows from the fraud-on-the-market theory underlying the presumption."  Id. at 2413.  "If the

---

[12]     The FAC and Appendix A to Class Plaintiffs' Responses and Objections to Defendants' Second Set of Interrogatories challenge fifteen *Fatos e Dados* blog posts, but the Petrobras Defendants were able to find only one Bloomberg News article referencing any information even similar to that contained in the contemporaneous blog posts – and even then, the article located contained just a single reference and did not identify the blog post itself.  56.1 ¶ 26.

misrepresentation was not publicly known, then it could not have distorted the stock's market price." Id.  In this case, there can be no genuine dispute that the statements on Petrobras's *Fatos e Dados* blog were not publicly known to the market—including to the Class members.

Under circumstances similar to the instant case, courts have held that the market does not incorporate information in foreign-language publications ignored by relevant market participants into the price of a company's securities, even if such information was publicly available.  See, e.g., Dartell v. Tibet Pharm., Inc., No. 14-3620, 2016 WL 718150, at *6 (D.N.J. Feb. 22, 2016) (holding that a Chinese-language posting on a Chinese website did not constitute public information where there was "no evidence that this disclosure actually was known to the relevant public or that the market quickly priced in the disclosure"); In re Fuwei Films Sec. Litig., 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009) (holding that the information published in three Chinese-language newspaper articles did not constitute public information).  Indeed, in In re BP p.l.c. Sec. Litig., the court determined that alleged misstatements made in regulatory filings were not sufficiently publicized under this analysis despite the fact that the filings were publicly available and in fact accessed by a handful of people.  No. 10-md-2185, 2013 WL 6388408, at *14-15 (S.D. Tex. Dec. 6, 2013).  As in this case, there was insufficient evidence that the filings "were known by the market and incorporated in the [relevant security's] price," and thus the "fraud-on-the-market" presumption could not be invoked.  Id. at *15.  For the same reasons, this Court should reject the "fraud-on-the-market" presumption with respect to information in the *Fatos e Dados* blog.  As the Supreme Court has recognized: "[A]llowing recovery in the face of affirmative evidence of non-reliance . . . would effectively convert Rule 10b-5 into a scheme of investor's insurance.  There is no support in the Securities Exchange Act, the Rule, or our cases for such a result."  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005).

III.   **MANY OF PLAINTIFFS' ALLEGED CORRECTIVE DISCLOSURES ARE NOT COMPENSABLE AS A MATTER OF LAW**

To establish the loss causation element of a securities fraud claim, a plaintiff must demonstrate "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232 (2d Cir. 2014) (quoting Suez Equity Inv'rs., L.P. v. Toronto–Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001) (quotation marks omitted)).  Under existing Second Circuit authority, a plaintiff can satisfy this burden "by alleging (a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." Id. at 232-33 (quoting In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 511, 513 (2d Cir. 2010) (further citations and quotation marks omitted)).

Plaintiffs assert that as information that was corrective of the Company's alleged misrepresentations and omissions was disclosed to the market, "the prior artificial inflation came out of" the prices of Petrobras securities.  FAC ¶ 489.  However, Plaintiffs have failed to provide any evidence of the link between a number of the alleged corrective disclosures in the FAC and any decline in the price of Petrobras securities.  In addition, several of the alleged disclosures are plainly not "corrective" as a matter of law, including because they are not new news but merely negative characterizations by analysts or ratings agencies of facts that had already been previously disclosed or because they relate to events that are (at best) tenuously connected to the alleged fraud and thus plainly fall outside the zone of risk established by the securities laws.  See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005) ("If th[e] relationship is sufficiently direct, loss causation is established, but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged

misstatements or omissions and the harm actually suffered, a fraud claim will not lie.") (citations and quotation marks omitted).  Finally, with respect to at least two dates on which allegedly corrective disclosures occurred, Plaintiffs have not disaggregated the impact of significant confounding news released on the same day, as they are required to do.  For these reasons, the Petrobras Defendants are entitled to summary judgment on any claim for damages based on the information released on these dates.

