# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: PETROBRAS SECURITIES LITIGATION

This Document Applies To:

ALL CASES LISTED IN APPENDIX A TO NOTICE OF MOTION

14-cv-9662 (JSR)

**STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED OF DEFENDANTS ALMIR GUILHERME BARBASSA, JOSE CARLOS COSENZA, GUILHERME DE OLIVEIRA ESTRELLA AND JOSE MIRANDA FORMIGLI FILHO**

Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendants Almir Guilherme Barbassa, Jose Carlos Cosenza, Guilherme de Oliveira Estrella and Jose Miranda Formigli Filho (together, the "Individual Defendants") hereby submit this statement of material facts as to which there is no genuine issue to be tried.

## I. INDIVIDUAL DEFENDANTS

1. Defendant Almir Guilherme Barbassa ("Barbassa") served as CFO of Petróleo Brasileiro, S.A. ("Petrobras" or "the Company") and was a member of Petrobras's Board of Executive Officers ("Executive Board") between July 2005 and February 2015. Barbassa Dep. 8:23-25, 15:4-9 (Ex. 105)[1]; see also Consolidated Fourth Am. Class Action Compl. ¶¶ 32, 562 (Nov. 30, 2015), ECF No. 342 ("FAC").

[1] Unless otherwise indicated, all documents cited in this statement are attached as exhibits to the Declaration of Ariel M. Fox In Support Of Defendants' Motion For Summary Judgment, dated June 27, 2016, and are cited in this statement as "Ex. __."

2. Barbassa did not serve on Petrobras's Board of Directors. Petróleo Brasileiro, S.A. – Petrobras, Annual Report (Form 20-F) (May 19, 2010), at 107-10 ("2009 20-F") (Ex. 106); Petróleo Brasileiro, S.A. – Petrobras, Annual Report (Form 20-F) (May 25, 2011), at 114-17 ("2010 20-F") (Ex. 2); Petróleo Brasileiro, S.A. – Petrobras, Annual Report (Form 20-F) (Mar. 30, 2012), at 112-16 ("2011 20-F") (Ex. 3); Petróleo Brasileiro, S.A. – Petrobras, Annual Report (Form 20-F) (Apr. 26, 2013), at 98-102 ("2012 20-F") (Ex. 4); Petróleo Brasileiro, S.A. – Petrobras, Annual Report (Form 20-F) (Apr. 30, 2014), at 98-102 ("2013 20-F") (Ex. 5); Petróleo Brasileiro, S.A. – Petrobras, Annual Report (Form 20-F) (May 15, 2015), at 117-21 ("2014 20-F") (Ex. 6); Petróleo Brasileiro, S.A. – Petrobras, Annual Report (Form 20-F) (Apr. 27, 2016), at 119-23 ("2015 20-F") (Ex. 1).

3. Defendant Jose Carlos Cosenza ("Cosenza") served as the Director of Supply at Petrobras and was a member of the Executive Board between April 2012 and February 2015. FAC ¶ 34.

4. Cosenza did not serve on Petrobras's Board of Directors. 2009 20-F, at 107-10 (Ex. 106); 2010 20-F, at 114-17 (Ex. 2); 2011 20-F, at 112-16 (Ex. 3); 2012 20-F, at 98-102 (Ex. 4); 2013 20-F, at 98-102 (Ex. 5); 2014 20-F, at 117-21 (Ex. 6); 2015 20-F, at 119-23 (Ex. 1).

5. Defendant Guilherme de Oliveira Estrella ("Estrella") served as the Director of Exploration and Production at Petrobras and was a member of the Executive Board between January 2003 and February 2012. FAC ¶ 36.

6. Estrella did not serve on Petrobras's Board of Directors. 2009 20-F, at 107-10 (Ex. 106); 2010 20-F, at 114-17 (Ex. 2); 2011 20-F, at 112-16 (Ex. 3); 2012 20-F, at 98-

102 (Ex. 4); 2013 20-F, at 98-102 (Ex. 5); 2014 20-F, at 117-21 (Ex. 6); 2015 20-F, at 119-23 (Ex. 1).

