# EXHIBIT A
# (Part I)



**PETRÓLEO BRASILEIRO S.A. – PETROBRAS**

**MEETING MINUTES NO. 1404 OF THE BOARD OF DIRECTORS**

**HELD ON 12/12/2014**


On the twelfth day of the month of December of two thousand fourteen, in the conference rooms of Petróleo Brasileiro S.A. – Petrobras, located in the company's offices in São Paulo at Avenida Paulista no. 901, 11th floor, Bairro Cerqueira César, and in Brasília, in North Autarky Sector – SAN, Quadra 01, Bloco "D" 1st floor, and at the Company's headquarters in the city of Rio de Janeiro at Avenida República do Chile no. 65, 24th floor, starting at eleven forty-two in the morning, Petrobras' ordinary meeting no. 1401 of the Board of Directors ordinary meeting no. 1401 was held, with Mr. Guido Mantega acting as Chairman of the Board, with the participation of Board Members Maria das Graças Silva Foster and Miriam Belchior, and Board Members José Guimarães Monforte, Luciano Galvão Coutinho, Francisco Roberto de Albuquerque, Mauro Rodrigues da Cunha, Sergio Franklin Quintella, and Silvio Sinedino Pinheiro. Invited participants were the Directors of Petrobras, Almir Guilherme Barbassa, José Alcides Santoro Martins, José Miranda Formigli Filho, José Carlos Cosenza, José Antonio de Figueiredo and José Eduardo de Barros Dutra. Not participating was Board Member Márcio Pereira Zimmerman, with justified motive. ----- Once the meeting started, the Chairman of the Board of Directors, Guido Mantega, suggested that the Minutes of the Board Meetings held on October 31, 2014 and November 4, 2014, November 14, 2014 and November 25, 2014, be discussed at the end of the meeting. Then the Chairman of the Board confirmed with the Board Members present the date of the next Board meeting, to be held on January 12, 2015 at 10:00 a.m., at the Company's offices. Next, Board Member Mauro Rodrigues da Cunha raised three questions on the order of the day. First, the Board Member reminded everyone that in the meeting that began on October 31, 2014 and that concluded on November 4, 2014, the contracting of individual legal advisory services for the board members was discussed, and he understood that the matter would be included again to be discussed in the next meeting; the Board Member stated that he sent the Company's Secretary General

Confidential                                                                 PBRCG_01224933

a list of attorney's names in the event that the model of hiring an advisor for the Board was adopted, and he said he would like to submit the matter for discussion. The Chairman of the Board of Directors, Guido Mantega, said the matter would be discussed at the end of the meeting. As the second matter on the order of the day, Board Member Mauro Rodrigues da Cunha pointed out that the executive session that was initiated during the meeting held on November 14, 2014 but that was interrupted due to difficulties with the agendas of the Board Members, should be continued; he reminded everyone that he sent an e-mail to the Board Members listing the points he had raised at the time of the executive meeting that was interrupted, and he called everyone's attention to the projected Internal Rules of the Board regarding holding executive meetings. The third matter on the order of the day raised by Board Member Mauro Rodrigues da Cunha was to tell the other Board Members present that he had received a letter signed by ten international investors, dated December 8, 2014, with regard to the challenges of Corporate Governance faced by the Company within the context of Operation Car Wash; the Board Member asked that a copy of that letter be distributed to the other Board Members, which was done during the course of the meeting. Board Member José Guimarães Monforte suggested, as a matter of order, inverting the order of the presentations, as he believed that presentation of the Financial Statements should be priority, due to the Company's current circumstances, which was supported by the Chairman of the Board of Directors, Guido Mantega. Next was presentation of the **"Financial Statements of Petrobras (Controller and Consolidated) for the Period Ended September 30, 2014 (unaudited) and the Corporate Performance Report,"** by the Executive Manager of Corporate Performance, Mário Jorge da Silva, and by the Legal Department's Financial Manager, Grace Salomão de Pinho, with the presence of the Manager of Evaluation of Economic and Operational Performance, Ricardo Rodriguez Besada Filho, the Executive Manager of Accounting, Marcos Antônio Silva Menezes, the General Manager of Accounting of the Controller and Consolidated Companies, Paulo José Alves, the Manager of Planning and Accounting Guidance for the Accounting Department, Amos da Silva Cancio, of the Executive Manager of Corporate Strategy, Antonio Eduardo Monteiro de Castro, of

OFFICIAL DOCUMENT 007.78/2015TCU



the General Manager of Regional Matters of the Legal
Department Hélio Siqueira Junior, of the Coordinator
with ties to the structure of the Executive Manager of
the Legal Department, Carlos Rafael Lima Macedo, by
invitation, and in Rio de Janeiro, of the Executive
Manager of Investor Relations, Theodore Marshall Helms.
The presenter, Mário Jorge da Silva, first explained
that the presentation was a simulation of the Company's
results in the third quarter of 2014, as there were
still not complete financial statements at that time,
and that he wanted to inform the Board of Directors of
the operating and financial indicators, and to discuss
the possible effects of Operation Car Wash; in addition,
he also clarified that the presentation was divided into
Operational    Performance,    Simulation    of    Results,
"Criteria for Gauging Adjustments arising from Operation
Car Wash," "Analysis of Risks of Releasing an Unaudited
Balance Sheet," and Decisions by the Executive Board.
The Executive Manager, Mário Jorge da Silva presented
the     Operational     Performance     during     the     period,
considering the following outside variables: exchange
rate, price of Brent oil, comparison of the price in
Brazil and the American Gulf [sic], and the sale of by-
products in Brazil. Depreciation of the *real* on the
order of 8% in the first nine months of 2014 was
reported; regarding the value of Brent, there was an
increase in global supply in the third quarter of 2014
and  lower projected demand, leading to the drop in the
price of Brent; in relation to the sales of by-products
in Brazil, there was an increase in demand for diesel
and gasoline in the first nine months of 2014; regarding
the gap between international prices and those charged
by the Company in Brazil, in the third quarter of 2014
there was a reduction in the gap between diesel and
gasoline, with a reversal in the fourth quarter in favor
of the prices charged in Brazil, to the point that it
would be interesting for possible entrants into the
Brazilian market to sell diesel and gasoline here, as
they would obtain a higher margin than in the North
American market. The Chairman of the Board of Directors,
Guido Mantega, asked if there were signs of competitors
who were already entering into the domestic market, and
the Director of Supply, José Carlos Cosenza clarified
that there are signs of companies looking for local
distributors to offer product, mainly in light of the
North American winter, which causes excesses of gasoline
and   diesel.   Continuing   with   the   presentation   on
Operating

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

Meeting Minutes No. 1401



Performance, the Executive Manager of Corporate Performance reported that the third quarter is a time of peak demand for by-products in Brazil (mainly diesel and gasoline), due to industry and agribusiness, in addition to residential consumption; there was an increase of 6.5% in the production of oil and liquefied natural gas by Petrobras compared to the prior quarter, with the entry into operation of UEPs [Stationary Production Units] P-63, P-55, P-62 and P-58, and the ramp-up of the FPSO systems on Cidade de Itajaí, Cidade de Paraty and Cidade de São Paulo, an increase of 6% in Petrobras' own production in relation to the prior quarter of oil and liquefied natural gas in Brazil with the interconnection of 46 new producing wells, and the arrival of four PLSVs; a greater supply of natural gas was verified to handle higher thermoelectric generation, while in the third quarter of 2014 there was a greater supply of domestically produced gas, which reduced the need to import LNG; and regarding the production of by-products in Brazil, it was found that production was higher with use of the same refining park due to an increase in the utilization factor. Next, Executive Manager Mário Jorge da Silva said that production in 2014 is projected to be 5.4% higher than production in 2013, with a ramp-up of the units that entered into production in the second quarter of 2013, and the entry into production of five new units in 2014, in addition to the interconnection of 62 wells; diversion from the goal (+7.5% ± 1 p.p.) as a function of delays in delivery of the Stationary Production Units, in licensing, and in interconnection of wells, which was offset by improved operating efficiency. Board Member Silvio Sinedino Pinheiro asked about the reason for the deviation in relation to the projected production curve, and the Director of Exploration, José Miranda Formigli Filho, explained that the result was impacted by problems concluding the work onboard platforms P63, P55, P58 and P62, with consequences to the operating efficiency of the sub-systems of the processing plant, particularly causing a delay in the injection of water, which has still not occurred in the reservoir in the Roncador field (P55 and P62); such circumstances influenced the increase in production at levels beyond what was expected, which in turn did not offset schedule stoppages. Board Member Mauro Rodrigues da Cunha asked if the 2015 production goal is being maintained, which was answered by the Director of Exploration and Production, José Miranda Formigli Filho, who said that the goal for 2015 was not

Confidential                                                                PBRCG_01224936



released to the market, not even through the Business and Management Plan (Plano de Negócios e Gestão – PNG). Board Member Mauro Rodrigues da Cunha asked if the production goal projected for 2020 will be influenced; Director José Miranda Formigli Filho said that the goal for 2020 should be confirmed or reviewed as a function of the current context, and the Board Member and President of Petrobras, Maria das Graças Silva Foster added to this, saying that the analysis should also take into consideration the delays at the shipyards, due to inefficiency and the inability to obtain financing. Moving on to the Simulation of Results, and pointing to the limited information that the Company has today regarding Operation Car Wash, the Executive Manager of Corporate Performance, Mário Jorge da Silva, made the following observations: (i) Net Operating Revenues were 13% higher than the same period in 2013 due to price adjustments in diesel and gasoline in November 2013, and a higher sales volume of by-products in the internal market and of exported oil, which was offset by lower exports of by-products; (ii) a larger market for derivatives, due to the exchange rate depreciation on expenses related to imports and government participation, which positively affected Gross Income by 8%; (iii) the lower result in the first nine months of 2014 in comparison with the same period of the prior year was explained by an additional 26% in operating expenses, due to provisioning of the PIDV (R$ 2.5 billion), higher write-offs of dry or sub-commercial wells (R$ 1.0 billion), lower gains in the sale of assets (R$ 0.9 billion), a write-off of assets due to return of fields (R$ 0.5 billion), and higher sales expenses (R$ 0.8 billion); (iv) simulated impacts of Operation Car Wash in the formation and operation of assets on the order of R$ 4.0 billion; and (v) income before the financial result, stakes and taxes 9% lower in comparison with the same period in 2013 due mainly to devaluation of the *real*. Board Member José Guimarães Monforte asked if, in relation to the contracts in which the payment of kickbacks had been identified, there are contracts under way, if they are being paid, and if any criticism has been made in relation to payment of such contracts. Executive Manager Mário Jorge da Silva said there are contracts in force that continue being paid at the agreed amounts, but that in the accounting ledgers the loss corresponding to the alleged value of the kickbacks has been recognized. Board Member and

