# EXHIBIT A
# (Part II)



**PETRÓLEO BRASILEIRO S.A. - PETROBRAS**

**ATA DA REUNIÃO N° 1.401 DO CONSELHO DE ADMINISTRAÇÃO**

**REALIZADA EM 12-12-2014**

Aos doze dias do mês de dezembro de dois mil e quatorze, realizou-se, nas salas de reunião da Petróleo Brasileiro S.A. - Petrobras, localizadas nos Escritórios de São Paulo, na Avenida Paulista, n° 901, 11° andar, Bairro Cerqueira César, e de Brasília, no Setor de Autarquias Norte-SAN, Quadra 01, Bloco "D", 1° andar, e na Sede da Companhia, na Cidade do Rio de Janeiro, na Avenida República do Chile, n° 65, 24° andar, com início às onze horas e quarenta e dois minutos, a reunião ordinária n° 1.401 do Conselho de Administração da Petrobras, sob a presidência do Presidente do Colegiado Guido Mantega, com a participação das Conselheiras Maria das Graças Silva Foster e Miriam Belchior, e dos Conselheiros José Guimarães Monforte, Luciano Galvão Coutinho, Francisco Roberto de Albuquerque, Mauro Rodrigues da Cunha, Sergio Franklin Quintella e Silvio Sinedino Pinheiro. Participaram como convidados os Diretores da Petrobras Almir Guilherme Barbassa, José Alcides Santoro Martins, José Miranda Formigli Filho, José Carlos Cosenza, José Antonio de Figueiredo e José Eduardo de Barros Dutra. Deixou de participar o Conselheiro Márcio Pereira Zimmermann, por motivo justificado. -- -------- Iniciada a reunião, foi sugerido pelo Presidente do Conselho de Administração Guido Mantega que as Atas das Reuniões do Colegiado realizadas em 31/10/2014 e 04/11/2014, 14/11/2014 e 25/11/2014 fossem apreciadas na parte final da presente reunião. Em seguida, o Presidente do Conselho confirmou com os Conselheiros presentes a data da próxima reunião do Colegiado, a ser realizada em 12/01/2015, às 10 horas, nos escritórios da Companhia. Na sequência, o Conselheiro Mauro Rodrigues da Cunha levantou três questões de ordem. Primeiramente, o Conselheiro lembrou que na reunião iniciada em 31/10/2014 e concluída em 04/11/2014 foi abordada a contratação de assessoria jurídica individual para os conselheiros, tendo entendido que a questão retornaria para ser deliberada na reunião seguinte; o Conselheiro afirmou que encaminhou para a Secretaria Geral da Companhia

Para verificar as assinaturas, acesse www.tcu.gov.br/autenticidade, informando o código 53509351.

PBRCG_01224933



indicações de nomes de advogados para o caso de ser adotado o modelo de contratação de um assessor para o Colegiado, e externou que gostaria de submeter a matéria a deliberação. O Presidente do Conselho de Administração Guido Mantega orientou que a questão fosse apreciada ao final da reunião. Como segunda questão de ordem, o Conselheiro Mauro Rodrigues da Cunha pontuou que deveria ser dada continuidade à sessão executiva iniciada na reunião realizada em 14/11/2014, mas que fora interrompida por dificuldade de agenda de Conselheiros; lembrou que circulou para os Conselheiros e-mail com relato dos pontos por ele levantados por ocasião da sessão executiva interrompida e chamou a atenção para a previsão do Regimento Interno do Conselho que trata da adoção de sessões executivas. A terceira questão de ordem levantada pelo Conselheiro Mauro Rodrigues da Cunha foi dar conhecimento aos demais membros presentes do Colegiado de que recebeu carta assinada por dez investidores internacionais, datada de 08/12/2014, a respeito dos desafios de Governança Corporativa enfrentados pela Companhia no contexto da Operação Lava Jato; o Conselheiro solicitou que cópia da referida carta fosse distribuída aos demais Conselheiros, o que foi feito no decorrer da reunião. O Conselheiro José Guimarães Monforte sugeriu, como questão de ordem, a inversão da pauta das apresentações, por entender que a apresentação das Demonstrações Contábeis deveria ser prioridade, em razão das circunstâncias atuais da Companhia, tendo contado com o apoio do Presidente do Conselho de Administração Guido Mantega. Em prosseguimento, passou-se à apresentação "**Demonstrações Contábeis da Petrobras (Controladora e Consolidadas) Referentes ao Período Findo em 30 de Setembro de 2014 (Não Revisadas) e Relatório de Desempenho Empresarial**", pelo Gerente Executivo de Desempenho Empresarial Mário Jorge da Silva e pela Gerente do Jurídico de Financeiro da Unidade Jurídico Grace Salomão de Pinho, com a presença, como convidados, do Gerente de Avaliação do Desempenho Econômico e Operacional Ricardo Rodriguez Besada Filho, do Gerente Executivo de Contabilidade Marcos Antônio Silva Menezes, do Gerente Geral de Contabilidade da Controladora e do Consolidado Paulo José Alves, do Gerente de Planejamento e Orientações Contábeis da Unidade Contabilidade Amos da Silva Cancio, do Gerente Executivo de Estratégia Corporativa Antonio Eduardo Monteiro de Castro, do

-2-

Para verificar as assinaturas, acesse www.tcu.gov.br/autenticidade, informando o código 53509351.

