# EXHIBIT A
# (Part III)



Diante dos encaminhamentos já dados aos relatórios das CIAs de COMPERJ e RNEST antes da análise do Comitê de Auditoria, o Presidente do Conselho de Administração Guido Mantega solicitou que o Padrão que regula o funcionamento das CIAs seja reavaliado, de forma a, nas questões mais relevantes, e não em toda e qualquer CIA, contemplar a passagem oportuna dos relatórios finais das CIAs pelo Comitê de Auditoria. Na continuação da reunião, o Conselheiro e Presidente do Comitê

-23-

Confidential

PBRCG_01224955

de Auditoria Sergio Franklin Quintella leu as conclusões e recomendações do Comitê sobre o relatório da CIA da RNEST, com as seguintes conclusões: (i) o relatório da CIA deixa evidenciado o descumprimento das normas de governança, descumprimento das normas de licitação e contratação, bem como um conjunto de ações que resultaram em substanciais perdas financeiras para a Petrobras; (ii) o relatório também informa que ausência de planejamento e a inexistência de projetos básicos de FEED em época própria contribuíram de forma relevante para o descumprimento de prazo, aumento de custos e termos aditivos de valores expressivos; os responsáveis de implantação da RNEST relacionados no relatório da CIA tomaram decisões que foram levadas à Diretoria Executiva *ad referendum*, mesmo para contratos e aditivos de valores superiores a R$ 1 bilhão; (iii) o Comitê de Auditoria recomenda ao Conselho de Administração da Petrobras que providencie a abertura de processo cível contra as 11 pessoas relacionadas no relatório da CIA (páginas 3, 5, 7, 11, 13, 14, 15 e 17), enviando o relatório da CIA e o parecer do Comitê de Auditoria ao Ministério Público Federal, à CGU e ao TCU para as devidas ações; (iv) em relação às empresas fornecedoras de equipamento, construção e montagem relacionadas no relatório da CIA, foi recomendado que sejam abertos processos investigatórios, com vistas à apuração de eventuais práticas de fraude, superfaturamento e corrupção de funcionários da Petrobras. Após leitura das recomendações, o Conselheiro Sergio Franklin Quintella solicitou a anexação do relatório à presente Ata (Anexo 2) e indagou aos membros do Conselho de Administração se concordavam com seus termos. O Conselheiro Mauro Rodrigues da Cunha concordou com o relatório, mas apontou as mesmas ressalvas apresentadas em relação ao relatório da CIA COMPERJ, sendo acompanhado pelo Conselheiro José Guimarães Monforte. Na continuidade da reunião, a Conselheira e Presidente da Petrobras Maria das Graças Silva Foster comentou com o Colegiado sobre as notícias divulgadas na mídia sobre a empregada Venina Velosa da Fonseca, informando que as acusações ventiladas pela empregada contra a Diretoria Executiva já haviam sido tratadas e que estava em elaboração pela Petrobras uma nota de esclarecimento. O Conselheiro Silvio Sinedino Pinheiro indagou a Conselheira e Presidente da Petrobras Maria das Graças Silva Foster por que a

-24-

Confidential

PBRCG_01224956



Auditoria não identifica algumas irregularidades que as CIA conseguem detectar, ao que a Conselheira esclareceu que existe diferença de procedimento seguido por cada qual, havendo mais recursos de investigação no caso das CIAs. O Conselheiro Mauro Rodrigues da Cunha comentou que os procedimentos de apuração das CIAs têm se mostrado muito demorados, e citou como exemplo o caso Pasadena, ocorrido em 2006 e que foi objeto de uma CIA apenas recentemente; o Conselheiro externou seu entendimento que a intempestividade de ação prejudica a efetividade do procedimento. Em seguida, o Conselheiro Mauro Rodrigues da Cunha indagou ao Colegiado se todos estavam de acordo com sua ressalva aos relatórios do Comitê de Auditoria para recomendar a imediata suspensão das empresas implicadas nas investigações da Operação Lava Jato, pontuando que a questão inclui também não enviar convites para que essas empresas participem dos procedimentos licitatórios da Companhia. O Presidente do Conselho de Administração Guido Mantega comentou que a decisão de excluir empresas de processos competitivos não é simples, exceto nos casos em que seus dirigentes estão sob investigação ou presos. Na sequência da reunião, passou-se à apresentação **Preservação da Liquidez da Companhia em 2015**", pelo Gerente Executivo de Desempenho Empresarial Mário Jorge da Silva, com a presença, como convidado, do Gerente de Avaliação do Desempenho Econômico e Operacional Ricardo Rodriguez Besada Filho. A apresentação foi iniciada com a informação de que o saldo de caixa da Companhia no início de dezembro era de US$ 25,6 bi, e de que a projeção para 2015 - caso não haja nenhuma captação e nem reajuste de preços - é de que o Caixa estaria em zero no mês de outubro; a análise considera um BRENT médio de US$ 79 e câmbio médio de US$ 2,58 ao longo de 2015. Nesse passo, informou o Gerente Executivo Mário Jorge da Silva que a Diretoria Executiva determinou às áreas que identificassem alternativas para aumentar a liquidez da Companhia. No bojo do Plano de Ação para Preservação da Liquidez da Companhia em 2015, foram identificadas 22 ações classificadas em 4 grupos, que totalizaram uma redução de R$ 40,8 bilhões: (i) Estratégicas - ações que usualmente envolvem mais de uma área e que tenham potenciais impactos externos à Companhia, demandando articulação com outras empresas ou órgãos de governo; (ii) Gestão de Preços dos Produtos - ações específicas de revisão da

