# EXHIBIT B
# (Part I)

**INTERNAL INVESTIGATION COMMITTEE (CIA)**

DIP DABAST 38/2015 of 06/03/2015

Corporate Security Registration Protocol No. 0012/2015

# FINAL REPORT

| Members | Registration |
|---|---|
| Wilson Carvalho Macedo (Coordinator) | 555907-8 |
| Rafael Paradella Freitas | 962864-5 |
| Leonardo Heitmann de Macedo | 020645-6 |
| Giovanni D'Elia Sobrinho | 016740-2 |
| Wilson Cézar Brasil Júnior | 021604-4 |
| Jailton Guedes de Sousa | 596454-3 |
| Flávio Augusto Pimentel de Lima | 517151-0 |

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]

[logo] BR *PETROBRAS*                                              [logo: NP-3]

INDEX

1        Objective ........................................................................................... 04

2        Background that motivated the Internal Investigation Committee (CIA) ................................. 04

3        Strategy and activities developed by the CIA ........................................................ 04

4        Investigation ...................................................................................... 06

4.1      REPAR Modernization Program ........................................................................ 06

4.2      Considerations on planning a portfolio of large-sized and highly complex enterprises ......... 16

4.3      Considerations on the analysis of consistency of the basic projects from the main
         onsite and offsite contracts for gasoline portfolios (CONPAR, CCPR and INTERPAR
         Consortia) ......................................................................................... 18

5        Analysis of the contracts .......................................................................... 20

5.1      Concentration of contract values by company ....................................................... 22

5.2      Presentation of administrative appeals ............................................................ 23

5.3      Amount of questioning and postponement of deadline in the presentation of
         proposals .......................................................................................... 24

5.4      Onsite contract for gasoline and coking portfolios –CONPAR Consortium– Contract
         0800.0035013.07.2 .................................................................................. 25

5.4.1    Analysis of direct contracting – CONPAR Consortium ................................................ 25

5.4.1.1. Previous estimates – PETROBRAS .................................................................... 26

5.4.1.2  Consortium proposals – CONPAR ..................................................................... 28

5.4.1.3  Negotiation process ............................................................................... 29

5.4.2    Analysis of consistency of basic project – CONPAR Consortium ...................................... 34

5.4.3    Analysis of amendments – CONPAR Consortium ........................................................ 37

5.4.4    Analysis of the Extrajudicial Transaction – CONPAR Consortium ..................................... 39

5.5      Onsite contract for coking portfolio - CCPR Consortium – Contract
         0800.0043403.08.2 .................................................................................. 40

5.5.1    Analysis of bids – CCPR Consortium ................................................................ 41

5.5.2    Analysis of consistency of basic project – CCPR Consortium ........................................ 44

5.5.3    Analysis of amendments – CCPR Consortium .......................................................... 44

5.5.4    Analysis of the Extrajudicial Transaction – CCPR Consortium ....................................... 45

5.6      Offsite contract for gasoline and coking portfolios - INTERPAR Consortium –
         Contract 0800.0043363.08.2 ......................................................................... 46

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                [Multiple signatures]

[logo] BR *PETROBRAS*                                                                              [logo: NP-3]

5.6.1   Analysis of bids for offsite contracting – INTERPAR Consortium ........................................... 46

5.6.2   Analysis of consistency of the basic project – INTERPAR Consortium ................................ 47

5.6.3   Analysis of amendments – INTERPAR Consortium .................................................. 49

5.6.4   Analysis of the Extrajudicial Transaction – INTERPAR Consortium ...................................... 51

5.7   Impacts arising from the absence of a comprehensive managerial timetable of the enterprise ........................................................................................................ 53

5.8   Impacts on job deadlines and costs due to the supply of critical equipment by PETROBRAS ........................................................................................................ 54

6   Verifications from the audit ............................................................................. 56

6.1   Internal audits ................................................................................................ 56

6.2   Analysis of the Federal Court of Auditors (TCU) judgments ................................... 57

7   Nonconformities .................................................................................................... 58

7.1   Tenders with immature basic projects ..................................................................... 58

7.2   Inclusion of companies, after the beginning of the bidding process, which did not meet the criteria for selection ...................................................................................... 58

7.3   Direct contracting of the CONPAR Consortium with substantial alterations to the contractual conditions related to the previously cancelled bid ................................. 59

7.4   Improper drafting of proposal at the upper limit of the range of admissibility (-15% to +20%) ....................................................................................................... 59

7.5   Failure to comply with the recommendation from the Legal Division regarding the necessity for evaluating the Financial Division for the contract of the CONPAR Consortium ......................................................................................................... 59

8   Other observations and salient points .................................................................... 60

8.1   Review of cost estimates during the contracting process ......................................... 61

8.2   Acts practiced by directors for subsequent approval by the Board of Directors ................... 63

9   Regarding people ................................................................................................. 63

10   Conclusion ........................................................................................................... 67

11   Recommendations ................................................................................................ 68

12   Final consideration. ............................................................................................... 69

13   Appendices ........................................................................................................... 69

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                              [logo: NP-3]

## 1. OBJECTIVE

The objective of the present report is to comply with that established in the Supplies Directory (DABAST) Petrobras Internal System Document (DIP) 38/2015 of 03/06/2015 (Appendix 1), whereby the Director of Supplies, Jorge Celestino Ramos, and of Engineering, Technology and Materials, Roberto Moro, constituted the Internal Investigation Committee (CIA) in order to ascertain, investigate and audit potential irregularities (nonconformities) in the bidding processes and the execution of modernization works at the Presidente Getúlio Vargas Refinery (REPAR), during the period from 2006 to 2014. By means of the dispatch on 03/16/2015 of the above-cited DIP, it was explained that *"After an alignment meeting with the Legal Division, in which there was reference to the evaluation of the execution of modernization works, the complaints, amendments, postponements, extrajudicial and discharge terms in the execution of the contracts should be analyzed."*

Not included within the scope of this CIA were (i) the technical and economic analysis which brought about the implementation of the modernization works at the above-cited Refinery; (ii) the analysis of the formation of the contract prices and the cost estimates; (iii) analysis of the criteria used by the Negotiation Committees in the contractual amendments entered into; (iv) verification of the measurements during the execution of the contracts, and (v) quantification of the possible losses caused to Petrobras.

## 2. BACKGROUND THAT MOTIVATED THE INSTITUTION OF THE CIA

The CIA was instituted by reason of the accusations aired in the press which point to evidence of irregularities in contracts signed for the implementation of modernization works by REPAR. References to such irregularities are also included in the plea bargains and depositions provided to the authorities within the scope of the investigations in Operation Car-Wash.

## 3. STRATEGY AND ACTIVITIES DEVELOPED BY THE CIA

The CIA defined the strategy for carrying out its tasks as follows:

a)   Selection of the contractual instruments for analysis: the contracts of the highest values were analyzed, which correspond to 89% of the total value of the contracts within the limit of authority of the Executive Managers, Directors, and Board of Directors for the works and contracts signed with the companies cited in the scope of Operation Car-Wash (see item 5);

b)   Analysis of the conformity with the current corporate system for the approval and re-approval of the following modernization projects by REPAR: gasoline, coking and propane portfolios[1].

---

[1] It is noteworthy that the aforementioned program encompassed other smaller-sized projects that were not evaluated by the CIA.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                            [logo: NP-3]

c)  Analysis of the documents on the bidding phases and on the execution of the selected contracts;

d)  Analysis of the chronology of events;

e)  Analysis of the depositions and plea bargains provided within the scope of Operation Car-Wash (Appendix 2);

f)  Thirty people were interviewed who participated or who were cited as having participated in the activities related to the enterprise (Appendix 3).

g)  Verification of the conformity of the contracts and contractual alterations related to the legislation, standards and procedures in force during that time, specifically:

   I.   Observance of the internal standards and procedures that apply to the bidding processes: Petróleo Brasileiro S.A. Simplified Regulation on Bidding Procedures (Decree 2.745 of 08/25/1998); PETROBRAS Contracting Procedures Manual (Instructions on Engineering Contracts);

   II.  Handling of the recommendations which were included in the judicial opinions issued during the contracts and contractual alterations;

   III. Criteria adopted for selection of the companies, as well as the rationales eventually used for including companies during the execution of the bidding processes;

   IV.  Observance and compliance with the jurisdictional limits established in the phases of bidding and execution of contracts;

h)  Analysis of internal audit reports conducted on the contracts for modernization works by REPAR;

i)  Analysis of the TCU judgments pertaining to the contracting processes for modernization works by REPAR;

j)  Analysis of the reports by other Internal Investigation Committees that occurred during the modernization works by REPAR. Matters related to the scope of this CIA were not identified;

k)  Confrontation of the list of subcontractors in the contracts evaluated with the roll of the companies cited in the Operation Car-Wash investigation;

l)  Reading of emails from ENGINEERING/IEABAST/IERP related to the selected contracts;

m)  Identification of the parties responsible for the nonconformities in the application of procedures intended for the contracting of the companies and the performance of the contractual alterations;

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                [Multiple signatures]

[logo] BR *PETROBRAS*                                                                    [logo: NP-3]

n) Issuance of the final report and submission to the competent authorities.

## 4. INVESTIGATION

### 4.1 REPAR Modernization Program

The REPAR Modernization Program was linked to the PETROBRAS Strategic Plan and to the Downstream Business Plan (PND). The main projects in this plan were the portfolios of gasoline, coking and propane.

The main objectives of the projects were: a) to adapt the production profile to the demand for derivatives, meeting quality requirements for the market, in accordance with the most restrictive specifications on fuels, approved by CONAMA Resolution No. 315 of 10/29/2002, published in the Official Union Gazette on 11/20/2002 (Appendix 4); b) to maximize the aggregate value of national petroleum; c) to guarantee the competitiveness of PETROBRAS, bearing mind the substitution of combustible oil for natural gas within the energy matrix; d) conforming with the strategy on selective expansion in the petrochemical field, adding value to the Supplies.

In order to make such objectives viable, there was the need for constructing new processing units (onsite) and their auxiliary units, besides interconnections and modifications in the existing units and systems (offsite).

The following table shows the units and systems that were integrated into the REPAR Modernization Program:

**Table 1 – Units comprising the REPAR modernization program**

| Unit | TAG | Description | Capacity |
|------|-----|-------------|----------|
| UGH | U-22311 | Hydrogen Generation | 1,600 kNm$^3$/d |
| UHDTI | U-2313 | Diesel Water Treatment | 6,000 m$^3$/d |
| DEA | U-32323K | Dietholamine Treatment - Coking | 100,000 Nm$^3$/d |
| DEA | U-32323G | Dietholamine Treatment - Gasoline | 45,000 Nm$^3$/d |
| HDT NK | U-2315 | Water Treatment – Coking Naphtha | 3,000 m$^3$/d |
| UFN | U-3111 | Naphtha Fractioning | 3,000 m$^3$/d |
| URC | U-2222 | Catalytic Converter | 1,000 m$^3$/d |
| HDS NC | U-2316 | Water Treatment – Cracked Naphtha | 5,000 m$^3$/d |
| UHS | U-2317 | Hydrogenization of Solvents | 260 m$^3$/d |
| UCR | U-2212 | Delayed Coking | 5,000 m$^3$/d |
| UTAA | U-25126 | Acidic Water Treatments | 120 m$^3$/d |
| UPE | U-2225 | Sulfur Recovery | 65 t/d |
| UTGR | U-2327 | Residual Gas Treatments | - |
| Substations | SE-2316 | Substations | - |
| | SE-2200 | | - |
| | SE-5900F | | - |
| | SE-5301 | | - |
| | SE-2313 | | - |
| | SE-5900C | | - |
| | SE-5900D | | - |

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                [Multiple signatures]

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

|  | SE-2315 |  |  |
| --- | --- | --- | --- |
|  | SE-5900E |  |  |
|  | SE-5941 |  |  |
|  | SE-6821 |  |  |
| Patio | U-6821 | Coke Stocking Patio |  |
| Propane | U-2912 | Propane Separator | 500 t/d |
| Boiler | GV-5603 | Steam Generator | 180 t/h |
| Boiler | GV-5604 | Steam Generator | 300 t/h |
| Boiler | GV-5605 | Steam Generator | 300 t/h |
| UTRA | U-5300 | Water Treatment and Cooling | 600 m$^3$/h |
| UTC | U-5600 | Condensation Treatment | 600 m$^3$/h |
| TR | T-5303 | Cooling Tower | 15,000 m$^3$/h |
| Tanks | TQ.-5602[a] | Demineralized Water Tank | - |
|  | TQ-5602B | Demineralized Water Tank | - |
|  | TQ-4267 | Acidic Water Tank | - |
|  | TQ-4270 | Light Naphtha Tank | - |
|  | TQ-4269 | Cooling Naphtha Tank | - |
|  | TQ-4228 | Naphtha Tank | - |
|  | TQ-4328 | Light Crude Oil (LCO) Tank | - |
|  | TQ-4370 | Aviation Kerosene (QAV) Tank | - |
|  | TQ-43100 | Diesel Tank | - |
|  | TQ-4327 | Diesel Tank | - |
|  | TQ-4268 | Naphtha Tank | - |
|  | TQ-4371 | Recovered Naphtha Tank | - |
|  | TQ-6501[a] | Raw Water Tank | - |
|  | TQ-4229 | Hexane Tank | - |
|  | TQ-4263 | Petrossolve Tank | - |
|  | TQ-4360 | Solvent Tank | - |
|  | TQ-4361 | Solvent Tank | - |
|  | TQ-4362 | Solvent Tank | - |
|  | TQ-4362 | Solvent Tank | - |
|  | TQ-4367 | Solvent Tank | - |
| UTDI | U-6350 | Industrial Waste Treatment | 450 m$^3$/h |
| City Gate | - | Receiving and Distribution of Gas | - |
| TG | TG-5603 | Turbogenerator | 20 MW |
| Torch | TC-6403/4 | Chemical/Conventional Torch/ | - |
| Sulfur | U-6720 | Sulfur Tablet Maker | - |

Figures 1, 2 and 3 show the evolution of the implementation of the enterprises. Figure 4 shows a simplified scheme diesel and gasoline portfolio. The object of these contracts is described in Table 3.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                              [logo: NP-3]

**Figure 1 – Timeline – Gasoline Portfolio**

| Original text | Translation |
|---|---|
| Aprovação da Fase I e autorização para início da Fase II | Approval of Phase I and authorization to begin Phase II |
| Aprovação da Fase II pela DE e autorização para inicio da Fase III | Approval of Phase I by the Exec. Director and authorization to begin Phase III |
| Autorização para celebração do contrato CONENGE/ELCO | Authorization to enter into the CONENGE/ELCO contract |
| Autorização para celebração do contrato CAMARGO CORREIA/WEG/SÊNIOR | Authorization to enter into the CAMARGO CORREIA/WEG/SENIOR contract |
| Autorização para celebração do contrato CONFAB | Authorization to enter into the CONFAB contract |
| Aprovação do DIP SIC do contrato carteira de gasolina | Approval by the Internal Document Initiation Request (DIP SIC) for the gasoline portfolio contract |
| Aprovação da Fase III e autorização para inicio da Fase IV | Approval of Phase III and authorization to begin Phase IV |
| Autorização para celebraçãodo contrato GODREJ | Authorization to enter into the GODREJ contract |
| Reavaliação e aprovação da continuidade do projeto e autorização para celebração do contrato CONPAR | Reevaluation and approval for project continuation and authorization to enter into the CONPAR contract |
| Autorização para celebração do contrato JARAGUÁ | Authorization to enter into the JARAGUÁ contract |
| Autorização para celebração do contrato INTERPAR | Authorization to enter into the INTERPAR contract |
| Autorização para celebração do contrato VWSB/Enfil | Authorization to enter into the VWSG/Enfil contract |
| Autorização para celebração do contrato CBC | Authorization to enter into the CBC contract |
| Reavaliação e aprovação da continuidade do projeto | Reevaluation and approval for project continuation |
| Partida das unidades da Carteira de Gasolina | Division of the units in the Gasoline Portfolio |
| Assinatura dos IPTEJs | Signing of Private Instruments of Extrajudicial Transactions (IPTEJs) |

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                          [logo: NP-3]

**Figure 2 – Timeline - Coke Portfolio**

| Original text | Translation |
|---|---|
| Aprovação da Fase I e autorização para início da Fase II | Approval of Phase I and authorization to begin Phase II |
| Aprovação da Fase II pela DE e autorização para inicio da Fase III | Approval of Phase I by the Exec. Director and authorization to begin Phase III |
| Autorização para celebração do contrato CONENGE/ELCO | Authorization to enter into the CONENGE/ELCO contract |
| Autorização para celebração do contrato CAMARGO CORREIA/WEG/SÊNIOR | Authorization to enter into the CAMARGO CORREIA/WEG/SENIOR contract |
| Autorização para celebração do contrato CONFAB | Authorization to enter into the CONFAB contract |
| Aprovação da Fase III e autorização para inicio da Fase IV | Approval of Phase III and authorization to begin Phase IV |
| Autorização para celebração do contrato GODREJ | Authorization to enter into the GODREJ contract |
| Autorização para celebração do contrato CONPAR | Authorization to enter into the CONPAR contract |
| Autorização para celebração do contrato JARAGUÁ | Authorization to enter into the JARAGUÁ contract |
| Autorização para celebração do contrato CONTRERAS | Authorization to enter into the CONTRERAS contract |
| Autorização para celebração do contrato CHICAGO e aprovação da continuidade do projeto | Authorization to enter into the CHICAGO contract and approval for project continuation |
| Autorização para celebração dos contratos INTERPAR e CCPR | Authorization to enter into the INTERPAR and CCPR contracts |
| Autorização para celebração do contrato CBC | Authorization to enter into the CBC contract |
| Autorização para celebração do contrato GEL/PASSARELI | Authorization to enter into the GEL/PASSARELI contract |
| Reavaliação e aprovação da continuidade do projeto | Reevaluation and approval for project continuation |
| Partida das unidades da Carteira de Coque | Division of the Coke Portfolio units |
| Assinaturas de IPTEJs | Signing of the Private Instruments of Extrajudicial Transactions (IPTEJs) |

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                                [logo: NP-3]

**Figure 3 – Timeline – Propane Portfolio**

| Original Text | Translation |
|---|---|
| Aprovoção da Fase II pela DE e autorização para início da Fase III | Approval of Phase II by the Board of Directors and authorization to begin Phase III |
| Aprovação da Fase I e e autorização para início da Fase II | Approval of Phase I and authorization to begin Phase II |
| Aprovação da Fase III e autorizaçao para início da Fase IV | Approval of Phase III and authorization to begin Phase IV |
| Autorização para celebração do contrato CONFAB | Authorization to enter into the CONFAB contract |
| Autorização para celebração do contrato SKANSKA/ENGEVIX | Authorization to enter into the SKANSKA/ENGEVIX contract |
| Partida das unidades da carteira de Propeno | Division of the Propane Portfolio units |
| Assinaturas de IPTEJs | Signing of the Private Instruments of Extrajudicial Transactions (IPTEJs) |

