# EXHIBIT B
# (Part II)

# COMISSÃO INTERNA DE APURAÇÃO

DIP DABAST 38/2015 de 06/03/2015

Protocolo de Registro na Segurança Empresarial nº 0012/2015

# RELATÓRIO FINAL

| Membros | Matrícula |
|---|---|
| Wilson Carvalho Macedo (Coordenador) | 555907-8 |
| Rafael Paradella Freitas | 962864-5 |
| Leonardo Heitmann de Macedo | 020645-6 |
| Giovanni D'Elia Sobrinho | 016740-2 |
| Wilson Cezar Brasil Junior | 021604-4 |
| Jailton Guedes de Sousa | 596454-3 |
| Flávio Augusto Pimentel de Lima | 517151-0 |

18 CÓPIA 18 Cleary Gottlieb Steen & Hamilton LLP

 **PETROBRAS** 

# I N D Í C E

| | | |
|---|---|---|
| 1 | Objetivo | 04 |
| 2 | Histórico que motivou a instauração da CIA | 04 |
| 3 | Estratégia e atividades desenvolvidas pela CIA | 04 |
| 4 | Apuração | 06 |
| 4.1 | Programa de Modernização da REPAR | 06 |
| 4.2 | Considerações sobre o planejamento de uma carteira de empreendimentos de grande porte e alta complexidade | 16 |
| 4.3 | Considerações sobre a análise de consistência dos projetos básicos dos principais contratos do *on-site* e *off-site* das carteiras de gasolina e coque (Consórcios CONPAR, CCPR e  INTERPAR) | 18 |
| 5 | Análise dos contratos | 20 |
| 5.1 | Concentração do valor de contratos por empresas | 22 |
| 5.2 | Apresentação de recursos administrativos | 23 |
| 5.3 | Quantidade de questionamentos e postergação de prazo na apresentação de propostas | 24 |
| 5.4 | Contrato do *on-site* das carteiras de gasolina e coque – Consórcio CONPAR – Contrato 0800.0005013.07.2 | 25 |
| 5.4.1 | Análise da contratação direta – Consórcio CONPAR | 25 |
| 5.4.1.1 | Estimativas prévias PETROBRAS | 26 |
| 5.4.1.2 | Propostas do Consórcio CONPAR | 28 |
| 5.4.1.3 | Processo de negociação | 29 |
| 5.4.2 | Análise da consistência do projeto básico – Consórcio CONPAR | 34 |
| 5.4.3 | Análise dos aditivos – Consórcio CONPAR | 37 |
| 5.4.4 | Análise da Transação Extrajudicial – Consórcio CONPAR | 39 |
| 5.5 | Contrato do *on-site* da carteira de coque – Consórcio CCPR – Contrato 0800.0043403.08.2 | 40 |
| 5.5.1 | Análise da licitação – Consórcio CCPR | 41 |
| 5.5.2 | Análise da consistência do projeto básico – Consórcio CCPR | 44 |
| 5.5.3 | Análise dos aditivos – Consórcio CCPR | 44 |
| 5.5.4 | Análise da Transação Extrajudicial – Consórcio CCPR | 45 |
| 5.6 | Contrato do *off-site* das carteiras de gasolina e coque – Consórcio INTERPAR – Contrato 0800.0043363.08.2 | 46 |

Cleary Gottlieb Steen & Hamilton LLP

18 CGSH 18



**PETROBRAS**

| | | |
|---|---|---|
| 5.6.1 | Análise da licitação da contratação do *off-site* – Consórcio INTERPAR....... | 46 |
| 5.6.2 | Análise da consistência do projeto básico – Consórcio INTERPAR.............. | 47 |
| 5.6.3 | Análise dos aditivos – Consórcio INTERPAR................................. | 49 |
| 5.6.4 | Análise da Transação Extrajudicial – Consórcio INTERPAR.................... | 51 |
| 5.7 | Impactos decorrentes da ausência de cronograma gerencial integrado do empreendimento.................................................... | 53 |
| 5.8 | Impactos nos prazos e custos da obra pelo fornecimento de equipamentos críticos pela PETROBRAS........................................ | 54 |
| 6 | Verificações de auditoria................................................. | 56 |
| 6.1 | Auditorias internas..................................................... | 56 |
| 6.2 | Análise de Acórdãos do TCU.............................................. | 57 |
| 7 | Não conformidades..................................................... | 58 |
| 7.1 | Licitações com projetos básicos imaturos................................. | 58 |
| 7.2 | Inclusão de empresas, após o início do processo licitatório, que não atendiam ao critério de seleção........................................ | 58 |
| 7.3 | Contratação direta do Consórcio CONPAR com alterações substanciais nas condições contratuais em relação à licitação anteriormente cancelada............................................................ | 59 |
| 7.4 | Enquadramento indevido de proposta no limite superior da faixa de admissibilidade (-15% a +20%).......................................... | 59 |
| 7.5 | Não atendimento a recomendação do Jurídico sobre a necessidade de avaliação da Área Financeira para a contratação do Consórcio CONPAR...... | 59 |
| 8 | Outras observações e pontos de atenção.................................. | 60 |
| 8.1 | Revisão de estimativas de custos durante os processos de contratação.... | 61 |
| 8.2 | Atos praticados por diretores para posterior homologação pela Diretoria Executiva............................................................ | 63 |
| 9 | Das pessoas.......................................................... | 63 |
| 10 | Conclusão............................................................ | 67 |
| 11 | Recomendações....................................................... | 68 |
| 12 | Considerações finais................................................... | 69 |
| 13 | Anexos............................................................... | 69 |



 

## 1. OBJETIVO

O presente relatório tem por objetivo atender ao estabelecido no DIP DABAST 38/2015 de 06/03/2015 (Anexo 1), através do qual os Diretores de Abastecimento, Jorge Celestino Ramos, e de Engenharia, Tecnologia e Materiais, Roberto Moro, constituíram a Comissão Interna de Apuração – CIA para averiguar, investigar e auditar possíveis irregularidades (não conformidades) nos processos licitatórios e execução das obras de modernização da Refinaria Presidente Getúlio Vargas – REPAR, no período de 2006 a 2014. Através de despacho em 16/03/2015 no citado DIP, foi explicitado que "*Após reunião de alinhamento com o Jurídico, no que se refere à avaliação da execução das obras de modernização, deverão ser analisados os pleitos, aditivos, adiamentos, termos extrajudiciais e de quitação ocorridos na execução dos contratos*".

Não constou do escopo desta CIA (i) a análise técnica e econômica que levou à implementação das obras de modernização da citada Refinaria; (ii) a análise da formação dos preços contratados e das estimativas de custos, (iii) análise dos critérios utilizados pelas Comissões de Negociação nos aditivos contratuais celebrados, (iv) a verificação das medições durante a execução dos contratos e (v) quantificação de eventuais prejuízos causados à PETROBRAS.

## 2. HISTÓRICO QUE MOTIVOU A INSTITUIÇÃO DA CIA

A CIA foi instituída em razão de denúncias veiculadas na imprensa que apontam indícios de irregularidades em contratos firmados para a implantação das obras de modernização da REPAR. Referências a tais irregularidades constam também nos termos de colaboração e depoimentos prestados às autoridades no âmbito das investigações da Operação Lava-Jato

## 3. ESTRATÉGIA E ATIVIDADES DESENVOLVIDAS PELA CIA

A CIA definiu a estratégia para desenvolver seus trabalhos conforme a seguir:

a) Seleção dos instrumentos contratuais para análise: foram analisados os contratos de maior valor, que correspondem a 89% do valor total dos contratos no limite de competência dos Gerentes Executivos, Diretores e Diretoria Executiva para as obras e os contratos assinados com empresas citadas no âmbito da Operação Lava-Jato (vide item 5);

b) Análise de conformidade com a sistemática corporativa vigente do processo de aprovação e reaprovação dos seguintes projetos de modernização da REPAR: carteiras de gasolina, de coque e de propeno[1].

---

[1] Cabe ressaltar que o referido programa abrangia outros projetos de menor porte que não foram avaliados pela CIA.

**PETROBRAS** 

c)   Análise dos documentos das fases de licitação e de execução dos contratos selecionados;

d)   Análise da cronologia de eventos;

e)   Análise dos depoimentos e termos de colaboração prestados no âmbito da Operação Lava Jato (Anexo 2);

f)   Foram entrevistadas 30 pessoas que tiveram participação ou foram citadas como tendo participado de atividades relacionadas ao empreendimento (Anexo 3).

g)   Verificação da conformidade das contratações e alterações contratuais em relação à legislação, normas e procedimentos vigentes à época, em especial:

   I. Observância das normas e procedimentos internos aplicáveis aos processos licitatórios: Regulamento do Procedimento Licitatório Simplificado da Petróleo Brasileiro S.A. (Decreto 2.745 de 25/08/1998); Manual de Procedimentos de Contratação da PETROBRAS; Instruções de Contratação da Engenharia;
   II. Tratamento das recomendações que constavam dos pareceres jurídicos emitidos durante as contratações e alterações contratuais;
   III. Critérios adotados para selecionar as empresas, bem como as justificativas eventualmente utilizadas para a inclusão de empresas durante a realização dos processos licitatórios;
   IV. Observância e atendimento dos limites de competência estabelecidos nas fases de licitação e execução de contratos;

h)   Análise de relatórios de auditorias internas realizadas nos contratos das obras de modernização da REPAR;

i)   Análise dos acórdãos do TCU referentes aos processos de contratação das obras de modernização da REPAR;

j)   Análise dos relatórios de outras Comissões Internas de Apuração que ocorreram durante as obras de modernização da REPAR. Não foram identificados assuntos relacionados ao escopo desta CIA;

k)   Confrontação da lista de subcontratadas nos contratos avaliados com rol de empresas citadas nas investigações da Operação Lava-Jato;

l)   Leitura de *e-mails* da ENGENHARIA/IEABAST/IERP relacionados aos contratos selecionados;

m)   Identificação dos responsáveis pelas não conformidades na aplicação de procedimentos destinados à contratação das empresas e realização de alterações contratuais;

 **PETROBRAS** 

n)  Emissão de relatório final e encaminhamento às autoridades competentes.

