# EXHIBIT B
# (Part III)

 

prioridade de partidas das Unidades pertencentes à Carteira de Coque / HDT (UHDT, UGH e UDEA) em relação à Carteira de Gasolina, além da compatibilização com o cronograma da parada das unidades da UN-REPAR; 2. Os serviços de construção e montagem do sistema vaporização de nafta da Unidade de Geração de Hidrogênio (UGH), em complementação ao Aditivo 6 já celebrado; 3. Os serviços de desengraxe, passivação e inertização das unidades do escopo contratual; 4. Prorrogação do prazo para ajustar o cronograma contratual conforme novas datas de partida das unidades; 5. Incluir a cláusula 3.14 no contrato, com a seguinte redação: "3.14 - Sucessivamente ao disposto no item 3.9, caso reste configurada a impossibilidade do cumprimento das obrigações ali assumidas, ou na eventual ocorrência de interferência outros contratos que impeçam a conclusão do presente contrato ou, ainda, em ocorrendo inversão de prioridade de conclusão de determinada obra deste contrato, observando o item 17.1, a PETROBRAS assumirá a obrigação pelo pagamento de eventuais custos adicionais daí decorrentes, desde que devidamente acordados com a CONTRATADA e aprovados pela Fiscalização após reprogramação dos serviços".

<u>Aditivo 16: valor de R$ 15.901.701,95:</u> adequar ao escopo contratual os serviços e fornecimentos constantes das Modificações de Projeto decorrentes de negociações efetuadas por Comissão especialmente designada, conforme especificados na Cláusula Segunda deste instrumento. 2. Elevar o valor contratual em decorrência das modificações relacionadas, conforme descrições elencadas neste instrumento. 3. Revisar a Planilha de Preços - anexo II - A. 4. Inserir as Planilhas de Preços - anexo II-S e II-T, para formalizar os ajustes efetuados neste aditivo".

<u>Aditivo 24: valor de R$ 107.556.721,03:</u> "Reprogramação de serviços em função de alteração das datas de entrega de equipamentos de ambas as partes e da alteração dos prazos de montagem, com a consequente modificação dos prazos de partida das Unidades".

<u>Aditivos 25, 26, 27 e 28: acréscimos de prazo de 86, 70, 65 e 60 dias, respectivamente:</u> "Prorrogar o prazo contratual em virtude da conclusão das atividades contratuais e desmobilização de infraestrutura básica de obras. Prorrogar o prazo contratual para a conclusão das atividades de escopo contratual e demolição de infraestrutura geral de canteiros, bem como resolução de pendências comerciais em andamento. Aditivos 27 e 28: Prorrogar o prazo contratual para entrega de sobressalentes remanescentes em aquisição, substituição da válvula FV-2313070 e solução de pendências técnicas e comerciais em andamento".

Não foi evidenciada pela CIA a ocorrência de não conformidades na celebração dos aditivos. Entretanto, a CIA identificou que os aditivos foram celebrados,

 

prioridade de partidas das Unidades pertencentes à Carteira de Coque / HDT (UHDT, UGH e UDEA) em relação à Carteira de Gasolina, além da compatibilização com o cronograma da parada das unidades da UN-REPAR; 2. Os serviços de construção e montagem do sistema vaporização de nafta da Unidade de Geração de Hidrogênio (UGH), em complementação ao Aditivo 6 já celebrado; 3. Os serviços de desengraxe, passivação e inertização das unidades do escopo contratual; 4. Prorrogação do prazo para ajustar o cronograma contratual conforme novas datas de partida das unidades; 5. Incluir a cláusula 3.14 no contrato, com a seguinte redação: "3.14 - Sucessivamente ao disposto no item 3.9, caso reste configurada a impossibilidade do cumprimento das obrigações ali assumidas, ou na eventual ocorrência de interferência outros contratos que impeçam a conclusão do presente contrato ou, ainda, em ocorrendo inversão de prioridade de conclusão de determinada obra deste contrato, observando o item 17.1, a PETROBRAS assumirá a obrigação pelo pagamento de eventuais custos adicionais daí decorrentes, desde que devidamente acordados com a CONTRATADA e aprovados pela Fiscalização após reprogramação dos serviços".

Aditivo 16: valor de R$ 15.901.701,95: adequar ao escopo contratual os serviços e fornecimentos constantes das Modificações de Projeto decorrentes de negociações efetuadas por Comissão especialmente designada, conforme especificados na Cláusula Segunda deste instrumento. 2. Elevar o valor contratual em decorrência das modificações relacionadas, conforme descrições elencadas neste instrumento. 3. Revisar a Planilha de Preços - anexo II - A. 4. Inserir as Planilhas de Preços - anexo II-S e II-T, para formalizar os ajustes efetuados neste aditivo'.

Aditivo 24: valor de R$ 107.556.721,03: "Reprogramação de serviços em função de alteração das datas de entrega de equipamentos de ambas as partes e da alteração dos prazos de montagem, com a consequente modificação dos prazos de partida das Unidades".

Aditivos 25, 26, 27 e 28: acréscimos de prazo de 86, 70, 65 e 60 dias, respectivamente: "Prorrogar o prazo contratual em virtude da conclusão das atividades contratuais e desmobilização de infraestrutura básica de obras. Prorrogar o prazo contratual para a conclusão das atividades de escopo contratual e demolição de infraestrutura geral de canteiros, bem como resolução de pendências comerciais em andamento. Aditivos 27 e 28: Prorrogar o prazo contratual para entrega de sobressalentes remanescentes em aquisição, substituição da válvula FV-2313070 e solução de pendências técnicas e comerciais em andamento".

Não foi evidenciada pela CIA a ocorrência de não conformidades na celebração dos aditivos. Entretanto, a CIA identificou que os aditivos foram celebrados,

 

 

dentre outros, para incorporar as diversas modificações ocorridas na execução das obras, fruto da contratação com deficiências no projeto básico.

### 5.4.4 Análise da Transação Extrajudicial – Consórcio CONPAR

Em dez/2013 foi firmado um Instrumento Particular de Transação Extrajudicial (IPTEJ) com o Consórcio CONPAR no valor de R$ 135.380.603,27 referente à execução dos serviços de consolidação do projeto básico; confecção do projeto executivo; fornecimento parcial de equipamentos, instrumentos e materiais; construção civil; montagem eletromecânica; condicionamento; assistência técnica à pré-operação, partida e operação e execução da manutenção da UHDTI (U-2313), UGH (U-22311), UDEA do Coque (U-32323).

O IPTEJ está descrito no DIP ENG-AB 577/2013 de 22/11/2013 (Anexo 18), assinado pelos Gerentes Executivos Sandoval Dias Aragão (ENG-AB interino) e Wilson Guilherme Ramalho da Silva (AB-PGI), e encaminhado aos Diretores José Antônio de Figueiredo (DETM) e José Carlos Cosenza (DABAST) para submeter à Diretoria Executiva a proposição de autorização para celebração do IPTEJ.

A seguir estão resumidas as condições negociadas para o IPTEJ:

- O pleito do Consórcio CONPAR de R$ 360.245.349,94, foi examinado por Comissão de Negociação instaurada localmente (DIP ENGENHARIA/IEABAST/IEIRP 62/2012 de 27/08/2012), com representantes da REPAR/EM e da ENG-AB/IEREFINO/IERP, a qual não obteve sucesso no desfecho das negociações. A CIA identificou que o valor reconhecido foi da ordem de R$ 75 milhões.
- Perdurando o impasse nas negociações face à complexidade envolvida, foi designada uma Comissão de Negociação Especial, para discussão do assunto com o Consórcio (DIP ENG-AB/IEREFINO 27/2013 de 23/05/2013), com representantes da ENG-AB/IEREFINO e do AB-PGI/REF. Essa prática encontrou amparo na Instrução de Contratação 29 – Gestão de Pleitos em Contratos de Projeto de Investimento (Anexo 19), gerida pela ETM-CORP/GPRI/CONTS.

Após sucessivas negociações, em reunião de 09/08/2013 entre a Comissão de Negociação Especial e o Consórcio CONPAR, foi comunicado o resultado da negociação, que resultou no valor total de R$ 135.380.603,27 (R$ 100.647.166,39 a preço contratual histórico – P0) em decorrência de: impactos decorrentes do terceiro replanejamento da obra; modificações de projeto; variação de quantitativos (Quantidade Apurada – QA e Quantidade Definida – QD); pagamento de chuvas; e pleito final, objetivando o encerramento das pendências existentes.

 

Sobre negociação de pleitos através de Comissões Especiais, a CIA obteve as seguintes declarações:

Declaração do Sérgio Albuquerque, Consultor Técnico no AB-PGI à época: *"que muitos contratos foram assinados com várias pendências de projeto; que havia pendências técnicas ao fechar os contratos; que houve mudanças de escopo, rearranjos, serviços adicionais que não eram previstos no contrato; que isso causava alteração nos prazos; que as comissões especiais focaram no escopo adicional, prazos adicionais e impeditivos (PTs, greves, chuvas, impeditivos registrados em RDO da obra); que usava como fato o que estava registrado e que podia ser quantificado; que não eram feitas inferências para negociação dos IPTEJs; que quando os contratos foram assinados já se tinha conhecimento que os prazos não eram reais; que se entendia à época que os EPCistas tenham capacidade de realizar o detalhamento do projeto básico; que a comissão especial não fez análise do projeto básico, que os escopo do seu trabalho a da comissão foi de avaliar os impactos causados pela Petrobras na obra; que todos os impactos analisados tinham registros e rastreabilidade; que havia n atraso no ressarcimento de modificações de projetos autorizadas pela Petrobras e efetivamente realizadas devido a atrasos na aprovação de documentos e aditivos e que isso gerava pleitos adicionais; que o que foi negociado pelas comissões especiais e pago pela Petrobras foi realmente o devido."*

Declaração do Sandoval Aragão, Gerente Geral do ENG-AB/IEPREMIUM à época: *"que a comissão que coordenou foi criada à luz do procedimento interno da PETROBRAS; que esse procedimento foi criado no bojo das discussões no mercado e na imprensa que a PETROBRAS não estava pagando aos seus fornecedores; que foi favorável para a PETROBRAS na negociação o fato da unidade estar operando e de que a comissão não estava envolvida diretamente na obra, tendo disponibilidade suficiente para realizar a análise; que foi notório que o volume de investimentos da PETROBRAS cresceu demais e que não havia quadros maduros suficientes para fiscalizar as obras".*

O IPTEJ foi autorizado pela Diretoria Executiva, conforme Ata DE 5.093, tendo sido assinado em 19/12/2013 e pago em 23/12/2013.

