# EXHIBIT J

0001
1
2          C O N F I D E N T I A L
3  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
4  ---------------------------------------
5  In Re PETROBRAS SECURITIES LITIGATION     Case No.
                        14-cv-9662
6  This Document Applies to: All Cases
7  ---------------------------------------
8
                   April 28, 2016
9                   9:47 a.m.
10
11       Videotaped deposition of MARIA DAS GRAÇAS
12  SILVA FOSTER, taken by Plaintiffs, pursuant to
13  Notice, held at the offices of Pomerantz LLP,
14  600 Third Avenue, New York, New York, before
15  Joseph R. Danyo, a Shorthand Reporter and Notary
16  Public within and for the State of New York.
17
18
19
20
21
22
23
24
25  HUDSON REPORTING & VIDEO                1-800-310-1769
0002
1
2  A P P E A R A N C E S :
3
     POMERANTZ LLP
4      Attorneys for Lead Plaintiff
       600 Third Avenue
5      New York, New York 10016
6    By:  EMMA GILMORE, ESQ.
          JOHN A. KEHOE, ESQ.
7         MARC I. GROSS, ESQ.
          MATTHEW MOEHLMAN, ESQ.
8         MARCELA LEVI, ESQ.
          ATILA CONDINI, ESQ.
9         WLADIMIR MESKELIS, ESQ.
          ALESSANDRA SOUZA, ESQ.
10
11
     KAPLAN FOX & KILSHEIMER LLP
12     Attorneys for Plaintiff Ohio Public
       Employees Retirement System
13     805 Third Avenue
       New York, New York 10022
14
     By:  MATTHEW P. McCAHILL, ESQ.
15
16

```
         KESSLER TOPAZ MELTZER CHECK LLP
17          Attorneys for Plaintiffs Dimensional,
            Aberdeen, Abbey Funds, Skagen, Danske,
18          Delaware and Russell Plaintiffs
         280 King of Prussia Road
19       Radnor, Pennsylvania 19087
20    By:  MATTHEW L. MUSTOKOFF, ESQ.
21
22
23
24
25
0003
 1
 2  A P P E A R A N C E S : (Continued)
 3
         ROBBINS GELLER RUDMAN & DOWD LLP
 4          Attorneys for Plaintiffs Central States NNIP
            and WSIB Plaintiffs
 5          655 West Broadway
            Suite 1900
 6          San Diego, California 92101
 7    By:  CODY R. LeJEUNE, ESQ.
 8
 9     GRANT & EISENHOFER P.A.
         Attorneys for Plaintiffs Transamerica,
10          NYCERS, INKA and Lord Abbett
         485 Lexington Avenue
11       New York, New York 10017
12    By:   JONATHAN D. PARK, ESQ.
13
14     KAHN SWICK & FOTI, LLC
         Attorneys for Aura Capital
15       500 Fifth Avenue
         Suite 1810
16       New York, New York 10110
17    By:   BRUCE W. DONA, ESQ.
18
19     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
         Attorneys for Plaintiffs in Janus and
20          Dodge and Cox action
         250 Hudson Street
21          8th Floor
         New York, New York 10013
22
      By:  JOY A. KRUSE, ESQ.
23          (Via Teleconference)
24
25
0004
 1
 2  A P P E A R A N C E S : (Continued)
 3
         QUINN EMANUEL URQUHART & SULLIVAN LLP
 4          Attorneys for Attorneys for Al Shams
            Investments Ltd., Pimco Funds, Pimco Total
```

5      Return Fund et al.
     51 Madison Avenue
6     22nd Floor
     New York, New York 10010
7
    By:  DANIEL G. AGIUS, JR., ESQ.
8      (Via Teleconference)
9
10   CLEARY GOTTLIEB STEEN & HAMILTON LLP
     Attorneys for the Petrobras Defendants
11    One Liberty Plaza
     New York, New York 10006-1470
12
    By:  ROGER A. COOPER, ESQ.
13      KATHERINE CURRIE, ESQ.
      PEDRO MARTINI, ESQ.
14
15
    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
16    Attorneys for the Underwriter Defendants
     500 Boylston Street
17    23rd Floor
     Boston, Massachusetts 02116
18
    By:  PETER SIMSHAUSER, ESQ.
19
20
    KING & SPALDING LLP
21    Attorneys for Defendant Pricewaterhouse
     Coopers Auditores Independentes
22    1700 Pennsylvania Avenue N.W.
     Washington, D.C. 20006-4707
23
    By:  KENNETH Y. TURNBULL, ESQ.
24
25
0005
 1
 2  A P P E A R A N C E S : (Continued)
 3
    GOODWIN PROCTER LLP
 4    Attorneys for the Witness
     620 Eighth Avenue
 5    New York, New York 10018
 6  By:  RICHARD STRASSBERG, ESQ.
     DANIEL ROESER, ESQ.
 7    JOHN O. FARLEY, ESQ.
     SYLVIA R. EWALD, ESQ.
 8
 9
   Also Present:
10
    PEDRO BARROSO,
11    ISABELLA ABDELHAY,
    RAPHAELA C.N. PERINI RODRIGUES,
12    Petrobras

13    GLENN D. SACKS,
        Marks Paneth
14
      ZILDA BUZACK,
15        Portuguese Interpreter
16    DANNY ORTEGA,
        Videographer
17
                ~oOo~
18
19
20
21
22
23
24
25
0006
1              Foster - Confidential
2          THE VIDEOGRAPHER:  We are now on the
3      record.  My name is Danny Ortega.  I am the
4      videographer for Hudson Reporting & Video.
5      Today's date is April 28, 2016 and the time
6      is 9:47 a.m.  This deposition is being held
7      at 600 Third Avenue, New York, New York in
8      the matter of In Re Petrobras for the United
9      States District Court, Southern District of
10      New York.
11          The deponent is Maria das Graca Foster.
12      Counsel will be noted on the stenographic
13      record.  The court reporter is Joe Danyo,
14      who will now swear in the witness and the
15      interpreter.
16    Z I L D A   B U Z A C K,  was duly sworn to interpret
17    the questions from English to Portuguese and the
18    answers from Portuguese to English:
19    M A R I A   D A S   G R A C A S   F O S T E R, having
20    been first duly sworn through the Interpreter by
21    Joseph R. Danyo, a Notary Public, was examined and
22    testified as follows:
23    EXAMINATION BY MS. GILMORE:
24          Q.  Good morning, Ms. Foster.  My name is
25    Emma Gilmore.  I represent plaintiffs in this
0007
1              Foster - Confidential
2    action.  Do you understand that you are here to
3    testify truthfully today?
4          A.  Yes.
5          Q.  Is there any reason that prevents you
6    from testifying truthfully here today?
7          A.  No.
8          Q.  Ms. Foster, do you speak English?
9          A.  Yes, I do.
10          Q.  Have you ever taken courses in English?
11          A.  Yes.
12          Q.  Are you conversational in English?

13     A.  Yes.
14     Q.  Have you ever hosted earnings calls in
15  English?
16          MR. COOPER:  Objection to form.
17     A.  Yes.
18          MR. COOPER:  Can we just put on the
19     record our understanding that an objection
20     by one defense counsel will be treated as an
21     objection by all defense counsel?
22          MS. GILMORE:  Sure.
23     Q.  Have you ever been deposed before?
24     A.  No.
25     Q.  Have you given any declarations before
0008
1          Foster - Confidential
2  in connection with the Lava Jato investigation?
3     A.  I was a witness for an engineer who
4  worked for Camargo Correa, actually not -- as a
5  matter of fact, no.  For Andrade Gutierrez.
6     Q.  Who was the engineer who worked for
7  Andrade Gutierrez?
8     A.  I did not know him.
9     Q.  Were you subpoenaed to testify?  Were
10  you called to testify?
11     A.  Subpoenaed to provide testimony
12  regarding a person I did not know.
13     Q.  Who subpoenaed you?
14     A.  Moro.  Judge Sergio Moro.
15     Q.  When did you give that testimony?
16     A.  About six months ago.
17     Q.  Can you tell me the context of what you
18  testified about?
19     A.  Do you know this gentleman?  No.  Have
20  you been with him at a Petrobras construction?  No.
21  Almost for the whole time the answer was no.
22     Q.  What is your understanding as to why Mr.
23  Moro called you to testify?
24     A.  I don't know.
25     Q.  How long was the testimony for?
0009
1          Foster - Confidential
2     A.  The testimony in fact just about five
3  minutes.
4     Q.  Did you have a lawyer representing you?
5     A.  Attorneys from Petrobras were
6  accompanying me.
7     Q.  Who?  Do you know the names?
8     A.  Elizabeth, Raphaela.  I think these were
9  the ones.  Were you there, Raphaela?  No, she was
10  not.  That is it.
11     Q.  Other than the testimony you just
12  testified about, did you give any other testimony
13  in connection with the Lava Jato investigation?
14     A.  No.
15     Q.  Did you give testimony before the
16  parliamentary committee?

17          MR. COOPER:  Objection to form.
18      A.  Yes.
19      Q.  When was that?
20      A.  I had a few.  There were four CPIs or
21  parliamentary committees.  One in the year of 2015,
22  two in the year of 2014, and plus two hearings in
23  the Senate.  The Senate and House of
24  Representatives regarding the same testimony I
25  provided to the parliamentary committee.
0010
1          Foster - Confidential
2      Q.  Can you tell me with respect to the
3  testimony before the CPI, the first one that you
4  said was in 2015, was it testimony under oath?
5      A.  Yes.
6      Q.  And you said there were two other
7  testimonies in front of the CPI in 2014.  Were
8  those testimonies also under oath?
9      A.  Yes.  Under oath to tell the truth.
10      Q.  And the two hearings in the Senate and
11  the House of Representatives, were those
12  testimonies under oath as well?
13      A.  They do not require the witness or the
14  person who is providing testimony to be under oath.
15      Q.  And were those testimonies you described
16  truthful and accurate?
17          MR. COOPER:  All of them?
18          MS. GILMORE:  Yes.
19      A.  All of them were accurate and truthful.
20          THE INTERPRETER:  The interpreter will
21      ask the witness to not speak at the same
22      time because she can't hear at the same time
23      she is speaking.
24      Q.  Ms. Foster, other than the testimonies
25  that you just described, did you give any other
0011
1          Foster - Confidential
2  testimonies in connection with the Lava Jato
3  investigation?
4          MR. COOPER:  Objection to form.  The
5      testimonies that she described before the
6      CPI and the hearings, she didn't say it was
7      related to Lava Jato.
8      A.  I don't know.  Could you repeat your
9  question.
10      Q.  Sure.  Let's go back, I just want to
11  clarify on the record then, the deposition you gave
12  to the CPI in 2015, was it related to Lava Jato?
13      A.  There were themes.  There were four
14  themes, and these themes, they were companies that
15  sold services to -- engineering services to
16  Petrobras.  This is the connection between the
17  axils and Petrobras and Lava Jato.
18      Q.  The two testimonies in front of the CPI
19  that you gave in 2014, were those testimonies
20  related to Lava Jato?

21         MR. COOPER:  Objection to form.
22     A.   They addressed themes that are part of
23  Lava Jato.
24         MS. LEVI:  Matters.
25         THE INTERPRETER:  The interpreter will
0012
1          Foster - Confidential
2      replace the word "themes" for "matters."
3      Okay.  The interpreter will go either way,
4      themes or matters.  The interpreter thinks
5      they are replaceable.
6      Q.   Ms. Foster, the two hearings that you
7   gave in the Senate and the House of
8   Representatives, were those related to Lava Jato?
9         MR. COOPER:  Objection to form.
10     A.   I had these hearings in the year of
11  2014.  In 2014 I had many hearings, a lot of them,
12  I don't even know how many, and in 2013, 2012,
13  2011, 2010, and the Lava Jato themes they keep
14  changing, and the matter that was not about Lava
15  Jato on the day that I spoke and then two weeks
16  after, one month after it turns to be a matter
17  addressed by Lava Jato or a month later or never.
18     Q.   I believe you testified you gave some
19  testimony in 2011.  Is that correct?  I'm sorry, in
20  2010.  Is that correct?
21     A.   Yes.  Where to?  I don't remember.
22     Q.   You don't remember.  Do you remember
23  whether in the testimony you gave in 2010 had
24  anything to do with allegations of overpricing or
25  other irregularities at Petrobras?
0013
1          Foster - Confidential
2         MR. COOPER:  Objection to form.
3      A.   I don't remember.  I apologize.
4      Q.   Do you have a record of the testimony
5   you gave in 20 -- the testimony or testimonies you
6   gave in 2010?
7      A.   It is possible.
8      Q.   Would you have destroyed or got rid of
9   it or would you have normally kept it?
10        MR. STRASSBERG:  Objection to form.
11     A.   Since I retired a year ago it is very
12  likely that I tossed it away.
13     Q.   Do you know who would have a record of
14  that testimony?
15     A.   Congress probably or I'm sorry.
16  Probably.
17     Q.   The testimony you gave in 2010 you
18  recall was to Congress only?
19        MR. COOPER:  Objection to form.
20     A.   It might have been to a house of
21  financial matters or a house that addresses
22  logistics because the Brazilian Congress has many
23  working areas, a lot of working areas, sometimes
24  for a lot of people, sometimes for not so many

25  people.
0014
1          Foster - Confidential
2          It is also important to classify the
3  dates because in 2010 I was an officer of
4  Petrobras, and later as of February 6, 2013 I
5  became CEO of Petrobras.
6      Q.  Ms. Foster, do you recall if any of the
7  testimony you gave in 2011 involved allegations of
8  overpricing or other illicit activity at Petrobras?
9          MR. COOPER:  Objection to form.
10     A.  2010, 2011, until February 6, 2013 I was
11  gas and energy officer, and about this division I
12  don't remember having.  I would only give
13  presentations about that division, and about that
14  division it didn't really have any overpricing.  It
15  was a division that didn't suffer as much with
16  overpricing.
17     Q.   And when you mean it didn't suffer as
18  much overpricing, can you describe for me what that
19  means?
20     A.  Overpricing, when I talk about
21  overpricing here I am talking about kickbacks or
22  bribery payments, it was a division, whereas in an
23  average we could do planning and get to a final
24  result very close to the planned amount.  And at
25  that time in 2010 we didn't talk about bribery
0015
1          Foster - Confidential
2  payments or conspiracy, nor cartel.  We didn't talk
3  about that.
4      Q.  What about in 2011, did you talk about
5  payments or conspiracy or cartel?
6          MR. STRASSBERG:  Objection to form.
7      A.  No, we did not.
8      Q.  When you say we, who do you mean?
9      A.  All of us, because there was no
10  indication of cartel.  In 2014 at the Paulo Roberto
11  Costa plea bargain he said the words cartel,
12  bribery payments, bribery payments, on this
13  project, on this project, on that other project.
14  Therefore and he was arrested.
15     Q.   Ms. Foster, in 2010 were you aware of
16  any indications of overpricing at Petrobras?
17         MR. STRASSBERG:  Objection.
18         MR. TURNBULL:  Objection to form.
19     A.  In 2010 -- where is the person who asked
20  me?  In 2010 in our vocabulary these words such as
21  cartel, bribery payments, they did not exist.
22     Q.   Did the word "overpricing" exist in 2010
23  at Petrobras?
24         MR. COOPER:  Objection to form.
25     A.  No, it did not.
0016
1          Foster - Confidential
2      Q.  In 2010 while you were employed at

3  Petrobras, is your testimony that you never heard
4  of the word "overpricing" at Petrobras?
5          MR. COOPER:  Objection to form.
6      A.  No.
7      Q.  No means that is your testimony that you
8  never heard of the word "overpricing" at Petrobras
9  in 2010?
10     A.  Yes, never.
11     Q.  In 2011 did you ever hear the word
12  "overpricing" involving Petrobras?
13         MR. COOPER:  Objection.
14     A.  2011, no.
15     Q.  In 2012 did you ever hear the word
16  "overpricing" involving Petrobras?
17         MR. COOPER:  Objection to form.
18     A.  No.
19         MR. COOPER:  You are saying like ever
20      from any source?
21         MS. GILMORE:  The witness understands
22      the question.
23         MR. COOPER:  I just want to make sure I
24      understand your question.
25         MS. GILMORE:  I think she does.
0017
1          Foster - Confidential
2      Q.  In 2013 did you hear the word
3  "overpricing" involving Petrobras?
4          MR. STRASSBERG:  Objection to form.
5      A.  Neither.
6      Q.  Neither meaning no?
7      A.  No.
8      Q.  In 2011 did you give any testimony that
9  involved any allegations of overpricing at
10  Petrobras?
11         MR. COOPER:  Objection to form.
12     A.  No.
13     Q.  In 2012 did you give any testimony that
14  involved any allegations of overpricing at
15  Petrobras?
16         MR. COOPER:  Objection to form.
17     A.  No.
18     Q.  In 2013 did you give any testimony that
19  involved any allegations of overpricing at
20  Petrobras?
21     A.  No.
22         MR. COOPER:  Objection.
23     Q.  When was the first time you became aware
24  of allegations of overpricing at Petrobras?
25         MR. COOPER:  Objection to form.
0018
1          Foster - Confidential
2      A.  In 2014 the head of downstream, he had
3  been arrested on the 20th.  I forgot to say that he
4  was no longer an officer of Petrobras.  He was a
5  former officer.  And after that day various
6  different newspaper articles would mention

7   overpricing, overpricing, cartel, overpricing, and
8   then I did hear about -- and then I did hear
9   mention about Paulo Roberto when I read Paulo
10  Roberto's plea bargain where he mentioned all of
11  the projects or part of the projects that where he
12  was involved and that these projects were
13  overpriced and involved bribery payments and there
14  were potential cartels.
15        Q.   Ms. Foster, you testified that the first
16  time you heard of overpricing was first in 2014
17  through various articles and afterwards reading
18  Roberto Costa's plea bargain, correct?
19           MR. COOPER:  Objection to form.
20      A.   Correct.
21        Q.   Were you surprised when you learned of
22  these allegations?
23      A.   We actually read, heard and saw because
24  it is different.  These are different moments and
25  us officers were terrorized.
0019
1             Foster - Confidential
2        Q.   What do you mean by officers were
3   terrorized?
4           MS. GILMORE:  Counsel, she is speaking.
5        You have to let her answer the question
6        first.
7           MR. COOPER:  No, a previous answer.
8           MR. MARTINI:  Terrified, not terrorized.
9           THE INTERPRETER:  Terrified is better.
10       Thank you.
11          MR. MOEHLMAN:  I believe we were going
12       to do this in Portuguese.
13          MR. MARTINI:  Me do, but we were trying
14       to explain that her question would be
15       answered by clarifying the translation.
16          MR. MOEHLMAN:  Please wait until she
17       finishes to clarify.
18          MR. COOPER:  You know what?  She used
19       the word in the next question.  That was a
20       mistranslation, so we needed to correct it.
21          THE INTERPRETER:  The interpreter will
22       stand corrected.  Terrified.
23       Q.   What do you mean by officers were
24  terrified?
25          MS. GILMORE:  I'm sorry.  Let me just
0020
1             Foster - Confidential
2        ask the witness.  That is probably a better
3        source of information.
4        Q.   Did you mean to say officers were
5   terrorized or terrified?
6        A.   No, they were terrified.  They couldn't
7   believe it.
8        Q.   What couldn't they believe?
9        A.   Everything.
10       Q.   What is everything?

