# TAB A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PETROBRAS SECURITIES LITIGATION

This Document Applies To:

*In re Petrobras Securities Litigation*, No. 14-cv-9662 (JSR)

*Washington State Investment Board v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-03923 (JSR)

No. 14-cv-9662 (JSR)

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

## MEMORANDUM OF LAW OF PRICEWATERHOUSECOOPERS AUDITORES INDEPENDENTES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Dated:  New York, New York
       June 27, 2016

KING & SPALDING LLP

James J. Capra, Jr.
Israel Dahan
Paul A. Straus
Lauren W. Mitchell
1185 Avenue of the Americas
New York, NY 10036-4003
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

Michael R. Pauzé (admitted *pro hac vice*)
Kenneth Y. Turnbull (admitted *pro hac vice*)
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4707
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737

*Attorneys for Defendant*
*PricewaterhouseCoopers Auditores*
*Independentes*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL BACKGROUND ............................................................................... 2

       LEGAL STANDARD ................................................................ 4

ARGUMENT ..................................................................................................... 4

    I.     The Section 11 Claim Fails as a Matter of Law Because PwC
          Brazil's Audit Opinions Did Not Contain a *Factual* Misstatement
          or Omission Under *Omnicare* ..................................................... 4

    II.    Plaintiffs Seek Section 11 Damages That Are Not Recoverable as
          a Matter of Law ................................................................... 10

        A.    PwC Brazil's negative causation defense is ripe for
             summary judgment. ................................................... 10

        B.    Plaintiffs cannot recover damages for any depreciation in
             the value of the Petrobras Notes that predates the first
             alleged corrective disclosure ..................................... 11

        C.    Plaintiffs cannot recover damages for any depreciation in
             the value of the Petrobras Notes that postdates the filing of
             the first Complaint in this matter. ............................. 12

        D.    None of the statistically significant price declines in the
             Petrobras Notes between November 14, 2014 and
             December 8, 2014 are the result of an alleged corrective
             disclosure implicating PwC Brazil. ................................... 14

            1.    November 14, 2014 is not a corrective disclosure
                 date ................................................................. 15

            2.    November 17, 2014 is not a corrective disclosure
                 date ................................................................. 20

             3.    December 1, 2014 is not a corrective disclosure
                 date ................................................................. 21

             4.    December 15, 2014 is not a corrective disclosure
                 date ................................................................. 22

CONCLUSION ................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akerman v. Oryx Commc'ns, Inc.*,
    810 F.2d 336, 340, 342 (2d Cir. 1987) .................................................... 10-11, 15

*Alaska Laborers Employers Ret. Fund v. Scholastic Corp.*,
    2011 WL 3427208, at *3 & n.2 (S.D.N.Y. Aug. 3, 2011) ............................... 17-18

*Alpern v. UtiliCorp United, Inc.*,
    84 F.3d 1525, 1543-44 (8th Cir. 1996) ......................................................... 13-14

*Bartesch v. Cook*,
    941 F. Supp. 2d 501, 510, 512 (D. Del. 2013)............................................................9

*Beecher v. Able*,
    435 F. Supp. 397, 401-02, 407 (S.D.N.Y. 1975) .............................................. 12-14

*Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*,
    2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010)....................................................11

*Brown v. Ambow Educ. Holding Ltd.*,
    2014 WL 523166, at *7, *14-16 (C.D. Cal. Feb. 6, 2014) ..............................16, 21

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 322-23 (1986) ..................................................................................4

*Chandok v. Klessig*,
    632 F.3d 803, 812 (2d Cir. 2011)............................................................................4

*D'Amico v. City of N.Y.*,
    132 F.3d 145, 149 (2d Cir. 1998)............................................................................4

*Dempsey v. Vieau*,
    130 F. Supp. 3d 809, 818 (S.D.N.Y. 2015)..............................................................9

*Dobina v. Weatherford Int'l*,
    909 F. Supp. 2d 228, 245 (S.D.N.Y. 2012)..............................................................9

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105, 111, 113 (2d Cir. 2011) ...................................................................9

*Genger v. Genger*,
    76 F. Supp. 3d 488, 493 n.8 (S.D.N.Y. 2015)..........................................................4

*Greenberg v. Crossroads Sys., Inc.*,
  364 F.3d 657, 659-63 (5th Cir. 2004) ............................................................. 20-21

*Greenidge v. Allstate Ins. Co.*,
  446 F.3d 356, 361 (2d Cir. 2006) ......................................................................... 8

*In re AFC Enters., Inc. Sec. Litig.*,
  348 F. Supp. 2d 1363, 1379 (N.D. Ga. 2004) .............................................. 13-14

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
  2010 WL 6397500, at *27-28 (S.D. Fla. Aug. 18, 2010) ............................. 19, 21

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
  665 F. Supp. 2d 404, 419 (S.D.N.Y. 2009) ................................................. 11, 17

*In re DVI, Inc. Sec. Litig.*,
  2010 WL 3522090, at *24 (E.D. Pa. Sept. 3, 2010) ..................................... 15-16

*In re Fannie Mae 2008 Sec. Litig.*,
  742 F. Supp. 2d 382, 409 (S.D.N.Y. 2010) ......................................................... 9

*In re Hansen Nat. Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) ............................................. 16, 18

*In re IMAX Sec. Litig.*,
  272 F.R.D. 138, 154–55 (S.D.N.Y. 2010) .................................................... 17, 21

*In re Lehman Bros. Sec. & ERISA Litig.*,
  2015 WL 5514692, at *5 n.44 (S.D.N.Y. Sept. 18, 2015) ..................................... 7

*In re Manulife Fin. Corp. Sec. Litig.*,
  276 F.R.D. 87, 104 (S.D.N.Y. 2011) ............................................................ 19, 21

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
  639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009) .................................................. 18

*In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*,
  543 F.3d 150, 168 (3d Cir. 2008) ................................................................. 20-21

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003) ........................................................ 11

*In re Moody's Corp. Sec. Litig.*,
  2013 WL 4516788, at *11 (S.D.N.Y. Aug. 23, 2013) ................................... 11, 19

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480, 487-88 (S.D.N.Y. 2011) ......................................................... 18

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501, 513-14 (2d Cir. 2010) .................................................................11

*In re OSG Sec. Litig.*,
   2015 WL 3466094, at *1-4 (S.D.N.Y. May 29, 2015) ...............................4, 11, 15, 17, 21, 23

*In re Puda Coal Sec. Inc. Litig.*,
   30 F. Supp. 3d 230, 236-40, 243, 258-59 (S.D.N.Y. 2014).................................................. 5-6

*Janbay v. Canadian Solar, Inc.*,
   2012 WL 1080306, at *15, 16 (S.D.N.Y. Mar. 30, 2012) ..................................... 11, 15-17, 21

*Johns-Davila v. City of N.Y.*,
   2000 WL 1725418, at *7 (S.D.N.Y. Nov. 20, 2000).............................................................8

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
   65 F.3d 1044, 1048 (2d Cir. 1995)......................................................................................11

*Meyer v. Greene*,
   710 F.3d 1189, 1200 (11th Cir. 2013) .................................................................................18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pen. Fund*,
   135 S. Ct. 1318, 1325-29, 1332 (2015) ......................................................... *passim*

*Pierce v. Morris*,
   2006 WL 2370343, at *4 (N.D. Tex. Aug. 16, 2006) ..........................................................14

*Querub v. Moore Stephens Hong Kong*,
   _ F. App'x _, 2016 WL 2942415, at *3 (2d Cir. May 20, 2016)
   (Summary Order) .................................................................................... *passim*

*Rosenfield v. Integrated Container Serv. Indus. Corp.*,
   50 F.R.D. 237, 239 (S.D.N.Y. 1970) ..................................................................................12

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
   _ F. App'x _, 2016 WL 1392280, at *2 (2d Cir. Apr. 8, 2016)
   (Summary Order) ....................................................................................... 7-8

*United States v. Martoma*,
   993 F. Supp. 2d 452, 457 (S.D.N.Y. 2014)................................................................... 20-21

**Statutes**

Section 11 of the Securities Act, 15 U.S.C. § 77k ................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 56.....................................................................................................1, 4

PricewaterhouseCoopers Auditores Independentes ("PwC Brazil") moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56, on the claims by Class Plaintiffs (Count III of the Consolidated Fourth Amended Class Action Complaint ("Compl.")) and Washington State Investment Board ("WSIB") (Count VIII of WSIB's Third Amended Complaint) (collectively, "Plaintiffs") under Section 11 of the 1933 Securities Act, 15 U.S.C. § 77k.  These are the sole pending claims against PwC Brazil in these actions.

## PRELIMINARY STATEMENT

PwC Brazil moves for summary judgment on two independent grounds.  ***First***, the Court should find that Plaintiffs' Section 11 claim against PwC Brazil fails as a matter of law because there is no evidence that PwC Brazil's audit opinions at issue contained a material misstatement or omission of *fact*.  Since the Court's ruling denying PwC Brazil's motion to dismiss the Section 11 claim,[1] the Second Circuit Court of Appeals has confirmed that audit opinions "are statements of opinion subject to the *Omnicare* standard for Section 11 claims," and, therefore, has affirmed dismissal of such claims on summary judgment when there was "no evidence that [the auditor] did not believe its 'clean audit opinions'" or "omitted material facts about the basis for its audit reports."  *Querub v. Moore Stephens Hong Kong*, _ F. App'x _, 2016 WL 2942415, at *3 (2d Cir. May 20, 2016) (Summary Order).  Here, too, there is no evidence that PwC Brazil did not believe its 2012 or 2013 audit opinions or omitted material facts about the basis for its audit reports.  Accordingly, the Court should enter summary judgment for PwC Brazil on Plaintiffs' Section 11 claim.

---

[1] The Court also granted PwC Brazil's motion to dismiss Plaintiffs' Section 10(b) claim because the more plausible inference from Plaintiffs' allegations was that PwC Brazil "took appropriate action upon learning evidence of fraud directly linked with Petrobras itself."  Feb. 19, 2016 Order at 6.  After fact discovery, the Court rejected Plaintiffs' request to add back the Section 10(b) claim, including because the "documents offered by plaintiffs do not appear to meaningfully call into question th[is] 'nonculpable explanation.'"  May 5, 2016 Order at 6.

***Second***, the Court should enter summary judgment for PwC Brazil because Plaintiffs have not sustained legally cognizable Section 11 damages.  It is well-settled that Plaintiffs are not entitled to recover losses that occurred before the first alleged disclosure of the fraud or after the first complaint in the matter was filed.  Nor may Plaintiffs recover for losses that occurred between these dates that were not caused by the disclosure of any material misstatements or omissions by PwC Brazil.  Here, as set forth below and in the Declaration of PwC Brazil's damages expert, Tsvetan N. Beloreshki, the evidence shows that Plaintiffs seek to recover from PwC Brazil for losses that predate the first alleged curative disclosure, postdate the first complaint's filing, and that are unconnected to the revelation of alleged material misstatements by PwC Brazil.  Plaintiffs cannot recover from PwC Brazil as a matter of law.

## FACTUAL BACKGROUND

Beginning in 2004, a cartel of outside companies colluded to overcharge Petróleo Brasileiro S.A. — Petrobras ("Petrobras" or "the Company") on contracts relating to its property, plant and equipment ("PP&E") assets, with help from a small number of Petrobras employees. ¶ 2.[2]  The cartel used a portion of the contract proceeds to pay a 3% kickback to politicians, parties, and those Petrobras employees ("Improper Payments").  ¶ 3.  This scheme ended no later than April 2012, when the last of four corrupt Petrobras employees left the Company.  ¶ 10.

About the same time this scheme ended, Petrobras hired PwC Brazil as its independent auditor.  ¶ 11.  Almost a year later, in February 2013, PwC Brazil issued its first audit opinion on Petrobras' financial statements and internal control over financial reporting as of year-end 2012.  PwC Brazil issued its second audit opinion, as of year-end 2013, in February 2014.  ¶¶ 12-13.

---

[2] Unless otherwise noted, all citations are to PwC Brazil's Rule 56.1 Statement of Facts, cited as "¶ _."  Documents referred to in the Statement of Facts are attached to the accompanying Declaration of James J. Capra, Jr. and referred to as "Capra Ex. _" or "Ex. _."

The contracts between Petrobras and the cartel companies, almost all of which predated PwC Brazil's engagement, had been awarded through the Company's bidding process and approved and signed by Company personnel for goods and services delivered.  ¶¶ 4-5.  Petrobras recorded its PP&E assets based on the costs it actually paid under these contracts; as a result, there was no discrepancy between the amounts paid and amounts recorded, which were consistent with supporting documentation, such as invoices.  ¶¶ 6, 22.  The Company's accounting records did not identify the amounts by which the cartel companies may have overcharged Petrobras or the amounts of the Improper Payments the cartel companies made from contract proceeds.  ¶¶ 7-8.

In late 2014, after PwC Brazil's 2012 and 2013 audits, Brazilian federal law enforcement authorities began unraveling the scheme, not through examining Petrobras' records, but through the fortuitous arrest of a former Petrobras director (Paulo Roberto Costa), followed by the use of prosecutorial tools, such as plea-bargains, that no independent auditor has.  ¶¶ 24-26.  After Costa's testimony was released in October 2014, PwC Brazil recommended that Petrobras hire outside law firms to investigate the allegations and refused to issue a review report on Petrobras' interim financial statements without further assessment.  ¶¶ 27-28.  About five months later— and after consulting with Brazilian federal law enforcement authorities, the Brazilian securities regulator, and the SEC's Office of Chief Accountant—Petrobras published its third quarter financial statements with a review report by PwC Brazil and its 2014 financial statements with an audit opinion by PwC Brazil.  ¶¶ 29, 36.  Because the amounts of the Improper Payments were not identified in its accounting records, the Company used an estimate, based on the testimony of cooperating defendants secured through plea agreements, to write off these

payments.  ¶¶ 30-33.  The write-off was $2.53 billion, about 1% of the total PP&E assets reported in the prior year.  ¶ 33.[3]

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  It suffices to negate a single element of the claim, *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011), and a court may award summary judgment on negative causation grounds.  *In re OSG Sec. Litig.*, 2015 WL 3466094, at *1 (S.D.N.Y. May 29, 2015) (outside auditor).  The non-moving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" supporting its factual assertions.  *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998); *see also Genger v. Genger*, 76 F. Supp. 3d 488, 493 n.8 (S.D.N.Y. 2015) (expert's *ipse dixit* insufficient).

## ARGUMENT

**I.      The Section 11 Claim Fails as a Matter of Law Because PwC Brazil's Audit Opinions Did Not Contain a *Factual* Misstatement or Omission Under *Omnicare*.**

Plaintiffs allege that PwC Brazil's 2012 and 2013 audit opinions were misstatements because they "falsely certified that Petrobras' financial statements were prepared in accordance with International Financial Reporting Standards and falsely represented that [PwC Brazil] conducted its audits or reviews in accordance with PCAOB standards."  Compl. ¶ 652; WSIB Compl. ¶ 520.

---

[3] PwC Brazil strongly disagrees with Plaintiffs' assertion that alleged cartel inflation—as distinct from Improper Payments that the cartel companies made from the contract proceeds—should not have been initially recorded as PP&E and therefore should also have been written off, a distinction Petrobras discussed with the SEC's Office of Chief Accountant.  For purposes of this motion, however, PwC Brazil assumes that Petrobras overstated its PP&E assets in excess of the Company's immaterial write-off.  PwC Brazil will contest this point at trial should the claim against PwC Brazil proceed.

PwC Brazil previously moved to dismiss the Section 11 claim for failure to plead a *factual* misstatement under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 135 S. Ct. 1318 (2015).  Noting that an auditor's "opinion" is a term of art that "may not be entirely synonymous with the more everyday use of the word discussed in *Omnicare*," this Court assumed *Omnicare* applied to PwC Brazil's audit opinions.  Feb. 19, 2016 Order at 9.  The Court held, however, that PwC Brazil's opinions contained "'embedded statements of fact,'" namely, the audited financial statements, and that Plaintiffs' allegations of errors in those financial statements sufficed to survive a motion to dismiss.  *Id.*  Since that ruling, the Second Circuit has confirmed that *Omnicare does* apply to audit opinions and has affirmed summary judgment in favor of an auditor even when the audited financial statements contained an admitted material error (which is *not* the case here, *see supra* note 3).  This case bears close examination because the Second Circuit's reasoning compels the same result here.

In *Puda Coal*, a Chinese holding company reported that it owned a 90% interest in a subsidiary; in fact, the two brothers who controlled the holding company had transferred the ownership interest in that subsidiary to themselves (and then pledged a portion of it to a state-owned fund).  *In re Puda Coal Sec. Inc. Litig.*, 30 F. Supp. 3d 230, 237-38 (S.D.N.Y. 2014), *aff'd sub nom. Querub v. Moore Stephens Hong Kong*, _ F. App'x _, 2016 WL 2942415 (2d Cir. May 20, 2016) (Summary Order).  After a short-seller discovered and publicized this transfer, the auditor resigned and withdrew its opinions on the company's financial statements.  30 F. Supp. 3d at 238-39, 243.  As the District Court described it, the accounting error was "fundamental" because "all aspects of the financial position of the company would have been entirely misstated, because the operations on which it was based were long gone."  *Id.* at 236.  Investors brought claims under Section 10(b) of the Exchange Act and under Section 11.

On summary judgment, there was evidence that the company's audited financial statements contained a material error, indeed, a misstatement of *fact*: "Puda no longer owned Shanxi Coal, and yet claimed it did." *Id.* at 258. There was also evidence that the auditor had relied on an outdated business license as well as unsigned legal letters for the purpose of confirming the company's holdings. *Id.* at 259. But there was "no evidence . . . that the Auditors ***knew*** that the Zhao brothers had transferred Shanxi Coal to themselves"—only that the auditors had "failed to figure this fundamental fact out." *Id.* (emphasis added). The District Court held that, "[i]n the absence of a triable issue as to subjective falsity, both the Section 11 and 10 claims against the Auditors must be dismissed." *Id.* at 260.[4]

On appeal, the Second Circuit held that "[a]udit reports, labeled 'opinions' and involving considerable subjective judgment, are statements of ***opinion*** subject to the *Omnicare* standard for Section 11 claims." *Querub*, 2016 WL 2942415, at \*3 (emphasis added). Accordingly, the Second Circuit affirmed summary judgment in favor of the auditor because there was "no evidence that [the auditor] did not believe its 'clean audit opinions' . . . [or] omitted material facts about the basis for its audit reports." *Id.* Respectfully, this recent decision by the Second Circuit compels a different analysis than this Court undertook on PwC Brazil's motion to dismiss. If a material error in the audited financial statements sufficed as evidence that the auditor had made a *factual* misstatement under *Omnicare*, then the Second Circuit would have reversed the District Court based on the admitted "fundamental" error in Puda Coal's financial

---

[4] The District Court also dismissed the Section 10 claim based on the lack of admissible evidence of the auditor's recklessness because plaintiffs' auditing expert was unqualified. *In re Puda Coal*, 30 F. Supp. 3d at 257-59. That is no basis for distinguishing this case because the District Court's holding on the Section 11 claim was not based on the lack of expert testimony, but instead on the lack of evidence that the auditor "knew" of the subsidiary's transfer. *Id.* at 259.

statements.  It did not.  Instead, the Second Circuit affirmed summary judgment in the auditor's favor.  The same result is warranted here.

*First*, there is no evidence in this case that PwC Brazil did not believe its 2012 or 2013 audit opinions—much less that it knew that a cartel of 27 companies had illegally colluded to overcharge Petrobras on contracts.  That is unsurprising because the scheme ended long before PwC Brazil's first audit opinion, the corrupt employees left before or at the outset of PwC Brazil's engagement (when the predecessor auditor issued its last opinion), and those corrupt employees were not responsible for preparing Petrobras' consolidated financial statements.  ¶¶ 9-10.  Moreover, Petrobras' accounting records did not identify the amounts by which the cartel companies may have overcharged Petrobras or the amounts of the Improper Payments the cartel companies made from contract proceeds.  ¶¶ 7-8.  On the contrary, the amounts Petrobras recorded for its PP&E assets were consistent with the supporting documentation (such as contracts and invoices) of the amounts Petrobras actually paid in connection with those assets. ¶¶ 6, 22.  As in *Querub*, there is no evidence that PwC Brazil knew when it issued its audit opinions that a 27-company cartel had colluded to overcharge Petrobras or had used a portion of contract proceeds to make $2.5 billion in Improper Payments.

*Second*, PwC Brazil did not supply any untrue "supporting *fact*" as a basis for its audit opinions.  *Omnicare*, 135 S. Ct. at 1327 (emphasis added); *Querub*, 2016 WL 2942415, at *3. The bases for PwC Brazil's opinions—that it had conducted audits in accordance with PCAOB auditing standards—is a matter of *opinion*, not fact.  *See In re Lehman Bros. Sec. & ERISA Litig.*, 2015 WL 5514692, at *5 n.44 (S.D.N.Y. Sept. 18, 2015) ("[A]n auditor's statement that the auditor conducted an audit in conformity with [audit standards] cannot properly be characterized as a statement of fact . . . ."); *see also Special Situations Fund III QP, L.P. v.*

*Deloitte Touche Tohmatsu CPA, Ltd.*, _ F. App'x _, 2016 WL 1392280, at *3 (2d Cir. Apr. 8, 2016) (Summary Order) (affirming dismissal of Section 18 claim because, absent adequate allegations that auditor "lacked a subjective belief in its opinions," those opinions were not actionable misstatements or omissions under *Omnicare*).

*Third*, Plaintiffs do not allege any omissions by PwC Brazil, which alone should preclude Plaintiffs from attempting to raise a triable omission claim.  *See* Compl. ¶ 652; WSIB Compl. ¶ 520 (alleging only misstatements).[5]  In any event, an omission claim would fail for lack of evidence.  As the Supreme Court held, "to avoid exposure for omissions under § 11, [a speaker] need only divulge an opinion's basis, or else make clear the real tentativeness of its belief." *Omnicare*, 135 S. Ct. at 1332.  It is undisputed that PwC Brazil *did* disclose the basis for its opinions on Petrobras' financial statements and internal controls over financial reporting, as discussed above.  ¶¶ 12-13.

