# TAB H

Advisory
Forensic Services

Draft

# *Forensic Services Memo* Review of Management's Investigations (CIAs)

*To: Marcos Panassol, Assurance Partner*

*From: Leonardo Lopes, Advisory Forensic Services Partner*

*March 20, 2015*



5. (DC3) Secreto - Altamente Confidencial

# *Table of Contents*

1. Third Quarter Review of Management's Investigations ........... 5

1.1. Overview of Third Quarter Review of CIAs ........... 5

1.2. PwC's Review of CIAs ........... 5

1.3. Conclusion ........... 6

1.4. Establishment of a Special Committee for an Independent Investigation ........... 8

2. Pasadena CIA ........... 9

2.1. Overview of Pasadena Acquisition and Allegations leading to the CIA ........... 9

2.2. List of key words used by management in their email review ........... 11

2.3. Review by Forensic Services ........... 12

2.4. Conclusions ........... 13

2.5. Individuals interviewed by the Pasadena CIA ........... 19

3. RNEST CIA ........... 22

3.1. Overview ........... 22

3.2. Allegations ........... 22

3.3. Investigation performed by management ........... 23

3.4. Conclusions of management's investigation ........... 24

3.5. Review by Forensic Services ........... 25

3.6. Individuals interviewed by the RNEST CIA ........... 26

3.7. Conclusions ........... 27

4. COMPERJ CIA ........... 30

4.1. Overview of COMPERJ Refinery and Petrochemical Project ........... 30

4.2. Review by Forensic Services ........... 34

4.3. Conclusions and Topics for Further Investigation ........... 44

4.4. Individuals interviewed by the COMPERJ CIA ........... 48

4.5. Companies who were mentioned by Mr. Paulo Roberto Costa as part of the cartel or who previously signed contracts with the Company in an environment in which there were lapses in internal controls ........... 50

5. SBM CIA ........... 58

5.1. Overview of SBM ........... 58

5.2. Allegations as outlined by the SBM CIA investigation report ........... 58

5.3. Allegations as outlined by SBM press releases ........... 59

5.4. Allegations per public media ........... 60

5.5. Investigation performed by management ........... 66

*1. (DOJ) Secreto - Altamente Confidencial*

5.6. Conclusions of management's investigation                                    68
5.7. Review by Forensic Services                                                  68

5.8. Conclusions                                                                  68

5.9. Individuals interviewed by the SBM CIA                                       72

5.10. Abbreviations of names used by the Wikipedia whistle-blower*               73

5.11. Entities to consider in the Special Committee Phase of the Investigation    73

5.12. Individuals to consider in the Special Committee Phase of the Investigation 75

5.13. Documents to consider in the Special Committee Phase of the Investigation*  77

6. Época CIA                                                                      78

6.1. Overview                                                                     78

6.2. Allegations                                                                  78

6.3. Investigation performed by management                                       81

6.4. Conclusions of management's investigation                                   82

6.5. Review by Forensic Services                                                 86

6.6. Conclusion and Topics for Further Investigation                             86

6.7. Individuals interviewed by the Época CIA                                    88

7. Ecoglobal CIA                                                                 91

7.1. Overview of Ecoglobal                                                       91

7.2. Review by Forensic Services                                                 94

7.3. Conclusions                                                                 94

7.4. Individuals interviewed by the Ecoglobal CIA                               94

7.5. Companies to consider in the next phase of the investigation               95

7.6. Individuals to consider in the next phase of the investigation             96

8. Astromaritima CIA                                                            97

8.1. Overview of Allegations                                                    97

8.2. Investigation performed by management                                      98

8.3. Conclusions of management's investigation                                  99

8.4. Review by Forensic Services                                                99

8.5. Conclusions                                                                100

8.6. Individuals interviewed by the Astromaritima CIA                          101

9. Toyo Setal CIA                                                               102

9.1. Overview of allegations                                                    102

9.2. Investigation performed by management                                      102

9.3. Conclusions of management's investigation                                  103

9.4. Review by Forensic Services                                                105

9.5. Conclusions                                                                106

*4. (DC@) Secreto - Altamente Confidencial*

| | |
|---|---|
| 10. Sanko Sider CIA | 108 |
| 10.1. Allegations and the subsequent investigation by management | 108 |
| 10.2. Conclusions of management's investigation | 109 |
| 10.3. Review by Forensic Services | 112 |
| 10.4. Conclusions | 112 |
| 10.5. Individuals interviewed by the Sanko Sider CIA | 113 |
| 11. Marketing CIA | 115 |
| 11.1. Overview of Marketing CIAs – allegations and events surrounding their creation | 115 |
| 11.2. Investigation performed by management | 116 |
| 11.3. Individuals interviewed by the Marketing CIAs | 117 |
| 11.4. Conclusions of management's investigation | 117 |
| 11.5. Review by Forensic Services | 119 |
| 11.6. Conclusions | 119 |
| 12. Email Review | 121 |
| 12.1. Work performed | 121 |
| 12.2. Findings | 123 |
| 12.3. Conclusions and next steps | 130 |
| 12.4. Annexes | 132 |
| 13. Selection of CIA Members | 139 |
| 13.1. Key points of Company policy governing CIAs | 139 |
| 13.2. Conclusions regarding the selection of CIA members | 140 |
| 13.3. Summary of individuals involved in the CIAs | 141 |
| 14. Sanctions applied | 144 |

4. (DC3) Secreto - Altamente Confidencial

Draft
Attorney Work Product
Privileged and Confidential

# 1. Third Quarter Review of Management's Investigations

## 1.1. Overview of Third Quarter Review of CIAs

As part of the 3rd Quarter Review procedures PwC Forensics was asked to assist the Petroleo Brasileiro S.A. ("Petrobras") audit team by reviewing the work of various management investigations into allegations of financial improprieties in refinery construction projects and other areas. Management's response to allegations of fraud and corruption by conducting its own investigation is appropriate, and further, is an appropriate element of the Company's governance. Such management investigations are carried out by ad-hoc Commissions, (Comissão Interna Apuração or CIAs) formed by the relevant business unit manager or executive officer to investigate the allegations. This is done pursuant to a formal Company policy, Review Procedure PP-OV4-00056-F. The principal management investigations were the result of allegations under investigation by the Federal Prosecutor in a wide ranging money laundering investigation called Operacao Lava Jato ("Lava Jato").

This investigation included a search and seizure operation on March 17, 2014 against various people, but significantly to Petrobras it included Mr. Alberto Youseff, a foreign currency exchange broker. He was arrested, and later provided information that connected Mr. Paulo Roberto Costa, a former Director of Petrobras for the Downstream, or Supply, division. As a result, Mr. Costa was also arrested and after considerable pressure to collaborate with the investigation he entered into a plea bargain (Acordo de Delacao Premiada). Mr. Costa's cooperation with the Prosecutor resulted in a variety of further allegations that were made public on October 8, 2014. He alleged that he, as would be expected of any politically appointed Director of Petrobras, used various contracting schemes to funnel money to the political parties, individual politicians, and to himself in the form of kickbacks. The primary method of funding these payments was agreeing to overpriced construction contracts with a select group of contractors (the "Cartel"), who in turn disbursed approximately 3% of the contract price as agreed with Petrobras executives. In general, he alleges that 2% went to political parties, and 1% was used for direct bribes and kickbacks to individuals.

## 1.2. PwC's Review of CIAs

Even before the full extent of Mr. Costa's allegations were known the Company established 3 CIAs in response to Lava Jato investigation; Pasadena, RNEST, and COMPERJ. The Forensic team has reviewed these three CIAs as well as 6 others. In all, the 9 CIAs reviewed are:

- Pasadena – DIP Presidencia 38/2014 dated March 24, 2014
- RNEST – DIP PRESIDENCIA 71/2014 dated April 25, 2014
- COMPERJ – DIP DEBAST 70/2014 dated April 25, 2014
- SBM – DIP DE&P 17/2014, February 13, 2014
- Epoca – August 9, 2013 in response to an article published that day
- Ecoglobal – April 11, 2014 or later – search warrant executed that day at Petrobras HQ focused on the Agreement signed July 2013 with Ecoglobal.
- Astromaritima – DIP DE&P 55/2014 dated April 14, 2014
- Toyo Setal – November 5, 2014 DIP DE&P 233/2014

CONFIDENTIAL

PwCBR_PETRO_000135743

- Sanko Sider – DETEM 09/2014 dated October 4, 2014
- Marketing – GAPRE 00123/2008 dated December 5, 2008 and DIP AB-CR 33/2009 dated January 30, 2009

PwC's work in relation to each of the CIAs included:

- Obtaining and reading the report of each CIA;
- Understanding the scope of each CIA;
- Reviewing the working papers of each CIA;
- Discussing the work and findings with the CIA Leader or other members of the CIA;
- Reviewing source documents, such as contracts and emails, used by the CIAs;
- Understanding the findings, proposed remedial actions, and proposed sanctions from each CIA, and;
- Preparing a summary of the key elements of each CIA, which is included in the sections that follow;

## 1.3. Conclusion

Based partly on the review of the CIAs, PwC has concluded that the Company should pursue an independent investigation of the allegations of corruption and fraud in connection with at least the COMPERJ and RNEST construction projects, the Pasedena acquisition and other allegations of corrupt activities.  Such investigation should be conducted by qualified attorneys assisted by forensic accountants and facilitated by the Company.  It should report directly and solely to the Board of Directors or appropriate sub-committee of the Board (i.e., Audit Committee or Special Committee of Independent Directors).

### 1.3.1. Factors Considered

This conclusion is based on a number of factors relating to the nature of the CIAs, the severity of the allegations stemming from the Brazilian Prosecutor's Lava Jato investigation into money laundering, and the seniority of the Company executives who may have been involved in the alleged misconduct, or who may have had knowledge of the misconduct and acquiesced to it or failed to report it.  Most significant to this last concern are those executives who remain in the Company's employ and on whom we rely, either formally in that they sign representation letters in the course of the audit of the consolidated financial statements, or informally, during the many different testing and inquiry procedures that comprise our audit.  In particular we have considered the following aspects of the CIAs in arriving at the decision to request an independent investigation:

- The scope of the CIAs is generally procedural or control process oriented and does not directly seek to determine if the allegations of fraud and corruption are true, and if so, to what extent and who was responsible;
- The CIAs are not staffed with personnel adequately independent of the business unit in which the investigation is being conducted;
- The CIAs do not report directly to the Board of Directors or Sub-Committee thereof, or appropriate "ombudsman" to protect the independence of their process, findings and conclusions;
- The CIAs are not staffed with personnel trained and experienced in forensic accounting investigation to an appropriate degree;

CONFIDENTIAL                                                                          PwCBR_PETRO_000135744

Email Review

Draft
Attorney Work Product
Privileged and Confidential

- The CIAs handling of electronic evidence is not aided with appropriate investigatory approaches to data capture, preservation or analysis and as such may proceed on an incomplete evidentiary basis;
- The CIAs generally do not seek information from outside parties or from law enforcement;
- The CIAs do reach conclusions about whether or not Company policies, procedures and controls were followed appropriately or not, however, the impact of their findings on the assessment of the adequacy of the Company's control structure and whether material weaknesses or significant deficiencies in the design or implementation of control processes exist are not documented in their Reports;
- The CIAs have generally not attempted to determine, either through direct fact finding or appropriate estimation, the monetary impact of the misconduct being examined, either in terms of losses suffered by the Company or on the financial statements of the Company;
- The CIAs have not generally attempted to identify opportunities to recover the losses caused by the misconduct; and
- The CIAs have generally not recommended significant remedial measures to the Company's culture, controls, systems, policies, or operating processes nor have they recommended any significant personnel actions (for example; of the 17 employees identified as having failed in their assigned responsibilities in respect of the COMPERJ or RNEST refinery projects not one sanction was recommended by these two CIAs).

In addition to considering these points relating to management's response to the allegations by the formation of various investigative commissions, PwC has also considered the following:

- The news reports about the "Lava Jato" investigation, in particular from October 8th onwards;
- The testimony and "confessions" of former Company Directors who participated in the corrupt scheme to direct payments to political parties, individual politicians, political causes, and to profit personally (first disclosed on October 8th);
- The information provided to the Company by at least one of their vendors, SBM;
- The seniority of the executives involved, or allegedly involved,  in the corruption scheme;
- The allegation that all Director level personnel were politically appointed and accordingly were expected to organize a means of funneling Company funds to political parties and political allies;
- The potential size of the losses suffered by the Company, i.e., billions of Reals;
- The possibility that the scheme has resulted in an overstatement of the Company's fixed assets as many of the payments to the cartel of contractors allegedly involved have been capitalized as construction costs of refinery assets;
- The length of time the scandal persisted – 2003 or 2004 to 2012 or even possibly to 2014;
- The possibility that because of the length of the scheme, the amounts involved, and the seniority of the personnel involved, that other senior executives that provide representations during the audit may also have known of the scheme;
- The fact that management has elected to bring the CIAs commenced in 2014 to a close rather than continue them with a revised focus on the newly reported allegations and admissions from the Lava Jato investigation;
- The possibility that the existence of the scheme represents one or more material weaknesses in internal accounting and financial reporting controls during the period under audit; and,
- The possibility that the culture of the enterprise has allowed other procurement or contracting fraud schemes to exist.

CONFIDENTIAL

PwCBR_PETRO_000135745

Email Review                                                                     Draft
                                                                          Attorney Work Product
                                                                       Privileged and Confidential

## 1.4. Establishment of a Special Committee for an Independent Investigation

In consideration of all of the above, pending the establishment of an appropriate Special Committee and Investigation Team with an adequate plan of investigation, PwC determined not complete its review of the third quarter financial statements. Instead, in consultation with the Audit Committee, Board, and CEO among others at the Company, the Company's Board of Directors has determined to establish and charter a Special Investigation Committee of adequate experience and capability. The Special Committee is uniquely composed of two outside people and one newly hired director, Joao Elek, who will be responsible for Governance, Risk and Compliance, and who is uniquely protected to ensure his independence in that pursuant to his employment agreement he can only be terminated with the agreement of the Board members representing the minority shareholders. The other two members are Judge Ellen Gracie Northfleet, retired, of the Brazilian Supreme Court, and Dr. Andreas Pohlman, retired Siemens director of Compliance and the executive responsible for overseeing Siemens' extensive remediation plan in the wake of their corruption scandal. These three members of the Special Committee will constitute the "reporting line" between the Investigation Team and the Board. They will supervise the investigation and ensure that it is conducted independently, objectively, without interference, and fully reports its findings and recommendations to the Board of Directors.

In the sections of the memo that follow, we provide more detail about our review of the individual CIAs.

CONFIDENTIAL                                                          PwCBR_PETRO_000135746

Draft
Attorney Work Product
Privileged and Confidential

# 2. Pasadena CIA

## 2.1. Overview of Pasadena Acquisition and Allegations leading to the CIA

### 2.1.1. Background of the Acquisition

The Strategic Plan of the Petrobras System 2000/2010 included the strategy of "Ensuring overseas surplus follows the flow of the production of heavy oil, through an integrated performance with distribution." This goal was the justification for acquiring the Pasadena refinery which could be used to refine the heavy oil produced by Petrobras wells.  After the Strategic Plan was approved the following happened:

- In 2000, the corporate area of New Business began to develop the project "Refining Overseas", aiming to ensure the placement of Petrobras' products in the international market.

- In 2002, presentations of this "Refining Overseas" initiative were  made to various internal management groups including the Commission of Business Enterprise, the Executive Directory and Board of Administration, based on a study conducted by Aegis Muse (an outside consultant) on the refining market in the US, Canada and the Caribbean.

- In the above presentations, the Pasadena refinery initially was ranked as 21st position (based on the analyses of 165,000 bpd) among potential acquisition opportunities and then was reclassified to 14th place in the rank of business priority (based on the analyses of 100 000 bpd) among 25 refineries analyzed.

- In July 2004 the International Directory, led by Mr. Nestor Cervero, the Executive Management Business Development (INTER-DN) was created, with a similar purpose to the area of New Business, of facilitating businesses to expand activities overseas.

- In October 2004 Astra, a privately held Belgium company that invests in oil refining and oil field facilities, purchased the Pasadena refinery from Crown Central Petroleum Company, a US public company that refines and sells petroleum products through a network of retail locations,  for a total cost of USD 42.5 million.  This information about Astra's acquisition at this lower price is used years after the fact as a basis for questioning Petrobras' judgment in paying a higher price as noted below.

- In January 2006, Petrobras agreed to pay $ 360 million for 50% of Pasadena refinery shares.

### 2.1.2. CIA established to Investigate Allegations

This CIA was established March 24, 2014 was long after the Pasadena transaction was conceived and completed.  It was established by DIP PRESIDÊNCIA 38/2014 with the generally stated purpose of analyzing facts and data regarding the acquisition process to the Pasadena Refinery – PRSI, in Texas/USA, to identify eventual impacts, losses, and accountabilities from such operation.  The specific allegations that motivated its establishment are not mentioned.  However, in its investigation report, the Pasadena CIA detailed the following reason as motivating its investigation:

CONFIDENTIAL

PwCBR_PETRO_000135747

Email Review                                                                     Draft
Attorney Work Product
Privileged and Confidential

- The Pasadena CIA was created to answer questions originated by the acquisition process of Pasadena Refinery. Such questions were made to Petrobras by the National Congress, Office of General Controller (CGU), Public Prosecutor's Office alongside the Federal Court of Auditors and the Federal Public Prosecutor's Office.

However, the details of these questions are not provided. While the Pasadena CIA does not specifically list which allegations it was established to consider, a media search performed by the Forensic Services team revealed allegations in the media relating to the decision making and approval process used by Petrobras, and questions about the put option structure that was contained in the acquisition agreement[1]. These media reports appeared a few days prior to the formation of the CIA. Note that these allegations are discussed in the Pasadena CIA Report and interviews it performed.

In October 2014, approximately six months after this CIA was established to consider the internal decision making processes and controls used to make the Pasadena acquisition, former director of Petrobras, Paulo Roberto Costa, admitted to the Federal Police that had received USD 1.5 million as bribes to allow the purchase of Pasadena refinery[2]. This new allegation of corruption in the transaction was not incorporated into the work of the CIA, which by this time was substantially complete.

## 2.1.3. Management's Investigation

The strategy adopted for the investigation, according to the Pasadena CIA Report, was the following:

- Examine the documentation that instructed the acquisition process of the Pasadena Refinery,
- Collect other documents relevant to the acquisition process
- Analyze chronology of events
- Identify key personnel involved in the process
- Schedule interviews
- Gather data regarding visits, meetings, internal telephone contacts and employee travels
- Verify if the acquisition was conducted in compliance with legislation, norms and procedures
- Issue a conclusive report and forward it to authorities to inform them and take action, if needed.

The work of the Pasadena CIA began with gathering of the documents related to the Pasadena purchase process. The Pasadena CIA attempted to understand the decision making process of Petrobras practiced at the time in acquiring overseas assets. Proceeded to the analysis of the documentation relating to this procedures used in the acquisition process, in order to identify the people who might contribute with information about the matter as well as to identify the occurrence of potential nonconformities in the acquisition process.

---

[1] http://www.washingtontimes.com/news/2014/mar/21/scandal-involving-refinery-hits-brazils-petrobras/#ixzz3IyNRozSd
[2] http://g1.globo.com/bom-dia-brasil/noticia/2014/09/paulo-roberto-costa-admite-propina-na-compra-da-refinaria-de-pasadena.html

CONFIDENTIAL                                                       PwCBR_PETRO_000135748

Draft
Attorney Work Product
Privileged and Confidential

In the course of the investigation, the Pasadena CIA identified the need to interview 57 people who would have participated in the various stages of the Pasadena acquisition process, and listed the trips related to the process.

## 2.2. List of key words used by management in their email review

According the Pasadena CIA, the Company performed the searches on the email basis select through a list of words considered as keywords, and the list of words employed were the following:

Alberto Youssef
Bonus + Pasadena
Cerveró
CFIUS
Clausula Marlim
Deloitte Touche
Due Diligence
EVTE + Pasadena
Exon Florio
Letter of Intent
Marlim Oil
Nilo + Marlim + Trader
Projeto Mangueira
PRSI Bylaws
put option
Revamp + Pasadena
Revamp Project
Rose Bowl
Stock + Pasadena
Winget e Valuation + Pasadena

### 2.2.1. Conclusions of management's investigation

The Pasadena CIA Report concluded that the following 11 non-conformities took place:

a) The project NPV was not updated during the acquisition process of the initial 50%.

b) Lack of audit trail and documentation of the steps taken in the negotiation process.

c) Company and Asset Acquisition Systematic conditions, set by the Executive Directory, in June 02, 2005, were not met in the process.

d) Purchase offer was above limit set by Directory (from October to December, 2005).

e) Proper approval processes were not followed for the "Marlim" and "Put Option" contract clauses

f) Information regarding clauses, conditions and other relevant information were not presented to the Board and to the Directory.

CONFIDENTIAL                                                                    PwCBR_PETRO_000135749

Email Review                                                                 Draft
Attorney Work Product
Privileged and Confidential

g)  Agreed conditions were changed during "closing" period.

h)  Flaws in the negotiation process for the remaining 50% (September to December, 2007).

i)  Purchase offer for the remaining 50% was submitted without knowledge of the Executive Directory. (December, 2007)

j)  Information presented to the Executive Directory regarding the acquisition of the remaining 50% was not updated. (February, 2008)

k)  There was not a formal approval to enter the arbitration process (June, 2008)

The Pasadena CIA Report also links the nonconformities above mentioned with the persons responsible for it, as follows:

| Name | Position at the time of events | Nonconformities | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | a | b | c | d | e | f | g | h | i | j | k |
| Nestor Cuñat Cerveró | Director of International Area | x | x | x | x | x | x | x | x | x | x | |
| Luís Carlos Moreira da Silva | Executive Manager INTER-DN | x | x | x | x | x | x | | | | | |
| Rafael Mauro Comino | Manager (INTER-DN/IM), then (INTER-DN/AB) | x | x | x | x | x | x | | | | | |
| Cezar de Souza Tavares | External Consultant (and former employee) | x | x | x | x | x | x | | | | | |
| Aurélio de Oliveira Telles | Refinery due diligence Coordinator | x | x | x | x | x | x | | | | | |
| José Sergio Gabrielli de Azevedo | Finance and IR Director, then President of Petrobras | | | | | | | | x | | | x |
| Thales Rezende Rodrigues de Miranda | International Law Coordinator | | | | x | | x | | | | | |
| Paulo Roberto Costa | Director of Abastecimento | | | | x | | | | x | | | x |
| Jorge Luiz Zelada | Director of International Area | | | | | | | | | | | x |

Note that the Pasadena CIA Report does not outline recommended sanctions for the above individuals.

The Pasadena CIA Report also recommended informing the relevant authorities of the results of their internal investigation in order to collaborate with ongoing external investigations.

## 2.3. Review by Forensic Services

### 2.3.1. Scope of the review

Forensic Services (or "we") reviewed the investigation report and all physical investigative documents provided to learn whether the findings had any ongoing relevance to the current financial statement audit, including the assessment of controls, and to identify any matter that should be carried forward

CONFIDENTIAL                                                   PwCBR_PETRO_000135750

into the investigation now being carried out by the Special Committee. We also read all the interview statements, emails included in the report, and any proposed remediation actions or plans.

Conclusions of our review can be found in Section 2.4.

### 2.3.1.1. Meeting to discuss the investigation performed

In the beginning of our field work, the Forensic Services team members met with Pasadena CIA Coordinator, Mr. Gerson Gonçalves, to discuss and understand all steps in the investigation process performed, what triggered the investigation commission, as well as conclusions and impressions from him.

Also, we had regular follow up meetings with the Company's Internal Audit Team and with PwC Audit Team throughout our work.

### 2.3.1.2. Review of the interview notes

We have reviewed the 49 interview statements provided by the Pasadena CIA.

### 2.3.1.3. Review of report

We have read and analyzed the Pasadena CIA Report issued by the Pasadena CIA on October 24, 2014.

Conclusions and judgment of persons still working at Petrobras and companies still transacting business with Petrobras were the main focus of our analysis, detailed in the next section, Section 1.1.3

## 2.4. Conclusions

Given that Costa's admission about accepting a bribe arose after this CIA did most of its work, and that this allegation was not incorporated into the CIA, our primary conclusion is that the Company should pursue an independent investigation of the allegations of corruption in connection with this project.

We also note that the Pasadena CIA Report stated the current evaluation of the Pasadena Refinery was not included as part of the scope of the CIA and as such operational, commercial, economical, financial aspects related to the strategic decisions of the acquisition of the plant as well as economic-financial analysis were not included in scope.[3] This point, however, is covered by the annual assessment of impairment of the Company's cash generating assets.

We do have certain recommendations and points for clarification to the work performed outlined in Section 2.4.1. We have communicated these points to the Special Committee for their consideration.

Additionally, we understand that the Company is analyzing the internal control weaknesses identified through the Pasadena CIA. Information we noted that should be considered in an internal control analysis can be found in Section 2.4.3.

---

[3] Item 5 of the Pasadena CIA Report.

CONFIDENTIAL                                                          PwCBR_PETRO_000135751

## 2.4.1. Topics requiring further investigation

As outlined in Section 2.1, the Pasadena CIA detailed certain conclusions and recommendations resulting from their review in their investigation report. Based on our review of the report, the minutes and the analysis of documents available, we would consider the following:

- Mr. Thales Rezende Rodrigues de Miranda ("Miranda"), former Petrobras internal legal advisor, according to the Pasadena CIA Report, left Petrobras under medical leave for a while, than later he resigned. On the letter issued by Miranda to Petrobras to address questions elaborated by the Pasadena CIA, he states that he suffered pressure from his boss Mr. Carlos Cesar Borromeu de Andrade ("Borromeu") to resign because he didn´t agreed with the modification done by Borromeu on the legal advices memorandum that Miranda prepared regarding the agreement clauses of Pasadena acquisition. According to Miranda the changes made by Borromeu on the memorandum were the cause of some financial damages to Petrobras on the acquisition and later on the arbitration process. The Pasadena CIA included on the report as attachment (#30b) which refers to a legal advice which Miranda appears as the author, together with Barromeu. However on the copy of this memorandum, there is no signature, there is only a sentence saying that Miranda and Barromeu have signed the original document. We believe this aspect of the matter may be indicative of "tone at the top" issues relating the Company's culture and controls and should be considered in the broader context of the Special Committee's work. Carlos Cesar Borromeu de Andrade ("Borromeu")', Legal Manager at the International Area of Petrobras, was responsible for the final legal advices memorandum regarding the Pasadena acquisition process. However, he is not mentioned on the Pasadena CIA Report conclusion as responsible for those matters. Given that Borromeu is a currently employed executive, we suggest that the Company consider his participation in and responsibility for the incomplete legal advice on the Pasadena acquisition.

- Cezar de Souza Tavares ("Tavares"), former employee, according to the Pasadena CIA Report and media, after leaving Petrobras he started a consultancy company named Cezar Tavares Consultores Ltda. which was hired by Petrobras to assist in the negotiations of the contractual clauses of Pasadena acquisition process, including the "Marlin" and "put option" clauses. However the Pasadena CIA Report there is no information about how much Petrobras has paid for his services and if he is still providing services for the Company. Given the circumstances, we recommend evaluating the amount and accounting treatment of his services (capitalized vs. expensed)   and whether he is still providing services for the Company.

- According media article[4], Astra Oil broke the relationship with Petrobras after the Energy Minister, Edison Lobão had sent to Houston an engineer, José Raimundo Brandão Pereira, to ask commissions (bribes) of 1,25% on the leasing of vessels. Note that Mr. Pereira was a Petrobras employee (Executive Manager and Diretor of the Petrobras International Finance Company) at the time he was sent to Houston, but subsequent left the company in 2012. This matter is referred to the Special Committee for consideration.

- Travel records of Paulo Roberto Costa show that on three occasions he traveled to Houston, presumably in relation to the Pasadena refinery acquisition, and immediately thereafter traveled to Brasília for meetings with the government. The three instances are as follows:

| Date | Destination | Justification |
| --- | --- | --- |

---

[4] http://oglobo.globo.com/brasil/refinaria-de-pasadena-pode-ter-sido-alvo-de-suborno-14799533

CONFIDENTIAL                                                                            PwCBR_PETRO_000135752

Draft
Attorney Work Product
Privileged and Confidential

| From | To | | |
|------|-----|---------|-----------------------------------------------|
| 08/20/2005 | 08/23/2005 | Houston | Operational inspection visit at Pasadena refinery |
| 08/25/2005 | 08/25/2005 | Brasília | Meeting at Brasília |

The opportunity to acquire the refinery was officially presented to Petrobras Diretoria Executiva by Nestor Cerveró through the DIP INTER-DN 54/2005 on August 18th, 2005.

On August 19th 2005, Petrobras sent an offer to Astra Refining System.

| Date | | Destination | Justification |
|------|-----|-------------|---------------|
| From | To | | |
| 04/30/2006 | 05/02/2006 | Houston | Join OTC and visit the refinery at USA |
| 05/03/2006 | 06/03/2006 | Brasília | Participate in a ceremony at the Senate about self-sufficiency |

In May 2006, the negotiation of the revamp was already in place, and according an email from Mr. Rogério Araújo (Odebrecht Director) to Mr. Renato Duque mentioned in the CIA Report, Odebrecht had already spoken with competitors and were able to win the bid to do the revamp in Pasadena refinery.

| Date | | Destination | Justification |
|------|-----|-------------|---------------|
| 09/18/2006 | 09/22/2006 | Houston | Signature of the Pasadena purchase agreement |
| 09/25/2006 | 09/25/2006 | Brasília | Meeting with minister* |

*Dilma Roussef

In addition to the 3 instances above, the CIA notes that, 2 days before the presentation to the Petrobras Board of Director for the acquisition of Pasadena on February 3rd 2006, Paulo Roberto went to Brasília to meet President Lula.

It is unclear to what extent the CIA inquired about the calendar and travel of Mr. Paulo Roberto Costa. The Pasadena CIA Report outlined that there is no record that Paulo Roberto Costa was at the site in Pasadena despite these details of his travel being included in the files of the CIA. Again, this is a matter for the Special Committee to consider.

- In 2008, the Board of Administration postponed the decision making on the remaining 50% three times, while the relationship with Astra was deteriorating. The matter was first presented to the Board in March 3, 2008. In June without having received any advice from the Board of Administration, Petrobras America Inc entered the arbitration process, informing the Board of Administration that it was the best solution. The CIA concludes that had the Board of Administration acted in a timely manner, it is possible that further efforts at a negotiated settlement might have taken place.

The Pasadena CIA performed an e-mail analysis of 13 employees, or former employees. Of these, 11 of 13 were also interviewed by the Pasadena CIA, as outlined below:

| Custodian | Interviewed by CIA |
|-----------|--------------------|

CONFIDENTIAL                                                                PwCBR_PETRO_000135753

Draft
Attorney Work Product
Privileged and Confidential

| Bruno Fragelli | Yes |
| Cezar de Souza Tavares | Yes |
| Francisco Pais | Yes |
| Jose Carlos Cosenza | Yes |
| Jose Sergio Gabrielli de Azevedo | Yes |
| Luis Carlos Moreira da Silva | Yes |
| Luiz Octavio de Azevedo Costa | No |
| Nestor Cunat Cervero | Yes |
| Nilo Carvalho Vieira Filho | Yes |
| Paulo Roberto Costa | No ( not available due to his arrest) |
| Publio Roberto Gomes Bonfadini | Yes |
| Reinaldo Damiance Baptista | Yes |
| Ronaldo da Silva Araújo | Yes |

In addition, to support the investigation, the Pasadena CIA asked for the calendar data of Paulo Roberto Costa and Renato Duque.

According the Pasadena CIA, the reason of Paulo Roberto Costa had a small amount of data is that he used to delete his emails before the backup process, done at night.

According what was reported by the Pasadena CIA the email search was done with no specific tool. The Commission asked the IT Department for the emails of the targets of the investigation and the IT Department provided the data on hard discs to be used on the searches.

The CIA ran keyword searches, but there is no statistical report for the search, such as, number of emails read, number of emails per custodian, number of hits by keywords, etc.

The keyword list used can be found in Section 2.2.

Additionally, we would consider adding the following recommendations to the Pasadena CIA:

- Evaluate the need of administrative and/or labor sanctions to employees responsible for the nonconformities.

- Review Internal Controls and procedures to assure segregation of duties and prevent the approval and signing of contracts without knowledge of the full content.

As discussed previously, the Company has established a Special Committee to carry out a comprehensive independent investigation.   As part of this investigation, we would recommend that the following items be considered:

- Mr. Paulo Roberto Costa, informed the authorities he had received USD 1.5 million, as he defined, "not to interfere with the business transaction." The Pasadena CIA's focus was mainly to identify the business decision process, responsibilities, and Internal Control deficiencies that might have occurred. However, due to the nature of the Pasadena CIA, the initial scope of work planned and other limitations, the work did not intend to seek clarification if such payments were made to Mr. Paulo Roberto Costa and/or other Directors.

- The Pasadena CIA did not investigate members of the Board of Directors, which ultimately were responsible for voting for the acquisition of the refinery. The Pasadena CIA judges the

CONFIDENTIAL

Draft
Attorney Work Product
Privileged and Confidential

information presented to the board was biased and lacked of important details, misleading the Board and possibly leading to a poor business decision. However, it is necessary that the involvement of Board Members, at the time the decision was made, is clarified to determine the degree to which the Board Members were aware of the alleged improper activities.

- During the interviews done by the Pasadena CIA, eight people brought up the Directors' intent to hire construction company Odebrecht to revamp the refinery. However, it is not clear how this contractor was selected. Mr. Pedro Barusco, on his interview explained Engevix, Andrade Gutierrez, UTC and Odebrecht were consulted. Odebrecht had great experience in construction work in the United States, and they joined Toyo, which had experience in projects, and last, UTC, that had recently bought a company in the United States, and has always been a partner of Odebrecht. These three companies entered in a consortium agreement. It is appropriate for the Special Committee to investigate whether the establishment of this consortium and the award of the revamp project to it was influenced by corruption.

- The Pasadena CIA indicates that Mr. Cezar de Souza Tavares was a Petrobras employee from June, 1974 to December, 2002. Afterwards he rendered consulting services to Petrobras, participating in the contract clauses negotiation team, including "marlim" and "put option" clauses. Mr. Alberto Feilhaber, Petrobras employee from 1976 to 1995, is the Vice President of Astra. We believe it is relevant to investigate if there are potential conflicts of interest between these former employees participating in the acquisition process.

## 2.4.1.1. Further review of email data

The following individuals should be included in an email review in a subsequent investigation:

- Thales Rezende Rodrigues de Miranda ("Miranda"), former Petrobras internal legal advisor, according to the Pasadena investigation Commission reports he left Petrobras under medical leave for a while, than later he resigned. On the letter issued by Miranda to Petrobras to address questions elaborated by the investigation Commission, he states that he suffered pressure from his boss Mr. Carlos Cesar Borromeu de Andrade ("Borromeu") to resign because he didn't agree with the modification done by Borromeu on the legal advices memorandum that Miranda prepared regarding the agreement clauses of Pasadena acquisition. According to Miranda, the changes made by Borromeu on the memorandum were the cause of some financial damages to Petrobras on the acquisition and later on the arbitration process. Additionally Miranda was not formally interviewed and did not have his email reviewed by the Pasadena CIA.

- Carlos Cesar Borromeu de Andrade ("Borromeu")', Legal Manager at the International Area of Petrobras, was responsible for the final legal advices memorandum regarding the Pasadena acquisition process. However, he is not mentioned on the Pasadena CIA Report conclusion as responsible for those matters. Additionally his email database was not reviewed by the Pasadena CIA.

- Rafael Mauro Comino, former Manager of Business Development of International Directory at Petrobras, according to the Pasadena CIA Report, has coordinated the negotiation terms of Pasadena acquisition and, after he left Petrobras, he joined Tavares on a consulting company. However his email database was not reviewed by the Pasadena CIA.

- Aurélio Oliveira Telles, former employee at Petrobras, according to the Pasadena CIA Report, he coordinated the pre-acquisition due diligence of Pasadena refinery. However his email database was not reviewed by the Pasadena CIA.

CONFIDENTIAL                                                            PwCBR_PETRO_000135755

Draft
Attorney Work Product
Privileged and Confidential

- Jorge Luiz Zelada ("Zelada"), former Petrobras International Director, according to the Pasadena CIA Report, worked on the legal disputes with AstraOil. Zelada was interviewed by the Pasadena CIA, but had no email data reviewed.

- Renato Tadeu Bertani, (former PAI General Manager), Fernando Kamache (PAI CEO) and Marcos Antônio Zacarias (Director of Petrobras International Braspetro BV - PIB BV), were involved on the Pasadena acquisition process and were interviewed by the Pasadena CIA. However they did not have their email databases reviewed by the Pasadena CIA.

- Additionally, on emails gathered, Mr. Fernando Castro de Sá, expressed he was uncomfortable speaking with the Pasadena CIA given the involvement of Mr. Nilton Maia, his former superior in the legal department, and he also stated he did not trust Mr. Gerson Gonçalves, Executive Manager of Internal Audit and Coordinator of the Pasadena and RNEST Commission.

As stated on the report (item 4.4.10), on May 5th 2006, Mr. Duque forwarded an email to Mr. Cerveró, containing a previous message from Mr. Rogerio Araújo to him. Mr. Rogério Araújo is Commercial Director of Construtora Norberto Odebrecht.

On the message, Mr. Araujo pointed the interest of his company to work on revamp in the Pasadena Refinery and that he had already dealt with the competitors, other constructions company, as showed below on a free translation:

> "Dear Duque, we did that round of negotiations focusing the overview of the project, the challenges of operating in the USA, our experience of 16 years in that country, reasons for us to be in contact with them, and even mention of participation in each company of approximately 15%.: AG[5] bluffed....saying that they think that they would be the third company (replacing Ultratec...), and they would think about; CCCC[6] reacted saying that they did not even know where the site is based and they would assess with their International team; QG[7], was curt, declining, given that Idelfonso[8] is married to an American and understands very well the obstacles to working there. I would like to meet you, to share with you the details and plan the next steps."

Despite of the mention of this email in the report, the companies mentioned were not asked to provide explanations about the negotiations, and the role of Mr. Araújo in that.

### 2.4.2. Items to consider in the internal control review

There are no recommendations in the Pasadena CIA Report regarding internal control environment, perhaps in part due to the fact that these events all took place six or more years ago and that the Company's personnel and processes are different now. However, based on their findings the following should be considered in terms of whether or not they may have continuing relevance to the Company's control environment:

- As Mr. Samir Passos Awad (Senior Petroleum Engineer) stated in his interview, Directors sent a proposal to Astra with the purchase price above their level of approval, without the approval of the Board of Directors or the appropriate disclosure ("subject to Board approval"). Mr. Samir Passos Awad also stated in his interview that the Directors approved the purchase of the second half of Pasadena refinery without the approval of Board of Directors. As mentioned

---

[5] Construtora Andrade Gutierrez
[6] Construções e Comércio Camargo Corrêa
[7] Grupo Queiroz Galvão
[8] Ildefonso Colares Filho, CEO of Queiroz Galvão

CONFIDENTIAL                                             PwCBR_PETRO_000135756

on the Pasadena CIA Report, the project's NPV was not updated during the acquisition process of the initial 50%.

- Understand what processes are in place to ensure that all companies are hired "at arm's length" – particularly given the fact that Cézar de Souza Tavares's (former employee of Petrobras 1974-2002) has participated in the negotiation process of the Pasadena refinery as external consultant hired through the company Cezar Tavares Consultores Ltda. He integrated the team responsible for negotiating the contract terms, including the terms "marlin" and put option.

- As mentioned on the Pasadena CIA Report, Company and Asset Acquisition Systematic conditions, set by the Executive Directory, in June 02, 2005, were not met during the acquisition process. In this case, there was no involvement of corporate areas of Strategy and Business Performance and Financial Planning in the acquisition process. As mentioned on the Pasadena CIA Report, agreed conditions were changed during "closing" period, as an example, the special allocation. Understand what processes are in place to ensure that previously agreed terms and conditions are not changed in the final contract.

- According to the Pasadena CIA Report, there was no formal approval to enter arbitration. In 2008 an arbitration process was initiated in the USA. There was no evidence that formal authorization (the President or the International Director) and the matter has not been previously discussed with the Executive Directors or the Board of Administration. Evaluate the effectiveness of the Company's whistleblowing hotline given that no one reported the irregularities encountered as part of this Commission.

While the events investigated by this CIA took place in 2005 to 2008 time period, and many changes in management personnel and control processes have taken place since then, the implications to the internal control structure of the Company may be of continuing relevance. For this reason these matters should be considered by the Special Committee in the context of their investigation and any remedial recommendations resulting therefrom.

## 2.5. *Individuals interviewed by the Pasadena CIA*

*Note that the individual is included in the priority phase of the external investigation currently underway.

| Ref | Name | Title | Interview Date |
|-----|------|-------|----------------|
| 1 | Gustavo Tardin* | Senior Civil Engineer | 08/04/2014 |
| 2 | Públio Roberto Gomes Bonfadini | Senior Processing Engineer | 08/04/2014 |
| 3 | Agosthilde Monaco de Carvalho | Assistant at BR Distribuidora (BR/DFIN) | 09/04/2014 |
| 4 | Abílio Paulo Pinheiro Ramos* | Senior Processing Engineer | 09/04/2014 |
| 5 | Fernando Gabriel Couto Kamache | Senior Economist | 14/04/2014 |
| 6 | Bruno Fragelli | Senior Processing Engineer | 14/04/2014 |
| 7 | Nilo Carvalho Vieira Filho | Senior Commerce Analyst | 16/04/2014 |
| 8 | Samir Passos Awad* | Senior Petroleum Engineer | 17/04/2014 |
| 9 | Francisco Pais | Senior Civil Engineer | 22/04/2014 |
| 10 | Carlos Cesar Borromeu de Andrade | Senior Lawyer | 22/04/2014 |
| 11 | Reinaldo Damiance Baptista | Senior Processing Engineer | 24/04/2014 |

CONFIDENTIAL

PwCBR_PETRO_000135757

Draft
Attorney Work Product
Privileged and Confidential

| 12 | Maria Angélica Ferreira da Silva | Senior Accountant | 24/04/2014 |
| 13 | Augusto Canellas Monteiro de Castro Junior | Senior Geophysicist | 25/04/2014 |
| 14 | Márcia Castanheira Schneider | Senior Accountant | 28/04/2014 |
| 15 | Luís Carlos Moreira da Silva | Former Executive Manager of INTER-DN | 28/04/2014 |
| 16 | Renato Bernardes | Senior Equipment Engineer | 29/04/2014 |
| 17 | Giampaolo Foschini di Donato | Senior Equipment Engineer | 29/04/2014 |
| 18 | Taísa Oliveira Maciel | Senior Lawyer | 29/04/2014 |
| 19 | Paulo Sérgio Soares | Senior Processing Engineer | 29/04/2014 |
| 20 | Nestor Cuñat Cerveró* | Former Director at Área Internacional | 05/05/2014 |
| 21 | José Carlos Cosenza* | Director at Área de Abastecimento | 05/05/2014 |
| 22 | Cezar de Souza Tavares | Former Consultant rendering services to Área Internacional | 06/05/2014 |
| 23 | Luiz Eduardo Magalhães Correa da Silva | Senior Processing Engineer | 06/05/2014 |
| 24 | José Sérgio Gabrielli de Azevedo | Former President of Petrobras | 07/05/2014 |
| 25 | Alberto da Fonseca Guimarães | Former President of Petrobras America Inc. | 07/05/2014 |
| 26 | Ronaldo da Silva Araújo | Former Downstream Portfolio Manager of INTER-DN | 08/05/2014 |
| 27 | Guilherme de Oliveira Estrella | Former Director of Exploração & Produção | 08/05/2014 |
| 28 | Rafael Mauro Comino | Former Manager of INTER-DN/AB | 08/05/2014 |
| 29 | Roman Alberto Echenique | Employee from Petrobras Argentina S.A | 09/05/2014 |
| 30 | Renato Cesar Tadeu Marques de Oliveira | Senior Chemical Engineer | 09/05/2014 |
| 31 | Marco AntonioBatista da Silva | Senior Environmental Engineer | 09/05/2014 |
| 32 | Fabiano Daleffe Aires | Commerce and Supply Chain Senior Analyst | 12/05/2014 |
| 33 | Almir Guilherme Barbassa* | Finance and Investor Relations Director | 13/05/2014 |
| 34 | João Carlos Araújo Figueira | Senior Geophysicist | 13/05/2014 |
| 35 | Renato Tadeu Bertani | Former General Manager of Petrobras America Inc | 15/05/2014 |
| 36 | Jorge Luiz Zelada | Former Director at Área Internacional | 15/05/2014 |
| 37 | Michael Ditchfield | Senior Economist | 15/05/2014 |
| 38 | Sérgio Baron | Former Commercial Manager of Petrobras America Inc. | 15/05/2014 |
| 39 | Jorge José Nahas Neto | Senior Economist | 15/05/2014 |
| 40 | Helio Shiguenobu Fujikawa* | Petrobras General Secretary (SEGEPE) | 16/05/2014 |
| 41 | José Eduardo de Barros Dutra* | Former President of Petrobras and current Director of Área Corporativa and Área de Serviços | 16/05/2014 |
| 42 | Alan Kardec Pinto | Former Executive Manager of Abastecimento/Refino | 19/05/2014 |
| 43 | Renato de Souza Duque | Former Director of Serviços | 19/05/2014 |
| 44 | Ildo Luis Sauer | Former Director of Gás e Energia | 19/05/2014 |
| 45 | Pedro José Barusco Filho | Former Executive Manager of Engenharia | 20/05/2014 |
| 46 | Alexandre Malburg Cotrim | Former INTER-AFE | 22/05/2014 |
| 47 | John Renwick | Muse Stancil Consulting firm representative | 29/05/2014 |

CONFIDENTIAL

Draft
Attorney Work Product
Privileged and Confidential

| 48 | Newton Vieiralves Sobrinho | Commerce and Supply Chain Senior Analyst | 30/05/2014 |
| 49 | Antônio Roberto da Silva* | Senior Accountant | 09/07/2014 |

CONFIDENTIAL

PwCBR_PETRO_000135759

# 3. *RNEST CIA*

## 3.1. *Overview*

While the RNEST CIA Report does not provide background on the RNEST project, a media search reveals the following:

- RNEST is a refinery under construction at the Suape Industrial Port Complex in the state of Pernambuco, Brazil.

- The complex covers 13,500 hectares and includes various ports, industrial and trade facilities.

- The cornerstone for the refinery's construction was laid in 2006. The refinery was originally to be brought on-stream in 2011, but the project has been delayed until November 2014.

- Once complete, the refinery will process heavy oil from oil found in Bacia de Campos, in particular Marlim, and will mainly produce diesel. The expectation is that RNEST can process up to 230,000 bpd ("barrels per day").

## 3.2. *Allegations*

The RNEST CIA was established on April 25, 2014 by DIP PRESIDÊNCIA 71/2014 to evaluate the procurement procedure adopted in the deployment of RNEST, in order to identify potential losses and accountabilities from such operation. Neither the DIP nor the CIA Report expressly set out the specific allegations that motivated the investigation. However, the CIA Report mentions that it was created in response to news stories about Mr. Costa the former Director of Abastecimento. Also, the creation of these CIAs follows the March 2014 arrest of Mr. Costa in the Lava Jato investigation. Our review of the media shows that the allegations in the media specific to RNEST immediately prior to the formation of the CIA include the following:

- Documents seized by the Brazilian Federal Police suggest that Paulo Roberto Costa enriched himself by selling Petrobras facilities, intermediating the interests of contractors and distributing bribes to politicians

- Paulo Roberto Costa had an extraofficial mission conferred by the political party that indicated him for his position, the PP, to support the financing of campaigns

- The Brazilian Federal Police discovered that Paulo Roberto Costa, a money changer, politicians, and service providers are interrelated in a criminal consortium created to facilitate fraudulent contracts with Petrobras, enrich consortium's members, and finance political parties.[9]

The RNEST CIA team completed fieldwork on 31 October 2014 and issued its final report on approximately 17 November 2014. In early October Mr. Costa's testimony first became public and indicated that he had received payments in relation to this project from one of the contractors. Further information was in the media in early November. The reports were as follows:

---

[9] Veja: O objetivo é o Caixa Dois, April 16, 2014,

Draft
Attorney Work Product
Privileged and Confidential

- Paulo Roberto Costa ("Costa"), former Petrobras Director of Supply, said on his testimony that  USD 23 million discovered in his accounts in Switzerland were deposited by the contractor Odebrecht. The money was deposited in the accounts of Coast between 2010 and 2011, during which time he was responsible for the construction of RNEST refinery[10].

- The Court of Accounts ("TCU") is investigating RNEST for indications of overbilling on contracts with constructions company that were responsible to do the foundation of the factory, TCU estimated that contracts were BRL 69 million  overbilled[11]

## 3.3. *Investigation performed by management*

The purpose of the investigation, according to the RNEST CIA Report, was to evaluate the procurement processes for the planning, design and construction of RNEST in Ipojuca in the State of Pernambuco, from the specification of services until the signing of contractual instruments.

The RNEST CIA Report details the following as its strategy behind its work plan:

- Evaluate the hiring process of goods and services for the RNEST refinery construction. The Commission assessed 23 contracts, out of 202, which represented 90% of the total amount of contracts signed related to RNEST construction (USD 22.4 billion).

- Identify and review all requisitions of RNEST with the total amounts greater than BRL 32 million (limit of competence of the Executive Directors)

- Analyze the chronology of the events

- Identify those responsible for the possible nonconformity in the hiring process of companies

- Conduct interviews with employees which could contribute to clarify the facts

- Evaluate if the hiring process were undertaken in accordance with the policy and legislations

- Issue a conclusive report and forward it to authorities in order to inform and actions, if needed

In light of the aforementioned strategy, the following activities were performed by the RNEST CIA:

- It was analyzed the documentation related to contracts of RNEST construction for the period July, 2007 to May, 2011.

- Analyze the list of companies invited by Petrobras to participate on the tender process, from July, 2007 to May, 2011.

- It analyzed whether the tender commissions were in accordance with the internal procedures used to define the procurement strategy and negotiation process and whether the formal contractual instruments were in compliance with policy.

---

[10] http://veja.abril.com.br/noticia/brasil/ex-diretor-da-petrobras-diz-ter-recebido-us-23-mi-da-odebretch
[11] http://www1.folha.uol.com.br/poder/2014/11/1543451-tcu-sugere-reter-verbas-de-refinaria-da-petrobras-abreu-e-lima.shtml

CONFIDENTIAL

PwCBR_PETRO_000135761

Email Review                                                                                                    Draft
                                                                                        Attorney Work Product
                                                                                    Privileged and Confidential

- In the course the investigation, the RNEST CIA identified the need to invite 43 employees or retired employees to be interviewed, 41 out of 43 accepted.

- The CIA analyzed the depositions of Mr. Costa and Mr. Youssef that were leaked from the "Operação Lava Jato" of the Federal Court Justice of Paraná State.

Given that the majority of the work of this CIA was approaching completion at the time the first depositions of Mr. Costa were leaked on October 8th, the mandate of the CIA was not revised to incorporate an investigation of these new disclosures of corruption into the CIA's work. The CIA did interpret its findings in relation to what it discovered about the relative position of the bidders for various RNEST contracts in the context of Mr. Costa's testimony, as discussed in Section 3.4 below.

## 3.4. Conclusions of management's investigation

The RNEST CIA Report detailed the following conclusions of their work:

a) There was not any technical or business justification for the implementation of the Refinery Acceleration Program - PAR, anticipating the start of operations in about a year – "schedule driven".

b) Low level of detail of the basic project and FEED for bidding between July/2007 to May/2011.

c) Due to the low level of details mentioned above, many questions from the bidders as well as the need for adjustments in the technical specifications during the bidding process.

d) Due the project changes, contractual amendments were necessary to allow for additional periods and scope changes, increasing the amounts of approximately US $ 4 billion.

e) On 23 bidding processes analyzed, in 4 companies were included that did not meet the criteria of Petrobras for bids.

f) The discount of R$ 25 million from Alusa, a supplier, was not applied. Petrobras negotiated R$ 34.2 million in rebates and only benefited from R$ 9.2 million.

g) 4 bidding procedures were completed without proof of legal advice.

h) Changes of the adjustment calculation of contracts, damaging Petrobras at $ 353 million.

i) Evidence of cartel practices of the companies participating in bid process of RNEST.

The RNEST CIA Report also links the non-conformities above mentioned with the persons responsible for it, as follows:

| Name | Position at the time of events | Non-conformities | | | | | | | | |
|------|-------------------------------|---|---|---|---|---|---|---|---|---|
| | | a | b | c | d | e | f | g | h | i |
| Paulo Roberto Costa | Director of Abastecimento | x | x | x | | x | x | | | |
| Renato de Souza Duque | Director of Services | x | x | x | | x | | x | | |
| Pedro José Barusco Filho | Executive Manager Engenharia | x | x | x | | x | | | | x |

CONFIDENTIAL                                                                       PwCBR_PETRO_000135762

Email Review

Draft
Attorney Work Product
Privileged and Confidential

| Name | Position at the time of events | Non-conformities | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | a | b | c | d | e | f | g | h | i |
| Venina Velosa da Fonseca | Executive Manager Abastecimento | x | x | | | x | | | | x |
| Francisco Pais | Abastecimento Director Assistant (Aug/03 – Oct/09)  Executive Manager Abastecimento (Oct/09 – May/12) | | | | | x | | | | |
| Luis Alberto Gaspar Domingues | Executive Manager (AB-PGI) | | | | | x | | | | |
| Glauco Colepicolo Legatti | General Manager RNEST | | x | x | | x | | | | |
| Carlos Alberto Carletto | Manager Engenharia | | | | | | | | x | |
| Omar Antônio Kristocheck Filho | Sectorial Manager Engenharia | | | | | x | | | | |
| Luis Carlos Queiroz de Oliveira | Sectorial Manager Abastecimento | | | | | x | | | | |
| Ricardo Luis Ferreira Pinto Távora Maia | Sectorial Manager Abastecimento | | | | | x | | | | |

## 3.5. *Review by Forensic Services*

In order to understand management's investigation, Forensic Services (or "we") reviewed the investigation report and all physical investigative documents provided.

We have reviewed the interview notes provided, the investigation report issued by the RNEST CIA, and the remediation taken, if any.

Additionally, we have also reviewed emails that were mentioned in the report.

In the beginning of our field work, the team met with RNEST CIA Coordinator, Mr. Gerson Gonçalves, to discuss and understand all steps in the investigation process, what triggered the investigation, as well as his impression that their findings indicated a cartel. Mr. Gonçalves related his belief that the arrest of Mr. Costa was significant to the decision taken by Graça to establish a CIA to investigate RNEST and COMPERJ. Also, we had regular follow up meetings with the Company's Internal Audit Team and with PwC Audit Team throughout our job, to further our understanding of the process and surrounding issues. On November 17, 2014, Leonardo Lopes and Paulo Leitão (Forensic Services) met with Mr. Gerson Luiz Gonçalves to clarify their remaining questions as a result of our review of the investigation report and supporting documentation. Clarifications received and our recommendations related to the work performed by the RNEST CIA can be found below.

As part of our analysis of the interviews, we listed the vendors and persons mentioned that were not interviewed, but may be worthwhile to do so. We linked the statements with potential allegations, assessing the individuals' involvement in the process regarding knowledge of any suspicion, responsibility in the process and/or participation, based on the interviews, newspapers, and document analysis.

CONFIDENTIAL

PwCBR_PETRO_000135763

Conclusions and judgments about the involvement of people (especially those that are still employed and may provide audit representations) or companies in the alleged schemes were the main focus of our review of the CIA Report and documentation.

Conclusions of our review can be found in Section 3.7.

## 3.6. Individuals interviewed by the RNEST CIA

Note that the RNEST CIA invited 43 individuals to interview. Two of thes individuals, Paulo Roberto Costa and Renato Souza Duque declined to be interviewed by the RNEST CIA. The individuals interviewed are listed below.

# REDACTED

| Ref | Name | Title | Interview Date |
|-----|------|-------|----------------|
| 1 | Paulo Cesar Silva | Manager of AB-PGI/GPI/CI | 31/07/2014 |
| 2 | Diego Barbosa Sampaio | Sector Manager of JURIDICO/JENG/ENG_AB | 31/07/2014 |
| 3 | Paulo Roberto Ribeiro da Silva | Coordinator of ETM/CORP/GPRI/CONTS | 31/07/2014 |
| 4 | Cláudio Povoa Comes da Hora | Operation Technician ENG-SUB/IESS/SIMA/PID | 04/08/2014 |
| 5 | Pablo Rodrigo Oliveira Vogel | Manager of MATERIAS/CE-AB/CRNEST | 06/08/2014 |
| 6 | Marcelino Guedes Ferreira Mosqueira Gomes | Manager of AB-PGI/GPI/CPDI | 06/08/2014 |
| 7 | Carlos Alberto Carletto | Manager of ENG-AB/IERENEST/IG | 06/08/2014 e 18/09/2014 |
| 8 | Jose Raimundo Lima Mendes | Sector Manager of ENG-AG/IERENEST/IEHDT/CMUGH | 11/08/2014 |
| 9 | Stenio Brasil Accioly de Araújo | Sector Manager of ENG-AB/IERENEST/IEUT/CMSIEC | 11/08/2014 |
| 10 | Rodrigo Avelino Mesquita dos Santos | Manager of ENG-AB/IERENEST/IEDACR | 12/08/2014 |
| 11 | Omar Antônio Kristoschek Filho | Sector Manager of ENG-AB/IERENEST/IEDAR/CMCO | 12/08/2014 |
| 12 | Luís Carlos Queiroz de Oliveira | Sector Manager of ENG-AB/IERENEST/IEHDT/CMHDT | 12/08/2014 |
| 13 | Ricardo Luiz Ferreira Pinto Távora Maia | Sector Manager of ENG-AB/IERENEST/IG/PID | 12/08/2014 |
| 14 | Ivo Tasso Bahia Baer | Manager of ENG-AB/IERENEST/IEINTER | 13/08/2014 |
| 15 | Marcos Jose Pessoa de Rezende | Manager of ENG-AB/IERENEST/IEHDT | 13/08/2014 |
| 16 | Antônio Cesar de Oliveira Silva | Manager of ENG-AB/IERENEST/IEUT | 13/08/2014 |
| 17 | Abenildo Alves de Oliveira | Manager of ENG-AG/IERENEST/IEOCV | 13/08/2014 |
| 18 | Glauco Colepicolo Legatti | General Manager of ENG-AB/IERENEST | 12/08/2014 |
| 19 | Antônio Edson Gomes | Sector Manager of ENG-AB/IERENEST/IEINTER/CMTT | 14/08/2014 |
| 20 | Heleno Lira | Former Manager of ENG-AB/IERENEST/IEOCV | 14/08/2014 |
| 21 | Maurício de Freitas Costa | Sector Manager of ETM-CORP/EC/BSA | 21/08/2014 |
| 22 | Ricardo Greenhalgh Barreto Neto | Manager of AB-CR/PP/ICP | 21/08/2014 |

CONFIDENTIAL                                              PwCBR_PETRO_000135764

Email Review

Draft
Attorney Work Product
Privileged and Confidential

| 23 | João Batista do Carmo Aquino | Former Corporate Director of Refinaria Abreu e Lima S.A. (Retired) | 21/08/2014 |
| 24 | Ana Cristiana Cardozo | Sector Manager of MATERIAIS/CG-IL/LC/AS | 25/08/2014 |
| 25 | Sueli Massae Nishi Ueta | General Manager of MATERIAS/DEMF | 25/08/2014 |
| 26 | Dewton Silva Carvalho | Manager of RENEST/MA | 28/08/2014 |
| 27 | Fernando de Castro Sá | Manager of CENPES/GTEC/ITPI | 28/08/2014 |
| 28 | Marco Aurélio da Rosa Ramos | Executive Manager of MATERIAS | 28/08/2014 |
| 29 | Venina Velosa da Fonseca | General Manager of PSPL | 04/09/2014 |
| 30 | Mariana Fernandes da Silva | Manager of Juridico/JENG | 04/09/2014 |
| 31 | Cláudio Carmo Herrmann Junior | General Manager of AB-PGI/REF | 04/09/2014 |
| 32 | Sérgio dos Santos Arantes | Current Assitant at ENG-SUB | 08/09/2014 |
| 33 | Vicente Gullo | Manager of AB-PGI/RPRE/REF | 08/09/2014 |
| 34 | Wilson Guilherme Ramalho da Silva | Executive Manager of AB-PGI | 11/09/2014 |
| 35 | Francisco Pais | General Manager of CENPES/GTEC | 15/09/2014 |
| 36 | Bruno Guimarães Bastos | Manager of ESTRAGIA/AIP | 18/09/2014 |
| 37 | Carlos Alberto Gratti | Manager of AB-LO/PL/PO | 18/09/2014 |
| 38 | Pedro Jose Barusco Filho | Executive Manager of Engenharia | 27/10/2014 |
| 39 | Luiz Alberto Gaspar Domingues | Senior Equipment Engineer | 22/10/2014 |
| 40 | Antonio Vianna | Gerente PLAFIN/PA | 3/11/2014 |
| 41 | José Carlos Consenza | Director Abast | *email interview* |

## 3.7. *Conclusions*

Based on the review of this and other CIAs, PwC has concluded that the Company should pursue an independent investigation of the allegations of corruption and fraud in connection with at least the COMPERJ and RNEST construction projects. In this regard, there are some matters the Special Committee may to consider as part of its work.

### 3.7.1. *Summoning vendors for interviews*

Internal norm PP-024-00056-F, which regulates CIAs, grants them the power to invite third party companies, such as vendors, to be interviewed, should the CIA judge necessary. We have observed companies that are mentioned in several complaints about unusual practices in the public tender processes within RNEST, but none of these companies' representatives were called to give explanations. Since the RNEST CIA has this authority, and by extension the Special Committee should have as well, we suggest that the companies mentioned below be interviewed in order to complete the investigation.

- Andrade Gutiterrez S.A.
- Camargo Correa S.A.
- Engevix Engenharia S.A.
- Galvão Engenharia S.A. GEDI
- GDK S.A.
- IESA Óleo e Gás S.A.
- Jaraguá Equipamentos Industrias Ltda

CONFIDENTIAL

PwCBR_PETRO_000135765

Draft
Attorney Work Product
Privileged and Confidential

- Mendes Júnior Trading e Engenharia S.A.
- Niplam Engenharia S.A.
- NM Engenharia S.A
- OAS S.A.
- Odebrecht S.A.
- Queiroz Galvão Óleo e Gás S.A.
- Sanko-Sider Imp. e Exp. de Produtos Siderúrgicos Ltda.
- UTC Engenharia S/A

Furthermore, the contracts examined contain clauses that permit Petrobras to request the documentation considered relevant. In contracts there are clauses that govern Management and Supervision, such as the clause 7.5.2 of the Agreement UDA8500.0000057.09.2 (attachment # A144 of CIA RNEST report):

> "7.5 – The management and supervisory activities required of the contractor and involve the following:
>
> 7.5.1 - ...
>
> 7.5.2 – Request the CONTRACTOR all the information and explanations necessary for the perfect understanding and monitoring of services. "

In these contracts, below, appears as Charge of the Contractor:

> "8.2.6 - Facilitate Surveillance providing information or providing access to documentation and the services and supplies answering promptly to comments and demands made by Petrobras. "

RNEST CIA Coordinator Mr. Gerson Gonçalves informed us, during a meeting, he had not called the construction companies because he felt threatened by their representatives on past occasions when these companies were invited to give explanations for other CIAs.

### 3.7.2. Alusa

Audit report R-13229/2011, dated from 2011, pointed out vendor ALUSA to be overpricing contracts within RNEST project. During interviews, there was no mention regarding this matter.

The report also points out internal control weaknesses that allowed the occurrence of overpricing. No measures were taken to minimize this weakness, since Alusa won more bids, in an improper way, as CIA RNEST Report states. There was no mention of this previous work in the report or in the interviews performed. This is a potential area of further investigation by the Special Committee.

### 3.7.3. Net Present Value

Mr. Carlos Alberto Carletto, Ms. Venina Velosa de Fonseca, Mr. Francisco Pais, Mr. Bruno Guimarães Bastos and Mr. Carlos Alberto Gratti mentioned in their interviews they were involved in the economic analysis of the Project, and mentioned that in the early stages of the study, the NPV was set at negative USD 3 billion.

This value was presented to the Executive Directors, they requested a new study, considering all opportunities to improve the project economically. The new study was based on new assumptions, such as perpetuity, an increase in the utilization factor from 92% to 96%, reduction of the hurdle rate

CONFIDENTIAL

PwCBR_PETRO_000135766

Draft
Attorney Work Product
Privileged and Confidential

from 10,7% to 9,6% (8,7% was the Petrobras standard rate for refineries) and tax benefits. After these changes the NPV was reduced to negative USD 1.9 billion from negative USD 3.0 billion.

According to Ms. Venina Velosa de Fonseca, the Downstream director's assistant requested, via email copied to the General Secretary, to change the NPV explanation, in order to show the result of a negative NPV in a less obvious manner. Following these requested changes, other analyses were also presented to show the tax benefits over retaining goods and services, tax waivers and avoiding the impact of eventual market share losses. All factors not applied to the basic NPV. With these new assumptions the NPV became positive, set at USD 76 million. On the other hand, the impact of plans to construct Refineries Premium I and II were not considered in the new NPV of the RNEST project.

Around the time of these new projections PDVSA (Venuzelean Oil Company) decided to leave the project. It is not clear from the work of the RNEST CIA if there is a connection between the changes in the projections and their decision not to participate.

We recommend that the Speicial Committee attempt to understand how this NPV was calculated and what were the opinions of the mentioned external consultants who evaluated if assumptions included in the NPV calculations were appropriate.

## 3.7.4. *Email Review*

The analysis of the electronic documents (e-mails, and Notes calendar entries) made by the CIA's were conducted in manual mode directly in the extracted Notes bases of the selected custodians. However, the rationale for selection these custodians is not clearly documented.

We note that the CIAs did not individually perform targeted email reviews in support of their CIA. Instead, as several people were relevant to several of the CIAs, their emails were analyzed by person with the goal of identifying relevant communications for the CIA RNEST, as well as the CIAs for COMPERJ and Pasadena.

The RNEST CIA performed analysis of 11 employees or former employees. Of these, not all were interviewed, as listed below:

| Custodian | Interviewed by the CIA |
| --- | --- |
| Everton Godinho Maria | No |
| Fernando de Castro Sá | Yes |
| Francisco Pais | Yes |
| Glauco Colepicolo Legatti | Yes |
| Luis Carlos Queiroz de Oliveira | Yes |
| Omar Antonio Kristoschek Filho | Yes |
| Pedro José Barusco Filho | Yes |
| Renato de Souza Duque | No |
| Ricardo Greenhalgh Barreto Neto | Yes |
| Venina Velosa da Fonseca | Yes |
| Wilson Guilherme Ramalho da Silva | Yes |

It may be observed in selected emails from the CIA, and reported by the CIA RNEST, the influence and the close contact of representatives of the contractors, mainly construction companies, with the

CONFIDENTIAL

PwCBR_PETRO_000135767

Draft
Attorney Work Product
Privileged and Confidential

Directors Paulo Roberto Costa and Renato Duque and Executive Managers Pedro Barusco and Francisco Pais.

Given the importance and impact of the issue, the emails of other senior management (President, CFO, etc.) should also have been copied, preserved, and analyzed.   The broader procedures of the Special Committee will deal with this issue.


During the work, we were told by the RNEST CIA team that the director Paulo Roberto Costa used to delete his emails before daily backup and the volume of emails available for analysis was small, something around 750 megabytes. But when we acquired the databases analyzed we can see that at least 20 gigabytes of emails for Director Paulo Roberto Costa were available.

Forensic Services have concluded that the emails analysis done by the CIA may not have resulted in an evidentiary base sufficient to cover the minimum aspects of the allegations. This will be dealt with by the broader and more thorough approach of the Special Committee's investigation.

CONFIDENTIAL

PwCBR_PETRO_000135768

Draft
Attorney Work Product
Privileged and Confidential

# 4. COMPERJ CIA

## 4.1. Overview of COMPERJ Refinery and Petrochemical Project

According to the COMPERJ CIA Report, the idea to build COMPERJ was originally conceived in 2004 in an environment in which there was a scarcity of petrochemicals in Brazil and the need to find a more profitable way to utilize the heavy oil found in Bacia de Campos, in particular Marlim (a type of crude oil). In 2008, the search for partners in this venture, as well as the earthwork, had begun. In February 2010, the environment was such that there was both a retraction in the market for petrochemicals and an interest in exploring the recently discovered pre-sal reserves. As such, the objectives of the construction were changed. Previously called "Project COMPERJ," the newly instated "Program COMPERJ" was to be developed in the following three phases:

- Phase 1 – a refinery for 165,000 bpd

- Phase 2 – a petrochemical complex

- Phase 3 – a second refining terminal (TREM 2)

### 4.1.1. Allegations

The COMPERJ CIA was established by DIP DEBAST 70/2014 on April 25, 2014. The DIP is not specific in identifying the allegations that led to its formation. While the COMPERJ CIA Report also did not specifically detail the allegations it considered, it cited the following reasons as motivating its investigation:

- The COMPERJ CIA was established by the Company's Board of Director, on the recommendation of counselor Silvio Sinedino Pinheiro, based on media scrutiny related to the costs of the Company's projects. Subsequently one commission was established for COMPERJ and another for Refinaria Abreu e Lima (RNEST).

- The investigation also considered the news surrounding the former Director of Abastecimento Paulo Roberto Costa, one of the managers responsible for leading the process of implementing COMPERJ.[i]

Specifically, it was known as of March 2014 that Paulo Roberto Costa, a former director of the Company for Abastecimento Division (Downstream) had been arrested in relation to the Lava Jato money laundering investigation although few other details were known. Forensic team review of media at the time of the CIAs formation reveal that allegations in the media specific to COMPERJ include the following:

- Documents seized by the Brazilian Federal Police suggest that Paulo Roberto Costa enriched himself by selling Petrobras facilities, intermediating the interests of contractors and distributing bribes to politicians

- Paulo Roberto Costa had an extraofficial mission conferred by the political party that indicated him for his position, the PP, to support the financing of campaigns

CONFIDENTIAL

PwCBR_PETRO_000135769

Draft
Attorney Work Product
Privileged and Confidential

- The Brazilian Federal Police discovered that Paulo Roberto Costa, a money changer, politicians, and service providers are interrelated in a criminal consortium created to facilitate fraudulent contracts with Petrobras, enrich consortium's members, and finance political parties.[12]

By the time the CIA completed its work and reported to the Board of Directors on 12 November 2014, further revelations from the testimony of Mr. Costa had been received in October. These allegations were used by the CIA team to better understand their findings, but the specific allegations of corruption were not incorporated into the investigation conducted by the CIA. These allegations will be dealt with by the government's ongoing Lava Jato investigation and by the independent investigation conducted by the Special Committee.

- The Tribunal de Contas da União ("TCU") is investigating COMPERJ for indications of overbilling in contracts[13]

- Companies, Glencore and Trafigura, controlled by Mr. Paulo Roberto Costa's son-in-laws, Humberto Mesquita and Márcio Lewkowicz, received contracts as part of COMPERJ[14]. These companies were allegedly had secret foreign bank accounts that received bribes payments. [15]

- Spreadsheets from Mr. Alberto Youssef are said to include records of bribes paid by Jaraguá Equipamentos Industriais and the consortium Conest, formed by Odebrecht and OAS. Jaraguá Equipamentos Industriais, as part of a consortium with Egesa, won contracts totaling R$ 337,000,000.00. Jaraguá alleged made political contributions to 5 PP party candidates, including R$ 500.000,00 for the ex-minister Mário Negromonte and R$ 500.000,00, a former PP leader in Brazil's House of Representatives.[16]

## 4.1.2. Investigation performed by management

The purpose of management's investigation, according to the COMPERJ CIA Report, was to evaluate the procurement processes for the planning, design and construction of COMPERJ in Itaboraí in the State of Rio de Janeiro, from the specification of services until the signing of contractual instruments.

The investigation report details the following as its strategy behind its work plan:

- Select the most relevant contracts and covenants based either on their value or those identified in previous audits as having possible incidents of non-conformity.

- Identify those responsible for the possible deviations in the procurment process through interviews and review of documents.

Note that according to the investigation report, the strategic decisions related to COMPERJ, as well as economic-financial analysis, were not included as part of the scope of this CIA.

In light of the aforementioned strategy, the following activities were performed by the COMPERJ CIA:

- 30 of approximately 300 contracts and covenants executed as part of COMPERJ were selected for further review. Note that according to the investigation report, these contracts and

---

[12] Veja: O objetivo é o Caixa Dois, April 16, 2014,
[13] http://www1.folha.uol.com.br/infograficos/2014/09/114361-escandalo-na-petrobras.shtml
[14] http://epoca.globo.com/tempo/noticia/2014/04/novas-provas-de-bcorrupcao-na-petrobrasb.html
[15] http://epoca.globo.com/tempo/noticia/2014/04/bgenro-de-paulo-roberto-costab-controlava-principal-conta-secreta-do-ex-diretor-da-petrobras-preso.html
[16] http://epoca.globo.com/tempo/noticia/2014/04/novas-provas-de-bcorrupcao-na-petrobrasb.html

CONFIDENTIAL                                      PwCBR_PETRO_000135770

covenants represent a total value of R$ 21.8 billion, equivalent to 77% of COMPERJ contracts above R$ 1.000.000,00 expenditures (R$28 billion) as of the investigation report release date of November 12, 2014.

- 71 individuals were interviewed and questionnaires were sent to Mr. Renato de Souza Duque, who responded, and Mr. Paulo Roberto Costa who, as of the date of this memo, has yet to respond. Note that a majority of the individuals interviewed were current or former employees of the Company, with a minority being third parties who had provided services to the Company as part of COMERJ. The interviews were conducted between July 22, 2014 and October 3, 2014. See Annex 4.4 for further information regarding individuals interviewed.

- The COMPERJ CIA analyzed the information provided by individuals as part of the interviews along with related documents to further clarify facts.

- On October 10, 2014, Judge Sérgio Moro authorized the Company to have access to the testimonies provided to the Justiça Federal to consider as part of its internal investigation.

Colonel Pedro Aramis de Lima Arruda, coordinator of this investigation stated that e-mails were also reviewed as part of the investigation. Note that this activity is not listed as part of the work performed in the investigation. Forensic Services performed a separate review of the email review performed by the various CIA's. For information regarding this review and resulting observations see Section 12.

Colonel Arruda also stated that the scope of their review included a review of the testimonies provided by the Justiça Federal through Judge Sérgio Moro.[17]

## 4.1.3. Conclusions of management's investigation

The COMPERJ CIA Report detailed the following conclusions of their work:

- Unrealistic deadlines were established for the construction of COMPERJ. The adjustments made to the project deadlines, based on regressive planning, compromised the quality of the bids and contracts.

- Uncertainties related to external factors affected the schedule. As a result addendums to the contracts were required to maintain equipment and installments during a dormant or "hibernating" period.

- Purchasing processing units (UDAV, UCR, HCC e HDT de Médios) in advance, without a business plan to be applied to the Utilities and Hydrogen Generation Units caused damages to the Company by creating the necessity to put equipment into a dormant or "hibernating" period.

- There is a lack of evidence to support the justifications presented to support direct hiring, especially in relation to hiring the Consortium TUC to construct the Generation of Vapor and Energy and Treatment of Water and Effluents Units.

- Businesses were included in bids using inconsistent justifications.

- Bidding Commissions included members without the proper qualification and experience in overseeing large-scale contracts.

---

[17] Note that the text included from the investigation report is a free translation of the original text, which was in Portuguese.

CONFIDENTIAL

PwCBR_PETRO_000135771

Email Review

Draft
Attorney Work Product
Privileged and Confidential

- The bidding processes for UCR, UDAV, and HCC were held without their basic designs and Front End Engineering Design ("FEED") completed.

- There were nine processes analyzed in which there were revisions made to the price estimate, after the start of the bid, with inconsistent justifications. These estimates, often questioned by the person responsible for their creation, could have created conditions for directing hiring.

- Acceptance of abusive requirements for required environmental licenses, contradicting a legal opinion, resulted in the celebration of a covenant with the state of Rio de Janeiro, as represented by the State Environment Institute for the State Environment Secretary, and Fundação Bio Rio.

- The management failures, non-conformities, and problems with planning and coordination in the execution of the project could have contributed in facilitating the occurrence of possible criminal actions under investigation as part of Operation Lava Jato.

The COMPERJ CIA Report's Executive Summary also noted that distribution of the largest value of contracts coincides with the companies mentioned as alleged part of the cartel:

- Toyo Setal Empreedimentos Ltda (13%)

- Construtora Noberto Odebrecht S.A. (12%)

- UTC Engenharia S.A. (10%)

- Construtora Queiroz Galvão S.A. (10%)

- Construtora Andrade Gutierrez S.A. (8%)

- IESA Óleo & Gás S.A. (4%)

- ENGEVIX Engenharia S.A. (1%)

The COMPERJ CIA Report also offers the following recommendations:

- Define corporate procedures that establish objective criteria for the definition and standardization of the filters for the selection of businesses required to be observed in all of the contracts executed by Petrobras.

- Establish corporate guidelines to discipline the justifications given for the possible inclusion of companies that do not meet established criteria.

- Adopt effective measures such that legislation, internal standards, and best business practices are obeyed.

- Evaluate the application of administrative and labor sanctions for the employees responsible for the non-conformities identified.

- Estimate the possible losses caused by the failures in hiring investigated by this commission and consider legal measures necessary to allow for the Company to be reimbursed.

- Obtain and evaluate the position of a law firms as it pertains to the Company's legal obligation to end this report to the Ministério Público and other public authorities, given the nature of the facts discussed in the report and its annexes

CONFIDENTIAL

PwCBR_PETRO_000135772

Email Review                                                                                                                                    Draft
Attorney Work Product
Privileged and Confidential

- Continue the investigation, as deemed necessary, should Mr. Paulo Roberto Costa return his questionnaire or other information arise.[18]

## 4.2. *Review by Forensic Services*

Forensic Services (or "we") reviewed the investigation report and all physical investigative documents provided to understand management's investigation, as discussed below.

We have reviewed the interview notes provided, the investigation report issued by the COMPERJ CIA, their methodology and planning, the persons of interest identified, the findings and any remediation that was suggested or taken.

Conclusions of our review can be found in Section 4.3.

### 4.2.1. *Meeting to discuss investigation performed*

Note that on November 18, 2014, Leonardo Lopes and Emily Kempf, members of the Forensic Services team, met with Colonel Arruda to clarify questions arising from our review of the investigation report and supporting documentation. The key points discussed were:

- *Rationale for persons interviewed:* Colonel Arruda explained that first they performed an analysis of the 30 contracts selected for review. As a result of this review, they selected individuals to be interviewed – for example individuals who participated in the bidding commissions. They started with persons having less responsibility over the process and built up to persons have more responsibility over the process.

- *Email review performed:* Colonel Arruda explained that an email review was performed as part of the investigation and that, while no emails were included as part of the investigation report received on November 14, 2014, the annexes, which were in the process of being updated, may include some emails. Note that Forensic Services performed a separate review of the email review performed by the various CIA's. For information regarding their review and resulting observations see Section12.

- *Judgment of whether or not an illegal act took place:* Colonel Arruda explained that it was not the role of the COMPERJ CIA to judge if the non-conformities that transpired constituted an illegal act. The report had the purpose to state all relevant facts surrounding the non-conformities.

- *Decision regarding when to end their investigation:* Colonel Arruda explained that they decided to finish their work when they reached a point where they believed further interviews and/or further review of documentation would not reveal information above what was already known.

### 4.2.2. *Review of interview notes*

We reviewed the interview meeting minutes provided for the 71 individuals interviewed as well as the questionnaire returned by Mr. Renato de Souza Duque. As part of our review, we understood the scope of the questions asked and noted possible topics for follow on questions resulting from our review of the interview statements. Note this document can be found at the following [ 2.15 - Projeto Centro_A - W.P. Oitivas _ Compilado _25nov2014] in the audit database. However, the Company

---

[18] Note that the text included from the investigation report is a free translation of the original text, which was in Portuguese.

CONFIDENTIAL                                                                                                    PwCBR_PETRO_000135773

Draft
Attorney Work Product
Privileged and Confidential

determined to conclude the work of this and the other CIAs as we were completing our review. Accordingly, these areas of potential further questions will be dealt with as part of the Special Committee's independent investigation.

Note that the interview statements only show the interviewer's interpretation of the answers provided (not a full transcription of such answers) by the interviewees and not the questions asked.

We understand the scope of the interviews were consistent with the objective of the COMPERJ CIA – to evaluate the hiring procedures for the implantation of COMPERJ in Itaboraí in the state of Rio de Janeiro, from the specification of services until the signing of contractual instruments.

While the individuals included in the interview process for the COMPERJ CIA was sufficient given their scope, we identified various persons who may be worthwhile including in the next phase of the investigation, which, now that the CIA has been closed, will be the Special Committee's investigation. We compiled this list based on individuals mentioned by persons who were interviewed who could potentially know more about the non-conformities that took place, or that we understand to have had some involvement through other sources – e.g. the investigation report and its supporting documentation and public news search.

## 4.2.2.1. Individuals to consider in the next phase of the investigation

| Ref | Name | Title | Observation |
|-----|------|-------|-------------|
| 1 | Maria de Graça Foster | CEO | Based on information provided by Mr. Victor Manuel Martins Pais, we understand that Ms. Maria de Graça Foster suggested Itaborá as the location for COMPERJ, despite already owning a site in Itaguaí. Based on information provided by Mr. Paulo Cezar Amaro Aquino, AB-CR/PP, we understand that Ms. Maria de Graça Foster commented that it may have been better to do only a refinery as the cost of a petrochemical would be very high. Based on information provided by Mr. Almir Guilherme Barbassa, Diretor Financeiro e de Relações com Investidores, we understand that Ms. Maria de Graça Foster voted in favor of the off-site project. |
| 2 | José Sergio Gabrielli | ex-Presidente | Based on information provided by Mr. Almir Guilherme Barbass, Diretor Financeiro e de Relações com Investidores, we understand that Mr. José Sergio Gabrielli voted in favor of the off-site project as requested by Mr. Paulo Roberto Costa. |

CONFIDENTIAL                                                           PwCBR_PETRO_000135774

Draft
Attorney Work Product
Privileged and Confidential

| 3 | Paulo Roberto Costa | Ex Diretor de Abastecimento | Note that while the COMPERJ Commission sent a questionnaire to Mr. Paulo Roberto Costa, he has as of yet declined to respond. |
| 4 | Rogerio Almeida Manso da Costa Reis | Ex-Diretor de Abastecimento, antes de Paulo Roberto | We understand that Mr. Rogerio Almeida Manso da Costa Reis was replaced by Mr. Paulo Roberto Costa in 2004. |
| 5 | José Carlos Cosenza | Atual Diretor de Abastecimento, após Paulo Roberto | We understand that Mr. José Carlos Cosenza replaced Mr. Paulo Roberto Costa as the Director of Abastecimento in 2012. |
| 6 | Sr. Orlando | Gerente Geral - MATERIAS/CG-IL | Mr. Simão da Silva stated that he was invited to work on COMPERJ on the recommendation of Mr. Orlando.  Mr. Paulo Cézar Amaro Aquino, AB-CR/PP, stated that Mr. Orlando was replaced by Mr. Jansem Ferreira da Silva, Gerente Geral - MATERIAS/CG-IL. |
| 7 | Sergio Nico | TBC | Based on the information provided by Mr. Paulo Cézar Amaro Aquino, AB-CR/PP, we understand that Mr. Orlando and subsequently Mr. Jansem consulted with Mr. Sergio Nico on the progress of the construction. |
| 8 | Jose Lima de Andrade Neto | Former Gerente Executivo do AB-PQF | Mr. Jose Lima de Andrade Neto was the predecessor of Paulo Cezar Aquino, Gerente Executivo do AB-PQF |
| 9 | Patrick Horbach Fairon | Current Gerente Executivo do AB-PQF | Mr. Patrick Horbach Fairon, was the successor of Paulo Cezar Aquino, Gerente Executivo do AB-PQF |
| 10 | Carlos Minc | Secretário do Meio Ambiente do Estado do Rio de Janeiro during the negotiation of the Fundação Bio-Rio contract | Based on the interviews reviewed, we understand that Carlos Minc was responsible for conducting negotiations with Mr. Paulo Roberto Costa on the topic of the environmental licenses. |
| 11 | Rosângela Carvalho | Organizava toda a documentação EIA/RIMA e as condicionantes | Ms. Claudia Labruna, Gerente de Controlada / Coligada GE - MC/DGN/CDGNRJ-II, stated that Ms. Rosângela Carvalho was responsible for organizing all of the documentation related to the environmental licenses and could provide more information regarding the requirements for the environmental licenses and the changes made. |
| 12 | Wagner Victor | Presidente da CEDAE | Based on information provided by Mr. Victor Manuel Martins Pais, we understand that Mr. Wagner Victor stated that the provider of water for the project would be CEDAE as negotiated between the government and the Petrobras Board of Directors. |
| 13 | Sr. Glauco | TBC | Mr. Sérgio Arantes, Atual Assistente da ENG-SUB, stated that he participated in a meeting with Paulo Roberto, Duque, Barusco, Glauco e Venina and other individuals from the technical |

CONFIDENTIAL

PwCBR_PETRO_000135775

Email Review                                                                                                                Draft
                                                                                                      Attorney Work Product
                                                                                                Privileged and Confidential

|    |    |    | area of business.  It is not known who Mr. Glauco is and what was his role. |
|----|----|----|----|
| 14 | Vitor Malmann | Presidente da Quattor - Maior cliente em potencial do COMPERJ | Mr. Carlos Fontes stated that Quattor prepared an economic viability study  alerting of potential problems in the project. |
| 15 | André Barcelos | Assistente indicado por Renato Duque | Based on information Mr. Francisco Pais, we understand that when Duque assumed the role as Director, Francisco was informed that he could stay in his current role only with a lower salary.  Mr. Francisco Pais stated that Duque wanted this position to be filled by Mr. André Barcelos. |
| 16 | Humberto Mesquita | Son-in-law of Mr. Paulo Roberto Costa | According to a public news source, two companies, Glencore and Trafigura, controlled by Mr. Paulo Roberto Costa's son-in-laws, Humberto Mesquita and Márcio Lewkowicz, received contracts as part of COMPERJ.  These companies were allegedly had secret foreign bank accounts that received bribes payments. |
| 17 | Márcio Lewkowicz | Son-in-law of Mr. Paulo Roberto Costa | According to a public news source, two companies, Glencore and Trafigura, controlled by Mr. Paulo Roberto Costa's son-in-laws, Humberto Mesquita and Márcio Lewkowicz, received contracts as part of COMPERJ.  These companies were allegedly had secret foreign bank accounts that received bribes payments. |
| 18 | Cláudio Carmo Herrmann Junior | Gerente Geral AB-PGI/REF | Based on information provided by Mr. Paulo Cézar Amaro Aqunio, AB-CR/PP, we understand that at one point during the project, there was an idea to develop a "cracker," however it was confirmed that such an initiative would not be economically viable.  Consequently, a group was established to reassemble to the project, composed of the following individuals with AB-PQ: Claudio Herrman, Sergio Bezerra and Laura. |
| 19 | Sergio Bezerra | *TBC* | Based on information provided by Mr. Paulo Cézar Amaro Aqunio, AB-CR/PP, we understand that at one point during the project, there was an idea to develop a "cracker," however it was confirmed that such an initiative would not be economically viable.  Consequently, a group was established to reassemble to the project, composed of the following individuals with AB-PQ: Claudio Herrman, Sergio Bezerra and Laura. |
| 20 | Sra. Laura | *TBC* | Based on information provided by Mr. Paulo Cézar Amaro Aqunio, AB-CR/PP, we understand that at one point during the project, there was an idea to develop a "cracker," however it was confirmed that such an initiative would not be economically viable. |

CONFIDENTIAL                                                                                    PwCBR_PETRO_000135776

Draft
Attorney Work Product
Privileged and Confidential

| | | | |
|---|---|---|---|
| | | | Consequently, a group was established to reassemble to the project, composed of the following individuals with AB-PQ: Claudio Herrman, Sergio Bezerra and Laura. |
| 21 | Sr. Sergio Paixão | Gerente Geral | Based on information provided by Mr.Paulo Cézar Amaro Aquino, AB-CR/PP, we understand that Mr. Sergio Paixão was a Gerente Geral who accompanied the various refinements made to the FEEDs at the time. |
| 22 | Sr. Egídio | *TBC* | Based on information provided Depoimento Jansem Ferreira da Silva, we understand that he had a tense relationship with a Mr. Egídio and that the relationship between Engineering and Abastecimento was often tense. Based on information provided by Mr. Paulo Cézar Amaro Aquino, AB-CR/PP, we understand that Mr. Egídio, prior to Mr. Heyder having responsibility, had responsibility for preparing the cost estimates of certain projects. |
| 23 | Hélio de Sá Rego Fortes Filho | Gerente Setorial da ENGENHARIA/IECOMPERJ/IEINTEM/OS | A draft version of the report stated that the COMPERJ Commission has not identified objective evidence that this individual has taken actions to prevent the occurrence of non-conformities. |
| 24 | José Américo Jorge de Souza | Gerente Setorial da ENGENHARIA/IECOMPERJ/ECOMPERJ/PR | A draft version of the report stated that the COMPERJ Commission has not identified objective evidence that this individual has taken actions to prevent the occurrence of non-conformities. |
| 25 | José Renato Correa Araujo | Gerente Setorial do ENG-AB/IECOMPERJ/IEPGN/PC | A draft version of the report stated that the COMPERJ Commission has not identified objective evidence that this individual has taken actions to prevent the occurrence of non-conformities. |
| 26 | Márcio Accorsi Miranda | Gerente Setorial da ENG/IECOMPERJ/IEINTEM/CMEXMU | A draft version of the report stated that the COMPERJ Commission has not identified objective evidence that this individual has taken actions to prevent the occurrence of non-conformities. |
| 27 | Vitor Malmann | Presidente da Quattor - Maior cliente em potencial do COMPERJ | Mr. Carlos Fontes stated that the Quattor performed the economic viability study alerting Mr. Paulo Robert to the fact that the project would not be worthwhile. |
| 28 | Marivaldo Jones da Silva Ramos | Comissão de Licitação para U2400 e SE24000 (ALUSA) | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 29 | Marcelo Tomasco de Albuquerque | Comissão de Licitação para U2400 e SE24000 (ALUSA) | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |

CONFIDENTIAL                                                    PwCBR_PETRO_000135777

Draft
Attorney Work Product
Privileged and Confidential

| | | | |
|---|---|---|---|
| 30 | Fernando de Campos Pinto | Comissão de Licitação para U2400 e SE24000 (ALUSA) | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 31 | Fernando Marcos Pierozan | Comissão de Licitação para U2400 e SE24000 (ALUSA) | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 32 | Paulo Duprat | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 33 | Renata Bogado | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 34 | Ailton de Lannes Gitahy Junior | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 35 | Alédio Alexandrino da Silva | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 36 | Alexandre Barcellos | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 37 | Alfredo Dimerlo Soares | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 38 | Ana Paula Fernandes Pinto | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 39 | Andre de Lira Pires | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 40 | André Rangel Oliveira | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 41 | Andrea Marta de Andrade dos Santos | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 42 | Antonio Carlos da Silva Lopes | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 43 | Antonio Melquiades Mesquita Filho | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 44 | Augusto Cesar Bernardo da | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |

CONFIDENTIAL                                                                 PwCBR_PETRO_000135778

Draft
Attorney Work Product
Privileged and Confidential

| | | | |
|---|---|---|---|
| | Silva | | |
| 45 | Bruno Flávio Ribeiro | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 46 | Bruno Gomes Pereira Leite | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 47 | Camila Belem | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 48 | Carlos Alberto Fernandes de Oliveira | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 49 | Carlos Alexandre Soares de Moraes | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 50 | Carlos Eduardo de Carvalho | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 51 | Carolina Fernandes Loss | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 52 | Claudia Goncalves Honnicke | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 53 | Claudio Ribeiro de Carvalho | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 54 | Cristiane Panosso | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 55 | Dilermando Alberto Ragone Lopes | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 56 | Dirceu Baleroni | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 57 | Edgar Megale Barrios | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 58 | Eduardo Miyoshi | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 59 | Eliane | *TBC* | - Member and/or coordinator of one or more |

CONFIDENTIAL

Draft
Attorney Work Product
Privileged and Confidential

| | | | |
|---|---|---|---|
| | Feliciano Barros | | COMPERJ bidding commissions that was not interviewed |
| 60 | Emilson Ribeiro | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 61 | Fabrizio Bittar Vicente da Silva | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 62 | Fernando Lemos da Cruz | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 63 | Flavia Vanessa M. de Carvalho | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 64 | Francisco José Viana Benites | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 65 | Frederico Doher Nogueira | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 66 | Gilberto Teixeira Junior | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 67 | Henrique Alberto Martins dos Santos | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 68 | Jeferson de Souza Costa | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 69 | Jefferson de Alencar Ponciano Ramos | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 70 | João Eduardo Cerutti Karam | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 71 | João Luis Batista da Silva | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 72 | João Paulo Pinto Pereira | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 73 | Jorge Luiz Gomes Rabello | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |

CONFIDENTIAL

Draft
Attorney Work Product
Privileged and Confidential

| 74 | Jorge Luiz Nascimento | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
|----|----|----|----|
| 75 | José Antônio Maldonado Dias | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 76 | José Ricardo Ribeiro da Silva | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 77 | José Ronaldo Santos de Oliveira | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 78 | Leonardo Augusto Barbosa Lemos | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 79 | Leonardo Rosas Leal | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 80 | Lucivaldo Ramos Brilhante | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 81 | Luiz Antônio de Oliveira Zucco | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 82 | Luiz Roberto Ceolin Meneghetti | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 83 | Marco Tulio Jennings | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 84 | Marcos Henrique Farias de Mello | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 85 | Oder Ana Souhami Belford Roxo | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 86 | Oliver Carlos Gottlieb | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 87 | Paulo Cesar Rodrigues | TBC | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not |

CONFIDENTIAL                                                          PwCBR_PETRO_000135781

Email Review

Draft
Attorney Work Product
Privileged and Confidential

| | | | interviewed |
|---|---|---|---|
| 88 | Paulo Roberto Alves do Carmo | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 89 | Priscila Feitoza Nascimento | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 90 | Renato Tomaz de Carvalho Aragão | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 91 | Ricardo Alves de Oliveira Lima | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 92 | Rodrigo C. Ferreira | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 93 | Rodrigo Cruz de Menezes | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 94 | Rodrigo Marcos da Silva Oliveira | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 95 | Rodrigo Pio Borges Menezes | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 96 | Rogerio Ferreira de Araujo | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 97 | Sergio de Carvalho Alcaires Mendes | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 98 | Victor Peyneau Gomes | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 99 | Virgílio Pires C. A. Neto | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |
| 100 | Vitor Mendes de Souza | *TBC* | - Member and/or coordinator of one or more COMPERJ bidding commissions that was not interviewed |

CONFIDENTIAL

PwCBR_PETRO_000135782

Email Review

Draft
Attorney Work Product
Privileged and Confidential

### 4.2.3. Review of report

We reviewed the investigation report that formed the basis of Mr. Arruda and Mr. Goncalves report to the Audit Committee. PwC (Leo, Panossol, Jorge, Lima, Alexandre) attended the Audit Committee meeting at which the CIA Report was presented. The summary of the CIAs was complete in terms of reporting on the scope of the CIA. Additionally, we reviewed the investigation report with the aim of furthering our understanding of the non-conformities identified by the COMPERJ CIA. For example, the contract analysis performed the COMPERJ CIA and included in the investigation report was useful in further our understanding of the specific lapses in controls that occurred during the procurement process and the extent to which they occurred. Our observations related to our review of the investigation report can be found in Section 4.3.

## 4.3. Conclusions and Topics for Further Investigation

Based on the review of this and other CIAs, PwC has concluded that the Company should pursue and independent investigation of the allegations of corruption and fraud in connection with at least the COMPERJ and RNEST construction projects, and possibly other allegations as well. Such investigation should be conducted by qualified attorneys assisted by forensic accountants and facilitated by the Company.

Areas we believe should be considered for such further independent investigation, specific to COMPERJ, are outlined in below in Sections 4.3.1, 4.3.2, 4.3.3, 4.3.4, 4.3.5, and 4.3.6.

Topics for further investigation include inquiry into certain businesses (see Section 4.5) and people (see Section 4.2.2.1) and additional review of environmental licenses, the selection of Itaboraí as the site of COMPERJ, and the disappropriation payments made to acquire the site.

### 4.3.1. Further investigation into companies who were mentioned by Mr. Paulo Roberto Costa as part of the cartel or who previously signed contracts with the Company in an environment in which there were lapses in internal controls

Further investigation into contracts that were signed in an environment where there were lapses or overrides of controls in the bidding process, may be appropriate. For example, some companies were included in the bid, despite not meeting the criteria, and in some cases these companies went on to win the bid. Some companies were able to sign contracts with Petrobras despite not going through the bidding process. The investigation report stated that these situations pointed to "weaknesses" in the vendor selection and contracting process. In some bids, the estimate originally prepared for the project was revised during the bid process in such a way that changed its classification, allowing the estimate of some companies to be within the acceptable range and removing some companies from the acceptable range.

As part of this process, we also recommend further consideration of investigation into the Company's dealings with businesses mentioned by Mr. Paulo Roberto Costa as forming part of the alleged cartel. As previously mentioned, the COMPERJ CIA Reported the following information on the topic:

- The management failures, non-conformities, and problems with planning and coordination in the execution of the project could have contributed in facilitating the occurrence of possible criminal actions under investigation as part of Operation Lava Jato.

CONFIDENTIAL                                                                    PwCBR_PETRO_000135783

Draft
Attorney Work Product
Privileged and Confidential

- The distribution of the largest value of contracts coincides with the companies mentioned as alleged part of the cartel:

    - Toyo Setal Empreedimentos Ltda (13%)

    - Construtora Noberto Odebrecht S.A. (12%)

    - UTC Engenharia S.A. (10%)

    - Construtora Queiroz Galvão S.A. (10%)

    - Construtora Andrade Gutierrez S.A. (8%)

    - IESA Óleo & Gás S.A. (4%)

    - ENGEVIX Engenharia S.A. (1%)

Given the gravity of these allegations and their potential impact on the Company, a more in depth review of the subject is recommended as part of the Special Committee's investigation.

See Section 4.5 for further details for companies that meet one or more of these characteristics described above – i.e. in which there were lapses or overrides of controls in the bidding process or that allegedly form part of cartel.

### 4.3.2. Further investigation into the environmental licenses obtained by the Company as part of the construction of COMPERJ

Further investigation into environmental licenses obtained by the Company as part of the construction of COMPERJ should also be considered.

The investigation report stated that the Company accepted "abusive" requirements from the state of Rio de Janeiro to obtain the necessary environmental licenses, above and beyond what was deemed necessary by a legal opinion. As part of these requirements, the following contracts were signed by Petrobras, the state of Rio de Janeiro through the Secretary of State for the Environment (SEA), the State Institute of the Environment (Inea), and Fundação Bio-Rio, a private non-profit organization:

- Covenant 6000.0074450.12.4 in the value of R$ 250.000.000,00;

- Covenant 6000.0074451.12.4 in the amount of R$ 99.446.000,00; and

- Covenant 6000.0074452.12.4 in the amount of R$ 60.554.000,00.

According to their website, the Fundação Bio-Rio offers the following consulting services: evaluations of public education, evaluations of private education, courses and trainings, certifications and evaluations, selective tests, public procurement, and entrance exams.[19] Note that Fundação Bio Rio was hired by the Company for the above contracts without a bidding process. As described in the CIA Report, according to Mr. Francisco Pais, Gerente Geral – CENPES/GTEC, Fundação Bio Rio was recommended by the state government without an alternative option available. In his interview with the COMPERJ CIA, Mr. Luiz Carlos Vieira dos Santos, Gerente Setorial / AB-PGI/COMPERJ/IOA/INFRA said that Petrobras provided financial support to Fundação Bio Rio

---

[19] http://concursos.biorio.org.br/consultoriaBRC.asp

CONFIDENTIAL                                                                    PwCBR_PETRO_000135784

which he believed to have been made through individuals associated with the Company rather than the Company itself.

In addition to the above contracts with Fundação Bio Rio, the CIA Report states that the following contracts were signed as part of the process to obtain the environmental licenses:

- Petrobras signed two contracts with Fundação para o Desenvolvimento Científico e Tecnológico em Saúde ("FIOTEC") for advising them on issues related to epidemiological monitoring. FIOTEC has, among other objectives, providing technical and operation support to the development of projects by Fundação Osvaldo Cruz (FIOCRUZ). The value of the contracts were R$ 3.279.234,69 and R$ 4.849.105,96. FIOTEC was hired without a bidding process and a cost estimate was not prepared.

- Petrobras signed a contract with Ambiental Engenharia e Consultoria e Estudos Técnicos Ltda for services related to "organizing and holding public hearings prior to the public hearing to present the environmental impact study." The value of this contract was R$ 2.783.098,68. Note that the COMPERJ CIA was not possible to find all the required documentation related to the cost estimate performed for this contract, including who was responsible for preparing the estimate.

## 4.3.3. Further investigation into the decision to select Itaboraí as the site of COMPERJ

Further investigation on the decision making process of the location in Itaboraí should be considered.

Based on information obtained by reading the COMPERJ CIA's interview notes from their interview with Mr. Victor Manuel Martins Pais, former employee of Petrobras, we understand that the site already owned by the Company in Itaguaí was originally to be used as the location for COMPERJ. After the technical studies decided that this location did not have sufficient space for COMPERJ, a search was initiated for a new site. The interview notes show that Mr. Victor Manuel Martins Pais stated that "naturally there were political influences" surrounding the decision. The interview notes also show he also said that Ms. Maria das Graças Foster, General Manager of Petroquisa at the time, requested a study group to evaluate the location of Itaboraí.

In his interview with the COMPERJ CIA, Mr. José Lima de Andrade Neto, President BR, told the COMPERJ CIA that he had reason to believe that Ms. Rosinha Garotinho, the governor of Rio de Janeiro at the time, exerted political pressure to influence Petrobras into choosing the city of Campos dos Goytacazes. Mr. Francisco Pais, Gerente Geral - CENPES/GTEC, also mentioned in his interview with the COMPERJ CIA that there was political pressure involved in the decision.

Note that there were a number of challenges with the site selected – e.g. lack of sufficient roads to transport equipment, lack of access to water, proximity to environmentally protected areas, a number of owners on the land to be used for the construction of COMPERJ, etc.

## 4.3.4. Further investigation into the disappropriation payments made to the city of São Gonçalo

As discussed previously, Petrobras had a site in Itaguaí which was originally considered as the site for the construction of COMPERJ. Based on our review of the interview notes from the COMPERJ CIA's interview with Mr. Carlos Alberto Fontes, a former employee of Petrobras, we understand this land was donated to Petroquisa, a subsidiary of Petrobras, by the state of Rio de Janeiro approximately 15 years ago. As outlined above in Section 4.2.3, a site in Itaboraí was ultimately chosen over this site for the construction of COMPERJ.

CONFIDENTIAL                                                                    PwCBR_PETRO_000135785

Based on our review of the interview notes from the COMPERJ CIA's interview with Mr. Victor Manuel Martins Pais, former employee of Petrobras, we understand that the same individual who previously owned the site in Itaguaí also owned a significant portion of the land in Itaboraí. One of the reasons provided for the selection of this particular site in Itaboraí was that the disappropriation process would be easier as this individual already knew how the process worked.

The investigation report does not clarify if the site in Itaguaí was donated to Petrobras by the state of Rio de Janeiro or purchased from the same individual who owned the site in Itaboraí.

From our review of the COMPERJ CIA's interview notes, we understand that during the process of obtaining the land in Itaborí, Petrobras made payments to city of São Gonçalo to be distributed by the city to the land owners as disappropriation payments. In his interview with the COMPERJ CIA, Mr. Simão Marcelino da Silva Tuma, a former employee of Petrobras, said that the payments had to be made to the city rather than directly to the land owners for legal reasons.

### 4.3.5. Further investigation into persons who were not included in the COMPERJ CIA or who were included, but questions remain

Based on our review of the investigative documents and information available in public media searches, we identified various persons who may be worthwhile including in the next phase of the investigation. We compiled this list based on individuals mentioned by persons who were interviewed who could potentially know more about the non-conformities that took place, or that we understand to have had some involvement through other sources – e.g. the investigation report and its supporting documentation and public news search. See Section 4.2.2.1 for further information.

### 4.3.6. Further review of documents and information available

Based on our review of the investigative documents, we suggest that the following documents be reviewed:

- The meeting minutes for the coordination meetings between Engineering and Abastecimento. Sr. Jansem Ferreira da Silva, Gerente Geral - MATERIAIS/CG-IL, suggested that they would be helpful in understanding the background of the various bids.

- Testimonies provided by the Justiça Federal

- Emails – based on our discussion with Colonel Arruda, we understand the COMPERJ CIA did not identify many emails as "hot documents." Given the success of email reviews in similar investigations in finding relevant information, we recommend that a more comprehensive email review be performed.                    REDACTED
                    REDACTED

### 4.3.7. Items to consider in the internal control review

We understand that the Company will be analyzing the internal control weaknesses identified through the COMPERJ CIA. Based on our review, we understand that the following items may be considered as part of this process:

- As Mr. Márcio Maragos Ribeiro stated in his interview, the controls around the bidding process were designed to work assuming separation between the Engineering and Supply

CONFIDENTIAL                                                           PwCBR_PETRO_000135786

Email Review                                                                                   Draft
                                                                              Attorney Work Product
                                                                          Privileged and Confidential

department. However, as these two groups constantly aligned, these controls were not effective.

- Given that the project was significantly over budget, it would be worthwhile to investigate which controls are in place to ensure projects stay within budget and that reasonable business discussions are made.

- Given that contracts often have a number of change orders; it would be worthwhile to understand which controls exist over the process of establishing a contract change order. While there are a number of controls over the initial contract, it is unclear what controls exist over change orders.

- The investigation report considers the explanations given to use direct contracts instead of bidding process are fragile. Evaluate the controls in place to approve exceptions on bidding processes, to ensure abuses are not widespread.

- Understand what processes are in place to ensure that all companies are hired "at arm's length" – particularly given the fact that Pragmática, a company who has Paulo Roberto's relative as partner, was hired for work

- Evaluate the effectiveness of the Company's whistleblowing hotline given that no one formally reported the irregularities encountered as part of this commission. As part of this evaluate the Company's other avenues to consider dissenting opinions. We understand from the COMPERJ CIA's interview with Mr. José Ferreira Xavier Borges, Coordinator E&P that a number of individuals raised inconsistencies noted in meetings; however it does not appear as though their opinions were properly considered. Evaluate the processes in place to ensure dissenting voices are heard.

These items should be considered in addition to the Internal Control weaknesses outlined in the investigation report.

## *4.4. Individuals interviewed by the COMPERJ CIA*

*Note that the individual was included in the priority phase of the external investigation

| Ref | Name | Title | Interview Date |
|---|---|---|---|
| 1 | Renato Torres Abi Ramia Chimelli | Service Provider ATNAS / ENGAB/IECOMPERJ/IEPGN/PC | 22/07/2014 |
| 2 | Jansem Ferreira da Silva | General Manager of - MATERIAS/CG-IL | 22/07/2014 e 09/09/2014 |
| 3 | Mário Zonenschein | Sector Manager of - ETM-CORP/CL/CLEP | 22/07/2014 |
| 4 | Lucimar Targa | Service Provider CONSULPRI / ENG-E&P/IESONDAS-II/ESPSSE-II/PID) | 22/07/2014 |
| 5 | Wagner Meneze de Magalhães | Manager of / ENG-AB/IECOMPERJ/IEUT) | 24/07/2014 |
| 6 | Márcio Margaod Ribeiro | Sector Manager of / ENGAB/IECOMPERJ/IEHCA/OS | 24/07/2014 |
| 7 | Leandro Schuler | Coordinator of / ETM-COPR/CL/CLEP | 24/07/2014 |
| 8 | Décio Roberto da Silva Cerqueira | Sector Manager of /ENG-AB/IECOMPERJ/IEDCH/PC | 25/07/2014 |
| 9 | Patrícia Freire Iorio Perrota | Coordinator of /ENG-AB/IECOMPERJ/IG/CONT | 25/07/2014 |
| 10 | Hugo César Alves | Manager of / ENG-AB/IECOMPERJ/IEDCH) | 30/07/2014 |
| 11 | Andréa Villas Boas Rezende | Manager of / ENG-AB/IECOMPERJ/IG | 30/07/2014 |

CONFIDENTIAL                                                                    PwCBR_PETRO_000135787

Email Review

Draft
Attorney Work Product
Privileged and Confidential

| | | | |
|---|---|---|---|
| 12 | Paulo Moreira Correa | Sector Manager of /ENG-AB/IECOMPERJ/IEOFF/CMTBTO | 30/07/2014 |
| 13 | João de Lima Veloso Filho | Sector Manager of / ENG-AB/IECOMPERJ/IECIN/CMINFRA | 30/07/2014 |
| 14 | Paulo Cezar Farah Muniz | Coordinator of / ENG-AB/IEPREMIUM/DEHIDRO | 30/07/2014 |
| 15 | Cristina Brito Repsold | GE-PGI/LIP | 31/07/2014 |
| 16 | Antônio Luiz Vianna de Souza | Manager of / PLAFIN/PA | 31/07/2014 |
| 17 | Ana Beatriz Pollo Mendonça | Sector Manager of /JURÍDICO/JÁ/PGI | 31/07/2014 |
| 18 | Luiz Carlos Vieira dos Santos | Sector Manager of / AB-PGI/COMPERJ/IOA/INFRA | 31/07/2014 |
| 19 | Denise Barros Souto | Sector Manager of /ENG-SUB/PROSUB/CONT | 31/07/2014 |
| 20 | Paulo Cesar Barroso Martins | Manager of /MATERIAS/SOG | 04/08/2014 |
| 21 | Adalberto Ermida Franco | Sector Manager of / ETM-CORP/EC/ECAB | 04/08/2014 |
| 22 | Paulo Alexandre de Fonseca Moreira | BR | 04/08/2014 |
| 23 | Ricardo Jorge de Medeiros Carlos | AB-PGI/IECOMPERJ/IOA/INFRA | 04/08/2014 |
| 24 | Fábio Barros de Lima | Sector Manager of / ENG -AB/IECOMPERJ/IEHCA/CMUGH | 04/08/2014 |
| 25 | José Pita Domingues | ENG-E&P/IEUEP-I/IES/PIP58P62 | 04/08/2014 |
| 26 | José Eduardo Loureiro | Manager of / ENG-AB/IECOMPERJ/IEOFF | 06/08/2014 |
| 27 | Eduardo Sampaio Alves | Sector Manager of / ENG-E&P/IESONDAS-II/IESPSSE-II/PID | 06/08/2014 |
| 28 | Raldo Moreira Mendes | Sector Manager of /ENG-AB/IECOMPERJ/IEOFF/PC | 08/08/2014 |
| 29 | Luiz Felipe Moraes D'avila | Sector Manager of /ENG-AB/IECOMPERJ/IEHCA/PC | 08/08/2014 |
| 30 | Jairo Luis Bonet | Manager of / ENG-AB/IECOMPERJ/IEHCA | 08/08/2014 |
| 31 | Almir Amorim Pustilnik | Sector Manager of / ENG-E&P/IESONDAS-I/IESPNE-III/CMTS | 12/08/2014 |
| 32 | Cláudia Maria Labruna | Manager of Subsidiary GE - MC/DGN/CDGNRJ-II | 12/08/2014 |
| 33 | Fernando Antônio Silva de Oliveira | Manager of ENG-AB/IECOMPERJ/IPS | 12/08/2014 |
| 34 | Carlos Alberto Fernandes de Oliveira | Sector Manager of ENG-AB/IECOMPERJ/IPS/PR | 12/08/2014 |
| 35 | Mario Cavalcante Pinheiro | Retired Employee | 12/08/2014 |
| 36 | Ricardo Schwery | SPE Consort (Skansa, Promon, Engevix) Process: UDAV | 14/08/2014 |
| 37 | Eneyla Maria Albuquerque Lopes | AB-PGI/LIC | 14/08/2014 |
| 38 | Glauber Diego Barreto Santos | TE-AG Consort (Techint, Andrade Gutierrez) Process: Coke | 14/08/2014 |
| 39 | Marcelo Duarte dos Santos | TE-AG Consort (Techint, Andrade Gutierrez) Process: Coke | 14/08/2014 |
| 40 | Marcelo Jorge Favaro | Chemtec Serviços de Engenharia e Software Processo: FEEDs to Business Units | 19/08/2014 |
| 41 | Carlos Frederico Trevia | Coordinator of CENPES | 19/08/2014 |
| 42 | Antonio Luiz de Paula Ribeiro Junior | Projectus Consultoria Process: FEEDs to Business Units | 19/08/2014 |
| 43 | José Ferreira Xavier Borges | Coordinator of E&P-PGSU/GEPRI/COL | 19/08/2014 |
| 44 | Cocis Alexandre dos Santos | ETM-CORP-EC/ECGE Processo: Water Treatment and HDT – medium | 21/08/2014 |
| 45 | Henrique Martins Lima | Coordinator of ETM-CORP/EC/ECAB | 21/08/2014 |

CONFIDENTIAL

PwCBR_PETRO_000135788

Email Review                                                                                    Draft
Attorney Work Product
Privileged and Confidential

| 46 | Alexandre Werner + Marcelo Nascimento Perlingeiro | Service Provider from Sondotécnica to ETM-CORP/EC + Responsible Agent for Sondotécnica. | 26/08/2014 |
| 47 | José Luiz Arantes de Moura | Sector Manager of ETM-CORP/EC/ECGE | 26/08/2014 |
| 48 | Luiza da Encarnação Galva França | Assistant AB-MC | 26/08/2014 |
| 49 | Venina Velosa da Fonseca | General Manager of AB-MC/PSPL | 04/09/2014 |
| 50 | Sergio dos Santos Arantes | Assistant ENG-SUB | 04/09/2014 |
| 51 | Simão Marcelino da Silva Tuma | Retired Employee | 09/09/2014 |
| 52 | Heyder de Moura Carvalho Filho | General Manager of MATERIAIS/CE-AB | 09/09/2014 e 26/09/2014 |
| 53 | Luiz Alberto Gaspar Domingues | Gerente Industrial PESA/DOWN | 11/09/2014 |
| 54 | Paulo Cezar Amaro Aquino | AB-CR/PP | 11/09/2014 |
| 55 | Victor Manuel Martins Pais | Retired Employee | 16/09/2014 |
| 56 | Célia de Jesus Alves Barbato | Secretary | 16/09/2014 |
| 57 | Daniella dos Santos Medeiros | Assistant E&P-PRESAL | 16/09/2014 |
| 58 | Valter Shimura | General Manager of AB-PGI/COMPERJ | 16/09/2014 |
| 59 | Celso Fernando Lucchesi | Former Empregado | 18/09/2014 |
| 60 | Fernando de Castro Sá | Manager of CENPES/GTEC/TIPI | 18/09/2014 |
| 61 | Wilson Guilherme Ramalho da Silva | Executive Manager of - AB-PGI | 18/09/2014 |
| 62 | José Lima de Andrade Neto* | President of BR | 22/09/2014 |
| 63 | Antonio Luiz Fernandes dos Santos | Executive Manager of GE-PGI | 23/09/2014 |
| 64 | Nilo Carvalho Vieira Filho | Retired Employee | 23/09/2014 |
| 65 | Carlos Alberto Fontes | Retired Employee | 23/09/2014 |
| 66 | Roberto Gonçalves | Manager of Controlada/Coligada - AB-LO/LOGUM | 25/09/2014 |
| 67 | Francisco Pais | General Manager of - CENPES/GTEC | 25/09/2014 |
| 68 | Maurício de Oliveira Guedes | Executive Manager of ENG-AB | 26/09/2014 |
| 69 | Maurício Martins da Silva | Manager of CENPES/GTEC/EST | 01/10/2014 |
| 70 | Pedro José Barusco Filho | Retired Employee | 01/10/2014 |
| 71 | Almir Guilherme Barbassa* | Director – DFIN | 03/10/2014 |

## 4.5. Companies who were mentioned by Mr. Paulo Roberto Costa as part of the cartel or who previously signed contracts with the Company in an environment in which there were lapses in internal controls

| Ref | Company | Observations |
| --- | --- | --- |

CONFIDENTIAL                                                                    PwCBR_PETRO_000135789

| 1 | Alusa Engenharia S.A. | - Alusa participated in the "EPC da Unidade Hidrocraqueamento Catalítico e sua Subestação Elétrica Unitária (SE-2400)" bid, despite not meeting the criteria and subsequently won, signing a contract of R$ 1.460.859.527,26. As of April 2014, 15 addendums to the contract were signed with a total value of R$ 688.695.563,50.<br>- Alusa participated in the HCC bid despite not meeting the criteria. Note that Alusa did not win this bid. |
|---|---|---|
| 2 | Andrade Gutierrez S.A. | - Cited by Mr. Paulo Roberto Costa as one of the companies that forms the alleged cartel |
| | | - Andrade Gutierrez was a member of the Consortium TE-AG along with Techint. Using item 2.1e of the Petrobras "Rules of Procedure Simplified Bidding" as a justification, Petrobras hired the consortium directly. These parties signed a contract with a value of R$ 1.938.191.350,00 and 5 addendums to the contract with a total value of R$ 688.054.188,89. The investigation report states that the hiring process was weakened due to the substantial modification of the contract originally tendered. |
| | | - Andrade Gutierrez was a member of the Consortium CTC along with Queiroz Galvão and Odebrecht. This consortium presented a bid 37% below the low end of the acceptable price range however went on to win the contract for R$ 819.800.000,00. As of May 2014, there were 13 addendums to the contract with a total value of R$ 360.045.319,30. Additionally, there were 3 extrajudicial transactions in a value of R$ 28.522.400,32.<br>- Andrade Gutierrez participated in the following bids despite not meeting the criteria: Interligações, HDT de NAFTA e URE, Tubovias, and Pipe Rack. Note that Andrade Gutierrez did not win these bids. |
| 3 | Carioca Christiani-Nielsen | - Carioca participated in the following bids, despite not meeting the criteria: UPGN Rota 3 and UGH. Note that Carioca did not win these bids. |
| | | - Christiani-Nielsen participated in the following bids despite not meeting the criteria: UGH and HCC. Note that Christiani-Nielsen did not win these bids. |
| 4 | Chicago | - Chicago participated in the following bids despite not meeting the criteria: Tancagem de produtos intermediários e acabados and Tanques de Petróleo e de água. Note that Chicago did not win these bids. |
| 5 | Construções e Comércio Comargo Corrrêa S.A. | - Comargo Corrêa participated in the following bids, despite not meeting the criteria: Terraplenagem, Interligações, HDT de NAFTA e URE. Note that Comargo Corrêa did not win these bids. |
| 6 | CONFAB | - CONFAB participated in the following bids despite not meeting the criteria: Tancagem de produtos intermediários e acabados and Tanques de Petróleo e de água bid despite not meeting the criteria. Note that CONFAB did not win these bids. |
| 7 | Constran | - Constran participated in the Terraplenagem bid, despite not meeting the criteria. Note that Constran did not win this bid. |
| 8 | Construcap | - Construcap participated in the UPGN Rota 3 bid despite not meeting the criteria. Note that Construcap did not win this bid. |

CONFIDENTIAL

PwCBR_PETRO_000135790

Email Review

Draft
Attorney Work Product
Privileged and Confidential

| 9 | Construtora Noberto Odebrecht S.A. | - Cited by Mr. Paulo Roberto Costa as one of the companies that forms the alleged cartel.<br>- Odebrecht was a member of the Consortium TUC along with UTC and Toyo. Using item 2.3k of the Petrobras "Rules of Procedure Simplified Bidding" as a justification, Petrobras hired the consortium directly. These parties signed a contract with a value of R$ 3.834.500.000,00.<br>- Odebrecht was a member of the Consortium Pipe Rack along with UTC and Mendes Junior. Using item 2.1e of the Petrobras "Rules of Procedure Simplified Bidding" as a justification, Petrobras hired the consortium directly (without a bidding process). These parties signed a contract with a value of R$ 1.869.624.800,00 and 3 addendums to the contract with a total value of R$ 77.760.538,47.<br>- Odebrecht was a member of the Consortium CTC along with Queiroz Galvão and Andrade Gutierrez. This consortium presented a bid 37% below the low end of the acceptable price range however went on to win the contract for R$ 819.800.000,00. As of May 2014, there were 13 addendums to the contract with a  total value of R$ 360.045.319,30. Additionally, there were 3 extrajudicial transactions in a value of R$ 28.522.400,32.<br>- Odebrecht participated in the HDT e Médios bid despite not meeting the criteria. Note that Odebrecht did not win this bid. |
| --- | --- | --- |
| 10 | Construtora Queiroz Galvão S.A. | - Cited by Mr. Paulo Roberto Costa as one of the companies that forms the alleged cartel<br>- According to an Estadão article on April 7, 2014, Mr. Othon Zanoide de Moraes Filho, Queiroz Galvão executive, appeared in emails discussing information to include in the invoices.[20]<br>- Queiroz Galvão was a member of the Consortium QGGI, along with Galvão and Iesa. This consortium was invited to participate in a bid, despite not meeting the criteria, and subsequently won, signing a contract with a value of R$ 977.814.500,00.  8 addendums to the contract were signed with a total value of R$ 448.399.827,34.<br>- Queiroz Galvão was a member of the Consortium CTC along with Queiroz Galvão and Odebrecht. This consortium presented a bid 37% below the low end of the acceptable price range however went on to win the contract for R$ 819.800.000,00. As of May 2014, there were 13 addendums to the contract with a  total value of R$ 360.045.319,30. Additionally, there were 3 extrajudicial transactions in a value of R$ 28.522.400,32.<br>- Queiroz Galvão participated in the following bids despite not meeting the criteria: HDT de Médios and HCC.  Note that Queiroz Galvão did not win these bids. |
| 11 | Contreras | - Contreras participated in the HDT de NAFTA e URE bid despite not meeting the criteria.  Note that Contreras did not win this bid. |
| 12 | Delta Construções S.A. | - Delta was a member of the Consortium Itaboraí-HDT, along with Projectus and TKK. This consortium was invited to participate in a bid, despite not meeting the criteria, and subsequently won, signing a contract with value of R$ 311.455.556,75.  During this bid, the estimate originally established was changed such that it changed the classification of the bid.  Petrobras cancelled this contract on May 11, 2012 due to their poor performance. |

---

[20] http://politica.estadao.com.br/noticias/geral,lava-jatinvestigado-foi-demitido-apos-eleicao-de-2010,1150605

CONFIDENTIAL

Draft
Attorney Work Product
Privileged and Confidential

|   |   |   |
|---|---|---|
|   |   | - Delta was also a member of the Consortium Itaboraí URE, along with Projectus and TKK.  This consortium was invited to participate in a bid, despite not meeting the criteria and subsequently wo, signing a contract with a value of R$ 531.837.596.00.  During this bid, the estimate originally established was changed in such a way that it changed the classification of the bid.  Petrobras cancelled this contract on May 11, 2012 due to their poor performance. <br> - Delta participated in the following bids despite not meeting the criteria: Terraplenagem, Interligações, and HDT de NAFTA e URE.  Note that Delta did not win these bids. |
| 13 | EBE | - EBE participated in the HCC bid despite not meeting the criteria.  Note that EBE did not win this bid. |
| 14 | Ecman | - Ecman participated in the following bids despite not meeting the criteria: Tancagem de produtos intermediários e acabados and Tanques de Petróleo e de água.  Note that Ecman did not win these bids. |
| 15 | ENESA | - ENESA  participated in the UGH bid despite not meeting the criteria.  Note that ENESA did not win this bid. |
| 16 | Engecampo | - Engecampo participated in the Tanques de Petróleo e de água bid despite not meeting the criteria.  Note that Engecampo did not win this bid. |
| 17 | Engeform | - Engeform participated in the HDT de NAFTA e URE bid despite not meeting the criteria.  Note that Contreras did not win this bid. |
| 18 | Engevix Engenharia S.A. | - Cited by Mr. Paulo Roberto Costa as one of the companies that forms the alleged cartel <br> - Engevix participated in the following bids despite not meeting the criteria: HCC, Tubovias, and Pipe Rack.  Note that Engevix did not win these bids. |
| 19 | Fidens | - Fidens participated in the HD de NAFTA e URE bid, despite not meeting the criteria.  Note that Fidens did not win this bid. |
| 20 | Galvão Engenharia S.A. | - Cited by Mr. Paulo Roberto Costa as one of the companies that forms the alleged cartel <br> - Galvão was a member of the Consortium QGGI, along with Queiroz Galvão and Iesa.  This consortium was invited to participate in a bid, despite not meeting the criteria, and subsequently won, signing a contract with a value of R$ 977.814.500,00.  8 addendums to the contract were signed with a total value of R$ 448.399.827,34 <br> - Galvão participated in the HDT de NAFTA e URE bid despite not meeting the criteria.  Note that Galvão did not win this bid. |
| 21 | GDK | - GDK participated in the following bids despite not meeting the criteria: HDT de NAFTA de URE, Tubovias, and UDAV. |
| 22 | Glencore | - Glencore, along with Trafigura, is allegedly controlled by Mr. Paulo Roberto Costa's son-in-laws Humberto Mesquita and Márcio Lewkowicz.  These companies have been said to have received contracts as part of COMPERJ.  Additionally, these companies are believed to have secret foreign bank accounts to receive bribe payments. |
| 23 | Iesa Óleo & Gas S.A. | - Cited by Mr. Paulo Roberto Costa as one of the companies that forms the alleged cartel <br> - Iesa was a member of the Consortium QGGI, along with Queiroz Galvão and Galvão.  This consortium was invited to participate in a bid, despite not meeting the criteria, and subsequently won, signing a |

CONFIDENTIAL
PwCBR_PETRO_000135792

Draft
Attorney Work Product
Privileged and Confidential

|    |                                              |                                                                                                                                                                                                                                                                                                                                                                       |
|----|----------------------------------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|    |                                              | contract with a value of R$ 977.814.500,00.  8 addendums to the contract were signed with a total value of R$ 448.399.827,34                                                                                                                                                                                                                                           |
|    |                                              | - Iesa was a member of the Consortium QGIT along with Queiroz Galvão and Tecna Brasil.  This consortium was invited to participate in a bid, despite the fact that Iesa did not meet the criteria.  They subsequently won this contract for a total value of R$ 1.807.997.477,00.  As of September 2014, there were 2 addendums to the contract with a total value of R$ 99.966,08.  - Iesa participated in the following bids despite not meeting the criteria: UPGN Rota 3 and HDT de NAFTA e URE.  Note that Iesa did not win these bids. |
| 24 | Jaraguá Equipamentos Industrias Ltda         | - Jaraguá participated in the following bids despite not meeting the criteria: UPGN Rota 3 and UGH.  Note that Jaraguá did not win these bids.                                                                                                                                                                                                                          |
| 25 | Megatranz Transportes Ltda                   | - Megantraz was a member of the Consortium Logístico COMPERJ along with Multrio.  This consortium won a bid  for which the criteria for the selection of businesses was not properly defined.  Petrobras and the consortium subsequently signed a contract of R$ 10.342.425,23 and 5 addendums to the contract with a total value of R$ 4.381.704,03.                     |
| 26 | Mendes Junior Trading e Engenharia S.A.      | - Mendes Junior was a member of the Consortium Pipe Rack along with Odebrecht and UTC.  Using item 2.1e of the Petrobras "Rules of Procedure Simplified Bidding" as a justification, Petrobras hired the consortium directly.  These parties signed a contract with a value of R$ 1.869.624.800,00 and 3 addendums to the contract with a total value of R$ 77.760.538,47. |
| 27 | MPE Montagens Industriais                    | - MPE participated in a bid, despite not meeting the criteria, and subsequently won the bid, signing a contract with a value of R$ 731.810.727,00.  - MPE participated in the Tubovias bid despite not meeting the criteria.  Note that MPE did not win this bid.                                                                                                        |
| 28 | Multitek                                     | - Multitek participated in the Tanques de Petróleo bid despite not meeting the criteria.  Note that Multitek did not win this bid.                                                                                                                                                                                                                                      |
| 29 | Multrio Operações Portuárias S/A             | - Multrio was a member of the Consortium Logístico COMPERJ along with Megatranz.  This consortium won a bid for which the criteria for the selection of businesses was not properly defined.  Petrobras and the consortium subsequently signed a contract of R$ 10.342.425,23 and 5 addendums to the contract with a total value of R$ 4.381.704,03.                      |
| 30 | Núcleo                                       | - Núcleo participated in the FEED Prédios e Interligações bid despite not meeting the criteria.  Note that Núcleo did not win this bid.                                                                                                                                                                                                                                 |
| 31 | OAS                                          | - OAS participated in the following bids, despite not meeting the criteria: UPGN Rota 3, HDT de NAFTA e URE, HCC, and UDAV.  Note that OAS did not win these bids.                                                                                                                                                                                                       |
| 32 | Planav                                       | - Planav participated in the FEED, Unidade de Processo e TCR bid despite not meeting the criteria.  Note that Planav did not win this bid.                                                                                                                                                                                                                              |
| 33 | Pragmática                                   | - Pragmática won a bid for which the criteria for the selection of business was not properly defined.  Petrobras and Pragmática subsequently signed a contract of R$ 1.085.872,21 and 2 addendums to the contract with a total value of R$ 1.435.130,93.  It is also of note that one of the partners at Pragmática was Humberto Sampaio Mesquita, the son-in-law of former Director Paulo Roberto Costa. |

CONFIDENTIAL

PwCBR_PETRO_000135793

| 34 | Projectus Consultoria LTDA | - Projectus was a member of the Consortium Itaboraí-HDT, along with Delta and TKK. This consortium was invited to participate in a bid, despite not meeting the criteria, and subsequently won, signing a contract with value of R$ 311.455.556,75. During this bid, the estimate originally established was changed such that it changed the classification of the bid. Petrobras cancelled this contract on May 11, 2012 due to their poor performance.<br>- Projectus was also a member of the Consortium Itaboraí URE, along with Delta and TKK. This consortium was invited to participate in a bid, despite not meeting the criteria and subsequently won, signing a contract with a value of R$ 531.837.596.00. During this bid, the estimate originally established was changed in such a way that it changed the classification of the bid. Petrobras cancelled this contract on May 11, 2012 due to their poor performance.<br>- Projectus was hired by Petrobras despite presenting a cost estimate below low range of the bid's cost estimate. The original contract value was R$ 9.628.955,34 and 6 addendums to the contract were signed with a total value of R$ 4.714.530,83. |
| --- | --- | --- |
| 35 | Promon Engenharia Ltda. | - Promon participated in the following bids despite not meeting the criteria: HDT de NAFTA e URE, Tubovias, Pipe Rack, and UDAV. Note that Promon did not win these bids. |
| 36 | Santa Barbara | - Santa Barbara participated in the HDT de NAFTA e URE bid despite not meeting the criteria. Note that Santa Barbara did not win this bid. |
| 37 | Schahin | - Schahin participated in the following bids despite not meeting the criteria: HDT de NAFTA e URE, UGH, and HCC. Note that Schahin did not win these bids. |
| 38 | Serven | - Serven participated in the Tubovias bid despite not meeting the criteria. Note that Serven did not win this bid. |
| 39 | Skanska Brasil Ltda | - Skanka participated in the HDT de NAFTA e URE bid despite not meeting the criteria. Note that Schahin did not win this bid. |
| 40 | SOG e União fabricação | - SOB e União fabricação participated in the following bids despite not meeting the criteria: Interligações and HDT de NAFTA e URE. Note that SOB e União fabricação did not win these bids. |
| 41 | Techint Engenharia e Contrução S.A. | - Techint was a member of the Consortium TE-AG along with Andrade Gutierrez. Using item 2.1e of the Petrobras "Rules of Procedure Simplified Bidding" as a justification, Petrobras hired the consortium directly. These parties signed a contract with a value of R$ 1.938.191.350,00 and 5 addendums to the contract with a total value of R$ 688.054.188,89. The investigation report states that the hiring process was weakened due to the substantial modification of the contract originally tendered.<br>- Techint participated in the HDT de NAFTA e URE bid despite not meeting the criteria. Note that Techint did not win this bid. |
| 42 | Technip | - Technip participated in the following bids despite not meeting the criteria: HDT de NAFTA e URE and FEED, Unidade de Processo e TCR. Note that Technip did not win these bids. |
| 43 | Tenace | - Tenace participated in the following bids, despite not meeting the criteria: Tancagem de produtos intermediários e acabados and Tanques de Petróelo e de água. |

CONFIDENTIAL

PwCBR_PETRO_000135794

| 44 | TKK Engenharia Ltda | - TKK was a member of the Consortium Itaboraí-HDT, along with Delta and Projectus. This consortium was invited to participate in a bid, despite not meeting the criteria, and subsequently won, signing a contract with value of R$ 311.455.556,75. During this bid, the estimate originally established was changed such that it changed the classification of the bid. Petrobras cancelled this contract on May 11, 2012 due to their poor performance. |
|  |  | - TKK was also a member of the Consortium Itaboraí URE, along with Delta and Projectus. This consortium was invited to participate in a bid, despite not meeting the criteria and subsequently won the bid, signing a contract with a value of R$ 531.837.596,00. During this bid, the estimate originally established was changed in such a way that it changed the classification of the bid. Petrobras cancelled this contract on May 11, 2012 due to their poor performance. |
|  |  | - TKK in a bid despite not meeting the criteria, and subsequently won, signing a contract with a value of R$31.127.727,35. There were various addendums to the contract that added a value of R$ 2.267.184,10. |
| 45 | Tomé | - Tomé participated in the following bids despite not meeting the criteria: Interligações and HDT de NAFTA e URE. Note that Tomé did not win these bids. |
| 47 | Toyo do Brasil - Consultoria e Construções Industrias Ltda / Toyo Setal Empreedimentos Ltda | - Cited by Mr. Paulo Roberto Costa as one of the companies that forms the alleged cartel. |
|  |  | - Toyo was a member of the Consortium TUC along with UTC and Odebrecht. Using item 2.3k of the Petrobras "Rules of Procedure Simplified Bidding" as a justification, Petrobras hired the consortium directly. These partied signed a contract with a value of R$ 3.834.500.000,00. The investigation report states the delay in the project permitted Consortium TUC to be hired despite a weak justification provided. |
|  |  | - Toyo won a bid despite not meeting the criteria, and subsequently won the bid, signing a contract with a value of R$ 1.119.798.243,00. |
|  |  | - Tomé participated in the following bids despite not meeting the criteria: Interligações and HDT de NAFTA e URE. Note that Tomé did not win these bids. |
|  |  | - Toyo participated in the Pipe Rack bid despite not meeting the criteria. Note that Toyo did not win this bid. |
| 48 | Trafigura | - Trafigura, along with Glencore, is allegedly controlled by Mr. Paulo Roberto Costa's son-in-laws, Humberto Mesquita and Márcio Lewkowicz. These companies have been said to have received contracts as part of COMPERJ. Additionally, these companies are believed to have secret foreign bank accounts to receive bribe payments. |
| 49 | Usiminas | - Usiminas participated in the following bids despite not meeting the criteria: HDT de NAFTA e URE and Tubovias. Note that Usiminas did not win these bids. |

CONFIDENTIAL

PwCBR_PETRO_000135795

Email Review                                                                          Draft
                                                                          Attorney Work Product
                                                                          Privileged and Confidential

| 50 | UTC Engenharia S.A. | - Cited by Mr. Paulo Roberto Costa as one of the companies that forms the alleged cartel |
|---|---|---|

- UTC was a member of the Consortium Pipe Rack along with Odebrecht and Mendes Junior.  Using item 2.1e of the Petrobras "Rules of Procedure Simplified Bidding" as a justification, Petrobras hired the consortium directly.  These parties signed a contract with a value of R$ 1.869.624.800,00 and 3 addendums to the contract with a total value of R$ 77.760.538,47.

- UTC was a member of the Consortium TUC along with Odebrecht and Toyo.  Using item 2.3k of the Petrobras "Rules of Procedure Simplified Bidding" as a justification, Petrobras hired the consortium directly.  These partied signed a contract with a value of R$ 3.834.500.000,00.  The investigation report states the delay in the project permitted Consortium TUC to be hired despite a weak justification provided.

- UTC was invited to participate in the HDT de NAFTA e URE bid despite not meeting the criteria.  Note that UTC did not win this bid.

CONFIDENTIAL                                                              PwCBR_PETRO_000135796

Email Review                                                                    Draft
                                                                    Attorney Work Product
                                                                    Privileged and Confidential

# 5. SBM CIA

## 5.1. Overview of SBM

SBM's website provides the following overview of their activities:

"SBM Offshore is a leader in floating production and mooring systems, production operations as well as terminals and services. The Group maintains a significant Intellectual Property (IP) portfolio including patents, trademarks, and copyrights, ensuring we maintain our technological edge.

With over 9,600 employees worldwide, spread over five main execution centers, 11 operational shore bases, several construction yards and onboard our offshore fleet, we can confidently supply floating production solutions through the entire product lifecycle, from engineering to procurement, construction, installation, operation, and relocation.

The Group is committed to conducting business in a sustainable way over the long-term by develop close relationships with local people, communities and businesses in host countries, and by safeguarding the natural environment.

It is our goal and driving ambition to be the trusted national partner of choice for the world's energy companies."[21]

SBM rents its floating production and mooring systems to Petrobras. Annex 3 of the investigation reports that they currently have 8 contracts with SBM – US$ 26,455 billion in charting and US$ 2,203 billion in construction. The investigation report also states that a ninth contract was finalized in December 2013 for construction and acquisition of a platform in Jubarte (page 18). The SBM CIA Reports that their oldest contract with SBM dates back to 1999 and their most recent was the one previously mentioned from 2013.

## 5.2. Allegations as outlined by the SBM CIA investigation report

Information and allegations specific to Petrobras' involvement with SBM are outlined below. The SBM CIA was established by DIP DE&P 17/2014 on February 13, 2014. Its stated purpose is to investigate allegations outlined in the Valor Econômico article.

In its investigation report, the SBM CIA stated that this review was motivated by the allegations outlined in an article "SBM bribery investigation includes Petrobras" published in Valor Econômico on February 13, 2014 and subsequent articles published in Valor Econômico, Veja, and others. The SBM CIA Report summarizes the allegations as follows:

- The Dutch company SBM Offshore, that rents floating platforms to oil companies including Petrobras, is under investigation by the authorities in Holland, the United Kingdom, and the United States Department of Justice since 2013 for alleged payment of bribes through its agents to companies, including state-owned enterprises, and public officials in Equatorial Guinea, Angola, Malaysia, Kazakhstan, Italy, Iraq, and Brazil.

---

[21] http://www.sbmoffshore.com/who-we-are/company-profile/

CONFIDENTIAL                                                        PwCBR_PETRO_000135797

- Certain details of this investigation became public through publication in a Dutch magazine "Quote" on February 6, 2014. The article referred to the allegations of an ex-employee of SBM posted on Wikipedia on October 18, 2013. According to this former employee, between 2005 and 2011 SBM paid US$ 275 million in bribes – US$ 139 million in Brazil, US$ 30 million in Equatorial Guinea, US$ 17 million in Angola, and US$ 89 in other countries.

- The motivation given by the ex-employee to publish this information on Wikipedia was the alleged attempts of SBM to hide the facts already known. These facts included irregular operations in Brazil and other countries not in Africa as well as the protection of employees involved in the alleged improper negotiation practices. In the beginning of 2012, SBM informed the market to having learned of irregular practices of its sales agents in two countries in Africa and was investigating a third country not in Africa.[22]

- According to the Wikipedia post, the payments would have been made through an SBM commercial representative's intermediary in Brazil, Júlio Faerman, and the companies linked to him. These companies include Faercom Energia Ltd, JF Oildrive Consultoria em Energia e Petróleo Ltda in Brazil and Bienfaire, Jandell, Journey Advisors e Hades Production Inc outside Brazil. Additionally, the post reports that of the 3% commission paid to Júlio Faerman, 1% was destined for him and his companies and 2% for Petrobras employees.[23]

## 5.3. Allegations as outlined by SBM press releases

SBM also made a variety of press releases on the allegations and the ongoing investigation which augment our understanding of the allegations as outlined by the SBM CIA Report. Note, however, that the following allegations were not considered by the SBM CIA as the CIA completed its work and delivered its report in March 2014.

April 2, 2014 – SBM released press release presenting the findings of its internal investigation, which had started in the first quarter of 2012 and had recently concluded. The release states that the investigation was carried out by independent external counsel and forensic accountants and focused on the use of agents over the period 2007 through 2011. The main findings included the following:

- "The Company paid approximately US$ 200 million in commissions to agents during that period of which the majority relates to three countries: US$ 18.8 million to Equatorial Guinea, US$ 22.7 million to Angola and US$ 139.1 million to Brazil;

This press release details its findings related to Brazil as follows:

- The investigation team further conducted a detailed investigation into the relationship between Group companies and their main agent in Brazil, and companies owned by that agent and the agent's family member and/or business partners. There were certain red flags but the investigators did not find any credible evidence that the agent made improper payments to government officials (including state company employees) in Brazil. Furthermore, evidence was found that the agent provided substantial and legitimate services to the Company, at a time when SBM's permanent non-operational presence in Brazil was very limited (4 people in 2007 compared to 220 today). Aggregate payment to sales agents by Group companies in

---

[22] http://en.wikipedia.org/w/index.php?title=SBM%20Offshore&oldid=577742341
[23] Note that the text included from the investigation report is a free translation of the original text, which was in Portuguese.

CONFIDENTIAL

PwCBR_PETRO_000135798

relation to Brazil in the years 2007 through 2011 totaled US$ 139.1 million, of which US$ 123.7 million was paid to the primary agent."[24]

November 12, 2014 – SBM released another press release announcing it reached a settlement with the Dutch Openbaar Ministerie that included a payment of US$ 240 million. It further reported that the United States Department of Justice informed SBM that it is not prosecuting them and has closed the inquiry into the matter. The settlement relates to payments to sales agents in Equatorial Guinea, Angola, and Brazil in the period from 2007 to 2011.[25]

## 5.4. Allegations per public media

A public media search SBM also released a variety of press released on the allegations and the ongoing investigation which augment our understanding of the allegations as outlined by the SBM CIA Report.

### 5.4.1. Article "Investigação de suborno da SBM inclui Petrobras" published on February 13, 2014

As mentioned previously, the SBM CIA cited the February 13, 2014 Valor Econômico article as the impetus for instated the SBM CIA. In addition to the details previously outlined, this article offers the following information:

- In his or her post on Wikipedia, the former SBM employee describes a conversation he or she had with with Bruno Chabas, SBM President, in which Mr. Chabas is reported to have said that it is not possible to exclude the possibility that payments made in Brazil may have had the objective of financing political parties.

- While Valor Econômico was not able to confirm the value of the contracts currently held between SBM and Petrobras, the article reported that on its last balance sheet, SBM had a portfolio of US$ 23 billion in orders that include platforms in Cidade de Paraty and Cidade de Maricá, and Cidade de Saquarema under construction for the state of Brazil.

- The former employee also states that in an interview with "HT" (believed to refer to Hanny Tagher, a former Director of Sales and Marketing at SBM) confirmed the 3% "commission" with 1% directed for Julio Faerman and 2% directed for Petrobras employees.

- Independently or with partners, SBM has nine signed contracts for construction and subsequent rental for platforms with Petrobras. Some are already in operation, such as Lula Nordeste (Cidade de Paraty) and Baleia Azul (Cidade de Anchieta) in the Santos pre-salt deposits, while others are still in construction. Units are installed in Roncador, Cachalote, Baleia Azul, Marlim Sul, and Jubarte. Cidade de Ilhabela is in construction in the Brasa shipyard and will go to Sapinhoá.

- Last year, SBM signed contracts for the construction of platforms in the Cidade de Maricá and Cidade de Saquarema – these are currently in construction in China and will be installed in the Lula field.[26]

---

[24] http://www.sbmoffshore.com/?press-release=sbm-offshore-findings-internal-investigation
[25] http://www.sbmoffshore.com/?press-release=sbm-offshore-achieves-settlement-dutch-public-prosecutors-office-alleged-improper-payments-united-states-department-justice-closes-matter
[26] http://www.valor.com.br/empresas/3428586/investigacao-de-suborno-da-sbm-inclui-petrobras

CONFIDENTIAL

Email Review                                                                                    Draft
Attorney Work Product
Privileged and Confidential

### 5.4.2. Article "Petrobras é citada em denúncia de propina" published in Estado on February 14, 2014

This article offers the following new information regarding the allegations involved:

- The former employee said that the confidential record of Petrobras meetings would include confirmation of payments to state employees.  He also cited a chief engineer named as "Figueiredo" as involved.

- Mr. José Sergio Gabrielli, President of Petrobras during the period in question, stated that he had "never heard" of the alleged scheme.

- The investigation in Holland is said to have emails from April 18, 2011 and April 21, 2011 in which the Petrobras chief engineer and SBM discussed extending their contract without an open bid.[27]

### 5.4.3. Article "Escândalo da Petrobras pode ter desdobramentos – dinheiro da holandesa SBM pode ter ido para campanha" published in the Jornal do Brasil on February 14, 2014

This article offers the following new information regarding the allegations involved:

- Potential beneficiaries of the scheme are alleged to include the former Ministro das Cidades and his son.

- Petrobras has commissioned platforms from SBM with a total value of US$ 23 billion, with some platforms still under construction.

- Political beneficiaries of the scheme meet on a weekly basis in a São Paulo hotel with a former director of Petrobras.

- Some contracts under investigation by the Tribunal de Contas da União ("TCU") included adjustments to the contract value of almost 60% over the original value, even though the law states that addendums to the contract cannot exceed 25% of the initial value of the contract.[28]

### 5.4.4. Article "Estatal tomará as 'providências cabíveis em denúncia de propina" published in Jornal Estado de São Paulo on February 15, 2014

This article offers the following new information regarding the allegations involved:

---

[27] http://economia.estadao.com.br/noticias/geral,petrobras-e-citada-em-denuncia-de-propina-imp-,1130119
[28] http://m.jb.com.br/economia/noticias/2014/02/14/escandalo-da-petrobras-pode-ter-desdobramentos/

CONFIDENTIAL                                                                        PwCBR_PETRO_000135800

Email Review                                                                                                          Draft
Attorney Work Product
Privileged and Confidential

- A Petrobras representatives said that as of yet, they have not been contacted by an authority from Holland, United Kingdom, United States or Brazil regarding the matter.

- The SBM Brazil Director, Philippe Levy, said that chartering the platforms from SBM resulted in twice the cost for Petrobras than if they had constructed their own platform. However, companies without access to necessary financing have no choice but to rent.[29]

## 5.4.5. Article *"Oposição planeja ir à Holanda para buscar documentos contra Petrobras"* published in Folha de São Paulo on February 15, 2014

This article offers the following new information regarding the allegations involved:

- Opposition leaders in the Câmara are planning to create a commission to go to Holland to look for information regarding the alleged receipt of bribes by Petrobras from SBM.

- In 2013, Petrobras closed a contract with SBM in the amount of R$ 3,5 billion to charter two platforms in the pre-sal reserves in Bacia de Santos.[30]

## 5.4.6. Article *"Propina no fundo do mar"* published in Veja on February 19, 2014

This article offers the following new information regarding the allegations involved:

- The former SBM employee responsible for the Wikipedia post is understood to be Jonathan Taylor, previously in SBM legal department.

- The chief engineer known as "Figueiredo," understood to be José Antonio de Figueirido, a career employee of Petrobras who previously worked in the international purchasing department under the management of then President José Sergio Gabrielli.  In 2012, he was promoted to the role of Diretor de Engenharia, Tecnologia e Materiais under President Graça Foster.

- One of the platforms mentioned as part of the scheme, the platform in Cidade de Anchieta, was rented by Petrobras from SBM for R$ 1,28 billion.  Also mentioned were the platforms in Cidade de Saquarema and Cidade de Maricá that has a contract value of R$ 3,5 billion with SBM and the platform in Cidade de Illabela which has a contract value of at least R$ 2,0 billion.

- In addition to cash payments, there is evidence of other "treats" such as tickets to the 2010 World Cup and the Monaco Grand Prix.

- Documents obtained show that Petrobras has 20 rental contracts with SBM totaling more than R$ 9,0 billion, with the most recent contract signed in August 2013 and the oldest from 2000.[31]

---

[29] http://economia.estadao.com.br/noticias/geral,estatal-tomara-as-providencias-cabiveis-em-denuncia-de-propina-imp-,1130642
[30] http://www1.folha.uol.com.br/mercado/2014/02/1412880-oposicao-planeja-viagem-a-holanda-para-buscar-documentos-contra-petrobras.shtml

CONFIDENTIAL                                                                                        PwCBR_PETRO_000135801

Draft
Attorney Work Product
Privileged and Confidential

## 5.4.7. Article "O mascarado da Petrobras!" published in Veja on February 26, 2014

This article offers the following new information regarding the allegations involved:

- Mr. Julio Faerman is reported to charge between 3% and 7% of the value of a contract to provide "approximation" services for companies, arranging meetings and inclusion in bids have documents obtained[32]

## 5.4.8. Article "Contratos entre SBM e Petrobras superam os outros gigantes" published in O Globo on March 7, 2014

This article, and the articles in the sections that follow, appear after the SBM CIA completed its work and made its report on March 29, 2014, so it was necessarily not considered in their work. This article offers the following new information regarding the allegations involved:

- In 2007, SBM's sales with Petrobras represented 18% of their total revenue and spanned 22 contracts. In 2011, SBM's sales with Petrobras represented 34% of their total revenue and spanned 26 contracts. Between 2007 and 2011 is the time frame established by SBM as when the alleged payments to government officials to obtain advantages in bids or in the extension of contracts. [33]

## 5.4.9. Article "Petrobras admite ter recebido confirmação de propina da SBM"

This article offers the following new information regarding the allegations involved:

- On November 17, 2014, Petrobras President, Graça Foster, confirmed that on May 23, 2014 she received information that SBM admitted to paying a bribe to a current or former Petrobras employee and that she shared this information with Controladoria Geral da União ("CGU").[34][35]

## 5.4.10. Article "CGU confirma irregularidades entre SBM Offshore e Petrobras" in Estadão on November 12, 2014

This article offers the following new information regarding the allegations involved:

- November 12, 2014 – the Controladoria Geral da União ("CGU") concluded that there were irregularities in the relationship with Petrobras and SBM. Their investigation, initiated in April 2014, indicates that there were six Petrobras employees, including former directors and

---

[31] http://veja.abril.com.br/noticia/brasil/petrobras-recebeu-propina-de-empresa-holandesa/imprimir

[32] http://veja.abril.com.br/noticia/brasil/quem-e-julio-faerman-o-homem-chave-para-desvendar-a-corrupcao-na-petrobras

[33] http://oglobo.globo.com/economia/contratos-entre-sbm-petrobras-superam-os-de-outras-gigantes-do-setor-11808173

[34] http://www1.folha.uol.com.br/poder/2014/11/1549387-petrobras-admite-ter-recebido-confirmacao-de-propina-da-sbm.shtml

[35] http://www.valor.com.br/politica/3789216/petrobras-nega-que-tenha-feito-representacao-contra-gabrielli

CONFIDENTIAL

PwCBR_PETRO_000135802

Draft
Attorney Work Product
Privileged and Confidential

individuals who are still working at Petrobras, who were involved in the negotiations with SBM. Jorge Hage, CGU ministro-chefe, did not provide the names of the six individuals in question. Mr. Hage said the he had received the SBM CIA's investigation report and it is useful as a starting point and that he understands Petrobras does not have the internal instruments necessary to advance the investigation further. He hoped the process would conclude in the first half of 2015.[36]

## 5.4.11. Article "Petrobras $100 Million Man Tops Graft Haul in Scandal" in Bloomberg on December 3, 2014

This article provided the following new information regarding the allegations involved:

- Pedro Barusco, a third-tier executive who reported to the head of the engineering division until 2010, contacted prosecutors and confessed he took bribes from construction companies, according to the text of a Nov. 18 decision by a judge to put Barusco's former boss under preventative house arrest.

- Barusco also took cash from SBM said a person with direct knowledge of the probe, who asked not to be named because the information is confidential.

- Barusco has offered to turn over the largest amount to the country every from a single person, according to the prosecution office working on the case. It's three times more than the amount agreed to by former refining director Paulo Roberto Costa, one of the leading figures to date in the R$ 10 billion laundering and corruption investigation dubbed Car Wash.

- Barusco left the state-run producer in 2010 and became a director at Sete Brasil that has more than $25 billion in contracts to provide drillships to Petrobras.

- Barusco said $22 million of the money he plans to return came from platform leaser SMB Offshore, according to the person connected to the investigation who asked not to be named because the information is classified.[37]

## 5.4.12. Article "CGU instaura mais nove processos contra suspeitos no caso de propina da holandesa SBM offshore" in Globo on December 2, 2014

This article provided the following new information regarding the allegations involved:

- Pedro Barusco, a third-tier executive who reported to the head of the engineering division until 2010, contacted prosecutors and confessed he took bribes from construction companies, according to the text of a Nov. 18 decision by a judge to put Barusco's former boss under preventative house arrest.

- Barusco also took cash from SBM said a person with direct knowledge of the probe, who asked not to be named because the information is confidential.

---

[36] http://politica.estadao.com.br/noticias/geral,cgu-confirma-irregularidades-entre-sbm-offshore-e-petrobras,1591828

[37] http://www.bloomberg.com/news/2014-12-03/petrobras-100-million-man-tops-graft-haul-in-scandal.html

CONFIDENTIAL

PwCBR_PETRO_000135803

- Barusco has offered to turn over the largest amount to the country every from a single person, according to the prosecution office working on the case. It's three times more than the amount agreed to by former refining director Paulo Roberto Costa, one of the leading figures to date in the R$ 10 billion laundering and corruption investigation dubbed Car Wash.

- Barusco left the state-run producer in 2010 and became a director at Sete Brasil that has more than $25 billion in contracts to provide drillships to Petrobras.

- Barusco said $22 million of the money he plans to return came from platform leaser SMB Offshore, according to the person connected to the investigation who asked not to be named because the information is classified.[38]

## 5.4.13. Article "Petrobras assinou contrato em branco com empresa holandesa" in Globo on December 15, 2014

This article provided the following new information regarding the allegations involved:

- An email exchange between Bruno Chabas, SBM CEO, and Zoe Taylor-Jones, SBM lawyer, revealed that SBM paid for Mr. Faerman's telephone and internet bill – as shown by a pending bill in the amount of R$ 1.207,00.

- The Tribunal de Contas da União found that in 2008 the Company signed a contract with SBM for a vessel platform P-57 without a specified value. The contract as a place where the value should be listed, however only "R$ XXXXX" is listed. The article reports that these values were completed 207 days after the contract was initially signed, however, the update did not include the full values of all domestic and foreign services.

- The article reports that the platform P-57 was ultimately sold to the Company at a cost of US$ 1,2 billion and that SBM paid US$ 36,3 million in bribes as part of the deal.

- SBM has confessed to paying US$ 102,2 million in bribes to Petrobras employees between 2005 and 2011.

- A parliamentary commission identified 7 Petrobras employees involved in the purchase of the platform P-57, namely Márcio Félix Carvalho de Bezerra, Luiz Robério Silva Ramos, Cornelius Franciscus Jozef Looman, Samir Passos Awad, Roberto Moro, José Luiz Marcusso, and Osvaldo Kawakami.

- The article reports that then Petrobras President, José Sérgio Gabrielli requested that the platform P-57 be ready in time for the 2010 election cycle and as such, additionally expenditure was required to facilitate the condensed time frame. This anticipation is said to have cost the Company an additional US$ 25 million. [39]

---

[38] http://www.bloomberg.com/news/2014-12-03/petrobras-100-million-man-tops-graft-haul-in-scandal.html

[39] http://oglobo.globo.com/brasil/petrobras-assinou-contrato-em-branco-com-empresa-holandesa-14833389

CONFIDENTIAL

PwCBR_PETRO_000135804

Draft
Attorney Work Product
Privileged and Confidential

## 5.5. *Investigation performed by management*

The purpose of the review, according to the SBM CIA Report, was to investigate the allegations published in Valor Econômico on February 13, 2014 and subsequent articles published in Valor Econômico, Veja, and others.

The investigation report details the following as its strategy behind its work plan:

- Analyze the allegations published in the press (during February and March 2014);

- Identify and analyze the contracts Petrobras has with SBM and its subsidiaries;

- Obtain, together with SBM, information related to the internal investigation performed in 2012 and the allegation of the former employee;

- Look for information together with the Holland's Ministério Público and the United States Department of Justice;

- Identify persons related to the processes under investigation;

- Schedule and conduct interviews;

- In parallel, prepare information related to visits made and visitors received, numbers dialed by Company phones, trips of directors and ex-directors to São Paulo, trips of employees to South Africa and Monaco;

- Establish the chronology of events and actors;

- Cross and analyze information obtained;

- Conclude on the truth of the allegations; and

- Send the investigation report to the relevant authorities.

In light of the aforementioned strategy, the following activities were performed by the SBM CIA:

- Requested that the E&P and ETM areas gather information related to contracts held with SBM and related companies, including both ongoing and closed contracts. The Communication department was requested to monitor publications related to the facts under investigation, gathering clarifying facts that may be useful.

- Researched the content of posted on Wikipedia mentioned in the Dutch magazine "Quote" on February 2, 2014 and by the Agência Estado on February 14, 2014.[40]

- Research and understand the process of chartering and constructing Floating, production, storage, and offloading ("FPSO") platforms. To assist in this endeavor, consult employee Edmar Diniz Monteiro, Gerente Geral do E&P-Corporativo/Contratação de Bens e Serviços) who previously prepared a presentation on the topic.

---

[40] http://en.wikipedia.org/w/index.php?title=SBM%20Offshore&oldid=577742341

CONFIDENTIAL                                                    PwCBR_PETRO_000135805

Draft
Attorney Work Product
Privileged and Confidential

- Analyzed the documentation available related to the contracts, looking to find people who would be able to provide information on the contracts.

- Requested that a team from Auditoria analyze all of the contracts, in chronological order, looking to identify possible non-conformities in the hiring process.

- Conducted interviews with Mr. Sietze Hepkema, SBM Chief Governance and Compliance Officer, accompanied by Mr. Philippe Levy, SBM Brazil Country Manager.

- Resulting from the interview with Mr. Sietze Hepekma, SBM Chief Governance and Compliance Officer, it was decided to continue the review in Holand. In Holand, they sought to enter into contact with the offices that conducted investigations for SBM as well as the Dutch Openbaar Ministerie.

- Four members of the SBM CIA, Nilton Antônio de Almeida Maia, Solange da Silva Guedes, Jorges Salles Neto, and Pedro Aramais de Lima Arruda, travelled to Holland and help a meeting with Petrobras Netherland BV ("PNBV") on February 25, 2014 to understand how the case was being perceived in Holland and, through PNBV's law firm, enter into contact with the OM to receive 5 representatives of the Company. In the following days, February 26-2008, they met with representatives from SBM and from the law firms De Brauw Blackstone Westbroek and Paul Hastings LLP. During these meetings, they received information related to the work developed by each of the offices. Information provided was limited by attorney-client privilege and obligations to the OM. During this time, SBM made available for consultation an electronic file of information they had related to Petrobras.

- Returning to Brazil, the SBM CIA analyzed the results obtained during the trip together with Auditoria. They presented their preliminary analyze related to the transformation of FPSO Espadarte em Cidade de Anchieta, in the hiring of FPSO P-57 and the charting of the FPSOs Brasil and Capixaba.

- From there, the SBM CIA established priorities for the internal research related to the visits, company phone calls, overnight trips to São Paulo, and email contacts. Also established at this time were priorities related to interviews with employees and certain third parties related to the facts in analysis.

- During the SBM CIA, 24 individuals were interviewed as outlined in Section 5.9.

- Following these activities, the SBM CIA analyzed all information gathered and sought to clarify the facts involved.

- Additionally, the SBM CIA sought to identify those responsible leaking confidential information and adopted the following measures:

  - During the visit to Holland, they verified together with SBM, examples of leaked documents. To locate them, they recorded correlated persons and dates.

  - With this information, they sought to identify all editors of the documents in the same format in which they were leaked.

  - Performed a forensic copy and classified the leaked documents in an electronic format and then conducted searches on the emails, expedited by the various criteria and identified editors and those who printed these documents.

CONFIDENTIAL                                                                    PwCBR_PETRO_000135806

- o As the research up until that point did not permit identification of the parties responsible for leaking the documents, a request was made to SBM to provide the documents in their original format. The files were sent with encryption, impeding the desired analysis.

- o As of the closing of the SBM CIA investigation report, the requested files were not received.[41]

## 5.6. Conclusions of management's investigation

The investigation report, dated 29 March 2014, concluded that based on the review performed to date and restricted by its regulatory jurisdiction, that it did not find facts or documents that evidenced payment of bribes to employees of Petrobras.

The investigation report also offers the following recommendations:

- The SBM CIA believes their investigative work should continue with the Segurança Empresarial (Enterprise Security) department as responsible. Once relevant information is identified, such information should be forwarded to the appropriate authorities.

- The SBM CIA understands that their investigation report and its annexes should be sent to the Controladoria Geral da União, the Tribunal da União, and the Ministério Público Federal to they can analyze its contents according to their respective objectives.

## 5.7. Review by Forensic Services

We reviewed the investigation report and performed a review of relevant allegations available through a public news search.

We reviewed the investigation report provided. Given the new allegations related to SBM (outlined in Section 5.4) that have surfaced since the SBM CIA closed their investigation report, we reviewed this report with the aim of understanding the work that had been performed by the SBM CIA and increasing our understanding of the further investigation that will be required as a result of the new allegations. Note that our observations and recommendations regarding next steps can be found in Section 5.8.

## 5.8. Conclusions

Based on the review of this CIA and its closing prior to learning many of the allegations contained in media reports after March 2014, PwC has concluded that the Company should pursue and independent investigation of the allegations of corruption and fraud in connection with the SBM contracts.

Specific reasons for this conclusion include the following:

- We observe that further investigation is required given additional revelations following the conclusion of the SBM CIA that provide stronger indication that the Company or someone associated with the Company may have received a bribe payment. Specifically, On November 17, 2014, Petrobras President, Graça Foster stated that in May 2014 she received information

---

[41] Note that the text included from the investigation report is a free translation of the original text, which was in Portuguese.

CONFIDENTIAL                                                   PwCBR_PETRO_000135807

that SBM admitted to paying a bribe to a current or former Petrobras employee and that she shared this information with Controladoria Geral da União ("CGU").[42]

- We observe that further investigation, to be carried out by another entity, is necessary given the limitations the Company has in accessing certain information. Towards this end,  Jose Hage, Controladoria Geral da União ("CGU") ministro-chefe, in acknowledging the contribution of the Company in their report, stated that he believed Petrobras does not have the internal instruments necessary to advance the investigation further.  For example, the Company would not have the ability to access bank account information of suspected persons/entities to trace potential bribe payments.[43]  Note that Mr. Hage said that he hoped the CGU would be able to conclude their investigation into this matter in mid-2015.

Section 5.8.1 discusses the reasons outlined above in further detail.

The SBM CIA itself recognized the necessity of a continued investigation in its recommendation: "The SBM CIA believes their investigative work should continue with the Segurança Empresarial department as responsible.  Once relevant information is identified, such information should be forwarded to the appropriate authorities."

## 5.8.1. Observations and recommendations regarding the investigation report

Regarding the investigation performed, we observe that the Company performed a review of contracts with SBM as well as allegations regarding the Company in the media and conducted interviews with relevant individuals internal to the Company and within SBM.

There is some evidence to suggest that some emails were reviewed, specifically the investigation report cites the following:

- Performed a forensic copy and classified the leaked documents in an electronic format and then conducted searches on the emails, expedited by the various criteria and identified editors and those who printed these documents. (page 7)

- "The Commission can confirm the exchange of emails with the name 'Figueiredo' that appear to be associated with the discussion of an extension of FPSOs in a particular location, however nothing irregular was noted." (Page 23)

- "SBM permitted the Commission to verify by viewing their computer screen a select sample of emails. An email in reference to Petrobras minutes dated 18 April refers to a Petrobras internal document.  A email dated 21 April refers to discussions regarding eventual extensions in the FPSOs" Page (36)

- "In a similar manner...we had access to read various emails between Júlio Faerman's companies and board members of SBM, in which the following names were identified:

---

[42] http://www1.folha.uol.com.br/poder/2014/11/1549387-petrobras-admite-ter-recebido-confirmacao-de-propina-da-sbm.shtml
[43] http://politica.estadao.com.br/noticias/geral,cgu-confirma-irregularidades-entre-sbm-offshore-e-petrobras,1591828

CONFIDENTIAL                                                    PwCBR_PETRO_000135808

Estrella, Duque, Figueiredo, Barusco, Formigli, Tuerte, Orlando, Marco Maddalena, Loureiro, Assayag, Nester Cerveró, Leonardo Vilian, Gustavo Adolfo e Nigri." (page 107)[44]

Additional activities that could have been performed within their designated scope include an analysis of payments made to SBM and their subsidiaries as well a more detailed email review, beyond what was alluded to above.

- As discussed in Section12, the email reviews performed by the Company for the various CIAs did not capture certain emails we classified as relevant during our limited review of the emails made available to us. This memo points to areas in which the Company could have performed a more robust analysis, particularly with more advanced tools as their disposal.

- While the SBM CIA included a contract review in its scope, a corresponding review of the payments made was not performed.

## 5.8.2. Topics requiring further investigation

As previously mentioned, we believe the Special Committee investigation should pick up the open points from the effort of this CIA. The following reasons are relevant to this conclusion:

- Recent current events provide stronger evidence that the Company or someone associated with the Company may have received a bribe. Subsequent to the conclusion of the SBM CIA in March 2014, the following events transpired related to the investigation that merit further review:

  o November 12, 2014 – SBM announced that it reached a US$ 240 million settlement with Holland's Openbaar Ministerie that relates to its payments to sales agents in Equatorial Guinea, Angola, and Brazil from the period from 2007 to 2011.[45]

  o November 12, 2014 – the Controladoria Geral da União ("CGU") concluded that there were irregularities in the relationship with Petrobras and SBM. Their investigation, initiated in April 2014, indicates that there were six Petrobras employees, including former directors and individuals who are still working at Petrobras, who were involved in the negotiations with SBM. Jorge Hage, CGU ministro-chefe, would not provide the names of the six individuals in question. Mr. Hage said he hoped the process would conclude in the first half of 2015.[46]

  o November 17, 2014 – Petrobras President, Graça Foster stated that in May 2014 she received information that SBM admitted to paying a bribe to a current or former Petrobras employee and that she shared this information with Controladoria Geral da União ("CGU").[47]

---

[44] Note that the text included from the investigation report is a free translation of the original text, which was in Portuguese.

[45] http://www.sbmoffshore.com/?press-release=sbm-offshore-achieves-settlement-dutch-public-prosecutors-office-alleged-improper-payments-united-states-department-justice-closes-matter
[46] http://politica.estadao.com.br/noticias/geral,cgu-confirma-irregularidades-entre-sbm-offshore-e-petrobras,1591828
[47] http://www1.folha.uol.com.br/poder/2014/11/1549387-petrobras-admite-ter-recebido-confirmacao-de-propina-da-sbm.shtml

CONFIDENTIAL

PwCBR_PETRO_000135809

Email Review                                                                 Draft
                                                          Attorney Work Product
                                                   Privileged and Confidential

- o December 3, 2014 – Pedro Barusco, a third-tier executive who reported to the head of the engineering division of Petrobras until 2010, said that $22 million of the money he plans to return comes from the contracts related to SBM offshore[48]

- o December 12, 2014 – the CGU announced that it was open nine additional processes against Petrobras related to the allegations surrounding SBM, bringing the number of suspects under investigation by the CGU to 16, up from 13.[49]

- o December 15, 2014 – The Tribunal de Contas da União found that in 2008 the Company signed a contract with SBM for a vessel platform P-57 without a specified value. The contract as a place where the value should be listed, however only "R$ XXXXX" is listed.[50]

Note that these news items are discussed in further detail in Section 5.4

- Clarity regarding issues critical to the investigation – i.e. purpose of payments to Mr. Júlio Faercom or other entities related to Mr. Faercom or the Company – is not possible given the information available to the Company and therefore the involvement of another party (e.g. the regulators) will be required to provide clarity on said information. Note that Jose Hage, Controladoria Geral da União ("CGU") ministro-chefe, while acknowledging the contribution of the Company in their report, stated that he believed Petrobras does not have the internal instruments necessary to advance the investigation further.[51] Any evidence information regarding payment of bribes or performance of other illegal acts that the CGU or other regulators are able to provide with the additional information available to them would be extremely helpful for our purposes and for those of the Company. Mr. Hage stated that the CGU hoped to finish its investigation on this topic in mid-2015. To the extent this information is not able to be eventually provided by the regulators, an alternative strategy may have to be developed.

As part of our review of the investigation report and public media search, we compiled a list of entities (Section 5.11), individuals (5.12) that presented certain red flags that would be worth considering in the Special Committee phase of the investigation. Additionally, we compiled a list of documents (Section 5.13) cited by the whistle-blower as support for his allegations regarding the payment of bribes in Brazil. In a further investigation, these documents would also merit additional attention.

### 5.8.3. Items to consider in the internal control review

Note that at the time the SBM CIA concluded its memo in March 2014, they lacked evidence to suggest payments of bribes to employees of Petrobras. Consequently lapses in IC were not identified by the SBM CIA. The investigation report states that "The hiring (of Faerman) followed the process provided for in legislation and our internal Petrobras regulations." (Page 66).[52]

---

[48] http://www.bloomberg.com/news/2014-12-03/petrobras-100-million-man-tops-graft-haul-in-scandal.html
[49] http://oglobo.globo.com/brasil/cgu-instaura-mais-nove-processos-contra-suspeitos-no-caso-de-propina-da-holandesa-sbm-offshore-14714049
[50] http://oglobo.globo.com/brasil/petrobras-assinou-contrato-em-branco-com-empresa-holandesa-14833389
[51] http://politica.estadao.com.br/noticias/geral,cgu-confirma-irregularidades-entre-sbm-offshore-e-petrobras,1591828
[52] Note that the text included from the investigation report is a free translation of the original text, which was in Portuguese.

CONFIDENTIAL                                                    PwCBR_PETRO_000135810

Email Review                                                                        Draft
Attorney Work Product
Privileged and Confidential

Various revelations following the close of the report that provide a stronger indication that Petrobras employees or persons associated with Petrobras received bribe payments. In particular, the following report highlights an incident, which if true, would represent a serious lapse in internal controls.

- An article published in Globo on December 15, 2014, stated that the Tribunal de Contas da União found that in 2008 the Company signed a contract with SBM for a vessel platform P-57 without a specified value. The contract as a place where the value should be listed, however only "R$ XXXXX" is listed. The article reports that these values were completed 207 days after the contract was initially signed, however, this update did not include the full values of all domestic and foreign services.[53]

## 5.9. *Individuals interviewed by the SBM CIA*

*Note that the individual was included in the priority phase of the external investigation

| Ref | Name | Title | Interview Date |
|---|---|---|---|
| 1 | Cláudio Siqueira Vianna | Gerente Geral – ETM-CORP/GPRI | 19/02/14 |
| 2 | Monique Carla Lima de Goes | Assistente – E&P-SSE | 19/02/14 |
| 3 | José João Afonso Filho | Gerente – E&P-Serv/US-CONT/CNTR | 19/02/14 |
| 4 | José Augusto Salgado da Silva | Chefe de gabinete da Diretoria de E&P | 19/02/14 |
| 5 | Ricardo Amador Serro | Gerente Setorial – E&P-PDP/CIP-OLC/PROJ-BLZ | 19/02/14 |
| 6 | Armando Gonçalves de Almeida | Gerente Geral – E&P-PDP/CTPDP | 07/03/14 |
| 7 | Fernando Telles Carneiro | Gerente – E&P-PGSU/RGSN | 07/03/14 |
| 8 | Marco Antonio Maddalena | Consultor Master – E&P-ENGP/IPP/EN | 10/03/14 |
| 9 | Leonardo Vilain João | Consultor Master – E&P-ENGP/IPP/EN | 10/03/14 |
| 10 | Gustavo Adolfo Villela de Castro | Gerente – ENG-SUB/AUP | 10/03/14 |
| 11 | José Eduardo Loureiro | Gerente – ENG-AB/IECOMPERJ/IEOFF | 10/03/14 |
| 12 | José Antônio de Figueiredo* | Director de Engenharia, Tecnologia e Materiais | 10/03/14 and 19/03/14 |
| 13 | Paulo Roberto Buarque Carneiro | Consultor Sênior – E&P-ENGP/IPP/EN | 11/03/14 |
| 14 | Nestor Cuñat Cerveró* | Diretor Financeiro | 11/03/14 |
| 15 | José Miranda Formigli* | Diretor da Área de Negócio de Exploração e Produção | 11/03/14 |
| 16 | Guilherme de Oliveira Estrella | | 12/03/14 |
| 17 | Tuerte Amaral Rolim | Gerente Geral – Unidade de Operações de Exploração e Produção da Bahia | 12/03/14 |
| 18 | José Orlando Melo de Azevedo | Gerente de Controlada/Coligada – GE-LPGN/CTAG-IV | 12/03/14 |
| 19 | Renato de Souza Duque | Diretoria Engenharia, Tecnologia, e Materias | 13/03/14 |
| 20 | Pedro José Barusco Filho | Gerente-Executivo – Engenharia, Tecnologia, e Materias | 13/03/14 |
| 21 | Júlio Faerman (Marcello Faerman e Luís Eduardo Campos Barbosa da Silva) | Ex-sócio gerente das empresas Faercom Energia Ltda e Oildrive Consultoria em Energia e Petróleo Ltda | 14/03/14 |
| 22 | Mário Nigri Klein | Gerente Geral – ENG-SUB/IESS | 13/03/14 |
| 23 | Marcos Isaac Assayag | Gerente Executivo – E&P-PGSU | 17/03/14 |

[53] http://oglobo.globo.com/brasil/petrobras-assinou-contrato-em-branco-com-empresa-holandesa-14833389

CONFIDENTIAL                                                                 PwCBR_PETRO_000135811

Email Review
Draft
Attorney Work Product
Privileged and Confidential

| | | | |
|---|---|---|---|
| 24 | Carlos Tadeu da Costa Fraga | Gerente Executivo – E&P-PRESAL | 17/03/14 |

## *5.10. Abbreviations of names used by the Wikipedia whistle-blower\**

*According to pages 28 – 29 of the investigation report.

BC – Bruno Chabas, CEO of SBM since January 1, 2012

BV – Bernard Verwilgehen, Secretário Geral

DK – Didier Keller, ex-CEO

FE – Former employee, Jonathan David Taylor.  SBM confirmed that FE was Mr. Taylor, previously the company's Legal Director for Sales and Marketing.

HT – Hanny Tagher, responsible for sales for areas outside Brazil

JPL – Jean-Philippe Laures, Operations Chief

MW – Mike Wyllie – Technical Chief

SB – Supervisory Board, located above the board and CEO with the mission to present the strategic guidelines of the company

SH – Sietze Hepkema, Chief of Governance and Compliance, board member

TD – Tim Dickinson

TG – Terry Gagliani

TM – Tony Mace, ex-CEO

WF – Wilkie Farr, Noble external lawer

## *5.11. Entities to consider in the Special Committee Phase of the Investigation*

| Ref | Name | Notes |
|---|---|---|
| 1 | Faercom Energia Ltda | - Established on 20/06/1995<br>- Partners include Marcello Faerman, Eline Faerman, Carlos Eduardo Bitencourt Fersura, Luiz Marcelo Bittencourt Fersura, Júlio Faerman, and Neide Bittencourt Faerman<br>- Source: page 120 to 124 of the investigation report |
| 2 | Oildrive Consultoria em Energia e Petróleo Ltda | - Established on 22/06/2006<br>- Partners include Faercom Energia Ltda and Luis Eduardo Campos Barbosa da Silva<br>- In his interview with the SBM CIA, Mr. Faerman said that |

CONFIDENTIAL
PwCBR_PETRO_000135812

Draft
Attorney Work Product
Privileged and Confidential

| Ref | Name | Notes |
|-----|------|-------|
| | | his company Oildrive continues to represent the following companies in their interactions with Petrobras: Benthic (Austrian geotechnical services company), Welspun (Indian pipe manufacturing company), Vertech (Norwegian company with flame repair products for use in helicopters), Tideway (Dutch company that is part of the DEME group with a focus in dredging and rock installation), and Gall Thomspon (British company specialized in safety marine breakaway couplings) |
| | | - Source: page 120 to 124 of the investigation report |
| 3 | Bien Faire Inc. | - Established on 26/05/2008<br>- Originally had Morgan&Morgan Trust Corporation as a director, however since 18/06/08 Júlio Faerman and his wife Neide Bittencourt Faerman have served as directors |
| | | - Source: page 120 to 124 of the investigation report |
| 4 | Journey Advisors | - Established on 18/05/2006<br>- Originally had Morgan&Morgan Trust Corporation as a director, however since 02/06/06, Júlio Faerman and his wife Neide Bittencourt Faerman have served as directors |
| | | - Source: page 120 to 124 of the investigation report |
| 5 | Jandell Investments Limited | - Established on 21/04/1998<br>- Originally called Arias, Fabrega&Fabrega Trust Co. BVI Limited<br>- Since 29/09/98, Júlio Faerman and his wife Neide Bittencourt Faerman have been partners in the entity |
| | | - Source: page 120 to 124 of the investigation report |
| 6 | Hades Production Inc | - Established on 17/09/2014<br>- Entity was created with Mossack Fonseca & Co. (BVI) Ltd as the agent and passed ownership to Júlio Faerman and Luis Eduardo Campos Barbosa da Silva the same day |
| | | - Source: page 120 to 124 of the investigation report |
| 7 | Modec | - The SBM investigation report states that this company provides services similar to those previously provided by SBM (page 75) |
| 8 | Teekay | - The SBM investigation report states that this company provides services similar to those previously provided by SBM (page 75) |
| 9 | BW Offshore | - The SBM investigation report states that this company provides services similar to those previously provided by SBM (page 75) |
| 10 | Bumi Armada | - The SBM investigation report states that this company provides services similar to those previously provided by SBM (page 75) |
| 11 | Omni | - The SBM investigation report states that this company provides services similar to those previously provided by SBM (page 75) |
| 12 | Saipme | - The SBM investigation report states that this company provides services similar to those previously provided by SBM (page 75) |
| 13 | Prosafe | - The SBM investigation report states that this company provides services similar to those previously provided by |

CONFIDENTIAL

Email Review

Draft
Attorney Work Product
Privileged and Confidential

| Ref | Name | Notes |
|-----|------|-------|
|  |  | SBM (page 75) |
| 14 | Sevan | - The SBM investigation report states that this company provides services similar to those previously provided by SBM (page 75) |
| 15 | Gusto Enginheering BV | - The SBM investigation report states that the Company has 3 contracts with Gusto Enginheering BV, a company related to SBM (page 75) |

## 5.12. Individuals to consider in the Special Committee Phase of the Investigation

| Ref | Name | Notes |
|-----|------|-------|
| 1 | Marcello Faerman | - Partner in Faercom Energia Ltda, a business associated with Mr. Faerman |
| 2 | Eline Faerman | - Partner in Faercom Energia Ltda, a business associated with Mr. Faerman |
| 3 | Carlos Eduardo Bitencourt Fersura | - Partner in Faercom Energia Ltda, a business associated with Mr. Faerman |
| 4 | Luiz Marcelo Bittencourt Fersura | - Partner in Faercom Energia Ltda, a business associated with Mr. Faerman |
| 5 | Júlio Faerman | - Partner in Faercom Energia Ltda, a business associated with Mr. Faerman |
| 6 | Neide Bittencourt Faerman | - Partner in Faercom Energia Ltda, Bien Faire Inc., Journey Advisors, and Jandell Investments Limited, businesses associated with Mr. Faerman |
| 7 | Luis Eduardo Campos Barbosa da Silva | - Partner in Oildrive Consultoria em Energia e Petróleo Ltda and Jandell Investments Limited, businesses associated with Mr. Faerman |
| 8 | Márcio Félix Carvalho de Bezerra, | According to the December 15, 2014 Globo article "Petrobras assinou contrato em branco com empresa holandesa," a parliamentary commission identified this Petrobras employee as having been involved in the purchase of the platform P-57, for which SBM was alleged to have paid US$ 36,3 million in bribes as part of the deal. |
| 9 | Luiz Robério Silva Ramos | According to the December 15, 2014 Globo article "Petrobras assinou contrato em branco com empresa holandesa," a parliamentary commission identified this Petrobras employee as having been involved in the purchase of the platform P-57, for which SBM was alleged to have paid US$ 36,3 million in bribes as part of the deal. |

CONFIDENTIAL

PwCBR_PETRO_000135814

Draft
Attorney Work Product
Privileged and Confidential

| Ref | Name | Notes |
|-----|------|-------|
| 10 | Cornelius Franciscus Jozef Looman | According to the December 15, 2014 Globo article "Petrobras assinou contrato em branco com empresa holandesa," a parliamentary commission identified this Petrobras employee as having been involved in the purchase of the platform P-57, for which SBM was alleged to have paid US$ 36,3 million in bribes as part of the deal. |
| 11 | Samir Passos Awad | According to the December 15, 2014 Globo article "Petrobras assinou contrato em branco com empresa holandesa," a parliamentary commission identified this Petrobras employee as having been involved in the purchase of the platform P-57, for which SBM was alleged to have paid US$ 36,3 million in bribes as part of the deal. |
| 12 | Roberto Moro, | According to the December 15, 2014 Globo article "Petrobras assinou contrato em branco com empresa holandesa," a parliamentary commission identified this Petrobras employee as having been involved in the purchase of the platform P-57, for which SBM was alleged to have paid US$ 36,3 million in bribes as part of the deal. |
| 13 | José Luiz Marcusso | According to the December 15, 2014 Globo article "Petrobras assinou contrato em branco com empresa holandesa," a parliamentary commission identified this Petrobras employee as having been involved in the purchase of the platform P-57, for which SBM was alleged to have paid US$ 36,3 million in bribes as part of the deal. |
| 14 | Osvaldo Kawakami | According to the December 15, 2014 Globo article "Petrobras assinou contrato em branco com empresa holandesa," a parliamentary commission identified this Petrobras employee as having been involved in the purchase of the platform P-57, for which SBM was alleged to have paid US$ 36,3 million in bribes as part of the deal. |

## 5.13. Documents to consider in the Special Committee Phase of the Investigation *

*As cited by the SBM whistle-blower in his Wikipedia as documents that would support the allegations he was making.[54]

| Ref | Description |
|-----|-------------|
| 1 | Service Agreement Commercial Representation between SBM Inc. and JF's company Oildrive Consultoria EM Energia Petroleo dated 2 June 2006 and its amendments |

[54] http://en.wikipedia.org/w/index.php?title=SBM%20Offshore&oldid=577742341

CONFIDENTIAL                                                                PwCBR_PETRO_000135815

| 2 | Amendment to an Agreement of 2 July 199 dated 7 February 2007 with Faercom Energia Ltda confirming a "commission" of 3% signed by HT for SBM Inc |
|---|---|
| 3 | Payments to Agents' Task Force document of 17th April 2012 prepared by SBM Internal Audit showing (inter alia) payments of US$ 139,216,000 to the JF Group of Companies: Faercom, Bienfaire, Oildrive, Jandell, Journey Advisors and Hades Production Inc, including payments made by SBM's Houston office. Cf. HT Interview 27 March 2012 in which HT confirmed these payments (ie. money allocated for bribes) were paid on to Petrobras officials. |
| 4 | Numerous e-mails implicating, for example, JPL, BC and MW, including: - 9 April 2011, JPL asking HT when "work" (i.e. bribes) will need to be done in Brazil — 18 and 21 April 2011 from JPL to (inter alia) BC and MW attaching confidential Petrobras Minutes (not information which is provided free of charge) and referring to a future meeting with Petrobras engineering chief Figueiredo to extend a lease 'without going via an open bid. |

CONFIDENTIAL

PwCBR_PETRO_000135816

# 6. *Época CIA*

## 6.1. *Overview*

Mr. João Augusto Rezende Henriques, former director and Petrobras, in an interview with Época magazine, outlined several allegations against the Company, largely related to bribes allegedly paid in the purchase and sale of assets and in the contracting process. The contents of this interview were published in Época on August 9, 2013 with a follow up article published on August 13, 2013. Details regarding these allegations can be found in Section 6.2 below. The Company established an internal investigation commission by DIP Presidencia 121/2013 on August 13, 2013. The stated scope of the CIA was to:

- Analyze the content of the Época article;

- Assess possible losses by Petrobras;

- Investigate the activities and performance of the whistleblower;

- Study variations from proper internal controls and processes; and,

- Determine the responsibility of those involved for irregularities discovered, if any.

## 6.2. *Allegations*

The Company established the Época CIA in response to Época's August 9, 2013 article entitled "As denúncias do operador do PMDB na Petrobras." This article included the following allegations related to the Company and the CIA's Report reflects the same points as noted below.

- *Overview*

  Mr. João Augusto Rezende Henriques, former director of BR Distribuidora and PMDB lobbyist, alleged that in order to win contracts with Petrobras, he had to give a portion of the value to the contract to the PMDB political party. Mr. João Augusto stated that in general, 60% to 70% of funds collected from the businesses were passed onto the PMDB political party. Mr. João Augusto also said that this money was used to pay for campaigns and transferred to the personal accounts of the congressmen and "operators" within Petrobras.

  According to Mr. João Augusto, Congressman Fernando Diniz had responsibility for coordinating with him regarding the transfer of funds to the PMDB political party. Mr. João Augusto reported that after Mr. Diniz's death, Congresmen Mauro Lopes and João Magalhães had responsibility for coordinating with him on the transfer of funds to the party.

- *Background of how Mr. João Augusto become involved*

  Mr. João Augusto said that when he was still Director at BR Distribuidora he ran into difficulty getting the support of other directors for various initiatives. Regarding this issue, he spoke with Benjamin Steinbruch, Companhia Siderúrgica Nacional ("CSN") owner, who explained to him that he need political support and subsequently called Tasso Jereissati, PSDB member, and Marcelo Alencar, then PSDB governor of Rio de Janeiro, to arrange such

CONFIDENTIAL                                                    PwCBR_PETRO_000135817

Draft
Attorney Work Product
Privileged and Confidential

support. After this, Mr. Alencar is alleged to have called Mr. Joel Rennó, then President of Petrobras, than "João Augusto is with us."

Given his political support, Mr. João Augusto was a PMDB favorite to join the Petrobras board of directors in 2008. His name, however, was barred by the Casa Civil on the basis of irregularities identified by the Tribunal de Contas da União at BR Distribuidora during his tenure as Director there. Consequently, Congressman Fernando Diniz asked him whom he would prefer to have his role in his place, to which he responded Mr. Jorge Zelada, a Petrobras engineer and one of his good friends at the Company. Sócrates José, another ally, became Zelada's chief of staff.

- *SMS contract with the Construtora Norberto Odebrecht*

  Mr. João Augusto told Época about what he viewed as his greatest deed; a contract signed by the International Area and construction company Odebrecht, worth almost BRL 1 billion, closed just before the runoff elections in 2010. By the contract, Odebrecht would be responsible for environmental safety in Petrobras operations spread over 10 countries.

  In second semester of 2009, the senate was conducting a parliamentary committee of inquiry (CPI) on allegations regarding irregularities on Petrobras. Mr. João Augusto told Época he made a deal with Petrobras CEO, Mr. José Gabrielli: The political party PMDB would help to bury the CPI, in exchange, Mr. José Gabrielli would not create any difficulties to approve the Odebrecht contract.

  The CPI was closed without any significant finding. However, according to Mr. João Augusto, Mr. José Gabrielli did not fulfill his part of the deal. When Odebrecht won the bid, which was already fixed, Mr. José Gabrielli tried to delay as much as possible the contract signature.

  Facing this situation Mr. João Augusto arranged a meeting in between Odebrecht and Mr. João Vaccari, treasurer of political party PT, the party responsible for Mr. José Gabrielli nomination. According to Mr. João Augusto, Odebrecht provided amounts around BRL 8 million to PT for the campaign of 2010 elections.

  The delay went past the first round of the elections, when the contract was signed before the runoff, and, according to Mr. João Augusto, everybody won, political party, employees, himself: "Everybody that participated was paid".

- *The sale of the San Lorenzo refinery (projeto Atreu)*

  Mr. João Augusto stated his first dealing of this type was a contract in Bueno Aires in 2009. The arrangement was alleged as follows: Sérgio Tourinho, a Brazilian lawyer and former congressman, would receive US$ 10 million from Jorge Rottemberg, an Argentine lobbyist, in the event that Petrobras sold a refinery in San Lorenzo, Argentina to Cristóbal Lopez, a businessman known to be friends with President Cristina Kirchner. This refinery was valued at US$ 110 million.

  Sérgio Tourinho was known to be a PMDB lobbyist who worked in partnership with Jorge Zelada, International Director at Petrobras March 2008 to July 2012 and, according to Mr. João Augusto, sponsored by the PMDB.

  According to Mr. João Augusto, Clóvis Correa, Petrobras Director in Argentina at the time, participated in meetings held in hotels to negotiate the deal and was to receive part of the "success" fee of US$ 10 million. This negotiation was reportedly known as "projeto Atreu."

CONFIDENTIAL

PwCBR_PETRO_000135818

According to Mr. João Augusto, originally US$ 6.8 million of this amount was to be transferred to him with US$ 5.0 million to be transferred on to the PMDB; however he later argued for a larger portion of US$ 6.8 million given pressure from the party. Mr. João Augusto reported that when the refinery was finally sold, he received nothing while Mr. Correa received the most. He said he had a number of commitments at the time and was left looking like an "idiot."

Note that Mr. Clóvis Correa is currently a consultant or advisor to Transpetro.

- *Contract with Vantage that included a US$ 14.5 million "commission"*

Mr. João Augusto said he was involved in the hiring of a drillship ("navio-sonda") from Vantage for US$ 1.6 billion, a contract which he alleged to have yielded a "commission" of US$ 14.5 million of which US$ 10 million was passed on to the PMDB political party. Mr. João Augusto said that José Carlos Amigo, who recently assumed management of Petrobras Latin America, was involved in this deal.

- *The purchase of a 50% participation in block 2714-A, offshore in Namibia*

Mr. João Augusto told Época he had put people he could trust, mostly colleagues from college, into jobs at Petrobras. The only one that did he did not go to college with was Mr. Fernando Cunha, who became Business Manager in Africa.

According to Mr. João Augusto, Mr. Fernando Cunha participated in an operation to acquire an oil field in Namibia, an operation in which Mr. Fernando Cunha received a commission payment from the selling side.

- *The sale of a 27.3% indirect participation in EDESUR*

Mr. João Augusto additionally told that after the Odebrecht contract, things started to change and a lot of Directors connected to PT left Petrobras. Mr. João Augusto, however, was still hunting for businesses with the Company. He had recently worked in the sale of a participation Petrobras had in an electrical distributor in Argentina (EDESUR).

- *Alleged recipients of funds*

Mr. João Augusto listed the following people and organizations as receiving funds resulting from this scheme:

  o Representatives / congressmen from the PMDB political party Antonio Andrade, Ministry of Agriculture

  o João Magalhães, President of Finance Commission from Congress

  o João Vaccari, Finance Secretary from PT

  o The campaign of President Dilma Rousseff

The scope of the Época CIA also included as part of its review the allegations outlined in Época's follow up article, dated August 16, 2013 and entitled "Lobista aponta mais empreiteiras com que tinha negócios na Petrobras." Additional allegations outlined in this article, and the Época CIA, include the following:

CONFIDENTIAL                                                                         PwCBR_PETRO_000135819

- Mr. João Augusto released a letter stating that he now denies the information he previously shared, stating that he never exercised "interference in Petrobras international's contracts."

- In his first interview, Mr. João Augusto referred to contracts with UTC Engenharia, Andrade (Gutierrez), Mendes Júnior, Trend Empreendimentos Participações e Serviços (company owned by Mr. João Augusto). However, Época was unable to isolate which contracts were involved in the scheme given the lack of details provided by Mr. João Augusto.

- Mr. João Augusto stated that he preferred to not know the details regarding how the payment was actually made and always relied on a *doleiro* or money changer to do this task. In particular, he said he relied on Ângelo Lauria and the lobbyist Felipe Diniz, son of Congressman Fernando Diniz.

  According to Mr. João Augusto, Felipe Diniz also worked closely with Bruno Queiroga, a lawyer, and Adriano Sarney, grandchild of Senator José Sarney. The article also states that Brasil Solair, previously known as DFV Solair and owned by Felipe and Bruno, as a company possibly involved in the scheme. Allegedly this company received R$ 6.2 million from the Caixa's Fundo Sócio Ambiental in exchange for installing solar energy panels in 1,000 Minha Casa Minha Vida homes. Businessman Nélson Côrtes, brother of Rio's Health Secretary, Sérgio Côrtes, is also an owner in Brasil Solair.

## 6.3. *Investigation performed by management*

As outlined in the investigation report, the objective of the Época CIA was to investigate the allegations made in the August 9, 2013 Época article entitled "As denúncias do operador do PMDB na Petrobras."

The Época CIA defined the following strategy for its review:

- Understand the flowchart of approvals for projects in the International area;

- Study the audit report related to the Odebrecht contract whose objective was to provide services related to rehabilitation, construction, assembly, diagnostic, and remediation related to the action plan of certification in Health, Safety and Environmental requirements ("SMS") contract in the International Business Area ("INTER");

- Verify the documentation related to the following processes;

  o The sale of the San Lorenzo refinery ("projeto Atreu"),

  o The purchase of a 50% participation in block 2714-A, offshore in Namibia,

  o Hiring of the Vantage Deepwater Company for drilling services of the drillship ("navio sonda") Titanium Explorer,

  o The sale of 27,3% indirect participation in EDESUR,

- Structure and interview schedule and plan interviews that will be performed establishing the relationship of people allegedly involved.

Based on this strategy, the investigation report states the following activities were performed:

- Analysis of audit report R-9265/2011

CONFIDENTIAL                                              PwCBR_PETRO_000135820

Draft
Attorney Work Product
Privileged and Confidential

- Analysis of a sample of documents of the bidding process for the hiring of services of SMS and chartering of the rig Titanium Explorer, both enacted under the International area

- Performed 28 interviews with employees and former employees that were in some way related to the allegations outlined in Época.  See Section 6.7 for information regarding individuals interviewed as part of this CIA.

- Performed an interview with a Construtora Noberto Odebrecht representative, Sr. Marco Duran

- Sent an invitation to Mr. João Augusto with the objective of obtaining additional information to investigate the non-conformities mentioned in Época

- Initially two letters were sent to Mr. João Augusto – due to a variety of circumstances, Mr. João Augusto was not able to be interviewed.  A questionnaire was subsequently sent to Mr. João Augusto via his legal representative Dr. José Cláudio and a response was provided.[55]

## 6.4. Conclusions of management's investigation

The Época CIA outlined the following conclusions in their investigation report:

- After reviewing various emails, reviewing documents, and performing a comparison with the information outlined in Época, it is possible to verify that, specifically in relation to the objective of investigation, there were some correlations between the documents reviewed and the allegations in the article, as shown by the tables inserted in the partial conclusions of this report.[56]

- The possibility that Mr. João Augusto exercised influence and acted as an intermediary of the business dealings under the responsibility of the International area based on the confirmed proximity with various employees that held key positions in that area.  Current Company employee José Carlos Vilar Amigo and Sócrates, a former employee, declared that they were good friends and had admiration for Mr. João Augusto, in addition to recognizing a normal level of contact with him.

- Additionally, various calls made by Company telephones, visits and meetings with Sócrates and Clóvis coincided with the periods in which the business deals cited in Época were taking place.  Specifically, there were 10 calls made to Mr. João Augusto by Fernando Cunha that he did not mention in his interview with the Época CIA.  In fact, in his interview he stated that he had little contact with Mr. João Augusto and no contact with him on the topics under review by this CIA.

- Of the five cases listed in the report with the involvement of Mr. João Augusto, four of these had business support.  Two represent earnings for Petrobras – the sale of refinery in San Lorenzo and EDESUR – and two are technically justified and do not present evidence of loss

---

[55] Note that the text included from the investigation report is a free translation of the original text, which was in Portuguese.
[56] Referring to tables on chapter 6 of the report, pp 7 - 36, in which the tables contrast allegations from Época and facts investigated that corroborate such allegations.

CONFIDENTIAL

Draft
Attorney Work Product
Privileged and Confidential

for the Company – farm-in in Namibia and the hiring of the rig of Vantage. However, the hiring of Odebrecht for the SMS project, besides being negotiated directly by the then direct and his advisor, did not follow the normal procedures and represents a set of non-conformities as outlined in the audit report R-9265/11.

- The necessity to correct liabilities from SMS was real. The companies abroad did not have budgetary limits imposing a slower pace that is desirable in the mitigation of environmental questions and of security over the process. The proposal to contract a projects company and a company with experience in SMS to verify the progress of work conducted by each company, locally, abroad, was well founded. However on January 26, 2010, under the advice of then Director Zelada, the execution of these services moved to be centralized in one contract.

- Subsequently, there was pressure to accelerate Obebrecht's retention which would eventually result in one contract that generated payments that did not correspond to the services provided. As a result of the audit report R-9265/2011, certain measures were taken by way of a contract addendum.

- The individuals selected to operate this contract had the necessary conditions to produce a quality work, which would not expose the Company. Therefore, we understand that employees on this process, marked by unusual procedures and generation of questionable documents, that could have been harmful to the interests of Petrobras, have responsibility.

- Lastly, this report addresses as well the payment of values in cash for employees that contributed to the success of the deals negotiated by Mr. João Augusto. In regards to this point, with the resources available to the Época CIA, it was not possible to verify or prove information.

- The subsequent edition of Época, dated August 16, 2013[57], mentioned four companies that had contracts with Petrobras and stated that these contracts were subject to the interference of political interests. The companies mentioned were CNO, UTC Engenharia, Mendes Júnior, and Andrade Gutierrez. Research conducted together with the Exploração e Produção (E&P) and Engenharia, Tecnologia e Materiais (ETM) areas, showed the existence of various contracts with these companies. We found that many of these contracts were the subject of routine work realized by Petrobras' Auditoria, and did not register indications of non-compliance with legislation and standards to which it was subject.[58]

Based on the above conclusion, the Época CIA offered the following recommendations:

- The system of corporate governance should always be observed by the Areas of the Company, in a form that avoids an environment where third party interests are favored over those of Petrobras

- The eventual substitutes of managers should be formalized, through a DIP, in a form that permits maximum confidence and traceability for the actions taken during the management of the substitutes

---

[57] http://epoca.globo.com/tempo/noticia/2013/08/lobista-aponta-mais-empreiteiras-com-que-tinha-bnegocios-na-petrobrasb.html
[58] Note that the text included from the investigation report is a free translation of the original text, which was in Portuguese.

CONFIDENTIAL                                                                    PwCBR_PETRO_000135822

- Considering the repercussions of the facts investigated by the Época CIA, as it pertains to third parties, including the request of this report by the TCU and CGU, the Época CIA recommends the following disciplinary measures – as outlined below. To this end, the Época CIA understand it to be prudent to obtain an opinion from the Legal department to support the following recommendations:

  o Aluísio Teles Ferreira Filho – the possible application of disciplinary sanctions up to the level of suspension for 29 days for reasons related to the act performed that can be characterized as negligent (negligent in the acts of the Special Commission) and the act of indiscipline (characterized because of continuing reports that do not match the reality of the documentation presented), that could have induced the CIA into error, as well as absenteeism.

  o Venâncio Pessoa Igrejas Lopes Filho – the possible application of disciplinary sanctions up to the level of suspension for 1 day for reasons related to negligence, of moderate severity, practiced while coordinator of a bidding commission (designation of employees without the necessary expertise and for not accompanying the works, despite being designated the superior authority.)

  o José Carlos Vilar Amigo – the possible application of disciplinary sanctions of a warning for reasons related to negligence, of moderate severity, embodied in the inobservance of the duty to discipline the activities of his subordinate, Aluísio Teles

  o Alexandre Penna Rodrigues – the possible application of disciplinary sanctions of a warning for reasons related to negligence, of moderate severity, characterized by the inadequate evaluation and approval of documents to which he was entrusted.

  o Teófanes de Almeida Elias – the possible application of disciplinary sanctions of a warning for reasons related to negligence, of moderate severity, characterized by non-attendance in the work of the bidding commission. Additionally, he signed the final report without having the conditions necessary to attest to its contents.

  o Levi Rodrigues de Oliveira Júnior – the possible application of sanctions of a warning for reasons related to negligence, of moderate severity, characterized by non-attendance in the work of the bidding commission. Additionally, he signed the final report of the bidding commissions without having the conditions necessary to attest to its contents.

  o Pedro Paulo Lofego Lobo – the possible application of sanctions of a warning for reasons related to negligence, of moderate severity, characterized by non-attendance in the work of the bidding commission. Additionally, he signed the final report of the bidding commission without having the conditions necessary to attest to its contents

  o Clóvis Correa de Queiróz – the possible application of sanctions up to a level of suspension for two days for reasons related to acts of indiscipline practiced, as detailed in the subsequent reports of the bidding commissions, that do not match with the documentation presented and that could have induced the Commission to error

CONFIDENTIAL                                              PwCBR_PETRO_000135823

o   Fernando Jóse Cunha – the possible application of sanctions up to a level of suspension for two days for reasons related to acts of indiscipline practices, as detailed in the subsequent reports of the bidding commissions, that do not match with the documentation presented and that could have induced the Commission to error.[59]

Lastly, the Época CIA offered the following final comments:

- Considering the limitations of this CIA, we recommend the delivery of this report to the Ministério Público to take the necessary measures they deem appropriate.

- Identical copies of the report were delivered to the Autoridade Constituinte da Comissão Interna de Apuração and to the Segurança Empresarial do GAPRE. Both were identified and signed by the Época CIA coordinator and its members.[60]

### *6.4.1. Involvement of the individuals according to the CIA Report*

| Individual | Still in Company at the date of report? | SMS contract with the Construtora Norberto Odebrecht | Sale of the San Lorenzo refinery (projeto Atreu) | Purchase of a 50% participation in offshore in Namibia mining of Vantage | Deepwater Company for ship Titanium Explorer | Sale of a 27.3% indirect participation in EDESUR |
|---|---|---|---|---|---|---|
| **Aluísio Teles Ferreira Filho** | Yes | X | | | | |
| **Armando R. Tripodi** | Yes | | | O | | |
| **Clóvis Correa de Queiróz** | Yes | | X | | | |
| **Eduardo Musa** | Yes | | | | O | |
| **Fernando José Cunha** | Yes | X | X | X | | |
| **Jorge Luiz Zelada** | Retired | X | | | X | |
| **José Carlos Vilar Amigo** | Yes | X | O | | | O |
| **José Gabrielli** | No | | | O | | |
| **Levi Rodrigues de Oliveira Jr.** | Yes | X | | | | |
| **Pedro Paulo Lofego Lobo** | Yes | X | | | | |
| **Ricardo Abi-Ramia** | Yes | | | O | | |
| **Roberto Gonçalves** | Yes | | O | O | | |
| **Samir Passos Awad** | Yes | | | O | | |
| **Sócrates José Fernandes Marques** | Retired | X | X | | X | |
| **Teófanes de Almeida Elias** | Yes | X | | | | |
| **Ulisses Sobral Calile** | Retired | X | | | | |

---

[59] Note that the text included from the investigation report is a free translation of the original text, which was in Portuguese.
[60] Note that the text included from the investigation report is a free translation of the original text, which was in Portuguese.

Draft
Attorney Work Product
Privileged and Confidential

| Venâncio Pessoa Igrejas Lopes Filho | Yes | X | | | | | |
|---|---|---|---|---|---|---|---|

## 6.5. *Review by Forensic Services*

In October 2014, Forensic Services reviewed this CIA primarily to further understand the background information available regarding the information becoming public from the Lava Jato investigation. To obtain such background information we had access to the CIA Report and Annexes thereto which contained interview notes, certain documents collected, and certain emails collected.

We reviewed the interview notes provided for the 43 individuals interviewed. For a list of individuals interviewed see Section 1.5.4. Our observations related to this review can be found in Section 4.

Our observations related to this review can be found in Section 6.6.

## 6.6. *Conclusion and Topics for Further Investigation*

We note the similarilty of the allegations investigated by this CIA with the information disclosed from the Lava Jato investigation. Accordingly, our primary conclusion from this review is that further investigation by an independent team, the Special Committtee, should incorporate the allegations addressed here within the scope of their work. Please find below some observations and recommendations based on our review that should be considered in the Special Committee review.

### 6.6.1. *Observations from the investigation report*

The Época CIA concluded that four out of the five business transactions, related to the allegations outlined in EPOCA, had a valid business explanation or purpose. In particular:

- The sale of the San Lorenzo refinery (projeto Atreu);

- The sale of a 27.3% indirect participation in EDESUR; represented earning for the company.

- The purchase of a 50% participation in block 2714-A, offshore in Namibia; and,

- the Hiring of Vantage Deepwater Company for services related to drilling by the ship Titanium Explorer;

were justified on the basis that they were profitable transactions or that they were technically sound and there is no evidence of loss to the Company. However, we note that the presence of a valid business purpose does not assure that the business transaction did not present irregularities, e.g., that a given party in the transaction was favored, if the price paid was in accordance to market value, and if money was embezzled to pay political parties and other bribes. Accordingly, further consideration by the Special Committee is appropriate.

Note that for the fifth business transaction related to the allegations, the SMS contract with the Construtora Norberto Odebrecht, the Época CIA concluded there was a true business need for the SMS contract, but that the tender process was not done correctly.

Additionally, the main allegation of the EPOCA article was that 60% to 70% of funds gathered by Mr. João Augusto were distributed to political party PMDB to finance campaigns. The Época CIA only included in its scope internal procedures relating to the transactions and did not include external

CONFIDENTIAL                                                              PwCBR_PETRO_000135825

Email Review                                                                Draft
Attorney Work Product
Privileged and Confidential

factors, such as potential relationships with congressmen and political candidates. The Época CIA was not designed to perform such a task, and indeed may not have had the ability to do so, but these factors should be included in further investigation by the Special Committee. We note that the CIA Report was timely shared with the competent government authorities.

## 6.6.2. *Topics requiring further investigation*

| | Allegation | CIA Conclusion | Our recommendations |
|---|---|---|---|
| 1. | SMS contract with the Construtora Norberto Odebrecht | The CIA concluded that there was a real business need to manage international SMS.<br><br>However, 11 non conformities were identified during the bidding process and contract signing | Investigate further in order to identify potential connections with political parties and the parliament inquiry commission (CPI).<br><br>If Petrobras granted the contract to Odebrecht, conditioned to Odebrecht's political donation to PT, and in exchange to bury the CPI investigation irregularities in Petrobras, there is a potential FCPA risk.<br><br>Additionally evaluate the remediation given to the SMS contract. |
| 2. | Sale of the San Lorenzo refinery (projeto Atreu) | The CIA concluded that the sale was above market value and followed all legal and internal requirements, except from anticipating the negotiation without any approval from the Executive Directory. | Evaluate the outcome of the sale, whether the value negotiated was paid to Petrobras in full, if commission payments were made and if the purchasing side was favored.<br><br>Additionally evaluate enforcement on confidentiality to assure privileged information is not being shared with interested parties. |
| 3. | Purchase of a 50% participation in block 2714-A, offshore in Namibia | The CIA concluded that the process followed the governance procedures in the International Area.<br><br>The CIA also concluded there was consent among the interviewees that this business was an exploration opportunity with appropriate cost for the risks associate. | Investigate the outcome of this transaction, whether the values paid as the same as the negotiated amount, and if there was commission payments paid as the allegations suggest.<br><br>Additionally evaluate if Petrobras still owns that participation, if the oilfield is in production, as well as any previously known information that could be hidden to encourage the Company to purchase. |

CONFIDENTIAL                                                          PwCBR_PETRO_000135826

Email Review
Draft
Attorney Work Product
Privileged and Confidential

| Allegation | CIA Conclusion | Our recommendations |
|---|---|---|
| 4. Hiring of Vantage Deepwater Company for services related to drilling by the ship Titanium Explorer | The CIA concluded that the transaction was at a fair market value | Investigate further to identify whether commission payments were made, and if this vendor was favored in the transaction. |
| | | If bribery is to be considered widespread, then all vendors in the market already include potential bribes in their prices, being necessary to adjust assets. |
| 5. sale of a 27.3% indirect participation in EDESUR | The CIA concluded that this sale generated value for Petrobras | Evaluate external influence in Company's decision making, as Mr. João Augusto explained he searches for business opportunities inside Petrobras, with or without the involvement of politicians. |

## 6.6.3. Items to consider in the internal control review

This CIA identified that the same team responsible for procuring the SMS contract with Odebrecht was also responsible for managing the contractor's performance. This suggests a lack of appropriate segregation of responsibilities for procurement and supervision.

The CIA concluded that internal information regarding the plan to sell the San Lorenzo refinery was shared with Mr. João Augusto in advance of any public announcement and that he appears to have used the information to assemble a group of buyers and propose a transaction to Petrobras. Thus, indicating a need to enforce the data and information security and ultimately the remediation of leaks of confidential information.

## 6.7. Individuals interviewed by the Época CIA

*Note that the individual was included in the priority phase of the external investigation

| Ref | Name | Title | Interview Date |
|---|---|---|---|
| 1 | José Carlos Vilar Amigo (2v) | Engenheiro de Equipamentos Sênior - CENPES/GTEC | 20/08/2013 |
| 2 | Fernando José Cunha | Engenheiro de Equipamentos Sênior - ENG-GE/PROJEN | 20/08/2013 |
| 3 | Abílio Paulo Pinheiro Ramos (2v)* | Engenheiro de Processamento Sênior - AB-CR | 21/08/2013 |
| 4 | Laércio do Prado Freires (2v) | Economista Sênior - INTER-AFE/GEMP/DE | 21/08/2013 |
| 5 | Luciano Seixas Pereira | Profissional Sênior | 21/08/2013 |

CONFIDENTIAL
PwCBR_PETRO_000135827

Email Review

Draft
Attorney Work Product
Privileged and Confidential

| Ref | Name | Title | Interview Date |
|-----|------|-------|----------------|
| 6 | Públio Roberto Gomes Bonfadini | Engenheiro de Processamento Sênior | 21/08/2013 |
| 7 | Teofanes de Almeida Elias (3v) | Engenheiro de Equipamentos Senior | 21/08/2013 |
| 8 | Pedro Paulo Lofego Lobo | Economista Pleno - INTER-CORP/EPL/GPI | 21/08/2013 |
| 9 | Dermarco Jorge Epifanio | INTER-AL | 22/08/2013 |
| 10 | Levi Rodrigues de Oliveira Junior | INTER-CORP/GGC/ADCT | 22/08/2013 |
| 11 | Augusto Canellas Monteiro de Castro Junior | Not Informed | 22/08/2013 |
| 12 | Carlos Cesar Borromeu de Andrade | Not Informed | 22/08/2013 |
| 13 | Roberto Gonçalves | AB-LO/LOGUM | 22/08/2013 |
| 14 | Agostinho Candido Gatto (2v) | Técnico de Suprimentos de Bens e Serviços Sênior - FINCORP/CSA | 23/08/2013 |
| 15 | Alexandre Penna Rodrigues (2v) | Engenheiro de Equipamentos Sênior - RH/UP/ECTGE | 23/08/2013 |
| 16 | Renato Pires de Oliveira (2v) | Economista Senior - COMPARTILHADO/RBG | 23/08/2013 |
| 17 | Clóvis Correa de Queiróz | Engenheiro de Equipamentos Sênior - INTER-AL | 26/08/2013 |
| 18 | Aluísio Teles Ferreira Filho | Engenheiro de Equipamentos Sênior - INTER-AL/INTEG | 27/08/2013 |
| 19 | Carlos Alberto da Costa (2v) | Geofísico Sênior - INTER-AL | 29/08/2013 |
| 20 | Sócrates José Fernandes Marques | Engenheiro de Equipamentos Sênior | 30/08/2013 |
| 21 | Carlos Alberto Pereira de Oliveira | Engenheiro de Petrolio Sênior - E&P-PDP | 02/09/2013 |
| 22 | Claudio Castejon* | AB-PQ/PETSUAPE-FIN | 02/09/2013 |
| 23 | Ulisses Sobral Calile | Técnico de Inspeção de Equipamentos | 02/09/2013 |
| 24 | Rudimar Andreis Lorenzatto (2v) | Engenheiro de Petróleo Sênior | 03/09/2013 |
| 25 | Eduardo Costa Vaz Musa | Not Informed | 04/09/2013 |
| 26 | Mário Luis de Oliveira | E&P-PGSU/CS-II | 04/09/2013 |
| 27 | Marco Aurélio Bobsin (2v) | INTER-AL | 05/09/2013 |
| 28 | Darcy Ferraço Júnior | INTER-AL | 05/09/2013 |

CONFIDENTIAL

PwCBR_PETRO_000135828

Email Review

Draft
Attorney Work Product
Privileged and Confidential

| Ref | Name | Title | Interview Date |
|-----|------|-------|----------------|
| 29 | Pedro Augusto Cortes Xavier Bastos | COMPARTILHADO/RBG/BS | 05/09/2013 |
| 30 | Alexandre Penna Rodrigues (2v) | Engenheiro de Equipamentos Sênior - RH/UP/ECTGE | 06/09/2013 |
| 31 | José Carlos Vilar Amigo (2v) | Engenheiro de Equipamentos Sênior - CENPES/GTEC | 06/09/2013 |
| 32 | Venâncio Pessoa Igrejas Lopes Filho (2v) | Advogado Senior - Jurídico/JPR/RE | 06/09/2013 |
| 33 | Marco Duran | Director at CNO | 09/09/2013 |
| 34 | Maria de Fátima Salles Abreu Passos | Analista de Pesquisa Operacional Senior - INTER-CORP | 19/09/2013 |
| 35 | Mateus de Andrade Fonseca | Admnistrador Pleno - FINCORP/PD | 19/09/2013 |
| 36 | Públio Roberto Gomes Bonfadini | Engenheiro de Processamento Sênior | 19/09/2013 |
| 37 | José Carlos Caino de Oliveira | Engenheiro de Equipamentos Sênior - COMPARTILHADO/RBG | 23/09/2013 |
| 38 | Leonardo Goldenberg | Administrador Senior - COMPARTILHADO/RBG/PGRH | 23/09/2013 |
| 39 | Ubiratan José Clair* (2v) | Engenheiro de Processamento Senior | 23/09/2013 |
| 40 | Públio Roberto Gomes Bonfadini (2v) | Engenheiro de Processamento Sênior | 24/09/2013 |

(2v) means we were given two versions of the same document among the report attachments

(3v) means we were given three versions of the same document among the report attachments

CONFIDENTIAL                                                                    PwCBR_PETRO_000135829

Email Review

Draft
Attorney Work Product
Privileged and Confidential

# 7. Ecoglobal CIA

## 7.1. Overview of Ecoglobal

Ecoglobal Ambiental Comércio e Serviços Ltda. ("Ecoglobal") was incorporated on 2003, started its operations on December 2005. With operational base in Macaé Rio de Janerio state and offices in the state capital, Rio de Janiero city, Ecoglobal operates in the Oil & Gas segment (O & G), with initial emphasis on treatment of back flow fluids and completion fluids resulting mainly from offshore operations.

The total contracted by Petrobras with the Ecoglobal and Ecoglobal Overseas LLC[61], between May 2006 and May 2014 is BRL 475 millions, which corresponds to 5 agreements, for services provided releted to treatment and disposal oily water, recovery of rivers, equipment rental and geologic formation assessment services as detailed below:

| Ref | Agreement # | Service | Inicial Service Date | Expiration date | Service Amount (BRL) | Balance |
|---|---|---|---|---|---|---|
| 1 | 2050.0015177.05.2 | Recovery of rivers | May 30, 2005 | November 25, 2006 | 3,215,677 | 6,552 |
| 2 | 2050.0049865.09.2 | Recovery of rivers | April 2, 2009 | August 19, 2009 | 18,195,731 | 921,752 |
| 3 | 2200.0055208.09.2 | Treatment and disposal oily water | April 5, 2011 | April 3, 2013 | 5,273,100 | 704,563 |
| 4 | 2200.0082539.13.2 | Treatment and disposal oily water | April 4, 2013 | February 27, 2014 | 5,128,200 | 2,801,279 |
| 5 | 2050.0082532.13.2 | Equipment rental and formation assessment services | July 24, 2014 | July 22, 2018 | 443,839,192 | 443,839,192 |

## 7.1.1. Allegations

The ECOGLOBAL CIA detailed the following allegations and reasons as motivating its investigation:

- On April 11, 2014, as part of the ongoing Operação Lava Jato investigation, the Brazillian Federal Police ("Federal Police") conducted a search and seizure at the Petrobras headquarters in Rio de Janeiro, and Macaé unit, in compliance with the warrant issued by 13th Federal Court of Curitiba. The focus of the search warrant was the agreement (#2050.0082532.13.2) signed by the Company on July 30, 2013 with Ecoglobal Ambiental Comércio e Serviços Ltda. and Ecoglobal Overseas LLC, with the total amount of BRL 443.8 million, for the rental of equipment and supply of specialized technical services for geologic formations evaluation.

- On the same date, Virmond Alves Pereira, General Manager of E & P-CPM / CMP-SPO / SCA gave oral testimony to Federal Police.

Additional allegations in the media specific to Ecoglobal appeared after the commencement of the CIA and include the following:

---

[61] American branch of Ecoglobal Ambiental Comércio e Serviços Ltda.

CONFIDENTIAL                                                                   PwCBR_PETRO_000135830

- According to the Federal Police, one of the documents seized in Macae (RJ), in Ecoglobal's headquarters, was a proposal letter between Ecoglobal and emissaries of Paulo Roberto Costa and Alberto Youssef, dated just two months after Petrobras signed a contract with Ecoglobal with the total amunt of BRL 443.8 million. According to the document, for BRL 18 million, 75% of Ecoglobal would be transferred to Quality Participações which belongs to Youssef, and Sunset Global Participações, which belongs to Costa[62].

- The Brazilian Federal Police also intercepted emails of businessman Pedro Storti Carlos Vieira ("Storti"), who was involved in the ECOGLOBAL sale negotiation. He offered BRL 16 million, while the owner, Vladimir Magalhães, wanted BRL18 million, arguing that he had to make a "financial and political" effort to by a Petrobras supplier. According Storti, Vladimir Magalhães also said there was the prospect that ECOGLOBAL would sign another contract with Petrobras of BRL 500 million, at which point about BRL 650 million could be raised. Paulo Roberto Costa is copied on the email. The same email was also sent to the GFD Investimentos, which, according to Federal Police, is a company owned by Alberto Youssef[63].

Finally, one article appeared after the completion of the CIAs written report on May 20, 2014 as follows:

- According to the Federal Police, the former director of Abastecimento  Paulo Roberto Costa, who was re-arrested, would act as a lobbyist of EcoglobalAmbiental, to facilitate sales to to Petrobras and would have helped the Company win a contract worth BRL$ 443.8 million, signed in July 2013.[64]

## 7.1.2. *Investigation performed by management*

The investigation was established by DIP DE&P 54/2014 on April 11, 2014.  The stated purpose of the investigation, according to the investigation report, was to evaluate the procurment procedures for the retention of the company Ecoglobal Ambiental to determine existence of non-conformities in the procurement process.

The investigation report details the following activities were perfomed by the ECOGLOBAL CIA:

- Request Gerências de Contratação de Bens e Serviço E&P to send all the documents relating to the five procurement process conducted by these units regarding the agreements between Petrobras and ECOGLOBAL.

- Review the documentation related to the five procurement process regarding ECOGLOBAL agreements, focusing in particular on the agreement #2050.0082532.13.2 as it was the focus of the investigation by the Brazilian Federal Police.

- Following the review of the documentation mentioned above, the Commission identified employees for interview, focusing on those who participated in the definition of the contracting strategy, bidding committee or negotiation and approvals. The Commission also interviewed the Partner of  ECOGLOBAL, Mr.Vladimir Magalhães da Silveira. See Section 6.7 for information regarding individuals interviewed.

---

[62] http://oglobo.globo.com/brasil/lava-jato/pf-investiga-contrato-de-4438-milhoes-da-petrobras-com-ecoglobal-12168689
[63] http://epoca.globo.com/tempo/noticia/2014/04/bgenro-de-paulo-roberto-costab-controlava-principal-conta-secreta-do-ex-diretor-da-petrobras-preso.html
[64] http://noticias.uol.com.br/politica/ultimas-noticias/2014/06/11/petrobras-estuda-cancelar-contrato-com-empresa-investigada-pela-lava-jato.htm

CONFIDENTIAL

PwCBR_PETRO_000135831

- The Commission requested from the Company's IT department a log of all telephone calls made to EGLOBAL by Petrobras telephones and the email data of the communication with the domain "@ecoglobalambiental.com.br".

- The Commission requested the updated report of the ownership structure of ECOGLOBAL and VMS Consultoria Ltda from GAPRE/SE/LCO[65].

- The Commission requested the access report for Mr. Pedro Storti Carlos Vieira at the Petrobras Macaé facilities.

- The Commission requested that the Petrobras Finance department verify if ECOGLOBAL had requested funding through the PROGRESS program.

- The Commission requested the Petrobras Vendors Master File to review the historical data of ECOGLOBAL registration.

The files of the investigation were available for our review.

### 7.1.3. Conclusions of management's investigation

The Commision investigation report detailed the following conclusions of their work[66]:

- No evidence of misconduct that could incriminate Petrobras employees involved in the procurement and bidding which resulted in hiring of Ecoglobal were identified.

- It was identified by the Ecoglobal CIA that the companies selected to participate on the bidding process had not had a financial assessment performed as required by internal procedure.

- As of the date of the investigation report issuance, May 20, 2014, no payments were made related to the latest agreement with Ecoglobal (agreement #2050.0082532.13.2) with the total amount of BLR $ 443 million.  Presumably because according to the contract the services do not begin until July 2014.

- It was found that Pedro Carlos Vieira Storti attended meetings at Petrobras, on November 11, 2013 and December 11, 2013, and facilitated the proposed presentation of Quality Holding (company related to Alberto Youssef) to acquire shares of ECOGLOBAL.

Our analysis of the conclusions of the investigation can be found in SectionXX.

## 7.2. Review by Forensic Services

We reviewed the Ecoglobal CIA Report and physical investigative documents provided.  There was no indication that any electronic collection of documents was successfully carried out as part of this CIA.

---

[65] V.M .S. Consultoria Ltda. was a shareholder of ECOGLOBAL during the period of its incorporation in 2003.

[66] Note that the text included from the investigation report is a free translation of the original text, which was in Portuguese.

CONFIDENTIAL                                                      PwCBR_PETRO_000135832

## 7.3. Conclusions

Based on the review of this CIA, PwC has concluded that the Company should pursue and independent investigation of the allegations of corruption and fraud in connection with the awarding of this contract to Ecoglobal.

In part, this conclusion is based on the lack of electronic evidence to inform the work of the CIA. The Ecoglobal CIA Report stated that it requested that the Company's IT department the log of all telephone calls made to EGLOBAL by Petrobras telephones and the email data of the communication with the domain "@ecoglobalambiental.com.br." However the report does not provide details into the email review performed – e.g. how many emails with the ECOGLOBAL domain were identified, how many emails were reviewed and what was the conclusion of this review.

### 7.3.1. Topics requiring further investigation

Based on our review of the Ecoglobal CIA Report, we we would recommend that the following areas for futher consideration in the Special Committee's investigation:

- Further investigation in the email exchange related to the ECOGLOBAL hiring process – e.g. communications with Pedro Storti Carlos Vieira ("pedro.storti@uol.com.br").

- Evaluation of the technical need for services to be provided under the contract with ECOGLOGAL (#2050.0082532.13.2).

- Performing corporate intelligence searches on Paulo Roberto Costa and Alberto Yousseff to see what other companies they own that may be relevant to this or other CIA's.

# REDACTED

### 7.3.2. Items to consider in the internal control review

The following items should be considered in an internal control review:

- The process for reviewing the ownership and relationships of contract counter parties is such that a pending relationship with Mr. Paulo Roberto Costa through his planned ownership Ecoglobal was not detected. This suggests that third party review processes should be re-evaluated.

- There appeared to be a lack of financial analysis of the companies that participated in the bid.

## 7.4. Individuals interviewed by the Ecoglobal CIA

Note that none of the individuals listed below were specifically considered in the priority phase of the external investigation.

| Ref | Name | Title | Interview Date |
|---|---|---|---|
| 1 | Jayme Eduardo Miranda e Silva | Engineer - CORP/EGP/ADE | May 6, 2014 |
| 2 | Virmondes Alves Pereira | Engineer – E&P-CPM/CMP-SPO | May 7 and 8, 2014 |
| 3 | Roberto Schechtman | Engineer - COM/CMP-DP-I/PROJ | April 28 and May 8, 2014 |

CONFIDENTIAL

Email Review                                                                    Draft
                                                        Attorney Work Product
                                                        Privileged and Confidential

| 4 | Dimitrios Chalela Magalhães | Administrated - E&P-COM/CMP-SPO/CDBS | April 29, 2014 |
| 5 | Paulo Roberto de Souza Ribeiro | Well Drilling Technician  - COM/CMP-SPO/SCA | April 29, 2014 |
| 6 | Reni Gregório Camilo | Well Drilling Technician - E&P-COM/CMP-SPO/SCA | April 30, 2014 |
| 7 | Samuel Fabian | Engineer  - E&P-COM/CMP-SPO/PGP-PO | April 30, 2014 |
| 8 | Eduardo Sousa Santos | Engineer  RIO/ATP-MLS/OP-P40 | April 30, 2014 |
| 9 | Pedro Henrique de Oliveira Caldas | Engineer E&P-COM/CMP-DP-I/PG | May 5, 2014 |
| 10 | Cláudio Estalano Cabral | Engineer  E&P-SERVUS-CONT/ECIC | May 5, 2014 |
| 11 | Cláudio César de Araújo | Engineer E&P-SERV/US-CONT | May 5, 2014 |
| 12 | Luiz Fernando Neves Manhães | Engineer E&P-CPM/CMP-DP-II/POLO-MAC | May 6, 2014 |
| 13 | Laerte Rocha Pires | Engineer - ESTRATEGIA/AE | May12, 2014 |
| 14 | Vladimir Magalhães da Silveira | Partner-Director of ECOGLOBAL | May 7 and 8, 2014 |

## 7.5. Companies to consider in the next phase of the investigation

| Ref | Company | Observations |
| --- | --- | --- |
| 1 | Ecoglobal Ambiental Comércio e Serviços Ltda. | According to the Federal Police, the former director of Abastecimento  Paulo Roberto Costa, who was re-arrested, would act as a lobbyist of EcoglobalAmbiental, to facilitate sales to Petrobras and would have helped the Company win a contract worth BRL$ 443.8 million, for the rental of equipment and supply of specialized technical services for formations evaluation. |
| 2 | Ecoglobal Overseas LLC | American branch of Ecoglobal Ambiental Comércio e Serviços Ltda. |
| 3 | Quality Holding | According to the Federal Police, Quality Holding is a company owned by Alberto Youssef, which was used to launder money from bribes. The Federal Police found that Quality Holding had made a proposal to buy 75% of Ecoglobal shares two months after Ecoglobal won a tender to provide services to Petrobras with the total amount of BRL 443 million. |
| 4 | Sunset Global Participações Ltda. | According to the Federal Police, Sunset is a company owned by Paulo Roberto Costa, which was used to recive bribes related to lobby activities on held companies to win contracts with Petrobras. Additionally the Federal Police found that the Sunset was negotiating the purchase of 75% of Ecoglobal's shares along with Quality Holding, two months after Ecoglobal won a tender to provide services to Petrobras with the total amount of BRL 443 million. |
| 5 | V.M .S. Consultoria Ltd | It was a shareholder of Ecoglobal during the period of its incorporation in 2003. |

CONFIDENTIAL                                                              PwCBR_PETRO_000135834

Draft
Attorney Work Product
Privileged and Confidential

## 7.6. *Individuals to consider in the next phase of the investigation*

| Ref | Name | Title | Observation |
|---|---|---|---|
| 1 | Vladimir Magalhães da Silveira | Owner of Ecoglobal | Owner of Ecoglobal, company suspected to won a tender to provide services to Petrobras with the total amount of BRL 443 million, under Paulo Roberto influence. |
| 2 | Paulo Roberto Costa | Owner of Sunset and former Petrobras Director | Former Petrobras director of Abastecimento, owner of Sunset. Paulo Roberto confessed to having received bribes to facilitate the contracting of services by companies in Petrobras. |
| 3 | Alberto Youssef | Owner of Quality Holding | Owner of Quality Holding, company used used to launder money from bribes. Youssef, confessed to the Federal Police to having operated a large money-laundering scheme, which came from Petrobras contracts. |
| 4 | Pedro Storti Carlos Vieira | | Suspected of negotiating the sale of Ecoglobal to Paulo Roberto Costa and Youssef. Also attended meetings at Petrobras during the period of negotiation between Petrobras e Ecoglobal. |

CONFIDENTIAL

PwCBR_PETRO_000135835

Email Review
Draft
Attorney Work Product
Privileged and Confidential

# 8. Astromaritima CIA

## 8.1. Overview of Allegations

According to Astromarítima Commission report, the internal investigation was triggered by media coverage on alleged irregularities regarding Astromarítima. The CIA was established on April 14, 2014. The scope of the Astromarítima CIA, as outlined by the Astromarítima CIA Report, is as follows:

"This report answers the internal document DIP DE&P 55/2014, Confidential, from April 14, 2014, which establishes the Commission to analyze occurrence of non-conformities in tender processes conducted by E&P, which resulted in the retaining of Astromarítima Navegação SA, as newspapers indicated potential irregularities in the process."

While the DIP does not recite the media reports, the CIA Report identifies the allegations as follows:

- In April 13, 2014, news show "Fantástico," aired on Globo Network, showed companies that closed deals with Petrobras after hiring services from Costa Global consulting company, owned by Mr. Paulo Roberto Costa.

  - In the story Astromarítima was mentioned for a contract signed in November 13, 2012, valid through November 13, 2014, with Costa Global, with a success fee of 5% up to BRL 110 million plus 50% of exceeding amounts.

  - Based on a spreadsheet apprehended in Paulo Roberto's home, to which "Fantástico" had access, the following contracts were linked to the one mentioned above:

    - October 2013 – 06 Contracts for vessel chartering, approximate value of BRL 490 million.

    - January 2014 – 01 contract for vessel chartering, approximate value of BRL 69 million.

- In April 14, 2014, press agency "Agência Estado" published a story saying that former director Paulo Roberto Costa tried to convince J&F (Controlling group of major slaughterhouse JBS) to invest in Astromarítima.

Later, after the work of the CIA was finalized, further disclosures from the governments Lava Jato investigation were disclosed.

- In his statement to the Federal Justice, dated from October 9, 2014, Paulo Roberto Costa declared the company Costa Global received bribery money from Construction Company Camargo Correia. The company was created after Mr. Paulo Roberto Costa left Petrobras, but the payments referred to money due from the time he was still acting as Director.

## 8.1.1. Allegations in print media

The report does not specifically outline the irregularities outlined in the newspapers. According to publically available information, however, the allegations related to Astromarítima and the Company are as follows:

CONFIDENTIAL
PwCBR_PETRO_000135836

Draft
Attorney Work Product
Privileged and Confidential

- The allegations of bribery, published in newspapers, regarding commissions paid to ECOGLOBAL, owned by Mr. Paulo Roberto Costa, and Astromarítima.

- Irregularities on contracts between Petrobras E&P Area and Astromarítima.

- External or Internal influences that could have favored Astromarítima to obtain contracts with Petrobras.

## 8.2. *Investigation performed by management*

The following activities were performed by the Astromarítima commission, as described in the report:

- Analysis of Astromarítima hiring processes:

    o Recent contracts signed between E&P and Astromarítima, i.e., contracts signed after 2009, were divided in 3 groups:

        ▪ Type 1 – Contracts mentioned in "Fantástico" story

        ▪ Type 2 – Direct contracts (without bidding process) with Astromarítima

        ▪ Type 3 – Contracts signed after July 13, 2012, date when Costa Global was founded.

            • There were 4 Contracts (International Biddings), signed with United Offshore Support & Co KG (for vessels World Pearl / Emerald / Diamond / Peridot) in which Astro Internacional S/A, qualified as a Brazilian Navigation Company, signed the chartering contracts, were not part of the work scope of the Commission.

- Ongoing hiring processes from E&P-SERV/US-CONT, in which Astromarítima is participating.

    o Bid 1432871138 (Opportunity 7001193124 of Petronect) – Chartering of PSV 1500 vessels.

- Commercial profile of Companies:

    o Astromarítima Navegação S.A.

    o Costa Global Consultoria e Participações Ltda.

- Interviews:

    o Renato de Andrade Cabral, President Director from Astromarítima Navegação S.A.

    o Kátia Cilene de Andrade Loures, contract manager for vessels ASTRO GUARA and ASTRO IARA.

    o Magdiel dos Santos, contract manager for vessels ASTRO TUPI and ASTRO TAMOIO.

    o Márcio de Abreu Grove, member and current Coordinator of Bidding commissions in the 3rd Prorefam (Sea Support Fleet Renovation Program).

CONFIDENTIAL                                                                          PwCBR_PETRO_000135837

Email Review                                                                                                    Draft
                                                                                        Attorney Work Product
                                                                                        Privileged and Confidential

- o   Gilmar Tavares Azeredo, Direct Hiring Commission Coordinator.

- o   Filipe Faria Rodrigues, Contract Termination Analysis Commission for delayed vessels - 1st and 2nd rounds of Prorefarm

## 8.3. Conclusions of management's investigation

The Astromarítima CIA concluded its report, dated May 13, 2014, that there were no irregularities found directly related to the scope of work.

The report further concluded that the processes analyzed did not contain a documented negotiation strategy that sought to achieve the best conditions for Petrobras, as described in item 6.23 of Decree 2.745. The report highlighted another non-conformity related to contract 2050.0059194.10.2 – Vessel ASTRO BADEJO; the contract was negotiated directly with the third party, however the SAP system recorded that an invitational bidding took place.

Lastly, the Astromarítima CIA concluded that the allegations in question were not true because:

- The contract between Astromarítima and Costa Global was signed exclusively to negotiate with J&F investment on Astromarítima, therefore, this contract was not linked to any Petrobras Contract.

- Contracts signed between Petrobras and Astromarítima, mentioned in "Fantástico" story refer to two contracts signed in October 20, 2009 and 3 contracts signed in November 4, 2010, but Costa Global was created in July 2012.

- Procurment processes involving Astromarítima were done in accordance and compliance with norms, laws and procedures. Contract management was also done right.

## 8.4. Review by Forensic Services

We reviewed the investigation report and all physical investigative documents provided.

We have reviewed all interview statements, analyzed in detail the final report issued by the CIA, to further understand the investigation plan and methods used, and, if any, the remediation and action plans undertaken and what they entailed.

Additionally, we have also reviewed emails that were mentioned in the report, as well as assessed if the e-discovery analysis was appropriate.

We understand that, due to the nature of the Astromarítima CIA, the scope of work was limited to analyze facts and data related to the acquisition process. Therefore, the work performed did not cover all allegations, which included disclosures in the media during or after the Commission's work.

### 8.4.1. Review of the interview notes

We have reviewed all six interview statements, signed by the Astromarítima CIA, and the interviewed person. As part of our analysis of the interviews, we have listed the vendors mentioned in each statement, as well as persons mentioned in the interviews that were not interviewed that may have additional information to offer the CIA. We linked the statements with potential allegations, assessing the individuals' involvement in the process regarding knowledge of any suspicion, responsibility in the process and/or participation, based on the interviews, newspapers, and document analysis.

CONFIDENTIAL                                                                PwCBR_PETRO_000135838

Moreover, we have sought to identify Internal Controls impacts from subjects discussed in the interviews, along with follow up inquiries that may be appropriate.

## 8.5. Conclusions

Based on the review of this and other CIAs, PwC has concluded that the Company should pursue and independent investigation of the allegations of corruption and fraud in connection with the retention of Astromaritima and the involvement of Mr. Costa.

### 8.5.1. Observations regarding management's conclusions

As outlined in Section 8.3, the Astromarítima CIA Report detailed certain conclusions and recommendations in their final report.  Based on our review the physical investigative documents, and media coverage, we would consider a further observation as follows:

- In the first round of the bid, Astromarítima placed 12th for PSV 3000, in a tender for 7 vessels. However, Astromarítima was called to negotiate fees, resulting in a lower fee and granting Astromarítima contracts for these vessels.

Additionally, we believe the report would benefit from the following clarifications:

- A Direct Hiring analysis notes that Petrobras consulted companies with Brazilian flag vessels to identify the availability of Brazilian Flagged PSV 1500 OR and PSV 1500. As an answer, Astromarítima "blocked" (i.e., reserved) the Vessels Astro Enchova, Astro Guarecima and Astro Badejo, thus apparently providing a justification for not using a tender process. Why this is in compliance with the relevant acquisition rules is not fully explained in the CIA Report.

- As part of an email review, we would recommend looking at emails with the following individuals:

    o Owners of Astromarítima: Mr. Francisco Matos dos Santos, Mr. Milton Linhares, Mr. Alcir Bourbon Cabral and Estate of deceased Mr. William Mac Laren;

    o President Director from Astromarítima: Mr. Renato de Andrade Cabral;

    o And Mr. Paulo Roberto Costa.

### 8.5.2. Topics requiring further investigation

As part of the external investigation to be performed, we would recommend that the following items be considered:

- In the statement given by Mr. Paulo Roberto Costa, he confirmed his company Costa Global was used to receive bribe money that was due from the time he was Director at Petrobras.

### 8.5.3. Items to consider in internal control review

The Astromaritima CIA Report does not make any recommendations regarding internal controls.   However, based on our review we understand that the following items may be appropriate to consider:

CONFIDENTIAL                                              PwCBR_PETRO_000135839

Email Review

Draft
Attorney Work Product
Privileged and Confidential

- The Astromarítima CIA Report concluded there was no documented evidence of a negotiation strategy that seeks to achieve profitable conditions for Petrobras as required by item 6.23 from the bidding regulatory law Number 2.745. As such, the internal control analysis should evaluate the process to assure the strategies are always implemented and documented appropriately.

- The Astromarítima CIA concluded that contract 2050.0059194.10.2 was not properly recorded in SAP Accounting System. As such, the internal control analysis should evaluate if other contracts are not reflected correctly in the system and if there is a process in place to prevent or remediate such errors.

## 8.6. Individuals interviewed by the Astromaritima CIA

Note that none of the individuals listed below were specifically considered in the priority phase of the external investigation.

| Ref | Name | Title | Interview Date |
|-----|------|-------|----------------|
| 1 | Renato de Andrade Cabral | President Director from Astromarítima Navegação S.A. | 02/05/2014 |
| 2 | Kátia Cilene de Andrade Loures | Contract manager for vessels ASTRO GUARA and ASTRO IARA | 05/05/2014 |
| 3 | Magdiel dos Santos | Contract manager for vessels ASTRO TUPI and ASTRO TAMOIO | 05/05/2014 |
| 4 | Márcio de Abreu Grove | Member and current Coordinator of Bidding commissions in the 3rd Prorefam (Sea Support Fleet Renovation Program) | 07/05/2014 |
| 5 | Gilmar Tavares Azeredo | Direct Hiring Commission Coordinator | 07/05/2014 |
| 6 | Filipe Faria Rodrigues | Contract Termination Analysis Commission for delayed vessels - 1st and 2nd rounds of Prorefarm | 08/05/2014 |

CONFIDENTIAL

PwCBR_PETRO_000135840

# 9. *Toyo Setal CIA*

## 9.1. *Overview of allegations*

According to the Toyo Setal CIA Report, the internal investigation was triggered by media coverage on alleged irregularities regarding Toyo Setal.  The report goes on to detail the following items:

- In October 28, 2014, news website "Portal G1" reported:

  - Mr. Júlio Gerin de Almeida Camargo, from Toyo Setal, had just accepted a plea bargain during investigation of police operation Lava Jato.

  - Toyo Setal is being accused for alleged price fixing and sharing construction work in the Company.

- In November 1, 2014, Estadão newspaper published:

  - Toyo Setal was the first construction company under investigation to collaborate with the authorities.

  - Toyo Setal, according to Mr. Paulo Roberto Costa, was participating in a cartel with giant construction companies.

- In November 4, 2014, news website "Portal Terra" reported:

  - Mr. Augusto Ribeiro de Mendonça Neto, member of the Board of Directors of shipyard EBR, owner of former Setal Óleo e Gás – merged with Japanese Toyo Engineering to create Toyo Setal, and also president of ABENAV and vice-president of Sinaval Labor Union, also agreed to a plea bargain in Lava Jato.

  - Company Tiupana Participações allegedly deposited excessive amounts to one of the accounts belonging to Mr. Alberto Youssef.

Following these allegations, on November 5, 2014 pursuant to DIP DE&P 233/2014, the Company instituted a commission to investigate contracts regarding to this company. The Toyo Setal Commission (CIA) focused on three objectives:

i.   Participation in Cartel

ii.  Overpricing in bids where Toyo Setal participated, either directly or in a consortium.

iii. Nonconformities regarding Corporate Directions on Supply of Goods and Services in contracts and amendments, since 2012.


The CIA released its report November 12, 2014.

## 9.2. *Investigation performed by management*

The following activities were performed by the Toyo Setal CIA, as described in their report:

CONFIDENTIAL

Draft
Attorney Work Product
Privileged and Confidential

1. Define the methodology to define the practice of cartel.

2. Define the methodology to analyze period of time covered by investigation.

3. Define the methodology to evaluate conformities in the macro process of Goods and Services Procurement.

4. List all subsidiaries and controlled companies by Toyo Setal group, and involvement with Petrobras.

5. List all contracts in place with companies related to Toyo Setal, including joint ventures.

6. List information related to the contracts that are going to be part of the scope.

7. List information from CIAs already done or ongoing that refer to Toyo Setal.

8. List and analyze audit reports from internal and external oversight units on the topic of this CIA.

9. List occasional complaints in the Ethics Hotline regarding Toyo Setal.

10. Apply the methods defined to analyze the contracts.

11. Interview individuals, if necessary.

12. Judge findings, concluding and suggesting future recommendations.

13. Present the report to E&P, Abastecimento and Gás e Energia Directors.

## *9.3. Conclusions of management's investigation*

In summary, Toyo Setal CIA concluded the prices were largely competitive with the exception of a few irregularities that were found in the bidding processes. The Toyo Setal CIA Report also describes the ownership of Toyo Setal and dates of contracts signed.

The conclusions are divided among two major topics:

- Regarding the 5 contracts analysed

   **a. Indication of overpricing**

   Based in Information gathered and evaluated for the items acquired, the Toyo Setal CIA concluded that the prices bid were competitive and were inside the range of acceptability from Petrobras cost estimate.

   Petrobras estimate is developed in detail by the market value prices of each component; unit costs of raw material necessary and indirect expenses such as meals, transportation and taxes.

   **b. Conformity with bidding process**

   *i. Utilities provided to COMPERJ Project*

CONFIDENTIAL                                                                    PwCBR_PETRO_000135842

Draft
Attorney Work Product
Privileged and Confidential

The CIA concluded there were four relevant non-conformities in the bid for Utilities in COMPERJ, related to the argument supporting the choose for direct negotiation instead of a public bid; the consistency in the price components presented by TUC, the consortium Toyo Setal participates; the lack of finance situation report for one of the companies in the consortium, PPI Projeto de Plantas Industriais; the approval of changes made in the procurement process that were different from the process established by the DIP at the start of the bidding (i.e., direct negogiation was substituted for the originally planned tender process).

   *ii.  Rota Cabiúnas – TECAB*

No relevant or "moderate nonconformities" were identified for this project.

   *iii.  Modules from P-74*

No relevant or "moderate nonconformities" were identified for this project.

   *iv.  UGH COMPERJ*

Two moderate nonconformities were identified in the bidding process for the UGH in Comperj: The contract templates were adjusted during the bid without authorization from legal department and there was no evidence of power of attorney from TOYO SETAL EMPREENDIMENTOS LTDA to sign the price spreadsheets, on behalf of the consortium.

   *v.  UFN V*

No relevant or "moderate nonconformities" were identified for this project.

**c.  Indication of cartel**

The Toyo Setal CIA concluded that, despite the apparent price arrangement in some tenders, on balance, there is a reasonable level of competition in the bids. Actions and strategies adopted by Petrobras mitigated the potential for payment for above market prices, resulting in the execution of contracts with competitive prices.

- Regarding the relationship with Petrobras and its managers

**a.  Utilities in COMPERJ**

Contract was signed in December 2011 with Consortium TUC:

33.34% - PPI Projetos de Plantas Industriais Ltda.; from which:

        99.9% - Toyo Engineering Corporation

        0.1% - Akihiko Kokuryo

33.33% - UTC Engenharia

33.33% - Construtora Norberto Odebrecht

CONFIDENTIAL

PwCBR_PETRO_000135843

Email Review                                                                  Draft
                                                          Attorney Work Product
                                                       Privileged and Confidential

**b.  Rota Cabiúnas – TECAB**

Contract was signed in March 2012 with Consortium SPS:

33.4% - Skanska Brasil Ltda.

33.3% - Promon Engenharia Ltda.

33.3% - SOG / Which was replaced in 28/02/2013 by Toyo Setal Empreendimentos Ltda.

**c.  Modules from P-74**

Contract was signed in April 2013 with company EBR – Estaleiros do Brasil Ltda:

99.99% - TS Participações e Investimentos S/A (TSPI)

0.01% - Toyo Setal Empreendimentos Ltda.

**d.  UGH COMPERJ**

Contract was signed in May 2013 with company Toyo Setal Empreendimentos Ltda:

99.9% - TS Participações e Investimentos S/A (TSPI)

0.1% - EBR – Estaleiros do Brasil Ltda.

TSPI's chairman is Mr. Júlio Camargo and is an association from companies Toyo Engineering Corporation and SOG – Setal Óleo e Gás S/A, 50% each.

**e.  UFN V**

Contract was signed in May 2013 with consortium Toyo Setal Ferilizantes:

50% - Toyo Engineering Corporation

50% - SOG – Setal Óleo e Gás S/A

**f.  Interview with Mr. Francisco Pais (executive manager for Mr. Costa)**

The investigation done by the Toyo Setal CIA identified an unusual frequency of meeting in between Mr. Júlio Camargo to former Executive Manager of Abastecimento, Mr. Francisco Pais, and former directors, Mr. Paulo Roberto Costa and Mr. Renato Duque.

Mr. Francisco Pais had 22 meetings in 2010 and 21 meetings in 2011 with Mr. Júlio Camargo, a Toyo Setal executive arrested in Lava Jato investigation. In his interview he explained we would host Mr. Júlio Camargo following directions of Mr. Paulo Roberto Costa, mostly to talk about ongoing projects.

## 9.4. Review by Forensic Services

We reviewed the investigation report and all physical investigative documents provided.

CONFIDENTIAL                                                      PwCBR_PETRO_000135844

Email Review

Draft
Attorney Work Product
Privileged and Confidential

We have reviewed the one interview statement done by this CIA of Mr. Pais. The interview mainly discusses the relationship in between Mr. Francisco Pais and Mr. Júlio Camargo. The interview does not clarify the purpose of the number of meetings held with Toyo Setal or whether any improper arrangements were made.

We understand that due to the nature of the CIA, the scope of work was limited to analyze facts and data related to Toyo Setal. Therefore, the work performed did not cover all allegations contained in the media.

We also note that this CIA lasted for only 8 days.

## 9.5. Conclusions

Based on the review of this CIA, PwC has concluded that the Company should pursue and independent investigation of the allegations of corruption and fraud in connection with the Toyo Setal contracts.

### 9.5.1. Observations regarding the investigation report

As outlined in Section 9.3, the Toyo Setal CIA detailed certain conclusions and recommendations in their final report. Based on our review the physical investigative documents, and media coverage, we would consider the following additional conclusion:

- Comparison of the contract prices in the Toyo Setal contracts with market price benchmarks and determining whether or not such prices fall within a reasonable range is not an investigative method that deals with the allegation that a portion of the contract price was earmarked to compensate Mr. Youssef.

- The conclusions regarding the relationship with Petrobras and its managers are not conclusions. The report only indicates the ownership of Toyo in contracts that were in the scope of the investigation solely because Toyo participated and won such bids.

### 9.5.2. Topics for further investigation

As part of the external investigation to be completed, we would recommend that the following items be considered:

- Analyze, interview and investigate employees that participate in the relationship with Toyo Setal, in bidding process, contract signing, service measurement and contract management.

- Email review including the communication made by the following individuals:

  o Mr. Júlio Camargo and Mr. Franciso Pais, as well as connection to Mr. Paulo Roberto Costa and Mr. Renato Duque.

- Investigate irregularities on contracts between Petrobras and all other companies in Lava Jato operation. To the date of this Memo, there were CIA's for Toyo Setal, Sanko Sider, SBM, Ecoglobal and Astromarítima. Other large construction companies involved in Lava Jato, such as Odebrecht, OAS, UTC and Camargo Correa, are approached by other CIAs but were not target of a CIA solely on their operations.

CONFIDENTIAL

PwCBR_PETRO_000135845

Draft
Attorney Work Product
Privileged and Confidential

### *9.5.3. Items to consider in the internal control review*

The Toyo Setal CIA does not detail any internal controls recommendations.  However, based on our review, the following items may be considered:

- Identify and evaluate controls in place for the security of internal estimates, and whether this information is being sent to vendors, in order to place their bids inside this range.

CONFIDENTIAL

PwCBR_PETRO_000135846

Draft
Attorney Work Product
Privileged and Confidential

# 10. Sanko Sider CIA

## 10.1. Allegations and the subsequent investigation by management

### 10.1.1. Overview

In the trial of Alberto Youssef, regarding money laundering and criminal organization, Penal Case # 50262128220144047000, Mr. Youssef requested an expert witness to verify if the company Sanko Sider was selling overpriced products to Petrobras, supplied via the consortium CNCC, comprised of two companies CNEC and Camargo Correa, in the construction of RNEST refinery. Accordingly, the Court directed that a competent member of the Federal Police be appointed to the role of expert on Mr. Youssef's behalf.

Additionally, a public news search shows that Sanko Sider allegedly paid bribes to companies owned by Alberto Youssef, and had paid money to former Downstream director Paulo Roberto Costa, after he retired from the Company, as further outlined in Section 10.1.2.

### 10.1.2. Allegations

The allegations addressed by this CIA are only the issues raised by Mr. Youssef's expert in relation to Petrobras' vendor registration process.  Note that the Company provided the necessary information for the expert witness through emails sent by Materials department. According to Sanko Sider CIA Report, the internal investigation was triggered by this expert witness report, which concluded that:

- The economic/financial aspects of Sanko Sider, specifically the smaller size of the company, suggested that it would not likely be recomended to register Sanko Sider as Petrobras' vendor.

- There is no evidence that Sanko Sider provided all documents required by internal standards of vendor registration, with emphasis on the books and records for the past 3 years. In 2012, even though there was no record that an evaluation of economic/financial aspects was performed, the registry was renewed.

- Sanko Sider was certified as vendor to Petrobras, more than once, based in the books and records of one of the company's shareholder that does not appear to be the parent company of Sanko Sider.

Therefore, the allegations that motivated the CIA relate largely to the vendor registration process.

Márcio Bonilho, owner of Sanko Sider, stated that his company had 12 contracts with Petrobras that were brokered by Alberto Youssef. Sanko Sider paid BRL 37 million to Alberto Youssef as commission for serving as the intermediary in the negotiation. He denied any irregularity in the payments.

He also denied that the products sold to the consortium CNCC were overpriced. The overall value of his contract was BRL 198 million and his net profit was around 6% or 8% of the total amount, from which he paid 15% as commissions.

He also confirmed his company had signed a contract with Paulo Roberto Costa and that monthly payments of BRL 10 thousand were made for four months. In exchange for these payments, Paulo

CONFIDENTIAL

Email Review                                                                                  Draft
                                                                            Attorney Work Product
                                                                       Privileged and Confidential

Roberto Costa was to find and bring more customers to Sanko Sider.  After four months, Mr. Costa did not bring any more clients and as such the payments stopped.[67]

## 10.1.3. Investigation performed by management

The CIA was initiated by DIP DETM 90/2014 dated October 4, 2014.  According to the Sanko Sider CIA Report he Sanko Sider CIA had its kick off meeting on October 6, 2014, where the activities were defined. The investigation plan had two parallel work streams:

- Obtain and analyze corporate documents regarding the vendor registration process, focusing in the registration process for Sanko Sider, from 2007 to 2014, identifying actions taken and who was involved, especially regarding the economic/financial evaluation.

- Interview employees in order to gain better understanding of the scenario.

The Sanko Sider CIA performed the following actions:

- Obtained and analyzed documents required for Vendor Registration process

- Reported the CIA's understanding of the registration process

- Interviewed 16 individuals, in a total of 18 interviews.

- Reported interview highlights

- Obtained and analyzed Sanko Siders registries from 2007 – 2014

- Compared information provided by the Materials Department to the Expert Witness with CIA's Analyses.

## 10.2. Conclusions of management's investigation

The Sanko Sider CIA Report, dated November 11, 2014, outlined the following conclusions:

l) The standards in place for economic evaluation of vendor should be reviewed to assure that such evaluations consider the past three years of the vendors' books and records.

m) The standards in place for delegation of economic evaluation should be reviewed to clearly define roles and responsibilities of Materials and Accounting departments, regarding who must perform the economic evaluation.

n) There were flaws in the management of vendor registration done by Materials department, especially in the indicator of special evaluations and content of meetings with the vendors, making it possible that nonconformities occur. Moreover, there were weaknesses in the information security of the old system (Sistema Legado), lack of direct and objective criteria to oversee the activities. Flaws also happened in the Accounting department, regarding the economic/financial evaluation.

---

[67] http://oglobo.globo.com/brasil/dono-da-sanko-sider-diz-que-pagou-comissao-de-37-mi-youssef-mas-nega-ilegalidade-14676253

CONFIDENTIAL                                                             PwCBR_PETRO_000135848

Draft
Attorney Work Product
Privileged and Confidential

o) The CIA could not conclude if there was intent to commit fraud via the irregular evaluations for Sanko Sider. The CIA explains it does not have power and means to conduct a deep investigation in this matter.

p) The CIA displays a conclusion on the registries related to Sanko Sider:

| Registration process / Year of the economic evaluation | CIA Conclusion Regular/ Irregular | Valid dates: |
|---|---|---|
| Subscription 8186 / 2008 | Regular | 15/05/2007 to  21/03/2008 |
| Renewal 17006/ 2008 | Regular | N/A (Registry was Denied) |
| Company without registration from 22/03/2008 to 22/07/2010 | | |
| Reclassification 32530/2009 | Irregular | 23/07/2010 to 22/01/2011 |
| Company without registration from 23/01/2011 to 02/05/2011 | | |
| Renewal 6321/2010 | Irregular | 03/05/2011 to 30/04/2012 |
| Renewal 122588/2011 | Regular | N/A (Registry was Denied) |
| Reclassification 128792/2011 | Irregular | N/A (Registry was maintained) |
| Renewal 158952/2012 | Regular | 29/03/2012 to 18/03/2013 |
| Renewal 3000088097/2013 | Regular | N/A (Registry was Denied) |
| Reclassification 3000139492/2013 | Irregular | N/A (Registry was Denied) |
| Company without registration from 19/03/2013 to 07/04/2013 | | |
| Review 3000142566/2013 | Irregular | 08/04/2013 to 21/03/2014 |
| Renewal 3000276973/2014 | Regular | N/A (Registry was Denied) |
| Company without registration since 22/03/2014 up to the report date (24/10/2014) | | |

The following individuals are mentioned in by the Sanko Sider CIA Report as responsible for the non-conformities:

| Name | Position at the time of events | Information |
|---|---|---|
| Leonardo Davico | Accountant | Responsible for economic evaluation using the trial balance of the shareholder, instead of that of Sanko Sider. The CIA could not conclude, due to the system's weaknesses, which individuals were responsible for the irregular evaluation. |
| Carlos de Jesus Fernandes | Senior Accountant | Responsible for economic evaluation using the trial balance of the shareholder, instead of Sanko Sider. The CIA could not conclude, due to the system's weaknesses, which individuals were responsible for the irregular evaluation. |
| Carlos Eduardo Malta Nascimento | Coordinator of Vendor Registration | Responsible for management of vendor registration, where flaws occurred under the individual's responsibility of monitoring and |

CONFIDENTIAL

PwCBR_PETRO_000135849

Email Review

Draft
Attorney Work Product
Privileged and Confidential

| Name | Position at the time of events | Information |
|------|-------------------------------|-------------|
| | | control, resulted in the granting of irregular registration to Sanko Sider. This individual was cited as responsible from 2010 to 2014. |
| Fernando Bernardo Magalhães | Manager of Vendor Registration | Responsible for management of vendor registration, where flaws occurred under the individual's responsibility of monitoring and control, resulted in the granting of irregular registration to Sanko Sider. This individual was cited as responsible from 2007 to 2014. |
| Ernani Turazzi | Manager of Vendor Registration | Responsible for management of vendor registration, where flaws occurred under the individual's responsibility of monitoring and control, resulting in the granting of irregular registration to Sanko Sider. This individual was cited as responsible from 2007 to 2010. |

Additionally, the Sanko Sider CIA Report provides the following recommendations for the individuals, companies and standards involved:

| Individual | Recommendation |
|------------|----------------|
| Carlos de Jesus | Since he is retired, no administrative action to be taken. |
| Leonardo Davico | Considering the conclusion that, due to system's weakness it is not possible to accurately track the responsible for performing the irregular registration, the CIA recommend that this individual be reassigned to other function, as a preventative measure. |
| Paola Pinheiro Silva | Since she is a third party employee, and imprudent analysis was made, the CIA recommended that her job position to be replaced by a Petrobras employee, due to the relevant nature of the task of registering vendors. |
| Carlos de Jesus, Leonardo Davico and Paola Pinheiro Silva | The Sanko Sider CIA recommended a process audit to track and identify any other occurrence of irregular evaluations made by these individuals. |

| Companies | Recommendation |
|-----------|----------------|
| Sanko Sider | The Sanko Sider CIA recommended that a Comission of Analysis of Applicability of Sanctions ("CAASE") to verify possible sanctions to be applied to Sanko Sider. |
| Cia. Mecânica Auxiliar | The Sanko Sider CIA recommended that a Comission of Analysis of Applicability of |

CONFIDENTIAL

Draft
Attorney Work Product
Privileged and Confidential

Sanctions ("CAASE") to verify possible sanctions to be applied to Cia Mecânica Auxiliar, the shareholder which provided Comfort Letters in favor of Sanko Sider.

| Process | Recommendation |
| --- | --- |
| Registration with economic evaluation performed by Carlos de Jesus, Leonardo Davico and Paola Pinheiro Silva | The CIA recommended an immediate audit to identify any potential irregular analysis made to other vendors. |
| Material and Accounting processes | The CIA recommended a review and improvement of the processes. |

## 10.3. Review by Forensic Services

We have reviewed all interview statements, analyzed in detail the final Sanko Sider CIA Report, understandstood the planning and methods used, the findings documented, and, if any, remediation actions taken.

We have reviewed the 18 interview statements provided by the Sanko Sider CIA. We note that the interviews started in parallel with the document analysis, so in a couple cases the CIA had to re-interview individuals to follow up on questions raised on the document analysis after the first interviews.

We have read and analyzed the Sanko Sider CIA Report with the main focus of our analysis on the people and schemes identified.

## 10.4. Conclusions

Based on our review performed, we note that Sanko Sider CIA did not investigate allegations of fraud and corruption, but limited its analysis to the procedural issues of vendor registration. Note that this is a conclusion reached by the Sanko Sider CIA itself, which it did not have power or means to conduct such an investigation. The Sanko Sider met its objective of identifying the registration processes of Sanko Sider and evaluating if the irregularities identified by the expert witness were well founded or not.

Accordingly, the issues relating to potential fraud or corruption in this relationship should be investigated by the Special Committee.

Note while we observe that the Sanko Sider CIA help the Forensic Services to gain understanding of the facts and circumstances, we do have certain recommendations and requested clarifications to the work performed outlined further in this section.

## 10.4.1. Topics for further investigation

The Sanko Sider CIA did not cover the other allegations regarding Sanko Sider, as outlined by below. As such external investigation should consider these as well as other allegations that arise as part of their review:

CONFIDENTIAL                                                                PwCBR_PETRO_000135851

Email Review                                                                Draft
                                                              Attorney Work Product
                                                            Privileged and Confidential

- The potential overpricing in the products supplied to EPC Consort CNCC, consequently impacting in Petrobras costs, the money paid to Alberto Youssef and the contract with Paulo Roberto Costa after his retirement.

- Federal Public Ministry ("MPF") report on Consort CNCC on construction work in RNEST shows unjustified payment of BRL 38 million to Sanko Sider and Sanko Serviços, as well as signs of overall overpricing calculated at BRL 613 million in the construction work provided by the Consort.[68]

- Allegedly Sanko Sider paid BRL 37 million to Alberto Youssef as bribery for supplying the CNCC Consort. Marcio Bonilho, owner of Sanko Sider confirmed the payments as commissions, but denied any irregularity in the payments.

- Allegedly, Paulo Roberto Costa signed a contract with Sanko Sider after his retirement to prospect customers for Sanko Sider in exchange of monthly payments of BRL 10 thousand. Since he did not bring any more clients, the payments stopped after 4 months.

- The circumstances relating to the years when Sanko Sider used Cia Mecânica Auxiliar's books and records or comfort letter to apply for the registration as a Petrobras vendor.

## 10.4.2. Items to consider in the internal control review

Consdier the items identified by the CIA in relation to the vendor registration process, as outlined in Section 10.2.

## 10.5. Individuals interviewed by the Sanko Sider CIA

*None of the individuals interviewed were specifically included in the priority phase of the external investigation.

| Ref | Name | Title | Interview Date |
|-----|------|-------|----------------|
| 1 | Leonardo Davico | Accountant | 08/10/2014 |
| 2 | Leonardo Davico – 2nd Interview | Accountant | 15/10/2014 |
| 3 | Paola Pinheiro Silva | Accountant | 08/10/2014 |
| 4 | Paola Pinheiro Silva | Accountant | 09/10/2014 |
| 5 | Rita de Cássia da Silva | Accounting Technician | 09/10/2014 |
| 6 | Valdelita Teixeira | Accountant | 09/10/2014 |
| 7 | Alexandre de Carvalho Quirino | Administrator | 09/10/2014 |
| 8 | Davi Teves de Aguiar | Equipment Engineer | 09/10/2014 |
| 9 | Fernando Bernardo Magalhães | Equipment Engineer | 10/10/2014 |
| 10 | Reinaldo Luz Ceia de Souza | Senior Accountant | 10/10/2014 |
| 11 | Vera Lúcia Lema Veiga | Accountant | 13/10/2014 |
| 12 | Maria Angélica Ferreira da Silva | Senior Accountant | 15/10/2014 |
| 13 | Carlos de Jesus Fernandes | (Retired) Senior Accountant | 15/10/2014 |
| 14 | Marcia Liberato Dias | Accountant | 15/10/2014 |

[68] http://politica.estadao.com.br/blogs/fausto-macedo/parecer-aponta-superfaturamento-de-r-613-milhoes-em-obras-de-abreu-e-lima/

CONFIDENTIAL                                                    PwCBR_PETRO_000135852

Draft
Attorney Work Product
Privileged and Confidential

| 15 | Roseane Carneiro de Souza e Oliveira | Economist | 17/10/2014 |
| 16 | Marco Aurélio da Rosa Ramos | Senior Equipment Engineer | 17/10/2014 |
| 17 | Carlos Roberto Wagner | Systems Engineer | 21/10/2014 |
| 18 | Ernani Turazzi | (Retired) Engineer | 21/10/2014 |

CONFIDENTIAL

PwCBR_PETRO_000135853

Email Review                                                                                    Draft
                                                                              Attorney Work Product
                                                                              Privileged and Confidential

# 11. Marketing CIA

## 11.1. Overview of Marketing CIAs – allegations and events surrounding their creation

There are no current CIAs in the marketing area. There are two CIAs from time period of 2008/2009. Because of publicity regarding potential improprieties in this area during the third quarter of 2014, these previously conducted CIAs were reviewed for the purpose of understanding the Company's point of view at the time, and gaining any historical information that could be useful in understanding the Company's current operations in this area.

The first Marketing CIA was established on December 5, 2008 by GAPRE 00123/2008 with the general purpose of investigating irregularities in the management of the AB-CR/GC/CI division. The specific allegations that motivated its establishment are as follows:

- Excessive quantity of occasional service invoices, referred to as "ZPQS" (the category in the Company's payment system used to capture such transactions) in Petrobras, received by the Downstream Marketing department.

- Payments of ZPQS issued to and approved by the Downstream Marketing Manager, Geovane de Morais, above the delegation of authority set at BRL 32.000.

- Actual expenditure of Downstream Marketing department in 2008 was around BRL 130 million, significantly above the budget for that year.

This first CIA came to the conclusion that the procurement process had internal control weaknesses and recommended a deeper investigation.

The second Marketing CIA was established on January 30, 2009 by DIP AB-CR 33/2009. The reason given for its establishment was the identification of irregularities in the budget control of the AB-CR/GC/CI group, along with the lack of adherence to procurment norms and procedures by that group's management. The second CIA was based on the conclusion of the first CIA, which indicated a deeper document analysis and investigation to evaluate services rendered to Downstream Marketing from January 01 to December 31, 2008 was appropriate. This CIA did not, however, specifically outline any allegations.

In addition to the allegations outlined by the first Marketing CIA, a media search performed by the Forensic Services team in the fourth quarter of 2014 revealed additional allegations related to the topics under investigation by the Marketing CIA. Specifically, a September 26, 2014 Revista Época article detailed the following: [69]

- Allegedly, Geovane embezzled BRL 57 million on small service invoices, in 2008, which was a year with president elections.

- Geovane had a budget of BRL 30 million for 2008. The area incurred BRL 150 million. Geovane was responsible for retaining 3.487 separate services, an average of almost 10 invoices per day, including weekends and public holidays.

---

[69] http://epoca.globo.com/tempo/noticia/2014/09/gerente-de-pequenos-servicos-bdesviou-r-57-milhoes-da-petrobrasb-revela-investigacao-da-estatal.html

CONFIDENTIAL                                                                        PwCBR_PETRO_000135854

- The Rio de Janeiro Police are also investigating the marketing department's purchasing practices during this 2008 time period. Companies that allegedly issued several sequential invoices to Downstream Marketing department complain in their police statements that these services were never orderd from them or rendered by them and that payment never reached their accounts. The majority of the transactions being questioned occurred with the following companies:

  - JCS Consultoria Planejamento e Serviço

  - A3J Comercial Industrial Ltda

  - ZAZ Comunicação Empresarial

  - A R.A. Brandão Produções Artísticas

  - Guanumbi Promoções e Eventos

  - Newsday Consultoria de Comunicação

The Epoca article alleges that the payments include concerts with widely known artists that never occurred, verbal agreements with suppliers, sequential invoices and services that apparently never happened and according to the supplier were never paid to them, suggesting that the invoices were fake and that any funds disbursed went to another entity.

To date, the publically reported allegations from Epoca's article have not caused management to reopen the previously conducted CIAs.

## 11.2. Investigation performed by management

While the first Marketing CIA Report did not describe its planned activities, it states the following activities were performed:

- Interview the Downstream Marketing General Manager, José Roberto Kaschel Vieira, who confirmed allegations, but stated the actual expenditure was set in BRL 80 million, due to cost sharing with other departments.

- Requested documents from Downstream Corporate Executive Management – note these documents were subsequently provided on December 11, 2008.

- Interviewed the assistant of the Executive Manager, Carlos Manuel Melo Gonçalves, who explained the process flow of ZPQS and approval workflow in SAP. He also stated that the system would accept any approval, regardless of delegation of authority, for invoices under BRL 160,000.

- Geovane de Morais, José Roberto Kaschel Vieria and José Augusto Nunes Junior were then formally interviewed.

The second Marketing CIA divided its activities performed into two separate workstreams, detailed as follows:

- Data Gathering and Organization

- o   To investigate the expenditure in Downstream Marketing in ZPQS, the CIA created a database consolidating the total of transactions of ZPQS from the information provided by the area.

- o   Reiteration with area to complete descriptions and follow ups on occasional doubts

- o   Formal interviews with four employees to better understand the processes of ZPQS.

- Analysis

- o   The analysis aimed to answer three objectives:

  - If service retaining standards were followed

  - If is there any evidence of services/payments were properly done.

  - If these services/payments were properly approved.

## 11.3. Individuals interviewed by the Marketing CIAs

*None of the individuals interviewed were included in the priority phase of the external investigation.

### 1st CIA

| Ref | Name | Title | Interview Date |
| --- | --- | --- | --- |
| 1 | Geovane de Morais | Downstream Marketing – CI Manager | 15/12/2008 |
| 2 | José Roberto Kaschel Vieria | General Manager of Downstream Communication | 15/12/2008 |
| 3 | José Augusto Nunes Junior | Downstream Marketing – CT Manager | 16/12/2008 |

### 2nd CIA

| Ref | Name | Title | Interview Date |
| --- | --- | --- | --- |
| 1 | Rodrigo Moreira de Faria | Analyst at AB-CR/GC/CI | 15/12/2008 |
| 2 | Carmen Silvia de Noronha Swire | Retired | 15/12/2008 |
| 3 | Geovane de Morais | Downstream Marketing – CI Manager | 16/12/2008 |
| 4 | José Roberto Kaschel Vieria | General Manager of Downstream Communication | 16/12/2008 |

## 11.4. Conclusions of management's investigation

The first Market CIA Report listed the following conclusions:

CONFIDENTIAL

PwCBR_PETRO_000135856

q)   ZPQS were issued in an excessive volume in the Downstream Marketing department, with evidences of the total amount being divided among multiple invoices, going against the service procurement standard in place at the time.

r)   There are evidences that Downstream Marketing department manager issued several ZPQS with amounts above his authority.

s)   There are evidences that budget elaboration and monitoring in Downstream Marketing department were not aligned with best practices.

t)   The CIA observed there are no controls in place for ZPQS in the Downstream Marketing.

u)   The CIA observed that SAP R-3 allows issuance of ZPQS with a limit set to the department, regardless of the authority limit of the manager approving, i.e., allowing managers to approve invoices over their delegated authority.

v)   The CIA observed that Finance area does not have controls to detect several sequential ZPQS issued to a given company, which may indicate existence of dividing a single project into multiple requests to avoid the delegation of authority limits.

Additionally, the first Marketing CIA Report provided the following recommendations:

a)   Evaluate sanctions possible to apply to the Manager, Geovane de Morais, for the irregularities detected by the CIA.

b)   Create mechanisms to monitor budget against actual expenditure of the Downstream Marketing.

c)   Review, along with General Marketing, the roles and responsibilities of Downstream Marketing.

d)   Reduce the volume of ZPQS, focusing on the exectution of master services contracts.

In 2009, Geovane's immediate superior, Venina Velosa, the Executive Manager of the Downstream division created a second CIA to handle this task. In this CIA, Geovane de Morais, referred to as Manager of AB-CR/GC/CI (his position at the time), was indicated as responsible for serious faults, and recommended that the high administration of the company, with legal assistance, determine possible disciplinary measures to be taken against him.

The second Marketing CIA Report offered the following conclusions:

a)   The excessive use of ZPQS shows that the corporate direction, to only use ZPQS to cover non-routine cases, is not being met.

b)   The delegation of authority limits were not followed for more than 1200 ZPQS.

c)   Division of payments to enable services that would otherwise need next level approval, so they could be approved by Geovane.

d)   ZPQS were issued by employee assigned to other area, even after his termination of employment to the Company.

e)   Lack of supporting evidences of the existence of the services paid.

CONFIDENTIAL                                         PwCBR_PETRO_000135857

f)   Agreement of services on the areas own initiative, without informing or consulting superiors.

g)   Informal processes, regarding the service rendering, approval of proposals, besides absence of price estimates.

h)   Budget and actual expenditure reports to superiors were distorted from actual expenditure.

i)   Allocation of payments in other cost centers that did not belong to Downstream Marketing, without formal consent of the cost center owner departments.

The CIA also consider the irregularities above as serious faults, subject to disciplinary sanctions, and recommends sequence to this work, in order to identify all companies, quantities and prices involved.

According to Época Newstory Geovane de Morais entered on medical leave after the conclusion of the CIA, for four and a half years, until 2013, when he was terminated with cause[70].

## 11.5. Review by Forensic Services

In order to acquire background information about prior control issues at the company that might be useful in the current audit period, we reviewed the investigation report and all physical investigative documents provided.

We have reviewed all interview statements, analyzed the final CIA Report, obtained an understanding the planning and methods used, the findings reported, and, if any, the remediation taken.

We have reviewed all 3 interview statements from the first CIA and the 4 interview statements from the second CIA, signed by the Marketing CIAs, and the interviewed person.

The interview notes show the answers provided by the interviewees.

## 11.6. Conclusions

### 11.6.1. Items to consider in the internal control review

These two CIAs from 2008 and 2009 indicate control weaknesses in the purchasing and control of marketing expenditures in the Downstream Marketing Department. These weaknesses relate to the effectiveness of the delegated authority limits, the review process, and the functionality of the payment system relative to the ZPQS category of transactions. Given the passage of time these control observations may have limited continuing relevance to the current control environment, but we nevertheless suggest their consideration in the assessment of controls in the current period.

### 11.6.2. Observations regarding the CIAs

The CIAs did not cover the core allegation contained in the Epoca article in 2014 that these transactions were a fraudulent means of funneling money to politicians. This is consistent with the focus found in other CIAs we have reviewed in that it examines the issues from the standpoint of policy, procedure and control failure. In this instance, substantive remedial action appears to have been taken regarding Geovane. However, there appear to be aspects of the situation that the CIAs did not investigate, including the following:

---

[70] According to Época Newstory.

CONFIDENTIAL

PwCBR_PETRO_000135858

- According to Valor newspaper[71], Venina Velosa, the Executive Manager of Corporate Downstream, Geovane's superior and who insisted on the creation of the second CIA and further investigations, was punished for doing so. She was removed from her position of Executive Manager and transferred to Singapore.

- 2008 when the irregularities investigated happened was election year, and in 2015, Estadão newspaper connected Geovane de Morais with political party PT and Labor Union in Bahia, same state where former Petrobras president José Gabrielli came from.

- Also according with Estadão in the same story, Alberot Youssef stated that Murano, one of the companies Geovane hired in 2008, paid bribes to the scheme, but had the company contract suspended. For this reason, Ricardo Vilani, owner of Murano, threatened to expose the scheme. Allegedly this escalated to President Lula, who then allegedly ordered that Ricardo Vilani's silence be purchased. This task was responsibility of Paulo Roberto Costa, who called Alberto Youssef, who collected the money from companies under Lava Jato operation. The newspaper tells that Ricardo Vilani admitted to the police that he dealt with Paulo Roberto Costa concerning the cancelled payments to his company, and after this conversation he had received BRL 2 million. However, he denies the blackmailing allegation.[72]

These points have been referred to the Special Committee for further consideration.

---

[71] http://www.valor.com.br/politica/3814406/diretoria-da-petrobras-foi-alertada-de-desvios
[72] http://politica.estadao.com.br/noticias/geral,sindicalista-desviava-recursos-na-petrobras-para-pt-da-bahia-diz-revista,1621234

CONFIDENTIAL

PwCBR_PETRO_000135859

Draft
Attorney Work Product
Privileged and Confidential

# 12. Email Review

## 12.1. Work performed

### 12.1.1. Email review performed by the Company

We learned, during our meetings with Mr. Gerson Gonçalves, Executive Manager of Internal Audit that emails were reviewed as part of the investigation performed by the commissions. We also were told that more than a thousand emails were analyzed from different custodians, and that they could not retrieve emails from Mr. Paulo Roberto Costa's mailbox as he allegedly deleted all emails at the end of the day before the overnight backup.

We were informed in meeting, and during our review of the emails for which we were given access, that the CIA's did not use any forensic tool to extract the email databases. IT personnel copied all available Lotus Notes databases from selected employees ("custodians") to external Hard Drives ("HDs"), and granted access to regular and classified messages to the Internal Auditors' user profile key. The internal audit user responsible for such access key accessed the databases and assisted us in our independent searches.

Upon conversation with Mr. Renivan Costa, third party employee from company Decatron, who was responsible for extracting the data and granting access to the CIA's, we understood the extraction was done by Petrobras IT personnel upon request of the CIA's. All available database replicas from the selected custodians were copied to external HD's and access permission was granted to the auditors' user profiles.

We were also told, in meetings with Mr. Gerson Gonçalves, who led RNEST and Pasadena CIA's, and Mr. Pedro Arruda, who led the COMPERJ CIA, that the review was also done with no eDiscovery technology platform; the search was done in Lotus Notes, choosing one replica of a custodian (there were multiple replicas from different time periods for each custodian), and searching keywords in each of these databases.  Each replica is a snapshot from the mailbox at a given time. There were different replicas for different time periods for each custodian. This means there are several duplicate messages among the replicas, but newer replicas have newer messages and may not have messages that were deleted, that may be in an older replica.

Note that some of the investigation reports issued by the various CIAs do not list an email review as part of their procedures performed nor mention how the email review process was done, however, these reports included some emails and meeting entries (agenda records) from Mr. Paulo Roberto and Mr. Renato Duque in the appendices to the reports.  We further note that not all CIAs included emails as part of their final investigation report.

### 12.1.2. Email Access

We were provided with access to the External HDs that were used by the CIAs to re-perform the email reviews.  We were also granted access to the user profile key of one of the Internal Auditors. Our analysis was done in a computer without network connection, inside the Internal Audit department and under constant supervision of the Internal Auditor who was the owner of the key.

We had access from November 24, 2014 to December 05, 2014, utilizing one reviewer in the first week, and two reviewers in the second week. We have performed the searches on the same approach used by the CIA's, i.e., using Lotus Notes email client.

CONFIDENTIAL

PwCBR_PETRO_000135860

## *12.1.3. Objectives*

We were provided with access to the External HDs that were used by the CIAs to re-perform the email reviews.  We were also granted access to the user profile key of one of the Internal Auditors. Our analysis was done in compliance with the Company's security arrangements on a computer without network connection, inside the Internal Audit department, and under constant supervision of the Internal Auditor who was the owner of the key.

We had access from November 24, 2014 to December 05, 2014, utilizing one reviewer in the first week, and two reviewers in the second week. We have performed the searches on the same approach used by the CIA's, i.e., using Lotus Notes email client.

## *12.1.4. Search techniques*

Since the custodians were split through multiple HD's  and search needed to be done manually, we chose to run a number of keywords in the more relevant custodians, instead of searching one keyword on all custodian – i.e., focusing our search in the in the former Directors and Executive Managers indicated in the CIA Reports as responsible for the events. The list of searches performed may be found below at Section 5.1 Searches performed.

We have used a combination of keywords, sender and recipient filter, conversation topics and dates of interest:

- Keywords
    - We have listed keywords identified in the media coverage, CIAs reports, and from the email review itself.
    - For details regarding keywords used, see Section 12.4.1.

- Sender and Recipient:
    - We have identified connections that could lead to relevant conversations, and reviewed all emails to and from such persons, in both custodians

- Conversation topics:
    - If a relevant message was identified, we performed a similar search in other replicas and other custodians to seek to find any replies and forwarding of these messages.

- Dates of Interest:
    - We searched dates close to the contract signings, bidding processes, and other dates identified on the media and in the reports.

CONFIDENTIAL

PwCBR_PETRO_000135861

## 12.1.5. Limitations

As discussed previously, the email review performed by the Company was largely manual and consequently, so was our review of their work. Consequently, we were not able to categorize messages to avoid reading duplicates and as such the same messages could be read multiple times.

Additionally, we did not read in detail all results from every keyword. In cases where the search results were great in quantity (.e.g. usually more than a hundred), we only reviewed messages from/to persons of interest that we have obtained knowledge during our review of the CIA's reports, during our media coverage analysis and employees that were considered relevant during a meeting with the Audit Team, as well the ones with subjects that caught our attention, for example, urgent, classified, no subject, or related to the investigation issues.

We did not review all replicas and all custodians as our objective, as further outlined in Section12.1.3, was principally to assess the sufficiency of the email review performed by the CIAs as not to perform a full email review. For the same reason, we have also not reviewed all proposed keywords. Section 5.1 provides further details on the searches performed, such as the keywords used and custodians reviewed.

## 12.2. Findings

### 12.2.1. Related to key personnel list

Below is as summary of emails found           REDACTED

# REDACTED

#### 12.2.1.1. Pedro Armais Arruda

| Doc # | Date | From | To | Summary |
|---|---|---|---|---|
| 1 | 25/11/2014 | Luciana Helena Morais | Francisco Pais | HR Manager, Ms. Lúcia Morais informs Mr. Francisco Pais of demands and complaints made by Labor Union regarding Reduc Refinery. |
| | | | | One of the allegations from the labor union SINDPETRO was about criminal organization in Reduc commanded by Mr. "Amauri". The message also describes there are dangerous relationships between Mr. Amauri, Mr. Arruda and Mr. Blanc, from President's Cabinet. |

CONFIDENTIAL                                              PwCBR_PETRO_000135862

Email Review

Draft
Attorney Work Product
Privileged and Confidential

## 12.2.1.2. Diego Hernandes

| Doc # | Date | From | To | Summary |
|---|---|---|---|---|
| 24 | 11/08/2005 | Maria Augusta Carneiro Ribeiro | José Gabrielli | Ms. Maria Ribeiro, responsible for the fraud hotline, sends to Mr. José Gabrielli, former CEO, complaints that she had received previously and that had been circulated to various employees. She warned him there are several comments about Mr. Diego Hernandes and Mr. Armando Tripodi, all saying unfavorable things about them.<br><br>The anonymous complaints connect Mr. Diego Hernandes and Mr. Armando Tripodi to Mr. Marcos Valério, who was the operator of the "Mensalão[73]" scheme. The complaints also connect Mr. Wilson Santarosa, who was Executive Manager of Communications, Mr. Rosemberg Pinto, who was advisor to the president,  Mr. Paulo Sérgio and Mr. Ricardo Bernardinelli, both from Transpetro in Bahia,  with Mr. Diego Hernandes and Mr. Armando Tripodi and demand an investigation in contracts with Dupont (BRL 200 million) and KBC (BRL 45 million) |
| 26 | 1/12/2006 | Carmen Barreto | Bcc: Francisco Pais | Message reffers to Mr. Diego Hernandes as the "New Rich Diego".<br><br>It also contains a forward news story about the political campaign of former CEO Mr. José Dutra, in which he received BRL164 thousand in political donations from Petrobras Employees, The largest individual contribution came from Mr. Diego Hernandes, who was the right hand of Mr. Dutra in the company, total amount BRL 25,000. |

---

[73] Mensalão was a political scandal, happened in between 2005 and 2006, when members from the government and from political party PT were accused of paying monthly allowances to congressmen to assure votes on projects that interested the executive power.

CONFIDENTIAL

PwCBR_PETRO_000135863

Draft
Attorney Work Product
Privileged and Confidential

## 12.2.1.3. *Maria das Graças Foster*

| Doc # | Date | From | To | Summary |
|---|---|---|---|---|
| 10 | 26/09/2010 | Maria das Graças Foster | José Gabrielli | Newspaper reporter Miriam Leitão wrote a document criticizing Mr. José Gabrielli's management of Petrobras. He drafted a response and shared with Directors, asking for their opinion. Ms. Maria das Graças Foster criticises the journalist and say she is a citizen very proud of her two presidents: Gabrielli and Lula. |
| 13 | 07/10/2011 | Venina Velosa | Maria das Graças Foster | Ms. Venina Velosa sent a note to Ms. Maria das Graças Foster, questioning the punishment she had received, and saying that the pride she had in the company transformed into shame, that Directors thought they were and acted as gods, and treated employees like animals.

She complains that what happened in the constructions and communication of Downstream directory was an absurd. Technical employees were trying to improve the tender processes and work oversight, but all of that was discarded and bids were divided into several parts inefficiently. She say it is too late to enter in details, and would like to show Ms. Foster another part of the documents she has, saying she has more than what Ms. Foster had already seen. |

## 12.2.2. *Other relevant emails*

Additionally, we selected the following emails that are not related to the individuals above, but may be relevant to the investigations or allegations of other potential schemes. These have also been shared with the Special Committee's investigation team.

| Doc # | Date | From | To | Summary |
|---|---|---|---|---|
| 2 | 25/12/2009 | Sergio Cabral | Paulo Roberto Carlos Minc Marilene Ramos | Petrobras signed a contract committing to purchase Bio Gas from Novo Gramacho S.A. for 20 years. Several dignitaries discuss about the inauguration dates and details. The governor of Rio de Janeiro refers to Mr. Paulo Roberto Costa as "Rich Cousin". The contact in the Biogas company is Paulo Tupinamba. There was an anonymous complaint from 2008 mentioning the Tupinamba family as one of the main responsible for the corruption in Petrobras. |

CONFIDENTIAL                                                           PwCBR_PETRO_000135864

Email Review

Draft
Attorney Work Product
Privileged and Confidential

| Doc # | Date | From | To | Summary |
|---|---|---|---|---|
| 3 | 10/07/2009 | Sergio Cabral | Paulo Roberto Costa<br><br>Washington Reis | Mr. Washington Reis, Mayor of Duque de Caxias, asks the Governor of Rio de Janeiro, Mr. Sergio Cabral, for a counterpart[74] of BRL 2.487.000 for a political amendment of BRL 2.100.000 obtained to renovate the stadium of a local soccer club. He asks if Paulo, from Petrobras could help him. The Governor, in a reply, asks Mr. Paulo Roberto Costa if it is possible to assist via Petrobras. Mr. Paulo Roberto Costa says he will verify and give an answer. |
| 4 | 08/09/2011 | Maria dos Anjos | Mauricio de Oliveira Guedes<br>Valter Shimura<br>Celso Araripe<br>Miguel Angelo Duque Estrada | Employee Ms. Maria dos Anjos emails a complaint regarding employee Marcos Matos, located in COMPERJ, who allegedly obtained BRL 1,6 million from Construction Company Galvão e Contreiras. She also says he ran over a biker with a company car, and to avoid termination, he destroyed the car in a local junk yard and reported to the police the car had been stolen. |
| 5 | 11/07/2011 | Erasmo Granado Ferreira | José Gabrielli<br>Roberto Gonçalves<br>Renato Duque<br>Antonio Sergio Santana<br>Wilson Santarosa<br>Armando Tripodi | Mr. Erasmo Ferreira, responsible for Crisis Communication, informs the response to be given to a news story regarding the Company Manchester, owned by Senator Eunicio de Oliveira, denying the company Seelba, which had informed newspapers about a complaint to Petrobras Hotline that was not verified.<br><br>The news story indicates Machester had made deals with all competitors to win the bid. There were already BRL 57 million paid for services directly contracted and the new contract would be worth BRL 300 million. |
| 6 | 14/09/2011 | Orlando Simões de Almeida | Renato Duque<br>Antonio Sergio<br>Cal Figueiredo<br>Francis Szczerbacki | Finance Department informs that company Seelba, whistle blower from Manchester, tried to obtain loans in two banks using Petrobras warranties with fake signatures. According to the message, the contract was going to be terminated and the Prosecution Office was already informed. |
| 7 | 01/10/2008 | Print Letter | Venina Velosa | Anonymous complaint against Mr. Mauricio Cabreiras, who allegedly defrauded, along with Mr. Augusto Faria, Airfare tickets and conflicts of interest in the hiring of third party service providers |
| 8 | 01/02/2009 | Anonymous sender | Veja@abril.com<br>gravidade@oglobo.com<br>Ouvidoria@petorbras.com<br>Ministério Público Federal | Anonymous complaint against Mr. Geovane de Morais, former Communication Manager, who allegedly embezzled BRL 100 million. According to the complaint, Director Mr. Paulo Roberto Costa covered up the situation, naming his secretary for the position, and Executive Manager, Ms. Venina |

---

[74] Each congressman receives an individual budget of amendments that they may expend as they see fit, granting benefits to the people. The counterparts are the projects that are funded with these amendments

CONFIDENTIAL

PwCBR_PETRO_000135865

Email Review

Draft
Attorney Work Product
Privileged and Confidential

| Doc # | Date | From | To | Summary |
|---|---|---|---|---|
| | | | Paulo Roberto Costa<br>Venina Velosa<br>José Gabrielli | Velosa, had a big and luxurious wedding party that was also suspicious. |
| 9 | 31/08/2011 | Venina Velosa | Paulo Roberto | Ms. Venina Velosa sent a note to Mr. Paulo Roberto questioning the reason of her "exile" in Singapore. She mentions the problem in the communication department, where hundreds of small invoices were being approved. She criticizes that she was very cautious during the commission work to be fair and unbiased. She knew there were external interests, but she always tried to avoid participating in these matters.<br><br>She says she never betrayed the Director, but was punished, stripped out of her position and exiled. |
| 11 | 31/05/2012 | Paulo Roberto | Francisco Pais | Mr. Francisco Pais informs Mr. Paulo Roberto Costa that after Mr. José Cosenza took the Downstream Directory, the department went back in time and things no longer work as they used to. Mr. Paulo Roberto Costa replies he would like to to work again with Mr. Francisco Pais and that they will both have many opportunities in the future.<br><br>The email does not give any further detail on the these opportunities or people involved. |
| 12 | 23/05/2005 | Deputado Aldo Demarchi | Jorge Nogueira de Souza | Congress Man Aldo Demarchi reaches out Petrobras to solve a finance question regarding companies Agritop and Talude. The congressman was requesting assistance to Agritop<br><br>Talude was hired to EPC "Area B" of a construction site not described in the email by Transpetro, and then hired Agritop to perform topological services, but did not pay for the services rendered.<br><br>Note that Talude was represented in a meeting by Mr. Shinko Nakandacaria, mentioned in the news as one of the operators of the corruption scheme investigated by Car Wash police operation. |
| 14 | 21/07/2009 | Ricardo Villani | Bruna Amantino Rêgo<br>who forwarded the email to: Claudete Simões Rodrigues Baptista de Leão<br>Who forwarded the email to :<br>Jose Roberto Kaschel Vieira<br>Who subsquently forwarded the email to:<br>Venina Velosa | Ricardo Villani demands Petrobras to pay for his work on Formula Indy Ethanol marketing work. He states that if Geovane's department had problems, it was not their fault, and they need to be paid.<br><br>Mr. Villani believes if Geovane did so, in his opinion, it was because he was following superior orders, in the same case when his department afforded the wedding party of an Executive Manger (Ms. Venina Velosa). |
| 15 | 23/12/2008 | Venina | Humberto Quadros | Mr. Humberto Quadros, from communication |

CONFIDENTIAL

PwCBR_PETRO_000135866

Draft
Attorney Work Product
Privileged and Confidential

| Doc # | Date | From | To | Summary |
|---|---|---|---|---|
| | | Velosa | Francisco Pais Paulo Roberto Costa Jose Roberto Kaschel Vieira | company Newsday, complains to Mr. Paulo Roberto that they need to get paid the remaining R$ 3.761.530 to pay the newspapers and other commitments the Company made.<br><br>He says he will invoice, as usual, splitting the values into smaller invoices to be under the approval limit of the communication manager.<br><br>Mr. Paulo Roberto forwards the message to Ms. Venina Velosa and Mr. Francisco Pais, requesting them to regularize the situation.<br><br>Ms. Venina Velosa answer that the Downstream Corporate department does not tolerate any maneuver to avoid approval limits. However, in another message, previously, she request to Mr. José Roberto Vieira and Ms. Claudete Simões to take the necessary measures. The message does not specify which measures. |
| 16 | 27/04/2012 | Carlos Minc | Washington Quaquá Marilene Ramos Paulo Roberto | Ministry of Environment Mr. Carlos Minc sends a note to Mayor of Maricá, Washington Quaquá, saying he already managed to get him a BRL 60(+33) million counterpart for the sewage construction in the city. Asks him not to make them look bad, that too much greed can affect future steps and stop the progress. |
| 17 | 30/04/2012 | Rachel Dias | Undisclosed | Ms. Rachel Dias sends on behalf of Mr. Paulo Roberto sends a goodbye message explaining his entire trajectory in the company.<br><br>The career path trailed by Mr. Paulo Roberto Costa may indicate clues and areas of interest for further investigations. |
| 18 | 10/08/2010 | Renato Oliveira | Renato Duque | Mr. Renato Oliveira, from Delft, says to Mr. Renato Duque that in the meeting with him and their friend congressman Marcos Lima, he understood that could count on his recommendation to participate in public bids.<br>He says they have obtained information from the market that there are a few tenders they are interested and requests an intervention from Mr. Renato Duque to request Delft is invited to participate in these bids. |
| 19 | 21/09/2009 | Enéas Figueiredo | Paulo Roberto | Former employee Mr. Enéas Figueiredo complains to Mr. Paulo Roberto Costa he used to work in Mr. Geovane's department, referring to Geovane de Morais, who was the general manager of communication in the Abastecimento. Mr. Enéas Figueiredo was terminated and is recently being harassed. He requests an urgent meeting with Mr. Paulo Roberto Costa to inform matters that are about to emerge and are not at all favorable to the |

CONFIDENTIAL                                                          PwCBR_PETRO_000135867

Email Review                                                                                                     Draft
                                                                                           Attorney Work Product
                                                                                        Privileged and Confidential

| Doc # | Date | From | To | Summary |
|---|---|---|---|---|
| | | | | Company. |
| 20 | 29/09/2010 | Alexandre Penteado | Pedro Barusco | Federal Auditors Court reports irregularities on contract with ABEMI. The report informs Mr. Pedro Barusco, Executive Manager and Mr. José Almeida, Executive at PROMINP, are the main responsible for the irregularities. |
| 21 | 08/01/2008 | Júlio Faerman | Pedro Barusco Renato Duque | Mr. Júlio Faerman, allegedly involved in the corruption case with SBM, invited Mr. Pedro Barusco and Mr. Renato Duque to visit SBM shipyards in the UAE. He says he can easily obtain visas for them should they accept the visit. |
| 22 | 12/12/2008 | Anonymous sender | nederluc venina agenor pcosta djalma.souza claudeteleao salles phaguiar sheila.transpetro claudiocampos latge carlos.rosa anavitoria sergiomachado (no names were shown, only email radical) | Anonymous complaint, regarding the influence and corruption in Petrobras Directory, influenced by politicians, lobbyists and construction companies. |
| 23 | 15/12/2009 | Felipe Souza | Undisclosed | Complaint about the International Area, which was allegedly rewarding employees that committed frauds and harassments with a "luxury exile", expatriating the employees with high salaries and positions, instead of investigating the cases. |
| 25 | 05/12/2012 | Fernando Castro Sá | Venina Velosa | Mr. Fernando Sá forwards to Ms. Venina Velosa a message he sent to Mr. Newton Sobrinho about a conversation between Mr. Marcio with Mr. Jorge, where it was said that Ms. Venina only discovered the small part of the problem.<br><br>Mr. Fernando Sá knows there are strict antifraud laws in Singapore; therefore he recommends interviewing the local staff first. He mentions the hole seems very deep, and that they need to be careful if there are external factors.<br><br>He also comments that phone calls and acts involving Sillas, Jorge, Cesar, Canabrava and Daniel are old, and are traceable.<br><br>There is no further explanation on what he means by "old and traceable". |

CONFIDENTIAL                                                                        PwCBR_PETRO_000135868

### *12.2.3. List of individuals identified*

As part of our review, we developed a list of individuals and companies, that, for the reasons provided, may need to be considered in the Special Committee phase of the investigations. Entities were included for reasons such as companies that requested to be included in bidding processes and individuals that are mentioned in anonymous complaints.

The full list of individuals might be found in Annex 12.4.2 List of Individuals and Companies.

## *12.3. Conclusions and next steps*

### *12.3.1. Conclusions*

As mentioned previously in our objectives (Section 12.1.3), we sought to assess the sufficiency of the email review performed by the Company's internal investigations. As part of this objective we reviewed the emails using the search techniques outlined in Section 12.4.1 to see if any further relevant information could be identified that were not previously identified by the CIAs as relevant.

During our review we identified 26 additional emails that in the context of current news, investigations already performed, and allegations, present relevant data for future investigations. We have also selected other 75 relevant emails, where politicians and/or entrepreneurs request certain companies to be included in bidding process, and other potential schemes with the same *method* of the enterprises and partnerships already under investigation.

Additionally, from the emails reviewed, we understand that Mr. Paulo Roberto Mailbox had more than 25.000 emails and different replicas with emails overlapping, which means that not every email were deleted before daily backup.

Given the number of additional relevant emails identified during our review, in particular the 25.000 emails of Mr. Paulo Roberto, we considered that professional technology assistance would be necessary to support the Special Committee's investigation and have recommended this to the Speical Committee.

Based on our review of emails, we offer the following observations:

We observed there is political influence over Executive Managers and Directors, recommending companies to bidding process, to hire certain people as third parties and to solve payment and contract discussions. This can be seen, for example, in emails #12 and #18.

We also understand that alerts and anonymous allegations were made to management and director levels, but not all of them were investigated. This can be seen, for example, in emails #7, #8, #22 and #23

We have identified connections between Executive Managers, Directors and Constructions Companies' Directors under investigation of the Federal Police. We have also identified connections with politicians, but the police investigation has not yet revealed the names of politicians involved.

### *12.3.2. Recommended next steps*

During our work reviewing the CIAs' work, meetings with Mr. Gerson Gonçalves and Mr. Pedro Arruda, meetings with the audit team, media coverage and brainstorming, we have listed topics,

CONFIDENTIAL

PwCBR_PETRO_000135869

Draft
Attorney Work Product
Privileged and Confidential

individuals, institutions, expressions and other parties that may be relevant to the Special Committee's investigation.

We recommend that the extended email review performed in the next phases of the investigation include the following keywords. This list has been shared by virtue of our comparison of our list with that used by the investigation teams and communicating any additional names or words.

| | |
|---|---|
| *eleiç\** | *janene* |
| *campanha* | *sócio controlador* |
| *esquema* | *miguel gradin* |
| *combin\** | *fernando barbosa* |
| *partido* | *arthur* |
| *policia* | *vinho* |
| *investig\** | *almoço* |
| *moro* | *nilton* |
| *lava* | *exil* |
| *jato* | *pragmática* |
| *suiça* | *em off* |
| *suiss\** | *Primo* |
| *costa* | *gabrielli* |
| *M.O.* | *dilma* |
| *ecoglobal* | *paulo otto* |
| *cingapura* | *lula* |
| *transpetro* | *licen\** |
| *machado* | *ambiental* |
| *Paulo Roberto* | *receita* |
| *pr* | *alusa* |
| *prc* | *cabral* |
| *alberto* | *cavendish* |
| *youssef* | *governador* |
| *range rover* | *alberto feilhaber* |
| *delta* | |
| *vargas* | |
| *delação* | |
| *depoimento* | |
| *PT* | |
| *PMDB* | |
| *PR* | |

CONFIDENTIAL                                                          PwCBR_PETRO_000135870

Sanctions applied                                                    Draft
                                                        Attorney Work Product
                                                      Privileged and Confidential

We also recommend that the following topics are part of the Special Committee investigation:

- Investigate what happened in the Downstream Communication department, under the management of Mr. Geovane Morais and the allegations regarding small service invoices.

- Investigate what happened with the Manchester Company, owned by a congressman, and that allegedly defrauded the public tender.

- Investigate the contract regarding the purchase for 20 years of Bio Gas from Nova Gramacho S.A.

- Investigate social project GOL SOCIAL, signed in partnership with soccer club Duque de Caxias, as well as any other contract signed with the club

- Investigate contract signed and relationship with ABEMI, which TCU has reported irregularities in 2010, under the management of Mr. Pedro Barusco

- Investigate if company personnel on whom the audit team relies for representations, participated in or was aware of any potential scheme.

- Perform background check of individuals and companies listed Annex 5.2 List of Individuals and Companies.

## 12.4. Annexes

## 12.4.1. Searches performed

| Custodian | Keyword | Hits |
|-----------|---------|------|
| Francisco Pais | Clube | 522 |
| Francisco Pais | To&From: Rogério Araújo | 21 |
| Francisco Pais | GEA Projetos | 83 |
| Francisco Pais | Sócio Controlador | 27 |
| Francisco Pais | Jorge Luz | 528 |
| Francisco Pais | Jorge Luz GEA | 3 |
| Francisco Pais | Carlos Minc | 346 |
| Francisco Pais | SCF | 8 |
| Renato Duque | Prc | 51 |
| Renato Duque | To&From: Pedro Barusco | |
| Renato Duque | Clube | 41 |
| Renato Duque | "em off" | 15 |
| Renato Duque | Cartel | 19 |
| Renato Duque | Denuncia | 107 |
| Renato Duque | Lula | 463 |
| Venina Velosa | Denuncia | 18 |
| Venina Velosa | Veninavelosa | 255 |

CONFIDENTIAL                                              PwCBR_PETRO_000135871

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

| Custodian | Keyword | Hits |
|---|---|---|
| Venina Velosa | Humberto Costa | 0 |
| Renato Duque | Humberto Costa | 2 |
| Francisco Pais | HC | 100 |
| Francisco Pais | Humberto Costa | 1 |
| Venina Velosa | LFSN | 0 |
| Renato Duque | LFSN | 0 |
| Francisco Pais | LFSN | 0 |
| Venina Velosa | Shinko | 0 |
| Renato Duque | Shinko | 0 |
| Francisco Pais | Shinko | 1 |
| Venina Velosa | Geovane | 34 |
| Paulo Roberto | Scf | 318 |
| Roberto Duque | bruno luz | 53 |
| Roberto Duque | Segredo | 20 |
| Roberto Duque | Deputado | 200 |
| Francisco Pais | Geovane | 781 |
| Francisco Pais | Astra | 99 |
| Francisco Pais | nestor cervero | 39 |
| Pedro Barusco | sete brasil | 11 |
| Pedro Barusco | Abemi | 20 |
| Renato Duque | Abemi | 4 |
| Renato Duque | sete brasil | 627 |
| Renato Duque | Joao Ferraz | 179 |
| Pedro Barusco | Joao Ferraz | 75 |
| Pedro Barusco | Auditores | 8 |
| Francisco Pais | sete brasil | 0 |
| José Gabrielli | Denuncia | 573 |
| Jose Carlos Cosenza | Lula | 860 |
| Jose Carlos Cosenza | Clube | 95 |
| Jose Carlos Cosenza | Scf | 10 |
| Jose Carlos Cosenza | carlos.minc | 93 |
| Jose Carlos Cosenza | Gramacho | 10 |
| Jose Carlos Cosenza | $$ | 22 |
| Jose Carlos Cosenza | Grana | 39 |
| Paulo Roberto | Pasta "Pessoal" | 86 |
| Paulo Roberto | Grana | 119 |
| Paulo Roberto | j.a.camargo | 14 |

Forensic Services Memo - Review of Management's Investigations (CIAs)
PwC

CONFIDENTIAL

PwCBR_PETRO_000135872

| Custodian | Keyword | Hits |
|---|---|---|
| Paulo Roberto | Vip | 65 |
| Paulo Roberto | Dr. Ariovaldo Rocha Filho | 87 |
| Paulo Roberto | Brmedconsultoria | 0 |
| Paulo Roberto | Nilton | 104 |
| Paulo Roberto | robertoconsta2011 | 21 |
| Paulo Roberto | Petros | 30 |
| Paulo Roberto | "da Hora" | 9 |
| Paulo Roberto | Pedro Dalcero | 25 |
| Paulo Roberto | Povoa | 0 |
| Paulo Roberto | "Burnett" | 1 |
| Paulo Roberto | Nunes Junior | 4 |
| Paulo Roberto | Rodada | 19 |
| Paulo Roberto | Ricardo Pessoa | 28 |
| Jose Carlos Cosenza | "rodada" | 63 |
| Paulo Roberto | ricardopessoa@utc.com.br | 13 |
| Jose Carlos Cosenza | ricardopessoa@utc.com.br | 1 |
| Pedro Barusco | SBM | 8 |
| Renato Duque | SBM | 12 |

## 12.4.2. List of individuals and companies for consideration by Special Committee investigation

| Name | Reason |
|---|---|
| Abengoa | This company is mentioned in Mr. Paulo Roberto Costa's schedule, in a meeting with Bruno Luz and Jorge Luz, who are also mentioned in the media. |
| Aldo Demarchi (State Congressman) | Demands from Petrobras intervention in the dispute between EPC Company (Talude) and subcontractor (Agritop) |
| Angela Fonti (President of Comlurb) | Participates in the email discussion regarding the signature of "Novo Gramacho" |
| Antonio Augusto A. Faria | Ms. Venina Velosa received an annonymous letter telling Mr. Mauricio Cabreira and Mr. Antonio Faria were favoring friends, hiring them as third party employees. They were also issuing a lot of airtickets, overpriced tickets, ghost trips, international trips to mistresses, and more than 20 tickets issued to Mr. Antonio Faria he never used. |
| Armando Tripodi | Is mentioned among with Mr. Diego Hernandes in annonymous complaints. |

CONFIDENTIAL

PwCBR_PETRO_000135873

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

| Name | Reason |
| --- | --- |
| Blanc (President's Cabinet) | Complaint by Labour Union SINDPETRO says he has a dangerous relationship with the alleged leader of a criminal organization in REDUC. |
| Carlos Fadigas (Braskem) | Is envolved in discussions with Mr. Paulo Roberto Costa regarding decision making in COMPERJ. |
| CBIE | Email sent to Mr. Paulo Roberto Costa to keep in touch after he retires. |
| Delft Serviços | Executive Renato Silva de Oliveira reaches out for Mr. Renato Duque, explaining they were recommended by Congressman Marcos Lima, and would like an intervention to participate in Bids from Petrobras. |
| Eden Grunewald (GEA Projetos) | Secretary Francisca Reis, from GEA Projetos, requests a meeting for Engineer Grunewald with Mr. Paulo Roberto Costa, according to a conversation between JL (potentially Mr. Jorge Luz) with Mr. Paulo Roberto Costa. She also mentions they are waiting on the topic disussed on the day before (detailed as 15/02/2009 - Meeting with Paulo César Aquino) |
| Gas Verde S.A. - Novo Gramacho S.A. | Petrobras signed a contract to purchase Biogas for the next 20 years from Novo Gramacho. In the email conversation, the responsible for the company states that the project would not be economically viable if not for this commitment from Petrobras. |
| GEA Projetos | Appears among companies that were invited to join Bids. |
| Geovane de Morais | Former Abastecimento Comunication manager. Annonymous compaint informs he stole more than BRL 100 million and nothing was done. There are also news stories telling he would have several invoices of small values to avoid the limits of delegation of authority. |
| Geralda Fonseca | Venina forwards the complaint about Mr. Geovane de Morais to this person, and ask her to delete the email after reading it.

(She and Venina share the same last name.) |
| Geraldo Feitosa | Sends from a personal email a note to Mr. Pedro Barusco, wishing him a happy birthday and a lot of "$UCE$$". |
| Gilberto Dantas (GEA Projetos) | Mentioned in Mr. Paulo Roberto Costa's schedule to be in a meeting with him about "Dalian China". Ms. Sandra de Lima Oliveira informs Mr. Paulo Roberto Costa that the purpose is to create an Special Purpose Entity. |
| Henidio Queiroz Jorge | Appears in multiple emails requesting to include companies in Bids. |
| Hugo Urbini Neto (Networker Engenharia) | Indication from congressman Marcos Lima, Mr. Hugo Urbini Neto, presents himself to Mr. Renato Duque, and informs him his company is now an authorized vendor and asks him about hte next steps to start participating in bids. |

CONFIDENTIAL                                        PwCBR_PETRO_000135874

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

| Name | Reason |
|------|--------|
| Humberto Quadros | Contact at Newsday, comunication company hired by Geovane e Morais. He sends an email to Mr. Paulo Roberto Costa informing he will, as usual, to invoice small amounts to avoid the authority limits. |
| João Carlos Medeiros Ferraz | Former Treasury General Manager. He discusses vacations in Milan with Mr. Renato Duque, Mr. Pedro Barusco and Mr. Julio Camargo from Toyo Setal. He was invited to be CEO of Sete Brasil, when the company was created. |
| John Goes | Tells Mr. João Carlos Ferraz and Mr. Pedro Barusco he will be glad to be part of team, and gives them his personal email, to avoid problems with the company he was still working. |
| Jorge Pinto (GEA Projetos) | Participates in oportunity presentation to management ( not detailed from which company or department), regarding the Dailan China. |
| Lubnor | Thanks Mr. Paulo Roberto Costa for including the company in a Bid. |
| Luis Andrade – Sargeant | Thanks Mr. Paulo Roberto Costa for including the company as an authorized vendor. |
| Marcos Barra (Ampla Auditores / MIX Lavanderia / JPA Lavanderias) | Mr. Pedro Barusco is in copy of an email sent by Mr. Marcos Barra, saying the dry cleaning/laundry companies JPA Lavandeira and MIX lavanderia were created, already have city permits, and are only missing one last approval to start issuing invoices. |
| Marcos Matos | Complaint by Ms. Maria do Anjos Inocente, telling Mr. Marcos Matos embezzled BRL 1,6 Million from company Galvão e Contreiras. He also ran over a cyclist with a company car, when driving with his mistress. To avoid being held responsible, he dismantled the car in junkyard and told the police his car was stolen earlier in that day. |
| Marilene Ramos | Participates in the email discussion regarding the signature of "Novo Gramacho" |
| Mauricio Cabreira | Ms. Venina Velosa received an annonymous letter telling Mr. Mauricio Cabreira and Mr. Antonio Faria were favoring friends, hiring them as third party employees. They were also issuing a lot of airtickets, overpriced tickets, ghost trips and international trips to mistresses. |
| Mr. Amauri | Allegations from the labor union SINDPETRO, regarding criminal organization in Reduc commanded by Mr. Amauri |
| Niplan | Mr. Renato Duque receives a complaint telling that political influences from PT caused the suspension of the punishment imposed to vendor Niplan. |
| Paulo Tupinambá | Is the responsible for the company Novo Gramacho S.A |
| Pedro Aramis Arruda | Complaint by Labour Union SINDPETRO says he has a dangerous relationship with the alleged leader of a criminal organization in REDUC. |

CONFIDENTIAL                                                                                     PwCBR_PETRO_000135875

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

| Name | Reason |
|------|--------|
| Petroleoum Terminal in China (PTC) | Petrobras, GEA and USAV would sign a Letter of Intent for Petroleoum Terminal in China (PTC) |
| Projeto Terminal Dalian China | Project with envolvement of GEA Projeto |
| Proship Engenharia | Company is mentioned in email regarding China Terminals, whose representatives are Mr. Gilberto Dantas and Jorge Pinto, from GEA Projeto. |
| Romulo de Miranda Coelho | Mr. Romulo Coelho shares Bid information with Mr. Pedro Barusco and Mr. João Ferraz |
| Rosemberg Evangelista Pinto | Used to be in President Jose Gabrielli's Cabinet, and was the leader of the CIA that investigated Mr. Geovane de Morais. According to newspaper Folha, the CIA did not identify any irregularities, and Ms. Venina Velosa requested a deeper investigation. Mr. Rosemberg Pinto is also mentioned in the complaint about Mr. Diego Hernandes and Mr. Armando Tripodi, saying that Mr. Rosemberg Pinto is part of the team. |
| Senator Serys (San Diego) | In Email to Mr. Renato Duque from his secretary with a To-Do list, there is mention to "Senato Serys Demand - Include Vendor San Diego" |
| Sérgio Cabral (Former Governor of Rio) | Mr. Sergio Cabral asked Mr. Paulo Roberto if he could assist the Duque de Caxias through Petrobras. Additionally, he lets Mr. Paulo Roberto Costa decide the date for the signature of "Novo Gramacho", and reffers to him as the "rich cousin" |
| Shinko Nakandacari | Represents company Talude, which was hired by Transpetro to EPC, and envolved in dispute with Agritop company. Mr. Shinko Nakandacari is also appointed as one of the operator of the scheme to distribute bribe money to the politicians. |
| Sr. Sergio Litholdo (AGRITOP) | Partner at Agritop, that should receive money from Talude, company represented by Mr. Shinko Nakandacari |
| Sra. Lizarda (Bid Commission) | Mr. João Ferraz sends a sarcastic emails Mr. Jose Gabrielli, Mr. Renato Duque and Mr. Armando Tripodi infroming Ms. Lizarda from Petrobras Bid Commission has the supreme power and should run for president of Brazil. |
| Vincentinho (Congressman) | Sends the CV of a friend to Mr. Renato Duque, and requests him a job for this friend in Petrobras or any other company he might know. |
| Washington Reis | Social Projetct GOL SOCIAL is a partnership signed in between Petrobras and Soccer Club Duque de Caixas. Washington Reis, mayor of Duque de Caxias, ask the governor if Petrobras could help them, the emails is then forwarded to Mr. Paulo Roberto Costa. |
| Wilson Carlos Carvalho | Informs about partnership with the State to create a community pool area (Piscinão) near COMPERJ, in São Gonçalo. |

CONFIDENTIAL                                    PwCBR_PETRO_000135876

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

## 12.4.3. Relevant emails discovered and shared with Investigation Team

| # | Subject | From | To |
|---|---------|------|-----|
| 1 | Enc_ Resumo da reunião com Sindipetro Caxias | Luciana Helena Morais | Francisco Pais |
| 2 | Re_ Res_ Re_ Res_ Assinatura Novo Gramacho – Petrobras | Sergio Cabral | Paulo Roberto & others |
| 3 | Res_ emenda duque de caxias | Sergio Cabral | Paulo Roberto Costa Washington Reis |
| 4 | Denuncia contra Marcos Matos | Maria dos Anjos | Mauricio de Oliveira Guedes and others |
| 5 | URGENTE!!! VALE ESTA | Erasmo Granado Ferreira | José Gabrielli & others |
| 6 | SEEBLA | Orlando Simões de Almeida | Renato Duque & others |
| 7 | Enc_ _Denúncia Anônima_ | Print Letter | Venina Velosa |
| 8 | Desvio de dinheiro na Petrobras. Até quando_ confidencial! | Anonymous sender | Venina Velosa & others |
| 9 | Enc_ Bom dia! | Venina Velosa | Paulo Roberto |
| 10 | Res_ O globo com minuscula mesmo | Maria das Graças Foster | José Gabrielli & Others |
| 11 | Re_ Res_ Atual | Paulo Roberto | Francisco Pais |
| 12 | Fw_ talude_agritop | Aldo Demarchi | Jorge Nogueira de Souza |
| 13 | Confidencial!!!!!!! | Venina Velosa | Maria das Graças Foster |
| 14 | Enc_ Pendências Financeiras | Ricardo Villani | Bruna Amantino Rêgo & others |
| 15 | Enc_ Res_ seminário | Venina Velosa | Humberto Quadros & others |
| 16 | Comperj X Maricá _Pendências | Carlos Minc | Washington Quaquá & others |
| 17 | Despedida | Rachel Dias | Undisclosed |
| 18 | Solicitação de intervenção para convite processo licitatório | Renato Oliveira | Renato Duque |
| 19 | Res_ PRIORIDADE ZERO URGENTE | Enéas Figueiredo | Paulo Roberto |
| 20 | Parecer do TCU no caso da ABEMI não definitivo, sujeita a ap | Alexandre Penteado | Pedro Barusco |
| 21 | Enc_ Invitation to Petrobras Abu Dhabi and Dubai | Júlio Faerman | Pedro Barusco Renato Duque |
| 22 | NORBERTO_Continuação da Ações | Anonymous sender | Paulo Roberto & others |
| 23 | Denuncia contra Petrobras Internacional | Felipe Souza | Undisclosed |
| 24 | ainda sobre denuncias | Maria Augusta Carneiro Ribeiro | José Gabrielli |
| 25 | Enc_ Ligacao | Fernado Castro Sá | Venina Velosa |
| 26 | [fundopetros] Diego Hernandes o NEW RICO | Carmen Barreto | Bcc: Francisco Pais |

CONFIDENTIAL

PwCBR_PETRO_000135877

Sanctions applied
Draft
Attorney Work Product
Privileged and Confidential

# 13. Selection of CIA Members

We reviewed the Company policy governing the creation and operation of a CIA, including the selection of individuals to conduct the CIA. Please find below key points from the policy. Note that this policy is consistent with what we have seen in practice in the CIAs we have reviewed.

## 13.1. Key points of Company policy governing CIAs

*Key points of PP-OV4-00056-F*

The creation of an internal commission ("Comissão Interna de Apuração" or "CIA") is guided by Company Procedure PP-OV4-00056-F. Key points of this policy include the following:

- *Coverage*: Applicable to Petróleo Brasileiro S.A. and recommends the application throughout Petrobras System as well. These procedures should be used as guidelines in controlled entities and subsidiaries.

- *CIA Objectives*: The CIA aims to investigate suspicions or occurrences against the workforce and/or company's assets, as well as to define administrative measures and procedures resulted from the investigation. Additionally, the CIA assures the right of defense to individuals and companies.

- *Creating a CIA:* It is the responsibility of the General Manager of the Area where the allegations occur to constitute the CIA and to name the CIA Coordinator and members. Should the allegations involve executive managers, the CIA must be defined by the Ethics Commission from Petrobras. In complex cases and/or that the allegations involve fraud or corruption and/or cases that result from audit work, the composition of CIA should contain at least five members, being:

    - One from Enterprise security
    - One from Legal
    - One from Internal Audit
    - There should also be a technical member with experience and knowledge about the matter, but working in a different area than where the allegations happened.

  Employees with specific training to participate in CIAs should be prioritized when naming the members.

- *Reporting line:* The CIA Coordinator must send the final report to the person responsible for creating the CIA, as well as a copy to the Enterprise Security Manager from the President's Cabinet (GAPRE/SE).

- *Involvement of the controller:* The controller has responsibility to monitor the results of CIAs when the triggering fact has been a suspicion of fraud or corruption.

- *Final Report:* The final report must contain:

    - Background and process (i.e. description of the allegations)
    - Sequence of activities performed
    - Analysis of interviewee statements
    - Judge conclusively the guilt or innocence of the individuals involved, clearly indicating the evidence that sustains the conclusions or highlighting the insufficiency of proof to conclude

CONFIDENTIAL
PwCBR_PETRO_000135878

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

- Identify and individually indicate responsibility for non-conformities regarding corporate policies and internal procedures
- Calculations, whenever possible, the losses to Petrobras, aiming to assist on administrative or legal actions
- Documents and annexes

# 13.2. Conclusions regarding the selection of CIA members

*The CIAs were not staffed with personnel adequately independent of the business unit in which the investigation is being conducted*

As outlined in the policy, outside situations in which the allegations executive managers, it is the responsibility of the General Manager of the Area where the allegations occur to constitute the CIA and to name the CIA Coordinator and members. In complex cases and/or that the allegations involve fraud or corruption and/or cases that result from audit work, the composition of CIA should contain at least five members, being:

- One from Enterprise security
- One from Legal
- One from Internal Audit
- There should also be a technical member with experience and knowledge about the matter, but working in a different area than where the allegations happened.

Such requirements create an environment in which members of the CIA may not be adequately independent of the business unit in which the investigation is being conducted. Of the CIAs included in our review, we noted the following individuals were members of CIAs that were investigation their area.

| CIA | Area under investigation | CIA members from the area under investigation |
|---|---|---|
| RNEST | Abastecimento | None |
| Pasadena | Presidência / Novos Negócios | Jorge Salles Camargo Neto |
| COMPERJ | Abastecimento | Antonio Rubens Silva Silvino |
| SBM | Exploração e Proudução | Solange da Silva Guedes |
| Epoca | Presidencia / Área de Negócios Internacional | Jorge Salles Camargo Neto |
| Ecoglobal | Exploração e Proudução | Edmar Diniz de Figueiredo Márcio do Nascimento Magalhães |
| Astromaritima | Exploração e Proudução | Edson David Meneghel José Roberto Saraiva Monteiro Sérgio Akira Suzuki |
| Toyo Setal | Exploração e Produção, Abastecimento e Gás e Energia | Abilio Paulo Pinheiro Ramos Paulo Marcelo Figueiredo Montes Solange da Silva Guedes |
| Sanko Sider | Materiais e Contabilidade | Etiocles Borges Tinoco |
| Marketing | Abastecimento /Corporativo | Alexandre França de Lima Carlos Alberto Meireles Marçal José Augusto Nunes Júnior |

CONFIDENTIAL

PwCBR_PETRO_000135879

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

*The CIAs are not staffed with personnel trained and experienced forensic accounting investigation to an appropriate degree*

Additionally the requirements governing the types of skills that must be present in complex cases, such as those that involve allegations of fraud or corruption do not call for an individual experienced in forensic accounting investigations.

*The CIAs do not report directly to the Board of Directors or Sub-Committee thereof, or appropriate "ombudsman" to protect the independence of their process, findings, and conclusions*

As outlined in the policy, the CIA Coordinator must send the final report to the person responsible for creating the CIA, as well as a copy to the Enterprise Security Manager from the President's Cabinet (GAPRE/SE).  As such, this may lead to situations where the party receiving the report is not sufficiently independent of the allegations to guarantee an objective review of the investigations results.

## 13.3. Summary of individuals involved in the CIAs

The following is a summary of individuals involved in the CIAs:

**Key**

**M – Member of CIA**

**C – Coordinator of CIA**

| Ref | Division | Name | RNEST | Pasadena | COMPERJ | SBM | Epoca | Ecoglobal | Astromarítima | Toyo Setal | Sanko Sider | Marketing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | AB-MC | Abílio Paulo Pinheiro Ramos | | | | | | | | M | | |
| 2 | AB-LO/TM/AF | Alexandre França de Lima | | | | | | | | | | M |
| 3 | AUDITORIA/ANEG/AEP | Alexandre Soares Filgueiras | | | | | | | M | | | |
| 4 | E&P-Corp/RH/DRH | Alvaro Adriano Rocha Martins | | | M | | | | | | | |
| 5 | CENPES | André Lima Cordeiro | | M | | | M | | | | | |
| 6 | GAPRE | Antônio Augusto Almeida Faria | | | | | | | | M | | |
| 7 | AB-CR | Antonio Rubens Silva Silvino | | | M | | | | | | | |
| 8 | AUDITORIA/ANEG/AEP | Arlindo Quintão Campos | | | | | | M | | | | |
| 9 | GAPRE/SE/REGBH | Bruno Vilas Boas Abreu | | | | | | | | M | | |
| 10 | AB-CR/PP/ADE | Carlos Alberto Meireles Marçal | | | | | | | | | | M |
| 11 | AB-RE | Cláudio Romeo Schlosser | | M | | | | | | | | |
| 12 | E&P-CORP/CBS/RMF | Edinar Siqueira Gomes | | | | | | | | | M | |

CONFIDENTIAL

PwCBR_PETRO_000135880

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

| Ref | Division | Name | RNEST | Pasadena | COMPERJ | SBM | Epoca | Ecoglobal | Astromarítima | Toyo Setal | Sanko Sider | Marketing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 | E&P-CORP/CBS | Edmar Diniz de Figueiredo | | | | | | C | | | | |
| 14 | E&P-SERV/US-IPSUB/PROJSUB | Edson David Meneghel | | | | | | | M | | | |
| 15 | Presidente | Elisabeth Elias Bohm | | M | | | | | | | | |
| 16 | E&P-PRESAL/CIP-I | Enéas de Souza Filho | | | | | | | | | | M |
| 17 | ETM-CORP/ST/SLADE | Etiocles Borges Tinoco | | | | | | | | | M | |
| 18 | GE-OPE/NE | Fernando Homem da Costa Filho | | | | | | | | M | | |
| 19 | Internal Audit | Gerson Luiz Gonçalves | C | C | | M | M | | | | | |
| 20 | New Business | Isabela Mesquita Carneiro da Rocha | | M | | | | | | | | |
| 21 | AUDITORIA/CTR/CPO | João Felipe da Costa Rocha | | | | | | | | | M | |
| 22 | GAPRE/SE/REGSP | João Soares da Silva | | | | | | | | | M | |
| 23 | Presidente | Jorge Salles Camargo Neto | | M | M | M | M | | | | | |
| 24 | AB-MC/PSPL | José Augusto Nunes Júnior | | | | | | | | | | M |
| 25 | E&P-CORP/CBS/EOD | José Roberto Saraiva Monteiro | | | | | | | C | | | |
| 26 | Presidente | Lázara Moreira dos Santos | M | | | | | | | | | |
| 27 | *CV not able to be provided as she is no longer with the Company* | Lúcia Helena Arruda R. de Morias | | | | | | | | | | C |
| 28 | Business Consultant | Marcelo da Silva Ramos | | | M | | | | | | | |
| 29 | E&P-CORP/CBS/RMF | Márcio do Nascimento Magalhães | | | | | | | M | | | |
| 30 | JURIDICO/JENG | Mariana Fernandes da Silva | | | | | | | | | M | |
| 31 | ENG-GE | Mauro de Oliveira Loureiro | | | | | | | | | C | |
| 32 | PRESIDENTE | Nilson Jaques Cytryn | | | | | | | | | M | |
| 33 | Legal | Nilton Antônio de Almeida Maia | M | M | M | M | M | | | | | |
| 34 | Eng Enquipamentos | Patrick Horbach Fairon | M | | | | | | | | | |
| 35 | AUDITORIA/ANEG/AB | Paulo Henrique de Castro Soalheiro | | | | | | | | M | | |
| 36 | ENG-E&P/IEUEP-II/IEREPL-I | Paulo Marcelo Figueiredo Montes | | | | | | | | M | | |
| 37 | Administrador PL | Paulo Roberto Povoa | M | | | | | | | | | |
| 38 | GAPRE/SE | Pedro Aramis de Limda Arruda | | M | C | C | C | | | | | |
| 39 | An Sistemas Sr / Gerente Executivo | Renata Faria Rodrigues Baruzzi Lopes | M | | | | | | | | | |
| 40 | E&P-CORP/CBS/GC | Sérgio Akira Suzuki | | | | | | | | M | | |
| 41 | E&P-CORP | Solange da Silva Guedes | | | | M | | | | | C | |

CONFIDENTIAL

PwCBR_PETRO_000135881

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

| Ref | Division | Name | RNEST | Pasadena | COMPERJ | SBM | Epoca | Ecoglobal | Astromaritima | Toyo Setal | Sanko Sider | Marketing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 42 | E&P-CPM/CMP-SS/PLC | Sônia Lúcia Lorencettie | | | | | | M | | | | |
| 43 | JURIDICO/JGE/GQL | Uilton dos Santos Salvador | | | | | | | | M | | |
| 44 | Engineering | Wilson Cezar Brasil Junior | | | M | | | | | | | |

CONFIDENTIAL

PwCBR_PETRO_000135882

# 14. Sanctions applied

Petrobras' standard PP-0V4-00056-F regulates the creation and conduct of CIAs (Comissão Interna de Apuração), commissions assigned to investigate allegations internally. This standard requires the CIAs to investigate and report upon summoning by the manager of a given area.

It is the area's responsibility to follow up and carry remediation actions after the report is issued. It is the CIA's responsibility to judge conclusively and individualized guilty or innocence of the involved individuals, to identify and individually indicate responsibility for nonconformities regarding corporate policies and internal procedures, as well as to give recommendations to improve the process.

Please find below a summary of the sanctions recommended by the CIAs reviewed.

- RNEST – the CIA assigned responsibility without recommending specific sanctions

- Pasadena – the CIA did not recommend sanctions as the individuals involved are no longer with the company

- COMPERJ – The CIA assigned responsibility to various individuals, but did not recommend any particular sanctions

- SBM – The CIA did not assign any responsibility or recommend any sanctions

- Epoca – The CIA recommended warnings and suspensions for up to 29 days for the individuals involved

- Ecoglobal – The CIA did not assign any responsibility or recommend any sanctions

- Astromarítima – The CIA did not assign any responsibility or recommend any sanctions

- Toyo Setal – The CIA did not assign any responsibility or recommend any sanctions

- Sanko Sider – The CIA assigned responsibility without recommending a particular sanction to one individual and reassigned two other individuals

- Marketing – The CIA recommended the termination of Geovane de Morais, however he was not able to be terminated until he return from medical leave four and a half years later

Key

N/A – Involvement is mentioned, but sanctions not applicable, since the person was not working with the company at the time of the report.

| Name / CIA Mentioning | Title | RNEST | Pasadena | COMPERJ | SBM | Época | Ecoglobal | Astromarítima | Toyo Setal | Sanko Sider | Marketing |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alberto | Former employee | | N | | | | | | | | |

CONFIDENTIAL                                                        PwCBR_PETRO_000135883

Sanctions applied
Draft
Attorney Work Product
Privileged and Confidential

| Name / CIA Mentioning | Title | RNEST | Pasadena | COMPERJ | SBM | Época | Ecoglobal | Astromarítima | Toyo Setal | Sanko Sider | Marketing |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Feilhaber | and Vice President of Astra Oil | | / A | | | | | | | | |
| Alexandre Penna Rodrigues | Senior Equipment Engineer - RH/UP/ECTGE | | | | | warning | | | | | |
| Aluísio Teles Ferreira Filho | Senior Equipment Engineer - INTER-AL/INTEG | | N / A | | | suspension 29 days | | | | | |
| Aurélio Oliveira Telles | Former employee | | N / A | | | | | | | | |
| Carlos Alberto Carletto | Engineering Management Integration Manager - ENG/AG/IERENEST/IG | CIA assigned responsibility without recommending a sanction | | | | | | | | | |
| Carlos de Jesus Fernandes | Former employee | | | | | | | | | CIA assigned responsibility without recommending a sanction | |
| Carlos Frederico Trevia | Marketing and Relationship Manager/ UPB/PRES/RCO | | | CIA assigned responsibility without recommending a sanction | | | | | | | |

CONFIDENTIAL
PwCBR_PETRO_000135884

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

| Name / CIA Mentioning | Title | RNEST | Pasadena | COMPERJ | SBM | Época | Ecoglobal | Astromarítima | Toyo Setal | Sanko Sider | Marketing |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cezar de Souza Tavares | Former employee | | N/A | | | | | | | | |
| Clóvis Correa de Queiróz | Former employee | | | | | Suspension 2 day | | | | | |
| Fernando José Cunha | Senior Equipment Engineer - ENG-GE/PROJEN | | | | | Suspension 2 day | | | | | |
| Francis o Pais | Assistant to former Director Paulo Roberto Costa | CIA assigned responsibility without recommending a sanction | | CIA assigned responsibility without recommending a sanction | | | | | | | |
| Glauco Colepicolo Legatti | General Manager – Implementation of Venture RNEST | CIA assigned responsibility without recommending a sanction | | | | | | | | | |
| Heyder de Moura Carvalho Filho | Manager - AB-CR/RPRE | | | CIA assigned responsibility without recommending a sanction | | | | | | | |
| Jairo Luis Bonnet | Manager - ENGENHARIA/IE COMPERJ/IEDCO | | | CIA assigned | | | | | | | |

CONFIDENTIAL

PwCBR_PETRO_000135885

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

| Name / CIA Mentioning | Title | RNEST | Pasadena | COMPERJ | SBM | Época | Ecoglobal | Astromarítima | Toyo Setal | Sanko Sider | Marketing |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | responsibility without recommending a sanction | | | | | | | |
| Jansem Ferreira da Silva | Manager - ENGENHARIA/IE COMPERJ/IEDCO | | | CIA assigned responsibility without recommending a sanction | | | | | | | |
| Jorge Luiz Zelada | Former Director from International Area | N/A | | | N/A | | | | | | |
| José Carlos Vilar Amigo | Senior Equipment Engineer - CENPES/GTEC | | | | | Warning | | | | | |
| José Eduardo Loureiro | Manager ENGENHARIA/IE COMPERJ/IEUC | | | CIA assigned responsibility without recommending a sanction | | | | | | | |
| José Sergio Gabrielli de Azevedo | Former CEO of Petrobras | N/A | | | | | | | | | |
| Leonardo Davico | Accountant /Evaluator of processes | | | | | | | | | Reassigning to new function | |

Forensic Services Memo - Review of Management's Investigations (CIAs)
PwC

CONFIDENTIAL
PwCBR_PETRO_000135886

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

| Name / CIA Mentioning | Title | RNEST | Pasadena | COMPERJ | SBM | Época | Ecoglobal | Astromarítima | Toyo Setal | Sanko Sider | Marketing |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Levi Rodrigues de Oliveira Júnior | INTER-CORP/GGC/ADCT | | | | | warning | | | | | |
| Luís Carlos Moreira da Silva | Former Director of International Area | | N/A | | | | | | | | |
| Luis Carlos Queiroz de Oliveira | Sector Manager – ENG-AB/IERENEST/IEDACR/CMHDT | CIA assigned responsibility without recommending a sanction | | | | | | | | | |
| Luiz Alberto Gaspar Domingues | Downstream Manager at Petrobras Argentina S.A. | CIA assigned responsibility without recommending a sanction | | CIA assigned responsibility without recommending a sanction | | | | | | | |
| Mario Zonenschein | Sector Manager – ETM-CORP/CL/CLAG | | | CIA assigned responsibility without recommending a sanction | | | | | | | |
| Nestor Cuñat Cerveró | Former Director of International Area | N/A | | | | | | | | | |

CONFIDENTIAL
PwCBR_PETRO_000135887

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

| Name / CIA Mentioning | Title | RNEST | Pasadena | COMPERJ | SBM | Época | Ecoglobal | Astromarítima | Toyo Setal | Sanko Sider | Marketing |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Omar Antônio Kristocheck Filho | Sector Manager - ENG-AB/IERENEST/IEDACR/CMCO | CIA assigned responsibility without recommending a sanction | | | | | | | | | |
| Paola Pinheiro Silva | Accountant from third party HOPE | | | | | | | | | replaced | |
| Paulo Cezar Amaro Aquino | Executive Manager - AB-PQF | | | CIA assigned responsibility without recommending a sanction | | | | | | | |
| Paulo Roberto Costa | Former Director of Supply | N/A | N/A | N/A | | | | | | | |
| Pedro José Barusco Filho | Former Executive Manager of Engineering | N/A | | N/A | | | | | | | |
| Pedro Paulo Lofego Lobo | Economist - INTER-CORP/EPL/GPI | | | | | warning | | | | | |
| Rafael Mauro Comino | Former employee | | N/A | | | | | | | | |
| Renato de Souza Duque | Former Director of Engineering | N/A | N/A | N/A | | | | | | | |
| Ricardo Luis F. | Sector Manager | CIA assigned | | | | | | | | | |

CONFIDENTIAL

PwCBR_PETRO_000135888

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

| Name / CIA Mentioning | Title | RNEST | Pasadena | COMPERJ | SBM | Época | Ecoglobal | Astromarítima | Toyo Setal | Sanko Sider | Marketing |
|---|---|---|---|---|---|---|---|---|---|---|---|
| P. Távora Maia | ENG-AB/IERENEST/IG/PID | d responsibility without recommending a sanction | | | | | | | | | |
| Roberto Gonçalves | Executive Manager of Engineering, then Manager of Subsidiary AB-LO/LOGUN | | | CIA did not recommend a sanction | | | | | | | |
| Teófanes de Almeida Elias | Executive Manager of Engineering, then Manager of Subsidiary AB-LO/LOGUN | | | | | warning | | | | | |
| Thales Rezende R. de Miranda | Former employee | | N/A | | | | | | | | |
| Venâncio Pessoa Igrejas Lopes Filho | Senior Lawyer – Jurídico/JPR/RE | | | | | Suspension 2 days | | | | | |
| Venina Velosa da Fonseca | Former Executive Manager of AB-CORP | N/A | | | | | | | | | |
| Geovanee de Morais | | | | | | | | | | | Eventually terminated after finishing medical leave |

CONFIDENTIAL

PwCBR_PETRO_000135889

Sanctions applied

Draft
Attorney Work Product
Privileged and Confidential

---

[i] Note that the text included from the investigation report is a free translation of the original text, which was in Portuguese.

CONFIDENTIAL                                                                 PwCBR_PETRO_000135890

# TAB I



# PETROBRAS CORRUPTION PREVENTION PROGRAM

—

## MANUAL



**PETROBRAS**

Confidential

# PETROBRAS CORRUPTION PREVENTION PROGRAM

MANUAL



Confidential

# MESSAGE FROM **PETROBRAS**



Petrobras arose as a result of Brazil's capacity to use its strategic natural resources to benefits own people. We are now the largest company in Latin America and one of the biggest integrated energy companies in the world, with a strategic role in oil geopolitics.

Over the course of our continuous growth process, we have cultivated and stimulated ethical values, working with integrity and respect in our relations with all our stakeholders. Successive generations of workers have faced and overcome the constant challenges brought about by the complex dynamics of a large company.

Attentive to constant changes in global conditions and aware of the impact of our activities in the economic, social and environmental spheres, we have created the Petrobras Corruption Prevention Program (PCPP), approved by the Executive Board (minutes of Executive Board meeting 5,047, July 4, 2013, item 28, subject number 820) and ratified by the Board of Directors at the same time as approving the creation of the Compliance General Management (minutes of Board of Directors meeting 1,386, November 29, 2013, item 2, subject number 56). The program is aimed at reinforcing the prevention, detection and correction of acts of fraud and corruption, through integrated management and improvement of actions and controls in our governance structure.

Associated with this initiative, we present the PCPP Manual, which sets out the main concepts and measures adopted by the Program and reaffirms our commitment to ethics, transparency and zero tolerance to fraud and corruption in our activities and businesses.

**Maria das Graças Silva Foster**
CEO

Confidential



# CONTENTS

Introduction _____ 07

1. Anti-Corruption Laws and International Commitments _____ 08

2. Ethics Management System _____ 09

3. Disciplinary Regime _____ 11

4. Internal Investigation Commissions (CIA) _____ 11

5. Fraud and Corruption Risk Management _____ 11

6. Relations With Third Parties _____ 12

7. Commission to Analyze the Application of Penalties
and Compliment (Caase) _____ 15

8. Channels for Tips, Complaints, Requests, Suggestions and Compliment  16

9. Conflicts of Interest _____ 16

10. Nepotism _____ 17

11. Presents, Gifts and Hospitality _____ 18

12. Support and Contributions to Political Parties _____ 18

13. Donations _____ 19

14. Sponsorship and Agreements _____ 19

15. Safeguarding of Assets _____ 20

16. Accounting Records _____ 20

17. Training _____ 21

18. Monitoring of The PCPP _____ 21

Glossary _____ 22

Confidential

# INTRODUCTION

The Petrobras Corruption Prevention Program (PCPP)* features continuous actions to prevent, detect and correct acts of fraud and corruption, as set out in this Manual.

The Manual is designed for our different stakeholders, such as customers, suppliers, investors, partners, public authorities, employees and service providers. Reading it, together with the Petrobras System Code of Ethics and Petrobras Conduct Guide, will contribute to everyone's commitment to preventing and combating fraud and corruption.

The PCPP is managed by the Internal Audit Area, through the Compliance General Management, in alignment with other areas of our governance structure.

*In Portuguese: Programa Petrobras de Prevenção da Corrupção (PPPC)

07

PBRCG_01612172

# 1. ANTI-CORRUPTION LAWS AND INTERNATIONAL COMMITMENTS

In performing our activities, in Brazil and abroad, we are subject to the following national and international anti-corruption laws:

- Brazilian Law 12,846 of August 1, 2013, which governs the administrative and civil liability of legal entities for the practice of acts against the national or foreign public administration.

- United States Foreign Corrupt Practices Act 1977 (FCPA), a federal anti-corruption law to which we are subject since we have American Depositary Receipts (ADRs) traded on the New York Stock Exchange.

- UK Bribery Act 2010, which permits British courts to judge crimes related to fraud and corruption committed by companies incorporated in the United Kingdom or that conduct operations in its territory.

In Brazilian legislation, passive and active corruption crimes are classified in articles 317 and 333 of Decree-Law 2,848 of December 7, 1940 (Brazilian Penal Code).

In addition, we are signatories to the following national and international anti-corruption initiatives: the United Nations Global Compact, the Partnering Against Corruption Initiative (PACI), the Extractive Industries Transparency Initiative (EITI) and the Brazilian Business Pact for Integrity and Against Corruption.

# 2. ETHICS MANAGEMENT SYSTEM

This is a coordinated set of institutional actions to promote, diagnose, investigate and monitor conduct at the company, in order to guarantee the appropriate and effective treatment of ethical issues.

The Ethics Commission manages ethics by guiding, disseminating and promoting compliance with the ethical principles and behavioral commitments established in the Petrobras System Code of Ethics, as well as proposing updates to incorporate new concepts and practices. It also advises the board in taking decisions concerning violations of the Code of Ethics.

## 2.1. PETROBRAS SYSTEM CODE OF ETHICS

This defines the ethical principles and behavioral commitments of the Petrobras System in its relations with its stakeholders, such as employees, customers, suppliers, partners and the public authorities, explaining

Confidential

PBRCG_01612173

the ethical meaning of our Mission, Vision and Strategic Plan. Our ethical principles are as follows: "respect for life and for all human beings, integrity, truth, honesty, justice, equity, institutional loyalty, responsibility, care, merit, transparency, legality, impersonality, and coherence between speech and practice."

We are committed to rejecting any practices of corruption and bribery, maintaining formal procedures to ensure control and consequences for any violations that occur in our relations with society, government and the state.

The content of our Code of Ethics is communicated to all members of our workforce at the moment when they join the company and throughout their career. In addition, our suppliers are required to respect our Code of Ethics.

Any employees who fail to comply with the principles and behavioral commitments expressed in our Code of Ethics will be subject to the penalties set forth in our Disciplinary Regime.

The Petrobras System Code of Ethics may be consulted on our internal portal and on our website.

## 2.2. PETROBRAS CONDUCT GUIDE

This presents the ethical conduct that must be observed by the members of Petrobras' Board of Directors, fiscal Council and Executive Board, the occupants of management functions, employees and interns in performing their activities or as a result of them, to guide their behavior, especially in situations that could be interpreted as contrary to laws and our internal standards, whether in or outside the workplace.

## 3. DISCIPLINARY REGIME

For the cases of misconduct, fraud or corruption, Petrobras' Disciplinary Regime sets forth penalties such as warnings, suspension or employment contract termination, according to the severity of the case.

## 4. INTERNAL INVESTIGATION COMMISSIONS (CIA)

We have set up Internal Investigation Commissions to investigate indications or occurrences of fraud and corruption involving our workforce and/or property, and to support the consequent administrative measures and procedures.

## 5. FRAUD AND CORRUPTION RISK MANAGEMENT

The management of business risks is conducted at a corporate level and deployed at organizational sites.

Confidential

These risks are currently classified into five groups of distinct natures: strategic, operational, business, financial and compliance.

The Internal Audit Area, through the Compliance General Management, is responsible for monitoring compliance risks related to fraud and corruption.

The Board of Directors, advised by the Audit Committee, is responsible for defining the company's risk appetite and for overseeing our management of business risks.

# 6. RELATIONS WITH THIRD PARTIES

Relations with third parties may represent business opportunities, aligned with the company's strategic and operational objectives, as well as result in the risk of violating national and/or international anti-corruption legislation, including possible financial harm or damage to our image and reputation.

## 6.1. SUPPLIERS

These are individuals or legal entities that supply goods and/or services to the company's different segments.

Procurement processes for construction work, services, purchases and disposals are governed by the Simplified Bidding Procedure Regulations, approved by Decree 2,745/98 and the Petrobras Procurement Manual (known by Portuguese acronym MPC). This process is underpinned by legal, technical, quality and cost criteria, and formally obliges suppliers to carry out their activities based on ethics and also social and environmental responsibility.

To reduce our exposure to fraud and corruption risks, we established segregation of functions among employees who demand goods or services, those who conduct the procurement process, and those who are responsible for approving it. We also established limits of authority, updated and approved periodically by the Executive Board, for the signing of contracts.

## 6.2. OPERATING PARTNERS

In many cases we explore and produce oil and gas through joint ventures, composed of two or more companies, domestic or foreign. These joint ventures are normally governed by a joint operating agreement (JOA), which establishes the rights and obligations of the parties and grants the operator – the company responsible for carrying out the partnership's activities – authorization to act on behalf of the other partners in executing the respective project, including the acquisition of goods and services.

Confidential

PBRCG_01612175

## 6.3. PARTNERS OR COUNTERPARTIES IN ACQUISITIONS AND DIVESTMENTS

Our evaluation for the partial or total acquisition of assets and shares in companies or to select purchasers for our divestments include verifying the counterparty's reputation, ethical conduct and practices related to preventing fraud and corruption, as well as accounting, economic, financial, tax, legal and environmental aspects.

## 6.4. INTEGRITY DUE DILIGENCE

We carry out integrity due diligence of our suppliers, joint venture partners and counterparties in acquisitions or divestments at the start of our commercial relationship with them, considering the following factors, among others: the geographical location of the company and where it does business; the company's interaction with public agents; its history and reputation; and the nature of the business.

Integrity due diligence starts by collecting information related to the trustworthiness of the company and its owners, obtained through declarations from the counterparty and/or other reliable sources, with the possible extension of due diligence procedures in proportion to the risks identified.

The results of integrity due diligence are documented and used by our managers to take decisions about the start of the intended commercial relationships and to define the level of monitoring for potential fraud and corruption risks identified.

Our contractual instruments for the provision of goods and services, asset acquisitions and divestments, and to form and manage partnerships in the Exploration and Production Area, have clauses related to compliance with anti-corruption legislation.

## 7. COMMISSION TO ANALYZE THE APPLICATION OF PENALTIES AND COMPLIMENT (Caase)

The purpose of this commission, known by Portuguese acronym Caase, is to deliberate on the application of administration penalties against companies supplying goods and services that, among other things, have acted in ways that conflict with our Code of Ethics and PCPP.

The companies we do business with, when proven to have been involved in cases of fraud and/or corruption, are subject to penalties, including being barred from working with the Petrobras System.

Confidential

# 8. CHANNELS FOR ALLEGATIONS, COMPLAINTS, REQUESTS, SUGGESTIONS AND COMPLIMENT

We provide secure and reliable communication channels, encouraging our employees and other stakeholders to record any situation indicating a known or potential violation of ethical principles, policies, standards, laws and regulations, or other improper conduct.

The General Ombudsman Area, which reports to the Board of Directors, is the area responsible for handling demands submitted by our employees or other stakeholders and reporting the results achieved to the Audit Committee.

We preserve the anonymity of people making allegations and we consider acts of retaliation to be improper conduct, which if identified may result in disciplinary penalties.

# 9. CONFLICTS OF INTEREST

Conflicts of interest are harmful to our business and our internal control environment, as they may improperly influence the conduct of our employees.

There is a conflict of interest when an employee is not independent in relation to the subject in question, and may influence or take decisions motivated by interests different from those of the company.

Through the General Ombudsman Area, we maintain communication instruments available to our employees to consult about potential conflict of interest situations and request authorization to perform activities that, due to their nature, may conflict with the company's interests.

# 10. NEPOTISM

In accordance with Decree 7,203 of June 4, 2010, company employees who hold a position that pays a bonus in addition to their basic salary ("função gratificada") are prohibited from favoring their spouse, partner or relatives (through marriages or shared blood, up to the third degree) in work relations, in hiring of third parties and contract execution.

As a condition for purchasing goods or services, we request from suppliers a formal declaration that their directors, partners or employees have no family relationship with our employees who hold a bonus-paying position, which would constitute nepotism.

During contract execution, if we identify a situation of nepotism, we ask the company to replace the professional in question, under penalty of a fine or contract termination, without prejudice to the determination of facts and the application of the respective system of consequences.

Confidential

PBRCG_01612177

Our employees who hold a bonus-paying position responsible for situations of nepotism are subject to disciplinary measures.

# 11. PRESENTS, GIFTS AND HOSPITALITY

The occasional receiving or offering of presents, gifts or hospitality may be a legitimate contribution to good business relations between organizations. However, it may also represent an opportunity for fraud and corruption. Therefore, we prohibit this practice in exchange for any personal benefit or favors for the giver or third parties.

The Petrobras Conduct Guide and our specific internal regulation that concerns the receiving and offering of gifts, presents and hospitality detail the guidelines applicable to the topic.

# 12. SUPPORT AND CONTRIBUTIONS TO POLITICAL PARTIES

We are committed to rejecting support and contributions to political parties or political campaigns for candidates standing for elective office.

# 13. DONATIONS

We prohibit the donation of goods, apart from valueless movable goods expressly assigned to projects and actions of social nature and/or in the public interest, or to provide aid in the wake of pubic disasters.

# 14. SPONSORSHIP AND COOPERATION AGREEMENTS

The signing of sponsorship contracts and agreements contributes to economic development, improvements to society's quality of life and the strengthening of the Petrobras brand. We support social, environmental, cultural and sports projects in Brazil and abroad.

We maintain internal control procedures for procurement, execution and monitoring of agreements and sponsorship, in order to detect and prevent acts of fraud and corruption.

The procedures and controls we have adopted include the following: public selection processes for social, environmental and cultural projects; the establishment of limits of authority for the signing of contracts, including with public authorities; the physical and financial tracking of projects; and proof of execution of projects and reciprocal image benefits.

Confidential

PBRCG_01612178

# 15. SAFEGUARDING OF ASSETS

The Corporate Security Area is responsible for promoting the protection of our tangible and intangible assets against threats arising from accidental events or deliberate actions, especially those related to acts of fraud and corruption.

Access to business information is restricted to people who need it for the proper execution of their professional activities.

We establish the level of protection for our business information according to the severity of damage that its improper use could cause to the company. The improper use of business information is subject to the penalties set forth in Petrobras' Disciplinary Regime.

# 16. ACCOUNTING RECORDS

We keep accounting records that faithfully reflect our operations.

Petrobras' internal control environment provides a reasonable guarantee that our transaction authorizations and records are properly maintained, in order to permit the production and disclosure of financial reports free

from distortions and in compliance with Brazilian and international legislation and accounting standards.

Our internal controls concerning our financial reports are tested annually by internal auditors and by an independent audit.

# 17. TRAINING

We disseminate a control and compliance culture by executing a Training Plan aimed at preventing and combating fraud and corruption, featuring subjects common to all employees and specific ones for employees performing activities with greater exposure to the risk of fraud and corruption.

# 18. MONITORING OF THE PCPP

We submit this program to a periodic evaluation in order to verify its effectiveness and compliance with laws, and to identify opportunities for improvement.

The Compliance General Management monitors and compiles the actions mentioned in this manual for subsequent presentation to senior management.

Confidential

# GLOSSARY

rupting a judgment or influencing the conduct of a person who is in a certain position of trust.

**ACTIVE CORRUPTION** | Direct or indirect action consisting of authorizing, offering, promising or delivering an improper advantage, of economic nature or otherwise, involving public agents or otherwise, with the aim of making someone do or not do a given act. Such conduct may be merely an attempt.

**BONUS-PAYING POSITION ("FUNÇÃO GRATIFICADA")** | Within Petrobras, such a position is held by the CEO, directors, managers of all levels, advisors, assistants, coordinators, consultants and supervisors, including those with an employment relationship through a special contract.

**BRIBE** | A payment, gift or favor offered or given with the aim of cor-

**COMPLIANCE** | System designed to prevent and detect breaches of laws and regulations (external and internal) existing in a company's or business' processes, which may be committed by its employees and other agents.

**COOPERATION AGREEMENT** | Legal deal entered into when Petrobras and other entities have mutual interests in jointly executing a social, environmental, educational or cultural initiative.

**CORRUPTION** | Direct or indirect action consisting of authorizing, offering, promising, requesting, accepting, delivering or receiving an improper advantage, of economic nature or otherwise, involving public agents or otherwise, with the aim of

making someone do or not do a given act. Such conduct may be merely an attempt.

**ETHICS** | Set of principles and references regulating the moral conduct of individuals, groups, institutions, organizations, communities, societies, people, nations, etc., aimed at being universally valid.

**FRAUD** | Any intentional action or omission aimed at injuring or deceiving another person, capable of resulting in a loss for the victim and/or an improper advantage, material or otherwise, for the author or third parties. It is also characterized by a false declaration or omission of material circumstances in order to lead or induce third parties to make a mistake.

**GIFT** | A promotional communication object, of no commercial value, normally displaying a logo. Aimed at specific relationship groups, designed to meet institutional objectives and to reinforce the corporate image.

**HOSPITALITY** | Generally consists of travel (air, maritime and/or land), accommodation, meals, and meet and greet services, related to entertainment events or otherwise.

**KICKBACK** | A form of corruption. It is synonymous with "bribery" and "active corruption." It consists of the offer of an improper advantage, in terms of money, goods or anything else of value, which requires in exchange the practice of an illegal or dishonest act, or that is aimed at influencing someone (a public or private agent) in the performance of their functions. A kickback may also be given to someone (a public or private agent) to make them not do something that they have a duty or responsibility to do.

**LIMITS OF COMPETENCE** | Competence to authorize the signing of contracts, acts of renunciation and extrajudicial transactions, defined by a limited value.

**PASSIVE CORRUPTION** | Direct or indirect action consisting of authorizing, requesting, accepting or receiving an improper advantage, of economic nature or otherwise, involving public agents or otherwise, with the aim of making someone do or not do a given act. Such conduct may be merely an attempt.

**PETROBRAS SYSTEM** | For corporate governance purposes, the Petrobras

Confidential

System's companies include Petróleo Brasileiro S.A. and its wholly owned subsidiaries, controlled companies, jointly controlled companies and affiliates in which Petróleo Brasileiro S.A. directly or indirectly holds an equity stake.

PUBLIC AGENT | A person representing someone who performs – even if temporarily or without pay, through election, appointment, designation, hiring or any other form of investiture or connection – a public mandate, position, job or function in a public or diplomatic entity, in a legal entity directly or indirectly controlled by a public authority of a foreign country, or in an international public organization.

PUBLIC AUTHORITIES | Institutions and entities that perform legislative, executive or judicial functions in the countries and regions where Petrobras operates, as well as entities that work within the scope of global governance.

RISK APPETITE | The risk level that an organization is willing to expose itself to in order to achieve its objectives.

SAFEGUARDING | Protection of an organization's tangible and intangible assets in order to ensure business continuity.

SPONSORSHIP | Financial support granted to projects instigated by third parties, in order to disclose activities, strengthen a concept, add value to a brand, expand sales, generate recognition or foster relations between the sponsor and its stakeholders.

STAKEHOLDERS | Groups of individuals and/or organizations with shared matters and/or needs of social, political, economic, environmental or cultural nature, which establish or may establish relationships with Petrobras and are capable of influencing – or being influenced by – the company's activities, businesses and/or reputation.

24

Confidential

PBRCG_01612181



December 2014

www.petrobras.com

PETROBRAS

Confidential



# PROGRAMA PETROBRAS DE PREVENÇÃO DA CORRUPÇÃO

—

## MANUAL



CONFIDENTIAL

# PROGRAMA PETROBRAS DE PREVENÇÃO DA CORRUPÇÃO

MANUAL



PwCBR_PETRO_000345210



# MENSAGEM DA **PETROBRAS**

A Petrobras surgiu como resultado da capacidade do Brasil de utilizar seus recursos naturais estratégicos em benefício do seu próprio povo. Hoje somos a maior empresa da América Latina e uma das maiores companhias integradas de energia do mundo, com posição estratégica na geopolítica do petróleo.

Ao longo do nosso contínuo processo de crescimento, cultivamos e estimulamos valores éticos, trabalhando com integridade e respeito no relacionamento com todos os nossos públicos de interesse. Sucessivas gerações de trabalhadores têm enfrentado e vencido os constantes desafios gerados pela complexa dinâmica de uma empresa de grande porte.

Atentos às constantes mudanças de cenários no mundo e conscientes do impacto de nossas atividades nas esferas econômica, social e ambiental, criamos o Programa Petrobras de Prevenção da Corrupção (PPPC), aprovado pela Diretoria Executiva (Ata DE 5.047, item 28, de 04/07/2013 – Pauta nº 820) e ratificado pelo Conselho de Administração, quando da aprovação da criação da Gerência Geral de Controladoria (Ata CA 1.386, item 2, de 29/11/2013 – Pauta nº 56), com o objetivo de reforçar a prevenção, detecção e correção de atos de fraude e de corrupção, por meio da gestão integrada e do aperfeiçoamento de ações e controles da nossa estrutura de governança.

Associado a essa iniciativa, apresentamos o Manual do PPPC, que reúne os principais conceitos e medidas adotados pelo Programa e reafirma o nosso compromisso com a ética, a transparência e a tolerância zero à fraude e à corrupção em nossas atividades e negócios.

**Maria das Graças Silva Foster**
Presidente da Petrobras

CONFIDENTIAL

PwCBR_PETRO_000345211



# SUMÁRIO

Introdução ............................................................ 07

1. Leis Anticorrupção e Compromissos Internacionais ....... 08

2. Sistema de Gestão da Ética .................................... 09

3. Regime Disciplinar ............................................... 11

4. Comissão Interna de Apuração (CIA) ....................... 11

5. Gerenciamento de Riscos de Fraude e de Corrupção ..... 11

6. Relacionamento com Terceiros ............................... 12

7. Comissão para Análise de Aplicação de Sanções e Elogios (Caase) ...... 15

8. Canal de Denúncia, Reclamação, Pedido, Sugestão e Elogios ........ 16

9. Conflito de Interesses ........................................... 16

10. Nepotismo ....................................................... 17

11. Presentes, Brindes e Hospitalidade ........................ 18

12. Apoio e Contribuições para Partidos Políticos ........... 18

13. Doações .......................................................... 19

14. Patrocínios e Convênios ..................................... 19

15. Salvaguarda de Ativos ........................................ 20

16. Livros e Registros Contábeis ................................ 20

17. Treinamento .................................................... 21

18. Monitoramento do PPPC ..................................... 21

Glossário ............................................................. 22

PwCBR_PETRO_000345212

# INTRODUÇÃO

O Programa Petrobras de Prevenção da Corrupção (PPPC) é movido por ações contínuas de prevenção, detecção e correção de atos de fraude e de corrupção, consolidadas neste Manual.

O Manual destina-se aos nossos diversos públicos de interesse, como: clientes; fornecedores; investidores; parceiros; poder público; empregados próprios e de empresas prestadoras de serviços. Sua leitura, em conjunto com o Código de Ética do Sistema Petrobras e com o Guia de Conduta da Petrobras, contribui para o compromisso de todos na prevenção e no combate à fraude e à corrupção.

A gestão do PPPC é realizada pela Auditoria Interna, por meio da Gerência Geral de Controladoria, em articulação com outras áreas de nossa estrutura de governança.

07

CONFIDENTIAL

# 1. LEIS ANTICORRUPÇÃO E COMPROMISSOS INTERNACIONAIS

No desenvolvimento de nossas atividades, no Brasil e no exterior, estamos sujeitos às seguintes leis nacionais e internacionais de combate à corrupção:

- Lei 12.846, de 01 de agosto de 2013, que dispõe sobre a responsabilização administrativa e civil de pessoas jurídicas pela prática de atos contra a administração pública, nacional ou estrangeira.

- *Foreign Corrupt Practices Act* 1977 (FCPA), lei federal dos Estados Unidos da América (EUA) de combate à corrupção, à qual estamos sujeitos, por termos ADRs (*American Depositary Receipts*) negociadas na Bolsa de Valores de Nova York.

- *UK Bribery Act* 2010, lei anticorrupção do Reino Unido, que permite aos tribunais britânicos julgarem crimes relacionados à fraude e à corrupção cometidos por empresas constituídas no Reino Unido ou que realizem operações em seu território.

Na legislação brasileira, os crimes de corrupção passiva e ativa encontram-se tipificados nos artigos 317 e 333 do Decreto-Lei 2.848 de 07 de dezembro de 1940 (Código Penal Brasileiro).

Adicionalmente, somos signatários de iniciativas de combate à corrupção nacionais e internacionais: Pacto Global das Nações Unidas, Iniciativa Conjunta contra a Corrupção (Paci), Iniciativa de Transparência das Indústrias Extrativistas (Eiti) e Pacto Empresarial pela Integridade e Contra a Corrupção.

# 2. SISTEMA DE GESTÃO DA ÉTICA

É um conjunto articulado de ações institucionais de promoção, diagnóstico, apuração e monitoramento de condutas na companhia, de forma a garantir o tratamento adequado e eficaz das questões éticas.

A Comissão de Ética realiza a gestão da ética ao orientar, disseminar e promover o cumprimento dos princípios éticos e dos compromissos de conduta estabelecidos no Código de Ética do Sistema Petrobras, além de propor atualizações mediante a incorporação de novos conceitos e práticas. Também assessora a diretoria na tomada de decisão concernente ao seu descumprimento.

## 2.1. CÓDIGO DE ÉTICA DO SISTEMA PETROBRAS

Define os princípios éticos e os compromissos de conduta do Sistema Petrobras nas relações com seus públicos de interesse, como empregados, clientes, fornecedores, parceiros e poder público, explicitando o sentido ético da nossa Missão, Visão e Plano Estratégico. Nossos

CONFIDENTIAL

PwCBR_PETRO_000345214

princípios éticos são: "o respeito à vida e a todos os seres humanos; a integridade; a verdade; a honestidade; a justiça; a equidade; a lealdade institucional; a responsabilidade; o zelo; o mérito; a transparência; a legalidade; a impessoalidade; e a coerência entre o discurso e a prática".

Estamos comprometidos a recusar quaisquer práticas de corrupção e propina, mantendo procedimentos formais de controle e de consequências sobre eventuais transgressões ocorridas nas nossas relações com a sociedade, o governo e o Estado.

A disseminação do conteúdo do nosso Código de Ética é dirigida a toda a força de trabalho no momento do seu ingresso na companhia e, de maneira contínua, ao longo de sua carreira. Adicionalmente, nossos fornecedores são requeridos a respeitar nosso Código de Ética.

O empregado, ao descumprir os princípios e compromissos de conduta expressos no nosso Código de Ética, está sujeito a penalidades previstas no Regime Disciplinar.

O Código de Ética do Sistema Petrobras pode ser consultado no nosso portal interno e no nosso site na internet.

## 2.2. GUIA DE CONDUTA DA PETROBRAS

Apresenta as condutas éticas que devem ser observadas pelos membros do Conselho de Administração, do Conselho Fiscal, da Diretoria Executiva, ocupantes de funções gerenciais, empregados e estagiários da Petrobras, no exercício de suas atividades ou em decorrência delas, para orientar o seu comportamento, principalmente em situações passíveis de serem interpretadas como contrárias às leis e às nossas normas internas, no ambiente de trabalho ou fora dele.

## 3. REGIME DISCIPLINAR

Para os casos de desvio de conduta, de fraude ou de corrupção, o Regime Disciplinar da Petrobras prevê penalidades tais como advertência, suspensão ou rescisão do contrato de trabalho, de acordo com a gravidade do caso.

## 4. COMISSÃO INTERNA DE APURAÇÃO (CIA)

Instauramos Comissões Internas de Apuração para averiguar indícios ou ocorrências de fraude e de corrupção envolvendo a nossa força de trabalho e/ou patrimônio e subsidiar medidas administrativas e procedimentos decorrentes.

## 5. GERENCIAMENTO DE RISCOS DE FRAUDE E DE CORRUPÇÃO

A gestão de riscos empresariais é realizada em nível corporativo e desdobrada nas unidades organizacionais.

CONFIDENTIAL

PwCBR_PETRO_000345215

Atualmente, tais riscos estão classificados em cinco grupos de naturezas distintas: estratégico, operacional, negócio, financeiro e conformidade.

A Auditoria Interna, por meio da Gerência Geral de Controladoria, é responsável por monitorar os riscos de conformidade relacionados à fraude e à corrupção.

O Conselho de Administração, assessorado pelo Comitê de Auditoria, é responsável por definir o apetite a riscos da companhia e por acompanhar a nossa gestão de riscos empresariais.

# 6. RELACIONAMENTO COM TERCEIROS

O relacionamento com terceiros pode representar oportunidades de negócios, alinhadas aos objetivos estratégicos e operacionais da companhia, assim como resultar em risco de descumprimento à legislação nacional e/ou internacional de combate à corrupção, incluindo possíveis danos financeiros ou à nossa imagem e reputação.

## 6.1. FORNECEDORES

São pessoas físicas ou jurídicas que fornecem bens e/ou serviços aos diversos segmentos da companhia.

As contratações de obras, serviços, compras e alienações são regidas pelo Regulamento do Procedimento Licitatório Simplificado, aprovado pelo Decreto nº 2.745/98 e pelo Manual da Petrobras para Contratação (MPC). Esse processo está fundamentado em critérios legais, técnicos, de qualidade e de custo, e exige formalmente do fornecedor a realização de suas atividades com base na ética e na responsabilidade social e ambiental.

Para a redução da exposição a riscos de fraude e de corrupção, estabelecemos a segregação de funções entre os empregados que demandam bens ou serviços, aqueles que conduzem o processo de contratação e os que são responsáveis pela sua aprovação. Também estabelecemos limites de competência, atualizados e aprovados periodicamente pela Diretoria Executiva, para celebração de contratos.

## 6.2. PARCEIROS OPERACIONAIS

Exploramos e desenvolvemos a produção de petróleo e gás também por meio de parcerias, formadas por duas ou mais empresas, nacionais ou estrangeiras. As parcerias são normalmente regidas por um Acordo de Operações Conjuntas (*Joint Operating Agreement* - JOA), que estabelece os direitos e as obrigações das partes e concede ao operador, empresa responsável por conduzir as atividades da parceria, uma autorização para agir em nome das demais na condução do respectivo projeto, incluindo a contratação de bens e serviços.

CONFIDENTIAL

PwCBR_PETRO_000345216

### 6.3. PARCEIROS OU CONTRAPARTES EM AQUISIÇÕES E DESINVESTIMENTOS

A nossa avaliação para aquisição parcial ou total de ativos e de participação societária em empresas ou para a seleção de compradores nos desinvestimentos inclui, além da verificação de aspectos contábeis, econômicos, financeiros, tributários, legais e ambientais, a reputação, a conduta ética e as práticas relacionadas à prevenção de fraude e corrupção da contraparte.

### 6.4. *DUE DILIGENCE* DE INTEGRIDADE

Realizamos *Due Diligence* de Integridade em nossos fornecedores, parceiros operacionais e em contrapartes em aquisições ou desinvestimentos no início do relacionamento comercial, considerando, entre outros fatores: a localização geográfica da empresa e da execução dos negócios; sua interação com agentes públicos; seu histórico e reputação; e a natureza do negócio.

A *Due Diligence* de Integridade é iniciada a partir da coleta de informações relacionadas à idoneidade da empresa e dos integrantes do seu quadro societário, obtidas por meio de declarações da contraparte e/ou de outras fontes confiáveis, com a possível extensão dos procedimentos de *Due Diligence*, proporcionalmente aos riscos identificados.

O resultado da *Due Diligence* de Integridade é documentado e utilizado pelos nossos gestores para a tomada de decisão sobre o início do relacionamento comercial pretendido e para a definição do nível de monitoramento dos riscos potenciais de fraude e corrupção identificados.

Os nossos instrumentos contratuais de fornecimento de bens e serviços, de aquisição e desinvestimento de ativos e de formação e gestão de parcerias da área de Exploração e Produção possuem cláusulas relativas à obediência à legislação anticorrupção.

### 7. COMISSÃO PARA ANÁLISE DE APLICAÇÃO DE SANÇÕES E ELOGIOS (Caase)

O objetivo da Caase é deliberar sobre a aplicação de sanções administrativas às empresas fornecedoras de bens e serviços que, dentre outros motivadores, atuarem de formas não condizentes com o nosso Código de Ética e com o PPPC.

As empresas com as quais mantemos negócios, quando comprovadamente envolvidas em casos de fraude e/ou de corrupção, estão sujeitas a sanções, o que inclui o impedimento de se relacionarem com o Sistema Petrobras.

CONFIDENTIAL

PwCBR_PETRO_000345217

## 8. CANAL DE DENÚNCIA, RECLAMAÇÃO, PEDIDO, SUGESTÃO E ELOGIOS

Disponibilizamos canais de comunicação seguros e confiáveis, incentivando nossos empregados e demais públicos de interesse a registrar qualquer situação que indique uma violação conhecida ou potencial transgressão de princípios éticos, políticas, normas, leis e regulamentos ou outras condutas impróprias.

A Ouvidoria Geral, vinculada ao Conselho de Administração, é a área responsável por tratar as demandas encaminhadas por nossos empregados ou outros públicos de interesse e comunicar os resultados alcançados ao Comitê de Auditoria.

Preservamos o anonimato do denunciante e consideramos que atos de retaliação constituem ações de conduta imprópria, os quais, se identificados, podem resultar em sanção disciplinar.

## 9. CONFLITO DE INTERESSES

O conflito de interesses é prejudicial aos nossos negócios e ao ambiente de controles internos, pois pode influenciar de maneira imprópria a conduta de nossos empregados.

Há conflito de interesses quando o empregado não é independente em relação à matéria em discussão e pode influenciar ou tomar decisões motivadas por interesses distintos daqueles da companhia.

Por meio da Ouvidoria Geral, mantemos instrumentos de comunicação disponíveis aos nossos empregados para a realização de consultas sobre potenciais situações de conflito de interesses e solicitação de autorização para exercer atividades que, em função de sua natureza, possam ser conflitantes com os interesses da companhia.

## 10. NEPOTISMO

Em consonância com o Decreto n° 7.203, de 04/06/2010, é vedado aos empregados da companhia, no exercício de função gratificada, o favorecimento de cônjuge, companheiro ou parentes em linha reta, colateral ou por afinidade, até o terceiro grau, nas relações de trabalho, na contratação de terceiros e na execução contratual.

Como condição para contratar bens ou serviços, solicitamos ao fornecedor uma declaração formal de que seus administradores, sócios ou colaboradores não possuem relação de parentesco com nossos empregados no exercício de função gratificada, que configure a prática de nepotismo.

Durante a execução contratual, caso identifiquemos uma situação de nepotismo, solicitamos à empresa contratada que substitua o profissional em questão, sob pena de aplicação de multa ou rescisão do contrato, sem prejuízo da apuração dos fatos e aplicação do respectivo sistema de consequências.

CONFIDENTIAL

PwCBR_PETRO_000345218

Os empregados com função gratificada responsáveis por situações de nepotismo estão sujeitos a medidas disciplinares.

## 11. PRESENTES, BRINDES E HOSPITALIDADE

O recebimento ou o oferecimento ocasional de presentes, brindes ou hospitalidade pode ser uma contribuição legítima para as boas relações de negócio entre organizações. Contudo, também pode representar uma oportunidade para a ocorrência de fraude e de corrupção. Dessa forma, proibimos essa prática em troca de qualquer benefício pessoal ou favorecimento ao ofertante ou a terceiros.

O Guia de Conduta da Petrobras e o normativo interno específico que trata do recebimento e oferta de brindes, presentes e hospitalidade detalham as diretrizes aplicáveis ao tema.

## 12. APOIO E CONTRIBUIÇÕES PARA PARTIDOS POLÍTICOS

Estamos comprometidos a recusar apoio e contribuições para partidos políticos ou campanhas políticas de candidatos a cargos eletivos.

## 13. DOAÇÕES

Proibimos a doação de bens, exceto bens móveis inservíveis, com destinação vinculada a projetos e ações de cunho social e/ou de interesse público ou na hipótese de calamidade pública.

## 14. PATROCÍNIOS E CONVÊNIOS

A celebração de contratos de patrocínios e convênios contribui para o desenvolvimento econômico, para a melhoria da qualidade de vida da sociedade e para o fortalecimento da marca Petrobras. Apoiamos projetos sociais, ambientais, culturais e esportivos no Brasil e no exterior.

Mantemos procedimentos de controles internos para a contratação, a execução e o acompanhamento de convênios e patrocínios, com o objetivo de detectar e prevenir atos de fraude e de corrupção.

Dentre os procedimentos e controles que adotamos destacam-se: seleções públicas de projetos socioambientais e culturais; o estabelecimento de limites de competência para celebração de contratos, inclusive com o poder público; o acompanhamento físico e financeiro dos projetos; e comprovação da execução do projeto e das contrapartidas de imagem.

18

CONFIDENTIAL

19

PwCBR_PETRO_000345219

## 15. SALVAGUARDA DE ATIVOS

A área de Segurança Empresarial é a responsável por promover a proteção de nossos ativos tangíveis e intangíveis contra ameaças decorrentes de eventos acidentais ou ações intencionais, sobretudo relacionadas a atos de fraude e de corrupção.

O acesso a informações empresariais é restrito às pessoas que tenham necessidade de conhecê-las para a adequada execução de suas atividades profissionais.

Estabelecemos o nível de proteção às nossas informações empresariais de acordo com a gravidade dos danos que a sua utilização indevida pode causar à companhia. A utilização indevida de informações empresariais está sujeita às penalidades previstas no Regime Disciplinar da Petrobras.

## 16. LIVROS E REGISTROS CONTÁBEIS

Mantemos registros contábeis que refletem com fidedignidade nossas operações.

O ambiente de controles internos da Petrobras fornece garantia razoável para que as autorizações e registros das nossas transações sejam realizados adequadamente, de forma a permitir a elaboração e divulgação de relatórios financeiros livres de distorções e em conformidade com a legislação e as normas contábeis brasileiras e internacionais.

Os controles internos sobre os relatórios financeiros são testados anualmente por auditores internos e por uma auditoria independente.

## 17. TREINAMENTO

Disseminamos a cultura de controle e conformidade por meio da execução de um Plano de Treinamento direcionado à prevenção e ao combate à fraude e à corrupção, que contém assuntos comuns a todos os empregados e específicos aos que desenvolvem atividades com maior exposição ao risco de fraude e de corrupção.

## 18. MONITORAMENTO DO PPPC

Submetemos este programa a uma avaliação periódica com intuito de verificar sua eficácia e conformidade às leis e de identificar oportunidades de aprimoramento.

A Controladoria monitora e consolida as ações citadas neste manual para posterior apresentação à alta administração.

CONFIDENTIAL

PwCBR_PETRO_000345220

# GLOSSÁRIO

É direcionado a públicos específicos de relacionamento, visando ao atendimento de objetivos institucionais e ao reforço da imagem empresarial.

**AGENTE PÚBLICO |** Representa aquele que exerce – ainda que transitoriamente ou sem remuneração, por eleição, nomeação, designação, contratação ou qualquer forma de investidura ou vínculo – mandato, cargo, emprego ou função pública em órgãos, entidades estatais ou em representações diplomáticas, em pessoas jurídicas controladas, direta ou indiretamente, pelo poder público de país estrangeiro ou em organizações públicas internacionais.

**APETITE A RISCOS |** É o nível de risco que uma organização está disposta a assumir para atingir seus objetivos.

**BRINDE |** É um objeto promocional de comunicação, sem valor comercial, normalmente exibindo logomarcas.

**CONFORMIDADE (COMPLIANCE) |** Sistema designado para prevenir e detectar a falta de conformidade com leis e regulamentações (externas e internas) existentes nos processos da empresa e no negócio, que possa ser cometida pelos seus empregados e outros agentes.

**CONVÊNIO |** Negócio jurídico firmado quando ocorrem interesses mútuos entre a Petrobras e outras entidades, visando à execução de objeto de cunho social, ambiental, educacional ou cultural, mediante ação conjunta.

**CORRUPÇÃO |** Ação, direta ou indireta, consistente em autorização, oferecimento, promessa, solicitação, aceitação, entrega ou recebimento de vantagem indevida, de natureza econômica ou não, envolvendo agentes públicos ou não, com o objetivo de que se pratique ou deixe de praticar determinado ato. A conduta pode ser apenas tentada.

**CORRUPÇÃO ATIVA |** Ação, direta ou indireta, consistente em autorização, oferecimento, promessa, ou entrega de vantagem indevida, de natureza econômica ou não, envolvendo agentes públicos ou não, com o objetivo de que se pratique ou deixe de praticar determinado ato. A conduta pode ser apenas tentada.

**CORRUPÇÃO PASSIVA |** Ação, direta ou indireta, consistente em autorização, solicitação, aceitação ou recebimento de vantagem indevida, de natureza econômica ou não, envolvendo agentes públicos ou não, com o objetivo de que se pratique ou deixe de praticar determinado ato. A conduta pode ser apenas tentada.

**ÉTICA |** Conjunto de princípios e referências que regulam a conduta moral de indivíduos, grupos, instituições, organizações, comunidades, sociedades, povos, nações etc., buscando ser universalmente válidos.

**FUNÇÃO GRATIFICADA |** No âmbito da Petrobras, abrange presidente, diretores(as), todos os níveis de gerentes, assessores(as), assistentes, coordenadores(as), consultores(as) e supervisores(as), inclusive aqueles que detêm vínculo por meio de contrato especial.

**FRAUDE |** É qualquer ação ou omissão intencional com o objetivo de lesar ou ludibriar outra pessoa, capaz de resultar em perda para a vítima e/ou vantagem indevida, patrimonial ou não, para o autor ou terceiros. Caracteriza-se também pela declaração falsa ou omissão de circunstâncias materiais com o intuito de levar ou induzir terceiros a erro.

**HOSPITALIDADE |** Geralmente compreende deslocamentos (aéreos, marítimos e/ou terrestres), hospedagens, alimentação e receptivos, relacionados ou não a eventos de entretenimento.

**LIMITE DE COMPETÊNCIA |** Competência para autorizar a celebração de contratos, de atos de renúncia e de transações extrajudiciais, definida por limites de valor.

**PATROCÍNIO |** Apoio financeiro concedido a projetos de iniciativa de terceiros, com objetivo de divulgar

CONFIDENTIAL

PwCBR_PETRO_000345221

atuação, fortalecer conceito, agregar valor à marca, incrementar vendas, gerar reconhecimento ou ampliar relacionamento do patrocinador com seus públicos de interesse.

PROPINA | É um pagamento, um presente, um favor oferecido ou dado com vistas a perverter o julgamento ou influenciar a conduta de uma pessoa que esteja em certa posição de confiança.

PODER PÚBLICO | Instituições e órgãos que exercem funções legislativas, executivas ou judiciárias, nos países e regiões em que a Petrobras atua, bem como entidades que trabalham no âmbito da governança global.

PÚBLICO DE INTERESSE | Grupos de indivíduos e/ou organizações com questões e/ou necessidades comuns de caráter social, político, econômico, ambiental ou cultural, que estabelecem ou podem estabelecer relações com a Petrobras e são capazes de influenciar – ou ser influenciados por – atividades, negócios e/ou a reputação da companhia.

SALVAGUARDA | Proteção do patrimônio tangível e intangível da organização de forma a assegurar continuidade dos negócios.

SISTEMA PETROBRAS | Para fins de Governança Societária, empresas/sociedades do Sistema Petrobras inclui a Petróleo Brasileiro S.A. e suas subsidiárias integrais, controladas, controladas em conjunto e coligadas onde a primeira, direta ou indiretamente, possua participação acionária.

SUBORNO | É uma forma de corrupção. É sinônimo de "pagamento de propina" e de "corrupção ativa". Trata-se da oferta de uma vantagem indevida, em dinheiro, em bens, ou em qualquer coisa de valor, que requer em troca a prática de um ato ilegal, desonesto, ou que vise a influenciar alguém (agente público ou privado) no desempenho de suas funções. Há suborno também quando se requer que o interlocutor (agente público ou privado) deixe de praticar um ato que por competência ou por ofício deveria ser realizado.

CONFIDENTIAL

PwCBR_PETRO_000345222



Dezembro 2014

**www.petrobras.com.br**

PwCBR_PETRO_000345223