A.     **Plaintiffs have provided no evidence that any decline in the price of Petrobras securities was linked to an alleged corrective disclosure on certain dates**

The element of loss causation requires proof of a sufficient nexus between a defendant's material misstatement or omission, and the economic harm suffered by a plaintiff. Dura, 544 U.S. at 341-42.  Here, Plaintiffs allege that, on a series of dates throughout the Class Period, Defendants made materially false and misleading statements that resulted in economic harm to investors, FAC ¶¶ 222-370, and that this harm was realized when the price of Petrobras's securities dropped on the release of information correcting these prior misstatements.

Despite purporting to identify 92 dates on which allegedly corrective information was disclosed to the market in their complaint, see id. ¶¶ 371-482, Plaintiffs only attempt to support the link between the disclosure of this information and a drop in the price of Petrobras's securities with respect to the 29 dates listed in the Expert Report of Dr. Blaine F. Nye (the "Nye Report") (Ex. 103).  For the 68 dates identified in the FAC but not discussed in the Nye Report, Plaintiffs fail to provide any analysis or evidence of the loss allegedly realized on these days.[13] Plaintiffs have therefore failed to raise an issue of material fact concerning whether they are entitled to recover any amounts based on the decline in the price of Petrobras securities on these

---

[13]     The Petrobras Defendants have listed the dates and the corresponding paragraphs in the FAC in Appendix A hereto.

days.  See In re Omnicom, 597 F.3d at 512 (rejecting corrective disclosure date due to insufficient evidence of "requisite causal connection between" purported corrective disclosures and fraud alleged); Phillips v. Scientific-Atlanta, Inc., 489 F. App'x 339, 342-43 (11th Cir. 2012) (affirming summary judgment due to Plaintiffs' failure to "eliminate sufficiently other possible explanations for the identified price drop"); In re Williams Sec. Litig.-WCG Subclass, 558 F.3d 1130, 1143 (10th Cir. 2009) ("Plaintiffs have failed to present evidence suggesting that the declines in price were the result of the revelation of truth and not some other factor.").

### B. Disclosures on certain dates are not corrective as a matter of law

To constitute a corrective disclosure, the published information must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint," Omnicom, 597 F.3d at 511 (emphasis added); Lentell, 396 F.3d at 175 n.4 (finding in order for information to be corrective, it must actually "reveal to the market the falsity of the prior [statements]."), or represent "a foreseeable materialization of the risk concealed by the fraudulent statement[s]" at issue.  Omnicom, 597 F.3d at 511.  Certain of the corrective disclosures that Plaintiffs have alleged are simply not "corrective" under these definitions, nor were they foreseeable or the proximate cause of Plaintiffs' losses.

First, Plaintiffs allege that on February 24, 2015, "Moody's Investors Service cut Petrobras's bonds to junk, stripping them of their investment grade rating" and that on April 27, 2015, Morgan Stanley "changed its Petrobras recommendation from 'neutral [hold]' to 'sell.'" FAC ¶¶ 458, 469.  Under clear Second Circuit law, an agency downgrade or analyst recommendation does not constitute a corrective disclosure because it is merely a "negative characterization of already-public information."  Omnicom, 597 F.3d at 512; see also Meyer v. Greene, 710 F.3d 1189, 1199 (11th Cir. 2013) ("[T]he mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective

disclosure"); In re Merck & Co., Inc. Sec. Litig., 432 F.3d 261, 270-71 (3d Cir. 2005) (Wall Street Journal's analysis of information that was previously available does not constitute a corrective disclosure).  The disclosure of opinions from Moody's and Morgan Stanley did not reveal anything new about the Company beyond a change in the views of Moody's and Morgan Stanley concerning that information, which is insufficient to establish loss causation.  Meyer, 710 F.3d at 1199; Merck & Co., 432 F.3d at 270.  Thus, no reasonable fact-finder could conclude that any declines in the price of Petrobras securities on February 25, 2015 and April 27, 2015 were caused by the disclosure of corrective information.[14]

Second, Plaintiffs incorrectly identify information disclosed on February 6, 2015 as corrective.  On this date, Petrobras filed a Form 6-K announcing the selection of Aldemir Bendine as CEO to replace Maria das Graças Silva Foster.  Plaintiffs contend that the appointment of Mr. Bendine, who Plaintiffs allege had "close ties" to the government, was a manifestation of the risk of the Payment Scheme.  See Nye Report at ¶ 153 (Ex. 103).  But this ignores that Petrobras clearly disclosed throughout the Class Period that the Brazilian government was its controlling shareholder and therefore could select the Company's CEO (including one with "close ties" to the government).  56.1 ¶ 7.  As such, the selection of Mr. Bendine represents (at best) a manifestation of a "risk" that investors were aware of throughout the Class Period, rather than one that was concealed by the Payment Scheme.  Moreover, Mr. Bendine's appointment was a decision entirely unrelated to the Payment Scheme, made years