7. Jose Miranda Formigli Filho ("Formigli") served as the Director of Exploration and Production at Petrobras and a member of the Executive Board between February 2012 and February 2015. Formigli Dep. 15:6-7, 24:14-23, 51:9-12 (Ex. 107); see also FAC ¶ 37.

8. Formigli did not serve on Petrobras's Board of Directors. 2009 20-F, at 107-10 (Ex. 106); 2010 20-F, at 114-17 (Ex. 2); 2011 20-F, at 112-16 (Ex. 3); 2012 20-F, at 98-102 (Ex. 4); 2013 20-F, at 98-102 (Ex. 5); 2014 20-F, at 117-21 (Ex. 6); 2015 20-F, at 119-23 (Ex. 1).

## II. PETROBRAS MANAGEMENT

9. Petrobras is one of the largest integrated oil and gas companies in the world. See 2015 20-F, at 37 (Ex. 1).

10. The Company operates principally in Brazil, where it is the dominant participant in the oil and gas sector, as well as in 12 other countries, including the United States and Africa. See id. at 37-38.

11. During the period 2010 to 2015, Petrobras employed approximately 80,000 people. See id. at 129; 2012 20-F, at 107 (Ex. 4).

12. Petrobras was managed by a Board of Directors and an Executive Board, each with independent and separate responsibilities. Petróleo Brasileiro S.A. – Petrobras, By-laws, 2002-2012 (Exhibit 1(a) to Annual Report (Form 20 F)) (July 1, 2002); Petróleo Brasileiro S.A. – Petrobras, By-laws, 2012-2016 (Exhibit 1.1 to Annual Report (Form 20 F)) (Apr. 2, 2012), Art. 17 ("Petrobras By-laws") (Ex. 108).

13. The Board of Directors was responsible for setting the overall direction of Petrobras's business and defining its mission, its strategic goals and guidelines. Id. Art. 28 § I.

14. The Board of Directors was also responsible for approving Petrobras's financial statements. Id. Arts. 28 § IV, 33 § I(d).

15. The Executive Board reviewed Petrobras's financial statements and submitted them to the Board of Directors for approval. See id.; see also Comunicação de Decisão do Conselho de Administração, Ata CA 1.384, item 3 [Communication of Decision by the Board of Directors, Minutes CA 1.384, item 3] (Oct. 25, 2013) [PBRCG _00749236] (Ex. 109); Comunicação de Decisão do Conselho de Administração, Ata CA 1.363, item 3 [Communication of Decision by the Board of Directors, Minutes CA 1.363, item 3] (Feb. 9, 2012) [PBRCG _00748907] (Ex. 110)

16. The Executive Board did not have the power to approve Petrobras's financial statements. See Petrobras By-laws, Art. 33 § II (Ex. 108).

## III. THE PAYMENT SCHEME

17. In 2009, Brazilian federal prosecutors launched an investigation named Operation Lava Jato ("Lava Jato") aimed at Brazilian money launderers. FAC ¶ 4.

18. The investigation was conducted under the oversight of a federal court in Curitiba, the capital of Paraná (the "Paraná Court"). See 13ª Vara Federal de Curitiba, Ação Penal, Sentença [13th Federal Court of Curitiba, Criminal Action, Ruling] Nº 5036528-23.2015.4.04.7000/PR (Mar. 8, 2016) ("13th Federal Court March 8 Ruling") (Ex. 10).

19. In 2014, part of the investigation shifted to focus on irregularities involving certain Brazilian contractors and suppliers to Petrobras, including some of Brazil's largest construction and engineering firms. This investigation uncovered an unlawful cartel formed by companies that had contracted with Petrobras on certain large-scale projects, which had been operating in secret for nearly a decade. FAC ¶¶ 5, 7-8, 54.

20. In March 2014, the Brazilian federal police arrested Alberto Youssef ("Youssef") in connection with Lava Jato. Youssef was responsible for money laundering schemes that distributed bribes to participating beneficiaries. Youssef set up shell companies to provide the appearance of legality. See 13th Federal Court March 8 Ruling ¶ 1066 (Ex. 10).

21. In March 2014, the Brazilian federal police arrested a former Director of Supply of Petrobras, Paulo Roberto Costa ("Costa"), in connection with Lava Jato. See 2014 20-F, at F-10 (Ex. 6).