Confidential

Meeting Minutes No. 1401



President of Petrobras, Maria das Graças Silva Foster added to this, saying that after the plea bargain of the former Director, Paulo Roberto Costa, the Executive Board decided that new amendments to the Comperj and RNEST contracts would not be approved, the only exceptions would be amendments without which the losses would have been higher than if there had not been amendments. Continuing with the presentation, the Executive Manager of Corporate Performance told the Board about the impacts of the structuring programs on net income, explaining that PROCOP (R$ 4.9 billion), PRODESIN (R$ 1.0 billion) and PROEF (R$ 1.3 billion) positively impacted the simulation of Net Income by 48% (R$ 7.2 billion). With respect to investments, the reduction of 10% was reported in comparison with the same period in 2013, with the following as the principal justifications for divergences in relation to the 2014-2018 PNG: (i) Contractor Performance for P-75 (R$ -0.7 billion) – critical equipment projected and not delivered, and a gap in the physical realization and financial measurement of hull conversion activities conducted in China; Comperj – Train 1 (R$ -0.6 billion): termination of contracts, 41 days of strike, delays in materials supply and construction and assembly; Cernambi-Tecab Gas Pipeline (R$ -0.6 billion): delay in bringing pipelines online and in obtaining an installation license; P-74 (R$ -0.5 billion): delay in conversion of the hull and in construction of UEP process models; Fertilizer Factory – MS (R$ -0.4 billion): low performance of the consortium, culminating in termination of the contract in December 2014; (ii) Performance of Petrobras – Pre-Salt Exploration in the Campos Basin (R$ -0.5 billion): re-planning of the new field evaluation campaign; FPSO Cidade de Ilhabelha (R$ -0.4 billion): re-planning of well interconnection activities due to environmental licensing; E&P Argentina (R$ -0.4 billion): non-payment of extension bonus for the Medanito and Entre Lomas concessions, due to delays in negotiations with the Argentine government; P-61 (R$ -0.3 billion): delay in installation of P-61/TAD; FPSO Cidade de Mangaratiba (R$ -0.3 billion): delay in the completion stage of three wells. With respect to the Cash Flow simulation in the third quarter of 2014, the final balance of R$ 70.3 billion was indicated, with elevation of the final balance from cash as a function of higher operating income and to the effect of the exchange rate variation on the balance in foreign currency; the higher operating income in the third

Confidential

Meeting Minutes No. 1401



quarter of 2014 mainly reflects the reduction in
inventory (R$ 7.0 billion) of imported oil formed in the
previous quarter, of domestic by-products, and exports
under way also from the prior quarter, as well as the
variation in taxes and rates (R$ 3.0 billion), mainly
due to the greater recovery of PIS/COFINS [Employee
Profit-Sharing/Tax for Social Security Financing].
Moving on to explain the Simulation of Indebtedness and
Leverage, it was reported that the Net Indebtedness
Indicator/EBITDA closed at 4.20 in the first nine months
of 2014, 19% higher than in 2013, mainly as a function
of the new financing obtained, which represented nearly
84% (R$ 33 billion) of the increase in Net Debt. Moving
on to the item regarding "Criteria for Measuring
Adjustments arising from Operation Car Wash," the
Executive Manager of Corporate Performance, Mário Jorge
da Silva, explained that this is in regard to criteria
approved by the Executive Board on December 11, 2014,
with depositions from the former director, Paulo Roberto
Costa and Mr. Alberto Youssef (October 8, 2014) as
reference, as well as the Plea Bargain Agreements of the
executives from Toyo Setal, Mr. Julio Camargo and Mr.
Augusto Mendonça Neto, that Petrobras had access on
December 3, 2014, which information was received by
Petrobras as borrowed evidence. With relation to the
period, it was reported that the contracts and
amendments entered into from 2004 to April 2012,
individually or in a consortium, were considered. Board
Member and President, Maria das Graças Silva Foster,
called attention to the fact that in the deposition
provided by former director Paulo Roberto da Costa to
the Federal Courts on October 8, 2014, people in the Gas
and Energy Division were not named, which is not what
happened with Engineering and the Supply Division. Board
Member Sergio Franklin Quintella asked if the Company
had recognized an overpayment, then shouldn't a
provision be recorded on the balance sheet for this
receipt? Encouraged by Board Member and President, Maria
das Graças Silva Foster, the Coordinator of the Legal
Department, Carlos Rafael Lima Macedo explained that
████████████████████████████████████████████ the
Financial and Investor Relations Director, Almir
Guilherme Barbassa added to this, saying that currently
it is a

Meeting Minutes No. 1401



contingent asset, which depends on the judicial decision that allows it to be recognized as a revenue. The presenter, Mário Jorge da Silva continued, noting that in relation to the values, the percentage of 3% was considered, or specific values on the total measured in each contract: (i) use of 3%, pointed to in the deposition of the former director, Paulo Roberto Costa, to the Federal Courts on October 8, 2014; (ii) use of specific values for the contracts specifically mentioned in the Plea Bargain Agreements of Mr. Augusto Mendonça Neto and Mr. Julio Camargo. Board Member Sergio Franklin Quintella noted a qualification regarding the understanding presented that the plea bargain agreement would be valid for basing the write-down in assets, but not for seeking reimbursement for the Company. Board Member José Guimarães Monforte asked if mention is made in the plea bargain of the contracts in which over payments of 3% were made, or if it is the Simulated Results calculations that generically considered that percentage. Executive Manager Mário Jorge da Silva clarified that according to the deposition of former director Paulo Roberto Costa, on average the indicated percentage of 3% was applied to contracts referring to Petrobras projects. Board Member Francisco Roberto de Albuquerque asked about the allotment of the funds to be recovered within the scope of Operation Car Wash. The Coordinator of the Legal Department, Carlos Rafael Lima Macedo, explained that

Confidential                                                                  PBRCG_01224940

**Meeting Minutes No. 1401**



The Executive Manager, Mário Jorge da Silva, continued to present the impacts of Operation Car Wash recognized in the simulation of the Company's results, and clarified that the larger parcel would be in the write-off of these impacts on the formation or operation of the assets (estimated to be R$ 3.870 million); it was reported that in this simulation the total amount of the impacts would reach R$ 4.060 million, considering the effects of reversal of depreciation of the mentioned assets, of the write-off of taxes receivable, of the repercussions on income tax and social contribution, and of the impacts of Operation Car Wash that were already recognized in the results. The Legal Coordinator, Carlos Rafael Lima Macedo, explained



Confidential                                                          PBRCG_01224941

Meeting Minutes No. 1401





Confidential

Meeting Minutes No. 1401





Confidential                                                                      PBRCG_01224943

Meeting Minutes No. 1401



Board

Member Sergio Franklin Quintella called attention to the fact that management was aware – due to the final reports from the Internal Investigation Committees – of possible overcharging, recommending caution in any release of values to the market. During the meeting, the Executive Manager of Corporate Performance, Mário Jorge da Silva, presented the Board with an informational table on "Deadlines to Release the Balance Sheet and Covenants," in which the following periods and respective acceleration of debts were highlighted: January 31, 2015, for publication of the unaudited quarterly balance sheet, under the penalty of acceleration of debt of US$ 12.35 billion; February 28, 2015, for publication of the unaudited quarterly balance sheet, under the penalty of acceleration of the debt of US$ 78.51 billion; May 31, 2015, for publication of the audited annual balance sheet, under the penalty of acceleration of the debt of US$ 32.21 billion; and June 30, 2015, for publication of the audited annual balance sheet, under the penalty of acceleration of the debt of US$ 78.51 billion. Next, the Executive Manager of Corporate Performance, Mário Jorge da Silva, reported to the Board of Directors the decisions made by the Executive Board in the meeting held on December 11, 2014, detailed as follows: (a) delay release of the unaudited quarterly balance sheet until January 31, 2015, considering that: I. Expiration of the first covenants was delayed until July 31, 2015; II. There is an expectation of availability within the next 30 days of new depositions and plea bargains within the scope of Operation Car Wash.

Confidential                                             PBRCG_01224944

Meeting Minutes No. 1401



III. The release of information that might be cause for corrections to be made within the next 30 days may serve as ammunition for lawsuits; and IV. There are still divergences with PwC that compromise the desired alignment with the external auditor, even in dealing with an unaudited balance sheet; (b) To release to the market on December 12, 2014 only the accounting information that will not be impacted by the effects of Operation Car Wash: I. Sales volume; (II. Net Operating Income; III. Operating Generation (+) and Investments (-) grouped; IV. Cash Balance (Cash and Cash Equivalents); V. Total and Net Debt; and also to release [sic] VI. Criteria for Measuring Adjustments arising from Operation Car Wash; and VII. Preliminary estimate of these adjustments in light of the known facts, and based on documents up until today's date. Board Member Mauro Rodrigues da Cunha pointed out that the discussion regarding what should be done by the Company should be divided into two parts: first, what should be done in relation to release of the Results; second, what should be done to obtain the audited balance sheet. In relation to the first point, the Board Member reminded everyone that the market is still waiting for release of the unaudited financial statements, and in his opinion, frustration of this expectation would be received very poorly by the market; in addition, the option not to release would signal to the market that the information to be considered about the Company continues to be the information that was released on June 30, 2014, which was the last official publication. Board Member Mauro Rodrigues da Cunha stated his agreement with the guidance provided by the law firm Cleary Gottlieb Steen & Hamilton presented on this date, and he also said that he believes that PwC's recommendations are not fitting at this time, considering that the procedure that the Company uses to release its unaudited financial statements says nothing with respect to the activities of the independent auditors, which is yet another legal and reputational matter of the Company. The Board Member suggested publication of the third-quarter 2014 financial statements with the adjustments arising from the impacts of Operation Car Wash, which would be complying with what was announced to the market, publishing the Company's "best guess." Board Member and President of Petrobras, Maria das Graças Silva Foster, said that this had been the initial position of the Executive Board, but that the Financial

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

 PBRCG_01224945

Meeting Minutes No. 1401



and Investor Relations Director, Almir Guilherme
Barbassa presented arguments against that initiative. To
clarify, the Financial and Investor Relations Director
pointed out the fragility of presenting financial
statements that might influence investors' decisions,
and which, subsequently, could be corrected, leaving
room for lawsuits to be filed against the Company. Board
Member Mauro Rodrigues da Cunha said that with the
information in the already-mentioned letter received
from Petrobras' international investors, deterioration
in the holders of the Company's assets can be seen:
high-quality investors are getting rid of Petrobras'
papers, and "predatory" investors are purchasing the
Company's shares and debt securities. The President of
the Board of Directors, Guido Mantega, proposed that the
question be submitted to a vote, which recommendation he
made to the Executive Board pursuant to the following
terms: (i) whether or not to publish the financial
statements; and (ii) how to publish them. Director Almir
Guilherme Barbassa intervened, explaining that if the
decision to publish is made, it is necessary to define
whether or not there will be retroactivity, as this is a
very important matter because of two main points:
alignment with the position held by PwC,

The President
of the Board of Directors, Guido Mantega, said that
investors are concerned about what might come out of the
investigations under way, and that in this context
failure to release information would contribute to
aggravating this environment of fear, for which reason
he believes that presentation of basic operating
information (sales volume, net operating income, among
others), would be a way of minimizing those impressions.
Board Member Silvio Sinedino de Pinheiro asked what the
risks are from the legal point of view, in light of the
lawsuits under way in the United States. The Legal
Financial Manager, Grace Salomão de Pinho, responded
that