Confidential

PBRCG_01224934



Gerente Geral de Matérias e Regionais do Jurídico Hélio Siqueira Junior, do Coordenador ligado à estrutura da Gerência Executiva da Unidade Jurídico Carlos Rafael Lima Macedo e, no Rio de Janeiro, do Gerente Executivo de Relacionamento com Investidores Theodore Marshall Helms. Inicialmente, o apresentador Mário Jorge da Silva esclareceu que a apresentação tratava de uma simulação de resultados da Companhia no terceiro trimestre de 2014, não havendo demonstrações contábeis completas até o momento, visando informar ao Conselho de Administração os indicadores operacionais e financeiros e debater possíveis efeitos da Operação Lava Jato; além disso, esclareceu também que a apresentação foi dividida em Desempenho Operacional, Simulação de Resultados, "Critérios para Mensuração de Ajustes decorrentes da Operação Lava Jato", "Análise dos Riscos de Divulgação do Balanço Não Auditado" e Decisões da Diretoria Executiva. O Gerente Executivo Mário Jorge da Silva passou a apresentar o Desempenho Operacional no período, considerando as seguintes variáveis externas: taxa de câmbio, preço do petróleo – Brent, comparação do preço Brasil e Golfo Americano e venda de derivados no Brasil. Foi informada a depreciação do real da ordem de 8% nos nove primeiros meses de 2014; quanto ao valor do Brent, foi constatada elevação da oferta mundial no 3º trimestre de 2014 e menor projeção de demanda, levando à queda na cotação do Brent; no que tange às vendas de derivados no Brasil, foi constatado aumento da demanda por diesel e gasolina nos 9 primeiros meses de 2014; sobre a defasagem entre os preços internacionais e aqueles praticados pela Companhia no Brasil, foi informado que no 3º trimestre de 2014 houve redução na defasagem do diesel e da gasolina, com reversão no 4º trimestre em favor dos preços praticados no Brasil, a ponto de ser interessante para potenciais entrantes no mercado brasileiro vender aqui diesel e gasolina, auferindo maior margem do que no mercado norte-americano. O Presidente do Conselho de Administração Guido Mantega indagou se há indicativos de competidores que já estariam efetivamente entrando no mercado nacional, tendo o Diretor de Abastecimento José Carlos Cosenza esclarecido existirem sinais de empresas procurando distribuidoras locais para oferecer produto, principalmente em face do inverno norte-americano, que provoca sobras de gasolina e diesel. Prosseguindo na apresentação sobre o Desempenho

-3-

Confidential

PBRCG_01224935



Ata nº 1.401

Operacional, o Gerente Executivo de Desempenho Empresarial informou que o terceiro trimestre é um momento de pico na demanda de derivados no Brasil (principalmente diesel e gasolina), por conta da indústria e do agronegócio, além do consumo das famílias; houve aumento de 6,5% na produção de óleo e LGN operada pela Petrobras em relação ao trimestre anterior, com a entrada em operação das UEPs P-63, P-55, P-62 e P-58 e o *ramp-up* dos sistemas FPSOs Cidade de Itajaí, Cidade de Paraty e Cidade de São Paulo, e aumento de 6% da produção própria da Petrobras, em relação ao trimestre anterior, de óleo e LGN no Brasil com a interligação de 46 Novos Poços produtores e chegada de 4 Novos PLSVs; verificada maior oferta de gás natural para atendimento à elevada geração termelétrica, sendo que no 3º trimestre de 2014 houve maior oferta de gás da produção nacional, reduzindo a necessidade de importação de GNL; e, quanto à produção de derivados no Brasil, foi identificada elevação da produção com a utilização do mesmo parque de refino, devido a aumento do fator de utilização. Na sequência, o Gerente Executivo Mário Jorge da Silva informou, quanto à produção de 2014, que há projeção 5,4% acima do realizado em 2013, com *ramp-up* das unidades que entraram em produção no 2º semestre de 2013 e a entrada de 5 novas unidades em 2014, além da interligação de 62 poços; desvio da meta (+7,5% +/- 1 p.p) em função dos atrasos na entrega de UEPs, nos licenciamentos e na interligação de poços, atenuado pela melhora da eficiência operacional. O Conselheiro Silvio Sinedino Pinheiro indagou sobre a razão do desvio em relação à curva de produção projetada, tendo o Diretor de Exploração e Produção José Miranda Formigli Filho esclarecido que o resultado foi impactado por problemas de conclusão de obras a bordo das plataformas P63, P55, P58 e P62, com consequências na eficiência operacional dos subsistemas da planta de processo, particularmente causando atraso na injeção de água, cujos efeitos ainda não foram produzidos no reservatório do campo de Roncador (P55 e P62); tais circunstâncias influenciaram o aumento da produção em níveis aquém do esperado, que, por seu turno, não compensou as paradas programadas. O Conselheiro Mauro Rodrigues da Cunha questionou se a meta de produção de 2015 está sendo mantida, ao que foi esclarecido pelo Diretor de Exploração e Produção José Miranda Formigli Filho que a meta para 2015 não foi divulgada ao mercado,