-25-

Confidential

PBRCG_01224957



estratégia de preços de produtos; (iii) Gestão dos Investimentos
- ações específicas para postergar ou cancelar projetos de
investimento ora em implantação; e (iv) Administrativas - ações
de contenção de orçamento de áreas administrativas. Como Ações
Estratégicas, que gerarão contribuição de R$ 16 bi ao Caixa,
foram descritas as medidas seguintes: postergar em 1 ano o
pagamento do bônus referente ao Excedente da Cessão Onerosa;
receber dívida Eletrobras; receber dívida da Cigás/Amazonas
Energia; parar Ativos com Resultado Negativo (aportes no
sistema); reconhecer o pagamento de dividendos 2014 pelo critério
limitado a 25% do Lucro Líquido; postergar o pagamento de
Dividendos de Maio para Agosto/2015; na Transpetro, receber
crédito de remuneração em favor da Petrobras a título de Juros
sobre Capital Próprio (JCP); na Gaspetro, receber crédito de
remuneração em favor da Petrobras a título de JCP; alteração do
regime de reconhecimento da variação cambial e alteração da taxa
de depreciação fiscal dos gasodutos; e Redução de Capital e
Dividendos nas participações em empresas de energia - coligadas.
Em seguida, como Ações de Gestão nos Preços dos Produtos, que
gerarão contribuição de R$ 11,8 bilhões ao Caixa - com o BRENT no
patamar de US$ 80 -, foram apontadas as seguintes medidas: GLP
Industrial - reajuste de 15% em dez/14 e 20% em nov/15; Asfalto -
reajuste de 20% em jan/15 e 10% em out/15; Gas Natural -
eliminação dos descontos praticados na denominada "Nova Política"
(equiparação da "Nova Política" ao preço do gás boliviano -
aumento de 14,5% em fevereiro/2015); e aumentos na Gasolina e
Diesel em 2015. Passando às Ações para Gestão dos Investimentos,
que gerarão R$ 12,9 bilhões de contribuição adicional no Caixa da
Companhia, foram apresentadas as seguintes medidas: na Exploração
e Produção - replanejamento dos prazos de construções das UEPs
Replicantes e Cessão Onerosa, com postergação da entrada em
operação; postergação do programa exploratório, mantendo
Programas Exploratórios Mínimos (PEM) e Planos de Avaliação de
Descoberta (PAD); impacto na curva de produção a partir de 2017
(-25 mbpd 2017; -90 mbpd 2018; e -28 mbpd 2019); R$ 1 bilhão em
adiantamento a fornecedores com impacto exclusivo no fluxo de
caixa; no Abastecimento - Comperj: partida do Trem 1 postergada
de dez/16 para jan/18, tendo por consequência mais R$ 0,7 bilhão
no investimento total e desmobilização de 10.000 trabalhadores;

-26-

Confidential

PBRCG_01224958



Premium I: postergação da partida da refinaria de set/19 para set/22; Premium II: postergação da partida da refinaria de jan/20 para out/23; TECAM: postergação de jul/16 para dez/17 e mais R$ 24,5 milhões no investimento total; UOTE: postergação de out/16 para set/17 e mais R$ 37,8 milhões no investimento total; REDUC: postergação de ago/16 para jan/18 e mais R$ 4,2 milhões no investimento total; no Gás e Energia - UFN-III: postergação da partida de jul/15 para abr/17; UFN-V: postergação da partida de mar/17 para mar/18; UPGN Rota 3: postergação do 1° módulo de out/16 para jun/17 e do 2° módulo de fev/17 para out/17; Dutos Norte Rota 3: postergação do duto de GLP de ago/16 para out/17; Dutos Norte Comperj: postergação dos dutos de petróleo, diesel/nafta e QAV de jul/16, ago/16 e ago/16 para dez/17, jan/18 e jan/18 respectivamente (estas medidas acarretam aumento do investimento total nestes projetos de investimento e a desmobilização de aproximadamente 2.900 trabalhadores); na Transpetro - postergação de 1 comboio do PROMEF Hidrovias para 2016; na Petrobras Biocombustível - suspensão dos aportes previstos para 2015 para o projeto Guarani. O Conselheiro Silvio Sinedino Pinheiro indagou ao Gerente Executivo Mário Jorge da Silva se as medidas apresentadas são irreversíveis, tendo sido esclarecido que algumas são irreversíveis e demandam decisão imediata. No que diz respeito às Ações Administrativas, com estimativa de R$ 0,1 bilhão de contribuição adicional no Caixa, as ações apresentadas foram as seguintes: reduzir o orçamento da Comunicação para 2015 (redução de 6% no PAN 2015 e manutenção do mesmo patamar de 2014 - justificativa: contrapor o grande volume de menções negativas sobre a Petrobras e manter patrocínios culturais e esportivos); reduzir o orçamento da Responsabilidade Social para 2015 (redução de 15% no PAN 2015 e manutenção do patamar de 2014); postergação de admissões de cargos administrativos (202 vagas postergadas de abr/2015 para jan/2016). O Gerente Executivo Mário Jorge da Silva esclareceu que, com tais medidas, a Diretoria Executiva assume que é possível operar a Companhia até o final de 2015 sem necessitar recorrer ao mercado de captações; caso o valor do Brent permaneça no patamar de US$ 70/bbl, o espaço para aumento de preços de produtos será menor, mas, ainda assim, a Companhia poderá operar até o final de 2015 sem necessidade de recorrer a captações. O