[logo] BR *PETROBRAS*                                                                        [logo: NP-3]

**Figure 4 – Simplified scheme of the gasoline and diesel portfolios**

| Original Text | Translation | Original Text | Translation |
|---|---|---|---|
| Tanques | Tanks | Carteira de Coque e HDT | Coke and HDT Portfolio |
| Carteira de Coque e Gasolina [Illegible] | Coke and Gasoline Portfolio [illegible] | [Illegible] | [Illegible] |
| [Illegible] | [Illegible] | Terraplanagem / Acessos | Grading / Access |
| Interligações | Interconnections | Carteira de Coque e Gasolina Azevedo Trevessos | Azevedo Trevessos Coke and Gasoline Portfolio |
| Carteira de Coque e Gasolina Consórcio INTERPAR | Coke and Gasoline Portfolio INTERPAR Consortium | Nafta Dest | Detached Naphtha |
| UTRA | UTRA | Nafta Coque | Coke Naphtha |
| Carteira de Coque e Gasolina Consórcio VEOLIAVENFIL | Coke and Gasoline Portfolio VEOLIAVENFIL Consortium | Gás Natural | Natural Gas |
| CAFOR | CAFOR | Diesel Hidrotratado | Hydro-treated Diesel |
| Carteira de Coque e Gasolina Consórcio* | Coke and Gasoline Portfolio Consortium* | Gás Ácido | Acidic Gas |
| UTDI | UTDI | HDT- Nafta de Coque | HDT – Coke Naphtha |
| Carteira de Coque Consórcio [illegible] | Coke Portfolio [illegible] Consortium | Carteria de Gasolina Consórcio CONPAR | CONPAR Consortium Coke and Gasoline Portfolio |
| [Illegible] | [illegible] | [illegible] | [illegible] |
| Carteira de Coque e Gasolina [illegible] | Coke and Gasoline Portfolio [illegible] | Carteira de Coque e Gasolina [Illegible] | Coke and Gasoline Portfolio [illegible] |
| Inicio | Start | [Illegible] | [Illegible] |
| Residuo Vácuo | Vacuum Residue | Nafta Craq | Cracked Naphtha |
| Diesel | Diesel | Nafta Hidrotratad | Hydro-treated naptha |
| Diesel Dest+FCC | Detached Diesel+FCC | Nafta Craq Hidrotratad | Hydro-treated cracked naptha |
| Energia Eléctrica | Electrical Energy | Reformado | Reformed |
| Ar Comp. | Compressed Air | Gás Residual | Residual Gas |
| Vapor | Steam | Gas Acido | Gas Acido |
| Águas Ácidas | Acidic Water | Enxofre | Sulfur |
| Capacídades das Unidades | Unit Capacities | Legenda | Legend |
| HDT de Nafta de Coque 3 000 m³/dia | HDT of Coke Naphtha 3,000 m³/day | On-Site Carteiras Coque/HDT | Onsite Coke/HDT Portfolios |
| HDS de Nafta Craqueada 5 000m³/dia | HDS of Cracked Naphtha 5,000m³/day | On-Site Carteira de Gasolina | Onsite Gasoline Portfolio |
| HDTI 6 000 m³/dia | HDTI 6,000 m³/day | Off-site | Offsite |
| Coque 5 000m³/dia | Coke 5,000m³/day | Infraestrutura | Infrastructure |
| Reforma Catalòca 1 000m³/dia | Catalytic Recovery 1,000m³/day | ** Consórcios INTERPAR, CAMARGO CORREIA/WEG,ABB.CE GELEC.CONENGE/ELCO and Chicago | **Consortia INTERPAR, CAMARGO CORREIA |
| Coque | Coke | COQUE | COKE |
| UCR (Coqueramento) | UCR (Coking) | GASOLINA | GASOLINE |
| Carteira de Coque e HDT | Coke and HDT Portfolio | [Illegible] de coque | Coke [illegible] |
| HDT-Diesel | HDT-Diesel | Carteira de Coque Consorcio CCPR | Coke Portfolio CCPR Consortium |
| Carteira de Coque e HDT Consórcio CONPAR | CONPAR Consortium Coke and HDT Portfolio | | |
| UTAA (Águas Ácidas) | UTAA (Acidic Water) | | |

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                  [Multiple signatures]

The REPAR Modernization Program had its beginnings in November of 2003 with the approval of Phase I of the coke portfolio. The division of the last units occurred in 2012. The time period of the works lasted 68 months, or 174% of the time planned. The initial cost of the Program was estimated at US$ 2.3 billion; the final cost of the Program was approximately US$ 7 billion.

For the execution of the Program, tight deadlines were adopted, with an assumption of risk for their non-compliance. The following rationales were presented:

a)  PETROBRAS was sued for assuming commitments related to the improvement of the quality of diesel and gasoline; that is, a reduction of sulfur emissions in these fuels, as well as an increase in their production, derived through the construction of conversion units (delayed coking) in the Company's refineries.

b)  Said enterprises were linked to the PCA – Accelerated Growth Program (Appendix 5).

Regarding this matter, the CIA obtained the following declarations:

Declaration of Alan Kardec, Executive of Supplies-Refining at the time: *"at that time the scenario of Refining and of PETROBRAS was extremely complex, primarily because there was tremendous pressure to adjust the specification of the product (diesel and gasoline); that there wasn't a glimpse of the possibility of postponing the deadline to adjust the specification of the derivatives; that secondly, there was huge growth in the Company's investments; that this increase in investments led to an inflation of demand; that the increase in price of materials such as steel and equipment occurred for everyone and more notably in Brazil; that there wasn't a sufficient qualified labor force for the execution of the enterprises; that the entire [production] chain of oil and gas in the world began heating up; that he thinks minimum requirements existed in a national context for the investments." "that the deadlines were tight and this was increased by the need for many investments to be carried out at the same time."*

Declaration of Mário Castrillon, Sector Manager at the Integrated Corporate Management System (IERP) at the time: *"that there was pressure to come up with the contracts so that the works would be completed meeting the timetable of the presidential elections of 2010;" "that the deadline initially approved for the enterprises was not defined through a technical engineering evaluation; that it created pressure for the original dates in the new fuel specification legislation; that from the beginning it was known since the beginning [sic] that the deadlines were unattainable; that the order for the deadlines came from the PETROBRAS Board through the Supplies structure;" "that*

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

*the deadlines were maintained in order to meet the deadline demands of the Board; that the upper administration decided the start-up date and that work was done in order to attempt to meet the deadline determined by the Board;" "that the equipment supply market was saturated and that it was not possible to meet the timetable deadlines of all the Refinery works at the same time; that the ENGINEERING/IMPLEMENTATION OF SUPPLIES ENTERPRISES (ENGINEERING/IEABAST) was advised that there would be problems in furnishing the compressors and pumps for the expansion works and modernization of the refineries."*

Declaration of Júlio Ludwig, Sector Manager at the Paraná Refinery (REPAR)/EM at the time: *"that there was a lot of pressure to meet the deadlines on the works; that there was political pressure related to the inaugurations of the works by PAC – Accelerated Growth Program; that the contracting strategy of Engineering, Procurement and Construction (EPC) on basic projects was not very successful, as it created delays of the works; that many things were changed during the detailing of the projects;" "that due to political commitments, PETROBRAS took on highly challenging deadlines."*

Declaration of Paulo Ruiz, IERP Sector Manager at the time: *"that in 2008 there was no labor force available; that the supplies market was saturated; that the reality at the time was difficult; that delays in the timetable are on account of the reality of the market at the time; seeing that there was no way to meet PETROBRAS' deadlines; that I heard and believed that there were failures in the basic projects; that the basic project was very macro; that a lot of things needed to be defined during the work; that the timetable was underestimated; there was no way for the work to be done by the approved deadline; that the technical group talked privately about how the work timetable, as approved, was unattainable;" that the delays in construction at the offsite units were the main causes for the delays in the rest of the works; that the feeds also failed a lot; that the engineering documentation such as the feeds were done with no level of maturity in light of the pressure to complete the work, to process national petroleum, to develop a refining facility, to grow the economy."*

After the approval of the projects, there was a need for reevaluations, according to that contained in the Investment Project Planning, Approval and Monitoring System, (Appendix 6), for the following reasons:

a)  The price escalation observed in the project development phases (Table 2);

b)  The heating up of the supplies market of goods and services and the simultaneity of the works in various Company units, and in particular, in Supplies.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS* [logo: NP-3]

**Table 2 – Escalation of the investment amount (CAPEX) and the postponement of the start-up dates for the gasoline and coke portfolios**

| Portfolio | Phase | Approval date | Forecast start-up date | Estimated CAPEX (US$ million) |
|---|---|---|---|---|
| Gasoline | I | 12/16/2003 | Dec/2007 | 217.2 |
| | II | 12/09/2004 | Jan/2009 | 247.5 |
| | III | 12/21/2006 | Aug/2009 | 577.0 |
| | IV (1st Reevaluation) | 08/24/2007 | Jun/2010 | 1,096.8 |
| | IV (2nd Reevaluation) | 07/29/2010 | Jan/2012 | 1,753.4 |
| | IV (PNG 12-16) | Jun/2012 | Sep/2012 | 1,716.7 |
| | IV (PNG 14-18) | Feb/2014 | Sep/2012 | 1,728.2 |
| Coke | I | 11/25/2003 | Dec/2008 | 539.0 |
| | II | 03/03/2005 | Jan/2009 | 632.1 |
| | III | 01/25/2007 | Jun/2010 | 1,550.7 |
| | IV (1st Reevaluation) | 06/23/2008 | UCR: Dec/2010 HDT: Apr/2011 | 4,284.2 |
| | IV (2nd Reevaluation) | 07/29/2010 | UCR: Mar/2012 HDT: Jan/2012 | 5,021.7 |
| | IV (PNG 12-16) | Jun/2012 | UCR. Jun/2012 HDT: Jan/2012 | 4,987.2 |
| | IV (PNG 14-18) | Feb/2014 | UCR: Aug/2012 HDT: Jan/2012 | 5,031.8 |

Regarding this matter, the CIA obtained the following declaration:

Declaration of Alan Kardec, Executive Manager of Supplies-Refining at the time: *"that keeping the price escalation in mind, a DIP was done for the DABAST, placing the entire scenario at the time and indicating that it was important to postpone the deadlines for the change to the specification of gasoline; that at the end of the aforementioned DIP it came up that SUPPLIES should put together a working group to re-study the investment timetable in order to reschedule the gasoline timetable; that DABAST was shown to be contrary to the proposal, bearing in mind the commitment to the quality of gasoline, logistical impacts and, as a result, additional costs, besides the negative impact on PETROBRAS' strategic plan, approved by the Board of Directors (CA); (...) that when it received the final proposal from CONPAR it sent a DIP to DABAST, proposing that no more contracts be signed until the enterprise implementation strategy had been revisited; that it knew that when it made the proposal to review the enterprise implementation strategy it was going against the Company's strategies; (...) that PETROBRAS was seeking to present its investment plan to the national market and that it thinks that the supplies market was not prepared to totally meet PETROBRAS' demands, which was reflected in an inflation of demand; that since there was not full accommodation of the implementation prices and costs for the investments, it made the suggestion of revisiting the enterprise implementation strategy."*

In order to substantiate the above-cited declaration, the CIA obtained DIP AB-RE 238/2007 of 08/14/2007 – Strategic reflections on the investment

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                          [logo: NP-3]

"Quality Portfolio" (Appendix 7) – signed by Alan Kardec, in which there were questions cited in relation to the tendency of price elevation and the consequent increase in the cost of the enterprises of the Supplies investment portfolios. The document, sent to the DABAST, proposed (i) the constitution of a Working Group – GT, in order to analyze the possibility of extending the deadline of the gasoline quality portfolio, and (ii) the postponement of signing new contracts until the conclusion of the works from this GT.

In response, the DIP DABAST 61/2007 of 08/15/2007 was issued (Appendix 8), signed by Paulo Roberto Costa, in the sense of maintaining the strategy of the continuity of the investments.

At that time (August/2007), the negotiations with the CONPAR Consortium were in progress (see Item 5.4). The CIA observed that, on that occasion, the approved value for the gasoline portfolio had increased from US$ 247.5 million (Phase II) to US$ 577 million (around R$ 1.2 billion). In order to make the contract viable, the Project needed to be submitted for new approval by the Board of Directors, which took place on 08/24/2007 (DE Minutes 4,659 – Appendix 9).

The Investment Project Planning, Approval and Monitoring System of the Petrobras System, which was in force at the time of the reevaluation of the enterprises for the gasoline and coke portfolios, indicated situations in which there would be a need for reviewing the corporate analysis for projects with values greater than US$ 25 million: (i) a negative Present Net Value (VPL) from the post-Technical and Economic Viability Study (EVTE); (ii) the influence of the managerial factors in the event of a VPL higher than 20%; (iii) a total increase of the investment of higher than 20%; or, (iv) a significant change in the scope.

According to the System, it fell to the Business Division (in this case, the Supplies Division), to coordinate the reevaluation of the corporate analysis of the project, with support from the Company Performance Strategy, from the Finance and Tax Divisions and Safety, Environment and Health (SMS). This reevaluation and the respective corporate opinions should have been presented to the Investment Committee and submitted to the Board of Directors for a decision regarding the continuity, postponement or cancellation of the project.

The CIA identified the submission to the Board of Directors for re-approval for the project portfolios on gasoline (Appendix 9) and coke (Appendix 10), which occurred in August 2007, June 2008, respectively, and which were not accompanied by the opinions of the above-cited corporate divisions. Neither did the Committee find evidence that the business analysis, on which the decision on the continuity of the projects was based, had been presented to the Company's Investment Committee, as indicated in the System. Besides this, the documents submitted for the reevaluation of the gasoline and coke portfolios affirmed that the reevaluations were done as professed by the Investment Project Planning, Approval and Monitoring System in force at that time.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                    [logo: NP-3]

Simultaneously with the reevaluation of the projects, the orders for the signatures on the construction contracts and portfolio assembly were submitted to the Board of Directors – CONPAR Consortium, in August/2007 (see Item 5.4.1), and the CCPR and INTERPAR Consortia, in July/2008 (see Items 5.5.1 and 5.6.1).

**4.2 Considerations on the planning of a large-sized, highly complex enterprise portfolio**

A work of this magnitude and complexity should be planned and scheduled according to a sequence and respecting the interdependence of the diverse activities, with the aim of organizing and aligning the steps of the basic project, the executive project, construction and assembly, conditioning, commissioning, pre-operation and start date of each unit. This being so, the basic projects of the onsite units should be the first step in the enterprise, however possible, based on these basic projects, the preparation of the basic projects of auxiliary and offsite units.

Besides this, the commissioning and the start date of the auxiliary and offsite units should necessarily occur before the end of the construction and assembly of the onsite units, as the utilities inputs and the raw materials will need to be available so that the processing units can initiate the commissioning, pre-operation and start date.

As an example: for it to be possible to prepare the basic project of a steam generating boiler (offsite), which will supply this utility for a coke unit (onsite), it is necessary to be familiar with the demand for steam, which will be determined after preparing the basic project of the unit that will consume said utility.

This means that in order to optimize the enterprise and to avoid units being built that cannot be commissioned for the start date, and, above all, so that there is no change in the basic projects with relevant impacts in costs and deadlines on the works, a comprehensive timetable is needed that respects the sequencing and the interdependencies among the diverse units and that the same be rigorously followed. The nonexistence of a comprehensive timetable substantially prejudices, when it does not render inviable, the control and planning of the order and sequencing of the phases and activities of the work. Challenges related to such a timetable can create an increase in costs and extension of the deadline for completing the works for the contract in which there was a challenge, and the works of the other contracts in progress.

Figure 5 shows the deviations in the signature marks on the contracts and the beginning of operation of the main units of the REPAR Modernization Program, forecast in the approval schedule for Phase III, in relation to that realized in fact.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                [logo: NP-3]

**Figure 5 – Deviations in the signature marks on the contracts and the beginning of operation of the main units**

| Original Text | Translation |
|---|---|
| Reforma Catalítica | Catalytic Reform |
| Interligações | Interconnections |
| Torre de Resfriamento | Cooling Tower |
| Caldeira – GV5605 | Boiler – GV5605 |
| Caldeira – GV5604 | Boiler – GV5604 |
| UGH | UGH |
| Propeno | Propane |
| URE | URE |
| Águas Ácidas | Acidic Water |
| UCR – Coque | UCR - Coke |
| HDS-Nafta Craqueada | HDS – Cracked Naphtha |
| HDS-Nafta de Coque | HDS – Coke Naphtha |
| HDT de Diesel | Diesel HDT |
| Mar/2007 | Mar/2007 |
| Dez/2007 | Dec/2007 |
| Out/2008 | Oct/2008 |
| Jul/2009 | Jul/2009 |
| Mai/2010 | May/2010 |
| Mar/2011 | Mar/2011 |
| Jan/2011 | Jan/2011 |
| Set/2012 | Sep/2012 |
| Mai/2013 | May/2013 |
| Atraso Assinatura | Delayed Signature |
| Prazo de Execução Fase III | Execution Deadline Phase III |
| Atraso em Relação a Fase III | Delay in relation to Phase III |

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]          [Multiple signatures]

[logo] BR PETROBRAS                                                                 [logo: NP-3]

Figure 6 shows, for the three main contracts (CONPAR, CCPR and INTERPAR Consortia), the comparison between the bidding deadlines and the execution of the works forecast in the approval schedule of Phase II, and that realized in the Execution Phase, where significant deviations can be seen on what was forecast against what was realized.

**Figure 6 – Comparison between forecast and realized deadlines of the three main contracts for works in the REPAR Modernization Program.**

| Original Text | Translation |
| --- | --- |
| Previsto | Forecast |
| Realizado | Completed |
| Jul/2006 | Jul/2006 |
| Set/2007 | Sep/2007 |
| Nov/2008 | Nov/2008 |
| Jan/2010 | Jan/2010 |
| Mar/2011 | Mar/2011 |
| Mai/2012 | May/2012 |
| Jul/2013 | Jul/2013 |
| Licitação | Bid |
| Prazo Contratual | Contractual Deadline |
| Aditivos de Prazo | Amendments to the Deadline |

**4.3 Considerations on the analysis of the consistency of the basic projects from the main contracts (onsite and offsite of the gasoline and coke portfolios) (CONPAR, CCPR and INTERPAR Consortia)**

In the contract signed with the CONPAR Consortium, possible corrections to the basic project were foreseen, through the inclusion of the scope of the contracting party, on the activities of the analysis of consistency, preparation of supplementary documents, and the consolidation of the basic project furnished by PETROBRAS. Although these contracts with the CCPR and INTERPAR Consortia only foresaw the assessment of consistency of the basic projects in a way that, in these cases, as soon as the contracts were signed, the members of Engineering, Procurement and Construction (EPCists) should have proceeded with the consistency assessment and notified PETROBRAS of possible nonconformities identified for clarification/corrections on the basic project, allowing for the executive project to be prepared.