## 4. APURAÇÃO

### 4.1 Programa de Modernização da REPAR

O Programa de Modernização da REPAR estava vinculado ao Plano Estratégico da PETROBRAS e ao Plano de Negócios do Downstream – PND. Os principais projetos deste programa eram as carteiras de gasolina, coque e propeno.

Os principais objetivos dos projetos eram: a) adequar o perfil de produção à demanda de derivados, atendendo às exigências de qualidade do mercado, de acordo com as especificações mais restritivas de combustíveis aprovadas pela Resolução CONAMA Nº 315 de 29/10/2002, publicada no Diário Oficial da União em 20/11/2002 (Anexo 4); b) maximizar o valor agregado ao petróleo nacional; c) garantir a competitividade da PETROBRAS tendo em vista a substituição do óleo combustível pelo gás natural na matriz energética; d) atender a estratégia de expansão seletiva na petroquímica, agregando valor ao Abastecimento.

Para viabilizar tais objetivos houve a necessidade de construção de novas unidades de processo (*on-site*) e suas unidades auxiliares, além de interligações e modificações em unidades e sistemas existentes (*off-site*).

A tabela a seguir apresenta as unidades e sistemas que integraram o Programa de Modernização da REPAR:

**Tabela 1 - Unidades que compuseram o programa de modernização da REPAR**

| Unidade | TAG | Descrição | Capacidade |
|---|---|---|---|
| UGH | U-22311 | Geração de Hidrogênio | 1.600 kNm³/d |
| UHDTI | U-2313 | Hidrotratamento de Diesel | 6.000 m³/d |
| DEA | U-32323K | Tratamento de Dietanolamina – Coque | 100.000 Nm³/d |
| DEA | U-32323G | Tratamento de Dietanolamina – Gasolina | 45.000 Nm³/d |
| HDT NK | U-2315 | Hidrotratamento – Nafta de Coque | 3.000 m³/d |
| UFN | U-3111 | Fracionamento de Nafta | 3.000 m³/d |
| URC | U-2212 | Reforma Catalítica | 1.000 m³/d |
| HDS NC | U-2316 | Hidrotratamento - Nafta Craqueada | 5.000 m³/d |
| UHS | U-2317 | Hidrogenação de Solventes | 260 m³/d |
| UCR | U-2212 | Coqueamento Retardado | 5.000 m³/d |
| UTAA | U-25126 | Tratamento de Águas Ácidas | 120 m³/d |
| URE | U-2225 | Recuperação de Enxofre | 65 t/d |
| UTGR | U-2327 | Tratamento de Gás Residual | - |
| Subestações | SE-2316 | Subestações | - |
| | SE-2200 | | - |
| | SE-5900F | | - |
| | SE-5301 | | - |
| | SE-2313 | | - |
| | SE-5900C | | - |
| | SE-5900D | | - |

Cleary Gottlieb Steen & Hamilton LLP — Clear & Legible COPY

**BR PETROBRAS** 

| | | | |
|---|---|---|---|
| | SE-2315 | | - |
| | SE-5900E | | - |
| | SE-5941 | | - |
| | SE-6821 | | - |
| Pátio | U-6821 | Pátio de Estocagem de Coque | - |
| Propeno | U-2912 | Separadora de Propeno | 500 t/d |
| Caldeira | GV-5603 | Geradora de Vapor | 180 t/h |
| Caldeira | GV-5604 | Geradora de Vapor | 300 t/h |
| Caldeira | GV-5605 | Geradora de Vapor | 300 t/h |
| UTRA | U-5300 | Tratamento e Resfriamento de Água | 600 m³/h |
| UTC | U-5600 | Tratamento de Condensado | 600 m³/h |
| TR | T-5303 | Torre de Resfriamento | 15.000 m³/h |
| Tanques | TQ-5602ª | Tanque de Água Desmineralizada | - |
| | TQ-5602B | Tanque de Água Desmineralizada | - |
| | TQ-4267 | Tanque de Água Ácida | - |
| | TQ-4270 | Tanque de Nafta Leve | - |
| | TQ-4269 | Tanque de Nafta de Coque | - |
| | TQ-4228 | Tanque de Nafta | - |
| | TQ-4328 | Tanque de LCO | - |
| | TQ-4370 | Tanque de QAV | - |
| | TQ-43100 | Tanque de Diesel | - |
| | TQ-4327 | Tanque de Diesel | - |
| | TQ-4268 | Tanque de Nafta | - |
| | TQ-4371 | Tanque de Nafta Reformada | - |
| | TQ-6501ª | Tanque de Água Bruta | - |
| | TQ-4229 | Tanque de Hexano | - |
| | TQ-4263 | Tanque de Petrosolve | - |
| | TQ-4360 | Tanque de Solvente | - |
| | TQ-4361 | Tanque de Solvente | - |
| | TQ-4362 | Tanque de Solvente | - |
| | TQ-4363 | Tanque de Solvente | - |
| | TQ-4367 | Tanque de Solvente | - |
| UTDI | U-6350 | Tratamento de Despejos Industriais | 450 m³/h |
| City Gate | - | Recebimento e Distribuição de Gás | - |
| TG | TG-5603 | Turbogerador | 20 MW |
| Tocha | TC-6403/4 | Tocha Química/Convencional | - |
| Enxofre | U-5720 | Pastilhadora de Enxofre | - |

As Figuras 1, 2 e 3 apresentam a evolução da implantação dos empreendimentos. A Figura 4 apresenta um esquema simplificado das carteiras de gasolina e diesel. O objeto dos contratos se encontra descrito na Tabela 3.



Figura 1 – Linha do tempo - Carteira de Gasolina



Figura 2 – Linha do tempo - Carteira de Coque



Figura 3 – Linha do tempo - Carteira de Propeno



BR PETROBRAS

## Figura 4 – Esquema simplificado das carteiras de gasolina e diesel

Cleary Gottlieb Steen & Hamilton LLP 18 CÓPIA 18

 

O Programa de Modernização da REPAR teve seu início em novembro/2003 com a aprovação da Fase I da carteira de coque. A partida das últimas unidades ocorreu em 2012. O período de obras durou 68 meses, ou 174% do tempo planejado. O custo inicial do Programa foi estimado em US$ 2,3 bilhões, o custo final do Programa foi de aproximadamente US$ 7 bilhões.

Para execução do programa foram adotados prazos exíguos, com assunção de riscos por seu não cumprimento. Foram apresentadas as seguintes justificativas:

a) A PETROBRAS foi demandada para assumir compromissos relacionados à melhoria da qualidade do diesel e gasolina, isto é, a redução dos teores de enxofre nesses combustíveis, bem como para aumentar a produção de tais derivados através da construção de unidades de conversão (coqueamento retardado) em refinarias da Companhia.

b) Tais empreendimentos estavam vinculados ao PAC – Programa de Aceleração do Crescimento (Anexo 5).

Sobre o assunto, a CIA obteve as seguintes declarações:

Declaração do Alan Kardec, Gerente Executivo do Abastecimento-Refino à época: *"que naquela época o cenário do Refino e da PETROBRAS era extremamente complexo, primeiramente porque havia uma pressão tremenda de ajustar a especificação dos produtos (diesel e gasolina); que não se vislumbrava a possibilidade de postergar o prazo de adequar a especificação dos derivados; que em segundo lugar, havia um crescimento muito grande dos investimentos da Companhia; que esse aumento dos investimentos levou a uma inflação de demanda; que o aumento de preço de materiais como aço e equipamentos ocorreu em todo mundo e mais notadamente no Brasil; que não havia mão-de-obra qualificada na quantidade suficiente para execução dos empreendimentos; que toda a cadeia de óleo e gás no mundo passava por um aquecimento; que acha que existiam exigências mínimas de conteúdo nacional para os investimentos"*. *"que os prazos eram apertados e isso era majorado pela necessidade de serem realizados muitos investimentos ao mesmo tempo"*.

Declaração do Mário Castrillon, Gerente Setorial no IERP à época: *"que havia pressão para sair com as contratações afim de que as obras fossem concluídas atendendo o cronograma das eleições presidenciais de 2010"; "que o prazo aprovado inicialmente para os empreendimentos não foram definidas através de uma avaliação técnica de engenharia; que pressionou para as datas originais as novas legislações de especificação de combustível; que desde o começo se sabia desde o começo os prazos eram inexequíveis; que a solicitação dos prazos vinha da diretoria da PETROBRAS através da estrutura do Abastecimento"; "que*



 

os prazos foram mantidos para atender as demandas de prazo da Diretoria; que as instâncias superiores da administração decidiram a data de partida e que se trabalhava para tentar cumprir o prazo decidido pela Diretoria"; "que o mercado fornecedor de equipamentos estava saturado e que não era possível que atender os prazos dos cronogramas de todas as obras das Refinarias ao mesmo tempo; que foi sinalizado para a ENGENHARIA/IEABAST que haveria problemas no fornecimento de compressores e bombas para as obras de expansão e modernização das refinarias".