Não foi evidenciada pela CIA a ocorrência de não conformidades na celebração da Transação Extra Judicial.

### 5.5 Contrato do *on-site* da carteira de coque – Consórcio CCPR – Contrato 0800.0043403.08.2

Objeto: "Fornecimento de materiais, equipamentos e serviços relativos à análise de consistência do projeto básico, elaboração do projeto executivo, construção, montagem eletromecânica, condicionamento e assistência à pré-operação,



 **PETROBRAS**



partida, operação e apoio à manutenção da Unidade de Coqueamento Retardado (U-212), Unidade de Manuseio de Coque (U-6821), Unidade de Recuperação de Enxofre (U-2225), Unidade de Tratamento Gás Residual (U-2327), Unidade de Águas Residuais (U-251 26) e Subestações (SE-2212 e SE-6821) pertencentes à Carteira de Coque e HDT da Refinaria Presidente Getúlio Vargas - UN-REPAR, em Araucária – PR".

**Tabela 7 – Quadro Resumo do Contrato CCPR**

| Contratada | Valores Iniciais | | | Alterações Contratuais | | | Transações Extrajudiciais | | Valores Finais | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Data Assin. | Prazo (dias) | R$ (MM) | Qtd. Aditivos | Acrés. Prazo | Aditivos R$ (MM) | Qtd. TEJ | R$ (MM) | Prazo (dias) | R$ (MM) |
| CCPR (Camargo Correa/ Promon) | 07/07/08 | 1.313 | 2.488 | 29 | 531 | 141 | 1 | 113 | 1.844 | 2.742 |

### 5.5.1 Análise da licitação – Consórcio CCPR

Mediante submissão dos Gerentes Executivos Pedro Barusco (Engenharia) e Alan Kardec (AB-RE) aos Diretores Renato Duque (DSEPV) e Paulo Roberto Costa (DABAST), contida no DIP ENGENHARIA 335/2007 de 16/05/2007, a Diretoria Executiva aprovou os critérios de seleção de fornecedores e a listagem com as 18 empresas a serem convidadas (Ata DE 4.648 de 21/06/2007, item 5, pauta 635 – Anexo 20).

Após a emissão dos convites (22/08/2007), foram incluídas as empresas Alusa e Construcap. A inclusão destas empresas não atendeu aos critérios de seleção aprovados pela Diretoria Executiva, e ocorreram através de despacho dos Diretores Paulo Roberto Costa (DABAST) e Renato Duque (DSERV) em 03/10/2007 e 09/10/2007, respectivamente, no DIP ENGENHARIA 634/2007 de 21/09/2007, assinado pelos Gerentes Executivos Pedro Barusco (Engenharia) e Luiz Alberto Gaspar Domingues (AB-RE) – Anexo 21.

A CIA evidenciou que a inclusão das citadas empresas foi homologada pela Diretoria Executiva, por ocasião da autorização para contratação do Consórcio CCPR (Ata DE 4.705 de 23/06/2008, item 26, pauta 752 – Anexo 22).

A Alusa declinou de sua participação no certame e a Construcap não compareceu e nem justificou sua ausência no certame.

Sobre esse assunto houve as seguintes declarações à CIA:

Declaração do Ademar Itakussu, Gerente Setorial no IERP à época: *"que no processo de licitação do contrato da CCPR foram incluídas duas licitantes que*



 **PETROBRAS** 

*não atendiam ao critério de seleção inicial que fora submetido à aprovação da DE, sendo que estas inclusões se deram após solicitação para participar do certame, por meio de correspondências enviadas pelas empresas Alusa e Construcap; que não lembra para quem foram endereçadas as correspondências enviadas pela Alusa e Construcap; que eventualmente a comissão de licitação recebia cartas solicitando a inclusão de empresas, que o gerente do IERP eventualmente recebia também cartas do mesmo teor e que havia casos de que a inclusão de empresas era solicitada ao Gerente Executivo da Engenharia, Pedro Barusco; que todas as inclusões eram submetidas, pela Engenharia e Abastecimento, por meio de DIP, aos Diretores de Abastecimento e de Serviços solicitando autorização para inclusão das mesmas no certame".*

Declaração do Emerson Telles, Gerente Setorial no IERP à época: *"que na inclusão de empresas no processo de licitação ocorria apenas o cumprimento de ordens vindo dos Diretores de Abastecimento e Serviços e que não se questionava estas ordens".*

Nesse processo, foram recebidas três propostas:

**Tabela 8 – Propostas contratação *on-site* de coque**

| Proponente | Valor |
|---|---|
| Consórcio CCPR (Camargo Correa-Promon) | R$ 2.489.772.835,01 |
| Consórcio Queiroz Galvão-Iesa | R$ 2.681.312.844,30 |
| Consórcio Techint-Andrade Gutierez | R$ 2.709.341.976,33 |

Constou no Relatório da Comissão de Licitação: *"Após comparações, a Comissão verificou que a proposta do CONSÓRCIO CAMARGO CORRÊA/PROMON, de menor valor, situou-se 24,4% acima da estimativa base, desconsiderando a verba prevista para ressarcimento de chuvas e descargas atmosféricas (R$ 29.000.000,00)".*

A CIA verificou que as demais propostas foram desclassificadas por preços excessivos e que a estimativa de custos da PETROBRAS foi revisada para correção de inconsistências de alguns custos parciais considerados a menor (DIP ENGENHARIA/SL/ECP 72/2008 de 18/04/2008 – na referida reanálise foram corrigidos os custos a menor de tubulação de aço-liga da U-2212, válvulas Delta Guard Model GV-815 e GV-830, bombas (70 unidades) da U-2212, sopradores SP-2-25001 A/B da U-2225, torres T-2512601/02 e vasos V-2512602/03 da U-2212, e isolamento dos vasos do coque V-2212001/02/03/04 da U-2212), passando de R$ 2.006.009.404,98 para R$ 2.093.988.284,45.

Com isso, a proposta do Consórcio CCPR situou-se 19,16% acima da estimativa base, desconsiderando-se a verba prevista para ressarcimento de chuvas e descargas atmosféricas (R$ 29.000.000,00).

 PETROBRAS 

Não houve apresentação de recurso por parte de nenhum licitante.

Em 18/06/2008 a Comissão de Licitação emitiu o Relatório recomendando a assinatura do contrato com o Consórcio CCPR, o que ocorreu em 07/07/2008, devidamente autorizado pela Diretoria Executiva (Ata DE 4.705 de 23/06/2008, item 26, pauta 752 – Anexo 22).

A CIA considerou como não conformidade a inclusão das empresas Alusa e Construcap no certame, sem prévia submissão à Diretoria Executiva. As referidas empresas não atendiam aos critérios de seleção previamente estabelecidos. A CIA também considerou insuficiente a justificativa apresentada para as inclusões – aumento de competitividade – a qual poderia ter sido utilizada para quaisquer outras empresas participarem do certame.

Outra situação identificada pela CIA referiu-se à alteração na curva de desembolso inicial do contrato. O edital divulgado aos licitantes em 17/08/2007 previa o pagamento de verba para instalação da infraestrutura a ser utilizada pela contratada (instalações sanitárias, vestiários, área para serviços médicos, portaria, escritórios, restaurante, rede elétrica e pluvial, dentre outros) e sua manutenção durante a vigência contratual.

Tal verba, estimada em 3% do valor do item contratual de consolidação do projeto básico, execução do projeto executivo, construção civil, montagem eletromecânica e condicionamento das unidades, seria paga à razão de:

- 21% na mobilização de pessoal e equipamentos;
- 6% na apresentação da documentação contratual de planejamento, execução e finalização;
- 3% na desmobilização de pessoal e equipamentos;
- 45% para implantação e desmobilização do canteiro de obras;
- 15% pela manutenção do canteiro;
- 10% para implantação de cercas, portões, pavimentação e arruamento.

Em 21/02/2008 houve solicitação da licitante Camargo Correa de alteração dessa verba de 3% para 8%. A CIA identificou que a Comissão de Licitação procedeu a revisão deste percentual para 15% (Circular 6 de 29/02/2008 – Anexo 23). Essa alteração representou o equivalente a cerca de 9% do valor do contrato (R$ 223,2 milhões).

O primeiro pagamento referente ao contrato totalizou R$ 34,6 milhões, em agosto/2008, mês seguinte à assinatura contratual, sem que houvesse contraprestação em serviços, pelo Consórcio, neste montante, caracterizando antecipação de pagamento.



 

### 5.5.2 Análise da consistência do projeto básico – Consórcio CCPR

O projeto básico da unidade de coque foi elaborado pela Conoco Phillips, tendo sido emitidos alguns documentos complementares pela ENGENHARIA e de uma Unidade de Tratamento de Águas Ácidas pelo CENPES. O anexo contratual I – Memorial Descritivo, item 7.1, previu atividade de consolidação do projeto básico e descreve como serviços relacionados: *"executar estudos técnicos minuciosos dos documentos do Projeto Básico e documentos do FEED"* e *"executar a consolidação do Projeto Básico das unidades, levando em consideração, entre outros, os relatórios de inconsistências enviados pela PETROBRAS"*.

Para a carteira do coque a PETROBRAS tinha como obrigação o fornecimento de cerca de 20 equipamentos (vasos, compressores, fornos, permutadores, "oil mist", SDCD e PES). O atraso na disponibilização das informações técnicas ocasionou postergação no desenvolvimento do projeto pelo Consórcio CCPR.

### 5.5.3 Análise dos aditivos – Consórcio CCPR

O citado contrato recebeu 29 aditivos, tendo o prazo sido acrescido em 531 dias e o valor em R$ 227.772.443,00. A maioria dos aditivos tratou apenas de extensão de prazo.

Foram observados alguns aditivos visando o acréscimo de escopo, decorrente de alterações no projeto básico, conforme exemplificado a seguir: Aditivo 5 – reforço das bandejas de torres; Aditivo 10 – fornecimento de equipamentos para o Sistema de Tratamento Cáustico Regenerativo; Aditivos 13 e 14 – diversas alterações de escopo (ex. modificação na linha de vapor amoniacal, inclusão de revestimento anticorrosivo em tanques, reforço na estrutura metálica de sustentação de torres, etc.).