11          MR. COOPER:  Objection to form.
12      A.   Everything that Paulo Roberto Costa
13   said.
14      Q.   Can you give me some examples?
15          MR. COOPER:  Objection to form.
16      A.   Just a second.  Company A paid 3 percent
17   to the officer of company in area X.
18          MR. MARTINI:  Company area X?
19      A.   To division X.
20          THE INTERPRETER:  Not company.
21      A.   This Paulo Roberto as an example would
22   make -- distribute into other payments and that is
23   what it was.  It would pay to the government or a
24   government party, and this was one case, and then
25   in another project and then the same story and
0021
1          Foster - Confidential
2   another project, same story, and another one also,
3   and we were scared or terrified and our heart
4   seemed to explode.
5      Q.   When you said scared or terrified, can
6   you tell me what is your knowledge about who was
7   terrified?
8          MR. COOPER:  Objection to form.
9      A.   Okay.  Let's pick a word.  Graca,
10   myself, Formigli, the officer, Officer Cosenza and
11   the engineering officer, the finance officer and
12   the corporate officer.
13      Q.   Do you know who the engineering officer
14   is that you were referring to?
15      A.   Yes, Officer Figuereido.
16      Q.   Do you know who the finance officer is
17   that you were referring to?
18      A.   Officer Barbassa.
19      Q.   Who was the corporate officer you are
20   referring to?
21      A.   This one is deceased.  Eduardo Dutra.
22      Q.   Prior to 2014 were you ever made aware
23   of any allegations of irregularities involving
24   Petrobras?
25          MR. COOPER:  Objection to form.
0022
1          Foster - Confidential
2      A.   No.
3      Q.   Prior to 2014 nobody ever told you that
4   there are any types of irregularities at Petrobras?
5          MR. STRASSBERG:  Objection to form.
6          MR. TURNBULL:  Objection to form.
7      A.   No.
8      Q.   Did you ever have -- between 2010 and
9   2014 -- strike that.  Between 2010 and February
10   2014 did you ever have any conversations with
11   anybody at Petrobras about any types of
12   irregularities at Petrobras?
13          MR. COOPER:  Objection to form.
14      A.   Individuals who addressed me over any

15  type of irregularities, no.
16       Q.   What did you do to prepare for today's
17  deposition?
18       A.   Well, I traveled on Sunday, I arrived on
19  Sunday, I slept a bit, and on Monday I went to have
20  a meeting with my counsel, my attorney Richard and
21  many others from Petrobras.
22       THE INTERPRETER:  The witness asked the
23       interpreter to repeat what was just said.
24       A.   So these are the individuals with whom I
25  have been on Monday, Tuesday, Wednesday and this
0023
 1           Foster - Confidential
 2  morning.
 3       Q.   And can you tell me was anybody from
 4  Cleary Gottlieb present at any of those meetings
 5  Monday, Tuesday and Wednesday?
 6       A.   All of them.
 7       Q.   How long was the meeting on Monday?
 8       A.   From 10 a.m. to 6 p.m.  Actually 11 to
 9  6.  On Tuesday it was from 10 a.m. to 8 p.m.
10  Yesterday was from 10 a.m. to 7:30.  And today one
11  hour before we all sat here.
12       Q.   Are you aware that other people have
13  been deposed in this case?
14       A.   Yes.
15       Q.   Did you read any of the deposition
16  transcripts of other people that have been deposed
17  in this case?
18       A.   No.
19       Q.   Did you discuss the topic of any
20  depositions that have taken place in this case?
21       A.   No.
22       Q.   Did you review any documents that
23  refreshed your recollection as to the events that
24  happened in this case?
25       A.   During these meetings that I had here in
0024
 1           Foster - Confidential
 2  New York?
 3       Q.   Yes.
 4       A.   I saw a lot of documents, a lot, a lot
 5  of them, but in any way I cannot say that they
 6  refreshed my recollection.
 7       Q.   Do you recall the general categories of
 8  documents you reviewed that refreshed your
 9  recollection?
10       A.   Many documents.
11       MR. STRASSBERG:  Objection.  She didn't
12       testify that they refreshed her
13       recollection.
14       Q.   Are there any documents that you
15  reviewed that refreshed your recollection?
16       MR. STRASSBERG:  Objection.
17       MR. COOPER:  Asked and answered.
18       THE WITNESS:  Should I answer?

19          MR. STRASSBERG:  Yes, you can try.
20      A.   The thing is that there are a lot of
21  documents, so I no longer know which one refreshed
22  my recollection.
23      Q.   Other than meeting with your attorneys
24  on Monday, Tuesday, Wednesday and today, did you do
25  anything else to prepare for today's deposition?
0025
 1          Foster - Confidential
 2      A.   Today I tried to utter sentences.  It
 3  was an exercise that I did this morning when I woke
 4  up, just sentences.
 5      Q.   Before the first time you met with your
 6  lawyers on Monday, did you do anything, anything
 7  else to prepare for today's deposition?
 8          MR. COOPER:  Objection to form.  Asked
 9      and answered.
10      A.   No.  I tried to keep calm, very calm.
11          MR. COOPER:  If you are going to move
12      onto something else, maybe we can take just
13      a five-minute break.
14          MS. GILMORE:  Sure.  Why don't we do
15      that now.
16          THE VIDEOGRAPHER:  The time now is 10:33
17      a.m.  We are off the record.
18          (Recess taken)
19          THE VIDEOGRAPHER:  The time now is 10:53
20      a.m.  We are back on the record.
21  BY MS. GILMORE:
22      Q.   Ms. Foster, when did you begin your
23  employment at Petrobras?
24      A.   I started to work at Petrobras in 1978
25  as an intern.
0026
 1          Foster - Confidential
 2      Q.   How long were you an intern for?
 3      A.   Eight months.
 4      Q.   Did you have another position next?
 5      A.   And then there was an internal exam and
 6  then I started to take the position of oil chemist
 7  in the exploration and production division and then
 8  I became division coordinator, a section
 9  coordinator, and then head of the sector, the
10  production and exploration area division head, and
11  I worked at this research center for 16 years and
12  then I left the research center and went to a new
13  division.  I went to work at TBG.  Petrobras owns
14  51 percent of the shares of this company.
15          And then I worked as an engineer at the
16  oil pipe construction that the oil pipe went to
17  Bolivia.  After the oil pipe became ready, I became
18  a business manager and then I went to work in
19  downtown, Petrobras' headquarters, and then I was
20  gas and energy technology manager.  And then later
21  I went to the mining and energy ministry to work
22  with Ms. Dilma Rousseff, a minister.  I worked

23  there for three years, and then I returned to
24  Petrobras and worked with Paulo Roberto Costa for
25  six months.  I was CEO of Petroquisa.
0027
1           Foster - Confidential
2           And then I went to work at BR
3  Distribuidora as BR Distribuidora CEO.  BR's
4  revenues are approximately at 40 billion reais a
5  year.  And then minister, Ms. Dilma, invited me to
6  be head of gas and energy.  And the same Ms. Dilma
7  when she was president of the country, on her
8  second administration, she invited me to be CEO of
9  Petrobras.  Now I am retired.  I am a student.  I
10  am on my first year of law school.
11      Q.   You want to be like us?
12      A.   Yes, of course I can.  Yes, I do.
13      Q.   Be careful what you wish for.
14           So there was a lot in there.  I wanted
15  to go back to the time that you said you were a gas
16  and energy technology manager at Petrobras.  Do you
17  recall when you held that position?
18      A.   I left this position in January of 2003
19  and I took on that position in the end of 1999.
20      Q.   Just so I understand, when you said I
21  left this position, what position are you referring
22  to?
23      A.   This position and went to work with
24  Minister Dilma as oil and gas secretary.  I didn't
25  mention that.
0028
1           Foster - Confidential
2      Q.   When did you start working with Minister
3  Dilma as an oil and gas secretary?
4      A.   It was in the month of January of 2003.
5      Q.   How long did you hold that position?
6      A.   Two years and 11 months.
7      Q.   Did Ms. Dilma invite you or offer you
8  the oil and gas secretary position?
9      A.   Yes.
10      Q.   What is your understanding as to why Ms.
11  Dilma invited you to be the oil and gas secretary?
12           MR. STRASSBERG:  Objection to form.
13      A.   Before actually I met Ms. Dilma when I
14  was building the pipeline between Brazil and
15  Bolivia, I met her when we were getting the
16  construction into Rio Grande do Sul.
17           THE INTERPRETER:  It was a gas pipeline.
18      A.   We had many different interactions.  She
19  got to know my work, and due to this work always
20  fulfilling the established goals, she invited me
21  right away to go to Brasilia.
22      Q.   After you ended your position as oil and
23  gas secretary, what did you do next?  When your
24  position ended as oil and gas secretary, what did
25  you do next?
0029

```
 1          Foster - Confidential
 2      A.  I went back to Rio de Janeiro because
 3  President Dilma started to be the chief of staff
 4  and I did not want to join her on these new
 5  activities, so I went back to Petrobras, and I went
 6  to work with Paulo Roberto Costa for six months at
 7  Petroquimica.
 8      Q.   What was your position at Petrobras in
 9  2008?
10      A.  I was head of gas and energy.
11      Q.   At what point were you elevated to the
12  position of president or CEO of Petrobras?
13      A.  February 13, 2012.
14      Q.   As a director of gas and energy at
15  Petrobras were you a member of the executive board
16  of Petrobras?
17      A.  No.
18      Q.   When did you first -- did you at any
19  point become a member of the executive board of
20  Petrobras?
21      A.  No.  I think there is a translation
22  mixup here.  I was head of gas and energy and I was
23  also part of the executive board.
24      Q.   And as a member of the executive board,
25  what were your duties?
0030
 1          Foster - Confidential
 2      MR. COOPER:  Objection to form.
 3      A.   As a member of the board, actually
 4  98 percent of my time was occupied as a head of oil
 5  and energy.  Gas and energy, not oil and energy.
 6      THE INTERPRETER:  The interpreter will
 7      correct herself.
 8      A.   And on board meetings as a member of the
 9  executive board, each one of us had an agenda with
10  our themes to be presented during that meeting, and
11  the CEO had the sum of all the agendas to be
12  presented and would hear the other members of the
13  board, and we would discuss the quality, the
14  importance and the urgency of those themes that
15  were presented to the executive board.
16      Q.   Do you recall some of the important
17  themes that were presented to the executive board
18  at the time you were a member of the executive
19  board of Petrobras?
20      MR. STRASSBERG:  Objection.
21      A.  I can mention even though you are asking
22  me about 2008, I can say that presalt was
23  discovered in 2006 when I was head of BR
24  Distribuidora, and I can say that this presalt
25  matter occupied our agendas every year until today
0031
 1          Foster - Confidential
 2  with CEO Bandine.  To this day with Mr. Bandine as
 3  CEO this matter continues to be addressed and
 4  discussed.
```

5      Q.  At any time, not just 2008, but at any
6  time that you are a member of the executive board
7  at Petrobras, were you ever involved in approving
8  contracts relating to refineries?
9          MR. STRASSBERG:  Objection.
10          MR. SIMSHAUSER:  Objection to form.
11      A.  Yes.
12      Q.   Can you describe for me the types of
13  contracts you were involved in approving?
14      A.   Refinery contracts.  This was your
15  question, right?
16      Q.   Yes.
17      A.   Refinery contracts related to market
18  presentation, if it is growing or going down, and
19  logistics for the flow of this new production
20  either inside Brazil or outside Brazil, and in the
21  meantime phases 1 through 4 were worked on and at
22  each phase a few activities would be initiated.
23          In the case of phase 3, between going
24  from phase 3 to 4, that is when we start to
25  effectively build the refinery.  There is an
0032
1          Foster - Confidential
2  important time which is when land is acquired, so
3  biddings to own the basic mature project.
4          MS. GILMORE:  Sir, you have got to let
5      her answer the question.
6          MR. COOPER:  We have a translation.
7          MS. GILMORE:  But she was still --
8          MR. COOPER:  It is the translation of
9      what she just said.
10          MS. GILMORE:  She wasn't finished with
11      her answer.  We agreed she would finish her
12      answer and then...
13          MR. COOPER:  Okay.  We weren't
14      objecting, we were correcting the
15      translation.
16          MS. GILMORE:  But she was in the middle
17      of her answer.
18          MR. BARROSO:  Okay.
19      A.  So that is the time when tenders or
20  biddings happened for acquisition of the units and
21  the acquisition of a few special pieces of
22  equipment.  These are the biddings that we do and
23  then after that, there is service biddings and then
24  the completed project and the units' commissioning.
25          THE INTERPRETER:  There is an important
0033
1          Foster - Confidential
2      time when land is acquired so biddings.  You
3      want instead of own to procure.
4          MR. MARTINI:  Yes.
5          THE INTERPRETER:  Instead of own,
6      procure.  Sure.
7          MR. MARTINI:  It was on page 27, line 7.
8      Q.  Ms. Foster, what types of information

 9   did you consider as a member of the Petrobras
10   executive board in determining whether to approve
11   contracts?
12          MR. COOPER:  Objection to form.
13          A.   I would actually like the question to be
14   clarified.
15          Q.   What don't you understand about the
16   question?
17          A.   I was a bit confused as when we approved
18   the projects, which individuals would be in the
19   room?
20          Q.   Let me try and rephrase it.  As a member
21   of Petrobras' executive board, were you involved in
22   approving any contracts related or planning related
23   to the Abreu e Lima refinery?
24          MR. COOPER:  Objection to form.
25          A.   Okay.  When you start to be an officer
0034
 1          Foster - Confidential
 2   of Petrobras, as soon as you go into the room, all
 3   we are are officers.  So the Abreu e Lima refinery
 4   matter, so in the FSPO floating, storage,
 5   production and offloading are approved or not
 6   approved by the same officers.
 7          So as Abreu e Lima's head of energy and
 8   gas, I would approve the project.  So I also
 9   approved the projects of Abreu e Lima.
10          THE INTERPRETER:  So as head of energy
11          and gas, I would also approve Abreu e Lima's
12          projects.
13          Q.   And what type of information would you
14   consider in approving the Abreu e Lima projects?
15          MR. COOPER:  Objection to form.
16          A.   The information was provided by the head
17   of the division.  The head of the division, we have
18   what we call, it is a document called DIP, which is
19   a Petrobras internal document, and this DIP would
20   come to the board many different times as the
21   project advanced as it would change phases.  We
22   would go from phase 1 to phase 2 and then phase 2
23   to phase 3 and then finally to phase 4.
24          So the executive manager of the head who
25   was in charge of that refinery, he would submit it
0035
 1          Foster - Confidential
 2   to the division officer or head of the division and
 3   sign it, and the head of the engineering division
 4   and his executive manager, engineering executive
 5   manager, would sign it, would sign all the contents
 6   up until that time, and none of the other officers
 7   nor the CEO would conduct any studies to find out
 8   if the information provided by the downstream
 9   officer of that refinery was correct or not.
10          Q.   Why wouldn't the executive officers or
11   the CEO conduct any studies to find out if the
12   information provided by the downstream officer of

13  the refinery was correct or not?
14        MR. COOPER:  Objection to form.
15      A.   Because it would be humanly impossible.
16  Because at the same time I had to do all types of
17  work for the energy and gas division and for the
18  international division, and that is the main
19  reason.
20        It is important to close my answer to
21  your question to say that the responsibility goes
22  all to the head of downstream and of the
23  engineering division as well.
24      Q.   In connection with the projects of the
25  Abreu e Lima refinery, as a member of the executive
0036
 1           Foster - Confidential
 2  board did you have to approve those projects?
 3        MR. COOPER:  Objection to form.
 4      A.   Yes.
 5      Q.   Why?
 6      A.   Because the management were executive
 7  board.  When it approves a project, it means it is
 8  an important project for the company and we are all
 9  equally responsible for the success of that
10  project.  If there is information that is
11  inappropriately worked or inappropriately dealt
12  with by the head of the engineering division, it is
13  understood that it is a mistake by all.
14      Q.   Who was the head of the engineering
15  division at Petrobras as you recall between 2009
16  and 2014?
17      A.   From 2009 to 2012 it was Renato Duque
18  and we had Figuereido from 2012 to 2015.
19      Q.   Do you know why Mr. -- did Mr. Duque
20  leave the company in 2012?
21      A.   If I know?  Mr. Duque did not want to
22  work with me.  He didn't tell me that directly, but
23  he made others come to me with that information,
24  and what he told me is that he was going to take
25  care of his own company.
0037
 1           Foster - Confidential
 2      Q.   What is your understanding as to why Mr.
 3  Duque did not want to work with you?
 4      A.   I thought about that many times.  I am a
 5  very centralizing person and I am a person who has
 6  high demands.  I was told I am a person who gets
 7  mad, but I don't.  This is it.  It is because they
 8  didn't want to work with me because I have a --
 9  actually all of them, all males were working with
10  Gabrielli for almost nine years and so was I, and
11  Gabrielli was always a very sweet person, a gentle
12  person, and he wants to see the work done, but he
13  doesn't really demand a lot.  I was very happy
14  working with him.
15        There are a lot of features Gabrielli
16  has that I would like to have, so that was it.