The only dispute is whether its audits complied with PCAOB standards—which, as noted, is a matter of *opinion*, not fact.  Indeed, the criticisms of Plaintiffs' auditing expert, Harris Devor, reinforce this point.  Mr. Devor does not appear to claim that an appropriate audit would have identified the existence of a cartel that had colluded to overcharge Petrobras.  *See* Capra Ex. 23 (H. Devor June 22, 2016 Tr. 199:13-21); Rebuttal Statement of Harris L. Devor, June 17, 2016 ¶ 9 ("My Initial Statement does *not* focus on the auditors' obligation to detect fraud . . . .").  Instead, Mr. Devor asserts that PwC Brazil could have identified alleged overstatements of PP&E by performing a different kind of impairment analysis, based on grouping Petrobras'

---

[5] *See, e.g.*, *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach the merits of an argument raised for the first time in opposition to summary judgment); *Johns-Davila v. City of N.Y.*, 2000 WL 1725418, at *7 (S.D.N.Y. Nov. 20, 2000) ("[B]ecause plaintiff Davila's complaint—prepared by counsel—only alleges that her fibromyalgia condition limits her ability to exercise . . . and does not allege an inability to work, she cannot rely on an alleged inability to work in opposition to summary judgment.").

refining assets into different cash-generating units as of 2012 and 2013.[6]  But as Mr. Devor admitted at deposition, an impairment analysis is based upon "*estimates*" that involve "*uncertainty*," and the identification of an asset's cash-generating unit involves "*judgment*."  ¶ 37 (emphases added); *see also* ¶¶ 17-21 (international accounting standards recognize that impairments are estimates and that classification of cash-generating units involves "judgement").

In this regard, the impairment analysis on which Plaintiffs focus is *not* a "fact-based estimate" (Feb. 19, 2016 Order at 11), but similar to other financial statement assertions that courts in the Second Circuit have recognized as *opinions*.  *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111, 113 (2d Cir. 2011) (goodwill estimates and loan loss reserves); *Dempsey v. Vieau*, 130 F. Supp. 3d 809, 818 (S.D.N.Y. 2015) (other-than-temporary impairments of investments); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 409 (S.D.N.Y. 2010) (valuation allowances for deferred tax assets); *see also Bartesch v. Cook*, 941 F. Supp. 2d 501, 510, 512 (D. Del. 2013) (allegations that company should have recorded an impairment loss on its long-lived assets failed to "establish falsity" because such impairments are a matter of "opinion") (citing *Fait*, 655 F.3d at 110).[7]

In sum, even if one considers the Company's financial statements "embedded" in PwC Brazil's audit reports for purpose of the *Omnicare* analysis (contrary to *Querub*), and even if one allows Plaintiffs to proceed on an unpleaded omissions claim, PwC Brazil is entitled to summary

---

[6]  *See* Rebuttal Statement of Harris L. Devor, June 17, 2016, ¶ 32 ("[I]f the Company had properly performed impairment analyses on at least RNEST and Comperj (as well as other sites where it was apparent that carrying values exceeded fair values) during the years 2012 and 2013, it would have been forced to acknowledge that the PP&E at such sites was impaired.")).

[7]  Mr. Devor's opinion that Petrobras had a material weakness in its internal control over financial reporting as of 2012 and 2013 based on its failure to perform its impairment analysis using his preferred classification of cash-generating units involves multiple matters of opinion.  *See Dobina v. Weatherford Int'l*, 909 F. Supp. 2d 228, 245 (S.D.N.Y. 2012) (recognizing that auditor's opinion on internal controls involves "a certain amount of subjectivity").

judgment.  A difference of opinion regarding the audit of a judgmental estimate is not evidence that PwC Brazil made a *factual* omission.

For all these reasons, the Court should grant summary judgment to PwC Brazil on the Section 11 claim.  Any other result would render PwC Brazil a guarantor of Petrobras' financial statements.  That would be inconsistent with the Second Circuit's holding that audit reports are "statements of opinion," *Querub*, 2016 WL 2942415, at *3, and inconsistent with the Supreme Court's teaching that "[r]easonable investors do not understand [opinion] statements as guarantees." *Omnicare*, 135 S. Ct. at 1328.

## II.    Plaintiffs Seek Section 11 Damages That Are Not Recoverable as a Matter of Law.

Plaintiffs are not entitled to recover damages from PwC Brazil for any depreciation in the value of the twelve series of 2013 and 2014 Petrobras notes (the "Petrobras Notes" or "Notes") that predate the first alleged curative disclosure or that postdate the filing of the first complaint in this matter.  Plaintiffs also may not recover from PwC Brazil for any decrease in value that occurred within that window, because that decrease was not caused by disclosures of a materially false or misleading statement or omission in PwC Brazil's audit opinions or in the Company's audited 2012 and 2013 financial statements.

### A.    PwC Brazil's negative causation defense is ripe for summary judgment.

Section 11 provides that even where a material misstatement or omission is found, damages are not recoverable if a defendant proves "that the depreciation in value resulted from factors other than the material misstatement[.]"  *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 340 (2d Cir. 1987) (citing 15 U.S.C. § 77k(e)).  In other words, "'[i]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from [the] part of the registration statement . . . [that contains the material misstatement or omission], such portion of or all such damages *shall not be recoverable*.'"

10

*McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1048 (2d Cir. 1995) (quoting 15 U.S.C. § 77k(e)) (emphasis in original).  This is known as negative causation.

While negative causation is an affirmative defense, "the difference between an affirmative defense and an element of liability (and the corresponding difference in burden of proof) is immaterial, [if] plaintiffs cannot point to *any evidence* that demonstrates loss causation."  *In re OSG*, 2015 WL 3466094, at *1 (granting summary judgment in favor of auditor) (emphasis in original).  Courts routinely grant summary judgment and even motions to dismiss on the basis of negative causation.  *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513-14 (2d Cir. 2010) (affirming grant of summary judgment); *In re OSG*, 2015 WL 3466094, at *2 (summary judgment appropriate when "plaintiffs cannot show loss causation in connection with [an outside auditor's] actions"); *In re Moody's Corp. Sec. Litig.*, 2013 WL 4516788, at *11 (S.D.N.Y. Aug. 23, 2013) (granting summary judgment); *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) (granting motion to dismiss); *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 419 (S.D.N.Y. 2009) (same).

**B.     Plaintiffs cannot recover damages for any depreciation in the value of the Petrobras Notes that predates the first alleged corrective disclosure.**

Courts in this Circuit have repeatedly held that, on Section 11 claims, "price decline[s] before disclosure may not be charged to defendants."  *Akerman*, 810 F.2d at 342 (affirming grant of summary judgment).  *See also Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010) (granting motion to dismiss Section 11 claim on negative causation grounds); *In re Britannia*, 665 F. Supp. 2d at 419 (same); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003) (granting motion to dismiss Section 11 claim where majority of losses occurred prior to first alleged

disclosure); *Beecher v. Able*, 435 F. Supp. 397, 407 (S.D.N.Y. 1975) (price declines before misstatements revealed not attributable to defendants).

Plaintiffs concede that November 14, 2014 was the first date on which potentially corrective information caused a statistically significant decrease in the price of the Petrobras Notes.  ¶ 47.  This is consistent with the unrebutted evidence presented by PwC Brazil:  at no point prior to November 14 was there both (1) a statistically significant negative price movement of any of the Petrobras Notes and (2) an alleged corrective disclosure relating to PwC Brazil's audit opinions.  ¶ 48.  Accordingly, any price declines, statistically significant or otherwise, in the Petrobras Notes before this date are not recoverable against PwC Brazil as a matter of law.

### C.    Plaintiffs cannot recover damages for any depreciation in the value of the Petrobras Notes that postdates the filing of the first Complaint in this matter.

Section 11 expressly caps damages recoverable by plaintiffs that still hold the relevant securities at the time suit is filed at "the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought."  15 U.S.C. § 77k(e)(1).  *See also Beecher*, 435 F. Supp. at 401; *Rosenfield v. Integrated Container Serv. Indus. Corp.*, 50 F.R.D. 237, 239 (S.D.N.Y. 1970) (confirming limitations on Section 11 damages for plaintiffs who hold stock past date of suit).[8] Plaintiffs embrace this formula in calculating their alleged Section 11 damages.  ¶¶ 49-50.

The first complaint in this action was filed on December 8, 2014.  ¶ 39.  This complaint drew on the same set of operative facts as did the first complaint asserting a Section 11 claim, which was filed on December 24, 2014.   ¶¶ 39-41.   This Court has previously noted these

---

[8] If, after the filing of suit, Plaintiffs sell their Petrobras Notes for a price higher than the Notes' price at the time of filing, damages will be, at most, the difference between the purchase price of the Notes (not exceeding the price at which the Notes were offered to the public) and the post-filing sale price.  15 U.S.C. § 77k(e)(3).

similarities, stating that the December 8 and December 24 Complaints "assert[] substantially similar claims," and ultimately holding that Plaintiffs' Section 11 claim relates back to the December 8 Complaint for statute of limitation purposes, even though the December 8 Complaint did not assert a Section 11 claim.  ¶¶ 42, 43.  Moreover, Plaintiffs have previously conceded that the Class Action Complaint relates back to the "first-filed complaint."  ¶ 44.

Other courts have confirmed that the date the *first* complaint is filed is the relevant date for purposes of calculating Section 11 damages.  *E.g.*, *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1543 (8th Cir. 1996).  This is true even if that first complaint does not assert a Section 11 claim.  *Id.*  In *Alpern*, the Eighth Circuit held that the filing date must be the date on which plaintiffs' first complaint was filed, even though plaintiffs only asserted a Section 11 claim in a later-filed complaint.  *Id.* at 1544.  The court reasoned that "Alpern's § 11 claim . . . was based on the same transactions, occurrences, and conduct alleged in the original complaint" and thus related back to the original filing.  *Id.* at 1543.  *Accord In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1379 (N.D. Ga. 2004) (adopting Eighth Circuit's relation-back holding).

The *Alpern* court cautioned that holding otherwise would allow plaintiffs to "damage shop" by filing a skeletal complaint and adding claims if the defendant's share price dropped.  84 F.3d at 1542-44 (citing *Beecher*, 435 F. Supp. at 402).  Likewise, in *Beecher*, a consolidated class action, the court held that "the most logical date for [Section 11 damages] purposes is . . . the date on which the first . . . action was filed."  435 F. Supp. at 402.  This holding was animated by prudential concerns:  the court noted that "[i]n future cases the prospect of selection of the filing day of the first suit may well reduce date-shopping subsequent to the first filing and so far as possible limit the multiplicity of identical suits.  Further, the certainty of the date of the first suit may shorten future damage trials, since evidence of value can be limited to one

13

particular day." *Id.  Accord Pierce v. Morris*, 2006 WL 2370343, at *4 (N.D. Tex. Aug. 16, 2006) (adopting relation-back principle because otherwise plaintiff may "delay filing Securities-Act claims until stock prices fall," thus "giving the plaintiff two bites at the apple and rendering the defendant a sitting duck").

Based on this Court's prior ruling in this case, Plaintiffs' prior admissions, and relevant case law, December 8 is the relevant filing date for calculating Section 11 damages. *Alpern*, 84 F.3d at 1543; *In re AFC*, 348 F. Supp. 2d at 1379; *Beecher*, 435 F. Supp. at 402.  Thus, for Plaintiffs that did not sell their Petrobras Notes before December 8, damages must be capped at the difference between their purchase price (not to exceed the price at which the Petrobras Notes were offered to the public) and the value of the Petrobras Notes on December 8.  15 U.S.C. § 77k(e)(1).  Accordingly, summary judgment precluding Section 11 damages against PwC Brazil for depreciation in the value of the Petrobras Notes after December 8, 2014 is appropriate.

> **D.** **None of the statistically significant price declines in the Petrobras Notes between November 14, 2014 and December 8, 2014 are the result of an alleged corrective disclosure implicating PwC Brazil.**

Between November 14, 2014 and December 8, 2014, Class Plaintiffs allege three corrective disclosure dates on which one or more Petrobras Notes experienced statistically significant price declines:  November 14, November 17, and December 1.  ¶ 47(a).  WSIB only claims that November 14 and 17 are corrective in this time period.  ¶ 47(b).  Extending the time period to December 24, 2014 (the relevant filing date according to Plaintiffs) yields only one additional alleged corrective disclosure date:  December 15. ¶ 47(c).[9]

---

[9] With respect to WSIB, these dates are extrapolated from WSIB's Section 10(b) claim.  WSIB did not separately allege corrective disclosure dates applicable to its Section 11 claim, and did not address PwC Brazil's date-by-date negative causation analysis in its expert rebuttal report.

But Plaintiffs cannot recover damages if PwC Brazil proves "that the depreciation in value [during such dates] resulted from factors other than the material misstatement[.]" *Akerman*, 810 F.2d at 340 (citing 15 U.S.C. § 77k(e)).  Summary judgment must be granted "[if] plaintiffs cannot point to *any evidence* that demonstrates loss causation."  *In re OSG*, 2015 WL 3466094, at *1 (granting summary judgment in favor of auditor) (emphasis in the original).  The evidence shows that none of the disclosures on the above dates purported to correct the materially false or misleading statements that Plaintiffs attribute to PwC Brazil's audit opinions or to the Company's 2012 and 2013 financial statements.  Plaintiffs are therefore not entitled to recover from PwC Brazil for any losses on these dates.

### 1.    November 14, 2014 is not a corrective disclosure date.

Plaintiffs allege that there were three corrective disclosures on November 14, 2014:  (1) Petrobras' announcement that it would delay issuing its third quarter 2014 financial statements; (2) arrests of several individuals who were at one point tied to Petrobras and the issuance of additional arrest warrants; and (3) a downgrade of Petrobras stock by Bank of America Merrill Lynch.  ¶¶ 52-53, 58, 60.  None of these disclosures revealed any material misstatements or omissions in PwC Brazil's audit opinions or Petrobras' 2012 or 2013 financial statements.  ¶ 51. And none of these disclosures are corrective as a matter of law.

The first category of alleged corrective disclosure, a delay in issuing financial statements, cannot be considered corrective.  Such announcements do not purport to disclose misstatements in financial statements, and they are therefore not corrective.  *Janbay*, 2012 WL 1080306, at *15 ("The announcement of a delay in the reporting of CSI's 1Q 2010 financials does not establish loss causation because it fails to reveal the truth that CSI had engaged in sham sales, secret consignments, or any wrongdoing asserted in the Complaint.") (granting motion to dismiss); *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *24 (E.D. Pa. Sept. 3, 2010) ("[T]he fact that DVI

received a notice of default for its failure to timely file its quarterly 10–Q with the SEC may indicate future financial troubles, but it does not reveal the truth underlying Defendants' misrepresentations in DVI's financial statements.") (granting summary judgment in part).[10]  This is no less true where the delay is caused by an investigation into allegations of fraud.  *See, e.g.*, *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (granting motion to dismiss where allegedly curative press release announced that issuer would delay filing its 10–Q due to special committee investigation into alleged options backdating).

Here, as in *Janbay* and *DVI*, the announced delay may have signaled financial uncertainty going forward, but it did not reveal or correct any prior material misstatement allegedly attributed to PwC Brazil or otherwise.   Plaintiffs can point to no evidence linking the announcement of delay with the disclosure of any fraud in  the financial statements.  ¶¶ 52, 55-56.  On the contrary, the evidence shows that the price declines in Petrobras Notes on this date were the result of "the potential of a covenant default should the Company be unable to file its third quarter 2014 financial results by the end of 2014."   ¶ 64.  Bloomberg aptly summarized investor concerns, noting that Petrobras "may breach covenants on at least $11 billion of bonds should the state-turn oil producer fail to release the [third quarter financial statements] by the end of the year."  ¶ 57. And, in fact, Plaintiffs that sold their securities shortly after the announced delay confirmed that they sold due to technical default fears.  ¶¶ 63-65.

---

[10]  *Accord Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *7, *14-16 (C.D. Cal. Feb. 6, 2014) ("Neither [Ambow's filing a notice of its late filing with the SEC nor its press release announcing that it was delaying filing with the SEC], however, revealed to the market any misrepresentations in Ambow's SEC filings concerning the three categories of alleged misstatements that Plaintiffs rely on in the SCAC. . . .  So while these announcements may have had a negative effect on Ambow stock, they did not have a corrective effect on any prior misrepresentation included in the three categories of misstatements . . . .") (granting motion to dismiss on negative causation grounds).

Plaintiffs try to contort Petrobras' announcement of delay into a corrective disclosure by claiming that "*if* Mr. Costa's testimony on corruption at Petrobras was accurate, it *could* impact the financial statements." ¶ 54 (emphasis added). But nothing in Petrobras' announcement or any of the news surrounding it suggests adjustments to the *prior* financials—the only reporting period mentioned is the third quarter of 2014. ¶ 55. Both law and logic dictate that a statement about current financial statements does not reveal misstatements in prior financials. *In re OSG*, 2015 WL 3466094, at *3 ("There can be no dispute that disclosures about specific time periods are not disclosures about earlier time periods.") (granting summary judgment); *Janbay*, 2012 WL 1080306, at *16 (press release referring to the fourth quarter of 2009 does not reveal anything to the market about the third quarter of 2009); *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 154–55 (S.D.N.Y. 2010) (disclosures made in 2005 and 2006 filings not corrective of 2004 filings); *In re Britannia*, 665 F. Supp. 2d at 419 (granting motion to dismiss because a later-filed 6-K "did not 'reveal to the market the falsity' of the Offering Documents").

The court's decision in *Alaska Laborers Employers Retirement Fund v. Scholastic Corp.*, 2011 WL 3427208 (S.D.N.Y. Aug. 3, 2011), is on point. Plaintiffs in *Alaska* alleged that defendant's 10–K and 10–Qs contained material misrepresentations regarding the status of the company's Continuities business. *Id.* at *3 n.2. According to plaintiffs, these misstatements were corrected through, among other things, a press release "announcing [defendant's] financial results for the fiscal second quarter of 2006 . . . [and] stating that: (1) '[t]he impact of . . . challenges in . . . Continuities . . . were all factors contributing to lower profits in the second quarter[.]'" *Id.* at *3. The court rejected plaintiffs' theory, noting that such statements

> cannot, as a matter of law, constitute a corrective disclosure because those statements did not convey any information that reveals the falsity of earlier statements made by Defendants. [The] statements disclosed the existence of problems in the Continuities

> business during the second quarter, but made no representation
> regarding the status of the Continuities business at an earlier time
> when most of the alleged misstatements were made by Defendants.

*Id.*  The court denied plaintiffs' motion for leave to amend following its dismissal for failure to

state a claim.  *Id.*

Here, Plaintiffs do not even *allege* that the announcement of delay corrected any material

misstatements in Petrobras' 2012 and 2013 financials.  ¶ 58.  Absent any such allegation,

Plaintiffs cannot dispute that "[n]owhere in Petrobras' announcements did the Company state

that it had concluded that its previously issued financial statements or PwC Brazil's audit

opinions for the 2013 and 2013 financial statements were materially false or misleading."  ¶ 57.

The second category of alleged corrective disclosure, reports of arrests, do not reveal

material misstatements in Petrobras' 2012 and 2013 financial statements, much less PwC

Brazil's audit opinions.  An announcement disclosing an investigation, without more, cannot be

corrective of the prior misstatements plaintiffs attribute to Petrobras' 2012 and 2013 financial

statements, or PwC Brazil's audit opinions regarding these statements.  *See, e.g.*, *In re Moody's

Corp. Sec. Litig.*, 274 F.R.D. 480, 487-88 (S.D.N.Y. 2011) ("The fact that Congress was going to

examine the rating agencies' conflicts does not amount to a revelation of the alleged fraud . . . .

There was no revelation of new information . . . . Thus, it cannot serve as a corrective

disclosure.") (denying class certification in part on loss causation grounds).[11]

---

[11] *Accord Meyer v. Greene*, 710 F.3d 1189, 1200 (11th Cir. 2013) ("[T]he commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure . . . .  The announcement of an investigation reveals just that—an investigation—and nothing more.") (affirming dismissal); *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009) (investigations not corrective because they "do not themselves indicate anything more than a 'risk' or 'potential' [of fraud]") (granting motion to dismiss in part); *In re Hansen*, 527 F. Supp. 2d at 1162 (delay in filing 10–Q due to special committee investigation into alleged fraud not corrective because "the mere existence of [an] investigation cannot support any inferences of wrongdoing or fraudulent scienter") (granting motion to dismiss).

The third category of alleged corrective disclosure, the downgrade of Petrobras stock by Bank of America Merrill Lynch, was not corrective.  The announcement did not downgrade Petrobras debt.  ¶ 60(b).  Nor did it purport to disclose any false statements in Petrobras' financial statements.  ¶ 60(c).  But in any case, negative analyst reports and downgrades are not corrective of fraud as a matter of law.  *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 104 (S.D.N.Y. 2011) ("Manulife's downgrade by Fitch Ratings does not qualify as . . . a corrective disclosure because the Amended Complaint does not allege that any new material information was revealed by the downgrade.") (granting motion to dismiss); *In re Moody's*, 2013 WL 4516788, at *11 (analyst's downgrade did not reveal new information about allegedly concealed conflicts of interest) (granting summary judgment).  Such reports rely on previously disclosed public information, and do not themselves transmit new disclosures.  As one court explained:

> [T]he public discussion of information that is already available to the market cannot constitute such a revelation. Even when the subsequent "disclosure" provides further analysis or constitutes a negative characterization of previously disclosed information, it cannot constitute a revelation of the concealed risk to support a finding of loss causation if it does not reveal information previously unavailable to the public.
>
> While the ratings change surely amounted to a negative assessment of the news, the downgrade was merely an analysis or negative characterization of already public information. As such, this information does not amount to either a corrective disclosure or the materialization of a risk that was not previously disclosed, and it cannot support a finding of loss causation as a result.