---

[14]     In addition to the Morgan Stanley downgrade on this date, Plaintiffs' expert identifies the announcement of money laundering charges by Brazilian prosecutors.  See Nye Report, Appendix A, ¶¶ 234-236 (Ex. 103).  A drop in stock price following the announcement of bad news does not constitute loss causation if the news did not disclose the alleged fraud.  Leykin v. AT&T Corp., 423 F. Supp. 2d 229, 245 (S.D.N.Y. 2006).  In February 2015, information about Lava Jato had already been revealed to the market.  As nothing in the prosecutors' announcement exposed the falsity of the Petrobras Defendants' prior alleged misstatements, they are similarly not corrective as a matter of law.  See Lentell, 396 F.3d at 175 n.4.

after the scheme ended, and did not reveal anything about the Payment Scheme.  Nor was it foreseeable at the time of the alleged misstatements what government would be elected by the Brazilian people in the intervening elections, let alone which person would be selected by that government as the company's new CEO.  Thus, "generalized investor reaction" to the change in leadership "is far too tenuously connected" to the alleged fraud "to support liability."  Omnicom, 597 F.3d at 513-14 (holding that an outside director's resignation and resulting negative press "did not add to the public knowledge" about the alleged fraudulent conduct and thus was outside the "zone of risk" defining liability).

As Plaintiffs have failed to identify any information disclosed on this date that reveals the falsity of any alleged misrepresentation or omission by Petrobras or represents a foreseeable materialization of the risk concealed by any alleged misrepresentation or omission, no reasonable factfinder could conclude that the disclosures on February 6, 2015 led to the realization of Plaintiffs' alleged losses.

C.    **Plaintiffs have failed to disaggregate the impact of clear, significant confounding news from the impact of alleged corrective disclosures on certain dates**

To establish loss causation, a plaintiff must "disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from [those attributable to] disclosures of the truth behind the alleged misstatements."  In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 36 (2d Cir. 2009) (quoting Dura, 544 U.S. at 343).  With respect to the alleged corrective disclosures on October 16, 2014 and January 2, 2015, Plaintiffs fail to adequately disaggregate the impact of the allegedly corrective information from the impact of confounding news released to the market that same day.  Accordingly, Plaintiffs cannot show that any portion of their loss is attributable to misstatements purportedly corrected on those dates.

Plaintiffs identify the following allegedly corrective information released on October 16, 2014: a TCU audit report on the Comperj refinery and subsequent commentary by news media and analysts, including a downgrade of Petrobras stock by Société Générale.[15]  See Nye Report, Appendix A, ¶ 3 (Ex. 103).  However, Plaintiffs ignore the negative impact of other confounding news released on this date concerning polls in the Brazilian presidential election, despite the fact that Dr. Nye himself acknowledges elsewhere that news about the Brazilian presidential elections is confounding information.  See id. ¶ 91 ("The prices of the Petrobras securities frequently reacted to election-related news, and on a number of dates when fraud-related material new information reached the market, its effects on security prices were confounded by the effects of information about developments in the campaign and election trends.").[16]  Petrobras is majority-owned by the Brazilian government and thus the government can and does affect the company, positively and negatively, in a number of ways, including through policies such as capping domestic fuel prices.  56.1 ¶ 29.  Many of the plaintiffs and investment managers deposed in this action testified that the market viewed President Rousseff's administration as having a negative impact on Petrobras.  Id. ¶ 30.  As a result, on dates when President Rousseff's challenger was up in the polls (indicating that President Rousseff may lose the election) Petrobras's share price increased, whereas on days where President Rousseff was

---

[15]     The TCU's finding were released during market hours on October 15, 2014.  Under Plaintiffs' own theory, any price impact of this information should have been incorporated when the news first emerged on October 15.  See Corrected Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA (Oct. 23, 2015), ECF No. 264-1, at ¶ 47 (Ex. 104) ("An efficient market . . . is a market in which publicly-available information is rapidly incorporated into the price of a security such that the trading price reflects all publicly-available information.").  In any event, as discussed supra, the Société Générale analyst report constitutes an opinion based on previously disclosed facts and is not reflective of any admission of truth by the Company.  See Omnicom, 597 F.3d at 512.