22. In August 2014, Costa entered a plea agreement with the Brazilian federal police. As part of his plea agreement, Costa cooperated on investigations and prosecutions pending before the Paraná Court for crimes including bribery, embezzlement, money laundering, cartelization and obstruction of the Lava Jato investigations. See Termo de Acordo de Colaboração Premiada de [Plea Agreement of] Paulo Roberto Costa (Aug. 27, 2014) (Ex. 8).

23. In September 2014, Youssef entered a plea agreement with the Brazilian federal police. As part of his plea agreement, Youssef cooperated on investigations and prosecutions pending before the Paraná Court for "crimes against the Administration, against the National Financial System and crimes of money laundering." See Termo de Colaboração Premiada de [Plea Agreement of] Alberto Youssef (Sept. 24, 2014) (Ex. 9). On October 8, 2014, Costa and Youssef testified in the Paraná Court. See 2014 20-F, at F-11 (Ex. 6).

24. The testimony of Costa and Youssef was made public and revealed the existence of a payment scheme (the "Payment Scheme") that involved a group of 27 companies (the "Cartel") that, between 2004 and April 2012, colluded to rig bids and overcharge Petrobras on certain refinery construction projects in Brazil (primarily in the "Downstream" or "Supply" segment). The Cartel used the proceeds of this scheme to bribe Brazilian political parties,

elected officials or other public officials, individual contractor personnel and certain former Petrobras executives who were involved in the scheme (the "Corrupt Executives"). See id. at F-10-F-11; see also 13th Federal Court March 8 Ruling ¶¶ 392, 395-396, 939 (Ex. 10).

25. The Lava Jato investigation revealed that the Cartel and the Corrupt Executives maintained secret offshore accounts in shell companies, outside of Petrobras's control or oversight. 13th Federal Court March 8 Ruling ¶¶ 114, 117, 119, 123, 132, 158 (Ex. 10).

26. The investigation also revealed that the Cartel members concealed the Payment Scheme through the use of intermediaries and hand-delivered cash payments. Id. ¶¶ 170-171, 294, 401; see also Termo de Colaboração de [Collaborator Statement of] Alberto Youssef N° 14, at 2 (Oct. 14, 2014) (Ex. 111)

27. The Payment Scheme was designed with the objective of being concealed from the Company. 13th Federal Court March 8 Ruling ¶¶ 392, 395-396, 939 (Ex. 10); see also Termo de Colaboração [Collaborator Statement of] Alberto Youssef N° 14, at 2 (Oct. 14, 2014) (Ex. 111).

28. Many of the improper payments made in connection with the Payment Scheme could not be traced because of the strategies employed by the Cartel members and Corrupt Executives. 13th Federal Court March 8 Ruling ¶¶ 170-171, 294, 401 (Ex. 10).

29. The Lava Jato investigation revealed that the Payment Scheme was hidden by the Cartel members by embedding bribe payments into large value contracts and issuing false invoices and service agreements that presented inflated charges to Petrobras. Id. ¶¶ 170-171, 294, 401; see also Termo de Colaboração de [Collaborator Statement of] Alberto Youssef N° 1, at 4 (Oct. 2, 2014) (Ex. 112); Termo de Colaboração de [Collaborator Statement of] Hermelino Leite N° 20, at 3 (Mar. 13, 2015) (Ex. 113).

30. The large number of high-value contracts at Petrobras made the Payment Scheme less likely to be detected. 13th Federal Court March 8 Ruling ¶¶ 170-171, 294, 401 (Ex. 10); see also Termo de Colaboração de [Collaborator Statement of] Alberto Youssef N° 1, at 4 (Oct. 2, 2014) (Ex. 112); Termo de Colaboração de [Collaborator Statement of] Hermelino Leite N° 20, at 3 (Mar. 13, 2015) (Ex. 113).

31. The Payment Scheme was difficult to detect because it involved both collusion and management override of controls. See Ussery Dep. 163:21-164:20 (Ex. 114).

32. Plaintiffs' own expert testified that he could not offer the opinion that senior Petrobras executives—including the Individual Defendants—knew or should have known of the Payment Scheme. See Henning Dep. 81:23-82:14, 85:21-86:15 (Ex. 115).