The Chairman of the Board of

Meeting Minutes No. 1401



Directors said that the Board is facing two types of risk: legal risk – which involves impacts due to the lawsuits filed by investors – and risk related to deterioration of the Company's shares; in his opinion the decision to be made must consider both risks. The voting began according to the terms proposed by the President of the Board of Directors, Guido Mantega, who wanted a vote on release of accounting data that will not be impacted by the effects of Operation Car Wash, with the information that the impacts on the financial statements are still being determined. Board Member Mauro Rodrigues da Cunha, recognizing that his proposal to publish the financial statements for the third quarter of 2014 with the adjustments arising from the impacts of Operation Car Wash had already been discussed, proposed that a vote be taken on which items from the decision of the Executive Board in the meeting held on December 11, 2014 the Board of Directors would recommend releasing: if items I to V (I. Sales volume; II. Net Operating Revenues; III. Operating Income (+) and Investments (-) grouped together; IV. Cash Balance (Cash and Cash Equivalents); V. Total and Net Debt) or if items I to VII (VI. Criteria for Determining Adjustments arising from Operation Car Wash; (VII. Preliminary estimate of these adjustments in light of the known facts based on documents up until today's date). The President of the Board of Directors, Guido Mantega, accepted the proposal from Board Member Mauro Rodrigues da Cunha and reopened the vote, stating that he was voting for publication of only items I to V, to which Board Member Sergio Granklin Quintella agreed. Board Member Francisco Roberto de Albuquerque voted with the Chairman of the Board, highlighting the importance of the release being accompanied by a very detailed explanatory note, which in his opinion would be well understood by the market. The Board Member and President of Petrobras, Maria das Graças Silva Foster presented as her vote the position sustained by the Executive Board of the Company, to release items I to VII, in which she was accompanied by Board Member Mauro Rodrigues da Cunha. Board Member Luciano Galvão Coutinho initially asked if PwC had made any statement about the subjects now being discussed by the Board, which was answered by the Director of Finance and Investor Relations, Almir Guilherme

Confidential

PBRCG_01224947

Meeting Minutes No. 1401



Barbassa, that the situation was not discussed with that
auditing firm; next the Board Member voted for release
of items I to VII, going along with the vote of the
Board Member and President of Petrobras, María das
Graças Silva Foster. Board Member José Guimarães
Monforte abstained from voting, with the argument that
neither of the proposals under discussion matched his
understanding. Director Almir Guilherme Barbassa
explained to the Board that when the law firm Cleary
became aware of the understanding of Petrobras'
Executive Board,

███████████████████████████████████████████████████

                                          ; Cleary referred to

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

                         Board Member Miriam Belchior
expressed her concern with the legal risk, and voted to
release only items I to V, accompanying the vote of the
Chairman of the Board of Directors, Guido Mantega. Board
Member Silvio Sinedino Pinheiro voted to release items I
to VII. In light of the votes presented, the Chairman of
the Board of Directors declared the result to be that
only items I to V would be released. In continuation of
the meeting, Board Member Mauro Rodrigues da Cunha
expressed his understanding about the immediate measures
to be taken by the Company to present the balance sheet;
he argued that Petrobras cannot wait for judicial
decisions to present them to the market; due to this, he
said that an independent evaluation must be requested of
the assets impacted by Operation Car Wash, with
formation of a provision for losses in the cases in
which the assets are evaluated at a lower value in
relation to the current data, and such provisions should
be adjusted as judicial decisions are released. Board
Member José Guimarães Monforte added that such an
evaluation should be in line with PwC, which must
subsequently validate the procedure. Board Member
Luciano Galvão Coutinho commented that this is a

Confidential

Meeting Minutes No. 1401



methodology that is quite sensitive to the premises currently under debate; in addition, he agreed that the Company's financial statements cannot be subject to the progress of a legal proceeding, for which reason he also believes that an alternative methodology must be agreed to with PwC, which allows the assets under investigation to be evaluated. In response to the request from Board Member Mauro Rodrigues da Cunha, the Chairman of the Board of Directors, Guido Mantega, summoned PwC representatives to participate in the meeting, as they were available to the Board in the São Paulo Office. Representing PwC were Mr. Marcos Donizete Panassol, Mr. Carlos Alberto Souza, and Mr. Jorge Roberto Manoel, who joined the meeting. The Chairman of the Board, after reminding everyone that Petrobras has been discussing all of the recommendations made by PwC in order to make preparation of the Company's audited balance sheet for the third quarter 2014 viable, he asked the auditor Marcos Panassol what conditions are necessary for the Company to obtain approval for the audited balance sheet in the period, as well as for fiscal year 2014. Auditor Marcos Panassol said that there are still some uncertainties regarding the numbers being reported by the Company, given the news that has been released on Operation Car Wash, which means that this reporting must be continued; he also mentioned that an evaluation by PwC is under way on the results of the Internal Investigation Committees, with the objective of verifying if the risks identified in the past still continue in fiscal year 2014, and to what extent the internal controls dealt with this; he continued, commenting that the independent investigation led by the contracted firms is a critical point, and PwC has no way to intervene in order to accelerate the procedure. Within this context, the matter of the reporting line was mentioned – to whom the investigations, their progress and conclusions will be reported – as a matter of corporate governance that is still pending. Board Member and President of Petrobras, María das Graças Silva Foster said that according to the contracted firms, Gibson, Dunn & Crutcher, and Trench, Rossi & Watanabe, the reporting line could be the Director of Governance, Risk and Compliance himself, along with two people outside the Company, professionals known to have technical knowledge, a Brazilian and someone not residing in Brazil. Board Member Silvio Sinedino Pinheiro asked if PwC is

Confidential

PBRCG_01224949

Meeting Minutes No. 1401



conditioning its signature of its report at the end of the attorneys' work; Board Member José Guimarães Monforte added to that, requesting clarification on when would be the moment, still during the course of the investigations, at which PwC would believe it had sufficient information for the independent auditor to take a position. Auditor Marcos Panassol answered the first question, saying that PwC can issue its report at any time, but that in light of the current circumstances it would not be a conclusive report; therefore, he stated that it is necessary for the investigations to evolve to the point at which it is possible for the Company to present trustworthy information with the necessary adjustments in order for a conclusive report to be issued. He continued with his explanations, stating that the moment to which Board Member José Guimarães Monforte is referring will be the moment at which the procedures adopted allow the Company to affirm that the people in charge of preparing and presenting the financial information are not being questioned about the points raised in the investigation. Board Member and President of Petrobras, María das Graças Silva Foster asked how many months away this point is, and Auditor Marcos Panassol answered that there is no way to determine the moment, because this depends on the work of the contracted law firms; the detailed planning of the independent investigations is pending, in his opinion, due to the failure to define the reporting line. Board Member Mauro Rodrigues da Cunha asked the auditor Marcos Panassol if the question of the reporting line within Petrobras' scope would be resolved if its Audit Committee was comprised of independent members of the Board of Directors, to which he received an affirmative response. The Chairman of the Board of Directors, Guido Mantega, asked why PwC believed that the current members of the Audit Committee are not qualified to function as a reporting line, as they are legally qualified to be members of the Audit Committee. The response was that this is a matter of independence in relation to the facts investigated and not to the qualification to be members of the Audit Committee. Board Member Mauro Rodrigues da Cunha asked if, considering the failure to define the reporting line, the auditor Marcos Panassol agreed with the words attributed to him at that time on page 11 of the

Confidential

Meeting Minutes No. 1401



minutes of meeting 1399 held on November 14, 2014, of
this Board, which said: "(…) the auditor Marcos Panassol
stated that Petrobras' governance channels are working
in a satisfactory manner in the investigations, and PwC
has direct access to the independent law firms hired by
the Company within the scope of the recent
investigations (…)." The auditor responded that he
agreed with the cited record, however, that a solution
still needed to be found for the matter of the reporting
line. The Chairman of the Board commented on the need
for an estimate to be given of the hired law firms
regarding the time necessary to produce information that
provides comfort for obtaining an audited balance sheet.
Board Member and President of Petrobras, Maria das
Graças Silva Foster added to this, asking the PwC
representatives what could be done to cut out steps and
accelerate this procedure; she asked if the departure of
the current President, as well as the members of the
Executive Board, would accelerate obtaining the audited
balance sheet. Auditor Marcos Panassol explained that
such removal would not have the capacity to clear up the
matter of information safety regarding the acts already
engaged in throughout fiscal year 2014, and that a
change in people would resolve the matter only from here
on out; but that in relation to the acts engaged in and
the contracts entered into, he said that this change
would not eliminate the need for the investigation, as
it dealt with acts engaged in during the period that is
the subject of the balance sheet. Next, Board Member
Mauro Rodrigues da Cunha commented on the suggestion to
work on creating with PwC a methodology of evaluation
that allows estimates to be reached with sufficient
certainty that gives comfort to the independent auditors
to issue a report on the Company's financial statements,
regardless of the progress of the investigations. Board
Member José Guimarães Monforte asked what the evaluation
alternatives would be, from PwC's point of view. Auditor
Marcos Panassol mentioned as examples, that asset cost
could be considered, extracting from it anything that
should not be inlcuded, in addition to an independent
market evaluation (by a consulting company), or use of a
present value calculation. Board Member Mauro Rodrigues
da Cunha asked the Director of Finance and Investor
Relations, Almir Guilherme Barbassa, if the publication
of a report with qualifications would accelerate debt
obligations, to

Confidential

Meeting Minutes No. 1401



which the Director responded yes, because such a document would be equal in the SEC (Securities and Exchange Commission) to failure to publish a balance sheet. Board Member and President of Petrobras, María das Graças Silva Foster asked if the Audit Committee can't be accepted as the reporting line due to the fact of having members on the Board of Directors named by the Government. The Executive Manager of Corporate Strategy, Antonio Eduardo Monteiro de Castro, explained, stating that the contracted firms reported that the independence of the reporting line passes because in its composition it does not have members appointed by the controlling shareholder, and that such fact was communicated by the firms to PwC. Board Member Luciano Galvão Coutinho, expressing a concern that the Company cannot sit around waiting for judicial decisions to finalize its balance sheet, asked if PwC would be able to evaluate in a timely manner, the costs and respective write-downs in the assets indicated in the presentation made by the Executive Manager of Corporate Performance, or if it would be necessary for Petrobras to obtain another opinion from a consulting firm from the market. Auditor Marcos Panassol said that PwC has this internal ability, but that in this particular case it would be prevented from auditing information produced by the audit company itself; he pointed out that an independent evaluation, if obtained, has the advantage of being safer, and able to produce effects before the regulatory agencies. Board Member Mauro Rodrigues da Cunha asked the auditor Marcos Panassol if the suspected assets were submitted to an independent economic market evaluation, if this would lead to greater facility in obtaining and approving an audited balance sheet, and the auditor, PwC, responded that it would. Next, Board Member Mauro Rodrigues da Cunha presented a recommendation that the Executive Board immediately move on to an independent evaluation of assets with materiality for the Company's Balance Sheet. Board Member and President of Petrobras, María das Graças Silva Foster said that her understanding was that part of this difference in the evaluation could be an overcharge, another may be inefficiency of teams, and it might also correspond to excessive rain during the period, or supplier delays, among others; she concluded, stating that the difference would not necessarily be a kickback or overcharge. In response, Board Member Mauro Rodrigues da Cunha said that,

Confidential

PBRCG_01224952



although her rationale is correct, this would be the
best vision that the Company could present at the
moment. Next, Board Member Mauro Rodrigues da Cunha
presented a proposal to the Board of Directors, in order
to resolve the matter of the reporting line: the
creation of a Committee formed by Board Member Mauro
Rodrigues da Cunha himself, plus Board Members José
Guimarães Monforte and Sergio Franklin Quintella, to act
as the reporting line until the Director of Governance,
Risk and Compliance is appointed. Considering this
proposal, Board Member Sergio Franklin Quintella said
that he would not agree to participate on such a
Committee if it could not be monitored by a trusted
attorney during the entire period it performed its
duties. The Chairman of the Board of Directors thanked
the PwC representatives, and they left the meeting. The
Executive Manager of Corporate Strategy, Antonio Eduardo
Monteiro de Castro, due to contacts maintained with the
contracted law firms, Gibson, Dunn & Crutcher, and
Trench, Rossi & Watanabe, expressed