-4-

Confidential

PBRCG_01224936



nem mesmo via Plano de Negócios e Gestão - PNG. O Conselheiro Mauro Rodrigues da Cunha indagou se a meta de produção projetada para 2020 será influenciada; o Diretor José Miranda Formigli Filho esclareceu que a meta para 2020 deverá ser confirmada ou revista em função do contexto atual, tendo a Conselheira e Presidente da Petrobras Maria das Graças Silva Foster complementado que esta análise também deverá levar em consideração os atrasos dos estaleiros, por ineficiência e por incapacidade de financiamento. Passando à Simulação de Resultados, e pontuando a limitação de informações hoje de conhecimento da Companhia sobre a Operação Lava Jato, o Gerente Executivo de Desempenho Empresarial Mário Jorge da Silva fez as seguintes observações: (i) Receita Operacional Líquida 13% superior ao mesmo período de 2013 devido a reajuste nos preços de diesel e gasolina em novembro de 2013 e maior volume de venda de derivados no mercado interno e de petróleo exportado, atenuado pela menor exportação de derivados; (ii) maior mercado de derivados, maior volume importado de gás natural e derivados, efeito da depreciação cambial sobre os gastos com importações e com participações governamentais impactando positivamente o Lucro Bruto em 8%; (iii) o resultado menor nos primeiros 9 meses de 2014 em comparação ao mesmo período do ano anterior era explicado pelo acréscimo de 26% nas despesas operacionais, devido a provisionamento do PIDV (R$ 2,5 bilhões), maiores baixas de poços secos ou subcomerciais (R$ 1,0 bilhão), menor ganho na venda de ativos (R$ 0,9 bilhão), baixa de ativos por devolução de campos (R$ 0,5 bilhão) e maiores despesas de vendas (R$ 0,8 bilhão); (iv) impactos simulados da Operação Lava Jato na constituição e operação de ativos da ordem de R$ 4,0 bilhões; e (v) lucro antes do resultado financeiro, participações e impostos 9% menor em comparação com o mesmo período de 2013 devido principalmente à desvalorização do real. O Conselheiro José Guimarães Monforte questionou se, em relação aos contratos em que foi identificado o pagamento de propina, existem contratos em execução, se estão sendo pagos e se foi feita alguma crítica em relação ao pagamento de tais contratos. O Gerente Executivo Mário Jorge da Silva informou que há contratos em vigor, que continuam sendo pagos nos valores avençados, mas que no plano contábil é reconhecida a perda correspondente ao suposto valor da propina. A Conselheira e

-5-

Confidential

PBRCG_01224937



Presidente da Petrobras Maria das Graças Silva Foster complementou informando que, após a delação premiada do ex-Diretor Paulo Roberto Costa, a Diretoria Executiva determinou que não serão aprovados novos aditivos advindos dos contratos de Comperj e RNEST; as únicas exceções sendo os aditivos sem os quais as perdas seriam maiores do que sua não celebração. Em continuidade à apresentação, o Gerente Executivo de Desempenho Empresarial informou o Colegiado sobre os impactos dos programas estruturantes no lucro líquido, esclarecendo que PROCOP (R$ 4,9 bilhão), PRODESIN (R$ 1,0 bilhão) e PROEF (R$ 1,3 bilhão) impactaram positivamente a simulação de Lucro Líquido em 48% (R$ 7,2 bilhões). A respeito dos investimentos, foi informada a redução de 10% em comparação com o mesmo período de 2013, tendo-se como principais justificativas para os desvios em relação ao PNG 2014-2018: (i) Desempenho da Contratada - P-75 (-R$ 0,7 bi) - equipamentos críticos previstos e não entregues, e defasagem na realização física e medição financeira nas atividades de conversão do casco realizadas na China; Comperj - Trem 1 (-R$ 0,6 bi): rescisão de contratos, 41 dias de greve, atrasos no suprimento de materiais e construção e montagem; Gasoduto Cernambi-Tecab (-R$ 0,6 bi): atraso no lançamento de dutos e na obtenção da licença de instalação; P-74 (-R$ 0,5 bi): atraso na conversão do casco e na construção dos módulos de processo da UEP; Fábrica de Fertilizantes - MS (-R$ 0,4 bi): baixa performance do consórcio culminando na rescisão do contrato em dezembro de 2014; (ii) Desempenho da Petrobras - exploração Pré-sal em Campos (-R$ 0,5 bi): replanejamento da campanha de avaliação de novos campos; FPSO Cidade de Ilhabelha (-R$ 0,4 bi): replanejamento das atividade de interligação de poços devido ao licenciamento ambiental; E&P Argentina (-R$ 0,4 bi): não pagamento de bônus de extensão das concessões Medanito e Entre Lomas, por atraso nas negociações com o governo argentino; P-61 (-R$ 0,3 bi): atraso na instalação da P-61/TAD; FPSO Cidade de Mangaratiba (-R$ 0,3 bi): postergação na etapa de completação de 3 poços. Dizendo respeito à simulação do Fluxo de Caixa no 3º trimestre de 2014, foi apontado Saldo final de R$ 70,3 bilhões, com elevação do saldo final de caixa em função da geração operacional superior aos investimentos e ao efeito da variação cambial sobre o saldo em moeda estrangeira; a maior geração

-6-

Confidential

PBRCG_01224938



operacional no 3º trimestre de 2014 reflete, principalmente, a redução de estoque (R$ 7,0 bi) de óleo importado, formado no trimestre anterior, de derivados nacionais, e a realização de exportações em andamento também do trimestre anterior, além da variação de impostos e taxas (R$ 3,0 bi), devido, principalmente, a maior recuperação de PIS/COFINS. Passando ao esclarecimento sobre Simulação do Endividamento e Alavancagem, foi informado que o Indicador Endividamento Líquido/EBITDA encerrou em 4,20 nos 9 primeiros meses de 2014, 19% acima de 2013, em função principalmente das novas captações, que representaram cerca de 84% (R$ 33 bilhões) do aumento do Endividamento Líquido. Passando ao item relativo aos "Critérios para Mensuração de Ajustes decorrentes da Operação Lava Jato", o Gerente Executivo de Desempenho Empresarial Mário Jorge da Silva esclareceu que se tratam de critérios aprovados pela Diretoria Executiva em 11/12/2014, tendo como referência depoimentos do ex-diretor Paulo Roberto Costa e do Sr. Alberto Youssef (08/10/2014), além de Termos de Colaboração Premiada dos executivos da Toyo Setal Srs. Julio Camargo e Augusto Mendonça Neto, que a Petrobras teve acesso em 03/12/2014, informações estas que foram recebidas pela Petrobras com caráter de provas emprestadas. Com relação ao período, foi informado que foram considerados os contratos e aditivos celebrados de 2004 a abril de 2012, individualmente ou em consórcio. A Conselheira e Presidente Maria das Graças Silva Foster chamou atenção para o fato de, no depoimento prestado pelo ex-Diretor Paulo Roberto da Costa à Justiça Federal em 8/10/2014, não serem indicados nomes na Diretoria de Gás e Energia, diferentemente do que ocorreu em relação à Engenharia e à Diretoria de Abastecimento. O Conselheiro Sergio Franklin Quintella indagou se, por haver um reconhecimento por parte da Companhia de pagamento a maior, não seria o caso de registrar em balanço uma provisão para esse recebimento. Instado pela Conselheira e Presidente da Petrobras Maria das Graças Silva Foster, o Jurídico, através do Coordenador ligado à estrutura da Gerência Executiva da Unidade Jurídico Carlos Rafael Lima Macedo, esclareceu que ███████████████████████████████████████
████████████████████████████████████████████████