-27-

Confidential

PBRCG_01224959



Conselheiro Luciano Galvão Coutinho indagou se o cenário de Brent num patamar baixo permite à Petrobras não recorrer ao mercado de captações, tendo sido esclarecido pelo Gerente Executivo Mário Jorge da Silva que sim, desde que não haja reduções de preços, mesmo assumindo uma eventual perda de *market share*; ressaltou também que, para o ano de 2015, como somos importadores líquidos a redução no preço do Brent é favorável para a geração operacional da Petrobras. Face aos valores apresentados para a geração de caixa e para o saldo final de caixa em 2015, em diferentes cenários de preço de petróleo, o Conselheiro Mauro Rodrigues da Cunha solicitou explicações adicionais sobre uma potencial discrepância entre estes montantes. O Conselheiro Mauro Rodrigues da Cunha comentou também sobre a aplicabilidade do art. 202, § 4º, da Lei nº 6.404/76 (Lei de Sociedades por Ações), que prevê que o dividendo não será obrigatório no exercício social em que os órgãos da administração informarem em assembleia serem tais dividendos incompatíveis com a situação financeira da companhia; na visão do Conselheiro, a Petrobras deveria aplicá-lo no contexto atual, por ser plenamente justificável. A apresentação **"Acompanhamento da Eficácia da Política de Preços de Óleo Diesel e Gasolina"** deixou de ser realizada, devido à longa duração da reunião e aos demais assuntos já tratados, não havendo deliberação sobre o tema. Com relação à aprovação e assinatura das atas das reuniões ordinárias de 31/10/2014 e 04/11/2014 e 14/11/2014, e extraordinária de 25/11/2014, foi acordado que os Conselheiros levariam as versões impressas para posterior verificação e coleta de assinaturas. Dentre as três questões de ordem levantadas pelo Conselheiro Mauro Rodrigues da Cunha (contratação de assessoria jurídica para os Conselheiros; realização de sessão executiva; e dar conhecimento aos Conselheiros da carta assinada por dez investidores internacionais, datada de 08/12/2014, a respeito dos desafios de Governança Corporativa enfrentados pela Petrobras), a sessão executiva deixou de ser realizada, restando para reunião seguinte. Em prosseguimento, passou-se à apresentação **"Limites de Atuação da Diretoria Executiva e Competência do Conselho de Administração para a qual é permitida Delegação"**, pelo Gerente Executivo de Organização, Gestão e Governança Washington Luiz

-28-

Para verificar as assinaturas, acesse www.tcu.gov.br/autenticidade, informando o código 53509351.

Confidential

PBRCG_01224960

Case 1:14-cv-09662-JSR   Document 976-3   Filed 09/24/19   Page 8 of 25



Faria Salles, com a presença, como convidada, da Consultora do Jurídico de Financeiro da Unidade Jurídico Fernanda Hissa Pereira Tieppo. Iniciada a apresentação, foi informado tratar-se de pauta anual do Conselho de Administração: (i) os parâmetros e valores acima dos quais os atos, contratos ou operações, embora de competência da Diretoria Executiva, especialmente os previstos nos incisos III, IV, V, VI e VIII do artigo 33 do Estatuto Social, deverão ser submetidos à aprovação do Conselho de Administração, para o exercício de 2015, em conformidade com o disposto no inciso V, do artigo 28 do Estatuto Social da Petrobras; e (ii) o valor abaixo do qual a competência para deliberar sobre transferência da titularidade de ativos da Companhia é delegada para a Diretoria Executiva, de acordo com o artigo 28, inciso VIII, do Estatuto Social. Especificamente sobre os atos de competência da Diretoria Executiva que deverão ser submetidos à aprovação do Conselho de Administração, foram apresentados os seguintes limites de autonomia e competência: (i) captação de recursos, contratação de empréstimos e financiamento no País ou no exterior (artigo 33, inciso III) - valor determinado no Plano de Negócios e Gestão (PNG), aprovado pelo Conselho de Administração para o ano corrente, ou outro valor que tenha sido especificamente autorizado pelo Conselho; (ii) prestação de garantias reais ou fidejussórias (artigo 33, inciso IV) - o órgão (Conselho de Administração ou Diretoria Executiva) que autorizar a celebração do contrato aprova a prestação de garantias; (iii) aquisição de bens imóveis, navios e unidades marítimas, bem como gravame e alienação de ativos da Companhia (artigo 33, inciso V) - Aquisições de bens imóveis, navios e unidades marítimas que estejam relacionadas com as atividades previstas no PNG da Petrobras, aprovado pelo Conselho de Administração; valor equivalente a US$ 200 milhões para os casos de gravames, alienações e aquisições não previstas no PNG; (iv) alienação ou gravame de ações ou cotas de sociedades (artigo 33, inciso VI) - compete à Assembleia Geral: alienação do controle do capital social de subsidiárias integrais da Companhia; compete ao Conselho de Administração: alienação de ações ou cotas de subsidiárias integrais e controladas em valores superiores a US$ 200 milhões, exceto Sociedades de Propósito Específico (SPEs), e cessação da participação em sociedades (alienação da totalidade