It is noteworthy that, in order to do this in light of the elevated volume of installations that comprised the REPAR Modernization Program, various service/contract packages were established, being formulated into a contracting strategy. The large quantity of units that were to be built made

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                                    [logo: NP-3]

the establishment of interfaces between the project development and the execution of the works inevitable.

The planning of these project activities for each contractor should be according to the requirement established in the Planning Guidelines, keeping in mind the specific volume in the Contract Planning and Control Manual prepared for each contractor in the phase after the signing of the contract.

During the CIA interviews, there were affirmations that, with the aim of accelerating the bids for the execution of the executive project and the construction, assembly and conditioning of the new units, PETROBRAS used basic projects that were still immature or inconsistent in the bids, or which demanded substantial alterations during the execution of the contracts, and consequently the necessity of effectuating several contractual alterations, with impacts on the deadlines and costs. The CIA verified that, in several amendments on deadlines and value, as well as extrajudicial transactions (TEJ), PETROBRAS acknowledged complaints referring to the alterations arising from the inconsistency of the basic project. The CIA further verified that PETROBRAS decided to sign the contract for the offsite (INTERPAR Consortium), even though it still did not have the onsite basic projects consolidated (see Item 5.6.3); in Table 3 are listed the draftsmen responsible for the preparation of the basic and executive projects:

**Table 3 – Draftsmen responsible for preparing the projects**

| Unit | Basic Project | Executive Project |
|------|--------------|-------------------|
| HDS Cracked Naphtha | AXENS | CONPAR |
| HDS Naphtha and Coke DD | UOP | CONPAR |
| Catalytic Reform | UOP | CONPAR |
| Sulfur Recovery | PARSONS E&C | CCPR |
| Treatment of Gas and Acidic Water | CENPES | CCPR |
| Delayed Coking | CONOCO PHILIPS | CCPR |
| HDT of Unstable [Substances] | CENPES | CCPR |
| Hydrogen Generation | CENPES | CCPR |
| Residual Gas Treatment | PARSONS E&C | CCPR |
| DEA Treatment Unit | CENPES | CONPAR |
| Offsite of the gasoline and coke portfolios | ENGINEERING /IEABAST/EAB | INTERPAR |
| Substations | ENGINEERING /IETEG/ETEG/EM | Conenge/Elco |
| Boilers | CBC | CBC |
| Water Treatment | ENGINEERING /IEABAST/EAB | VWSB/Enfil |
| Cooling Tower | ENGINEERING /IEABAST/EAB | Conenge/SC |

Regarding this matter, the CIA obtained the following declarations:

<u>Declaration of Oscar Tokikawa, Manager of REPAR/EM at the time:</u> *"that some conceptual errors were identified on the basic project even before the bidding phase, but in order to meet the deadlines, the projects were bid without adjustments; that in these cases it was decided that adjustments would be made after the signing of the contracts;" "that the deadlines on consolidation of the interfaces between*

[logo] BR *PETROBRAS*                                                                [logo: NP-3]

units, pipelines, Industrial Waste Treatment Station (ETDI), and several units were underestimated; that there was not an appropriate deadline for consolidating the information and interlinking the contracts in a suitable way; that the interlinking deadline on the contracts and the contract planning vis-à-vis the times for consolidating the interfaces was the main cause for the delay in the work."

Declaration of Fernando Biato, General Manager of ENGINEERING/IEABAST at the time: *"that I believed that the reasonable level of maturity of the basic projects, that they could be a higher level of maturity at the time of bidding; however, they needed to be bid at that time, keeping in mind the need to meet the quality adjustment deadlines on the fuels from the CONAMA resolution."*

Declaration of César Arantes, IERP Sector Manager at the time: *"that the weak point in the conduction of the substation projects was the fact that the loading list of the new units was not perfect (the onsite projects were not mature); that there were adjustments on works in progress due to new information on projects in the new units; that it was initially believed that the basic projects of the onsite units were mature and that later it was perceived that the projects were not mature enough."*

Declaration of Mário Castrillon, IERP Sector Manager at the time: *"that especially the offsite projects were immature and were not ready to be bid; that as far as the equipment to be acquired was defined, the projects underwent the needed adjustments; that there were some shortages, but that the impact was very low compared with the adjustments of projects due to the maturation of same over time."*

Declaration of Eduardo Blois, IERP Sector Manager at the time: *"that the contracting process for construction of the offsite areas was especially impacted by the low level of maturity of the projects and that the Local Directive Committee (IERP, REPAR/EM, REPAR, IEABAST, AB-RE/EM) was familiar with the delays in the contracting timetables; that no risk of delay was perceived in the INTERPAR contract due to the delay, there is a Signature on the offsite contracts and other portfolios; that there was low maturity of the utility projects when the main contracts were signed on the REPAR Modernization work."*

In the planning of the project activities of each contracting party, according to the requirement established in the planning guidelines, the specific volume should be contemplated in the planning and control manual, prepared by each contracting party after the contract was signed.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                [logo: NP-3]

## 5. ANALYSIS OF THE CONTRACTS

The CIA established, as the main criteria for the selection of contracts for analysis, the citation of the company in Operation Car Wash. The second criterion was the value of the contract. With this, contracts were selected with 13 suppliers (Table 4 and Figure 7).

These contracts totaled R$ 10.6 billion, corresponding to 89% of the contracts higher than R$ 12,800,000.00 (the jurisdictional limits of the General Manager, or, that is, contracts approved by the Executive Managers, Directors and Board of Directors) – which represents 75% of the contracts for goods and services related to the REPAR modernization.

### Table 4 – Contracts analyzed by the CIA

| Item | Contractor | Contract/Order | Oject | R$ (final value) | % |
|------|-----------|----------------|-------|------------------|---|
| 1 | Cons. INTERPAR | 0800.0043363.08.2 | Offsite | 2,863,783 641.94 | 24 |
| 2 | Cons. CCPR | 0800.0043403.08.2 | Onsite of Coke | 2,829,168,035.44 | 24 |
| 3 | Cons. CONPAR | 0800.0035013.07.2 | Onsite of gasoline and part of coke | 2,502,621,337.37 | 21 |
| 4 | Cons. VWBS/Enfil | 0800.0045604.08.2 | UTRA e UTC | 653,337,614.72 | 6 |
| 5 | Cons. Passareli/Gel | 0800.0048529.09.2 | UTDI | 499,996,304.39 | 4 |
| 6 | CBC Ind.Pesadas | 4502480166 | Boilers | 284,869,044.13 | 2 |
| 7 | Cons. Skanska-Engevix | 0800.0030725.07.2 | Propane | 272,723,869,15 | 2 |
| 8 | Cons. Conenge/Elco | 0800.0041321.08.2 | Substations | 201,905,511.27 | 2 |
| 9 | Confab Industrial | Several[2] | Spheres | 182,501,691.11 | 2 |
| 10 | Jaraguá Equipamentos | 0800.0041315.08.2 | UGH Reformer Furnace | 115,811,203.60 | 1 |
| 11 | Godrej & Boyce | 4501681308 4501930649 | Permutators and Reactors | 89,532,863,99 | 1 |
| 12 | Contreras Empreendimentos | 0800.0041321.08.2 | Modifications in the UTAA and URE | 72,392,796.91 | 1 |
| 13 | Cons. CC/Weg/Sênior | 0800.0033538.07.2 | Interconnection 230 Kv | 39,069,411.11 | <1 |
| | **TOTAL** | | | **10,607,713,325.13** | |

### Figure 7 – Analysis of Pareto Chart of the contracts selected by the CIA

| Original Text | Translation |
|---------------|-------------|
| R$ Milhões | R$ Million |
| % Acumulado | % Accumulated |
| Outros | Others |

---

[2] Confab had more than one supply for the REPAR Modernization Program. The purchase orders analyzed were: 4501727332, 4501739564, 4501762524, 4502126991 e 4502818121.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                          [logo: NP-3]

The job of analyzing the contracts also included investigation into the subcontracting. The intent was to verify whether there were subcontracts approved by PETROBRAS for companies supposedly used for money laundering, as mentioned in the plea bargains and depositions from the investigation in Operation Car-Wash (Appendix 2). No evidence was found by the CIA on the existence of subcontracting of the cited companies in the contracts analyzed, approved by PETROBRAS. It is worth noting, in the information gathered by the CIA during the investigations, that there was no evidence of contracting of these companies directly by PETROBRAS.

### 5.1 Concentration of contract values by companies

The universe of companies invited to the largest bidding processes included twenty-five large contractors, responsible for the provision of engineering services and industrial construction and assembly. Of those, 18 were invited to participate in the bids on the propane portfolio and the one for the offsite gasoline and coke portfolios; 20 for the bid on the onsite coke portfolio; and 22 for the bid on the onsite gasoline and part of the coke portfolio. In the case of the main REPAR contracts, few proposals were presented from the same consortiums (see Figure 8).

**Figure 8 – Presentation of proposals for the propane, gasoline, coke and offsite portfolios**

| Original text | Translation |
| --- | --- |
| Valor das Propostas (R$ milhões) | Value of the Proposals (in R$ millions) |
| Propeno | Propane |
| Gasolina | Gasoline |
| Coque | Coke |
| Interligações | Interconnections |
| Fev/2007 | Feb/2007 |
| Abr/2008 | Apr/2008 |

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

In relation to Figure 8, it is worth noting that the bid referring to the onsite gasoline portfolio and part of the coke was cancelled due to excessively high prices and a direct negotiation with the CONPAR Consortium (CNO/OAS/UTC) was opted for, which had presented the best proposal in the cancelled bid (see Item 5.4).

The CIA also found that, with the people interviewed, in order to mitigate the risk of excessive concentration of contracts, the companies that comprised the CONPAR Consortium were not invited to the process for the onsite coke portfolio. It is worth noting that there was no evidence of any manifestation of these companies requesting their participation in the process or questioning PETROBRAS regarding the reasons they were not included in the process (see Item 5.2).

The main contracts were signed with the companies accused of participating in the alleged cartel of contractors. The consortiums INTERPAR (Mendes Júnior, MPE e Setal), CONPAR (CNO/OAS/UTC) e CCPR (Camargo Correa and Promon) answered for 77% of the contracts analyzed, in value. (Figure 9).

**Figure 9 – Participation of the companies in the main contracts for the REPAR Modernization Program**

| Original text | Translation |
|---|---|
| Consorcio INTERPAR (SETAL, MENDES JUNIOR e MPE) | INTERPAR Consortium (SETAL, MENDES JUNIOR and MPE) |
| Consorcio CONPAR (OAS, UTC e ODEBRECHT) | CONPAR Consortium (OAS, UTC and ODEBRECHT) |
| Consorcio CCPR (CAMARGO CORREA e PROMON) | CCPR Consortium (CAMARGO CORREA and PROMON) |

**5.2 Presentation of the Administrative appeals**

The CIA verified the nonexistence of administrative appeals filed by bidders in all tenders evaluated. It is also worth noting the nonexistence of administrative appeals in the bidding process for the onsite portfolio of gasoline and part of the coke, which bid was cancelled due to excessively high prices and a contract was entered into with the CONPAR Consortium (comprising the contractors

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

OAS, UTC and CNO) via direct negotiation, without any questioning about the market.

Another fact related to this aspect is that the contractors OAS, UTC and CNO did not present an appeal or question PETROBRAS about their not having been invited to participate in the process regarding the onsite coke portfolio, which bidding process was won by the CCPR Consortium (comprised of Camargo Correa and Promon).

### 5.3 Amount of questioning and postponement of deadlines in the presentation of proposals

It was verified by the CIA that there was a large amount of questioning and requests for clarification during the bidding processes evaluated, mainly on the three main contracts (Figure 10). This finding goes to the finding of other evaluations done by the CIA, which indicate that the basic projects were not mature enough when the tenders were done.

**Figure 10 – Amount of questioning in the bidding processes**

| Original text | Translation |
|---|---|
| Qtd. Questionamentos | Amount of Questioning |
| Interligações | Interconnections |
| On-Site Gasolina e Coque | Onsite Gasoline and Coke |
| On-Site Coque | Onsite Coke |
| Propeno | Propane |
| Subestações | Substations |
| UTAA e URE | UTAA and URE |
| UTRA e UTC | UTRA and UTC |

Among other facts, the large amount of questioning on the part of the companies invited, during the bidding process, was reflected in the delays of the deadlines for receiving the proposals (Figure 11). The bid for the offsite contract had its deadline postponed by 212 days for the receipt of proposals; in turn, the bid on the onsite gasoline and coke contract had a deadline postponed by 109 days.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

Also contributing to the deadline postponements, mainly in the bid on the offsite contract, was the adjustment of the scope of the projects and the remittance of documents by PETROBRAS after the call notices had been issued.

**Figure 11 – Amount of days of postponement for the receipt of proposals**

| Original text | Translation |
|---|---|
| Qtd. Dias | Number of days |
| Interligações | Interconnections |
| Coque | Coke |
| UTRA e UTC | UTRA and UTC |
| UTAA e URE | UTAA and URE |
| Gasolina | Gasoline |
| Propeno | Propane |
| Subestações | Substations |
| Prazo Original | Original Deadline |
| Prorrogação de Prazo | Deadline Extension |

**5.4 Contract for the onsite gasoline and coke portfolios – CONPAR Consortium – Contract 0800.0035013.07.2**

The contract with the CONPAR Consortium had the following objective: "Basic Project Consolidation Services; Execution of the Executive Project; Partial Supplying of Equipment, Instruments and Materials; Civil Construction; Electromechanical Assembly; Conditioning; Technical and Pre-Operational Assistance; Start-Up and Operation and Maintenance Assistance for the Units that comprise the Gasoline and the UHDTI Portfolio (U-2313); UGH (U-22311) and UDEA (U-32323) of the Coke Portfolio for the Getúlio Vargas Refinery (UN-REPAR) in Araucária – PR."

**Table 5 – Summary table of the CONPAR contract**

| Contractor | Initial Amounts | | | Contractual Alterations | | | Extrajudicial Transactions | | Final Amounts | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Date signed | Deadline (days) | R$ (Millions) | No. Of Amendments | Increase to Deadline | Amendments R$ (Millions) | No. of TEJs | R$ (Millions) | Deadline (days) | R$ (Millions) |
| CONPAR (OAS / UTC/CNO) | 08/31/07 | 1,090 | 1.821 | 28 | 994 | 546 | 1 | 135 | 2,084 | 2,502 |

**5.4.1 Analysis of the direct contracting – CONPAR Consortium**

Twenty-two companies were invited to the process and only 2 proposals were presented: CONPAR Consortium - R$ 2,079,593,082.66; Camargo Corrêa/Promon Consortium - R$ 2,273,217,113.27.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                [Multiple signatures]

[logo] BR *PETROBRAS*                                                                    [logo: NP-3]

The proposal with the lowest price was situated at 42.9% higher than PETROBRAS' estimate and 18.5% higher than the upper limit of the acceptable framework (+20% from the PETROBRAS estimate). Due to this, the bidding was cancelled because of excessively high prices, as set forth in the bidding committee report: *"The Bidding Committee compared the price on the proposal from the CONSTRUTORA NORBERTO ODEBRECHT S.A/UTC ENGINEERING/CONSTRUTORA OAS LTDA. Consortium, the lowest price offered, in the amount of R$ 2,079,593,082.06 (two billion, seventy-nine million, five hundred ninety-three thousand, eighty-two reais and six cents), with the estimate prepared by PETROBRAS, and took the acceptable limits into consideration (-15% and +20%), concluding that the price offered by the Consortium was 42.9% higher than the estimate, and 18.5% higher than the upper limit of acceptability, therefore being considered excessive. The Committee met in order to analyze the process and issued, on 03/26/2007, a "Memorandum" to the IERP Manager, describing the occurrence and requesting authorization to declassify the proposals due to excessively high prices; this authorization was granted. On 03/27/2007 Circular No. 15 was issued to the bidders, communicating on the declassification of the proposals due to excessively high prices."*

The decision to carry out the negotiation for the direct contracting was supported in Item 2.1, line "e" of the Petrobras Regulation on Procedure, Simplified Bidding, approved by Decree 2745/1998, and accompanied by the respective legal opinion (DIP JURÍDICO/JSERV 4582/2007 of 05/02/2007).

On 05/03/2007, the DIP ENGINEERING 289/2007 was issued by the Executive Manager Pedro Barusco (Engineering) and Alan Kardec (Supplies-Refining), proposing that the Directors, Renato Duque (DSERV), and Paulo Roberto Costa (DABAST), submit the cancellation of the bid to the Board of Directors due to excessively high prices, and authorization for the negotiation with the CONPAR Consortium, with the aim of direct contracting.

Said proposition was approved by the Board of Directors on 05/10/07, according to DE Minutes 4.643, Item 16, ruling no. 495 (Appendix 11). The negotiation with the Consortium was conducted by the Negotiation Committee instituted through the DIP ENGINEERING/IEABAST/IERP 58/07 of 05/12/2007.

### 5.4.1.1 Previous PETROBRAS estimates

Within the direct negotiation process, the initial amount of PETROBRAS' previous estimate of R$ 1,372,799,201.00 was the same one used in the cancelled bidding process, bearing in mind that there had been no alteration to the scope of the Project, as well as no inconsistency having been identified in same.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                [Multiple signatures]

[logo] BR *PETROBRAS*                                                                   [logo: NP-3]

Meanwhile, during the course of the negotiations, the previous estimate underwent two revisions, which increased the final amount of same up to R$ 1,475,523,355.84, as can be seen in Table 6.