Declaração do Júlio Ludwig, Gerente Setorial na REPAR/EM à época: "que havia muita pressão para cumprir os prazos das obras; que havia pressão política relacionada as inaugurações de obras do PAC – Programa de Aceleração do Crescimento; que a estratégia de contratação de EPC com projetos básicos não foi bem sucedida, pois gerou atraso das obras; que muita coisa era mudada durante o detalhamento dos projetos"; "que por compromissos políticos a PETROBRAS assumiu prazos altamente desafiadores".

Declaração do Paulo Ruiz, Gerente Setorial no IERL à época: "que em 2008 não havia mão-de-obra disponível; que o mercado fornecedor estava saturado; que a realidade da época era difícil; que atrasos de cronograma se devem à realidade de mercado à época, visto que este não tinha condições de atender os prazos da PETROBRAS; que ouvia e achava que havia falhas nos projetos básicos; que o projeto básico era muito macro; que muita coisa precisou ser definida durante a obra; que o cronograma estava subestimado, não dava para a obra ser feita durante o prazo aprovado; que o grupo técnico comungava que o cronograma da obra com foi aprovado originalmente era inexequível"; que o atraso na construção das unidades of-sites foram as principais causas dos atrasos nas demais obras; que os feeds também falharam muito; que as documentações de engenharia como os feeds foram  feitos sem nível de maturidade visto a pressão para fazer a obra, processar petróleo nacional, desenvolver parque de refino, crescer a economia".

Após a aprovação dos projetos, houve necessidade de reavaliações, segundo constava na sistemática de Planejamento, Aprovação e Acompanhamento de Projetos de Investimento do Sistema Petrobras (Anexo 6) pelas seguintes razões:

a) Escalada de preços observada nas fases de desenvolvimento do projeto (Tabela 2);

b) Aquecimento do mercado fornecedor de bens e serviços e a simultaneidade de obras em diversas unidades da Companhia, e em particular no Abastecimento.



 **PETROBRAS** 

**Tabela 2 – Escalada do valor do investimento (CAPEX) e postergação das datas de partida das carteiras de gasolina e coque**

| Carteira | Fase | Data de aprovação | Data prevista de partida | CAPEX estimado (US$ milhões) |
|---|---|---|---|---|
| Gasolina | I | 16/12/2003 | Dez/2007 | 217,2 |
| | II | 09/12/2004 | Jan/2009 | 247,5 |
| | III | 21/12/2006 | Ago/2009 | 577,0 |
| | IV (1ª Reavaliação) | 24/08/2007 | Jun/2010 | 1.096,8 |
| | IV (2ª Reavaliação) | 29/07/2010 | Jan/2012 | 1.753,4 |
| | IV (PNG 12-16) | Jun/2012 | Set/2012 | 1.716,7 |
| | IV (PNG 14-18) | Fev/2014 | Set/2012 | 1.728,2 |
| Coque | I | 25/11/2003 | Dez/2008 | 539,0 |
| | II | 03/03/2005 | Jan/2009 | 632,1 |
| | III | 25/01/2007 | Jun/2010 | 1.550,7 |
| | IV (1ª Reavaliação) | 23/06/2008 | UCR: Dez/2010 HDT: Abr/2011 | 4.284,2 |
| | IV (2ª Reavaliação) | 29/07/2010 | UCR: Mar/2012 HDT: Jan/2012 | 5.021,7 |
| | IV (PNG 12-16) | Jun/2012 | UCR: Jun/2012 HDT: Jan/2012 | 4.987,2 |
| | IV (PNG 14-18) | Fev/2014 | UCR: Ago/2012 HDT: Jan/2012 | 5.031,8 |

Sobre o assunto, a CIA obteve a seguinte declaração:

Declaração do Alan Kardec, Gerente Executivo do Abastecimento-Refino à época: *"que tendo em vista a escalada de preços, fez um DIP para o DABAST colocando todo o cenário da época e indicando que era importante postergar os prazos da mudança da especificação da gasolina; que ao final do referido DIP sugeriu que o ABASTECIMENTO montasse um grupo de trabalho para reestudar o cronograma de investimento para reescalonar o cronograma da gasolina; que o DABAST se mostrou contrário à proposta, tendo em vista compromisso de qualidade da gasolina, impactos logísticos e, consequentemente, custos adicionais, além de impactar negativamente o plano estratégico da PETROBRAS, aprovado pelo CA; (...) que quando recebeu a proposta final do CONPAR enviou DIP para o DABAST propondo não assinar mais nenhum contrato até que a estratégia de implantação de empreendimentos fosse revisitada; que sabia que quando fez a proposição de revisar a estratégia de implantação de investimentos estava entrando em contramão com as estratégias da Companhia; (...) que a PETROBRAS buscou apresentar ao mercado nacional o seu plano de investimento e que acha que o mercado fornecedor não estava preparado para atender totalmente as demandas da PETROBRAS, o que se refletiu em uma inflação de demanda; que como não houve a acomodação plena dos preços e custos de implementação para os investimentos, fez a sugestão de revisitar a estratégia de implantação dos empreendimentos"*.

De modo a consubstanciar a citada declaração, a CIA obteve o DIP AB-RE 238/2007 de 14/08/2007 – Reflexões estratégicas sobre o investimento



 **PETROBRAS**

"Carteira de Qualidade" (Anexo 7) – assinado por Alan Kardec, onde foram citadas questões relativas à tendência de elevação de preços e consequente acréscimo no custo dos empreendimentos das carteiras de investimento do Abastecimento. O documento, enviado ao DABAST, propunha (i) a constituição de um Grupo de Trabalho – GT para analisar a possibilidade de alongamento do cronograma da carteira de qualidade de gasolina, e (ii) o adiamento da assinatura de novos contratos até a conclusão dos trabalhos desse GT.

Em resposta, foi emitido o DIP DABAST 61/2007 de 15/08/2007 (Anexo 8), assinado por Paulo Roberto Costa, no sentido da manutenção da estratégia de continuidade dos investimentos.

Naquela época (agosto/2007), estavam em andamento as negociações com o Consórcio CONPAR – vide item 5.4. A CIA observou que, na ocasião, o valor aprovado para a carteira de gasolina havia aumentado de US$ 247,5 milhões (fase II) para US$ 577 milhões (cerca de R$ 1,2 bilhão). Para viabilização da contratação o Projeto precisou ser submetido a nova aprovação pela Diretoria Executiva, o que veio a acontecer em 24/08/2007 (Ata DE 4.655 – Anexo 9).

A Sistemática de Planejamento, Aprovação e Acompanhamento de Projetos de Investimento do Sistema Petrobras vigente à época da reavaliação dos empreendimentos das carteiras de gasolina e coque, indicava as situações nas quais haveria necessidade de revisão da análise empresarial, para projetos com valor superior a US$ 25 milhões: (i) VPL do pós-EVTE negativo; (ii) influência dos fatores gerenciáveis na queda de VPL superior a 20%; (iii) aumento total do investimento superior a 20%; ou (iv) mudança significativa de escopo.

Segundo a Sistemática, cabia à Área de Negócio (neste caso, a Área de Abastecimento) coordenar a reavaliação da análise empresarial do projeto, com o apoio da Estratégia e Desempenho Empresarial, da Área Financeira, Tributário e SMS. Essa reavaliação e os respectivos pareceres corporativos deveriam ser apresentados ao Comitê de Investimentos e submetidos à Diretoria Executiva, para decisão quanto à continuidade, adiamento ou cancelamento do projeto.

A CIA identificou que a submissão à Diretoria Executiva para reaprovação dos projetos das carteiras de gasolina (Anexo 9) e coque (Anexo 10), ocorridas em agosto/2007, junho/2008, respectivamente, não foram acompanhadas dos pareceres das citadas áreas corporativas. Tampouco a Comissão encontrou evidências de que a análise empresarial que embasou a decisão pela continuidade dos projetos tenha sido apresentada ao Comitê de Investimentos da Companhia, conforme indicado na Sistemática. Além disso, os documentos de submissão de reavaliação das carteiras de gasolina e coque afirmavam que as reavaliações foram realizadas conforme preconizavam a Sistemática de Planejamento, Aprovação e Acompanhamento de Projetos de Investimento do Sistema Petrobras vigente à época.



---

 **PETROBRAS** 

Simultaneamente à reavaliação dos projetos, foram submetidas à Diretoria Executiva as solicitações para assinatura dos contratos de construção e montagem das carteiras – Consórcio CONPAR, em agosto/2007 (vide item 5.4.1), e Consórcios CCPR e INTERPAR, em julho/2008 (vide itens 5.5.1 e 5.6.1).

## 4.2 Considerações sobre o planejamento de uma carteira de empreendimentos de grande porte e alta complexidade

Uma obra dessa magnitude e complexidade deve ser planejada e programada segundo uma sequência e respeitando a interdependência das diversas atividades, visando organizar e alinhar as etapas de projeto básico, projeto executivo, construção e montagem, condicionamento, comissionamento, pré operação e partida de cada unidade. Assim sendo, os projetos básicos das unidades *on-site* devem ser a primeira etapa do empreendimento, de forma que seja possível, com base nesses projetos básicos, a elaboração dos projetos básicos das unidades auxiliares e *off-site*.

Além disso, o comissionamento e a partida das unidades auxiliares e *off-site* devem, necessariamente, ocorrer antes do término da construção e montagem das unidades do *on-site*, já que os insumos, utilidades e matérias-primas terão que estar disponíveis para que as unidades de processamento possam dar início ao comissionamento, pré-operação e partida.

Exemplificando: para que seja possível elaborar o projeto básico de uma caldeira geradora de vapor (*off-site*) que fornecerá essa utilidade para uma unidade de coque (*on-site*), é necessário conhecer a demanda de vapor, o que só será determinado após a elaboração do projeto básico da unidade que consumirá a utilidade.