O aditivo 21 (valor de R$ 205.254.769,38 e prazo de 229 dias), assinado em 18/05/2012, decorreu do acréscimo de custos indiretos (mão-de-obra indireta – MOI, equipamentos, serviços de terceiros, etc.) devido à extensão do prazo contratual e teve por objeto: replanejamento contratual considerando: a) Extensão do prazo contratual; b) Preservação de equipamentos, instrumentos ou sistemas operacionais; c) Pleitos (permanência de mão-de-obra indireta e equipamentos durante o período contratual); d) Acréscimos de serviços (proposições de alteração de escopo) de mesma natureza do objeto contratual e e) Aditamento da verba para ressarcimento dos custos correspondentes a paralisações devido a chuvas, descargas atmosféricas e suas consequências.

Não foi evidenciada pela CIA a ocorrência de não conformidades na celebração dos aditivos. Entretanto, a CIA identificou que os aditivos foram celebrados,



Cleary Gottlieb Steen & Hamilton LLP
Confidential COPY A - 1st

 

dentre outros, para incorporar as diversas modificações ocorridas na execução das obras, fruto da contratação com deficiências no projeto básico.

### 5.5.4 Análise da Transação Extrajudicial – Consórcio CCPR

Em set/2013, foi firmado um Instrumento Particular de Transação Extrajudicial (TEJ) com o Consórcio CCPR no valor de R$ 113.050.086,48, referente a pagamento de pleitos decorrentes de: a) custos adicionais de responsabilidade da PETROBRAS por alterações de projeto e modificações de escopo; b) custos relativos à inclusão de serviços para adequação de erros de projeto básico integrante da documentação do processo licitatório; c) pagamento de custos adicionais incorridos pelo Consórcio em decorrência de atrasos em eventos de responsabilidade da PETROBRAS, que impactaram o caminho crítico da obra e acarretaram na reprogramação de serviços do contrato e na implementação de plano de aceleração; d) pagamento de custos adicionais por consequências de chuvas; e) incidência de juros por pagamento realizado após data de vencimento em faturas e notas fiscais emitidas pelo Consórcio.

Para conduzir o processo de análise das condições técnicas, jurídicas e econômicas relativas ao pleito do Consórcio CCPR (cerca de R$ 380,7 milhões), foi constituída localmente Comissão de Negociação (DIP ENG-AB/IEREFINO/IERP 7/2012 de 07/12/2012), a qual não obteve sucesso no desfecho das negociações. A CIA identificou que o valor reconhecido foi da ordem de R$ 29,5 milhões.

Foi então designada Comissão de Negociação Especial com o Consórcio CCPR (DIP ENG-AB/IEREFINO 13/2013 de 15/03/2013) para solução de pendências contratuais, com representante da ENG-AB e do AB-PGI. Essa prática encontrou amparo na Instrução de Contratação 29 – Gestão de Pleitos em Contratos de Projeto de Investimento (Anexo 19), gerida pela ETM-CORP/GPRI/CONTS. A minuta do IPTEJ foi submetida ao Jurídico que emitiu o Parecer JURÍDICO/GT-PLEITOS/ENG-AB 4153/13.

O IPTEJ está descrito no DIP ENG-AB 350/2013 de 02/08/2013 (Anexo 24) assinado por Maurício Guedes (ENG-AB), Joel Trindade Junior (ENG-GE – interino), Vilson Guilherme Ramalho (AB-PGI), Erardo Gomes Barbosa Filho (E&P-SSE), Marco Tulio Pereira Machado (ENG-E&P) e Osmond Coelho Junior (E&P-I GSU), encaminhado aos Diretores José Antônio de Figueiredo (DETM) e José Carlos Cosenza (DABAST) para submissão à Diretoria Executiva da proposição de autorização para sua assinatura.

Não foi evidenciada pela CIA a ocorrência de não conformidades na celebração da Transação Extra Judicial.

 **PETROBRAS** 

**5.6 Contrato do** *off-site* **das carteiras de gasolina e coque – Consórcio INTERPAR – Contrato 0800.0043363.08.2**

Objeto: "Fornecimento de materiais, equipamentos e serviços, relativos à análise de consistência do projeto básico, elaboração do projeto executivo, construção e montagem eletromecânica, condicionamento e assistência à pré-operação, partida, operação e apoio à manutenção das unidades e sistemas *off-site* pertencentes às carteiras de gasolina e de coque e HDT da Refinaria Presidente Getúlio Vargas – UN-REPAR".

**Tabela 9 – Quadro Resumo do Contrato INTERPAR**

| Contratada | Valores Iniciais | | | Alterações Contratuais | | | Transações Extrajudiciais | | Valores Finais | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Data Assin. | Dur. Dias | R$ (MM) | Qtd. Aditivos | Acrés. Prazo | Aditivos (R$ MM) | Qtd. TEJ | R$ (MM) | Prazo | R$ (MM) |
| INTERPAR (Setal, Mendes Jr., MPE) | 07/07/08 | 1.115 | 2.252 | 31 | 946 | 389 | 1 | 221 | 2.061 | 2.863 |

**5.6.1 Análise da licitação da contratação do** *off-site*

Foram convidadas 18 empresas e recebidas 3 propostas, sendo que uma foi desclassificada por preços excessivos (Tabela 10):

**Tabela 10 – Propostas recebidas licitação do** *off-site*

| Proponente | Valor (R$) | Classificação | Percentual em relação à estimativa Petrobras |
|---|---|---|---|
| Consórcio INTERPAR – Setal/Mendes Junior/MPE | 2.253.710.536,05 | 1ª | 8,73% |
| Consórcio COROS – CNO/UTC/OAS | 2.472.953.014,05 | 2ª | 19,53% |
| Consórcio QI – Queiroz Galvão/Iesa | 2.581.233.420,41 | desclassificada | 24,86% |

A CIA verificou que não houve interposição de recursos administrativos relativos à decisão da Comissão de Licitação.

Conforme citado no relatório da Comissão de Licitação, *"Ao comparar a proposta do Consórcio INTERPAR com a estimativa base, desconsiderando a verba prevista para ressarcimento de chuvas e descargas atmosféricas (R$ 46.000.000,00), verificamos que a mesma situou-se 8,73% acima, isto é, dentro da faixa da aceitabilidade previamente estabelecida"*.

Quanto ao item previsto para infraestrutura do canteiro de obras, a CIA identificou que o edital enviado às licitantes em 30/04/2007 previa a verba igual



 

a 3% do item contratual referente à consolidação do projeto básico, realização do projeto executivo, construção, montagem e condicionamento das unidades e sistemas *off-site*. Em 12/02/2008, durante o processo licitatório, a Setal Óleo e Gás solicitou revisão desse percentual, de 3% para 6%, o que não foi aceito pela Comissão de Licitação, conforme Circular 14 de 21/02/2007 – (Anexo 25).

Entretanto, a CIA observou que a Comissão de Licitação alocou o percentual de 12% do citado item, alterando sua decisão quanto a não aceitação da solicitação feita pela empresa Setal Óleo e Gás. Isso representou o montante de R$ 196 milhões para pagamento do item de infraestrutura. A CIA não evidenciou as razões para esse fato. Como consequência, as duas primeiras medições do contrato alcançaram R$ 44,2 milhões, pagas em agosto/2008 (R$ 10,2 milhões) e setembro/2008 (R$ 34 milhões), logo após a assinatura contratual (julho/2008), sem que houvesse evidenciação de contraprestação em serviços neste montante, pelo Consórcio, caracterizando adiantamento de pagamentos.

### 5.6.2 Análise de consistência do projeto básico

O contrato com o Consórcio INTERPAR tinha como escopo a consolidação do projeto básico, compreendendo a análise dos documentos do projeto básico elaborados pela PETROBRAS, documentos do pré-detalhamento de engenharia (FEED – planilhas de quantitativos) e documentos da REPAR e emissão do relatório de análise de consistência considerando as diversas informações recebidas na etapa de licitação e as originadas posteriormente de outras fontes. Dentre as obrigações relacionadas ao projeto, fornecimento e montagem, estavam as interligações de processo e utilidades das carteiras de gasolina e de coque (*on-site*), objeto de outras contratadas, além de instalações que atendiam ao conjunto de unidades, tais como: novas tubovias, sistema de combate a incêndio, ampliação de parque de bombas, ampliação da casa de força, novas tochas e nova casa de compressores. Desta forma, para o desenvolvimento do seu projeto, inclusive consolidação do projeto básico, o Consórcio INTERPAR necessitava de informações oriundas de outras contratadas, além de toda a documentação disponível por ocasião do início de suas atividades, caracterizando-se, assim, as diversas interfaces entre contratos, com interdependência de informações.

A CIA identificou que o contrato com o Consórcio INTERPAR teve suas principais interfaces com as seguintes contratadas: Consórcio CONPAR (carteira de gasolina); Consórcio CCPR (carteira de coque); Consórcio Conenge-SC (torre de resfriamento); Consórcio Passarelli-GEL (unidade de tratamento de despejos industriais-UTDI); Consórcio Veolia-Enfil (expansão da planta de tratamento de água e reuso de efluentes) e CBC (caldeiras de vapor).

  

 **PETROBRAS** 

O fluxo de informações relativo às interfaces acima citadas pode ser esquematicamente visualizada na Figura 13.

**Figura 13 – Fluxo de informações de projetos – Consórcio INTERPAR**



A CIA constatou a interdependência entre os projetos (carteiras de gasolina e coque) e que houve impactos nos contratos.

Especificamente, no que se refere aos atrasos na contratação e na consolidação dos projetos básicos, por parte das diversas contratadas, o Aditivo 14 do Consórcio INTERPAR, de maio/2011, contemplou a necessidade de extensão contratual associado a este problema.

No Aditivo 14 constam os seguintes atrasos médios: "*Sistema de torre de resfriamento: atraso médio de 17 meses; Sistema tratamento de agua e condensado: atraso médio de 14 meses; Sistema interligação com as caldeiras: atraso médio de 18 meses; Sistema interligação Gasolina e Coque: atraso médio de 14 meses*". O referido aditivo foi de 371 dias.