17  Renato Duque had his own company and he did not
18  want to work with me.
19       Q.   During the time you were employed at
20  Petrobras did you have any disagreements with Mr.
21  Duque?
22           MR. STRASSBERG:  Objection.
23       A.   Many, many.
24       Q.   Can you describe for me the types of
25  disagreements you had with him?
0038
 1           Foster - Confidential
 2       A.   Because he is in charge of the project
 3  deadlines, duration deadlines, and he is in charge
 4  of project quality, and what I mean by quality is
 5  in every meaning of the word such as from materials
 6  to having everything working and we in charge of
 7  gas and energy production and exploration and
 8  downstream were in charge of the resources, and if
 9  we take years to complete a project, it becomes
10  more expensive and only very much further down the
11  line is where you are going to collect the funds
12  for this project, so my arguments with Duque were
13  always these long discussions.
14           THE INTERPRETER:  The interpreter is
15       repeating where the witness stopped.
16       A.   Period.
17       Q.   Can you give me some examples of the
18  specific arguments you had with Mr. Duque?
19           MR. COOPER:  Objection to form.
20       Misstates testimony.
21           THE WITNESS:  But I can answer, right?
22       A.   I will give you some examples.  You are
23  building or in this case he is building a gas
24  pipeline, 1,000 kilometers or 2,000 kilometers, and
25  for that there are a lot of companies that have
0039
 1           Foster - Confidential
 2  parts of it to build.  Certain parts of it to build
 3  and a few of them, not many when you look at the
 4  whole construction and you look at the whole
 5  construction and it is much farther behind or
 6  slower than the others, and I would always visit
 7  the construction, always look at them with my team,
 8  and I would look and say this company is going to
 9  delay the construction by months, and what happened
10  is that there was a construction right behind it,
11  and if that one was delayed, the other one would be
12  delayed as well because it couldn't connect to that
13  one, and I would tell him, remove this company from
14  my construction because I'm not going to pay and
15  then you can imagine the havoc that it created.
16       Q.   What specific argument did you have with
17  Mr. Duque, if any, with respect to the Abreu e Lima
18  refinery?
19           MR. COOPER:  Objection to form.
20       A.   I didn't have great arguments with Mr.

21  Duque regarding the engineering construction,
22  because as head of the division I didn't go visit
23  the refinery constructions that much.  I didn't
24  have that type of commitment.  I had discussions
25  with Officer Paulo, Roberto, because he should
0040
1           Foster - Confidential
2  expect more or demand more, because I thought he
3  should demand more from Renato Duque.
4       Q.   And when you say that Paulo Roberto
5  should have demanded more of Renato Duque, what do
6  you mean?
7       A.   That he should also visit the
8  constructions, and Paulo did that.  He would do
9  that to be firmer about completing the projects and
10  to start out a new project if necessary.  Would
11  visit the construction sites.
12       Q.   Did you believe that the projects would
13  be completed quicker?
14           MR. COOPER:  Objection to form.
15       A.   It is possible.  It is possible.
16       Q.   What is the basis for your answer?
17       A.   There are very simple things.  Let's say
18  you were at a construction site in Rio Grande do
19  Norte and you are building a thermal electrical
20  plant that huge, construction lasting between four
21  and five years, and there are a lot of
22  construction, you have a lot of engineers that are
23  born in Rio Grande do Norte, they are from Rio
24  Grande do Norte, whose companies are from Rio
25  Grande do Norte, and the companies are from Rio
0041
1           Foster - Confidential
2  Grande do Norte, many different small companies are
3  from Rio Grande do Norte, so the state governor
4  does not want the construction completed.  The
5  region's mayor does not want the construction to be
6  completed so the Rio Grande do Norte engineer does
7  not want to leave Rio Grande do Norte.  So it is
8  something simple, trivial, but that delays the
9  construction by one to two years.
10           A union was created just for that
11  specific thermal electrical plant, because there is
12  nothing there before, and they are going to start
13  receiving zero money after the construction project
14  because there is nobody there working.  It has
15  5,000 to 10,000 employees and the thermal
16  electrical plant is going to be functioning with 30
17  individuals.  Okay.
18       Q.   Do you know who was the state governor
19  who did not want the project to be completed?
20           MR. COOPER:  Objection to form.
21       A.   I know the state governor did not want
22  the production units to be completed in the south
23  of Brazil.  The construction would not be completed
24  until there were more production units to bring

25  over to the shipyard, and that cannot exist because
0042
 1              Foster - Confidential
 2  there is a bidding process.  Whoever wins it takes
 3  it.
 4        Q.   Can you explain to me what you mean that
 5  it does not exist because there is a bidding
 6  process, whoever wins it takes it?
 7        A.   Is that what she wants to know?  We have
 8  12 huge shipyards in Brazil, and we have, no, not
 9  that we have, but we work with a lot of additional
10  shipyards in China, Korea, Singapore, and when we
11  have a tender, we invite all of the shipyards who
12  have experience with this type of floating unit
13  that we need, and there is a bidding process, so
14  whoever has the best project with the lowest price
15  and less time to complete it will have their
16  project approved, and that project will be built or
17  into construction either in a shipyard in China if
18  China is the one who won it or Rio Grande do Sul in
19  Brazil.
20        Q.   And what was wrong with the specific
21  bidding process you just described?
22            MR. COOPER:  Objection to form.
23            MR. TURNBULL:  Lack of foundation.
24        A.   Because in that case the government
25  leaves -- no, actually not the government but the
0043
 1              Foster - Confidential
 2  employee leaves, employees leave to go look for
 3  work elsewhere or they either stay in that same
 4  state and they create a lot of social problems that
 5  the government or the governor of that state has to
 6  address because there are no other vessels to be
 7  built there.
 8            What happens is that the person in
 9  charge of that construction usually, he or she
10  takes all of those workers of that construction
11  site to work at other states throughout Brazil, and
12  they do not always want to go, and that becomes
13  complicated.
14        Q.   You also mentioned that the region's
15  mayor with respect to this project did not want the
16  project to be completed.  Can you tell me who the
17  region's mayor was?
18            MR. COOPER:  Objection to form.
19        A.   I don't remember.
20        Q.   What is your understanding as to why the
21  region's mayor did not want the project to be
22  completed?
23            MR. COOPER:  Objection to form.
24        A.   He thinks, well, it is obvious, he
25  thinks he is going to lose all of those 4500
0044
 1              Foster - Confidential
 2  workers that are working there, and that is the

3  case and the heat-up of the internal market such as
4  supermarkets, they create various different little
5  towns around it, and all of these things are going
6  to end because the workers are going to leave.
7     Q.   What is your understanding -- strike
8  that.  Did Mr. Duque agree with the state governor
9  and the region's mayor on this issue?
10        MR. COOPER:  Objection to form.
11     Misstates testimony.
12     A.   I don't know.
13     Q.   Do you know whether Mr. Duque was
14  friendly with the state governor?
15     A.   I don't know.  All I know is that I
16  didn't have, I tried not to have any relationships
17  with any governors or mayors or with anyone like
18  that because I didn't want them to ask me for
19  anything, but I don't know if Duque had or not.
20     Q.   Why didn't you want to have a
21  relationship with the governors or anyone like
22  that?
23        MR. COOPER:  Objection to form.  Asked
24     and answered.
25     A.   Because they thought like that.  Oh, the
0045
1        Foster - Confidential
2  construction is going to end, and then they would
3  start to ask, is there going to be another
4  construction here?  Where are you going to send the
5  construction?  And then the two governors are
6  friends, so they start to delay licenses.
7     Q.   And how did you learn with respect to
8  the project you just testified about, how did you
9  learn that the state governor and the region's
10  mayor did not want the project to be completed?
11        MR. STRASSBERG:  Objection.
12     A.   Because they were worried about losing
13  the workers, which would result in social problems
14  for the city, but if you tell him, oh, no, but I
15  have two more thermal plants to build, and then the
16  governor will let construction be completed
17  quicker, because there are two more constructions
18  and then two more governors.  Two more
19  constructions and then two more governors.
20        THE INTERPRETER:  That is what the
21     interpreter heard.
22     A.   Because there are two more thermal
23  electrical plants.  Thermal electrical power
24  plants.
25        THE INTERPRETER:  Okay.
0046
1        Foster - Confidential
2     Q.   Which --
3        MR. COOPER:  We have been going over an
4     hour.  We should take a break soon.
5     Q.   Which were the two thermal electrical
6  power plants?

7           MR. COOPER:  Objection to form.
8      A.   A good example that fits into it is
9   Seropedica in Rio de Janeiro.
10      Q.   What was the second one if you remember?
11           MR. STRASSBERG:  Objection.
12           MR. COOPER:  Objection.
13      A.   It was an upgrade to Seropedica.  We
14   built a plant that was larger than Seropedica
15   itself.
16      Q.   When you said earlier that you learned
17   of the state governor and the region's mayor did
18   not want the project to be completed, how did you
19   learn that?
20      A.   Due to the pace of the construction
21   itself, you notice that the pace is dropping
22   without any explanations, and in case of platform
23   construction, you build one part and the workers
24   themselves take advantage of a certain moment in
25   time and they break down the platform that was just
0047
1           Foster - Confidential
2   built or that was built, and that continues like
3   that.  And that stays like that.
4           THE INTERPRETER:  Not continues.  That
5      stays like that.
6      Q.   Who other than you at the time knew that
7   the state governor and the region's mayor did not
8   want the project to be completed?
9           MR. COOPER:  Objection to form.
10      A.   I believe that this matter is a matter
11   discussed by the executive board, because this
12   results in losses for the company.  That is a
13   point.
14           THE VIDEOGRAPHER:  The time now is 12:02
15      p.m.  We are off the record.
16         (Recess taken)
17           THE VIDEOGRAPHER:  The time now is 12:28
18      p.m.  We are back on the record.
19   BY MS. GILMORE:
20      Q.   Ms. Foster, the project you testified
21   about earlier pursuant to which the state governor,
22   with respect to which the state governor and the
23   region's mayor did not want it to be completed, did
24   that project relate to the Abreu e Lima refinery?
25           MR. COOPER:  Objection to form.
0048
1           Foster - Confidential
2      A.   No, it was not related to Abreu e Lima.
3      Q.   What was it related to?
4           MR. COOPER:  Objection to form.
5      A.   They are regarding thermal electrical
6   units that are situated in the state of Ceara, and
7   the last ones that I mentioned about platform
8   production units, they are located in Rio Grande do
9   Sul.
10      Q.   Are those related to the COMPERJ

11  refinery?
12          MR. COOPER:  Objection to form.
13      A.  No.  COMPERJ is located in Rio.
14      Q.  Did you have any disagreements with Mr.
15  Duque with respect to the COMPERJ refinery?
16      A.  The officer who is in charge of
17  budgeting for COMPERJ is Paulo Roberto Costa.  So
18  the two used to have interactions about the
19  efficiency and the expedition of the construction.
20  I did not have any relationship with them unless
21  for the executive board.
22      Q.  And when you say the two used to have
23  interactions about the efficiency and the
24  expedition of the construction, what do you base
25  your testimony on?
0049
1          Foster - Confidential
2      A.  In the meetings that they held, I did
3  not attend them, but I knew of those meetings and
4  that they were held.
5      Q.  How did you know of those meetings and
6  that they were held?
7      A.  Because I would come to the executive
8  board meeting and I would hear we had a meeting
9  today with this company who is a supplier and then
10  if that company does not resume its operational
11  efficiency, it will have to be removed from the
12  construction and from the Petrobras supplier's
13  list.
14      Q.  During the course of the meetings that
15  you attended as part of the executive board
16  meetings, can you describe for me what the
17  interactions were between Mr. Duque and Mr. Costa
18  with respect to the efficiency and expedition of
19  the COMPERJ construction?
20          MR. COOPER:  Objection to form.
21      A.  Discussions were always around higher
22  cost, service and construction costs were higher
23  and taking more time to complete it than was
24  planned.
25      Q.  Can you describe for me whether there
0050
1          Foster - Confidential
2  were specific disagreements with respect to higher
3  costs of COMPERJ?
4          MR. COOPER:  Objection to form.
5          THE INTERPRETER:  The interpreter is
6      translating the objection.
7      A.  Well, COMPERJ is a project that changed
8  a lot.  The project scope changed more than three
9  times.  This means more delays and more money
10  spent.  So this was always the explanation why
11  COMPERJ project prices were so high.  But there is
12  a huge reason or very significant reason because
13  this industrial park, it was supposed to be a
14  refinery of more than 165,000 barrels a day.  There

15  is the possibility of building another train.  What
16  I mean by another train is another plant to work
17  jointly with the first one.  But Petrobras doesn't
18  know when it will be able to build these additional
19  165,000 barrels.
20          So this small refinery, COMPERJ refinery
21  of 165,000 barrels, has to pay for facilities such
22  as hydrogen, oxygen, water, steam, electrical
23  aspects and many others.  Is it clear that COMPERJ,
24  it is a tiny plant, it has a tiny plant that is
25  there all by itself and it has to pay by itself.
0051
 1          Foster - Confidential
 2  It has a tiny plant that is there and it has to pay
 3  by itself.  Not by there itself.
 4          THE INTERPRETER:  It is the
 5      interpreter's mistake.

# Commercially Sensitive

16      Q.  Ms. Foster, do you know Mr. Jorge
17  Zelada?
18      A.  Yes, I do.
19      Q.  Was he employed at Petrobras?
20      A.  He used to be employed by Petrobras.
21      Q.  What was his position at Petrobras?
22      A.  His last position at Petrobras was
23  international division officer.
24      Q.  Do you know whether Mr. Zelada left
25  Petrobras in or around 2012?
0052
 1          Foster - Confidential
 2      A.  It was in June of 2012.
 3      Q.  What is your understanding as to why Mr.
 4  Zelada left Petrobras in or around June 2012?
 5      A.  Because of me.
 6      Q.  Can you tell me why because of you?
 7      A.  Because they all, the ones who were
 8  there, thought I was too centralizing.  I want to
 9  know, I want to see, and that disturbed them a
10  great deal.
11          Zelada, I'm not sure if it is his
12  company, but he had gotten a job overseas to deal
13  with natural projects.  This is it.
14      Q.  Did you and Mr. Zelada have any
15  disagreements?
16      A.  No.
17          MR. STRASSBERG:  Objection.
18      Q.  Did you and Mr. Zelada have any

19  differences of opinion at any point when you were
20  both employed at Petrobras?
21        MR. COOPER:  Objection to form.
22     A.  Yes, we did.
23        Q.  What were those differences?
24        A.  The differences were regarding details.
25  I wanted to get to know about the details of his
0053
 1        Foster - Confidential
 2  projects, but he didn't always knew them.  He
 3  didn't always knew them.  Didn't always know them.
 4        THE INTERPRETER:  I'm sorry.
 5        A.  So it was difficult to talk to someone
 6  who didn't have any information to provide, so I
 7  would end up losing my patience, but I was only his
 8  co-worker because I was head of the gas and power
 9  division.
10        Q.  What kind of details were you looking to
11  obtain from Mr. Zelada?
12        MR. COOPER:  Objection to form.
13        A.  As I sit here, I don't remember, because
14  it was almost on a daily basis because we worked
15  together for three and a half years, almost four
16  years.
17        Q.  Do you remember whether the details you
18  were looking to obtain had to do with bidding
19  processes?
20        MR. COOPER:  Objection.
21        A.  No.  They were more about projects and,
22  and he would not attend presentations, and there
23  were also details about contracts that were not
24  present, so we had a lot of arguments around that,
25  but regarding bidding, it wasn't really a weekly
0054
 1        Foster - Confidential
 2  fight, no.
 3        THE INTERPRETER:  The interpreter will
 4        stand corrected.  He didn't provide
 5        presentation lines and not that he didn't
 6        show up on presentations.  Thank you.
 7        That's correct.
 8        Q.  When you say the bidding arguments were
 9  not really a weekly fight, can you describe for me
10  what types of fights you had about bidding?
11        MR. STRASSBERG:  Objection to form.
12        A.  I said that there were not fights about
13  biddings because there is a manual to be followed
14  for bids, but a few elements that comprised what to
15  present to suppliers were not always shown or not
16  every time or a few times only were shown to us,
17  the other executive board members clearly.
18        Q.  Are you done with your answer?  Can you
19  describe for me what the elements were that were
20  not presented to the other executive board members?
21        MR. COOPER:  Objection to form.
22        Misstates her testimony.