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 WL 6397500, at *27-28 (S.D. Fla. Aug. 18, 2010) (granting summary judgment).  Merrill Lynch did not rely on nonpublic or previously unavailable information.  ¶ 60(a).  Thus, the downgrade is at most a "negative characterization of previously disclosed information."  *In re BankAtlantic*, 2010 WL 6397500, at *27.

Accordingly, none of the disclosures relied on by Plaintiffs—the announcements of delay in the issuance of Petrobras' third quarter financials, the arrests made and warrants issued by the Brazilian government, and the downgrade by Merrill Lynch—can be considered corrective disclosures as a matter of law.

### 2. November 17, 2014 is not a corrective disclosure date.

On November 17, 2014, Plaintiffs allege that two of the 12 Petrobras Notes showed a statistically significant decline. ¶ 65. The fact that only two of the twelve Notes reacted this way (and ten did not) is itself strong evidence that investors did not consider any of the information disclosed on November 17 to be material. ¶ 66. *See In re Merck & Co., Inc. Sec. Derivative & ERISA Litig.*, 543 F.3d 150, 168 (3d Cir. 2008) (lack of significant price movement is evidence that disclosure was immaterial); *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 659-63 (5th Cir. 2004) (same); *United States v. Martoma*, 993 F. Supp. 2d 452, 457 (S.D.N.Y. 2014) (same).

In any event, none of the Petrobras-related news on this date revealed any material misstatements or omissions in Petrobras' 2012 or 2013 financial statements or PwC Brazil's audit opinions with respect to those statements. ¶ 67. The news revolved around a Petrobras conference call elaborating on the Company's previously announced delay in issuing its third-quarter financials. ¶ 68. The questions on the conference call make clear that the market was concerned with the third quarter 2014 financials:

> The first question goes to [CFO] Barbassa, perhaps you could help us understand, what kind of accounting adjustments could be necessary, if indeed the accusations of surcharge – overcharge are confirmed, I don't want to discuss whether they've happened or not this was not up to us, however we need to understand how this can possibly impact the *financial statements of the company in the third quarter or the fourth quarter.*

*Id.* (emphasis added).  The information disclosed during the conference call does not reveal any material misstatements Plaintiffs attribute to the 2012 and 2013 financial statements.[12]

Moreover, Plaintiffs concede that the stock price dropped at least in part because Petrobras "acknowledged the existence of cross-default clauses in bond agreements, which could accelerate defaults," ¶ 68(a), and not because of any revelations of fraud.  This is consistent with other evidence that investors were worried solely about the possibility that any delay (no matter the reason) would result in a technical default.  ¶ 68(a-b).

Finally, Plaintiffs cannot be allowed to claim as corrective disclosures securities analysts' "overwhelmingly negative" reactions to the conference call or analysts' subsequent warnings "that losses in the corruption investigation would lower Petrobras' credit quality." ¶ 68(c).  An analyst's reaction to information previously disclosed on a conference call is, on its face, a characterization of existing information, and not a new disclosure.  *In re BankAtlantic*, 2010 WL 6397500, at *27-28; *see also In re Manulife*, 276 F.R.D. at 104.

### 3.    December 1, 2014 is not a corrective disclosure date.

Plaintiffs claim that on December 1, two of twelve Petrobras Notes experienced statistically significant declines following news detailing the expansion of the Lava Jato investigation.   ¶ 69.   Even if true, the claim that only two of twelve Notes experienced a statistically significant decline is strong evidence that investors did not consider any of the day's information to be material.  ¶ 70.  *See In re Merck*, 543 F.3d at 168; *Greenberg*, 364 F.3d at 659-63; *Martoma*, 993 F. Supp. 2d at 457.  In fact, WSIB does not claim December 1 as a corrective

---

[12]  *See also Janbay*, 2012 WL 1080306, at *15-16 (no loss causation when the alleged disclosures do not relate to "any wrongdoing asserted in the Complaint"); *Ambow*, 2014 WL 523166, at *7 (no loss causation when "[n]either [of the allegedly corrective announcements] revealed to the market any misrepresentations in Ambow's SEC filings concerning the three categories of alleged misstatements that Plaintiffs rely on"); *see generally In re OSG*, 2015 WL 3466094, at *3; *In re IMAX*, 272 F.R.D. at 154–55.

disclosure date.  ¶ 47(b).  Moreover, none of the news on December 1 revealed any material misstatements in Petrobras' 2012 or 2013 financial statements or PwC Brazil's audit opinions with respect to those financial statements.  ¶ 71.

The news regarding Petrobras on December 1 and the preceding weekend days was that: (1) a Brazilian judge stated that contractors (not Petrobras) had produced false documents to the court; (2) prosecutors would "soon" bring charges against former Petrobras executives; (3) there was evidence that the treasurer of the Brazil Workers' Party—not a Petrobras executive—had benefitted from Petrobras-related corruption; (4) a former Petrobras manager who had *previously* been reported to have taken bribes was consulted on Petrobras' decision to join a World Economic Forum anti-corruption initiative in 2005, and (5) an article speculating that if overpayments were shown, Petrobras could have greater tax liability.  ¶¶ 72-77.

None of these come close to being corrective of any material misstatements Plaintiffs attribute to PwC Brazil.  First, the market was already aware of the Brazilian government's wide-ranging investigation into a corruption scheme among third-party contractors, and that certain executives within Petrobras were alleged to have benefitted from this scheme.  ¶ 78.  Second, whatever "new" information the market may have found in these details regarding the already-reported investigation, this news revealed nothing about alleged material misstatements in Petrobras' prior audited financial statements or PwC Brazil's audit opinions with respect to these financial statements.  ¶ 71.  And third, as discussed above, news regarding an investigation, without more, cannot be considered corrective as a matter of law.  *See* Section II(D)(1), *supra*.

## 4.    December 15, 2014 is not a corrective disclosure date.

As shown in Section II(B), Plaintiffs cannot recover damages against PwC Brazil for price declines that occurred after December 8, 2014, the date the first action was filed, since for purposes of calculating Section 11 damages, any price decline after that filing date is irrelevant.

Nevertheless, even if the Court were to conclude that the appropriate filing date is December 24, none of the price declines up to this date were caused by a corrective disclosure relating to Petrobras' 2012 or 2013 financial statements or PwC Brazil's audit opinions with respect to those financial statements.

None of the three types of Petrobras-related disclosures that were made on December 15, 2014 relate to PwC Brazil's 2012 and 2013 audit opinions, ¶ 85, and none can be considered corrective as a matter of law. These claimed disclosures include: (1) Petrobras' failure to release unaudited third-quarter 2014 financial statements; (2) analyst commentary following this delay, including that "[a]nalysts *inferred* that this development meant that the corruption was of a greater magnitude than previously identified"; and (3) an additional indictment in the Lava Jato investigation. ¶¶ 79-84 (emphasis added).

Petrobras' further delay in releasing its financial statements precipitated liquidity concerns, which most likely caused price declines in the Petrobras Notes on this date. ¶ 86. As previously discussed, however, delays in releasing financial statements are not corrective of fraud. *See* Section II(D)(1), *supra*. The same is true of announcements of investigations. *Id.* Likewise, analyst commentary, which relies on previously available public information and does not reveal anything new, cannot be considered a corrective disclosure. *Id.* And even if the further delay in releasing the financial statements led analysts to "infer" that the magnitude of the corruption was greater than previously thought, these analyst inferences did not reveal prior material misstatements in the 2012 and 2013 financial statements. "[F]ederal appellate courts are in agreement that loss caused solely by a general impression in the market that something is wrong is insufficient to establish causation." *In re OSG*, 2015 WL 3466094, at *4 (granting summary judgment) (internal quotations and citations omitted).

In sum, the evidence shows that none of the statistically significant price declines between November 14, 2014 and the filing of Plaintiffs' complaint were caused by a disclosure correcting an alleged material misstatement or omission by PwC Brazil.  The Court should grant summary judgment and dismiss Plaintiffs' claims to the extent they seek such damages.

## **CONCLUSION**

For all the foregoing reasons, the Court should grant summary judgment in favor of PwC Brazil on Count III of Class Plaintiffs' Consolidated Fourth Amended Class Action Complaint and Count VIII of WSIB's Third Amended Complaint, and enter judgment for PwC Brazil.


Dated: New York, New York
           June 27, 2016

                          Respectfully submitted,

                          KING & SPALDING LLP


                          By:    /s/ James J. Capra, Jr.
                                 James J. Capra, Jr.
                                 Israel Dahan
                                 Paul A. Straus
                                 Lauren W. Mitchell
                                 1185 Avenue of the Americas
                                 New York, NY 10036-4003
                                 Telephone:  (212) 556-2100
                                 Facsimile:  (212) 556-2222

                                 Michael R. Pauzé (admitted *pro hac vice*)
                                 Kenneth Y. Turnbull (admitted *pro hac vice*)
                                 1700 Pennsylvania Avenue, NW
                                 Washington, DC 20006-4707
                                 Telephone:  (202) 737-0500
                                 Facsimile:  (202) 626-3737

                                 *Attorneys for Defendant*
                                 *PricewaterhouseCoopers Auditores*
                                 *Independentes*

**TAB B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE PETROBRAS SECURITIES LITIGATION

This Document Applies To:

*In re Petrobras Securities Litigation*, No. 14-cv-9662 (JSR)

*Washington State Investment Board v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-03923 (JSR)

No. 14-cv-9662 (JSR)

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**RULE 56.1 STATEMENT OF PRICEWATERHOUSECOOPERS
AUDITORES INDEPENDENTES IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

In accordance with Rule 56.1 of this Court's Local and Civil Rules, Defendant PricewaterhouseCoopers Auditores Independentes ("PwC Brazil") submits the following statement of material facts as to which there is no genuine issue to be tried.[1]   Documents referenced in this Statement are attached to the accompanying Declaration of James J. Capra, Jr. in Support of PwC Brazil's Motion for Summary Judgment and referred to as "Capra Ex. _" or "Ex. _."

**I.      Background on Petrobras and the Payment Scheme**

1.      Petroléo Brasilerio S.A. – Petrobras ("Petrobras" or the "Company") was incorporated in Brazil in 1953 to produce and refine crude oil and natural gas on behalf of the Brazilian government.  Capra Ex. 1 (Petrobras 2014 Form 20-F at 32).

2.      A cartel of outside companies colluded to overcharge Petrobras on contracts relating to its property, plant and equipment ("PP&E") assets, with help from certain Petrobras

---

[1]  PwC Brazil reserves the right to supplement this statement as appropriate during further briefing on the Motion.

employees.  Consolidated Fourth Am. Class Action Complaint ("Compl.") ¶¶ 5, 54-58, 82; Capra Ex. 1 (Petrobras 2014 Form 20-F at F-10).  Petrobras has reported that, based on testimony from the Lava Jato criminal investigation that started to become available in October 2014, the scheme (the "Payment Scheme") began in 2004.  Ex. 1 (Petrobras 2014 Form 20-F at F-10).

3.     The cartel of outside companies used a portion of the contract proceeds to pay a kickback, typically 3% of the contract's total value, to political parties, politicians, and certain Petrobras employees ("Improper Payments").  Compl. ¶¶ 5, 55-58, 86-87, 113; *see also* Capra Ex. 1 (Petrobras 2014 Form 20-F at F-14).

4.     These contracts were awarded through the Company's bidding process, which included a Petrobras bidding committee and approval of bids by Petrobras' executive board. Capra Ex. 2 (M. Das Gracas Foster Apr. 28, 2016 Tr. 73:17-74:23).  Petrobras generally would accept bids within a range of -15% to +20% of its internal estimate of what a project would cost. Ex. 2 (M. Das Gracas Foster Apr. 28, 2016 Tr. 75:11-14); *see also* Ex. 3 (G. Goncalves Feb. 19, 2016 Tr. 28:2-30:14).

5.     These contracts were approved and signed by Company personnel for services and goods that were delivered.  Capra Ex. 4 (M. Panassol Apr. 19, 2016 Tr. 249:22-250:23).

6.     The amounts that Petrobras recorded for its PP&E assets were consistent with the supporting documentation (such as contracts and invoices) of the amounts that Petrobras actually paid in connection with those assets.  Capra Ex. 4 (M. Panassol Apr. 19, 2016 Tr. 249:22-250:23).

2

7.     Petrobras' accounting records do not identify the amounts by which Petrobras may have been overcharged as a result of the cartel's activity.  Capra Ex. 4 (M. Panassol Apr. 19, 2016 Tr. 252:3-14; 299:8-20).

8.     Petrobras' accounting records do not identify the amounts of the Improper Payments that cartel companies made from proceeds of the contracts.  Capra Ex. 1 (Petrobras 2014 Form 20-F at F-10, F-14); Ex. 5 (P. Alves Apr. 8, 2016 Tr. 73:24-75:14); Ex. 4 (M. Panassol Apr. 19, 2016 Tr.   229:2-13); Ex. 6 (Termo de Colaboração nº 2 [Cooperation Agreement No. 2], Declarações que presta Paulo Roberto Costa [Declaration of Paulo Roberto Costa] (Aug. 30, 2014) (with English translation)).

9.     The Petrobras officers who assisted the cartel in the Payment Scheme, such as Paulo Roberto Costa and Renato de Souza Duque, were not responsible for preparing Petrobras' consolidated financial statements.  Compl. ¶¶ 8, 33, 35, 54, 92.

10.     Petrobras has reported that, based on testimony from the Lava Jato criminal investigation, the Payment Scheme ended no later than April 2012, when certain officers (including Costa and Duque) left the Company.  Capra Ex. 1 (Petrobras 2014 Form 20-F at F-10); Ex. 7 (M. Jorge Da Silva Mar. 10, 2016 Tr. 69:21-70:18); Ex. 8 (R. Alves Apr. 22, 2016 Dep. Ex. 19 (Petrobras March 2015 SEC Presentation at 9)); Compl. ¶¶ 33, 35.

II.     **PwC Brazil's Engagement as Independent Auditor**

11.     In January 2012 Petrobras management engaged PwC Brazil as its independent auditor.  Compl. ¶ 49.

12.     PwC Brazil provided audit opinions on the Company's financial statements, and on the effectiveness of its internal control over financial reporting, as of 2012 and 2013.  Those opinions were dated, respectively, February 4, 2013 and February 25, 2014.  Compl. ¶ 183;

3

Capra Ex. 9 (2012 audit opinion); Ex. 10 (2013 audit opinion). PwC Brazil's audit opinions were included, respectively, in Petrobras' 2012 Form 20-F, filed April 26, 2013 (Ex. 11 [excerpts]) and its 2013 Form 20-F, filed April 30, 2014 (Ex. 12 [excerpts]).

13.     PwC Brazil's 2012 audit opinion was incorporated into the 2013 Form 424(b)(2) Prospectus Supplement of Petrobras' August 29, 2012 Registration Statement. Capra Ex. 13 (May 15, 2013 Prosp. Supp. at S-62 and 2012 Form 20-F Ex. 15.1). PwC Brazil's 2013 audit opinion was incorporated into the 2014 Form 424(b)(2) Prospectus Supplement. Ex. 14 (Mar. 11, 2014 Prosp. Supp. at S-87 and 2013 Form 6-K/A Ex. A).

### III.     Petrobras' Accounting for Property, Plant & Equipment and Impairment

14.     In its 2012 and 2013 financial statements, Petrobras reported that it used International Financial Reporting Standards as issued by the International Accounting Standards Board as the basis for its accounting. Capra Ex. 11 (Petrobras 2012 Form 20-F at F-12); Ex. 12 (2013 Form 20-F at F-11).

15.     Under that basis of accounting, International Accounting Standard 16 (*Property, Plant and Equipment*) ("IAS 16") applied to Petrobras' accounting for its PP&E assets. Compl. ¶ 160.

16.     Under IAS 16, a company capitalizes its PP&E at the "cost" of an asset, which includes its "purchase price," other costs relating to bringing the asset into operation, and an initial estimate of dismantling and removing it. Compl. ¶ 160; Capra Ex. 15 (IAS 16 ¶ 16).

17.     International Accounting Standard 36 (*Impairment of Assets*) ("IAS 36") also applied to Petrobras' accounting for its PP&E. Compl. ¶ 161.

18.     Under IAS 36, a company must assess whether there are any indications that its assets are impaired, and if so, estimate the recoverable amount of that asset. The recoverable

amount is the higher of an asset's fair value (less costs of disposal) or its value in use.  Petrobras generally used "value in use."  If the carrying amount of the asset exceeds its value in use, then a company records an impairment.  Capra Ex. 16 (IAS 36 ¶¶ 6, 8, 9, 18); Ex. 11 (Petrobras 2012 Form 20-F at F-19 to F-20); Ex. 12 (2013 Form 20-F at F-20); Compl. ¶ 161.

19.     Under IAS 36, value in use is defined as the present value of the future cash flows expected to be derived from an asset or cash-generating unit (discussed below).  Value in use is an estimate based on, among other things, estimated future cash flows expected to arise from the continuing use of the asset, a discount rate, and management's estimate of the range of economic conditions that will exist over the remaining useful life of the asset.  Capra Ex. 16 (IAS 36 ¶¶ 6, 30-33); Ex. 11 (Petrobras 2012 Form 20-F at F-20); Ex. 12 (2013 Form 20-F at F-20); Compl. ¶ 161.

20.     Under IAS 36, an asset that constitutes PP&E is considered for impairment as either an individual asset or a cash-generating unit ("CGU").  Under IAS 36, a cash-generating unit is defined as the smallest identifiable group of assets that generates cash inflows that are largely independent of the cash inflows from other assets or groups of assets.  Capra Ex. 16 (IAS 36 ¶¶ 6-7, 66).

21.     Under IAS 36, "Identification of an asset's cash-generating unit involves judgement."  Capra Ex. 16 (IAS 36 ¶ 68).

22.     Petrobras reported that it recorded PP&E assets as the cost it paid in acquiring or constructing the assets.  Capra Ex. 11 (Petrobras 2012 Form 20-F at F-18); Ex. 12 (2013 Form 20-F at F-19).  Petrobras reported its PP&E assets to be $205 billion as of 2012 and $228 billion as of 2013.  Ex. 12 (Petrobras 2013 Form 20-F at F-6).

23.     In 2012 and 2013, Petrobras included all of its Brazilian refineries within a single CGU for purposes of its impairment testing relating to those assets.  Capra Ex. 12 (Petrobras 2013 Form 20-F at F-25 to F-26).  Petrobras reported total impairments charges with respect to its PP&E assets of $880 million as of 2012 and $1.125 billion as of 2013.  Ex. 12 (Petrobras 2013 Form 20-F at F-9).

## IV.     Revelation of the Payment Scheme

24.     Beginning in mid-February 2014, as reported publicly, the Company and then the Brazilian government began investigations into allegations of corruption.  Compl. ¶¶ 372-73.

25.     On or about March 20, 2014, Brazilian federal police arrested Paulo Roberta Costa, not because of his former ties to Petrobras, but because he had received an expensive automobile from Alberto Youssef, the target of a pre-existing money laundering investigation.  Compl. ¶ 186 (fourth bullet point); Capra Ex. 4 (M. Panassol Apr. 19, 2016 Tr. 226:4-227:24).  Brazilian authorities secured the testimony of Youssef and Costa, among others, using plea agreements.  Compl. ¶¶ 54, 95.

26.     On or about October 9, 2014, the Brazilian judiciary released Costa's testimony to the public.  Compl. ¶ 401; Capra Ex. 1 (Petrobras 2014 Form 20-F at F-11).

27.     After Costa's testimony was released, and on PwC Brazil's recommendation, Petrobras hired independent law firms to conduct an investigation pursuant to Section 10A of the Securities and Exchange Act.  Petrobras also established a special committee to oversee the investigation.  Capra Ex. 17 (M. Panassol Apr. 20, 2016 Tr. 113:6-115:25).

28.     In mid-November 2014, Petrobras announced the first of several delays in the filing of its third quarter financial statements, pending its evaluation of this information, and that the issuance of these financial statements with a PwC Brazil review report would be "contingent

upon assessments from the Company's Auditors."  Capra Ex. 18 (Petrobras Nov. 14, 2014 Form 6-K at 2); Compl. ¶ 418.

29.     About five months later, in April 2015, the Company published its third quarter 2014 financial statements with a PwC Brazil review report and, simultaneously, filed its year-end 2014 financial statements with a PwC Brazil audit opinion.  Compl. ¶¶ 354-55.

## V.     Adjustments to PP&E in Petrobras' 2014 Financial Statements

30.     Petrobras recorded certain adjustments to its PP&E assets as of the third quarter and fourth quarter of 2014 and reported on those adjustments in its 2014 Form 20-F, filed May 15, 2015.  Capra Ex. 1 (Petrobras 2014 Form 20-F at F-9 to F-17 and F-50 to F-53).

31.     Petrobras concluded that the amounts of the Improper Payments that had been made from the proceeds of contracts entered into during the period of the Payment Scheme should not have been included in historical costs of its PP&E assets.  As of September 30, 2014, Petrobras recorded a $2.53 billion write-off of its PP&E assets based on these Improper Payments.  Capra Ex. 1 (Petrobras 2014 Form 20-F at F-10, F-17).

32.     Petrobras reported that, because the Improper Payments were not identified in its accounting records, the Company developed a method to estimate these amounts.  Capra Ex. 1 (Petrobras 2014 Form 20-F at F-10).

33.     Using the available testimony from the Lava Jato testimony, Petrobras identified the time period of the Payment Scheme, the cartel participants, and the amount of the Improper Payments (generally 3% of the contract value); applied that percentage to the total payments under all contracts with these companies in this period; and thereby derived an estimate of the total Improper Payments of $2.53 billion, which Petrobras recorded as a write-off as of September 30, 2014.  Capra Ex. 1 (Petrobras 2014 Form 20-F at F-14 to F-17).