[16]     Moreover, John D. Finnerty, an expert retained by Plaintiffs in one individual action, excluded October 16, 2014 from his calculations due to "other economically significant, negative confounding information" released on that day.  56.1 ¶ 35.

leading or tied in the polls (indicating that she could be reelected), the prices of Petrobras securities regularly declined.  Id. ¶ 31.  October 16, 2014 was one such date where Petrobras shares reacted negatively to election news:  on that day, Valor, a widely read Brazilian financial newspaper, reported that the Brazilian stock market, and Petrobras in particular, "f[ell] sharply with electoral indecision" based on polls published in Brazil the night before showing that President Rousseff was tied in the polls.  See id. ¶ 32 (noting that "[a]mong shares in the 'election kit,' Petrobras PN lost 7.44%").  Plaintiffs provide no coherent justification for ignoring election-related news on October 16, 2015, while treating it as confounding on other dates.

With respect to January 2, 2015, Dr. Nye points to the disclosure of multiple pieces of news as purportedly corrective, including President Rousseff's statement in her inauguration speech that she remained committed to the country's local content rules (i.e. rules that required the Company and other state-controlled businesses to use contractors and suppliers based in Brazil rather than abroad).  Nye Report, Appendix A, ¶¶ 74-79 (Ex. 103).  However, this statement in no way corrected any alleged misstatements by Petrobras, nor have Plaintiffs provided evidence linking President Rousseff's decision to uphold the local content rules to a risk concealed by the Payment Scheme.  To the contrary, President Rousseff's decision to uphold local content rules, which were in place and publicly disclosed during the Class Period, represents a risk that investors were aware of at all times throughout the Class Period.  Moreover, it was not foreseeable at the time of the alleged misstatements who would be President of Brazil on January 2, 2015, let alone what decision that President would make concerning Brazil's local content rules.  Further, to the extent President Rousseff's statement impacted the price of Petrobras securities at all, it was due to the fact that the country's local content rules directly affected Petrobras as a state-owned company and were perceived negatively by investors.  See

56.1 ¶ 34.  Thus, if anything, President Rousseff's speech constitutes confounding information and Plaintiffs' failure to disaggregate its impact is fatal to any claim for damages based on the fall in the price of Petrobras's securities on January 2, 2015.

Because Plaintiffs have failed to disaggregate losses caused by confounding information from those attributable to "disclosures of the truth behind the alleged misstatements," the Petrobras Defendants are entitled to summary judgment on any of Plaintiffs' claims that are based on the alleged corrective disclosures on October 16, 2014 and January 2, 2015.  In re Flag Telecom Holdings, 574 F.3d at 36 (quoting Dura, 544 U.S. at 343).

## IV. THE PETROBRAS DEFENDANTS JOIN ARGUMENTS IN FAVOR OF SUMMARY JUDGMENT MADE BY OTHER DEFENDANTS, TO THE EXTENT APPLICABLE

The Petrobras Defendants also join in and make as if their own any summary judgment arguments asserted by other Defendants in the action, to the extent applicable.  In particular, but without limitation, the Petrobras Defendants do so with respect to the arguments made by (i) PricewaterhouseCoopers Auditores Independentes in Sections I and II of its memorandum of law in support of its motion for summary judgment; and (ii) Maria das Graças Silva Foster in Section I.C.1 of her memorandum of law in support of her motion for partial summary judgment.

## CONCLUSION

For the reasons set forth above, the Court should grant partial summary judgment on Plaintiffs' claims based on puffery, forward-looking statements, and the *Fatos e Dados* blog, as well as their claims to the extent Plaintiffs cannot prove loss causation.