33. The Tribunal das Contas da União ("TCU"), a governmental auditing body with access to all Petrobras contracting and bidding information, wrote in an August 26, 2015 report that the Payment Scheme was "unimaginable." Decision N° 2163/2015, Proceeding N° TC 010.546.2009-4, ¶ 32 (Aug. 26, 2015) (Ex. 116).

34. Petrobras's accounting records did not contain the information necessary to determine the timing or amounts of improper payments to political parties, elected officials or other public officials, individual contractor personnel, former Petrobras personnel or other individuals involved in the Payment Scheme. See 2014 20-F, at F-14 (Ex. 6); see also P. Alves Dep. 74:9-75:22 (Ex. 117); R. Alves Dep. 302:24-303:14 (Ex. 118).

35. Brazilian prosecutors have publicly stated their conclusion that Petrobras was a victim of the Payment Scheme. See Justiça Federal, Seção Judiciaria do Paraná [Federal Court, Judicial District of Paraná], 13ª Vara Federal de Curitiba, Termo de Audiencia nas Ações Penais [13th Federal Court of Curitiba, Record of Hearing in Criminal Actions] Nos. 5083258-

29.2014.404.7000/PR, 5083351-89.2014.404.7000/PR, 5083360-51.2014.404.7000/PR, 5083376-05.2014.404.7000/PR, 5083401-18.2014.404.7000/PR] (Apr. 28, 2015) (Ex. 12).

36. Judge Moro of the Paraná Court, who is presiding over the public proceedings in Brazil, has also recognized that Petrobras was "the victim of unlawful acts." 13[a] Vara Federal de Curitiba, Ação Penal, Despacho/Decição [13th Federal Court of Curitiba, Criminal Action, Order/Decision] N[o] 5036528-23.2015.4.04.7000/PR ¶ 34 (Aug. 18, 2015) (Ex. 11).

37. Petrobras is cooperating with prosecutors and Judge Moro of the Paraná Court in their investigation of the wrongdoers, and is participating as an assistant to the Brazilian prosecutors in proceedings seeking to recover damages from Cartel members. See 13th Federal Court March 8 Ruling ¶ 34 (Ex. 10); see also Dos Santos Dep. 24:6-29:5, 39:19-43:10, 138:22-139:2, 143:18-24 (Ex. 13).

## IV. INTERNAL AUDITING CONTROLS AT PETROBRAS

38. Petrobras had an audit committee ("Audit Committee") with the responsibility of assuring legal and regulatory compliance, including with regard to certification of internal controls, compliance procedures and ethics, and monitoring the financial position of the Company. The Audit Committee was composed of a subset of members of the Board of Directors. See 2014 20-F, at 123-24 (Ex. 6).

39. Petrobras had an independent internal audit department ("Internal Audit") that reported directly to Petrobras's Board of Directors via the Audit Committee. See Gonçalves Dep. 11:3-5 (Ex. 119).

40. Internal Audit planned and performed audits of Petrobras's internal controls, including controls over procurement and contracting of goods and services. It

employed a risk matrix to allocate resources for conducting audits and testing controls. See Ussery Dep. 138:11-22, 144:5-8 (Ex. 114); see also Gonçalves Dep. 50:8-25 (Ex. 119).

41. Petrobras had an Ombudsman's office that reported directly to the Board of Directors via the Audit Committee on a quarterly and annual basis. See Petrobras 2014 20-F, at 125-26 (Ex. 6); see also Neto Dep. 55:5-9 (Ex. 120).

42. The Ombudsman's office was responsible for receiving and channeling whistleblower complaints to other departments at Petrobras, including Corporate Security and Internal Audit. Internal Audit investigated whistleblower complaints and reported its findings to the Audit Committee. See Fontes Dep. 10:25-11:6 (Ex. 121).

43. Internal Audit separately audited each area within the Company, including the procurement process and the contracting of goods and services as part of the scheduled audits outlined in its Annual Audit Plan. See Ussery Dep. 144:3-8, 145:5-17 (Ex. 114).

44. Internal Audit also performed unscheduled audits upon the request of external regulatory bodies such as the Controladoria Geral da União ("CGU") and the TCU. See id. 41:11-44:7.