Considering the deadlines for publishing the
unaudited quarterly balance sheet, the Board Members
agreed that the Company should seek to use a methodology
that would make release of the mentioned balance sheet
feasible before the end of January. Continuing with the
meeting, on the topic of **"Matters of the Committees –
Audit Committee,"** Board Member and President of the
Audit Committee, Sergio Franklin Quintella, read the
conclusions and recommendations of the Audit Committee
to the Board of Directors about the report from the
Internal Investigative Committee – (Comissão Interna de
Apuração – CIA) on COMPERJ: (i) the report from the
Internal Investigation Committee shows failure to comply
with governance rules, failure to comply with bidding
and contracting rules, and a set of actions that
resulted in

Confidential

Meeting Minutes No. 1401



substantial financial losses for Petrobras; (ii) the Audit Committee recommends to Petrobras' Board of Directors that it file a civil lawsuit against the 12 people listed in the Internal Investigation Committee's report on pages 47-66, and 63-66, and that it should send the Internal Investigation Committee's report and the report from the Audit Committee to the Public Prosecutors, to the Comptroller General of Brazil and to the Audit Court of Brazil for the measures they determine to be fitting; (iii) the companies listed in the Internal Investigation Committee report on pages 28-66 and 46-66 should be evaluated by the appropriate authorities for eventual repayment of Petrobras. After reading the conclusions and recommendations, Board Member Sergio Franklin Quintella asked that the report from the Audit Committee be attached to these Minutes (Annex 1), and asked the members of the Board of Directors to agree with its terms. Board Member Mauro Rodrigues da Cunha agreed with the report from the Audit Committee, but pointed out the following reservations to the terms presented: (i) from his point of view, in some points generic recommendations were made, although it is necessary to actually solve problems; (ii) he believes there is a problem of governance in the Internal Investigation Committees which, in his opinion, show an inability to judge acts that involve members of the Executive Board; (iii) he suggested that the conclusions be sent not only to the Public Prosecutor, but also to the judge in charge of handling Operation Car Wash; (iv) he believes that the companies that have been implicated should be suspended immediately from entering into new contracts with the Company, at least until the internal processes are reviewed; and (v) he said he maintains his position that they should wait for the outside legal opinion requested by the Tax Committee on the most appropriate judicial action to seek repayment that might be due. Board Member José Guimarães Monforte agreed with the statements made by Board Member Mauro Rodrigues da Cunha. At this point during the meeting, with the agreement of the Chairman of the Board of Directors, Guido Mantega, the Coordinator in the Executive Management of the Legal Department, Braulio Licy Gomes de Mello, made a presentation

Confidential

PBRCG_01224954

Meeting Minutes No. 1401





       Considering that the reports from the Internal Investigation Committees on COMPERJ and RNEST had already been sent prior to analysis by the Audit Committee, the Chairman of the Board of Directors, Guido Mantega, asked that the standard that regulates the functioning of the Internal Investigation Committees be re-evaluated so that in the most relevant matters, and not in any and every Internal

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

Confidential                                                                                     PBRCG_01224955

Meeting Minutes No. 1401



Investigation Committee, they consider sending the final
reports from the Internal Investigation Committees in a
timely manner to the Audit Committee. Continuing the
meeting, Board Member and President of the Audit
Committee, Sergio Franklin Quintella, read the
Committee's conclusions and recommendations on the
Internal Investigation Committee's report on RNEST, with
the following conclusions: (i) the report from the
Internal Investigation Committee clearly shows the
failure to comply with governance rules, failure to
comply with bidding and contracting rules, as well as a
set of actions that resulted in substantial financial
losses for Petrobras; (ii) the report also states that
the absence of planning and the non-existence of basic
FEED projects at the appropriate time contributed
materially to the failure to comply with the period, the
increase in costs and amendments involving significant
amounts; those responsible for implementing RNEST, in
relation to the Internal Investigation Committee report,
made decisions that were taken to the Executive Board *ad
referendum*, even for contracts and amendments in amounts
higher than R$ 1 billion; (iii) the Audit Committee
recommends that Petrobras' Board of Directors allow and
file a civil lawsuit against the 11 people listed in the
Internal Investigation Committee's report (pages 3, 5,
7, 11, 13, 14, 15 and 17), sending the Internal
Investigation Committee report and the opinion from the
Audit Committee to the Federal Public Prosecutor, to the
Comptroller General of Brazil, and to the Brazilian
Court of Audits so that the appropriate steps can be
taken; (iv) in relation to the equipment suppliers,
construction and assembly companies listed in the
Internal Investigation Committee's report, it was
recommended that investigative proceedings be filed in
order to investigate any practices of fraud,
overcharging and corruption of Petrobras employees.
After reading the recommendations, Board Member Sergio
Franklin Quintella requested that the report be attached
to these Minutes (Annex 2), and asked the members of the
Board of Directors if they agreed with its terms. Board
Member Mauro Rodrigues da Cunha agreed with the report,
but pointed out the same reservations presented in
relation to the report from the Internal Investigation
Committee report on COMPERJ, with which Board Member
José Guimarães Monforte agreement. Continuing with the
meeting, Board Member and President of Petrobras, Maria
das Graças Silva Foster, commented to the Board on the
news released in the media on the employee Venina Velosa

Meeting Minutes No. 1401



da Fonseca, reporting that the accusations made by the employee against the Executive Board had already been handled, and that a note of clarification was already being prepared. Board Member Silvo Sinedino Pinheiro asked the Board Member and President of Petrobras, Maria das Graças Silva Foster why the Audit did not identify some of the irregularities that the Internal Investigation Committees had been able to detect, to which the Board Member replied that there is a difference in the procedure followed by each, and that there are more resources for investigation in the case of the Internal Investigation Committees. Board Member Mauro Rodrigues da Cunha commented that the Internal Investigation Committee's investigation procedures have proven to be very slow, and cited the case of Pasadena as an example, which occurred in 2006 and which was only recently the object of an Internal Investigation Committee; the Board Member stated that from his point of view the lack of timeliness of the action harms the effectiveness of the procedure. Next, Board Member Mauro Rodrigues da Cunha asked the Board if everyone agreed with his reservation to the reports from the Audit Committee to recommend immediate suspension of the companies implicated in the investigations of Operation Car Wash, pointing out that the matter also included not sending invitations for these companies to participate in the Company's bid tenders. The Chairman of the Board of Directors, Guido Mantega, said that the decision to exclude companies from competitive procedures is not simple, except in the cases in which their managers are under investigation or in jail. Next in the meeting was the presentation **"Preservation of the Company's Liquidity in 2015,"** by the Executive Manager of Corporate Performance, Mário Jorge da Silva, with the presence, as an invitee, of the Manager of Evaluation of Economic and Operating Performance, Ricardo Rodriguez Besada Filho. The presentation was initiated with the information that the Company's cash balance at the beginning of December was US$ 25.6 billion, and that the projection for 2015 – if no financing is raised and if there are no price adjustments – is that Cash would be at zero by October; the analysis considers average Brent of US$ 79 and an average exchange rate of US$ 2.58 throughout 2015. At this point Executive Manager Mário Jorge da Silva said that the Executive Board decided that the areas should identify alternatives to increase the Company's liquidity. In the Action Plan to Preserve the Company's Liquidity in 2015, 22 classified actions

Confidential                                                                 PBRCG_01224957

Meeting Minutes No. 1401



separated into four groups were identified, which totaled a reduction of R$ 40.8 billion: (i) Strategies – actions that usually involve more than one area and that have potential external impacts to the Company, requiring discussion with other companies or government entities; (ii) Management of Product Prices – specific actions to review product pricing strategies; (iii) Management of Investments – specific actions to delay or cancel investment projects now being implemented; and (iv) Administrative – budget-containment actions in administrative areas. Strategic Actions, which will generate a contribution of R$ 16 billion to Cash, the following measures were described: to delay by one year payment of bonuses referring to Excess of Burdened Transfer; to receive a dividend from Eletrobras; to receive a dividend from Cigás/Amazonas Energia; stoppage of Assets with Negative Results (contributions in the system); to recognize the payment of dividends in 2014 using the criteria limited to 25% of Net Income; to delay payment of May Dividends to August 2015; at Transpetro, to receive remuneration credit in favor of Petrobras by way of Interest on Own Capital (Juros sobre Capital Próprio – JCP); at Gaspetro, to receive remuneration credit in favor of Petrobras by way of Interest on Own Capital; change in the manner that exchange rate variations and changes in the tax depreciation rate of gas pipelines are recognized; and Reduction of Capital and Dividends in stakes in affiliated energy companies. Next, as Product Pricing Management Actions, which will generate a contribution of R$ 11.8 billion to Cash, with Brent oil at the level of US$ 80, the following measures were provided: Industrial Liquefied Petroleum Gas – adjustment of 15% in December 2014 and 20% in November 2015; Asphalt – adjustment of 20% in January 2015 and 10% in October 2015; Natural Gas – elimination of discounts allowed in the so-called "New Policy" (equalization of the "New Policy" to the price of Bolivian gas – increase of 14.5% in February 2015); and increases in gasoline and diesel in 2015. Moving on to Investment Management Activities, which will generate R$ 12.9 billion by way of an additional contribution to the Company's Cash, the following measures were presented: in Exploration and Production – re-planning of the construction periods for Replicating Stationary Production Units and Burdened Transfer, with delay of entry into operation; delay of the exploratory program, maintaining Minimal Exploratory Programs (Programas Exploratórios Mínimos – PEM) and

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

PBRCG_01224958

Meeting Minutes No. 1401



Discovery Evaluation Plans (Planos de Avaliação de Descoberta – PAD); impact on the production curve as of 2017 (-25 mbpd 2017; -90 mbpd 2018; and -28 mbpd 2019); R$ 1 billion in advances to suppliers with an exclusive impact on the cash flow; in Supply – Comperj: start-up of Train 1 delayed from December 2016 until January 2018, with the consequence of more than R$ 0.7 billion in total investment and demobilization of 10,000 workers; Premium I: delay in start-up of the refinery from September 2019 to September 2022; Premium II: delay in start-up of the refinery from January 2020 to October 2023; TECAM: delay from July 2016 to December 2017 and another R$ 24.5 million in total investment; UOTE: delay from October 2016 to September 2017 and another R$ 37.8 million in total investment; REDUC: delay from August 2016 to January 2018, and another R$ 4.2 million in total investment; in Gas and Energy – UFN-III: delay in start-up from July 2015 to April 2017; UFN-V: delay of start-up from March 2017 to March 2018; UPGN Route 3: delay of first module from October 2016 to June 2017, and of the second module from February 2017 to October 2017; North Pipelines Route 3: delay of GLP pipeline from August 2016 to October 2017; North Pipelines Comperj: delay of oil, diesel/naphtha and QAV pipelines from July 2016, August 2016 and August 2016, to December 2017, January 2018 and January 2018, respectively (these measures combine for an increase in total investment in these investment projects, and demobilization of approximately 2900 workers); at Transpetro – delay of one PROMEF waterway train to 2016; at Petrobras Biocombustível – suspension of contributions projected for 2015 for the Guaraní project. Board Member Silvio Sinedino Pinheiro asked Executive Manager, Mário Jorge da Silva, if the measures presented are irreversible, and it was explained that some are irreversible and require an immediate decision. With respect to the Administrative Activities, estimated to be an additional R$ 0.1 billion in additional contributions to Cash, the following actions were presented: to reduce the Communication budget for 2015 (reduction of 6% in the 2015 Business Action Plan, and maintenance at the same level for 2014 – justification: to offset the large volume of negative mentions of Petrobras and to maintain cultural and sporting sponsorships); to reduce the budget for Social Responsibility for 2015 (reduction of 15% in the 2015 Business Action Plan and to maintain that level for 2014); delay in admissions to administrative positions (202 positions delayed from