Diretor Financeiro e de Relações com Investidores Almir Guilherme Barbassa complementou informando que, atualmente, trata-se de

-7-

Confidential

PBRCG_01224939


ativo contingente, que depende de decisão judicial que permita
seu reconhecimento como receita. O apresentador Mário Jorge da
Silva prosseguiu, observando que, com relação aos valores, foi
considerado o percentual de 3% ou valores específicos sobre o
total medido em cada contrato: (i) aplicação de 3%, apontado no
depoimento do ex-diretor Paulo Roberto Costa à Justiça Federal em
08/10/14; (ii) utilização de valores específicos para os
contratos especificamente mencionados nos Termos de Colaboração
Premiada dos Srs. Augusto Mendonça Neto e Julio Camargo. O
Conselheiro Sergio Franklin Quintella manifestou ressalva quanto
ao entendimento apresentado de que a colaboração premiada seria
válida para fundamentar baixa nos ativos, mas não para buscar o
ressarcimento da Companhia. O Conselheiro José Guimarães Monforte
indagou se na delação premiada é feita menção aos contratos em
que foram pagos os sobrepreços de 3% ou se os cálculos da
Simulação de Resultados é que consideraram esse percentual de
forma genérica. O Gerente Executivo Mário Jorge da Silva
esclareceu que, de acordo com depoimento do ex-Diretor Paulo
Roberto Costa, era aplicado – em média – o apontado percentual de
3% sobre os contratos referentes a obras da Petrobras. O
Conselheiro Francisco Roberto de Albuquerque indagou sobre o
destino dos recursos a serem recuperados no âmbito da Operação
Lava Jato. O Coordenador ligado à estrutura da Gerência Executiva
da Unidade Jurídico Carlos Rafael Lima Macedo esclareceu que,



–8–

Confidential

PBRCG_01224940



O Gerente Executivo Mário Jorge da Silva seguiu apresentando os impactos da Operação Lava Jato reconhecidos na simulação de resultado da Companhia, e esclareceu que a maior parcela estaria na baixa desses impactos na constituição ou operação dos ativos (estimada em R$ 3.870 milhões); foi informado que, nesta simulação, o total dos impactos atingiria R$4.060 milhões, considerando os efeitos da reversão da depreciação dos referidos ativos, da baixa de impostos a recuperar, da repercussão sobre o imposto de renda e contribuição social e dos impactos da Operação Lava Jato já reconhecidos anteriormente no resultado. O Coordenador do Jurídico Carlos Rafael Lima Macedo esclareceu



–9–

Confidential

PBRCG_01224941



−10−

Confidential

PBRCG_01224942



-11-

Para verificar as assinaturas, acesse www.tcu.gov.br/autenticidade, informando o código 53509351.

PBRCG_01224943



O Conselheiro Sergio Franklin Quintella chamou a atenção para o fato de a administração ter tomado ciência, por meio dos relatórios finais das Comissões Internas de Apuração, de potenciais práticas de sobrepreço, o que recomenda cautela numa eventual divulgação de valores ao mercado. Na sequência da reunião, o Gerente Executivo de Desempenho Empresarial Mário Jorge da Silva apresentou ao Colegiado tabela informativa sobre "Datas Limite para Divulgação do Balanço e *Covenants*", em que foram destacados os seguintes prazos e respectivas acelerações de dívidas: 31/01/2015, para publicação de balanço trimestral não-auditado, sob pena de aceleração de dívida de US$ 12,35 bilhões; 28/02/2015, para publicação de balanço trimestral não-auditado, sob pena de aceleração de dívida de US$ 78,51 bilhões; 31/05/2015, para publicação de balanço anual auditado, sob pena de aceleração de dívida de US$ 32,21 bilhões; e 30/06/2015, para publicação de balanço anual auditado, sob pena de aceleração de dívida de US$ 78,51 bilhões. Em prosseguimento, o Gerente Executivo de Desempenho Empresarial Mário Jorge da Silva informou ao Conselho de Administração as decisões deliberadas pela Diretoria Executiva na reunião de 11/12/2014, detalhadas da seguinte forma: (a) postergar para até 31/01/2015 a divulgação do balanço trimestral não auditado, considerando que: I. o vencimento dos primeiros *covenants* foi postergado para 31/01/15; II. há a expectativa da disponibilização, nos próximos 30 dias, de novos depoimentos e termos de colaboração premiada no âmbito da Operação Lava Jato;