-29-

Confidential

PBRCG_01224961



da participação acionária detida pela Petrobras) em subsidiárias,
sociedades controladas ou coligadas, exceto SPEs; compete à
Diretoria Executiva: (a) alienação de ações ou cotas de
sociedades nas quais a Companhia detenha mais de 10% (dez por
cento) do capital social, exceto SPEs, até o limite de US$ 200
milhões, desde que não acarrete alteração do *status* de sociedade
coligada ou controlada, onde aplicável; ou alteração na
estratégia da Companhia quanto à sua participação na referida
sociedade; (b) alienação de ações ou cotas de SPEs, independente
do valor, bem como cessão de direitos em consórcios e *joint-
ventures*; (c) cessação da participação em sociedade que não seja
subsidiária, controlada ou coligada, desde que não altere a
estratégia da Companhia, limitado ao valor equivalente a US$ 200
milhões; (v) atos de renúncia, transação judicial ou
extrajudicial (artigo 33, inciso VIII) - o órgão (Conselho de
Administração ou Diretoria Executiva) que autorizar a celebração
do contrato aprova atos de renúncia, transação judicial ou
extrajudicial; não havendo contrato principal, a aprovação
compete à Diretoria Executiva, limitado ao valor equivalente a
US$ 200 milhões. Com relação ao ato de competência do Conselho de
Administração que pode ser praticado pela Diretoria Executiva,
foi proposta a manutenção do limite de valor equivalente a US$
200 milhões para transferência da titularidade de ativos da
Companhia (artigo 28, inciso VIII). No que diz respeito à
aprovação de atos de renúncia, transação judicial ou
extrajudicial, o Conselho de Administração acatou sugestão do
Conselheiro Mauro Rodrigues da Cunha para que seja estabelecido o
limite de US$ 200 milhões para qualquer renúncia, transação
judicial ou extrajudicial a ser aprovada pela Diretoria
Executiva, em lugar da inexistência de limite atualmente em vigor
para os casos em que o contrato original tenha sido autorizado
pela Diretoria Executiva, alterando-se a proposta submetida à
apreciação do Conselho de Administração, que mantinha a lógica da
Diretoria Executiva poder autorizar renúncias, transações
judiciais ou extrajudiciais de qualquer valor, desde que o
contrato original tivesse sido autorizado por aquele Colegiado.
Em seguida, o Conselheiro Mauro Rodrigues da Cunha fez comentário
sobre o inciso VII do artigo 33 do Estatuto Social, que envolve
negócios jurídicos com a União Federal, parte relacionada da

-30-

Confidential

PBRCG_01224962

NP-3

Petrobras; externou seu entendimento de que deveria haver o mesmo limite de US$ 200 milhões para a Diretoria Executiva autorizá-los, em lugar da inexistência de limite atualmente em vigor. O Gerente Executivo de Organização, Gestão e Governança Washington Luiz Faria Salles sugeriu que seja feita análise para avaliar previamente os impactos do estabelecimento de um limite para tal inciso do artigo 33. Ficou acordado que a matéria será tratada futuramente. O Conselheiro Mauro Rodrigues da Cunha externou seu entendimento de que não é positivo estar na alçada da Diretoria Executiva tudo que diz respeito ao PNG; sustentou que devam ser previstos limites de alçada por projetos, superiores a US$ 200 milhões, na casa de US$ 1 a US$ 2 bilhões, como é comum em várias empresas do setor, mas que algum limite deve ser estabelecido. A Conselheira e Presidente da Petrobras Maria das Graças Silva Foster pontuou que a proposta do Conselheiro Mauro Rodrigues da Cunha pode ser avaliada, mas que tal proposta poderia implicar em uma mudança no perfil das atividades do Conselho de Administração da Petrobras, que passaria a receber uma maior quantidade de pautas para deliberação e que poderia ser chamado a realizar um maior número de reuniões, inclusive extraordinárias. O Conselho de Administração acordou que esta questão também será tratada futuramente. Na continuação da reunião, passou-se à apresentação **"Informações sobre a Operação Lava Jato – Atualização"**, pelo Coordenador ligado à estrutura da Gerência Executiva da Unidade Jurídico Carlos Rafael Lima Macedo, com a presença, como convidados, do Coordenador Carlos da Silva Fontes Filho e do Gerente Setorial Pedro Jardim de Paiva Barroso ambos da Unidade Jurídico. O Conselho de Administração foi atualizado quanto ao envio de cartas para as empresas mencionadas na mídia: conforme decidido na reunião do Conselho de Administração de 04/11/2014, as empresas OAS e Mendes Júnior foram instadas a esclarecer as indagações da Petrobras a respeito das notícias veiculadas pela imprensa; a OAS respondeu informando "que não possuímos nenhum contrato com a referida empresa (MO Consultoria) que tenha como objeto contratos ou obras da Petrobras" e que "existe um contrato de prestação de serviços [...] cujo objeto é a realização de auditoria fiscal e trabalhista em obras no estado de São Paulo"; a Mendes Júnior respondeu reconhecendo a existência de contratos e pagamentos com a GFD, uma das empresas controladas pelo Sr.

-31-

Confidential

PBRCG_01224963



Alberto Youssef.