**Table 6 – Previous PETROBRAS estimates**

| Item | Rubric | Original (R$ ) | Revision A (R$ ) | Revision B (R$ ) |
|---|---|---|---|---|
| 1 | Overall Total with Plan | 1,327,799,201.47 | 1,447,682,800.84 | 1,475,523,355.84 |
| 2 | Detailing Plan | 74,059,500.00 | - | - |
| 3 | Overall Total | 1,298,739,701.47 | 1,447,682,800.84 | 1,475,523,355.84 |
| 4 | Direct Costs | 810,416,581.86 | 920,661,260.40 | 917,222,047.53 |
| 4.1 | Supplies | 493,909,809.18 | 493,909,809.18 | 493,909,809.18 |
| 4.2 | Construction and Assembly | 175,305,311.26 | 203,230,427.77 | 200,670,420.85 |
| 4.2.1 | Equipment/Machinery | 33,850,718.38 | 53,274,939.55 | 53,274,939.55 |
| 4.2.2 | Tooling | 2,631,952.41 | 2,798,636.63 | 2,748,440.42 |
| 4.2.3 | Direct Wrokforce | 131,597,620.38 | 139,931,831.50 | 137,422,020.80 |
| 4.2.4 | Materials for Consumption | 7,225,020.09 | 7,225,020.09 | 7,225,020.19 |
| 4.2.5 | Assisted Operation | - | - | - |
| 4.3 | Subonctractors | 141,201,461.42 | 223,521,023.46 | 222,641,817.50 |
| 5 | Indirect Costs | 163,024,400.54 | 177,661,895.37 | 200,892,141.88 |
| 5.1 | Logístics | 163,024,400.54 | 177,661,895.37 | 200,892,141.88 |
| 6 | Supplementary Costs | 325,298,719.07 | 349,359,645.06 | 357,409,166.42 |

Revision A, issued on 05/29/2007, was requested by the ENGINEERING/SL/ECP through the DIP ENGINEERINGG/IEABAST/IERP/CMHS 23/2007 of 05/29/2007 and resulted in an increase of the previous estimate by R$ 74,883,599.37. The main alterations were:

• Direct Costs:

a) Revision of the histogram of the machinery and equipment needed for assembly and the updating of the reference table of prices. This item increased R$ 19,424,221.16 from the estimate (Item 4.2.2, Table 6)

b) An increase in the amount pertaining to the tooling by R$ 166,684.22. This amount is a percentage of the amount of the direct labor force. (Item 4.2.2, Table 6)

c) Revision of the percentage of the social security contributions for the direct labor force. This alteration occurred due to the change in the premise on the employee's time of permanence, which was decreased from 23 to 9 months (an increase in turnover), bringing about an increase in the factor of social security contributions from 116% to 129.5%, and which corresponded to an increase of R$ 8,334,211.12 (item 4.2.3, Table 6).

d) The consideration that the detailing project would be subcontracted and a revision of the man-hours (HH) of the project, resulting in an increase of R$ 8,260,062.04.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                      [logo: NP-3]

- Indirect Costs:

  a) Alteration of the percentage of social security contributions of the indirect labor force (MOI), in the form that was considered for the direct labor force (MOD);

  b) The inclusion of new medical exams for the labor force;

  c) A change in the medical care plan;

  d) Revision of the total area of the construction site and the inclusion of computers.

The increase in indirect costs corresponded to R$ 14,637,494.83.

- Supplementary costs (BDI): in spite of a reduction in the social security (ISS) rate from 5% to 2%, representing a decrease of R$ 8,370,094.28, the supplementary costs were increased from R$ 24,060,926.00 as a result of the increase in its basis of calculation (direct and indirect costs).

Revision B, issued on 06/19/2007, was requested through the ENGINEERING/IEABAST/IERP/CMHS DIP 28/2007 of 06/18/2007 and resulted in an increase from Revision A of R$ 27,840,555.00. The main alterations were:

- Direct costs: there was a reduction of R$ 3,439,212.87 (Item 1, Table 6), overall pursuant to the reduction in the non-productivity index from 20% to 17%, in addition to a downward adjustment in the costs for the executive project (R$ 879,205.95).

- Indirect costs: the MOI histogram was revised, increasing the estimate by R$ 23,230,246.51 (Item 2, Table 6).

- Supplementary costs: the increase in the basis of calculation, provoked by the increase in Indirect Costs, led to an elevation of R$ 8,049,521.36 in Supplementary Costs (Item 3, Table 6).

### 5.4.1.2 Proposals from the CONPAR Consortium

During the course of the negotiations, the CONPAR Consortium reduced the amount of the proposal from R$ 2,079,593,082.66 to R$ 1,821,012,130.93, through the following steps in the negotiation:

**1st Step** – The amount of R$ 2,016,727,315.56 was offered to the Negotiation Committee, as a result of the adjustments in the quantities [assessments] of the MOD for construction and assembly, the civil MOD and MOI, contemplating an allotment attributed to the "Supplementary Supplies and Services,"

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                          [logo: NP-3]

which, once being expurgated, the pricing basis came to be R$ 1,891,220,985.88.

**2nd Step** – In this stage, an amount of R$ 1,805,315,153.00 was offered by the Consortium. This reduction was a function of several adjustments in the Work Breakdown Structure (EAP), and measurement criteria. This proposal was not accepted by the Committee due to having been considered excessive.

**3rd Step** – As a function of the rejection of the previous proposal and through alterations related to the definition of zero-tolerance for several items of the Defined Quantity (QD), other adjustments in the Work Breakdown Structure (EAP) and the incorporation into the contract of PETROBRAS' corporate guidance for the exchange rate in force at the time, the Consortium presented the amount of R$ 1,769,000,000.00. However, the amount of R$ 52,012,130.93 was added on top of this amount, as budget planning for the compensation for possible stoppages due to rain, lightning and their consequences, and quantitative differences [assessments]. Therefore, the final negotiated amount was that of R$ 1,821,012,130.93.

**5.4.1.3 Negotiation Process**

During the negotiation process, the following alterations in the contractual conditions were made:

a) The inclusion of a compensatory budget.

The Negotiation Committee included, in the composition of the contract price, the amount of R$ 52,012,130.93 as compensation for costs for possible stoppages due to rain, lightning and their consequences, and differences in amounts, through the creation of Item 3.3 – "Global Events" – in Appendix II-B of the contract, replacing the budget for payment for "Supplementary Supplies and Services," which was withdrawn from the contract price, on the recommendation of the Legal Department.

During the bidding process, there was a forecast budget for the payment of "supplementary services," corresponding to 10% of the forecast budget for the item relating to the consolidation of the basic project and the carrying out of the executive project, civil construction, electromagnetic assembly and conditioning. In the proposal received by the CONPAR Consortium during the bidding process (R$ 2,079,593.082.66), around R$ 130.8 million were in reference to said budget. During the direct negotiation process, which culminated in the final proposal from the Consortium of R$ 1,769,000,000.00, there was considered, as an increase, a budget of R$ 102.5 million. The Negotiation Committee understood that the cited budget for "supplementary services" should have been increased to the proposed price, which would, therefore, reach R$ 1,871,543,474.81. However, the legal opinion (DIP JURÍDICO/JSERV 5148/2007 - Appendix 12) did not

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]          [Multiple signatures]

[logo] BR *PETROBRAS*                                                                [logo: NP-3]

recommend the inclusion of the budget in function of the following legal aspects; (i) Article 104 of the Civil Code (the budget for "supplementary services" would result in an indeterminacy in the contracted object); (ii) Item 1.3 of the Petrobras Bidding Procedure Regulation *("No work or service will be bid without the approval of the respective basic project, with the definition of the characteristics, references and other elements needed for the perfect understanding, by the interested parties, of the works to be carried out, nor the contracting party, without the provision of sufficient financial resources for their execution and full completion")*; and (iii) Item 7.2 of the Regulation, due to an illicit increase in the contractual amount.

In order to accommodate the above-cited legal opinion, the Negotiation Committee opted to exclude R$ 102.5 million from the budget for "supplementary services" and to incorporate the amount of R$ 52 million for compensation of costs for stoppages due to rain, lightning and their consequences, as well as the variation in the quantities [assessments] of the contractually defined items.

b) Improper framing of the proposal in the range of admissibility (-15% to +20%)

After defining the budget cited in the previous item, the Negotiation Committee added the amount of R$ 52,012,13.93 to the previous estimate prepared by the ENGINEERING/SL/ECP, raising the amount by R$ 1,475,523,356.00 to R$ 1,527,535,486.93.

The included budget comprised two allotments; one for compensation for costs of stoppages due to rain, lightning and their consequences, in the amount of R$ 10,625,220.79 and the other for payment of possible differences in amounts [assessments] that were determined in the contract (QD), in the amount of R$ 41,386,910.14, reaching R$ 52,012,130.93, as seen in Appendix 13.

However, according to the *International Recommended Practice No. 17R-97 - COST ESTIMATE CLASSIFICATION SYSTEM of the AACE (The Association for the Advancement of Cost Engineering)*, the range of admissibility of -15% to +20% of the estimate, in theory, already contemplated possible quantitative variations [assessments] defined in the project, and were based on the preparation of the previous estimate. In this way, the estimate contemplated this budget (R$ 41,386,910.14) in duplicity.

Additionally, the allotment for covering the cost stoppages from rain, lightning and their consequences was R$ 8,065,213.87; higher than the amount of R$ 2,560,006.79 withdrawn from the estimate before Revision B, under the heading of a reduction in direct labor force (MOD) non-productivity, with the idea of retracting the new

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

premise of a "dry timetable." In other words, the Negotiation Committee, once considering that PETROBRAS would assume the risks related to stoppages due to rain, lightning and their consequences, withdrew from the estimate the amount of R$ 2,560,006.79 and increased, through a compensatory budget, the amount of R$ 10,625,220.79.

In brief, the CIA considers that the previous estimate was unduly encumbered by R$ 49,452,124.01 (R$ 41,386,910.14 + R$ 8,065,213.87). In this way, considering the aforementioned, the correct amount of the previous estimate would be R$ 1,478,083,356.76 and the final amount offered by the CONPAR Consortium was R$ 1,821,012,130.93. Therefore, the amount of the proposal would be 23.2% higher than the estimate, thus being situated outside the range of admissibility.

Regarding this direct contracting, the CIA obtained the following declarations:

Declaration of Fernando Biato, IEABAST General Manager at the time: *"the need to meet the deadlines of the enterprises was weighed in the decision to begin the direct negotiation with the CONPAR Consortium;" "that the proposal of carrying out a direct contracting occurred in the Local Directive Committee (CDL) for the REPAR modernization works; that due to the overall pressure for the deadline to conclude the enterprises, direct negotiation with the CONPAR Consortium was decided upon.*

Declaration of José Paulo Assis, IERP Manager at the time: *"that a new bid was inviable for the contracting on the gasoline portfolio because there was no way to change the scope, nor were there any more companies that could be called for a new process, and that due to these aspects and the short-term deadline, there was a request along with the Board to do a direct negotiation with the CONPAR Consortium; that a request for direct negotiation was sent to the Executive Managers and it was approved by the Board;" "that there was pressure on the Company's deadline to close the deal with the CONPAR Consortium;" "that at that time the clause on 'down payment' was a practice in the contract signing and other events in the contracts; that the financial Work Breakdown Structure (EAP) was based on tangible deliverables by the contracting party; that the question of a 'down payment" was not mentioned in the committee's final report because apparently it was considered to be contained within the events of the measurement criteria."*

Declaration of Luis Scavazza, IERP Sector Manager at the time: *"that there was pressure from Headquarters to initiate the contracting of the CONPAR Consortium;" "that the negotiations passed through a review by the CONPAR Consortium on the productivity factors, among others, and, as a result, there was a reduction of prices; that there was also a review of the PETROBRAS budget; he supposes that the direct contracting had the same scope and conditions as the original bid; that the focus of the meetings on direct negotiations with the CONPAR Consortium was to frame out the budget;"*

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                              [logo: NP-3]

*"that the option of direct contracting and the terms of negotiation were premises from IEABAST;" "that in the meetings in São Paulo and Rio de Janeiro, the person who gave the guidelines, as well as who participated in same during the direct contracting negotiation, was the IEBAST General Manager;" "that the terms of the negotiation and the clauses negotiated were passed through the IEBAST General Manager;" "that he does not remember the down payment for the contract signature;" "that there was prioritization on the part of the IERP Management to quickly conclude the negotiations on the direct contracting for REPAR."*

Declaration of Sérgio Costa, employee of the IERP contracting activities at the time: *"by not being complicit in some of the decisions of the superiors, he believes that because of this, his position had become extinct; that this occurred because, in his report on the contracting of the CONPAR Consortium, he reported that the contract was being signed in a higher amount than the acceptable limit of the proposal; that this contract was closed directly by general manager Biato and Renato Rodrigues of Odebrecht, in a meeting in the conference room of the executive manager, Pedro Barusco;" "that in that contract closing meeting he advised José Assis that the contract could not be entered into due to its exceeding the limit of 20%; that when he put this information in the report, the manager, José Assis, ordered the information to be removed; that due to his having a relationship with the executive manager, Paes, he called him, letting him know what had happened and that Paes ordered that the report be sent in the form it was in, because Director Paulo Roberto Costa was demanding signature of the contract; that he was reprimanded by Assis for having maintained the contract and for passing on information on the upper limit having been exceeded; that analytical metrics were suggested with which he did not agree; that after having sent the report, he was removed from the position of coordinator; that he believes that this was retaliation regarding his stance;" "that during the negotiation, the CONPAR Consortium insisted on withdrawing clauses from the contract that could not be withdrawn:" "that in the bid that was cancelled due to excessive pricing, there were allusions to having a bidding approval done based on a budget revision; that he was against this re-approval of the bid; that he proposed doing a new expedited bid and that this suggestion was not accepted by José Assis;" "that he thought the decision of carrying out direct contracting was absurd; that he also found absurd the intervention by the general manager, Biato, and his decision to close the direct negotiation closing with the CONPAR Consortium;"*

c) Alteration in the Work Breakdown Structure (EAP)

During the negotiation, an advance payment of 15% of the amount of the contract was proposed by the CONPAR Consortium, under the heading of "contractual signature." The Negotiation Committee rejected such proposition; however, it agreed with

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                                [logo: NP-3]

the modifications in the EAP; altering the infrastructure item from 6% to 10%, and the project item from 7% to 10%.

Regarding this matter, the Legal Department (DIP JURÍDICO/JSERV 4874/2007 de 28/06/2007 - Appendix 14) expressed itself regarding the exceptional nature of the practice of advances at PETROBRAS, which should have been submitted for assessment by the Financial Department, as established in the Financial Manual. The CIA did not find evidence of a consultation with the Financial Department regarding such a matter.

The first payment to the CONPAR Consortium, in October 2007, the month following the contract signature, in a total of R$ 92.8 million, was carried out without having evidence of the realization of the services during the period in this amount; in this way, it could be characterized as advance payments (Appendix 15).

The CIA found that this advance was not made explicit in the contractual clause or in the measurement criteria (only in the EAP), and neither was it explicitly reported in the report by the Negotiation Committee, nor in the documentation submitted for assessment by the Board of Directors.

d) Other significant alterations in the contractual conditions

- Alteration of the measurement criteria
- A reduction in the acceptable variation of certain quantities (that at the bid they included a tolerance or contingency of + or -15%, and, after the negotiation, it was stipulated as + or -0%; therefore, without a tolerance margin);
- A reduction in the percentage limit of civil liability of the CONPAR Consortium (from 100% to 15% of the amount of the contract).

During the negotiation process, the opinion contained in DIP JURÍDICO/JSERV 5148/2007 of 08/14/2007 indicated that *"according to the prevalent guidance in this LEGAL DEPARTMENT, substantial modifications to the object of the contract cannot be made, under penalty of giving rise to fraud in the application of the rules on waiving the bid. This restriction arises from the fact of this direct negotiation, which follows the thwarted bid, encountering limits in the object and under the circumstances of that process."*

The CIA found evidence that, when the proposal was sent for authorization by negotiation, approved changes already existed in the scope of the object being bid (see Item 5.4.2).

Through the DIP ENGENEHARIA 571/2007 of 08/15/2007, the Executive Managers, Pedro Barusco (Engineering), Luis Gaspar Domingues (interim AB-RE) and Venina

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

Velosa da Fonseca (AB-CR), submitted to Directors, Renato Duque (DSERV) and Paulo Roberto Costa (DABAST), the proposition for entering into the direct contracting with the CONPAR Consortium, in the amount of R$ 1,821,012,130.93. On 08/24/2007, said proposition was approved by the Board of Directors, according to DE Minutes 4.659, Item 16, Ruling 877 (Appendix 9).

Figure 12 shows the evolution of the previous PETROBRAS estimates and of the proposals from the CONPAR Consortium.

**Figure 12 – Evolution of the estimates and proposals – CONPAR Consortium**

| Original text | Translation |
|---|---|
| Valor de Estimativas e Propostas R$ (milhões) | Amounts of the estimates and proposals (R$ (million) |
| Proposta CCCC/Promon | CCCC/Promon Proposal |
| Estimativa da Licitação | Estimate of the Bid |
| 1ª Revisão Petrobras (Negociação Direta) | 1st Revision – Petrobras (Direct Negotiation) |
| 2ª Revisão Petrobras (Negociaçã doreta_ | 2nd Revision – Petrobras (Direct Negotiation) |
| Limite Inferior | Lower Limit |
| Estimativa Petrobras | Petrobras Estimate |
| Limite Superior | Upper Limit |

It was verified by the CIA that the negotiation attempts with the CONPAR Consortium were accompanied by Executive Manager, Pedro Barusco Filho, and General Manager, Fernando de Almeida Biato (Appendices 16 and 17).

**5.4.2 Analysis of the consistency of the basic project – CONPAR Consortium**

The CIA verified that there was a delay in the preparation of the analysis of the consistency of the basic project, mostly imputable to PETROBRAS, bearing in mind the construction having been carried out from the immature basic project and the delay in the availability of the information on the equipment supplied by PETROBRAS.

The scope of the CONPAR Consortium was that of *"Verifying the consistency of the basic projects and/or pre-detailing on that which the operation refers to; performance, safety and reliability (...) Supplementation and updating of*

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                          [Multiple signatures]

[logo] BR *PETROBRAS*                                                                          [logo: NP-3]

*the utilities in the basic projects (air, water, steam, condensation, gas fuel, nitrogen) and the supplementary onsite systems."*

Such activities, according to the contractual documents, consisted of the verification and compatibility of the process flowcharts, with datasheets on the equipment and instruments, a study on the definitive equipment with a dimensional analysis, etc.

At the time of the contracting of the CONPAR Consortium, the documents regarding the suppliers directly contracted by PETROBRAS were not made available, but only the basic documents from the acquisition (Materials Acquisition (RMs) and Datasheets (FDs). Moreover, within the duties of the contracting party, there were the analysis and approvals of the designs of these suppliers, making it clear that this documentation was received by the CONPAR Consortium only throughout its contractual term.

PETROBRAS reported, during the contracting phase, the forecast delivery dates for this equipment, however, without indicating the deadline of the availability of the suppliers' engineering documents. In other words, any delay on the part of the suppliers would also imply a delay for the CONPAR Consortium, and would be reflected in the executive project (in the case of delayed documents) and/or in the construction and assembly (delayed delivery).

Regarding that which is referred to in the information originating from PETROBRAS itself, some interference in the project was retracted in some of the contractual amendments. Through the content of these amendments, we verified that part of the information made available by PETROBRAS was altered later, and missing information was added during the bidding period which impacted the development of the Contractor's project. We will show the examples below:

Amendment 2: The Negotiation Committee's Report on this amendment recorded that same was necessary to *"incorporate the modifications on the project into the contract, introduced by PETROBRAS in the Coke and HDT Portfolio."*

Amendment 3: The Negotiation Committee's Report on this amendment recorded that same was necessary for *"execution of the modification services on the project, introduced by PETROBRAS in the Onsite Units for the Gasoline Portfolio;"*

Amendment 5: Additional scope, with the inclusion of streets and drainage systems of the units, with consolidation activities on the basic and executive projects, supplies and construction;

Amendment 6: Adaptation of the Hydrogen Generation Unit (UGH) for operation with naphtha, according to the basic project revised by CENPES. Said amendment further contemplated the extension of the global deadline of the contract by 180 days;

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

Amendment 9: Adaptations to the project; identified during the detailing and introduced by PETROBRAS in the scope of the gasoline portfolio and the coke portfolio;

Amendment 14: Adaptations to the project related to the gasoline and coke portfolios.