Isso significa que para otimizar o empreendimento e para evitar que unidades sejam construídas e não possam ser comissionadas para a partida, e, sobretudo, para que não haja mudança nos projetos básicos com relevantes impactos em custos e prazos da obra, é necessário um cronograma integrado que respeite o sequenciamento e as interdependências entre as diversas unidades e que o mesmo seja seguido rigorosamente. A inexistência do cronograma integrado prejudica substancialmente, quando não inviabiliza, o controle e planejamento da ordem e sequenciamento das fases e atividades da obra. Desvios em relação a tal cronograma poderão gerar aumento de custos e extensão do prazo para conclusão das obras do contrato em que houve o desvio e nas obras dos outros contratos em andamento.

A figura 5 apresenta os desvios dos marcos de assinatura dos contratos e entrada em operação das principais unidades do Programa de Modernização da REPAR, previstos no cronograma de aprovação de Fase III, em relação ao de fato realizado.





**Figura 5 – Desvios dos marcos de assinatura dos contratos e entrada em operação das principais unidades**

Cleary Gottlieb Steen & Hamilton LLP
18 CÓPIA 18

 **PETROBRAS** 

A Figura 6 apresenta, para os três principais contratos (Consórcios CONPAR, CCPR e INTERPAR), a comparação entre os prazos de licitação e execução das obras previstos no cronograma de aprovação da Fase III e o realizado na Fase de execução, onde pode ser observado significativos desvios do que foi previsto contra o realizado.

**Figura 6 – Comparação entre prazos previstos e realizados dos três principais contratos das obras de modernização da REPAR**



**4.3 Considerações sobre a análise de consistência dos projetos básicos dos principais contratos (*on-site* e *off-site* das carteiras de gasolina e coque) (Consórcios CONPAR, CCPR e INTERPAR)**

No contrato assinado com o Consórcio CONPAR foram previstas eventuais correções do projeto básico, através da inclusão no escopo da contratada das atividades de análise de consistência, elaboração de documentos complementares e consolidação do projeto básico fornecido pela PETROBRAS. Enquanto que os contratos com os Consórcios CCPR e INTERPAR previam somente a avaliação de consistência dos projetos básicos, de forma que, nestes casos, tão logo assinados os contratos, as EPCistas deveriam proceder a avaliação de consistência e informar à PETROBRAS eventuais não conformidades identificadas para esclarecimentos/correções do projeto básico, permitindo que o projeto executivo fosse elaborado.

Cabe ressaltar que, para fazer frente ao elevado volume de instalações que compunham o Programa de Modernização da REPAR, diversos pacotes de serviços/contratos foram estabelecidos, formulando-se uma estratégia de contratação. A grande quantidade de unidades que seriam construídas tornava



Cleary Gottlieb Steen & Hamilton LLP
18 CÓPIA 18

 **PETROBRAS** 

inevitável o estabelecimento de interfaces entre o desenvolvimento dos projetos e a execução das obras.

O planejamento das atividades de projeto de cada contratada deveria estar, conforme requisito estabelecido na Diretriz de Planejamento, contemplado em volume específico no Manual de Planejamento e Controle do Contrato elaborado por cada contratada na fase após assinatura do contrato.

Durante as entrevistas à CIA, houve afirmações de que, visando acelerar as licitações para a execução do projeto executivo e construção e montagem e condicionamento das novas unidades, a PETROBRAS utilizou projetos básicos ainda imaturos ou inconsistentes nas licitações, o que demandou substanciais alterações durante a execução dos contratos, e consequentemente a necessidade de se efetuar diversas alterações contratuais, com impactos em prazos e custos. A CIA verificou que, em diversos aditivos de prazo e valor, bem como em transações extra-judiciais (TEJ), a PETROBRAS reconheceu pleitos referentes a alterações decorrentes de inconsistências do projeto básico. A CIA verificou ainda que a PETROBRAS decidiu assinar o contrato para o *off-site* (Consórcio INTERPAR), mesmo não possuindo ainda os projetos básicos consolidados do *on-site* (vide item 5.6.3). Na Tabela 3 estão listados os projetistas responsáveis pela elaboração dos projetos básicos e executivos:

Tabela 3 – Projetistas responsáveis pela elaboração dos projetos

| Unidade | Projeto Básico | Projeto Executivo |
|---|---|---|
| HDS Nafta Craqueada | AXENS | CONPAR |
| HDS Nafta DD e de Coque | UOP | CONPAR |
| Reforma Catalítica | UOP | CONPAR |
| Recuperação de Enxofre | PARSONS E&C | CCPR |
| Tratamento de Gás e Águas Ácidas | CENPES | CCPR |
| Coqueamento Retardado | CONOCO PHILIPS | CCPR |
| HDT de Instáveis | CENPES | CCPR |
| Geração de Hidrogênio | CENPES | CCPR |
| Tratamento de Gás Residual | PARSONS E&C | CCPR |
| Unidade de Tratamento de DEA | CENPES | CONPAR |
| Off-site das carreiras de gasolina e coque | ENGENHARIA/IEABAST/EAB | INTERPAR |
| Subestações | ENGENHARIA/IETEG/ETEG/EM | Conenge/Elco |
| Caldeiras | CBC | CBC |
| Tratamento de Água | ENGENHARIA/IEABAST/EAB | VWSB/Enfil |
| Torre de Resfriamento | ENGENHARIA/IEABAST/EAB | Conenge/SC |

Sobre o assunto a CIA obteve as seguintes declarações:

Declaração do Oscar Tokikawa, Gerente da REPAR/EM à época: *"que foram identificados alguns erros conceituais de projeto básico ainda antes da fase de licitação, mas que para atender prazos os projetos foram licitados sem ajustes; que nesses casos decidiu-se que ajustes seriam feitos posteriormente aos contratos assinados"; "que os prazos de consolidação de interfaces entre*



 **PETROBRAS** 

*utilidades, tubovias, ETDI, diversas unidades, foi subestimada; que não houve prazo hábil para consolidar as informações e encadear as contratações de forma adequada; que os prazos de encadeamento das contratações e o planejamento das contratações vis-a-vis os tempos de consolidação de interfaces foi a principal causa do atraso da obra".*

<u>Declaração do Fernando Biato, Gerente Geral do ENGENHARIA/IEABAST à época:</u> *"que acreditava que o nível de maturidade razoável dos projetos básicos, que poderiam estar em nível de maturidade maior na hora de licitar, porém precisaram ser licitados naquele momento tendo em visto a necessidade de atender os prazos de ajuste da qualidade dos combustíveis da resolução CONAMA".*

<u>Declaração do César Arantes, Gerente Setorial no IERP à época:</u> *"que o ponto fraco na condução dos projetos das subestações foi o fato de que a lista de carga das novas unidades não estava perfeita (os projetos dos on-site não estavam maduros); que havia ajustes em obras em andamento devido a novas informações sobre projetos das novas unidades; que inicialmente se acreditava que os projetos básicos das unidades on-site estavam maduros e que depois se percebeu que os projetos não tinham a maturidade suficiente".*

<u>Declaração do Mário Castrillon, Gerente Setorial no IERP à época:</u> *"que especialmente os projetos de off-site estavam imaturos e que não estava pronto para ser licitado; que à medida que eram definidos os equipamentos que seriam adquiridos os projetos passavam pelos devidos ajustes; que haviam algumas querências, mas que o impacto foi muito pequeno se comparado com os ajustes de projetos devido a maturação do mesmo ao longo do tempo".*

<u>Declaração do Eduardo Blois, Gerente Setorial no IERP à época:</u> *"que o processo de contratação de construção dos off-sites foi especialmente impactado pelo baixo nível de maturidade dos projetos e que o Comitê Diretivo Local (IERP, REPAR/EM, REPAR, IEABAST, AB-RE/EM) conhecia os atrasos nos cronogramas de contratação; que não foi percebido risco de atraso no contrato INTERPAR devido ao atraso na assinatura dos contratos de off-sites e demais carteiras; que havia uma baixa maturação dos projetos de utilidades quando foram assinados os principais contratos da obra de modernização da REPAR".*

O planejamento das atividades de projeto de cada contratada deveria estar, conforme requisito estabelecido na diretriz de planejamento, contemplado em volume específico no manual de planejamento e controle elaborado por cada contratada após assinatura do contrato.

 

## 5. ANÁLISE DOS CONTRATOS

A CIA estabeleceu como critério primário de seleção dos contratos para análise a citação da empresa na Operação Lava Jato. O critério secundário foi o valor do contrato. Com isto, foram selecionados contratos com 13 fornecedores (Tabela 4 e Figura 7).

Estes contratos totalizaram R$ 10,6 bilhões, correspondendo a 89% das contratações acima de R$ 12.800.000,00 (limite de competência do Gerente Geral, ou seja, contratos aprovados pelos Gerentes Executivos, Diretores e Diretoria Executiva) – o que representa 75% das contratações de bens e serviços relativos à modernização da REPAR.