A CIA identificou que o contrato com o Consórcio INTERPAR foi assinado sem o grau de maturidade requerido para a atividade contratual de consolidação do projeto básico. A Tabela 11 mostra as datas previstas e realizadas de assinatura dos diversos contratos que possuem interdependência com o contrato de *off-site*, e cujo atraso na liberação da documentação técnica necessária para a atividade de consolidação, pela PETROBRAS (mais especificamente os fluxogramas de processo dos sistemas de interligação, casa de força, enxofre e tocha), impactou a elaboração do projeto, onerando significativamente o



 PETROBRAS 

contrato. Ajustes de projetos e modificação de escopo das utilidades ocorreram durante a licitação do contrato de *off-site* (Anexo 26).

Tabela 11 – Cronograma de contratação do *off-site*

| Contrato | Previsão na aprovação de Fase III (jan/2007) | Previsão na assinatura do CT-111 (jul/2008) | Realizado |
|---|---|---|---|
| CT-103 Torres de Resfriamento | 31/08/2007 | 04/08/2008 | 01/06/2009 |
| CT-121 CBC MIP (Caldeiras) | 16/08/2007 | 12/08/2008 | 22/12/2008 |
| CT-149 Veolia-Enfil (UTRA+UTC) | 31/08/2007 | 02/05/2008 | 29/09/2008 |
| CT-114 Passarelli-GEL (UTDI) | 15/09/2007 | 14/10/2008 | 10/03/2009 |

**5.6.3 Análise de aditivos – Consórcio INTERPAR**

O contrato recebeu 31 aditivos, tendo o prazo sido acrescido em 929 dias e o valor em R$ 551.810.000,00.

Os aditivos mais relevantes foram:

- Aditivo 10 – valor R$ 20.132.536,49. Objeto: adequação da tubovia e dos pipe-racks da área 5300 situados entre CAFOR e UTRA, adequação do sistema de água desaerada e alteração do pipe-rack na área 5600 entre as caldeiras GV-5604 e GV-5603;

- Aditivo 14 – valor R$ 316.138.786,64 e prazo de 371 dias. Objeto: extensão de prazo em 371 dias com término em 31/07/2012, pagamento de custos por acréscimo de recursos, e acréscimo de serviços, sendo de limpeza química, recursos adicionais para assistência à pré-operação e modificações de projeto das unidades e sistemas *off-site*;

- Aditivo 18 – valor R$ 10.527.457,50. Objeto: acréscimo de serviços referente às modificações de projeto das unidades e sistemas *off-site*;

- Aditivo 23 – valor R$ 19.759.985,09. Objeto: adequação ao escopo contratual os serviços e fornecimentos constantes das modificações de projeto;

Na análise do Aditivo 14, a CIA identificou a falta de gestão integrada dos contratos que compuseram as carteiras de coque e gasolina.

O critério de definição do percentual de responsabilidade do Consórcio INTERPAR na extensão de prazo concedida no Aditivo 14 correspondeu ao

 

atraso médio na entrega dos fluxogramas de processo, em relação às datas estabelecidas contratualmente (num total de 75 fluxogramas).

A CIA identificou que, na definição deste percentual, foram utilizadas as datas planejadas de entrega informadas pelo Consórcio INTERPAR, para as quais houve aceitação pela fiscalização da PETROBRAS.

Cabe ressaltar que essa aceitação só poderia ser ratificada quando da assinatura dos contratos das unidades auxiliares, o que só veio a ocorrer posteriormente à emissão destes fluxogramas pelo Consórcio.

Tal assunto constou do relatório da Comissão de Negociação do Aditivo 14: *"O contrato ora em processo de aditamento tem no seu escopo, a execução dos serviços de análise de consistência do projeto básico, elaboração do projeto executivo, fornecimento, construção, montagem eletromecânica de interligações entre as novas unidades e/ou existentes, portanto, há uma interface e sinergia com vários contratos (com interface) que estão sendo implementados atualmente na UO-REPAR".*

A seguir, destacamos os principais contratos com interface.

a) Contrato CT-101: implementação das unidades pertencentes à Carteira de Gasolina e as unidades de Hidrotratamento de Instáveis (UHDT), de Geração de Hidrogênio (UGH) e de Dietanolamina (UDEA) da Carteira de Coque e HDT;
b) Contrato CT-112: implementação das unidades auxiliares e Unidade de Coque (UCR);
c) Contrato CT-114: implementação da Unidade de Tratamento de Despejos Industriais;
d) Contrato CT-121: implementação das caldeiras GV-5604 e GV-5605;
e) Contrato CT-103: implementação da torre de resfriamento;
f) Contrato CT-149: implementação da unidade de tratamento de águas (UTRA) e de tratamento de condensado (UTC).

Os contratos para a implementação dos sistemas de utilidades: CT-114, CT-121, CT-103 e CT-149 são complexos e foram assinados em tempos distintos, após o início dos serviços de consolidação de projeto pela contratada, exemplo:

a) Torre de Resfriamento, contrato assinado em junho/2009;
b) Caldeiras GV-5604 e 5605, em dezembro/2008;
c) Unidade de Tratamento de Despejos Industriais (UTDI), em março/2009;
d) Unidades de Tratamento de Água e Tratamento de Condensado (UTRA e UTC), em setembro/2008.



 

O prazo médio para consolidação do projeto básico pela Contratada é de 7 meses, conforme previsto no manual de planejamento. Considerando o início dos serviços em 07/07/2008 (data da Autorização de Serviços), o término seria em janeiro/2009. Ou seja, levando-se em conta somente a assinatura dos contratos acima citados, verificou-se que os dados de processo e arranjos (*layout*) definitivos das respectivas unidades ainda eram aqueles do projeto básico disponibilizados pela PETROBRAS.

Com a evolução dos trabalhos de engenharia desenvolvidos pelas contratadas, alguns dados de processo e arranjos foram ajustados em relação àqueles que haviam sido disponibilizados pela PETROBRAS para a Contratada na fase de licitação.

Não foi evidenciada pela CIA a ocorrência de não conformidades na celebração dos aditivos. Entretanto, a CIA identificou que o Aditivo 14 foi celebrado por falhas no planejamento integrado da obra de modernização da REPAR.

### 5.6.4 Análise do IPTEJ – Consórcio INTERPAR

Foi firmado Instrumento Particular de Transação Extrajudicial (IPTEJ) com o Consórcio INTERPAR no valor de R$ 221.079.671,50 (junho/2013), referentes ao pagamento de custos adicionais pela reprogramação dos serviços e relativos às alterações de projeto, de responsabilidade da PETROBRAS, objetivando o encerramento das pendências existentes relativas ao contrato.

A negociação ocorreu em duas etapas. A primeira buscou atender a diversas revisões e modificações de projeto determinantes para a continuidade das obras e requeridas em função da constatação de inconsistências nos projetos básicos, o que gerou pleito do Consórcio de R$ 25.070.132,27. A Comissão de Negociação instituída na REPAR (DIP ENGENHARIA/IEABAST/IERP 63/2012 de 27/08/2012) reconheceu valor de R$ 4.658.506,09.

Numa segunda etapa foi instaurada Comissão de Negociação Especial (DIP ENG-AB/IEREFINO 5/2013 de 25/01/2013), para avaliar demais pleitos do Consórcio INTERPAR quanto a extensão de prazo contratual, custo de antecipação de datas, solicitações de serviços adicionais e pagamento de chuvas, perfazendo R$ 1.068.183.519,22. Foi reconhecido o valor de R$ 216.421.165,41.

Mediante o DIP ENG-AB 298/2013 de 28/06/2013 (Anexo 27) assinado pelos Gerentes Executivos Mauricio de Oliveira Guedes (ENG-AB) e Wilson Guilherme Ramalho da Silva (AB-PGI), encaminhado aos Diretores José Antônio de Figueiredo (DETM) e José Carlos Cosenza (DABAST), o IPTEJ foi submetido à Diretoria Executiva para autorização de assinatura. A autorização ocorreu em 18/07/2013 (Ata DE 5.049, pauta 845).



 

Declarações sobre a celebração do IPTEJ:

Declaração do Emerson Telles, Gerente Setorial no IERP à época: *"que a comissão interna para negociação do TEJ com a INTERPAR não conseguiu evoluir na solução e negociação porque o Consórcio se recusava abrir informações detalhadas que permitissem apurar devidamente os custos devidos; que devido a isso foi comunicada a instância superior e, consequentemente, esta foi cancelada e foi criada uma comissão especial para negociação; que comissão especial para negociação avaliou os pleitos do TEJ sob outras metodologias, diferente dos coeficientes de responsabilidades das partes que eram utilizadas na IERP";*

Declaração do Guilherme Klingelfus, Gerente do REPAR/EM à época: *"que os últimos aditivos foram negociados por comissões especiais, devido dificuldades para se chegar a um acordo com as contratadas no âmbito do Empreendimento"; "que se recorda que nos contratos firmados com os consórcios INTERPAR e CCPR o ponto principal era relacionado ao valor pleiteado pelas empresas, que estava bem acima do que o Empreendimento entendia como correto"; "que a metodologia adotada para avaliar os pleitos dos consórcios foi bastante discutida"; "que nunca foi discutida nenhuma flexibilização para assinatura de aditivo e que tenha conhecimento";*

Declaração do José Paulo de Assis, Gerente da ENGENHARIA/IERP à época: *"que alguns pleitos que ficaram para análise pelas comissões de negociação de TEJ não tinham sido aceitos pelo IERP";*

Declaração do Paulo Ruiz, Gerente Setorial da ENGENHARIA/IERP à época: *"que as cobranças, no sentido de avaliação de pleitos, do IERP e REPAR muitas vezes atrasaram a conclusão de aditivos o que levou aos TEJs negociados pelas Comissões Especiais indicadas pela Sede; que a IERP mantinha uma linha irrepreensível na negociação de pleitos e aditivos; que as Comissões Especiais que negociaram os últimos aditivos e TEJs passaram por cima das análises feitas pelo IERP e aceitaram pleitos que até então eram negados em níveis locais; que acredita que nos TEJ podem ter sido pagos pleitos indevidos";*

Declaração do Sérgio de Souza Albuquerque, Consultor Técnico do Abastecimento à época: *"que foi membro das comissões especiais de IPTEJ da Interpar, CCPR, Skanska-Engevix, CONPAR, VWSB-Enfil, Confab, Azevedo Travassos, ABB-Cegelec-MHA, Contreras, Montecalm-SES, representando o AB-PGI; que a orientação era solucionar pendências a partir de análises técnicas, jurídicas e econômicas, com o resultado mais vantajoso e adequado para Petrobras e emitir documentação para aprovação e análise jurídica; que os atrasos nas obras foram significativos, algumas vezes mais do que dobrando o prazo dos serviços; que houve erro na estratégia de implementação dos*



 

*empreendimentos ao assumir a compra dos equipamentos para fornecimento aos EPCistas; que houve atraso na entrega dos equipamentos adquiridos e por conta disso os contratos foram aditivados em prazo, e em valor posteriormente; que houveram muitos aditivos de contratos por conta desses atrasos; que pelo fato de Petrobras ser a responsável pelo atraso dos equipamentos e, consequentemente da obra, as negociações eram fechadas com um percentual de responsabilidade alta para Petrobras; que ao negociar o encerramento do contrato, a IERP informava que os percentuais de responsabilidade da Petrobras se reduziram durante o andamento da obra visto os equipamentos terem sido entregues e a obra ter sido liberada; que isso gerou dificuldades de negociação para as quais foram criadas as comissões especiais de negociação de IPTEJ".*

Não foi evidenciada pela CIA a ocorrência de não conformidades na celebração da Transação Extrajudicial.