23            THE INTERPRETER:  Is this lady that you
24      are translating for, is she a judge?
25      Q.   Me?
0055
1            Foster - Confidential
2      A.   I would like to know to address you.
3      Q.   Emma.
4            THE INTERPRETER:  Everything that is
5      said by the witness has to be translated.
6      A.   Mrs. Emma.  It is a bit difficult
7  because your question is a bit vague.
8      Q.   Okay.  Let me try to clear it up.  You
9  said that there is a manual for the bidding process
10  to be followed, but a few elements that comprise
11  what to present to suppliers were not always shown
12  or not every time or a few times only were shown to
13  us, the other executive board members clearly.
14      A.   Yes.
15      Q.   My question is what were those few
16  elements that you just testified to.
17      A.   I understand.  I understand.
18            THE INTERPRETER:  Should the interpreter
19      interpret anyway?
20            MR. COOPER:  Yes, please.
21      A.   Sometimes they would not be clearly
22  specified the number of office pieces of equipment,
23  number of xerox copy machines as an example, how
24  many men, as an example, would work with carpentry
25  and compensation.  This doesn't seem like much, but
0056
1            Foster - Confidential
2  when the report is audited or the documents
3  regarding contracting are audited or procurement,
4  the auditor will ask every member of the executive
5  board, but you didn't see this, you didn't see
6  that, and that is an issue because it wasn't
7  presented, so we could not have seen it.
8      Q.   Was it important for you to see this?
9            MR. COOPER:  Objection to form.
10      A.   It was important if that information
11  would be important for that specific project.
12      Q.   Let's go to Mr. Costa.  Have you at any
13  point in time worked with Mr. Costa?
14      A.   Yes.
15      Q.   Can you tell me what was Mr. Costa's
16  position at Petrobras?
17            MR. COOPER:  At what time?
18      Q.   When you worked with him between 2010
19  and 2012.
20      A.   I worked with Mr. Costa in 2005 towards
21  the end of 2005, towards the end of 2005 and the
22  beginning of 2006, during six months, so he was an
23  officer.  There were four divisions connected to
24  him, and one of them was petrochemical and I was
25  the CEO of a company named Petroquisa.
0057

```
 1          Foster - Confidential
 2      Q.  Did Mr. Costa leave Petrobras at one
 3  point?
 4      A.  He was fired right after I started to
 5  occupy the position as CEO of Petrobras.  He was
 6  fired two months after that with Renato Duque.
 7      Q.  What is your understanding as to why Mr.
 8  Costa was fired?
 9      A.  He was fired by the board of directors.
10  He was occupying the executive board since 2004 for
11  nine years.  He was also a hard working man, very
12  intelligent, but the way he worked was as if
13  downstream were a different company altogether and
14  not part of Petrobras.  He received -- he was a
15  very centralizing man.  He received the company's
16  budget.  It is not like he put it in his pocket,
17  but he would receive it and others, I would receive
18  the budget and others would as well, and after
19  receiving it, he would not let anybody know about
20  anything.
21          And when I started to occupy my position
22  as CEO and at that time the budget resources
23  stopped being by division and started -- and became
24  budgeting by project, and he was very disturbed by
25  that.  I have a lot of e-mails that I sent to him
0058
 1          Foster - Confidential
 2  requesting him what we call S curves, physical and
 3  financial S curves, and he didn't like that idea at
 4  all.  So he never liked to follow orders and to
 5  tell where he was going.  Things like that that we
 6  need to know.
 7          So I had a discussion with the mining
 8  and energy minister.  Petrobras is connected to the
 9  mining and energy minister, and the minister then
10  contacted Paulo Roberto and asked Paulo Roberto to
11  leave the company.  That is what he did.
12      Q.  And when you said you had a discussion
13  with the mining and energy minister, who was the
14  mining and energy minister at the time?
15      A.  It was Minister Lobao.  I don't know his
16  full name.
17      Q.  Can you describe for me the discussion
18  you had with Minister Lobao about Mr. Costa?
19      A.  I wasn't present, I only know what Paulo
20  Roberto Costa spoke at a Senate parliamentary
21  committee, and that he was asking to leave the
22  company, and he understood very well why he was
23  asking to leave the company, that every person who
24  becomes a CEO comes in with their own ideas, and he
25  said that he was not the only one who was leaving.
0059
 1          Foster - Confidential
 2  He spoke about himself, that he was leaving.  He
 3  spoke about Zelada, Duque, and he also spoke of our
 4  dear head of production and exploration at the
```

 5  time, Mr. Estrella.
 6          This gentleman, Mr. Estrella, also left
 7  as soon as I started, but it is important to
 8  mention that he left the company because he was
 9  very tired.  He was much older than we were, and he
10  returned to his small farm.
11      Q.  And you mentioned that Mr. Costa spoke
12  at a Senate parliamentary committee.  Do you recall
13  when he spoke at that committee?
14      A.  It was in 2014 on March 20th, Paulo
15  Roberto had been arrested, and he stayed in jail
16  for about four months, and then he left,
17  and then the Senate contacted Paulo Roberto to
18  depose.  To provide testimony.  To speak.
19          THE INTERPRETER:  The interpreter will
20      go back.  Contacted Paulo Roberto to speak.
21      A.  And then after a few days he was
22  arrested again, but at the first time when he was
23  arrested, when he explained why he had been fired,
24  there is a page on the transcription of the
25  parliamentary committee's report -- am I speaking
0060
 1          Foster - Confidential
 2  English?  This transcription is in Portuguese, so
 3  it is important to try and get this translation and
 4  to print it.  So he was very honest at describing
 5  his leaving the company.
 6      Q.  Did you read the transcription where Mr.
 7  Costa explained why he had been fired?
 8      A.  Yes.
 9      Q.  And what is your understanding as to why
10  Mr. Costa was fired?
11          MR. COOPER:  Objection.  Asked and
12      answered.
13      A.  He was fired because he would turn the
14  downstream division into Petrobras.  He was a very
15  free person.  He did not tell much.
16      Q.  And when you say that he turned the
17  downstream division into Petrobras, what do you
18  mean by that?
19      A.  He was the king.  He was a king.  He
20  only needed his division to do everything.  He
21  didn't like to tell much.
22          MR. COOPER:  We are almost ten after 1.
23          MS. GILMORE:  Why don't we stop then and
24      do you want to pick up at 2 or earlier?
25          MR. COOPER:  Let's aim for earlier.
0061
 1          Foster - Confidential
 2  Let's go off the record.
 3          THE VIDEOGRAPHER:  The time now is 1:09
 4  p.m.
 5          (Lunch recess:  1:09 p.m.)
 6
 7
 8

```
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0062
 1              Foster - Confidential
 2              Afternoon Session
 3              1:57 p.m.
 4         THE VIDEOGRAPHER:  The time now is 1:57
 5    p.m.  We are back on the record.
 6    M A R I A  D A S  G R A C A S  F O S T E R, having
 7    been previously duly sworn, was examined and
 8    testified further as follows:
 9    EXAMINATION (Continued)
10    BY MS. GILMORE:
11         Q.  Ms. Foster, prior to the break you
12    referred to Mr. Costa as a king, correct?
13         A.  Yes.
14         Q.  What is your understanding as to why Mr.
15    Costa had so much power?
16         MR. COOPER:  Objection to form.
17         A.  I don't know.
18         Q.  Do you know why he was permitted to have
19    so much power?
20         MR. COOPER:  Objection to form.
21         A.  I'm not sure if he had so much more
22    power than I did or more power than the other
23    executive board members had.
24         Q.  Why did you refer to him as a king?
25         A.  When I used to go to the state of Bahia
0063
 1              Foster - Confidential
 2    up in the northeast of Brazil, I used to tell my
 3    boss's assistant or secretary.  My boss was
 4    Gabrielli.  I will come back in two days.  Paulo
 5    Roberto on the other hand used to not advise.  That
 6    is just an example.  Used to not inform of that.
 7         Q.  And you testified earlier that Mr. Costa
 8    would not share budget information with other
 9    members of the executive board.  Can you tell me
10    what is your understanding of why he didn't want to
11    share budget information?
12         MR. COOPER:  Objection to form.
```

13          THE INTERPRETER:  The interpreter will
14      repeat the question.
15      A.   Did I say that he shared or didn't share
16  budgets with other board members?
17      Q.  He did not.
18      A.  I would like to see that.
19          (Record read)
20          MR. COOPER:  Then is there a question
21      about this?
22          MS. GILMORE:  Yes.
23      Q.   Do you want me to read the question
24  again?
25          THE INTERPRETER:  The interpreter will
0064
1           Foster - Confidential
2       read the actual question again.
3           (Record read)
4           MR. COOPER:  I object to the form.
5       Misstates prior testimony.
6       A.   I continue thinking that I did not say
7  that he did not want to show the budgets that he
8  applied on which phases of which projects.  What
9  was read above says, what is here, Pedro?
10          MR. MARTINI:  The translation was
11      correct.
12          THE WITNESS:  But did I say that,
13      really?
14          MR. STRASSBERG:  It is up for Ms.
15      Gilmore to ask questions and you try to
16      answer them as best you can.
17      Q.   Ms. Foster, was there any time that Mr.
18  Costa did not share budget information with other
19  members of the executive board?
20          MR. COOPER:  Objection to form.
21      A.  I don't know.
22      Q.   Let's go back to your testimony about
23  the executive board's process of approval for
24  projects.  What type of information did the
25  executive board consider in approving projects?
0065
1           Foster - Confidential
2           MR. COOPER:  Objection, vague.
3       A.   Phase 1, the consolidation of the
4  opportunity to build a certain industrial unit,
5  opportunities, when I say opportunities, I say
6  mainly markets just to simplify it.  Regarding the
7  budget, during that phase, phase 1, we have a
8  variation that can go from minus 15 percent to
9  minus 35 percent.  I'm sorry, minus 50 percent.
10      Q.  50?
11      A.  50.
12          THE INTERPRETER:  The witness corrected
13      herself from minus 15 to minus 50.
14      A.   During the second phase it is more in
15  depth.  All the market studies have been conducted
16  and tested.  The technology has been selected, and

17  there is a variation of minus 15 to minus
18  35 percent.
19        On phase 3 after that, the variation
20  usually is between minus 15 through 20 percent, and
21  if there is approval by the executive board, we go
22  into phase 4, and that is when there is a need for
23  labor, land acquisition and various different
24  biddings.
25      Q.   And with respect to let's go by each
0066
1         Foster - Confidential
2  phase.  With respect to phase 1, what kinds of
3  information does the board consider prior to
4  approval?
5          MR. COOPER:  Objection to form.
6      A.   The business committee recommends or not
7  approval to the executive board.
8      Q.   And what kind of information does the
9  business committee provide to the executive board
10  in connection with phase 1?
11        A.   It confirms market studies conducted.
12  It confirms the existence of technology and
13  confirms the calculations conducted regarding the
14  present value.
15      Q.   Then in connection with phase 2, what
16  type of information does the executive board
17  consider for approval of the projects?
18          MR. COOPER:  Objection to form.
19      A.   Petrobras, actually the business
20  committee again says something, confirming what has
21  been presented by experts at that time.  All the
22  times information is virtually the same.  What
23  changes is the scope and depth of that information.
24      Q.   What about phase 3?  In connection with
25  phase 3 approval, what type of documentation does
0067
1         Foster - Confidential
2  the executive board consider?
3          MR. COOPER:  Objection to form.
4      A.   So on phase 3 you already have gone to
5  phase 4 and then you need to have all of the
6  environmental licenses.  In order to have those
7  licenses you need to have the land, the project and
8  then you can go ahead.
9      Q.   And in connection with the phase 4
10  approval, what type of information does the
11  executive board consider?
12          MR. COOPER:  Objection to form.
13      A.   On phase 4 you already are building.  On
14  phase 4 you need to have your S curves physically
15  and financially and this is essential.  It is very
16  important, because without them, since 2012 you go
17  into the system and you are not going to have money
18  for your project if the curve is not updated.
19      Q.   What is the S curve?
20      A.   I am going to draw it for you.

21      Q.  I don't think that is going to help.
22      A.  S curve.  Something like this.  T equal
23  zero.  T equal five years.  So you have progress.
24  At the same time you have the financial curve.  So
25  you are spending more and taking longer to build
0068
1            Foster - Confidential
2  your industrial plant.
3      Q.  At what point in the phase 1 through 4
4  process does bidding occur?
5          MR. COOPER:  Objection to form.
6      A.  Phase 1, phase 2, phase 3, and phase 4
7  all have biddings or procurement or contracting
8  sometimes they are not biddings.  They are direct
9  contracting.
10      Q.  What do you mean by sometimes they are
11  not procurement, they are direct contracting?
12          THE INTERPRETER:  The interpreter said
13      sometimes they are not biddings but direct
14      contracting.
15      Q.  Let me rephrase my question.  What do
16  you mean by sometimes they are not bidding, they
17  are direct contracting?
18      A.  Sometimes I go to university and I hire
19  market study of downtown Sao Paulo, and further
20  ahead on phase 3 or 4, I bid.  I open a bidding to
21  procure 58 compressors and 10,000 kilometers worth
22  of piping.  Those are two examples.
23      Q.  And in connection with approving
24  projects, does the executive board review any
25  bidding information?  Does the executive board
0069
1            Foster - Confidential
2  review any bidding information.  My question refers
3  to the time when you were on the executive board of
4  Petrobras.
5          THE INTERPRETER:  The interpreter will
6      repeat the question.
7      (Record read)
8          MR. COOPER:  Are you talking about
9      different phases?  Any phase in the project?
10          MS. GILMORE:  Yes, any phase.
11      A.  I don't understand.  If you can, I would
12  like your question to be more specific.
13      Q.  Let me see if I can make it more
14  specific.  In connection with phase 2, does the
15  executive board review any bidding information
16  before approving a project?
17          MR. SIMSHAUSER:  Objection to form.
18      A.  Before it goes into phase 2?
19      Q.  Let's start with that.
20          MR. SIMSHAUSER:  Objection.
21      A.  So I am going to repeat the question to
22  make sure I understood it correctly or to make sure
23  that this is the answer that you are looking for.
24  If the executive board reviews the bidding process

25   before it goes into phase 3?
0071

1            Foster - Confidential
2     Q.  Sure.  From phase 2 to 3.
3     A.  Yes.
4     Q.  And can you describe the type of bidding
5  information that the executive board reviews before
6  it goes from phase 2 to 3?
7            MR. COOPER:  Objection to form.  Vague.
8     A.  NPV.
9     Q.  What other things specific to bidding
10  does the board review -- does the executive board
11  review at the time we just discussed?
12           MR. COOPER:  Objection to form.
13       A.  I already answered this question, but I
14  am going to answer one more time.  The business
15  committee receives market data.  This market data
16  goes to the committee for a second time, and there
17  was a huge heating up of the economy in China, and
18  this China growth in the economy was not
19  considered.
20           So the committee sends out, so the
21  committee submits it and says you are not ready to
22  bring the materials to the executive board.  This
23  is one example.
24       Q.  Does the executive committee look at the
25   winning bids before it approves a project going
0071
1            Foster - Confidential
2  from one phase to another?
3            MR. SIMSHAUSER:  Objection to form.
4            MR. COOPER:  You mean executive board?
5            MS. GILMORE:  Yes, executive board.
6            MR. SIMSHAUSER:  Objection to form.
7       A.  There is a bidding process, a process.
8  It is written.  It is a company formal document.
9  The business committee looks at this document and
10  it goes to the executive board to ask for approval
11  to start the bidding process.  After 90 days,
12  sometimes after one year, it really depends, the
13  bidding results come back.  Let's say if ten
14  companies, this first one has the lowest price.  So
15  this process, these companies, the first, actually
16  the one who wins the bid is introduced.
17           If you are finished, I am also finished.
18       Q.  Were you involved in the approval of the
19  Abreu e Lima refinery?
20       A.  I was part of the executive board.
21           MR. COOPER:  Objection to the form.  My
22       objection is noted.
23       A.  I was part of the company's executive
24  board, I was not the CEO, and I approved phase 3.
25  During phases 1 and 2 I was working at another
0072
1            Foster - Confidential
2  company owned by the Petrobras system.