34.    Petrobras reported that it had also considered and rejected a different, fair value method for estimating the amount of the Improper Payments.  Capra Ex. 1 (Petrobras 2014 Form 20-F at F-30 to F-33).   Petrobras employees testified that the Company considered this alternative fair value approach in December 2014, based on the concern that additional testimony would come to light in the on-going Lava Jato investigation that could be inconsistent with the testimony available at that time (which served as the basis for the 3% method).  Ex. 7 (M. Jorge Da Silva Mar. 10, 2016 Tr. 94:25-95:23); Ex. 19 (A. Cancio Apr. 27, 2016 Tr. 68:4-71:17).   In February 2015, additional testimony from the Lava Jato investigation became available to Petrobras.  Ex. 8 (R. Alves Apr. 22, 2016 Dep. Ex. 19 (Petrobras March 2015 SEC Presentation at 15)).   In May 2015, Petrobras reported that the reasons it decided not to use the fair value method as a proxy for quantifying the Improper Payments was that this method would include elements with no direct relation to these payments, such as changes in economic and financial variables over time.  Ex. 1 (Petrobras 2014 Form 20-F at F-32 to F-33); *see also* Ex. 7 (M. Jorge Da Silva Mar. 10, 2016 Tr. 91:11-92:18).

35.    Petrobras also recorded $16.8 billion in impairments of certain refinery and exploration and production ("E&P") assets as of December 31, 2014.  Approximately $11.6 billion related to the Comperj refinery and to the second refining unit of the RNEST refinery. Capra Ex. 1 (Petrobras 2014 Form 20-F at F-51).  In performing its impairment analysis as of December 31, 2014, Petrobras decided to exclude the Comperj and RNEST 2nd Refining Unit refineries from the single cash generating unit that included its other Brazilian refineries. Petrobras reported that the basis for that exclusion was its decision in the fourth quarter of 2014 to postpone the completion of these projects for an extended period of time based on changed circumstances, including:  (i) a decrease in expected future operating revenues following the

decline of international crude oil prices; (ii) the devaluation of the Brazilian real, and the increased cash outflows to service the Company's debt in the near term, most of which is denominated in foreign currencies; (iii) Petrobras' current inability to access the capital markets; and (iv) insolvency of contractors and suppliers and a consequent shortage of qualified contractors and suppliers (as a result of the difficulties created for suppliers by the Lava Jato investigation or otherwise).  Ex. 1 (Petrobras 2014 Form 20-F at F-50 to F-51).

36.      Prior to releasing its reviewed third quarter financial statements (which reflected the $2.53 billion write off of Improper Payments as of September 30, 2014) and its year-end audited financial statements (which reflected the $16.8 billion impairment of its refining and E&P assets), Petrobras consulted with the Ministerio Publico Federal (the Brazilian Federal Prosecution Office) whether the estimated 3% amount of the Improper Payments was consistent with information that had not yet been made public.  Capra Ex. 17 (M. Panassol Apr. 20, 2016 Tr. 46:14-49:11).  Petrobras also consulted with the Securities and Exchange Commission and its Brazilian analogue, the CVM, including meeting with the Commission's Chief Accountant and SEC staff in March 2015.  Capra Ex. 20 (W. Carnall Apr. 21, 2016 Tr. 100:18-101:18, 133:5-138:4, 157:15-158:22); Ex. 8 (R. Alves Apr. 22, 2016 Dep. Ex. 19 (Petrobras March 2015 SEC Presentation)).  Following the meeting and subsequent calls in which SEC staff participated, the SEC's Office of Chief Accountant did not object to Petrobras' proposed accounting treatment. Ex. 4 (M. Panassol Apr. 19, 2016 Tr. 282:23-285:14); Ex. 20 (W. Carnall Apr. 21, 2016 Tr. 98:12-24); Ex. 21 (R. Alves Apr. 22, 2016 Ex. 18 (Apr. 14, 2015 Petrobras Letter to SEC)). Neither did the Brazilian CVM.  Ex. 22 (I. De Souza Monteiro Tr. Apr. 14, 2016 98:1-7).

## VI.      Testimony of Plaintiffs' Expert Accounting and Auditing Witness

37.      Plaintiffs' expert accounting and auditing witness, Harris L. Devor, admitted that:

9

a.      An impairment analysis is based upon "estimates" that involve "uncertainty."  Capra Ex. 23 (H. Devor June 22, 2016 Tr. 224:15-226:13);

b.      The identification of a cash-generating unit involves "judgment."  Capra Ex. 23 (H. Devor June 22, 2016 Tr. 169:19-170:5).

c.      He did not perform an individualized impairment analysis of the kind he asserts should have been done on RNEST and Comperj as of 2012 and 2013.  Capra Ex. 23 (H. Devor June 22, 2016 Tr. 177:22-178:22; 184:21-187:6).

## VII.    Facts Relating to Alleged Damages

### A.      The Notes Offerings

38.     The following series of Petrobras Notes were issued pursuant to the Petrobras prospectuses referred to in paragraph 13, *supra*:

a.      May 20, 2013 Offering: 71647NAD1; 71647NAC3; 71647NAE9; 71647NAB5; 71647NAF6; 71647NAA7.  Compl. App'x A.

b.      March 17, 2014 Offering: 71647NAG4; 71647NAJ8; 71647NAH2; 71647NAL3; 71647NAM1; 71647NAK5.  Compl. App'x A.

### B.      Facts Relating to Filing of Initial Complaint

39.     The initial class action complaint filed in this action (the "Consolidated Action"), captioned *Kaltman v. Petroléo Brasileiro S.A. – Petrobras*, 14-CV-9662 (S.D.N.Y.), was filed in the Southern District of New York on December 8, 2014 (the "December 8 Complaint").  Dkt. 1. The December 8 Complaint was styled as a class action on behalf of all purchasers of Petrobras shares on U.S. exchanges between May 20, 2010 and November 21, 2014.  *Id.* ¶ 1.

a.      The December 8 Complaint alleged that "[Petrobras] made materially false and misleading statements by misrepresenting facts and failing to disclose a multi-year,

multi-billion dollar money-laundering and bribery scheme. Specifically, Petrobras' senior executives inflated the value of the Company's construction contracts for the sole purpose of receiving kickbacks from companies such as Odebrecht S.A. ('Odebrecht') and SBM Offshore NV ('SBM') that were awarded the contracts illegally. These illegal acts caused the Company to overstate its property, plant and equipment line item on its balance sheet because the overstated amounts paid on inflated third party contracts were carried as assets on the balance sheet." *Id.* ¶ 3.

       b.    The December 8 Complaint also alleged that "this illegal bribery and kickback scheme further violated representations Petrobras made to its investors concerning the Company's own anti-corruption and anti-bribery practices under its Code of Ethics. During the Class Period, Petrobras filed reports, forms, and other documents with the SEC that contained false and misleading statements regarding the effectiveness of Petrobras' internal controls and procedures. Petrobras consistently represented that the 'Company identified no change in its internal controls over financial reporting.'" *Id.* ¶ 4.

       c.    The December 8 Complaint alleged that Petrobras shares declined in value following "a series of revelations including the arrests of Costa and Duque and admission that the Company may have to adjust its historical financial statements to recognize the difference in overpricing its construction contracts[.]" *Id.* ¶ 11.

       d.    The December 8 Complaint alleged that "the news that PwC refused to sign off on the Company's third quarter financial results, as independently confirmed by a news article, caused Petrobras's ADSs to decline . . . ." *Id.* ¶ 83.

       e.    The December 8 Complaint alleged violations of Section 10(b) of the Exchange Act, *id.* ¶¶ 111-118, but did not allege violations of Section 11 of the Securities Act.

40.     On December 24, 2014, the City of Providence filed a complaint in the Southern

District of New York, captioned *City of Providence v. Petroléo Brasileiro S.A. – Petrobras*, 14-

CV-10117 (S.D.N.Y.) (the "December 24 Complaint").  14-CV-10117, Dkt. 1.

a.     The December 24 Complaint was styled as a "federal securities class

action . . . on behalf of all persons or entities who, between January 22, 2010 and November 21,

2014 . . . purchased or otherwise acquired the securities of Petrobras . . . ."  December 24

Complaint ¶ 1.

b.     The December 24 Complaint alleged that "[p]rior to and during the Class

Period, the Company facilitated a scheme in which contractors paid bribes to certain influential

individuals in Petrobras and other organizations in exchange for the award of lucrative oil and

gas construction contracts.  Petrobras compensated the contractors for these bribes by paying

inflated amounts under the contracts."  *Id.* ¶ 8.

c.     The December 24 Complaint further alleged that "Petrobras capitalized

these bribe repayments, treating them as costs related to the construction, installation, and

completion of oil and gas infrastructure and recording them as part of the value of the acquired

assets on the Company's balance sheet. Petrobras then recognized expenses for the depreciation

of these assets—including the portion related to bribes—over subsequent periods. Petrobras

further calculated and reported the Company's periodic net income based, in part, on these

expense figures."  *Id.* ¶ 9.

d.     The December 24 Complaint alleged that "[t]hroughout the Class Period,

Petrobras issued public statements, including financial statements that the Company filed with

the SEC, which set forth, among other things: (1) the Company's asset values; (2) the

Company's periodic expenses and net income; and (3) the assessment that the Company did not

suffer from a material weakness in its disclosure controls and procedures or its internal controls over financial reporting.  These statements were false . . . ."  *Id.* ¶¶ 13-14.

e.     The December 24 Complaint alleged violations of Section 11 of the Securities Act.  *Id.* ¶¶ 106-110.

41.     The action in which the December 24 Complaint was filed was ultimately consolidated with the Consolidated Action.  Dkt. 74.  The December 24 Complaint was the earliest-filed complaint in the Consolidated Action to allege violations of Section 11.

42.     This Court has noted that "[b]etween December 8, 2014 and January 7, 2015, five separate class action complaints were filed in this Court asserting substantially similar claims . . . ."  Op. on Mot. To Dismiss at 2 (Dkt. 194).  The December 8 Complaint and the December 24 Complaint were two of these five complaints.

43.     This Court has ruled that Plaintiffs' Section 11 claims relate back to the December 8 Complaint for statute of limitations purposes, notwithstanding the fact that the December 8 Complaint does not allege a Section 11 claim.  *Id.* at 33.

44.     Plaintiffs have previously argued that the Class Action Complaint relates back to the "first-filed complaint in this consolidated Action[.]" Pls. Mem. of Law in Opp'n to Defs. Mot. to Dismiss, at 49 (Dkt. 160).

**C.     Facts Relating to Alleged Corrective Disclosures**

45.     The Fourth Amended Class Action Complaint in the Consolidated Action was filed on November 30, 2015.  Dkt. 342.

46.     Plaintiffs allege that PwC Brazil issued unqualified audit opinions on Petrobras' financial statements and its internal controls over financial reporting as of 2012 and 2013 (dated,

respectively, February 4, 2013 and February 25, 2014), and that these opinions were materially false and misleading statements.  Compl. ¶¶ 623-31.

47.     The first disclosure relied on by both Plaintiffs and WSIB which purported to correct material misstatements that Plaintiffs and WSIB attribute to PwC Brazil's 2012 and 2013 audit opinions of Petrobras' financial statements occurred on November 14, 2014. Capra Ex. 24 (Dr. Blaine F. Nye June 21, 2016 Tr. 317:22-319:11; 320:8-15); Declaration of Tsvetan Beloreshki, dated June 27, 2016 ("Beloreshki Decl.") ¶¶ 3-5.

a.      Dr. Nye, on behalf of Class Plaintiffs, identifies three corrective disclosure dates pertaining to the Petrobras Notes between the beginning of the class period and December 8, 2014 (the filing date of the initial complaint in this matter): November 14, November 17, and December 1.  Beloreshki Decl. ¶ 5.

b.      Dr. Feinstein, on behalf of WSIB, identifies only two corrective disclosure dates during this period: November 14, and November 17.  *Id.*

c.      If the relevant filing date is December 24, Dr. Nye and Professor Feinstein identify one additional corrective disclosure date: December 15, 2014.  *Id.*

48.     At no time before November 14, 2014 was there both (1) a statistically significant negative price movement of any of the Petrobras Notes and (2) a purported corrective disclosure relating to PwC Brazil's audit opinions or PwC Brazil's opinions regarding Petrobras' internal controls.  *See id.* ¶¶ 3-5.

49.     Plaintiffs, through their expert, Dr. Nye, have stated that "in accordance with the statutory measure of damages . . . [f]or Section 11 Class members that have retained the Offering Notes (*i.e.*, did not sell the notes), per-note damages are the difference between the price paid for such notes (not to exceed the offering price) and the greater of the present value of the Offering

14

Notes, which may be estimated to be the price as of the date of trial, and the price of the Notes on the Suit Date."  Beloreshki Decl. ¶ 6.

50.     WSIB, through its expert, Professor Steven P. Feinstein, has stated that "WSIB's recoverable loss under the statutory formula would be, for each security purchased, the difference between the lesser of (A) the investor's (i) actual purchase price of the security or (ii) the offering price of that security, and (B) the investor's (i) actual sale price if the security was sold prior to the date suit was brought, or (ii) the price of the security on the day suit was brought if the investor continued to hold the security on the day suit was brought, or (iii) the actual sale price if the security sold after the date of suit but before judgment, if the sale price was less than the offering price and greater than the price on the date of suit."  Beloreshki Decl. ¶ 7.

## 1.     November 14, 2014

51.     None of the news released on November 14, 2014 mentioned Petrobras' 2012 or 2013 financial statements or PwC Brazil's audit opinions concerning those financial statements. *Id.*. ¶¶ 9-10.

52.     On November 14, 2014, Petrobras announced that it would delay the release of its third quarter 2014 financial statements, which were previously expected to be released on this date.  Petrobras stated that the reasons for this delay were so that the Company could:  (a) "gain greater understanding from the ongoing investigations by the independent law firms"; (b) "make any adjustments to the financial statements based on the accusations and investigations related to the 'Lava Jato Operation'"; and (c) "evaluate the need for internal controls improvements." Petrobras also noted that it "expects to release its third quarter 2014 financial statements, without a review by its Independent Auditors, on December 12, 2014 . . . ."  Capra Ex. 25 (Petrobras November 13, 2014 Form 6-K).

53.     Petrobras issued a separate statement on November 14, 2014, noting that it "has several financial contracts with covenants that provide for the delivery of quarterly financial statements, audited or unaudited, to the financial agents within 90 (ninety) days following the end of the quarter. These provisions allow the Company until 12.30.2014 to deliver the third quarter financial statements."  The statement noted that "credit rating agencies will be informed of the reasons why the Company did not disclose its financial statements" at a later date.  Capra Ex. 18 (Petrobras November 14, 2014 Form 6-K).

54.     Plaintiffs, through their expert Dr. Nye, contend that "if Mr. Costa's testimony on corruption at Petrobras was accurate, it could impact the financial statements."  Beloreshki Decl. ¶ 8.

55.     Nowhere in Petrobras' announcements did the Company state that it had concluded that its previously issued financial statements or PwC Brazil's audit opinions for the 2013 and 2013 financial statements were materially false or misleading.  Beloreshki Decl. ¶¶ 9-11.

56.     Plaintiffs and WSIB do not expressly allege in their respective pleadings that the announcement of delay corrected any material misstatements in Petrobras' 2012 and 2013 year-end financials.  *See generally* Dkt. 342; 15-cv-03923 Dkt. 74.

57.     Referring to Petrobras' November 14, 2014 statement, Bloomberg reported that "delay in posting quarterly results may breach covenants on at least $11 billion of bonds should the state-run oil producer fail to release the information by the end of the year."  Bloomberg also noted that on this news, "[b]onds plunged today, sending yields to an eight-month high."  Capra Ex. 26 (*Bloomberg*, "Petrobras Risks Debt-Contract Breach If Earnings Delays Extended," November 14, 2014).

58.     Also on November 14, 2014, Brazilian authorities announced that 27 arrest warrants had been issued in connection with the Lava Jato investigation.  Those arrests included executives at Brazilian construction companies.  One of the warrants was for Renato Duque, a former director at Petrobras.  Capra Ex. 27 (*Bloomberg*, "Petrobras Former Director Renato Duque Arrested in Car Wash Case," November 14, 2014); Ex. 28 (*Bloomberg*, "Petrobras Contractors Targeted as Brazil Kickback Probe Expands," November 14, 2014).  There were widespread reports weeks earlier that as many as 30 individuals are being investigated in connection with the Payment Scheme and testimony confirmed that Duque was a central figure.  Ex. 29 (*Bloomberg*, "Brazil Fixated as 'Human Bomb' Revelations Rock Elections," October 20, 2014); *see also* Ex. 30 (Beloreshki Jun. 22, 2016 Tr. 39:21-40:4).

59.     None of the news reports on November 14, 2014 regarding these arrest warrants or the Lava Jato investigation mentioned any material misstatements or omissions with respect to Petrobras' 2012 and 2013 financial statements, or PwC's audit opinions within those financial statements.  Beloreshki Decl. ¶ 10.

60.     Separately, on November 14, 2014, Merrill Lynch downgraded Petrobras equity from Buy to Neutral "following postponement of its third quarter earnings release . . . ."  Merrill Lynch added, "[t]hough we see potential substantial upside long-term for Petrobras's stock price, the current financial uncertainty has added a material source of risk for the near term and medium term."  Capra Ex. 31 (*Bank of America Merrill Lynch*, "Petrobras ON – Downgrade to Neutral/reduce POs on reporting uncertainty," November 14, 2014).

a.     Merrill Lynch did not rely on any nonpublic or previously unavailable information in downgrading Petrobras' stock.  Beloreshki Decl. ¶ 11.

17

b.    Merrill Lynch's announcement did not downgrade or otherwise comment on Petrobras' debt offerings.  *Id.*

c.    Merrill Lynch's announcement made no mention of any material misstatements or omissions with respect to Petrobras' 2012 and 2013 financial statements, or PwC Brazil's audit opinions concerning those financial statements.  *Id.*

61.    William Kennett, the 30(b)(6) and 30(b)(1) witness for WSIB, testified that prior to Petrobras' filing its third quarter 2014 financial statements, WSIB was concerned about the specter of a technical default: "I think it was everyone, and I don't know if they knew or not, but they said if they didn't file audited financials by a given date that, technically, that would be a default, and that was a huge concern at the time."  Capra Ex. 32 (W. Kennett Mar. 8, 2016 Tr. 224:18-225:18).

62.    Gregory Haendel, the 30(b)(6) witness for Bradford & Marzec, investment advisor to the Employee Retirement System of Hawaii, testified during his deposition that his firm ultimately sold their Petrobras Notes at least in part "because of the potential for a technical default."  Capra Ex. 33 (G. Haendel Feb. 5, 2016  Tr. 179:9-17).

63.    Mark Hughes, the 30(b)(6) witness for Western Asset Management testified as follows:

a.    "there were negative repercussions for [Petrobras' third quarter 2014 financial statements] not being reported."  Capra Ex. 34 (M. Hughes Apr. 22, 2016 Tr. 187:7-188:15);

b.    "the markets' concern about -- about covenant violations would be assuaged by -- by getting the financials published."  *Id.* 190:14-21;

c.      Hughes agreed that even as of April 1, 2015, "the market was pricing in a high chance of getting Petrobras's restated financials out before a covenant breach." *Id.* 193:15-194:15.

64.    The evidence shows that the price declines in Petrobras Notes on this date were the result of the potential of a covenant default should the Company be unable to file its third quarter 2014 financial results by the end of 2014.  Capra Ex. 30 (Beloreshki Jun. 22, 2016 Tr. 37:11-38:20); Beloreshki Decl. ¶ 12.

### 2.      November 17, 2014

65.    Plaintiffs contend that two of the Petrobras Notes experienced statistically significant price declines on November 17, 2014.  Beloreshki Decl. ¶ 13.

66.    The lack of a general reaction that would have affected more of the series of the Petrobras Notes is an indication that either the news on this day was already known to the market or it was not material to the market.  Beloreshki Decl. ¶ 14.

67.    None of the news reports on November 17, 2014 revealed to the market any material misstatements or omissions with respect to Petrobras' 2012 and 2013 financial statements, or PwC's audit opinions within those financial statements.  Beloreshki Decl. ¶ 15.

68.    On November 17, 2014, Petrobras held an investor call to discuss the third quarter 2014 financial statements and the Company's operating results.  The call did not disclose any new information about the Lava Jato investigation or its effects on Petrobras.  The Company reiterated that it was delaying issuing its third quarter financial statements while it studied the effect, if any, that the Lava Jato investigation would have on those statements.  The Company also did not detail whether the payment of dividends would be affected.  The Company repeatedly referred to positive aspects of the Abreu e Lima project.  Capra Ex. 35 (Transcript of November 17, 2014 Petrobras conference call).

a.      During the conference call, Petrobras repeatedly acknowledged the possibility that the lack of audited financials may lead to cross-acceleration of debt and that it was necessary to file audited financial statements as soon as practicable in order to not violate the Company's bond covenants.  *Id.*  Plaintiffs contend that Petrobras securities declined on the day at least in part because Petrobras "acknowledged the existence of cross-default clauses in bond agreements, which could accelerate defaults."  Beloreshki Decl. ¶ 16.

b.      Plaintiffs' expert, Dr. Nye, observed that during the call, the Company was "noncommittal about the effect of the recognition of corruption losses on payment of dividends" and that it "insisted the [Abreu e Lima] project had been well-managed financially."  Beloreshki Decl. ¶ 16.

c.      Dr. Nye contends that analysts had "overwhelmingly negative" reactions to the conference call and expressed the opinion "that losses in the corruption investigation would lower Petrobras' credit quality."  Beloreshki Decl. ¶ 17.

### 3.      December 1, 2014

69.      Plaintiffs contend that two of the Petrobras Notes experienced statistically significant price declines on December 1, 2014.  Beloreshki Decl. ¶ 18.

70.      The lack of a general reaction that would have affected more of the series of the Petrobras Notes is an indication that either the news on this day was already known to the market or it was not material to the market.  *Id.* ¶ 19.

71.      None of the news reports on December 1, 2014 revealed to the market any material misstatements or omissions with respect to Petrobras' 2012 and 2013 financial statements, or PwC's audit opinions within those financial statements.  *Id.* ¶ 20.

72.      On November 28 and 29, the Workers Party announced that it would publicly back and defend a party senior official who had been implicated in the Lava Jato investigation.