Dated: New York, New York
      June 27, 2016

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____
      Lewis J. Liman
      Roger A. Cooper
      Luke A. Barefoot
      Elizabeth Vicens
      Jared Gerber

One Liberty Plaza
New York, New York  10006
T: 212-225-2000
F: 212-225-3999

Attorneys for the Petrobras Defendants

**APPENDIX A**

| No. | Date | FAC ¶ |
|-----|------|-------|
| 1. | 11/9/12 | ¶ 371 |
| 2. | 11/13/12 | ¶ 371 |
| 3. | 11/14/12 | ¶ 371 |
| 4. | 11/15/12 | ¶ 371 |
| 5. | 11/16/12 | ¶ 371 |
| 6. | 2/14/14 | ¶ 372 |
| 7. | 2/18/14 | ¶ 372 |
| 8. | 2/19/14 | ¶ 372 |
| 9. | 3/12/14 | ¶ 373 |
| 10. | 3/13/14 | ¶¶ 374, 375 |
| 11. | 3/14/14 | ¶¶ 376, 377 |
| 12. | 3/17/14 | ¶¶ 378, 379 |
| 13. | 4/8/14 | ¶ 381 |
| 14. | 4/9/14 | ¶ 382 |
| 15. | 4/10/14 | ¶ 382 |
| 16. | 4/15/14 | ¶ 384 |
| 17. | 4/22/14 | ¶ 385 |
| 18. | 4/25/14 | ¶ 387 |
| 19. | 5/8/14 | ¶ 388 |
| 20. | 5/15/14 | ¶ 389 |
| 21. | 6/17/14 | ¶ 391 |
| 22. | 7/23/14 | ¶ 392 |

| No. | Date | FAC ¶ |
|-----|------|-------|
| 23. | 8/13/14 | ¶ 393 |
| 24. | 8/22/14 | ¶ 394 |
| 25. | 9/8/14 | ¶ 395 |
| 26. | 9/9/14 | ¶ 396 |
| 27. | 9/12/14 | ¶ 398 |
| 28. | 9/29/14 | ¶ 399 |
| 29. | 10/1/14 | ¶ 400 |
| 30. | 10/9/14 | ¶ 401 |
| 31. | 10/15/14 | ¶ 402 |
| 32. | 10/20/14 | ¶¶ 404, 406 |
| 33. | 10/21/14 | ¶¶ 405, 406 |
| 34. | 10/22/14 | ¶ 408 |
| 35. | 10/23/14 | ¶ 409 |
| 36. | 10/27/14 | ¶ 411 |
| 37. | 10/29/14 | ¶ 413 |
| 38. | 11/3/14 | ¶ 414 |
| 39. | 11/10/14 | ¶ 415 |
| 40. | 11/13/14 | ¶ 416 |
| 41. | 11/20/14 | ¶ 424 |
| 42. | 11/24/14 | ¶¶ 425, 426 |
| 43. | 11/25/14 | ¶ 426 |
| 44. | 11/28/14 | ¶ 427 |
| 45. | 12/4/14 | ¶ 431 |

| No. | Date | FAC ¶ |
|-----|------|-------|
| 46. | 12/5/14 | ¶ 432 |
| 47. | 12/8/14 | ¶ 433 |
| 48. | 12/10/14 | ¶ 434 |
| 49. | 12/24/14 | ¶ 438 |
| 50. | 12/29/14 | ¶ 439 |
| 51. | 1/12/15 | ¶ 442 |
| 52. | 1/20/15 | ¶ 443 |
| 53. | 1/27/15 | ¶ 446 |
| 54. | 2/10/15 | ¶ 456 |
| 55. | 2/19/15 | ¶ 457 |
| 56. | 3/2/15 | ¶ 460 |
| 57. | 3/4/15 | ¶ 461 |
| 58. | 5/15/15 | ¶ 470 |
| 59. | 5/19/15 | ¶ 471 |
| 60. | 5/22/15 | ¶ 472 |
| 61. | 5/26/15 | ¶ 473 |
| 62. | 6/19/15 | ¶ 474 |
| 63. | 7/2/15 | ¶ 475 |
| 64. | 7/8/15 | ¶ 476 |
| 65. | 7/17/15 | ¶ 477 |
| 66. | 7/22/15 | ¶ 479 |
| 67. | 7/24/15 | ¶ 480 |
| 68. | 7/27/15 | ¶ 481 |

| No. | Date | FAC ¶ |
|-----|------|-------|
| 69. | 7/29/15 | ¶ 482 |