45. Petrobras communicated regularly with the TCU and CGU, and responded to each regulatory body's requests for information as part of its ongoing audit processes. See id. 53:16-54:12, 141:19142:12, 43:10-44:3; see also Gonçalves Dep. 128:19-129:18, 130:9-11 (Ex. 119).

46. Internal Audit also performed unscheduled audits arising from complaints made through the anonymous whistleblower channel of the Ombudsman's office. See Neto Dep. 60:7-17 (Ex. 120).

47. Internal Audit designed, monitored and tested controls over procurement and the contracting of goods and services. See Ussery Dep. 147:21-148:10, 149:2-6, 153:4-15 (Ex. 114).

48. Internal Audit identified instances of non-compliance with Petrobras policies and worked to remediate issues as necessary. See Neto Dep. 61:5-13 (Ex. 120).

49. Internal Audit reported its findings regarding scheduled and unscheduled audits to the Audit Committee, the Executive Board, the Board of Directors and Petrobras's independent auditor, PricewaterhouseCoopers Auditores Independentes ("PwC Brazil"), on a quarterly and annual basis. See Ussery Dep. 47:12-48:6, 49:5-49:11 (Ex. 114); see also Panassol Dep. 160:11-16 (Ex. 122).

## V. INTERNAL FINANCIAL CONTROLS AT PETROBRAS

50. Petrobras's financial statements were prepared by the Finance Department, working with the Accounting Department and with support from the relevant business areas. Petrobras, Elaborar [Prepare] Form 20-F (July 12, 2011) [PBRCG_01552175] (Ex. 143).

51. Petrobras had a Corporate Finance department (FINCORP). A subdivision of employees within this department ("SOX Certification Group") was responsible for ensuring compliance with the certification requirements under Sections 302 and 404 of the Sarbanes-Oxley Act ("Sarbanes Oxley") for the disclosure of financial statements. Petrobras Presentation on Fundamentals in Internal Controls, at 35 [PBRCG_01788077] (Ex. 123).

52. The SOX Certification Group led a company-wide annual process to assess Petrobras's internal controls framework, and to manage the certification process for Petrobras' Form 20-F. See id.

53. The SOX Certification Group evaluated entity-level and process-design controls, and analyzed the self-assessments made by the various Petrobras management divisions based on questionnaires prepared by the SOX Certification Group. See id.

54. Internal Audit, as part of its scheduled auditing procedures, tested internal controls and verified whether controls were operating effectively. Internal Audit suggested remediation and re-tested non-compliant controls for the SOX Certification Group. See Barbassa Dep. 200:4-15 (Ex. 105); see also Ussery 148:18-149:11, 150:24-151:4 (Ex. 114).

55. Internal Audit also communicated the results of its tests to its external auditors. Petrobras Presentation on Fundamentals in Internal Controls, at 21 [PBRCG_01788077] (Ex. 123).

56. The SOX Certification Group provided quarterly and annual updates to the Audit Committee and PwC Brazil at regular Audit Committee meetings, where it discussed its assessment of Petrobras's control environment and the status of the annual certification process. See Cunha Dep. 253:25-254:12 (Ex. 124).

57. In compliance with Sarbanes-Oxley, Petrobras's management was required to annually confirm its responsibilities in maintaining a proper internal control framework and submit a report on internal controls on the financial statement preparation and disclosure process. Petrobras Presentation on Fundamentals in Internal Controls, at 33 [PBRCG_01788077] (Ex. 123).

58. Barbassa testified that he believed that Petrobras's controls were sound. Barbassa Dep. 67:20-68:19 (Ex. 105).

59. While at Petrobras, all of the members of the Executive Board, including Costa, Renato de Souza Duque ("Duque"), and Nestor Cuñat Cerveró ("Cerveró"), provided sub-

certifications on internal controls in their capacity as executive directors of their respective divisions, in compliance with Section 302 of Sarbanes-Oxley. Id. 188:22-189:6; see, e.g., 2011 20-F Sarbanes-Oxley Act Art. 302 Sub-Certification (Mar. 29, 2012) [PBRCG_01788339] (Ex. 125).