Confidential

PBRCG_01224959

Meeting Minutes No. 1401



April 2015 to January 2016). The Executive Manager,
Mário Jorge da Silva, explained that with these measures
the Executive Board assumes that it is possible to
operate the Company until the end of 2015 without having
to resort to the market for financing; if the price of
Brent remains at the level of US$ 70 bbl, the space to
increase product prices will be less, but even so the
Company can operate until the end of 2015 without the
need to raise financing. Board Member Luciano Galvão
Coutinho asked if the scenario of Brent at a low level
will allow Petrobras not to resort to the market for
financing, and it was explained by Executive Manager
Mário Jorge da Silva that yes, as long as there is no
drop in price, even assuming a possible loss of market
share; he also pointed out that for the year 2015, as we
are net importers, the reduction in the price of Brent
is favorable for Petrobras' operating income.
Considering the values presented for cash generation and
for the final balance of cash in 2015, in different oil
price scenarios, Board Member Mauro Rodrigues da Cunha
requested additional explanations about a potential
discrepancy between these amounts. Board Member Mauro
Rodrigues da Cunha also commented on the applicability
of Article 202, §4 of Law No. 6404/76 (Law of Share
Companies), which states that a dividend is not
mandatory in a fiscal year in which the administrative
entities report in a shareholders meeting that such
dividends are incompatible with the financial situation
of the company; from the Board member's viewpoint,
Petrobras should apply this in the current context, as
it is completely justifiable. The presentation
**"Monitoring the Efficacy of the Oil, Diesel and Gasoline
Pricing Policy"** was not made, due to the long duration
of the meeting, and to the other matters already
discussed, and there was no discussion on the matter. In
regard to approval and signature of the minutes of the
ordinary meetings held on October 31, 2014 and November
4, 2014, and November 14, 2014, and the extraordinary
meeting held on November 25, 2014, it was agreed that
the Board Members would take the printed versions with
them for subsequent verification and collection of
signatures. Among the three questions on the order of
the day raised by Board Member Mauro Rodrigues da Cunha
(hiring a law firm for the Board Members; holding an
executive meeting; and informing the Board Members of
the letter signed by ten international investors dated
December 8, 2014, with respect to the challenges of
Corporate Governance faced by Petrobras), the executive

Confidential                                                    PBRCG_01224960

Meeting Minutes No. 1401



meeting was not held, and remained for the next meeting. The next presentation was **"Limits of Activities of the Executive Board and Competence of the Board of Directors for which Delegation is Permitted,"** made by the Executive Manager of Organization, Management and Governance, Washington Luiz Faria Salles, with the presence, by way of invitation, of the Legal Financial Consultant from the Legal Department, Fernanda Hissa Pereira Tieppo. The presentation began, and it was stated that it was about the annual agenda of the Board of Directors: (i) the parameters and values above which the acts, contracts or operations, especially those established in Sections III, IV, V, VI and VIII of Article 33 of the Corporate By-Laws, must be submitted for approval by the Board of Directors for fiscal year 2015, in accordance with Section V of Article 28 of Petrobras' Corporate By-Laws; and (ii) the amount below which competence to discuss transfer of ownership of the Company's assets is delegated to the Executive Board, according to Article 28, Section VIII of the Corporate By-Laws. Specifically on the acts of competence of the Executive Board, which must be submitted for approval by the Board of Directors, the following limits of autonomy and competence were presented: (i) raising financing, taking out loans and financing in Brazil or abroad (Article 33, Section III) – amount determined in the Business and Management Plan (Plano de Negócios e Gestão – PNG), approved by the Board of Directors for the current year, or another value that has been specifically authorized by the Board; (ii) provision of real or personal guarantees (Article 33, Section IV) – the entity (Board of Directors or Executive Board) that authorizes that a contract be entered into, approve the provision of guarantees; (iii) acquisition of real property, ships, and maritime vessels, as well as burdening and disposal of the Company's assets (Article 33, Section V) – Acquisition of real property, ships and maritime vessels that are related to the activities established in Petrobras' Business and Management Plan, approved by the Board of Directors; amount equal to US$ 200 million for liens, transfers and acquisitions not established in the Business and Management Plan; (iv) transfer or burdening of company shares or quotas (Article 33, Section VI) – the General Shareholders Meeting is responsible for the following: transfer of control of corporate capital of integral subsidiaries of the Company; the Board of Directors is responsible for: transfer of shares or quotas of integral subsidiaries

Confidential
PBRCG_01224961

Meeting Minutes No. 1401



and controlled companies in amounts exceeding US$ 200 million, except for Special Purpose Companies (SPCs), and cessation of participation in companies (transfer of entire shareholder stake held by Petrobras) in subsidiaries, controlled companies or affiliated companies, except SPCs; the Executive Board is responsible for: (a) transfer of shares or quotas of companies in which the Company holds more than 10% (ten percent) of the corporate capital, except SPCs, up to the limit of US$ 200 million, as long as this does not result in a change in the status of the affiliated or controlled company, where applicable; or change in the Company's strategy regarding its participation in that company' (b) transfer of shares or quotas of SPCs, regardless of value, as well as transfer of rights in consortia and joint ventures; (c) cessation of stakes in companies that are not subsidiaries, controlled or affiliated companies, as long as the Company's strategy is not altered, limited to an amount equal to US$ 200 million; (v) acts of renunciation, judicial or extra judicial operations (Article 33, Section VIII) – the entity (Board of Directors or Executive Board) that authorizes that contracts be entered into, approves acts of renunciation, judicial or extra judicial operation; if there is no principal contract, approval is the responsibility of the Executive Board, limited to an amount equal to US$ 200 million. In relation to an act that is the responsibility of the Board of Directors that may be performed by the Executive Board, the proposal was to maintain the limit on an amount equal to US$ 200 million for transfer of ownership of the Company's assets (Article 28, Section VIII). With respect to approval of acts of renunciation, judicial or extra judicial operation, the Board of Directors accepted the suggestion of Board Member Mauro Rodrigues da Cunha that a limit of US$ 200 million be established for any renunciation, judicial or extra judicial transaction to be approved by the Executive Board, instead of non-existence of the limit currently in force for the cases in which the original contract has been authorized by the Executive Board, altering the proposal submitted for evaluation by the Board of Directors, which maintained the logic of the Executive Board being able to authorize renunciations, judicial or extra judicial transactions of any amount, as long as the original contract had been authorized by that Board. Next, Board Member Mauro Rodrigues da Cunha commented on Section VII of Article 33 of the Corporate By-Laws,

OFFICIAL DOCUMENT - 07.09.2015 TCU

Confidential

PBRCG_01224962

Meeting Minutes No. 1401



which involve legal negotiations with the Federal
Government, which is the related party in Petrobras; he
expressed his understanding that there should be the
same limit of US$ 200 million for the Executive Board to
authorize, instead of the lack of any limit currently in
force. The Executive Manager of Organization, Management
and Governance, Washington Luiz Faria Salles, suggested
that analyses be done to fist assess the impacts of
establishing a limit for that section of Article 33. It
was agreed that the matter will be discussed in the
future. Board Member Mauro Rodrigues da Cunha expressed
his belief that it is not positive to be under the
jurisdiction of the Executive Board with everything that
relates to the Business and Management Plan; he said
that limits of jurisdiction by project should be
established that are higher than US$ 200 million, such
as US$ 1 billion to US$ 2 billion, which is common in
many companies in the sector, but that some limit should
be established. Board Member and President of Petrobras,
Maria das Graças Silva Foster said that the proposal of
Board Member Mauro Rodriges da Cunha may be evaluated,
but that such a proposal could mean a change in the
profile of the activities of Petrobras' Board of
Directors, which would then receive a larger number or
agenda items to discuss, and which could be required to
hold a larger number of meetings, including
extraordinary meetings. The Board of Directors agreed
that this matter will also be handled in the future.
Continuing the meeting, the next presentation was
**"Information on Operation Car Wash – Update,"** made by
the Coordinator in the Executive Area of the Legal
Department, Carlos Rafael Lima Macedo, with the
presence, by way of invitation, of Coordinator Carlos da
Silva Fontes Filho, and Sector Manager Pedro Jardim de
Paiva Barroso, both in the Legal Department. The Board
of Directors was given an update on sending letters to
the companies mentioned in the media: as decided in the
meeting of the Board of Directors on November 4, 2014,
the companies OAS and Mendes Júnior were asked to
clarify questions from Petrobras with respect to the
news in the press; OAS responded, stating "that we do
not have any type of contract with that company (MO
Consultoria) whose purpose is Petrobras contracts or
works," and that "there is a service provision agreement
(…) whose purpose is to perform a tax and labor audit on
works in the state of São Paulo"; Mendes Júnior
responded, recognizing the existence of contracts and
payments with GFD, one of the companies controlled by

Meeting Minutes No. 1401



Mr. Alberto Youssef.



To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

Confidential                                                                 PBRCG_01224964

Meeting Minutes No. 1401





To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

Meeting Minutes No. 1401



Once the presentation on Operation Car Wash was concluded, Board Member Mauro Rodrigues da Cunha went back to the question of hiring a legal adviser for the Board of Directors; the Board stated its agreement with the proposal, except for the position of Board Member and President of Petrobras, Maria das Graças Silva Foster, who thought the Company's Legal advisory services were sufficient. Board Member Mauro Rodrigues da Cunha reminded the Board that he already sent suggestions and names of attorneys to the Company, and he is awaiting evaluation. ----- Next, on the topic of formal discussions, after conclusion of the presentations and the comments, the Board moved on to examine the matters for discussion and for information. **1) Agenda Item No. 58 – RAISING FINANCING IN 2014:** The Chairman of the Board of Directors, Guido Mantega, decided to submit to the Board the matter in reference, which had already been discussed by the Executive Board (Executive Board Minutes 5186, item 11, of December 4, 2014), according to proposals made in the respective Executive Summary. **DECISION:** The Board of Directors, according to the Executive Summary and the explanations provided by the Financial and Investor Relations Director, Almir Guilherme Barbassa in relation to the matter, and modifying the original proposal sent by the Executive Board: (i) authorized an increase in the limit of raising financing in 2014,