-12-

Confidential

PBRCG_01224944



III. a divulgação de informações que podem ser motivo de correções nos próximos 30 dias poderá servir de munição para ações judiciais; e IV. ainda há divergências com a PwC que comprometem o desejado alinhamento com o auditor externo, mesmo em se tratando de um balanço não auditado; (b) divulgar ao mercado em 12/12/2014 apenas os dados contábeis que não serão impactados pelos efeitos da Operação Lava Jato: I. volume de vendas; II. Receita Operacional Líquida; III. Geração Operacional (+) e Investimentos (-) agrupados; IV. Saldo de Caixa (Disponibilidades); V. Endividamento Total e Líquido; e também divulgar VI. Critérios para Mensuração de Ajustes decorrentes da Operação Lava Jato; e VII. estimativa preliminar desses Ajustes à luz dos fatos conhecidos e fundamentados em documentos até a presente data. O Conselheiro Mauro Rodrigues da Cunha pontuou que a discussão sobre o que deve ser feito pela Companhia deve ser divida em duas partes: primeira, o que deve ser feito com relação à divulgação dos Resultados; segunda, o que deve ser feito para que seja obtido o Balanço auditado. Com relação ao primeiro ponto, o Conselheiro lembrou que o mercado aguarda para a presente data a divulgação de Demonstrações Contábeis não auditadas e a frustração dessa expectativa, ao seu ver, seria muito mal recebida pelo mercado; além disso, a opção por não divulgar sinalizaria para o mercado que as informações a serem consideradas sobre a Companhia permanecem as divulgadas em 30/06/2014, que foi a última publicação oficial. O Conselheiro Mauro Rodrigues da Cunha manifestou sua concordância com as orientações do escritório Cleary Gottlieb Steen & Hamilton apresentadas nesta data, bem como pontuou entender que as recomendações da PwC não são cabíveis neste momento, tendo em vista que o procedimento que a Companhia adota para divulgar Demonstrações Contábeis não auditadas não diz respeito à atuação dos auditores independentes, sendo mais uma questão jurídica e de reputação da Companhia. O Conselheiro sugeriu a publicação das Demonstrações Contábeis do 3º trimestre de 2014 com os ajustes decorrentes dos impactos da Operação Lava Jato, com o que estaria sendo cumprido o que foi anunciado ao mercado, publicando-se o "*best guess*" da Companhia. A Conselheira e Presidente da Petrobras Maria das Graças Silva Foster comentou que esta foi inicialmente a posição da Diretoria Executiva, mas que o Diretor

-13-

Confidential

PBRCG_01224945



Financeiro e de Relações com Investidores Almir Guilherme Barbassa apresentou argumentos contra tal iniciativa. Em esclarecimento, o Diretor Financeiro e de Relações com Investidores apontou a fragilidade de se apresentar Demonstrações Contábeis que podem influenciar decisões de investidores e que, posteriormente, poderiam ser corrigidas, dando margem a ações judiciais contra a Companhia. O Conselheiro Mauro Rodrigues da Cunha comentou que, com as informações trazidas pela já mencionada carta recebida de investidores internacionais da Petrobras, pode ser percebida uma deterioração nos detentores de ativos da Companhia: os investidores de alta qualidade estão se desfazendo dos papéis da Petrobras e os investidores "predadores" estão comprando ações e títulos de divida da Companhia. O Presidente do Conselho de Administração Guido Mantega propôs que a questão fosse submetida à votação qual recomendação fazer à Diretoria Executiva, nos seguintes termos: (i) publicar ou não as Demonstrações Contábeis e (ii) de que forma publicar. O Diretor Almir Guilherme Barbassa interveio, esclarecendo que, caso seja feita a opção pela publicação, é necessário restar definido se ocorrerá com retroatividade ou não, sendo essa uma questão muito importante por conta de dois pontos principais: alinhamento com a posição sustentada pela PwC,

O Presidente do Conselho de Administração Guido Mantega pontuou que o investidor está temeroso quanto ao que pode surgir das investigações em curso e que, nesse contexto, a não divulgação de dados contribuiria para agravar esse quadro de temor, razão pela qual entende que a apresentação de informações básicas de natureza operacional (volume de vendas, receita operacional líquida, entre outras) seria uma maneira de minimizar essas impressões. O Conselheiro Silvio Sinedino de Pinheiro indagou quais são os riscos na percepção do Jurídico, em vista das ações em curso nos Estados Unidos. A Gerente do Jurídico de Financeiro Grace Salomão de Pinho respondeu que

O Presidente do Conselho de

-14-

Confidential

PBRCG_01224946



Administração comentou que o Colegiado está diante de duas espécies de risco: risco jurídico – que envolve os impactos nas ações judiciais movidas pelos investidores – e risco relativo à deterioração das ações da Companhia; em sua opinião, a decisão a ser adotada deve considerar a conjugação de ambos os riscos. Iniciada a votação nos termos propostos pelo Presidente do Conselho de Administração Guido Mantega, por este foi declarado votar pela divulgação de dados contábeis que não serão impactados pelos efeitos da Operação Lava Jato, com a informação de que os impactos nas Demonstrações ainda estão sendo mensurados. O Conselheiro Mauro Rodrigues da Cunha, reconhecendo que foi vencida nos debates sua proposta de publicação de Demonstrações Contábeis do 3º trimestre de 2014 com os ajustes decorrentes dos impactos da Operação Lava Jato, propôs que fosse feita votação sobre quais itens da decisão da Diretoria Executiva de 11/12/2014 o Conselho de Administração recomendaria a divulgação: se os itens I a V (I. Volume de vendas; II. Receita Operacional Líquida; III. Geração Operacional (+) e Investimentos (-) agrupados; IV. Saldo de Caixa (Disponibilidades); V. Endividamento Total e Líquido) ou se os itens I a VII (VI. Critérios para Mensuração de Ajustes decorrentes da "Operação Lava Jato"; VII. Estimativa preliminar desses Ajustes à luz dos fatos conhecidos e fundamentados em documentos até a presente data). O Presidente do Conselho de Administração Guido Mantega aceitou a proposta do Conselheiro Mauro Rodrigues da Cunha e reabriu a votação, manifestando que votava pela publicação apenas dos itens I a V, no que foi acompanhado pelo Conselheiro Sergio Franklin Quintella. O Conselheiro Francisco Roberto de Albuquerque acompanhou o voto do Presidente do Conselho, ressaltando a importância da divulgação ser acompanhada de nota explicativa bem detalhada, que em sua opinião seria bem compreendida pelo mercado. A Conselheira e Presidente da Petrobras Maria das Graças Silva Foster apresentou como seu voto a posição sustentada pela Diretoria Executiva da Companhia, pela divulgação dos itens I a VII, no que foi acompanhada pelo Conselheiro Mauro Rodrigues da Cunha. O Conselheiro Luciano Galvão Coutinho inicialmente indagou se a PwC externou alguma manifestação sobre as hipóteses ora em debate no Conselho, tendo sido esclarecido pelo Diretor Financeiro e de Relações com Investidores Almir Guilherme