-32-

Confidential

PBRCG_01224964



-33-

Confidential                                                                                                PBRCG_01224965

Case 1:14-cv-09662-JSR   Document 976-3   Filed 09/24/19   Page 13 of 25



Concluída a apresentação sobre a operação Lava Jato, o Conselheiro Mauro Rodrigues da Cunha retornou à questão da contratação de assessoria jurídica para o Conselho de Administração; o Colegiado manifestou sua concordância com a proposta, ressalvada a posição da Conselheira e Presidente da Petrobras Maria das Graças Silva Foster, que entendeu ser suficiente a assessoria do Jurídico da Companhia. O Conselheiro Mauro Rodrigues da Cunha lembrou que já enviou sugestões e nomes de advogados à Companhia, cuja avaliação está aguardando. ---------- A seguir, no tópico das deliberações formais, após a conclusão das apresentações e dos comentários, passou-se para o exame das matérias para deliberação e para conhecimento.**1) Pauta nº 58 – CAPTAÇÃO DE RECURSOS FINANCEIROS EM 2014:** – O Presidente do Conselho de Administração Guido Mantega resolveu submeter ao Colegiado a matéria da referência, já apreciada pela Diretoria Executiva (Ata DE 5.186, item 11, de 4-12-2014), conforme proposições constantes do respectivo Resumo Executivo. **DECISÃO:** - O Conselho de Administração, nos termos do Resumo Executivo e das explicações fornecidas pelo Diretor Financeiro e de Relações com Investidores Almir Guilherme Barbassa, relativos à matéria, e modificando a proposição original encaminhada pela Diretoria Executiva: i) autorizou a elevação do limite das captações de recursos financeiros em 2014,

-34-

Confidential

PBRCG_01224966



sujeitas à aprovação da Diretoria Executiva, para o valor total de até US$30 bilhões líquidos, em lugar dos US$ 25,55 bilhões originalmente propostos, estando incluídas no limite as captações da Petróleo Brasileiro S.A. - Petrobras e de suas subsidiárias e controladas; e ii) autorizou a Diretoria Executiva a aprovar, no ano de 2014, a contratação de financiamentos junto ao Banco Nacional de Desenvolvimento Econômico e Social - BNDES, Agências de Crédito à Exportação e outras instituições financeiras, estabelecendo-se que quaisquer saques de recursos referentes a tais financiamentos estão sujeitos aos limites mencionados na proposição (i) acima. ---------- **2) Pauta nº 59- LIMITES DE ATUAÇÃO DA DIRETORIA EXECUTIVA DA PETROBRAS E DELEGAÇÃO DE COMPETÊNCIA AO CONSELHO DE ADMINISTRAÇÃO:** - Em face da apresentação do Gerente de Executivo de Organização, Gestão e Governança, Washington Luiz Faria Salles, o Presidente do Conselho de Administração Guido Mantega resolveu submeter ao Colegiado a matéria da referência, já apreciada pela Diretoria Executiva (Ata DE 5.182, item 15, de 19-11-2014). **DECISÃO:** - O Conselho de Administração, nos termos do Resumo Executivo relativo à matéria e seus anexos, e dos debates, aprovou: a) os parâmetros e valores acima dos quais os atos, contratos ou operações, embora de competência da Diretoria Executiva, especialmente os previstos nos incisos III, IV, V, VI e VIII do artigo 33 do Estatuto Social da Petrobras, deverão ser submetidos à aprovação do Conselho de Administração, para o exercício de 2015, em conformidade com o disposto no inciso V, do artigo 28 do Estatuto Social da Petrobras, ressalvado que passa a ser estabelecido o novo limite de US$ 200 milhões (duzentos milhões de dólares) para qualquer renúncia, transação judicial ou extrajudicial a ser aprovada pela Diretoria Executiva, em substituição da inexistência de limite originalmente proposta para os casos em que o contrato original tenha sido autorizado pela Diretoria Executiva; e b) o valor abaixo do qual a competência para deliberar sobre transferência da titularidade de ativos da Companhia é delegada para a Diretoria Executiva, de acordo com o artigo 28, inciso VIII, do Estatuto Social. Outrossim, o Conselho solicitou ainda avaliação sobre a definição de limites para os atos previstos no inciso VII do artigo 33 do Estatuto Social. ---------- **3) Pauta nº 60 - PROGRAMAÇÃO ANUAL**