There was also a lot of equipment to be installed at the units, which was directly acquired by PETROBRAS, for which there were still no documents issued by the suppliers, and for which the technical and dimensional characteristics should have been considered in the project, both in the consolidation phase of the basic project and in the executive project. Throughout the contractual period delays occurred on the part of PETROBRAS' suppliers. The documentation analyzed indicated significant delays, which created delays in the availability of the technical data needed for the development of the project.

This situation was observed in a few documents, such as:

Amendment 11: This amendment considered, in its object, the "*Contractual re-planning in function of the alteration, in relation to that defined in the original contractual documentation, on the equipment delivery deadlines by PETROBRAS.*" The Negotiation Committee's Report shows the following justifications for entering into this contractual amendment (besides the amount of R$ 345,986,318.13, this amendment added 393 days to the contract term): "*The equipment acquired by PETROBRAS that belongs to the units in the contractual scope (of CONPAR), suffered significant delays in their delivery (...) these delays come generating significant impacts on the conclusion of the Engineering, Construction and Assembly services, with which we highlight: the Reactors at the HDT unit (...) an average delay of 600 days; the centrifuge Compressor (...) average delay of 600 days; PSA (...) average delay of 750 days.*"

The letter from the ENGINEERING/IEABAST/IERP 003026/2009 of 08/27/2009, in response to the letter sent by the CONPAR Consortium, recorded the delays on the part of PETROBRAS' suppliers, as in the following transcription: "*We inform you that we acknowledge the impacts on the progress of the contract caused by: 1) Delay in the consolidation of the basic project, 2) Delay in the receipt by CONPAR of the designs from PETROBRAS suppliers, 3) Delayed response from technical consultants, 4) Delay in the approval of the project detailing. These impacts were identified and validated according to the meeting minutes 101-OPP/PCC-EM-315 of 08/06/2009, from which the impacts on deadlines at each unit are cited in the following table: U-32323 –DEA G, 04 months; U-32323 - DEA K, 05 months; U-2315, 08 months; U-3111, 09 months; U-22311, 08 months; U-2222 07, months; U-2316, 07 months; U-2313, 03 months.*"

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                  [logo: NP-3]

Besides the equipment furnished by PETROBRAS, the units in implementation had various other equipment acquired by the CONPAR Consortium itself, for which the technical characteristics had to be considered in its project.

As to Amendment 11, the Negotiation Committee highlighted delays on the part of the CONPAR suppliers, emphasizing: *"Exchanger P-3111004: average delay of 286 days; Vessel V-3111003: average delay of 577 days; Vessel V-231304: average delay of 279 days."*

Such delays in the furnishing of equipment by the CONPAR Consortium implied delays in the development of the project.

The CIA verified that there was a delay in the preparation of the consistency analysis of the basic project, mostly imputable to PETROBRAS, bearing in mind the contract having been carried out from the immature basic project.

### 5.4.3 Analysis of the amendments – CONPAR Consortium

The above-cited contract received 28 amendments, with the term having been increased by 994 days and the amount by R$ 554,337.861.70.

The most relevant amendments were:

Amendment 5: amount of R$ 29,601,051.5[Illegible]: *"provision of additional goods and services required for the construction of internal streets, bridges, systems for rainwater drainage, idle and contaminated sump tanks, in the units for the Gasoline Portfolio and the HDTI, UGH, and DEA units for the UN-REPAR Coke Portfolio, as per the Modification Requests no. 024-G."*

Amendment 6: amount of R$ 20,501,924,031 and deadline of 180 days: *"to introduce the Adaptation services at the Hydrogen Generation Unit (UGH) for operation with Naphtha; 1.1 Revision of the Price Summary Spreadsheet – Appendix II-A; .1.2, Insert the Service Prices Spreadsheet – Appendix II-J, for formatting the adjustments made in this Amendment; 1.3 Insert the Spreadsheet for Prices of Goods and/or Materials offered in Brazil – Appendix II-K, for formalizing the adjustment made in this Amendment. 2. Extend the contractual deadline by reason of the deadline for furnishing the equipment as the object of this amendment."*

Amendment 11: amount of R$ 345,986,318,13 and deadline of 393 days: *"1. Contractual re-planning in function of the alteration related to that defined in the original contractual documentation on the deadlines for equipment delivery by PETROBRAS, the need for the compatibility of the timetables with the other integral contracts on the Gasoline and Coke/HDT Portfolios, on the inversion of*

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                           [logo: NP-3]

*priorities of the divisions of the Units belonging to the Coke/HDT (UHDT, UGH and UDEA) Portfolio in relation to the Gasoline Portfolio, in addition to the compatibility with the timetable on stoppage in the UN-REPAR units; 2. The construction and assembly services of the naphtha vaporization system in the Hydrogen Generation Unit (UGH), as a supplement of Amendment 6, already entered into. 3. The services of degreasing, passivation and inertization of the units in the contractual scope; 4. Extension of the deadline for adjusting the contractual timetable according to the new start-up dates for the units; 5. Including Clause 3.14 in the contract, with the following text: "3.14 – Following the provision in Item 3.9, in the case that the impossibility of compliance with the obligations assumed therein remains in place, or in the possible event of interference from other contracts that may impede the conclusion of the present contract, or, further, the occurrence of an inversion of priorities in the conclusion of a certain work from this contract, in observance of Item 17.1, PETROBRAS will assume the obligation for payment of possible additional costs arising from same, provided that these are duly agreed upon with the CONTRACTING PARTY and approved by the Auditors after rescheduling the services."*

Amendment 16: amount of R$ 15,901,701.95: *to adapt the services and supplies to the contractual scope found in the Project Modifications, arising from the negotiations conducted by the Committee, specially designated according to the specifics in Clause Two of this instrument. 2. To raise the contractual amount as a result of the aforementioned modifications, according to the descriptions outlined in this instrument. 3. To revise the Price Spreadsheet – Appendix II-A. 4. To insert the Price Spreadsheets – Appendices II-S and II-t, in order to formalize the adjustments made in this amendment."*

Amendment 24: amount of R$ 107,556,721.03: *"Rescheduling of the services in function of the alteration of the equipment delivery dates of both parties, and from the alteration of the assembly deadlines with the resulting modification to the start-up deadlines of the Units."*

Amendments 25, 26, 27 and 28: increased deadline of 86, 70, 65 and 60 days, respectively: *"To extend the contractual deadline by virtue of the conclusion of the contractual activities and the demobilization of the basic infrastructure of the works. To extend the contractual deadline until the completion of the activities in the contractual scope and the demolition of the overall infrastructure of the beds, as well as the rescission of pending business in progress. Amendments 27 and 28: To extend the contractual deadline for the delivery of the remaining spare items acquired for replacement of valve FV-2313070, and the pending technical and commercial solutions in progress."*

The CIA did not find evidence of the occurrence of nonconformities in the execution of the amendments. However, the CIA identified that the amendments were executed,

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                      [logo: NP-3]

among other things, in order to incorporate the various modifications that occurred in the execution of the works; a fruit of the contract with deficiencies in the basic project.

### 5.4.4 Analysis of the Extrajudicial Transaction – CONPAR Consortium

In December 2003 a Private Instrument of Extrajudicial Transaction (IPTEJ) was signed with the CONPAR Consortium in the amount of R$ 135,380,603.27, in reference to the execution of the consolidation services on the basic project, the production of the executive project, partial supply of the equipment, instruments and materials, civil construction, electromechanical assembly, conditioning, technical and pre-operation assistance, start-up of the operation and the execution of maintenance of the UHDTI (U-2313), UGH (U-22311) and Coke UDEA (U-32323).

The IPTEJ is described in the DIP ENG-AB 577/2013 of 11/22/2013 (Appendix 18), signed by Executive Managers Sandoval Dias Aragão (interim ENG-AB) and Wilson Guilherme Ramalho da Silva (AB-PGI), and sent to Directors José Antônio de Figueiredo (DETM) and José Carlos Cosenza (DABAST) in order to submit the authorization proposal to the Board of Directors for executing the IPTEJ.

The conditions negotiated for the IPTEJ are summarized below:

*   The claim by the CONPAR Consortium of R$ 360,285,349.94 was examined by the locally established Negotiation Committee (DIP ENGINEERING/IEABAST/IERP 62/2012 of 08/27/2012), with representatives from REPAR/EM and from ENG-AB/IEREFINO/IERP, which had no success in the pay-off of the negotiations. The CIA identified that the acknowledged amount was in the order of R$ 75 million.
*   There being a lasting deadlock in the negotiations, in light of the complexity involved, a Special Negotiation Committee was designated for discussing the matter with the Consortium (DIP ENG-AB/IEREFINO 27/2013 of 05/23/2013), with representatives from the ENG-AB/IRREFINO and from the AB-PGI/REF. This practice found support in Contract Instruction 29 – Claim Management in Project and Investment Contracts (Appendix 19), administered by the ETM- CORP/GPRI/CONTS.

After successive negotiations, in a meeting on 08/09/2013 between the Special Negotiation Committee and the CONPAR Consortium, the result of the negotiation was released, which resulted in the total amount of R$ 135,380,603.27 (R$ 100,647,166.39 at the historical contract price – P0), arising from: impacts from the third re-planning of the work, project modifications, a variation in the quantity (Quantity Discharged – QA and Quantity Defined – QD); rainy day payments, and the final claim, with the aim of closing out the existing pending matters.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

Regarding the negotiation of claims through the Special Committees, the CIA obtained the following declarations:

Declaration of Sérgio Albuquerque, Technical Consultant at AB-PGI at the time: *"many contracts were signed with several pending projects; there were technical pending matters upon closing the contracts; there were changes in scope, rearranging, additional services that were not foreseen in the contract; this caused changes in the deadlines; the special committees focused on the additional scope, additional deadlines and impediments (Total losses, strikes, rain, impediments in the Daily Work Log (RDO) of the work); which used as fact that which was recorded and could be quantified; inferences were not made for negotiating the IPTEJs; when the contracts were signed, it was already known that the deadlines were not real; it was understood at the time that Engineering, Procurement and Construction (EPC-ists),would have the capacity to carry out the detailing of the basic project, that the scope of their job and of the committee was to evaluate the impacts to the work caused by Petrobras; that all the impacts analyzed had records and traceability; that there was a delay in the repayment for modifications to projects authorized by Petrobras and effectively carried out due to the delays in the document approval and the amendments and that this generated additional claims; that what was negotiated by the special committees and paid by Petrobras was actually what was owed."*

Declaration of Sandoval Aragão, General Manager of ENG-AB/IEPREMIUM at the time: *"the coordinating committee was created in light of the PETROBRAS internal procedure; this procedure was created in the wake of the discussions in the market and in the press that PETROBRAS was not paying its suppliers; it was in PETROBRAS' favor in the negotiation that the unit was operating and that the committee was not directly involved in the work, having sufficient availability to perform the analysis; it was notorious that the volume of PETROBRAS' investments grew too much and that there was not enough mature framework to supervise the works."*

The IPTEJ was authorized by the Board of Directors, according to DE Minutes 5.093, having been signed on 12/9/2013 and paid on 12/23/2013.

No evidence was found by the CIA of the occurrence of noncompliance in the execution of the Extrajudicial Transaction.

**5.5 Contract for the onsite coke portfolio – CCPR Consortium – Contract 0800.0043403.08.2**

Object: "Provision of materials, equipment and services related to the analysis of the consistency of the basic project, preparation of the executive project, construction, electromechanical assembly, conditioning and pre-operation assistance,

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                [Multiple signatures]

[logo] BR *PETROBRAS*                                                                [logo: NP-3]

start-up, operation and maintenance support at the Delayed Coking Unit (U-212), Coke Handling Unit (U-6821), Sulfur Recovery Unit, (U-2225), Residual Gas Treatment Unit (U-2327), Residual Water Unit (U-251 26) and Substations (SE-2212 and SE-6821) belonging to the Coke and HDT Portfolio of the Presidente Getúlio Vargas Refinery - UN-REPAR, in Araucária – PR."

**Table 7 – Summary of the CCPR Contract**

| Contracting Party | Initial Amounts | | | Contractual Alterations | | | Extrajudicial Transactions | | Final Amounts | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Date Signed | Deadline (days) | RS (Million) | No. Of Amendments | Increases/ Deadline | Amendments R$ (Million) | No. Of TEJs | RS (million) | Deadline (days) | RS (Million) |
| CCPR (Camargo Correa/ Promon) | 07/07/08 | 1,313 | 2,488 | 29 | 531 | 141 | 1 | 113 | 1,844 | 2,742 |

### 5.5.1 Analysis of the bid – CCPR Consortium

Through the submissions from Executive Managers Pedro Barusco (Engineering) and Alan Kardec (AB-RE) to Directors Renato Duque (DSERV) and Paulo Roberto Costa (DABAST), contained in DIP ENGINEERING 335/2007 of 05/16/2007, the Board of Directors approved the selection criteria on suppliers and the list with the 18 companies to be invited (DE Minutes 4.648 of 06/21/2007, Item 5, Ruling 635 – Appendix 20).

After the issuance of the call notices, (08/22/2007) the companies Alusa and Construcap were included. The inclusion of these companies did not meet the selection criteria approved by the Board of Directors, and happened through the dispatch from Directors Paulo Roberto Costa (DABAST) and Renato Duque (DSERV), on 10/03/2007 and 10/09/2007, respectively, in DIP ENGINEERING 634/2007 of 09/21/2007, signed by Executive Managers Pedro Barusco (Engineering) and Luiz Alberto Gaspar Domingues (AB-RE) - Appendix 21.

The CIA found evidence that the inclusion of the above-cited companies was approved by the Board of Directors on the occasion of the contracting authorization of the CCPR Consortium (DE Minutes 4.705 of 06/23/2008, Item 26, Ruling 752 – Appendix 22).

Alusa declined its participation in the process, and Construcap did not make an appearance, nor did it justify its absence in the process.

Regarding this matter, there were the following declarations to the CIA:

Declaration of Ademar Itakussu, IERP Sector Manager at the time: *"in the bidding process of the CCPR contract, two bidders were included that*

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                                          [logo: NP-3]

*did not meet the original selection criteria that was submitted for the approval of the DE, considering that these inclusions were made after the request to participate in the process, by means of letters sent by the companies Alusa and Construcap; he does not remember to whom the letters sent by Alusa and Construcap were addressed; eventually the bidding committee received letters requesting the inclusion of companies, the IERP manager also eventually received letters of the same content and that there were cases in which the inclusion of companies was requested from the Executive Manager of Engineering, Pedro Barusco; all inclusions were submitted by Engineering and Supplies, by means of a DIP, to the Supplies and Services Directors, requesting authorization to include same in the process."*

Declaration of Emerson Telles, IERP Sector Manager at the time: *"that the inclusion of companies in the bidding process happened only in compliance with orders coming from the Supplies and Services Directors and that these orders were not questioned."*

Three proposals were received in this process:

**Table 8 – Coke contracting proposals**

| Proponent | Amount |
|---|---|
| CCPR Consortium (Camargo Correa-Promon) | R$ 2,489,772,835.01 |
| Queiroz Galvão-Iesa Consortium | R$ 2,681,312,844.30 |
| Techint-Andrade Gutierrez Consortium | R$ 2,709,341,976.33 |

Included in the Bidding Committee report: *"After the comparisons, the Committee verified that the proposal from the CAMARGO CORRÊA/PROMON CONSORTIUM, of a lesser amount, was situated at 24.4% over the base estimate, disregarding the forecast budget for rain and atmospheric discharges (R$ 29,000,000.00)."*

The CIA verified that the rest of the proposals were declassified due to excessively high prices and that PETROBRAS' costs estimate was revised in order to correct inconsistencies in some of the partial costs considered to be the lowest (DIP ENGINEERING/SL/ECP 72/2008 of 04/18/2008 – in the aforementioned re-analysis, the smallest costs on steel alloy piping were corrected in U-2212, the Delta Guarde Model GV-815 and GV-830 valves, pumps (70 units) in U-2212, blowers SP-2225001 A/B in U-225, towers T-2512601/02 and vessels V-2512602/03 in U-25126, and isolating of the coke vessels V-2212001/02/03/04 from U-2212), going from R$ 2,006,009,404.98 to R$ 2,093,988,284.45.

With that, the proposal from the CCPR Consortium was situated at 19.16% over the base estimate, disregarding the forecast budget for rain and atmospheric discharges (R$ 29,000,000.00).

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                       [logo: NP-3]

There was no presentation of appeal on the part of either bidder.

On 06/18/2008, the Bidding Committee issued the report recommending the signing of the contract with CCPR Consortium which happened on 07/07/2008, duly authorized by the Board of Directors (DE Minutes 4.705 of 06/23/2008, Item 26, Ruling 752 – Appendix 22).

The CIA considered the inclusion of Alusa and Construcap in the process as noncompliance, without a previous submission to the Board of Directors. The aforementioned companies did not meet the previously established selection criteria. The CIA also considered the justification presented for the inclusions to be insufficient – increased competitiveness – which could have been used for any other companies participating in the process.

Another situation identified by the CIA referred to the alteration in the initial disbursement curve in the contract. The announcement released to the bidders on 08/17/2007 foresaw a budget payment for installing the infrastructure to be used by the contracting party (sanitary installations, dressing rooms medical service areas, lobby, offices, restaurant, electrical and rainwater networks, among others) and their maintenance during the effective contractual term.

Said budget, estimated at 3% of the contractual item on consolidation of the basic project, execution of the executive project, civil construction, electromechanical assembly and conditioning of the units, would be paid by reason of:

- 21% in the mobilization of personnel and equipment;
- 6% in the presentation of the contractual planning, executions and finalization documentation;
- 3% in the demobilization of personnel and equipment
- 45% for implementing and demobilizing the construction site;
- 15% for maintenance on the construction site;
- 10% for implementing fences, gates, pavement and street layouts;

On 02/21/2008, there was a request from the bidder Camargo Correa to alter this budget from 3% to 8%. The CIA identified that the Bidding Committee carried the revision of this percentage up to 15% (Circular 6 of 02/29/2008 – Appendix 23). This alteration represented the equivalent of around 9% of the amount of the contract (R$ 223.2 million).