### Tabela 4 – Contratos analisados pela CIA

| Item | Contratada | Contrato/Pedido | Objeto | R$ (valor final) | % |
|------|-----------|-----------------|--------|------------------|---|
| 1 | Cons. INTERPAR | 0800.0043363.08.2 | Off-site | 2.863.783.641,94 | 24 |
| 2 | Cons. CCPR | 0800.0043403.08.2 | On-site do coque | 2.829.168.035,44 | 24 |
| 3 | Cons. CONPAR | 0800.0035013.07.2 | On-site da gasolina e parte do coque | 2.502.623.337,37 | 21 |
| 4 | Cons. VWBS/Enfil | 0800.0045604.08.2 | UTRA e UTC | 655.337.614,72 | 6 |
| 5 | Cons. Passareli/Gel | 0800.0048529.09.2 | UTDI | 499.996.304,39 | 4 |
| 6 | CBC Ind.Pesadas | 4502480166 | Caldeiras | 284.869.044,13 | 2 |
| 7 | Cons. Skanska-Engevix | 0800.0030725.07.2 | Propeno | 272.723.869,15 | 2 |
| 8 | Cons. Conenge/Elco | 0800.0041321.08.2 | Subestações | 201.905.511,27 | 2 |
| 9 | Confab Industrial | Vários⁷ | Esferas | 182.501.691,11 | 2 |
| 10 | Jaraguá Equipamentos | 0800.0041565.08.1 | Forno reformador da UGH | 115.811.203,60 | 1 |
| 11 | Godrej & Boyce | 4501681308 4501760649 | Permutadores e reatores | 89.532.863,99 | 1 |
| 12 | Contreras Empreendimentos | 0800.0041321.08.2 | Modificações na UTAA e URE | 72.392.796,91 | 1 |
| 13 | Cons. CC/Weg/Sênior | 0800.0033538.07.2 | Interligação 230 Kv | 39.069.411,11 | <1 |
| | | **TOTAL** | | 10.607.713.325,13 | |

### Figura 7 – Análise de Pareto dos contratos selecionados pela CIA



---

⁷ Confab teve mais de um fornecimento para o programa de modernização da REPAR. Foram analisados os pedidos de compra 4501727332, 4501739564, 4501762524, 4502126991 e 4502818121.

Cleary Gottlieb Steen & Hamilton LLP

 

O trabalho de análise dos contratos também incluiu a averiguação de subcontratações. O intuito era verificar se houve subcontratações aprovadas pela PETROBRAS de empresas supostamente utilizadas para lavagem de dinheiro, conforme mencionado nos termos de colaboração e depoimentos da investigação da Operação Lava-Jato (Anexo 2). Não foi evidenciada pela CIA a existência de subcontratações das empresas citadas, nos contratos analisados, aprovadas pela PETROBRAS. Cabe ressaltar que, nas informações coletadas pela CIA durante as investigações não foi evidenciada a contratação dessas empresas diretamente pela PETROBRAS.

### 5.1 Concentração do valor de contratos por empresas

O universo de empresas convidadas para os maiores certames licitatórios incluía vinte e cinco grandes empreiteiras, responsáveis pela prestação dos serviços de engenharia, construção e montagem industrial. Daquelas, 18 foram convidadas para participar das licitações da carteira de propeno e do *off-site* das carteiras de coque e gasolina; 20 para a licitação do *on-site* carteira de coque; e 22 para licitação do *on-site* da carteira de gasolina e parte do coque. No caso das principais contratações da REPAR, foram apresentadas poucas propostas, dos mesmos consórcios (vide Figura 8).

**Figura 8 – Apresentação de propostas para as carteiras de propeno, gasolina, coque e *off-site***





 **PETROBRAS** 

Em relação a Figura 8, deve-se ressaltar que a licitação referente ao *on-site* da carteira de gasolina e parte do coque foi cancelada por preços excessivos e optou-se por uma negociação direta com o Consórcio CONPAR (CNO/OAS/UTC) que havia apresentado melhor proposta na licitação cancelada (vide item 5.4).

A CIA apurou com as pessoas entrevistadas que, para mitigar o risco de excessiva concentração de contratos, as empresas que compunham o Consórcio CONPAR não foram convidadas para o certame do *on-site* da carteira de coque. Cabe ressaltar que não foi evidenciada nenhuma manifestação dessas empresas solicitando sua participação no certame ou questionando a PETROBRAS quanto às razões da não inclusão no processo (vide item 5.2).

As principais contratações foram firmadas com as empresas acusadas de participar do suposto cartel de empreiteiras. Os consórcios INTERPAR (Mendes Júnior, MPE e Setal), CONPAR (CNO/OAS/UTC) e CCPR (Camargo Corrêa e Promon) responderam por 77% das contratações analisadas, em valor (Figura 9).

**Figura 9 – Participação das empresas nos principais contratos do programa de modernização da REPAR**



### 5.2 Apresentação de recursos administrativos

A CIA constatou a inexistência de recursos administrativos impetrados por licitantes em todos os processos avaliados. Vale ressaltar também a inexistência de recursos administrativos no processo licitatório para o *on-site* da carteira de gasolina e parte do coque, cuja licitação foi cancelada por preços excessivos e celebrada contratação do Consórcio CONPAR (composto pelas empreiteiras



 

OAS, UTC e CNO), via negociação direta, sem que tivesse havido nenhum questionamento do mercado.

Outro fato relacionado a esse aspecto é que as empreiteiras OAS, UTC e CNO não apresentaram recurso ou interpelaram a PETROBRAS pelo fato de não terem sido convidadas para participar do certame referente ao *on-site* da carteira de coque, cujo processo licitatório foi vencido pelo Consórcio CCPR (formado por Camargo Correa e Promon).

### 5.3 Quantidade de questionamentos e postergações de prazo na apresentação de propostas

Foi verificado pela CIA que houve grande número de questionamentos e solicitações de esclarecimento durante os processos licitatórios avaliados, principalmente nos três principais contratos (Figura 10). Esta constatação vai ao encontro de outras avaliações feitas pela CIA, que indicam que os projetos básicos não estavam maduros o suficiente quando foram realizadas as licitações.

Figura 10 – Quantidade de questionamentos nos processos licitatórios



Dentre outros fatos, a grande quantidade de questionamentos por parte das empresas convidadas, durante o processo de licitação, se refletiu no adiamento dos prazos para recebimento das propostas (Figura 11). A licitação do contrato de *off-site* teve o recebimento das propostas postergado em 212 dias; por sua vez, a licitação do contrato do *on-site* das carteiras de gasolina e coque teve o recebimento das propostas postergado em 109 dias.

 

Contribuiu também para as postergações de prazo, principalmente na licitação do contrato de *off-site*, o ajuste de escopo dos projetos e o envio de documentações pela PETROBRAS após terem sido emitidos os convites.

**Figura 11 – Quantidade de dias postergados para recebimento de propostas**



## 5.4 Contrato do *on-site* das carteiras de gasolina e coque – Consórcio CONPAR – Contrato 0800.0035013.07.2

O contrato com o Consórcio CONPAR teve o seguinte objeto: "Serviços de Consolidação do Projeto Básico, Execução de Projeto Executivo, Fornecimento Parcial de Equipamentos, Instrumentos e Materiais, Construção Civil, Montagem Eletromecânica, Condicionamento, Assistência Técnica à Pré-Operação, Partida e Operação e Assistência à Manutenção das Unidades que compõem a Carteira de Gasolina e da UHDT (U-2313), UGH (U-22311) e UDEA (U-32323) da Carteira do Coque da Refinaria Presidente Getúlio Vargas (UN-REPAR) em Araucária-PR".

**Tabela 5 – Quadro resumo do contrato CONPAR**

| Contratada | Valores Iniciais | | | Alterações Contratuais | | | Transações Extrajudiciais | | Valores Finais | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Data Assin. | Prazo (dias) | R$ (MM) | Qtd. Aditivos | Acrésc. Prazo | Aditivos R$ (MM) | Qtd. TEJ | R$ (MM) | Prazo (dias) | R$ (MM) |
| CONPAR (OAS/ UTC/CNO) | 31/08/07 | 1.090 | 1.821 | 28 | 994 | 546 | 1 | 135 | 2.084 | 2.502 |

## 5.4.1 Análise da contratação direta – Consórcio CONPAR

Foram convidadas para o certame 22 empresas e apenas 2 propostas foram apresentadas: Consórcio CONPAR – R$ 2.079.593.082,66; Consórcio Camargo Corrêa/Promon – R$ 2.273.217.113,27.



 

A proposta de menor preço situou-se 42,9% acima da estimativa da PETROBRAS e 18,5% acima do limite superior da faixa de aceitabilidade (+20% da estimativa da PETROBRAS*)*. Por isso a licitação foi cancelada por preços excessivos, conforme consta no relatório da comissão de licitação: *"A Comissão de Licitação comparou o preço da proposta do Consórcio CONSTRUTORA NORBERTO ODEBRECHT S.A/UTC ENGENHARIA/CONSTRUTORA OAS LTDA., menor preço ofertado, no valor de R$ 2.079.593.082,06 (dois bilhões, setenta e nove milhões, quinhentos e noventa e três mil, oitenta e dois reais e sessenta e seis centavos), com a estimativa elaborada pela PETROBRAS, e levou em consideração os limites de aceitabilidade (-15% e + 20%), concluindo que o preço ofertado pelo Consórcio situou-se 42,9% acima da estimativa e 18,5% acima do limite superior de aceitabilidade, sendo portanto, considerado excessivo. A Comissão reuniu- e para análise do processo e emitiu em 26/03/2007, 'Nota' ao Gerente da ISRP relatando o ocorrido e solicitando autorização para a desclassificação das propostas, por preço excessivo, autorização esta que foi concedida. Em 27/03/2007 foi emitida a Circular n° 15 às licitantes comunicando a desclassificação das propostas, por preço excessivo".*

A decisão de realizar a negociação para a contratação direta foi amparada no item 2.1, alínea "e" do Regulamento do Procedimento Licitatório Simplificado da Petrobras, aprovado pelo Decreto 2745/1998, e acompanhada do respectivo parecer jurídico (DIP JURÍDICO/JSERV 1532/2007 de 02/05/2007).

Em 03/05/2007, houve a emissão do DIP ENGENHARIA 289/2007 pelos Gerentes Executivos Pedro Barusco (Engenharia) e Alan Kardec (Abastecimento-Refino), propondo aos Diretores Renato Duque (JSERV) e Paulo Roberto Costa (DABAST) submeter à Diretoria Executiva o cancelamento da licitação por preços excessivos e autorização para negociação com o Consórcio CONPAR visando contratação direta.