### 5.7 Impactos decorrentes da ausência de cronograma gerencial integrado do empreendimento

Tendo em vista a complexidade do empreendimento, com a diversidade de unidades de *on-site* e *off-site* e, ainda, a elevada quantidade de interfaces daí decorrentes, havia a necessidade de ter um cronograma gerencial integrado da Obra, cujo acompanhamento levasse à tomadas de decisão visando evitar que cada carteira fosse realizada de forma independente, de forma a minimizar os impactos de prazo e custo. A CIA constatou a inexistência de tal cronograma gerencial integrado, e isso foi confirmado em declarações conforme transcritas a seguir:

Declaração do Oscar Tokikawa, Gerente da REPAR/EM à época: *"que não havia um cronograma integrado; que sempre houve uma demanda da REPAR junto a ENGENHARIA, mas que ele nunca existiu; que houve várias tentativas de integração entre REPAR e IERP para se chegar a um cronograma integrado, mas que não se chegou a fazer; que o IERP alegava que havia muitas interfaces de cronograma e que não se conseguia fazer um cronograma com respaldo no detalhamento do projeto; que os prazos de consolidação de interfaces entre utilidades, tubovias, ETDI, diversas unidades, foi subestimada; que não houve prazo para hábil para consolidar as informações e encadear as contratações de forma adequada; que os prazos de encadeamento das contratações e o planejamento das contratações vis-a-vis os tempos de consolidação de interfaces foi a principal causa do atraso da obra".*

Declaração do José Paulo Assis, Gerente do IERP à época: *"que trabalhou entre 2002 e 2013 como gerente do IERP; que não tem conhecimento se foi apresentado a Diretoria um cronograma integrado da obra em níveis gerenciais, mas que acredita que foi apresentado pelo Abastecimento; que a gestão de*



 

*portfólio integrado foi evoluindo durante a execução das obras na empresa com a realização de reuniões de CDL".*

Declaração do João Oderich, Gerente Geral da REPAR à época: *"que o fato da licitação das obras de interligações (INTERPAR) ter ficado para trás acabou impactando o andamento das demais frentes".*

Declaração do Emerson Telles, Gerente Setorial no IERP à época: *"que houve atrasos na formalização de contratos das unidades de "on-site" e que o contrato de interligações foi impactado pelo atraso no recebimento dos dados de processo consolidados das unidades "on-site" e "off-sites"; que para que o contrato das interligações avançasse era necessário de informações das unidades de "on-site" que tiveram as contratações atrasadas em relação ao cronograma previsto; que o atraso na contratação das unidade de "on-site" e "off-site" impactou o andamento do contrato INTERPAR; que as modificações nos projetos de utilidades das unidades acabaram impactando nos projetos de interligação".*

A inexistência do cronograma gerencial integrado da obra foi um fator crítico de impacto prazo e custo e não possibilitava o acompanhamento sistemático e a tomada de decisão adequada.

## 5.8 Impactos nos prazos e custos da obra pelo fornecimento de equipamentos críticos pela PETROBRAS

A CIA verificou, conforme declaração do Gerente Executivo de MATERIAIS Marco Aurélio Rosa Ramos, que a estratégia para a PETROBRAS fornecer diretamente equipamentos considerados críticos para a obra *"foi montada em um grande Workshop realizado pela Companhia; que participou do Workshop o antigo Gerente Executivo de MATERIAIS e representantes das áreas de Negócio (ABASTECIMENTO e ENGENHARIA)".* Foram adquiridos e fornecidos equipamentos tais como: reatores de HDT, permutadores de calor, caldeiras de vapor e compressores especiais. Tais aquisições sofreram atrasos significativos, conforme Tabela 12:

**Tabela 12 - Atraso na entrega de equipamentos adquiridos pela PETROBRAS**

| Carteira | Equipamento | Fornecedor | Data Requerida | Data de Entrega | Atraso (dias) |
|---|---|---|---|---|---|
| Gasolina | Compressor | ELLIOT | Jan/2010 | Mar/2011 | 425 |
| | Compressor | KOBELCO | Jul/2010 | Jan/2011 | 180 |
| | Permutadores | GODREJ | Mar/2010 | Abr/2011 | 395 |
| | Compressor | THOMASSEM | Abr/2010 | Jan/2011 | 270 |
| | Bomba | FLOWSERVE DO BRASIL | Jun/2010 | Set/2011 | 425 |
| | Caldeiras | CBC | Jul/2009 | Abr/2011 | 270 |
| Coque | Compressor | ELLIOT | Jul/2009 | Abr/2011 | 540 |



 **PETROBRAS** 

| Reatores | GODREJ | Abr/2009 | Ago/2011 | 650 |
|---|---|---|---|---|
| Bombas | SULZER | Mai/2010 | Jan/2011 | 240 |
| Permutadores | LARSEN & TOUBRO | Fev/2009 | Ago/2010 | 575 |
| Compressor | ELLIOT | Ago/2009 | Abr/2011 | 635 |
| Sistema de Descoqueamento | FLOWSERVE | Out/2011 | Dez/2011 | 60 |
| Casa de Analisadores | PENSALAB | Out/2012 | Out/2013 | 365 |

Esses atrasos impactaram os cronogramas e foram reconhecidos pela PETROBRAS e, em consequência, geraram aumento de prazos e custos na obra.

A CIA identificou que o atraso no fornecimento de equipamentos por parte da PETROBRAS foi um dos principais fatores de impacto em prazo e custo da obra.

Sobre as razões de tais atrasos, as áreas de MATERIAIS e ENGENHARIA atribuíram o não cumprimento de prazos à elevada demanda junto ao mercado fornecedor, pois a PETROBRAS estava comprando além da capacidade de fabricação, bem como o estabelecimento de prazos inviáveis. Citaram ainda a demora da PETROBRAS no fornecimento de informações técnicas aos fornecedores, conforme descrito a seguir:

Declaração do Fernando Biato, Gerente Geral do ENGENHARIA/IEABAST à época: *"que na época das obras não havia informação que os equipamentos críticos iriam atrasar por tanto tempo; que devido ao fato de que a expectativa era de que não houvesse atrasos tão extensos na entrega de equipamentos, não foi aventada a possibilidade de desmobilizar a obra."*

Declaração do João Oderich, Gerente Geral da REPAR à época: *"que o impacto do fornecimento de equipamentos pelas empresas Godrej, Larsen, Thomassen, Elliot, Sundyne, etc. foi grande; que o mesmo ocorreu com outros fornecedores como Siemens e Sulzer".*

Declaração do Maurício Costa, Gerente do MATERIAIS/CO à época: *"o mercado estava muito aquecido, fruto das próprias aquisições da PETROBRAS; que havia mudança de tecnologia (cromo-molibdênio para cromo-molibdênio e vanádio); que havia poucas empresas nessa nova tecnologia; que havia a questão do desenvolvimento de conteúdo nacional; que as empresas não tinha aço disponível; que tudo isso prejudicaria o andamento/prazo dos projetos; que o mercado pedia muito adiamento para elaboração de propostas; que o mercado também estava muito sobrecarregado (carteira cheia); que os processos de compra de compressores foram extremamente demorados (parecer técnico demorado); que não havia licença de fornecedor nacional para fornecer "breech lock" (permutador)".*



Cleary Gottlieb COPIA Steen & Hamilton LLP

 

<u>Declaração do Oscar Tokikawa, Gerente da REPAR/EM à época</u>: *"que o atraso na entrega de equipamentos adquiridos pela PETROBRAS também impactou as obras; que o atraso de reatores fabricados na Índia atrasou a obra; "que houve atraso nos compressores e que estes atrasos também impactaram o cronograma da obra; que os prazos de fornecimento de equipamentos foram subestimados pela PETROBRAS; que foram estipulados prazos de entrega padrão de equipamentos que não se confirmaram; que o mercado mundial de equipamentos estava aquecido e que isso impactou os prazos de fornecimento de equipamentos adquiridos pela Companhia".*

<u>Declaração do Mário Castrillon, Gerente Setorial no IERP à época</u>: *"que devido a indefinição do prazo de entrega dos equipamentos críticos, que mudava constantemente, os recursos e equipes dos EPCistas ficavam mobilizados na obra; que havia comissão para negociar os aditivos de custos"; "que a principal causa de atraso nas obras do Consórcio CONPAR foi a compra e o fornecimento de equipamentos críticos pela PETROBRAS".*

<u>Declaração do Asley Monteiro, Gerente Setorial de MATERIAIS/CO/ECPL à época</u>: *"que as especificações de aço para os novos equipamentos o mercado interno não tinha condição de fornecer; que poucas usinas no mundo fabricavam aços especiais para atender a grande demanda do mercado; que as especificações da PETROBRAS não eram consideradas tradicionais pelos fornecedores devido a critérios de fabricações mais restritas e materiais especiais; que havia peculiaridades na especificação de equipamentos que levaram a muitos questionamentos durante a licitação; que o mercado para fornecimento de grandes máquinas estava muito saturado; que foram detectados problemas fabris no fornecimento de equipamentos fabricados pela Godrej (Índia); que foram necessários ajustes no processo de fabricação da Godrej o que acabou impactando as obras da REPAR."*

<u>Declaração do Paulo Ruiz, Gerente Setorial no IERP à época</u>: *"que MATERIAIS atrasava os prazos de compra; que o efetivo de MATERIAIS era subdimensionado para atender as aquisições das obras da PETROBRAS".*

## 6. VERIFICAÇÕES DE AUDITORIAS

A CIA identificou os seguintes assuntos reportados em relatórios de auditorias realizadas na REPAR durante a execução das obras:

### 6.1 Auditorias Internas

Em relatório de 07/01/2008, a Auditoria Interna mencionou o fato da inclusão das empresas Constran e Alusa durante os processos licitatórios para as obras de construção da unidade de propeno (Consórcio Skanska-Engevix) e de

 

Cleary Gottlieb Steen & Hamilton LLP — Copr. 18

 

modernização de instalações elétricas (Consórcio ABB/Cegelec/MHA), após o envio dos convites. O relatório registrou que, apesar de haver o "de acordo" dos Diretores do Abastecimento (em exercício) e de Serviços, a inclusão de empresas, após início dos processos, estaria sujeita a nova aprovação pela Diretoria Executiva, antes da finalização do processo, em função do limite de competência.