3       THE INTERPRETER:  May the interpreter
4    refer to Petrobras as PB?
5       MS. GILMORE:  I prefer that you say
6    Petrobras.
7       THE WITNESS:  Okay.
8    Q.  In connection with the approval of the
9    phase 3 of the Pasadena refinery, did you look
10   at --
11      MR. COOPER:  Pasadena?  You just said
12      Pasadena.
13      MS. GILMORE:  Strike that.
14   Q.  In connection with the approval of phase
15   3 of the Abreu e Lima refinery, did you look at who
16   the winning bids went to?
17      MR. COOPER:  Objection to form.
18      MR. SIMSHAUSER:  Is the question who the
19      winning bidders were?  Objection.
20      MS. GILMORE:  Yes.
21   A.  At the refinery you have one time, at
22   the refinery when there are approvals.
23      THE INTERPRETER:  The interpreter will
24      stand corrected.
25   A.  At the refinery you don't only have one
0073
1          Foster - Confidential
2    time at the refinery when there are approvals, you
3    have many different times.  The cracking plant and
4    the pyrolysis unit, the electrical power plant and
5    so on.  So there are different times.  What was
6    your question again?
7    Q.  In connection with approving the phase 3
8    of the Pasadena refinery, did you know who had won
9    the winning bids?
10      MR. COOPER:  Sorry.  You said Pasadena
11      again.
12      MS. GILMORE:  Sorry.  Abreu e Lima.
13      MR. COOPER:  Objection to the form of
14      the question.
15   A.  I don't know because there were many
16   different biddings.
17   Q.  Did you in connection with your role, in
18   connection with your role as a member of the
19   executive board, did you have access to bidding
20   committee reviews or minutes?
21      MR. COOPER:  Objection to form.
22   A.  You are saying bidding committee?  Is
23   that what you said?
24   Q.  Minutes or documents prepared by the
25   bidding committees.
0074
1          Foster - Confidential
2       MR. COOPER:  Objection.
3       MR. STRASSBERG:  Objection.
4    A.  What I had access to were the following:
5    The Petrobras internal document asking for
6    permission to start a bidding process.  That I had

7  access as CEO and as member of the executive board.
8  I had access and it was approved.  Okay.  Of course
9  if it was approved.  And then it would go to
10  engineers, lawyers, and that was for the second
11  phase, the bidding itself.  Engineers, lawyers and
12  economists.
13       THE INTERPRETER:  The interpreter will
14    go back.
15       A.   So after this was completed, they would
16  do the bidding process, start a bidding process,
17  which is also standardized.  There is a process to
18  it.  So they would submit the process for the
19  knowledge of the executive board.  If it was
20  approved, it was approved.  That is it.
21       Q.   When you say if it was approved,
22  approved by whom?
23       A.   Executive board.
24       Q.   Can you tell me if there was a range, an
25  internal range for approval within Petrobras,
0075
1        Foster - Confidential
2  internal bidding range?
3       MR. COOPER:  Objection to form.  Vague.
4       A.   What do you mean, what kind of range are
5  you talking about?
6       Q.   Was there any internal acceptable range
7  at Petrobras of acceptable bids that Petrobras
8  would accept?
9       A.   What kind of range?
10       MR. COOPER:  Objection to form.
11       Q.   Ms. Foster, do you recall whether
12  Petrobras has a bidding range of between negative
13  15 percent and positive 20 percent?
14       A.   Yes, it had.
15       Q.   Are you aware that many of the bids came
16  close to the positive 20 percent when you were
17  there at Petrobras?
18       MR. COOPER:  Objection to form.
19       A.   Yes.
20       Q.   How did you become aware of that?
21       A.   Because I used to work at Petrobras and
22  I would see it.
23       Q.   How would -- how did you come about
24  seeing it?
25       A.   Because it was presented during the
0076
1        Foster - Confidential
2  executive board meeting.
3       Q.   Was this topic discussed at the
4  executive board meetings?
5       MR. TURNBULL:  Objection to form.
6       A.   We had, yes.
7       Q.   Can you tell me what those discussions
8  were?
9       A.   We had an estimated amount that was
10  locked.  It was kept away as part of the process.

11  We would open the company's envelopes, would open
12  the estimated price, and the bidding winner was
13  confirmed.  In order to approve the bidding, he had
14  to submit the estimated amount as well as the
15  approved amount and also the lower amount would win
16  the bidding.
17         THE INTERPRETER:  So not locked, but
18      sealed.  Thank you.  Yes.  Please replace
19      locked with sealed.  Thank you.
20      Q.   Were there any concerns at Petrobras
21  that many bids were coming in close to the top
22  ceiling plus 20 percent?
23         MR. COOPER:  Objection to form.
24      A.   This 20 percent is international
25  practice during that phase.  When it got to
0077
 1          Foster - Confidential
 2  20 percent, we were within the range of
 3  international prices.
 4      Q.   Were there any concerns at Petrobras
 5  that the winning bids were coming close to the
 6  20 percent?
 7         MR. COOPER:  Objection, asked and
 8      answered.
 9      A.   We understood that we were until because
10  there is two phases at Petrobras, two phases.  So
11  there is one phase when I was part of the executive
12  board and another phase when I was the CEO.  There
13  is the phase before the officer Mr. Paulo Roberto
14  Costa before his plea bargain and after that.
15         So thus far, actually his plea bargain
16  was on October 8, 2012.  We understood that we were
17  on top of 20 percent because it matched
18  international practices to be on top of 20 percent.
19         THE INTERPRETER:  The interpreter is
20      saying on top because the interpreter is not
21      sure if it is above or close.
22      A.   After Paulo Roberto's plea bargain
23  everything started to be a matter of concern, and
24  in 2014 I was at the World Economic Forum and we
25  had a meeting with the CEOs of key oil companies
0078
 1          Foster - Confidential
 2  throughout the world and we did some work and we
 3  discussed the price increase, and the results just
 4  came out back in September 2015 and Petrobras'
 5  results compared with 100 projects, Petrobras'
 6  capex compared to the others was one of the lower
 7  ones.
 8      Q.   Is it your testimony that before Mr.
 9  Costa's arrest, Petrobras was contracting at market
10  prices?
11         MR. COOPER:  Objection to form.
12      A.   I would say that I don't have that
13  answer.  So when I saw that the largest companies
14  in the world like Petrobras hire large projects

15  with a capex where they spend more money than we do
16  and they delay projects more than we do, so I
17  cannot say that before Paulo Roberto or during his
18  time at Petrobras that Petrobras was hiring above
19  the market.
20              MR. COOPER:  Can we take a quick break?
21              MS. GILMORE:  Sure.
22              THE VIDEOGRAPHER:  The time now is 2:45
23      p.m.  We are off the record.
24          (Recess taken)
25              THE VIDEOGRAPHER:  This marks the
0079
 1          Foster - Confidential
 2      beginning of tape number 3.  The time now is
 3      3:07 p.m.  We are back on the record.
 4  BY MS. GILMORE:
 5      Q.  Ms. Foster, at this prior break did you
 6  discuss the subject of your testimony with your
 7  counsel?
 8              MR. COOPER:  Objection.
 9              MS. GILMORE:  I'm not asking her for the
10      subject.  I am entitled to know whether or
11      not she discussed with you the topic of the
12      testimony.
13              MR. STRASSBERG:  No, I don't think you
14      are.
15              MS. GILMORE:  Are you instructing her
16      not to answer?
17              MR. STRASSBERG:  I am.
18              MS. GILMORE:  Okay.  Are you asserting
19      attorney-client privilege as to that
20      question?
21              MR. STRASSBERG:  Yes, we are.
22              MS. GILMORE:  We are going to reserve
23      our rights.
24          (Foster Exhibit 1, Federal Senate
25      request, was so marked for identification,
0080
 1          Foster - Confidential
 2      as of this date.)
 3              THE INTERPRETER:  Can the interpreter do
 4      the attorney discussion simultaneously or is
 5      that a problem for the court reporter?  It
 6      is a problem.  Okay.
 7      Q.  Ms. Foster, I show you what has been
 8  marked as Foster Exhibit 1.  Take a couple of
 9  minutes to look at the document.  I will have a
10  couple of questions for you.
11              MR. SIMSHAUSER:  Skadden needs one copy
12      of the exhibit, please.
13              MR. TURNBULL:  Same with King &
14      Spalding.
15              MS. GILMORE:  I ask if people are of the
16      same firm, we just have one, because we only
17      have ten copies.
18              MR. TURNBULL:  I am only one person from

19     my firm and I don't have one.  Thank you.
20     A.  Okay.
21     Q.  Are you familiar with this document?
22     A.  No.
23     Q.  Have you ever seen it before today?
24     A.  No.
25     Q.  Are you aware that in 2009 the Federal
0081
1              Foster - Confidential
2  Senate was looking to investigate indications of
3  fraud in the bids to renovate oil platforms at
4  Petrobras?
5          MR. COOPER:  Objection to form.
6      A.  No.
7      Q.  Were you aware at any point that the
8  Federal Senate was looking to investigate
9  indications of fraud with respect -- indications of
10  major irregularities in contracts for building oil
11  platforms at Petrobras?
12         MR. COOPER:  Objection to form.
13     A.  I don't remember.
14     Q.  You don't remember one way or another
15  whether at any time you were employed at Petrobras
16  the Federal Senate was looking to investigate major
17  irregularities in contracts for building oil
18  platforms at Petrobras?
19         MR. COOPER:  Objection.
20     A.  I do not remember the Senate trying to
21  or making those inquiries.
22     Q.  Were you aware at any point you were
23  employed at Petrobras that in 2009 the Federal
24  Senate was looking to investigate evidence of
25  overbilling in the Abreu e Lima refinery
0082
1              Foster - Confidential
2  construction?
3          MR. COOPER:  Objection.
4      A.  No.  No, I don't remember.
5      Q.  You could have been aware of it at the
6  time but you just don't remember?
7          MR. COOPER:  Objection.  She said no.
8          MS. GILMORE:  She said no, I don't
9      remember.
10         MR. COOPER:  Objection.  Calls for
11     speculation.
12     A.  I don't have a way to answer that.
13     Q.  Are you aware -- during the time you
14  were employed at Petrobras, are you aware that in
15  2009 the Federal Senate was looking to investigate
16  accusations of fraud involving payments, agreements
17  and compensations from ANP to sugar mill owners?
18         MR. COOPER:  Objection.
19     A.  I don't know.
20     Q.  Are you aware that during the time you
21  were employed at Petrobras, are you aware that in
22  2009 the Federal Senate was looking to investigate

23  accusations of accounting fraud which resulted in a
24  4.3 billion reais reduction in tax and contribution
25  collection?
0083
1           Foster - Confidential
2           MR. COOPER:  Objection to form.
3       A.  No, I don't know.
4       Q.  During the time that you were employed
5  at Petrobras were you aware that in 2009 the
6  Federal Senate was looking to investigate
7  accusations of irregularities in the usage of
8  Petrobras' sponsorship funds?
9           MR. COOPER:  Objection.
10      A.  I don't know.
11      Q.  In 2009 were you a member of the
12  Petrobras executive board?
13      A.  Yes.
14      Q.  Would you have expected that as a member
15  of the Petrobras executive board in 2009 you would
16  have become aware of this information?
17          MR. STRASSBERG:  Objection.
18      A.  It is possible but it has been five to
19  six years.  I no longer remember.
20      Q.  Would you have remembered that Petrobras
21  was in press crime sections in 2009?
22          MR. COOPER:  Objection, vague.
23      A.  I don't remember that either.
24      Q.  Do you recall when you were employed at
25  Petrobras in 2009 to 2014 that Petrobras was
0084
1           Foster - Confidential
2  subject to repeated accusations of irregularities
3  from control bodies such as the federal police, the
4  public prosecutor's office and the Federal Court of
5  Auditors?
6           MR. COOPER:  Objection to form.
7       A.  It is a general question.
8       Q.  Are you aware that when you were
9  employed at Petrobras between 2009 and 2014,
10  Petrobras was subject to accusations of
11  irregularities by the Brazilian federal police?
12          MR. STRASSBERG:  Objection.
13      A.  This is also very generic.  I don't have
14  a way to answer to that.
15      Q.  Are you aware that in 2009, the Senate
16  looking into investigating irregularities and
17  evidences of overbilling in Abreu e Lima refinery
18  also stated that the TCU considers Petrobras one of
19  the most resistant and closed companies when it
20  comes to providing information to the company?
21          MR. COOPER:  Objection to form.  You are
22      asking if she is aware of that today?
23      Q.  Were you aware at any point before
24  today?
25          MR. COOPER:  Objection to form.
0085

```
 1          Foster - Confidential
 2     Q.   When I say providing information, to the
 3  court, not to the company.
 4     A.   Yes, I do remember.
 5     Q.   How did you learn that?
 6     A.   Newspapers.
 7     Q.   Do you recall when you learned that?
 8     A.   No.
 9     Q.   What is your understanding as to why the
10  TCU considered Petrobras one of the most resistant
11  and closed companies when it comes to providing
12  information to the TCU?
13          MR. COOPER:  Objection, foundation.
14     A.   Your question is TCU considered, not
15  that it considers today.  Is that your question?
16     Q.   Considered at the time.
17     A.   Correct.  Petrobras was very, very large
18  and what TCU was requesting Gabrielli was
19  demanding, asking for, of his cabinet, the head of
20  his office and other divisions looking for the TCU
21  documentation to find out if the deadline to give
22  the answer had already been extrapolated.  Expired.
23          So with that, as soon as I became CEO I
24  created a managing division with a flow chart of
25  processes to do what Gabrielli used to do, which
0086
 1          Foster - Confidential
 2  was to making phone calls, inquiring, whatever was
 3  automated, so that it would be automated.
 4     Q.   How did you know that the TCU was
 5  requesting information from Mr. Gabrielli at the
 6  time?
 7          MR. COOPER:  Objection, misstates
 8     testimony.
 9     A.   Because they were requesting it of me as
10  well because I was part of the executive board, and
11  I knew from the head of production and exploration
12  division that there were documents that they needed
13  to provide that they were requiring.
14     Q.   What was the time period that you were
15  talking about when the TCU was requiring documents?
16     A.   TCU requires documentation all the time.
17  All the time.
18     Q.   And you referred to Mr. Gabrielli
19  having -- being asked by the TCU to provide some
20  documentation.  Do you recall when exactly that
21  was?
22     A.   No.
23     Q.   Was it before you became the CEO?
24     A.   Oh, yes, before.
25     Q.   Before February 2012?
0087
 1          Foster - Confidential
 2     A.   Correct.
 3     Q.   Do you recall whether there was --
 4  whether or not a parliamentary committee was
```

 5  established in 2009 to investigate allegations of
 6  irregularities or overbilling at Petrobras?
 7          MR. COOPER:  Objection to form.
 8      A.  Yes.
 9      Q.  Is your testimony that yes, a
10  parliamentary committee was established in 2009 to
11  investigate allegations of irregularities or
12  overbilling at Petrobras?
13      A.  I don't know if there were any
14  overbillings, I don't know if they existed, but
15  irregularities, probably, yes.
16      Q.  What do you mean by irregularities?
17      A.  Irregularities -- overbilling are
18  bribery payments, and irregularities can be
19  procedural irregularities or others.
20      Q.  Is it your testimony that overbilling
21  only refers to bribery?
22          MR. COOPER:  Objection, misstates her
23      testimony.
24      A.  Okay.
25      Q.  Does that mean yes, your testimony is
0088
 1          Foster - Confidential
 2  that overbilling only refers to bribery?
 3          MR. COOPER:  Same objection.
 4      A.  I did not say that overbilling occurred,
 5  I said that there was a parliamentary committee in
 6  2009, but I do not know what the reasons for it
 7  were.
 8      Q.  And do you draw a distinction between
 9  overbilling and bribery?
10          MR. COOPER:  Objection.  Asked and
11      answered.
12      A.  Yes.
13      Q.  And what is the distinction?
14      A.  It is difficult.  It really depends on a
15  sentence context.
16      Q.  Do you believe that when Petrobras pays
17  20 percent on a contract, that means there is
18  overbilling involved?
19          MR. COOPER:  Objection, vague.
20          MR. TURNBULL:  Objection to form,
21      foundation.
22      A.  No.
23      Q.  Do you believe that -- why not?
24          MR. COOPER:  Objection.
25      A.  Because you can have a project that is
0089
 1          Foster - Confidential
 2  200 percent more expensive and you have not given
 3  anyone any money, and during plea bargains
 4  witnesses said that companies did not take any
 5  money.
 6          MS. GILMORE:  And the interpreter will
 7      replace the word "witnesses" with
 8      "individuals" said.

9        THE INTERPRETER:  Informants.  Okay.
10      Some companies.  Okay.
11      Q.   Do you believe -- is it your testimony
12  that if Petrobras pays beyond market prices, there
13  is overbilling involved?
14          MR. COOPER:  Objection, vague,
15      foundation.  Calls for speculation.
16          MS. GILMORE:  Objection to form,
17      Counsel.
18      A.  I agree with them.
19      Q.   You agree with your lawyer that I asked
20  you to speculate?
21      A.   No.
22      Q.  Do you agree with me?
23          MR. SIMSHAUSER:  Objection.
24      A.  I agree with you, but I just think your
25  question is very vague.
0090
1        Foster - Confidential
2          MS. GILMORE:  Counsel, I ask you not to
3      coach the witness.
4          MR. COOPER:  I'm not coaching the
5      witness.
6          MR. MUSTOKOFF:  Objection to form,
7      Roger.  It's the Southern District of New
8      York.
9          MR. COOPER:  I will say what I need to.
10      That question was unfair.
11          MS. GILMORE:  No, it wasn't unfair.  If
12      you have an issue, you object to form.  That
13      is all you are permitted to do.
14          MR. COOPER:  This question was a
15      hypothetical.  Just ask her fact questions.
16      That is what she is here to testify about.
17          MS. GILMORE:  Just put the objections
18      you're allowed to on the record, that is
19      all.  Stop coaching the witness and taking
20      her on breaks and talking to her about her
21      deposition testimony.
22          MR. COOPER:  Ask your question.
23          MS. GILMORE:  I am going to.  Object
24      appropriately.
25      Q.  Ms. Foster, do you believe that if
0091
1        Foster - Confidential
2  Petrobras pays a contractor beyond market prices,
3  that Petrobras is being overbilled?
4          MR. COOPER:  Objection to form.
5          MR. STRASSBERG:  Objection.
6      A.   If Petrobras does price research or gets
7  the prices, so Petrobras obtains prices of various
8  different pieces of equipment and then Petrobras
9  goes into a bidding process.  Petrobras is aware of
10  the prices, they are right here, and this group on
11  this side gives me a higher price, and I put right
12  here my costs to buy and my cost to do inventory.