Capra Ex. 36 (Certified translation of: *Exame.com*, "Vaccari diz que sabe o que fez em evento do PT" ("Vaccari says he knows what he did in PT event"), November 28, 2014).

73.     On November 30, 2014, the head of the Workers Party called for corrupt individuals to be punished in the wake of the Lava Jato investigation.  Capra Ex. 37 (*EFE News Service*, "Brazilian President's party to punish corrupt members," November 30, 2014).

74.     On December 1, 2014, a Brazilian news source reported that Brazilian authorities were preparing to bring charges against several executives of contractors, whose companies had histories of working with Petrobras.  Capra Ex. 38 (Certified translation of: *Zero Hora*, "Força-tarefa proporá simultaneamente ações cíveis e criminais na Lava-Jato" ("Task force to propose simultaneous civil and criminal actions in Operation Lava Jato"), December 1, 2014).

75.     News sources also reported on this day that some contractors may have produced fraudulent or false documents to Brazilian courts.  Capra Ex. 39 (Certified translation of: *Zero Hora*, "Juiz mantém prisão de executivo da Mendes Júnior" ("Judge orders continued imprisonment of Mendes Júnior executive"), December 1, 2014).

76.     It was also reported on this day that a former Petrobras manager, who had previously been implicated in bribe-taking, had been consulted on the Company's decision in 2005 to join the "World Economic Forum's Partnering Against Corruption Initiative."  Capra Ex. 40 (Certified Translation of *O Globo*, "Ex-diretores incriminados na Lava-Jato aprovaram política anticorrupção da Petrobras" ("Former directors incriminated in Lava-Jato approved Petrobras' anticorruption policy"), December 1, 2014).

77.     Finally, it was reported on this day that Petrobras' tax obligations could be greater than anticipated if contracts were shown to have been overpriced.  Capra Ex. 41 (Certified translation of: *O Estado de Sao Paulo*, "Petrobrás pode virar alvo do Fisco").

78.     Multiple news articles, as well as the testimony of Paulo Roberto Costa, had previously disclosed the existence of a corruption scheme among Brazilian contracting companies and detailed the potential involvement of current and former Petrobras executives. *E.g.*, Capra Ex. 29 (*Bloomberg*, "Brazil Fixated as 'Human Bomb' Revelations Rock Elections," October 20, 2014).

### 4.     December 15, 2014

79.     After market close on December 12, 2014, a Friday, Petrobras announced that, contrary to prior statements by the Company, it would not release its third quarter 2014 financial statements on December 15, 2014.  It listed five reasons for the delay.  Four of these reasons had been widely reported prior to December 12, and the fifth was that the Company obtained a waiver allowing it to delay release of its financial statements until January 31, 2015, without there being any risk of acceleration.  Capra Ex. 42 (Petrobras December 12, 2014 Form 6-K).

80.     A news report published after market close on December 12, 2014 suggested that Petrobras' delay in issuing its financial statements was due to the Board's failure to agree on the amount of write-downs associated with the Lava Jato investigation.  Capra Ex. 43 (*Bloomberg*, "More: Petrobras Said to Delay 3Q Unaudited Financial Results," December 12, 2014).

81.     Analyst reports issued that weekend posited that the delay was due to uncertainties regarding the magnitude of the Lava Jato investigation, as well as the general uncertainty surrounding the Company's financial status between now and January 31, when the financial statements were expected to be published.  Capra Ex. 44 (*Credit Suisse*, "Petrobras - A good promise, but a hard one to keep," December 14, 2014); Ex. 45 (*ItauBBA*, "Petrobras – No Non-Audited 3Q14 Results For Now," December 14, 2014); Ex. 46 (*Morgan Stanley*, "Petrobras – Not Just Yet…Further Delays in Unaudited Financials Reporting," December 14, 2014); Ex.

47 (*UBS*, "Petrobras (ON) – 3Q delayed again, but because co. renegotiated loan covenants; lower capex on weaker BRL, Brent?" December 14, 2014).

82.     Plaintiffs' expert Dr. Nye construes these analyst reports as "infer[ences]" about the "magnitude" of corruption implicating Petrobras.  Beloreshki Decl. ¶ 21.

83.     Many of the reports focused on the negative effect that Petrobras' decreased liquidity (a direct result of its failure to release audited financial statements for third quarter 2014) would have on the Company.  Capra Ex. 48 (*RBS Corporate Credit Hotspots*, "Petrobras: too much fear," December 15, 2014); Ex. 49 (*J.P.Morgan Latin America Equity Research*, "Petrobras: Partial Information from 3Q14 Results; Missing Financial and Operational Data," December 15, 2014); Ex. 50 (*Bradesco Flashnote*, "Petrobras:  Just the Beginning," Dec. 15, 2014).

84.     Separately, on December 14, 2014, a former head of Petrobras' international division was indicted in connection with the Lava Jato investigation.  The charges revolved around bribery in connection to several drilling vessels.  Capra Ex. 51 (*Wall Street Journal*, "Brazil Prosecutors Charge Another Former Petrobras Executive," December 15, 2014).

85.     None of this news, or any other news leading into the December 15, 2014 trading day disclosed to the market any alleged material misstatements regarding Petrobras' 2012 and 2013 financial statements, or any material misstatements by PwC with respect to their 2012 and 2013 audit opinions of those financial statements.  Beloreshki Decl. ¶ 23.

86.     The specter of decreased liquidity troubled bond investors and caused Petrobras Notes prices to decline on the day.  Beloreshki Decl. ¶ 22.

Dated: New York, New York
      June 27, 2016

                             Respectfully submitted,

                             KING & SPALDING LLP

By:   /s/ James J. Capra, Jr.
        James J. Capra, Jr.
        Israel Dahan
        Paul A. Straus
        Lauren W. Mitchell
        1185 Avenue of the Americas
        New York, NY 10036-4003
        Telephone:  (212) 556-2100
        Facsimile:  (212) 556-2222

        Michael R. Pauzé (admitted *pro hac vice*)
        Kenneth Y. Turnbull (admitted *pro hac vice*)
        1700 Pennsylvania Avenue, NW
        Washington, DC 20006-4707
        Telephone:  (202) 737-0500
        Facsimile:  (202) 626-3737

        *Attorneys for Defendant*
        *PricewaterhouseCoopers Auditores*
        *Independentes*

**TAB C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE PETROBRAS SECURITIES LITIGATION

This Document Applies To:

*In re Petrobras Securities Litigation*, No. 14-cv-9662 (JSR)

*Washington State Investment Board v. Petróleo Brasileiro S.A. – Petrobras, et al.*, No. 15-cv-03923 (JSR)

No. 14-cv-9662 (JSR)

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

---

### DECLARATION OF TSVETAN N. BELORESHKI IN SUPPORT OF DEFENDANT PRICEWATERHOUSECOOPERS AUDITORES INDEPENDENTES' MOTION FOR SUMMARY JUDGMENT

TSVETAN N. BELORESHKI hereby declares pursuant to 28 U.S.C. § 1746:

1. I am a Senior Managing Director in the Forensic and Litigation Consulting practice of FTI Consulting, Inc., where I specialize in securities and financial economics, concentrating on structured finance products, financial engineering, and risk management. I have provided consulting services to individuals, financial institutions, investment managers, corporations, and governments. I have presented and published on various topics related to assessing, pricing, and risk management of the credit and default risks inherent in emerging markets debt instruments.

   a. Prior to my consulting career, I was a member of Banque Paribas' Emerging Markets Structured Products and Credit Derivatives team. As a trader, I analyzed and managed the risks associated with an array of complex financial instruments, and effected transactions in, among other securities, sovereign and corporate emerging markets fixed income instruments (including such issued by Petrobras).

b. I have been qualified at trial and in arbitration hearings as an expert in financial economics, securities markets, structured finance, financial engineering, securities valuation, market microstructure, and industry customs and practices.

c. I have a Masters in Business Administration degree and a Bachelor of Arts degree from the University of Chicago. My studies there focused primarily on financial economics, asset pricing, derivative securities, financial engineering, statistics and econometrics.

2.      I have been retained by counsel for Defendant PricewaterhouseCoopers Auditores Independentes ("PwC Brazil") in the above-captioned action to quantify the amount of damages, if any, sustained by purchasers of 12 series of notes issued by Petrobras in 2013 and 2014 (the "Petrobras Notes") as a result of PwC Brazil's alleged violations of Section 11 of the Securities Act of 1933. I have submitted an expert report and an expert rebuttal report in connection with this assignment.

3.      I have reviewed the expert report of Dr. Blaine F. Nye, damages expert for the class plaintiffs in the above-captioned matter ("Class Plaintiffs"). According to Dr. Nye, none of the Petrobras Notes experienced any reduction in price inflation until November 14, 2014. *See* Expert Report of Blaine F. Nye ("Nye Rep."), Exhibit 11B. In other words, Dr. Nye's analysis identifies November 14, 2014 as the first date on which the Petrobras Notes decreased in value due to an allegedly corrective disclosure. Dr. Nye confirmed this at his deposition. *See* Dr. Blaine F. Nye June 21, 2016 Tr. 320:8-15, attached to the Declaration of James J. Capra. Jr. as Exhibit 24.

4.      I have reviewed the expert report of Professor Steven P. Feinstein, damages expert for plaintiff Washington State Investment Board in the above-captioned matter ("WSIB"). Professor Feinstein identifies November 14, 2014 as the first alleged corrective disclosure date in

2

this matter. *See* Expert Report of Professor Steven P. Feinstein, Ph.D., CFA ("Feinstein Rep.") ¶ 198.

5.       Dr. Nye, on behalf of Class Plaintiffs, identifies three corrective disclosure dates pertaining to the Petrobras Notes between the beginning of the class period and December 8, 2014 (the filing date of the initial complaint in this matter): November 14, November 17, and December 1.[1] *See* Nye Rep. at Ex. 11B; Expert Rebuttal Expert Report of Blaine F. Nye, Ph.D. ¶¶ 111-112. Dr. Feinstein, on behalf of WSIB, identifies only two corrective disclosure dates during this period: November 14, and November 17. *See* Feinstein Rep. ¶¶ 106-115. If the relevant filing date is December 24, Dr. Nye and Professor Feinstein identify one additional corrective disclosure date: December 15, 2014. *See* Nye Rep. at Ex. 11B; Feinstein Rep. at ¶¶ 116-121.

6.       In performing his Section 11 damages analysis, Dr. Nye purports to conform his damages calculation to the statutory requirements of Section 11, noting that "in accordance with the statutory measure of damages . . . [f]or Section 11 Class members that have retained the Offering Notes (*i.e.*, did not sell the notes), per-note damages are the difference between the price paid for such notes (not to exceed the offering price) and the greater of the present value of the Offering Notes, which may be estimated to be the price as of the date of trial, and the price of the Notes on the Suit Date." Nye Rep. ¶ 56.

7.       Dr. Feinstein likewise purports to conform his Section 11 damages analysis to the language of the statute, noting that "WSIB's recoverable loss under the statutory formula would be, for each security purchased, the difference between the lesser of (A) the investor's (i) actual

---

[1] I am relying on counsel's representation that the relevant filing date is December 8, 2014. I also understand from counsel that Class Plaintiffs and WSIB allege the relevant filing date to be December 24, 2014.

3

purchase price of the security or (ii) the offering price of that security, and (B) the investor's (i) actual sale price if the security was sold prior to the date suit was brought, or (ii) the price of the security on the day suit was brought if the investor continued to hold the security on the day suit was brought, or (iii) the actual sale price if the security sold after the date of suit but before judgment, if the sale price was less than the offering price and greater than the price on the date of suit." Feinstein Rep. ¶ 266.

8.    In his loss causation analysis for November 14, 2014, Dr. Nye states that Petrobras announced that it would delay releasing its third-quarter 2014 financial statements in order to evaluate the effects of the Lava Jato investigation on those statements, noting that "*if* [former Petrobras Downstream Director, Paulo Roberto] Costa's testimony [to the Brazilian government] on corruption at Petrobras was accurate, it *could* impact the financial statements." Nye Rep. ¶ 63 (emphasis added).

9.    I have reviewed relevant analyst and news reports regarding Petrobras on November 14, 2014, including the Petrobras announcement cited by Dr. Nye in his analysis of that date. Nowhere in that announcement did Petrobras state that it had concluded that its previously issued financial statements or PwC Brazil's audit opinions for the 2013 and 2013 financial statements were materially false or misleading. Moreover, in my professional experience, including as a bond trader, I would not have interpreted Petrobras' announcement to implicate any financial statements other than the delayed third-quarter 2014 statements the announcement discussed.

10.    I have also reviewed the news reports cited by Dr. Nye in his analysis of whether November 14, 2014 was a loss causation date. None of the November 14, 2014 news reports relied on by Dr. Nye implicated any material misstatements or omissions with respect to

Petrobras' 2012 and 2013 financial statements, or PwC's audit opinions within those financial statements.

11.     I have also reviewed the November 14, 2014 Merrill Lynch report cited by Dr. Nye, which downgraded its recommendation regarding Petrobras equities from Buy to Neutral following Petrobras' announcement that its financial statements would be delayed.  Merrill Lynch did not rely on any nonpublic or previously unavailable information in downgrading Petrobras' stock.  Moreover, Merrill Lynch's downgrade did not extend to Petrobras debt, and therefore, did not affect the Petrobras Notes.  Finally, the announcement made no mention of any material misstatements or omissions with respect to Petrobras' 2012 and 2013 financial statements, or PwC Brazil's audit opinions concerning those financial statements

12.     Petrobras' announcements regarding the delay, as well as news stories and analyst reports covering Petrobras' announcements, repeatedly noted that a delay in issuing the third quarter 2014 financial statements may result in a technical default.  Both Dr. Nye and Professor Feinstein acknowledge this risk in their respective analyses.  Based on my experience, I believe that the possibility of a technical default represents the most significant increase in the risks faced by bondholders.  Thus, in my estimation, the price declines in Petrobras Notes on this date were the result of the potential of a covenant default should the Company be unable to file its third quarter 2014 financial results by the end of 2014.

13.     Dr. Nye contends that on November 17, 2014, two of the 12 Petrobras Notes experienced statistically significant price declines.  Nye Rep. Ex. 15C at 126, 152.

14.     The lack of a general reaction in the prices of the Petrobras Notes on November 17 is an indication that either the news on this day was already known to the market or it was not material to the market.

5

15. Moreover, I have reviewed relevant news reports regarding Petrobras on November 17, 2014, including the news reports cited by Dr. Nye in his November 17 analysis. These news reports did not reveal to the market any alleged material misstatements or omissions with respect to Petrobras' 2012 and 2013 financial statements, or PwC's audit opinions within those financial statements.

16. On this date, Petrobras held an investor call to discuss its third-quarter 2014 financial statements. In analyzing the effect, if any, the investor call had on the market that day, Dr. Nye notes that Petrobras securities declined on the day at least in part because Petrobras "acknowledged the existence of cross-default clauses in bond agreements, which could accelerate defaults." Nye Rep. ¶ 64. Dr. Nye further observed that during the call, Petrobras management was "noncommittal about the effect of the recognition of corruption losses on payment of dividends" and that management "insisted the [Abreu e Lima] project had been well-managed financially." *Id.*

17. Dr. Nye claims that analyst reactions to the November 17 conference call constitute separate corrective disclosures. He notes that analysts had an "overwhelmingly negative" reaction after the call, and that analysts speculated "that losses in the corruption investigation would lower Petrobras' credit quality." *Id.* However, Dr. Nye does not present any evidence showing that these analyst opinions provided any new information about Petrobras.

18. Dr. Nye contends that on December 1, 2014, two of the 12 Petrobras Notes experienced statistically significant price declines. Nye Rep. Ex. 15C at 22, 178.

19. The lack of a general reaction in the prices of the Petrobras Notes on December 1 is an indication that either the news on this day was already known to the market or it was not

6

material to the market. In fact, Professor Feinstein does not identify December 1 as a corrective disclosure date. *See generally* Feinstein Rep.

20. Moreover, I have reviewed relevant news reports regarding Petrobras on December 1, 2014, including the news reports cited by Dr. Nye in his December 1 analysis. These news reports did not reveal to the market any alleged material misstatements or omissions with respect to Petrobras' 2012 and 2013 financial statements, or PwC's audit opinions within those financial statements.

21. I have reviewed relevant news reports regarding Petrobras between market close on December 12, 2014, and the next trading day, December 15, 2014. After market close on December 12, 2014, Petrobras announced that it would further delay releasing its third-quarter 2014 financial statements. This announcement was discussed in several analyst reports between December 12 and the next trading day, December 15. In his loss causation analysis for December 15, 2014, Dr. Nye discusses certain of these analyst reports, opining that following Petrobras' announcement, "[a]nalysts *inferred* that this development meant that the corruption was of greater magnitude than previously known." Nye Rep. ¶ 69.

22. I have reviewed the analyst reports cited by Dr. Nye on this date, as well as others that Dr. Nye did not cite to in his report. Many of the analyst reports focused on the negative effect that Petrobras' decreased liquidity (a direct result of its failure to release its financial statements) would have on the Company. This threat of decreased liquidity caused several of the Petrobras Notes to decline in price on the day.

23. None of this news, or any other news leading into the December 15, 2014 trading day disclosed to the market any alleged material misstatements regarding Petrobras' 2012 and

7

2013 financial statements, or any material misstatements by PwC with respect to their 2012 and 2013 audit opinions of those statements.

Dated: New York, NY
      June 27, 2016

Tsvetan N. Beloreshki

# TAB D

# **EXHIBIT 4**
# **(FILED UNDER SEAL)**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

In Re

PETROBRAS SECURITIES LITIGATION

This Document Applies to: All Cases

Cast No  14-cv-9662

-------------------------------------x


C O N F I D E N T I A L

VIDEOTAPED DEPOSITION OF
MARCOS PANASSOL
Tuesday, April 19, 2016
New York, New York


REPORTED BY:
Christina Diaz, CRR, RMR, CSR, CLR
Job Number:  12131
HUDSON REPORTING & VIDEO        1-800-310-1769

---

Page 2

```
 1
 2
 3
 4
 5
 6
 7              April 19, 2016
 8              9:35 a.m.
 9
10        Videotaped deposition of MARCOS
11   PANASSOL, taken by plaintiff, pursuant to
12   notice, at the offices of King & Spalding LLP,
13   1185 Avenue of the Americas, New York, New
14   York, before Christina Diaz, a Certified
15   Realtime and Registered Merit Reporter and
16   Notary Public within and for the State of New
17   York.
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1
 2          A P P E A R A N C E S
 3
 4   POMERANTZ LLP
 5   Attorneys for Lead Plaintiff
 6      600 Third Avenue
 7      New York, New York 10016
 8   BY:  EMMA GILMORE, ESQ.
        egilmore@pomlaw.com
 9
        MATTHEW C. MOEHLMAN, ESQ.
10      mmoehlman@pomlaw.com
11
12   CLEARY GOTTLIEB STEEN & HAMILTON LLP
13   Attorneys for the Petrobras Defendants
14      One Liberty Plaza
15      New York, New York 10006 1470
16   BY:  LINA BENSMAN, ESQ.
        lbensman@cgsh.com
17
        GRACE KURLAND, ESQ.
18      gkurland@cgsh.com
19      ANDRES SAENZ, ESQ.
        asaenz@cgsh.com
20
        FRANCESCA ODELL, ESQ.
21      fodell@cgsh.com
22
23
24
25
```