60. The annual sub-certifications signed by Costa, Duque, and Cervero, like those for all of the members of the Executive Board, certified that: (i) the director had reviewed the 20-F with regard to the area for which he was responsible; (ii) affirmed that to his knowledge, the 20-F did not contain any untruthful statement as to a fact relevant to the market, and that the statements were not misleading; (iii) all the information required for the 20-F provided by the representatives under his responsibility was obtained with the support of documents filed at the Company and (iv) the Director assumed responsibility for the truthfulness of the information contained therein. See, e.g., 2011 20-F Sarbanes-Oxley Act Art. 302 Sub-Certification (Mar. 29, 2012) [PBRCG_01788339] (Ex. 125).

61. Prior to the revelation of the Payment Scheme in 2014, neither the company nor its independent auditors identified a material weakness in Petrobras's internal controls, and Petrobras received clean audit opinions every year from Ernst & Young Auditores Independentes S/S (2004, 2005), KPMG Auditores Independentes (2006-2011) and PwC Brazil (2012, 2013). Reports of Independent Registered Public Accounting Firm (Petróleo Brasileiro, S.A. – Petrobras, Annual Report (Form 20-F) (June 30, 2005), at F-3-F-4 ("2004 20-F"); Petróleo Brasileiro, S.A. – Petrobras, Annual Report (Form 20-F) (June 28, 2006), at F-1-F-2 ("2005 20-F"); Petróleo Brasileiro, S.A. – Petrobras, Annual Report (Form 20-F) (June 26, 2007), at F-1-F-2 ("2006 20-F"); Petróleo Brasileiro, S.A. – Petrobras, Annual Report (Form 20-F) (May 19, 2008), at F-5-F-7 ("2007 20-F"); Petróleo Brasileiro, S.A. – Petrobras, Annual

Report (Form 20-F) (May 22, 2009), at F-3 ("2008 20-F"); 2009 20-F, at F-3-F-4; 2010 20-F, at F-3–F-4; 2011 20-F, at F-4-F-5; 2012 20-F, at F-3-F-4; 2013 20-F, at F-3-F-5) (Ex. 126); see also Expert Report of Michael Ussery ¶ 16 (May 27, 2016) (Ex. 127); Expert Report of Gary B. Goolsby ¶ 15 (May 27, 2016) (Ex. 128).

## VI. THE PASADENA REFINERY

62. The Company's acquisition of Pasadena Refining System Inc. (the "Pasadena refinery") in 2006 was part of a larger strategic plan to expand its refining abroad. See 2006 20-F, at F-83 (Ex. 129).

63. On February 2, 2006, the Executive Board approved the acquisition of a 50% interest in the Pasadena refinery from a U.S.-based refining and trading company owned by the Belgian group Compagnie Nationale à Portefeuille SACNP. See Ata da Reunião N° 4.567 da Diretoria Executiva [Executive Board Meeting Minutes No. 4.567] (Feb. 2, 2006) [PBRCG_01548352] (Ex. 130); 2006 20-F, at 5 (Ex. 129).

64. In October 2014, Costa testified that he received a US$ 1.5 million bribe in connection with the acquisition of the Pasadena refinery, the sum of which was deposited in a bank account in Liechtenstein. See Termo de Colaboração de [Collaborator Statement of] Paulo Roberto Costa N° 54, at 3 (Sept. 7, 2014) (Ex. 131).

65. In October 2014, Costa testified that he believed the source of the US$ 1.5 million was Astra Oil. See id.

66. Astra Oil was not a member of the Cartel. Superintendência-Geral [Office of the Superintendent General], Despachos Do Superintendente-Geral [Orders of the Superintendent-General], Nº 105, Processo Administrativo [Administrative Case] Nº 08700.002086/2015-14 (Jan. 26, 2016) (Ex. 132).

67. Petrobras took impairment charges with respect to the Pasadena refinery of US$ 223 million in 2008, US$ 147 million in 2009 and US$ 225 million in 2012. 2008 20-F, at 70 (Ex. 133); 2009 20-F, at 80 (Ex. 106); 2012 20-F, at 80 (Ex. 4).

## VII. THE RNEST REFINERY

### A. Petrobras's disclosures concerning RNEST

68. The Abreu e Lima Refinery ("RNEST") was a new refinery construction effort by Petrobras, to be located in Northeastern Brazil. See 2005 20-F, at 44-45 (Ex. 134).