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

Meeting Minutes No. 1401



subject to approval by the Executive Board, to the total amount of up to US$ 30 billion net, instead of the US$ 25.55 billion originally proposed, including in the limit financing raised by Petróleo Brasileiro S.A. – Petrobras, and its subsidiaries and controlled companies; and (ii) it authorized the Executive Board to approve in the year 2014 raising financing with Banco Nacional de Desenvolvimento Econômico e Social - BNDES, Export Credit Agencies and other financial institutions, establishing that any withdrawal of funds referring to such financing is subject to the limits mentioned in proposal (i) above. ----- **2) Agenda Item No. 59 – LIMITS OF ACTIVITIES OF PETROBRAS' EXECUTIVE BOARD AND DELEGATION OF RESPONSIBILITY TO THE BOARD OF DIRECTORS:** In light of the presentation made by the Executive Manager of Organization, Management and Governance, Washington Luiz Faria Salles, the Chairman of the Board of Directors, Guido Mantega, decided to submit to the Board the matter in reference, already discussed by the Executive Board (Executive Board Minutes 5182, item 15, of November 19, 2014). **DECISION:** The Board of Directors, according to the Executive Summary on the matter and its annexes, and the debates, approved: a) the parameters and values above which the acts, contracts or operations, while they are the responsibility of the Executive Board, especially those established in Sections III, IV, V, VI and VIII of Article 33 of Petrobras' Corporate By-Laws, must be submitted for approval of the Board of Directors for fiscal year 2015, in accordance with Section V of Article 28 of Petrobras' Corporate By-Laws, except what is established in the new limit of US$ 200 million (two hundred million dollars) for any renunciation, judicial or extra judicial transaction to be approved by the Executive Board, in substitution of the nonexistent limit originally proposed for the cases in which the original contract was authorized by the Executive Board; and b) the value below which the competence to deliberate on transfer of ownership of the Company's shares is delegated to the Executive Board, in accordance with Article 28, Section VIII of the Corporate By-Laws. The Board also requested an evaluation of the definition of limits for the acts established in Section VII of Article 33 of the Corporate By-Laws. ----- **3) Item No. 60 – ANNUAL SCHEDULE**

Confidential

PBRCG_01224967

Meeting Minutes No. 1401



**OF THE PERMANENT AGENDAS AND THE CALENDAR OF ORDINARY MEETINGS OF THE BOARD OF DIRECTORS OF PETROBRAS FOR 2015:** The Chairman of the Board of Directors, Guido Mantega, decided to submit to the Board the matter in reference, according to proposals made in the respective Executive Summary. **DECISION:** The Board of Directors, according to the Executive Summary in relation to the matter and its annexes: a) approved the annual scheduling of the permanent agenda items and the calendar of the ordinary meetings of Petrobras' Board of Directors for the year 2015; and b) authorized the Chairman of the Board of Directors to proceed with the changes that might be necessary to the dates established in the calendar of meetings. -------------- **4) Agenda Item No. 61 – SUMMONS OF THE GENERAL ORDINARY SHAREHOLDERS MEETING 2015 (AUGUST 2015):** The Chairman of the Board of Directors, Guido Mantega, decided to submit to the Board the matter in reference, according to proposals made in the respective Executive Summary. **DECISION:** The Board of Directors, according to the Executive Summary on the matter, approved summons of the General Ordinary Shareholders Meeting of Petrobras for 2015 (August 2015) for April 29, 2015, at 3:00 p.m., at the Company's main offices. --------------- **6) Agenda Item No. 62 – MONITORING OF PHYSICAL AND FINANCIAL PROGRESS OF THE INVESTMENT PROJECTS:** The Chairman of the Board of Directors, Guido Mantega, decided to submit to the Board the matter in reference, already discussed by the Executive Board (DE Minutes 5176 of October 30, 2014), for their information. **DECISION:** The Board of Directors was made aware that the consolidated indicators of the 184 projects monitored every month by Upper Management reached the Physical Advance Indicators (Indicador de Avanço Físico – IAF) percentages of 95.7% and the Cost Compliance Indicator (Indicador de Cumprimento de Custo – ICC) of 99.8%, according to the report distributed to the Board Members in this meeting. --At seven fifty in the evening, the Chairman of the Board of Directors closed the meeting, for which these minutes were drafted, and after having been read and approved, was signed by the Chairman of the Board, by the participating Board Members, and by me, João Gonçalves Gabriel, Secretary General of Petrobras.

Confidential

PBRCG_01224968

Meeting Minutes No. 1401



ATTACHMENTS: (1) Report dated December 12, 2014, from the Audit Committee for the Board of Directors on the CIA COMPERJ report; (2) Report dated December 12, 2014 from the Audit Committee to the Board of Directors on the CIA RNEST report.

:IA RNEST.



Guido Mantega
Chairman

Maria das Graças Silva Foster
Board Member

Miriam Belchior
Board Member

José Guimarães/Monforte
Board Member

Luciano Galvão Coutinho
Board Member

Francisco Roberto de Albuquerque
Board Member

Mauro Rodrigues da Cunha
Board Member

Sergio Franklin Quintella
Board Member

Silvio Sinedino Pinheiro
Board Member

João Gonçalves Gabriel
Secretary General of Petrobras

Confidential                                                                PBRCG_01224969

**CONFIDENTIAL**                                                                    **NP3**

## ABREU e LIMA REFINERY (RNEST)

## AUDIT COMMITTEE REPORT FOR THE

## BOARD OF DIRECTORS

The report from the Internal Investigation Commission CIA on RNEST, fulfilling DIP DABAST 71/2014 of 04/25/2014 (Annex 1) Registration Protocol on Corporate Security no. 0031/2014, under the coordination of the Internal Auditor Mr. Gerson Luiz Gonçalves and another 5 Petrobras employees, in its 28 pages and in the addendum of the analyzed contracts, briefly presents the following considerations:

1)  The report aims to identify potential losses and liabilities in contracting for the implementation of RNEST from the specification of services related to the economic assessment of the refinery implementation.

2)  The analysis of issues related to the economic assessment of the implementation of RNEST, which was not part of the object of this CIA, is under the responsibility of the Supply Board.

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.
Confidential                                                                    PBRCG_01224970

**CONFIDENTIAL**                                                                   **NP3**

3) The justifications to institute the CIA were due to allegations of contracts irregularities (circulated by the press) and the accusation of fund diversion, allegedly made by Mr. Paulo Roberto Costa, former Supply Director of Petrobras, one of the two main responsible parties for conducting the implementation of RNEST, also taking into account the statements made to the Federal Police, Prosecutor's Office and the Paraná Federal Judge.

4)  CIA examined 23 contracts related to RNEST, whose value amounted R $ 22.6 billion, which represents a little more than 90% of all 202 contracts signed (Table I page 4/28 of the CIA).

5)  324 amendments have been identified related to 23 contracts analyzed, for a total of R$ 4 billion, mostly arising directly from the implementation of the Refinery Acceleration Plan - PAR. Amendments added 21.5%, on average, but some amendments added 65% and 108.5% to their original contractual values.

6) In February 2007, former Supply Director Mr. Paulo Roberto Costa proposed the elaboration of the PAR and on 03/08/2007, in less than a month, Ms. Venina Velosa Fonseca issued DIP AB-CR 76/2007, making the plan official.

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.
Confidential                                                                   PBRCG_01224971

**CONFIDENTIAL**                                          **NP3**

7)  In addition to accelerating by one year the refinery's start-up, the PAR covered the acquisition of equipment that were considered critical to the hydro treating units, pre-detailing engineering services and executive project and contracting an EPC (engineering Procurement and Construction) specific to utilities.

8)  On the same date of 03/08/2007, the Executive Board (DE Minute 4632, item 29, agenda 255 - Annex 4) approved the PAR and thus created the need for project implementation acceleration activities, such as the contracting of engineering project, tendering for the purchase of critical equipment and contracting specific EPC.

9)  The CIA did not obtain evidence of return to the Executive Board of the definitive proposal of the contracting strategy for equipment and services, which should have occurred on 04/22/2007.

10) The CIA found no evidence of appropriate justification for the preparation of the PAR, to the extent that only in March/2007, the same month that it was approved, the units' basic projects were started. The execution of basic projects should have taken place before the approval of the PAR, as key to the development of a

*Abreu e Lima Refinery - RNEST - Audit Committee Report to the CA*                    *Page 3/16*

**CONFIDENTIAL**                                                    **NP3**

schedule consistent with the acceleration of the project and realistic budget.

11) The fact of the PAR approval without fully defined basic projects included adding one additional atmospheric distillation unit (UDA), instead of just one as planned in the initial basic project for RNEST, given the different characteristics of the Marlin oil and Venezuela oil.

12) On 03/18/2008, through DIP AB-CR 97/2008 - Annex 9, Ms. Venina Velosa Fonseca, Mr. Pedro José Barusco Filho and Dr. Marco Aurélio da Rosa Ramos asked the DABAST and DSERV for continuity of the purchasing processes of critical equipment for PAR, for that the project would include the two UDAs mentioned above.

13) On 03/27/2008, the Executive Board approved the DIP mentioned in the previous item, authorizing the start of the purchasing process of heating furnace, spares and contracting of Delayed Cracking Unit (UCR) and Hydrogen Generation Unit (UGH).

14) In testimony to the CIA, Mr. Marco Aurélio da Rosa Ramos, Executive Manager of Materials, said there had been changes in specifications during the tendering process and that he

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.
Confidential                                                              PBRCG_01224973

**CONFIDENTIAL**                                            **NP3**

still considers that the project was started without proper critical equipment specifications maturity.

15)  On 08/17/2008, the Executive Board approved the contracting model for RNEST proposed by SUPPLY through DIP AB-CR 264/2008 of 07/10/2008 Annex 11. This model was based on DIP LEGAL 4216/2008, of 07/17/2008, which was exclusive to the contracting procedures for RNEST and had different clauses.

16)  On 07/09/2008, the day before the proposition of the exclusive contracting model for RNEST, Mr. Renato de Souza Duque and Paulo Roberto Costa, respectively, then Directors of Services and Supply, received the request for establishment of 12 tendering processes for refinery work. This request was signed by Mr. Pedro José Barusco Filho and Ms. Venina Velosa Fonseca, through the DIP ENGINEERING 536/2008 (Annex 13). The CIA detected that these 12 cases were given priority to the objectives of the PAR. among the 23 analyzed.

17)  The CIA verified that the 12 tendering processes began in July/2008 concomitantly to pre-detailing services of the basic projects and the basic projects have undergone several changes over the contests.

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.
Confidential                                                          PBRCG_01224974

**CONFIDENTIAL**                                                 **NP3**

18)   Mr. Dewton Carvalho, then Sector Manager of Equipment and Services for RNEST and current Maintenance Manager for RNEST, told the CIA that there were no specifications of equipment, basic project and FEED at the time of preparation of the PAR, and the conceptual project information that was available at the time was used.

19)  Mr. Marco Aurélio da Rosa Ramos told the CIA that PAR deadlines were mistaken and the attempts for acceleration with suppliers aimed at enabling the PAR. He also states that there were changes in specifications during and after the tendering.

20)   Mr. Marcelino Guedes, then CEO of RNEST and current Manager of Professional Training of Supply, told the CIA that the PAR broke the concept of EPC and the acceleration of contracting generated amendments and increased costs. Mr. Wilson Guilherme Ramalho, then Deployment Manager of RNEST and current Executive Manager of Supply Investment Programs confirms the thesis that the basic project was not ready for the implementation of the PAR.

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.
Confidential                                                                PBRCG_01224975

**CONFIDENTIAL**                                                    **NP3**

21) Of the 12 tendering processes posted, 6 were canceled for excessive prices, that is, far above the upper limit of 20% of the estimate from ENGINEERING.

22)      From February/2009 onwards, ENGINEERING and SUPPLY continued the procedure for the signing of six processes without deviations between the recommendations and estimates.

23) From May/2009 onwards, new proposals were received for the 6 processes canceled earlier, whose proposed values were close to the upper limit of the range, between -15% and +20% from the estimates prepared by ENGINEERING/SL/SCP.

24) The CIA has identified 9 types of NONCONFORMITIES in 11 contracts of the 23 contracts selected for analysis (Table 1, page 4/28 of the CIA Report).