-15-

Confidential

PBRCG_01224947



Barbassa que a situação não foi tratada com aquela auditoria; em seguida, o Conselheiro votou pela divulgação dos itens I a VII, acompanhando o voto da Conselheira e Presidente da Petrobras Maria das Graças Silva Foster. O Conselheiro José Guimarães Monforte absteve-se de votar, ao argumento de que nenhuma das proposições em debate correspondia ao seu entendimento. O Diretor Almir Guilherme Barbassa esclareceu ao Colegiado que o escritório Cleary, ao tomar conhecimento do entendimento construído na Diretoria Executiva da Petrobras, ████████████████████████

████████████████████████████████████████

████████████████████; o Cleary referiu-se a ██████

████████████████████████████████████████

████████████████████████

████████████████████████████████████████

A Conselheira Miriam Belchior externou sua preocupação com o risco jurídico, e votou pela divulgação apenas dos itens I a V, acompanhando o voto do Presidente do Conselho de Administração Guido Mantega. O Conselheiro Silvio Sinedino Pinheiro votou pela divulgação dos itens I a VII. Em vista dos votos apresentandos, o Presidente do Conselho de Administração declarou como resultado que apenas os itens I a V sejam divulgados. No prosseguimento da reunião, o Conselheiro Mauro Rodrigues da Cunha externou seu entendimento em relação às providências imediatas a serem adotadas pela Companhia para viabilizar a apresentação do Balanço; argumentou que a Petrobras não pode ficar na dependência de decisões judiciais para apresentá-lo ao mercado; em razão disso, sustentou que deva ser solicitada avaliação independente dos ativos impactados pela Operação Lava Jato, com a constituição de provisão para perdas nos casos em que os ativos sejam avaliados a menor em relação aos dados atuais, devendo tais provisões serem ajustadas conforme sejam divulgadas decisões judiciais. O Conselheiro José Guimarães Monforte complementou que tal avaliação deve ser alinhada com a PwC, que posteriormente deverá validar o procedimento. O Conselheiro Luciano Galvão Coutinho comentou que se trata de

-16-

Confidential

PBRCG_01224948



metodologia bastante sensível às premissas conjunturais hoje em debate; além disso, concordou com que as Demonstrações Contábeis da Companhia não podem estar sujeitas ao andamento de um processo judicial, razão por que também entende que deve ser consensada com a PwC metodologia alternativa que permita avaliar os ativos sob investigação. Atendendo solicitação do Conselheiro Mauro Rodrigues da Cunha, o Presidente do Conselho de Administração Guido Mantega convocou os representantes da PwC para participarem da reunião, pois os mesmos encontravam-se à disposição do Conselho no Escritório de São Paulo. Representando a PwC, os Srs. Marcos Donizete Panassol, Carlos Alberto Souza e Jorge Roberto Manoel entraram na reunião. O Presidente do Conselho, após lembrar que a Petrobras vem acatando todas as recomendações da PwC com o objetivo de viabilizar a elaboração de Balanço auditado da Companhia referente ao 3º trimestre de 2014, indagou ao auditor Marcos Panassol quais são as condições necessárias para que a Companhia obtenha a aprovação do Balanço auditado do período, bem como do exercício de 2014. O Auditor Marcos Panassol comentou que ainda persistem incertezas quanto aos números em apuração pela Companhia, dado as notícias que têm sido divulgadas sobre a Operação Lava Jato, o que demanda a continuidade dessa apuração; mencionou, também, que está em andamento avaliação da PwC sobre os resultados das Comissões Internas de Apuração, com o objetivo de verificar se os riscos identificados no passado ainda persistem no exercício de 2014, e em que medida os controles internos trataram disso; prosseguiu comentando que a investigação independente conduzida pelos escritórios contratados é um ponto crítico, não tendo a PwC como intervir para acelerar o procedimento. Nesse contexto, foi comentada a questão do *reporting line* - para quem as investigações, seus andamentos e conclusões serão reportados - como sendo uma questão de governança corporativa ainda pendente. A Conselheira e Presidente da Petrobras Maria das Graças Silva Foster pontuou que, segundo os escritórios contratados Gibson, Dunn & Crutcher e Trench, Rossi e Watanabe, o *reporting line* poderia ser o próprio Diretor de Governança, Risco e Conformidade, em conjunto com duas pessoas externas à Companhia, profissionais de notório conhecimento técnico, um brasileiro e um não residente no Brasil. O Conselheiro Silvio Sinedino Pinheiro indagou se a PwC está