-35-

Confidential

PBRCG_01224967



DAS PAUTAS PERMANENTES E DO CALENDÁRIO DAS REUNIÕES ORDINÁRIAS DO CONSELHO DE ADMINISTRAÇÃO DA PETROBRAS PARA 2015: - O Presidente do Conselho de Administração Guido Mantega resolveu submeter ao Colegiado a matéria da referência, conforme proposições constantes do respectivo Resumo Executivo. **DECISÃO:** - O Conselho de Administração, nos termos do Resumo Executivo relativo à matéria e seus anexos: a) aprovou a programação anual das pautas permanentes e o calendário das reuniões ordinárias do Conselho de Administração da Petrobras para o ano de 2015; e b) autorizou a Presidência do Colegiado a proceder às alterações porventura necessárias nas datas fixadas no calendário de reuniões. --------- -- **4) Pauta nº 61 - CONVOCAÇÃO DA ASSEMBLEIA GERAL ORDINÁRIA DE 2015 (AGO-2015):** - O Presidente do Conselho de Administração Guido Mantega submeteu ao Conselho de Administração a matéria da referência, conforme proposição constante do respectivo Resumo Executivo. **DECISÃO:** - O Conselho de Administração, nos termos do Resumo Executivo relativo à matéria, aprovou a convocação da Assembleia Geral Ordinária de Acionistas da Petrobras de 2015 (AGO-2015) para o dia 29-4-2015, às 15 horas, na Sede da Companhia. -------------- **6) Pauta nº 62 - ACOMPANHAMENTO DO AVANÇO FÍSICO E FINANCEIRO DOS PROJETOS DE INVESTIMENTO:** - O Presidente do Conselho de Administração Guido Mantega resolveu submeter ao Colegiado a matéria da referência, já apreciada pela Diretoria Executiva (Ata DE 5.176, de 30-10-2014), para conhecimento. **DECISÃO:** - O Conselho de Administração tomou conhecimento de que os indicadores consolidados dos 184 projetos acompanhados mensalmente pela Alta Administração alcançaram os percentuais de IAF (Indicador de Avanço Físico) de 95,7% e de ICC (Indicador de Cumprimento de Custo) de 99,8%, conforme Relatório distribuído aos Conselheiros na presente reunião. ------------- Às dezenove horas e cinquenta minutos, o Presidente do Conselho de Administração deu por encerrada a reunião, da qual se lavrou a presente ata que, depois de lida e aprovada, vai assinada pelo Presidente do Conselho, pelos Conselheiros partícipes e por mim, João Gonçalves Gabriel, Secretário-Geral da Petrobras.

-36-

Confidential

PBRCG_01224968



ANEXOS: (1) Relatório, datado de 12/12/2014, do Comitê de Auditoria para o Conselho de Administração sobre o relatório da CIA COMPERJ; (2) Relatório, datado de 12/12/2014, do Comitê de Auditoria para o Conselho de Administração sobre o relatório da CIA RNEST.

| | |
|---|---|
| Guido Mantega | Maria das Graças Silva Foster |
| Presidente | Conselheira |
| Miriam Belchior | José Guimarães Monforte |
| Conselheira | Conselheiro |
| Luciano Galvão Coutinho | Francisco Roberto de Albuquerque |
| Conselheiro | Conselheiro |
| Mauro Rodrigues da Cunha | Sergio Franklin Quintella |
| Conselheiro | Conselheiro |
| Silvio Sinedino Pinheiro | João Gonçalves Gabriel |
| Conselheiro | Secretário-Geral da Petrobras |

–37–

Confidential

PBRCG_01224969

CONFIDENCIAL                                        NP3

## REFINARIA ABREU e LIMA (RNEST)
## RELATÓRIO DO COMITÊ DE AUDITORIA PARA O
## CONSELHO DE ADMINISTRAÇÃO

O relatório da CIA Interna de Apuração sobre RNEST, que atende ao DIP DABAST 71/2014, de 25/04/2014 (Anexo 1), Protocolo de Registro na Segurança Empresarial nº 0031/2014, sob a coordenação do Auditor Interno Sr. Gerson Luiz Gonçalves e mais 5 funcionários Petrobras, em suas 28 páginas e no adendo dos contratos analisados, apresenta resumidamente as seguintes considerações:

1) O relatório visa a identificação de eventuais prejuízos e responsabilidades na contratação da implantação da RNEST, desde a especificação dos serviços relacionados à avaliação econômica da implementação da refinaria.

2) A análise dos assuntos relacionados à avaliação econômica da implementação da RNEST, que não compôs o objeto desta CIA, está a cargo da Diretoria de Abastecimento.

---

Para verificar as assinaturas, acesse www.tcu.gov.br/autenticidade, informando o código 53509351.

Confidential                                                                                    PBRCG_01224970

CONFIDENCIAL                                                    NP3

3) As justificativas para a instituição da CIA, foram decorrentes das denúncias de irregularidades nos contratos (veiculadas na imprensa) e da acusação de desvios de verbas que teriam sido realizadas pelo Sr. Paulo Roberto Costa, ex-Diretor de Abastecimento da Petrobras, um dos dois principais responsáveis pela condução da implantação da RNEST, tendo ainda em conta as declarações à Polícia Federal, Ministério Público e Juiz Federal do Paraná.

4) A Cia analisou 23 contratos, relacionados à RNEST, cujos valores somam R$ 22,6 bilhões, que corresponde a pouco mais que 90% de todos os 202 contratos assinados (Quadro I, pag. 4/28 da CIA).

5) Foram identificados 324 aditivos relacionados aos 23 contratos analisados, num total de R$ 4 bilhões, em sua maioria decorrentes diretamente da implementação do Plano de Antecipação da Refinaria – PAR. Os aditivos são 21,5%, em média, mas foram encontrados aditivos de 65% e 108,5% superiores aos respectivos valores contratuais originais.

6) Em fevereiro de 2007, o ex-Diretor de Abastecimento Sr. Paulo Roberto Costa propôs a elaboração do PAR e, em 08/03/2007, em menos de um mês, a Sra. Venina Velosa Fonseca emitiu o DIP AB-CR 76/2007, oficializando o plano.

Para verificar as assinaturas, acesse www.tcu.gov.br/autenticidade, informando o código 53509351.