The first payment related to the contract totaled R$ 34.6 million, in August 2008, the month after the contract signature, without there being consideration in services by the Consortium in this amount, characterizing an advance payment.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                    [logo: NP-3]

**5.5.2 Analysis of the consistency of the basic project – CCPR Consortium**

The basic project in the coke unit was prepared by Conoco Phillips, some supplementary documentation having been issued by ENGINEERING and from an Acid Water Treatment Unit by CENPES. The Contractual Appendix I – Descriptive Datasheet, Item 7.1, foresaw consolidation activity on the basic project and describes, as related services: *"to carry out minute technical studies of the documents for the Basic Project and the documents from FEED"* and *"to carry out the consolidation of the Basic Project of the units, taking into consideration, among other things, the reports on inconsistencies sent by PETROBRAS."*

For the coke portfolio, PETROBRAS had the obligation of furnishing around 20 pieces of equipment (vessels, compressors, furnaces, exchangers, "oil mist," distributed control system (SDCD) and Project Equipment Systems (PES)). The delay in the availability of technical information led to the postponement of the project development by the CCPR Consortium.

**5.5.3 Analysis of the amendments – CCPR Consortium**

The above-cited contract received 29 amendments, with the deadline being increased by 531 days and the amount by R$ 227,772,443.00. The datasheet on the amendments only dealt with the deadline extension.

Some amendments were observed with the aim of increasing the scope, arising from alterations in the basic project, as exemplified in the following: Amendment 5 – reinforcement of the tower trays; Amendment 10 – furnishing of equipment for Regenerative Caustic Treatment System; Amendments 13 and 14 – various alterations in scope (ex: modification of the ammonia vapor, inclusion of the anticorrosive coating on tanks, reinforcement in the metallic structure of tower supports, etc.).

Amendment 21 (amount of R$ 205,254,769.38 and deadline of 229 days), signed on 05/18/2012, resulted from the increase in indirect costs (indirect labor force (MOI), equipment, outsourced services, etc.) due to the extension of the contractual deadline, and had as the object: contractual re-planning, considering: a) Extension of the contractual deadline; b) Preservation of equipment, instruments or operating systems; c) Claims (permanence of the indirect labor force and equipment during the contractual period); d) Increases in services (propositions on altering the scope) of the same nature as the contractual object, and e) Additions to the budget for the compensation for costs corresponding to stoppages due to rain, atmospheric discharges and their consequences.

There was no evidence found by the CIA of events of noncompliance in the execution of the amendments. However, the CIA identified that the amendments were entered into,

[logo] BR *PETROBRAS*                                                              [logo: NP-3]

among other things, in order to incorporate the various modifications occurring in the execution of the works; a fruit of the contract with deficiencies in the basic project.

### 5.5.4 Analysis of the Extrajudicial Transaction – CCPR Consortium

In September 2013, a Private Instrument of Extrajudicial Transaction was signed (TEJ) with the CCPR Consortium in the amount of R$ 113,050,086.48, in relation to the payment for claims arising from: a) additional costs under PETROBRAS' responsibility for project alterations and modifications in scope; b) costs related to the inclusion of services for correcting errors in the basic project, integral to the documentation on the bidding process; c) payment for additional costs incurred by the Consortium arising from events under PETROBRAS' responsibility, which impacted the critical path of the work and resulted in the rescheduling of contract services, and in the implementation of the acceleration plan; d) payment for additional costs as a result of rain; e) the incidence of interest due on payments made after the due date on bills and invoices issued by the Consortium.

In order to conduct the process of analyzing the technical, legal and economic conditions related to the claim from the CCPR Consortium (around R$ 380.7 million), a Negotiation Committee was established locally (DIP ENG-AB/IEREFINO/IERP 7/2012 of 12/07/2012), which had no success in the pay-off of the negotiations. The CIA identified that the amount acknowledged was R$ 29.5 million.

Then a Special Negotiation Committee was designated with the CCPR Consortium (DIP ENG-AB/IEREFINO 13/2013 of 03/15/2013) for a solution to the contractual pending matters, with a representative from the ENG-AB and from AB-PGI. This practice found support in Contracting Instruction 29 – Claim Management in Project and Investment Contracts (Appendix 19), generated by ETM-CORP/GPRI/CONTS. The minutes of the IPTEJ were submitted to the Legal Department, which issued Opinion JURÍDICO/GT-PLEITOS/ENG-AB 4153/13.

The IPTEJ is described in DIP ENG-AB 350/2013 of 08/02/2013 (Appendix 24), signed by Maurício Guedes (ENG-AB), Joel Trindade Junior (interim ENG-GE), Wilson Guilherme Ramalho (AB-PGI), Erardo Gomes Barbosa Filho (E&P-SSE), Marco Tulio Pereira Machado (ENG-E&P) and Osmond Coelho Júnior E&P-PGSU), and sent to Directors José Antônio de Figueiredo (DETM) and José Carlos Cosenza (DABAST) for submission to the Board of Directors, on the authorization of the proposal, for their signature.

There was no evidence found by the CIA on the occurrence of noncompliance in the execution of the Extrajudicial Transaction.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                [Multiple signatures]

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

## 5.6 Contract for the offsite gasoline and coke portfolios – INTERPAR Consortium – Contract 0800.0043363.08.2

Object: "Furnishing of materials, equipment and services related to the analysis of the consistency of the basic project, preparation of the executive project, construction and electromechanical assembly, conditioning and pre-operation assistance, start-up, operation and maintenance support for the offsite units and systems belonging to the gasoline, coke and HDT portfolios of the Presidente Getúlio Vargas Refinery - UN-REPAR."

### Table 9 – Summary of the INTERPAR Contract

| Contractor | Initial Amounts | | | Contractual Changes | | | Extrajudicial Transactions | | Final Amounts | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Date signed | Duration Days | R$ (Million) | No. of Amend-ments | Shares Deadline | Amend-ments (R$ MM) | No. of TEJs | R$ (Million) | Deadline | R$ (Million) |
| INTERPAR (Setal, Mendes Jr., MPE) | 07/07/08 | 1,115 | 2,252 | 31 | 946 | 389 | 1 | 221 | 2,061 | 2,863 |

### 5.6.1 Analysis of the offsite contracting bid

Eighteen companies were invited, 3 proposals received, as one was declassified for excessively high prices (Table 10).

### Table 10 – Offsite bidding proposals received

| Proponent | Amount (R$ ) | Classification | Percentage in relation to Petrobras' estimate |
|---|---|---|---|
| INTERPAR Consortium- Setal/Mendes Junior/MPE | 2,253,710,536.05 | 1st | 8.73% |
| COROS Consortium - CNO/UTC/OAS | 2,472,953,014.05 | 2nd | 19.53% |
| QI Consortium - Queiroz Galvão/Iesa | 2,581,233,420.41 | declassified | 24.86% |

The CIA verified that there was no interposition of administrative appeals related to the decision on Bidding Erosion.

According to that cited in the Bidding Committee's report: *"Upon comparing the proposal from the INTERPAR Consortium as a basis for estimate, disregarding the budget foreseen for compensation for rain and atmospheric discharges, (R$ 46,000,000.00), we verified that same was situated at 8.73% over this; that is, within the previously established limit of acceptability."*

As to the item foreseen for the infrastructure of the construction site, the CIA identified that the public bid sent to the bidders on 04/30/2007 foresaw a budget equal to

[logo] BR *PETROBRAS*                                                        [logo: NP-3]

3% of the contractual item referring to the consolidation of the basic project, execution of the executive project, construction, assembly and conditioning of the units and offsite systems. On 02/12/2008, during the bidding process, Setal Oil and Gas requested a revision of this percentage from 3% to 6%, which was not accepted by the Bidding Committee, according to Circular 14 of 02/21/2007 (Appendix 25).

However, the CIA observed that the Bidding Commission allocated the percentage of 12% of the above-cited item, changing its decision regarding the non-acceptance of the request made by the company Setal Oil and Gas. This represented the amount of R$ 196 million for payment on the infrastructure item. The CIA did not find evidence of the reasons for this fact. As a result, the first two measurements of the contract reached R$ 44.2 million, paid in August 2008 (R$ 10.2 million) and September 2008 (R$ 34 million), right after the contractual signature (July 2008), without there being any evidence of consideration in services in this amount by the Consortium characterizing an advance payment.

### 5.6.2 Analysis of the consistency of the basic project

The scope of the contract with the INTERPAR Consortium was the consolidation of the basic project, comprised of the document analysis on the basic project prepared by PETROBRAS, pre-detail documents from engineering (FEED – quantitative spreadsheets) and documents from REPAR, and the issuance of the analysis of consistency report, considering the diverse information received in the bidding step and those originating afterward from other sources. Among the obligations related to the project, supplies and assembly, were the interconnections of process and utilities for the gasoline and coke portfolios (onsite); object of other contracting parties, besides the facilities that attended to the group of units, such as: new pipelines, a firefighting system, expansion of the pump complexes, expansion of the power house, new torches and a new compressor house. In this way, for the development of the project, including consolidation of the basic project, the INTERPAR Consortium needed the information derived from the other contracting parties, besides all the documentation made available on the occasion of the beginning of their activities; thereby characterizing the various interfaces between contracts, with an interdependence of information.

The CIA identified that the contract with the INTERPAR Consortium had its main interfaces with the following contracting parties: CONPAR Consortium (gasoline portfolio); CCPR Consortium (coke portfolio); Conenge-SC Consortium (cooling tower); Passarelli-GEL Consortium (industrial waste treatment unit – UTDI); Veolia-Enfil Consortium (expansion of the water treatment plant and reuse of effluents) and CBC (steam boilers).

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                      [logo: NP-3]

The flow of information relative to the above-cited interfaces can be seen schematically in figure 13.

**Figure 13 – Information flow on the projects – INTERPAR Consortium**

| Original Text | Translation |
|---|---|
| INSTALAÇÕES EXISTENTES | EXISTING FACILITIES |
| PROJETO BÁSICO (PB) | BASIC PROJECT (PB) |
| OUTROS PACOTES | OTHER PACKAGES |
| CONPAR Carteira de Gasolina | CONPAR Gasoline Portfolio |
| CCPR Carteira de Coque | CCPR Coke Portfolio |
| CONEGUE Torre | CONEGUE Tower |
| PASSARELLI Torre | PASSARELLI Tower |
| VEOLIA Tratamento de Área | VEOLIA Area Treatment |
| CBC Caldeiras | CBC Boilers |
| Fornecedores | Suppliers |
| Contrato Interpar | INTERPAR Contract |

The CIA found an interdependence between the projects (gasoline and coke portfolios), and that there were impacts on the contracts.

Specifically, on that referring to the contracting delays and those in the consolidation of the basic projects on the part of several contracting parties, Amendment 14 by the INTERPAR Consortium, of May 2011, contemplated the need for a contractual extension associated with this problem.

The following average delays are included in Amendment 14: *"The cooling tower system, average delay of 17 months; water and condensation treatment system, average delay of 14 months; interconnection system with boilers, average delay of 18 months; gasoline and coke interconnection system, average delay of 14 months."* Said amendment was for 371 days.

The CIA identified that the contract with the CONPAR consortium was signed without the required degree of maturity for the contractual activity of consolidation of the basic project. Table 11 shows the signature dates foreseen and execution of the various contracts that possess an interdependency with the offsite contract, and for which the delay in the release of the technical documentation needed for the consolidation activity, by PETROBRAS (more specifically, the flowcharts of the interconnection systems' processes, the power house, sulfur and torches), impacted the preparation of the project; significantly encumbering

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

the contract. Adjustments to the projects and modification of the scope of the utilities occurred during the bidding of the offsite contract (Appendix 26).

**Table 11 – Timetable of the offsite contracting**

| Contract | Forecast approval of Phase III (Jan/2007) | Forecast signature of CT-111 (Jul/2008) | Completed |
|---|---|---|---|
| CT-103 Cooling Towers | 08/31/2007 | 08/04/2008 | 06/01/2009 |
| CT-121 CBC MIP (Boilers) | 08/16/2007 | 08/12/2008 | 12/22/2008 |
| CT-149 Veolia-Enfil (UTRA+UTC) | 08/31/2007 | 05/02/2008 | 09/29/2008 |
| CT-114 Passarelti-GEL (UTDI) | 09/15/2007 | 10/14/2008 | 03/10/2009 |

### 5.6.3 Analysis of the amendments – INTERPAR Consortium

The contract received 31 amendments, with the deadline being increased by 920 days and the amount by R$ 551,810,000.00.

The most relevant amendments were:

• Amendment 10 – amount of R$ 20,132,536.49. Object: adaptation of the pipelines and of the pipe-racks of area 5300 situated between CAFOR and UTRA, adaptation of the de-aerated water system and alteration of the pipe-rack in area 5600 between the boilers GV-5604 and GV-56[illegible];

• Amendment 14 – amount of R$ 316,138,786.64 and deadline of 371 days. Object: extension of the deadline by 371 days, ending on 07/31/2012, payment of costs for increased resources and increased services; these being chemical cleaning, additional resources for pre-operation assistance and project modification of the offsite units and systems.

• Amendment 18 – amount of R$ 10,527,457.50. Object: increased services related to the project modifications at the offsite units and systems.

• Amendment 23 – amount of R$ 19,759,985.09. Object: adaptation of the services and supplies included in the project modification into the contractual scope.

In the analysis of Amendment 14, the CIA identified a lack of overall management on the contracts that comprised the coke and gasoline portfolios.

The defining criteria of the percentage of the INTERPAR Consortium's responsibility in the deadline extension granted in Amendment 14 corresponded with

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

the average delay in the delivery of process flowcharts, in relation to the contractually established dates (in a total of 75 flowcharts).

The CIA identified that, in defining this percentage, the planned delivery dates reported by the INTERPAR Consortium were used, for which there was acceptance by PETROBRAS for the supervision.

It is worth noting that this acceptance could only be ratified in regard to the contract signatures of the auxiliary units, which came about only after the issuance of these flowcharts by the Consortium.

Said matter was included in the Negotiation Committee's report on Amendment 14: *"The scope of the contract that is now in the process of being amended is the execution of the analytical services on the consistency of the basic project, preparation of the executive projects, supplies, construction, electromechanical assembly of interconnections between the new and/or existing units; and accordingly, in an interface and synergy with several contracts (with interfaces), that are currently being implemented at UO-REPAR."*

We highlight the main contracts with interfaces as follows:

a)  Contract CT-101: implementation of the units belonging to the Gasoline Portfolio and the Hydro-treatment units for unstable substances (UHDT), for Hydrogen Generation (UGH), and Diethanolamine (UDEA) of the Coke and HDT Portfolio;

b)  Contract CT-112: implementation of the auxiliary units and the Coke Unit (UCR).

c)  Contract CT-114: implementation of the Industrial Waste Treatment Unit;

d)  Contract CT-121: implementation of the boilers GV-5604 and GV-5605;

e)  Contract CT-103: implementation of the cooling tower;

f)  Contract CT-149: implementation of the water treatment unit (UTRA) an the condensate treatment [unit] (UTC).

The contracts for the implementation of utilities: CT-114, CT-121, CT-103 and CT-149 are complex and were signed at distinct times, after the start of the project consolidation services by the contracting party, for example:

a)  Cooling Tower; contract signed in June 2009;

b)  Boilers GV-5604 and GV-5605, in December 2008;

c)  Industrial Waste Treatment Unit (UTDI), in March 2009;

d)  Water and Condensation Treatment Units (UTRA and UTC), in September 2008.

[logo] BR *PETROBRAS*                                                                    [logo: NP-3]

The average deadline for basic project consolidation for the Contracting party is 7 months, according to projections in the planning manual. Considering the start of the services as being on 07/07/2008 (the date of Authorization of Services), the end date would be in January 2009. In other words, taking into account only the signature of the above-cited contracts, it was verified that the data on the definitive process and arrangements (layout) of the respective units were still those of the basic project made available by PETROBRAS.

With the evolution of the engineering works carried out by the contracting parties, some data on the process and arrangements was adjusted in relation to that which had been made available by PETROBRAS to the Contractor in the bidding phase.

No evidence was found by the CIA on the occurrence of noncompliance in the execution of the amendments. However, the CIA identified that Amendment 14 was signed due to a lack of comprehensive planning of the REPAR modernization work.

### 5.6.4 Analysis of the IPTEJ – INTERPAR Consortium

The Private Instrument of Extrajudicial Transaction (IPTEJ) was signed with the INTERPAR Consortium in the amount of R$ 221,079,671.50 (July 2013), in reference to the payment of additional costs for the rescheduling of services and those related to project alterations, under PETROBRAS' responsibility, with the purpose of closing out the existing pending matters related to the contract.

The negotiation occurred in two stages. The first sought to attend to the diverse revisions and modifications to the project; determinants for the continuity of the works and required in function of the inclusion of inclusions of inconsistencies in the basic projects, which generated a claim from the Consortium in the amount of R$ 25,070,132.27. The Negotiation Committee [that was] instituted at REPAR (DIP ENGINEERING/IEABAST/IERP 63/2012 of 08/27/2012) acknowledged an amount of R$ 4,658,506.09.

In a second stage, a Special Negotiation Committee was established (DIP ENG- AB/IEREFINO 5/2013 of 01/25/2013), in order to evaluate the other claims from the INTERPAR Consortium in regard to the extension of the contractual deadline, the cost of anticipated dates, requests for additional services and payments for rain, coming to R$ 1,068,783,579.22. The amount of R$ 216,421,165.41 was acknowledged.

Through the DIP ENG-AB 298/2013 of 06/28/2013 (Appendix 27), signed by Executive Managers Mauricio de Oliveira Guedes (ENG-AB) and Wilson Guilherme Ramalho da Silva (AB-PGI), sent to Directors José Antônio de Figueiredo (DETM) and José Carlos Cosenza (DABAST), the IPTEJ was submitted to the Board of Directors for authorization and signature. The authorization occurred on 07/18/203 (DE Minutes 5.049, Ruling 845).