Tal proposição foi aprovada pela Diretoria Executiva em 10/05/07, conforme Ata DE 4.643, item 16, Pauta nº 495 (Anexo 11). A negociação com o Consórcio foi conduzida pela Comissão de Negociação instituída através do DIP ENGENHARIA/IEABAST/IERP 58/07 de 12/05/2007.

### 5.4.1.1 Estimativas prévias PETROBRAS

No processo de negociação direta, o valor inicial da estimativa prévia da PETROBRAS, de R$ 1.372.799.201,00, foi o mesmo utilizado no processo licitatório cancelado, tendo em vista não ter havido nenhuma alteração de escopo no Projeto, bem como não ter sido identificada nenhuma inconsistência na mesma.

 

Entretanto, com o desenrolar das negociações a estimativa prévia sofreu duas revisões, as quais levaram o valor final da mesma para R$ 1.475.523.355,84 conforme pode ser observado na Tabela 6.

Tabela 6 – Estimativas prévias PETROBRAS

| Item | Rubrica | Original (R$) | Revisão A (R$) | Revisão B (R$) |
|---|---|---|---|---|
| 1 | Total Geral com Projeto | 1.327.799.201,47 | 1.447.682.800,84 | 1.475.523.355,84 |
| 2 | Projeto de Detalhamento | 74.059.500,00 | - | - |
| 3 | Total Geral | 1.298.739.701,47 | 1.447.682.800,84 | 1.475.523.355,84 |
| 4 | Custos Diretos | 810.416.581,86 | 920.661.260,40 | 917.222.047,53 |
| 4.1 | Suprimento | 493.909.809,18 | 493.909.809,18 | 493.909.809,18 |
| 4.2 | Construção e Montagem | 175.305.311,26 | 203.230.427,77 | 200.670.420,85 |
| 4.2.1 | Equipamentos/máquinas | 33.850.718,38 | 53.274.939,55 | 53.274.939,55 |
| 4.2.2 | Ferramental | 2.631.952,41 | 2.798.636,63 | 2.748.440,42 |
| 4.2.3 | Mão-de-Obra Direta | 131.597.620,38 | 139.931.831,50 | 137.422.020,09 |
| 4.2.4 | Material de Consumo | 7.225.020,09 | 7.225.020,09 | 7.225.020,09 |
| 4.2.5 | Operação Assistida | - | - | - |
| 4.3 | Subfornecedores | 141.201.461,42 | 223.521.023,46 | 227.691.817,50 |
| 5 | Custos Indiretos | 163.024.400,54 | 177.661.895,37 | 200.892.141,88 |
| 5.1 | Logística | 163.024.400,54 | 177.661.895,37 | 200.892.141,88 |
| 6 | Custos Complementares | 325.298.719,07 | 349.359.645,06 | 357.409.166,42 |

A revisão A, emitida em 29/05/2007, foi solicitada à ENGENHARIA/SL/ECP através do DIP ENGENHARIA/IEABAST/ERP/CMHS 23/2007 de 29/05/2007 e resultou num aumento da estimativa prévia em R$ 74.883.599,37. As principais alterações foram:

- Custos Diretos:

    a) Revisão do histograma de máquinas e equipamentos necessários à montagem e atualização da tabela referencial de preços. Este item acresceu R$ 19.424.221,15 à estimativa (item 4.2.1 da Tabela 6);
    b) Aumento do valor referente ao ferramental em R$ 166.684,22. Este valor é um percentual do valor da mão-de-obra direta (item 4.2.2 da Tabela 6);
    c) Revisão do percentual de encargos sociais relacionados à mão-obra-direta. Esta alteração ocorreu devido à mudança na premissa do tempo de permanência dos empregados, o qual foi reduzido de 23 para 9 meses (aumento do *turn-over*), acarretando no aumento do fator de encargos sociais de 116% para 129,5% e correspondeu a um acréscimo de R$ 8.334.211,12 (item 4.2.3 da Tabela 6).
    d) Consideração de que o projeto de detalhamento seria subcontratado e revisão do HH de projeto, resultando num aumento de R$ 8.260.062,04.

 **PETROBRAS** 

- Custos Indiretos:

    a) Alteração do percentual de encargos sociais da mão-de-obra indireta (MOI), aos moldes do que foi considerado para a MOD;
    b) Inclusão de novos exames médicos para a força de trabalho;
    c) Mudança no plano de assistência médica;
    d) Revisão da área total do canteiro de obras e inclusão de computadores.

O aumento dos custos indiretos correspondeu a R$ 14.637.494,83.

- Custos complementares (BDI): em que pese ter havido uma redução na alíquota de ISS de 5% para 2%, representando uma redução de R$ 8.370.094,28, os custos complementares foram acrescidos de R$ 24.060.926,00 em decorrência do aumento de sua base de cálculo (custos diretos e custos indiretos).

A revisão B, emitida em 19/06/2007, foi solicitada através do DIP ENGENHARIA/IEABAST/IERP/CMHS 28/2007 de 18/06/2007 e resultou num aumento da Revisão A de R$ 27.840.555,00. As principais alterações foram:

- Custos diretos: houve uma redução de R$ 3.419.212,87 (item 1 da Tabela 6), sobretudo em função da redução de índice de improdutividade de 20% para 17%, além de um ajuste, para baixo, nos custos do projeto executivo (R$ 879.205,95).

- Custos indiretos: o histograma de MOI foi revisado, onerando a estimativa em R$ 23.230.246,51 (item 2 da Tabela 6).

- Custos complementares: o aumento da base cálculo, provocado pelo aumento dos Custos Indiretos, levou a uma elevação de R$ 8.049.521,36 dos Custos Complementares (item 3 da Tabela 6).

### 5.4.1.2 Propostas do Consórcio CONPAR

Durante o curso das negociações o Consórcio CONPAR reduziu o valor da proposta de R$ 2.079.593.082,66 para R$ 1.821.012.130,93, através das seguintes etapas de negociação:

**1ª Etapa** – Foi ofertado à Comissão de Negociação valor de R$ 2.016.727.315,56 resultante de ajustes nos quantitativos de MOD de construção e montagem, MOD de civil e MOI, contemplando uma parcela atribuída a "Fornecimentos e



 **PETROBRAS**   

Serviços Complementares", a qual, ao ser expurgada, a base de preços passou a ser R$ 1.891.220.985,88.

**2ª Etapa** – Nesta etapa, foi ofertado pelo Consórcio valor de R$ 1.805.315.153,00. Esta redução foi função de diversos ajustes na EAP (Estrutura Analítica de Projeto) e critérios de medição. Esta proposta não foi aceita pela Comissão de Negociação por ter ainda sido considerada excessiva.

**3ª Etapa** – Em função da recusa da proposta anterior e mediante alterações relacionadas à definição de tolerância zero para diversos itens de QD (Quantidade Definida), outros ajustes na EAP e incorporação ao contrato da orientação corporativa da PETROBRAS para o taxa de câmbio, vigente à época, o Consórcio apresentou o valor de R$ 1.769.000.000,00. Entretanto, sobre este valor foi acrescido do valor de R$ 52.012.130,93 como verba prevista para o ressarcimento de eventuais paralizações por chuvas, raios e suas consequências e diferenças de quantitativos. Com isto, o valor final negociado foi de R$ 1.821.012.130,93.

**5.4.1.3 Processo de Negociação**

Durante o processo de negociação foram realizadas as seguintes alterações nas condições contratuais:

a) Inclusão de verba para ressarcimento

A Comissão de Negociação incluiu na composição do preço do contrato, através da criação do item 3.3 – "Eventos Globais" no anexo II-B do contrato, de uma verba, no valor de R$ 52.012.130,93, para o ressarcimento dos custos de paralisações por chuvas, raios e suas consequências e diferenças de quantitativos em substituição à verba para pagamento de "Fornecimentos e Serviços Complementares", a qual foi retirada da formação do preço do contrato por recomendação do Jurídico.

Durante o processo licitatório, foi prevista verba para pagamento de "serviços complementares", correspondente a 10% da verba prevista para o item relativo à consolidação do projeto básico e realização do projeto executivo, construção civil, montagem eletromecânica e condicionamento. Na proposta recebida pelo Consórcio CONPAR durante o processo licitatório (R$ 2.079.593.082,66), cerca de R$ 130,8 milhões referiam-se a tal verba. Durante o processo de negociação direta que culminou com a proposta final do Consórcio de R$ 1.769.000.000,00, foi considerada, em acréscimo, a verba de R$ 102,5 milhões. A Comissão de Negociação entendeu que a citada verba de "serviços complementares" deveria ser acrescida ao preço proposto, que, portanto, alcançaria R$ 1.871.543.474,81. No entanto, o parecer jurídico (DIP JURÍDICO/JSERV 5148/2007 – Anexo 12) não



 

recomendou a inclusão da verba em função dos seguintes aspectos legais: (i) art. 104 do Código Civil (a verba para "serviços complementares" resultaria numa indeterminação no objeto contratado); (ii) item 1.3 do Regulamento do Procedimento Licitatório da Petrobras *("Nenhuma obra ou serviço será licitado sem a aprovação do projeto básico respectivo, com a definição das características, referências e demais elementos necessários ao perfeito entendimento, pelos interessados, dos trabalhos a realizar, nem contratado, sem a provisão dos recursos financeiros suficientes para sua execução e conclusão integral")*; e (iii) item 7.2 do Regulamento, por ampliar o valor contratual de forma ilegítima.