Com relação à contratação direta do Consórcio CONPAR, o relatório da Auditoria Interna de 11/07/2008 apontou a revisão nos preços estimados a partir da proposta da contratada e sem evidências de adoção de critério técnico ou mercadológico. Segundo o relatório, a alteração na orçamentação da PETROBRAS careceu de justificativas para as alterações em determinados itens (tais como: histograma de máquinas e de mão-de-obra, encargos sociais, verba para instalação de canteiro e custos com assistência médica), *"revelando lacunas que só foram identificadas após comparação com o Demonstrativo de Formação de Preços - DFP da licitante"*, e recomendando que fosse estabelecido procedimento para adequação das futuras estimativas à situação de mercado. Também foi registrado o não atendimento a recomendações indicadas no parecer JURÍDICO/JSERV 5148/2007 referente à citada contratação direta.

Por fim, em relatório de 17/06/2010, a Auditoria Interna apontou alteração do fluxo de desembolso previsto no edital, implicando em antecipação de faturamento ao Consórcio CCPR, mediante a revisão dos percentuais para valoração dos serviços de Infraestrutura (que passou de 3% para 15% do valor do item de Consolidação do Projeto Básico e Elaboração do Projeto Executivo, Construção Civil, Montagem Eletromecânica e Condicionamento); dos projetos básico e executivo (passou de 7% para 14% do valor dos itens de Construção Civil, Montagem Eletromecânica e Condicionamento); e dos serviços de condicionamento (que passou de 3% para 6% do valor dos itens de Construção Civil e Montagem Eletromecânica).

Quanto à contratação dos Consórcios CCPR e INTERPAR, foram observados percentuais elevados nas parcelas de Contingência e Lucro que compuseram os preços contratados, da ordem de 17,65% e 21,7%, respectivamente, o que estaria incompatível com os indicadores médios apresentados em acórdãos do TCU, à época.

### 6.2 Análise de Acórdãos do TCU

O Tribunal de Contas da União – TCU realizou verificações relativas aos processos de contratação das obras de modernização da REPAR. As principais constatações foram relacionadas a:



Cleary Gottlieb Steen & Hamilton LLP

 **PETROBRAS**

- irregularidades na execução das obras das unidades de gasolina, coque e propeno;
- projeto básico deficiente ou desatualizado;
- restrição à competitividade da licitação;
- reserva de contingência integrante do BDI considerada excessiva e taxa de BDI diferenciada por tipo de serviço;
- preços contratuais acima da média dos preços dos sistemas Sinapi e Datafolha;
- preços contratuais distintos para serviços idênticos;
- indícios de sobrepreço e superfaturamento no contrato de construção e montagem das unidades de tratamento e resfriamento de água e de condensado.

Parte dos assuntos tratados nas verificações do TCU relativos às contratações das obras de modernização da REPAR compuseram o objeto da CIA. Dentre estes, a CIA ratificou a identificação de falhas nos projetos básicos licitados. Os assuntos que envolveram análise de preços e/ou indícios de superfaturamento não compuseram o escopo da CIA (vide item 1).

### 7. NÃO CONFORMIDADES

A CIA constatou, no decorrer dos trabalhos, a existência das seguintes não conformidades:

### 7.1 Licitações com projetos básicos imaturos

Foram utilizados projetos básicos imaturos nas contratações de bens e serviços relativos às obras das carteiras de coque e gasolina, o que gerou a necessidade de alterações contratuais no decorrer da execução dos contratos, com impactos em custos e prazos (vide itens 4.3, 5.4.2, 5.5.2 e 5.6.2).

### 7.2 Inclusão de empresas, após o início do processo licitatório, que não atendiam ao critério de seleção

A CIA identificou a inclusão das empresas Alusa e Construcap no processo licitatório para contratação das unidades *on-site* da carteira de coque, sem prévia submissão à Diretoria Executiva (vide item 5.5.1). Além disso, a CIA também identificou a inclusão das empresas Alusa, Azevedo & Travassos Engenharia, Construtora Aterpa e UTC Engenharia no processo licitatório de contratação da UTDI, que não atendiam aos critérios de seleção, sem prévia submissão à Diretoria Executiva (DIPs ENGENHARIA 415/2007 de 13/06/2007, 365/2008 de 14/05/2008 e 383/2008 de 23/05/2008 – Anexo 28). As referidas empresas não atendiam aos critérios de seleção previamente estabelecidos. A



 **PETROBRAS**                                    

CIA também considerou insuficiente a justificativa apresentada para as inclusões – aumento de competitividade – a qual poderia ser utilizada para quaisquer outras empresas participarem do certame.

**7.3 Contratação direta do Consórcio CONPAR com alterações substanciais nas condições contratuais em relação à licitação anteriormente cancelada**

Durante o processo de negociação direta para contratação das unidades *on-site* da carteira de gasolina, a CIA identificou que ocorreram alterações substanciais nas condições contratuais em relação àquelas inicialmente consideradas na licitação anteriormente cancelada por preços excessivos. Tais modificações representaram não conformidade em relação às orientações jurídicas e normativas, e estão descritas no item 5.4 deste Relatório.

**7.4 Enquadramento indevido de proposta no limite superior da faixa de admissibilidade (-15% a +20%)**

Ao final do processo de negociação com o Consórcio CONPAR, foi agregado o à proposta o valor de R$ 52.012.130,93, a título de ressarcimento de custos de paralisações por chuvas, raios e suas consequências e diferenças de quantitativos. Parte deste valor (cerca de R$ 49 milhões) já estava contida na estimativa prévia elaborada pela PETROBRAS e, portanto, a CIA considerou que foi contemplado em duplicidade. Isso permitiu o enquadramento da proposta no limite superior da faixa de admissibilidade. Caso contrário, a proposta ficaria 23,2% acima da estimativa. Vide item 5.4.1.1

**7.5 Não atendimento à recomendação do Jurídico sobre a necessidade de avaliação da Área Financeira para a contratação do Consórcio CONPAR**

Para a contratação do Consórcio CONPAR o Jurídico recomendou, em junho/2007 (DIP JURÍDICO/SERV 4874/2007), a avaliação desta contratação pela Área Financeira – vide item 5.4.1.3.c. A CIA não evidenciou o atendimento a esta recomendação.

Adicionalmente, a sistemática de Planejamento, Aprovação e Acompanhamento de Projetos de Investimento do Sistema Petrobras previa, em razão do aumento do valor investimento superior a 20% (de US$ 577 milhões para US$ 1,1 bilhão), que a submissão à Diretoria Executiva para reavaliação e continuidade do projeto deveria ser acompanhada dos pareceres das áreas corporativas envolvidas (Estratégia, Desempenho, Finanças, Tributário e SMS) – vide item 5.4.1.



 **PETROBRAS** 

## 8. OUTRAS OBSERVAÇÕES E PONTOS DE ATENÇÃO

A CIA considerou como outras observações e pontos de atenção os seguintes itens:

a) Simultaneidade de obras e empreendimentos na PETROBRAS, em especial no Abastecimento, com impactos nos fornecimento de bens e de serviços;

b) Ausência de um cronograma gerencial integrado das carteiras do programa de modernização da REPAR (gasolina e coque), o que impediu a visão das interfaces e interdependências entre as diversas etapas da obra;

c) Assinatura do contrato com o Consórcio INTERPAR antes da assinatura de outros contratos de unidades auxiliares, que serviriam como insumo para a consolidação dos projetos básico e executivo do *off-site* (vide item 5.6.2);

d) Fornecimento de equipamentos críticos pela PETROBRAS, que assumiu o risco de atrasos com impactos de custo e prazo nos contratos de construção e montagem (vide item 8.1);

e) Inexistência de recursos administrativos impetrados por licitantes durante os processos de contratação de bens e de serviços analisados (vide item 5.2);

f) Revisões de estimativas de custos durante os processos de contratação (vide item 8.1);

g) Efetivação de antecipações de pagamento em montantes não previstos nos processos licitatórios (vide itens 5.5.1 e 5.6.1);

h) Atos praticados pelos Diretores Paulo Roberto Costa e Renato Duque para posterior homologação pela Diretoria Executiva (vide item 8.2);

i) Formalização de aditivos de aumento de prazo, pelo gerente da ENGENHARIA/IEABAST/IERP, quando já se sabia que tais aditivos teriam impactos de custos e que, portanto, deveriam ser submetidos à Diretoria Executiva;

j) Envio de convite para licitação do EPC da UTDI em 23/04/2007, antes da aprovação pela Diretoria Executiva, conforme Ata DE 4.641, item 16, pauta 438 de 26/04/2007;

k) Aprovação da continuidade das carteiras de gasolina e coque, em agosto/2007 e junho/2008, respectivamente, por ocasião das autorizações para contratação dos Consórcios CONPAR, CCPR e INTERPAR, sem os pareceres das áreas corporativas, conforme indicado na Sistemática de Planejamento, Aprovação e Acompanhamento de Projetos de Investimento vigente à época. A CIA identificou que posteriormente, em junho/2009, a obtenção de tais pareceres passou a ser opcional.