13  I will be paying more money.  That is it.  If I
14  decide to use this company, I will retain more
15  money.  I'm not calling it overprice.
16      Q.  Is it your testimony that between 2009
17  and 2014 Petrobras did not overpay on contracts?
18          MR. COOPER:  Objection.
19          MR. STRASSBERG:  Objection.  It is also
20      misstating the testimony in a fairly
21      egregious way after that outburst before.
22          MS. GILMORE:  Sir, just confine yourself
23      to objection to form.  That is all you are
24      required to say.
25      A.  What is the question, please?
0092
1           Foster - Confidential
2           MS. GILMORE:  Can you ask my question
3       again.
4           (Record read)
5       A.  I say that between 2009 and 2014
6   Petrobras did overpay, but only when the informants
7   arrested by the federal police said that this glass
8   here, this cup here, that Petrobras paid more for
9   this cup here as an example because it distributed
10  the money to various different individuals, because
11  the informant distributed the money to various
12  different individuals.
13      Q.  What is your understanding as to what
14  that overpayments were?
15          MR. COOPER:  Objection to form.
16      A.  I don't know how to explain a word.  I
17  don't have enough knowledge of English to explain
18  that word on its own.  Overpayment exactly.  I
19  cannot speak as to exactly what it means.  I can
20  only speak to something if it is within the context
21  of a sentence.
22          (Foster Exhibit 2, Document bearing
23      Bates numbers PBRCG-P underscore 01928893
24      through 01928895, was so marked for
25      identification, as of this date.)
0093
1           Foster - Confidential
2       Q.  I hand you what has been marked as
3   Foster Exhibit 2.  Take a couple of minutes to look
4   at it and I will have some questions on it.  Let me
5   know when you are ready.
6       A.  Okay.
7       Q.  Ms. Foster, are you familiar with this
8   document?
9       A.  No.
10      Q.  Are you aware that in January 2010 the
11  TCU found severe -- evidence of severe
12  irregularities at Petrobras?
13          MR. COOPER:  Objection to form.
14      A.  At Petrobras?
15      Q.  Yes.
16      A.  No.

17      Q.   Are you aware in 20 -- were you aware in
18  2010 that the TCU found severe irregularities at
19  Petrobras and was looking to suspend contracts
20  related to the construction of the Abreu e Lima
21  refinery?
22          MR. COOPER:  Objection to form.  Are you
23      looking at somewhere in this document that
24      you want her to look at?
25          MS. GILMORE:  Counsel, I am just asking
0094
1          Foster - Confidential
2   her if she is aware of it.
3          MR. COOPER:  You have shown her a
4       document.  I just want to be sure of what
5       you want to do with it.
6       A.  I do remember.
7       Q.   And can you tell me how did you become
8   aware of that fact?
9       A.   By comments by the executive board and
10  by newspapers.
11      Q.   When you said comments by the executive
12  board, were those comments made during an executive
13  board meeting?
14      A.   Yes, but they were not on the meeting
15  agenda, they were just comments.
16      Q.   And when was the meeting that you are
17  referring to?  When did the meeting that you are
18  referring to take place if you remember?
19      A.   I don't remember.
20      Q.   Do you recall whether it was in early
21  2010?
22          MR. COOPER:  Objection.
23      A.   Yes.
24      Q.   Do you recall who was present at that
25  meeting?
0095
1          Foster - Confidential
2       A.   Definitely the officer Paulo Roberto,
3   because that matter would only come into the
4   meeting if he was there.
5       Q.   What do you mean that matter would only
6   come into the meeting if Mr. Paulo Roberto Costa
7   was there?
8       A.   Because he was the one who had the
9   elements to speak and explain.
10      Q.   And why do you say that he was the only
11  one who had the elements to speak and explain?
12          MR. COOPER:  Objection.  Misstates the
13      testimony.
14      A.   Because he was a person who attended the
15  meeting.  He was the downstream man and only he
16  could explain to us as part of the executive board
17  and the CEO what was happening.
18      Q.   Can you describe for me what Mr. Costa
19  explained at that meeting about what was happening
20  with respect to irregularities in connection with

21  the Abreu e Lima refinery?  Allegations of
22  irregularities.
23      A.  I apologize, but I don't remember.
24      Q.  Do you recall whether Petrobras did
25  anything to investigate the allegations of severe
0096
1           Foster - Confidential
2   irregularities at the Abreu e Lima refinery in
3   2010?
4           MR. COOPER:  Objection to form.
5       A.  I don't know if they did it or not
6   because you could have a division of conducting an
7   audit, the CEO is going to know about it, the
8   officer will know about it, but other officers of
9   other divisions will probably not know.
10      Q.  Is it your testimony that the
11  executive -- the members of the executive board at
12  Petrobras would not know if there were severe
13  irregularities, allegations of severe
14  irregularities in connection with the Abreu e Lima
15  refinery in 2010?
16          MR. COOPER:  Objection.
17          MR. STRASSBERG:  Objection.  Again
18      misstates the testimony.
19      A.  I think we all knew because we all would
20  read the newspapers.
21      Q.  If there was an investigation at
22  Petrobras done in connection with those specific
23  allegations we just discussed in 2010, would the
24  executive board be aware of the results of those
25  investigations?
0097
1           Foster - Confidential
2           MR. COOPER:  Objection to form.
3       A.  No, it would not know.  It would not
4   know.  It really depends on the divisions, the head
5   of the division, if they presented the auditing
6   results to the other members.
7       Q.  Would you have inquired with respect to
8   the specific allegations of severe irregularities
9   into Abreu e Lima in 2010, would you have inquired
10  whether those allegations had any merit?
11          MR. COOPER:  Objection to form.
12      A.  If I would?
13      Q.  Yes.
14      A.  If it were a matter as important as or
15  as magnanimous as at the gas and energy division, I
16  would.
17      Q.  When you say a matter that is as
18  magnanimous as the one as at the gas and energy
19  division, what are you referring to?
20      A.  To the capex, to the importance of the
21  project, to the number of suppliers.  Capex is all
22  together.  C-a-p-e-x.
23      Q.  Ms. Foster, I am asking you to go to
24  Bates number ending in 894.  Do you see on the

25  bottom it says reasons for the problem and then 1?
0098
1              Foster - Confidential
2  Do you see that?
3      A.  Right here?
4          THE INTERPRETER:  The witness read to
5      herself.
6      Q.  Did you have any knowledge in 2010 that
7  there was overpricing at Petrobras found in items
8  of unitary costs of the projects when compared with
9  standards provided in the LDO, which is law of
10  budgetary guidelines?
11          MR. COOPER:  Objection to form.
12      A.  All I know is that there is always
13  discussions between TCU and Petrobras throughout my
14  whole lifespan at Petrobras because TCU uses one
15  model.  Petrobras uses a different model to
16  calculate the same thing.  That never is going to
17  work out.  So there are many cases the processes --
18  the suits take many years and then the amounts,
19  they get closer together.
20          MR. MARTINI:  Proceedings.
21          THE INTERPRETER:  Proceedings.
22      A.  And then one day there is a decision
23  that Petrobras has to pay or not pay.
24      Q.  Is it your testimony that you disagree,
25  in 2010 you disagreed with the TCU's finding that
0099
1              Foster - Confidential
2  there is evidence of overpricing at Petrobras when
3  compared with standards provided in the law of
4  budgetary guidelines?
5          MR. COOPER:  Objection to form.
6          MR. STRASSBERG:  Objection.
7      A.  Since this matter was not brought up to
8  the executive board in a formal way and that was
9  not within my specialty or it was not something of
10  my division as an executive board member, so I
11  don't have studies that can justify or either agree
12  or not agree.
13      Q.  You can put that aside.
14          (Foster Exhibit 3, Document bearing
15          Bates numbers PBRCG underscore 00345110
16          through 00345112, was so marked for
17          identification, as of this date.)
18      A.  Okay.
19      Q.  Ms. Foster, do you recall receiving this
20  e-mail from Mr. Jose Fantine?
21      A.  Yes.
22      Q.  Who is Mr. Fantine?
23      A.  At that time Jose Fantine, actually Jose
24  Fantine had been an officer at Petrobras 30 years
25  ago, maybe 20, and when I started, when I occupied
0100
1              Foster - Confidential
2  the position as a CEO he started to be my advisor.

3   In 2010 here, I don't know where he was.
4       Q.   Do you know -- what is your
5   understanding as to why Mr. Fantine was contacting
6   you?
7       A.   Fantine is a friend of mine.
8       Q.   Mr. Fantine says, if you look on page
9   that ends with 111, the second page, towards the
10  bottom of the page, Mr. Fantine tells you, and I
11  quote, "They appointed a director Elson in the EPE
12  some time ago that they say they could demoralize
13  the company minimally in the area of downstream."
14  And later on it says "That director they say that
15  he does not understand what he does, and they fear
16  that he is taking advantage of the vacuum of the
17  election/transition and of the prestige of his
18  godfathers.  He says he is a man of Lobao, father
19  and son, they say."
20          What is your understanding of what Mr.
21  Fantine is telling you here?
22          MR. COOPER:  Objection to form.
23      A.   I understand Fantine mixed a lot of
24  things together.  I don't understand what he means.
25  What I remember is that.  What I know is that
0101
1           Foster - Confidential
2   Manguinhos refinery was going to be leveled and
3   that they were thinking of putting an NGO there, I
4   found that out through newspapers maybe, and that
5   an NGO was going to grow medication plants for the
6   slums that were located around the area.  That is
7   all I know.  I don't know anything else.
8       Q.   Do you have any understanding as to what
9   the director Elson was enjoying the prestige of his
10  godfather?  Do you understand what that means?
11          MR. COOPER:  Objection to form.
12          MR. STRASSBERG:  Objection.
13      A.   No, I don't know.
14      Q.   Do you know, have you heard of the term
15  "godfather" appointing personnel at Petrobras?
16          MR. COOPER:  Objection to form.  There
17          is nothing here that says this person is at
18          Petrobras.
19      Q.   Ms. Foster, you can answer my question.
20      A.   Godfather, so please, your question was?
21      Q.   Have you ever heard of godfathers
22  appointing personnel at Petrobras?
23      A.   Yes.
24      Q.   When was the first time you heard of
25  that?
0102
1           Foster - Confidential
2       A.   Many, many years ago.
3       Q.   Did you know by January -- by December
4   2010 that godfathers were appointing personnel at
5   Petrobras?
6           MR. COOPER:  Objection to form.

7      A.  I didn't know the individuals appointed
8  were the ones who were saying that, but this has
9  nothing to do with Petrobras.  I don't even know
10  why it ended up getting here.  The only thing is
11  that Fantine is a person that I know.
12      Q.  You can put that away.
13          MR. STRASSBERG:  Good time to take a --
14      we will try to keep it tight.  Take a short
15      break.
16          MS. GILMORE:  I am very much for that,
17      so if you want five minutes, we can take
18      five.
19          THE VIDEOGRAPHER:  The time is 4:10 p.m.
20      We are off the record.
21          (Recess taken)
22          THE VIDEOGRAPHER:  This marks the
23      beginning of tape number 4.  The time now is
24      4:28 p.m.  We are back on the record.
25  BY MS. GILMORE:
0103
1          Foster - Confidential
2      Q.  Ms. Foster, I am handing you what has
3  been marked as Foster Exhibit 4.  Please take a
4  couple of minutes and look at the document and let
5  me know when you are ready.
6          (Foster Exhibit 4, Document bearing
7      Bates numbers PBRCG underscore 00349569
8      through 00349582, was so marked for
9      identification, as of this date.)
10          MR. COOPER:  I also want to put on the
11      record that we reserve our rights to object
12      to any of the translations of the documents
13      that we have been looking at.  It is a
14      standard objection that we have been making,
15      but in this respect I want to note one
16      issue.
17          MS. GILMORE:  That is not part of the
18      record just before you make your objection.
19      We are only introducing the Portuguese.  The
20      one, the translation I am just giving to
21      counsel.
22          MR. COOPER:  This word here should be
23      draft in English, not minutes, so if you
24      were going to read that word in your
25      question off of the translation, I just want
0104
1          Foster - Confidential
2      to put that on the record.
3          MS. GILMORE:  Fair enough.  Just to make
4      it clear for the record and the witness, the
5      only thing that has been introduced as
6      Exhibit 4 is the Portuguese.
7          MR. MUSTOKOFF:  Just so we're clear, Mr.
8      Cooper, are you saying the word "minuta"
9      does not mean minutes, rather it means
10      draft?  Is that correct?

11        MR. COOPER:  Correct.
12        MR. MARTINI:  Yes.
13        MR. MUSTOKOFF:  Is that true?
14        MS. LEVI:  Yes.
15        MR. MUSTOKOFF:  Thank you.
16     A.   Okay.
17     Q.   Ms. Foster, do you recognize document
18  Exhibit 4?
19     A.   No.
20     Q.   Would you have received as a member of
21  the executive board in 2011 audit reports?
22        MR. COOPER:  Objection to form.
23     A.   No, because the audit reports go to the
24  heads of the divisions.
25     Q.   By head of divisions, what do you mean?
0105
 1          Foster - Confidential
 2     A.   Head of gas and energy, the head of
 3  exploration and production, downstream officer.
 4     Q.   In 2011 you were the director of gas and
 5  energy?
 6     A.   Yes.
 7     Q.   But you would never see this document
 8  because it didn't relate to the gas and energy
 9  division?
10     A.   Yes.
11     Q.   So as a member of the executive board
12  would you have had access to internal audits,
13  whether they related to a particular division or
14  not?
15        MR. COOPER:  Objection to form.
16     A.   No.
17     Q.   Were you aware in 2011 that the TCU was
18  investigating a contract between Petrobras and
19  Alusa with respect to the RNEST refinery?
20        MR. COOPER:  Objection to form.
21     A.   It was the same matter that we addressed
22  just a little while ago.  Correct?
23     Q.   I believe this is a specific contract
24  with respect to Alusa.
25     A.   Regarding Alusa.  Okay.
0106
 1          Foster - Confidential
 2     Q.   So were you aware in 2011 that the TCU
 3  was investigating a contract between Petrobras and
 4  Alusa?
 5        MR. COOPER:  Objection to form.
 6     A.   No.  No, I don't remember.
 7     Q.   Were you aware in 2011 that internal
 8  audit at Petrobras was looking into the same
 9  contract that the TCU was investigating between
10  Petrobras and Alusa?
11        MR. COOPER:  Objection to form.
12     A.   I did not know.
13     Q.   Were you aware in 2011 that Petrobras'
14  internal audit found that Alusa's profit rate was

15   approximately 70 percent above the market rates?
16        MR. COOPER:  Objection.
17        MR. STRASSBERG:  Objection.
18      A.  No.
19      Q.   Would you have wanted to know as a
20   member of Petrobras' executive board that in 2011
21   Petrobras' internal audit found Alusa's profit rate
22   was approximately 70 percent above the market rates
23   with respect to its contract with Petrobras?
24        MR. COOPER:  Objection to form.
25      A.  Yes.
0107
1          Foster - Confidential
2      Q.  Why would you have wanted to know that
3   fact?
4      A.   Because I would have made or the
5   Petrobras service division would be hiring Alusa or
6   contracting Alusa for a gas and energy project and
7   I could be paying a margin of 40 percent or
8   30 percent or 10 percent.
9      Q.   Do you know who received -- do you know
10   if anybody from the legal department at Petrobras
11   received audit reports, internal audit reports?
12        MR. COOPER:  Just generally?
13        MS. GILMORE:  Yes.
14        MR. COOPER:  Objection to form.
15      A.   I cannot answer that question, but we do
16   have an auditing committee at Petrobras, and this
17   auditing committee is connected to the board of
18   directors and all auditing reports are submitted to
19   this auditing committee, so with that, the board of
20   directors is knowledgeable or is aware of all the
21   work that has been done and the CEO of Petrobras is
22   also a member of the board of directors.  In that
23   way the CEO knows what is going on and he or she
24   can act streaming down in a way that he or she
25   finds appropriate.
0108
1          Foster - Confidential
2      Q.  With respect to this particular contract
3   between Alusa and Petrobras pursuant to which Alusa
4   made a profit of approximately 70 percent above the
5   market rate, do you believe that Petrobras was
6   overpaying on this contract?
7        MR. COOPER:  Objection to form.
8   Foundation.
9      A.  I'm not aware of the details of the
10   contract.  I do not know how it had been
11   calculated, so I cannot say anything about that.
12      Q.   Assume that the internal audit's finding
13   that Petrobras -- that Alusa was making a profit
14   through Petrobras of 70 percent above the market
15   price, assume that the finding by the audit
16   committee of Petrobras is correct, with that
17   assumption, is it your testimony that Petrobras is
18   overpaying Alusa on that contract?