---

Page 4

```
 1
 2      A P P E A R A N C E S (Continued)
 3
 4   KING & SPALDING LLP
 5   Attorneys for Defendant PwC
 6      1185 Avenue of the Americas
 7      New York, New York 10036 4003
 8      212.556.2100
 9   BY:  JAMES J. CAPRA, JR., ESQ.
        jcapra@kslaw.com
10
             and
11
        1700 Pennsylvania Avenue N.W.
12
        Washington, D.C. 20006 4707
13
   BY:  KENNETH Y. TURNBULL, ESQ.
14      kturnbull@kslaw.com
15      SARA BRESCIA, ESQ.
        sbrescia@kslaw.com
16
        NATASHA TRIFUN, ESQ.
17      ntrifun@kslaw.com
18      LAUREN MITCHELL, ESQ.
        lmitchell@kslaw.com
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

1          M. Panassol - Confidential
2    was a very significant fact, as compared
3    to -- I am sorry.  Let me finish -- as
4    compared to March, when he was arrested
5    on a separate allegation.  He was involved in
6    other activities, money laundering that did
7    not involve Petrobras.  And the allegations
8    around Petrobras were general in the media.
9    So two separate significantly different
10   events.
11       Q.   Just so I understand, you are saying
12   that the March 2013 --
13       A.   '14.
14       Q.   -- March 2014 -- sorry --
15   allegations in the media with respect to Costa
16   did not involve bribes at Petrobras?
17          MR. CAPRA:  Object to the form.
18       A.   So the allegations after he was
19   arrested, the allegations that came out was
20   that -- there were allegations that he would
21   have received money from suppliers of
22   Petrobras while he was a director of
23   Petrobras.  So there wasn't any allegation
24   that he would have received money from
25   Petrobras.  That was your question.

1          M. Panassol - Confidential
2    BY MS. GILMORE:
3        Q.   Just one second.
4          And is there a distinction between
5    those allegations -- I am trying to understand
6    the distinction between those allegations made
7    on March 14, 2014 and the information that
8    came out in October 2014.
9        A.   Okay.
10       Q.   What is that distinction?
11       A.   Okay.  So he was arrested in
12   February.  He had left the company for two
13   years already, so he was no longer an official
14   or employee of the company.  He was not
15   providing services of the company.  So he was
16   a third party at that time.  He was arrested
17   under what the police disclosed to be a money-
18   laundering investigation not related to
19   Petrobras at the time.  The police just
20   mentioned money-laundering investigation.
21          So after his arrest, there were
22   media -- information through the media that
23   they were suspecting -- again, the media was
24   alleging that he would be receiving money or
25   he would have received money from suppliers of

1          M. Panassol - Confidential
2    Petrobras when he was a director of Petrobras.
3    So he was a director from 2004 through the
4    first quarter of 2012.
5          So that's the scenario in April.  He
6    is arrested.  Money laundering.  General
7    allegations.  Nothing is specific.  Nothing
8    confirmed.
9          In October 8th -- on October 8th, he
10   provided a testimony, a live testimony before
11   a federal judge in Brazil.  And that became
12   public immediately.  In that one testimony, he
13   was very detailed about the scheme he was
14   running.  He mentioned the name of the
15   contractors that were part of that scheme,
16   people that were his contacts, and that he
17   would be getting 3 percent and on whom that
18   money was going to be sent.  And he also
19   mentioned that he was aware that that was
20   going on in other areas of the company, but he
21   was not running those.
22          So specific, time related, names
23   applied, suppliers identified.  So that really
24   made a difference.
25       Q.   So based on -- and this was the

1          M. Panassol - Confidential
2    difference that PwC -- that PwC thinks is a
3    game changer?
4        A.   (Nodding affirmatively).
5          MR. CAPRA:  You have to answer out
6    loud.
7          THE WITNESS:  Sorry.  Yes.  It was
8    specific.  It was time related, named
9    individuals, and companies.
10   BY MS. GILMORE:
11       Q.   Can we go to the next sentence?
12   Actually, it says -- the one that says, "The
13   determination of the amount of the adjustment
14   would be extremely difficult, as the
15   corruption took place outside the companies by
16   the contractors and suppliers."
17          Do you see that?
18       A.   It starts with "The determination"?
19       Q.   It's kind of in the middle of the
20   document, and it starts in the middle of --
21       A.   Yes.  Yes.  "The determination of
22   the amount of the adjustment would be
23   extremely difficult, as the corruption took
24   place outside of the company by the
25   contractors and suppliers."

                    57  (Pages 225 to 228)

Page 229

1           M. Panassol - Confidential
2      Q.   Was that PwC's view at the time?
3      A.   Based on our understanding of what
4  had become public in our conversations with
5  the company and all the many, many meetings we
6  had had with them and what it turned out
7  really to be confirmed, it was cartel
8  companies operating in collusion with the
9  executives.  So as I mentioned, the
10 companies -- the cartel companies were making
11 the illegal payments.  So within the
12 accounting records of the company there is no
13 evidence of the illegal payments.
14     Q.   What do you define as the illegal
15 payments in this context?
16     A.   The bribes that were paid to the
17 directors and other parties.
18     Q.   And do you believe that overpayments
19 by Petrobras to contractors about the
20 briberies are considered illegal payments?
21          MR. CAPRA:  Object to the form.
22     A.   There are two elements there.  One
23 is the bribes that were paid to individuals,
24 and one is the effect of the cartel.  The
25 impact of the cartel is what the company paid,

Page 230

1           M. Panassol - Confidential
2  is what they recorded, and that's it.
3  BY MS. GILMORE:
4      Q.   And do you believe that the effect
5  of the cartel was that Petrobras was
6  overpaying contractors?
7          MR. CAPRA:  Object to the form.
8      A.   In essence, when a cartel operates,
9  that's the fair value.  That's what the
10 company pays for.  It has no other option.
11 BY MS. GILMORE:
12     Q.   And if I were to tell you that
13 documents from Petrobras indicate that
14 Petrobras could have obtained the same
15 contract at a lower price but worked in
16 conjunction with cartel members and overpaid
17 on the contracts, would you agree with me that
18 those overpayments are illegal payments?
19          MR. CAPRA:  Object to the form.
20          MS. BENSMAN:  Objection.  Misstates
21     the record.
22     A.   That's an assumption that I don't
23 have a basis to agree or disagree.  I don't --
24 BY MS. GILMORE:
25     Q.   What is your basis for stating that

Page 231

1           M. Panassol - Confidential
2  Petrobras had no other option but to contract
3  with the cartel members.
4      A.   That's the essence of a cartel.
5      Q.   Assuming other companies outside the
6  cartel were willing to provide services to
7  Petrobras at a lower price -- strike that.
8           How do you know that other companies
9  outside the cartel were not willing to provide
10 service at a lower cost to Petrobras?
11          MR. CAPRA:  Object to the form.
12     A.   I don't know.  You are asserting you
13 know, but I don't know.
14 BY MS. GILMORE:
15     Q.   Do you know, or you don't know?
16     A.   I don't know.  If a cartel is
17 operating, then, hypothetically, that's how it
18 works.  No other company would provide
19 services there.
20     Q.   Did the PwC do any investigations as
21 to whether or not Petrobras was a knowing
22 participant in the cartel?
23          MR. CAPRA:  Object to the
24     form.
25     A.   I don't understand the question.

Page 232

1           M. Panassol - Confidential
2  BY MS. GILMORE:
3      Q.   Okay.  Let me rephrase it.
4      A.   Yes, please.
5      Q.   Did PwC do any investigation to
6  determine whether or not Petrobras was
7  conspiring with the cartel to inflate the
8  prices of the contracts?
9           MR. CAPRA:  Object to the form.
10     A.   We didn't do an investigation -- the
11 answer is no.  The company established a
12 special committee to perform an independent
13 investigation using the information coming
14 from the Lava Jato operation.
15 BY MS. GILMORE:
16     Q.   And what is the status of that
17 investigation?
18     A.   It's ongoing.
19     Q.   Okay.  Can we go to the next page on
20 the top, please.
21     A.   Page 766?
22     Q.   Yes.  It says -- or you say, "Also
23 it is important to clearly articulate the
24 problem that the company wants to discuss with
25 the staff in one line, such as the assets are

58  (Pages 229 to 232)

Page 249

1        M. Panassol - Confidential
2  and corruption scheme"?
3        A.   Yes.  When you look at the Footnote
4  3 of the 2014 financial statement, there is a
5  paragraph -- there is a part of it that deals
6  with the cartel entities, and there is another
7  part that deals with the non-cartel entities.
8  Because at the time, the company had
9  identified that other specific contracts had
10 been -- the company had obtained evidence that
11 -- through the police investigation that other
12 specific contracts were also subject to
13 illegal payments that were not part of the
14 cartel.
15       Q.   Let's go to slide 8, please.  And I
16 am reading under the first bullet point.  It
17 says, "The company recognized" --
18       MR. CAPRA:  Is that the second
19    sentence?
20       MS. GILMORE:  Yes.
21 BY MS. GILMORE:
22       Q.   "The company recognized in its
23 accounting records the amounts billed in
24 accordance with the contracts which were
25 regular contract payments and has all the

Page 250

1        M. Panassol - Confidential
2  contracts and invoices to support the
3  accounting records and the amounts that were
4  actually paid to the suppliers."
5        Do you agree with this statement?
6        A.   So, "The company recognized in its
7  accounting records the amounts billed in
8  accordance with the contracts which were
9  regular contract payments and has all
10 contracts and invoices to support the
11 accounting records and the amounts that were
12 actually paid to the suppliers."
13       As part of our audit, we don't look
14 at all contracts and all invoices.  So the
15 "all" here -- but as part of our testing, our
16 audit, whenever we -- let me rephrase that.
17       The company's statement is coming
18 from the fact that the company itself did not
19 make the improper payments.  The company's
20 payments were made to -- under contract, they
21 were approved and signed and for service and
22 goods delivered.  So that's where this
23 statement is coming from.
24       Q.   And when you say "improper
25 payments," you mean the bribe payments?

Page 251

1        M. Panassol - Confidential
2        A.   The bribe payments.
3        Q.   And if the improper payments
4  actually included the overpayments the company
5  made to the cartel, would it -- based on the
6  fact that the company has in its possession
7  all contracts and invoices to support the
8  accounting records and the amounts that were
9  actually paid to suppliers, would you agree
10 with me that it would be possible to determine
11 -- to allocate how much money Petrobras paid
12 each year in those kinds of payments?
13       MR. CAPRA:  Object to the form of
14    the question.
15       A.   Allocate what to each year?
16 BY MS. GILMORE:
17       Q.   The overpayments --
18       MR. CAPRA:  Same objection.
19 BY MS. GILMORE:
20       Q.   -- to the financial statements.
21       A.   The improper payments?
22       Q.   The overpayments.
23       MR. CAPRA:  Same objection.
24       A.   Please.  What do you call
25 overpayment?

Page 252

1        M. Panassol - Confidential
2  BY MS. GILMORE:
3        Q.   So in my example, overpayments are
4  the payments that Petrobras paid to the cartel
5  as a result of the cartel.
6        MR. CAPRA:  Object to the form.
7        A.   The payments that -- the company
8  cannot determine in their payments whether
9  there is an impact of the cartel or not.  They
10 paid what was contracted and was provided.  So
11 I don't agree with you that they can go back
12 and allocate because they cannot determine the
13 impact of the cartel in the payments they
14 made.
15       Q.   And if I were to tell you that the
16 TCU was able to determine the impact of the
17 cartel in each year, would you agree with me
18 that such methodology would be possible in
19 order to determine how many overpayments were
20 made by the company each year?
21       MR. CAPRA:  Object to the form.
22       MS. BENSMAN:  Objection.  Misstates.
23       A.   See, I don't know what methodology
24 the TCU would have used, and I don't know if
25 that methodology would be appropriate for the

63  (Pages 249 to 252)

1          M. Panassol - Confidential
2     Q.   Do you know whether the company went
3   back to BNP and Deloitte and asked them to
4   apply different metrics in order to estimate
5   the improper payments?
6     A.   No.  I don't.
7     Q.   You don't know.  Have you seen any
8   other analysis around the time performed by
9   BNP Paribas or Deloitte?
10     A.   In addition to the one that was
11   presented to us in that meeting?
12     Q.   Yes.
13     A.   No.
14     Q.   Do you know whether or not Petrobras
15   itself performed its own valuation of the
16   assets that had been valued by BNP Paribas or
17   Deloitte?
18          MR. CAPRA:  At this time?
19          MS. GILMORE:  Around this time.
20     A.   At that time for the same assets for
21   the same purpose, no.  I am not aware of that.
22   BY MS. GILMORE:
23     Q.   And you mentioned that there were
24   subsequent discussions where the company
25   looked at other testimony that was made public

1          M. Panassol - Confidential
2   and looked at the three percent alternative.
3          Were you present at those -- were
4   you present when those discussions were made?
5     A.   So these are not one-off events.
6   These were happening every day new things
7   would come.  So the company was monitoring
8   that.  So it was happening every day
9   throughout the day.  From time to time we
10   would meet with them and they would present us
11   with an update of it.  But again, it was
12   working meetings.  Nothing as formal as a
13   board meeting, for example.
14     Q.   Did the company eventually decide to
15   use the three percent method as a surrogate
16   for determining the improper payments?
17     A.   Moving on through time then after
18   this time was passed and prior to meeting with
19   the SEC, then the company had performed an
20   exercise in identifying the amounts paid and
21   applied the three percent and that's what was
22   included in the meeting with the SEC on March.
23     Q.   At that time in March 2015 did PwC
24   agree with the three percent methodology that
25   would be employed to determine the improper

1          M. Panassol - Confidential
2   payments?
3     A.   So at the time we went to visit with
4   the SEC the company had already performed the
5   calculation.  We had sat with them and
6   reviewed the assumptions and we believed that
7   we could apply proper audit procedures and get
8   the comfort we needed for that estimate.  But
9   the work was ongoing.
10     Q.   Did Petrobras inform the SEC that
11   there were overpayments above and beyond the
12   bribery payments?
13          MR. CAPRA:  Object to the form.
14     A.   In the presentation, the company
15   describes the events.  There was a cartel
16   operating in collusion with a former official
17   of the company.  They described it.
18   BY MS. GILMORE:
19     Q.   And where would that be described,
20   in the slide presentation?
21     A.   The March presentation which is
22   similar to what ended up in the footnote 3 to
23   the 2014 financial statement.
24     Q.   Did the SEC inform Petrobras, to
25   your knowledge, that it agreed with the

1          M. Panassol - Confidential
2   methodology -- the three percent methodology
3   that Petrobras sought to utilize?
4          MR. CAPRA:  Can I just get the
5   question read back, please.
6          (Question read)
7     A.   The meeting happened March 6th.
8   There were subsequent discussions over the
9   phone within the company, their U.S.
10   securities lawyers and we would participate as
11   well.  And at the end of those calls, probably
12   four or five, the SEC concluded that it would
13   not object to the company adopting that
14   methodology.
15   BY MS. GILMORE:
16     Q.   And this conclusion -- is this
17   conclusion reflected somewhere in a document?
18     A.   It's documented in a letter that the
19   company wrote to the SEC describing the
20   discussions and confirming that it was the
21   company's understanding that the SEC would not
22   object.
23     Q.   Was the SEC informed by Petrobras or
24   PwC at any point that the Brazilian federal
25   police found that Petrobras overpaid to the

Page 285

1        M. Panassol - Confidential
2    tune of 17 to 20 percent on specific contracts
3    with respect to some of the biggest
4    refineries, such as Abreu e Lima and COMPERJ?
5        MR. CAPRA:  Object to the form.
6        A.   You asked if PwC informed the SEC?
7    BY MS. GILMORE:
8        Q.   Or Petrobras.
9        A.   PwC never had direct contact with
10    the SEC.  Again, the events were discussed in
11    the slide presentation, and they were
12    discussed in person in that March 6th meeting.
13    Specifically to what you are making reference,
14    I'm not aware of.
15        MS. GILMORE:  Okay.  You can put
16    that document away.
17        How much time do we have?
18        THE VIDEOGRAPHER:  46 minutes.
19        MR. CAPRA:  Don't feel you have to
20    take it all.
21        MS. GILMORE:  I am afraid I will.
22        (Panassol Exhibit 15, e-mail dated
23    2/18/15 bearing Production Nos.
24    PWCUS PETRO 10731 through 10733, was
25    marked for identification)

Page 286

1        M. Panassol - Confidential
2        MR. CAPRA:  He can start looking at
3    it?
4        MS. GILMORE:  Sure.
5        MR. CAPRA:  Great.
6        THE WITNESS:  (Reviewing document).
7        Okay.
8    BY MS. GILMORE:
9        Q.   Mr. Panassol, I have handed you
10    what's been marked as Exhibit 15.
11        Can I direct you to look at the last
12    page of the document ending in Bates number
13    10733?
14        A.   (Witness reviewing document).
15        Okay.
16        Q.   And I want to direct your attention
17    to the statement you made -- the sentence
18    where you state, "My concern is that if we
19    present a slide that implies we are still
20    thinking about if there is a MW."  I am
21    assuming that a material weakness -- "that it
22    could detract from the objective of the
23    meeting.  There could be a credibility issue."
24        Can you tell me what that means?
25        MR. CAPRA:  I object to the form of

Page 287

1    the question.  I think you are
2    mischaracterizing the document.
3        A.   It was Wayne Carnall's comment.  It
4    was not mine.
5    BY MS. GILMORE:
6        Q.   Oh, I'm sorry.  That's Mr. Carnall.
7    Apologies.
8        Do you have any understanding of
9    what Mr. Carnall meant when he said that?
10        A.   Yes.  So this was in response to one
11    of the draft versions received, so he provided
12    comments.  And here the discussion was -- in
13    one part of the -- the presentation was not
14    covering the potential for a material weakness
15    as a result of what we have been calling the
16    management override.  So our suggestion to the
17    company was that the company, when meeting
18    with the SEC, would have their own view
19    whether they believed there would be a
20    material weakness in relation to the
21    management override.  That's it.
22        Q.   And do you have any understanding as
23    to why the company did not want to disclose a
24    material weakness?
25

Page 288

1        M. Panassol - Confidential
2        MR. CAPRA:  Object to the form.
3        MS. BENSMAN:  Objection.  Misstates.
4        A.   The company never said they did not
5    want to disclose.  The discussion at the time
6    was to -- this -- again, just going back, we
7    are in February.  Information was coming out
8    of the depositions.  So the complexity there
9    was for the company to understand what exactly
10    happened in the past and how they could assess
11    that in 2014 from a controls perspective.
12        So at the time, they were -- they
13    still needed some work to do in order to
14    understand whether they were going to report a
15    material weakness and how that material
16    weakness would be worded, which they ended up
17    reporting.
18    BY MS. GILMORE:
19        Q.   And why would you have considered
20    not putting a material weakness in after such
21    an enormous fraud?
22        MR. CAPRA:  Object to the form.
23        MS. BENSMAN:  Objection.  Misstates.
24        A.   Again, it wasn't "we."  It was the
25    company.

72  (Pages 285 to 288)

1          M. Panassol - Confidential
2    financial statement of where the company
3    reported that, Footnote 14.1.1(a).  That's
4    page F-50.
5    BY MS. GILMORE:
6        Q.   Yes.
7        A.   The second paragraph there.
8    However.  I am going to read it.  I think it's
9    important.  "However, during the quarter ended
10   December 31, 2014, changes in circumstances
11   prompted a review of the company's planned
12   projects and ultimately led management to
13   remove -- to revise certain projects under
14   construction.  As a result, Petrobras has
15   recently decided to postpone for an extended
16   period of time the completion of the following
17   refinery projects:  Petrochemical Complex of
18   Rio and the second refining unit in Abreu e
19   Lima.  For that reason of December 31, 2014,
20   those assets under construction were removed
21   from the downstream CGU and were tested for
22   impairment individually," so that the
23   macroeconomic circumstances are mentioned in
24   the following paragraph.
25          "Those circumstances include a

1          M. Panassol - Confidential
2    decrease in expected feature future operating
3    revenues following the decline the
4    international crude oil prices, the
5    devaluation of the Brazilian Real, and
6    decreased cash outflows to service the
7    company's debt in the near term, most of which
8    is denominated in foreign currency; and
9    Petrobras's current inability to access the
10   capital market and insolvency of contractors
11   and suppliers and a consequent shortage of
12   qualified contractors and suppliers (as a
13   result of the difficulties created for
14   supplies by the Lava Jato investigation)."
15          So those were the reasons that led
16   the company to reassess its assets, perform
17   the calculation and record impairment.
18       Q.   Do you believe that Petrobras's
19   overpayments as a result of the cartel as
20   reflected as capitalized costs need to be
21   restated?
22          MR. CAPRA:  Object to the form.
23       A.   The overpayments need to be
24   restated?  The company records what it paid
25   for.  If it was impacted by cartel or not,

1          M. Panassol - Confidential
2    that doesn't change that.  It still would have
3    to record what it paid for.  Once it records
4    it, that's what it paid for and that's what
5    needs to be used in the company's depreciation
6    and the company's impairment calculation.
7    BY MS. GILMORE:
8        Q.   And if that amount that Petrobras
9    paid was overstated, is it your position that
10   it does not need to be corrected?
11          MR. CAPRA:  Object to the form.
12          MS. BENSMAN:  Objection.  Asked and
13      answered.
14       A.   You are making an assumption that
15   the amounts are overstated.  That's not in the
16   company records.  The company paid for it.  If
17   the company paid for -- if the company paid
18   for it under other contracts and has the
19   supporting documentation, that's the cost that
20   should be on the books.
21   BY MS. GILMORE:
22       Q.   Is there an accounting rule that
23   states that?
24       A.   Yes.  IAS 16.
25       Q.   What does it say?

1          M. Panassol - Confidential
2          MR. CAPRA:  Object to the form.
3        A.   We can look at the company's
4    financial statements and accounting policies
5    that describes that.
6          I am on page F 23, footnote 4.8.
7    BY MS. GILMORE:
8        Q.   Okay.
9        A.   "Property plant and equipment are
10   measured at the cost and the cost to acquire
11   or construct, including all costs necessary to
12   bring the asset to working condition for its
13   intended use, including the present value for
14   the estimated cost of dismantling and removing
15   the asset."  So the first phrase that I just
16   read is "Property plant and equipment are
17   measured at the cost to acquire or construct,
18   including all costs necessary to bring the
19   asset to working condition."  So that's what
20   the accounting standards require.
21       Q.   If Petrobras paid more than what
22   Petrobras could have otherwise paid in an
23   arm's length transaction, you believe that
24   that overpayment should not be -- should be
25   capitalized?

75  (Pages 297 to 300)

# TAB E

# EXHIBIT 17
# (FILED UNDER SEAL)

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
                                        x
In Re

PETROBRAS SECURITIES LITIGATION
This Document Applies to All Cases
Case No. 14 cv 9662
                                        x


CONFIDENTIAL

VIDEOTAPED DEPOSITION OF
30 (b)(6) MARCOS PANASSOL
Wednesday, April 20, 2016
New York, New York


REPORTED BY:
Eileen Mulvenna, CSR/RMR/CRR
Job No. 12413

HUDSON REPORTING & VIDEO      1 800 310 1769

---

Page 2

1
2              April 20, 2016
3              9:39 a m
4
5
6
7      VIDEOTAPED DEPOSITION of MARCOS PANASSOL,
8    a 30(b)(6) witness on behalf of PwC Brazil in
9    the above-titled action, held at the above time
10   and place, before Eileen Mulvenna, CSR/RMR,
11   Certified Shorthand Reporter, Registered Merit
12   Reporter and Notary Public of the State of New
13   York
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1
2    A P P E A R A N C E S:
3
4
5      POMERANTZ LLP
       Attorneys for Lead Plaintiff
6         600 Third Avenue
          New York, New York  10016
7      BY:  EMMA GILMORE, ESQ
          egilmore@pomlaw com
8         MATTHEW C  MOEHLMAN, ESQ
          mmoehlman@pomlaw com
9
10     CLEARY GOTTLIEB STEEN & HAMILTON, LLP
       Attorneys for the Petrobras Defendants
11        One Liberty Plaza
          New York, New York  10006-1470
12     BY:  LINA BENSMAN, ESQ
          lbensman@cgsh com
13        GRACE KURLAND, ESQ
          gkurland@cgsh com
14
15
16     KING & SPALDING, LLP
       Attorneys for Defendant PricewaterhouseCoopers
       Auditores Independentes and the Witness
17        1185 Avenue of the Americas
          New York, New York  10036-4003
18     BY:  JAMES J  CAPRA, JR , ESQ
19        jcapra@kslaw com
20         -and-
21     KING & SPALDING, LLP
          1700 Pennsylvania Avenue, N W
          Washington, D C  20006-4707
22     BY:  LAUREN MITCHELL, ESQ
          lmitchell@kslaw com
23        NATASHA TRIFUN, ESQ
          ntrifun@kslaw com
24        KENNETH Y  TURNBULL, ESQ
          kturnbull@kslaw com
25

---

Page 4

1
2    A P P E A R A N C E S (Continued):
3
4      SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
       Attorneys for the Underwriter Defendants
5         500 Boylston Street
          23rd Floor
6         Boston, Massachusetts  02116
       BY:  PETER SIMSHAUSER, ESQ.
7         peter.simshauser@skadden.com
8
9
10
     A L S O  P R E S E N T:
11
12        BRIAN DUFFY, Friedman LLP
13        HARRIS DEVOR, Friedman LLP
14        FERNANDA GALBES, Pomerantz Law
15        INGRID RODRIGUEZ, Videographer
16
17
18
19
20
21
22
23
24
25

---

1 (Pages 1 to 4)

Page 45

1           M. PANASSOL - CONFIDENTIAL
2       A.    No.
3       Q.    Was the content -- were the
4   contents of the meeting -- of the April 2015
5   meeting discussed with anybody from -- with
6   anybody at PwC US?
7       A.    Discussed -- can you specify,
8   "discussed" --
9       Q.    Communicated or --
10      A.    As part of the review process
11  that --
12          (Reporter seeks clarification.)
13      A.    -- the review process that
14  Mr. Wayne Carnall performed, he was communicated
15  that we did have that meeting with CVM.
16      Q.    And did you share the presentation
17  made at that April 2015 meeting with Mr. Carnall?
18      A.    No, I don't recall keeping that
19  presentation.  It was the company's
20  presentation.
21      Q.    In connection with the 2012, 2013
22  or 2014 audits, did PwC have any communications
23  with BMJ?
24      A.    I assume that's Brazilian
25  Ministry of Justice?

Page 46

1           M. PANASSOL - CONFIDENTIAL
2       Q.    We can look at the definitions
3   here.
4          MR. CAPRA:  The definitions would
5       be in Exhibit 1, Mr. Panassol.
6          THE WITNESS:  Brazilian Ministry
7       of Justice, no, we did not have any
8       communication with them.
9   BY MS. GILMORE:
10      Q.    In connection with the 2012, '13
11  and '14 audits, did PwC have any communications
12  with the US Department of Justice?
13      A.    No.
14      Q.    In connection with the 2012, 2013,
15  and 2014 audits, did PwC have any communications
16  with the -- with MPF?
17      A.    So the definition of MPF is the
18  Ministerio Publico Federal, or Brazilian Federal
19  Prosecution Office.  Yes, we had a meeting with
20  the Brazilian Prosecution Office in
21  March 2015 -- actually, the company scheduled a
22  meeting and asked us to come along.  So we
23  participated in one meeting with the
24  prosecutors.
25      Q.    Can you tell me who from PwC was

Page 47

1           M. PANASSOL - CONFIDENTIAL
2   present at that meeting?
3       A.    It was myself, Carlos Sousa and
4   another -- one of our lawyers, Fernando Loeser,
5   L-O-E-S-E-R.
6       Q.    What firm is Mr. Fernando Loeser
7   affiliated with?
8          (Reporter seeks clarification.)
9       A.    Loeser & Portela, P-O-R-T-E-L-A.
10      Q.    I assume that's a Brazilian law
11  firm?
12      A.    It's Brazilian.
13      Q.    And who from Petrobras was present
14  at that meeting?
15      A.    It was the CE -- CFO, Mr. Ivan
16  Monteiro; and an accounting manager, Rodrigo
17  Araujo, A-R-A-U-J-O; and another manager of the
18  accounting department, Amos, A-M-O-S, separate
19  name Cancio, C-A-N-C-I-O; and there were two
20  lawyers of the company.
21      Q.    Do you recall their names?
22      A.    Pedro -- I miss his last name.
23  It's Pedro.  And there was another one, Carlos
24  Fontes, F-O-N-T-E-S.  There was a third lawyer,
25  Carlos Rafael, R-A-F-A-E-L.

Page 48

1           M. PANASSOL - CONFIDENTIAL
2       Q.    Was anybody from the Securities and
3   Exchange Commission present at that meeting?
4       A.    No.
5       Q.    Other than PwC, the company -- and
6   the company and members of the Brazilian Federal
7   Police, was there anybody else present at that
8   meeting?
9       A.    Not Federal Police, Federal
10  Prosecutors.
11      Q.    Federal Prosecutors Office, yes.
12      A.    No.
13      Q.    And do you know why that meeting
14  took place other than that Petrobras asked for it?
15          MR. CAPRA:  Object to the form.
16          THE WITNESS:  The company asked
17      for a meeting, so that's the reason the
18      meeting happened.
19  BY MS. GILMORE:
20      Q.    And what was discussed at that
21  meeting?
22      A.    The company -- as the company had
23  evolved on the methodology of the 3 percent and
24  there were assumptions the company was using
25  based on testimony, and part of the testimony

12  (Pages 45 to 48)

1          M. PANASSOL - CONFIDENTIAL
2    was not public yet, the company wanted to
3    discuss with the prosecutors the assumptions
4    they were using.
5          And they were requesting the
6    prosecutors -- if they could provide their views
7    on what -- the assumption the company was using
8    made sense in light of the information that they
9    had that wasn't public yet, obviously observing
10   the confidentiality.  So those were the topics
11   of the meeting.
12       Q.    What was the -- what was the
13   Brazilian Prosecutors Office's view as to the
14   methodology presented by the company?
15          MR. CAPRA:  Object to the form.
16          THE WITNESS:  They didn't have a
17   view on the methodology; they had a view
18   on the assumptions.  And by assumptions
19   is the 3 percent, the companies involved
20   in the cartel, and the period of time,
21   2002 through first quarter of 2012.
22          And the views of the prosecutors
23   was that it made sense.  It was that it
24   made sense.
25

1          M. PANASSOL - CONFIDENTIAL
2    BY MS. GILMORE:
3        Q.    Was there anything -- I believe you
4    said there was a presentation made in connection
5    with that meeting, or no?
6        A.    No, it was a discussion.
7        Q.    Was that discussion memorialized
8    anywhere in PwC's documents?
9        A.    It's in our 2014 audit work
10   papers, electronic work papers.
11       Q.    Was there -- other than this
12   meeting on March 2015, was there any other meeting
13   with the Brazilian Prosecutions Office while PwC
14   was present?
15       A.    No.
16       Q.    Okay.  Let's go to the next one,
17   which is PF.
18          In connection with the 2012, '13,
19   '14 audits -- and '14 audits, were there any
20   meetings between -- were there any
21   communications between PwC Brazil and PF?
22       A.    So PF is the federal police.  No,
23   no meetings with the federal police.
24       Q.    In connection with the 2012, '13 or
25   '14 audits, were there any communications between

1          M. PANASSOL - CONFIDENTIAL
2    PwC Brazil and the New York Stock Exchange?
3        A.    No.
4        Q.    In connection with the 2012, '13 or
5    '14 audits, were there any communications between
6    PwC and the PCAOB?
7          MR. CAPRA:  You can answer that
8    yes or no, Mr. Panassol.
9          THE WITNESS:  Yes.
10         MS. GILMORE:  Are you asking him
11   to assert privilege as to the type of
12   communications?
13         MR. CAPRA:  He's answered your
14   question.  Is there a question pending?
15   BY MS. GILMORE:
16       Q.    Can you describe for me the content
17   of those communications?
18         MR. CAPRA:  I'm going to object
19   on the basis -- I'm going to object to
20   any further inquiry on the basis of
21   Title 15 of the United States Code,
22   Section 7215.
23         MS. GILMORE:  And what is that?
24         MR. CAPRA:  It's a privilege with
25   respect to certain communications in

1          M. PANASSOL - CONFIDENTIAL
2    relation to the PCAOB and says that they
3    shall be confidential and privileged as
4    an evidentiary matter in any proceeding
5    in any federal or state court and shall
6    not be subject to civil discovery.
7    That's the basis for my objection.
8          MS. GILMORE:  Okay.  I think we
9    can square that off later on then.  Are
10   you asking him then not to answer the
11   question?
12         MR. CAPRA:  Yes, I'm directing
13   Mr. Panassol not to answer the question
14   on the basis of that statutory
15   protection.
16   BY MS. GILMORE:
17       Q.    Do you recall when those
18   communications took place between PwC and the
19   PCAOB?
20         MR. CAPRA:  You can answer -- you
21   can give the time period.
22         THE WITNESS:  The time period.
23         It was in November -- from
24   November through January --
25   November 2014 through January 2015.

13  (Pages 49 to 52)