69. RNEST was located in Northeastern Brazil because of its strategic location for North American and South American markets, and to promote the development of industry in this region. See Comunicação de Decisão da Diretoria Executiva, Ata de. 4.786, item 30 [Notice of Executive Board Decision, Minutes of Meeting 4.786, item 30] (Nov. 25, 2009) [PBRCG_01187023] (Ex. 135).

70. On August 27, 2009, Petrobras filed a Form 6-K with the SEC (the "August 27, 2009 Form 6-K"). Petróleo Brasileiro S.A. – Petrobras, Report of Foreign Private Issuer (Form 6-K), Clarification about news: Abreu e Lima Refinery (Aug. 27, 2009) (Ex. 136).

71. The August 27, 2009 Form 6-K contained information about RNEST. Id. at 2.

72. The August 27, 2009 Form 6-K stated that in late 2006, the processing capacity of RNEST was "set at 200,000 barrels of oil per day and investments estimated at $4.056 billion." Id.

73. The August 27, 2009 Form 6-K stated that, from 2007 to 2009, the processing capacity of RNEST "was increased to 230,000 barrels per day," and "investments [were] estimated at $12.00 billion." Id.

74. On May 19, 2010, Petrobras filed a Form 20-F with the SEC for the fiscal year ended December 31, 2009. 2009 20-F (Ex. 106).

75. The 2009 20-F stated that Petrobras was "currently building a new 230 mbbl/d [230,000 barrel per day] refinery named Abreu e Lima [RNEST] in Northeastern Brazil," and that "the total estimated cost [was] approximately U.S.$13.3 billion." Id. at 41.

76. On August 13, 2012, Theodore Helms ("Helms"), then the executive manager of investor relations at Petrobras, spoke at EnerCom Inc., the Oil & Gas Conference. Preliminary Transcript of Petróleo Brasileiro S.A. – Petrobras Presentation at EnerCom Inc The Oil & Gas Conference (Aug. 13, 2012) ("EnerCom Transcript") (Ex. 137); see Helms Dep. 10:6-18 (Ex. 138).

77. At that conference, Helms stated: "[O]ne thing we have to admit is that we're starting this RNEST project. It is a 230,000 barrel a day refinery that could cost when it's all said and done $20 billion. That's over $90,000 a barrel a day capacity." EnerCom Transcript, at 7 (Ex. 137).

78. On April 30, 2014, Petrobras filed a Form 20-F with the SEC for the fiscal year ended December 31, 2013. 2013 20-F (Ex. 5).

79. The 2013 20-F stated: "Abreu e Lima – RNEST, a refinery in Northeastern Brazil[,] is designed to process 230 mbbl/d [230,000 barrel per day] of crude oil …. We expect operations to come on stream in the last quarter of 2014, and as of December 31, 2013, we have completed approximately 84.3% of construction and invested U.S.$14.8 billion." Id. at 38.

**B. Presentations to the Executive Board concerning RNEST**

80. A presentation was made to the Executive Board on July 16, 2009 concerning, among other things, RNEST. Petrobras, Planejamento Integrado do Segmento RTC

Refino, Transporte e Comercialização, RTC 2020 [Integrated Planning for the Refining, Transporting and Marketing (RTM) Segment, RTM 2020], (July 16, 2009) [PBRCG-P_01828023] (Ex. 139).

81. The presentation indicated that, under certain assumptions, the net present value of RNEST was negative and made several recommendations in order to increase the project's value. Id. at 74, 77.

82. Another presentation was made to the Executive Board concerning RNEST on September 3, 2009. Petrobras, Projeto de Implantação da Refinaria do Nordeste [Project for establishing the Northeast Refinery] (Sept. 3, 2009) [PBRCG_01788658] (Ex. 140).

83. This presentation identified a number of reasons why the cost of RNEST had increased from approximately US$ 4 billion when the Executive Board last approved the project in 2006 to US$ 13.3 billion in 2009. These reasons included the decision to increase the capacity of the refinery (from 200,000 barrels per day to 230,000 barrels per day), the need to build local infrastructure and the overall growth in the costs of engineering, raw materials, equipment and labor during this period. Id. at 7, 11-12; Corrected Expert Report of Philip K. Verleger, Jr., Ph.D. ¶¶ 95-96, 101, 103 (June 2, 2016) (Ex. 141).