25) The first NONCONFORMITY is the lack of submission to the Executive Board in EPC change of contracting strategy of utilities (Alusa Engenharia). The tendering of CAFOR, ETA, ETDI and security systems was proposed differently from the originally approved in the PAR in March/2007. Instead of a single

*Abreu e Lima Refinery - RNEST - Audit Committee Report to the CA*                    *Page 7/16*

Confidential                                              PBRCG_01224976

**CONFIDENTIAL**                                                    **NP3**

tender, it was broken up into four tenders, a change that was not explained in the DIPs, signed by Mr. Pedro José Barusco Filho and Ms. Venina Velosa Fonseca and forwarded to the Executive Board by former Directors Mr. Renato de Souza Duque and Mr. Paulo Roberto Costa.

26)  The second NONCONFORMITY is the negotiation of the proposal after the close of the tender and the corresponding approval for contracting by the Executive Board (Alusa Engenharia). In 09/19/2008, the Executive Board approved the contracting for the CAFOR for R$ 966 million and on the same date, Ms. Venina Velosa Fonseca informed by *e-mail* that this amount would not be compatible because it was 272% higher than estimated by ENGINEERING. After signing the contract for the cited amount, negotiations in scope and prices were made with Alusa Engenharia, aiming to reduce the amounts. As for this discounts negotiation with Alusa in October and November/2008, after ending the tendering process and signing had been authorized by the Executive Board since 09/19/2008, the CIA considered this procedure unusual and contrary to internal standards and regulations. The acquisition of new commercial conditions should have been taken to the Executive Board by the former Directors Renato de Souza Duque and Paulo Roberto Costa, which did not occur. We highlight that 272% above the budgeted amount corresponds to an increase of R$ 706.4 million and it is worth remembering that there were

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.
Confidential                                                                        PBRCG_01224977

**CONFIDENTIAL**                                              **NP3**

amendments of R$ 249.1 million, bringing the contract with Alusa to R$ 1,215.2 million.

27) The third NONCONFORMITY corresponds to the inclusion of companies after the beginning of the tendering process, which did not meet the selection criteria. The CIA has identified four instances of that type. In 2 cases, the winner did not meet the selection criteria (Alusa Engenharia and Egesa Engenharia). Testimonials claim that an opinion on the inclusion of Alusa was not requested, but rather a higher determination for this procedure. Of note, the CIA states that the request for the inclusion of Alusa in the tendering was managed by Mr. Renato de Souza Duque, Services Director, on 04/09/2008.

28) The fourth NONCONFORMITY is the lack of definition of the adjustment formula percentage in the public notice of tendering and/or changes in the tendering process (Camargo Correa/CNEC Consortium, Odebrecht/OAS Consortium, Queiroz Galvão/IESA Consortium). The CIA has identified that the historical weight of labor in Petrobras similar contracts range between 55 and 60%. Of the 3 mentioned contracts, the first two have a weight of 80% for labor and the other has a weight of 70%, leading to an additional amount of R$ 354 million readjustment (Table IV). The CIA found that there was an increase of the weight of labor for two consortiums during the tendering process. The CIA considered as

*Abreu e Lima Refinery - RNEST - Audit Committee Report to the CA*                    *Page 9/16*

Confidential                                                            PBRCG_01224978

**CONFIDENTIAL**                                           **NP3**

insufficient the justifications for the weights of 80% for labor, as there are inaccuracies in various items used as labor.

29) The fifth NONCONFORMITY is the lack of inclusion of companies in the new tendering process, in noncompliance of Decree 2,745/1998 (Odebrecht/OAS Consortium, Camargo Correa/CNEC Consortium and Queiroz Galvão/IESA Consortium). In contracting procedures of the said consortiums, after the cancellation of the first tendering process and approval for a new one, the inclusion of new companies to participate in the event was not identified, going against the provisions of section 5.6.2. of Decree 2,745/1998. The submission of these contracting processes to the Executive Board was made by Mr. Pedro Jose Brusco, Francisco Pais and Luiz Alberto Gaspar Domingues and Ms. Venina Velosa Fonseca.

30)  The sixth NONCONFORMITY is the revision of estimates due to tendering processes with excessive prices (Odebrecht/OAS, Camargo Correa/CNEC and Queiroz Galvão/IESA Consortiums). The CIA has identified that there were reductions of Petrobras previous estimates and of proposals, from the first tender to the "re-tendering". It is clear that the winning proposals of the "re-tendering"

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.
Confidential                                                              PBRCG_01224979

**CONFIDENTIAL**                                        **NP3**

always presented values close to the maximum limit of 20% compared to Petrobras estimates.

31)   The seventh NONCONFORMITY is the authorization to start three tendering processes in dates prior to the approval by the Executive Board (Odebrecht/OAS Consortium). Three tendering processes of the above mentioned consortium were filed in dates prior to their respective approval by the former Director of Services Mr. Renato de Souza Duque. The CIA considered inadequate the practice of forwarding "ad referendum" acts to the Executive Board, especially due to the relevance of the amounts involved (UDA - R$1.9 billion and UCR - R$ 3.1 billion).

32)   The eighth NONCONFORMITY is the lack of submission to the Executive Board the changes in EPC contracting model for RNEST (Egesa/TKK consortium, Odebrecht/OAS Consortium Queiroz Galvão/IESA Consortium and Camargo Correa/CNEC Consortium). Mr. Carlos Alberto Carletto, Management Integration Director for ENGINEERING/IERENEST, asked the LEGAL department for implementation of changes in EPC contract minute for RNEST, such as the exclusion of extendable and non-extendable milestones, including guarantees of the FEED *(Front End Engineering Design)* quantitative and inclusion of

*Abreu e Lima Refinery - RNEST - Audit Committee Report to the CA*                    **Page 11/16**

**CONFIDENTIAL**                                         **NP3**

reimbursement of costs related to rainfall. The CIA found no evidence of approval by the Executive Board, as directed by LEGAL.

33)  The ninth NONCONFORMITY deals with the lack of issue of legal opinion in four tendering processes (Orteng, Invensys, Engevix and Enfil/Veolia Consortium). The CIA noted the absence of legal opinion on the tendering results, conducted by Mr. Pedro José Barusco Filho and Ms. Venina Velosa Fonseca.

## CONCLUSIONS OF INTERNAL INVESTIGATION CIA

7.1     The CIA has not obtained evidence of technical or business justification for the preparation of the PAR, whose goal would be to inaugurate the refinery in August/2010, that is, one year ahead of scheduled.

7.2     The tenders performed between July/2007, and May/2011 had a low degree of definition of the basic project and pre-detailing (FEED).

7.3     Due to the previous item, there was need for scope, quantitative and technical specification changes during the tenders.

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

**CONFIDENTIAL**                                                    **NP3**

7.4    In implementing the project, between July 2007 and July 2014, due to the previously mentioned changes, it was necessary contractual amendments to deadlines and scope, resulting in an increase of R$ 3.979 billion, up to July 2014 in the amount for the project.

7.5    Among the 23 tendering processes analyzed, 4 of them had a weakness in the selection of the companies, due to the inclusion of 13 bidders who did not meet the criteria, during the event.

7.6    The discounts negotiated with Alusa Engenharia between September and November/2008, of R$ 25 million, were not considered, after the approval of the Executive Board.

7.7    There was no legal opinion on the results of four tendering processes for RNEST, when they were referred for the approval of the Executive Board, going against internal standards.

7.8    Petrobras' historical percentage of 55% for labor, on contractual adjustments formulas, was changed to 80% without justification, resulting in the addition of R$ 353 million on the value of the project.

7.9    The "re-tendering" resulted in contracts signed towards the "Top" of the estimate, which means, close to 20% higher than

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

Confidential                                                    PBRCG_01224982

**CONFIDENTIAL**                                                       **NP3**

the reference of ENGINEERING estimates. This indicates the possibility of cartel practices between the companies involved, as per the statement of former Director Paulo Roberto Costa.

## LIST OF PERSONS

The CIA report lists 11 persons responsible for NONCONFORMITIES cited as follows:

Pages: 03, 05, 11, 13, 14, 15 and 17/28.

*Abreu e Lima Refinery - RNEST - Audit Committee Report to the CA*                    *Page 14/16*

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

Confidential                                                            PBRCG_01224983

## CONCLUSIONS AND RECOMMENDATIONS OF THE AUDIT COMMITTEE

The report from the CIA (Internal Investigation Commission) gives proof, in a clear and objective way, of noncompliance with the standards and practices of good governance, the omission of relevant information and, above all, a set of actions that have resulted in substantial losses for Petrobras.

The report also states that the lack of planning and lack of basic projects for FEED at the appropriate time contributed significantly to the breach of terms, increase in costs and amendments terms of significant amounts. The ones responsible for deployment of RENEST listed in the CIA report made decisions that were taken to the Executive Board "ad referendum," even for contracts and amendments of over R $ 1 Billion.

*1. The Audit Committee recommends that the Board of Directors determine the opening of a Civil Lawsuit against the 11 persons listed in the report (pages 03, 05, 07, 11, 13, 14, 15 and 17 of the CIA), sending the Internal Investigation Commission report and this opinion of the Audit Committee to the Federal Prosecutor's Office, the CGU and the TCU, for appropriate action.*

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

PBRCG_01224984

**CONFIDENTIAL**                                                        **NP3**

In relation to companies, equipment suppliers, construction and assembly related to CIA report, we recommend to open an investigation process, in order to ascertain eventual fraud cases, overbilling and corruption of Petrobras employees.

The Audit Committee refers its recommendations and conclusions to the Board of Directors for deliberation and requests for the inclusion in the Minutes as annex.

Rio de Janeiro, 12th of December 2014

[signature]
Sergio Franklin Quintella
Member of the Board of Directors
President of the Audit Committee

[signature]                                    [signature]
Miriam Aparecida Belchior                Luciano Galvão Coutinho
Administrative Council and Members of the Audit
Committee

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

CONFIDENTIAL                                      **NP3**

# COMPERJ

## AUDIT COMMITTEE REPORT FOR THE BOARD
## OF DIRECTORS

The report from the Internal Investigation Commission (CIA) on the contracting and execution procedures for the implementation of the Petrochemical Complex of Rio de Janeiro (COMPERJ) fulfilled the provisions of DIP DABAST 70/2014 - Confidential of 04/25/2014 and was completed in October 2014 under the coordination of Mr. Pedro Aramis de Lima Arruda and six Petrobras employees.

Designed to be one Petrochemical/Refinery unit, engineering projects and processes were changed until the current configuration consisting of a refinery and a separate petrochemical plant, with corporate discussions still under negotiation regarding pricing of the commodity (gas) and final sizing.

In its 66 pages and numerous annexes, the CIA takes into account a number of considerations:

Setting unrealistic deadlines and the insistence of the Supply and Services Directors that a new

*Comperj - Audit Committee Report to CA*                          *Page 1/14*

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

Confidential                                      PBRCG_01224986

schedule be met resulted in a series of planning mistakes, in particular, the beginning of the tendering processes without basic project and FEEDS and the advance purchase of equipment without transportation conditions and problems of an environmental and logistical nature.

The CIA report also points out a number of failures to comply with tendering rules such as:

1.  Contracting companies of inappropriate economic size.

2.  Direct contracting with weak justifications, creating conditions for steering the contracts.

As a result, the COMPERJ accumulates considerable additional costs to Petrobras because of the hibernation of units, various amendments with cost increases, extension of terms and delays in the face of cancellation of contracts that already started, due to execution failure.