-17-

Confidential

PBRCG_01224949



condicionando a assinatura de seu relatório ao término dos
trabalhos dos advogados; o Conselheiro José Guimarães Monforte
complementou demandando esclarecimento sobre qual seria o
momento, ainda no curso das investigações, em que a PwC
entenderia haver informações suficientes para o posicionamento da
auditoria independente. O auditor Marcos Panassol esclareceu a
primeira indagação afirmando que a PwC tem condições de emitir
seu relatório a qualquer momento, mas que, diante das
circunstâncias atuais, não seria um relatório conclusivo; por
esta razão, afirmou que é necessário que as investigações evoluam
até o ponto em que seja possível à Companhia apresentar
informações fidedignas com os necessários ajustes, para que seja
emitido relatório conclusivo. Prosseguiu em seus esclarecimentos
afirmando que o momento a que se referiu o Conselheiro José
Guimarães Monforte será aquele em que os procedimentos adotados
permitirem que a Companhia afirme que as pessoas encarregadas da
elaboração e apresentação das informações financeiras estão
livres de questionamento quanto aos pontos levantados na
investigação. A Conselheira e Presidente da Petrobras Maria das
Graças Silva Foster indagou em quantos meses se chegaria a esse
ponto, tendo o auditor Marcos Panassol esclarecido que não há
como precisar no momento, porque isso depende do trabalho dos
escritórios contratados; o planejamento detalhado das
investigações independentes está pendente, em sua opinião, pela
falta de definição do *reporting line*. O Conselheiro Mauro
Rodrigues da Cunha indagou ao auditor Marcos Panassol se a
questão do *reporting line* no âmbito da Petrobras estaria
resolvida se o seu Comitê de Auditoria fosse composto por membros
independentes do Conselho de Administração, tendo recebido
resposta afirmativa. O Presidente do Conselho de Administração
Guido Mantega indagou porque a PwC entendeu que os membros atuais
do Comitê de Auditoria não estão qualificados para funcionarem
como *reporting line*, já que estão juridicamente qualificados para
comporem o referido Comitê, ao que foi esclarecido que se trata
de uma questão de independência em relação aos fatos investigados
e não à qualificação para serem membros do Comitê de Auditoria. O
Conselheiro Mauro Rodrigues da Cunha indagou se, tendo em vista a
falta de definição do *reporting line*, o auditor Marcos Panassol
concordava com as palavras a ele atribuídas na página 11 da então

-18-

Confidential

PBRCG_01224950



minuta da ata da reunião 1399, de 14/11/2014, deste Colegiado,
que dizia "(...) o auditor Marcos Panassol afirmou que os canais
de governança da Petrobras estão funcionando a contento nas
investigações, tendo a PwC acesso direto aos escritórios de
advocacia independentes contratados pela Companhia no âmbito das
recentes investigações (...)". O auditor respondeu que concordava
com o registro citado, porém que restava buscar a solução para a
questão do reporting line. O Presidente do Conselho comentou
sobre a necessidade de que seja dada uma estimativa dos
escritórios contratados sobre o tempo necessário para produzir
informações que dêem conforto para a obtenção do Balanço
auditado. A Conselheira e Presidente da Petrobras Maria das
Graças Silva Foster complementou indagando aos representantes da
PwC o que poderia ser feito para encurtar etapas e acelerar esse
procedimento; indagou se a saída da atual Presidente, bem como
dos integrantes da Diretoria Executiva, aceleraria a obtenção do
Balanço auditado. O auditor Marcos Panassol esclareceu que tal
afastamento não teria capacidade de sanar a questão da segurança
sobre as informações acerca dos atos já praticados ao longo do
exercício de 2014 e que a mudança de pessoas poderia resolver a
questão apenas deste momento para frente; mas que com relação aos
atos praticados e contratos realizados, afirmou que essa mudança
não eliminaria a necessidade de investigação, por se tratarem de
atos já praticados durante o período objeto do balanço. Na
sequência, o Conselheiro Mauro Rodrigues da Cunha comentou sobre
a sugestão de ser trabalhada com a PwC a criação de uma
metodologia de avaliação que permita chegar a estimativas com
certeza suficiente que dê conforto aos auditores independentes
para emissão do relatório sobre as Demonstrações Contábeis da
Companhia, independentemente do andamento das investigações. O
Conselheiro José Guimarães Monforte questionou sobre quais seriam
as alternativas de avaliação no entender da PwC. O auditor Marcos
Panassol comentou, como exemplos, que pode ser considerado o
custo do ativo, extraído o que dele não deveria constar, além de
avaliação independente de mercado (por empresa de consultoria) ou
utilização de cálculo a valor presente. O Conselheiro Mauro
Rodrigues da Cunha perguntou ao Diretor Financeiro e de Relações
com Investidores Almir Guilherme Barbassa se a publicação de um
relatório com ressalvas aceleraria obrigações de dívida, tendo