Confidential                                                                                    PBRCG_01224971

CONFIDENCIAL                                            NP3

7) Além de antecipar em um ano a entrada de operação da refinaria, o PAR abrangia a aquisição dos equipamentos considerados críticos para as unidades de hidrotratamento, serviços de engenharia de pré-detalhamento e projeto executivo e a contratação de um EPC (engenneering Procurement and Construction) específico de utilidades.

8) Na mesma data 08/03/2007, a Diretoria Executiva (Ata DE 4.632, item 29, pauta 255 – Anexo 4) aprovou o PAR e, dessa forma, gerou a necessidade de antecipações de atividades para a implementação do projeto, tais como a contratação de projeto de engenharia, licitações para a aquisição de equipamentos críticos e contratação de EPC específico.

9) A CIA não obteve evidência de retorno à Diretoria Executiva da Proposta definitiva da elaboração de estratégia de contratação de equipamentos e serviços que deveria ter ocorrido em 22/04/2007.

10) A CIA não encontrou evidências de justificativas adequadas para a elaboração do PAR, na medida em que somente em março /2007, mesmo mês da aprovação do mesmo, foram iniciados os projetos básicos das unidades. A realização dos projetos básicos deveriam ter ocorrido antes da aprovação do PAR, por serem fundamentais para a elaboração de um

---

Para verificar as assinaturas, acesse www.tcu.gov.br/autenticidade, informando o código 53509351.
Confidential                                                    PBRCG_01224972

CONFIDENCIAL                                        NP3

cronograma consistente de antecipação do projeto e orçamento realista.

11) O fato da aprovação do PAR sem projetos básicos totalmente definidos incluiu o acréscimo de mais uma unidade de destilação atmosférica (UDA), em vez de uma única como estava previsto no projeto básico inicial da RNEST, face as características diferentes do óleo de Marlim e da Venezuela.

12) Em 18/03/2008, por meio do DIP AB-CR 97/2008 – Anexo 9, Sra. Venina Velosa Fonseca, Sr. Pedro José Barusco Filho e Dr. Marco Aurélio da Rosa Ramos solicitaram ao DABAST e DSERV a continuidade dos processos de compra dos equipamentos críticos do PAR, para que o projeto passasse a contar com as duas UDAs acima referidas.

13) Em 27/03/2008, a Diretoria Executiva aprovou o DIP citado no item anterior, autorizando o início dos processos de compra dos fornos de aquecimento, sobressalentes e a contratação da Unidade de Craqueamento Retardado (UCR) e da Unidade de Geração de Hidrogênio (UGH).

14) Em depoimento à CIA, o Sr. Marco Aurélio da Rosa Ramos, Gerente Executivo de Materiais, declarou que houve alterações nas especificações durante os processos licitatórios e que

Para verificar as assinaturas, acesse www.tcu.gov.br/autenticidade, informando o código 53509351.

Confidential                                                                PBRCG_01224973

CONFIDENCIAL                                    NP3

considera ainda que o projeto foi iniciado sem a devida maturidade nas especificações dos equipamentos críticos.

15) Em 17/08/2008, a Diretoria Executiva aprovou o modelo de contratação a RNEST, proposto pelo ABASTECIMENTO, através do DIP AB-CR 264/2008, de 10/07/ 2008 – Anexo 11. Esse modelo se baseava no DIP JURÍDICO 4216/2008, de 17/07/2008, e era exclusivo para os processos de contratação da RNEST e contava com cláusulas diferenciadas.

16) Em 09/07/2008, um dia antes da proposição do modelo de contratação exclusivo da RNEST, os Srs. Renato de Souza Duque e Paulo Roberto Costa, respectivamente, então Diretores de Serviços e de Abastecimento, receberam a solicitação de instauração de 12 processos licitatórios para as obras da refinaria. Essa solicitação foi assinada pelo Sr. Pedro José Barusco Filho e Sra. Venina Velosa Fonseca, por meio do DIP ENGENHARIA 536/2008 (Anexo 13). A CIA identificou que esses 12 processos foram considerados como prioritários para os objetivos do PAR, dentre os 23 analisados.

17) A CIA verificou que os 12 processos licitatórios foram iniciados em julho/2008, de forma concomitante aos serviços de pré-detalhamento dos projetos básicos e que os projetos básicos sofreram diversas alterações ao longo dos certames.

Para verificar as assinaturas, acesse www.tcu.gov.br/autenticidade, informando o código 53509351.

Confidential                                                                                    PBRCG_01224974

CONFIDENCIAL                                                    NP3

18) O Sr. Dewton Carvalho, então Gerente Setorial de Equipamentos e Serviços da RNEST e atual Gerente de Manutenção da RNEST, declarou à CIA que não existiam as especificações dos equipamentos, projeto básico e FEED no momento da elaboração do PAR, tendo sido utilizadas as informações do projeto conceitual que estavam disponíveis na época.

19) O Sr. Marco Aurélio da Rosa Ramos, afirmou à CIA que os prazos do PAR estavam equivocados e as tentativas de antecipação junto aos fornecedores que visavam viabilizar o PAR. Ele também afirma que houve alterações nas especificações durante e após as licitações.