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                     [logo: NP-3]

Declarations regarding the execution of the IPTEJ:

Declaration of Emerson Telles, IERP Sector Manager at the time: *"that the internal committee for negotiating the TEJ with INTERPAR could not come up with a solution and a negotiation because the Consortium refused to open detailed information that would allow for duly investigating the costs owed; that because of this, it was communicated to the higher job title and, as a result, this was cancelled and a special negotiation committee was created; that the special negotiation committee evaluated the claims by the TEJ through other methodologies, different than the coefficients of the parties' liabilities that were used in the IERP."*

Declaration of Guilherme Klingelfus, REPAR/EM Manager at the time: *"that the last amendments were negotiated by special committees, due to difficulties in coming to an agreement with the contracting parties in the Enterprise's environment;" "that he remembers that, in the contracts signed with the INTERPAR and CCPR Consortiums, the main point was related to the amount claimed by the companies, which was well over that which the Enterprise understood to be correct;" "that the methodology adopted for evaluating the claims from the consortiums was much discussed;" "that no flexibility of the contract signature was ever discussed that he knows of;"*

Declaration of José Paulo de Assis, ENGINEERING/IERP Manager at the time: *"that some claims that came under analysis by the TEJ negotiation committees had not been accepted by the IERP;"*

Declaration of Paulo Ruiz, ENGINEERING/IERP Sector Manager at the time: *"that the charges, in the sense of evaluating the claims, by IERP and REPAR, were often delayed until the conclusion of the amendments which led to the TEJs negotiated by the Special Committees appointed by the Headquarters; that the IERP maintained an irreprehensible stance in the negotiation of the claims and amendments; that the Special Committees that negotiated the last amendments and TEJs passed over the analyses done by the IERP and accepted claims that until then were negotiated at local levels; that he believes that in the TEJ there may have been payments made on undue claims."*

Declaration of Sérgio de Souza Albuquerque, Technical Consultant of Supplies at the time: *"that he was a member of the special committees of the IPTEJ of Interpar, CCPR, Skanska-Engevix, CONPAR, VWSB-Enfil, Confab, Azevedo Travassos, ABB-Cegelec-MHA, Contreras, Montecalm-SES, representing the AB-PGI; that the guidance was to resolve the pending matters from the technical, legal and economic analyses, with the most advantageous and suitable result for Petrobras and to issue documentation for legal approval and analysis; that the delays in the works were significant, sometimes more than doubling the timeline of the service; that there was a mistake in the implementation strategy for the*

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

*enterprises in assuming the purchase of equipment to supply to Engineering, Procurement and Construction (EPC-ists); that there was a delay in the delivery of the acquired equipment and, consequently, the contracts were amended in deadlines and in amounts afterward; that there were many contract amendments on account of these delays; that due to the fact that Petrobras is the responsible party for the equipment delays and, as a result, of the work, the negotiations were closed with a high percentage of liability for Petrobras; that when negotiating the closing of the contract, the IERP reported that Petrobras' percentages of liability were reduced during the progress of the work, considering that the equipment had been delivered and the work had been released; that this generated difficulties in the negotiation for which the special negotiation committees were created for the IPTEJ."*

No evidence was found by the CIA on noncompliance in the execution of the Extrajudicial Transaction.

## 5.7 Impacts arising from the absence of a comprehensive managerial timetable of the Enterprise

Keeping in mind the complexity of the enterprise, with the diversity of onsite and offsite units, and, moreover, the elevated amount of interfaces arising from this, there was a need to have a comprehensive managerial timetable of the Work, the monitoring of which led to decision-making with the aim of avoiding each portfolio being realized independently, so as to minimize the deadline and cost impacts. The CIA found that such a comprehensive managerial timetable did not exist, and this was confirmed in declarations, as transcribed below:

Declaration of Oscar Tokikawa, REPAR/EM Manager at the time: *"that there was not a comprehensive timetable; that there was always a demand from REPAR along with ENGINEERING, but that it never existed'; that there were various attempts at integration between REPAR and IERP in order to arrive at a comprehensive timetable, but that it never came to be done; the IERP alleged that there were many timetable interfaces and that it could not make a timetable backed by details on the project; that the deadlines for consolidation of interfaces between utilities, pipelines, ETDI, various units, was underestimated; that there was no deadline for enabling the consolidation of information and interlinking the contracts in an adequate way; that the deadlines for interlinking the contracts and the contract planning vis-à-vis the times for interface consolidation was the main cause for the delay in the work."*

Declaration of José Paulo de Assis, IERP Manager at the time: *"that he worked between 2002 and 2013 as the IERP manager; that he has no knowledge whether a comprehensive timetable on the work was presented to the Board at managerial levels, but that he believes that it was presented by Supplies; that the management of*

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                                        [logo: NP-3]

*the integrated portfolio was evolving during the execution of the works in the company with meetings held by the Local Distribution Companies (CDLs)."*

Declaration of João Oderich, REPAR General Manager at the time: *"that the fact of the bidding on the interconnection works (INTERPAR) having been held back ended up impacting the progress on the other fronts."*

Declaration of Emerson Telles, IERP Sector Manager at the time: *"that there were delays in formalizing the contracts for the onsite units and that the interconnections contract was impacted by the delay in the receipt of the data on the consolidated processes for the onsite and offsite units; that in order for the interconnections contract to advance, the information was needed on the onsite units that had delayed contracts in relation to the foreseen timetable; that the delay in the contracting of the onsite and offsite units impacted the progress of the INTERPAR contract; that the modifications in the utilities projects in the units ended up impacting the interconnection projects."*

The nonexistence of a comprehensive managerial timetable for the work was a critical factor in the impact on the deadline and cost and did not allow for systematic monitoring and adequate decision-making.

## 5.8 Impacts on job deadlines and costs due to the supply of critical equipment by PETROBRAS

The CIA verified, according to the declaration of General Manager of MATERIALS, Marco Aurélio Rosa Ramos, that the strategy for PETROBRAS to directly supply equipment considered to be critical for the work *"was put together in a huge Workshop conducted by the Company; that the former General Manager of MATERIALS and representatives from the Negotiation departments participated in the Workshop (SUPPLIES and ENGINEERING)."* Equipment was acquired and supplied, such as: HDT reactors, heat exchangers, steam boilers and special compressors. Such acquisitions suffered significant delays, as shown in Table 12.

**Table 12 – Delays in the delivery of equipment acquired by PETROBRAS**

| Portfolio | Equipment | Supplier | Order Date | Delivery Date | Delay (days) |
|---|---|---|---|---|---|
| Gasoline | Compressor | ELLIOT | Jan/2010 | Mar/2011 | 425 |
| | Compressor | KOBELCO | Jul/2010 | Jan/2011 | 180 |
| | Exchanger | GODREJ | Mar/2010 | Apr/2011 | 395 |
| | Compressor | THOMASSEM | Apr/2010 | Jan/2011 | 270 |
| | Pump | FLOWSERVE DO BRASIL | Jun/2010 | Sep/2011 | 425 |
| | Boilers | CBC | Jul/2009 | Apr/2011 | 270 |
| Coke | Compressor | ELLIOT | Jul/2009 | Apr/2011 | 540 |

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                              [Multiple signatures]

[logo] BR *PETROBRAS*                                                                  [logo: NP-3]

|  | Reactors | GODREJ | Apr/2009 | Aug/2011 | 650 |
|---|---|---|---|---|---|
|  | Pumps | SULZER | May/2010 | Jan/2011 | 240 |
|  | Exchangers | LARSEN & TOUBRO | Feb/2009 | Aug/2010 | 575 |
|  | Compressor | ELLIOT | Aug/2009 | Apr/2011 | 635 |
|  | De-coking System | FLOWSERVE | Oct/2011 | Dec/2011 | 60 |
|  | Analyzer's House | PENSALAB | Oct/2012 | Oct/2013 | 365 |

These delays impacted the timetables and were acknowledged by PETROBRAS, and, as a result, generated increased deadlines and costs in the work.

The CIA identified that the delay in supplying the equipment on the part of PETROBRAS was one of the main factors in the impact on the deadline and cost of the work.

Regarding the reasons for such delays, the MATERIALS and ENGINEERING departments attributed the failure to meet the deadlines to the elevated demand along with the supplier market, as PETROBRAS was purchasing beyond the manufacturing capacity, as well as establishing inviable deadlines. They further cited PETROBRAS' delay in furnishing technical information to the suppliers, as described below:

Declaration of Fernando Biato, General Manager of ENGINEERING/IEABAST at the time: *"that at the time of the works there was no information that the critical equipment would be delayed for such a long time; that due to the fact that the expectation was that there would not be such long delays in the delivery of the equipment, the possibility of demobilizing the work was not suggested."*

Declaration of João Oderich, General Manager of REPAR at the time: *"that the impact of the equipment supplied by the companies Godrej, Larsen, Thomassen, Elliot, Sundyne, etc. was large; that the same thing occurred with other suppliers such as Siemens and Sulzer."*

Declaration of Maurício Costa, MATERIALS/CO Manager at the time: *"the market was very hot, a fruit of the very acquisitions by PETROBRAS; that there was a change in technology (chrome-molybdenum and chrome-molybdenum for vanadium); that there were few companies in this new technology; that there was the question of the development of the national content; that the companies did not have steel available; that all this would impair the progress/deadline of the projects; that the market was asking for a lot of postponements for preparing proposals; that the market was also very overloaded (full portfolio); that the purchasing processes of compressors were extremely delayed (technical opinion delayed); that it did not have a national supplier's license for supplying a "breech lock" (exchanger)."*

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                            [logo: NP-3]

Declaration of Oscar Tokikawa, REPAR/EM Manager at the time: *"that the delay in delivering the equipment acquired by PETROBRAS also impacted the works; that the delay of the reactors manufactured in India delayed the work;" "that there was a delay on the compressors and that these delays also impacted the timetable of the work; that the deadlines for supplying equipment were underestimated by PETROBRAS; that standard equipment delivery deadlines were stipulated that were not confirmed; that the world market of equipment was hot and that this impacted the deadlines for supplying the equipment acquired by the Company."*

Declaration of Mário Castrillon, IERP Sector Manager at the time: *"that due to the indefiniteness of the delivery deadline for the critical equipment, which changed constantly, the resources and equipment of the EPC members remained mobilized at the site; that there was a committee for negotiating the amendments for costs;" "that the main cause of delay in the CONPAR Consortium works was the purchase and supply of critical equipment by PETROBRAS."*

Declaration of Asley Monteiro, MATERIALS/CO/ECPL Sector Manager at the time: *"that the national market was unable to furnish the steel specifications for new equipment; that few factories in the world manufactured special steel to meet the great demand of the market; that PETROBRAS' specifications were not considered traditional by the suppliers due to the more restrictive manufacturing criteria and special materials; that there were peculiarities in the equipment specifications that led to a lot of questioning during the bid; that the market for supplying large machines was very saturated; that production problems were detected in the supply of equipment manufactured by Godrej (India); that adjustments were needed in Godrej's manufacturing process which ended up impacting REPAR's works."*

Declaration of Paulo Ruiz, IERP Sector Manager at the time: *"that MATERIALS delayed the purchasing deadlines, that MATERIALS' cash was insufficient for attending to the acquisitions of PETROBRAS' works.*

## 6. VERIFICATIONS FROM AUDITS

The CIA identified the following matters reported in audit reports conducted at REPAR during the execution of the works:

### 6.1 Internal Audits

In the report of 01/07/2008, the Internal Audit mentioned the fact of the inclusion of the companies Constran and Alusa during the bidding processes for the construction works at the propane unit (Skanska-Engevix Consortium), and of

[logo] BR *PETROBRAS*                                                                                    [logo: NP-3]

modernization of the electrical facilities (ABB/Cegelec/MHA Consortium), after the call notices had been sent. The report recorded that, in spite of having "the agreement" of the Supplies and the Services Directors (acting), the inclusion of companies after the beginning of the processes would be subject to a new approval by the Board of Directors, before finalizing the process, in function of the jurisdictional limits.

In relation to the direct contracting of the CONPAR Consortium, the Internal Audit report of 07/11/2008 pointed out a revision in the estimated prices from the contracting party's proposal and without evidence of adopting technical or marketing criteria. According to the report, PETROBRAS' alteration in the budgeting required justifications for the alterations on certain items. (such as: a history of machines and labor force, social security contributions, budget for installing the construction site and costs such as medical assistance), *"revealing gaps that were only identified after a comparison with the Price Formation Statement (DFP) of the bidder,"* and recommending that a procedure be established for adapting the estimated futures to the market situation. Also recorded was the non-compliance with the recommendations indicated in the opinion JURÍDICO/JSERV 5148/2007, in reference to the above-cited direct contracting.

Finally, in the report of 06/17/2010, the Internal Audit pointed out an alteration in the flow of repayment foreseen in the notice, implying advance billing to the CCPR Consortium, through the revision of the percentages for the valuation of the Infrastructure services (that it went from 3% to 15% of the amount of the item Basic Project Consolidation and Preparation of the Executive Project, Civil Construction, Electromechanical Assembly and Conditioning); on the basic and executive projects (increased from 7% to 14% of the amount of the items for Civil Construction, Electromechanical Assembly and Conditioning); and conditioning services (which increased from 3% to 6% of the amount for the items of Construction and Electromechanical Assembly).

As to the contracting of the CCPR and INTERPAR Consortiums, elevated percentages were observed in the allotments for Contingency and Profit that comprised the contracted prices, in the order of 17.65% and 21.7 %, respectively, which would be incompatible with the average indicators presented in agreements by the TCU at that time.

## 6.2 Analysis of TCU Judgments

The Federal Court of Auditors (TCU) conducted verifications related to the contracting processes for the REPAR modernization works. The main findings were related to:

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

- irregularities in the execution of the works at the gasoline, coke and propane units;
- deficient or outdated basic project;
- restrictions on the competitiveness of the bid;
- contingency reserve integral to the Indirect Profits and Expenses (BDI) was considered excessive and the BDI differentiated by the type of service;
- contractual prices above the price average of the Sinape and Datafolha systems
- different contractual prices for identical services;
- indications of overpricing and overbilling in the construction and assembly contract for the water treatment, cooling and condensation units.

Part of the matters dealt with in the verifications of the TCU related to the contracts for the REPAR modernization works comprised the object of the CIA. Among these, the CIA ratified the identification of failures in the bid on basic projects. The matters that involved price analysis and/or indications of overbilling did not comprise the scope of the CIA (see Item 1).

## 7. NONCOMPLIANCE

The CIA found the existence of the following noncompliance during the course of the works:

### 7.1 Bids with immature basic projects

Immature basic projects were used in the contracts for goods and services related to the works on the coke and gasoline portfolios, which generated the need for contractual alteration during the course of the works, with impacts on costs and deadlines (see Items 4.3, 5.4.2, 5.5.2 and 5.6.2).

### 7.2 Inclusion of companies after the beginning of the bidding process, which did not meet the selection criteria

The CIA identified the inclusion of the companies Alusa and Construcap in the bidding process for contracting onsite units in the coke portfolio, without a previous submission to the Board of Directors (see Item 5.5.1). Besides this, the CIA also identified the inclusion of the companies Alusa, Azevedo & Travassos Engenharia, Construtora Aterpa and UTC Engenharia in the bidding process for contracting the UTDI, which did not meet the selection criteria, without a previous submission to the Board of Directors (DIPs ENGINEERING 415/2007 of 06/13/2007, 365/2008 of 05/14/2008 and 383/2008 of 05/23/2008 - Appendix 28). Said companies did not meet the previously established selection criteria.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                [Multiple signatures]

[logo] BR *PETROBRAS*                                                                                    [logo: NP-3]

The CIA also considered the justification presented for the inclusions – increased competitiveness – to be insufficient, which could have been used for any other companies participating in the process.

### 7.3 Direct contracting by the CONPAR Consortium with substantial alterations in the contractual conditions related to the previously cancelled bid

During the direct negotiation process for contracting the onsite units in the gasoline portfolio, the CIA identified that substantial alterations occurred in the contractual conditions, in relation to those originally considered in the bid that had been previously cancelled due to excessively high prices. Such modifications represented noncompliance in relation to the legal and normative guidance, and are described in Item 5.4 of this Report.

### 7.4 Improper framing of the proposal at a limit higher than the range of admissibility (-15% to +20%)

At the end of the negotiation process with the CONPAR Consortium, the amount of R$ 52,012,130.93 was added to the proposal, under the heading of compensation for costs of stoppages from rain, lightning and their consequences, and quantitative differences [assessments]. Part of this amount (around R$ 49 million) was already contained in the estimate previously prepared by PETROBRAS, and, therefore, the CIA considered that it had been contemplated in duplicate. This allowed for the framing of the proposal at a limit higher than the range of admissibility. Otherwise, the proposal would have been 23.2% above the estimate. See Item 5.4.1.3.

### 7.5 Non-compliance with the recommendation from the Legal Department regarding the need for evaluation by the Financial Department for contracting the CONPAR Consortium

For the contracting of the CONPAR Consortium, the Legal Department recommended, in June 2007 (DIP JURÍDICO/JSERV 4874/2007), the evaluation of this contract by the Financial Department – see Item 5.4.1.3.c. The CIA did not find evidence of compliance with this recommendation.

In addition, the Planning System, Investment Project Approval and Monitoring from the previous Petrobras System, by reason of the increase in the investment amount being higher than 20% (from US$ 577 million to US$ 1.1 billion), that the submission to the Board of Directors for reevaluating the continuity of the project should have been accompanied by the opinions of corporate departments involved (Strategy, Performance, Finance, Taxes and Safety, Environment and Health (SMS) – see Item 4.1.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

## 8. OTHER OBSERVATIONS AND SALIENT POINTS

The CIA considered the following items as other observations and salient points:

a) The simultaneity of works and enterprises in PETROBRAS, especially in Supplies, with impacts on the provision of goods and services.

b) The absence of a comprehensive managerial timetable on the portfolios for the REPAR modernization program (gasoline and coke), which impeded the vision of the interfaces and interdependencies among the various steps in the work;

c) Signature of the contract with the INTERPAR Consortium before the signature of other contracts on auxiliary units, which served as input for the consolidation of the offsite basic and executive projects (see Item 5.6.2);

d) The supply of critical equipment by PETROBRAS, which assumed the risk of delays, with impacts on the costs and deadlines in the construction and assembly contracts (see Item 8.1).

e) The nonexistence of administrative appeals filed by bidders during the analyzed contracting processes on goods and services (see Item 5.2).

f) Revisions to cost estimates during the contracting processes (see Item 8.1).

g) Completion of advance payments in amounts unforeseen in the bidding processes (see Items 5.5.1 and 5.6.1).

h) Acts practiced by Directors Paulo Roberto Costa and Renato Duque for subsequent approval by the Board of Directors (see Item 8.2).

i) Formalization of the amendments on increased deadlines, by the Manager of ENGINEERING/IEABAST/IERP, when it was already known that such amendments would have impacts on costs, and that, therefore, they should be submitted to the Board of Directors.

j) Remittance of the call notice for the EPC bid on the UTDI on 04/23/2007, before the approval of the Board of Directors, according to DE Minutes 4.641, Item 16, Ruling 438 of 04/26/2007.

k) Approval on the continuity of the gasoline and coke portfolios in August 2007 and June 2008, on the occasion of the authorizations for contracts of the CONPAR, CCPR and INTERPAR Consortiums, without the opinions from the corporate departments, as indicated in the Investment Project Planning, Approval and Monitoring System in force at that time. The CIA identified that subsequently, in June 2009, the obtainment of such opinions came to be optional.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                    [logo: NP-3]

**8.1 Revisions of the previous costs estimated during the contracting processes**

The previous cost estimate is PETROBRAS' internal parameter for establishing the price of certain goods or services, so as to set criteria for analyzing the proposals presented by companies that participated in a bidding process. In this way, it should be prepared judiciously, and its content treated confidentially.