De modo a acolher o citado parecer jurídico, a Comissão de Negociação optou por excluir os R$ 102,5 milhões da verba para "serviços complementares" e incorporar o valor de R$ 52 milhões para ressarcimento de custos devidos a paralisações por chuvas, raios e suas consequências, bem como variação de quantitativos de itens definidos contratualmente.

b) Enquadramento indevido de proposta na faixa de admissibilidade (-15% a +20%)

Após a definição da verba citada no item anterior, a Comissão de Negociação agregou o valor de R$ 52.012.130,93 à estimativa prévia elaborada pela ENGENHARIA/SL/ECP, elevando o valor R$ 1.475.523.356,00 para R$ 1.527.535.486,93.

A verba incluída era composta de duas parcelas, uma para o ressarcimento dos custos de paralisações por chuvas, raios e suas consequências, no valor de R$ 10.625.220,79 e outra para o pagamento de eventuais diferenças de quantitativos que foram determinados no contrato (QD), no valor de R$ 41.386.910,14, perfazendo R$ 52.012.130,93, conforme observado no Anexo 13.

Entretanto, conforme a *International Recommended Practice Nº 17R-97 – COST ESTIMATE CLASSIFICATION SYSTEM da AACE (The Association for the Advancement of Cost Engineering)*, a faixa de admissibilidade de -15% a +20% da estimativa, conceitualmente, já contemplava eventuais variações nos quantitativos definidos no projeto e tomados como base para a elaboração da estimativa prévia. Desta forma, a estimativa contemplou esta verba (R$ 41.386.910,14) em duplicidade.

Além disso, a parcela para a cobertura dos custos de paralisações por chuvas, raios e suas consequências foi de R$ 8.065.213,87, superior ao valor de R$ 2.560.006,79 retirado da estimativa prévia revisão B, a título de redução na improdutividade da mão de obra direta (MOD), com o intuito de retratar a nova

 

Cleary Gottlieb Steen & Hamilton LLP

 

PETROBRAS NP-3

premissa de "cronograma seco". Ou seja, a Comissão de Negociação, ao considerar que a PETROBRAS assumiria os riscos relacionados a paralisações por chuvas, raios e suas consequências, retirou da estimativa o valor de R$ 2.560.006,79 e acrescentou, via verba de ressarcimento, o valor de R$ 10.625.220,79.

Em resumo, a CIA considera que a estimativa prévia foi onerada indevidamente em R$ 49.452.124,01 (R$ 41.386.910,14 + R$ 8.065.213,87).
Desta forma, considerando o exposto acima, o valor correto da estimativa prévia seria R$ 1.478.083.356,76 e o valor final ofertado pelo Consórcio CONPAR foi de R$ 1.821.012.130,93. Com isto, o valor da proposta ficaria 23,2% acima da estimativa, se situando, portanto, fora da faixa de admissibilidade.

Sobre essa contratação direta, a CIA obteve as seguintes declarações:

Declaração do Fernando Biato, Gerente Geral do IEABAST à época: *"que a necessidade de cumprimento dos prazos dos empreendimentos pesou na decisão de iniciar a negociação direta com o Consórcio CONPAR"; "que a proposta de realizar uma contratação direta ocorreu no Comitê Diretivo Local – CDL – das obras de modernização da REPAR; que devido à pressão geral do prazo de conclusão dos empreendimentos foi decidida a negociação direta com o Consórcio CONPAR".*

Declaração do José Paulo Assis, Gerente do IERP à época: *"que era inviável uma nova licitação para contratação da carteira de gasolina porque não havia como mudar o escopo nem havia mais empresas que poderiam ser chamadas para um novo certame e que devido a estes aspectos e ao prazo escasso foi pleiteado junto à Diretoria fazer a negociação direta com o Consórcio CONPAR; que o pleito de negociação direta foi encaminhado para os Gerentes Executivos e que foi aprovado pela Diretoria"; "que havia uma pressão de prazo da Companhia para fechar a negociação com o Consórcio CONPAR"; "que na época a cláusula de 'downpayment' era uma prática na assinatura do contrato e outros eventos dos contratos; que a EAP financeira era baseada em entregáveis tangíveis pela contratada; que a questão do 'downpayment' não foi mencionada no relatório final da comissão porque, aparentemente, se considerava que estava contida dentro dos eventos do critério de medição".*

Declaração do Luis Scavazza, Gerente Setorial no IERP à época: *"que havia uma pressão da Sede para dar andamento à contratação do Consórcio CONPAR"; "que as negociações passaram por uma revisão do Consórcio CONPAR dos fatores de produtividade entre outros e, consequentemente, houve redução de preços; que também houve revisão do orçamento da PETROBRAS; que supõe que a contratação direta tinha o mesmo escopo e condições da licitação original; que o foco das reuniões de negociação direta com Consórcio CONPAR era*

Cleary Gottlieb Steen & Hamilton LLP 18 CÓPIA 18

*enquadrar a orçamentação"; "que a opção de contratação direta e os termos da negociação eram premissas do IEABAST"; "que nas reuniões de São Paulo e Rio de Janeiro quem dava as diretrizes, bem como participava das mesmas, durante a negociação da contratação direta, era o Gerente Geral do IEABAST; que os termos de negociação e as cláusulas negociadas foram repassadas pelo Gerente Geral do IEABAST"; "que não se lembra do pagamento pela assinatura do contrato (downpayment)"; "que houve priorização por parte da Gerência do IERP para concluir rapidamente as negociações para contratação direta para REPAR".*

Declaração do Sérgio Costa, empregado da atividade de contratação no IERP à época: *"que por não ser conivente com algumas decisões dos superiores, acredita que, por isso, teve seu cargo extinto; que isso ocorreu porque em seu relatório sobre a contratação do Consórcio CONPAR informava que o contrato estava sendo assinado no valor acima do limite de aceitação da proposta; que este contrato foi fechado diretamente pelo gerente geral Biato e o Renato Rodrigues da Odebrecht em uma reunião na sala de reuniões do gerente executivo Pedro Barusco"; "que na reunião de encerramento do contrato ele avisou ao José Assis que o contrato não poderia ser celebrado por ultrapassar o limite de 20%; que quando colocou esta informação no relatório, o gerente José Assis mandou que a informação fosse suprimida; que devido ter relacionamento com o gerente executivo Paes, ligou para ele informando o acontecido e que o Paes mandou enviar o relatório do jeito que estava, porque o Diretor Paulo Roberto Costa estava cobrando a assinatura do contrato; que foi repreendido pelo Assis por ter mantido contato e passado informações sobre o limite superior ter sido excedido; que foram sugeridas métricas de análise que não concordava; que depois de ter enviado o relatório foi destituido do cargo de coordenador; que acredita que isso foi uma retaliação sobre o seu posicionamento"; "que durante a negociação, o Consórcio CONPAR insistia para retirar do contrato cláusulas que não podiam ser retiradas"; "que na licitação que foi cancelada por preço excessivo houve alusões a se fazer um aproveitamento da licitação a partir de uma revisão do orçamento; que foi contra a esse reaproveitamento da licitação; que propôs fazer uma nova licitação expedita e que essa sugestão não foi aceita pelo José Assis"; "que achou absurda a decisão de realizar contratação direta; que achou também absurda a intervenção do gerente geral Biato e sua decisão de fechar o encerramento da negociação direta com o Consórcio CONPAR".*

c) Alteração na EAP

Durante a negociação, foi proposto pelo Consórcio CONPAR o pagamento antecipado de 15% do valor do contrato, a título de "assinatura contratual". A Comissão de Negociação negou tal proposição, entretanto, concordou com



Cleary Gottlieb Steen & Hamilton LLP

 

modificações na EAP, alterando de 6% para 10% o item de infraestrutura e de 7% para 10% o item de projeto.

Sobre o assunto, o Jurídico (DIP JURÍDICO/JSERV 4874/2007 de 28/06/2007 – Anexo 14) se manifestou quanto à excepcionalidade da prática de antecipação na PETROBRAS, a qual deveria ser previamente submetida à apreciação da Área Financeira, conforme previsto no Manual Financeiro. A CIA não evidenciou consulta à Área Financeira sobre tal assunto.

O primeiro pagamento ao Consórcio CONPAR, em outubro/2007, mês seguinte à assinatura contratual, no total de R$ 92,8 milhões foi realizado sem que houvesse evidência da realização de serviços no período neste montante, desta forma, podendo ser caracterizado como antecipação de pagamentos (Anexo 15).

A CIA apurou que esta antecipação não foi explicitada em cláusula contratual ou nos critérios de medição (apenas na EAP), tampouco, foi relatada de forma explícita no relatório da Comissão de Negociação ou na documentação submetida à apreciação da Diretoria Executiva.

d) Demais alterações significativas nas condições contratuais

- alteração do critério de medição;
- redução na variação aceitável de quantidades determinadas (que na licitação abrangiam uma tolerância ou contingência de +ou- 5% e após a negociação se estipulou em +ou- 0%, portanto, sem margem de tolerância);
- redução do limite percentual de responsabilidade civil do Consórcio CONPAR (de 100% para 15% do valor do contrato).

Durante o processo de negociação, o parecer contido no DIP JURÍDICO/JSERV 5148/2007 de 14/08/2007 indicou que "*segundo a orientação prevalente nesse JURÍDICO, não se pode fazer modificações substanciais no objeto do contrato, sob pena de ensejar burla à aplicação da regra de dispensa de licitação. Essa restrição decorreu do fato dessa negociação direta que se segue à licitação frustrada, encontrar limites no objeto e nas circunstâncias daquele certame*".

A CIA encontrou evidências de que, quando a proposta foi encaminhada para autorização da negociação, já existiam mudanças aprovadas no escopo do objeto licitado (vide item 5.4.2).