 **PETROBRAS**



**8.1 Revisões de estimativas prévias de custos durante os processos de contratação**

A estimativa prévia de custos é o parâmetro interno da PETROBRAS para estabelecer o preço de determinado bem ou serviço, de forma a fixar critérios para análise das propostas apresentadas pelas empresas que participam de um processo licitatório. Desta forma, deve ser elaborada de forma criteriosa, sendo conferido caráter sigiloso ao seu conteúdo.

À época da realização dos processos de contratação para o Programa de Modernização da REPAR, as condições para eventuais revisões da estimativa prévia de custos após a abertura das propostas comerciais estavam consolidadas em parecer jurídico – DIP JURIDICO/JSERV 4611/05 (Anexo 29) – com os seguintes trechos:

*"(...) não há qualquer irregularidade em se promover a alteração da estimativa de custos durante o curso da licitação, já após a abertura dos preços das licitantes.*

*Todavia, é importante destacar que essa revisão de estimativa deve sempre ser adotada como uma medida de exceção."*

*"(...) a primeira estimativa deve sempre ser elaborada por equipes técnicas especializadas, fundamentada em rigorosos critérios técnicos, avaliações de mercado, diligências, experiências passadas etc. Daí porque a necessidade de revisão deve se apresentar em poucas oportunidades".*

*"O novo estudo técnico deverá se pautar pelos mesmos critérios rigorosos através dos quais se fez a estimativa original (critérios esses, aliás, que devem ser adotados em quaisquer estimativas da PETROBRAS), podendo a equipe técnica se valer, como referência, das novas informações e indícios que foram trazidos pelas propostas dos licitantes.*

*Esse novo estudo não poderá nunca ter o caráter de mera ratificação das propostas dos licitantes. Isto é, não poderá servir simplesmente para aproximar os valores, sem qualquer critério, com o único objetivo de tornar as propostas dos licitantes classificáveis. Isso seria totalmente incorreto."*

A revisão da estimativa prévia de custos, portanto, é procedimento lícito e regular, e deve ser adotada de forma excepcional e desde que restem comprovadas alterações na situação mercadológica que reflitam uma variação no preço do serviço a ser contratado, não devendo, de forma alguma, ser usada como artifício para tornar classificáveis as propostas.

 **PETROBRAS** 

A CIA evidenciou a ocorrência de revisões de estimativas prévias de custos após o recebimento de propostas em licitações, e que resultaram no enquadramento da proposta dentro da margem estabelecida (de -15% a +20%). A Tabela 13 indica que o procedimento revisão da estimativa aconteceu em 11 dos 18 processos analisados.

Tabela 13 – Revisões de estimativa nos processos analisados pela CIA

| Objeto | Qtde. Empresas convidadas | Qtde. propostas recebidas | Estimativa original (R$) | Qtde. revisões | Estimativa final (R$) |
|---|---|---|---|---|---|
| Off-site | 18 | 3 | 2.076.398.713,04 | - | 2.076.398.713,04 |
| On-site do coque | 20 | 3 | 2.006.009.404,98 | 1 | 2.093.988.284,45 |
| On-site da gasolina e parte do coque | 22 | 3 | 1.372.799.201,00 | 2 (*) | 1.475.523.336,00 |
| UTRA e UTC | 6 | 3 | 436.674.880,57 | - | 436.674.880,57 |
| UTDI | 24 | 7 | 464.941.096,95 | - | 464.941.096,95 |
| Caldeiras | 10 | 3 | 428.445.066,87 | - | 428.445.066,87 |
| Propeno | 18 | 4 | 267.293.832,17 | 1 | 216.741.957,06 |
| Subestações | 34 | 8 | 197.309.042,00 | 1 | 168.887.046,98 |
| Esferas de propeno | (**) | | 99.030.580,29 | - | 99.030.580,29 |
| Fornos de carga CONFAB | 7 | 7 | 113.713.786,83 | 1 | 118.058.347,54 |
| Forno reformador da UGH | 9 | 5 | 118.673.569,00 | - | 118.673.569,00 |
| Reatores GODREJ (Gr. B1) | 11 | 3 | 48.029.067,62 | 1 | 66.125.614,68 |
| Reatores CONFAB (Gr. B2) | 11 | 3 | 42.754.160,39 | 1 | 46.061.199,08 |
| Reatores CONFAB (Gr. C1) | 3 | 7 | 3.782.494,24 | 1 | 7.257.272,72 |
| Permutadores GODREJ (27) | 9 | 2 | 13.754.231,18 | - | 13.754.231,18 |
| Modificações na UTAA e URE | 35 | 6 | 62.652.319,57 | 1 | 48.367.836,17 |
| Interligação 230 kVA | 30 | 8 | 73.351.756,26 | 1 | 49.664.229,75 |
| Tambores de coque | 1 | 3 | 41.345.428,80 | 1 | 43.627.481,69 |

(*) As revisões ocorreram durante etapa de negociação direta, após cancelamento do processo licitatório anterior, por preços excessivos.
(**) Mediante DIP MATERIAIS 250/2006 de 09/10/2006, foi submetida à Diretoria proposição para cancelamento de procedimento licitatório para aquisição das 5 esferas da REPAR, e instauração de negociação para contratação direta com as empresas Confab, Jaraguá, IESA e Usiminas Mecânica, para atendimento a empreendimentos diversos das áreas do E&P e Abastecimento, dentre os quais a REPAR.

 

**8.2 Atos praticados por Diretores para posterior homologação pela Diretoria Executiva**

A tabela de limites de competência da PETROBRAS estabelece os atos passíveis de serem praticados pelos Diretores, individualmente. Com relação aos processos de contratação, atos a partir de R$ 32 milhões são de exclusiva competência da Diretoria Executiva. Nos processos de contratação para o Programa de Modernização da REPAR, a CIA identificou que os Diretores Paulo Roberto Costa e Renato de Souza Duque, praticaram atos além de sua alçada, os quais foram posteriormente homologados pela Diretoria Executiva, dentre os quais:

- inclusão de empresas após a decisão da Diretoria Executiva quanto a instauração de início de processo licitatório;
- autorização para assinatura de contrato de aquisição e montagem de esferas no valor de R$ 84.166.503,72, sem prévia submissão à Diretoria Executiva;
- autorização de início do processo de fabricação de 5 esferas de propeno em 17/05/2007, pelo Diretor Renato de Souza Duque – a Diretoria Executiva aprovou a contratação em 28/06/2007 (Ata DE 4.649, item 27, pauta 684, Anexo 30);
- autorização de prosseguimento de processo licitatório para contratação das modificações na UTAA e URE, cujo valor inicialmente estimado no limite de competência do Diretor, passou para a alçada da Diretoria Executiva.

**9. DAS PESSOAS**

**9.1 Paulo Roberto Costa**

- Foi Diretor de Abastecimento (DABAST) entre maio/2004 e abril/2012, responsável pela implantação do programa de modernização da REPAR;
- Encaminhou à Diretoria Executiva, em conjunto com Renato de Souza Duque, proposição de negociação para contratação direta do Consórcio CONPAR;
- Encaminhou à Diretoria Executiva, em conjunto com Renato de Souza Duque, proposição para assinatura do contrato com o Consórcio CONPAR;
- Encaminhou à Diretoria Executiva, em conjunto com Renato de Souza Duque, proposição para assinatura dos contratos referentes ao programa de modernização da REPAR;
- Encaminhou à Diretoria Executiva, em conjunto com Renato de Souza Duque, proposições de continuidade da implantação das carteiras de gasolina e coque da REPAR;
- Autorizou a inclusão de empresas na licitação da carteira de coque, que não atendiam aos critérios de seleção. Posteriormente, encaminhou para homologação pela Diretoria Executiva;



 **PETROBRAS** NP-3

- Encaminhou em 15/08/2007 o DIP DABAST 61/2007 ao Gerente Executivo Alan Kardec (AB-RE), em resposta ao DIP AB-RE 238/2007, informando que a postergação de investimentos na carteira do Abastecimento seria prejudicial aos negócios da PETROBRAS;
- Responsável pelas não conformidades citadas nos itens 7.1, 7.2, 7.3, 7.4 e 7.5.

### 9.2 Renato de Souza Duque

- Foi Diretor de Serviços (DSERV) entre fevereiro/2003 e abril/2012, responsável pelos processos de contratação de bens e de serviços para o Programa de Modernização da REPAR;
- Encaminhou à Diretoria Executiva, em conjunto com Paulo Roberto Costa, proposição de negociação para contratação direta do Consórcio CONPAR;
- Encaminhou à Diretoria Executiva, em conjunto com Paulo Roberto Costa, proposição para assinatura do contrato com o Consórcio CONPAR;
- Encaminhou à Diretoria Executiva, em conjunto com Paulo Roberto Costa, proposição para assinatura dos contratos referentes ao Programa de Modernização da REPAR;
- Encaminhou à Diretoria Executiva, em conjunto com Paulo Roberto Costa, proposições de continuidade da implantação das carteiras de gasolina e coque da REPAR;
- Autorizou a inclusão de empresas na licitação da carteira de coque, que não atendiam aos critérios de seleção. Posteriormente, encaminhou para homologação pela Diretoria Executiva;
- Responsável pelas não conformidades citadas nos itens 7.1, 7.2, 7.3, 7.4 e 7.5.

### 9.3 Pedro José Barusco Filho

- Foi Gerente Executivo de Engenharia entre fevereiro/2003 e março/2011;
- Encaminhou, juntamente com o gerente executivo Alan Kardec Pinto (AB-RE), aos Diretores de Abastecimento Paulo Roberto Costa e de Serviços Renato de Souza Duque, proposições para autorização da licitação das unidades *on-site* e *off-site* das carteiras de gasolina e coque;
- Encaminhou, juntamente com o gerente executivo Alan Kardec Pinto (AB-RE), aos Diretores de Abastecimento Paulo Roberto Costa e de Serviços Renato de Souza Duque, proposição para negociação visando a contratação direta do Consórcio CONPAR;
- Encaminhou, juntamente com o gerente executivo em exercício Luiz Alberto Gaspar Domingues (AB-RE) e a gerente executiva Venina Velosa da Fonseca (AB-CR), aos Diretores de Abastecimento Paulo Roberto Costa e de Serviços

Cleary Gottlieb Steen & Hamilton LLP
CERTIFIED AS A TRUE COPY



 **PETROBRAS** 

Renato de Souza Duque, proposições para continuidade da implantação da carteira de gasolina e assinatura do contrato com o Consórcio CONPAR;

- Encaminhou, juntamente com o gerente executivo Luiz Alberto Gaspar Domingues (AB-RE) aos Diretores de Abastecimento Paulo Roberto Costa e de Serviços Renato de Souza Duque, a proposição para inclusão das empresas Alusa e Construcap, que não atendiam aos critérios de seleção, no processo de licitação do *on-site* da carteira de coque, para posterior homologação pela Diretoria Executiva;
- Encaminhou aos Diretores de Abastecimento Paulo Roberto Costa e de Serviços Renato de Souza Duque, proposições para assinatura dos contratos das carteiras de gasolina, coque e propeno da REPAR;
- Responsável pelas não conformidades citadas nos itens 7.1, 7.2, 7.3, 7.4 e 7.5.