19          MR. STRASSBERG:  Objection.
20          MR. COOPER:  Objection.  When you say is
21     it your testimony, are you referring to some
22     other testimony?
23          MS. GILMORE:  No, I am referring to her
24     testimony now.
25     A.   I'm not sure if I am entitled here to
0109
1               Foster - Confidential
2  say that I do not want to answer questions based on
3  hypotheses.  I don't know if I can do that.  I'm
4  not sure if I can say that I do not want to answer
5  because I do not want to answer questions based on
6  hypotheses.
7          Q.   Do you believe that the finding in the
8  internal report by Petrobras that Alusa was making
9  70 percent above the market value is a hypothesis?
10         MR. COOPER:  Objection.  Misstates what
11     is in this document.
12         A.   No, I do not believe that this report
13  has been worked based on hypothesis.  What I am
14  saying here is that since this was not a matter of
15  the gas and energy division, I do not feel secure
16  or I do not have any foundation to say that the
17  calculation is correct.
18         Q.   You can put that aside.
19             (Foster Exhibit 5, Executive board
20         decision dated October 6, 2011 bearing Bates
21         number PBRCG underscore 00747867, was so
22         marked for identification, as of this date.)
23         A.   Okay.
24         Q.   Ms. Foster, are you familiar with this
25  document?
0110
1               Foster - Confidential
2          A.   No.  This one specifically, no, I don't.
3          Q.   Do you recall approving on or about
4  October 2011 a capital investment of over 1 billion
5  reais for the Abreu e Lima refinery for the month
6  of November and December 2011?
7          A.   I remember that we made various
8  different allocations to the Abreu e Lima refinery,
9  various different ones, but I don't know if that
10  was exactly the one, because they are very similar.
11  Because they follow basically a standard.
12         Q.   Did anybody at Petrobras perform any
13  analysis to understand why Abreu e Lima needed over
14  $1 billion for the month of November and December
15  2011?
16         MR. COOPER:  Objection to form.
17         Q.   Reais.
18         A.   Up until 2011, my answer is I do not
19  know.  As of 2011, from 2011 onwards, there was
20  very strict work in order to have the allocation
21  and where the money would go, in other words, we
22  had to explain what we would do with the money and

23  three months after that if you ask for another
24  allocation, you would have to demonstrate that you
25  physically performed and that the finance aspect
0111
 1          Foster - Confidential
 2  equaled exactly the amount that you requested, and
 3  that allocation was approved by the board of
 4  Petrobras the same way that this one was.
 5          So the allocation request was brought to
 6  the board of Petrobras to make sure that it was
 7  applied, so everything was presented to the
 8  executive board of Petrobras and the executive
 9  board would approve it and what we did with the
10  money.
11          THE INTERPRETER:  When the interpreter
12      said board, she meant executive board
13      throughout the whole answer.
14      A.  I believe the same was done, but outside
15  the executive board.
16      Q.  You can put that away.
17          (Foster Exhibit 6, Document bearing
18      Bates number C 452116 on pages 1 and 2, was
19      so marked for identification, as of this
20      date.)
21      A.  Okay.
22      Q.  Ms. Foster, do you recall receiving this
23  e-mail from Ms. Fonseca?
24      A.  Yes.
25      Q.  Can you tell me what is your
0112
 1          Foster - Confidential
 2  understanding as to why Ms. Fonseca approached you
 3  on October 7, 2011?
 4          MR. STRASSBERG:  Objection.
 5      A.  This question is very vague.  Actually,
 6  I'm sorry, it is very ample or it covers too much.
 7  Very broad.  Because it covers a lot of different
 8  subjects.
 9      Q.  Let's try and go subject by subject.  On
10  the first paragraph, it says "I would like to be
11  there."  I am quoting.  "I would like to be there
12  talking to you looking you straight in the eye to
13  help you feel what he want to say even taking the
14  chance of crying in front of you.  It would not be
15  the first time."
16          When was the first time -- was there a
17  first time that Ms. Fonseca cried in front of you?
18          MR. SIMSHAUSER:  Objection.  Counsel,
19      you said earlier you were only marking the
20      Portuguese version, and yet you are
21      purporting to quote it.
22      Q.  If my quote is not correct, you can
23  correct me.
24      A.  Okay.
25          MR. SIMSHAUSER:  I object to the
0113

```
 1              Foster - Confidential
 2      translation.
 3              MR. COOPER:  We renew our objection.
 4      A.   Okay.  So what is your question?
 5      Q.   When was the first time that Ms. Fonseca
 6  cried in front of you?
 7              MR. COOPER:  Objection to form.
 8      A.   She cried once in front of me.
 9      Q.   Before October 7, 2011?
10      A.   Before.  Before.
11      Q.   Why did she cry?
12              MR. COOPER:  Objection to form.
13      A.   She was very upset regarding something
14  that had happened with one of her employees, and
15  then she cried.
16      Q.   Do you recall what had happened?
17      A.   This young man had issued payments that
18  went above his level of authority.
19      Q.   Do you recall whether this man was Mr.
20  Morais?
21      A.   I don't know.  I know his first name.
22  Geovane.  I'm not sure if it is Morais or not.
23              THE INTERPRETER:  Please replace upset
24      with nervous.
25              MR. MARTINI:  On page 106, line 3.
0114
 1              Foster - Confidential
 2              THE INTERPRETER:  The interpreter would
 3      say upset is better because nervous is when
 4      you are about to go on stage, you are
 5      nervous.
 6      Q.   Ms. Foster, was Ms. Fonseca upset when
 7  she came to see you at that time?
 8      A.   Very much so.  She was nervous with wet
 9  eyes.
10              THE INTERPRETER:  The interpreter will
11      go literal.  She was nervous.  She had wet
12      eyes.
13      Q.   She was crying?
14      A.   Her eyes were wet.
15              MS. LEVI:  Teary eyes.
16      Q.   When was this that Ms. Fonseca
17  approached you and cried?
18      A.   I think it was April 2009.
19      Q.   What did Ms. Fonseca tell you then?
20      A.   She told me that everybody knew.
21  Everyone knew that Geovane had paid a lot of
22  different services much above his level of
23  authority.
24              THE INTERPRETER:  She told me what
25      everybody knew.  So she told me what
0115
 1              Foster - Confidential
 2      everybody already knew.
 3      A.   But still I welcomed her.
 4      Q.   When you say everybody knew, who is
```

5   everybody?
6      A.   Who?  Everybody, my assistants would
7   tell me that even the man who worked on the
8   elevator or the person who served coffee knew.
9      Q.   Did Mr. Gabrielli know?
10        MR. COOPER:  Objection to form.
11      A.   I suppose that he did, but I don't know.
12      Q.   And let's go to the middle of the page
13   here, it says "Today."  Do you see that?  Can you
14   tell me what do you understand Ms. Fonseca is
15   telling you there?
16      A.   "Today, I can say that I am virtually
17   alone in the company and the facts that occurred
18   when I was dismissed from my position and sent to
19   Singapore made people," "made closer people get
20   away from me afraid to suffer retaliation."
21        MR. COOPER:  Let the record, let it be
22      clear she is reading from the document.
23        MS. GILMORE:  She is reading from the
24      Portuguese document.  Yes.
25        THE INTERPRETER:  The interpreter was
0116
1        Foster - Confidential
2      sight-translating the Portuguese document
3      and not reading the English version of the
4      document.
5        MS. GILMORE:  The witness was reading
6      from the Portuguese version of the document.
7        MR. COOPER:  And not stating her
8      understanding, which is what your question
9      was.
10        MS. GILMORE:  Right.
11      A.   What is the question for me?
12      Q.   What is your understanding as to why Ms.
13   Fonseca was removed from her position and sent to
14   Singapore?
15        MR. COOPER:  Objection.
16        MR. STRASSBERG:  Objection.
17      A.   Her boss, Mr. Paulo Roberto Costa, for
18   reasons unknown to me, five and a half years after
19   she was his executive manager, proposed to the
20   executive board to have her go to Singapore to go
21   for an MBA in marketing or management or things of
22   that nature.  It was a Chicago University site.
23   That site was at the University of Chicago.
24      Q.   Do you have an understanding now as to
25   why Mr. Costa wanted Ms. Fonseca to go to
0117
1        Foster - Confidential
2   Singapore?
3        MR. COOPER:  Objection to form.
4      A.   I have no idea whatsoever.  They were
5   very close.  They were very close.  I don't know
6   why.
7      Q.   You can put that away.  Let's go to page
8   2 for a second.  Do you see where it says "I am

 9   evaluating some alternatives"?
10       A.  Yes.
11       Q.  "I would like to show you part of the
12   documents I have.  I know you are aware of part of
13   them."
14           Is that a proper reading of what you see
15   in the Portuguese version?
16       A.  Yes.
17       Q.  Do you know -- did Ms. Fonseca show you
18   part of the documents?
19           MR. COOPER:  Objection to form.
20       A.  She showed part of the document when she
21   came to my office to talk about Geovane.  She
22   provided me with the documents.  That was in 2009,
23   and they were regarding Geovane.  And actually I
24   had access to these documents because these
25   documents were available to the executive board
0118
 1          Foster - Confidential
 2   members, and these additional documents, I had
 3   never seen them.  She had never showed them to me
 4   or left them with me.
 5       Q.  And the documents that Ms. Fonseca did
 6   give you, did they include an interview or a
 7   transcript of interviews that Mr. Morais had given
 8   in connection with an investigation into his
 9   actions around that time?
10           MR. COOPER:  Objection to form.
11       A.  Around that time, you are talking about
12   2009?  I didn't read everything because I believe
13   at that time that the word for his firing had
14   already been given.  I grabbed the documents that
15   she left with my assistant or secretary and I
16   handed them to Paulo Roberto, because I was
17   surprised that there was something wrong between
18   both of them, that they had had a fight or that
19   they had separated.
20       Q.  And when you said before this, you said
21   that everybody knew about what Mr. Morais did.
22   What is your understanding of what Mr. Morais did?
23       A.  He had issued various different
24   payments, the sum of which were a few millions.  I
25   don't know how many millions.  And he could have
0119
 1          Foster - Confidential
 2   never done that.  He had no powers to do that.  He
 3   had done that to pay for services contracted in
 4   very different agencies.
 5       Q.  What is your understanding as to whether
 6   or not Mr. Morais remained at Petrobras after
 7   October 2011?
 8           MR. COOPER:  Objection to form.
 9       Q.  I'm sorry.  After 2009.
10           MR. COOPER:  Objection.
11       A.  As far as I know, he was away on a
12   medical leave.  That was for four years.  And one

13  day in 2013, I don't remember exactly when, the
14  company's security guards told me that he was
15  inside the building, and I requested the legal
16  department and the officer Mr. Cosenza to fire
17  him if he was under medical leave.
18          THE INTERPRETER:  To fire him if he was
19      not under medical leave.  So to have him
20      fired if he was not under medical leave.
21      Q.   And did you discuss the issue with
22  respect to Mr. Morais with Gabrielli at the time?
23          MR. COOPER:  Objection to form.  This
24      e-mail is 2011, but she is also --
25          MS. GILMORE:  At any time.
0120
1           Foster - Confidential
2       A.  In no time at all.
3       Q.  Why not?
4       A.  I don't know.  He didn't contact me to
5   discuss anything.
6           THE INTERPRETER:  The answer is in no
7       time at all.
8       Q.  Did you ever respond to Ms. Fonseca's
9   October 7, 2011 e-mail?
10      A.  No.
11      Q.  Why not?
12      A.  First of all, I virtually reply to no
13  e-mail, especially e-mails of this size.  I don't
14  know how you are going to say that in English, but
15  they are sort of encrypted.  They have little
16  traps, and I didn't reply.  I thought one of
17  these days she is going to show up and talk to me
18  again.
19      Q.  Did you look for Ms. Fonseca to try to
20  speak to her?
21      A.  No.
22      Q.  Why not?
23      A.  Because I thought that after an e-mail
24  such as this one, if she wanted to, she should be
25  the one to come and speak with me.  This was in
0121
1           Foster - Confidential
2   2011, and she had a CEO to discuss with.  She had
3   an executive board member to speak with and she
4   selected me.  I was not even her friend or close
5   to her, so I could not understand this whole
6   story.
7       Q.  Did you consider the issues she
8   approached you with to be important?
9           MR. STRASSBERG:  Objection.
10      A.  I considered that important, but nothing
11  outside the usual pattern of things.  I don't know
12  if that e-mail that she said that there was a
13  weapon pointed at her head.  No, I don't think that
14  is the one.  Because there is another one that she
15  says someone pointed a weapon at her daughter's
16  head.  Actually, no, at her head.

17      Q.  Can you tell me what you know about that
18  e-mail where Ms. Fonseca told you that someone
19  pointed a gun at her head?
20          MR. SIMSHAUSER:  Objection to form.
21      A.  That is all I remember.  That is all I
22  remember.  Maybe someone has that e-mail message
23  here.  I'm not sure.
24      Q.  Did you feel any sympathy for Ms.
25  Fonseca when you received that letter in October
0122
1               Foster - Confidential
2  2011?
3      A.  This one here?
4      Q.  Yes.
5      A.  Certainly.
6      Q.  Why?
7      A.  A person who was sad and anxious.
8      Q.  Did you believe she had a reason to be
9  upset?
10          MR. COOPER:  Objection to form.
11      A.  Can you imagine, you know, in 2011 one
12  of her subordinates had something that was very
13  creative that no one had ever done before.  Myself,
14  if that was done to me, I would have been very
15  nervous and very sad such as she did, and she is an
16  excellent professional in my opinion.
17          Of what I know of Venina, she works very
18  hard, she is very committed.  That is what I know
19  of her.  Sometimes I say that about her and there
20  are individuals who do not agree with me, because
21  she has a lot of difficulty in dealing with people
22  and she ends up losing -- putting everything at a
23  loss.
24      Q.  Let's put that away.  Exhibit 7, please.
25          MR. COOPER:  Can we go off the record
0123
1               Foster - Confidential
2  for one second.
3          THE VIDEOGRAPHER:  The time now is 5:22
4  p.m.  We are off the record.
5          (Recess taken)
6          THE VIDEOGRAPHER:  The time now is 5:35
7  p.m.  We are back on the record.
8  BY MS. GILMORE:
9      Q.  Ms. Foster, are you aware of an SMS
10  contract between Petrobras and Odebrecht entered on
11  or about 2010?
12      A.  Yes.
13      Q.  Can you tell me what you knew in 20 --
14  strike that.  Did you approve the contract, the SMS
15  contract between Petrobras and Odebrecht on or
16  about 2010?
17          MR. COOPER:  Objection to form.
18      A.  The executive board of Petrobras
19  approved the contract.
20      Q.  And at the time you were a member of the

21  executive board?
22      A.  Yes.
23      Q.  Do you recall exactly when the executive
24  board of Petrobras approved the SMS contract
25  between Petrobras and Odebrecht?
0124
1           Foster - Confidential
2      A.  2010.  I believe it was in October.
3      Q.  Did the executive board of Petrobras
4  consider any documents or analysis in connection
5  with their approval in October 2010 of the SMS
6  contract?
7          MR. COOPER:  Objection to form.
8      A.  Yes.
9      Q.  What types of documents or analysis did
10  the executive board consider in connection with
11  their approval of the SMS contract?
12         MR. COOPER:  Objection.
13      A.  I no longer remember the details.  I no
14  longer remember the details.  What I know of this
15  contract that it went back and forth until it was
16  approved a few times.
17      Q.  Do you know the reasons why the contract
18  went back and forth until it was approved?
19      A.  What really calls attention is that
20  there were different aspects compared to what we
21  had done before in the international division.
22  What was different is that there was a company in
23  Brazil with operations overseas that was a
24  requirement of the bid, so that this company had
25  experience in other countries where Petrobras had
0125
1           Foster - Confidential
2  operations and it would be the head of a huge
3  revision of all the sites owned by Petrobras, so
4  wouldn't it be more simple to have each CEO or each
5  executive board member on each of the overseas
6  countries, if it wouldn't be better that they would
7  always hire locally and to try and get the best
8  prices and then Zelada, Officer Zelada, convinced
9  us that it was important to have one person dealing
10  with this issue in Brazil of one company, so
11  providing all the policies of HSE to all the same
12  ones exactly to all the different sites, so we were
13  convinced that this would be a good option, but we
14  established a few restrictions.
15         So, first, the Okinawa refinery in Japan
16  at Nansei Island, that refinery, plus the refinery
17  in Argentina and the refinery in Pasadena here in
18  the U.S., so before they would do the work, they
19  would revert or resort to the executive board to
20  see what could be made or could be done in those
21  refineries.
22         So with this requirement and other few
23  requirements, based on videos that Zelada would
24  show us showing the urgency of doing the physical

25  integration of the refineries, so physical
0126
1               Foster - Confidential
2  integrity.
3               THE INTERPRETER:  I made a mistake.  I
4       misspoke.
5       A.   Physical integrity of the refineries.
6  That is it.
7       Q.   In connection with the board of
8  executives' approval of the SMS contract around
9  October 2010, did the board of executive directors
10  review the contract?
11       A.   I don't understand your question.
12               THE INTERPRETER:  The interpreter asks
13       the witness if it should be repeated in
14       Portuguese or in English and the witness
15       said in English.
16       Q.  You want me to repeat the question?
17       A.  Yes.
18       Q.  Was there a proposed contract with SMS
19  that the board approved?
20               MR. COOPER:  Objection to form.  With
21       SMS?
22               MS. GILMORE:  The SMS contract.
23               MR. COOPER:  You said with SMS.
24       Q.   Was there a proposed contract between
25  Petrobras and Odebrecht on SMS that the board
0127
1               Foster - Confidential
2  approved?
3       A.   It approved this one with these
4  restrictions.
5       Q.   Was there a written contract presented
6  to the board for approval?
7               MR. COOPER:  Objection to form.
8       A.   There was a contract and an approval had
9  been issued after a PowerPoint presentation.  Based
10  on a PowerPoint presentation.  We had a Petrobras
11  internal document, and this presentation would be
12  attached to the internal Petrobras documents
13  requesting the approval.  DIP.
14               THE INTERPRETER:  That is not what the
15       interpreter heard.  The interpreter
16       interpreted what she heard.
17       Q.  Did the board review the terms of the
18  contract before approval?  The terms of the
19  contract between Petrobras and Odebrecht.
20               MR. COOPER:  Objection.  Just in the
21       question you said the board.  Do you mean
22       the executive board?
23               MS. GILMORE:  The executive board.
24       A.   It reviewed based on what the PowerPoint
25  presentation showed and the DIP.
0128
1               Foster - Confidential
2       Q.   And at any point were there

3    irregularities detected in connection with the SMS
4    contract?
5              MR. COOPER:  Objection to form.
6         A.   We had a report.  An auditing report.
7    An audit report.  It was a volunteer auditing,
8    because the auditing department can audit beyond
9    what has been planned.  So when I took up the CEO
10   position, this audit was ongoing, which I didn't
11   know.
12             In October 2012, Gerson, the auditing
13   executive manager, had told me that the report had
14   been completed, and at that time he was discussing
15   with the international division officer for
16   Petrobras because I had been CEO of Petrobras and I
17   had been head of the international division as well
18   and of course earning just one salary for that.
19             So in any event, I told Gerson to
20   complete or to finalize the report completely and
21   to submit it for my reading, and that is what I
22   did.  And I decided to inform the executive board
23   about it due to the non-compliances that were
24   found.
25        Q.   When was the first time that you learned
0129
1              Foster - Confidential
2    of non-compliances in connection with the SMS
3    contract?
4         A.   That is the exact day when Gerson called
5    me saying that he had the report in his hands.  It
6    was 99 ready and if I wanted to read it, and I said
7    no, I don't want to read it.
8         Q.   Why not?
9         A.   Because he was mixing up the two
10   positions, the CEO and the head of the
11   international division.  And I told him you have
12   all the powers to write anything that you want to
13   write and then we will bring it to the executive
14   board, because it was too much power for just one
15   individual.
16        Q.   Can you tell me what the non-compliances
17   were that were identified with respect to the SMS
18   contract?
19             MR. COOPER:  Objection to form.
20        A.   First, it was a contract worth
21   $850 million, but that would only pay for what
22   would in fact be done, and I do not like to work
23   with contracts, open contracts, of this nature.
24             Secondly, because there were double
25   prices, duplicated prices or triplicated prices, to
0130
1              Foster - Confidential
2    perform one service on one site only, there were
3    revisions or reevaluations of the integrity of the
4    structures.  For example, an oil tank.  That is
5    just an example.  The service, let's say specified
6    a floating cap tank.  A tank with a floating cap.