```
 1          M. PANASSOL - CONFIDENTIAL
 2   Rossi were hired by the company at the end of
 3   2014, and the special committee was established
 4   early 2015.  So that's about the time they
 5   started.
 6          Q.    And do you know who recommended
 7   that Petrobras commence -- hire law firms -- an
 8   outside law firm to commence an internal
 9   investigation --
10          MS. KURLAND:  Again I'd like to
11     request -- sorry.
12          Again I'd like to request you
13     instruct him that he can answer only to
14     the extent that it doesn't reveal
15     privileged information.
16          MR. CAPRA:  I object to the form
17     of the question.
18          And I need more specific
19     direction from you than that, please,
20     Counsel.
21          MS. KURLAND:  Well --
22          MR. CAPRA:  The question is who
23     recommended --
24          MS. KURLAND:  If your knowledge
25     is based -- if it's based on public
```

```
 1          M. PANASSOL - CONFIDENTIAL
 2   information, but if it's based on
 3   privileged information, I'd ask that you
 4   ask him not to answer.
 5          MS. GILMORE:  I don't think it's
 6     privileged, but you can try and convince
 7     me otherwise.
 8          MR. CAPRA:  Could we take a
 9     break, please, and go off the record?
10          MS. GILMORE:  Sure.
11          MR. CAPRA:  Thanks.
12          THE VIDEOGRAPHER:  The time now
13     is 12:04 p.m. and we're off the record.
14          (Recess from the record.)
15          THE VIDEOGRAPHER:  This marks the
16     beginning of Tape No. 3.  The time now
17     is 12:29 p.m. and we're back on the
18     record.
19          MR. CAPRA:  Could the court
20     reporter please read back the last
21     question.
22          (Record read.)
23          MS. KURLAND:  Mr. Capra, I'd ask
24     that, on the grounds of Petrobras'
25     attorney and work product privilege, you
```

```
 1          M. PANASSOL - CONFIDENTIAL
 2   instruct your client to omit from his
 3   answer advice given by the company's
 4   counsel to the company that's in your
 5   presence.
 6          MR. CAPRA:  Okay.
 7          If you can answer the question
 8     subject to that, Mr. Panassol, you
 9     should go ahead and do it.
10          THE WITNESS:  Okay.
11          In the meeting we -- we, PwC
12     Brazil, in which I participated -- we
13     had with the CEO of the company on --
14     around October 14 of '15, we recommended
15     that given the testimony that had just
16     been released from Mr. Paulo Roberto,
17     that the company consulted its legal
18     counsel.  And we suggested that the
19     company hire independent -- an
20     independent law firm specialized to
21     perform internal investigation.
22   BY MS. GILMORE:
23          Q.    And by "we," Mr. Panassol, you mean
24   PwC Brazil?
25          A.    PwC Brazil, yes.
```

```
 1          M. PANASSOL - CONFIDENTIAL
 2          Q.    And why did PwC deem important to
 3   recommend -- why did -- strike that.
 4          Why did PwC Brazil recommend to
 5   Petrobras that it hire an independent law firm
 6   to perform the internal investigation?
 7          A.    Well, given the complexity of the
 8   testimony and the circumstances and, in our
 9   experience as a firm, we believed it would be
10   appropriate for the company to hire independent
11   legal counsel to perform an investigation.
12          Q.    Did you believe that the
13   independent investigation the company -- that
14   Petrobras was itself performing was inadequate?
15          MR. CAPRA:  Object to the form.
16          THE WITNESS:  Again, that was
17     discussed.  And we -- regardless of any
18     assessment of the quality of the
19     internal investigation, given the
20     complexity of the facts, we suggested
21     the company hire an independent
22     investigation [sic].
23   BY MS. GILMORE:
24          Q.    Did PwC -- did the PwC forensic
25   team conclude, either in 2014 or 2015, that the
```

# TAB F

# EXHIBIT 20
# (FILED UNDER SEAL)

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO  14-cv-9662-JSR
----------------------------------------
IN RE:
PETROBRAS SECURITIES LITIGATION
This Document Applies to:
ALL CASES
----------------------------------------

CONFIDENTIAL - UNDER PROTECTIVE ORDER
(CONTAINS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY)

VIDEO DEPOSITION OF

WAYNE CARNALL

April 21, 2016

New York, New York

Lead: Emma Gilmore, Esq

Firm: Pomerantz LLP

Job No  12329
REPORTED BY:  Bridget Lombardozzi, CCR, CRR, RMR, CLR
HUDSON REPORTING & VIDEO        1-800-310-1769

Page 2

1    APPEARANCES:
2
3    COUNSEL FOR LEAD PLAINTIFF:
4    BY   EMMA GILMORE, ESQ.
5    BY   JENNIFER BANNER SOBERS, ESQ.
6    POMERANTZ LLP
7    600 Third Avenue
8    New York, New York 10016
9    Tel: 212 661 1100
10   E mail: egilmore@pomlaw.com
11
12
13   COUNSEL FOR UNDERWRITER DEFENDANTS:
14   BY   PETER SIMSHAUSER, ESQ.
15   SKADDEN ARPS SLATE MEAGHER & FLOM LLP
16   500 Boylston Street, 23rd Floor
17   Boston, Massachusetts 02116
18   Tel: 617 573 4880
19   E mail: Peter.simshauser@skadden.com
20
21
22
23
24
25

Page 3

1    A P P E A R A N C E S (Continued)
2
3    COUNSEL FOR PwC LLP
4    BY   BRIAN S. WEINSTEIN, ESQ.
5    BY   JUSTIN SOMMERS, ESQ.
6    DAVIS POLK & WARDWELL LLP
7    450 Lexington Avenue
8    New York, New York  10017
9    Tel: 212.450.4972
10   E mail: brian.weinstein@davispolk.com
11
12
13
14
15   APPEARANCES (Continued):
16   COUNSEL FOR THE PETROBRAS DEFENDANTS:
17   BY   ALEX LEONARD, ESQ.
18   BY   ANDRES FELIPE SAENZ, ESQ.
19   BY   LEWIS J. LIMAN, ESQ.
20   CLEARY GOTTLIEB STEEN & HAMILTON LLP
21   One Liberty Plaza
22   New York, New York 10006 1470
23   Tel: 212 225 2225
24   E mail: aleonard@cgsh.com
25

Page 4

1    A P P E A R A N C E S (Continued)
2
3    COUNSEL FOR DEFENDANT PRICEWATERHOUSECOOPERS
4        AUDITORES INDEPENDENTES
5    BY - JAMES J  CAPRA, JR , ESQ
6    KING & SPALDING LLP
7    1185 Avenue of the Americas
8    New York, New York  10036-4003
9    Tel  202-626-2644
10   E-mail  Jcapra@kslaw com
11       -and-
12   BY - KENNETH Y  TURNBULL, ESQ
13   KING & SPALDING LLP
14   1700 Pennsylvania Avenue, NW
15   Washington, D C   20006-4707
16   Tel  202 626 2644
17   E-mail  Kturnbull@kslaw com
18
19   ALSO PRESENT
20
21   KIERAN CLAFFEY, Partner, PwC
22   BRIAN ARMSTRONG, Esq , PwC
23   HARRIS L  DEVOR, CPA, Friedman LLP
24   ROMAN MASLENNIKOV, CPA, MBA, Friedman LLP
25   DANNY ORTEGA, Legal Videographer

1 (Pages 1 to 4)

1    foundation.
2        A.   Given this issue, the uniqueness of this
3    issue, where the company could not determine the
4    amount of the payments that would have -- you
5    know, exactly -- again, the information did not go
6    through Petrobras's accounts and that there was
7    going to have to be -- come up with some type of
8    an estimation process, this matter was discussed
9    with the SEC staff.  It was something that the
10   company agreed that needed to be done.  It was
11   something that PwC Brazil also believed needed to
12   be done to make sure that the SEC staff understood
13   what was unique in this fact pattern and how the
14   company was proposing to adjust for this item.
15       So the -- the company was very clear in
16   its communications to the staff of what the
17   underlying issues were and what the underlying
18   challenges were, as well as what the company was
19   doing to propose an adjustment.
20       Q.   Did the company inform the SEC that it
21   was a participant in the scheme with the cartel?
22       MR. WEINSTEIN:  Objection to form.
23       MR. LEONARD:  Objection to form and
24   foundation.
25       MR. WEINSTEIN:  Foundation.

1        MR. LEONARD:  Mischaracterizes the
2    testimony.
3        A.   The staff was aware that there were
4    former Petrobras employees -- again, at the time
5    when we -- when the company met with the SEC
6    staff, none of the people were actually working at
7    Petrobras.  So they were former employees.
8        So the staff was very much aware that
9    there were former employees that were working
10   with -- excuse me, that were involved with the
11   cartel process.
12       Q.   And the SEC blessed the accounting
13   knowing that the company was a participant in the
14   cartel scheme -- with the cartel scheme?
15       MR. WEINSTEIN:  Objection to form.
16       MR. LEONARD:  Objection;
17   mischaracterizes the testimony.
18       MR. SIMHAUSER:  Objection to form.
19       A.   The staff -- you used the word
20   "blessed."  The company was very transparent in
21   their disclosure, what they were proposing.  The
22   staff did not object to the company using an
23   estimation process in terms of how to determine
24   the amount of the write-off.
25       Q.   And did the SEC specifically tell the

1    company that it was a proper accounting procedure
2    not to -- to capitalize the overpayments that
3    Petrobras used in conjunction with the cartel
4    knowingly in order to increase the price of the
5    contract?
6        MR. WEINSTEIN:  Objection to form.
7        MR. LEONARD:  Objection; deliberately
8    mischaracterizes the testimony.
9        A.   Yeah, I'm not sure I understand your
10   question.  I'm sorry.
11       Q.   Okay.  Could you -- let's withdraw it.
12       Can you tell me under which accounting
13   rule this -- a company that works in connection
14   with the cartel to increase the price of the
15   contract is allowed to capitalize those costs?
16       MR. WEINSTEIN:  Objection to form.
17       MR. LEONARD:  Objection to form.
18       A.   IAS-16 is fairly clear that you would
19   record the asset at what you paid for it.
20       Q.   Even --
21       A.   It was not a basis to record a reduction
22   in -- in that asset.
23       Q.   And IAS-16 discusses whether or not you
24   can record an asset at cost even though you
25   participate with a cartel in increasing the cost

1    of that asset?
2        MR. WEINSTEIN:  Objection to form.
3        MR. LEONARD:  Objection to form.
4        A.   IAS-16 basically says you record the
5    asset at cost.  You record at what was paid.  If
6    you paid $100, that's the value you record it at.
7        Q.   And does I -- when does IAS-16 say that
8    if you overpay as a -- in connection -- if -- if
9    you choose to overpay because -- strike that.
10       And IAS-16 is clear that you can still
11   record an asset at cost even though you overpay on
12   that asset when you act in connection with the
13   cartel to increase the cost of that asset?
14       MR. WEINSTEIN:  Objection to form.
15       MR. LEONARD:  Objection to form.
16       A.   I'm sorry, could you -- could you repeat
17   your question or summarize it?
18       Q.   Sure.  And IAS-16 is clear that you
19   can -- that you can still record an asset at cost
20   even though you overpay on that asset when you act
21   in connection with the cartel to increase the cost
22   of that asset?
23       MR. WEINSTEIN:  Same objection.
24       MR. LEONARD:  Objection to form and
25   foundation.

1    A.  IAS-16 does not address that specific
2  question, but IAS-16 is clear that you record the
3  asset at its cost.  If you pay $100 for an asset,
4  you record it at $100 for an asset.
5    Interestingly, when this issue was
6  discussed with the SEC staff, the staff actually
7  raised questions about was it really necessary to
8  even write off the kickbacks that were going to --
9  the 3 percent kickbacks?  And we explained to Jim
10  Schnurr, who raised the question why the company
11  believed it was appropriate, it was distinguishing
12  this from any amount relating to an overpayment
13  for the cartel because the money was being a
14  round-trip.  The money was coming basically from
15  the company -- from the -- excuse me, the
16  construction company to the political parties.  So
17  there was money coming out is the reason for the
18  distinction.
19    Q.  Do you believe that Petrobras is a
20  victim here?
21      MR. WEINSTEIN:  Objection to form.
22    A.  I don't want to speculate on how I
23  would -- whether they are or they're not.
24  That's -- that's not my role.
25    Q.  You don't want to give me an opinion of

1  whether or not you think Petrobras is a victim or
2  not?
3    A.  I --
4      MR. WEINSTEIN:  Same objection; asked
5  and answered.
6      MR. SIMHAUSER:  Objection to form.
7  Could you please wait for the objections, sir?
8  Thank you.
9      THE WITNESS:  Thank you.
10  BY MS. GILMORE:
11    Q.  So, in your opinion, Petrobras did
12  nothing wrong?
13      MR. WEINSTEIN:  Objection to form.
14      MR. LEONARD:  Objection to form.
15    A.  I'm not going to -- to speculate on
16  whether they did something wrong or they didn't do
17  something wrong.  That's -- that's not my role.
18    Q.  Do you believe that Petrobras's
19  statements -- Petrobras's financial statements are
20  materially misstated?
21      MR. WEINSTEIN:  Objection to form.
22      MR. TURNBULL:  As of what period?  Would
23  you please ask what period?
24    A.  I'm sorry --
25      MR. WEINSTEIN:  Wait.  Just hold on a

1  second.  Which -- which financial statements are
2  you talking about?
3      MS. GILMORE:  Any time between 2012 and
4  2015.
5      MR. WEINSTEIN:  Objection to form.
6    A.  I never expressed an opinion on
7  Petrobras's financial statements.  That is not my
8  role.  My role is to basically -- to do the
9  Appendix K review, and in that review, I never
10  express an opinion on the financial statements.
11  That's not my role.
12    Q.  Have you encountered the situation as
13  the one at Petrobras where you say the accounting
14  under IAS-16, it is proper to record the assets at
15  cost even though the company conspires with the
16  cartel to inflate those costs?
17      MR. WEINSTEIN:  Objection to form.
18      MR. LEONARD:  Objection to form and
19  foundation.
20    A.  I'm sorry, what's your question?
21    Q.  Have you ever encountered a situation
22  other than in connection with your work at
23  Petrobras where the accounting under IAS-16 was --
24  was found to be proper by a court of law where
25  that accounting recorded the assets at cost even

1  though the company conspired with the cartel to
2  inflate -- to inflate those costs?
3      MR. LEONARD:  Objection to form and
4  foundation.
5      MR. WEINSTEIN:  Objection to form.
6    A.  I -- most times courts of law aren't
7  making determinations on -- on financial
8  statements, so I'm not -- could you repeat your
9  question?  I'm not sure if I understand it.
10    Q.  Okay.  Let me try and rephrase it.
11    A.  Okay.
12    Q.  Have you ever en -- encountered a
13  situation in the course of litigation whether a
14  finding -- whether there was a finding that
15  accounting under IAS-16 was proper where the
16  accounting recorded the assets at cost even though
17  the company conspired with the cartel to inflate
18  those costs?
19      MR. WEINSTEIN:  Objection to form.
20      MR. LEONARD:  Objection to form.
21    A.  To that question, no, I've not -- I
22  personally have not been involved in a matter
23  involving litigation like this before.
24    Q.  Other than you personally being involved
25  in a matter involving litigation like this before,

26  (Pages 101 to 104)

1    perspective, it was primarily me.
2        Q.   And when you say "Larry," you mean Larry
3    Borek?
4        A.   Larry Borek, yes.
5        Q.   And did you -- was there a meeting with
6    the SEC made in connection with the
7    presentation --
8        A.   Yes.
9        Q.   -- in March 2015?
10       A.   Yes.  There would have been -- they
11   submitted the -- the presentation, a PowerPoint
12   presentation, to -- again, I believe the company
13   sent it to Paul Dudek, who's the chief of the
14   office of corporate finance.  And Paul distributed
15   it to other people in the division of corporation
16   finance and to the office of the chief accountant
17   and others.
18       Q.   And was that presentation to the SEC --
19   that PowerPoint presentation sent to the SEC
20   before the meeting?
21       A.   Yes.
22       Q.   And do you know how many -- whether it
23   was -- how long before the meeting that
24   presentation was sent?
25       A.   I -- I don't recall the -- the time

1    frame.
2        Q.   And let's go to the March 2015
3    meeting -- meeting with the SEC.
4             What was the -- do you recall the
5    specific date when that meeting took place?
6        A.   No, I'm sorry, I don't recall the date.
7        Q.   Who was present at that meeting?
8        A.   There were representatives of --
9    from the -- the office of the chief accountant,
10   Jim Schnurr, the chief accountant of the
11   Commission participated.  Dan Murdock, who was the
12   deputy chief accountant, participated.  Carlton
13   Tartar, who is an associate chief accountant from
14   the office of chief accountant, participated.
15   Jennifer Minke-Girard, who is a senior associate
16   accountant, participated from the office of the
17   chief accountant.
18            From the division -- oh, Brian Croteau,
19   who is a deputy chief accountant, also
20   participated.  Jeff Mitten, who is their chief
21   lawyer in the office of chief accountant,
22   participated.
23            From the division of corporation
24   finance, Mark Kronforst, who is the chief
25   accountant of the division participated; Paul

1    Dudek, the chief of the office of the
2    international corporate finance, participated.
3    Let's see.  There were a few people from the
4    review group that -- from Corp Fin that
5    participated.  I'm just drawing a blank on one of
6    the gentlemen's names.  But the people who would
7    actually  do the reviewing participated.
8             There was someone, and I can't remember
9    who, from the division of enforcement that
10   participated.  And then there was also a link
11   to -- to the CVM in Brazil.  So the CVM
12   participated via phone.
13       Q.   Do you know who from CVM in Brazil
14   participated?
15       A.   No, I do not.
16       Q.   Who from PwC U.S. participated?
17       A.   From PwC U.S., I participated.
18       Q.   Anybody else?
19       A.   No.
20       Q.   What about PW -- from PwC Brazil?
21       A.   It was Marcos Panassol, and, again, that
22   one gentleman whose name I'm just still drawing a
23   blank on, the risk management leader of -- of the
24   Brazilian -- Brazilian firm.
25       Q.   Was anybody from Petrobras --

1        A.   Yes.
2        Q.   Who?
3        A.   I'm going to be very terrible with --
4    with some of their names.  It was their -- one of
5    their lawyers, Gracie.  I don't know any of their
6    last names, Rodrico, who is one of the
7    accountants.  Another gentleman from the
8    accounting staff, and I'm drawing a blank on his
9    name.  And then there was also another lawyer, and
10   I don't remember his name, from Petrobras.
11            So there was one, two, three -- I
12   believe four people from pet -- oh, I'm sorry.
13   Ivan, the -- the recently appointed chief
14   financial officer, was also there.  Ivan -- Ivan
15   did a presentation, a small presentation.
16            So it was Ivan, the CFO; two people --
17   at least two people from the accounting
18   department, and I believe two people from the
19   legal department.
20       Q.   Anybody from Cleary Gottlieb?
21       A.   Yes, Nick Grabar.
22       Q.   Anybody else?
23       A.   Oh, actually, there was actually -- I'm
24   trying to think if there was anybody else besides
25   Nick that was there.  I -- I don't recall.  It was

34  (Pages 133 to 136)

Page 137

1    a fairly -- fairly big group.
2        Q.  Did you speak at that meeting?
3        A.  Yes.
4        Q.  And can you tell me if you recall what
5    you said?
6        A.  I don't recall the specifics, but it was
7    in response to a question that Jim Schnurr, the
8    chief accountant, had.
9        Q.  Did it have to do an account -- with an
10   account -- did it have to do with an accounting
11   issue?
12       A.  Again, I don't recall the specifics.
13   I'd be speculating, but I'm presuming it would be
14   an accounting issue coming from him.
15       Q.  Did you take notes at that meeting?
16       A.  No.
17       Q.  What happened after that meeting?  Were
18   there subsequent phone calls, meetings, or other
19   conversations between Petrobras and the SEC or PwC
20   and the SEC?
21       MR. WEINSTEIN:  Objection to form;
22   foundation.
23       A.  There were subsequent conversations
24   between -- that also would have been handled by
25   Nick Grabar.  I don't recall if I was on any

Page 138

1    discussions after that meeting with the SEC staff.
2    I may have been, but I just don't recall.  There
3    were several -- several phone calls that -- that
4    Nick was involved with.
5        Q.  Were you required to review the
6    company's 20-F before it was filed?
7        MR. WEINSTEIN:  Objection to form.
8        A.  In my role as Appendix K reviewer, yes,
9    I would have reviewed the -- the Form 20-F.
10       Q.  And where -- where in an Appendix K
11   review does it say -- does it say that you're
12   required to review the 20-F before it gets filed?
13       A.  That's the basic concept of -- of -- of
14   what's in the Appendix K, that you review it
15   before you -- it gets filed as opposed to after.
16       Q.  Could Petrobras have filed the 20-F with
17   the SEC without your review?
18       MR. WEINSTEIN:  Objection to form.
19       A.  It could -- in terms of the question as
20   could it have filed without the review being
21   performed?  The review itself would have had to
22   have been performed, but in terms of who assumes
23   responsibility, it is them.  If there is a
24   disagreement, they don't have to follow my
25   recommendations.  It's a process that has to take

Page 139

1    place.
2        The process has to be that it has to be
3    reviewed, but the local or the foreign firm is
4    assuming responsibility for it.
5        Q.  And after the meetings with the SEC and
6    the subsequent conversations, was there a point
7    where the company decided to adopt one particular
8    method with respect to quantifying the bribery
9    payments?
10       A.  Yes.
11       Q.  Do you know when the decision was made?
12       A.  You know, in terms of time frame, I'm
13   not sure if there is a -- a date that says this is
14   going to be the -- the day that they're going to
15   use the depositions because it was -- basically as
16   more information was coming, excuse me, that -- in
17   terms of getting a higher level of comfort.
18       So, you know, if you look at the -- the
19   opinion, the opinion wasn't dated that PwC Brazil
20   issued until sometime in May of 2015.  And I know
21   that there was -- that Marcos had a number of
22   conversations with people at that point of time,
23   you know, including us and meeting with the
24   federal police.
25       Q.  And what was the company's -- what

Page 140

1    methodology did the company ultimately adopt?
2        A.  They adopted a methodology -- again,
3    it's articulated in the financial statements --
4    of where they went through all of the contracts
5    that were mentioned in the depositions over the
6    period of time that was covered in the
7    depositions, from like 2004 to 2012.  So they took
8    all the contracts that could be covered.  And it
9    was basically taking those numbers times 3 percent
10   for the kickback as the amount of the adjustment.
11       Q.  And where was the -- where did they
12   derive the 3 percent from?
13       A.  The 3 percent was derived from the --
14   from the testimonies of -- of the various
15   participants in the -- in the kickback scheme.  It
16   was viewed that that was going to be on the upper
17   end, that there was a number of -- a number of
18   the -- in some of the testimony, in the
19   depositions, it indicated numbers less than 3
20   percent, but the company believed that it would be
21   more appropriate to use the upper end of the range
22   of estimate.
23       Q.  Were there -- were there testimonies
24   that showed that more than 3 percent was derived?
25       A.  I recall -- and this was a point that

35  (Pages 137 to 140)

Page 157