84. On November 25, 2009, the Executive Board approved moving to Phase IV of RNEST. The decision noted that RNEST had previously presented a negative net present value and noted that additional analysis had been carried out to take into account benefits from (i) tax relief that Petrobras was in the process of negotiating in connection with RNEST, worth up to US$ 1.3 billion; and (ii) preventing the potential loss of market share should Petrobras abandon RNEST and a competitor establish a refinery in the same region, valued at US$ 722 million. See Comunicação de Decisão da Diretoria Executiva, Ata de 4.786, item 30 [Notice of

Executive Board Decision, Minutes of Meeting 4.786, item 30], at 6-7 (Nov. 25, 2009) [PBRCG_01187023] (Ex. 135). Together with certain adjustments to the valuation model, these factors resulted in a net present value for RNEST of US$ 76 million. Id. at 7.

## VIII. DISCOVERY

85. On May 23, 2016, Class Plaintiffs served their Responses and Objections to Defendants' Contention Interrogatories. Plaintiffs state that Petrobras, PGF, and all individual defendants named in the FAC are liable "for the materially false and misleading statements and/or material omissions set forth herein . . . that occurred during their respective period of employment." Class Plaintiffs' Responses and Objections to Defendants' Second Set of Interrogatories to Plaintiffs, App'x, at 1 n.1 (May 23, 2016) (Ex. 144). The list of statements that followed did not separately identify the maker of each statement. Id.

## IX. ALLEGED MISSTATEMENTS

86. In regard to the issues in this case, Barbassa did not have the authority to approve the publication of and did not approve the publication of any of the *Fatos e Dados* blog postings. Declaration of Almir Guilherme Barbassa in Support of Defendants' Motion for Summary Judgment ("Barbassa Declaration") ¶ 2 (Ex. 145).

87. Barbassa did not write, disseminate, cause or direct the dissemination of, publish, sign, or have ultimate authority over the publication of any of the *Fatos e Dados* blog postings to the extent related to this case. Id. ¶ 3.

88. In regard to the issues in this case, Cosenza did not have the authority to approve the publication of and did not approve the publication of any of the following: Petrobras's financial statements, press releases, sustainability reports, Corruption Prevention Program Manual, securities filings, including on Form 20-F and Form 6-K, or *Fatos e Dados*

blog posting. Declaration of Jose Carlos Cosenza in Support of Defendants' Motion for Summary Judgment ("Cosenza Declaration") ¶ 2 (Ex. 146).

89. Cosenza did not write, disseminate, cause or direct the dissemination of, publish, sign, or have ultimate authority over the publication of any of the above-mentioned documents to the extent related to this case. Id. ¶ 3.

90. In regard to the issues in this case, Estrella did not have the authority to approve the publication of and did not approve the publication of any of the following: Petrobras's financial statements, press releases, sustainability reports, Corruption Prevention Program Manual, securities filings, including on Form 20-F and Form 6-K, or Fatos e Dados blog posting. Declaration of Guilherme de Oliveira Estrella in Support of Defendants' Motion for Summary Judgment ("Estrella Declaration") at ¶ 2 (Ex. 147).

91. Estrella did not write, disseminate, cause or direct the dissemination of, publish, sign, or have ultimate authority over the publication of any of the above-mentioned documents to the extent related to this case. Id. ¶ 3.

92. In regard to the issues in this case, Formigli did not have the authority to approve the publication of and did not approve the publication of any of the following: Petrobras's financial statements, press releases, sustainability reports, Corruption Prevention Program Manual, securities filings, including on Form 20-F and Form 6-K, or Fatos e Dados blog posting. Declaration of Jose Miranda Formigli Filho in Support of Defendants' Motion for Summary Judgment ("Formigli Declaration") at ¶ 2 (Ex. 148).

93. Formigli did not write, disseminate, cause or direct the dissemination of, publish, sign, or have ultimate authority over the publication of any of the above-mentioned documents to the extent related to this case. Id. ¶ 3.

Dated: New York, New York
June 27, 2016

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: ______________________________
Lewis J. Liman
Roger A. Cooper
Luke A. Barefoot
Elizabeth Vicens
Jared Gerber

One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999

Attorneys for the Individual Defendants