Below is the main information from the CIA report that corroborates the above summary:

• Setting unrealistic deadlines.

"Unrealistic deadlines were set for the construction of COMPERJ. The adjustment of deadlines for implementation based on

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.
PBRCG 01224987
Confidential

regressive planning compromised the quality of the bids and contracts "
(page 4/66. 1st paragraph).

"The start-up date was set without taking into account technical criteria.
Thus, engineering needed to do regressive planning, which eventually
introduced a series of imbalances in the execution schedules of various
contracts and the divergence from the contracts in relation to the work
schedule" (item 8.1.1 page 12).

"During the CIA's research, reports of time pressures for Engineering by
the Supply Directors (DABAST) and the Services Directors (DSERV)
became evident. This fact **led to unrealistic contracting planning.
This caused the divergence from contracts in relation to the work
schedule" (page 2/66, 4th paragraph).**

- Defective planning, causing delays and additional costs:

Factors associated with the location and uncertainties in extramural
projects impacted the schedule. As a result, contracts recorded
amendments to hibernate equipment and facilities" (p. 4/66: 2nd
paragraph).

"The acceleration of contracting for the processing units (UDAV, UCR,
HCC and HDT) without setting the

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.
Confidential                                                          PBRCG_01224988

**CONFIDENTIAL**   **NP3**

business model that would be applied to Utilities and Hydrogen Generation Units caused damages to PETROBRAS due to the need to hibernate equipment and processing units" (page 4/66, 3rd paragraph).

"Considering a period of twelve (12) months, the cost of hibernations, added to the rescheduling of contracts, generated a loss to PETROBRAS that exceeded the amount of R$ 1 billion" (item 8.5.2, page 17/66):

"Many contracts were signed while leaving a high level of uncertainty as a result of unfinished basic projects and FEEDs" (item 8.11, page 27/66):

  • Failure to comply with the tendering and contracting processes, with poorly qualified staff, manipulation of participating companies and weak justification for direct contracting of suppliers:

"CIA identified the participation of several employees with little or no professional experience in Tendering Commissions for large-value contracts" (item 8.7.4, page 19/66):

"Tendering Commission formed with members without proper qualifications and experience in large contracts" (page 4/66, 6th paragraph).

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.
Confidential                                                                PBRCG_01224989

'"Employees interviewed by the CIA characterized the filter correction applied for inclusion of companies. The goal would be to welcome companies that did not meet the established criteria" (item 8.7,2, page 18/66).

"One of the most frequent reasons for inclusion of companies was the intent to increase the competitiveness of the tendering process. However, this step eventually led to contracting companies that failed to fulfill the contractual objective" (item 8.7,3, page 19/66):

"Inclusion of companies in the tendering process without consistent justification" (page 4/66. 5th paragraph).

"Lack of evidence that confirms the justifications given for direct contracting, specifically regarding the contracting the TUC Consortium for the construction of Steam and Energy Generating Units, Water and Wastewater Treatment" (page 4/66 4th paragraph).

"Acceptance of abusive environmental licensing conditions, going against legal opinion, resulting in signing an agreement with the State of Rio de Janeiro, represented by the State Secretariat of the Environment, the Environmental State Institute and the participation of the Bio-Rio Foundation" (page 4/66. 9th paragraph.)

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

• Revisions of cost estimates (after the opening of proposals) with fragile justifications and, in some cases changed the classification of the proposals:

"In the nine (09) examined cases, there were successive price estimate revisions (after opening of proposals), with inconsistent justifications. These estimates, sometimes questioned by the person responsible for their preparation, may have created conditions for steering contracts "(page 4/66, 8th paragraph)

"In tendering contests analyzed, the CIA identified 09 (nine) occurrences of estimate revision after opening of proposals. In 06 (six) cases, the estimate revision, by changing the limits of acceptability, changed the classification of proposals "(item 8.7.6, p. 20/66):

"Contracting the TEC/AG Consortium for the amount of R$ 1,938,191,350.00, supported in point e, item 2.1 of Petrobras Regulation for Simplified Tendering Procedure (Decree No. 2,745/98), is weakened due to the substantial change in the object of the contract originally bid" (item 8.6.1 (a), page 17/66).

"The contracting of the TUC consortium, for the amount of R$ 3,824,500,000.00, based on point "k", subsection 2.3 of the

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

aforementioned regulation, is supported by fragile justification due to the delay in the schedule" (item 8.6.1 (b), page 17/66):

"In addition to these contracts, to attend the conditions of the environmental license, 03 (three) contract agreements were signed with the Bio-Rio Foundation. For the record, there is no link between the object of the agreement (civil work of dam construction) and the social purposes set forth in the articles of the Bio-Rio Foundation (biotechnology branch foundation)" (paragraph 8.6.2, page 18/66).

## CONCLUSIONS OF
## INTERNAL INVESTIGATION COMMISSION

12.1    "At the end of this CIA's work, which was carried out within the limits of its competence and according to the documentation collected from the business units as well as by narratives provided by various employees, former employees and retired employees of Petrobras as well as employees of service provider companies and representatives of contracted companies that in some manner participated the contracting procedures."

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.
Confidential                                                                                   PBRCG_01224992

"Item 8, POINTS OF ATTENTION IN THE CONTRACTING AND AGREEMENTS PROCESS details this conclusion. Given the above, it was possible to conclude that:

12.1.1. "Unrealistic deadlines were set for the construction of COMPERJ. The adjustment of implementation deadlines, based on regressive planning, compromised the quality of tenders and contracts;"

12.1.2. "Uncertainties in extramural projects impacted the schedule. As a result, contracts required amendments to hibernate installations and conditioning equipment;"

12.1.3. "The acceleration of contracting for the processing units (UDAV, UCR, HCC and HDT), without defining the business model, which would be applied to Utilities and Hydrogen Generation Units, caused damage to PETROBRAS due to the need to hibernate equipment and Processing Units;"

12.1.4. "Lack of evidence that confirms the justifications given for direct contracting, specifically regarding contracting the TUC Consortium for the construction of Steam and Energy Generating Units, Water and Wastewater Treatment;"

Confidential

12.1.5. "Inclusion of companies in the tendering process without consistent justification;"

12.1.6. "Tendering Commission formed with members without proper qualifications and experience in large contracts;"

12.1.7. "The tendering process for the UDAV, UCR, HCC, among others, was initiated before the basic projects and the FEED were completed. This situation brought greater risks to the bidders regarding the uncertainties of scope, with a consequent cost increase. It may also have negatively reflected the necessary leveling of proposals. During the implementation of the work, this gave rise to term and value amendments;"

12.1.8. "In 09 (nine) examined cases, there were successive price estimate revisions (after opening of proposals), with inconsistent justifications. These estimates sometimes questioned by the person responsible for their preparation, may have created conditions to contracts steering;"

12.1.9. "Acceptance of conditioning of Environmental Abusive licensing, against legal opinion, resulting in the agreements signed with the State of Rio de Janeiro, represented by the State Secretariat of the Environment,

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

State Institute for Environment and with the participation of Bio-Rio Foundation;"

12.1.10. "Management failures, nonconformities, planning problems and coordination in project implementation may have contributed to facilitate the occurrence of eventual criminal activity under investigation by Operação Lava Jato [Lava Jato Investigation]."


# LIST OF COMPANIES


The Internal Investigation Commission selected 30 (thirty) contracts/agreements, representing 77% of the total investment contracted by Petrobras for COMPERJ, out of a total of approximately 300 (three hundred) contracts/agreements.

The report of the Internal Investigation Commission (CIA) regarding COMPERJ shows on pages 28/66 to 46/66 the 29 participating companies of the selected contracts, specifying the contracting characteristics of each one of them.

The CIA report states that there was evidence of steering for Delta, Toyo and Jaraguá companies

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.
Confidential                                                                            PBRCG_01224995

(Item 8.9, page 24). Under the allegation of increasing the competitiveness of the tendering process, smaller companies and/or companies that did not meet the supply pre-requisites were invited. Despite winning the bids, they did not complete the work: Delta, TKK, Jaraguá (Item 8.8, Page. 24).

## LIST OF PERSONS

The report of the Internal Investigation Commission (CIA) regarding COMPERJ shows on pages 47/66 to 63/66 the name of 12 employees, directors and former directors of Petrobras that played a significant part in the various contractual processes analyzed by the CIA.

*Comperj - Audit Committee Report to CA*                                      *Page 11/14*

Confidential

CONFIDENTIAL                                                      NP3

## RECOMMENDATIONS OF INTERNAL
## INVESTIGATION COMMISSION

On page 64/66, item 13, the CIA makes the following recommendations, which are fully adopted by this Audit Committee.

13.1   - Take effective measures to ensure that the legislation, internal standards and best practices are followed.

13.2   - Quantify the possible losses generated by contract failures investigated by the CIA, and consider measures needed to compensate Petrobras.

13.3   - Evaluate and hear the position of the criminal office on the legal obligation of forwarding the report to the public prosecutor and other public authorities, given the nature of the events covered in this report and its annexes.

13.4     - Set corporate procedures that establish objective criteria for definition and standardization of companies' selection filters, required compliance in all contracts held by Petrobras, as well as guidelines for the reasons of justifications for possible inclusions of companies that do not meet some of the criteria.

13.5   - Evaluate the application of administrative and labor sanctions to employees responsible for the identified noncompliance.

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

Confidential                                                            PBRCG_01224997

## CONCLUSIONS AND RECOMMENDATIONS OF THE

## AUDIT COMMITTEE

The Internal Investigation Commission (CIA) report makes evident the noncompliance of governance standards, the noncompliance of tendering and contracting rules as well as a set of actions that resulted in substantial financial losses for Petrobras.

(Page 5/66 1st paragraph) "Management failures, noncompliance, planning problems and coordination in project execution may have contributed to facilitate the occurrence of eventual criminal activity under investigation by Operação Lava Jato."

This Audit Committee recommends that the Petrobras Board of Directors determine the opening of a Civil Lawsuit against the 12 persons listed in the CIA Report on pages 47/66 to 63/66, sending the Report of the Internal Investigation Commission and the opinion of the Audit Committee to Prosecutor's Office, to CGU and to TCU, for measures that they deem appropriate.

Companies listed in the CIA Report on pages 28/66 to 46/66 should be the object of evaluation by the

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.

competent authorities for eventual compensation to Petrobras.


The Audit Committee refers its conclusions and recommendations to the Board of Directors and requests inclusion of the minutes as an annex.

Rio de Janeiro, 12th of January 2014


[signature]
Sergio Franklin Quintella
Member of Board Directors
President of the Audit Committee



[*signature*]                                    [*signature*]
Miriam Aparecida Belchior              Luciano Galvão Coutinho
Administrative Council and Members of the Audit
Committee

To verify signatures, go to www.tcu.gov.br/autenticidade, and input code 53509351.
Confidential                                                      PBRCG_01224999



# TRANSLATION CERTIFICATION

450 7th Avenue
10th Floor
New York, NY 10123
Tel 212.643.8800
Fax 212.643.0005
www.morningtrans.com

**County of New York**
**State of New York**

Date: March 30, 2016

To whom it may concern:

This is to certify that the attached translation from Brazilian Portuguese into English is an accurate representation of the documents received by this office.

The documents are designated as:

- PBRCG_01224933_redacted_2014-12-12_bd_minutes.pdf

Ilaria Taylor, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

*Ilaria Taylor*

_____
Signature of Ilaria Taylor

Accurate Translation Services 24/7