-19-

Confidential

PBRCG_01224951



sido esclarecido pelo Diretor que sim, porque tal documento equivaleria na SEC (*Securities and Exchange Commission*) à não-publicação de Balanço. A Conselheira e Presidente da Petrobras Maria das Graças Silva Foster perguntou se o Comitê de Auditoria não pode ser aceito como *reporting line* pelo fato de ter como integrantes membros do Conselho de Administração indicados pelo Governo. O Gerente Executivo de Estratégia Corporativa Antonio Eduardo Monteiro de Castro esclareceu afirmando que os escritórios contratados informaram que a independência do *reporting line* passa por não ter em sua composição membros de indicação do acionista controlador, e que tal fato foi comunicado pelos escritórios à PwC. O Conselheiro Luciano Galvão Coutinho, externando preocupação de a Companhia não poder ficar a reboque de decisões judiciais para ultimar seu Balanço, questionou se a PwC teria condições de avaliar em tempo hábil os custos e respectivos expurgos dos ativos indicados na apresentação realizada pelo Gerente Executivo de Desempenho Empresarial, ou se seria necessário à Petrobras obter outra opinião de consultoria de mercado. O auditor Marcos Panassol afirmou que a PwC tem essa competência interna, mas que, no caso em questão, estaria impedida de auditar informação produzida pela própria empresa de auditoria; ressaltou que uma avaliação independente, caso obtida, tem a vantagem de ser mais segura, apta a produzir efeitos perante os órgãos reguladores. O Conselheiro Mauro Rodrigues da Cunha questionou ao auditor Marcos Panassol se os ativos sob suspeita forem submetidos a uma avaliação econômica independente de mercado isso levaria a uma maior facilidade de obtenção de Balanço aprovado e auditado, tendo o auditor da PwC respondido afirmativamente. Em sequência, o Conselheiro Mauro Rodrigues da Cunha apresentou recomendação de que a Diretoria Executiva parta imediatamente para a avaliação independente dos ativos com materialidade para o Balanço da Companhia. A Conselheira e Presidente da Petrobras Maria das Graças Silva Foster pontuou seu entendimento de que parte dessa diferença da avaliação pode ser sobrepreço, outra parte pode ser ineficiência de equipes, como também pode corresponder a chuvas excessivas no período ou a atrasos de fornecedores, dentre outros; concluiu comentando que a diferença não seria necessariamente propina ou sobrepreço. Em resposta, o Conselheiro Mauro Rodrigues da Cunha comentou que,

-20-

Confidential

PBRCG_01224952



embora o raciocínio da Conselheira esteja correto, esta seria a melhor visão que a Companhia poderia apresentar no momento. Em seguida, o Conselheiro Mauro Rodrigues da Cunha apresentou proposta ao Conselho de Administração com o objetivo de resolver a questão do *reporting line*: a criação de um Comitê formado pelo próprio Conselheiro Mauro Rodrigues da Cunha, mais os Conselheiros José Guimarães Monforte e Sergio Franklin Quintella, para atuação como *reporting line* enquanto o Diretor de Governança, Risco e Conformidade não seja designado. Diante de tal proposta, o Conselheiro Sergio Franklin Quintella manifestou que não aceitaria participar de tal Comitê se não pudesse ser acompanhado de advogado de sua confiança durante todo o período de desempenho de tais atribuições. O Presidente do Conselho de Administração agradeceu a participação dos representantes da PwC e dispensou sua presença na reunião. O Gerente Executivo de Estratégia Corporativa Antonio Eduardo Monteiro de Castro, em razão dos contatos mantidos com os escritórios contratados Gibson, Dunn & Crutcher e Trench, Rossi e Watanabe, externou

Diante das datas apresentadas como limite para publicação de balanço trimestral não-auditado, os Conselheiros acordaram que a Companhia deveria buscar uma metodologia que viabilizasse a divulgação do referido balanço antes do final de janeiro. Em prosseguimento da reunião, no tópico **"Assuntos dos Comitês - Comitê de Auditoria"**, o Conselheiro e Presidente do Comitê de Auditoria Sergio Franklin Quintella passou à leitura das conclusões e recomendações do Comitê de Auditoria ao Conselho de Administração acerca do relatório da Comissão Interna de Apuração - CIA sobre o COMPERJ: (i) o relatório da CIA deixa evidenciado o descumprimento das normas de governança, descumprimento das normas de licitação e contratação, bem como um conjunto de ações que resultaram em

-21-

Confidential

PBRCG_01224953



substanciais perdas financeiras para a Petrobras; (ii) o Comitê de Auditoria recomenda ao Conselho de Administração da Petrobras que determine a abertura de processo cível contra as 12 pessoas relacionadas no relatório da CIA nas páginas 47/66 a 63/66, enviando o relatório da CIA e o parecer do Comitê de Auditoria ao Ministério Público, à CGU e ao TCU para as medidas que julgarem cabíveis; (iii) as empresas relacionadas no relatório da CIA nas páginas 28/66 e 46/66 devem ser objeto de avaliação das autoridades competentes para eventual ressarcimento da Petrobras. Após leitura das conclusões e recomendações, o Conselheiro Sergio Franklin Quintella solicitou a anexação do relatório do Comitê de Auditoria à presente Ata (Anexo 1) e indagou aos membros do Conselho de Administração se concordavam com seus termos. O Conselheiro Mauro Rodrigues da Cunha concordou com o relatório do Comitê de Auditoria, mas apontou as seguintes ressalvas aos termos apresentados: (i) em sua visão, em alguns pontos foram feitas recomendações genéricas, quando é necessário resolver efetivamente os problemas, (ii) entendeu haver um problema de governança nas CIAs que, ao seu ver, demonstram incapacidade de julgar atos que envolvam membros da Diretoria Executiva, (iii) sugeriu o encaminhamento das conclusões não apenas para o Ministério Público, como também para o juiz encarregado da condução do processo da Operação Lava Jato, (iv) entendeu que devam ser suspensas imediatamente as empresas implicadas, com relação a novos contratos com a Companhia, pelo menos até que os processos internos sejam revistos e (v) registrou que mantém seu entendimento de que se deve aguardar o parecer jurídico externo solicitado pelo Conselho Fiscal sobre a ação judicial mais adequada para buscar os ressarcimentos que forem cabíveis. O Conselheiro José Guimarães Monforte acompanhou a manifestação do Conselheiro Mauro Rodrigues da Cunha. Neste ponto da reunião, com a concordância do Presidente do Conselho de Administração Guido Mantega, o Coordenador ligado à estrutura da Gerência Executiva da Unidade Jurídico Braulio Licy Gomes de Mello realizou para o Colegiado a apresentação ███████████████████

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

-22-

Confidential

PBRCG_01224954