20) O Sr. Marcelino Guedes, então Diretor-Presidente da RNEST e atual Gerente de Capacitação Profissional do Abastecimento, declarou a CIA que o PAR quebrou o conceito de EPC e a antecipação das contratações gerou aditivos e elevação de custos. O Sr. Wilson Guilherme Ramalho, então Gerente de Implantação da RNEST e atual Gerente Executivo de Programas de Investimento do Abastecimento confirma a tese de que o projeto básico não estava maduro para a implantação do PAR.

Para verificar as assinaturas, acesse www.tcu.gov.br/autenticidade, informando o código 53509351.

Confidential                                                    PBRCG_01224975

CONFIDENCIAL                                    NP3

21) Dos 12 processos licitatórios lançados, 6 foram cancelados por preços excessivos, ou seja, muito acima do limite superior de 20% da estimativa da ENGENHARIA.

22) A partir de fevereiro/2009, a ENGENHARIA e o ABASTECIMENTO prosseguiram a tramitação para a assinatura dos 6 processos sem divergências entre as propostas e as estimativas.

23) A partir de maio/2009, foram recebidas novas propostas para os 6 processos cancelados anteriormente, cujas valores propostos estavam próximos do limite superior da faixa de valores, entre -15% e +20% em relação às estimativas, elaboradas pela ENGENHARIA/SL/SCP.

24) A CIA identificou 9 naturezas de NÃO CONFORMIDADES em 11 contratos, dos 23 contratos selecionados para análise (Quadro I, pag. 4/28 do Relatório da CIA).

25) A primeira NÃO CONFORMIDADE se refere à falta de encaminhamento à Diretoria Executiva da mudança na estratégia de contratação do EPC de utilidades (Alusa Engenharia). A licitação da CAFOR, ETA, ETDI e sistemas de segurança foi proposta de forma diferente da aprovada originalmente no PAR, em março/2007. Ao invés de uma única

Para verificar as assinaturas, acesse www.tcu.gov.br/autenticidade, informando o código 53509351.

Confidential                                                                        PBRCG_01224976

CONFIDENCIAL                                          NP3

licitação, houve o desmembramento em quatro licitações, mudança não explicitada nos DIPs, assinados pelo Sr. Pedro José Barusco Filho e Sra. Venina Velosa Fonseca, e encaminhados à Diretoria Executiva pelos ex Diretores Srs. Renato de Souza Duque e Paulo Roberto Costa.

26) A segunda NÃO CONFORMIDADE é a negociação de proposta após o encerramento da licitação e a respectiva aprovação da contratação pela Diretoria Executiva (Alusa Engenharia). Em 19/09/2008, a Diretoria Executiva aprovou a contratação da CAFOR por R$966 milhões e, na mesma data, a Sra. Venina Velosa Fonseca informou por *e-mail* que esse valor não estaria compatível, pois encontrava-se 272% acima do valor orçado pela ENGENHARIA. Após a assinatura do contrato pelo valor citado, foram feitas negociações de escopo e preços com a Alusa Engenharia, visando a redução de valores. Quanto a essa negociação de descontos com a Alusa, em outubro e novembro/2008, após encerrado o processo licitatório e autorizada a assinatura pela Diretoria Executiva, desde 19/09/2008, a CIA considerou esse procedimento não usual e contrário aos padrões e normativos internos. A obtenção de novas condições comerciais deveria ter sido levada à Diretoria Executiva pelos ex Diretores Srs. Renato de Souza Duque e Paulo Roberto Costa, o que não ocorreu. Cabe ressaltar que 272% acima do valor orçado corresponde a uma majoração de R$706,4 milhões e cabe ainda lembrar que houve

Para verificar as assinaturas, acesse www.tcu.gov.br/autenticidade, informando o código 53509351.

Confidential                                                                 PBRCG_01224977

CONFIDENCIAL                                              NP3

aditivos de R$249,10 milhões, elevando o contrato com a Alusa para R$1.215,20 milhões.

27) A terceira NÃO CONFORMIDADE corresponde à inclusão de empresas após o início do processo licitatório, que não atendiam ao critério de seleção. A CIA identificou 4 ocorrências desse tipo. Em 2 casos, a vencedora não atendia ao critério de seleção (Alusa Engenharia e Egesa Engenharia). Depoimentos afirmam que não foi solicitado um parecer sobre a inclusão da Alusa, mas sim uma determinação superior para tal procedimento. Em nota, a CIA coloca que o pedido de inclusão da Alusa na licitação foi atendido pelo Sr. Renato de Souza Duque, Diretor de Serviços, em 09/04/2008.

28) A quarta NÃO CONFORMIDADE se refere à ausência de definição dos percentuais da fórmula de reajuste no edital de licitação e/ou alteração durante o processo licitatório (Consórcio Camargo Correa/CNEC, Consórcio Odebrecht/OAS, Consórcio Queiroz Galvão/IESA). A CIA identificou que os pesos históricos de mão de obra nos contratos similares da Petrobras oscilam entre 55 e 60%. Dos 3 contratos citados, os dois primeiros encontram-se com o peso de 80% para a mão de obra e o outro está com 70% de peso, o que acarretou um valor de R$ 354 milhões a mais de reajuste (Quadro IV). A CIA apurou que houve aumento do peso da mão-de-obra para dois consórcios durante o processo licitatório. A CIA considerou como

Para verificar as assinaturas, acesse www.tcu.gov.br/autenticidade, informando o código 53509351.

Confidential                                                                                              PBRCG_01224978