At the time of execution of the contracting processes for the REPAR Modernization Program, the conditions for possible revisions to the previous cost estimate after the opening of the business proposals were consolidated in a legal opinion - DIP JURIDICO/JSERV 4611/05 (Appendix 25) – with the following excerpts:

*"(...) there is no irregularity in promoting the alteration of the cost estimate during the course of the bidding, being after the opening of the bidder's prices.*

*Still, it is important to emphasize that this revision on the estimate should always be adopted as an exceptional measure."*

*"(...) the first estimate should always be prepared by specialized technical teams, founded on rigorous technical criteria, market evaluations, diligence, past experiences, etc. There lies the reason for the need for a revision to be presented in few opportunities."*

*"The new technical study should be guided by the same rigorous criteria by which the original was made (by the way, these criteria should be adopted in any of PETROBRAS' estimates), for the technical team to be able to take advantage, as a reference, of the new information and indications that were brought up by the bidder's proposals.*

*This new study may never take on the character of mere ratification of the bidder's proposals. That is, it cannot serve for simply approximating the amounts without any criteria, with the sole objective of making the bidder's proposals classifiable. This would be totally incorrect."*

The revision to the previous cost estimate, however, is a lawful and regular procedure, and should be adopted exceptionally, and since there remain proven alterations in the market situation that may reflect a price variation on the service to be contracted, it should not be used in any way as an artifice for making the proposals classifiable.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                [logo: NP-3]

The CIA found evidence of the occurrence of revisions to previous cost estimates after the receipt of proposals in the bidding, and which resulted in the framing of the proposal within the established margin (from -15% to +20%). Table 13 shows that the estimate revision procedure happened in 11 of the 18 processes analyzed.

**Table 13 – Revisions to estimates in the processes analyzed by the CIA**

| Object | No. Of Companies Invited | No. Of Proposals Received | Original Estimate (R$ ) | No. Of Revisions | Final Estimate (R$ ) |
|---|---|---|---|---|---|
| Off-site | 18 | 3 | 2,076,398,713.04 | - | 2,076,398,713.04 |
| Coke On-site | 20 | 3 | 2,006,009,404.98 | 1 | 2,093,988,284.45 |
| On-site gasoline and part of coke | 22 | 3 | 1,372,799,201.00 | 2(*) | 1,475,523,356.00 |
| UTRA and UTC | 6 | 3 | 436,674,880.57 | - | 436,674,880.57 |
| UTDI | 24 | 7 | 464,941,096.95 | - | 464,941,096.95 |
| Boilers | 10 | 3 | 428,445,066.87 | - | 428,445,066.87 |
| Propane | 18 | 4 | 267,293,832.17 | 1 | 246,741,957.06 |
| Substations | 34 | 8 | 197,309,042.10 | 1 | 168,887,046.98 |
| Propane Spheres | (**) | | 99.030.580.29 | - | 99,030,520.29 |
| CONFAB Load Furnaces | 7 | 7 | 113,773,786.83 | 1 | 118,058,347.54 |
| UGH Reforming Furnaces | 9 | 5 | 118,673,569.00 | - | 118,673,569,.00 |
| Reactors GODREJ (Gr. B1) | 11 | 3 | 48,029,067.62 | 1 | 66,125,614.68 |
| Reactors CONFAB (Gr. B2) | 11 | 3 | 42,734,160.39 | 1 | 46,061,199.08 |
| Reactors CONFAB (Gr. C1) | 13 | 7 | 3,782,494.24 | 1 | 7,257,272.72 |
| Exchangers GODREJ (27) | 9 | 2 | 13,754,231.18 | - | 13,754,231.18 |
| Modifications in the UTAA and URE | 35 | 6 | 62,652,319.57 | 1 | 48,367,836.17 |
| Interconnection 230 kVA | 30 | 8 | 73,351,756.26 | 1 | 49,664,229.75 |
| Coke barrels | 4 | 3 | 41,345,428.80 | 1 | 43,627,481.69 |

(*) The revisions occurred during the direct negotiation step, after the cancellation of the previous bidding process due to excessively high prices.

(**) Through the DIP MATERIALS 250/2006 of 10/09/2006, a proposition was submitted to the Board for the cancellation of the bidding process for the acquisition of 5 of REPAR's spheres, and the establishing of negotiation for the direct contracting with the companies Confab, Jaraguá, IESA and mechanical [Illegible], in order to attend to the various enterprises in the E&P and supplies departments; among which is REPAR.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

## 8.2 Acts practiced by Directors for subsequent approval by the Board of Directors

PETROBRAS' table of the jurisdictional limits established the acts that are likely to be practiced by the Directors individually. In relation to the contracting processes, actions in values of R$ 32 million and above are under the exclusive jurisdiction of the Board of Directors. In the contracting processes for the REPAR Modernization Program, the CIA identified that Directors Paulo Roberto Costa and Renato de Souza Duque practiced acts outside of their authority, which was subsequently approved by the Board of Directors, among which are:

- The inclusion of companies after the decision by the Board of Directors regarding the establishment of the beginning of the bidding process;
- Authorization for the signature of the contract for acquisition and assembly of spheres in the amount of R$ 84,166,503.72, without previous submission to the Board of Directors;
- Authorization for the beginning of the manufacturing process of the 5 propane spheres on 05/17/2007, by Director Renato de Souza Duque – the Board of Directors approved the contract on 06/28/2007, in DE Minutes 4.649, Item 27, Ruling 684 (Appendix 30);
- Authorization to proceed with the bidding process for the contracting of the modifications in the UTAA and URE, the amount of which was initially estimated at the jurisdictional limit of the Director, and went on under the jurisdiction of the Board of Directors.


## 9. REGARDING PEOPLE

### 9.1 Paulo Roberto Costa

- Was the Director of Supplies (DABAST) between May 2004 and April 2012, responsible for the implementation of the REPAR Modernization Program;
- Forwarded to the Board of Directors, along with Renato de Souza Duque, a proposition for negotiating the contract with the CONPAR Consortium;
- Forwarded to the Board of Directors, along with Renato de Souza Duque, a proposition for signing the contract with the CONPAR Consortium;
- Forwarded to the Board of Directors, along with Renato de Souza Duque, a proposition for signing the contracts related to the REPAR modernization system;
- Forwarded to the Board of Directors, along with Renato de Souza Duque, propositions on the continuity of implementing REPAR's gasoline and coke portfolios;
- Authorized the inclusion of companies in the bidding process for the coke portfolio which did not meet the selection criteria. Subsequently, he forwarded it for approval by the Board of Directors;

[logo] BR *PETROBRAS*                                                                                      [logo: NP-3]

- Forwarded, on 08/15/2007 the DIP DABAST 61/2007 to the Executive Manager Alan Kardec (AB-RE), in response to the DIP AB-RE 238/2007, reporting that the postponement of investments in the Supplies portfolios would be prejudicial to PETROBRAS' negotiations.
- Was responsible for the noncompliance cited in Items 7.1, 7.2, 7.3, 7.4 and 7.5.


## 9.2 Renato de Souza Duque

- Was the Director of Services (DSERV) between February 2003 and April 2012; responsible for the contracting processes for goods and services for the REPAR Modernization Program;
- Forwarded to the Board of Directors, along with Paulo Roberto Costa, a proposition for negotiation of direct hiring of the CONPAR Consortium;
- Forwarded to the Board of Directors, along with Paulo Roberto Costa, a proposition for signing the contract with the CONPAR Consortium;
- Forwarded to the Board of Directors, along with Paulo Roberto Costa, a proposition for signing the contracts pertaining to the REPAR Modernization Program;
- Forwarded to the Board of Directors, along with Paulo Roberto Costa, a proposition for the continuity of the implementation of REPAR's gasoline and coke portfolios;
- Authorized the inclusion of companies in the bidding on the coke portfolio, which did not meet the selection criteria. Subsequently, he forwarded it for approval by the Board of Directors;
- Was responsible for the noncompliance cited in Items 7.1, 7.2, 7.3, 7.4 and 7.5.


## 9.3 Pedro José Barusco Filho

- Was the Executive Manager of Engineering between February 2003 and March 2011;
- Forwarded, along with Executive Manager Alan Kardec Pinto (AB-RE), to Director of Supplies Paulo Roberto Costa, and Director of Services, Renato de Souza Duque, propositions for authorization of tenders on the onsite and offsite units of the gasoline and coke portfolios;
- Forwarded, along with Executive Manager Alan Kardec Pinto (AB-RE), to Director of Supplies Paulo Roberto Costa, and Director of Services, Renato de Souza Duque, a negotiation proposition with the aim of direct contracting with the CONPAR Consortium;
- Forwarded, along with the acting Executive Manager Luiz Alberto Gaspar Domingues (AB-RE), and Executive Manager Venina Velosa da Fonseca (AB-CR), to the Directors of Supply, Paulo Roberto Costa, and of Services,

[logo] BR *PETROBRAS*                                                                 [logo: NP-3]

Renato de Souza Duque, propositions for the continuity of the implementation of the gasoline portfolio and for signing the contract with the CONPAR Consortium;

• Forwarded, along with Executive Manager Luiz Alberto Gaspar Domingues (AB-RE), to the Director of Supplies, Paulo Roberto Costa and Director of Services, Renato de Souza Duque, the proposition for the inclusion of the companies Alusa and Construcap, which did not meet the selection criteria in the bidding process for the onsite coke portfolio, for subsequent approval by the Board of Directors;

• Forwarded to the Director of Supplies, Paulo Roberto Costa and Director of Services, Renato de Souza Duque, propositions for signing the contracts on REPAR's gasoline, coke and propane portfolios.

• Was responsible for the noncompliance cited in Items 7.1, 7.2, 7.3, 7.4 and 7.5.


**9.4 Alan Kardec Pinto**

• Was the Executive Manager of Supplies-Refining (AB-RE) between June 2004 and August 2007;

• Forwarded, along with Executive Manager Pedro José Barusco Filho (ENGINEERING), to the Director of Supplies, Paulo Roberto Costa and Director of Services, Renato de Souza Duque, propositions for the authorization of the bids on the onsite and offsite units for the gasoline and coke portfolios;

• Forwarded, along with Executive Manager Pedro José Barusco Filho (ENGINEERING), to the Director of Supplies, Paulo Roberto Costa and Director of Services, Renato de Souza Duque, a negotiation proposition with the aim of directly contracting the CONPAR Consortium;

• Forwarded DIP AB-RE 238/2007 on 08/14/2007, to Director Paulo Roberto Costa, proposing the constitution of a Working Group in Supplies for analyzing the possibility of elongating the timetable for the gasoline portfolio and the addition of signing new contracts;

• Was responsible for the noncompliance cited in Item 7.1.


**9.5 Luiz Alberto Gaspar Domingues**

• Was the General Manager of Refining Enterprises (AB-RE/EM) between November 2000 and August 2007.

• Was the Executive Manager of Refining Enterprises (AB-RE) between August 2007 and June 2008.

• Was the Executive Manager of Supplies Investment Programs (AB-PGI) between June 2008 and September 2009.

• Forwarded, along with Executive Manager Pedro Barusco Filho (ENGINEERING) and Executive Manager Venina Velosa da Fonseca (AB-CR) to the

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                                    [logo: NP-3]

Director of Supplies, Paulo Roberto Costa and Director of Services, Renato de Souza Duque, propositions on the continuity of the implementation of the gasoline portfolio and for signing the contract with the CONPAR Consortium.

- Forwarded, along with Executive Manager Pedro Barusco Filho (ENGINEERING), to the Director of Supplies, Paulo Roberto Costa and Director of Services, Renato de Souza Duque, the proposition for the inclusion of the companies Alusa and Construcap, which did not meet the selection criteria in the bidding process for the onsite coke portfolio, for subsequent approval by the Board of Directors;
- Was responsible for the noncompliance cited in Items 7.1, 7.2, 7.3, 7.4 and 7.5.


### 9.6 Venina Velosa da Fonseca

- Was Executive Manager of Corporate Supply (AB-CR) between September 2005 and October 2009.
- Forwarded, along with the acting Executive Manager Luiz Alberto Gaspar Domingues (AB-RE) and Executive Manager Pedro José Barusco Filho (ENGINEERING), to the Director of Supplies, Paulo Roberto Costa and Director of Services, Renato de Souza Duque, propositions on the continuity of the implementation of the gasoline portfolio and for signing the contract with the CONPAR Consortium.
- Forwarded to Executive Manager José Carlos Cosenza (AB-RE) the reevaluation of REPAR's coke portfolio on 06/11/2008, recommending the implementation of the enterprise.
- Was responsible for the noncompliance cited in Item 7.5.


### 9.7 Fernando Almeida Biato

- Was the General Manager of Engineering (IEABAST and IEREFINO) between November 2000 and October 2010, responsible for the REPAR enterprise;
- Was responsible for preparing the proposition to Pedro José Barusco Filho for the negotiation on direct contracting with the CONPAR Consortium;
- Was responsible for preparing the proposition to Pedro José Barusco Filho, to be forwarded to the Director of Supplies, Paulo Roberto Costa and Director of Services, Renato de Souza Duque, for submission to the Board of Directors, for authorization on the bids and direct contracting (CONPAR Consortium) for the REPAR Modernization Program;
- Was responsible for the noncompliance cited in Items 7.1, 7.3 and 7.4.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                              [logo: NP-3]

**9.8 José Paulo Assis**

- Was the Manager of the REPAR Enterprise Implementation (ENGINEERING/IEABAST/IERP) between August 2002 and August 2013; locally responsible for all the steps in the REPAR enterprise;
- Was responsible for forwarding propositions to Fernando Almeida Biato for authorizations on bids and for direct contract negotiation (CONPAR Consortium);
- Was responsible for forwarding the proposition to Fernando Almeida Biato for direct contracting of the CONPAR Consortium;
- Constituted the Negotiation Committee for the direct contracting of the CONPAR Consortium and approved the negotiation report;
- Was responsible for the noncompliance cited in Items 7.3 and 7.4.

**9.9 Luiz Antônio Scavazza**

- Was the Sector Manager of Construction and Assembly at the REPAR HDS Unit (ENGINEERING/IEABAST/IERP/CMHS) between April 2007 and March 2008;
- Coordinated the Negotiation Committee for direct contracting of the CONPAR Consortium and submitted the negotiation report to the Manager José Paulo Assis;
- Was responsible for the noncompliance cited in Items 7.3 and 7.4.

**10. CONCLUSIONS**

The CIA concluded that the contracting processes for REPAR's modernization works presented the following noncompliance:

- Tenders with immature basic projects;
- The inclusion of companies, after the beginning of the bidding process, that did not meet the selection criteria;
- Direct contracting of the CONPAR Consortium with substantial alterations in the contractual conditions in relation to the previously cancelled bid;
- Improper framing of the proposal, at a limit higher than the range of admissibility (-15% to +20%) in the direct contracting of the CONPAR Consortium;
- Noncompliance with the recommendation from the Legal Department regarding the need for evaluation by the Financial Department for contracting the CONPAR Consortium.

In addition, the CIA verified the following observations and salient points:

- The simultaneity of the works and enterprises in PETROBRAS, especially in Supplies, with impacts on the supply of goods and services;

[logo] BR *PETROBRAS*                                                                            [logo: NP-3]

- The absence of a comprehensive managerial timetable on the portfolios in the REPAR Modernization Program (gasoline and coke), which impeded the aim of the interfaces and the interdependencies among the various steps of the work;
- Signing the contract with the INTERPAR Consortium before signing the other contracts on auxiliary units, which served as input for the consolidation of the offsite basic and executive projects;
- The supply of critical equipment by PETROBRAS, which assumed the risk of delays with impacts on costs and deadlines in the construction and assembly contracts;
- The nonexistence of administrative appeals filed by bidders during the analyzed contracting processes on goods and services;
- Revisions to the cost estimated during the contracting processes;
- The execution of advance payments in amounts not foreseen in the bidding processes;
- Acts practiced by Directors Paulo Roberto Costa and Renato de Souza Duque for subsequent approval by the Board of Directors;
- Formalization of amendments for increased deadlines by the manager of ENGINEERING/IEABAST/IERP, when it was already known that such amendments would have impacts on costs, and that, therefore, they should be submitted to the Board of Directors;
- Remittance of the call notice for the EPC bid on the UTDI on 04/23/2007, before the approval of the Board of Directors, according to DE Minutes 4.641, Item 16, Ruling 438 of 04/26/2007;
- Approval on the continuity of the gasoline and coke portfolios in August 2007 and June 2008, on the occasion of the authorizations for contracts of the CONPAR, CCPR and INTERPAR Consortiums, without the opinions from the corporate departments, as indicated in the Investment Project Planning, Approval and Monitoring System in force at that time. The CIA identified that subsequently, in June 2009, the obtainment of such opinions came to be optional.

The noncompliance, observations and salient points verified by the CIA in relation to the implementation of the REPAR Modernization Program may have contributed to facilitating the occurrence of possible criminal cases under investigation in Operation Car Wash.

## 11. RECOMMENDATIONS

The CIA recommends that the Legal Department evaluate the routing of this report to the Federal Public Prosecutor's Office and other Public Authorities.

[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                    [Multiple signatures]

[logo] BR *PETROBRAS*                                                    [logo: NP-3]

## 12. FINAL CONSIDERATIONS

The present report was prepared in two copies of equal content, which were forwarded, initially, to the Constituent Authority of the Internal Investigation Committee, and secondly to the GAPRE Corporate Security. Both are identified and signed by the Coordinator and members of the CIA.

## 13. APPENDICES

The Appendices are included in digital media and are an integral part of this report.


Rio de Janeiro, June 8, 2015.


Coordinator:


[Signature]
Wilson Carvalo Macedo
Registration 555907-8


Members:


[Signature]                                     [Signature]
Rafael Paradella Freitas                        Leonardo Heitmann de Macedo
Registration 962864-5                           Registration 020645-6


[Signature]                                     [Signature]
Giovanni D' Elia Sobrinho                       Wilson Cezar Brasil Junior
Registration 016740-2                           Registration 021604-4


[Signature]                                     [Signature]
Jailton Guedes de Sousa                         Flávio Augusto Pimentel de Lima
Registration 596454-3                           Registration 517151-0


[Stamped Across Page: 18 Copy 18 - Cleary Gottlieb Steen & Hamilton LLP]                [Multiple signatures]



**LEGAL LANGUAGE SERVICES**

A division of ALS International
18 John Street
Suite 300
New York, NY 10038

Telephone  (212) 766-4111
Toll Free   (800) 788-0450
Telefax     (212) 349-0964
www.legallanguage.com

January 11, 2016

To whom it may concern:

This is to certify that the attached translation from Portuguese into English is an accurate representation of the document received by this office. This document is designated as:

*INTERNAL INVESTIGATION COMMITTEE (CIA)*
*DIP DABAST 38/2015 of 06/03/2015*
*Corporate Security Registration Protocol No. 0012/2015*

*FINAL REPORT*

George Alves, who translated this document, is certified by this company as fluent in Portuguese and standard North American English and is qualified to translate.

He attests to the following:

"To the best of my knowledge, the accompanying text is a true, full and accurate translation of the specified document."

_____

Signature of George Alves

Subscribed and sworn to before me this ___11th___ day of ___January___ 2016.

_____

Elizabeth Griffin
Notary Public, State of New York
No. 01GR6308221
Qualified in New York County
Certificate filed in New York County
Commission Expires July 21, 2018

Sincerely,

Victor J. Hertz
President & CEO