Através do DIP ENGENHARIA 571/2007 de 15/08/2007 os Gerentes Executivos Pedro Barusco (Engenharia), Luiz Gaspar Domingues (AB-RE interino) e Venina

 

Velosa da Fonseca (AB-CR) submeteram aos Diretores Renato Duque (DSERV) e Paulo Roberto Costa (DABAST) a proposição para a celebração de contratação direta com o Consórcio CONPAR, no valor de R$ 1.821.012.130,93. Em 24/08/2007 tal proposição foi aprovada pela Diretoria Executiva, conforme Ata DE 4.659, item 16, Pauta 877 (Anexo 9).

A Figura 12 apresenta a evolução das estimativas prévias da PETROBRAS e das propostas do Consórcio CONPAR.

**Figura 12 – Evolução de estimativas e propostas – Consórcio CONPAR**

Foi verificado pela CIA que as tratativas de negociação com o Consórcio CONPAR foram acompanhadas pelo Gerente Executivo Pedro Barusco Filho e pelo Gerente Geral Fernando de Almeida Biato (Anexos 16 e 17).

### 5.4.2 Análise de consistência do projeto básico – Consórcio CONPAR

A CIA verificou que houve atraso na elaboração da análise de consistência do projeto básico, em sua maior parte imputado à PETROBRAS tendo em vista a contratação ter sido realizada a partir de projeto básico imaturo e ao atraso na disponibilização das informações dos equipamentos fornecidos pela PETROBRAS.

O Consórcio CONPAR tinha como escopo a *"Verificação de consistência dos projetos básicos e/ou pré-detalhamento no que se refere à operação, desempenho, segurança e confiabilidade. (...) Complementação e atualização do*



 

*projeto básico das utilidades (ar, água, vapor, condensado, gás combustível, nitrogênio) e sistemas complementares do on-site"*.

Tais atividades, conforme documentos contratuais, consistia da verificação e compatibilização de fluxogramas de processo com folhas de dados dos equipamentos e instrumentos; estudo do arranjo de equipamentos definitivos com análise dimensional, etc.

Quando da contratação do Consórcio CONPAR, não foram disponibilizados os documentos dos fornecedores diretamente contratados pela PETROBRAS, mas apenas os documentos básicos de aquisição (Requisições de Materiais – RMs e Folhas de Dados – FDs). Aliás, dentre as atribuições da contratada estava a análise e aprovação de desenhos destes fornecedores, deixando claro que essa documentação foi recebida pelo Consórcio CONPAR somente ao longo do seu período contratual.

A PETROBRAS informou, na etapa de contratação, as datas previstas para entrega desses equipamentos, porém sem indicar o prazo de disponibilidade dos documentos de engenharia dos fornecedores. Ou seja, qualquer atraso por parte dos fornecedores implicaria atraso também para o Consórcio CONPAR, refletindo-se no projeto executivo (em caso de atraso de documentos) e/ou na construção e montagem (atraso na entrega).

No que se referem às informações originadas da própria PETROBRAS, algumas interferências no projeto foram retratadas em alguns aditivos contratuais. Pelo teor destes aditivos, verificamos que parte das informações disponibilizadas pela PETROBRAS foi alterada posteriormente, bem como foram acrescentadas informações inexistentes no período de licitação que impactaram o desenvolvimento do projeto da contratada. Apresentamos os exemplos abaixo:

Aditivo 2: O Relatório da Comissão de Negociação deste aditivo registrou que o mesmo foi necessário para *"incorporar ao contrato as modificações de projeto introduzidas pela PETROBRAS na Carteira de Coque e HDT";*

Aditivo 3: O Relatório da Comissão de Negociação deste aditivo registrou que o mesmo foi necessário para: *"execução dos serviços de modificações de projeto introduzidas pela PETROBRAS nas Unidades On-site da Carteira de Gasolina";*

Aditivo 5: Escopo adicional, com inclusão de ruas e sistemas de drenagem das unidades, com atividades de consolidação do projeto básico, executivo, fornecimentos e construção;

Aditivo 6: Adaptação da Unidade de Geração de Hidrogênio (UGH) para operação com nafta, conforme projeto básico revisado pelo CENPES. Tal aditivo contemplou ainda a prorrogação do prazo global do contrato em 180 dias;



 **PETROBRAS** 

Aditivo 9: Adequações de projeto, identificadas durante o detalhamento e introduzidas pela PETROBRAS no escopo da carteira de gasolina e carteira de coque;

Aditivo 14: Adequações de projeto referentes às carteiras de gasolina e de coque.

Havia também diversos equipamentos a serem instalados nas unidades, que foram adquiridos diretamente pela PETROBRAS, para os quais ainda não se tinham documentos emitidos pelos fornecedores, e cujas características técnicas e dimensionais deveriam ser consideradas no projeto, tanto na fase de consolidação do projeto básico como no projeto executivo. Ao longo do período contratual ocorreram atrasos por parte dos fornecedores da PETROBRAS. A documentação analisada indicou atrasos significativos, o que gerou atrasos na disponibilização de dados técnicos necessários ao desenvolvimento do projeto.

Esta situação foi observada em alguns documentos, tais como:

Aditivo 11: Esse aditivo considera em seu objeto o *"Replanejamento contratual em função da alteração, em relação ao definido na documentação original, dos prazos de entrega de equipamentos pela PETROBRAS"*. O Relatório da Comissão de Negociação apresenta as seguintes justificativas para a celebração deste aditivo contratual (além do valor de R$ 345.986.318,13, este aditivo acresceu 393 dias ao prazo do contrato): *"Os equipamentos adquiridos pela PETROBRAS que pertencem às unidades do escopo contratual (do CONPAR) sofreram atrasos significativos na sua entrega (...) estes atrasos vêm gerando impactos significativos na conclusão dos serviços de Engenharia e de Construção e Montagem, dentre os quais destacamos: Reatores da unidade de HDT (...) atraso médio 600 dias; Compressor centrífugo ( ...) atraso médio 600 dias; · PSA (...) atraso médio 750 dias.*

A correspondência da ENGENHARIA/IEABAST/IERP 003026/2009 de 27/08/2009, em resposta à correspondência enviada pelo Consórcio CONPAR, registrava os atrasos por parte dos fornecedores da PETROBRAS, conforme transcrição a seguir: *"Informamos que reconhecemos os impactos no andamento do contrato motivados por: 1) Atraso na consolidação do projeto básico; 2) Atraso no recebimento pelo CONPAR de desenhos de fornecedores PETROBRAS; 3) Demora na resposta de consultas técnicas; 4) Demora na aprovação do detalhamento do projeto. Estes impactos foram identificados e validados conforme ata de reunião: 101-OPP/PCC-EM-315 de 6/08/2009, cujos impactos de prazo em cada unidade são citados na tabela abaixo: U-32323 – DEA G 04 meses; U-32323 – DEA K 05 meses; U-2315 08 meses; U-3111 09 meses; U-22311 08 meses; U-2222 07 meses; U-2316 07 meses; U-2313 03 meses".*



 

Além dos equipamentos fornecidos pela PETROBRAS, as unidades em implantação tinham diversos outros equipamentos de aquisição pelo próprio Consórcio CONPAR, cujas características técnicas também tinham que ser consideradas no seu projeto.

Quando do Aditivo 11, a Comissão de Negociação ressaltou atrasos por parte de fornecedores do CONPAR, destacando: *"Permutador P-3111004: atraso médio 286 dias; Vaso V-3111003: atraso médio 577 dias; Vaso V-231304: atraso médio 279 dias"*.

Tais atrasos no fornecimento dos equipamentos pelo Consórcio CONPAR implicaram atrasos no desenvolvimento do projeto.

A CIA verificou que houve atraso na elaboração da análise de consistência do projeto básico, em sua maior parte imputado à PETROBRAS, tendo em vista a contratação ter sido realizada a partir de projeto básico imaturo.

### 5.4.3 Análise dos aditivos – Consórcio CONPAR

O citado contrato recebeu 28 aditivos, tendo o prazo sido acrescido em 994 dias e o valor em R$ 554.337.861,70.

Os aditivos mais relevantes foram:

<u>Aditivo 5: valor de R$ 29.601.051,50</u>: *"fornecimento de bens e serviços adicionais requeridos para construção de ruas internas, pontilhões, sistemas de drenagem pluvial, oleosa e contaminada e "sump tank" das unidades da Carteira de Gasolina e das unidades HDTI, UGH e DEA da Carteira de Coque da UN-REPAR, conforme Solicitações de Modificação n° 024 G"*.

<u>Aditivo 6: valor de R$ 29.501.924,031 e prazo de 180 dias</u>: *"introduzir a execução dos serviços de Adaptação da Unidade de Geração de Hidrogênio (UGH) para operação com Nafta; 1.1. Revisar a Planilha de Preços Resumo - anexo II-A; 1.2. Inserir a Planilha de Preços de Serviços - anexo II-J, para formatação dos ajustes efetuados neste Aditivo; 1.3. Inserir a Planilha de Preços de Bens e/ou Materiais ofertados no Brasil - anexo II-K, para formalização dos ajustes efetuados neste Aditivo. 2. Prorrogar o prazo contratual em razão do prazo de fornecimento dos equipamentos objeto desse aditivo"*.

<u>Aditivo 11: valor de R$ 345.986.318,13 e prazo de 393 dias</u>: *"1. Replanejamento contratual em função da alteração, em relação ao definido na documentação contratual original, dos prazos de entrega de equipamentos pela PETROBRAS, necessidade de compatibilização de cronogramas com os demais contratos integrantes das Carteiras de Gasolina e de Coque/HDT, da inversão de*