### 9.4 Alan Kardec Pinto

- Foi Gerente Executivo do Abastecimento-Refino (AB-RE) entre junho/2004 e agosto/2007;
- Encaminhou, juntamente com o gerente executivo Pedro José Barusco Filho (ENGENHARIA), aos Diretores de Abastecimento Paulo Roberto Costa e de Serviços Renato de Souza Duque, proposições para autorização da licitação das unidades *on-site* e *off-site* das carteiras de gasolina e coque;
- Encaminhou, juntamente com o gerente executivo Pedro José Barusco Filho (ENGENHARIA), aos Diretores de Abastecimento Paulo Roberto Costa e de Serviços Renato de Souza Duque, proposição para negociação visando a contratação direta do Consórcio CONPAR;
- Encaminhou em 14/08/2007 a DIP AB-RE 238/2007 ao Diretor Paulo Roberto Costa, propondo constituição de um Grupo de Trabalho no Abastecimento para analisar a possibilidade de alongamento do cronograma da carteira de gasolina e adiamento da assinatura de novos contratos;
- Responsável pela não conformidade citada no item 7.1.

### 9.5 Luiz Alberto Gaspar Domingues

- Foi Gerente Geral de Empreendimentos do Refino (AB-RE/EM) entre novembro/2000 e agosto/2007;
- Foi Gerente Executivo do Abastecimento Refino (AB-RE) entre agosto/2007 e junho/2008;
- Foi o Gerente Executivo de Programas de Investimentos do Abastecimento (AB-PGI) entre junho/2008 e setembro/2009;
- Encaminhou, juntamente com o gerente executivo Pedro Barusco Filho (ENGENHARIA) e a gerente executiva Venina Velosa da Fonseca (AB-CR), aos




 **PETROBRAS** 

Diretores de Abastecimento Paulo Roberto Costa e de Serviços Renato de Souza Duque, proposições para continuidade da implantação da carteira de gasolina e assinatura do contrato com o Consórcio CONPAR;

- Encaminhou, juntamente com o gerente executivo Pedro Barusco Filho (ENGENHARIA) aos Diretores de Abastecimento Paulo Roberto Costa e de Serviços Renato de Souza Duque, a proposição para inclusão das empresas Alusa e Construcap, que não atendiam aos critérios de seleção, no processo de licitação do *on-site* da carteira de coque, para posterior homologação pela Diretoria Executiva;
- Responsável pelas não conformidades citadas nos itens 7.1, 7.2, 7.3, 7.4 e 7.5.

### 9.6 Venina Velosa da Fonseca

- Foi Gerente Executiva de Abastecimento Corporativo (AB-CR) entre setembro/2005 e outubro/2009;
- Encaminhou, juntamente com o gerente executivo em exercício Luiz Alberto Gaspar Domingues (AB-RE) e o gerente executivo Pedro José Barusco Filho (ENGENHARIA), aos Diretores de Abastecimento Paulo Roberto Costa e de Serviços Renato de Souza Duque, proposições para continuidade da implantação da carteira de gasolina e assinatura do contrato com o Consórcio CONPAR;
- Encaminhou ao Gerente Executivo José Carlos Cosenza (AB-RE) a reavaliação da carteira de coque da REPAR em 11/06/2008, recomendando a implantação do empreendimento;
- Responsável pela não conformidade citada no item 7.5.

### 9.7 Fernando Almeida Blato

- Foi Gerente Geral da Engenharia (IEABAST e IEREFINO) entre novembro/2000 e outubro/2010, responsável pelo empreendimento da REPAR;
- Responsável pela elaboração da proposição ao Pedro José Barusco Filho para negociação de contratação direta do Consórcio CONPAR;
- Responsável pela elaboração da proposição ao Pedro José Barusco Filho para encaminhamento aos Diretores de Abastecimento Paulo Roberto Costa e de Serviços Renato de Souza Duque, de submissão à Diretoria Executiva, para a autorização de licitações e de  contratação direta (Consórcio CONPAR) para o Programa de Modernização da REPAR;
- Responsável pelas não conformidades citadas nos itens 7.1, 7.3 e 7.4.



 

### 9.8 José Paulo Assis

- Foi Gerente de Implantação de Empreendimentos da REPAR (ENGENHARIA/IEABAST/IERP) entre agosto/2002 e agosto/2013, responsável local por todas as etapas do empreendimento REPAR;
- Responsável pelo encaminhamento a Fernando Almeida Biato das proposições para a autorização de licitações e de negociação de contratação direta (Consórcio CONPAR);
- Responsável pelo encaminhamento a Fernando Almeida Biato da proposição para a contratação direta do Consórcio CONPAR;
- Constituiu a Comissão de Negociação para a contratação direta do Consórcio CONPAR e aprovou o relatório da negociação;
- Responsável pelas não conformidades citadas nos itens 7.3 e 7.4.

### 9.9 Luis Antônio Scavazza

- Foi Gerente Setorial de Construção e Montagem da Unidade de HDS da REPAR (ENGENHARIA/IEABAST/IERP/CMHS) entre abril/2007 e março/2008;
- Coordenou a Comissão de Negociação para contratação direta do Consórcio CONPAR e submeteu o relatório da negociação ao Gerente José Paulo Assis;
- Responsável pelas não conformidades citadas nos itens 7.3 e 7.4.

## 10. CONCLUSÃO

A CIA concluiu que os processos de contratação para as obras de modernização da REPAR apresentaram as seguintes não conformidades:

- Licitações com projetos básicos imaturos;
- Inclusão de empresas, após o início do processo licitatório, que não atendiam ao critério de seleção;
- Contratação direta do Consórcio CONPAR com alterações substanciais nas condições contratuais em relação à licitação anteriormente cancelada;
- Enquadramento indevido de proposta no limite superior da faixa de admissibilidade (-15% a +20%) na contratação direta do Consórcio CONPAR;
- Não atendimento a recomendação do Jurídico sobre a necessidade de avaliação da Área Financeira para contratação do Consórcio CONPAR.

Adicionalmente, a CIA verificou as seguintes observações e pontos de atenção:

- Simultaneidade de obras e empreendimentos na PETROBRAS, em especial no Abastecimento, com impactos nos fornecimento de bens e de serviços;



 **PETROBRAS** 

- Ausência de um cronograma gerencial integrado das carteiras do programa de modernização da REPAR (gasolina e coque), o que impediu a visão das interfaces e interdependências entre as diversas etapas da obra;
- Assinatura do contrato com o Consórcio INTERPAR antes da assinatura de outros contratos de unidades auxiliares, que serviriam como insumo para a consolidação dos projetos básico e executivo do *off-site*;
- Fornecimento de equipamentos críticos pela PETROBRAS, que assumiu o risco de atrasos com impactos de custo e prazo nos contratos de construção e montagem;
- Inexistência de recursos administrativos impetrados por licitantes durante os processos de contratação de bens e de serviços analisados;
- Revisões de estimativas de custos durante os processos de contratação;
- Efetivação de antecipações de pagamento em montantes não previstos nos processos licitatórios;
- Atos praticados pelos Diretores Paulo Roberto Costa e Renato Duque para posterior homologação pela Diretoria Executiva;
- Formalização de aditivos de aumento de prazo, pelo gerente da ENGENHARIA/IEABAST/IERP, quando já se sabia que tais aditivos teriam impactos de custos e que, portanto, deveriam ser submetidos à Diretoria Executiva.
- Envio de convite para licitação do EPC da UTU em 23/04/2007, antes da aprovação pela Diretoria Executiva, conforme Ata DE 4.641, item 16, pauta 438 de 26/04/2007;
- Aprovação da continuidade das carteiras de gasolina e coque, em agosto/2007 e junho/2008, respectivamente, por ocasião das autorizações para contratação dos Consórcios CONPAR, CCPR e INTERPAR, sem os pareceres das áreas corporativas, conforme indicado na Sistemática de Planejamento, Aprovação e Acompanhamento de Projetos de Investimento vigente à época. A CIA identificou que posteriormente, em junho/2009, a obtenção de tais pareceres passou a ser opcional.

As não conformidades, observações e pontos de atenção verificados pela CIA, relacionados à implementação do Programa de Modernização da REPAR, podem ter contribuído para facilitar a ocorrência de eventuais ações criminosas sob investigação da Operação Lava Jato.

## 11. RECOMENDAÇÕES

A CIA recomenda ao Jurídico avaliar o encaminhamento deste relatório ao Ministério Público Federal e outras Autoridades Públicas.

 

## 12. CONSIDERAÇÕES FINAIS

O presente relatório foi confeccionado em duas vias de igual teor que foram encaminhadas, a primeira, para a Autoridade Constituinte da Comissão Interna de Apuração, e a segunda, para a Segurança Empresarial do GAPRE. Ambas estão identificadas e assinadas pelo Coordenador e membros da CIA.

## 13. ANEXOS

Os anexos constam em mídia digital que acompanha e é parte integrante deste relatório.

Rio de Janeiro, 8 de junho de 2015.

Coordenador:

Wilson Carvalho Macedo
Matrícula 355197-8

Membros:

Rafael Paradella Freitas
Matrícula 962864-5

Leonardo Heitmann de Macedo
Matrícula 020645-6

Giovanni D'Elia Sobrinho
Matrícula 016740-2

Wilson Cezar Brasil Júnior
Matrícula 021604-4

Jailton Guedes de Sousa
Matrícula 590454-3

Flávio Augusto Pimentel de Lima
Matrícula 517151-0