7  And on a site where the tank that was there was a
8  fixed cap tank.
9          So there were many, many irregularities,
10  imperfections, non-conformities or non-compliances.
11  Imperfections.  No irregularities.  Imperfections.
12          MS. GILMORE:  Counsel, can I just tell
13      you again to please wait until the witness
14      answers the whole question before you try
15      and interpose an objection.
16          MR. COOPER:  She did.
17          MS. GILMORE:  No, she was still talking.
18      A.   So I believe that I answered regarding
19  the non-compliances, and I think I answered a bit
20  of what you asked.
21          THE INTERPRETER:  The interpreter is
22      asking the witness as per the attorney's
23      request what she meant by tripled or
24      doubled.
25          MS. GILMORE:  No, I don't think that is
0131
1          Foster - Confidential
2      proper.  I am the one that is asking the
3      questions.  If you have a specific
4      translation problem with a word.
5          MR. MARTINI:  I need a question in
6      Portuguese to clarify the translation.  We
7      were talking about this to clarify, so I
8      just asked the translator to clarify that
9      point.
10          THE INTERPRETER:  May the translator do
11      that?
12      A.   So let's say you only had one telephone
13  on a specific site and on a list you would see the
14  evaluation of that telephone times 3 as if there
15  were three telephones.
16      Q.   Were there --
17      A.   I am just giving you a symbolic example.
18      Q.   Do you have any specific examples of the
19  SMS contract, whether there were duplicate or
20  triple prices?
21          MR. COOPER:  Objection to form.
22      A.   I don't know.
23          MS. GILMORE:  Let's introduce Exhibit 7,
24      please.
25          (Foster Exhibit 7, Document bearing
0132
1          Foster - Confidential
2      Bates numbers PBRCG-P underscore 02297792
3      through PBRCG-P underscore 02297793
4      underscore 00006, was so marked for
5      identification, as of this date.)
6      A.   Okay.
7      Q.   Ms. Foster, do you recall any
8  discussions on or around February 17, 2012 about
9  the tone, changing the tone of the internal audit
10  report on SMS?

11          MR. COOPER:  Objection to form.
12      A.   This is very strange, because I became
13 aware of this report in October 2012.
14      Q.   This February 17, 2012 e-mail refers to
15 a discussion and guidance that you had for Mr.
16 Gerson.  Do you see that?
17          MR. COOPER:  Objection to form.
18      A.   No.  Here it is written the other way
19 around.  It is written as we spoke, so I am
20 submitting suggestions for conversations with
21 Graca.  In other words, the conversations had not
22 occurred yet.  They would occur after your
23 conversation and guidance from Graca to Gerson.  In
24 other words, Zelada would still have to speak with
25 me so that I would discuss with Gerson to change
0133
 1          Foster - Confidential
 2 the report's philosophy.
 3      Q.   And why was there a desire to change the
 4 philosophy of the report?
 5          MR. COOPER:  Objection, foundation.
 6      A.   This friend here, this young man here is
 7 the one who should know that.
 8          THE INTERPRETER:  The interpreter will
 9      correct herself.  Friend -- there is no word
10      friend.  It is actually the last name.
11      A.   This person here Jose Carlos Vilar Amigo
12 would have to speak with Zelada, who was the head
13 of the division, to discuss with me the reason why
14 the report had to be changed.
15      Q.   Were you done with your answer?
16      A.   Yes, I am.
17      Q.   Did you discuss on or about February 17,
18 around that time, whether or not the text of the
19 internal report on SMS should be changed?
20          MR. COOPER:  Objection to form.  Asked
21      and answered.
22      A.   No, I did not discuss with Zelada.  He
23 did not mention anything about this to me, and I
24 was not copied on the e-mail as well.
25      Q.   Did you discuss with anybody at
0134
 1
 2 Petrobras changing the language or the text of the
 3 internal report on SMS?
 4          MR. COOPER:  At what time?
 5      Q.   Around the time of February 2012.
 6      A.   No.  This was four days after I took
 7 office as a CEO and I felt that the world was
 8 falling over me, so this was not a priority.  I
 9 didn't even find out about this.
10      Q.   Do you see the last paragraph that
11 starts with in the text below at the bottom?
12      A.   I am reading it now for the first time.
13      Q.   The first page, do you see the last
14 where it says in the text below which is the word

15  "Open"?  Do you see that?  That makes reference to
16  you suggesting a language to the auditing
17  department?
18       A.   Well, you have to see, if you are
19  looking at the English version there, because these
20  are wordings that we understand that Graca shall
21  suggest to the auditing executive manager are these
22  that are signaled in red.  Never mind.
23       Q.   I guess we don't want that on the
24  record.
25           Do you have any reason to believe that
0135
 1           Foster - Confidential
 2  Mr. Carlos Vilar had no understanding as to the
 3  fact that you would have to suggest language to the
 4  auditing department about the SMS contract?
 5       MR. COOPER:  Objection to form.
 6       A.   I don't understand the question.
 7       Q.   Did you at any point between
 8  February 17, 2012 and October 2012 suggest language
 9  to be used in the internal audit contract for SMS?
10       MR. COOPER:  Objection to form.
11       A.   No.  As a matter of fact, Gerson called
12  me asking me if I wanted to read the report.  I
13  answered no.
14       Q.   Let's go to the page, the second page of
15  the report that ends in Bates number 7793
16  underscore 00002.  I'm sorry, let's go to the first
17  page ending in 7793, the first page of the minutes.
18  The minutes of the audit.
19       MR. COOPER:  This again at the top
20       should be draft, not minutes in English.
21       Q.   Do you see the language in yellow under
22  purpose and then the one after it in red all caps?
23       A.   Yes.  I read it.  What do I do?
24       Q.   Do you know why there were suggestions
25  that the language irregularity be removed and
0136
 1           Foster - Confidential
 2  replaced by another language?
 3       MR. COOPER:  Objection to form.  Where
 4       does it say that?
 5       MS. GILMORE:  The last paragraph in the
 6       text under purpose.
 7       A.   "The purpose of changing the wording"?
 8       Q.   Yes.
 9       A.   I don't know.
10       Q.   Are you surprised to see this?
11       A.   Yes, I am.  This one, yes, I am.
12       Q.   Why?
13       A.   It is incredible.  It is crazy to think
14  that I would make suggestions to Gerson, who is an
15  authority in Brazil and overseas as well, an
16  auditing authority, to change the wording of his
17  own report.
18       Q.   Let's go to the second page of the

19  report.  Under B where it says "Definitions,
20  confirmations together to the contracted party."
21  Do you see that entry?
22          THE INTERPRETER:  Definitions of
23      services?
24          MR. STRASSBERG:  I'm sorry.  Where are
25      you?
0137
1            Foster - Confidential
2      Q.   Page 2 of the report.  Towards the
3  bottom where it says B.  Do you see that?
4      A.   Okay.
5      Q.   Can you tell me, can you read for me in
6  the record what that says under starting with
7  (Portuguese) from Portuguese to English.
8          MR. COOPER:  Wait.  What are you asking?
9          MS. GILMORE:  I am asking her to read
10      for the record what it says in English.
11          MR. COOPER:  You want the witness to
12      read the Portuguese and have it translated
13      into English?
14          MS. GILMORE:  I want her to translate
15      that in English, to the best of your
16      ability.
17          MR. COOPER:  The witness?
18          MS. GILMORE:  Yes.
19          MR. STRASSBERG:  No.  She is not a
20      translator.
21          MS. GILMORE:  Are you instructing her
22      not to do it?
23          MR. STRASSBERG:  That is not what she is
24      here for.
25          MS. GILMORE:  Okay, but I am asking her
0138
1            Foster - Confidential
2      to do it if she can do it.  She speaks
3      English.
4          MR. STRASSBERG:  That is improper.
5          MS. GILMORE:  Why don't you do that.
6      Why don't you translate what that says.
7          THE INTERPRETER:  Should the interpreter
8      just translate what the whole paragraph
9      says?
10          MS. GILMORE:  Yes, in English.
11          MR. STRASSBERG:  So I am clear, there is
12      no question.  You are just asking her to
13      read it in Portuguese?
14          MS. GILMORE:  Yes.
15          MR. STRASSBERG:  We object to that.
16          MR. MUSTOKOFF:  What is the basis of the
17      objection?
18          MR. STRASSBERG:  Because that is not the
19      purpose of a deposition.  A deposition is to
20      ask questions.  The documents are the
21      documents.  So that is an improper question.
22      We are not going to direct her not to answer

23     because I don't think it rises to that
24     level, but it is improper use of the time of
25     the deposition.
0139
1       Foster - Confidential
2      MS. GILMORE:  It is my deposition.
3      MR. MUSTOKOFF:  To the extent the
4     defendants have objected throughout the day
5     about documents not being provided in
6     English, in all accounts to have the witness
7     read something in Portuguese and have the
8     interpreter translate would probably be to
9     everybody's benefit.  Go ahead.
10      MS. GILMORE:  Go ahead.
11      THE INTERPRETER:  "Performing the
12     bidding process was inefficient because the
13     bidding committee recommended to contract
14     services under the allegation that you would
15     be with a total price that was appropriate
16     and an advantage since it is only 5.28
17     percent above Petrobras' budgeting, although
18     the unit price list and the layout of the
19     then bidding party did not only present
20     costs" -- "did not only present inputs and
21     costs that are not coherent, but are also
22     inappropriate and excessive, and also due to
23     a considerable difference between the unit
24     prices proposed and the ones budgeted by
25     Petrobras which were accepted without any
0140
1       Foster - Confidential
2     questioning whatsoever.  Under these
3     circumstances, the bidding process should
4     have been halted."
5      MR. COOPER:  We object to the
6     translation.  It is not certified.
7      MS. GILMORE:  You have made your
8     objection many times.
9    Q.   Ms. Foster, do you have any
10  understanding why Petrobras wanted the language
11  removed from the internal audit report on SMS?
12      MR. COOPER:  Objection to form.
13    A.   It was not Petrobras who wanted the
14  language of the report changed.  It was Mr. Amigo
15  who was suggesting this to Mr. Zelada.  It is not
16  Petrobras, Graca or a board member, executive board
17  member.  This Jose Amigo not for this reason
18  because I was not aware of this, I fired him to
19  another planet for different reasons, for other
20  reasons actually, for other reasons.
21    Q.   I'm sorry.  You said you fired Mr.
22  Vilar?
23    A.   When Zelada left the company, right
24  after, I fired Mr. Amigo as well.
25    Q.   Just to be clear, who did you fire?
0141

1       Foster - Confidential
2       A.   Zelada did not want to work with me at
3   all.
4       Q.   And you said you also fired Mr. --
5           MR. COOPER:  Objection to form.  She
6       didn't say also.
7       A.   The first one.  This Jose Carlos Vilar
8   Amigo.
9       Q.   Why did you fire Mr. Amigo?
10      A.   Because he could do things of this
11  nature.  Not this one exactly, but other things
12  similar to this one.
13      Q.   Can you tell me what other things
14  similar to this one Mr. Amigo did?
15      A.   He was this project's manager and his
16  management was terrible.  That is the reason why he
17  left.
18          MR. STRASSBERG:  So we are around 6:25.
19      It may be a good time to break.
20          MS. GILMORE:  I am just going to finish
21      with this document and then we can break.
22          MR. STRASSBERG:  Okay.
23      Q.   Do you know that the language that we
24  just looked at was actually removed from the final
25  report?  Did not appear in it?
0142
1       Foster - Confidential
2           MR. COOPER:  Objection to form.
3       A.   I do not have the report from the top of
4   my head as I sit here, but if it were up to me to
5   speak with Gerson, I did not speak, so the real
6   final wording must be there.
7       Q.   What do you mean by that?
8       A.   That no one changed the language to what
9   Gerson wanted to write.
10      Q.   And what did Mr. Gerson want to write?
11          MR. COOPER:  Objection to form.
12          MR. STRASSBERG:  Objection.
13      A.   No.  As far as I understood, that this
14  gentleman Jose Carlos Amigo wanted Gerson to change
15  the language in a way that Jose Carlos wanted it to
16  be.
17      Q.   To your understanding, who was ultimate
18  decision maker as to what language goes in the
19  audit report on SMS?
20          MR. COOPER:  Objection to form.
21      A.   Gerson, because Gerson is not connected
22  to the CEO.  He is linked to the board of directors
23  of the company.  What he wanted me to do was to
24  influence Gerson according to what is written here,
25  but he never said that to me.
0143
1       Foster - Confidential
2       Q.   And what was Mr. Gerson's position at
3   the time?
4       A.   He was the auditor.

5      Q.   Was he the head of the audit team at
6  Petrobras?
7      A.   Not head, but he was auditing executive
8  manager, which is one position below head of
9  auditing, and like all auditors, they are linked to
10  the board of directors.  That is why he created
11  this document without asking for permission to
12  President Gabrielli or Zelada, because he was not
13  required to do so.
14      Q.   How do you know --
15          MR. MARTINI:  Apologies.
16          THE INTERPRETER:  Okay.  So the
17       interpreter will stand corrected, not head
18       of auditing but head of division.
19      Q.   Just one more question.  Do you know
20  whether Mr. President Gabrielli at the time was
21  aware of efforts by Mr. Amigo to change the
22  language of the audit report?
23          MR. COOPER:  Objection.  Foundation.
24      A.   On February 17 of 2012 I was already a
25  CEO.  The CEO.  Okay?  Gabrielli was already in
0144
1          Foster - Confidential
2  Bahia.
3          MS. GILMORE:  Okay.  Thank you very
4       much.
5          THE VIDEOGRAPHER:  The time now is 6:29
6       p.m.  We are off the record.
7          (Time noted:  6:29 p.m.)
8                _____
9
10  Subscribed and sworn to
11  before me this____day of_____, 2016.
12  _____
13
14
15
16
17
18
19
20
21
22
23
24
25
0145
1
2          C E R T I F I C A T I O N
3
4          I, Joseph R. Danyo, a Shorthand
5  Reporter and Notary Public, within and for the
6  State of New York, do hereby certify:
7          That I reported the proceedings in the
8  within entitled matter, and that the within

 9  transcript is a true record of such proceedings.
10          I further certify that I am not related,
11  by blood or marriage, to any of the parties in this
12  matter and that I am in no way interested in the
13  outcome of this matter.
14          IN WITNESS WHEREOF, I have hereunto
15  set my hand this 29th day of April, 2016.
16
17
18
19                    JOSEPH R. DANYO
20
21
22
23
24
25
0146
 1
 2                    I N D E X
 3  Witness                              Page
 4  MARIA DAS GRAÇAS SILVA FOSTER              6
 5
 6                    E X H I B I T S
 7  Foster                               Page
 8     Exhibit 1  Federal Senate request      79
 9     Exhibit 2  Document bearing Bates numbers   92
               PBRCG-P underscore 01928893
10             through 01928895
11     Exhibit 3  Document bearing Bates numbers   99
               PBRCG underscore 00345110
12             through 00345112
13     Exhibit 4  Document bearing Bates numbers   103
               PBRCG underscore 00349569
14             through 00349582
15     Exhibit 5  Executive board decision dated   109
               October 6, 2011 bearing Bates
16             number PBRCG underscore
               00747867
17
       Exhibit 6  Document bearing Bates number   111
18             C 452116 on pages 1 and 2
19     Exhibit 7  Document bearing Bates numbers   131
               PBRCG-P underscore 02297792
20             through PBRCG-P underscore
               02297793 underscore 00006
21
22                    ~oOo~
23
24
25
0147
 1     APRIL 28, 2016 - MARIA DAS GRAÇAS SILVA FOSTER
 2         I wish to make the following changes for
 3  The following reasons:
 4  PAGE   LINE

5   ____  ____   CHANGE:_____
6   REASON:_____
7   ____  ____   CHANGE:_____
8   REASON:_____
9   ____  ____   CHANGE:_____
10  REASON:_____
11  ____  ____   CHANGE:_____
12  REASON:_____
13  _____   CHANGE:_____
14  REASON:_____
15  ____  ____   CHANGE:_____
16  REASON:_____
17  ____  ____   CHANGE:_____
18  REASON:_____
19  ____  ____   CHANGE:_____
20  REASON:_____
21  ____  ____   CHANGE:_____
22  REASON:_____
23  ____  ____   CHANGE:_____
24  REASON:_____
25  Hudson Reporting & Video, Inc.     1-800-310-1769