```
 1    what the -- the writer of the newspaper article
 2    was insinuating, so I don't want to speculate
 3    on -- on what he was alleging.
 4        Q.  Are you -- are -- is your testimony that
 5    you have no opinion as to -- you -- you have no
 6    understanding at all as to what this article is
 7    reporting?
 8        MR. WEINSTEIN:  Objection to form.
 9        MR. LEONARD:  Objection.
10        A.  I don't want to speculate on what
11    this -- the author of this article was alleging or
12    alluding to.
13        Q.  What is your --
14        A.  It's a newspaper article.
15        Q.  What is your understanding upon reading
16    this article?
17        MR. WEINSTEIN:  Objection to form.
18        MR. LEONARD:  Objection.
19        A.  He's making a statement that he believes
20    that there are other costs that -- that related to
21    the -- the corruption issue.  But it's not the
22    same as the kickback scheme.  It's -- they're two
23    different -- two different items.
24        Q.  Do you believe that this information
25    should be disclosed to the SEC?
```

Page 158

```
 1        MR. WEINSTEIN:  Objection to form.
 2        MR. LEONARD:  Objection to form;
 3    foundation.
 4        A.  I don't want to speculate on what the
 5    company should disclose, but I don't view this as
 6    being at all inconsistent with -- with information
 7    that has been conveyed to the SEC staff.
 8        Q.  Why --
 9        A.  Because the SEC -- when the discussion
10    took place with the staff, it was discussed that
11    there could be additional charges that were, you
12    know, part of the -- the cartel process that were
13    unknown, indeterminable, but there could be other
14    costs that would relate.  But that is not what the
15    charge was that was written off.
16        The charge that was written off related
17    to the kickback scheme where money was leaving the
18    companies, leaving the construction companies, to
19    go into the political parties.
20        And as I mentioned, that's what the
21    staff agreed would be the amount or the concept of
22    what would be expensed.
23        Q.  Do you believe that Petrobras paid --
24    overpaid the 3 percent?
25        MR. WEINSTEIN:  Objection to form.
```

Page 159

```
 1        MR. LEONARD:  Objection; foundation.
 2        A.  I'm sorry, could you rephrase?
 3        Q.  Do you believe that Petrobras overpaid
 4    the 3 percent that was used as bribes?
 5        MR. WEINSTEIN:  Objection to form;
 6    foundation.
 7        A.  I apologize, could you rephrase the
 8    question again?
 9        Q.  What do you understand the 3 percent to
10    be?
11        A.  The 3 percent was the amount of the
12    kickbacks that was -- went from the construction
13    companies to either Petrobras employees or to the
14    political parties.  It was basically viewed -- the
15    concept of this was it was viewed as if Petrobras
16    paid $100 for the asset, $3 went to the political
17    party.  So it was the equivalent of Petrobras
18    paying $3 to a political party.
19        Q.  And where did the 3 percent come from?
20        A.  It came from the testimony of various
21    depositions from both people that were former
22    Petrobras employees.  I believe there was a
23    gentleman who was responsible for the money
24    laundering.  I believe there was also a number of
25    the -- several of the construction companies that
```

Page 160

```
 1    indicated that there was a 3 percent kickback.
 2    And it was also my understanding that that is the
 3    number that the federal police were also using in
 4    terms of trying to recover money.
 5        Q.  Apparently not anymore, is that correct?
 6        A.  I am --
 7        MR. WEINSTEIN:  Objection.
 8        MR. LEONARD:  Objection to form.
 9        A.  I -- I can't speculate on a -- on a
10    newspaper article.
11        Q.  Did the 3 percent of bribe amount come
12    from the overpayments that Petrobras was paying
13    the contractors?
14        MR. TURNBULL:  Objection to form.
15        MR. WEINSTEIN:  Objection to form;
16    foundation.
17        MR. LEONARD:  Mischaracterizes
18    testimony.
19        A.  I'm sorry, could you ask the question
20    again?
21        Q.  Yes.  The 3 percent that you said was
22    distributed among various individuals, did --
23    where did that amount actually come from?  And I'm
24    talking about where did the money come from?  Did
25    it come from overpayments that Petrobras was
```

40  (Pages 157 to 160)

# TAB G

# EXHIBIT 30
# (FILED UNDER SEAL)

C O N F I D E N T I A L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------

In Re PETROBRAS SECURITIES LITIGATION     Case No.
                                          14-cv-9662
This Document Applies to: All Cases

---------------------------------------


                         June 22, 2016
                         9:34 a.m.


        Videotaped deposition of TSVETAN N. BELORESHKI,

taken by Plaintiffs, pursuant to Notice, held at

the offices of Pomerantz LLP, 600 Third Avenue,

New York, New York, before Joseph R. Danyo, a

Shorthand Reporter and Notary Public within and

for the State of New York.

Beloreshki - Confidential
1
2  piece of information has come out, if substantially
3  the same piece of information comes subsequently,
4  it is difficult for me to think that it is a new
5  piece of information.
6      Q.  When you say that, what is your opinion
7  based upon?
8      A.  This last piece?
9      Q.  Correct.
10     A.  This is, one, common sense analysis, and
11 two, it is the nature of economists.  You have a
12 piece of information, and you are trying to
13 determine how important or how material it is, and
14 if I have seen this thing cross the wire yesterday
15 and if I see the same news story today, how much
16 weight would I assign to it?
17     Q.  Okay.  Turning to page 18 of your
18 report, what were you trying to do in this section
19 A of your appendix, which is -- Appendix A -- where
20 your first cite cap is bond investor considerations
21 with respect to the Petrobras notes?  What was your
22 intent here?
23     A.  My intent actually was to be helpful to
24 the reader in the sense that I wanted to clarify my
25 thoughts with respect to at least two issues.  One

Beloreshki - Confidential
1
2  was how a market participant would process
3  information related to a delay in the financial
4  statements, and the other one was how a
5  professional in the industry would think about the
6  implications for credit rating action.
7      Q.  Were you in effect trying to also
8  propose alternative explanations for why prices
9  declined that were unrelated to the fraud?
10     A.  I am almost agreeing with you.  I wasn't
11 trying to propose them.  It is just that the
12 information that hit us got us moving in that
13 direction.  So that it made sense to point that
14 out.
15     Q.  Let's look at your first paragraph
16 there.  You say the announcement of a delay in the
17 filing of the company's financial statements alone
18 does not provide sufficient information, for
19 example, with respect to the various issues alleged
20 in the complaint for investors to conclude that a
21 prior financial statement was deficient.  You then
22 go on to in the third paragraph, you say "The
23 marketplace reaction to the announcement of a delay
24 in a filing of a company's financial statements
25 will then be a function of the market participant's

Beloreshki - Confidential
1
2  assessment of the available information, the
3  particular reasons behind such delays, and the
4  expected impact of the company's economic value,
5  and thus the prices of its securities."
6      Now, when you are referring to in the
7  third paragraph the reasons for such delays, to the
8  extent that the reasons for the delays may have
9  been connected to revelations of the corruption, is
10 it your position that the market did not associate
11 the delay of the filings to the corruption?
12     MR. STRAUS:  Objection.
13     A.  Just so we are on the same page, in
14 terms of defining the term "corruption," just if
15 you could tell me what you mean.
16     Q.  Sure.  I think that is a fair request.
17 In this case the corruption is the multiyear
18 multibillion dollar scheme whereby Petrobras
19 overpaid its suppliers by upwards of $17 billion in
20 return for which its executives and others got
21 kickbacks of $3 billion which resulted in the
22 arrests of four members of its executive board, all
23 of whom were integrally involved with this scheme,
24 all of which we allege had a significant damage to
25 the investors of Petrobras.

Beloreshki - Confidential
1
2      MR. STRAUS:  Objection.
3      MR. GERBER:  Objection.
4      Q.  Now that you asked.
5      A.  We understand I don't necessarily have
6  to agree with every number that you just gave me,
7  but I will use corruption in the same context.  You
8  used the word "revelation" of corruption in your
9  question.  I don't think the delay had much to do
10 with a revelation.  That is one.
11     Two, if you were to read the company's
12 announcement of the first delay, I believe it was
13 November 14, the company explicitly said and
14 referenced all the revelations that had been made
15 prior to that point.  So if you put yourself in an
16 investor's or trader's shoes for a moment, there
17 has been flow of information for months about
18 issues along the lines of the corruption that you
19 described related to Petrobras.
20     So you as a trader have developed a
21 picture.  You have some sort of a distribution of
22 likely event.  You have some idea of what you
23 believe your assessment is as to the likelihood of
24 a problem and the magnitude of the problem,
25 contingent there being one and you have a fair

10  (Pages 34 to 37)

1    Beloreshki - Confidential
2  sense of what the market's view of that is.
3        Now there comes a point in time when the
4  company says we are acknowledging that there has
5  been revelations about something in the past, that
6  there has been information about something in the
7  past, and therefore we are going to take a look
8  into it and try to narrow down or nail down the
9  impact of this corruption on the company.  That
10  does nothing to change my view, my expectations, my
11  distribution of things.  All it tells me is that
12  the company is going to look into something.
13        So the only thing that I take out of it
14  is that, while I get no new information that would
15  inform me as a trader, how I should view that,
16  quote unquote, corruption, whether it is worse or
17  better than what I had thought prior to that
18  announcement, the one new piece of information for
19  me is the announcement of a delay in the financial
20  statements for 3Q '14.
21     Q.  I am trying to use the terminology of
22  financial economists as I understand it, your
23  position is that the only new value relevant
24  information that is released on November 14 has to
25  do with the delay in the financials not with regard

1  to the corruption, is that correct?
2        MR. STRAUS:  Objection to form.
3     A.  No, the announcement is not a two
4  sentence announcement.  There is a substantial
5  amount of information.  What I am suggesting is
6  this.  We think that announcement, there is no new
7  information that would cause me to change my
8  expectation or my view of what you refer to as
9  corruption.  The only thing that would hit me as a
10  relevant thing as a trader would be the revelation
11  that the company will have its financial statements
12  for 3Q '14 delayed.
13     Q.  So it is your testimony that the only
14  piece of information that was driving the stock,
15  I'm sorry, the notes down on that day was the
16  announcement of the delay in the financials.
17  Correct?
18     A.  That was not my testimony.
19     Q.  Okay.
20     A.  My testimony was that nothing in that
21  day's announcement gave me new information related
22  to what you refer to as corruption.  Nothing in
23  that announcement gave me any new information as to
24  the role of auditors in that process.  The only

1    Beloreshki - Confidential
2  thing that would drive me and my actions based on
3  that statement is the revelation of delaying
4  filings.
5     Q.  And is it your opinion that the delays
6  in the financials had nothing to do with the
7  accountants?
8        MR. STRAUS:  Objection to form.
9     A.  I didn't say that, no.
10     Q.  Well, okay.  Do you have an
11  understanding of whether or not PWC Brazil had a
12  role in the decision to delay the financials?
13        MR. STRAUS:  Objection.
14     A.  Again, I'm not an accountant.  It would
15  be my assumption that there was some role.  What it
16  was, I don't know.
17     Q.  To the extent that PWC did have a role
18  in the delay of the financials, you would agree
19  that it has sufficient link to that piece of
20  information that was announced on that day, is that
21  correct?
22        MR. STRAUS:  Objection.
23     A.  I don't know about the strength or the
24  weakness of that link, one, and two, we are talking
25  about a link to the financial statements for 3Q '14

1    Beloreshki - Confidential
2  and not prior financial statements, 2012 and 2013.
3     Q.  Okay.  In connection with your
4  assessment as to whether or not there was new
5  information upon which you would as a bond trader
6  be trading on these dates that you examined, with
7  regard to corruption, it was your assessment that
8  all the news was already out?
9        MR. STRAUS:  Objection.
10     A.  I don't know what you mean by all the
11  news was already out.
12     Q.  Well, all the news that would be
13  value-relevant to pricing the bonds.
14        MR. STRAUS:  Objection.
15     A.  I still don't understand that.
16     Q.  What is it that you don't -- perhaps you
17  can clarify your understanding.
18     A.  I just don't know how you use all the
19  news.  I just don't know.  I mean that is the least
20  time-dependent.  The information that I would rely
21  on the price of a bond today would be different
22  than the information that I would rely on in
23  pricing a bond tomorrow.  So all the information
24  today would have one meaning and all the
25  information tomorrow would have a different

11  (Pages 38 to 41)